# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATION OF ADMINISTRATIVE RECORD FOR THE IMPLEMENTATION OF CHANGES TO THE PAROLE PROCESS FOR VENEZUELANS

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since August 2019.

I am the custodian of the Department of Homeland Security's *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1,279 (Jan. 9, 2023), and of a copy of the administrative record for the decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered.

JULIANA J
BLACKWELL

Digitally signed by
JULIANA J BLACKWELL
Date: 2023.03.17 21:45:36
-04'00'

Juliana Blackwell
Executed this 17th day of March, 2023 in Washington, D.C.

**Implementation of Changes to the Parole Process for Venezuelans**
**Certified Administrative Record Index**

| | Executive Orders & Federal Register Sources (Chronological Order) | Bates Number(s) |
|---|---|---|
| 1. | *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007), https://www.federalregister.gov/documents/2007/11/21/E7-22679/cuban-family-reunification-parole-program. | Venezuela AR_ 000001 |
| 2. | *Implementation of Haitian Family Reunification Parole Program*, 79 Red. Reg. 75,581 (Dec. 18, 2014), https://www.federalregister.gov/documents/2014/12/18/2014-29533/implementation-of-haitian-family-reunification-parole-program. | Venezuela AR_ 000002 |
| 3. | *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended*, 81 Fed. Reg. 5,906 (Feb. 4, 2016), https://www.federalregister.gov/documents/2016/02/04/2016-02191/visas-documentation-of-nonimmigrants-under-the-immigration-and-nationality-act-as-amended. | Venezuela AR_ 000005 |
| 4. | *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28,097 (May 9, 2017), https://www.federalregister.gov/documents/2016/05/09/2016-10750/filipino-world-war-ii-veterans-parole-policy. | Venezuela AR_ 000006 |
| 5. | *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4,769 (Jan. 17, 2017),  https://www.federalregister.gov/documents/2017/01/17/2017-00915/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-arriving-by-air. | Venezuela AR_ 000010 |
| 6. | *Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00914/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-encountered-in-the-united. | Venezuela AR_ 000013 |
| 7. | *International Entrepreneur Rule*, 82 Fed. Reg. 5,238 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00481/international-entrepreneur-rule. | Venezuela AR_ 000017 |
| 8. | *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25,040 (Apr. 27, 2022), https://www.federalregister.gov/documents/2022/04/27/2022-09087/implementation-of-the-uniting-for-ukraine-parole-process. | Venezuela AR_ 000069 |
| 9. | *Implementation of a Parole Process for Venezuelans*, 87 Fed Reg. 63,507 (Oct. 19, 2022), https://www.federalregister.gov/documents/2022/10/19/2022-22739/implementation-of-a-parole-process-for-venezuelans. | Venezuela AR_000073 |
| | **U.S. Government Sources (Alphabetical Order)** | |

| 10. | Declaration of Robert E. Perez, Deputy Comm'r, U.S. Customs and Border Protection (Mar. 3, 2020). | Venezuela AR_000084 |
|---|---|---|
| 11. | Letter from Alexandria Ocasio-Cortez and Adriano Espaillat, U.S. Congress, House of Representatives (Aug 5, 2022). | Venezuela AR_000092 |
| 12. | Letter from the Hon. Lucille Roybal-Allard & the Hon. Chuck Fleischmann, U.S. Congress, House Subcommittee on Homeland Sec. (Sept. 9, 2022). | Venezuela AR_000094 |
| 13. | Letter from Antony J. Blinken, Sec'y of State, *Temporary Protected Status Designation - Venezuela* (Apr. 25, 2022). | Venezuela AR_000096 |
| 14. | Memorandum for Jeffrey L. Weiss, Dir., U.S. Dep't of Justice, Immigration and Naturalization Service, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001). | Venezuela AR_000111 |
| 15. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y of Homeland Sec., Office of Strategy, Policy, and Plans, Christopher Magnus, Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Venezuelan Nationals* (Oct. 12, 2022). | Venezuela AR_000117 |
| 16. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Troy Miller, Acting Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Updates to the Parole Process for Certain Venezuelan Nationals* (Dec. 22, 2022). | Venezuela AR_000144 |
| 17. | Memorandum for the Sec'y through John W. Priddy, Acting Dir., Joint Task Force-East, John K. Tien, Deputy Sec., and from Brendan C. McPherson, Director, Homeland Sec. Task Force-Southeast, *Operation Vigilant Sentry (OVS) Phase 1B* (Aug. 21, 2022). | Venezuela AR_000152 |
| 18. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec, *DHS Plan for Southwest Border Security and Preparedness*, (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf | Venezuela AR_000154 |
| 19. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | Venezuela AR_000174 |
| 20. | Memorandum from Blas Nuñez-Neto, Acting Sec'y for Border and Immigration Policy, *Data on Migration Through Costa Rica, Ecuador, and Colombia* (Dec. 20, 2022). | Venezuela AR_000178 |
| 21. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces More than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas* (June 10, 2022), https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela. | Venezuela AR_000181 |
| 22. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region* (Sept. 22, | Venezuela AR_000183 |

| | 2022), https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela. | |
|---|---|---|
| 23. | U.S. Census Bureau, *Selected Population Profile in the United States; Venezuelan 2021.* | Venezuela AR_000188 |
| 24. | U.S. Department of Homeland Security and U.S. Department of Defense, *Joint Brief on Mass Maritime Migration* (August 2022). | Venezuela AR_000206 |
| 25. | U.S. Dep't of Homeland Security, *DHS Drawdown Plan.* | Venezuela AR_000215 |
| 26. | U.S. Dep't of Homeland Security, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf. | Venezuela AR_000220 |
| 27. | U.S. Dep't of Homeland Security, *Table 21. Persons Naturalized by Region and Country of Birth: Fiscal Years 2011 to 2020.* | Venezuela AR_000259 |
| 28. | U.S. Dep't of Homeland Security, *Uniting for Ukraine* (Sept. 23, 2022). | Venezuela AR_000264 |
| 29. | U.S. Dep't of Homeland Security, Homeland Security Task Force Southeast, *Operation Vigilant Sentry Phases: Prevent, Deter, and Respond to Illegal and Unsafe Maritime Migration* (July 13, 2021). | Venezuela AR_000266 |
| 30. | U.S. Dep't of Homeland Security, Office of Immigration Policy, *CHNV Displacement Statistics 2018-2021.* | Venezuela AR_000268 |
| 31. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, Annual Flow Report, *U.S. Naturalizations: 2021* (June 2022). | Venezuela AR_000276 |
| 32. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *U.S. Border Patrol Encounters of Venezuelan Nationals* (Dec. 5, 2022). | Venezuela AR_000282 |
| 33. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Total Monthly SWB Encounters*, (Dec. 14, 2022). | Venezuela AR_000285 |
| 34. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *2020 Naturalizations-Venezuela.* | Venezuela AR_000293 |
| 35. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Process for Venezuelans, Daily Report* (Dec. 8, 2022). | Venezuela AR_000297 |
| 36. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Process for Venezuelans, Daily Report* (Dec. 12, 2022). | Venezuela AR_000300 |
| 37. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Process for Venezuelans, Daily Report* (Dec. 27, 2022). | Venezuela AR_000304 |

| 38. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Venezuela Analysis 10.7.22*. | Venezuela AR_000306 |
|---|---|---|
| 39. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Venezuela Encounter Trends* (Sept. 23, 2022). | Venezuela AR_000333 |
| 40. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Venezuela Slides* (Sept. 22, 2022). | Venezuela AR_000336 |
| 41. | U.S. Dep't of Homeland Security, Office of Intelligence and Analysis, *Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States* (June 6, 2022). | Venezuela AR_000340 |
| 42. | U.S Dep't of Homeland Security, Office of Intelligence and Analysis, *Venezuelans React to US Immigration Policies; Flow Probably Will Increase in Early 2023* (Dec. 12, 2022). | Venezuela AR_000345 |
| 43. | U.S. Dep't of Homeland Security, Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans: Venezuelans Who Seek to Enter the U.S. Illegally Will be Returned to Mexico; New Lawful Pathway Created for Some Venezuelans* (Oct. 12, 2022), https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans. | Venezuela AR_000350 |
| 44. | U.S. Dep't of Homeland Security, Southwest Border Task Force, *Executive Leadership Report* (Sept. 23, 2022). | Venezuela AR_000352 |
| 45. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Eligible to Naturalize Overview* (Aug. 12, 2022). | Venezuela AR_000366 |
| 46. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Policy Memorandum, *Parole of Spouses, Children and Parents of Active U.S Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and the Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility Under the Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013). | Venezuela AR_000367 |
| 47. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Daily Venezuela Report* (Dec. 8, 2022). | Venezuela AR_000376 |
| 48. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Daily Venezuela Report* (Dec. 12, 2022). | Venezuela AR_000379 |
| 49. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Daily Venezuela Report* (Dec. 27, 2022). | Venezuela AR_000382 |
| 50. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *FY21-FY22 Unaccompanied Children*. | Venezuela AR_000385 |
| 51. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains Fiscal Year 2022 Report to Congress* (Mar. 29, 2022). | Venezuela AR_000390 |

| 52. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Southwest Land Border Encounters and Credible Fear Since 2000*. | Venezuela AR_000410 |
|---|---|---|
| 53. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Email, *Decompression* (Dec. 11, 2022). | Venezuela AR_000412 |
| 54. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Office of Field Operations, *Ukrainian Arrivals Snapshot* (May 9, 2022). | Venezuela AR_000415 |
| 55. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, U.S. Border Patrol, *Del Rio Sector After Action Report Mass Migration Event Sept. 8, 2021-Sept. 24, 2021* (Oct. 7, 2021). | Venezuela AR_000422 |
| 56. | U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/. | Venezuela AR_000453 |
| 57. | U.S. Dep't of State, *2022 Trafficking in Persons Report: Venezuela*, https://www.state.gov/reports/2022-trafficking-in-persons-report/venezuela/#:~:text=NGOs%20reported%20an%20increased%20incidence,with%205.6%20per%201%2C000%20people. | Venezuela AR_000518 |
| 58. | U.S. Dep't of State, Cable, *Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico* (Dec. 1, 2022). | Venezuela AR_000526 |
| 59. | U.S. Dep't of State, Email, *Costa Rica Struggles to Cope with Surge of Venezuelan Migrants* (Sept. 20, 2022). | Venezuela AR_000529 |
| 60. | U.S. Dep't of State, Email, *Migration Update: UNHCR Highlights Continuing Surge in Venezuelan Migration* (Sept. 30, 2022). | Venezuela AR_000533 |
| 61. | U.S. Dep't of State, Email, *Panama: Mid-Year, Irregular Migrant Entrants at Panama-Colombia Border Outpacing 2021 by 85 Percent* (July 12, 2022). | Venezuela AR_000538 |
| 62. | U.S. Dep't of State, Email, *Venezuelan Reporting – November 30* (Nov. 30, 2022). | Venezuela AR_000544 |
| 63. | The White House, *Collaborative Migration Management Strategy*, (July 29, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery | Venezuela AR_000549 |
| 64. | The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Gov't and Foreign Partner Deliverables*, (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/ | Venezuela AR_000563 |
| 65. | The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/ | Venezuela AR_000570 |

| 66. | The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2022), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf | Venezuela AR_000575 |
|---|---|---|
| | **OMB & Related Documents** | |
| | ***Financial Support*** | |
| 67. | Memorandum from Samantha Deshommes, Regulatory Coordination Division Chief, U.S. Citizenship and Immigration Services, Office of Policy and Strategy, *Request for Emergency OMB Paperwork Reduction Act Clearance – Form I-134, Declaration of Financial Support* (Oct. 17, 2022). | Venezuela AR_000595 |
| 68. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Form I-134, *Declaration of Financial Support*. | Venezuela AR_000599 |
| 69. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Form I-134 Instructions, *Declaration of Financial Support*. | Venezuela AR_000612 |
| 70. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Supporting Statement for Declaration of Financial Support*. | Venezuela AR_000620 |
| | ***Advance Travel Authorization*** | |
| 71. | Memorandum from Matthew S. Davies, Executive Dir., U.S. Customs and Border Protection, *Emergency Approval Request for Advance Travel Authorization Capability Under the Paperwork Reduction Act* (Oct. 17, 2022). | Venezuela AR_000632 |
| 72. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Travel Authorization Supporting Statement* (Oct. 13, 2022). | Venezuela AR_000636 |
| | **Non U.S. Government Sources** | |
| 73. | Amnesty International, *Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions* (Feb. 10, 2022). | Venezuela AR_000641 |
| 74. | Alvarez, Priscilla, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border*, CNN (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html#:~:text=CNN%20Store-,First%20on%20CNN%3A%20A%20record%20number%20of%20migrants%20have,crossing%20the%20US%2DMexico%20border&text=Nearly%20750%20migrants%20have%20died,Security%20figures%20shared%20with%20CNN. | Venezuela AR_000699 |
| 75. | Bertelsmann Stiftung, *BTI 2022 Country Report – Venezuela*, https://bti-project.org/en/reports/country-report/VEN. | Venezuela AR_000706 |

| 76. | City of San Diego Office of Immigration Affairs, Email, *Concern With Asylum Seekers at Our Border* (Sept. 26, 2022). | Venezuela AR_000771 |
|---|---|---|
| 77. | Confair, Denelle, *Local migrant shelter reaching max capacity as it receives hundreds per day*, KGUN9 Tuscon (Sept. 23, 2022), available at https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day. | Venezuela AR_000773 |
| 78. | Corchado, Alfredo, *Ahead of Title 42's End, U.S.-Mexico Negotiations Called "Intense," "Round-the-Clock,"* Dallas Morning News (Dec. 14, 2022), https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotations-called-intense-round-the-clock/. | Venezuela AR_000777 |
| 79. | Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, The New York Times (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html. | Venezuela AR_000785 |
| 80. | Elamroussi, Aya and Winston, Adrienne, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving from Other States*, CNN (Sept. 21, 2022), | Venezuela AR_000789 |
| 81. | Garcia, Jacob, *Migrant truck crashes in Mexico killing*, Reuters (Dec. 10, 2022), available at https://www.reuters.com/world/americas/least-49-people-killed-mexico-trailer-accident-officials-say-2021-12-09. | Venezuela AR_000798 |
| 82. | Gonzalez, Valerie, *Migrants risk death crossing treacherous Rio Grande river for "American Dream"*, the Guardian (Sept. 5, 2022), available at https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream | Venezuela AR_000806 |
| 83. | Gov't of Panama, *Cuadro No. 001 Transito Irregular de Extranjeros por la Frontera con Colombia por Region Segun Orden de Importancia: Ano 2022*, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf. | Venezuela AR_000819 |
| 84. | Human Rights First, *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico* (Sept. 15, 2022), https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico. | Venezuela AR_000821 |
| 85. | Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, *Regional Refugee and Migrant Response Plan January-December 2022* (Dec. 9, 2021), https://www.r4v.info/en/document/rmrp-2022. | Venezuela AR_000822 |
| 86. | Kinosian, Sarah, *As United States' 'Remain in Mexico' Plan Begins, Mexico Plans to Shut Its 'Too Successful' Humanitarian Visa Program*, Global Post (Jan. 24, 2019), https://theworld.org/stories/2019-01-24/united-states-remain-mexico-plan-begins-mexico-plans-shut-its-too-successful. | Venezuela AR_001091 |
| 87. | La Prensa Latina, *More Than 4,000 Migrants Voluntarily Returned to Venezuela from Panama* (Nov. 9, 2022), https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from- | Venezuela AR_001102 |

| | | |
|---|---|---|
| | panama/. | |
| 88. | Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, Los Angeles Times (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | Venezuela AR_001105 |
| 89. | Miroff, Nick and Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, The Washington Post (Oct. 24, 2018), https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html. | Venezuela AR_001121 |
| 90. | Nunez, Claudia, *"It Would Have Been Better to Let Me Die," on the Other Side of the Darien, Hundreds Survive the Nightmare of Death*, The Los Angeles Times (Mar. 4, 2022), https://www.latimes.com/espanol/internacional/articulo/2022-03-04/al-otro-lado-del-darien-cientos-sobreviven-la-pesadilla-de-la-muerte. | Venezuela AR_001130 |
| 91. | Pazmiño, Liz Briceño, *Biden's New Border Policy Throws Venezuelan Migrants Into Limbo*, Axios (Nov. 7, 2022), https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap. | Venezuela AR_001147 |
| 92. | Rosenberg, Mica, Cooke, Kristina, and Trotta, Daniel, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X. | Venezuela AR_001156 |
| 93. | Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media. | Venezuela AR_001164 |
| 94. | United Nations, Dep't of Economic and Social Affairs, *International Migration 2020 Highlights* (Jan. 25, 2021), https://www.un.org/en/desa/international-migration-2020-highlights. | Venezuela AR_001179 |
| 95. | United Nations Children's Fund, *2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S.* (Oct. 11, 2022), https://www.unicef.org/lac/en/press-releases/record-number-of-children-crossing-darien-gap-towards-us-this-year#:~:text=From%20January%20to%20October%2C%20some,quadrupling%20the%20previous%20year%27s%20total. | Venezuela AR_001239 |
| 96. | United Nations High Comm'n for Refugees, *Global Trends Forced Displacement in 2018* (June 19, 2019), https://www.unhcr.org/globaltrends2018/. | Venezuela AR_001247 |
| 97. | United Nations High Comm'n for Refugees, *Global Trends Forced Displacement in 2021* (June 16, 2022), https://www.unhcr.org/en-us/publications/brochures/62a9d1494/global-trends-report-2021.html. | Venezuela AR_001323 |
| 98. | United Nations High Comm'n for Refugees / International Office of Migration, Joint Press Release, *Venezuela Outflow Continues Unabated, Stands Now at 3.4 Million* (Feb. 22, 2019), https://www.unhcr.org/en-us/news/press/2019/2/5c6fb2d04/venezuelan-outflow-continues-unabated-stands-34-million.html. | Venezuela AR_001371 |

| 99. | United Nations High Comm'r for Refugees, Fact Sheet, *Americas August 2022* (Aug. 22, 2022), https://data.unhcr.org/en/documents/details/95054. | Venezuela AR_001374 |
|---|---|---|
| 100. | United Nations High Comm'r for Refugees, *Venezuela Situation*, https://www.unhcr.org/en-us/venezuela-emergency.html. | Venezuela AR_001381 |
| 101. | United Nations High Comm'r for Refugees, *Venezuela Situation May-September 2021* (Nov. 3, 2021), https://data.unhcr.org/en/documents/details/89782. | Venezuela AR_001385 |
| 102. | United Nations High Comm'n for Refugees, Fact Sheet, *Venezuela Situation June 2022* (June 15, 2022), https://data.unhcr.org/en/documents/details/93629. | Venezuela AR_001387 |
| 103. | Voice of America, *US Policy Prompts Some Venezuelan Migrants to Change Route* (Oct. 14, 2022), https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html. | Venezuela AR_001391 |
| 104. | Villagran, Lauren, *El Paso struggles to keep up with Venezuelan migrants: 5 key things to know*, El Paso Times (Sept. 14, 2022), available at https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007. | Venezuela AR_001394 |
| 105. | Whelan, Robbie, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program: Migrants Seeking Shelter in the U.S. Under Trump Administration Policy Report Rising Numbers of Kidnappings by Criminal Groups*, Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. | Venezuela AR_001399 |

**65588**  **Federal Register** / Vol. 72, No. 224 / Wednesday, November 21, 2007 / Notices

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

BILLING CODE 4410–10–P

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]

RIN 1615–ZA61

## Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:**
Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter "Migration Accords")). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel

documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of "immediate relatives" (*e.g.*, spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

## II. The CFRP Program

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains,

however, a case-by-case, discretionary determination.

## III. Participation in the CFRP Program

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, "Petition for Alien Relative," that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

BILLING CODE 4410–10–P

---

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–5123–N–16]

## Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

Venezuela AR_000001

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

## III. Participation in the CFRP Program and Application Process

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not require a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver

request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as ''immediate relatives'' under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not ''immediate relatives,'' if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

## IV. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual

average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov*.

Dated: December 11, 2014.

**León Rodríguez**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]**

## Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

• The HFRP Program will only be available to Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014.

• On or after February 2, 2015, the Department of State's National Visa Center (NVC) will begin sending to eligible petitioners written invitations to apply to the HFRP Program.

**FOR FURTHER INFORMATION CONTACT:** Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone (202) 272–1892.

**SUPPLEMENTARY INFORMATION:**

**I. Background of the HFRP Program**

The rebuilding and development of a safe and economically strong Haiti is a priority for the United States. While progress has been made since the 2010 earthquake that devastated parts of the country, Haiti continues to face significant development challenges. Reconstruction and development in Haiti will continue for many years.[1]

With the exception of "immediate relatives" of U.S. citizens (USCs) (*i.e.,* parent, spouse and unmarried child(ren) under 21 years of age), *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* INA secs. 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. These statutory limits have resulted in long waiting periods before family members remaining in Haiti may join the U.S.C. and lawful permanent resident (LPR) family members in the United States who petitioned for them.

Under the HFRP Program, USCIS will exercise its discretionary parole authority[2] to permit certain eligible Haitians in Haiti to join their family members in the United States up to approximately two years before their immigrant visas become available, thereby promoting family unity. By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States.

Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development. Once paroled into the United States, HFRP Program beneficiaries will be eligible to apply for employment authorization, and those who are able to work may contribute to Haiti's post-earthquake reconstruction and development through remittances. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

**II. Participation in the HFRP Program and Application Process**

USCIS offers participation in the HFRP Program to eligible Haitians: (1) In Haiti; (2) who are the beneficiaries (including any accompanying or following-to-join spouse and children[3]) of Forms I–130, Petition for Alien Relative, that were approved on or before the date of publication of this notice; (3) whose immigrant visas are not available, but are expected to become available within approximately 18 to 30 months; and (4) whose petitioning relatives in the United States have received a written invitation to apply for the HFRP Program on their behalf from the Department of State's National Visa Center (NVC).

The NVC will issue a written invitation to petitioners of approved Forms I–130 based upon the date when the immigrant visas for their beneficiary relatives are expected to become available. Each year the NVC will identify approved Forms I–130 whose filing dates (priority dates) are expected to become current in approximately the next 18 to 30 months, meaning that the immigrant visas for those cases are expected to become available within that timeframe. The NVC will prioritize the issuance of invitations to petitioners within that group, beginning with the oldest Form I–130 filing date and working forward to the most recent filing date. The number of HFRP Program invitations may be limited annually based on U.S. Government operational capacity in Haiti and the availability of U.S. Government resources to aid program beneficiaries. Initially, the U.S. Government will seek to interview approximately 5,000 HFRP Program beneficiaries in Haiti per year. Petitioners will be given a deadline by which they must apply to have their beneficiary relatives considered for parole under the program. Participation in the HFRP Program is voluntary.

On or after February 2, 2015, eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 filed on behalf of a beneficiary relative in Haiti for whom a visa is not available but expected to become available within approximately 18 to 30 months, will receive a written notice from the NVC regarding the beneficiary's eligibility to participate in the HFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request to apply for parole under the HFRP Program on behalf of each beneficiary. USCIS will reject a request for parole under the HFRP Program that is not submitted as instructed, without the required completed form, or without the fee(s) or a request for a fee waiver.

USCIS or Department of State consular officers will interview qualified beneficiaries in Port au Prince, Haiti, to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to grant parole under the HFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Haiti. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident once the beneficiary's immigrant visa becomes available.

Participation in the HFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. If, however, an immigrant visa becomes available for a beneficiary who is not an "immediate relative" while the Form I–131 is pending, the beneficiary will still be able to complete the parole process, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

**III. Paperwork Reduction Act (PRA)**

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they

---

[1] *http://www.state.gov/s/hsc/factsheets/2014/219539.htm.*

[2] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

[3] *See* INA sec. 203(d), 8 U.S.C. 1153(d).

impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to this form in connection with the implementation of the HFRP Program and this notice. USCIS estimates that the HFRP Program will result in an average of 5,000 Form I–131 filings per year. The current OMB-approved estimated number of annual respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a HFRP Program-related request will be covered within the 940,671 estimated. Because USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice, it is publishing no notice under the PRA and making no revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the HFRP program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez,**
*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29533 Filed 12–17–14; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

[Docket No. ONRR–2014–0002; DS63610000 DR2PS0000.CH7000 145D0102R2]

### Office of Natural Resources Revenue; Agency Information Collection Activities: Proposed Collection–United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection, Comment Request

**AGENCY:** Office of Natural Resources Revenue (ONRR), Interior.

**ACTION:** Notice of a new information collection.

---

**SUMMARY:** To comply with the Paperwork Reduction Act of 1995 (PRA), we are inviting comments on an information request that we will submit to the Office of Management and Budget (OMB) for review and approval. This Information Collection Request (ICR) covers the voluntary paperwork requirements for participation in the United States' implementation of the Extractive Industries Transparency Initiative (EITI). It encompasses

upcoming requests that certain companies voluntarily provide information on the amount of revenue which they have paid to the Federal government for extracting Federally-owned natural resources.

**DATES:** Submit written comments on or before February 17, 2015.

**ADDRESSES:** You may submit comments on this ICR to ONRR by using one of the following three methods (please use ONRR 2014–0002 as an identifier in your comment):

1. Electronically, go to *http:// www.regulations.gov.* In the entry titled ''Enter Keyword or ID,'' enter ONRR–2014–0002 and then click ''Search.'' Follow the instructions to submit public comments. ONRR will post all comments.

2. Mail comments to Mr. Luis Aguilar, Regulatory Specialist, ONRR, P.O. Box 25165, MS 61030A, Denver, Colorado 80225–0165.

3. Hand-carry or mail comments, using an overnight courier service, to ONRR. Our courier address is Building 85, Room A–614, Denver Federal Center, West 6th Ave. and Kipling St., Denver, Colorado 80225.

**FOR FURTHER INFORMATION CONTACT:** For questions on technical issues, contact Mr. Jon Swedin, Program Analyst, at (303) 231–3028, or email *Jonathan.Swedin@onrr.gov.* For other questions, contact Mr. Luis Aguilar, telephone (303) 231–3418, or email *Luis.Aguilar@onrr.gov.* You may also contact Mr. Aguilar to obtain copies, at no cost, of (1) the ICR, (2) any associated form, and (3) the regulations that require us to collect the information.

**SUPPLEMENTARY INFORMATION:**

*Title:* United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection.

*OMB Control Number:* 1012—0NEW.

*Bureau Form Number:* United States Extractive Industries Transparency Initiative (USEITI) Company Payment Reporting Template.

*Abstract:* The Secretary of the U.S. Department of the Interior is responsible for mineral resource development on Federal and Indian lands and the Outer Continental Shelf (OCS). Under various laws, the Secretary's responsibility is to manage mineral resources production on Federal and Indian lands and the OCS, collect the royalties and other mineral revenues due, and distribute the funds collected under those laws. ONRR performs the royalty management functions and assists the Secretary in carrying out the Department's responsibility. We have posted those laws pertaining to mineral leases on

Federal and Indian lands and the OCS at *http://www.onrr.gov/Laws_R_D/ PubLaws/default.htm.*

In September 2011, President Obama announced the U.S. commitment to domestic implementation of EITI, a key element of the President's Open Government Partnership commitments. President Obama appointed the Secretary of the Interior as the senior U.S. official to lead USEITI implementation. EITI is a voluntary global effort designed to strengthen transparency, accountability, and public trust for the revenues paid and received for a country's oil, gas, and mineral resources. The Administration renewed its commitment to implement EITI in the December 2013 U.S. Open Government National Action Plan. By signing onto the global EITI standard, the U.S. Government will help ensure that American taxpayers are receiving every dollar due for the extraction of these valuable public resources. The EITI Standard contains the set of requirements that countries need to meet in order to be recognized first as an EITI Candidate and, ultimately, an EITI-Compliant Country. In March 2014, the U.S. became the first G7 country to achieve Candidate Country status. When fully implemented, EITI will ensure more transparency in how the country's natural resources are governed and also will provide full disclosure of government revenues from its extractive sector.

The following laws and executive initiative are applicable to USEITI, including the Secretary's and ONRR's management of mineral resource production, revenue, and information disclosure obligations:

• U.S. Open Government National Action Plan
• Freedom of Information Act, as amended (5 U.S.C. 552)
• Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331–56b), including provisions of the Energy Policy Act of 2005 (42 U.S.C. 15801 *et seq.*)
• Federal Oil and Gas Royalty Management Act of 1982 as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. 1701–1759).
• Geothermal Steam Act of 1970 (30 U.S.C. 1001–28)
• Mineral Leasing Act (30 U.S.C. 181–287)
• Mineral Leasing Act for Acquired Lands (30 U.S.C. 351–60)

**General Information**

International EITI requirements direct participating governments to publish annual reports to help citizens

Venezuela AR_000004

the frequency and severity of alopecia during chemotherapy in which alopecia-inducing chemotherapeutic agents are used.

(b) *Classification*—Class II (special controls). The special controls for this device are:

(1) Non-clinical performance testing must demonstrate that the device meets all design specifications and performance requirements, and that the device performs as intended under anticipated conditions of use. This information must include testing to demonstrate accuracy of the temperature control mechanism.

(2) Performance testing must demonstrate the electromagnetic compatibility and electrical safety of the device.

(3) Software verification, validation, and hazard analysis must be performed.

(4) The patient contacting components of the device must be demonstrated to be biocompatible. Material names must be provided.

(5) Labeling must include the following:

(i) A statement describing the potential risk of developing scalp metastasis.

(ii) Information on the patient population and chemotherapeutic agents/regimen for which the device has been demonstrated to be effective.

(iii) A summary of the non-clinical and/or clinical testing pertinent to use of the device.

(iv) A summary of the device technical parameters, including temperature cooling range and duration of cooling.

(v) A summary of the device- and procedure-related adverse events pertinent to use of the device.

(vi) Information on how the device operates and the typical course of treatment.

(6) Patient labeling must be provided and must include:

(i) Relevant contraindications, warnings, precautions, and adverse effects/complications.

(ii) Information on how the device operates and the typical course of treatment.

(iii) Information on the patient population for which there is clinical evidence of effectiveness.

(iv) The potential risks and benefits associated with use of the device.

(v) Postoperative care instructions.

(vi) A statement describing the potential risk of developing scalp metastasis.

Dated: February 8, 2016.

Leslie Kux,
*Associate Commissioner for Policy.*
[FR Doc. 2016–02878 Filed 2–11–16; 8:45 am]
**BILLING CODE 4164–01–P**

## DEPARTMENT OF STATE

### 22 CFR Part 41

[Public Notice: 9439]

RIN 1400–AD17

### Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended

**AGENCY:** Department of State.
**ACTION:** Interim final rule; correction.

**SUMMARY:** The Department of State published a **Federal Register** interim final rule on February 4, 2016, in Volume 81, No. 23, page 5906. The document contains an error in the Regulatory Findings. This document corrects the rule by replacing the text, "included elsewhere in this edition of the **Federal Register**" with "published in the **Federal Register** on February 8, 2016, 81 FR 6430." There is also a correction in the **ADDRESSES** section, to provide the correct public notice number to find the rule to submit comments on *www.regulations.gov*.
**DATES:** This correction is effective on February 19, 2016. Written comments must be received on or before April 4, 2016.

**FOR FURTHER INFORMATION CONTACT:**
Paul-Anthony L. Magadia, U.S. Department of State, Visa Services, Legislation and Regulations Division, Washington, DC 20006, 202–485–7641; email: *magadiapl@state.gov.*

**SUPPLEMENTARY INFORMATION:** The Department of State published an interim final rule on February 4, 2016 (81 FR 5906); this document corrects text in the **ADDRESSES** section and in the discussion of Executive Order 12866.

### Correction

In the FR Doc 2016–02191, appearing on page 5906 in the **Federal Register** of February 4, 2016 (81 FR 5906):

1. In the second column of page 5906, third item under **ADDRESSES**, the term "XXXX" is corrected to read "9428."

2. In the third column of page 5907, the first sentence of the discussion regarding "Executive Order 12866: Regulatory Review" is corrected to read: "The costs of this rulemaking are discussed in the companion DHS rule, RIN 1651–AB09, published in the **Federal Register** on February 8, 2016, 81 FR 6430."

Dated: February 9, 2016.

David S. Newman,
*Director of Legal Affairs, Visa Services, Bureau of Consular Affairs, U.S. Department of State.*
[FR Doc. 2016–02962 Filed 2–11–16; 8:45 am]
**BILLING CODE 4710–06–P**

## PENSION BENEFIT GUARANTY CORPORATION

### 29 CFR Part 4022

### Benefits Payable in Terminated Single-Employer Plans; Interest Assumptions for Paying Benefits

**AGENCY:** Pension Benefit Guaranty Corporation.
**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Pension Benefit Guaranty Corporation's regulation on Benefits Payable in Terminated Single-Employer Plans to prescribe interest assumptions under the regulation for valuation dates in March 2016. The interest assumptions are used for paying benefits under terminating single-employer plans covered by the pension insurance system administered by PBGC.
**DATES:** Effective March 1, 2016.

**FOR FURTHER INFORMATION CONTACT:**
Catherine B. Klion (*Klion.Catherine@pbgc.gov*), Assistant General Counsel for Regulatory Affairs, Pension Benefit Guaranty Corporation, 1200 K Street NW., Washington, DC 20005, 202–326–4024. (TTY/TDD users may call the Federal relay service toll-free at 1–800–877–8339 and ask to be connected to 202–326–4024.)

**SUPPLEMENTARY INFORMATION:** PBGC's regulation on Benefits Payable in Terminated Single-Employer Plans (29 CFR part 4022) prescribes actuarial assumptions—including interest assumptions—for paying plan benefits under terminating single-employer plans covered by title IV of the Employee Retirement Income Security Act of 1974. The interest assumptions in the regulation are also published on PBGC's Web site (*http://www.pbgc.gov*).

PBGC uses the interest assumptions in Appendix B to Part 4022 to determine whether a benefit is payable as a lump sum and to determine the amount to pay. Appendix C to Part 4022 contains interest assumptions for private-sector pension practitioners to refer to if they wish to use lump-sum interest rates determined using PBGC's historical methodology. Currently, the rates in Appendices B and C of the benefit payment regulation are the same.

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0016]

### Agency Information Collection Activities: Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act, Form I–191; Revision of a Currently Approved Collection

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 60-day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) invite the general public and other Federal agencies to comment upon this proposed revision of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.,* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until July 8, 2016.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0016 in the subject box, the agency name and Docket ID USCIS–2006–0070. To avoid duplicate submissions, please use only *one* of the following methods to submit comments:

(1) *Online.* Submit comments via the Federal eRulemaking Portal Web site at *http://www.regulations.gov* under e-Docket ID number USCIS–2006–0070;

(2) *Email.* Submit comments to *USCISFRComment@uscis.dhs.gov;*

(3) *Mail.* Submit written comments to DHS, USCIS, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW, Washington, DC 20529–2140.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Acting Chief, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, Telephone number (202) 272–8377 (This is not a toll-free number. Comments are not accepted via

telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

**Comments:**

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2006–0070 in the search box. Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Relief under Former Section 212(c) of the Immigration and Nationality Act.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–191; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–191 is necessary for USCIS to determine whether the applicant is eligible for discretionary relief under former section 212(c) of the Immigration and Nationality Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–191 is 600 and the estimated hour burden per response is 1.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 900 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $75,750.

**Samantha Deshommes,**
*Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2016–10803 Filed 5–6–16; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2573–15; DHS Docket No. USCIS–2016–0003]

### Filipino World War II Veterans Parole Policy

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Filipino World War II Veterans Parole (FWVP) policy. Under this policy, USCIS will

offer certain beneficiaries of approved family-based immigrant visa petitions an opportunity to request a discretionary grant of parole on a case-by-case basis so that they may come to the United States as they wait for their immigrant visa numbers to become available. Among other things, the policy recognizes the extraordinary contributions and sacrifices of Filipino veterans who fought for the United States during World War II. The policy also enhances the ability of such elderly veterans and their spouses to obtain care and support from their family members abroad.

**DATES:** On or after June 8, 2016, individuals will be able to request parole under the FWVP policy.

**FOR FURTHER INFORMATION CONTACT:** Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone 202–272–1892. (This is not a toll-free number.)

**SUPPLEMENTARY INFORMATION:**

## I. Background of the FWVP Policy

More than 260,000 Filipino soldiers enlisted to fight for the United States during World War II. Estimates indicate that as many as 26,000 of these brave individuals became U.S. citizens. As U.S. citizens or lawful permanent residents (LPRs), these veterans may petition for certain of their family members to come to the United States. Estimates indicate that there are approximately between 2,000 to 6,000 Filipino American World War II veterans still alive in the United States today, many of whom greatly desire to have their family members in the United States during their final days.[1]

With the exception of "immediate relatives" (*i.e.,* parents, spouses, unmarried children under 21 years of age) of U.S. citizens, *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-sponsored immigrant visas that are available in any given year is limited by statute. *See* INA secs. 201(a) and (c), 202(a) and 203, 8 U.S.C. 1151(a) and (c), 1152(a) and 1153. These statutory limits have resulted in long waiting periods before family members may join the petitioning U.S. citizens or LPRs in the United States and become LPRs

themselves. For certain Filipino American family members, this wait can exceed 20 years.[2]

Recognizing the contributions and sacrifices of Filipino veterans who fought for the United States during World War II and their families, USCIS has decided to implement the FWVP policy. In many cases, paroling these family members may also allow them to provide support and care for elderly veterans or their surviving spouses. Under this policy, USCIS will consider individual requests for parole submitted for certain relatives who are the beneficiaries of approved family-based immigrant visa petitions filed by Filipino veterans or their surviving spouses.[3] Where USCIS determines that exercising such discretion is appropriate, USCIS may approve parole requests for such relatives so that they may wait in the United States until they are able to adjust status under existing immigration laws.[4]

In light of the circumstances described above, among other considerations, USCIS believes that the parole of qualified applicants who establish on a case-by-case basis that they are eligible for consideration under this policy and merit a favorable exercise of discretion would generally yield a "significant public benefit." Additionally, considering the advanced age of World War II Filipino veterans and their spouses, and their increased need for care and companionship, grants of parole under the FWVP policy would often address urgent humanitarian concerns. In all cases, whether to parole a particular individual under this policy is a discretionary determination that will be made on a case-by-case basis. Accordingly, parole applications for

individuals who fall within the general criteria but whose cases present overriding adverse factors (*e.g.,* criminal history) would not be approved.

## II. Participation in the FWVP Policy and Application Process

Those who may benefit from the FWVP policy are individuals: (1) who are the beneficiaries of Forms I–130, Petition for Alien Relative, including any accompanying or following-to-join spouse and children,[5] who were approved on or before the filing date of the parole request (Form I–131, Application for Travel Document); (2) whose qualifying relationship with the petitioning relative existed on or before May 9, 2016; (3) whose petitioning relative is residing in the United States (or, if deceased, was residing in the United States at the time of death); (4) whose immigrant visas are not authorized for issuance per the Application Final Action Dates chart for family-sponsored preference cases on the Department of State's Visa Bulletin; and (5) whose petitioning relatives have established they are either Filipino World War II veterans or are the surviving spouses of such individuals.

The Filipino veteran's qualifying World War II military service must have previously been recognized by the Department of Defense and must be described in section 405 of the Immigration Act of 1990 (IMMACT'90),[6] as amended by section 112 of Department of Justice Appropriations Act, 1998, which requires an individual to fall within one of three categories: [7]

1. Individuals who are *listed on the final roster* prepared by the recovered Personnel Division of the United States Army of those who served honorably in an active duty status with the Philippine Army during the World War II occupation and liberation of the Philippines;

2. Individuals who are *listed on the final roster* prepared by the Guerilla Affairs Division of the United States Army of those who received recognition as having served honorably in an active duty status within a recognized guerilla unit during the World War II occupation and liberation of the Philippines; or

3. Individuals who served honorably in an active duty status within the Philippine Scouts or within any other component of the United States Armed Forces in the Far East (other than a component described in clauses 1 or 2) at any time during the period beginning

---

[1] See *Modernizing and Streamlining our Legal Immigration System for the 21st Century 38 (July 2015), available at https://www.whitehouse.gov/sites/default/files/docs/final_visa_modernization_report1.pdf.*

[2] The January 2016 Visa Bulletin issued by the Department of State indicates that for individuals chargeable to the Philippines, visas may be issued to individuals with priority dates ranging from before August 01, 2014 for family-sponsored second preference category (for spouses and unmarried children of LPRs) to before July 22, 1992 for the family-sponsored fourth preference category (for siblings of U.S. citizens). *See* January 2016 Visa Bulletin, U.S. Department of State, Bureau of Consular Affairs, *available at http://www.travel.state.gov/content/dam/visas/Bulletins/visabulletin_january2016.pdf.*

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(a) and (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole).

[4] *See* INA sec. 245(a), 8 U.S.C. 1255(a), permits adjustment of status for an alien paroled into the United States. Under 8 CFR 245.1(d)(1)(v), a parolee is considered to be in a lawful status for purposes of INA sec. 245(c)(2) if an individual is seeking adjustment of status as an immediate relative or family-based immigrant.

[5] *See* INA sec. 203(d), 8 U.S.C. 1153(d).

[6] *See* Pub. L. 101–649, 104 Stat. 4978.

[7] *See* Pub. L. 105–119, 111 Stat. 2440.

September 1, 1939, and ending December 31, 1946.

USCIS will review government records to verify that the Filipino veteran's World War II military service was recognized by the Department of Defense. When this documentation is not available, USCIS will issue a Request for Evidence to allow the petitioner to submit evidence establishing the Filipino veteran's military service.

When the petitioning relative in the United States is the Filipino World War II veteran, individuals eligible for parole consideration could include beneficiaries under any family-sponsored preference category. Individuals who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i), however, will not be eligible for parole under this policy because immigrant visas for these individuals are already immediately available. Immediate relatives may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. In situations where the petitioning relative in the United States is the surviving spouse of a Filipino World War II veteran, eligible individuals who may be considered for parole under this policy include only the child, son, or daughter of the surviving spouse who is also the child, son, or daughter of the Filipino World War II veteran.[8]

In cases where the petitioning relative is deceased, eligible individuals described in this paragraph may also seek parole on their own behalf, under this policy, in cases where USCIS has reinstated the approval of Form I–130, Petition for Alien Relative, for humanitarian reasons. If such petition is reinstated, the self-petitioner must establish (1) a qualifying family relationship with the deceased Filipino veteran or spouse (*i.e.* the self-petitioner is a qualifying child, son, daughter, brother or sister of the Filipino World War II veteran); and (2) that the deceased Filipino veteran had qualifying World War II military service, as described above. Again, each of these parole requests will be reviewed on a case-by-case basis to determine whether the petitioner has met the criteria for parole and merits a favorable exercise of discretion.

Seeking parole under the FWVP policy is voluntary.

On or after June 8, 2016, an eligible U.S.-based U.S. citizen or LPR Filipino

World War II veteran, or surviving spouse, with an approved Form I–130 may request parole under the FWVP policy on behalf of his or her eligible beneficiary relatives (or, if a self-applicant, on his or her own behalf). An eligible petitioner or self-applicant must file a completed Form I–131, Application for Travel Document, and a completed Form I–134, Affidavit of Support, and submit the required fee(s) or fee waiver request[9] on behalf of each beneficiary he or she wishes to have considered for parole. The veteran, surviving spouse, or self-petitioner must provide documentation of the veteran's qualifying World War II military service as described under section 405 of IMMACT'90, as amended. Detailed instructions on how to request parole under this policy will be included in the Instructions to Form I–131, Application for Travel Document, and on the USCIS Web site at (*www.uscis.gov*). USCIS will reject a Form I–131 that is not properly filed. USCIS strongly encourages individuals seeking to request parole under the FWVP policy to make such requests within 5 years from June 8, 2016 in order for their qualifying family members to be considered under this policy. Following the first four years of the implementation of this policy, USCIS will conduct additional outreach and evaluate whether the volume of actual or potential requests would support maintaining the policy, or whether it should be phased out at the end of 5 years.

USCIS or Department of State consular officers will interview all individuals considered for parole under the FWVP policy to determine whether parole is appropriate on a case-by-case basis.[10] Individuals requesting parole under this policy may also be required to have their biometrics collected. If USCIS favorably exercises its discretion to issue parole under the FWVP policy by approving the Form I–131, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in the location he or she was interviewed. These travel documents generally will enable the beneficiary to travel to a U.S. port-of-entry and request parole from U.S. Customs and Border

Protection (CBP) to join his or her family member. Before the beneficiary's parole expires, the beneficiary would be required to (1) seek re-parole; (2) if eligible, apply to adjust status to that of lawful permanent resident or apply and be processed overseas for an immigrant visa; or (3) depart the United States.

If an immigrant visa becomes available to an individual who is not an "immediate relative" while a Form I–131 filed under the FWVP policy is pending, the individual will be considered for parole under this policy, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the immigrant visa and admissible by CBP at a U.S. port of entry.

### III. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is only revising the Form I–131 Instructions in connection with the implementation of the FWVP policy and this notice. USCIS filed an emergency request with OMB and obtained approval of the changes to the Form I–131 Instructions. More information regarding the annual burden impact resulting from the implementation of this new policy will be provided during the next renewal cycle of the Form I–131. Currently, USCIS estimates that the FWVP policy might result in approximately 6,000 new respondents filing Form I–131s. The current OMB-approved estimated number of respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a request under the FWVP policy will be covered within the 940,671 estimated.

Additional information about the consideration of parole requests under the FWVP policy will be posted on the USCIS Web site at *www.uscis.gov*.

---

[8] *See* INA sec. 101(b)(1) (defining "child"). This definition includes individuals who qualify as step-children, legitimized children, children born out of wedlock and adopted children.

[9] The Director of USCIS has determined that individuals seeking parole under the FWVP policy may request a waiver of the fee for Form I–131, Application for Travel Document. Making the fee waiver available for those applicants who are unable to pay is in the public interest and consistent with other applicable law, consistent with 8 CFR 103.7(d). A fee waiver may be requested by completing Form I–912, Request for Fee Waiver, in accordance with its instructions, and submitting that form with Form I–131.

[10] The Department of State, however, will not make parole determinations.

Dated: May 2, 2016.

**León Rodríguez,**
*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2016–10750 Filed 5–6–16; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

**[FWS–R8–ES–2016–N044; FF08ESMF00–FXES11120800000–156]**

### Proposed Habitat Conservation Plan/ Natural Community Conservation Plan for Western Butte County, California: Environmental Impact Statement

**AGENCY:** Fish and Wildlife Service, Interior; National Marine Fisheries Service, Commerce.

**ACTION:** Notice; reopening of public comment period.

**SUMMARY:** We, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, are reopening the comment period for our joint request for comments on the Butte Regional Conservation Plan (Plan) and the Draft Environmental Impact Statement/Report (DEIS/R) for Authorization of Incidental Take and Implementation of the Plan. As of January 19, 2016, we have received comments from four organizations and individuals requesting that the comment period be extended. In response to these requests, we are reopening the comment period.

If you previously submitted comments, you need not resubmit them; we have already incorporated them into the public record and will fully consider them in finalizing these documents.

**DATES:** *Submitting Comments:* To ensure consideration, written comments must be received by June 8, 2016, no later than 5 p.m. Pacific Time.

**ADDRESSES:** *Submitting Comments:* Please address written comments to one of the following individuals:

1. Mike Thomas, Chief, Conservation Planning Division; or Eric Tattersall, Assistant Field Supervisor, by mail/ hand-delivery at U.S. Fish and Wildlife Service, Sacramento Fish and Wildlife Office, 2800 Cottage Way, W–2605, Sacramento, California 95825; or by facsimile to (916) 414–6713. You may telephone (916) 414–6600 to make an appointment during regular business hours to drop off comments at the Sacramento Fish and Wildlife Office.

2. Maria Rea, Assistant Regional Administrator, by mail/hand-delivery at National Oceanic and Atmospheric Administration, West Coast Region, National Marine Fisheries Service, 650 Capitol Mall, Suite 5–100, Sacramento, California 95814; or by facsimile to (916) 930–3629. You may telephone (916) 930–3600 to make an appointment during regular business hours to drop off comments at the National Marine Fisheries Service.

Please send comments related specifically to the California Environmental Quality Act (CEQA) process to the Jon Clark, Executive Director, Butte County Association of Governments, 2580 Sierra Sunrise Terrace, Suite 100, Chico, California 95928. You may also submit comments by facsimile to (530) 879–2444.

**FOR FURTHER INFORMATION CONTACT:**

(1) Rick Kuyper, Endangered Species Division; Mike Thomas, Chief, Conservation Planning Division; or Eric Tattersall, Deputy Assistant Field Supervisor, at the Sacramento Fish and Wildlife Office address above or at (916) 414–6600 (telephone); or

(2) Gretchen Umlauf, National Marine Fisheries Service, at the address above or at (916) 930–5646 (telephone).

If you use a telecommunications device for the deaf, please call the Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:** We are reopening the comment period for the Butte Regional Conservation Plan and a DEIS/R for Authorization of Incidental Take and Implementation of the Plan. On November 18, 2015, we opened a 90-day public comment period via a **Federal Register** notice (80 FR 72108). This comment period officially closed on February 16, 2016. Public meetings in Butte County were held in the cities of Chico on January 5, 2016, and Oroville and Gridley on January 6, 2016. As of January 19, 2016, we have received comments from four organizations and individuals requesting that the comment period be extended. In response to requests from the public, we have reopened the comment period (see **DATES**).

### Background Information

For background information, see our November 18, 2015, notice (80 FR 72108).

### Document Availability

You may obtain copies of the Draft Plan and DEIS/R from any of the individuals in **FOR FURTHER INFORMATION CONTACT**, or from the Sacramento Fish and Wildlife Office Web site at *http://*

*www.fws.gov/sacramento.* Copies of these documents are also available for public inspection, by appointment, during regular business hours, at the Sacramento Fish and Wildlife Office. Additionally, hard-bound copies of the DEIS/R and Draft Plan are available for viewing, or for partial or complete duplication, at the following locations in Chico:

• Butte County Association of Governments, 2580 Sierra Sunrise Terrace, Suite 100;

• Biggs Branch Library, 464A B Street;

• Chico Branch Library, 1108 Sherman Avenue;

• Gridley Branch Library, 299 Spruce Street; and

• Oroville Branch Library, 1820 Mitchell Avenue.

**Alexandra Pitts,**
*Deputy Regional Director, Pacific Southwest Region, U.S. Fish and Wildlife Service, Sacramento, California.*

**Angela Somma,**
*Chief, Endangered Species Conservation Division, Office of Protected Resources, National Marine Fisheries Service.*

[FR Doc. 2016–10863 Filed 5–6–16; 8:45 am]

**BILLING CODE 4333–15–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[167 A2100DD/AAKC001030/ A0A501010.999900]**

### Renewal of Agency Information Collection for Indian Self-Determination and Education Assistance Contracts

**AGENCIES:** Bureau of Indian Affairs, DOI.

**ACTION:** Notice of request for comments.

**SUMMARY:** In compliance with the Paperwork Reduction Act of 1995, the Bureau of Indian Affairs (BIA) is seeking comments on the renewal of Office of Management and Budget (OMB) approval for the collection of information for Indian Self-Determination and Education Assistance Contracts, authorized by OMB Control Number 1076–0136. This information collection expires July 31, 2016.

**DATES:** Submit comments on or before July 8, 2016.

**ADDRESSES:** You may submit comments on this information collection activities to Ms. Sunshine Jordan, Acting Division Chief, Office of Indian Services— Division of Self-Determination, 1849 C Street NW., MS 4513–MIB, Washington, DC 20240, telephone: (202) 513–7616, email: *Sunshine.Jordan@bia.gov.*


# Rules and Regulations

**Federal Register**

Vol. 82, No. 10

Tuesday, January 17, 2017

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

**8 CFR Part 235**

**[DHS Docket No. DHS–2017–0003]**

**RIN 1601–AA81**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This final rule revises Department of Homeland Security (DHS) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by Regulatory Information Number (RIN) 1601–AA81 and DHS Docket Number DHS–2017–0003, by any one of the following methods:

• *Federal e-Rulemaking Portal* www.regulations.gov. Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http://www.regulations.gov.* The *http://www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http://www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http://www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize what are known as "expedited removal proceedings." Specifically, section 235(b) was amended to authorize the Attorney General (now the Secretary of Homeland Security [1]) to remove, without a hearing before an immigration judge, aliens arriving in the United States who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii).

When it created the expedited removal process, Congress also created a limited exception for certain aliens who arrived at a U.S. port of entry by aircraft. Under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." For many years, this exception applied to Cuban nationals due to the lack of full diplomatic relations between the United States and Cuba. DHS regulations implementing section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), thus expressly stated that the expedited removal provisions apply to "[a]rriving aliens, as defined in 8 CFR 1.2, except for citizens of Cuba arriving at a United States port-of-entry by aircraft." 8 CFR 235.3(b)(1)(i); *see also* 8

[1] Under section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice (DOJ) official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

CFR 1235.3(b)(1)(i) (parallel Department of Justice (DOJ) regulations stating that the expedited removal provisions apply to ''[a]rriving aliens, as defined in [8 CFR 1001.1(q)], except for citizens of Cuba arriving at a United States port-of-entry by aircraft'').[2]

Since that regulation was promulgated, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries. DHS, in consultation with the Department of State, has determined that the limitation at section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F) no longer applies with respect to Cuba.

Moreover, DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. Accordingly, DHS is eliminating provisions in its regulations that categorically exempt Cuban nationals who arrive at a U.S. port of entry by aircraft from expedited removal proceedings under 8 CFR 235.3. Importantly, the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by air no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. Moreover, previous U.S. policy justifications for exempting Cuban nationals from expedited removal—including Cuba's general refusal to accept the repatriation of its nationals—are no longer valid in many respects. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS, in consultation with the Department of State, has determined that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States. Accordingly, as a result of this final rule, Cuban nationals will be subject to expedited removal proceedings under section 235(b) of the INA and 8 CFR 235.3 like nationals of other countries. For the same reasons, DHS is also publishing a notice in this issue of the **Federal Register** to remove the parallel exceptions for expedited removal of Cuban nationals who arrive by sea or who are encountered by an immigration officer within 100 air miles of the U.S. border.

## II. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The promulgation of this rule as a final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)(B)). Delaying the implementation of the change announced in this rule to allow pre-promulgation notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). And this rule is necessary to remove quickly from the United States certain Cuban nationals who arrive by air at U.S. ports of entry. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

Pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Specifically, DHS is concerned that publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge could result in significant loss of human life. Accordingly, DHS finds that it would be impracticable and contrary to the public interest to accept pre-promulgation comments on this rule. For the same reasons, DHS also finds good cause to issue this rule without a 30-day delayed effective date requirement of the APA, *see* 5 U.S.C. 553(d).[3]

In addition, the change implemented by this rule is part of a major foreign policy initiative announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and is also exempt from the notice and comment and 30-day delayed effective date requirements of the APA on that basis. DHS is

---

[2] DOJ initially promulgated 8 CFR 235.3(b)(1)(i) as an exercise of the functions of the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review. *See* 62 FR 10312 (Mar. 6, 1997). Following enactment of the HSA, 8 CFR 235.3(b)(1)(i) was transferred to DHS, and effectively duplicated in parallel DOJ regulations at 8 CFR 1235.3(b)(1)(i). *See* 68 FR 10349 (Mar. 5, 2003). DOJ is revising its parallel regulation by separate rulemaking in this issue of the **Federal Register**.

[3] In addition, in light of the lack of pre-publication notice and comment and a delayed effective date for the related notice that DHS has published in this issue of the **Federal Register**, a delay in the effective date of this regulation would be incongruous and unnecessary.

nevertheless providing the opportunity for the public to comment.

### B. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget has not designated this rule as a significant regulatory action under section 3(f) of Executive Order 12866. Accordingly, the Office of Management and Budget has not reviewed this rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare a regulatory flexibility analysis that describes the effect of a proposed rule on small entities when the agency is required to publish a general notice of proposed rulemaking. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act); a small not-for-profit organization; or a small governmental jurisdiction (locality with fewer than 50,000 people). Because this final rule is exempt from notice-and-comment rulemaking requirements under 5 U.S.C. 553, a regulatory flexibility analysis is not required.

### Regulatory Amendments

**List of Subjects for 8 CFR Part 235**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Authority and Issuance**

For the reasons stated in the preamble, part 235 of title 8 of the Code of Federal Regulations is amended as set forth below:

**8 CFR CHAPTER I**

**PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION**

■ 1. The authority citation for part 235 continues to read:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2004 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; Title VII of Public Law 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); Pub. L. 112–54.

■ 2. Revise § 235.3(b)(1)(i) to read as follows:

**§ 235.3   Inadmissible aliens and expedited removal.**

\*      \*      \*      \*      \*
  (b) \*  \*  \*
  (1) \*  \*  \*
  (i) Arriving aliens, as defined in 8 CFR 1.2;

\*      \*      \*      \*      \*

Signed at Washington, DC, this 11th of January 2017.

**Jeh Charles Johnson,**
*Secretary of Homeland Security.*

[FR Doc. 2017–00915 Filed 1–13–17; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1235**

**[AG Order No. 3817–2017; EOIR Docket No. 401]**

**RIN 1125–AA80**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This final rule revises Executive Office for Immigration Review (EOIR) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. This final rule conforms with a parallel Department of Homeland Security (DHS) regulation. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017. Comments received by mail will be considered timely if they are

postmarked on or before that date. The electronic Federal Docket Management System (FDMS) will accept comments until midnight Eastern Time at the end of that day.

**ADDRESSES:** Please submit written comments to Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041. To ensure proper handling, please reference RIN No. 1125–AA80 or EOIR Docket No. 401 on your correspondence. You may submit comments electronically or view an electronic version of this proposed rule at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041; telephone (703) 605–1744 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

### I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. EOIR also invites comments that relate to the economic, environmental, or federalism effects that might result from this rule. To provide the most assistance to EOIR, comments should explain the reason for any recommended change, and should include data, information, or authority that supports such recommended change.

All comments submitted for this rulemaking should include the agency name and RIN 1125–AA80 or EOIR Docket No. 401. Please note that all comments received are considered part of the public record and will be made available for public inspection at *www.regulations.gov.,* including personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) voluntarily submitted by the commenter.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment. You also must prominently identify confidential

# DEPARTMENT OF HOMELAND SECURITY

**[Docket No. DHS–2016–0089]**

## National Infrastructure Advisory Council

**AGENCY:** National Protection and Programs Directorate, DHS.

**ACTION:** Committee management; notice of an Open Federal Advisory Committee meeting.

**SUMMARY:** The National Infrastructure Advisory Council (NIAC) will meet Thursday, February 16, 2017, at 1331 F Street NW., Suite 1000, Washington, DC 20004. This meeting will be open to the public.

**DATES:** The NIAC will meet on February 16, 2017. The meeting will be held from 1:30 p.m.–4:30 p.m. EST. The meeting may close early if the committee has completed its business. For additional information, please consult the NIAC Web site, *www.dhs.gov/NIAC,* or contact the NIAC Secretariat by phone at (703) 235–2888 or by email at *NIAC@ hq.dhs.gov.*

**ADDRESSES:** 1331 F Street NW., Suite 1000, Washington, DC 20004. Members of the public will register at the registration table prior to entering the meeting room. For information on facilities or services for individuals with disabilities, or to request special assistance at the meeting, contact the person listed under **FOR FURTHER INFORMATION CONTACT** below as soon as possible.

To facilitate public participation, we are inviting public comment on the issues to be considered by the Council as listed in the "Summary" section below. Comments must be submitted in writing no later than 12:00 p.m. on February 13, 2017, in order to be considered by the Council in its meeting. The comments must be identified by "DHS–2016–0089," and may be submitted by any *one* of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting written comments.

• *Email: NIAC@hq.dhs.gov.* Include the docket number (DHS–2016–0089) in the subject line of the message.

• *Fax:* (703)235–9707.

• *Mail:* Ginger Norris, National Protection and Programs Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0612, Washington, DC 20598–0607.

*Instructions:* All written submissions received must include the words "Department of Homeland Security"

and the docket number for this action. Written comments received will be posted without alteration at *www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket or to read background documents or comments received by the NIAC, go to *www.regulations.gov.* Enter "NIAC" in the search line and the Web site will list all relevant documents for your review.

Members of the public will have an opportunity to provide oral comments on the topics on the meeting agenda below, and on any previous studies issued by the NIAC. We request that comments be limited to the issues and studies listed in the meeting agenda and previous NIAC studies. All previous NIAC studies can be located at *www.dhs.gov/NIAC.* Public comments may be submitted in writing or presented in person for the Council to consider. Comments received by Ginger Norris on or after 1:00 p.m. on February 16, 2017 will still be accepted and reviewed by the Members, but not necessarily at the time of the meeting. In-person presentations will be limited to three minutes per speaker, with no more than 15 minutes for all speakers. Parties interested in making in-person comments should register on the Public Comment Registration list available at the entrance to the meeting location prior to the beginning of the meeting.

**FOR FURTHER INFORMATION CONTACT:** Ginger Norris, Department of Homeland Security, National Protection and Programs Directorate, Office of Infrastructure Protection, NIAC, Designated Federal Officer, 245 Murray Lane SW., Mail Stop 0607, Washington, DC 20598–0607, telephone 202–441– 5885.

**SUPPLEMENTARY INFORMATION:** Notice of this meeting is given under the Federal Advisory Committee Act, 5 U.S.C. appendix. The NIAC shall provide the President, through the Secretary of Homeland Security, with advice on the security and resilience of the Nation's critical infrastructure sectors. The NIAC will meet to discuss issues relevant to critical infrastructure security and resilience, as directed by the President.

The meeting will commence at 1:00 p.m. EST. At this meeting, the Council will discuss its newest tasking and receive briefings. All presentations will be posted prior to the meeting on the Council's public Web page— *www.dhs.gov/NIAC.*

## Public Meeting Agenda

I. Opening of Meeting
II. Roll Call of Members
III. Opening Remarks and Introductions

IV. Approval of SEP 2016 Meeting Minutes
V. Presentations on Future Focus Study
VI. Public Comment
VII. Discussion of New NIAC Business
VIII. Closing Remarks
IX. Adjournment

Dated: January 4, 2017.

**Ginger Norris,**
*Designated Federal Officer for the NIAC.*
[FR Doc. 2017–00789 Filed 1–13–17; 8:45 am]
**BILLING CODE 9110–9–P**

# DEPARTMENT OF HOMELAND SECURITY

## Office of the Secretary

**[DHS Docket No. DHS–2017–0004]**

## Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice concerns the authority of the Department of Homeland Security (DHS or the Department) to place certain designated categories of aliens in expedited removal proceedings. On November 13, 2002, the former Immigration and Naturalization Service (INS) of the Department of Justice issued a notice designating certain aliens who arrive by sea, either by boat or other means, as eligible for placement in expedited removal proceedings, with an exception for Cuban citizens or nationals (hereinafter "Cuban nationals"). On August 11, 2004, DHS issued a notice designating certain aliens in the United States as eligible for placement in expedited removal proceedings, also with an exception for Cuban nationals. In light of recent changes in the relationship between the United States and Cuba, the Department has determined that the exceptions for Cuban nationals, contained in the designations of November 13, 2002 and August 11, 2004, are no longer warranted and are thus hereby eliminated. The rest of the November 13, 2002 and August 11, 2004 designations, including any implementing policies, are unaffected by this notice and remain unchanged.

**DATE:** This notice is effective on January 13, 2017. Interested persons are invited to submit written comments on this notice on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by DHS Docket Number DHS– 2017–0004, by any one of the following methods:

• *Federal e-Rulemaking Portal* *www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http://www.regulations.gov.* The *http://www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http://www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http://www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to

remove, without a hearing before an immigration judge, aliens arriving in the United States and certain other applicants for admission who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii). Specifically, with limited exception, the Act authorizes the Secretary to apply (by designation) expedited removal proceedings to all or any subset of aliens who (1) have not been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and (2) have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility. Section 235(b)(1)(A)(iii)(I)—(II), 8 U.S.C. 1225(b)(1)(A)(iii)(I)—(II). The Secretary may modify such designations at any time. *Id.*

On November 13, 2002, the former INS issued a **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), to designate additional aliens who may be placed in expedited removal proceedings. 67 FR 68924. Specifically, that notice designated the following class of aliens who may be placed in expedited removal proceedings: "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." *Id.* The INS noted at the time that "[p]lacing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions,

will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected." *Id.* The INS also stated that "exercising its authority to detain this class of aliens . . . will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life." *Id.* The INS further noted that preventing illegal migration by sea also protects national security, as "[a] surge in illegal migration by sea threatens [that] security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities." *Id.*

The November 13, 2002 notice, however, contained an exception for Cuban nationals who are otherwise described in the designated class, stating that expedited removal proceedings would not be initiated against such Cuban nationals who arrive by sea. *Id.* The INS based this exception on "longstanding U.S. policy to treat Cubans differently from other aliens," citing the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), as an example of such treatment. *Id.* The notice also cited section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), which at the time statutorily exempted Cuban nationals who arrived by aircraft at a U.S. port of entry from being placed into expedited removal proceedings because of the lack of diplomatic relations between the United States and Cuba. That section expressly provides that expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." Section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F).

On August 11, 2004, DHS issued a similar **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), to designate an additional class of aliens to be placed in expedited removal proceedings. 69 FR 48877. That notice authorized the Department to place in expedited removal proceedings any or all members of the following class of aliens: "Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, who are encountered by an immigration officer within 100 air miles

of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter.'' *Id.* DHS noted at the time that ''exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.'' *Id.*

Like the November 13, 2002 notice, the August 11, 2004 notice contained an exception for Cuban nationals who are otherwise described in the designated class and stated that expedited removal proceedings would not be initiated against such nationals encountered in the United States. *Id.* The notice similarly based this exception on that fact that ''removals to Cuba [could not] presently be assured and for other U.S. policy reasons,'' *id.,* citing section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), as well.

Since those notices were issued, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries.

DHS also has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. First, the Department notes that the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. *See* section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). In fact, DHS and DOJ are promulgating rules in this issue of the **Federal Register**, amending 8 CFR 235.3(b)(1)(i) and 1235.3(b)(1)(i) to strike the regulatory exception for Cuban nationals arriving by aircraft at a U.S. port of entry. Second, the improved relationship between the United States and Cuba, along with Cuba's agreement to accept the repatriation of its nationals, has eroded certain U.S. policy justifications for the exception. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS has determined, in consultation with the Department of State, that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States.

Accordingly, this notice eliminates the categorical exceptions for Cuban nationals, with respect to both the November 13, 2002 and August 11, 2004 notices, on a prospective basis, beginning on January 13, 2017, *see* 8 CFR 235.3(b)(1)(ii) (designation may be effective as early as the date of issuance). As a result, Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal as designated in the November 13, 2002 and August 11, 2004 notices. DHS is not changing any other aspects of those designations and, apart from the modification described above, will continue exercising its expedited removal authority as indicated in the November 13, 2002 and August 11, 2004 notices.

As it did for the November 13, 2002 and August 11, 2004 notices, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii), the Department has determined that good cause exists to exempt this notice from the notice-and-comment and 30-day delayed effective date requirements under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(3)(B) and (d)(3). Delaying the implementation of this notice to allow public notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I).

Moreover, as with the August 11, 2004 notice, the designation in this notice is necessary to remove quickly from the United States aliens who are encountered shortly after illegally entering across U.S. land borders. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

DHS has determined that pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Among other things, such opportunity for notice and comment could result in a surge in migration of Cuban nationals seeking to travel to and enter the United States prior to the effectuation of the changes announced in this notice. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. *See Matter of D–J–,* I. & N. Dec. 572, 579 (A.G. 2003). A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge in migration over land or sea could result in significant loss of human life. For the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable and contrary to the public interest.

In addition, the change implemented by this notice is part of a major foreign policy initiative announced by the President, and is central to ongoing

Venezuela AR_000015

diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and that this notice is exempt from APA procedural requirements on that basis.

Finally, and for the same reasons described above, DHS finds that delay caused by publication would adversely affect the interests of the United States and the effective enforcement of the immigration laws, and therefore invokes 8 CFR 235.3(b)(1)(ii) to make this designation effective immediately upon placement on public inspection.

Although advance notice and comment procedures are not in the interests of the United States with respect to this notice, DHS is interested in receiving comments from the public on the elimination of the categorical exception for Cuban nationals. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

## Notice of Designation of Aliens Subject to Expedited Removal Proceedings

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(A)(iii)) and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) With respect to the above-referenced Designation of November 13, 2002, 67 FR 68924, I hereby rescind the provision at numbered paragraph (5), specifying that "[e]xpedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

(2) With respect to the above-referenced Designation of August 11, 2004, 69 FR 48877, I hereby rescind the provision at numbered paragraph (6), specifying that "[t]he expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

Signed: at Washington, DC this 11th of January, 2017.

**Jeh Charles Johnson,**
*Secretary of Homeland Security.*
[FR Doc. 2017–00914 Filed 1–13–17; 8:45 am]
**BILLING CODE P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2593–16; DHS Docket No. USCIS–2015–USCIS–2013–0006]

RIN 1615–ZB62

### Extension of the Designation of Somalia for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Somalia for Temporary Protected Status (TPS) for a period of 18 months, effective March 18, 2017 through September 17, 2018. This extension allows eligible Somali nationals (and aliens having no nationality who last habitually resided in Somalia) to retain TPS through September 17, 2018, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because conditions in Somalia supporting its designation for TPS continue to be met. Through this Notice, DHS also sets forth procedures necessary for nationals of Somalia (or aliens having no nationality who last habitually resided in Somalia) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** The 18-month extension of the TPS designation of Somalia is effective as of March 18, 2017, and will remain in effect through September 17, 2018. The 60-day re-registration period runs from January 17, 2017 through March 20, 2017. Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.

**FOR FURTHER INFORMATION CONTACT:**
• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS

Web page at *http://www.uscis.gov/tps.* You can find specific information about the extension of Somalia's designation for TPS by selecting "Somalia" from the menu on the left side of the TPS Web page.
• You can also contact Guillermo Roman-Riefkohl, TPS Program Manager, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.
• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

### What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible aliens without nationality who last habitually resided in the designated country.
• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs, so long as they continue to meet the requirements of TPS.

Venezuela AR_000016

**5238** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, and 274a**

**[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]**

**RIN 1615–AC04**

### International Entrepreneur Rule

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security (DHS) regulations to implement the Secretary of Homeland Security's discretionary parole authority in order to increase and enhance entrepreneurship, innovation, and job creation in the United States. The final rule adds new regulatory provisions guiding the use of parole on a case-by-case basis with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. If granted, parole would provide a temporary initial stay of up to 30 months (which may be extended by up to an additional 30 months) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States.

**DATES:** This final rule is effective July 17, 2017.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–1470.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  D. Summary of Changes From the Notice of Proposed Rulemaking
  E. Summary of Costs and Benefits
  F. Effective Date
II. Background
  A. Current Framework
  B. Final Rule
III. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority
  C. Significant Public Benefit
  D. Definitions
  E. Application Requirements
  F. Parole Criteria and Conditions
  G. Employment Authorization
  H. Comments on Parole Process
  I. Appeals and Motions To Reopen
  J. Termination of Parole
  K. Opposition to the Overall Rule
  L. Miscellaneous Comments on the Rule
  M. Public Comments on Statutory and Regulatory Requirements
IV. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Purpose of the Rule
  3. Volume Estimate
  4. Costs
  5. Benefits
  6. Alternatives Considered
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), confers upon the Secretary of Homeland Security the discretionary authority to parole individuals into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. As described in more detail below, the final rule would establish general criteria for the use of parole with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid growth and job creation that they would provide a significant public benefit to the United States. In all cases, whether to parole a particular individual under this rule is a discretionary determination that would be made on a case-by-case basis.

Given the complexities involved in adjudicating applications in this context, DHS has decided to establish by regulation the criteria for the case-by-case evaluation of parole applications filed by entrepreneurs of start-up entities. By including such criteria in regulation, as well as establishing application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis, DHS

expects to facilitate the use of parole in this area.

Under this final rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation. DHS believes that such potential would be indicated by, among other things, the receipt of (1) significant capital investment from U.S. investors with established records of successful investments or (2) significant awards or grants from certain Federal, State, or local government entities. The final rule also includes alternative criteria for applicants who partially meet the thresholds for capital investment or government awards or grants and can provide additional reliable and compelling evidence of their entities' significant potential for rapid growth and job creation. An applicant must also show that he or she has a substantial ownership interest in such an entity, has an active and central role in the entity's operations, and would substantially further the entity's ability to engage in research and development or otherwise conduct and grow its business in the United States. The grant of parole is intended to facilitate the applicant's ability to oversee and grow the start-up entity.

DHS believes that this final rule will encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation, and dynamism. Particularly in light of the complex considerations involved in entrepreneur-based parole requests, DHS also believes that this final rule will provide a transparent framework by which DHS will exercise its discretion to adjudicate such requests on a case-by-case basis under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

### B. Legal Authority

The Secretary of Homeland Security's authority for the proposed regulatory amendments can be found in various provisions of the immigration laws. Sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), provides the Secretary the authority to administer and enforce the immigration and nationality laws. Section 402(4) of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 202(4), expressly authorizes the

Federal Register / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

**5239**

Secretary to establish rules and regulations governing parole. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole for urgent humanitarian reasons or significant public benefit to applicants for admission temporarily on a case-by-case basis.[1] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's general authority to extend employment authorization to noncitizens in the United States. And section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), establishes as a primary mission of DHS the duty to ''ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland.''

*C. Summary of the Final Rule Provisions*

This final rule adds a new section 8 CFR 212.19 to provide guidance with respect to the use of parole for entrepreneurs of start-up entities based upon significant public benefit. An individual seeking to operate and grow his or her start-up entity in the United States would generally need to demonstrate the following to be considered for a discretionary grant of parole under this final rule:

1. *Formation of New Start-Up Entity.* The applicant has recently formed a new entity in the United States that has lawfully done business since its creation and has substantial potential for rapid growth and job creation. An entity may be considered recently formed if it was created within the 5 years immediately preceding the date of the filing of the initial parole application. *See* 8 CFR 219.12(a)(2), 8 CFR 103.2(a)(7).

2. *Applicant is an Entrepreneur.* The applicant is an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial

grant of parole; and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. *See* final 8 CFR 212.19(a)(1). Such an applicant cannot be a mere investor.

3. *Significant U.S. Capital Investment or Government Funding.* The applicant can further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.

b. *Government grants.* The applicant may show that the start-up entity has received significant awards or grants from Federal, State or local government entities with expertise in economic development, research and development, or job creation. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received monetary awards or grants totaling $100,000 or more from government entities that typically provide such funding to U.S. businesses for economic, research and development, or job creation purposes.

c. *Alternative criteria.* The final rule provides alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment or government funding may be considered for parole under this rule if he or she provides additional reliable and compelling evidence that they would provide a significant public benefit to the United States. Such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

This final rule states that an applicant who meets the above criteria (and his or her spouse and minor, unmarried children,[2] if any) generally may be

considered under this rule for a discretionary grant of parole lasting up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. An applicant will be required to file a new application specifically tailored for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit under this rule, along with applicable fees. Applicants will also be required to appear for collection of biometric information. No more than three entrepreneurs may receive parole with respect to any one qualifying start-up entity.

USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through background checks and other means, to determine whether the applicant has satisfied the above criteria, whether the specific applicant's parole would provide a significant public benefit, and whether negative factors exist that warrant denial of parole as a matter of discretion. To grant parole, adjudicators will be required to conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion.

If parole is granted, the entrepreneur will be authorized for employment incident to the grant of parole, but only with respect to the entrepreneur's start-up entity. The entrepreneur's spouse and children, if any, will not be authorized for employment incident to the grant of parole, but the entrepreneur's spouse, if paroled into the United States pursuant to 8 CFR 212.19, will be permitted to apply for employment authorization consistent with new 8 CFR 274a.12(c)(34). DHS retains the authority to revoke any such grant of parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS has reason to believe that the approved application involves fraud or misrepresentation. *See* new 8 CFR 212.19(k).

As noted, the purpose of this parole process is to provide qualified entrepreneurs of high-potential start-up entities in the United States with the improved ability to conduct research and development and expand the entities' operations in the United States so that our nation's economy may

---

[1] In sections 402 and 451 of the HSA, Congress transferred from the Attorney General to the Secretary of Homeland Security the general authority to enforce and administer the immigration laws, including those pertaining to parole. In accordance with section 1517 of title XV of the HSA, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the HSA, tit. XV, section 1517). Authorities and functions of DHS to administer and enforce the immigration laws are appropriately delegated to DHS employees and others in accordance with section 102(b)(1) of the HSA, 6 U.S.C. 112(b)(1); section 103(a) of the INA, 8 U.S.C. 1103(a); and 8 CFR 2.1.

[2] The terms ''child'' and ''children'' in this proposed rule have the same meaning as they do

under section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1) (defining a child as one who is unmarried and under twenty-one years of age).

benefit from such development and expansion, including through increased capital expenditures, innovation, and job creation. The final rule allows individuals granted parole under this rule to be considered for re-parole for an additional period of up to 30 months (2.5 years) if, and only if, they can demonstrate that their entities have shown signs of significant growth since the initial grant of parole and such entities continue to have substantial potential for rapid growth and job creation.

An applicant under this rule will generally need to demonstrate the following to be considered for a discretionary grant of an additional period of parole:

1. *Continuation of Start-Up Entity.* The entity continues to be a start-up entity as defined by the proposed rule. For purposes of seeking re-parole, an applicant may be able to meet this standard by showing that the entity: (a) Has been lawfully operating in the United States during the period of parole; and (b) continues to have substantial potential for rapid growth and job creation.

2. *Applicant Continues to Be an Entrepreneur.* The applicant continues to be an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (a) Continues to possess a significant (at least 5 percent) ownership interest in the entity at the time of adjudication of the grant of re-parole; and (b) continues to have an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and continuing to grow its business in the United States. This reduced ownership amount takes into account the need of some successful start-up entities to raise additional venture capital investment by selling ownership interest during their initial years of operation.

3. *Significant U.S. Investment/Revenue/Job Creation.* The applicant further validates, through reliable supporting evidence, the start-up entity's continued potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Additional Investments or Grants.* The applicant may show that during the initial period of parole the start-up entity received additional substantial investments of capital, including through qualified investments from U.S. investors with established records of successful investments; significant

awards or grants from U.S. government entities that regularly provide such funding to start-up entities; or a combination of both. An applicant would generally be expected to demonstrate that the entity received at least $500,000 in additional qualifying funding during the initial parole period. As noted previously, any private investment that the applicant is relying upon as evidence that the investment criterion has been met must be made by qualified U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. Government awards or grants must be from U.S. federal, state or local government entities with expertise in economic development, research and development, or job creation.

b. *Revenue generation.* The applicant may show that the start-up entity has generated substantial and rapidly increasing revenue in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity reached at least $500,000 in annual revenue, with average annualized revenue growth of at least 20 percent, during the initial parole period.

c. *Job creation.* The applicant may show that the start-up entity has demonstrated substantial job creation in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity created at least 5 full-time jobs for U.S. workers during the initial parole period.

d. *Alternative criteria.* As with initial parole, the final rule includes alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole will continue to provide a significant public benefit. As discussed above, such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

As indicated above, an applicant who generally meets the above criteria and merits a favorable exercise of discretion may be granted an additional 30-month period of re-parole, for a total maximum period of 5 years of parole under 8 CFR 212.19, to work with the same start-up entity based on the significant public benefit that would be served by his or her continued parole in the United States. No more than three

entrepreneurs (and their spouses and children) may receive such additional periods of parole with respect to any one qualifying entity.

As with initial parole applications, USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through verification methods, to determine whether the applicant has satisfied the above criteria and whether his or her continued parole would provide a significant public benefit. To be re-paroled, adjudicators will be required to conclude, based on the totality of the circumstances, both: (1) That the applicant's continued parole would provide a significant public benefit, and (2) that the applicant continues to merit parole as a matter of discretion. If the applicant is re-paroled, DHS retains the authority to revoke parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the application involved fraud or made material misrepresentations.

The entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. At any time prior to reaching the 5-year limit for parole under this final rule, such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or as a lawful permanent resident pursuant to an EB–2 National Interest Waiver). Because parole is not considered an admission to the United States, parolees are ineligible to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. For example, if such individuals are approved for a nonimmigrant or employment-based immigrant visa classification, they would generally need to depart the United States and apply for a visa with the Department of State (DOS) for admission to the United States as a nonimmigrant or lawful permanent resident.

Finally, DHS is making conforming changes to the employment authorization regulations at 8 CFR 274a.12(b) and (c), the employment eligibility verification regulations at 8 CFR 274a.2(b), and fee regulations at 8 CFR 103.7(b)(i). The final rule amends 8 CFR 274a.12(b) by: (1) Adding entrepreneur parolees to the classes of

aliens authorized for employment incident to their immigration status or parole, and (2) providing temporary employment authorization for those applying for re-parole. The final rule amends 8 CFR 274a.12(c) by extending eligibility for employment authorization to the spouse of an entrepreneur paroled into the United States under 8 CFR 212.19. The final rule amends 8 CFR 274a.2(b) by designating the entrepreneur's foreign passport and Arrival/Departure Record (Form I–94) indicating entrepreneur parole as acceptable evidence for employment eligibility verification (Form I–9) purposes.[3] The final rule also amends 8 CFR 103.7(b)(i) by including the fee for the new Application for Entrepreneur Parole form.

### D. Summary of Changes From the Notice of Proposed Rulemaking

Following careful consideration of public comments received, including relevant data provided by stakeholders, DHS has made several modifications to the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on August 31, 2016. See 81 FR 60129. Those changes include the following:

• *Minimum Investment Amount.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 212.19(b)(2)(ii)(B)(*1*), a provision that identifies the qualifying investment amount required from one or more qualified investors. In the NPRM, DHS proposed a minimum investment amount of $345,000. Based on data provided by the public, DHS is revising this figure to $250,000. Thus, under the final rule, an applicant would generally be able to meet the investment standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. In addition, DHS has increased the timeframe during which the qualifying investments must be received from 365 days to 18 months immediately preceding the filing of an application for initial parole.

• *Definition of Entrepreneur: Ownership Criteria.* In the final rule,

DHS is revising proposed 8 CFR 212.19(a)(1), a provision that defines the term "entrepreneur," and establishes a minimum ownership percentage necessary to meet the definition. In the NPRM, DHS proposed that the entrepreneur must have an ownership interest of at least 15 percent for initial parole, and 10 percent for re-parole. In response to public comment, DHS is modifying this requirement to allow individuals who have an ownership interest of at least 10 percent in the start-up entity at the time of adjudication of the initial grant of parole, and at least a 5 percent ownership interest at the time of adjudication of a subsequent period of re-parole, to qualify under this definition.

• *Qualified Investment Definition.* DHS is revising proposed 8 CFR 212.19(a)(4), which establishes the definition of a qualified investment. In the NPRM, DHS proposed that the term "qualified investment" means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of equity or convertible debt issued by such entity. In response to public comment, DHS is modifying this definition to include other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry.

• *Qualified Investor Definition.* DHS is revising proposed 8 CFR 212.19(a)(5), which establishes the definition of a qualified investor. In the NPRM, DHS proposed that an individual or organization may be considered a qualified investor if, during the preceding 5 years: (i) The individual or organization made investments in start-up entities in exchange for equity or convertible debt in at least 3 separate calendar years comprising a total within such 5-year period of no less than $1,000,000; and (ii) subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. In this final rule, the minimum investment amount has been decreased from the originally proposed $1,000,000 to $600,000. The requirement that investments be made in at least 3 separate calendar years has also been removed from this final rule. DHS is also making revisions to the form of investment made by the individual or organization consistent

with the change to the qualified investment definition by adding "or other security convertible into equity commonly used in financing transactions within their respective industries."

• *Start-up Entity Definition.* In the final rule, DHS is revising the definition of a start-up entity as proposed in 8 CFR 212.19(a)(2). In the NPRM, DHS proposed that an entity may be considered recently formed if it was created within the 3 years preceding the date of filing of the initial parole request. In response to public comment, DHS is modifying this provision so that an entity may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the initial parole request. Additionally, for purposes of paragraphs (a)(3) and (a)(5) of this section, which pertain to the definitional requirements to be a qualified investor or qualified government award or grant, respectively, DHS made corresponding changes in this final rule such that an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

• *Job Creation Requirement.* In the final rule, DHS is revising proposed 8 CFR 212.19(c)(2)(ii)(B)(*2*), a provision that identifies the minimum job creation requirement under the general re-parole criteria. In the NPRM, DHS proposed that an entrepreneur may be eligible for an additional period of parole by establishing that his or her start-up entity has created at least 10 qualified jobs during the initial parole period. In response to public comment, DHS is modifying this provision so that an entrepreneur may qualify for re-parole if the start-up entity created at least 5 qualified jobs with the start-up entity during the initial parole period.

• *Revenue Generation.* In the final rule, DHS is clarifying proposed 8 CFR 212.19(c)(2)(ii)(B)(*3*), a provision that identifies the minimum annual revenue requirement under the general re-parole criteria. DHS has clarified that for the revenue to be considered for purposes of re-parole, it must be generated in the United States.

• *Parole Validity Periods.* In the final rule, DHS is revising proposed 8 CFR 212.19(d)(2) and (3), which are provisions that identify the length of the initial and re-parole periods. In the NPRM, DHS proposed (1) a potential initial period of parole of up to 2 years beginning on the date the request is approved by USCIS and (2) a potential period of re-parole of up to 3 years beginning on the date of the expiration

---

[3] Additionally, DHS is making a technical change to this section by adding the Department of State (DOS) Consular Report of Birth Abroad (Form FS–240) to the regulatory text and to the "List C" listing of acceptable documents for Form I–9 verification purposes. This rule departs from the Notice of Proposed Rulemaking by not adding "or successor form" after Form FS–240. DHS determined that inclusion of the phrase is unnecessary and may cause confusion in the future.

of the initial parole period. First, DHS revised 8 CFR 212.19(d)(2) to correct that the initial parole period would begin running on the date the individual is initially paroled into the United States. Second, in response to public comment, DHS revised 8 CFR 212.19(d)(2) and (3) to provide 2 potential parole periods of up to 30 months each, rather than an initial 2-year period followed by a potential 3-year period of re-parole. Specifically, 8 CFR 212.19(d)(2) now provides that an applicant who meets the eligibility criteria (and his or her spouse and minor, unmarried children, if any) may be considered under this rule for a discretionary grant of an initial parole period of up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. DHS also revised in this final rule the period of re-parole in 8 CFR 212.19(d)(3) to reduce the period of re-parole from 3 years to 30 months in order to extend the initial parole period, while still maintaining the overall 5-year period of parole limitation.

• *Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(a)(10), a provision that defines material changes. The final rule adds the following to the definition of material changes: "a significant change with respect to ownership and control of the start-up entity." This reflects a change from the originally proposed language of any significant change to the entrepreneur's role in or ownership and control in the start-up entity or any other significant change with respect to ownership and control of the start-up entity. Additionally, the final rule at 8 CFR 212.19(a)(1) adds language that permits the entrepreneur during the initial parole period to reduce his or her ownership interest, as long as at least 5 percent ownership is maintained. This provision was revised in response to a number of public comments that requested that DHS reconsider how and when material changes should be reported.

• *Reporting of Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(j), a provision that describes reporting of material changes. DHS is revising 8 CFR 212.19(j) to allow DHS to provide additional flexibility in the future with respect to the manner in which material changes are reported to DHS. The final rule also makes conforming changes based on changes to the definition of entrepreneur.

• *Termination of Parole.* In the final rule, DHS is revising proposed 8 CFR 212.19(k)(2), a provision that describes automatic termination of parole. The final rule makes conforming revisions to this provision based on changes to the definition of entrepreneur and to the material change provisions.

*E. Summary of Costs and Benefits*

DHS does not anticipate that this rule will generate significant costs and burdens to private or public entities. Costs of the rule stem from filing fees and opportunity costs associated with applying for parole, and the requirement that the entrepreneur notify DHS of any material changes.

DHS estimates that 2,940 entrepreneurs will be eligible for parole annually and can apply using the Application for Entrepreneur Parole (Form I–941). Each applicant for parole will face a total filing cost—including the application form fee, biometric filing fee, travel costs, and associated opportunity costs—of $1,591, resulting in a total cost of $4,678,336 (undiscounted) for the first full year the rule will take effect and any subsequent year. Additionally, dependent family members (spouses and children) seeking parole with the principal applicant will be required to file an Application for Travel Document (Form I–131) and submit biographical information and biometrics. DHS estimates approximately 3,234 dependent spouses and children could seek parole based on the estimate of 2,940 principal applicants. Each spouse and child 14 years of age and older seeking parole will face a total cost of $765 per applicant,[4] for a total aggregate cost of $2,474,914.[5] Additionally, spouses who apply for work authorization via an Application for Employment Authorization (Form I–765) will incur a total additional cost of $446 each. Based on the same number of entrepreneurs, the estimated 2,940 spouses[6] will incur total costs of $1,311,830 (undiscounted). The total cost of the rule to include direct filing costs and monetized non-

filing costs is estimated to be $8,136,571 annually.

DHS anticipates that establishing a parole process for those entrepreneurs who stand to provide a significant public benefit will advance the U.S. economy by enhancing innovation, generating capital investments, and creating jobs. DHS does not expect significant negative consequences or labor market impacts from this rule; indeed, DHS believes this rule will encourage entrepreneurs to pursue business opportunities in the United States rather than abroad, which can be expected to generate significant scientific, research and development, and technological impacts that could create new products and produce positive spillover effects to other businesses and sectors. The impacts stand to benefit the economy by supporting and strengthening high-growth, job-creating businesses in the United States.

*F. Effective Date*

This final rule will be effective on July 17, 2017, 180 days from the date of publication in the **Federal Register**. DHS has determined that this 180-day period is necessary to provide USCIS with a reasonable period to ensure resources are in place to process and adjudicate Applications for Entrepreneur Parole filed by eligible entrepreneurs and related applications filed by eligible dependents under this rule without sacrificing the quality of customer service for all USCIS stakeholders. USCIS believes it will thus be able to implement this rule in a manner that will avoid delays of processing these and other applications.

**II. Background**

*A. Discretionary Parole Authority*

The Secretary of Homeland Security has discretionary authority to parole into the United States temporarily "under conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any individual applying for admission to the United States," regardless of whether the alien is inadmissible. INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[7] The Secretary's parole authority is expansive. Congress did not define the phrase "urgent humanitarian reasons or significant public benefit," entrusting interpretation and application of those

---

[4] On October 24, 2016, U.S. Citizenship and Immigration Services published a final rule establishing a new fee schedule for immigration benefits and services (81 FR 73292). The new filing fees for Form I–131 and Form I–765, $575 and $410, respectively, will be effective on December 23, 2016. This final rule uses those new filing fees in estimating costs to potential applicants under this rule.

[5] For parole requests for children under the age of 14, only the filing fee will be required, as such children do not appear for biometric collection. Applicants under the age of 14 and over the age of 79 are not required to be fingerprinted. However, they may still be required to attend a biometrics appointment in order to have their photographs and signatures captured.

[6] DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

[7] Although section 212(d)(5) continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Arrabally,* 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).

**Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations **5243**

standards to the Secretary. Aside from requiring case-by-case determinations, Congress limited the parole authority by restricting its use with respect to two classes of applicants for admission: (1) Aliens who are refugees (unless the Secretary determines that "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled . . . rather than be admitted as a refugee" under INA section 207, 8 U.S.C. 1157), *see* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B); and (2) certain alien crewmen during a labor dispute in specified circumstances (unless the Secretary "determines that the parole of such alien is necessary to protect the national security of the United States"), INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A).

Parole decisions are discretionary determinations and must be made on a case-by-case basis consistent with the INA. To exercise its parole authority, DHS must determine that an individual's parole into the United States is justified by urgent humanitarian reasons or significant public benefit. Even when one of those standards would be met, DHS may nevertheless deny parole as a matter of discretion based on other factors.[8] In making such discretionary determinations, USCIS considers all relevant information, including any criminal history or other serious adverse factors that would weigh against a favorable exercise of discretion.

Parole is not an admission to the United States. *See* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); *see also* 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Parole may also be terminated at any time in DHS's discretion, consistent with existing regulations; in those cases, the individual is "restored to the status that he or she had at the time of parole." 8 CFR 212.5(e); *see also* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[9]

DHS regulations at 8 CFR 212.5 generally describe DHS's discretionary parole authority, including the authority to set the terms and conditions of parole. Some conditions are described in the regulations, including requiring reasonable assurances that the parolee

will appear at all hearings and will depart from the United States when required to do so. *See* 8 CFR 212.5(d).

Each of the DHS immigration components—USCIS, U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE)—has been delegated the authority to parole applicants for admission in accordance with section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). *See* 8 CFR 212.5(a). The parole authority is often utilized to permit an individual who is outside the United States to travel to and come into the United States without a visa. USCIS, however, also accepts requests for "advance parole" by individuals who seek authorization to depart the United States and return to the country pursuant to parole in the future. *See* 8 CFR 212.5(f); Application for Travel Document (Form I–131). Aliens who seek parole as entrepreneurs under this rule may need to apply for advance parole if at the time of application they are present in the United States after admission in, for example, a nonimmigrant classification, as USCIS is unable to grant parole to aliens who are not "applicants for admission." *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Advance authorization of parole by USCIS does not guarantee that the individual will be paroled by CBP upon his or her appearance at a port of entry.[10] Rather, with a grant of advance parole, the individual is issued a document authorizing travel (in lieu of a visa) indicating "that, so long as circumstances do not meaningfully change and the DHS does not discover material information that was previously unavailable, . . . DHS's discretion to parole him at the time of his return to a port of entry will likely be exercised favorably." [11]

Currently, upon an individual's arrival at a U.S. port of entry with a parole travel document (*e.g.,* a Department of State (DOS) foil, Authorization for Parole of an Alien into the United States (Form I–512L), or an Employment Authorization Document (Form I–766)), a CBP officer at a port of entry inspects the prospective parolee. If parole is authorized, the CBP officer issues an Arrival/Departure Record (Form I–94) documenting the grant of parole and the length of the parolee's

authorized parole period. *See* 8 CFR 235.1(h)(2). CBP retains the authority to deny parole to a parole applicant or to modify the length of advance parole authorized by USCIS. *See* 8 CFR 212.5(c).

Because parole does not constitute an admission, individuals may be paroled into the United States even if they are inadmissible under section 212(a) of the INA, 8 U.S.C. 1182(a). Further, parole does not provide a parolee with nonimmigrant status or lawful permanent resident status. Nor does it provide the parolee with a basis for changing status to that of a nonimmigrant or adjusting status to that of a lawful permanent resident, unless the parolee is otherwise eligible.

Under current regulations, once paroled into the United States, a parolee is eligible to request employment authorization from USCIS by filing a Form I–765 application with USCIS. *See* 8 CFR 274a.12(c)(11). If employment authorization is granted, USCIS issues the parolee an employment authorization document (EAD) with an expiration date that is commensurate with the period of parole on the parolee's Arrival/Departure Record (Form I–94). The parolee may use this EAD to demonstrate identity and employment authorization to an employer for Form I–9 verification purposes as required by section 274A(a) and (b) of the INA, 8 U.S.C. 1324a(a) and (b). Under current regulations, the parolee is not employment authorized by virtue of being paroled, but instead only after receiving a discretionary grant of employment authorization from USCIS based on the Application for Employment Authorization.

Parole will terminate automatically upon the expiration of the authorized parole period or upon the departure of the individual from the United States. *See* 8 CFR 212.5(e)(1). Parole also may be terminated on written notice when DHS determines that the individual no longer warrants parole or through the service of a Notice to Appear (NTA). *See* 8 CFR 212.5(e)(2)(i).

### B. Final Rule

Following careful consideration of public comments received, DHS has made several modifications to the regulatory text proposed in the NPRM (as described above in Section I.C.). The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to these regulatory amendments. Section III of this final rule includes a detailed summary and analysis of public comments that are pertinent to the proposed rule and DHS's role in

---

[8] The denial of parole is not subject to judicial review. *See* INA section 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii); *Bolante* v. *Keisler,* 506 F.3d 618, 621 (7th Cir. 2007).

[9] The grounds for termination set forth in 212.19(k) are in addition to the general grounds for termination of parole described at 8 CFR 212.5(e).

[10] *See Matter of Arrabally,* 25 I. & N. Dec. at 779 n.6 (citing 71 FR 27585, 27586 n.1 (May 12, 2006) ("[A] decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-entry, should DHS determine that parole is no longer warranted.")).

[11] *Id.*

Venezuela AR_000022

administering the International Entrepreneur Rule. A brief summary of comments deemed by DHS to be out of scope or unrelated to this rulemaking, making a detailed substantive response unnecessary, is provided in Section III.K. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov,* docket number USCIS–2015–0006.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received 763 comments during the 45-day public comment period. Of these, 43 comments were duplicate submissions and approximately 242 were letters submitted through mass mailing campaigns. As those letters were sufficiently unique, DHS considered all of these comment submissions. Commenters consisted primarily of individuals but also included startup incubators, companies, venture capital firms, law firms and representatives from State and local governments. Approximately 51 percent of commenters expressed support for the rule and/or offered suggestions for improvement. Nearly 46 percent of commenters expressed general opposition to the rule without suggestions for improvement. For approximately 3 percent of the public comments, DHS could not ascertain whether the commenter supported or opposed the proposed rule.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by commenters.

### B. Legal Authority

*Comments.* One commenter supported DHS's stated authority for promulgating this regulation and said that the INA grants the Secretary of Homeland Security the authority to establish policies governing parole and that efforts to reduce barriers to entrepreneurship via regulatory reform directly addresses DHS's mandate, "to ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." On the other hand, some commenters questioned DHS's authority to implement this rule. A commenter asserted that the rule created a new visa category which is under the exclusive purview of Congress, and therefore an illegal extension of authority by the

executive branch. Another commenter indicated that the proposed rule is too vague regarding whether "the agency intends to grant parole to aliens already present in the United States," and questioned whether the proposed exercise of parole authority is supported by legislative history, is consistent with the INA's overall statutory scheme, and whether "significant public benefit parole" as outlined in this rule is "arbitrary and capricious."

*Response.* DHS agrees with the commenter that contended that the Secretary has authority to promulgate this rule. As noted above, DHS's authority to promulgate this rule comes primarily from sections 101(b)(1)(F) and 402(4) of the HSA; sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3); section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5); and section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B). The Secretary retains broad statutory authority to exercise his discretionary parole authority based upon "significant public benefit."

DHS disagrees with the comment asserting that the proposed rule would effectively create a new visa category, which only Congress has the authority to do. *See* INA section 101(a)(15), 8 U.S.C. 1101(a)(15) (identifying nonimmigrant categories). Congress expressly empowered DHS to grant parole on a case-by-case basis, and nothing in this rule uses that authority to establish a new nonimmigrant classification. Among other things, individuals who are granted parole—which can be terminated at any time in the Secretary's discretion—are not considered to have been "admitted" to the United States, *see* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and cannot change to a nonimmigrant category as a parolee, *see* INA section 248(a), 8 U.S.C. 1258(a). Nor does parole confer lawful permanent resident status. To adjust status to that of a lawful permanent resident, individuals generally must, among other things, be admissible to the United States, have a family or employment-based immigrant visa immediately available to them, and not be subject to the various bars to adjustment of status. *See* INA section 245(a), (c), (k); 8 U.S.C. 1255(a), (c), (k); 8 CFR 245.1.

DHS further disagrees with the comment that this rule is inconsistent with the legislative history on parole. Under current law, Congress has expressly authorized the Secretary to grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. The statutory language in place today is somewhat

more restrictive than earlier versions of the parole authority, which did not always require case-by-case review and now includes additional limits on the use of parole for refugees and certain alien crewmen. *See* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B) (refugees); INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A) (alien crewmen); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, sec. 602(a)–(b), 110 Stat. 3009–689 (1996) (changing the standard for parole). But the statute clearly continues to authorize the granting of parole. Across Administrations, moreover, it has been accepted that the Secretary can identify classes of individuals to consider for parole so long as each individual decision is made on a case-by-case basis according to the statutory criteria. *See, e.g.,* 8 CFR 212.5(b) (as amended in 1997); Cuban Family Reunification Parole Program, 72 FR 65,588 (Nov. 21, 2007). This rule implements the parole authority in that way.

In addition to the concerns described above, one commenter argued that the proposed rule did not clearly explain whether "the agency intends to grant parole to aliens already present in the United States." DHS believes it is clear under this rule that an individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA sections 212(d)(5)(A), 235(a)(1); 8 U.S.C. 1182(d)(5)(A), 1225(a)(1). As further discussed in section III.H. of this rule, moreover, DHS does not contemplate using this rule to grant requests for parole in place for initial requests for parole.

*Comment:* A commenter objected to the extension of employment authorization by this rule to entrepreneur parolees for the sole purpose of engaging in entrepreneurial employment, stating that DHS is barred from doing so given the comprehensive legislative scheme for employment-based temporary and permanent immigration.

*Response:* DHS disagrees with the commenter. Under a plain reading of INA section 103(a), 8 U.S.C. 1103(a), the Secretary is provided with broad discretion to administer and enforce the Nation's immigration laws and broad authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the [INA]," *see* INA section 103(a)(3), 8 U.S.C. 1103(a)(3). Further, the specific definitional

provision at section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which was raised by the commenter, presumes that employment may be authorized by the Secretary and not just by statute. *See Arizona Dream Act Coal.* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1048, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as "permissive" and largely "unfettered"). The fact that Congress has directed the Secretary to authorize employment to specific classes of foreign nationals in certain statutory provisions does not diminish the Secretary's broad authority under other statutory provisions to administer the immigration laws, including through the extension of employment authorization. *See generally* 8 CFR 274a.12 (identifying, by regulation, numerous "classes of aliens authorized to accept employment").

C. Significant Public Benefit

*Comment:* One commenter stated that the quality of the jobs created should be a factor in determining whether the entrepreneur's parole will provide a significant public benefit. The commenter suggested formalizing some form of priority criteria.

*Response:* Under this final rule, evidence regarding job creation may be considered in determining whether to parole an individual into the United States for "significant public benefit." An entrepreneur may be considered for an initial period of parole if the entrepreneur's start-up entity has received a qualifying investment or grant. Alternatively, if the entity has received a lesser investment or grant amount, the entrepreneur may still be considered for parole by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS in determining whether the evidence, when combined with the amount of investment, grant or award, establishes that the entrepreneur will provide a significant public benefit to the United States. As with initial parole determinations, evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS to determine whether the entrepreneur should be granted re-parole.

Given the way job creation will already be considered, DHS believes it is unnecessary to make "job quality" its own separate criterion in determining whether to grant parole or re-parole. It is also unclear how the commenter believes DHS should apply any such criterion. Under this final rule, DHS will evaluate the totality of the circumstances, including the evidence about job creation, in determining whether to parole an individual into the United States for significant public benefit.

*D. Definitions*

1. Entrepreneur—Ownership Criteria

*Comments:* Several commenters expressed concern with the 15 percent "substantial ownership interest" requirement in the definition of "entrepreneur" in the proposed rule. One such commenter said the 15 percent "substantial ownership interest" requirement is only reasonable for smaller startups and proposed that the rule also separately include a dollar amount to satisfy the "substantial ownership interest" requirement (*e.g.,* 15 percent ownership interest or ownership interest valued at $150,000 or more). Several commenters recommended that the final rule reduce the initial parole threshold from 15 to 10 percent and reduce the re-parole threshold from 10 to 5 percent. Other commenters suggested that 10 percent ownership per individual would be a more appropriate threshold because some start-ups may be founded by teams of founders that need to split equity and requiring more than 15 percent ownership might be too restrictive and limit business creativity and growth.

*Response:* Consistent with the commenters' concerns and suggestions, DHS is revising the definition of entrepreneur in this final rule to reduce the ownership percentage that the individual must possess. *See* 8 CFR 212.19(a)(1). Based on further analysis, DHS believes that the thresholds from the proposed rule could have unnecessarily impacted an entrepreneur's ability to dilute his or her ownership interest to raise additional funds and grow the start-up entity. In this final rule, an individual may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. DHS believes that the revised

ownership percentage requirements in this final rule adequately account for the possibility of equity dilution, while ensuring that the individual continues to have a substantial ownership interest in, and assumes more than a nominal financial risk related to, the start-up entity.

Given that this is a new and complex process, DHS declines to adopt a separate option of establishing substantial ownership interest based on a valuation of the entrepreneur's ownership interest. DHS believes that the percentages provided within the final rule offer clear guidance to stakeholders and adjudicators as to what constitutes a substantial ownership interest regardless of the industry involved. Reliance upon valuations of an owner's interest would unnecessarily complicate the adjudicative review process, could potentially increase fraud and abuse, and may be burdensome for the applicant to obtain from an independent and reliable source. DHS, therefore, believes that the best indicator of an entrepreneur's ownership interest is the individual's ownership percentage since that is easy for an applicant to establish and provides an objective indicator for DHS to assess. DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

2. Other Comments on Entrepreneur Definition

*Comment:* One commenter stated that, in defining who counts as an "entrepreneur," the rule should take into account whether an individual has been successful in the past, including by having previously owned and developed businesses, generated more than a certain amount of revenue, created more than a certain number of jobs, or earned at least a certain amount.

*Response:* Under this final rule, evidence regarding an entrepreneur's track record may be considered in determining whether to parole an individual into the United States for "significant public benefit." The final rule's definition of entrepreneur requires the applicant to show that he or she both: (1) Possesses a substantial ownership interest in the start-up entity, and (2) has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. *See* new 8 CFR 212.19(a)(1). Some of the factors suggested by the commenter are

relevant evidence that the applicant can submit to show that he or she is well-positioned to substantially assist the entity with the growth and success of its business. DHS will also evaluate the totality of the evidence to determine whether an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. Given the way an entrepreneur's track record may already be considered on a case-by-case basis, DHS believes it is unnecessary to make the specific factors identified by the commenter their own separate criteria in determining whether to grant parole or re-parole.

*Comment:* A few commenters recommended that DHS clarify the term "well-positioned" as used in the definition of "entrepreneur." *See* final 8 CFR 212.19(a)(1) (requiring an international entrepreneur to prove that he or she "is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business"). The commenters believe that the proposed rule did not explain how an applicant would demonstrate that he or she is "well-positioned." The commenters recommend that the "substantial ownership interest" test in the same provision should provide a rebuttable presumption that the entrepreneur is "well-positioned" and that the "significant capital financing" requirements reflect the market demand for the entrepreneur to grow the business.

*Response:* DHS believes that both the proposed rule and this final rule sufficiently explain how an applicant may establish that he or she is "well-positioned" to grow the start-up entity. An applicant may generally establish that he or she is well-positioned to advance the entity's business by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial grant of parole, and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. Such an applicant cannot be a mere investor. The applicant must be central to the entity's business and well-positioned to actively assist in the growth of that business, such that his or her presence would help the entity create jobs, spur research and development, or provide other benefits to the United States. Whether an applicant has an "active and central

role," and therefore is well-positioned to advance the entity's business, will be determined based on the totality of the evidence provided on a case-by-case basis. Such evidence may include:

• Letters from relevant government agencies, qualified investors, or established business associations with an understanding of the applicant's knowledge, skills or experience that would advance the entity's business;

• news articles or other similar evidence indicating that the applicant has received significant attention and recognition;

• documentation showing that the applicant or entity has been recently invited to participate in, is currently participating in, or has graduated from one or more established and reputable start-up accelerators;

• documentation showing that the applicant has played an active and central role in the success of prior start-up or other relevant business entities;

• degrees or other documentation indicating that the applicant has knowledge, skills, or experience that would significantly advance the entity's business;

• documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise;

• a position description of the applicant's role in the operations of the company; and

• any other relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States.

Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain applicants meet the "well-positioned" requirement. The burden of proof remains with the applicant.

*Comment:* One commenter representing a group of technology companies recommended that DHS add the term "intellectual property" as a metric that an adjudicator would take into consideration when determining the "active and central role" that the international entrepreneur performs in the organization. The commenter noted that it had several member companies that have non-citizen inventors on a key patent application, and have had core intellectual property developed by non-citizens, often within the university environment. In many of these situations, the non-citizen inventors were unable to obtain work

authorization and join the emerging startup company, resulting in loss of key technical ability, delay, and additional cost for the startup company to achieve market success. The commenter believes this rule could alleviate this investment risk.

*Response:* As discussed above, an applicant for parole under this rule may provide any relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States. Such evidence includes documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise. DHS will consider such evidence to determine whether the applicant performs, or will perform, an active and central role in the start-up entity.

Given the breadth of evidence that can already be considered in these determinations, DHS declines to amend the definition of "entrepreneur" in 8 CFR 212.19(a)(1) to include some consideration of "intellectual property" as a specific metric to determine if the applicant will have an active and central role in the start-up entity. DHS believes it is appropriate to allow for sufficient flexibility in the definition for adjudicators to evaluate each case on its own merits. Given the considerable range of entrepreneurial ventures that might form the basis for an application for parole under this rule, DHS believes that such flexibility is important to ensure that cutting edge industries or groundbreaking ventures are not precluded from consideration simply because of an overly rigid or narrow definition of "entrepreneur."

*Comment:* One commenter noted that DHS's inclusion of criteria in section IV.B.1. of the NPRM, "Recent Formation of a Start-Up Entity," is reminiscent of criteria used in the O–1 nonimmigrant classification for individuals with extraordinary ability, except for the focus on entrepreneurial endeavors. The commenter especially welcomed the final "catch-all" that referenced "any other relevant, probative, and credible evidence indicating the entity's potential for growth." The commenter asserted that as it pertains to "newspaper articles," one of the major difficulties of the O–1 petition process is the lack of awareness by adjudicators of tech-press publications, such as Recode or TechCrunch. The commenter explained that coverage in these publications is very valuable to startups, and forcing startups to garner traditional media coverage in publications like the *Wall Street Journal* or the *New York*

*Times* is often counterproductive towards the entrepreneur's success.

*Response:* DHS agrees with the commenter that the list of evidence provided in the preamble to the NPRM and this final rule provides an illustrative, non-exhaustive list of the types of evidence that might be submitted by an applicant to establish that he or she meets the definition of entrepreneur in 8 CFR 212.19(a)(1). Applicants may submit any relevant, probative and credible evidence that demonstrates the entity's potential for growth, including tech-press publications.

*Comment:* One commenter recommended broadening the proposed requirement that the parolee play a central role in operations. The commenter noted that the DHS November 2014 memorandum,[12] which initially directed USCIS to develop a proposed rule under the Secretary's parole authority, refers to researchers, not just managers or founders. The commenter stated that in the technology world, "technical founders" are key employees who lead the research and development phase, and recommended that these technical founders be included even if they are not managing overall operations. To keep this expansion targeted, the commenter recommended requiring a technical founder to have an advanced degree in a STEM field from a U.S. institution of higher education.

*Response:* DHS agrees that "technical founders" are often key employees who play an important role in the development and success of a start-up entity. DHS disagrees, however, with the commenter's assertion that the definition of entrepreneur in 8 CFR 212.19(a)(1) does not sufficiently encompass technical founders. Technical founders can perform a central and active role in the operations of their start-up entity, and may be well-positioned, due to their knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. The definition of "entrepreneur" is not limited to those individuals who manage the overall operations of the start-up entity. Thus, DHS believes it is unnecessary to broaden the definition of "entrepreneur" in the way the commenter suggests.

*Comment:* One commenter suggested that the rule should provide a clear-cut definition of a typical entrepreneur.

This commenter asserted that the draft rule does not adequately account for situations where a typical entrepreneur partially qualifies or does not qualify for parole, but nevertheless seeks to start a business in the United States. The commenter stated that USCIS and the White House should plan to have a separate case study team to evaluate each application.

*Response:* DHS believes that the rule provides a reasonable and clear definition of an entrepreneur. This rule is not designed or intended to provide parole to everyone who seeks to be an entrepreneur, but will instead provide a framework for case-by-case determinations based upon specified criteria for determining that a grant of parole in this context provides a significant public benefit. The framework in this rule is consistent with DHS's parole authority under INA section 212(a)(5), 8 U.S.C. 1182(a)(5), and is based on the statutory authorization to provide parole for significant public benefit. Each application for parole under this rule will be adjudicated by an Immigration Services Officer trained on the requirements for significant public benefit parole under 8 CFR 212.19. DHS believes that a separate case-study team could unnecessarily complicate and delay adjudications and declines to adopt the commenter's suggestion.

3. Definition of Start-Up Entity— "Recently-Formed" and the 3-year Limitation

*Comment:* Several commenters expressed concern with the definition of "start-up entity" and the requirement that an entity, in order to satisfy that definition, must have been created within the 3 years immediately preceding the parole request filing date. A few individual commenters said that the 3-year limitation could be inadequate in certain situations, such as when investing in an inactive business with other co-founders to initiate the start-up, or when investing in high-priority areas like healthcare, biotechnology, and clean energy that have long gestation times. A couple of individual commenters said that the 3-year limitation may not be necessary given the other, more stringent requirements in the proposed rule. Some commenters provided the following recommendations relating to the 3-year limitation: Eliminate the limitation, lengthen the period to 5 years, lengthen the period to 10 years, or include a case-by-case provision allowing for submissions that may satisfy the definition of "start-up entity." One commenter recommended

that "recently formed" should include entities formed within the last 10 years, and also requested that where applicable, DHS accept alternative evidence to determine and establish that the company is a "start-up" entity, such as letters of attestation from investors, industry experts within a particular niche field, and government agencies that speak to the average growth cycle of a new company within a particular area. A few commenters stated that the 3-year limitation was appropriate.

*Response:* In response to these comments, DHS revised proposed 8 CFR 212.19(a)(2) and the definition of "start-up entity" in this final rule to require that the entity must have been formed within the 5 years immediately preceding the filing of the initial parole application, rather than 3 years as proposed. DHS believes that this definition appropriately reflects that some entities, particularly given the industry in which the entity operates, may require a longer gestation time before receiving substantial investment, grants, or awards. This 5-year limitation continues to reflect the Department's intention for parole under this final rule: To incentivize and support the creation and growth of new businesses in the United States, so that the country may benefit from their substantial potential for rapid growth and job creation. DHS recognizes that the term "start-up" is usually used to refer to entities in early stages of development, including various financing rounds used to raise capital and expand the new business, but the term "goes beyond a company just getting off the ground." [13] Limiting the definition of "start-up" in this proposed rule to entities that are less than 5 years old at the time the parole application is filed is a reasonable way to help ensure that the entrepreneur's entity is the type of new business likely to experience rapid growth and job creation, while still allowing a reasonable amount of time for the entrepreneur to form the business and obtain qualifying levels of investor financing (which may occur in several rounds) or government grants or awards.

4. Other Comments on the Definition of Start-Up Entity

*Comment:* One commenter said that formation should be defined to be either the creation of a legal entity under which the activities of the business

---

[12] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https:// www.dhs.gov/sites/default/files/publications/14_ 1120_memo_business_actions.pdf.*

[13] U.S. Small Business Administration, Startups & High Growth Businesses, available at *https:// www.sba.gov/content/startups-high-growth-businesses* ("In the world of business, the word 'startup' goes beyond a company just getting off the ground.").

would be conducted or the effective date of an agreement between the entrepreneur and an existing business to launch the business activities as a start-up, branch, department, subsidiary, or other activity of an existing business entity. Another commenter suggested that DHS consider restructuring (*e.g.*, use successor-in-interest rules) and other pivots (in terms of changes in the service or product, as well as markets) during the 3-year period immediately preceding the filing of the parole application and at time of application for re-parole.

*Response:* DHS appreciates the commenters' suggestions and notes that recent formation within the definition of "start-up entity" in 8 CFR 212.19(a)(2) is already limited to the creation of the entity within the 5 years immediately preceding the filing date of the alien's initial parole request. DHS further declines to amend 8 CFR 212.19(a)(2) to broaden what may be considered "recently formed" to include the effective date of an agreement between the entrepreneur and an existing business to launch new business activities, restructurings and other pivots. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter suggested that start-up entities under this rule should be limited to businesses that fill a need that is currently not being fulfilled in the United States.

*Response:* One of the goals of this final rule is to increase and enhance entrepreneurship, innovation, and job creation in the United States; and, under this rule, evidence regarding the expected contributions of a start-up entity will be considered in determining whether to parole an individual into the United States. A successful start-up entity, particularly one with high-growth potential, will fulfill an identified business need. For example, the entrepreneur may be starting the business to alter an existing industry through innovative products or processes, innovative and more efficient methods of production, or cutting-edge research and development to expand an existing market or industry. It is also unclear from the commenter's suggestion how "business need" would be defined, and DHS believes that attempting to do so in this rule could result in an overly restrictive definition that fails to account for future innovation, would be unnecessarily rigid, and would lessen the rule's ability

to retain and attract international entrepreneurs who will provide a significant public benefit to the United States.

*Comment:* An individual commenter requested that staffing companies be included as a type of startup.

*Response:* In this final rule, and for purposes of parole under this program, DHS defines a "start-up entity" as a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(a)(2). The rule requires that entities meet certain specified criteria for obtaining parole, but the rule does not specifically exclude staffing companies from participating if they otherwise meet these criteria. DHS therefore will not revise the definition of start-up entity in this rule as requested by the commenter.

*Comment:* One commenter asserted that the rule fails to specify how a start-up entity can demonstrate that it has "lawfully done business" or "has substantial potential for rapid growth and job creation." The commenter recommended revising the definition to more closely align with 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H) by instead requiring evidence that the entity is or will be engaged in the regular, systematic, and continuous provision of goods or services. This commenter suggested that the submission of expert witness testimony by a reputable third party, such as a recognized professor or leader in the start-up entity's proposed field, should be given deference and treated under the final rule as a rebuttable presumption establishing that the start-up "has substantial potential for rapid growth and job creation."

*Response:* DHS declines to adopt the commenter's suggested changes in this final rule. DHS believes that an applicant can demonstrate the start-up entity's lawful business activities through many different means and will keep this requirement flexible to account for the many differences among start-up entities. Such evidence might include, but is not limited to, business permits, equipment purchased or rented, contracts for products or services, invoices, licensing agreements, federal tax returns, sales tax filings, and evidence of marketing efforts.

DHS believes that the rule provides a clear framework for establishing that a start-up entity has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(b)(2)(ii) and (iii). An applicant generally must satisfy the criteria in 8 CFR 212.19(b)(2)(ii) to be

considered for parole under this rule. An applicant who only partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii) may still be eligible for consideration for parole under this rule if the applicant provides additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS recognizes that the rule does not provide specific evidence that must be submitted in order to satisfy the alternative criteria in 8 CFR 212.19(b)(2)(iii). DHS believes that providing a specific set of evidence would have the unintended effect of narrowing a provision that was designed to allow for the submission of any evidence that the applicant believes may establish the substantial potential of his or her start-up entity, recognizing that such evidence may vary depending on the nature of the business and the industry in which it operates. DHS believes that it is important to retain criteria that provide flexibility to the applicant and DHS. Such flexibility is consistent with DHS's parole authority and the case-by-case nature of each parole determination as required by statute. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

DHS does not believe that the rule should be revised to align with 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H). The requirements set forth in 8 CFR 214.2(l)(1)(ii)(G)(*2*) and (l)(1)(ii)(H) relate specifically to eligibility for classification as an L–1 nonimmigrant and are not necessarily relevant to the requirements set forth in this rule, which are specifically designed to provide the framework by which USCIS will determine whether to grant parole to certain individuals for significant public benefit. Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain entities have substantial potential for rapid growth and job creation. The burden of proof remains with the applicant.

5. Qualified Government Award or Grant

*Comment:* One commenter stated that the rule's grant-based criteria for consideration focused too narrowly on awards made by government entities The commenter noted that entrepreneurs seek grants from a variety of sources and that funding from non-profits or not-for-profit entities (such as U.S. universities) can be significant sources of start-up capital. The

commenter requested that the rule be revised to allow entrepreneurs of non-profit start-up entities to qualify for parole under this program based on the receipt of charitable grants.

*Response:* DHS appreciates the commenter's suggestion, but declines to adopt the suggestion in this final rule to include charitable grants as a type of qualifying grant or award under 8 CFR 212.19(a)(3). DHS believes, given the nature of charitable grants, that they would not present the same level of validation regarding the entity's high-growth potential as would a grant or award from a Federal, State, or local government entity with expertise in economic development, research and development, or job creation. Since the validating quality of a substantial government grant or award is an important factor DHS will rely upon to determine if the entrepreneur will provide a significant public benefit to the United States, and since that same validating quality does not necessarily extend to charitable grants or awards, DHS declines to adopt the commenter's suggestion. DHS notes, however, that nothing in this final rule prohibits entrepreneurs from accepting charitable grants or pointing to such funding as evidence that parole would be justified and that they merit a favorable exercise of discretion. Moreover, given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter noted that the definition of qualified government award or grant and the phrase "federal, state, or local government entity," are ambiguous as to whether an entrepreneur may qualify under the rule based on a grant by a foreign government. According to the commenter, the rule does not explicitly state that the "federal, state, or local government entity" needs to be restricted to entities in the United States. The commenter encouraged USCIS to adopt a broad approach in determining which kinds of grants may qualify and to allow entrepreneurs to qualify if their start-up entity attracts substantial foreign government financing. The commenter also suggested that USCIS and CBP should again emphasize that parole may be discretionarily denied in cases that could risk national security or impair international relations.

*Response:* While DHS always maintains the ability to deny parole in its discretion, including in those cases where there may be a national security

or foreign relations concerns, DHS declines to expand the definition of qualified government grant or award to include grants or awards from a foreign governmental entity. To eliminate potential confusion, DHS is revising the definition as proposed to specifically exclude foreign government entities. The receipt of significant funding from certain U.S. federal, state or local government entities is an important factor that DHS will weigh in determining if the entrepreneur will provide a significant public benefit to the United States. DHS believes that significant funding from certain U.S. federal, state or local governmental entities is a strong indicator of a start-up entity's substantial potential for rapid growth, including through enhancing innovation, generating revenue, obtaining significant additional investments of capital, and creating jobs. Such government entities regularly evaluate the potential of U.S. businesses, so the choice to provide a significant award or grant to a particular start-up entity can be a compelling indicator of that start-up's substantial potential for rapid growth and job creation. Because these government entities are formed to serve the U.S. public, their choice to fund a particular business may be more indicative than that of a foreign government as to whether the business's operations would provide a significant public benefit in the United States. DHS believes that the reliability and weight of the independent assessment performed by certain U.S. federal, state or local governmental entities before issuing a grant or award does not necessarily extend to grants or awards made by foreign governmental entities. DHS therefore declines to adopt the commenter's suggestion to revise the rule to include funding from foreign governmental entities as one of the criteria in 8 CFR 212.19(a)(3).

6. Qualified Investment

*Comment:* Some commenters suggested that DHS define "capital" broadly to include cash, cash equivalents, secured or unsecured loan proceeds, payments for or obligations under binding leases, the value of goods, equipment, and intangible property such as patent rights, trademarks, trade secrets, and distinctive "know how."

*Response:* DHS declines to adopt the commenters' suggestions. "Qualified investment" as a general criterion for parole is limited to a specific monetary investment in the form of equity or convertible debt, to ensure that the investment is easily valued as well as

significant in nature. This promotes fair and efficient administration of the process under this rule, while also ensuring the integrity of that process. In addition, equity investments and convertible debt investments both involve a distinctive level of expert review, due diligence, and oversight. For example, according to the Small Business Administration, venture capital firms and angel investors typically review a business plan and evaluate a start-up's management team, market, products and services, operating history, corporate governance documents, and financial statements before making an equity investment.[14] Such investment generally also involves active monitoring via board participation, strategic marketing, governance, and capital structure.[15] While non-monetary contributions made to a start-up entity may not be considered as a qualified investment for purposes of the general criteria of a parole determination under this rule, the rule does not prohibit such contributions and they may be considered as evidence under the alternative criteria at 8 CFR 212.19(b)(2)(iii) and (c)(2)(iii) to establish that the start-up entity has, or continues to have, substantial potential for rapid growth and job creation.

*Comment:* One commenter stated that the requirement that start-up capital must be equity or convertible debt may be too limiting given the venture finance markets today. The commenter said that other investment instruments are commonly used by sophisticated market participants, and that such investments might not technically be considered equity or convertible debt even though they are bona fide capital investments. The commenter recommended that the definition be made "future-proof" by creating a catch-all for other investment instruments that are convertible, exchangeable, or exercisable for equity in the start-up, regardless of the name of the investment instrument.

*Response:* DHS understands that the regulatory text may not capture all possible future investment instruments and has amended the regulatory text to capture other commonly used convertible securities now and in the future. The final rule defines "qualified investment" as an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up

---

[14] Venture Capital, *https://www.sba.gov/starting-business/finance-your-business/venture-capital/venture-capital.*

[15] *Id.*

entity that is a purchase from such entity of its equity, convertible debt or other security convertible into its equity commonly used in financing transactions within such entity's industry. DHS believes that this definition, in practice, will apply to other securities convertible into equity (other than convertible debt) that are or become commonly used within the start-up entity's industry, and DHS may issue additional guidance in the future regarding such securities as necessary. Given that this program is new and complex, DHS has decided to take an incremental approach and will consider potential modifications in the future after it is able to assess implementation of the rule and its impact on operational resources.

### 7. Qualified Investor

*Comment:* Several commenters, including associations and individual commenters, stated that the proposed "qualified investor" definition is more stringent than the "accredited investor" definition adopted by the Securities and Exchange Commission (SEC). Several commenters stated that many angel investors, especially newer investment firms and angels, would not be considered "qualified investors" under this rule. One of these commenters suggested revising the definition of a qualified investor using the guidelines set forth by AngelList, which requires all syndicate leads on their site to have registered as accredited investors, to have made at least two direct investments in technology start-ups, and to have attracted additional funding beyond the syndicate lead. Some commenters generally stated that many potentially high-growth firms started by international entrepreneurs will not qualify for parole or re-parole because the business did not receive an investment from a qualified U.S. investor, and encouraged the rule to be more flexible to allow for additional sources of capital.

*Response:* In response to comments received, DHS is revising proposed 8 CFR 212.19(a)(5), which provides the definition of a qualified investor. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years, the individual or organization made investments in start-up entities in exchange for equity or convertible debt or other security convertible into its equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS has

removed the proposed requirement that the total investment amount be made in 3 separate calendar years and, consistent with its analysis of relevant investment data, reduced the amount from $1,000,000 to $600,000.[16] DHS is also making revisions consistent with the change to the qualified investment definition by adding "other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry." DHS agrees with commenters that the qualified investor requirement is more stringent than the SEC "accredited investor" definition, but believes the additional parameters for qualified investors under the rule are appropriate. The "accredited investor" definition for SEC purposes is focused on the investing entity's assets or the individual investor's net worth or annual income,[17] not on the investor's

---

[16] To arrive at this level, DHS relied on the $250,000 median seed round for active firms that successfully exited accelerators, as is described more fully in in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule notice. Second, DHS multiplied this figure by 2.4, which is an estimate of the average number of investments made over a five-year period by qualified investors. DHS arrived at the figure for average investments over five years using the following methodology. DHS used the "investor graph" section of the Seed DB data set to extract investment round information for investors that have invested in various startup accelerators' portfolio companies. The search engine is not set up in a manner in which random sampling can be done, so DHS obtained data for nine accelerators chosen from the 2016 Seed Accelerator Rankings project (SARP), the report of which is found at: *http://seedrankings.com/pdf/ sarp_2016_accelerator_rankings.pdf*. SARP ranks accelerators via a composite scoring system based on various metrics, including funding value averages and exit performance, and produces a list of the top-rated accelerators, although there is no pre-set number of accelerators that can appear in the ranking list each year. In the 2016 SARP report there were twenty-three Seed Accelerators ranked out of a total of 160 that the program tracks. DHS was able to extract investment round data from nine of the twenty-three SARP ranked accelerators, for a total of about 3,600 individual investment rounds. Next, DHS grouped these rounds for the five-year period October 2011–November 2016 to result in 3,085 records. Next, DHS removed duplicates to parse the list into records for unique investor names. As a result, 1,329 unique investors remained. Dividing the 3,085 by 1,329 investors yields an average of 2.4, which DHS used as a reasonable estimate of the average number of investments that qualified investors made in a five year period, at least for the specific accelerators involved. DHS notes that there are several caveats to this analysis. First, the data only includes investments made through accelerators. If non-accelerator investments were included, for which DHS could not obtain data, the average would likely be higher. Second, some rounds did not include an amount and some investor names appeared with variations. DHS conducted several data runs based on different filtering techniques and generally the range of average investments was between 2.32 and 2.5.

[17] 17 CFR 230.501(a).

---

track record of successfully investing in start-up entities. An investor's successful track record of investing in start-up entities provides an important measure of objective validation that DHS will rely upon as part of evaluating whether granting parole to a particular individual would provide a significant public benefit.

DHS also declines to adopt the investor track record criteria associated with AngelList's requirements, as DHS believes that the past success of qualified investors can be demonstrated sufficiently by utilizing the criteria set forth in the final rule. DHS has maintained the requirements under 8 CFR 212.19(a)(5)(ii) as evidence that the investor has had previous successful investments, which are similar to certain criteria for a start-up entity to demonstrate eligibility for re-parole under this rule. *See* final 8 CFR 212.19(a)(5)(ii).

*Comment:* A joint submission from an advocacy group and a non-profit organization proposed that DHS create a "whitelist" of qualified investors and modify the rule such that any start-up receiving an investment from a whitelisted investor proceed through an expedited review process. The commenter said that this would both streamline the parole process and diminish the burden on adjudicators to analyze the merits of often complicated technology companies. The commenter said that the qualification process for such an investor whitelist could be significantly more robust than the rule's proposed definition of "qualified investor" and should be updated on an annual or biannual basis. Another joint submission suggested the creation of a "Known Qualified Investor" program, similar to the "Known Employer" pilot program recently created by DHS in a different context, to assist the overall adjudication process.

*Response:* DHS appreciates the commenters' suggestions. The Known Employer program referenced by the commenter remains in a pilot stage. DHS will assess the effectiveness of the Known Employer program after the pilot is complete, and then determine whether the program should be made permanent. If the program is successful, DHS will assess whether it may be expanded to other adjudication contexts. Committing to use a similar program in the context of this rulemaking would thus be premature. DHS also declines to adopt the commenters' suggestion to create a "whitelist of qualified investors" and an expedited process for applications based on investment from such investors at this time. Given that this is a new and

Venezuela AR_000029

complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after the Department has assessed the implementation the process and its impact on operational resources.

## 8. Evidence Required To Establish Qualified Investor

*Comment:* Several commenters expressed concern about the burden of proving that investors have met the revenue and job creation criteria in the definition of qualified investor, which the commenters said could prevent investors from participating. One commenter stated that early-stage investors usually do not keep records of employees or the revenues of their portfolio companies, and that those companies would not be inclined to respond to paperwork requests from their investors that do not relate to their own success. Another commenter said that some investors do not make their investments known publicly and the vast majority of investors do not make public their returns (let alone the number of jobs created). Another commenter said that the rule should only require evidence of publicly available information, concluding that it would be too invasive to require disclosure of confidential employee data or other confidential financial information of third-party companies that have no ties to the start-up entity related to the parole applicant. A few commenters requested that DHS allow venture capitalists, accelerators, and incubators to register so that they would not be required to produce the evidence of their qualifications with each parole application.

*Response:* DHS does not believe that providing evidence of revenues generated or jobs created by entities in which the investor previously invested is overly burdensome or would require the investor to publicly reveal otherwise sensitive information. DHS believes, given the significance of an investor's track record of successful investment in start-ups to the determination of significant public benefit, that the need for this evidence outweighs the potential burden on the applicant and investor to compile and submit it. However, as DHS continues to assess the implementation of the process once the rule is final, the Department will consider potential ways to modify the process given the kinds of issues raised by these comments.

## 9. Foreign Funding/Investment

*Comment:* Several commenters provided input on the proposed requirement that "qualified investor"

funds must come from either U.S. citizens, lawful permanent residents, or entities that are majority owned and controlled by U.S. citizens or lawful permanent residents. Nearly all commenters on this topic expressed concerns about this requirement as a major limiting factor of the rule. Some commenters focused on the potential economic benefits of broadening the definition of "qualified investor" to include foreign investment. These commenters asserted that it would be economically beneficial to allow non-U.S. investments, as there are many experienced investors from outside the United States that could bring direct foreign investment into the country and create jobs. Another commenter stated that, by limiting qualification to domestic investors, DHS is foregoing a critical opportunity to attract foreign entrepreneurs and their investments.

*Response:* DHS disagrees with the assertion that this rule precludes or otherwise discourages foreign investment. This rule does not preclude entrepreneurs from seeking and obtaining investment from any number of sources, whether that is foreign investment, personal funds, or funds from friends and family. This rule, however, does limit the types of investment that will be considered by DHS as a qualifying investment for purpose of determining if the entrepreneur and his or her start-up entity meet the requirements for consideration for parole set out in 8 CFR 212.19. DHS believes it is important to limit the type and source of investment that will be considered a qualifying investment, since the investment is meant to serve in part as an objective way to help ensure and validate that the start-up entity's activities will benefit the United States. DHS does not believe investments from foreign sources— which are significantly more difficult for DHS to evaluate for legitimacy and screen for indicators of fraud and abuse—would provide the same measure of objective validation.

*Comment:* Multiple commenters stated that eligibility criteria should focus exclusively on the location of the start-up entity and its related growth and job creation, not on the citizenship and residence of the investor. Some commenters stated that excluding foreign investors from the definition of "qualified investors" is unduly limiting, because many high-potential international entrepreneurs might not have a pre-existing relationship with a U.S.-based investor. Commenters state that such entrepreneurs, especially if living in other countries, would have difficulty attracting investment from

U.S. investors and becoming eligible for parole under this rule. Another commenter cited data concluding that foreign entrepreneurs currently outside of the United States are at a particular disadvantage, as they lack access to U.S.-based angel and venture funding.

*Response:* DHS agrees that the U.S. location of the start-up entity and its related growth and job creation should be a critical component of eligibility under this rule in order to help ensure the exercise of parole is justified by significant public benefit to the United States. DHS believes, however, that the "qualifying investor" must also be a U.S. citizen or lawful permanent resident or an entity that is majority owned or controlled by U.S. citizens or lawful permanent residents. DHS can evaluate more rapidly, precisely, and effectively whether these investors have an established track record of prior investments, in part due to greater access to relevant and reliable records. Such investors will also be subject to the laws of the United States, which provides some additional assurance that the entrepreneurs they back will provide a significant public benefit to the United States.

DHS is not prohibiting foreign investors from investing in the entrepreneur's start-up entity, but rather is simply limiting those investors that can serve as "qualified investors" for purposes of establishing the entrepreneur's eligibility for parole under this rule. DHS anticipates that entrepreneurs living outside the United States will be able to demonstrate eligibility for parole consideration under this rule, whether based on investment from U.S. investors, grants or awards from certain U.S. Government entities, or a mixture of alternative criteria. For all the reasons above, the definition of "qualified investor" will help DHS manage an efficient process for adjudicating requests under this rule while appropriately screening for potential fraud or abuse and ensuring that each grant of parole is justified by significant public benefit to the United States.

*Comment:* Other commenters focused on specific ways that DHS might allow applicants to use foreign investment to establish their eligibility for parole consideration, including by limiting such investment to the entrepreneur's country of origin, or to only those foreign investors who do not present a national security concern. A few commenters asserted that DHS has the capability to verify the bona fides of foreign investors through, for example, the following mechanisms: Making inquiries through U.S. embassy officials,

requesting resumes and the investment history for foreign angel investors, requesting similar documentation used by EB–5 petitioners to establish their lawful source of funds, and consulting publicly available data on reputable foreign investors with a history of successful investments in various countries. Some commenters provided suggestions for alternative or revised definitions relating to foreign investors that could remain easily verifiable by DHS, with the burden being on the investor, including (1) professionally managed funds with at least $10 million under management and registered with the local jurisdiction, and (2) angel investors that have made credible investments in U.S. companies under the same standards as U.S. ''qualified investors.'' Finally, an individual commenter expressed concerns that even investments from U.S. sources could be suspect, and could serve as a pass-through for ineligible investors such as the entrepreneur's family or foreign nationals.

*Response:* While DHS understands that international entrepreneurs can attract legitimate investment capital from non-U.S. sources, DHS believes—as explained at greater length above—that it is appropriate and important to require that a ''qualified investment'' come from a U.S. source as one of the general criteria to establish that the start-up entity has the substantial potential for rapid growth and job creation. DHS is prepared to monitor the bona fide nature of such U.S.-based investments, as described in greater detail above. Moreover, the rule neither precludes an applicant from securing funding from non-U.S. sources nor precludes such funding from being considered, non-exclusively, under the alternative criteria at 8 CFR 212.19(b)(2)(iii) or (c)(2)(iii). Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

10. Self-Funding/''Bootstrapping''

*Comment:* Several commenters argued that entrepreneurs should be able to demonstrate eligibility for parole under this rule not only through funding from U.S. investors or U.S. Government entities, but also through self-financing (known as ''bootstrapping''). One commenter noted that many highly successful start-up founders initially grew their companies through bootstrapping, not by raising capital from external investors.

*Response:* DHS declines to expand the definition of ''qualified investment'' to include self-funding by the entrepreneur applicant. DHS believes that this definition should include only those investors who have a history of making similar investments over a 5-year period and who can demonstrate that at least two of the entities receiving such investments have subsequently experienced significant growth in revenue or job creation. *See* final 8 CFR 212.19(a)(5). DHS believes that the investment of a substantial amount of capital by qualified investors in an entrepreneur's start-up entity can serve as a strong indication of the entity's substantial and demonstrated potential for rapid business growth and job creation. Self-funding, while a rational financing strategy for many entrepreneurs, does not provide the same objective and external validation that DHS requires in assessing whether granting parole to an individual is justified based on significant public benefit.

11. Other Comments on Qualified Investors

a. Crowdfunding

*Comment:* Several commenters stated that the rule should allow crowdfunding as a qualified investment. These commenters noted that entrepreneurs have raised over a billion dollars in investments through various types of crowdfunding platforms, which serve to broaden the base of available investors and demonstrate a venture's potential growth. Commenters also cited the Jumpstart Our Business Startups Act (JOBS Act) of 2012, which created a national regulatory framework for securities-based crowdfunding platforms in particular, along with public statements suggesting that securities-based crowdfunding is recognized by Congress and the Administration as a valuable and increasingly-used investment tool. One commenter also stated that allowing the use of crowdfunding platforms would increase the pool of potential applicants for entrepreneurial parole and could provide a workable intermediary for foreign investment in eligible start-up entities. One commenter suggested potential requirements that would facilitate the use of crowdfunding investment sources, such as setting a threshold amount for eligible crowdfunding investments and confirming that such investments have been deposited in the start-up entity's bank account after the end of the crowdfunding campaign.

*Response:* DHS appreciates the commenters' suggestions. Investments made in a start-up entity through an SEC-compliant intermediary, such as an SEC-compliant crowdfunding platform, will be treated no differently for purposes of this rule than had the investments been made directly. In order to promote the integrity of adjudications under this rule, DHS declines to make changes to the definition of ''qualified investor'' that would effectively treat funds generated through crowdfunding platforms as a different class of eligible investment. DHS notes, however, that evidence of a successful donation-based or securities-based crowdfunding campaign could be provided under the rule's alternative eligibility criteria.

b. Established U.S. Investors

*Comment:* One commenter questioned the requirement that capital be received ''from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.'' The commenter stated that the requirement increases the relative bargaining power of established investors working with entrepreneurs seeking parole under this rule, while diminishing that of new venture capital firms, new angel investors, and new start-up accelerators. The commenter stated that if it is kept in its current form, the rule is not clear whether an investment from a non-established investor would jeopardize the parole eligibility of an entrepreneur whose start-up entity is also funded by established investors.

*Response:* The definition of ''qualified investor, including the requirement that an investor have a history of substantial investment in successful start-up entities, is intended to help ensure that such investors are bona fide and not concealing fraud or other illicit activity—and thus protect the integrity of the parole process under this rule. The definition is also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit.

DHS emphasizes that the rule does not prohibit investment from U.S. investors who do not have an established track record of substantial investment in start-up entities under the rule's definition of ''qualified investor.'' Any investment from an investor who is not a qualified investor, however, will not count toward the minimum investment criteria associated with the initial parole period or re-parole period. DHS will, of course, monitor all

elements of an application for evidence of fraud or other illegal or illicit activities. It will also assess the totality of the evidence in evaluating whether granting parole to an entrepreneur is justified by significant public benefit.

### c. Approved Regional Centers

*Comment:* One commenter requested that USCIS-approved Regional Centers (based on an approved Form I–924) be allowed to qualify as established U.S. investors. The commenter stated that investment by a Regional Center in a U.S. start-up entity would be a natural extension of what Regional Centers already do, since Regional Centers pool investment for qualified EB–5 visa projects.

*Response:* DHS believes it is important to limit qualifying investors to those who have an established record of successful investments in start-up entities. DHS believes that such a record would include, during the 5-year period immediately preceding the filing of the parole application, one or more investments in other start-up entities in exchange for equity or convertible debt comprising a total of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS will require monetary commitments, rather than non-monetary commitments such as credit for in-kind value (*e.g.,* credit for services), given the difficulty of valuing such commitments and the potential for fraud and abuse. The applicant would also need to show that, subsequent to such investment by the investor, at least 2 such entities each created at least 5 qualified jobs or achieved at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. *See* final 8 CFR 212.19(a)(5)(ii).

As described in greater detail above, these criteria are intended to ensure that investors are bona fide and thus protect the integrity of the parole process under this rule. They are also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit. DHS declines to adopt a special provision for regional centers approved to participate in the EB–5 visa program. Although such centers are not categorically excluded from the definition of "qualified investor" under this rule, they would need to meet all the same criteria as any other qualified investor.

### 12. Qualified Jobs

### a. Qualifying Employee

*Comments:* Two commenters recommended that DHS broaden the definition of the term "qualifying employee." One commenter stated that the term should include any individual authorized to work in the United States, regardless of immigration status, to avoid creating a conflict for employers who are prohibited from discriminating based on an individual's citizenship or immigration status. Another commenter advocated for the inclusion of independent contractors in the definition of qualifying employee.

*Response:* DHS declines to expand the definition of qualifying employee, which already includes a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. *See* final 8 CFR 212.12(a)(7). DHS believes that creating jobs for these individuals is more likely to provide a significant public benefit given their stronger ties to the United States. Similarly, DHS believes that entrepreneurs and start-up entities that create positions for employees are more likely to provide a significant public benefit than those who rely only on arrangements with independent contractors. Such arrangements would generally have a weaker nexus to the start-up entity, may not have been created as a direct result of the start-up entity's activities, and could be more difficult to validate. Nothing in this rule either supersedes or conflicts with nondiscrimination laws enacted under the Immigration Reform and Control Act (IRCA).[18] Under existing law, it would generally be an unfair immigration-related employment practice for an entity to discriminate against someone authorized to work in the United States because of that person's national origin or, in the case of a "protected individual," citizenship status. *See* 8 U.S.C. 1324b(a) (generally prohibiting such practices, subject to specific exceptions, and defining "protected individual" to include U.S. citizens, lawful permanent residents, and certain other immigrants). This rule does not permit any such otherwise prohibited practices. Instead, it uses the creation of jobs for U.S. citizens, permanent residents, and other authorized immigrants as one indication of the

benefit created by an entrepreneur's start-up entity.[19]

### b. Full-Time Employment

*Comments:* Several commenters said that the rule should have a more flexible definition of "full-time employment." One commenter said that the definition of the term should not require the job to be filled for at least a year and should include job-sharing arrangements. Another commenter recommended that the definition of full-time employment include combinations of part-time positions.

*Response:* DHS declines to expand the definition of full-time employment to include jobs filled for less than a year by a qualifying employee, job-sharing arrangements, and combinations of part-time jobs. DHS believes that the creation of long-term and full-time positions is a more reliable indicator that an entrepreneur's start-up entity is continuing to yield significant public benefit. Jobs filled for less than a year could be temporary or seasonal, thus limiting the duration and impact of the benefit. Additionally, including job-sharing or combinations of part-time positions could significantly complicate adjudications. The final rule, moreover, already reduces by half the threshold number of jobs to qualify for a re-parole period, making it all the more reasonable to require that each of such jobs be full-time positions as part of the criteria for ensuring that granting parole to an international entrepreneur is justified by significant public benefit.[20]

### 13. Material Change

*Comment:* One commenter recommended that the final rule expressly exempt from the definition of "material change" transitions that are typical within start-ups, such as a company's (1) pivoting its products or services; (2) bringing on board a significant round of funding that could dilute the entrepreneur's ownership interest; (3) changing the role of a founder to meet the needs of the growing company; or (4) by virtue of a foreseeable stock or asset acquisition, executing a merger into or with a related or unrelated entity, or some other form of corporate restructuring. A few

---

[18] Public Law 99–603 section 102, 100 Stat. 3359 (Nov. 6, 1986); INA section 274B.

[19] It is important to note that job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

[20] As explained earlier, job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

**5254** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

commenters recommended that DHS clarify what constitutes a "material change" given the rapidly evolving nature of start-ups.

*Response:* DHS appreciates the concerns expressed by commenters regarding the material change definition in the NPRM. This final rule reflects changes that help clarify what constitutes a material change, with the understanding that start-up entities are likely to experience a variety of transitions as part of their legitimate development and growth. DHS disagrees, however, that all of the events listed by commenters should be specifically exempted from the definition of material change. Some changes to the start-up entity can clearly impact the determination of whether the entrepreneur provides, or will continue to provide, a significant public benefit to the United States. It is essential to the rule's integrity that such material changes are clearly defined and reported to DHS. In the final rule, DHS has outlined those changes that DHS believes are critical to the continuing eligibility of the entrepreneur to be granted parole based on a significant public benefit to the United States. Specifically, the final rule maintains that the following changes are material: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution, or cessation of operations of the start-up entity; and the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity. DHS has revised the definition of "material change" to include the cessation of the entrepreneur's qualifying ownership interest in the start-up entity.

DHS recognizes that not all changes to the ownership structure of a start-up entity constitute a change of such significance that it would reasonably affect the outcome of the determination of whether the entrepreneur provides, or

continues to provide, a significant public benefit to the United States. DHS has revised the final rule to limit material change regarding ownership changes only to "a significant change with respect to ownership and control of the start-up entity." For example, a significant change with respect to ownership and control of the start-up entity may include a transfer of equity in the start-up entity that results in an owner or owners not previously identified on the Application for Entrepreneur Parole (Form I–941) collectively acquiring a controlling stake in the entity. DHS recognizes that achieving a significant round of funding for the start-up entity during the initial parole period may often constitute the very qualifying investment that renders the entrepreneur eligible for a re-parole period under this rule's significant public benefit test, despite diluting the entrepreneur's ownership interest. While DHS will make these determinations on a case-by-case basis, DHS does not anticipate that such significant changes with respect to ownership and control of the start-up entity will often result in termination of parole. A full vetting of new investors with a significant ownership interest, however, can provide DHS with additional insights into the start-up entity's activities in the United States and will help DHS ensure the entrepreneur is continuing to provide a significant public benefit to the United States. In the future, DHS may issue additional guidance on the scope of such significant changes in ownership interest if deemed necessary.

DHS believes these changes are sufficient to clarify the definition of "material change" in regulation and to provide entrepreneurs with sufficient detail about the kinds of changes that could impact their eligibility and must be reported. Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*E. Application Requirements*

1. Application for Entrepreneur Parole

*Comments:* One commenter supported the Application for Entrepreneur Parole (Form I–941), and called it "ideal" because without the form applicants must attempt to list information on existing application forms that do not specifically relate to entrepreneurs. Another commenter requested that the application process resemble the Canadian express entry immigration system and be simplified

so that the assistance of an attorney is not required.

*Response:* DHS agrees with the comment that the Form I–941 is beneficial for capturing information specific to parole requests filed under this rule. DHS declines to model the application process for parole under this rule after the Canadian express entry program as that program is a points system designed to manage applications for permanent residence under certain Canadian federal economic immigration programs.[21] DHS has attempted to develop the Form I–941 to be as simple as possible for applicants while capturing sufficient information to enable adjudicators to make appropriate case-by-case decisions under the statutory and regulatory requirements for parole.

2. Submissions of Documentary/ Supporting Evidence

*Comment:* Two commenters expressed concern that the evidentiary requirements were excessive and that start-up entities operating in "stealth-mode" would not be able to provide letters or media articles. Both commenters suggested that evidence of a significant capital investment from a qualified investor should be sufficient to demonstrate the potential for rapid growth and job creation.

*Response:* As an initial matter, DHS recognizes there may be legitimate reasons for operating a start-up in a manner that does not attract significant public attention. In part for this reason, this final rule extends the definition of start-up entity to include entities formed within the 5 years immediately preceding the filing date of the applicant's initial parole request. DHS believes that start-up entities that are seeking to operate without significant public attention will generally have sufficient time to emerge from that status prior to the parole application.

DHS agrees with the commenters that evidence of having received substantial investment from a qualified investor may be sufficient to establish that the start-up entity has the potential for rapid growth and job creation (one factor in making parole determinations under this rule). *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). DHS understands that other evidence that may be required to establish eligibility for parole consideration under this rule, including whether the applicant is well-positioned to advance the entity's business, may not be a matter of public record. DHS believes, however, that even an entrepreneur operating a company in

[21] *http://www.cic.gc.ca/english/express-entry/.*

"stealth mode" should generally be able to provide such evidence for purposes of satisfying the requirements of this rule. Indeed, for entrepreneurs to be paroled under this rule, they must persuade adjudicators, based on the totality of the evidence, that they will provide a significant public benefit.

3. Application Requirements of Spouses and Minor Children

*Comment:* DHS received a few comments supporting the provision in the proposed rule allowing the spouse and children of an entrepreneur granted parole under this rule to also apply for and be granted parole in the United States in order to accompany or ultimately join the entrepreneur. One commenter also supported the proposal to allow the spouse, if granted parole, to obtain employment authorization in the United States in order to work and help support the entrepreneur's family.

*Response:* DHS agrees with these comments. Each spouse or child seeking parole must independently establish eligibility for parole based on significant public benefit (or, alternatively, for urgent humanitarian reasons), and that the individual merits a favorable exercise of discretion. In a case in which an entrepreneur has been granted parole based on significant public benefit under this rule, DHS may consider granting parole to the entrepreneur's spouse and children who provide a significant public benefit by maintaining family unity and thereby further encouraging the entrepreneur to operate and grow his or her business in the United States—and to provide the benefits of such growth to the United States.

Under this final rule, spouses of entrepreneur parolees who wish to obtain employment authorization must apply for an EAD pursuant to 8 CFR 274a.12(c)(34), consistent with current parole policy that allows parolees to apply for employment authorization. DHS agrees with the commenter that allowing spouses of entrepreneurs to apply for work authorization may alleviate a significant portion of the potential economic burdens that entrepreneurs and their families may face, such as paying for education expenses for their children, and to ensure that they satisfy the condition on their parole that they maintain household income that is greater than 400 percent of the Federal poverty line, as they grow and develop their start-up entities. Moreover, extending employment authorization to the spouse may further incentivize an international entrepreneur to bring a start-up entity to the United States—along with new jobs,

innovation, and growth—rather than create it in another country.

4. Other Comments on Application Requirements

*Comment:* One commenter asked that DHS clarify the application procedures for Canadians and whether they may apply at the border or whether they must visit a U.S. consulate prior to requesting to be paroled at a U.S. port of entry.

*Response:* Canadians and applicants from other countries may apply for parole under this rule while inside or outside of the United States. If the applicant's parole request is approved, the applicant would request to be paroled by Customs and Border Protection at a U.S. port of entry after arriving from outside the United States. Canadian nationals who will be appearing at a U.S. port of entry directly from Canada will not have to visit a U.S. consulate prior to appearing at the port of entry and requesting that CBP grant parole. Canadian nationals who will not be appearing at a U.S. port of entry directly from Canada, and will instead be travelling to the United States from another country abroad to request a grant of parole may, similar to other applicants, have to visit a U.S. consulate first in order to obtain travel documentation (*e.g.,* a boarding foil) that allows the individual to travel to a U.S. port of entry. In all cases, however, the individual must have an approved Form I–941 before the individual may appear at the port-of-entry to request a grant of parole.

*F. Parole Criteria and Conditions*

1. Minimum Investment

*Comment:* Numerous commenters— including advocacy groups, law firms, associations, and individual commenters—argued that the proposed rule's minimum investment criterion for the initial parole period would set too high an eligibility bar for many high-potential entrepreneurs. Citing a range of different kinds of evidence, several commenters argued that the proposed $345,000 threshold represented significantly more capital than is actually needed by most start-ups initially and would unnecessarily exclude from consideration some entrepreneurs whose entities would create significant public benefit in the United States.

*Response:* In response to public comments, DHS is reducing the proposed minimum investment of $345,000 to $250,000 in the final rule. *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). Multiple public comments

recommended setting the threshold at $250,000, and DHS's further analysis of seed and angel investment data indicates that this level is reasonable. As is described more fully in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule, DHS's analysis of investments received by a set of new firms that graduated from startup accelerator programs revealed that the median seed investment was $250,000.[22] Following the intent of this final rule to increase and enhance entrepreneurship, innovation, and job creation in the United States, DHS determined that investment amounts that entrepreneurs would need to meet to be considered for parole under this rule should be more in line with typical early investment rounds, rather than the higher investment levels typical of later rounds. In each individual case, DHS must be persuaded that granting parole would provide a significant public benefit and that the person requesting parole merits a favorable exercise of discretion.

*Comment:* One commenter stated that there should not be a minimum investment amount and suggested that the rule instead establish minimum revenue amounts. Several other commenters suggested that evidence of rapid revenue growth should be a standalone eligibility criterion for the initial parole period under 8 CFR 212.19(b)(2)(ii).

*Response:* DHS disagrees with the suggestion that there should not be a minimum investment amount. Establishing a minimum investment amount based on available data provides a clear and predictable benchmark for how an applicant may demonstrate that a start-up entity has substantial potential for rapid growth and job creation (one factor in making parole determinations under this rule). If international entrepreneurs are unable to meet the threshold investment amount but have received some qualified investments or qualified government awards or grants, they may alternatively qualify for parole consideration under this rule if they partially meet the threshold criteria and provide "other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." *See* final 8 CFR 212.19(b)(2)(iii).

---

[22] The data utilized by DHS is provided publicly by SeedDB: *http://seed-db.com/accelerators,* as well as the Angel List: *https://angel.co/,* and the Angel Capital Association (ACA): *https://www.angelcapitalassociation.org/.*

Venezuela AR_000034

DHS disagrees with the suggestion that evidence of rapid revenue growth or generation of a certain amount of revenue should be a separate criterion under 8 CFR 212.19(b)(2)(ii). In setting threshold criteria, DHS intends to identify reliable indicators of a start-up entity's substantial potential for rapid growth and job creation and, ultimately, of the significant public benefit that a grant of parole would provide in an individual case. DHS does not believe that revenue should be the sole external validation factor as compared to substantial funding from qualified U.S. investors and government entities for initial parole applications. DHS reiterates, however, that a start-up entity's revenue may be taken under consideration, both under the "alternative criteria" test and as part of the totality of evidence relevant to whether the grant of parole in an individual case would be justified by significant public benefit and the person requesting parole deserves a favorable exercise of discretion. *See* 8 CFR 219.2(b)(2)(iii), 219.2(c)(2)(B)(iii).

*Comment:* Several individual commenters recommended that the investment threshold be based upon the type of business activity.

*Response:* In an effort to provide a reasonable level of simplicity and predictability in the final rule, DHS decided to utilize a single investment threshold rather than several amounts based on the type of business activity. DHS believes that determining multiple investment thresholds based on business activity or industry would be unduly complicated, making adjudications more labor-intensive and increasing processing times. DHS believes that using a single investment threshold, backed by available data, is a reasonable approach and provides a clearer benchmark for applicants, investors, and adjudicators.

*Comment:* Some commenters provided input on the requirement that funding be received within the preceding 365 days. A CEO roundtable agreed that the $345,000 threshold was an appropriate amount, but questioned the 365-day requirement, recommending that the rule be changed to require that only 65 percent of the investment to have occurred within the last 365 days. A trade association and a joint submission from a professional association and a non-profit organization recommended that the investment occur within a 3-year window. As an alternative, the trade association stated that some of a start-up entity's capital that would otherwise count toward the qualified investment amount should do so even if its ultimate

receipt by the start-up entity is contingent upon the approval of parole.

*Response:* DHS is revising the proposed requirement that the substantial investment be received within the 365 days immediately preceding the filing of the application for initial parole. The final rule increases this period from 12 months (365 days) to 18 months. DHS made this change based on feedback that it often takes longer than 12 months for a start-up to secure and receive investment funding. This revised requirement still ensures that a qualified investor or government entity has recently validated (within 18 months) the start-up entity's potential for rapid growth and job creation. With respect to the comment suggesting that DHS accept funding contingent upon approval of parole toward the qualified investment amount, DHS believes that funds contingent on the occurrence of a future event, such as a grant of parole to the entrepreneur, would not satisfy the general criteria in 8 CFR 212.19(b)(2)(ii). DHS notes, however, that such funds may be considered under the alternative criteria in 8 CFR 212.19(b)(2)(iii) if the entrepreneur partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii)(B), since DHS may consider such contingent funds as other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Given that this process is a new and complex one, DHS has decided to take an incremental approach and will consider the suggested modification in the future after assessing the implementation of the rule and its impact on operational resources.

2. Minimum Government Grants or Awards

*Comment:* Several commenters argued that DHS should require less than $100,000 to meet the eligibility criteria based on a start-up entity's receipt of government grants and awards. An individual commenter said that most government grants were well beneath the $100,000 minimum threshold in the proposed rule. Another individual commenter recommended a $50,000 government grant threshold. By contrast, one commenter stated that the $100,000 minimum investment for government grants and awards is too low to start a meaningful business and suggested increasing the amount to $500,000 or more. Several commenters stated that the $100,000 grant threshold aligns with the timing of the Federal Small Business Innovation Research

(SBIR)[23] and Small Business Technology Transfer (STTR) awards and dollar amounts.

*Response:* DHS declines to make the suggested changes to the minimum government grant or award threshold. In light of the range of comments received on increasing or decreasing the minimum grant amount, DHS believes its proposed minimum grant amount is reasonable. Because government entities regularly evaluate the potential of U.S. businesses, the choice to provide a significant award or grant to a particular start-up entity will often be a strong indicator of that start-up's substantial potential for growth and job creation. Additionally, because government entities are by definition formed to serve the public, the choice by such an entity to fund a particular business generally indicates the government entity's independent assessment that the business's operations would provide a significant public benefit—and can be a strong indicator of a start-up entity's substantial potential for rapid growth and job creation. The specific $100,000 minimum government funding threshold identified in this final rule is based in part on the fact that seed funding awards ("Phase I" awards) from the Federal SBIR/STTR program are generally below $150,000.

3. Initial Parole Alternative Criteria

*Comment:* Several commenters offered suggestions for the factors to be considered by DHS under the rule's alternative criteria for the initial parole period, such as adding a metric for number of users or customers of the entrepreneur's start-up entity, the start-up entity's social impact, and the start-up entity's national scope or location in a low- or middle-class neighborhood. Other commenters proposed the following factors: The applicant's academic degree; participation in or training from a start-up accelerator; prior success as demonstrated by market share from patented innovations, annual sales volume, or job creation; and

[23] The Small Business Innovation Research (SBIR) program is coordinated by the Small Business Administration to seed capital for start-up businesses. It is designed to stimulate technological innovation among small private-sector businesses, and it is the largest source of seed capital in the United States for technology driven start-ups, funding between 5,000 and 7,000 projects a year. The "first phase" award is an innovation grant made for initial eligibility and corresponds to the start-up of the commercial business and proof of "concept phase"—the average award amounts vary by department, but most SBIR Phase I awards are made at or below $150,000. The Phase I awards are geared towards financing the startup of the private commercial entity and also the innovation and research and development (R&D) that the enterprise undertakes.

demonstrated success using alternative funding platforms.

*Response:* DHS agrees with these suggestions. DHS may consider the following additional types of evidence, among others, as factors under the alternative criteria for those applicants who partially satisfy 8 CFR 212.19(b)(2)(ii):

• number of users or customers;
• revenue generated by the start-up entity;
• social impact of the start-up entity;
• national scope of the start-up entity;
• positive effects on the start-up entity's locality or region;
• success using alternative funding platforms, including crowdfunding platforms;
• the applicant's academic degrees;
• the applicant's prior success in operating start-up entities as demonstrated by patented innovations, annual revenue, job creation, or other factors; and
• selection of the start-up entity to participate in one or more established and reputable start-up accelerators or incubators.

With respect to start-up accelerators and incubators, DHS expects to evaluate them on several relevant factors, including years in existence, graduation rates, significant exits by portfolio start-ups, significant investment or fundraising by portfolio start-ups, and valuation of portfolio start-ups.

DHS understands that some applicants will be able to establish that their start-up entity is likely to grow rapidly and create jobs based on other factors beyond only the amount of capital investment or government funding received, which is why DHS has not limited the types of evidence that may be considered under the alternative criteria at 8 CFR 212.19(b)(2)(iii) for those who only partially meet the initial threshold criteria at 8 CFR 212.19(b)(2)(ii)(B).

*Comment:* One commenter suggested linking the rule's application to applications for other initiatives, such as National Minority Supplier Development Council Certification and, when applicable, Minority Women Based Entrepreneur Certification.

*Response:* DHS appreciates the commenters' suggestions but declines to adopt these factors as evidence of substantial potential for rapid business growth or job creation. Nothing in this rule prohibits or discourages entrepreneurs from participating in initiatives or certification processes designed to help promote more diverse and inclusive entrepreneurship. DHS does not believe, however, that such initiatives and certifications

independently provide sufficient external validation that a start-up entity has the substantial potential for rapid growth or job creation and meets the "significant public benefit" requirement under this rule. Evidence that the start-up is involved with certain initiatives in the public interest can, however, be considered a positive factor in determining whether an entrepreneur merits a grant of parole as a matter of discretion. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said the term "reliable and compelling evidence" in proposed 8 CFR 212.19(b)(2)(iii), with respect to the start-up entity's substantial potential for rapid growth and job creation, is too vague and should be elaborated on further in the regulatory text.

*Response:* DHS disagrees with the commenter's suggestion to elaborate further in 8 CFR 212.19(b)(2)(iii) on the type of evidence that may be submitted and considered as reliable and compelling. DHS believes that this alternative criterion should be flexible so as not to restrict the types of evidence that may be submitted and relied upon to determine if the start-up entity has substantial potential for rapid growth and job creation. DHS believes that such flexibility is important given the case-by-case nature of these discretionary parole determinations. An applicant for parole under this rule who does not meet the threshold capital investment or government funding criteria in 8 CFR 212.19(b)(2)(ii)(B) may submit any evidence that the applicant believes is reliable and compelling to support the claim that the applicant's start-up entity has substantial potential for rapid growth and job creation. DHS, after reviewing the application and all of the evidence submitted in support of the application, will make a determination as to whether the applicant is eligible for parole consideration under the relevant statutory and regulatory standards, and as to whether the person seeking parole merits a favorable exercise of discretion.

*Comment:* One commenter asserted that securing an investment from a U.S. investor or obtaining a U.S. government grant or award is not a viable option for most people.

*Response:* DHS believes that qualified investments or government funding are appropriate factors to consider when assessing the ability of a start-up entity to achieve rapid growth and job creation

(one factor in making parole determinations under this rule). DHS, however, understands that some start-up entities with the potential to yield significant public benefit may have legitimate economic or strategic reasons to not pursue or accept capital investment or government funding at the levels set forth in 8 CFR 212.19(b)(2)(ii)(B). Therefore, DHS has provided in the rule an alternative criterion for further consideration of those applications where the applicant only partially satisfies the capital investment or government funding thresholds, but provides additional reliable and compelling evidence that establishes the substantial potential of the start-up entity for rapid growth and job creation.

*Comment:* A commenter suggested that, instead of focusing on capital investment and job creation criteria, DHS should focus on whether the start-up entity would be in industries in traded sectors. The commenter proposed that the following industries would qualify: Manufacturing, software publishers, Internet publishing, and research and development services.

*Response:* While DHS recognizes the benefits of increased exports to the U.S economy, it declines to limit eligible start-up entities to traded sectors, since start-up entities in a much wider set of industries can yield significant public benefit to the United States through rapid growth and job creation.

*Comment:* A commenter requested that DHS form an advisory group of industry experts to recommend alternative criteria.

*Response:* DHS afforded an opportunity for notice and comment on the NPRM and expressly sought proposals for alternative criteria from the public. DHS does not believe that forming a new advisory group is necessary at this time.

*Comment:* One commenter suggested that the term "rapid growth" should be determined based on factors pertaining to the start-up entity's industry, normal business growth in the industry, geographic area, and the amount of investment in the entity. The commenter also recommended that the term "substantial potential" take into account the start-up entity's particular geographic area rather than a national scale.

*Response:* While the industry- and geography-specific factors suggested by the commenter may be taken into consideration by DHS as part of the totality of the circumstances for a given application, DHS believes that the general and alternative eligibility criteria provided in the final rule are

**5258** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

sufficient to determine if a start-up entity has the substantial potential for rapid growth and job creation, and provide a more predictable framework by which these parole applications will be adjudicated than would a more mechanical and unduly rigid consideration of the variables suggested by the commenter.

### 4. Re-parole Criteria

#### a. Minimum Investment or Grants/Awards

*Comment:* Several commenters discussed the proposed re-parole eligibility criteria at 8 CFR 212.19(c)(2)(ii)(B)(*1*), namely that the applicant's start-up entity has received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period. Most commenters argued that this funding level was unduly high, especially given the duration of the initial parole period.

*Response:* DHS declines to adjust the $500,000 funding threshold. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS believes that $500,000 is a reasonable level for re-parole. An industry report on startups shows the median seed investment round for the first half of 2016 was $625,000, which rose from $425,000 in 2015. This figure is valuable because it includes seed rounds for firms that participate with accelerators and that often start out with investment rounds below $100,000.[24] The median for angel group seed investments is reported at $620,000 as the annual average over 2013–2015, which rose sharply to $850,000 in 2015 from a median of $505,000 from the previous two years. Venture capital round sizes are even larger, as the 2014 median round size for both seed and startup stage venture rounds was $1,000,000.

DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to seek and receive qualified investments or government funding, to meet the re-parole criteria. If an entrepreneur is unable to meet the minimum funding

criterion, moreover, he or she may still be eligible for re-parole based on revenue generated or jobs created. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*) and (*3*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

#### b. Minimum Annual Revenue

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(*3*), which establishes an eligibility threshold when the applicant's start-up entity has reached at least $500,000 in annual revenue and averaged 20 percent in annual revenue growth during the initial parole period. Most commenters suggested alternative approaches, arguing that start-ups are often legitimately focused on the development of an innovative product or service, and not on generating early revenue. Another commenter stated that the revenue criterion is reasonable.

*Response:* DHS declines to adjust these criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS chose $500,000 in revenue and 20 percent annual revenue growth as threshold criteria because, after consulting with SBA, DHS determined these criteria: (1) Would be reasonable as applied across start-up entities regardless of industry or location; and (2) would serve as strong indications of an entity's potential for rapid growth and job creation (and that such entity is not, for example, a small business created for the sole or primary purpose to provide income to the owner and his or her family). As noted, DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to meet the minimum revenue threshold for re-parole. If an entrepreneur is unable to meet the minimum revenue requirement, he or she may still be eligible under the minimum investment or job creation criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*) and (*2*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

*Comment:* An individual commenter suggested that DHS should include in the rule a criterion for user growth, rather than revenue growth, as many

start-ups focus more on growing their number of users in their early years.

*Response:* DHS declines to include user growth as a stand-alone criterion for establishing eligibility for re-parole. DHS, however, may consider user growth as a factor when evaluating an entrepreneur's eligibility under the alternative criteria provision. The list of factors provided in the preamble to the proposed rule was intended only to illustrate the kinds of factors that DHS may consider as reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

As noted in the NPRM, DHS is not defining in regulation the specific types of evidence that may be deemed "reliable and compelling" at this time, because DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant the Secretary's exercise of discretion in granting parole based on significant public benefit. DHS believes, however, that such evidence would need to be compelling to demonstrate that the entrepreneur's presence in the United States would provide a significant public benefit. DHS will evaluate on a case-by-case basis whether such evidence—in conjunction with the entity's substantial funding, revenue generation, or job creation—establishes that the applicant's presence in the United States will provide a significant public benefit during a re-parole period.

*Comment:* An individual commenter suggested that the minimum annual revenue threshold for re-parole be set as just enough to sustain the entrepreneur's salary and continue business operations.

*Response:* The final rule states that the start-up entity must be of a type that has the substantial potential to experience rapid growth and job creation, including through significant levels of capital investment, government awards or grants, revenue generation, or job creation during the re-parole period. These factors are intended to help DHS identify the types of start-up entities that are most likely to provide a significant public benefit, while excluding entities without such potential—such as a business with limited growth potential created by an entrepreneur for the sole or primary purpose of providing income to the entrepreneur and his or her family.[25] Because this latter type of business is less likely to experience rapid growth

---

[24] The report on the seed median is published as a newsletter by Crunchbase and is found at: *https://techcrunch.com/2016/09/07/crunchbase-sees-rise-in-average-seed-round-in-2016/*. The Angel group median round size is obtained from the Angel Resource Institute's annual (2015) "Halo Report," found at *http://angelresourceinstitute.org/reports/halo-report-full-version-ye-2015.pdf*. The venture capital figures are obtained from the Ernst and Young Venture Capital Insights Report (4th quarter 2014) and are found at: *http://www.ey.com/Publication/vwLUAssets/Venture_Capital_Insights_4Q14_-_January_2015/%24FILE/ey-venture-capital-insights-4Q14.pdf*.

[25] Erik Hurst & Benjamin Wild Pugsley, "What Do Small Businesses Do?" (Aug. 2011), *available at http://www.brookings.edu/~/media/files/programs/es/bpea/2011_fall_bpea_papers/2011_fall_bpea_conference_hurst.pdf*.

Venezuela AR_000037

and job creation, DHS believes it is unlikely that the entrepreneur of such a business would be able to meet the significant public benefit requirement for a grant of parole. Establishing a minimum annual revenue threshold for re-parole that would, by definition, cover only an entrepreneur's salary and continue business operations would not likely help identify whether an entrepreneur's activity in the United States would provide a significant public benefit. DHS therefore declines to adopt the commenter's suggestion.

### c. Minimum Jobs Created

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(*2*), which establishes an eligibility threshold for applicants whose start-up entities have created at least 10 qualified jobs within the start-up entities during the initial parole period. Most commenters argued that this job creation requirement was unduly high or that the time period for compliance was too short.

*Response:* Based on comments received, DHS has lowered the job creation criterion for re-parole from 10 to 5 qualified jobs. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*). DHS agrees with commenters that requiring 10 jobs to satisfy this criterion may be unduly high for many start-ups, even those with demonstrated substantial potential for rapid growth and job creation. DHS believes that the creation of 5 qualifying jobs during the initial period of parole is sufficient to determine that the start-up entity continues to have substantial potential for rapid growth and job creation, particularly in light of the substantial capital investment, government funding, or other reliable and compelling evidence that supported the initial parole determination. In each case, DHS must be persuaded that re-parole is justified by significant public benefit and that the person seeking re-parole merits a favorable exercise of discretion. As discussed elsewhere in this preamble, DHS has also extended the initial period of parole from 2 years to 30 months, in order to allow additional time for start-up entities to grow, obtain additional substantial funding, generate substantial revenue, or create jobs. *See* 8 CFR 212.19(c)(2)(iii).

### d. Re-Parole Alternative Criteria

*Comment:* One commenter suggested that DHS should consider taxes paid by a start-up entity as a criterion for re-parole, leaving the task to DHS to define the threshold of the amount and type of taxes paid.

*Response:* DHS declines to adopt the commenter's suggestion. DHS believes that a start-up entity would have to generate a significant level of revenue or job creation (which are already criteria under this rule) to meet any separate, standalone tax-based threshold. Any such additional criterion would therefore be unlikely to be particularly probative in determining whether re-parole is justified by significant public benefit or the person seeking re-parole merits a favorable exercise of discretion. DHS therefore declines to include the payment of taxes as a stand-alone eligibility criterion.

*Comment:* A commenter suggested that if DHS lowers the funding and job creation thresholds for re-parole, there should be no need for alternative criteria.

*Response:* While DHS did reduce the job creation threshold for re-parole in the final rule, DHS believes that parolees should have the flexibility to present other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Examples of such evidence are provided above, in the discussion on alternative criteria for the initial parole period. DHS believes that it is important to retain such flexibility in the final rule, consistent with the case-by-case nature of these parole determinations. DHS, therefore, has not adopted the commenter's suggestions.

### 5. Authorized Periods of Parole

*Comment:* Several commenters discussed the initial 2-year parole period at 8 CFR 212.19(d)(2). Most commenters argued that the 2-year period was unduly short, as start-ups with significant potential for rapid growth and job creation may require more time to meet re-parole eligibility requirements. Some commenters suggested having a 3-year initial period of parole and a 2-year period of re-parole. Other commenters suggested a range for initial parole from 3 to 5 years. A number of comments discussed the overall duration of the parole periods, the majority of which advocated for longer periods ranging from 6 to 10 years in total. Some of these commenters based the need for an extended parole period on the typical duration of the start-up growth path from seed funding to venture capital financing to exit (through an initial public offering or a merger or acquisition).

*Response:* Based on the comments received, DHS is changing the maximum periods for initial parole and re-parole to 30 months (2.5 years) each, for a total maximum parole period under this rule of up to 5 years. The additional time for the initial parole period will provide entrepreneurs with more time to receive additional qualified investments or government funding, increase revenue, or create qualified jobs sufficient to meet the eligibility criteria for an additional period of parole. While this change does reduce the length of the re-parole period, DHS believes that this approach is necessary to provide additional time during the initial period of parole while maintaining the same maximum overall parole period of 5 years. DHS further believes that a 5-year total maximum parole period is consistent with the amount of time successful start-up entities generally require to realize rapid growth and job creation potential. Moreover, an entrepreneur of a start-up entity that is almost 5 years old when the parole application is filed would have the possibility to obtain up to 5 years of parole, which would allow the entity to realize its rapid growth and job creation potential by the time it is 10 years old—and to provide those benefits in the United States.[26] DHS retains the discretion to provide any length of parole to an applicant, including a period shorter than 30 months where appropriate. DHS also notes that although USCIS would designate an appropriate initial parole period upon approval of the Application for Entrepreneur Parole, CBP would retain its authority to deny parole to an applicant or to modify the length of parole authorized by USCIS upon issuing parole at the port of entry, consistent with CBP's discretion with respect to any advance authorization of parole by USCIS.

---

[26] Estimates based on the Census Bureau Business Dynamics Statistics suggest that on average 55 percent of new firms survived after 3 years, but 80 percent of the firms that survived 3 years also made it through 5 years. Dane Stangler and Jared Konczal "Give me your entrepreneurs, your innovators: Estimating the Employment Impact of a Startup Visa", Ewing Marion Kauffman Foundation (Feb. 2013), available at *http://www.kauffman.org/~/media/kauffman_org/research%2Oreports%20and%20covers/2013/02/startup_visa_impact_final.pdf*; "CrunchBase Reveals: The Average Successful Startup Raises $41M, Exits at $242.9M," Techcrunch.com (Dec. 14, 2013), available at *http://techcrunch.com/2013/12/14/crunchbase-reveals-the-average-successful-startup-raises-41m-exits-at-242-9m/*; see also TruBridge Capitol Partners, *Why the 'Next Billion Dollar Startup' Is not Always the Next IPO,* Forbes, Apr. 15, 2015, available at *http://www.forbes.com/sites/truebridge/2015/04/15/why-next-billion-dollar-startup-not-always-next-ipo/* ("From 2001–2004, the average age of a company at its public exit was 5.4 years. . . . From 2009–2012, the average age was 7.9.").

## 6. Limitation on Number of Entrepreneurs

*Comment:* Several commenters addressed 8 CFR 212.19(f) in the proposed rule, which states that no more than three entrepreneurs may be granted parole based on the same start-up entity. Most commenters on this provision recommended that DHS increase the number of entrepreneurs, with suggestions to increase the maximum number to 4 or 5. Several other commenters, including a trade association and a professional association, supported the proposed rule's limit of 3 entrepreneurs obtaining parole under this rule based on the same start-up entity. An individual commenter stated that DHS should allow for additional entrepreneurs to qualify for parole based on the same start-up entity, not only at the time of application but also at a later date, asserting that it is very common for technology companies to introduce multiple co-owners over time that are key personnel vital to the operations of the start-up entity.

*Response:* DHS appreciates the comments regarding this limitation and recognizes that some start-ups may initially have more than 3 founders or owners. After reviewing all comments, DHS declines to increase the number of entrepreneurs permitted to request parole related to the same start-up entity, and will retain the current limit of no more than 3 eligible entrepreneur applicants per start-up entity. *See* final 8 CFR 212.19(f). As an initial matter, DHS believes it would be difficult for a larger number of entrepreneurs associated with the same start-up entity to each meet the eligibility criteria and comply with the conditions on parole while ultimately developing a successful business in the United States. A higher number of entrepreneurs associated with the same start-up entity may affect the start-up's ability to grow and succeed, and may even result in the startup's failure, thus preventing the goals of the parole process under this rule from being realized.[27] Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that each entrepreneur's

parole will provide a significant public benefit.

The limitation, moreover, will help strengthen the integrity of the international entrepreneur parole process in various ways. Among other things, limiting the number of individuals that may be granted parole under this rule in connection with the same start-up entity will provide an additional safeguard against an entity being used as a means to fraudulently allow individuals to come to the United States. Such a limit diminishes, for example, the incentive to dilute equity in the start-up entity as a means to apply for parole for individuals who are not bona fide entrepreneurs. Finally, DHS clarifies that the rule does not require that additional entrepreneurs, up to 3 entrepreneurs per start-up entity, apply for parole based on the same start-up entity at the same time.

## 7. Income-Related Conditions on Parole

*Comment:* Several commenters discussed the proposed rule's provision requiring that entrepreneurs paroled into the United States must maintain a household income that is greater than 400 percent of the Federal poverty line for their household size, as defined by the Department of Health and Human Services. Many of these commenters discussed the financial difficulties faced by start-ups and argued that the income requirements were unduly high or suggested other alternatives. The majority of commenters on this issue stated that entrepreneurs in start-up endeavors typically do not take a salary or take a minimal salary in the early years. Several commenters recommended lowering this income threshold, with many suggesting lowering it to 100 percent, while others suggested alternatives of 125 percent, 200 percent, or 250 percent of the Federal poverty level. An individual commenter recommended that DHS institute a minimum yearly income requirement of $80,000, while another individual commenter stated that DHS should adopt a more nuanced approach that takes into account factors like standard of living, unemployment rates, and economic growth by state. Other commenters recommended that DHS allow for other types of compensation, in the form of benefits or rewards, in addition to salary to satisfy the income-related conditions on parole. Another individual commenter stated that DHS should use the income threshold already established by the Affidavit of Support,[28] which is set at 125 percent

above the poverty guidelines. Lastly, one commenter said the "significant public benefit" determination should not just be applied to entrepreneurs who meet a particular income or wealth criterion, but should be liberally applied to all entrepreneurs who are seeking to build and grow a business.

*Response:* DHS appreciates the concerns raised by these commenters, but declines to adopt the commenter's suggestion to eliminate or alter the income-related condition on parole. Establishing this income-related condition on parole is consistent with the Secretary's discretionary authority to grant parole "under conditions as he may prescribe." INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). As stated in the NPRM, DHS established this income threshold to ensure that applicants seeking parole under this rule will have sufficient personal economic stability to make significant economic and related contributions to the United States. Those policy goals remain valid and are appropriate in guiding the decision to retain the requirement that the household income of an entrepreneur requesting parole under this rule be greater than 400 percent of the Federal poverty line.

Under this rule, DHS will take steps to ensure that each grant of parole will provide a positive net benefit to the economy of the United States, consistent with the statutory framework authorizing parole only for significant public benefit absent urgent humanitarian issues. In addition to considering all the other positive evidence—from job creation to investment to growth—DHS includes the income threshold as an additional safeguard that the entrepreneur and his or her family will not be eligible to draw upon Federal public benefits or premium tax credits under the Health Insurance Marketplace of the Affordable Care Act. Furthermore, Secretary Johnson indicated in his memorandum titled "Policies Supporting U.S. High-Skilled Business and Workers" that such thresholds would be created so that individuals would not be eligible for these public benefits or premium tax credits in light of the purpose of the policy.[29]

DHS emphasizes that the funding amounts received by a start-up entity from governmental sources or from

---

[27] Max Marmer, Bjoern Lasse Herrmann, Ertan Dogrultan, Ron Berman, *Startup Genome Report Extra on Premature Scaling,* Startup Genome Report: Premature scaling v 1.2 (Mar. 2012 ed.) (explaining that "hiring too many people too early" in a start-up's development is one of several reasons that most start-ups fail), available at *https://s3.amazonaws.com/startupcompass-public/StartupGenomeReport2_Why_Startups_Fail_v2.pdf.*

[28] Affidavits of Support, filed using Form I–134 or I–864, are required for certain immigrants to

show that they have adequate means of financial support and are not likely to rely on the U.S. government for financial support.

[29] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

qualified investors in order to meet the rule's eligibility thresholds are distinct from the possible sources of salary payments to the individual entrepreneur. Nothing in this rule prevents a start-up entity from raising higher funding levels than the minimum parole eligibility thresholds, and from a wider set of funders than those in the rule's definitions of qualified investors and government entities. DHS intends for the eligibility criteria for parole to be useful independent validation tools for assessing the significant growth and job creation potential of the start-up entity. While there is certainly validity to the arguments made by some of the commenters that many entrepreneurs do not take large salaries, choosing instead to re-invest available funds back into the start-up entity or to take other forms of non-cash compensation, DHS must establish criteria that protect the overall policy goals of this rule in accordance with the requirements of the INA. The income-related requirements offer a clear and predictable mechanism for DHS to have a strong measure of confidence that the entrepreneur and his or her family, while paroled into the United States under this rule, will be net positive contributors to the American economy.

8. Reporting of Material Changes

*Comment:* Several commenters discussed the proposed requirement that entrepreneurs report any material changes during a parole period to DHS by submitting a new application for parole. Most commenters argued that such a requirement would be onerous given the constantly changing nature of start-ups. A law firm argued that requiring entrepreneurs to report and reapply when there are pending actions against the start-up entity or entrepreneur would be unfair, as both are entitled to due process, and suggested a reporting requirement only if an adverse judgment were issued. An individual commenter stressed that a $1,200 fee to report every material change would create a major financial burden for entrepreneurs.

*Response:* DHS recognizes that the nature of start-up entities involves constant change. DHS also appreciates the concerns regarding the administrative and financial burden placed on entrepreneurs by additional filings. DHS believes, however, that the revised definition of material change in the final rule will help to clarify the situations in which the entrepreneur must notify the agency of material changes, and thus limit the administrative and financial burdens on the entrepreneur. Specifically, DHS

understands that start-ups may have frequent ownership changes over the course of successive funding rounds, and thus has revised the definition of ''material change'' regarding ownership changes to cover only those that are ''significant'' in nature. Clarifying the scope of the material change definition also limits the reporting requirement, which should help reduce the anticipated burden on entrepreneurs. DHS also emphasizes that the rule requires notification of pending actions only in the context of a criminal case or other action brought by a government entity, while actions brought by private individuals or entities are not considered ''material changes'' until a settlement, judgment, or other final determination is reached. DHS does not believe that the material change reporting requirement under this rule will impact an individual's due process or would otherwise be unfair. DHS believes, however, that it is important for an entrepreneur granted parole under this rule to immediately inform USCIS if certain actions are brought against the entrepreneur or his or her start-up entity.

*Comment:* One commenter recommended that the process of addressing material changes would be improved if DHS were to implement a policy similar to the ''deference'' policy it applies in the EB–5 investor program. Such a policy provides that DHS will defer to prior determinations regarding certain documentary evidence used to establishing program eligibility requirements absent fraud, misrepresentation, a mistake of law or fact, or a material change.

*Response:* As discussed above, DHS decided to narrow and clarify the definition of ''material change'' in order to address commenters' concerns about reporting burdens. In the absence of specific suggestions, DHS could not ascertain from this comment what aspect of the EB–5 deference policy could be applied under this rule. DHS believes it is important for this rule to provide mechanisms, including the requirement to report material changes, to ensure that parole continues to be justified by significant public benefit in each particular case.

*Comment:* A joint submission from a professional association and a non-profit organization stated that, where a material change filing is mandated by the rule, the entrepreneur should only be required to file an update with USCIS, instead of being required to re-file an entire parole or re-parole application.

*Response:* As explained above, while DHS appreciates that a new filing may

appear burdensome to the entrepreneur, DHS believes that a new filing is necessary in order to re-evaluate the entrepreneur's eligibility when such material changes occur. Material changes, by their definition, may affect the entrepreneur's ability to demonstrate that the start-up entity has potential for rapid growth and job creation, and whether the entrepreneur will continue to provide a significant public benefit to the United States. Therefore, at present, the entrepreneur must file a new application to allow DHS the opportunity to determine the entrepreneur's continued eligibility for parole. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

9. Other Comments on Parole Criteria and Conditions

*Comment:* Several comments expressed concern that the rule did not require that the entrepreneur receive prevailing wages for their work, with some commenters expressing concern that the only wage requirements relate to the Federal Poverty Level.

*Response:* DHS appreciates commenters' concerns regarding prevailing wages. Unlike some employment-based visa classifications, however, the intention of this parole process is not to address labor shortages in the United States. Rather, it is to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States. DHS believes that requiring the parolee to maintain a household income of greater than 400 percent of the Federal Poverty Level adequately ensures that he or she will have sufficient personal economic stability to provide a significant public benefit to the United States through entrepreneurial activities.

*Comment:* One commenter recommended that DHS should not require an applicant's start-up entity to receive investment prior to the initial application for parole; that DHS should recognize cash infusions during the growth period of a start-up entity as eligibility criteria for re-parole; and that at the end of the initial parole period, if the venture is deemed successful, no additional funding milestones should be required for re-parole eligibility.

*Response:* DHS appreciates the comment but declines to revise the rule as suggested. DHS believes that the alternative criteria provided in this rule to determine if the start-up entity has

substantial potential for rapid growth and job creation provide sufficient flexibility for those entrepreneurs who may have received amounts of qualified investments or government funding that are less than those required to satisfy the general criteria for parole consideration under this rule. The determination that the entity has substantial potential for rapid growth and job creation will be made based on the evidence in the record at the time the parole application is adjudicated, rather than the possibility that the entity may receive cash infusions at some point in the future. If cash infusions from various sources are received by the start-up entity during the period of initial parole, evidence of such cash infusions may be taken into consideration if the entrepreneur applies for re-parole. DHS, however, does not believe that cash infusions into the start-up entity during the initial parole period will independently suffice to establish that the entity continues to have the significant potential for rapid growth and job creation. Infusions of cash, as a general matter, do not have the same validating qualities as do evidence of additional investment from qualifying investors, grants or awards from qualifying government entities, significant revenue growth, or job creation.

*Comment:* One commenter asserted that entrepreneurs who have left their start-up entity should not have their parole status immediately revoked. The commenter suggested that DHS issue guidance and options for entrepreneurs who leave their start-up entity but have contributed to the significant public benefit of the United States. A similar comment recommended that individuals be able to remain in the United States under parole and qualify for re-parole if a second start-up meets the requirements of the rule. Another related comment argued that entrepreneurs whose start-up entities fail should be given a second chance, in order to account for the dynamism and uncertainty inherent in new businesses.

*Response:* DHS appreciates the commenters' suggestions. As a matter of statutory authority, once, in the opinion of DHS, the purpose of parole has been served, parole should be terminated. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS emphasizes that the purpose of granting parole under this rule is to allow an entrepreneur to grow a start-up entity in the United States with substantial potential for rapid growth and job creation, by working in an active and central role for the entity. Accordingly, DHS will not continue parole for entrepreneurs who are no longer actively working in a central role with the start-up entity that served as the basis for the initial parole application. The individual's activity through a new start-up entity, however, could serve as a basis for a new grant of parole if all requirements for such parole are met.

*Comment:* One commenter suggested that DHS should utilize the same methodology for granting parole for entrepreneurs as defined in a proposed nonimmigrant visa classification in a Senate bill, S. 744, 113 Cong. section 4801(2013).

*Response:* DHS appreciates the comment but declines to adopt the commenter's suggestion. Under this rule, DHS has identified a process for implementing the Secretary's existing statutory authority to grant parole consistent with section 212(d)(5) of the INA. DHS does not believe it is advisable to import in this rule the standards from unenacted legislation focused on nonimmigrant visas rather than discretionary grants of parole.

### G. Employment Authorization

#### 1. Automatic Employment Authorization Upon Parole

*Comment:* One commenter suggested that if employment authorization were deemed incident to parole, rather than through a follow-up application, then the regulations governing employment verification would need to be amended to permit employment by the parolee and spouse without an EAD.

*Response:* DHS agrees that the employment verification provisions of the regulations should be appropriately revised. In this final rule, and as proposed, DHS is revising the employment eligibility verification regulations by expanding the foreign passport and Form I–94 document combination described at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include Forms I–94A containing an endorsement that an individual is authorized to work incident to parole. This document combination was previously acceptable only for certain nonimmigrants authorized to work for a specific employer incident to status pursuant to 8 CFR 274a.12(b), which the final rule amends to include those paroled into the United States as entrepreneurs under this rule. *See* final 8 CFR 274a.12(b)(37).

However, in this final rule, and as proposed, only the entrepreneur parolee is accorded employment authorization incident to his or her parole. *See* final 8 CFR 274a.12(b). Given the basis for parole, it is essential to limit any delays in the entrepreneur's own employment authorization. Such delays could create difficulties for the entrepreneur's operation of the start-up entity, as he or she would be prohibited from working until work authorization was approved, and would frustrate the very purpose for paroling the entrepreneur into the United States. As an entrepreneur's spouse would not be coming for the same kind of specific employment purpose, DHS does not believe there is a similar need to provide him or her work authorization incident to parole. Instead, this rule adds a new provision making the spouse of an entrepreneur parolee eligible to seek employment authorization. *See* final 8 CFR 274a.12(c)(34). Based on this provision and 8 CFR 274a.13(a), an entrepreneur's spouse seeking employment authorization under this rule would need to file an Application for Employment Authorization (Form I–765) with USCIS in accordance with the relevant form instructions.

*Comment:* One commenter expressed concern that the proposed employment authorization provision is too narrow in scope. The commenter stated that DHS should clarify that employment with an entity that is under common control as the start-up entity, such as a subsidiary or affiliate, would be permissible.

*Response:* Under the final rule, the entrepreneur parolee's employment authorization is limited to the specific start-up entity listed on the Application for Entrepreneur Parole, Form I–941. This limitation helps ensure that the entrepreneur's work is consistent with the purposes for which parole was granted, especially since parole applications will be evaluated based in part on the activities and performance of that particular start-up entity. DHS appreciates that there are certain circumstances in which some flexibility could further the purpose of encouraging entrepreneurship, innovation, economic growth, and job creation in the United States. Given that this is a new process however, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

*Comment:* One commenter stated that difficulties obtaining a work visa have caused many entrepreneurs to move out of the United States.

*Response:* DHS agrees with the commenter's statement. While this rule does not address all of the difficulties that entrepreneurs may face, or make legislative changes that only Congress can make, DHS believes it will encourage international entrepreneurs

to develop and grow their start-up entities—and provide the benefits of such growth—in the United States. Entrepreneurs paroled into the United States under this rule will be authorized to work for the start-up entity for the duration of the parole (and any re-parole) period.

### 2. Spousal Employment

*Comment:* Several commenters, including a business incubator, asserted that spouses should be granted employment authorization and argued that spouse employment authorization will entice more entrepreneurs to come to the United States. Several other commenters stated that, in order to attract the best entrepreneurial talent, spouses of entrepreneur parolees should automatically receive work authorization incident to status without the need to apply separately.

*Response:* DHS agrees with commenters that extending employment authorization to spouses of entrepreneur parolees is important to help attract entrepreneurs to establish and grow start-up entities in the United States. For reasons provided above, however, DHS disagrees that these spouses must be provided with employment authorization incident to their parole. Instead, these spouses may seek employment authorization under 8 CFR 274a.12(c)(34).

*Comment:* A few commenters stated opposition to permitting employment authorization for the spouses of international entrepreneurs.

*Response:* DHS disagrees with the commenters' opposition to allowing an entrepreneur's spouse to apply for employment authorization. Permitting spouses to seek employment authorization is an important aspect of the rule's intent to attract international entrepreneurs who may provide a significant public benefit by growing their start-up entities in the United States.

*Comment:* One commenter objected to spousal employment authorization unless it is restricted to the same new high-potential start-up entity that served as the basis for the parole.

*Response:* DHS disagrees with the suggestion that spousal employment should be authorized only for employment with the start-up entity that served as the basis of parole for the entrepreneur. Nothing in this rule prevents people married to each other from applying for parole associated with the same start-up entity. But DHS believes that it is not appropriate or necessary to limit the employment of an entrepreneur's spouse to that entity. Making those spouses eligible to seek

employment from a broader range of employers can further the central purpose of the rulemaking—encouraging international entrepreneurs to develop and grow their start-up entities within the United States and provide the benefits of such growth to the United States. It may also encourage entrepreneurs to create more jobs outside the family through the start-up entity, furthering the benefits provided to others in the United States. DHS therefore declines to revise the rule as suggested.

### H. Comments on the Parole Process

#### 1. Ability of Individuals To Qualify for Parole Under This Rule

*Comment:* Two individual commenters asked what kind of immigration status or visa an international entrepreneur should maintain in order to be eligible to apply for parole under this rule. The commenters expressed concern about the types of activities that would need to be conducted in the United States prior to a parole application in order to establish a business, obtain funds from investors, and otherwise qualify for the parole under this rule. These commenters also expressed concern about requiring prior investment as a condition for parole, and that investors would be hesitant to make such an investment in a start-up entity if the entrepreneur lacked an immigrant or nonimmigrant visa. A professional association stated that, since parole does not constitute formal admission to the United States, it will likely be very difficult for international entrepreneurs without formal immigration status to enter into long-term contracts, raise significant investment capital, and employ people.

*Response:* This final rule aims to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are in turn expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy. Under this final rule, an international entrepreneur may request parole in accordance with the form instructions. The final rule provides that individuals seeking initial parole under this program must present themselves at a U.S. port of entry to be paroled into the United States; there is no requirement that an international entrepreneur currently be in the United States or maintain any prior immigration status. DHS notes, however, that under the statute governing parole authority, individuals

who have already been admitted to the United States are ineligible to be considered for parole inside the United States because only applicants for admission are eligible to be considered for parole. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Individuals who have been admitted in a nonimmigrant classification, and are currently in the United States pursuant to that admission, may not be paroled, even if they have overstayed their admission, unless they first depart the United States.

DHS appreciates that international entrepreneurs may face many challenges in starting and growing a business in the United States, including attracting investment capital or government grants or awards. DHS disagrees with the premise, however, that qualifying investors will be very reluctant to make a qualifying investment in a start-up entity that is wholly or partially owned by an individual that will be seeking a grant of parole under this rule. DHS believes that there are a myriad of factors that go into a decision to invest significant funds in a start-up entity. While the underlying immigration status, or lack thereof, of the start-up entity's owner(s) may be a factor presenting a degree of additional risk, DHS believes that this rule will effectively mitigate some of that risk by providing a known framework under which certain significant public benefit parole requests will be reviewed and adjudicated. This final rule provides investors and entrepreneurs with greater transparency into the evaluation process and manner in which such requests will be reviewed, so that those individuals and entities can weigh the various risks and benefits that might apply to the particular investment decision being considered. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

#### 2. Waiver for Entrepreneurs Presently Failing To Maintain Status

*Comment:* An individual commenter stated that international entrepreneurs already in the United States should be able to receive a waiver in order to establish eligibility for parole under this rule if they do not have a valid prior immigration status. Another commenter suggested that immigration status violations, such as unauthorized employment, should not be grounds for denying parole under this rule and, if parole is granted, any prior

**5264** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

unauthorized employment that was used to meet the requirements for parole should be disregarded for purposes of any future immigration applications.

*Response:* As discussed above, eligibility for parole under INA section 212(d)(5), 8 U.S.C. 1182(d)(5), is not wholly dependent upon an individual's current immigration status. Unauthorized employment or a prior status violation will not necessarily preclude an individual from qualifying for parole under this rule. However, the fact that an entrepreneur has worked without authorization, is out of status, or not legally present in the United States would be considered in determining whether DHS should grant parole under its discretionary authority. All requests for a discretionary grant of parole are adjudicated on a case-by-case basis and ultimately determined by evaluating all positive and negative factors.

DHS will not adopt the commenter's suggestion to disregard, for purposes of any future immigration applications, any prior unauthorized employment that was used to meet the requirements for parole. DHS believes that such a provision would require a statutory change, as eligibility for certain benefits is barred by statute if the applicant previously worked without authorization.[30]

3. Relationship Between Parole and Various Nonimmigrant Visa Classifications

a. Pathway for Current Nonimmigrants To Use Entrepreneur Parole

*Comment:* Some commenters expressed concern that it would be challenging for foreign students, recent graduates of U.S. universities, and other nonimmigrants presently in the United States to meet this rule's requirements for parole consideration under the constraints of their current visas. These commenters said that the rule should allow these individuals a realistic and clear pathway to easily utilize parole, and should clarify that potential applicants currently in the United States in nonimmigrant status will not be violating their existing visa status when taking the necessary steps to establish eligibility for significant public benefit parole. One commenter requested that students in F–1 nonimmigrant status and eligible to work on Curricular Practical Training (CPT) or Optional Practical Training (OPT) should become eligible for parole under the rule if they founded a start-up and raised $100,000 in capital.

*Response:* DHS appreciates that some entrepreneurs who are present in the United States and who might otherwise qualify for parole under this program may be unable to engage in certain activities given the limitations placed on their nonimmigrant status, making it difficult, for example, for them to raise significant capital for a start-up entity. DHS, however, disagrees with the commenters' assertion that individuals present in the United States in F–1 nonimmigrant status will be unable to meet the requirements for parole under this program, such as starting a business and raising significant investment, without violating their F–1 nonimmigrant status. For example, an individual in F–1 status who has obtained OPT employment authorization may start and work for his or her own business in the United States. The OPT employment, and thus the business, must relate to the F–1 nonimmigrant's program of study and can occur either before (pre-completion OPT) or after the completion of a program of study (post-completion OPT).[31] Additional requirements apply to F–1 nonimmigrants who are otherwise eligible for a STEM OPT extension, such as establishing that their STEM OPT employer will have a valid employer-employee relationship with the F–1 OPT nonimmigrant, but those additional requirements do not pertain to the initial 12-month OPT period, and in any event do not present an absolute bar against entrepreneurial activities. DHS believes that it is certainly realistic that an F–1 nonimmigrant in the United States can start a business during his or her OPT period, and during that time can take steps to obtain significant investment in the start-up entity, which the individual may then rely upon if applying for parole under this rule. DHS declines to adopt the commenters' suggestion to include in this rule a blanket provision stating that potential applicants currently in the United States in nonimmigrant status will not be violating their existing status when taking steps to establish eligibility for parole. Such changes would pertain to the statutory and regulatory limitations placed on various nonimmigrant classifications and are outside the scope of this rule.

DHS believes that this final rule provides a realistic and clear option for certain entrepreneurs to actively grow their qualifying start-up entity in the United States. As discussed below, parole is not a nonimmigrant status, and individuals present in the United States

in a nonimmigrant status will not be able to change status or otherwise be granted parole without first departing the United States and appearing at a U.S. port of entry for inspection and parole. Under this final rule, however, an individual present in the United States in a nonimmigrant status may apply for and obtain an approval of the Application for Entrepreneur Parole (Form I–941). Filing and obtaining approval of a Form I–941 application under this rule will not, by itself, constitute a violation of the individual's nonimmigrant status. After approval of the Form I–941 application, if the individual decides to rely upon parole to actively grow his or her business in the United States, the individual will need to appear at a U.S. port of entry for a final parole determination to allow him or her to come into the United States as a parolee.

This final rule already provides appropriate criteria under which all applications will be reviewed, including those submitted by F–1 nonimmigrants. As indicated in this final rule, one basis on which an individual may be considered for parole under this rule is if he or she has raised at least $250,000 in investment capital from a qualifying investor (and meets certain other criteria). Individuals who raise a substantial amount of capital from a qualifying investor, but less than $250,000, may still qualify for and be granted parole under other criteria identified in the rule—including the receipt of a qualifying government grant or award or other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

b. Switching Between Nonimmigrant Status and Parole

*Comment:* Several commenters raised questions or provided suggestions regarding switching from a nonimmigrant status to parole, or from parole to a nonimmigrant status. Specifically, one commenter asked what her status would be if she were in the United States as an H–4 nonimmigrant, authorized to work pursuant to an EAD, but nevertheless pursued parole under this rule. Another commenter suggested that DHS should include a provision in this rule that expressly allows someone to switch from nonimmigrant status to parole, and from parole to nonimmigrant status, similar to DHS's policy to terminate and restore the H–1B or L–1 status of certain individuals who have temporarily departed the United States but came back using an advance parole document that was

---

[30] *See, e.g.,* INA section 245(c), 8 U.S.C. 1255(c).

[31] *https://studyinthestates.dhs.gov/training-opportunities-in-the-united-states.*

Venezuela AR_000043

Federal Register / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations **5265**

issued based on a pending Form I–485 application for adjustment of status.

*Response:* DHS declines to adopt a provision in this rule allowing individuals to change between nonimmigrant status and parole while in the United States. An individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Moreover, an individual who has been paroled into the United States cannot change to nonimmigrant status without leaving the United States, as INA section 248, 8 U.S.C. 1258, only permits individuals who are maintaining nonimmigrant status to change to another nonimmigrant status. If an individual who has been paroled into the United States under this rule has a petition for nonimmigrant classification approved on his or her behalf, he or she would have to leave the United States and pursue consular processing of a nonimmigrant visa application before seeking to return to the United States.

**c. Entrepreneur Pathways and Entrepreneur Parole**

*Comment:* One commenter stated that the international entrepreneur parole rule should complement and not supplant prior USCIS policy pertaining to entrepreneurs, including those reflected on the USCIS Entrepreneur Pathways Web site.[32] The commenter, while expressing concerns with aspects of existing policies pertaining to entrepreneurs and this rule, suggested that if an entrepreneur cannot qualify for parole under this rule, USCIS should encourage the entrepreneur to seek a visa associated with his or her start-up entity under the existing immigrant or nonimmigrant visa system. Specifically, the commenter suggested that the final rule should expressly include an amendment to the H–1B regulations to allow approval of an H–1B petition under the policies articulated on the Entrepreneur Pathways Web site, and that USCIS adjudicators should see an express statement in the final rule that, notwithstanding the existence of this rule, the H–1B visa remains available for working owners of start-up entities. The commenter noted that the USCIS Entrepreneur Pathways Web site also provides guidance for entrepreneurs to use other existing nonimmigrant visa classifications (*e.g.,* L–1, O, and E visas) that could be more advantageous to the

entrepreneur than the parole rule, so adjudicators should continue to approve petitions in that spirit. The commenter asserted that the unique requirements under the parole rule, such as a threshold investment amount, should not be allowed to ''bleed into and taint'' the adjudicatory process for securing employment-based visas traditionally used by entrepreneurs.

*Response:* DHS appreciates the commenter's suggestions, but the suggested changes to the H–1B regulations are outside the scope of this rulemaking. DHS agrees with the commenter that parole under this program is intended to complement, and not supplant, other options that may already exist for entrepreneurs under other immigrant and nonimmigrant visa classifications. This rule does not alter existing rules or policies regarding the ability of entrepreneurs to qualify for any immigrant or nonimmigrant status. This rule does, however, provide an additional avenue for entrepreneurs to consider when exploring options that may be available to them to grow a start-up entity in the United States.

**4. Travel Document Issuance**

*Comment:* A commenter urged DHS to grant multiple-entry parole to foreign nationals so that they may travel internationally and return to the United States, as this is not explicit in the regulation. The commenter stated that this ability is essential to ensure that entrepreneurs can raise additional funds and market innovations worldwide. In addition, this commenter stated that some foreign nationals may begin their businesses and seek entrepreneur parole while in nonimmigrant status in the United States, such as in F–1 or H–1B nonimmigrant status (and thus seek to depart the United States with advance parole and then request parole from CBP upon their return to a U.S. port of entry). The commenter suggested that the regulation clarify how these foreign nationals will be able to return to the United States.

*Response:* DHS notes that individuals who have been admitted to the United States, such as those in nonimmigrant status, are not eligible to be granted parole unless they first depart the United States. DHS clarifies that any immigration status violations by any applicant for parole, including those related to their entrepreneurial efforts, will be taken into account as negative factors in the case-by-case determination of whether the applicant merits an exercise of discretion to grant parole, though they will not necessarily

prohibit the individual from obtaining a grant of parole under this rule.

DHS recognizes that international travel can be essential for the success of some start-up entities. Under existing law, an individual's authorized period of parole ends each time he or she departs the United States. *See* 8 CFR 212.5(e)(1)(i). DHS may, however, authorize advance parole before departure and can specify that such authorization is valid for multiple uses. An entrepreneur granted advance parole would be able to leave the country, present himself or herself at a port of entry upon return, and request a subsequent grant of parole for the remaining period of his or her initially granted parole period. At such time, DHS must then inspect the individual and determine whether or not to grant parole into the United States.[33] If the individual is granted parole, he or she may only be paroled for up to the time initially granted. Any time spent outside the United States after the parole period is initiated will count against the total period of parole, so that the total time period of the parole period remains consistent with the date of initial parole granted by CBP.

**5. Parole in Place**

*Comment:* Several commenters requested that DHS allow parole-in-place under this rule. Some of these commenters stated that parole-in-place should be added so that individuals already in the United States in a nonimmigrant status, such as H–1B or F–1 nonimmigrant status, can apply for and be granted parole under this rule without having to depart the United States. Several other commenters noted that DHS has the jurisdiction to allow parole-in-place for spouses or dependents, as they do for military family members, and that this could be applied to the International Entrepreneur Rule. Some commenters argued that the requirement to be out of the country to apply for parole under this rule puts an unnecessary financial burden on applicants who are already residing in the United States.

*Response:* DHS appreciates, but declines to adopt, the commenters' suggestions that parole-in-place be allowed under this rule for individuals already in the United States in H–1B or F–1 nonimmigrant status. Only applicants for admission are eligible to

---

[32] *See https://www.uscis.gov/eir.*

[33] This process is not appropriately described as ''multiple-entry parole.'' Parole does not constitute an admission to the United States, INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and parole terminates upon the individual's departure from the United States, 8 CFR 212.5(e)(1)(i).

Venezuela AR_000044

be considered for parole, thus precluding individuals who have already been admitted from being considered for parole inside the United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing ''applicants for admission''). Such individuals are not eligible for parole, regardless of whether they have overstayed their admission, unless they first depart the United States.

**6. Comments on Options After 5-Year Total Parole Period Ends**

*Comment:* Many commenters provided views on the options available to entrepreneurs who have exhausted their up to 5 years of eligibility for parole under this rule. Some commenters were concerned that the rule does not provide a direct path to lawful permanent residence, which could limit the investment prospects for start-up entities. Other commenters were concerned that including such a path could exacerbate current immigrant visa backlogs and thus disadvantage those already in the queue for immigrant visa numbers.

A number of commenters were more broadly concerned that the overall uncertainty inherent in parole may discourage entrepreneurs from using this rule to start and grow their businesses in the United States. One particular commenter expressed concerns about an entrepreneur's ability to demonstrate nonimmigrant intent for purposes of a visa that does not permit dual intent. Others wanted DHS to consider entrepreneurs who have completed a 5-year parole period, and whose start-ups continue to demonstrate growth, as eligible for an EB–2 immigrant visa with a National Interest Waiver based upon the economic benefit to the United States. Other commenters urged DHS to establish *prima facie* eligibility for lawful permanent residence based on 3 years of parole under this rule. Still others wanted assurance that an individual who is the beneficiary of an approved immigrant petition would keep his or her priority date for purposes of receiving lawful permanent residence if he or she were granted parole under this rule.

*Response:* DHS appreciates the wide range of comments about immigration options for entrepreneurs after the end of their authorized period or periods of parole under this rule. Nothing in this rule forecloses otherwise available options for international entrepreneurs who are granted parole. DHS further notes that this rule does not impact existing rules and policies pertaining to

retention of priority dates in the immigrant petition context. The rule does not, however, establish a direct path to lawful permanent residence by creating a new immigrant visa classification for international entrepreneurs, which could only be done by Congress.

As discussed in the NPRM, the entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. Such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or lawful permanent residence through employer sponsorship). Individuals who are granted parole under this rule may ultimately be able to qualify for an EB–2 immigrant visa with a National Interest Waiver. If an entrepreneur is approved for a nonimmigrant or employment-based immigrant visa classification, he or she would generally be required to depart the United States and apply for a visa at a U.S. embassy or consulate abroad. As noted above, because parole is not considered an admission to the United States, parolees will be unable to apply to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. DHS does not believe that merely being granted parole under this rule would prevent an individual from demonstrating nonimmigrant intent for purposes of obtaining a subsequent nonimmigrant visa for entry into United States. DHS believes that this rule presents sufficient clarity and predictability for many individuals who want to establish and grow their businesses in the United States, and will contribute significantly to economic growth and job creation here. Such positive outcomes may be relevant in the event that entrepreneurs granted parole under this rule later seek to apply for an existing nonimmigrant or immigrant visa.

*I. Appeals and Motions To Reopen*

*Comment:* Several commenters requested that applicants be allowed to file appeals or motions to reconsider adverse parole decisions. A business association requested that submissions of motions to reopen or motions for reconsideration result in uninterrupted employment authorization for the parolee.

*Response:* DHS appreciates but declines to adopt these suggestions.

DHS has concluded that granting a right of appeal following a decision to deny entrepreneur parole would be inconsistent with the discretionary nature of the adjudication and contrary to how DHS treats other parole decisions. The final rule also precludes applicants from filing motions to reopen or for reconsideration under 8 CFR 103.5(a)(1). DHS retains its authority and discretion, however, to reopen or reconsider a decision on its own motion as proposed. *See* final 8 CFR 212.19(d)(4). Applicants may alert DHS, through existing customer service channels, that they believe that a decision to deny parole was issued in error and include factual statements and arguments supporting such claims.

Because the determination to grant or deny a request for parole is discretionary, the parole process in this final rule may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner. Parole determinations would continue to be discretionary, case-by-case determinations made by DHS, and parole may be revoked or terminated at any time in accordance with the termination provisions established by this rule at 8 CFR 212.19(k). Parolees under this final rule would assume sole risk for any and all costs, expenses, opportunity costs, and any other potential liability resulting from a revocation or termination of parole. A grant of parole would in no way create any reliance or due process interest in obtaining or maintaining parole or being able to remain in the United States to continue to operate a start-up entity or for other reasons.

*J. Termination of Parole*

**1. Discretionary Authority To Revoke/ Terminate Parole**

*Comments:* One commenter expressed concern that the basis for terminating parole is subjective, particularly with respect to reporting material changes. This commenter suggested that USCIS should limit such reporting to adverse judgments, since entrepreneurs and start-up entities are entitled to due process. Other commenters requested that USCIS adjudicators be specifically trained on entrepreneurship issues so that they can make the most informed decisions regarding parole.

*Response:* USCIS is committed to providing sufficient training on entrepreneurship issues for those adjudicators who will be assigned to adjudicating entrepreneur parole

requests. DHS does not believe that further revisions to the rule are necessary to protect against possible unfair or inconsistent determinations among adjudicators. By statute, parole decisions are discretionary and must be made on a case-by-case basis. This rule establishes transparent parameters for termination of parole, including automatic termination and termination on notice. Automatic termination applies at the expiration of parole, or upon written notification to DHS from the entrepreneur parolee that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. *See* final 8 CFR 212.19(k)(2). Termination on notice with an opportunity for the entrepreneur to respond is authorized by 8 CFR 212.19(k)(3). These bases for termination are tied to objective facts regarding eligibility for parole, thereby placing all parolees on the same footing.

The commenter expressed particular concern regarding terminations based on material changes. DHS believes that this concern is sufficiently addressed by the parameters set by this rule's definition of material change. Under this rule, material change means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. *See* final 8 CFR 212.19(a)(10). This rule provides further guidance by listing several examples illustrating material changes, including: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up

entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity. *See* final 8 CFR 212.19(a)(10).

2. Notice and Decision

*Comments:* A couple of commenters suggested that DHS provide notice and opportunity to respond before terminating parole.

*Response:* DHS agrees with the commenters that providing the entrepreneur parolee with notice and an opportunity to respond prior to termination is reasonable in certain scenarios, such as when grounds for termination require an assessment of the underlying case by the adjudicator. However, where no such assessment is required, DHS believes that automatic termination is appropriate. The NPRM provided for termination at DHS's discretion, including automatic termination in limited circumstances and termination on notice under a range of circumstances deemed appropriate by DHS. This rule finalizes that proposal without change. *See* final 8 CFR 212.19(k)(2) and (3). Under this rule, therefore, DHS will generally provide notice of termination and an opportunity to respond where it believes that:

(1) The facts or information contained in the request for parole were not true and accurate;

(2) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(3) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess the required ownership stake in the start-up entity;

(4) The alien otherwise violated the terms and conditions of parole; or

(5) Parole was erroneously granted.

Automatic termination will apply upon the expiration of parole or if DHS receives written notice from the parolee informing DHS that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. DHS believes that these bases for automatic termination clearly evidence that the entrepreneur no longer qualifies for parole under this rule; therefore, notice and opportunity to respond are unnecessary. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. This rule also finalizes the provision indicating that the

decision to terminate parole may not be appealed, that USCIS will not consider a motion to reopen or reconsider a decision to terminate parole and, upon its own motion, USCIS may reopen or reconsider a decision to terminate. *See* final 8 CFR 212.19(k)(4).

3. Other Comments on Application Adjudication and Parole Termination

*Comments:* Multiple commenters suggested an expedited or premium processing option for entrepreneur parole applicants. Some of these commenters suggested a maximum 30-day adjudication time period.

*Response:* While DHS appreciates the concern for timely adjudications, at this time DHS declines to include premium or expedited processing as part of the final rule. DHS may consider the possibility of premium processing or expedited processing after assessing implementation of the rule and an average adjudication time for processing requests for parole under this rule has been determined.

K. Opposition to the Overall Rule

*Comment:* Multiple commenters expressed overall opposition to the rule, stating that there is no reason to add an additional parole process for highly trained and talented entrepreneurs when visa and residency pathways already exist, such as the O nonimmigrant visa, EB–5 immigrant visa, or EB–2 immigrant visa based on a National Interest Waiver. Other commenters asserted that the United States needs to limit immigration, not create more immigration programs. Several individual commenters argued that the U.S. Government should reform other visa programs, such as the H–1B nonimmigrant classification, and address the current immigrant visa backlog before creating more programs. Several individual commenters asserted that taxpayer money should be used on domestic issues, such as reviving the American economy, rebuilding infrastructure, promoting national security, and supporting veterans, rather than on administering a parole process for international entrepreneurs.

*Response:* DHS disagrees with the commenters' assertions that sufficient avenues for international entrepreneurs already exist. DHS believes that this final rule will, by further implementing authority provided by Congress, reduce barriers standing in the way of innovation and entrepreneurial activity that will benefit the U.S. economy.[34]

---

[34] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the U.S. is a struggle,* The
Continued

**5268** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

This final rule provides an avenue for innovative entrepreneurs to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of this rule, these innovative entrepreneurs might be delayed or discouraged altogether in contributing innovation, job creation, and other benefits to the United States.

DHS also disagrees with the commenters' assertions that reforms should be made to the H–1B nonimmigrant classification and that the immigrant visa backlog should be addressed before this rule is finalized. Parole is an entirely separate option within the Secretary's authority to allow individuals to come to the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. While DHS appreciates the commenters' sentiment that changes should be made in other contexts, the exact changes contemplated by the commenters are unclear, are outside the scope of this rulemaking, or would require congressional action.

DHS also disagrees with the assertion that taxpayer funds will be misallocated to process applications for parole under this final rule. Applicants for parole under this rule will be required to submit a filing fee to fully cover the cost of processing of applications.

*L. Miscellaneous Comments on the Rule*

1. Additional Suggested Changes to the Rule

*Comments:* A number of commenters suggested additional changes to the final rule that are beyond the scope of this rulemaking. These comments proposed changes to the regulations governing certain nonimmigrant programs, namely: Employment of F–1 nonimmigrant students through Optional Practical Training (OPT); annual H–1B numerical limitations; ''period of stay'' duration for L–1 nonimmigrants starting a new office in the United States; and merging significant public benefit parole with the O–1 visa program. A commenter suggested providing Employment Authorization Documents or lawful permanent resident status to individuals who obtained their Master's degrees in the United States. Other commenters

Guardian, Sept. 14, 2014, available at *http://www.theguardian.com/business/2014/sep/14/foreign-tech-entrepreneurs-visa-us-struggle*; Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals*, April 11, 2014, available at *http://immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* (''Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.'').

suggested providing tax incentives to established U.S. corporations that would agree to mentor immigrant entrepreneurs, or establishing a system of compensation for certain senior citizens in the United States to mentor immigrant entrepreneurs. Other commenters recommended balancing parole for entrepreneurs with refugee admissions.

*Response:* DHS thanks commenters for these suggestions but declines to make changes to the rule as these comments are outside the scope of this rulemaking.

*Comment:* A joint submission from an advocacy group and professional association recommended that DHS consider parole for individuals who work in social services fields that do not command a high income or who might otherwise perform work in the national interest.

*Response:* This final rule is aimed at international entrepreneurs who will provide a significant public benefit to the United States—which could include entrepreneurs whose startup entities operate in the field of social services, so long as they meet the criteria for parole in this final rule. Furthermore, this rule does not limit the Secretary's broader authority to grant parole to other applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

2. Information/Guidance

*Comment:* One commenter recommended that DHS make parole data from the program publicly available.

*Response:* While DHS did not propose to disclose parole data related to this rule, DHS appreciates the commenter's suggestion, and may consider making such data publicly available after this rule is implemented.

*Comment:* Other commenters suggested that DHS provide additional guidance to those granted parole under this rule and to provide resources for small start-ups interested in applying for the rule.

*Response:* DHS will evaluate whether to provide additional guidance following publication of this final rule and an assessment of its implementation.

*Comment:* One commenter suggested that DHS add a provision to the rule for retrospective review, in order to analyze the effects of the rule's implementation.

*Response:* DHS agrees with the commenter's suggestion that the effects of the rule, after its implementation, should be reviewed; however, DHS does not believe adding a provision to the final regulatory text requiring such

review is necessary. DHS intends to review all aspects of this parole rule and process subsequent to its implementation and consistent with the direction of Executive Order 13563. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said these rules should serve as a guide, but that companies and entrepreneurs should be analyzed on case-by-case basis.

*Response:* DHS may grant parole on a case-by-case basis under this rule if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion.

*Comment:* An individual commenter suggested that DHS should, as part of its assessment of parole applications under this rule, evaluate the performance of applicants' prior start-ups in their home countries.

*Response:* DHS agrees with the commenter and believes that the performance of applicants' prior start-ups in their home countries is the type of evidence already contemplated by the final rule both under the alternative criteria provisions and as part of the determination as to whether an applicant merits a favorable exercise of discretion. The alternative criteria allow an applicant who partially meets one or more of the general criteria related to capital investment or government funding to be considered for initial parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would provide a significant public benefit to the United States. Such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation. DHS is not defining the specific types of evidence that may be deemed ''reliable and compelling'' at this time, as DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant DHS's exercise of discretion in granting parole based on significant public benefit.

3. Comments Regarding the E–2 Nonimmigrant Classification

*Comment:* Several commenters submitted comments regarding the E–2 nonimmigrant classification. The majority supported the inclusion of E–2 businesses into the parole process under this rule. Several companies and an individual commenter further recommended that the rule should

accommodate E–2 businesses already in the United States.

*Response:* The final rule lays out specific criteria for determining the kind of start-up enterprise that has substantial potential for job growth and job creation, and for assessing whether an individual entrepreneur's parole would be justified by significant public benefit. DHS believes it is unnecessary to identify these enterprises even more specifically than in this final rule. DHS notes that the rule does not prevent individuals who might otherwise qualify for an existing immigrant or nonimmigrant classification from applying for parole under this rule.

*Comment:* One commenter stated that the proposed rule is much more complicated than the E–2 nonimmigrant classification, and that DHS should incorporate elements of the E–2 program into this rule's parole process.

*Response:* DHS disagrees with the commenter's suggestion.[35] A grant of parole under this rule is based on a determination that the individual will provide a significant public benefit to the United States. Eligibility for E–2 nonimmigrant classification is based on different standards, and DHS believes that applying E–2 requirements would not suffice to meet the statutory requirements for parole and establish that an individual merits a favorable exercise of discretion. DHS therefore declines to adopt the commenter's suggestion.

*Comment:* A commenter suggested that the proposed rule is unnecessary since the E–2 program already supports international entrepreneurs.

*Response:* DHS disagrees with the commenter's statement. The E–2 program allows nationals of a treaty country (a country with which the United States maintains a qualifying Treaty of Friendship, Commerce and Navigation or its equivalent) to be admitted to the United States when investing a substantial amount of capital in a U.S. business. Foreign entrepreneurs from nontreaty countries, such as Brazil, China, India, Israel, or Russia, are currently not eligible for an E–2 nonimmigrant visa. Also, the E–2 category requires the entrepreneur to invest his or her own funds, and is therefore not applicable to entrepreneurs relying upon funds from investors or government entities to build and grow their business. DHS believes that this rule provides a viable option,

consistent with the Secretary's parole authority, to allow entrepreneurs to build and grow their businesses in the United States, providing significant public benefit here.

### 4. Usefulness of the Rule

*Comment:* Multiple commenters argued that this rule will not necessarily help international entrepreneurs succeed, because there are too many restrictions in place for foreign residents to qualify. One commenter asserted that the rule as proposed is too complex and its goals will be impossible to achieve.

*Response:* DHS disagrees with these assertions. DHS acknowledges that this final rule will not benefit all international entrepreneurs seeking to enter or remain in the United States. As several commenters have stated, the final rule does not and cannot create a new visa classification specifically designed for international entrepreneurs, which is something that can only be done by Congress. This final rule, however, provides an additional option that may be available to those entrepreneurs who will provide a significant public benefit to the United States. This parole option complements, but does not supplant, current immigrant and nonimmigrant visa classifications for which some international entrepreneurs might qualify to bring or keep their start-up entities in the United States.

The requirements governing eligibility for consideration for parole under this rule establish a high evidentiary bar that must be met in order to assist DHS in its determination that the individual will provide a significant public benefit to the United States. DHS, however, does not agree with the commenter's assertion that the requirements are impossible for all entrepreneurs to meet. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

### 5. Include On-Campus Business Incubators in the Rule

*Comment:* One commenter urged USCIS to tie eligibility for parole to an applicant's participation in business incubators and accelerators located on U.S. university and college campuses that allow international entrepreneurs to grow start-up companies. The commenter stated that these programs meet the goal of the rule while providing benefits on a local and national scale. The commenter elaborated that the proposed rule only contemplates a traditional start-up arrangement, which creates

requirements based on ownership interest, type of investor, and amount of money invested. The commenter asserted that international entrepreneurs that engage with campus-based incubators cannot meet these requirements because the structure and opportunities provided by a higher education institution do not follow the traditional models. The commenter urged DHS to create alternative criteria to recognize the role higher education plays in fostering international entrepreneurs.

*Response:* DHS appreciates the comment but will not adopt changes to the rule in response. DHS recognizes and values the important role that incubators and accelerators located on a U.S. university or college campuses perform in the entrepreneur community. DHS believes, however, that the framework provided by this rule does allow DHS to consider, in its discretionary case-by-case determination, the fact that the start-up entity is participating in such an incubator or accelerator. DHS believes that evidence of such participation is one factor to be weighed for those individuals who do not fully meet the general capital investment or government funding criteria and are relying on additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS believes that reliable and compelling evidence may, depending on all the circumstances, include evidence that the start-up entity is participating in a reputable incubator or accelerator located on a U.S. university or college campus.

### 6. Objection to Use of the Word "Parole"

*Comment:* Multiple commenters objected to the use of the word "parole" to describe the provisions in this rule. Commenters are concerned that use of the word in an immigration context will be confused with the use of the word in the criminal context. A commentator suggested using the term "conditional status" or "provisional status."

*Response:* DHS declines to accept the commenters' suggestion. "Parole" is a term established by statute at section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). The use of that term in the INA should not be confused with the word's usage in non-immigration contexts. Use of alternative terms as suggested by the commenter would be misleading.

---

[35] The E–2 nonimmigrant classification allows a national of a treaty country (a country with which the United States maintains a treaty of commerce and navigation) to be admitted to the United States when investing a substantial amount of his or her own capital in a U.S. business.

Venezuela AR_000048

7. Concern Over Possible Exploitation of Entrepreneurs

*Comment:* Two commenters suggested that international entrepreneurs would be vulnerable to exploitation by venture capital investors under this rule. The commenters compare the influence of venture capitalists over entrepreneurs granted parole to the influence of employers over H–1B employees. One commenter expressed concern that the rule could allow a venture capitalist almost total dominance over the international entrepreneur's life, through the threat of withdrawing funding and thereby triggering termination of parole.

*Response:* DHS disagrees with the commenters' assertions that the final rule will facilitate such exploitation of international entrepreneurs by venture capital investors. As a general matter, venture capitalists and other investors cannot easily withdraw funding from a start-up entity once this investment transaction has been duly executed. Once an entrepreneur has applied for parole on the basis of prior investment, and has been granted such parole, the investor will not be in a position to directly interfere with the entrepreneur's continued eligibility during the parole period. The final rule will not create conditions for exploitation that do not already exist currently for international entrepreneurs—or for that matter, domestic entrepreneurs—in the United States.

*Comment:* One commenter stated that the United States should be mindful of what may happen to poorer countries when the United States attracts their best entrepreneurs.

*Response:* DHS stresses that application for parole under this rule is voluntary and has the primary goal of yielding significant public benefit for the United States. DHS believes that applicants will assess economic and business conditions both in the United States and in other countries and will consider these conditions, along with numerous others, in the decision to apply for parole under this rule. DHS does not believe that the rule itself, which authorizes parole only for a limited period of time and under specific limited circumstances, will create significant negative consequences for poorer countries. Additionally, positive spillovers from new innovations are not limited to the specific country in which they were developed. Parole under this rule in no way prevents an entrepreneur contributing to the economy of his or her home, including through remittance payments or upon return. Furthermore, individuals may be interested in returning to their home countries in the future for a variety of reasons, including the temporary nature of parole.

*M. Public Comments on Statutory and Regulatory Requirements*

1. *Regulatory Impact Analysis*
*Comment:* Two commenters suggested alternative estimates for the number of applicants that could apply to this rule. One commenter estimated that 5,000 international entrepreneurs will apply for parole under this rule. This estimate was approximately 2,000 more entrepreneurs than the estimate provided by DHS. Another commenter stated that the rule's eligibility criteria are narrow and therefore, the rule would cause fewer than 3,000 people to apply.

*Response:* DHS recognizes that uncertainty in business and economic conditions, as well as data limitations, make it difficult to accurately predict how many entrepreneurs will apply for parole under this rule. However, as discussed in the ''Volume Projections'' section of this rule, DHS utilized limited data available to estimate that approximately 2,940 entrepreneurs could seek parole each year. This estimate was bolstered by an alternative estimate based on accelerator investment round data that DHS analyzed. Given limits on DHS's information about such entrepreneurs and that this is a new process, DHS does not know how many people within the estimated eligible population will actually apply. Additionally, fluctuations in business and economic conditions could cause the number of applications to vary across years.

While one commenter estimates that the eligible number of entrepreneurs will be higher than the DHS estimate, another commenter estimates it will be lower. Neither of the commenters provided a basis or data from which their figures were derived. DHS reaffirms that the estimate provided in this rule is reasonable. The assessment is based on analysis of data and publicly available information, and reflects, where data and analysis allow, reasonable medians or averages.

*Comment:* One commenter argued that the rule would only benefit certain special-interest venture capitalists.

*Response:* DHS respectfully disagrees with this commenter. Fundamentally, this rule is designed to yield significant public benefit to the United States— including through economic growth, innovation, and job creation—and not to any particular private-sector interest group. While some venture capital firms may benefit from the rule by having new opportunities to invest in start-up entities that would not have otherwise been able to locate in the United States, this is also true for a range of other ''qualified investors'' as defined in the rule. Moreover, many international entrepreneurs may qualify for parole under this rule without having raised private-sector capital investment at all, since funding from government entities is also an eligibility criterion.

*Comment:* Several commenters stated that the rule would provide significant economic benefits.

*Response:* DHS agrees with these commenters that the rule will provide significant economic benefits to the United States. As discussed in the proposed rule and elsewhere in this section, DHS believes that this rule will help the United States compete with programs implemented by other countries to attract international entrepreneurs. International entrepreneurs will continue to make outsized contributions to innovation and economic growth in the United States.

*Comment:* Several commenters provided feedback on the costs of applications. One commenter stated that the fees were reasonable. Another commenter suggested allowing market prices to determine parole costs, essentially allowing those entrepreneurs with more likelihood of success to invest in parole opportunities. Still other commenters stated that the application fee was too high, especially compared to various visa applications.

*Response:* DHS appreciates commenters' feedback on the costs for applications. DHS determines the costs of applications through a biennial fee study it conducts, which reviews USCIS' cost accounting process and adjusts fees to recover the full costs of services provided by USCIS. The established fees are necessary to fully recover costs and maintain adequate service by the agency, as required by INA section 286(m); 8 U.S.C. 1356(m).

*Comment:* Several commenters generally stated support for the rule because it will likely improve innovation for local and regional economic areas. Another commenter stated support for the rule because it would increase intangible assets.

*Response:* DHS concurs with this expectation that the rule will foster innovation at the local and regional level. Studies on entrepreneurs reveal that they are key drivers of innovation throughout the United States, and that such innovation benefits local, regional, and the national economy through technical progress and improvements in efficiency and productivity. The rule's

eligibility criteria focus on start-ups with high growth potential, and DHS expects that new firms started by entrepreneurs covered by the rule will conduct research and development, expand innovation, and bring new technologies and products to market in addition to creating jobs in the United States. These activities will produce benefits that will spill over to other firms and sectors.

DHS also agrees with the commenter on impacts to intangible assets. Intangible assets are generally integrated into a firm's or sector's total assets and have become important in broad analyses of productivity and efficiency. Such assets can include proprietary software, patents, and various forms of research and development. This rule is intended to attract the types of ventures that will increase intangible assets.

a. Job Creation

*Comment:* Many commenters agreed that this rule will help create jobs and significantly benefit the U.S. economy. A commenter noted that immigrants have helped to found one quarter of U.S. firms and therefore allowing more international entrepreneurs would result in new job creation. Commenters also mentioned that immigrants have historically been successful in creating and establishing new businesses, which in turn create jobs in the United States. Commenters also more specifically endorsed the need to provide more investment opportunities for venture capitalists and angel investors who indirectly create jobs. Finally, commenters from the technology industry stated that attracting entrepreneurs to the Unites States to operate in high unemployment areas could provide access to new jobs where they are most needed.

*Response:* DHS appreciates the commenters' support of this rule with regard to attracting international entrepreneurs, and emphasizes that job creation for U.S. workers is one of the rule's primary goals, as discussed in the Regulatory Impact Analysis (RIA).

b. Impact on Native U.S. Entrepreneurs and Native U.S. Workers

*Comment:* Several commenters suggested the rule will have negative consequences for native U.S. entrepreneurs and native U.S. workers. These commenters were concerned that the rule would be disadvantageous to native U.S. entrepreneurs and would create incentives for venture capital firms to find international entrepreneurs instead of investing in native U.S. entrepreneurs. The commenters argued that job creation could be accomplished

through investment of native U.S. entrepreneurs instead of foreign entrepreneurs. Several commenters also stated that the government should assist U.S. entrepreneurs and workers before helping international entrepreneurs. Commenters also mentioned that the need for international innovators was overstated and that the number of native U.S. innovators is already adequate. Finally, these commenters asserted that foreign workers are often exploited for cheap labor and harm job prospects for native U.S. workers.

*Response:* DHS disagrees with these commenters' assertion that the rule will have negative impacts on native U.S. entrepreneurs and native U.S. workers. This rule focuses on identifying entrepreneurs associated with start-up entities with significant potential for bringing growth, innovation, and job creation in the United States. Much research supports the conclusion that high-growth firms drive job creation for workers in the United States, including for native U.S. workers. As discussed in further detail in the RIA, research also shows that immigrants have been outsized contributors to business ownership and entrepreneurship in the United States and abroad. Self-employment rates for immigrants are higher than for the native U.S. population. As discussed in the RIA, although one economic study has suggested that a very small number of native U.S. entrepreneurs may be displaced by international entrepreneurs, other researchers have noted that the finding itself raises the possibility that such displacement could occur without providing evidence that it actually does.[36] DHS reiterates, moreover, that the numbers of entrepreneurs who may be eligible for parole under this rule is limited and that the aim of the rule is to increase overall entrepreneurial activity and significant economic benefit throughout the United States. In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

c. Impact on Innovation

*Comment:* Several commenters provided feedback on the rule's impact on innovation. Two commenters stated that this type of international entrepreneurship supports innovation in the United States. Another commenter stated that the rule would not help foreign innovators because of complications with patents and modeling designs.

*Response:* DHS agrees with the commenters that stated that this rule supports innovation in the United States. Entrepreneurs tend to engage in research and development in order to develop and commercialize new products and technologies, and often stimulate patents and other intellectual capital linked to these efforts. DHS does not agree with the commenter that stated the rule is not helpful to foreign innovators because of issues with patents and modeling designs, and DHS sees no basis for this comment. Nothing in the rule poses specific burdens or constraints on the ability of entrepreneurs to seek and obtain patents or other intellectual capital.

2. Review Under the National Environmental Policy Act (NEPA)

*Comment:* An advocacy organization stated that all rules, including immigration rules, are subject to review under the National Environmental Policy Act. The commenter suggested that, at minimum, an Environmental Assessment be conducted to account for the growth-inducing impacts that would occur with an influx in population under this rule.

*Response:* DHS agrees that NEPA applies to this, as to every, final rulemaking. As explained in section IV.E of this preamble, the rule has been reviewed for environmental effects and found to be within two categorical exclusions from further review because experience has shown rules of this nature have no significant impacts on the environment. DHS also notes that any entrepreneurial ventures undertaken will be governed by local, state and federal laws and regulations, including those protecting human health and the environment. We disagree with the commenter's assertion that an Environmental Assessment is required.

3. Proposed Information Collections Under the Paperwork Reduction Act

a. Employment Eligibility Verification, Form I–9

*Comment:* An individual commenter suggested that List A documents should be updated to include the verified

---

[36] Compare Fairlie, R.W., and B.D. Meyer. "The effect of immigration on native self-employment." *Journal of Labor Economics* 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/ papers/published/jole%202003%20- %20native%20se.pdf*, with, *e.g.*, Magnus Lofstrom, "Immigrants and Entrepreneurship," Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/ immigrants-and-entrepreneurship.pdf*.

**5272** **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

driver's licenses (sample attached and included in the file) that meet federal guidelines and require the presentation of the same documentation needed to obtain a passport. The commenter stated that it is no longer reasonable for those who receive a verified license and who paid the premium necessary for the processing of the extra documents, to have to locate their birth certificate and social security card in order to complete the Form I–9 process.

*Response:* DHS presumes that by "verified driver's licenses" the commenter is referring to State driver's licenses that comply with the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 302. The specific suggestion about amending List A on Form I–9, which would have wide-ranging effect and not be limited to entrepreneurs under this rule, is outside the scope of this rulemaking. This rule and accompanying form revisions limit changes to List A of Form I–9 to the modification of an existing document specified at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include individuals authorized to work incident to parole.

b. Application for Entrepreneur Parole, Form I–941

*Comment:* DHS received a public comment that stated that the time burden estimate of 1.33 hours for the respondent to complete the information collection was too low.

*Response:* DHS appreciates and agrees with this comment. Based on further review of the information collection and public comments on this specific issue, DHS is revising the estimated time burden from 1.33 hours to 4.7 hours for Form I–941 respondents.

4. Comments and Responses to Impact on Small Businesses

*Comment:* The U.S. Small Business Administration, Office of Advocacy (SBA) commented by supporting the goals of this rule, but expressed concern that the rule could significantly impact small entities. The SBA commented that the proposed rule was erroneously certified under the Regulatory Flexibility Act (RFA). The SBA stated that the only international entrepreneurs eligible for this parole program are those with significant ownership stakes in a start-up entity formed in the previous three years. The SBA also stated that the thresholds to qualify for parole were directly tied to the ability of the entrepreneur's start-up to produce significant public benefit to the United States. The SBA noted that under the proposed rule, an entrepreneur is not permitted to transfer work authorization to another start-up

entity, and that these restrictions could impact start-up entities if the entrepreneur were no longer eligible to stay in the United States. For these reasons, SBA concluded that this rule directly impacts start-up entities. The SBA recommended that DHS submit a supplemental analysis on the impact of the final rule on small entities.

*Response:* DHS has concluded that a RFA certification statement for this final rule is appropriate. This final rule does not regulate small entities nor does it impose any mandatory requirements on such entities. Instead, it provides an option for certain individual entrepreneurs to seek parole on a voluntary basis. There are no compliance costs or direct costs for any entity, small or otherwise, imposed by this rule since it does not impose any mandatory requirements on any entity. Historically, when an employer petitions on behalf of an individual or employee, DHS has provided an RFA analysis for the impact to small businesses. However, under this rule, a small entity or an employer does not apply for parole on behalf of an employee; instead, an entrepreneur applies for parole on a voluntary basis on his or her own behalf, and only those eligible individuals seeking parole would be subject to the anticipated costs of application. Entrepreneurs with an ownership stake in a start-up make the cost-benefit decision to voluntarily apply for parole.

In both the RFA and SBA's Guide for Government Agencies on the RFA, government agencies are required to consider significant alternatives to the rule when providing a full RFA analysis. Among the kinds of alternatives that SBA suggests considering include "the exemption for certain or all small entities from coverage of the rule, in whole or in part." [38] Even if this rule directly impacted small entities and DHS were required to engage in an analysis to minimize negative impacts of the rule on small entities by exempting them from the rule, that alternative would only harm small entities, which would no longer be able to benefit from the rule's allowing entrepreneurs to seek parole and work authorization.

The SBA also commented on various policy issues on the eligibility of entrepreneurs in this rule. Notwithstanding DHS' belief that entrepreneurs when filing for parole are not small entities, DHS has carefully

considered all those comments and has made policy changes in this final rule to address the comments. Specifically, the SBA commented that thresholds to qualify for parole are directly tied to the ability of the international entrepreneur's start-up to produce significant public benefit for the United States. DHS has considered this comment along with other public comments on this issue and has made the decision to lower the eligible threshold investment amount for initial parole from the proposed $345,000 in the NPRM to $250,000 in the final rule. Additionally, in the NPRM and in this final rule, DHS has provided some flexibility and alternative criteria for those entrepreneurs meeting partial eligibility requirements, as described in further detail in the preamble.

SBA also commented that the rule only allows the entrepreneur to work for the business identified on the parole application without providing leniency in transferring the work authorization to another entity. The SBA further comments that the start-up entity may be imperiled if the entrepreneur is no longer eligible to stay in the United States. The eligibility criteria for consideration for parole under this rule require an entrepreneur to have recently formed a new entity in the United States with substantial potential for rapid growth and job creation. Before an application for parole under this rule is approved, USCIS must make a discretionary determination that the entrepreneur is well-positioned to provide a significant public benefit to the United States. Therefore, these eligibility criteria are not limiting entrepreneurs, but aimed at ensuring that only those entrepreneurs with high growth potential are eligible for parole consideration under this rule. DHS has also provided avenues for an additional parole period specifically to prevent instability of a start-up entity.

DHS reiterates that RFA guidance allows an agency to certify a rule, instead of preparing an analysis, if the rule is not expected to have a significant economic impact on a substantial number of small entities.[39] DHS reiterates that this rule does not regulate small entities. Any costs imposed on businesses will be driven by economic and business conditions and not by the

---

[38] The Regulatory Flexibility Act, 5 U.S.C. 603(c)(4). The Small Business Administration's RFA Guide for Government, p. 38, available at *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf*.

[39] *See* SBA, Office of Advocacy, "A Guide for Government Agencies; "How to Comply with the Regulatory Flexibility Act, Implementing the President's Small Business Agenda and Executive Order 13272'' (May 2012), available at: *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf*.

voluntary participation for benefits from this rule.

## IV. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2015 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is $155 million.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155 million in 2015 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

### C. Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action'' under section 3(f) of

Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

1. Summary

This final rule is intended to add new regulatory provisions guiding the use of parole with respect to individual international entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential is indicated by, among other things, the receipt of significant capital financing from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. The regulatory amendments will provide the general criteria for considering requests for parole submitted by such entrepreneurs.

DHS assesses that this final rule will, by further implementing authority provided by Congress, reduce a barrier to entry for new innovative research and entrepreneurial activity in the U.S. economy.[40] Under this final rule, some additional international entrepreneurs will be able to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of the rule, these innovative entrepreneurs might be delayed or discouraged altogether in bringing innovation, job creation, and other benefits to the United States.

Based on review of data on startup entities, foreign ownership trends, and Federal research grants, DHS expects that approximately 2,940 entrepreneurs, arising from 2,105 new firms with investment capital and about 835 new firms with Federal research grants, could be eligible for this parole program annually. This estimate assumes that each new firm is started by one person despite the possibility of up to three owners being associated with each start-up. DHS has not estimated the potential for increased demand for parole among foreign nationals who may obtain

substantial investment from U.S. investors and otherwise qualify for entrepreneur parole, because changes in the global market for entrepreneurs, or other exogenous factors, could affect the eligible population. Therefore, these volume projections should be interpreted as a reasonable estimate of the eligible population based on past conditions extrapolated forward. Eligible foreign nationals who choose to apply for parole as an entrepreneur will incur the following costs: A filing fee for the Application for Entrepreneur Parole (Form I–941) in the amount of $1,200 to cover the processing costs for the application; a fee of $85 for biometrics submission; and the opportunity costs of time associated with completing the application and biometrics collection. After monetizing the expected opportunity costs and combining them with the filing fees, an eligible foreign national applying for parole as an entrepreneur will face a total cost of $1,591. Any subsequent renewals of the parole period will result in the same previously discussed costs. Filings to notify USCIS of material changes to the basis for the entrepreneur's parole, when required, will result in similar costs; specifically, in certain instances the entrepreneur will be required to submit to USCIS a new Form I–941 application to notify USCIS of such material changes and will thus bear the direct filing cost and concomitant opportunity cost. However, because the $85 biometrics fee will not be required with such filings, these costs will be slightly lower than those associated with the initial parole request and any request for re-parole.

Dependent spouses and children who seek parole to accompany or join the principal applicant by filing an Application for Travel Document (Form I–131), will be required to submit biographical information and biometrics as well. Based on a principal applicant population of 2,940 entrepreneurs, DHS assumes a total of 3,234 spouses and children will be eligible for parole under this rule. Each dependent will incur a filing fee of $575, a biometric processing fee of $85 (if 14 years of age and over) and the opportunity costs associated with completing the Form I–131 application and biometrics collection.[41] After monetizing the expected opportunity costs associated with providing biographical information to USCIS and submitting biometrics and combining it with the biometrics

---

[40] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the US is a struggle,* The Guardian, Sept. 14, 2014, available at *http://www.theguardian.com/business/2014/sep/14/foreign-tech-entrepreneurs-visa-us-struggle;* Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals,* April 11, 2014, available at *http://immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* (''Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.'').

[41] The filing fees have been updated and reflect those promulgated in the 2016 Fee Rule (1615–AC09, CIS No. 2577–15 DHS Docket No. USCIS–2016–0001).

Venezuela AR_000052

processing fee, each dependent applicant will face a total cost of $765. DHS is also allowing the spouse of an entrepreneur paroled under this rule to apply for work authorization. Using a one-to-one mapping of principal filers to spouses, the total population of spouses eligible to apply for work authorization is 2,940. To obtain work authorization, the entrepreneur's spouse will be required to file an Application for Employment Authorization (Form I–765), incurring a $410 filing fee and the opportunity costs of time associated with completing the application. After monetizing the expected opportunity costs and combining it with the filing fees, an eligible spouse will face a total additional cost of $446 (rounded). DHS expects that applicants will face the above costs, but does not anticipate that this rule will generate significant additional costs and burdens to private entities, or that the rule will generate additional processing costs to the government to process applications. While applicants may face a number of costs linked to their business or research endeavors, these costs will be driven by the business and innovative activity that the entrepreneur is engaged in and many other exogenous factors, not the rule itself or any processes related to the rule. Thorough review of academic, business, and policy research does not indicate that significant expected costs or negative consequences linked to attracting international entrepreneurs are likely to occur. As such, DHS expects that the negative consequences, if any, will be greatly exceeded by the positive effects of this rule.

In each case in which an entrepreneur will be granted parole under this rule, DHS will have made a determination that parole will yield a significant public benefit and that the person requesting parole merits a favorable exercise of discretion. Consistent with those decisions, the rule is expected to produce broad economic benefits through the creation of new business ventures that otherwise would not be formed in the United States. These businesses are likely to create significant additional innovation, productivity, and job creation. It is reasonable to conclude that investment and research spending on new firms associated with this rule will directly and indirectly benefit the U.S. economy and create jobs for American workers. In addition, innovation and research and development spending are likely to generate new patents and new technologies, further enhancing innovation. Some portion of the international entrepreneurs likely to be attracted to this parole process may develop high-growth and high-impact firms that can be expected to contribute disproportionately to U.S. job creation. In summary, DHS anticipates that this rule will produce positive effects that would greatly exceed any negative consequences.

Using an estimate of 2,940 annual applications for significant public benefit entrepreneur parole as developed in the ensuing volume projections section of this analysis, DHS anticipates the total cost of this rule for principal filers who face a total per applicant cost of $1,591 to be $4,678,336 (undiscounted) annually for any given year. (These estimates focus only on principal initial filers, not entrepreneurs who might be eligible for a re-parole period of up to 30 months, or their spouses.) Dependent spouses and children who must submit the Form I–131 application and biometrics will face a per-applicant cost of $765, for a total of $2,474,914 (undiscounted). Dependent spouses who apply for employment authorization will face a per applicant cost of $446, which DHS projects will total $1,311,830 (undiscounted). Adding together the costs for the principal filers and family members—including filing costs, costs of submitting biometrics, and monetized opportunity costs—yields a total cost of this rule for the first year, 2017 and subsequently 2018, of $8,465,080 (undiscounted). The total annual cost of the rule of $8,465,080 can be expected for each subsequent year in the ten-year period. The total ten-year undiscounted cost is $84,650,081.

### 2. Background and Purpose of the Rule

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole applicants for admission into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, research and development and other forms of innovation, and job creation in the United States. The rule will establish general criteria for the use of parole with respect to individual entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States.

The purpose of the rule is to attract talented entrepreneurs to the United States who might otherwise choose to pursue such innovative activities abroad, or otherwise be significantly delayed in growing their companies in the United States, given the barriers they presently face. In addition to the benefits associated with entrepreneurial innovation, including new products, business networks, and production efficiencies that such activities are likely to generate, entrepreneurs have been and remain vital to economic growth and job creation in the United States and have generated a cohort of high-growth firms that have driven a highly disproportionate share of net new job creation.[42]

A body of research documents both the importance of entrepreneurial activity to the U.S. economy and its link to immigration. In this background section, DHS does not attempt to comprehensively summarize this large body of work but instead focuses on specific aspects central to the purpose of the rule and to its potential impacts.[43] In summary, DHS focuses on the role of new entrepreneurial firms in job creation in the United States, and the role that immigrant entrepreneurs have played in innovation and the high technology sector.

The labor market of the United States is highly dynamic. DHS analysis of data published by the U.S. Department of Labor's Bureau of Labor Statistics (BLS) indicates that between 2004 and 2013, on average about 847,000 firms were ''born'' each year and 784,000 ''died.''[44] To illustrate the extent of the labor market churn, since 1980 the private sector has generated about 16.3 million gross jobs annually but an average of only about 1.4 million net jobs annually. In both general business cycle expansions and contractions, large numbers of jobs are created and destroyed, comprising a key dynamic in the forces of creative destruction.[45]

---

[42] See Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, *High-employment-growth firms: Defining and counting them*, Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1–2, available at: *http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf*.

[43] DHS notes that the body of research concerning immigration in general and its impact on the labor market, most notably germane to earnings and employment of domestic workers, is not addressed in the present analysis.

[44] Figures were obtained from the BLS, Business employment Dynamics, Table 8, ''Private sector establishment births and deaths, seasonally adjusted:'' available at *http://www.bls.gov/news.release/cewbd.t08.htm*. Firm ''births'' in these data only include new firms and thus exclude new franchises and expansions of existing firms.

[45] See Ryan Decker, John Haltiwanger, Ron Jarmin, and Javier Miranda, *The Role of*

Research into the highly dynamic and volatile labor market in the United States has evolved. Earlier focuses on small- and new-firm size as the primary co-determinants of job creation has been reoriented to focus on the role of a relatively small subset of entrepreneurial firms.

This rule focuses on identifying entrepreneurs associated with types of start-up firms that are more likely to experience high growth, contribute to innovation, and create jobs in the United States. This deliberate focus is critical to ensuring that parole in individual cases is justified by significant public benefit. Research has shown that the average start-up company does not survive long.[46] Most new firms do not add much net job creation either, as they are not focused on achieving high growth. By some estimates, the vast majority—as much as 95 percent—of all new firms are not substantial job creators or innovators.[47] About 95 percent of new firms start with fewer than 20 employees, and about the same percentage ultimately close with fewer than 20 employees, indicating that business turnover is heavily influenced by small firms.[48]

There is significant research, however, demonstrating that a small subset of new firms tends to be highly dynamic and to contribute disproportionately to net job creation. The BLS has highlighted the role of the small subset of high-growth firms that comprise about 2 percent of all firms but have accounted for 35 percent of gross job gains in recent years. "High-growth firms" are defined by the BLS and the Organization for Economic Cooperation (OECD) as those with at least ten employees that grow by at least 20 percent for each of 3 consecutive years based on employment. As of 2012, there were 96,900 high-growth firms in the United States that had created about 4.2 million jobs.[49] A key finding by the BLS is that high-growth firms especially add jobs in their first ten years, though they generally continue to add a diminishing number of new jobs even after that period of time to the extent they survive. Job creation in the United States for the last several decades has been driven primarily by high-growth firms that tend to be young and new, and by a smaller number of surviving high-growth firms that age for a decade or more.[50]

This highly disproportionate, "up or out" dynamism of high-growth firms has been substantiated by many researchers. The SBA reported that about 350,000 "high impact firms"—defined as enterprises whose sales have at least doubled over a 4-year period and which have an employment growth quantifier of 2 or more over the same period—generated almost all net new jobs in the United States between 1994 and 2006.[51] The Kauffman Foundation, a leading institute on research, data collection, and advocacy for entrepreneurial activity, reports that the top-performing one percent of firms generates roughly 40 percent of new job creation, and, the fastest of them all—the "gazelles"—comprising less than one percent of all companies, generated roughly ten percent of new jobs.[52] The same general result has been found internationally; the OECD reports that between three percent and six percent of all firms can be considered high-growth firms but about one percent can be considered the even more high-performing "gazelles."[53]

Despite the finding across a large number of studies that small new firms tend to exhibit an "up or out" dynamic in which a small number survive to age five to become high-growth firms or "gazelles," other key findings that have emerged in the literature suggest that the growth and performance of new firms, even high-growth firms, vary substantially (as indicated by metrics that include labor productivity, profitability, revenue, and research and development intensity).[54] Models that can sort out various business characteristics and economic conditions to predict high-growth probabilities are still in nascent stages. Nevertheless, this rule includes threshold criteria for parole consideration meant to identify entrepreneurs associated with the kinds of promising start-up entities that appear more likely to contribute to American innovation, economic development, and job creation. As described in more detail below, businesses started and run by immigrants have propelled these kinds of broadly shared economic benefits for many years.

Broadly speaking, high-growth entrepreneurs engage in research and development (R&D) in order to develop and commercialize new products and technologies. Several studies have found that such entrepreneurs tend to engage in R&D spending in the first year, tend to attract patents and other forms of intellectual capital, and tend to attract venture capital financing.[55]

*Entrepreneurship in U.S. Job Creation and Economic Dynamism,* Journal of Economic Perspectives—Vol. 28, Number 3 (Summer 2014), pp. 3–24, available at: *http://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.28.3.3.*

[46] According to BLS findings, "20 percent of newly created establishments don't survive their first year in business, 32 percent don't survive their first two years, and 50 percent don't survive their first 5 years." *See* Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, *High-employment growth firms: Defining and counting them,* Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1, available at: *http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.*

[47] *See* Jason Wiens and Chris Jackson, *The Importance of Young Firms for Economic Growth,* Ewing Marion Kauffman Foundation (2014), pp. 1–2, available at: *http://www.kauffman.org/~/media/kauffman_org/resources/2014/entrepreneurship%20policy%20digest/september%202014/entrepreneurship_policy_digest_september2014.pdf; see also* Hurst, Erik, and Benjamin Wild Pugsley. 2011; *What Do Small Businesses Do?* Brookings Paper on Economic Activity, no. 2 (2011), pp. 73–142.

[48] *See* Headd, Brian, *An Analysis of Small Business and Jobs,* SBA Office of Advocacy (2010), p. 6, available at: *https://www.sba.gov/sites/default/files/files/an%20analysis%20of%20small%20business%20and%20jobs(1).pdf.*

[49] *See* R. Clayton et al. (June 2013), supra n. 50, pp. 2–4. For a description of the methodology utilized to measure high growth firms, see OECD, *OECD-Eurostat Manual on Business Demography Statistics* (2007), pp. 59–65, available at: *http://www.oecd.org/std/39974460.pdf.*

[50] For specific detailed information on survival rates and employment creation at various intervals along the HGF life-span, see R. Decker et al. (2014), *supra* n. 53, pp. 6–24. The BLS and others use the term "gazelles" to differentiate the fastest growing HGFs.

[51] *See* Spencer Tracy, Jr., *Accelerating Job Creation in America: The Promise of High-Impact Companies,* SBA Office of Advocacy (2011), pp. 1–4, available at: *https://www.sba.gov/sites/default/files/advocacy/HighImpactReport.pdf; see also* Acs, Zoltan, William Parsons, and Spencer L. Tracy, Jr, *High-Impact Firms: Gazelles Revisited;* Study prepared for the SBA, Office of Advocacy (2008), p. 1, available at: *http://www.sba.gov/advo/research/rs328tot.pdf.* The SBA high-impact cohort is about 6.3% of all firms, which is higher than the 2% high-growth category found in the BLS studies. The SBA cohort is larger because the criteria are slightly less restrictive and it includes older firms.

[52] *See* Dane Stangler, *High-Growth Firms and the Future of the American Economy, Kauffman Foundation Research Series: Firm Formation and Economic Growth* (2010), p. 2, available at: *http://www.kauffman.org/~/media/kauffman_org/*

research%20reports%20and%20covers/2010/04/highgrowthfirmsstudy.pdf.

[53] David B. Audretsch, *Determinants of High-Growth Entrepreneurship,* report prepared for the OECD/DBA International Workshop on High-growth firms: local policies and local determinants, OECD, p. 2–5, available at: *http://www.oecd.org/cfe/leed/Audretsch_determinants%20of%20high-growth%20firms.pdf.*

[54] *See* R. Decker et al (2014), *supra* n. 53, pp. 5–7; *see also* Davis, Steven J., R. Jason Faberman, John Haltiwanger, Ron Jarmin, and Javier Miranda, *Business Volatility, Job Destruction, and Unemployment.* American Economic Journal: Macroeconomics 2(2) (2010): 259–87. Research and development intensity is typically measured as the ratio of research and development spending to revenue, net income, or overall costs.

[55] *See* Shah, Sonali K. and Winston Smith, Sheryl and Reedy, E. J., *Who are User Entrepreneurs? Findings on Innovation, Founder Characteristics, and Firm Characteristics,* The Kauffman Firm Survey (Feb. 2012), pp. 2–5, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2012/02/whoareuserentrepreneurs.pdf.*

Venezuela AR_000054

Immigrants have been central contributors to business ownership and entrepreneurship in the United States and abroad. According to OECD data, self-employment rates for immigrants are higher than those of the native-born populations in many counties, including in the United States.[56] Based on the most recent data available from the U.S. Census Bureau, 12.9 percent of the United States population was foreign-born. Their rate of self-employment is about 30 percent higher than that of the native-born population (7.7 percent vs. 5.9 percent; n=1.8 million). The Census Bureau's 2012 Survey of Business Owners showed that 14.4 percent of U.S. firms were owned by at least one person not born a citizen of the United States.[57] Two studies based on samples of U.S firms found slightly higher r foreign-born ownership rates.[58]

Many high-growth firms are involved in activities classified in the STEM (science, technology, engineering, and math) fields. The high concentration of immigrant entrepreneurs in these industries has garnered much attention. Between 2006 and 2012, one-third of companies financed with venture capital that made an initial public offering had an immigrant founder, a sharp rise from seven percent in 1980. These companies have generated 66,000 jobs and $17 billion in sales.[59] A survey of entrepreneurs in technology-oriented privately held companies with venture backing also showed about one-third were foreign born, and 61 percent held at least one patent.[60]

Further evidence points to similar findings. Between 1995 and 2005, 25 percent of science and technology focused businesses founded in the United States had a foreign-born chief executive or lead technologist. In 2005, those companies generated $52 billion in sales revenue and employed 450,000 workers. In Silicon Valley, the share of immigrant-founded start-ups increased to 52 percent by 2005. In 2006, foreign nationals residing in the United States were involved (as inventors or co-inventors) in about 26 percent of patent applications filed that year. Immigrant founders of Silicon Valley firms tend to be highly educated, with 96 percent holding bachelor's degrees and 74 percent holding advanced degrees, and with three-quarters of the latter in STEM fields. As of 2010, according to one study, more than 40 percent of the Fortune 500 companies had been founded by an immigrant or the child of an immigrant.[61]

To reiterate, high-growth firms tend to be new and young, and one of their primary contributions to the highly dynamic labor market of the United States has been through job creation. High-growth firms tend to innovate and focus on developing new products and services. The intense involvement of immigrant entrepreneurs in successful technology-driven activities suggests substantial economic contributions. While measuring the precise value and impact of innovation is difficult and still at a nascent stage in research, many economists believe innovation creates positive externalities and spillover effects that further drive economic growth.[62]

Notwithstanding the research on the positive effects of high-growth entrepreneurship, there is some evidence of a long-term slowing in start-up dynamism and entrepreneurial activity in the United States; this trend began several decades ago, driving many economists to advocate for policies that attract more entrepreneurs in general.[63] Many business entrepreneurial advocacy centers have also advocated in recent years for the United States to enact a formalized pathway for immigrant entrepreneurs. DHS is aware of one estimate of the potential benefits of a theoretical start-up visa (which, as an entirely new visa classification, only Congress can create). A Kauffman Foundation study (2013) estimated that, under certain conditions, the establishment of a start-up visa program could lead to the creation of between 500,000 and 1.6 million new jobs after ten years.[64] The potential benefits of attracting immigrant entrepreneurs have not gone unnoticed internationally. Thirteen of the thirty-five nations that are part of the Organization of Economic Cooperation and Development (OECD) have enacted special immigration programs for entrepreneurs, although the eligibility criteria vary among them to a significant extent.[65]

3. Population of Entrepreneurs Potentially Eligible

DHS cannot precisely predict the volume of new businesses that will start in the United States due to this rule. DHS has instead examined available data to provide a broad estimate of the population of individual entrepreneurs who may be eligible to request parole consideration under this rule. Given limits on DHS's information about such entrepreneurs, DHS does not know how many people within the estimated eligible population will actually seek such consideration; the estimates contained in this section represent an approximation to the size of the eligible population. DHS has estimated the population of entrepreneurs potentially eligible for parole under this rule based on two sub-groups: (1) Foreign individuals who seek to come to the United States to start a new business with financial backing from a qualified U.S. investor; and (2) foreign individuals who seek to come to the United States to start a new business as recipients of U.S. funded and awarded

[56] OECD, *Migrant Entrepreneurship in OECD Countries*, prepared by Maria Vincenza Desiderio (OECD) and Josep Mestres-Domènech for the Working Party on Migration (2011), pp. 141–144, available at: *http://www.oecd.org/els/mig/Part%20II_Entrepreneurs_engl.pdf*. This, and many other similar studies and analyses are based on self-employment rates, which are a proxy, but not a perfect measure, of business ownership, because some ownership structures such as partnerships, that could involve a foreign-born owner, are generally not considered to be proprietary.

[57] The categorization of "foreign-born" does not differentiate between lawful permanent residents and naturalized citizens. It also does not provide details of the firm history, implying that some firms owned by persons not born in the United States could have been founded by U.S. citizens and sold to foreign-born persons.

[58] *See* David M. Hart, Zoltan J. Acs, and Spencer L. Tracy, Jr., *High-tech Immigrant Entrepreneurship in the United States.;* report developed under a contract with the Small Business Administration, Office of Advocacy (2009), page 8, available at: *https://www.sba.gov/sites/default/files/advocacy/rs349tot_0.pdf; see also* Robert W. Fairlie and Magnus Lofstrom, *Immigration and Entrepreneurship*, Institute for the Study of Labor (2013), p. 1, available at: *http://ftp.iza.org/dp7669.pdf*. The foreign born ownership rates for U.S. firms reported in these papers is 16% and 18.2%, in order.

[59] This information is found from various sources and found in Stuart Anderson, *American Made 2.0. How Immigrant Entrepreneurs Continue to Contribute to the United States Economy*, National Foundation for American Policy, sponsored by the National Venture Capital Association (NVCA) (2013), pp. 3–7.

[60] *Id.* at pp. 2–5.

[61] Vivek Wadhwa, *Foreign-Born Entrepreneurs: An Underestimated American Resource*, Ewing Marion Kauffman Foundation (2008), pp. 2–6, available at: *http://www.kauffman.org/~/media/kauffman_org/z_archive/article/2008/11/wadhwatbook09.pdf*.

[62] *See SMEs, Entrepreneurship and Innovation*, OECD (2010), pp 26–28, available at: *http://www.oecd.org/berlin/45493007.pdf*.

[63] *See* R. Decker et al. (2014), supra n. 53, p. 16–22.

[64] *See* Dane Stangler and Jared Konczal, *Give Me your Entrepreneurs, Your innovators; Estimating the Employment Impact of a Startup Visa*, Ewing Marion Kauffman Foundation, (Feb. 2013), pp. 1–3, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2013/02/startup_visa_impact_finalsada*. The estimates are based on a fixed pool of 75,000 startup visas for a 10-year period, in which firm deaths each year cycle some of visa to new entrants.

[65] Most programs have been enacted after 2010. A country list and some descriptive data can be found at Jean-Christophe Dumont, *Investor Visas in OECD Countries*, OECD Conference on Global High-Skilled Immigration Policy, The National Academies Board on Science, Technology and Economic Policy (2014), available at: *http://sites.nationalacademies.org/cs/groups/pgasite/documents/Web page/pga_152202.pdf*.

research grants and who intend to conduct the concomitant research in the United States. DHS assumes that each member of the eligible population will start a business and that the general criterion for investment from a qualified investor (e.g., venture capital firms, angel investors, or accelerators or incubators) be set at $250,000, while for government grants or awards the general criterion will be $100,000. Based on these amounts, DHS analyzed various past endeavors for the potential sources of funds. DHS estimates that approximately 2,940 foreign nationals annually could be eligible to apply for parole under this rule. Table 1 summarizes the analysis by source of funds.

### Table 1—Number of Entrepreneurs Potentially Eligible

| Sub-group | Annual eligibility |
| --- | --- |
| New firms funded with investment capital ................ | 2,105 |
| New firms funded with U.S. grants or awards ............... | 835 |
| Total ............................... | 2,940 |

DHS has no way of predicting with certainty the actual number of foreign nationals who will seek parole under this rule over time, as the size of the eligible population could change significantly. DHS acknowledges that the estimate of eligible individuals annually is an approximation based on past foreign ownership and start-up capital amounts. The analysis utilized to estimate the potential eligible population is also based implicitly on assumptions that: (1) The rule will not significantly change the frequency of U.S. funded grant applications from international researchers; and (2) that the rule will not significantly affect the market for international entrepreneurs and the market for the types of investment structures the rule will involve. Based on these assumptions and the data limitations, DHS projects that for the first full year that the rule will be effective, annual eligibility will be approximately 2,940.[66] DHS projects

that this number will hold steady for the second year as well. The next section provides key data and analytical approaches utilized to arrive at the estimates of eligible individuals. DHS first considers volume estimates of eligible individuals based on official U.S. data. The resulting estimates based on official data are those utilized for the cost projections of the rule. Due to particular constraints in the data, DHS follows with an alternative method of volume estimation of eligible individuals that adds robustness to the official estimate.

### Volume Projections Data and Methodology

#### A. Grants

Because U.S.-funded research grants may be a qualifying investment under this rule, DHS obtained publicly available data on federally funded grants for fiscal years 2013–2015.[67] Although numerous agencies within the Federal Government award grants to foreign-born individuals, most are humanitarian or development focused.[68] For this reason DHS parsed the very large data set comprising 1.7 million records to obtain a viable analytical cohort. First, the records were filtered to capture Federal Government agencies that award grants to both United States and foreign-born recipients. Secondly, the records were sorted to only include the Federal Government agencies that award grants focused on "projects," thereby excluding block and assistance grants.[69] The foreign-born cohort used for the eligibility projections excluded grants made to recipients in U.S. territories, as such recipients may be subject to special considerations outside the

parole parameters.[70] DHS also excluded grant amounts recorded as negative, zero, and trivial amounts of less than $1,000—such values were recorded if grants were rescinded or for some other reason not ultimately funded. On average, 138,447 grants comprised the annual resulting analytical cohort derived from the above filtering procedures. Of that total, a small portion, 2,043 grants, or 1.5 percent, were awarded to foreign-born individuals. Having determined a reasonable eligibility threshold of $100,000, DHS proceeded to the next step, to determine the potential annual eligible population of grant-sourced researchers. Over the period of analysis, 41 percent of the Federal grants awarded to foreign recipients equaled or surpassed the $100,000 benchmark, for an average of 835 annually.

#### B. Investment Capital

To estimate the number of potential new entrepreneurial start-ups, DHS obtained and analyzed data from the BLS and the Census Bureau. From the BLS Business Employment Dynamics (BED) data suite, DHS obtained the number of private establishments aged 1 year or less for nine broad sectors likely to be involved in innovative activity, in order to focus on entrants.[71] Although a reasonable proxy, the number of establishments aged 1 year or less is not a perfect measure of firm start-ups (births). The chosen metric may

---

[66] DHS emphasizes that the total is a broad estimate, as the Department has no means to determine the demand for entrepreneurial parole, changes in the eligible population that the rule may cause, time-variant possibilities, and application preferences. These conditions could change, if, for example, some foreign researchers see parole as attractive and apply for federally funded grants that they otherwise might not have applied for in the absence of the rule. In addition, volume estimates should be interpreted to apply to only initial applications, not considerations for re-parole at some future point in time. Lastly, the market for the

types of investments involved, such as venture capital, are fluid and becoming more global in scope. DHS has no means to determine how the evolution of these investment markets will affect, or be affected by, the rule.

[67] The data were obtained from USASpending.gov: https://www.usaspending.gov/Pages/Default.aspx. From the homepage, the data can be accessed from the linked "data download" section. The files were obtained on April 20, 2015.

[68] It is certainly the case that U.S. State governments and other governmental entities issue research grants that foreign recipients could potentially utilize for parole eligibility. However, DHS is not aware of any database that collects and provides such data publicly.

[69] The Federal entities that awarded scientific focused research to foreign recipients were: Agricultural Resource Service, National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration, Department of Defense, National Aeronautics and Space Administration, National Oceanic and Atmospheric Administration, National Institute of Standards and Technology, and National Science Foundation. The U.S. Department of State and the Agency for International Development (USAID) were excluded from the analysis.

[70] There is a particular way in which the data germane to foreign grants were parsed and analyzed. There are two possible foreign indicators listed for each grant. One is the "principal place" involving the research and the other is the "recipient country." The incumbent volume projections are based on the latter because this indicator generally implies that the grant was made to a person or institution outside the United States. The former is not used because this indicator could apply to grants awarded to U.S. or foreign persons in order to conduct the ensuing research outside the United States. Implicit in this analysis is that persons awarded U.S.-funded grants that are overseas could conduct their research and innovation in the United States, and are not otherwise precluded from doing so, even if the focus of such research is in a foreign country.

[71] The BLS data is found at http://www.bls.gov/bdm/bdmage.htm. DHS utilized the "Establishment age and survival BED data for nation by major industry" set and figures from Table 5, "Number of private sector establishments by age," for the nine major sectors shown in Table 2. The BLS does provide figures on firm births that could be used in the present analysis. However, DHS chose establishment age data because it is broken down in a way that corresponds precisely to the innovating sectors, discussed below. The firm birth data is not categorized in the exact same manner. The nine major sectors were chosen to envelope the approximately 430 individual activities that DHS considers to involve "science, technology, engineering, and math" (STEM). The full list based on the 2012 update can be found at: http://www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf.

overstate births, by including expansions and new franchises of existing businesses. Conversely, it may understate the actual number of start-ups, because some fraction of firms does not survive the first year (the data are tabulated in March of the respective year such that the establishments aged 1 year and less are those that opened within the previous year but remained in business as of March of the following year), and those that opened in the previous year and were still in business but had not reached 2 years of age. DHS utilized the relevant figure for March 2015, because the latter is the most recent figure reported in the BED dataset.

For each sector, DHS obtained the corresponding share of firms owned by a person "not born a citizen of the United States" from the Census Bureau's Survey of Business Owners

data set.[72][73] For brevity, we utilize the term "foreign" here to describe such firms. The foreign share was obtained by dividing the number of foreign-owned private firms in a sector by the total number of reporting firms in the same sector. This share applies to firms that have a least one owner who was not born in the United States but does not differentiate between various types of ownership structures. The figure for new firms obtained from the BLS BED data was multiplied first by the foreign share to generate an estimate of firms per sector started by a person not born in the United States.

Next, DHS attempted to calculate how many of the firms were started with at least $250,000, the minimum investment threshold that the rule sets. The SBO data provides ranges of such startup capital amounts but DHS could not conduct a precise estimate because

the data do not provide a category bound by the threshold minimum. In fact, the encompassing tranche is very large, from $249,500 to $1 million in range. The SBO does not provide actual cohort data or other information from which DHS could evaluate the distribution and, therefore, DHS has no way of ascertaining how many firms in this large range will occupy the $250,000 to $1 million segment. As a result, DHS relied on the share of firms in this tranche and the additional tranches over $1,000,000 relative to the share of all firms reporting for the sector, and recognizes that the volume projection is likely larger than is realistic. An additional assumption is that the startup threshold is the same for businesses with native and foreign-born founders. The relevant data and estimates per sector are shown in Table 2.

TABLE 2—SUMMARY OF ENTREPRENEUR ESTIMATES

| Sector | New firms | Foreign share (%) | Start-up threshold (%) | Annual eligible |
|---|---|---|---|---|
| Agriculture | 10,182 | 4.9 | 2.5 | 12 |
| Utilities | 1,204 | 10.8 | 5.5 | 7 |
| Manufacturing | 29,883 | 11.0 | 5.4 | 178 |
| Information | 22,855 | 11.9 | 2.0 | 55 |
| Professional Services* | 165,425 | 12.8 | 1.2 | 248 |
| Management | 7,334 | 7.3 | 20.2 | 108 |
| Waste Services | 66,161 | 16.4 | 0.9 | 94 |
| Education | 15,226 | 11.9 | 0.7 | 13 |
| Health Care | 210,977 | 18.0 | 3.7 | 1,391 |
| Total | ..................... | ..................... | ..................... | 2,105 |

* Abbreviation for "Professional, Scientific, and Technical Services".

As is discussed in the preamble, DHS has revised two substantive components of the eligibility criteria for this final rule. Foremost, the general investment amount requirement has been lowered from $345,000 to $250,000. DHS believes that the volume estimate of entrepreneurs based on investment capital will be higher than the 2,105 presented above but cannot make a determination of exactly how much higher. The reason is that the lower investment amount will allow some firms to be created that otherwise would not at the higher amount proposed initially, but the Census Bureau capital

size bin relevant to the level proposed is the $249,500 to $1 million in range, which includes both figures. Because DHS does not have data on the distribution of amounts within this range, the entire bin was included in the proposed estimates and is retained in the final estimates. However, as is described below, DHS has conducted an alternative method of estimation—to include updates from the initial proposal based on new information and data—that compares very closely to the estimated total volume of 2,940. Specifically, an alternative estimate of total volume annually is 2,920.

C. An Alternative Estimate of Entrepreneurs Based on Investment Structures

DHS recognizes the imperfections in estimating the potential population of eligible entrepreneurs based on extrapolating past conditions of foreign ownership rates and capital thresholds. The main benefit of this method is that it is based on official data. A main limitation is that it assumes that the annual crop of firms created are entrepreneurial and the types of firms covered by the parole process in the rule. In practice, some, but not all, will

[72] The Census SBO data are found at: *http:// www.census.gov/data/tables/2012/econ/sbo/2012-sbo-characteristics.html.* The foreign ownership figures per sector are found under "Characteristics of Business owners," Table SB1200CSBO11: "Statistics for Owners of Respondent Firms by Whether the Owner Was Born in the United States by Gender, Ethnicity, Race, and Veteran Status for the U.S." and the startup capital data are found under Characteristics of Businesses, Table SB1200CSB16: "Statistics for All United States

Firms by Total Amount of Capital Used to Start or Acquire the Business by Industry, Gender, Ethnicity, Race, and Veteran Status for the United States: 2007." The foreign ownership share of firms is provided in the table and thus did not need to be calculated by DHS. The SBO data are part of the 2012 survey for which data was released publicly between February and June 2016.

[73] A possible source of upward bias in the foreign ownership share and hence the estimate of eligible entrepreneurs is that this share does not

differentiate between foreign owners who came to the United States to open a business and those who acquired one after being in the United States for some period of time (*e.g.*, lawful permanent residents or naturalized citizens). A general finding among the literature on this topic is that many foreign-born business owners were driven to start a business by "push" factors in the labor market after arrival in the United States. DHS does not have a means to parse out the ownership rate in a more granular way to account for such differences.

be innovators, even though the present analysis focuses on the sectors of the economy linked to STEM activity (DHS is not aware of any methods or data that can allocate a research-innovation share of firms to each sector). A second limitation is that the DHS method of measuring new firms in the context of the rule is imprecise. The final rule revised the definition of "start-up entity" in 8 CFR 212.19(a)(2) to include firms that were formed up to 5 years prior to the filing of the application for parole, compared to three years as proposed in the NPRM. However, the BLS cohort of new firms utilized for the volume projections is 1 year of age or less, not five or even three years, and is thus a smaller estimate of the number of new firms that could be eligible. This limitation cannot be overcome because of the manner in which the survival cohorts are presented.[74] Because the volume projections are derived from information obtained from official sources—the BLS and Census Bureau—DHS retains them for purposes of the costs and volume estimates of the rule. DHS believes, however, that an alternative method of estimation will inform readers and strengthen the regulatory analysis by providing a viable comparison to the official projections. In this alternative approach, DHS focuses on business accelerators and incubators (described together as "accelerators" for brevity). By analyzing the foreign component of these structures, data permitting, an alternative estimate of entrepreneurs can be obtained for comparison purposes.

DHS obtained publicly available information from Seed-DB, which provides data on U.S. accelerators collected from industry associations and fee-based data providers such as Crunchbase, which is a large data provider for venture capital, angel investors, and accelerators.[75] From the Seed-DB Web site DHS utilized the list to "firms that have exited" to collect the cohort of firms that underwent accelerators and then exited via an acquisition or public offering. Next, DHS parsed the data to capture firms that reported total funding, exit value, and were not recorded as "dead" (last accessed on Nov. 7, 2016). The parsing described above yielded a cohort of 89 firms. DHS followed the Seed-DB links to Crunchbase for each firm and extracted the seed round, recording its value.[76] Analysis of the investment rounds reveals that the median is $250,000. Having determined a median seed round size from the data, DHS next attempted to estimate a foreign share of accelerated firms. The exit cohort from which the median was calculated did not provide such information, hence DHS turned to the Seed-DB data suite that lists the total number of companies incubated for each accelerator and the countries that the companies were located in. Since there is wide variation in the number of companies per incubator, ranging from 1 to over a thousand, DHS grouped the incubators by country and then weighted each one for its share of total companies. The resulting weighted average indicates that one quarter of incubated companies were foreign.[77] Having determined a median seed round and a foreign share estimate, the final point required is the number of firms to apply these figures to. Based on the most recent data from the Center for Venture Research, the 2013–2015 annual average for angel financed firms in the seed and startup phase was 33 percent, which equals 23,336 firms annually. Multiplying this average number of firms by 0.25 to capture the foreign share and then by 0.5 to reflect the median and also the investment level DHS has set yields an annual estimate of 2,920.

This estimate compares well to the official total volume estimate of 2,940. The accelerator data captures seed rounds that involve venture capital, angel, accelerator investments, and grants, which is why it is compared to the total volume estimate.

D. Potential Variability in the Volume Projections

This section discusses several potential cohorts involving entrepreneurial activity that is difficult to estimate.

In light of the potential benefits to the U.S. economy and job creation, DHS is proposing this rule to provide a mechanism that, consistent with the requirements of the INA, encourages international entrepreneurs described herein to form and create innovative firms in the United States. In 2011, DHS began outreach and stood up the Entrepreneurs in Residence initiative to try to encourage entrepreneurship among foreign nationals.[78] DHS began tracking the number of foreign nationals who indicated interest in starting up an entrepreneurial endeavor at some point during their admission as an H–1B nonimmigrant. Over four fiscal years (FY 2010–2013), an average of 77 foreign nationals indicated such interest. In light of the relatively small numbers of foreign nationals who indicated their entrepreneurial intentions, DHS believes that considering parole requests under this rule will promote further innovation and other economic benefits in addition to those created by existing programs and policies used by foreign nationals to pursue high-growth entrepreneurial activity in the United States. When the rule is effective, there could be some small substitution effects as some portion of this cohort could switch to seeking parole instead of relying on other existing nonimmigrant programs and policies. DHS, however, does not believe such substitution will occur on a large scale because the ability to be admitted to the United States as a nonimmigrant offers materially more benefits and protections than parole.

In addition, the rule lists a number of ancillary conditions for eligibility—and conversely a number of conditions that

---

[74] Specifically, the BLS BED provides the number of firms surviving to a specific age and below. For example, the five year cohort includes all firms started within five years surviving up to that point, and so on for younger cohorts. However, the data does not count the number of firms within each survival cohort by their true age. Hence, the five year survivals do not include firms that started up and may have died after three years that could have been eligible at one time. Therefore, the five year survival cohort significantly undercounts the number of firms that will potentially have been considered new in the context of the final rule. Conversely, adding up the survival cohorts to a point, say year five, will significantly over-count the number of firms considered new in the context of the final rule. The reason is that a firm that survived four years and went on to age five will be included in both the five and four year cohort, not to mention the younger ones. Thus, adding the two (age four and five) cohorts together would double count the survivor. This problem is less onerous for firms aged one or zero.

[75] The Seed-DB information is found at *www.seed-db.com/.*

[76] For most of the firms in the exit cohort, the initial round of investment date-wise was also the smallest round in terms of value and labeled as the "seed" or "angel" round. For about 10 percent of the firms however, determining which round to use for the analysis was not straightforward and DHS had to utilize some discretion. For example, for some firms the seed round was listed after other rounds, such as venture capital or Series A rounds. For others, the seed round was not the smallest round recorded. DHS does not know why these anomalies are present but proceeded to choose the "seed round" regardless of its dating or amount. The only exception was in the few cases in which the seed round post-dated other rounds and was larger in amount. In these few cases the initial round was chosen, regardless of what investment type it was.

[77] This foreign share found by DHS in the analysis corresponds strongly to a finding in a study of high technology firms that found that 24 percent of such firms were founded by a foreign born person. *See America's New Immigrant Entrepreneurs,* Vivek Wadhwa, AnnaLee Saxenian, Ben Rissing, and Gary Gereffi, available at: *http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf.*

[78] Source: "USCIS Announces 'Entrepreneurs in Residence Initiative,'" available at: *http://www.uscis.gov/news/public-releases-topic/business-immigration/uscis-announces-entrepreneurs-residence-initiative; see also http://www.uscis.gov/eir/visa-guide/entrepreneur-visa-guide.*

will leave individuals unlikely or unable to be paroled into the United States (or continue to be paroled in the country). Because ancillary conditions can be considered for eligibility, the actual volume may be smaller than the estimates herein. Two examples are that, under the rule, applicants must maintain household income greater than 400 percent of the poverty line and that the qualifying start-up capital cannot come from family members. The volume estimates presented in this analysis assume all ancillary eligibility conditions are met.

Finally, two potential elements of the eligible population are considered. First, as alluded to in the summary, the volume estimates and ensuing cost estimates assume one individual owner for each new firm; under the rule, DHS will allow up to three individuals per firm to seek parole but does not attempt to estimate how many of the startups could have more than one owner. Second, the volume estimate for grants is based on Federal awards only. DHS will consider eligibility based on State or local grants and awards, including those from State or local Economic Development Corporations (EDCs). However, unlike in the case of Federal awards, there is not a database capturing State and local grants or the transmission mechanisms through which some Federal grants are distributed to other entities, such as EDCs, and as such DHS is unable to estimate the number of entrepreneurs potentially eligible for parole as a result of receiving State and local grants.

4. Costs

A. Principal Filer Costs

The rule will permit certain foreign nationals to apply for a 30-month (2.5-year) initial period of parole into the United States provided they meet the eligibility criteria. Those who seek such parole into the United States will face the costs associated with the application, which involve a $1,200 application fee plus other costs, detailed below. The costs will stem from filing fees and the opportunity costs of time associated with filing the Application for Entrepreneur Parole (Form I–941).

The filing fee for the Form I–941 application is $1,200. The fee is set at a level intended to recover the anticipated processing costs to DHS.[79]

In addition, DHS is proposing that applicants for parole as an entrepreneur submit biometrics and incur the $85 biometric services fee. Because entrepreneurs could start firms in any number of occupations, DHS believes it is appropriate to utilize the mean hourly wage for all occupations, which is $22.71.[80] In order to anticipate the full opportunity cost to petitioners, DHS multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, for a total of $33.16 per hour.

DHS estimates that the application will take 4.7 hours to complete. After DHS receives the application and fees, if the applicant is physically present in the United States, USCIS will send the applicant a notice scheduling him or her to visit a USCIS Application Support Center (ASC) for biometrics collection. Along with the $85 biometric services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity cost of traveling to an ASC, the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours. DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[81] By applying the

$33.16 hourly time value for applicants to the total biometrics-related time burden, DHS finds that the opportunity cost for a principal applicant to travel to and from an ASC, and to submit biometrics, will total $121.68.[82] In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[83] DHS assumes that each individual will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants.

DHS estimates that each principal parole applicant will incur the following costs: $1,285 in filing fees to cover the processing costs for the application and biometrics; $306.27 after summing the monetized cost of travel to submit biometrics, the total opportunity costs of time of the initial applications, biometrics, and estimated travel costs, resulting in a total cost of $1,591.27 per application, rounded to $1,591.[84] If DHS receives 2,940 applications from persons eligible to apply, DHS anticipates that such applications will result in annual filing fee transfers of $3,777,900 (undiscounted), which comprise the application fee and cost of submitting biometrics, and opportunity and other burden costs of $900,436 for a total annual cost of $4,678,366. Any subsequent renewal of the parole period will result in costs similar to those previously discussed, with the exceptions of travel costs, since the applicant will not be required to depart the United States and re-enter. Similarly, the same costs will result for material changes requiring the filing of amended applications, with the exception of the travel costs noted above and costs associated with biometrics collections, including the time and travel to an ASC.

---

[79] USCIS calculates its fees to recover the full cost of USCIS operations, including meeting national security, customer service, and adjudicative processing goals. As with other fees, USCIS uses Activity Based Costing (ABC) to assign costs to specific benefit requests. This model uses completion rates (actual or estimated depending on whether the benefit type is already being

adjudicated) to calculate a fee or fee adjustment for a benefit type. A completion rate reflects an average time an adjudicator spends actually working on a case but does not include "queue" or wait times. Because parole under this rule has not yet been implemented, the completion rate used is based on a 4-hour estimate provided by USCIS' subject matter experts. At this time, USCIS has estimated that 30 additional staff will be required to satisfy the forecasted workload associated with this rule. However, USCIS requires adjudicators to report actual adjudication hours and case completions by benefit type. This reporting will occur after this rule is implemented. Adjudication hours will be divided by the number of completions for the same time period to determine the *actual* average completion rate. This rate will be used in future fee adjustments and will help determine future staffing allocations necessary to handle the projected workload for parole under this rule.

[80] Please see U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program, National Occupational Employment and Wage Estimates, United States (May 2014), available at: *http://www.bls.gov/oes/2014/may/oes_nat.htm*.

[81] Foreign nationals who submit their applications from outside the United States will still be required to pay the $85 biometric processing fee and travel to a USCIS office abroad, if available, or a U.S. embassy or consulate office for biometric processing at the time of travel document issuance. Due to data limitations, and to capture general

impacts of the rule, DHS has estimated costs of submitting biometrics under the assumption that all applicants are traveling to an ASC in the United States.

[82] Calculation: $33.16 * 3.67 hours = $121.68.

[83] Calculation: 50 miles multiplied by $0.575 per mile equals $28.75. See 79 FR 78437 (Dec. 30, 2014) for GSA mileage rate.

[84] Calculation: $1,285 + 306; $1,285 is the sum of the direct cost of the $1,200 filing fee and the $85 cost of biometrics. The $306(rounded) figure is obtained by adding the cost of travel ($28.75) plus the total opportunity cost of $277, the latter of which is the product of the total time burden (8.37 hours) and the average burdened hourly wage ($33.16).

## B. Dependent Spouses and Children

The rule will require all dependent family members (spouses and children) accompanying or joining the entrepreneur to file an Application for Travel Document (Form I–131), and will require all spouses and children 14 years of age through age 79 to submit biometrics.[85] Those spouses and children will face the costs associated with filing the application and submitting biometrics. DHS recognizes that many dependent spouses and children do not currently participate in the U.S. labor market, and as a result, are not represented in national average wage calculations. In order to provide a reasonable proxy for time valuation, DHS has to assume some value of time above zero and therefore uses an hourly cost burdened minimum wage rate of $10.59 to estimate the opportunity cost of time for dependent spouses. The value of $10.59 per hour represents the Federal minimum wage with an upward adjustment for benefits.[86] The value of $10.59 per hour is consistent with other DHS rulemakings when estimating time burden costs for those who are not authorized to work.[87]

DHS will require dependents of parole applicants (spouses and children of the parole applicant) to file an Application for Travel Document (Form I–131). There is a $575 filing fee associated with the Form I–131 application, and DHS estimates it will take 3.56 hours to complete each submission. In addition to filing the Form I–131 application, each dependent spouse and child 14 years of age and over will be required to submit biometric information (fingerprints, photograph, and signature) by attending a biometrics services appointment at a designated USCIS Application Support Center (ASC). The biometrics processing fee is $85.00 per applicant. In addition to the $85 biometrics services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity and mileage costs of

traveling to an ASC, and the opportunity cost of submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours.[88] DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours. In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[89] DHS has assumed that each applicant will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants. DHS also assumed all children were over the age of 14 for the purposes of this analysis and, therefore, this cost estimate may be slightly overestimated.

DHS projects that approximately 3,234 dependents will be required to file a Form I–131 application and submit biometrics, based on the estimate of 2,940 principal applicants and using a multiplier for expected family members of 1.1.[90] The total cost for those spouses and children requesting parole under this program includes the filing fee, biometrics processing fee, travel costs associated with biometrics processing, and the opportunity cost of filing the Form I–131 application and submitting

biometrics. The total time burden is 7.23 hours. At the cost-burdened wage, the total opportunity cost is $76.53. Adding the $28.75 cost of travel, the total non-filing cost is estimated to be $105.28, and the total cost per applicant is $765.28. At the projection of 3,234 applicants, the non-filing cost is $340,474 (undiscounted), and combined with filing costs of $2,134,440, the total estimated cost for dependents germane to the Form I–131 application is $2,474,914.

In addition, DHS is allowing independent employment authorization for spouses of entrepreneurs granted parole under this rule. DHS will permit these individuals to apply for employment authorization by filing a Form I–765 application. To estimate the number of potential persons applying for employment authorization, DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

The current filing fee for the Form I–765 application is $410.00. The fee is set at a level to recover the processing costs to DHS. Based on the projection of 2,940 applicants, the total filing cost is $1,205,400 (undiscounted). DHS estimates the time burden of completing the Form I–765 application is 3.42 hours.[91] At the cost-burdened wage, the total opportunity cost is $36.20. At the projection of 2,940 applicants, the non-filing cost is $106,430 (undiscounted) and combined with filing costs of $1,205,400 the total estimated cost for spouses germane to the Form I–765 application is $1,311,830.

In addition to the filing costs, applicants for parole may face other costs associated with their entrepreneurial activities. These could include the administrative costs of starting up a business, applying for grants, obtaining various types of licenses and permits, and pursuing qualified investments. However, these costs apply to the entrepreneurial activity and the business activity that the applicant has chosen to be involved in and are not driven by the parole process or other governmental functions attributable to the rule itself. Hence, DHS does not attempt to estimate, quantify, or monetize such costs.

Lastly, DHS recognizes that some individuals who were lawfully admitted in the United States in certain nonimmigrant classifications may seek

---

[85] Note: If a child under the age of 14 requires a travel document, he or she will need to appear for biometrics by traveling to an ASC, but will not be required to pay a biometrics fee.

[86] U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009. Available at *http://www.dol.gov/dol/topic/wages/minimumwage.htm*. The calculation for total employer costs for employee compensation for dependent spouses and children of principals with an approved Form I–140: $7.25 per hour × 1.46 = $10.59 per hour.

[87] *See* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[88] DHS has estimated travel distances and ensuing travel times at 2.5 hours in prior rulemakings. *See, e.g.,* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[89] *See* U.S. General Services Administration Web site for Privately Owned Vehicle (POV) Mileage Reimbursement Rates, *http://www.gsa.gov/portal/content/100715* (accessed Aug. 8, 2015).

[90] The multiplier of 1.1 was obtained from DHS estimates of the average historical ratio of principal versus dependent recipients of lawful permanent resident status. DHS studies based on statistics obtained from office of Immigration Statistics reveal that multipliers for the employment preference categories EB–1, EB–2, and EB–3 range from 2.04 to 2.27. DHS believes that 2.1. is a reasonable multiplier for the estimates and utilized this multiplier in regulatory assessments involved in American Competitiveness in the Twenty-First Century Act, (AC21) provisions, specifically: "Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers'' (RIN 1615–AC05), rule. Because the Form I–131 filings relevant to this rule do not apply to principals, only spouses and dependent children, DHS believes it is valid to subtract 1 from the 2.1 multiplier to yield the final multiplier of 1.1.

[91] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–765 (OMB control number 1615–0040). The PRA Supporting Statement can be found at Question 13 on *Reginfo.gov* at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201502-1615-004*.

parole. Individuals who are present in the United States at the time their parole application is approved, based on admission as a nonimmigrant, will have to depart the United States and appear at a U.S. port of entry in order to be granted parole since USCIS is unable to grant parole to individuals who are not applicants for admission. *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5). These individuals will be ineligible for a change of status under section 248 of the INA, 8 U.S.C. 1258. Such applicants will therefore bear the travel costs of exit and returning to a port of entry. However, because there are no similar programs for comparison, DHS cannot determine the demand for parole or substitution effects from other classifications and thus cannot estimate, quantify, or monetize such potential travel costs. Finally, because the program allows for re-parole under conditions that DHS has set, entrepreneurs and their spouse and children, if applicable, will likely face filing and opportunity costs associated with applying for re-parole. However, DHS has no means of estimating the share of the potential eligible population that will seek and be eligible for re-parole, hence re-parole conditions are not included in this analysis. In summary, DHS believes that it is possible that there could be some substitution into the parole program from other programs and such applicants and dependents will incur travel and possible other costs related to exit and requesting a grant of parole at a U.S. port of entry.

## C. Potential for Negative U.S. Labor Market Impacts

DHS does not expect the rule to generate significant costs or negative consequences. Extensive review of information relevant to immigrant entrepreneurship indicates that while much about the impact of such entrepreneurship is not known, there is no reason to expect that substantial negative consequences, including adverse impact on domestic workers, are likely. The possibility that immigrant entrepreneurs may displace (''crowd-out'') native entrepreneurs has been raised by a few researchers. One study indicated that a very small number of native entrepreneurs were possibly displaced by immigrant entrepreneurs.[92] However, because of difficulties in controlling for a large amount of variables related to

entrepreneurship, other researchers have noted that this finding only raises the possibility that displacement could not be ruled out completely, but did not actually provide evidence that it had actually occurred.[93] Another study, conducted by the Brookings Institution, did not find displacement but acknowledged that more research and refined control techniques, along with longitudinal data, will need to be studied before ruling out the possibility completely.[94] In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

DHS recognizes that the potential inclusion of spouses can incur labor market implications and possibly impact U.S. workers. As was noted in previous sections of the regulatory impact analysis, DHS did not attempt to assess or measure the labor market impact of the estimated entrepreneurs potentially eligible for parole because as founders of firms, these persons will not affect the labor market in the same way as other workers. Although spouses could have labor market impacts as new labor market entrants, DHS believes such potential impacts will be negligible. The main reason is that the size of the potential new cohort is very small. As of the end of 2015, there were an estimated 157,130,000 people in the U.S. civilian labor force.[95] Consequently, the estimated ''new'' available workers in the first year will represent approximately 0.001 percent of the overall U.S. civilian labor force.[96] DHS believes this fraction is too small

to have a significant impact on the labor market.

While the figures above apply to the general U.S. labor force, DHS recognizes that concentration of new labor force entrants can impact specific labor markets. DHS believes that any such potential impacts linked to this rule will be insignificant. The NVCA and other sources of information that DHS reviewed indicates that while the area of California known as Silicon Valley has traditionally been, and continues to be, the primary recipient geographically for technology startup capital, other large urban centers on the East Coast and, even more recently, parts of the Mid- and Mountain West have seen increased technology startup activity. To provide just one example of a potential area-specific impact, DHS considered the San Jose-San Francisco-Oakland (CA) Combined Statistical Area (CSA) conjoining the seven Metropolitan Statistical Areas (MSAs) and nine encompassed counties constituting the economic linkages of Silicon Valley. Based on data from the BLS, the population of this CSA is about 8.6 million (as of May 2014) and the employed population (a narrower measure of the labor market than the labor force) about 3.75 million. If the share of new entrants is based on the proportion of venture capital to the area, which is 42 percent, then 2,746 spousal entrants could impact the area.[97] Assuming such entrants gain employment, this cohort represents just 0.02 percent of the employed population of the specific CSA.

## D. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of the Form I–941 application based on notional application filing volumes and estimated resource commitments. During the biennial fee review, DHS

[92] Fairlie, R.W., and B.D. Meyer, *The effect of immigration on native self-employment,* Journal of Labor Economics 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf.*

[93] *See* Magnus Lofstrom, *Immigrants and Entrepreneurship,* Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf.*

[94] *See* Zoltan J. Acs and David M. Hart, *Immigration and High-Impact, High-Tech Entrepreneurship,* Brookings, Issues in Technological innovation (Feb. 2011), available at *http://www.brookings.edu/research/papers/2011/02/immigration-hart-acs.*

[95] *See* News Release, United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment—2015 Annual Averages, Table 1 ''Employment status of the civilian non-institutional population 16 years of age and over by region, division, and state, 2014–15 annual averages'' (Mar. 24, 2016), available at *http://www.bls.gov/news.release/pdf/srgune.pdf.*

[96] Source: United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistic. Figure applies to seasonally adjusted level for December 2014, available at: *http://data.bls.gov/timeseries/LNS11000000.* Calculation for new worker labor force share: 1813/157,130,000.

[97] The employment figures are provided by the BLS, Occupational Employment Statistics (OES), found at: *http://www.bls.gov/oes/current/oes_42100.htm.* The population data is provided by the Census Bureau, which tabulates CSAs: ''Combined Statistical Area Totals Dataset: Population and Estimated Components of Change: April 1, 2010 to July 1, 2014'' (CSV), 2014 Population Estimates. United States Census Bureau, Population Division. March 2015. The information on the venture capital share for the region is found in the NVCA 2015 yearbook, and is found in figure 8, p. 14. The calculation is as follows: (.42 ×1813) = 761, which is then divided by the CSA population of 3,750,000.

will examine whether the fee is sufficient to recover the full costs of adjudication, as required by the INA.

5. Benefits

As referenced previously, evidence suggests that innovation-focused start-ups contribute disproportionately to job creation. The rule will reduce entry barriers, and thus support efforts by international entrepreneurs to generate entrepreneurial activity in the United States.

The rule is expected to generate important net benefits to the U.S. economy. For one, expenditures on research and development by the grant-based researchers that DHS has identified that could qualify for entrepreneur parole will generate direct and indirect jobs. In addition, this research-focused spending could potentially generate patents, intellectual property, licensing, and other intangible assets that can be expected to contribute to innovation and technological advances and spill over into other sectors of the overall economy. DHS acknowledges that it is extremely difficult to gauge the precise economic value of such assets and that peer-reviewed research in this area is still nascent. Despite the nascent stage of the research and the difficulty of measuring quantitatively the benefit of innovation driven by new high technology firms, a large body of research indicates that the innovation driven by entrepreneurs contributes directly to economic growth, generates important efficiencies and cost reductions for firms that utilize such innovation, and increases productivity and profitability for firms that benefit indirectly through new products generated by such innovation.

Lastly, DHS believes that many of the start-up firms operated by international entrepreneurs during the parole period could eventually become high-growth firms that generate exceptionally high levels of economic activity and contribute disproportionately to job creation in the United States.

*D. Regulatory Flexibility Act*

In accordance with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601(6), DHS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people).

In the proposed rule, DHS certified that this rule would not have a

significant impact on a substantial number of small entities. DHS made this determination based on the following facts: This is not a mandatory rule; this rule only impacts those individual entrepreneurs who make the voluntary decision to apply for parole; and this rule does not regulate the business entities in any way. After reviewing public comments, including the formal letter submitted on the record by the U.S. Small Business Administration's Office of Advocacy (Advocacy), DHS maintains its certification that the rule does impose a significant impact on a substantial number of small entities. For a full discussion of the DHS response to the letter submitted by Advocacy, please see Section III.M.4 of this preamble.

Individuals are not defined as a "small entity" by the RFA. The rule will not mandate that all individuals apply for parole. This rule provides flexibilities and options that do not currently exist for individuals who wish to establish or operate a start-up business in the United States. Importantly, the rule does not require any individuals or businesses, including those created by foreign nationals, to seek parole—either generally or as a specific condition for establishing or operating a business in the United States. Rather, as mentioned previously, this rule is intended to provide an additional flexibility for foreign individuals who are unable to obtain another appropriate nonimmigrant or immigrant classification, in order to facilitate the applicant's ability to oversee and grow the start-up entity. If any individual believes this rule imposes a significant economic impact, that individual could simply choose not to seek parole under the rule and thus incur no economic impact. As discussed previously, this rule imposes direct filing costs of $1,285 (which includes the $1,200 application fee and the $85 biometrics fee), plus $194 in time-related opportunity costs for those individuals who do choose to apply for parole as entrepreneurs under the rule. This cost is relatively minor when considering the costs of starting up a new business and the capital necessary to start a business.

Under the general term "entrepreneur," DHS includes those who desire to form firms with investment funds from certain U.S. investors. For purposes of the RFA, the regulatory requirements place compliance costs and establish eligibility criteria for the individual requesting consideration for parole under this rule. DHS believes that the costs of application for parole will burden the individual applicant, and

not the entrepreneurial venture (firm). This rule will not alter or change the normal procedure for fundraising or other start-up administrative costs that occur in forming a business entity. Such costs are not direct costs of this rule and could include, but are not limited to, business application fees, legal fees, and licensing that precede significant infusions of investment, the latter of which are primarily utilized for operational and capital expenses in order to produce goods or services.

It is possible that some of the 2,940 estimated entrepreneurs who could be eligible for parole annually could involve business structures in which the filing fees are paid by a business entity. In the event that small business entities are impacted by this rule because they choose to pay the filing fees on behalf of an individual entrepreneur, DHS believes that the filing cost of $1,285 per application will be insignificant compared to such entities' annual gross revenues, potential for revenue, and other economic activity.

For businesses that may pay the filing costs, the expected impact to such businesses will be small. For businesses that utilize either the minimum threshold of $100,000 for a qualifying government grant or award or $250,000 in capital investment to source the filing costs, such costs will constitute 1.3 percent and 0.4 percent, respectively, of the total capital amount. These relatively low cost proportions apply to those firms that only obtain the minimum investment amounts and have no other source of funding or revenues. In addition, DHS analyzed the cost impact relative to more typical RFA indices. DHS analysis of Census Bureau data on the smallest firms found that the average revenue based on sales receipts for firms with no paid employees is $309,000, while the average for firms with one to four paid employees is $411,000.[98] The filing cost relative to these averages is 0.42 percent and 0.31 percent, respectively.

DHS also analyzed the average revenue for new firms. Since the rule defines a new firm as one that is less than five years old at the time the initial parole application is filed, DHS grouped private sector firms for the 2012 survey as those responding that the year of

---

[98] The data utilized for the analysis are found in the SBO Table SB1200CSA09, "Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012, 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/ 2012-sbo.html.* The file location is: *http:// factfinder.census.gov/faces/tableservices/jsf/pages/ productview.xhtml?pid=SBO_2012_ 00CSA09&prodType=table.* The figures are rounded from $309,279 and $410,900, respectively.

establishment was either 2012, 2011, 2010, 2009, or 2008. DHS obtained the average revenue per firm and then weighted the average by the yearly proportion of firms. Based on the resulting weighted average of $162,000, such new firms will face a filing-cost burden of 0.8 percent.[99] DHS notes that there is a large difference between the revenue of new firms with paid employees and those without such employees (*i.e.,* sole proprietors). For the latter, average revenues are about $34,000, and the cost burden will be 3.8 percent. However, because a central component of this parole program requires a demonstration of significant public benefit in the form of economic activity and job growth, DHS does not anticipate that sole proprietors will be eligible to participate in this program.

In summary, DHS believes that per-applicant costs will be primarily incurred by the individual (which is not covered by the RFA), any direct cost due to this rule will be relatively minor, and these costs will only be borne by those who voluntarily choose to apply for parole under this rule. While the applicant for parole may be the owner of a firm that could be considered small within the definition of small entities established by 5 U.S.C. 601(6), DHS considers the applicants to be individuals at the point in time they are applying for parole, particularly since it is the individual and not the entity that files the application and it is the individual whose parole must provide a significant public benefit under this rule. Furthermore, even if firms do voluntarily decide to incur the compliance costs on behalf of the individual requesting consideration for parole under this rule, the only compliance costs those businesses will be permitted to incur will be the filing costs for the applications. As indicated previously, based on the comparison metric used, those costs are expected to be insignificant.

Based on the evidence presented in this RFA section and throughout this preamble, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

[99] The data utilized for the analysis are found in the SBO Table SB1200CSCB11, "Statistics for All U.S. Firms by Year the Business Was Originally Established or Self-Employment Activity Begun by Industry, Gender, Ethnicity, Race, and Veteran Status for the U.S.: 2012: 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/2012-sbo.html*. The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSCB11&prodType=table*. The average revenue figure is rounded from $162,293.

## E. National Environmental Policy Act

DHS Directive (Dir) 023–01 Rev. 01 establishes the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA. 40 CFR parts 1500 through 1508.

The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Directive 023–01 Rev. 01 establishes Categorical Exclusions that DHS has found to have no such effect. Dir. 023–01 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Directive 023–01 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Dir. 023–01 Rev. 01 section V.B (1)–(3).

DHS analyzed this action and does not consider it to significantly affect the quality of the human environment. This rule provides criteria and procedures for applying the Secretary's existing statutory parole authority to entrepreneurs in a manner to assure consistency in case-by-case adjudications. DHS has determined that this rule does not individually or cumulatively have a significant effect on the human environment because it fits within two categorical exclusions under DHS Directive 023– 01 Rev. 01, Appendix A, Table 1. Specifically, the rule fits within Categorical Exclusion number A3(a) for rules strictly of an administrative or procedural nature and A3(d) for rules that interpret or amend an existing regulation without changing its environmental effect.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Fewer than 3,000 individuals, an insignificant number in the context of the population of the United States, are projected to receive parole through this program. Furthermore, any ventures will be governed by local, state and federal laws and regulations, including those protecting the human health and the environment. Therefore, this rule is categorically excluded from further NEPA review.

## F. Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## H. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule involves a new information collection and makes revisions to the existing information collections as follows:

Overview of Information Collection, Application for Entrepreneur Parole, Form I–941

This final rule requires that an applicant requesting entrepreneur parole complete an Application for Entrepreneur Parole, Form I–941, and is considered a new information collection under the PRA. USCIS did receive one comment regarding the time burden of this form and, upon review of the work involved to review the form, gather necessary information to support the submission, and the time required to complete and submit the form, USCIS has revised the estimated hour burden per response to 4.7 hours.

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals, other than those filing an application on the basis of a material change, are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Entrepreneur Parole, Form I–941.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–941, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Businesses and other for profit; Not-for-profit Institutions.

f. *An estimate of the total annual numbers of respondents:* 2,940.

g. *Hours per response:* The estimated hour per response for Form I–941 is 4.7 hours; the estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 17,258 hours.

Overview of Information Collection, Application for Travel Document Form I–131, OMB Control No. 1615–0013

DHS is revising the collection by including spouses and children seeking parole on the basis of an entrepreneur parolee.

In addition to revising the form and form instructions, DHS is revising the estimate of total burden hours has increased due to the addition of this new population of Application for Travel Document, Form I–131, filers, and the increase of burden hours associated with the collection of biometrics from these applicants.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by dependents of individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Travel Document, Form I–131.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Application for Travel Document, Form I–131, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 594,324.

The total number of respondents includes the additional population of 3,234 individuals as estimated previously in the analysis in Section IV.C.

g. *Hours per response:* The estimated hour per response for Form I–131 Supplement is 1.9 hours; the estimated hour burden per response for the biometric processing is 1.17 hours; the estimated hour burden per response for the passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 1,372,928 hours.

Overview of Information Collection, Employment Eligibility Verification, Form I–9, OMB Control No. 1615–0047

In accordance with new 8 CFR 274a.2(b)(1)(v)(A)(*5*), DHS is revising the Employment Eligibility Verification, Form I–9, Lists of Acceptable Documents, List A item 5 to replace "nonimmigrant alien" with "individual," to replace "alien's nonimmigrant" with "individual," and to add "or parole" after "status" in List A item 5.b.(2). With these changes the acceptable List A document is described as the following: For an individual authorized to work for a specific employer because of his or her status or parole, a foreign passport and Form I–94 (or Form I–94A) that has the same name as the passport and has an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole. DHS is also updating the Lists of Acceptable Documents, List C so that the most current version of the certification or report of birth issued by the Department of State is acceptable for Form I–9.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This form was developed to facilitate compliance with section 274A of the Immigration and Nationality Act, which prohibits the knowing employment of unauthorized aliens. This information collection is necessary for employers, agricultural recruiters and referrers for a fee, and state employment agencies to verify the identity and employment authorization of individuals hired (or recruited or referred for a fee, if applicable) for employment in the United States.

c. *Title of Form/Collection:* Employment Eligibility Verification.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–9, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Business or other for-profit; Individuals or households; State, local or Tribal Government.

f. *An estimate of the total annual numbers of respondents:* 78 million employers and 78 million individuals. (The total number of responses will be only 78 million responses. Each response involves an employer and an individual who is being hired.)

g. *Hours per response:*
• Time Burden for Employees—20 minutes (.33 hours) total;
• Time Burden for Employers—10 minutes (.17 hours) total;
• Time Burden for Recordkeeping—5 minutes (.08 hours) total

h. *Total Annual Reporting Burden:* Approximately 40,600,000 total annual burden hours.

Overview of Information Collection, Application for Employment Authorization, Form I–765, OMB Control No. 1615–0040

DHS is making minor revisions to the form instructions to reflect changes made by this final rule that allow spouses of an entrepreneur parolee to request employment authorization.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

This form was developed for individual aliens to request employment authorization and evidence of that employment authorization. The form is being amended to add a new class of aliens eligible to apply for employment authorization, specifically a spouse of an entrepreneur parolee described as eligible for employment authorization under this rule. Supporting documentation demonstrating eligibility must be filed with the application. The form lists examples of relevant documentation.

c. *Title of Form/Collection:* Application for Employment Authorization, Form I–765.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–765, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

Venezuela AR_000064

f. *An estimate of the total annual numbers of respondents:* 2,139,523.

This total represents the aggregate estimate for this information collection, to include the additional estimate of 2,940 respondents under this rule.

g. *Hours per response:* The estimated hour per response for Form I–765 is 3.42 hours; the estimated hour burden per response for biometric processing is 1.17 hours; the estimated hour burden per response for Form I–765 WS is .5 hours; the estimated hour burden per response for passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 8,985,859 hours.

## Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change.

## List of Subjects

### 8 CFR Part 103

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements.

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.7 is amended by adding paragraph (b)(1)(i)(KKK) to read as follows:

### § 103.7   Fees.

\*       \*       \*       \*       \*

(b) \*   \*   \*

(1) \*   \*   \*

(i) \*   \*   \*

(KKK) *Application for Entrepreneur Parole (Form I–941).* For filing an application for parole for entrepreneurs: $1200.

\*       \*       \*       \*       \*

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Add § 212.19 to read as follows:

### § 212.19   Parole for entrepreneurs.

(a) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Entrepreneur* means an alien who possesses a substantial ownership interest in a start-up entity and has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. For purposes of this section, an alien may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. During the period of initial parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of initial parole, maintain at least a 5 percent ownership interest in the entity. During the period of re-parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of parole, maintain an ownership interest in the entity.

(2) *Start-up entity* means a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. An entity that is the basis for a request for parole under this section may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the alien's initial parole request. For

purposes of paragraphs (a)(3) and (5) of this section, an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

(3) *Qualified government award or grant* means an award or grant for economic development, research and development, or job creation (or other similar monetary award typically given to start-up entities) made by a federal, state, or local government entity (not including foreign government entities) that regularly provides such awards or grants to start-up entities. This definition excludes any contractual commitment for goods or services.

(4) *Qualified investment* means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of its equity, convertible debt, or other security convertible into its equity commonly used in financing transactions within such entity's industry. Such an investment shall not include an investment, directly or indirectly, from the entrepreneur; the parents, spouse, brother, sister, son, or daughter of such entrepreneur; or any corporation, limited liability company, partnership, or other entity in which such entrepreneur or the parents, spouse, brother, sister, son, or daughter of such entrepreneur directly or indirectly has any ownership interest.

(5) *Qualified investor* means an individual who is a U.S. citizen or lawful permanent resident of the United States, or an organization that is located in the United States and operates through a legal entity organized under the laws of the United States or any state, that is majority owned and controlled, directly and indirectly, by U.S. citizens or lawful permanent residents of the United States, provided such individual or organization regularly makes substantial investments in start-up entities that subsequently exhibit substantial growth in terms of revenue generation or job creation. The term "qualified investor" shall not include an individual or organization that has been permanently or temporarily enjoined from participating in the offer or sale of a security or in the provision of services as an investment adviser, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent or credit rating agency, barred from association with any entity involved in the offer or sale of securities or provision of such

Venezuela AR_000065

services, or otherwise found to have participated in the offer or sale of securities or provision of such services in violation of law. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years:

(i) The individual or organization made investments in start-up entities in exchange for equity, convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000; and

(ii) Subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent.

(6) *Qualified job* means full-time employment located in the United States that has been filled for at least 1 year by one or more qualifying employees.

(7) *Qualifying employee* means a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. This definition shall not include independent contractors.

(8) *Full-time employment* means paid employment in a position that requires a minimum of 35 working hours per week. This definition does not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

(9) *U.S. business entity* means any corporation, limited liability company, partnership, or other entity that is organized under federal law or the laws of any state, and that conducts business in the United States, that is not an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments.

(10) *Material change* means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. Such changes include, but are not limited to, the following: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination

concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity.

(b) *Initial parole*—(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file an Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for parole under this section if the alien demonstrates that a grant of parole will provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (b)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien is an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity is a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(*1*) Received, within 18 months immediately preceding the filing of an application for initial parole, a qualified investment amount of at least $250,000 from one or more qualified investors; or

(*2*) Received, within 18 months immediately preceding the filing of an application for initial parole, an amount of at least $100,000 through one or more qualified government awards or grants.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (b)(2)(ii)(A) of this section and partially meets one or both of the criteria in paragraph (b)(2)(ii)(B) of this section may alternatively meet the standard described in paragraph (b)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(c) *Additional periods of parole*—(1) *Filing of re-parole request form.* Prior to the expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file the Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for re-parole under this section if the alien demonstrates that a grant of parole will continue to provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (c)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien continues to be an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity continues to be a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(*1*) Received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period;

(*2*) Created at least 5 qualified jobs with the start-up entity during the initial parole period; or

(*3*) Reached at least $500,000 in annual revenue in the United States and averaged 20 percent in annual revenue growth during the initial parole period.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (c)(2)(ii)(A) of this section and partially meets one or more of the criteria in paragraph (c)(2)(ii)(B) of this section may alternatively meet the standard

**5288**   **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

described in paragraph (c)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(d) *Discretionary authority; decision; appeals and motions to reopen*—(1) *Discretionary authority.* DHS may grant parole under this section in its sole discretion on a case-by-case basis if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. In determining whether an alien's presence in the United States will provide a significant public benefit and whether the alien warrants a favorable exercise of discretion, USCIS will consider and weigh all evidence, including any derogatory evidence or information, such as but not limited to, evidence of criminal activity or national security concerns.

(2) *Initial parole.* DHS may grant an initial period of parole based on the start-up entity listed in the request for parole for a period of up to 30 months from the date the individual is initially paroled into the United States. Approval by USCIS of such a request must be obtained before the alien may appear at a port of admission to be granted parole, in lieu of admission.

(3) *Re-parole.* DHS may re-parole an entrepreneur for one additional period of up to 30 months from the date of the expiration of the initial parole period. If the entrepreneur is in the United States at the time that USCIS approves the request for re-parole, such approval shall be considered a grant of re-parole. If the alien is outside the United States at the time that USCIS approves the request for re-parole, the alien must appear at a port of entry to be granted parole, in lieu of admission.

(4) *Appeals and motions to reopen.* There is no appeal from a denial of parole under this section. USCIS will not consider a motion to reopen or reconsider a denial of parole under this section. On its own motion, USCIS may reopen or reconsider a decision to deny the Application for Entrepreneur Parole (Form I–941), in accordance with 8 CFR 103.5(a)(5).

(e) *Payment of biometric services fee and collection of biometric information.* An alien seeking parole or re-parole under this section will be required to pay the biometric services fee as prescribed by 8 CFR 103.7(b)(1)(i)(C). An alien seeking an initial grant of parole will be required to submit biometric information. An alien seeking

re-parole may be required to submit biometric information.

(f) *Limitations.* No more than three entrepreneurs may be granted parole under this section based on the same start-up entity. An alien shall not receive more than one initial grant of entrepreneur parole or more than one additional grant of entrepreneur re-parole based on the same start-up entity, for a maximum period of parole of five years.

(g) *Employment authorization.* An entrepreneur who is paroled into the United States pursuant to this section is authorized for employment with the start-up entity incident to the conditions of his or her parole.

(h) *Spouse and children.* (1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file an Application for Travel Document (Form I–131). Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. A biometric services fee is required to be filed with the application. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

(2) The spouse and children of an entrepreneur granted parole under this section may be granted parole under this section for no longer than the period of parole granted to such entrepreneur.

(3) The spouse of the entrepreneur parolee, after being paroled into the United States, may be eligible for employment authorization on the basis of parole under this section. To request employment authorization, an eligible spouse paroled into the United States must file an Application for Employment Authorization (Form I–765), in accordance with 8 CFR 274a.13 and form instructions. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship.

(4) Notwithstanding 8 CFR 274a.12(c)(11), a child of the entrepreneur parolee may not be authorized for and may not accept employment on the basis of parole under this section.

(i) *Conditions on parole.* As a condition of parole under this section, a parolee must maintain household income that is greater than 400 percent of the federal poverty line for his or her household size as defined by the Department of Health and Human Services. USCIS may impose other such

reasonable conditions in its sole discretion with respect to any alien approved for parole under this section, and it may request verification of the parolee's compliance with any such condition at any time. Violation of any condition of parole may lead to termination of the parole in accordance with paragraph (k) of this section or denial of re-parole.

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee (not including any biometric fees), in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

(k) *Termination of parole*—(1) *In general.* DHS, in its discretion, may terminate parole granted under this section at any time and without prior notice or opportunity to respond if it determines that the alien's continued parole in the United States no longer provides a significant public benefit. Alternatively, DHS, in its discretion, may provide the alien notice and an opportunity to respond prior to terminating the alien's parole under this section.

(2) *Automatic termination.* Parole granted under this section will be automatically terminated without notice upon the expiration of the time for which parole was authorized, unless the alien timely files a non-frivolous application for re-parole. Parole granted under this section may be automatically terminated when USCIS receives written notice from the entrepreneur parolee that he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity in accordance with paragraph (j) of this section. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. If parole is terminated, any employment authorization based on that parole is automatically revoked.

(3) *Termination on notice.* USCIS may terminate on notice or provide the entrepreneur or his or her spouse or children, as applicable, written notice of

its intent to terminate parole if USCIS believes that:

(i) The facts or information contained in the request for parole were not true and accurate;

(ii) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(iii) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity;

(iv) The alien otherwise violated the terms and conditions of parole; or

(v) Parole was erroneously granted.

(4) *Notice and decision.* A notice of intent to terminate issued under this paragraph should generally identify the grounds for termination of the parole and provide a period of up to 30 days for the alien's written rebuttal. The alien may submit additional evidence in support of his or her rebuttal, when applicable, and USCIS will consider all relevant evidence presented in deciding whether to terminate the alien's parole. Failure to timely respond to a notice of intent to terminate will result in termination of the parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole (if parole has not already been terminated), unless otherwise specified. Any further immigration and removal actions will be conducted in accordance with the Act and this chapter. The decision to terminate parole may not be appealed. USCIS will not consider a motion to reopen or reconsider a decision to terminate parole under this section. On its own motion, USCIS may reopen or reconsider a decision to terminate.

(l) *Increase of investment and revenue amount requirements.* The investment and revenue amounts in this section will be automatically adjusted every 3 years by the Consumer Price Index and posted on the USCIS Web site at *www.uscis.gov.* Investment and revenue amounts adjusted under this paragraph will apply to all applications filed on or after the beginning of the fiscal year for which the adjustment is made.

**PART 274a—CONTROL OF EMPLOYMENT OF ALIENS**

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Section 274a.2 is amended by:

■ a. Revising paragraphs (b)(1)(v)(A)(*5*) and (b)(1)(v)(C)(*2*);

■ b. Removing paragraph (b)(1)(v)(C)(*3*); and

■ c. Redesignating paragraphs (b)(1)(v)(C)(*4*) through (*8*) as paragraphs (b)(1)(v)(C)(*3*) through (*7*).

The revisions read as follows:

**§ 274a.2   Verification of identity and employment authorization.**

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

(v) \* \* \*

(A) \* \* \*

(*5*) In the case of an individual who is employment-authorized incident to status or parole with a specific employer, a foreign passport with an Arrival/Departure Record, Form I–94 (as defined in 8 CFR 1.4) or Form I–94A, bearing the same name as the passport and containing an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole;

\* \* \* \* \*

(C) \* \* \*

(*2*) Certification or report of birth issued by the Department of State, including Forms FS–545, DS–1350, FS–240;

\* \* \* \* \*

■ 7. Section 274a.12 is amended by:

■ a. Revising paragraph (b) introductory text;

■ b. Removing the word ''or'' at the end of paragraph (b)(24);

■ c. Removing the period at the end of paragraph (b)(25) and adding ''; or'' in its place;

■ d. Adding and reserving paragraphs (b)(26) through (36);

■ e. Adding paragraph (b)(37);

■ f. Revising paragraph (c)(11); and

■ g. Adding paragraph (c)(34).

The revisions and additions read as follows:

**§ 274a.12   Classes of aliens authorized to accept employment.**

\* \* \* \* \*

(b) *Aliens authorized for employment with a specific employer incident to status or parole.* The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole or of their admission in, or subsequent change to, the designated nonimmigrant classification. An alien in one of these classes is not issued an employment authorization document by DHS:

\* \* \* \* \*

(37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240-day period and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

(c) \* \* \*

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

\* \* \* \* \*

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

\* \* \* \* \*

Jeh Charles Johnson,

*Secretary of Homeland Security.*

[FR Doc. 2017–00481 Filed 1–13–17; 8:45 am]

**BILLING CODE 9111–97–P**

for approval. All comments will become a matter of public record.

## Overview of This Information Collection

*Title:* Record of Vessel Foreign Repair or Equipment Purchase.

*OMB Number:* 1651–0027.

*Form Number:* CBP Form 226.

*Current Actions:* Revision of an existing information collection.

*Type of Review:* Revision.

*Affected Public:* Businesses.

*Abstract:* 19 U.S.C. 1466(a) provides for a 50 percent *ad valorem* duty assessed on a vessel master or owner for any repairs, purchases, or expenses incurred in a foreign country by a commercial vessel registered in the United States. CBP Form 226, Record of Vessel Foreign Repair or Equipment Purchase, is used by the master or owner of a vessel to declare and file entry on equipment, repairs, parts, or materials purchased for the vessel in a foreign country. This information enables CBP to assess duties on these foreign repairs, parts, or materials. CBP Form 226 is provided for by 19 CFR 4.7 and 4.14 and is accessible at: *https:// www.cbp.gov/document/forms/form-226-record-vessel-foreign-repair-or-equipment-purchase.*

### Proposed Change

This form is anticipated to be submitted electronically as part of the maritime forms automation project through the Vessel Entrance and Clearance System (VECS), which will eliminate the need for any paper submission of any vessel entrance or clearance requirements under the above referenced statutes and regulations. VECS will still collect and maintain the same data, but will automate the capture of data to reduce or eliminate redundancy with other data collected by CBP.

*Type of Information Collection:* Record of Vessel Foreign Repair or Equipment Purchase.

*Estimated Number of Respondents:* 421.

*Estimated Number of Annual Responses per Respondent:* 28.

*Estimated Number of Total Annual Responses:* 11,788.

*Estimated Time per Response:* 2 hours.

*Estimated Total Annual Burden Hours:* 23,576.

Dated: April 22, 2022.

**Seth D. Renkema,**

*Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.*

[FR Doc. 2022–08983 Filed 4–26–22; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of the Uniting for Ukraine Parole Process

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of a U.S. Department of Homeland Security (DHS) parole process called *Uniting for Ukraine.* Pursuant to this process, DHS will offer certain Ukrainian citizens and their immediate family members who were recently displaced by Russia's war of aggression in Ukraine, pass biometric and biographic vetting, have sufficient financial support in the United States, and meet other eligibility requirements, an opportunity to apply for and receive advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole for urgent humanitarian reasons or significant public benefit for up to two years. The process is intended to be a safe, legal, and orderly pathway to support vulnerable Ukrainian citizens and their immediate family members in Europe who have been displaced from their country as a result of Russia's unprovoked invasion.

**DATES:** DHS will make the *Uniting for Ukraine* parole process available on April 25, 2022.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King, Jr. Avenue SE, Washington, DC 20528–0445

**SUPPLEMENTARY INFORMATION:**

### I. Background

On February 24, 2022, Russia's military launched an unprovoked full-scale invasion of the sovereign nation of Ukraine, marking the largest conventional military action in Europe since World War II [1] and causing the fastest growing refugee crisis in modern history. As of April 10, 2022, nearly 12 million people have fled Russia's invasion, including seven million displaced inside Ukraine.[2] Russia's

forces have continued to engage in significant, sustained bombardment of major cities, indiscriminately targeting civilian populations and causing widespread terror.[3] While most of those fleeing the violence remain in Europe,[4] the United States has committed to welcoming up to 100,000 displaced Ukrainians and others fleeing Russian aggression.[5] Among other legal pathways, the United States will consider, on a case-by-case basis, granting Ukrainians advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole for urgent humanitarian reasons or significant public benefit.[6]

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis, for ''urgent humanitarian reasons or significant public benefit.'' INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States. INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request, and may impose reasonable conditions on parole. INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may terminate parole in its discretion at any time. *See* 8 CFR 212.5(e). Individuals who are paroled into the United States generally may apply for employment authorization. *See* 8 CFR 274a.12(c)(11).

---

[1] ''Russia invades Ukraine on multiple fronts in 'brutal act of war','' *PBS,* Feb. 24, 2022, available at: *https://www.pbs.org/newshour/world/russia-invades-ukraine-on-multiple-fronts-in-brutal-act-of-war* (last visited Apr. 20, 2022); Natalia Zinets and Aleksandar Vasovic, ''Missiles rain down around Ukraine,'' *Reuters,* Feb. 24, 2022, available at: *https://www.reuters.com/world/europe/putin-orders-military-operations-ukraine-demands-kyiv-forces-surrender-2022-02-24/* (last visited Apr. 20, 2022).

[2] ''Russia's invasion of Ukraine in maps—latest updates,'' *Financial Times,* Apr. 20, 2022, available

at: *https://www.ft.com/content/4351d5b0-0888-4b47-9368-6bc4dfbccbf5* (last visited Apr. 20, 2022).

[3] Ukraine: Humanitarian Impact Situation Report No. 1, United Nations Office for the Coordination of Humanitarian Affairs, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[4] Map: Where Ukraine refugees are heading, *ABC News,* Mar. 30, 2022, available at *https://abcnews.go.com/International/map-ukrainian-refugees-heading/story?id=83178031.*

[5] *FACT SHEET: The Biden Administration Announces New Humanitarian, Development, and Democracy Assistance to Ukraine and the Surrounding Region,* White House Briefing Room, Mar. 24, 2022, available at *https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/24/fact-sheet-the-biden-administration-announces-new-humanitarian-development-and-democracy-assistance-to-ukraine-and-the-surrounding-region/* (last visited Apr. 20, 2022).

[6] *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR 212.5(f).

*Uniting for Ukraine* establishes a process by which eligible Ukrainian citizens and their immediate family members, if supported by an individual or entity in the United States, can apply for advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole. If advance authorization is granted, the recipient will be permitted to board a flight to the United States for the purpose of requesting parole. This notice outlines the process by which U.S.-based persons can apply to financially support eligible Ukrainian citizens and their immediate family members, the process by which those Ukrainians may request advance authorization to travel to the United States, and the relevant screening and vetting that is required prior to issuance of such travel authorization and any grant of parole.

The decision to parole a noncitizen into the United States is made at the port of entry, on a case-by-case basis, pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A); as a result, approval of travel authorization to apply for parole at a U.S. port of entry, *see* 8 CFR 212.5(f), does not guarantee that the individual will be paroled. If parole is granted pursuant to this process, it will generally be for a term of up to two years.

## II. Ongoing Armed Conflict, Human Rights Abuses, and Humanitarian Situation in Ukraine

Russia's full-scale military invasion of Ukraine, beginning on February 24, 2022, has indiscriminately targeted civilian populations, placing civilians throughout the country at significant risk of physical harm.[7] As of mid-April 2022, Russian forces continue sustained shelling campaigns of cities and towns across Ukraine that have harmed, killed, and injured civilians and struck hospitals, schools, and apartment buildings.[8] Artillery attacks and air strikes by Russia's military forces have become regular occurrences in cities across Ukraine since the start of the February 2022 invasion.[9] Aerial bombardments in and around major cities have been reported as Russia's forces continue to target critical infrastructure.[10] In an April 13, 2022 update, the United Nations (UN) Office of the High Commissioner for Human Rights (OHCHR) reported 4,521 civilian casualties during the ongoing Russian invasion of Ukraine, with more casualties expected as the fighting continues.[11] OHCHR also notes that these estimates likely significantly undercount civilian fatalities.[12]

Russia's unprovoked war against Ukraine continues to "generate further population displacement, damage civilian infrastructure, and exacerbate humanitarian needs across the country."[13] Since February 24, significant infrastructural damage in Ukraine from Russia's air strikes has "left hundreds of thousands of people without electricity or water, while bridges and roads damaged by shelling have left communities cut off from markets for food and other basic supplies."[14] In February 2022, the U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA) estimated that millions of Ukrainian nationals were in need of water, sanitation and hygiene assistance.[15] Those without access to alternative water sources have been most heavily impacted.[16]

Food security remains an ongoing is concern in Ukraine, with more than one million Ukrainian nationals in need of food assistance—including a significant number that are severely or moderately food insecure.[17] The impact on women has been particularly pronounced: "available data show that female-headed households are an estimated 1.3 times more often experiencing food insecurity, compared to the overall population."[18] According to the United Nations, women and girls also face "higher risks of human rights violations and sexual exploitation and abuse, including transactional sex, survival sex and conflict-related sexual violence."[19]

Critical medicines, health supplies and equipment, and shelter and protection for those displaced from their home are also in short supply.[20] According to the United Nations, more than a million Ukrainian nationals were in need of health care assistance, even prior to the initiation of conflict; the conflict has significantly exacerbated these challenges.[21] Hospitals have struggled with the volume of COVID cases and Ukraine has one of the lowest vaccination rates in Europe.

These factors, coupled with the ongoing violence, have led to large scale displacements of Ukrainians. Since Russia invaded Ukraine, over five million people have, as of April 19, 2022, fled Ukraine for Poland, Hungary, Slovakia, Romania, and Moldova.[22] Another seven million have been internally displaced inside Ukraine.[23]

---

[7] *Press briefing notes on Ukraine,* UN OHCHR, Mar. 8, 2022, available at: *https://www.ohchr.org/en/press-briefing-notes/2022/03/press-briefing-notes-ukraine* (last visited Apr. 20, 2022).

[8] *War Crimes by Russia's Forces in Ukraine, Press Statement,* U.S. Secretary of State Antony J. Blinken, Mar. 23, 2022, available at: *https://www.state.gov/war-crimes-by-russias-forces-in-ukraine/* (last visited Apr. 20, 2022).

[9] "Fear, darkness and newborn babies: inside Ukraine's underground shelters," *The Guardian,* Feb. 26, 2022, available at: *https://www.theguardian.com/world/2022/feb/26/fear-darkness-and-newborn-babies-inside-ukraine-underground-shelters* (last visited Apr. 20, 2022).

[10] "Russia's invasion of Ukraine in maps—latest updates," *Financial Times,* Apr. 20, 2022, available at: *https://www.ft.com/content/4351d5b0-0888-4b47-9368-6bc4dfbccbf5* (last visited Apr. 20, 2022).

[11] UN OHCHR, "Ukraine: civilian casualty update 13 April 2022," Apr. 13, 2022, available at: *https://www.ohchr.org/en/news/2022/04/ukraine-civilian-casualty-update-13-april-2022* (last visited Apr. 20, 2022).

[12] *See supra* note 7.

[13] *Ukraine—Complex Emergency,* U.S. Agency for International Development, Mar. 25, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-03-25_USG_Ukraine_Complex_Emergency_Fact_Sheet_8.pdf* (last visited Apr. 20, 2022).

[14] *Ukraine: Humanitarian Impact, Situation Report No. 01,* UNOCHA Ukraine, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[15] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 73, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[16] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 39, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[17] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 79, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[18] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 51, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[19] *Rapid Gender Analysis of Ukraine: Secondary data review,* UNHCR, Mar. 29, 2022, *https://data2.unhcr.org/en/documents/details/91723* (last visited Apr. 20, 2022).

[20] *Ukraine: Humanitarian Impact, Situation Report No. 01,* UNOCHA Ukraine, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[21] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 87, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022); *Impact of Health Reform on the Primary Healthcare Level in Conflict-Affected Areas of Donetsk and Luhansk Oblasts,* Médicos del Mundo, June 2021, available at: *https://reliefweb.int/report/ukraine/impact-healthcare-reform-primary-healthcare-level-conflict-affected-areas-donetsk-and* (last visited Apr. 20, 2022).

[22] Operational Data Portal, UNHCR, Apr. 19, 2022, available at: *https://data2.unhcr.org/en/situations/ukraine* (last visited Apr. 20, 2022).

[23] *One in Six People Internally Displaced in Ukraine,* International Organization on Migration, Apr. 21, 2022, available at: *https://reliefweb.int/*

Continued

## III. Uniting for Ukraine

Pursuant to the process established by *Uniting for Ukraine,* U.S.-based individuals who agree to provide financial support to Ukrainian citizens and their immediate family members (supporters) will be able to initiate a process that will ultimately allow those Ukrainian citizens and their immediate family members (Ukrainian beneficiaries) to seek advance authorization to travel to the United States for the purpose of seeking parole into the United States at a U.S. port of entry. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of a noncitizen into the United States for urgent humanitarian reasons or significant public benefit); 8 CFR 212.5(f). The determination as to whether to parole a particular noncitizen who presents such authorization remains a case-by-case, discretionary determination made upon arrival at the port of entry.

## IV. Participation in Uniting for Ukraine and Filing Process

### 1. Eligibility

Certain Ukrainian citizens, and certain non-Ukrainian immediate family members,[24] who were physically present in Ukraine as of February 11, 2022 and have a U.S.-based supporter are eligible for this process. The process is triggered when a prospective supporter files a Form I–134, *Declaration of Financial Support,* with U.S. Citizenship and Immigration Services (USCIS) through an online portal. USCIS will review that form in order to verify and vet the information submitted. Once USCIS determines that the Form I–134 includes sufficient evidence of financial support, the relevant Ukrainian beneficiary will be notified and will be prompted to submit any additional required information. To be eligible, the Ukrainian beneficiary must possess a valid Ukrainian passport, or if a child without their own passport, be included in a parent's passport. At this time, only children

traveling with a parent or a legal guardian will be eligible for *Uniting for Ukraine.* Individuals who are not eligible for *Uniting for Ukraine* may make an appointment at the nearest U.S. Embassy or consulate for additional information about available options.

The Ukrainian beneficiary also must clear biographic and biometric background checks, and will need to meet public health requirements, including, as appropriate, proof of required vaccinations, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention (CDC). Pursuant to these requirements, Ukrainian beneficiaries must demonstrate proof of first doses of measles, polio, and COVID–19 vaccines and must complete a screening for tuberculosis for all individuals two years of age or older. These requirements may be adjusted in accordance with evolving public health needs; the most up-to-date requirements will be available at *www.dhs.gov/ ukraine.*

### 2. Processing Steps

*Filing and confirmation of financial support:* The process is initiated when a supporter—either an individual or an individual acting on behalf of an organizations—files a Form I–134, *Declaration of Financial Support,* online using the myUSCIS platform. This declaration must include biographic and financial information on the supporter, and biographic identifying information on the Ukrainian beneficiary.

The individual who submits and signs the Form I–134 must be a U.S.-based person in lawful status, a parolee, or a beneficiary of deferred action or Deferred Enforced Departure. The individual can, however, represent an organization. If the individual is acting on behalf of an organization, and if that organization is providing the financial or other services to support the Ukrainian beneficiary, this information should be provided as part of the evidence submitted with the Form I–134.

USCIS will conduct background checks on the supporter to protect against exploitation and abuse and to determine the supporters' financial suitability to support beneficiaries. If the supporter is approved, USCIS will notify the Ukrainian beneficiary electronically with an invitation to create a myUSCIS account.

*Ukrainian beneficiary account registration:* Following USCIS's approval of the named supporter, the Ukrainian beneficiary will receive an electronic communication from USCIS

with instructions on how to set up an account with myUSCIS and other next steps. The Ukrainian beneficiary will be required to confirm their biographic information on myUSCIS and attest to completion of all other requirements, including the required vaccinations and screening listed above.

*Vetting and Clearance:* Biographic information provided by the prospective Ukrainian beneficiary will be vetted against national security and law enforcement databases. The my USCIS system will transmit biographic information for Ukrainian beneficiaries directly to U.S. Customs and Border Protection (CBP) and into CBP's Automated Targeting System (ATS) for vetting. Only Ukrainian beneficiaries who complete all the requirements, including vaccinations, and clear the vetting of their biographic information will receive the necessary advanced authorization to travel to the United States to seek parole

Once vetting is complete and advance authorization to travel has been approved, Ukrainian beneficiaries will receive a notification in myUSCIS in an automated manner. Cleared individuals will be authorized to travel via commercial routes to the United States for a period of 90 days. Carriers utilizing CBP's Document Validation program will be able to access this authorization to facilitate generation of a boarding pass. Carriers who are not participants in the Document Validation program will utilize manual verification mechanisms to generate a boarding pass.

*Travel and public health related requirements:* Ukrainian beneficiaries who receive advance authorization to travel to the United States will be responsible for arranging and funding their travel to the United States. In addition, Ukrainian beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel,[25] including

---

report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022 (last visited Apr. 24, 2022).

[24] Ukrainians' immediate family members who are not Ukrainian citizens may also be considered for parole under *Uniting for Ukraine.* Immediate family members, for the purposes of *Uniting for Ukraine,* include: The spouse or common-law partner of a Ukrainian citizen; and their unmarried children under the age of 21. Non-Ukrainian immediate family members authorized to travel under this process must accompany the principal Ukrainian when completing travel to the United States. Unaccompanied minors and family groups that include minors traveling with adults that are not the child's parent or legal guardian are not currently eligible for this process.

[25] Changes to requirements for travel by air were implemented by, *inter alia,* Presidential Proclamation 10294 of October 25, 2021, 86 FR 59603 (Oct. 28, 2021) ("Presidential Proclamation"), and a related CDC orders, 86 FR 61224 (Nov. 5, 2021) and 87 FR 20405 (Apr. 7, 2022). *See also* CDC, *Requirement for Proof of Negative COVID–19 Test or Recovery from COVID–19 for All Air Passengers Arriving in the United States, https:// www.cdc.gov/quarantine/pdf/Global-Testing-Order-10-25-21-p.pdf* (Apr. 25, 2021); *Requirement for Airlines and Operators to Collect Contact Information for All Passengers Arriving into the United States, https://www.cdc.gov/quarantine/pdf/ CDC-Global-Contact-Tracing-Order-10-25-2021-p.pdf* (Oct. 25, 2021). CDC later amended its testing order following developments related to the Omicron variant. *See* CDC, *Requirement for Proof of Negative COVID–19 Test Result or Recovery from COVID–19 for All Airline Passengers Arriving into the United States, https://www.cdc.gov/quarantine/*

Venezuela AR_000071

vaccination and/or testing requirements for diseases like COVID–19, polio, measles, and tuberculosis.

*Parole determination at a U.S. port of entry:* Upon arrival at a port of entry, Ukrainian beneficiaries will be inspected by a CBP officer who will make a case-by-case processing determination, to include consideration of parole. Individuals granted parole pursuant to this process will generally be paroled for a period of up two years. Individuals granted parole under this process will be eligible to apply for employment authorization with USCIS.

## V. Paperwork Reduction Act

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. OMB has approved USCIS Form I–134, *Declaration of Financial Support,* and assigned the revision to OMB control number 1615–0014.

USCIS is making some changes to this form in connection with the implementation of the *Uniting for Ukraine* process and has submitted a request to OMB for emergency approval of the required changes under 5 CFR 1320.13. Following OMB approval of the emergency request, USCIS will publish a notice under the PRA and will make some revisions to the currently approved burden for OMB control number 1615–0014.

## VI. Implementation

This process will be implemented beginning on April 25, 2022.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2022–09087 Filed 4–25–22; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF THE INTERIOR

### Geological Survey

**[GX22EE000101100]**

### Public Meeting of the National Geospatial Advisory Committee

**AGENCY:** Department of Interior.
**ACTION:** Notice of public meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act of 1972, the U.S. Geological Survey (USGS) is publishing this notice to announce that a Federal Advisory

*pdf/Amended-Global-Testing-Order_12-02-2021-p.pdf* (Dec. 2, 2021).

Committee meeting of the National Geospatial Advisory Committee (NGAC) will take place.

**DATES:** The meeting will be held as a webinar on Wednesday, May 18, 2022, from 1:00 p.m. to 5:00 p.m., and on Thursday, May 19, 2022, from 1:00 p.m. to 5:00 p.m. (Eastern Daylight Time).

**ADDRESSES:** The meeting will be held on-line and via teleconference. Instructions for accessing the meeting will be posted at *www.fgdc.gov/ngac.* Comments can be sent to Ms. Dionne Duncan-Hughes, Group Federal Officer by email to *gs-faca@usgs.gov.*

**FOR FURTHER INFORMATION CONTACT:** Mr. John Mahoney, Federal Geographic Data Committee (FGDC), USGS, by mail at 909 First Avenue, Room 703, Seattle, WA 98104; by email at *jmahoney@usgs.gov;* or by telephone at (206) 375–2565.

**SUPPLEMENTARY INFORMATION:** This meeting is being held under the provisions of the Federal Advisory Committee Act of 1972 (5 U.S.C., Appendix 2), the Government in the Sunshine Act of 1976 (5 U.S.C. 552B, as amended), and 41 CFR 102–3.140 and 102–3.150.

*Purpose of the Meeting:* The NGAC provides advice and recommendations related to management of Federal and national geospatial programs, the development of the National Spatial Data Infrastructure (NSDI), and the implementation of the Geospatial Data Act of 2018 (GDA) and the Office of Management and Budget Circular A–16. The NGAC reviews and comments on geospatial policy and management issues and provides a forum to convey views representative of non-federal stakeholders in the geospatial community. The NGAC meeting is one of the primary ways that the FGDC collaborates with its broad network of partners. Additional information about the NGAC meeting is available at: *www.fgdc.gov/ngac.*

*Agenda Topics:*
—FGDC Update
—GDA Reporting
—Landsat Advisory Group
—Partnerships/Stakeholder Engagement
—3D Elevation Program
—Executive Order 14008/Climate Mapping Initiative
—Public Comment

*Meeting Accessibility/Special Accommodations:* The webinar meeting is open to the public and will take place from 1:00 p.m. to 5:00 p.m. on May 18, 2022, and from 1:00 p.m. to 5:00 p.m. on May 19, 2022. Members of the public wishing to attend the meeting should visit *www.fgdc.gov/ngac* or contact Mr.

John Mahoney (see **FOR FURTHER INFORMATION CONTACT**). Webinar/conference line instructions will be provided to registered attendees prior to the meeting. Individuals requiring special accommodations to access the public meeting should contact Mr. John Mahoney (see **FOR FURTHER INFORMATION CONTACT**) at least five (5) business days prior to the meeting so that appropriate arrangements can be made.

*Public Disclosure of Comments:* There will be an opportunity for public comment during both days of the meeting. Depending on the number of people who wish to speak and the time available, the time for individual comments may be limited. Written comments may also be sent to the Committee for consideration. To allow for full consideration of information by the Committee members, written comments must be provided to John Mahoney (see **FOR FURTHER INFORMATION CONTACT**) at least three (3) business days prior to the meeting. Any written comments received will be provided to the committee members before the meeting.

Before including your address, phone number, email address, or other personally identifiable information (PII) in your comment, you should be aware that your entire comment—including your PII—may be made publicly available at any time. While you may ask us in your comment to withhold your PII from public review, we cannot guarantee that we will be able to do so.

*Authority:* 5 U.S.C. Appendix 2.

**Kenneth Shaffer,**
*Deputy Executive Director, Federal Geographic Data Committee.*
[FR Doc. 2022–08924 Filed 4–26–22; 8:45 am]
**BILLING CODE 4338–11–P**

---

## INTERNATIONAL TRADE COMMISSION

### Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** International Trade Commission.
**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain CPAP Pillows, DN 3615;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission,


**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the **Federal Register.**[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**
*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*

[FR Doc. 2022–22712 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

---

# DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process—modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

## I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.*

---

and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[2] *See* Memorandum for the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on

a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important

foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

*B. Conditions at the Border*

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic— continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America [5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

---

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

### 2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as

described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

### a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity." [12] Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its

territory from Colombia via the Darién jungle each day.

### b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

### c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC*,—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



**NOTE:** Figure depicts 30-day average of daily encounters.

Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health order—daily encounters dropped to fewer than twelve per day.[17]

Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

### 3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB.

This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a ten-fold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.

Venezuela AR_000076

that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these air resources are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant public benefit." [23] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United

States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public

health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

### 2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

[21] Data from SBCC, as of September 29, 2022.

[22] Data from SBCC, as of September 29, 2022.

[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[26] *See* 8 CFR 212.5(f).

[27] *See* 8 CFR 212.5(e).

[28] *See* 8 CFR 274a.12(c)(11).

**63512**   **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

### 3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

### 4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries will also be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

---

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office (last visited Sept. 29, 2022).*

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sep. 14, 2022, available at: *https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/* (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. Sept. 20, 2022, available at: *https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/* (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day* (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream* (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

Venezuela AR_000078

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: *https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us* (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: *https://www.migracion.gob.pa/inicio/estadisticas*

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R* (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X* (last visited Oct. 2, 2022).

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

## 6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

[43] L.A. Declaration.

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

[44] The Department of State Cable, 22 Panama 624.



**Note:** September figure is a preliminary estimate.

Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelan, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022,

PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a

two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 29, 2022).

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

*A. Supporters*

U.S.-based supporters will initiate an application on behalf of a Venezuelan national [48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

*B. Beneficiaries*

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United

States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Venezuela or be a non-Venezuelan immediate family member [49] of and traveling with a Venezuelan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;

• possess a passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country.[50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order;[51]

• has crossed irregularly into the United States, between the POEs, after October 19, 2022;

• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[52]

*Travel requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *https://www.uscis.gov/venezuela.*

*C. Processing Steps*

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.

[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.

[51] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Sunset, Renewal, and Termination*

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

*E. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**

*Secretary of Homeland Security.*

[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]

**BILLING CODE 9110–9M–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7050–N–52]**

**30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.

**DATES:** *Comments Due Date:* November 18, 2022.

**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_submission@ omb.eop.gov* or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The **Federal Register** notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

*A. Overview of Information Collection*

*Title of Information Collection:* Debt Resolution Program.

*OMB Approval Number:* 2502–0483.

*OMB Expiration Date:* November 30, 2022.

*Type of Request:* Revision of a currently approved collection.

*Form Number:* HUD–56141, HUD– 56142, HUD–56146.

*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).

*Respondents:* Individuals or Households, Business or other For-Profit.

*Estimated Number of Respondents:* 648.

*Estimated Number of Responses:* 2,159.

*Frequency of Response:* 1.

*Average Hours per Response:* 1.

*Total Estimated Burden:* 590 hours.

---

[58] *See* 82 FR 4902 (Jan. 17, 2017).

[59] 5 U.S.C. 553(b)(B).

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Chad F. Wolf, *et al.*,      )
     *Applicants,*     )
           )
v.               )        No. 19-15716
           )
Innovation Law Lab, *et al.*,    )
     *Respondents.*    )
_____)

### DECLARATION OF ROBERT E. PEREZ

I, Robert E. Perez, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1.    This declaration is being submitted to supplement the declaration submitted before this Court on February 28, 2020, in support of the Government's Emergency Motion under Circuit Rule 27-3 for an Immediate Stay Pending Disposition of a Petition for Certiorari or an Immediate Administrative Stay in *Innovation Law Lab* v. *Wolf*, No. 19-15716.

2.    As the Deputy Commissioner of U.S. Customs and Border Protection (CBP), and the agency's senior career official, my primary focus is working closely with the Commissioner to ensure that CBP's mission of protecting our Nation's borders from terrorists and terrorist weapons is carried out effectively in partnership with other Federal, state, local, and foreign entities. Other top CBP priorities for which I am responsible include securing and facilitating legitimate global trade and travel, keeping illegal drugs

1

Venezuela AR_000084

and illegal aliens from crossing our borders, and protecting our Nation's food supply and agriculture industry from pests and disease.

3. I am familiar with the Ninth Circuit's February 28, 2020 order in *Innovation Law Lab v. Wolf*, No. 19-15716, lifting the stay imposed by a motions panel of the Ninth Circuit and affirming the decision of the district court to issue a preliminary injunction setting aside the Migrant Protection Protocols (MPP). I previously advised of the injunction's significant implementation concerns for CBP. As noted below in some of the reporting available to CBP regarding the events of February 28-29, 2020, those concerns began to be realized quickly after the issuance of the Ninth Circuit's decision.

4. The temporary suspension of port operations in certain locations became necessary to ensure the safety of the traveling public and port employees and maintain the integrity of border security operations. Shortly after the issuance of the Ninth Circuit's ruling, attorneys were contacting the ports and other CBP offices, demanding that their clients be permitted to present themselves at the port of entry and to enter the United States. Indeed, one attorney demanded to be permitted immediately to bring over 1,000 individuals to a bridge at the Brownsville port of entry.

5. By the afternoon of February 28, 2020, about 100 migrants were gathered on the Mexican side of the border at the Brownsville, Texas Port of Entry at the Gateway International Bridge. Attorneys showed up at the Gateway International Bridge to advise CBP personnel that MPP had been enjoined and demanded that their clients be paroled into the United States. Later that evening, additional CBP personnel and local law enforcement responded to the Brownsville Port of Entry due to large groups of migrants and attorneys gathering on the Gateway International Bridge in Brownsville to provide additional security at the Port

2

of Entry while standing by to deploy in the event of a surge. Specifically, the OFO Special Response Team (SRT) was activated, and the OFO Mobile Field Force (MFF) was assembled and made ready. Also, ten Border Patrol Agents (BPAs) and one Supervisory BPA were pulled from line-watch operations in the Brownsville are of responsibility and redeployed to support Port operations. Mexican authorities were notified and worked to remove the mass gathering from the bridge. By midnight EST on Saturday, February 29, 2020, it was communicated to CBP that all but about 35 migrants had returned to the shelter.

6.  Notably, based on information available to CBP, there are currently about 2,200 people waiting at campsites on the Mexican side of the Gateway International Bridge. To the best of CBP's knowledge, approximately 1,400 of those aliens have been processed pursuant to MPP and are pending hearings in immigration court. While not all of the approximately 2,200 individuals are pending removal proceedings after being processed pursuant to MPP, a large group is about 50 yards from the border crossing point at the Gateway International Bridge. In addition to the aliens within immediate proximity to the border at the campsite, there are MPP-processed aliens housed at a shelter approximately five miles from the Gateway International Bridge. If there was a surge of this group based on an injunction applicable to MPP, it would hinder the port's ability to fulfill CBP's priority missions, particularly when detention capacity at the Gateway International Bridge is only 15 individuals.

7.  On February 28, 2020, in El Paso, Texas, approximately 250-350 Cuban nationals assembled on the Mexican side of the bridge at the Paso Del Norte (PDN) border crossing. Mexican authorities were also contacted to attempt to disperse the group. Additional

3

Office of Field Operations (OFO), Border Patrol, Air and Marine Operations and state and local law enforcement were deployed to El Paso PDN to support port personnel in securing the port. Specifically, the OFO SRT was activated, and the OFO MFF was assembled and made ready. The Mexican side of the bridge was cleared of vehicle and pedestrian traffic; however, the migrant group remained on the Mexican side of the bridge. The El Paso Police Department posted police officers north of the POE to provide additional security. CBP Officers assigned to the Paso Del Norte Border Crossing reported the group of migrants had dispersed and departed the area. On the morning of February 29, following port closure of about nine hours, operations resumed at PDN, and the SRT and MFF were demobilized.

8. Moreover, during an approximate 12-hour timeframe, there were a total of 32 apprehensions of aliens crossing between the ports in the El Paso area, 28 of which had been previously processed for MPP. Thus, the anticipated surge of such migrants was not limited to the Ports of Entry but was realized between the Ports of Entry as well.

9. The Hidalgo, Texas area also reported large groups of migrants gathering to arrive from Mexico. The Hidalgo POE reported approximately 25 Cuban nationals approaching the Hidalgo International Bridge. Due to safety concerns to the traveling public, CBP Officers temporarily halted both northbound and southbound vehicular and pedestrian traffic by 6:00 pm. Although all northbound and southbound traffic resumed by 7:15 pm EST, MFF officers deployed to secure the port. Shortly thereafter, by 7:30 pm EST, an additional group of Cuban nationals arrived at the border crossing point resulting in traffic being halted once again. All northbound and southbound traffic resumed again by 8:00 pm EST. By 9:30 pm EST, the group of migrants grew to approximately 200 individuals. Border

4

Venezuela AR_000087

Patrol provided additional personnel to assist at the POE. After coordinating with Government of Mexico officials, the Hidalgo Port Director agreed to explain the status of Port operations to a small group of representatives of the larger migrant group. The group had been informed by their attorneys that MPP was no longer in effect, and they should report to the Port of Entry to be processed and should be allowed to enter the United States. The Port Director clarified the status of Port operations as they related to MPP, and by midnight EST on February 29, the large group of Cuban nationals dispersed. Ports then resumed normal operations.

10. In making operational decisions related to the Hidalgo POE, Port management must be mindful of the population in Mexico that may rush to the border, especially when 25 aliens had already gathered shortly after the issuance of a decision enjoining a significant program. Per information currently available to CBP, there are about 1,400 individuals residing in the community surrounding the shelter, and most have been processed for MPP. In addition to those residing in the area surrounding the shelter, CBP understands that there are about 300 individuals inside the shelter that are waiting to make entry into the United States.

11. The Laredo, Texas POE reported large groups of migrants gathering to arrive from Mexico. At approximately 6:50 pm EST on February 28, the Laredo POE received reports of migrants leaving shelters in Nuevo Laredo, Tamaulipas, Mexico with the intent of making entry through the Lincoln Juarez and Gateway to the Americas bridges in Laredo. MFF Officers were placed on standby at the Lincoln Juarez and Gateway to the Americas bridges. Additional officers were deployed to the border crossing points. Border Patrol and Laredo Police Department provided personnel to supplement operations at the POE.

5

Venezuela AR_000088

Admissibility processing was temporarily suspended. Mexican authorities assisted with the influx of migrants on the Mexican side of the Gateway to the Americas Bridge, which led to the migrants being dispersed by the early morning hours of February 29.

12. At this time, there are approximately 2,000 aliens who have been processed pursuant to MPP, returned through the Laredo Port of Entry. At any given time, it is my understanding that there are approximately 200-300 individuals spread throughout the seven shelters in Nuevo Laredo who have been processed for MPP or otherwise expected to be seeking admission into the United States. Mexican officials have also advised that there are other aliens that stay in hotels throughout the Nuevo Laredo area, but that number is unknown at this time.

13. The Nogales, Arizona Port of Entry also reported large groups of migrants gathering to arrive from Mexico, but port closure was not determined to be operationally necessary. The San Ysidro Port of Entry reported approximately 50 migrants gathered in Tijuana, but held back by Mexican immigration officials.

14. Within hours of the issuance of the Ninth Circuit's decision, mass gatherings on the Mexican side of the border were determined to be a safety risk to the traveling public and CBP personnel, and operational decisions were made to temporarily suspend port operations in certain locations. While it is difficult to know with certainty what may have occurred had the Ninth Circuit not granted a temporary stay of its decision, it is likely that the number of migrants gathered at the border, whether at or between the ports of entry, could have increased dramatically. This could have included not only the approximately 25,000 individuals currently waiting in Mexico for removal proceedings who may arrive in

6

Venezuela AR_000089

the United States from Mexico and request immediate admission, but also others in Mexico that have become aware of CBP's operational limitations and seek to exploit them.

15. During the short period of time that the injunction was operative on February 28, the ability of CBP law enforcement officers and agents to protect against national security threats and interdict illicit materials was undoubtedly and negatively impacted. For example, Border Patrol assets were redeployed and redirected to Ports of Entry to address the large groups forming. The diversion of manpower and aerial assets to support response to these events adversely impacted the ability for Border Patrol to safeguard the border between the ports of entry and created a vulnerability in these areas. At Ports of Entry, response to these events diverted resources from other priority missions, including performance of secondary inspections of high-risk conveyances and travelers, and facilitation of lawful trade and travel. These gaps in coverage for CBP law enforcement agents and officers covering such surges increase the likelihood of successful smuggling events and pose a national security risk at the border that is frequently exploited by organized transnational criminal activity. For Border Patrol in particular, these gaps in coverage also create an officer safety issue because agents that remain performing their primary function of patrolling the border continue to do so in isolated areas with less agents to provide back-up in response to high risk arrests/incidents.

7

Venezuela AR_000090

I declare that the foregoing is true and correct to the best of my knowledge, information,
and belief.

Executed this third day of March, 2020.

Robert E. Perez
Deputy Commissioner
U.S. Customs and Border Protection

8



# Congress of the United States
## House of Representatives
### Washington, DC 20515

August 05, 2022

The Honorable Alejandro Mayorkas
Secretary
Department of Homeland Security
Washington, D.C. 20528

Dear Secretary Mayorkas:

We write to you today regarding the transfer of asylum seekers from our nation's border states of Arizona and Texas to New York City. According to recent reporting, asylum seekers being loaded onto buses from Arizona and Texas are dealt official Department of Homeland Security documentation directing them to social services organizations, rather than New York City's Department of Homeless Services Prevention Assistance and Temporary Housing (PATH) intake center located at 151 East 151st Street in the Bronx.[1] Alarmingly, many instances reflect that the addresses to social services organizations on the documents asylum seekers receive are inaccurate, misleading them and in some cases, putting that at risk of removal due to missing an important court date.

Furthermore, we understand that when asylum seekers arrive, they are left stranded, unaware of the resources and locations of the city's intake centers. Briefings provided by the Mayor's Office of New York City indicate that about approximately 4,000 asylum seekers have arrived in New York City over the past few months.[2] With recent news of Texas' Governor bussing additional asylum seekers to New York City, we are concerned that if this matter is not dealt with in a timely manner, thousands of migrants will continue to be misled and denied resources they are legally owed such as access to food and shelter.

To reiterate, we are concerned with incorrect addresses listed on asylum seekers' paperwork where they intend and expect to receive services. Without an official address to receive all their correspondence, many may miss their court dates to plead their case in front of an immigration judge. As such, it is imperative that your agency work with municipalities who are receiving bussed asylum seekers and guarantee that addresses you are directing them to are accurate. Doing so will avoid ensure that migrants, many of whom are families with children, receive

---

[1] Russo, Melissa. "Migrants Being Sent to NYC from Texas - to the Wrong Places, with No Help, Sources Say."*NBC New York*, NBC New York, 31 July 2022, https://www.nbcnewyork.com/investigations/migrants-being-sent-to-nyc-from-texas-to-the-wrong-places-with-no-help-sources-say/3799297/.

[2]Mays, Jeffery C. "Adams Blames Migrants for Shelter Woes. Critics Say That's Too Simple." *The New York Times*, The New York Times, 25 July 2022, https://www.nytimes.com/2022/07/25/nyregion/asylum-migrant-homeless-nyc.html.

lifesaving resources in a timely manner. Coordination between federal, state, and local partners is critical to affirm safe housing and access to appropriate social and legal services for asylum seekers.

Considering the miscommunication between DHS, city agencies, social services providers, legal services providers, and asylum seekers, please provide to our offices in writing within 20 calendar days answers to the following questions:

1. How is DHS working to ensure asylum seekers have an opportunity to present themselves to an immigration judge?
2. For individuals that missed or will miss their court date due to being directed to an inaccurate address, what measures will you establish to assure they have an opportunity to reschedule and are not wrongfully penalized for a matter that was no fault of their own?

Thank you for your attention to this matter and we look forward to your response.

Best regards,

Alexandria Ocasio-Cortez
Member of Congress

Adriano Espaillat
Members of Congress

# Congress of the United States

# Washington, D.C. 20515

September 9, 2022

The Honorable Lucille Roybal-Allard
Chair
House Subcommittee on Homeland Security
Committee on Appropriations
2006 Rayburn House Office Building
Washington, DC 20515

The Honorable Chuck Fleischmann
Ranking Member
House Subcommittee on Homeland Security
Committee on Appropriations
2006 Rayburn House Office Building
Washington, DC 20515

Dear Chair Roybal-Allard and Ranking Member Fleischmann:

As negotiations begin on the first fiscal year (FY) 2023 continuing resolution, we write to request that the bill provide $50 million above the enacted FY2022 level to the Federal Emergency Management Agency's Emergency Food and Shelter Program (EFSP) for humanitarian assistance to migrants.

Since mid-April, the governors of Texas and Arizona have exploited and harmed approximately 10,000 vulnerable people fleeing desperate and dangerous situations in their home countries for political gain by busing them to D.C., New York City and Chicago.

The EFSP provides federal funding for food, shelter and other necessities.  In FY 2022, Congress provided $150 million to this program for humanitarian assistance for migrants.  As of July 21, 2022, approximately $85 million of this funding remained available.  However, the busing of migrants to D.C., New York City and Chicago and resettlement in cities like Boston has increased funding requests across the Northeast and the Midwest.  Without additional funding, the EFSP may exhaust its funding.

This funding would ensure that the EFSP can continue to provide humanitarian assistance to meet the needs of all migrants.

Sincerely,

Eleanor Holmes Norton
Member of Congress

Jesús G. "Chuy" García
Member of Congress

Adriano Espaillat
Member of Congress

Jamaal Bowman, Ed.D.
Member of Congress

Anthony G. Brown
Member of Congress

Tony Cárdenas
Member of Congress