Veronica Escobar
Member of Congress

Raúl M. Grijalva
Member of Congress

Hakeem Jeffries
Member of Congress

Mondaire Jones
Member of Congress

Carolyn B. Maloney
Member of Congress

James P. McGovern
Member of Congress

Grace Meng
Member of Congress

Jerrold Nadler
Member of Congress

Marie Newman
Member of Congress

Chellie Pingree
Member of Congress

Ayanna Pressley
Member of Congress

Mike Quigley
Member of Congress

Jamie Raskin
Member of Congress

Jan Schakowsky
Member of Congress

Albio Sires
Member of Congress

Juan Vargas
Member of Congress

Nydia Velázquez
Member of Congress

2

**THE SECRETARY OF STATE**
**WASHINGTON**

April 25, 2022

The Honorable
Alejandro N. Mayorkas
Secretary of the Department of Homeland Security
Washington, DC 20528

Dear Secretary Mayorkas:

The Department of State assesses that extraordinary and temporary conditions currently exist in Venezuela that prevent Venezuelan nationals in the United States from returning to Venezuela in safety.  As such, I recommend extending Venezuela's Temporary Protected Status (TPS) designation for 18 months.

A complex political, humanitarian, and economic crisis, the presence of non-state armed groups, repression, and a crumbling infrastructure mean Venezuelans cannot return to their country in safety.  Venezuelans who return continue to face the possibility of torture, extrajudicial killings, forced disappearances, human trafficking, unjust detentions, and politically motivated reprisals.  NGOs reported 33 forced disappearances through May 2021 with 14 people still missing as of November 2021, and report 240 political prisoners in custody as of February 14.

The United States is coordinating with states hosting large Venezuelan displaced populations including Brazil, Chile, Colombia, Ecuador, and Peru to support measures conducive to the socio-economic integration of Venezuelan migrants and refugees, citing the security risks and humanitarian needs pervasive in Venezuela.

I therefore recommend that you extend TPS for Venezuela for 18 months beyond the current September 9 expiration based on extraordinary and temporary conditions.  To help inform your decision, the Department prepared the attached country conditions assessment.

Sincerely,

Antony J. Blinken

Enclosures:
        As stated.

SENSITIVE BUT UNCLASSIFIED

# (U) DEPARTMENT OF STATE RECOMMENDATION REGARDING
# TEMPORARY PROTECTED STATUS (TPS) FOR VENEZUELA
# APRIL 2022

## I.   Statutory Basis for Designation

***Have the conditions under which the foreign state was designated for TPS ceased to exist?***

(U) No.  The conditions under which Venezuela was designated for TPS continue to exist.

### A. Armed conflict

**1. Is the foreign state still involved in an ongoing, internal, armed conflict?**

(U) N/A.

**2. If so, would the return of nationals of the foreign state to that state (or to the part of the state) still pose a serious threat to their personal safety?**

(U) N/A.

### B. Environmental Disaster

**1. Does there continue to be a substantial, but temporary, disruption of living conditions in the foreign state affected by an earthquake, flood, drought, epidemic, or other environmental disaster?**

(U) N/A.

SENSITIVE BUT UNCLASSIFIED
SENSITIVE BUT UNCLASSIFIED

**2. Is the foreign state still unable, temporarily, to handle adequately the return to the state of nationals of the state?**

(U) N/A.

**3. Does the foreign state continue to support the TPS designation for its nationals in the United States?**

(U) N/A.

*C. Extraordinary and Temporary Conditions*

**1. Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?**

(SBU) Yes.  The manmade disaster induced and perpetuated by the Maduro regime has forced approximately 6 million Venezuelans to flee their country.  A complex political, humanitarian, and economic crisis, the presence of non-state armed groups, repression, and a crumbling infrastructure mean Venezuelans still cannot return to their country in safety.  These conditions are the cumulative result of the factors described below.  Venezuelans who return to their country continue to face the possibility of torture, extrajudicial killings, forced disappearances, human trafficking, unjust detentions, and politically motivated reprisals.

**(SBU) Violence:**  Citizens of Venezuela are subject to ongoing violence at a tremendous scale that has contributed directly to the mass exodus of citizens from the country.  Episodes of localized violence are frequent, unpredictable, and are not adequately prevented or addressed.  Parts of the country experience violence from armed groups because of a deterioration of the rule of law, the long-term presence of non-state armed groups, and illicit economic activities.

(SBU) The current homicide rate in the country stands at 40.9 violent deaths per 100,000 inhabitants according to the NGO Observatorio Venezolano de Violencia, creating an insecure and uncertain environment for Venezuelan citizens remaining in or returning to the country.  The 2021 International Narcotics Control Strategy Report (INCSR) notes that the Maduro regime's practically nonexistent international drug control cooperation; appropriation of the judiciary and military services for its own illicit ends; corruption; and cooperation with criminal elements provide ideal conditions for drug trafficking and associated violence.  The regime increasingly depends on narcotrafficking funds, among other illicit revenue streams, to sustain its patronage network and maintain power.  The Maduro regime provides a permissive environment for terrorist groups including the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP), Segunda Marquetalia, and the Colombian-origin National Liberation Army (ELN).  The ELN continues to expand its presence beyond its historic base in the border zone with Colombia and consolidate its social control.  According to local and international media, the ELN was present in 12 of Venezuela's 24 states (with strength in Anzoátegui, Amazonas, Apure, Bolívar, Zulia, and Táchira states).  With the complicity of the regime in some regions, and due to the Maduro regime's lack of territorial control in others, these narcotrafficking and terrorist groups repress – sometimes violently – populations residing in areas that fall under their control.  In 2021, the Maduro regime provided support to the Revolutionary Armed Forces of Colombia – Dissidents and the National Liberation Army, non-state armed groups that recruited or used child soldiers.  In other areas, Venezuelan security forces confront narcotrafficking and terrorist groups, creating more violence and instability.

**(SBU) Deteriorating Humanitarian Situation:**  Because of the economic collapse and political crisis, the UN and humanitarian organizations have been coordinating Humanitarian Response Plans (HRP) for Venezuela since 2019.  The 2021 Global Humanitarian Needs Overview noted that more than seven million people in Venezuela (of a total population of 28.4 million) required humanitarian assistance.  To date, approximately 6 million Venezuelans have left the country, making it the second largest refugee and migrant crisis in the world.  The IOM and UNHCR project 8.9 million Venezuelans will have left Venezuela by the end of 2022.

(SBU) Persistent operational constraints inside Venezuela imposed by the Maduro regime, including harassment and open hostility toward humanitarian workers, are obstructing the international community's relief efforts.  The Maduro regime has created a constrained humanitarian space, leading to the freezing of NGO registration, obstruction of import permits, and refusal to grant visas for humanitarian workers.  State and USAID implementing partners have reported harassment by the regime and its supporters who have also prevented other humanitarian actors from operating in Venezuela.

(SBU) The COVID-19 pandemic exacerbated conditions already intensified by the humanitarian crisis, including gender-based violence and violence against children.  NGO surveys on the situation inside Venezuela show marked increases in forced labor, child labor, and gender-based violence because of the pandemic, with Utopix registering 239 femicides in 2021, a 43 percent increase since 2019.

**(SBU) Severe Economic Crisis:**  Venezuela's economy is in shambles following years of mismanagement and corruption, the persistent and widespread impacts of the COVID-19 pandemic, a hollowing out of the private sector, and hyperinflation.  According to the IMF, Venezuela's GDP growth precipitously declined by more than 80 percent since its 2014 peak.  Venezuela's GDP fell 30 percent in 2020 and another 5 percent in 2021.

(SBU) Oil revenues, the Maduro regime's largest source of income, are estimated to have fallen more than 90 percent from their 2014 highs.  As a result, the Venezuelan Central Bank's reserves have fallen over 48 percent since 2016 and now hover just below $6 billion.  Venezuela may have the highest value of government debt as a percentage of GDP of any country in the world.  The World Bank estimates the country's external debt is $190 billion, equivalent to 267 percent of GDP, as of February 2022.  Foreign currency shortages, combined with rampant public spending, have set off waves of hyperinflation, topping out at over two million percent in 2018 and "slowing" to 686 percent in 2021.

(U) The collapse of the country's sovereign currency, the Bolivar, means that the minimum wage in Venezuela stands at just over $2 per month.  Consequently, the percentage of transactions in foreign currency has dramatically increased.  Today, foreign currency is used in between 60 and 70 percent of all transactions, most of which are in U.S. dollars.

**(U) Food Insecurity and Malnutrition:**  Access to adequate and nutritious food is an increasing challenge for vulnerable Venezuelans due to continued hyperinflation and price fluctuations.  Venezuela's population is primarily urban and relies heavily on food imports, making it especially vulnerable to supply and price shocks.

SENSITIVE BUT UNCLASSIFIED
-6-

(U) In August 2019, the Maduro regime halted most of its food imports and allowed the private sector to take over, however, food insecurity is worsening under the weight of increased corruption, fuel shortages, and hyperinflation.  Imported food items are available in supermarkets but priced in dollars and out of the reach of most Venezuelans.  In July 2021, the WFP started distributing food supplies to children enrolled in pre-schools and to school staff in areas identified by WFP as most affected by food insecurity.

(SBU) Agriculture accounts for less than five percent of Venezuela's GDP and a small percentage of the labor force.  Fuel shortages, compromised infrastructure, restricted access to credit, and agricultural input scarcity make agricultural development challenging.  Uncertain land tenure and a legacy of nationalizations discourage agricultural entrepreneurship and investment.

(SBU) Reduced economic activity due to COVID-19 mitigation measures further decreased household incomes, particularly in the informal sector, and in the first seven months of quarantine, food inflation reached 671.8 percent.  Remittances have declined as the diaspora's employment levels and purchasing power decreased, further increasing humanitarian needs among Venezuelans in country, as well as among Venezuelan refugees and migrants.

(SBU) The Maduro regime has prevented a comprehensive assessment of the state of hunger in Venezuela since 2019 by imposing restrictive visa measures on humanitarian workers and by implementing obstructive financial auditing and logistical measures for aid groups inside Venezuela.  However, humanitarian organizations report that families are increasingly unable to meet their daily food needs.  A 2020 WFP report placed Venezuela among the top four countries suffering from food insecurity.  Global Acute Malnutrition (GAM) has reached catastrophic levels in some communities.  Malnutrition has jeopardized the next generation and reversing its effects could take decades.

SENSITIVE BUT UNCLASSIFIED
-7-

(SBU) The country's traditional remedial measures for providing food have shown increased signs of strain. The regime has long relied on subsidized food rations, known as CLAP boxes, to alleviate food scarcity while buying loyalty from its citizens by politicizing eligibility, for example, by distributing CLAP boxes based on express loyalty to Maduro or his political parties and allies. The quality, quantity, and timeliness of these boxes has deteriorated significantly over recent years for several reasons. First, pro-regime armed groups in many instances play a role in the distribution of the boxes. Second, corrupt distribution networks skimmed funds from the program. Due to corruption, which reduced the money spent on actual food, the quality of the CLAP boxes declined dramatically, often lacking animal-based protein, infested with mold or vermin, and much smaller than they were historically. Surveys by Venezuelan NGOs Convite and Ciudadania en Accion indicate that the percentage of families receiving CLAP boxes dropped from 38 percent in 2020 to 16 percent in 2021.

(U) **Lack of Access to Lifesaving Health Services:** The 2020 UN Humanitarian Response Plan indicates that the state of health infrastructure in Venezuela remains poor, and there continues to be a lack of qualified health professionals, medicine, and essential supplies. According to the Venezuelan Medical Federation, as of August 2021, 40,000 Venezuelan doctors have left the country. Health workers who stayed in Venezuela earned between $4 and $18 a month, and many have had to walk to work, sometimes for over ten kilometers, as they cannot afford transport. The COVID-19 pandemic further exacerbated this crisis. According to the Interim Government and local NGOs, the number of COVID-19 related deaths among health care workers in Venezuela remains the highest in Latin America at approximately 30 percent of all COVID-19 deaths nationwide. Local health facilities have limited capacity to address growing needs.

(SBU) According to the Venezuelan Medical Federation, many hospitals are unable to offer services because they only have 3-4 percent of necessary medicines available.  A health union announced in November 2021 that Venezuela's public hospitals had a 40 percent shortage of masks and a 46 percent shortage of gloves.  Outbreaks of communicable diseases, including yellow fever, measles, and diphtheria are persistent threats.  Health infrastructure in Venezuela is primarily managed by the Maduro regime and has therefore been subject to years of neglect and disrepair.

(SBU) **Human Rights Abuses:**  NGOs and international organizations have long reported human rights abuses committed by the Maduro regime, its associates, and aligned armed groups.  According to their reports, security forces regularly engage in torture, extrajudicial killings, forced disappearances, unjust detentions, and politically motivated reprisals.  The UN Human Rights Council's Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (IIFFM) found in its September 2020 report, "reasonable grounds to believe that Venezuelan authorities and security forces have since 2014 planned and executed serious human rights violations, some of which – including arbitrary killings and the systematic use of torture – amount to crimes against humanity."[1] According to Ms. Marta Valiñas, chairperson of the Mission, "these crimes were coordinated and committed pursuant to State policies, with the knowledge or direct support of commanding officers and senior government officials.".  As noted in the Department's Country Report on Human Rights Practices, NGOs reported 33 forced disappearances through May 2021 with 14 people still missing as of November 2021.  NGOs report 240 political prisoners in custody as of February 14.

---

[1] OHCHR | Venezuela: UN report urges accountability for crimes against humanity 16 Sept. 2020.

SENSITIVE BUT UNCLASSIFIED
-9-

(SBU) Targets of violence include opposition politicians, journalists, students, civil society activists, and anyone perceived to be at odds with the Maduro regime. According to these reports, once in custody, security agents subject detainees to torture, sexual abuse, and other cruel, inhuman, or degrading treatment or punishment, sometimes leading to the detainee's death. Human trafficking remains a serious concern. Traffickers exploit and subject Venezuelans, including those fleeing the country, to egregious forms of exploitation, including sex trafficking and forced labor. Non-state armed groups that operate in the country with impunity subject Venezuelans to forced labor, forced criminality, and recruit child soldiers. These groups lure children in vulnerable conditions and dire economic circumstances with gifts and promises of basic sustenance for themselves and their families to later recruit them into their ranks. Please see the Department's Country Report on Human Rights Practices 2021, the 2021 Trafficking in Persons Report, and the IIFFM reports on Venezuela, dated September 16, 2020, and 16 September 2021, for additional detail on human rights abuses in the country.

**(U) Extrajudicial Killings:** A 2020 IIFFM report concluded that there are reasonable grounds to believe that Venezuelan security forces committed extrajudicial killings, with the knowledge and tacit approval of high-level regime authorities. According to reports from Human Rights Watch, police and security forces in Venezuela killed roughly 19,000 people between 2016 and 2019. NGO Observatorio Venezolano de Violencia reported 2,332 killings committed by regime security forces in 2021. NGO Control Ciudadano reported regime security forces killed at least 106 people in January 2022. Control Ciudadano assured the majority of these cases had characteristics consistent with extrajudicial killings. In January 2022, the Inter-American Commission on Human Rights (IACHR) condemned extrajudicial killings in Venezuela of young men living in poverty.

SENSITIVE BUT UNCLASSIFIED
-10-

(U) According to these NGOs, raids conducted by the Bolivarian National Guard, the Bolivarian National Police (PNB), the Bolivarian National Intelligence Service (SEBIN), and state police resulted in allegations of extrajudicial killings, arbitrary detentions, destruction of homes, and mistreatment of detainees.

**(SBU) Absence of Rule of Law:**  The Maduro regime-controlled judiciary lacks any semblance of independence and transparency. NGOs and international organizations reported allegations of corruption and political interference resulting in judicial decisions in favor of the regime.  A variety of independent domestic and international human rights groups operate in Venezuela with undue restrictions imposed by the Maduro regime.  Additionally, the Maduro regime condones or supports criminal non-state armed groups throughout the country, including in areas in which it does not have territorial control.  The regime's tolerance of these groups leads to high levels of physical insecurity, human trafficking, and environmental degradation, with outsized impacts on vulnerable populations such as women, children, and indigenous peoples.

## 2. Would permitting nationals of the foreign state to remain temporarily in the United States be contrary to the national interest of the United States?

(U) No.  Permitting eligible Venezuelan nationals to remain temporarily in the United States advances the national interest by assuring our resolve to offer haven for those fleeing the conditions detailed in this report.  As President Biden said in his February 4, 2021, remarks at the Department, such actions are part of this Administration's effort to restore U.S. moral leadership, and in the past have served as an example to push other countries to assist such populations.  In his October 20, 2021, remarks the Secretary highlighted the situation with Venezuelan refugees and migrants as particularly urgent and called for directing resources to communities hosting migrants and refugees from Venezuela.

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED
-11-

## II.   Discretionary Factors

**What, if any, additional information relevant to this decision should be brought to the attention of the Department of Homeland Security?**

### Adverse Impact on Regional Stability

(SBU) Venezuela poses a clear threat to regional stability and its economic collapse could drag down key U.S. allies in Latin America.  According to the UN Refugee Agency and IOM, over 6 million Venezuelans have fled to other countries due to the humanitarian crisis, with approximately 5 million spread throughout Latin America.  The joint UN and IOM R4V Regional Refugee and Migrant Response Plan (RMRP) projects 8.9 million Venezuelans will have left Venezuela by the end of 2022.  The United States remains the largest donor responding to the regional humanitarian crisis.  Since 2017, the United States has provided more than $1.9 billion in humanitarian, economic, development, and health assistance to help Venezuelans in Venezuela, those who have fled, and the communities hosting Venezuelan migrants and refugees.

(SBU) Colombia remains the country most affected by the crisis in the region, hosting nearly 2 million Venezuelan refugees and vulnerable migrants.  The sheer number of Venezuelans strains the Colombian government's capacity to respond, especially in the areas of health and social services, and compounds the difficulties Colombia faces in its efforts to address the needs of more than 8 million Colombians internally displaced due to violence by illegal armed groups.

SENSITIVE BUT UNCLASSIFIED

(SBU) Since the crisis began, Colombia took iterative steps to confer status on Venezuelans, for the purposes of working in the formal sector, accessing education and healthcare, and integrating into Colombian society, but these measures did not reach a majority of the Venezuelan refugees and vulnerable migrants in the country.  Recognizing the need for a more comprehensive approach, Colombia announced on February 8, 2021, a 10-year temporary protective status for Venezuelans that had entered the country prior to January 31, 2021.  To date, over 1.8 million Venezuelans in Colombia have completed pre-registration to access temporary status and more than 628,000 temporary protective status permits have been approved, with substantial State/PRM and USAID assistance for printers, identification cards, staffing, and equipment.  The provision of this status to Venezuelans by Colombia allows them to access public services, including healthcare, education, and the financial system, and assists in their socio-economic integration in the country.

(SBU) Brazil, Chile, Ecuador, and Peru combined host an additional 2.5 million Venezuelan refugees and migrants.  More than 1.3 million Venezuelans currently reside in Peru, the second largest number in the region behind Colombia, placing an immense strain on the country's social services including its health system.  Peru hosts approximately 22 percent of Venezuelan migrants and refugees worldwide and the largest population of Venezuelan asylum seekers in the region.  On average, more than 1,500 Venezuelans enter Peru daily from Ecuador.  The RMRP projects by the end of 2022, the number of Venezuelans in Peru will rise to 1.45 million.  The Peruvian government implemented two alternative regularization processes:  the Temporary Permanence Permit Card and the humanitarian residency permit, directed towards the 530,000 asylum-seekers.  Peru, like many other countries, closed its borders due to the COVID-19 pandemic, which gave rise to criminal networks smuggling and trafficking Venezuelans through irregular entry points.

(SBU) Ecuador hosts the third-highest population of Venezuelans in the region.  Of the more than 508,000 Venezuelans residing there, approximately half possess a valid migration status in the country.  The government of Ecuador pledged in 2021 and 2022 to announce a new effort to regularize Venezuelans in the country, but those plans had not materialized as of February 2022.  As many as 1,500 Venezuelans continue to enter Ecuador daily, with the majority intending to transit to Chile or Peru.  Chile hosts over 448,100 Venezuelan migrants and refugees, the fourth-largest population in the region.  UNHCR notes this figure does not include the 400 and 500 refugees and migrants entering Chile daily since November 2021 via irregular border crossings.  The RMRP reports that communities along Chile's northern border that serve as sites of first reception struggle to meet the emergency shelter, health, and food needs of new arrivals.  Brazil, with 261,400 Venezuelans, hosts the fifth-largest population in the region.  The Brazilian government provided documentation and integration support to more than 261,000 Venezuelan migrants in Brazil as of February 2022.  Brazil has granted refugee status to more than 49,000 Venezuelans, the largest recognized Venezuelan refugee population in the region.

## Regional Migration Management

(SBU) In FY 2021, encounters with Venezuelans increased over 1,225 percent (47,753) compared to the previous five fiscal years combined (3,604), according to CBP data.  Venezuelan migrant encounters at the U.S. southern border further spiked in November and December 2021, with Venezuelans the top nationality encountered after Mexicans.  DHS reports that 80 percent of Venezuelans encountered arrived from Colombia and other South American countries, reflecting a growing secondary migration trend.  Venezuelans account for 30 percent of arrivals in Panama through the Darien as of March, marking a sharp increase in Venezuelans taking the dangerous journey through the jungle.

(SBU) Extending the current TPS protection would maintain protected status for those Venezuelans physically present in the United States before March 8, 2021.  By contrast, re-designation of TPS would extend coverage to Venezuelans who entered the United States after March 8, 2021, and signal that the arduous and dangerous journey will lead to admittance and regularized status in the United States.  Re-designation of TPS would undermine ongoing U.S. efforts to stabilize existing migrant populations in other Western Hemisphere countries (including specifically, Colombia, Peru, and Ecuador for Venezuelan nationals), to prevent secondary movements, and to encourage partner governments to take a more active role in regional migration management, stabilization, and creation and expansion of legal migration pathways.  An extension of the current TPS designation for eligible Venezuelan nationals in the United States before March 8, 2021, however, in conjunction with collaborative regional migration management efforts, would best serve to disincentivize irregular migration and illegal immigration at the U.S. southern border, while continuing to provide protected status to vulnerable and eligible Venezuelans.

## III.   **Recommendation**

(SBU) For the reasons described herein, the Department (1) recommends that Venezuela's TPS designation be extended for 18 months on the basis of extraordinary and temporary conditions and (2) does not recommend a re-designation of TPS.



**U.S. Department of Justice**
Immigration and Naturalization Service

HQCOU 90/15-P; HQCOU 120/17-P

Office of the General Counsel

*425 I Street NW*
*Washington, DC 20536*

JUN 1 5 2001

MEMORANDUM FOR JEFFREY L. WEISS, DIRECTOR
OFFICE OF INTERNATIONAL AFFAIRS

FROM:        Bo Cooper
             General Counsel

SUBJECT:     Legal Opinion:  Parole of Individuals From the Former Soviet Union Who Are
             Denied Refugee Status

## I. Question Presented:

1. May the Attorney General continue to parole individuals into the United States from the
Former Soviet Union after they are denied refugee status?

## II. Summary Conclusion:

1. Yes.  Section 212(d)(5)(A) of the Immigration and Nationality Act, as amended, authorizes
the Attorney General to parole individuals into the United States from the Former Soviet Union
after they are denied refugee status.

## III. Analysis:

### A. Introduction

This memorandum explores the legal basis upon which, and the extent to which, the
Immigration and Naturalization Service (INS) may continue to parole into the United States
individuals who are denied refugee status after applying through the in-country refugee program
in Moscow.  Since 1988, the INS has exercised its discretionary authority to parole into the
United States aliens from the Former Soviet Union who were denied refugee status.  In 1996, the
104th Congress amended the standards which guide the Attorney General's exercise of the parole
power.  As amended in 1996, section 212(d)(5)(A) of the Immigration and Nationality Act (INA,
or the Act) does not curtail the Attorney General's legal authority to parole into the United States
individuals from the Former Soviet Union who are denied refugee status.

Memorandum for Jeffrey L. Weiss                                                                    Page 2
Subject:  Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

### B.  Refugee Processing and Parole in the Context of the Former Soviet Union

Before 1988, Soviet refugee applicants were processed in Rome.  The shift to in-country processing in Moscow began in August 1988 with approximately 2000 Armenians who were divested of their Soviet citizenship, but unable to leave the Soviet Union for lack of State Department funding for their transportation and temporary support in Rome.  At the inception of in-country refugee processing in Moscow, INS adjudicators apparently construed refugee eligibility more broadly than permitted by the statute and, as a result, approval rates were high.  Attorney General Edwin Meese instructed INS to bring the Moscow program "into sync" with existing statutes and INS procedures, but nonetheless offered to parole into the United States those individuals who did not qualify as refugees.[1]

*The Lautenberg Amendment (1990)*:  When INS aligned its overseas refugee processing with the standards set out in the Act, refugee approval rates in the Moscow program declined appreciably.  Congress responded by adopting a provision, commonly known as the Lautenberg Amendment, designed to restore the traditionally high approval rates for certain categories of refugee applicants by reducing the evidentiary burden for establishing eligibility for refugee status.[2]  While not expressly endorsing parole of those denied refugee status, section 599E of the Lautenberg Amendment does permit nationals of the Soviet Union, Vietnam, Laos, or Cambodia to adjust their status if they had been paroled into the United States after being denied refugee status.

To date, INS in Moscow continues both to process qualified refugee applicants under the reduced evidentiary standards set out in the Lautenberg Amendment and also to parole into the United States a high percentage of Lautenberg category members who are denied refugee status.

---

[1]  Letter from Edwin Meese, Attorney General, to then Lt. General Colin Powell, Assistant to the President for National Security Affairs (Aug. 4, 1988) (on file with the INS, Office of the General Counsel).

[2]  Sections 599D and E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Pub. L. No. 101-167, 103 Stat. 1195 (1989).  An introductory note to the July 13, 1989, Senate Voting Record on the Lautenberg Amendment explains:

> Proponents stated that this amendment is necessary to correct the actions of Attorney General Meese, who, in 1988, changed the criteria under which Soviet Jews and Vietnamese . . . could qualify as refugees.  In the past, these two groups of people have been assumed to have a well-founded fear of persecution and, therefore, have automatically qualified as refugees.  As a result of the Attorney General's actions in March 1988, the denial rate for Soviet Jews rose from seven percent to a high of 38 percent. . . .  Many of the refugees from the Soviet Union and Vietnam, who have been turned down, are displaced and uprooted.  They have given up their country, homes, and families because they thought they could rely on the U.S. government's long-standing promise of resettlement.

Senate Voting Record No. 134, Bill No. S.1160 (H.R. 1487), Amendment No. 367.  Temp. Cong. Rec. S-8394 (July 20, 1989).

Memorandum for Jeffrey L. Weiss                                                    Page 3
Subject:  Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

Parole decisions are made on a case-by-case basis in accordance with section 212(d)(5)(A) of the
Act.

### C.  Evolution of INA Section 212(d)(5)

The Attorney General's parole authority has changed little since 1952, when it was
codified into section 212(d)(5) of the INA.  Though subsequent Congresses often debated the
proper scope of the Attorney General's parole power,[3] section 212(d)(5) has been amended only
three times in the past fifty years.  As originally enacted, section 212(d)(5) of the Act provided:

> (5)  The Attorney General may in his discretion parole into the United States temporarily
> under such conditions as he may prescribe for emergent reasons or for reasons deemed
> strictly in the public interest any alien applying for admission to the United States, but
> such parole of such alien shall not be regarded as an admission of the alien and when the
> purposes of such parole shall, in the opinion of the Attorney General, have been served
> the alien shall forthwith return or be returned to the custody from which he was paroled
> and thereafter his case shall continue to be dealt with in the same manner as that of any
> other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5) (1952); Act of June 27, 1952, 66 Stat. 163.

*The Refugee Act of 1980*:  As part of the comprehensive restructuring of refugee
admission procedures achieved in the Refugee Act of 1980,[4] the 96th Congress split section
212(d)(5) into subparagraphs (A) and (B), adding the underlined text as follows:

> (A)  The Attorney General may, except as provided in subparagraph (B), in his discretion
> parole into the United States. . . .

> (B)  The Attorney General may not parole into the United States an alien who is a refugee
> unless the Attorney General determines that compelling reasons in the public interest
> with respect to that particular alien require that the alien be paroled into the United States
> rather than be admitted as a refugee under section 207.

1980 Refugee Act § 202(f).  This language was designed to funnel all refugee admissions under
the numerical cap to be established annually by the President after consultations with Congress,

---

[3]  See, e.g., Arthur Helton, *Immigration Parole Power: Toward Flexible Responses to Migration Emergencies*, 71
INTERPRETER RELEASES 1637 (Dec. 12, 1994); Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis:  A
Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L. REV. 9 (1981); Elizabeth J. Harper, IMMIGRATION
LAWS OF THE UNITED STATES 503-14 (3d ed. 1975).

[4]  Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 108, *codified as* 8 U.S.C. §§ 1157-1159 (1980) (hereinafter 1980
Refugee Act).

Memorandum for Jeffrey L. Weiss                                                    Page 4
Subject: Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

and thus to discourage the admission of additional refugees under the Attorney General's parole power.[5]

   *The Immigration Act of 1990*:  In 1990, the 101st Congress added a minor limitation to section 212(d)(5)(A):  "The [AG] may, except as provided in subparagraph (B) <u>or in section 214(f)</u>, in his discretion parole. . ." (emphasis added).[6]  This amendment curtails the Attorney General's power to parole an alien crewmember who is present in the United States during a labor dispute that leads to a strike or lockout.  <u>See</u> <u>also</u> INA § 214(f)(2)(A).  Until this point, no Congress had modified the substantive criteria that guide the Attorney General's exercise of the parole authority.

   *The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)*:  In 1996, as part of its overhaul of the INA, the 104th Congress narrowed the Attorney General's parole authority by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  IIRIRA § 602(a).[7]

## D.  Construing INA Section 212(d)(5)(A), as Amended by IIRIRA Section 602

   The question presented is whether, under the amended statutory criteria, INS may continue to parole into the United States persons denied refugee status.

   *Plain Meaning*:  The preferred method of statutory construction is to carry out the plain meaning of the text of a statute.  <u>Perry v. Commerce Loan Co.</u>, 383 U.S. 392, 400, <u>reh'g denied</u>, 384 U.S. 934 (1966), *cited in* <u>Matter of H-N-</u>, Int. Dec. 3414 (BIA 1999).  The 104th Congress replaced "emergent" reasons with "urgent humanitarian" reasons, and "strictly in the public interest" with "significant public benefit."  IIRIRA § 602(a).  The differences between these phrases are perceptible, but the text alone is insufficient to determine whether Congress intended, by this amendment, to end the practice of paroling those denied refugee status from the Former Soviet Union.

---

[5]  For analysis of this amendment to section 212(d)(5) of the Act and of the 1980 Refugee Act in general, see Anker & Posner, *supra* note 3.

[6]  Reference to section 214(f) added by section 202(b) of the Immigration Act of 1990, Act of Nov. 29, 1990, Pub. L. 101-649, 104 Stat. 4978.

[7]  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996).  At the same time, Congress also inserted a provision requiring the Attorney General to submit an annual report describing the number and category of aliens paroled into the United States, including information such as the country of origin, duration of parole, current status of such parolees.  IIRIRA § 602(b).

Section 602 of IIRIRA, which amends INA section 212(d)(5), is entitled "Limitation on Use of Parole."[8] Titles have a communicative function. They may be considered to clarify uncertainty in the text but cannot limit the text's plain meaning. 2A Sutherland, *Statutes and Statutory Construction* (6th ed., Norman Singer ed.) § 47.03. The title "Limitation on Use of Parole" confirms what the text suggests, but does not resolve by *how much* Congress intended to curtail the Attorney General's parole authority.

*Legislative History*: The legislative history of IIRIRA section 602 is similarly vague. Describing the import of proposed language that would ultimately be adopted in the final version of IIRIRA section 602, a Senate Report states only that the amendment "[t]ightens The [sic] Attorney General's parole authority. . . ." S. Rep. No. 249, 104th Cong., 2d Sess. 21 (1996). Nor does the final Conference Report for IIRIRA explain to what extent parole should be "tightened." H.R. Conf. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996).

While the legislative history does not clarify to what extent Congress sought to limit the parole authority, it does indicate that the 104th Congress rejected language that would have circumscribed the Attorney General's authority to parole individuals who were denied refugee status. The adopted Senate language replaced an earlier House proposal, section 524 of H.R. 2202, that enumerated four exclusive reasons for which the Attorney General could parole an individual into the United States: medical emergency; organ donation; to visit a dying relative; and to assist U.S. law enforcement efforts (or to protect an individual who so assisted). In addition, section 524 provided:

> (D) LIMITATION ON THE USE OF PAROLE AUTHORITY- The Attorney
> General may not use the parole authority under this paragraph to permit to come to
> the United States aliens who have applied for and have been found to be ineligible for
> refugee status or any alien to whom the provisions of this paragraph do not apply.

The 104th Congress specifically considered, but rejected, the House's proposal to limit the practice of paroling into the United States those denied refugee status. "[W]here the language under question was rejected by the legislature and thus not contained in the statute it provides an indication that the legislature did not want the issue considered." 2A Sutherland, *supra*, § 48.04.

*Re-Authorization of the Lautenberg Amendment*: Within the Omnibus Consolidated Appropriations Act of 1997, Congress both amended the Attorney General's parole authority (Division C) and re-authorized the Lautenberg Amendment for an additional year (Division A). *Compare* Pub. L. 104-208, Div. C, Title VI § 602(a), 110 Stat. 3009-689 (Sept. 30, 1996), *with* Pub. L. 104-208, Div. A, Title I § 101(c) [Title V, § 575(2)], 110 Stat. 3009-168 (Sept. 30, 1996). As discussed above, the Lautenberg Amendment affords adjustment of status to those who are paroled into the United States after being denied refugee status. Not only did the 104th Congress specifically reject proposed limits to the Attorney General's authority to parole denied

---

[8] This title is not codified into the INA.

refugee applicants, it tacitly approved of the practice by renewing an existing provision that permitted these parolees to adjust their status to that of lawful permanent residents.  Subsequent Congresses have re-authorized the Lautenberg Amendment four (4) times since IIRIRA.[9]

*Case-by-case basis of parole decisions*:  For indivi...  s found to be ineligible to be classified as a refugees, parole decisions must comply with i    case-by-case requirement of amended section 212(d)(5)(A) of the Act and may not be made on a "blanket" basis. Designating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with a "case-by-case" decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case.

Under current practice, every refugee applicant is interviewed by an immigration officer for possible classification as a refugee.  If the applicant is found not to be eligible for refugee status, the officer considers the merits of the case for an offer of parole.  So long as individual consideration is given to parole decisions, the Service's determination - that it is generally in the public interest to parole denied refugee applicants from Moscow who belong to groups specified in the Lautenberg Amendment - does not violate the case-by-case requirement.

## IV.  Conclusion:

While section 602 of IIRIRA generally tightens the criteria by which parole decisions are made, it is the opinion of the General Counsel that section 212(d)(5)(A), as amended, does not curtail the Attorney General's legal authority to parole into the United State individuals from the Former Soviet Union who are denied refugee status.

---

[9] Pub. L. 105-118, Title V, § 574(2), Nov. 26, 1997, 111 Stat. 2432; Pub. L. 105-277, Div. A, § 101(f) [Title VII, § 705(2)], Oct. 21, 1998, [12 Stat. 2681-389; Pub. L. 106-113, Div. B, § 1000(a)(4) [Title II, § 214(2)], Nov. 29, 1999, 113 Stat. 1535, 1501A-240; Pub. L. 106-554, enacting by reference Title II, § 212(2) of H.R. 5656, Dec. 21, 2000, 14 Stat. 2763A-25.

PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
Washington, DC 20528

October 12, 2022

**ACTION**

MEMORANDUM FOR THE SECRETARY

| | | |
|---|---|---|
| FROM: | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans | ROBERT P SILVERS  Digitally signed by ROBERT P SILVERS  Date: 2022.10.12 16:12:28 -04'00' |
| | Christopher Magnus<br>Commissioner<br>U.S. Customs and Border Protection | CHRISTOPHER J MAGNUS  Digitally signed by CHRISTOPHER J MAGNUS  Date: 2022.10.12 15:32:11 -04'00' |
| | Ur M. Jaddou<br>Director<br>U.S. Citizenship and Immigration Services | UR M JADDOU  Digitally signed by UR M JADDOU  Date: 2022.10.12 14:50:21 -04'00' |

SUBJECT:          **Parole Process for Certain Venezuelan Nationals**

**Summary**

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating meaningful and safe, orderly, and humane processes for migration throughout the region. While this strategy shows great promise, it will take time to fully implement in a way that will have meaningful effects on migratory patterns in the region. These changes will not take effect quickly enough to have an immediate impact on the significant challenges we face today along the southwest border (SWB).

In light of this reality, DHS is proposing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between ports of entry (POE) along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe, orderly, and streamlined manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, we anticipate that this effort will serve as a deterrent to irregular migration, by

providing a meaningful alternative to irregular migration, and by imposing immediate consequences on Venezuelan nationals who seek to irregularly enter the United States between POEs. It would provide an incentive for Venezuelans to avoid the often-dangerous journey to the border altogether by putting in place a safe, orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[1]  After this process is announced, Venezuelan nationals attempting to irregularly enter the United States between POEs would be subject to expulsion or removal to Mexico or other third countries and ineligible for parole under this process as a result. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process will be conditioned on the GOM—for the first time— accepting the expulsion or removal of large numbers of Venezuelan nationals seeking to irregularly enter the United States between POEs on the SWB. As such, this new process will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB.

The new parole policy would be modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at POEs along the SWB. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safer and more orderly process. This new process would be procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual (and certain non-Venezuelan nationals who are immediate family members of a primary beneficiary) and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Venezuelan nationals would be required to meet several eligibility criteria to be considered, on a case-by-case basis, for advance travel authorization or parole. Individuals would be ineligible if they have been ordered removed from the United States within the prior five years. They are ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after the date of the announcement. Venezuelan nationals also are ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela. In addition, Venezuelan nationals must meet the following criteria: (i) beneficiaries must travel by air to seek entry at a POE; and (ii) beneficiaries must pass vetting for national security and public safety purposes prior to traveling to the United States and again at the POE. Only those who meet all specified criteria would be eligible to receive advance

---

[1] *See* 8 U.S.C. § 118d(d)(5) (granting the Secretary the "discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

Venezuela AR_000118

PRE-DECISIONAL/DELIBERATIVE

authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

A discretionary grant of parole would be for a temporary period of up to two years.  During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region.  These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate nonetheless and lack a valid claim of asylum or other lawful basis to remain in the United States.  The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States as they do so.  Those who are not granted asylum or other immigration benefits will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process would provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country.  Most significantly, we anticipate it would: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.  The process would be capped at 24,000 Venezuelan beneficiaries.  After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

This memo includes information on the current conditions at the border; outlines the proposed process; details eligibility criteria and vetting mechanisms; further explains the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends that you approve the policy and policy rationale identified in this memo.

## I.  Background

### 1.  Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered.  Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.  By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from

3

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

2011–2017.[2] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America[3] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[4]

The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019.[5] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.[6]

---

[2] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[3] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[4] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[5] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[6] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

4

Venezuela AR_000120

PRE-DECISIONAL/DELIBERATIVE

2. <u>Push and Pull Factors</u>

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe, orderly, and humane migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to expel or remove Venezuelan nationals to Venezuela or elsewhere, as described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

*Factors pushing migration from Venezuela*

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[7]  Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[8]  In a February 2022 report, Amnesty International noted that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity."[9]  Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[10]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[11]  At least in the short-term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere.  As described below, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

---

[7] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited September 24, 2022)

[8] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, April 12, 2022, available at: https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/ (last visited September 24, 2022)

[9] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.11, Feb. 10, 2022, available at: https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited September 25, 2022)

[10] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited September 25, 2022)

[11] *Id.*

5

Venezuela AR_000121

*Return Limitations*

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[12] But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally failed to accept Venezuelans as well. As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

*Overall Effect*

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly incentivized irregular migration. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of return flights, average daily encounters fell by 37 percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[13] Since then, encounters for both countries have fluctuated but remain well below the pre-August 4 numbers; in September 2022, encounters averaged 509 per day for Guatemala and 474 per day for Honduras.[14]

---

[12] *Louisiana v. CDC*, -- F. Supp. 3d --, 2022 WL 1604901 (W.D. La. May 20, 2022).

[13] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[14] OIS analysis of UIP data pulled October 6, 2022.

6

PRE-DECISIONAL/DELIBERATIVE

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1 – November 1, 2021



Note: Figure depicts 30-day average of daily encounters.
Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient.  While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day.  The proposed process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This proposal is informed by the way that similar incentives and disincentives worked in the U4U process.  In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States.  After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[15]  Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3.   Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps.  Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022.

---

[15] OIS Persist Dataset based on data through August 31, 2022.

7

PRE-DECISIONAL/DELIBERATIVE

It has detailed 3,770 officers and agents from CBP and ICE to the SWB.  In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program – Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB.  This spending is in addition to $1.4 billion in FY 2022 appropriations for SWB enforcement and processing capacities.[16]

The impact has been particularly acute in certain border sectors.  The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity.  In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[17]  In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), a ten-fold increase over the average for FY 2014 - FY 2019, primarily as a result of increases in Venezuelans and other non-traditional source countries.[18]  The focused increase in encounters in those three sectors is particularly challenging.  Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing.  El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process.  In just one week (between September 22—September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[19]  In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[20]  Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.  This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above.  DHS assesses that a reduction in

---

[16] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, April 26, 2022.
[17] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1 – 30, 2022.
[18] OIS analysis of OIS Persist Dataset through August 31, 2022.
[19] Data from SBCC, as of September 29, 2022.
[20] Data SBCC, as of September 29, 2022.

8

Venezuela AR_000124

the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II.   Overview and Discussion of Proposed Venezuela Parole Process

This process would provide a streamlined way for individuals from Venezuela who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and seek a temporary period of parole for up to two years for urgent humanitarian reasons and significant public benefit. Such individuals must have a supporter in the United States; pass robust national security and public safety vetting; meet other specified criteria; and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's planned design.

*Supporters*:   U.S.-based supporters will initiate an application on behalf of a Venezuelan national and, if applicable, their immediate family members. Supporters can be individuals filing on their own, with other individuals, or on behalf of entities. They must provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters will be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*:   To benefit from this process, Venezuelan nationals must be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an air POE and final U.S. destination; pass required screening and vetting. They must comply with additional requirements including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the CDC.

Venezuelan nationals are ineligible for this process if they have been ordered removed from the United States within the past five years or if they are subject to a bar based on a prior removal order;[21] have crossed without authorization into the United States between the POEs or have irregularly crossed the Mexican or Panamanian border after the date of the announcement. They are ineligible if they are a permanent resident or dual national of any country other than Venezuela, or currently hold refugee status in any country. Venezuelans who are currently in Mexico or Panama as of the date of the announcement, however, will be eligible if they meet all the other eligibility criteria.

Unaccompanied children (*i.e.*, children under 18 not traveling with a parent or legal guardian) are not eligible for this process.

*Beneficiary vetting*:   Potential beneficiaries will be required to submit biographic and biometric information in the form of a live photograph in advance of travel. This information will be used for vetting by the National Targeting Center (NTC) and to inform classified vetting

---

[21] *See* Immigration and Nationality Act (INA) § 212(a)(9)(A), 8 U.S.C. § 1182(a)(9)(A).

9

Venezuela AR_000125

support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect an additional photograph and fingerprints. This biometric information will support further vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted.

Beneficiaries also will be subject to continuous vetting throughout their period of parole. If derogatory information emerges during this continuous vetting, parole may be terminated and the noncitizen placed into removal proceedings.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries can access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting may receive electronically an advance authorization to travel, allowing them to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries will be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the port of entry, parole generally will be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States will be required to leave prior to the expiration of their parole. Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States will be placed in removal proceedings. During this two-year period, the Department will continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly immigration processes, and increase removal options for Venezuelan nationals.

*Employment Authorization and Public Benefits*: Parolees will be eligible to apply for employment authorization for the duration of the parole.[22] USCIS anticipates that it will be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of work authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or food bank resources than the population of Venezuelans currently encountered crossing the SWB, thus minimizing—and ultimately reducing—the burden on states and localities.[23]

---

[22] 8 C.F.R. § 274a.12(c)(11).

[23] *Id.* Venezuelans paroled for a period of one year or more are considered "Qualified Aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.*, 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS

10

*Scale and Pace:* The process will be capped at 24,000 Venezuelan beneficiaries. DHS anticipates significant public interest in the process. If needed in order to better manage the processing workload and volume, DHS may cap throughput or travel authorization output to a fixed amount per day.

*Sunset/Renewal/Termination*: As described above, the process will be capped at 24,000 Venezuelan beneficiaries over a six-month time period. After this cap is reached, the process will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

## III.    Justification for Venezuela Parole Process

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[24] Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[25] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. DHS may terminate parole in its discretion at any time.[26] Under the current regulations, parolees may apply for and be granted employment authorization to work lawfully in the United States.
[27]

*Significant Public Benefit*

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines new consequences for those who seek to enter the United States irregularly between POEs, with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States— will serve a significant public benefit for multiple intersecting reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhancing border security and national security by vetting individuals

---

does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. Section 202(c)(2)(B), (d)(11) of the Real ID Act of 2005.

[24] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[25] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)A).

[26] *See* 8 C.F.R. § 212.5(e).

[27] *See* 8 C.F.R. § 274a.12(c)(11).

11

Venezuela AR_000127

PRE-DECISIONAL/DELIBERATIVE

before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhance the security of our border by reducing irregular migration of Venezuelan nationals.

Implementation of the parole process is contingent on the GOM agreeing to accept the return of a significant number of Venezuelan nationals encountered at the SWB attempting to irregularly enter the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public health Order, these returns would take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal, who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico would impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a parole, this process will create a combination of incentives and disincentives that could lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

2. Enhance border security and national security by vetting individuals before they arrive at our border.

The Venezuelan parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to undertake this vetting *before* an individual arrives at the border so that we can stop individuals who could pose threats to national security or public safety threats from even crossing into the country.

12

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

As described above, the proposed vetting will require prospective beneficiaries to upload a live photograph via an app.  This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel *before* they arrive at our border.  This is an improvement over the status quo.

3.  Reduce the burden on DHS personnel and resources.

As already described, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB.  By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through the streamlined process DHS is contemplating, we anticipate the process could relieve some of this burden.  This could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody.  While the proposed process would also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

4.  Minimize the domestic impact.

The increased migratory flows have put a strain on domestic resources, which is felt most acutely by border communities.  As the number of arrivals increases, thus necessitating more provisional releases, the strains are shared by others as well.  Given the inability to return or repatriate Venezuelans in substantial numbers, DHS is currently conditionally releasing 95 percent of the Venezuelan nationals it encounters at the border pending their removal proceedings or the initiation of such proceedings.  Venezuelan nationals accounted for 27 percent of all encounters released at the border in September 2022.[28]  Venezuelan nationals thus account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29]  DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB.  This

---

[28] OIS analysis of CBP book-out dispositions for September 1 – 27, 2022 based on CBP UIP data pulled September 28, 2022.

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, September 21, 2022, available at: https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office. (Last visited: September 29, 2022).

13

PRE-DECISIONAL/DELIBERATIVE

funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The proposed parole process would address these concerns by diverting flows of Venezuelan nationals to interior POEs through an orderly and lawful process. DHS anticipates this will yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

5. Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks.

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since

---

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. September 14, 2022, available at: https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/. (Last visited: September 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. September 20, 2022, available at: https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/. (Last visited September 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, September 23, 2022.

[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, September 23, 2022, available at: https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day, (Last visited: September 29, 2022).

[33] https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, September 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html, (Last visited: September 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

14

Venezuela AR_000130

March 2022.[37]  CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38]  The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north.  Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama.  Women and children are particularly vulnerable.  Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that require immediate attention.[39]  According to Panamá Migración, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migratory movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41]  These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow.  Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.  Tragically, a significant number of individuals perish along the way.  The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

The proposed process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks.  DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

---

[37] Migrants risk death crossing treacherous Rio Grande river for 'American dream' | US-Mexico border | The Guardian https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., October 11, 2021, available at: https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us (last visited September 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá – Colombia 2022, available at: https://www.migracion.gob.pa/inicio/estadisticas

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, April 26, 2022.

[42] Migrant truck crashes in Mexico killing 54, available at: https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R (last visited September 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X (last visited October 2, 2022)

15

6. Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Signatory countries are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example. The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. According to the Venezuelan Ambassador to Costa Rica, 1,700 Venezuelan migrants were entering Costa Rica daily in the month of September 2022.[44] Colombia, Peru and Ecuador are now hosting almost 4 million displaced Venezuelans between them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of which are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[45] Unofficial accounts indicate Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

---

[43] L.A. Declaration
[44] The Department of State Cable, 22 San Jose 796
[45] The Department of State Cable, 22 Panama 624

16

PRE-DECISIONAL/DELIBERATIVE

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap,
February – September 2022



Note: September figure is a preliminary estimate.
Source: Panama Migration Report, September 24, 2022

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and
Panama, all of which are also affected by the increased movement of Venezuelan nationals—
have been seeking greater action to address these challenging flows for some time.
Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends
that contribute to large populations of migrants, many of whom are Venezuelan, entering
Mexico.  These entries strain local governmental and civil society resources in Mexican border
communities in both the south and north, and have at times led to violence, crime, and unsafe
and unhealthy encampments.

The United States is already taking key steps to address some of these concerns.  On June 10,
2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the
U.S. Agency for International Development (USAID) announced $314 million in new funding
for humanitarian and development assistance for refugees and vulnerable migrants across the
hemisphere, including support for socio-economic integration and humanitarian aid for
Venezuelans in 17 countries of the region.[46]  And on September 22, 2022, PRM and USAID
announced nearly $376 million in additional humanitarian assistance, which will provide
essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed

---

[46] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian
Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at:
https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-
new-stabilization-efforts-venezuela (last visited October 11, 2022).

17

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[47]

The new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a two-year temporary residency visa.[48] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly across the SWB. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve

---

[47] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, September 22, 2022, available at: https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela, (last visited September 30, 2022).

18

Venezuela AR_000134

PRE-DECISIONAL/DELIBERATIVE

conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

*Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this proposed process would address the urgent humanitarian needs of many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without making a dangerous journey that puts them in the hands of smugglers.

## IV. Consideration of changes to this process

1. Length of parole and employment authorization

The proposed length of parole is up to two years. This is consistent with other parole processes, such as U4U for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the Cuban Family Reunification Parole Program established in 2007. A two-year period of parole would provide significant public benefit and meets the urgent humanitarian needs of Venezuelan nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole needs to be sufficiently long to make it an attractive alternative to the status quo, in which migrants put their lives in smugglers' hands to enter the country irregularly. DHS believes that a period of two years achieves that goal. It allows beneficiaries to gain work authorization and contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole provides eligible beneficiaries sufficient time to pursue a durable immigration status or benefit under the law. Some Venezuelan beneficiaries may qualify for asylum, while others may qualify for adjustment of status based on the availability of a family- or employment-based immigrant visa.

*Third*, a two-year time period provides a meaningful amount of time for the United States government, in conjunction with foreign partners, to continue its ongoing work to help address the root causes of migration, including the humanitarian and economic conditions in the region that are spurring a large migratory flow. For similar reasons, a two-year time period also provides a window for the U.S. Government to work with Venezuela to increasingly accept the return of Venezuelan nationals who are subject to a final order of removal. Finally, this two-year period will provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other lawful immigration pathways, both for the United States and to other partner nations.

19

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

2.  Supporter Issues

DHS has learned of certain instances in which U4U supporters, including family members, have ceased providing housing and other support for parolees prior to the end of their parole period.  DHS has learned from the U4U experience and is making form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation and other forms of abuse.  This is intended to further reduce the risk that supporters do not follow through on their obligations; it is also intended to address risks of human trafficking, and other forms of abuse and exploitation.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[49]  While such risks cannot be completely mitigated, this parole process is being structured to address these risks to the greatest extent possible.  The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB.  As described above, all migrants, but particularly women and children, are susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[50]  A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations.  Almost all, if not all, are required to pay compulsory fees and taxes by criminal organizations at different points along their journey North.  We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, will meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3.  Eligibility Criteria

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have vulnerabilities or other compelling circumstances.  We have ultimately concluded that such a requirement is not preferable for a combination of operational and substantive reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism.  For instance, any such vulnerability screening would require a process for triaging potential beneficiaries and identifying those who are more vulnerable.  To be effective, it would require third parties—likely international NGOs—to play a role in the screening.  However, DHS lacks authority to fund such screening outside the United States.  Such a screening requirement also would substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

---

[49] 2022 Trafficking in Persons Report, available at: https://www.state.gov/reports/2022-trafficking-in-persons-report/ (last visited September 30, 2022).
[50] *Id.* at 386.

20

PRE-DECISIONAL/DELIBERATIVE

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Venezuelan nationals who would otherwise make the dangerous journey to the U.S.-Mexico border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration this process seeks to achieve.

For these reasons, DHS determined that keeping eligibility at the nationality level—like U4U—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Venezuelan nationals.

## V.    Consideration of alternative approaches

DHS has considered several alternative approaches to managing the current surge in migration from Venezuela. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

1. Status quo

First, DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB driven by a surge in migration by Venezuelan nationals. Venezuelans account for an estimated 186,000 unique encounters in FY 2022, up from 47,328 unique encounters in FY 2021, an increase of 293 percent. Venezuelans alone account for 22 percent of the total growth in unique encounters between 2021 and 2022.[51]

Importantly, DHS anticipates that encounters of Venezuelan nationals at the border are likely to continue to increase in the coming weeks and months. As noted above, Panama has seen a 30-fold increase of Venezuelan nationals crossing irregularly into its territory from Colombia over the past six months, with more than 12,700 entering irregularly during the week ending October 1, 2022. And, as noted above, Panama is currently encountering more than 3,000 people, mostly Venezuelans, entering from Colombia through the Darién Gap each day. This sharp increase shows no signs of abating absent material changes such as those proposed here.

---

[51] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data through September 30, 2022.

21

Venezuela AR_000137

PRE-DECISIONAL/DELIBERATIVE

As described above, the current surge in Venezuelan migration has forced DHS to reallocate resources and personnel to the SWB. Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY staffing to support SWB operations is simply not sustainable in the long term.

For these reasons, DHS has concluded that maintaining the status quo is not an option.

2. Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. However, we have already been engaging at the highest levels of government with these countries and many have extended themselves in historic ways with limited results. The bottom line is that our foreign partners in the region have seen record movements of migrants that far outstrip their capacity to process and provide protection, and they simply do not have the capability to meaningfully impact these flows in the immediate term, as is needed.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process.

3. Increasing removals to home countries

As noted above, DHS data shows that increases in returns of individuals from a given country can reduce encounters at the border over time. For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico over the past year have led to a sustained decrease in encounters at the border.

DHS considered whether more could be done in the immediate term to increase returns of Venezuelans to Venezuela. However, that is currently not a viable option given the current status of diplomatic relations with Venezuela.

As stated above, DHS intends to continue to work to address root causes, including the political instability and repression that have led to difficulties in returning Venezuelans to Venezuela. That, however, will require time and is not a viable option to meet immediate needs.

4. Utilizing contiguous territory return authority

DHS considered whether resuming and greatly scaling up the return of Venezuela individuals to Mexico under section 235(b)(2)(C) of the INA, either by restarting the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. Notably, the contiguous territory return authority that was used to implement MPP can only be used with individuals "pending a proceeding" under INA § 240— meaning that any individual returned to Mexico under this authority would need to be placed in

22

Venezuela AR_000138

PRE-DECISIONAL/DELIBERATIVE

full removal proceedings, in the United States, and continue to come in and out of the United States for court hearings. DHS has concluded that this is not a feasible or preferred option for the following key reasons:

*First*, it would not necessarily diminish the strains at the border and could potentially exacerbate them. Moreover, those enrolled in MPP need to periodically enter the United States for their court hearings and then return to Mexico afterwards. The need to process these individuals each they time for their court hearings, and maintain custody of them while they are in the United States, adds to the strain on already stretched resources along the SWB.

By contrast, the parole process DHS is proposing is specifically designed to provide significant incentives for Venezuelan nationals to apply to travel to the United States from where they are situated, and to incentivize them not to travel to Mexico in the first instance. Venezuelan nationals who are in Mexico as of the day of the announcement would also have no need to travel to, or congregate along, the SWB.

*Second,* the application of MPP generally results in concentrating individuals close to the border, in some of the most dangerous parts of Mexico. This is because individuals who are enrolled in MPP must remain proximate to the border so that they can travel to and from their court hearings—creating significant humanitarian concerns.[52] In previously considering whether to continue MPP, the Secretary ultimately concluded that the "substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico" outweighed any potential gain in terms of reduced migratory flows.[53] The recent court-ordered reimplementation of MPP confirmed these concerns, as individuals were subject to kidnappings, rapes, and other targeted violence.[54]

*Third,* it is operationally infeasible. Even at its height in August 2019, only 12,000 individuals per month were enrolled in the MPP program, or roughly 400 a day. This is considerably less than the more than 1,200 Venezuelan nationals currently being encountered at the border daily. To employ the contiguous return authority at scale, the United States would need to build and develop a massive amount of infrastructure for noncitizens to be processed in and out of the United States throughout the duration of their removal proceedings. This would require, among other things, the construction of additional court capacity along the border, additional funding for transportation and security contracts, additional immigration judges and ICE prosecutors to conduct the hearings, and more CBP personnel to receive and process those who are coming into and out of the country to attend court. The number of resources needed to put

---

[52] Robbie Whelan. *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program.* Wall Street Journal. December 28, 2019. Available at: https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000

[53] *See* Memorandum from Secretary Mayorkas to ICE Director Tae D. Johnson et al re Termination of the Migrant Protection Protocols at 2 (Oct. 29, 2021); *see also* DHS, Explanation of the Decision to Terminate the Migrant Protection Protocols (Oct. 29, 2021).

[54] Human Rights First. *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico.* September 15, 2022. Available at https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico/.

23

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

in place a program at the scale needed to address the current flows, and with the appropriate humanitarian protections, is simply not operationally feasible.

*Fourth,* implementation of MPP requires Mexico's unilateral concurrence and support—something that is unlikely at scale. When the Department was under a court-ordered obligation to re-implement MPP, Mexico only agreed to accept the return of a small number of MPP enrollees, consistent with available shelter capacity in specific regions. Even those limited returns had to be paused on a number of occasions due to security concerns raised by Mexico or a lack of shelter capacity.

5. Increasing the use of detention for Venezuelan nationals

DHS considered whether it could detain all or most Venezuelan nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result. There are, however, legal and operational limits in the ability to do so.

*First*, there are legal limits on the duration of detention for those ordered removed and who—like the Venezuelan nationals—do not have a significant likelihood of removal in the foreseeable future. Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from detaining individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[55]

*Second*, it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Venezuelan nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Venezuelan nationals is not a viable option at this time.

6. Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. The U.S. Government also committed to increasing immigrant visa adjudications.[56] However, those alternative processes are narrow and in many cases difficult to access.

---

[55] *Zadvydas v. Davis*, 533 U.S. 678 (2001).
[56] Fact Sheet: The Los Angeles Declaration.

24

Venezuela AR_000140

A key feature of this new process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully virtual and accessible from anywhere. We thus assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Venezuela today—and that regional efforts to improve lawful pathways, while critically important, will not be sufficiently timely to address the immediate needs. We thus assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

## VI.   Administrative Procedure Act

This proposal is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[57] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[58]

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[59] In addition, although under the Administrative Procedure Act, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[60] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly across the SWB to Mexico, and the United States ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is

---

[57] 5 U.S.C. § 553(b)(A).
[58] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).
[59] 5 U.S.C. § 553(a)(1).
[60] *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

25

prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. In 2017, for example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[61]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[62] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

---

[61] *See* 82 FR 4902 (January 17, 2017).
[62] *See* 5 U.S.C. § 553(b)(B).

26

**Recommendation**

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Venezuelan nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance.  Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve/ ████████████████████████     Disapprove/date _____

                            10/12/22

Modify/date _____     Needs discussion/date _____

PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
Washington, DC 20528

December 22, 2022

## ACTION

## MEMORANDUM FOR THE SECRETARY

| | | |
|---|---|---|
| **FROM:** | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans | ROBERT P SILVERS  Digitally signed by ROBERT P SILVERS  Date: 2022.12.22 18:05:25 -05'00' |
| | Troy Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection | TROY A MILLER  Digitally signed by TROY A MILLER  Date: 2022.12.22 19:39:13 -05'00' |
| | Ur M. Jaddou<br>Director<br>U.S. Citizenship and Immigration Services | UR M JADDOU  Digitally signed by UR M JADDOU  Date: 2022.12.22 18:36:35 -05'00' |

**SUBJECT:**      **Updates to the Parole Process for Certain Venezuelan Nationals**

### I. Summary

On October 12, 2022, PLCY, CBP, and USCIS recommended, and you approved, a new process for Venezuelans that provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at the port of entry, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.[1]  This process is contingent on DHS's ability to impose a consequence on such individuals for entering the United States without authorization along the Southwest Border (SWB).  Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2]  It also has led to a precipitous decline in Venezuelan irregular migration

---

[1] *See* Memorandum for the Secretary from Under Secretary for Strategy, Policy, and Plans Silvers et al, re Parole Process for Certain Venezuelan Nationals, Oct. 12, 2022; DHS, DHS Announces New Migration Enforcement Process for Venezuelans, Oct. 12, 2022, https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

throughout the Western Hemisphere.  The number of Venezuelans attempting to enter Panama through the Darién Gap was down from 40,593 in October to just 668 in November.[3]

For the reasons described in the October 12 memo, and based on the demonstrated success of the process, DHS would like to ensure its continuation, including to account for the expected transition from enforcing the Centers for Disease Control and Prevention's (CDC) public health Order issued pursuant to Title 42 authorities to immigration processing pursuant to Title 8 authorities.  As such, the purpose of this memo is to recommend two changes to the existing process for Venezuelans:

1)  Removing the 24,000 limit on travel authorizations for Venezuelans.  This would be replaced with a monthly cap of 30,000 travel authorizations across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate memoranda sent to you today).  Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

    This change reflects the fact that DHS has received about 100,000 supporter applications over the first two months of the process.  It would, as a result, allow DHS to continue to maintain a strong incentive for Venezuelan nationals to wait in safe locations and apply and be vetted to fly directly to the U.S., rather than entering without authorization at the SWB.  This change further accounts for DHS establishing similar—but separate and independent— parole processes for nationals of Cuba, Haiti, and Nicaragua.

2)  Updating the eligibility criteria by including an exception that would enable Venezuelans, who crossed without authorization into the United States at the SWB and were subsequently authorized a one-time option to voluntarily depart or voluntarily withdraw their application for admission, to still maintain their eligibility to participate in this parole process.  This change would preserve resources that otherwise would be expended on processing individuals through expedited removal or full removal proceedings, and allow more individuals the option to seek parole through this process.  This change would also update the dual nationality ineligibility provision to accommodate the implementation of other similar parole processes.

DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing irregular migration at our border and throughout the hemisphere, and instead channels these flows into a safe, secure, and orderly process that is sufficiently robust to continue to incentivize migrants to use it.

**II. Background**

---

[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

2

PRE-DECISIONAL/DELIBERATIVE

On October 19, 2022, DHS published a Federal Register Notice to describe a new effort to address the high number of Venezuelans encountered at the SWB.[4]  To date, Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization, are either expelled to Mexico pursuant to the CDC's Title 42 public health Order or, if not expelled, processed for removal proceedings or the initiation of such proceedings.

Upon the termination of the Title 42 public health Order, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities.  For this process to continue to be effective, the Government of Mexico (GOM) will need to make an independent decision to accept the return of Venezuelan nationals under Title 8 processes—thus continuing to maintain, and expand, on the success of the Venezuela process to date.

*Eligibility to Participate in the Process*

Pursuant to the October 12 memorandum, DHS implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner.  To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022.  Venezuelan nationals also are ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela; as a conforming change, this memorandum seeks your approval to limit this "dual national ineligibility provision" such that it does not apply if DHS operates a similar parole process for the additional country's nationals.  Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.  The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

**III. Assessment of the Process to Date**

The Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can yield a meaningful change of migratory flows.  The new parole process for Venezuelans enables those who are backed by supporters in the United States to come to the United States by flying to interior ports of entry— thus obviating the need for such individuals to make a dangerous journey to the SWB.  Meanwhile, the GOM made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health

---

[4] *Id.*

3

PRE-DECISIONAL/DELIBERATIVE

order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process.

Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day.[5]  As of the week ending December 4, the number has fallen further, to an average of 86 a day.[6]  With the vast majority of those encountered returned to Mexico, fewer releases has freed up DHS resources that would otherwise be used to process these individuals; it also means fewer individuals for state and local governments, as supported by civil society, to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién Gap have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[7]  Other migrants who were about to enter the Darién Gap have turned around and headed back south.[8]  And still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[9]

DHS has seen strong interest in this parole process.  As of December 12, 2022, DHS has received almost 96,000 supporter applications, confirmed more than 18,600 of them, and authorized travel for more than 14,700 Venezuelan beneficiaries.  Already more than half of the available number of travel authorizations have been approved.[10]  Of those authorized to travel to the United States, more than 8,400 have arrived and were paroled into the country.[11]  Nearly 2,800 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 1,900 came from Venezuela, 1,200 from Mexico, and 2,500 from other countries.  Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[12]

**IV. Proposed Changes**

---

[5] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022.  Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[6] *Id.*

[7] La Prensa Latina Media, *More Than 4,000 Migrants Voluntarily Returned to Venezuela from Panama*, Nov. 9 2022, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, (last viewed Dec. 8, 2022).

[8] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, Oct. 14, 2022, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, (last viewed Dec. 8, 2022).

[9] Axios, *Biden's New border Policy Throws Venezuelan Migrants into Limbo*, Nov. 7 2022, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap, (last viewed Dec. 8, 2022).

[10] Department of Homeland Security, Daily Venezuela Report, Dec. 12, 2022.

[11] *Id.*

[12] *Id.*

4

PRE-DECISIONAL/DELIBERATIVE

Given the early success of the process, DHS is seeking two changes to the process to ensure its continued viability, particularly as we prepare for an eventual transition from Title 42 processing to full Title 8 processing at the border.

*Replace the 24,000 limit on travel authorizations*

As provided for in the October 12 memorandum and described in the October 19 *Federal Register* Notice, there is a limit of 24,000 travel authorizations issued as part of the Venezuela process. The demand has exceeded the limit. As of December 12, in less than two months of operation, DHS has received more than 96,000 applications from supporters, and has approved well more than half of the available travel authorizations (14,700 of 24,000). When DHS reaches the numerical cap, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see an increased irregular migration of Venezuelans as a result.

Accordingly, we recommend that you replace the numerical limit on travel authorizations for Venezuelans. We recommend that you replace it with a monthly cap of 30,000 travel authorizations spread across this process and the separate and independent processes recommended for nationals of Cuba, Haiti, and Nicaragua. Under this change, DHS would continue to intake applications and process travel authorizations at a pace that could accommodate up to 30,000 each month, but would retain flexibility within that cap in terms of how the authorizations are considered and processed. This recommended change is based on DHS's experience with the pre-existing Venezuela process, taking into account a combination of DHS resource limitations, supporter and beneficiary demand, and an assessment of the effect on migratory flows. We recommend that the Department continue to evaluate this cap and make adjustments if needed over time.

As before, the Secretary would retain the sole discretion to terminate the process at any point. Although the monthly limit on the number of travel authorizations granted under this process would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans , each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

*Update eligibility criteria*

With the GOM's independent decision to accept returns of Venezuelans, DHS is currently expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[13]

---

[13] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

5

PRE-DECISIONAL/DELIBERATIVE

When the Title 42 public health order is no longer in place, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8 authorities, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to INA § 240B, 8 U.S.C. § 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4), or may be ordered removed. DHS assesses that this change will, in addition to providing migrants a one-time opportunity to continue to access a parole process about which they may not have been fully informed, be appreciated by the GOM and inform their internal decision making as they consider whether to make an independent decision to accept the return of migrants processed pursuant to Title 8. In addition, permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

If the proposed change is put into effect, individuals would, in general, continue to be ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization along the SWB after October 19, 2022. The change would, however, introduce the following exception: individuals who have been permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) would still maintain their eligibility to participate in the parole process. This change would only be applicable for those individuals who crossed into the United States after December 20, 2022.

DHS considered not implementing this request but decided that it was needed to inform the Government of Mexico's independent decision to accept the return of Venezuelan nationals under Title 8 processes. This in turn is critical to our ability to continue combining the Venezuela process with a consequence for those who fail to pursue this process and instead cross the SWB without authorization; this change is in the Department's interest at this time.

## VI. Administrative Procedure Act

The October 12 memorandum authorizing this process explained that implementation of this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[14] (2) the process pertains to a foreign affairs function of the United States,[15] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[16] The changes recommended in this memorandum are amenable to immediate issuance and implementation for the same reasons.

---

[14] 5 U.S.C. § 553(b)(A).

[15] 5 U.S.C. § 553(a)(1).

[16] 5 U.S.C. § 553(b)(B).

6

PRE-DECISIONAL/DELIBERATIVE

First, these changes relate to a general statement of policy, *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[17]  As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, these changes continue to pertain to a foreign affairs function of the United States, as described in the October 12 decision memorandum, and are directly responsive to ongoing conversations with, and requests from, foreign partners.  Specifically, the GOM has urged the U.S. to consider lifting the 24,000 limit,[18] which would allow more Venezuelans able to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders.  Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's willingness to continue to accept returns under Title 8 processes and produce undesirable international consequences.  Absent these changes, once the Title 42 public health order is lifted, DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable.  That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere, and to our border.

Finally, even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.  Specifically, as noted above, absent the implementation of these changes DHS would not be able to seamlessly transition the Venezuela process to Title 8 authorities after the Title 42 public health order ceases to be in effect.  This would, in turn, undermine the substantial improvement to border security that has been achieved through the dramatic reduction of unauthorized entries that has resulted from the implementation of the Venezuela process to date.  For these reasons, DHS cannot delay in issuing the FRN associated with this process.

---

[17] *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'*, Dec. 13, 2022, https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotations-called-intense-round-the-clock/, (last viewed Dec. 14, 2022)

7

**Recommendation**

For the reasons described in this memo, we recommend that you approve the two changes to the process for Venezuelans, announced on October 12, 2022 and implemented on October 19, 2022.

1. Remove the 24,000 limit on travel authorizations put in place by the prior *Federal Register* notice and instead establish a monthly limit that would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans, and shall not exceed 30,000 each month.

2. Update the eligibility criteria in the previous *Federal Register* notice by including an exception that would permit Venezuelans who crossed without authorization into the United States after December 20, 2022, who have been permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c, or a single voluntary withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4), to maintain their eligibility to participate in this parole process. This change also updates the dual nationality ineligibility provision to accommodate the implementation of other similar parole processes.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

This memorandum, once approved, would, together with the October 12 memorandum, be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

Approve/date _____  Disapprove/date _____

DEC 2 2 2022

Modify/date _____  Needs discussion/date _____

8

UNCLASSIFIED//FOR OFFICIAL USE ONLY



August 21, 2022

## INFORMATION

MEMORANDUM FOR THE SECRETARY

THROUGH:            John W. Priddy
                    Acting Director, Joint Task Force – East (JTF-E)

                    John K. Tien
                    Deputy Secretary, U.S. Department of Homeland Security

FROM:               RADM Brendan C. McPherson
                    Director, Homeland Security Task Force – Southeast (HSTF-SE)

SUBJECT:            **OPERATION VIGILANT SENTRY (OVS) Phase 1B**

REFERENCE:          (a) Homeland Security Act of 2002, P.L. 107-296
                    (b) DHS MASS MIGRATION PLAN (DMMP), dtd 8 SEP 2011
                    (c) OPERATION VIGILANT SENTRY, Rev. 5 dtd 13 JUL 2021

1.  This memorandum provides formal notification that I have directed the HSTF-SE Unified Command to transition from Operation Vigilant Sentry (OVS) Phase 1a (*Steady State - Preparation*) to Phase 1b (*Surge - Prevention*), in accordance with references (a) through (c).  I directed this change in order to enhance our collective preparedness to effectively address a marked, enduring increase in irregular maritime migration flow within the Caribbean area of operations in recent months, most notably originating from Cuba and Haiti.  The current conditions in Cuba and Haiti remain fragile and conducive to seeing additional foreign nationals taking to the sea, in significant numbers, with the intent of reaching the United States.

2.  HSTF-SE will immediately implement operational and tactical level plans and activities to deter and prevent any threat of maritime mass migration.  The principal objectives of this operation will focus on: effective deterrence; early interdiction; safe, efficient and humane care and processing of migrants; and direct repatriation of migrants rescued and interdicted at sea in support of U.S. national security interests. Ultimately, the mission of HSTF-SE is to save lives and secure our borders.

3.  HSTF-SE will coordinate all interagency requests for assistance, requests for forces, recommendations for suspension of protection screening (if deemed necessary and appropriate), determination for state and local assistance, or other operational matters with JTF-E and the DHS Office of the Military Advisor.

1

UNCLASSIFIED//FOR OFFICIAL USE ONLY

4.  HSTF-SE will maintain OVS Phase 1b *(Surge)* until operational conditions permit a timely transition back to OVS Phase 1a *(Steady State).*

5.  All DHS components are responsible for their own costs in support of HSTF-SE.  Each component is responsible for establishing appropriate mechanisms for capturing and documenting costs in support of HSTF-SE operations.  The Under Secretary for Management will centrally collect cost information from across all DHS agencies.  The Under Secretary for Management and Chief Financial Officer will also periodically review the situation and make adjustments accordingly.

Attach: Graphic - Operation Vigilant Sentry (OVS) Phases and Command Structure

cc:     Commandant, U.S. Coast Guard
        Commissioner, U.S. Customs and Border Protection
        Acting Director, U.S. Immigration and Customs Enforcement
        Administrator, Federal Emergency Management Agency
        DHS, Under Secretary for Management
        DHS, Director of Operations Coordination
        DHS, Office of the Military Advisor
        HSTF-SE Unified Command
        Commander, U.S. Southern Command
        Commander, U.S. Northern Command

UNCLASSIFIED//FOR OFFICIAL USE ONLY



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

April 26, 2022

MEMORANDUM FOR:     Interested Parties

FROM:     Alejandro N. Mayorka▮
Secretary of Homeland Security

SUBJECT:     **DHS Plan for Southwest Border Security and Preparedness**

## EXECUTIVE SUMMARY

Under the Biden-Harris Administration, the Department of Homeland Security (DHS) has been executing a comprehensive and deliberate strategy to secure our borders and build a safe, orderly, and humane immigration system.  After inheriting a broken and dismantled immigration system, since January 2021 DHS has effectively managed an unprecedented number of noncitizens seeking to enter the United States and interdicted more drugs and disrupted more smuggling operations than ever before.

The legal authority for enforcing our border security and immigration laws comes from Title 8 of the U.S Code.  Among other things, Title 8 provides that individuals who cross the border without legal authorization are processed for removal and, if unable to establish a legal basis to remain in the United States, promptly removed from the country.

In March 2020, the Centers for Disease Control and Prevention (CDC) invoked a section of Title 42 of the U.S. Code, a law addressing public health, not immigration, to require the immediate expulsion of noncitizen single adults and families in order to protect Americans from the spread of COVID-19.  As a result, a significant percentage of all noncitizens encountered at the Southwest Border are currently expelled pursuant to the Title 42 public health Order.  Beginning in September 2021, DHS began planning in anticipation of the eventual lifting of Title 42.  On April 1, 2022, CDC announced that it was lifting the Order effective May 23.  All noncitizens will then be processed pursuant to Title 8 once again.

When the Title 42 public health Order is lifted, we anticipate migration levels will increase, as smugglers will seek to take advantage of and profit from vulnerable migrants.  The increase in migration being experienced by the United States is consistent with larger global trends: there are currently more people in the world displaced from their homes than at any time since World War II, including in the Western Hemisphere.

This memorandum provides more details on how DHS is leading the execution of a whole-of-government plan to prepare for and manage increased encounters of noncitizens at our Southwest Border. Many elements of this plan are already being implemented as we manage a historic number of encounters, including a record number of noncitizens trying to enter the United States multiple times. Others are elements that we are prepared to implement once the Title 42 termination goes into effect. The six pillars of our plan are as follows:

*Border Security Pillar 1*: **We are surging resources, including personnel, transportation, medical support, and facilities to support border operations.**

U.S. Customs and Border Protection (CBP) currently has 23,000 Agents and Officers working along the Southwest Border, which includes a recent increase of 600 personnel and support of law enforcement officers and agents from other government agencies. Additionally, approximately 500 Agents have been returned to the vital border security mission as a result of increased civilian processing personnel to perform those functions, as well as processing efficiency. By May 23, we will be prepared to hold approximately 18,000 noncitizens in CBP custody at any given time, up from 13,000 at the beginning of 2021, and we have doubled our ability to transport noncitizens on a daily basis, with flexibility to increase further. In order to safeguard public health and the safety of our workforce, noncitizens, and border communities, our efforts also include medical support and COVID-19 mitigation protocols, including testing and administering age-appropriate COVID-19 vaccines in 24 CBP sites by May 23, building on our existing vaccination program for those in Immigration and Customs Enforcement (ICE) custody.

*Border Security Pillar 2*: **We are increasing CBP processing efficiency and moving with deliberate speed to mitigate potential overcrowding at Border Patrol stations and to alleviate the burden on the surrounding border communities.**

This includes launching three new initiatives, which will support these decompression efforts, while ensuring the continued integrity of our security screening processes: Enhanced Central Processing Centers; en route processing; and streamlined processing. CBP is also working to increase processing efficiency at Ports of Entry (POEs) to further facilitate safe and orderly inspection of noncitizens.

*Border Security Pillar 3*: **We are administering consequences for unlawful entry, including removal, detention, and prosecution.**

Core to this plan is our commitment to continue to strictly enforce our immigration laws. This includes increased use of Expedited Removal, detaining single adults when appropriate, referring for prosecution those whose conduct warrants it, and accelerating asylum adjudications that enable us to more quickly process and remove from the United States those who do not qualify for relief under our laws.

*Border Security Pillar 4*: **We are bolstering the capacity of non-governmental organizations (NGOs) to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings. And, we are ensuring appropriate**

Venezuela AR_000155

**coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities.**

Our goal is to help communities alleviate the pressures they experience by expanding NGO capacity, through communication and coordination with all relevant partners, and other assistance such as the Emergency Food and Shelter Program (EFSP), a Federal Emergency Management Agency (FEMA) grant program that supplements and expands ongoing work of local NGOs to meet the needs of local agencies.

*Border Security Pillar 5*: **We are targeting and disrupting the transnational criminal organizations (TCOs) and smugglers who take advantage of and profit from vulnerable migrants, and who seek to traffic drugs into our country.**

In April 2022, DHS and other federal agencies intensified our disruption efforts, marshalling the largest surge of resources and disruptive activities against human smuggling networks in recent memory.  The immediate result has been over 2,500 arrests, investigations, and disruptions of smuggling infrastructure, such as buses and safe houses.  The federal government has also established a new intelligence unit to coordinate and strengthen the capability for early warning of migrant movements.

*Border Security Pillar 6*: **We are deterring irregular migration south of our border, in partnership with the Department of State (DOS), other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.**

In the past two months, we have signed new migration agreements with Costa Rica and Panama and continue close cooperation with Mexico.  We are also sending a clear message in the region to counteract misinformation from smugglers, including that the termination of the Title 42 public health Order does not mean that the U.S. border is open. As we execute this work, our objective continues to be the safe, orderly, and humane processing of noncitizens, consistent with our laws, while protecting national security and public safety. Across all of our work in this space, we are ensuring we can uphold our laws and our values in treating noncitizens in a humane way, as we did last year when we rapidly addressed the acute needs of unaccompanied children at the Southwest Border.

**Conclusion**

Our outdated immigration system was not built to manage the current levels and types of migratory flows that we are experiencing and is already under strain.  This is true at the federal level, as well as for state, local, and NGO partners.  However, we have been able to manage increased encounters because of prudent planning and execution, and the talent and unwavering dedication of the DHS workforce and our state, local, and community partners.

Despite these efforts, a significant increase in migrant encounters will substantially strain our system even further.  We will address this challenge successfully, but it will take time, and we need the partnership of Congress, state and local officials, NGOs, and communities to do so.  We are operating within a fundamentally broken immigration system that only Congress can fix.

# BACKGROUND

**After inheriting a broken and dismantled immigration system, the Biden-Harris Administration is securing the border and building a fair, orderly, and humane immigration system, with demonstrable results since January 2021.**

The Biden-Harris Administration inherited a broken and dismantled immigration system.  On January 20, 2021, the President sent the *U.S. Citizenship Act of 2021* to Congress with a call for urgent action.  At DHS, we are working every day, despite that broken system, to secure our borders and build a more just immigration system.

## Securing the Border

DHS works tirelessly to secure the Southwest Border through a combination of highly trained personnel, sophisticated ground and aerial monitoring systems, and robust intelligence and information sharing networks.  Through this layered border security network, we have a better understanding of who is attempting to enter the country than ever before and can focus our enforcement efforts more effectively to address potential threats.

The greatest asset in our border security network is the DHS workforce.  There are currently over 23,000 CBP Agents and Officers working along the Southwest Border.  Over the past year, DHS has supplemented permanent staff by overseeing the deployment of more than 10,000 additional federal personnel to the Southwest Border in multiple rotations.  This includes CBP Agents and Officers; other agency law enforcement personnel; personnel from the Department of Defense (DOD), which has supporting CBP operations since 2006, and the DHS Volunteer Force.  Personnel have been added to increase patrols along the Southwest Border to prevent the entry of people and goods between POEs, enhance processing efficiency, and increase humanitarian capacity.  DHS also has worked to train thousands of additional agents and officers and execute contracts for processing assistance to further augment border security efforts.

DHS has been investing in technology and installing new systems to enhance border security and the effectiveness of our operations, including advanced automated surveillance towers, ground movement detection systems, and new aerial platforms.  These efforts have delivered concrete results, as further described below.

With support from Congress, DHS has been applying appropriated financial resources to support our efforts.  In the Fiscal Year (FY) 2022 budget, DHS secured additional resources: $100 million to strengthen Border Patrol Agent hiring programs and contract for processors to work in Border Patrol stations; more than $250 million in funding for border security technology; over $85 million for non-intrusive inspection technology to scan vehicles and goods entering the country; and more than $70 million for additional aircraft and sensors.  In addition, Congress allocated $1.4 billion to support contingency operations on the Southwest Border.

## Building a More Just Immigration System

Along with our efforts to secure the border, over the past 15 months, we implemented critical reforms that ended cruel and unjust policies of the prior Administration.  We have issued new guidelines regarding immigration enforcement priorities that focus the Department's resources

Venezuela AR_000157

on the apprehension and removal of noncitizens who pose a threat to our national security, border security, or public safety.  These guidelines mark a new approach to enforcement as they focus resources on those who pose the greatest threat.  The most recent guidelines also enable the Department's experienced personnel to use their discretion and focus DHS enforcement resources in a more targeted way, while protecting civil rights and civil liberties.

The results speak for themselves.  ICE Enforcement and Removal Operations (ERO) arrested an average of 1,034 aggravated felons per month from February through September 2021, a 53 percent increase over the monthly average during 2016 and a 51 percent increase over the period 2017-2020.  During the same period in 2021, ICE removed an average of 937 aggravated felons per month, the highest level ever recorded and the greatest public safety impact since ICE began collecting detailed criminality data.  From February-September 2021, 46 percent of ICE removals were of serious criminals overall (persons convicted of felonies or aggravated felonies), compared to 17 percent during 2016 and 18 percent during 2017-2020.

The Department is committed to protecting vulnerable populations and has taken several significant steps to advance our efforts on this front.  A few examples:

- We have implemented actions to promote a fair labor market by focusing our enforcement on unscrupulous employers, thereby supporting more effective enforcement of wage protections, workplace safety, labor rights, and other employment laws and standards.
- We have issued a new, comprehensive policy that provides an expanded and non-exhaustive list of Protected Areas – such as courthouses, places of worship, and disaster or emergency relief sites – to ensure that enforcement actions, to the fullest extent possible, are not taken at or near a location that would restrain people's access to essential services or engagement in essential activities.
- We have made significant strides in improving the conditions of care in detention facilities including implementing trauma-informed care in CBP facilities, hiring additional child welfare and medical providers to work in CBP facilities, implementing new policies establishing standards of care for vulnerable individuals, and closing facilities that repeatedly have failed to maintain safe conditions.
- In partnership with DOS, we reimplemented and expanded the Central American Minors program to increase the pool of qualified candidates who can access this safe, orderly pathway.  For example, the expansion now allows legal guardians in the United States with a pending asylum application or U visa petition to sponsor their children for resettlement consideration.
- In partnership with the Department of Health and Human Services (HHS), we ensured the safe and humane treatment of unaccompanied children in our custody by quickly reducing the average time to transfer a child into HHS care and the number of unaccompanied children in Border Patrol facilities.
- And critically, we have reunited more than 200 families who were cruelly and unjustly separated at the U.S.-Mexico border by the prior Administration and are working to reunite many more.

Venezuela AR_000158

# STATE OF MIGRATION

**The United States is experiencing an increase in migration, consistent with larger global trends.  There are currently more people in the world displaced from their homes than at any time since World War II, including in the Western Hemisphere.**

Over the past few years, irregular migration along the Southwest Border has increased to unprecedented levels and presents new challenges that affect our processing and complicate removals.  In the past three weeks, CBP has encountered an average of over 7,800 migrants per day across the Southwest Border.  This is compared to a historical average of 1,600 per day in the pre-pandemic years (2014-2019).  In addition to this exponential increase, DHS has seen a pronounced shift in the demographics and nationalities of noncitizens encountered at and between land ports of entry – with more single adults claiming fear, varying levels of family units, and a steady flow of unaccompanied children, who have unique vulnerabilities and needs.  Migrants from Cuba, Venezuela, and Nicaragua have steadily increased, accounting for 37 percent of FY 2022 non-Mexican encounters to-date, up from 8 percent between 2014-2019.  And due to the sharp increase in encounters of Ukrainians at the Southwest Border in the wake of the Russian invasion of Ukraine, we have established a new program for processing Ukrainians in Europe that will substantially reduce incentives to seek admission via Mexico.

The United States is not alone in experiencing an increase in migration.  There are currently more people displaced from their homes across the world than at any time since World War II.  In our hemisphere, violence, food insecurity, severe poverty, corruption, climate change, the COVID-19 pandemic, and dire economic conditions all contribute to the increase.  More than 6 million Venezuelan refugees and migrants have fled their homes, making this the second-largest external displacement crisis in the world.  Seventeen countries in Latin America and the Caribbean generously host approximately 80 percent of this Venezuelan diaspora, including an estimated 1.8 million in Colombia, 1.3 million in Peru, and large numbers in Ecuador, Chile, Brazil and elsewhere.  Costa Rica, a country of only 5 million people, is hosting approximately 150,000 Nicaraguan migrants.

Noncitizens making their way to the Southwest Border travel via air, land, and sea into Mexico and up to Mexico's northern states.  These movements into and through Mexico are often facilitated by numerous human smuggling organizations that exploit them for profit, and involve crossing inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow.  Upon reaching the border area, noncitizens seeking to enter the United States without going through the POEs pay cartels to guide them along the final miles of their journey.  This cartel-controlled movement of people across the border is a billion-dollar criminal enterprise.  The cartels willfully place noncitizens in danger during their journey.  Tragically, a significant number of individuals perish along the way.  The depth of suffering these migrants are willing to endure speaks to the desperation they feel about their prospects in their home countries.

**When the Title 42 public health Order is lifted, we anticipate migration levels will increase further, as smugglers will seek to take advantage of and profit from vulnerable migrants. We will continue to remove individuals without legal claims under Title 8, consistent with our laws.**

Venezuela AR_000159

Following the lifting of CDC's Title 42 public health Order, we expect increased border flows, in light of exploitation by smugglers, continued demand for access to the United States from people fleeing violence and economic turmoil in their home countries, and other factors discussed above.  In preparation for this, DHS operational agencies and partners have planned for multiple scenarios to ensure preparedness and the safe, orderly, and humane processing of individuals, consistent with our laws.

**Migration Authorities**
As noted above, we have been managing historic levels of migration: 1.72 million encounters by CBP in FY 2021.  DHS completed 1.2 million repatriations in FY 2021, via a combination of immigration enforcement removals pursuant to Title 8 and public health expulsions pursuant to Title 42.  This was the highest number of repatriations since 2006.

Since March 2020, CDC's Title 42 public health Order has required the immediate expulsion of noncitizen single adults and families at the Southwest Border to mitigate risk to the American public due to COVID-19.  As a result, a significant percentage of all noncitizens encountered at the Southwest Border are currently expelled pursuant to Title 42.  The large number of expulsions during the pandemic has contributed to a higher-than-usual number of noncitizens making repeated border crossing attempts: more than one in three encounters at the Southwest Border are repeat entrants, including almost half of single adult encounters.  Thus, while total enforcement encounters increased 82 percent between 2019 (the last pre-pandemic year) and 2021, the number of unique individuals encountered at the border increased by 30 percent.

In light of CDC's decision to terminate Title 42, beginning on May 23, 2022, families and single adults who cross the border without legal authorization will be placed into Title 8 removal proceedings.  Under Title 8 authorities, noncitizens without a viable asylum claim or unable to establish a legal basis to remain in the United States are removed to their home countries.  Economic need and flight from generalized violence are not a basis for asylum in the United States.  Only those with a well-founded fear of persecution based on protected grounds are eligible for asylum.  Expedited Removal is a tool to quickly remove individuals who do not express a fear of return to their home country, following an assessment of asylum claims.  In addition, Mexican migrants can be quickly removed under Voluntary Removal, a process that in practice takes about the same amount of time as an expulsion pursuant to Title 42.  There are consequences to entering without authorization.  Recent arrivals ordered for removal or subject to Expedited Removal are generally subject to a five-year bar on admission to the United States, and reentry within this five-year period after removal is subject to felony prosecution.

Of note, our border security efforts also address irregular maritime migration, which is always dangerous and often deadly.  The termination of Title 42 will not impact the U.S. Coast Guard's (USCG) ability to rescue and intercept individuals attempting this dangerous journey.  Individuals interdicted at sea who are attempting to enter the United States irregularly are, and will continue to be, subject to repatriation to their home country.  DHS continues to maintain its readiness in the maritime domain and has longstanding plans and procedures that govern how to respond to any potential increase in maritime migration.

Venezuela AR_000160

**Border Processing**

CBP Agents and Officers work tirelessly to detect and interdict noncitizens who cross the border. Upon encountering individuals who have entered between POEs, Border Patrol Agents transport them to stations for processing. This includes verifying their identities through a review of their documents and biographic information, as well as the collection of biometric records. Each individual processed by CBP is screened against numerous records systems, including the FBI's Terrorist Screening Database, to determine whether or not they pose a national security or public safety threat. After initial identity verification and record checks, CBP Agents and Officers determine the appropriate processing pathway from the available options, which are determined based on an individual's nationality, age, family status, and results of security screening and vetting. This process, including final processing for each pathway, takes, on average, one to two hours per individual.

Adults and families commonly spend 48 to 72 hours in CBP custody awaiting processing and then transfer or release. During this time, individuals are provided food, water, medical care, clothing, and other necessities to ensure their safety. Upon completion of CBP processing, certain noncitizens may be quickly removed and others may be transferred to ICE for continued detention. Unaccompanied children must be transferred to HHS. Noncitizens not transferred to other government agencies are processed for release during the pendency of their removal proceedings. This often includes enrollment in an ICE Alternatives to Detention (ATD) program and coordination with NGOs to assist with planning for travel away from the border and the provision of other basic services. Noncitizens placed into proceedings will have an opportunity to present their case before an Asylum Officer or Immigration Judge who will review their claims and either order their removal or grant them asylum or other relief in accordance with law.

**Our broken immigration system was not built to manage the migration levels and types we are currently experiencing and is already under strain. However, we have been able to effectively manage these encounters because of prudent planning and execution, the talent and unwavering dedication of the DHS workforce, and our state, local, and community partners.**

Congress designed the U.S. border management system over 25 years ago. At the time, the migrant population largely consisted of single adult males who were seeking employment opportunities. As described above, the populations DHS now encounters at the border are substantially different, including many families and unaccompanied children who are seeking humanitarian relief. The current system is outdated, was further dismantled by the last Administration, and was not built to contend with these demands. Further, social media and other online platforms have increased smugglers' access to potential migrants, creating an environment ripe for manipulation of information with respect to migration policies at the border.

As noted above, we are already managing a high volume of migrant encounters (on average 7,800 over the past three weeks), which is significantly higher than our system was built to manage and process effectively. While CBP, ICE, and our community partners are all strained under current operations, we are processing individuals in a safe, humane, and orderly manner as

Venezuela AR_000161

a result of improvements we have made over the past year and thanks to the collaboration of outside partners.  DHS efforts include capacity building, strengthened logistics and processing (including the deployment of soft-sided facilities and virtual processing), and decompression tactics to ensure U.S. Border Patrol sectors can most efficiently support one another.

## BORDER SECURITY PLAN

Building on lessons learned and in preparation for the termination of CDC's Title 42 public health Order, DHS commenced planning exercises in Fall 2021.  In February 2022, DHS formally launched the Southwest Border Coordination Center (SBCC), which is coordinating a whole-of-government response to the anticipated increase in border encounters.  I designated a Senior Coordinating Official (SCO) to oversee the SBCC, who reports directly to me.

The SBCC has centralized coordination among key government agencies within a single structure to ensure effective, holistic planning and execution.  It is staffed by dozens of experienced professionals from across DHS and contains subject matter expert representatives from throughout the federal government.  In addition to the full complement of DHS agencies and offices, several federal agencies are supporting the whole-of-government response, including:

- DOS is continuing intensive diplomacy throughout the region designed to limit irregular migration to the Southwest Border;
- DOD will provide, as needed, rapid contracting support for air and ground transportation, as well as land for the establishment of temporary facilities for migrant processing and lodging for housing federal employees near the Southwest Border;
- The Department of Justice (DOJ) is providing transportation support and law enforcement personnel from the Bureau of Prisons and U.S. Marshals Service, and prosecuting smugglers, repeat offenders, and others whose conduct warrants such a response;
- HHS continues to accept the transfer of unaccompanied children from CBP custody, as well as adjudicate requests for medical support via the ESF-8 council, which governs the allocation of Federal medical responses; and,
- The Office of the Director of National Intelligence (ODNI) is providing intelligence coordination and support to strengthen the capability for early warning of migrant surges at the Southwest Border.

**Building on work to date and informed by input from our partners, we developed and are currently executing the DHS Border Security plan, described below.  Our objective continues to be the safe, orderly, and humane processing of noncitizens consistent with our laws to ensure national security and public safety.**

The plan has six pillars: surge resources; increase efficiency to reduce strain on the border; employ an aggressive consequence regime; bolster the capacity of NGOs and partner with state and local partners; go after cartels and smugglers; and work with our regional partners.  This comprehensive plan leverages a whole-of-government approach to prepare for and manage the current and anticipated increases in encounters of noncitizens at our Southwest Border.

Venezuela AR_000162

Across each of the lines of effort, DHS has undertaken a deliberate and methodical approach to readiness prior to and for May 23.  Following months of planning based on multiple potential scenarios, we are pre-positioning and expanding available resources.  We are also conducting extensive testing of processes that have not been used at scale since the implementation of Title 42 and new approaches like an en route processing capability, which will be explained below.  Finally, our preparations culminate with us scaling to meet migration levels as they increase over time by accessing additional resources through interagency agreements and contracts.

## *Border Security Pillar 1:* We are surging resources, including personnel, transportation, medical support, and facilities to support border operations.

### Increased Personnel

Over the past several months, we have deployed additional personnel in support of several key functions.  First and foremost, we are working to maximize the number of CBP Agents and Officers in the field.  As of April 25, CBP has over 23,000 Agents and Officers working along the Southwest Border, over 600 of whom have deployed since February 1 in response to increasing operational demands.  The SBCC will continue to augment CBP's operations by bringing in law enforcement agents and officers from other parts of the country as needed.

Additionally, there are currently over 300 civilian Border Patrol Processing Coordinators who work in Border Patrol stations to complete processing duties; the volume of processing has required some Border Patrol Agents to be assigned to processing.  Over the next few months, we are on track to deploy over 500 additional full-time and contract processors, which relieves Border Patrol Agents to return to the field and continue their tireless work to secure the border.  President Biden's FY 2023 Budget request to Congress proposes hiring an additional 300 Border Patrol Agents and an additional 300 Border Patrol Processing Coordinators.  If enacted, this would be the first increase in the number of Border Patrol Agents since 2011.

The SBCC is augmenting CBP's operations by bringing in law enforcement officers and agents from other parts of the country.  We are also hiring, contracting for, and soliciting volunteers for administrative processing support to enable law enforcement officers and agents to focus on front-line work.

### Increased Transportation Capacity

CBP utilizes air and ground transportation to prevent Border Patrol facilities from becoming overcrowded.  This long-standing process enables increased efficiency, while better protecting the health and safety of our workforce and noncitizens.   Building on this approach, the SBCC is expanding the capacity for lateral movements of noncitizens within and between Border Patrol sectors to help relieve overcrowded sectors quickly.  For example, CBP will complete a blanket purchase agreement to contract for 394 additional bus movements per day by April 29.  CBP can currently move about 4,900 people per day and this additional capacity will enable the movement of an additional 4,100 people per day, almost double, with the potential for further expansion.  The SBCC has secured eight U.S. Bureau of Prisons buses with supporting personnel to replace buses and drivers currently staffed by Border Patrol Agents.  Those Border Patrol Agents currently staffing buses will then be able to return to the field and perform their critical

Venezuela AR_000163

law enforcement and border security missions. The SBCC is also finalizing an interagency agreement with ICE for contracted ground transportation resources for an additional 40 bus movements per day and air movements for family units.

**Additional Medical Support**
It is among DHS's top priorities to ensure the health, safety, and well-being of those in DHS care and custody, the DHS workforce, and surrounding communities. To this end, we have invested in ensuring that we have appropriate and accessible medical care, including for those with unique vulnerabilities, medical conditions, and for tender-aged children. The SBCC is working to make medical resources available by the end of April to provide urgent clinical care for a planning scenario of 18,000 noncitizens in CBP custody at any given time. The SBCC has developed a medical support plan, which has been reviewed by interagency medical experts, and is currently determining which federal agencies can provide support through an interagency agreement signed with DOD, HHS, USCG, and FEMA.

Beginning in 2021, DHS rapidly scaled its COVID-19 vaccine program to noncitizens in ICE custody. The provision of vaccines, coupled with the testing of noncitizens on intake and rigorous isolation and quarantine protocols, has led to markedly low morbidity and mortality in ICE facilities. Separately, on March 28, 2022, DHS expanded its COVID-19 vaccine program to include noncitizens in CBP custody with a goal to expand to 24 sites by May 23. All Title 8, age-eligible, non-citizens are eligible for the CBP COVID-19 vaccine program and receive their first dose prior to onward travel. Additionally, at the highest-volume CBP sectors, unaccompanied children are tested on intake for COVID-19 and, if positive, are triaged for immediate movement to HHS facilities. These mitigation measures at CBP and ICE have kept COVID-19 rates among noncitizens at or lower than surrounding communities during most of 2021 and 2022.

**Increased CBP's Border Holding Capacity**
We have worked to increase CBP's holding capacity, currently at over 17,000 compared to less than 13,000 in January 2021. This includes three soft-sided facility expansions totaling approximately 1,300 in holding capacity initiated in the past two months and one that will be completed in mid-May. There are additional facility expansions still in the planning phase. By April 27, CBP will also complete its assessment of DOD sites for potential additional temporary facilities.

*Border Security Pillar 2*: **We are increasing CBP processing efficiency and moving with deliberate speed to mitigate potential overcrowding at Border Patrol stations and alleviate the burden on the surrounding border communities.**

As noted above, CBP's goal at Border Patrol stations is to hold noncitizens in a safe, orderly, and humane environment; ensure appropriate security screening; and to quickly process and transfer screened noncitizens out of CBP custody to ensure that facilities do not become overcrowded, while facilitating the lawful trade and travel that is critical to our economy. CBP, which initially encounters and apprehends migrants, does not have sufficient capacity or resources in its short-term facilities to hold individuals for over 72 hours. In the case of unaccompanied children, CBP

Venezuela AR_000164

must, by law, transfer these children to the custody of the HHS Office of Refugee Resettlement (ORR) within 72 hours of encounter.

CBP will continue to achieve these goals by employing several strategies, such as transferring noncitizens from stations that are over capacity to those that have capacity and transferring them to ICE ERO for Expedited Removal and detention, where appropriate.  The SBCC is also launching the following three new initiatives to support decompression efforts, which ensure the continued integrity of our security screening processes: enhanced central processing center, en route processing, and streamlined processing.  Further, CBP is working to increase processing efficiency at POEs to allow noncitizens to present for inspection in a safe and orderly manner.

### Enhanced Central Processing Centers (ECPC)

Processing a noncitizen upon apprehension and entering them into immigration removal proceedings involves multiple steps, multiple electronic systems, and, often, multiple federal agencies.  Specific issues include the referral process from CBP to ICE, coordination between CBP and ICE on custody and transportation of noncitizens, and coordination between CBP and HHS on the transfer of unaccompanied children.  To address these challenges, the SBCC is testing and rapidly developing a model that will co-locate CBP, ICE, NGOs, and possibly other entities at ECPCs to eliminate any inefficiencies and more rapidly process noncitizens.  This innovative model will allow CBP to quickly triage noncitizens it encounters based on risk, ensuring that higher risk individuals are held in secure, hardened facilities until they are placed in detention, while lower risk individuals are processed quickly and humanely at facilities that do not require as significant a law enforcement presence.

This will allow the Border Patrol to focus more of its agents on its priority mission to secure our border rather than processing and administrative duties.  ICE personnel will be on-site in order to minimize delays associated with referrals, and NGOs will be present as well to provide legal orientation services and onward transportation for those low-risk individuals who are ultimately released on ATD.  The first ECPC will be operational in Laredo, Texas effective April 29.  Informed by this experience, the SBCC will complete a plan for the development of additional enhanced central processing centers beyond Laredo.

### En Route Processing

As noted above, processing of noncitizens at CBP facilities can be time intensive.  When noncitizens are transported to alleviate overcrowding, the time in transit is an opportunity to process those being transported.  By testing and refining operational plans to complete processing of noncitizens while in transit, the SBCC can move noncitizens out of CBP facilities faster, while retaining the integrity of biometric and biographic screening processes and ensuring noncitizens apprehended at the border are placed expeditiously into removal proceedings.

As part of DHS's strategic use of existing Title 8 processing pathways, this processing would be reserved for family units, especially from countries that do not accept repatriations quickly or at all.  The SBCC is actively engaging with cities that are located within a six-hour drive of the border and will employ en route processing to relieve pressure on Border Patrol facilities and border communities. The SBCC is working closely with local governments, including law

Venezuela AR_000165

enforcement, in these cities to ensure that local governments and receiving NGOs have the support and resources they need, as described further below.

The SBCC is testing en route processing and is continuing to develop options to expand its capacity further.  In particular:

- *Del Rio to Laredo:* The SBCC has developed a concept of operations for en route processing from Del Rio to Laredo that has already been successfully tested.
- *Bus Technology:* Border Patrol is outfitting buses with necessary technology to support processing requirements while in transit.

### Streamlining Processing Methods

Processing a single noncitizen for a Notice to Appear (NTA) can take two to three hours, including the time to complete the processing documents and subsequent review between CBP and ICE to ensure accuracy.  An NTA is a charging document, issued by ICE or CBP, which initiates removal proceedings against a noncitizen, and specifies the date and time for the noncitizen to appear in immigration court.  Last year, DHS launched the Southwest Border Technology Integration Program to digitize and automate noncitizen processing.  Today, over 70 percent of Title 8 cases are reviewed and signed digitally by CBP.  We project this has saved over 20,000 hours of processing time already.

The SBCC is identifying and implementing further technological and administrative improvements to reduce overall processing time of noncitizens, while also maintaining security. For example, the SBCC is focused on expanding digital processing towards a fully digital "A-File," which is shared across CBP, ICE, U.S. Citizenship and Immigration Services (USCIS), and DOJ throughout the immigration lifecycle.  Digital A-Files for voluntary returns and digital review and signatures for other disposition types will be implemented by May 23.  DHS will continue to focus on digitizing all other elements of the A-File to maximize efficiency.  In addition, the SBCC is eliminating administrative redundancy by identifying and removing certain forms in the document exchange between CBP and ICE.

### Port of Entry Processing

The imposition of the Title 42 public health Order severely restricted the ability of undocumented noncitizens to present at POEs for inspection and processing under Title 8.  The closure of this immigration pathway for much of the time Title 42 has been in effect has driven people between POEs at the hands of the cartels.  Returning to robust POE processing is an essential part of DHS border security efforts.  Beginning in the summer of 2021, DHS restarted processing vulnerable individuals through POEs under Title 8, on a case-by-case basis for humanitarian reasons, pursuant to the exception criteria laid out in CDC's Title 42 Order.  These efforts, which we have recently expanded, offer individuals in vulnerable situations a safe and orderly method to submit their information in advance and present at POEs for inspection and subsequent immigration processing under Title 8.  We also have enhanced Title 8 POE processing through the development of the CBP One mobile application, which powers advanced information submission and appointment scheduling prior to an individual presenting at a POE. We will make this tool publicly available and continue to expand its use to facilitate orderly immigration processing at POEs.

13 of 20

## *Border Security Pillar 3*: **We are administering consequences for unlawful entry, including removal, detention, and prosecution.**

Attempting to enter the United States without authorization carries potential long-term consequences, including removal from the United States, bars on subsequent admission, and criminal liability.  By expeditiously removing individuals who do not have a lawful basis to stay in our country, the United States is making clear that while we are a nation of immigrants, we are also a nation of laws.  We will continue fully enforcing those laws, employing a combination of Expedited Removal and removal proceedings before an immigration judge, detaining single adults where appropriate, and referring for prosecution border-related criminal activity.

### Expedited Removal

DHS is preparing to maximize the use of Expedited Removal for populations where removal is possible or likely, consistent with the law, and is working to streamline Expedited Removal processes across relevant federal agencies, with an eye towards quickly removing those who receive a negative credible fear finding while in ICE custody.  DHS is increasing the availability of interview facilities and USCIS officers to conduct credible fear interviews, creating an electronic process to refer appeals of negative fear findings to the DOJ Executive Office for Immigration Review (EOIR), and working with partner countries throughout the hemisphere to significantly improve our ability to quickly remove and repatriate individuals with final orders of removal.

Increased use of Expedited Removal serves key law enforcement and operational goals.  It is a fair and effective means of efficiently removing those with no lawful basis to remain in the United States.  Those subject to Expedited Removal also face a five-year bar on admission from the date of removal and potential criminal prosecution if they seek to unlawfully re-enter, thus serving to deter would-be border crossers.

Single adults placed in Expedited Removal are generally detained throughout the process, making the capacity to detain critical to its effectiveness and to increasing its use.  DHS utilizes a network of detention facilities across the country to detain noncitizens who are subject to Expedited Removal, who pose a threat to public safety or national security, to ensure presence at immigration proceedings, and to effectuate removals.  As COVID-19 physical distancing restrictions are revised, DHS will regain additional bed space within its existing facility footprint.

### Asylum Office Rule

Individuals in Expedited Removal who establish a credible fear of persecution or torture are currently referred to an immigration court for full consideration of their applications for asylum and related protection.  Under the new Asylum Office rule, effective May 31, DHS can instead refer these cases to USCIS for significantly more expeditious adjudication.  The new rule will allow DHS and DOJ to conclude certain asylum cases in months instead of years, meaning that those deemed ineligible for asylum can be removed more quickly.  While full implementation will take time, this will have a transformative impact on the asylum system.

14 of 20

**Timely Immigration Court Proceedings**

For families not processed through Expedited Removal and who are instead placed in removal proceedings, DOJ and DHS have jointly established a new, more efficient process known as the Dedicated Docket to conduct speedier immigration court proceedings that comport with due process.  DHS is utilizing the Dedicated Docket for certain family unit members who arrive between POEs at the Southwest Border and are traveling to one of 11 destination cities.  Families placed on the Dedicated Docket are prioritized for adjudication and are generally expected to receive final decisions in their cases within 300 days of initiation, as opposed to several years.  The Dedicated Docket includes a Family Group Legal Orientation Program in which nonprofit organizations explain the immigration court process and provide referrals to pro bono legal services to support families placed on this Docket.

In addition to the Dedicated Docket, DOJ will continue to operate its long-standing detained docket for individuals in ICE custody, moving cases through the immigration court system in a matter of months, rather than years.

**Prosecuting Border-Related Criminal Activity**

DHS will continue to refer border-related criminal activity to DOJ for prosecution where warranted, including that of smugglers, repeat offenders, and other noncitizens whose conduct warrants such law enforcement action.  We also continue to enforce CBP's Repeat Offender initiative to target recidivism.  This enforcement regime has improved DHS's ability to leverage legal consequences to deter irregular migration while conserving limited processing resources.

***Border Security Pillar 4*: We are bolstering the capacity of NGOs to receive noncitizens after they have been processed by CBP and are awaiting the results of their immigration removal proceedings.  And, we are ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities.**

Increased migration levels put additional pressure not only on DHS personnel and resources, but also on border communities and NGO partners who play a critical role in helping noncitizens who are released from DHS custody for the pendency of their removal proceedings.  Noncitizens who are not subject to ICE detention are screened by CBP as described above, entered into immigration removal proceedings, and permitted to travel to onward destinations, where they are subject to ongoing supervision.  Once a noncitizen is released from custody by DHS, the Department is no longer operationally engaged in their transportation, medical care, or shelter.  Nonetheless, our goal is to help communities alleviate the pressures they experience by expanding NGO capacity, through communication and coordination, and grants through the Emergency Food and Shelter Program (EFSP).  We are also exploring other ways to provide assistance to communities and welcome the ongoing dialogue we have with local leaders to that end.

**Bolstering NGO Capacity**

NGOs play a critical role in providing care and support with onward travel to noncitizens who are entered into immigration removal proceedings, not subject to detention, and released from

Venezuela AR_000168

CBP custody.  The SBCC has assessed and is tracking NGO capacity and sharing information to ensure there is a common operating picture across all relevant parties, to include gaps that can be remediated with external assistance.

The EFSP, administered by DHS through FEMA, supplements and expands ongoing work of local NGOs to meet the urgent needs of local agencies assisting the unique and vulnerable migration population encountered by DHS.  In FY 2022, Congress authorized $150 million for EFSP Southwest Border support, and this month, FEMA has taken necessary steps to ensure these funds can be accessed by eligible partners in short order.  We are working to ensure the eligibility criteria for EFSP can cover the broadest set of possible needs and will provide more information for entities that are not familiar with EFSP by the end of April.

For the subset of non-citizens who may be released from custody directly into a community (i.e., those who cannot be released in coordination with an NGO due to capacity constraints or other issues), DHS is defining required criteria for CBP leadership to reference when determining whether and how to release individuals.  This is particularly important given the potential for increases in this population going forward.  The criteria will include safety checks, notification to local officials, information on local resources and legal services, and required documentation.  The SBCC will complete an operational checklist, informed by feedback from our local stakeholders including law enforcement partners, also by the end of April.

Additionally, by the beginning of May, the SBCC will complete an updated information package to distribute to all noncitizens released from federal custody. The update was designed to ensure individuals more clearly understand their obligations and requirements for compliance with the enforcement and removal process.

**Communication with State, Local, and Community Leaders**
To ensure close operational coordination and support ongoing local planning efforts, the SBCC and CBP leaders continue to engage extensively with state and local governments, including law enforcement entities, public health authorities, and NGOs, including in California, Arizona, New Mexico, and Texas, as well as other locations as needed.  This regular coordination includes a focus on noncitizen transport and capacity planning, resolving logistical challenges, and addressing community concerns through shared solutions.  These and other coordination sessions will increase as operations necessitate.

***Border Security Pillar 5:* We are targeting and disrupting the transnational criminal organizations (TCOs) and smugglers who take advantage of and profit from vulnerable migrants, and who seek to traffic drugs into our country.**

DHS works at home and abroad to identify, investigate, and interdict the TCOs that smuggle people and drugs into our country.  Human smuggling organizations peddle misinformation that the border is open, in order to profit from the vulnerability of migrants.  DHS is targeting these organizations, in close collaboration with other federal agencies, state and local law enforcement, and international partners.  While this has been a consistent priority, our efforts have intensified in recent months.

16 of 20

## Migration Intelligence

Building on the Intelligence Community's existing work to monitor migration activity in the Western Hemisphere, in April, ODNI stood up a Migration Intelligence Cell with the goal of providing advanced geographic and time-based warning of large human smuggling movements in the region and analysis and targeting information for disruption activities.  The Migration Intelligence Cell has highlighted to the entire Intelligence Community the priority of human smuggling to prompt additional focus.  This intelligence will be used for disruption activities as well as border security and management actions.

## Disrupting Smuggling Networks

Building on existing efforts, in April 2022 DHS surged disruption efforts in partnership with other federal agencies along six coordinated and interconnected lines of effort.  These include:

- Operation Expanded Impact led by Homeland Security Investigations (HSI), a division of ICE.  HSI is focusing its investigative efforts along the Southwest Border to launch additional criminal investigations of the organizations taking advantage of vulnerable individuals, working to detect, disrupt, and dismantle TCOs involved in narcotics, human smuggling, and human trafficking.  HSI has assigned approximately 250 special agents and criminal analysts to carry out investigations in the United States;
- Operation Sentinel, which is an interagency counter-network operation targeting TCOs affiliated with the smuggling of migrants;
- Joint Task Force Alpha, a DOJ-led effort to target smuggling and trafficking groups;
- Blue Indigo, led by DOJ and DHS to disrupt cartel operations and illicit networks in South Texas;
- Financial disruption conducted by the Treasury Department; and,
- The ODNI cell referenced above.

This is the largest surge of resources and disruptive activities against human smuggling networks in recent memory.  So far this month, these lines of effort produced over 2,500 arrests, investigations, and disruptions of smuggling infrastructure, such as buses and safe houses, among other actions, and have slowed, stopped, or reversed the flows of thousands of migrants.  This activity represents a dramatic increase in human smuggling network-related disruption events in FY 2022 compared to the same time and in the same region in FY 2021.

Partnerships with Mexican and Central American counterparts have resulted in multiple significant enforcement actions against human smuggling and trafficking groups operating in Mexico, Guatemala, El Salvador, and Honduras.  In Guatemala, efforts have focused on the indictments and extraditions of Guatemalan human smugglers to face prosecution.  In Honduras, DHS has provided robust support to Operation Scorpion, a border surge initiative of the Honduran National Police that targets human smugglers and traffickers.

## Drug Seizures and Enforcement

DHS has increased efforts to stem the flow of illegal drugs into the United States.  In FY 2021, HSI Special Agents conducted 12,920 criminal arrests and seized over 2.4 million pounds of narcotics, which included 14,530 pounds of fentanyl.  This compares to FY 2020 seizures of more than 1.4 million pounds.  In addition, HSI Special Agents seized more than $188 million in

Venezuela AR_000170

total currency and assets.  In FY 2021, CBP seized 900,000 pounds of narcotics, a significant increase over the previous year.

DHS employs a multi-layered approach to countering narcotics trafficking, in close partnership with other federal and partner government agencies.  CBP's National Targeting Center uses advanced analytics and targeting capabilities to identify critical logistics, financial, and communication nodes and exploit areas of weakness in opioid trafficking networks.  ICE HSI Special Agents exchange information, coordinate investigations, and facilitate enforcement actions with law enforcement partners abroad to deter the ability of TCOs to smuggle drugs, people, and contraband into and out of the United States.

### *Border Security Pillar 6:* **We are deterring irregular migration south of our border, in partnership with the Department of State, other federal agencies, and nations throughout the Western Hemisphere, to ensure that we are sharing the responsibility throughout the region.**

Deterring migrants who will not meet the criteria for asylum is an important tool to alleviate pressure at the border.  As described earlier, that is a challenge.  Across the world, more people are displaced from their homes than at any time since World War II.  While the United States is a destination country for those fleeing their homes, we do not experience the phenomenon alone.  Colombia, Costa Rica, Ecuador, and many other countries in the region are experiencing increases in migration, especially of Venezuelans, but of other nationalities as well.  In light of the increased levels we are experiencing, DHS, working with DOS and other partners, has intensified our work to manage and deter irregular migration throughout the region.

#### New Bilateral Arrangements on Migration and Protection
On March 15, I traveled to Costa Rica and joined President Alvarado in announcing a bilateral Migration Arrangement, which outlines our shared commitment to both manage migrant flows and promote economic growth in the region.  On April 19, the U.S. government signed a Bilateral Arrangement on Migration and Protection with the Government of Panama, similarly detailing our collaborative commitments to improve migration management, expand stabilization efforts, and increase access to legal pathways and protection for those in the region.  DHS and DOS are actively engaged with other countries in the region to advance similar bilateral arrangements, as well as a Hemispheric Declaration on Migration and Protection to be completed at the upcoming Summit of the Americas in June 2022.

#### Partnership with the Government of Mexico
The Biden-Harris Administration continues to maintain a close partnership with the Government of Mexico to stem irregular migration, which includes creating viable legal pathways, facilitating lawful trade and travel, and combating the shared dangers of transnational organized crime.  Last month, I made my fourth official visit to Mexico City where I met with President López Obrador to intensify our shared commitment to promoting lawful trade and travel and developing a regional approach to migration management.

**In-Region Messaging**

DHS coordinates closely with DOS to track trends, share research, and coordinate messaging to counter disinformation that smugglers use to victimize vulnerable migrants.  Our approach has included paid advertising on radio and digital platforms and press conferences and media interviews in source and transit countries.  These messages counter disinformation propagated by human smugglers and warn migrants of the dangers of being exploited and facing death at the hands of unscrupulous criminal organizations.

# CONCLUSION

**Despite the efforts of our dedicated DHS workforce and our partners executing this comprehensive plan, a significant increase in migrant encounters will substantially strain our system even further.  We will address this challenge, but it will take time, and we need partnership and support to do so successfully.  We are also operating within a fundamentally broken immigration system that only Congress can fix.**

As described above, DHS and its federal and community partners have been taking steps for months to prepare for the lifting of Title 42, while operating within a system that is not designed to handle the current volume of migrants nor the increased volume we expect over the coming months.  The preparations and deliberate planning detailed in this memorandum will enable us to manage and mitigate known and unanticipated challenges more effectively, while protecting the safety and security of our communities.  But notwithstanding the efforts described in this paper, a significant increase will substantially strain our system even further.

We are especially mindful of the following challenges and potential developments at higher levels of encounters:

- For several months, CBP, ICE, NGOs, and other critical partners have been managing levels beyond the capacity for which their infrastructure was designed and resourced, meaning additional increases will create further pressure and potential overcrowding in specific locations along the border.
- With NGOs strained, there is a potential for a higher number of single adults and families to be released into communities without NGO or other sponsor support.  The federal government has few tools or authorities to support the related impacts on local communities, though we are actively working to develop more.
- Depending on levels, land ports of entry could experience processing delays and disruptions at specific points in time.
- Communication and coordination across state, local, and community leaders requires good faith engagement of all parties, to help ensure we can effectively manage these developments together.

We welcome partners' support in mitigating these risks and challenges.  We appreciate Congress' support in FY 2022, appropriating $1.4 billion for DHS to manage an increase in Southwest Border encounters.  DHS is currently managing these resources responsibly and has submitted the required spend plan to Congress.  DHS expenditures for the $1.4 billion appropriated in FY 2022 include but are not limited to: soft-sided facilities; medical contracts;

19 of 20

transportation; and support for NGOs through the EFSP.  DHS will also need to utilize its limited transfer and reprogramming authority once the $1.4 billion is exhausted.  Should additional resources be necessary to manage a sustained increase in encounters, DHS will engage Congress on any potential need for supplemental appropriations.

Over the past 15 months, the Department of Homeland Security has demonstrated time and time again our ability to tackle significant challenges, while operating consistent with our laws and our values.  From responding to unprecedented levels of migration and ensuring the safety of individuals in our care to vetting and processing tens of thousands of evacuees from Afghanistan and Ukraine, we have consistently risen to the challenge in extremely difficult circumstances. We will continue to work tirelessly on behalf of the American people, but there is broad agreement that our immigration system is fundamentally broken.  As it has since its first day in office, the Biden-Harris Administration continues to call on Congress to pass legislation that holistically addresses the root causes of migration, strengthens border security, fixes our immigration system, and improves legal pathways.

Venezuela AR_000173

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



October 29, 2021

MEMORANDUM TO:    Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

FROM:    Alejandro N. Mayorkas
Secretary

SUBJECT:    **Termination of the Migrant Protection Protocols**

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*. In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations.  *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021).  As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration.  *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original).  The Department is fully complying with the District Court's order.  At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways.  In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border.  I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated.  In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.  Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving

2

either of these goals. Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities. It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes. Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico. Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border. Of course, correlation does not equal causation and, even here, the evidence is not conclusive. I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims. I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border. This is a shared responsibility of all countries across the region. MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration. This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements. Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program. But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog. Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

3

and lasting changes to the asylum system.  MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts.  MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix.  Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form.  For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP.  Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP.  The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP.  But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

4



**U.S. Department of Homeland Security**
Washington, DC 20528

December 20, 2022

MEMORANDUM TO FILE

FROM:        Blas Nuñez-Neto
Acting Assistant Secretary for Border and Immigration
Office of Strategy, Policy, and Plans

SUBJECT:    Data on Migration through the Western Hemisphere

Purpose

This memorandum commits to writing data and information considered by the Department of
Homeland Security's (DHS) Office of Strategy, Policy and Plans (PLCY) ███████████████
███████████████████████████████████████████████████████████

Description of Data or Information

PLCY states that, according to reporting from U.S. Embassy San Jose, nearly 1,500 Venezuelans
requested asylum in Costa Rica in the latter half of October, which nearly matched the number of
applicants of all nationalities for the first eight months of the year.

PLCY also mentions that, according to reporting from U.S. Embassy San Jose, the Government
of Costa Rica established the Special Temporary Category (STC) of status for Cubans,
Nicaraguans and Venezuelans in Costa Rica who applied for asylum between January 1, 2010
and September 30, 2022 and desire to withdraw their application in favor of receiving STC and
having access to employment authorization and social services.

PLCY states that, according to reporting from U.S. Embassy Bogota, the Government of
Colombia was working on plans to expedite the 26,000-case backlog of asylum cases in the latter
half of 2022.

PLCY describes the Government of Ecuador's phased registration process for temporary
residence permits. Specifically, according to reporting from U.S. Embassy Quito, that the first
phase was launched on September 1, 2022, by opening online registration to an estimated
120,000 Venezuelans who hold or previously held a regular migration stat us and all
unaccompanied minors. More than 68,500 individuals registered within the first week.

PLCY relays how the Government of Ecuador opened Phase Two on November 16, 2022, to
approximately 100,000 non-Venezuelan migrants who entered regularly. As of November 25,

more than 89,000 individuals had registered and over 22,000 have already received their temporary residency visa. PLCY continues to explain that Phase Three will open February 17, 2023, to an estimated 350,000 Venezuelans who entered irregularly.

PLCY outlines the parameters of the new amnesty program, according to reporting from U.S. Embassy Belmopan. This program will include asylum applicants who had previously been denied as long as they were registered in Belize by March 31, 2020. Among other categories that qualify under this amnesty program are individuals who resided in Belize before December 31, 2016. Total beneficiaries are estimated to range between 6,000-8,000 and will receive permanent residency and a path to citizenship.

PLCY mentions how the Government of Mexico would not accept more noncitizens returned to Mexico via the Migrant Protection Protocols (MPP) than local shelters had the capacity for, which was limited. Additionally, reporting from U.S. Embassy Mexico City that describes how MPP returns were paused in San Diego for an extended amount of time in the summer of 2022 due to a lack of shelter space in Tijuana.

PLCY describes concern from international partners, as conveyed by Embassy reporting, about the potential consequences of lifting Title 42, as was originally planned on May 23, 2022. Specifically, partners expressed concern that the end of Title 42 would be perceived by migrants—and messaged by smugglers—as an opening of the U.S. border, which could cause a dramatic and overwhelming increase in migration flows through partner countries. Another potential pull factor cited by partners was the perception that U.S. immigration officials release migrants into the community. Additionally, one partner expressed concern that in the past, rumors alone of the end of Title 42 had spurred the creation of caravans moving towards the border.  In conversations, another foreign partner noted that the lack of consequences at our border is a driver for irregular migration.

PLCY describes conversations with international partners, as relayed in a meeting readout from the Department of State, in which at least one country encouraged the U.S. Government to expand the Venezuela parole process to other nationalities as a pathway for individuals to reach the United States without making the dangerous journey through the hemisphere. PLCY relays information from other conversations with international partners in which they worry that these pathways will be undermined when the Centers for Disease Control and Prevention's Title 42 Order is no longer being implemented.

PLCY describes conversations with international partners in which they conveyed that their willingness to receive increased returns of migrants was contingent on expanding the model provided by U4U and the Venezuela process, which decreased irregular migration throughout the hemisphere by increasing options for lawful pathways and adding consequences for noncitizens who bypass those opportunities to travel irregularly to the United States. In general, international partners have been active participants in carrying out actions related to stabilizing populations, expanding lawful pathways and humanely managing borders, as per the Los Angeles Declaration on Migration and Protection.  However, our foreign partners regularly express concern about having to divert resources from other priorities to respond to the ongoing surge in migration, and believe that the U.S. Government should be doing more, particularly now, to reduce these irregular flows and channel them into safe and orderly processes.

PLCY reports that the Venezuela process was predicated on returning nationals of that country to Mexico under Title 42 authorities, and Mexico has historically not accepted the return under Title 8 of third-country nationals with final orders of removal.

PLCY describes conversations with at least one international partner that refused to entertain negotiating a Safe Third Country Agreement with the United States, claiming it is not a politically viable option for them.

Finally, PLCY considered reporting from U.S. Embassy Panama City stating that 59,800 irregular migrants crossed the Darien Gap in October 2022, which was a 130 percent increase over October 2021. However, there was a sharp decline in migrants crossing from Colombia into Panama after DHS announced the process for Venezuela on October 12. The daily average dropped from 2,500 migrants in the first two weeks of October 2022 to about 1,000 migrants in the last two weeks. Embassy Panama City cited a seasonal decrease from October to November 2021. However, in the same period in 2022, the overall number of Venezuelan migrants crossing has decreased, whereas the overall the number of Ecuadorians and Haitians saw much smaller variation.

10/11/22, 5:33 PM    The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans …

Case 6:23-cv-00007 Document 95-2 Filed on 03/24/23 in TXSD Page 87 of 222

HOME » NEWS AND INFORMATION » PRESS RELEASES » THE UNITED STATES ANNOUNCES MORE THAN $314 MILLION IN NEW
ASSISTANCE FOR VENEZUELANS AND OTHER MIGRANTS AT THE SUMMIT OF THE AMERICAS

# THE UNITED STATES ANNOUNCES MORE THAN $314 MILLION IN NEW STABILIZATION EFFORTS AND HUMANITARIAN ASSISTANCE FOR VENEZUELANS AND OTHER MIGRANTS AT THE SUMMIT OF THE AMERICAS

### For Immediate Release

Friday, June 10, 2022

Office of Press Relations
press@usaid.gov

During the Summit of the Americas, President Biden announced new efforts by the Department of State and USAID that will assi
vulnerable refugees and migrants across the region, including those displaced from the political and economic crisis in Venezue
and humanitarian assistance for vulnerable Venezuelans in Venezuela.

**$40 Million in USAID Development Funding**

- With $35.9 million in FY 2021 Development Assistance (DA), Economic Support Fund (ESF), and Global Health Programs–
  USAID funds for South America, including in Brazil, Colombia, Ecuador, and Peru, USAID will promote the social and econom
  integration of the millions of Venezuelan migrants through policy reform, pathways for legal status, professional certification
  job training and placement, microenterprise creation, access to financial services, and other socio-economic integration
  efforts.

- In Central America, with $4.1 million in FY 2018 and FY 2019 ESF, USAID will expand integration efforts in Belize, Costa Rica,
  and Panama, to support the dignified social and economic integration of third country migrants from Nicaragua, as well as
  from Venezuela, Haiti, and other countries around the region.

**$171 Million USAID Humanitarian Funding**

- This new funding will provide direct relief to vulnerable Venezuelans who have remained within the country, including
  healthcare, food, nutrition, water and sanitation, and protection services. The new funding will also help Venezuelan migra
  and refugees who have fled to Brazil, Colombia, Ecuador, and Peru by providing emergency food assistance. With USAID
  support, partners aim to address acute food insecurity among Venezuelan migrants and refugees in these four countries by
  providing them with hot meals, cash transfers, food vouchers, and food kits.

**Nearly $103 Million Department of State Humanitarian Funding**

- This new funding through the State Department's Bureau of Population, Refugees, and Migration (PRM) supports a wide ran
  of life-saving humanitarian programs for Venezuelan refugees and migrants, such as emergency shelter; access to health ca
  water, sanitation, and hygiene supplies; increased access to education; support for livelihoods; COVID-19 support, and
  protection for vulnerable groups including women, youth, LGBTQI+, and indigenous people in seventeen countries includin
  Argentina, Aruba, Brazil, Chile, Colombia, Costa Rica, Curacao, Dominican Republic, Ecuador, Guyana, Mexico, Panama,
  Paraguay, Peru, Trinidad and Tobago, Uruguay, and Venezuela.

Venezuela AR_000181

Last updated: September 23, 2022

**SHARE THIS PAGE**

Venezuela AR_000182

3/17/23, 12:23 PM          The United States Announces Nearly $376 Million in Additional Humanitarian Assistance For People Affected By The Ongoing Cr…

Case 6:23-cv-00007 Document 95-2 Filed on 03/24/23 in TXSD Page 89 of 222

🇺🇸 An official website of the United States government
 Here's how you know

# The United States Announces Nearly $376 Million In Additional Humanitarian Assistance For People Affected By The Ongoing Crisis In Venezuela And The Region

Home      News & Information      Press Releases      The United States Announces Nearly $376 Million In Additional Humanitarian Assistance For People …

## For Immediate Release

Office of Press Relations
press@usaid.gov

Thursday, September 22, 2022

# Press Release

Today the United States, through the U.S. Agency for International Development, announced nearly $376 million in additional humanitarian assistance for people affected by the Venezuela regional crisis. The humanitarian toll from this political and economic crisis in Venezuela remains dire. More than 7.7 million people in Venezuela need immediate humanitarian assistance and more than 6.8 million Venezuelans have fled their home country in search of better opportunities and livelihoods, resulting in one of the largest migrant and refugee crises in the world.

3/17/23, 12:23 PM                    The United States Announces Nearly $376 Million Additional Humanitarian Assistance For People of the Ongoing Cr…

Case 6:23-cv-00007 Document 95-2 Filed on 03/24/23 in TXSD Page 90 of 222

USAID Assistant to the Administrator Sarah Charles and Deputy Assistant Secretary of State for the Bureau of Population, Refugees, and Migration Janine Wynne made the announcement on the margins of the United Nations General Assembly. Consistent with U.S. commitments under the Los Angeles Declaration on Migration and Protection, the additional humanitarian funding, which includes more than $194 million through USAID and more than $181 million through the U.S. Department of State, will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and the generous host communities across the region.

USAID funding inside Venezuela will provide critically needed food and nutrition assistance and help rehabilitate water and sanitation infrastructure in vulnerable communities and at health facilities. It will also provide essential medical and hygiene supplies to keep people healthy alongside support to ensure the continuity of healthcare services, and provide specialized protection support to help safeguard Venezuelans from violence and exploitation. Across Colombia, Ecuador, and Peru, USAID funding will provide hot meals, food vouchers, and direct cash assistance to Venezuelan migrants and refugees so they can purchase food and other urgent necessities from local markets.

The United States remains the largest single donor for the response to the Venezuela regional crisis. Since Fiscal Year 2017, the United States has provided nearly $2.7 billion in total humanitarian, development, economic, and health assistance for the Venezuela regional crisis, including over $2.3 billion in humanitarian assistance and approximately $356 million in development assistance for those in need inside Venezuela and across the region.

Humanitarian aid is critical to ease people's suffering, but it cannot address the underlying conditions that caused Venezuela's protracted crisis. The United States supports Venezuelan-led negotiations as the best path toward a peaceful restoration of democracy and fundamental freedoms of all Venezuelans. Only a peaceful, political solution can address the corruption, political repression, failed policies, and gross economic mismanagement at the root of this crisis.

For the latest updates on USAID's humanitarian assistance for the Venezuela regional crisis, click here.

---

**Para publicación inmediata**
**22 de septiembre de 2022**

**COMUNICADO DE PRENSA**

# Estados Unidos anuncia casi $376 millones en asistencia humanitaria adicional para las

# personas afectadas por la crisis en curso en Venezuela y la región

Los Estados Unidos, a través de la Agencia de Estados Unidos para el Desarrollo Internacional, anunció hoy casi $376 millones adicionales para asistencia humanitaria adicional para las personas afectadas por la crisis regional de Venezuela. El costo humanitario de esta crisis política y económica en Venezuela sigue siendo terrible. Más de 7,7 millones de personas en Venezuela necesitan asistencia humanitaria inmediata y más de 6,8 millones de venezolanos han huido de su país en busca de mejores oportunidades y medios de vida, lo que ha dado lugar a una de las mayores crisis de migrantes y refugiados del mundo.

La Asistente del Administrador de USAID, Sarah Charles, y la Subsecretaria de Estado Adjunta para la Oficina de Población, Refugiados y Migración, Janine Wynne, hicieron el anuncio al margen de la Asamblea General de las Naciones Unidas. De conformidad con los compromisos de EE. UU. en virtud de la Declaración de Los Ángeles sobre Migración y Protección, el financiamiento humanitario adicional, que incluye más de $194 millones a través de USAID y más de $181 millones a través del Departamento de Estado de EE. UU., brindará un apoyo esencial para los venezolanos vulnerables dentro de Venezuela así como la asistencia que se necesita con urgencia para los migrantes, los refugiados y las generosas comunidades de acogida en toda la región.

Los fondos de USAID dentro de Venezuela proporcionarán asistencia alimentaria y nutricional críticamente necesaria y ayudarán a rehabilitar la infraestructura de agua y saneamiento en comunidades vulnerables y en centros de salud. También proporcionará suministros médicos y de higiene esenciales para mantener a las personas saludables junto con apoyo para garantizar la continuidad de los servicios de atención médica y brindará apoyo de protección especializado para ayudar a proteger a los venezolanos de la violencia y la explotación. En Colombia, Ecuador y Perú, los fondos de USAID proporcionarán comidas calientes, cupones para alimentos y asistencia directa en efectivo a los migrantes y refugiados venezolanos para que puedan comprar alimentos y otras necesidades urgentes en los mercados locales.

Estados Unidos sigue siendo el mayor donante para la respuesta a la crisis regional de Venezuela. Desde el año fiscal 2017, Estados Unidos ha brindado casi $2700 millones en asistencia humanitaria, de desarrollo económico  y de salud para la crisis regional de Venezuela. De estos 2700 millones, más de $2300 millones  son para asistencia humanitaria y aprox $356 millones en asistencia de desarrollo para quienes lo necesitan dentro de Venezuela y en toda la región.

La ayuda humanitaria es fundamental para aliviar el sufrimiento de las personas, pero no puede abordar las condiciones subyacentes que causaron la crisis prolongada de Venezuela. Estados Unidos apoya las negociaciones lideradas por Venezuela como el mejor camino hacia una restauración pacífica de la democracia y las libertades fundamentales de todos los venezolanos.

Solo una solución política pacífica puede abordar la corrupción, la represión política, las políticas fallidas y la grave mala gestión económica a raíz de esta crisis.

Para obtener las últimas actualizaciones sobre la asistencia humanitaria de USAID para la crisis regional de Venezuela, visite.

SARAH CHARLES          JANINE WYNNE          UNGA 2022

## Related Press Releases

The United States Announces More than $171 Million in Additional Humanitarian and Development Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region

March 17, 2023

U.S. Support Trains Public Sector Accounting and Auditing Professionals on Accounting Standards and IT

February 16, 2023

World Radio Day 2023 Theme "Radio and Peace" Highlights Importance of Radio in South Sudan

February 13, 2023

USAID Deepens Democratic Partnership with the Government and People of Nepal

February 7, 2023

SHARE THIS PAGE





Follow USAID

**United States Agency for International Development**

3/17/23, 12:23 PM    The U.S. Announces Nearly $376 Million In Additional Humanitarian Assistance For People Affected By the Ongoing Cr…

Case 6:23-cv-00007    Document 95-2    Filed on 03/24/23 in TXSD    Page 93 of 222

1300 Pennsylvania Ave, NW
Washington DC 20004


**Contact**

**White House**

**USA.gov**

**Office of Inspector General**

**Forms**

**Archives**


Privacy Policy

Accessibility

EGOV

FOIA

No FEAR Act

Open Government

Venezuela AR_000187

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan | | Texas Venezuelan | | United States Venezuelan | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| TOTAL NUMBER OF RACES REPORTED | | | | | | |
| Total population | 307,448 | ±19,189 | 99,700 | ±16,021 | 659,631 | ±28,793 |
| One race | 42.9% | ±2.8 | 46.8% | ±8.5 | 45.4% | ±2.0 |
| Two races | 55.9% | ±2.8 | 50.2% | ±8.3 | 52.4% | ±1.9 |
| Three races | 1.2% | ±0.8 | 2.8% | ±2.2 | 1.8% | ±0.5 |
| Four or more races | 0.0% | ±0.1 | 0.3% | ±0.4 | 0.4% | ±0.2 |
| SEX AND AGE | | | | | | |
| Total population | 307,448 | ±19,189 | 99,700 | ±16,021 | 659,631 | ±28,793 |
| Male | 47.3% | ±1.7 | 42.5% | ±3.2 | 46.7% | ±1.0 |
| Female | 52.7% | ±1.7 | 57.5% | ±3.2 | 53.3% | ±1.0 |
| Under 5 years | 4.5% | ±1.3 | 6.7% | ±3.5 | 5.0% | ±0.7 |
| 5 to 17 years | 17.3% | ±1.9 | 17.3% | ±4.1 | 17.1% | ±1.1 |
| 18 to 24 years | 8.5% | ±0.9 | 7.7% | ±2.1 | 9.3% | ±0.7 |
| 25 to 34 years | 13.7% | ±1.7 | 19.9% | ±3.9 | 15.7% | ±1.2 |
| 35 to 44 years | 19.4% | ±1.8 | 14.9% | ±3.1 | 18.8% | ±1.2 |
| 45 to 54 years | 17.0% | ±1.6 | 18.4% | ±3.1 | 16.5% | ±1.0 |
| 55 to 64 years | 10.3% | ±1.4 | 10.0% | ±2.8 | 9.9% | ±0.9 |
| 65 to 74 years | 6.2% | ±0.9 | 3.8% | ±1.8 | 5.2% | ±0.6 |
| 75 years and over | 3.1% | ±0.7 | 1.3% | ±0.7 | 2.5% | ±0.4 |
| Median age (years) | 38.3 | ±1.7 | 34.2 | ±2.8 | 36.7 | ±0.8 |
| 18 years and over | 78.2% | ±2.3 | 76.0% | ±4.6 | 77.8% | ±1.2 |
| 21 years and over | 74.7% | ±2.3 | 73.9% | ±4.5 | 74.3% | ±1.2 |
| 62 years and over | 12.1% | ±1.7 | 7.1% | ±2.2 | 10.1% | ±0.9 |
| 65 years and over | 9.3% | ±1.3 | 5.1% | ±2.0 | 7.7% | ±0.7 |
| Under 18 years | 67,162 | ±9,433 | 23,919 | ±7,351 | 146,177 | ±10,942 |
| Male | 49.6% | ±4.4 | 36.7% | ±9.3 | 48.6% | ±2.9 |
| Female | 50.4% | ±4.4 | 63.3% | ±9.3 | 51.4% | ±2.9 |

Venezuela_AR_000188

1

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Venezuelan Margin of Error | Texas Venezuelan Estimate | Texas Venezuelan Margin of Error | United States Venezuelan Estimate | United States Venezuelan Margin of Error |
|---|---|---|---|---|---|---|
| 18 years and over | 240,286 | ±14,328 | 75,781 | ±10,442 | 513,454 | ±22,838 |
| Male | 46.6% | ±1.6 | 44.4% | ±3.1 | 46.2% | ±1.0 |
| Female | 53.4% | ±1.6 | 55.6% | ±3.1 | 53.8% | ±1.0 |
| 18 to 34 years | 68,098 | ±6,610 | 27,526 | ±5,530 | 164,802 | ±10,947 |
| Male | 47.1% | ±3.8 | 43.3% | ±6.3 | 47.7% | ±2.3 |
| Female | 52.9% | ±3.8 | 56.7% | ±6.3 | 52.3% | ±2.3 |
| 35 to 64 years | 143,726 | ±10,128 | 43,185 | ±6,778 | 297,977 | ±15,157 |
| Male | 48.8% | ±2.0 | 44.6% | ±4.7 | 46.8% | ±1.4 |
| Female | 51.2% | ±2.0 | 55.4% | ±4.7 | 53.2% | ±1.4 |
| 65 years and over | 28,462 | ±3,989 | 5,070 | ±2,060 | 50,675 | ±5,469 |
| Male | 34.3% | ±4.1 | 48.1% | ±14.7 | 37.4% | ±3.4 |
| Female | 65.7% | ±4.1 | 51.9% | ±14.7 | 62.6% | ±3.4 |
| RELATIONSHIP | | | | | | |
| Population in households | 306,771 | ±19,178 | 99,253 | ±16,008 | 655,507 | ±28,780 |
| Householder or spouse | 52.6% | ±1.9 | 53.6% | ±2.9 | 53.0% | ±1.1 |
| Unmarried partner | 2.7% | ±0.7 | 3.4% | ±2.0 | 2.9% | ±0.5 |
| Child | 27.8% | ±1.9 | 30.1% | ±4.2 | 28.2% | ±1.1 |
| Other relatives | 13.6% | ±2.1 | 8.5% | ±2.8 | 11.8% | ±1.3 |
| Other nonrelatives | 3.3% | ±0.7 | 4.4% | ±3.0 | 4.1% | ±0.8 |
| HOUSEHOLDS BY TYPE | | | | | | |
| Households | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| Family households | 83.3% | ±2.5 | 78.4% | ±5.1 | 78.2% | ±1.9 |
| With own children of the household under 18 years | 44.4% | ±3.8 | 41.3% | ±8.2 | 41.9% | ±2.4 |
| Married-couple family | 58.8% | ±3.9 | 62.3% | ±6.8 | 56.6% | ±2.5 |
| With own children of the household under 18 years | 33.5% | ±3.9 | 32.6% | ±8.4 | 31.7% | ±2.4 |

Venezuela AR_000189

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Venezuelan Margin of Error | Texas Venezuelan Estimate | Texas Venezuelan Margin of Error | United States Venezuelan Estimate | United States Venezuelan Margin of Error |
|---|---|---|---|---|---|---|
| Female householder, no spouse present, family | 15.9% | ±2.6 | 10.5% | ±4.2 | 14.2% | ±1.4 |
| With own children of the householder under 18 years | 8.5% | ±1.9 | 7.6% | ±4.2 | 8.3% | ±1.2 |
| Nonfamily households | 16.7% | ±2.5 | 21.6% | ±5.1 | 21.8% | ±1.9 |
| Male householder | 6.8% | ±1.5 | 10.0% | ±3.0 | 10.3% | ±1.3 |
| Living alone | 4.3% | ±1.2 | 6.5% | ±2.7 | 6.6% | ±1.0 |
| Not living alone | 2.5% | ±1.1 | 3.5% | ±1.6 | 3.7% | ±0.8 |
| Female householder | 9.9% | ±1.9 | 11.6% | ±4.5 | 11.5% | ±1.4 |
| Living alone | 7.5% | ±1.7 | 5.5% | ±2.2 | 8.0% | ±1.3 |
| Not living alone | 2.3% | ±0.8 | 6.1% | ±3.8 | 3.5% | ±0.8 |
| Average household size | 3.01 | ±0.11 | 2.97 | ±0.19 | 2.95 | ±0.07 |
| Average family size | 3.25 | ±0.11 | 3.32 | ±0.20 | 3.29 | ±0.06 |
| MARITAL STATUS | | | | | | |
| Population 15 years and over | 251,845 | ±14,761 | 79,537 | ±11,060 | 539,589 | ±23,112 |
| Now married, except separated | 56.0% | ±2.4 | 56.8% | ±4.6 | 54.0% | ±1.6 |
| Widowed | 3.0% | ±0.7 | 1.3% | ±0.6 | 2.6% | ±0.4 |
| Divorced | 11.4% | ±1.4 | 8.2% | ±2.5 | 10.3% | ±1.0 |
| Separated | 1.9% | ±0.7 | 2.5% | ±1.2 | 1.9% | ±0.4 |
| Never married | 27.7% | ±2.1 | 31.2% | ±3.6 | 31.1% | ±1.4 |
| Male 15 years and over | 117,548 | ±8,245 | 34,454 | ±5,767 | 250,218 | ±11,789 |
| Now married, except separated | 61.2% | ±3.0 | 62.0% | ±5.7 | 57.3% | ±2.0 |
| Widowed | 0.7% | ±0.6 | 0.4% | ±0.5 | 0.7% | ±0.4 |
| Divorced | 7.3% | ±1.6 | 5.2% | ±2.8 | 6.8% | ±1.1 |
| Separated | 1.9% | ±1.0 | 3.0% | ±1.7 | 2.0% | ±0.6 |
| Never married | 28.9% | ±2.8 | 29.4% | ±5.2 | 33.2% | ±2.2 |

Venezuela AR_000190

3

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Margin of Error | Texas Venezuelan Estimate | Texas Margin of Error | United States Venezuelan Estimate | United States Margin of Error |
|---|---|---|---|---|---|---|
| Female 15 years and over | 134,297 | ±8,351 | 45,083 | ±6,392 | 289,371 | ±13,414 |
| Now married, except separated | 51.3% | ±2.9 | 52.8% | ±5.2 | 51.2% | ±1.8 |
| Widowed | 5.1% | ±1.3 | 2.1% | ±1.0 | 4.3% | ±0.8 |
| Divorced | 14.9% | ±2.0 | 10.5% | ±3.9 | 13.4% | ±1.4 |
| Separated | 1.9% | ±0.9 | 2.1% | ±1.5 | 1.8% | ±0.6 |
| Never married | 26.8% | ±2.8 | 32.7% | ±4.9 | 29.4% | ±1.6 |
| SCHOOL ENROLLMENT | | | | | | |
| Population 3 years and over enrolled in school | 74,563 | ±8,448 | 28,121 | ±6,862 | 170,841 | ±11,987 |
| Nursery school, preschool | 2.8% | ±1.1 | 6.9% | ±5.5 | 4.8% | ±1.2 |
| Kindergarten | 4.7% | ±1.6 | 7.3% | ±4.5 | 5.5% | ±1.2 |
| Elementary school (grades 1-8) | 45.1% | ±4.8 | 37.6% | ±9.4 | 39.2% | ±2.5 |
| High school (grades 9-12) | 21.7% | ±3.4 | 17.9% | ±5.9 | 21.4% | ±2.2 |
| College or graduate school | 25.7% | ±4.0 | 30.3% | ±7.7 | 29.0% | ±2.4 |
| Male 3 years and over enrolled in school | 36,342 | ±4,578 | 10,919 | ±3,688 | 82,524 | ±7,150 |
| Percent enrolled in kindergarten to grade 12 | 73.5% | ±5.3 | 61.3% | ±13.3 | 69.3% | ±3.5 |
| Percent enrolled in college or graduate school | 23.7% | ±5.1 | 33.4% | ±14.7 | 26.3% | ±3.5 |
| Female 3 years and over enrolled in school | 38,221 | ±5,671 | 17,202 | ±4,723 | 88,317 | ±7,213 |
| Percent enrolled in kindergarten to grade 12 | 69.5% | ±5.2 | 63.6% | ±12.0 | 63.2% | ±3.2 |
| Percent enrolled in college or graduate school | 27.6% | ±5.2 | 28.4% | ±10.8 | 31.6% | ±3.3 |

Venezuela AR_000191

4

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Venezuelan Margin of Error | Texas Venezuelan Estimate | Texas Venezuelan Margin of Error | United States Venezuelan Estimate | United States Venezuelan Margin of Error |
|---|---|---|---|---|---|---|
| **EDUCATIONAL ATTAINMENT** | | | | | | |
| Population 25 years and over | 214,162 | ±12,858 | 68,102 | ±9,680 | 452,370 | ±20,766 |
| Less than high school diploma | 5.2% | ±1.0 | 7.8% | ±3.2 | 5.9% | ±0.7 |
| High school graduate (includes equivalency) | 14.7% | ±2.3 | 15.3% | ±3.8 | 14.9% | ±1.3 |
| Some college or associate's degree | 26.5% | ±2.2 | 16.0% | ±4.0 | 22.3% | ±1.5 |
| Bachelor's degree | 34.4% | ±2.6 | 41.2% | ±4.7 | 35.8% | ±1.7 |
| Graduate or professional degree | 19.2% | ±2.2 | 19.7% | ±4.6 | 21.1% | ±1.5 |
| High school graduate or higher | 94.8% | ±1.0 | 92.2% | ±3.2 | 94.1% | ±0.7 |
| Male, high school graduate or higher | 95.3% | ±1.3 | 90.8% | ±3.8 | 94.4% | ±1.0 |
| Female, high school graduate or higher | 94.4% | ±1.3 | 93.2% | ±3.4 | 93.8% | ±0.9 |
| Bachelor's degree or higher | 53.6% | ±2.8 | 60.9% | ±5.3 | 56.9% | ±1.8 |
| Male, bachelor's degree or higher | 53.2% | ±3.4 | 56.3% | ±8.2 | 55.7% | ±2.6 |
| Female, bachelor's degree or higher | 54.0% | ±3.5 | 64.4% | ±5.8 | 58.0% | ±2.1 |
| **FERTILITY** | | | | | | |
| Women 15 to 50 years | 89,909 | ±6,174 | 34,671 | ±5,526 | 203,422 | ±10,098 |
| Women 15 to 50 years who had a birth in the past 12 months | 5,578 | ±1,687 | 932 | ±599 | 10,323 | ±2,418 |

Venezuela AR_000192

5

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan | | Texas Venezuelan | | United States Venezuelan | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Unmarried women 15 to 50 years who had a birth in the past 12 months | 1,350 | ±937 | N | N | 2,790 | ±1,375 |
| As a percent of all women with a birth in the past 12 months | 24.2% | ±14.6 | N | N | 27.0% | ±10.1 |
| RESPONSIBILITY FOR GRANDCHILDREN UNDER 18 YEARS | | | | | | |
| Population 30 years and over | 192,494 | ±12,076 | 60,024 | ±9,181 | 402,749 | ±19,390 |
| Grandparents living with grandchild(ren) | 5.3% | ±1.4 | 0.8% | ±0.6 | 4.6% | ±0.8 |
| Grandparents responsible for grandchildren as a percentage of living with grandchildren | 7.3% | ±5.6 | N | N | 7.7% | ±4.3 |
| VETERAN STATUS | | | | | | |
| Civilian population 18 years and over | 239,967 | ±14,311 | 75,755 | ±10,444 | 512,553 | ±22,870 |
| Civilian veteran | 0.5% | ±0.2 | 0.9% | ±0.6 | 0.7% | ±0.2 |
| DISABILITY STATUS | | | | | | |
| Total civilian noninstitutionalized population | 306,942 | ±19,164 | 99,399 | ±16,050 | 657,874 | ±28,801 |
| With a disability | 4.9% | ±1.0 | 4.5% | ±1.7 | 5.3% | ±0.7 |
| Civilian noninstitutionalized population under 18 years | 67,162 | ±9,433 | 23,919 | ±7,351 | 146,132 | ±10,948 |
| With a disability | 2.8% | ±1.3 | 1.5% | ±1.6 | 3.1% | ±1.1 |

Venezuela AR_000193

Table: ACSSP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Margin of Error | Texas Venezuelan Estimate | Texas Margin of Error | United States Venezuelan Estimate | United States Margin of Error |
|---|---|---|---|---|---|---|
| Civilian noninstitutionalized population 18 to 64 years | 211,318 | ±13,080 | 70,410 | ±9,929 | 461,075 | ±20,675 |
| With a disability | 4.0% | ±0.9 | 5.0% | ±2.2 | 4.5% | ±0.7 |
| Civilian noninstitutionalized population 65 years and older | 28,462 | ±3,989 | 5,070 | ±2,060 | 50,667 | ±5,471 |
| With a disability | 16.7% | ±5.4 | 11.7% | ±7.2 | 19.2% | ±4.0 |
| RESIDENCE 1 YEAR AGO | | | | | | |
| Population 1 year and over | 305,456 | ±19,107 | 99,289 | ±15,913 | 655,783 | ±28,619 |
| Same house | 79.7% | ±2.4 | 73.4% | ±7.8 | 76.2% | ±2.0 |
| Different house in the U.S. | 17.8% | ±2.4 | 21.3% | ±7.6 | 19.9% | ±2.0 |
| Same county | 13.6% | ±2.0 | 7.8% | ±4.2 | 11.7% | ±1.3 |
| Different county | 4.2% | ±1.2 | 13.5% | ±7.4 | 8.2% | ±1.7 |
| Same state | 2.9% | ±1.0 | 9.1% | ±6.9 | 5.2% | ±1.5 |
| Different state | 1.3% | ±0.7 | 4.4% | ±4.3 | 3.0% | ±0.8 |
| Abroad | 2.5% | ±0.6 | 5.3% | ±2.1 | 3.9% | ±0.7 |
| PLACE OF BIRTH, CITIZENSHIP STATUS AND YEAR OF ENTRY | | | | | | |
| Native | 59,071 | ±6,826 | 20,979 | ±6,538 | 159,547 | ±11,066 |
| Male | 48.6% | ±4.0 | 38.3% | ±8.8 | 46.3% | ±2.4 |
| Female | 51.4% | ±4.0 | 61.7% | ±8.8 | 53.7% | ±2.4 |
| Foreign born | 248,377 | ±17,018 | 78,721 | ±12,327 | 500,084 | ±23,039 |
| Male | 46.9% | ±1.9 | 43.7% | ±3.5 | 46.8% | ±1.2 |
| Female | 53.1% | ±1.9 | 56.3% | ±3.5 | 53.2% | ±1.2 |
| Foreign born; naturalized U.S. citizen | 87,763 | ±8,460 | 27,276 | ±7,055 | 173,911 | ±12,651 |
| Male | 45.3% | ±3.1 | 42.3% | ±5.9 | 44.5% | ±2.0 |
| Female | 54.7% | ±3.1 | 57.7% | ±5.9 | 55.5% | ±2.0 |

Venezuela AR_000194

7

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan | | Texas Venezuelan | | United States Venezuelan | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Foreign born; not a U.S. citizen | 160,614 | ±14,622 | 51,445 | ±9,481 | 326,173 | ±18,573 |
| Male | 47.8% | ±2.4 | 44.4% | ±5.2 | 48.1% | ±1.6 |
| Female | 52.2% | ±2.4 | 55.6% | ±5.2 | 51.9% | ±1.6 |
| Population born outside the United States | 248,377 | ±17,018 | 78,721 | ±12,327 | 500,084 | ±23,039 |
| Entered 2010 or later | 67.0% | ±3.0 | 61.0% | ±7.1 | 64.2% | ±2.2 |
| Entered 2000 to 2009 | 16.2% | ±1.9 | 26.1% | ±6.2 | 17.8% | ±1.5 |
| Entered before 2000 | 16.8% | ±2.0 | 12.9% | ±4.1 | 18.0% | ±1.3 |
| WORLD REGION OF BIRTH OF FOREIGN BORN | | | | | | |
| Foreign-born population excluding population born at sea | 248,377 | ±17,018 | 78,721 | ±12,327 | 500,084 | ±23,039 |
| Europe | N | N | N | N | 0.3% | ±0.1 |
| Asia | N | N | N | N | 0.1% | ±0.1 |
| Africa | N | N | N | N | 0.1% | ±0.1 |
| Oceania | N | N | N | N | 0.0% | ±0.1 |
| Latin America | N | N | N | N | 99.5% | ±0.2 |
| Northern America | N | N | N | N | 0.1% | ±0.1 |
| LANGUAGE SPOKEN AT HOME AND ABILITY TO SPEAK ENGLISH | | | | | | |
| Population 5 years and over | 293,538 | ±18,566 | 92,989 | ±13,469 | 626,400 | ±27,572 |
| English only | 6.8% | ±1.2 | 7.5% | ±3.2 | 11.2% | ±1.0 |
| Language other than English | 93.2% | ±1.2 | 92.5% | ±3.2 | 88.8% | ±1.0 |
| Speak English less than "very well" | 50.5% | ±2.2 | 48.1% | ±6.0 | 45.1% | ±1.4 |
| EMPLOYMENT STATUS | | | | | | |

Table: ACSSPP1Y2021.S0201

| | Florida | | Texas | | United States | |
|---|---|---|---|---|---|---|
| | Venezuelan | | Venezuelan | | Venezuelan | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Population 16 years and over | 248,134 | ±14,572 | 77,523 | ±10,577 | 530,300 | ±22,920 |
| In labor force | 74.4% | ±2.2 | 71.2% | ±5.2 | 73.8% | ±1.6 |
| Civilian labor force | 74.3% | ±2.2 | 71.2% | ±5.2 | 73.6% | ±1.6 |
| Employed | 70.5% | ±2.2 | 66.0% | ±5.1 | 69.0% | ±1.6 |
| Unemployed | 3.8% | ±0.8 | 5.2% | ±2.2 | 4.6% | ±0.7 |
| Unemployment Rate | 5.1% | ±1.1 | 7.3% | ±3.0 | 6.3% | ±0.9 |
| Armed Forces | 0.1% | ±0.2 | 0.0% | ±0.1 | 0.2% | ±0.1 |
| Not in labor force | 25.6% | ±2.2 | 28.8% | ±5.2 | 26.2% | ±1.6 |
| Females 16 years and over | 132,636 | ±8,157 | 43,551 | ±6,172 | 284,523 | ±13,310 |
| In labor force | 66.1% | ±3.6 | 65.9% | ±6.8 | 67.0% | ±2.3 |
| Civilian labor force | 66.1% | ±3.6 | 65.9% | ±6.8 | 67.0% | ±2.3 |
| Employed | 62.1% | ±3.8 | 61.2% | ±6.6 | 62.1% | ±2.6 |
| Unemployed | 4.0% | ±1.0 | 4.7% | ±2.8 | 5.0% | ±0.9 |
| Unemployment Rate | 6.1% | ±1.5 | 7.1% | ±4.1 | 7.4% | ±1.4 |
| COMMUTING TO WORK | | | | | | |
| Workers 16 years and over | 170,934 | ±11,005 | 49,463 | ±7,056 | 357,772 | ±16,811 |
| Car, truck, or van - drove alone | 63.2% | ±2.7 | 66.9% | ±6.6 | 61.2% | ±1.8 |
| Car, truck, or van - carpooled | 14.3% | ±2.0 | 12.0% | ±4.4 | 13.0% | ±1.2 |
| Public transportation (excluding taxicab) | 1.1% | ±0.6 | 1.3% | ±1.1 | 3.5% | ±0.8 |
| Walked | 1.6% | ±1.0 | 1.7% | ±1.5 | 2.1% | ±0.6 |
| Other means | 2.0% | ±0.7 | 4.6% | ±2.8 | 2.4% | ±0.6 |
| Worked from home | 17.8% | ±1.8 | 13.5% | ±4.0 | 17.8% | ±1.3 |
| Mean travel time to work (minutes) | 26.4 | ±1.0 | 26.8 | ±2.5 | 26.8 | ±0.8 |
| OCCUPATION | | | | | | |

Venezuela AR_000196

9

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan | | Texas Venezuelan | | United States Venezuelan | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Civilian employed population 16 years and over | 174,910 | ±11,207 | 51,169 | ±7,411 | 366,058 | ±17,302 |
| Management, business, science, and arts occupations | 34.5% | ±2.5 | 33.8% | ±6.1 | 37.5% | ±1.9 |
| Service occupations | 15.8% | ±2.3 | 14.7% | ±5.0 | 15.2% | ±1.5 |
| Sales and office occupations | 24.0% | ±2.5 | 23.9% | ±4.7 | 22.9% | ±1.4 |
| Natural resources, construction, and maintenance occupations | 8.7% | ±1.6 | 6.6% | ±2.6 | 7.9% | ±1.1 |
| Production, transportation, and material moving occupations | 17.0% | ±2.4 | 21.0% | ±4.7 | 16.5% | ±1.6 |
| Male civilian employed population 16 years and over | 92,557 | ±7,155 | 24,522 | ±3,966 | 189,458 | ±9,836 |
| Management, business, science, and arts occupations | 35.0% | ±3.4 | 39.6% | ±7.5 | 37.6% | ±2.4 |
| Service occupations | 12.3% | ±2.8 | 6.5% | ±4.1 | 10.9% | ±1.8 |
| Sales and office occupations | 15.2% | ±2.6 | 11.5% | ±4.7 | 16.4% | ±1.8 |
| Natural resources, construction, and maintenance occupations | 15.8% | ±2.9 | 13.5% | ±5.3 | 14.3% | ±2.0 |
| Production, transportation, and material moving occupations | 21.7% | ±3.8 | 28.8% | ±8.0 | 20.8% | ±2.6 |
| Female civilian employed population 16 years and over | 82,353 | ±7,362 | 26,647 | ±4,610 | 176,600 | ±11,170 |
| Management, business, science, and arts occupations | 33.9% | ±3.6 | 28.4% | ±7.6 | 37.4% | ±2.7 |

Venezuela AR_000197   10

Table: ACSSPP1Y2021.S0201

| Label | Florida | | Texas | | United States | |
|---|---|---|---|---|---|---|
| | Venezuelan | | Venezuelan | | Venezuelan | |
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Service occupations | 19.8% | ±2.7 | 22.2% | ±7.5 | 19.8% | ±2.1 |
| Sales and office occupations | 33.8% | ±4.0 | 35.3% | ±7.8 | 29.9% | ±2.4 |
| Natural resources, construction, and maintenance occupations | 0.6% | ±0.5 | 0.3% | ±0.5 | 1.1% | ±0.4 |
| Production, transportation, and material moving occupations | 11.8% | ±2.4 | 13.8% | ±5.1 | 11.8% | ±1.6 |
| INDUSTRY | | | | | | |
| Civilian employed population 16 years and over | 174,910 | ±11,207 | 51,169 | ±7,411 | 366,058 | ±17,302 |
| Agriculture, forestry, fishing and hunting, and mining | 0.3% | ±0.2 | 1.4% | ±0.9 | 0.5% | ±0.2 |
| Construction | 10.5% | ±1.8 | 7.3% | ±2.5 | 8.4% | ±1.1 |
| Manufacturing | 7.2% | ±1.2 | 12.4% | ±4.0 | 8.8% | ±1.1 |
| Wholesale trade | 3.7% | ±1.0 | 2.8% | ±1.9 | 3.1% | ±0.6 |
| Retail trade | 10.7% | ±1.8 | 11.9% | ±4.2 | 11.8% | ±1.2 |
| Transportation and warehousing, and utilities | 13.0% | ±1.9 | 15.3% | ±3.5 | 11.9% | ±1.3 |
| Information | 1.5% | ±0.6 | 1.1% | ±1.3 | 2.1% | ±0.5 |
| Finance and insurance, and real estate and rental and leasing | 7.6% | ±1.3 | 3.3% | ±1.8 | 6.4% | ±0.8 |
| Professional, scientific, and management, and administrative and waste management services | 14.7% | ±1.8 | 12.9% | ±4.1 | 14.5% | ±1.2 |

Venezuela_AR_000198   11

Table: ACSSPP1Y2021.S0201

| Label | Florida | | Texas | | United States | |
|---|---|---|---|---|---|---|
| | Venezuelan | | Venezuelan | | Venezuelan | |
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Educational services, and health care and social assistance | 13.5% | ±1.9 | 16.3% | ±4.1 | 15.7% | ±1.4 |
| Arts, entertainment, and recreation, and accommodation and food services | 11.8% | ±2.0 | 10.4% | ±4.6 | 10.4% | ±1.2 |
| Other services (except public administration) | 4.6% | ±1.2 | 4.5% | ±2.1 | 4.9% | ±0.7 |
| Public administration | 1.0% | ±0.4 | 0.3% | ±0.3 | 1.5% | ±0.4 |
| CLASS OF WORKER | | | | | | |
| Civilian employed population 16 years and over | 174,910 | ±11,207 | 51,169 | ±7,411 | 366,058 | ±17,302 |
| Private wage and salary workers | 83.0% | ±1.9 | 80.1% | ±5.2 | 82.9% | ±1.5 |
| Government workers | 5.3% | ±1.2 | 10.2% | ±3.5 | 7.3% | ±1.0 |
| Self-employed workers in own not incorporated business | 11.2% | ±2.0 | 9.7% | ±3.5 | 9.6% | ±1.2 |
| Unpaid family workers | 0.4% | ±0.3 | 0.0% | ±0.5 | 0.2% | ±0.1 |
| INCOME IN THE PAST 12 MONTHS (IN 2021 INFLATION-ADJUSTED DOLLARS) | | | | | | |
| Households | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| Median household income (dollars) | 64,048 | ±5,273 | 63,866 | ±11,177 | 66,615 | ±3,622 |
| With earnings | 93.1% | ±1.7 | 89.1% | ±6.2 | 93.1% | ±1.3 |
| Mean earnings (dollars) | 86,522 | ±7,813 | 94,313 | ±9,726 | 91,395 | ±4,423 |

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan | | Texas Venezuelan | | United States Venezuelan | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| With Social Security income | 11.2% | ±2.3 | 7.5% | ±3.7 | 9.5% | ±1.2 |
| Mean Social Security income (dollars) | 12,233 | ±1,644 | 15,591 | ±4,440 | 14,417 | ±1,491 |
| With Supplemental Security Income | 4.1% | ±1.2 | N | N | 3.6% | ±0.8 |
| Mean Supplemental Security Income (dollars) | 9,214 | ±2,389 | 6,705 | ±2,955 | 8,194 | ±1,479 |
| With cash public assistance income | 4.9% | ±1.0 | 7.8% | ±4.2 | 5.5% | ±0.9 |
| Mean cash public assistance income (dollars) | 5,010 | ±1,385 | 6,120 | ±2,122 | 5,834 | ±1,393 |
| With retirement income | 4.5% | ±1.3 | 6.7% | ±3.7 | 6.7% | ±1.1 |
| Mean retirement income (dollars) | 16,341 | ±3,948 | 8,336 | ±2,929 | 16,824 | ±2,894 |
| With Food Stamp/SNAP benefits | 10.8% | ±2.3 | 7.4% | ±4.3 | 8.4% | ±1.3 |
| Families | 82,063 | ±5,349 | 24,911 | ±4,020 | 167,310 | ±8,434 |
| Median family income (dollars) | 66,388 | ±4,450 | 75,183 | ±26,615 | 71,465 | ±5,696 |
| Married-couple family | 70.6% | ±3.9 | 79.5% | ±6.3 | 72.3% | ±2.4 |
| Median income (dollars) | 75,047 | ±5,412 | 91,109 | ±22,712 | 81,663 | ±3,538 |
| Male householder, no spouse present, family | 10.3% | ±2.7 | 7.1% | ±3.5 | 9.6% | ±1.7 |
| Median income (dollars) | 49,028 | ±11,230 | 46,855 | ±29,759 | 49,939 | ±4,368 |
| Female householder, no husband present, family | 19.0% | ±3.0 | 13.4% | ±5.3 | 18.1% | ±1.8 |
| Median income (dollars) | 47,494 | ±5,693 | 15,802 | ±9,614 | 45,224 | ±4,664 |
| Individuals | 307,448 | ±19,189 | 99,700 | ±16,021 | 659,631 | ±28,793 |

**data.census.gov** | Measuring America's People, Places, and Economy

Venezuela AR_000200   13

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Venezuelan Margin of Error | Texas Venezuelan Estimate | Texas Venezuelan Margin of Error | United States Venezuelan Estimate | United States Venezuelan Margin of Error |
|---|---|---|---|---|---|---|
| Per capita income (dollars) | 29,552 | ±2,538 | 28,165 | ±4,188 | 31,190 | ±1,612 |
| With earnings for full-time, year-round workers: | | | | | | |
| Male | 68,150 | ±5,878 | 20,787 | ±3,702 | 140,577 | ±8,664 |
| Female | 52,792 | ±5,595 | 13,880 | ±3,210 | 109,585 | ±8,262 |
| Mean earnings (dollars) for full-time, year-round workers: | | | | | | |
| Male | 66,115 | ±6,487 | 79,340 | ±12,581 | 71,971 | ±4,838 |
| Female | 49,572 | ±9,588 | 40,874 | ±5,842 | 51,434 | ±4,969 |
| Median earnings (dollars) full-time, year-round workers: | | | | | | |
| Male | 42,470 | ±4,415 | 51,881 | ±19,448 | 47,867 | ±3,307 |
| Female | 35,883 | ±2,828 | 33,063 | ±5,048 | 37,832 | ±2,630 |
| HEALTH INSURANCE COVERAGE | | | | | | |
| Civilian noninstitutionalized population | 306,942 | ±19,164 | 99,399 | ±16,050 | 657,874 | ±28,801 |
| With private health insurance | 75.0% | ±2.3 | 64.0% | ±7.4 | 70.6% | ±1.9 |
| With public coverage | 16.2% | ±1.9 | 17.8% | ±5.4 | 18.9% | ±1.4 |
| No health insurance coverage | 13.2% | ±1.7 | 20.8% | ±4.0 | 15.2% | ±1.2 |
| POVERTY RATES FOR FAMILIES AND PEOPLE FOR WHOM POVERTY STATUS IS DETERMINED | | | | | | |
| All families | 8.8% | ±2.7 | 19.9% | ±7.8 | 11.4% | ±2.1 |

Venezuela AR_000201   14

Table: ACSSPP1Y2021.S0201

| Label | Florida | | Texas | | United States | |
|---|---|---|---|---|---|---|
| | Venezuelan | | Venezuelan | | Venezuelan | |
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| With related children of the householder under 18 years | 10.5% | ±3.8 | 29.6% | ±13.0 | 13.4% | ±3.2 |
| With related children of the householder under 5 years only | 14.4% | ±8.7 | 79.2% | ±27.0 | 20.9% | ±10.4 |
| Married-couple family | 7.3% | ±2.7 | 12.9% | ±9.0 | 8.2% | ±2.1 |
| With related children of the householder under 18 years | 8.0% | ±3.4 | 21.9% | ±15.4 | 9.1% | ±3.1 |
| With related children of the householder under 5 years only | 13.1% | ±9.3 | 74.5% | ±37.3 | 18.0% | ±12.3 |
| Female householder, no spouse present, family | 16.5% | ±7.9 | 61.8% | ±21.6 | 23.3% | ±5.5 |
| With related children of the householder under 18 years | 22.1% | ±11.7 | 65.1% | ±27.7 | 31.0% | ±8.3 |
| With related children of the householder under 5 years only | 34.8% | ±28.4 | 100.0% | ±35.7 | 52.0% | ±20.5 |
| All people | 10.5% | ±2.1 | 19.1% | ±7.4 | 12.6% | ±1.9 |
| Under 18 years | 10.7% | ±4.2 | 27.2% | ±14.8 | 13.2% | ±3.6 |
| Related children of the householder under 18 years | 10.1% | ±4.1 | 27.2% | ±14.8 | 12.9% | ±3.6 |
| Related children of the householder under 5 years | 6.8% | ±5.5 | 53.4% | ±33.7 | 16.7% | ±9.9 |
| Related children of the householder 5 to 17 years | 10.9% | ±4.8 | 16.7% | ±13.3 | 11.8% | ±3.3 |
| 18 years and over | 10.4% | ±2.0 | 16.5% | ±5.6 | 12.4% | ±1.7 |

Venezuela AR_000202   15

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Florida Venezuelan Margin of Error | Texas Venezuelan Estimate | Texas Venezuelan Margin of Error | United States Venezuelan Estimate | United States Venezuelan Margin of Error |
|---|---|---|---|---|---|---|
| 18 to 64 years | 9.1% | ±1.8 | 16.5% | ±5.8 | 11.9% | ±1.7 |
| 65 years and over | 19.8% | ±7.6 | 17.0% | ±11.9 | 16.9% | ±4.6 |
| People in families | 8.3% | ±2.3 | 19.0% | ±8.4 | 10.6% | ±2.0 |
| Unrelated individuals 15 years and over | 27.7% | ±4.4 | 19.5% | ±9.0 | 25.1% | ±3.3 |
| HOUSING TENURE | | | | | | |
| Occupied housing units | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| Owner-occupied housing units | 38.4% | ±3.2 | 36.6% | ±7.2 | 38.3% | ±2.1 |
| Renter-occupied housing units | 61.6% | ±3.2 | 63.4% | ±7.2 | 61.7% | ±2.1 |
| Average household size of owner-occupied unit | 3.10 | ±0.17 | 3.07 | ±0.29 | 3.15 | ±0.10 |
| Average household size of renter-occupied unit | 2.95 | ±0.12 | 2.92 | ±0.29 | 2.83 | ±0.08 |
| UNITS IN STRUCTURE | | | | | | |
| Occupied housing units | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| 1-unit, detached or attached | 41.1% | ±3.2 | 46.5% | ±7.1 | 43.1% | ±2.3 |
| 2 to 4 units | 7.8% | ±2.1 | 7.4% | ±3.9 | 9.5% | ±1.4 |
| 5 or more units | 50.4% | ±3.3 | 45.7% | ±7.1 | 46.8% | ±2.4 |
| Mobile home, boat, RV, van, etc. | 0.7% | ±0.5 | 0.4% | ±0.7 | 0.6% | ±0.3 |
| YEAR STRUCTURE BUILT | | | | | | |
| Occupied housing units | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| Built 2020 or later | 1.6% | ±0.7 | 3.3% | ±3.0 | 2.4% | ±0.8 |
| Built 2010 to 2019 | 23.2% | ±3.5 | 40.1% | ±8.5 | 22.7% | ±2.3 |
| Built 2000 to 2009 | 19.0% | ±2.7 | 20.0% | ±5.9 | 17.1% | ±1.8 |
| Built 1980 to 1999 | 32.2% | ±3.0 | 20.9% | ±4.7 | 28.2% | ±1.8 |

Venezuela AR_000203   16

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan | | Texas Venezuelan | | United States Venezuelan | |
|---|---|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error | Estimate | Margin of Error |
| Built 1960 to 1979 | 18.6% | ±2.9 | 13.0% | ±3.4 | 18.0% | ±1.8 |
| Built 1940 to 1959 | 4.5% | ±1.1 | 1.8% | ±1.4 | 6.5% | ±1.0 |
| Built 1939 or earlier | 0.9% | ±0.6 | 0.9% | ±0.9 | 5.0% | ±0.9 |
| VEHICLES AVAILABLE | | | | | | |
| Occupied housing units | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| None | 4.3% | ±1.4 | 3.9% | ±2.0 | 7.6% | ±1.3 |
| 1 or more | 95.7% | ±1.4 | 96.1% | ±2.0 | 92.4% | ±1.3 |
| HOUSE HEATING FUEL | | | | | | |
| Occupied housing units | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| Gas | 4.3% | ±1.3 | 34.3% | ±7.1 | 28.7% | ±1.9 |
| Electricity | 87.3% | ±2.2 | 62.6% | ±7.3 | 65.3% | ±2.2 |
| All other fuels | 0.5% | ±0.4 | 2.4% | ±2.5 | 1.4% | ±0.5 |
| No fuel used | 8.0% | ±1.6 | 0.7% | ±0.8 | 4.6% | ±0.8 |
| SELECTED CHARACTERISTICS | | | | | | |
| Occupied housing units | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| No telephone service available | 1.1% | ±0.6 | N | N | 1.0% | ±0.4 |
| 1.01 or more occupants per room | 10.1% | ±2.2 | 17.1% | ±5.3 | 10.7% | ±1.6 |
| SELECTED MONTHLY OWNER COSTS AS A PERCENTAGE OF HOUSEHOLD INCOME IN THE PAST 12 MONTHS | | | | | | |
| Housing units with a mortgage (excluding units where SMOC cannot be computed) | 24,313 | ±3,632 | 9,824 | ±2,397 | 60,426 | ±5,828 |
| Less than 30 percent | 57.4% | ±6.1 | 79.5% | ±10.0 | 67.8% | ±4.2 |
| 30 percent or more | 42.6% | ±6.1 | 20.5% | ±10.0 | 32.2% | ±4.2 |

Venezuela AR_000204   17

Table: ACSSPP1Y2021.S0201

| Label | Florida Venezuelan Estimate | Margin of Error | Texas Venezuelan Estimate | Margin of Error | United States Venezuelan Estimate | Margin of Error |
|---|---|---|---|---|---|---|
| **OWNER CHARACTERISTICS** | | | | | | |
| Owner-occupied housing units | 37,824 | ±4,043 | 11,622 | ±2,677 | 81,937 | ±6,062 |
| Median value (dollars) | 344,400 | ±20,816 | 322,000 | ±29,942 | 344,700 | ±12,690 |
| Median selected monthly owner costs with a mortgage (dollars) | 2,045 | ±135 | 2,063 | ±307 | 2,035 | ±91 |
| Median selected monthly owner costs without a mortgage (dollars) | 764 | ±61 | 948 | ±389 | 776 | ±57 |
| **GROSS RENT AS A PERCENTAGE OF HOUSEHOLD INCOME IN THE PAST 12 MONTHS** | | | | | | |
| Occupied units paying rent (excluding units where GRAPI cannot be computed) | 58,568 | ±4,306 | 17,213 | ±3,082 | 124,624 | ±6,488 |
| Less than 30 percent | 38.8% | ±5.0 | 47.9% | ±9.7 | 40.5% | ±3.7 |
| 30 percent or more | 61.2% | ±5.0 | 52.1% | ±9.7 | 59.5% | ±3.7 |
| **GROSS RENT** | | | | | | |
| Occupied units paying rent | 59,345 | ±4,259 | 19,709 | ±3,683 | 128,505 | ±6,836 |
| Median gross rent (dollars) | 1,674 | ±52 | 1,329 | ±126 | 1,583 | ±42 |
| **COMPUTERS AND INTERNET USE** | | | | | | |
| Total households | 98,491 | ±5,319 | 31,774 | ±4,454 | 213,838 | ±9,364 |
| With a computer | 99.4% | ±0.4 | 99.8% | ±0.4 | 99.1% | ±0.3 |
| With a broadband Internet subscription | 92.8% | ±2.0 | 96.0% | ±2.4 | 94.4% | ±1.1 |

Venezuela AR_000205    18



# Joint Brief on Mass Maritime Migration

UNCLASSIFIED//For Official Use Only

Venezuela_AR_000206

# Current Situation



**Data Current As of: 12 August**

**Data includes all nationalities:**
Primary:
• Haiti
• Cuba
• Dominican Republic

**AOR Total**

138% ⬆ in FY22(YTD) from FY21
FY22 (YTD) Total Flow – 24,966
*FY21 Total Flow – 10,489*

437% ⬆ over previous five year average
*FY16-FY21 Average – 4,645*

**Eastern Caribbean**

308% ⬆ in FY22(YTD) from FY21
1,256% ⬆ over FY16-FY21 Average

*FY22 (YTD) Total Flow – 339*
*FY21 Total Flow – 83*
*FY16-FY21 Average – 25*

**Mona Passage**

35% ⬆ in FY22(YTD) from FY21
200% ⬆ over FY16-FY21 Average

*FY22 (YTD) Total Flow – 4,674*
*FY21 Total Flow – 3,470*
*FY16-FY21 Average – 1,550*

**North Florida Straits**

27% ⬇ in FY22(YTD) from FY21
35% ⬆ over FY-16-FY21 Average

*FY22 (YTD) Total Flow – 747*
*FY21 Total Flow – 1,027*
*FY16-FY21 Average – 550*

**Windward Pass**

188% ⬆ in FY22(YTD) from FY21
485% ⬆ over FY16-FY21 Average

*FY22 (YTD) Total Flow – 13,157*
*FY21 Total Flow – 4,573*
*FY16-FY21 Average – 2,250*

**South Florida Straits**

357% ⬆ in FY22(YTD) from FY21
2,118% ⬆ over FY16-FY21 Average

*FY22 (YTD) Total Flow – 5,988*
*FY21 Total Flow – 1,311*
*FY16-FY21 Average – 270*

**Yucatan**

*FY22 (YTD) Total Flow – 61*
*FY21 Total Flow – 00*

**Data Explanation:** *Total Flow is based on USCG, Partner Agency, and Partner Nation reports of migrant cases. Additionally when a landing occurs but no apprehensions are made an average is applied based on the vector (i.e. 09 CUB in the S. FL Straits or 19 DOM in the Mona).*

Venezuela AR 000207

UNCLASSIFIED//For Official Use Only







# Task Force Director's Risk Calculus

## Jul-Aug 2021 vs Jul-Aug 2022

### Force Laydown

**Migrant Flow**

| 2021 | 1,397 (175/wk) |
| 2022 | 3,319 (474/wk) |

+140%

1 Large Cutter + 2 Patrol Boats → +2 +5 → 3 Large Cutters + 7 Patrol Boats

1 Fixed Wing → +1 +2 → 2 Fixed Wing + 2 MH-60

*Includes all Caribbean migrant vectors*



## Operational Commander Considerations

1. Repatriation ability
2. Available deck capacity (based on saturation level on all cutters)
3. # ventures detected
4. Landings
5. Regional Weather/Sea State
6. Tropical Weather Outlook
7. Push factors (socio-economic conditions, surges in violence)
8. Pull factors (perceived US policy, diaspora influence)
9. Indications & warning
10. MOC capacity

### Key Takeaways

- Decisions to increase force laydown are driven by an aggregate of these considerations. There is no single indicator that signals that a mass migration is imminent.

- Although current maritime migration flow is not nearly the volume being observed on the Southwest Border, the dynamic environment and ever-present hazards **make this a higher-consequence mission with far greater possibilities for serious injuries and the loss of life.**

- Increasing our posture by transitioning to **OVS Phase 1B brings additional resources** to this mission while **providing structure** to the surge of forces that has been in place since March 2022.

Venezuela_AR_000209

3

UNCLASSIFIED//For Official Use Only



# DoD Support and Integration

- Use of Naval Station Guantanamo Bay (NSGB) **prior to** a Presidentially declared mass migration event

  ➢ Provide location for Migrant Operations Center (MOC)

  ➢ Provide services (meals, water, housing, transportation) on a **reimbursable basis**

- Use of Naval Station Guantanamo Bay (NSGB) **following** a Presidentially declared mass migration event

  ➢ Provide services (meals, water, housing, transportation) on a **non-reimbursable basis**

- Upon an approved Request for Assistance (RFA), DoD can provide support (naval forces) to USCG for the maritime interdiction of migrants.

**DHS and DOS share the responsibility for migrant processing both prior to and after a Presidentially declared mass migration.**

UNCLASSIFIED//For Official Use Only

Venezuela_AR_000210





# Integrated DHS-DoD Preparation & Response







# DoD Migration Camp Capacities



**Increased Risk** ←→ **Decreased Capacity**

AOD risk: Physical terrain limitations

AOD risk: medical (COVID and non-COVID) and physical protection factors

Stressed Infrastructure: 35k*

Risk: NSGB infrastructure stress (water, power, sewage)

29,750 migrants (max planning factor)

NSGB Infrastructure: 29,750 + 9K JTF (~38K)

~25% decrement (COVID)

COVID Mitigation: ~22.3K

~7-10% decrement (by nationality)

COVID Mitigation + Nationality: ~20K

~7-10% decrement (by category)

COVID Mitigation + Nationality + Categories : ~18K

**Total:**
- ~39,000 migrants based only on tent/land space
- ~29,750 migrants based on NSGB Infrastructure/Support capacity

Golf Course ~11,000
McCalla ~11,000
Windward
Phillips ~4,000
Leeward
Leeward South ~13,000

**NSGB camp capacities depend on several factors:: composition of migrants + infrastructure + physical terrain. 29,750 is the "max camp service capacity before degradation".**

CUI

Venezuela AR_000212





# Readiness Lines of Effort

**Planning Efforts**
- DoD's Caribbean Maritime Mass Migration Plan Reviews
- DoD Component Support Plan for Caribbean Maritime Mass Migration Review

**Exercises**
- DHS UNIFIED SUPPORT 21
- DoD Tabletop Exercise
- DoD-led Interagency Rehearsal of Concept (ROC) Drill
- Naval Station Guantanamo Bay Migrant Operations Exercise
- HSTF-SE Incident Command Post Functional Exercise
- Senior Leader Seminar

**Real World Response**
- Haiti Earthquake Response

**Assessments**
- Joint Assessment of HTI Coast Guard
- DoD Assessment of ability to implement JTF-MIGOPS (focus upon COVID impacts)

**Upcoming**
- Joint Staff Contingency Sourcing Assessment
- SOUTHCOM Sustainment ROC Drill
- Engineer Exercise on GTMO

**Caribbean Maritime Migration plans are coordinated and regularly exercised.**

**UNCLASSIFIED**

Venezuela AR_000213

v.12

7



# Challenges & Mitigation

## Challenges

- At-sea migrant holding capacity threshold (saturation) depends on the type and number of surface assets assigned and on station.

- Resources drawn from other missions via appropriate risk management.

- HUMINT in Haiti is extremely limited due to persistent security threat posed by gang activity; results in significant intelligence gap.

- Detection of migrant ventures via ISR without prior cueing.

- Repatriations to Haiti are currently limited only to Cap Haitien.

## Mitigation – Current & Next Steps

- USCG has surged cutters by repurposing from JIATFS counter drug patrols, and domestic fisheries patrols to increase surface asset capacity in migrant vectors.

- Continue to conduct exercises & readiness activities.

- Pre-script RFAs – HSTF-SE will advance these to JTF-E.

- Continued interagency / NSC support for a whole of government approach to detect, deter, and respond to maritime migration.

UNCLASSIFIED//For Official Use Only



# DoD – DHS Drawdown Plan

*DoD and DHS have developed a plan to ensure that DHS can maintain current capacity without DoD support*

## CURRENT STATE

- DoD and DHS seeking to responsibly reduce reliance on DoD resources needed to fill current DHS capability gaps
- DHS faces challenges processing record levels of migration with unclear financial support from Congress and OMB
- Drawdown plan faces severe obstacles without additional support

## EXISTING GAPS

- Historically, DHS has depended on DoD to provide support across:
  - Detection and monitoring
  - Aviation
  - Analysis

## DRAWDOWN PLAN OBJECTIVES

- ✓ Increase DHS capability and capacity to secure and manage the Southwest Border
- ✓ Responsibly reduce reliance on DoD personnel and resources
- ✓ Conclude the Southwest Border security support mission by the end of FY 24 if supported by a joint risk assessment

## ASSUMPTIONS

- Common goal between departments to responsibly reduce CBP's reliance on DoD to mitigate capability gaps
- Migration activity has increased significantly and is expected to remain high for the foreseeable future
- DoD support is not military unique but rather mitigates DHS current capacity shortfalls
- DoD and DHS will not have the authority to order members of the Ready Reserve to active duty, without the consent of the member, after FY 2023 orders expire

## DRAWDOWN PLAN APPROACH

### Increase DHS personnel to address mission needs

- ✓ Frontload recruitment efforts and lean forward when possible in the hiring process
- ✓ Explore use of rehired annuitant programs to reduce onboarding learning curve
- ✓ Increase throughput in the federal hiring process by ramping up contract support
- ✓ Expand use of DoD to DHS pipeline programs

### Acquire innovative technologies to resolve capability gaps

- ✓ Leverage autonomous capabilities to improve resource allocation
- ✓ Implement AI and advanced analytics to reveal operational insights and anticipate events
- ✓ Enhance sensor and data capabilities to increase issue detection and resolution
- ✓ Improve communications to enable shared situational awareness

### Partner with DoD to leverage experience, equipment, and programs

- ✓ Mitigate capability gaps in areas where DHS has depended on DoD to provide support, including
  - Camera operations, mobile surveillance
  - All-source video analysis, geospatial analysis
  - 12,500 annual flight hours

Venezuela AR_000215

This document contains pre-decisional and/or deliberative process information

# DoD – DHS Drawdown Plan (cont.)

*It is highly unlikely that DHS will receive any funding before spring 2024 when the FY 24 budget is enacted. At enactment there will be a lag to get technology and staffing in place. Furthermore, DHS may require additional funding along the extended timeline required for this plan. DHS will mitigate those costs by reprogramming resources from across the department unless supplemental funding is provided. Ultimately, DHS aims to upgrade and expand capabilities beyond what is presented here.*

## CRITICAL INVESTMENTS

**UPON RECEIPT OF OMB PASSBACK**
Budget Roll-out Materials
Agency specific OMB FY2024 President's Budget Rollout Materials.

**MARCH**
Reassessment and Contingency Plan
Assess FY2023 budget impacts on mitigation plans

**APRIL/MAY**
Congressional Hearings and Committee Engagement
Budget briefings and additional engagements

**MAY/JUNE**
Risk Management Plan based on FY23 Indicators
Assess risks based on committee interactions and potential marks

**JULY/AUGUST**
Budget Reassessment based on Mark ups
Update drawdown plan and risk mitigation plan based on mark-ups

## NEXT STEPS

1. Assess the impact of the FY23 budget once released by Congress

2. Develop contingency plans for the current record-breaking migration trends

3. Continue DHS and DoD advocacy for the FY24 DHS Budget Request through appropriate channels

4. Begin execution of forward-leaning Technology and Human Capital Plan activities to the extent possible

5. Maintain open lines of communication between DHS and DoD and assess plans as FY24 information becomes available

## KEY RISKS TO EXECUTION

- Lack of Office of Management and Budget (OMB) and Congressional support for FY24 budget request would drastically effect gap mitigation strategies that rely on an influx of FY24 funding

- Record levels of migration in FY22 have resulted in unprecedented workload for CBP personnel

- Executive Order requiring full vaccination could result in a reduction in the number of qualified personnel available to support the mission

- Funding uncertainty limits DHS' ability to lean forward on planning activities

Venezuela_AR_00008





# DoD – DHS Current Operational Picture

*DoD support to the DHS mission along the U.S Southwest Border is expected to conclude by FY24. In response, DHS is developing a Drawdown Plan to increase capability and reduce reliance on DoD personnel and resources for detection and monitoring, analysis, and aviation.*

## POTENTIAL IMPACTS FACING DHS

*As DoD support draws back by FY24, the following impacts face execution of the DHS mission if capability gaps are not addressed.*

**Loss of 1,417 Personnel**

Reducing law enforcement capability along the Southwest Border, where migration activity is expected to remain high

**~50% Reduction in Aviation Capability**

Leading to a significant gap in flight hours necessary to gathering intelligence on populations arriving to the Southwest Border

**100 MSCs and 33 Camera Room Operations Unattended**

Diminishing situation awareness as available technology is unused due to loss of personnel

## DETAILED OVERVIEW OF DoD SUPPORT

Venezuela_AR_000217

# Scenario 1 – Full Budgetary Support

DHS will require $593 Million in newly appropriated resources in FY24 to provide CBP with the investments needed to avoid gaps resulting from DoD's drawdown.

## Critical Investments with Full Budgetary Support

DHS will address capability gaps by making critical technical and human capital investments in the following areas:

Distribution of allocated technology will need to remain fluid and dynamic to support current activity and irregular migration levels.



**Nationwide Resources**

**Decisional Considerations**

*Resources may also be placed based on:*

1. Areas with heaviest encounters, give-ups vs. actively avoiding apprehension

2. Empirical data on got-away traffic and areas

3. Replacing DoD on a one for one technology swap

**Expected Impacts**

Mitigate the loss of DoD support by investing in additional personnel and frontloading recruitment efforts

Modernize CBP technologies and serve as a force multiplier for CBP agents and officers that will increase domain and situational awareness across all borders

Ability to leverage existing capabilities and address necessary fixes to MSCs as needed

# Scenario 2 – Partial Budgetary Support

*If only partial funding is received, DHS will use a prioritized approach to ensure that the most critical needs to mitigate gaps resulting from DoD's drawdown are met.*

Critical Investments with Partial Budgetary Support

**USBP**
**Personnel**
**and**
**Support Positions**

**AMO Agents and Flight Hours**
**OFO Officers and Specialists**

***First priority***
- Human capital is irreplaceable in border security functions.
- The DoD drawdown will have a heavier impact on USBP.
- Continued hiring and fulfillment of agents, officers, contractors, and support personnel is vital to keep up with attrition rates and maintain the manpower requirement.
- USBP is set to lose 1,254 soldiers currently assigned to border missions under the FY 2023 RFA, compared to 51 soldiers assigned to OFO and none to AMO.

**Operation and Sustainment of Existing Technologies**

***Second priority***
- Including COP, SAMSON and TAK.
- Additionally, DHS intends to use **$55M**, depending on the fully appropriated amount, to reimburse DoD for air support hours.

**Procurement, Construction and Improvements of Technology**

***Third priority***
- Emphasizing Integrated Surveillance Towers (IST), Ground Sensor Technologies, and Common Operating Picture (COP).



**Explanation of the Decision to Terminate the Migrant Protection Protocols**

October 29, 2021

I.      Executive Summary ................................................................................ 2

II.     Background ............................................................................................ 3

  A.    MPP's Statutory Basis and Implementation .................................... 5

  B.    Prior Evaluations of MPP ................................................................ 7

  C.    Litigation Regarding the Prior Implementation of MPP.................. 9

  D.    Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP ................................................................................ 10

  E.    Challenge to the Suspension and Termination................................ 10

III.    Evaluation of MPP .............................................................................. 11

  A.    Conditions for Migrants in Mexico ............................................... 12

  B.    *Non-Refoulement* Concerns ........................................................... 14

  C.    Access to Counsel, Notice of Hearings, and Other Process Concerns ......................... 16

  D.    Impacts of MPP on Immigration Court Appearance Rates and Outcomes ................. 18

  E.    MPP and Recidivist Irregular Re-Entries ...................................... 21

  F.    Investments and Resources Required to Operate MPP.................... 22

  G.    Impact of MPP and its Termination on SWB Migration Flows ..................... 23

  H.    Addressing the Concerns of States and Border Communities ....................... 24

  I.    Relationship between Implementation of MPP and Statutory Mandates ..................... 26

  J.    Impact on U.S.-Mexico Relationship.............................................. 29

IV.     The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management........................................................................................ 30

  A.    Managing Flows .............................................................................. 31

  B.    Managing Asylum Claims ............................................................... 34

    1.  Dedicated Docket ........................................................................ 34

    2.  Asylum Officer Rule .................................................................... 35

V.      Consideration of Alternatives to Terminating MPP........................... 36

VI.     Conclusion........................................................................................... 38

## I.   <u>Executive Summary</u>

On February 2, 2021, President Biden issued an Executive Order directing the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."[1]  After extensive review, the Secretary of Homeland Security concluded that the Migrant Protection Protocols (MPP) should be terminated, and on June 1, 2021, issued a memorandum to that effect.[2]  On August 13, 2021, however, the U.S. District Court for the Northern District of Texas determined that the June 1, 2021, memorandum was not issued in compliance with the Administrative Procedure Act (APA) and caused DHS to violate 8 U.S.C. § 1225, vacated the memorandum, and remanded it to the Department for further consideration.  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA"—a ruling that the government is vigorously appealing.

Pursuant to the Texas court's remand, and in continuing compliance with the President's direction in the Executive Order, the Secretary has considered anew whether MPP should be maintained, terminated, or modified in a variety of different ways.  After carefully considering the arguments, evidence, and perspectives of those who support continuing to use MPP, those who support terminating the program, and those who have argued for the use of MPP with modifications, the Secretary has determined that MPP should be terminated.  In reaching this conclusion, the Secretary recognizes that MPP likely contributed to reduced migratory flows.  But it did so by imposing substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico.  The Biden-Harris Administration, by contrast, is pursuing a series of policies that will disincentivize irregular migration while incentivizing safe, orderly, and humane pathways.  These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced.  It is also a nation of immigrants.  This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture.  MPP is neither the best, nor the preferred, strategy for achieving either of these goals.  Significant evidence indicates that individuals were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited from putting migrants in harms' way while awaiting their court hearings in Mexico.  It is possible that some of these humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.

---

[1] Exec. Order No. 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[2] Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) [hereinafter June 1 Memo].

Venezuela AR_000221

Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

Importantly, as the Secretary has emphasized, the management of migratory flows is a shared responsibility among all countries in the hemisphere.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader, and more enduring, solutions.  Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.

Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program—the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systemically tackle the problem of irregular migration and protect our border.  Moreover, the personnel required to adequately screen MPP enrollees, potentially multiple times—to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases—pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.

Having assessed the benefits and costs of the previous implementation of MPP as well as how the program could potentially be improved, the Secretary has concluded that there are inherent problems with the program—including the vulnerability of migrants to criminal networks, and the challenges associated with accessing counsel and courts across an international border—that resources cannot sufficiently fix.  Others cannot be addressed without detracting from other key Administration priorities.  It is thus the Secretary's judgment that the benefits of MPP are far outweighed by the costs of the program, in whatever form.

As a result, for the many reasons described in what follows, the Secretary in a memorandum issued today entitled, "Termination of the Migrant Protection Protocols," has decided to terminate MPP.[3]  This determination will be implemented as soon as practicable after a final judicial decision to vacate the Texas injunction that currently requires good-faith enforcement of MPP.

## II.    Background

On January 25, 2019, Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols."  On January 20, 2021, Acting Secretary David Pekoske issued a memorandum temporarily suspending new enrollments into the Migrant Protection Protocols (MPP) pending

---

[3] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Sec., *Termination of the Migrant Protection Protocols* (Oct. 29, 2021).

3

further review.[4]  Two weeks later, on February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.[5]  In this Executive Order, President Biden directed the Secretary of Homeland Security to "promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols" and "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[6]  In response, Secretary Mayorkas initiated a comprehensive review of MPP.  The Secretary, in conjunction with other agencies, also implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and certain of their immediate family members for proceedings.[7]

At the conclusion of his review, on June 1, 2021, Secretary Mayorkas issued a memorandum announcing and explaining his determination that MPP should be terminated (the "June 1 Memorandum").[8]  On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 Memorandum did not reflect reasoned decision-making and thus was not issued in compliance with the Administrative Procedure Act (APA), and that the memorandum caused the Department to violate detention provisions found in 8 U.S.C. § 1225.[9]  The court vacated the June 1 Memorandum in its entirety and remanded it to the Department of Homeland Security (DHS) for further consideration.[10]  The court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA."[11]  The government is complying with that injunction while appealing the decision.

Pursuant to the district court's remand, and consistent with the President's direction in EO 14010, the Secretary has considered anew whether MPP should be maintained, terminated, or modified.  This memorandum sets forth the results of that analysis and the basis for the Secretary's decision to terminate MPP by way of a separate memorandum being issued today.  The Secretary's memorandum immediately supersedes and rescinds the June 1 Memorandum, as well as Secretary Nielsen's January 25, 2019 memorandum and any other guidance or other documents prepared by the Department to implement it.  The Secretary's decision to terminate

---

[4] Memorandum from David Pekoske, Acting Sec'y of Homeland Sec., *Suspension of Enrollment in the Migrant Protection Protocol Program* (Jan. 20, 2021) [hereinafter MPP Suspension Memorandum].

[5] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[6] *Id.* at 8270.

[7] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[8] *See supra* note 2.

[9] *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021), *appeal pending*, No. 21-10806 (5th Cir. filed Aug. 16, 2021).

[10] *Id.* at *27.

[11] *Id.* (emphasis in original).

4

MPP is to be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction that currently requires good faith implementation and enforcement of MPP.

A.  <u>MPP's Statutory Basis and Implementation</u>

Enacted in 1996, Section 235(b)(2)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(2)(C), grants DHS discretionary authority to return to Mexico or Canada certain noncitizens who are arriving on land from those contiguous countries pending their removal proceedings before an immigration judge under Section 240 of the INA, 8 U.S.C. § 1229a.  Historically, DHS and the legacy Immigration and Naturalization Service (INS) used this discretionary authority on a case-by-case basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry; occasionally, the provision also was used for third-country nationals under certain circumstances provided they did not have a fear of persecution or torture related to return to Canada or Mexico.[12]  On December 20, 2018, the Department announced a decision to initiate MPP—a novel programmatic implementation of Section 235(b)(2)(C)—along the Southwest Border (SWB).  That same day, Mexico announced its independent decision to accept those returned to Mexico through the program—a key precondition to implementation.[13]

At the time of its initial announcement, DHS stated that the program was intended to: (1) reduce unlawful migration and false claims of asylum; (2) ensure that migrants are not able to "disappear" into the United States prior to a court decision; (3) focus attention on more quickly assisting legitimate asylum seekers; (4) free up personnel and resources to better protect U.S. territory and clear the backlog of unadjudicated asylum applications; and (5) offer protection to vulnerable populations while they wait in Mexico for their removal proceedings.[14]

---

[12] Prior to MPP, DHS and the former INS primarily used Section 235(b)(2)(C) on an ad-hoc basis to return certain Mexican and Canadian nationals who were arriving at land border ports of entry. CBP, for instance, invoked Section 235(b)(2)(C) to return certain Mexican nationals who were U.S. lawful permanent residents (LPRs) and whose criminal histories potentially subjected them to removal, as well as LPRs who appeared to have abandoned their permanent residence in the United States but were not willing to execute a Form I-407, Record of Abandonment of Lawful Permanent Residence. At the Northern Border, CBP used Section 235(b)(2)(C) to return certain Canadian nationals or those with status in Canada who, for instance, appear to be subject to a criminal ground of inadmissibility. Although guidance is scant, DHS and the former INS also used Section 235(b)(2)(C), on a case-by-case basis, for certain third country nationals even prior to MPP. For example, CBP issued field guidance in 2005 advising that a Cuban national arriving at a land border port of entry may "be returned to contiguous territory pending section 240 proceedings . . . if: (1) the alien cannot demonstrate eligibility for the exercise of parole discretion; (2) the alien has valid immigration status in Canada or Mexico; (3) Canadian or Mexican border officials express a willingness to accept the returning alien; and (4) the alien's claim of fear of persecution or torture does not relate to Canada or Mexico." Mem. from Jayson P. Ahern, Asst. Comm'r, Office of Field Ops., CBP, *Treatment of Cuban Asylum Seekers at Land Border Ports of Entry* 2-3 (June 10, 2005). The INS also issued guidance in 1997 and 1998 contemplating the use of Section 235(b)(2)(C) only as a "last resort" and only when the individual does not claim a fear of persecution related to Canada or Mexico. Mem. from Michael A. Pearson, Executive Assoc. Comm'r, Office of Field Ops., INS, *Detention Guidelines Effective October 9, 1998* 3 (Oct. 7, 1998); Mem. from Chris Sale, Deputy Comm'r, INS, *Implementation of Expedited Removal* 4 (Mar. 31, 1997) (same).

[13] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[14] Press Release, DHS, "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration," Dec. 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration [hereinafter Nielsen Release].

Venezuela AR_000224

On January 25, 2019, DHS issued policy guidance for implementing MPP,[15] which was augmented a few days later by operational guidance from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).[16]  Under MPP, certain non-Mexican applicants for admission who arrived on land at the SWB were placed in removal proceedings and returned to Mexico to await their immigration court proceedings under Section 240 of the INA.[17]  For those enrolled in MPP, DHS attempted to facilitate entry to and exit from the United States to attend their immigration proceedings, which were prioritized on the non-detained docket by the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR).

MPP was initially piloted at the San Ysidro port of entry and San Diego Immigration Court.  In July 2019, the program was expanded into Texas and as of January 2020, individuals could be enrolled in MPP at locations across the SWB.  Individuals returned to Mexico were processed back into the United States to attend their removal proceedings at one of four immigration court locations in California and Texas.[18]  It was initially anticipated that enrollees' first hearings would be scheduled within 30-45 days, consistent with the goal of timely adjudication of cases.  But enrollment quickly outpaced EOIR's capacity to hear cases.  Over time, capacity constraints meant that even initial hearings were scheduled many months after enrollment.  Large numbers of migrants ended up living in camps in Northern Mexico that were, as well-documented in numerous reports and as described below, crowded, unsanitary, and beset by violence.[19]

Due to public health concerns brought on by the COVID-19 pandemic, EOIR paused immigration court hearings for all non-detained individuals, including those enrolled in MPP, in March 2020.[20]  MPP hearings never resumed prior to the program's January 2021 suspension,

---

[15] Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[16] Guidance documents are available at the archived MPP landing page under the *MPP Guidance Documentation heading:* https://www.dhs.gov/archive/migrant-protection-protocols.

[17] Individuals who could be enrolled into MPP were, generally, individuals from Spanish-speaking countries and Brazil.

[18] Individuals enrolled in MPP in the San Diego or El Paso jurisdictions attended hearings at the immigration courts in San Diego or El Paso; individuals enrolled in MPP in San Antonio or Harlingen jurisdictions attended hearings at the Immigration Hearing Facilities (IHFs) in Laredo or Brownsville, respectively.

[19] *See infra* Section III.A; *see also* Caitlin Dickerson, *Inside the Refugee Camp on America's Doorstep*, N.Y. Times, Oct. 23, 2020; Miriam Jordan,  *'I'm Kidnapped': A Father's Nightmare on the Border*, N.Y. Times, Dec. 21, 2019; Nomaan Merchant, *Tents, stench, smoke: Health risks are gripping migrant camp*, A.P. News, Nov. 14, 2019; Human Rights Watch, *Like I'm Drowning: Children and Families Sent to Harm by the US 'Remain in Mexico' Program*, Jan. 6, 2021 ("As a result [of MPP], thousands of people are concentrated in dangerous Mexican border towns indefinitely, living lives in limbo . . . . Migrant shelters in Ciudad Juárez and Tijuana quickly filled, and a large shelter run by Mexican federal authorities in Ciudad Juárez also quickly hit capacity soon after it opened in late 2019. In Matamoros, dangers in the city have led as many as 2,600 people to live in an informal camp on the banks of the river marking the border between Mexico and the United States, a location prone to flooding.").

[20] *See* Press Release, DHS, "Joint DHS/EOIR Statement of MPP Rescheduling," Mar. 23, 2020, https://www.dhs.gov/news/2020/03/23/joint-statement-mpp-rescheduling.

but new enrollments into MPP continued during this period, albeit at significantly reduced rates.[21]

In total, between the initial implementation of MPP on January 25, 2019, and the suspension of new enrollments that became effective on January 21, 2021,[22] DHS returned to Mexico approximately 68,000 individuals, according to DHS and EOIR data.[23]  During that same period, CBP processed a total of 1.5 million SWB encounters, including approximately 1 million encounters processed under Title 8 authorities (including the 68,000 processed through MPP) and approximately 500,000 Title 42 expulsions.[24]

B.  Prior Evaluations of MPP

Prior to the Secretary's June 1, 2021, termination memorandum, the Department produced two notable assessments of the program that reached divergent conclusions.

In June 2019, as the Department prepared to expand MPP across the entire SWB, it formed a committee of senior leaders from multiple components (known as the "Red Team") to conduct a "top-down review of MPP's policies and implementation strategy and provide overall recommendations to increase the effectiveness of the program."[25]  The Red Team members were chosen, in part, because they had "little to no involvement developing policy or with implementing MPP," thus helping to ensure an independent assessment.[26]  The report and recommendations (the "Red Team Report") was issued October 25, 2019, but not publicly released.[27]  In preparing its report, the Red Team reviewed key MPP background documents, conducted dozens of interviews, made site visits, and performed additional research.[28]  The Red Team identified significant deficiencies in MPP and made multiple recommendations for improving MPP, organized around five different areas: the need for standardization and clarity

---

[21] *See* U.S. Customs and Border Protection, "Migrant Protection Protocols FY2021," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols; U.S. Customs and Border Protection, "Migrant Protection Protocols FY2020," https://www.cbp.gov/newsroom/stats/migrant-protection-protocols-fy-2020; *see also* MPP Suspension Memorandum, *supra* note 4.

[22] MPP Suspension Memorandum, *supra* note 4.

[23] *See* "Migrant Protection Protocols Metrics and Measures," Jan. 21, 2021, https://www.dhs.gov/publication/metrics-and-measures.

[24] DHS Office of Immigration Statistics analysis of U.S. CBP administrative records. In March 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued a public health order under 42 U.S.C. §§ 265 and 268 to prevent the spread of COVID-19 in CBP holding facilities and in the United States.  85 Fed. Reg. 16,559 (Mar. 24, 2020).  The Order temporarily suspending the introduction of certain persons into the United States from countries where a communicable disease exists. *Id*. In August 2021, CDC issued a new Order, which replaced, reaffirmed, and superseded the previous Orders. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021).

[25] Memorandum from Kevin McAleenan, Acting Sec'y of Homeland Sec., *Review of Migrant Protection Protocols Policy and Implementation* (June 12, 2019).

[26] *Id.* Working under the oversight of the Acting Deputy Secretary of Homeland Security, the Red Team was composed of individuals from the Offices of Privacy, Management, Civil Rights and Civil Liberties, and the Coast Guard.

[27] DHS Office of Operations Coordination, *The Migrant Protection Protocols Red Team Report* (Oct. 25, 2019) [hereinafter Red Team Report].

[28] *Id.* at 4.

with respect to information provided to migrants upon initial screening and processing; the need
for better access to counsel and better mechanisms for communication with counsel; the need to
ensure better *non-refoulement* protections;[29] the need for safe housing and protections for those
returned to Mexico; and the need for administrative and logistical improvements, including the
establishment of measures of effectiveness and better mechanisms for the sharing of key
information between migrants and relevant government agencies.  In December 2020—at a point
when new enrollments into MPP had already dropped significantly and only a month before the
program's suspension—the Department issued supplementary policy and operational guidance
designed to address several of the Red Team's recommendations.[30]

Three days after the issuance of the Red Team Report, the Department released publicly a
separate review of MPP (the "October 2019 Assessment"), which offered a very different
assessment of the program.[31]  The October 2019 Assessment declared that MPP had
demonstrated operational effectiveness, including by helping to address "the ongoing crisis at the
southern border and restoring integrity to the immigration system."[32]  The assessment noted that
apprehensions of noncitizens at and between ports of entry decreased from May through
September 2019; reported that rapid and substantial declines in apprehensions occurred in areas
where the greatest number of MPP-amenable noncitizens had been processed and returned to
Mexico through MPP; asserted that MPP was restoring integrity to the immigration system;
claimed that both the U.S. Government and the Government of Mexico (GOM) were
endeavoring to provide safety and security for migrants returned to Mexico; and stated that the

---

[29] Article 33 of the 1951 Convention Relating to the Status of Refugees provides that "[n]o Contracting State shall
expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or
freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or
political opinion." Convention Relating to the Status of Refugees, done July 28, 1951, 19 U.S.T. 6259, 6276, 189
U.N.T.S. 150, 176. The United States is not a party to the 1951 Convention, but the United States is a party to the
1967 Protocol Relating to the Status of Refugees, done Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. 6577, which
incorporates Article 33 of the 1951 Convention. The phrase "life or freedom would be threatened" is interpreted in
U.S. law as meaning that it is more likely than not that the individual would be persecuted. *See, e.g.*, *INS v. Stevic*,
467 U.S. 407, 428 & n.22 (1984). Separately, Article 3 of the Convention Against Torture and Other Cruel, Inhuman
or Degrading Treatment or Punishment (CAT) provides, "No State Party shall expel, return ("refouler") or extradite
a person to another State where there are substantial grounds for believing that he would be in danger of being
subjected to torture." *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112
Stat. 2681, 2681-2822 (8 U.S.C. § 1231 note). Article 3 of the CAT likewise is understood in U.S. law as requiring a
"more likely than not" standard.  *See, e.g.*, *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005) (citing Senate
Resolution, 136 Cong. Rec. S17,486, S17491-92 (daily ed. 1990)). These *non-refoulement* obligations are non-self-
executing, *see, e.g.*, *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009) (1967 Refugee Protocol); *Al-Fara v.
Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) (CAT), and are not specifically required by statute with respect to MPP
returns.

[30] The policy and operational guidance was published on an MPP website and took the form of a series of
memoranda that provided clarity on matters like access to counsel during the *non-refoulement* interview, the
importance of maintaining family unity, and more consistent application of the "known mental and physical health"
exclusion for enrollment in MPP. DHS, *Supplemental Policy Guidance for Implementation of the Migrant
Protection Protocols* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocols Guidance, Initial Document
Service* (Dec. 7, 2020); CBP, *Supplemental Migrant Protection Protocol Guidance, MPP Amenability* (Dec. 7,
2020).

[31] DHS, "Assessment of the Migrant Protection Protocols (MPP)," Oct. 28, 2019,
https://www.dhs.gov/publication/assessment-migrant-protection-protocols-mpp [hereinafter Oct. 2019 Assessment].
[32] *Id.*

screening protocols in place were appropriately assessing noncitizens' fear of persecution or torture in Mexico.

The public October 2019 Assessment presented MPP as a resounding success, whereas the internal Red Team Report raised serious concerns with the program.  Notably, the October 2019 Assessment did not acknowledge or address any of the shortcomings identified by the Red Team Report, despite the fact that the Assessment was released *after* the Red Team Report was completed.

### C.  Litigation Regarding the Prior Implementation of MPP

MPP was challenged many times on multiple grounds in federal court and remains the subject of ongoing litigation in several jurisdictions.  Among other claims, litigants challenged the program as an impermissible exercise of the underlying statutory authority; argued that MPP caused DHS to return noncitizens to Mexico to face persecution, abuse, and other harms and that its procedures inadequately implemented *non-refoulement* protections; argued that their right to access counsel before and during *non-refoulement* interviews had been violated; contested the return to Mexico pursuant to MPP of noncitizens with mental and physical disabilities; asserted that the program had been implemented in violation of the APA; and contended that MPP's expansion across the SWB was unlawful because it led to the return of migrants to places that were particularly dangerous.[33]  Both in the course of litigation and otherwise, litigants described, and some courts credited, extreme violence and substantial hardships faced by those returned to Mexico to await their immigration court proceedings, as well as substantial danger traveling to and from ports of entry to those hearings.  Litigants described being exposed to violent crime, such as rape and kidnapping, as well as difficulty obtaining needed support and services in Mexico, including adequate food and shelter.[34]  In addition, more than one hundred MPP enrollees who received final orders of removal have petitioned the federal courts of appeal for review of such orders on the grounds that various features of MPP, including limited access to

---

[33] *See, e.g.*, *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021); *Bollat Vasquez v. Wolf*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *E.A.R.R. v. Dep't of Homeland Sec.*, No. 3:20-cv-2146 (S.D. Cal. filed Nov. 2, 2020); *Adrianza v. Trump*, 505 F. Supp. 3d 164 (E.D.N.Y. 2020), *dismissed*, No. 1:20-cv-03919 (E.D.N.Y. Sept. 2, 2021); *Nora v. Wolf*, No. 20-993, 2020 WL 3469670 (D.D.C. June 25, 2020); *Turcios v. Wolf*, No. 1:20-cv-1982, 2020 WL 10788713 (S.D. Tex. Oct. 16, 2020).

[34] For example, in *Innovation Law Lab v. Wolf*, the Ninth Circuit observed:

> The MPP has had serious adverse consequences for the individual plaintiffs. Plaintiffs presented evidence in the district court that they, as well as others returned to Mexico under the MPP, face targeted discrimination, physical violence, sexual assault, overwhelmed and corrupt law enforcement, lack of food and shelter, and practical obstacles to participation in court proceedings in the United States. The hardship and danger to individuals returned to Mexico under the MPP have been repeatedly confirmed by reliable news reports.

951 F.3d at 1078; *see also Bollat Vasquez*, 520 F. Supp. 3d at 111–12 (describing plaintiffs' unrebutted descriptions of rape, death threats, kidnapping risks, and insufficient food and shelter as supported by the U.S. State Department's assignment to Tamaulipas of a "Level 4: Do Not Travel" warning "due to crime and kidnapping").

9

counsel and inability to access court hearings, prejudiced their ability to pursue relief in removal proceedings.[35]

   D. <u>Suspension of New Enrollments and Phased Strategy for the Safe and Orderly Entry of Individuals Subjected to MPP</u>

On January 20, 2021, Acting Secretary David Pekoske issued a memorandum suspending new enrollments into MPP, effective January 21, 2021, pending further review of the program.[36] The MPP Suspension Memorandum was followed by the President's issuance of EO 14010 on February 2, 2021, which, in addition to requiring the Secretary to review the program, directed the Secretary to "promptly consider a phased strategy for the safe and orderly entry into the United States, consistent with public health and safety and capacity constraints, of those individuals who have been subject to MPP."[37]

From February 19, 2021, until the effective date of the district court's order on August 25, 2021, DHS implemented a phased process for the safe and orderly entry into the United States of thousands of individuals who had been placed in MPP and remained outside the United States.[38]  Certain individuals whose removal proceedings were pending before EOIR or whose proceedings resulted in an *in absentia* order of removal or termination, and certain of their immediate family members, were processed into the United States to continue their Section 240 removal proceedings.[39]  About 13,000 individuals were processed into the United States to participate in Section 240 removal proceedings as a result of this process.[40]

   E. <u>Challenge to the Suspension and Termination</u>

On April 13, 2021, the States of Missouri and Texas filed suit in the U.S. District Court for the Northern District of Texas, challenging the suspension of new enrollments into MPP on the grounds that the January 20, 2021, suspension memorandum violated the APA, 8 U.S.C. § 1225, the Constitution, and a purported agreement between Texas and the federal government.

---

[35] *See, e.g., Hernandez Ortiz v. Garland*, No. 20-71506 (9th Cir. filed Mar. 15, 2021) (describing repeated failed attempts to contact legal service providers from within Mexico and ultimately agreeing to proceed pro se because the alternative was to wait longer in Mexico at continued risk to the family's safety); *Del Toro v. Garland*, No. 20-60900 (5th Cir. filed Dec. 14, 2020) (explaining that MPP restricted access to counsel, which prevented the individual from filing an update State Department country report on Cuba for his individual hearing); *Del Carmen Valle v. Garland*, No. 20-72071 (9th Cir. filed July 16, 2020) (arguing that the individual's "extreme distress and vulnerability in Mexico, lack of access to counsel, and difficulty in preparing and presenting her asylum application" as grounds for appeal).

[36] MPP Suspension Memorandum, *supra* note 4.

[37] Exec. Order No. 14010, 86 Fed. Reg. at 8270.

[38] *See* Press Release, DHS, "DHS Announces Process to Address Individuals in Mexico with Active MPP Cases," Feb. 11, 2021, https://www.dhs.gov/news/2021/02/11/dhs-announces-process-address-individuals-mexico-active-mpp-cases.

[39] *Id.*; Press Release, DHS, "DHS Announces Expanded Criteria for MPP-Enrolled Individuals Who Are Eligible for Processing into the United States," June 23, 2021, https://www.dhs.gov/news/2021/06/23/dhs-announces-expanded-criteria-mpp-enrolled-individuals-who-are-eligible-processing.

[40] Data on the number of people permitted to enter the United States under this phased process, February 19-August 25, 2021, provided by the Department of State on October 24, 2021.

Subsequent to the Secretary's June 1, 2021, termination memorandum, Missouri and Texas amended their complaint to challenge the June 1 Memorandum and filed a motion to enjoin the memorandum.

On August 13, 2021, the district court issued a nationwide permanent injunction requiring DHS "to enforce and implement MPP *in good faith*" until certain conditions were satisfied.[41] The district court determined that the June 1 Memorandum was arbitrary and capricious because, according to the court, the Department ignored critical factors and reached unjustified conclusions.  In particular, the district court found that the June 1 Memorandum failed to sufficiently account for several considerations, including the prior administration's assessment of the benefits of MPP; warnings allegedly made by career DHS personnel during the presidential transition process that suspending MPP would lead to a surge of border crossers; the costs of terminating MPP to the States as well as their reliance on MPP; the impact that terminating MPP would have on the Department's ability to comply with detention provisions in the INA, which the court construed to require detention and to foreclose release based on detention capacity concerns; and modifications to MPP short of termination that could similarly achieve the Department's goals.[42]  As a result, the district court enjoined the June 1 Memorandum in its entirety and "remanded" it to the Department for further consideration.[43]  The district court denied a request for a stay of the injunction pending appeal, and the U.S. Court of Appeals for the Fifth Circuit and the Supreme Court of the United States also denied stays.[44]  As a result, the district court's order, as construed by the Fifth Circuit, went into effect at 12:01 a.m. on August 25, 2021.

Since August, the Department has worked actively to reimplement MPP in good faith, as required by the district court's order.[45] At the same time, pursuant to the district court's order and in continuing compliance with the President's direction in EO 14010, the Secretary has considered anew whether to maintain, terminate, or modify MPP in various ways.

## III.   **Evaluation of MPP**

In considering whether to maintain, terminate, or modify MPP anew, the Department considered, among other things, the decisions of the *Texas* district court, Fifth Circuit, and Supreme Court; the decisions of multiple other courts in litigation challenging MPP or its termination; the briefs and declarations filed in all such lawsuits pertaining to MPP; various Departmental assessments of MPP, including both the Red Team Report and agency responses and the October 2019 Assessment; a confidential December 2019 Rapid Protection Assessment from the U.N. High Commissioner for Refugees (UNHCR) and publicly available sources of information, including news reports and publicly available sources of information, pertaining to conditions in Mexico; records and testimony from Congressional hearings on MPP and reports

---

[41] *Texas*, 2021 WL at 3603341, at *27 (emphasis in original).

[42] *Id*. at *17-22.

[43] *Id*. at * 27.

[44] *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (U.S. Aug. 24, 2021); *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021).

[45] *See* Declaration of Blas Nuñez-Neto, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021); Defendants' First Supplemental Notice of Compliance with Injunction, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. Oct. 14, 2021).

Venezuela AR_000230

by nongovernmental entities; and data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings conducted for MPP enrollees; and the impact of other government programs and policies concerning migration and the southern border.  In addition, over the course of several months, the Secretary and his staff met with a broad array of internal and external stakeholders with divergent views about MPP, including members of the DHS workforce engaged in border management, state and local elected officials across the border region, including from Texas, California, Arizona, and New Mexico, border sheriffs and other law enforcement officials, representatives from multiple nonprofit organizations providing legal access and humanitarian aid to noncitizens across the SWB, and dozens of Members of Congress focused on border and immigration policy.  The Secretary also assessed other migration-related initiatives the Administration is undertaking or considering undertaking.  And he examined the considerations that the district court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its obligations under 8 U.S.C. § 1225.

After carefully considering the arguments, evidence, and perspectives of those who support resuming MPP, with or without modification, as well as those who support termination, the Secretary has determined that MPP should be terminated.  The following outlines the considerations that informed the Secretary's decision.

A.  Conditions for Migrants in Mexico

In January 2019, the Department implemented MPP with the stated expectation that vulnerable populations would get the protection they needed while they waited in Mexico during the pendency of their removal proceedings.[46]  In practice, however, there were pervasive and widespread reports of MPP enrollees being exposed to extreme violence and insecurity at the hands of transnational criminal organizations that prey on vulnerable migrants as they waited in Mexico for their immigration court hearings in the United States.  These security concerns, together with barriers many individuals faced in accessing stable and safe housing, health care and other services, and sufficient food, made it challenging for some to remain in Mexico for the duration of their proceedings.  Notably, the United States has limited ability to fix these issues, given that they relate to migrant living conditions and access to benefits in Mexico—an independent sovereign nation.

Concerns about migrants' safety and security in Mexico, and the effect this had on their ability to attend and effectively participate in court proceedings in the United States, have been highlighted in internal Department documents, court filings, and a range of external studies and press reports.  In its internal evaluation of the program, the Department's Red Team Report emphasized the need for safe housing for vulnerable populations.[47]  The Ninth Circuit, in affirming a district court ruling that enjoined implementation of MPP, determined that

---

[46] *See* Nielsen Release, *supra* note 14; *see also* Memorandum from Kirstjen M. Nielsen, Sec'y of Homeland Sec., *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019).

[47] Red Team Report, *supra* note 27, at 7.

Venezuela AR_000231

"[u]ncontested evidence in the record establishes that non-Mexicans returned to Mexico under the MPP risk substantial harm, even death, while they await adjudication of their applications for asylum."[48]  A Massachusetts district court similarly described the plaintiffs' claims of extreme violence and insecurity in Mexico and observed that "[t]heir personal accounts are unrebutted and are supported by affidavits from employees of two nongovernmental organizations and the U.S. State Department's assignment to Tamaulipas of a 'Level 4: Do Not Travel' warning 'due to crime and kidnapping.'"[49]  The court further cited a Human Rights First report that included a list of 1,544 allegations of serious harm (including homicide, rape, and kidnapping) faced by individuals placed in MPP from January 2019 to February 2021.[50]

Multiple other reports have similarly highlighted security and treatment concerns. A December 2019 UNHCR Rapid Protection Assessment found that 81% of individuals and families returned to Mexico under MPP did not feel safe in Mexico, and that 48% had been a victim or witness of violence in Mexico.[51]  According to this assessment, children represented about half (48%) of targets for physical violence, and about half (48%) of kidnapping victims.[52] The organization Médecins Sans Frontières (Doctors Without Borders) noted that 75% of its patients who were in Nuevo Laredo in October 2019 due to MPP reported having been kidnapped.[53]  In 2019, a U.S. Commission on Civil Rights report similarly credited several news and NGO reports in noting that "asylum seekers [awaiting proceedings in Mexico] have been killed, women have been raped, and children have been kidnapped."[54]  Similar accounts of insecurity and violence were the subject of numerous press reports describing squalor and violence in the "camps" where many MPP enrollees lived as they waited their court hearings.[55] But as bad as conditions often were in the makeshift border camps, migrants gathered there because the threat of violence and kidnapping in surrounding areas outside of the camps could be

---

[48] *Innovation Law Lab*, 951 F.3d at 1093.

[49] *Bollat Vasquez*, 520 F. Supp. 3d at 111-12 (issuing a preliminary injunction ordering the Department to return to the United States seven plaintiffs who had been enrolled in MPP).

[50] Human Rights First, *Delivered to Danger; Trump Administration sending asylum seekers and migrants to danger*, Feb. 19, 2021, https://www.humanrightsfirst.org/campaign/remain-mexico; *see Bollat Vasquez*, 520 F. Supp. 3d at 99 n.10 (citing a declaration by Kennji Kizuka, Senior Researcher and Policy Analyst at Human Rights First, regarding an earlier version of this list explaining that "'[a]s of December 15, 2020, Human Rights First has identified 1,314 public reports of murder, torture, rape, kidnapping, and other violent assaults against asylum seekers returned to Mexico under MPP' and that 'the security situation in Mexico, including in the state of Tamaulipas has worsened' with one of Mexico's 'most powerful and violent cartels' reportedly increasing its activities in Tamaulipas and migrants in Matamoros and Nuevo Laredo have been repeatedly targeted'").

[51] UNHCR, *Rapid Protection Assessment: MPP Returnees at the Northern Border of Mexico* 15, Dec. 2019. The UNHCR assessment, shared confidentially with the United States government, is cited here with the express permission of UNHCR.

[52] According to the UNHCR survey, it did not take long for MPP enrollees to experience danger in Mexico. Just over half of the individuals surveyed (51%) had been in Mexico for less than one month and more than nine-in-ten had been in Mexico for less than three months. *Id*. at 7, 17.

[53] Médecins Sans Frontières, *The devastating toll of 'Remain in Mexico' asylum policy one year later*, Jan. 29, 2020, https://www.msf.org/one-year-inhumane-remain-mexico-asylum-seeker-policy; *cf*. Emily Green, *Trump's Asylum Policies Sent Him Back to Mexico. He was Kidnapped 5 Hours Later By a Cartel.*, Vice, Sept. 16, 2019.

[54] U.S. Commission on Civil Rights, *Trauma at the Border; The Human Cost of Inhumane Immigration Policies*, Oct. 2019, https://www.usccr.gov/files/pubs/2019/10-24-Trauma-at-the-Border.pdf.

[55] *See*, *e.g.*, Dickerson, *supra* note 19; Jordan, *supra* note 19; Merchant, *supra* note 19; This American Life, *The Out Crowd*, Nov. 15, 2019, https://www.thisamericanlife.org/688/transcript.

greater.[56]  Poor conditions and violence in the Matamoros camp also created an operational challenge when migrants at the camp blocked traffic in both directions on the Gateway International Bridge for hours as a sign of protest.[57]  The security and treatment of MPP enrollees also been the subject of congressional oversight and investigation.[58]

The adverse living conditions and violence experienced by migrants returned to Mexico pursuant to MPP are of grave concern to the Secretary.  The return of noncitizens to Mexico under MPP is predicated, by statute, upon individuals' ability to remain in Mexico during the pendency of their removal proceedings.[59]  In practice, however, myriad problems faced by noncitizens returned to Mexico impeded their ability to access those removal proceedings.  As a result, the Secretary has determined that the key predicate on which the statutory authority underlying the program is built—that noncitizens stay in Mexico and continue to participate in their removal proceedings—was upended by reality in too many cases.  This is an intolerable result that is inconsistent with this Administration's values, which include ensuring the rights of migrants to seek lawful protection from removal in a safe environment.

Moreover, these are problems that cannot easily be fixed.  Once migrants are returned to Mexico—an independent sovereign nation—the United States' ability to respond and provide adequate conditions and safety is diminished.

B. _Non-Refoulement_ Concerns

Concerns about the _non-refoulement_ process under MPP as it was previously implemented and the additional costs and resources that would be required to address those concerns also weigh against continued reliance on MPP.  As previously designed and implemented, MPP's _non-refoulement_ screening process—used to assess whether individuals would likely face persecution on account of a protected ground or torture in Mexico—was limited in at least four respects.

First, as originally implemented, individuals processed for MPP were not questioned by CBP about their fear of persecution or torture in Mexico, but were instead required to affirmatively articulate such a fear regarding return to Mexico—a sharp contrast to the approach

---

[56] _See, e.g._, María Verza and Fernanda Llano, _Lawless Limbo Within Sight of America_, Associated Press, Nov. 18, 2019; Delphine Schrank, _Asylum seekers cling to hope, safety in camp at U.S.-Mexico Border_, Reuters, Oct. 16, 2019, https://www.reuters.com/article/us-usa-immigration-mexico-matamoros-feat-idUSKBN1WV1DY.

[57] Adolfo Flores, "Asylum-Seekers Protesting Squalid Conditions Shut Down A US Border Crossing For 15 Hours," Buzzfeed, Oct. 11, 2019, https://www.buzzfeednews.com/article/adolfoflores/asylum-seekers-protesting-bridge-close-matamoros-texas.

[58] _See, e.g._, Press Release, H. Comm. on the Judiciary, "Chairman Nadler Announces House Judiciary Investigation into Trump Administration's 'Remain in Mexico' Policy," Jan. 14, 2020, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=2397; _Examining the Human Rights and Legal Implications of DHS's "Remain in Mexico" Policy_: Hearing Before the H. Comm. on Homeland Sec., 116th Cong. _passim_ (2019).

[59] _See_ 8 U.S.C. § 1225(b)(2)(C) (specifying that the Secretary may return a noncitizen to a contiguous territory "pending a proceeding under [8 U.S.C. §] 1229a").

Venezuela AR_000233

used in the expedited removal context, in which individuals are affirmatively asked standard questions about fear of return to their home countries and the responses are recorded.[60]

Second, rather than using a screening standard familiar to asylum officers (such as the "significant possibility" standard used for credible fear interviews or the "reasonable possibility" standard used for reasonable fear interviews to screen for possible withholding or deferral of removal claims), *non-refoulement* screenings for MPP applied a more restrictive "more likely than not" standard.[61]  Under this standard, noncitizens had to demonstrate to an asylum officer that it was more likely than not that they would be persecuted or tortured if returned to Mexico in order to avoid a return to Mexico—a higher substantive standard than they would ultimately have had to establish to secure asylum and the same substantive standard they would have had to establish to an immigration judge if they were ineligible for asylum but were seeking withholding or deferral of removal under the INA or regulations implementing CAT.

Third, the Department did not initially allow counsel to participate in the *non-refoulement* interviews.[62]  This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative.[63]  Eventually, and in part as response to a district court order, these restrictions were eased.[64]

---

[60] *See* 8 C.F.R. § 235.3(b)(2). Importantly, even if migrants processed for MPP expressed a fear of repatriation to their home country, they were never asked about any fear of being returned to Mexico. Assessing this feature of the program, Judge Watford of the U.S. Court of Appeals for the Ninth Circuit stated in *Innovation Law Lab* that it was "virtually guaranteed to result in some number of applicants being returned to Mexico in violation of the United States' *non-refoulement* obligations," as many individuals returned under MPP who feared persecution or torture in Mexico would "be unaware that their fear of persecution in Mexico is a relevant factor in determining whether they may lawfully be returned to Mexico, and hence is information they should volunteer to an immigration officer. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 511 (9th Cir. 2019) (Watford, J. concurring).

[61] Prior to MPP implementation, this standard had been used almost exclusively by immigration judges to adjudicate statutory withholding of removal or withholding or deferral of removal under regulations implementing the Convention Against Torture (CAT). *See* 8 C.F.R. §§ 208.16(a), (c)(4); 208.17(b)(1); 208.31(c); 1208.16(b); 1208.17(b). It was, as a result, not a standard that had previously been used by asylum officers in the screening context, which resulted in additional, burdensome training and implementation requirements.

[62] U.S Citizenship and Immigration Services, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols*, PM-602-0169 3 (Jan. 28, 2019) ("DHS is currently unable to provide access to counsel during the [*non-refoulement*] assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."). This differs from how fear interviews are conducted during the expedited removal process; in that context, noncitizens receive at least at 48-hour period to find and consult with a legal representative. *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[63] *See* Form M-444, Information about Credible Fear Interview (May 17, 2019).

[64] *Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020). Previously retained counsel were permitted to participate in *non-refoulement* interviews conducted at Immigration Hearing Facilities (IHFs) in Laredo and Brownsville as of December 2019 and within the Ninth Circuit in January 2020. Supplemental guidance issued in December 2020 expanded this access to counsel to all MPP locations and required DHS to ensure the ability of retained counsel to participate telephonically in USCIS' MPP *non-refoulement* assessments, but only "where it does not delay the interview, or is required by court order." Supplemental Policy Guidance for Implementation of the Migrant Protection Protocols, *supra* note 30, at 1-2.

Fourth, in practice, there were multiple challenges and inconsistencies in the implementation of *non-refoulement* screenings.  The Red Team Report emphasized the need for standard operating procedures to ensure consistency and address problems such as the use of a "pre-screening process" by CBP personnel at some locations that "preempt[ed] or prevent[ed]" USCIS from ever having cases referred for a determination.[65]  The report additionally noted that some CBP officials "pressure[d] USCIS to arrive at negative outcomes when interviewing migrants on their claim of fear of persecution or torture."[66]

Moreover, throughout the use of MPP, more than 2,500 individuals raised fear claims at multiple points in this process, leading to multiple screenings for those individuals during the pendency of their cases.[67]  These kinds of unproductive, redundant screenings are a drain on resources that may be more likely to occur in MPP as individuals are returned to Mexico multiple times over the pendency of a single removal proceeding, often to unsafe conditions.

For all these reasons, the Secretary has concluded that continuation of MPP in its prior form is not advisable.  These concerns likely could be addressed by policy changes that require the affirmative asking, the use of a more appropriate screening standard that protects those who face a reasonable or significant possibility of persecution or torture upon return to Mexico, the opportunity for individuals to consult with counsel prior to screenings, and better training and oversight.  But making these changes would likely lengthen the screenings and require DHS to devote additional asylum officers and detention space to these screenings, both of which are in short supply, especially as a result of challenges related to the COVID-19 pandemic.  New procedures could lengthen the screening process.  Such an approach would divert critical personnel and resources from other Administration priorities, including ongoing efforts to build a more durable, fair, and efficacious asylum system as discussed in greater detail in Section IV. The additional burdens that would be required to implement a *non-refoulement* process acceptable to the Department weigh against retention of MPP.  Moreover, even if making these changes better protected individuals from being returned to persecution or torture, it would not protect people from generalized violence or other extreme hardships that have no nexus to statutorily protected grounds, and that have been experienced by many returnees.

C.  Access to Counsel, Notice of Hearings, and Other Process Concerns

Individuals in MPP faced multiple challenges accessing counsel and receiving sufficient information about court hearings.  First, there were several problems in communicating accurate and up-to-date information to migrants about rescheduled court hearings.  As noted in the Red Team Report, some migrants in MPP had to give up their shelter space in Mexico when they returned to the United States for their court hearings.  As a result, they were unable to provide the court an address for follow-up communications.[68]  To submit a change of address while in Mexico, migrants had to print and mail a Change of Address Form, which posed logistical challenges for individuals who lacked internet access and who could not readily print and mail

---

[65] Red Team Report, *supra* note 27, at 6.

[66] *Id*. at 4-5.

[67] Data on MPP Cases with Multiple Referrals, provided by USCIS on October 28, 2021.

[68] Red Team Report, *supra* note 27, at 7.

Venezuela AR_000235

documents internationally.  This made it difficult to communicate updates regarding enrollees' court cases and hearing dates.

Second, MPP enrollees faced several barriers in accessing counsel both in the United States and in Mexico.  Although MPP enrollees were permitted to meet with counsel at hearing locations prior to their hearings, these meetings were limited to a single hour before the court hearing took place.[69]  Opportunities for attorneys to meet with their clients outside of those organized at the hearing locations were limited due to, among other constraints, complications associated with cross-border communication.  Many migrants lacked access to a telephone with international coverage or other forms of technology that could be used to communicate with counsel.  Some legal services organizations also adopted policies against visiting clients in Mexico due to serious safety concerns.[70]  In addition, because hearings for the tens of thousands of people enrolled in MPP were concentrated in a handful of courts along the border, demand for legal assistance far outstripped supply.[71]

These problems are of significant concern to the Secretary.  Inadequate access to counsel casts doubt on the reliability of removal proceeding.  It also undermines the program's overall effectiveness at achieving final resolution of immigration proceedings; in several cases, noncitizens challenged adverse immigration-judge decisions on the ground that they did not have an adequate opportunity to identify and retain counsel, or to gather or present the evidence in support of their claims.[72]  More broadly, access to counsel is critical to ensuring migrants receive a full and fair hearing; this Administration recognizes the importance of access to counsel in civil contexts, including in immigration proceedings, and considers fostering legal representation and access to justice a priority.[73]

Meanwhile, some of these flaws are exceedingly challenging to fix.  While migrants could be provided additional means to communicate from Mexico with counsel by video or telephone, doing so requires a significant expenditure of resources to ensure that the appropriate technology is available in Mexico.  In-person consultations are significantly constrained by the

---

[69] See U.S. Immigration and Customs Enforcement, *Migrant Protection Protocols Guidance* 3 (Feb. 12, 2019).  As noted above, DHS also did not initially allow counsel to participate in *non-refoulement* interviews conducted by USCIS.

[70] See Brief for the Laredo Project, et al. as Amici Curiae Supporting Respondents at 20-21, *Wolf v. Innovation Law Lab*, No. 19-1212 (Jan. 22, 2021) ("The Laredo Project considered providing assistance across the border in Nuevo Laredo, but determined that it was far too dangerous. When Laredo Project attorneys took an exploratory trip across the border, the local pastor with whom they were scheduled to meet (who ran a shelter for migrants) was missing; he had been kidnapped by cartel members, reportedly because he attempted to stop them from kidnapping Cuban asylum seekers.").

[71] Human Rights Watch, *We Can't Help You Here"*; *U.S. Returns of Asylum Seekers to Mexico*, July 2, 2019, https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico ("[U]nder the MPP, thousands of asylum seekers have been forcibly concentrated in El Paso and San Diego, overwhelming the limited number of immigration attorneys who practice there.").

[72] See supra note 35.

[73] White House, "FACT SHEET: President Biden to Sign Presidential Memorandum to Expand Access to Legal Representation and the Courts," May 18, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/18/fact-sheet-president-biden-to-sign-presidential-memorandum-to-expand-access-to-legal-representation-and-the-courts/.

reality that migrants are in Mexico and space for meetings with counsel to take place at ports of entry or upon their return to court is extremely limited.  Providing migrants with additional time to consult with attorneys would likely require them to spend a night in detention, which would also place additional strain on CBP facilities that have consistently been operating over their COVID restricted capacity.  In fact, the holding areas in six out of nine Border Patrol Sectors are over COVID-capacity as of October 27, 2021.[74]

### D.  Impacts of MPP on Immigration Court Appearance Rates and Outcomes

The Department's October 2019 Assessment of MPP concluded that MPP was "restoring integrity to the immigration system" by (1) providing bona fide asylum seekers the opportunity to obtain relief in months, not years, and (2) eliminating the "perverse incentives" that reward and encourage people with non-meritorious asylum claims to enter the United States.[75]  But upon further consideration and examination, the facts tell a more complex story, thus undermining the claimed benefits.

MPP did result in some removal proceedings being completed more expeditiously than is typical for non-detained cases.  Overall, 41 percent of MPP cases resulted in a final enforcement disposition as of June 30, 2021, versus 35 percent of comparable non-MPP cases.[76]  But the fact that MPP may have resolved cases more quickly does not mean that the cases were resolved fairly or accurately.  The integrity of the nation's immigration system should be assessed by whether immigration proceedings achieve fair and just outcomes, both for individuals who merit relief and those who do not. In the Secretary's judgment, the data show that MPP generally failed to meet that bar.

Importantly, noncitizens in MPP were substantially more likely to receive *in absentia* removal orders than comparable noncitizens who were not placed in MPP during the relevant time period.  Overall, of the 67,694 cases of individuals enrolled in MPP,[77] 21,818 were subject to an *in absentia* order of removal at some point during their removal proceedings—32 percent of all individuals enrolled in MPP.[78]  For comparable noncitizens who were not processed

---

[74] Data on holding area capacity by U.S. Border Patrol Sector, provided by CBP on October 28, 2021.

[75] Oct. 2019 Assessment, *supra* note 31, at 3, 6.

[76] For the purposes of this memorandum, comparable noncitizens or comparable non-MPP cases are defined as non-Mexican single adults and family units who were apprehended along the SWB between January 25, 2019, and January 20, 2021, were not enrolled in MPP and were not detained throughout the pendency of their proceedings. Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020) [hereinafter FY 2020 Enforcement Lifecycle Report].

[77] *Id*. This is based on DHS's Office of Immigration Statistics (OIS) analysis of MPP cases; this analysis excludes 345 cases originally identified as MPP enrollees in CBP data because the records are for unaccompanied children, accompanied minors, or Mexican nationals, all of whom are ineligible for the program, or because the records could not be matched to other administrative data.

[78] In his June 1 Memorandum, the Secretary referenced a 44% *in absentia* rate for this time period. The Department has since updated its methodology for measuring *in absentia* rates in two important ways. First, the Department did not count *in absentia* orders that were subject to subsequent motions to reopen or any other further action by DHS or

18

through MPP during that same time period and who were also not detained for the duration of their proceedings, the *in absentia* rate was 13 percent—about two-fifths the rate of the MPP group.[79]

Moreover, an additional 6,151 MPP cases were terminated by the immigration court.[80] Courts generally issued such orders in MPP cases when a noncitizen failed to appear but the immigration judge declined to issue an *in absentia* removal given concerns that the noncitizen did not have proper notice of how to attend his or her hearing.[81]  Including these cases brings the total number of cases of individuals in MPP that involved the issuance of an *in absentia* order of removal or termination to 27,969 (41 percent of all MPP cases and nearly three-and-a-half times higher than the *in absentia* rate for comparable noncitizens not enrolled in MPP).[82]

The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were considerably higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP.  For instance, the October 2019 Assessment concluded that MPP was incentivizing people without meritorious claims to voluntarily leave Mexico and return home.[83]  That assessment pointed to the fact that out of more than 55,000 MPP enrollees (at that time), only 20,000 were sheltered in northern Mexico and an additional 900 had returned home through International Organization for Migration's Assisted Voluntary Return program.

---

DOJ, thus undercounting the total number of *in absentia* orders that had been issued. Second, the *in absentia* rate of 44 percent only included cases in which there was a final disposition, rather than the full universe of MPP cases including those that were still pending, thus overstating the percentage. The updated numbers in this memorandum, by contrast, take into account the total number of *in absentia* orders issued in MPP cases, irrespective of whether there was a subsequent motion to reopen or other further action in the case, as well as the total number of MPP cases, including both active cases and those with a final disposition. This analysis captures all *in absentia* orders and compares them to the full set of MPP cases.

[79] *Id.*

[80] For individuals in removal proceedings under Section 240 of the INA who are not in MPP, termination of proceedings is frequently reported by DHS OIS as a form of relief because it generally marks the end of efforts to remove the noncitizen from the country. That situation is very different for noncitizens enrolled in MPP, who are outside of the country during the pendency of removal proceedings and have no basis upon which to seek admission to the United States once proceedings are terminated.

[81] *Matter of Herrera-Vasquez*, 27 I&N Dec. 825 (BIA 2020); *Matter of Rodriguez-Rodriguez*, 27 I&N Dec. 762 (BIA 2020).

[82] The district court in *Texas v. Biden* cited EOIR data indicating that *in absentia* rates in removal proceedings were also quite high in 2015 and 2017—42% and 47% percent, respectively. 2021 WL 3603341, at *21. But there are critical methodological differences between the ways in which these numbers are calculated and the *in absentia* rates presented in this memorandum. As explained in note 77, *supra*, the data presented in this memorandum measure *in absentia* rates as a share of the *total* number of cases. The EOIR data measures *in absentia* orders as a share of *completed* cases only, which excludes cases that remain ongoing that are disproportionately likely to not result in such cases. *See* Ingrid Eagley and Steven Shafer, *Measuring* In Absentia *Removal in Immigration Court*, American Immigration Council, Jan. 2021, https://www.americanimmigrationcouncil.org/research/measuring-absentia-removal-immigration-court. A recalculation of the 2015 and 2017 *in absentia* rates as a share of *total* cases referred to EOIR in those years yields rates of 21 percent and 20 percent, respectively. This is one-half the *in absentia* and termination rate found in MPP cases.

[83] Oct. 2019 Assessment, *supra* note 31, at 3.

19

Other reports suggest, however, that individuals abandoned claims or otherwise failed to appear for proceedings because of insecurity in Mexico and inadequate notice about court hearings.[84]  The difficulties that MPP enrollees faced in Mexico, including the threat of violence and kidnapping, coupled with inadequate and unreliable access to food and shelter, likely contributed to people placed in MPP choosing to forego further immigration court proceedings regardless of whether their claims had merit.  Indeed, a number of petitions for review filed in federal courts of appeals by individuals in MPP who received *in absentia* removal orders explain their failure to appear based on serious threats to their personal safety.[85]

While individuals in MPP were more likely to receive *in absentia* removal orders than comparable noncitizens not enrolled in MPP, they were also less likely to receive relief or protection from removal.  This was true even though the decision to place someone in MPP was not linked to any assessment of the likely merits of the individual's claim.  DHS data reflect that only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection from removal—a grant rate of just 1.1.[86]  For the comparable set of non-MPP cases from the same time period, the relief-granted rate was nearly two-and-a-half times as high (2.7 percent).[87]

The remarkably low 1.1 percent grant rate for MPP cases—the majority of which involved individuals from the Northern Triangle countries of Central America—is notable also because when MPP was first announced the Department observed that "approximately 9 out of

---

[84] *See, e.g.*, Kevin Sieff, "They missed their U.S. court dates because they were kidnapped. Now they're blocked from applying for asylum.," Washington Post, Apr. 24, 2021; Camilo Montoya-Galvez, "'Leave me in a cell': The desperate pleas of asylum seekers inside El Paso's immigration court," CBS News, Aug. 11, 2019, https://www.cbsnews.com/news/remain-in-mexico-the-desperate-pleas-of-asylum-seekers-in-el-paso-who-are-subject-to-trumps-policy/.

[85] *See, e.g.*, *Tabera-Columbi v. Garland*, No. 20-60978 (5th Cir. filed Oct. 26, 2020) (noting that MPP enrollee had been sexually assaulted by the police and was in a hospital as a result on the morning of the hearing); *Quinones Rodriguez v. Garland*, No. 20-61204 (5th Cir. filed Dec. 17, 2020) (describing an individual who did not attend the MPP hearing because he was hiding from gangs who threatened to kidnap him on his way to the hearing); *Miranda-Cruz v. Garland*, No. 21-60065 (5th Cir. filed Feb. 1, 2021) (describing a family that was kidnapped en route to an MPP hearing and held for ransom); *see also* Hamed Aleaziz and Adolfo Flores, "They Missed Their US Asylum Hearings Fearing the Cartel Would Kill Them. Now They're Stuck in Mexico," Buzzfeed, May 18, 2021.

[86] Relief or protection from removal is defined to include EOIR grants of asylum, grants of relief in non-asylum removal proceedings, withholding of removal, or conditional grants; DHS grants of Special Immigrant Juvenile (SIJ) status, lawful permanent residence, S, T, or U nonimmigrant status, and Temporary Protected Status (TPS); the exercise of DHS prosecutorial discretion; and findings by DHS that the subject is a U.S. citizen or lawfully present noncitizen not subject to removal. *See* FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

[87] As discussed in note 79, this figure includes cases that were terminated. For those located in the United States, termination ends removal proceedings and effectively allows the subject to remain in the United States until further action is taken. The low relief-granted rates for both the MPP and comparable non-MPP cases are likely the result of a number of different factors. During this period, a policy was implemented that barred asylum for individuals who transited through third countries and decisions were issued that limited humanitarian protection claims based on family membership and gender; these likely depressed grant rates. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019); *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019), *vacated*, 28 I&N Dec. 304 (A.G. 2021); *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), *vacated*, 28 I&N Dec. 307 (A.G. 2021). Additionally, the period of time being analyzed is both brief and recent. OIS analysis indicates that relief-granted rates tend to increase over the first three to four years after a case resulting from a credible or reasonable fear claim is initiated in immigration court. None of this, however, explains the substantial discrepancy in outcomes between MPP case and comparable non-MPP cases over the same time period. And none of this diminishes the statutory obligation to fairly assess asylum applications with the goal of producing reliable adjudications.

20

10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges."[88]  DHS does not have a record of the methodology used to generate this "9 out of 10" statistic.  To the contrary, an analysis of EOIR case outcomes for Northern Triangle asylum-related claims originating in border encounters (i.e., all EOIR removal proceedings originating with border encounters followed by credible fear or reasonable fear claims) in the years leading up to MPP yields a relief-granted rate of about 29 percent— significantly higher than the 10 percent reflected in Department's January 2019 statement.  That relief-granted rate is more than 26 times the 1.1 percent grant rate observed for all forms of relief or protection among MPP enrollees.  These discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access.[89]

Based on the Department's experience with MPP and informed by the data above, the Secretary has determined that the program did not succeed in a sufficient number of cases at achieving timely and reliable adjudication of migrants' removal proceedings.  Multiple features of MPP, especially combined with the difficulties in accessing counsel and migrants' living experience in Mexico as described above, have led the Secretary to conclude that the program deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims. Given the Administration's values, commitments, and policy preferences, the Secretary has concluded that this is an unacceptable result.  Individuals who may have abandoned meritorious protection claims should have been offered a meaningful opportunity to seek protection in the United States.  As stated above, the return-to-contiguous-territory authority at INA § 235(b)(2)(C) is predicated on the notion that individuals will be able to pursue their removal proceedings from within Mexico; the fact that so many individuals enrolled in MPP were unable to complete their proceedings due to their tenuous situation in Mexico undercuts a key requirement of the statute.  As a global leader in offering protection and resettlement to refugees, the United States also has a moral obligation to fairly consider such claims.  The Secretary is committed to ensuring meritorious claims are heard, even if that means non-meritorious claims end up being adjudicated as well.

E.  MPP and Recidivist Irregular Re-Entries

As discussed below, CBP encounters along the SWB decreased dramatically over a number of months in which MPP was fully operational across the SWB.  But the data also show that a significant share of individuals enrolled in MPP—33 percent as of June 30, 2021—were subsequently encountered attempting to reenter the country without inspection, rather than continuing to wait in Mexico for the resolution of their removal proceedings.[90]  This rate is more

---

[88] Nielsen Release, *supra* note 14.

[89] Indeed, that conclusion is not dissimilar to the one reached in the October 2019 Assessment, when the Department found that "MPP is one among several tools DHS has employed effectively to reduce the incentive for aliens to assert claims for relief or protection, *many of which may be meritless*, as a means to enter the United States to live and work during the pendency of multi-year immigration proceedings." Oct. 2019 Assessment, *supra* note 31, at 6 (emphasis added). Implicit in this statement is an acknowledgment that some such claims do have merit.

[90] FY 2020 Enforcement Lifecycle Report, *supra* note 75. When the Department previously considered this issue in June, 27 percent of MPP enrollees had been re-encountered by CBP subsequent to their enrollment in MPP (not

21

than two-and-a-half times higher than the historical average for recidivism (defined as re-encounters within 12 months of initial apprehension) of 14 percent for individuals processed under Title 8 authorities.[91]  The high rate of repeat encounters undercuts one of MPP's key claimed advantages—namely its deterrent effect on would-be border crossers.  Contrary to such claims, the data show that MPP enrollees were much more likely try to cross the border after being returned to Mexico than individuals who were removed from the country under other Title 8 authorities.  Such re-encounters also impose significant additional work on frontline Border Patrol agents, who had to encounter, track, and process MPP enrollees multiple times—resources that could and should have been deployed to other objectives.

    F.  <u>Investments and Resources Required to Operate MPP</u>

MPP was, according to the December 2018 announcement, intended to reduce burdens on border security personnel and resources to free them up to better protect the U.S. territory.  It was also intended to help clear the backlog of unadjudicated asylum claims.  In reality, however, backlogs in the Nation's immigration courts and asylum offices grew significantly during the period that MPP was in effect.[92]  In addition, MPP created substantial additional responsibilities on Department personnel that detracted from other critically important mission sets. This played out in numerous ways.

First, each time an MPP enrollee returns to the United States to attend a court proceeding, which could happen multiple times over the life of a case, DHS personnel are required to conduct additional rounds of processing, including biographic and biometric collection, property collection and return, and medical screenings.  None of this is required for those in removal proceedings in the United States.  The labor-intensive process of bringing migrants back into the United States for their court proceedings directly impacts staffing at the four U.S. ports of entry where migrants re-entered, taking frontline personnel away from other key missions—such as facilitating legal cross-border trade and travel.

Second, in order to implement and operate MPP, the Department devoted significant resources and personnel to building, managing, staffing, and securing specialized immigration hearing facilities (IHFs) to support EOIR.  During the period when MPP was operational during the prior Administration, IHFs cost approximately $168 million to build and operate.[93]  As part of its current efforts to comply the *Texas* court order and reimplement MPP in good faith, the Department has procured new contracts for IHFs, at a cost of approximately $14.1 million to build and $10.5 million per month to operate.[94]

---

counting encounters at POEs in connection with MPP). The increase since then reflects that individuals enrolled in MPP continued to seek entry without inspection to the United States.

[91] DHS Office of Immigration Statistics data provided on 10/29/2021.

[92] Between January 2019 and January 2021—the period when MPP was operational—the number of pending immigration court cases increased from 829,200 to 1,283,090 (a 55 percent increase). Data on pending caseload, provided by EOIR on October 28, 2021. The backlog of pending affirmative asylum claims increased over the same time period from 331,100 to 399,100. Data on the affirmative asylum backlog, USCIS Refugee, Asylum, and International Operations Directorate on October 27, 2021.

[93] DHS Office of the Chief Financial Officer analysis.

[94] Nuñez-Neto Decl., *supra* note 45, at ¶ 15.

Venezuela AR_000241

Third, adjudication of claims by individuals in MPP diverts asylum officers and immigration judges from other key efforts designed, as described in Section IV.B, to more effectively process cases and reduce backlogs.  As initially implemented, MPP required the training of asylum officers to learn the newly applied *non-refoulement* screening standards and support an additional adjudicative caseload.  Moreover, each time migrants came in and out of the United States for court hearings, there was another opportunity to claim fear—and another possible fear screening.  Department data shows that in the short time that MPP was operational, more than 2,500 individuals had repeat fear screenings.[95]

Fourth, the program drew on the same limited resources that non-profits and humanitarian organizations used to help other individuals in Mexico—thus focusing efforts on northern Mexico and diverting resources and services away from other parts of Mexico and the broader region.

Each of these, and other investments or resources, divest resources from other critically important Departmental missions and undercut the Department's ability to pursue longer-term, durable reform.

G. Impact of MPP and its Termination on SWB Migration Flows

In making his determination decision, the Secretary has presumed—as is likely—that MPP contributed to a decrease in migration flows.  From January through May 2019, when MPP was used in a limited number of locations, encounters rose.[96]  But from June 2019, when DHS announced that MPP would be fully implemented along the entire SWB, through September 2019, border encounters decreased rapidly, falling 64 percent in just three months.  Border encounters continued to decrease until April 2020.  Beginning in May 2020, encounters once again started rising.[97]  At that point, individuals continued to be enrolled into MPP, however, at lower rates than previously; immigration court hearings for MPP enrollees were also suspended.

The sharp decrease in SWB encounters during the months in which MPP was fully operational is notable.  Of course, correlation does not equal causation.  And even at the height of MPP's implementation in August 2019, it was not the Department's primary enforcement tool; approximately 12,000 migrants were enrolled in MPP but more than 50,000 were processed under other Title 8 authorities.[98]  In addition, beginning in April 2019, Mexico surged its own enforcement, thus increasing their level of apprehensions and returns.  This, coupled with a range of other push and pull factors, both known and unknown, likely contributed to the decline in encounters.[99]  The relevant data is simply insufficiently precise to make an exact estimate of the extent to which MPP may have contributed to decreased flows at the southwest border.

---

[95] *See supra* note 66.

[96] U.S. Customs and Border Protection, "Southwest Land Border Encounters," https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[97] *Id.*

[98] DHS OIS analysis of U.S. CBP administrative records.

[99] *See* Congressional Research Service, *Mexico's Immigration Control Efforts* (May 28, 2021).

Venezuela AR_000242

That said, the Secretary has, nonetheless, evaluated MPP on the premise that it contributed to decreased flows.[100]  Even so, the Secretary has concluded that this benefit cannot be justified, particularly given the substantial and unjustifiable human costs on the migrants who were exposed to harm while in Mexico, and the way in which MPP detracts from other regional and domestic goals and policy initiatives that better align with this Administration's values while also serving to manage migratory flows, as described in Section IV.

### H.  Addressing the Concerns of States and Border Communities

In the course of litigation, plaintiffs have alleged that the Secretary's June 1 Memorandum failed to consider the additional costs that States would allegedly incur as a result of the decision to terminate MPP.  Texas and Missouri, for example, argued—and the district court found—that the termination of MPP could lead to an increased number of noncitizens without proper documentation in their States, which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs.[101]  State-plaintiffs also alleged that terminating MPP led to an increase in organized crime, human trafficking, and drug cartel activity, specifically with respect to the illegal trafficking of fentanyl.[102]  And State-plaintiffs further claimed that they had developed "reliance interests" dependent on the continued operation of MPP.

The Secretary takes these concerns seriously.  He has sought to understand and address the impacts that Departmental policies and practices may have on communities and has consulted with numerous state and local officials from across the SWB about the Department's border management strategy, including the decision to terminate MPP.  The Secretary has, as a result taken and will continue to take, steps designed to minimize adverse consequences of any policy shifts on border states.

Prior to the district court's injunction, for example, the Department facilitated the safe and orderly entry into the United States of about 13,000 individuals previously enrolled in MPP for purposes of participating in their removal proceedings.  Prior to doing so, however, the Department ensured that these individuals received COVID-19 tests before crossing the border and entering the United States.  The Department also worked in close partnership with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports that facilitated their onward movement to final destinations away from the border.

---

[100] The district court faulted the Secretary for not taking into account alleged warnings to members of the Biden-Harris transition team by career DHS officials that terminating MPP would cause a spike in border encounters. *Texas*, 2021 WL 3603341, at *7. The Department is unaware of any such specific conversations, yet is aware of, and has taken into account, similar concerns raised by others.

[101] *See Texas*, 2021 WL 3603341, at *9-10.

[102] First Amended Complaint at 2, 38-39, *Texas v. Biden*, No. 2:21-cv-67 (N.D. Tex. filed June 3, 2021); *see also* Complaint, *West Virginia v. Biden*, No. 2:21-cv-22 (N.D. W.Va. filed Aug. 19, 2021); First Amended Complaint, *Arizona v. Mayorkas*, No. 2:21-cv-617 (D. Ariz. filed July 12, 2021).

24

In addition, the Secretary has devoted extensive resources on efforts designed to stop trafficking networks and protect border states from risks associated with criminal activity. Shortly after assuming office, the Secretary directed FEMA to increase funding for SWB law enforcement through FEMA's Operation Stonegarden, a $90 million grant that supports law enforcement partners, with more than 80% of such funds being been directed to SWB areas. Multiple and significant narcotics seizures have resulted from this initiative.[103] The Secretary also directed DHS to work with GOM partners on joint law enforcement operations designed to attack the smuggling and trafficking organizations. Operation Sentinel, which was launched in April, is a key example of these efforts—a multifaceted counter-network operation focused on identifying and taking law enforcement actions against transnational criminal organizations involved in the facilitation of mass migration to the SWB of the United States. Working with the GOM, DHS law enforcement has identified over 2,200 targets associated with transnational criminal organizations and revoked multiple visas and Trusted Traveler memberships, blocked bank accounts, and blocked certain entities from conducting business with the U.S. government.[104]

These efforts build on the Department's longstanding partnership with state, local, territorial, and tribal (SLTT) governments and law enforcement agencies, including many on the SWB, to address transnational crime, including human smuggling and trafficking. ICE's Homeland Security Investigations, for example, operates 79 Border Enforcement Security Task Forces nationwide, staffed by more than 700 State and Local law enforcement officers, that work cooperatively to combat emerging and existing transnational criminal organizations. Operational successes resulted in the seizure of 2,503 weapons, 215,301 pounds of narcotics, and $104,742,957 in FY20.[105] The ICE Criminal Apprehension Program also helps SLTT law enforcement partners better identify, arrest, and remove priority noncitizens who have been convicted of crimes in the United States and are incarcerated within federal, state, and local prisons and jails. In FY21, ICE issued 65,940 immigration detainers to noncitizens booked in jails or prisons.[106] All such activities are ongoing.

The Department also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking. Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation. Seizure of narcotics between ports of entry have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.[107] These declines have been driven by a substantial decrease in marijuana smuggling. Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation. Seizure trends for

---

[103] FEMA data on Operation Stonegarden provided on Oct. 28, 2021.

[104] CBP data on Operational Sentinel, provided on Oct. 28, 2021.

[105] ICE data on Border Enforcement Security Task Forces, provided on Oct. 28, 2021.

[106] ICE data on the Criminal Apprehension Program, provided on Oct. 28, 2021.

[107] Analysis of CBP data on drug seizures by U.S. Border Patrol agents, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

Venezuela AR_000244

hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20.[108]

Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP.

Moreover, even after his many consultations, the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation (or in response to the prior termination) of MPP. State-plaintiffs in the litigation also have not identified any specific actions they took in reliance on MPP.[109] Moreover, any claimed reliance interest is undermined by the fact that the program itself is discretionary, as are decisions to detain or parole individuals into the country. *No* administration has ever done what State-plaintiffs in the litigation argue is required here—detain or return to Mexico everyone that the Department encounters along the border. States cannot have a reliance interest based on something that has never previously been implemented. Notably, only 6.5 percent of noncitizens encountered along the SWB and processed through Title 8 were enrolled in MPP during the period it was in place. In no month when MPP was operating—including in August 2019, the month with the highest number of MPP enrollments—were more than one-in-five noncitizens encountered at the SWB and processed through Title 8 placed in MPP.[110] The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the SWB who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States.

    I.    <u>Relationship between Implementation of MPP and Statutory Mandates</u>

In enjoining the June 1 Memorandum, the district court faulted the Department for not considering the impact terminating MPP would have on the Department's ability to comply with the detention requirements in 8 U.S.C. § 1225.[111] In so doing, the district court accepted plaintiffs' argument that, pursuant to 8 U.S.C. § 1225, DHS has two options with regard to

---

[108] *Id.*

[109] The district court in *Texas* also discussed a purported "agreement" that the Department entered into with the State of Texas and several other states in early January 2021. *Texas*, 2021 WL 3603341, at *6-7. As the Department has explained in litigation, those documents were void *ab initio* and unenforceable. Any reliance on those documents is therefore unreasonable. To the extent those documents were ever valid, the Department has since terminated them and, in any event, Texas conceded in litigation that the "agreement" was no longer binding as of August 1, 2021.

[110] DHS OIS analysis of CBP administrative records.

[111] *Texas*, 2021 WL 3603341, at *21-23.

Venezuela AR_000245

noncitizens seeking asylum at the border: (1) mandatory detention or (2) return to a contiguous territory.[112]  This is a clear misreading of the statute for all of the reasons explained at length by the U.S. Government in the litigation—including a misreading of Section 1225 to effectively mandate detention of all those who are not subject to the contiguous-territory-return provision of 8 U.S.C. § 1225(b)(2)(C) if the agency lacks detention capacity to detain all noncitizens not otherwise subject to contiguous territory return.  It is also completely at odds with the history of immigration detention in this country, and the agency's consistent and longstanding interpretation of its statutory authorities.  Section 1225(b)(2)(C) is discretionary, and nothing in section 1225's text or history suggests any relationship between Congress's grant of return authority and section 1225's detention provisions.

Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory.  Section 1225 "does not mean" that every noncitizen "must be detained from the moment of apprehension until the completion of removal proceedings."[113]  The INA provides DHS with latitude for processing noncitizens beyond returns or detention.  DHS "may ... in [its] discretion" release a noncitizen placed in Section 1229a proceedings through "parole," pursuant to 8 U.S.C. § 1182(d)(5) "for urgent humanitarian reasons or significant public benefit."[114]

Pursuant to Section 1182(d)(5)'s parole authority, Congress has expressly granted DHS the broad authority to release applicants for admission from detention as an exercise of the Department's parole power.  That power has been exercised for as long as the federal government has been regulating immigration.[115]  Indeed, Congress enacted 8 U.S.C. § 1182(d)(5) as a "codification of the [prior] administrative practice."[116]  And in the decades since, immigration agencies have continued to broadly exercise their parole power to release certain noncitizens from detention.  Notably, the statute does not set any limit on the number of individuals DHS can decide to release on parole.  Nor does it provide that the agency cannot rely on its limited resources and detention capacity to release noncitizens otherwise subject to detention under section 1225.  Rather, Congress simply required that parole decisions be made on a case-by-case basis and that they be based on "urgent humanitarian reasons" or "significant public benefit."[117]  As the statute does not define those ambiguous terms, Congress left it to the

---

[112] *Id*. at *22.

[113] *Matter of M-S-*, 27 I&N Dec. 509, 516-517 (A.G. 2019); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018).

[114] 8 U.S.C. § 1182(d)(5)(A); *see* 8 C.F.R. §§ 212.5(b), 235.3(c). Additionally, "pending a decision on whether the alien is to be removed" and "[e]xcept as provided in [§ 1226(c)]," noncitizens present in the United States "may" be released on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2)(A)-(B).

[115] *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 651, 661 (1892) (discussing release of noncitizen to care of private organization); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (same).

[116] *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

[117] In a section entitled "Limitation on the Use of Parole," Congress amended the parole statute in 1996 to recharacterize the permissible purposes of parole from "emergent reasons or for reasons deemed strictly in the public interest" to "*only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 302, 602, 110 Stat 3009 (emphasis added). But it did not otherwise alter DHS's parole authority and did not define these manifestly ambiguous statutory terms. Accordingly, after the 1996 amendment to the parole statute, the agency

27

agency to define them.[118]  In implementing section 1182(d)(5), the agency has long interpreted the phrase "significant public benefit" to permit it to parole noncitizens "whose continued detention is not in the public interest as determined by" specific agency officials.[119]  And in turn, the agency has for decades viewed detention as not being in the "public interest" where, in light of available detention resources, detention of a specific noncitizen would limit the agency's ability to detain another noncitizen whose release may pose a greater risk of flight or danger to the community.[120]

Moreover, no administration has *ever* interpreted or implemented 8 U.S.C § 1225, as the district court in *Texas* has read it, to require the detention of virtually all inadmissible applicants for admission, except for those returned to Mexico.  The Department does not have—and has never had under any prior administration—sufficient detention capacity to maintain in custody every single person described in section 1225.  In September 2021, for example, CBP encountered approximately 192,000 individuals along the SWB.[121]  And as discussed above, even in August 2019, when MPP enrollments were at their zenith, CBP encountered nearly 63,000 individuals along the SWB.  Meanwhile, ICE Enforcement and Removal Operations (ERO) is generally appropriated for approximately 34,000 detention beds nationwide with some modest fluctuation from year to year.

This variance between border crossings and detention capacity is not new and was in fact the reality even when MPP was in place (see Appendix 1).  From Fiscal Years 2013 to 2019, nearly three-quarters of single adult and family unit members who were encountered at the SWB were either never placed in or released from detention during the pendency of their proceedings—more than 1.1 million (41 percent) were never booked into ICE detention and nearly 900,000 (33 percent) were booked in for a period of time but released prior to the conclusion of their removal proceedings.[122]  Even during the period that MPP was in effect from late January 2019 to January 20, 2021, more than two-thirds of single adults and individuals in family units encountered along the SWB and processed through non-MPP Title 8 authorities—more than 650,000 individuals—were never detained or released from ICE custody during the

---

incorporated the new "case-by-case" requirement into its regulation, while also maintaining its longstanding regulatory authority to release when "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), which remained consistent with the statute after the 1996 amendment. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,313 (Mar. 6, 1997).

[118] 8 U.S.C § 1103(a)(1); *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *cf., e.g., Ibragimov v. Gonzales*, 476 F.3d 125, 137 n.17 (2d Cir. 2007) (deferring to another aspect of same parole regulation).

[119] 8 C.F.R. § 212.5(b)(5).

[120] *See, e.g., Interim Guidance for Implementation of Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture; ICE Policy No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009); *see also Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1377-78 (S.D. Fla. 2002) (referring to INS detention use policies, including parole policies, based on having to establish "priorities for the use of limited detention space"), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

[121] Southwest Land Border Encounters, *supra* note 95.

[122] FY 2020 Enforcement Lifecycle Report, *supra*, note 75.

28

duration of their proceedings; a full 42 percent (more than 415,000 individuals) were never booked into ICE detention at all.[123]

By interpreting Section 1225 to mandate either detention or return to Mexico, the court essentially concluded that every single administration since 1997 has repeatedly and consistently violated Section 1225, by exercising the parole authority to release noncitizens detained under that authority, on a case-by-case basis, where detention of a specific noncitizen would limit the agency's ability to detain another noncitizen who release may pose a greater risk of flight or danger to the community.  There is no indication that Congress, in enacting Section 1225, intended to *require* the Secretary to use the explicitly *discretionary* return authority found at 8 U.S.C. § 1225(b)(2)(C) for virtually any noncitizen the Department fails to detain because of resource limitations.[124]  Rather, the decision to use the authority found in 8 U.S.C. § 1225(b)(2)(C) is entrusted to the Secretary's discretion and to his discretion alone.  Given these clear statutory authorities, and DHS's longstanding interpretation of the ambiguous parole statute, the Secretary's decision to terminate MPP creates no conflict with the detention authorities in Section 1225.

## J.   Impact on U.S.-Mexico Relationship

Mexico is a sovereign nation.  This means that the U.S. Government cannot return individuals to Mexico without an independent decision by the GOM to accept their entry.  It was for good reason that MPP was put into effect only *after* the U.S. government had conducted diplomatic engagement with GOM and *after* the GOM announced its independent decision to accept returnees.  The initiation of MPP required substantial diplomatic engagement in 2019; it does in 2021 as well.[125]

In deciding to accept returns of non-Mexican nationals under MPP, the GOM agrees to shoulder the burden of receiving these individuals, facilitating legal status and shelter, and accounting for their safety and security.  Not only does this place a great deal of strain on the GOM's ability to provide services for its own citizens and lawful residents, it diverts Mexican law enforcement resources from other missions that are important to the United States—

---

[123] *Id*. Indeed, when the last Administration created MPP, it expressly excluded from its coverage as a matter of discretion certain noncitizens, including citizens or nationals of Mexico, returning lawful permanent residents seeking admission, noncitizens with known physical or mental health issues, and other noncitizens. DHS, "Migrant Protection Protocols (Trump Administration Archive)," https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration.

[124] Congress is aware that it would need to appropriate substantial additional funds to detain everyone potentially subject to detention under Section 1225; yet, it has never done so. *See* 8 U.S.C. § 1368(b) (providing for bi-annual reports to Congress on detention space, including estimates on "the amount of detention space that will be required" during "the succeeding fiscal year"). Although Congress has amended Section 1225 since 1996, *see* Pub. L. 110-229, 122 Stat. 754, 867 (2008), it has never amended Section 1225 to mandate the use of return authority when the agency lacks resources to detain all applicants for admission or to override the agency's longstanding interpretation permitting the use of parole to address capacity limitations as a significant public benefit. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

[125] *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act*, *supra* note 13.

Venezuela AR_000248

including addressing transnational organized crime networks and root causes of migration.  Over the past nearly three years, MPP has played an outsized role in its policy and operational engagement with GOM, thus distracting from other diplomatic initiatives and programs concerning migration flows.  These engagements, which have increased substantially in tempo and intensity since the court's order, require enormous amounts of time to prepare for and execute, and involve the same individuals at DHS and DOS who would otherwise be working on advancing other key bilateral priorities.

The Department is eager to expand the focus of the relationship with GOM to address broader issues related to migration to and through Mexico.  This includes implementing the bilateral economic and security frameworks adopted in September and October 2021, respectively;[126] addressing the root causes of migration from Central America; improving regional migration management; enhancing protection and asylum systems throughout North and Central America; and expanding cooperative efforts to combat smuggling and trafficking networks, and more.  Terminating MPP will, over time, help to broaden the United States' engagement with the GOM to address these critical efforts, which we expect will produce more effective and sustainable results than what we achieved through MPP.  It will also provide more space and resources to address the many other bilateral issues that fall within DHS's diverse mission, such as countering transnational organized crime, cybersecurity, trade and travel facilitation, cargo and port security, emergency management, biosurveillance, and much more.

## IV.  The Biden-Harris Administration's Affirmative Efforts to Enhance Migration Management

In December 2018, when DHS announced the start of MPP, the Department stated that MPP was expected to provide numerous benefits for the immigration system, including reducing false asylum claims, more quickly adjudicating meritorious asylum claims, clearing the backlog of unadjudicated asylum applications, and, perhaps most importantly, stemming migration flows across the SWB.  All of these goals remain top priorities for the Department and Administration.  But the Secretary assesses that there are ways to advance these goals through means other than MPP—through policies and practices that will more effectively and more humanely achieve the stated goals than continuing to implement MPP as designed or in modified form.

Not only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine the Department's efforts to address irregular migration and achieve lasting reform of the asylum system through other means.  As noted earlier, the Secretary is undertaking this review on the premise that MPP was responsible for a share of the significant decrease in SWB encounters that occurred during many months of MPP's operations.  However, MPP is not the only, and certainly not the preferred, means of tackling irregular migration.  To the contrary, the Department is currently pursuing a range of other measures that it anticipates will disincentivize irregular migration in ways that are

---

[126] White House, "Joint Statement: U.S.-Mexico High-Level Security Dialogue," Oct. 8, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/joint-statement-u-s-mexico-high-level-security-dialogue/; White House, "Fact Sheet: U.S.-Mexico High-Level Economic Dialogue," Sept. 9, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/09/fact-sheet-u-s-mexico-high-level-economic-dialogue/.

Venezuela AR_000249

more consistent with this Administration's values and enduring, including by addressing root causes and building regional solutions.  In addition, the Department is committed to channeling migration through safe and orderly pathways and reforming our asylum adjudication system to achieve more timely, fair, and efficient results,

In July 2021, the Administration released a Blueprint describing its overarching strategy—as well as the concrete steps that will be taken—to ensure a secure, humane, and well-managed border, implement orderly and fair asylum processing, strengthen collaborative migration management with regional partners, and invest in the root causes of migration in Central America.[127]  The Administration, with DHS playing a critical role, has made significant investments and taken substantial actions to move forward with its strategy.

A. <u>Managing Flows</u>

The current Administration is pursuing a comprehensive vision for managing migration and facilitating safe, orderly, and legal pathways for individuals seeking protection or intending to migrate.[128]  A key part of this vision involves disincentivizing unlawful entries by robustly enforcing our laws at the land border while also ensuring the humane and lawful treatment of those who do arrive in the United States.  Doing so requires a concerted effort to address root causes of migration, provide alternative protection solutions in the region, enhance lawful pathways for migration to the United States, and streamline the fair adjudication of asylum claims at the border—efforts that the Department has determined will be more effective at reducing irregular migration than continuing to implement MPP.

To disincentivize irregular migration, the Administration is pursuing a multi-pronged approach.  At our border, we are employing expedited removal to rapidly, but humanely, return certain individuals and families that are encountered unlawfully crossing between POEs.  Those who do not express fear of persecution or torture, and who are nationals of countries that allow electronic nationality verification (ENV), are returned to their countries within a few days of being encountered.  DHS is working closely with the Department of State to expand the use of these ENV agreements throughout the hemisphere to more expeditiously facilitate removals of individuals who do not claim a fear of persecution or torture.  The Department additionally treats any noncitizen who unlawfully entered the United States on or after November 1, 2020, as a presumed border security enforcement and removal priority under current guidance,[129] as well as in guidance that will become effective on November 29, 2021.[130]

---

[127] White House, "Fact Sheet: The Biden Administration Blueprint for a Fair, Orderly and Humane Immigration System," July 27, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/.

[128] EO 14010 directed the creation of a Root Causes Strategy and Collaborative Migration Management Strategy. Published in July 2021, the strategies articulate a bold and comprehensive vision for managing migration throughout the Western Hemisphere. *Id.*

[129] Memorandum from Tae D. Johnson, Acting Director, ICE, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021).

[130] Memorandum from Alejandro Mayorkas, Sec'y of Homeland Security, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021).

Recognizing that the management of migration is a shared responsibility among sending, transiting, and receiving countries, the Administration is also working with our partner countries across the region to manage migratory flows.  As part of these efforts, the United States is working bilaterally and multilaterally with countries across the Western Hemisphere, seeking to encourage humane border enforcement and enhance legal pathways throughout the region.  DHS is also working closely with the Department of State to provide additional technical assistance, mentoring, and resources to border and immigration authorities in the region, with the goal of enhancing the capability and effectiveness of our partners' efforts to identify and interdict unlawful activity.  As part of these efforts, the United States and Colombia co-hosted a regional conference on migration in Colombia on October 20, 2021 that brought together foreign ministries and immigration authorities from 17 partner nations across the hemisphere to directly address recent trends in irregular migration in the region. During this conference, countries committed to enhancing protection, combating human smuggling and trafficking, and expanding humane enforcement efforts.

The Department is also working bilaterally with countries across the region to build law enforcement capacity, tackle transborder crime, and slow migratory flows.  Beginning in April 2021, for example, DHS deployed dozens of CBP personnel to Guatemala to train and support local law enforcement units and help enhance the security of Guatemalan border crossings, checkpoints, and ports.[131]  And in October 2021, for example, the United States and Mexico agreed on joint actions to prevent transborder crime, with a particular focus on reducing arms trafficking, targeting illicit supply chains, and reducing human trafficking and smuggling.[132]  Such efforts build on the successes of Operation Sentinel, in which DHS is working with other U.S. government agencies and the GOM to identify and impose meaningful sanctions on those involved in human smuggling, including by freezing their assets, revoking their visas, and curtailing their trade activities.  DHS seeks to expand these efforts across the hemisphere, with the GOM as a key partner.  However, the senior U.S. and Mexican officials who would lead these efforts are the same officials that have spent much of the past three months negotiating the reimplementation of MPP—detracting from efforts to advance other key parts of the bilateral relationship.

The Administration is also expanding efforts to address root causes of migration and enhance legal pathways for individuals who intend to migrate, as well as building and improving asylum systems in other countries and scaling up protection efforts for at-risk groups.  These efforts reduce incentives to come to the United States to seek protection and, for those who still choose to do so, reduce incentives to cross the border unlawfully.  As part of these efforts, DHS is working with Department of State to expand efforts to build and improve asylum systems in other countries and scale up protection efforts for at-risk groups, thereby providing alternative opportunities for individuals to seek protection without making the often-dangerous journey to the SWB.

The Department of State and DHS, for example, are working to stand up Migrant Resource Centers (MRC) in key sending countries, including Guatemala, where individuals who

---

[131] CBP data on Guatemalan deployments provided on 10/29/2021.

[132] Joint Statement: U.S.-Mexico High-Level Security Dialogue, *supra* note 125.

intend to migrate can apply for a visa or seek other available protection.[133]  The Department of State established the first MRC in Guatemala this year, and is working with international organizations to expand the MRCs to multiple locations and countries over the coming year.  The Administration is also working to continue to expand the legal pathways that are available for individuals who apply at these facilities.  We are also expanding refugee processing in Central America—including through in-country processing in Northern Triangle countries—and are helping international organizations and local non-governmental organizations identify and refer individuals with urgent protection needs to the U.S. Refugee Admissions Program and resettlement agencies in other countries.

Additionally, on March 10, 2021, DHS, in close coordination with the Department of State, restarted the Central American Minors (CAM) program to reunite eligible children from El Salvador, Guatemala, and Honduras with parents who are lawfully present in the United States.  On June 15, 2021, the Departments expanded CAM eligibility to include certain U.S.-based parents or legal guardians who have a pending asylum application or U visa petition filed before May 15, 2021, thereby allowing them to file petitions on behalf of children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.  This important program provides an avenue for children to come to the United States that would not otherwise be available, which in turn supports family unity and reduces the incentives for unlawful entry.  By restarting and expanding this safe, orderly, and lawful pathway through which children may reunite with their parent or legal guardians in the United States, CAM reduces the incentive for such vulnerable and often unaccompanied children to make the dangerous journey to the United States border.[134]

The Department also has expanded access to temporary work visas in the region, thereby providing a lawful pathway to work temporarily in the United States for individuals who might otherwise take the irregular and dangerous journey to the United States in search of economic opportunities and cross the border unlawfully.  To that end, on May 21, 2021, DHS published a temporary final rule making available 6,000 H-2B supplemental visas for temporary non-agricultural workers from Honduras, Guatemala, and El Salvador in FY21.[135]  The Administration is also working to enhance access to H-2A visas for temporary agricultural workers, for when there are insufficient qualified U.S. workers to fill these jobs.  Departments and agencies are engaged with the Northern Triangle governments, international organizations, the private sector, civil society, labor unions, and worker rights organizations to promote this program.

---

[133] *Id.*

[134] *See* "Joint Statement by the U.S. Department of Homeland Security and U.S. Department of State on the Expansion of Access to the Central American Minors Program," June 15, 2021, https://www.dhs.gov/news/2021/06/15/joint-statement-us-department-homeland-security-and-us-department-state-expansion.  Under the expanded guidance, eligible minors may apply for refugee status if they are sponsored by a parent or legal guardian in the United States who is in one of the categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; withholding of removal; or certain parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.

[135] Exercise of Time-Limited Authority To Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 86 Fed. Reg. 28,198 (May 25, 2021).

Venezuela AR_000252

These efforts, all of which have only recently been initiated, require diplomatic engagement and investment of resources.  They will take some time to achieve substantial results.  Once fully operational, they will provide legal and regular pathways for individuals seeking protection and opportunity to work in the United States, thus reducing the need for unlawful crossings and reducing the appeal of exploitative smugglers.  By incentivizing migration through lawful channels, and disincentivizing the use of unlawful channels, these initiatives achieve several key goals of MPP, but in a more humane way that matches the Administration's values.

    B.  <u>Managing Asylum Claims</u>

The Department also is taking a number of different steps to better manage asylum claims that will allow the United States to more humanely, and fairly, achieve some of MPP's stated benefits: reducing false asylum claims, more quickly adjudicating meritorious asylum claims, and clearing the backlog of unadjudicated asylum applications.

    1.  *Dedicated Docket*

In May 2021, DHS and DOJ jointly announced a new Dedicated Docket, designed to expeditiously and fairly conduct removal proceedings for families who enter the United States between ports of entry at the SWB.[136]  With a goal that immigration judges will generally complete cases on the Dedicated Docket within 300 days, the process is intended to significantly decrease the length of time for adjudication of such noncitizens' cases, while also providing fair hearings for families seeking asylum and other forms of relief or protection from removal. Dedicated Dockets have been established in 11 cities (Boston, Denver, Detroit, El Paso, Los Angeles, Miami, Newark, New York City, San Diego, San Francisco, and Seattle) chosen because they are common destination cities for migrants and have robust communities of legal service providers.  Once fully up and running, it is expected to adjudicate approximately 80,000 cases each year.

The Dedicated Docket serves multiple goals: It provides a mechanism for the more efficient adjudication of claims.  It ensures compliance with court proceedings through use of case management services provided through ICE's Alternatives to Detention (ATD) program.[137] It promotes efficiency and fairness in those proceedings through robust access to legal orientation for families on the docket (including group and individual legal orientations and friend-of-the-court services for unrepresented individuals).  And, as MPP was designed to do, it discourages non-meritorious claims by dramatically reducing the amount of time that a noncitizen may remain in the United States while his or her claims for relief or protection are adjudicated.

---

[136] Press Release, DHS, "DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings," May 28, 2021, https://www.dhs.gov/news/2021/05/28/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings.

[137] ICE Enforcement and Removal Operations (ERO), "Alternatives to Detention Program," https://www.ice.gov/detain/detention-management.

Venezuela AR_000253

Moreover, it is expected to achieve these goals in ways that avoid the pitfalls associated with MPP.  Unlike MPP, which was plagued with high *in absentia* rates, the Dedicated Docket is designed, via the use of ATD and case management services, to ensure high appearance rates and contribute to the proper functioning of our immigration system.  As of October 25, 2021, EOIR had conducted nearly 12,000 initial hearings for individuals in Dedicated Docket cases, just 4.5 percent of which had ended in issuance of an *in absentia* order of removal.[138]  ICE data reflect a 98.9% attendance rate at all hearings for individuals enrolled into ATD from the SWB from FY14 to FY21.[139]

Two immigration court locations currently hearing Dedicated Docket cases—El Paso and San Diego—are slated for use as part of the court-ordered reimplementation of MPP because of their proximity to ports of entry along the border.  To staff MPP cases, EOIR will have to either divert judges from existing initiatives such as the Dedicated Docket—which will prolong those cases and undermine the effort—or reassign other immigration judges handling other non-detained cases, which will exacerbate the 1.4 million case backlog that already exists.  It is the Department's reasoned decision—working in close partnership with EOIR—that the limited pool of asylum officers and immigration judges are best spent supporting the Dedicated Docket and other initiatives that achieve the goals of timely and fair adjudications.

### 2. *Asylum Officer Rule*

On August 20, 2021, DHS and DOJ promulgated a Notice of Proposed Rulemaking (NPRM) for the so-called "Asylum Officer Rule," which seeks to address systemic problems with the asylum system in an enduring way consistent with the Administration's values.  Specifically, it amends the procedures for credible fear screenings and consideration of asylum, withholding of removal, and CAT, so as to streamline the asylum process and address the current backlogs in the system.[140]  The comment period of this NPRM recently closed, and DHS and DOJ are currently reviewing the comments received and working on a final rule.

The proposed rule addresses the fact that the number of asylum and related protection claims at the SWB has increased dramatically over the years, that the system has not been able to keep pace, and that large immigration court backlogs and lengthy adjudicated delays are the result.[141]  As stated in the NPRM, the proposed rule also evidences this Administration's recognition that "[a] system that takes years to reach a result is simply not a functional one.  It delays justice and certainty for those who need protection, and it encourages abuse by those who will not qualify for protection and smugglers who exploit the delay for profit."[142]  The Asylum Officer Rule thus responds to the very same concerns identified by the last Administration when

---

[138] Data on the number of initial hearings for individuals on Dedicate Docket, provided by EOIR on Oct. 25, 2021.

[139] Data from ICE ERO Custody Management Division FY14, 15, 16, 17, 18, 19, 20, and 21 through Aug. 31, 2021 FAMU BP Apprehensions-Subsequently Enrolled into ATD, ISAP IV EOIR Court Appearance Rates FY14 & FY15 & FY16 & FY17 & FY18 & FY19 & FY20 & FY21 through Aug. 31, 2021.

[140] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 Fed. Reg. 46,906 (Aug. 20, 2021).

[141] *Id*. at 46,907.

[142] *Id*.

Venezuela AR_000254

it adopted MPP—and to a number of the concerns relied upon by the *Texas* court—but tackles them in a transformative and systemic way, while holding true to our laws and values.

To support the more expeditious and fair adjudication of claims, the proposed rule would transfer from immigration judges to USCIS asylum officers the initial responsibility for adjudicating asylum and related protection claims made by noncitizens who are encountered at or near the border and who are placed into expedited removal proceedings.  Individuals who establish a credible fear of persecution or torture following an initial screening interview would have their applications referred to USCIS, rather than the immigration court, for further consideration of their claim.  The initial credible fear interview would serve as the basis for the individual's asylum application, thereby introducing a key efficiency into the process.

Allowing cases with positive credible-fear findings to remain within USCIS for the full asylum merits adjudication, rather than being shifted to immigration judge-review, will capitalize on the investment of time and expertise developed during the screening interview and allow cases to be resolved more quickly.  This will, in turn, employ limited asylum officer and immigration court resources more efficiently, reduce asylum backlogs, and protect against further expansions of the already large immigration court backlog.  As currently drafted, the NPRM is also designed to include key procedural safeguards—including the ability to appeal, be represented by counsel, and present additional evidence as necessary to ensure due process, respect for human dignity, and equity.  Once implemented, the Asylum Officer Rule is expected to represent a transformative and lasting shift in asylum claim processing that will ensure rapid and fair processing in a way that delivers appropriate outcomes and realistically keeps pace with the workflow.

Achieving the rule's objectives will require substantial investment in resources, training, and personnel; to fully implement this new process, USCIS will need to quadruple the current asylum officer corps.[143]  Importantly, these are the same asylum officers needed to conduct *non-refoulement* interviews for MPP.  Restarting MPP will likely undercut the ability to implement this new rule as designed.

It is the Department's reasoned view that these limited resources are better expended on implementing both the Dedicated Docket and the Asylum Officer Rule.  Like MPP, both the Dedicated Docket and the Asylum Officer Rule are designed to render timely decisions and discourage non-meritorious claims.  Unlike MPP, however, they do so without subjecting vulnerable individuals to increased risk in Mexico and without creating the inevitable barriers to accessing counsel that exist for those returned to Mexico.

## V.   Consideration of Alternatives to Terminating MPP

The Department has considered the following as alternatives to terminating MPP: First, implementing MPP in the same manner as the prior Administration.  Second, implementing with modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations, consistent with demands from the GOM.  (These modifications are currently

---

[143] *Id*. at 46,933.

Venezuela AR_000255

being planned pursuant to the court's order to implement MPP in good faith.)  Third, implementing a significantly modified programmatic use of the Section 235(b)(2)(C) authority, as described below.

Reimplementation of MPP in the same manner as the prior Administration is not currently an available option.  As has been described in court filings, the United States cannot unilaterally implement MPP without the independent agreement of the GOM to accept those who the United States seeks to return.  In ongoing discussions with the GOM, the GOM has made clear it would agree to accept such returns only if certain changes were implemented, including (i) measures to ensure that cases are generally adjudicated within six months, thus limiting the amount of time individuals are waiting in Mexico; (ii) clear means of communicating to MPP enrollees accurate information about the time and date of their hearings; (iii) improved access to counsel; and (iv) better screenings to protect particularly vulnerable individuals from being returned to Mexico.  Each of these changes would, as a result, need to be made in any reimplementation.  Unless the GOM significantly changes its position, resuming the program as it existed previously is simply not possible in the foreseeable future as a matter of international diplomacy.

Moreover, the Secretary has his own independent and significant concerns about the prior implementation of MPP, including concerns about the safety and security of those returned to Mexico, deficiencies in the *non-refoulement* interview process, barriers to access to counsel, and the ways in which reimplementation of MPP would divert from other Administration goals and result in significant burdens for the Department that would limit DHS's opportunities to make other needed reforms consistent with this Administration's policy priorities.  In light of these concerns, the Secretary has decided not to resume MPP in precisely the same form as it previously existed, even if were a viable option.

As an alternative, the Secretary considered a modified implementation and enforcement plan, in the manner that the Administration is planning to start doing in the coming weeks— pending an independent decision by the GOM to facilitate returns—in order to comply with the district court's order.  As the Department moves to reimplement, it is making changes to account for GOM's concerns—changes which are designed to better protect individuals returned to Mexico and ensure, among other things, timely and accurate notice about court hearings.  In addition, the Department is evaluating what changes could be made to address the issues raised in the Red Team Report, to include changes announced by the December 2020 supplementary guidance to better ensure family unity, access to counsel during *non-refoulement* interviews, and assessment of vulnerability.  In addition, in the near term, the Department will need to put in place robust COVID-19 mitigation measures to safeguard DHS personnel, the public, and the migrants themselves from the spread of the pandemic.

The Secretary has carefully considered whether these changes would sufficiently address his concerns regarding MPP to such an extent that he would support reimplementation of a modified MPP in lieu of termination.  But ultimately he has concluded that, while helpful, they fail to address the fundamental problems with MPP—which is that it puts an international barrier between migrants and their counsel and relevant immigration court where their proceedings are pending and it places their security and safety in the hands of a sovereign nation, over which the

United States does not exercise control.  Further, the reimplementation of MPP diverts resources from key priorities that designed to address the same policy goals more effectively and in a more humane way, including this Administration's landmark efforts to transform our asylum system and address the root causes of migration.

A third alternative still would be to attempt to do even more to address the humanitarian and other concerns associated with MPP, thus designing a programmatic use of the Section 235(b)(2)(C) authority that aggressively tackles the humanitarian concern and is more fully aligned with the Administration's broader vision for migration management.  It is doubtful that DHS *could* adequately address these problems, given Mexican territorial sovereignty.  At best, any such effort would require the provision of significant U.S. foreign assistance to counterparts operating in Mexico to assist with housing, transportation to and from court hearings, and other protections to address safety and security concerns.  Attempting to do so would divert enormous Department of State resources away from the Administration's signature policy goals—to address the root causes and develop regional solutions for enforcing against irregular migration while providing regional approaches to lawful pathways.  Meanwhile, the fundamental flaws with MPP remain.

After careful consideration, and for all the reasons laid out in his termination memo and this explanatory document, the Secretary has concluded that there are inherent problems with the program that no amount of resources can sufficiently fix, and others that cannot be sufficiently addressed without detracting from key Administration priorities and more enduring solutions.

## VI.   <u>Conclusion</u>

In sum, continuation of MPP—even in a significantly modified format—is inconsistent with the current policy approach of this Administration.  Rather than forcing individuals to return to Mexico to await court hearings, this Administration is pursuing a range of other policies and rulemaking efforts—including regional approaches to addressing the root causes of migration and a reform of the asylum system—to better achieve the key goals of securing the border, reducing migratory flows, timely and fairly adjudicating asylum claims, and reducing the asylum backlog.  Many of these efforts are currently underway and will bear fruit over time; the resources needed to implement MPP will detract from these efforts.

It is squarely within the authority of the Secretary of Homeland Security to decide to pursue the immigration policies and practices that he believes are most effective, and to decide not to exercise the discretion granted him by Congress in Section 235(b)(2)(C) of the INA to continue MPP.  The Secretary reserves the prerogative to exercise this discretionary authority if circumstances—and the factors that led to this conclusion—change.  Until such time, the Secretary has determined that MPP is incompatible with his goals for managing migratory flows at the border, and doing so in a humane way, consistent with the Administration's values.

Venezuela AR_000257

**Appendix 1: Encounters by Detention, Fiscal Years 2013-2021**

| Fiscal Year | Total Encounters | Continuous detention | | Booked out prior to final outcome | | Never detained | |
|---|---|---|---|---|---|---|---|
| 2013 | 287,535 | 114,673 | 40% | 76,776 | 27% | 96,086 | 33% |
| 2014 | 338,650 | 113,005 | 33% | 102,371 | 30% | 123,274 | 36% |
| 2015 | 296,856 | 105,425 | 36% | 82,221 | 28% | 109,210 | 37% |
| 2016 | 373,506 | 105,295 | 28% | 131,147 | 35% | 137,064 | 37% |
| 2017 | 292,102 | 73,809 | 25% | 106,405 | 36% | 111,888 | 38% |
| 2018 | 360,574 | 93,449 | 26% | 149,183 | 41% | 117,942 | 33% |
| 2019 | 762,912 | 100,700 | 13% | 246,099 | 32% | 416,113 | 55% |
| 2020 | 312,794 | 61,751 | 20% | 37,981 | 12% | 213,062 | 68% |
| 2021 | 665,158 | 27,402 | 4% | 62,744 | 9% | 575,012 | 86% |
| 2013-2019 | 2,712,135 | 706,356 | 26% | 894,202 | 33% | 1,111,577 | 41% |
| 2013-2021 | 3,690,087 | 795,509 | 22% | 994,927 | 27% | 1,899,651 | 51% |
| Non-MPP Cases | 991,012 | 323,425 | 33% | 251023 | 25% | 416,564 | 42% |

*Note: Non-MPP cases are defined as single adults and family units encountered between Jan. 25, 2019, and Jan. 20, 2021, and not enrolled in MPP and not expelled under Title 42.*

Source: Data derived from DHS Office of Immigration Statistics Enforcement Lifecycle, which is based on a comprehensive person-level analysis of DHS and EOIR enforcement and adjudication records. *See* Marc Rosenblum and Hongwei Zhang, *Fiscal Year 2020 Enforcement Lifecycle Report* (Dec. 2020).

Venezuela_AR_000259

Table 21.
PERSONS NATURALIZED BY REGION AND COUNTRY OF BIRTH: FISCAL YEARS 2011 TO 2020

| Region and country of birth | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| REGION | | | | | | | | | | |
| Total | 694,193 | 757,434 | 779,929 | 653,416 | 730,259 | 753,060 | 707,265 | 761,901 | 843,593 | 628,254 |
| Africa | 69,738 | 74,775 | 71,872 | 62,175 | 71,492 | 72,338 | 61,851 | 64,934 | 84,990 | 66,436 |
| Asia | 249,940 | 257,035 | 275,700 | 233,163 | 261,374 | 271,733 | 255,306 | 275,621 | 327,273 | 246,099 |
| Europe | 82,209 | 82,714 | 80,333 | 71,325 | 78,074 | 74,344 | 65,141 | 71,436 | 81,040 | 57,403 |
| North America | 217,750 | 261,673 | 271,807 | 222,547 | 247,492 | 259,645 | 258,371 | 277,592 | 276,100 | 204,050 |
| Oceania | 3,734 | 3,386 | 3,849 | 3,389 | 3,811 | 3,953 | 3,327 | 3,792 | 4,308 | 3,392 |
| South America | 70,485 | 76,992 | 76,167 | 60,665 | 67,927 | 70,821 | 63,063 | 67,892 | 68,678 | 50,441 |
| Unknown | 337 | 359 | 201 | 142 | 89 | 26 | 206 | 634 | 394 | 233 |
| COUNTRY | | | | | | | | | | |
| Total | 694,193 | 757,434 | 779,929 | 653,416 | 730,259 | 753,060 | 707,265 | 761,901 | 843,593 | 628,254 |
| Afghanistan | 1,998 | 1,758 | 2,074 | 1,853 | 1,589 | 1,444 | 1,414 | 1,569 | 2,794 | 4,025 |
| Albania | 4,267 | 3,615 | 3,538 | 3,131 | 3,237 | 2,813 | 2,169 | 2,203 | 2,778 | 2,308 |
| Algeria | 773 | 891 | 841 | 928 | 943 | 1,035 | 949 | 918 | 1,235 | 1,063 |
| American Samoa | 205 | 180 | 265 | 187 | 296 | 285 | 216 | 182 | 279 | 177 |
| Angola | 162 | 166 | 143 | 145 | 132 | 131 | 125 | 147 | 136 | 94 |
| Anguilla | 38 | 30 | 26 | 18 | 31 | 16 | 20 | 34 | 25 | 19 |
| Antigua and Barbuda | 386 | 390 | 366 | 358 | 381 | 383 | 311 | 356 | 386 | 265 |
| Argentina | 3,870 | 3,909 | 4,177 | 3,683 | 3,886 | 4,015 | 3,486 | 3,977 | 3,956 | 2,884 |
| Armenia | 3,965 | 3,285 | 3,203 | 2,488 | 2,874 | 2,516 | 1,994 | 2,085 | 2,327 | 1,852 |
| Aruba | 40 | 27 | 42 | 28 | 37 | 28 | 32 | 33 | 54 | 37 |
| Australia | 1,291 | 1,312 | 1,296 | 1,159 | 1,379 | 1,389 | 1,235 | 1,545 | 1,838 | 1,436 |
| Austria | 271 | 241 | 248 | 223 | 207 | 221 | 177 | 238 | 214 | 160 |
| Azerbaijan | 1,153 | 958 | 786 | 585 | 568 | 574 | 483 | 512 | 597 | 451 |
| Bahamas | 609 | 647 | 681 | 545 | 570 | 590 | 481 | 590 | 640 | 481 |
| Bahrain | 80 | 93 | 76 | 90 | 80 | 77 | 77 | 86 | 116 | 79 |
| Bangladesh | 7,325 | 8,417 | 9,571 | 7,475 | 9,750 | 9,949 | 8,629 | 7,797 | 9,067 | 6,883 |
| Barbados | 648 | 687 | 683 | 550 | 646 | 651 | 645 | 555 | 625 | 399 |
| Belarus | 1,814 | 1,896 | 1,797 | 1,437 | 1,710 | 1,518 | 1,313 | 1,393 | 1,730 | 1,302 |
| Belgium | 525 | 522 | 513 | 408 | 505 | 514 | 493 | 520 | 575 | 430 |
| Belize | 742 | 817 | 966 | 773 | 851 | 870 | 810 | 859 | 950 | 669 |
| Benin | 183 | 210 | 206 | 229 | 310 | 317 | 309 | 249 | 343 | 297 |
| Bermuda | 58 | 65 | 59 | 67 | 66 | 61 | 65 | 70 | 64 | 52 |
| Bhutan | 55 | 42 | 275 | 2,639 | 4,562 | 5,563 | 5,557 | 6,180 | 6,920 | 4,536 |
| Bolivia | 1,446 | 2,063 | 1,861 | 1,527 | 1,689 | 1,862 | 1,806 | 1,575 | 1,679 | 1,208 |
| Bosnia and Herzegovina | 4,259 | 4,904 | 3,662 | 2,309 | 3,304 | 2,257 | 1,760 | 1,805 | 1,709 | 1,269 |
| Botswana | 9 | 11 | 29 | 24 | 29 | 29 | 27 | 38 | 41 | 34 |
| Brazil | 10,251 | 9,884 | 9,565 | 8,625 | 10,516 | 10,268 | 9,701 | 10,538 | 10,451 | 8,323 |
| Brunei | 11 | 17 | 11 | 15 | 13 | 10 | 11 | 15 | 26 | 19 |
| Bulgaria | 3,103 | 2,964 | 2,646 | 2,226 | 2,336 | 2,086 | 1,887 | 1,825 | 2,251 | 1,656 |
| Burkina Faso | 163 | 166 | 230 | 235 | 307 | 322 | 303 | 347 | 426 | 376 |
| Burma | 2,321 | 2,384 | 3,489 | 4,225 | 6,045 | 6,956 | 6,825 | 7,858 | 11,674 | 9,181 |
| Burundi | 168 | 209 | 379 | 415 | 437 | 406 | 266 | 284 | 394 | 280 |
| Cabo Verde | 974 | 1,037 | 1,014 | 979 | 1,054 | 1,207 | 1,355 | 1,429 | 1,316 | 930 |
| Cambodia | 4,589 | 6,189 | 4,161 | 2,866 | 2,878 | 2,756 | 2,184 | 2,467 | 2,877 | 2,405 |
| Cameroon | 2,172 | 2,459 | 2,541 | 2,120 | 3,170 | 3,088 | 2,416 | 2,319 | 3,197 | 2,873 |
| Canada | 9,318 | 9,077 | 8,690 | 8,385 | 9,492 | 9,346 | 7,829 | 9,379 | 11,059 | 8,423 |
| Cayman Islands | 15 | 29 | 17 | 13 | 30 | 20 | 23 | 23 | 35 | 20 |
| Central African Republic | 34 | 56 | 54 | 44 | 52 | 80 | 61 | 73 | 120 | 82 |
| Chad | 50 | 69 | 64 | 74 | 84 | 105 | 78 | 90 | 90 | 56 |

Venezuela_AR_000260

| Country | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Chile | 1,527 | 1,586 | 1,649 | 1,435 | 1,486 | 1,666 | 1,620 | 1,752 | 1,784 | 1,329 |
| China, People's Republic | 32,864 | 31,868 | 35,387 | 30,284 | 31,241 | 35,794 | 37,674 | 39,600 | 39,490 | 26,110 |
| Colombia | 22,693 | 23,972 | 22,196 | 16,478 | 17,207 | 18,601 | 16,184 | 17,564 | 17,126 | 12,768 |
| Congo, Democratic Republic | 908 | 1,173 | 1,250 | 1,246 | 1,490 | 1,707 | 1,437 | 1,776 | 2,877 | 2,482 |
| Congo, Republic | 345 | 381 | 402 | 438 | 473 | 395 | 322 | 316 | 351 | 191 |
| Costa Rica | 1,511 | 1,597 | 1,661 | 1,461 | 1,633 | 1,862 | 1,720 | 1,860 | 1,859 | 1,394 |
| Cote d'Ivoire | 694 | 868 | 958 | 910 | 1,078 | 1,127 | 907 | 908 | 1,206 | 1,012 |
| Croatia | 569 | 725 | 561 | 428 | 563 | 438 | 351 | 371 | 412 | 271 |
| Cuba | 21,071 | 31,244 | 30,482 | 24,092 | 25,770 | 32,101 | 25,961 | 36,089 | 36,246 | 31,369 |
| Curacao | - | - | - | 11 | 13 | 16 | 20 | 20 | 30 | 28 |
| Cyprus | 115 | 92 | 112 | 107 | 105 | 84 | 125 | 84 | 115 | 81 |
| Czechia | 485 | 477 | 562 | 565 | 733 | 692 | 595 | 644 | 600 | 426 |
| Czechoslovakia (former) | 310 | 291 | 232 | 303 | 371 | 344 | 251 | 260 | 325 | 206 |
| Denmark | 124 | 133 | 127 | 129 | 243 | 1,193 | 769 | 650 | 656 | 508 |
| Djibouti | 22 | 26 | 39 | 26 | 26 | 52 | 48 | 65 | 96 | 94 |
| Dominica | 594 | 597 | 642 | 520 | 653 | 610 | 539 | 612 | 740 | 391 |
| Dominican Republic | 20,508 | 33,351 | 39,590 | 23,775 | 26,665 | 31,320 | 29,734 | 22,970 | 23,101 | 18,675 |
| Ecuador | 6,929 | 8,783 | 9,470 | 6,952 | 7,664 | 8,568 | 7,748 | 7,996 | 7,731 | 5,204 |
| Egypt | 5,848 | 6,191 | 6,213 | 5,094 | 5,693 | 5,696 | 5,154 | 6,549 | 8,311 | 6,636 |
| El Salvador | 13,834 | 16,685 | 18,401 | 15,598 | 16,930 | 17,240 | 16,941 | 17,300 | 18,280 | 12,606 |
| Equatorial Guinea | 9 | 19 | 14 | 12 | 14 | 18 | 8 | 9 | 15 | 18 |
| Eritrea | 985 | 1,059 | 1,145 | 1,045 | 1,494 | 1,797 | 1,424 | 1,457 | 1,951 | 1,597 |
| Estonia | 217 | 234 | 213 | 183 | 208 | 183 | 157 | 190 | 210 | 157 |
| Eswatini | 15 | 10 | 15 | 7 | 12 | 8 | 16 | 16 | 25 | D |
| Ethiopia | 8,519 | 8,803 | 8,323 | 7,002 | 8,312 | 8,725 | 7,370 | 6,769 | 9,065 | 7,385 |
| Fiji | 1,118 | 1,134 | 1,003 | 770 | 850 | 996 | 841 | 875 | 778 | 624 |
| Finland | 344 | 329 | 300 | 274 | 301 | 303 | 279 | 283 | 343 | 250 |
| France | 2,527 | 2,358 | 2,534 | 2,589 | 2,784 | 2,841 | 2,812 | 2,854 | 3,315 | 2,553 |
| French Polynesia | 14 | 15 | 8 | 8 | 14 | 14 | 14 | 13 | 18 | 15 |
| Gabon | 53 | 80 | 72 | 63 | 89 | 83 | 67 | 81 | 113 | 87 |
| Gambia | 505 | 556 | 573 | 510 | 685 | 724 | 586 | 650 | 729 | 610 |
| Georgia | 1,253 | 1,271 | 1,205 | 898 | 1,027 | 988 | 889 | 751 | 973 | 709 |
| Germany | 4,461 | 4,192 | 4,066 | 4,375 | 4,380 | 4,329 | 3,879 | 4,284 | 4,745 | 3,162 |
| Ghana | 4,690 | 5,344 | 5,105 | 5,108 | 6,033 | 6,411 | 5,777 | 6,047 | 6,936 | 4,973 |
| Greece | 844 | 867 | 938 | 780 | 867 | 1,013 | 945 | 1,074 | 1,137 | 828 |
| Grenada | 528 | 683 | 717 | 544 | 664 | 658 | 629 | 463 | 640 | 478 |
| Guatemala | 7,285 | 8,797 | 9,530 | 8,549 | 9,344 | 9,764 | 9,131 | 9,566 | 8,948 | 6,421 |
| Guinea | 575 | 787 | 958 | 908 | 999 | 1,077 | 957 | 924 | 1,069 | 771 |
| Guinea-Bissau | 29 | 31 | 24 | 27 | 28 | 29 | 25 | 29 | 23 | 20 |
| Guyana | 5,413 | 6,201 | 6,295 | 4,327 | 5,162 | 5,284 | 4,527 | 4,625 | 5,089 | 3,631 |
| Haiti | 14,191 | 19,114 | 23,480 | 13,676 | 14,053 | 15,276 | 12,794 | 14,389 | 14,308 | 10,865 |
| Honduras | 9,286 | 9,627 | 11,623 | 9,620 | 10,344 | 9,507 | 8,324 | 8,409 | 11,310 | 8,828 |
| Hong Kong | 3,980 | 5,294 | 5,462 | 4,433 | 5,039 | 5,819 | 5,310 | 5,645 | 6,353 | 5,150 |
| Hungary | 2,184 | 1,980 | 2,093 | 1,801 | 1,716 | 1,662 | 1,623 | 1,768 | 1,924 | 1,545 |
| Iceland | 953 | 1,014 | 984 | 891 | 941 | 934 | 729 | 922 | 983 | 754 |
| India | 76 | 97 | 75 | 70 | 88 | 88 | 83 | 69 | 101 | 69 |
| Indonesia | 45,985 | 42,928 | 49,897 | 37,854 | 42,213 | 46,188 | 50,802 | 52,194 | 64,631 | 48,109 |
| Iran | 2,345 | 2,123 | 2,190 | 1,568 | 1,743 | 1,641 | 1,566 | 1,807 | 2,093 | 1,359 |
| Iraq | 3,360 | 3,523 | 7,771 | 12,377 | 14,899 | 15,276 | 12,130 | 12,448 | 18,386 | 12,321 |
| Ireland | 1,171 | 1,295 | 1,413 | 1,375 | 1,383 | 1,405 | 1,623 | 1,621 | 1,698 | 1,179 |
| Israel | 3,153 | 2,859 | 3,466 | 3,015 | 3,182 | 3,071 | 2,466 | 2,743 | 3,265 | 2,363 |
| Italy | 2,231 | 2,234 | 2,355 | 2,313 | 2,760 | 2,692 | 2,501 | 2,920 | 3,244 | 2,324 |
| Jamaica | 14,591 | 15,531 | 16,442 | 13,547 | 16,566 | 16,772 | 15,087 | 17,213 | 18,010 | 13,465 |
| Japan | 1,744 | 1,663 | 1,837 | 1,635 | 1,858 | 1,758 | 1,713 | 1,869 | 1,969 | 1,584 |

Venezuela AR_000261

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jordan | 2,345 | 2,436 | 2,816 | 2,427 | 2,461 | 2,552 | 2,239 | 2,630 | 3,430 | 2,607 |
| Kazakhstan | 891 | 1,040 | 909 | 789 | 819 | 760 | 729 | 823 | 1,147 | 803 |
| Kenya | 3,621 | 4,170 | 4,257 | 3,885 | 4,738 | 4,834 | 4,348 | 4,302 | 5,329 | 4,186 |
| Korea, North | 13 | 19 | 27 | 24 | 23 | 16 | 15 | 30 | 25 | 17 |
| Korea, South | 12,664 | 13,790 | 15,786 | 13,587 | 14,230 | 14,347 | 14,643 | 16,031 | 16,298 | 11,350 |
| Kosovo | 465 | 510 | 487 | 392 | 547 | 530 | 410 | 451 | 597 | 482 |
| Kuwait | 869 | 820 | 920 | 791 | 819 | 790 | 677 | 789 | 1,111 | 840 |
| Kyrgyzstan | 440 | 420 | 395 | 305 | 418 | 408 | 412 | 483 | 534 | 411 |
| Laos | 5,452 | 7,027 | 3,932 | 2,564 | 2,042 | 1,999 | 1,726 | 2,027 | 2,303 | 1,704 |
| Latvia | 401 | 392 | 364 | 366 | 342 | 356 | 306 | 315 | 365 | 241 |
| Lebanon | 3,127 | 2,914 | 3,002 | 2,528 | 2,463 | 2,284 | 2,081 | 2,339 | 2,683 | 1,715 |
| Lesotho | 11 | 10 | 8 | 8 | 11 | 9 | 8 | 9 | 18 | 7 |
| Liberia | 3,794 | 4,322 | 3,923 | 3,035 | 3,042 | 3,022 | 2,421 | 2,752 | 3,334 | 2,429 |
| Libya | 180 | 195 | 206 | 228 | 193 | 210 | 207 | 308 | 447 | 309 |
| Lithuania | 973 | 938 | 933 | 744 | 752 | 626 | 584 | 699 | 885 | 529 |
| Luxembourg | 18 | 23 | 16 | 34 | 20 | 18 | 14 | 20 | 23 | 20 |
| Macau | 86 | 106 | 97 | 102 | 109 | 101 | 70 | 79 | 92 | 61 |
| Madagascar | 44 | 37 | 50 | 50 | 65 | 65 | 61 | 53 | 63 | 47 |
| Malawi | 86 | 85 | 76 | 76 | 91 | 95 | 84 | 114 | 120 | 91 |
| Malaysia | 1,137 | 1,150 | 1,169 | 1,052 | 1,113 | 1,189 | 1,170 | 1,388 | 1,406 | 942 |
| Mali | 274 | 288 | 332 | 352 | 405 | 456 | 391 | 398 | 446 | 390 |
| Malta | 54 | 44 | 59 | 40 | 50 | 43 | 47 | 51 | 49 | 37 |
| Marshall Islands | 32 | 21 | 17 | 20 | 22 | 27 | 16 | 21 | 15 | 13 |
| Mauritania | 405 | 495 | 520 | 376 | 355 | 323 | 288 | 252 | 319 | 188 |
| Mauritius | 64 | 57 | 67 | 69 | 60 | 63 | 65 | 70 | 67 | 55 |
| Mexico | 94,783 | 102,181 | 99,385 | 94,889 | 105,958 | 103,550 | 118,559 | 131,977 | 122,286 | 84,081 |
| Micronesia, Federated States | 74 | 73 | 96 | 62 | 85 | 67 | 53 | 34 | 39 | 26 |
| Moldova | 1,398 | 1,602 | 1,594 | 1,279 | 1,681 | 1,689 | 1,442 | 1,680 | 2,010 | 1,494 |
| Mongolia | 242 | 286 | 347 | 335 | 324 | 227 | 416 | 468 | 541 | 428 |
| Montenegro | 205 | 227 | 231 | 202 | 209 | 222 | 187 | 205 | 254 | 162 |
| Montserrat | 63 | 51 | 65 | 47 | 43 | 45 | 45 | 52 | 50 | 37 |
| Morocco | 3,656 | 3,872 | 3,768 | 3,538 | 3,805 | 3,684 | 2,943 | 2,644 | 3,142 | 2,462 |
| Mozambique | 49 | 48 | 51 | 34 | 43 | 51 | 38 | 43 | 63 | 32 |
| Namibia | 32 | 21 | 40 | 31 | 42 | 33 | 27 | 29 | 61 | 39 |
| Nepal | 2,235 | 2,448 | 2,711 | 2,888 | 4,225 | 5,004 | 4,509 | 5,352 | 7,409 | 5,793 |
| Netherlands | 778 | 919 | 786 | 665 | 778 | 829 | 699 | 851 | 953 | 667 |
| Netherlands Antilles (former) | 60 | 76 | 82 | 43 | 35 | 45 | 42 | 48 | 56 | 48 |
| New Zealand | 480 | 563 | 482 | 463 | 514 | 565 | 468 | 577 | 608 | 577 |
| Nicaragua | 5,092 | 5,064 | 5,064 | 3,775 | 4,181 | 4,663 | 4,181 | 4,277 | 4,346 | 3,474 |
| Niger | 124 | 143 | 167 | 161 | 180 | 140 | 126 | 110 | 143 | 112 |
| Nigeria | 9,344 | 9,322 | 9,545 | 8,667 | 10,363 | 9,520 | 7,652 | 8,459 | 11,360 | 8,929 |
| North Macedonia | 578 | 635 | 665 | 625 | 611 | 704 | 582 | 669 | 800 | 577 |
| Norway | 90 | 87 | 80 | 92 | 80 | 93 | 60 | 93 | 111 | 270 |
| Oman | 37 | 48 | 39 | 41 | 47 | 58 | 30 | 44 | 68 | 66 |
| Pakistan | 10,655 | 11,150 | 12,948 | 11,210 | 11,912 | 11,729 | 10,166 | 10,414 | 13,079 | 9,975 |
| Palau | 68 | 72 | 64 | 50 | 44 | 43 | 32 | 28 | 32 | 23 |
| Panama | 1,340 | 1,532 | 1,598 | 1,277 | 1,412 | 1,458 | 1,266 | 1,308 | 1,361 | 989 |
| Papua New Guinea | 17 | 16 | 20 | 7 | 21 | 19 | 13 | 17 | 19 | 20 |
| Paraguay | 289 | 338 | 331 | 256 | 338 | 396 | 343 | 401 | 387 | 278 |
| Peru | 10,266 | 11,814 | 11,782 | 9,572 | 10,701 | 11,319 | 10,014 | 10,043 | 9,899 | 6,910 |
| Philippines | 42,520 | 44,958 | 43,489 | 34,591 | 40,815 | 41,285 | 36,828 | 38,816 | 43,668 | 33,417 |
| Poland | 8,844 | 8,715 | 8,697 | 8,304 | 7,886 | 7,198 | 5,840 | 6,370 | 6,973 | 4,653 |
| Portugal | 1,426 | 1,607 | 1,585 | 1,587 | 1,690 | 1,665 | 1,807 | 2,031 | 1,712 | 1,081 |
| Qatar | 101 | 101 | 107 | 69 | 75 | 98 | 95 | 92 | 105 | 120 |

Venezuela_AR_000262

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Romania | 4,314 | 4,253 | 4,050 | 3,267 | 3,478 | 3,379 | 2,986 | 3,104 | 3,627 | 2,320 |
| Russia | 8,257 | 8,154 | 8,222 | 6,824 | 6,552 | 6,067 | 5,534 | 6,225 | 7,628 | 5,360 |
| Rwanda | 265 | 285 | 374 | 302 | 300 | 369 | 267 | 343 | 466 | 410 |
| Saint Kitts and Nevis | 306 | 319 | 315 | 270 | 360 | 345 | 317 | 281 | 335 | 211 |
| Saint Lucia | 600 | 724 | 856 | 635 | 775 | 791 | 697 | 604 | 758 | 574 |
| Saint Vincent and the Grenadines | 416 | 511 | 574 | 405 | 467 | 500 | 507 | 401 | 528 | 363 |
| Samoa | 172 | 178 | 206 | 181 | 213 | 192 | 164 | 168 | 239 | 159 |
| Saudi Arabia | 814 | 779 | 927 | 795 | 796 | 869 | 872 | 990 | 1,313 | 998 |
| Senegal | 752 | 790 | 869 | 806 | 974 | 969 | 882 | 990 | 956 | 742 |
| Serbia | 85 | 109 | 117 | 276 | 522 | 532 | 476 | 596 | 829 | 569 |
| Serbia and Montenegro (former) | 2,185 | 2,012 | 1,830 | 1,338 | 1,297 | 1,164 | 820 | 805 | 820 | 494 |
| Seychelles | 19 | 15 | 9 | 7 | 17 | 17 | 5 | 11 | D | 13 |
| Sierra Leone | 1,831 | 1,861 | 1,613 | 1,406 | 1,692 | 1,662 | 1,328 | 1,177 | 1,604 | 1,319 |
| Singapore | 311 | 293 | 263 | 258 | 285 | 308 | 279 | 332 | 359 | 255 |
| Sint Maarten | - | - | - | 7 | 17 | 33 | 21 | 22 | D | D |
| Slovakia | 421 | 401 | 413 | 317 | 443 | 428 | 384 | 394 | 432 | 275 |
| Slovenia | 57 | 64 | 58 | 52 | 61 | 63 | 52 | 57 | 68 | 68 |
| Somalia | 7,971 | 9,286 | 6,875 | 4,097 | 3,691 | 3,998 | 3,774 | 3,979 | 6,915 | 5,684 |
| South Africa | 2,566 | 2,294 | 2,233 | 2,083 | 2,538 | 2,197 | 1,901 | 2,262 | 2,967 | 2,084 |
| South Sudan | | | 81 | 132 | 131 | 74 | 109 | 146 | 101 | 1,589 |
| Soviet Union (former) | 2,812 | 2,610 | 2,807 | 2,334 | 2,372 | 2,268 | 2,123 | 2,252 | 2,280 | 1,589 |
| Spain | 1,253 | 1,242 | 1,367 | 1,326 | 1,414 | 1,515 | 1,469 | 1,674 | 1,945 | 1,517 |
| Sri Lanka | 1,334 | 1,146 | 1,258 | 1,104 | 1,246 | 1,497 | 1,364 | 1,480 | 1,609 | 1,140 |
| Sudan | 2,444 | 2,291 | 1,924 | 1,482 | 1,740 | 1,776 | 1,348 | 1,611 | 2,527 | 1,753 |
| Suriname | 194 | 189 | 160 | 127 | 183 | 164 | 143 | 176 | 170 | 91 |
| Sweden | 872 | 798 | 783 | 724 | 885 | 795 | 708 | 797 | 936 | 731 |
| Switzerland | 427 | 427 | 452 | 388 | 411 | 375 | 333 | 436 | 488 | 365 |
| Syria | 1,981 | 1,814 | 2,196 | 1,832 | 2,004 | 2,043 | 1,789 | 2,475 | 3,364 | 2,455 |
| Taiwan | 5,065 | 4,573 | 5,255 | 4,326 | 4,420 | 4,263 | 4,151 | 4,576 | 3,821 | 3,422 |
| Tajikistan | 155 | 142 | 168 | 146 | 156 | 212 | 222 | 261 | 364 | 251 |
| Tanzania | 516 | 543 | 647 | 525 | 553 | 639 | 547 | 561 | 731 | 530 |
| Thailand | 5,299 | 6,585 | 5,544 | 4,805 | 5,213 | 5,211 | 4,672 | 5,324 | 6,678 | 5,572 |
| Togo | 1,523 | 1,448 | 1,380 | 1,141 | 1,171 | 1,099 | 907 | 893 | 1,054 | 927 |
| Tonga | 251 | 306 | 371 | 473 | 352 | 337 | 262 | 319 | 354 | 300 |
| Trinidad and Tobago | 5,014 | 5,596 | 5,784 | 4,147 | 4,869 | 4,867 | 4,504 | 4,378 | 4,592 | 3,027 |
| Tunisia | 377 | 345 | 362 | 310 | 314 | 352 | 344 | 306 | 393 | 295 |
| Turkey | 3,100 | 3,329 | 3,390 | 2,925 | 3,150 | 3,201 | 3,108 | 3,275 | 3,289 | 2,305 |
| Turkmenistan | 146 | 136 | 160 | 110 | 153 | 102 | 109 | 117 | 203 | 122 |
| Turks and Caicos Islands | 36 | 49 | 47 | 33 | 31 | 31 | 26 | 40 | 28 | 28 |
| Uganda | 838 | 820 | 763 | 724 | 817 | 823 | 742 | 703 | 922 | 727 |
| Ukraine | 8,489 | 9,459 | 8,624 | 6,984 | 8,926 | 8,374 | 6,644 | 6,990 | 8,019 | 5,444 |
| United Arab Emirates | 425 | 431 | 499 | 435 | 443 | 473 | 475 | 542 | 730 | 545 |
| United Kingdom | 9,246 | 9,145 | 9,459 | 8,906 | 10,095 | 9,562 | 9,049 | 10,530 | 12,195 | 8,842 |
| United States | 45 | 60 | 55 | 31 | 75 | 95 | 84 | 122 | 174 | 163 |
| Uruguay | 751 | 849 | 933 | 812 | 902 | 1,044 | 1,028 | 1,073 | 1,088 | 822 |
| Uzbekistan | 2,463 | 3,071 | 2,482 | 1,725 | 1,660 | 1,685 | 1,498 | 1,532 | 1,950 | 1,482 |
| Venezuela | 6,856 | 7,404 | 7,648 | 6,871 | 8,192 | 7,633 | 6,463 | 8,172 | 9,317 | 6,993 |
| Vietnam | 20,922 | 23,490 | 24,277 | 18,837 | 21,976 | 24,848 | 19,323 | 21,082 | 25,646 | 22,705 |
| Virgin Islands, British | 48 | 41 | 45 | 49 | 59 | 46 | 42 | 54 | 59 | 45 |
| Yemen | 1,320 | 1,452 | 1,355 | 1,160 | 1,284 | 1,490 | 1,445 | 1,544 | 2,509 | 2,158 |
| Zambia | 337 | 338 | 352 | 318 | 370 | 404 | 401 | 402 | 501 | 340 |
| Zimbabwe | 715 | 691 | 658 | 734 | 852 | 843 | 675 | 709 | 810 | 559 |
| All other countries[1] | 45 | 40 | 41 | 41 | 41 | 42 | 38 | 42 | 63 | 50 |
| Unknown | 337 | 359 | 201 | 142 | 89 | 26 | 206 | 634 | 394 | 233 |

Venezuela AR_000263

D Data withheld to limit disclosure.
- Represents zero.
¹ Includes countries with fewer than 10 naturalizations per year.
Note: Based on N-400 data for persons aged 18 and over.
Source: U.S. Department of Homeland Security.



23 September 2022

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Uniting for Ukraine

Since previous report, **792 supporter applications** were filed on behalf of Ukrainian U4U paroles. Since March 24th, a total of **152,660** Ukrainians have entered the United States, including **58,356 U4U paroles and 0 unaccompanied children.**

I-134 Data Transmitted From USCIS to CBP — Approval/Denial Status Sent to USCIS — Approved Ukrainian Citizens Schedule Travel — Travel Status Checked For Arriving Ukrainians

## U4U SUPPORTER APPLICATIONS
**133,711**
Cumulative applications
+792 since previous report

114,078
9,240
7,500
38

## U4U USCIS ACCOUNTS
**96,797**
Cumulative beneficiary accounts
+594 since previous report

96,797
142

## TRAVEL AUTHORIZATIONS
**94,306**
Cumulative approvals
+564 since previous report

94,306
35,950
2,124

## U4U ARRIVALS AT POES
**58,356**
58,356

Cumulative paroles
+605 since previous report

Cumulative UC paroles
+0 since previous report
**0**

Port of Entry Parole Grants
| | |
|---|---|
| Air | 57,908 |
| Land | 445 |
| Sea | 3 |

**152,660**
Total Entries Since March 24th
+1,042 since previous report

24,469
Admissions
+166 since previous report

45,966
Admissions
+247 since previous report

22,936
Entries
+5 since previous report

933
Admissions
+19 since previous report

Venezuela AR-000264

Legend: Pending ■ Approvals/Confirmations ■ Denials/Non-Confirmations ■ Active approvals ■

## OTHER ADMISSIONS & HUMANITARIAN RELIEF

### TPS APPLICATIONS
SINCE APR. 19TH
**24,452**
Cumulative applications
+87 since previous report

19,863
4,551

### EAD APPLICATIONS
SINCE MAR. 24TH
**50,853**
Cumulative applications
+558 since previous report

16,495
10,235
24,123

Legend: TPS Applicants ■ Traditional Paroles ■ U4U Paroles ■

### ADMISSIONS & NON-U4U PAROLE
SINCE MAR. 24TH

Immigrants
Nonimmigrants
Traditional Paroles
Refugees

Legend: B1/B2 ■ Other ■ Total ■

Notes: Report data are person-level (i.e., exclude duplicate entry records). U4U supporter application denials data include expired applications and exclude administrative closures. Active approvals include unexpired approvals for beneficiaries who remain outside the United States (and are therefore eligible to enter in the future). As of 9/22/22, 100% of Ukrainians with approved U4U travel authorizations arriving at POEs were admitted as paroles. TPS application denials data include withdrawn applications. Non-U4U admission and parole data exclude returning LPRs, crew members, inadmissible Ukrainians, and unknown classes of admission. Data validity times: 6:35 AM for U4U parole applications and my USCIS account data; 6:12 AM for U4U paroles application data; 6:43 AM for TPS applications data valid; and 9:00 AM for EAD applications data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Uniting for Ukraine

## I-134 Supporters by Top Metro Areas

| Metro Area | Total | % of Total |
|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 22,220 | 17% |
| Chicago-Naperville-Elgin, IL-IN-WI | 16,997 | 13% |
| Seattle-Tacoma-Bellevue, WA | 7,244 | 5% |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 6,046 | 5% |
| Los Angeles-Long Beach-Anaheim, CA | 4,579 | 3% |
| Sacramento-Roseville-Folsom, CA | 3,861 | 3% |
| Miami-Fort Lauderdale-Pompano Beach, FL | 3,529 | 3% |
| Portland-Vancouver-Hillsboro, OR-WA | 3,249 | 2% |
| Detroit-Warren-Dearborn, MI | 2,983 | 2% |
| Cleveland-Elyria, OH | 2,966 | 2% |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 2,587 | 2% |
| San Francisco-Oakland-Berkeley, CA | 1,974 | 1% |
| Non-CBSA | 1,896 | 1% |
| Atlanta-Sandy Springs-Alpharetta, GA | 1,779 | 1% |
| Boston-Cambridge-Newton, MA-NH | 1,634 | 1% |
| Other | 50,167 | 38% |
| Total | 133,711 | N/A |

## U4U Entries by Top POEs

| Port of Entry | Total | % of Total |
|---|---|---|
| JFK | 12,369 | 21% |
| ORD | 11,207 | 19% |
| EWR | 5,736 | 10% |
| SEA | 3,967 | 7% |
| LAX | 3,178 | 5% |
| MIA | 3,128 | 5% |
| SFO | 2,462 | 4% |
| ATL | 2,324 | 4% |
| IAD | 1,662 | 3% |
| BOS | 1,596 | 3% |
| Other | 10,727 | 18% |
| Total | 58,356 | N/A |



## U4U Parolees by Age & Sex

Notes: Age group 0-17 contains 3 parolees whose gender is unknown. Age group 31-44 contains 2 parolees whose gender is unknown. Data validity times: 6:35 AM for I-134 supporters by top metro areas; 6:12 AM for U4U entries by POE and U4U Parolees by age & sex.

Venezuela AR_000265







UNCLAS//FOUO

# Homeland Security Task Force Southeast



Venezuela AR_000267



**CHNV DISPLACEMENT DATA (2018 -2021)**



*Figure 1. USAID Data Library Query: IDPs (2018-2021)[1]*

## Cuba

## Displacement to other countries

- 2018: **32,091 displaced**[2]
  Top Destinations: **22% Brazil** (7,168), **19.3 % Uruguay** (6,198), **10.3 % Chile** (3,307), **9.1% Peru** (2,930)[3]
- 2019: **62,600 displaced**[4]
  Top Destinations: **23.6 % Brazil** (14,798), **19.8% Uruguay** (12,396), **12.2% United States** (7,664), **11.3% Mexico** (7,071).[5]
- 2020: **71,100 displaced**[6]
  Top Destinations: **22.1% Brazil** (15,751), **17.3% United States** (12,342), **14.5 % Mexico** (10,325) **12.8% Uruguay** (9,135).[7]
- 2021: **83,100 displaced**[8]
  Top Destinations: **32.5% Mexico** (27,047), **25% United States** (20,729), **19.3 % Brazil** (16,061), **12.4% Uruguay** (10,341).[9]

---

[1] 'New Displacement' refers to the number of new cases or incidents of displacement recorded over the specified year, rather than the number of people displaced. This is done because people may have been displaced more than once. See [IDEA: QUERY (usaid.gov)](IDEA: QUERY (usaid.gov))
[2] UNHCR: Global Trends 2018.
[3] [OCHA Cuba - Data on forcibly displaced populations and stateless persons](#)
[4] [Cuba - Data on forcibly displaced populations and stateless persons](#)
[5] [OCHA Cuba - Data on forcibly displaced populations and stateless persons](#)
[6] [Cuba - Data on forcibly displaced populations and stateless persons](#)
[7] [OCHA Cuba - Data on forcibly displaced populations and stateless persons](#)
[8] [Cuba - Data on forcibly displaced populations and stateless persons](#)
[9] [OCHA Cuba - Data on forcibly displaced populations and stateless persons](#)

**CHNV DISPLACEMENT DATA (2018 -2021)**

## U.S. Population

- Based on 2021 American Community Survey Data, there are approximately 2,400,152 people of Cuban ancestry residing in the United States.[10] This population primarily resides in Florida.
    - Florida (1,541,559)
        - Within this population, 565,059 individuals are native, and 976,500 are foreign born.
    - Texas (123,565)
    - California (103,500)
    - New Jersey (94,260)
    - New York (83,771).[11]
- In FY 2020, 31,369 Cubans naturalized; a majority of these individuals reside in Florida.[12]
- As of August 2022, there are more than 500,000 Cubans who are lawful permanent residents.
    - More than 400,000 Cubans eligible to naturalize; they reside primarily in Florida.[13]

## Haiti

### Internally Displaced Persons (IDPs)

- According to UNHCR data, Haitian IDPs have increased over the past 3 years.
    - 2019: 2,100
    - 2020: 7,900
    - 2021: 17,000.[14]

- Due to continued violence 13,600 people displaced from Port-au-Prince Metropolitan area, increasing number of IDPs to an estimated 17,000 people from August 2020 to June 23, 2021.[15]
    - Bel'Air: 1,242
    - Tabarre Issa: 2,160
    - Toussaint Brave: 413
    - Carrefour (Sports Centre): 1,115
    - Delmas 2 (Salvation Army): 500
    - Delmas 2 (Ecole Komite): 1,000
    - Eglise St. Yves: 1,000
    - Delmas 103: 500
    - Saint Martin/Delmas 2: 4,000
    - Others: 5,110 (estimates within host families and other departments)[16]
- In the first two weeks of June 2021, approximately 10,000 people were internally displaced in Haiti.[17]

---

[10]  S0201: SELECTED POPULATION PROFILE… - Census Bureau Table
[11]  S0201: SELECTED POPULATION PROFILE… - Census Bureau Table
[12] U.S. Department of Homeland Security, Office of Immigration Statistics.
[13] USCIS Eligible to Naturalize Dashboard.
[14] United Nations High Commissioner for Refugees (UNHCR) (2019). UNHCR Statistical Online Population Database. UNHCR Refugee Statistics
[15] OCHA Haiti: Displacements due to gang violence in Port au Prince Situation Report No.3, June 23, 2021; Refugees and internally displaced persons - The World Factbook (cia.gov)
[16] OCHA Haiti: Displacements due to gang violence in Port au Prince Situation Report No.3, June 23, 2021
[17] OCHA Haiti: Displacements due to gang violence in Port-au-Prince Situation Report No. 2, June 14, 2021

**CHNV DISPLACEMENT DATA (2018 -2021)**

- o 8,500 of these IDPs were women and children internally displaced due to gang violence.[18]
- August 14, 2021: 7.2 magnitude earthquake leads to 19,000 IDPs and 40,000 displaced persons.[19]
  - o Conditions for Haitians who were displaced due to August 2021 earthquake as well as Haitians who were displaced due to gang-related violence in the Port-au-Prince Metropolitan area "have significantly deteriorated, especially for 6,830 households living in makeshift [IDP] sites [in Haiti]."[20]
- Gang violence has led to internal displacement of thousands of Haitian families who have left the Port-au-Prince metropolitan area (Bel-air, Bas-Delmas, Centre-Ville, Martissant, Cité Soleil, Croix-des-Bouquets and Tabarre) from the October 2020 to 2022.[21]
  - o "Thousands of households, including children, have been forced to flee these areas for their safety, many are being accommodated in host families who themselves are having to stretch their means to support additional family, and others have had to move to provincial towns."[22]
- April to May 2022: approximately 16,800 individuals internally displaced as violence from organized crime increased in Port-au-Prince and surrounding area.[23]
- May to June 2022: 1000 individuals internally displaced as insecurity persists.[24]
- 9,000 Haitians were displaced from Croix-des-Bouquets, Tabarre and Cité Soleil as they fled gang violence.[25]

## Displacement to other countries

- 2018 total: **68,511 displaced** [26]
- From 2019-2022, the number of Haitians who fled to other countries **increased**.
  - o 2019: **92,400 displaced**
    Top Destinations:
  - o 2020: **105,900 displaced**
    Top Destinations:
  - o 2021: **165,000 displaced**[27]
    Top Destinations: **42% Mexico** (69,877**), 32% United States** (53,028), **23.5% Brazil** (38,717)[28]

---

[18] Haiti: about 8,500 women and children displaced by 'urban guerrilla' in two weeks (unicef.org)

[19] United Nations Economic and Social Council: Report of the Ad Hoc Advisory Group on Haiti, April 18, 2022.

[20] United Nations Office for the Coordination of Humanitarian Affairs, "Haiti: Impact of social unrest on the humanitarian situation Flash Update #1," September 22, 2022.

[21] UNICEF Haiti Humanitarian Situation Report, Mid-Year 2022.

[22] UNICEF Haiti Humanitarian Situation Report #1 (Mid-Year 2022)

[23] USAID BHA - Haiti Complex Emergency Fact Sheet #6

[24] USAID BHA - Haiti Complex Emergency Fact Sheet #6

[25] Voices of The Displaced | UNICEF

[26] UNHCR: Global Trends 2018.

[27] Haiti - Data on forcibly displaced populations and stateless persons - Humanitarian Data Exchange (humdata.org)

[28] "Demographics and locations of forcibly displaced persons originating from Haiti," United Nations Office for the Coordination of Humanitarian Affairs, Humanitarian Data Exchange, accessed September 24, 2022, https://data.humdata.org/dataset/9c29bda6-7653-4c7e-9268-66d27457ab85/resource/70efe5e6-85ac-4cf1-a18f-4c0d0ce3e4cb/download/demographics_originating_hti.csv

**CHNV DISPLACEMENT DATA (2018 -2021)**



*Figure 2. Displacements from Haiti (2012-2021)[29]*

## U.S. Population

- Based on 2021 American Community Survey Data, there are approximately 1,054,233 people of Haitian ancestry residing in the United States.[30] This population primarily resides in Florida and New York.
  - Florida (479,714)
  - New York (180,710).
  - Massachusetts (78,510)
  - New Jersey (68,558)[31]
- In FY 2020, 10,865 Haitians naturalized; most of these individuals reside in Florida, New York, and Massachusetts.[32]
- As of August 2022, there are more than 200,000 Haitians who are lawful permanent residents.
  - More than 138,000 Haitians are eligible to naturalize; they reside primarily in Florida, New York, Massachusetts, and New Jersey.[33]

## Nicaragua

### Displacement to other countries

"Restrictions on civic space and persecution of perceived opponents, in addition to the worsening socio-economic situation, have led to an increase in the number of people leaving Nicaragua for the United States, from **5,450** people intercepted at the border in all of 2020, to **84,055** in the first six months of

---

[29] [Haiti - Data on forcibly displaced populations and stateless persons - Humanitarian Data Exchange (humdata.org)](#)
[30] [S0201: SELECTED POPULATION PROFILE... - Census Bureau Table](#)
[31] [S0201: SELECTED POPULATION PROFILE... - Census Bureau Table](#)
[32] U.S. Department of Homeland Security, Office of Immigration Statistics.
[33] USCIS Eligible to Naturalize Dashboard.

**CHNV DISPLACEMENT DATA (2018 -2021)**

2022. The number of refugees and asylum seekers in Costa Rica had reached **over 150,000** people as of March 2022."[34]

- 2018: **33,942 displaced**[35]
  Top Destinations: **68% Costa Rica** (23,162), **10.2% Panama** (3,464), **10% United States** (3,393), **4.1% Spain** (1,395)[36]
- 2019: **71,200 displaced**[37]
  Top Destinations: **63% Costa Rica** (44,883), **11% Panama** (7,728), **9% Spain** (6,327), **10.3% United States** (7,350)[38]
- 2020: **70,800 displaced**[39]
  Top Destinations: **60% Costa Rica** (42,511), **14.3 % United States** (10,127), **8.2% Panama** (5,841), **9.8% Spain** (6,943)[40]
- 2021: **175,100 displaced**[41]
  Top Destinations: **81% Costa Rica** (141,301), **16% Mexico** (28,006), **8% United States** (13,845), **4% Guatemala** (7,065)[42]
- 2022:

## U.S. Population

- Based on 2021 American Community Survey Data, there are approximately 457,005 people of Nicaraguan ancestry residing in the United States.[43] This population primarily resides in Florida and California.[44]
  - Florida (166,933)
  - California (118,963)
- In FY 2020, 3,474 Nicaraguans naturalized; most of these individuals reside in Florida.[45]
- As of August 2022, there are more than 30,000 Nicaraguans who are lawful permanent residents.
  - Almost 20,000 Nicaraguans are eligible to naturalize; they reside primarily in Florida, California, Texas, and New York.[46]

---

[34] Human rights situation in Nicaragua - Report of the United Nations High Commissioner for Human Rights (A/HRC/51/42) (Unofficial English Translation)

[35] UNHCR: Global Trends 2018.

[36] Nicaragua - Data on forcibly displaced populations and stateless persons - Demographics and locations of forcibly displaced persons originating from Nicaragua - Humanitarian Data Exchange (humdata.org)

[37] Nicaragua - Data on forcibly displaced populations and stateless persons

[38] Nicaragua - Data on forcibly displaced populations and stateless persons - Demographics and locations of forcibly displaced persons originating from Nicaragua - Humanitarian Data Exchange (humdata.org)

[39] Nicaragua - Data on forcibly displaced populations and stateless persons

[40] Nicaragua - Data on forcibly displaced populations and stateless persons - Demographics and locations of forcibly displaced persons originating from Nicaragua - Humanitarian Data Exchange (humdata.org)

[41] Nicaragua - Data on forcibly displaced populations and stateless persons

[42] Nicaragua - Data on forcibly displaced populations and stateless persons - Demographics and locations of forcibly displaced persons originating from Nicaragua - Humanitarian Data Exchange (humdata.org); See also UNHCR - Number of displaced Nicaraguans in Costa Rica doubles in less than a year.

[43] Census Bureau Tables

[44] S0201: SELECTED POPULATION PROFILE... - Census Bureau Table

[45] U.S. Department of Homeland Security, Office of Immigration Statistics.

[46] USCIS Eligible to Naturalize Dashboard.

**CHNV DISPLACEMENT DATA (2018 -2021)**

## Venezuela

## Displacements to other countries

- By the end of 2018, more than 3 million Venezuelans fled to the Latin America and the Caribbean region.[47]
- For the first time, asylum claims from Venezuelans dominated the global asylum statistics with 341,800 new asylum claims in 2018, accounting for more than 1 in 5 claims submitted.[48]
  - Most asylum claims made in Peru (190,500), Brazil (61,600), and United States (27,500)[49]


- 2018: **3,078,226 displaced**[50]
  Top Destinations: **38% Columbia** (1,174,375), **21% Peru** (656,274), **9.4% Chile** (288,233), **8.5% Ecuador** (262,572), **4% Argentina** (128,183).[51]
- 2019: **4.5 million displaced**[52]
- 2020: **4.9 million displaced**[53]
  According to UNHCR, Venezuela was the third largest country of internationally displaced persons in 2020, with more than 90,000 refugees, almost 800,000 asylum-seekers and more than 3.5 million Venezuelans displaced abroad that year.[54]
- 2021: **5.6 million displaced**[55]
  Top Destinations: Peru, Ecuador, Chile, Colombia, United States.[56]
  Refugees: 199,000; Asylum seekers: 971,000[57]
  Total Venezuelans displaced internationally in 2021: 4.4 million[58]

  Among refugees and Venezuelans displaced abroad in 2021:

  - 72 percent lived in countries neighboring their countries of origin.[59]

---

[47] UNHCR: Global Trends 2018.

[48] UNHCR: Global Trends 2018.

[49] UNHCR: Global Trends 2018.

[50] UNHCR: Global Trends 2018.

[51] Venezuela (Bolivarian Republic of) - Data on forcibly displaced populations and stateless persons - Demographics and locations of forcibly displaced persons originating from Venezuela (Bolivarian Republic of) - Humanitarian Data Exchange (humdata.org)

[52] Venezuela (Bolivarian Republic of) - Data on forcibly displaced populations and stateless persons - Humanitarian Data Exchange (humdata.org)

[53] Venezuela (Bolivarian Republic of) - Data on forcibly displaced populations and stateless persons - Humanitarian Data Exchange (humdata.org)

[54] United Nations Department of Economic and Social Affairs, Population Division (2020). International Migration 2020 Highlights (ST/ESA/SER.A/452).

[55] Venezuela (Bolivarian Republic of) - Data on forcibly displaced populations and stateless persons - Humanitarian Data Exchange (humdata.org)

[56] Venezuela (Bolivarian Republic of) - Data on forcibly displaced populations and stateless persons - Demographics and locations of forcibly displaced persons originating from Venezuela (Bolivarian Republic of) - Humanitarian Data Exchange (humdata.org)

[57] UNHCR Venezuela Situation

[58] Refugee Statistics | USA for UNHCR (unrefugees.org)

[59] UNHCR: Global displacement hits another record, capping decade-long rising trend (unrefugees.org); UNHCR Global Trends: Forced Displacement in 2021.

**CHNV DISPLACEMENT DATA (2018 -2021)**

- o  Colombia hosted 1.8 million Venezuelans displaced abroad.
- o  Globally, there were 6.1 million Venezuelan refugees, asylum seekers and migrants combined in 2021 (reported through the Coordination Platform for Refugees and Migrants from Venezuela).[60]



*Figure 3. Total Venezuelans Displaced Across Borders in millions (2012-2021).[61]*

- •  2022:
  "[As of] May 2022, more than 6.1 million Venezuelans were living outside of Venezuela, according to R4V, led by the International Organization for Migration (IOM) and UNHCR."[62]
  - o  Out of almost 6 million displaced Venezuelans, 4.8 million lived in the Latin America Caribbean region as of September 2021.[63]

## U.S. Population

- •  Based on 2021 American Community Survey Data, there are approximately 659,631 people of Venezuelan ancestry residing in the United States.[64] Top destinations for Venezuelans are Florida and Texas.
  - o  Florida (307,448)
  - o  Texas (99,700)[65]

---

[60] UNHCR: Global displacement hits another record, capping decade-long rising trend (unrefugees.org)
[61] OCHA Humanitarian Data Exchange, Venezuela (Bolivarian Republic of) - Data on forcibly displaced populations and stateless persons.
[62] USAID: Venezuela Regional Crisis – Complex Emergency, June 14, 2022.
[63] UNHCR Venezuela Situation - Response in the Americas (May - September 2021).
[64] S0201: SELECTED POPULATION PROFILE... - Census Bureau Table
[65] S0201: SELECTED POPULATION PROFILE... - Census Bureau Table

## CHNV DISPLACEMENT DATA (2018 -2021)

- In FY 2020, 6,993 Venezuelans naturalized; most of these individuals reside in Florida. [66]
- As of August 2022, there are more than 120,000 Venezuelans who are lawful permanent residents.
    - More than 70,000 Venezuelans are eligible to naturalize; they reside primarily in Florida, Texas, and New York. [67]

---

[66] U.S. Department of Homeland Security, Office of Immigration Statistics.
[67] USCIS Eligible to Naturalize Dashboard.

# U.S. Naturalizations: 2021

**SEAN LEONG**

The naturalization process confers U.S. citizenship upon applicants who have fulfilled the requirements established in the Immigration and Nationality Act (INA). After naturalization, foreign-born citizens enjoy almost all the same benefits, rights, and responsibilities that the U.S. Constitution gives to U.S. citizens at birth, including the right to vote. The *2021 U.S. Naturalizations Annual Flow Report*, authored by the Office of Immigration Statistics (OIS) in the Department of Homeland Security (DHS), presents information on the number and characteristics of applicants aged 18 years and over who naturalized during 2021.[1,2]

## SUMMARY

The number of U.S. naturalizations rose to 814,000 persons in 2021, up 30 percent from 628,000 in 2020 (Table 1) (Figure 2) and up 10 percent from the 2011-2019 average of 742,000.[3] The suspension of in-person naturalization services from March 18, 2020 to June 4, 2020 to help slow the spread of COVID-19 contributed to the lower number of naturalizations in 2020 (Figure 1). The number of applications for citizenship in 2021 decreased to 789,000 from 968,000 applications in 2020 and was down from the 2011-2019 average of 846,000 applications. The number of naturalizations does not match the number of applications due to previously

**Figure 1.**

**Persons Naturalized by Month: Fiscal Years 2019 to 2021**



Source: DHS Office of Immigration Statistics

---

[1] In this report, "years" refer to fiscal years, which run from October 1 to September 30. Numbers in the text of this report are rounded to the nearest thousand; please refer to data tables for precise figures.

[2] This report does not include data on children acquiring citizenship based upon the citizenship status of a parent. The child of a U.S. citizen parent may acquire citizenship using the N-400 (naturalization) or the N-600K (expedited naturalization), but they are not required to do so and most do not. Therefore, naturalizations described in this report, obtained from N-400 records and limited to applicants who are 18 years of age or older, do not represent a complete count of persons who obtained citizenship status during the reporting year.

[3] Naturalization numbers reflect changes in the numbers of naturalization applications received as well as the number processed, which may be affected by applications pending from previous years and available resources. As a result, caution should be exercised in drawing conclusions from these data about trends in the underlying demand to naturalize. Average naturalization totals over a period of years provide a more accurate indication of long-term trends in naturalization.



**Homeland Security**

Office of Immigration Statistics
**OFFICE OF STRATEGY, POLICY, AND PLANS**

**Figure 2.**

**Persons Naturalized: Fiscal Years 1909 to 2021**



Source: DHS Office of Immigration Statistics

**Figure 3.**

**Applications for U.S. Citizenship: Fiscal Year 2021**



Source: DHS Office of Immigration Statistics

adjudicated applications, denials, and delays in application processing (Figure 3).[4] The leading countries of birth of newly naturalized citizens for 2021 were Mexico (113,000), India (57,000), the Philippines (48,000), Cuba (48,000), and the People's Republic of China (China) (29,000) (Table 1). The top three states of residence of persons naturalizing were California (172,000), Florida (109,000), and New York (90,000) (Table 2).

**THE NATURALIZATION PROCESS AND REQUIREMENTS**

To be considered for naturalization, an applicant must meet INA requirements and file such documentation on a Form N-400, *Application for Naturalization*. U.S. Citizenship and Immigration Services (USCIS) reviews the application and interviews all applicants to determine their eligibility to naturalize. Following approval, USCIS schedules applicants for a required oath ceremony before a judge or USCIS official.

Generally, to naturalize, applicants must be at least 18 years of age, establish that they have been lawfully admitted to the United States for permanent residence at the time of filing the naturalization application, and have resided continuously in the United States for at least 5 years[5] as a lawful permanent resident (LPR) immediately preceding the date of filing the application and up to the time of admission to citizenship. The applicant generally must be physically present in the United States for at least 30 months out of the 5 years immediately preceding the date of filing the application and must have lived within the state or district with jurisdiction over the applicant's place of residence for at least 90 days prior to

---

[4] See 2021 *Yearbook of Immigration Statistics*; Table 20: Applications for Naturalization Filed, Persons Naturalized, and Applications for Naturalization Denied.

[5] Certain permanent residents who are married to U.S. citizens and with evidence of continuous residency are eligible for naturalization after 3 years instead of the normally required 5 years as a permanent resident applying for citizenship. In addition, certain persons with qualifying military service may be eligible to apply for naturalization without any period of continuous residence in the United States. For more information, please visit https://www.uscis.gov/military/naturalization-through-military-service and https://www.uscis.gov/us-citizenship/citizenship-through-naturalization for citizenship through military service and naturalization, respectively.

the date of filing. Additional requirements for applicants include the ability to speak, read, and write in the English language; knowledge of U.S. Government and its history; attachment to the principles of the U.S. Constitution;[6] and being of good moral character. Special provisions of naturalization law generally exempt spouses of U.S. citizens employed abroad and persons with qualifying military service in the U.S. Armed Forces from some of these requirements.

## TRENDS AND CHARACTERISTICS OF PERSONS NATURALIZING

### Historical Trend

The average number of persons naturalizing increased from fewer than 113,000 per year during the 1950s and 1960s to 210,000 per year during the 1980s, 500,000 during the 1990s, 680,000 during the 2000s, and 730,000 per year between 2010 and 2019 (Figure 2). While annual naturalization rates have gradually increased, short-term naturalization rates since the mid-1990s have varied substantially due to dynamics related to election years, USCIS fee increases, and proposed legislative or actual statutory

changes.[7] USCIS was particularly affected by the COVID-19 pandemic in 2020 because the agency is fee-funded and experienced a budget shortfall following the suspension of in-person services and the reduction of worldwide travel. Spending reductions impacted all USCIS operations, including naturalizations.

### Region and Leading Countries of Birth

Until the early 1970s, persons naturalizing were predominately from Europe. Asia overtook Europe as the leading region of origin for newly naturalized citizens following increased Asian immigration pursuant to the 1965 amendments to the INA. Other factors include the arrival of large numbers of Indochinese refugees in the 1970s along with a pattern of higher-than-average naturalization rates among Asian immigrants. Asia has continued to be the leading region of origin in recent decades (Figure 4) and is closely followed by the North American region. From 2020 to 2021, the number of naturalizations varied from these regions, though their respective proportions remained similar to recent years. Caribbean naturalizations increased by the largest proportion to 49 percent, followed by persons from South America with 44 percent, and Central America with 41 percent (Table 1). The 2021 recovery to more normal levels of

---

[6] On July 19, 2019, USCIS announced plans to revise the naturalization civics test. On December 1, 2020, USCIS implemented the 2020 civics test but after determining the 2020 civics test's development and implementation "may inadvertently create potential barriers to the naturalization process," reverted to the 2008 version of the civics test starting on March 1, 2021. Applicants had the option to take either exam until the 2020 test was phased out on April 19, 2021.

[7] Since 1990 the numbers of naturalizations were notably higher than the long-term trend in 1996, 1999, and 2008 and demonstrated smaller spikes in 1994, 2006, and 2019 (Figure 2). Several of these spikes coincided with announcements of upcoming USCIS fee increases (including in 1998, 2007, 2010, and 2016) as higher shares of eligible LPRs naturalized in advance of rate increases and/or with election years, as eligible LPRs opted to obtain citizenship in time to participate in national elections. In August 2020, USCIS proposed fee increases but a lawsuit blocked implementation days before they would have gone into effect on October 2, 2020. On December 28, 2020, the Federal Government voluntarily moved to dismiss its appeal, ending the fee increases along with the form and policy changes that were included in the proposed rule.

---

**Figure 4.**

**Percent of Total Persons Naturalized by Region of Birth (Select Years prior to 2006 and 2016 to 2021)**



Note: Oceania has an average value of 0.5 percent over the last 5-year period. Africa had a value of 0.5 percent in 1966.
Source: DHS Office of Immigration Statistics

Venezuela AR_000278

naturalizations (after the 2020 drop in naturalizations – the lowest since 2010) exceeded those of 2019, but was uneven across regions. The total numbers of newly naturalized citizens from North America, South America, and Oceania exceeded their 2019 counts and Asia, Africa, and Europe's numbers of naturalizations were less.

Among the top 10 countries of birth for persons naturalizing in 2021, Mexico was the leading country (14 percent of the total), followed by India (7.0 percent), the Philippines (6.0 percent), Cuba (5.9 percent), and China (3.6 percent) (Table 1). The top five countries of birth for persons naturalizing were unchanged from 2020. The 10 top countries of origin accounted for 50 percent of all naturalizing citizens in 2021, essentially unchanged from 2020. The largest numeric increase in naturalizations between 2020 and 2021 occurred among immigrants born in Mexico (29,000), Cuba (17,000), the Philippines (15,000), the Dominican Republic (9,000), and India (9,000). The largest percentage increase in naturalizations between 2020 and 2021 was experienced by immigrants born in Jamaica (54 percent), Cuba (53 percent), the Dominican Republic (50 percent), Brazil (50 percent), and Bangladesh (47 percent).

## Leading States and Metropolitan Areas of Residence

In 2021, 595,000 people, or 73 percent of all persons naturalizing, resided in 10 states. California was home to the largest number of persons naturalizing with 172,000 (21 percent of the total), up from 113,000 in 2020; Florida followed with 109,000 (13 percent), up from 79,000 in 2020; and New York with 90,000 (11 percent), up from 56,000 in 2020 (Table 2). The largest percentage increases among states of residence of newly-naturalized citizens between 2020 and 2021 occurred in New Jersey (80 percent), New York (60 percent), California (52 percent), and Pennsylvania (52 percent), while Maryland was about the same in 2021 as 2020. In 2021, 52 percent of all newly naturalized citizens lived in 10 metropolitan areas (Table 3).[8] The leading metropolitan areas were New York-Newark-Jersey City, NY-NJ-PA, with 116,000 persons (14 percent of the total), up from 69,000 in 2020; Los Angeles-Long Beach-Anaheim, CA with 81,000 persons (9.9 percent),

---

[8] The most current Core-Based Statistical Area (CBSA) definitions are available from OMB at https://www.census.gov/programs-surveys/metro-micro.html.

**Table 1.**

**Persons Naturalized by Region and Country of Birth: Fiscal Years 2019 to 2021**

(Countries ranked by 2021 persons naturalized)

| Region and country of birth | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **REGION** | | | | | | |
| Total . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| Africa . . . . . . . . . . . . . . . . | 85,014 | 10.1 | 66,450 | 10.6 | 76,009 | 9.3 |
| Asia . . . . . . . . . . . . . . . . . | 327,434 | 38.8 | 246,215 | 39.2 | 295,224 | 36.3 |
| Europe. . . . . . . . . . . . . . . | 81,051 | 9.6 | 57,410 | 9.1 | 77,084 | 9.5 |
| North America . . . . . . . . . . | 276,969 | 32.8 | 204,269 | 32.5 | 288,431 | 35.4 |
| Caribbean . . . . . . . . . . . | 101,342 | 12.0 | 80,888 | 12.9 | 120,601 | 14.8 |
| Central America . . . . . . . | 42,085 | 5.0 | 30,704 | 4.9 | 43,379 | 5.3 |
| Other North America. . . . . | 133,542 | 15.8 | 92,677 | 14.8 | 124,451 | 15.3 |
| Oceania. . . . . . . . . . . . . . . | 4,311 | 0.5 | 3,393 | 0.5 | 4,304 | 0.5 |
| South America . . . . . . . . . . | 68,687 | 8.1 | 50,442 | 8.0 | 72,701 | 8.9 |
| Unknown. . . . . . . . . . . . . . | 127 | - | 75 | - | 108 | - |
| **COUNTRY** | | | | | | |
| Total . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| Mexico. . . . . . . . . . . . . . . . | 122,305 | 14.5 | 84,090 | 13.4 | 113,269 | 13.9 |
| India . . . . . . . . . . . . . . . . . | 64,638 | 7.7 | 48,111 | 7.7 | 57,043 | 7.0 |
| Philippines . . . . . . . . . . . . | 43,675 | 5.2 | 33,422 | 5.3 | 48,478 | 6.0 |
| Cuba . . . . . . . . . . . . . . . . . | 36,253 | 4.3 | 31,371 | 5.0 | 47,919 | 5.9 |
| China, People's Republic . . . | 39,492 | 4.7 | 26,111 | 4.2 | 29,227 | 3.6 |
| Dominican Republic. . . . . . . | 23,105 | 2.7 | 18,675 | 3.0 | 28,103 | 3.5 |
| Vietnam. . . . . . . . . . . . . . . | 25,652 | 3.0 | 22,707 | 3.6 | 24,224 | 3.0 |
| Jamaica. . . . . . . . . . . . . . . | 18,019 | 2.1 | 13,466 | 2.1 | 20,716 | 2.5 |
| El Salvador . . . . . . . . . . . . | 18,263 | 2.2 | 12,606 | 2.0 | 18,340 | 2.3 |
| Colombia . . . . . . . . . . . . . . | 17,128 | 2.0 | 12,768 | 2.0 | 17,539 | 2.2 |
| Korea, South. . . . . . . . . . . . | 16,299 | 1.9 | 11,350 | 1.8 | 14,996 | 1.8 |
| Haiti. . . . . . . . . . . . . . . . . . | 14,314 | 1.7 | 10,867 | 1.7 | 14,882 | 1.8 |
| Brazil . . . . . . . . . . . . . . . . . | 10,451 | 1.2 | 8,323 | 1.3 | 12,448 | 1.5 |
| Pakistan . . . . . . . . . . . . . . | 13,080 | 1.6 | 9,975 | 1.6 | 12,377 | 1.5 |
| United Kingdom . . . . . . . . . | 12,195 | 1.4 | 8,842 | 1.4 | 11,407 | 1.4 |
| Canada . . . . . . . . . . . . . . . | 11,061 | 1.3 | 8,423 | 1.3 | 10,928 | 1.3 |
| Nigeria. . . . . . . . . . . . . . . . | 11,364 | 1.3 | 8,930 | 1.4 | 10,921 | 1.3 |
| Iran . . . . . . . . . . . . . . . . . . | 11,311 | 1.3 | 8,830 | 1.4 | 10,798 | 1.3 |
| Venezuela . . . . . . . . . . . . . | 9,317 | 1.1 | 6,993 | 1.1 | 10,215 | 1.3 |
| Bangladesh. . . . . . . . . . . . . | 9,069 | 1.1 | 6,883 | 1.1 | 10,110 | 1.2 |
| All other countries . . . . . . . . | 316,602 | 37.5 | 235,511 | 37.5 | 289,921 | 35.6 |

- Figure rounds to 0.0.
Source: DHS Office of Immigration Statistics.

**Table 2.**

**Persons Naturalized by State of Residence: Fiscal Years 2019 to 2021**

(States ranked by 2021 persons naturalized)

| State of residence | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| California . . . . . . . . . . . . . | 148,765 | 17.6 | 112,738 | 17.9 | 171,863 | 21.1 |
| Florida. . . . . . . . . . . . . . . . | 96,149 | 11.4 | 78,641 | 12.5 | 109,235 | 13.4 |
| New York. . . . . . . . . . . . . . | 85,444 | 10.1 | 56,273 | 9.0 | 89,989 | 11.1 |
| Texas. . . . . . . . . . . . . . . . . | 97,675 | 11.6 | 66,942 | 10.7 | 77,025 | 9.5 |
| New Jersey . . . . . . . . . . . . | 36,661 | 4.3 | 22,185 | 3.5 | 39,953 | 4.9 |
| Massachusetts. . . . . . . . . . | 22,894 | 2.7 | 20,367 | 3.2 | 24,085 | 3.0 |
| Illinois . . . . . . . . . . . . . . . . | 30,472 | 3.6 | 19,835 | 3.2 | 22,684 | 2.8 |
| Virginia . . . . . . . . . . . . . . . | 23,345 | 2.8 | 17,360 | 2.8 | 20,732 | 2.5 |
| Maryland. . . . . . . . . . . . . . | 19,349 | 2.3 | 19,878 | 3.2 | 19,797 | 2.4 |
| Pennsylvania . . . . . . . . . . . | 21,014 | 2.5 | 12,925 | 2.1 | 19,693 | 2.4 |
| Other*. . . . . . . . . . . . . . . . | 261,825 | 31.0 | 201,110 | 32.0 | 218,805 | 26.9 |

*Includes unknown, U.S. territories, and U.S. armed forces posts.
Source: DHS Office of Immigration Statistics.

Venezuela AR_000279

**Table 3.**

**Persons Naturalized by Core Based Statistical Area (CBSA) of Residence: Fiscal Years 2019 to 2021**

(CBSA ranked by 2021 persons naturalized)

| Metropolitan area of residence | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| New York-Newark-Jersey City, NY-NJ-PA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107,964 | 12.8 | 68,933 | 11.0 | 116,201 | 14.3 |
| Los Angeles-Long Beach-Anaheim, CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56,850 | 6.7 | 43,381 | 6.9 | 80,727 | 9.9 |
| Miami-Fort Lauderdale-Pompano Beach, FL . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 60,590 | 7.2 | 52,921 | 8.4 | 68,880 | 8.5 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV. . . . . . . . . . . . . . . . . . . . . . . . | 30,808 | 3.7 | 26,306 | 4.2 | 30,089 | 3.7 |
| Dallas-Fort Worth-Arlington, TX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,521 | 3.6 | 22,371 | 3.6 | 26,151 | 3.2 |
| Houston-The Woodlands-Sugar Land, TX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33,826 | 4.0 | 21,462 | 3.4 | 24,369 | 3.0 |
| San Francisco-Oakland-Berkeley, CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,903 | 2.5 | 23,479 | 3.7 | 21,909 | 2.7 |
| Chicago-Naperville-Elgin, IL-IN-WI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,049 | 3.4 | 18,588 | 3.0 | 21,729 | 2.7 |
| Boston-Cambridge-Newton, MA-NH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,786 | 2.1 | 15,817 | 2.5 | 19,015 | 2.3 |
| Riverside-San Bernardino-Ontario, CA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,330 | 1.3 | 8,015 | 1.3 | 16,645 | 2.0 |
| Other, including unknown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 443,966 | 52.6 | 326,981 | 52.0 | 388,146 | 47.7 |

Notes: Metropolitan areas defined based on the 2020 update of Core Based Statistical Areas (CBSAs) definitions. As a result, numbers for previous years may differ from previously published figures.
Source: DHS Office of Immigration Statistics.

up from 43,000 persons in 2020; and Miami-Fort Lauderdale-West Palm Beach, FL with 69,000 persons (8.5 percent), up from 53,000 persons in 2020. The leading metropolitan areas of residence was largely the same as in 2020, but Riverside-San Bernardino-Ontario, CA replaced Atlanta-Sandy Springs-Alpharetta, GA in the top 10 for 2021. The largest numeric increase in among states of residence for newly naturalized citizens occurred in New York-Newark-Jersey City, NY-NJ-PA (47,000) and Los Angeles-Long Beach-Anaheim, CA (37,000), exceeding their 2020 numbers both numerically and in their percentages relative to the total. The largest percentage increases among states of residence for newly naturalized citizens between 2020 and 2021 among metropolitan areas occurred in Riverside-San Bernardino-Ontario, CA (108 percent), Los Angeles-Long Beach-Anaheim, CA (86 percent), and New York-Newark-Jersey City, NY-NJ-PA (69 percent), while San Francisco-Oakland-Berkeley, CA saw a decrease of 7 percent.

## Sex, Age, and Marital Status

Naturalization proportions by sex, age, and marital status varied only very slightly between 2020 and 2021 (Tables 4, 5, and 6, respectively). In 2021, females accounted for the majority of naturalizations at 56 percent of all persons naturalizing, essentially unchanged from 2020 (Figure 5). Fifty-one percent of newly naturalized adults were ages 25 to 44 years, almost unchanged from 2020. Twenty-two percent were ages 55 years and older, the same as in 2020, and 7.4 percent

**Table 4.**

**Persons Naturalized by Sex: Fiscal Years 2019 to 2021**

| Sex | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| Female . . . . . . . . . . . . . . . | 464,561 | 55.1 | 348,333 | 55.4 | 456,025 | 56.0 |
| Male . . . . . . . . . . . . . . . . . | 378,793 | 44.9 | 279,832 | 44.5 | 357,768 | 44.0 |
| Unknown. . . . . . . . . . . . . . | 239 | - | 89 | - | 68 | - |

- Figure rounds to 0.0.
Source: DHS Office of Immigration Statistics.

**Table 5.**

**Persons Naturalized by Age: Fiscal Years 2019 to 2021**

| Age | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| 18 to 24 years . . . . . . . . . . | 69,013 | 8.2 | 51,421 | 8.2 | 60,056 | 7.4 |
| 25 to 34 years . . . . . . . . . . | 196,412 | 23.3 | 149,900 | 23.9 | 190,634 | 23.4 |
| 35 to 44 years . . . . . . . . . . | 229,217 | 27.2 | 171,844 | 27.4 | 225,886 | 27.8 |
| 45 to 54 years . . . . . . . . . . | 157,821 | 18.7 | 115,667 | 18.4 | 156,454 | 19.2 |
| 55 to 64 years . . . . . . . . . . | 107,926 | 12.8 | 80,548 | 12.8 | 109,131 | 13.4 |
| 65 years and over . . . . . . . . | 83,204 | 9.9 | 58,874 | 9.4 | 71,700 | 8.8 |
| Unknown. . . . . . . . . . . . . . | - | - | - | - | - | - |
| Median age (years) . . . . . . . | 41 | X | 41 | X | 41 | X |

X Not applicable.
- Figure rounds to 0.0 or 0.
Source: DHS Office of Immigration Statistics.

**Table 6.**

**Persons Naturalized by Marital Status: Fiscal Years 2019 to 2021**

| Marital status | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total. . . . . . . . . . . . . . . . . | 843,593 | 100.0 | 628,254 | 100.0 | 813,861 | 100.0 |
| Married . . . . . . . . . . . . . . . | 543,672 | 64.4 | 411,725 | 65.5 | 543,627 | 66.8 |
| Single . . . . . . . . . . . . . . . . | 177,418 | 21.0 | 131,044 | 20.9 | 164,532 | 20.2 |
| Other* . . . . . . . . . . . . . . . . | 122,503 | 14.5 | 85,485 | 13.6 | 105,702 | 13.0 |

*Includes persons who were divorced, separated, widowed, or of unknown marital status.
Source: DHS Office of Immigration Statistics.

were ages 18 to 24 years, a slight decrease from 2020 (Figure 6). The median age of those naturalizing in 2021 was 41, unchanged from 2020.[9] Nearly 67 percent of individuals naturalizing were married in 2021, up from 66 percent in 2020, and 20 percent were single, a slight decrease from 2020 (Table 6).

## Years in Immigrant Status

Persons naturalizing in 2021 spent a median of 7 years in LPR status before becoming U.S. citizens, down from 8 years in 2019 (Table 7). Immigrants born in Africa spent the least number of years in LPR status (6 years), followed by immigrants from Asia (7 years), South America (7 years), Europe (8 years), North America (9 years), and Oceania (9 years), the ordering largely unchanged over the last decade. Europe, North America, and Oceania had their time spent in LPR status decline, reversing years-long trends of increasing time spent in LPR status.

## DATA

This report is based on data from USCIS administrative records of new U.S. citizens[10] who naturalized in 2021. These records consist of information taken from Form N-400 applications, such as the date and country of birth, sex, marital status, and state of residence. The Electronic Immigration System (ELIS) provided slightly more than 99 percent of the data while the Central Index System provided 0.8 percent.

## FOR MORE INFORMATION

For more information about immigration and immigration statistics, visit the OIS web page at http://www.dhs.gov/immigration-statistics.

[9] This report excludes data on children acquiring citizenship based on the citizenship of a parent; see footnote 2.
[10] A lawful permanent resident becomes a naturalized U.S. citizen only after the oath ceremony date.

**Figure 5.**

**Naturalizations by Age and Sex: Fiscal Year 2021**



Source: DHS Office of Immigration Statistics.

**Table 7.**

**Median Years in Lawful Permanent Resident Status for Persons Naturalized by Region of Birth and Year of Naturalization: Fiscal Years 2012 to 2021**

| Region of birth | Fiscal Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Total | 7 | 7 | 7 | 7 | 7 | 8 | 8 | 8 | 7 | 7 |
| Africa | 5 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Asia | 6 | 6 | 6 | 6 | 6 | 6 | 7 | 7 | 6 | 7 |
| Europe | 7 | 7 | 8 | 9 | 9 | 9 | 9 | 9 | 8 | 8 |
| North America | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 | 10 | 9 |
| Caribbean | 9 | 9 | 9 | 9 | 9 | 10 | 9 | 9 | 8 | 7 |
| Central America | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 | 10 | 10 |
| Other North America | 11 | 11 | 12 | 11 | 11 | 14 | 15 | 13 | 13 | 11 |
| Oceania | 8 | 8 | 9 | 9 | 10 | 10 | 10 | 10 | 10 | 9 |
| South America | 6 | 6 | 7 | 7 | 7 | 8 | 8 | 8 | 7 | 7 |

Note: Excludes persons who were not required to be lawful permanent residents prior to naturalization.
Source: DHS Office of Immigration Statistics.

Venezuela AR_000282

Average encounters 10/5 - 10/11/22    1,137
Average encounters 10/18 - 10/24    170
Average encounters 11/28 - 12/4    86

| USBP encounters of Venezuela nationals | |
| --- | --- |
| 1-Oct | 1240 |
| 2-Oct | 1510 |
| 3-Oct | 1366 |
| 4-Oct | 1260 |
| 5-Oct | 1139 |
| 6-Oct | 1174 |
| 7-Oct | 1083 |
| 8-Oct | 1006 |
| 9-Oct | 1202 |
| 10-Oct | 1224 |
| 11-Oct | 1128 |
| 12-Oct | 796 |
| 13-Oct | 1256 |
| 14-Oct | 1056 |
| 15-Oct | 834 |
| 16-Oct | 484 |
| 17-Oct | 298 |
| 18-Oct | 187 |
| 19-Oct | 158 |
| 20-Oct | 159 |
| 21-Oct | 132 |
| 22-Oct | 145 |
| 23-Oct | 160 |
| 24-Oct | 247 |
| 25-Oct | 296 |
| 26-Oct | 415 |
| 27-Oct | 301 |
| 28-Oct | 408 |
| 29-Oct | 405 |
| 30-Oct | 331 |
| 31-Oct | 430 |
| 1-Nov | 412 |
| 2-Nov | 331 |
| 3-Nov | 305 |
| 4-Nov | 348 |
| 5-Nov | 250 |
| 6-Nov | 239 |
| 7-Nov | 265 |
| 8-Nov | 260 |
| 9-Nov | 262 |
| 10-Nov | 262 |
| 11-Nov | 338 |
| 12-Nov | 192 |
| 13-Nov | 197 |
| 14-Nov | 158 |
| 15-Nov | 168 |
| 16-Nov | 490 |
| 17-Nov | 1074 |

Venezuela AR_000283

| Date | Value |
|---|---|
| 18-Nov | 210 |
| 19-Nov | 90 |
| 20-Nov | 116 |
| 21-Nov | 84 |
| 22-Nov | 126 |
| 23-Nov | 80 |
| 24-Nov | 60 |
| 25-Nov | 51 |
| 26-Nov | 55 |
| 27-Nov | 75 |
| 28-Nov | 66 |
| 29-Nov | 83 |
| 30-Nov | 86 |
| 1-Dec | 102 |
| 2-Dec | 95 |
| 3-Dec | 79 |
| 4-Dec | 93 |
| Oct persist | |

Nov and Dec Data pulled from UIP on 12/5/2022

Venezuela AR_000284

Venezuela_AR_000285

| | | Average in 30 days ending 12/13/22 | 8,281 |
| | | Average in 30 days ending 4/1/22 | 7,227 |
| | | Average in November 2021 | 5,828 |

Total Monthly SWB Encounters

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| Oct-21 | 66,049 | 51,036 | 47,752 | 164,837 |
| Nov-21 | 63,846 | 50,238 | 60,761 | 174,845 |
| Dec-21 | 51,475 | 48,024 | 79,754 | 179,253 |
| Jan-22 | 60,341 | 31,677 | 62,856 | 154,874 |
| Feb-22 | 71,850 | 39,436 | 54,724 | 166,010 |
| Mar-22 | 88,132 | 46,008 | 88,434 | 222,574 |
| Apr-22 | 82,568 | 43,999 | 109,218 | 235,785 |
| May-22 | 77,454 | 50,178 | 113,505 | 241,137 |
| Jun-22 | 66,730 | 57,948 | 83,156 | 207,834 |
| Jul-22 | 55,692 | 48,504 | 95,966 | 200,162 |
| Aug-22 | 60,772 | 38,575 | 104,740 | 204,087 |
| Sep-22 | 63,431 | 35,995 | 128,121 | 227,547 |
| Oct-22 | 65,788 | 34,851 | 130,039 | 230,678 |

Total daily SWB encounters

| | Mexico | NCA | Other | Total |
|---|---|---|---|---|
| 1/1/2022 | 724 | 405 | 1,625 | 2,754 |
| 1/2/2022 | 766 | 569 | 1,832 | 3,167 |
| 1/3/2022 | 1,214 | 775 | 1,470 | 3,459 |
| 1/4/2022 | 1,371 | 927 | 1,211 | 3,509 |
| 1/5/2022 | 1,513 | 872 | 1,467 | 3,852 |
| 1/6/2022 | 1,573 | 949 | 1,712 | 4,234 |
| 1/7/2022 | 1,658 | 770 | 1,604 | 4,032 |
| 1/8/2022 | 1,528 | 697 | 1,561 | 3,786 |
| 1/9/2022 | 1,534 | 601 | 1,381 | 3,516 |
| 1/10/2022 | 1,833 | 697 | 1,465 | 3,995 |
| 1/11/2022 | 2,164 | 856 | 1,247 | 4,267 |
| 1/12/2022 | 2,063 | 923 | 1,646 | 4,632 |
| 1/13/2022 | 2,031 | 1,129 | 1,945 | 5,105 |
| 1/14/2022 | 2,015 | 931 | 1,741 | 4,687 |
| 1/15/2022 | 2,083 | 1,010 | 2,027 | 5,120 |
| 1/16/2022 | 1,889 | 791 | 2,668 | 5,348 |
| 1/17/2022 | 2,264 | 1,046 | 2,567 | 5,877 |
| 1/18/2022 | 2,495 | 1,613 | 2,970 | 7,078 |
| 1/19/2022 | 2,372 | 1,483 | 2,555 | 6,410 |
| 1/20/2022 | 2,251 | 1,199 | 2,826 | 6,276 |
| 1/21/2022 | 2,166 | 1,187 | 2,577 | 5,930 |
| 1/22/2022 | 2,062 | 1,136 | 2,867 | 6,065 |
| 1/23/2022 | 1,742 | 1,016 | 2,553 | 5,311 |
| 1/24/2022 | 2,255 | 1,249 | 2,628 | 6,132 |
| 1/25/2022 | 2,473 | 1,360 | 2,203 | 6,036 |
| 1/26/2022 | 2,395 | 1,294 | 1,994 | 5,683 |
| 1/27/2022 | 2,588 | 1,557 | 2,304 | 6,449 |
| 1/28/2022 | 2,547 | 1,173 | 2,274 | 5,994 |
| 1/29/2022 | 2,299 | 1,307 | 2,222 | 5,828 |
| 1/30/2022 | 2,087 | 918 | 1,952 | 4,957 |
| 1/31/2022 | 2,386 | 1,237 | 1,762 | 5,385 |
| 2/1/2022 | 2,475 | 1,391 | 2,024 | 5,890 |
| 2/2/2022 | 2,836 | 1,651 | 2,039 | 6,526 |
| 2/3/2022 | 2,506 | 1,436 | 1,823 | 5,765 |
| 2/4/2022 | 2,079 | 1,156 | 1,642 | 4,877 |
| 2/5/2022 | 1,945 | 1,429 | 1,760 | 5,134 |
| 2/6/2022 | 2,009 | 1,115 | 2,023 | 5,147 |
| 2/7/2022 | 2,314 | 1,231 | 1,672 | 5,217 |
| 2/8/2022 | 2,650 | 1,707 | 1,767 | 6,124 |
| 2/9/2022 | 2,576 | 1,675 | 1,710 | 5,961 |
| 2/10/2022 | 2,782 | 1,469 | 1,579 | 5,830 |
| 2/11/2022 | 2,573 | 1,661 | 2,280 | 6,514 |
| 2/12/2022 | 2,400 | 1,684 | 1,973 | 6,057 |

Venezuela_AR_000286



| Date | | | | |
|---|---|---|---|---|
| 2/13/2022 | 2,167 | 1,134 | 1,934 | 5,235 |
| 2/14/2022 | 2,390 | 1,184 | 2,346 | 5,920 |
| 2/15/2022 | 2,893 | 1,526 | 1,638 | 6,057 |
| 2/16/2022 | 2,961 | 1,713 | 1,830 | 6,504 |
| 2/17/2022 | 2,925 | 1,484 | 1,993 | 6,402 |
| 2/18/2022 | 2,958 | 1,339 | 2,257 | 6,554 |
| 2/19/2022 | 2,261 | 1,243 | 2,065 | 5,569 |
| 2/20/2022 | 2,347 | 1,144 | 2,078 | 5,569 |
| 2/21/2022 | 2,702 | 1,219 | 1,673 | 5,594 |
| 2/22/2022 | 3,064 | 1,619 | 2,015 | 6,698 |
| 2/23/2022 | 2,895 | 1,556 | 1,610 | 6,061 |
| 2/24/2022 | 2,840 | 1,531 | 2,460 | 6,831 |
| 2/25/2022 | 2,795 | 1,365 | 2,087 | 6,247 |
| 2/26/2022 | 2,480 | 1,364 | 2,210 | 6,054 |
| 2/27/2022 | 2,398 | 1,097 | 2,044 | 5,539 |
| 2/28/2022 | 2,629 | 1,313 | 2,192 | 6,134 |
| 3/1/2022 | 3,057 | 1,805 | 2,276 | 7,138 |
| 3/2/2022 | 3,061 | 1,663 | 2,408 | 7,132 |
| 3/3/2022 | 2,957 | 1,482 | 2,417 | 6,856 |
| 3/4/2022 | 2,961 | 1,384 | 2,711 | 7,056 |
| 3/5/2022 | 2,675 | 1,352 | 2,968 | 6,995 |
| 3/6/2022 | 2,155 | 1,107 | 2,593 | 5,855 |
| 3/7/2022 | 2,527 | 1,347 | 2,544 | 6,418 |
| 3/8/2022 | 3,431 | 1,725 | 2,782 | 7,938 |
| 3/9/2022 | 3,227 | 1,697 | 2,413 | 7,337 |
| 3/10/2022 | 3,209 | 1,445 | 1,991 | 6,645 |
| 3/11/2022 | 3,275 | 1,665 | 2,768 | 7,708 |
| 3/12/2022 | 2,534 | 1,415 | 2,727 | 6,676 |
| 3/13/2022 | 2,150 | 1,091 | 3,193 | 6,434 |
| 3/14/2022 | 2,850 | 1,343 | 2,599 | 6,792 |
| 3/15/2022 | 2,759 | 1,516 | 2,858 | 7,133 |
| 3/16/2022 | 2,803 | 1,444 | 3,016 | 7,263 |
| 3/17/2022 | 3,020 | 1,497 | 2,897 | 7,414 |
| 3/18/2022 | 2,754 | 1,450 | 3,098 | 7,302 |
| 3/19/2022 | 2,619 | 1,135 | 2,986 | 6,740 |
| 3/20/2022 | 2,202 | 954 | 3,529 | 6,685 |
| 3/21/2022 | 2,444 | 1,386 | 3,466 | 7,296 |
| 3/22/2022 | 3,125 | 1,728 | 3,156 | 8,009 |
| 3/23/2022 | 2,887 | 1,546 | 2,805 | 7,238 |
| 3/24/2022 | 2,924 | 1,755 | 2,948 | 7,627 |
| 3/25/2022 | 2,975 | 1,510 | 2,760 | 7,245 |
| 3/26/2022 | 2,579 | 1,519 | 2,810 | 6,908 |
| 3/27/2022 | 2,399 | 1,190 | 3,320 | 6,909 |
| 3/28/2022 | 2,880 | 1,491 | 2,634 | 7,005 |
| 3/29/2022 | 3,010 | 1,669 | 2,928 | 7,607 |
| 3/30/2022 | 3,216 | 1,893 | 3,682 | 8,791 |
| 3/31/2022 | 3,467 | 1,804 | 3,151 | 8,422 |

Venezuela AR_000287

| Date | | | | |
|---|---|---|---|---|
| 4/1/2022 | 3,218 | 1,694 | 3,584 | 8,496 |
| 4/2/2022 | 2,783 | 1,640 | 3,668 | 8,091 |
| 4/3/2022 | 2,509 | 1,388 | 3,633 | 7,530 |
| 4/4/2022 | 2,769 | 1,548 | 3,501 | 7,818 |
| 4/5/2022 | 3,416 | 1,898 | 3,651 | 8,965 |
| 4/6/2022 | 3,057 | 1,599 | 3,905 | 8,561 |
| 4/7/2022 | 3,195 | 1,462 | 3,671 | 8,328 |
| 4/8/2022 | 3,090 | 1,581 | 3,943 | 9,162 |
| 4/9/2022 | 2,834 | 1,469 | 4,491 | 8,246 |
| 4/10/2022 | 2,422 | 1,300 | 4,150 | 7,872 |
| 4/11/2022 | 2,816 | 1,590 | 4,529 | 8,935 |
| 4/12/2022 | 3,077 | 1,659 | 4,192 | 8,928 |
| 4/13/2022 | 3,098 | 1,871 | 4,298 | 9,267 |
| 4/14/2022 | 3,054 | 1,753 | 4,132 | 8,939 |
| 4/15/2022 | 2,761 | 1,774 | 4,368 | 8,903 |
| 4/16/2022 | 2,006 | 1,286 | 3,453 | 6,745 |
| 4/17/2022 | 1,638 | 851 | 3,249 | 5,738 |
| 4/18/2022 | 1,869 | 1,151 | 3,027 | 6,047 |
| 4/19/2022 | 2,641 | 1,671 | 3,532 | 7,844 |
| 4/20/2022 | 3,153 | 1,451 | 3,052 | 7,656 |
| 4/21/2022 | 2,947 | 1,556 | 3,113 | 7,616 |
| 4/22/2022 | 2,467 | 1,305 | 3,213 | 7,333 |
| 4/23/2022 | 2,150 | 1,191 | 3,249 | 6,907 |
| 4/24/2022 | 2,411 | 1,079 | 3,191 | 6,420 |
| 4/25/2022 | 3,229 | 1,099 | 3,734 | 7,244 |
| 4/26/2022 | 2,691 | 1,424 | 3,067 | 7,720 |
| 4/27/2022 | 2,914 | 1,376 | 3,193 | 7,260 |
| 4/28/2022 | 3,047 | 1,544 | 2,928 | 7,519 |
| 4/29/2022 | 2,491 | 1,386 | 3,915 | 8,232 |
| 4/30/2022 | 2,246 | 955 | 3,586 | 7,463 |
| 5/1/2022 | 2,593 | 1,295 | 3,395 | 6,596 |
| 5/2/2022 | 3,060 | 1,535 | 3,277 | 7,181 |
| 5/3/2022 | 2,693 | 1,494 | 2,952 | 7,872 |
| 5/4/2022 | 2,938 | 1,553 | 3,530 | 7,139 |
| 5/5/2022 | 2,904 | 1,755 | 3,591 | 8,021 |
| 5/6/2022 | 2,490 | 1,315 | 4,265 | 8,250 |
| 5/7/2022 | 1,978 | 1,295 | 3,611 | 8,070 |
| 5/8/2022 | 2,614 | 1,867 | 3,546 | 6,884 |
| 5/9/2022 | 2,552 | 1,449 | 2,856 | 8,027 |
| 5/10/2022 | 2,553 | 1,697 | 3,895 | 6,857 |
| 5/11/2022 | 2,702 | 1,815 | 4,267 | 8,145 |
| 5/12/2022 | 2,880 | 1,487 | 4,180 | 8,784 |
| 5/13/2022 | 2,273 | 1,547 | 4,364 | 8,547 |
| 5/14/2022 | 2,073 | 1,091 | 4,171 | 8,184 |
| 5/15/2022 | 2,402 | 1,470 | 3,625 | 7,335 |
| 5/16/2022 | 3,016 | 1,981 | 4,016 | 7,497 |
| 5/17/2022 | | | | 9,013 |

Venezuela_AR_000288

| Date | | | | |
|---|---|---|---|---|
| 5/18/2022 | 2,809 | 1,649 | 3,912 | 8,370 |
| 5/19/2022 | 2,921 | 1,922 | 4,043 | 8,886 |
| 5/20/2022 | 2,796 | 1,380 | 4,682 | 8,858 |
| 5/21/2022 | 2,337 | 1,731 | 4,595 | 8,663 |
| 5/22/2022 | 2,043 | 1,262 | 4,101 | 7,406 |
| 5/23/2022 | 2,234 | 1,759 | 3,111 | 7,104 |
| 5/24/2022 | 2,574 | 2,177 | 3,807 | 8,558 |
| 5/25/2022 | 2,333 | 1,863 | 3,738 | 7,934 |
| 5/26/2022 | 2,574 | 1,926 | 3,241 | 7,741 |
| 5/27/2022 | 2,309 | 1,671 | 3,603 | 7,583 |
| 5/28/2022 | 2,131 | 1,744 | 3,427 | 7,302 |
| 5/29/2022 | 1,920 | 1,316 | 3,198 | 6,434 |
| 5/30/2022 | 2,071 | 1,721 | 2,985 | 6,777 |
| 5/31/2022 | 2,435 | 2,456 | 2,228 | 7,119 |
| 6/1/2022 | 2,571 | 1,900 | 2,615 | 7,086 |
| 6/2/2022 | 2,364 | 1,911 | 2,417 | 6,692 |
| 6/3/2022 | 2,622 | 1,769 | 2,676 | 7,067 |
| 6/4/2022 | 1,863 | 1,671 | 2,821 | 6,355 |
| 6/5/2022 | 1,656 | 1,657 | 2,565 | 5,878 |
| 6/6/2022 | 2,422 | 2,074 | 2,380 | 6,876 |
| 6/7/2022 | 2,553 | 2,028 | 2,707 | 7,288 |
| 6/8/2022 | 2,634 | 2,258 | 2,088 | 6,980 |
| 6/9/2022 | 2,551 | 2,173 | 2,493 | 7,217 |
| 6/10/2022 | 2,595 | 1,741 | 2,370 | 6,706 |
| 6/11/2022 | 1,995 | 1,586 | 2,874 | 6,455 |
| 6/12/2022 | 1,952 | 1,468 | 2,999 | 6,419 |
| 6/13/2022 | 1,892 | 1,876 | 2,115 | 5,883 |
| 6/14/2022 | 2,361 | 2,272 | 2,572 | 7,205 |
| 6/15/2022 | 2,451 | 2,274 | 3,299 | 8,024 |
| 6/16/2022 | 2,537 | 1,980 | 3,091 | 7,608 |
| 6/17/2022 | 2,319 | 2,006 | 2,723 | 7,048 |
| 6/18/2022 | 1,963 | 1,705 | 3,503 | 7,171 |
| 6/19/2022 | 1,654 | 1,594 | 3,436 | 6,684 |
| 6/20/2022 | 1,782 | 1,616 | 2,842 | 6,240 |
| 6/21/2022 | 2,558 | 2,104 | 3,380 | 8,042 |
| 6/22/2022 | 2,499 | 2,217 | 2,839 | 7,555 |
| 6/23/2022 | 2,129 | 2,089 | 2,908 | 7,126 |
| 6/24/2022 | 2,278 | 2,162 | 3,005 | 7,445 |
| 6/25/2022 | 1,961 | 1,646 | 2,753 | 6,360 |
| 6/26/2022 | 1,714 | 1,698 | 2,497 | 5,909 |
| 6/27/2022 | 2,064 | 2,025 | 2,719 | 6,808 |
| 6/28/2022 | 2,253 | 2,165 | 2,466 | 6,884 |
| 6/29/2022 | 2,377 | 2,204 | 2,696 | 7,277 |
| 6/30/2022 | 2,160 | 2,079 | 3,307 | 7,546 |
| 7/1/2022 | 1,870 | 1,690 | 2,994 | 6,554 |
| 7/2/2022 | 1,900 | 1,783 | 3,441 | 7,124 |
| 7/3/2022 | 1,701 | 1,322 | 2,991 | 6,014 |

Venezuela AR_000289

| Date | | | | |
|---|---|---|---|---|
| 7/4/2022 | 1,993 | 1,782 | 3,101 | 6,876 |
| 7/5/2022 | 2,126 | 1,876 | 3,239 | 7,241 |
| 7/6/2022 | 2,130 | 1,958 | 3,605 | 7,693 |
| 7/7/2022 | 1,796 | 1,711 | 3,383 | 6,890 |
| 7/8/2022 | 1,867 | 1,572 | 3,089 | 6,528 |
| 7/9/2022 | 1,579 | 1,526 | 3,515 | 6,620 |
| 7/10/2022 | 1,488 | 1,469 | 3,381 | 6,338 |
| 7/11/2022 | 1,703 | 1,729 | 2,965 | 6,397 |
| 7/12/2022 | 2,052 | 1,837 | 3,923 | 7,812 |
| 7/13/2022 | 2,056 | 1,744 | 3,735 | 7,535 |
| 7/14/2022 | 1,930 | 1,849 | 3,173 | 6,952 |
| 7/15/2022 | 1,768 | 1,631 | 2,672 | 6,071 |
| 7/16/2022 | 1,609 | 1,557 | 3,678 | 6,844 |
| 7/17/2022 | 1,579 | 1,199 | 3,104 | 5,882 |
| 7/18/2022 | 1,475 | 1,566 | 2,950 | 5,991 |
| 7/19/2022 | 1,966 | 1,971 | 3,442 | 7,379 |
| 7/20/2022 | 1,941 | 1,516 | 2,908 | 6,365 |
| 7/21/2022 | 1,709 | 1,553 | 3,574 | 6,836 |
| 7/22/2022 | 1,933 | 1,400 | 3,033 | 6,366 |
| 7/23/2022 | 1,464 | 1,168 | 3,141 | 5,773 |
| 7/24/2022 | 1,539 | 1,235 | 2,762 | 5,536 |
| 7/25/2022 | 1,586 | 1,415 | 2,293 | 5,294 |
| 7/26/2022 | 2,031 | 1,602 | 2,855 | 6,488 |
| 7/27/2022 | 1,942 | 1,554 | 2,690 | 6,186 |
| 7/28/2022 | 1,867 | 1,528 | 2,676 | 6,071 |
| 7/29/2022 | 1,773 | 1,214 | 2,473 | 5,460 |
| 7/30/2022 | 1,798 | 1,250 | 2,589 | 5,637 |
| 7/31/2022 | 1,521 | 1,297 | 2,591 | 5,409 |
| 8/1/2022 | 1,532 | 1,290 | 2,354 | 5,176 |
| 8/2/2022 | 1,927 | 1,658 | 2,820 | 6,405 |
| 8/3/2022 | 2,003 | 1,409 | 2,739 | 6,151 |
| 8/4/2022 | 1,900 | 1,508 | 2,269 | 5,677 |
| 8/5/2022 | 2,056 | 1,440 | 2,828 | 6,324 |
| 8/6/2022 | 1,859 | 1,233 | 3,113 | 6,205 |
| 8/7/2022 | 1,728 | 995 | 3,037 | 5,760 |
| 8/8/2022 | 1,922 | 1,256 | 2,889 | 6,067 |
| 8/9/2022 | 2,400 | 1,467 | 3,348 | 7,215 |
| 8/10/2022 | 2,192 | 1,235 | 3,759 | 7,186 |
| 8/11/2022 | 2,182 | 1,479 | 3,156 | 6,817 |
| 8/12/2022 | 1,731 | 1,129 | 3,596 | 6,456 |
| 8/13/2022 | 1,887 | 1,180 | 2,919 | 5,986 |
| 8/14/2022 | 1,667 | 945 | 3,443 | 6,055 |
| 8/15/2022 | 1,651 | 1,164 | 3,498 | 6,313 |
| 8/16/2022 | 1,900 | 1,363 | 3,129 | 6,392 |
| 8/17/2022 | 2,151 | 1,482 | 3,663 | 7,296 |
| 8/18/2022 | 2,096 | 1,232 | 3,449 | 6,777 |
| 8/19/2022 | 2,032 | 1,130 | 3,740 | 6,902 |

Venezuela AR_000290

| Date | | | | |
|---|---|---|---|---|
| 8/20/2022 | 1,811 | 1,137 | 4,020 | 6,968 |
| 8/21/2022 | 1,740 | 986 | 3,686 | 6,412 |
| 8/22/2022 | 1,806 | 1,040 | 4,061 | 6,907 |
| 8/23/2022 | 2,090 | 1,172 | 3,992 | 7,254 |
| 8/24/2022 | 2,200 | 1,451 | 3,608 | 7,259 |
| 8/25/2022 | 2,242 | 1,253 | 3,787 | 7,282 |
| 8/26/2022 | 2,079 | 1,228 | 3,355 | 6,662 |
| 8/27/2022 | 1,857 | 1,208 | 3,915 | 6,980 |
| 8/28/2022 | 1,662 | 1,010 | 4,288 | 6,960 |
| 8/29/2022 | 1,978 | 1,275 | 3,967 | 7,220 |
| 8/30/2022 | 2,361 | 1,234 | 3,196 | 6,791 |
| 8/31/2022 | 2,130 | 986 | 3,116 | 6,232 |
| 9/1/2022 | 2,203 | 1,186 | 3,838 | 7,227 |
| 9/2/2022 | 2,348 | 1,039 | 4,319 | 7,706 |
| 9/3/2022 | 1,756 | 999 | 4,921 | 7,676 |
| 9/4/2022 | 1,543 | 668 | 3,372 | 5,583 |
| 9/5/2022 | 1,607 | 979 | 4,546 | 7,132 |
| 9/6/2022 | 2,097 | 1,271 | 4,047 | 7,415 |
| 9/7/2022 | 2,209 | 1,363 | 4,540 | 8,112 |
| 9/8/2022 | 2,147 | 1,341 | 4,860 | 8,348 |
| 9/9/2022 | 2,232 | 1,171 | 4,590 | 7,993 |
| 9/10/2022 | 1,912 | 1,061 | 4,356 | 7,329 |
| 9/11/2022 | 1,732 | 1,118 | 4,452 | 7,302 |
| 9/12/2022 | 1,843 | 1,060 | 4,621 | 7,524 |
| 9/13/2022 | 2,379 | 1,393 | 4,827 | 8,599 |
| 9/14/2022 | 2,263 | 1,231 | 4,795 | 8,289 |
| 9/15/2022 | 2,491 | 1,372 | 3,701 | 7,564 |
| 9/16/2022 | 1,851 | 1,127 | 4,405 | 7,383 |
| 9/17/2022 | 1,546 | 1,214 | 4,511 | 7,271 |
| 9/18/2022 | 1,641 | 968 | 4,134 | 6,743 |
| 9/19/2022 | 1,925 | 1,184 | 3,296 | 6,405 |
| 9/20/2022 | 2,432 | 1,420 | 4,014 | 7,866 |
| 9/21/2022 | 2,384 | 1,392 | 3,955 | 7,731 |
| 9/22/2022 | 2,272 | 1,245 | 4,082 | 7,599 |
| 9/23/2022 | 2,213 | 1,399 | 4,081 | 7,693 |
| 9/24/2022 | 1,910 | 1,017 | 4,436 | 7,363 |
| 9/25/2022 | 1,992 | 1,071 | 4,122 | 7,185 |
| 9/26/2022 | 2,427 | 1,197 | 4,086 | 7,710 |
| 9/27/2022 | 2,541 | 1,379 | 4,182 | 8,102 |
| 9/28/2022 | 2,435 | 1,408 | 4,139 | 7,982 |
| 9/29/2022 | 2,501 | 1,490 | 4,429 | 8,420 |
| 9/30/2022 | 2,599 | 1,232 | 4,464 | 8,295 |
| 10/1/2022 | 1,877 | 1,047 | 4,409 | 7,333 |
| 10/2/2022 | 1,815 | 885 | 4,988 | 7,688 |
| 10/3/2022 | 2,044 | 1,063 | 4,408 | 7,515 |
| 10/4/2022 | 2,574 | 1,319 | 4,607 | 8,500 |
| 10/5/2022 | 2,505 | 1,397 | 5,003 | 8,905 |

Venezuela_AR_000291

| Date | | | | |
|---|---|---|---|---|
| 10/6/2022 | 2,515 | 1,422 | 4,577 | 8,514 |
| 10/7/2022 | 2,336 | 1,259 | 4,357 | 7,952 |
| 10/8/2022 | 2,040 | 1,250 | 4,641 | 7,931 |
| 10/9/2022 | 1,822 | 1,098 | 4,638 | 7,558 |
| 10/10/2022 | 1,903 | 1,078 | 4,328 | 7,309 |
| 10/11/2022 | 2,273 | 1,290 | 4,257 | 7,820 |
| 10/12/2022 | 2,285 | 1,080 | 3,922 | 7,287 |
| 10/13/2022 | 2,107 | 1,325 | 4,740 | 8,172 |
| 10/14/2022 | 1,929 | 1,100 | 4,437 | 7,466 |
| 10/15/2022 | 1,826 | 1,046 | 3,818 | 6,690 |
| 10/16/2022 | 1,816 | 748 | 3,592 | 6,156 |
| 10/17/2022 | 1,974 | 1,078 | 3,442 | 6,494 |
| 10/18/2022 | 2,513 | 1,405 | 2,930 | 6,848 |
| 10/19/2022 | 2,237 | 1,217 | 3,605 | 7,059 |
| 10/20/2022 | 2,435 | 1,270 | 3,667 | 7,372 |
| 10/21/2022 | 2,372 | 1,065 | 4,018 | 7,455 |
| 10/22/2022 | 2,079 | 1,079 | 3,760 | 6,918 |
| 10/23/2022 | 1,857 | 876 | 4,147 | 6,880 |
| 10/24/2022 | 2,084 | 1,054 | 3,575 | 6,713 |
| 10/25/2022 | 2,582 | 1,322 | 4,235 | 8,139 |
| 10/26/2022 | 2,438 | 1,179 | 4,002 | 7,619 |
| 10/27/2022 | 2,314 | 1,138 | 4,464 | 7,916 |
| 10/28/2022 | 2,231 | 972 | 4,529 | 7,732 |
| 10/29/2022 | 1,979 | 1,098 | 4,908 | 7,985 |
| 10/30/2022 | 1,491 | 906 | 4,093 | 6,490 |
| 10/31/2022 | 1,968 | 945 | 3,965 | 6,878 |
| 11/1/2022 | 2,032 | 1,170 | 4,606 | 7,808 |
| 11/2/2022 | 2,100 | 1,182 | 4,958 | 8,240 |
| 11/3/2022 | 1,983 | 1,094 | 3,950 | 7,027 |
| 11/4/2022 | 2,086 | 1,097 | 4,607 | 7,790 |
| 11/5/2022 | 1,836 | 1,138 | 4,007 | 6,981 |
| 11/6/2022 | 1,619 | 910 | 5,331 | 7,860 |
| 11/7/2022 | 2,044 | 1,127 | 4,216 | 7,387 |
| 11/8/2022 | 2,466 | 1,354 | 4,585 | 8,405 |
| 11/9/2022 | 2,215 | 1,038 | 4,296 | 7,549 |
| 11/10/2022 | 2,162 | 1,226 | 4,695 | 8,083 |
| 11/11/2022 | 2,291 | 1,123 | 5,048 | 8,462 |
| 11/12/2022 | 1,930 | 1,109 | 4,441 | 7,480 |
| 11/13/2022 | 1,638 | 916 | 4,529 | 7,083 |
| 11/14/2022 | 2,088 | 1,066 | 4,732 | 7,886 Production |
| 11/15/2022 | 2469 | 1142 | 4,525 | 8136 UIP |
| 11/16/2022 | 2345 | 1213 | 4,635 | 8193 |
| 11/17/2022 | 2234 | 1268 | 6,063 | 9565 |
| 11/18/2022 | 2068 | 1126 | 4,696 | 7890 |
| 11/19/2022 | 1805 | 1004 | 5,082 | 7891 |
| 11/20/2022 | 1501 | 859 | 4,565 | 6925 |
| 11/21/2022 | 1775 | 1020 | 5,179 | 7974 |

Venezuela AR_000292

| Date | | | | |
|---|---|---|---|---|
| 11/22/2022 | 1958 | 1221 | 4,762 | 7941 |
| 11/23/2022 | 1802 | 1077 | 4643 | 7522 |
| 11/24/2022 | 1851 | 1257 | 4251 | 7359 |
| 11/25/2022 | 1761 | 831 | 4566 | 7158 |
| 11/26/2022 | 1632 | 925 | 5461 | 8018 |
| 11/27/2022 | 1505 | 861 | 4746 | 7112 |
| 11/28/2022 | 1796 | 1186 | 4747 | 7729 |
| 11/29/2022 | 2092 | 1263 | 4322 | 7677 |
| 11/30/2022 | 1931 | 1216 | 6068 | 9215 |
| 12/1/2022 | 2218 | 1203 | 5092 | 8513 |
| 12/2/2022 | 1901 | 1236 | 6500 | 9637 |
| 12/3/2022 | 1492 | 951 | 5471 | 7914 |
| 12/4/2022 | 1344 | 914 | 5700 | 7958 |
| 12/5/2022 | 1888 | 1142 | 5280 | 8310 |
| 12/6/2022 | 1887 | 1085 | 5411 | 8383 |
| 12/7/2022 | 1971 | 1181 | 6170 | 9322 |
| 12/8/2022 | 1914 | 1422 | 5949 | 9285 |
| 12/9/2022 | 1875 | 1023 | 6505 | 9403 |
| 12/10/2022 | 1487 | 1100 | 6571 | 9158 |
| 12/11/2022 | 1381 | 1186 | 6260 | 8827 |
| 12/12/2022 | 1501 | 934 | 6279 | 8714 |
| 12/13/2022 | 1738 | 1234 | 5830 | 8802 |

Source: OIS pull of UIP 12/14/22

**Persons Naturalized During Fiscal Year 2020**
**by Region/Country of Birth and Selected Characteristics**

**Region/Country: Venezuela**

| Characteristic | Total | Female | Male |
|---|---|---|---|
| Total | 6,993 | 3,969 | 3,024 |
| | | | |
| Age | | | |
| Under 18 years | - | - | - |
| 18 to 24 years | 634 | 336 | 298 |
| 25 to 34 years | 1,545 | 838 | 707 |
| 35 to 44 years | 1,822 | 1,046 | 776 |
| 45 to 54 years | 1,500 | 848 | 652 |
| 55 to 64 years | 875 | 511 | 364 |
| 65 years and over | 617 | 390 | 227 |
| Unknown | - | - | - |
| | | | |
| Marital status | | | |
| Married | 4,502 | 2,534 | 1,968 |
| Single | 1,324 | 654 | 670 |
| Other | 1,101 | 741 | 360 |
| Unknown | 66 | 40 | 26 |
| | | | |
| Occupation | | | |
| Management, professional, and related occupations | 1,212 | 659 | 553 |
| Service occupations | 206 | 129 | 77 |
| Sales and office occupations | 287 | 201 | 86 |
| Farming, fishing, and forestry occupations | D | D | D |
| Construction, extraction, maintenance and repair occupations | 81 | 24 | 57 |
| Production, transportation, and material moving occupations | 169 | 42 | 127 |
| Military | 18 | D | D |
| No occupation/not working outside home | D | D | D |
| Homemakers | - | - | - |
| Students or children | D | - | D |
| Retirees | D | - | D |
| Unemployed | D | D | D |
| Unknown | 5,012 | 2,908 | 2,104 |
| | | | |
| Leading states/territories of residence | | | |
| Arizona | 49 | 29 | 20 |
| California | 228 | 137 | 91 |
| Colorado | 56 | 40 | 16 |
| Florida | 3,935 | 2,246 | 1,689 |
| Georgia | 201 | 113 | 88 |
| Illinois | 66 | 41 | 25 |
| Maryland | 81 | 48 | 33 |

| | | | |
|---|---:|---:|---:|
| Massachusetts | 94 | 58 | 36 |
| Minnesota | 34 | 16 | 18 |
| Nevada | 33 | 18 | 15 |
| New Jersey | 115 | 67 | 48 |
| New York | 207 | 107 | 100 |
| North Carolina | 121 | 71 | 50 |
| Ohio | 49 | 24 | 25 |
| Pennsylvania | 65 | 32 | 33 |
| Tennessee | 53 | 27 | 26 |
| Texas | 811 | 448 | 363 |
| Virginia | 93 | 56 | 37 |
| Washington | 40 | 22 | 18 |
| Other | 588 | 326 | 262 |
| Unknown | 74 | 43 | 31 |

D Data withheld to limit disclosure.

- Represents zero.

Source: U.S. Department of Homeland Security.

**Unknown**

Venezuela AR_000296

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Daily Venezuela Report

8 December 2022

## VENEZUELA ENCOUNTERS YESTERDAY

**119**

Total Venezuelan Encounters:
Southwest Border

+35 since previous day

**54**

Venezuela Encounters:
El Paso Sector

+14 since previous day

**125**

Total Venezuelan Expulsions:
Southwest Border

+76 since previous day

**84**

Venezuela Expulsions:
El Paso Sector

+53 since previous day

**9**

Total Venezuelan Releases:
Southwest Border

-3 since previous day

**0**

Venezuela Releases:
El Paso Sector

-3 since previous day

## PROCESS FOR VENEZUELANS

### SUPPORTER APPLICATIONS CONFIRMED

**18,487**

Cumulative confirmed applications

+68 since previous report

### BENEFICIARY MATERIALS COMPLETED

**15,538**

Cumulative submissions completed

+94 since previous report

### BENEFICIARY TRAVEL AUTHORIZATIONS

**14,565**

Cumulative approvals

+77 since previous report

### BENEFICIARY PAROLEES AT POE

**7,641**

Cumulative beneficiaries

+239 since previous report

---

**A total of 119 Venezuelans were encountered at the Southwest Border yesterday and 125 Venezuelans were expelled under Title 42 authority. Since October 18th, 18,487 confirmed applications have been filed on behalf of Venezuelan beneficiaries, and a total of 7,641 beneficiaries have entered the United States.**

VENEZUELAN ENCOUNTERS, RELEASES AND EXPULSIONS

Encounters    Releases    T42 Expulsions



Venezuela AR_000297

[Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/8/2022 6:00 AM. T42 expulsion data is based on manual count based on manual count provided by field operators. Supporter application data come from USCIS and are valid as of 12/08/2022 8:39 AM. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/8/2022 7:04 AM. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.]

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

8 December 2022

# Venezuelan Encounters

VENEZUELAN ENCOUNTERS, RELEASES, AND T42 EXPULSIONS



Legend: Encounters · Releases · T42 Expulsions

Single Adults

Family Unit Individuals

## Venezuelans

| Sector | Encounters | | | Total in Custody | | | | Bookouts | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 20 | 33 | 1 | 153 | 99 | 1 | 84 | 0 | 2 | 0 |
| Del Rio | 17 | 21 | 0 | 15 | 21 | 0 | 21 | 0 | 0 | 0 |
| Yuma | 3 | 5 | 0 | 4 | 12 | 0 | 8 | 2 | 0 | 0 |
| Other | 12 | 7 | 0 | 26 | 5 | 0 | 12 | 7 | 2 | 0 |
| Total | 52 | 66 | 1 | 198 | 137 | 1 | 125 | 9 | 4 | 0 |

### Venezuelan Expulsions by Departure Port

| | SA | FM |
|---|---|---|
| San Ysidro | 32 | 2 |
| Nogales | 9 | 0 |
| El Paso | 1 | 0 |
| Eagle Pass | 18 | 3 |
| Brownsville | 13 | 48 |
| Total | 73 | 53 |

### Venezuelan Expulsions by Originating Sector

| | SA | FM |
|---|---|---|
| El Paso | 36 | 48 |
| Del Rio | 18 | 3 |
| Yuma | 6 | 2 |
| RGV | 3 | 0 |
| Other | 9 | 0 |
| Total | 72 | 53 |

## All Nationalities

| Sector | Encounters | | | Total in Custody | | | | Bookouts | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 1,277 | 625 | 106 | 2,688 | 1,494 | 163 | 416 | 997 | 2 | 2 |
| Del Rio | 1,521 | 509 | 59 | 1,452 | 492 | 97 | 282 | 1,090 | 33 | 0 |
| Yuma | 603 | 378 | 22 | 1,220 | 732 | 21 | 8 | 587 | 24 | 7 |
| Other | 1,968 | 516 | 260 | 4,829 | 1,866 | 260 | 724 | 2,709 | 203 | 62 |
| Total | 5,369 | 2,028 | 447 | 10,189 | 4,584 | 541 | 1,430 | 5,383 | 262 | 800 |

CUMULATIVE SOUTHWEST BORDER COUNTS SINCE OCTOBER 12

**15,961**
Cumulative Venezuelan Encounters
+119 since previous day

**13,478**
Cumulative Venezuelan Expulsions
+125 since previous day

**5,590**
Cumulative Venezuelan Releases
+9 since previous day

Venezuela AR_000298

Releases include parole-ATD, releases by CBP with a Notice to Appear (NTA), releases to ICE for release at the border with an NTA. Transfers to ICE include people placed in expedited removal and others placed in removal proceedings and transferred to ICE for a custody determination. Encounter, total in custody, and T8 book-out data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/8/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. All figures are based on preliminary data pulled from live systems and are subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

2

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Process for Venezuelans SINCE OCTOBER 18, 2022



Venezuela AR_000299

Notes: Report data are person-level (i.e, exclude duplicate entry records). Data on confirmed applications, supporter locations, and beneficiary locations come from USCIS and are valid as of 12/08/2022 8:39 AM. Beneficiary location data exclude persons listing U.S. addresses. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/8/2022 7:04 AM. Travel authorization approvals include authorizations that have been cancelled after the traveler's arrival. Arrivals by country of embarkation estimated based on CBP's analysis of flight data. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data. Cumulative supporter and beneficiary data are since October 18, 2022.

# Daily Venezuela Report

12 December 2022

**A total of 159 Venezuelans were encountered at the Southwest Border yesterday and 150 Venezuelans were expelled under Title 42 authority. Since October 18th, 18,606 confirmed applications have been filed on behalf of Venezuelan beneficiaries, and a total of 8,465 beneficiaries have entered the United States.**

## VENEZUELA ENCOUNTERS YESTERDAY

**159**

Total Venezuelan Encounters: Southwest Border
+55 since previous day

**103**

Venezuela Encounters: El Paso Sector
+32 since previous day

**150**

Total Venezuelan Expulsions: Southwest Border
+94 since previous day

**113**

Venezuela Expulsions: El Paso Sector
+72 since previous day

**4**

Total Venezuelan Releases: Southwest Border
+3 since previous day

**0**

Venezuela Releases: El Paso Sector
+0 since previous day

## VENEZUELAN ENCOUNTERS, RELEASES AND EXPULSIONS



Legend: Encounters, Releases, T42 Expulsions

## PROCESS FOR VENEZUELANS

### SUPPORTER APPLICATIONS CONFIRMED

**18,606**

Cumulative confirmed applications
+50 since previous report

### BENEFICIARY MATERIALS COMPLETED

**15,726**

Cumulative submissions completed
+18 since previous report

### BENEFICIARY TRAVEL AUTHORIZATIONS

**14,767**

Cumulative approvals
+42 since previous report

### BENEFICIARY PAROLEES AT POE

**8,465**

Cumulative beneficiaries
+160 since previous report

Venezuela AR_000300

Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/12/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. Supporter application data come from USCIS and are valid as of 12/12/2022 8:27 AM. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/12/2022 7:15 AM. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

12 December 2022

# Venezuelan Encounters

VENEZUELAN ENCOUNTERS, RELEASES, AND T42 EXPULSIONS

**Legend:** Encounters | Releases | T42 Expulsions



Single Adults

Family Unit Individuals

## Venezuelans (Single Adults)

| Sector | Encounters | | | Total in Custody | | | Bookouts | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 31 | 72 | 0 | 160 | 121 | 2 | 113 | 0 | 0 | 3 |
| Del Rio | 4 | 33 | 0 | 7 | 33 | 0 | 13 | 0 | 0 | 0 |
| Yuma | 3 | 6 | 0 | 5 | 8 | 0 | 11 | 0 | 0 | 3 |
| Other | 8 | 2 | 0 | 14 | 6 | 0 | 13 | 4 | 1 | 0 |
| Total | 46 | 113 | 0 | 186 | 168 | 2 | 150 | 4 | 1 | 6 |

## All Nationalities

| Sector | Encounters | | | Total in Custody | | | | Bookouts | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 1,238 | 1,022 | 136 | 2,407 | 2,618 | 252 | 345 | 1,219 | 34 | 55 |
| Del Rio | 1,035 | 367 | 41 | 1,900 | 555 | 101 | 194 | 929 | 0 | |
| Yuma | 731 | 359 | 28 | 1,303 | 748 | 36 | 11 | 420 | 36 | |
| Other | 1,776 | 461 | 414 | 5,401 | 2,063 | 517 | 452 | 2,413 | 108 | |
| Total | 4,780 | 2,209 | 619 | 11,011 | 5,984 | 906 | 1,002 | 4,981 | 178 | |

### Venezuelan Expulsions by Departure Port

| | SA | FM |
|---|---|---|
| San Ysidro | 89 | 5 |
| Nogales | 9 | 0 |
| El Paso | 0 | 0 |
| Eagle Pass | 9 | 4 |
| Brownsville | 0 | 34 |
| Total | 107 | 43 |

### Venezuelan Expulsions by Originating Sector

| | SA | FM |
|---|---|---|
| El Paso | 81 | 32 |
| Del Rio | 9 | 4 |
| Yuma | 8 | 3 |
| RGV | 0 | 0 |
| Other | 9 | 4 |
| Total | 107 | 43 |

**CUMULATIVE SOUTHWEST BORDER COUNTS SINCE OCTOBER 12**

**16,369** Cumulative Venezuelan Encounters +159 since previous day

**13,816** Cumulative Venezuelan Expulsions +150 since previous day

**5,614** Cumulative Venezuelan Releases +4 since previous day

Venezuela AR_000301

Releases include parole-ATD, releases by CBP with a Notice to Appear (NTA), and transfers to ICE for release at the border with an NTA. Transfers to ICE include people placed in expedited removal and others placed in removal proceedings and transferred to ICE for a custody determination. Encounter, total in custody, and T8 book-out data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/12/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. All figures are based on preliminary data pulled from live systems and are subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

2

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Process for Venezuelans SINCE OCTOBER 18, 2022



Venezuela AR_000302

Notes: Report data are person-level (i.e, exclude duplicate entry records). Data on confirmed applications, supporter locations, and beneficiary locations come from USCIS and are valid as of 12/12/2022 8:27 AM. Beneficiary location data exclude persons listing U.S. addresses. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/12/2022 7:15 AM. Travel authorization approvals include authorizations that have been cancelled after the traveler's arrival. Arrivals by country of embarkation estimated based on CBP's analysis of flight data. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data. Cumulative supporter and beneficiary data are since October 18, 2022.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Daily Venezuela Report

27 December 2022

## USBP VENEZUELA ENCOUNTERS YESTERDAY

**178**
Total Venezuelan Encounters:
Southwest Border
-1 since previous day

**145**
Venezuela Encounters:
El Paso Sector
+61 since previous day

**385**
Total Venezuelan Expulsions:
Southwest Border
+286 since previous day

**163**
Venezuela Expulsions:
El Paso Sector
+97 since previous day

**16**
Total Venezuelan Releases:
Southwest Border
+11 since previous day

**1**
Venezuela Releases:
El Paso Sector
-1 since previous day

A total of **178** Venezuelans were encountered at the Southwest Border yesterday **385** Venezuelans were expelled under Title 42 authority. Since October 18th, **19,665** confirmed applications have been filed on behalf of Venezuelan beneficiaries, and a total of **10,692** beneficiaries have entered the United States.

### VENEZUELAN ENCOUNTERS, RELEASES AND EXPULSIONS



Legend: Encounters, Releases, T42 Expulsions

## PROCESS FOR VENEZUELANS

SUPPORTER APPLICATIONS CONFIRMED

**19,665**
Cumulative confirmed applications
+113 since previous report

BENEFICIARY MATERIALS COMPLETED

**16,747**
Cumulative submissions completed
+140 since previous report

BENEFICIARY TRAVEL AUTHORIZATIONS

**15,766**
Cumulative approvals
+106 since previous report

BENEFICIARY PAROLEES AT POE

**10,692**
Cumulative beneficiaries
+313 since previous report

Venezuela AR_000303

Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/27/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. Supporter application data come from USCIS and are valid as of 12/27/2022 8:32 AM. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/27/2022 7:01 AM. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

27 December 2022

# Venezuelan Encounters

VENEZUELAN ENCOUNTERS, RELEASES, AND T42 EXPULSIONS



**Legend:** Encounters · Releases · T42 Expulsions

Single Adults

Family Unit Individuals

### Venezuelans

| Sector | Encounters | | | Total in Custody | | | | Bookouts | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 93 | 52 | 0 | 184 | 115 | 1 | 163 | 1 | 4 | 2 |
| Del Rio | 4 | 4 | 0 | 54 | 5 | 1 | 68 | 1 | 0 | 2 |
| Yuma | 1 | 6 | 0 | 3 | 6 | 0 | 2 | 2 | 0 | 1 |
| Other | 9 | 8 | 1 | 288 | 320 | 0 | 152 | 12 | 0 | 3 |
| Total | 107 | 70 | 1 | 529 | 446 | 2 | 385 | 16 | 4 | 8 |

### All Nationalities

| Sector | Encounters | | | Total in Custody | | | | Bookouts | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE |
| El Paso | 756 | 462 | 70 | 880 | 670 | 104 | 260 | 558 | 108 |
| Del Rio | 667 | 185 | 20 | 814 | 287 | 65 | 173 | 1,628 | 86 |
| Yuma | 525 | 450 | 17 | 845 | 649 | 29 | 2 | 662 | 35 |
| Other | 1,055 | 433 | 99 | 4,701 | 1,901 | 115 | 398 | 2,640 | 194 |
| Total | 3,003 | 1,530 | 206 | 7,240 | 3,507 | 313 | 833 | 5,488 | 423 |

### Venezuelan Expulsions by Departure Port

| | SA | FM |
|---|---|---|
| San Ysidro | 3 | 0 |
| Nogales | 78 | 0 |
| El Paso | 0 | 0 |
| Eagle Pass | 80 | 27 |
| Brownsville | 86 | 111 |
| Total | 247 | 138 |

### Venezuelan Expulsions by Originating Sector

| | SA | FM |
|---|---|---|
| El Paso | 145 | 18 |
| Del Rio | 41 | 27 |
| Yuma | 2 | 0 |
| RGV | 42 | 93 |
| Other | 17 | 0 |
| Total | 247 | 138 |

CUMULATIVE SOUTHWEST BORDER COUNTS SINCE OCTOBER 12

**19,804** Cumulative Venezuelan Encounters +178 since previous day

**16,392** Cumulative Venezuelan Expulsions +385 since previous day

**5,844** Cumulative Venezuelan Releases +16 since previous day

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

Venezuela AR_000304

2

Releases include parole-ATD, releases by CBP with a Notice to Appear (NTA), and transfers to ICE for release at the border with an NTA. Transfers to ICE include people placed in expedited removal and others placed in removal proceedings and transferred to ICE for a custody determination. Encounter, total in custody, and T8 book-out data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/27/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. All figures are based on preliminary data pulled from live systems and are subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Process for Venezuelans SINCE OCTOBER 18, 2022



Notes: Report data are person-level (i.e. exclude duplicate entry records). Data on confirmed applications, supporter locations, and beneficiary locations come from USCIS and are valid as of 12/27/2022 8:32 AM. Beneficiary location data exclude persons listing U.S. addresses. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/27/2022 7:01 AM. Travel authorization approvals include authorizations that have been cancelled after the traveler's arrival. Arrivals by country of embarkation estimated based on CBP's analysis of flight data. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data. Cumulative supporter and beneficiary data are since October 18, 2022.

Venezuela AR_000305

3

Venezuela AR_000306

USBP Encounters at Southwest Border by Sector, FY 1960 - August 2022

| FY | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1960 | 732 | 3,013 | 1,839 | 3,610 | 1,024 | 5,515 | 3,371 | 1,255 | 633 | 21,022 |
| 1961 | 954 | 3,458 | 1,878 | 3,540 | 1,172 | 6,713 | 2,279 | 1,178 | 573 | 21,745 |
| 1962 | 1,431 | 3,250 | 1,426 | 3,304 | 1,274 | 5,569 | 3,091 | 1,247 | 511 | 21,103 |
| 1963 | 2,026 | 4,417 | 1,690 | 3,813 | 1,753 | 9,592 | 3,768 | 1,466 | 719 | 29,644 |
| 1964 | 3,146 | 4,489 | 2,640 | 4,486 | 2,168 | 9,173 | 4,521 | 1,200 | 696 | 32,519 |
| 1965 | 3,973 | 4,292 | 5,344 | 6,355 | 2,310 | 8,057 | 6,558 | 1,480 | 1,651 | 40,020 |
| 1966 | 6,592 | 6,845 | 6,916 | 10,119 | 3,658 | 8,706 | 13,362 | 2,392 | 4,050 | 62,640 |
| 1967 | 7,049 | 7,906 | 6,974 | 13,656 | 4,378 | 9,929 | 17,844 | 3,068 | 4,269 | 73,973 |
| 1968 | 8,834 | 9,576 | 8,358 | 19,408 | 5,715 | 10,093 | 24,116 | 4,537 | 6,004 | 96,641 |
| 1969 | 11,973 | 12,991 | 9,195 | 31,159 | 8,129 | 14,076 | 33,311 | 8,301 | 8,833 | 137,968 |
| 1970 | 16,770 | 18,711 | 12,028 | 43,440 | 11,569 | 20,708 | 50,663 | 14,212 | 13,469 | 201,780 |
| 1971 | 22,026 | 25,780 | 14,242 | 57,796 | 17,665 | 28,281 | 59,375 | 23,548 | 15,218 | 263,991 |
| 1972 | 20,269 | 31,110 | 15,327 | 78,168 | 21,781 | 29,338 | 73,115 | 32,272 | 19,946 | 321,326 |
| 1973 | 22,378 | 42,232 | 23,125 | 82,186 | 23,854 | 37,092 | 128,489 | 44,824 | 36,286 | 441,066 |
| 1974 | 23,976 | 54,098 | 56,143 | 112,432 | 30,061 | 38,668 | 196,981 | 50,108 | 49,824 | 577,606 |
| 1975 | 20,472 | 32,008 | 27,217 | 99,000 | 26,199 | 31,300 | 185,499 | 39,941 | 50,628 | 512,264 |
| 1976 | 18,846 | 32,988 | 32,327 | 114,886 | 24,665 | 38,839 | 266,709 | 34,641 | 42,598 | 607,499 |
| 1977 | 22,782 | 43,182 | 38,441 | 145,659 | 27,239 | 38,704 | 337,135 | 33,295 | 48,669 | 733,153 |
| 1978 | 23,501 | 54,098 | 42,118 | 174,010 | 36,627 | 45,201 | 325,557 | 34,991 | 53,338 | 789,441 |
| 1979 | 20,116 | 50,262 | 55,532 | 149,722 | 50,666 | 41,915 | 337,930 | 37,075 | 52,580 | 795,798 |
| 1980 | 15,602 | 50,762 | 57,099 | 127,488 | 39,167 | 35,012 | 285,984 | 33,668 | 45,862 | 690,554 |
| 1981 | 17,584 | 50,455 | 59,774 | 146,872 | 36,910 | 32,809 | 326,836 | 33,085 | 45,483 | 749,808 |
| 1982 | 20,268 | 48,753 | 55,640 | 152,882 | 40,385 | 32,533 | 314,979 | 32,344 | 48,236 | 745,820 |
| 1983 | 23,689 | 57,178 | 73,126 | 185,944 | 65,779 | 37,706 | 429,121 | 63,595 | 59,777 | 1,033,974 |
| 1984 | 22,155 | 87,058 | 68,543 | 212,652 | 87,059 | 66,860 | 407,828 | 46,283 | 59,777 | 1,058,276 |
| 1985 | 23,667 | 99,280 | 71,519 | 240,350 | 114,931 | 82,826 | 427,772 | 55,269 | 67,337 | 1,183,351 |
| 1986 | 23,796 | 123,952 | 95,186 | 312,892 | 143,685 | 121,783 | 629,656 | 71,675 | 93,219 | 1,615,844 |
| 1987 | 9,536 | 64,934 | 55,521 | 131,394 | 74,139 | 71,038 | 500,327 | 47,441 | 67,377 | 1,122,067 |
| 1988 | 6,209 | 59,403 | 41,179 | 182,566 | 69,912 | 60,294 | 431,592 | 48,683 | 42,723 | 942,561 |
| 1989 | 5,560 | 46,786 | 27,524 | 148,105 | 75,292 | 79,650 | 366,757 | 51,445 | 31,387 | 852,506 |
| 1990 | 7,180 | 41,373 | 28,308 | 223,219 | 89,052 | 97,018 | 473,333 | 53,061 | 36,387 | 1,049,321 |
| 1991 | 8,764 | 38,554 | 30,450 | 211,775 | 72,293 | 87,319 | 540,347 | 59,728 | 28,646 | 1,077,876 |
| 1992 | 13,819 | 33,414 | 29,852 | 248,642 | 72,449 | 85,889 | 565,581 | 71,036 | 24,892 | 1,145,574 |
| 1993 | 15,486 | 42,289 | 30,058 | 285,781 | 82,348 | 109,048 | 531,689 | 92,639 | 23,548 | 1,212,886 |
| 1994 | 13,494 | 50,036 | 27,654 | 79,688 | 73,142 | 124,251 | 450,152 | 139,473 | 21,211 | 979,101 |
| 1995 | 11,552 | 76,400 | 37,317 | 110,971 | 93,305 | 169,101 | 524,231 | 227,529 | 20,894 | 1,271,390 |
| 1996 | 13,214 | 121,137 | 66,873 | 145,929 | 131,841 | 210,553 | 483,815 | 305,348 | 28,310 | 1,507,020 |
| 1997 | 8,604 | 131,030 | 164,210 | 124,376 | 141,893 | 243,793 | 283,889 | 272,397 | 30,177 | 1,368,707 |
| 1998 | 14,509 | 131,058 | 226,695 | 125,035 | 103,433 | 204,257 | 248,092 | 387,406 | 76,195 | 1,516,680 |
| 1999 | 14,952 | 156,653 | 225,279 | 110,857 | 114,004 | 169,151 | 182,267 | 470,449 | 93,388 | 1,537,000 |
| 2000 | 13,933 | 157,178 | 238,126 | 115,696 | 108,973 | 133,243 | 151,681 | 616,346 | 108,747 | 1,643,679 |
| 2001 | 12,087 | 104,875 | 172,852 | 112,857 | 87,068 | 107,844 | 110,075 | 449,675 | 78,385 | 1,235,718 |
| 2002 | 11,392 | 66,985 | 108,273 | 94,154 | 82,095 | 89,927 | 100,681 | 333,648 | 42,654 | 929,809 |
| 2003 | 10,319 | 50,145 | 92,099 | 88,816 | 70,521 | 77,749 | 111,515 | 347,263 | 56,638 | 905,065 |
| 2004 | 10,530 | 53,794 | 74,467 | 104,399 | 74,706 | 92,947 | 138,608 | 491,771 | 98,060 | 1,139,282 |
| 2005 | 10,536 | 68,506 | 55,722 | 122,679 | 75,346 | 134,186 | 126,904 | 439,079 | 138,438 | 1,171,396 |
| 2006 | 7,520 | 42,636 | 61,465 | 122,256 | 74,843 | 110,528 | 142,104 | 392,074 | 118,549 | 1,071,972 |
| 2007 | 5,536 | 22,920 | 55,883 | 75,464 | 56,714 | 73,430 | 152,460 | 378,239 | 37,992 | 858,638 |
| 2008 | 5,391 | 20,761 | 40,961 | 30,312 | 43,658 | 75,473 | 162,390 | 317,696 | 8,363 | 705,005 |
| 2009 | 6,360 | 17,082 | 33,521 | 14,999 | 40,569 | 60,989 | 118,721 | 241,673 | 6,951 | 540,865 |
| 2010 | 5,288 | 14,694 | 32,251 | 12,251 | 35,337 | 59,766 | 68,565 | 212,202 | 7,116 | 447,731 |
| 2011 | 4,036 | 16,144 | 30,191 | 10,345 | 36,053 | 59,243 | 42,447 | 123,285 | 5,833 | 327,577 |
| 2012 | 3,964 | 21,720 | 23,916 | 9,678 | 44,872 | 97,762 | 28,461 | 120,000 | 6,500 | 356,873 |
| 2013 | 3,684 | 23,510 | 11,154 | 9,279 | 50,749 | 154,453 | 27,496 | 120,939 | 6,106 | 414,397 |
| 2014 | 4,096 | 24,255 | 14,511 | 12,339 | 44,009 | 256,392 | 29,911 | 87,915 | 5,902 | 479,370 |
| 2015 | 5,031 | 19,013 | 12,820 | 14,495 | 35,888 | 147,257 | 26,290 | 63,997 | 7,142 | 331,333 |
| 2016 | 6,366 | 23,078 | 19,448 | 25,634 | 36,562 | 186,830 | 31,891 | 64,891 | 14,170 | 408,870 |
| 2017 | 6,002 | 13,476 | 18,633 | 25,193 | 25,460 | 137,562 | 26,086 | 38,657 | 12,847 | 303,916 |
| 2018 | 8,045 | 15,833 | 29,230 | 31,561 | 32,641 | 162,262 | 38,591 | 52,172 | 26,244 | 396,579 |
| 2019 | 9,637 | 57,559 | 35,558 | 182,143 | 38,933 | 339,135 | 58,049 | 63,490 | 68,269 | 851,508 |
| 2020 | 8,627 | 40,342 | 27,487 | 54,936 | 51,425 | 90,013 | 53,277 | 66,074 | 8,804 | 400,635 |
| 2021 | 37,766 | 259,294 | 50,831 | 93,918 | 112,241 | 549,077 | 142,459 | 191,232 | 114,488 | 1,659,206 |
| 2022* | 38,684 | 438,556 | 64,321 | 258,766 | 100,695 | 440,423 | 160,912 | 220,035 | 284,078 | 1,999,770 |



Note: FY 2022 data limited to first 11 months of the fiscal year
Source: FY 1960 - FY 2012 from US Border Patrol; FY 2013-FY2021 from OIS Persist Dataset.

Venezuela AR_000307





Venezuela AR_000308

| | | Cuba | Haiti | Nicaragua | Venezuela | CHNV | All Other | All Other ( Total | All Other |
|---|---|---|---|---|---|---|---|---|---|
| Oct-20 | 10 | 467 | 569 | 162 | 114 | 1312 | 37987 | 39299 | 39185 |
| Nov-20 | 11 | 528 | 96 | 255 | 151 | 1030 | 36782 | 37812 | 37661 |
| Dec-20 | 12 | 849 | 227 | 386 | 173 | 1635 | 35413 | 37048 | 36875 |
| Jan-21 | 1 | 1047 | 1610 | 299 | 257 | 3213 | 38898 | 42111 | 41854 |
| Feb-21 | 2 | 2746 | 713 | 537 | 859 | 4855 | 54863 | 59718 | 58859 |
| Mar-21 | 3 | 4708 | 2610 | 1730 | 2497 | 11545 | 104975 | 116520 | 114023 |
| Apr-21 | 4 | 2968 | 1013 | 2873 | 5797 | 12651 | 104849 | 117500 | 111703 |
| May-21 | 5 | 2508 | 2411 | 4206 | 7177 | 16302 | 94698 | 111000 | 103823 |
| Jun-21 | 6 | 2931 | 5310 | 7177 | 7382 | 22800 | 99960 | 122760 | 115378 |
| Jul-21 | 7 | 3462 | 5137 | 13219 | 6031 | 27849 | 125771 | 153620 | 147589 |
| Aug-21 | 8 | 4410 | 6671 | 9506 | 6199 | 26786 | 128902 | 155688 | 149489 |
| Sep-21 | 9 | 4728 | 17121 | 7006 | 10691 | 39546 | 101607 | 141153 | 130462 |
| **2021 Total** | | 31352 | 43488 | 47356 | 47328 | 169524 | 964705 | 1134229 | 1086901 |

**March-Sept average**

Source: OIS Persist Dataset; Unique Encounters pivot table filtered for unique encounters + OFO Admin encounters at SWB.

Venezuela AR_000309

Venezuela AR_000310

| | CNHV | Mexico | NCA | Other | Venezuela | Other |
|---|---|---|---|---|---|---|
| 2014-2019 | 32,794 | 180,254 | 264,702 | 25,468 | 1666 | 459404 |
| 2020 | 15,895 | 187,354 | 80,685 | 24,874 | 2543 | 363731 |
| 2021 | 169,524 | 322,804 | 488,871 | 153,030 | 47328 | 433667 |
| 2022 | 605,208 | 407,026 | 372,453 | 377,505 | 152443 | 208482 |

| | CNHV | Mexico | N. Central America | Other | Venezuela | Other | |
|---|---|---|---|---|---|---|---|
| 2014-2019 | 7% | 36% | 53% | 5% | 0.36% | 99.64% | 88% |
| 2020 | 5% | 61% | 26% | 8% | 0.69% | 99.31% | 87% |
| 2021 | 15% | 28% | 43% | 13% | 9.84% | 90.16% | 72% |
| 2022 | 34% | 23% | 21% | 21% | 42.24% | 57.76% | 44% |

Data through 8/31/22 from OIS Persist 8/31/22 unique encounters pivot table. Sept. 2022 data from UIP pulled 10/6/22 and deflated by unique encounter ratio for FY 2022.

Chart (horizontal bars) — axis: 0, 0.2, 0.4, 0.6, 0.8, 1, 1.2; category 1; Legend: Series1, Series2, Series3, Series4

Unique encounters through August 2022
Sum of count Column Labels

| Row Labels | Brazil | Chile | Colombia | Ecuador | India | Other | Peru | Romania | Russia | Ukraine | Venezuela | Cuba | Haiti | Nicaragua | El Salvador | Guatemala | Honduras | Mexico | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 566 | 43 | 319 | 4753 | 1323 | 6786 | 934 | 871 | 44 | 45 | 74 | 17556 | 470 | 1775 | 64491 | 71182 | 88651 | 2e+05 | 461070 |
| 2015 | 1371 | 25 | 401 | 2575 | 2143 | 7616 | 518 | 434 | 109 | 131 | 155 | 31062 | 336 | 1001 | 41608 | 54603 | 32371 | 2e+05 | 364274 |
| 2016 | 4499 | 46 | 472 | 2913 | 2524 | 10129 | 661 | 2547 | 137 | 206 | 321 | 41609 | 6365 | 1343 | 80604 | 76952 | 56685 | 2e+05 | 480995 |
| 2017 | 4596 | 50 | 275 | 1568 | 2311 | 7888 | 549 | 1165 | 196 | 170 | 387 | 15512 | 9161 | 1097 | 54556 | 71259 | 51025 | 1e+05 | 360925 |
| 2018 | 5783 | 27 | 305 | 1537 | 6187 | 9071 | 592 | 592 | 523 | 161 | 661 | 7020 | 307 | 3502 | 35383 | 125209 | 85140 | 2e+05 | 456066 |
| 2019 | 19236 | 318 | 592 | 12430 | 4954 | 14153 | 897 | 312 | 888 | 264 | 7518 | 32385 | 3041 | 14108 | 89173 | 257261 | 252058 | 2e+05 | 893976 |
| 2020 | 6785 | 653 | 324 | 7453 | 940 | 7566 | 350 | 275 | 435 | 93 | 2543 | 7312 | 4433 | 1607 | 12917 | 37261 | 30507 | 2e+05 | 308808 |
| 2021 | 54912 | 6150 | 5581 | 60447 | 2437 | 12377 | 2437 | 4016 | 4014 | 659 | 47328 | 31352 | 43488 | 47356 | 67902 | 197015 | 223954 | 3e+05 | 1134229 |
| 2022 | 49740 | 13544 | 109084 | 109084 | 17006 | 13144 | 41935 | 5628 | 18927 | 25248 | 152443 | 187858 | 44566 | 139446 | 60509 | 149363 | 138005 | 4e+05 | 1594037 |
| Grand Total | 147488 | 13541 | 117353 | 110682 | 35963 | 135239 | 48948 | 15840 | 25273 | 26977 | 211430 | 371666 | 112167 | 211235 | 503491 | 1043757 | 958396 | 2e+06 | 6056382 |

0.1494619
0.3289215

Unique Encounters from DIS period

| Row Labels | Brazil | Chile | Colombia | Cuba | Ecuador | El Salvador | Guatemala | Haiti | Honduras | India | Mexico | Nicaragua | Other | Peru | Romania | Russia | Ukraine | Venezuela | Grand Total | CNV | All other (Non-Venezuela) | Venezuela | All Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 276 | 25 | 473 | 1700 | 3969 | 30084 | 49502 | 847 | 42846 | 2952 | 224475 | 1353 | 5197 | 788 | 627 | 50 | 18 | 59 | 377695 | 16019 | 361676 | 59 | 377636 |
| 2014 | 566 | 43 | 319 | 17556 | 4753 | 64491 | 71162 | 470 | 88651 | 1323 | 230187 | 1775 | 6786 | 934 | 871 | 44 | 45 | 74 | 463595 | 19875 | 443195 | 74 | 463596 |
| 2015 | 1371 | 25 | 401 | 10362 | 2975 | 41608 | 54603 | 336 | 73271 | 2143 | 188915 | 1001 | 7616 | 518 | 434 | 109 | 131 | 155 | 363730 | 32556 | 331150 | 155 | 363119 |
| 2016 | 4499 | 46 | 472 | 41609 | 2913 | 76952 | 80604 | 6365 | 56685 | 2524 | 192982 | 1343 | 10329 | 661 | 2547 | 137 | 206 | 321 | 480695 | 49438 | 431357 | 321 | 480474 |
| 2017 | 4596 | 50 | 275 | 15512 | 1568 | 54956 | 73239 | 5161 | 53225 | 2315 | 193160 | 1097 | 7888 | 549 | 1365 | 196 | 170 | 387 | 360525 | 26157 | 334708 | 387 | 360538 |
| 2018 | 5783 | 27 | 305 | 35383 | 1537 | 35383 | 123209 | 307 | 65140 | 6387 | 173993 | 3502 | 9071 | 667 | 592 | 163 | 161 | 661 | 456068 | 11490 | 444578 | 661 | 455407 |
| 2019 | 19236 | 318 | 592 | 32385 | 12430 | 89173 | 257261 | 3041 | 250268 | 4954 | 184388 | 14108 | 14153 | 897 | 312 | 338 | 204 | 7518 | 889976 | 57052 | 826934 | 7518 | 886458 |
| 2020 | 876 | 653 | 324 | 7312 | 7423 | 12367 | 37261 | 3443 | 35057 | 940 | 107954 | 1607 | 7566 | 350 | 275 | 436 | 93 | 2545 | 308888 | 15895 | 292913 | 2545 | 306365 |
| 2021 | 5491.2 | 6150 | 5581 | 31062 | 31953 | 59703 | 149358 | 48468 | 228954 | 2437 | 322804 | 47356 | 12377 | 2457 | 4614 | 609 | 47328 | 114629 | 1134229 | 169524 | 964705 | 47328 | 1085901 |
| 2022 | 49740 | 6229 | 109508 | 127018 | 17006 | 137906 | 349516 | 44566 | 138205 | 13144 | 275253 | 139646 | 43595 | 5628 | 18927 | 23248 | 153643 | 185932 | 1104437 | 534311 | 1269726 | 153643 | 1441594 |
| September 1-30 2022 from UIP | 1732 | 528 | 13801 | 26106 | 5377 | 6214 | 13268 | 5175 | 14224 | 2021 | 63025 | 16200 | 10154 | 8233 | 276 | 49 | 3810 | 49 | 226873 | 83371 | 143502 | 3810 | 593563 |
| Unique Encounters rate from UI | 96% | 94% | 98% | 96% | 95% | 67% | 69% | 91% | 81% | 70% | 96% | 96% | 96% | 98% | 98% | 99% | 130% | 100% | 76% | 93% | 76% | | |
| Projected fY22 Unique Encount | 1665 | 494 | 13533 | 25262 | 4888 | 4145 | 10541 | 4723 | 9990 | 1631 | 58867 | 17421 | 10015 | 8137 | 272 | 49 | 33480 | 2572 | 185932 | | 33489 | | |
| 2023 full year projection | 51405 | 6723 | 123617 | 231120 | 21904 | 64654 | 159904 | 49389 | 143395 | 14775 | 407026 | 558667 | 69668 | 50072 | 5900 | 25297 | 21499 | 185932 | 1362193 | 605208 | 1156985 | 185932 | 1576261 |

CNV   20%   40%
235%
Venezuela   25%
293%

See formulas

|  | CNV | All other | Total |
|---|---|---|---|
| FY22 | 605208 | 1156985 | 1762193 |
| FY21 | 169524 | 964705 | 1134229 |
| FY19 ave | 32784 | 470424 | 503218 |

Share of change from 21: 0.693806 0.306193   3.370649965
Share of change from 19-19: 0.454663 0.545334   18.45466095

0   #VALUE!

431684   192280   627964

Venezuela AR_000311

Venezuela AR_000312

Unique encounters

| | Cuba | Haiti | Nicaragua | Venezuela | Sum |
|---|---|---|---|---|---|
| 2014 | 1,463 | 39 | 148 | 6 | 1,656 |
| 2015 | 2,589 | 28 | 83 | 13 | 2,713 |
| 2016 | 3,467 | 530 | 112 | 27 | 4,137 |
| 2017 | 1,293 | 763 | 91 | 32 | 2,180 |
| 2018 | 585 | 26 | 292 | 55 | 958 |
| 2019 | 2,699 | 253 | 1,176 | 627 | 4,754 |
| 2020 | 609 | 369 | 134 | 212 | 1,325 |
| Oct-20 | 467 | 569 | 162 | 114 | 1,312 |
| Nov-20 | 528 | 96 | 255 | 151 | 1,030 |
| Dec-20 | 849 | 227 | 386 | 173 | 1,635 |
| Jan-21 | 1,047 | 1,610 | 299 | 257 | 3,213 |
| Feb-21 | 2,746 | 713 | 537 | 859 | 4,855 |
| Mar-21 | 4,708 | 2,610 | 1,730 | 2,497 | 11,545 |
| Apr-21 | 2,968 | 1,013 | 2,873 | 5,797 | 12,651 |
| May-21 | 2,508 | 2,411 | 4,206 | 7,177 | 16,302 |
| Jun-21 | 2,931 | 5,310 | 7,177 | 7,382 | 22,800 |
| Jul-21 | 3,462 | 5,137 | 13,219 | 6,031 | 27,849 |
| Aug-21 | 4,410 | 6,671 | 9,506 | 6,199 | 26,786 |
| Sep-21 | 4,728 | 17,121 | 7,006 | 10,691 | 39,546 |
| Oct-21 | 5,821 | 869 | 9,011 | 13,266 | 28,967 |
| Nov-21 | 6,551 | 995 | 13,131 | 20,191 | 40,868 |
| Dec-21 | 7,934 | 6,939 | 14,439 | 24,652 | 53,964 |
| Jan-22 | 9,641 | 3,233 | 11,173 | 22,596 | 46,643 |
| Feb-22 | 16,405 | 1,795 | 12,973 | 3,016 | 34,189 |
| Mar-22 | 31,411 | 2,054 | 15,431 | 4,014 | 52,910 |
| Apr-22 | 34,296 | 5,420 | 12,184 | 4,057 | 55,957 |
| May-22 | 21,827 | 9,755 | 17,644 | 5,033 | 54,259 |
| Jun-22 | 15,513 | 3,580 | 10,502 | 13,099 | 42,694 |
| Jul-22 | 19,595 | 4,555 | 11,610 | 17,389 | 53,149 |
| Aug-22 | 18,864 | 5,371 | 11,348 | 25,130 | 60,713 |
| 9/2022 est | 25,262 | 4,723 | 17,421 | 33,489 | 80,895 |
| 9/1-30/22 | 26186 | 5175 | 18200 | 33810 | 83,371 |
| Unique Enc | 96% | 91% | 96% | 99% | |

| Mexico | Gtm | Hnd | SLV |
|---|---|---|---|
| 31,773 | 10,541 | 9,890 | 4,145 |

| | Cuba | | Haiti | | Nicaragua | | Venezuela | | CVHN | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Unique | Total | Unique | Total | Unique | Total | Unique | Total | Unique | Total |
| FY 2022 Projection | 213,120 | 220,468 | 49,289 | 53,919 | 156,867 | 163,550 | 185,932 | 188,547 | 605,208 | 626,484 |
| Increase over 2021 | 7 | 6 | 1.1 | 1.1 | 3 | 3 | 4 | 4 | 4 | 3 |
| Increase over 2020 | 29 | 16 | 11 | 12 | 98 | 71 | 73 | 68 | 38 | 27 |
| Increase over 2019 | 7 | 7 | 16 | 18 | 11 | 11 | 25 | 25 | 11 | 11 |
| Increase over 2018 | 30 | 31 | 161 | 175 | 45 | 46 | 281 | 275 | 53 | 54 |
| Increase over 2017 | 14 | 14 | 5 | 6 | 143 | 142 | 480 | 477 | 23 | 24 |
| Increase over 2016 | 5 | 5 | 8 | 8 | 117 | 119 | 579 | 578 | 12 | 13 |
| Increase over 2015 | 7 | 7 | 147 | 157 | 157 | 153 | 1,200 | 1,157 | 19 | 19 |
| Increase over 2014 | 12 | 13 | 105 | 109 | 88 | 87 | 2,513 | 2,417 | 30 | 31 |
| Increase over 2014-2019 average | 9 | 9 | 15 | 16 | 41 | 42 | 122 | 121 | 18 | 19 |

Data in rows 5 - 13 are quotients of 2022 values by preceding years and describe growth factors from the earlier years. For example, cell B7 indicates that "Unique Cuban encounters over 2021 increase over 2021 encounters." FY 2022 projection based on OIS persist through Aug. 2021 and UIP data deflated by unique encounter ratio for first 11 months of year.

| | CHNV | Mexico | NCA | Other | Venezuela | Other |
|---|---|---|---|---|---|---|
| 2014-2019 | 32,794 | 180,254 | 264,702 | 25,468 | 1666 | 459404 |
| 2020 | 15,895 | 187,354 | 80,685 | 24,874 | 2543 | 363731 |
| 2021 | 169,524 | 322,804 | 488,871 | 153,030 | 47328 | 433667 |
| 2022 | 605,208 | 407,026 | 372,453 | 377,505 | 152443 | 208482 |

| | CHNV | Mexico | N. Central Ame | Other | Venezuela | Other | |
|---|---|---|---|---|---|---|---|
| 2014-2019 | 7% | 36% | 53% | 5% | 0.36% | 99.64% | 88% |
| 2020 | 5% | 61% | 26% | 8% | 0.69% | 99.31% | 87% |
| 2021 | 15% | 28% | 43% | 13% | 9.84% | 90.16% | 72% |
| 2022 | 34% | 23% | 21% | 21% | 42.24% | 57.76% | 44% |

Data through 8/31/22 from OIS Persist 8/31/22 unique encounters pivot table. Sept. 2022 data from UIP pulled 10/6/22 and deflated by unique encounter ratio for FY 2022.



■Series1 ■Series2 ■Series3 ■Series4

Unique encounters through August 2022

Sum of cou Column Labels

| Row Labels | Brazil | Chile | Colombia | Ecuador | India | Other | Peru | Romania | Russia | Ukraine | Venezuela | Cuba | Haiti | Nicaragua | El Salvador | Guatemala | Honduras | Mexico | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 566 | 43 | 319 | 4753 | 1323 | 6786 | 934 | 871 | 44 | 45 | 74 | 17556 | 470 | 1775 | 64491 | 71182 | 88651 | 2E+05 | 461070 |
| 2015 | 1371 | 25 | 401 | 2575 | 2143 | 7616 | 518 | 434 | 109 | 131 | 155 | 31062 | 336 | 1001 | 41608 | 54603 | 32371 | 2E+05 | 366274 |
| 2016 | 4499 | 46 | 472 | 2913 | 2524 | 10129 | 661 | 2547 | 137 | 206 | 321 | 41609 | 6365 | 1343 | 76952 | 80604 | 56685 | 2E+05 | 480995 |
| 2017 | 4596 | 50 | 275 | 1568 | 2311 | 7888 | 549 | 1165 | 196 | 170 | 387 | 15512 | 9161 | 1097 | 54556 | 71259 | 51025 | 1E+05 | 360925 |
| 2018 | 5783 | 27 | 305 | 1537 | 6187 | 9071 | 667 | 592 | 523 | 161 | 661 | 7020 | 307 | 3502 | 35383 | 125209 | 85140 | 2E+05 | 456068 |
| 2019 | 19236 | 318 | 592 | 12430 | 4954 | 14153 | 897 | 312 | 888 | 264 | 7518 | 32385 | 3041 | 14108 | 89173 | 257261 | 252058 | 2E+05 | 893976 |
| 2020 | 6785 | 653 | 324 | 7453 | 940 | 7566 | 350 | 275 | 435 | 93 | 2543 | 7312 | 4433 | 1607 | 12917 | 37261 | 30507 | 3E+05 | 308808 |
| 2021 | 54912 | 6150 | 5581 | 60447 | 2437 | 12377 | 2437 | 4016 | 4014 | 659 | 47328 | 31352 | 43488 | 47356 | 67902 | 197015 | 223954 | 3E+05 | 1134229 |
| 2022 | 49740 | 6229 | 109084 | 17006 | 13144 | 59653 | 41935 | 5628 | 18927 | 25248 | 152443 | 187858 | 44566 | 60509 | 139446 | 149363 | 138005 | 4E+05 | 1594037 |
| Grand Tota | 147488 | 13541 | 117353 | 110682 | 35963 | 135239 | 48948 | 15840 | 25273 | 26977 | 211430 | 371666 | 112167 | 211235 | 503491 | 1043757 | 958396 | 2E+06 | 6056382 |

0.1494619

0.3289215

Venezuela AR_000315



Venezuela

| | Unique | Total |
|---|---|---|
| FY 2022 Projection | 185,932 | 185,547 |
| Increase over 2021 | | 4 |
| Increase over 2020 | 75 | 68 |
| Increase over 2019 | 25 | 25 |
| Increase over 2018 | 281 | 275 |
| Increase over 2017 | 480 | 477 |
| Increase over 2016 | 579 | 578 |
| Increase over 2015 | 1,200 | 1,157 |
| Increase over 2014 | 2,513 | 2,417 |
| Increase over 2014-2019 average | 122 | 121 |

Venezuela

| | Unique | Total | | Monthly Unique | Total |
|---|---|---|---|---|---|
| 2022* | 185,932 | 185,932 | | 188,547 | 15,712 |
| 2021 | 47,328 | 47,328 | | 48,678 | 4,057 |
| 2020 | 2,543 | 2,543 | | 2,787 | 232 |
| 2019 | 7,518 | 7,518 | | 7,677 | 640 |
| 2018 | 661 | 661 | | 686 | 57 |
| 2017 | 387 | 387 | | 395 | 33 |
| 2016 | 321 | 321 | | 326 | 27 |
| 2015 | 155 | 155 | | 163 | 14 |
| 2014 | 74 | 74 | | 78 | 6 |
| | 1,519 | 1,519 | | 1,554 | 127 |

a

| El Salvador | Guatemala | India | Mexico | Nicaragua | Grand Total |
|---|---|---|---|---|---|
| 30084 | 40902 | 2952 | 223475 | 1353 | 377695 |
| 44491 | 71182 | 1323 | 201187 | 1775 | 461070 |
| 41608 | 54603 | 2143 | 189815 | 1001 | 366274 |
| 76952 | 86604 | 2524 | 192982 | 1343 | 480995 |
| 54556 | 71259 | 2311 | 139160 | 1097 | 360025 |
| 55383 | 120209 | 6187 | 173993 | 3502 | 456068 |
| 89173 | 257261 | 4954 | 184388 | 14108 | 893976 |
| 12917 | 37261 | 940 | 187354 | 1607 | 308608 |
| 67902 | 197015 | 2437 | 328304 | 47356 | 1634229 |
| 66509 | 149363 | 13144 | 375253 | 139446 | 1594037 |
| 6218 | 15248 | 2021 | 63025 | 18200 | 226878 |
| 67% | 69% | 81% | 50% | 96% | 74% |
| 64604 | 159904 | 14775 | 407026 | 31773 | 1762193 |

Mexican+NAC Sept #
1.3
97.6

Mexican+NAC Sept #
55.4%

| | CNHV | | All other | | Total | Mexican+NAC | | CNHV | | % Other % |
|---|---|---|---|---|---|---|---|---|---|---|
| | #REF! | | #REF! | | 3019308 | #REF! | | #REF! | | #REF! #REF! |
| | #REF! | | #REF! | | | #REF! | | | | |
| | #REF! | | #REF! | | | | | | | |
| | #REF! | | #REF! | | | | | | | |
| | #REF! | | #REF! | | | | | | | |
| | #REF! | | #REF! | | Total | Mexican | 1762193 | 40720b | #REF! | |
| | | | | | 1762193 | 18156 | | | | |
| | | | | | 17421 | | | | | |

2014
2015
2016
2017
2018
2019
2020
20-Oct
20-Nov
20-Dec
21-Jan
21-Feb
21-Mar
21-Apr
21-May
21-Jun
21-Jul
21-Aug
21-Sep
21-Oct
21-Nov
21-Dec
22-Jan
22-Feb
22-Mar
22-Apr
22-May
22-Jun
22-Jul
22-Aug
22-Sep

Projection FY2022

| | Total Encounters | T42 expulsions | T8 removals | T8 returns | Total departures | Departures as share of encounters |
|---|---|---|---|---|---|---|
| Cuba | 194,727 | 4,620 | 53 | 110 | 4,783 | 2.5% |
| Haiti | 48,826 | 12,159 | 1,495 | 161 | 13,815 | 28.3% |
| Nicaragua | 145,684 | 4,159 | 2,439 | 292 | 6,890 | 4.7% |
| Venezuela | 153,905 | 988 | 454 | 429 | 1,871 | 1.2% |

All data from OIS Persist dataset as of 8/31/22.

| | |
|---|---|
| Cuba | 2.5% |
| Haiti | 28.3% |
| Nicaragua | 4.7% |
| Venezuela | 1.2% |

Venezuela AR_000316