Venezuela AR_000317



Guatemala and Honduras CBP SW Land Border Encounters
7-Day Rolling Average: 9/4/2021- 12/1/2021

| | | | | |
|---|---|---|---|---|
| **4/14/2021** | 1 139 | 1 269 | 1 009 | 1 255 |
| **4/15/2021** | 1 112 | 1 420 | 1 012 | 1 253 |
| **4/16/2021** | 851 | 1 040 | 993 | 1 205 |
| **4/17/2021** | 912 | 1 078 | 982 | 1 179 |
| **4/18/2021** | 844 | 1 232 | 993 | 1 210 |
| **4/19/2021** | 977 | 1 106 | 1 016 | 1 209 |
| **4/20/2021** | 1 299 | 1 437 | 1 019 | 1 226 |
| **4/21/2021** | 1 040 | 1 268 | 1 005 | 1 226 |
| **4/22/2021** | 1 109 | 1 309 | 1 005 | 1 210 |
| **4/23/2021** | 977 | 1 155 | 1 023 | 1 226 |
| **4/24/2021** | 702 | 1 005 | 993 | 1 216 |
| **4/25/2021** | 748 | 930 | 979 | 1 173 |
| **4/26/2021** | 837 | 1 081 | 959 | 1 69 |
| **4/27/2021** | 1 103 | 1 270 | 931 | 1 145 |
| **4/28/2021** | 1 052 | 1 346 | 933 | 1 157 |
| **4/29/2021** | 995 | 1 124 | 916 | 1 130 |
| **4/30/2021** | 954 | 1 158 | 913 | 1 131 |
| **5/1/2021** | 671 | 916 | 909 | 1 118 |
| **5/2/2021** | 716 | 706 | 904 | 1 086 |
| **5/3/2021** | 889 | 1 229 | 911 | 1 07 |
| **5/4/2021** | 961 | 1 201 | 891 | 1 097 |
| **5/5/2021** | 1 054 | 1 164 | 891 | 1 071 |
| **5/6/2021** | 860 | 1 025 | 872 | 1 057 |
| **5/7/2021** | 901 | 1 184 | 865 | 1 061 |
| **5/8/2021** | 783 | 1 056 | 881 | 1 081 |
| **5/9/2021** | 579 | 837 | 861 | 1 099 |
| **5/10/2021** | 760 | 910 | 843 | 1 054 |
| **5/11/2021** | 796 | 1 007 | 819 | 1 026 |
| **5/12/2021** | 933 | 1 019 | 802 | 1 005 |
| **5/13/2021** | 869 | 1 050 | 803 | 1 009 |
| **5/14/2021** | 997 | 1 237 | 817 | 1 017 |
| **5/15/2021** | 880 | 973 | 831 | 1 005 |
| **5/16/2021** | 781 | 839 | 859 | 1 005 |
| **5/17/2021** | 992 | 956 | 893 | 1 012 |
| **5/18/2021** | 1 015 | 1 218 | 924 | 1 042 |
| **5/19/2021** | 1 037 | 1 137 | 939 | 1 059 |
| **5/20/2021** | 889 | 907 | 942 | 1 038 |
| **5/21/2021** | 882 | 1 101 | 925 | 1 019 |
| **5/22/2021** | 684 | 888 | 897 | 1 007 |
| **5/23/2021** | 872 | 1 059 | 910 | 1 038 |
| **5/24/2021** | 727 | 798 | 872 | 1 015 |
| **5/25/2021** | 924 | 1 356 | 859 | 1 035 |
| **5/26/2021** | 966 | 1 125 | 849 | 1 033 |
| **5/27/2021** | 992 | 1 239 | 864 | 1 081 |
| **5/28/2021** | 822 | 1 029 | 855 | 1 071 |
| **5/29/2021** | 721 | 1 014 | 861 | 1 089 |
| **5/30/2021** | 679 | 860 | 833 | 1 060 |
| **5/31/2021** | 820 | 1 091 | 846 | 1 02 |
| **6/1/2021** | 1 065 | 1 123 | 866 | 1 069 |
| **6/2/2021** | 886 | 1 098 | 855 | 1 065 |
| **6/3/2021** | 1 005 | 1 129 | 857 | 1 049 |
| **6/4/2021** | 928 | 1 181 | 872 | 1 071 |
| **6/5/2021** | 778 | 814 | 880 | 1 042 |
| **6/6/2021** | 514 | 936 | 857 | 1 053 |
| **6/7/2021** | 799 | 1 073 | 854 | 1 051 |
| **6/8/2021** | 1 046 | 1 257 | 851 | 1 070 |
| **6/9/2021** | 880 | 1 130 | 850 | 1 074 |
| **6/10/2021** | 1 260 | 1 171 | 886 | 1 080 |
| **6/11/2021** | 981 | 1 130 | 894 | 1 073 |
| **6/12/2021** | 870 | 869 | 907 | 1 081 |
| **6/13/2021** | 660 | 925 | 928 | 1 079 |
| **6/14/2021** | 870 | 1 157 | 938 | 1 091 |
| **6/15/2021** | 924 | 1 141 | 921 | 1 075 |
| **6/16/2021** | 1 162 | 1 345 | 961 | 1 05 |
| **6/17/2021** | 1 075 | 1 134 | 935 | 1 00 |
| **6/18/2021** | 1 086 | 1 364 | 950 | 1 134 |
| **6/19/2021** | 1 208 | 1 135 | 998 | 1 172 |
| **6/20/2021** | 972 | 1 025 | 1 042 | 1 86 |
| **6/21/2021** | 1 052 | 1 112 | 1 068 | 1 179 |
| **6/22/2021** | 1 347 | 1 416 | 1 129 | 1 219 |
| **6/23/2021** | 1 332 | 1 302 | 1 153 | 1 213 |
| **6/24/2021** | 1 015 | 1 349 | 1 145 | 1 243 |
| **6/25/2021** | 1 085 | 1 398 | 1 144 | 1 248 |
| **6/26/2021** | 1 022 | 1 054 | 1 118 | 1 237 |
| **6/27/2021** | 959 | 1 191 | 1 116 | 1 260 |
| **6/28/2021** | 1 082 | 1 297 | 1 120 | 1 287 |
| **6/29/2021** | 1 076 | 1 375 | 1 082 | 1 281 |
| **6/30/2021** | 1 307 | 1 402 | 1 078 | 1 295 |
| **7/1/2021** | 1 207 | 1 295 | 1 05 | 1 287 |
| **7/2/2021** | 960 | 1 442 | 1 088 | 1 294 |
| **7/3/2021** | 783 | 1 207 | 1 053 | 1 316 |
| **7/4/2021** | 833 | 1 234 | 1 035 | 1 322 |
| **7/5/2021** | 1 150 | 1 587 | 1 045 | 1 63 |
| **7/6/2021** | 1 127 | 1 164 | 1 052 | 1 333 |
| **7/7/2021** | 1 099 | 1 318 | 1 023 | 1 321 |
| **7/8/2021** | 1 174 | 1 424 | 1 018 | 1 339 |
| **7/9/2021** | 1 107 | 1 357 | 1 039 | 1 327 |
| **7/10/2021** | 866 | 1 118 | 1 051 | 1 315 |
| **7/11/2021** | 781 | 1 053 | 1 043 | 1 289 |
| **7/12/2021** | 1 158 | 1 127 | 1 045 | 1 223 |
| **7/13/2021** | 1 377 | 1 865 | 1 080 | 1 323 |
| **7/14/2021** | 909 | 1 440 | 1 053 | 1 341 |
| **7/15/2021** | 1 272 | 1 472 | 1 067 | 1 347 |
| **7/16/2021** | 1 129 | 1 460 | 1 070 | 1 62 |
| **7/17/2021** | 856 | 1 338 | 1 069 | 1 394 |
| **7/18/2021** | 1 364 | 1 458 | 1 152 | 1 451 |
| **7/19/2021** | 1 119 | 1 380 | 1 147 | 1 488 |
| **7/20/2021** | 1 385 | 1 489 | 1 148 | 1 434 |
| **7/21/2021** | 1 503 | 1 644 | 1 233 | 1 463 |
| **7/22/2021** | 1 364 | 1 681 | 1 246 | 1 493 |
| **7/23/2021** | 1 167 | 1 321 | 1 251 | 1 473 |
| **7/24/2021** | 1 288 | 1 931 | 1 313 | 1 558 |
| **7/25/2021** | 788 | 1 223 | 1 231 | 1 524 |
| **7/26/2021** | 946 | 1 280 | 1 206 | 1 510 |
| **7/27/2021** | 2 281 | 1 886 | 1 334 | 1 567 |
| **7/28/2021** | 1 568 | 1 811 | 1 343 | 1 590 |
| **7/29/2021** | 1 566 | 1 833 | 1 372 | 1 612 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **7/30/2021** | 1 439 | 1 974 | 1 411 | 1 705 | | |
| **7/31/2021** | 902 | 1 485 | 1 356 | 1 642 | | |
| **8/1/2021** | 1 209 | 1 652 | 1 416 | 1 703 | | |
| **8/2/2021** | 1 437 | 1 297 | 1 486 | 1 705 | | |
| **8/3/2021** | 1 512 | 1 815 | 1 376 | 1 695 | | |
| **8/4/2021** | 1 786 | 1 768 | 1 407 | 1 689 | 1 249 | 1 502 |
| **8/5/2021** | 1 066 | 1 560 | 1 336 | 1 650 | 195% | 315% |
| **8/6/2021** | 1 401 | 1 916 | 1 330 | 1 642 | | |
| **8/7/2021** | 1 173 | 1 286 | 1 69 | 1 613 | | |
| **8/8/2021** | 894 | 1 239 | 1 324 | 1 554 | | |
| **8/9/2021** | 998 | 1 310 | 1 261 | 1 556 | | |
| **8/10/2021** | 1 524 | 1 637 | 1 263 | 1 531 | | |
| **8/11/2021** | 1 445 | 1 465 | 1 214 | 1 488 | | |
| **8/12/2021** | 1 974 | 1 635 | 1 344 | 1 498 | | |
| **8/13/2021** | 1 245 | 1 411 | 1 322 | 1 426 | | |
| **8/14/2021** | 1 302 | 1 508 | 1 340 | 1 458 | | |
| **8/15/2021** | 858 | 1 125 | 1 335 | 1 442 | | |
| **8/16/2021** | 948 | 1 087 | 1 328 | 1 410 | | |
| **8/17/2021** | 1 030 | 1 203 | 1 257 | 1 348 | | |
| **8/18/2021** | 1 355 | 1 378 | 1 245 | 1 335 | | |
| **8/19/2021** | 968 | 1 446 | 1 01 | 1 08 | | |
| **8/20/2021** | 1 266 | 1 277 | 1 04 | 1 289 | | |
| **8/21/2021** | 1 106 | 1 212 | 1 076 | 1 247 | | |
| **8/22/2021** | 822 | 967 | 1 071 | 1 224 | | |
| **8/23/2021** | 991 | 1 102 | 1 077 | 1 226 | | |
| **8/24/2021** | 1 257 | 1 092 | 1 09 | 1 211 | | |
| **8/25/2021** | 1 129 | 1 550 | 1 077 | 1 235 | | |
| **8/26/2021** | 1 634 | 1 605 | 1 172 | 1 258 | | |
| **8/27/2021** | 849 | 952 | 1 113 | 1 211 | | |
| **8/28/2021** | 1 023 | 1 153 | 1 01 | 1 203 | | |
| **8/29/2021** | 798 | 873 | 1 097 | 1 190 | | |
| **8/30/2021** | 784 | 1 177 | 1 068 | 1 200 | | |
| **8/31/2021** | 1 324 | 1 427 | 1 077 | 1 248 | | |
| **9/1/2021** | 1 058 | 1 238 | 1 067 | 1 204 | | |
| **9/2/2021** | 841 | 1 014 | 954 | 1 119 | | |
| **9/3/2021** | 686 | 735 | 931 | 1 088 | | |
| **9/4/2021** | 682 | 818 | 882 | 1 040 | | |
| **9/5/2021** | 523 | 645 | 843 | 1 008 | | |
| **9/6/2021** | 575 | 771 | 813 | 950 | | |
| **9/7/2021** | 748 | 899 | 730 | 874 | | |
| **9/8/2021** | 874 | 1 020 | 704 | 843 | | |
| **9/9/2021** | 1 034 | 1 161 | 732 | 864 | | |
| **9/10/2021** | 1 113 | 1 092 | 793 | 915 | | |
| **9/11/2021** | 782 | 890 | 807 | 925 | | |
| **9/12/2021** | 668 | 772 | 828 | 944 | | |
| **9/13/2021** | 775 | 834 | 856 | 953 | | |
| **9/14/2021** | 1 057 | 1 159 | 900 | 990 | | |
| **9/15/2021** | 1 023 | 1 137 | 922 | 1 006 | | |
| **9/16/2021** | 957 | 950 | 911 | 976 | | |
| **9/17/2021** | 863 | 914 | 875 | 951 | | |
| **9/18/2021** | 901 | 994 | 892 | 966 | | |
| **9/19/2021** | 640 | 759 | 888 | 964 | | |
| **9/20/2021** | 493 | 676 | 848 | 941 | | |
| **9/21/2021** | 675 | 780 | 793 | 887 | | |
| **9/22/2021** | 801 | 1 023 | 761 | 871 | | |
| **9/23/2021** | 882 | 996 | 751 | 877 | | |
| **9/24/2021** | 774 | 607 | 738 | 834 | | |
| **9/25/2021** | 697 | 825 | 709 | 809 | | |
| **9/26/2021** | 548 | 654 | 696 | 794 | | |
| **9/27/2021** | 592 | 799 | 710 | 812 | | |
| **9/28/2021** | 1 119 | 954 | 773 | 837 | | |
| **9/29/2021** | 841 | 1 018 | 779 | 836 | | |
| **9/30/2021** | 1 066 | 944 | 805 | 829 | | |
| **10/1/2021** | 671 | 648 | 791 | 835 | | |
| **10/2/2021** | 596 | 776 | 776 | 828 | 789 | 875 |
| **10/3/2021** | 322 | 660 | 744 | 828 | -37% | -42% |
| **10/4/2021** | 608 | 695 | 746 | 814 | | |
| **10/5/2021** | 603 | 785 | 672 | 789 | | |
| **10/6/2021** | 769 | 897 | 662 | 772 | | |
| **10/7/2021** | 726 | 918 | 614 | 768 | | |
| **10/8/2021** | 752 | 761 | 625 | 785 | | |
| **10/9/2021** | 553 | 719 | 619 | 776 | | |
| **10/10/2021** | 437 | 634 | 635 | 773 | | |
| **10/11/2021** | 420 | 568 | 609 | 755 | | |
| **10/12/2021** | 576 | 746 | 605 | 749 | | |
| **10/13/2021** | 766 | 954 | 604 | 757 | | |
| **10/14/2021** | 609 | 664 | 588 | 721 | | |
| **10/15/2021** | 680 | 839 | 577 | 732 | | |
| **10/16/2021** | 505 | 675 | 570 | 726 | | |
| **10/17/2021** | 363 | 539 | 560 | 712 | | |
| **10/18/2021** | 549 | 596 | 578 | 716 | | |
| **10/19/2021** | 649 | 780 | 589 | 721 | | |
| **10/20/2021** | 737 | 812 | 585 | 701 | | |
| **10/21/2021** | 774 | 705 | 608 | 707 | | |
| **10/22/2021** | 774 | 660 | 622 | 681 | | |
| **10/23/2021** | 570 | 589 | 631 | 669 | | |
| **10/24/2021** | 500 | 487 | 650 | 661 | | |
| **10/25/2021** | 482 | 504 | 641 | 648 | | |
| **10/26/2021** | 610 | 611 | 635 | 624 | | |
| **10/27/2021** | 668 | 738 | 625 | 613 | | |
| **10/28/2021** | 820 | 654 | 632 | 606 | | |
| **10/29/2021** | 901 | 945 | 650 | 647 | | |
| **10/30/2021** | 654 | 637 | 662 | 654 | | |
| **10/31/2021** | 725 | 663 | 694 | 679 | | |
| **11/1/2021** | 550 | 548 | 704 | 685 | | |
| **11/2/2021** | 809 | 782 | 732 | 710 | | |
| **11/3/2021** | 670 | 788 | 733 | 717 | | |
| **11/4/2021** | 622 | 681 | 704 | 721 | | |
| **11/5/2021** | 812 | 699 | 692 | 685 | | |
| **1 /6/2021** | 611 | 511 | 686 | 667 | | |
| **11/7/2021** | 453 | 465 | 647 | 639 | | |
| **11/8/2021** | 798 | 650 | 682 | 654 | | |
| **11/9/2021** | 666 | 868 | 662 | 666 | | |
| **11/10/2021** | 870 | 778 | 690 | 665 | | |
| **11/11/2021** | 646 | 811 | 694 | 683 | | |
| **11/12/2021** | 676 | 858 | 674 | 706 | | |
| **11/13/2021** | 555 | 771 | 666 | 743 | | |



| | | | | |
|---|---|---|---|---|
| **11/14/2021** | 531 | 478 | 677 | 745 |
| **11/15/2021** | 581 | 635 | 646 | 743 |
| **11/16/2021** | 915 | 649 | 682 | 711 |
| **11/17/2021** | 757 | 687 | 666 | 698 |
| **11/18/2021** | 790 | 738 | 686 | 688 |
| **11/19/2021** | 585 | 570 | 673 | 647 |
| **11/20/2021** | 605 | 707 | 681 | 638 |
| **11/21/2021** | 596 | 547 | 690 | 648 |
| **11/22/2021** | 630 | 657 | 697 | 651 |
| **1 /23/2021** | 849 | 800 | 687 | 672 |
| **1 /24/2021** | 754 | 592 | 687 | 659 |
| **11/25/2021** | 815 | 877 | 691 | 679 |
| **11/26/2021** | 674 | 628 | 703 | 687 |
| **11/27/2021** | 600 | 539 | 703 | 663 |
| **11/28/2021** | 640 | 647 | 709 | 677 |
| **11/29/2021** | 581 | 514 | 702 | 657 |
| **11/30/2021** | 828 | 631 | 699 | 633 |
| **12/1/2021** | 871 | 769 | 716 | 658 |
| **12/2/2021** | 1 036 | 783 | 747 | 644 |
| **12/3/2021** | 772 | 709 | 761 | 656 |
| **12/4/2021** | 871 | 860 | 800 | 702 |
| **12/5/2021** | 738 | 641 | 814 | 701 |
| **12/6/2021** | 813 | 723 | 847 | 731 |
| **12/7/2021** | 770 | 659 | 839 | 735 |
| **12/8/2021** | 961 | 737 | 852 | 730 |
| **12/9/2021** | 796 | 748 | 817 | 725 |
| **12/10/2021** | 746 | 515 | 814 | 698 |
| **12/11/2021** | 651 | 489 | 782 | 645 |
| **12/12/2021** | 638 | 394 | 768 | 609 |
| **12/13/2021** | 724 | 484 | 755 | 575 |
| **12/14/2021** | 994 | 672 | 787 | 577 |
| **12/15/2021** | 918 | 659 | 781 | 566 |
| **12/16/2021** | 837 | 716 | 787 | 561 |
| **12/17/2021** | 757 | 626 | 788 | 577 |
| **12/18/2021** | 618 | 540 | 784 | 584 |
| **12/19/2021** | 716 | 562 | 795 | 608 |
| **12/20/2021** | 590 | 430 | 776 | 601 |
| **12/21/2021** | 901 | 771 | 762 | 615 |
| **12/22/2021** | 733 | 593 | 736 | 605 |
| **12/23/2021** | 698 | 613 | 716 | 591 |
| **12/24/2021** | 488 | 611 | 678 | 589 |
| **12/25/2021** | 234 | 291 | 623 | 553 |
| **12/26/2021** | 267 | 403 | 559 | 530 |
| **12/27/2021** | 394 | 441 | 531 | 532 |
| **12/28/2021** | 507 | 447 | 474 | 486 |
| **12/29/2021** | 342 | 433 | 419 | 463 |
| **12/30/2021** | 362 | 390 | 371 | 431 |
| **12/31/2021** | 266 | 431 | 339 | 405 |
| **1/1/2022** | 164 | 211 | 329 | 394 |
| **1/2/2022** | 182 | 311 | 317 | 381 |
| **1/3/2022** | 306 | 353 | 04 | 368 |
| **1/4/2022** | 381 | 397 | 286 | 361 |
| **1/5/2022** | 434 | 280 | 299 | 339 |
| **1/6/2022** | 439 | 351 | 310 | 333 |
| **1/7/2022** | 313 | 287 | 317 | 313 |
| **1/8/2022** | 263 | 312 | 331 | 327 |
| **1/9/2022** | 213 | 265 | 336 | 321 |
| **1/10/2022** | 296 | 276 | 334 | 310 |
| **1/11/2022** | 334 | 339 | 327 | 301 |
| **1/12/2022** | 391 | 379 | 321 | 316 |
| **1/13/2022** | 579 | 332 | 341 | 313 |
| **1/14/2022** | 469 | 304 | 64 | 315 |
| **1/15/2022** | 472 | 371 | 393 | 324 |
| **1/16/2022** | 362 | 278 | 415 | 326 |
| **1/17/2022** | 486 | 322 | 442 | 332 |
| **1/18/2022** | 775 | 545 | 505 | 362 |
| **1/19/2022** | 691 | 503 | 548 | 379 |
| **1/20/2022** | 508 | 465 | 538 | 398 |
| **1/21/2022** | 537 | 458 | 547 | 420 |
| **1/22/2022** | 458 | 447 | 545 | 431 |
| **1/23/2022** | 468 | 354 | 560 | 442 |
| **1/24/2022** | 570 | 474 | 572 | 464 |
| **1/25/2022** | 536 | 510 | 538 | 459 |
| **1/26/2022** | 567 | 455 | 521 | 452 |
| **1/27/2022** | 625 | 644 | 537 | 477 |
| **1/28/2022** | 499 | 442 | 532 | 475 |
| **1/29/2022** | 545 | 525 | 544 | 486 |
| **1/30/2022** | 419 | 347 | 537 | 485 |
| **1/31/2022** | 574 | 474 | 538 | 485 |
| **2/1/2022** | 611 | 518 | 549 | 486 |
| **2/2/2022** | 733 | 574 | 572 | 503 |
| **2/3/2022** | 630 | 538 | 573 | 488 |
| **2/4/2022** | 531 | 400 | 578 | 482 |
| **2/5/2022** | 800 | 436 | 614 | 470 |
| **2/6/2022** | 470 | 488 | 621 | 490 |
| **2/7/2022** | 623 | 443 | 628 | 485 |
| **2/8/2022** | 837 | 522 | 661 | 486 |
| **2/9/2022** | 812 | 552 | 672 | 483 |
| **2/10/2022** | 665 | 506 | 677 | 478 |
| **2/11/2022** | 771 | 574 | 711 | 503 |
| **2/12/2022** | 812 | 571 | 713 | 522 |
| **2/13/2022** | 444 | 443 | 709 | 516 |
| **2/14/2022** | 518 | 466 | 694 | 519 |
| **2/15/2022** | 708 | 525 | 676 | 520 |
| **2/16/2022** | 771 | 620 | 670 | 529 |
| **2/17/2022** | 710 | 549 | 676 | 535 |
| **2/18/2022** | 582 | 435 | 649 | 516 |
| **2/19/2022** | 562 | 450 | 614 | 498 |
| **2/20/2022** | 515 | 454 | 624 | 500 |
| **2/21/2022** | 501 | 494 | 621 | 504 |
| **2/22/2022** | 792 | 542 | 633 | 506 |
| **2/23/2022** | 696 | 567 | 623 | 499 |
| **2/24/2022** | 656 | 586 | 615 | 504 |
| **2/25/2022** | 748 | 416 | 639 | 501 |
| **2/26/2022** | 605 | 519 | 645 | 511 |
| **2/27/2022** | 475 | 411 | 639 | 505 |
| **2/28/2022** | 634 | 476 | 658 | 502 |

| | | | | |
|---|---|---|---|---|
| 3/1/2022 | 762 | 741 | 654 | 531 |
| 3/2/2022 | 774 | 663 | 665 | 545 |
| 3/3/2022 | 803 | 469 | 686 | 528 |
| 3/4/2022 | 592 | 514 | 664 | 542 |
| 3/5/2022 | 581 | 545 | 660 | 546 |
| 3/6/2022 | 526 | 416 | 667 | 546 |
| 3/7/2022 | 550 | 544 | 655 | 556 |
| 3/8/2022 | 785 | 607 | 659 | 537 |
| 3/9/2022 | 817 | 565 | 665 | 523 |
| 3/10/2022 | 732 | 491 | 655 | 526 |
| 3/11/2022 | 784 | 590 | 682 | 537 |
| 3/12/2022 | 656 | 506 | 693 | 531 |
| 3/13/2022 | 486 | 437 | 687 | 534 |
| 3/14/2022 | 631 | 482 | 699 | 525 |
| 3/15/2022 | 740 | 515 | 692 | 512 |
| 3/16/2022 | 737 | 447 | 681 | 495 |
| 3/17/2022 | 727 | 478 | 680 | 494 |
| 3/18/2022 | 718 | 449 | 671 | 473 |
| 3/19/2022 | 506 | 402 | 649 | 459 |
| 3/20/2022 | 397 | 361 | 637 | 448 |
| 3/21/2022 | 599 | 468 | 632 | 446 |
| 3/22/2022 | 799 | 560 | 640 | 452 |
| 3/23/2022 | 781 | 477 | 647 | 456 |
| 3/24/2022 | 805 | 624 | 658 | 477 |
| 3/25/2022 | 740 | 470 | 661 | 480 |
| 3/26/2022 | 689 | 526 | 687 | 498 |
| 3/27/2022 | 553 | 410 | 709 | 505 |
| 3/28/2022 | 611 | 615 | 711 | 526 |
| 3/29/2022 | 757 | 588 | 705 | 530 |
| 3/30/2022 | 917 | 606 | 725 | 548 |
| 3/31/2022 | 833 | 647 | 729 | 552 |
| 4/1/2022 | 863 | 502 | 746 | 556 |
| 4/2/2022 | 751 | 578 | 755 | 564 |
| 4/3/2022 | 631 | 565 | 766 | 586 |
| 4/4/2022 | 745 | 524 | 785 | 573 |
| 4/5/2022 | 898 | 650 | 805 | 582 |
| 4/6/2022 | 760 | 518 | 783 | 569 |
| 4/7/2022 | 652 | 524 | 757 | 552 |
| 4/8/2022 | 714 | 541 | 736 | 557 |
| 4/9/2022 | 758 | 450 | 737 | 539 |
| 4/10/2022 | 508 | 534 | 719 | 534 |
| 4/11/2022 | 703 | 616 | 713 | 548 |
| 4/12/2022 | 683 | 635 | 683 | 545 |
| 4/13/2022 | 877 | 699 | 699 | 571 |
| 4/14/2022 | 780 | 665 | 718 | 591 |
| 4/15/2022 | 813 | 627 | 732 | 604 |
| 4/16/2022 | 500 | 542 | 695 | 617 |
| 4/17/2022 | 347 | 383 | 672 | 595 |
| 4/18/2022 | 483 | 446 | 640 | 571 |
| 4/19/2022 | 752 | 598 | 650 | 566 |
| 4/20/2022 | 680 | 442 | 622 | 529 |
| 4/21/2022 | 737 | 511 | 616 | 507 |
| 4/22/2022 | 588 | 426 | 584 | 478 |
| 4/23/2022 | 497 | 447 | 583 | 465 |
| 4/24/2022 | 417 | 403 | 593 | 468 |
| 4/25/2022 | 419 | 441 | 584 | 467 |
| 4/26/2022 | 655 | 419 | 570 | 441 |
| 4/27/2022 | 651 | 504 | 566 | 450 |
| 4/28/2022 | 750 | 502 | 568 | 449 |
| 4/29/2022 | 684 | 500 | 582 | 459 |
| 4/30/2022 | 609 | 542 | 598 | 473 |
| 5/1/2022 | 411 | 380 | 597 | 470 |
| 5/2/2022 | 592 | 449 | 622 | 471 |
| 5/3/2022 | 691 | 549 | 627 | 489 |
| 5/4/2022 | 697 | 531 | 633 | 493 |
| 5/5/2022 | 715 | 531 | 628 | 497 |
| 5/6/2022 | 759 | 677 | 639 | 523 |
| 5/7/2022 | 521 | 556 | 627 | 525 |
| 5/8/2022 | 567 | 507 | 649 | 543 |
| 5/9/2022 | 805 | 715 | 679 | 581 |
| 5/10/2022 | 621 | 559 | 669 | 582 |
| 5/11/2022 | 796 | 605 | 683 | 593 |
| 5/12/2022 | 713 | 760 | 683 | 626 |
| 5/13/2022 | 596 | 624 | 660 | 618 |
| 5/14/2022 | 649 | 587 | 678 | 622 |
| 5/15/2022 | 455 | 460 | 662 | 616 |
| 5/16/2022 | 574 | 627 | 629 | 603 |
| 5/17/2022 | 950 | 701 | 676 | 623 |
| 5/18/2022 | 739 | 629 | 668 | 627 |
| 5/19/2022 | 924 | 665 | 698 | 613 |
| 5/20/2022 | 631 | 525 | 703 | 599 |
| 5/21/2022 | 834 | 568 | 730 | 596 |
| 5/22/2022 | 442 | 625 | 728 | 620 |
| 5/23/2022 | 712 | 718 | 747 | 633 |
| 5/24/2022 | 1 070 | 808 | 765 | 648 |
| 5/25/2022 | 824 | 668 | 777 | 654 |
| 5/26/2022 | 797 | 696 | 759 | 658 |
| 5/27/2022 | 690 | 670 | 767 | 679 |
| 5/28/2022 | 695 | 759 | 747 | 706 |
| 5/29/2022 | 471 | 637 | 751 | 708 |
| 5/30/2022 | 654 | 766 | 743 | 715 |
| 5/31/2022 | 872 | 1 178 | 715 | 768 |
| 6/1/2022 | 725 | 834 | 701 | 791 |
| 6/2/2022 | 664 | 872 | 682 | 817 |
| 6/3/2022 | 680 | 826 | 680 | 839 |
| 6/4/2022 | 658 | 765 | 675 | 840 |
| 6/5/2022 | 613 | 774 | 695 | 859 |
| 6/6/2022 | 742 | 1 064 | 708 | 902 |
| 6/7/2022 | 731 | 946 | 688 | 869 |
| 6/8/2022 | 968 | 926 | 722 | 882 |
| 6/9/2022 | 842 | 983 | 748 | 898 |
| 6/10/2022 | 751 | 689 | 758 | 878 |
| 6/11/2022 | 665 | 642 | 759 | 861 |
| 6/12/2022 | 628 | 627 | 761 | 840 |
| 6/13/2022 | 762 | 790 | 764 | 800 |
| 6/14/2022 | 1 017 | 903 | 805 | 794 |
| 6/15/2022 | 1 005 | 896 | 810 | 790 |

| | | | | |
|---|---|---|---|---|
| **6/16/2022** | 892 | 772 | 817 | 760 |
| **6/17/2022** | 841 | 818 | 830 | 778 |
| **6/18/2022** | 775 | 683 | 846 | 784 |
| **6/19/2022** | 678 | 698 | 853 | 794 |
| **6/20/2022** | 678 | 694 | 841 | 781 |
| **6/21/2022** | 992 | 740 | 837 | 757 |
| **6/22/2022** | 1 108 | 779 | 852 | 741 |
| **6/23/2022** | 943 | 850 | 859 | 752 |
| **6/24/2022** | 1 000 | 816 | 882 | 751 |
| **6/25/2022** | 741 | 652 | 877 | 747 |
| **6/26/2022** | 687 | 809 | 878 | 763 |
| **6/27/2022** | 950 | 842 | 917 | 784 |
| **6/28/2022** | 883 | 937 | 902 | 812 |
| **6/29/2022** | 989 | 876 | 885 | 826 |
| **6/30/2022** | 1 041 | 689 | 899 | 803 |
| **7/1/2022** | 752 | 707 | 863 | 787 |
| **7/2/2022** | 791 | 736 | 870 | 799 |
| **7/3/2022** | 507 | 630 | 845 | 774 |
| **7/4/2022** | 706 | 810 | 810 | 769 |
| **7/5/2022** | 804 | 788 | 799 | 748 |
| **7/6/2022** | 864 | 799 | 781 | 737 |
| **7/7/2022** | 812 | 657 | 748 | 732 |
| **7/8/2022** | 668 | 638 | 736 | 723 |
| **7/9/2022** | 615 | 675 | 711 | 714 |
| **7/10/2022** | 672 | 570 | 734 | 705 |
| **7/11/2022** | 792 | 670 | 747 | 685 |
| **7/12/2022** | 766 | 760 | 741 | 681 |
| **7/13/2022** | 719 | 686 | 721 | 665 |
| **7/14/2022** | 855 | 667 | 727 | 667 |
| **7/15/2022** | 766 | 609 | 741 | 662 |
| **7/16/2022** | 661 | 620 | 747 | 655 |
| **7/17/2022** | 514 | 482 | 725 | 642 |
| **7/18/2022** | 585 | 684 | 695 | 644 |
| **7/19/2022** | 702 | 974 | 686 | 675 |
| **7/20/2022** | 629 | 622 | 673 | 665 |
| **7/21/2022** | 611 | 659 | 638 | 664 |
| **7/22/2022** | 638 | 541 | 620 | 655 |
| **7/23/2022** | 432 | 542 | 587 | 643 |
| **7/24/2022** | 527 | 528 | 589 | 650 |
| **7/25/2022** | 506 | 658 | 578 | 646 |
| **7/26/2022** | 651 | 659 | 571 | 601 |
| **7/27/2022** | 561 | 692 | 561 | 611 |
| **7/28/2022** | 616 | 630 | 562 | 607 |
| **7/29/2022** | 499 | 484 | 542 | 599 |
| **7/30/2022** | 505 | 552 | 552 | 600 |
| **7/31/2022** | 492 | 610 | 547 | 612 |
| **8/1/2022** | 478 | 628 | 543 | 608 |
| **8/2/2022** | 707 | 685 | 551 | 612 |
| **8/3/2022** | 642 | 558 | 563 | 592 |
| **8/4/2022** | 601 | 614 | 561 | 590 |
| **8/5/2022** | 695 | 506 | 589 | 593 |
| **8/6/2022** | 463 | 532 | 583 | 590 |
| **8/7/2022** | 379 | 456 | 566 | 568 |
| **8/8/2022** | 418 | 606 | 558 | 565 |
| **8/9/2022** | 569 | 596 | 538 | 553 |
| **8/10/2022** | 401 | 620 | 504 | 561 |
| **8/11/2022** | 529 | 678 | 493 | 571 |
| **8/12/2022** | 417 | 540 | 454 | 575 |
| **8/13/2022** | 441 | 512 | 451 | 573 |
| **8/14/2022** | 314 | 484 | 441 | 577 |
| **8/15/2022** | 481 | 469 | 450 | 557 |
| **8/16/2022** | 669 | 506 | 465 | 544 |
| **8/17/2022** | 594 | 629 | 492 | 545 |
| **8/18/2022** | 496 | 506 | 487 | 521 |
| **8/19/2022** | 458 | 464 | 493 | 510 |
| **8/20/2022** | 495 | 467 | 501 | 504 |
| **8/21/2022** | 309 | 486 | 500 | 504 |
| **8/22/2022** | 395 | 442 | 488 | 500 |
| **8/23/2022** | 443 | 551 | 456 | 506 |
| **8/24/2022** | 684 | 535 | 469 | 493 |
| **8/25/2022** | 602 | 459 | 484 | 486 |
| **8/26/2022** | 514 | 462 | 492 | 486 |
| **8/27/2022** | 577 | 421 | 503 | 479 |
| **8/28/2022** | 400 | 419 | 516 | 470 |
| **8/29/2022** | 498 | 485 | 531 | 476 |
| **8/30/2022** | 546 | 448 | 546 | 461 |
| **8/31/2022** | 435 | 319 | 510 | 430 |

Venezuela AR_000323

UIP data pulled 10/6/2022

| Row Labels | Guatemala | Honduras |
|---|---|---|
| September 1-30 2022 from UIP | 15258 | 14224 |
| Daily average | 508.6 | 474.13333 |

Venezuela AR_000324



Total Encounters

CNMI countries
Column Labels

| | Big Bend | Del Rio TX | El Centro CA | El Paso TX | Laredo TX | Rio Grande Valley TX | San Diego CA | Tucson AZ | Yuma AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| First 11 mo | 2225 | 221218 | 13203 | 44627 | 655 | 98273 | 10054 | 11070 | 120574 | 521899 |
| | 0% | 42% | 3% | 9% | 0% | 19% | 2% | 2% | 23% | |
| 9/1-9/27 | | 27489 | | 21809 | | | | | 10846 | 74692 |
| | | 37% | | 29% | | | | | 14% | |
| FYTD | | 248707 | | 66436 | | | | | 133203 | 596591 |
| FY22 % of total | | 42% | | 11% | | | | | 22% | 100% |

All countries

| | Big Bend | Del Rio TX | El Centro CA | El Paso TX | Laredo TX | Rio Grande Valley TX | San Diego CA | Tucson AZ | Yuma AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| First 11 mo | 30684 | 428556 | 64221 | 258766 | 100495 | 440423 | 160312 | 220235 | 284479 | 1997770 |
| | 2% | 22% | 3% | 13% | 5% | 22% | 8% | 12% | 14% | |
| 9/1-9/27 | | 46645 | | 43135 | | | | | 23218 | 203850 |
| | | 23% | | 21% | | | | | 12% | |
| FYTD | | 474971 | | 305901 | | | | 307296 | | 2199620 |
| | | 22% | | 14% | | | | 14% | | 100% |
| | | 0.5336257 | | 0.22005893 | | | | 0.429264 | | 0.271225 |

Unique Encounters

CNMI

| | Big Bend | Del Rio TX | Rio Grande Valley TX | El Centro CA | El Paso TX | Laredo TX | Rio Grande Valley TX | San Diego CA | Tucson AZ | Yuma AZ | Grand Total | DIFF | EFF Y42 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OS persist | 2188 | 216282 | | 12753 | 42140 | | | 9668 | 10186 | 11701 | 506360 | | |
| | 43% | | 3% | 8% | | | 2% | 2% | 23% | | | |
| UIP | | 26875.64 | | | 20559.62 | | | | | 10137.4 | 72468.12337 | | |
| | | 37% | | | 28% | | | | | 14% | | |
| combined | | 243157.6 | | | 62733.62 | | | | | 127549.4 | 578828.1234 | | 79% |
| Sector share of total | | 42% | | | 11% | | | | | 22% | 100% | | 75% |
| Unique encounter ratio | | 0.977687 | | | 0.944271 | | | | | 0.970458 | 0.97022604 | | |
| CNMI is share of total | | | | | | | | | | | | |

All countries

| | Big Bend | Del Rio TX | Rio Grande Valley TX | El Centro CA | El Paso TX | Laredo TX | Rio Grande Valley TX | San Diego CA | Tucson AZ | Yuma AZ | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OS persist | 20540 | 347306 | | 40714 | 170910 | | 45723 | 351803 | 91554 | 128922 | 1461630 |
| | 1% | 24% | | 3% | 12% | | 3% | 24% | 6% | 9% | |
| UIP | | 37682.32 | | | 28489.84 | | | | | 21542.51 | 1476736.706 |
| | | 26% | | | 19% | | | | | 15% | |
| combined | | 385608.3 | | | 199399.8 | | | | | 285320.5 | 1699310 |
| Sector share of total | | 24% | | | 12% | | | | | 18% | 100% |
| Unique encounter ratio | | 0.811857 | | | 0.660681 | | | | | 0.927837 | 0.731620718 |
| CNMI is share of total | | 0.630582 | | | 0.314612 | | | | | 0.46595 | 0.359674793 |
| | | | | | | | | | | | 0.490712 |

FY2022 data through Aug from OIS persist; 9/1-9/27 from UIP POS Encounter dashboard; Columns P-Y are unique encounters from persist and applying unique encounter ratio to deflate UIP data

Venezuela AR_000325

Venezuela AR_000326

Unique SWB USBP encounters from August Unique Encounters pivot table

Sum of count

| Row Labels | Big Bend, TX | Del Rio, TX | El Centro, C | El Paso, TX | Laredo, TX | Rio Grande Va | San Diego, C | Tucson, AZ | Yuma, AZ | Grand Total | DRT+EP1+Remaining sectors |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 3684 | 23510 | 16306 | 11154 | 50749 | 154453 | 27496 | 120939 | 6106 | 414397 | 40770 | 373627 |
| 2014 | 4096 | 24255 | 14511 | 12339 | 44049 | 256392 | 29911 | 87915 | 5902 | 479370 | 42496 | 436874 |
| 2015 | 5031 | 19013 | 12820 | 14495 | 35888 | 147257 | 26290 | 63397 | 7142 | 331333 | 40650 | 290683 |
| 2016 | 6366 | 23078 | 19448 | 25634 | 36562 | 186830 | 31891 | 64891 | 14170 | 408870 | 62882 | 345988 |
| 2017 | 6002 | 13476 | 18633 | 25193 | 35460 | 137562 | 26086 | 38657 | 12847 | 303916 | 51516 | 252400 |
| 2018 | 8045 | 15833 | 29230 | 31561 | 32641 | 162262 | 38591 | 52172 | 26244 | 396579 | 73638 | 322941 |
| 2019 | 9637 | 57269 | 35138 | 182143 | 38378 | 339135 | 58049 | 63490 | 68269 | 851508 | 307681 | 543827 |
| 2020 | 8627 | 40342 | 27487 | 54396 | 51425 | 90203 | 53277 | 66074 | 8804 | 400635 | 103542 | 297093 |
| 2021 | 37266 | 259294 | 59231 | 199918 | 112241 | 549077 | 142459 | 191232 | 114488 | 1659206 | 567700 | 1091506 |
| 2022 | 30684 | 428556 | 64221 | 256766 | 100495 | 440423 | 163312 | 230235 | 284078 | 1997770 | 971400 | 1026370 |
| Grand Total | 119438 | 904626 | 297025 | 809599 | 527888 | 2463594 | 594362 | 979002 | 548050 | 7243584 | 2262275 | 4981309 |
| | 33473.45455 | 467515.636 | 70059.273 | 282290.182 | 106310.9 | 480461.4545 | 174885.818 | 251165.5 | 309903.3 | 2179385 | 1059709 | 1119676 |
| | -10% | 80% | 18% | 46% | -2% | -12% | 23% | 31% | 171% | 31% | 87% | 3% |
| | 4.126495834 | 17.3430581 | 2.2389866 | 4.81312474 | 2.088514 | 1.34478577 | 3.9773497 | 3.067215 | 12.81708 | 3.718006 | 9.98404 | 2.063811 |

Source: OIS Persist Dataset
Note: FY2022 projection based on first 11 months of data inflated by 12/11; this is a conservative methodology given recent trends.

Venezuela AR_000327



Total Ukraine SWB Encounters March 1 2022 - August 31 2022

Source: OIS Persist Dataset as of 8/31/22

| | | |
|---|---|---|
| 3/1/2022 | 0 | |
| 3/2/2022 | 14 | |
| 3/3/2022 | 7 | |
| 3/4/2022 | 32 | |
| 3/5/2022 | 12 | |
| 3/6/2022 | 19 | |
| 3/7/2022 | 26 | |
| 3/8/2022 | 48 | |
| 3/9/2022 | 33 | |
| 3/10/2022 | 25 | |
| 3/11/2022 | 59 | |
| 3/12/2022 | 72 | |
| 3/13/2022 | 43 | |
| 3/14/2022 | 44 | |
| 3/15/2022 | 62 | |
| 3/16/2022 | 88 | |
| 3/17/2022 | 66 | |
| 3/18/2022 | 86 | |
| 3/19/2022 | 49 | |
| 3/20/2022 | 127 | |
| 3/21/2022 | 64 | |
| 3/22/2022 | 57 | |
| 3/23/2022 | 123 | |
| 3/24/2022 | 193 | |
| 3/25/2022 | 198 | |
| 3/26/2022 | 180 | |
| 3/27/2022 | 197 | |
| 3/28/2022 | 260 | |
| 3/29/2022 | 251 | |
| 3/30/2022 | 401 | |
| 3/31/2022 | 428 | |
| 4/1/2022 | 471 | |
| 4/2/2022 | 561 | |
| 4/3/2022 | 581 | |
| 4/4/2022 | 589 | |
| 4/5/2022 | 593 | |
| 4/6/2022 | 752 | |
| 4/7/2022 | 821 | |
| 4/8/2022 | 1071 | |
| 4/9/2022 | 829 | |
| 4/10/2022 | 986 | |
| 4/11/2022 | 862 | |
| 4/12/2022 | 1093 | 941.3571 |
| 4/13/2022 | 1317 | |
| 4/14/2022 | 11 0 | |
| 4/15/2022 | 1060 | |
| 4/16/2022 | 980 | |
| 4/17/2022 | 1023 | |
| 4/18/2022 | 578 | |
| 4/19/2022 | 746 | |
| 4/20/2022 | 703 | |
| 4/21/2022 | 697 | |
| 4/22/2022 | 767 | |
| 4/23/2022 | 732 | |
| 4/24/2022 | 765 | |
| 4/25/2022 | 396 | |
| 4/26/2022 | 2 | |
| 4/27/2022 | 13 | |
| 4/28/2022 | 8 | |
| 4/29/2022 | 5 | |
| 4/30/2022 | 8 | 11.9375 |
| 5/1/2022 | 13 | |
| 5/2/2022 | 22 | |
| 5/3/2022 | 27 | |
| 5/4/2022 | 11 | |
| 5/5/2022 | 3 | |
| 5/6/2022 | 24 | |
| 5/7/2022 | 20 | |
| 5/8/2022 | 6 | |
| 5/9/2022 | 14 | |
| 5/10/2022 | 9 | |
| 5/11/2022 | 6 | |
| 5/12/2022 | 17 | |
| 5/13/2022 | 13 | |
| 5/14/2022 | 3 | |
| 5/15/2022 | 5 | |
| 5/16/2022 | 6 | |
| 5/17/2022 | 8 | |
| 5/18/2022 | 8 | |
| 5/19/2022 | 21 | |
| 5/20/2022 | 0 | |
| 5/21/2022 | 4 | |
| 5/22/2022 | 9 | |
| 5/24/2022 | 3 | |
| 5/25/2022 | 2 | |
| 5/26/2022 | 14 | |
| 5/27/2022 | 2 | |
| 5/28/2022 | 27 | |
| 5/29/2022 | 7 | |
| 5/30/2022 | 1 | |
| 5/31/2022 | 0 | |
| 6/1/2022 | 1 | |
| 6/2/2022 | 3 | |
| 6/3/2022 | 6 | |
| 6/4/2022 | 15 | |
| 6/5/2022 | 4 | |
| 6/6/2022 | 13 | |
| 6/7/2022 | 6 | |
| 6/8/2022 | 4 | |
| 6/9/2022 | 7 | |
| 6/10/2022 | 1 | |
| 6/11/2022 | 3 | |
| 6/12/2022 | 13 | |
| 6/13/2022 | 2 | |

Venezuela AR_000329

## CBP Book-out Dispositions by Country of Citizenship, September 1 - 27, 2022

| Disposition Type | Venezuela | Cuba | Nicaragua | Haiti | CNHV total | Mexico | Honduras | Guatemala | El Salvador | MxNCA total | Colombia | Peru | Ecuador | Russia | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 21 | 15 | 8 | 5 | 49 | 28,895 | 4,760 | 4,887 | 1,365 | 39,907 | 14 | 5 | 55 | 1 | 48 | 40,079 |
| Title 42 delayed | 42 | 44 | 25 | 4 | 115 | 13,931 | 2,248 | 3,680 | 1,463 | 21,322 | 1,474 | 37 | 19 | 0 | 7 | 22,974 |
| Repatriations processed by CBP | N/A | N/A | N/A | N/A | 0 | 6,096 | 110 | 152 | 409 | 6,767 | N/A | N/A | N/A | N/A | N/A | 6,767 |
| Transfer to ICE for removal processing | 1,523 | 1,155 | 1,138 | 42 | 3,858 | 152 | 60 | 54 | 51 | 317 | 1,508 | 1,578 | 877 | 218 | 3,778 | 12,134 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| Release with OFO parole | 1 | 0 | 0 | 3 | 4 | 897 | 3 | 7 | 5 | 912 | 0 | 2 | 0 | 5 | 31 | 954 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Transfer to ICE for release with NTA | 842 | 1,437 | 443 | 31 | 2,753 | 173 | 360 | 76 | 134 | 743 | 609 | 445 | 342 | 387 | 693 | 5,972 |
| Release with NTA | 577 | 891 | 114 | 4,409 | 5,991 | 2,810 | 1,778 | 327 | 403 | 5,318 | 1,087 | 335 | 124 | 1,657 | 2,321 | 16,833 |
| Release with I-94 parole ATD | 27,830 | 19,666 | 14,800 | 67 | 62,363 | 193 | 221 | 170 | 161 | 745 | 7,640 | 4,587 | 3,194 | 143 | 7,094 | 85,766 |
| Total SWB Releases | 29,249 | 21,994 | 15,357 | 4,507 | 71,107 | 3,176 | 2,359 | 573 | 698 | 6,806 | 9,336 | 5,367 | 3,660 | 2,187 | 10,108 | 108,571 |
| Total | 30,836 | 23,208 | 16,528 | 4,561 | 75,133 | 53,149 | 9,540 | 9,354 | 3,992 | 76,035 | 12,332 | 6,989 | 4,611 | 2,411 | 13,972 | 191,483 |
| Percent of releases | 27% | 20% | 14% | 4% | 65% | 3% | 2% | 1% | 1% | 6.3% | 9% | 5% | 3% | 2% | 9% | 100% |
| | 95% | 95% | 93% | 99% | 95% | | | | | | | | | | | |
| | 95% | 95% | 93% | 93% | 95% | | | | | | | | | | | |

Note: Data valid as of 9/28/2022. Data in "Repatriations processed by CBP" row represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.
Source: DHS Office of Immigration Statistics analysis of CBP UIP data.

Total SWB releases defined by CBP bookout dispositions including transfers to ICE for release at the border with NTA, CBP release with NTA, and CBP Parole-ATD. Data pulled from UIP 9/28/22.

Venezuela AR_000330

| | Cuba | | Haiti | | Nicaragua | | Venezuela | | CVNH | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Unique | Total | Unique | Total | Unique | Total | Unique | Total | Unique | Total |
| FY 2022 Projection | 213,120 | 220,668 | 49,289 | 53,919 | 156,867 | 163,550 | 185,912 | 188,547 | 605,208 | 626,684 |
| Increase over 2021 | 7 | 6 | 11 | 11 | 3 | 3 | 3 | 4 | 4 | 4 |
| Increase over 2020 | 29 | 16 | 11 | 12 | 98 | 71 | 73 | 68 | 38 | 27 |
| Increase over 2019 | 7 | 7 | 16 | 18 | 11 | 11 | 25 | 25 | 11 | 11 |
| Increase over 2018 | 30 | 31 | 161 | 175 | 45 | 46 | 281 | 275 | 53 | 54 |
| Increase over 2017 | 14 | 14 | 5 | 6 | 143 | 142 | 480 | 477 | 23 | 24 |
| Increase over 2016 | 5 | 5 | 8 | 8 | 117 | 119 | 579 | 578 | 12 | 13 |
| Increase over 2015 | 7 | 7 | 147 | 157 | 157 | 153 | 1,200 | 1,157 | 19 | 19 |
| Increase over 2014 | 12 | 13 | 105 | 109 | 88 | 87 | 2,513 | 2,417 | 30 | 31 |
| Increase over 2014-2019 average | 9 | 9 | 15 | 16 | 41 | 42 | 122 | 121 | 18 | 19 |

Data in rows 5 - 13 are quotients of 2022 values by preceding years and describe growth factors from the earlier years. For example, cell B7 indicates that "Unique Cuban encounters were a 7-fold increase over 2021 encounters." FY 2022 projection based on DHS persist through Aug. 2021 and UIP data deflated by unique encounter ratio for first 11 months of year.

**Unique Encounters from DS period**

| Row Labels | Brazil | Chile | Colombia | Cuba | Ecuador | El Salvador | Guatemala | Haiti | Honduras | India | Mexico | Nicaragua | Other | Peru | Romania | Russia | Ukraine | Venezuela | Grand Total | A (Other non venezuela) | CNNV | All non-CNNV | NCA | Non-CNNV/NCA/Na |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 276 | 15 | 473 | 13760 | 13766 | 35904 | 40382 | 847 | 42640 | 2932 | 222475 | 1353 | 5197 | 788 | 627 | 50 | 18 | 59 | 375695 | 59 | 375916 | 361676 | 123826 | 14375 |
| 2014 | 566 | 43 | 319 | 17556 | 4753 | 64491 | 71382 | 470 | 88651 | 1323 | 201187 | 1775 | 6786 | 594 | 871 | 44 | 45 | 74 | 461070 | 74 | 460996 | 441195 | 224324 | 15684 |
| 2015 | 1371 | 25 | 401 | 13062 | 2375 | 41608 | 56403 | 336 | 58271 | 2143 | 189815 | 1001 | 7616 | 518 | 434 | 109 | 131 | 155 | 364274 | 155 | 366119 | 333720 | 128582 | 15323 |
| 2016 | 4499 | 46 | 472 | 41609 | 2913 | 39952 | 80604 | 6365 | 56685 | 2524 | 192982 | 1343 | 10529 | 661 | 2047 | 137 | 206 | 321 | 440995 | 321 | 485074 | 431357 | 214241 | 24134 |
| 2017 | 4396 | 50 | 275 | 15512 | 1568 | 54556 | 71359 | 9163 | 51025 | 2311 | 139160 | 1097 | 7888 | 549 | 1165 | 196 | 170 | 387 | 360695 | 387 | 360538 | 334768 | 176840 | 18768 |
| 2018 | 5393 | 27 | 205 | 7020 | 1517 | 53303 | 123209 | 307 | 85140 | 6187 | 179393 | 3502 | 9071 | 667 | 592 | 523 | 361 | 661 | 450668 | 661 | 451487 | 444578 | 245732 | 24851 |
| 2019 | 19236 | 318 | 592 | 33285 | 12400 | 89173 | 237261 | 3041 | 253038 | 4956 | 164388 | 14153 | 14153 | 897 | 312 | 888 | 264 | 7518 | 893976 | 7518 | 886458 | 836934 | 598492 | 54044 |
| 2020 | 6785 | 653 | 324 | 7312 | 7663 | 12917 | 37261 | 4643 | 30507 | 940 | 187316 | 1607 | 7566 | 360 | 275 | 435 | 93 | 2543 | 308888 | 2543 | 306351 | 290753 | 80685 | 24874 |
| 2021 | 56912 | 6190 | 5583 | 13332 | 60447 | 97602 | 197015 | 34448 | 223594 | 3437 | 202004 | 47356 | 13377 | 2437 | 4016 | 4016 | 609 | 47328 | 1114229 | 47328 | 1088901 | 964705 | 488871 | 153000 |
| 2022 | 49740 | 6229 | 13801 | 109084 | 187858 | 175806 | 169263 | 48656 | 372253 | 2021 | 189446 | 59653 | 19446 | 8231 | 43935 | 5628 | 25248 | 189207 | 1504037 | 189207 | 1443594 | 524313 | 347877 | 346594 |
| September 1-30 2022 from UIP | 1252 | 528 | 33801 | 28686 | 26186 | 6218 | 13258 | 5175 | 14224 | 2021 | 6805 | 10154 | 14800 | 8231 | 276 | 2606 | 49 | 23880 | 228074 | 23880 | 83371 | 149502 | 15700 | 44777 |
| Unique Encounters ratio from DS period | 96% | 94% | 98% | 96% | 93% | 67% | 69% | 91% | 70% | 81% | 50% | 95% | 95% | 95% | 98% | 99% | 100% | 99% | 97% | | | | | |
| Projected 5Y22 Unique Encounters | 1665 | 494 | 13333 | 25262 | 4898 | 4145 | 4723 | 1831 | 17421 | 10015 | 31773 | 272 | 2572 | 8137 | 80895 | 33489 | 49 | | | | | | 24576 | 30911 |
| 2023 full year projection | 51405 | 6723 | 122617 | 213120 | 64654 | 159904 | 147895 | 40926 | 156867 | 69668 | 50072 | 5900 | 21699 | 50072 | 605208 | 185932 | 25297 | | | | | | 372433 | 377505 |

474,1333
588.6
474,1333

|  | CNNV | A | other (non CNNV) | All non-venezuela |
|---|---|---|---|---|
| FY22 |  | 601,208 | 1,156 985 | 1342193 |
| FY21 | 169,524 | 964 705 | 1,134 229 | 1782393 |
| FY14-19 average | 32,794 | 470,424 | 503,118 | 1086001 1134229 |

Share of charge from 21   0.16938427   0.30516723   1519   503118
Share of charge from 14-19   0.54546606   0.54333432

192 280   627 964

|  | CNNV | All Other (non Venezuela) |
|---|---|---|
|  | 180912 | 1376261 |
|  | 964 705 | 47328 1086001 |
|  | 470,424 | 1519   503118 |

435 684

CNNV   192 280   489 360   192 280

Venezuela   -0.37915183

Venezuela   All other (non Venezuela)
24,576   2.570045   0.199315
372,433   377,505

Venezuela AR_000332

Venezuela AR_000333



Homeland
Security

# Venezuela Trends

*September 23, 2022*

# SW Land Border Unique Encounters: Venezuela

- Venezuela is on pace to exceed 185,000 unique encounters in FY 2022, a 4-fold increase over the FY 2021 total and a 123-fold increase over the FY 2014 – 2019 average

- Venezuela accounted for 25,130 unique encounters in August 2022 and is on pace for over 34,000 unique encounters in September, more than Mexico

- Venezuela unique encounters are up 11-fold increase since Feb. 2022



Note: Unique encounters are encounters with individuals for whom there are no prior encounters within the preceding 12 months. Data also include OFO paroles.
Source: FY 2014 – August 2022 from OIS Persist as of August 31, 2022; September 2022 from CBP UIP.



Office of Immigration Statistics
OFFICE OF STRATEGY, POLICY, AND PLANS

Venezuela AR_000334

# Broad Trends in SW Land Border Unique Encounters by Citizenship FY 2014 – FYTD 2022

- Mexico and Northern Central America (NCA) accounted for 88% of unique SW border encounters in 2014 – 2019 but rising encounters from Venezuela and other countries have reduced the Mexican and NCA share to 45 percent in FY 2022 through August

- Venezuela constitutes 10 percent of unique encounters in FY 2022 (through August), up from less than 1 percent in 2014 – 2019 and 4 percent in 2021

- Unique encounters from Venezuela outnumbered Mexican nationals in August and are on pace to outnumber them in September



Note: "NCA" indicates Northern Central America (El Salvador, Guatemala, and Honduras). Unique encounters are encounters with individuals for whom there are no prior encounters within the preceding 12 months. Data also include parolees and other OFO administrative encounters.
Source: OIS Persist as of August 31, 2022.

Office of Immigration Statistics
OFFICE OF STRATEGY, POLICY, AND PLANS

Venezuela AR_000335

Homeland Security



Venezuela AR_000336

# Venezuela Trends

*September 22, 2022*

# Monthly SW Land Border Unique Encounters, FY 2014 to FYTD 2022

- Average encounters FY 2014-2019: 100/month

- Average encounters FYTD 2022: 14,000/month

- Venezuela Encounters fell from 23,000 in January 2022 to 3,000 in February following Mexico's imposition of visa requirements, but reached 25,000 in August



Note: Unique encounters are encounters with individuals for whom there are no prior encounters within the preceding 12 months. Data also include OFO paroles.
Source: OIS analysis of CBP data.

Office of Immigration Statistics
OFFICE OF STRATEGY, POLICY, AND PLANS

Venezuela AR_000337




# Broad Trends in SW Land Border Unique Encounters by Citizenship FY 2014 – FYTD 2022

- Mexico and Northern Central America (NCA) accounted for 88% of unique SW border encounters in 2014 – 2019 but rising encounters from Venezuela and other countries have reduced the Mexican and NCA share to 45 percent in FY 2022 through August

- Venezuela constitutes 10 percent of unique encounters in FY 2022 (through August), up from less than 1 percent in 2014 – 2019 and 4 percent in 2021

- Unique encounters from Venezuela outnumbered Mexican nationals in August and are on pace to outnumber them in September



Note: "NCA" indicates Northern Central America (El Salvador, Guatemala, and Honduras). Unique encounters are encounters with individuals for whom there are no prior encounters within the preceding 12 months. Data also include parolees and other OFO administrative encounters.
Source: OIS Persist as of August 31, 2022.

Office of Immigration Statistics
OFFICE OF STRATEGY, POLICY, AND PLANS

Venezuela AR_000338

# Estimated U.S. Populations: Venezuela, and Ukraine

- The Venezuelan- and Ukrainian-American populations are similar in size and could generate similar numbers of sponsor applications



Source: OIS estimates based on 2019 U.S. Census American Community Survey data.

Office of Immigration Statistics
OFFICE OF STRATEGY, POLICY, AND PLANS

Venezuela AR_000339


Homeland
Security

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



# OFFICE *of* INTELLIGENCE *and* ANALYSIS

## INTELLIGENCE IN FOCUS

6 JUNE 2022 DHS-IA-IF-2022-00774-A

*BORDER SECURITY*

## *(U//LES)* Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States

*(U//LES)* **Widespread use of social media platforms by human smugglers broadens client access to illicit pathways to the United States, probably improving the chance of successfully arriving at the southern border.** Social media platforms enable smugglers and clients to connect online, facilitate payments, and coordinate smuggling operations—helping migrants who otherwise would struggle to navigate transnational networks and border security operations along smuggling routes, according to DHS and FBI reporting.

- *(U//SBU)* Human smugglers often target vulnerable populations who view illegal migration as a necessary means to escape natural disasters, poverty, war, or oppression, according to US Government and open source reporting. Broad access to online networks has expanded the way smugglers and migrants connect, allowing migrants to seek out facilitation services and communicate directly as an alternative to third-party introductions and word-of-mouth, according to Western press reporting.

- *(U//LES)* Human smugglers advertise their services on sites like Facebook and YouTube and use encrypted messaging platforms, such as WhatsApp and Telegram, as well as some gaming platforms to discuss logistics, according to DHS reporting. Encrypted messaging platforms enable smugglers to provide directions and receive payments from their clients without revealing any personally identifiable information, judging from DHS and FBI reporting.

*(U)* Prepared by the Counterintelligence Mission Center, the Counterterrorism Mission Center, the Transnational Organized Crime Mission Center, and ICE's Human Smuggling and Extraterritorial Criminal Travel Unit. Coordinated within the DHS Intelligence Enterprise (CBP and USCG) and with FBI and SOUTHCOM. For questions, contact ██████████@hq.dhs.gov

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

> *(U//LES)*  **Illicit Pathways Vulnerable to Exploitation by Foreign Adversaries**
>
> *(U//LES)*  Some smugglers and their clients use encrypted platforms to help conceal their identities, which would appeal to individuals with ties to terrorists or foreign adversaries seeking illicit access to the United States, judging from DHS, FBI, and open source reporting. We judge that human smugglers primarily are profit-driven but vary in their tolerance for exposing operations to the law enforcement scrutiny associated with facilitating travel for terrorists or foreign adversaries.

*(U//FOUO)*  **Law enforcement efforts to de-platform human smugglers on social media will probably be challenged by privacy concerns and the large scale of online content providing guidance on illicit pathways to the United States.** ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████

- *(U)*  The privacy policies of companies like Snapchat[USPER] and Instagram[USPER] enable users to share photos and messages without restrictions. Many social media companies, including Meta[USPER] and Twitter[USPER], claim to remove harmful content, but face limitations due to terms of service agreements, according to Twitter's company policy and Western press accounts of US media company policies.

- *(U//LES)*  ██████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████  In March, a list of five Facebook groups for intending migrants in Mexico, Guatemala, and Honduras jointly had an estimated 406,000 members, according to DHS reporting.

- *(U//SBU/LES)*  Human smugglers' engagement with prospective clients on social media platforms probably makes their advertising efforts vulnerable to detection by law enforcement authorities, judging from DHS reporting. ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

## Source, Reference, and Dissemination Information

| | |
|---|---|
| **Source Summary Statement** | *(U//LES)* We have **moderate confidence** in our assessment that the widespread use of social media platforms by human smugglers broadens client access to illicit pathways to the United States, improving the chance of successfully arriving at the southern border. Our assessment is based on a body of DHS, US Government, and FBI reporting, as well as Western press. Our confidence in this assessment is based upon reliable, firsthand reporting, most of which has been corroborated.<br><br>*(U//LES)* We have **moderate confidence** in our assessment that law enforcement efforts to de-platform human smugglers on social media will be challenged by privacy concerns and the large scale of online content providing guidance on illicit pathways to the United States. This assessment is based on a body of DHS, US Government, and Western press reporting, all of which we deem to be reliable. |
| **Reporting Suspicious Activity** | *(U)* **To report suspicious activity, law enforcement, Fire-EMS, private security personnel, and emergency managers should follow established protocols; all other personnel should call 911 or contact local law enforcement.** Suspicious activity reports (SARs) will be forwarded to the appropriate fusion center and FBI Joint Terrorism Task Force for further action. For more information on the Nationwide SAR Initiative, visit www.dhs.gov/nsi. |
| **Privacy, Civil Rights, Civil Liberties, Intelligence Oversight Notice** | *(U//FOUO)* US persons linking, citing, quoting, or voicing the same arguments raised by these foreign influence activities likely are engaging in First Amendment-protected activity, unless they are acting at the direction or control of a foreign threat actor. Furthermore, variants of the topics covered in this product, even those that include divisive terms, should not be assumed to reflect foreign influence or malign activity absent information specifically attributing the content to malign foreign actors. This information should be considered in the context of all applicable legal and policy authorities to use open source information while protecting privacy, civil rights, and civil liberties. |
| **Dissemination** | *(U)* DHS Intelligence Enterprise, Intelligence Community, and federal, state, local, tribal, and territorial partners. |
| **Warning Notices & Handling Caveats** | *(U)* **LAW ENFORCEMENT SENSITIVE:** The information marked (U//LES) in this document is the property of DHS and may be distributed within the Federal Government (and its contractors), US intelligence, law enforcement, public safety or protection officials, and individuals with a need to know. Distribution beyond these entities without DHS authorization is prohibited. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. Information bearing the LES caveat may not be used in legal proceeding without first receiving authorization from the originating agency. Recipients are prohibited from subsequently posting the information marked LES on a website on an unclassified network.<br><br>*(U)* This product contains US person information that has been deemed necessary for the intended recipient to understand, assess, or act on the information provided. It has been highlighted in this document with the label <sup>USPER</sup> and should be handled in accordance with the recipient's intelligence oversight and/or information handling procedures.<br><br>*(U)* **Warning:** This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. |

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS.

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



Office of Intelligence and Analysis

# Customer Feedback Form

Product Title: (U//LES) Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States

All survey responses are completely anonymous. No personally identifiable information is captured unless you voluntarily offer personal or contact information in any of the comment fields. Additionally, your responses are combined with those of many others and summarized in a report to further protect your anonymity.

| 1. Please select partner type: | Select One | and function: | Select One |
|---|---|---|---|

| 2. What is the highest level of intelligence information that you receive? | Select One |
|---|---|

| 3. Please complete the following sentence: "I focus most of my time on:" | Select One |
|---|---|

**4. Please rate your satisfaction with each of the following:**

| | Very Satisfied | Somewhat Satisfied | Neither Satisfied nor Dissatisfied | Somewhat Dissatisfied | Very Dissatisfied | N/A |
|---|---|---|---|---|---|---|
| Product's overall usefulness | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's relevance to your mission | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's timeliness | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's responsiveness to your intelligence needs | ○ | ○ | ○ | ○ | ○ | ○ |

**5. How do you plan to use this product in support of your mission?** *(Check all that apply.)*

- ☐ Drive planning and preparedness efforts, training, and/or emergency response operations
- ☐ Observe, identify, and/or disrupt threats
- ☐ Share with partners
- ☐ Allocate resources (e.g. equipment and personnel)
- ☐ Reprioritize organizational focus
- ☐ Author or adjust policies and guidelines
- ☐ Initiate a law enforcement investigation
- ☐ Intiate your own regional-specific analysis
- ☐ Intiate your own topic-specific analysis
- ☐ Develop long-term homeland security strategies
- ☐ Do not plan to use
- ☐ Other:

**6. To further understand your response to question #5, please provide specific details about situations in which you might use this product.**

**7. What did this product _not_ address that you anticipated it would?**

**8. To what extent do you agree with the following two statements?**

| | Strongly Agree | Agree | Neither Agree nor Disagree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|---|
| This product will enable me to make better decisions regarding this topic. | ○ | ○ | ○ | ○ | ○ | ○ |
| This product provided me with intelligence information I did not find elsewhere. | ○ | ○ | ○ | ○ | ○ | ○ |

| 9. How did you obtain this product? | Select One |
|---|---|

| 10. Would you be willing to participate in a follow-up conversation about your feedback? | Yes |
|---|---|

*To help us understand more about your organization so we can better tailor future products, please provide:*

| Name: | | Position: | |
|---|---|---|---|
| Organization: | | State: | |
| Contact Number: | | Email: | |

**Submit Feedback ▶**

*Privacy Act Statement*

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE



# OFFICE *of* INTELLIGENCE *and* ANALYSIS
### INTELLIGENCE IN BRIEF

12 DECEMBER 2022                                                                    DHS-IA-IB-2022-22905-A

*BORDER SECURITY*

## (U//SBU)  Venezuelans React to US Immigration Policies; Flow Probably Will Increase in Early 2023

**(U//SBU)  Although the number of Venezuelan migrants arriving at the US Southwest Border decreased after the mid-October US migration policy announcement, we expect migration flows to begin rising in response to the reversal of Title 42.**[a] On 12 October, DHS announced a new migration enforcement program that offers 24,000 qualifying Venezuelans a pathway to the United States and returns irregular migrants to Mexico. In mid-November, a US federal court ruling ended Title 42 authorities, which will allow migrants to claim asylum. With Title 42 ending, Venezuelan migrants who previously considered returning to Venezuela or remaining in third countries to apply for legal pathways to enter the United States will likely recalculate their decision and transit north to the US Southwest Border.

- *(U//SBU/LES)*  Amid mixed reactions to DHS's mid-October policy announcement, most Venezuelan migrants have chosen to stay in place or return to Venezuela or a host nation, judging from CBP encounter data and US Government reporting. CBP saw a 76 percent decrease of Venezuelan encounters from the 1,180 daily average number in early October to a daily average of about 280 after the announcement.[b] In Colombia, the number of departures from Necocli, north of the Darien Gap, dropped by 80 percent in late October, according to US Government and press reporting. Some migrants continue to travel, but numbers are unlikely to rebound over the next month to early October numbers if migrants believe that they will be returned to Mexico.

---

[a] *(U)*  The DHS Migration Enforcement Policy authorizes up to 24,000 qualifying Venezuelans to enter the United States, and those Venezuelans who enter the United States between ports of entry without authorization will be returned to Mexico. To be eligible, migrants must have a US supporter who will provide financial and other support; pass biometric and biographic national security and public safety screening and vetting; and complete vaccinations and other public health requirements. Venezuelans are approved on a case-by-case basis to travel to the United States by air directly to an interior port of entry.

[b] *(U//LES)*  Unofficial preliminary encounters of Venezuelan nationals at the US Southwest Border 3-9 October, before the 12 October announcement, compared to 7-13 November, following the announcement.

---

*(U)* Prepared by the Transnational Organized Crime Mission Center. Coordinated within the DHS Intelligence Enterprise (CBP, ICE, TSA, USCG, USSS) and with DIA, NGA, the NIC, and Treasury. For questions, contact ███████@hq.dhs.gov

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

- *(U//SBU)* Title 42 authorities are set to expire on 21 December, and the reversal of the policy will likely increase migration flows immediately as migrants adapt to recent changes. Misperceptions of the May ruling to lift Title 42 probably fueled migration flows to the US Southwest Border, judging from US Government reporting. Migrants who have settled in encampments along the US-Mexico border probably will attempt to re-enter the United States after Title 42 expires, judging from US Government reporting. Human smuggling organizations will likely adjust their methods to successfully cross migrants into the United States and will employ social media and encrypted messages to fuel misinformation regarding US enforcement, judging from US Government reporting.

---

*(U//SBU)* **Transit Countries Struggling With Persistent Venezuelan Migration**

*(U//SBU)* Venezuelan nationals returning south to Venezuela or to third countries are exacerbating already strained regional governments, judging from US Government reporting. Costa Rica, Mexico, and Panama are experiencing significant constraints at immigration facilities, revealing limited capacity; insufficient processing, detention, and deportation processes; and limited enforcement resources. In response to the new DHS policy and the southbound flow of Venezuelans, Panama began enforcing an established visa requirement for Venezuelan nationals seeking to enter Panama from Costa Rica, leaving them stranded in Costa Rica or unable to continue southbound, according to US Government reporting and press reporting.

---

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

Venezuela AR_000346

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# OFFICE *of* INTELLIGENCE *and* ANALYSIS

## INTELLIGENCE IN BRIEF

# (U//FOUO) US Immigration Policy Changes Affecting Regional Migration Flow

12 DECEMBER

(U//SBU) Following a drop in the number of Venezuelan migrants at the US Southwest Border in October, the ending of Title 42 likely will prompt more migrants to transit north. Many Venezuelan migrants who reached the border as of October have been waiting in transit countries or have begun to travel southbound. Latin American countries are struggling to manage high migration flows both coming from and returning to Venezuela, exacerbating regional governments' financial and resource constraints. Some Latin American governments are taking measures to slow down migration to the US Southwest Border, but these measures will do little to mitigate migration flows.

OVERALL GRAPHIC CLASSIFICATION: UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

### Mexico

(U//SBU) The Mexican Government and international organizations report a need for an increase in humanitarian assistance in Mexico City and northern and southern Mexico as Mexico processes Venezuelan nationals returned from the United States. The Government of Mexico has increased its enforcement efforts in the south and is working to address overwhelmed shelters in the north. Hundreds of Venezuelan nationals are seeking refuge, work, and legal status in Mexico to avoid deportation. Mexican Government officials in Chihuahua outlined that Venezuelan nationals in Mexico may apply for a humanitarian visa to work legally in Mexico or may work with Mexico's National Migration Institute to return to a third country.

### Honduras and Guatemala

(U//SBU) Honduras and Guatemala are unprepared and underfunded to handle the increases in southbound Venezuelan migrants, with some seeking asylum and others turning themselves into migration officials and requesting voluntary repatriation to Venezuela. In late October, the number of Venezuelan migrants traveling northbound through Guatemala had dropped significantly.

### Costa Rica

(U//SBU) Venezuelan nationals are stranded in Costa Rica because Panama's and Colombia's restrictive policies are preventing Venezuelans from continuing southbound. This influx has placed additional pressure on the Costa Rican Government to host migrants attempting to transit through the country, which Costa Rica, however, is considering adopting tougher migration policies toward Venezuelan migrants

### Panama

(U//SBU) In late October, Panama's National Migration Service reiterated that migrants seeking to enter Panama via Costa Rica must have a valid visa. The Venezuelan Embassy in Panama is providing temporary shelter and travel documents to facilitate the voluntary return of Venezuelan migrants back to Venezuela. Panama is working with Maduro regime officials to return 4,000 Venezuelan nationals to Venezuela, according to US Government reporting.

### Colombia

(U//SBU) The number of US-bound Venezuelan nationals leaving Colombia dropped 80 percent in the week following the announcement.

### Chile, Ecuador, and Peru

(U//SBU) Venezuelan nationals are traveling south from Colombia, into Ecuador, into Peru and Chile. As of mid-November, Venezuelan arrivals into Ecuador were greater than departures since April 2022.



○ Overwhelmed Migrant Shelters

### (U//FOUO) Monthly Encounters of Venezuelan Nationals at the US Southwest Border

(U//SBU) Mexico imposed a visa requirement on Venezuelan nationals on 21 January 2022.

35K
30K
25K
20K
15K
10K

Oct 2021 · Nov 2021 · Dec 2021 · Jan 2022 · Feb 2022 · Mar 2022 · Apr 2022 · May 2022 · Jun 2022 · Jul 2022 · Aug 2022 · Sep 2022 · Oct 2022 · Nov 2022

Monthly Encounters in Thousands

### Weekly Encounters
Sep-Nov 2022

New DHS Enforcement
Process Implemented
on 12 October 2022

10K
8K
6K
4K
2K
0K

19–25 Sep
26 Sep–2 Oct
3–9 Oct
10–16 Oct
17–23 Oct
24–30 Oct
31 Oct–6 Nov
7–13 Nov
14–20 Nov
21–27 Nov

- Unofficial preliminary CBP encounter data

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

DHS-I-A-IB-2022-22905-A

Venezuela_AR_000347

22-447-IA

UNCLASSIFIED//SENSITIVE BUT UNCLASSIFIED/LAW ENFORCEMENT SENSITIVE

| Source, Reference, and Dissemination Information | |
|---|---|
| **Source Summary Statement** | (U//SBU) We have **moderate confidence** in our assessment that the flow of Venezuelan migrants to the US Southwest Border is being affected by the new DHS immigration policy. Our assessment is based on a review of corroborated and detailed government reporting, CBP firsthand interviews with Venezuelan nationals encountered at the US Southwest Border, CBP preliminary encounter data, and news reporting. |
| **Reporting Suspicious Activity** | (U) **To report suspicious activity, law enforcement, Fire-EMS, private security personnel, and emergency managers should follow established protocols; all other personnel should call 911 or contact local law enforcement.** Suspicious activity reports (SARs) will be forwarded to the appropriate fusion center and FBI Joint Terrorism Task Force for further action. For more information on the Nationwide SAR Initiative, visit www.dhs.gov/nsi. |
| | (U) **To report a computer security incident, either contact US-CERT at 888-282-0870, or go to https://forms.us-cert.gov/report/ and complete the US-CERT Incident Reporting System form.** The US-CERT Incident Reporting System provides a secure, web-enabled means of reporting computer security incidents to US-CERT. An incident is defined as a violation or imminent threat of violation of computer security policies, acceptable use policies, or standard computer security practices. In general, types of activity commonly recognized as violating typical security policies include attempts (either failed or successful) to gain unauthorized access to a system or its data, including personally identifiable information; unwanted disruption or denial of service; the unauthorized use of a system for processing or storing data; and changes to system hardware, firmware, or software without the owner's knowledge, instruction, or consent. |
| **Dissemination** | (U) National Security Council; senior policymakers; DHS leadership; the Intelligence Community; the DHS Intelligence Enterprise; DHS congressional oversight committees; and cleared state, local, tribal, and territorial partners. |
| **Warning Notices & Handling Caveats** | (U) **LAW ENFORCEMENT SENSITIVE:** The information marked (U//LES) in this document is the property of CBP and may be distributed within the Federal Government (and its contractors), US intelligence, law enforcement, public safety or protection officials, and individuals with a need to know. Distribution beyond these entities without CBP authorization is prohibited. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. Information bearing the LES caveat may not be used in legal proceeding without first receiving authorization from the originating agency. Recipients are prohibited from subsequently posting the information marked LES on a website on an unclassified network. |
| | (U) **Warning:** This document contains UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO) information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, the media, or other personnel who do not have a valid need to know without prior approval of an authorized DHS official. State and local homeland security officials may not share this document with critical infrastructure and key resource personnel or private sector security officials without further approval from DHS. |

Venezuela AR_000348



**Office of Intelligence and Analysis**
# Customer Feedback Form

Product Title: (U//SBU) Venezuelans React to US Immigration Policies; Flow Probably Will Increase in Early 2023

All survey responses are completely anonymous. No personally identifiable information is captured unless you voluntarily offer personal or contact information in any of the comment fields. Additionally, your responses are combined with those of many others and summarized in a report to further protect your anonymity.

**1. Please select partner type:** Select One **and function:** Select One

**2. What is the highest level of intelligence information that you receive?** Select One

**3. Please complete the following sentence: "I focus most of my time on:"** Select One

**4. Please rate your satisfaction with each of the following:**

| | Very Satisfied | Somewhat Satisfied | Neither Satisfied nor Dissatisfied | Somewhat Dissatisfied | Very Dissatisfied | N/A |
|---|---|---|---|---|---|---|
| Product's overall usefulness | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's relevance to your mission | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's timeliness | ○ | ○ | ○ | ○ | ○ | ○ |
| Product's responsiveness to your intelligence needs | ○ | ○ | ○ | ○ | ○ | ○ |

**5. How do you plan to use this product in support of your mission?** *(Check all that apply.)*

☐ Drive planning and preparedness efforts, training, and/or emergency response operations
☐ Observe, identify, and/or disrupt threats
☐ Share with partners
☐ Allocate resources (e.g. equipment and personnel)
☐ Reprioritize organizational focus
☐ Author or adjust policies and guidelines

☐ Initiate a law enforcement investigation
☐ Intiate your own regional-specific analysis
☐ Intiate your own topic-specific analysis
☐ Develop long-term homeland security strategies
☐ Do not plan to use
☐ Other: _____

**6. To further understand your response to question #5, please provide specific details about situations in which you might use this product.**

**7. What did this product _not_ address that you anticipated it would?**

**8. To what extent do you agree with the following two statements?**

| | Strongly Agree | Agree | Neither Agree nor Disagree | Disagree | Strongly Disagree | N/A |
|---|---|---|---|---|---|---|
| This product will enable me to make better decisions regarding this topic. | ○ | ○ | ○ | ○ | ○ | ○ |
| This product provided me with intelligence information I did not find elsewhere. | ○ | ○ | ○ | ○ | ○ | ○ |

**9. How did you obtain this product?** Select One

**10. Would you be willing to participate in a follow-up conversation about your feedback?** Yes

*To help us understand more about your organization so we can better tailor future products, please provide:*

| | |
|---|---|
| Name: | Position: |
| Organization: | State: |
| Contact Number: | Email: |

*Submit Feedback* ▶

*Privacy Act Statement*



**U.S. Department of Homeland Security**

# DHS Announces New Migration Enforcement Process for Venezuelans

**Release Date:** October 12, 2022

***Venezuelans who seek to enter the U.S. illegally will be returned to Mexico; New lawful pathway created for some Venezuelans***

WASHINGTON – Today, as part of the Biden-Harris Administration's ongoing work to build a fair, orderly, and secure immigration system, the Department of Homeland Security (DHS) is announcing joint actions with Mexico to reduce the number of people arriving at our Southwest border and create a more orderly and safe process for people fleeing the humanitarian and economic crisis in Venezuela.

Almost four times as many Venezuelans as last year attempted to cross our southern border, placing their lives in the hands of ruthless smuggling organizations. Meanwhile, irregular migration from northern Central America is down by a quarter from the level encountered last year. The actions the United States and Mexico are announcing today are intended to address the most acute irregular migration and help ease pressure on the cities and states receiving these individuals.

Effective immediately, Venezuelans who enter the United States between ports of entry, without authorization, will be returned to Mexico. At the same time, the United States and Mexico are reinforcing their coordinated enforcement operations to target human smuggling organizations and bring them to justice. That campaign will include new migration checkpoints, additional resources and personnel, joint targeting of human smuggling organizations, and expanded information sharing related to transit nodes, hotels, stash houses, and staging locations. The United States is also planning to offer additional security assistance to support regional partners to address the migration challenges in the Darién Gap.

Our comprehensive effort to reduce the irregular migration of Venezuelans also includes a new process to lawfully and safely bring up to 24,000 qualifying Venezuelans into the United States. The United States will not implement this process without Mexico keeping in place its independent but parallel effort to accept the return of Venezuelan nationals who bypass this process and attempt to enter irregularly.

"These actions make clear that there is a lawful and orderly way for Venezuelans to enter the United States, and lawful entry is the only way," **said Secretary of Homeland Security Alejandro N. Mayorkas.** "Those who attempt to cross the southern border of the United States illegally will be returned to Mexico and will be ineligible for this process in the future. Those who follow the lawful process will have the opportunity to travel safely to the United States and become eligible to work here."

This effort is intended to enhance border security by reducing the number of Venezuelans seeking to irregularly enter the United States. It is derived from the success of the Uniting for Ukraine (U4U) program, which decreased flows at the border by creating an orderly process for the entry of Ukrainians fleeing Russia's invasion of Ukraine.

DHS will closely monitor the implementation of this process, and Mexico's independent and parallel efforts, and may consider expanding it in the future.

To be eligible, Venezuelans must:

- have a supporter in the United States who will provide financial and other support;
- pass rigorous biometric and biographic national security and public safety screening and vetting; and
- complete vaccinations and other public health requirements.

Venezuelans are ineligible if they:

- have been ordered removed from the United States in the previous five years;
- have crossed without authorization between ports of entry after the date of announcement;
- have irregularly entered Mexico or Panama after the date of announcement, or are a permanent resident or dual national of any country other than Venezuela, or currently hold refugee status in any country; or
- have not completed vaccinations and other public health requirements.

Venezuela AR_000350

Venezuelans should not travel to Mexico to pursue entry into the United States.

Venezuelans approved via this process will be authorized on a case-by-case basis to travel to the United States by air directly to an interior port of entry, thus relieving pressure at the border. Once in the United States, they will be eligible to apply for work authorization.

DHS will administer the process, working with communities and other partners. Any U.S.-based individual with lawful status, including representatives of businesses or other organizations or entities, can support a potential beneficiary from Venezuela. A supporter must prove that they have the means to provide financial and other support for the beneficiary. In the coming days, potential supporters can apply to DHS to support individual eligible Venezuelans via www.uscis.gov/Venezuela (http://www.uscis.gov/Venezuela). Individuals and representatives of organizations seeking to apply as a supporter must declare the organization's financial support and they must pass security background checks to protect against exploitation and abuse.

The State Department will also engage in a robust in-region messaging campaign to communicate about this new process and the consequences of attempting irregular entry.

More information will be available at www.uscis.gov/Venezuela (http://www.uscis.gov/Venezuela) in the coming days.

Today's actions are part of the Biden-Harris Administration's ongoing efforts to reduce irregular migration throughout the Western Hemisphere, including through the U.S. Strategy for Addressing the Root Causes of Migration and the multinational Los Angeles Declaration on Migration and Protection. The process announced today is one more element of the United States' multilateral approach to addressing irregular migration that is impacting countries throughout Latin America, and it is premised on pairing increased enforcement in response to irregular immigration with the development of lawful and safe pathways for qualifying individuals.

Venezuelans have been migrating throughout the hemisphere since approximately 2014, yet the level of irregular migration of Venezuelans has increased dramatically throughout the hemisphere in the past several years. There are currently 2.4 million Venezuelans residing in Colombia. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019. Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

The United States, in partnership with Mexico, also is committing to further expanding lawful labor pathways for Mexican and Northern Central American nationals. This last year, the United States doubled the number of H-2 visas issued to nationals of the Northern Central American countries of Guatemala, Honduras, and El Salvador. Today, we are announcing (https://www.dhs.gov/news/2022/10/12/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2023) the largest H-2B supplemental in history for Fiscal Year 2023: nearly 65,000 new H-2B visas, including a set-aside of 20,000 to nationals of Northern Central American countries and Haiti. Historically, approximately 90% of these visas have been used by Mexican nationals. This increase is coupled with strong measures to protect both U.S. and H-2B workers. Concurrent with this announcement, the Biden-Harris Administration is launching a White House-led Worker Protection Task Force to ensure ethical recruitment and dignified labor standards for foreign workers alongside protections for U.S. workers.

The United States also is renewing its commitment to tackle the root causes of migration and support countries in the region that are most impacted by these flows. For that reason, the United States has announced nearly $817 million in new assistance since September 2022 under the Los Angeles Declaration on Migration and Protection. This includes more than $240 million in new regional humanitarian and security assistance, $376 million in additional humanitarian assistance for people affected by the Venezuela regional crisis, and more than $199 million in additional humanitarian assistance for Mexico and Central America.

###

**Keywords**

SECRETARY ALEJANDRO MAYORKAS (/KEYWORDS/SECRETARY-ALEJANDRO-MAYORKAS)

Last Updated: 10/12/2022

UNCLASSIFIED // FOR OFFICIAL USE ONLY

Venezuela AR_000352

# DHS Southwest Border Task Force Executive Leadership Report

23 SEPTEMBER 2022

## Table of Contents

2. Encounters

3. Encounters: Recent Trends

4. Unaccompanied Children (UC) Dashboard

5. CBP in Custody

6. CBP Encounters

7. Unaccompanied Child Encounters & HHS in Care

8. Unaccompanied Children in Custody & CBP Transfers

9. Family Unit Individual Encounters

10. Family Unit Individual CBP Book-out Dispositions

11. Single Adult Encounters

12. Single Adult CBP Book-out Dispositions

13. Glossary

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Encounters

## DAILY ENCOUNTERS YESTERDAY

**7,055**

**Total Encounters**
Total includes accompanied minors.

▼ 7% vs. previous day
▼ 8% vs. last week's avg

7,596 encounters 2-days ago

**1,777**

Family Unit Individuals

▲ 5% vs. previous day
▼ 9% vs. last week's avg

1,688 encounters 2-days ago

**4,913**

Single Adults

▼ 10% vs. previous day
▼ 8% vs. last week's avg

5,434 encounters 2-days ago

**359**

Unaccompanied Children

▼ 23% vs. previous day
▼ 6% vs. last week's avg

468 encounters 2-days ago

## AVERAGE WEEKLY ENCOUNTERS BY SECTOR

— El Paso Sector  — Del Rio Sector  — Rio Grande Valley Sector

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|---|---|---|---|---|---|---|---|---|
| El Paso | 733 | 922 | 931 | 1,040 | 1,108 | 1,245 | 1,725 | 1,689 |
| Del Rio | 1,237 | 1,699 | 1,778 | 1,912 | 1,631 | 1,937 | 1,827 | 1,525 |
| RGV | 912 | 945 | 810 | 802 | 931 | 912 | 895 | 867 |
| All Other | 2,827 | 2,948 | 2,953 | 3,237 | 3,192 | 3,328 | 3,335 | 3,078 |

## AVERAGE WEEKLY ENCOUNTERS BY NATIONALITY

— Northern Central America  — Mexico  — Other

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|---|---|---|---|---|---|---|---|---|
| NCA | 1,377 | 1,301 | 1,215 | 1,168 | 1,161 | 1,095 | 1,195 | 1,181 |
| Mex | 1,780 | 2,048 | 1,869 | 1,988 | 2,034 | 1,955 | 2,114 | 1,936 |
| Other | 2,552 | 3,165 | 3,387 | 3,834 | 3,667 | 4,373 | 4,473 | 4,042 |
| **Total** | **5,709** | **6,514** | **6,471** | **6,990** | | | | **7,159** |

## AVERAGE WEEKLY ENCOUNTERS BY FAMILY STATUS

— Unaccompanied Children  — Family Unit Individuals  — Single Adults

| | 4-Aug | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep |
|---|---|---|---|---|---|---|---|---|
| UC | 365 | 370 | 361 | 343 | 392 | 389 | 400 | 378 |
| FM | 1,355 | 1,622 | 1,735 | 1,831 | 1,687 | 1,791 | 1,887 | 1,713 |
| SA | 3,980 | 4,510 | 4,366 | 4,807 | 4,776 | 5,237 | 5,489 | 5,061 |
| **Total** | **5,709** | **6,514** | **6,471** | **6,990** | **6,862** | **7,423** | **7,782** | **7,159** |



UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Encounters: Recent Trends

## DAILY ENCOUNTERS BY NATIONALITY

| | Mexico | Venezuela | Cuba | Nicaragua | Guatemala | Honduras | Colombia | Peru | El Salvador | Ecuador | Haiti | Dom. Rep. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Daily Encounters | 1,936 | 1,078 | 838 | 566 | 489 | 486 | 465 | 261 | 205 | 166 | 136 | 63 |
| 7-Day Average UC | 74 | 8 | 6 | 9 | 143 | 86 | 3 | 2 | 35 | 7 | 0 | 0 |
| 7-Day Average FM | 161 | 285 | 242 | 101 | 51 | 118 | 240 | 122 | 50 | 105 | 43 | 15 |
| 7-Day Average SA | 1,695 | 785 | 590 | 456 | 296 | 282 | 222 | 136 | 121 | 54 | 92 | 48 |
| 12-Month Change | 1% | 220% | 434% | 144% | -39% | -48% | 507% | 808% | -46% | -33% | -71% | N/A |
| 3-Month Change | -10% | 163% | 59% | 59% | -40% | -42% | 8% | 39% | -36% | -52% | 25% | N/A |
| 1-Month Change | -3% | 11% | 22% | 27% | 1% | -1% | 2% | -15% | 7% | 32% | -42% | 49% |
| 1-Week Change | -8% | -11% | -12% | -14% | -3% | -3% | 12% | 2% | 9% | 1% | -22% | -9% |

Data valid as of September 22, 2022 0545. Change percentages reflect the daily average compared to the daily average from the respective period.

## ENCOUNTERS: TOP 5 NON-MEXICAN COUNTRIES

## ENCOUNTERS: TOP 6 OTHER COUNTRIES



Guatemala — Honduras — El Salvador — Venezuela — Cuba

Nicaragua — Ecuador — Colombia — Haiti — Peru — Venezuela

AR_000354

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# UC Dashboard



UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# CBP in Custody

## CBP in Custody

| Country of Citizenship | Total Count | 1-Day Change | 7-Day Avg | 1-Week Change | Avg TIC | < 72 hours | 72 =<120 hours | >= 120 hours |
|---|---|---|---|---|---|---|---|---|
| Mexico | 471 | ▼8% | 466 | ▼15% | 33 | 443 | 8 | 20 |
| Guatemala | 538 | ▼32% | 689 | ▲11% | 42 | 456 | 37 | 45 |
| Honduras | 558 | ▲21% | 520 | ▲1% | 48 | 413 | 125 | 20 |
| El Salvador | 199 | ▼4% | 240 | ▼14% | 56 | 137 | 30 | 32 |
| NCA Total | 1,295 | ▼11% | 1,450 | ▲2% | 47 | 1,006 | 192 | 97 |
| Venezuela | 2,904 | ▼6% | 3,285 | ▼4% | 64 | 1,785 | 683 | 436 |
| Cuba | 1,395 | ▼11% | 1,666 | ▲26% | 42 | 1,169 | 155 | 71 |
| Nicaragua | 1,254 | ▼23% | 1,740 | ▲11% | 50 | 953 | 208 | 93 |
| Colombia | 1,091 | ▼8% | 1,503 | ▼2% | 53 | 838 | 129 | 124 |
| Peru | 473 | ▲16% | 668 | ▼4% | 57 | 368 | 36 | 69 |
| Ecuador | 461 | ▲5% | 525 | ▲9% | 73 | 302 | 67 | 92 |
| Haiti | 38 | ▼24% | 39 | ▲181% | 58 | 28 | 5 | 5 |
| Dom. Rep. | 188 | ▲6% | 245 | ▲2% | 91 | 90 | 40 | 58 |
| Other | 1,020 | ▼10% | 1,342 | ▼8% | 76 | 686 | 87 | 247 |
| Other Total | 8,824 | ▼10% | 11,013 | ▼9% | 59 | 6,219 | 1,410 | 1195 |
| CBP Total | 10,590 | ▼10% | 12,928 | ▼8% | 56 | 7,668 | 1,610 | 1,312 |

CBP custody data covers persons in custody as of September 23, 2022 05:28.

## CBP Family Unit Individuals in Custody by Location

| USBP Sector/OFO Field Office | Count | 7-Day Avg | 1-Day Chg | 1-Week Change | % Capacity | Avg TIC |
|---|---|---|---|---|---|---|
| San Diego | 126 | 181 | ▼16% | ▲19% | 22% | 33 |
| El Centro | 66 | 102 | ▼4% | ▲33% | 52% | 27 |
| Yuma | 497 | 443 | ▲4% | ▼33% | 140% | 52 |
| Tucson | 139 | 193 | ▲26% | ▼22% | 28% | 34 |
| El Paso | 584 | 835 | ▼5% | - flat - | 68% | 26 |
| Big Bend | 0 | 0 | - flat - | - flat - | 0% | 0 |
| Del Rio | 250 | 281 | - flat - | ▼45% | 54% | 21 |
| Laredo | 35 | 107 | ▼73% | ▼58% | 6% | 31 |
| RGV | 458 | 728 | ▼6% | ▲22% | 36% | 55 |
| USBP Total | 2,155 | 2,869 | ▼6% | ▼16% | 43% | 39 |
| San Diego FO | 44 | 40 | ▲47% | ▼20% | 42% | 25 |
| Tucson FO | 0 | 1 | - flat - | ▼14% | 0% | 0 |
| El Paso FO | 4 | 1 | N/A | ▲89% | 9% | 17 |
| Laredo FO | 0 | 8 | ▲100% | ▲440% | 0% | 0 |
| OFO Total | 48 | 49 | ▲2% | ▲41% | 18% | 24 |
| Total | 2,203 | 2,919 | ▼6% | ▼15% | 42% | 38 |

Data covers family unit individuals in custody as of September 23, 2022 05:28.

## CBP Single Adults in Custody by Location

| USBP Sector/OFO Field Office | Count | 1-Day Change | 7-Day Avg | 1-Week Change | % Capacity | Avg TIC |
|---|---|---|---|---|---|---|
| San Diego | 694 | ▼13% | 843 | ▲11% | 122% | 62 |
| El Centro | 175 | ▲4% | 245 | ▲37% | 137% | 38 |
| Yuma | 685 | ▲26% | 605 | ▼22% | 194% | 36 |
| Tucson | 448 | ▲19% | 571 | ▲12% | 91% | 55 |
| El Paso | 2,423 | ▼10% | 2,592 | ▲6% | 282% | 60 |
| Big Bend | 74 | ▲469% | 47 | ▲313% | 28% | 53 |
| Del Rio | 828 | ▼10% | 795 | ▼46% | 178% | 25 |
| Laredo | 681 | ▼14% | 769 | ▼22% | 125% | 81 |
| RGV | 1,672 | ▼25% | 2,811 | ▲1% | 131% | 102 |
| USBP Total | 7,680 | ▼12% | 9,278 | ▼7% | 155% | 65 |
| San Diego FO | 85 | - flat - | 93 | ▲1% | 80% | 39 |
| Tucson FO | 0 | ▲100% | 3 | ▼10% | 0% | 0 |
| El Paso FO | 7 | ▲40% | 5 | ▲27% | 16% | 20 |
| Laredo FO | 7 | ▲42% | 12 | ▲200% | 9% | 18 |
| OFO Total | 99 | ▼7% | 112 | ▲7% | 37% | 36 |
| Total | 7,779 | ▼12% | 9,390 | ▼6% | 149% | 64 |

Data covers single adults in custody as of September 23, 2022 05:28.

DHS Southwest Border Task Force Executive Leadership Report – Data Tables

AR_000356

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# CBP Encounters

| Country of Citizenship | USBP Encounters | | | | | | OFO Encounters | | | | | | CBP Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | 7-Day Avg | 21-Day Avg | UC | FM | SA | Total | 7-Day Avg | 21-Day Avg | UC | FM | SA | Total | 7-Day Avg | 21-Day Avg |
| Mexico | 1,652 | 1,663 | 1,738 | 63 | 57 | 1,532 | 308 | 273 | 264 | 10 | 138 | 155 | 1,960 | 1,936 | 2,002 |
| Guatemala | 460 | 480 | 481 | 123 | 62 | 275 | 11 | 9 | 13 | 0 | 5 | 6 | 471 | 489 | 494 |
| Honduras | 399 | 412 | 398 | 89 | 80 | 230 | 80 | 74 | 70 | 1 | 55 | 24 | 479 | 486 | 469 |
| El Salvador | 168 | 188 | 179 | 26 | 43 | 99 | 6 | 18 | 16 | 0 | 4 | 2 | 174 | 205 | 195 |
| NCA Total | 1,027 | 1,080 | 1,058 | 238 | 185 | 604 | 97 | 101 | 99 | 1 | 64 | 32 | 1,124 | 1,181 | 1,157 |
| Venezuela | 1,096 | 1,077 | 1,164 | 8 | 293 | 795 | 0 | 1 | 1 | 0 | 0 | 0 | 1,096 | 1,078 | 1,165 |
| Cuba | 767 | 837 | 873 | 9 | 207 | 551 | 2 | 1 | 1 | 0 | 0 | 2 | 769 | 838 | 873 |
| Nicaragua | 501 | 566 | 597 | 13 | 97 | 391 | 0 | 0 | 1 | 0 | 0 | 0 | 501 | 566 | 598 |
| Colombia | 445 | 463 | 451 | 5 | 229 | 211 | 7 | 1 | 2 | 0 | 2 | 5 | 452 | 465 | 453 |
| Peru | 231 | 260 | 268 | 2 | 120 | 109 | 0 | 1 | 1 | 0 | 0 | 0 | 231 | 261 | 269 |
| Ecuador | 165 | 165 | 164 | 6 | 105 | 54 | 0 | 0 | 0 | 0 | 0 | 0 | 165 | 166 | 164 |
| Haiti | 12 | 11 | 6 | 0 | 5 | 7 | 204 | 124 | 163 | 0 | 90 | 114 | 216 | 136 | 169 |
| Dom. Rep. | 54 | 63 | 59 | 0 | 11 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 54 | 63 | 59 |
| Other | 371 | 360 | 428 | 4 | 103 | 264 | 116 | 110 | 118 | 0 | 71 | 44 | 487 | 470 | 546 |
| Other Total | 3,642 | 3,803 | 4,009 | 47 | 1,170 | 2,425 | 329 | 238 | 287 | 0 | 163 | 165 | 3,971 | 4,042 | 4,296 |
| CBP Total | 6,321 | 6,546 | 6,805 | 348 | 1,412 | 4,561 | 734 | 613 | 650 | 11 | 365 | 352 | 7,055 | 7,159 | 7,455 |

Note: Data as of 9/23/2022 05:28 describes previous day's total encounters. OFO and CBP total rows also include accompanied minors encountered at ports of entry.

** NOTE: Data reports on all previous day's encounters by CBP: data valid as of 9/23/22 05:28. Daily reporting pulled from the live CBP system are based on interim numbers; values reported today do not capture final data. All Encounter numbers are "apprehensions" between next day and end-of-month reporting.

VESTIGATIVE DATA VERSION_10.0.355

6

23 September 2022

# Unaccompanied Child Encounters & HHS in Care

UNCLASSIFIED // FOR OFFICIAL USE ONLY

| | Encounters | | CBP Unaccompanied Children in Custody | | | | Transfers | |
|---|---|---|---|---|---|---|---|---|
| | Count | 21-Day Avg | In Custody | In Custody > 72 hours | Avg TIC (hours) | Processed Complete | TOT ERO | Mexican Returns |
| Non-Mexicans | 286 | 316 | 451 | 0 | 24 | 302 | 260 | 0 |
| Mexicans 13 and younger | 10 | 10 | 12 | 0 | 14 | 8 | 1 | 4 |
| Mexicans 14 and older | 63 | 64 | 52 | 0 | 18 | 28 | 3 | 57 |
| **Total** | **359** | **389** | **515** | **0** | **23** | **338** | **264** | **61** |

Data as of 9/23/22 05:28 describes previous day's unaccompanied child encounters and transfers by CBP, and today's unaccompanied children in custody.

## CBP Unaccompanied Child Encounters by Country

| Country of Citizenship | % of Total | Count | 1-day Change | 7-day Average | 1-week Change |
|---|---|---|---|---|---|
| **Mexico** | 20% | 73 | - flat - | 74 | ▼5% |
| Guatemala | 34% | 123 | ▲29% | 143 | ▲2% |
| Honduras | 25% | 90 | ▲26% | 86 | ▼9% |
| El Salvador | 7% | 26 | ▲54% | 35 | ▲15% |
| **NCA Total** | 67% | 239 | ▲32% | 264 | ▲6% |
| Venezuela | 2% | 8 | ▲20% | 8 | ▲38% |
| Cuba | 3% | 9 | ▲18% | 6 | ▲11% |
| Nicaragua | 4% | 13 | ▲160% | 9 | ▼23% |
| Colombia | 1% | 5 | ▲25% | 3 | ▲57% |
| Peru | 1% | 2 | ▲100% | 2 | ▲50% |
| Ecuador | 2% | 6 | ▲20% | 7 | ▼11% |
| Haiti | 0% | 0 | ▲100% | 0 | ▲200% |
| Dominican Republic | 0% | 0 | - flat - | 0 | ▲100% |
| Other | 1% | 4 | ▲20% | 4 | ▼4% |
| **Other Total** | 13% | 47 | ▲12% | 40 | - flat - |
| **Total** | | 359 | ▼23% | 378 | ▲6% |

Data as of 9/23/22 05:28 describes previous day's encounters by CBP.

## CBP Unaccompanied Child Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-Day Change | 7-day Average | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 2% | 7 | ▲46% | 10 | ▲3% |
| El Centro | 3% | 9 | ▲50% | 6 | ▲39% |
| Yuma | 6% | 20 | ▲100% | 19 | ▼18% |
| Tucson | 16% | 59 | ▼8% | 50 | ▼17% |
| El Paso | 15% | 54 | ▲53% | 68 | ▼4% |
| Big Bend | 1% | 2 | N/A | 2 | ▼7% |
| Del Rio | 12% | 43 | ▼54% | 36 | ▼8% |
| Laredo | 3% | 11 | ▼35% | 10 | ▲1% |
| RGV | 40% | 143 | ▲30% | 166 | ▼3% |
| **USBP Total** | 97% | 348 | ▼24% | 366 | ▼6% |
| San Diego FO | 1% | 2 | ▼33% | 3 | ▼45% |
| Tucson FO | 1% | 4 | ▲20% | 3 | ▲77% |
| El Paso FO | 1% | 3 | ▲200% | 1 | - flat - |
| Laredo FO | 1% | 2 | ▲33% | 4 | ▲138% |
| **OFO Total** | 3% | 11 | ▼8% | 12 | ▲15% |
| **Total** | | 359 | ▼23% | 378 | ▲6% |

Data as of 9/23/22 05:28 describes previous day's encounters by CBP.

## HHS ORR Unaccompanied Child Discharges by Sponsor Type

| | # Discharges | % Discharges | Avg Days |
|---|---|---|---|
| 1. Parent or Guardian | 779 | 35% | 18 |
| 2. Other Close Relative | 1,015 | 46% | 28 |
| 3. Other Sponsor | 318 | 14% | 56 |
| 4. No Sponsor | 83 | 4% | 97 |
| **Total** | **2,195** | | **31** |

Data as of 9/23/22 05:00 describe unaccompanied child discharges for week ending 9/22/22.

## HHS ORR Unaccompanied Children in Care

| | Previous Day | 7-Day Avg | 21-Day Avg |
|---|---|---|---|
| UCs Referred from DHS | 341 | 321 | 331 |
| UCs Discharged from HHS | 339 | 314 | 306 |
| Total in Care | 9,530 | 9,397 | 9,212 |
| Operational Occupancy | 65% | 62% | 61% |
| Discharge Rate | 3.5% | 3.3% | 3.3% |

Data as of 9/23/22 05:00 describe unaccompanied children in care. Operational occupancy includes active influx.

Venezuela AR_000358

DHS Southwest Border Task Force Executive Leadership Report – Data Tables

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

# Unaccompanied Children in Custody & CBP Transfers

| USBP Sector / OFO Field Office | Count | 1-Day Change | 7-Day Average | 1-Week Change | % Capacity | Avg TIC | Processed Complete | TOT ERO | Mexican Returns |
|---|---|---|---|---|---|---|---|---|---|
| | | CBP Unaccompanied Children in Custody | | | | | | Transfers | |
| San Diego | 10 | - flat - | 8 | ▼30% | 2% | 16 | 4 | 3 | 8 |
| El Centro | 11 | ▲267% | 6 | ▲48% | 9% | 21 | 9 | 1 | 0 |
| Yuma | 18 | ▲6% | 20 | ▼24% | 5% | 17 | 14 | 17 | 4 |
| Tucson | 93 | ▲133% | 59 | ▼35% | 19% | 26 | 61 | 18 | 18 |
| El Paso | 123 | ▲4% | 123 | ▲3% | 14% | 32 | 84 | 43 | 4 |
| Big Bend | 1 | N/A | 2 | ▲300% | 0% | 6 | 0 | 0 | 0 |
| Del Rio | 56 | ▲124% | 42 | ▼34% | 12% | 22 | 37 | 21 | 6 |
| Laredo | 11 | ▲27% | 9 | ▲6% | 2% | 18 | 8 | 5 | 11 |
| RGV | 189 | ▲16% | 188 | ▼13% | 15% | 17 | 121 | 154 | 9 |
| USBP Total | 512 | ▲31% | 457 | ▼7% | 10% | 23 | 338 | 262 | 60 |
| San Diego FO | 2 | ▼50% | 5 | ▼33% | 2% | 20 | 0 | 2 | 1 |
| Tucson FO | 0 | - flat - | 1 | N/A | 0% | 0 | 0 | 0 | 0 |
| El Paso FO | 1 | N/A | 0 | ▼50% | 2% | 9 | 0 | 0 | 0 |
| Laredo FO | 0 | ▲100% | 2 | ▲175% | 0% | 0 | 0 | 0 | 0 |
| OFO Total | 3 | ▼50% | 8 | ▼10% | 1% | 16 | 0 | 2 | 1 |
| Total | 515 | ▲30% | 465 | ▼7% | 10% | 23 | 338 | 264 | 61 |

Data as of 9/23/22 05:28 describes today's unaccompanied children in custody and previous day's unaccompanied child transfers by CBP.

UNCLASSIFIED // FOR OFFICIAL USE ONLY

23 September 2022

Venezuela AR_000360

# Family Unit Individual Encounters

| Country of Citizenship | USBP Encounters | | | | | OFO Encounters | | | | | CBP Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | % of Total | 1-day Change | 7-day Average | 1-Week Change | Count | % of Total | 1-day Change | 7-day Average | 1-Week Change | Count | % of Total | 1-day Change | 7-day Average | 1-Week Change |
| Mexico | 57 | 3% | ▼20% | 62 | ▼13% | 138 | 8% | ▼5% | 99 | ▲5% | 195 | 11% | ▼10% | 161 | ▼3% |
| Guatemala | 62 | 3% | ▲48% | 46 | ▲4% | 5 | 0% | ▼44% | 5 | ▼58% | 67 | 4% | ▲31% | 51 | ▼14% |
| Honduras | 80 | 5% | ▼12% | 71 | ▼3% | 55 | 3% | ▲19% | 47 | ▲30% | 135 | 8% | ▼15% | 118 | ▼13% |
| El Salvador | 43 | 2% | ▲8% | 41 | ▼13% | 4 | 0% | ▼60% | 9 | ▲27% | 47 | 3% | ▼6% | 50 | ▲15% |
| NCA Total | 185 | 10% | ▼7% | 158 | ▲3% | 64 | 4% | ▼26% | 60 | ▼30% | 249 | 14% | ▲4% | 218 | ▼9% |
| Venezuela | 293 | 16% | ▼24% | 285 | ▼14% | 0 | 0% | - flat - | 0 | ▼80% | 293 | 16% | ▼24% | 285 | ▼15% |
| Cuba | 207 | 12% | ▲13% | 242 | ▼7% | 0 | 0% | - flat - | 0 | - flat - | 207 | 12% | ▲13% | 242 | ▼7% |
| Nicaragua | 97 | 5% | ▼9% | 101 | ▼9% | 0 | 0% | - flat - | 0 | - flat - | 97 | 5% | ▲9% | 101 | ▼9% |
| Colombia | 229 | 13% | ▲3% | 239 | ▲15% | 2 | 0% | N/A | 0 | N/A | 231 | 13% | ▲4% | 240 | ▲15% |
| Peru | 120 | 7% | ▲18% | 122 | - flat - | 0 | 0% | - flat - | 0 | ▼100% | 120 | 7% | ▲18% | 122 | ▼1% |
| Ecuador | 105 | 6% | ▲13% | 105 | ▼2% | 0 | 0% | - flat - | 0 | N/A | 105 | 6% | ▲13% | 105 | ▲2% |
| Haiti | 5 | 0% | N/A | 3 | ▲100% | 90 | 5% | ▲84% | 40 | ▲52% | 95 | 5% | ▲94% | 43 | ▲49% |
| Dom. Rep. | 11 | 1% | ▼31% | 15 | ▼28% | 0 | 0% | - flat - | 0 | - flat - | 11 | 1% | ▼31% | 15 | ▼53% |
| Other | 103 | 6% | ▲13% | 123 | ▲24% | 71 | 4% | ▲137% | 59 | ▼24% | 174 | 10% | ▲44% | 181 | ▲26% |
| Other Total | 1,170 | 66% | ▲3% | 1,235 | ▲7% | 163 | 9% | ▲106% | 99 | ▼39% | 1,333 | 75% | ▲10% | 1,334 | ▼10% |
| CBP Total | 1,412 | 79% | ▲3% | 1,455 | ▲6% | 365 | 21% | ▲17% | 258 | ▼24% | 1,777 | 100% | ▲5% | 1,713 | ▼9% |

Data reports on previous day's family unit individual encounters by CBP; data valid as of September 23, 2022 0528.

## CBP Family Unit Individual Encounters by Location

| USBP Sector / OFO Field Office | Count | % of Total | 1-day Change | 7-day Avg | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 68 | 4% | ▼24% | 99 | ▼13% |
| El Centro | 49 | 3% | ▼23% | 69 | ▼1% |
| Yuma | 358 | 20% | ▼52% | 303 | ▼3% |
| Tucson | 55 | 3% | ▲41% | 65 | ▲6% |
| El Paso | 431 | 24% | ▲10% | 456 | ▲3% |
| Big Bend | 3 | 0% | N/A | 0 | ▲50% |
| Del Rio | 285 | 16% | - flat - | 289 | ▲18% |
| Laredo | 2 | 0% | ▼67% | 4 | ▲26% |
| RGV | 161 | 9% | ▼11% | 171 | ▲5% |
| USBP Total | 1,412 | 79% | ▲3% | 1,455 | ▼6% |
| San Diego FO | 153 | 9% | ▲31% | 136 | ▲21% |
| Tucson FO | 33 | 2% | ▼54% | 26 | ▲46% |
| El Paso FO | 16 | 1% | ▼11% | 7 | ▲79% |
| Laredo FO | 163 | 9% | ▲55% | 88 | ▼50% |
| OFO Total | 365 | 21% | ▲17% | 258 | ▼24% |
| Total | 1,777 | 100% | ▲5% | 1,713 | ▼9% |

# Family Unit Individual CBP Book-out Dispositions

## CBP Family Unit Individual Book-out Dispositions by Country of Citizenship

| Disposition Type | Mexico | Guatemala | Honduras | El Salvador | Venezuela | Cuba | Nicaragua | Colombia | Peru | Ecuador | Haiti | Dom. Rep. | Other | CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 29 | 21 | 26 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 81 |
| Title 42 delayed | 25 | 141 | 10 | 10 | N/A | 0 | N/A | N/A | 33 | N/A | N/A | N/A | 0 | 219 |
| Repatriations processed by CBP | 8 | 1 | 0 | 0 | N/A | 0 | N/A | N/A | 0 | N/A | 0 | 0 | 0 | 9 |
| Transfer to ICE for removal processing | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Transfer to ICE for release with NTA | 5 | 0 | 3 | 4 | 0 | 8 | 2 | 0 | 14 | 0 | 0 | 0 | 4 | 40 |
| Release with NTA | 121 | 9 | 54 | 0 | 0 | 0 | 0 | 40 | 3 | 0 | 96 | 0 | 101 | 424 |
| Release with I-94 parole ATD | 3 | 6 | 12 | 19 | 279 | 213 | 148 | 145 | 66 | 97 | 1 | 18 | 83 | 1,090 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | 210 | 178 | 105 | 38 | 279 | 221 | 151 | 185 | 116 | 97 | 97 | 18 | 188 | 1,883 |

## CBP Family Unit Individual Book-out Dispositions by USBP Sector

| Disposition Type | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | USBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 0 | 36 | 0 | 37 | 2 | 0 | 6 | 0 | 0 | 81 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 2 | 146 | 4 | 21 | 46 | 219 |
| Repatriations processed by CBP | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 3 |
| Transfer to ICE for removal processing | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 4 |
| Transfer to ICE for release with NTA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 32 |
| Release with NTA | 0 | 0 | 2 | 0 | 0 | 2 | 82 | 0 | 0 | 86 |
| Release with I-94 parole ATD | 0 | 181 | 50 | 473 | 119 | 87 | 0 | 115 | 65 | 1,090 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | 0 | 217 | 52 | 510 | 123 | 237 | 92 | 139 | 145 | 1,515 |

## CBP Family Unit Individual Book-out Dispositions by OFO Field Office

| Disposition Type | El Paso | Laredo | San Diego | Tucson | OFO Total |
|---|---|---|---|---|---|
| Title 42 immediate | 0 | 0 | 0 | 0 | 0 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 0 |
| Repatriations processed by CBP | 0 | 4 | 0 | 2 | 6 |
| Transfer to ICE for removal processing | 0 | 0 | 0 | 0 | 0 |
| Transfer to ICE for release with NTA | 0 | 0 | 8 | 0 | 8 |
| Release with NTA | 9 | 172 | 137 | 20 | 338 |
| Release with I-94 parole ATD | 0 | 0 | 0 | 0 | 0 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 3 | 2 | 0 | 11 | 16 |
| Other | 0 | 0 | 0 | 0 | 0 |
| **Total** | 12 | 178 | 145 | 33 | 368 |

Data in "Repatriations processed by CBP" rows represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.

Data valid as of September 23, 2022 05:28 describes previous day's book-outs of family unit individuals.

Venezuela AR_000361

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Single Adult Encounters

| Country of Citizenship | USBP Encounters | | | | | | OFO Encounters | | | | | CBP Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change | % of Total | Count | 1-day Change | 7-day Average | 1-Week Change |
| Mexico | 31% | 1,532 | ▼15% | 1,537 | ▼10% | 3% | 155 | ▼28% | 159 | ▲5% | 34% | 1,687 | ▼16% | 1,695 | ▼9% |
| Guatemala | 6% | 275 | ▲18% | 292 | ▲2% | 0% | 6 | ▼500% | 4 | ▼58% | 6% | 281 | ▲16% | 296 | ▲2% |
| Honduras | 5% | 230 | ▲11% | 256 | ▲3% | 0% | 24 | ▲25% | 27 | ▼30% | 5% | 254 | ▼6% | 282 | ▼5% |
| El Salvador | 2% | 99 | ▼29% | 112 | ▲13% | 0% | 2 | ▼83% | 9 | ▼27% | 2% | 101 | ▼34% | 121 | ▲16% |
| NCA Total | 12% | 604 | ▼11% | 659 | ▲2% | 1% | 32 | ▼29% | 39 | ▼30% | 13% | 636 | ▼13% | 698 | ▲4% |
| Venezuela | 16% | 795 | ▲5% | 784 | ▼10% | 0% | 0 | ▼100% | 1 | ▲80% | 16% | 795 | ▲5% | 785 | ▼10% |
| Cuba | 11% | 551 | ▼4% | 589 | ▼14% | 0% | 2 | N/A | 1 | - flat - | 11% | 553 | ▲3% | 590 | ▼14% |
| Nicaragua | 8% | 391 | ▲19% | 456 | ▼15% | 0% | 0 | ▼100% | 0 | - flat - | 8% | 391 | ▲19% | 456 | ▼15% |
| Colombia | 4% | 211 | ▲6% | 221 | ▲9% | 0% | 5 | N/A | 0 | N/A | 4% | 216 | ▲9% | 222 | ▲8% |
| Peru | 2% | 109 | ▲12% | 136 | ▼4% | 0% | 0 | - flat - | 1 | ▼100% | 2% | 109 | ▲12% | 136 | ▲5% |
| Ecuador | 0% | 54 | ▼22% | 54 | ▲9% | 0% | 0 | - flat - | 0 | N/A | 1% | 54 | ▼22% | 54 | ▼8% |
| Haiti | 0% | 7 | ▲13% | 8 | ▲100% | 2% | 114 | ▲35% | 84 | ▼52% | 2% | 121 | ▲34% | 92 | ▲4% |
| Dom. Rep. | 1% | 43 | ▲13% | 48 | ▼18% | 0% | 0 | - flat - | 0 | - flat - | 1% | 43 | ▲13% | 48 | ▼18% |
| Other | 5% | 264 | ▲10% | 234 | ▼15% | 1% | 44 | ▼21% | 51 | ▼24% | 6% | 308 | ▲4% | 285 | ▼12% |
| Other Total | 49% | 2,425 | ▲1% | 2,529 | ▼10% | 3% | 165 | ▼29% | 139 | ▼39% | 53% | 2,590 | ▲4% | 2,667 | ▼10% |
| CBP Total | 93% | 4,561 | ▼8% | 4,725 | ▼9% | 7% | 352 | ▼29% | 336 | ▼24% | 100% | 4,913 | ▼10% | 5,061 | ▼8% |

Data reports on previous day's single adult encounters by CBP; data valid as of September 23, 2022 05:28.

## CBP Single Adult Encounters by Location

| USBP Sector / OFO Field Office | % of Total | Count | 1-Day Change | 7-Day Average | 1-Week Change |
|---|---|---|---|---|---|
| San Diego | 8% | 403 | ▲25% | 382 | ▼3% |
| El Centro | 3% | 155 | ▼14% | 185 | ▲4% |
| Yuma | 12% | 597 | ▲35% | 493 | ▲11% |
| Tucson | 14% | 671 | ▼6% | 530 | ▼15% |
| El Paso | 20% | 964 | ▲25% | 1,165 | ▼4% |
| Big Bend | 1% | 46 | ▲318% | 38 | ▼7% |
| Del Rio | 23% | 1,130 | ▲1% | 1,201 | ▲16% |
| Laredo | 4% | 188 | ▲31% | 201 | ▲4% |
| RGV | 8% | 407 | ▼32% | 530 | ▼3% |
| USBP Total | 93% | 4,561 | ▼8% | 4,725 | ▼9% |
| San Diego FO | 2% | 121 | ▲26% | 128 | ▲2% |
| Tucson FO | 0% | 20 | ▼77% | 32 | ▲20% |
| El Paso FO | 1% | 29 | ▼12% | 25 | ▲16% |
| Laredo FO | 4% | 182 | ▼14% | 151 | ▲10% |
| OFO Total | 7% | 352 | ▼29% | 336 | ▼5% |
| Total | | 4,913 | ▼10% | 5,061 | ▼8% |

Venezuela AR_000362

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Single Adult CBP Book-out Dispositions

## CBP Single Adult Book-out Dispositions by Country of Citizenship

| Disposition Type | Mexico | Guatemala | Honduras | El Salvador | Venezuela | Cuba | Nicaragua | Colombia | Peru | Ecuador | Haiti | Dom. Rep. | Other | CBP Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 1,084 | 224 | 169 | 60 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 1,543 |
| Title 42 delayed | 266 | 151 | 12 | 22 | N/A | 0 | 3 | 99 | N/A | 0 | N/A | N/A | 0 | 554 |
| Repatriations processed by CBP | 177 | 2 | 7 | 2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 188 |
| Transfer to ICE for removal processing | 3 | 2 | 2 | 4 | 130 | 11 | 82 | 63 | 53 | 14 | 8 | 22 | 173 | 567 |
| Transfer to ICE for release with NTA | 1 | 1 | 15 | 2 | 34 | 18 | 5 | 3 | 3 | 1 | 0 | 6 | 19 | 112 |
| Release with NTA | 10 | 5 | 24 | 2 | 47 | 13 | 0 | 3 | 7 | 0 | 104 | 1 | 31 | 243 |
| Release with I-94 parole ATD | 0 | 1 | 1 | 0 | 834 | 661 | 625 | 202 | 88 | 46 | 6 | 29 | 129 | 2,622 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 20 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 23 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **1,561** | **387** | **231** | **92** | **1,045** | **703** | **715** | **370** | **152** | **64** | **118** | **58** | **356** | **5,852** |

## CBP Single Adult Book-out Dispositions by USBP Sector

| Disposition Type | Big Bend | Del Rio | El Centro | El Paso | Laredo | RGV | San Diego | Tucson | Yuma | USBP Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Title 42 immediate | 7 | 452 | 57 | 180 | 225 | 46 | 72 | 444 | 0 | 1,483 |
| Title 42 delayed | 0 | 11 | 32 | 46 | 22 | 164 | 113 | 85 | 81 | 554 |
| Repatriations processed by CBP | 11 | 5 | 2 | 3 | 8 | 23 | 9 | 37 | 28 | 126 |
| Transfer to ICE for removal processing | 0 | 80 | 10 | 150 | 222 | 27 | 22 | 42 | 3 | 556 |
| Transfer to ICE for release with NTA | 0 | 0 | 0 | 0 | 0 | 21 | 34 | 0 | 40 | 95 |
| Release with NTA | 0 | 4 | 2 | 1 | 0 | 0 | 65 | 0 | 1 | 73 |
| Release with I-94 parole ATD | 0 | 521 | 105 | 319 | 366 | 637 | 348 | 262 | 64 | 2,622 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **18** | **1,073** | **208** | **699** | **843** | **918** | **663** | **870** | **217** | **5,509** |

## CBP Single Adult Book-out Dispositions by OFO Field Office

| Disposition Type | El Paso | Laredo | San Diego | Tucson | OFO Total |
|---|---|---|---|---|---|
| Title 42 immediate | 8 | 34 | 14 | 4 | 60 |
| Title 42 delayed | 0 | 0 | 0 | 0 | 0 |
| Repatriations processed by CBP | 8 | 27 | 18 | 9 | 62 |
| Transfer to ICE for removal processing | 2 | 2 | 6 | 1 | 11 |
| Transfer to ICE for release with NTA | 1 | 1 | 15 | 0 | 17 |
| Release with NTA | 5 | 120 | 45 | 0 | 170 |
| Release with I-94 parole ATD | 0 | 0 | 0 | 0 | 0 |
| Release with NTR | 0 | 0 | 0 | 0 | 0 |
| Release OFO parole | 4 | 4 | 5 | 10 | 23 |
| Other | 0 | 0 | 0 | 0 | 0 |
| **Total** | **28** | **188** | **103** | **24** | **343** |

Data in "Repatriations processed by CBP" rows represent ER or reinstatement, no fear claim, bag and baggage, voluntary return, and withdrawal dispositions limited to nationals of Mexico, Guatemala, Honduras, and El Salvador.

Data valid as of September 23, 2022 05:28 describes previous day's book-out of single adults.

Venezuela AR_000363

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Leadership Report Glossary

Definitions are in alphabetical order from left to right, top to bottom

| Term | Definition |
|---|---|
| **Accompanied Minor** | A child who has no lawful immigration status in the United States, is younger than 18 years old, and is traveling with a lawfully admissible adult. |
| **All non-Mexican UCs and Mexican UCs 13 or younger** | Refers to combined apprehensions/inadmissibles (under Title 8) processed under CBP's immigration authority. Under the Homeland Security Act (as amended by the Trafficking Victims Protection Reauthorization Act) non-Mexican UCs are admitted into ORR care; most Mexican UCs younger than 14 years-old are also transferred into ORR care. |
| **Alternatives to detention (ATD) enrollments with tech / without tech** | ICE program using technology and other tools to manage a noncitizen's compliance with release conditions while they are on the / non-detained docket. |
| **Available beds for SW border transfer** | Operational metric based on field reporting used by ICE to describe the number of beds in interior facilities available to accept transfers from the border. |
| **Average days in care for children discharged in last 7 days** | The average number of days spent in ORR care by unaccompanied children who were discharged from ORR care over the past 7 days. |
| **Average length of stay (ICE detention)** | Calculated as time between book-in and book-out for noncitizens booked out of ICE custody. (Not calculated for noncitizens remaining in ICE custody). |
| **Beds available for border designation or transfer (UC Dashboard)** | The number of beds ostensibly available for ORR designation or transfer. This includes beds that are available for direct border placement, as well as beds that are technically available, but not necessarily for direct border placement. |
| **Capacity (CBP)** | Total short-term holding space in CBP border facilities, accounting for COVID-related restrictions. |
| **Capacity (ICE)** | Total funded ICE detention beds for single adults under current appropriations law, excluding beds that are unavailable due to litigation, COVID, and for operational or other reasons. |
| **CBP holding (UC Dashboard)** | Noncitizens held for processing in CBP border facilities. |
| **CBP processed complete** | Noncitizens in CBP facilities who have been completely processed and are awaiting transfer. |
| **Children discharged in last 7 days by individual sponsor category (UC Dashboard)** | The number of unaccompanied children who have been discharged in the last 7 days, divided into 1 of 4 sponsor categories: 1. Parent or legal guardian; 2. An immediate relative - a broader relative: sister; grandparent or other close relatives (aunt, uncle, first cousin) who either was or was not previously the UC's primary caregiver; 3. Other sponsor, such as distant relatives and unrelated adult individuals; 4. No sponsors identified. |

# SW Border Executive Leadership Report Color Chart

**By Demographic –**
- Unaccompanied Child (UC)
- Single Adult (SA)
- Family Unit (FM)

**By Citizenship –**
- Mexico (Mex)
- Northern Triangle Countries (NTC)
- Other

**By Agency –**
- Customs and Border Protection (CBP)
- Health and Human Services (HHS)
- Immigration and Customs Enforcement (ICE)

| Term | Definition |
|---|---|
| **Children transferred out of CBP custody (UC Dashboard)** | Unaccompanied children who are booked out of CBP custody for transfer to ORR care facilities. |
| **Encounter forecast – UC Dashboard** | CBP's projected number of daily encounters with unaccompanied children from countries other than Mexico. |
| **Encounters** | The sum of USBP Title 8 apprehensions, OFO Title 8 inadmissibles, and noncitizens processed for expulsions under Title 42 authority by USBP or OFO. |
| **Expulsions** | Noncitizens expelled under Title 42 authority (see Title 42). |
| **Family unit individuals (FM)** | Individuals processed by CBP who belong to a family unit, defined as one or more minors plus their parent(s) or legal guardian(s) with whom they are traveling; excludes minor children (under the age of 18) traveling with adult family members who are not their parents or legal guardians. All references to family units or FMs are to numbers of individuals in families, not to family groupings. |
| **Flight capacity (Ice Air)** | The percentage of seats occupied based on total number of seats per flight. |
| **I-94 parole-ATD (CBP book-out disposition)** | Noncitizens paroled into the United States by CBP and enrolled in an ICE alternatives to detention (ATD) program prior to their release. |
| **In CBP holding > 72 hours (UC Dashboard)** | The number of Unaccompanied Children (excluding those from Mexico) in CBP custody over 72 hours. With the exception of Mexican and Canadian children who are amenable to Voluntary Return (VR), the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) requires CBP to transfer the child to ORR custody within 72 hours of determining they meet the Unaccompanied Child definition. |
| **In Detention (ICE)** | Noncitizens detained in ICE civil immigration detention system in furtherance of their removal proceedings or to affect their departure from the United States after a final order of removal from a federal immigration judge. |
| **In ORR Care > 35 days (UC Dashboard)** | Unaccompanied children who have been in ORR care over 35 days (excluding long term foster care) - an indicator that a child has been in ORR care for a long time, as the process of finding, vetting, and reunifying a sponsor with a child is ideally fewer than 35 days. |

Venezuela AR_000364

UNCLASSIFIED // FOR OFFICIAL USE ONLY

# Leadership Report Glossary

Definitions are in alphabetical order from left to right, top to bottom

| Term | Definition |
|------|-----------|
| Mexicans 14 or older (UC Dashboard) | Unaccompanied Children from Mexico may be repatriated by CBP if the following are true: • The child has not been a victim of a severe form of trafficking in persons and there is no credible evidence that the minor is at risk of being trafficked upon return to his/her country of nationality or last habitual residence (as documented on CBP Form 93); • The child does not have a fear of returning to his/her country of nationality or last habitual residence owing to a credible fear of persecution; and • The child is able to decide independently to return voluntarily to his/her country of nationality or last habitual residence. |
| Northern Central America (NCA) | El Salvador, Guatemala, and Honduras. |
| Notice to appear (NTA) | The I-862 form, a document that instructs an individual to appear before an immigration judge. This is the first step in starting removal proceedings under Section 240 of the Immigration and Nationality Act. |
| Other releases (FM and SA Dashboards) | Persons released from CBP custody without being booked into ICE custody or enrolled in ATD. |
| Parole (CBP) | Discretionary permission granted to an otherwise inadmissible noncitizen to temporarily enter the United States due to an emergency and urgent humanitarian reason or significant public benefit |
| Ports of entry | Any location in the United States or its territories that is designated as a point of entry for noncitizens and U.S. citizens. |
| Released ATD - no Tech (FM and SA Dashboards) | Noncitizens released from CBP custody and immediately enrolled in ATD without some form of technology. |
| Released ATD with Tech (FM and SA Dashboards) | Noncitizens released from CBP custody and immediately enrolled in ATD with some form of technology. |
| Repatriations | The sum of Title 8 removals and returns to countries of citizenship. |
| Room occupancy (FM Dashboard) | Number of rooms housing family units in ICE custody divided by the number of total rooms available. |

| Term | Definition |
|------|-----------|
| Single adults (SA) | Individuals encountered by CBP who are at least 18 years of age and not part of a family unit. |
| Time in custody (TIC) | Elapsed time between a noncitizen's border encounter and the time at which TIC is calculated (applies to noncitizens who remain in CBP custody at the time of the report). |
| Title 42 (T42) | Title 42 of the United States Code, which includes provisions related to public health. Under a March 2020 CDC order, border encounters processed under Title 42 authority are expelled from the United States as expeditiously as possible in the interest of U.S. public health to prevent the spread of COVID-19. |
| Title 42 delayed expulsions | Noncitizens expelled under Title 42 authority following transfer from their encounter area of responsibility to another CBP area of responsibility or to ICE for expulsion by air. |
| Title 42 immediate expulsions | Noncitizens expelled under Title 42 authority by CBP from the area of responsibility of their encounter. |
| Title 8 (T8) | Title 8 of the United States Code, which includes most provisions for immigration enforcement. Encounters processed under Title 8 authority may be subject to removal from the United States. |
| Total beds (UC Dashboard) | The number of 'total beds designated' plus the number of 'beds available to designate' (see definitions of each term). |
| Total beds designated (UC Dashboard) | The number of beds designated to unaccompanied children based on the current census of children (includes those pending transfer from CBP, in transit, and physically in ORR's care). Total beds designated = beds designated to kids in care + beds designated to kids who haven't arrived yet. |
| Total discharges from ORR care (UC Dashboard) | The number of unaccompanied children who have exited ORR's care. |
| Unaccompanied children (UC) | Children who have no lawful immigration status in the United States, are younger than 18 years old, and either: 1. Do not have a parent or legal guardian in the U.S., or 2. Do not have a parent or legal guardian in the U.S. who is able to provide care and physical custody. |
| Unaccompanied children system capacity (UC Dashboard) | A ratio (expressed as a percentage) that compares the total number of unaccompanied children in CBP and ORR care to the total number of ORR beds in use or available for initial ORR designations. |

# Eligible to Naturalize Overview

Click to view
Tabular page

| Cob Name | Eligible to Naturalize | State or Territory |
|---|---|---|
| Venezuela | All | All |

**U.S. Map view by State or Territory**    *Select a Map view by:*  States or Territories



© 2022 Mapbox © OpenStreetMap

**No. Lawful Permanent Residents by States or Territories**    *Select a Chart view by:*  States or Territories

| State or Territory | Eligible to Naturalize | LPR Count |
|---|---|---|
| Florida | Yes | 45,217 |
| | No | 34,409 |
| Texas | Yes | 9,202 |
| | No | 8,049 |
| New York | Yes | 4,026 |
| | No | 2,770 |
| California | Yes | 2,945 |
| | No | 2,227 |

Values less than 1,000 are suppressed to avoid disclosing information about individuals. In these instances, the map and tables may appear blank or reflect a zero or "D".



OIS Refresh as of:
8/12/2022 12:39:34 PM



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

November 15, 2013                                PM-602-0091

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S.
Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on
Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

## Purpose

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to
ensure consistent adjudication of parole requests made on behalf of aliens who are present without
admission or parole and who are spouses, children and parents of those serving on active duty in the
U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S.
Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility
under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i).  This amendment to AFM chapter
40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

## Scope

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS)
employees.

## Authority

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i),
1182(d)(5)(A), 1225(a), and 1255(a), (c)

## Background

**Parole of Spouses, children and parents of Armed Forces personnel**
- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives
  to assist military members, veterans, and their families to navigate our complex immigration
  system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active
  members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready
  Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 2

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them. It is a commitment that begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families. The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible." Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States. Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called "parole in place." The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2] That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3] In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4] The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States." INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).
[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.
[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).
[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under INA § 236(a)(2)(B) (so-called "conditional parole"), see Matter of Castillo-Padilla, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues. The first is a policy question: Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, *individuals* in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve? The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)? That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, parole <u>in place</u> is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual. If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled." This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States). Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]." Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection. As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate. In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority. "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008). Their decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense. Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended.  The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity") (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or policy reason to interpret "arrives" in that way.

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless.  One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i).  Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years.  That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole.  Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies.  An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).  The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection).  Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i).  It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

Venezuela AR_000371

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States." INA § 245(c)(2). Parole does not erase any periods of prior unlawful status. Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**
AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞   1. A new section 21.1(c) is added to read:

## 21.1   General Information About Relative Petitions

* * * * *

(c) Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole in place only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o  Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o  Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or *less*, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

Venezuela AR_000372

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

  o Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);

  o Two identical, color, passport style photographs; and

  o Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞  2. Chapter 40.6.2(a) of the AFM is revised:

   a. By amending Chapter 40.6.2(a)(1);

   b. By deleting Chapter 40.6.2(a)(3)(ii);

   c. By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and

   d. By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

### (a) INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).  The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility.  An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

(4) Exemptions and Waivers

* * * * *

(ii) Waivers.  There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞    3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c)** **Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Daily Venezuela Report

8 December 2022

**A total of 119 Venezuelans were encountered at the Southwest Border yesterday and 125 Venezuelans were expelled under Title 42 authority. Since October 18th, 18,487 confirmed applications have been filed on behalf of Venezuelan beneficiaries, and a total of 7,641 beneficiaries have entered the United States.**

## VENEZUELA ENCOUNTERS YESTERDAY

**119**
Total Venezuelan Encounters: Southwest Border
+35 since previous day

**125**
Total Venezuelan Expulsions: Southwest Border
+76 since previous day

**9**
Total Venezuelan Releases: Southwest Border
-3 since previous day

**54**
Venezuela Encounters: El Paso Sector
+14 since previous day

**84**
Venezuela Expulsions: El Paso Sector
+53 since previous day

**0**
Venezuela Releases: El Paso Sector
-3 since previous day

### VENEZUELAN ENCOUNTERS, RELEASES AND EXPULSIONS



Legend: Encounters, Releases, T42 Expulsions

## PROCESS FOR VENEZUELANS

SUPPORTER APPLICATIONS CONFIRMED

**18,487**
Cumulative confirmed applications
+68 since previous report

BENEFICIARY MATERIALS COMPLETED

**15,538**
Cumulative submissions completed
+94 since previous report

BENEFICIARY TRAVEL AUTHORIZATIONS

**14,565**
Cumulative approvals
+77 since previous report

BENEFICIARY PAROLEES AT POE

**7,641**
Cumulative beneficiaries
+239 since previous report

Venezuela AR_000376

[Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/8/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. Supporter application data come from USCIS and are valid as of 12/08/2022 8:39 AM. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/8/2022 7:04 AM. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

[Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/8/2022 6:00 AM. T42 expulsion data based on manual count based on

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

8 December 2022

# Venezuelan Encounters

**VENEZUELAN ENCOUNTERS, RELEASES, AND T42 EXPULSIONS**

Legend: ■ Encounters  ■ Releases  ■ T42 Expulsions



Single Adults

Family Unit Individuals

### Venezuelans

| Sector | Encounters | | | | Total in Custody | | | | Bookouts | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 20 | 33 | 1 | | 153 | 99 | 1 | 84 | 0 | 2 | 0 |
| Del Rio | 17 | 21 | 0 | | 15 | 21 | 0 | 21 | 0 | 0 | 0 |
| Yuma | 3 | 5 | 0 | | 4 | 12 | 0 | 8 | 2 | 0 | 0 |
| Other | 12 | 7 | 0 | | 26 | 5 | 0 | 12 | 7 | 2 | 0 |
| **Total** | **52** | **66** | **1** | | **198** | **137** | **1** | **125** | **9** | **4** | **0** |

### Venezuelan Expulsions by Departure Port

| | SA | FM |
|---|---|---|
| San Ysidro | 32 | 2 |
| Nogales | 9 | 0 |
| El Paso | 1 | 0 |
| Eagle Pass | 18 | 3 |
| Brownsville | 13 | 48 |
| **Total** | **73** | **53** |

### Venezuelan Expulsions by Originating Sector

| | SA | FM |
|---|---|---|
| El Paso | 36 | 48 |
| Del Rio | 18 | 3 |
| Yuma | 6 | 2 |
| RGV | 3 | 0 |
| Other | 9 | 0 |
| **Total** | **72** | **53** |

### All Nationalities

| Sector | Encounters | | | | Total in Custody | | | | Bookouts | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | | SA | FM | UC | T42 | Release | Transfer to ICE | |
| El Paso | 1,277 | 625 | 106 | | 2,688 | 1,494 | 163 | 416 | 997 | 2 | |
| Del Rio | 1,521 | 509 | 59 | | 1,452 | 492 | 97 | 282 | 1,090 | 33 | |
| Yuma | 603 | 378 | 22 | | 1,220 | 732 | 21 | 8 | 587 | 24 | |
| Other | 1,968 | 516 | 260 | | 4,829 | 1,866 | 260 | 724 | 2,709 | 203 | |
| **Total** | **5,369** | **2,028** | **447** | | **10,189** | **4,584** | **541** | **1,430** | **5,383** | **262** | |

**CUMULATIVE SOUTHWEST BORDER COUNTS SINCE OCTOBER 12**

| 15,961 | 13,478 | 5,590 |
|---|---|---|
| Cumulative Venezuelan Encounters | Cumulative Venezuelan Expulsions | Cumulative Venezuelan Releases |
| +119 since previous day | +125 since previous day | +9 since previous day |

Venezuela_AR_000377

Releases include parole-ATD, releases by CBP with a Notice to Appear (NTA), and transfers to ICE for release at the border with an NTA. Transfers to ICE include people placed in expedited removal and others placed in removal proceedings and transferred to ICE for a custody determination. Encounter, total in custody, and T8 book-out data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/8/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. All figures are based on preliminary data pulled from live systems and are subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

2

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Process for Venezuelans SINCE OCTOBER 18, 2022



**SUPPORTER APPLICATIONS CONFIRMED**

**18,487**

Cumulative confirmed applications

+68 since previous report

**BENEFICIARY MATERIALS COMPLETED**

**15,538**

Cumulative submissions completed

+94 since previous report

**BENEFICIARY TRAVEL AUTHORIZATIONS**

**14,565**

Cumulative approvals

+77 since previous report

**BENEFICIARY PAROLEES AT POE**
BY TOP 3 COUNTRIES OF EMBARKATION

**7,641**

Cumulative beneficiaries

+239 since previous report

**SUPPORTER LOCATIONS**
BY TOP 5 STATES OF RESIDENCE

**BENEFICIARY LOCATIONS**
BY TOP 5 COUNTRIES

**ARRIVALS BY AGE AND SEX**

Notes: Report data are person-level (i.e, exclude duplicate entry records). Data on confirmed applications, supporter locations, and beneficiary locations come from USCIS and are valid as of 12/08/2022 8:39 AM. Beneficiary location data exclude persons listing U.S. addresses. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/8/2022 7:04 AM. Travel authorization approvals include authorizations that have been cancelled after the traveler's arrival. Arrivals by country of embarkation estimated based on CBP's analysis of flight data. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data. Cumulative supporter and beneficiary data since October 18, 2022.

# Daily Venezuela Report

12 December 2022

**A total of 159 Venezuelans were encountered at the Southwest Border yesterday and 150 Venezuelans were expelled under Title 42 authority. Since October 18th, 18,606 confirmed applications have been filed on behalf of Venezuelan beneficiaries, and a total of 8,465 beneficiaries have entered the United States.**

## VENEZUELA ENCOUNTERS YESTERDAY

**159**
Total Venezuelan Encounters: Southwest Border
+55 since previous day

**150**
Total Venezuelan Expulsions: Southwest Border
+94 since previous day

**4**
Total Venezuelan Releases: Southwest Border
+3 since previous day

**103**
Venezuela Encounters: El Paso Sector
+32 since previous day

**113**
Venezuela Expulsions: El Paso Sector
+72 since previous day

**0**
Venezuela Releases: El Paso Sector
+0 since previous day

## VENEZUELAN ENCOUNTERS, RELEASES AND EXPULSIONS



Encounters   Releases   T42 Expulsions

## PROCESS FOR VENEZUELANS

**SUPPORTER APPLICATIONS CONFIRMED**

**18,606**
Cumulative confirmed applications
+50 since previous report

**BENEFICIARY MATERIALS COMPLETED**

**15,726**
Cumulative submissions completed
+18 since previous report

**BENEFICIARY TRAVEL AUTHORIZATIONS**

**14,767**
Cumulative approvals
+42 since previous report

**BENEFICIARY PAROLEES AT POE**

**8,465**
Cumulative beneficiaries
+160 since previous report

Venezuela AR_000379

Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/12/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. Supporter application data come from USCIS and are valid as of 12/12/2022 8:27 AM. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/12/2022 7:15 AM. All figures are based on live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

12 December 2022

# Venezuelan Encounters

VENEZUELAN ENCOUNTERS, RELEASES, AND T42 EXPULSIONS

Legend: ■ Encounters  ■ Releases  ■ T42 Expulsions



Single Adults

Family Unit Individuals

## Venezuelans

| Sector | Encounters | | | Total in Custody | | | Bookouts | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE | Other |
| El Paso | 31 | 72 | 0 | 160 | 121 | 2 | 113 | 0 | 0 | 3 |
| Del Rio | 4 | 33 | 0 | 7 | 33 | 0 | 13 | 0 | 0 | 0 |
| Yuma | 3 | 6 | 0 | 5 | 8 | 0 | 11 | 0 | 0 | 3 |
| Other | 8 | 2 | 0 | 14 | 6 | 0 | 13 | 4 | 1 | 0 |
| Total | 46 | 113 | 0 | 186 | 168 | 2 | 150 | 4 | 1 | 6 |

### Venezuelan Expulsions by Departure Port

| | SA | FM |
|---|---|---|
| San Ysidro | 89 | 5 |
| Nogales | 9 | 0 |
| El Paso | 0 | 0 |
| Eagle Pass | 9 | 4 |
| Brownsville | 0 | 34 |
| Total | 107 | 43 |

### Venezuelan Expulsions by Originating Sector

| | SA | FM |
|---|---|---|
| El Paso | 81 | 32 |
| Del Rio | 9 | 4 |
| Yuma | 8 | 3 |
| RGV | 0 | 0 |
| Other | 9 | 4 |
| Total | 107 | 43 |

## All Nationalities

| Sector | Encounters | | | Total in Custody | | | Bookouts | | |
|---|---|---|---|---|---|---|---|---|---|
| | SA | FM | UC | SA | FM | UC | T42 | Release | Transfer to ICE |
| El Paso | 1,238 | 1,022 | 136 | 2,407 | 2,618 | 252 | 345 | 1,219 | 34 |
| Del Rio | 1,035 | 367 | 41 | 1,900 | 555 | 101 | 194 | 929 | 0 |
| Yuma | 731 | 359 | 28 | 1,303 | 748 | 36 | 11 | 420 | 36 |
| Other | 1,776 | 461 | 414 | 5,401 | 2,063 | 517 | 452 | 2,413 | 108 |
| Total | 4,780 | 2,209 | 619 | 11,011 | 5,984 | 906 | 1,002 | 4,981 | 178 |

### CUMULATIVE SOUTHWEST BORDER COUNTS SINCE OCTOBER 12

**16,369**
Cumulative Venezuelan Encounters
+159 since previous day

**13,816**
Cumulative Venezuelan Expulsions
+150 since previous day

**5,616**
Cumulative Venezuelan Releases
+4 since previous day

Venezuela AR_000380

2

Releases include parole-ATD, releases by CBP with a Notice to Appear (NTA), and transfers to ICE for release at the border with an NTA. Transfers to ICE include people placed in expedited removal and others placed in removal proceedings and transferred to ICE for a custody determination. Encounter, total in custody, and TB book-out data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/12/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. All figures are based on preliminary data pulled from live systems and are subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Process for Venezuelans SINCE OCTOBER 18, 2022



**Form I-134 Data Transmitted From USCIS to CBP** · **Approval/Denial Status Sent to USCIS** · **Approved Beneficiaries Schedule Travel** · **Travel Status Checked For Arrivals**

## SUPPORTER APPLICATIONS CONFIRMED

**18,606**

Cumulative confirmed applications

+50 since previous report

## BENEFICIARY MATERIALS COMPLETED

**15,726**

Cumulative submissions completed

+18 since previous report

## BENEFICIARY TRAVEL AUTHORIZATIONS

**14,767**

Cumulative approvals

+42 since previous report

Approved 14,767 · Denied 643 · Pending 316

## BENEFICIARY PAROLEES AT POEs
BY TOP 3 COUNTRIES OF EMBARKATION

**8,465**

Cumulative beneficiaries

+160 since previous report

Colombia 2,799 · Venezuela 1,897 · Mexico 1,209 · Other 2,560

## ADMISSIONS & ARRIVALS

Confirmations 18,606 · Non-Confirmations 2,226

## SUPPORTER LOCATIONS
BY TOP 5 STATES OF RESIDENCE

Florida 7,390 · Texas 2,630 · Georgia 766 · Utah 686 · New York 661

## BENEFICIARY LOCATIONS
BY TOP 5 COUNTRIES

Venezuela 12,944 · Mexico 1,466 · Chile 933 · Colombia 871 · Peru 586

## ARRIVALS BY AGE AND SEX

Female 4,135 · Male 4,330

0-17 1,066 · 18-30 3,518 · 31-61 3,518 · 61+ 2,304 · 1,577

Venezuela AR_000381

Notes: Report data are person-level (i.e, exclude duplicate entry records). Data on confirmed applications, supporter locations, and beneficiary locations come from USCIS and are valid as of 12/12/2022 8:27 AM. Beneficiary location data exclude persons listing U.S. addresses. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/12/2022 7:15 AM. Travel authorization approvals include authorizations that have been cancelled after the traveler's arrival. Arrivals by country of embarkation estimated based on CBP's analysis of flight data. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data. Cumulative supporter and beneficiary data are since October 18, 2022.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Daily Venezuela Report

27 December 2022

## USBP VENEZUELA ENCOUNTERS YESTERDAY

**178**
Total Venezuelan Encounters:
Southwest Border
-1 since previous day

**145**
Venezuela Encounters:
El Paso Sector
+61 since previous day

**385**
Total Venezuelan Expulsions:
Southwest Border
+286 since previous day

**163**
Venezuela Expulsions:
El Paso Sector
+97 since previous day

**16**
Total Venezuelan Releases:
Southwest Border
+11 since previous day

**1**
Venezuela Releases:
El Paso Sector
-1 since previous day

A total of **178** Venezuelans were encountered at the Southwest Border yesterday. **385** Venezuelans were expelled under Title 42 authority. Since October 18th, **19,665** confirmed applications have been filed on behalf of Venezuelan beneficiaries, and a total of **10,692** beneficiaries have entered the United States.

### VENEZUELAN ENCOUNTERS, RELEASES AND EXPULSIONS



Legend: Encounters | Releases | T42 Expulsions

## PROCESS FOR VENEZUELANS

SUPPORTER APPLICATIONS CONFIRMED

**19,665**
Cumulative confirmed applications
+113 since previous report

BENEFICIARY MATERIALS COMPLETED

**16,747**
Cumulative submissions completed
+140 since previous report

BENEFICIARY TRAVEL AUTHORIZATIONS

**15,766**
Cumulative approvals
+106 since previous report

BENEFICIARY PAROLEES AT POE

**10,692**
Cumulative beneficiaries
+313 since previous report

Venezuela AR_000382

[Encounter and release data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/27/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. Supporter application data come from USCIS and are valid as of 12/27/2022 8:32 AM. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/27/2022 7:01 AM. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.]

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

27 December 2022

# Venezuelan Encounters



VENEZUELAN ENCOUNTERS, RELEASES, AND T42 EXPULSIONS

Single Adults

Family Unit Individuals

Legend: ■ Encounters   ■ Releases   ■ T42 Expulsions

**Venezuelans**

| Sector | Encounters SA | FM | UC | Total in Custody SA | FM | UC | T42 | Bookouts Release | Transfer to ICE | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| El Paso | 93 | 52 | 0 | 184 | 115 | 1 | 163 | 1 | 4 | 2 |
| Del Rio | 4 | 4 | 0 | 54 | 5 | 1 | 68 | 1 | 0 | 2 |
| Yuma | 1 | 6 | 0 | 3 | 6 | 0 | 2 | 2 | 0 | 1 |
| Other | 9 | 8 | 1 | 288 | 320 | 0 | 152 | 12 | 0 | 3 |
| Total | 107 | 70 | 1 | 529 | 446 | 2 | 385 | 16 | 4 | 8 |

**Venezuelan Expulsions by Departure Port**

| | SA | FM |
|---|---|---|
| San Ysidro | 3 | 0 |
| Nogales | 78 | 0 |
| El Paso | 0 | 0 |
| Eagle Pass | 80 | 27 |
| Brownsville | 86 | 111 |
| Total | 247 | 138 |

**Venezuelan Expulsions by Originating Sector**

| | SA | FM |
|---|---|---|
| El Paso | 145 | 18 |
| Del Rio | 41 | 27 |
| Yuma | 2 | 0 |
| RGV | 42 | 93 |
| Other | 17 | 0 |
| Total | 247 | 138 |

**All Nationalities**

| Sector | Encounters SA | FM | UC | Total in Custody SA | FM | UC | T42 | Bookouts Release | Transfer to ICE |
|---|---|---|---|---|---|---|---|---|---|
| El Paso | 756 | 462 | 70 | 880 | 670 | 104 | 260 | 558 | 108 |
| Del Rio | 667 | 185 | 20 | 814 | 287 | 65 | 173 | 1,628 | 86 |
| Yuma | 525 | 450 | 17 | 845 | 649 | 29 | 2 | 662 | 35 |
| Other | 1,055 | 433 | 99 | 4,701 | 1,901 | 115 | 398 | 2,640 | 194 |
| Total | 3,003 | 1,530 | 206 | 7,240 | 3,507 | 313 | 833 | 5,488 | 423 |

**CUMULATIVE SOUTHWEST BORDER COUNTS SINCE OCTOBER 12**

**19,804**
Cumulative Venezuelan Encounters
+178 since previous day

**16,392**
Cumulative Venezuelan Expulsions
+385 since previous day

**5,848**
Cumulative Venezuelan Releases
+16 since previous day

Venezuela AR_000383

Releases include parole-ATD, releases by CBP with a Notice to Appear (NTA), and transfers to ICE for release at the border with an NTA. Transfers to ICE include people placed in expedited removal and others placed in removal proceedings and transferred to ICE for a custody determination. Encounter, total in custody, and TB book-out data for yesterday come from USBP (and are limited to USBP encounters) and are valid as of 12/27/2022 6:00 AM. T42 expulsion data based on manual count provided by field operators. All figures are based on preliminary data pulled from live systems and are subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // NOT FOR FURTHER DISSEMINATION

# Process for Venezuelans SINCE OCTOBER 18, 2022



Venezuela AR_000384

SUPPORTER APPLICATIONS CONFIRMED

**19,665**

Cumulative confirmed applications

+113 since previous report

BENEFICIARY MATERIALS COMPLETED

**16,747**

Cumulative submissions completed

+140 since previous report

BENEFICIARY TRAVEL AUTHORIZATIONS

**15,766**

Cumulative approvals

+106 since previous report

BENEFICIARY PAROLEES AT POE
BY TOP 3 COUNTRIES OF EMBARKATION

**10,692**

Cumulative beneficiaries

+313 since previous report

ARRIVALS BY AGE AND SEX

SUPPORTER LOCATIONS
BY TOP 5 STATES OF RESIDENCE

BENEFICIARY LOCATIONS
BY TOP 5 COUNTRIES

Notes: Report data are person-level (i.e, exclude duplicate entry records). Data on confirmed applications, supporter locations, and beneficiary locations come from USCIS and are valid as of 12/27/2022 8:32 AM. Beneficiary location data exclude persons listing U.S. addresses. Data on submissions completed, approvals, and parolees come from OFO and are valid as of 12/27/2022 7:01 AM. Travel authorization approvals include authorizations that have been cancelled after the traveler's arrival. Arrivals by country of embarkation estimated based on CBP's analysis of flight data. All figures are based on preliminary data pulled from live systems and subject to change as reporting matures. All figures are based on DHS Office of Immigration Statistics analysis of preliminary data. Cumulative supporter and beneficiary data since October 18, 2022.

Venezuela AR_000385

# UCs In-Custody/Averages

Data as of September 29, 2022:

- Total UCs in Custody: 413
- 7 Day Average of UC Encounters: 361
- 7 Day Average of UC OTM Encounters: 287
- 21 Day Average of UC Encounters: 375
- 21 Day Average of UC WA/NTA: 316
- Average Time in Custody: 18 Hours
- Average Time from CBP Arrest to ORR Placement: 15 Hours
- UCs Over 72 Hours: 0
- UCs Pending ORR Placement: 72



**U.S. Customs and Border Protection**



# FY21/FY22 UC Encounters

**FY21/FY22 UC Encounters as of August 31, 2022**

Venezuela AR_000386



U.S. Customs and
Border Protection



# FY21/FY22 September UC Encounters

**FY21/FY22 September UC Encounters as of September 28, 2022**

Venezuela AR_000387



**U.S. Customs and
Border Protection**

# Irregular Migration Trends

**Total Subjects Encountered From These Groups in FYTD22 as of September 27, 2022:**

DRT: 68,586
RGV: 21,588
YUM: 3,798
LRT: 2,446
EPT: 697
TCA: 1,069
SDC: 467

*602 large groups this FYTD for a total of 98,651 subjects ** 72 large groups have impacted our SWB since Sept. 1st for a total of 12,795 encounters — an approximate average of 178 subjects per group**

*Need to establish a unified front to mitigate large groups to manageable encounters that do not surpass binational capabilities and/or place irregular migrants and first responders' lives at risk.*

Large Groups:
- FYTD 22:  602 events of 100+ migrants
- Demographics:
  - FAMU: 39%
  - SA: 44%
  - UAC: 17%
- Nationality Breakdown:
  - Cuba: 28.16
  - Venezuela: 27.81%
  - Nicaragua: 14.13%
  - Colombia: 7.07%
- GOM Efforts Update:
  - Op Echo Alliance II
    - October 5 – November 15
    - Possible extension to November 30
  - Sustained Deflection in Del Rio to El Paso through Disruption Efforts
  - Focused Intel Teams to Identify Targets



DRT +521%   RGV +38%   YUM +275%   LRT -19%   EPT +500%   TCA -58%   SDC +400%

FYTD21   FYTD22

**U.S. Customs and Border Protection**

Venezuela AR_000388

# El Paso Sector Current Situation

Currently, El Paso Sector (EPT) has approximately 3,326 migrants in custody and over 500 awaiting processing under the Paseo Del Norte Port of Entry in El Paso, Texas. *EPT is experiencing a 150% increase in encounters compared to Fiscal Year to Date 2021.*

## Current Situation

**EPT Activity as of 9/29/2022:**

In Custody:
- 2,902 within system of record.

Migrants Detained and At/Under Paseo Del Norte POE Bridge:
- 536

Movement:
- Flights (Outbound): 4
- Parole Plus NGO Movement: 470
- City Transfers: 300
- Safe Community Releases: 0

## Lines of Effort – Current Situation

**PERSONNEL:**
- RGV personnel has been deployed to assist in setting up TOPS

**TRANSPORTATION:**
- Additional buses have been acquired to aid in transportation/decompression efforts.

**PROCESSING:**
- MERP buses are being utilized to expedite processing
- TOPS

**MEDICAL:**
- Medical personnel has been deployed to provide medical screenings (EMTs, SOD)

**DECOMPRESSION EFFORTS:**
- Increased flights decompression to RGV, SDC, LRT

**GOM ENGAGEMENT:**
- FOB continues to work with the government of Mexico to stem the flow of migrants in the area.

Venezuela_AR_000389



**U.S. Customs and Border Protection**



# Rescue Beacons and Unidentified Remains

Fiscal Year 2022 Report to Congress



*U.S. Customs and Border Protection*

# Message from the Deputy Commissioner of CBP

March 29, 2022

I am pleased to submit the following report, "Rescue Beacons and Unidentified Remains," which has been prepared by U.S. Customs and Border Protection (CBP).



The report has been compiled pursuant to direction set forth in the Missing Persons and Unidentified Remains Act of 2019 (P.L. 116–277).  The report explains CBP's response to the Committee's request to establish a Missing Migrant Program (MMP) regarding preventing the loss of lives of migrants attempting to enter the United States.

Pursuant to congressional requirements, this report is being provided to the following Members of Congress:

> The Honorable Gary C. Peters
> Chairman, Senate Committee on Homeland Security and Governmental Affairs
>
> The Honorable Rob Portman
> Ranking Member, Senate Committee on Homeland Security and Governmental Affairs
>
> The Honorable Bennie G. Thompson
> Chairman, House Committee on Homeland Security
>
> The Honorable John Katko
> Ranking Member, House Committee on Homeland Security

I would be pleased to respond to any questions you may have.  Please do not hesitate to contact my office at (202) 344-2001.

Sincerely,

Troy A. Miller
Deputy Commissioner
U.S. Customs and Border Protection

Venezuela AR_000391

# Executive Summary

The Department of Homeland Security and CBP are committed to preventing the loss of life of migrants attempting to enter the United States.  In 2017, CBP's U.S. Border Patrol (USBP) began implementing new procedures, partnerships, and databases to assist in locating and identifying migrants who are reported lost or missing.  Through partnerships with federal, state, tribal, and local agencies, along with nongovernmental organizations (NGO) and foreign consular offices, USBP now has a standardized, active MMP in all nine USBP Southwest Border sectors.

Since its inception, MMP has improved response times for 911 calls, increased the number of rescue beacons, and implemented 911 rescue placards with information that assists rescue personnel with locating migrants in distress.  In addition, these efforts have improved information flow with and between federal agencies; state, tribal, and local governments; NGOs, and foreign consular offices associated with locating and identifying migrants in danger or those migrants who may have died during the journey to the United States.  In Fiscal Year (FY) 2021, USBP MMP implemented an Internal Operating Procedure, which increased standardization and led to enhanced reporting.

FY 2021 presented many unprecedented challenges in border security.  In addition to dealing with the consequences of the COVID-19 global pandemic, CBP experienced a historic influx of irregular migration, stressing capacity limitations and requiring the flexing of personnel to address localized surges.  USBP recorded a record number of migrant encounters (1,662,167), migrant rescues (12,857), and unfortunately, migrant deaths (568).  While this is concerning, migrant rescues and migrant deaths could have been much higher if not for the humanitarian efforts and resources dedicated to the MMPs.

As USBP Sector MMPs continue to mature, CBP will continue to communicate the dangers of the border region on multiple media platforms, will increase collaboration with internal and external stakeholders to enhance situational awareness of the border region, and will continue to educate the public on the risks associated with irregular migration caused by criminal organizations.

Venezuela AR_000392



# Rescue Beacons and Unidentified Remains

# Table of Contents

I.   Legislative Language ...................................................................................................1

II.  Background ...............................................................................................................3
     A. CBP Migrant Death Mitigation....................................................................3
     B. CBP Rescue Efforts ......................................................................................4

III. Discussion ................................................................................................................5
     A. Migrant Rescues ...........................................................................................8
     B. Rescue Beacons ..........................................................................................10
     C. 911 Placards ...............................................................................................11
     D. MMP Future Requirements .......................................................................11

IV.  Conclusion .............................................................................................................13

V.   Appendices..............................................................................................................14
     Appendix A.  List of Abbreviations.................................................................14
     Appendix B.  Map of Migrant Rescues and Rescue Beacons .......................15
     Appendix C.  Map of Migrant Deaths and Rescue Beacons .........................16

Venezuela AR_000393

# I.   Legislative Language

This document was compiled pursuant to direction set forth in the Missing Persons and Unidentified Remains Act of 2019 (P.L. 116–277), which states:

(a) UNIDENTIFIED REMAINS.—
   (1) REPORTING REQUIREMENT.— Not later than 1 year after the date of enactment of this Act, and annually thereafter, the Commissioner of U.S. Customs and Border Protection shall submit a report to the appropriate committees of Congress regarding all unidentified remains discovered, during the reporting period, on or near the border between the United States and Mexico, including—
      (A) for each deceased person—
         (i) the cause and manner of death, if known;
         (ii) the sex, age (at time of death), and country of origin (if such information is determinable); and (iii) the location of each unidentified remain;
      (B) the total number of deceased people whose unidentified remains were discovered by U.S. Customs and Border Protection during the reporting period;
      (C) to the extent such information is available to U.S. Customs and Border Protection, the total number of deceased people whose unidentified remains were discovered by Federal, State, local or Tribal law enforcement officers, military personnel, or medical examiners offices;
      (D) the efforts of U.S. Customs and Border Protection to engage with nongovernmental organizations, institutions of higher education, medical examiners and coroners, and law enforcement agencies—
         (i) to identify and map the locations at which migrant deaths occur; and
         (ii) to count the number of deaths that occur at such locations; and
      (E) a detailed description of U.S. Customs and Border Protection's Missing Migrant Program, including how the program helps mitigate migrant deaths while maintaining border security.

   (2) PUBLIC DISCLOSURE.—Not later than 30 days after each report required under paragraph (1) is submitted, the Commissioner of U.S. Customs and Border Protection shall publish on the website of the agency the information described in subparagraphs (A), (B), and (C) of paragraph (1) during each reporting period.

(b) RESCUE BEACONS.—Not later than 1 year after the date of enactment of this Act, and annually thereafter, the Commissioner of U.S. Customs and Border Protection shall submit a report to the appropriate committees of Congress regarding the use of rescue beacons along the border between the United States and Mexico, including, for the reporting period—
   (1) the number of rescue beacons in each border patrol sector;
   (2) the specific location of each rescue beacon;
   (3) the frequency with which each rescue beacon was activated by a person in distress;
   (4) a description of the nature of the distress that resulted in each rescue beacon activation (if such information is determinable); and

1

(5) an assessment, in consultation with local stakeholders, including elected officials, nongovernmental organizations, and landowners, of necessary additional rescue beacons and recommendations for locations for deployment to reduce migrant deaths.

2

# II.   Background

## A.   CBP Migrant Death Mitigation

U.S. Customs and Border Protection (CBP) initiated the Missing Migrant Program (MMP) in 2017 to prevent the loss of life of migrants during their journey to the United States.

MMP is a humanitarian effort, led by the U.S. Border Patrol (USBP), that focuses on border safety, locating migrants reported missing, rescuing migrants in distress, preventing migrant deaths, and identifying and reunifying decedents with their families in the border region.  Guided by the *Missing Persons and Unidentified Remains Act of 2019*, MMP institutionalizes procedures for third-party missing migrant reports, providing a focal point for collaboration and integration with internal and external stakeholders such as medical examiners and coroners, non-governmental organizations (NGO), academia, and other law enforcement agencies.

In collaboration with CBP's Intergovernmental Public Liaison Office, MMP participates in NGO Days, where CBP hosts NGOs and provides operational briefings, facility tours, border tours, and a presentation on the local MMP.  These types of engagements strengthen our partnerships and establish strong lines of communication for future coordination.

Through MMP, CBP has improved its ability to locate migrants reported missing by conducting more efficient searches of CBP databases for migrants previously encountered by CBP, increasing the number of rescue beacons and 911 rescue placards deployed to reduce rescue times, and coordinating rescue efforts with internal and external partners.  The border region is a harsh environment, and in some rescue scenarios, minutes can be the difference between life and death.  Understanding this urgency and promoting processes and procedures that maximize efficiencies, MMP focuses on four lines of effort to reduce migrant deaths.

The four lines of effort for MMP are as follows:

- **Prevent**
  - Strategic messaging with internal and external stakeholders to highlight the dangers of irregular migration;
  - Informed deployment of rescue equipment; and
  - Improved information flow from foreign consulates and NGOs.
- **Locate**
  - Improved response time for 911 calls and rescues;
  - Database queries; and
  - Physical location determinations.
- **Identify**
  - Biographic information exchange of decedents with NGOs, foreign consular offices, medical examiners offices, and federal, state and local partners, as appropriate.
- **Reunite**
  - Assist with the return of subjects to their native countries and their families; and

Venezuela AR_000396

    o   Provide closure for families of migrants who perished.

## B.   CBP Rescue Efforts

MMP has identified four categories of searches to apply the appropriate resources, to minimize search times, and to enhance the chances of locating missing migrants.  The categories are:

**Category 1 – Subject Query**
- USBP searches its databases to determine if a subject has previously been encountered;
- The subject's name, date of birth, place of birth, and last known location are recorded; and
- The subject's record either is located or not located via database searches and results are shared with MMP partners.

**Category 2 - Search and Rescue**
- USBP receives and records the subject's biographic information, last known location, and other information pertinent to the situation;
- USBP shares recorded information and coordinates the search-and-rescue operations with partners; and
- USBP reports the disposition of the subject (located or not located) and additional information to partners.

**Category 3 - Search and Recovery**
- USBP facilitates a missing migrant search, as described above.
- If the migrant is deceased, the global positioning system location of the remains is reported to the appropriate agency and the landowner, if applicable, is notified.

**Category 4 - Identification of Remains**
- In addition to those actions listed in Category 3:
  - o  USBP coordinates with the local medical examiner to identify the remains;
  - o  USBP searches the National Missing and Unidentified Persons System for identification of the remains; and
  - o  USBP reports any possible identity matches to federal, state, local, and international partners, as appropriate.

In Fiscal Year (FY) 2021, USBP recorded 568 migrant deaths and conducted 3,423 rescue events resulting in 12,857 rescued migrants.  In addition to being an increase from FY 2020, where USBP reported 254 decedents and rescued 5,336 migrants, this also represents a record number for USBP in both migrant rescues and migrant deaths.

Venezuela AR_000397

# III.  Discussion

FY 2021 marked a significant increase in both migrant rescues and migrant deaths along the Southwest border.  A few factors led to this increase.  First, USBP recorded 1,662,167 encounters, marking a staggering 310 percent increase from FY 2020, where 405,036 encounters were recorded.  Additionally, as the USBP MMPs continue to mature and expand their partnerships at the federal, state, and local levels, they have become increasingly more aware of reportable incidents, also accounting for an increase in fiscal year reporting.

The tables below demonstrate the significant increase in migrant deaths in every Southwest border sector in FY 2021.  Mexican national decedents were the highest nationality reported, accounting for 59 percent of the overall total.  The South Texas region accounted for 54 percent of the reported decedents with 305.

Table 1

**Southwest Border Migrant Deaths Reported by Sector**

| Sector | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Rio Grande Valley | 104 | 96 | 69 | 58 | 130 |
| Laredo | 84 | 69 | 78 | 57 | 75 |
| Del Rio | 18 | 20 | 38 | 34 | 100 |
| Big Bend | 3 | 10 | 3 | 15 | 39 |
| El Paso | 8 | 6 | 20 | 10 | 39 |
| Tucson | 73 | 58 | 61 | 43 | 78 |
| Yuma | 2 | 1 | 7 | 7 | 30 |
| El Centro | 2 | 17 | 17 | 17 | 45 |
| San Diego | 4 | 4 | 7 | 13 | 32 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

Table 2

**Migrant Death by Type**

| Type of Death | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Environmental Exposure-Heat | 68 | 95 | 110 | 104 | 219 |
| Environmental Exposure-Cold | 2 | 28 | 7 | 7 | 21 |
| Train-Related | 2 | 0 | 0 | 1 | 1 |
| Motor-Vehicle-Related | 2 | 5 | 11 | 9 | 41 |
| Water-Related | 91 | 54 | 66 | 41 | 78 |
| Other | 51 | 36 | 21 | 20 | 86 |
| Undetermined | 35 | 37 | 60 | 42 | 73 |
| Skeletal Remains | 47 | 26 | 25 | 30 | 49 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

Venezuela AR_000398

**Table 3**

**Migrant Death by Nationality**

| Nationality | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|
| Bangladesh | 1 | 2 | 1 | 0 | 0 |
| Brazil | 7 | 1 | 1 | 0 | 4 |
| China | 0 | 0 | 1 | 0 | 1 |
| Colombia | 0 | 1 | 0 | 0 | 2 |
| Cuba | 1 | 0 | 0 | 0 | 4 |
| Dominican Republic | 2 | 0 | 3 | 0 | 0 |
| Ecuador | 6 | 2 | 6 | 4 | 12 |
| El Salvador | 15 | 8 | 7 | 2 | 19 |
| Guatemala | 20 | 20 | 21 | 11 | 32 |
| Honduras | 10 | 14 | 16 | 11 | 30 |
| India | 0 | 0 | 1 | 0 | 0 |
| Kazakhstan | 1 | 0 | 0 | 0 | 0 |
| Mexico | 98 | 117 | 124 | 136 | 334 |
| Nicaragua | 1 | 1 | 2 | 0 | 4 |
| Peru | 0 | 1 | 0 | 0 | 0 |
| Romania | 1 | 0 | 0 | 0 | 0 |
| Venezuela | 0 | 0 | 0 | 1 | 1 |
| Unknown | 135 | 114 | 117 | 89 | 125 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

6

| Table 4 | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Southwest Border Deaths by Gender, Age Group, and Discoverer** | | | | | |
| **Gender** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** |
| Female | 18 | 15 | 28 | 22 | 101 |
| Male | 151 | 164 | 178 | 148 | 364 |
| Unknown | 129 | 102 | 94 | 84 | 103 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |
| **Age Group** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** |
| 0 - 17 | 9 | 4 | 8 | 7 | 8 |
| 18 - 25 | 29 | 44 | 43 | 46 | 110 |
| 26 - 35 | 43 | 39 | 53 | 42 | 114 |
| 36 - 45 | 30 | 32 | 40 | 27 | 75 |
| 46 - 55 | 6 | 9 | 12 | 9 | 37 |
| 56 and Older | 2 | 2 | 3 | 6 | 13 |
| Unknown | 179 | 151 | 141 | 117 | 211 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |
| **Discoverer** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** |
| USBP | 201 | 201 | 226 | 200 | 448 |
| Other | 97 | 80 | 74 | 54 | 120 |
| **Totals** | **298** | **281** | **300** | **254** | **568** |

The majority of reported migrant deaths were male, accounting for 64 percent of the overall total.  Thirty-nine percent were between the ages of 18-35, however 37 percent of the decedent's ages remain unknown.  Similar to previous fiscal years, USBP agents discovered the majority of reported migrant deaths, accounting for 79 percent of the total in FY 2021.

Migrant deaths were highest during the months of June (105), August (95), and September (76), which accounted for 49 percent of all reported migrant deaths in FY 2021.  In those same months, USBP averaged approximately 187,000 migrant encounters per month.  The extreme temperatures along the Southwest border during these months were a contributing factor, often leading to heat-related injuries.  Heat exposure continues to be the leading identified cause of migrant deaths along the southwest border.

It is also important to note that migrants are often ill-prepared to make the journey across border waterways and through the harsh terrain of the desert.  Transnational criminal organizations engaged in human smuggling typically disregard migrant safety over profit, and underplay the dangers of the environment, misinform migrants on the travel distance, abandon them when they are injured, or leave them behind if they cannot keep up with the group causing them to become lost.

Venezuela AR_000400

Venezuela AR_000401

## A.  Migrant Rescues

The number of individuals rescued and overall rescue events by USBP increased drastically in FY 2021.  This is largely driven by the 310 percent increase in overall USBP encounters, which rose from 405,036 in FY 2020, to 1,662,167 in FY 2021.  Additionally, there was a significant increase in motor-vehicle rescues, specifically with tractor-trailers, which accounted for 47 percent of overall reported rescues.  The overwhelming majority, or 95 percent, of the motor-vehicle rescues were reported in the Laredo Sector.

USBP also reported an increase in rescues associated with 911 calls.  In FY 2021, USBP reported 4,724 rescues from 911 calls, which is a 136 percent increase from FY 2020, where USBP reported 1,586 rescues.  In FY 2021, the MMP Internal Operating Procedure was implemented across all Southwest border sectors, promoting standardization in reporting and accounting for rescue efforts recorded under the MMP.  This data highlights the extraordinary amount of resources USBP has dedicated to this humanitarian mission and to preventing the loss of life in the border region.

**Table 5**

| | Number of Rescue Incidents and People | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rescue Incidents | | | | | People | | | | |
| Sector | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
| Rio Grande Valley | 355 | 345 | 184 | 138 | 508 | 1,191 | 1,623 | 794 | 304 | 949 |
| Laredo | 248 | 278 | 310 | 317 | 568 | 1,242 | 1,509 | 2,453 | 3,549 | 7,109 |
| Del Rio | 50 | 60 | 108 | 104 | 906 | 99 | 114 | 480 | 202 | 2,096 |
| Big Bend | 12 | 27 | 13 | 66 | 190 | 26 | 71 | 45 | 150 | 748 |
| El Paso | 19 | 10 | 20 | 4 | 526 | 44 | 17 | 40 | 12 | 688 |
| Tucson | 476 | 574 | 570 | 423 | 164 | 757 | 926 | 930 | 774 | 233 |
| Yuma | 2 | 10 | 23 | 35 | 137 | 6 | 20 | 82 | 114 | 424 |
| El Centro | 4 | 9 | 30 | 69 | 158 | 4 | 14 | 78 | 171 | 328 |
| San Diego | 27 | 13 | 16 | 40 | 266 | 48 | 25 | 19 | 60 | 282 |
| Totals | 1,193 | 1,326 | 1,274 | 1,196 | 3,423 | 3,417 | 4,319 | 4,921 | 5,336 | 12,857 |

8

Table 6

**Number of Rescues by Type**

| Rescue Type | Incidents | | | | | People | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
| Environmental Exposure-Heat | 366 | 480 | 380 | 458 | 1,664 | 725 | 1,209 | 924 | 1,159 | 3,760 |
| Environmental Exposure-Cold | 49 | 56 | 64 | 56 | 317 | 112 | 118 | 132 | 139 | 961 |
| Water-Related | 54 | 53 | 239 | 206 | 136 | 131 | 86 | 742 | 384 | 249 |
| Other | 509 | 543 | 444 | 315 | 1,075 | 829 | 945 | 768 | 631 | 1,713 |
| Motor-Vehicle-Related | 215 | 188 | 138 | 152 | 209 | 1,620 | 1,938 | 2,343 | 2,979 | 5,999 |
| Train-Related | 0 | 6 | 9 | 9 | 22 | 0 | 23 | 12 | 44 | 175 |
| **Totals** | **1,193** | **1,326** | **1,274** | **1,196** | **3,423** | **3,417** | **4,319** | **4,921** | **5,336** | **12,857** |

9

Venezuela AR_000402

## B.   Rescue Beacons

USBP is utilizing a rescue beacon suitability model to determine the most suitable deployment locations using spatial data science.  Data sets, such as historic trends, land access, elevation, and Agent response time, can be weighted according to criteria unique to each sector, allowing for maximum effectiveness in each operating environment.

USBP has deployed 160 rescue beacons in high-traffic areas, many with unreliable or no cellular phone coverage.  Additionally, these areas historically have been near locations where migrant remains have been discovered or multiple rescues have occurred.  The use of these beacons has proven useful over the years for providing a means of alerting USBP to migrants in distress; however, the nature of distress that led to the specific activation of a deployed rescue beacons is a data point that is not captured by USBP's systems.  USBP does have the ability to record a disposition for a rescue beacon activation.

In FY 2021, USBP reported 83 successful rescues associated with rescue beacon activations. While this number is relatively small compared to the overall number of beacons, USBP identified a technological gap where the "rescue" had to be manually entered into the system at the time of processing, and this was at times omitted.  Given the implementation of the Internal Operating Procedure and the standardization of reporting, USBP anticipates an increase in reported rescues associated with rescue beacon activations in the future.

Additionally, USBP is transitioning from the legacy, fixed rescue beacons to a mobile rescue beacon platform.  Along with the added capability of adjusting to shifts in migration patterns, mobile beacons are less expensive and have a smaller footprint, leading to more permissions from landowner access requests. Currently, 50 of the deployed beacons, or 31 percent, are mobile rescue beacons.  USBP will continue to collaborate with local stakeholders regarding rescue beacon locations and additional recommendations to reduce migrant deaths.



Fixed Rescue Beacon



Mobile Rescue Beacon

10

## C.   911 Placards

In FY 2021, USBP continued the implementation of the 911 rescue placard system.  These placards are placed in areas where rescue beacons were impractical or not able to be deployed because harsh terrain or land ownership access issues.  There are currently 2,279 rescue placards deployed in strategic locations along the southwest border.  In FY 2021, 207 recorded rescues were associated with this type of rescue equipment.



- The 911 placards are a simple and accessible rescue aid that are deployed almost anywhere there is cell phone coverage.
- If migrants have access to both a cell phone (which is common) and cellular battery life, they will be able to call 911 for help.
- The informational placards provide migrants with a unique location identifier that the migrants can use to contact emergency management services to assist with locating them.
- 911 placards are placed on existing infrastructure and do not require any changes to the landscape.
- USBP is developing a tracking mechanism for evaluating the system's effectiveness versus a rescue beacon, considering cellular network coverage.

## D.   MMP Future Requirements

The dynamic border environment requires a strategy that is adaptive and responsive.  CBP is committed to MMPs lines of effort and will evolve with the ever-changing landscape.  To that end, CBP will focus efforts on multi-platform strategic messaging to accurately highlight the dangers of irregular migration and combat the false narrative portrayed by smugglers and criminal organizations.  These efforts will include print, radio, social media, and others to properly educate the targeted population.  The criminal element uses social media very effectively to advertise their illegal services and is responsible for many of these migrant deaths.

MMP will continue to engage with foreign and regional partners to increase trust and credibility, improve feedback, and identify initiatives to partner to multiply the effectiveness of operations.  Specifically, MMP will enhance partnerships with the Office of Medical Examiners and NamUs to build situational awareness and increase program effectiveness.  MMP will promote

11

transparency to achieve the desired outcome of maximized program capabilities through mutually beneficial partnerships with internal and external stakeholders.

Technology changes fast and quickly becomes obsolete.  MMP will continue to capitalize on innovative solutions to meet program needs.  Partnering with Industry, MMP is currently in the process of piloting a Commercial Off the Shelf rescue beacon to deploy in the rugged terrain along the Southwest border.  The Commercial Off the Shelf model will reduce the construction time and resources while increasing capability standardization.  MMP is also researching drone technology to increase situational awareness on the border using limited resources.

Finally, MMP is committed to continuously evaluating program data to make sound resource and strategic decisions to improve outcomes.  This will inform resource allocation, ensure mission alignment, provide accountability to stakeholders, and influence the resource acquisition process. MMP is currently piloting a 911 Emergency Management Portal in south Texas, which is a multi-tiered system for recording and managing MMP activities within a given environment. Based on significant increases in rescue response rates and data management, CBP will determine the necessary resources for program expansion.

Venezuela AR_000405

# IV.  Conclusion

CBP is unwavering in its mission and aims to rise to every challenge with which it is faced.  We are committed to these humanitarian efforts and will continue to dedicate the appropriate levels of resources to make the border region safer.  We cannot do it alone, and we welcome the opportunity to partner with our stakeholders in this shared mission to save lives.

As previously stated, CBP faced unprecedented challenges in FY 2021 but responded with equal vigor and commitment.  USBP alone conducted 12,857 successful rescues, setting an agency record.  The MMPs continue to be resourced and expanded, providing CBP with greater humanitarian capabilities to match the threat.  As the largest federal law enforcement agency in the United States, CBP will continue to meet these existing and emerging humanitarian challenges head on.

Venezuela AR_000406

# V.   Appendices

## Appendix A.  List of Abbreviations

| Abbreviation | Definition |
| --- | --- |
| CBP | U.S. Customs and Border Protection |
| FY | Fiscal Year |
| MMP | Missing Migrant Program |
| NGO | Nongovernmental Organizations |
| USBP | U.S. Border Patrol |

Venezuela AR_000407

## Appendix B.  Map of Migrant Rescues and Rescue Beacons



15

Appendix C.  Map of Migrant Deaths and Rescue Beacons



16

Venezuela AR_000409



Venezuela_AR_000410

**SW Land Border Encounters by FY and Country Group: Production data as of 9/6/2022**

| | ENCOUNTERS | | | | | | |
| | Counts | | | | Percentage | | |
| | Mexico | NCA | Other | Total | Mexico | NCA | Other |
|---|---|---|---|---|---|---|---|
| 2000 | 1,540,683 | 19,340 | 6,398 | 1,566,421 | 98.4% | 1.2% | 0.4% |
| 2001 | 1,201,510 | 21,127 | 8,775 | 1,231,412 | 97.6% | 1.7% | 0.7% |
| 2002 | 902,042 | 21,138 | 7,161 | 930,341 | 97.0% | 2.3% | 0.8% |
| 2003 | 867,256 | 30,348 | 9,130 | 906,734 | 95.6% | 3.3% | 1.0% |
| 2004 | 1,074,330 | 51,462 | 14,455 | 1,140,247 | 94.2% | 4.5% | 1.3% |
| 2005 | 1,103,162 | 114,040 | 52,028 | 1,269,230 | 86.9% | 9.0% | 4.1% |
| 2006 | 1,058,026 | 89,249 | 21,034 | 1,168,309 | 90.6% | 7.6% | 1.8% |
| 2007 | 882,216 | 52,640 | 19,540 | 954,396 | 92.4% | 5.5% | 2.0% |
| 2008 | 727,494 | 46,616 | 18,299 | 792,409 | 91.8% | 5.9% | 2.3% |
| 2009 | 565,248 | 39,935 | 13,930 | 619,113 | 91.3% | 6.5% | 2.2% |
| 2010 | 467,461 | 43,590 | 16,362 | 527,413 | 88.6% | 8.3% | 3.1% |
| 2011 | 344,013 | 40,505 | 16,540 | 401,058 | 85.8% | 10.1% | 4.1% |
| 2012 | 316,890 | 88,322 | 20,893 | 426,105 | 74.4% | 20.7% | 4.9% |
| 2013 | 317,562 | 140,442 | 31,608 | 489,612 | 64.9% | 28.7% | 6.5% |
| 2014 | 285,502 | 248,063 | 36,483 | 570,048 | 50.1% | 43.5% | 6.4% |
| 2015 | 253,660 | 142,341 | 48,855 | 444,856 | 57.0% | 32.0% | 11.0% |
| 2016 | 256,083 | 227,458 | 75,450 | 558,991 | 45.8% | 40.7% | 13.5% |
| 2017 | 181,519 | 187,539 | 46,141 | 415,199 | 43.7% | 45.2% | 11.1% |
| 2018 | 221,711 | 258,413 | 39,820 | 519,944 | 42.6% | 49.7% | 7.7% |
| 2019 | 237,067 | 623,569 | 116,593 | 977,229 | 24.3% | 63.8% | 11.9% |
| 2020 | 297,692 | 106,760 | 53,614 | 458,066 | 65.0% | 23.3% | 11.7% |
| 2021 | 655,591 | 701,049 | 378,043 | 1,734,683 | 37.8% | 40.4% | 21.8% |
| 2022 | 807,236 | 541,088 | 1,029,008 | 2,377,332 | 34.0% | 22.8% | 43.3% |

Venezuela_AR_000411

**SW Land Border Encounters by Expedited Removals and Credible Fear: 2013 -2022Q3**

| | Total Encounters | Expedited Removal | Credible Fear | As a % of ER | As a % of Encounters |
|---|---|---|---|---|---|
| 2013 | 489,612 | 236,330 | 38,981 | 16% | 8% |
| 2014 | 570,048 | 229,389 | 54,230 | 24% | 10% |
| 2015 | 444,856 | 180,679 | 50,043 | 28% | 11% |
| 2016 | 558,991 | 228,019 | 97,575 | 43% | 17% |
| 2017 | 415,199 | 160,397 | 71,121 | 44% | 17% |
| 2018 | 519,944 | 214,808 | 99,825 | 46% | 19% |
| 2019 | 977,229 | 223,291 | 101,734 | 46% | 10% |
| 2020 | 458,066 | 91,765 | 25,705 | 28% | 6% |
| 2021 | 1,734,683 | 84,707 | 69,635 | 82% | 4% |
| 2022Q3 | 1,710,734 | 84,513 | 55,119 | 65% | 3% |

Notes: Results based on source data as of June 30, 2022 and OIS Enforcement Lifecycle methodology as of May 31, 2021.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle.

**From:**
**To:**
**Subject:** RE: Updated data - decompression
**Date:** Sunday, December 11, 2022 8:02:06 AM

Sorry about that, better breakdown for Nov. 2022:

Total Domestic Lateral Movement Flights = 124 (91 singe adult flights and 33 family unit flights)
Total non-citizens laterally moved, via flight, for decompression = 14,469 (9412 single adults; 5057 family units)

The MCC does not have numbers on the bus movements.

**From:**
**Sent:** Sunday, December 11, 2022 7:43 AM
**To:**

**Subject:** RE: Updated data - decompression

Thank you,     Can you break down that 14,469 number a bit? Does that represent the total number of bus routes + flights, or individuals, or something else?

     | Acting Director, Border and Immigration Policy | DHS |

**From:**
**Sent:** Sunday, December 11, 2022 7:38 AM
**To:**

**Subject:** Re: Updated data - decompression

The number of lateral movements of both single adults and family units via air in Nov. 2022 is 14469

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:**
**Sent:** Saturday, December 10, 2022 4:58:24 PM
**To:**

**Subject:** Re: Updated data - decompression

I have the November information for flights, if that is needed. Will have been early tomorrow morning.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** ███████████████████
**Sent:** Saturday, December 10, 2022, 4:42 PM
**To:** ███████████████
**Cc:** ████████████████
**Subject:** RE: Updated data - decompression

Looping in ████████ the MCC Section Chief.


Thank you,

████████████

National Incident Commander
Southwest Border Coordination Center
US Customs and Border Protection
Department of Homeland Security

███████████

---

**From:** ████████████████
**Sent:** Wednesday, December 7, 2022 12:04 AM
**To:** ████████████████
**Subject:** Updated data - decompression

Shane – can you point me to the right POC to update this data to reflect the month of November?



Acting Director, Border and Immigration Policy
U.S. Department of Homeland Security

Venezuela AR_000414



Office of Field Operations

# Ukrainian Arrivals Snapshot

May 9, 2022

Law Enforcement Sensitive / For Official Use Only

Venezuela AR_000445



## Executive Summary

## For May 8, 2022:

- On the Southwest Border (SWB), OFO encountered a total of 3 inadmissible Ukrainians.

- On the SWB, there were no inadmissible Ukrainians processed as paroles (DT or UHP).

- Also, on the SWB, 3 inadmissible Ukrainians were processed as withdrawals (San Ysidro: 3).

- On the Northern Border (NB), 3 inadmissible Ukrainians were processed as paroles (UHP) (Buffalo: 1; Champlain: 1; Lynden: 1).

- Also, on the NB, 1 inadmissible Ukrainian was processed as a withdrawal (Champlain: 1)

- In the air and sea environments, 28 inadmissible Ukrainians were processed as paroles (UHP) (New York: 7; Chicago: 5; Newark: 4; Orlando: 4; Los Angeles: 3; San Jose: 2; Seattle: 2; Houston: 1).

- CBP has received 5,987 USCIS-approved applications for Uniting for Ukraine (UHP parole) to date. Of these, 5,650 were approved, 162 were denied, and 175 are pending.

- Since March 24, 2022, a total of 23,973 inadmissible Ukrainians have been granted port paroles and 43 inadmissible Ukrainian have been granted UHP paroles.

*Note:  Adjusted reporting start date to March 24, 2022, from February 11, 2022.*

Law Enforcement Sensitive / For Official Use Only

U.S. Customs and
Border Protection



# Ukrainians in CBP *Uniting for Ukraine Process*



*Note: CBP began receiving USCIS-approved applications on May 4, 2022. Data as of May 8, 2022, 2400 hours.*

Law Enforcement Sensitive / For Official Use Only

Venezuela AR_000417

3

U.S. Customs and
Border Protection



# Arrivals of Ukrainians to Southwest Land Border



Law Enforcement Sensitive / For Official Use Only



Venezuela AR_000418



U.S. Customs and
Border Protection



# Dispositions of Arrivals



### Dispositions of Ukrainian Arrivals

| | Business/Pleasure Visitors | Lawful Permanent Residents | Port Paroles (DT) | Humanitarian Paroles (UHP) | Other |
|---|---|---|---|---|---|
| Arrivals | 11,438 | 4,971 | 23,973 | 43 | 32,559 |

- Since March 24, 2022, 72,984 Ukrainians have arrived in the U.S.

*Note: 'Other' category of arrivals includes all immigrant or non-immigrant admissions not included elsewhere on chart including crewmembers. Crewmembers are crew working aboard vessels or aircraft or transiting the United States and usually have multiple entries during this time period.*

Law Enforcement Sensitive / For Official Use Only

Venezuela AR_000419

5



U.S. Customs and Border Protection

# Demographics of Port Paroles



## Demographics of Ukrainian Paroles (UHP & DT) - Age & Gender

| | 0-17 | 18-30 | 31-44 | 45-60 | 61 & Over |
|---|---|---|---|---|---|
| Female | 3,857 | 4,147 | 3,410 | 1,808 | 823 |
| Male | 3,976 | 2,726 | 2,245 | 659 | 359 |
| Unknown | 3 | 0 | 2 | 0 | 1 |

■ Female ■ Male ■ Unknown

Law Enforcement Sensitive / For Official Use Only

Venezuela AR_000420




U.S. Customs and
Border Protection



# Ukrainian Arrivals to Mexico

*Information derived from Mexican Advanced Passenger Information System*



Ukraine National Mexican APIS Arrivals Arriving at US Land Border

*Note: Foreign APIS data does not incorporate onboard indicators and may include individuals who booked a flight for multiple days or multiple arrival airports. This information also excludes children under 2 and persons issued a current a U.S. visa.*

| Arrival Airport in MX | Total Inbound to Mexico |
|---|---|
| Cancun (CUN) | 4,116 |
| Guadalajara (GDL) | 320 |
| Mexico City (MEX) | 16,909 |
| Monterrey (MTY) | 195 |
| Puerto Vallarta (PVR) | 4 |
| Los Cabos (SJD) | 1 |
| **TOTAL** | **21,545** |

Data Source: MxAPIS, CBP Encounter data, Visa data



U.S. Customs and
Border Protection

Law Enforcement Sensitive / For Official Use Only

Venezuela AR_000421

7

FOUO / LAW ENFORCEMENT SENSITIVE

# Customs and Border Protection
# After Action Report (AAR)
# Mass Migration Event (MME)
# Del Rio, Texas
# September 8, 2021 – September 24, 2021
# Report Date: October 7, 2021



# United States Border Patrol
# Del Rio Sector

FOUO/LAW ENFORCEMENT SENSITIVE

| | |
|---|---|
| **Op Order Name:** | Del Rio, TX Mass Migration Event (MME) |
| **Report Date:** | October 5, 2021 |
| **Authors:** | PAIC ████████, PAIC ████████, PAIC ████████, |
| PAIC ████████ | |

## DATES

A. Mass Migration Event Operational Dates:  September 8, 2021 – September 24, 2021

## LOCATION

Del Rio, Texas, Del Rio Sector (DRT) ████
████████████████

## COMMAND

A. **Mass Migration Event Chain of Command**:

| | |
|---|---|
| ████████ | Del Rio Sector (Interim) Chief Patrol Agent |
| | Laredo Sector Deputy Chief Patrol Agent (Incident Commander) |
| ████████ | Del Rio Station Patrol Agent in Charge (Deputy IC) |
| | Eagle Pass Station Patrol Agent in Charge (Deputy IC) |
| ████████ | Special Operations Detachment Patrol Agent in Charge (Deputy IC) |

## DESCRIPTION:

A. **Executive Summary**

From September 8, 2021 to September 24, 2021, Del Rio Sector (DRT) experienced an unprecedented Mass Migration Event (MME) of primarily Haitian nationals illegally crossing into the United States that created a humanitarian crisis which overwhelmed U.S. Border Patrol (USBP), CBP and greater DHS resources.  This was the largest mass migration event in recorded history of the USBP.  A gap in intelligence dissemination and inadequate resourcing and response capabilities resulted in DRT being unprepared to initially manage the volume and speed of which migrants illegally crossed into the United States in a short period of time.  An Incident Command Post (ICP) stood up by USBP and supported by numerous federal, state, local law enforcement components, and non-governmental organizations (NGOs), led efforts to manage the MME.  During the 17-day MME, DRT, supported by internal and external partners encountered 19,752 migrants making illegal entry seeking passage into the United States.

DRT faced significant challenges when thousands of primarily Haitian nationals illegally crossed into the United States in ████ at the weir dam and accumulated underneath the Del Rio Port of Entry (DRL POE) International Bridge.  At one point, the mass of subjects underneath the bridge reached approximately 15,000 migrants from 58 different

FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE

countries. USBP, along with internal and external partners, faced conditions consistent with those of a mass casualty type event, public health and humanitarian crisis. Already faced with overcrowded temporary holding facilities and limited ground and air transport capabilities, DRT could not relocate subjects to safer facilities/environments from the bridge in an expeditious manner commensurate with the need. Many of the subjects suffering from heat exhaustion or other conditions necessitated immediate medical attention. Additionally, migrants required water and nourishment while waiting for days in areas that became increasingly unsanitary.

Supported by multiple sectors, internal and external partners, the Incident Commander (IC) employed over ▮▮▮▮ law enforcement and support personnel to feed, provide general and medical care, transport and process the migrants over the 17-day span. On September 24, 2021, DRT transported the last remaining migrants from underneath the bridge and formally returned command of operations back to Del Rio Station. During the MME, DRT fortunately did not experience any migrant deaths, violent events, or use of force incidents.

## B. Mission Statement

CBP will protect our nation's borders, personnel, infrastructure, and ensure the health and safety of the traveling public, while managing the effects of a land mass migration surge. CBP will provide additional manpower and resources to Del Rio Sector and Field Office to ensure border security in coordination with State and Local law enforcement partners.

## C. Intelligence/ Events Leading to Event

a. Since June of 2021, in the Del Rio Station (DRS) area of responsibility, large numbers of migrants began congregating at the boundary fence near the ▮▮▮▮▮▮ ▮▮▮▮▮▮" waiting to turn themselves in to law enforcement and Border Patrol agents. There was no shelter at this location for migrants, especially families with vulnerable persons, small children and pregnant females, were consistently experiencing medical issues due to the heat and exposure to the elements.

b. On July 30, 2021, DRT implemented a temporary staging area under the DRL POE International Bridge to allow the freely congregating migrants shelter from the elements while they waited to surrender to Border Patrol agents. Due to the number of migrants congregating at this location DRT provided security, 900 feet of temporary fencing, water, four light plants, twelve port-a-potties, hand washing stations, and dumpsters to maintain sanitation and to prevent the spread of disease as much as possible with limited resources.

c. On average, between 200 to 1,000 migrants were staged under the bridge while DRT arranged for transportation to various stations and other Sectors for processing. A large portion these migrants were Haitian. The identified catalyst

LITIGATION/LAW ENFORCEMENT SENSITIVE

that caused a rapid increase in migrants staged under the International Bridge was the short notice cancelation of Title 42 expulsion flights from September 8, 2021, until September 19, 2021, to Haiti.  Throughput was interrupted as 900 migrants that were processed for expulsion flights had to be re-processed through other available dispositional pathways.  DRT was already holding approximately 3,200 migrants in temporary holding facilities, 688% over its capacity, when the mass migration event began.  The number of staged migrants rapidly increased from 2,456 on September 13, 2021, to a high of 14,921 on September 18, 2021.

**D.  Timeline of Events**

Day 1: Wednesday September 8, 2021
- DRT holding 2,159 in custody / 648 unprocessed
- Title 42 Flights to Haiti Cancelled
- Total DRT POE (Bridge) Encounters 345

Day 2: Thursday September 9, 2021
- Total DRT POE Encounters 454

Day 3: Friday September 10, 2021
- Total DRT POE Encounters 486

Day 4: Saturday September 11, 2021
- Current state of DRT POE is 907 subjects under the bridge.  Most are identified as Haitian migrants.
- Numbers of illegal crossings begin to rapidly increase

Day 5: Sunday September 12, 2021
- DRT holding 2,274 in custody / 1,015 unprocessed
- Additional 499 DRT POE Encounters
- A total of 1,500 migrants are reported to be staged under the DRT POE Bridge

Day 6: Monday September 13, 2021
- Additional 738 DRT POE Encounters
- A total of 2,456 migrants are staged under the DRT POE Bridge

Day 7: Tuesday September 14, 2021
- Additional 848 DRT POE Encounters
- A total of 3,171 migrants are staged under the DRT POE Bridge
- Intelligence reports 8 full charter buses arrive in Ciudad Acuna with more on the way

Day 8: Wednesday September 15, 2021
- 7,007 migrants staged under the DRT POE Bridge
- Del Rio Sector requests additional manpower and OA assistance
- Overtime guidance is updated for all USBP manpower

FOUO//LAW ENFORCEMENT SENSITIVE

Day 9: Thursday September 16, 2021
- Encounters increase to over 1,000 per day and rapidly increase
- A total of 10,503 migrants are staged under the DRT POE Bridge
- Initial request to close the Del Rio POE is submitted
- ICE Aviation Operations is directed to resume Haitian flights beginning next week
- OA assistance begins to arrive in mass

Day 10: Friday September 17, 2021
- DRT holding 2,286 in custody / 1,255 unprocessed
- A total of 13,965 migrants are staged under the DRT POE Bridge
- EOC expands for additional OA tracking and transportation coordination
- Del Rio Sector begins transporting migrants to other Sectors for processing assistance
- DHS Volunteer Force reaches high water mark of ▮ personnel
- Bureau of Prisons reaches high water mark of ▮ personnel
- Texas DPS begins relocating up to ▮ troopers to assist in securing the border
- Texas National Guard is activated and begins to arrive in Del Rio
- DRT POE closes at 1600 hours and reroutes traffic to the Eagle Pass POE.
- Eagle Pass POE entry lanes are reduced to one lane of entry for all cross-border traffic
- All Del Rio Sector Checkpoints closed
- SOG Mobile Command Center (MCC) arrives and becomes operational as ICP

Day 11: Saturday September 18, 2021
- A high-water mark of 14,921 migrants staged under the DRT POE bridge
- Outside temperature reaching 106° Fahrenheit.
- Government of Mexico (GOM) increases efforts to deter migrants in Ciudad Acuna
- GOM established 5 active checkpoints on highways leading into the State of Coahuila, Mexico.  All buses with migrants are being turned around.
- ICE ERO increases manpower support to Del Rio Sector

Day 12: Sunday September 19, 2021
- DRT holding 2,789 in custody / 1,986 unprocessed
- A total of 11,941 migrants are staged under the DRT POE bridge
- Texas DPS hits a high-water mark of ▮ personnel
- First 3 Title 42 Expulsion Flights to Haiti begin
- Del Rio Police Department deployed to assist
- Kinney County Sheriff's Office deployed to assist
- Val Verde County Sheriff's Office deployed to assist

Day 13: Monday September 20, 2021
- A total of 10,413 migrants are staged under the DRT POE bridge
- HHS DMAT reaches high water mark of ▮ personnel for medical assistance
- San Antonio Fire Department personnel arrive for medical assistance

- HSI reaches high water mark of ▮ personnel
- OFO begins processing migrants at the Export Lot and Passport Control Area.
- Prosecution accepted for migrant bus event in Sarita, Texas (escape)

Day 14: Tuesday September 21, 2021
- A total of 8,556 migrants are staged under the DRT POE bridge
- ICE ERO reaches high water mark of ▮ personnel
- Expulsion flights continue to Haiti

Day 15: Wednesday September 22, 2021
- DRT holding in custody 2,745 / 1,103 unprocessed
- A total of 4,994 migrants are staged under the DRT POE bridge
- OFO manpower reaches a high-water mark of ▮ officers
- USBP manpower reaches a high-water mark of ▮ agents

Day 16: Thursday September 23, 2021
- DRT holding 3,216 in custody / 1,059 unprocessed
- A total of 3,447 migrants are staged under the DRT POE bridge

Day 17: Friday September 24, 2021
- DRT holding 2,959 in custody / 743 unprocessed
- All migrants moved to processing facilities.  Zero (0) remain under the DRT POE bridge
- Demobilization begins and OA support begins to reduce
- Operational control of DRT POE is transferred back to Del Rio Station PAIC
- Del Rio POE issues a press release for the re-opening of the port at 1600 hours



LIMITED OFFICIAL USE // LAW ENFORCEMENT SENSITIVE

**E. Statistics/ Outcomes based on the information from e3 (All statistics are preliminary, subject to change, and should be considered unofficial)**

    a. Total Encounters (T8 and T42): 19,752
- No Entry Zone Confirmed: 107
- Del Rio Zone ▮: 19,538
- 5 Encounters (Mexican Nationals) are amenable to Title 42 immediate and therefore do not have an assigned Zone in e3

    b. Disposition Breakdown:
- Deportable Apprehensions (T8): 13,926
- Title 42 Delayed (T42): 5,821
- Title 42 Immediate (T42): 5

    c. Demographics:
- Family Unit (FMUA): 10,646
- Single Adults (SAs and FMGs): 9,047
- Unaccompanied Children (UACs): 59

    d. Peak Holding at POE Bridge was 14,921 on 9/18/2021

    e. Peak Day: 09/21/2021 had a total of 2,958 encounters

    f. Highest in custody number 3,216 on 9/23/2021 (DRT only)

    g. Citizenship:
- A total of 58 unique Countries of Citizenship were encountered.
- Top 5 Countries (95% of all encounters):
  1. Haiti: 13,893 (70%)
  2. Chile: 2,146 (11%)
  3. Cuba: 1,210 (6%)
  4. Venezuela: 1,077 (5%)
  5. Brazil: 489 (2%)
- Haitian subjects traveled through multiple countries prior to entering the United States. Some subjects from Chile, Brazil, or other countries may belong to Haitian Family Units but have citizenship in the country in which they were born.
- See Country Breakdown (Annex A) for a full list of the 58 countries and encounters.

    h. Total number processed for Title 42 expulsion to Haiti was 4,435 with 3,440 expelled during the reporting period.
- As of September 30, 2021, 6,085 Haitians have been expelled by aircraft (additional flights are expected)

    i. There were ▮▮▮ Law Enforcement and support personnel who responded to the MME (Refer to Annex B for agency breakdown)

    j. Contracts for 139 porta potties, 28 hand washing stations, and 8 bulk trash bins were used to support the migrants (this was wholly insufficient but also exhausted total regional supplies)

k.  Red Cross provided 17,000 hygiene kits (each kit contained a razor blade that had to be removed prior to issuance)
l.  World Central Kitchen and local contracted vendors provided 14,000 meals daily to migrants on average.
**m.** CBP medical personnel responded to 672 calls for assistance to evaluate and treat migrants.  A total of 425 migrants required advanced care and were referred to HHS DMAT medical personnel.  Migrants were treated for a variety of issues ranging from seizures to respiratory distress.  Medical teams delivered one baby at the POE bridge and 10 others were born at local hospitals.  A total of 16 migrants were transported to local hospitals after being evaluated by DMAT medical personnel.  **<u>There were zero (0) deaths during the MME.</u>**
n.  Border Patrol Search and Rescue teams successfully performed 56 water rescues in the Rio Grande River.  Most water rescues occurred on September 23, 2021 (53 rescues)
o.  ▮ transport buses and ▮ transport vans were surged into Del Rio for assistance. (There actual requirement was ▮ busses, but the requirement could not be met from current government/private sector supplies)
  - ▮ USBP buses
  - ▮ Contract Services buses
  - ▮ United States Marshal Service buses
  - ▮ Bureau of Prison buses
  - ▮ leases buses
  - ▮ Vans
  - ▮ contracted vans

**F.  Law Enforcement and Support Partners**
a.  Air and Marine Operations
b.  Office of Field Operations
c.  Department of Homeland Security Volunteer Force
d.  Immigration and Customs Enforcement, Enforcement and Removal Operations Special Response Team (ERO/SRT)
e.  Homeland Security Investigations Special Response Team (HSI/SRT)
f.  Department of Justice (DOJ) Bureau of Prisons (BOP)
g.  Health and Human Services (HHS)
h.  Texas Department of Public Safety (DPS)
i.  Texas Military Department (Texas National Guard)
j.  Val Verde County Sheriff's Office (VVSO)
k.  City of Del Rio, Mayor's Office
l.  Del Rio Police Department (DRPD)
m.  Texas Parks and Wildlife Department (TPWD)
n.  San Antonio Fire Department (FDSA)
o.  Texas Intrastate Fire Mutual Aid System (TIFMAS)
p.  National Institute of Migration of Mexico (INM)

q.  Mission Border Hope (NGO, Eagle Pass, TX)
r.  Val Verde Border Humanitarian Coalition (NGO, Del Rio, TX)
s.  World Central Kitchen (NGO)

## G. Roles and Responsibilities

The U.S. Border Patrol was the lead Component charged with managing the MME due to statutory authority.  The Incident Command Post (ICP) was stood up on September 16, 2021, and the Incident Commander (IC) was responsible for coordination with supporting federal, state, local partners, and non-governmental organizations.  The IC conducted daily operational briefs with supporting partners for situational awareness as well as task assignments.  Responsibilities were broken down into the support categories of Administrative Support, Intelligence Support, Operational Support, Logistical Support and Medical Support.  The DRT Sector Chief maintained responsibility of controlling the outer perimeter and security patrols within the crowds in the containment zone, which afforded the ability to provide security and immediate medical assistance when necessary



## H. Technical Performance

The current processing pathways in place are adequate for normal migrant and seasonal flow.  However, the sheer volume of the mass migration overwhelmed throughput within CBP, ICE, and HHS.  Personnel, CBP facility holding/detention capacities, and transportation (ground and air) are wholly insufficient to safely manage this type of Mass Migration event. Synchronization between USBP and ERO manifests continues to evolve to decrease processing and transfer of custody time.

## I. Equipment Performance

All equipment performed as expected.  Del Rio Sector and CBP Facilities, Maintenance, and Equipment (FM&E) facilitated many contracts in support of life sustaining functions

for migrants and personnel assisting with operations, security, and support. Equipment not readily available to CBP was contracted through local vendors.

**J. Finance and Resources**

    a. Del Rio Sector Finance Office continues to work through pending acquisitions and reconciliation processes. Actual figures are expected to fluctuate as reimbursements and fiscal year closeouts continue. Estimates are current as of October 7, 2021.

    b. DRT Sector Expenses: █████

    c. OFAM / FM&E Expenses: ██████

    d. PMOD Expenses: █████

    e. SPAD Expenses: ███████

    f. Border Patrol TDY estimate per day █████████████

    g. Overtime cost estimate ████

    h. HHS DMAT cost estimate: ██████

    i. Loyal Source Contract for 13 days: ██████

    j. Sanitation Expenses: █████

    k. Del Rio Sector weekly fuel cost: █████

    l. Ground Transportation: ████

    m. ICE flight cost ████

    n. Department of Defense flight support cost estimate - ████

    o. DHS Volunteer Force █████

    **p. Total DRT / Border Patrol Cost Estimate:** ██████

    q. Additionally, Office of Field Operations (OFO) reported a loss of an average of ██████ daily in estimated duties and fees collected as well as an estimated ██████ lost in import value.

**K. Safety Concerns**

Ensuring the safety of migrants, law enforcement, and support personnel was the first line of effort for the IC.

    a. The Del Rio POE closure mitigated potential risk to all personnel below the bridge.

    b. A Temporary Flight Restriction (TFR) was put in place for the safety and security of the migrants and the numerous law enforcement aviation assets supporting operations. Media and privately owned drones caused a concern and the TFR provided an effective way to mitigate safety issues while allowing operations to continue uninterrupted.

    c. AMO was able to synchronize aviation support and leverage local organic resources to provide ISR capabilities to maintain situational awareness and enhance officer safety on a 24 hour cycle.

    d. Local and national media requests for drone coverage were coordinated through the DRT Strategic Communications Office.

LAW ENFORCEMENT SENSITIVE

e.  CBP EMTs were immediately requested and redirected to support medical needs.

f.  COVID exposure and other contagious disease spread in a mass migration event continues to be a safety issue for law enforcement and the general public. Multiple CBP employees deployed to Del Rio reported testing positive for COVID either during or immediately after their deployment as well as one agent contracting SCABIES infection.

g.  FBI continually monitored information from both anti-law enforcement and anti-immigrant threat groups.  Many National Security issues were mitigated during the mass migration event to include two special interest migrants with national security concerns being apprehended and the interception of a possible violent actor at the Del Rio Port of Entry.

## L.  Communication of Directions, Events and Changes to Plans

Incident command conducted daily scheduled and hasty meetings with all executive leaders throughout the MME.  Communication was adequate to ensure operational expectations and requirements were clear for supporting law enforcement personnel.  On-site visits by Headquarters personnel and White House officials ensured the full scope of the event was understood for maximum support of resources and planned actions.

## M. Strategic Communications

Strategic Communications (StratCom) and CBP Public Affairs (PA) are a critical role to ensure leadership at all levels as well as the media and the general public have the perspective of the agents on the ground managing the MME.  Both DRT StratCom and CBP PA are co-located in Del Rio and synchronizes the messaging.  Del Rio Sector StratCom had been messaging the use of the bridge as a staging location for large groups of migrants arriving since July 31, 2021.  This created an advantage with the Del Rio Mayor and local law enforcement officials as they were already aware of the situation before the mass migration event occurred.  Del Rio Sector had previously posted the use of the bridge and current situation on social media, new articles, distributed photos, and even had Congressional visits at the location before the mass migration event.

On September 13, 2021, numbers staged at the bridge began to rapidly increase.  Due to the previous engagements with the City of Del Rio, resources began to arrive in support of the efforts.  Messaging was put on hold until press conferences could be held that were approved by the Office of Public Affairs (OPA).  The only messaging that StratCom released was the POE closure to the Office of Congressional Affairs (OCA) on September 17, 2021.  Media and community members were the only entities distributing information which caused the Border Patrol to lose control of the messaging.

Chief Ortiz provided a short interview with local KENS 5 on September 17, 2021 and held a formal press conference on September 19, 2021.  The DHS Secretary also held a press conference on September 20, 2021.  Headquarters approval was required for all social media posts.  The early and consistent release of unconstrained accurate messaging

from the Border Patrol would have provided a more holistic view to the public and other law enforcement agencies.

Detailing media support and additional StratCom personnel early in the crisis was needed to manage multiple site visits which overwhelmed the small Del Rio StratCom team.

### N. Environmental Concerns

Summer temperatures reached as high as 106° and weather threatened the safety of the migrants that illegally crossed the border and the law enforcement personnel managing on scene issues.  Additionally, migrants had no water, food, or shelter to protect themselves from the environmental hazards. Medical support was needed for on-site assistance for minor and advanced medical care.  CBP EMTs were the first to surge to the area followed by HHS DMAT personnel for an increased capability and capacity.  Zero fatalities occurred during the MME.

### O. Physiological Impacts (Stress and Fatigue Impact)

The chaotic scene and high level of coordination required long hours of work in a very stressful environment.  Leadership and personnel performing tasks to care for the migrants endured physical and mental exhaustion to ensure solutions were carried through to manage the MME.  Mandated overtime further reduced rest cycles.  The arrival of additional high-level leadership and detailers was needed early in the mass migration event to reduce physical and physiological impacts.  CBP, State and Local law enforcement as well as all support personnel rose to the challenges of the crisis that produced a highly successful resolution of the MME.

### Lessons Learned (issues/ recommendations)

### A. Title 42 Flights Cancelled

   a. On September 8, 2021, DRT Staff was informed by ICE/ERO that Title 42 flights supporting the expulsion of migrants from the United States would be cancelled. USBP was required to reprocess hundreds of migrants under Parole ATD, which created an immediate backlog of nearly over 1000 migrants.  Additionally, it is believed the halt in expulsions was communicated immediately within the Haitian population creating an added pull factor and a rush to cross illegally into the U.S.
   b. In leu of Title 42 expulsion and expected termination of CDC Tile 42 authority, USBP and DHS partners should seek alternative options to immediately remove amenable migrants from custody upon completion of processing.
   c. Advanced warning needs to be given when expulsion flights are cancelled in order to avoid a disruption in throughput due to re-processing requirements.

### B. Del Rio POE Closure

   a. DRT Staff coordinated with DRL Staff for several days prior to the closure of the DRL POE.  On September 16, 2021, USBP formally made the request the close the Del Rio POE due to increasing number of migrants under the bridge and for

LAW ENFORCEMENT SENSITIVE

security and safety concerns. On the evening of September 17, 2021, the Del Rio Field Office closed the Del Rio POE. Additionally, the Eagle Pass POE, the nearest POE (approximately 50 miles away) was reduced to one lane due to OFO manpower supporting the MME. The closures resulted in significant delays for all essential and commercial cross border travel from Ciudad Acuna to Piedras Negras.

b. In future MMEs, POE closures should be considered, discussed, and planned with OFO to be engaged swiftly to address security concerns. The POE closure mitigated risks to the migrants directly below the bridge, POE footprint security, and allowed Mexican authorities an opportunity to disperse migrants staged along the Rio Grande River, thus reducing cross border activity at the Weir Dam and the Boat Ramp crossings.

**C. Migrant Transportation Coordination (Busses)**

a. DHS lacked sufficient transportation and there was no mass transportation coordination mechanism within the Department to relocate the mass of migrants in Del Rio. CBP and ERO transportation capabilities were also limited. DOJ Bureau of Prisons assisted CBP by providing busses and drivers that could drive beyond the time restrictions set forth in current CBP transportation contracts. The Commissioner's Action Group (CAG) assisted with the reallocation of CBP contracted buses and communicated directly with the IC to coordinate additional transportation throughout the Southern United States and to Haiti as well.

b. Establish a scalable, high capacity CBP transportation contract. A scalable contract will allow CBP to increase or redirect contracted transportation assets throughout the nation or throughout established regions to better support sectors when migrant flows develop and or evolve.

c. Establish inter and intra agency MOUs to expand transportation capacity immediately within hours, not days.

d. As the MME emerged, DRT expanded their sector transportation cell from a minimally staffed coordination element that mostly coordinated movement within sector to a fully staffed unit comprised of subject matter experts who coordinated detainee movement from the incident site to CPCs and stations in and outside of DRT.

**D. ERO Manifest Issues**

a. USBP does not have access to ERO systems of record utilized for passenger manifests, nor does ERO have access to USBP's detention module in e3. This lack of access forces USBP agents to manually enter names and dates of birth to generate manifest rosters for ERO. This process is not efficient – the process to generate a manifest for an expulsion flight of 130 passengers requires 8-man hours to produce from DRT personnel alone.

b. USBP and ERO systems must be linked to generate passenger manifests more efficiently, or DHS should have a singular processing system that accommodates

FOUO/LAW ENFORCEMENT SENSITIVE

all Departmental requirements from intake/processing, care and custody, and finally book-out/manifesting. It is also recommended USBP maintain ERO teams imbedded onsite at USBP sectors or temporary holding facilities to expedite manifest coordination.

   c.  CBP and ERO functions in a mass migration event are intertwined with what CBP interdicts.  Greater volumes of people need to be swiftly and effectively moved by ERO to expanded ERO holding capacities across the nation.

## E.  Lead Field Command Construct

   a.  The Lead CBP Field Coordinator (LFC) construct provides an identified CBP leader directed to develop and maintain a regional based preparedness plan that incorporates coordinated planning and leverages the resources and capabilities of all CBP Components within a region.  Although the Del Rio MME warranted unified emergency and humanitarian responses from CBP, DHS, and local law enforcement resources, the LFC construct was not activated.

   b.  It is recommended for CBP leadership to consider at what point during a crisis, such as the Del Rio MME, a LFC activation is warranted.  Trigger points may need to be identified that would assist with LFC activation requirements.

## F.  Detention Capacity

   a.  Del Rio Sector's (DRT) total detention capacity is ███ and has been averaging 500 percent over capacity at any given time which results in excessive time-in-custody and overcrowding at every station, including the soft side processing facility in Eagle Pass.  DRT, along with USBP Sectors along the Southwest Border (SWB), continue to experience overcrowding at levels not seen before.  There is no indication that ICE/ERO detention capacity will ever increase to meet the flow of migrants illegally entering the Unites States through Del Rio Sector or any SWB sector.  ICE/ERO needs to immediately address their shortfall in holding capacity across the nation.

   b.  It is recommended that USBP HQ in collaboration with ICE ERO take ownership of the detention space problem and, with the support of all pertinent DHS partners, embark on a Regional Processing and Detention Centers (RPDC) initiative that will alleviate overcrowding in DRT, LRT, and RGV (specifically) as well as the rest of the SWB.  Multiple RPCD facilities centrally located in the southwest or south-central area of Texas and supported by DHS ICE partners would be responsible for Housing, Processing, and the proper disposition of migrants.  The centers would also serve and the central transportation coordination hub.  Initial holding capacities ████ should be scalable and gauged by current in custody numbers, projections for evolving large migration volume headed to our southwest border, and processing times.

FOUO//LAW ENFORCEMENT SENSITIVE

**G. Designated Areas at IC for Supporting Agencies**

    a. Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP). The ICP in Del Rio was comprised of a Mobile Command Center (MCC) provided by USBP SOG. The MCC was located approximately 100 yards away from the migrant staging area. Although AMO, ERO and Texas DPS had representation in the ICP, no other supporting components or agencies were staged nearby.

    b. When establishing the ICP, the IC, Deputy ICs, and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements. Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.

**H. Regional Mobile Command Centers**

    a. DRT does not possess its own MCC and therefore requested SOG's MCC which arrived on September 17, twenty-four hours after it was requested. Prior to establishing a location for the ICP, the IC staff maintained a mobile posture on foot or in vehicles.

    b. The IC recommends the procurement of sector MCCs to support future incidents. At a minimum, one MCC could support multiple sectors using a regional concept. For example, one centrally located MCC could support incidents from Rio Grande Valley to Del Rio Sector. This should evolve to every sector having an MCC with further ability to create expanded climate-controlled IC tent structures to supplement for multiple LE partner collaboration.

**I. Personnel Lodging**

    a. There were ▮▮▮ law enforcement, first responder, and support personnel (internal and external to DHS) supporting the Del Rio MME. Del Rio, TX has an approximate population of 36,000 and limited lodging options throughout the local and regional economies. Many deployed personnel could not secure lodging within a 55-mile radius and traveled over 100 miles from their lodging sites to the Del Rio POE daily. DRT coordinated with the City of Del Rio to secure 500 retrofitted lodging spaces at the local convention center through contractual services made available to DHS employees.

    b. At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.

**J. Sensitive Compartmented Information Facilities (SCIF)**

    a. The dissemination of relevant information for MMEs is critical for Sectors when preparing for mass migration management, and all other law enforcement operations. Most USBP Sectors do not have the ability to communicate high-

LAW ENFORCEMENT SENSITIVE

level law enforcement and sensitive information from the Intelligence Community (IC) without Sensitive Compartmented Information Facilities (SCIF).

b. All USBP Sectors must have access to SCIFs located at designated sites within a sector or within reasonable commuting distances to receive pertinent IC information or other sensitive law-enforcement information.  Even portable solutions like Yuma Sector's capability would be acceptable access.  DHS needs to invest in SCIF buildouts for all USBP Sectors.

**K.  Department of Defense (DoD) Crisis Response Force (CRF) Support**

a. Even with the combined resources from DHS and DOJ, DRT experienced significant challenges at the onset of the mass migration event (MME).  The most significant challenges were the transportation, housing, feeding, security, and welfare of migrants.

b. Sectors planning for an MME should consider Department of Defense (DoD) Requests for Assistance (RFA) for Crisis Response Force (CRF) elements.  The CRF was an approved duty description for RFA FY21 however, DoD did not approve the CRF for RFA FY22.  A separate or updated RFA is required for this function to be available to CBP during a mass migration event.  A CRF would provide DHS with assistance to enhance force protection, medical, aviation, and engineering capabilities.  More specifically, the CRF should include additional support functions to include CDL Drivers, high-capacity Transportation Vehicles, high-capacity Field Holding Structures, security functions associated with the stand up of high-capacity field holding structures, medical, and high-capacity fixed wing support for moving both CBP personnel and migrants.  DoD RFAs are submitted through the CBP Executive Agent as requirements are identified by CBP. This RFA needs to be approved yearly, all associated actions executable with preset timelines when CBP identifies emerging incidents and continues to evolve with the expanding MME problem sets impacting the country.

c. The speed, number, and frequency of MMEs require DoD pre-coordinated assistance that is immediately responsive and agile.  DHS always looks internally before seeking assistance outside the department.  CBP currently does not have the organic resources to fill the various capability gaps identified during large mass migration events.

## SUMMARY

The seventeen (17) day Mass Migration Event (MME) required a whole of government response to ensure the safety, rapid transport, and efficient processing of migrants from 58 different countries that illegally crossed into the United States and congregated under the Del Rio Port of Entry International Bridge.  The MME was unlike anything that CBP had encountered in its history and at its peak, 14,921 migrants were staged under the bridge.  CBP temporary holding facilities were already over capacity and local resources were inadequate to manage the speed and volume of migrants flowing into the United States.  State, Local, and Community partners

FOUO/LAW ENFORCEMENT SENSITIVE

responded to CBP's support request and exhausted all available resources to assist in managing the event. All Southwest Border Patrol Sectors assisted by sending personnel and resources to Del Rio and hundreds of Border Patrol agents and CBP officers from across the country arrived to assist.

A massive effort to care for the migrant's safety and basic needs was underway as ground and air transportation relocated thousands of migrants to facilities across the Southwest Border for processing. This unprecedented historical response to the MME successfully prevented any loss of life and treated hundreds of migrants in need of medical assistance. The Office of Field Operations played a key role in assisting the Border Patrol and in the closure of the Port of Entry was the turning point that increased safety and gained a greater response from the Government of Mexico and officials in the National Capital Region. The response by the State of Texas and the surge of Department of Public Safety Troopers was monumental.

Intelligence and open-source reporting have indicated that tens of thousands more migrants are traveling to the southern border of the United States that intend to make illegal entry. Transnational Organized Crime (TOC) elements have exploited policy changes and are facilitating the movement of migrants through the Western Hemisphere to the U.S. Southern Border with profit being the primary driving factor. National Security continues to be at greater risk as CBP collapses resources and personnel to manage large groups of migrants. TOC will continue to exploit our border in areas left vulnerable while CBP attends to MME as they occur. Policy changes and increased capacity and capabilities of all components and agencies that have a role in Border Security and thereby National Security, the immigration process, and the detention/adjudication continuum are needed for the humane and efficient management of mass migration.

## ANNEXES:

- Annex A: Country Breakdown of Encounters
- Annex B: Supporting Personnel and Asset List
- Annex C: Photos

End of Report

### ANNEX A: Country Encounter Breakdown (September 8, 2021 to September 24, 2021)

| | Deportable Aprehensions | T42 Delayed | T42 Immediate | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 1 | 0 | 0 | 1 | 0% |
| ANGOLA | 49 | 0 | 0 | 49 | 0% |
| ARGENTINA | 3 | 0 | 0 | 3 | 0% |
| BAHAMAS | 2 | 0 | 0 | 2 | 0% |
| BANGLADESH | 1 | 0 | 0 | 1 | 0% |
| BENIN | 1 | 0 | 0 | 1 | 0% |
| BOLIVIA | 6 | 0 | 0 | 6 | 0% |
| BRAZIL | 375 | 114 | 0 | 489 | 2% |
| BURKINA FASO | 18 | 1 | 0 | 19 | 0% |
| CAMEROON | 14 | 1 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 1,626 | 520 | 0 | 2,146 | 11% |
| COLOMBIA | 62 | 0 | 0 | 62 | 0% |
| CONGO | 11 | 0 | 0 | 11 | 0% |
| COSTA RICA | 6 | 0 | 0 | 6 | 0% |
| CUBA | 1,204 | 6 | 0 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 12 | 0 | 0 | 12 | 0% |
| DOMINICAN REPUBLIC | 54 | 1 | 0 | 55 | 0% |
| ECUADOR | 35 | 12 | 0 | 47 | 0% |
| EL SALVADOR | 4 | 8 | 3 | 15 | 0% |
| EQUATORIAL GUINEA | 2 | 0 | 0 | 2 | 0% |
| ERITREA | 5 | 0 | 0 | 5 | 0% |
| ETHIOPIA | 1 | 0 | 0 | 1 | 0% |
| FRANCE | 2 | 1 | 0 | 3 | 0% |
| FRENCH GUIANA | 5 | 0 | 0 | 5 | 0% |
| GAMBIA | 2 | 0 | 0 | 2 | 0% |
| GHANA | 50 | 0 | 0 | 50 | 0% |
| GUATEMALA | 4 | 9 | 0 | 13 | 0% |
| GUINEA | 23 | 0 | 0 | 23 | 0% |
| GUYANA | 9 | 0 | 0 | 9 | 0% |
| HAITI | 8,878 | 5,015 | 0 | 13,893 | 70% |
| HONDURAS | 22 | 54 | 2 | 78 | 0% |
| MALI | 3 | 0 | 0 | 3 | 0% |
| MAURITANIA | 5 | 0 | 0 | 5 | 0% |
| MEXICO | 31 | 69 | 0 | 100 | 1% |
| NICARAGUA | 169 | 1 | 0 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 9 | 0 | 0 | 9 | 0% |
| PAKISTAN | 5 | 0 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 1 | 0 | 0 | 1 | 0% |
| PERU | 19 | 0 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 1 | 0 | 0 | 1 | 0% |
| SENEGAL | 48 | 2 | 0 | 50 | 0% |
| SIERRA LEONE | 5 | 0 | 0 | 5 | 0% |
| SOMALIA | 4 | 0 | 0 | 4 | 0% |
| SOUTH AFRICA | 4 | 0 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 2 | 0 | 0 | 2 | 0% |
| TOGO | 4 | 0 | 0 | 4 | 0% |
| TURKEY | 1 | 0 | 0 | 1 | 0% |
| URUGUAY | 23 | 0 | 0 | 23 | 0% |
| UZBEKISTAN | 9 | 0 | 0 | 9 | 0% |
| VANUATU | 1 | 0 | 0 | 1 | 0% |
| VENEZUELA | 1,071 | 6 | 0 | 1,077 | 5% |
| **Total** | **13926** | **5821** | **5** | **19752** | |

| | FMUA | Single Adult | UAC | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 0 | 0 | 0 | 1 | 0% |
| ANGOLA | 35 | 12 | 2 | 49 | 0% |
| ARGENTINA | 2 | 1 | 0 | 3 | 0% |
| BAHAMAS | 1 | 1 | 0 | 2 | 0% |
| BANGLADESH | 0 | 1 | 0 | 1 | 0% |
| BENIN | 0 | 1 | 0 | 1 | 0% |
| BOLIVIA | 2 | 4 | 0 | 6 | 0% |
| BRAZIL | 485 | 4 | 0 | 489 | 2% |
| BURKINA FASO | 9 | 10 | 0 | 19 | 0% |
| CAMEROON | 0 | 15 | 0 | 15 | 0% |
| CENTRAL AFRICAN REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| CHAD | 3 | 0 | 0 | 3 | 0% |
| CHILE | 2,144 | 1 | 1 | 2,146 | 11% |
| COLOMBIA | 35 | 27 | 0 | 62 | 0% |
| CONGO | 8 | 3 | 0 | 11 | 0% |
| COSTA RICA | 5 | 1 | 0 | 6 | 0% |
| CUBA | 219 | 988 | 3 | 1,210 | 6% |
| CZECH REPUBLIC | 0 | 2 | 0 | 2 | 0% |
| DEM REP OF THE CONGO | 10 | 1 | 1 | 12 | 0% |
| DOMINICAN REPUBLIC | 25 | 29 | 1 | 55 | 0% |
| ECUADOR | 32 | 15 | 0 | 47 | 0% |
| EL SALVADOR | 8 | 6 | 1 | 15 | 0% |
| EQUATORIAL GUINEA | 0 | 2 | 0 | 2 | 0% |
| ERITREA | 0 | 5 | 0 | 5 | 0% |
| ETHIOPIA | 0 | 1 | 0 | 1 | 0% |
| FRANCE | 3 | 0 | 0 | 3 | 0% |
| FRENCH GUIANA | 4 | 1 | 0 | 5 | 0% |
| GAMBIA | 0 | 2 | 0 | 2 | 0% |
| GHANA | 16 | 34 | 0 | 50 | 0% |
| GUATEMALA | 10 | 3 | 0 | 13 | 0% |
| GUINEA | 3 | 17 | 3 | 23 | 0% |
| GUYANA | 3 | 6 | 0 | 9 | 0% |
| HAITI | 6,805 | 7,063 | 25 | 13,893 | 70% |
| HONDURAS | 45 | 25 | 8 | 78 | 0% |
| MALI | 1 | 2 | 0 | 3 | 0% |
| MAURITANIA | 0 | 5 | 0 | 5 | 0% |
| MEXICO | 27 | 71 | 2 | 100 | 1% |
| NICARAGUA | 69 | 98 | 3 | 170 | 1% |
| NIGER | 3 | 0 | 0 | 3 | 0% |
| NIGERIA | 4 | 5 | 0 | 9 | 0% |
| PAKISTAN | 0 | 5 | 0 | 5 | 0% |
| PANAMA | 12 | 1 | 0 | 13 | 0% |
| PAPUA NEW GUINEA | 0 | 1 | 0 | 1 | 0% |
| PERU | 12 | 7 | 0 | 19 | 0% |
| PHILIPPINES | 1 | 0 | 0 | 1 | 0% |
| SAO TOME AND PRINCIPE | 0 | 1 | 0 | 1 | 0% |
| SENEGAL | 3 | 47 | 0 | 50 | 0% |
| SIERRA LEONE | 4 | 1 | 0 | 5 | 0% |
| SOMALIA | 0 | 4 | 0 | 4 | 0% |
| SOUTH AFRICA | 0 | 4 | 0 | 4 | 0% |
| SURINAME | 1 | 0 | 0 | 1 | 0% |
| TAJIKISTAN | 0 | 2 | 0 | 2 | 0% |
| TOGO | 0 | 4 | 0 | 4 | 0% |
| TURKEY | 0 | 1 | 1 | 1 | 0% |
| URUGUAY | 20 | 2 | 1 | 23 | 0% |
| UZBEKISTAN | 0 | 9 | 0 | 9 | 0% |
| VANUATU | 0 | 1 | 0 | 1 | 0% |
| VENEZUELA | 569 | 500 | 8 | 1,077 | 5% |
| **Total** | **10,646** | **9,047** | **59** | **19,752** | |



Annex C
Photo Annex
Del Rio Mass Migration Event

LAYDOWN at ONSET



BUILDUP



Annex C
Photo Annex
Del Rio Mass Migration Event

FINAL LAYDOWN





DEL RIO ICP / STAGING AREA

Annex C
Photo Annex
Del Rio Mass Migration Event

September 16, 2021



September 17, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 18, 2021



September 19, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 22, 2021



September 22, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event

September 23, 2021



September 24, 2021



Annex C
Photo Annex
Del Rio Mass Migration Event





## Del Rio Mass Migration 09/2021
## Known Costs

| Del Rio Surge Requirements | Projected O&S Costs | O&S Obligations |
|---|---|---|
| HHS Disaster Medical Assistance Team (DMAT) & Caregiver Services | | |
| Transportation Costs | | |
| Operational Costs | | |
| TDY | | |
| Overtime | | |
| Volunteer Force | | |
| AMO Flight Hours | | |
| Soft-Sided Facilities (SSF) and Medical Service Contract (MSC)** | | |
| Del Rio Surge Requirements Total | | |

* FY22 Q1 Projected Costs are not provided specific to Del Rio given they are embedded in the overall SWB costs.

** Soft-Sided Facilities and Medical Service Contract costs are not specific to Del Rio; they are embedded in the overall SWB contracts.

Operational Costs include water, food, Del Rio Civic Center, porta-johns, sanitary products, bridge trash clean-up, consumables for safety and sustainment.

TDY, OT, and Volunteer Force are estimates for Del Rio based on latest obligations; Del Rio Sector costs are embedded within overall SWB costs.

Venezuela AR0010348

**Surge Planning Considerations – Emerging Actions from Del Rio Mass Migration Event**

**September 8, 2021, to September 24, 2021**

Del Rio Sector (DRT) experienced an unprecedented number of migrant apprehensions that placed DRT in a critical state by overwhelming transportation, processing, and detention capacities.  A complex issue quickly became chaotic as Emergency Operations increased and multiple components and outside agencies surged manpower and resources to the area.  The unique situation did not allow for best practices to be implement and emerging practices became the path forward for a crisis event the Border Patrol had not encountered in its history.

**Emerging Practices and Response Considerations:**

- Activate the Region VI or Region IX LFCs
  - ➢ The Lead CBP Field Coordinator (LFC) is directed to develop and maintain a CBP Region Preparedness Plan that incorporates the coordinated plans and leverages the resources and capabilities of each OBP, OFO, and AMO component within the region.
  - ➢ The CBP Region Preparedness Plan will establish a CBP Region Mass Migration Task Force (MMTF).  The MMTF provides the organizational framework to facilitate the assignment of roles to participating agencies, define processes for intra-departmental collaboration, and detect a mass migration event or other contingency operation.
  - ➢ Operation Vigilant Sentry Southwest describes the basic organization and structure by which the MMTF will deploy resources and direct multi-agency operations to address a potential or full-scale mass migration event.
- Plan according to a Mass Casualty Type Event:
  - ➢ Increase capacity and capability for feeding, medical, transportation, and holding.
  - ➢ Contracts were established with local restaurants to prepare meals.  World Central Kitchen brought in for meal prep and distribution.  They also consolidated local meal contracts into one CBP contract.
  - ➢ Sector MSS personnel were used to receive and distribute food and water while uniformed agents continued security and transport operations.
  - ➢ HHS DMAT (Disaster Medical Assistance Team) was activated for increased medical support.  DMAT can provide advanced level care on site.
  - ➢ Bureau of Prison (BOP) bus drivers required deputization to provide support to CBP.  Local CBP OCC was able to conduct the deputization.  Approximately 48-hour lead time was needed to ensure compliance.  The Commissioner's Action Group (CAG) coordinated BOP support.
  - ➢ All SWB Sectors assisted with holding processed and unprocessed migrants to reduce the total numbers in DRT staged at the POE bridge.
  - ➢ Consider all available operational and operational support resources to support MME (ex. MRT, Task Forces, & Checkpoints).
  - ➢ Calls for other federal, state, and local assistance should take place as early as possible.

- <u>Sector Transportation Coordination Cell:</u>
  - ➢ Consider limitations of local ICE/ERO office and contracted transportation services.
  - ➢ Transportation Coordination Cell consists of subject matter experts in flight operations and transportation coordination between sectors and contractual services.
  - ➢ Coordinate detainee transportation with receiving sectors and identify transporting components (CBP Contracted, USBP, DOJ).
  - ➢ Coordinate flight manifest requirements between transporting station/s and ICE/ERO
  - ➢ Coordinate transportation to flight lines
- <u>Personnel Lodging Considerations:</u>
  - ➢ At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.
  - ➢ In instances where lodging through the local economy is not available, communicate with local officials for potential options, such as retrofitting city office space or convention centers.
- <u>Designated Areas at IC for Supporting Agencies</u>
  - ➢ Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP).  The ICP should be comprised of a Mobile Command Center (MCC) located appropriately distanced from the incident site.
  - ➢ When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements.  Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.
- <u>Accountability</u>
  - ➢ Identify an expedient process to account for migrants entering an established containment area.  DRT utilized a ticket system to track the number of migrants making entry into the US.  The same ticket system was also used to prioritize the order of movement of migrants during transport.
- <u>Designated Areas for Medical and NGOs</u>
  - ➢ Identify location/s for Medical sites such as mobile hospitals and decontamination sites.
  - ➢ Consider the location/s for feeding services that affords a practical distance from containment areas.
- <u>Additional Hygiene and Sanitation Assistance</u>
  - ➢ Medical recommendation as per CBP Office of Chief Medical Officer is 1 porta-johns per 32 persons.
  - ➢ Handwashing Stations 1 per 100 persons is recommended.

- ➢ Coordinate for additional bulk water delivery and water buffalo stations for drinking water and personal hygiene.
- ➢ Collapsible plastic water containers passed out upon arrival for individual use will support the CDC recommended amount of water for adequate life sustainment.
- ➢ Decontamination stations for agents: power washers for boots and water/bleach buckets for dunking.
- Ensure an early site visit by CBP HQ Personnel, White House Officials, or Commissioner Action Group
  - ➢ Firsthand visual assessment led to greater support.  News and other official reporting do not provide the same impact as being on site.
  - ➢ Ensured financial assistance at a more rapid approval rate
  - ➢ Once the HQ visit was done, expect +72 hours for funding to start flowing.
- Establish a Regional Communication Representative to assist local PAO
  - ➢ Local PAO was overwhelmed with coordinating congressional and dignitary site visits.
  - ➢ Talking points and briefing memos were generated from the Regional Representative that assisted the Chief and IC
  - ➢ Ensured better coordination with Media and NGOs
  - ➢ Allowed IC personnel to focus on the operational requirements
- New Requests for Assistance (RFA) need to be established with DoD
  - ➢ The Crisis Response Force (CRF) activation would have provided a MP Company, Medical, Close Air Rotary Support, and Engineering Support.  A phone call to the J3 at NORTHCOM is the requirement to activate the CRF.  Note: The CRF was not approved by DoD for RFA FY22
  - ➢ RFAs should include: CDL Drivers, High-Capacity Transportation Vehicles, High-Capacity Field Holding Structures, High-Capacity Fixed Wing Support for moving both CBP personnel and migrants.
- Closure of POEs
  - ➢ Full closure of POE directly affected.  Justification is for the safety of the migrants and the LE officials managing the scene.
  - ➢ Partial closure / lane reduction of adjacent POEs (ex. Eagle Pass POE closed all but one lane for all vehicles entering the US)
  - ➢ Closing the POE was the turning point to gains support from both the GOM as well as the NCR.
  - ➢ Implement a TFR (temporary flight restriction) for security and uninterrupted ISR assistance.
- MOU with the United States Coast Guard for fixed wing air support (National Level)
  - ➢ CONUS flights only.  USBP personnel provided security
- Imbed ERO for assistance requirements / pre-coordination planning
  - ➢ Processing support and expedited file completion
  - ➢ Transportation surge
- Request for additional overtime funding
  - ➢ 6th day was mandated

➢ Option of 2-4 additional hours of OT per shift should be considered instead of a mandated 6th day to avoid burnout.
➢ Consider requests for bi-weekly overtime cap waivers for personnel expected to work beyond Congressionally mandated bi-weekly limits.

# VENEZUELA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

While Venezuela is legally a multiparty, constitutional republic, the authoritarian regime led by Nicolas Maduro usurped control over all branches of government: executive, judicial, legislative, the offices of the prosecutor general and ombudsman, and the electoral institutions.  In December 2020 the Maduro regime organized parliamentary elections that were rigged in favor of the regime, and approximately 60 countries and international bodies publicly declared the elections were neither free nor fair.

Civilian authorities' control over the security forces continued to decline and was deeply politicized.  Increasingly unpopular with citizens, the Maduro regime depended on civilian and military intelligence services, and to a lesser extent, progovernment armed gangs known as *colectivos*, to neutralize political opposition and subdue the population.  The Bolivarian National Guard – a branch of the military that reports to the Ministry of Defense and the Ministry of Interior, Justice, and Peace – is responsible for maintaining public order, guarding the exterior of key government installations and prisons, conducting counternarcotics operations, monitoring borders, and providing law enforcement in remote areas.  The Ministry of Interior, Justice, and Peace controls the National Scientific Criminal, and Investigative Corps, which conducts most criminal investigations, and the Bolivarian National Intelligence Service, which collects intelligence within the country and abroad and is responsible for investigating cases of corruption, subversion, and arms trafficking.  Police include municipal, state, and national police forces.  Mayors and governors oversee municipal and state police forces.  The Bolivarian National Police report to the Ministry of Interior, Justice, and Peace.  The national police largely focused on policing Caracas' Libertador municipality; patrolling Caracas-area highways, railways, and metro system; and protecting diplomatic missions.  The national armed forces patrolled other areas of the country.  There were credible reports that members of security forces committed numerous abuses, and a 2020 United Nations report concluded there were reasonable grounds to believe that Maduro regime authorities and security

Country Reports on Human Rights Practices for 2021
United States Department of State • Bureau of Democracy, Human Rights and Labor

Venezuela AR_000453

forces committed crimes against humanity.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings by regime forces; forced disappearances by the regime; torture and cruel, inhuman, and degrading treatment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention by security forces; political prisoners or detainees; serious problems with independence of the judiciary; unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious restrictions on free expression and media, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; serious restrictions on or harassment of domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence; significant barriers to accessing reproductive health; trafficking in persons; crimes involving violence or threats of violence targeting indigenous persons and lesbian, gay, bisexual, transgender, queer, or intersex persons; and the worst forms of child labor.

The Maduro regime took no effective action to identify, investigate, prosecute, or punish officials who committed human rights abuses or corruption.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that the Maduro regime committed arbitrary or unlawful killings. Although the regime did not release statistics on extrajudicial killings, nongovernmental organizations (NGOs) reported that national, state, and municipal police entities, as well as the armed forces and regime-supported

colectivos, carried out hundreds of such killings during the year.  In September the UN Independent Fact-Finding Mission (FFM) on Venezuela also noted, for the second consecutive year, concern regarding "extrajudicial executions, enforced disappearance, arbitrary detentions, and torture and cruel, inhuman, and degrading treatment, including sexual and gender-based violence."  The FFM report stated "real and perceived opponents or critics" of the Maduro regime increasingly included individuals and organizations that documented, denounced, or attempted to address human rights or social and economic problems in the country.  The FFM concluded that it had reasonable grounds to believe the justice system had played a significant role in the state's repression of government opponents.

The Public Ministry is responsible for initiating judicial investigations of security force abuses.  The Office for Protection of Human Rights in the Public Ministry is responsible for investigating cases involving crimes committed by public officials, particularly security officials.  There was, however, no official information available on the number of public officials prosecuted, convicted, or sentenced to prison for involvement in extrajudicial killings, which, in the case of killings committed by police, were often classified as "resistance to authority."

The Office of the UN High Commissioner for Human Rights (OHCHR) reported a reduction in the rate of killings in the context of security operations or protests, yet the number remained high.  No official data was available, but the NGO Monitor de Victimas reported 87 extrajudicial killings by the National Scientific, Criminal, and Investigative Corps (CICPC), Special Action Forces (FAES), Bolivarian National Guard, and Bolivarian National Police in greater Caracas from June 2020 to March 2021.  The NGOs Venezuelan Education-Action Program on Human Rights (PROVEA) and Fundacion Gumilla documented 825 extrajudicial killings in the context of security operations or protests in the first half of the year.

According to the OHCHR, there were fewer allegations of extrajudicial killings attributed to FAES since September 2020 but more attributed to other forces, including state and municipal police forces and the CICPC.

On January 8-9, members of FAES, the Bolivarian National Police, and other security forces killed at least 24 persons, including two minors, in a police operation in Caracas' La Vega parish.  Investigations by human rights NGOs

determined that at least 14 deaths constituted extrajudicial killings.  Families of victims refuted the argument that the deaths stemmed from "resistance to authority," the charges alleged by the Maduro regime to justify killings committed by security forces.  The families reported security forces entered their homes without a warrant, robbed and killed the victims, and altered the crime scene to suggest a violent confrontation.  Although human rights NGOs and international organizations demanded an investigation, the Maduro regime attorney general and human rights ombudsman did not issue a statement responding to the allegations.  The Inter-American Commission on Human Rights (IACHR) and other international organizations demanded the regime investigate and convict the security forces responsible for the violence.  No arrests had been made as of November regarding any of these killings.

The Maduro regime attorney general reported that from 2017 through February, 1,019 officers were accused of homicide, torture, or inhuman, cruel, or degrading treatment, but only 177 were convicted for such crimes, with no reference to arbitrary killings.  The regime did not release details on officer convictions or other investigations of security officers involved in killings.  The OHCHR found that investigations of human rights violations committed by regime security forces were hampered by the regime's refusal to cooperate, tampering with evidence, judicial delays, and harassment of relatives of victims.  According to NGOs, prosecutors occasionally brought cases against perpetrators of extrajudicial killings, but prosecutions often resulted in light sentences, and convictions were often overturned on appeal.  In many cases the regime appeared to be scapegoating low-level functionaries while allowing high-level officials who issued the illegal orders to continue in their positions.

On March 21, the armed forces launched a military operation against a group of the Revolutionary Armed Forces of Colombia dissidents (FARC-D) in Apure State.  NGOs denounced serious human rights violations committed by Maduro regime security forces during the operation.  PROVEA reported that members of the notoriously violent FAES kidnapped a family of five in El Ripial, executed them, and dressed the bodies with uniforms and weapons to suggest an affiliation with FARC-D.  Local residents reported intense fear of members of the armed forces and noted that FAES officers seized cell phones to monitor communications.

Maduro regime defense minister Vladimir Padrino Lopez criticized coverage of the violence by media outlets and NGOs as the propagation of "falsehoods and terror." The attorney general designated a special commission to investigate human rights violations committed during the conflict, but as of October the investigation had not resulted in charges.

## b. Disappearance

The NGO Foro Penal confirmed incidents of forced disappearances continued and said the forced disappearances were deployed by the state to control and intimidate opponents.  This practice also extended to family members to coerce them to turn in relatives.  In 2019 Directorate General of Military Counterintelligence (DGCIM) officials arrested Hugo Marino Salas, a civilian who had worked as a military contractor, but authorities did not respond to habeas corpus petitions filed by his relatives, and his whereabouts remained unknown as of November, according to OHCHR documentation.  Foro Penal documented 33 disappearances through the end of May, with 14 persons still missing as of November.

The Maduro regime continued to deny requests by the UN Working Group on Enforced or Involuntary Disappearances to visit the country to conduct an investigation.  On September 21, the Working Group requested the regime clarify the status of 20 disappearance cases in a report it presented to the UN Human Rights Council.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, there were credible reports that Maduro-aligned security forces regularly tortured and abused detainees.  As of November the Maduro regime had not revealed information regarding individuals convicted or accused of torturing or abusing detainees.

The Maduro regime-aligned Office of the Human Rights Ombudsman did not publish statistics regarding allegations of torture by police during the year.  Several NGOs detailed cases of widespread torture and "cruel, inhuman, and degrading treatment."  Human rights groups and the FFM reported the regime continued to

influence the attorney general and public defenders to conduct investigations selectively and subjectively. The FFM also found that at times judges ordered pretrial detention in Bolivarian National Intelligence Service (SEBIN) or DGCIM facilities, despite the risk or commission of torture, even when detainees in court rooms denounced, or displayed signs consistent with, torture. No official data were available on investigations, prosecutions, or convictions in cases of alleged torture. Foro Penal maintained that hundreds of cases were not reported to government institutions because victims feared reprisal. The OHCHR found that in some cases doctors issued false or inaccurate medical reports intended to cover up signs of torture.

Media and NGOs reported that beatings and humiliating treatment of suspects during arrests were common and involved various law enforcement agencies and the military controlled by the Maduro regime. Cases of torture and other cruel, inhuman, or degrading treatment or punishment of prisoners were also reported during the year. Regime-aligned authorities reportedly subjected detainees to asphyxiation, electric shock, broken bones, being hung by their limbs, and being forced to spend hours on their knees. Detainees were also subjected to cold temperatures, sensory deprivation, and sleep deprivation; remained handcuffed for extended periods of time; and received death threats to themselves and their relatives. Detainees reported regime-aligned security forces moved them from detention centers to houses and other clandestine locations where abuse took place. Cruel treatment frequently involved Maduro regime authorities denying prisoners medical care and holding them for long periods in solitary confinement. The latter practice was most prevalent with political prisoners. NGOs detailed reports from detainees who were victims of sexual and gender-based violence by security units. The OHCHR noted instances of detainees telling judges they had been tortured or mistreated but then returned to the custody of those allegedly responsible for the reported mistreatment. In some cases the alleged perpetrators were called to testify against the victims in the criminal processes against them. The OHCHR continued to receive allegations of such cases, with no precautionary measures taken by judges or prosecutors to protect the alleged victims or address related due process concerns.

The Casla Institute for the Study of Latin America continued to denounce the

construction of new places of torture utilized by FAES and colectivos. NGOs reported new torture patterns employed by military authorities, including the use of continuous loud noise, metallic spikes applied to the face, cells without ventilation or light, and exposure to the point of hypothermia.

Foro Penal reported multiple instances of political prisoners denied adequate medical treatment while in Maduro regime custody, including political prisoners who died in custody. As of October Foro Penal reported that 50 of the 260 individuals detained on politically motivated grounds were in a critical health situation. The health reports detailed muscle problems, severe fractures, hernias, and high blood pressure. Foro Penal also noted instances in which regime authorities transferred detainees to a medical facility, where instead of receiving treatment, they were interrogated by security officials.

The NGO Una Ventana por la Libertad (UVL) denounced the shooting and killing of Daniela Figueredo by a police officer while in custody in Zamora, Miranda State, on March 13. The officer was allegedly attempting to sexually assault the victim. The NGO also denounced that seven other prisoners in the cell were sexually assaulted and raped by police officers.

Impunity was a significant problem in the security forces. Despite continued reports of police abuse and involvement in crime, particularly in the activities of illegally armed groups, including illegal and arbitrary detentions, extrajudicial killings, kidnappings, and the excessive use of force, the Maduro regime took no effective action to investigate officials who committed human rights abuses. Corruption, inadequate police training and equipment, and insufficient central government funding, particularly for police forces in states and municipalities governed by opposition officials, reduced the effectiveness of the security forces. NGOs noted that many victims did not report violent crimes to police or other regime authorities due to fear of retribution or lack of confidence in police.

On November 3, International Criminal Court chief prosecutor Karim Khan announced a formal investigation into crimes against humanity committed in Venezuela under the Maduro regime and signed a memorandum of understanding "to facilitate cooperation and mutual assistance to advance accountability for atrocity crimes."

## Prison and Detention Center Conditions

Most prison conditions were harsh and life threatening due to gross overcrowding, food shortages, inadequate sanitary conditions and medical care, systemic violence, and poor infrastructure.

**Physical Conditions:**  According to the NGO Venezuelan Observatory for Prisons (OVP), prison capacity was approximately 21,200, while the estimated population was 37,500 inmates as of October.  Conditions were most acute in pretrial detention facilities such as police station jails.  Overcrowding was 177 percent on average across detention facilities, exacerbated by the excessive use of pretrial detention.  Generally unsanitary conditions placed prisoners at increased risk of contracting respiratory diseases such as COVID-19 and tuberculosis, which had become the main cause of death among inmates.  Lack of water and cleaning supplies, inadequate access to recreation and sunlight, and insufficient food also increased the risk of respiratory diseases.  The OVP reported that deaths from malnutrition rose during the year.

Male and female inmates were held together in most prisons.  The law stipulates women in mixed prisons must be held in annexes or separate women's blocks; however, a local NGO reported that male and female prisoners intermingled.  Maduro regime security forces and law enforcement authorities often held minors together with adults, although separate facilities existed.  Because institutions were filled beyond capacity, hundreds of children accused of infractions were confined in juvenile detention centers, where they were reportedly crowded into small, unsanitary cells.

The CICPC and SEBIN detention facilities, police station jails, and detention centers also were overcrowded, causing many police station offices to be converted into makeshift prison cells.  Long delays in court proceedings and prison transfers created a parallel system that held prisoners in police station jails, in some cases for years, although these facilities were designed to hold individuals only for 48 hours.  Prisoners reportedly took turns sleeping on floors and in office chairs, and sanitation facilities were inadequate or nonexistent.  A UVL study of 111 facilities holding pretrial detainees revealed 311 percent overcrowding.  These centers had a designed capacity of 3,702 persons; as of April they housed 11,527 detainees.  The

UVL also found that only 9 percent of facilities provided medical services, one in 26 detention centers had potable water, 16 percent had running water, 22 percent did not have regular trash collection, 63 percent lacked proper restrooms, and 35 percent lacked electricity.  None of the centers had proper infrastructure for persons with disabilities.

The Bolivarian National Guard and the Ministry of Interior, Justice, and Peace have responsibility for prisons' exterior and interior security, respectively.  The Maduro regime failed to provide adequate prison security.  The OVP estimated a staffing gap of 90 percent for prison security personnel, with one guard for every 100 inmates instead of one for every 10, as recommended by international standards.  Armed gangs, known as *pranes*, exercised de facto control within some prisons and used these bases to operate criminal networks on the outside.

According to the OVP, between January and June, 170 prisoners died in prisons and pretrial detention centers.  Some deaths resulted from detention center riots and unsafe prison conditions.  On February 7, a grenade exploded in the Monagas Police Coordination Center, killing two prisoners killed and injuring 26.  Official reports claimed the deaths resulted from a riot, but media reported one of the inmates was handling a grenade, indicating the lax security controls inside prisons.

There are no gender-oriented policies that address female-specific prison needs.  According to the OVP, the female population was 2,327 inmates (6.6 percent of the total population), with only one prison dedicated exclusively to women.  That facility, the Feminine Orientation Institute, with a designed capacity of 350, was overcrowded with 533 women.  Pregnant or lactating women lacked proper facilities, medical assistance, prenatal supplements, and basic hygiene goods.  Women were also victims of sexual violence, abuse, and torture, and they were frequently asked for sexual favors in exchange for food or water.  NGOs reported guards knew and tolerated these abuses and sometimes were also accomplices.

The OVP reported inmate deaths were due to generally unsanitary and unsafe conditions prevalent in prisons, with 73 percent the result of tuberculosis and malnutrition.  The OVP reported that due to inadequate nutrition and lack of potable water, stomach illnesses were common among inmates.  The UVL and OVP reported that in 98 percent of detention facilities, prisoners depended upon

family visits to supply them with food, water, and medicine.  Media reported prison guards regularly stole food that families purchased for inmates and extorted families attempting to bring food into prisons.  The NGO Solidarity Action found prison rules resulted in the isolation of those with HIV/AIDS in "inadequate spaces."  The OVP reported a generalized lack of medical care, drugs, equipment, and physicians for prisoners.  Inmates often received the same pills regardless of their symptoms, and pregnant women lacked adequate facilities for medical attention.

On January 3, indigenous political prisoner Salvador Franco died in regime custody after he was denied court-ordered medical attention due to his declining health.  Franco and 12 other members of the Pemon indigenous community had been in the custody of the Maduro regime since 2019 for their alleged participation in an uprising against the regime.  Human rights NGOs denounced the arbitrary arrest, torture, and violations of due process during the detention of the Pemon political prisoners.  On February 12, the regime released the 12 surviving political prisoners, although they remained subject to restrictions of movement and other unspecified court orders.  (See section 6, Indigenous Peoples for more.)

On August 29, military officer Gabriel Medina died in La Pica Prison, in Monagas State, after being held for three months for allegedly attempting to kidnap regime vice president Diosdado Cabello.  Medina died due to respiratory arrest after requesting but not receiving medical attention for more than 30 days.

**Administration:**  The Maduro regime's Ministry of Penitentiary Services did not respond to requests from the OVP, UVL, other human rights organizations, inmates, or families regarding credible allegations of mistreatment or investigations of the harsh conditions that led to hunger strikes, violent uprisings, and massacres.

Prisoners and detainees generally had access to visitors, including some with overnight privileges, every other week until the COVID-19 pandemic, which led to visit restrictions.  In some cases prison officials harassed or abused visitors.  For political prisoners, prison officials imposed significant restrictions on visits by family and legal representation.  When allowed access, visitors were at times subjected to strip searches.

**Independent Monitoring:**  Human rights observers experienced lengthy delays and restrictions in gaining access to prisons and detention centers.  More than 300 lay members from the Venezuelan Episcopal Conference of the Roman Catholic Church volunteered in 40 prisons.  Although prohibited from formally entering prisons, Catholic laity visited prisoners on family visitation days.  The OHCHR conducted visits of eight detention centers, and the Red Cross was allowed access to three.

## d. Arbitrary Arrest or Detention

The constitution prohibits the arrest or detention of an individual without a judicial order and provides for the accused to remain free while being tried, but judges and prosecutors often disregarded these provisions.  NGOs such as Foro Penal, the Committee for the Families of Victims of February-March 1989, the Institute for Press and Society, Espacio Publico, and PROVEA noted at least 2,000 open cases of arbitrary detentions; however, Maduro regime authorities rarely granted detainees the right to challenge the lawfulness of their detentions in court, even though the right to petition is stipulated under law.  Regime authorities arbitrarily detained individuals, including foreign citizens, for extended periods without criminal charges.

**Arrest Procedures and Treatment of Detainees**

While a warrant is required for an arrest, detention is permitted without an arrest warrant when an individual is apprehended in the act of committing a crime or to secure a suspect or witness during an investigation.  Police often detained individuals and raided their homes without a warrant.  The OHCHR found that in several cases the Maduro regime issued warrants retroactively or forged the warrant's date of issuance.  Foro Penal maintained that detentions were often conducted without a warrant, which were provided retroactively by complicit prosecutors and judges.  Detainees were presented without proper defense before a court days after being disappeared; public defenders were imposed in violation of detainees' right to choose their own lawyers.

The law mandates that detainees be brought before a prosecutor within 12 hours and before a judge within 48 hours to determine the legality of the detention.  The

law also requires that detainees be informed promptly of the charges against them. The regime routinely ignored these requirements.

Although the law provides for bail, release on bail is not afforded to persons charged with certain crimes.  Bail also may be denied if a person is apprehended in the act of committing a crime or if a judge determines the accused may flee or impede the investigation.  The law allows detainees access to counsel and family members, but that requirement was often not met, particularly for political prisoners.  The constitution also provides any detained individual the right to immediate communication with family members and lawyers who, in turn, have the right to know a detainee's whereabouts.  A person accused of a crime may not be detained for longer than the possible minimum sentence for that crime or for longer than two years, whichever is shorter, except in certain circumstances, such as when the defendant is responsible for the delay in the proceedings.  The regime routinely ignored these requirements.

**Arbitrary Arrest:**  Foro Penal reported 266 cases of arbitrary detention between January 1 and August 16.  More than 10 cases were referred to the UN Working Group on Arbitrary Detentions, but the cases received no response from the regime.

On January 12, five members of the UNAIDS-affiliated HIV-prevention NGO Azul Positivo were detained in Zulia State by military police without explanation. They were released on February 10, but the charges they faced, relating to terrorism, terrorism financing, and money laundering, were not dropped.

The Maduro regime arbitrarily detained 15 journalists from January to July, according to a report from the NGO Un Mundo Sin Mordaza.

On July 2, SEBIN officers arrested Javier Tarazona, director of the domestic human rights NGO Fundaredes, two days after he held a news conference alleging links between members of the Maduro regime and illegal armed groups accused of human rights abuses (see section 5).  He and two other Fundaredes workers were detained in Falcon State.  As of November, two had been released, but Tarazona remained in custody without trial and in need of medical treatment (see section 5).

In November 2020 unionized oil worker Guillermo Zarraga was detained in Coro,

Falcon State, without a warrant.  He was later transferred to a military facility, the DGCIM headquarters in Caracas, with no contact with family or lawyers through October.

**Pretrial Detention:**  Pretrial detention remained an egregious problem.  According to the Maduro regime attorney general, there were 22,759 persons in pretrial detention in December 2020, representing more than two-thirds of the total prison population.  According to the UVL, approximately 70 percent of the prison population was in pretrial detention.  The NGO Citizen Observatory of the Penal Justice System attributed trial delays to the shortage of prosecutors and penal judges.  The OHCHR also observed the routine use of pretrial detention without due consideration of alternative measures to detention, even in the context of the COVID-19 pandemic.  The FFM found that judges ordered pretrial detention as routine, rather than an exceptional measure, and without providing sufficient or appropriate justification.

Despite constitutional protections that provide for timely trials, judges reportedly scheduled initial hearings months after the events that led to the detention.  Proceedings were often deferred or suspended when an officer of the court, such as the prosecutor, public defender, or judge, failed to attend.  Prisoners reported to NGOs that a lack of transportation and disorganization in the prison system reduced their access to the courts and contributed to trial delays.

On June 12, Rodney Alvarez, a Ferrominera (state-owned industrial iron firm) union leader, was sentenced to 15 years in prison after waiting in pretrial detention for 10 years.

**Detainee's Ability to Challenge Lawfulness of Detention before a Court:**
Detained individuals may challenge the grounds for their detention, but proceedings were often delayed and hearings postponed, stretching trials for years.  Courts frequently disregarded defendants' presumption of innocence.  Maduro regime authorities often failed to allow detainees to consult with counsel or access their case records when filing challenges.  Some detainees remained on probation or under house arrest indefinitely.

## e. Denial of Fair Public Trial

The constitution provides for an independent judiciary, but the judiciary lacked independence and generally judged in favor of the Maduro regime at all levels. There were credible allegations of corruption and political influence throughout the judiciary.  According to the International Commission of Jurists, 85 percent of judges had provisional appointments and were subject to removal at will by the Supreme Court (TSJ) Judicial Committee.  The IACHR also reported the judiciary operated with opacity, which obfuscated whether judges were appointed according to established procedures or political imperatives.  Provisional and temporary judges, who legally have the same rights and authorities as permanent judges, allegedly were subjected to political influence to make proregime determinations. The OHCHR reported that lower courts received instructions from the TSJ on cases, especially those of a political nature, and observed that TSJ decisions related to the legitimate National Assembly were inconsistent and raised concerns regarding politicization.  Low salaries for judges at all levels increased the risk of corruption.

There was a general lack of transparency and stability in the assignments of district attorneys to cases and a lack of technical criteria for assigning district attorneys to criminal investigations.  These deficiencies hindered the possibility of bringing offenders to justice and resulted in a 90 percent impunity rate for common crimes and a higher percentage of impunity for cases of alleged human rights abuses.

NGOs reported the lack of independence of the judiciary impeded the normal functioning of investigations and judicial processes and highlighted the fragility of norms and procedures.

The September FFM report noted judges interviewed by the OHCHR experienced regular threats of dismissal, or pressure to resign or seek early retirement.  The judges alleged the presidents of the criminal judicial circuits were responsible for many such threats for retaliatory or coercive purposes.  Former judges and prosecutors reported they and their family members had been subjected to threats and intimidation, including phone tapping, surveillance, and monitoring.

**Trial Procedures**

The law provides for the right to a fair and public trial with oral proceedings for all individuals.  By law defendants are considered innocent until proven guilty.  The law requires that detainees be informed promptly of the charges against them.  These requirements were often ignored, according to human rights organizations.  Defendants have the right to consult with an attorney.  According to the Office of the Human Rights Ombudsman, there were approximately 1,300 state and municipal public defenders, but indigent defendants' right to free counsel was often not respected due to attorney shortages.  Free interpretation was often not available to defendants.  Some NGOs provided pro bono counsel to defendants.

Defendants may request no fewer than 30 days and no more than 45 days to prepare their defense.  Defendants have the right to question adverse witnesses and present their own witnesses.  By law defendants may not be compelled to testify or confess guilt.  Defendants and plaintiffs have the right of appeal.

The FFM and OHCHR reports concluded that authorities frequently violated the rights to a fair trial without undue delay and to legal counsel.  Lack of judicial independence allowed authorities to use the judiciary to arbitrarily prosecute opponents and led to rampant impunity of rights violations.

The OHCHR documented cases in which the Maduro regime prevented lawyers from meeting with defendants and denied them confidentiality or access to case files.  The OHCHR also identified that in the context of COVID-19, restrictions were placed on lawyers' visits to detention places and at times used as an additional tool of the state to manipulate trial procedures.  The excessive application of these restrictions impeded the right of prisoners to effectively access legal assistance, communicate freely and privately with counsel, and prepare an adequate defense.

Trial delays were common.  Trials in absentia were permitted in certain circumstances, although opponents of the procedure claimed the constitution prohibits such trials.  The law also states that, in the absence of the defense attorney, a trial may proceed with a public defender whom the court designates.  The law gives judges the discretion to hold trials behind closed doors if a public

trial could "disturb the normal development of the trial."

In eight cases documented by the OHCHR, public defenders were appointed against the defendants' express will, preventing access to legal counsel of their choice.  For example, two foreign citizens who did not speak Spanish were represented, without understanding the proceedings, by a public defender.  The UVL reported that, with the intention of lowering overcrowding in detention centers, 29 prisoners were pressured to accept charges to be released.

The law mandates that municipal courts handle "less serious" crimes, i.e., those carrying maximum penalties of imprisonment of fewer than eight years.  Municipal courts may levy penalties that include three to eight months of community service.  Besides diverting some "less serious" crimes to the municipal courts, this diversion also permits individuals accused of "lesser crimes" to ask the courts to suspend their trials conditionally in exchange for their admission of responsibility, commitment to provide restitution "in a material or symbolic form," such as community service or any other condition imposed by the court.

The law provides that trials for military personnel charged with human rights abuses after 1999 be held in civilian rather than military courts.  In addition, under the organic code of military justice, an individual may be tried in the military justice system for "insulting, offending, or disparaging the national armed forces or any related entities."  NGOs and the IACHR expressed concern regarding the Maduro regime's practice of trying civilians under the military justice system for protests and other actions not under military jurisdiction.  According to Foro Penal, since 2014 military courts had processed 872 civilians.

**Political Prisoners and Detainees**

The Maduro regime used the judiciary to intimidate and prosecute individuals critical of regime policies or actions.  Foro Penal reported 260 political prisoners in regime custody as of October, 50 of whom were in a critical state of health.  Since 2014, a total of 15,761 persons had been detained for political reasons, many without knowing the charges against them or having access to legal defense.  Foro Penal recorded more than 9,400 persons remained subject to arbitrary criminal proceedings for political reasons under precautionary measures.  The regime

routinely held political prisoners in SEBIN installations or the Ramo Verde military prison without an explanation of why they were not being held in civilian detention facilities.

According to Foro Penal, the state security forces that detained the most political prisoners were DGCIM, FAES, municipal police, the Bolivarian National Guard, and CICPC.

On February 25, legitimate National Assembly deputy Gilberto Sojo was arbitrarily imprisoned by FAES agents without a warrant or an evident excuse. Sojo, previously a victim of the Maduro regime's arbitrary detentions, was released on September 3.

In July legitimate National Assembly deputy Freddy Guevara livestreamed his detention without a warrant by SEBIN officers on one of the main highways in eastern Caracas.  Regime attorney general Tarek William Saab publicly accused Guevara of maintaining links with Colombian paramilitary groups and announced without providing evidence that Guevara was to be prosecuted for terrorism, assault on the constitutional order, treason against the homeland, and conspiracy to commit a crime.  Guevara's lawyers were not allowed access to him, in violation of Guevara's right to defense and due process.  Guevara remained imprisoned in the SEBIN headquarters of El Helicoide in Caracas until August 15, when he was released with the condition of reporting to a court every 30 days.

As of November political leader and journalist Roland Carreno, arrested in October 2020, remained arbitrarily detained on grounds of conspiracy, weapons smuggling, and terrorism financing, despite facing serious health problems.

The six executives of the state-owned petroleum company's (PDVSA) U.S.-based CITGO remained in prison, serving eight- to 13-year sentences delivered in a November 2020 trial marred by a lack of legal due process and based on politically motivated charges.  Since their arrest in 2017, they had been granted house arrest twice but subsequently reimprisoned each time, most recently in October.  Family members expressed concern regarding the deteriorating health of some of the men and the potential for contracting COVID-19 in prison.

Political prisoner and former Chavez defense minister Raul Isaias Baduel died in

regime custody on October 12, the third political prisoner death of the year and 10th since 2014.  Regime attorney general Tarek William Saab tweeted that Baduel died of complications from COVID, but Baduel's family denied he was ill and claimed he was killed.  Baduel, also a former general in the Venezuelan Armed Forces, was jailed from 2009 to 2015 on politically motivated charges after he broke with Chavez and again from 2017 until his death.  A lawyer for the family told press that Baduel's son, also detained by the regime, was threatened with torture in an attempt to force him to declare that his father had died of COVID. Other family members and the lawyer were also threatened.  The OHCHR called for an independent investigation to determine the cause of death.

**Misuse of International Law-enforcement Tools:**  There were credible reports that the Maduro regime attempted to misuse international law enforcement tools, including Interpol Red Notices, for politically motivated purposes as a reprisal against specific individuals located outside the country.  On May 11, the TSJ issued an extradition request for Leopoldo Lopez, former political prisoner and opposition leader.  The regime sentenced Lopez in absentia to 14 years' imprisonment for allegedly instigating violence during protests in 2014.

## Civil Judicial Procedures and Remedies

While there are separate civil courts that permit citizens to file lawsuits seeking damages, there are no procedures for individuals or organizations to seek civil remedies for human rights abuses.

## Property Seizure and Restitution

Widely circulated social media posts documented army soldiers threatening civilians, looting their homes, and destroying property.  More than 5,000 Venezuelans and Colombian refugees fled across the border to Colombia amid widespread panic and distrust.

# f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution provides for the inviolability of the home and personal privacy, but the Maduro regime generally failed to respect these prohibitions.  In many

cases, particularly regarding the political opposition, regime-aligned authorities searched homes without judicial or other appropriate authorization, seized property without due process, and interfered in personal communications. FAES and other security forces regularly conducted both politically motivated and indiscriminate household raids. Throughout the year media reports documented raids by security forces on the homes of opposition party politicians, their relatives, and members of independent media. NGO offices were also subject to arbitrary raids and their work equipment seized.

State surveillance remained rampant, including through the assistance of telecom regulator the National Telecommunications Commission (CONATEL) and state-run telecommunications provider CANTV. Furthermore, telecommunications companies reportedly assisted the regime in monitoring communications of political opponents. Technical attacks against media outlets appeared to be linked to the armed forces.

China, through its telecommunications corporation ZTE (Zhongxing Telecommunication Equipment Corporation), provided the Maduro regime with technology to monitor citizens' social, political, and economic behavior through an identity card called *carnet de la patria* (homeland card). To force citizens to comply, the regime made it obligatory to present the card to obtain social services, including pensions, medicine, food baskets, subsidized fuel, and in some instances COVID vaccinations. Citizens essentially had no choice but to obtain and use the card despite the known tracking methods. Chinese companies such as Huawei and the China National Electronics Import-Export Company also supported, financially and technologically, these surveillance methods.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression for the Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press and other media, but the combination of laws and regulations governing libel, slander, and media content as well as legal harassment, physical intimidation of individuals and media, and executive influence on the judiciary resulted in

significant repression of these freedoms.  National and international groups, such as the IACHR, Human Rights Watch, Freedom House, Inter American Press Association, Reporters without Borders, and Committee to Protect Journalists, condemned Maduro regime efforts throughout the year to restrict press freedom and create a climate of fear and self-censorship.

**Freedom of Expression:**  The law makes conviction of insulting the president punishable by six to 30 months in prison without bail, with lesser penalties for insulting lower-ranking officials.  The Maduro regime's 2017 "Constitutional Law against Hate, for Political Coexistence and Tolerance" stipulates prison sentences of up to 20 years for violations.  While the regime stated the purpose of the law was to "promote peace and tolerance," NGOs observed the vaguely written law could be used to silence political parties, activists, and civil society leaders as well as media outlets and journalists.  Conviction of exposing another person to public contempt or hatred is punishable by prison sentences of one to three years and fines.  In August the OHCHR reported that at least five journalists were arrested, or threatened with arrest, on charges of "incitement to hatred" under this law and that two individuals were charged with incitement to hatred after posting content critical of the regime on social media or a messaging application.

The NGO Espacio Publico reported 150 violations of freedom of expression in 74 cases, including 135 arrests, between January and April.  The NGO Institute of Press and Society reported 213 violations of freedom of expression in 126 cases between January and June.

The Maduro regime threatened, harassed, and arrested journalists, opposition politicians, and health-care workers for speaking out regarding COVID-19 and the response to the pandemic.  Espacio Publico documented at least 90 arrests from March 2020 to January 2021 for COVID-19 coverage, of which 40 percent were journalists and reporters.

**Freedom of Expression for Members of the Press and Other Media, Including Online Media:**  The law provides that inaccurate reporting deemed to disturb the public peace is punishable by prison terms of two to five years.  The requirement that media disseminate only "true" information was undefined and open to politically motivated interpretation.

The law prohibits all media from disseminating messages that incite or promote hate or intolerance for religious, political, gender-related, racial, or xenophobic reasons; incite, promote, or condone criminal acts; constitute war propaganda; foment anxiety in the population or affect public order; do not recognize legitimate government authorities; incite homicide; or incite or promote disobedience of the established legal order.  Penalties range from fines to the revocation of licenses.  The threat of nonrenewal of operating licenses systematically led to self-censorship on the part of several media outlets.

Despite such laws, Maduro and the regime-aligned United Socialist Party of Venezuela (PSUV) used the nearly 600 regime-owned or -controlled media outlets to insult and intimidate the political opposition throughout the year.  The illegitimate National Assembly president Diosdado Cabello continued to use his weekly television program to denounce individual journalists and media outlets.

The law declares telecommunications a "public interest service," thereby giving the government authority to regulate the content and structure of radio, television, and audiovisual production sectors.  The law provides that the government may suspend or revoke licenses when it judges such actions necessary in the interests of the nation, public order, or security.  The law empowers the government to impose heavy fines and cancel broadcasts for violations of its norms; CONATEL oversees the law's application.

The Maduro regime continued legal actions against high-profile independent media outlets *TalCual*, *El Nacional*, *El Nuevo Pais*, *La Patilla*, *El Pitazo*, and *Efecto Cocuyo*.

On January 11, CONATEL and the national tax agency SENIAT conducted a raid at the offices of independent broadcaster Venezolanos por la Informacion (VPI TV), seizing equipment and ordering the station to cease operations.  Observers said the Maduro regime used the controversial antihate law to justify a shutdown of VPI for its reporting on corruption and gasoline shortages.  Also on January 11, SENIAT forced the closure of the newspaper *Diario Panorama* for alleged tax arrears, while digital news sites *Efecto Cucuyo* and *TalCual* reported they had suffered a cyberattack.

Maduro regime-owned and -influenced media provided almost continuous proregime programming.  In addition, private and public radio and television stations were required to transmit mandatory nationwide broadcasts throughout the year, including a daily 15-minute news broadcast that provided reports and summaries of regime activities.  Media reported the Bolivarian National Guard regularly barred journalists from covering legitimate National Assembly debates and activities.  The country's online independent newspapers were frequently blocked by regime-owned internet service provider CANTV.  NGOs noted that CANTV also routinely blocked commercial streaming and web searches during Interim President Guaido's speeches and during weekly National Assembly sessions; private internet companies did the same under pressure from CONATEL.

Several times Nicolas Maduro instructed the illegitimate National Assembly to include "very strict regulations on social networks" in reforms made to the Law of Social Responsibility in Radio, Television, and Electronic Media (Resorte Law). The illegitimate National Assembly also contemplated a chapter to regulate social media.

NGOs identified threats and intimidation to social networks users for publishing content critical of the regime on Facebook, Twitter, and WhatsApp.  The online media monitor ProBox noted the regime used bots to flood social media platforms such as Twitter with proregime information.  ProBox estimated that more than 60 percent of progovernment messages on Twitter appeared to originate from bots. There is no legislation to protect data.

Media and NGOs reported increased repression and intimidation of journalists following the emergence of COVID-19, with restrictions and persecutions intensifying during the year.  Despite a specific exception permitting travel for members of the press during quarantine, the Maduro regime limited the freedom of movement of journalists.

The law requires practicing journalists to have journalism degrees and be members of the National College of Journalists, and it prescribes jail terms of three to six months for those practicing the profession illegally.  These requirements were waived for foreigners and opinion columnists.

**Violence and Harassment:**  Senior national and state leaders of the Maduro regime continued to harass and intimidate privately owned and opposition-oriented television stations, media outlets, and journalists by using threats, property seizures, administrative and criminal investigations, and prosecutions.  Un Mundo Sin Mordaza reported a total of 63 acts of harassment, threats, and aggressions against journalists and press workers during the first half of the year.

Espacio Publico registered 12 arbitrary detentions for online publication workers through the end of August, most of them NGO activists, public workers, health workers, human rights NGOs, individuals, and journalists.  In at least five cases, the antihate law was cited in the accusations.

On February 25, a SEBIN commission visited the home of journalist Luisana Suarez, a reporter for a radio station in Cojedes, to discuss a publication made on social networks.  The officers assured Suarez's relatives that they wanted to discuss the information published on her Facebook profile about the lack of contraceptives in the outpatient clinic in the Anzoategui municipality of the region. Concerned that Suarez could be arbitrarily detained, relatives and neighbors of the reporter posted themselves at the house, and after several minutes the officials left. Suarez reported police forces had visited her residence without apparent cause on previous occasions.

On March 31, Kevin Arteaga from the news outlet *El Carabobeno* was conducting interviews at a gasoline station in Valencia, Carabobo, when he was intercepted by two members of the national police.  He was forced to delete information from his cell phone, and a criminal investigation was opened against him.

Also in March, Milagros Mata Gil, a 70-year-old writer, was arrested and charged with incitement to hatred for a satirical message she published on WhatsApp and Facebook.  Juan Manuel Munoz, another writer, was also detained.  Mata Gil's message gave an account of a double wedding carried out in the northeastern city of El Tigre despite strict government quarantine requirements.  Maduro regime attorney general Tarek William Saab was present.  After 24 hours authorities released both writers under precautionary measures.

In August the National Union of Press Workers said the regime shadow governor

in Merida State, Jehyson Guzman, launched attacks on independent media in the area who attempted to cover the Maduro regime's response to major flooding.

**Censorship or Content Restrictions:**  NGOs noted the Maduro regime's preference for using legal proceedings, financial sanctions, and administrative actions against unfavorable news outlets instead of shutting them down outright. Members of the independent media and human rights activists who had limited or ceased their activities said they regularly engaged in self-censorship due to fear of regime reprisals.  This resulted in many journalists posting articles to their personal blogs and websites instead of publishing them in traditional media.

The regime also exercised control over content through licensing and broadcasting requirements.  CONATEL acted selectively on applications from private radio and television broadcasters for renewal of their broadcast frequencies.  According to NGO reports, approximately 80 percent of radio stations throughout the country were in "illegal" status due to CONATEL's not having renewed licenses for most radio stations since 2007, a tool used to intimidate and censor.

CONATEL censured, closed, and seized equipment of seven radio stations, while four others stopped broadcasting their programs after administrative processes were applied against them.

According to the local journalists' union, print news outlets closed due to the Maduro regime's economic policies, which made it difficult for independent newspapers to access foreign currency, preventing many from purchasing critical supplies and equipment necessary for day-to-day business operations.  In January, 16 print outlets suspended circulation, generally for lack of supplies, and at least 200 media outlets were blocked, censored, or closed by May.

The Maduro regime controlled a large portion of the country's businesses and paid for advertising only with regime-owned or regime-friendly media.

According to Espacio Publico, citizens in 10 states lived in "media deserts" or "silenced zones" – areas that had no access to print, television, radio, or digital media due to censorship, forced closures of television and radio stations, and reprisals against journalists.  Access to information was most heavily restricted in border territories and indigenous communities, and these areas also faced greater

internet restrictions.

**Libel/Slander Laws:**  Regime-aligned officials engaged in reprisals against media organizations and individuals who publicly expressed criticism of Maduro or regime policy.

On May 14, the Maduro regime expropriated *El Nacional*'s headquarters in service of a foreclosure after the TSJ ruled the newspaper committed libel when reporting facts about regime corruption in 2015.  A judge accompanied national guard units during the May 14 raid of *El Nacional*'s 162,000-square-foot property.  On April 21, the IACHR and its Office of the Special Rapporteur for Freedom of Expression (RELE) expressed concern regarding the TSJ decision that ordered *El Nacional* to pay 13.4 million dollars for moral damages to Diosdado Cabello.  In a lawsuit first presented in 2015, Diosdado Cabello sued *El Nacional* because it had republished an article of the Spanish newspaper *ABC* that linked Cabello to known drug traffickers.  The IACHR and RELE called on the state to refrain from using direct or indirect pressure mechanisms to silence journalistic work, and they called for the Maduro regime to remove all disproportionate restrictions that prevent media from doing their job.

**National Security:**  The law allows the government to suspend or revoke licenses when it determines such actions necessary in the interests of public order or security.  The Maduro regime exercised control over the press through a public entity, the Strategic Center for Security and Protection of the Homeland, which is similar to the governmental entity Center for National Situational Studies.  The two entities have similar mandates and are responsible for "compiling, processing, analyzing, and classifying" both regime-released and other public information with the objective of "protecting the interests and objectives of the state."

During the year Maduro renewed several times the "state of alarm" issued in March 2020, citing the COVID-19 pandemic, and granted himself the power to restrict rights otherwise provided for in the constitution.  The 60-day emergency decree, which by law is renewable only once and requires National Assembly endorsement to be effective, allows the president to block any action he deems could "undermine national security" or could "obstruct the continuity of the implementation of economic measures for the urgent reactivation of the national

Venezuela AR_000477

economy." The regime also threatened, harassed, and arrested journalists, opposition politicians, and health-care workers for speaking out on COVID-19 and the response to the pandemic.

The regime continuously used the law against organized crime and the financing of terrorism to implicate and accuse political opponents of committing crimes.

**Nongovernmental Impact:** Widespread violence in the country, often encouraged or left undeterred by the Maduro regime, made it difficult to determine whether attacks on journalists resulted from common criminal activity or whether criminals or others targeted media members.

## Internet Freedom

The Maduro regime restricted or disrupted access to the internet and censored online content. The regime exercised broad control over the internet through CONATEL. The China National Electronics Import-Export Company provided the regime with cyber support, technical experts, and a suite of software and hardware that was a commercial version of China's internet regulator Great Firewall to maintain online censorship, control information, and prevent the internal dissemination of content deemed undesirable by political leadership. According to media reports, users of social networks accused CONATEL of monitoring their online activity and passing identifying information to regime intelligence agencies, such as SEBIN.

The 2020 *Freedom on the Net* report noted Maduro regime authorities' efforts to block a web page created by the president of the National Assembly, Juan Guaido, to provide information on the pandemic and the temporary arrest of several journalists who reported on the virus. Freedom House noted in its 2021 *Freedom on the Net* report that detentions, imprisonment, legal, and extralegal restrictions on certain forms of online speech led to widespread self-censorship by journalists and media outlets.

The law puts the burden of filtering prohibited electronic messages on service providers; it allows CONATEL to order service providers to block access to websites that violate these norms and sanctions service providers with fines for distributing prohibited messages. As of July the Maduro regime blocked 13

websites and social media platforms.  The regime used both direct means and administrative sanctions to cause HTTP (Hypertext Transfer Protocol) or DNS (Domain Name System) blocks by CANTV or indirect means through cyberattacks or false reports on social networks that led to the closure of the accounts of the related users.

According to the Institute for Press and Society and the VE Sin Filtro (VE without Filter) internet monitoring project sponsored by internet freedom watchdog Venezuela Inteligente, the regime blocked websites during events of public interest.  Social media and video streaming sites such as Facebook, Twitter, YouTube, and Instagram were blocked during live speeches made by Interim President Guaido throughout the year.  Espacio Publico registered through July four episodes of internet manipulation and blocking that affected the websites of nine journalists, two media outlets, one NGO, and one interim government website, TelesurLibre.

Regime-controlled intelligence agencies, which lacked independent oversight, conducted surveillance for political purposes.  Courts relied on evidence obtained from anonymous *patriotas cooperantes* (cooperating patriots) to harass perceived opponents of the Maduro regime, and senior regime-aligned officials used personal information gathered by patriotas cooperantes to intimidate regime critics and human rights defenders.  Users were arrested and criminally accused of actions such as tweeting information publicly available on webpages.

In December 2020 VE Sin Filtro identified a series of blocks against servers used by the Voatz app, a digital voting tool implemented as one of the participation mechanisms for the Consulta Popular (People's Consultation) organized and promoted by the National Assembly as a foil to the December 2020 fraudulent parliamentary elections, which were boycotted by the opposition and not recognized by the opposition-controlled National Assembly.  The IP (Internet Protocol) blocks carried out by CANTV partially affected some functions of the Voatz app.  Mobile telephone services providers in the country appeared to have blocked the SMS (Short Message Service) messages used by Voatz to verify users' telephone numbers.

On May 24, internet providers blocked the *TeleSur Libre* website, a news outlet

source supported by the interim government of Juan Guaido.  VE Sin Filtro reported the Maduro regime launched multiple phishing attacks against users of platforms organized by Juan Guaido.

On May 29, VE Sin Filtro documented a significant increase in internet blockages against media outlets, including measures that affected digital news outlets *Caraota Digital*, *Alberto News*, and *La Patilla*, the most visited news web portal in the country.  They also observed the blockage of at least two alternative domains of the news portal *Caraota Digital* used to evade censorship.

State-controlled CANTV is the leading internet provider in the country with 70 percent of subscribers.  CANTV implemented a blocking HTTP/HTTPS that required the use of a VPN (virtual private network) to evade censorship.  Other internet providers Inter, Movistar, Digitel, Supercable, and NetUno implemented a DNS block, which could be circumvented by simply changing the DNS of the devices.

**Academic Freedom and Cultural Events**

There were no substantiated reports of Maduro regime restrictions on cultural events, but the regime imposed restrictions on academic freedom.  Aula Abierta (Open Classroom), a local human rights NGO focused on academic freedom, reported the regime retaliated against opposition-oriented autonomous universities by denying them sufficient funding and failing to adjust budgetary allocations to inflation.  During the year several of the country's most important universities operated with deficits averaging 97 percent.

According to Aula Abierta, there were 151 security incidents, including fires, thefts, threats, and violence, directed by unidentified perpetrators towards university students, professors, and school property.

The Maduro regime continued to increase its control over local universities, including the admissions process.  In March the University Sector Planning Office ordered the transfer of the payroll system of the entire university community to the Maduro regime's Sistema Patria (Homeland System), eroding the financial autonomy of universities and raising fears of political recrimination among teachers and staff.  The Maduro regime continued its practice of educational

financial incentives for holders of the carnet de la patria.  NGOs and university students denounced the use of the card as a discriminatory policy that politicized the issuance of scholarships and restricted academic freedom.

## b. Freedoms of Peaceful Assembly and Association

The Maduro regime restricted freedoms of peaceful assembly and association.

### Freedom of Peaceful Assembly

The constitution provides for the right of peaceful assembly, but the Maduro regime generally repressed or suspended it.  A 2015 public decree regulates the right to assembly and grants the armed forces authority to control public order. Human rights groups continued to criticize the law as enabling the regime to charge protesters with serious crimes for participating in peaceful demonstrations. Ambiguous language in the law also allows the Maduro regime to criminalize organizations and persons critical of it.  Protests and marches require advance authorization from the regime and are forbidden within designated "security zones."  In addition NGOs and opposition deputies expressed concern that the illegitimate Maduro regime used quarantine restrictions as a form of social control to criminalize protests and silence critics.

Citizens organized sporadic and often spontaneous small-scale protests throughout the year to demand basic goods and services such as water, gasoline, electricity, and access to vaccines.  Workers also periodically demonstrated to demand a living wage.  Some political parties and candidates staged small-scale demonstrations to protest moves to deny their registration for November's regional elections.  The Venezuelan Observatory of Social Conflict documented 3,393 protests in the first six months of the year, 59 of which were repressed by regime-aligned security forces and armed groups.  The observatory documented 25 detentions, seven injured, and one death during protests as of September.

In at least three cases documented by the OHCHR, armed colectivos participated in the repression of demonstrations.  The OHCHR also documented the killing of an 18-year-old fisherman from Toas Island, Zulia State, who was allegedly shot by Coast Guard officers on July 16 in a protest regarding access to fuel.

The OHCHR documented the detention of 34 persons in the context of protests and was informed of dozens of protesters who went into hiding or left the country due to fear of reprisals.

On July 21, Ada Macuare and Jhoana Paredes, nurses at the Ali Romero Hospital, were detained by police officers in Barcelona, Anzoategui State, after protesting for better working conditions, wages, and COVID-19 precautions.  Paredes was released, but the state brought charges of terrorism and incitement to hatred against Macuare.  Macuare was released in August without charges but with a requirement to report to court every 30 days.

On October 4, two members of the Tachira state police were sentenced to 27 and 21 years in prison, respectively, for the 2019 shooting of protester Rufo Chacon, blinding Chacon as he demonstrated in the city of San Cristobal for access to cooking gas.

**Freedom of Association**

The constitution provides for freedom of association and freedom from political discrimination, but the Maduro regime did not respect these rights.  Although professional and academic associations generally operated without interference, a number of associations complained that the TSJ and the National Electoral Council (CNE), which is responsible for convoking all elections and establishing electoral dates and procedures, interfered with their attempts to hold internal elections.

According to Aula Abierta, 73 percent of university teacher association group boards had expired, but registration obstacles imposed by proregime actors at the CNE prevented them from electing new board members.

The Maduro regime created the Association of Bolivarian Rectors to supplant the Venezuelan Association of University Rectors to exercise greater control over nonautonomous universities.  Likewise, in the student sphere, the regime promoted the National Federation of Students as a parallel creation to the Federation of University Centers, and in the administrative sphere, the regime developed the Federation of University Workers of Venezuela to supplant the Federation of Teachers Associations University.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https://www.state.gov/international-religious-freedom-reports/.

## d. Freedom of Movement and the Right to Leave the Country

The constitution provides for freedom of internal movement, foreign travel,
emigration, and repatriation; however, the Maduro regime did not respect these
rights.

**In-country Movement:**  The Maduro regime restricted the movement of certain
opposition leaders, preventing them from traveling on regime-controlled airlines
and refusing to allow them to board some domestic flights.

The "state of alarm," declared by Maduro in March 2020 to limit the spread of
COVID-19, restricted freedom of movement and suspended social and business
activities, and it was extended several times during the year.  The decree
authorized regime-aligned security forces broad latitude and discretion to enforce
the decree and conduct investigations.  Media reported the Maduro regime
employed the armed forces, FAES, and armed colectivos to enforce quarantine
measures.  PROVEA documented an excessive use of force in implementing the
lockdown, including arbitrary detentions, beatings, torture, and humiliating
treatment for individuals allegedly failing to comply with quarantine measures.
NGOs documented police and military forces utilizing the movement restrictions
as a premise to solicit bribes from citizens at checkpoints.  In November 2020 the
Maduro regime reopened airports for limited international travel, beginning with
travel to Mexico, the Dominican Republic, Turkey, and Iran and later expanding in
June to Russia, Bolivia, and Panama.

Due to continued border closures through much of the year, Venezuelans traveling
into and out of the country had no choice but to use informal border crossings that
largely were controlled by illegal armed groups.  While no official statistics were
available, activists and NGOs reported that citizens utilizing the crossings faced
significant risks, such as gender-based violence and human trafficking, including
forced labor, sexual servitude, and the forced recruitment of children into armed

conflict at the hands of criminal groups. Human traffickers used sea routes to transport victims to nearby countries, and migrant smugglers also sent refugees and migrants on dangerous sea journeys. On April 21, at least 10 intending migrants were killed when their boat sank on its way to Trinidad and Tobago in the Boca de Serpiente sector, Delta Amacuro State; another 12 individuals survived and seven were missing.

Individuals were often subjected to debt bondage or forced to pay a form of taxation at the informal border crossing to illegal armed groups, increasing the vulnerability of migrants to labor exploitation, harassment, sexual violence, and human trafficking, including forced labor and sex trafficking. Many were vulnerable to recruitment, sometimes forced, into drug trafficking rings or illegal and other armed groups.

See the Department of State's annual Trafficking in Persons Report at https://www.state.gov/trafficking in-persons-report/.

**Foreign Travel:** Obtaining a passport remained difficult during the year. Prospective applicants waited overnight in lines and in some instances did not receive passports after years of delays. The regime repeatedly seized passports from journalists, members of the opposition, and National Assembly deputies at ports of entry without explanation as they attempted to depart the country.

## e. Status and Treatment of Internally Displaced Persons

The NGOs PROVEA and COFAVIC documented cases of internal displacement of families fleeing violent gang clashes in the communities of La Vega and La Cota 905 in western Caracas. Clashes between military forces and nonstate armed groups in Apure caused hundreds of civilians to be displaced to neighboring states and municipalities.

## f. Protection of Refugees

The Maduro regime did not cooperate with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of concern.

**Access to Asylum:**  The law provides for the granting of asylum or refugee status, and there is an established system for providing protection to refugees, although delays in the system allowed for abuse at the hands of private individuals and representatives of the state.

**Abuse of Migrants and Refugees:**  With the refugee status determination process centralized at the National Refugee Commission (CONARE) headquarters in Caracas, asylum seekers often waited years to obtain a final decision.  During this period they had to continue renewing their documentation every three months to stay in the country and avoid arrest and deportation.  While traveling to the commission's headquarters, particularly vulnerable groups, including women with young children, older persons, and persons with disabilities, faced increased personal risks such as arrest and deportation, extortion, exploitation, and sexual abuse by regime authorities at checkpoints and other locations.

**Employment:**  Refugees without legal residency permits had limited access to the job market.

**Access to Basic Services:**  Asylum seekers without legal residency permits had limited access to education and health systems.  The lack of documentation created significant difficulties in achieving sufficient protection and long-term integration. Maduro regime authorities permitted Colombian children to attend school but inconsistently granted them diplomas or certificates of completion without residency documentation, resulting in high dropout rates for Colombian children. In 2019 CONARE announced the creation of a border migration control card for refugees present in the country, similar to the carnet de la patria.

# Section 3. Freedom to Participate in the Political Process

The 1999 constitution provides citizens the ability to change their government through free and fair elections, but Maduro regime interference, electoral irregularities, unconstitutional appointments of electors, and harassment and manipulation of voters and candidates restricted the exercise of this right in the 2018 presidential and municipal elections, the 2020 legislative elections, and the November 21 regional elections for governor, mayor, and state and local officials. The regime continued to arbitrarily ban key opposition figures from participating,

maintained hundreds of political prisoners, utilized judicial processes to steal the legal personages of political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.

## Elections and Political Participation

**Recent Elections:**  Nicolas Maduro's illegitimate second term as president began on January 10, 2019, following flawed presidential elections in 2018, which were widely condemned by the political opposition and international observers as fraudulent and constitutionally invalid.  On January 23, 2019, legitimate National Assembly president Juan Guaido invoked Article 233 of the constitution, which calls on the National Assembly president to assume the role of interim president in the event of presidential vacancy.

In December 2020 the Maduro regime conducted fraudulent legislative elections that failed to meet any minimum standard of credibility.  The regime usurped the TSJ's legislative powers and illegally appointed members to the CNE; hijacked political parties through the theft of their brand name, assets, and ballot logos, including those from the left that challenged the regime's control of Chavez's political legacy; prohibited many political opponents of the regime from running for office and stripped them of their political rights; kidnapped, exiled, and tortured opposition politicians; suppressed indigenous political representation; and arbitrarily increased the number of seats in the National Assembly from 167 to 277.  Consequently, electoral and constitutional experts, most independent political parties, and civil society organizations rejected the process.  Despite international nonrecognition of the electoral results, the new assembly was sworn in on January 5, and Jorge Rodriguez elected president of the body.

The interim government utilized a provision in the constitution to hold a public referendum, the Consulta Popular, in December 2020.  The referendum questions focused on rejecting the Maduro regime's December 6 farce election and restoring democracy through free and fair presidential and legislative elections.  Participation was open to both citizens in the country and abroad, who could vote via a secure online platform.  In-person voting was also available within the country.

Additionally, the National Assembly elected in 2015 (AN-2015) reformed the Statute for the Transition to allow a smaller body called the Delegate Commission to assume the legislative competences beyond the expiration of its constitutional period in January 2021. A group of opposition deputies from different political parties did not support the decision and ended their mandate on January 5. The Delegate Commission continued to hold Ordinary Session throughout the year, led by Interim President Juan Guaido.

On February 9, the illegitimate National Assembly elected the members of the Nominations Committee, starting the process stipulated in the constitution to elect CNE members. After three months the process resulted in the appointment of 15 new rectors (council members) – five main rectors and 10 assistants. With participation of the civil society group Foro Civico, which engaged in discussions with members of the Maduro regime, the illegitimate assembly appointed five opposition-linked rectors. Of those, two were main and the other three assistant. The reconstituted CNE returned the Democratic Unity Roundtable (MUD) ticket, barred in 2018, to the opposition, paving the way for the opposition to run under the MUD ticket in the November 21 regional elections. Although the appointment of two of the five principal rectors to opposition-linked candidates helped provide greater balance in the CNE, major electoral problems remained. Control of party and candidate registration remained outside the hands of legitimate political party leaders and in the hands of regime representatives, hundreds of opposition figures remained barred from running for elections, and the electoral registry remained out of date and incomplete.

**Political Parties and Political Participation:** Opposition political parties and PSUV dissidents operated in an increasingly restrictive atmosphere characterized by intimidation, the threat of prosecution or administrative sanction on questionable charges, and very limited mainstream media access.

The Maduro regime regularly targeted National Assembly deputies, interim government staffers, and other opposition politicians and their relatives through violence or threats of violence, arbitrary arrest, politically motivated prosecution, violation of privacy, and restrictions on movement. Multiple opposition politicians fled the country or sought refuge in diplomatic missions to avoid arbitrary detention and the possibility of torture. On February 25, FAES detained AN-2015

Popular Will (VP) deputy Gilberto Sojo, violating legal procedures for detention and holding him incommunicado for more than 96 hours.  Sojo was detained until September 3 for allegedly violating the previous terms of his arrest in 2016 when he was held for two years on spurious terrorism charges.  On July 12, VP deputy Freddy Guevara was detained by Maduro regime forces on false accusations of terrorism and treason related to violent clashes in the neighborhood of La Cota 905 in western Caracas.  The detention was recorded live by Guevara himself.  Guevara was freed one month later without judicial charge.  On the same day, Interim President Juan Guaido was harassed in the parking lot of his residence by SEBIN agents.  On July 13, the regime attorney general alerted that capture orders were issued against VP militants Luis Somaza, Emilio Grateron, Gilber Caro, and Hasler Iglesias.  Grateron sought refuge in the Chilean embassy where he remained as of November, while Caro fled the country on August 31.

According to a March 23 OHCHR report, the Maduro regime attorney general announced 25 investigations had been opened against members of the opposition for the alleged seizure of national assets abroad.  The attorney general indicated they were under investigation for crimes of usurpation of functions, corruption, aggravated embezzlement, fraudulent use of public funds, conspiracy with foreign governments, terrorism, rebellion, trafficking in weapons of war, treason, and criminal conspiracy.

In negotiations held in Mexico between the regime and political opposition figures in August-September regarding the crisis in Venezuela, the regime granted apparent flexibility to some opposition party members who were competing in or supporting the November 21 regional elections.  Social Christian Party leader Roberto Enriquez, who had taken refuge in the Chilean embassy in 2017, joined the negotiations on August 12, ending his asylum.  Freddy Guevara also joined the negotiations weeks after his release.  Other opposition figures in exile returned to the country as well, including AN-2015 deputies Americo De Grazia (former Radical Cause member) and Justice First party members Jose Manuel Olivares and Tomas Guanipa, all running for office.  Other exiled returnees included Enzo Scarano (Clean Accounts) and Ramon Martinez.

Despite these changes, the Maduro regime continued to hold hundreds of individuals in prison on politically motivated charges and prevented hundreds of

opposition candidates from exercising their full rights to run for office.  On September 26, Bolivarian National Guard forces temporarily detained Caroni (Bolivar State) mayoral candidate Carlos Chancellor as he was campaigning; they released him three hours later without explanation or charges.

In November the regime allowed some political opponents to participate in the elections for governors, mayors, and regional and local officials, but it did not allow for conditions that would permit free and fair conditions for true competition.  Civil society organizations noted the elections were marred by credible reports of election irregularities and violations of election law and that the regime had stifled the possibility of a fair competition through pre-election manipulation to include arbitrary arrests and harassment of political and civil society actors, criminalization of opposition parties' activities, bans on candidates across the political spectrum, manipulation of voter registration rolls, and persistent media censorship.

**Participation of Women and Members of Minority Groups:**  No law limits participation of women or members of minority groups in the political process, and they did participate.

On July 29, the CNE published the Norms on Gender Parity for Alternative Nominations for political parties during regional and municipal elections. According to the norms, the political parties must present a list of candidates with a 50-50 percent gender parity both in their principal candidates' nominations and their alternates.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, but the Maduro regime did not implement the law effectively.  Several officials explicitly acknowledged corruption as a major problem.  The regime frequently investigated, prosecuted, and detained political opponents on corruption charges to harass, intimidate, or imprison them.  According to Transparency International, among the main reasons for the country's widespread corruption were impunity, systematic institutional weakening, and a lack of transparency in the management of

government resources.

**Corruption:**  According to Maduro regime attorney general Tarek William Saab, during 2020, 802 persons were convicted for corruption, with a total of 2,274 convicted since August 2017, although observers claimed regime statistics were unreliable.  From January to June, 269 public prosecutors were charged and 24 convicted of corruption.  Between February and July, 51 senior managers at companies and state-owned institutions were prosecuted on corruption grounds.

Corruption was a major problem in all security and armed forces, whose members were generally poorly paid and minimally trained.  No data were publicly available on the number of cases involving police and military officials during the year, although the Public Ministry publicized several individual cases against police officers for soliciting bribes and other corrupt activities.

The NGO Transparencia Venezuela reported an increase of corruption in the country amid the pandemic crisis, highlighting the opacity of the vaccination plan and the purchase of medical equipment from the governments of Russia, China, Cuba, and Iran.  NGOs also documented an increase in bribes requested by military and police during the quarantine periods in exchange for allowing citizens to move freely throughout the country.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of independent domestic and international human rights groups generally operated with restrictions from the Maduro regime.  Major domestic human rights NGOs conducted investigations and published their findings on human rights cases.  Regime officials were rarely cooperative or responsive to their requests.  Domestic NGOs reported fear the regime would use the 2017 law against hate to justify widespread repression of their activities, jailing of the participants and organizers, and threats against family members.  Some domestic NGOs reported threats against and harassment of their leaders, staff, and organizations, in addition to raids and detentions, but they were able to publish dozens of reports during the year.  Some human rights activists reported regime authorities barred them from

traveling abroad or that they feared not being able to return to the country if they traveled.  NGOs played a significant role in informing citizens and the international community regarding alleged abuses and key human rights cases.

On March 30, the regime promulgated a decree that obligates NGOs to register in the unified registry of the Office Against Organized Crime and Terrorism Financing in the Ministry of Interior and Justice.  Human rights watchdogs assessed the decree as a mechanism that would allow the Maduro regime to force civil society organizations to provide information with the intent of supervising and controlling their activities.  Among the registration requirements were a list of international donors from whom they receive contributions, a list of the overseas headquarters of the organizations, and a list of all beneficiaries.  Critics said the legal instrument criminalizes international cooperation and prequalifies the NGOs as terrorists.  These new requirements and conditions were lightened in an amendment introduced on May 3, but it included four other mandatory registries for NGOs, raising concerns regarding the right to freedom of association.

NGOs noted the Maduro regime created a dangerous atmosphere for them to operate.  The regime continued to implement increasingly stringent legal means aimed at controlling and supervising the actions of human rights and humanitarian organizations, including additional oversight of the banking operations of NGOs, resulting in raids, arrest warrants, and attempted prosecutions against members of organizations such as Azul Positivo, Accion Solidaria, Prepara Familia, Convite, Alimenta la Solidaridad, and Caracas Mi Convive.

Human rights organizations claimed they were subject to frequent internet hacking attacks and attempts to violate their email privacy.  The regime targeted multiple humanitarian NGOs by issuing politically motivated arrest warrants against their staff and directors, raiding their facilities, and stealing their computers and other electronic devices.

The Maduro regime attempted to discredit and threaten NGOs with criminal investigations for allegedly illegally accepting foreign funds.  Various regime officials accused human rights organizations on national television and other media of breaking the law by receiving funding from international donors.

The NGO Center for Defenders and Justice published a report that recorded 374 attacks and security incidents against human rights defenders and civil society organizations in the first half of the year, a 243 percent increase compared with the same period in 2020.  In April alone there were at least 115 incidents.  The NGO remarked that one of the mechanisms used by the Maduro regime to subdue human rights defenders was the Unified Registry of Obligated Subjects of the Office of Organized Crime and Terrorism Financing.  The regime used the registry to seek information on external sources of support to civil society under the premise of terrorism or crimes against the state.

In February a draft law on international cooperation that threatened to restrict funding for NGOs was once more placed on the agenda of the illegal National Assembly.  Although the law did not pass, the revival of the draft created a climate of fear among human rights NGOs and a hesitancy to seek international assistance.

In addition to the restrictions placed on fund raising, domestic NGOs also faced regulatory limitations on their ability to perform their missions.  The law includes provisions eliminating the right of human rights NGOs to represent victims of human rights abuses in legal proceedings.  The law provides that only the public defender and private individuals may file complaints in court or represent victims of alleged human rights abuses committed by public employees or members of security forces.

The OHCHR recorded 97 incidents related to human rights defenders, including journalists, union leaders, human rights activists, and civil society organizations. They included two killings, six acts of violence, 62 instances of criminalization, 17 accounts of threats and intimidation, and 10 cases of stigmatization.  At least 16 members of the opposition were arbitrarily arrested; most were released shortly their detention.

On July 1, the OHCHR gave an update on the human rights situation, indicating it continued to receive credible reports of torture, new cases of forced disappearance, and other forms of Maduro regime-authorized violence and intimidation.  The report also focused on the deteriorated condition of the country's prisons and detention centers and discussed the regime's pattern of voter intimidation and coercion.

On January 14, five human rights defenders and humanitarian workers of Azul Positivo – Johan Leon Reyes, Yordy Bermudez, Layners Gutierrez Diaz, Alejandro Gomez Di Maggio, and Luis Ferrebuz – were indicted on charges of "fraudulent handling of smart cards, money laundering, and criminal association."  On February 11, they were released on probation and subsequently required to report to court every 30 days.

On July 2, Javier Tarazona, director of the human rights NGO Fundaredes, was detained by SEBIN officers.  Tarazona had gone to the Public Ministry to report the persecution he was suffering in Falcon State by police officers and unidentified individuals.  He was arbitrarily detained along with Omar de Dios Garcia and Jose Rafael Tarazona, also human rights defenders.  Regime attorney general Tarek William Saab accused Fundaredes members of issuing public accusations that incited hatred and compromised the peace of the country after Tarazona demanded an investigation into the alleged links of the country with Colombian guerrilla groups.  As of November Tarazona remained in custody without trial and in need of medical treatment, but the other two had been released.

**The United Nations or Other International Bodies:**  The Maduro regime was generally hostile toward international human rights bodies and continued to refuse to permit a visit by the IACHR, which last visited the country in 2002.  In 2019 the regime and the OHCHR signed a memorandum of understanding that provided for the presence of two UN human rights officers, and in October the UN Human Rights Council voted to extend the mandate of the OHCHR until 2022.  In 2019 the UN Human Rights Council adopted a resolution to establish a one-year FFM to investigate "extrajudicial executions, enforced disappearances, arbitrary arrests, torture, and other cruel, inhumane, or degrading treatment committed in Venezuela since 2014."  The FFM was extended again in 2020 until 2022.

In September the FFM issued its second report demonstrating the Maduro regime had systematically deployed the judicial system since 2014 as a tool to attack and repress members of independent civil society and political opponents.

In November Chief International Criminal Court prosecutor Karim Khan visited the country, culminating in the announcement of the opening of an investigation into crimes committed under the Maduro regime.

**Government Human Rights Bodies:**  Throughout the year the Maduro regime gave its 2016-19 human rights plan minimal attention, with no announcements to renew or update the plan.

The TSJ continued to hold the National Assembly in "contempt" status, which diminished the purview and operational effectiveness of the assembly's subcommission on human rights.  The regime's human rights ombudsman failed to advocate for citizen victims of human rights neutrally and objectively, especially in the most emblematic of cases.  In September regime attorney general Tarek William Saab announced the formation of a new Office to Attend to Victims of Human Rights Abuses; the office showed limited public progress by year's end.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalizes rape of men or women, including spousal rape, making it punishable by a prison term of eight to 14 years.  A man may legally avoid punishment by marrying (before he is sentenced) the person he raped.  The law allows authorities to consider alternative forms of punishment, including work release, for those convicted of various crimes, including rape, if they have completed three-quarters of their sentence.  The law was not consistently enforced.

The law criminalizes physical, sexual, and psychological violence in the home or community and at work, with increased penalties for intimate partner violence.  The law punishes perpetrators of domestic violence with penalties for conviction ranging from six to 27 months in prison.  The law requires police to report domestic violence to judicial authorities and obligates hospital personnel to notify authorities when admitting patients who are victims of domestic abuse.  Police generally were reluctant to intervene to prevent domestic violence and were not properly trained to handle such cases.  The law also establishes women's bureaus at local police headquarters and tribunals specializing in gender-based violence, and two-thirds of states had specialized courts.  The Public Ministry's Women's Defense Department employed a team of lawyers, psychiatrists, and other experts who dealt exclusively with cases of femicide, gender-related violence, and other

crimes against women.  The law was often not followed or enforced.

The Maduro regime did not publish statistics on gender-based violence.  The OHCHR reported a lack of due diligence in investigations of gender-based violence cases.  According to NGOs, government efforts to protect victims of gender-based violence were ineffective or nonexistent.  Enforcement of laws and access to justice were limited, as victims of gender-based violence reported a lack of progress and inability to follow up on cases after filing reports with authorities.

Many advocates observed there was a lack of public awareness among women regarding resources and support available to prevent and combat domestic violence.  There were four shelters for victims of gender-based violence, one each in Aragua, Cojedes, Sucre, and Trujillo States, but only two remained open; the remaining two struggled to operate effectively due to a lack of government support.  NGOs provided most domestic abuse support services.

NGOs and media reported an increase of domestic abuse and gender-based violence during the COVID-19 pandemic.  The NGO Center for Justice and Peace reported 207 femicides between January and September 30.

On February 21 and 22, Eduarlys Falcon and Eliannys Martinez Ronoz were killed in Turen, Portuguesa State.  The two young women were missing for more 24 hours and were later found with signs indicating they were tortured and sexually assaulted before being strangled to death.  On February 28, the regime attorney general declared the alleged murderer had been arrested.  In his annual report before the illegitimate National Assembly, the attorney general stated since 2017 there had been 610 femicide cases, of which 50 percent had been resolved.

**Sexual Harassment:**  Sexual harassment is illegal and punishable by fines and a prison sentence of one to three years.  Although allegedly common in the workplace, sexual harassment cases were rarely reported.  Several cases of harassment at the hands of security forces – both police and military – were reported during the year.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of the Maduro regime.  The regime restricted access to sexual and reproductive health services for sexual violence survivors, including

emergency contraception for the clinical management of rape.

The regime's economic mismanagement and neglect of the country's health-care infrastructure severely restricted access to resources for menstrual health and hygiene as well as to skilled health attendance during pregnancy and childbirth. Media reported access to methods of contraception and emergency contraception were limited. When available, birth control pills cost almost 10 times the monthly minimum wage, and an intrauterine device cost 25 times the monthly minimum wage. A pack of condoms cost three times the monthly minimum wage. According to NGOs, the COVID-19 pandemic further reduced access to contraception and the ability to see doctors and pharmacies. A 2020 study by the Venezuelan Association for Alternative Sex Education (AVESA) found that fewer than 50 percent of women of reproductive age had their need for family planning satisfied with modern methods.

The IACHR found that many young women who were pregnant or had young children migrated to other countries to gain access to prenatal care and health and reproductive services. The IACHR also reported that women seeking neonatal or obstetric care had to provide their own surgical and personal protective equipment. Pregnant women frequently did not receive prenatal care or take prenatal supplements containing iron or folic acid needed for correct child formation, which affected child development and caused possible malnutrition and diseases. The precarious economic situation limited access to food to the entire population, which had a direct negative impact on pregnant women and their unborn children.

Hospitals lacked qualified health-care professionals, medicine, and necessities such as water, electricity, and cleaning supplies. The country's health-care crisis, including the inability to attend to maternal health, was compounded by the pandemic as hospitals prioritized COVID-19 cases over other health services. AVESA also studied the impact the COVID-19 pandemic on the sexual and reproductive health of women in reproductive age in the Capital District and Miranda State. A report released during the year showed that between October and December 2020, there was a reduction of 18 percent in health assistance centers with family planning services, with no increase of the numbers of centers for assistance regarding sexually transmitted infections. Media reported sexually transmitted infections, including those passed onto children, were on the rise and

citizens had limited access to resources to address them.

Women, children, and teenagers lacked the conditions and information to safely make decisions about their sexual and reproductive health and also lacked access to services and contraceptive methods in a timely manner and in terms of quality. The pandemic's mobility restrictions and closure of services aggravated the situation.

The Maduro regime claimed in its report to the UN Women's Convention for the Elimination of All Forms of Discrimination towards Women that maternal mortality had dropped, which experts doubted.  According to the Society of Obstetrics and Gynecology of Venezuela, the maternal death rate in 2019 was 112 per 100,000 live births, with postpartum hemorrhages, sepsis, and pregnancy-induced hypertension cited as the leading causes of maternal mortality.  Doctors stated these were "predictable and treatable" conditions but were often fatal due to hospitals' lack of adequate beds, medical resources, and medicine.  Statistics were unreliable due to the compounded crisis in the country, and experts believed the numbers could potentially be higher.  An increasing number of births took place at home due to faltering medical services.

According to the UN Population Fund, the adolescent birth rate in 2019 was 95 births for every 1,000 adolescents ages 15 to 19.

In October 2020 Vanesa Rosales, a human rights defender from the city of Merida, was arrested on accusations of providing information and medications for the voluntary termination of pregnancy for a 13-year-old adolescent who became pregnant as a result of rape.  Rosales was charged with conspiracy, conspiracy to commit a crime, and abortion induced by a third party, exposing her to severe penalties.  She was detained without due process and was released in May.

**Discrimination:**  Women enjoy the same legal status and rights as men under the constitution.  Women and men are legally equal in marriage, and the law provides for gender equality in exercising the right to work.  The law specifies that employers must not discriminate against women regarding pay or working conditions.  According to the Ministry of Labor and the Confederation of Workers, regulations protecting women's labor rights were enforced in the formal sector,

although according to the World Economic Forum, women earned 36 percent less on average than men doing comparable jobs.  Gender disparities persisted despite guarantees provided by law.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution prohibits discrimination based on race.  The law prohibits all forms of racial discrimination and provides for a maximum of three years' imprisonment for acts of racial discrimination.  As mandated by law, signage existed outside commercial and recreational establishments announcing the prohibition against acts of racial discrimination.  Beyond signage, the Maduro regime did little to enforce laws against discrimination or prosecute cases of discrimination.

## Indigenous Peoples

The law prohibits discrimination based on ethnic origin.  The constitution provides for three seats in the National Assembly for deputies of indigenous origin to "protect indigenous communities and their progressive incorporation into the life of the nation," but some indigenous communities continued without representation due to the TSJ's annulment of the 2015 election of Amazonas State's indigenous representatives.

NGOs and the press reported local political authorities seldom took account of indigenous interests when making decisions affecting indigenous lands, cultures, traditions, or allocation of natural resources.  Indigenous groups continued to call for faster implementation of the demarcation process.

Indigenous groups and NGOs expressed concern regarding mining in the expanding Arco Minero, an area between the states of Bolivar, Amazonas, and Delta Amacuro.  Indigenous communities reported the Maduro regime developed and expanded mining zones without consulting those native to the region, resulting in a rise in environmental degradation, water contamination, and malaria.  Illegal armed groups, including the National Liberation Army and FARC-D, had a considerable presence in the area, increasing the level of violence and insecurity in the communities.  There was also an unprecedented influx of disease; drugs;

human trafficking, including commercial sexual exploitation and forced labor; and other illegal activities in the mining areas, putting indigenous communities at risk.

Indigenous groups regularly reported violent conflicts with miners and cattle ranchers regarding land rights.  There were reports of harassment, attacks, and forced evictions against indigenous persons living in areas included as part of Maduro regime mining concessions.  Indigenous persons reported a lack of consultation by the regime on the social and environmental impact of mining activity in indigenous and protected areas.

Border disputes with Colombia affected indigenous groups living in border regions.  There were many reported cases in which movements of indigenous groups were restricted, including from border closures.  After more than 18 months, these regions continued to suffer severe restrictions that impeded tourism and forced indigenous communities of Santa Elena de Uairen, Bolivar State, to practice mining.  The tourism chamber affirmed that approximately 28 indigenous communities stopped working in tourism due to the closure of the country's borders and gasoline shortages, which made them depend on illegal mining for 60 percent of their income.

NGOs stated that quarantine measures imposed by the Maduro regime unduly affected indigenous communities, preventing transit to and through territories and making it impossible for indigenous persons to obtain sufficient food, water, and access to medical care, which was already difficult due to gasoline shortages in the area.  PROVEA alerted that the migration of indigenous communities from Amazonas State to Colombia had increased in the past five years due to the worsening of the political-economic crisis and the increase in mining activity and invasion of indigenous territories.  Colombian authorities estimated 3,900 Venezuelans had registered in 25 indigenous and nonindigenous settlements in Puerto Carreno as migrants or displaced persons.

In January there was concern for the 12 indigenous members of the Pemon community detained in the Rodeo II prison, due to the poor detention conditions. All were detained on allegations of having assaulted the 513 Jungle Infantry Battalion Mariano Montilla in 2019.  Foro Penal called on authorities to grant them priority medical assistance, since they had tuberculosis due to poor sanitary

conditions and lack of adequate food and water. Their lawyers affirmed in their case that due process was not guaranteed and that they had been subject to cruel and inhuman treatment. Advocacy groups decried that they should have been tried in an indigenous jurisdiction to respect indigenous rights. The National Observatory for Human Rights demanded the detainees be transferred to another facility closer to their community where they could have access to family and community. They also requested as a minimum condition to receive medical assistance according to their indigenous practices. They were released on February 13.

On February 21, an assembly of indigenous leaders in Bolivar State denounced the continued presence of illegal armed groups engaged in illegal mining activities on indigenous lands and declared a state of emergency in the community of San Luis de Morichal. The National Assembly denounced environmental degradation, instability, human rights violations, and the closure of schools. Leaders condemned the inaction and complicity of the Maduro regime and called on the regime to enforce protections for indigenous communities as enshrined in the constitution.

On June 21, Fundaredes in Apure State reported FARC dissidents killed six indigenous individuals in the Macanilla sector, located in the Pedro Camejo municipality. According to the NGO, the deaths occurred on June 15 after indigenous individuals allegedly looted a food truck that was moving from San Juan de Payara to a church in Puerto Paez, in the Codazzi parish. Fundaredes also said the indigenous communities were unprotected by the state and suffered from malnutrition, sexual abuse, human trafficking, and displacement by irregular armed groups.

Also in June the OHCHR expressed concern regarding the death of indigenous Pemon leader Salvador Franco while he was in detention and called on authorities to conduct an immediate and independent investigation and to protect the rights of the detainees, especially their right to receive medical assistance. As of November neither the Attorney General's Office nor the human rights ombudsman had made a statement regarding the case.

## Children

**Birth Registration:**  Citizenship is derived by birth within the country's territory. The children's rights NGO Cecodap reported that families struggled to register births due to quarantine measures related to the COVID-19 pandemic.

**Child Abuse:**  According to UNICEF and NGOs working with children and women, child abuse, including incest, occurred but was rarely reported.  The Maduro regime made efforts to detain and prosecute some perpetrators of child abuse.  Although the judicial system acted to remove children from abusive households, the press reported public facilities for such children were inadequate. According to NGOs, in many cases children were returned to their homes without proper reintegration measures or follow-up.  An investigation by Cecodap documented the lack of information from official sources regarding the violation of child and adolescents' rights, noting that only 23 percent of the monitored news came from official sources.

During the first quarter of the year, Cecodap identified 209 violent episodes involving child and adolescents and said they were the victims in 86 percent of the cases.  Cecodap reported that 30 percent of episodes monitored involved sexual abuse and most victims were between seven and 12 years old.

**Child, Early, and Forced Marriage:**  The legal minimum age for marriage is 18 for women and men, but with parental consent the minimum age is 16.

**Sexual Exploitation of Children:**  By law conviction for having sexual relations with a minor younger than 13, with an "especially vulnerable" person, or with a minor younger than 16 when the perpetrator is a relative or guardian is punishable with a mandatory sentence of 15 to 20 years' imprisonment.  The law prohibits the forced commercial sexual exploitation and the corruption of minors.  Penalties range from 15 to 20 years' imprisonment in cases of forced labor and some forms of sex trafficking of women and girls.  The law requires a demonstration of force, fraud, or coercion to constitute child sex trafficking.  The law prohibits the production and sale of child pornography and establishes penalties of 16 to 20 years' imprisonment.

**Displaced Children:**  Children's rights advocates and media reported an increase

in the number of abandoned children living on the street.  State-run facilities, already filled to capacity, were unable to support the influx.  Cecodap estimated that as many as one million minors had been left behind with family members when their parents fled the country's economic crisis, many of whom also struggled with the country's economic downturn.  These children resided in limbo, since their parents who left were unable legally to transfer guardianship to a third party.  Private institutions denounced the Maduro regime's refusal to provide subsidized food benefits to support the country's population.

NGOs noted young girls constituted almost one-half of the children living on the streets.  This shift posed particular challenges for shelters, which historically housed predominantly male populations.  With institutions filled to capacity, hundreds of children accused of infractions, such as curfew violations, were confined in inadequate juvenile detention centers.

The Human Rights Center of the Catholic University Andres Bello documented that between October 2020 and February, at least 430 children and adolescents permanently left the country alone or accompanied by other minors.  An additional 51,250 minors were recorded as regularly crossing the border between Venezuela and Colombia.

Save The Children affirmed that 70 percent of children and adolescents left the country to find their parents and to achieve a family reunion; the remainder fled domestic violence.  Many of these children were motivated by deceptive job offers.  NGOs confirmed cases of unaccompanied Venezuelan girls who were victims of sex trafficking in Colombia, Ecuador, Panama, and Peru.

**International Child Abductions:**  The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at https://www.travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The Confederation of Israelite Associations in Venezuela estimated there were 10,000 Jews in the country.  Jewish community leaders expressed concern

regarding anti-Semitic pieces in regime-aligned media outlets.  They stated regime-owned or -associated media and supporters of the Maduro regime promoted Zionist conspiracy theories.  There were reports of societal abuses or discrimination based on religious affiliation, belief, or practice, including anti-Semitism.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

The law prohibits discrimination against persons with physical and mental disabilities, but the Maduro regime did not implement the law, inform the public of it, or combat societal prejudice against persons with disabilities.  The law requires that all newly constructed or renovated public parks and buildings provide access, but persons with disabilities had minimal access to public transportation, and ramps were almost nonexistent.  Many persons with disabilities expressed concern that public transportation workers often were unwilling to transport them and forced them to find taxis, which were often unaffordable and frequently not equipped to support patrons with disabilities.  NGOs reported hospitals lacked infrastructure to accommodate persons with mobility problems and staff to communicate with deaf persons.  Parents of children with disabilities also complained they were forced to wait in long lines for services rather than receive preference as afforded by law.  Online resources and access to information were generally available to persons with disabilities, although access to closed-captioned or audio-described online videos for persons with sight and hearing disabilities was limited.  Leading advocates for persons with hearing disabilities lamented difficult access to public services due to a lack of interpreters in public courts, health-care facilities, and legal services, as well as a lack of other public accommodations.

The National Council for Persons with Disabilities, an independent agency, advocated for the rights of persons with disabilities and provided medical, legal, occupational, and cultural programs.  All forms of organization, whether public or private, are required by law to incorporate no less than 5 percent of persons with disabilities in their work area, according to their condition, their abilities, their

skills, and their specialties with the aim of seek job placement.  There was no available information regarding the number of persons registered with regime health programs who were fully employed.  The law was generally not followed or enforced.

Some children with disabilities attended separate schools, while others were in mainstream schools with their peers without disabilities.  Media reported that schools for children with disabilities suffered from underfunding, decaying infrastructure, and little consideration for the specific needs of individual disabilities.  Parents of children with disabilities reported significant difficulties in school enrollment, which prevented their children from receiving formal education. NGOs reported that in the shift to online classes due to COVID-19, children with disabilities had limited access to educational materials, and the Ministry of Education did not adapt curricula for children with disabilities.

The NGOs Cecodap and Deaf Confederation of Venezuela reported three legal cases where the accused were individuals with cognitive disabilities who were arbitrarily detained and deprived of liberty.  In each case the court omitted information about the defendant's mental disability, even when the disability was reflected and endorsed by medical reports from each of the accused.  The most recent case was in December 2020, regarding a 15-year-old adolescent in Yaracuy State who allegedly was involved in crimes of extortion and kidnapping.  He was linked to the crime by a cell phone that was used by his mother, who went missing at that time.

## HIV and AIDS Social Stigma

The law provides for the equal rights of persons with HIV or AIDS and their families.  Nevertheless, leading advocates alleged discrimination occurred against such persons.  Media and NGOs denounced that during the pandemic more than one thousand persons died due to lack of antiretroviral treatment, as well as poor care in public hospitals.  Since 2016 the regime had not purchased antiretroviral medicine, which also affected a great number of children with HIV.  The NGO Citizen Action Against AIDS reported there was permanent discrimination in public hospitals and refusal of medical attention against persons with HIV and mistreatment of pregnant women with HIV at the time of delivery.

The number of persons with HIV in treatment increased in the last two years from 24 percent to 54 percent in December 2020, according to UNAIDS. On January 12, DGCIM arbitrarily detained six members of NGO Azul Positivo that provided humanitarian aid to the HIV-positive population of Zulia State, raided the NGO's offices, and seized equipment.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

Local police and private security forces allegedly prevented lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons from entering malls, public parks, and recreational areas. NGOs reported the Maduro regime systematically denied legal recognition to transgender and intersex persons by preventing them from obtaining identity documents required for accessing education, employment, housing, and health care. This vulnerability often led transgender and intersex persons to become victims of human trafficking.

The armed forces criminalize homosexual relations in the military justice code, punishing members of the LGBTQI+ community with prison from one to three years and fines.

NGOs reported incidents of bias-motivated violence against LGBTQI+ persons. Reported incidents were most prevalent against transgender individuals. Leading advocates noted that law enforcement authorities often did not properly investigate to determine whether crimes were bias motivated.

In June media reported at least seven hate crimes against LGBTQI+ persons. These cases should have been processed by the Special Ombudsman's Office for the Protection of Persons of Sexual Diversity (an entity created in December 2020 and attached to the Ombudsman's Office), but NGOs affirmed the office was ineffective and that most related hate crimes were not investigated.

The constitution provides for equality before the law of all persons and prohibits discrimination based on "sex or social condition," but it does not explicitly prohibit discrimination based on sexual orientation or gender identity. According to a TSJ ruling, no individual may be subjected to discrimination because of sexual

orientation, but the ruling was rarely enforced.

The law establishes the principle of no discrimination for sexual orientation as well as no discrimination in the workplace for sexual preferences; however, there were no mechanisms to denounce violations of the law.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides that all private- and public-sector workers (except members of the armed forces) have the right to form and join unions of their choice, and it provides for collective bargaining and the right to strike. The law, however, places several restrictions on these rights, and the Maduro regime deployed a variety of mechanisms to undercut the rights of independent workers and unions. Minimum membership requirements for unions differed based on the type of union. Forming a company union requires a minimum of 20 workers; forming a professional, industrial, or sectoral union in one jurisdiction requires 40 workers in the same field; and forming a regional or national union requires 150 workers. Ten persons may form an employee association, a parallel type of representation the Maduro regime endorsed and openly supported.

The law prohibits "any act of discrimination or interference contrary to the exercise" of workers' right to unionize. The law requires all unions to provide the Ministry of Labor a membership roster that includes the full name, home address, telephone number, and national identification number for each union member. The ministry reviews the registration and determines whether the union fulfilled all requirements. Unions must submit their registration application by December 31 of the year the union forms; if not received by the ministry or if the ministry considers the registration unsatisfactory, the union is denied the ability to exist legally. The law also requires the presence of labor inspectors to witness and legitimize unions' decisions before the Ministry of Labor. The International Labor Organization (ILO) raised concerns regarding the ministry's refusal to register trade union organizations.

By law employers may negotiate a collective contract only with unions that

represent most of their workers.  Minority organizations may not jointly negotiate in cases where no union represents an absolute majority.  The law also restricts unions' ability to administer their activities.  For example, the CNE has the authority to administer internal elections of labor unions, federations, and confederations.  By law elections must be held at least every three years.  If CNE-administered and -certified elections are not held within this period, the law prohibits union leaders from representing workers in negotiations or engaging in anything beyond administrative tasks.  The ILO repeatedly found cases of interference by the CNE in trade union elections and since 1999 called for delinking the CNE from the union election process.

The law recognizes the right of all public- and private-sector workers to strike, subject to conditions established by law.  Workers participating in legal strikes receive immunity from prosecution, and their time in service may not be reduced by the time engaged in a strike, but this was not enacted in practice.  The law requires that employers reincorporate striking workers and provides for prison terms sufficient to deter violations for employers who fail to do so.  This law also was not enforced.  Replacement workers are not permitted during legal strikes. The law prohibits striking workers from paralyzing the production or provision of essential public goods and services, but it defines "essential services" more broadly than ILO standards.  The ILO called for the law to be amended to exclude from the definition of "essential services" activities "that are not essential in the strict sense of the term…so that in no event may criminal sanctions be imposed in cases of peaceful strikes."

The minister of labor may order public- or private-sector strikers back to work and submit their disputes to arbitration if a strike "puts in immediate danger the lives or security of all or part of the population."  Other legal provisions establish criminal penalties for exercising the right to strike in certain circumstances.  For example, anyone who "organizes, supports, or instigates the realization of activities within security zones that are intended to disturb or affect the organization and functioning of military installations, public services, industries and basic (i.e., mining) enterprises, or the socioeconomic life of the country" could be punished with five to 10 years in prison.  The law also provides for prison terms sufficient to deter violations by those who restrict the distribution of goods and "those…who

develop or carry out actions or omissions that impede, either directly or indirectly, the production, manufacture, import, storing, transport, distribution, and commercialization of goods."

The organic code of military justice establishes arrest sentences between six months and one year for expressing outrage to a sentry, a public official, or the armed forces.  This type of criminal offense was used against indigenous leaders and workers unconstitutionally subjected to military jurisdiction.

The Maduro regime restricted the freedom of association and the right to collective bargaining through administrative and legal mechanisms.  The regime did not effectively enforce the law, and penalties were not commensurate with those for other laws involving denial of civil rights, such as discrimination.

The ILO raised concerns regarding violence against trade union members and intimidation of the Associations of Commerce and Production of Venezuela by the Maduro regime.  In 2018 ILO member countries voted to establish an ILO Commission of Inquiry (COI) for Venezuela to investigate long-standing complaints first filed in 2015 of labor rights violations of ILO Conventions Nos. 26, 87, and 144, which pertain to minimum-wage fixing, freedom of association and protection of the right to organize, and tripartite consultation, respectively.  In 2019 the commission submitted its report to the ILO director general, noting the regime had repeatedly committed violations of international conventions on minimum wage, freedom of association and the right to organize, and labor standards.  The report also called for "the immediate release of any employer or trade unionist who may be in prison as a result of carrying out the legitimate activities of their workers' or employers' organization."

On March 27, the ILO Governing Body agreed to increase the pressure on the Maduro regime to comply with the COI recommendations that requested "the immediate halt of all violent acts, threats, persecution, stigmatization, harassment, and aggression" against organization of workers and employers not affiliated with the Maduro regime and the adoption of measures to guarantee such acts would not be repeated in the future.  The ILO COI also requested a tripartite social dialogue. The regime categorically rejected the COI recommendations and continued to detain individuals because of their union activities in cases where the activities

were perceived as counter to the interests of the Maduro regime.

Organized labor activists continued to report that the annual requirement to provide the Ministry of Labor a membership roster was onerous and infringed on freedom of association.  They alleged the ministry removed member names from the rosters for political purposes, particularly if members were not registered voters on the CNE's rolls.  Labor leaders also criticized the laborious and costly administrative process of requesting CNE approval for elections and subsequent delays in the CNE's recognition of such union processes.  In addition there reportedly was a high turnover of ministry contractors, resulting in a lack of timely follow-through on union processes.  Labor unions in both the private and public sectors noted long delays in obtaining CNE concurrence to hold elections and in receiving certification of the election results, which hindered unions' ability to bargain collectively.

The Maduro regime continued to support "parallel" unions, which sought to dilute the membership and effectiveness of traditional independent unions.  The regime excluded from consideration other, independent union federations, including the Confederation of Venezuelan Workers, General Confederation of Venezuelan Workers, Confederation of Autonomous Unions of Venezuela, and National Union of Workers.

The Maduro regime continued to refuse to adjudicate or otherwise resolve the cases of thousands of PDVSA employees who were dismissed during and after the 2002-03 strike.  The Ministry of Labor continued to deny registration to the National Union of Oil, Gas, Petrochemical, and Refinery Workers.

The concept of striking, demonized since the 2002 national security law, was used periodically as a political tool to accuse regime opponents of coup plotting or other destabilizing activities.  Some companies, especially in the public sector, had multiple unions with varying degrees of allegiance to the ruling party's version of the "socialist revolution," which could trigger interunion conflict and strife.

The crimes of association to commit a crime, instigation to commit a crime, obstruction of the public way, violation of the security zone, crimes against freedom of work, and terrorism were frequently used against union leaders who

demanded labor rights.

The OHCHR documented at least three union leaders were arrested on charges of terrorism or terrorism financing in 2020.

NGOs reported the Maduro regime continued harassment of unions by prosecuting union members in military courts.

The Venezuelan Observatory of Union Liberty reported in February that between September 2019 and November 2020, there were 28 new cases of union leaders targeted with judicial proceedings, at least five workers deprived of liberty, and more than 100 on probation.

On January 15, the Venezuelan Teachers Union went on strike to demand better salaries, benefits, and infrastructure.  As a result of the protest, the Ministry of Education dismissed 200 educators and suspended their salaries without explanation.

On July 26, a member of the College of Nurses of the State of Anzoategui, Ada Macuare, was arrested in the city of Barcelona after a WhatsApp note was circulated among medical professionals indicating Macuare's attempt to call for a strike due to personal protective equipment and COVID-19 vaccine shortages.  The nurse appeared before a judge on July 27 and faced charges of instigating hatred and terrorism.  On August 5, Macuare was released and ordered to appear before a judge every 30 days.

On September 25, military intelligence officials from the DGCIM detained seven workers from the PDVSA-owned Paraguana refining complex in Falcon State on terrorism-related charges.  The officials alleged the workers were involved in sabotaging the oil company.  On October 4, human rights NGOs and family members of the detainees told media the workers had not been granted access to lawyers since the time of their arrest.

In November 2020 Eudis Felipe Girot, a PDVSA plant operator and executive director of the Unitary Federation of Oil Workers, was detained by the DGCIM at his residence, in the Diego Bautista Urbaneja municipality of Anzoategui State, for exercising union obligations and denouncing mismanagement of PDVSA facilities,

the lack of gasoline, and the violation of workers' rights.  In a June 10 preliminary hearing, the court sentenced Girot to house arrest.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits some forms of forced or compulsory labor but does not provide criminal penalties for certain forms of forced labor.  The law on organized crime prohibits human trafficking by organized crime groups.  It prescribes penalties sufficient to deter human trafficking of adults carried out by a member of an organized-crime group of three or more individuals.  The organized-crime law, however, fails to prohibit trafficking by any individual not affiliated with such a group.  Prosecutors may employ other statutes to prosecute such individuals.  The law increases penalties for child trafficking with the purpose of forced labor. There was no comprehensive information available regarding the Maduro regime's enforcement of the law.  The labor group Autonomous Front in Defense of Employment, Wages, and Unions (FADESS) reported that public-sector worker agreements included provisions requiring service in the armed forces' reserves. NGOs noted sex trafficking and forced labor in domestic service within the country increased in 2019 (see section 7.c.).

Some doctors participating in Cuba's overseas medical program showed indicators of forced labor.  According to FADESS, Cubans worked in the Maduro regime's social programs, such as the Mission Inside the Barrio, in exchange for the regime's provision of oil resources to the Cuban government.  FADESS noted Cubans worked in the ministries of Education, Registrar, Notary, Telecommunications, and Security.  FADESS also cited that the G-2 Cuban security unit was present in the armed forces and in state enterprises.  Observers noted indications the Cuban government may have forced some Cubans to participate in its government-sponsored medical missions.  Some Cuban medical personnel who participated in the social program Mission Inside the Barrio described indicators of forced labor, including underpayment of wages, mandatory long hours, limitations on movement, the use of "minders" to conduct surveillance of participants outside of work, forced political indoctrination, and threats of retaliatory actions against workers and their families if they left the program or did not return to Cuba as directed by government supervisors.  The Cuban government acknowledged it withheld the passports of Cuban medical personnel in the country.

Authorities did not investigate allegations of forced labor in Cuba's overseas medical program.  Additionally, doctors who deserted the program reported Cuban "minders" coerced them to indoctrinate the population into supporting the Maduro regime and to falsify records to bolster the number of individuals assisted.

The law does not criminalize all forms of forced or compulsory labor, and penalties were not commensurate with those for analogous serious crimes, such as kidnapping.

Illegal mining operations existed in some of the country's most remote areas, including Bolivar State, where armed groups exploited girls in sex trafficking, forcibly recruited youth to join armed criminal groups, and forced children to work in gold mines under dangerous conditions.

Reliable reports indicated that forced labor occurred throughout the Orinoco Mining Arc, a swath of land in southern Bolivar state, where most of the country's gold is concentrated.  An estimated 300,000 to 500,000 gold miners were in the country.  Mines were largely run by armed and violent criminal groups, and research showed evidence that officials from the Maduro regime, including members of security forces and local authorities, colluded with and allowed members of nonstate armed groups to commit human rights violations and labor abuses.  Miners experienced unsafe working conditions, unsafe and degrading living conditions, extortion and financial penalties, limited freedom of communication, and threats of violence and torture.

The Human Rights Center of the Catholic University Andres Bello also documented forced recruitment in the Mining Arc, where irregular armed groups controlled the mining activity through corruption and extortion networks that involved the military.  These groups recruited men and children under threats of violence, death, and debt manipulation to gain control over the zone.

An estimated 3,500 women and girls, between ages 12 and 35, were subjected to forced labor in the illegal mines, forced into prostitution, or exploited as washerwomen and cooks.

In 2020 the OHCHR identified a pattern of labor exploitation, a sharp increase in sexual exploitation and trafficking in mining areas, including of adolescent girls,

and reports that children as young as age seven were present in mining areas, often unaccompanied, leaving them vulnerable to exploitation.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits all the worst forms of child labor.  The law sets the minimum employment age at 14.  Children younger than 14 may work only if granted special permission by the National Institute for Minors or the Ministry of Labor.  Such permission may not be granted to minors who are younger than the legal age for work in hazardous occupations that risk their life or health or could damage their intellectual or moral development.  According to the ILO, the Maduro regime had not made publicly available the list of specific types of work considered hazardous.  Children ages 14 to 18 may not work without permission of their legal guardians or in occupations expressly prohibited by law, and they may work no more than six hours per day or 30 hours per week.  Minors younger than 18 may not work outside the normal workday.

Anyone employing children younger than eight is subject to time in prison.  Employers must notify authorities if they hire a minor as a domestic worker.  The Maduro regime did not effectively enforce the law.  Penalties were not commensurate with those for other analogous serious crimes, such as kidnapping.

No information was available on whether or how many employers were sanctioned for violations.  The regime continued to provide services to vulnerable children, including street children, working children, and children at risk of working.  There was no independent accounting of the effectiveness of these and other regime-supported programs.

Child labor increased 20 percent during the COVID-19 pandemic, according to the most recent report by the NGO World Vision.  Most children who worked did so in the agricultural sector, street vending, domestic service, or in small and medium-size businesses, most frequently in family-run operations.  There continued to be isolated reports of children exploited in domestic servitude, mining, forced begging, sexual exploitation (see section 6), and human trafficking, including sex

trafficking and forced criminality.  Members of the Maduro regime supported the operations of the National Liberation Army and FARC-D by allowing the exploitation and human trafficking, including sex trafficking, forced labor, and forced recruitment of children for armed conflict.

Fundaredes reported that nonstate armed groups in the border states of Tachira and Apure forcibly recruited children, invaded property, charged for public services, and threatened communities.

A study by Cecodap found that child laborers constituted up to 45 percent of those working in mines.  Media reported children as young as nine years old worked in mines.  Underfunded schools and high rates of student dropouts pushed children into labor situations.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The constitution prohibits employment discrimination of every citizen.  The law prohibits discrimination based on age, race, sex, social condition, creed, marital status, union affiliation, political views, nationality, disability, or any condition that could be used to lessen the principle of equality before the law.  No law specifically prohibits employment discrimination based on sexual orientation, gender identity, or HIV/AIDS status.  Media and NGOs, such as PROVEA and the Human Rights Center of the Catholic University Andres Bello, reported the Maduro regime did not effectively enforce applicable law, and penalties were not commensurate to those related to civil rights infractions, such as election interference.

NGOs reported public employees faced discrimination and harassment for their political beliefs or activities.  According to Aula Abierta, 4,876 public servants were dismissed from their jobs for political reasons in 2018.

In March four Siderurgica del Orinoco Alfredo Maneiro union leaders –  Jose Saracual, Cesar Soto, Carlos Ramirez, and Cruz Hernandez – had their salaries frozen and were banned from entry into the workplace after they demanded the

board comply with the collective contract and improve salaries.  Their names and faces were used in a campaign inside the enterprise to show others what would happen if they made such demands.  They were also qualified as terrorists.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The national minimum wage remained below the poverty line.  Labor experts noted the unilateral nature of the most recent regime decree to raise the minimum wage contravened ILO Convention No. 26, which requires the government to consult with employers and workers prior to enacting wage increases.  Legislators noted the decree violated the law, since it supplanted collective bargaining agreements.  Union leaders from the petroleum, health, telecommunications, and electricity sectors highlighted that the decree did not include wage adjustments to keep up with hyperinflation and thus remained insufficient to afford the basic food basket.  The decree also violated the law by nullifying previously signed collective bargaining agreements, including wage tables that scaled salaries to account for seniority and merit pay.

The trade union of the industrial sector stated that in 2020, 88 industries ceased operations and that at the end of the year only 2,121 remained, an 83 percent reduction from the more than 12,000 entities in 1997.

The law sets the workweek at 40 hours (35 hours for a night shift).  The law establishes separate limits for "shift workers," who may not work more than an average of 42 hours per week during an eight-week period, with overtime capped at 100 hours annually.  Managers are prohibited from obligating employees to work additional time, and workers have the right to two consecutive days off each week.  Overtime is paid at a 50 percent surcharge if a labor inspector approves the overtime in advance and at a 100 percent surcharge if an inspector does not give advance permission.  The law establishes that after completing one year with an employer, a worker has a right to 15 days of paid vacation annually.  A worker has the right to an additional day for every additional year of service, for a maximum of 15 additional days annually.

**Occupational Safety and Health:**  The law provides for secure, hygienic, and adequate working conditions.  Workplaces must maintain "protection for the health

and life of the workers against all dangerous working conditions." The law obligates employers to pay workers specified amounts for workplace injuries or occupational illnesses, ranging from two times the daily salary for missed workdays to several years' salary for permanent injuries. Workers may remove themselves from situations that endanger health or safety without jeopardy to their employment. Occupational safety and health (OSH) standards were not appropriate for the main industries in the country, and workers were not able to remove themselves from situations that endangered health or safety without jeopardy to their employment. The Maduro regime did not effectively enforce OSH law. Penalties for OSH law violations were not commensurate with those for crimes, such as negligence.

The law covers all workers, including temporary, occasional, and domestic workers. There was reportedly some enforcement by the Ministry of Labor of minimum wage rates and hours of work provisions in the formal sector, but an estimated 40 percent of the population worked in the informal sector, where labor law and protections generally were not enforced. There was no publicly available information regarding the number of inspectors or the frequency of inspections to implement health and safety, minimum wage, or hours of work provisions. Ministry inspectors seldom closed unsafe job sites. Official statistics regarding workplace deaths and injuries were not publicly available.

Health workers were severely exposed to COVID-19 due to the lack of personal protective equipment. The Maduro regime cracked down on medical professionals who spoke about the realities they faced in their work. The NGO Medicos Unidos por Venezuela reported 736 health-worker deaths due to COVID-19 through August.

Nurses' unions said that during the pandemic they were subjected to labor exploitation and persecution and could not reject or abandon these conditions due to threats, violence, coercion, deception, or abuse of power. Medical professionals lacked vaccines and biosafety equipment for individual protection, worked excessively long hours, and assumed the daily risk of infecting their family members.

NGOs and media reported hazardous conditions in mining areas, many of which

operated illegally and exposed miners to injury, disease, and mercury poisoning.

The OHCHR documented high levels of violence and human rights violations linked to the control of and dispute over mines by organized criminal and armed groups.  In some cases security forces were reportedly involved in some of the violent incidents.

NGOs reported the use of beatings, mutilation, disappearances, and killings by armed groups to enforce control in mining areas.

**Informal Sector:**  Vast portions of the economy operated in the informal sector, where standardized labor protections did not exist, and labor violations occurred frequently.  The regime made little effort to provide social protections in this area.

# 2022 Trafficking in Persons Report: Venezuela

**OFFICE TO MONITOR AND COMBAT TRAFFICKING IN PERSONS**

**IN THIS SECTION /**
**VENEZUELA (TIER 3)**

## Venezuela (Tier 3)

The Venezuela does not fully meet the minimum standards for the elimination of trafficking and is not making any efforts to do so, even considering the impact of the COVID-19 pandemic on its anti-trafficking capacity; therefore Venezuela remained on Tier 3. On January 10, 2019, the term of former president Nicolás Maduro ended. On January 23, 2019, National Assembly president Juan Guaidó assumed the role of interim president based on a presidential vacancy clause in the Venezuelan Constitution. Maduro refused to cede control, preventing interim President Guaidó from exercising authority within the country. The United States continues to recognize the authority of the democratically elected 2015 National Assembly and Juan Guaidó as the interim president of Venezuela. References herein reflect efforts made, or lack thereof, by the Maduro regime representatives and not the democratically elected administration that was unable to exercise its' authority within the country during the reporting period. Mentions of "representatives," "regime," "regime representatives," or "Maduro regime" below are not intended to indicate that the United States considers such entities to be the recognized government of Venezuela. Despite the lack of significant efforts, the regime representatives took some steps to address trafficking, including arresting some complicit individuals and issuing a decree for the development of the national action plan (NAP). However, regime representatives did not report assisting any victims or prosecuting or convicting any traffickers. Regime restrictions on the press and pandemic- related measures limited reporting. Maduro and regime representatives continued to provide support and maintained a permissive environment to non-state armed groups that recruited and used child soldiers for armed conflict and engaged in sex trafficking and forced labor while operating with impunity. Despite such reports, representatives did not make sufficient efforts to curb forced recruitment of children by non-state armed groups.

# PRIORITIZED RECOMMENDATIONS:

Vigorously investigate, prosecute, and convict traffickers, including complicit regime representatives and those involved in the forcible recruitment of children into illegal armed groups.

Provide specialized services for all trafficking victims, including repatriated victims, child soldiers, men, boys, and LGBTQI+ individuals.

Proactively inform Venezuelans fleeing the country on the risks of human trafficking, as well as where and how to seek services.

Train all migration and law enforcement personnel operating in border crossings to identify and respond appropriately to trafficking indicators.

Draft and enact comprehensive anti-trafficking legislation criminalizing all forms of trafficking, including the criminalization of child sex trafficking without elements of force, fraud, or coercion, and the trafficking of men and boys.

Increase staffing and funding for the office of the special prosecutor to combat trafficking.

Given significant concerns about forced labor indicators in Cuban international work programs, screen Cuban overseas workers, including medical professionals, for trafficking indicators and refer those identified to appropriate services.

Implement formal procedures and training for identifying victims among vulnerable populations, such as individuals in commercial sex, and for referring victims for care.

Finalize, fund, and implement a NAP to address trafficking and present challenges, including mass migration and displacement, regime complicity, and forced recruitment of children for armed conflict.

Enhance interagency cooperation by forming a permanent anti-trafficking working group.

Improve data collection of anti-trafficking efforts and make this data publicly available.

# PROSECUTION

Regime representatives under Maduro maintained inadequate law enforcement efforts. Venezuelan law did not criminalize all forms of trafficking. The law criminalized labor trafficking and some forms of sex trafficking of women and girls through a 2007 law on women's rights that

prescribed penalties of 15 to 20 years' imprisonment. Inconsistent with international law, it required a demonstration of force, fraud, or coercion to constitute child sex trafficking and therefore did not criminalize all forms of trafficking. Venezuelan law failed to criminalize trafficking of men and boys when perpetrators were not part of an organized criminal organization. The law addressing organized crime criminalized trafficking by organized criminal groups of three or more individuals, with penalties of 20 to 30 years' imprisonment. The penalties for trafficking crimes by organized criminal groups were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape.

The organized crime office (ONCDOFT) focused on trafficking crimes and continued to be the lead entity for trafficking issues. Regime representatives did not report investigating, prosecuting, or convicting any traffickers. A media outlet reported that the regime arrested between 26 and 30 alleged traffickers in 2021, compared with similar reports from previous years noting the arrest or indictment of 63 individuals in 2020, 17 in 2019, and 99 in 2018. In previous years, observers asserted some of the arrests and investigations reported in the media were politically motivated persecutions by the Maduro regime of individuals helping opposition supporters and others depart Venezuela. Years of corruption, incompetence, and abuse weakened the Maduro regime's capacity to govern and hollowed out the country's institutions, fostering a permissive environment for non-state armed groups to operate with impunity. According to stakeholders, regime representatives at high levels linked to Maduro were complicit in trafficking crimes perpetrated by non-state armed groups and provided support and a permissive environment. NGOs indicated that regime representatives continued to overlook the forced recruitment of children by illegal armed groups. Near border crossings, survivors reported national guard personnel facilitated, and sometimes actively participated in, trafficking crimes. According to family members of those who disappeared at sea, regime representatives were unwilling to investigate a trafficking network between Venezuela and Caribbean countries because those same individuals were involved in the perpetration of trafficking crimes. Media sources reported some regime representatives charged between $300 to $400 to allow the departure of boats transporting trafficking victims to nearby Caribbean islands. The regime did not make notable efforts to investigate official complicity, including in a case reported last year involving 13 alleged traffickers, including seven members of the national guard who may have facilitated the transport of victims to Trinidad and Tobago in a ship that capsized and killed 28 alleged victims of trafficking. In a press statement, the regime reported arresting five civil servants for trafficking

crimes. Regime representatives did not report any prosecutions or convictions of public representatives complicit in trafficking crimes.

There were two special prosecutor's offices responsible for investigating trafficking crimes against women, developing anti-trafficking policies, and facilitating victims' access to justice. The special prosecutor's mandate did not include trafficking crimes against transgender individuals, children, or men, leading to impunity of traffickers and leaving victims unprotected and at risk of re-victimization. Media reporting indicated the specialized prosecutor's office was handling the investigation of a child sex trafficking ring operating in Apure that led to numerous arrests including some complicit regime-affiliated individuals. Civil society organizations expressed some doubt whether the special prosecutor's offices were active. Venezuelan prosecutors facilitated two workshops for civil servants on the criminalization of trafficking crimes.

# PROTECTION

Regime representatives under Maduro maintained inadequate protection efforts. Regime representatives did not report identifying or referring victims to services during the reporting period. In a press statement, the attorney general noted that since 2017, the regime and its predecessor had identified nearly 696 victims of human trafficking, of which 14 were identified in 2021. Availability of victim services remained limited, and there were no specialized shelters for trafficking victims in the country. While civil society and religious organizations provided some services to victims of trafficking, such assistance may have been temporarily suspended or limited as a result of the pandemic. In addition, regime efforts to restrict foreign funding limited their ability to provide services to trafficking victims. The regime claimed to have a non-specialized victim care program under the public ministry. Regime representatives reportedly provided services based on a victim's degree of vulnerability and social risk, the type of crime involved, the victim's relationship with the aggressor, and the victim's individual psychological, social, and economic profile. NGOs remained skeptical of the regime's reported efforts. Historically, victims could reportedly access regime centers for victims of domestic violence or at-risk youth, although services for male victims were minimal. Venezuelan law and the regime representatives focused primarily on women and girls as potential victims of human trafficking crimes to the exclusion of boys, men, and LGBTQI+ persons, leaving them vulnerable and unprotected. The regime reportedly made psychological and medical examinations available to trafficking victims, but additional victim services, such as follow-up medical aid, legal assistance with filing a complaint, job training, and reintegration assistance, were minimal. According to

media sources, the ONCDOFT continued to operate a 24-hour hotline to receive general reports of abuse against women, including trafficking allegations; however, in previous years several of the numbers provided were often inactive. Stakeholders reported unemployment, caused by pandemic quarantine measures, increased the vulnerability of Venezuelans to sex trafficking and forced labor, as many were unable to secure employment in the formal or informal sector. Civil society organizations reported the regime used resources that would otherwise have been dedicated to victim identification and support to address the impact of the pandemic. International media sources continued to report on the growing number of Venezuelan victims identified abroad; many repatriated or were deported back to Venezuela; the regime did not report what assistance, if any, they provided victims upon their return or if they coordinated with foreign governments to ensure the protection of those victims.

## PREVENTION

Regime representatives under Maduro maintained inadequate prevention efforts. No permanent anti-trafficking interagency body existed. In 2021, the regime approved a decree for the development of the 2021-2025 NAP; however, regime representatives did not report efforts to implement or fund the NAP. NGOs noted it was impossible to verify progress made due to lack of transparency and coordination with external actors. In addition, the regime did not report on the content of the plan, including whether it addressed present challenges, such as the increase in cases of forced labor in domestic service, the forced recruitment of children into armed conflict, the increase in victim repatriations from other countries, and efforts necessary to mitigate the exploitation of those leaving the country as a result of the economic crisis. ONCDOFT conducted an awareness campaign in the State of Portuguesa and separately participated in the trafficking in persons breakout meeting at the South American Conference on Migration. The regime did not provide anti-trafficking training for their diplomatic personnel and did not report any specific activities to reduce the demand for commercial sex acts.

## TRAFFICKING PROFILE

As reported over the past five years, human traffickers exploit domestic and foreign victims in Venezuela, and traffickers exploit Venezuelan victims abroad. As the economic situation continues to spiral into critical deterioration, more than six million Venezuelans have fled Venezuela to neighboring countries. Traffickers exploit Venezuelan nationals in Aruba, The

Bahamas, Bolivia, Brazil, Chile, the People's Republic of China, Colombia, Costa Rica, Curaćao, Dominican Republic, Ecuador, Egypt, Germany, Guyana, Haiti, Iceland, Macau, Mexico, Panama, Peru, Spain, Suriname, and Trinidad and Tobago. Venezuelan women and girls are particularly at risk of sex trafficking in Colombia, Ecuador, and Trinidad and Tobago. In 2021, traffickers lured women, including transgender women, to Spain and Germany with fraudulent employment opportunities and subjected them to forced surgical procedures before exploiting them in commercial sex. A civil society organization reported 517 victims were identified in 2020, of which 124 were children, 210 were identified domestically, 60 in Colombia and Guyana, 52 in Trinidad and Tobago, 39 in Spain, 32 in the Dominican Republic, and 26 in Mexico. Traffickers increasingly exploit Venezuelan men in forced labor in other countries, including Aruba and Curaćao.

Non-state armed groups, including Colombian illegal armed groups, especially near border regions, subject Venezuelans to forced criminality and use child soldiers. In 2019, the UN, foreign governments, media outlets, and credible NGOs reported Maduro regime representatives, including members of security forces and local representatives, including those near border regions, colluded with, tolerated, and allowed Colombian illegal armed groups to operate in Venezuelan territory with impunity, while also confronting groups at other times. These officials reportedly provided support and a permissive environment to non-state armed groups that recruited children for armed conflict and forced criminality. These non-state armed groups grew through the recruitment of child soldiers and engaged in sex trafficking and forced labor. They lured children in vulnerable conditions and dire economic circumstances with gifts and promises of basic sustenance for themselves and their families to later recruit them into their ranks. These groups recruited children to strengthen their operations and terrorize border communities in Venezuela and neighboring countries, especially Colombia, in areas with limited governance. An NGO reported non-state armed groups indoctrinated, recruited, and engaged children in five Venezuelan states using lectures, brochures, and school supply donations. Reports have documented the presence of six dissident movements comprising FARC dissident combatants in at least seven of 24 Venezuelan states, including Amazonas, Apure, Bolívar, Guárico, Mérida, Táchira, and Zulia, five of which are border states. In 2019, Colombian authorities estimated there were approximately 36 ELN camps located on the Venezuela side of the Colombia-Venezuela border. In 2021, the regime imprisoned a civil society activist under politically motivated pretexts after his organization denounced and documented the regime's support for non-state armed groups, including those that recruited children for armed conflict among other crimes. Members of the Maduro regime probably profit from such non-state armed groups' criminal and terrorist activities inside Venezuela, including human trafficking, and such funds

likely contribute to their efforts to maintain their control. According to documents reportedly from the regime's intelligence agency (SEBIN) and published in Colombian press, the Armed Forces in 2019 ordered members of the Army, National Guard, and militias present in four states along the Colombia-Venezuela border to avoid engaging unspecified allied groups in Venezuelan territory and encouraged the armed forces to aid and support their operations. These groups threaten to destabilize the region, as they grow their ranks exploiting children in sex trafficking, forced labor, and forced recruitment. According to NGOs, forced labor is a common punishment for violating rules imposed by armed groups. Illegal armed groups forced Venezuelans, including children, to work in mining areas and women and girls into sex trafficking.

Traffickers subject Venezuelan women and girls, including some lured from poor interior regions to Caracas, Maracaibo, and Margarita Island, to sex trafficking and child sex tourism within the country. Traffickers, often relatives of the victims, exploit Venezuelan children in domestic servitude within the country. Regime representatives and international organizations have reported identifying sex and labor trafficking victims from South American, Caribbean, Asian, and African countries in Venezuela. Foreign nationals living in Venezuela subject Ecuadorians, Filipinos, and other foreign nationals to domestic servitude. Illegal gold mining operations exist in some of the country's most remote areas, including the Orinoco Mining Arc in Bolivar state, where traffickers exploit girls in sex trafficking, forcibly recruit youth to join armed criminal groups, and force children to work in the mines under dangerous conditions; Approximately 45 percent of miners in Bolivar state were children and extremely vulnerable to trafficking. Armed groups exploit civilians and kidnapping victims in sex trafficking and forced labor, including farming, domestic service, and construction. Workers recruited from other areas of the country were victims of forced labor and manipulated through debt, threats of violence, and even death. In 2021, an NGO reported non-state armed groups operating near Delta Amacuro in Bolivar State led members of the Indigenous Warao community into Guyana to work long shifts in illegal mines with no medical care and under precarious conditions. Traffickers recruited Warao women to work as cooks in the mines and later subjected them to sex trafficking in Guyana. Some doctors participating in Cuba's overseas medical program showed indicators of forced labor. In 2021, there were between 19,500 and 21,000 Cuban medical workers in the country. The Cuban government may be exploiting Cuban overseas workers, participating in its government-sponsored medical missions in Venezuela, in forced labor. Some Cuban medical professionals posted in Venezuela indicated Cuban minders withheld their documentation and coerced them to falsify medical records. An NGO reported failure to obtain adequate personal protective equipment for potential medical worker victims could have contributed to the death of at least

one Cuban medical worker. NGOs reported an increased incidence of domestic servitude and sex trafficking within the country. According to civil society organizations, Venezuela has the highest rate in Latin America of people exploited in human trafficking with 5.6 per 1,000 people.

Current Cable 33137153



**CURRENT**
NCTC Online

CABLE

**CABLE PRODUCED BY**
*AMEMBASSY MEXICO*

| | |
|---|---|
| **Processed** | 01 Dec 2022 - 00:10 |
| **Doc #** | 33137153 |
| **EMS #** | 22-HQS165635230 |
| **Serial #** | AMEMBASSY MEXICO 003134 |
| **DTG** | 2022-12-01 00:10:00 |
| **TOPICS** | TERR and HSEC |
| **Countries** | Worldwide |

**Addressing**

**To Addressees**
  ZEN/SECSTATE WASHDC

**Field Dissem**
  None

**Points of Contact**
• Office:

  Not Available

**CL BY:**

**DRV FROM:**

### (U) (SBU) Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico

Access Controls

| | | | |
|---|---|---|---|
| **Classification** | UNCLASSIFIED/// | | |
| **COI Level** | 1 | | |
| **Product Type** | Cable | **Producers** | AMEMBASSY MEXICO |
| **Reporting Type** | CABLE | **Audience** | IC |

**Summary: (U)** (U) NONE

22 MEXICO 3134

SENSITIVE

E.O. 13526: N/A
TAGS: PGOV, PREL, PREF, PHUM, SMIG, KNCV, SHLH, MX, ECON, EINT, ELTN, ETRD
SUBJECT: (SBU) Mexico: Potential Impact of End of Title 42 on Migrant
Populations and Border Flows in Mexico

1. (SBU) Summary:  In the wake of a U.S. district court decision to end Title
42-based operations by December 21, Mexican authorities have expressed concern
regarding an upcoming surge of migrants.  This concern is corroborated by
comments from many migrants and asylum seekers in Mexico, who report they plan
to attempt entry into the United States once Title 42 is no longer in effect.
Mexicos National Institute of Migration (INM) has little capacity to deal with
further migration streams (whether arriving from the south or returned from the
United States), having already seen a dramatic rise in apprehensions since
installing 234 checkpoints in southern Mexico in October.  As a result, Mexico
has little remaining detention shelter space and limited ability to repatriate
most of those who are apprehended.  Commercial trade flows and non-trade
traffic at the U.S.-Mexico border could experience disruptions under a
post-December 21 migrant surge.  End Summary.

2. (SBU) Comment:  The Government of Mexicos (GOM) inability to provide shelter
and repatriate migrants beyond current limits shows post-Title 42 flows may
overwhelm local authorities ability to conduct enforcement absent significant
action.  Even if the United States were to grant parole to other nationalities,
INM and CBP encounter data shows northbound flows of irregular migrants not
eligible for parole would quickly fill the gap.  End comment.

(SBU) End of Title 42 Could Incite Migrant Surge, Some Unprepared

3. (SBU) In the wake of the November 15 U.S. district court decision to end
Title 42-based operations by December 21, there is widespread unease among GOM
and NGO partners regarding the prospect of an upcoming migrant surge.  In
discussions with embassy and consulate officers, GOM officials at the federal,
state, and local levels have expressed concern regarding constrained capacity
to apprehend, detain, and/or shelter the current levels of irregular migrants
and asylum-seekers (ref A), much less those resulting from an additional
surge.  Four INM staff members in Ciudad Acuna told Consulate Nuevo Laredo
PolOffs they were unprepared for large-scale, irregular migrant flows to the
border and noted their top priority was to prevent gatherings akin to the

Venezuela AR_000526

September 2021 influx of Haitian migrants to Del Rio that disrupted commercial traffic (ref B).  Chihuahua state officials in Ciudad Juarez expressed concern the lifting of Title 42 would spur migrants to travel in large groups to the border to seek asylum, noting such movements could quickly overwhelm shelters and strain other migrant resources.

(SBU) President Lopez Obrador Calls for Venezuela Parole Process Expansion to Other Nationalities, but Shelters in Mexico Already at Capacity

4. (SBU) While President Lopez Obrador has called for the United States to expand the current Venezuelan parole process to include other nationalities, shelter capacity  which humanitarian actors note would be important to post-Title 42 orderly processing  has already surpassed occupancy limits. Incoming northbound flows after December 21 may further test shelter constraints, humanitarian actors expressed.  In Tijuana, a makeshift shelter at the Unidad Deportiva housing over 300 Venezuelans is in quarantine until December 16 due to a chicken pox outbreak, while private shelters are fully occupied, according to consulate officials.  Another Tijuana shelter  La Embajada Migrante  reportedly also announced its plan to close in response to alleged increased criminal activity and police extortion.  Piedras Negras, Coahuila shelters have no remaining capacity.  Shelters across Tamaulipas are similarly overcrowded or closed due to security concerns.  According to one shelter director in Reynosa, a group of Haitians reportedly attacked a shelter guard on November 29 out of frustration related to conflicting information they are receiving regarding the Title 42 exception process.  Shelters in Ciudad Juarez, Hermosillo, and Nogales have also surpassed their capacity, IOs reported, while Mexico City shelters are at a 191 percent occupancy rate. Overcrowding and health issues in the shelter in San Pedro Tapanatepec, Oaxaca housing 8,000 migrants prompted calls from local authorities and humanitarian actors to relocate to another facility.

(SBU) Migrants Take a Wait and See Approach to Policy Changes

5. (SBU) Most migrants and asylum seekers currently in Mexico plan to wait until Title 42 is lifted on December 21 before attempting to enter the United States, IOs reported on November 25.  Speculation regarding how the United States will manage the end of Title 42 and what policy decisions come next will affect migrants decisions, IOs told PolOffs.  They assessed the typical seasonal slowdown in migration during December and early January would likely occur this year as well, however, despite the lifting of Title 42. Highlighting the estimated 50,000 migrants and asylum seekers congregated along Mexico's northern border, UNHCR emphasized the need for an orderly and humane process to manage flows seeking entry into the United States and offered to provide input into any such system to ensure it satisfies protection principles.

(SBU) Messaging Important to Combat Post-Title 42 Misinformation

6. (SBU) IOM flagged fraud and abuse concerns, which they characterized as rampant in the current Title 42 exception process, cautioning that any migration management process should avoid providing too much control to local organizations in determining who was permitted access to the United States. IOM stressed the need for clear and proactive U.S. messaging on what post-Title 42 migration enforcement would look like to combat misinformation from human smuggling operations that would falsely promise the border is open.  IOs indicated they would continue efforts to provide accurate information to migrants, and IOM and UNHCR reported they were mobilizing increased assistance to migrants and shelters in northern Mexico as temperatures drop and the need for blankets, heating units, and warm clothing grows.

Venezuela AR_000527

UNCLASSIFIED///

(SBU) INM Apprehensions Spike, Repatriations Remain Low


7. (SBU) Since the implementation of the Venezuelan parole process, Mexico has increased migrant interdictions more than three-fold, but lagging repatriations demonstrate limitations to Mexicos enforcement, according to DHS officials at Post.  INM apprehensions of Cubans, Nicaraguans, and Venezuelans sharply increased after adding 234 checkpoints along highways and migration routes in southern Mexico on October 8, but repatriations have remained low due to INMs limited ability to repatriate those nationalities.  Currently, INM conducts one repatriation flight with approximately 135 Nicaraguans per week, while Cubans and Venezuelans are mostly detained and then eventually released, INM told DHS.  The dramatic rise in apprehensions of these nationalities led to maximum occupancy in INM detention centers, prompting authorities to contain approximately 18,000 migrants in non-detention facilities in Oaxaca and 17,000 in Chiapas by late October.  INM replaced an open-door shelter in Oaxaca with migrant processing facilities in Tapachula and Huixtla, Chiapas after local authorities complained about overcrowding and health issues.  INM told DHS the Huixtla and Tapachula facilities had thus far prevented caravans but projected that continued high flows in Tapachula could cause them to start.


(SBU) Migrant Influx Could Disrupt Commercial Trade, Increase Wait Times
8. (SBU) Disruptions to commercial trade flows at the U.S.-Mexico border could occur in the face of a migrant surge, warned Mexican associations representing customs agents and the freight transport sector (ref C).  Migrant arrivals in large groups would overwhelm customs authorities, reduce traffic lanes, and lengthen wait times at ports of entry.  Customs and transport contacts cautioned migrants could board commercial trucks in waiting areas leading to POE inspection lines without operator knowledge, harming trade flows.  They also warned that if U.S. border states were to implement additional vehicle inspections after vehicles cleared CBP inspection areas  as Texas did in April northbound commercial traffic would be severely disrupted.


(SBU) Concerns about Disruption to Pedestrian and Vehicle Lanes Vary


9. (SBU) Migrant stakeholders along the U.S.-Mexico border conveyed to PolOffs that migrant arrivals in large groups after Title 42 ends would pose low-to-moderate risks of disruption to non-trade traffic.  In Nuevo Laredo, contacts told consulate PolOffs the risk is low, noting migrant numbers were unlikely to spike due to the precarious security environment and cartel threats deterring migrant arrivals.  CBP Tucson told Consulate Nogales PolOffs they would likely need to close private vehicle lanes and pull personnel to process asylum seekers if a large group of migrants were to present at the POE, increasing wait times for vehicle crossings.  Northern Coahuila officials were confident that the aggressive border security and highway checkpoints maintained by their state officials, coupled with their swiftness in enacting stringent measures to maintain order in Piedras Negras and Ciudad Acuna, put them in a low risk category for disruptions.  Officials in Tijuana and Matamoros voiced concern migrants could flood pedestrian lanes, forcing them to shut down normal pedestrian traffic.
SALAZAR

Attached Image

UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 22 SAN JOSE 796 |
| **Date/DTG:** | Sep 20, 2022 / 201856Z SEP 22 |
| **From:** | AMEMBASSY SAN JOSE |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PREL, PGOV, PHUM, SMIG, CR |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 22 SAN JOSE 596 |
| | B) 22 SAN JOSE 238 |
| **Subject:** | Costa Rica Struggles to Cope with Surge of Venezuelan Migrants |

1. (SBU) **Summary and Comment:** Costa Rican President Rodrigo Chaves and key cabinet members have repeatedly emphasized to the Ambassador and Washington visitors the urgent need for increased resources to address a new surge of Venezuelan migrants and assist the large population of vulnerable migrants already residing in Costa Rica.  The International Organization for Migration (IOM) in Costa Rica reported a 70 percent increase of migrants entering Costa Rica through unofficial border crossings along the Panamanian border, with an average of 1,000 migrants entering daily in August, compared to 124 in January.  Venezuelan Ambassador to Costa Rica Maria Faria told the Ambassador there were 1,700 Venezuelan migrants entering each day, which Costa Rican government contacts confirmed.  The influx has caught public attention, with media coverage emphasizing the humanitarian needs of the migrants, the majority of whom are Venezuelan, and many of whom have been in the streets of San Jose seeking money to continue their northward journey.  The increased public attention on migrants in Costa Rica has added pressure on the Government of Costa Rica, which wants to avoid politicization of the issue.  The GOCR at its highest levels is sending increasingly urgent messages to the U.S. government about its already overburdened migration system and public services, and the pressing need for support to continue hosting hundreds of thousands of vulnerable migrants.  During our negotiations encouraging the Costa Rican government to sign a bilateral agreement on migration and to join the LA Declaration, the GOCR continuously emphasized that it shared our priorities but needed to receive increased resources in order to meet the commitments we were asking them to

make.  Providing support to the GOCR during this crisis would demonstrate we took seriously their concerns and be a powerful symbol of solidarity.  **End Summary and Comment.**

**Escalating Urgency from President Chaves and Cabinet (SBU)**

2. (SBU) In multiple engagements over the last two weeks, President Chaves and key cabinet members have increased the urgency with which they are requesting U.S. assistance to address migration related burdens.  In multiple recent conversations with the Ambassador, President Chaves, Minister of Foreign Affairs Arnoldo André, Minister of Public Security Jorge Torres, and other high-level officials have sounded the alarm about the recent influx of Venezuelan migrants adding to already overstretched migration, humanitarian, education, and social services.  In September 13 and 14 meetings with U.S. Coast Guard Commandant Linda Fagan and Under Secretary for Economic Growth, Energy, and the Environment Jose Rodriguez, President Chaves and his team turned the conversation to the urgent migration situation and Costa Rica's need for support. In addition to the pressing needs of vulnerable migrants, the GOCR needs a tangible signal that the United States stands with Costa Rica in its migration management efforts.

3. (SBU) The GOCR sent the same message to the wider international community at a national       Comprehensive Regional Protection and Solutions Framework (MIRPS) event on September 14.  As head of the Migration Authority (DGME) Marlen Luna emphasized, the GOCR is concerned that the public attention to the recent influx of high-needs migrants, along with the challenging fiscal environment, could lead to public backlash.  The GOCR wants to avoid at all costs, she said, a situation that sparks xenophobia and pushback against GOCR efforts to address the needs of refugees, asylum seekers, and other vulnerable migrants.  GOCR officials emphasized the principle of shared responsibility for vulnerable migrants throughout the meeting, as they requested international assistance to demonstrate to Costa Ricans that donor countries take this responsibility seriously.

**IOM Costa Rica Reports Increased Numbers of Migrants in Transit (U)**

4. (SBU) IOM Costa Rica reported increasing numbers of predominantly Venezuelan migrants in transit entering Costa Rica at unofficial entry points along the Panama border.  IOM estimates an average of approximately 1,000 people entered Costa Rica daily in August 2022, compared to 124 in January 2022.  The

majority are Venezuelans seeking to continue their journey northward.  According to Venezuelan Ambassador to Costa Rica Maria Faria, there were 1,700 Venezuelan migrants entering each day, which Costa Rican government contacts confirmed.  IOM estimates there has been a 70 percent increase in the number of migrants entering Costa Rica from the south, compared to the same timeframe in 2021.  During a September 13 meeting, IOM Country Director Diana Cartier told PolOff that migrants currently entering Costa Rica have significantly fewer economic resources and are far more vulnerable than previous waves of Venezuelan migrants, while Ministry of Security officials told the Ambassador there was an increase in criminal elements among the current wave.  Cartier highlighted that many Venezuelan migrants do not have funds to pay for transportation, hotels, basic needs, or the $150 per person unofficial fee charged by Nicaraguan officials to enter Nicaragua (Ref A).

**Humanitarian Needs Highlighted by Media Add Pressure to Government (U)**

5. (SBU) Throughout August media reports highlighted the dire humanitarian needs of migrants, the failure of the "collapsed" refugee system, and the growing informal tented camps, primarily in San Jose, where migrants stay for two to three days.  Media reports note that migrants in need of medical attention are burdening medical centers in San Jose.  Cartier expressed concern that the media coverage and public opinion could turn against migrants as the crisis continues to wear on Costa Rica's public health system and remains, quite literally, in the public eye with tented camps in public parks.  IOM is working with the GOCR, Municipality of San Jose, and civil society to provide shelter, food, and basic items to those most in need.  According to Cartier, the GOCR has been supportive of efforts to assist vulnerable migrants but does so in a low-profile manner to prevent a "pull factor."



Photo of a migrant tent camp in San Jose published by Costa Rican media outlet CRHoy on August 23, 2022

SENSITIVE BUT UNCLASSIFIED

**Signature:**       TELLES



| **Drafted By:** | | K |
| **Cleared By:** | | |
| | | |
| | | |
| **Approved By:** | | |
| **Released By:** | | |
| **Info:** | | |

**XMT:**       CARACAS, AMEMBASSY

**Dissemination Rule:**   Archive Copy

**UNCLASSIFIED**
SBU



**From:** SMART Core <svcSmartBtsEwsSPrec@state.gov>
**Sent:** Friday, September 30, 2022 5:23 PM
**To:** Campbell, Yanique (Mexico City) <CampbellY@state.gov>
**Subject:** (SBU) MEXICO Migration Update: UNHCR Highlights Continuing Surge in Venezuelan Migration

<div align="center">

**UNCLASSIFIED**
SBU

</div>



**Action Office:**          DOJ, POL, ECON, INL, RSO, FMM, DAO, NAS, OBO, ADO, PAS
**Info Office:**            EAC, POL_LES

Venezuela AR_000533

| | |
|---|---|
| **MRN:** | 22 MEXICO 2624 |
| **Date/DTG:** | Sep 30, 2022 / 302221Z SEP 22 |
| **From:** | AMEMBASSY MEXICO |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PGOV, PREL, PHUM, SMIG, SHLH, KNCV, MX, CO |
| **Captions:** | SENSITIVE |
| **Subject:** | (SBU) MEXICO Migration Update: UNHCR Highlights Continuing Surge in Venezuelan Migration |

1. (SBU) **Summary:**  The National Migration Institute (INM) apprehended 2,604 migrants per day and repatriated an average of 228 migrants per day from September 25 to 29.  UNHCR said it continued to track record levels of Venezuelan irregular flows through the Panama-Colombia Darien Gap.  A lack of political will, widening trust deficit, and ineffective mechanisms to regulate irregular migrant flows departing Colombia underpin fractured cooperation on migration matters between Mexico and Colombia, according to Colombian Chargé d'Affaires Luis Carlos Rodriguez.  INM underscored enforcement and repatriation efforts in meetings with Border Patrol in northern Mexico September 26 to 27.  The Migration Affairs Committee in the Chamber of Deputies shared a work plan focused on human rights and engagement with federal institutions and NGOs on September 22.  Ambassador Salazar's September 27 Chihuahua trip spotlighted shared U.S.-Mexico security and migration cooperation.  **End summary.**

**(SBU) Apprehension Statistics**

2. (SBU) INM apprehensions of irregular migrants from September 25 to 29 averaged 2,604 per day while repatriations averaged 228 per day.



*Figure 1: INM Apprehensions and Repatriations, Daily Average.  Source:  INM*

Venezuela AR_000534

**(U) UNHCR Highlights Continuing Surge in Venezuelan Migration**

3. (U) At a September 19 donor meeting, UNHCR reported Venezuelan migrants continue to flow through the Panama-Colombia Darien Gap in record numbers.  UNHCR said they used Panama Migration Service data to track over 11,000 Venezuelans crossing the Darien in June 2022, up from 1,000 in January.  UNHCR reported asylum applications continue to rise, while also noting Venezuelans generally do not seek asylum in Mexico as they are focused on reaching the United States.  The top asylum-seeking nationalities in Mexico are Hondurans, Cubans, and Haitians as of August.  Nicaraguans were fifth on the list with 6,900 applications as of June, a significant rise from 2,900 in December 2021 when they occupied ninth place.  UNHCR highlighted it has provided integration assistance to over 25,000 people since 2016 in efforts to strengthen the Mexican asylum system.  UNHCR reported it now has presence in 20 locations around Mexico, with a large concentration in the southern and central regions of the country.

**(SBU) Colombian Officials Express Frustrations Over Mexico's Unwillingness to Cooperate on Migration**

4. (SBU) Colombian Chargé d'Affaires to Mexico Luis Carlos Rodriguez told POLMINCOUNS on September 27 he was frustrated with the lack of political will, trust deficit, and ineffective mechanisms to regulate irregular Colombian migration when it comes to the Mexico-Colombia bilateral migration cooperation.  Rodriguez recalled with frustration that senior officials at INM told senior Colombian migration officials, "off the record," that they were only meeting with them at the behest of the United States.  Rodriguez said the Colombian delegation was disappointed to learn their meeting with INM Director Francisco Garduno had been relegated to working-level counterparts.  He asserted INM statistics concerning Colombian migrants were inaccurate and could not be trusted.  Mexican immigration officials perpetrate inhumane treatment of detained migrants, solicit bribes, and delay repatriation of detained Colombian migrants, he said, which has further widened the trust deficit.  Mechanisms to stem irregular migrants, such as electronic pre-arrival certification before boarding flights, were ineffective, Rodríguez said, adding that Mexican immigration authorities routinely harassed Colombians regardless of their socio-economic level, purpose of travel, and length of stay.  As a result, the Government of Colombia did not support repatriation flights from Mexico out of concern that these flights would generate increased GOM discrimination against Colombians.  Rodríguez said he was waiting for more directions from the relatively new Petro administration.

**(SBU) INM Travels to Northern Mexico to Coordinate Border Patrol Efforts**

5. (SBU) INM Commissioner Francisco Garduno met with Rio Grande Valley, Del Rio, and El Paso U.S. Border Patrol leadership September 26 to 29, according to DHS.  Garduno assessed INM detention facilities were currently at 77 percent occupancy, representing 5,276 migrants out of the 6,878 total currently detained in Mexico.  Reviewing efforts so far in 2022, Garduno noted that INM had encountered 410 large groups of migrants, half of whom had been encountered in

northern Mexico, transferred over 535 suspected smugglers to the Mexican Attorney General's (FGR) office, and seized 485 vehicles.  INM estimated it cost USD 8.1 million (162.8 million pesos) to repatriate approximately 11,750 migrants from Mexico's northern border to Chiapas and Tabasco so far in 2022.  INM said it prevented 65,732 migrants from entering Mexico on commercial air flights and a total of 140,642 migrants from traveling to the U.S.-Mexico border.  Of the total number of migrants INM denied entry, there were 22,992 Colombians, 12,090 Peruvians, 7,863 Brazilians, 3,837 Venezuelans, 3,176 Turkish, and 1,832 Indians.

**(SBU) Migration Affairs Committee in Congress to Focus on Human Rights**

6. (SBU) On September 22, the Migration Affairs Committee in Mexico's Chamber of Deputies shared with Post its work plan for September 2022 to May 2023.  The committee intends to revise the current migration legal framework to meet international human rights standards, draft initiatives to address internal forced displacement and climate migration, propose alternative care models for unaccompanied migrant children, and continue outreach to federal institutions.  The committee reported it strengthened coordination between migration authorities and other stakeholders, including engagement with the Mexican Commission for Refugee Assistance (COMAR), IOM, the Secretariat of the Interior's (SEGOB) Migration Policy Unit, the Institute for Women in Migration (IMUMI), and several NGOs.

**(SBU) INM Enforcement and Repatriation Efforts**

7. (SBU) On September 26, INM Commissioner Garduno said INM removed 74,910 migrants in 2022 as of September, including 33,745 flight repatriations, 21,103 land repatriations to Guatemala and 20,062 to Honduras.  On September 27, municipal police apprehended 16 Hondurans in San Cristobal de las Casas, Chiapas after a smuggler abandoned them.  On September 25, local authorities apprehended 108 migrants in a trailer in Santa Catarina near the Monterrey-Saltillo highway and transferred them to INM custody.  On September 24, INM detained 38 minors and 44 adults in a refrigerator box in a tractor trailer in Cadereyta Jimenez near the Monterrey-Reynosa highway.  INM apprehended 110 migrants in Saltillo, Coahuila who were traveling at the back of a trailer on September 22.  There were 96 Guatemalans, 7 Ecuadorans, 5 El Salvadorans, 2 Hondurans, and one family unit of 10 which included two minors.

**(SBU) Ambassador's Chihuahua Visit Highlights Migration and Security**

8. (SBU) Ambassador Salazar visited Chihuahua on September 27 and met with Governor Maru Campos and the First Lady of Mexico Beatriz Muller to discuss shared security cooperation and efforts to curb irregular migration.  The Ambassador also visited a migrant shelter operated by the city of Ciudad Juarez to see firsthand the challenges migrants in the region confront.  The Ambassador's tweets on the visit resulted in over 55,000 impressions with more than 1,100 engagements.  Mission Mexico social media teams shared several media stories this week emphasizing the dangers of the journey as part of the #NoTeArriesgues ("Don't Risk it") and

Venezuela AR_000536

#NoAlCoyote ("Say No to the Smuggler") campaigns.  The stories included those of migrants found in trailers and apprehended from safe houses, as well as deaths following attempts to cross the Rio Grande.  The posts received 25,000 impressions and more than 1,000 engagements.  Embassy Mexico City posted about an INL Mexico training for INM agents.  INL trained the agents in special water rescue operations to try to save migrants crossing the Rio Grande irregularly.  The post resulted in 1,696 impressions with 88 engagements.

SENSITIVE BUT UNCLASSIFIED



| | |
|---|---|
| **Signature:** | ███████ |
| **Drafted By:** | ██████████████████████ ) |
| **Cleared By:** | ████████████████ |
| | ██████████████ |
| | ███████████████ |
| | ██████████████████ |
| | ██████████████████ |
| | █████████████████ |
| | █████████████████ |
| | ██████████████ |
| **Approved By:** | ████████████████████ |
| **Released By:** | ████████████████ |
| **Info:** | |
| **XMT:** | CARACAS, AMEMBASSY |
| **Action Post:** | NONE |
| **Dissemination Rule:** | ████████████████████████ |

**UNCLASSIFIED**
SBU

SENSITIVE BUT UNCLASSIFIED

Venezuela AR_000537

UNCLASSIFIED
SBU



| | |
|---|---|
| **MRN:** | 22 PANAMA 624 |
| **Date/DTG:** | Jul 12, 2022 / 122150Z JUL 22 |
| **From:** | AMEMBASSY PANAMA |
| **Action:** | WASHDC, SECSTATE *ROUTINE* |
| **E.O.:** | 13526 |
| **TAGS:** | PGOV, PREL, PHUM, SMIG, ECON, MARR, MASS, CO, PA |
| **Captions:** | SENSITIVE |
| **Reference:** | A) 22 PANAMA 602 |
| **Subject:** | Panama: Mid-Year, Irregular Migrant Entrants at Panama-Colombia Border Outpacing 2021 by 85 Percent |

## Summary

1. (SBU) Between January and June, roughly 48,000 migrants entered Panama from Colombia through its land border in the Darien jungle, representing an 85 percent increase over the same period in 2021.  In June, Venezuelans constituted roughly 73 percent of migrants entering Panama via the Panama-Colombia border, compared to just 2 percent in 2021.  As a percentage of entrants, the proportion of minors entering between January and June (15 percent) mirrored the proportions seen in the same period in 2021, although in terms of raw numbers notably more minors have entered Panama via the Darien Gap (roughly 7,200 versus 4,300) in 2022.  Migration through the Panama-Colombia border in the first half of the year has outpaced 2021 numbers, provoking significant concerns for high-level Panamanian government officials (Ref A) and Post.  If, as we expect, the trend continues, government officials will certainly increase pressure on the United States to provide more support and hold sending countries accountable.  End summary.

**Between January and June, More Migrants Than Ever Crossed Border**

UNCLASSIFIED



*(U) Chart comparing monthly migrant entry numbers at the Panama-Colombia border in the first half of 2022 and 2021.*

2. (U) Between January and June, over 48,000 migrants entered Panama from Colombia through its land border in the Darien jungle, according to Panama's National Migration Service (SNM).  This represents an 85 percent increase over the same period in 2021, when just more than 26,000 migrants crossed.  In May, nearly three times as many migrants crossed the Panama-Colombia border as in May 2021.  In June, 43 percent more migrants crossed the border than in June 2021.  April represented the only month this year in which irregular entries at the Panama-Colombia border did not outpace the respective month from the previous year.  Of the 15,633 migrants who crossed in June, three-fourths (11,632) were men—a proportion similar to the male-female divide across other months.

**Many More Venezuelans, Significantly Fewer Haitians…**



*(U) Chart comparing proportion of Venezuelan migrants entering Panama at its Colombian border between 2022 and 2021.*

3. (SBU) In June, Venezuelans constituted roughly 73 percent of migrants entering Panama via the Panama-Colombia border, compared to just 2 percent in 2021. Based on SNM's preliminary figures, in the first three days of July Venezuelans comprised 80 percent of entrants.  Between January and June, approximately 28,000 Venezuelans entered Panama via this route.  In contrast, between January and June 2021, only 330 Venezuelans crossed the border.  Approximately 3,800 Haitians crossed the border between January and June of this year, compared to roughly 14,000 in that period in 2021.  Between July and December 2021, roughly 69,000 more Haitians crossed.  Since February, IOM and UNICEF officials have noted increased concern about not just the quantity of Venezuelan entrants but also their notably worse health, lack of resources, and general unpreparedness. Regional SNM officials said that Venezuelan migrants come with less money on average and in many cases cannot pay to continue their journey across the country.  As a result, Venezuelan migrants must stay longer at the camps to seek opportunities to earn money in order to continue.  Foreign Minister Erika Mouynes and SNM Director Samira Gozaine have expressed increasingly intense concern to high-level U.S. interlocutors, including most recently SOUTHCOM Commander General Laura Richardson, about the growing number of Venezuelans entering Panama from Colombia (Ref A).

**…and Concern About Minors Increases**



*(U) Chart comparing proportion of minors entering Panama at its Colombian border between 2022 and 2021.*

4. (SBU) As a percentage of entrants, the proportions of minors entering between January and June mirrored those seen in the same period in 2021.  Still, because of increased entries overall, the number of minors entering notably increased: more than 7,200 minors entered between January and June versus 4,300 during the same period in 2021.  In June, UNICEF staff in Panama expressed alarm about the increasing number of minors crossing the Panama-Colombia border.  According to UNICEF, most of the arriving children were under the age of 12.  UNICEF staff also noted an increase in unaccompanied adolescents arriving from Venezuela and Ecuador.  Publicly, Panama's Human Rights Ombudsman raised concerns in May and June about the number of minors arriving from the Darien without their biological parents, noting the potential for child trafficking.

**Comment**



*(U) Line chart comparing monthly migrant entry numbers at the Panama-Colombia border in 2022 (January-June) with total flow in 2021.*

5. (SBU) Migrant entries at the Panama-Colombia border in the first half of the year outpace 2021 numbers, provoking significant concerns for high-level Panamanian government officials (Ref A) and Post.  Panamanian officials have repeatedly stressed that limited border personnel and resources are being depleted at even faster rates due to the migrant influx.  (Post will report in more detail septel.)  The numbers in May caused particular concern, reflecting a nearly three-fold increase compared to May 2021.  A similar three-fold increase in the next quarter would substantially overwhelm the government's capacity to handle the situation.   Due to renovations underway at the San Vicente Migrant Reception Station, authorities have moved migrants to a nearby temporary reception station with limited capacity, where conditions are already overcrowded and deteriorating.  The UN, international organizations, and civil society actors will continue to draw public attention to this issue.  Venezuelans – often with more humanitarian needs than the Haitians who came before them – present a uniquely difficult problem set for SNM officials.  As the trend continues, government officials will most certainly increase pressure on the United States to provide more support and hold sending countries accountable.  End comment.

SENSITIVE BUT UNCLASSIFIED

**Signature:**

**Drafted By:**
**Cleared By:**



**Approved By:**
**Released By:**
**Info:**

**XMT:** CARACAS, AMEMBASSY

**Dissemination Rule:** Archive Copy

**UNCLASSIFIED**
SBU



**Subject:** RE: Venezuela Reporting - November 30

**Importance:** Low

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Colleagues,

The below reporting is a combined effort of PRM, WHA, Posts, and Refugee Coordinators. Thanks to all who contributed.

BLUF:

- On November 27, 815 migrants entered irregularly through the Darien. Ecuadorians were the leading group (386), followed by Haitians (258), Indians (39), and Venezuelans (28).

- Intentions surveys and border entry/exit data in South America show a continuing trend of circular and southbound flows among Venezuelans; Ecuadorians continue to make up the highest numbers of people transiting the Darien into Panama; and US-supported enforcement efforts in Guatemala continue.

- Mexican state and municipal authorities dismantled the Ciudad Juarez encampment on Sunday, November 27.  Estimated hundreds of Venezuelans remain nearby or in the Bellavista neighborhood.  A group of 200 attempted to reassemble outdoors, but municipal authorities prevented it.

- According to IOM Ecuador's most recent GTRM report, 42 percent of surveyed Venezuelans leaving Ecuador reported their intention to return to Venezuela, mainly to reunite with other relatives (39 percent). Of these, approximately half plan to return to Venezuela indefinitely, while the other half will do so temporarily, to later continue to other destinations:  Ecuador (28 percent), Peru (18 percent), and the United States (17 percent).  More than 63 percent reported feeling affected by the DHS Title 42 announcement.

## (SBU) OPERATIONAL UPDATES

**CBP overall encounters on November 29**: 7,493
**CBP Encounters of Venezuelans along the U.S. Southwest Border on November 29:** not yet available
**CBP Expulsion of Venezuelans to Mexico on November 29**: not yet available
**CBP Expulsion of Venezuelans to Mexico since October 12:** Approx 11,000

*INM Checkpoints* in southern Mexico: 234 operational

NOTE:  INM has indicated its intent to continue enhanced enforcement operations in southern Mexico until January 15.

(SBU) Ciudad Juarez:
- State and municipal authorities dismantled the encampment on Sunday, November 27.  Estimated hundreds of Venezuelans remain nearby or in the Bellavista neighborhood.  A group of 200 attempted to reassemble outdoors, but municipal authorities prevented it.
- Venezuelans who went from the encampment to shelters feared they would be deported, relocated, or mistreated, which has not happened.

## (SBU) SHELTER UPDATES

**IO Shelter Tracker**:  PRM's IO partners have created a Shelter Tracker Dashboard to provide information on shelter capacity at various points in northern Mexico.  The partners are committed to updating the tracker every Wednesday.

Tijuana – AT CAPACITY
- The Unidad Deportiva Reforma (temporary city-funded shelter) housing over 300 Venezuelans is under quarantine until at least December 8due to a chicken pox infection.  No new migrants have entered since the outbreak on 11/24.
- Private shelters all above capacity.  If more Venezuelans arrive, they will be referred to CIM.
- Many Venezuelans who arrive in Tijuana depart for Matamoros to try and avail themselves of the Title 42 exception process.

Ciudad Juarez – LIMITED CAPACITY
- There are 439 people in the Leona Vicario-CIM shelter, including 163 Venezuelans, Kiki Romero Municipal Shelter: 118, including 40 Venezuelans.
- The Casa Onix temporary shelter has closed.

Nogales – LIMITED CAPACITY
- No Venezuelans returned to Nogales.
- Hermosillo shelter capacity at 70 percent, Nogales at 50 percent.
- Increased presence of VZ men soliciting work in public plazas of downtown Nogales.

Hermosillo – LIMITED CAPACITY

Venezuela AR_000545

- Shelters are near capacity in Hermosillo.  Vida Plena Corazon Contento shelter has seen a rise in Venezuelans in recent days.
- Sonora state authorities are prepared to host up to 400 migrants at the Gym Ana Gabriela Guevara temporary facility.  It will open once the other three shelters are deemed to be over capacity.

Piedras Negras – NO CAPACITY

- Small number of Venezuelans sheltering at the Shelter Frontera Digna.  The Shelter may open a new space in coming weeks, if needed.
- Venezuelans continue to be returned here daily.

Matamoros/Reynosa – OVER CAPACITY

- **Casa del Migrante shelter in Matamoros remains closed** for security reasons; last week it was visited by armed men looking for payment.
- Over 500 migrants (mostly Haitian and some Venezuelan) are sleeping on streets, abandoned buildings, and on the street in Matamoros while they pursue Title 42 exceptions.  Tents appear and disappear sporadically the streets near the Rio Grande.
- The Matamoros Government opened Alberca Chavez, a converted sports facility.  It currently houses 100 migrants and limits them to a one-night stay.  Requesting beds from the CIM and IOM but to increase capacity.
- An unknown number of Venezuelans are staying in rental rooms throughout Matamoros.
- Venezuelans continue to depart Tijuana, where they are not processed for T42 exceptions, for Matamoros, where they are processed for T42 exceptions.
- **Shelters in Reynosa remain vastly over capacity**, largely with Haitian migrants.  Buses from Reynosa to Matamoros for Title 42 exemptions remain paused given the large number of migrants in Matamoros.
- Haitian migrants attacked a guard at Senda de Vida shelter in Reynosa on November 29 in response to the imminent end of Title 42.  Shelter Director Hermano Hector said that U.S. based NGO Sidewalk School is "causing misunderstanding, sowing discord, telling Haitians they will soon not be able to cross into the U.S., and encouraging them to continue going Matamoros to be processed." Following the disruption, Senda de Vida resumed normal operations.


Monterrey - UNDER CAPACITY

- IO partners estimate there are approximately 700 beds available, and shelters are operating at about 32 percent capacity.

Mexico City – OVER CAPACITY

- At Terminal del Norte there are an estimated 1,000 people. 700 men, 200 women and 100 children.  Tickets are sold out in many bus companies.  Small groups are spending the night outside the terminal; around 45 people wait in the parking lot or inside the terminal, either to raise money to buy tickets, or to await until tickets are available.
- 1,311 people are registered occupying shelters, mainly Venezuelans.

Southern Mexico – OVER CAPACITY

- RefCoord Team is in Tapachula, Chiapas monitoring IO and NGO operations.
- In Tapachula, INM set up a new provisional module with the aim to provide people with a temporary immigration document (FMM) with a maximum validity of 30 calendar days.  According to local media this document will be only valid within Chiapas state.


## PERU:

- Per the latest weekly report from IOM Peru on November 22, Venezuelan migrants continue to travel south in greater numbers than northbound travelers.  At the northern border in Tumbes, there were 805 entries, compared to 524 exits.  While at the southern border in Tacna, there were 228 entries, compared to 426 exits.


## ECUADOR:

Venezuela AR_000546

- According to IOM Ecuador's most recent GTRM report, 42 percent of surveyed Venezuelans leaving Ecuador reported their intention to return to Venezuela, mainly to reunite with other relatives (39 percent). Of these, approximately half plan to return to Venezuela indefinitely, while the other half will do so temporarily, to later continue to other destinations: Ecuador (28 percent), Peru (18 percent), and the United States (17 percent). More than 63 percent reported feeling affected by the DHS Title 42 announcement. Ecuador remains both a transit country for flows in both directions and a country where migrants and refugees from Venezuela plan to settle.

PANAMA:

- (U) According to official Panamanian government (GoP) statistics:
  - On November 26, 1,026 migrants entered irregularly through the Darien. Ecuadorians were the leading group (508), followed by Haitians (275), Venezuelans (79), and Brazilians (30).
  - On November 27, 815 migrants entered irregularly through the Darien. Ecuadorians were the leading group (386), followed by Haitians (258), Indians (39), and Venezuelans (28).
  - Please note that these migration statistics are provisional only, and that the monthly chart is the official record.
- (U) On November 28, a Migration Office rep in Chiriqui said there were about 230 Venezuelan migrants at the Los Planes migrant reception center near the Costa Rican border. Panama's Director of Migration Samira Gozaine said would begin sending all Venezuelans awaiting flights home to the Los Planes ERM and would move to close the temporary shelter in Panama City on December 3.

GUATEMALA:

- (SBU) The Customs and Border Protection (CBP) vetted Mobile Tactical Interdiction Unit encountered 11 Venezuelan irregular migrants on November 23 and 10 on November 24 while conducting checkpoint operations near the Sanarate Interagency Checkpoint. They deployed to the Chiquimula area of operations on November 25 and remained there through November 27.
- (SBU) From November 18 to 24, Embassy Guatemala City published 30 posts across the three digital platforms, including 15 posts explained the new immigration enforcement policies for Venezuelans, emphasizing the applications process through the USCIS website, with graphics to explain each step of the process. Engagement continues to decrease over the past two weeks in messaging related to Venezuela and the new USCIS process.
- (SBU) Government of Guatemala News Agency reported that National Police agents transferred six Venezuelans to the Guatemalan Migration Institute (IGM) for entering Guatemala by evading immigration controls. Security authorities maintain checkpoints in Jutiapa, Chiquimula, and Izabal, where several groups of Venezuela nationals have been located.

Venezuela AR_000547

- (SBU) The IGM reported that 2,492 migrants, mostly Venezuelans (923), have been sheltered in the Guatemalan Migration Institute's Migratory Attention Center for Foreigners in Guatemala City from January to date.  According to the IGM, 4,633 Venezuelans entered the country legally from January 1 to November 15.



SENSITIVE BUT UNCLASSIFIED



# COLLABORATIVE MIGRATION MANAGEMENT STRATEGY

JULY 2021

NATIONAL SECURITY COUNCIL



THE WHITE HOUSE
WASHINGTON

Venezuela AR_002548



# TABLE OF CONTENTS

I.      Executive Summary
II.     Strategic Environment
III.    U.S. Interests
IV.     Desired End State
V.      Strategic Objectives
VI.     Lines of Action

Venezuela AR_002550



# Executive Summary

The humanitarian situation in the Northern Triangle (El Salvador, Guatemala, and Honduras) has deteriorated significantly in recent years, prompting an increasing number of people to make the difficult choice to migrate.  In addition to the long-standing drivers of migration, including violence, lack of employment opportunities, and corruption, the COVID-19 pandemic, recurrent droughts, and two hurricanes in November 2020 have devastated communities, created crisis-level food insecurity, and placed the Northern Triangle on the map with other global humanitarian emergencies.  This situation demands both immediate responses and a new, strategic approach for managing regional migration in the medium- to long-term.

 The United States has strong national security, economic, and humanitarian interests in **promoting safe, orderly, and humane migration.**

The United States has strong national security, economic, and humanitarian interests in promoting safe, orderly, and humane migration.  Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, issued February 2, 2021, lays out a four-pronged comprehensive approach that includes addressing the root causes of irregular migration, collaboratively managing migration in the region, expanding lawful pathways for protection and opportunity in the United States, and restoring and enhancing asylum processing at the U.S. Southwest border.  The Executive Order directs the Assistant to the President for National Security Affairs, in coordination with U.S. departments and agencies, to prepare a Root Causes Strategy and a Collaborative Migration Management Strategy (Migration Strategy).

The Migration Strategy identifies and prioritizes actions to strengthen cooperative efforts to manage safe, orderly, and humane migration in North and Central America, in line with our Nation's highest values, while the Root Causes Strategy addresses the underlying factors leading to migration.  Both strategies are driven by the U.S. Government belief that all individuals should be able to find safety and achieve a stable and dignified life within their own countries.  When that is not the case, asylum and other legal migration pathways should be readily available to those who need them.

The Migration Strategy aims to address urgent humanitarian needs in the Northern Triangle, promote access to protection, improve secure and humane border management, provide support for returnees, and enhance access to legal pathways for migration.  Individuals and families' internal and international migration decisions are often interlinked with their access to protection, the availability of legal migration pathways, and their ability to live safe and prosperous lives.  By enhancing humanitarian support, regional protections, and investing in migration management, the United States will help build a more stable region, strengthen legal pathways for those who choose to or are forced to migrate, and reduce irregular migration.

The U.S. Government consulted with a wide range of stakeholders to inform the Migration Strategy, including governments in the region, Members of Congress and their staff, international organizations, civil society organizations, labor unions, and the private sector.

**3**



# Strategic Environment

Over the past decade, millions of people from Mexico, Guatemala, Honduras, and El Salvador have arrived at the U.S. Southwest border in search of protection and opportunity. Some of the primary factors driving this migration include high levels of crime and violence, lack of economic opportunity, weak governance, widespread corruption and impunity, the impacts of climate change, food insecurity, and the desire for family reunification. Since 2015, hundreds of thousands of these individuals submitted asylum claims in the United States, showing the scope of regional challenges and contributing to significant backlogs in the U.S. asylum system.

In recent years, there have been some successes in strengthening regional protection frameworks, recognizing and responding to internal displacement, creating effective labor migration programs, strengthening border security, and scaling returnee reception efforts. However, the COVID-19 pandemic and two devastating hurricanes in Central America in November 2020 strained governments in the region, caused severe economic disruption, and made efforts to institutionalize migration management practices even more challenging.

 The Migration Strategy **identifies and prioritizes actions to strengthen cooperative efforts** to manage safe, orderly, and humane migration in North and Central America.

The United States has strong relationships with a broad range of actors who will be critical partners for implementing the Migration Strategy. The United States will continue to work closely with international organizations that provide support for refugees, asylum seekers, internally displaced persons (IDPs), and returned migrants, and assist governments with migration management in the region. Civil society organizations will also be critical as they advise governments on protection and migration management and implement programs to fill gaps in government capacity. The private sector will be an important player in expanding and supporting labor migration pathways and has a role in helping governments improve migration management.

4



# U.S. Interests

The United States has strong national security, economic, and humanitarian interests in reducing irregular migration and promoting safe, orderly, and humane migration.  Irregular migration places a heavy burden on U.S. border security infrastructure and personnel and presents opportunities for criminal actors to exploit vulnerable populations.  The United States is seeking to expand U.S. and international efforts to address the humanitarian situation in the Northern Triangle and improve regional collaborative migration management by promoting strong migration management practices, encouraging greater regional responsibility-sharing, and expanding access to legal pathways.  The United States believes that all individuals should be able to find safety and achieve a stable and dignified life within their own countries, while ensuring that asylum and other legal migration pathways remain available to those who need them.



> The United States believes that all individuals should be able to find safety and achieve a stable and dignified life within their own countries, while **ensuring that asylum and other legal migration pathways remain available to those who need them.**



# Desired End State

This Strategy does not seek to end migration.  To the contrary – human mobility is part of the fabric and tradition of Central and North America.  Instead, the Migration Strategy envisions that migration within and through Mexico and Central America would be by choice, and that fewer people would feel compelled to make that choice.  It envisions more legal pathways available for those who choose to leave. If individuals must flee, they would have options to seek protection within their own countries, within the region, or in the United States.

**5**



# Strategic Objectives

Our strategic objectives are to:  stabilize populations facing acute needs; strengthen international and in-country protections throughout North and Central America so individuals seeking safety have access to protection and services within their countries of origin or in the region; support third country labor migration programs that facilitate equitable access to work opportunities that ensure and expand worker protections; increase reception and reintegration of returned migrants or IDPs to allow them to find safety and support in their countries of origin; support secure and humane border practices that allow regional governments to regulate the movement of people into and out of their territory and respond to large-scale migration events; coordinate migration messaging campaigns to share accurate and timely information about migration laws and policies and counter mis- and disinformation; and expand lawful pathways for protection and opportunity in the United States.

As a part of our work, we will:

***Consult and Coordinate***:  The U.S. Government will continue to consult with Congress, civil society, international organizations, the private sector, labor unions, and governments inside and outside the region.  We will listen, learn the lessons from past efforts, create an approach that draws on input from across sectors, and develop a broad base of support that advances efforts across the Migration Strategy.

***Communicate:***  We will create a robust communications plan, leveraging independent and social media, to convey our efforts to improve migration cooperation, build support for our approach, and instill hope in the region.

***Assess:***  Throughout implementation, we will build in assessment points to ensure our efforts are producing the desired results, strengthening where needed, adjusting course where warranted, and discontinuing as required.

Venezuela AR_000554



# Lines of Action

To achieve the strategic objectives set out above, the Migration Strategy sets out concrete lines of effort the United States will pursue to support regional programs to stabilize populations with acute needs; expand access to international protection; strengthen access to protection in countries of origin; expand access to third country labor migration programs that ensure and improve worker protections; assist and reintegrate returned persons; promote secure and humane border management; strengthen regional public messaging on migration, and expand access to lawful pathways for protection and opportunity in the United States.  The Migration Strategy will also help guide U.S. diplomatic engagements with governments in the region and outside the Western Hemisphere, including through multilateral fora and platforms, such as the Regional Conference on Migration and the Comprehensive Regional Protections and Solutions Framework (MIRPS).

## 1.  Stabilize Populations with Acute Needs

The United States will provide and mobilize assistance to address the increased humanitarian needs in the Northern Triangle given the COVID-19 pandemic, November 2020 hurricanes, and prolonged droughts.

- **Surge U.S. assistance.**  The United States will provide increased assistance to address food insecurity and malnutrition, support the agricultural sector to mitigate the effects of droughts and increasingly unpredictable weather and build resilience to future shocks, provide materials to support the rebuilding of shelter and schools, and address the immediate safety and protection needs of refugees, asylum seekers, internally displaced persons, and other vulnerable populations in the region.

- **Work multilaterally.**  The United States will work with the United Nations to mobilize a Humanitarian Response Plan to galvanize international support for the deteriorating situation in the Northern Triangle and coordinate activities under one system.

## 2.  Expand Access to International Protection

A critical element of this strategy is expanding access to international protections for refugees, asylum seekers, and vulnerable migrants within the region, including new mechanisms for protection referrals.  These efforts will be complemented by expanding efforts to integrate refugees into their new communities and specialized programming and support for the most at-risk groups.

- **Build and improve national asylum systems.**  The United States will support regional government efforts to strengthen and expand their asylum systems to provide vulnerable individuals with protection closer to home.  These systems have historically been limited, but with U.S. support, there is potential to offer protections to tens of thousands of people within

7

the region.  For example, since 2016, the Mexican Commission for Refugee Assistance has expanded dramatically with U.S. support, opening new field offices and tripling its annual case processing capacity.  The United States will continue to work with Mexico to build on this success and with other regional governments to help expand their asylum systems.

- **Establish Migration Resource Centers (MRCs).**  The United States will work with international organizations and in coordination with governments to support the establishment of MRCs throughout the region.  These facilities will focus on protection screening, services for people in need of protection, and referrals to protection or other lawful migration pathways.  MRCs will also have referral mechanisms for existing labor migration and reintegration programs for people who do not have protection needs.  Fixed location and mobile MRCs will be strategically located to benefit communities at risk of displacement, those with high levels of emigration, and in major transit hubs.

- **Increase efforts to integrate refugees in the region.**  Once people receive protection within the region, they still face the challenge of integrating into new communities.  The United States will support inclusion and integration programs that ensure individuals can access livelihood opportunities, services, healthcare, and education, and can develop roots in their new communities.  The United States will look to expand successful ongoing integration efforts, such as a program that relocates protection recipients from southern Mexico to industrial belt municipalities in Mexico with labor needs.

- **Support assistance for asylum seekers and refugees.**  The United States will increase shelters and other safe space networks for asylum seekers, refugees, and other vulnerable migrants within the region.  This assistance also includes, but is not limited to, assisting asylum seekers with access to accurate information, legal representation, education, livelihood opportunities, cash and **voucher** assistance, and health care.  The United States will also respond to and support the water, sanitation, and hygiene (WASH) needs for refugees and asylum seekers across the region.

- **Scale up protection efforts for at-risk groups.**  While all displaced individuals are vulnerable, some face heightened risks, including women, children, families, individuals with disabilities, LGBTQI+ individuals, indigenous peoples, and racial minorities.  The United States will support protections for these groups by funding international organizations for targeted programming, encouraging governments to pass and implement legislation that protects these groups, and providing technical assistance to regional government agencies that interact with these populations.  Additionally, the United States will work with regional governments to develop human rights violation early warning systems and prevent and respond to human rights violations and abuses against migrants.

- **Enhance efforts to resettle refugees from the region.**  In recent years, countries including Australia, Brazil, Canada, and Uruguay have resettled small numbers of refugees from El Salvador, Guatemala, and Honduras.  The United States will continue to work with these countries, particularly Canada, to resettle larger numbers of refugees and encourage other governments to do the same.

## 3. Expand Access to Protection in Countries of Origin

Individuals seeking protection in a third country have often been previously forcibly displaced at least once within their countries of origin before crossing an international border. By strengthening protection, assistance, and solutions for IDPs and encouraging governments to find durable solutions, the United States can help people obtain safety and sustainable livelihoods within countries of origin and reduce international forced displacement.

- **Improve protections for IDPs.** IDPs are often unrecognized or marginalized in their countries of origin, making it a significant humanitarian, human rights, and governance issue. The United States will encourage governments to pass legislation and implement laws recognizing and providing services for IDPs, and fund additional research on internal displacement within the region to better understand the needs of IDPs.

- **Support humanitarian assistance and integration for IDPs.** The United States will continue to increase shelters and other safe space networks for IDPs. The United States will support programs offering solutions for these populations, such as relocation and integration support to help them reestablish their lives in their new homes. This support includes, but is not limited to, assisting IDPs with access to protection services, prevention and response to gender-based violence, education, livelihood opportunities, cash and voucher assistance, health care and WASH needs.

- **Include IDPs and affected communities in development programs.** The United States will include and prioritize IDPs in development programs that aim to combat insecurity and gender-based violence, reduce poverty, increase opportunities to access permanent housing, improve health outcomes, increase access to justice, and strengthen access to education.

## 4. Expand Third Country Labor Migration Programs While Improving Worker Protections

The United States aims to enhance coordination with third countries on labor migration programs and worker protections. Third country labor migration programs allow individuals to find work opportunities and provide support for their families through formalized migration channels. These programs also provide critical labor to economies, particularly since the COVID-19 pandemic has resulted in reduced inter-regional travel.

- **Expand access to third country labor migration programs with worker protections.** The United States will support efforts to develop and expand labor migration programs that protect workers' rights and allow equitable access for individuals in the region to find meaningful economic opportunities in a third country while improving worker protections. Some successful regional labor programs could be expanded or replicated in line with local conditions. For example, in 2020, a successful pilot program connected workers from Panama with the seasonal coffee harvest in Costa Rica. This program then expanded to

**9**

include temporary workers from Nicaragua.  The United States will support countries with labor needs in developing or expanding similar programs that match regional workers with labor demands, such as Canada and Mexico's temporary worker programs.  The United States will also continue to build the capacity of governments in the region to better assist their populations in identifying temporary labor opportunities and eliminating discriminatory or exploitative labor practices.

- **Expand support for migrant worker protections, including ethical recruitment.** Ensuring protections for migrant workers are a critical component to sustainable and ethical work programs.  The United States will enhance our programming to ensure recruitment and treatment of migrant workers is fair and humane throughout the region by engaging with the private sector, labor unions, governments, and civil society.  The United States will also increase awareness and access to resources to combat labor trafficking.

## 5.  Assist and Reintegrate Returned Persons

Governments have limited capacity to receive their nationals from other countries.  Individuals who are returned to their countries of origin may have spent significant time living abroad and may have limited knowledge on how to obtain documentation, access information, find work, or receive support.  Returned minors may require support to re-enroll in the education system, and they and their families may benefit from psychosocial and other support to increase resilience and overall well-being.  Targeted development assistance programming to reintegrate returned persons into their communities helps them create safe and prosperous lives in the region.

- **Expand reception centers.**  The United States will continue to expand the capacity of governments to develop and sustain reception centers for individuals returning to their countries of origin.  This includes expanding existing centers and adding reception centers. These centers will allow governments to provide specialized services, conduct interviews, connect individuals to reintegration opportunities, and provide medical, counseling, and protection services.

- **Build out reintegration services.**  The United States will work with governments, international organizations, civil society, and the private sector to create and expand reintegration programs that match returnees with jobs that capitalize on skills learned abroad, such as English language proficiency, IT skills, and training in the hospitality sector, among others.  These services will also assist returnees with integration in their host communities through job placement and skills training, and will address the different needs of returnees, including women, minors, and indigenous people.  To support these populations, the United States will work with regional governments, international organizations, and civil society organizations to include and prioritize returnees in development programs and community initiatives.

- **Assist with reintegration policies and frameworks.**  The United States will work with regional governments to develop and implement policies that enable individuals to overcome structural challenges associated with being returned after living overseas.  Programs will facilitate validation of school and work certifications, financial inclusion, nationality status

and identity card issuance, and access to social programs.  The United States will also engage in outreach campaigns to help prevent discrimination.

- **Support Assisted Voluntary Return (AVR).**  The United States will continue to support efforts by regional governments and international organizations to offer individuals the opportunity for AVR should they choose to return to their countries of origin.  These AVR opportunities will provide these individuals with a safe, humane, and dignified way to return home.

## 6.  Foster Secure and Humane Management of Borders

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration within the region.  Making advances in these areas requires improving institutional governance and regulation within the region, encouraging collaborative migration and border management approaches, providing equipment to modernize and improve border infrastructure and technology, and taking a comprehensive and coordinated approach to supporting migrant smuggling and human trafficking investigations and enforcement.

- **Provide institutional capacity building, training, technical assistance, and support equipment needs for national migration authorities in the region.**  The United States will work with governments to build the region's migration-focused departments and agencies to develop institutional capacity; establish comprehensive training programs and dedicated professional units, consistent with international law and standards; ensure the development and implementation of humane migration practices; screen for protection needs; institute transparency and internal accountability mechanisms; and secure the necessary resources to fulfill their missions.  The United States will also consider support to regional governments to improve their ability to identify, process, detain, and repatriate individuals without legal standing in a safe and humane manner that is consistent with international law.

- **Support for border infrastructure and technology.**  The United States will provide support for the modernization of border infrastructure and technology.  Improved technology allows regional border officials to monitor trends, identify persons of interest, share information with regional government partners, and use resources more efficiently.  Such efforts can help enhance economic growth and reduce corruption in the region by professionalizing ports of entry and customs authorities and processes.  The United States will also support deploying technologies to increase electronic processing of people and goods, implementing of the World Trade Organization Trade Facilitation Act, and promoting best practices in professional responsibility.

- **Enhance migrant-smuggling and human-trafficking investigations and prosecutions.**  The United States, in partnership with regional governments, will expand and strengthen efforts to hold individuals involved in migrant smuggling, human trafficking, and other crimes against migrants accountable, whether through prosecutions, or, where appropriate, additional financial or other penalties.  For example, in April 2021, the United

**11**

States announced Operation Sentinel, a new counter-network targeting operation focused on transnational criminal organizations involved in migrant smuggling.

- **Promote collaborative migration and border management approaches.** The United States will facilitate and encourage regional approaches to address migration, including improving or establishing legal frameworks; promoting border security, migration management, and migration enforcement best practices and standards; and enhancing coordination and information sharing. The United States will also continue to support regional coordination to address large coordinated migration movements.

- **Increase information sharing with and among regional partners.** The United States will continue to develop and expand efforts to share information with and among regional partners on humane border management best practices, migrant smuggling and human trafficking efforts, and data sharing and transparency. This includes replicating and enhancing support for programs that facilitate greater information sharing and coordination among local and regional law enforcement, and with U.S. law enforcement partners related to migrant smuggling, human trafficking, other crimes against migrants, and gang activity.

## 7.  Strengthen Regional Public Messaging on Migration

Effective regional communications and messaging allow the United States and other governments to share factual information about their migration policies, counter disinformation, and discourage irregular migration. Partnerships with international organizations and other stakeholders can amplify these messages and provide complementary messaging.

- **Support regional messaging campaigns.** The United States will expand its work with regional governments, international organizations, civil society organizations, the private sector, and other stakeholders to share information on regional migration policies and ensure consistent messaging that discourages irregular migration and promotes safe, orderly, and humane migration.

## 8.  Expand Access to Lawful Pathways for Protection and Opportunity in the United States

The United States is committed to enhancing access to protection and opportunity in the United States. The United States is taking a number of steps to increase access to the U.S. Refugee Admissions Program (USRAP) for Northern Triangle nationals. The United States is also examining parole options for Northern Triangle nationals, as recommended by Executive Order 14010. In addition, the United States is evaluating options to enhance access for Northern Triangle nationals to immigrant and non-immigrant visas to the United States, as appropriate and consistent with the law.

- **Restart and expand the Central American Minors (CAM) program.** The CAM program provides certain minors in El Salvador, Guatemala, and Honduras the opportunity to be considered for refugee resettlement in the United States. Individuals who are determined to be ineligible for refugee status are considered for the possibility of entering the United States under parole. In March 2021, the United States announced that the CAM program would reopen and process cases that were closed when the program was paused in 2018. In June 2021, the United States announced the expansion of the program to increase the categories of eligible U.S.-based relatives who can petition for their children in the Northern Triangle. The United States will continue to consider ways to expand the program.

- **Expand refugee processing in the region.** The United States is seeking to enhance the capacity of international organizations and civil society to identify and refer more individuals with urgent protection needs. The Costa Rican government paused implementation of the Protection Transfer Arrangement (PTA) in September 2020 due to COVID-19. With support from the United States, Costa Rica resumed PTA transfers in early April 2021. In addition, the United States is working to increase USRAP processing capacity in the region during the COVID-19 pandemic, including by implementing and exploring new processes and technologies to support remote case processing. The United States will also continue to explore additional ways to enhance and expand refugee processing in the region.

- **Increase access to nonimmigrant work visas while ensuring worker protections.** Expanding legal pathways for Northern Triangle nationals seeking to provide for their families is an important component of a comprehensive regional migration response. It must also address the vulnerability of workers to abusive labor practices. The United States will undertake efforts to significantly increase the number of Northern Triangle agricultural workers who receive an H-2A visa in FY 2022, paying particular attention to improving recruitment practices in the Northern Triangle and labor conditions in the United States. The United States will enhance outreach and engagement with U.S. employers; work with Northern Triangle governments, international organizations, civil society, and the private sector to develop a more robust pipeline of Northern Triangle nationals who can meet the needs of U.S. employers when there are insufficient U.S. workers who are qualified and available to perform the work; assist the Northern Triangle governments with registering and vetting workers; connect workers with U.S. employers; and engage with labor unions and worker rights organizations to identify ways to improve transparency in the recruitment process and overall worker protections. The United States also made 6,000 supplemental H-2B temporary non-agricultural visas available for Northern Triangle nationals in FY 2021.

- **Reduce immigrant visa backlogs.** The United States aims to reduce the backlog of immigrant visa applications for Northern Triangle nationals as quickly as possible.

Venezuela AR_000561



JUNE 10, 2022

# Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables

Today, President Biden joins leaders from across the Western Hemisphere to present the Los Angeles Declaration on Migration and Protection at the Summit of the Americas. The Declaration seeks to mobilize the entire region around bold actions that will transform our approach to managing migration in the Americas. The Declaration is organized around four key pillars: (1) stability and assistance for communities; (2) expansion of legal pathways; (3) humane migration management; and (4) coordinated emergency response.

In preparation for the Summit, the United States and other countries in the region developed a suite of bold new migration-related deliverables.

**Pillar I: Stability and Assistance for Communities**

Addressing the unprecedented migration crisis in the region requires us to rethink how we view multilateral development finance and how we manage the strains on our economies. Globally, International Financial Institutions (IFIs) and development assistance have been directed to poor and low-income countries, designations which no longer apply to most of Latin America and the Caribbean. The need for economic stabilization and support is particularly important in countries housing the more than six million refugees and migrants.

- **Belize will implement in August 2022 a program to regularize Central American and CARICOM migrants** who have been living illegally in the country for a specified time.

- **Colombia's leadership in responding to Venezuelan migrants and refugees with forward-leaning policies based on solidarity, humanitarian relief, and protection:** Colombia reaffirms its commitment to fully implement its announcement of temporary protected status for displaced Venezuelan migrants and refugees in its territory. As of June 10, it has granted regularization documents to over 1.2 million individuals, allowing them to work legally, access public and private services, integrate successfully, and contribute to Colombia's economy and society. Colombia further reaffirms its commitment to grant

regularization permits to 1.5M Venezuelan migrants and refugees in total, by the end of August 2022.

- **Costa Rica commits to plan for a renewal of the special temporary complementary protection category scheme for migrants from Venezuela, Nicaragua, and Cuba**, that have arrived prior to March 2020, contingent on obtaining necessary financial resources, and to convene an international task force to secure additional direct support and financial resources to support its implementation.

- **Ecuador issued an executive decree that creates a path to a regular migration status for Venezuelans who entered the country regularly via an official port of entry, but who are currently out of status.** This process includes unaccompanied or separated migrant children and a migration amnesty. It contemplates the provision of identification documents for the regularization process, taking into account the current difficulties facing Venezuelan citizens. It intends to expand this process to include all Venezuelans.

- **The United States will provide additional U.S. support for a crisis response mechanism on migration**. Working with Congress, we will provide an additional $25 million to the Global Concessional Financing Facility (GCFF) housed at the World Bank to prioritize countries in Latin America such as Ecuador and Costa Rica in their newly announced regularization programs for displaced migrant and refugee populations residing within their respective countries.  The new funding would support registration processes, the extension of social services, integration programs, and would benefit host communities that have generously opened their doors to the most vulnerable.

- **The United States will announce $314 million in new PRM and USAID funding for stabilization efforts in the Americas.** USAID and the State Department's Bureau of Population, Refugees, and Migration (PRM) will announce more than $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere. This includes support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.

**Pillar II: Legal Pathways and Protection**

Expanding legal pathways for protection and opportunity is at the heart of efforts to humanely address irregular migration in the Americas. The goal is to *change the way* people migrate. Countries in the region have strategically pegged priority legal pathway programs with the primary reasons for migrating: (1) jobs; (2) protection; and (3) family reunification.

- **Canada's resettlement and complementary pathways initiative:** Canada is welcoming record numbers of refugees and in line with Canada's immigration levels plans. As part of these growing efforts, Canada will increase refugee resettlement from the Americas and aims to welcome up to 4,000 individuals by 2028, providing durable solutions to a number of refugees in the region. Canada recognizes the important support of the UNHCR and the IOM in the region. Canada will also look to promote its regular pathways in the region to help provide opportunities including to those in vulnerable situations. For example, Canada will advance a promotion and recruitment efforts related to its Francophone Immigration Program which may offer opportunities to French speaking newcomers such as Haitians with skills and experience, some of which may gave have been displaced due to the pandemic.

- **Canada is addressing root causes and investing $26.9 million, in 2022-2023, in additional funding toward migration- and protection-related capacity building in the Americas.** This funding is supporting projects across Latin America and the Caribbean focused on supporting the socio-economic and labour market integration of refugees and migrants; improving border and migration management systems; contributing to the safeguarding of migrants, refugees and host communities' rights; advancing gender equality and inclusive economic growth; and preventing and tackling migrant smuggling and trafficking in persons.

- **Canada expects to welcome more than 50,000 agricultural workers from Mexico, Guatemala and the Caribbean in 2022.** Canada is a strong supporter of labour mobility and continues to actively promote regular pathways for migration, including temporary foreign worker programs that respond to employer labour needs, to address our labour market gaps and as alternatives to irregular migration.

- **Guatemala approves new legislation to promote legal labor migration programs.** On June 1, the Government of Guatemala approved new legislation to incentivize fair recruitment and expand legal pathways for its citizens. The legislation exempts airline tickets from value-added and departure taxes for those traveling for temporary work abroad contracts obtained through the Ministry of Labor.  The new initiative is part of a broader set of Guatemalan programs and policies to expand access to labor migration programs, ensure ethical recruitment, and promote legal protections for Guatemalan workers.

- **Mexico will expand the existing Border Worker Card program to include 10,000 to 20,000 additional beneficiaries.** This program allows greater labor mobility to meet

Venezuela AR_000565

employer needs in Mexico, promote economic development in Central America, and provide an alternative to irregular migration.

- **Mexico will launch a new temporary labor program providing work opportunities in Mexico for 15,000 to 20,000 workers from Guatemala per year.** The Government of Mexico aims to expand eligibility for that program to include Honduras and El Salvador in the medium-term.

- **Mexico will integrate 20,000 recognized refugees into the Mexican labor market over the next three years.** With the support of UNHCR, the program would connect individuals with legal status as recognized refugees in Mexico to work opportunities in regions with labor shortages. A joint initiative with UNHCR, the private sector and the Mexican Government, both refugees and firms will benefit from successful integration into Mexico's formal labor market.

- **The United States will launch the development of a $65 million U.S. Department of Agriculture (USDA) pilot program to support U.S. farmers hiring agricultural workers under the H-2A program.** In collaboration with other agencies, USDA is exploring a multi-year pilot program funded by the President's American Rescue Plan to provide grants to agricultural employers that hire farmworkers from Northern Central American countries under the seasonal H-2A visa program and agree to additional protections to benefit both U.S. and H-2A workers. The pilot will promote the resiliency of our food and agricultural supply chain and three major Administration priorities: (1) driving U.S. economic recovery by addressing current labor shortages in agriculture; (2) reducing irregular migration through the expansion of legal pathways; and (3) improving working conditions for U.S. and migrant agricultural workers. USDA will enter into a cooperative agreement with the United Farm Workers of America (UFW), which will work with relevant stakeholders, including farmers, farmworkers, farmworker advocates and unions, to ensure that the agency benefits from a wide range of views in designing this program.

- **The United States will provide 11,500 H-2B nonagricultural seasonal worker visas for nationals of Northern Central America and Haiti.** To address labor shortages in key sectors of the U.S. economy and reduce irregular migration, the Department of Homeland Security (DHS) and Department of Labor (DOL) made an additional 11,500 H-2B visas available in late May. These visas are dedicated for nationals of the Northern Central America countries and Haiti for this fiscal year. This is combined with new employer oversight provisions.

- **The United States will roll out new Fair Recruitment Practices Guidance for Temporary Migrant Workers with the cooperation of major employers, including Walmart.** As the United States and various other countries expand temporary worker programs in the Western Hemisphere, President Biden recognizes the importance of safeguarding against exploitation of workers. This is why his Administration will issue first-of-its-kind "Guidance on Fair Recruitment Practices for Temporary Workers." The guidance promotes best practices for governments seeking to increase participation in the H-2 visa programs and employers relying on these programs. The United States has also mobilized the support of major U.S. retailer Walmart, which notes the importance of H-2A migrant workers to U.S. agriculture and that the fair recruitment guidance aligns with the company's own expectations around responsible recruitment.

- **The United States will commit to resettle 20,000 refugees from the Americas during Fiscal Years 2023 to 2024.** This represents a three-fold increase from this year and reflects the Biden Administration's strong commitment to welcoming refugees. The protection needs are significant in the Western Hemisphere. More than 5 million Venezuelans have been displaced in the Americas, and hundreds of thousands more people from other countries across Latin America and the Caribbean are also displaced [across borders]. As the United States scales up its resettlement operations in the Americas, we call on other governments to do the same.

- **The United States will increase resettlement of Haitian refugees.** Reflecting the President's commitment to support the people of Haiti, the United States also commits to receiving an increased number of referrals to the U.S. Refugee Admissions Program for Haitians. The United States encourages other governments to join us in strengthening legal pathways for protection and opportunity for Haitians and other displaced populations in the Americas.

- **The United States will resume and increase participation in the Haitian Family Reunification Parole Program.** The Department of Homeland Security will announce the resumption of the Haitian Family Reunification Parole Program, which allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Haiti. Additionally, U.S. Citizenship and Immigration Services will take steps to increase participation in the program by reducing barriers to access. New invitations to apply under the program are anticipated to be issued in early fall 2022.  Concurrently, the Department of State will increase efforts to process Haitian immigrant visas and reduce the existing backlog. State is in the process of assessing options to augment consular adjudicator staffing in Embassy Port-au-Prince and review additional operational efficiencies to decrease the immigrant visa backlog for Haitians.

- **The United States will resume the Cuban Family Reunification Parole Program.** Last month, the United States announced the resumption of operations for the Cuban Family Reunification Parole Program (CFRP). CFRP provides a safe, orderly pathway to the United States for certain Cuban beneficiaries of approved family-based immigrant petitions. DHS will resume processing cases this summer, work with the Department of State to begin interviews in Cuba by early fall, and build capacity to consider and process approved applicants, thus contributing to migration accord targets over the next two years.

*Observer States*

- **Spain will double the number of labor pathways for Hondurans** to participate in Spain's circular migration programs.

**Pillar III: Humane Border Management**

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration across the hemisphere. The focus moving forward should be on: 1) humane border enforcement; 2) return of migrants lacking protection needs or other legal basis to remain; 3) facilitating returns to countries of most recent residence or origin; 4) support for assisted voluntary returns; and 5) strengthened bilateral and regional law enforcement information sharing and cooperation to combat migrant smuggling and human trafficking.

- **The United States will announce a multilateral "Sting Operation" to disrupt human smuggling networks across the Hemisphere.** The President will announce a first of its kind campaign, unprecedented in scale, to disrupt and dismantle smuggling networks in Latin America. In the last two months, the United States, led by DHS, has surged over 1,300 personnel throughout the region and invested over $50 million to support these activities. Through the end of May, efforts have produced approximately 20,000 total disruption actions including arrests and prosecutions, seizures of property such as houses and vehicles used to hide and smuggle people, and criminal investigations. DHS assesses that this has led to 900 fewer migrants arriving at the Southwest border each day, and we are just getting started. The U.S. will seek to expand efforts with other governments in the region to improve information sharing, build capacity, and advance criminal investigations.

- **The United States will improve the efficiency and fairness of asylum at the border.** In late May, DHS and Department of Justice began implementing a new process that improves and expedites processing of asylum claims made by noncitizens subject to expedited removal, to ensure that those who are eligible for asylum are granted relief

quickly, and those who are not are promptly removed. The new process is a further step toward a more functional and sensible asylum system that reduces the caseload in immigration courts while also providing individuals with a prompt and fair decision in their case. DHS is phasing in the implementation of this rule and when fully implemented, the rule will shorten the administrative process from several years to just several months.

JUNE 10, 2022

# Los Angeles Declaration on Migration and Protection

We, the Heads of State and Government of the Argentine Republic, Barbados, Belize, the Federative Republic of Brazil, Canada, the Republic of Chile, the Republic of Colombia, the Republic of Costa Rica, the Republic of Ecuador, the Republic of El Salvador, the Republic of Guatemala, Co-operative Republic of Guyana, the Republic of Haiti, the Republic of Honduras, Jamaica, the United Mexican States, the Republic of Panama, the Republic of Paraguay, the Republic of Peru, the United States of America, and the Oriental Republic of Uruguay, gathered in Los Angeles on the margins of the Ninth Summit of the Americas, reiterate our will to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration and to strengthen frameworks for international protection and cooperation.

We embrace the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin.  Migration should be a voluntary, informed choice and not a necessity.

We are committed to protecting the safety and dignity of all migrants, refugees, asylum seekers, and stateless persons, regardless of their migratory status, and respecting their human rights and fundamental freedoms.  We intend to cooperate closely to facilitate safe, orderly, humane, and regular migration and, as appropriate, promote safe and dignified returns, consistent with national legislation, the principle of non-refoulement, and our respective obligations under international law.

We acknowledge that addressing irregular international migration requires a regional approach, and that ongoing health, social, and economic challenges of the pandemic exacerbate the root causes driving irregular migration, including the vulnerabilities of many migrants and their communities.

We value the tradition of our region in welcoming refugees and migrants and showing solidarity with our neighbors.  We recognize the positive contributions of refugees and migrants to the socio-economic development of their host communities.  We recognize the sustained efforts of States in our hemisphere in hosting refugees, providing regular migration

Venezuela AR_000570

pathways, promoting local economic and social integration, facilitating safe, dignified, and voluntary return, and supporting the sustainable reintegration of returnees.

We remain committed to collectively leveraging the benefits of migration while addressing its challenges in countries and communities of origin, transit, destination, and return.  We do so in a spirit of collaboration, solidarity, and shared responsibility among States and in partnership with civil society and international organizations.  We reaffirm our shared commitment to supporting host communities; strengthening and expanding regular pathways and access to international protection; fostering opportunities for decent work; facilitating regularization and access to basic services; and promoting principles of safe, orderly, humane, and regular migration.

We also intend to strengthen the institutions that are responsible for migration management in our countries and exchange best practices in order to provide efficient and adequate care to migrants and access to protection for refugees.

**Promoting Stability and Assistance for Communities of Destination, Origin, Transit, and Return**

We affirm that countries of origin and countries and communities hosting large numbers of migrants and refugees may need international financing and assistance related to development, basic humanitarian needs, protection, security, public health, education, financial inclusion, and employment, among others.  We support efforts that allow all migrants, refugees, asylum seekers, and persons in situations of vulnerability to integrate into host countries and access legal identity, regular status, dignified employment, public services, and international protection, when appropriate and in accordance with national legislation, to rebuild their lives and contribute to those communities.  We plan to continue efforts to prevent and reduce statelessness.  We intend to expand efforts to address the root causes of irregular migration throughout our hemisphere, improving conditions and opportunities in countries of origin and promoting respect for human rights.  We reaffirm the importance of safe, dignified, and sustainable return, readmission, and reintegration of migrants to help them reestablish themselves in their communities of origin.  We further reaffirm the importance of ensuring all foreign nationals receive prompt consular assistance when needed or requested, and returnees are treated humanely and in a dignified manner, regardless of their immigration status, including in the process of their repatriation and return.

**Promoting Regular Pathways for Migration and International Protection**

We affirm that regular pathways, including circular and seasonal labor migration opportunities, family reunification, temporary migration mechanisms, and regularization programs promote safer and more orderly migration.  We intend to strengthen fair labor migration opportunities in the region, integrating robust safeguards to ensure ethical recruitment and employment free of exploitation, violence, and discrimination, consistent with respect for human rights and with a gender perspective.  We intend to promote, in accordance with national legislation, the recognition of qualifications and the portability of social benefits.  We intend to pursue accountability for those who commit human rights violations and abuses.  We plan to promote access to protection and complementary pathways for asylum seekers, refugees, and stateless persons in accordance with national legislation and with respect for the principle of non-refoulement.  We seek to promote border security and management processes that respect human rights and encourage and facilitate lawful, safe, and secure travel within the region.  We commit to guarantee human rights to individuals in vulnerable situations and to provide access to international protection, as appropriate.  We further intend to provide specialized and gender-responsive attention to individuals in situations of vulnerability.

**Promoting Humane Migration Management**

Renewing our commitment to respect and ensure the human rights of all migrants and persons in need of international protection, we recognize each country's responsibility to manage mixed movements across international borders in a secure, humane, orderly, and regular manner.  We intend to expand collaborative efforts to save lives, address violence and discrimination, counter xenophobia, and combat smuggling of migrants and trafficking in persons.  This includes expanded collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks.  We commit to provide appropriate protection and assistance to victimized individuals.  We intend, in accordance with national legislation, to improve and facilitate regional law enforcement information sharing, with the purpose of supporting the investigation and prosecution of crimes. We intend to explore new mechanisms, while preserving and leveraging existing regional, subregional, hemispheric, and global fora, to strengthen cooperation on border management and apply current mechanisms on visa regimes and regularization processes to combat exploitation by criminal groups.  In the instance of foreign nationals without a need for international protection and without a legal basis to remain in their country of presence, we commit to conduct any returns in a manner consistent with our respective obligations under international human rights law and international refugee law, and that respects the dignity of the individual, integrates safeguards to prevent refoulement, and promotes the return of children to safe conditions.

**Promoting a Coordinated Emergency Response**

Recognizing the imperative of promoting safe, orderly, and regular migration, and the safety of migrants, refugees, and asylum seekers in the region, we intend to work to cooperate in emergency response and humanitarian assistance in situations of mass migration and refugee movements.  We plan to strengthen existing regional coordination mechanisms and, as appropriate, the participation of civil society and international organizations to advance those aims.  This includes strengthening information sharing, as appropriate and in accordance with national legislation, enhancing early warning systems, leveraging existing relevant fora and processes, and defining a common set of triggers that activate a coordinated response.

**A Shared Approach to Reduce and Manage Irregular Migration**

To advance the common goals laid out in this Declaration and create the conditions for safe, orderly, humane, and regular migration through robust responsibility sharing, we intend to work together across the hemisphere to:

- Convene multilateral development banks, international financial institutions, and traditional and non-traditional donors to review financial support instruments for countries hosting migrant populations and facing other migration challenges, without prejudice to existing financing priorities and programs.

-  Improve regional cooperation mechanisms for law enforcement cooperation, information sharing, protection-sensitive border management, visa regimes, and regularization processes, as appropriate and in accordance with national legislation.

- Strengthen and expand temporary labor migration pathways, as feasible, that benefit countries across the region, including through new programs promoting connections between employers and migrant workers, robust safeguards for ethical recruitment, and legal protections for workers' rights.

-  Improve access to public and private services for all migrants, refugees, and stateless persons to promote their full social and economic inclusion in host communities.

- Expand access to regular pathways for migrants and refugees to include family reunification options where appropriate and feasible, in accordance with national legislation.

This Declaration builds upon existing efforts and international commitments and advances the vision set forth in the Global Compact on Refugees and the Global Compact for Safe, Orderly and Regular Migration (GCM) anchored in the 2030 Agenda for Sustainable Development.  We acknowledge the progress noted in the International Migration Review Forum Progress Declaration for the GCM.  We affirm the fundamental work that continues under the Comprehensive Regional Protection and Solutions Framework (MIRPS), the Regional Conference on Migration (RCM), and the South American Conference on Migration (SACM), as key regional bodies to facilitate the implementation of this Declaration, as well as the Quito Process and the Regional Inter-agency Coordination Platform for refugees and migrants from Venezuela.  The United Nations 1951 Refugee Convention; its 1967 Protocol; the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; the Geneva Conventions of 1949 and International Humanitarian Law; the United Nations Convention against Transnational Organized Crime; its Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children; its Protocol against the Smuggling of Migrants by Land, Sea and Air; the United Nations Convention on the Rights of the Child; the International Convention on the Protection of the Rights of all Migrant Workers and Members of their Families; as well as other international conventions, remain binding on Parties to those conventions that endorse this Declaration.  This Declaration aligns with States' commitments in the International Labour Organization's Declaration on Fundamental Principles and Rights at Work and its General Principles and Operational Guidelines for Fair Recruitment.  We reiterate the importance and meaning of the principle of non-refoulement as a cornerstone of the international protection of refugees.  We applaud efforts throughout the region to provide a coordinated and comprehensive response to all migrants, returnees, refugees, asylum seekers, and stateless persons.  We make this Declaration of non-legally binding commitments to enhance cooperation and shared responsibilities on managing migration and protection in ways grounded in human rights, transparency, nondiscrimination, and State sovereignty.

###



# U.S. STRATEGY FOR ADDRESSING THE ROOT CAUSES OF MIGRATION

# IN CENTRAL AMERICA

JULY 2021

NATIONAL SECURITY COUNCIL



THE WHITE HOUSE
WASHINGTON



# U.S. Strategy for Addressing the Root Causes of Migration in Central America

## *Cover Message from Vice President Kamala Harris*

In Central America, the root causes of migration run deep—and migration from the region has a direct impact on the United States. For that reason, our nation must consistently engage with the region to address the hardships that cause people to leave Central America and come to our border.

For decades, our nation has engaged in Central America. Often well intentioned, the engagement has often not been consistent. And over the last few years, the United States significantly pulled back from work in the region.

Under our Administration, President Joe Biden and I have restarted our nation's engagement in Central America and diplomatic efforts with Central American governments. Our Root Causes Strategy is comprehensive and draws from decades of experience—and is based on four core pieces of evidence.

**First, addressing the root causes of migration is critical to our overall immigration effort.**

Just after we took office, President Joe Biden outlined our Administration's vision to reform our immigration system by creating a pathway to citizenship for the nearly 11 million undocumented migrants in our country, modernizing our immigration process, and effectively managing our border.

Shortly after that, the President asked me to lead our nation's efforts to address the root causes of that migration. That is because migration to our border is also a symptom of much larger issues in the region.

**Second, providing relief is not sufficient to stem migration from the region.**

The COVID-19 pandemic and extreme weather conditions have indeed exacerbated the root causes of migration—which include corruption, violence, trafficking, and poverty. While our Administration is proud that we have sent millions of vaccine doses and hurricane relief, we know that it is not enough to alleviate suffering in the long term.

The root causes must be addressed both in addition to relief efforts—and apart from these efforts. In everything we do, we must target our efforts in those areas of highest out-migration—and ensure that these programs meet the highest standards of accountability and effectiveness.

**Third, unless we address all of the root causes, problems will persist.**

Recently, I travelled to Guatemala, where one of the largest challenges is corruption. Our Administration knows that, where corruption goes unchecked, people suffer. And so, on that trip, the United States announced that we will launch an Anticorruption Task Force which will include U.S. prosecutors and law enforcement experts who will investigate corruption cases. It is our goal that, in dealing directly with corruption, we will also mitigate the lack of economic and educational opportunities on the ground.

Venezuela AR_000576



**Fourth, and most importantly, the United States cannot do this work alone.**

Our Strategy is far-reaching—and focuses on our partnerships with other governments, international institutions, businesses, foundations, and civil society. At this writing, we have already received commitments from the governments of Mexico, Japan, and Korea, and the United Nations, to join the United States in providing relief to the region. Our Administration is also working hand-in-hand with foundations and non-profits to accelerate efforts in Central America.

While, in the past, the private sector has been an underutilized partner, our Administration is calling on U.S. and international businesses to invest in the region – and thus far, 12 have done so. Private sector investment not only boosts economic opportunity, but it also incentivizes regional governments to create the conditions on the ground to attract such investment.

\* \* \*

**Ultimately, our Administration will consistently engage in the region to address the root causes of migration. We will build on what works, and we will pivot away from what does not work. It will not be easy, and progress will not be instantaneous, but we are committed to getting it right. Because we know: The strength and security of the United States depends on the implementation of strategies like this one**

2



# TABLE OF CONTENTS

I.      Introduction

II.     Strategic Environment

III.    Desired End State

IV.     Strategic Framework

V.      Pillar I: Addressing Economic Insecurity and Inequality

VI.     Pillar II: Combating corruption, strengthening democratic governance, and advancing the rule of law

VII.    Pillar III:  Promoting respect for human rights, labor rights, and a free press

VIII.   Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

IX.     Pillar V:  Combating sexual, gender-based, and domestic violence

X.      Implementation Sequencing Highlights



# Introduction

It is in the national security interest of the United States to promote a democratic, prosperous, and secure Central America, a region closely connected to the United States by culture, geography, and trade. COVID-19, extreme weather, and severe economic decline are compounding longstanding challenges in the region, forcing far too many Central Americans to conclude the future they desire for themselves and their children cannot be found at home.  They have lost hope and are fleeing in record numbers.

Persistent instability and insecurity in Central America have gone on for too long.  Poverty and economic inequality, pervasive crime and corruption, and political leaders' drift toward authoritarian rule have stunted economic growth and diverted critical resources from healthcare and education, robbing citizens of hope and spurring migration.  The worsening impacts of climate change, manifesting as prolonged periods of drought and devastating storms, have exacerbated these conditions and undermine U.S. and international interests.  All of these factors contribute to irregular migration, and none of them can ultimately be addressed without honest and inclusive democratic governance that is responsive to the needs of citizens in the region.

The Root Causes Strategy, directed by the President in Executive Order 14010, focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and that "take(s) into account, as appropriate, the views of bilateral, multilateral,

 *This Strategy lays out a framework to use the policy, resources, and diplomacy of the United States, and to leverage the expertise and resources of a broad group of public and private stakeholders, **to build hope for citizens in the region that the life they desire can be found at home.***

and private sector partners, as well as civil society."  This Strategy lays out a framework to use the policy, resources, and diplomacy of the United States, and to leverage the expertise and resources of a broad group of public and private stakeholders, to build hope for citizens in the region that the life they desire can be found at home.

The U.S. government consulted with a wide range of stakeholders to inform this Strategy, including governments in the region, Members of Congress and their staff, international organizations, civil society organizations, labor unions, and the private sector.  Consultations will continue throughout implementation.



# Strategic Environment

Weak investment in infrastructure and education and poor rule of law leaves Central America at a competitive disadvantage for external investments, economic growth, and talent retention.  Weather shocks due to climate change contribute to growing poverty, homelessness, and food insecurity. Corruption and other government actions to undermine transparency and democratic governance limit confidence of the public in their governments and discourage domestic and foreign investment.  Threats

4

such as gang violence, criminal activity, and illicit drug flows challenge the security environment in Central America.

Nevertheless, opportunities for change exist. A growing number of stakeholders, including from civil society and the private sector, are interested in pushing governments toward reforms that foster greater transparency and address climate change. Likeminded government actors, as well as multilateral banks, private companies, foundations, civil society organizations, and international organizations, are interested in partnering on efforts to address the root causes of migration. Sustainable technology can help increase access to government services and economic opportunities. We will take advantage of these opportunities to address the reasons individuals choose to leave their home.



# Desired End State

*A democratic, prosperous, and safe Central America, where people advance economically, live, work, and learn in safety and dignity, contribute to and benefit from the democratic process, have confidence in public institutions, and enjoy opportunities to create futures for themselves and their families at home.*



# Strategic Framework

The Strategy focuses on the most commonly cited factors limiting progress in Central America, particularly those related to economic opportunity, governance and transparency, and crime and insecurity. It is often a combination of multiple factors, resulting in a lack of hope that their country will improve, that marginalizes large populations within the region and pushes some people to migrate. As such, we must work across all pillars to create economic opportunities, empower women and youth, support responsive and transparent governments, and build communities where people feel safe. As individuals observe and experience improvements in these areas, we anticipate more people in El Salvador, Guatemala, and Honduras will have a reason to believe they can build successful lives at home rather than abroad.

> " Effecting systemic change and achieving the desired end state of a democratic, prosperous, and safe region will require the governments of El Salvador, Guatemala, and Honduras to govern in a transparent, professional and inclusive manner **that favors the public interest over narrow private interests.**

U.S. foreign assistance cannot substitute for political will in these countries. Used strategically, however,

5

U.S. development, diplomatic, and related tools can generate political leverage, empower champions of change, combat impunity and state capture, and catalyze improvements in governance, private investment, and human capital.

Execution of the Strategy will draw on the breadth of the U.S. government and a diverse group of public and private stakeholders.  It will draw on technological advances and leverage existing technology to offer dynamic, creative, efficient, and transparent solutions.  Throughout, it will focus on ensuring opportunities are available to all citizens regardless of gender, race, ethnicity, or sexual orientation.

The strategy is organized under five pillars:

- Pillar I:  Addressing economic insecurity and inequality

- Pillar II:  Combating corruption, strengthening democratic governance, and advancing the rule of law

- Pillar III:  Promoting respect for human rights, labor rights, and a free press

- Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

- Pillar V:  Combating sexual, gender-based, and domestic violence

Each Pillar is supported by various lines of effort, many of which advance progress in multiple pillars. While implementation of the lines of effort will be similar in each country, the specifics will differ.  To build political will among leaders in Central America, the United States will utilize diplomacy, public diplomacy, sanctions and visa revocations, and targeted foreign assistance programs.

 Even with a strong, sustained commitment, the type of **systemic change envisioned in the Strategy will take time to achieve**, and progress will not be linear.

The United States will combine our efforts with those of other governments, including in Central America and beyond, the private sector, civil society, international organizations, and multilateral banks and institutions, to leverage investments and speak with a similar voice as we advocate for partner government actions to affect sustainable change.  This holistic approach utilizes all U.S. government tools and a broad array of partnerships to leverage expertise, creative ideas, and the power of multiple voices to generate necessary change to provide citizens in the region with hope.  Even with a strong, sustained commitment, the type of systemic change envisioned in the Strategy will take time to achieve, and progress will not be linear.  Implementing the Strategy demands a disciplined approach that relies on innovation and evidence, but also clear accomplishments along the way to maintain momentum.

Across all pillars of our work, we will:

- ***Consult and Coordinate:***  To further develop our path forward, the administration will continue to consult with Congress, civil society, international organizations, the private sector, like-minded partners, and governments.  We will listen, learn the lessons of past efforts, create an approach, which draws on input from across sectors, and develop a broad base of support that advances efforts across the Strategy.

- *Communicate:*  We will create a robust communications plan, leveraging independent and social media, to convey our efforts to improve conditions in the region, build support for our approach, and instill hope in the region.  We will also seek to discourage irregular migration and dispel misinformation.

- *Assess:*  We will move forward deliberately with clear goals, measurable objectives, and strong safeguards to guide our efforts.  Throughout implementation, we will build in assessment points to ensure our efforts are producing the results we seek, strengthening where needed, adjusting course where warranted, and discontinuing as required.



# Pillar I: Addressing Economic Insecurity and Inequality

Despite reductions in poverty rates and increases in GDP per capita prior to the double impacts of the pandemic and hurricanes Eta and Iota, the economies of El Salvador, Guatemala, and Honduras remain largely informal and highly unequal.  Key to growth will be structural reforms to address impediments to investment, economic diversification, increased judicial transparency, improved governance and transparency, expanded access to financial capital for businesses, streamlining of government procedures to start businesses and pay taxes, investment in workers, and formalization of the economy.  Inclusive growth, that reaches women and marginalized populations, and includes decent work, will be critical to creating hope among citizens in the region.  The COVID-19 pandemic exposed weakness in national health care systems, led to severe economic downturns, and devastated tourism.  The consequences of climate change are only projected to get worse, further disrupting growing cycles, upending farmer livelihoods, and exacerbating food insecurity and malnutrition.  Securing commitments from regional governments while working with the private sector, international donors, foundations, international financial institutions (IFIs), and multilateral development banks (MDBs) will be critical to fostering the reforms necessary for businesses to thrive, mobilizing investment, and promoting economic development in the region.  Across these efforts, we will focus on empowering women, youth, and marginalized communities.

## Strategic Objectives:

1. ***Foster a Business Enabling Environment for Inclusive Economic Growth***:  Governments build an enabling environment for business by implementing reforms to address structural impediments to growth, streamlining and digitalizing business registration and operations processes, offering legal certainty, reducing opportunities for corruption, enforcing labor and environmental rules, combating insecurity and extortion, and leveling the playing field for international businesses.  Governments promote and facilitate economic growth in a manner that is available to all sectors of society, including women, minorities, and other marginalized populations.

2. ***Increase and Diversify Trade:***  Customs and border systems are more efficient and less subject to malfeasance, there is increased alignment and reduced redundancy of regulations across the

region, and infrastructure projects better facilitate trade.  Enhance and diversify trade to include new export sectors, including those that reinforce U.S. supply chain needs.

3. ***Enhance Workforce Development, Health, Education, and Protection:***  Governments are able to effectively manage the COVID-19 response and prepare for the potential of future pandemics, and all citizens, including women and girls, have improved access to quality education, health care and clean water access, and social safety nets.

4. ***Build Resilience to Address Climate Change and Food Insecurity:***  Governments target investments so they are better able to mitigate the impact of severe weather events, including flooding and drought.  Agriculture, including fisheries and aquaculture, is developed toward higher levels of climate resilience, leading to affordable and available food that can be utilized for a healthy diet, contributing to greater food security.

## Lines of Effort:

1. **Foster a business-enabling environment for inclusive economic growth.**  The United States will work with governments to streamline regulatory processes and services, including via digitalization of government services such as records, databases, permitting, and tax collection. This will include efforts to address structural impediments to investment; support business incubation and acceleration to strengthen value chains by helping businesses produce higher-value goods in the agricultural and emerging sectors, and ensure all populations are incorporated into economic development policies.

   - **Promote legal certainty.**  Weak rule of law is often cited as the top factor limiting new investment in El Salvador, Guatemala, and Honduras.  We will work with the private sector, governments, and civil society to strengthen transparency, promote business ethics, and foster predictable legal and regulatory business environments.

   - **Promote investment-enabling reforms.**  The United States will partner with regional governments, multilateral development banks, and the private sector to promote reforms to address structural impediments to investment and facilitate greater private sector participation in these economies, leveraging U.S. government partnerships with these entities to support business development and create jobs.

   - **Embrace technological solutions.**  The United States will leverage rights-respecting technology to facilitate economic growth, increase opportunities for excluded populations, promote financial inclusion, and strengthen education and workforce development in coordination with the private sector.  This will include extending existing technological solutions to our areas of focus, and guarding against unintended consequences of technological expansion.

   - **Expand opportunity for women, youth, and minorities.**  The United States will work to ensure government programs and financial capital reach underserved groups, including small and medium sized enterprises (SMEs), youth, women- and indigenous-owned businesses, businesses serving rural areas, and internally displaced persons (IDPs).

2. **Enhance and diversify trade.**  The United States will work with a variety of stakeholders to increase trade, diversify industry, and create decent work for citizens in the region, while working with governments to promote reforms needed to facilitate this growth.

Venezuela AR_000583

- **Facilitate trade.**  The United States will work with governments to expand and diversify trade by reducing malfeasance and corruption in customs regimes; promoting prioritization of lending and technical support for infrastructure projects that facilitate trade; aligning and integrating regional customs systems; harmonizing regulatory certification requirements; and supporting business compliance with internationally recognized labor rights, environmental protections, and complex international trade rules.

- **Partner with International Financial Institutions (IFIs) and Multilateral Development Banks (MDBs).**  The United States will partner with IFIs and MDBs to diversify donors and provide a wide range of financing options to governments and private sectors in the region.  We will leverage the IFIs and MDBs to prioritize support for infrastructure development that facilitates trade and investment while incorporating transparency and good governance priorities in their financing and technical assistance initiatives.

- **Partner with the Private sector.**  The United States will partner with private sector companies to sustainably grow economies by attracting greater private investment while encouraging governance, economic, and other reforms to support business-enabling environments that create decent work.  We will conduct outreach to U.S. and vetted multinational businesses that already operate in the region, as well as business chambers of commerce in Central America.

- **Promote cross-border energy infrastructure.**  The United States will support cleaner and more efficient cross-border energy systems including new energy delivery infrastructure to facilitate increased reliability and cross border power integration and trade.

3. **Enhance workforce development, health, and education.**  The United States will support workforce training and vocational education programs, including improving the quality of existing education and increasing children enrolled in education and food programs that ensure children's basic nutritional needs are met; expand access to clean and potable water; and support a stronger COVID-19 response.

- **Increase access to quality education.**  The United States will support governments in providing youth with appropriate, safe, and accessible educational opportunities; and ensuring educational and vocational offerings reflect labor market needs so youth are able to access decent work upon completion of their studies.

- **Improve health.**  The United States will support water and sanitation programs to expand access to clean water.  The United States will support programs to strengthen health systems to address current and future public health challenges.

4. **Build resilience to address climate change and food insecurity.**  The United States will partner with governments, MDBs, IFIs, and the private sector to facilitate the development of agricultural practices to ensure farmers can better respond to the impacts of climate change and extreme weather events, which have contributed to food insecurity.

- **Increase resilience.**  The United States will support improved agriculture production and income generation to reduce food insecurity while supporting sustainable food systems.  We will support efforts to improve crop resilience, adopt environmentally and economically sustainable agricultural practices, and improve land and water

management; improve the resilience of residential, commercial, and public buildings and core public infrastructure; and mitigate the impacts of and support a more rapid recovery from hurricanes and other severe weather events.

- **Enhance renewable energy.** The United States will support new electricity generation projects, including in renewable energy and power grid improvement; a more efficient regulatory framework, especially for distributed generation, increased reliability, grid sustainability, and cross-border power integration and trade. We will focus on investment categories including power generation with a focus on renewable energy, energy efficiency, and storage; residential, commercial, and public buildings; and water efficient agriculture.



# Pillar II:  Combating corruption, strengthening democratic governance, and advancing the rule of law

Governance challenges, including widespread corruption, undercut progress on economic opportunity, protection of human rights, and civilian security. Private companies cite corruption as an impediment to investment. Weak democratic institutions, coupled with rampant impunity, have lowered citizens' trust in their governments and the independence of judicial systems. Contested elections and opaque government decision-making have led to violence.

As seen during the COVID-19 pandemic, governments all too often fail to provide needed services to their citizens and lack of government investment in infrastructure, education, health, and civilian security has hobbled advancement. We will partner with civil society and independent media so they can maintain their critical oversight role and will work with civil society, the private sector, governments, and international institutions to advocate for sustainable progress in these areas.

## Strategic Objectives:

1. ***Strengthen Democratic Institutions to Improve Governance and Rule of Law:***  Governments enact and implement legislative reforms towards transparent and participatory policy making and electoral processes, including broad civic engagement. Oversight is instituted at all levels of government.

2. ***Combat Corruption*:**  Governments are freed from entrenched networks of corruption and impunity. They develop and strengthen independent and transparent systems to eliminate conflicts of interest, including in selection of judges and other government personnel.

3. ***Improve Government Service Delivery:***  Governments improve capacity to raise and manage public resources, initiate reforms to improve fiscal and operational transparency, and provide services to all citizens.

Venezuela AR_000585

## Lines of Effort:

1. **Strengthen democratic institutions to improve governance and rule of law.**  The United States will work with countries to promote reform agendas across all branches of government so government better serves all citizens.  This will include a focus on adequately resourcing judicial and oversight institutions, ensuring their independence, and promoting reform of personnel selection and retention processes.

   - **Strengthen the independence of the justice sector.**  The United States will promote a merit-based, independent process for nomination and selection of justice and oversight officials, and establish anti-corruption norms limiting immunity of officials from prosecution and banning candidates for office with disqualifying criminal records.  We will promote adequate funding of justice institutions so they have the resources to serve the country.

   - **Promote transparency.**  The United States will work with partners to promote transparency in electoral systems through reform and enforcement of electoral campaign finance rules and open list systems to allow for direct representation.  We will empower independent audit and oversight institutions to monitor use of public funds, and promote transparency in government processes, including open government mechanisms and the promotion of open data.  We will explore how to leverage the concept of "vetted units" to bring trusted actors into key roles in oversight bodies, including in legislative committees.

   - **Improve efficacy of legislative branches.**  The United States will work with partners to root out corruption in legislative branches and improve the transparent and efficient functioning of those bodies.

   - **Empower public and private sector actors.**  The United States will partner with civil society and independent media so they have the tools, knowledge, and networks needed to safely identify government neglect and abuse, raise awareness, and demand accountability.  We will partner with the private sector to advocate for necessary reforms and regulations to promote transparency.

2. **Prioritize an anticorruption agenda.**  The United States will work regionally, bilaterally, and, if we must, unilaterally to root out corruption and enhance transparency across the region.

   - **Support civil society and media organizations.**  Across Central America, citizens, nongovernmental organizations, and media organizations have led efforts to promote transparency and demand improved governance.  The United States will expand support for NGOs and other entities in the region focused on governance promotion to encourage local leadership of such efforts and foster resiliency and sustainability.

   - **Prevent, detect, investigate, and prosecute corruption.**  The United States will work with partners to develop and implement a variety of anti-corruption tools aimed at preventing, detecting, investigating, and ultimately punishing corruption at all levels and in all branches of the government, and throughout society.  We will identify, support, and

partner with prosecutorial teams that demonstrate a commitment to holding corrupt actors to account.

- **Sanction corrupt actors.**  The United States will use various tools, including financial sanctions and visa restrictions, to signal we will not tolerate corruption and antidemocratic behavior.  We will press governments to strengthen transparency, accountability, and the rule of law with decisive and meaningful reforms.

3. **Improve administration of public resources.**  The United States will work with governments to establish proper budgeting, management, and use of public resources at the local and national levels to enhance service delivery for all citizens, including in underserved areas and vulnerable populations.

    - **Improve government finances.**  The United States will work with governments to review fiscal policy to identify gaps and incongruences in taxation, and opportunities to progressively expand the tax base, incentivizing individuals and businesses to move into the formal economy and to transition public procurement to a competitive, transparent, and merit-based system to curb political influence and diminish the opportunities for corruption.

    - **Target key populations.**  The United States will work with governments to establish strategies to provide services in marginalized communities, including IDPs, high-threat crime areas, and regions with highest outbound migration.



# Pillar III:  Promoting respect for human rights, labor rights, and a free press

Respect for human rights, labor rights, and press freedom are essential elements to democratic and social development in the region.  Marginalized populations, including women and girls, indigenous, Afro-descendent, and LGBTQI+ populations often suffer discrimination and may be victims of hate crimes. Victims of violence at the hand of the state or criminal organizations suffer from systemic violations of their rights under the law (including redress, protection, and recognition), and IDPs are particularly at risk.  Labor rights activists, human rights and environmental defenders, and independent journalists face violence and intimidation.  Authorities often do not hold perpetrators of these crimes accountable and labor law enforcement is weak.  We will work with partners in the region, including civil society, to promote respect for human rights for all citizens.

## Strategic Objectives:

1. ***Enhance Respect for Human Rights:***  Governments prevent, reduce, and mitigate risk factors and reduce human rights violations.  Civil society organizations and a robust free press hold government actors accountable.  At-risk populations have national and international recourse, including U.S. government support and advocacy.

2. ***Enhance Respect for Labor Rights:*** Governments ensure labor laws are enforced as required by CAFTA-DR, with a particular emphasis on freedom of association and the right to organize and bargain collectively, addressing child labor and forced labor, and promoting decent work in safe, healthy, and inclusive workplaces free from discrimination.

3. ***Promote a Free Press:*** Governments respect the independence of all forms of media so citizens can access information necessary to make informed decisions and hold governments accountable.

## Lines of Effort:

1. **Strengthen respect for human rights.** The United States will work with governments and civil society to strengthen legal frameworks, promote the enforcement of laws that protect citizens' rights, support regional and domestic early warning systems to track risks for violations, and build institutional capacity to protect citizens' rights.

   - **Protect human rights defenders and at-risk populations.** The United States will work with governments and civil society to protect marginalized individuals and groups, including human rights and environmental defenders, youth activists, LGBTQI+ people, indigenous people, IDPs forcibly displaced by violence, labor rights activists, and other individuals who are at risk of persecution or abuse.

   - **Respond promptly and decisively to ensure accountability.** The United States will work with governments so they decisively respond when human rights violations occur, extending access to justice for all citizens, and reducing impunity by ensuring justice and security actors hold perpetrators accountable.

   - **Curb extrajudicial killings.** The United States will support efforts to curb abuses by security personnel, including the police, and hold perpetrators accountable.

   - **Strengthen civil society protections.** The United States will work with governments and civil society organizations to ensure that civil society and media groups are able to hold governments accountable without legal restriction and free from intimidation.

2. **Strengthen respect for labor rights.** The United States will work with governments to strengthen legal frameworks and the enforcement of labor laws, promote decent work, and support workers in exercising their freedom of association and collective bargaining rights.

   - **Protect trade unionists and the right to organize.** The United States will work with governments to ensure laws that protect the rights of workers to organize and bargain collectively are in place and are effectively enforced. The United States will work with governments to empower workers to claim their rights, protect labor rights activists, and build the capacity of democratic, worker-led organizations.

   - **Improve legal frameworks, enforcement, and awareness.** The United States will work with governments to ensure laws that protect fundamental labor rights are in place and enforced, with appropriate dispute resolution mechanisms and proactive outreach to communities, unions, civil society, and employers. The United States will promote labor rights compliance among employers, including accountability in the supply chains of priority sectors. The United States will work with governments, employers, and worker organizations to promote constructive dialogue on labor issues to improve legal

**13**

frameworks, inform enforcement strategies, and strengthen worker voices related to labor and employment issues.

3. **Promote a free press.**  The United States will work with governments and civil society to ensure citizens have access to information from independent sources to inform their choices.

   • **Strengthen independent media.**  The United States will support a regulatory environment that ensures independent media can operate without fear of reprisal or intimidation, and will support development of media that can serve as an effective oversight tool to those in power.



# Pillar IV:  Countering and preventing violence, extortion, and other crimes perpetrated by criminal gangs, trafficking networks, and other organized criminal organizations

U.S. assistance contributed to important advances in the professionalism and capability of law enforcement and security services throughout Central America, in particular with the capacity of vetted units, community policing, and violence prevention initiatives.  Homicide rates have decreased and capacity to seize illicit drugs has increased in recent years, though violence against women and children has increased.  Gangs and extortion remain a threat, and transnational crime is on the rise.  Challenges remain with uneven capabilities among law enforcement and security services, inadequate resourcing of security needs, the impact of the pandemic on law enforcement, and the military's role in policing.

Obtaining clear and meaningful commitments from our partners to tackle corruption and support transparency is a foundational element for sustainable progress across the criminal justice systems of Central America.  Increasing security within communities is key to generating hope for citizens in the region so they can move safely to school and work, but also to attract investment.  We will work with partner governments and community organizations to build professional security forces and focus on violence prevention and intervention to build a more secure region.

## Strategic Objectives:

1. ***Professionalize Security Forces***:  Governments support the development of accountable security forces that earn the respect of the citizens they serve.  This includes adopting budgets for security forces that enable them to be sufficiently staffed, trained, equipped, and compensated, and have internal oversight to strengthen accountability.  Governments establish legal limitations on the use of militaries in civilian policing and implement plans for the removal of militaries from civilian policing.

**14**

2. ***Counter Organized Crime***:  Security forces counter organized crime and using place-based strategies, disrupt and dismantle transnational criminal organizations and other criminal actors in key corridors to improve citizen security.

3. ***Build Safe Communities through Violence Prevention and Intervention***:  Governments make legal and policy reforms in violence prevention, support rehabilitation and re-insertion into society of former gang members and individuals previously incarcerated, and provide protection to at-risk youth and victims of violence, and other marginalized populations, including prevention of human trafficking.

## Lines of Effort:

1. **Professionalize security forces.**  The United States will support the development of well-trained civilian law enforcement and other security forces that can provide effective, accountable services with respect for the rule of law and human rights.  We will work with governments so civilian law enforcement has the resources and capacity to assume full responsibility for civilian security, enabling the drawdown of military from policing roles.

   - **Improve civilian policing.**  The United States will work with governments to target resources at the most pressing security challenges, while ensuring intelligence-led and community policing concepts are introduced and implemented nationwide, designed to increase dialogue and trust with populations, and establish community-based solutions to crime that respect human rights.

   - **Enhance accountability.**  The United States will work with governments to build accountability into security forces through initiatives to support audit and oversight functions to root out and address misconduct and poor performance.

2. **Counter organized crime.**  The United States will work with governments to increase capacity of law enforcement and other security forces to address the unique transnational and national threats to the region, such as drug trafficking, gangs, extortion, smuggling, corruption, and money laundering, including through vetted and specialized units, regional cooperation, and legislative reform to increase penalties for organized crime.

   - **Build trusted partners.**  The United States will work with and expand vetted and specialized units to build capacity to address complex crimes, including human and drug trafficking, and ensure trusted partners that can work with the United States and others in the region.

   - **Promote regional cooperation.**  The United States will promote coordination and information sharing among countries in the region to address transnational crime, including to combat narcotics and other illicit trafficking.

3. **Build safe communities.**  The United States will work with governments, law enforcement, community organizations, and others to build trust between the community and government, prevent crime, and provide alternatives to youth considering a life of crime.

   - **Create safe spaces.**  The United States will work with municipalities and community organizations to increase the availability of safe spaces, such as parks and youth centers,

and improve the safety of public transportation, so that citizens can engage in economic and social life without fear

- **Create meaningful alternative for at-risk youth.** The United States will work with a diverse range of stakeholders from government, civil society, and the private sector to prevent youth from joining gangs, including through opportunities to play, learn, work, and feel connected with their families and communities.

- **Reintegrate offenders.** The United States will work with governments and civil society to support offenders' efforts to disengage from gangs and reintegrate into communities by addressing trauma, community resiliency, education and economic opportunity, and case management services.



# Pillar V:  Combating sexual, gender-based, and domestic violence

Across the region, gender-based violence (GBV)--including, but not limited to, intimate partner violence, rape, gender-based murder of women and girls (femicide)--and other crimes, including sex and labor trafficking, significantly hinder the ability of women and girls to participate fully in society and contribute to their families and communities.  Women and youth from historically marginalized communities often face even higher levels of GBV.  In El Salvador, Guatemala, and Honduras, women and youth subjected to violence or human trafficking lack sufficient access to justice and protection services.  The ability of law enforcement to combat sexual, gender-based, and domestic violence remains a challenge, and domestic violence has been exacerbated by the COVID-19 pandemic.  We will work with partner governments, civil society organizations, and others to combat violence in the region.

## Strategic Objectives:

1. *Combat sexual, gender-based, and domestic violence:*  Governments and civil society take steps to prevent sexual, gender-based, and domestic violence; hold perpetrators accountable; and protect and provide services for victims.

## Lines of Effort:

1. **Combat sexual, gender-based, and domestic violence.**  The United States will work with governments and civil society to prevent, address, and support victims of sexual, gender-based, and domestic violence.

   - **Prevent and prosecute sexual, gender-based, and domestic violence.**  The United States will work with governments in the region to implement existing legislation relating to sexual, gender-based, and domestic violence, and ensure law enforcement and the justice sector is equipped to investigate and prosecute these crimes, reducing impunity for

16

these crimes.  We will work with community-based organizations to change the culture around gender-based violence and empower women.

- **Support victims.**  The United States will work with governments and civil society to increase support and protection for survivors of these crimes, and break down stereotypes and cultural norms that permit these crimes to continue.



# Implementation Sequencing Highlights

## Short-Term:

**Build Partnerships:**  We will build a coalition of people, organizations, and businesses committed to creating economic opportunity and fostering political will for structural reforms in Guatemala, El Salvador, and Honduras.

**Mobilize Investment:**  We will work with the private sector to mobilize investment in the region to create economic opportunity.

**Address Acute Causes:**  We will address humanitarian needs from the fall 2020 hurricanes, provide training and finance to jump start the economies after COVID-19 and hurricane devastation, and provide critical support to those in need of food assistance.  We will focus on education and training for youth.

**Communicate:**  We will ensure people in the region know about the United States' commitment to supporting good governance, economic opportunities, and security so they understand help is on the way to build hope for a better future at home.  We will communicate clearly to governments in the region that the United States wants to be a partner in their success, but that this partnership requires a shared commitment to inclusive and transparent democratic governance.

## Medium Term:

**Promote Reforms:**  We will focus our efforts on deepening implementation of initiatives that promote reforms fundamental to addressing root causes of migration, employing the full range of U.S. government tools to combat corruption and promote political will where necessary.

**Create Economic Opportunity:**  We will expand our partnership with foundations, civil society, and the private sector to deliver new economic opportunities to citizens in the region, and mobilize appropriate technological solutions.

**Fight Corruption:**  We will launch a regional anti-corruption initiative and work closely with partners to prosecute corruption and transnational criminal operations, including illicit political finance, migrant smuggling and trafficking cases, that will help improve governance in Central America.

**Combat Insecurity:**  We will target security assistance on the most common security-related drivers of migration, including extortion and gender-based violence.

17

**Address Climate Change and Improve Disaster Preparedness:**  We will work with partners to reinforce national and regional preparedness and disaster response capabilities and implement programs to adapt to and mitigate the impacts of climate change.

**Communicate:**  We will continue to communicate progress and actions to build hope across society.

## Long-Term:

**Deepen Partnerships:**  We will solidify and expand implementation across the pillars, informed by constant feedback and consultation from stakeholders in Congress, civil society, international organizations, the private sector, and partner governments.

**Institutionalize Programs:**  We will aim for institutionalization of longer-term structural changes in governance to ensure strong democratic institutions and governments that invest in the well-being of their societies.  We will assess our progress and increase the sustainability of our efforts by transferring increased ownership to partners in the region.

**Integrate Regionally:**  We will seek deeper economic and political integration across Central America, and with North America, to safely and humanely manage migration and to help realize a vision of a more prosperous and stable region.

Venezuela AR_000593



Venezuela AR_000594



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Information Technology*
Washington, DC  20529

# Memorandum

TO:  Dominic Mancini
     Deputy Administrator,
     Office of Information and Regulatory Affairs,
     Office of Management and Budget

THROUGH:  Eric Hysen
          DHS Chief Information Officer

ERIC N HYSEN    Digitally signed by ERIC
                N HYSEN
                Date: 2022.10.17
                19:06:26 -04'00'

FROM:  Samantha Deshommes
       USCIS Office of Policy and Strategy,
       Regulatory Coordination Division, Chief

SAMANTHA L DESHOMMES    Digitally signed by
                        SAMANTHA L DESHOMMES
                        Date: 2022.10.17 15:50:42
                        -04'00'

SUBJECT:  Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form I-134,
          Declaration of Financial Support


**Purpose:** USCIS is requesting emergency approval of the revision of USCIS Form I-134, Declaration of
Financial Support, which is an approved collection of information under 5 CFR 1320.13.

**Background:** The U.S. Department of Homeland Security (DHS) and consular officers of the U.S.
Department of State use Form I-134 to determine whether, at the time of the beneficiary's application,
petition, or request for certain immigration benefits, the beneficiary has sufficient financial support to pay
for expenses for the duration of their temporary stay in the United States.  U.S. Citizenship and
Immigration Services (USCIS) is updating the online Form I-134, instructions, and respondent burden to
account for the new population of noncitizens who will need to have a Form I-134 filed on their behalf
and confirmed so that they can seek parole into the United States under section 212(d)(5)(A) of the
Immigration and Nationality Act (INA).  The updated Form I-134 (online) will be used by supporters
filing that form on behalf of beneficiaries seeking parole under the *Uniting for Ukraine* (U4U) process
and noncitizens (and their immediate family members) from Venezuela who will be seeking parole into
the United States under special parole processes.

Following Russia's attack on Ukraine, DHS created a process for Ukrainian nationals and their immediate
family members to request parole under section 212(d)(5)(A) of the INA. USCIS revised Form I-134 for

use in the U4U process.  Information collected from the supporter on Form I-134 and subsequently the beneficiary is used by CBP to facilitate vetting prior to the beneficiary's travel to the United States.  The U4U process is still ongoing.

In addition to U4U, DHS is now working with its interagency partners to allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed U.S. Customs and Border Protection (CBP) Advance Travel Authorization (ATA) capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Participation will be limited to those individuals from Ukraine and Venezuela who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter.  Pending Office of Management and Budget (OMB) approval, this functionality may launch as early as October 18, 2022.

The changes to the online Form I-134 are essential to effectively support CBP in their efforts to adjudicate parole requests submitted by beneficiaries of the U4U process and other noncitizens and their immediate family members from Venezuela who are eligible to be considered for parole under certain special processes. USCIS cannot reasonably comply with the normal clearance procedures as it would delay the agency's ability to provide immediate support to CBP in the emerging and urgent humanitarian crisis.

**Emergency Justification:** The United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing unprecedented challenges processing such individuals in a timely manner.

The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals.  Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328.  They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019.   Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs.  DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease. But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed.  To date, other countries, including Mexico, have generally failed to accept Venezuelans as well.  As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

This crisis has culminated in a new parole process for eligible Venezuelans, as described in the Department's recently published Federal Register notice entitled *Implementation of a Parole Process for*

*Venezuelans*, and in conjunction with emergency approval of a new CBP collection entitled *Advance Travel Authorization*¬.

Accordingly, USCIS is revising the online Form I-134 information collection instrument to reflect additional information data points for vetting and processing individuals who agree to financially support the beneficiary from Ukraine or Venezuela named on Form I-134. The online information collection for Form I-134 that is currently used only for the U4U process and, upon approval of this emergency revision, will also be used for noncitizens from Venezuela and their immediate family members who are eligible to be considered for parole under special parole processes is separate from the paper information collection for Form I-134.

These revisions are necessary to increase the validity and integrity of the information provided by individuals who agree to financially support beneficiaries of U4U and Venezuela. Prior to confirmation of a prospective supporter's Form I-134, DHS conducts background checks and vetting of the supporter. DHS searches public and private sector databases that use sex as an identifier. Based on DHS's experience with the *Uniting for Ukraine* process, USCIS found multiple instances of predominantly male supporters submitting Form I-134 (online) to support much younger female and child beneficiaries – an indicator of potential trafficking or circumvention of the screening processes traditionally associated with immigrant and nonimmigrant visa categories related to fiancé/cee and spouses. The sex data element is critical for our efforts to make sure the parole processes that require the Form I-134 (online) are not used to facilitate human trafficking or circumvent some of the protections provided by statutes such as the Adam Walsh Act, Violence Against Women, and the International Marriage Broker Regulation Act of 2005. By adding the sex data element, DHS will be able to quickly identity, through systematic checks, trends and other indicators in the filings of Form I-134 supporters and proposed beneficiaries that may reveal patterns commonly associated with human trafficking and transnational criminal activity. This will provide DHS the necessary additional tool to identity potential cases that require further investigation prior to confirmation of a Form I-134 or for which DHS may initiate an interview with a prospective supporter to ascertain the bases for their agreement to financially support certain individuals. This data collection also will streamline and enhance account verification, reduce fraud, and ensure the safety of a vulnerable population, allowing DHS to respond to an emerging humanitarian crisis in a timely manner. Finally, the capture of the sex data element is also consistent with the U.S. recognition policy for certain passports and identity documents issued by those foreign countries that allow an individual to indicate a non-binary assignment or gender-neutral option.

USCIS must also capture the Social Security Number of U.S. Citizens and Lawful Permanent Residents who will be filing to support Ukrainian and Venezuelan persons who are eligible to enter the United States as a part of the efforts being undertaken by the Secretary of Homeland Security. Collecting this data for this specific population will ensure that USCIS can successfully run background checks on these persons. Some of this population may not have Alien File Numbers or other identifying data points that USCIS would already have on file to conduct a search of its databases in its vetting of these respondents. USCIS is requesting this information during this emergency submission to ensure that sponsors approved under this program are acting the beneficiary's best interests.

USCIS will seek comment on these two data elements being added to the information collection during the subsequent revision package that will be submitted within 6 months of approval of this emergency package. At the time of submission, USCIS will also provide OIRA with any evidence or data that supports the justification to continue collecting both new data elements.

This form has been thoroughly reviewed and vetted by USCIS.

USCIS seeks emergency processing of the Form I-134 information collection package in accordance with 5 CFR 1320.13. USCIS certifies that the requirements of 5 CFR 1320.13(a) are met and that:

- The collection of information is needed immediately and is essential to the mission of the agency.
- The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information.
- Public harm is reasonably likely to result if normal clearance procedures are followed.

USCIS greatly appreciates the timely consideration of this request.

**Recommendation**: Please sign decision memo requesting emergency approval of this collection of information under 5 CFR 1320.13.



# Declaration of Financial Support

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 04/30/2023

▶ **START HERE - Type or print in black ink.**

## Part 1.  Basis for Filing

**1.**   I am filing this form on behalf of:   ☐ Myself as the beneficiary.   ☐ Another individual who is the beneficiary.

## Part 2.  Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

**1.**   Beneficiary's Current Legal Name (**Do not** provide a nickname.)

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
|  |  |  |

**2.**   Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
|  |  |  |
|  |  |  |

**3.**   Date of Birth (mm/dd/yyyy)   **4.**   Gender   ☐ Male   ☐ Female   **5.**   Alien Registration Number (A-Number)   ▶ **A-** ☐☐☐☐☐☐☐☐☐

**6.**   Place of Birth

| City or Town | State or Province |
|---|---|
|  |  |

Country

**7.**   Country of Citizenship or Nationality

**8.**   Passport Number of the beneficiary's most recently issued passport

Country that issued the most recently issued passport

Expiration date for the most recently issued passport (mm/dd/yyyy)

**9.**   Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Legally Separated   ☐ Marriage Annulled

☐ Other (Explain):