## Part 2.  Information about the Beneficiary (continued)

10.   Beneficiary's Mailing Address

In Care Of Name

Street Number and Name                                                    Apt.Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                    State    ZIP Code

Province                              Postal Code              Country

11.   Are the beneficiary's mailing address and physical address the same?                    ☐ Yes ☐ No

If you answered "No" to **Item Number 11.**, provide your physical address in **Item Number 12.**

12.   Beneficiary's Physical Address

In Care Of Name

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.)   Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                    State    ZIP Code

Province                              Postal Code              Country

13.   Beneficiary's Daytime Telephone Number        14.   Beneficiary's Mobile Telephone Number (if any)

15.   Beneficiary's Email Address (if any)

### *Beneficiary's Anticipated Length of Stay*

16.   Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐  (mm/dd/yyyy)

☐  No End Date

**Part 2.  Information about the Beneficiary** (continued)

*Beneficiary's Financial Information*

Provide information about the beneficiary's income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Beneficiary's Income**

17. Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**).  Information about assets that are not based on employment should be added in **Item Number 22.** and not in **Item Number 17.**

| **Individual's Full Name** (First, Middle, Last) (do not include any individuals named in **Part 3.**) | **Date of Birth** (mm/dd/yyyy) | **Relationship to the Beneficiary** (Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | **Income contribution to the beneficiary annually** (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |

|  |  |
|---|---|
| **Total** Number of Dependents |  |
| Total Income **$** |  |

18. Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?   ☐ Yes   ☐ No

19. If you answered "Yes" to **Item Number 18.**, what amount of the beneficiary's total income comes from an illegal activity or source?  (Type or print "N/A" if you answered "No" to **Item Number 18.**)   $ _____

20. Does any of the beneficiary's total income come from means-tested public benefits as defined in 8 CFR 213a.1?   ☐ Yes   ☐ No

21. If you answered "Yes" to **Item Number 20.**, what amount of the beneficiary's total income comes from means-tested public benefits?   $ _____

## Part 2.  Information about the Beneficiary (continued)

### Beneficiary's Assets

22.  In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder (First, Middle, Last) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** (U.S. dollars) $ |  |

## Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

1.  Current Legal Name (**Do not** provide a nickname.)

Family Name (Last Name)          Given Name (First Name)          Middle Name

2.  Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

Family Name (Last Name)          Given Name (First Name)          Middle Name

3.  Current Mailing Address

In Care Of Name

Street Number and Name          Apt. Ste. Flr.  ☐ ☐ ☐  Number

City or Town          State          ZIP Code

Province          Postal Code          Country

Venezuela AR_000602

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**4.**   Is your current mailing address the same as your current physical address?          ☐ Yes    ☐ No

If you answered "No" to **Item Number 4.**, provide your current physical address in **Item Numbers 5.**

**5.**   Physical Address

In Care Of Name

Street Number and Name                                                                Apt.Ste. Flr.   Number
                                                                                     ☐ ☐ ☐

City or Town                                                                          State    ZIP Code

Province                                    Postal Code                    Country

## Other Information

**6.**   Date of Birth (mm/dd/yyyy)

**7.**   Place of Birth

City or Town                                                        State or Province

Country

**8.**   Alien Registration Number (A-Number)          **9.**   USCIS Online Account Number
▶ A-                                                    ▶

**10.**   What is your relationship to the beneficiary?

## Immigration Status

**11.**   What is your current immigration status?  Provide documentation as provided in the instructions.

☐ U.S. Citizen

☐ U.S. National

☐ Lawful Permanent Resident

☐ Nonimmigrant  Form I-94 Arrival-Departure Record Number
              ▶

Other (Explain):

Venezuela AR_000603

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

### Employment Information

12.  Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)  ☐ Unemployed or Not Employed  ☐ Retired

☐ Other (Explain): [                                                    ]

If you indicated that you are employed in **Item Number 12.**, provide the information requested in **Item Numbers 13. - 14.**

13.  **A.**  ☐ I am currently employed as a/an          Name of Employer

[                                    ]    [                                    ]

**B.**  ☐ I am currently self-employed as a/an

[                                    ]

14.  Current Employer's Address

Street Number and Name                                          Apt.Ste. Flr.   Number
[                                                    ]   ☐ ☐ ☐   [                    ]

City or Town                                                    State   ZIP Code
[                                                    ]   [        ]   [                    ]

Province                          Postal Code           Country
[                    ]   [                ]   [                            ]

### Financial Information

Provide information about your income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8.  Additional Information**.

**Income**

15.  Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**).  Information about assets that are not based on employment should be added in **Item Number 20.** and not in **Item Number 15.**

| Full Name (First, Middle, Last) (do not include any individuals named in **Part 2.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Individual Agreeing to Financially Support (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | Income Contribution to the Beneficiary Annually (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | **Total** Number of Dependents |  |
|  |  | Total Income $ |  |

Venezuela AR_000604

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

16. Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?  ☐ Yes  ☐ No

17. If you answered "Yes" to **Item Number 16.**, what amount of income comes from an illegal activity? (Type or print "N/A" if you answered "No" to **Item Number** 16.)  $ [_____]

18. Does any of the income listed above come from means-tested public benefits as defined in 8 CFR 213a.1?  ☐ Yes  ☐ No

19. If you answered "Yes" to **Item Number 18.**, what amount of income is from means-tested public benefits?  $ [_____]

**Assets**

20. Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | **TOTAL** (U.S. dollars) $ |  |

*Financial Responsibility for Other Beneficiaries*

21. Have you previously submitted a Form I-134 on behalf of a person other than the beneficiary named in **Part 2?**  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 21.**, provide the information requested in **Item Numbers 21. - 23.**  If you need additional space to complete this section, use the space provided in **Part 8. Additional Information.**

22. Person 1

Family Name (Last Name) [_____]  Given Name (First Name) [_____]  Middle Name [_____]

A-Number
► A- [_____]  Date Submitted (mm/dd/yyyy) [_____]

23. Person 2

Family Name (Last Name) [_____]  Given Name (First Name) [_____]  Middle Name [_____]

A-Number
► A- [_____]  Date Submitted (mm/dd/yyyy) [_____]

Venezuela AR_000605

## Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2. (continued)

### *Intent to Provide Specific Contributions to the Beneficiary*

24.  I  ☐ intend  ☐ do not intend to make specific contributions to the support of the beneficiary named in **Part 2.**

Explain the contribution.  For example, if you intend to furnish room and board, state for how long.  If you intend to provide money, state the amount in U.S. dollars and whether it is to be given in a lump sum, weekly, or monthly, and for how long.  If you need additional space, use **Part 8. Additional Information**.

## Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (Only complete this section if Part 1. Basis for Filing selection is "Myself as the beneficiary", otherwise continued to Part 5.)

If you are the beneficiary and are filing Form I-134 on your own behalf, complete and sign **Part 4**.

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

### *Beneficiary's Statement*

**NOTE:** Select the box for either **Item A.** or **B.** in **Item Number 1**.  If applicable, select the box for **Item Number 2**.

1.  I, as the beneficiary, certify the following:

   **A.** ☐ I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question**.**

   **B.** ☐ The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood everything.

2.  ☐ At my request, the preparer named in **Part 7.,** _____, prepared this declaration for me based only upon information I provided or authorized.

### *Beneficiary's Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

   1)  I reviewed and provided or authorized all of the information in my declaration;

   2)  I understood all of the information contained in, and submitted with, my declaration; and

   3)  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

Venezuela AR_000606

**Part 4.   Statement, Contact Information, Certification, and Signature of the Beneficiary (Only complete this section if Part 1. Basis for Filing selection is "Myself as the beneficiary", otherwise continued to Part 5.)** (continued)

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

### *Beneficiary's Signature*

**3.**   Beneficiary's Signature

➡️

Date of Signature (mm/dd/yyyy)

**Part 5.   Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary**

If you are filing Form I-134 on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:**  Read the Penalties section of the Form I-134 Instructions before completing this section.

### *Statement of Individual Agreeing to Financially Support the Beneficiary*

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1**.  If applicable, select the box for **Item Number 2**.

**1.**   I, as the individual agreeing to financially support the beneficiary, certify the following:

   **A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

   **B.**  ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood.

**2.**   ☐  At my request, the preparer named in **Part 7.,** _____, prepared this declaration for me based only upon information I provided or authorized.

### *Contact Information of Individual Agreeing to Financially Support the Beneficiary*

**3.**   Daytime Telephone Number

**4.**   Mobile Telephone Number (if any)

**5.**   Email Address (if any)

### *Certification of Individual Agreeing to Financially Support the Beneficiary*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

   **1)**  I reviewed and provided or authorized all of the information in my declaration;

   **2)**  I understood all of the information contained in, and submitted with, my declaration; and

   **3)**  All of this information was complete, true, and correct at the time of filing.

Venezuela AR_000607

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary (continued)

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

### Signature of Individual Agreeing to Financially Support the Beneficiary

**6.**   Signature

➡️

Date of Signature (mm/dd/yyyy)

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:**  If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

## Part 6.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### Interpreter's Full Name

**1.**   Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.**   Interpreter's Business or Organization Name (if any)

### Interpreter's Mailing Address

**3.**   Street Number and Name

Apt. Ste. Flr.   Number

City or Town

State   ZIP Code

Province

Postal Code

Country

### Interpreter's Contact Information

**4.**   Interpreter's Daytime Telephone Number

**5.**   Interpreter's Mobile Telephone Number (if any)

**6.**   Interpreter's Email Address (if any)

**Part 6.  Interpreter's Contact Information, Certification, and Signature** (continued)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and [_____] which is the same language specified in **Part 4.** or in **Part 5.**, **Item B.** in **Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the identified language every question and instruction on this declaration and his or her answer to every question.  The individual agreeing to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.**   Interpreter's Signature

Date of Signature (mm/dd/yyyy)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary**

Provide the following information about the preparer.

### Preparer's Full Name

**1.**   Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

**2.**   Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.**   Street Number and Name

Apt. Ste. Flr.   Number

City or Town

State   ZIP Code

Province

Postal Code

Country

### Preparer's Contact Information

**4.**   Preparer's Daytime Telephone Number

**5.**   Preparer's Mobile Telephone Number

**6.**   Preparer's Email Address (if any)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### Preparer's Statement

**7.**   **A.**   ☐   I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

    **B.**   ☐   I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends ☐ does not extend beyond the preparation of this declaration.

**NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.**   Preparer's Signature

Date of Signature (mm/dd/yyyy)

## Part 8.  Additional Information

If you need extra space to provide any additional information within this declaration, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.**  Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.**  A-Number          ▶ **A-**

**3.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

   **D.**

**4.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

   **D.**

**5.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

   **D.**

**6.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

   **D.**



# Declaration of Financial Support

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-134**
OMB No. 1615-0014
Expires 10/31/2022

## What Is the Purpose of Form I-134?

Some immigration benefits that involve a temporary stay in the United States require U.S. Citizenship and Immigration Services (USCIS) to determine whether the applicant or beneficiary of the request has sufficient financial resources or financial support to pay for expenses during the temporary stay. The individual who signs and submits Form I-134 must establish that he or she has both sufficient financial resources and access to those funds to support the beneficiary listed on Form I-134 for the duration of the beneficiary's stay in the United States.

Form I-134, Declaration of Financial Support, was previously titled "Form I-134, Affidavit of Support."

## Who Must File Form I-134?

Certain individuals applying for parole into the United States for urgent humanitarian reasons or significant public benefit who are not filing Form I-131 may also be required to submit this form. In such cases, Form I-134 is completed by an individual other than the beneficiary who is agreeing to financially support the beneficiary for the period of his or her temporary stay in the United States.

**NOTE:** Whether or not the beneficiary of this Form I-134 will have sufficient means of support while in the United States is an important factor in determining whether to exercise discretion to authorize parole. We require evidence that the beneficiary of this Form I-134 has financial support for the duration of his or her stay in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole.

## Who May File Form I-134?

You may file this form on behalf of yourself or on behalf of a B, F, or M nonimmigrant requesting extension of stay or change of status.

Form I-134 may also be requested by Department of State in certain instances.

**Do not use Form I-134 if the beneficiary you are agreeing to financially support must have Form I-864, Affidavit of Support Under Section 213A of the INA, filed on his or her behalf instead.**

## Submission of Declaration

If you are agreeing to financially support more than one beneficiary, you must submit a separate Form I-134 for each beneficiary. You, as the individual agreeing to financially support the beneficiary, must sign your full name on the form.

## General Instructions

USCIS provides forms free of charge through the USCIS website. To view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**. If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you. The USCIS Contact Center provides information in English and Spanish. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Signature.** Each declaration must be properly signed and filed. For all signatures on this declaration, USCIS will not accept a stamped or typewritten name in place of a signature. A legal guardian may also sign for a mentally incompetent person. If the request is not signed or if the requisite signature on the request is not valid, USCIS will reject the request. See 8 CFR 103.2(a)(7)(ii)(A). If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS will deny the request.

**Validity of Signatures.** USCIS will consider a photocopied, faxed, or scanned copy of the original handwritten signature valid for filing purposes. The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.** There is no filing fee to file Form I-134.

**Evidence.** You must submit all evidence requested in these Instructions with your declaration. If you fail to submit required evidence, USCIS may reject or deny your declaration for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

**Biometric Services Appointment.** USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition. After USCIS receives your declaration and ensures it is complete, we will inform you if you need to attend a biometric services appointment. If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1. You provided or authorized all information in the declaration;

2. You reviewed and understood all of the information contained in, and submitted with, your declaration; and

3. All of this information was complete, true, and correct at the time of filing.

**Copies.** You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document. USCIS may request an original document at the time of filing or at any time during processing of an application or petition. If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Translations.** If you submit a document with information in a foreign language, you must also submit a full English translation. The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English. The certification should also include the translator's signature, printed name, the signature date, and the translator's contact information.

### How To Fill Out Form I-134

1. Type or print legibly in black ink.

   Venezuela AR_000613

2. If you need extra space to complete any item within this declaration, use the space provided in **Part 8. Additional Information** or attach a separate sheet of paper.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

4. **Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary** (Only complete this section if **Part 1. Basis for Filing** selection is "Myself as the beneficiary", otherwise continue to **Part 5**).  You must sign in **Part 4.** if you are filing Form I-134 on your own behalf.  Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you.  If someone helped you complete the declaration, select the box indicating that you used a preparer.  A stamped or typewritten name in place of a signature is not acceptable.

5. **Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary.**  You must sign **Part 5.** if you are filing Form I-134 on behalf of someone else (a beneficiary).  Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you.  If someone assisted you in completing the declaration, select the box indicating that you used a preparer.  Further, you must sign and date your declaration and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every declaration **MUST** contain the signature of the individual agreeing to financially support the beneficiary (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

6. **Part 6.  Interpreter's Contact Information, Certification, and Signature.**  If you used anyone as an interpreter to read the Instructions and questions on this declaration to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the declaration.

7. **Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary.**  If someone other than you, the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself), completed your declaration, this section must contain the signature.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 6.** and **Part 7.**  If the person who completed this declaration is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this declaration **MUST** sign and date the declaration.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your declaration is an attorney or accredited representative, he or she may also need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your declaration.

> **We recommend that you print or save a copy of your completed declaration to review in the future and for your records.**

## Specific Instructions

**Part 1.  Basis for Filing.**  Select the appropriate box for **Item Number 1.**

Select the first box if you are the beneficiary who is applying for an immigration benefit.  A beneficiary may file Form I-134 on his or her own behalf.

Venezuela AR_000614

Select the second box if you are the individual agreeing to financially support the beneficiary.

**Part 2.  Information about the Beneficiary**

The beneficiary is the individual who is applying for an immigration benefit.  A beneficiary may file Form I-134 on behalf of himself or herself.

**Item Number 1.  Beneficiary's Current Legal Name.**  Provide the beneficiary's legal name, as shown on his or her birth certificate or legal name change document.  If the beneficiary has two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print the beneficiary's last, first, and middle names in each appropriate field.

**Item Number 3.  Date of Birth.**  Enter the beneficiary's date of birth in mm/dd/yyyy format in the space provided.  For example, type or print October 5, 1967 as 10/05/1967.

**Item Number 4.  Gender.**  Provide the beneficiary's gender.

**Item Number 5.  Alien Registration Number (A-Number).**  Provide the beneficiary's A-Number.  The A-Number is the number used to identify an individual's immigration records.  It begins with an "A" and can be found on correspondence the beneficiary received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 6.  Place of Birth.**  Enter the name of the city or town, state or province, and country where the beneficiary was born.  Type or print the name of the country as it was named when the beneficiary was born, even if the country's name has changed or the country no longer exists.

**Item Number 7.  Country of Citizenship or Nationality.**  Provide the name of the country where the beneficiary is a citizen and/or national.  This is not necessarily the country where the beneficiary was born.  If the beneficiary does not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 8. Additional Information**.

**Item Number 9.  Marital Status.**  Select the appropriate box.

**Item Numbers 11.** - **12.  Beneficiary's Physical Address.**  Provide the physical address where the beneficiary lives.

**Item Number 16.  Beneficiary's Anticipated Length of Stay.**  Enter the anticipated start date of the beneficiary's stay in the United States in **Item Number 16.**  Select the option that matches the anticipated end date of the beneficiary's stay.  If the beneficiary's stay has an end date, you must enter the anticipated end date in mm/dd/yyyy format in the space provided for that option.  If the beneficiary's anticipated stay does not have an end date, select the "No End Date" option.

**Item Number 17.  Beneficiary's Income.**  Provide information on any income the beneficiary will receive.  If the beneficiary will not receive any income, then type or print $0 in the table.  Do not include any individuals named in **Part 3.**

**Item Numbers 18.** - **19.**  Identify whether any of the beneficiary's total income comes from an illegal activity or source, such as proceeds from illegal gambling or illegal drug sales or other activities and identify the amount.  Do not include income from illegal gambling or illegal drug sales attributed to any individuals named in **Part 3.**

**Item Number 22.  Beneficiary's Assets.**  Provide information about any assets available to the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether the assets are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 3.**

You may include the net value of the beneficiary's home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you list the net value of the beneficiary's home, then you must include documentation demonstrating that the beneficiary owns the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of the beneficiary's automobile unless the beneficiary has more than one automobile, and at least one automobile is not included as an asset.  Submit evidence of the value of the assets listed.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

**Item Number 1.  Current Legal Name.**  Provide the full name of the individual who is agreeing to financially the support the beneficiary named in **Part 2.**  Provide your legal name, as shown on your birth certificate or legal name change document.  If you have two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print your last, first, and middle names in each appropriate field.

**Item Number 8.  Alien Registration Number (A-Number).**  Provide your A-Number.  Your A-Number is the number used to identify your immigration records.  It begins with an "A" and can be found on correspondence you have received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 10.  Immigration Status.**  Select the appropriate box for your current immigration status.  Provide evidence of your status. A U.S. citizen or U.S. national may submit a copy of a birth certificate, certificate of naturalization, certificate of citizenship, consular report of birth abroad to U.S. parents, or a copy of the biographic data page on your U.S. passport.  Proof of lawful permanent resident status includes a photocopy of both sides of the Permanent Resident Card or Alien Registration Receipt Card (Form I-551), or a photocopy of an unexpired temporary Form I-551 stamp in either a foreign passport or DHS Form I-94 Arrival Departure Record.  Proof of lawful nonimmigrant status may include a copy of an unexpired visa in a foreign passport.

**Item Number 19.  Assets.**  Provide information about any assets you will use to support the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether they are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 2.**

You may include the net value of a home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you include the net value of your home, then you must include documentation demonstrating that you own the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of an automobile unless you show that you have more than one automobile, and at least one automobile is not included as an asset.

Submit evidence of the value of your or your household members' assets.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

## Supporting Evidence (for beneficiary and person providing support to beneficiary)

As the beneficiary or the person who agrees to financially support the beneficiary, you must show you have sufficient income or financial resources to support the beneficiary.

Evidence should consist of copies of any of the documents listed below that apply.

Failure to provide evidence of sufficient income or financial resources may result in the denial of the foreign national's application for a visa or his or her removal from the United States.

Submit in duplicate evidence of income and resources, as appropriate:

1. Statement from an officer of the bank or other financial institutions with deposits, identifying the following details regarding the account:

    **A.** Date account opened;

    **B.** Total amount deposited for the past year; and

    **C.** Present balance.

2. Statement(s) from your employer on business stationery showing:

    **A.** Date and nature of employment;

Venezuela AR_000616

    **B.**  Salary paid; and

    **C.**  Whether the position is temporary or permanent.

**3.**  Copy of last U.S. federal income tax return filed (tax transcript); or

**4.**  List containing serial numbers and denominations of bonds and name of record owner(s).

## What Is the Filing Fee?

There is no filing fee for Form I-134.

## Where To File?

Please see our website at **www.uscis.gov/I-134** or visit the USCIS Contact Center at **www.uscis.gov/contactcenter** to connect with a USCIS representative for the most current information about where to file this declaration. The USCIS Contact Center provides information in English and Spanish. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Change

If you are not a U.S citizen or U.S. national, you must notify USCIS of your new address within 10 days of moving from your previous residence. For information on filing a change of address, go to the USCIS website at **www.uscis.gov/ addresschange** or reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help. The USCIS Contact Center provides information in English and Spanish. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing Information

**Initial Processing.** Once USCIS accepts your declaration, we will check it for completeness. If you do not completely fill out this declaration, you will not establish a basis of support for the beneficiary or for yourself (if you are applying on your own behalf), and USCIS or the Department of State may reject or deny your declaration.

**Requests for More Information.** USCIS or Department of State may request that you provide more information or evidence to support your declaration. We may also request that you provide the originals of any copies you submit. If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.** We may request that you appear at a USCIS office for an interview based on your declaration. At the time of any interview or other appearance at a USCIS office, we may require that you provide your biometrics to verify your identity and/or update background and security checks.

**Decision.** The decision on Form I-134 involves a determination of whether you have established a basis of support for the beneficiary seeking an immigration benefit. USCIS will notify you of the decision in writing.

Venezuela AR_000617

## USCIS Forms and Information

To ensure you are using the latest version of this declaration, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Please visit us at **www.uscis.gov/contactcenter** to get basic information about immigration services and ask questions about a pending case.  Through our digital self-help tools and live assistance, the USCIS Contact Center provides a pathway for you to get consistent, accurate information and answers to immigration case questions.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-134, we will deny your Form I-134 and may deny any other immigration benefit the beneficiary seeks.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this declaration, and the associated evidence, is collected under the Immigration and Nationality Act sections 212(d)(5), 214 and 248.

**PURPOSE:**  The primary purpose for providing the requested information on this declaration of financial support is to determine whether the beneficiary of this declaration has adequate financial means to support and that, if this individual is admitted or paroled into the United States, this individual has sufficient financial resources available to them for the duration of their temporary stay in the United States.  DHS uses the information you provide to grant or deny the immigration benefit the beneficiary of Form I-134 is seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of the beneficiary's benefit request.

**ROUTINE USES:**  DHS may share the information you provide on this declaration and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System, DHS/USCIS-007 Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check] and the published privacy impact assessments [DHS/USCIS/PIA-003 Integrated Digitization Document Management Program (IDDMP), DHS/USCIS/PIA-056 USCIS Electronic Immigration System, DHS/USCIS/PIA-071 myUSCIS Account Experience, and DHS/USCIS/PIA-051 Case and Activity Management for International Operations] which you can find at **www.dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 2 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the declaration, preparing statements, attaching necessary documentation, and submitting the declaration.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0014.  **Do not mail your completed Form I-134 to this address.**

Venezuela AR_000619

**SUPPORTING STATEMENT FOR**
**Declaration of Financial Support**
**OMB Control No.: 1615-0014**
**COLLECTION INSTRUMENT(S): Form I-134**


**A. Justification**

1.  **Explain the circumstances that make the collection of information necessary. Identify any legal or administrative requirements that necessitate the collection. Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

    Section 212(d)(5)(A) of the Immigration and Nationality Act (INA), authorizes the Secretary to "parole into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ." Additionally, under section 214 and 248 of the INA, the Secretary is authorized to prescribe conditions in granting extension of stay and change of status to nonimmigrants.

    Certain individuals seeking parole, extension of stay, change of status, or immigrant visas abroad must demonstrate that they have sufficient financial resources available to them for the duration of their temporary stay in the United States.

    **Background for Emergency Revision Request**
    Through this emergency revision to the online version of Form I-134, DHS is seeking to allow US-based supporters, including United States citizens, legal permanent residents, and individuals in lawful nonimmigrant status, to submit an online application on behalf of certain noncitizen beneficiaries from Venezuela, and their qualifying immediate family members, to demonstrate that the beneficiary has sufficient financial support to pay for expenses for the duration of their temporary stay in the United States. This application is the first step in a newly-established parole process for eligible noncitizens of Venezuela that will enable them to obtain advance travel authorization to travel to the United States to seek parole.

    This emergency revision is necessary to respond to a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, DHS CBP is facing significant and unprecedented challenges processing such individuals in a timely manner.

    The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals.  Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328.  They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022.  Average

1

monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019. Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating.  Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs.  DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.   But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those that are subject to the Title 42 Order or who are ordered removed.  To date, other countries, including Mexico, have generally failed to accept Venezuelans as well.  As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

This crisis has culminated in a new parole process for eligible Venezuelans, as described in the Department's recently published *Federal Register* notice entitled *Implementation of a Parole Process for Venezuelans,* and in conjunction with emergency approval of a new CBP collection entitled *Advance Travel Authorization*. The exact revisions to online Form I-134 are explained in more detail in Question 15 below. More information about the new Venezuelan parole process can be found at www.uscis.gov/venezuela.

2. **Indicate how, by whom, and for what purpose the information is to be used. Except for a new collection, indicate the actual use the agency has made of the information received from the current collection.**

The U.S. Department of Homeland Security (DHS) and consular officers of the Department of State (DOS) use both the online and paper versions of Form I-134 to determine whether, at the time of the beneficiary's application, petition, or request for certain immigration benefits, that beneficiary has sufficient financial support to pay for expenses for the duration of their temporary stay in the United States.

The online and paper version of Form I-134 have two distinct uses. The paper version of the form is used solely for certain individuals other than the Ukrainian and Venezuelans, who file the electronic USCIS Form I-134 applying for parole into the United States for urgent humanitarian reasons or significant public benefit who are not filing Form I-131

2

may also be required to submit this form. In such cases, Form I-134 is completed by an individual other than the beneficiary who is agreeing to financially support the beneficiary for the period of his or her temporary stay in the United States.

In contrast, the online version of the form is only available for use by eligible citizens of Ukraine and Venezuela. Under this emergency revision in support of the action being taken by the Secretary of Homeland Security to expand the ability for U.S. Citizens and Lawful Permanent Residents to file with a statement that they will provide support for both the Ukrainian and Venezuelan persons who could be allowed to enter the United States. Biographic information about the beneficiary provided on the online Form I-134 will be used for biographic security screening and advance travel authorization from CBP (OMB Control Number 1651-New) (pending approval) for eligible Venezuelan and Ukrainian nationals. Prior to the transmission of this biographic information to CBP for this purpose, the beneficiary will be requested to confirm electronically the accuracy of the biographic information provided on their behalf by the respondent.

Because the paper and online versions have distinct uses and apply to separate populations, USCIS is considering future updates to this information collection to separate the online version of Form I-134 under its own OMB control number.

3. **Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses, and the basis for the decision for adopting this means of collection. Also describe any consideration of using information technology to reduce burden.**

This information collection provides the most efficient means for gathering and processing information about whether certain noncitizens have financial support to pay for expenses that arise during their temporary stay in the United States.  With this emergency revision Form I-134 can be filed electronically online only by certain individuals on behalf of noncitizens seeking parole into the United States for urgent humanitarian reasons or significant public benefit under the *United for Ukraine* process. This emergency request also seeks to expand the online form use to include filing Form I-134 on behalf of noncitizens from Venezuela and their immediate family members, who will be seeking parole into the United States under special parole processes.


For respondents filling for beneficiaries from countries other than Ukraine and Venezuela, the paper-version of Form I-134 is available as a fillable PDF on the USCIS website at uscis.gov/i-134 . It can be completed electronically, printed, signed, and submitted to U.S. Citizenship and Immigration Services (USCIS) by mail.  Form I-134 can also be filed with DOS. See www.travel.state.gov for more information on filing.


4. **Describe efforts to identify duplication. Show specifically why any similar**

3

**information already available cannot be used or modified for use for the purposes described in Item 2 above.**

A search of USCIS' automated forms tracking system revealed no duplication. There is no similar data collected.

**5.   If the collection of information impacts small businesses or other small entities (Item 5 of OMB Form 83-I), describe any methods used to minimize burden.**

This collection of information does not have an impact on small businesses or other small entities.

**6.   Describe the consequence to Federal program or policy activities if the collection is not conducted or is conducted less frequently, as well as any technical or legal obstacles to reducing burden.**

If the information is not collected, USCIS would not be able to determine whether certain noncitizens seeking to come to the United States temporarily have sufficient financial support to cover expenses for the duration of their stay in the United States.

**7.   Explain any special circumstances that would cause an information collection to be conducted in a manner:**

- **Requiring respondents to report information to the agency more often than quarterly;**

- **Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;**

- **Requiring respondents to submit more than an original and two copies of any document;**

- **Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records for more than three years;**

- **In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;**

- **Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;**

- **That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or**

4

- **Requiring respondents to submit proprietary trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.**

This information collection is conducted in a manner consistent with the guidelines in 5 CFR 1320.5(d)(2).

8.  **If applicable, provide a copy and identify the data and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB. Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

    **Describe efforts to consult with persons outside the agency to obtain their views on the availability of data, frequency of collection, the clarity of instructions and recordkeeping, disclosure, or reporting format (if any), and on the data elements to be recorded, disclosed, or reported.**

    **Consultation with representatives of those from whom information is to be obtained or those who must compile records should occur at least once every 3 years - even if the collection of information activity is the same as in prior periods. There may be circumstances that may preclude consultation in a specific situation. These circumstances should be explained.**

    USCIS is seeking emergency approval under 5 CFR 1320.13 and, as such, has not yet published a notice in the Federal Register. Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

9.  **Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

    USCIS does not provide any payment for benefit sought.

10. **Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation or agency policy.**

    There is no assurance of confidentiality.

    This collection is covered under the following Privacy Impact Assessments:

    - DHS/USCIS/PIA-051 - Case and Activity Management for International

5

Operations (CAMINO);
- DHS/USCIS/PIA-003 - Integrated Digitization Document Management Program (IDDMP);
- DHS/CBP-024 - Arrival and Departure Information System
- DHS/CBP-068 - CBP One Mobile Application
- DHS/USCIS/PIA-056(a) - USCIS Electronic Information System (USCIS ELIS); and,
- DHS/USCIS/PIA-071 - myUSCIS Account Experience.

The collection is covered under the following System of Records Notices:
- DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records November 21, 2013, 78 FR 69864;
- DHS/USCIS-007 - Benefits Information System September 29, 2008, 73 FR 56596; and
- DHS/USCIS-018 - Immigration Biometric and Background Check July 31, 2018, 83 FR 36950.

**11.   Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private. This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

This information collection contains questions that are of a sensitive nature. Respondents must provide information and records about personal income and financial resources. This information is necessary to establish that the beneficiary named on Form I-134 has sufficient financial resources to pay for expenses during their temporary stay in the United States.

Under this emergency processing request, USCIS seeks to collect the respondent's U.S. social security number (SSN) to facilitate and expedite the confirmation  of the sufficiency of the filing of Form I-134(online).  USCIS personnel conduct background security checks on U.S. Citizens and Lawful Permanent Residents for the purpose of determining whether either respondent has demonstrated that they have sufficient financial resources to support the beneficiary during their stay in the United States.  The SSN information is used to establish and corroborate their identity, as not all respondents who file Form I-134 (online) have a passport or A-number.  Additionally, some of the U.S. Citizens or Lawful Permanent Residents may create multiple separate USCIS accounts to file online Forms I-134 on behalf of beneficiaries and there is not a unique identifier to merge these accounts.  In addition, in this limited circumstance the SSN is critical to linking USCIS accounts to help determine whether the respondent has sufficient resources to support each beneficiary on whose behalf the respondent has submitted a Form I-134.  Collecting the respondent's SSN is a critical tool for making

6

accurate sufficiency decisions.

Again, under emergency approval, USCIS is also adding a data element for sex to the Form I-134 (online). USCIS will evaluate and the U.S. Citizen or Lawful Permanent Resident to determine whether that person poses a public safety or national security risk to the person for which they are applying to support. USCIS will use this biographic identifier to query the holdings of interagency and intelligence community partners, and as needed, to query state, local, or international agencies. Name, DOB, and sex are the three most important identifiers for biographic searches or queries. Sex will be used to verify identity and to confirm information relates when records are found. This is applicable to nearly all required and as needed (ad hoc) system checks. DHS also searches public and private sector databases that use sex as an identifier. USCIS has found multiple instances of predominantly male supporters submitting Form I-134 to support much younger female and child beneficiaries. The gender data element will be critical in our efforts to make sure the parole processes that require the Form I-134 (online) are not used to facilitate human trafficking. By adding this data element, DHS will be able to quickly identity, through systematic checks, trends and other indicators in the filings of Form I-134 supporters and proposed beneficiaries that may reveal patterns commonly associated with human trafficking and transnational criminal activity. This will provide DHS additional tools to identity potential cases that require further investigation prior to confirmation of a Form I-134 or for which DHS may initiate an interview with a prospective supporter to ascertain the bases for their agreement to financially support certain individuals. Finally, the capture of the sex data element is also consistent with the U.S. recognition policy for certain passports and identity documents issued by those foreign countries that allow an individual to indicate a non-binary assignment or gender-neutral option. As this is a temporary emergency collection, DHS intends to amend the paper form in the forthcoming months to bring the information collections into full parity.

**12.    Provide estimates of the hour burden of the collection of information. The statement should:**

- **Indicate the number of respondents, frequency of response, annual hour burden, and an explanation of how the burden was estimated. Unless directed to do so, agencies should not conduct special surveys to obtain information on which to base hour burden estimates. Consultation with a sample (fewer than 10) of potential respondents is desirable. If the hour burden on respondents is expected to vary widely because of differences in activity, size, or complexity, show the range of estimated hour burden, and explain the reasons for the variance. Generally, estimates should not include burden hours for customary and usual business practices.**

- **If this request for approval covers more than one form, provide separate hour burden estimates for each form and aggregate the hour burdens in Item 13 of OMB Form 83-I.**

7

- **Provide estimates of annualized cost to respondents for the hour burdens for collections of information, identifying and using appropriate wage rate categories. The cost of contracting out or paying outside parties for information collection activities should not be included here. Instead, this cost should be included in Item 14.**

| | | A | B | C (=AxB) | D | E (=CxD) | F | (=ExF) |
|---|---|---|---|---|---|---|---|---|
| Type of Respondent | Form Name / Form Number | #. of Respondents | #. of Responses per Respondent | # of Responses | Avg. Burden per Response (in hours) | Total Annual Burden (in hours) | Avg. Hourly Wage Rate* | Total Annual Respondent Cost |
| Individuals and Households | Declaration of Financial Support, Form I-134 (paper) | 2,500 | 1 | 2,500 | 2 | 5,000 | $40.89 | $187,756 |
| Individuals and Households | Form I-134 (online)*** | 130,000 | 1 | 130,000 | 1.94 | 251,983 | $40.89 | $10,303,599 |
| **Total** | | | | **132,500**** | | **256,983** | | **$10,508,049** |

*    *The above Average Hourly Wage Rate is the May 2021 Bureau of Labor Statistics average wage for All Occupations of $28.01 times the wage rate benefit multiplier of 1.46 (to account for benefits provided) equaling $40.89. The selection of "All Occupations" was chosen because respondents to this collection could be expected from any occupation.*
*** The estimated number of respondents includes receipts of Form I-134 by both USCIS and Department of State.*
**** The beneficiary named on the I-134(online) will be asked to confirm electronically that the biographic information provided on the I-134 by the respondent/supporter is accurate. USCIS does not anticipate that this will pose more than a negligible burden on the beneficiary, but will seek comment on this assumption.*

As a result of the expansion to Venezuelan beneficiaries, the estimated number of respondents using this form to apply for parole will increase from 50,000 to 130,00 (+80,000) to account for the expectation that more than 80,000 respondents will file the online version of the USCIS Form I-134. Even though the program is limited to the number of approved filings, based on DHS findings, that the number of Venezuelans presenting at the border totaled about 16,000 in FY2022, but the numbers had rapidly increased in August and September of 2022.  USCIS estimates 20,000 filings a month, multiplied by 12 months, would equal 240,000 annual submissions for the online form. However, with the program currently capped at a lower level of 24,000 approvals, USCIS will estimate that the 3-year average may be closer to 80,000 a year and may revise this number in the future if program changes occur. By updating Form I-134 (online) with specific data requirements and enabling online filing for additional individuals, USCIS should be able to streamline processing efficiencies of these populations.

**13.    Provide an estimate of the total annual cost burden to respondents or record**

keepers resulting from the collection of information. (Do not include the cost of any hour burden shown in Items 12 and 14).

- **The cost estimate should be split into two components:  (a) a total capital and start-up cost component (annualized over its expected useful life); and (b) a total operation and maintenance and purchase of services component. The estimates should take into account costs associated with generating, maintaining, and disclosing or providing the information. Include descriptions of methods used to estimate major cost factors including system and technology acquisition, expected useful life of capital equipment, the discount rate(s), and the time period over which costs will be incurred. Capital and start-up costs include, among other items, preparations for collecting information such as purchasing computers and software; monitoring, sampling, drilling and testing equipment; and record storage facilities.**

- **If cost estimates are expected to vary widely, agencies should present ranges of cost burdens and explain the reasons for the variance. The cost of purchasing or contracting out information collection services should be a part of this cost burden estimate. In developing cost burden estimates, agencies may consult with a sample of respondents (fewer than 10), utilize the 60-day pre-OMB submission public comment process and use existing economic or regulatory impact analysis associated with the rulemaking containing the information collection, as appropriate.**

- **Generally, estimates should not include purchases of equipment or services, or portions thereof, made: (1) prior to October 1, 1995; (2) to achieve regulatory compliance with requirements not associated with the information collection; (3) for reasons other than to provide information or keep records for the government; or, (4) as part of customary and usual business or private practices.**

There are no capital, start-up, operational or maintenance costs associated with this collection of information. There is no fee cost to respondents for filing these requests. USCIS, however, estimates that respondents will incur an estimated cost of $4.25 average postage cost for each respondent to submit the completed I-134 (paper) package to USCIS.

Postage to mail completed package (2,500 x $4.25 average postage) = **$10,625** (total annual cost burden to respondents).

14. **Provide estimates of annualized cost to the Federal government. Also, provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment, overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information. Agencies also may aggregate cost estimates from Items 12, 13, and 14 in a single table.**

9

USCIS establishes its fees using an activity-based costing model to assign costs to an adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs, plus an amount to recover unassigned overhead (which includes the suggested average hourly rate for clerical, officer, and managerial time with benefits) and immigration benefits provided for free. USCIS uses the fee associated with an information collection as a reasonable measure of the collection's costs to USCIS, since these fees are based on resource expenditures related to the benefit in question. In addition, this figure includes the estimated overhead cost for printing, stocking, distributing and processing of this form.

**The estimated cost to the Government is $8,566,125.** This figure is calculated by multiplying the estimated number of respondents (132,500) by the time required to adjudicate the form (1 hour), which is multiplied by the average hourly rate of USCIS adjudicators ($64.65), for a total of $8,566,125.

15. **Explain the reasons for any program changes or adjustments reporting in Items 13 or 14 of the OMB Form 83-I.**

In this emergency revision action, USCIS is uniquely revising the online Form I-134 in several ways, and USCIS will review the need to update or change other forms independently of this form submission. First, USCIS is revising the question of "gender" for the noncitizen beneficiary to now ask for "sex," instead. In accordance with this Administration's stated goal of advancing gender equity and equality, USCIS is also including a third response option for sex ("X") in addition to "M" or "F." Next, USCIS will now be asking for the sex of the US-based supporter on the online version of the form, also with three response options ("M," "F," and "X"). The form instructions for both questions have also been updated to explain that the applicant should select the sex that matches their official travel documents.

Second, a new drop-down option has been added to the online form to allow applicants to indicate if the beneficiary is either from "Ukraine" or "Venezuela." This change is important as the only two approved uses of the online form are for noncitizens from either country. The beneficiary named on the I-134 (online) will be asked to confirm electronically that the biographic information provided on the I-134 (online) by the respondent/supporter is accurate. USCIS does not anticipate that this will pose more than a negligible burden on the beneficiary but will seek comment on this assumption in the subsequent revision that will be conducted within 6 months of the approval of this submission to OMB-OIRA.

Finally, this emergency revision includes clarifying instructions to expand filing options for certain individuals applying for parole and align with CBP Advance Travel Authorization (ATA) capability within the CBP One[TM].

10

USCIS requests emergency approval to add "Venezuela" as an eligible country for the reasons described in Question 1 above. USCIS requests emergency approval to also require "sex" and "SSN" to support the Venezuelan parole process as supported in the response to the above Question 11.  USCIS will obtain public comment on the need to capture these two data elements from the U.S. Citizen or Lawful Permanent Resident in the Federal Register Notices to be published within 6 months of approval of this submission before making these two data elements permanent requirements.  They are currently only approved on emergency basis and continued collection will be dependent on USCIS showing a continued need to collect the data.

| Data collection Activity/Instrument (in hours) | Program Change (hours currently on OMB Inventory) | Program Change (New) | Difference | Adjustment (hours currently on OMB Inventory) | Adjustment (New) [new minus current] | Difference |
|---|---|---|---|---|---|---|
| Form I-134 (paper) | | | | 5,000 | 5,000 | 0 |
| Form I-134 (online) | 91,500 | 251,983 | 160,483 | | | |
| **Total(s)** | **91,500** | **251,983** | **160,483** | **5,000** | **5,000** | **0** |

USCIS is reporting an increase of 160,483 hours in the estimated annual hour burden to respondents for this collection of information. This increase is the result of an incremental expansion of the categories of respondents who can file the information collection online.

| Data collection Activity/Instrument (in hours) | Program Change (Cost currently on OMB Inventory) | Program Change (New) | Difference | Adjustment (Cost currently on OMB Inventory) | Adjustment (New) [new minus current] | Difference |
|---|---|---|---|---|---|---|
| Form I-134 (paper) | | | | $10,625 | $10,625 | $0 |
| Form I-134 (online) | | | | $212,500 | $0 | -$212,500 |
| **Total(s)** | | | | **$223,125** | **$10,625** | **-$212,500** |

USCIS is reporting a decrease of $212,500 in the estimated annual cost burden to

11

respondents for this collection of information. This decrease is the result of a large increase in the number of respondents that will be using the online process to file the information collection and not mailing paper forms.

16. **For collections of information whose results will be published, outline plans for tabulation, and publication. Address any complex analytical techniques that will be used. Provide the time schedule for the entire project, including beginning and ending dates of the collection of information, completion of report, publication dates, and other actions.**

This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date for OMB approval of the information collection, explain the reasons that display would be inappropriate.**

USCIS will display the expiration date for OMB approval of this information collection.

18. **Explain each exception to the certification statement identified in Item 19, "Certification for Paperwork Reduction Act Submission," of OMB 83-I.**

USCIS does not request an exception to the certification of this information collection.

**B. Collections of Information Employing Statistical Methods.**

There is no statistical methodology involved with this collection.

12



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

October 14, 2022

TO:           Dominic Mancini, Deputy Administrator
                      Office of Information and Regulatory Affairs
                      Office of Management and Budget

THROUGH:  Eric Hysen
                      Chief Information Officer
                      Department of Homeland Security

ERIC N HYSEN
Digitally signed by ERIC N HYSEN
Date: 2022.10.17 13:27:22 -04'00'

FROM:        Matthew S. Davies
                      Executive Director, Admissibility & Passenger Programs
                      U.S. Customs and Border Protection

MATTHEW S DAVIES
Digitally signed by MATTHEW S DAVIES
Date: 2022.10.14 17:09:09 -04'00'

SUBJECT:   Emergency Approval Request for Advance Travel Authorization Capability under
                      the Paperwork Reduction Act

This memorandum requests an emergency approval to implement a new collection of information under the Paperwork Reduction Act (PRA) for U.S. Customs and Border Protection's (CBP) Advance Travel Authorization (ATA) capability to collect certain information, including photographs, in advance of travel.  CBP currently collects photographs of individuals as part of the inspection process at the time of encounter.

The Department of Homeland Security (DHS) is working with its interagency partners to allow certain noncitizens from Venezuela, and their qualifying immediate family members[1], who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole.  Implementation of ATA will require the collection of a facial photograph via CBP One™.  Participation will be limited to those individuals who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter.  Pending Office of Management and Budget (OMB) approval, this functionality may launch as early as October 12, 2022.

---

[1] Immediate family members include spouse and unmarried children under the age of 21.  Eligible family members must travel with the principal noncitizen to be processed under an ATA program upon arrival in the United States.  Unaccompanied children are not eligible for this process.

The United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing significant and unprecedented challenges processing such individuals in a timely manner.

The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals.  Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328.  They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022.  Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019.[2]  Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating.  Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.[3]

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs.  DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[4]  But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed.  To date, other countries, including Mexico, have generally failed to accept Venezuelans as well.  As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

CBP's Office of Field Operations (OFO) is developing the ATA capability, a new functionality in CBP One™, which will collect a facial photograph and biographic information from a noncitizen who is submitting information to request an advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. This information will be provided to CBP.

The facial photograph collected from the noncitizens will be linked to biographic information provided by the individual to U.S. Citizenship and Immigration Services (USCIS).  CBP will

---

[2] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022.  Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[3] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[4] *Louisiana v. CDC*, -- F. Supp. 3d --, 2022 WL 1604901 (W.D. La. May 20, 2022).

conduct vetting of noncitizens using the biographic information provided to CBP by USCIS and the facial photograph collected by CBP via CBP One™. This information collection will facilitate the vetting of noncitizens seeking to obtain advance authorization to travel and give air carriers that participate in CBP's document validation program the ability to validate an approved travel authorization, facilitating generation of a noncitizen's boarding pass without having to use other manual validation processes.

CBP One™ allows the user to capture their image and confirm submission after viewing the captured image. If the user is not satisfied with the image captured, the user can retake the image. A user can retake the image up to three times. If after three attempts CBP One™ cannot successfully capture the user's image, CBP One™ will provide the user an error message notifying them that their submission was unable to be completed and that they can access the capability and try again. If the user continues to experience technical difficulties, the CBP One™ application provides a help desk email to provide assistance. In the event that the user is not authorized to travel under this process, they may still seek entry through another process, including by filing a request for consideration of parole with USCIS or applying with the Department of State (DOS) to obtain a visa.

Once submitted, CBP will vet available biographic information and the facial photograph against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety. DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting. Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied. DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel. CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek parole. If the travel authorization is denied, the individual will not be authorized to travel to the United States to seek parole under this process. If approved, the approval establishes that the individual has obtained advance authorization to travel to the United States to seek parole, consistent with 8 C.F.R. 212.5(f), but does not guarantee boarding or a specific processing disposition at a POE. Upon arrival to a United States POE, the traveler will be subject to inspection by a CBP officer, who will make a case-by-case processing disposition determination.

DHS requests an emergency approval to implement new data collection in CBP One™ to allow CBP to collect a facial photograph in advance to permit individuals to obtain advance authorization to travel to the United States to seek a discretionary grant of parole. The information will allow DHS to vet noncitizens who may otherwise present themselves for inspection at a southwest land border POE, or enter the United States between POEs, without any prior vetting. The advance vetting affords the noncitizen the opportunity to book international travel to arrive near their intended United States destination address and, as a result, is expected to reduce the strain on CBP resources at the southwest land border. Data will be collected on the efficacy of this process in achieving the desired outcomes, to include reduction

in southwest land border encounters, identifying derogatory information before individuals travel, increased arrivals to final destination and grants of parole, and access to employment authorization as well as assessment of the efficacy of automated facial matching, including by demographic group, in order to assess whether this emergency measure has been effective.

Development and deployment of this ATA capability has been expedited to facilitate DHS' ability to respond to the current U.S. Government (USG) resource strain along the SWB, and to enable certain individuals, based on urgent humanitarian reasons or significant public benefit, to travel to the United States to seek a discretionary grant of parole at the POE.  This process may also ease the burden on certain locations outside the United States that are unable to continue to support the influx of these migrants because of already overburdened humanitarian relief mechanisms.

DHS is requesting an emergency information collection under 5 CFR 1320.13, with the intention of carrying out all the regular requirements for publication and review after implementation. This collection of information is needed prior to the expiration of time periods established under the normal PRA notice and comment process and is essential to the mission of the agency. Further, the agency cannot reasonably comply with the normal clearance procedures under this part because delayed implementation and awareness of DHS' intent would likely have unpredictable impact on the movement and may further raise pressure on U.S. border operations and the migration management conducted by our foreign partners and could jeopardize our relations with foreign partners.

After implementation of the new data element collection, CBP will undergo the normal PRA renewal process.  After publication of the two Federal Register Notices (FRNs) required under the PRA, DHS will address comments and concerns as necessary under the PRA and submit the ICR to OMB for renewal within the required timeframe.

Thank you for your consideration of this Emergency Request.

Supporting Statement
Advance Travel Authorization (ATA)
1651-NEW

## A.   Justification

1.   **Explain the circumstances that make the collection of information necessary.  Identify any legal or administrative requirements that necessitate the collection.  Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

The Department of Homeland Security (DHS) is working with its interagency partners to allow certain noncitizens from Venezuela and their qualifying immediate family members[1] who lack United States entry documents to submit information through the newly developed CBP Advance Travel Authorization (ATA) capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek a discretionary grant of parole.  Implementation of ATA will require the collection of a facial photograph via CBP One™ from those eligible noncitizens who voluntarily elect to participate in the process.  Participation will be limited to those individuals who meet certain DHS established criteria, including possession of a valid, unexpired passport, as well as having an approved U.S.-based supporter.  Pending Office of Management and Budget (OMB) approval, this functionality will be available as early as October 12, 2022.

**Background:**

The United States is currently encountering a large number of undocumented noncitizens at the Southwest Border (SWB) of the United States where, despite surging resources and personnel, CBP is facing unprecedented challenges processing such individuals in a timely manner.

The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals.  Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328.  They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022.  Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019.[2]  Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

---

1 Immediate family members include spouse and unmarried children under the age of 21.  Eligible family members must travel with the principal noncitizen to be processed under an ATA program upon arrival in the United States.  Unaccompanied children are not eligible for this process.
2 OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022.  Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months.  Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

Venezuela AR_000636

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating.  Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.3

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs.  DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.4  But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed.  To date, other countries, including Mexico, have generally failed to accept Venezuelans as well.  As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

CBP's Office of Field Operations (OFO) is developing the ATA capability, a new functionality in CBP One™, which will collect biographic information and a facial photograph from a noncitizen who is submitting information to request an advance authorization to travel to the United States to seek a discretionary grant of parole.  This information will be provided to CBP.

**Advance Travel Authorization (ATA):**

The facial photograph collected from the noncitizens will be linked to biographic information provided by the individual to U.S. Citizenship and Immigration Services (USCIS).  CBP will conduct vetting of noncitizens using the biographic information provided to CBP by USCIS and the facial photograph collected by CBP via CBP One™.  This information collection will facilitate the vetting of noncitizens seeking to obtain advance authorization to travel and give air carriers that participate in CBP's document validation program the ability to validate an approved travel authorization, facilitating generation of a noncitizen's boarding pass without having to use other manual validation processes.

CBP One™ allows the user to capture their image and confirm submission after viewing the captured image. If the user is not satisfied with the image captured, the user can retake the image. A user can retake the image up to three times.  If after three attempts CBP One™ cannot successfully capture the user's image, CBP One™ will provide the user an error message notifying them that their submission was unable to be completed and that they can access the capability and try again.  If the user continues to experience technical difficulties, the CBP One™ application provides a help desk email to provide assistance.  In the event

---

3 OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.
4 *Louisiana v. CDC*, -- F. Supp. 3d --, 2022 WL 1604901 (W.D. La. May 20, 2022).

2

that the user is not authorized to travel under this process, they may still seek entry through another process, including by filing a request for consideration of parole with USCIS or applying with the Department of State (DOS) to obtain a visa.

Once submitted, CBP will vet available biographic information and the facial photograph against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.  CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek a discretionary grant of parole at the POE.

If the travel authorization is denied, the individual will not be authorized to travel to the United States to seek parole under this process.  If approved, the approval establishes that the individual has obtained advance authorization to travel to the United States to seek parole, consistent with 8 C.F.R. 212.5(f), but does not guarantee boarding or a specific processing disposition at a POE.  Upon arrival to a United States POE, the traveler will be subject to inspection by a CBP officer, who will make a case-by-case processing disposition determination.

This collection of information is authorized by 8 U.S.C. 1182(d)(5), 8 C.F.R. 212.5(f).  The Department has also published a notice in the *Federal Register* announcing the policy and accompanying collection.

CBP One™ collects the following information from the individual submitting a request for an advance authorization to travel to the United States to seek parole:

1. Facial Photograph
2. Photo obtained from the passport or Chip on ePassport, where available
3. Alien Registration Number
4. First and Last Name
5. Date of Birth
6. Passport Number

Data will be collected on the efficacy of this process in achieving the desired outcomes, to include reduction in SWB encounters, identifying derogatory information before individuals travel, increased arrivals to final destination and grants of parole, and access to employment authorization, as well as assessment of the efficacy of automated facial matching, including by demographic group, in order to assess whether this emergency measure has been effective.

2.    **Indicate how, by whom, and for what purpose the information is to be used.  Except for a new collection, indicate the actual use the agency has made of the information**

3

**received from the current collection**.

This information is used by CBP to vet against selected security and law enforcement databases available to DHS and other federal agencies, for national security, border security, public health and safety. CBP conducts this vetting to determine whether the individual poses a security risk to the United States, and to determine whether the individual is eligible to receive advance authorization to travel to the United States to seek parole. DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting. Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied. DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from all DHS and other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.

3. **Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g. permitting electronic submission of responses, and the basis for the decision for adopting this means of collection. Also describe any consideration of using information technology to reduce burden**.

The information is submitted to CBP via the CBP One$^{TM}$ mobile application, which the individual can access to provide basic biographic information. This biographic information is provided solely to verify that the individual accessing the specific functionality within CBP One$^{TM}$ has a USCIS-approved U.S.-based supporter, has verified their biographic information, and has attested to DHS required attestations related to process eligibility criteria.

4. **Describe efforts to identify duplication. Show specifically why any similar information already available cannot be used or modified for use for the purposes described in Item 2 above.**

This information is not duplicated in any other place or any other form.

5. **If the collection of information impacts small businesses or other small entities describe any methods used to minimize burden.**

This information collection does not have an impact on small businesses or other small entities.

6. **Describe consequences to Federal program or policy activities if the collection is not conducted or is conducted less frequently.**

Failure to collect this information would prevent CBP from having access to information needed to conduct vetting to ascertain security and safety risks posed by individuals requesting advance authorization to travel to the United States to seek parole.

4

**7.    Explain any special circumstances.**

This information is collected in a manner consistent with the guidelines of 5 CFR 1320.5(d)(2).

**8.    If applicable, provide a copy and identify the date and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB.  Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments. Specifically address comments received on cost and hour burden.**

Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

**9.    Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

There is no offer of a monetary or material value for this information collection.

**10.   Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation, or agency policy.**

CBP is drafting a new Privacy Impact Assessment (PIA) for the ATA capability and updating the CBP One™ PIA, which are expected to publish concurrent with OMB approval of this information collection.  The System of Record Notice (SORN) that permits this information collection is the ATS SORN (DHS/CBP-006 Automated Targeting System, May 22, 2012, 77 FR 30297), which permits collection of information from persons, including operators, crew, and passengers, who seek to, or do in fact, enter, exit, or transit through the United States or through other locations where CBP maintains an enforcement or operational presence by land, air, or sea. Information submitted by noncitizens seeking advance authorization to travel to the United States to seek parole is broadly covered by the ATS SORN.  CBP uses the advance information to compare it against law enforcement and intelligence databases to identify individuals and cargo requiring additional scrutiny, which aligns to the border security mission of DHS.  DHS will limit use and sharing of the photograph to what is strictly necessary to perform this vetting.  Any potential travel authorization denials resulting from facial photograph matches against these databases or mismatches to confirm identity will be verified by a CBP officer before the travel authorization is denied.  DHS will retain the facial photograph for the duration of the travel authorization validity but no more than 180 days and ensure that it is deleted from any DHS or other agency databases after that time unless the photograph matches against national security or law enforcement databases, as verified by CBP personnel.

Venezuela AR_000640

11. **Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private.  This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

There are no questions of a sensitive nature.

12. **Provide estimates of the hour burden of the collection of information.**

| INFORMATION COLLECTION | TOTAL ANNUAL BURDEN HOURS | NO. OF RESPONDENTS | NO. OF RESPONSES PER RESPONDENT | TOTAL RESPONSES | TIME PER RESPONSE |
|---|---|---|---|---|---|
| ATA Process | 4,008 | 24,000 | 1 | 24,000 | 10 minutes (0.167 hours) |

The new Venezuela parole process is capped at 24,000 beneficiaries.  After this cap is reached, the program will sunset absent a decision by the DHS Secretary to continue the process, based on the Secretary's sole discretion.  The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

Under this emergency information collection request, CBP will only process applications until the 24,000 cap is reached. If the cap is increased above 24,000 or if the Secretary, at his sole discretion, otherwise expands eligibility for this process, CBP will seek a revision to the collection under normal PRA processes at 5 CFR 1320.12.

**Public Cost**

The estimated cost to the respondents is $188,777.  This is based on the estimated burden hours (4,008) multiplied by the average hourly wage rate for all-purpose air travelers ($47.10).  CBP used the U.S. Department of Transportation's (DOT) recommended hourly value of travel time savings for intercity, all-purpose travel by air and high-speed rail, which is provided in 2015 U.S. dollars. CBP assumes an annual growth rate of 0 percent; the 2015 U.S. dollar value is equal to the 2022 U.S. dollar value.[5]

13. **Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information.**

There are no record keeping, capital, start-up or maintenance costs associated with this information collection.

---

5 Source: U.S. Department of Transportation, Office of Transportation Policy. *The Value of Travel Time Savings: Departmental Guidance for Conducting Economic Evaluations Revision 2 (2016 Update)*, "Table 4 (Revision 2 - 2016 Update): Recommended Hourly Values of Travel Time Savings for Intercity, All-Purpose Travel by Air and High-Speed Rail." September 27, 2016.  Available at https://www.transportation.gov/sites/dot.gov /files/docs/2016%20Revised%20Value%20of%20Travel%20Time%20Guidance.pdf. Accessed May 25, 2022.

Venezuela AR_000641

14. **Provide estimates of annualized cost to the Federal Government.  Also provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information.**

It is estimated that 70% of submissions received will be approved automatically by the system, and 30% of the submissions will be reviewed manually by a CBP Officer.

The estimated annual cost to the Federal Government associated with the review of these submissions is $1,258,761.  This is based on the number of responses that must be reviewed manually (56,160) multiplied by the time burden to review and process each response (0.33 hours) = 18,533 hours multiplied by the average hourly loaded rate for a CBP officer ($67.92)[6] = $1,258,761.

15. **Explain the reasons for any program changes or adjustments reported in Items 12 or 13.**

This is a new information collection.

16. **For collection of information whose results will be published, outline plans for tabulation, and publication.**

This information collection will not be published for statistical purposes.

17. **If seeking approval to not display the expiration date, explain the reasons that displaying the expiration date would be inappropriate.**

CBP will display the expiration date for OMB approval of this information collection.

18. **"Certification for Paperwork Reduction Act Submissions."**

CBP does not request an exception to the certification of this information collection.

19. **Collection of Information Employing Statistical Methods**

No statistical methods were employed.

---

6 CBP bases this wage on the FY 2022 salary and benefits of the national average of CBP Officer Positions, which is equal to a GS-11, Step 10.  Source: Email correspondence with CBP's Office of Finance on June 27, 2022.

7

# VENEZUELA:
# CALCULATED REPRESSION

CORRELATION BETWEEN STIGMATIZATION
AND POLITICALLY MOTIVATED
ARBITRARY DETENTIONS



Foro Penal



CENTRO PARA
LOS DEFENSORES
Y LA JUSTICIA



AMNESTY
INTERNATIONAL

Venezuela AR_000643

© Amnesty International 2022

Except where otherwise noted, content in this document is licensed under a Creative Commons
(attribution, non-commercial, no derivatives, international 4.0) licence
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website:https://www.amnesty.org/es/about-us/permissions/.
Where material is attributed to a copyright owner other than Amnesty International this material is
not subject to the Creative Commons licence.

← 👁

Cover photo: © smspsy/Shutterstock
First published in 2022 by Amnesty International Ltd.
Peter Benenson House, 1 Easton Street
London WC1X 0DW, Reino Unido

Index no.: AMR 53/5133/2022
Original language: Spanish
**amnesty.org**

**Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights.**

**Our vision is of a world where those in power keep their promises, respect international law and are held to account. We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations.**

**We believe that acting in solidarity and compassion with everywhere can change our societies for the better.**

# ▶CONTENTS

EXECUTIVE SUMMARY                                                                    06

▶1. INTRODUCTION                                                                     11

▶2. METHODOLOGY                                                                      12

2.1 DATA ANALYTICS                                                                   13

2.1.1 STATISTICAL MODELS APPLIED TO THE DATA                                         13

2.1.2 METHODOLOGICAL PREMISES APPLIED                                                14

2.2 QUALITATIVE RESEARCH                                                             14

▶3. CALCULATING REPRESSION                                                           15

3.1 STIGMATIZATION OF HUMAN RIGHTS DEFENDERS                                         15

3.1.1 WHAT IS KNOWN ABOUT STIGMATIZATION IN VENEZUELA?                               16

3.1.2 WHAT ARE THE DATA ON THE SOURCES OF STIGMATIZATION?                            19

3.1.3 NATURE OF THE SOURCES OF STIGMATIZATION IN VENEZUELA                           20

3.1.4 CONCLUSIONS ON THE SOURCES OF STIGMATIZATION                                   22

3.2 POLITICALLY MOTIVATED ARBITRARY DETENTIONS IN VENEZUELA                          23

3.2.1 REPRESSION IN THE PERIOD ANALYSED                                              25

3.2.2 SECURITY FORCES THAT CARRIED OUT DETENTIONS AFTER THE ACTS OF STIGMATIZATION   25

3.2.3 COURTS IN CHARGE OF CASES OF ARBITRARY DETENTIONS                              27

3.2.4 CONCLUSIONS ON POLITICALLY MOTIVATED ARBITRARY DETENTIONS AND                  32
       THEIR KEY ACTORS

Venezuela AR_000646

**3.3** CORRELATION BETWEEN STIGMATIZATION AND ARBITRARY DETENTIONS        33

3.3.1 OVERALL ANNUAL CORRELATION BETWEEN STIGMATIZATION
AND ARBITRARY DETENTIONS        33

**3.4** CORRELATION BETWEEN STIGMATIZATION AND THE SECURITY
FORCES THAT CARRY OUT DETENTIONS        35

3.4.1 THE HIGHER CORRELATION BETWEEN THE DETENTIONS CARRIED OUT
BY INTELLIGENCE SERVICES AND ACTS OF STIGMIZATION        37

3.4.2 RELATIONSHIP BETWEEN SECURITY FORCES AND SOURCES OF STIGMATIZATION        38

**3.5** RELATIONSHIP BETWEEN SOURCES OF STIGMATIZATION AND THE COURTS        41

3.5.1 RELATIONSHIP BETWEEN THE SOURCES OF STIGMATIZATION AND
COURTS WITH SPECIAL JURISDICTION OVER 'TERRORISM'        41

3.5.2 RELATIONSHIP BETWEEN THE SOURCES OF STIGMATIZATION AND COURTS
WITH MILITARY JURISDICTION        43

**3.6** OTHER PATTERNS OF CORRELATION IN SPECIFIC PERIODS        46

**3.7** CONCLUSIONS ON PATTERNS OF CORRELATION BETWEEN STIGMATIZATION AND
ARBITRARY DETENTION IN VENEZUELA        50

**3.8** PATTERNS OF STIGMATIZATION AS A SIGN OF POLITICAL PERSECUTION        51

**3.9** DEPRIVING A SPECIFIC GROUP OF PEOPLE OF THEIR FUNDAMENTAL RIGHTS        52

3.10 POLITICALLY MOTIVATED DISCRIMINATION        53

**4. CONCLUSIONS AND RECOMMENDATIONS**        54

AMNESTY INTERNATIONAL

# ▶EXECUTIVE SUMMARY

This report is the product of a collaboration between the Center for Defenders and Justice (CDJ), the Foro Penal (Penal Forum) and Amnesty International.

The following research had as its starting hypothesis, as mentioned above, the existence of a correlation between politically motivated arbitrary detentions and the stigmatization disseminated by media outlets linked to the government of Nicolás Maduro in Venezuela. In turn, it is possible to establish evidence on how repression works, the key actors and the trends of repression that have been followed over the years.

Using qualitative and quantitative methodologies, the conclusions reached were checked against international human rights law standards and international criminal law, which the following report is based upon, aiming to determine the pattern in which stigmatization occurs at certain times and coming from certain actors, while other actors apply other repressive measures such as arbitrary detentions, without matching victims.

Different statistical models were applied to the databases of the CDJ -on stigmatization of human rights defenders by media close to the government of Nicolás Maduro- and of the Foro Penal -on politically motivated arbitrary detentions-, such as Pearson's correlation, and other descriptive analytical models such as evolutionary analysis and distribution of percentage frequencies. In addition, in order to homogenize the methodology, different assumptions were applied, such as: omitting seven dates with more than 60 arbitrary detentions per day; grouping arbitrary detentions in the three days following the acts of stigmatization; and filtering the results through Qlik Sense tools that allowed us to observe the interactions between the different variables automatically.

## STIGMATIZATION IN VENEZUELA

In 2011, the United Nations Special Rapporteur on Human Rights Defenders defined stigmatization as the characterization of human rights defenders as "terrorists", "enemies of the State" or "political opponents" by state authorities and state media and its use to delegitimize their work, increasing their vulnerability to human rights abuses and violations.[1]

The CDJ has recorded acts of stigmatization against human rights defenders between January 2019 and June 2021 in Venezuela, through public and private media outlets with links to the government. Often these media outlets, which may take the form of web portals, television programmes and blogs, among others, use the spaces to attack, expose and harass people who are perceived as critical of the government of Nicolás Maduro.

Upon analysing the database with more than 300 acts of stigmatization between January 2019 and June 2021, the media outlets whose content was most frequently repeated ahead of detentions by Venezuelan security forces were Con el Mazo Dando, Misión Verdad and the web portal Lechuguinos.[2]

When analysing the profiles of the perpetrators of stigmatization, the public (state-led) legal nature of several of them stands out, as well as the state financing and protection of the production through the public television channel Venezolana de Televisión (VTV) and other public agencies such as the Ministry of Popular Power for Foreign Affairs (MPPRE), which reposts the content of some of these media outlets on its official website.

---

[1] UN Human Rights Council, Special Rapporteur on the situation of human rights defenders, 30 December 2009, UN Document Number A/HRC/13/22, para. 27.

[2] Agents of the Ministry of Foreign Affairs, who carried out 104 detentions after their stigmatization, have been excluded because they are considered different in nature from the rest of the means of stigmatization. However, their presence as a perpetrator of stigmatization will be discussed further below.





**VENEZUELA: CALCULATED REPRESSION**
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

6

# POLITICALLY MOTIVATED ARBITRARY DETENTIONS IN VENEZUELA

Politically motivated arbitrary detentions in Venezuela have been widely documented by national and international organizations. Such detentions, and other crimes under international law, are committed as part of a course of action that has proven to be systematic and widespread and that leads to a well-founded belief that they may constitute crimes against humanity.[3] More than 1,200 arbitrary detentions were documented in the period analysed.

Politically motivated arbitrary detentions are carried out by Venezuelan state security forces, including civilian and military security forces, some of which are responsible for safeguarding public order, such as the Bolivarian National Guard (GNB); and others, with intelligence and preventive investigation roles, such as the Bolivarian National Intelligence Service (SEBIN) and the Directorate General of Military Counterintelligence (DGCIM).

In a cross comparison of the interaction of the variables of stigmatization and politically motivated arbitrary detentions, the analysis of the security forces involved in the detentions indicates that throughout the period analysed there have been changes in the authorities that have implemented the repression and carried out the arbitrary detentions.

Although in 2019 the GNB played a primary role in arbitrary detentions that year -which was maintained in 2020-, by 2021 this military body only appeared in fourth place in terms of numbers of arbitrary detentions. On the other hand, the DGCIM, a military body, ranks in second place in terms of security forces carrying out arbitrary detentions each year.

Another significant development has been how the Special Action Forces (FAES) of the Bolivarian National Police (PNB) have increased the number of detentions they have carried out. While in 2019 they were in fifth place among security forces that carried out arbitrary detentions, by 2020 they were in third place and in 2021 they took first place among security forces carrying out arbitrary detentions.

On the other hand, the judiciary and the courts involved in arbitrary detentions have also varied over the years, and in particular the increase in the last year of the use of non-ordinary courts to deal with cases of arbitrary detentions should be highlighted.

# CORRELATION BETWEEN STIGMATIZATION AND ARBITRARY DETENTIONS

The correlation between politically motivated arbitrary detentions, carried out by all state security agents, and stigmatization, carried out by all sources of stigmatization, was filtered by each year analysed due to the different nature of each period. From this analysis it was shown that while in 2019 the overall correlation between both variables was 29%, in 2020 it increased to 42% and in the first half of 2021 it reached 77%. The annual correlations between arbitrary detentions and stigmatization also varied depending on the different security forces involved in the detention. Thus, there is a closer correlation in 2019 with detentions occurring by intelligence agencies (DGCIM and SEBIN), in 2020 by bodies under the PNB, including the FAES, which rises to 92%, and in 2021 by bodies of a civilian and decentralized nature, such as the FAES, municipal police forces and the Scientific, Penal and Criminal Investigation Corps (CICPC) which also rises to 92% correlation with stigmatization.

[3] Amnesty International, Hunger for Justice: Crimes against humanity in Venezuela ,AMR 53/0222/2019, 13 May 2019. UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, UN Document Number A/HRC/45/CRP.11 15 September 2020, para. 2084. Office of the Prosecutor of the International Criminal Court, "Report on Preliminary Examination Activities 2020," 14 December 2020, para. 204.



When looking for the correlation in the different periods analysed between stigmatization and detentions carried out in 2019 by the two main intelligence agencies, the SEBIN and the DGCIM, the correlation turned out to be 74%.

Both security forces, one of a civilian nature, the SEBIN, which depends on the Executive Branch, and the other of a military nature, the DGCIM, which functionally depends on the Commander in Chief of the Armed Forces, i.e., the President of the Republic, and administratively on the Ministry of Defence, have acted as repressive bodies of the government of Nicolás Maduro.

When breaking down the data by periods and differentiating the different security forces that carried out the repression, it was shown that:

| PERIOD | SECURITY FORCE | PERCENTAGE CORRELATION |
|---|---|---|
| **2019** | Intelligence agencies  (**DGCIM** y **SEBIN**) | **74%** |
| **2020** | Security forces under the **Bolivarian National Police** (including the Special Actions Forces **FAES**) | **92%** |
| **2021** January-June | Decentralized security forces: (**FAES**, **PNB**, **municipal police forces and Scientific**, **Criminal and Criminal Investigations Corps**) | **92%** |

Further analysis of the variables showed that:

-At least for the 2019 period, courts with jurisdiction over terrorism were used more frequently to prosecute those arbitrarily detained for political reasons and were closely related to (68%) and coordinated with the stigmatization carried out by Misión Verdad.

-There is a high correlation (65%) between the actions of the military courts and the stigmatization from Con El Mazo Dando, especially when the arbitrary detentions were carried out by military security forces during the entire period analysed. In particular, in 2020 this correlation reached 94%.

-In specific periods of reports of human rights violations before international organizations, as well as announcements by the United Nations Office of the High Commissioner for Human Rights, the United Nations Independent International Mission on Venezuela and the International Criminal Court, the data showed an increase in the peaks of repression with correlations between 70 and 88%.





8

VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

These trends that emerge from the analysis have consequences in the identification of the patterns in which human rights violations and crimes under international law are committed in Venezuela.

## PATTERNS OF STIGMATIZATION AS A SIGN OF POLITICAL PERSECUTION

This report has analysed the trends and correlation between politically motivated arbitrary detentions and stigmatization carried out by media outlets linked to the government of Nicolás Maduro, both public and private in Venezuela.

The trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents of the government of Nicolás Maduro.

Acts of stigmatization, which in themselves are defined as discriminatory acts and attacks that tend to entrench confrontational and 'them versus us' statements and narratives, are used as another tool for repression. Undoubtedly, stigmatization and its reflection in politically motivated arbitrary detentions point to the discriminatory factors that affect human rights in Venezuela and crimes under international law.

The public nature of stigmatization allows us to see the motivation of political discrimination behind these acts more clearly, but the way in which they are related to arbitrary detentions and the criminalization of political activists can be taken as an indicator of political persecution through arbitrary detentions and stigmatization in Venezuela.

The arbitrary nature of the detentions has been widely documented, but the findings of this report indicate with greater certainty the nature of the political discrimination behind them. The correlation between arbitrary detentions and stigmatization -which have an obvious political nature- are an indicator that the policy of repression has a clear objective of political discrimination that severely affects the rights of people in Venezuela who think differently than the government of Nicolás Maduro.

In addition, the periods for which the analysis is carried out and even the courts in charge of the cases of arbitrary detentions are a strong indicator that the relationship between detentions and stigmatization could constitute acts of persecution as a crime against humanity.

# CONCLUSIONS AND RECOMMENDATIONS

In light of all this numerical evidence, the organizations consider that the dependent relationship between the discriminatory narratives (stigmatization) and the human rights violations (arbitrary detentions and criminalization) could indicate the existence of the crime against humanity of persecution, for which the Venezuelan authorities, including those at the highest level, should be investigated to determine their criminal responsibility for these acts.[4]

Therefore, some of the recommendations are:

▸ To the Office of the Prosecutor of the ICC

● To include in its investigation into crimes against humanity in Venezuela the facts evidenced in this report, with a view to determining key actors, specific cases and possible participants in the crimes against humanity of arbitrary deprivation of liberty and politically motivated persecution.

▸ To the international community

● To continue to support the International Independent Fact-Finding Mission in its mandate to contribute to accountability for human rights violations in Venezuela since 2014;

● To sustain and strengthen support for the International Criminal Court, both financially and politically, contributing to its work against impunity for crimes against humanity.

[4] For the analysis of the lack of access to domestic resources to obtain justice, truth and reparation for these acts, see: Amnesty International, Hunger for Justice: Crimes against humanity in Venezuela, AMR 53/0222/2019, 13 May 2019, UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, UN Document Number A/HRC/48/69, 16 September 2021.





10   VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

# ▶1.INTRODUCTION

For years, Amnesty International has documented and reported the policy of repression by the government of Nicolás Maduro in Venezuela, which has aimed to silence criticism and dissent. Crimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity.

This policy of repression, which has been widely documented by organizations inside and outside Venezuela, has as its fundamental basis the stigmatization of dissent. The authorities under Nicolás Maduro have, for years, consolidated a narrative in which criticism of public policies, or any action perceived as opposition, is rejected, censored and attacked.

These acts of stigmatization and attacks on dissidents or those perceived as such have been carried out by public and private media, and their discourse usually has a high discriminatory content and incitement to violence.

In this report, Amnesty International, the Center for Defenders and Justice (CDJ), and the Penal Forum (or Foro Penal) demonstrate how the stigmatizing and discriminatory discourse promoted by the authorities under Nicolás Maduro constitutes acts of persecution and serves the purpose of the policy of repression, due to the close relationship they have with politically motivated arbitrary detentions.

For this research, CDJ, Foro Penal and Amnesty International used a methodology of statistical measurement and data analytics to identify the relationship between the stigmatization produced by the media linked to the government of Nicolás Maduro and politically motivated arbitrary detentions in the period 2019-2021. This methodology showed as its main conclusion that there is a direct relationship between stigmatization and hate speech in media with links to the government or the United Socialist Party of Venezuela (PSUV) and politically motivated arbitrary detentions, which complement and feed back on each other. In other words, the greater the number of acts of stigmatization, the more arbitrary detentions increase, and the same can be predicted when they decrease, demonstrating that rather than being isolated events, acts of stigmatization are a fundamental part of the policy of repression and accentuate the discriminatory and persecutory factor of arbitrary detentions.

# ▶2.METHODOLOGY

The following research had as its starting hypothesis, as mentioned above, the existence of a correlation between politically motivated arbitrary detentions and the stigmatization disseminated by media outlets linked to the government of Nicolás Maduro in Venezuela. In turn, it is possible to establish evidence on how repression works, the key actors and the trends of repression that have been followed over the years.

In order to carry out this research, a combined methodology was used with both a quantitative and a qualitative analysis of human rights violations in Venezuela in the context of stigmatization of human rights defenders and politically motivated arbitrary detentions.

The **quantitative** component of the research has as its main component the analysis of data collected by Venezuelan organizations on stigmatization attributable to the authorities, and politically motivated arbitrary detentions in Venezuela.

Data analytics, or data analysis, is "the process of examining data sets to find trends and draw conclusions about the information they contain. Data analytics is increasingly being used with the help of specialized systems and software."[5]

For the application of this stigmatization and arbitrary detention data analysis methodology, the first step was to obtain the information to be analysed. For this, it was essential for the CDJ to collect information on acts of stigmatization, their source, date, and verification link. Similarly, with regard to politically motivated arbitrary detentions, Foro Penal was responsible for providing the figures, dates, gender of the detained person, security force that carried out the detention and the court in charge of the case. The data were then categorized, homogenized and extracted for input into the Qlik Sense data analytics software.

Once the statistical models were applied and authenticated, the different patterns revealed by the data were observed and recorded. This analysis of the information produced specific premises that have been expanded through qualitative research.

For this **qualitative** component of the research, open-source research was used covering the origins, functioning, financing and links between the government-related media quantitatively identified as the most prominent perpetrators of stigmatization. In addition, the security forces and their relationship with the perpetrators of stigmatization were identified.

Both methodologies were employed and the conclusions obtained were checked against international human rights law standards and international criminal law, which is the basis for the following report.

It is worth clarifying that this research does not aim to demonstrate a causal relationship between the specific stigmatization carried out by media linked to the government of Nicolás Maduro with specific arbitrary detentions. On the contrary, what is sought is to determine the pattern in which stigmatization occurs at certain times and coming from certain actors, while other actors apply other repressive measures such as arbitrary detentions, without matching victims.



[5]TechTarget, Craig Stedman, Data Analysis or Data Analytics, searchdatacenter.techtarget.com/en/definition/Data-Analysis (accessed 25 August 2021), in "Business Analytics and BI."



**VENEZUELA: CALCULATED REPRESSION**
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

# 2.1 DATA ANALYTICS

As mentioned above, two databases were used. By applying statistical models to them, they generated sufficient evidence to support the conclusions established in this report.

The first database, provided by the CDJ, was the register of acts of stigmatization against human rights defenders between January 2019 and June 2021.[6] This database has extensive and detailed information on each act of stigmatization, which was filtered for the purposes of this research.

The definition of acts of stigmatization or 'stigmatization' that was used for the research consists of attacks or degrading speeches against human rights defenders that have been issued by a media outlet or social media linked to the government. This database showed 359 acts of stigmatization between January 2019 and June 2021.

## METHODOLOGICAL DEFINITION OF STIGMATIZATION

| STIGMATIZATION DIRECTED TOWARDS HRDS | + MEDIA OUTLET OR PERPETRATOR OF STIGMATIZATION | + DATE | = Act of stigmatization or 'stigmatization' |
|---|---|---|---|

The second database corresponding to politically motivated arbitrary detentions was provided by Foro Penal, with 1,270 arbitrary detentions for which information was filtered regarding the date of detention, the security force that carried out the detention, the court in charge of the case and the gender of the detained person. The arbitrary nature of the detentions had been previously identified and documented by this organization.

## 2.1.1 STATISTICAL MODELS APPLIED TO THE DATA

The organizations used Qlik Sense software to apply the following statistical models:

▶ Pearson correlation for the correlation between arbitrary detentions and stigmatization[7]

▶ Examination of descriptive analytic data:

Evolutionary analysis (dates) through bar graphs whose X axis is time and Y axis is the number of detentions and acts of stigmatization, superimposing both curves.

Percentage frequency distribution analysis, which represents the number of repetitions of a value in the total number of observations.

---

[6] The definition of 'stigmatization' will be the subject of analysis in the next section of the report, 3. Mission: Stigma.
[7] A regression measure intended to quantify the degree of joint variation between two variables. See section 3.3. *Correlation between stigmatization and arbitrary detentions.*



## 2.1.2 METHODOLOGICAL PREMISES APPLIED

In order to improve the presentation and interpretation of the information extracted from the databases, some methodological premises were assumed.

The first of these is the identification and exclusion of outliers. Thus, in the data collected on arbitrary detentions between January 2019 and June 2021, seven dates were identified where more than 60 arbitrary detentions occurred on the same day. Although this decision does not exclude the arbitrary nature of the detentions nor their inclusion in the framework of the policy of repression in Venezuela, their inclusion led to a distortion of the rest of the values such as averages and standard deviations and in reality they come from massive social protest events that altered the results of the rest of the values in the rest of the period analysed.

The second methodological premise was the grouping of politically motivated arbitrary detentions and their relationship with acts of stigmatization in a period of three days after the stigmatization occurred. This is to adjust to the reality that arbitrary detentions hardly occur on the same day that stigmatization occurs, and usually the effect of stigmatization occurs days after it.

Finally, the possibilities of data analysis with the Qlik Sense programme allow the cross comparison of more than two variables and filtering of the different results. The main variables used for the analysis were: number of acts of stigmatization per calendar date, number of detentions per calendar date, source of the stigmatization, number of detentions in the three days following each act of stigmatization, court in charge of the detention case, gender of the victim of the arbitrary detention. Therefore, the relevant results in which the correlation between the different variables held a significance for the hypothesis put forward were analysed.

# 2.2 QUALITATIVE RESEARCH

Once the data analysis had been carried out, relevant conclusions on human rights were detected, which were deepened through qualitative research methods.

The qualitative research focused on delving into the media outlets and perpetrators of the stigmatization, their financing, their legal nature and even if a link can be traced between them and the authorities of the government of Nicolás Maduro. Similarly, a contextual analysis was carried out based on the accumulated body of research of the organizations, particularly in relation to the policy of repression of the government of Nicolás Maduro.

In terms of temporal patterns, the research warranted identification of the moments when stigmatization decreased while arbitrary detentions also decreased, and likewise for the case of increases in both curves. This made it possible to establish some temporal milestones that, when compared with important socio-political events, could explain the correlation between the different means of repression at those specific moments.



14

VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

# ▶3.CALCULATING REPRESSION

## 3.1 STIGMATIZATION OF HUMAN RIGHTS DEFENDERS

The International Covenant on Civil and Political Rights, to which Venezuela is a party, protects the right to freedom of expression and opinion in Article 19.[8] So do other international instruments, such as the American Convention on Human Rights, among others.[9]

Freedom of expression has been defined in General Comment 34 of the United Nations Human Rights Committee as the obligation of "State Parties (…) to guarantee the right to freedom of expression, including the right to seek, receive and impart information and ideas of all kinds, regardless of frontiers".[10]

While freedom of opinion contains no limitations in international human rights law, there are restrictions on the right to express that opinion. These restrictions must be subject to the principles of legality, proportionality and necessity in order to be legitimate, and discriminatory expressions or those that incite violence are not protected by freedom of expression.[11]

Thus, General Comment 18 of the same Committee, states that

> "the term "discrimination" as used in the Covenant should be understood to imply any distinction, exclusion, restriction or preference which is based on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status, and which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise by all persons, on an equal footing, of all rights and freedoms." [12]

The Committee on Economic, Social and Cultural Rights has said that individuals may suffer discrimination because of their association with a particular group or because they are perceived as part of that group.[13]

Moreover, in particular, the Human Rights Committee recognizes that, with regard to expressions covered by freedom of expression, "Nor, under any circumstance, can an attack on a person, because of the exercise of his or her freedom of opinion or expression, including such forms of attack as arbitrary arrest, torture, threats to life and killing, be compatible with article 19."[14]

---

[8] International Covenant on Civil and Political Rights, Article 19.

[9] American Convention on Human Rights, Article 13. European Convention on Human Rights, Article 10.

[10] UN Human Rights Committee, General Comment 34, 12 September 2011, UN Document Number CCPR/C/GC/34.

[11] UN Human Rights Committee, General Comment 34, 12 September 2011, UN Document Number CCPR/C/GC/34, para. 22.

[12] UN Human Rights Committee, General Comment 18, para. 7.

[13] UN Human Rights Council, Report of the Special Rapporteur on the human right to safe drinking water and sanitation, 2 July 2012, UN Document Number A/HRC/21/42, para. 15.

[14] UN Human Rights Committee, General Comment 34, 12 September 2011, UN Document Number CCPR/C/GC/34, para. 23.



Academics have defined stigma as a phenomenon closely related to power and inequality, and the arbitrary way in which those who hold power make use of it.[15] Thus, "stigma can be understood as a process of dehumanization, degradation, discrediting and devaluation of persons from certain population groups".[16] This generates a perception of separation between some people and others, who oppose each other. [17]

In 2011, the United Nations Special Rapporteur on Human Rights Defenders defined stigmatization as the characterization of human rights defenders as "terrorists", "enemies of the State" or "political opponents" by state authorities and state media and its use to delegitimize their work, increasing their vulnerability to human rights abuses and violations.[18]

In this case, the CDJ has recorded the acts of stigmatization against human rights defenders between January 2019 and June 2021 in Venezuela. These acts have as a main characteristic attacks with discriminatory language and, sometimes, false accusations against human rights defenders in Venezuela who are often perceived as critics of the government of Nicolás Maduro.

This report will demonstrate how these acts of stigmatization not only hinder the work of defending and protecting human rights in Venezuela, but also reflect certain patterns in arbitrary detentions at the national level. To this end, an account will be given of the perpetrators of stigmatization and their relationship with the Venezuelan authorities, in order to find their link with the state's obligations under international law.

## 3.1.1 WHAT IS KNOWN ABOUT STIGMATIZATION IN VENEZUELA?

For many years, Venezuelan civil society organizations have reported the continuous attacks and intimidation they receive from public and private media, which extend to social media and which, on occasions, have affected the lives and safety of human rights defenders.[19]

In Venezuela, the media have been subjected to a tight administrative control that has involved the closure and discontinuation of media concessions.[20] Meanwhile, public media, financed by the state budget, and other media outlets with editorial lines close to the governing party, have prospered. It is common for these media and communication spaces to identify people in places of influence who have or have had public positions and roles, and also for state bodies to repost information from these sources.

Often these media outlets, which may take the form of web portals, television programmes and blogs, among others, use the spaces to attack, expose and harass people who are perceived as critical of the government of Nicolás Maduro. Among the people who are subjected to this discourse are political activists, human rights defenders, and people attached to humanitarian aid organizations, among others.

These acts of stigmatization have been condemned by international organizations, including the Office of the Special Rapporteur for Human Rights Defenders, the Inter-American Commission on Human Rights and the Office of the United Nations High Commissioner for Human Rights.[21]

[15] UN Human Rights Council, Report of the Special Rapporteur on the human right to safe drinking water and sanitation, 2 July 2012, UN Document Number A/HRC/21/42, para. 12 citing Erving Goffman, Stigma: Notes on the Management of Spoiled Identity (New York, Simon & Schuster, 1963), p. 5

[16] UN Human Rights Council, Report of the Special Rapporteur on the human right to safe drinking water and sanitation, 2 July 2012, UN Document Number A/HRC/21/42, para. 12

[17] UN Human Rights Council, Report of the Special Rapporteur on the human right to safe drinking water and sanitation, 2 July 2012, UN Document Number A/HRC/21/42, para. 12

[18] UN Human Rights Council, Special Rapporteur on the situation of human rights defenders, 30 December 2009, UN Document Number A/HRC/13/22, para. 27.

[19] COFAVIC, Report: "Enemigos Internos" La defensa de derechos humanos bajo ataque ("Internal Enemies" The defence of human rights under attack), March 2020, cofavic.org/wp-content/uploads/2020/05/Informe-Venezuela-enemigos-internos_2020.pdf (Spanish only). Center for Defenders and Justice, monthly reports on the situation of human rights defenders, centrodefensores.org.ve/ (Spanish only). Inter-American Commission on Human Rights, Office of the Special Rapporteur for Freedom of Expression, IACHR and OSRFE Condemn Attacks Against Human Rights Defenders and Journalists and Warn of the Closure of Democratic Spaces in Venezuela, 21 February 2021, https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/025.asp, inter alia.

[20] Espacio Público, Situación general del derecho a la libertad de expresión (General situation of the right to freedom of expression) Report January-August 2021, espaciopublico.ong/situacion-general-del-derecho-a-la-derecho-a-libertad-de-expresion/ (Spanish only) (accessed 21 October 2021).

[21] UN Special Rapporteur on the situation of human rights defenders, UN Special Rapporteur on the promotion and protection of freedom of opinion and expression, UN Special Rapporteur on the right to peaceful assembly, inter alia, "High time to pull the plug on televised reprisals against rights defenders in Venezuela," 22 July 2015, www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=16259&LangID=E. Inter-American Commission on Human Rights, "IACHR Concerned about Harassment against Human Rights Defenders in Venezuela," 22 February 2019, https://www.oas.org/en/iachr/media_center/PReleases/2019/040.asp. Office of the United Nations High Commissioner for Human Rights, "Statement by the United Nations High Commissioner for Human Rights, Michelle Bachelet," 46th session of the Human Rights Council, https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=26874&LangID=E



These examples illustrate acts of stigmatization:

| | |
|---|---|
| **CON EL MAZO DANDO, 20 AUGUST 2019.**[22] | Según el consultor                          , acérrimo opositor a la Revolución Bolivariana, las "agencias de cooperación internacional han metido dinero en Venezuela" que han robado las Organizaciones No Gubernamentales (ONG) como <br><br> *[According to consultant                , a staunch opponent of the Bolivarian Revolution, "international cooperation agencies have put money into Venezuela" that has been stolen by Non-Governmental Organisations (NGOs) such as* |
| **CON EL MAZO DANDO, 16 JULY 2019.**[23] | En su informe Michelle Bachelet habla de personas detenidas supuestamente por expresar opiniones políticas. Se dan, como ciertos, los datos aportados por partidos de la oposición y algunas ONGs cuya confiabilidad ética es cuestionable ya que son financiadas por el gobierno de Estados Unidos. <br><br> *[In her report Michelle Bachelet mentions people allegedly detained for expressing political opinions. Data provided by opposition parties and some NGOs whose ethical reliability is questionable as they are financed by the US government are taken as true.]* |
| **MISIÓN VERDAD TWEET, 20 SEPTEMBER 2019.**[24] | MV<br>@Mision_Verdad                                                   •••<br><br>Se autoproclaman como los representantes de la "sociedad civil", pero las ONGs como            no son más que instrumentos de la política exterior estadounidense. bit.ly/2ejTbai<br><br>7:14 a. m. - 20 sept. 2019 · TweetDeck<br><br>*[They call themselves representatives of "civil society" but NGOs like              are no-thing more than pawns of US foreign policy.]* |
| **LA IGUANA TV, 8 OCTOBER 2020.**[25] | La jurista indicó que este factor sesga la información aportada. Entre las fuentes utilizadas, precisó, se encuentran ONGs que en el año 2002, cuando le dan el golpe de Estado al Comandante Hugo Chávez, se pusieron de parte de intereses foráneos. "Están siendo financiadas, además, por potencias hostiles", aseguró la también constituyente.<br><br>*[The lawyer indicated that this factor means that information provided is biased. Among the sources used, she said, are NGOs that in 2002, when the coup d'état against Commander Hugo Chávez was carried out, sided with foreign interests. "They are also being financed by hostile powers," she said.]* |

---

[22] Con el Mazo Dando, ¡No lo dice el Mazo! Consultor escuálido develó estafas de la derecha con sus ONG (+Video) (Opposition consultant revealed right-wing scams with its NGOs (+Video)), 20 August 2019, www.conelmazodando.com.ve/no-lo-dice-el-mazo-consultor-escualido-develo-estafas-de-la-derecha-con-sus-ong-video (Spanish only) (accessed 22 October 2021)

[23] Con el Mazo Dando, "Jorge Valero: ¿Hacia dónde va Michelle Bachelet?" ("Jorge Valero: Where is Michelle Bachelet headed?"), 16 July 2019, https://www.conelmazodando.com.ve/jorge-valero-hacia-donde-va-michelle-bachelet (Spanish only) (accessed 22 October 2021).

[24] Twitter, Misión Verdad, 20 September 2019, twitter.com/Mision_Verdad/status/1175020280059576321?ref_src=twsrc%5Etfw%7Ctwcamp%5E-tweetemb%20ed%7Ctwterm%5E1175020280059576321&ref_url=http%3A%2F%2Fmisionverdad.com%2Fla-guerra-en-%20venezuela%2Fata-ques-y-criminalizacion-a-los-clap-como-forma-de-exterminio (Spanish only) (accessed 22 October 2021).

[25] La Iguana TV, "Estas son las principales objeciones al informe de la Misión de la ONU contra Venezuela" ("These are the main objections to the report of the UN Mission against Venezuela"), 8 October 2020, www.laiguana.tv/articulos/815441-objeciones-informe-a-onu-venezuela/ (Spanish only) (accessed 22 October 2021).



| | |
|---|---|
| **MISIÓN VERDAD TWEET, 27 NOVEMBER 2020.** [26] | *[A Venezuelan opposition network of corruption was exposed, which sought to divert money from state funds confiscated in Europe to supposedly "humanitarian" NGOs run by     ]* |
| **CON EL MAZO DANDO, 19 MARCH 2021.** [27] | El pseudo informe al que hace alusión el ministro Padrino, fue publicado por          , supuesta "ONG" que es dirigida por            , furibunda opositora venezolana que se dedica al ataque constante contra la Fanb y sus integrantes, como parte de las acciones promovidas desde el *Departamento de Estado* de los *Estados Unidos*, con el objeto de provocar el derrocamiento de la *Revolución Bolivariana*. |
| | *[The pseudo-report to which Minister Padrino refers was published by            , a supposed "NGO" run by           , a fanatical Venezuelan opposition figure who constantly attacks the Fanb and its members, as part of the actions promoted by the US State Department, with the aim of overthrowing the Bolivarian Revolution.]* |

[26] Twitter, Misión Verdad, 27 November 2020, twitter.com/Mision_Verdad/status/1332298375366991872 (Spanish only) (accessed 22 October 2021).

[27] Con el Mazo Dando, "Ministro Padrino desestima pseudo informe que ataca unidad e integridad de la Fanb" ("Minister Padrino dismisses pseudo report attacking unity and integrity of the Fanb"), 19 March 2021, mazo4f.com/ministro-padrino-desestima-pseudo-informe-que-ataca-unidad-e-integridad-de-la-fanb (Spanish only) (accessed 22 October 2021).



## 3.1.2 WHAT ARE THE DATA ON THE SOURCES OF STIGMATIZATION?

To establish a hierarchy of the sources of stigmatization that could have a relationship with or greater impact on violations of personal liberty, the organizations analysed the data on arbitrary detentions and stigmatization in the period January 2019 - June 2021.

The first quantitative finding that led to the need to expand the qualitative research was the identification of the most prominent perpetrators of stigmatization whose actions coincided with the most frequent politically motivated arbitrary detentions three days after the stigmatization.



**ACTS OF STIGMATIZATION BY SOURCE**
Percentage of stigmatizations by source, 2019-Jun 2021

- Con El Mazo Dando 20,4%
- Misión Verdad 15,1%
- Lechuguinos 9,8%
- Individuals 9,5%
- La Hojilla 5,6%
- Zurda Konducta 5,6%
- ① 5,3%
- La Iguana Tv 4,1%
- Unknown 4,1%
- Others 20,4%

① Ministry of Foreign Affairs' agents

Source: **Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

The aim of this analysis was to establish which media source had their content most frequently repeated before detentions were carried out by Venezuelan security forces. The result of this analysis shows that the main perpetrators of stigmatization for the whole period analysed were Con el Mazo Dando, Misión Verdad and the web portal Lechuguinos.[28]



Detentions within the next three days after an act of stigmatization
**2019-Jun 2021**

| | |
|---|---|
| Misión Verdad | **486** |
| Con el Mazo Dando | **481** |
| Lechuginos | **103** |

According to this data, in 486 arbitrary detentions, the web portal Misión Verdad had issued stigmatizing publications three days before the detention took place. Similarly, in 481 cases, the same occurred on the part of the television programme Con El Mazo Dando, and in about 100 cases, the detentions took place three days after the portal Lechuginos published stigmatizing content.

### 3.1.3 NATURE OF THE SOURCES OF STIGMATIZATION IN VENEZUELA

Having obtained a clear threshold on the perpetrators of stigmatization carrying out these attacks, it is necessary to study the nature of these perpetrators of stigmatization in order to determine the obligations of the Venezuelan state.

To do so, we analysed the open sources that correspond to each of the media outlets that were relevant when measuring which ones had issued stigmatizing publications three days before the detentions (see previous section). Information was gathered and collected on the legal nature of the source, i.e., whether it is public or private, whether it is known where the funding comes from, the mission, vision and self-conception of each source and whether there was any public and evident link with Venezuelan state officials.

[28] Agents of the Ministry of Foreign Affairs, who carried out 104 detentions after their stigmatization, have been excluded because they are considered different in nature from the rest of the means of stigmatization. However, their presence as a perpetrator of stigmatization will be discussed further below.



As for financing through public or private funds, this is shown in the following diagram:



Thus, the main perpetrator or source of stigmatization was the television programme and web portal Con el Mazo Dando, broadcast and produced by the Venezuelan State television channel Venezolana de Televisión (VTV). VTV's website includes a section within its structure exclusively dedicated to this television programme. The host of this programme is Diosdado Cabello, who currently serves as Vice President of the National Assembly elected in 2020 and has held various important positions in the government of Nicolás Maduro and in the United Socialist Party of Venezuela (PSUV). So patent is his link to the programme that the web page of Con el Mazo Dando is linked directly to Cabello's Twitter account.

It was found that other sources, such as the television programmes that are sources of stigmatization called Zurda Konducta and La Hojilla are also VTV productions, so it would be reasonable to conclude that their production is somehow financed by public money.

For its part, the blog Misión Verdad, whose frequency in stigmatization-detentions is in second place, boasts among its opinion columnists Jorge Arreaza, who until August 2021 served as Minister of People's Power for Foreign Affairs and who, subsequently, served as Minister of People's Power for Industries and National Production. Although his participation is not enough to prove that this means of stigmatization is of a public nature, VTV also publishes his opinion columns in a specific section of its web page.  The same happens in the news section of the Ministry of People's Power for Foreign Affairs (MPPRE), which also publishes the columns of Misión Verdad.  The financing of Misión Verdad is not evident, and its website only includes the possibility of making donations through cryptocurrencies.

On the other hand, regarding web portals such as La Tabla, La Iguana TV and Lechuguinos, it could not be established where their financing comes from, but at least in the case of La Tabla, it is also featured in a section of its own on the website of the state channel VTV. Among these media outlets there are also links and repetitions among the people who publish in each of them.

Although these media outlets and sources are not homogeneous and each one has its own profile, they have in common the use of hate speech, denigrating attacks, exposés and the tools of 'fake news' to stigmatize human rights defenders, political activists and, in short, any actor who is considered critical of the government of Nicolás Maduro.

The evidence obtained provides confirmation that these media outlets publish coordinated statements, with an undeniable link to official state media, and to the government party. All these elements point to the fact that political propaganda makes use of stigmatization against people perceived as critical of the government of Nicolás Maduro.

### 3.1.4 CONCLUSIONS ON THE SOURCES OF STIGMATIZATION

According to the analysis of the data it can be concluded that there are different sources of stigmatization in Venezuela. However, there were three of them that between January 2019 and June 2021 carried out more acts of stigmatization the three days before arbitrary detentions were carried out. These three main sources were: Con el Mazo Dando, Misión Verdad and Lechuguinos.

When analysing the profiles of the perpetrators of stigmatization, the public (as in state-led) legal nature of several of them stands out, as well as the state financing and protection of the production through the public television channel Venezolana de Televisión (VTV) and other public agencies such as the Ministry of Popular Power for Foreign Affairs (MPPRE), which reposts the content of some of these media outlets on its official website.

For the organizations, there is no doubt about the close relationship between agents of the Venezuelan state, i.e., public officials, public and private media, and attacks against human rights defenders. It should be noted that the obligations of the authorities go beyond preventing and sanctioning these acts, but that they are also obliged to effectively refrain from any discriminatory practices based on political grounds.

[29] For example: Venezolana de Televisión, "Canciller Arreaza recomendó leer análisis sobre contrato mercenario suscrito por Guaidó con SilverCorp" ("Chancellor Arreaza recommended reading analysis on mercenary contract signed by Guaidó with SilverCorp"), 11 May 2020, www.vtv.gob.ve/canciller-arreaza-analisis-contrato-mercenario-silvercorp-guaido/ www.vtv.gob.ve/tag/mision-verdad/, (Spanish only) accessed 20 August 2021.

[30] Venezuelan Ministry of People's Power for Foreign Affairs, , "Canciller Arreaza a Misión Verdad: Estamos listos para defender a Venezuela en cualquier escenario", ("Foreign Minister Arreaza to Misión Verdad: We are ready to defend Venezuela in any scenario"), 5 April 2020, www.mppre.gob.ve/2020/04/05/canciller-arreaza-mision-verdad-estamos-defender-venezuela-cualquier-escenario/  (Spanish only) (accessed in July 2021, not available in October 2021, verified in archives).




## 3.2 POLITICALLY MOTIVATED ARBITRARY DETENTIONS IN VENEZUELA

Politically motivated arbitrary detentions in Venezuela have been widely documented by national and international organizations. Such detentions, and other crimes under international law, are committed as part of a course of action that has proven to be systematic and widespread and that leads to a well-founded belief that they may constitute crimes against humanity.[31]

The factors contributing to a detention being considered arbitrary are the manner in which it is carried out, which is usually without a warrant, and also the lack of due process guarantees.

In Venezuela, these criteria have been documented and can be observed in:

▸ The manner in which the detention is carried out:

- Detentions in alleged flagrante delicto situations that are not subsequently proven;

- Searches and detentions without warrants;

▸ The absence of due process guarantees:

- Incommunicado detention and isolation of the person deprived of liberty;

- Torture and other cruel, inhuman and degrading treatment of detainees;

- Use of broadly discretionary and highly political criminal offences;

- Presentation of civilians before military courts;

- Anonymous informants as the sole basis for detention;

- Interference of high-ranking authorities in judicial cases, publicly or privately;

- Disregard of release orders by the authorities..[32]

In addition to the use of military courts, which is an express denial of the principle of the natural judge and raises concerns about the lack of independence and impartiality of judges, it has become common to use ordinary courts with special jurisdiction over terrorism, which restricts the right to defence of people prosecuted in this way.

Since 2014, Foro Penal has recorded that at least 875 civilians have been investigated, prosecuted or tried by military courts.[33]

Politically motivated arbitrary detentions are carried out by Venezuelan state security forces, including civilian and military security forces, some of which are responsible for safeguarding public order, such as the Bolivarian National Guard (GNB); and others, with intelligence and preventive investigation functions, such as the Bolivarian National Intelligence Service (SEBIN) and the Directorate General of Military Counterintelligence (DGCIM).

Foro Penal has categorized the different purposes behind politically motivated arbitrary detentions into five categories:

[31] Amnesty International, Hunger for Justice: Crimes against humanity in Venezuela, AMR 53/0222/2019, 13 May 2019. UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, UN Document Number A/HRC/45/CRP.11 15 September 2020, para. 2084. Office of the Prosecutor of the International Criminal Court, "Report on Preliminary Examination Activities 2020", 14 December 2020, para. 204.
[32] Amnesty International, Venezuela: Silenced by Force: Politically-Motivated Arbitrary Detentions in Venezuela, AMR 53/6014/2017, 26 April 2017.
[33] Foro Penal database.



| PURPOSE | MAIN CHARACTERISTICS |
|---|---|
| **Exclusion or neutralization of the person** | Detention is used as a tool to exclude the person or prevent their influence in the sector in which they operate. This isolation or exclusion from the public sphere produces a neutralization of the person. |
| **Intimidation or deterrent effect on the group (chilling effect)** | Aims to have a demonstration effect on the rest of the target group. Thus, for example, it has occurred with the judicial sector, the military, journalists, among others. It is used to demonstrate the negative consequences of dissenting from the government party line. |
| **Propaganda or consolidation of the official narrative** | Detentions that occur as a way of sustaining a campaign or official narrative. For example, to divert responsibility for events of national importance, which in turn generates impunity for real responsibilities that should be investigated and that are excluded in the official narrative. |
| **Extraction of information** | Detentions or threats of detention are used as a way to illegally obtain information against other people who have been targeted for harassment. An example of this is the detention of people's relatives to find out the location of those who have an arrest warrant out against them or are victims of harassment. |
| **Personal or arbitrary exercise of power** | Does not serve a political aim or purpose but results from the abuse or excessive arbitrariness in the exercise of power by public officials. These cases are included in the spectrum of political persecution because the victimizer (in these cases an official with power and influence in the repressive mechanisms) carries out acts of repression or harassment, for personal benefit, but under the protection of the political power they have and exercise. |

**SPECIAL OR SUPERVENING CASES**
Occurs when a person is detained in a legitimate manner and in accordance with legal procedures. However, the situation may arise when, once the repression of these persons has materialized, they are subjected by the authorities to conditions of harassment, prosecution, imprisonment or serving a sentence that flagrantly violate their human rights, with the aim of fulfilling a political purpose, formally declared or not, of the authorities, but which corresponds to the aforementioned purposes.


Foro Penal



**VENEZUELA: CALCULATED REPRESSION**
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS
24

## 3.2.1 REPRESSION IN THE PERIOD ANALYSED

The period analysed covers two and a half calendar years (from January 2019 to June 2021, inclusive), and in each one the phenomenon of repression in Venezuela was affected by external factors that must be taken into consideration.

Firstly, 2019 was a year of massive nationwide protests, which were lambasted with excessive use of force, acts of torture, and massive arbitrary detentions by state authorities and armed groups of individuals linked to the government of Nicolás Maduro, with sufficient grounds to consider that these events could constitute crimes against humanity.[34]

As of March 2020, quarantine measures and mobility restrictions were imposed in Venezuela, as well as in almost all countries around the world, due to the Covid-19 pandemic. Some of these measures remain in place as of the date of writing of this report. Undoubtedly, these restrictions on mobility, with the closure of courts, among other restrictions, affected the ways in which the authorities have repressed the population since that time and to date.

## 3.2.2 SECURITY FORCES THAT CARRIED OUT DETENTIONS AFTER THE ACTS OF STIGMATIZATION

The cross comparison of the two variables analysed, i.e.: (1) which were the security forces that carried out detentions in the three days after (2) a perpetrator of stigmatization carried out an attack, showed results by year as follows:

In 2019, most of the detentions that occurred after attacks against defenders were carried out by the Bolivarian National Guard (GNB), followed by the Directorate General of Military Counterintelligence (DGCIM). Next, it was found that the various state security forces and the Bolivarian National Intelligence Service (SEBIN) occupied the third and fourth place in terms of security forces carrying out these types of detentions.

It is not surprising that in 2019 most of the detentions were carried out by the GNB, due to the massive protests and events of social unrest throughout the country. However, this supports the hypothesis that alongside the detentions carried out by the GNB, stigmatization was also taking place.

In 2020, the GNB and the DGCIM remained in first and second place among those carrying out arbitrary detentions, but the third and fourth places were occupied by the Special Action Forces (FAES) of the Bolivarian National Police (PNB) and by the PNB itself.

Finally, in the first half of 2021, the FAES and the DGCIM occupied the first two places out of agents who arbitrarily detained people after stigmatization took place, municipal police forces occupied the third place and the GNB the fourth, while the SEBIN occupied the fifth place.

When analysing the three graphs, one can see the presence of the DGCIM as a repressive body and how it remains predominant among the security forces that carry out arbitrary detentions after stigmatization has occurred, throughout the period analysed.

It is worth mentioning that, although SEBIN has been an intelligence agency pointed out on multiple occasions for its constant participation in politically motivated arbitrary detentions, the correlation with stigmatization seems to not be as high in the periods in general.

[34] Amnesty International, Hunger for Justice: Crimes against humanity in Venezuela, AMR 53/0222/2019, 13 May 2019.



## DETENTIONS CARRIED OUT WITHIN THE NEXT THREE DAYS AFTER AN ACT OF STIGMATIZATION, BY SECURITY FORCE

Detentions by security forces three days after an act of stigmatization

| | 2019 | 2020 | Jan-Jun 2021 |
|---|---|---|---|
| GNB (Bolivarian National Guard) | 186 | 191 | 4 |
| DGCIM (Directorate General of Military Counterintelligence) | 108 | 49 | 7 |
| State police | 44 | 29 | 1 |
| SEBIN (Bolivarian National Intelligence Service) | 41 | 15 | 3 |
| FAES (Special Action Forces) | 39 | 44 | 12 |
| PNB (Bolivarian National Police) | 33 | 35 | 0 |
| Municipal Police | 32 | 24 | 6 |
| CICPC (Penal and Criminal Investigation Corps) | 30 | 12 | 2 |
| National Army | 10 | 0 | 1 |
| CONAS (Anti-Extortion and Kidnapping Command) | 6 | 17 | 2 |
| GNB/SEBIN/PNB / National Army - Gran Sabana Bolívar | 2 | 0 | 0 |
| State police intelligence service | 1 | 2 | 0 |
| REDIP central | 1 | 0 | 0 |
| DIEP Police Intelligence Directorate Yaracuy | 0 | 1 | 0 |
| GAES (GNB's Special Actions Group) | 0 | 5 | 0 |
| Aragua State Police | 0 | 2 | 0 |
| Guanipa Municipal Police | 0 | 1 | 0 |
| DIEP Police Intelligence Directorate | 0 | 9 | 0 |
| DIEP Police Intelligence Directorate Aragua | 0 | 2 | 0 |
| CPNB Police Criminal Investigation Directorate | 0 | 0 | 1 |
| POLICARACAS | 0 | 0 | 1 |

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

Venezuela AR_000008

### 3.2.3 COURTS IN CHARGE OF CASES OF ARBITRARY DETENTIONS

The justice system in Venezuela has been used in recent years to facilitate human rights violations. The lack of judicial independence has been documented in addition to how this has been used for the policy of repression and to endorse violations of judicial guarantees and due process in cases against people perceived as opponents of the government of Nicolás Maduro.[35]

Foro Penal documented more than 1,270 arbitrary detentions between January 2019 and June 2021.[36] Of these politically motivated arbitrary detentions, the courts and judges who were in charge of the cases once those detained were brought before the judicial authority were tracked.

Thus, in 33.3% of the cases the people detained between 2019 and June 2021 were brought before ordinary courts with criminal jurisdiction, 9% were brought before courts with special jurisdiction over terrorism and 6.6% before courts with military jurisdiction.



**COURTS IN CHARGE OF THE ARRESTS**
Percentage of cases under different jurisdictions

- Unknown
- Ordinary
- Non Applicable
- Ordinary-Terrorism
- Military

6,6%
33,7%
9,0%
17,4%
33,3%

**Total: 1272**   **2019-Jun 2021**

**Source:** Foro Penal

[35] Amnesty International, Venezuela: Silenced by Force: Politically motivated arbitrary detentions, AMR 53/6014/2017, 26 April 2017, UN International Independent Fact-Finding Mission on Venezuela, UN Document Number A/HRC/45/CRP.11, 15 September 2020, para. 240 et seq. UN High Commissioner for Human Rights, Results of the investigation into allegations of possible human rights violations of the right to life, liberty and physical and moral integrity in the Bolivarian Republic of Venezuela, UN Document Number A/HRC/44/20, 2 July 2020, para. 83.
[36] The dates referred to in the methodology section are excluded.

Most cases of politically motivated arbitrary detentions are prosecuted by ordinary courts. These courts, although they should have the guarantees of due process in force in the Organic Code of Criminal Procedure, often suffer from interference from the Executive Branch and the authorities of the judiciary itself. It is common for people prosecuted in these ordinary courts to be charged with illegal association (agavillamiento) and treason, among other criminal conduct.[37]

The special courts with jurisdiction over 'terrorism' originate from the Organic Law against Organized Crime and Financing of Terrorism, which contains a catalogue of crimes that must be investigated with special prerogatives and prosecuted by courts specially designated for this purpose.[38]

The use of this type of court and the application of criminal offences contained in said Law has been frequently used by the authorities to silence dissidence. Particularly in 2019, at least 60 people arbitrarily detained were prosecuted in these courts.[39] Among the most common criminal offences under this Law are association to commit a crime, 'terrorism' and 'financing of terrorism'.

On the other hand, in Venezuela, the Code of Military Justice in force establishes that military offences, whether committed by civilians or military personnel, are under the jurisdiction of military courts.[40] However, this violates the right to a fair trial and to a natural judge enshrined in international human rights treaties and standards.[41]

Nonetheless, in recent years, the use of these courts to silence dissent in Venezuela has been documented.[42]Military courts have prosecuted hundreds of civilians and retired military personnel for alleged violations of the Code of Military Justice. It is common for those prosecuted in military courts to be charged with treason, affront to the military guard (ultraje al centinela) and even rebellion.

Similar use has not always been made of these different courts to prosecute people for political reasons in Venezuela. At some points the use of military courts has prevailed, especially when civilian authorities have been more resistant to following lines of action by the authorities of the government of Nicolás Maduro.[43]Similarly, ordinary courts with jurisdiction over terrorism are associated with periods where repression is selective and seeks to promote a conspiracy narrative, which goes hand in hand with the stigmatization and consolidation of the discourse of 'them versus us'.

In 2019, while further details on the courts that carried out the detention prosecution are unknown, most cases were brought before ordinary courts, followed by the use of military courts and finally special courts with jurisdiction over terrorism.

---

[37] Foro Penal database.

[38] Organic Law Against Organized Crime and Financing of Terrorism, Article 63, www.oas.org/juridico/pdfs/mesicic4_ven_ley_del_org_finan_terr.pdf (Spanish only).

[39] Foro Penal database.

[40] Organic Code of Military Justice, 17 September 1998, data.miraquetemiro.org/sites/default/files/documentos/Codigo%20Organico%20de%20Justicia%20Militar.pdf (Spanish only).

[41] On 16 September 2021, the Code of Military Justice was amended to establish that non-military persons may not be subject to prosecution by military courts, and cases may only be brought before these courts for violations of the Code of Military Justice. http://www.asambleanacional.gob.ve/noticias/an-sanciono-reforma-del-codigo-organico-de-justicia-militar (Spanish only).

[42] Amnesty International, Venezuela: Silenced by Force: Politically-Motivated Arbitrary Detentions, AMR 53/6014/2017, 26 April 2017

[43] UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, UN Document Number A/HRC/45/CRP.11 15 September 2020, para. 365.



28

VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS



By 2020, in contrast, ordinary courts processed the vast majority of cases, but cases in special courts with jurisdiction over terrorism were more than triple (10.7%) the cases that were brought before military courts (3%).



**COURTS IN CHARGE OF THE ARRESTS 2020**
Percentage of cases under different jurisdictions

Legend: Unknown | Ordinary | Non Applicable | Ordinary-Terrorism | Military

24,0%
53,7%
8,7%
10,7%

**Total: 438**                    **2020**

**Source:** Foro Penal

Finally, in the first half of 2021, ordinary courts also remained in first place, but there was an increase in both the use of special courts with jurisdiction over terrorism (15%) and in the use of military courts (7.5%).





The correlation between prosecution by the different courts, arbitrary detentions by the different security forces and sources of media stigmatization will be analysed below.

## 3.2.4 CONCLUSIONS ON POLITICALLY MOTIVATED ARBITRARY DETENTIONS AND THEIR KEY ACTORS

Politically motivated arbitrary detentions in Venezuela have been a practice of both civilian and military authorities, with responsibility for safeguarding public order and also intelligence and crime prevention.

The analysis of the security forces involved in the detentions indicates that throughout the period analysed there have been changes in the authorities that have implemented the repression and carried out the arbitrary detentions.

Although in 2019 the GNB played a primary role in arbitrary detentions that year -which was maintained in 2020-, by 2021 this military component only appeared in fourth place in terms of numbers of arbitrary detentions.

On the other hand, the DGCIM, of a military nature, ranks in second place in terms of security forces carrying out arbitrary detentions each year.

Another significant development has been how the FAES have increased the detentions they have carried out. While in 2019 they were in fifth place among security forces that carried out arbitrary detentions, by 2020 they were in third place and in 2021 they took first place among security forces carrying out arbitrary detentions.

On the other hand, the judiciary and the courts involved in arbitrary detentions have also varied over the years, and in particular the increase in the last year of the use of non-ordinary courts to deal with cases of arbitrary detentions should be highlighted.

The organizations have proven below the correlation between these variables and how the sources of stigmatization are connected with the security forces and the courts that hear the cases in a repressive system.

## 3.3 CORRELATION BETWEEN STIGMATIZATION AND ARBITRARY DETENTIONS

Correlation, also known as a linear correlation coefficient (Pearson's), is a regression measure that aims to quantify the degree of joint variation between two variables.[44] This means that the correlation indicates how much two variables increase or decrease at the same time. Although correlation is not an indicator of causality between one variable and another, high correlation between two variables can indicate how the two or more variables studied are dependent on each other.[45]

The organizations have analysed the stigmatization databases by date, sources of stigmatization, dates of arbitrary detentions, security forces that carried out the detentions, courts in charge of the detention cases, among other variables to determine if there is a dependency and a relationship between stigmatization and politically motivated arbitrary detentions in Venezuela.

In analysing the data, these were the most important findings on the relationship between the two major variables: stigmatization and arbitrary detentions.

### 3.3.1 OVERALL ANNUAL CORRELATION BETWEEN STIGMATIZATION AND ARBITRARY DETENTIONS

The correlation between politically motivated arbitrary detentions, carried out by all state security agents, and stigmatization, carried out by all sources of stigmatization, was filtered by each year analysed due to the different nature of each period.

While in 2019 the correlation between the two variables is only 29%, the correlation in 2020 increases to 42% and finally for the half of the year 2021 that was analysed, the overall correlation is 77%.



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS - 2019**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

(r = 0.29)

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

[44] Economipedia, Alfonso Peiro Ucha, Coeficiente de correlación lineal (Coefficient of linear correlation), (accessed 8 October 2021) https://economi-pedia.com/definiciones/coeficiente-de-correlacion-lineal.html (Spanish only).

[45] Economics360, Coeficiente de correlación lineal (Coefficient of linear correlation), (accessed 8 October 2021), www.economia360.org/coeficiente-de-correlacion-lineal/ (Spanish only).





**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS - 2020**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

(r = 0.42)

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS JANUARY - JUNE 2021**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

(r=0.77)

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)




**VENEZUELA: CALCULATED REPRESSION**
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

This means that, over time, the curve of occurrence of stigmatization and the curve of arbitrary detentions have been getting closer and closer.

This increase in the correlation between detentions and stigmatization could be an indicator of how the policy of repression has become increasingly sophisticated and has been refining its use of both tools with more similar trends and more aligned objectives.

We can observe this same trend if, instead of analysing stigmatization coming from all sources of stigmatization, we take only the first three, i.e. Con el Mazo Dando, Misión Verdad and Lechuguinos, given that in 2019 the correlation between these acts of stigmatization and arbitrary detentions is 29%, while there is an increase of up to 70% in 2020, culminating in an 86% correlation in 2021.

## 3.4 CORRELATION BETWEEN STIGMATIZATION AND THE SECURITY FORCES THAT CARRY OUT DETENTIONS

The organizations observed annual correlations between arbitrary detentions and stigmatization also varied depending on the different security forces involved in the detention. Thus, a closer correlation in 2019 with detentions occurring by intelligence agencies (DGCIM and SEBIN), in 2020 by bodies under the PNB, including the FAES, which rises to 92%, and in 2021 by bodies of a civilian and decentralized nature, such as the FAES, municipal police forces and the Scientific, Penal and Criminal Investigation Corps (CICPC) which also rises to 92% correlation with stigmatization.



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS CARRIED OUT BY SEBIN AND DGCIM- 2019**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

These differences between one period analysed and another are indications that the repression through arbitrary detentions is not isolated, and each year has a different actor that has responded in a similar pattern to how the acts of stigmatization are generated.



**CORRELATION BETWEEN ACTS OF STIGMATIZATIONS AND ARRESTS CARRIED OUT BY PNB, FAES OFFICERS - 2020**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS CARRIED OUT BY PNB, FAES, MUNICIPAL POLICE AND CICPC OFFICERS BETWEEN 2019 - JUNE 2021**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)





### 3.4.1 THE HIGHER CORRELATION BETWEEN THE DETENTIONS CARRIED OUT BY INTELLIGENCE SERVICES AND ACTS OF STIGMIZATION

As previously explained, both security forces, one of a civilian nature, the SEBIN, which depends on the Executive Branch, and the other of a military nature, the DGCIM, which functionally depends on the Commander in Chief of the Armed Forces, i.e., the President of the Republic, and administratively on the Ministry of Defence, have acted as repressive bodies of the government of Nicolás Maduro.

International organizations have documented and reported on multiple occasions the widespread and systematic practice of these security forces in carrying out arbitrary detentions, but also in using torture and other cruel, inhuman or degrading treatment methods. Even the United Nations International Independent Mission on Venezuela has requested an investigation into the crimes under international law committed by these security forces and also into their authorities for their possible criminal responsibility for these acts.[46]

In the different periods analysed the stigmatization and detentions carried out in 2019 by the two main intelligence agencies, the SEBIN and the DGCIM, the correlation observed reached 74%.



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS CARRIED OUT BY SEBIN AND DGCIM OFFICERS - 2019**
Acts of stigmatizations vs. politically motivated arbitrary detentions, by calendar week

(r = 0.74)

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

Thus, the close correlation in this year between stigmatization and detentions by intelligence agencies may confirm a pattern in which politically motivated arbitrary detentions and the most prominent intelligence agencies, both civilian and military, tended to be coordinated in their actions. Therefore, if the stigmatization is aimed at silencing dissidence, and the arbitrary detentions carried out by SEBIN and DGCIM are also aimed at silencing dissidence, this high correlation between the two may show that this is an orchestrated policy and that one variable cannot be isolated from the other.

[46] UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, UN Document Number A/HRC/45/CRP.11 15 September 2020, Recommendations 1, 63 and 65.



## 3.4.2 RELATIONSHIP BETWEEN SECURITY FORCES AND SOURCES OF STIGMATIZATION

It has already been established that in 2019 the highest correlation between stigmatization and arbitrary detentions (74%, see above) occurs with detentions carried out by both civilian and military intelligence agencies. However, it should not be overlooked that in those cases where detentions were carried out by intelligence services, there was around a one-in-three chance that only two sources were responsible for acts of stigmatization: Misión Verdad and Con el Mazo Dando.



**ACTS OF STIGMATIZATION BY SOURCE WHEN SEBIN AND DGCIM CARRIED OUT ARRESTS - 2019**

Percentage of acts of stigmatization by source, three days prior to intelligence services carrying out arbitrary detentions

- Others 8,6%
- Lechuguinos 5,7%
- Aporrea 5,7%
- Ministry of Foreign Affairs' agents 5,7%
- La Iguana TV 11,4%
- Misión Verdad 34,3%
- Con El Mazo Dando 28,6%

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

The same occurred in 2020 with the security forces that have the highest correlation with acts of stigmatization, namely the PNB and FAES: the most prevalent perpetrators of stigmatization continue to be Misión Verdad and Con el Mazo Dando.



**VENEZUELA: CALCULATED REPRESSION**
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY MOTIVATED ARBITRARY DETENTIONS

38



**ACTS OF STIGMATIZATION BY SOURCE WHEN PNB AND FAES OFFICERS CARRIED OUT ARRESTS - 2020**

Percentage of acts of stigmatization by source, three days prior to PNB or FAES carrying out an arbitrary detention

- 23,5% Others
- 23,5% Misión Verdad
- 26,5% Con El Mazo Dando
- 5,9% United Socialist Party of Venezuela
- 8,8% Aporrea
- 5,9% Ministry of Foreign Affairs' agents
- 5,9% La Iguana TV

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

Finally, in the first half of 2021 this pattern changed as the main perpetrators of stigmatization with the highest correlation between stigmatization and arbitrary detentions by the PNB and FAES were Zurda Konducta and Lechuguinos.

AMNESTY INTERNATIONAL



**ACTS OF STIGMATIZATION BY SOURCE WHEN PNB, FAES, MUNICIPAL POLICE AND CICPC CARRIED OUT ARRESTS - 2019 - JUNE 2021**

Percentage of acts of stigmatization by source, three days prior to PNB, FAES, Municipal police and CICPC carrying out an arbitrary detention

Zurda Konducta 24,3%

Lechuguinos 16,2%

Ministry of Foreign Affairs agents 5,4%

Venezolana de Televisión 5,4%

Comité Revolucionario Bolívar y Zamora 5,4%

La Hojilla 5,4%

Unknown 5,4%

Others 32,4%

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

Although it would be worthwhile to analyse the change in the pattern, it can be concluded that at least in most of the period analysed (24 months of the 30 studied), the repressive actions of the security forces were related to acts of stigmatization by Misión Verdad and Con el Mazo Dando. This conclusion does not exclude the work of other security forces and other media that replicate the stigmatization.





VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

40

## 3.5 RELATIONSHIP BETWEEN SOURCES OF STIGMATIZATION AND THE COURTS

After identifying which security forces acted in the different periods in a more coordinated manner with the acts of stigmatization, we went on to include the variable of which were the courts and under which jurisdiction they were most frequently processed after arbitrary detentions took place.

This analysis became particularly important with respect to the frequent use of military courts and special courts with jurisdiction over terrorism to prosecute people who have been considered opponents of the government of Nicolás Maduro, which is why they form a fundamental part of the policy of repression implemented in Venezuela.

### 3.5.1 RELATIONSHIP BETWEEN THE SOURCES OF STIGMATIZATION AND THE COURTS WITH SPECIAL JURISDICTION OVER 'TERRORISM'

When analysing the 2019 data, there is a 68% correlation between arbitrary detentions processed by courts with jurisdiction over 'terrorism' and acts of stigmatization.



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS UNDER SPECIAL JURISDICTION OVER "TERRORISM" - 2019**
Acts of stigmatizations vs. politically motivated arbitrary detentions under special jurisdiction over "terrorism"

(r = 0.68)

Source: **Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

On the other hand, almost half (47.1%) of the arbitrary detentions that were prosecuted by courts with special jurisdiction occurred within three days of an act of stigmatization by the Misión Verdad blog:



**ACTS OF STIGMATIZATION BY SOURCE, WHEN CASES WERE UNDER THE SPECIAL JURISDICTION OVER "TERRORISM" 2019**

Percentage of acts of stigmatization by source three days before the case was brought over courts with special jurisdiction on "terrorism"

- Misión Verdad 47,1%
- La Iguana Tv 17,6%
- Con El Mazo Dando 11,8%
- Lechuguinos 11,8%
- 1  5,9%
- 2  5,9%

1  Office of the presidency
2  Ministry of People's Power for Penitentiary Affairs

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

From the above, the organizations concluded that, at least for the 2019 period, in which courts with jurisdiction over terrorism were most frequently used to prosecute people arbitrarily detained for political reasons, they were closely related to and coordinated with the stigmatization published by Misión Verdad.

Although, unlike Con el Mazo Dando, Misión Verdad is a blog whose source of funding is unknown, several official portals belonging to the Venezuelan state repost its content, such as the MPPRE and the web portal of the state channel, VTV. Similarly, the former Minister of People's Power for Foreign Affairs himself was a columnist for this media outlet. Therefore, there is sufficient evidence to make it essential to investigate the role of this media outlet in the repression, which is particularly accentuated when the periods during which it carries out acts of stigmatization are reflected in arbitrary detentions and prosecution through the special jurisdiction against 'terrorism'.





**VENEZUELA: CALCULATED REPRESSION**
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY MOTIVATED ARBITRARY DETENTIONS

## 3.5.2 RELATIONSHIP BETWEEN THE SOURCES OF STIGMATIZATION AND COURTS WITH MILITARY JURISDICTION

When analysing the participation of courts with military jurisdiction between January 2019 and June 2021, the correlation between their actions with arbitrary detentions carried out by military security bodies (GNB, GAES, DGCIM and National Army) that occurred in the three days following the stigmatization rose to 94%, i.e. the amount and the increase and decrease in the actions of military courts in cases of arbitrary detentions coincided with the acts of stigmatization carried out.



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS UNDER MILITARY JURISDICTION**
Number of acts of stigmatizations vs. politically motivated arbitrary detentions of cases brought before military jurisdiction

(r = 0.94)

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

It is worth noting that the security forces that carried out these detentions are the following, where the DGCIM stands out predominantly.



**ARRESTS BY SECURITY FORCES UNDER MILITARY JURISDICTION -2019 - June 2021**

Number of arbitrary detentions under military jurisdiction in the days following an act of stigmatization

| Force | Count |
|---|---|
| **DGCIM** Directorate General of Military Counterintelligence | 56 |
| **National Army** | 10 |
| **GNB** (Bolivarian National Guard) | 10 |
| **GAES** (Special Actions Group) | 3 |

Source: **Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal

In addition, when analysing the sources of stigmatization related to the detentions by the military and those which were subjected to military jurisdiction, we found that the stigmatization that occurred three days before the detentions was more frequent in Con el Mazo Dando.





**ACTS OF STIGMATIZATION BY SOURCE, THREE DAYS PRIOR TO ARRESTS BROUGHT BEFORE MILITARY COURTS – 2019 – JUNE 2021**

Percentage of acts of stigmatization by source in arbitrary detentions brought before military jurisdiction

Telesur 6,3%

Organizations linked to the government 6,3%

Lechuguinos 6,3%

La Tabla 6,3%

La Iguana TV 6,3%

Con El Mazo Dando 43,8%

Misión Verdad 25,0%

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022

In conclusion, the military courts and the stigmatization from Con El Mazo Dando were closely linked to the arbitrary detentions made by military security forces during the entire period analysed.

This hypothesis becomes even more interesting when applying the 2019 filter. As we have seen above, 2019 was characterized by the use of special courts with jurisdiction over 'terrorism' and its degree of correlation with the stigmatization from Misión Verdad was quite high. However, in the 2019 cases where the arbitrary detention was prosecuted by a military court, the correlation between this prosecution and the acts of stigmatization rises to 65% and Con El Mazo Dando takes first place as a source of stigmatization.

Taking into account that Con el Mazo Dando is a programme produced and televised by the state channel, it is important to conclude that the concurrence of this pattern of repression makes it evident that there is a coordination between the stigmatization issued by this television medium and the actions of the military forces in carrying out arbitrary detentions that are then brought before military courts. This demonstrates a pattern that includes three phases: stigmatization, arbitrary detention and the validation and criminalization of the person in the military courts, which, in most cases, can be said to violate the guarantees of due process and the natural judge, since these are people prosecuted by the military courts for crimes or military criminal offences that are not applicable to them, either because they are civilians or because they are retired from the Armed Forces.

# 3.6 OTHER PATTERNS OF CORRELATION IN SPECIFIC PERIODS

In analyzing the overall correlation data, the organizations detected certain peaks of anomalies in both variables, i.e., anomaly peaks where both stigmatizations and arrests increased or decreased sharply. When analyzing these peaks of irregularities, it was observed that the correlation increased in these periods. The organizations then proceeded to identify whether there were any socio-political milestones that could be associated with these anomalies, with the following results.



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS FROM JANUARY TO FEBRUARY 2019**

Acts of stigmatization vs. politically motivated arbitrary detentions in the period between January and February 2019, by calendar week

(r = 0.56)

Units

— Arrests
— Acts of stigmatization

Week

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions.
Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)





**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS FROM DECEMBER 2019 TO MARCH 2020**

Number of acts of stigmatization vs. politically motivated arbitrary detentions in the period between December 2019 and March 2020, by calendar week

**(r = 0.51)**

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS FROM APRIL TO MAY 2020**

Number of acts of stigmatization vs. politically motivated arbitrary detentions in the period between April and May 2020, by calendar week

**(r = 0.88)**

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

The organizations have found that the events where human rights violations were exposed and reported at national and international levels usually provoke periods of repression with higher correlation in general. Thus, the announcements by the OHCHR, the Fact-Finding Mission and the International Criminal Court have had an impact on the greater correlation between stigmatization and arbitrary detentions for political reasons, showing repressive peaks.

This trend has been reported by the Secretary General of the United Nations himself, in his report Cooperation with the United Nations, its representatives and mechanisms in the field of human rights, in which he stated that:

"Multiple UN actors addressed allegations of intimidation and reprisals against human rights defenders and civil society that cooperated or were perceived as cooperating with the UN, in particular those implementing UN humanitarian programmes. They noted NGOs were labelled as "criminals", "mercenaries", "thieves", "terrorists", and "enemies of the State", including in UN forums and on Government-affiliated online portals."[47]

In this same document, concerns over how complaints and cooperation with the United Nations affect the guarantees and protection of the rights of detainees are noted.[48]



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS FROM AUGUST TO OCTOBER 2020**
Acts of stigmatization vs. politically motivated arbitrary detentions in the period between August and October 2020, by calendar week

**(r = 0.98)**

Source: Venezuela: Calculated Repression: Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)

---

[47] UN Secretary-General, Cooperation with the United Nations, its representatives and mechanisms in the field of human rights, UN document number: A/HRC/48/28, 17 September 2021, para. 122.

[48] UN Secretary-General, Cooperation with the United Nations, its representatives and mechanisms in the field of human rights, UN document number: A/HRC/48/28, 17 September 2021, para. 123.



48

VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS FROM JANUARY TO MARCH 2021**

Acts of stigmatization vs. politically motivated arbitrary detentions in the period between January and March 2021, by calendar week

**Source: Venezuela: Calculated Repression:** Correlation between stigmatization and politically motivated arbitrary detentions. Amnesty International Centro para los Defensores y la Justicia, Foro Penal (2022)



**CORRELATION BETWEEN ACTS OF STIGMATIZATION AND ARRESTS IN MAY 2021**

Acts of stigmatization vs. politically motivated arbitrary detentions in May 2021, by calendar week

Source: Venezuela: Calculated Repression: Correlation between stigmatization and politically motivated arbitrary detentions (2022)

## 3.7 CONCLUSIONS ON PATTERNS OF CORRELATION BETWEEN STIGMATIZATION AND ARBITRARY DETENTION IN VENEZUELA

Each period analysed has shown different trends and patterns of repression. This means that in most cases it cannot be concluded that the policy of repression in Venezuela is static and is constantly initiated and executed by the same actors.

While in 2019 the existence of massive demonstrations marked a year of repression by producing, in turn, arbitrary detentions in large numbers carried out by the GNB, the role of the national intelligence security forces had a close relationship with the arbitrary detentions that happened following stigmatization in media linked to the government of Nicolás Maduro.

By 2020, the security forces whose detentions had the highest correlation with the acts of stigmatization were the PNB and the FAES. It is difficult to speculate on the reasons why this correlation was higher in that year than that of the intelligence agencies, but this shows -once again- that arbitrary detentions are not isolated events and that their political content is directed and guided by a state policy.

The same happened in the first half of 2021, in which there was an almost complete correlation between stigmatization and arbitrary detentions carried out by the FAES, the municipal police, and the CICPC, which suggests that there was a decentralization of repression that was possibly also related to the continued effects of the Covid-19 pandemic.

The data analysis also allowed us to observe the differentiated correlation between different perpetrators of stigmatization and the security forces that carried out the arbitrary detentions, in addition to the correlation between the courts in charge of the cases, revealing that in 2019 the arbitrary detentions that were processed by special courts with jurisdiction over 'terrorism' had a 68% degree of correlation to stigmatization, and that the greatest perpetrator of stigmatization was Misión Verdad.

Also, for 2020, the degree of correlation between the detentions that were processed by military courts and that had been carried out by military officials and the acts of stigmatization is almost complete (94%), with the greatest source of stigmatization being the television programme Con el Mazo Dando.

These trends that emerge from the analysis have consequences in the identification of the patterns in which human rights violations and crimes under international law are committed in Venezuela. Therefore, the organizations will now analyse the impact of these findings on people's rights in Venezuela.





VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

50

## 3.8 PATTERNS OF STIGMATIZATION AS A SIGN OF POLITICAL PERSECUTION

Persecution is a crime against humanity set forth in Article 7(1)(h) of the Rome Statute of the International Criminal Court describing it as "Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender as defined in paragraph 3, or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court."[49] For its part, Article 7(2)(g) of the Statute defines the crime as "the intentional and severe deprivation of fundamental rights contrary to international law by reason of the identity of the group or collectivity".

For an act to be considered a crime against humanity, it is necessary not only for it to be framed within the specific elements of the criminal offence (both objective and subjective), but also that the contextual elements contained in the Rome Statute are included, which in this case are that the acts occur or are "committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack".[50]

Within the Elements of the Crime of Persecution are:

> That the perpetrator has seriously deprived one or more persons of their fundamental rights in contravention of international law;

> That the perpetrator has directed their act against that person or persons by reason of the identity of a group or collectivity or against the group or collectivity as such;

> The act was directed against such persons on political, racial, national, ethnic, cultural, religious or gender grounds, as defined in article 7, paragraph 3, of the Statute, or on other grounds universally recognized as unacceptable under international law;[51]

> Contextual elements (part of a widespread or systematic attack against a civilian population).

While the contextual nature of these events has been widely documented by human rights authorities, it is important to analyse the specific elements of the type of persecution in light of the evidence presented in this report.

[49] Rome Statute of the International Criminal Court. Articles 7(1)(h) and 7(2)(g). On the accessory nature of the crime of persecution, see: Amnesty International, The problematic formulation of persecution under the Draft Convention on crimes against humanity, 30 October 2018, IOR 40/9248/2018.

[50] Rome Statute of the International Criminal Court. Article 7 (1)

[51] Official Records of the Review Conference of the Rome Statute of the International Criminal Court, Kampala, 31 May–11 June 2010 (International Criminal Court publication, RC/11. https://asp.icc-cpi.int/iccdocs/asp_docs/ASP9/OR/RC-11-ENG.pdf



## 3.9 DEPRIVING A SPECIFIC GROUP OF PEOPLE OF THEIR FUNDAMENTAL RIGHTS

This report has analysed the trends and correlation between politically motivated arbitrary detentions and stigmatization carried out by media outlets linked to the government of Nicolás Maduro, both public and private in Venezuela.

In addition, the nature of arbitrary detentions in Venezuela and the context in which they occur also seriously affect the right to fair trial guarantees and due process.

The jurisprudence of the Special Tribunal for the former Yugoslavia established that:
"Thus far, the Trial Chambers of the ICTY have found that the following acts may constitute persecution when committed with the requisite discriminatory intent: imprisonment, unlawful detention of civilians or infringement upon individual freedom, murder, deportation or forcible transfer, 'seizure, collection, segregation and forced transfer of civilians to camps' (…). "[52]

Therefore, arbitrary deprivation of liberty and the manner in which the rights to fair trial guarantees and due process are denied could constitute acts of persecution.

In Venezuela, the arbitrary detentions that have occurred from 2014 onwards have a notorious aspect that has been documented in multiple reports. As mentioned above, there are objective criteria that have shown that most cases of arbitrary detentions in the country are highly politically motivated.

The trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents of the government of Nicolás Maduro.

The people belonging to this group are all different, but it is possible to identify particular groups that have been especially targeted by the policy of repression, namely students, political activists, and human rights defenders.



[52] International Tribunal for the former Yugoslavia, Prosecutor v. Kvočka et al., "Judgment", IT-98-30/1-T, 2 November 2001, para. 186.



## 3.10 POLITICALLY MOTIVATED DISCRIMINATION

The element of discrimination is essential in order to define an event as an act of persecution. The document on the Elements of Crimes of the Rome Statute of the International Criminal Court states precisely that political motivation may be among those forms of discrimination behind the persecution. The jurisprudence of other international criminal courts has established that discrimination is one of the main characteristics that distinguishes the crime of persecution from other crimes against humanity, and therefore, if a crime is committed in a discriminatory manner, it could qualify as persecution, understanding that discriminatory factors may occur on political, racial, religious or other grounds. [53]

In this report, the organizations have demonstrated how there is a policy of repression that stigmatizes people who may be perceived as opponents to the government of Nicolás Maduro and how this is accompanied by a policy of arbitrary detentions to silence dissidence.

Acts of stigmatization, which in themselves are defined as discriminatory acts and attacks that tend to entrench confrontational and 'them versus us' statements and narratives, are used as another tool for repression. Undoubtedly, stigmatization and its reflection in politically motivated arbitrary detentions point to the discriminatory factors that affect human rights in Venezuela and crimes under international law.

The public nature of stigmatization allows us to see the motivation of political discrimination behind these facts more clearly, but the way in which they are related to arbitrary detentions and the criminalization of political activists can be taken as an indicator of political persecution through arbitrary detentions and stigmatization in Venezuela.

The arbitrary nature of the detentions has been widely documented, but the findings of this report indicate with greater certainty the nature of the political discrimination behind them. The correlation between arbitrary detentions and stigmatization -which have an obvious political character- are an indicator that the policy of repression has a clear objective of political discrimination that severely affects the rights of people in Venezuela who think differently than the government of Nicolás Maduro.

In addition, the periods for which the analysis is carried out and even the courts in charge of the cases of arbitrary detentions are a strong indicator that the relationship between detentions and stigmatization could constitute acts of persecution as a crime against humanity.

---

[53] International Tribunal for the former Yugoslavia, Prosecutor v. Kvočka et al., "Judgment", IT-98-30/1-T, 2 November 2001, para. 194.



# 4.CONCLUSIONS AND RECOMMENDATIONS

The Center for Defenders and Justice, Foro Penal and Amnesty International carried out a data analysis of acts of repression in Venezuela in which the different patterns showing how politically motivated arbitrary detentions are interconnected with stigmatizing attacks against human rights defenders.

This analysis led to different findings that form a series of signs and evidence regarding the functioning, sources and coordination between the different actors that form part of the repressive apparatus in the country.

These findings show how stigmatization and the use of discriminatory narratives against human rights defenders, and even against judicial authorities involved in the cases, have been part of the repressive policy, which on several occasions have been interrelated with politically motivated arbitrary detentions.

It was possible to identify how different trends correspond to other factors that are beyond the scope of this research, but that should be followed as lines of investigation in order to understand the individual and institutional responsibility behind the repression in Venezuela.

In 2019, a year marked by massive nationwide citizen protests, stigmatization in pro-government media had a particularly high correlation with the special courts on terrorism, while in 2020 this occurred with the military courts.

Similarly, the sources of stigmatization that played a more predominant role in the repression were Misión Verdad, Con el Mazo Dando, Lechuguinos and Zurda Konducta. Without minimizing the role of other very active sources of stigmatization, the analysis of the data showed that for several years these sources have accompanied in an almost synchronized manner the increase or decrease in arbitrary detentions.

The evidence on the security forces that acted in the different periods analysed and the very high correlation between the detentions carried out by SEBIN and DGCIM and the acts of stigmatization in 2019, and how then the DGCIM both in 2020 and 2021 became one of the security forces that acted more often in the three days following the stigmatization of human rights defenders, cannot be overlooked.

In light of all this numerical evidence, the organizations consider that the dependent relationship between the discriminatory narrative (stigmatization) and the human rights violations (arbitrary detentions and criminalization) could indicate the existence of the crime against humanity of persecution, for which the Venezuelan authorities, including at the highest level, should be investigated to determine their criminal responsibility in these acts.[54]

Therefore, the organizations recommend:

▸ To the Office of the Prosecutor of the ICC

● To include in its investigation into crimes against humanity in Venezuela the facts evidenced in this report, with a view to determining key actors, specific cases and possible participants in the crimes against humanity of arbitrary deprivation of liberty and politically motivated persecution.

[54] For the analysis of the lack of access to domestic resources to obtain justice, truth and reparation for these acts, see: Amnesty International, Hunger for Justice: Crimes against humanity in Venezuela, AMR 53/0222/2019, 13 May 2019, UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela, UN Document Number A/HRC/48/69, 16 September 2021.



VENEZUELA: CALCULATED REPRESSION
CORRELATION BETWEEN STIGMATIZATION AND POLITICALLY
MOTIVATED ARBITRARY DETENTIONS

**To the international community**

- To continue to support the International Independent Fact-Finding Mission in its mandate to contribute to accountability for human rights violations in Venezuela since 2014;

- To sustain and strengthen support for the International Criminal Court, both financially and politically, contributing to its work against impunity for crimes against humanity;

**To the international community to urge Maduro's government to:**

- Refrain from continuing to apply various repressive tactics, and that the spaces of stigmatization, such as television programmes, web portals, in particular those named in this report and that are public in nature and publicly funded, be shut down;

- Put an end to the practice of politically motivated arbitrary detentions;

- Refrain from using special courts or courts with special competencies (in 'terrorism' and military jurisdiction) to criminalize people who oppose their policies;

- Extend and accept the in loco visits of the various special procedures of that Council aimed at improving the human rights situation in the country, including the possibility for the Fact-Finding Mission to visit Venezuela; In particular extending invitations to the Special Rapporteur on Human Rights Defenders, the Working Group on Arbitrary Detention, the United Nations Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, the United Nations Special Rapporteur on the Promotion and Protection of the Right to Freedom of Opinion and Expression and the Special Rapporteur on the Right to Freedom of Assembly and Association, among others.

Index no.: AMR 53/5133/2022
Original language: Spanish
**amnesty.org**

**AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS. WHEN INJUSTICE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.**

amnesty.org

*Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*

Political repression and escalating economic difficulties on the island, along with a new visa-free travel policy in Nicaragua, are some of the factors driving the change.

Yaquemile, a migrant from Cuba, wading through the Rio Grande from Mexico into Texas in April. Credit...Adrees Latif/Reuters





By **Maria Abi-Habib** and **Eileen Sullivan**
Published May 3, 2022 Updated May 4, 2022
Leer en español
**Sign up for the Russia-Ukraine War Briefing.** Every evening, we'll send you a summary of the day's biggest news. Get it sent to your inbox.

Cuban migrants are arriving to the United States in the highest numbers seen in four decades, with about 150,000 expected to arrive this year, according to senior American officials, as the economic and political situation on the island grows more desperate.

For decades, Cubans trying to flee repression, food insecurity and economic devastation boarded rickety boats, risking their lives to get to American shores.

Now they are coming in record numbers, but this time on foot, their flight aided by Nicaragua, which dropped visa requirements late last year for Cubans, giving them a toehold in Central America to journey overland through Mexico to the United States. American officials have accused Nicaragua's authoritarian president, Daniel Ortega, of enacting the policy to pressure the United States to drop sanctions on his country.

The surge in Cubans trying to cross the southern border represents just a portion of migrants who have at times overwhelmed border officials as undocumented crossings continue to rise under the Biden administration. March set a record for the number of people caught crossing illegally in a single month in two decades: 221,303.

Since October — the start of the federal government's 2022 fiscal year — nearly 79,000 Cubans have arrived at the United States' southern border, more than in the previous two years combined, according to Customs and Border Protection figures. In March, more than 32,000 Cubans arrived at the border, most of them flying first to Nicaragua then traveling overland to the United States, according to a senior State Department official, who spoke on the condition of anonymity because of ongoing dialogue with the Cuban government.

The official said visa-free travel to Nicaragua was encouraging migrants to spend their life savings to pay smugglers for the journey, and added that some were falling prey to trafficking by criminal groups.
Image



A swimming instructor in Estelí, Nicaragua, teaches would-be migrants how to swim, in anticipation of crossing the Rio Grande, the border between Mexico and the United States.Credit...Maynor Valenzuela/Reuters

The numbers are the highest since the Mariel boatlift in 1980, when 125,000 Cubans migrated to the United States after the island nation opened its seaports to American vessels to evacuate anyone who wanted to leave.

Public discontent in Cuba has been simmering since mass protests erupted last summer across the country over escalating inflation, chronic food and drug shortages and ongoing power outages. During the Obama administration, the United States eased restrictions on travel and remittances to Cuba significantly, but they were resurrected under former President Donald J. Trump, dealing a harsh economic blow.

The demonstrations caught the Communist government by surprise and it has responded by imposing one of the biggest crackdowns in decades. More than 700 Cubans have been charged for taking part in protests, including some teenagers who received 30 years in prison.
The deteriorating political and economic conditions are feeding the growing exodus. Nicaragua's government dropped its Cuba visa requirement in November, opening a land route for migrants reluctant to embark on the dangerous sea journey to American shores. Since then the number of flights to Managua from Havana has soared.

"I think we are seeing governments try to weaponize migration because they know it causes political disruptions in receiving countries," said Andrew Selee, the president of the Migration Policy Institute, a research institute in Washington.

Mr. Selee and other analysts said Nicaragua was likely using Cuban migrants to press the United States to lift sanctions on Mr. Ortega and his inner circle. The move has been compared to Belarus dropping visa requirements for Iraqis last year to facilitate their entry into the European Union, in retaliation for sanctions the bloc had levied on Belarus for its disputed election.

"They're not fools," Mr. Selee said. "The government in Managua knew that this would force the U.S. to come to the bargaining table at some point." Still, it is unclear if the looser migration rules would yield any changes in U.S. policy.

Nicaragua's government did not respond to questions sent by The Times. Cuba's government did not respond to requests for comment.



Asylum seekers from Venezuela and Cuba being processed after crossing the border from Mexico in Yuma, Ariz., in February.Credit...Go Nakamura/Reuters

Many Cubans are desperate to leave, even if it means going into debt to go on a perilous journey. Cubans describe selling whatever they have — homes, clothing and furniture — and taking loans with steep interest rates to raise the thousands of dollars they need to get to the United States, even though the average salary on the island is about $46 a month.

Zenen Hernández, 35, was one of 414 Cubans who crossed the Rio Grande into the United States on April 5, out of a total of 1,488 undocumented migrants who crossed that section of the Texas border (about 245 miles) that day.

"Food and medicine are scarce," Mr. Hernández said, describing conditions in Cuba. "It's only poverty."

The Cuban government blames the United States' decades-long embargo of the nation for its economic woes.

The economy there was dismal before the pandemic hit, but Mr. Hernández scraped by, selling bread and chips. By the summer of 2020, the situation had become untenable. When Nicaragua opened its borders to Cubans, he decided it was time to go.

"I had to sell my house," he said.

The cost was steep: $16,000 for the flight to Nicaragua and the ensuing 1,800-mile trek to reach the United States — often on foot — through the jungles, mountains and rivers of Central America and Mexico. Along the way, migrants are routinely threatened and extorted by the police and preyed upon by criminal organizations that kidnap and beat them for ransom. When Mr. Hernández was asked to describe his trip, he choked up recalling the miserable journey.

"I don't have words," he said. "They rob you — the police, the smugglers. They rob you." Pent-up demand for legal crossings is another factor increasing migration. In 2017, the Trump administration slashed staffing at the United States Embassy in Cuba after a series of unexplained health problems that became known as "Havana syndrome" affected American personnel there.

The drawdown forced Cubans to apply for visas from the American embassy in Guyana, a trip too expensive for many. The move also prevented the United States from upholding its commitment to provide 20,000 immigrant visas to Cubans annually, part of a 1994 agreement between the countries to provide a legal pathway and discourage illegal migration.

This week, the United States Embassy in Havana will hold the first interviews for immigrant visa applicants since 2017, one of the senior American officials said.

Image



The Trump administration reduced staffing at the United States Embassy in Havana after personnel were affected by mysterious health incidents.Credit...Amanda Perobelli/Reuters

The first high-level talks between Cuba and the United States since 2018 took place in late April, focused on restoring regular migration channels. The Cuban government asked the United States to uphold the agreement to issue 20,000 immigrant visas annually; the American government requested that Havana start accepting Cuban deportees who have arrived illegally.

The American official said the two sides would likely meet again in six months.

"If the talks are successful, they will get back to a formula that worked before, providing a real, feasible legal channel for Cubans to come to the U.S. in exchange for the deportation of those who don't use the legal channel," said Mr. Selee, of the Migration Policy Institute. "Migration is a rare point of cooperation between the countries that has really worked."

For decades, Cubans who migrated to the United States enjoyed preferential treatment. Those caught at sea were turned back but those who reached U.S. soil were allowed to stay, under a policy commonly referred to as "wet-foot, dry-foot." President Obama ended the policy in 2017. The bilateral talks came ahead of the Summit of the Americas in Los Angeles in June, where countries will try to agree on a regional framework for migration and shore up financial support for Latin American countries with large migrant populations. Colombia received $800 million last year in loans from multilateral lenders, including the World Bank, to support the 1.7 million Venezuelan migrants it hosts, the type of support the summit will look to extend throughout the region.

Although the Biden administration has maintained that only democratic governments will be invited to the summit, Cuba was invited to the previous two, in 2015 and 2018, and is hoping for an invitation this year.

But American officials said that was yet to be decided, sparking ire from the Cuban government. "The United States resorts once again to all kinds of resources and lies to assert the right won by Cuba and its people to be present at these Summits on an equal footing with the rest of the countries in the region," Cuba's foreign minister, Bruno Rodriguez, tweeted on April 25. This is "something shameful."

Bryan Avelar and Frances Robles contributed reporting.

# Venezuela Country Report 2022

‹ **Country Dashboard Venezuela**

↗ More about Venezuela in the BTI Atlas

| | |
|---|---|
| Politische Transformation | + |
| Wirtschaftliche Transformation | + |
| Governance-Index | + |

⊗  Share Graphic

⊟ **To previous reports**        ⬇ **Download Report (PDF)**        ⬀ **Share**

## Executive Summary

By the close of the review period, Venezuela continued to have two presidents and two legislatures. The de facto power-wielding President Nicolás Maduro and the National Assembly elected in an unfree and unfair process in December 2020 had been recognized by about 20 countries, while nominal interim President Juan Guaidó and the legitimate National Assembly elected in 2015 had been endorsed by about 60 countries as of January 2021.

A petrostate in decay, the country is characterized by the amassing of political and economic power in the hands of an autocratic ruling elite, unfettered corruption, patronage networks, weak institutional arrangements and the brutal repression of dissent. Gross mismanagement of fiscal, monetary, budgetary and foreign exchange policies, as well as extensive graft, has thrown the country into a complex humanitarian crisis. Under President Maduro's watch, the economy came to a grinding halt, with the GDP plummeting by 86% and inflation topping 65,000% (in 2018). The IMF forecasts further GDP contractions of -10% in 2021 and -5% in 2022.

The complex humanitarian crisis has left over 1 million children between three and 17 years of age out of school, and about 350,000 migrant children and youth at risk of lagging behind. Severe structural constraints such as extreme poverty, the lack of a skilled labor force and a decaying infrastructure restrict the regime's governance capacity. But these constraints did not exist when the regime came to power. They are the result of irresponsible macroeconomic management characterized by excessive state interventionism, arbitrary expropriations, and the destruction of the price system and market rules, all of which resulted in the strangulation of the private sector. The share of citizens living under conditions of extreme poverty surged to 79.3% in 2019, and the proportion of the workforce deemed skilled labor dropped to 42.3%, a consequence of the decaying education and training system, as well as the massive exodus of well-educated and skilled Venezuelans who have fled the country's crisis.

With oil production down to a trickle, other products such as gold took center stage in generating foreign exchange. The quasi-legitimization of irregular gold mining in collusion with criminal syndicates, along with the stealth sale of the gold produced for cash, helped the regime's leaders survive but also implied that they are involved with criminal gangs. The regime has been effective in clinging to power, while evidently insensible to the complex humanitarian crisis affecting the population. Even the recent steps to loosen the tight controls on the economy, such as de facto dollarization and the stealth reprivatization plan via the Anti-Blockade Law, are intended to serve as lifelines for the cash-strapped regime rather than a move toward liberalization.

The country's strategic partners, including Cuba, Russia, China, Iran and Turkey, have provided the regime a real lifeline. Thus, the government has been extremely effective in the use of international support for its overarching strategic goal, namely securing and tightening its own grip on power. The support is not an integral part of a long-term socioeconomic development strategy. Russia, China and Iran consider Venezuela a bridgehead for their own longer-term geopolitical interests in the region.

At first sight, COVID-19 infection and fatality rates appear to be fairly low in Venezuela. However, the data is probably incomplete, and even so, the pandemic is exacerbating the ongoing humanitarian crisis in Venezuela. According to a report by the Center for Strategic & International Studies (CSIS), the already dismal humanitarian situation has further worsened over the course of the pandemic. The government did not act transparently, but rather with a mixture of misinformation and conspiracy theories, and used the state of emergency as cover for repressive measures against the opposition and to punish dissenters.

**BTI 2022: Media kit**

**Methodology**

**FAQ**

# History and Characteristics

By 2020, seven years of uninterrupted economic recession that had knocked out two-thirds of the country's GDP and saw oil production and exports shrink to a trickle had turned Venezuela into a decaying petrostate. Petroleum had taken center stage in the economy during the 1920s, spurring social and economic modernization. Democratization started in the mid-1940s, but a first attempt failed. Democracy was reestablished only in 1958, after another authoritarian period, with the democratic order consolidating over the course of the 1960s. Successive democratically elected and alternating governments formed in the context of an elite pact model called "puntofijismo" (1958 – 1998) pursued the diversification of the economy through the creation of state-owned basic industries and import substitution industrialization in a protected market, a model that entailed huge subsidies that rewarded inefficiencies. The positive results of that period include the construction of modern infrastructure, the emergence of a middle class, increased upward mobility, and significantly improved education and health care systems.

A second opportunity to reduce the country's dependence on petroleum was lost with an IMF-assisted adjustment program launched as a shock policy implemented by technocrats in the Carlos Andrés Pérez administration (1989 – 1992), which in turn triggered spontaneous popular protests. Their violent repression provided a group of conspiring army officers led by Lt. Col. Hugo Chávez with a pretext for staging two coup attempts in 1992. The charges against Chávez were later dropped, allowing him to tour the country campaigning in the political arena. He was elected president in 1998. Riding on a tidal wave of popularity, he managed to get a new constitution approved that emphasizes four principles: plebiscitary democracy, the concentration of power, the re-centralization of the state, and the primacy of a state-regulated social market economy.

Chávez was re-elected in 2006 and 2012. His movement scored further victories at the polls in local, regional and national elections. However, he was unable to assume office in 2013 due to severe illness, from which he ultimately died in 2013. Maduro, his hand-picked successor, secured a razor-thin victory in the presidential elections of April 2013. In the legislative elections of 2015, the opposition secured a two-thirds majority in the National Assembly. Expectations that this would open the door to a gradual change were soon belied when the government urged a compliant Supreme Court to declare the National Assembly to be "in contempt" in order to bypass the legislative power.

Venezuela AR_000708

The opposition initiative for a recall referendum on Maduro in 2016 was backed by 7.5 million voters but was ultimately blocked by the electoral authority. Massive demonstrations in favor of the referendum were brutally repressed, leaving more than 150 dead. The national elections that followed from 2018 to 2020 failed to meet constitutional requirements and were neither free nor fair. President Maduro was re-elected in May 2018 but was denied recognition by the opposition and a large part of the international community. The election of a constituent assembly consisting entirely of members of the Maduro-headed United Socialist Party of Venezuela (PSUV) in July 2018 was unconstitutional and was also denied recognition by the opposition and abroad. In January 2019, the National Assembly elected 36-year-old Juan Guaidó as its president for the 2019 – 2020 session. In a surprise move, the Assembly also formally declared Maduro's de facto presidency to be "judicially ineffective," and in accordance with constitutional provisions, assumed the executive power with Guaidó as interim president. While Maduro has been backed by his allies Cuba, China, Russia, Turkey, Nicaragua and a few other countries, Guaidó has been recognized by about 60 countries, including most of Latin America, the United States and the European Union.

# Political Transformation

## Stateness

If, according to Max Weber, the (modern) state is a human community that (successfully) claims the monopoly of the legitimate use of physical force within a given territory, Venezuela has – intentionally or not – experienced a further refeudalization, given the fragmentation of the once comprehensive state monopoly on the use of force. The boundaries between state and non-state actors have become even more blurred, placing a great burden on future redemocratization. The governing elite has de facto delegated parts of the state monopoly on the use of force to guerrillas; mining, drug and human-trafficking mafias; and regime-friendly urban gangs, the so-called colectivos. This is true in large areas of the border states as well as in specific neighborhoods of the big cities. Illegal gold, coltan and diamond mining in the "mineral arc" south of the Orinoco (about 112,000 km2) are mainly controlled by the Colombian National Liberation Army (ELN) guerrilla in collusion with Venezuelan military mafias. Transparency Venezuela (2020) estimates that only between 10% and 30% of the gold extracted is processed by the State Gold Mining Company (Minerven) and delivered to the central bank as required by law. The rest leaves the country in trucks and planes, or carried by human "mules." Drug and human trafficking in Apure, Táchira and Zulia on the Colombian border, as well as in Sucre, close to Trinidad, are controlled by cartels in collusion with military-political mafias. The U.S. Drug Enforcement Administration (DEA, March 2020) has charged President Maduro and 14 current or former high officials with narco-terrorism and drug trafficking, among other criminal charges, offering millions of dollars as a reward for information leading to their capture.

Monopoly on the use of force

Venezuela AR_000709



'06                    '22

10

8

7

6

5

4

4

1

All social groups agree about citizenship and accept the nation-state as legitimate. Access to citizenship is simple and without discrimination. However, in 2020, the Electoral Council deprived indigenous peoples, about 3% of the population, of their full citizenship rights by replacing the constitutionally enshrined direct, secret and universal vote with a second-degree suffrage process based on the show of hands. Although there is no systematic denial of citizenship on the formal level, the fusion of nation and chavismo in some sort of civil religion amounts to the denial of citizenship for dissidents, at least on the rhetorical level.

State identity



The legal order and political institutions are entirely free from religious dogmas. The majority of the Venezuelan population (about 90%) is Catholic, but neither the widely trusted Catholic Church nor evangelicalism, which is present in poor urban areas, are interfering in the legal structure or political institutions of the state.

No interference of religious dogmas



'06 10 '22 10 10

_____  1

The state's administrative structure still covers the whole territory and is easily accessible but has deteriorated even more in the past two years in terms of effectiveness and regulatory quality and implementation. The system of social missions, formerly a parallel administrative structure in the framework of a "new institutionality," has all but disappeared: the official mission website has not been updated in recent years, and the National Statistics Institute lists only eight programs, down from over three dozen, with little information or data on performance. The Food Distribution Mission was replaced by Local Supply and Production Councils (CLAP) managed by the ruling party (PSUV).

In recent years, about one-fifth of the population has fled the country, causing what is currently the most severe refugee crisis in the world outside of Syria. The massive emigration of trained workers, as well as staff recruitment and promotion practices based on political loyalty rather than performance, have exacerbated the poor technical conduct and capacity of public services. Venezuela's civil service is perceived as the least professional and most politicized in Latin America (OECD 2020: Government at a Glance. Latin America and the Caribbean). The judiciary consists of a five-layer court system: the Supreme Tribunal, the superior courts of appeal, the district courts, the courts of first instance and the parish courts. The courts of special jurisdiction include military, tax and juvenile courts, along with justices of the peace. The justice system is not independent, impartial, transparent, accessible or effective

(UNHCHR Report 2020). Citizen confidence in the judiciary is at a low level (OECD 2020). The tax authority (SENIAT) meets professional standards. Tax system complexity is low (taxcomplexity.org); tax returns can be filed easily via the internet. Law enforcement is incumbent upon half a dozen national, 23 state and 114 municipal police departments, totaling about 115,000 agents. The public perceives the police forces as uniformed crooks rather than as law enforcers (trust in the police 18%, Latinobarómetro).

Mobile telephone and broadband services are provided by two private companies and the state-owned telecom firm CANTV, which also runs a landline network. Several cable TV operators provide internet access. The telecommunication networks cover the whole territory, but connectivity problems are frequent due to underinvestment, poor maintenance and power outages. The loss of the country's telecommunications satellite Venesat-1 in March 2020 degraded connectivity in rural areas. Intra- and interurban transportation is provided by a complex mix of private and public companies. Several big cities have subway networks. The system is in existential crisis due to controlled prices that do not cover costs, lack of spare parts or fuel shortages. The state-owned company BAER operates over a dozen international and domestic airports. Government-appointed military officers operate and control nine major ports and hydrocarbon terminals. Although over 90% of households are connected to water supply systems, only just over 20% have regular access to safe drinking water. Fully 95% use improved sanitation facilities (ENCOVI 2020).

Education is provided by a system of public and private institutions at the university, secondary, primary and pre-primary levels. There are over 90 universities and institutes of higher education and 28,000 primary and secondary schools. The country's general crisis has affected school attendance. Health care is also provided by public and private institutions covering the whole country. There are over 200 public hospitals and a dense network of primary health care stations (outpatient and diagnostic centers). Health care is in disarray due to the loss of human capital, supply shortages and the breakdown of medico-technical equipment.

According to a survey commissioned by the National Assembly on the impact of the COVID-19 pandemic in nine cities (October 2020), 40% of the households suffered daily and 28% weekly power outages, and 76% suffered weekly drinking-water supply disruptions (in some cases, there was not even water for washing hands). The reported disruptions cannot be attributed to the COVID-19 pandemic alone.

Basic administration

Venezuela AR_000713



## Political Participation

Elections are called frequently at the national, regional and local levels, but often not regularly under the terms of office and schedules established by the constitution and the laws. The country's score on the Perception of Electoral Integrity Index is a very low 27, with the lowest values for electoral laws (12), procedures (16), campaign finance (16) and electoral authorities (19) (Electoral Integrity Project 2019, data referring to the presidential elections 2018).

The conduct of the parliamentary election of December 2020 was irregular from the beginning to the end of the cycle, including aspects such as its schedule; regulation; the registration of voters, parties and candidates; observation; the voting itself; the vote count; the audit; and the proclamation of elected representatives. Most opposition parties decided to boycott the election, considering it not to be free and fair due to countless irregularities and lack of guarantees, but a handful of micro-parties agreed to participate and were allowed to run. Members of the leadership ranks of major opposition parties were suspended by the Supreme Tribunal and their parties with their symbols were handed over to groups of dissidents who had agreed to participate. The World Jurist Association declared the last parliamentary elections "null and void."

The time limits for registration were too tight; the number of representatives was increased from 167 to 277, disrespecting the proportionality principle enshrined in the constitution; the rules were updated by the Electoral Council just two months before the election, violating the constitutional term of at least six months; millions of Venezuelans who live abroad were excluded from voting; a process based on the show of hands was imposed on the indigenous peoples, stripping them of their right to a direct and secret vote as enshrined in the constitution; there was no independent observation or audit; the ruling party set up checkpoints ("Puntos Rojos") near the voting stations aimed at intimidating voters who depend on government handouts; and the government systematically used food assistance to pressure citizens to vote. Not all posts were filled according to the election outcome, as two micro-party leaders who failed to muster the necessary votes were let in through the back door by the Electoral Council, which added the votes cast for other micro-parties to their total.

As in other past elections, the official party and its allies had privileged access to the state-controlled media and public resources. Access to the over 14,000 polling stations was easy for rural and urban voters. Special biosecurity protocols for COVID-19 prevention were established and followed during the voting process, including obligatory face masks, social-distancing rules, and disinfectants for pencils and hands before touching the voting machines. The Electoral Council, the electoral management body which ranks as one of the five power branches set up in the constitution, was appointed by the Supreme Tribunal in violation of the procedure established in the fundamental law. The body is not impartial, as the majority of its members are known regime loyalists.

The election was condemned by a host of nations for its lack of freedom and fairness but recognized by resource-rich allies such as China, Iran, Russia and Turkey. Venezuela presents the lowest Global State of Democracies Indices in Latin America (0.25, lower than Cuba's 0.28).


Free and fair elections

Venezuela AR_000715



Given the absolute concentration of power in the presidency and top party and military elite, elected representatives lack the effective power to govern. This is true of the judicial, legislative, electoral and people's branches of government, and of the regional and local authorities. Before the parliamentary election, Maduro announced that he proposed to have a National Communal Parliament Law approved, creating a body based on the unelected commune structure. This would be dominated by the ruling party, and would hence be a welcome instrument for keeping the National Assembly in check, even though the ruling party holds an overwhelming majority of 90% of the seats there.

Effective power to govern





The rights of association and assembly are constitutionally guaranteed but are not protected in practice. Practical restrictions on assembly and association include the criminalization of protest and arbitrary detentions of party leaders, and even of members of parliament in violation of their immunity from prosecution. The Supreme Court's June 2020 rulings ordering the takeover of major opposition parties by regime loyalists amounted to a direct attack on the freedom to form political groups.

The United Nations Independent International Fact-Finding Mission on Venezuela (Geneva, September 2020) documented 87 human rights violations against protesters, 36 instances in which protesters had been killed and instances of torture in detention. Protesters have often been charged with crimes based on "evidence" fabricated by security forces. The report concluded that the violations amount to crimes against humanity, and that Maduro and two of his ministers were aware of the crimes: "They gave orders, coordinated activities and supplied resources in furtherance of the plans and policies under which the crimes were committed." Referring to attacks on civil society, the UNHR experts said: "Venezuela must stop trying to control civil society organizations and stop publicly stigmatizing their leaders and criminalizing the work of civil society and human rights defenders."

Venezuela AR_000717

The regime did not waste time in seizing the opportunity presented by the COVID-19 pandemic to invoke emergency powers, tightening its control and seeking to legitimize the already habitually brutal repression of social protests against failing services and supply shortages. In doing so, it argued that public safety concerns were at stake. Protests by health care workers against their inadequate working conditions were brutally repressed, and more than a dozen were detained for publicly criticizing the situation. People who tested positive for the coronavirus using rapid tests were forcefully quarantined in makeshift quarters without minimum facilities; most never received a confirmed test result. Venezuelan migrants who had lost their jobs in Colombia due to the pandemic and who returned to their country were corralled in temporary camps and characterized by official spokespersons as "bioterrorists" who were spreading the disease to the fatherland. As of January 2021, the system of rotating strict and flexible quarantine measures was still in place. Seven days of strict quarantine with most businesses closed were followed by seven days of flexible quarantine, during which most businesses were allowed to open.

Association / assembly rights



The regime has succeeded in reducing the number of independent media outlets to almost zero. There are no independent print media or TV channels, and just a few independent radio stations survive. The regime monitors broadcast and social media, and threatens or persecutes critical journalists and users. The National Telecommunications Commission (CONATEL) controls the internet, restricting or disrupting access to websites or social media providers. In 2019, the Instituto Prensa y Sociedad Venezuela (IPYS Venezuela) recorded 1,032 incidences in which individual expression and information-access rights – both of journalists and ordinary citizens – had been violated, mostly by state actors. This number exceeded even that recorded at the height of the protests in 2017 (Humanists International).

Human Rights Watch (HRW) found that authorities have harassed, detained, and prosecuted political opponents, including several lawmakers, journalists who have published reports critical of the government, and human rights lawyers who provide legal support to demonstrators protesting the lack of access to water, gasoline and medicines. Security forces have confiscated cellphones and laptops from journalists and forced them to erase photos or videos. According to the high commissioner for human rights, in Venezuela "journalists and human rights defenders critical of the government continue to face intimidation and public defamation," and there are clear "restrictions on the freedom of expression," including the "application of legislation against targeted groups, attacks against human rights defenders and the detention of journalists."

Censorship – both state-enforced and self-imposed – has become increasingly prevalent in Venezuela. Direct attacks on journalists, restrictive legislation, lawsuits against media outlets and the government's control of imports, including printing paper, have combined to stifle the climate and have led to growing self-censorship (Humanists International). The Reporters without Borders World Press Freedom Index ranks Venezuela at 147th place out of 180 countries.

Such measures have reportedly increased following the outbreak of the COVID-19 pandemic. Access to a web portal created by members of the opposition designed to spread information about the pandemic was blocked. Health care workers are warned not to reveal any information about cases or conditions in their individual workplaces, and not to criticize the government's handling of the pandemic. Attacks on journalists have continued as the authorities have sought to control coverage of the COVID-19 pandemic. IPYS Venezuela reports that at least 146 journalists attempting to cover the pandemic faced obstructions during first four months of the year (Humanists International).

Freedom of expression



## Rule of Law

The constitution of 1999 establishes five branches of government: in addition to the traditional structure of legislative, executive and judicial powers, there is an electoral and a people's power. However, their independence is only on paper. The principle of checks and balances is rejected by the regime as a bourgeois relic that must be overcome. The four other powers are executive appendages that rubber-stamp whatever actions are put before them to keep up appearances. A case in point: In October 2020, the Constituent National Assembly granted special rights to Maduro to confront the economic sanctions imposed by the United States without considering legal restrictions or following constitutional procedures.

In March 2020, Maduro declared a state of alarm, one of the types of states of exception established by the constitution. This was periodically extended. The Supreme Tribunal ruled that the extensions were constitutional without providing reasons for its ruling or publishing its ruling as required. The emergency measures taken under the state of alarm have included tax relief, and rules prevented employees from being dismissed, and tenants from being evicted. However, the need to control the pandemic was also used as a pretext justifying arbitrary government action and the violation of human rights. The Max

Planck Institute for Comparative Public Law and International Law characterizes the Venezuelan regulation as a state of emergency without the rule of law.

Separation of powers





The judiciary is institutionally differentiated but by no means independent. Judicial functions are provided by a five-layer court system that includes the Supreme Tribunal, the superior courts of appeal, district courts, courts of first instance and parish courts. The courts of special jurisdiction include military, tax and juvenile courts, along with justices of the peace. The justice system is not independent, impartial, transparent, accessible or effective (UNHCHR Report 2020). Citizens have a low level of confidence in the judiciary (OECD 2020).

The judges of the Supreme Tribunal are designated by the National Assembly and are supposed to serve for 12 years. Since 2004, government has used its parliamentary majority to fill the court with loyalists. When the opposition gained a parliamentary majority in 2015, the lame-duck Assembly appointed 13 new judges to substitute for sitting judges who had "surprisingly" asked for early retirement. In the following years, the court acted as a tool for outmaneuvering the legislature. Lower courts are vulnerable

to political manipulation, too – as of 2019, according to reports from the International Commission of Jurists, as many as 85% of all judges had provisional appointments and were subject to removal at will by the Supreme Tribunal's Judicial Committee.

The Supreme Tribunal's ruling declaring the legitimate National Assembly to be null and void, and its reversal when a dissident opposition group of representatives co-opted by the regime attempted to take control of the legislature (2017/2020), show beyond doubt that the judiciary functions as an appendage of the executive.

Independent judiciary





Impunity is the norm for office abuse, be it in the form of nepotism, corruption or human rights violations. The nontransparent administration characteristic of authoritarian regimes makes it impossible to provide evidence for this. The Comptroller General's homepage, reviewed in January 2021, reported 924 penalties for abuses of administrative office committed between 2000 and 2012. No cases have been reported since.

The 2020 UN report on human rights in Venezuela included reviews of thousands of extrajudicial killings by security forces and concluded that "President Maduro and the ministers of the interior and defense were aware of the crimes," and that "Venezuela's judiciary failed to serve as a check on other state actors." The report urges accountability for crimes against humanity and demands an end to the impunity.

Prosecution of office abuse





Formally, that is, constitutionally, civil rights are guaranteed. Art. 21 of the constitution explicitly states that "no discrimination based on race, sex, creed or social standing shall be permitted, nor, in general, any discrimination with the intent or effect of nullifying or encroaching upon the recognition, enjoyment or exercise, on equal terms, of the rights and liberties of every individual."

Some basic rights such as the free exercise of religion are, if not protected, then at least not actively violated by the state. But given a compromised judiciary, the absence of the rule of law, the politically motivated detention and torture including deaths in prison as a consequence of torture and the denial of medical assistance, the systematic violation of human rights, and countless extrajudicial killings (UNHCHR), there are no mechanisms and institutions to protect residents against violations of their

rights. The country is still one of the most violent in Latin America, with a homicide rate of 45.6 per 100,000 residents in 2020, and de facto near-total impunity. While the rate has decreased by about 30% compared to 2019, likely due to COVID-19 containment measures, the Venezuelan Violence Observatory (Observatorio Venezolano de Violencia) reports that a growing share of killings is being carried out by security forces. The UNHCHR report recommends: "Other jurisdictions under their national laws, as well as the International Criminal Court, should also consider legal actions against individuals responsible for violations and crimes the mission identified."

Civil rights



## Stability of Institutions

Democratic institutions legitimized according to the existing constitution no longer exist.

In principle, the constitution provides a solid basis for democratic rule, which may be reestablished after a regime change. Thus, although the spirit and the letter of the constitution are at present absolutely

disrespected, the shell of democratic institutions is still in place, and may be put to genuinely democratic use at some point.

Performance of democratic institutions





Democratic institutions legitimized by origin have ceased to exist. Their illegitimate substitutes are used as a façade, at best. Rules are violated – for example, when the Supreme Court designated the members of the electoral authority – without even a pretense of constitutionality. Nevertheless, the oppositional National Assembly is still working informally and advocates for real democratic change. There are at least some opposition-controlled governorships left, and the idea of popular sovereignty is uncontested. The regime has used the COVID-19 pandemic as a pretext for tightening social control and intensifying the repression of dissent.

Commitment to democratic institutions





## Political and Social Integration

Under Venezuela's current party system, the ruling United Socialist Party of Venezuela (PSUV), a disciplined and well-organized cadre party, has hegemonized the political spectrum, even though its popular support does not exceed 25%. The highly fragmented opposition, ranging from mere regime appendages to groups favoring foreign military intervention, is supported by about one-third of the population, and independents make up more than 40% of the registered voters.

Party allegiance is defined mostly by proximity to the regime. Those benefiting from corruption and state capture join the PSUV, while those aiming at regime change lean toward the opposition, and anyone else is stuck in the middle. It should be noted, however, that there is a core of convinced "chavistas" who still support the regime for ideological reasons (10% to 15% of the electorate, at a rough guess) and who still adhere to the personalist myth established by Hugo Chávez. Considering this ideological element, the party system may also be described as polarized between chavistas and anti-chavistas, but this ideological divide only applies to a minority of the electorate. With regard to clientelism, it would be more adequate to speak of the extortion of voters in need of food assistance. The abuse of government aid for electoral purposes does not establish a durable clientelistic linkage.

Party allegiance is better explained by attitudes toward democracy and a market economy than by socioeconomic variables: PSUV supporters show significantly stronger delegative-authoritarian and statist-patronage tendencies than do opposition supporters. The participation of small opposition groups and their electorate in the (illegitimate) National Assembly elections, plus the uncommitted, creates a gray zone in the otherwise highly polarized system.

Party system





Interest groups such as unions; employer and professional associations; and social, student and environmental movements still exist, often polarized into regime and opposition camps, but they lack the clout to mediate between society and the political system. Several high-profile NGOs monitor public policies and the deteriorating living conditions of the people, keeping the public informed in cases where official information is absent, opaque or false. Their reports and records describe the reality in contrast to the post-truth-framed official propaganda.

Associational life in general is weak and fragmented with the unions in particular expressing these characteristics. In 2018, the illegitimate Constituent National Assembly passed a law authorizing the

creation of so-called Productive Workers' Councils (Consejos Productivos de Trabajadores), which are a top-down structure controlled by the Ministry of Labor, combining the function of unions with the control of production and distribution. They are directly connected to the militia, as one of their members must belong to the militia. Thus, what remains of the independent union movement in Venezuela is on the verge of extinction. The umbrella organization SINERGIA facilitates cooperation between different civil society groups. The paramedics' and doctors' organizations have been particularly vocal in denouncing the collapse of the health system during various periods of the COVID-19 pandemic.

Interest groups



Despite living in an authoritarian environment, Venezuelans express the highest level of support for democracy in Latin America; this share, at 77%, is significantly higher than among the citizens of proven democracies like Costa Rica and Uruguay, which follow in second and third place (Latinobarómetro, latest published data 2018). The public's attitude toward democracy as the form of government preferable to any other bodes well for the prospect of a peaceful regime change.

Venezuela AR_000728

According to the 2018 Latinobarómetro survey, only 12% of Venezuelans were satisfied with their democracy. Institutions are not trusted, except the Catholic Church (74%). The police (12%), political parties (14%), the government (17%), the judiciary and the electoral authority (18%), the armed forces (19%) and the National Assembly (20%) are only trusted by small minorities. Finally, 86% are convinced that the country is ruled for the benefit of powerful groups. Only 12% think the country is ruled for the benefit of the people.

Approval of democracy

'06                                                    '22
────────────────────────────                    10

──────────────────────────────              1
n/a

The social capital dimension of the 2020 Legatum Prosperity Index showed a further sharp drop for Venezuela, with the country falling 14 positions to 143rd place out of 167 countries. The latest Latinobarómetro survey (2018) ranks Venezuela at the bottom of the table with 8% of respondents who agree with the sentence "you can trust most people," in a region that is characterized as a whole by low interpersonal trust indicators. No data is available on the impact of the pandemic on social capital. There is no information about social initiatives or solidarity actions in Venezuela. If any such initiatives exist, they are likely directed toward Venezuelan migrants in the neighboring countries.

Social capital





## Economic Transformation

## Socioeconomic Development

Venezuela's ongoing crisis is multidimensional. The country is mired in a social, economic and humanitarian disaster of historic proportions. With oil production down to a trickle, the economy ruined and the physical infrastructure in tatters, GDP per capita has plummeted to a bare one-seventh of its peak value before the "revolution." This has left the country as one of Latin America's three poorest countries, above only Nicaragua and Haiti. By the end of 2020, the recession had continued for 28 trimesters and the hyperinflation for 38 months. From a Human Development Index score of 0.743 (92nd place) in 2017, the country declined steeply to a score of 0.711 (113th place) in 2019; the overall loss in the HDI score due to inequality is 17.8%.

Official information on socioeconomic development is often unavailable and out of date. The few bits and pieces that are published are unreliable. The most reliable and up-to-date source of data has been the

Survey on Living Conditions (Encovi) conducted since 2014 by three universities; the 2019 – 2020 sample, which is representative at the municipal level, includes roughly 10,000 households. The poverty rate has surged to 96% (41% chronic, 54% recent), and inequality has escalated to unprecedented levels, reflected in a Gini coefficient of 0.51. Over 70% of the heads of poor households are women. The country's score on the Gender Inequality Index remained almost unchanged throughout the decade (2019: 0.479) and is now the second-worst in the region, ahead only of Haiti. Urban slums and most rural communities are at a clear disadvantage when it comes to economic opportunities. About 44% of the population 15 or more years of age is economically inactive, the highest such proportion in Latin America. A total of 46% of the workforce hold regular jobs in the public (24%) and private (22%) sectors, while 45% works in the informal sector. The Legatum Prosperity Index ranked Venezuela at 150th place out of 167 countries, down from 31st when first measured in 2007.

A total of 43% of the households reported diminished incomes or loss of work due to the COVID-19 pandemic restrictions; the impact was significantly stronger in the two highest income quintiles. In comparing October 2019 with February 2020, the share of households that received transfers from the state rose from 23% to 52% in March/April 2020. On average, the value of the transfers received amounted to $5.

Socioeconomic barriers



## Market and Competition

The market for goods and services is controlled by the government through price controls, the regulation of profit margins, foreign exchange controls, arbitrary expropriations and confiscations, import restrictions, and rationing of inputs (fuels, gas and water). The Superintendency for the Defense of Socioeconomic Rights (SUNDDE) enforces the Fair Price Law, often imposing arbitrary sanctions. State-owned companies and communal businesses get preferential treatment including access to foreign exchange.

In October 2020, the outgoing unconstitutional Constituent Assembly approved an Anti-Blockade Law that allows the executive to circumvent constitutional provisions requiring parliamentary approval of international contracts and deals involving the country's resources, giving it unchecked control of state-owned companies. The law also protects international investors against international sanctions. Agreements and contracts are made confidential, and the executive is free to act without public bidding processes or scrutiny. A further step in the authoritarian direction signals that the regime elite may have learned that tightening state controls is counterproductive, but do not think that their base will understand steps toward even limited liberalization and privatizations.

The World Bank's Ease of Doing Business report ranks Venezuela at 188th place out of 190 countries, and at 190th place in the category of starting a business (20 procedures, 230 days and a cost of 211.8% of per capita GNI). In the Heritage Foundation's Index of Economic Freedom, Venezuela still ranks 179th out of 180 countries, just above North Korea. Regarding informality, the most recent Encovi study puts the share of the informal sector at 45% of total employment, which would mean a reduction relative to the Economic Commission for Latin America and the Caribbean (ECLAC) numbers from 2013 (49.4%). However, Encovi also states that 44% of the employable population is economically inactive.

Market organization



There is no recognizable competition policy. Procompetencia, the agency responsible for protecting competition, has disappeared from the public eye. The link to its webpage was broken as of the time of writing; its latest tweet dated from April 22, 2015. The Antitrust Superintendency enforces the Antitrust Law, which excludes state-owned companies and the communal economic system. It has not published any decision since its creation in 2014, and has disappeared from the public eye; the link to its webpage (http://www.antimonopolio.gob.ve/) was also broken as of the time of writing; its latest tweet was dated March 10, 2020.

Currently, Venezuela is searching for ways to bring private companies into the oil sector to raise production, which is at historically low levels. Generally, however, the private sector plays a minor role in the economy – there are almost no private companies of noteworthy size left in the country. According to the business association Fedecamaras, the number of private companies has decreased by 60% and those still existing are operating at only 30% of their capacity. Thus, there is only minimal economic activity and no appreciable competition to be regulated.

Competition policy



Venezuela's exports (mainly natural resources) and imports (mainly refined petroleum and agricultural products) are largely controlled by the state. Venezuela's foreign trade has been in steep decline in line with the economy as a whole. Exports of goods and services in 2019 reached a total value of $17.8 billion, imports $12.3 billion (WTO). Export volumes decreased (change over the previous year) by 28.4% in 2018 and 46.3% in 2019. Likewise, import volumes fell by 22% in 2018 and 50.75% in 2019. For the first three-quarters of 2020, the WTO registered exports worth $4.1 billion and imports of $4.4 billion. Concerning tariffs on imports, the simple average MFN applied tariff was 13.8% in 2019 (with 13.0% for agricultural

and 13.9% for non-agricultural products). (The figures for the simple average final bound tariff were 36.5%, 55.8% and 33.6%, respectively.)

Venezuela has not presented the instrument of ratification for the WTO Trade Facilitation Agreement. The latest Trade Policy Review by the WTO was performed in 2002. No notifications have been received by the organization; the country's trade policy is opaque. The OECD Trade Facilitation Index score of 7.853 places the country's performance across all areas in the bottom group of Latin America and the Caribbean. Venezuela is a beneficiary of preferential trade agreements with nine countries, a member of two regional trade agreements (LAIA/Latin American Integration Association and GSTP/Global System of Trade Preferences among Developing Countries), and the WTO negotiations groups G-20, G-33 and NAMA-11. Three dispute cases involve Venezuela as a complainant, two as respondent and 31 as a third party.

Liberalization of foreign trade



The banking system consists of 29 institutions, 23 private and six public, with market shares of 23% and 77% respectively. About 3,000 agencies and nearly half a million card scanners offer the public easy

access to electronic payment opportunities, a vital necessity given the cash-strapped financial system. The highest-value banknote is VES 50,000 or the equivalent of $0.03, and the maximum amount that can be withdrawn from an ATM is VES 200,000 or $0.12. The electronic payment maximum is VES 500 million, and the maximum for transfers is VES 700 million ($302 and $403, respectively, according to the official exchange rate on January 22, 2021).

The capital market regulation agencies – the non-autonomous central bank and the Bank Superintendent – suffocate the sector through interest rate caps, compulsory lending and extreme minimum reserve requirements that squeeze liquidity. The core activity of banks, financial intermediation, is severely limited by the regulatory framework and hyperinflation: depositors do not save and banks do not lend. As a consequence, three-quarters of their profits are generated by non-financial services. According to the October 2020 report of the Bank Superintendent, the total credit portfolio was a little over $200 million at the official exchange rate at that moment. Deposits totaled $370 million, serving for mere transactional purposes. Solvency was 95.8%, coverage 75.7%, the share of non-performing loans was 4.5%, the ratio of productive assets to liabilities was 192.6%, return on equity was 5.85%, financial intermediation 15.6% and liquidity was 72.8%. The liquid assets ratio stood between 16% and 21% in 2020. There has not been much variation in this indicator during the past three years. Banks are adequately capitalized; the credit crisis is not due to non-performing loans, but rather to the tight regulatory framework and hyperinflation.

Banking system



'06                    '22

10

7

6            6

5

4            5

4

4

1

## Monetary and Fiscal Stability

Three years of hyperinflation has offered ample evidence that the monetary authority – the formerly autonomous, competent and respected central bank that was stripped of its autonomy by the regime and politicized to the core – has been unable or unwilling to pursue the goals of price and monetary stability. The institute dutifully converged with the spendthrift regime's ideologically justified approach to monetizing the exploding fiscal deficit. After having knocked three zeros off the bolivar in 2008, the central bank slashed another five zeros in August 2018. At that time, the exchange rate to the U.S. dollar was about 61 bolivars; as of January 2021, it had surged to 1.8 million bolivars. Cafeterias served a cup of coffee for 2.50 bolivars in mid-2018; by January 2021, the price had exploded to 1.3 million bolivars.

Recent developments such as the easing of exchange controls, the de facto dollarization of the economy, and the Anti-Blockade Law allowing for stealth privatizations may signal a new willingness to change course. That may be too little too late. On the other hand, the dollarization may be linked to the increase of organized crime activities in the Orinoco Mining Belt. The cash-strapped regime sold tons of the central bank's gold to Turkey and Abu Dhabi for cash. In April 2020, it legalized gold mining in wide swathes of protected areas in Bolivar State. There have been reports of killings of indigenous people by

irregular gangs and guerrillas in collusion with state actors. The central bank's gold reserves dropped significantly in 2018 and 2019, but began to increase again in the third quarter of 2020.

The COVID-19 pandemic did not affect monetary stability variables.

Monetary stability





The regime's cautious moves toward adopting the de facto dollarization of the economy as official policy, and toward reprivatizing ailing and bankrupt expropriated companies that had been productive when still in private hands, may pave the way for abandoning the ruinous "socialism of the 21st century" model in lockstep with Cuba. In the meantime, however, the unsustainable policies and their consequences have changed little. The current account balance was -$1.7 billion in 2020, falling from $5.4 billion in 2019, while general government gross debt increased from 181% (2018) and 233% (2019) to 304% of GDP (IMF DataMapper April 2021). External debt amounted to $157 billion in 2020 (500% of GDP; IDB) up from $148 billion in 2019. The fiscal deficit was 11% of GDP in 2019 and 7.9% in 2020 (UCAB data & forecast), while total reserves amounted to $6.4 billion.

Over the past 10 years, Venezuela has been continuously downgraded by international rating agencies, reaching a bottom in 2019. Since then, however, the outlook has been set at "stable," meaning only that there is no further deterioration of the financial situation. Currently, government and state-owned oil-company bonds are traded at around 10% of their original value. The financial situation has been aggravated by international sanctions, which impede access to international financial markets and complicate the issue of debt restructuring.

Tax exemptions and extensions on tax filings and payments in the wake of the COVID-19 pandemic have reduced state revenues; international donations of equipment and protective gear contributed significantly to helping the struggling hospitals respond to the crisis. The IMF denied the regime's request for a $5 billion loan to fight the COVID-19 pandemic because there was no clarity on its recognition.

The impact of the coronavirus pandemic exacerbated Venezuela's complex humanitarian crisis, especially regarding food insecurity, access to health care and restrictions on the activities of aid organizations. The pandemic also exacerbated the already expected collapse of the economy.

Venezuela AR_000739

Fiscal stability





## Private Property

Property rights are in theory protected by the constitution, but due to the absence of the rule of law, they are neither respected nor enforced in practice. Arbitrary across-the-board expropriations without compensation have characterized the official policy regarding property rights. The ideologically motivated assault on property rights is a major cause of the country's economic debacle. Sooner or later, the expropriated companies all collapsed due to the sacking of competent staff, politically motivated replacements and general mismanagement. The payments ordered in international arbitration cases have contributed significantly to the exploding external debt. Venezuela is the state with the second-highest number of arbitrations initiated before the International Center for Settlement of Investment Disputes (ICSID). More aggressive movements by investors to enforce international arbitration awards against Venezuela seem to have convinced the regime of the need to cooperate and negotiate settlements. The softening of exchange controls and the stealthy reprivatizations sanctioned by the recent Anti-Blockade Law are signals in that direction.

Property rights



'06    '22
                   10



The regime's command economy model, combined with massive across-the-board expropriations and the scaring away of human talent, has asphyxiated the private sector, even though scores of companies have managed to survive. In November 2020, the Employers Association declared that 60% of the country's companies had closed, and that the rest were operating at 30% of capacity. In 2019 and 2020, there were contradictory moves, evidencing factional competition in the ruling elite: steps toward an opening – including the flexibilization of exchange controls, the passage of the Anti-Blockade Law and reprivatization of expropriated companies (Agropatria) – but also moves in the opposite direction such as interventions in several food producers (Polar, Plumrose, Coposa) and the temporary tightening of price controls.

Venezuela ranks 188th out of 190 countries in the 2020 Ease of Doing Business Index, 179th out of 180 in the Heritage Economic Freedom Index, and 113th out of 140 in the World Economic Forum Global Competitiveness Index. The regime has not nationalized private companies or taken equity stakes due to the COVID-19 pandemic.

Private enterprise





## Welfare Regime

The Social Security Institute covers risks associated with old age, health care, unemployment, invalidity and accidents, and additionally offers life insurance. The pay-as-you-go system is heavily subsidized with tax money, as dwindling contributions do not even come close to covering the cost of the growing benefit-receiving population.

Full pensions are granted after 750 weekly contributions and at the age of 55 years for women and 60 years for men, but many were included as beneficiaries without ever having contributed. Non-citizens have equal access to the existing social safety nets. As of September 2020, about 5 million flat-rate pensions were being paid, roughly $2 per month each. The Institute also runs primary health care centers and hospitals. The Institute's benefits are entitlements, while other benefits are based on a patronage system. Such benefits include cash transfers, subsidies, food programs and educational initiatives. Most of

them are managed via the so-called Fatherland Card System created with the help of the Chinese telecom company ZTE, a step toward comprehensive social control.

Cash transfers include various bonuses with names such as "Dignified Fatherland" and "Anti-Economic War" (roughly $2) and have been paid monthly to about 19 million Fatherland Cardholders since the beginning of 2020, discouraging work for minimum wage. Public cash transfers make up about 25% of the overall household income. Subsidies include fuels (gas, gasoline and diesel) which are rationed and heavily subsidized; their cost is negligible. Electricity, water, sewage and waste collection are free. The implicit subsidy for food boxes amounts to about $7 per household monthly.

Regarding food programs, the School Lunch Program covers most public schools, and some schools offered takeaway lunches during the COVID-19 pandemic. The Food Box Program (CLAP) covers about 92% of the population (Encovi). Despite the coverage of that program, the World Food Programme reckons that roughly one-third of the population is moderately or severely food insecure. The regime has blocked the United Nations from bringing food aid into the country, because it insists on controlling distribution.

Concerning education, there are scholarships for university education ($0.50/month) and support for labor market integration (900,000 beneficiaries, about $0.50/month), both paid via the Fatherland Card System. The Sucre Educational Mission offers more than a dozen study programs at the university level with a 16-week introductory knowledge harmonization course.


Social safety nets



'06      '22

10

6

5

3

3

1

There is no inequality of opportunity based on gender, sexual orientation, religion or ethnicity, but there is political discrimination and inequality as a consequence of the economic and complex humanitarian crisis. Open dissent turns citizens into enemies who are discriminated against in public sector employment and in access to subsidized services (HRW 2020). Educational exclusion has increased, as the goal of universal access to high-quality education has not been achieved. About 40% of school-aged children are unable to attend school regularly and the poor are unable to accumulate the educational capital necessary to overcome poverty. School attendance (between the ages of three and 24 years) is directly related to income distribution: enrollment shares are 61% in the bottom vs. 77% in the top income-distribution quintile. A total of 43% of 12- to 17-year-olds in the bottom quintile lag one to two years behind the average, compared to 29% in the top quintile. The inequality of opportunity is highlighted in the group aged 18 to 24 years: only 16% of the bottom quintile attend an educational institution in this group, vs. 44% of the top quintile (Encovi 2020).

Equal opportunity



## Economic Performance

Gross misrule and rampant corruption under the Maduro regime have thrown the country into a complex humanitarian crisis. There is no data regarding the impact of the regime's response to the COVID-19 pandemic, as the economy is in free fall anyway. The latter is reflected in all relevant indicators. In 2020, GDP per capita plummeted by -29.7%, following drops of -18.2% in 2018 and -27.1% in 2019 (ECLAC); the IMF forecasts further contractions of -10% in 2021 and -5% in 2022, and reports hyperinflation rates of 130,000% (2018), 9,600% (2019) and 3,000% in 2020, as well as a soaring public debt of 304% of GDP. The fiscal deficit mounted to 7.9% of GDP (2020, UCAB forecast), accompanied by low tax revenues of $462 million (SENIAT, equivalent to 1% of GDP according to IMF). The unemployment rate has risen continuously over the past years, reaching 35.5% in 2018; the IMF projects an increase to 54.4% in 2020 and 57.3% in 2021.

Output strength



## Sustainability

The country boasts a Ministry of Ecosocialism and a Ministry of Ecological Mining Development. The agencies claim to "construct and consolidate ecosocialism" as the only option vis-à-vis the "predatory capitalist system." But the practice is far from the discourse. Venezuela ranks 59th in the Yale Environmental Performance Index. A closer look shows the main problems: sanitation and drinking water, 94th; solid waste management, 133rd; greenhouse gas (GHG) intensity trend, 172nd; GHG per capita, 130th; sustainable nitrogen management, 146th. The higher overall rank is mainly due to very high scores in ecosystem vitality.

The 2020 UN report on access to justice and the situation of human rights in the mining area highlights the ecocide and ethnocide caused by illicit mining controlled by criminal organizations and the impunity enjoyed by security forces responsible for serious violations including torture, forced disappearances and killings. The environmental damage caused by illicit mining is devastating, it includes the destruction of large rainforest areas, most of them in theory protected as national parks, the contamination of freshwater sources with mercury used in gold mining and the destruction of the livelihoods of indigenous peoples.

This is how the "construction and consolidation of ecosocialism" works in practice: CAMIMPEG, the Anonymous Military Company of Mining, controls the mining activities in the region and the transport routes with the support of the armed forces. A 2020 CSIS report on illegal mining in the mineral arc says the regime benefits directly from illicit mining. "The semi-official mining sector involves state-owned enterprises that source minerals from illicit mines and export them officially to other countries, most notably Turkey and the United Arab Emirates. Revenues from mining currently provide political elites with a financial lifeline and are of paramount importance to maintaining power."

Environmental concerns are not recognized by the public as primary problems to be addressed, receive no consideration in practice, and are entirely subordinated to regime survival concerns.

Environmental policy





The quality and coverage of education are deteriorating further. The complex humanitarian crisis has left over 1 million children between three and 17 years of age out of school, and about 350,000 migrant children and youth at risk of falling behind. For the 18 – 24 group, class attendance halved between 2016 and 2019, falling from 48% to 25%. Only 60% of the three- to 17-year-olds (not including roughly 1

million children who are out of school) attend school regularly; 40% attend irregularly due to the lack of water supply, power outages, transport problems or teacher absences. School lunches, a major incentive for school attendance, is regularly available in only 28% of schools (Data Encovi 2019 – 2020). The inequality is set to increase as private for-profit schools have been able to shift away from the classroom to online learning, widening the knowledge gap between those who can pay for private education and those who have to enroll in public institutions that are unable to switch to online teaching.

Over 2 million university students did not attend classes in the public tertiary education sector.

Despite adverse conditions – underfunding, student and teacher desertion, crumbling campuses, attacks on academic freedom and university autonomy – three public universities and one private institution kept their positions on the top 100 list of the QS University Ranking for Latin America.

There is no reliable updated information on funding, enrollment, faculty or performance. The inequality-adjusted Education Index score dropped further to 0.638 (as compared to the HDI score of 0.711). Venezuela is one of the very few countries whose U.N. Education Index score has declined in recent years (2014: 0.725; 2019: 0.700). R&D expenditure remained stable at 0.3% of GDP, significantly lower than the military expenditure of 0.5% of GDP (2018, HDR 2018).

Education / R&D policy



## Governance

## Level of Difficulty

Severe structural constraints such as extreme poverty, the lack of a skilled labor force, and a decaying infrastructure restrict the regime's governance capacity. Venezuela features one of the worst cases of Dutch disease observable today; it has depended on oil revenues for nearly a century, but it was the Bolivarian regime that exacerbated the petrostate symptoms. Many of the current constraints did not exist when the regime came to power. They are the result of two decades of irresponsible macroeconomic management characterized by excessive state interventionism, arbitrary expropriations, the destruction of the price system and market rules that resulted in the strangulation of the private sector. The 2019 GNI per capita of $4,615 PPP is lower than in the first year of the "revolutionary" government, and just over one-third of its value at the beginning of the Maduro administration in 2013 (World Data Atlas).

High levels of education began to spiral downward when the relentless mismanagement of leaders reading the country's situation in a parallel universe culminated in a complex humanitarian crisis. Extreme poverty surged to 79.3% in 2019 (Encovi 2018-2020) and the proportion of skilled labor dropped to 42.3% (HDR 2020), a consequence of the decaying education and training system and the

massive exodus of well-educated and skilled Venezuelans who fled the country's crisis. Accordingly, the WB Policy Research Working Paper (9332/2020) on Venezuelan migrants in Ecuador confirms Venezuelan workers' high skills and high rates of employment, compared with Ecuadorans.

The COVID-19 crisis added to existing problems and constraints but did not fundamentally change the situation. As of mid-January 2021, there had been 118,000 confirmed cases and 1,090 deaths, with a fatality rate of 0.9% and a recovery rate of 94.6%. The average number of daily cases receiving treatment was 5,326, and the daily number of confirmed cases per million inhabitants was 4,171.

Structural constraints



Along with the regime's authoritarian degeneration and its ideologically based antipathy toward autonomous civil society organizations, the pattern of associativity in the country has changed fundamentally. On the one hand, the regime establishment created its dependent organizations, including about 3,200 communes and over 45,000 local food and production councils that do not produce anything, but distribute subsidized food bags. On the other, many traditional civil society organizations have

disappeared even as new ones have emerged, mainly dedicated to the defense of human rights. Sinergia, the Venezuelan Network of Civil Society Organizations, now includes over 50 member organizations.

In this complex humanitarian crisis, the organizations defending human rights have proven to be essential in monitoring and documenting human rights violations, and in assisting vulnerable sectors of society with the support of international agencies and organizations. Their well-documented reports will help the International Criminal Court determine in 2021 whether to open a full investigation into crimes against humanity committed by Venezuelan authorities.

In June 2020, the authorities signed an agreement with the opposition that allows humanitarian aid to be delivered to the population, and to strengthen the response to the COVID-19 pandemic with the support of the Pan American Health Organization. Despite having found some common ground with the opposition and NGOs, the authorities increased their attacks on several humanitarian organizations, raiding their offices, confiscating equipment and detaining their staff. UN human rights experts condemned the crackdown: "Since November 2020, Venezuela has systematically stigmatized and persecuted civil society organizations, dissenting voices, and human rights defenders, and this must stop."

Civil society traditions



The conflict between the regime and the opposition continues to be a stalemate in which neither side accepts the other as a valid interlocutor. Both sides are supported by about half the population, split into more or less equal parts, while the other half does not support either of them. On the other hand, surveys signal that about four in five Venezuelans favor a regime change.

In 2019, the Venezuelan Observatory of Social Conflict registered the highest conflict intensity in a decade; in 2020 the intensity decreased substantially. Legislative elections and the opposition public consultation process organized in the first half of December 2020 aside, there were no large mobilizations of people. Violence in terms of homicides dropped sharply in 2020 to just over half the number registered in 2018 (12,000 vs. 23,000), with at least one-third of the homicides attributable to raids by security forces. In January 2021, the Special Forces killed 23 persons in a single raid in La Vega, Caracas. The COVID-19 pandemic did not affect the confrontational nature of politics. The restrictive measures imposed by the authorities in response to the pandemic contributed to a decrease in conflict intensity.

Conflict intensity



## Steering Capability

The Maduro regime's overarching strategic priority is to keep and strengthen its grip on power, whatever it takes. It has been successful so far and is set to continue in that condition for the foreseeable time. Nevertheless, the strategic approach taken to pursue this goal is far from clear and consistent. Rather, the government acts mostly in an ad hoc manner, reacting to immediate pressures and developments such as the loss of the parliamentary majority in 2015, or Guaidó's move to assume the interim presidency.

By increasing repression, the regime has managed to keep the pauperized population in check. Staging an unfree and unfair election, it managed to recapture control of the legislature, capitalizing on the fragmentation of the opposition. Relying on the staunch support of its international allies Cuba, China, Iran, Russia and Turkey, it has found ways to resist the U.S. policy of maximum pressure and circumvent the sanctions. With oil production down to a trickle – primarily due to gross mismanagement, professional incompetence, underinvestment and the regime's history of scaring away talent – other

products such as gold have taken center stage with regard to generating foreign exchange. The quasi-legitimization of irregular gold mining in the mineral arc in collusion with criminal syndicates and the stealth sale of the production for cash has helped the regime survive but has also implied a direct involvement with criminal gangs.

The COVID-19 pandemic had no impact on the regime's long-term strategy. Undermined by the complex ongoing humanitarian crisis, the health care system was completely unprepared to address the COVID-19 pandemic. The regime agreed to open the door for foreign aid in cooperation with national NGOs but made no further concessions whatsoever regarding the establishment of common ground with the opposition.

Prioritization





The regime has been effective in implementing its overarching strategic priority of clinging to power, showing no interest in arrangements to address the aggravating complex humanitarian crisis that affects the population. Even the recent ad hoc steps to loosen the tight controls on the economy, such as the de facto dollarization and the stealth reprivatization plan via the Anti-Blockade Law, are not a move toward

liberalization but rather are intended to serve as lifelines for the cash-strapped regime. Such policies have been implemented in a system of autocratic lawmaking and decision processes; the violation of constitutional norms regarding cooperation between the branches of public power (Art. 136) and the socioeconomic order (Art. 299); the promotion of political instability; external sanctions; and legal insecurity.

The COVID-19 pandemic had no impact on the implementation of the regime's policy priorities.

Implementation





The dire need for financial and economic relief has finally forced at least some of the regime's inner circle to try to tell facts from fiction. While the ultra-interventionist model still dominates the leadership's discourse, liberal ideas have begun to find their way into practical policies by stealth. The Anti-Blockade Law enables the executive to close secret deals involving the privatization of public companies, circumventing transparency rules, parliamentary scrutiny and constitutional restrictions. Selective privatizations will produce foreign exchange revenues beyond the oil sector, and those revenues will be treated as extra-budgetary funds at the sole disposal of the executive. So as not to alienate ideological

purists, the first vice president of the newly elected National Assembly announced she would introduce a law allowing the expropriation of the properties left behind by citizens who migrated abroad.

The regime did not signal any willingness or ability to improve institutional learning in response to the COVID-19 pandemic. The agreement signed with the opposition under UN auspices, which facilitates the distribution of humanitarian aid, has not to date been followed up by similar joint initiatives for the benefit of the suffering people.

Policy learning



'06            '22
                        10



## Resource Efficiency

The state's performance in making efficient use of available human, financial and organizational resources is utterly poor, as clearly evidenced by all indicators reflecting outcomes in education, health care, public security, utilities, transport and infrastructure. Public sector recruiting is entirely based on patronage and loyalty, with disregard for professional experience or competence. The public sector employs over half of the formal labor force in the administration and state-owned companies. In many public enterprises, such

as the huge aluminum and steel corporations in Bolivar State, production is down to zero, but they still employ and pay thousands of workers. Oil giant PDVSA, the cash cow of governments for decades, is in free fall, with plummeting to just half a million barrels/day and the refineries down to zero, but the company still employs over 100,000 workers.

The bizarre management styles used by the regime's industrial leaders, who all too often are active or retired military officers, are reflected in the case of the country's biggest and most important corporation. Former PDVSA CEO and simultaneously Oil Minister Major General Quevedo's recovery strategy was a ceremony at which he and other senior oil ministry officials asked God to boost oil output. "This place of peace and spirituality," read a release by the Oil Ministry that was later scrubbed from its website, "was the site of prayer by workers for the recovery of production of the industry" (Reuters). Military officers run about 60 state-owned companies and have established hundreds of businesses that receive lucrative state contracts.

The lack of public access to information and data on the regime's budgetary policy, efficiency in the use of budget resources in pursuit of the proposed goals, and opportunities for the people to participate in the budget process defy analysis. The latest Comptroller reports and proceedings refer to 2017; the link titled "Fight against corruption" reproduces the texts of the United Nations and the Interamerican Conventions against corruption. The public debt has soared through the roof, hitting 232% of GDP. The Open Budget Survey 2019 ranked Venezuela at 113th place out of 117 countries, with transparency and public participation scores of 0/100 and a budget oversight score of 13/100. None of the budget documents is readily available to the public, and legislative and audit oversight is characterized as weak. The country's score on the UN e-Government Development Index 2020 dropped to 0.5268 (rank 118 out of 193) and the score on the e-Participation Index has nearly halved since 2018 to 0.2381 (172/193), both far below the South American average. The COVID-19 response included tax relief and state compensation schemes.

Most public administration units are exposed to the constant rotation of agency heads and the ensuing replacement of senior officials. The lack of continuity makes effective professional management impossible. Even well-intended user-friendly innovations such as the announcement of power rationing or water supply dates on social media are mostly not complied with. Governors and mayors have in practice been stripped of their functional and financial autonomy. Some functions have been transferred to the local supply and production councils, which are controlled by the official party structure.

Efficient use of assets





The constitution establishes an institutional structure for policy planning and coordination: the Federal Council on Government, complemented by regional and local planning councils. The Federal Council on Government "is the organ charged with planning and coordination of policies and actions to develop the process of decentralization and transfer of powers from the national authority to the states and municipalities." It consists of the cabinet ministers, the state governors, one mayor from each state and representatives of the organized society, and is presided over by the executive vice president. It is supposed to meet annually. The Council's homepage is under construction, the mandatory meeting reports are unavailable, and there is no continuous information about regular meetings (except one in 2014). If the institutional design was functioning, it should facilitate coherent and participatory policy formation, implementation, monitoring and adjustment where necessary. But the approach to real policy formation is command style, ad hoc, and improvised with little or no relation to past decisions. To cite just one example, since the beginning of the economic downturn, President Maduro has presented one recovery plan after the other, dropping zeros from the worthless currency, vowing to reverse the trend, all of them to no avail. The response to the COVID-19 pandemic followed a similar pattern.

Policy coordination





As in other matters, the constitutional and legal provisions establishing integrity mechanisms against corruption comply with the highest standards but are completely ignored in practice. The audit agency is not operational, party and campaign financing are regulated but not complied with in the case of the official party, access to information on public affairs is difficult or impossible, officeholders are not accountable as long as they demonstrate their loyalty to the regime, and the public procurement system is not based on bidding processes.

Corruption has been the regime's lifeline since its inception. Huge sums embezzled from public funding for colossal infrastructure, transport, hospital and factory projects that were never concluded are a major factor in the country's decline. The coincidence of the end of the oil price boom with the free fall of production due to utter mismanagement and the need for cash to secure the new civil and military oligarchs' loyalties forced the regime to collude with criminal gangs to reap benefits from drug lords and irregular mining in the mineral arc.

As a consequence, the U.S. Anti-Drug Agency has announced criminal charges against Maduro and over a dozen of his top lieutenants for running a drug partnership with the Colombian FARC guerrilla group. In January 2021, Swiss prosecutors announced in Zurich that Venezuela had become the biggest provider of

questionable funds to Swiss banks. They had identified hundreds of accounts in 30 banks containing about CHF 9 billion they suspected had come from embezzled public funds in Venezuela (Le Matin Dimanche, Jan. 17, 2021).

Anti-corruption policy





## Consensus-building

There is no consensus on the type of political or economic order best suited to foster the country's development. While the regime elite intends to impose the Cuban model of a communitarian socialist state, the various opposition elites only agree on rejecting the Cuban model, while holding up the principles of representative democracy, separation of powers and accountable government. Venezuelans have been struggling to survive in the middle of a complex humanitarian crisis, are desperate for immediate change and most want President Maduro to go.

The regime's Fatherland Plan 2019 – 2025 aims at deepening the entrenchment of the people's democracy model. In the December 2020 public consultation organized by the mainstream opposition,

about 6.5 million registered voters indicated that they supported free and fair elections as the path toward reestablishing democracy. More radical opposition sectors do not support the electoral path and have boycotted the consultation.

For public consumption, the regime elite sticks to the Cuban model set up in the 2019 – 2025 Fatherland Plan, involving a tightly regulated command economy and absolute social control with little or no breathing space for the private sector. But the Anti-Blockade Law approved by the now extinct Constituent National Assembly allows the executive to secretly open the back door to private investments in strategic sectors, while conducting privatizations to generate urgently needed cash inflows without any oversight.

The mainstream opposition has presented the Country Plan, a road map toward economic recovery that contains significant elements of a market economy, such as the reestablishment of central bank autonomy, privatizations, the abolition of exchange controls and steps toward public service pricing.

The response of civil society organizations has been of vital importance in mitigating the impact of the COVID-19 pandemic on the already desperate situation of vulnerable communities in the complex humanitarian crisis. The regime's reaction to such activities has been openly hostile and has sometimes resulted in harassment. In January 2021, six members of Azul Positivo were arrested and detained in Zulia State. Azul Positivo, a humanitarian organization primarily dedicated to aiding people with AIDS, has been active in combating the impact of COVID-19 on local communities.


Consensus on goals



The regime elites that control the state are the anti-democratic actors, backed by Chinese, Cuban, Russian and now also Iranian military, political and economic advisers. Further reforms allowing an escape from the ideological command economy straitjacket, such as the Anti-Blockade Law, may eventually be demanded by allies in order to secure their economic interests in the country. Reformers advocating democracy, such as opposition groups inside and outside the former parliament, have been completely sidelined again.

Anti-democratic actors





The populist ingredient in the regime's ideology requires feeding the friend-enemy binary of politics with a conflict-exacerbating rhetoric that facilitates identification. The opposition leadership, for its part, must defend the "we"-feeling, while at the same time drawing a clear line between "them" and "us." Bridging the conflict has hitherto proven impossible, as several approaches aimed at reaching some common ground via internationally sponsored negotiations have failed miserably.

Cleavage / conflict management





Civil society participation is a constitutional requirement for filling positions in the branches of government not elected by popular vote. However, this has never been respected, even to keep up appearances. The concept of civil society is anathema to a regime that relies on the concept of "the people," which is equivalent to their loyal followers, however few they may be. Neither the "civil society" nor "the people" are involved in agenda setting, policy formation, deliberation and decision-making, policy implementation, or performance monitoring. Instead, the regime engages in repression and harassment of civil society actors (as reported in "Association / assembly rights" and "Freedom of expression").

Civil society participation





The National Assembly dominated by the mainstream opposition approved an Amnesty Law in January 2019 aimed at laying the foundation for national reconciliation. It provides guarantees for democratic reinsertion to create incentives for civilians and police officers as well as the components of the Armed Forces to refuse Maduro orders. The law did not produce any effect.

For its part, the president of the newly elected but unrecognized National Assembly pledged "national reconciliation" followed by the threat "there can be no forgiveness with forgetfulness, there can't be any reconciliation with amnesia," This assembly appointed a commission tasked with investigating the "crimes" committed by lawmakers of the legitimate National Assembly, headed by a former opposition representative now aligned with the regime. The radical sector of the opposition holds an identical no-forgiveness vision.

Reconciliation



# International Cooperation

The country's strategic partners, Cuba, Russia, China, Iran and Turkey, have provided the regime a real lifeline. In this sense, the country's leaders have been extremely effective in the use of international support for their overarching strategic goal of securing and tightening their grip on power. The support is not an integral part of a long-term socioeconomic development strategy.

Cuba has been the ideological inspiration and tactical adviser of the Bolivarian Revolution from its beginning. It has been rewarded with generous oil shipments, on which it has become existentially dependent. For its part, it provides medical assistance as well as security and military consulting services, including Maduro's international air transport and security detail. Russia is a military supplier and a privileged partner active in the Orinoco Basin heavy crude business, and has been helpful with oil shipments that circumvent U.S. sanctions. China is the regime's largest creditor and the top importer of Venezuelan oil (circumventing U.S. sanctions via ship-to-ship (STS) transfers), as well as a provider of technology for social control. Iran's gasoline shipments in defiance of U.S. sanctions were vital in mitigating the severe fuel shortages in 2020, and Turkey has recently entered the partner group as the main destiny for the country's gold exports. Russia, China and Iran consider Venezuela to be a bridgehead

for their longer-term geopolitical interests in the region. In December 2020, Venezuela approved Russia's Sputnik COVID-19 vaccine, and signed a contract to purchase 10 million doses.

Effective use of support





The Maduro regime does not demonstrate an interest in honoring its contractual commitments and obligations in the international arena. The IMF Board found Venezuela in breach of its obligation to provide data. The most recent WTO Trade Policy Review, normally due every six years, took place in 2002. The regime was reluctant to grant the UN Human Rights Mission unfettered access to victims and detention centers throughout the country. It was also reluctant to allow the delivery of health and protection materials by the Red Cross and the Pan American Health Organization (PAHO) for the country's response to the COVID-19 pandemic.

Venezuela is party to several hundred international treaties and conventions. However, in 2013, Venezuela withdrew from the American Convention on Human Rights. In 2017, Venezuela's membership in Mercosur was suspended in response to the "rupture of the democratic order." With regard to labor relations, there are currently several complaints under investigation by the ILO concerning non-

observance of the Freedom of Association and Protection of the Right to Organize Convention, the Protection of Wages Convention, and the Discrimination (Employment and Occupation) Convention. According to the U.S. State Department, the Maduro regime has also attempted to misuse international law enforcement tools for politically motivated purposes.

Credibility





The novel regional cooperation architecture sponsored by the Bolivarian Revolution's checkbook diplomacy, which broke down when the money ran out and when some allies lost elections, has not reemerged despite the return of friendly governments to power in Argentina and Bolivia. Relations with the Caribbean countries have been put under strain by about 200,000 migrants who fled to the islands, often as illegal boat people, and by Venezuela's renewed threats against Guyana in the Essequibo territorial dispute. An International Court of Justice (ICJ) hearing on the matter in 2020 was not attended by Venezuela. The Caribbean community issued a statement backing the maintenance of Guyana's territorial integrity, and firmly repudiating any act of aggression by Venezuela against Guyana.

Colombia and Brazil, the country's two other neighbors, are members of the Lima Group which supported Guaidó and has called the Maduro regime "illegitimate and dictatorial." Thus, there is obviously no cooperation taking place in the immediate regional environment, and there is also no common ground for any kind of cooperation as long as the authoritarian regime is in place. The regional organizations inspired and funded by Chávez – the Bolivarian Alliance of the Peoples of America (ALBA), the Union of South American Nations (UNASUR), and the Community of Latin American and Caribbean States (CELAC) – are no longer really operative, as Venezuela's checkbook diplomacy has run out of steam. For the time being, Venezuela is as isolated in the region as before.

Regional cooperation



## Strategic Outlook

The Socialist Party's predictable takeover of the National Assembly in the questioned December 2020 elections dealt a final blow to the mainstream opposition's strategy aimed at unseating Maduro as a condition for a settlement. With the regime's cohesion reinforced and the opposition falling apart, Venezuela's political crisis looks ever more intractable. The economic disaster and the humanitarian

Venezuela AR_000769

catastrophe cannot be effectively addressed until both sides abandon their zero-sum vision in order to find common ground from which to overcome the stalemate. An arrangement should be possible, as the government is aware that repression alone will not secure its survival, and the opposition will have to unite around a roadmap for a gradual transition.

Relief for the highly vulnerable population is the first task that needs to be addressed in the most depoliticized fashion possible. The regime has been reluctant to admit the existence of a humanitarian emergency and blocked the entry of an aid convoy organized by the opposition in 2019, but finally agreed to the joint distribution of aid under UN auspices in 2020. This represented a first, timid step toward the de-politicization of aid. Further steps in that direction, especially urging the authorities to stop harassing humanitarian NGOs, would facilitate the commitment of international aid organizations that have hitherto been reluctant to assist due to the political tensions.

Some signs of hope have emerged in the political arena. For one, U.S. Secretary of State Antony Blinken told Senate members that the government would seek to make sanctions more effective, while also considering more humanitarian aid to Venezuela. For another, Maduro said he was willing to "walk a new path" in the country's relations with the United States and was prepared to accept a recall referendum to be organized against him in 2022. And the president of the legislature elected in December 2020 said the National Assembly would be "the epicenter of national reconciliation." For the time being, the United States, the EU and the Lima Group continue to recognize the 2016 legislature and Guaidó's leadership as legitimate, but they will probably resort to quieter diplomacy in order to promote a settlement conducive to free and fair elections.

The Maduro regime is aware of the urgent need to solve the country's financial troubles and revitalize the sputtering economy. Its allies Russia and China are reluctant to pour more cash into Venezuela's ailing oil sector given the dwindling demand due to zero-carbon strategies. Consequently, the international community and multilateral actors must be involved. Easing the sanctions, for instance allowing oil-for-diesel swaps, would be a first step toward building confidence. In return, the regime could free political prisoners, a gesture it had already made in previous attempts at negotiating a settlement. Both the opposition and the government need to connect with the peoples' unprecedented suffering. That is a strong incentive for both sides to establish common ground, a condition for the involvement of multilateral institutions like the IMF, which in 2020 denied a loan request by the Maduro regime due to its disputed legitimacy. The devastated economy can only be revitalized if the foreign debt is restructured, clear rules established and transparent administration practices put in place.



**From:** Bishop, Walter ███████████████
**Sent:** Monday, September 26, 2022 8:04 PM
**To:** Hyer, Brian ████████████
**Cc:** Fernandez, Rita █████████████
**Subject:** FW: Concerns with Asylum Seekers at our Border

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Hey Brian – I wanted to give you a heads up on the below.

Rita has been tracking this closely and working with our CBOs on their needs. We will keep you posted moving forward, but wanted to flag given the fast moving nature of this.

Best,
Walt

**From:** Fernandez, Rita ████████████
**Sent:** Friday, September 23, 2022 5:22 PM
**To:** Bishop, Walter █████████████
**Subject:** Concerns with Asylum Seekers at our Border

Hi Walt,

I wanted to follow up on our conversation about the current situation in our region concerning resources for asylum seekers. One of our partner organizations, Catholic Charities, alerted us this week that their temporary shelter for migrants is reaching capacity. They work in collaboration with the State of California Department of Social Services which provides them funding to temporarily house asylum seekers in their shelter. Ordinarily, CBP drops off migrants at their shelter and Catholic Charities then does intake and provides resources and medical services. About 90-95% of migrants at their shelter leave within two to four days to reconnect with family or friends in other parts of the United states.

Given the high number of new arrivals that they're seeing come through, they are concerned that

they will quickly reach capacity. In addition to the matter of higher volumes of individuals, they are also noticing that some of the newer populations that are arriving at the border don't have a point of contact in the U.S. In fact they say about 25-50% of newer arrivals do not have a point of contact meaning they have nowhere in particular to go and their stay at the shelter needs to be extended . As a side note, state funding only provides shelter for 30 days.

I think it's important we flag this for our federal partners given the growing concern. The general worry among stakeholders in the region is that the situation could lead to CBP releasing migrants in the community, which is a concern. We want to make sure they're aware of these developments and inquire about the potential for continued resources from our federal partners. The need may not only include additional resources on the ground but also space for temporary shelter.

Happy to discuss more with our colleagues at DHS. Thank you and let me know if you have any questions.

**Rita Fernández** *(she/her)*
Executive Director
Office of Immigrant Affairs
City of San Diego

**CONFIDENTIAL COMMUNICATION**
This electronic mail message and any attachments are intended only for the use of he addressee(s) named above and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail message in error, please immediate notify the sender by replying to this message or by telephone. Thank you.





**Menu**    KGUN TUCSON    **Watch Now**

Quick links...

KGUN 9 ON YOUR SIDE  >  NEWS  >  **LOCAL NEWS**

  

# Local migrant shelter reaching max capacity as it receives hundreds per day

*Posted: 3:00 PM, Sep 22, 2022  Updated: 11:42 AM, Sep 23, 2022*

 By: Denelle Confair



0:00 / 0:00

Casa Alitas is reaching max capacity.



Venezuela AR_000773



TUCSON, Ariz. — A local migrant shelter may soon have to turn away migrants as they near capacity. That could mean Border Patrol will start to have to do community releases for migrants in their custody.

The influx the shelter has been seeing is putting a strain on their resources. Shelter workers describe the increased numbers as hectic and are hoping for relief.

Recent Stories from kgun9.com



"Unfortunately, the reality is that's increased our numbers past the point that Alitas is able to welcome all of these folks and it could result in straight releases here in Tucson," said Executive Director of Casa Alitas Teresa Cavendish.

Several buses were seen dropping off an upwards of 50 people at the Tucson shelter on Thursday.

At Casa Alitas, they are given COVID tests along with food, water and travel arrangements but with the influx of guests, workers say they just can't keep up.

"We're tapped out on how many we can receive safely, where it is safe for both our guests, for our volunteers and for our staff. And so anything in excess of our maximum numbers are what they call community releases," explained Cavendish.

For the past three weeks, she says they have been receiving about 400 to 450 migrants a day. The shelter usually receives an average of 300 guests a day.

From men and women to infants, some may start to be turned away. Despite the challenges, volunteers here just do what they can, for the people they can help.

"All of us somewhere in our background. Most likely grandparents more than anything are coming from Europe after World War II or God only knows where," said Laurence Olivier, a volunteer at Casa Alitas.

Casa Alitas is in need of volunteers, as well as supplies such as clothing and toiletries. For more information on donating, check out the Casa Alitas website.

——-

**Denelle Confair** *is an anchor and investigative reporter for KGUN 9. It's been her dream to tell your stories for the past decade. She is extremely curious and wants to continue to use her storytelling for the greater good. Share your story ideas and important issues with Denelle by emailing* **denelle.confair@kgun9.com** *or by connecting on* Facebook, *and* Twitter.



News   Weather   Traffic   You Ask. We Investigate.™   Support

Scripps Local Media
© 2022 Scripps Media, Inc

*Give Light and the People Will Find Their Own Way*

Sitemap   Privacy Policy   Privacy Center
Journalism Ethics Guidelines   Terms of Use   EEO   Careers
KGUN FCC Public File   KWBA FCC Public File
FCC Application   Public File Contact   Accessibility Statement
Closed Captioning Contact

Venezuela AR_000775

12/20/22, 9:29 AM
Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 177 of 344
Local migrant shelter reaching max capacity

Venezuela AR_000776

MORE FROM HOMEPAGE

‹   What we know about the storm and tornadoes that ripped through North Texas

What Texas coach Rodr
Longhorns   ›

NEWS

# Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'

Mexico will ask the Biden administration to strengthen policies for resettling migrants in the U.S. and foster economic development in the migrants' homelands.



Migrants travelling in a caravan of more than a thousand people from countries such as Nicaragua, Peru, Ecuador, Colombia, Venezuela and the Dominican Republic cross the Rio Bravo river (or Rio Grande river, as it is called in the US) to ask for political asylum in the United States, in Ciudad Juarez, Chihuahua state,

Venezuela AR_000777



Mexico, on December 11, 2022. (Photo by HERIKA MARTINEZ / AFP) (Photo by HERIKA MARTINEZ/AFP via Getty Images) (HERIKA MARTINEZ / AFP via Getty Images)

 

By [Alfredo Corchado](#)
6:00 AM on Dec 13, 2022 CST

▶  Listen to this article now
⟲ ⟲ 1.0×
🌐 Powered by **Trinity Audio**
00:00                                                  05:21

MEXICO CITY — A senior Mexican official said his country stands ready to work with the Biden administration when a pandemic-related public health order lifts later this month — but if, and only if, the U.S. agrees to fundamental steps, including strengthening policies for resettling migrants in the U.S. and fostering economic development in the migrants' homelands.

In an interview with *The Dallas Morning News*, Roberto Velasco, a top diplomat and Mexico's chief officer for the North America Unit at the Mexican Secretariat of Foreign Affairs, described negotiations with the U.S. as "intense" and "round-the-clock."



FEATURED ON DALLAS NEWS

**Dallas Cowboys make a visit to Children's Medical Center**

Dallas Cowboys

The ongoing negotiations between officials from both countries come as more than 1,500 migrants made their way from Ciudad Juárez to El Paso on Sunday,

Venezuela AR_000778

after some said they escaped or were rescued by Mexican federal forces from a cell controlled by members of organized crime.

The weekend's surge comes as U.S. and Mexican officials prepare for an increased migrant flow in anticipation of the Dec. 21 lifting of Title 42, the public health order that allows U.S. border agents to expel migrants without giving them a chance to apply for asylum under the justification that it was for pandemic safety.

A federal judge has ordered the end of Title 42, although the Biden administration has said it plans to appeal, it's not clear what the Biden administration's plans are after the lifting of the public health order.



Migrants travelling in a caravan of more than a thousand people from countries such as Nicaragua, Peru, Ecuador, Colombia, Venezuela and the Dominican Republic crossed the Rio Bravo (or Rio Grande, as it is called in the U.S.) to ask for political asylum in the United States in Ciudad Juarez, Chihuahua state, Mexico, on Dec. 11, 2022. (Photo by HERIKA MARTINEZ/AFP via Getty Images) (HERIKA MARTINEZ / AFP via Getty Images)

An average of about 2,400 people are turning themselves in daily to agents of the U.S. Border Patrol in El Paso. Migrants from Latin America — including Peru,

Nicaragua, Colombia, Ecuador and Venezuela — are crossing the Rio Grande and turning themselves in to agents at a processing center on the U.S. side.

> **Related:** **Holding onto their dream, a Venezuelan family finds jobs at the Texas-Mexico border**

To relieve pressure on the overcrowded processing center, migrants are being flown to Border Patrol locations in other regions — including the remote Big Bend area, according to U.S. Customs and Border Protection, or CBP. Between three to five flights a day depart from El Paso, according to CBP.

The drama plays out as Homeland Security Secretary Alejandro N. Mayorkas is expected to visit El Paso on Tuesday for a previously planned trip.

> **Related:** **On a cold riverbank at U.S.-Mexico border, migrants endure limbo as U.S. policy shifts**

It's the chaotic situation on the border that Velasco said the Mexican government wants to avoid. He said he expects the U.S. to seek help from its neighbor to take more migrants, yet declined to elaborate, describing the issue as "sensitive" and "delicate."

Velasco said any scenario where Mexico collaborates with the U.S. after the lifting of Title 42 must have these conditions:

- An expansion of a new humanitarian parole program to apply for asylum in the U.S. without have to traverse Mexico, a journey that's costly and dangerous.

- Efforts to continue the diplomatic dialogue with countries that have poor to no diplomatic ties to the U.S. — like Cuba and Venezuela. These are countries with high numbers of migrants coming to North America often because of U.S. sanctions.

- Stronger policies for resettling migrants across the Americas.

Venezuela AR_000780

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 182 of 344

- A strategy for fostering economic development in the migrants' homelands with the hope of stemming migration.

Since late summer, El Paso has become ground zero for migration, with 53,000 encounters recorded by Border Patrol agents in October. A similar number is expected in November, according to the U.S. Border Patrol. Federal agents have recorded a record number of encounters along the entire southern border, more than 2.2 million, in a year.

Mexico plays an outsize influence in the migration flow, as the U.S. is limited in how to manage its ability to expel migrants to countries it has no diplomatic ties with. This is the case for Nicaraguans, the latest group that has put the U.S. in a difficult spot. Mexico won't take them, forcing U.S. immigration authorities to release the migrants with tracking devices to await a court hearing.



Migrants gathered along the banks of the Rio Grande after turning themselves in to U.S. immigration authorities on Wednesday, Nov. 16, 2022, in El Paso.  (Luis Torres / The Dallas Morning News)

Last October, the U.S. and Mexico agreed on a plan that allows some Venezuelan migrants to enter the U.S. legally without having to set foot in Mexico. Under the

Venezuela AR_000781

Case 6:23-cv-00007    Document 95-4    Filed on 03/24/23 in TXSD    Page 183 of 344

plan, migrants were able to apply for humanitarian visas online. A cap was set at 24,000. The idea behind the plan is to ease pressure at the U.S.-Mexico border, Velasco said. More than 6 million people have left Venezuela in the past five years.

"We believe the model we used with Ukrainians and Venezuelans has worked very successfully," said Velasco. "It's a more realistic and creative approach. In essence, we look to create real pathways for a more orderly, safe and regular migration, in contrast with traveling through Mexico and Central America.

"The results are clear: The new pathways work well and irregular migration has very significantly shrunk," he said, adding that the number of Venezuelans entering Mexico has plummeted significantly, from 4,000 to daily to less than 200.

*Angela Kocherga, news director of KTEP public radio, and freelance journalist Luis Torres contributed to this report from Ciudad Juárez.*

> **Related:** **This affluent city in Mexico has become a waystation for migrants with eyes on Texas**

   



[Alfredo Corchado](). Alfredo Corchado has covered U.S.-Mexico issues for The News since 1993. A graduate of UTEP, he's also reported from Washington and Cuba. Before the News, Corchado reported at El Paso Herald-Post & The Wall Street Journal in Dallas and Philadelphia. He's author of Midnight in Mexico and Homelands.

 acorchado@dallasnews.com   /ajcorchado   @ajcorchado

**District Of Columbia Homeowners To Get Old Roofs Replaced (See If You Qualify Here)**

Venezuela AR_000782

consumertrustalliance.com | Sponsored

**New Sleep Patch Technology Has Taken The Sleep Industry By Storm**

Zleep | Sponsored                                                    [ Learn More ]


**New 4K HD Drone Drops To 50% Off And Takes America By Storm**

Daily Gadget Finds | Sponsored


**If You Used Baby Powder & Have Cancer, You Might Be In For A Large Cash Settlement**

Classactions Together | Sponsored


**Download PDF (Free)**
File Size: 1.2MB. OS: Windows - Convert PDF

PDF Hub | Sponsored


**Prime Is Now $139, But Few Know This Saving Trick**
Amazon Prime has millions of subscribers, but only few know about this amazing savings trick!

ExpertsInMoney.co | Sponsored


**Pizza brings people together, so fire up the love this Season with a Ooni Pizza Oven**

Ooni Pizza Ovens | Sponsored                                         [ Learn More ]


**Washington: Unsold SUVs Under $4,000 (Deal of the Day)**
Perform A Simple Search On The Next Page To See Deals

CarsGenius | Sponsored                                               [ Search Now ]

**I ORDERED TWO $70.98 MIXED TOOL PALLET UNBOXING: RETAIL VALUE WAS INSANE!!**

KIROUSSI | Sponsored

Buy Now

**The Killer New Cadillacs Will Leave You Breathless**

Cadillac SUVS | Search Ads | Sponsored

10/3/22, 7:25 PM          Confusion on the Border as Appeals Court Rules Against Trump's 'Remain in Mexico' Policy - The New York Times

Case 6:23-cv-00007  Document 95-4  Filed on 03/24/23 in TXSD  Page 186 of 344

**The New York Times** | https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html

## Confusion on the Border as Appeals Court Rules Against Trump's 'Remain in Mexico' Policy

The court upheld an injunction blocking a policy that requires asylum applicants to wait in Mexico until their cases are decided. But a stay on the order means the policy could remain in effect.

 **By Caitlin Dickerson**

Published Feb. 28, 2020   Updated Oct. 29, 2021

A federal appeals court found a central pillar of the Trump administration's immigration agenda legally invalid on Friday, ruling that asylum seekers must be allowed into the United States while their cases weave through American immigration courts.

The court stayed its decision, however, in order to allow the government time to appeal the ruling.

After a year in which nearly a million migrants crossed the southwestern border, jamming processing facilities and defying President Trump's attempts to curtail immigration, border crossings have dropped sharply in recent months, in part because of the administration's "Remain in Mexico" policy, the subject of Friday's court ruling. The decision from the United States Court of Appeals for the Ninth Circuit, if allowed to stand, would eliminate one of the administration's key levers for controlling the arrival of new asylum seekers.

A three-judge panel in San Francisco upheld an injunction blocking the policy, which has required people applying for asylum at the border to wait in Mexico while their claims for protection are reviewed, a process that often takes months or years.

The judges gave lawyers in the case until Monday to respond to the stay.

Since the "Remain in Mexico" restrictions were rolled out early in 2019, more than 59,000 asylum seekers have been turned back by American authorities into Mexican border cities, where kidnappings and violence have surged. Because shelters in Mexico are scant and overrun, many of the migrants are living in vast tent encampments exposed to the elements. Powerful Mexican drug cartels have moved in to exploit them.

"It's a resounding rejection," Judy Rabinovitz of the American Civil Liberties Union, who was the lead lawyer representing the plaintiffs, said of the court's ruling earlier Friday. She added, "The policy is a disgrace, it's illegal, it's morally indefensible, and it needs to stop."

Chad Wolf, acting secretary of homeland security, said U.S. border officials have continued to process meritorious asylum claims and reduced fraudulent and invalid claims.

"Should this ruling stand, the safety and security of our border communities, international relationships and regional stability is at risk," he said in a statement.

"This nationwide injunction is grave and reckless, rewrites the laws passed by Congress and undermines the U.S. Constitution," he said.

Lawyers who brought the challenge represented a group of 11 asylum seekers who had been returned to Mexico and several legal advocacy organizations. The plaintiffs won a nationwide injunction, but because a higher court stayed the ruling, the policy has continued to expand — most recently taking effect in Nogales, Ariz., in December.

Venezuela AR_000785

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 187 of 344



These families from Honduras heard rumors that people in the Remain in Mexico Program might be allowed into the United States and went to the bridge to find out.  Cengiz Yar for The New York Times

Friday's appeals court ruling, before it was stayed, prompted widespread celebration among those who had been fighting the policy, followed by hours of confusion over when and how it might go into effect. Mr. Wolf said his department was working with the Justice Department "to expeditiously appeal this inexplicable decision." Human rights organizers in the Mexican border cities where asylum seekers are clustered — including Tijuana, Ciudad Juárez and Matamoros — scrambled to analyze the opinion, while also trying to maintain calm among the thousands of migrants now held up in those cities to prevent a panicked rush toward the United States.

Migrants held in Mexico under the policy began gathering at several international bridges. About 50 collected Friday evening at the Paso Del Norte bridge in Ciudad Juárez, hoping to cross into El Paso, but Mexican authorities closed the bridge to all traffic.

A 28-year-old man from Cuba, who was among those trying to cross, said he would wait for an opportunity. "If God wants us to, we will cross," said the man, who did not want his name published for fear of jeopardizing his asylum case. "I'm going to wait here."

Late Friday, the Customs and Border Protection agency said it had halted processing of new cases under the program, but that was before the stay. "We are continuing to utilize every tool at C.B.P.'s disposal to ensure the integrity of our immigration system and processing programs," the agency said in a statement.

The policy at issue is known formally as "migrant protection protocols" — though the lawyers who challenged it argued that it did just the opposite by placing vulnerable people in harm's way. Instead of safeguarding people fleeing persecution abroad, as is required under federal law, the policy banished them to perilous conditions in a different place, the lawyers said.

Government lawyers defended the policy based on a little-known provision of the 1996 federal immigration law allowing the American government to return some migrants to contiguous countries while their cases for entry into the United States are being processed.

They argued that the provision could be applied to asylum seekers, and that the United States had fulfilled its legal duty to protect people fleeing persecution by conducting a screening to identify possible fears before it sends people back to Mexico.

But those challenging the policy countered that asylum seekers are exempt from the legal provision, and said the government's provisions for screening to determine whether migrants had a credible fear of persecution was insufficient. They pointed to cases of people who had been kidnapped or raped while they were waiting in Mexico and were told afterward by American authorities that their fear of residing in Mexico was not credible.

In a 2-to-1 opinion on Friday, the appeals court judges said the policy violated the federal government's obligation to avoid returning migrants to dangerous places, and they concluded that the legal provision invoked by the government in creating the policy was never meant to be applied to asylum seekers.

They found that the policy was "invalid in its entirety" and concluded that a lower-court ruling that initially enjoined its implementation was "not an abuse of discretion." The stay issued Friday night, the court said, would remain in effect pending review of the government's petition for an immediate appeal.

Venezuela AR_000786

Case 6:23-cv-00007 Document 95-4 Filed on 03/24/23 in TXSD Page 188 of 344

Judge William A. Fletcher, an appointee of President Bill Clinton, wrote the opinion, joined by Judge Richard A. Paez, also a Clinton appointee. Judge Ferdinand F. Fernandez, nominated to the court by President George Bush, dissented.

In a separate ruling on Friday, the same panel of appeals court judges rejected another of the Trump administration's attempts to restrict asylum. In that case, the judges reviewed a policy that blocks anyone who entered the United States illegally — as opposed to presenting themselves at a legal port of entry — from applying for asylum.

The court found unanimously that the policy runs counter to asylum law, which states that people can apply for the status regardless of where they enter the country. That policy had been enjoined by a district court judge shortly after it was announced, and the appeals court on Friday reaffirmed the injunction.

"What's especially significant is that, in both cases, the court found that the administration ignored Congress," said Lee Gelernt, deputy director of the American Civil Liberties Union's Immigrants' Rights Project, who argued the case.

The administration took additional steps last year to make it harder to apply for asylum, signing a deal with Guatemala to resettle asylum seekers there, instead of in the United States. It also adopted a policy requiring most applicants from Central America to first seek asylum in another country along their route of travel.

That policy is also being challenged in federal court.

The policies are part of a constellation of measures undertaken by the Trump administration to help stem the record number of migrant families, mainly from Central America, who began crossing the border in the fall of 2018.

The influx led to overcrowded detention facilities and overwhelmed immigration courts, prompting President Trump to double down on his pledges to build a wall and clamp down on immigration across the southwestern border.



The Migration Protection Protocols Immigration Hearing Facility in Laredo, Texas. Tamir Kalifa for The New York Times

Taken together, the policies have effectively shrunk the American asylum system to a fraction of what it once was. By the end of the 2019 fiscal year, in October, overall border apprehensions had shrunk to 60,781, from a high of 144,116 in May.

The news that the "Remain in Mexico" policy might be invalidated sparked chaos in some areas of the border, where some migrants have been living for months in filthy and crime-ridden areas, with little hope of entering the United States. Emma Obando, 42, had been cooking plantains for her two sons in the Matamoros tent encampment on Friday when a crying woman ran toward her, yelling to everyone she passed, "We should go; we should cross right now because they have undone the law of M.P.P."

Ms. Obando has been living in Matamoros with her 7- and 10-year-old sons, the elder of whom has autism, since September, after having fled their home in Honduras. She said many migrants flocked to the border after hearing news of the court ruling on Friday, but soon after, organizers called them off, instead advising people not to "make a big fuss" yet, and to prepare their government documents instead.

Eventually, Ms. Obando said, the mood calmed. She decided to try crossing into the United States with her sons on Saturday.

Venezuela AR_000787

Mexican officials and civic leaders were also trying to make sense of how the ruling might impact their communities.

"There are various unknowns, various questions," said Dirvin Luis García Gutiérrez, the head of the migration program for the population agency in the state of Chihuahua.

He said that Ciudad Juárez, where more than 19,700 migrants have been returned under the program, was currently supporting a transient population of between 13,000 and 15,000 migrants, including migrants returned under the program as well as those who are still waiting to cross into the United States to apply for asylum.

In an immigration court in downtown San Diego on Friday morning, more than a dozen migrants who had been subjected to "Remain in Mexico" were in court for their asylum hearings when the appeals court's opinion was released. Most were not represented by lawyers and had little guidance on how to proceed.

When the "Remain in Mexico" program was initially enjoined by a federal judge in California in April of last year, migrants who had been in court on that day ended up spending more than two weeks in government holding cells while officials decided how to proceed. When the injunction was stayed, the migrants were returned to Mexico, allowed to enter the United States only for their court hearings.

Government officials moved quickly to reverse the decision. It appeared clear that, whatever the immediate outcome, the issue would ultimately be decided by the United States Supreme Court.

Hundreds of asylum seekers who have been returned to Mexico have since given up their claims, accepting free transportation provided by the American government and the United Nations back to their homes in Central America. But others have vowed to continue with their cases.

Yoleydi Gonzalez Jimenez, 26, arrived from Cuba with her husband in the Mexican city of Matamoros in September and has been living in a tent encampment at the end of an international bridge into the United States ever since. With little access to public bathrooms, the camp smells of human waste.

Ms. Gonzalez Jimenez wears socks with her flip-flops to keep warm. A donated air mattress covered with pink and purple sheets fills the tent that has become the couple's home. Their few possessions are stacked on top and become soaked with water that seeps inside when it rains.

"I can't give up after all the time I've been waiting here, even though I feel like I'm going to die," she said after a court hearing in December. Her next hearing was scheduled in Brownsville, Texas. Until then, she was told, she would have to go back to Mexico.

Reporting was contributed by Max Rivlin-Nadler, Manny Fernandez, Zolan Kanno-Youngs and Kirk Semple.

Venezuela AR_000788

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 190 of 344

# Washington, DC, approves creation of new agency to provide services for migrants arriving from other states

By <u>Aya Elamroussi</u> and Adrienne Winston, CNN

Updated 3:51 AM EDT, Wed September 21, 2022



Marat Sadana/Reuters

A group of mainly Venezuelan migrants, who were sent by bus from detention in Texas, are dropped off outside the Naval Observatory, the official residence of U.S. Vice President Kamala Harris in Washington, DC, on September 17.

 **US**                                                                    AudioLive TV

(CNN) — Washington, DC, city council has recently voted to create an office overseeing the <u>recent arrival of migrants</u> who were sent to the district from states whose leaders oppose the Biden administration's stance on <u>immigration</u> policies.

The move aims to improve response to the thousands of migrants who have been <u>arriving in the nation's capital</u> from Arizona and Texas, whose Republican leaders have come under scrutiny for the tactic.

The Washington city council approved the launch of the new agency in a unanimous vote after Mayor Muriel Bowser requested it to address the needs of migrants.

"With the establishment of the Office of Migrant Services, we stay true to our DC values by creating a framework for providing support to individuals and families while ensuring our homeless services systems continue to support our DC residents," said Bowser, who is a Democ...

Venezuela AR_000789

systems continue to support our DC residents," said Bowser, who is a Democrat.



**RELATED ARTICLE**
Texas is sending migrants to New York and Washington, DC, by bus. Many are glad to go

The new agency will be housed within the district's Department of Human Services. Its goal is to provide arriving migrants with basic needs– including meals, transportation, urgent medical care as well as transportation to connect people to resettlement services.

The district will allocate $10 million to establish and support the new office, and Bowser said she will seek reimbursement for part of that funding through the US Federal Emergency Management Agency.

About 8,000 migrants have arrived in the capital over the past six months, according to councilmember Brianna Nadeau, who sponsored the bill proposing the creation of the agency. Nadeau believes that the passage of the bill can help the city provide better assistance to the migrants, according to her spokesperson.

"This legislation will ensure that every migrant is greeted by a bilingual, culturally competent professional; that they have respite; that they have food and clothing, and that they are safe, and welcome," Nadeau said.



Stefani Reynolds/AFP/Getty Images

Migrants from Venezuela, who boarded a bus in Texas, wait to be taken to a local church by volunteers after being dropped off outside the residence of US Vice President Kamala Harris on September 15.

12/5/22, 4:56 PM    Cities overwhelmed as migrants dropped off with little notice in Washington, DC, spurs creation of new agency to provide services | CNN Politics

The new agency is being created as at least three Republican governors send migrants out of their states to liberal cities, including Chicago and New York, and recently Martha's Vineyard in Massachusetts. The drop-offs, some of which were done with little notice, have left officials on the receiving end struggling to accommodate the needs of thousands of people

Last week, Texas Gov. Greg Abbott said the state deliberately sent two buses of migrants to Vice President Kamala Harris' official residence in Washington, DC.

Dozens of migrants were left outside the gated residence on grass and sidewalks because those in charge of responding to the group weren't prepared to meet them at that location, leaving volunteers scrambling to make arrangements.

SAMU First Response, one of the groups helping migrants in Washington, was not provided prior notice of the drop-off location, according to the group's managing director, Tatiana Laborde.

"By the time our team got to the migrants, they were very lost," Laborde told CNN Thursday morning. "(The migrants) didn't understand where they were standing – this is a very residential area."


**RELATED ARTICLE**
Legal group files class action lawsuit on behalf of advocacy group and migrants flown to Martha's Vineyard

Abbott's efforts to send migrants to Washington and New York has cost his state more than $12 million.

"VP Harris claims our border is 'secure' & denies the crisis," Abbott tweeted at the time. "We're sending migrants to her backyard to call on the Biden Administration to do its job & secure the border."

Also last week, Florida Gov. Ron DeSantis took credit for flying about 50 migrants to Martha's Vineyard in Massachusetts, which was not expecting the group. The Republican governor's move was met by backlash from White House, migrants' advocates and Democratic officials.

"We are not a sanctuary state, and it's better to be able to go to a sanctuary jurisdiction, and yes, we will help facilitate that transport for you to be able to go to greener pastures," DeSantis said last week. "Every community in America should be sharing in the burdens. It shouldn't all fall on a handful of red states."

The term "sanctuary state" is a broad description applied to jurisdictions that have policies in place designed to limit cooperation with or involvement in federal immigration enforcement actions.

Similarly, Arizona Gov. Doug Ducey has sent more than 1,800 migrants to Washington, DC, and has no plans to stop, according to the Republican governor's office. As of last week, 50 buses carrying migrants from Colombia, Peru, Venezuela have dropped off migrants in the capital, with efforts costing about $4 million.

CNN's Paradise Afshar contributed to this report.

Venezuela AR_000791

12/5/22, 4:56 PM                    Police Immigration Service Over Arlington, DC - approves reporting of new agency to provide services to migrants arriving from other ...

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 193 of 344



Log In

Live TV

Audio

World

US Politics

Business

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

More

 US

FOLLOW CNN

12/5/22, 4:56 PM   Police OMB, migrant services office in Washington, DC, approved creation of new agency to provide services to migrants arriving from other …





Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2022 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office

Venezuela AR_000794

Venezuela AR_000795

12/5/22, 4:56 PM    D.C.'s office on migrant services investigating no-approved contracts, agency to provide services to migrants arriving from other ...

Venezuela AR_000797

12/20/22, 11:10 AM
Migrant truck crashes in Mexico killing 54 | Reuters
Case 6:23-cv-00007    Document 95-4    Filed on 03/24/23 in TXSD    Page 199 of 344

TOP NEWS

DECEMBER 9, 2021 / 7:45 PM / UPDATED A YEAR AGO

# Migrant truck crashes in Mexico killing 54

By Jacob Garcia

TUXTLA GUTIERREZ, Mexico（Reuters) - Fifty-four mostly Central Americans were killed on Thursday when the truck they were in flipped over in southern Mexico, in one of the worst accidents involving migrants who risk their lives to reach the United States.

**At least 54 migrants die in Mexico truck accident**

01:23

The trailer broke open, spilling out people, when the truck crashed on a sharp curve outside the city of Tuxtla Gutierrez in the state of Chiapas, according to video footage of the aftermath and civil protection authorities.

Chiapas Governor Rutilio Escandon said 49 people died at the scene, and five more while receiving medical attention.

"It took a bend, and because of the weight of us people inside, we all went with it," said a shocked-looking Guatemalan man sitting at the scene in footage broadcast on social media.

"The trailer couldn't handle the weight of people."

More than 100 people were inside the trailer, authorities said. Several dozen were injured and taken to hospitals in Chiapas, which borders Guatemala. Dozens of Guatemalan migrants were named in lists of the injured published on social media.

A Reuters witness heard cries and sobs among survivors as emergency personnel rushed to the site of where the overturned truck shuddered to a halt by a highway footbridge.

Reuters images showed a white trailer on its side, with injured people splayed out on tarps on the ground. There were also rows of what appeared to be bodies wrapped in white cloth.

A video of the scene streamed on social media showed a woman holding a child wailing in her lap, both covered in blood. Another video showed a man curled up in pain inside the destroyed trailer, hardly moving as helpers pulled out bodies.

Slideshow ( 4 images )

Men, women and children were among the dead, the Chiapas state government said, and President Andres Manuel Lopez Obrador on Twitter expressed his sorrow at the "very painful" incident.

'NOT THE BEST WAY'

Migrants fleeing poverty and violence in Central America typically trek through Mexico to reach the U.S. border, and sometimes cram into large trucks organized by smugglers in extremely dangerous conditions.

"This shows us that irregular migration is not the best way," Kevin Lopez, a spokesman for Guatemala's presidency, told Milenio television after the accident.

He did not know how many Guatemalan victims there were.

El Salvador's foreign minister, Alexandra Hill, said her government was working to see if Salvadorans had died.

Venezuela AR_000799

Mexico offered lodging and humanitarian visas to the survivors, and Chiapas Governor Escandon said those responsible for the accident would be held to account.

Officials in Mexico routinely come across migrants packed into trailers, including 600 people found hidden in the back of two trucks in eastern Mexico last month.

Slideshow ( 4 images )

The journey north from Mexico's border with Guatemala is perilous and expensive, and many migrants fall prey to criminal gangs en route. In January, 19 people, mostly migrants, were massacred with suspected police involvement in northern Mexico.

Record numbers of people have been arrested on the U.S.-Mexico border this year as migrants seek to capitalize on President Joe Biden's pledge to pursue more humane immigration policies than his hardline predecessor, Donald Trump.

Mexican authorities in Chiapas have attempted to persuade migrants to not form caravans to walk thousands of miles to the U.S. border, and have begun transporting people from the southern city of Tapachula to other regions of the country.

The Biden administration has also urged migrants not to leave their homelands for the United States, and this week saw the restart of a policy initiated under Trump to send asylum seekers back to Mexico to await their court hearings.

Some critics argue that tougher policies push migrants into the hands of the human smugglers, putting their lives at risk.

"(Authorities) generate smuggled migration that generates billions of dollars in profits," said migrant activist Ruben Figueroa.

Venezuela AR_000800

Reporting by Jacob Garcia; Additional reporting by Jose Torres, Lizbeth Diaz, Noe Torres and Stefanie Eschenbacher; Writing by Daina Beth Solomon; Editing by Aurora Ellis, Dave Graham and Robert Birsel

*Our Standards: The Thomson Reuters Trust Principles.*

PAID PROMOTIONAL LINKS                                    Promoted by Dianomi



Do You Have Enough To Retire? Use Our Free Retirement Calculator.

Personal Capital



Best trading technology + $0 commission equities & options.

TradeStation



Ask Carrie: What can I do about interest rates?

Charles Schwab



Invesco Chief Market Strategist on the central bank and rate hikes

Invesco Institutional



Finance with confidence. Lock in your rate.

Chase Multifamily Lending

MORE FROM REUTERS



China races to install hospital beds as COVID surge sparks concern...

20 Dec



Putin says situation extremely difficult in several Ukrainian regions

20 Dec



'I don't trust it:' Vaccine hesitancy lingers even as China COVID...

19 Dec



U.S. State Dept says toll of COVID in China a concern for the world

19 Dec



North Korea says sanctions won't stop its missile development –KCNA

20 Dec

Venezuela AR_000802

Venezuela AR_000803

**MORE FROM REUTERS**



Japan set to keep ultra-low rates but doubts over yield cap grow

19 Dec



Special Report: Binance's books are a black box, filings show, as...

19 Dec



TikTok bans hit more U.S. states; security firm says most access...

19 Dec



Multiple victims after shooting in Canada's Vaughan

19 Dec



U.S. preps for more migrant crossings as COVID-era restrictions set...

19 Dec

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Venezuela AR_000804

© 2022 Reuters. All Rights Reserved.

Venezuela AR_000805

Sign in

**Support us** →

**News**   **Opinion**   **Sport**   **Culture**   **Lifestyle**



**US-Mexico border**

# Migrants risk death crossing treacherous Rio Grande river for 'American dream'

Nine died while swimming the Rio Grande on Friday as deaths became commonplace this year after a migration shift pushed thousands here

*Valerie Gonzalez in Eagle Pass, Texas*

Mon 5 Sep 2022 02.00 EDT

Two small inflatable floats with printed aquatic animals in bright colors lay by the river under the Eagle Pass port of entry in Texas on Saturday, a day after nine migrants died while swimming the Rio Grande.

A parent had placed their child in the floats and jumped in a river that looked deceptively calm. National guardsmen tasked with watching that section of Eagle Pass saw it for what it was: a treacherous, deep body of water with whirlpools between pillars holding up the international bridge.

"That's the problem with people from other countries," said Tom Schmerber, the Maverick county sheriff. "When they come, they're used to seeing big rivers. Then they see this one. It's not too big for them. But the Rio Grande carries a lot of currents."

Deaths in the river became commonplace this year, after a migration shift pushed thousands here.

"Almost every single day we respond to the river and recover at least one body a day," said Manuel Mello, the Eagle Pass fire chief. "Some days you won't recover for two or three days. [But] Monday or Tuesday we recovered four bodies with the Border Patrol."

Mello estimates about 30 bodies have been taken from the river each month since March.

Migrant encounters, rescues and recidivism rates increased dramatically when Title 42, a public health policy barring migrants from seeking asylum, went into place in the Covid pandemic.

Locals said rains over the last two weeks dumped more water into the river, which had been in drought, adding to its volatility.

Many migrants cross dangerous terrain like the infamous Darien Gap in southern Panama or other perilous routes.

Jhoana Contreras, a 33-year-old Venezuelan mother of three who made it to Eagle Pass after border patrol released her and sent her to Mission: Border Hope, a welcome center in Eagle Pass helping guide migrants through their journeys into the US.

"I didn't think it would ever end," she said of the journey, adding, "because it took days, days and days, rivers, rivers and rivers".

Contreras broke down as she recounted other times she, her husband and brother nearly lost it all.

"We were kidnapped in Guatemala. We went through things we never imagined we'd go through. I thank God who always kept us safe."

Contreras and family members crossed into the US via the Rio Grande, or Rio Bravo as it's known in Mexico, for its wild nature. At one point, she said, she went under the water and was rescued by her husband.

She was one of the lucky ones.



📷 Migrant families enter the Unites States after being smuggled across the Rio Grande river from Mexico into Roma, Texas, on 26 August. Photograph: Adrees Latif/Reuters

On Saturday, dozens of migrants were dropped off and picked up from Mission: Border Hope. Parents shuffled down charter buses with children in their arms. Some children were fast asleep. Others were wide awake.

Contreras' children were not with her.

"I wouldn't want the experience that so many children had on the way," she said. "I saw some children who would faint. They needed food, water, and medicine."

Her mother is watching them while Contreras and her husband work to get permission to bring them to the US.

Some parents, like Andrés Lecuna, a 39-year-old Venezuelan father of a five-year-old girl, brought their families in spite of the danger.

"It's something I lived through myself, because my daughter and wife nearly drowned. Some people we were traveling with helped save them," Lecuna said. "My arms were giving out, because the current was too strong. I felt I was drowning."

Lecuna's daughter, who wore a pink shirt and braids made by her mother, played with rocks outside the welcome center as her father contemplated the fate of those who died Friday in the same waters.

"I was surprised, because some of those who died were people traveling with us. A mother of an autistic son died. She was traveling with her husband and a daughter," Lecuna said.

The Guardian was not able to verify his account.

He said other men went under, men who knew how to swim like he did.

"I went under with my feet touching the ground and the top of my head wouldn't even touch the surface," he said. He calculated the depth was between 6ft and 9ft. "You get a cramp. Your arms get tired. You go into shock."

Migrants often travel in groups, to help each other through tough spots.

"If we come together, we cross together," said Jorge Luis Acosta, a 34-year-old single man from Cuba in Eagle Pass. "It was a bit dangerous, because it was deep. We were keeping watch over women and children so nothing bad would happen to them."

The last two years have seen record-breaking numbers of people attempting to cross the border illegally. The border patrol sector that includes Eagle Pass has seen almost as many migrants this year as the Rio Grande Valley sector, the traditional route of entry. The Eagle Pass region has seen about 376,000 encounters, while the Valley had nearly 413,000. Many tried to get in more than once.

Recidivism rates increased from 14% in 2015 to 26% and 27% in the last two years.

As desperation grows, more people are willing to risk their lives. From 2019 to 2022, rescues nearly tripled, with a 284% increase, according to US government data. The

change started last year, up to nearly 13,000 from about 5,000 in 2020.

"You have females drowning. We found some who were pregnant. Their kids drown. It's not only just them, but families," Sheriff Schmerber said.

For many, the risk seems worth it.

"It's not easy to go through so much adversity, but it's worth it because I believe in the American dream," said Lecuna, who traveled with his wife and daughter.

Acosta said: "They're people just like you. People who are looking for a better life: a better economy, a way to feed, clothe and educate their children. That's all they want."

---

I hope you appreciated this article. Before you move on, I was hoping you would consider taking the step of supporting the Guardian's journalism.

From Elon Musk to Rupert Murdoch, a small number of billionaire owners have a powerful hold on so much of the information that reaches the public about what's happening in the world. The Guardian is different. We have no billionaire owner or shareholders to consider. Our journalism is produced to serve the public interest - not profit motives.

And we avoid the trap that befalls much US media - the tendency, born of a desire to please all sides, to engage in false equivalence in the name of neutrality. While fairness guides everything we do, we know there is a right and a wrong position in the fight against racism and for reproductive justice. When we report on issues like the climate crisis, we're not afraid to name who is responsible. And as a global news organization, we're able to provide a fresh, outsider perspective on US politics - one so often missing from the insular American media bubble.

Around the world, readers can access the Guardian's paywall-free journalism because of our unique reader-supported model. That's because of people like you. Our readers keep us independent, beholden to no outside influence and accessible to everyone - whether they can afford to pay for news, or not.

**If you can, please consider supporting the Guardian today. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

| Single | **Monthly** | Annual |
|---|---|---|

| **$7 per month** | **$13 per month** | Other |
|---|---|---|

**Continue** →       ( **Remind me in April** )    VISA  mastercard  AMERICAN EXPRESS  PayPal

Venezuela AR_000811

## Most viewed

Venezuela AR_000813

Venezuela AR_000814

Venezuela AR_000815

Venezuela AR_000816

Venezuela AR_000817

Venezuela AR_000818

REPÚBLICA DE PANAMÁ
GOBIERNO NACIONAL

MIGRACIÓN
SERVICIO, EXCELENCIA Y CONTROL

**Cuadro No. 001  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR REGIÓN SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| Región | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| América del Sur | 180,944 | 1,780 | 1,991 | 2,099 | 3,147 | 10,900 | 12,490 | 18,737 | 26,439 | 43,173 | 51,978 | 8,210 | - |
| Antillas | 24,674 | 1,012 | 817 | 876 | 1,311 | 1,493 | 1,369 | 1,789 | 2,501 | 3,049 | 4,926 | 5,531 | - |
| África | 11,058 | 1,316 | 1,056 | 1,259 | 1,072 | 764 | 942 | 1,031 | 1,012 | 841 | 967 | 798 | - |
| Asia | 11,186 | 576 | 378 | 588 | 600 | 734 | 808 | 1,252 | 1,145 | 1,131 | 1,886 | 2,088 | - |
| Europa | 56 | 12 | 7 | 2 | 1 | - | 19 | 8 | 1 | 2 | 3 | 1 | - |
| América Central | 35 | 1 | 2 | 1 | 1 | 1 | 2 | 5 | 4 | 7 | 10 | 1 | - |
| Eurasia | 16 | 3 | 4 | - | - | 2 | 2 | - | - | 1 | 2 | 2 | - |
| Oceanía | 10 | - | 7 | 1 | 2 | - | - | - | - | - | - | - | - |
| América del Norte | 6 | 2 | - | 1 | - | - | 1 | - | 1 | - | 1 | - | - |
| Otras regiones | 2 | - | - | - | - | - | - | - | 1 | - | - | 1 | - |

*Cifras preliminares al 30 de noviembre del 2022 sujetas a revisión y actualización.*

**Cuadro No. 002  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Hombres | 165,596 | 3,557 | 3,047 | 3,449 | 4,632 | 10,316 | 11,632 | 17,239 | 23,481 | 35,550 | 41,735 | 10,958 | - |
| Mujeres | 62,391 | 1,145 | 1,215 | 1,378 | 1,502 | 3,578 | 4,001 | 5,583 | 7,623 | 12,654 | 18,038 | 5,674 | - |

**Gráfico No. 001  TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA: AÑO 2022**



**Gráfico No. 002  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN REGIÓN DE PROCEDENCIA: AÑO 2022**



Venezuela AR_000819

**Cuadro No. 003   TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA POR PAÍS SEGÚN ORDEN DE IMPORTANCIA: AÑO 2022**

| País | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Venezuela | 148,953 | 1,421 | 1,573 | 1,704 | 2,694 | 9,844 | 11,359 | 17,066 | 23,632 | 38,399 | 40,593 | 668 | - |
| Ecuador | 21,535 | 100 | 156 | 121 | 181 | 527 | 555 | 883 | 1,581 | 2,594 | 8,487 | 6,350 | - |
| Haití | 16,933 | 630 | 471 | 485 | 628 | 810 | 860 | 1,021 | 1,538 | 2,170 | 3,713 | 4,607 | - |
| Cuba | 5,530 | 367 | 334 | 361 | 634 | 567 | 416 | 574 | 589 | 490 | 663 | 535 | - |
| Colombia | 4,876 | 48 | 72 | 59 | 72 | 248 | 287 | 407 | 569 | 1,306 | 1,600 | 208 | - |
| India | 3,248 | 67 | 74 | 88 | 172 | 179 | 228 | 431 | 332 | 350 | 604 | 723 | - |
| Brasil | 2,614 | 168 | 139 | 160 | 134 | 150 | 121 | 149 | 271 | 282 | 488 | 552 | - |
| Senegal | 1,928 | 589 | 280 | 264 | 328 | 127 | 109 | 77 | 95 | 34 | 18 | 7 | - |
| Rep. Dominicana | 2,183 | 15 | 12 | 30 | 48 | 115 | 88 | 194 | 373 | 388 | 542 | 378 | - |
| Bangladesh | 1,829 | 70 | 81 | 201 | 126 | 254 | 210 | 236 | 150 | 189 | 143 | 169 | - |
| Perú | 1,504 | 17 | 23 | 18 | 29 | 88 | 109 | 136 | 247 | 365 | 438 | 34 | - |
| Nepal | 1,512 | 108 | 64 | 56 | 121 | 75 | 136 | 217 | 276 | 117 | 167 | 175 | - |
| Afganistán | 1,624 | 1 | 3 | 40 | 31 | 67 | 82 | 162 | 128 | 180 | 551 | 379 | - |
| Angola | 1,271 | 198 | 304 | 378 | 107 | 32 | 26 | 68 | 71 | 26 | 29 | 32 | - |
| Somalia | 1,366 | 84 | 27 | 60 | 83 | 103 | 149 | 201 | 182 | 134 | 193 | 150 | - |
| Ghana | 1,230 | 113 | 83 | 90 | 141 | 88 | 354 | 84 | 91 | 85 | 55 | 46 | - |
| Camerún | 1,248 | 31 | 24 | 92 | 91 | 103 | 41 | 210 | 132 | 199 | 209 | 116 | - |
| China | 1,310 | 32 | 39 | 56 | 59 | 67 | 66 | 85 | 119 | 136 | 274 | 377 | - |
| Chile | 1,205 | 9 | 17 | 13 | 23 | 37 | 44 | 75 | 112 | 190 | 324 | 361 | - |
| Congo | 610 | 69 | 141 | 143 | 38 | 24 | 13 | 64 | 47 | 5 | 27 | 39 | - |
| Eritrea | 591 | 30 | 32 | 34 | 56 | 72 | 50 | 91 | 69 | 48 | 49 | 60 | - |
| Nigeria | 615 | 23 | 54 | 45 | 53 | 41 | 49 | 31 | 63 | 72 | 72 | 112 | - |
| Guinea | 457 | 40 | 10 | 44 | 40 | 39 | 37 | 31 | 39 | 57 | 72 | 48 | - |
| Uzbekistán | 410 | 164 | 42 | 60 | 13 | 6 | 14 | 31 | 28 | 48 | 3 | 1 | - |
| Mauritania | 300 | 18 | 7 | 8 | 21 | 15 | 17 | 31 | 53 | 28 | 74 | 28 | - |
| Burkina Faso | 317 | 18 | 17 | 22 | 19 | 25 | 24 | 33 | 36 | 34 | 32 | 57 | - |
| Pakistán | 253 | 27 | 9 | 20 | 18 | 30 | 24 | 17 | 24 | 16 | 29 | 39 | - |
| Mali | 227 | 18 | 12 | 19 | 13 | 19 | 10 | 17 | 31 | 47 | 25 | 16 | - |
| Tayikistán | 195 | 88 | 11 | 17 | 2 | 1 | 7 | 16 | 30 | 20 | 3 | - | - |
| Etiopía | 210 | 9 | 7 | 4 | 21 | 20 | 15 | 23 | 26 | 27 | 37 | 21 | - |
| Sri Lanka | 188 | 5 | 12 | 12 | 12 | 26 | 15 | 7 | 13 | 34 | 16 | 36 | - |
| Kirguistán | 198 | 3 | 31 | 2 | 21 | 5 | 14 | 17 | 11 | 8 | 27 | 59 | - |
| Sierra Leona | 153 | 18 | 6 | 9 | 27 | 10 | 8 | 23 | 6 | 10 | 22 | 14 | - |
| Siria | 85 | 6 | 3 | 21 | 3 | 13 | 4 | 7 | 4 | 10 | 13 | 1 | - |
| Togo | 82 | 18 | 16 | 6 | 12 | 2 | 5 | 4 | 4 | 3 | 4 | 8 | - |
| Otros Países | 1,197 | 80 | 76 | 85 | 63 | 65 | 87 | 103 | 132 | 103 | 177 | 226 | - |

**Cuadro No. 004   TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN: AÑO 2022**

| Condición | Total | Ene. | Feb. | Mar. | Abr. | May. | Jun. | Jul. | Ago. | Sep. | Oct. | Nov. | Dic. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 227,987 | 4,702 | 4,262 | 4,827 | 6,134 | 13,894 | 15,633 | 22,822 | 31,104 | 48,204 | 59,773 | 16,632 | - |
| Adultos | 191,854 | 4,059 | 3,527 | 3,958 | 5,358 | 11,885 | 13,296 | 19,784 | 26,939 | 41,198 | 48,863 | 12,987 | - |
| Menores | 36,133 | 643 | 735 | 869 | 776 | 2,009 | 2,337 | 3,038 | 4,165 | 7,006 | 10,910 | 3,645 | - |

**Gráfico No. 003  PORCENTAJE DE TRÁNSITO IRREGULAR DE EXTRANJEROS POR LA FRONTERA CON COLOMBIA SEGÚN CONDICIÓN : AÑO 2022**





Servi  Venezuela AR_000820

3/17/23, 12:29 PM    New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico | Human Rights First

Case 6:23-cv-00007 Document 95-4 Filed on 03/24/23 in TXSD Page 222 of 344



Donate

AUTHORITARIANISM / SYSTEMIC INJUSTICE

# NEW REPORT DOCUMENTS DEVASTATING TOLL OF COURT-ORDERED REIMPLEMENTATION OF REMAIN IN MEXICO

WASHINGTON, DC -- A new report, *Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived*, finds that asylum seekers subjected to the court-ordered reimplementation of the Remain in Mexico (RMX) policy suffered kidnappings and other violent attacks in Mexico. The report comes as the federal district court in Texas that had enjoined the initial termination of Remain in Mexico considers a request by Trump-aligned attorneys general to force the Biden administration to halt the policy's end again.

**WASHINGTON, DC** — A new **report**, *Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived*, finds that asylum seekers subjected to the court-ordered reimplementation of the Remain in Mexico (RMX) policy suffered kidnappings and other violent attacks in Mexico. The report comes as the federal district court in Texas that had enjoined the initial termination of Remain in Mexico considers a request by Trump-aligned attorneys general to force the Biden administration to halt the policy's **end** again.

"The Remain in Mexico policy was, and remains, an unmitigated human rights and refugee protection disaster. U.S. policies that return asylum seekers to Mexico cannot be implemented lawfully, safely, or humanely," said **Kennji Kizuka, associate director for refugee protection research at Human Rights First and co-author of the report.** "Just like the initial policy, the court-ordered reimplementation of Remain in Mexico delivered asylum seekers to brutal, targeted attacks. This policy should never be resurrected by a future administration, adopted in law by Congress, or again forced by the courts into use."

*Fatally Flawed* draws on interviews conducted by Human Rights First with asylum seekers returned to Mexico as well as nearly 2,700 interviews conducted by pro bono legal staff with migrants and asylum seekers enrolled in RMX during the court-ordered reimplementation ("RMX 2.0"). These interviews reveal brutal attacks on asylum seekers, including kidnappings, rapes, torture, and other violence after returning to Mexico under the court-imposed reimplementation of RMX.

"Every day that asylum seekers are forced to wait in Mexico for the policy to be fully unwound is another day they are at risk of being kidnapped, raped, or tortured," said **Julia Neuser, research and policy associate attorney at Human Rights First and co-author of the report.** "The Biden administration was right to end this brutal policy that returned thousands of asylum seekers to horrific violence."

Key findings from the **report** include:

Skip to content

3/17/23, 12:29 PM    New Report Documents Devastating Toll of Court-ordered Reimplementation of Remain in Mexico | Human Rights First

Case 6:23-cv-00007 Document 95-4 Filed on 03/24/23 in TXSD Page 223 of 344

 Human Rights First

<span style="border:1px solid">Donate</span>

-Mexican officials were responsible for, or complicit in, 36 percent of these reported attacks (399 reports).
-More than 60 individuals reported highly invasive strip searches, groping, and other inappropriate conduct by Mexican officials during stops.

- Despite steps announced by the Department of Homeland Security (DHS) to "**enhance**" security, kidnappings, rapes, and other violent assaults continued against people after DHS had returned them to Mexico under RMX 2.0. Recent attacks include: a Nicaraguan woman kidnapped and sexually assaulted, a Venezuelan asylum seeker beaten and shot at, a teenage girl sexually assaulted, and two Nicaraguans kidnapped by a cartel and forced to watch as cartel members put a gun in another man's mouth and threatened to kill him.

- RMX 2.0 remained a due process farce:
-Only **five percent** of people returned under RMX 2.0 had a lawyer – an even lower rate than the eight percent represented during RMX under the Trump administration.
-Recent government data shows only **63** asylum seekers in RMX 2.0 have been granted relief out of 1,600 completed cases. This rate is nearly identical to the **4.1 percent** grant rate for RMX cases completed during the Trump administration.

- Of those subjected to RMX 2.0, **78 percent** were from Cuba, Nicaragua, and Venezuela – countries from which many refugees are fleeing.

- Black and Indigenous migrants continue to be targeted for kidnappings, violence and discrimination in Mexico due to their race and/or Indigenous identity.

- Mexican police, immigration officers, and other government authorities continue to be responsible, often in collusion with cartels, for brutal attacks on migrants and asylum seekers after being returned to, or while passing through, Mexico.

---

**PRESS**

Published on September 15, 2022

**SHARE**

in  f  🐦  🔗

**RELATED POSTS**    ←  →

<span style="border:1px solid">Skip to content</span>

Venezuela AR_000822

# RMRP 2022

## REGIONAL REFUGEE AND MIGRANT RESPONSE PLAN (RMRP)

January - December 2022



R4V
Inter-Agency Coordination
Platform for Refugees and
Migrants from Venezuela



Venezuela_AR_00082

**Cover photo credits:**

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 |
| 12 | | 13 | 14 |
| 15 | | 16 | 17 |

...............................................................

1. **©PAHO/** Karen González
2. **©UNHCR/** Allana Ferreira
3. **©UNHCR/** Yhan Cancino
4. **©PAHO/** Karen González
5. **©World Vision/** Chris Huber
6. **©World Vision/** Chris Huber
7. **©UNHCR /** Diana Diaz
8. **©R4V**
9. **©UNHCR/** Sara Aliaga
10. **©UNICEF/** Vanessa Romero
11. **©World Vision/** Natalie Vargas
12. **©UNHCR/** Eugenia Paz
13. **©PAHO/** Karen González
14. **©WFP/** Luis Grimaldi
15. **©UNHCR/** Catalina Betancur
16. **©IOM/** Hanz Rippe
17. **©World Vision/** Chris Huber

# RMRP 2022

## REGIONAL REFUGEE AND MIGRANT RESPONSE PLAN (RMRP)

January - December 2022



Inter-Agency Coordination
Platform for Refugees and
Migrants from Venezuela

Venezuela AR_000825

# TABLE OF CONTENTS

FOREWORD                                                        6

| REGIONAL | 9 |

REGIONAL AT A GLANCE                                            10
KEY FIGURES BY NATIONAL AND SUB-REGIONAL
PLATFORMS                                                      13
REGIONAL BACKGROUND & CONTEXT                                  14
REGIONAL PLANNING ASSUMPTIONS                                  17
RMRP – STRATEGIC OBJECTIVES
AND CONSIDERATIONS                                             19
REGIONAL WORKING GROUPS AND
CROSS-CUTTING THEMES                                           24
    ENVIRONMENT                                                28
    CENTRALITY OF PROTECTION                                   29
    PROTECTION FROM SEXUAL EXPLOITATION
    AND ABUSE (PSEA)                                           30
    ACCOUNTABILITY TO AFFECTED POPULATIONS (AAP)   31
    COMMUNICATION WITH COMMUNITIES/
    COMMUNICATION FOR DEVELOPMENT (CWC / C4D)      33
    CASH AND VOUCHER ASSISTANCE (CVA)                          34
DATA AND INFORMATION IN THE RMRP                               35
EDUCATION                                                      37
FOOD SECURITY                                                  39
HEALTH                                                         41
HUMANITARIAN TRANSPORTATION                                    43
INTEGRATION                                                    46
NUTRITION                                                      48
PROTECTION                                                     51
SUPPORT SPACES                                                 53
CHILD PROTECTION                                               55
GBV                                                            57
HUMAN TRAFFICKING ANS SMUGGLING                                60
SHELTER                                                        62
WASH                                                           65

| BRAZIL | 67 |

BRAZIL AT A GLANCE                                             68
COUNTRY OVERVIEW                                               71
    EDUCATION                                                  74
    FOOD SECURITY                                              75
    HEALTH                                                     76
    HUMANITARIAN TRANSPORTATION                                77
    INTEGRATION                                                78
    NUTRITION                                                  79

PROTECTION                                                     80
    CHILD PROTECTION                                           81
    GBV                                                        82
    HUMANITARIAN TRAFFICKING AND SMUGGLING                     83
    SHELTER                                                    84
    WASH                                                       86

| CHILE | 87 |

CHILE AT A GLANCE                                              88
COUNTRY OVERVIEW                                               91
    EDUCATION                                                  94
    FOOD SECURITY                                              95
    HEALTH                                                     96
    HUMANITARIAN TRANSPORTATION                                97
    INTEGRATION                                                98
    PROTECTION                                                 99
    CHILD PROTECTION                                           100
    GBV                                                        101
    HUMAN TRAFFICKING ANS SMUGGLING                            102
    SHELTER                                                    103
    WASH                                                       104

| COLOMBIA | 105 |

COLOMBIA L AT A GLANCE                                         106
COUNTRY OVERVIEW                                               109
    CASH AND VOUCHER ASSISTANCE (CVA)                          112
    COMMUNICATION WITH COMMUNITIES (CWC)/
    ACCOUNTABILITY TO AFFECTED POPULATIONS (AAP)   113
    EDUCATION                                                  114
    FOOD SECURITY                                              115
    HEALTH                                                     116
    HUMANITARIAN TRANSPORTATION                                117
    INTEGRATION                                                118
    NUTRITION                                                  120
    PROTECTION                                                 121
    CHILD PROTECTION                                           122
    GBV                                                        123
    HUMANITARIAN TRAFFICKING AND SMUGGLING                     125
    SHELTER                                                    126
    WASH                                                       127

## ECUADOR 129

ECUADOR AT A GLANCE 130
COUNTRY OVERVIEW 133
CASH AND VOUCHER ASSISTANCE (CVA) 136
EDUCATION 137
FOOD SECURITY 138
HEALTH 139
HUMANITARIAN TRANSPORTATION 140
INTEGRATION 141
NUTRITION 142
PROTECTION 143
CHILD PROTECTION 144
GBV 145
HUMANITARIAN TRAFFICKING AND SMUGGLING 146
SHELTER 147
WASH 148

## PERU 149

PERU AT A GLANCE 150
COUNTRY OVERVIEW 153
CASH AND VOUCHER ASSISTANCE (CVA) WORKING GROUP 155
CASH AND VOUCHER ASSISTANCE (CVA) 155
EDUCATION 156
FOOD SECURITY 157
HEALTH 158
HUMANITARIAN TRANSPORTATION 159
INTEGRATION 160
NUTRITION 161
PROTECTION 162
CHILD PROTECTION 164
GBV 165
HUMANITARIAN TRAFFICKING AND SMUGGLING 166
SHELTER 167
WASH 168

## CARIBBEAN 169

CARIBBEAN AT A GLANCE 170
COUNTRY OVERVIEW 173
EDUCATION 177
FOOD SECURITY 178
HEALTH 179
HUMANITARIAN TRANSPORTATION 180
INTEGRATION 181
NUTRITION 182
PROTECTION 183
CHILD PROTECTION 185

GBV 186
HUMANITARIAN TRAFFICKING AND SMUGGLING 187
SHELTER 189
WASH 190

## CENTRAL AMERICA & MEXICO 191

CENTRAL AMERICA & MEXICO AT A GLANCE 192
COUNTRY OVERVIEW 195
EDUCATION 198
FOOD SECURITY 199
HEALTH 200
HUMANITARIAN TRANSPORTATION 201
INTEGRATION 202
PROTECTION 203
CHILD PROTECTION 204
GBV 205
HUMANITARIAN TRAFFICKING AND SMUGGLING 206
SHELTER 207
WASH 208

## SOUTHERN CONE 211

COUNTRY OVERVIEW 215
EDUCATION 219
FOOD SECURITY 220
HEALTH 221
HUMANITARIAN TRANSPORTATION 222
INTEGRATION 223
NUTRITION 225
PROTECTION 226
CHILD PROTECTION 227
GBV 228
HUMANITARIAN TRAFFICKING AND SMUGGLING 229
SHELTER 230
WASH 231

## ANNEXES 233

ABBREVIATIONS AND ACRONYMS 234
RMRP 2022 PARTNER ORGANIZATIONS 266

# FOREWORD

## By Eduardo Stein

Latin America and the Caribbean are witness to the largest flow of refugees and migrants in the region's history. More than six million refugees and migrants from Venezuela have left their country of origin, with more than five million being hosted in the region. The COVID-19 pandemic has deepened pre-existing inequalities and increased the vulnerability of refugees and migrants in society. The effects on the living conditions, security, dignity and health of refugees and migrants from Venezuela and their host communities have been dramatic.



Venezuela AR_000828

During 2021, we observed what has been a growing trend since the beginning of the pandemic: resorting to irregular routes and informal border crossings due to largely closed borders, facing despite at-times drastic mobility restrictions aimed to curb the spread of COVID-19, adverse climatic and environmental conditions, blizzards, perilous roads, jungles and rivers, and increasingly exposed to human trafficking, as well as to exploitation and abuse at the hands of smugglers and other criminal networks – all in search of protection, access to basic goods and services, and a better future. By September 2021, R4V partners implementing a broad range of activities under the regional Refugee and Migrant Response Plan (RMRP) had provided assistance to more than 2.6 million refugees and migrants from Venezuela and members of affected host communities, but we will need to significantly scale up our efforts to ensure we continue reaching the most vulnerable with humanitarian, protection and integration support.

The RMRP 2022 was developed in accordance with regional planning assumptions arising from extensive consultations carried out by the Regional Platform with stakeholders and R4V actors from across all 17 countries in which the RMRP is implemented. The development of these regional planning assumptions reflects the complex and dynamic situation affecting refugees and migrants, as well as their host countries. In particular, increased movements witnessed in the second half of 2021 – which saw the relatively new phenomenon of onwards movements, including on northern routes – remind us of the need for partners to respond in an agile manner in support of and to complement the efforts of host authorities.

Four years since its creation, the Regional Platform is increasingly interconnected with other important regional fora related to the response to the crisis, such as the Quito Process, currently led by the Government of Brazil, while leveraging the unwavering support of the international community through International Donor Conferences and collaboration with international financial institutions (IFIs), the private sector and development actors.

The RMRP 2022 introduces some notable improvements, including the measurement of R4V actors' impact on the situation of refugees and migrants from Venezuela against the global Sustainable Development Goals (SDG) indicators; greater levels of transparency in the activities of partners and

their implementation across all countries of the region; and greater operationalization of global commitments on Protection from Sexual Exploitation and Abuse (PSEA), Accountability to Affected Populations (AAP) and environmental standards. Of particular note is the focus on localization in the 2022 RMRP, which now includes 23 refugee- and migrant-led Venezuelan diaspora and community-based organizations having become R4V appealing organizations (equivalent to 12 per cent of all appealing partners), leading to even greater ownership of the response by affected refugees and migrants.

Against the background of a year that saw COVID-19 becoming a determining factor of everyday life, I would like to acknowledge and highlight the importance of host countries' increasing inclusion of refugees and migrants from Venezuela in their response and recovery plans, as well as the important commitments made to reduce the situation of irregularity in which many refugees and migrants across the region find themselves. I am confident that through these concerted efforts we will see them benefitting from greater access to health, education, protection and socio-economic inclusion opportunities, allowing refugee and migrant communities across the region to further demonstrate their added value to their host communities. Through a broad range of activities contained in this RMRP, and an impact-oriented collaboration with the Quito Process, R4V actors will assist host governments in transforming the widespread irregularity of refugees and migrants into a situation conducive for sustainable integration in their host communities.

The RMRP 2022 represents the strong commitment of 192 R4V partners to work jointly and through a coordinated sectoral structure on the complex challenges affecting refugees and migrants from Venezuela and host communities. I am confident that through these collective efforts and the support of the international community, the RMRP 2022 will effectively enhance and complement the responses of governments in the region.

**EDUARDO STEIN**

**UNHCR-IOM JOINT SPECIAL REPRESENTATIVE FOR VENEZUELAN REFUGEES AND MIGRANTS**

Venezuela AR_000829



Venezuela AR_000930



**REGIONAL**

Venezuela AR_000831

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 233 of 344



© PAHO / Karen González

# REGIONAL
## AT A GLANCE



*



**POPULATION PROJECTION**

**8.90 M**



**PEOPLE IN NEED**

**8.40 M**



**PEOPLE TARGETED**

**3.82 M**

| | POPULATION PROJECTION | PEOPLE IN NEED | PEOPLE TARGETED |
|---|---|---|---|
| **VENEZUELANS IN DESTINATION** | 6.05 M | 4.6 M | 2.55 M |
| **VENZUELANS PENDULAR** | 1.87 M | 1.12 M | 202 K |
| **COLOMBIAN RETURNEES** | 980 K | 645 K | 241 K |
| **HOST COMMUNITY** | – | 2.03 M | 824 K |
| **IN TRANSIT**\*\* | 600 K | 458 K | 348 K |

**GENDER DISAGGREGATION**



♂ **32.4%**   ♂ **34.9%**
♀ 16.0%   ♀ **16.7%**



♂ **32.4%**   ♂ **34.0%**
♀ 16.7%   ♀ **16.9%**



♂ **31.2%**   ♂ **35.2%**
♀ 17.1%   ♀ **16.5%**



**TOTAL REQUIREMENTS**
**$1.79 B**



**RMRP PARTNERS**
**192**

\*    Host communities are not included in this graph as there is no population projection.

\*\*   Figures for refugees and migrants in-transit to other countries are not included in the totals on the top as they can be -by definition- recipients of services in more than one country. However, the total budget and sector specific requirements include activities targeting this population group, including as refugees and migrants in-transit will have specific needs to be adressed.

Venezuela AR_000632

## FUNDING REQUEST AND BENEFICIARIES TARGETED



**PEOPLE TARGETED 2022**

- 3.750 – 24.505
- 24.506 – 54.375
- 54.376 – 158.567
- 158.568 – 893.702
- 893.703 – 2.135.883

| COUNTRY | 📊 | 👥 | 👥 | 💰 |
|---|---|---|---|---|
| Colombia | 5.51 M | 4.83 M | 2.14 M | $ 802 M |
| Peru | 1.57 M | 1.70 M | 894 K | $ 304 M |
| Ecuador | 803 K | 873 k | 548 k | $ 288 M |
| Chile | 562 K | 481 K | 159 K | $ 59.5 M |
| Brazil | 336 K | 312 K | 129 K | $ 126 M |
| Argentina | 190 K | 225 K | 106 K | $ 23.2 M |
| Dominican Republic | 121 K | 99.1 K | 54.4 K | $ 24.3 M |
| Trinidad & Tobago | 34.1 K | 35.3K | 24.5 K | $ 20.8 M |
| Mexico | 91.4 K | 56.0 K | 23.2 K | $ 6.15 M |

| COUNTRY | 📊 | 👥 | 👥 | 💰 |
|---|---|---|---|---|
| Panama | 128 K | 93.9 K | 21.29 | $ 8.51 M |
| Bolivia | 13.5 K | 33.2 K | 13.7 K | $ 8.77 M |
| Guyana | 28.9 K | 29.5 K | 13.7 K | $ 10.5 M |
| Curaçao | 19.0 K | 19.1 K | 12.2 K | $ 7.28 M |
| Costa Rica | 31.1 K | 25.1 K | 11.1 K | $ 9.40 M |
| Uruguay | 19.2 K | 15.1 K | 7.68 K | $ 7.97 M |
| Aruba | 19.0 K | 21.2 K | 6.67 K | $ 5.27 M |
| Paraguay | 7.23 K | 10.9 K | 3.75 K | $ 6.68 M |

📊 Population Projection   👥 People in Need   👥 People Targeted   💰 Budget   Venezuela AR_000833

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

| | International NGOs | National NGOs / CSOs‡ | Others‡‡ | UN Agencies |
|---|---|---|---|---|
| Financial requirements | 17.8% | 1.91% | 3.75% | 76.5% |
| Organizations | 62 | 79 | 36 | 15 |

‡ Civil Society Organizations.
‡‡ Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR

| Sector | People in need (PiN) | Targeted / In need | People targeted | Financial requirements (USD) | Partners |
|---|---|---|---|---|---|
| Education | 4.48 M | | 806 K | 100 M | 67 |
| Food security | 6.9 M | | 2.11 M | 283 M | 63 |
| Health | 6.81 M | | 2.72 M | 230 M | 86 |
| Humanitarian Transportation | 994 K | | 103 K | 11.6 M | 21 |
| Integration | 7.55 M | | 950 K | 381 M | 114 |
| Nutrition | 2.83 M | | 188 K | 8.67 M | 13 |
| Protection* | 6.84 M | | 1.29 M | 220 M | 109 |
| Child Protection | 2.52 M | | 306 K | 53.0 M | 48 |
| Gender-Based Violence (GBV) | 1.82 M | | 510 K | 44.1 M | 55 |
| Human Trafficking & Smuggling | 1.46 M | | 42.2 K | 13.6 M | 26 |
| Shelter | 5.47 M | | 580 K | 112 M | 52 |
| WASH | 4.87 M | | 1.09 M | 65.3 M | 55 |
| Multipurpose Cash Assistance | - | - | 902 K | 201 M | 55 |
| Common Services** | - | - | - | 62.6 M | 55 |

\*     This includes Support Spaces

\*\*   This includes AAP, Communication, Coordination, CwC/ C4D, Fundraising, Information Management, PSEA and Reporting.

Venezuela AR_000834

# KEY FIGURES BY NATIONAL AND SUB-REGIONAL PLATFORMS

## REGIONAL



 **POPULATION PROJECTION**
■ **8.90 M**

 **PEOPLE IN NEED**
■ **8.40 M**

 **PEOPLE TARGETED**
■ **3.82 M**

 **TOTAL REQUIREMENTS**
**$1.79 B**

 **RMRP PARTNERS**
**192**

---

### BRAZIL



336 K    $126 M
312 K    39
129 K

### CHILE



562 K    $59.5 M
481 K    14
159 K

---

### COLOMBIA



5.51 M    $803 M
4.83 M    78
2.14 M

### ECUADOR



803 K    $288 M
873 K    53
548 K

---

### PERU



1.57 M    $304 M
1.70 M    55
894 K

### CARIBBEAN



223 K    $68.4 M
204 K    27
111 K

---

### CENTRAL AMERICA & MEXICO



265 K    $24.1 M
175 K    6
55.6 K

### SOUTHERN CONE



239 K    $46.7 M
284 K    21
132 K

# REGIONAL BACKGROUND & CONTEXT

Over the course of the four years of its existence, the Regional Inter-Agency Coordination Platform (also known as "Response for Venezuelans" or "R4V") and its partners have continuously expanded their efforts to respond to the unprecedented outflow of refugees[1] and migrants from the Bolivarian Republic of Venezuela (hereinafter "Venezuela"). Compounded by the impact of the COVID-19 pandemic, the concerning political, human rights and socio-economic situation in Venezuela has severely tested the capacities of authorities, host communities and the international aid community.

By end-2021 there were more than 6 million refugees and migrants from Venezuela outside their home country.[2] The 17 countries of Latin America and the Caribbean that are covered by this Regional Refugee and Migrant Response Plan (hereinafter "RMRP" or "Response Plan") are hosting an estimated 84 per cent of all refugees and migrants from Venezuela, amounting to some 5 million.[3]

As reflected in the population projections for this Response Plan and in line with the monthly population updates published by the Regional Platform on r4v.info, persistent outflows of thousands of refugees and migrants from Venezuela coupled with considerable transit and onward movements between countries characterize the movement dynamics in the region. In parallel, the majority of refugees and migrants from Venezuela have spent multiple years in their host countries. As a result, needs of refugees and migrants from Venezuela go beyond immediate life-saving interventions, and include access to asylum and regularization, longer-term protection, self-reliance and integration.

Despite the generosity of host communities and governments, refugees and migrants across the region face increasing challenges related to growing unemployment and poverty, constraints accessing education and basic services as well as serious protection risks linked to widespread irregularity. The devastating impact of COVID-19 has further aggravated vulnerability and dependence on assistance – as reflected in the increased needs detailed in the RMRP 2022.

Since the onset of the Venezuela crisis, United Nations (UN) agencies, international and national Non-Governmental Organizations (NGOs) and civil society actors (including refugee- and migrant-led diaspora organizations, faith-based organizations and the Red Cross Movement[4]) have complemented the response efforts of host governments through a regionally coherent and consistent Response Plan. The RMRP, now in its fourth iteration, is a comprehensive,

integrated, inclusive and regional strategic response and advocacy tool to support country and sub-regional operations, and to systematically support refugees and migrants from Venezuela, as well as affected host communities and governments.

Coordinated through the International Organization for Migration (IOM) and the United Nations High Commissioner for Refugees (UNHCR)-led Regional Inter-Agency Coordination Platform (R4V), the RMRP: (i) drives consistent advocacy and fundraising efforts to the benefit of R4V actors; (ii) ensures an informed, efficient and coordinated response; (iii) promotes positive policies and related dialogues for refugees and migrants, including with the Quito Process[5]; (iv) convenes different stakeholders, including R4V response actors, host governments, donor community and affected refugee and migrant communities; and (v) delivers humanitarian and development-focused assistance.

The above elements are developed through an intra-regional and field-driven strategic planning process, bringing together 192 appealing organizations, in consultation with host governments, refugee- and migrant-led organizations and the donor community. The structure of the RMRP reflects the sectoral logic of the Regional Inter-Agency Coordination Platform, where all strategies and activities articulated in this Response Plan have been reviewed and cleared by the different Platforms and Sectors, both at the regional and national/sub-regional levels.

Considering the political and socio-economic developments in Venezuela, as well as in some host countries, and the ongoing impact of the COVID-19 pandemic, the outlook for 2022 remains complex and fragile. In maintaining the agile character of the RMRP, R4V actors commit to systematically, regularly and transparently reporting on their implementation and activities using the dedicated monitoring and reporting framework of the RMRP, and on corresponding financial contributions received using the Financial Tracking System of OCHA (FTS), while remaining highly responsive to new challenges and developments impacting on the situation of refugees and migrants from Venezuela as well as affected host communities.

---

[1]   For the purpose of this document and all relating materials, any reference to "refugees" shall be understood to include asylum-seekers.

[2]   As of the date of drafting of this RMRP (mid-November 2021). Please see r4v.info for regular updates on population figures.

[3]   Ibid.

[4]   For the purpose of this Response Plan and all relating documentation, the "Red Cross Movement" shall be understood to include national Red Cross societies, the International Federation of the Red Cross (IFRC) and the International Committee of the Red Cross (ICRC).

## COVID-19

Almost two years since its emergence, COVID-19 has altered and become part of everyday life for nearly every person on the planet. Like elsewhere, in the 17 RMRP countries, movement restrictions, sanitary precautions, regular testing requirements and vaccination passes have become an integral part of daily routines, including to access services and work, education and travel.

Since being declared a global pandemic, COVID-19 has officially claimed some 5.2 million[5] lives (2.4 million alone in Latin America and the Caribbean), while there is a high likelihood of this pandemic having actually claimed the lives of between 10.9 and 20.3 million persons.[6] Following the availability and rollout of a dozen vaccines and treatments, coupled with the realization that eradicating COVID-19 is impossible, societies around the world have identified means to live with the disease.

The most important development to address the COVID-19 pandemic has been the successful rollout of vaccines. By end-November 2021, some 65 per cent of persons in Latin America and the Caribbean were at least partially vaccinated; almost 50 per cent were fully vaccinated.[7] This relatively higher average than the global situation (49 per cent of the world's population has so far received at least one dose of a COVID-19 vaccine) takes into account the notable achievements in Chile and Uruguay, where 83 and 76 per cent, respectively, of the populations were fully vaccinated (and an additional 4 per cent were partially vaccinated in both countries).

In line with the broad advocacy of the Regional Platform[8], 2021 saw all countries covered by the RMRP including refugees and migrants from Venezuela in their vaccination campaigns. This has been achieved despite logistical and other challenges posed by the ever-high rates of irregularity and the need to ensure full vaccination, in many cases requiring two doses within a timeframe of 1-2 months. 2022 will see the additional challenge of addressing the diminishing effect of vaccines over time, as well as the occurrence of additional variants of the virus increasing the chances of getting infected and requiring considerations for boosters to be administered. Governments and public health actors will need to ensure that vulnerable refugees and migrants from Venezuela, including those in irregular situations, remain an integral element of their response strategies.

Reflective of the requirement of governments to mainstream refugees and migrants in their COVID-19 response strategies, R4V actors whose activities form this RMRP 2022 have mainstreamed COVID-19-senstive approaches and programmatic priorities, including the ongoing provision of personal protective equipment (PPEs) and remote or monetized forms of assistance, into their programming. In as much as activities focus fully on COVID-19-related aspects, like in the RMRP 2021,[9] they are identified as such.



**SHARE OF PEOPLE VACCINATED AGAINST COVID-19, NOV 22, 2021**

Alternative definitions of a full vaccination, e.g. having been infected with SARS-CoV-2 and having 1 dose of a 2-dose protocol, are ignored to maximize comparability between countries.

■ Share of people fully vaccinated against COVID-19   ■ Share of people only partly vaccinated against COVID-19

*Source: Official data collated by Our World in Data. This data is only avaliable for countries which report the breakdown of doses administered by first and second doses in absolute numbers.*

---

[5]   Source: World Health Organization (WHO), COVID-19 Dashboard. Accessed 23 November 2021: https://covid19.who.int/

[6]   Source: The Economist, Estimated global excess deaths, with a 95 per cent confidence level. Accessed 23 November 2021: https://www.economist.com/graphic-detail/coronavirus-excess-deaths-estimates

[7]   Source: Our World in Data. Accessed 23 November 2021: https://ourworldindata.org/covid-vaccinations

[8]   See hereto: R4V Regional Platform, Access for refugees and migrants from Venezuela to COVID-19 Vaccines in RMRP countries, 2021, available at: https://www.r4v.info/es/documents/details/84972

[9]   https://www.r4v.info/es/document/rmrp-2021-es

## TOTAL CVA REQUIREMENTS



🎒 **$1.79 B**
**Total requirements**

$518 M | $201 M | $1.07 B

- ■ Cash and Voucher Assistance (CVA) Modality Requeriements
- ■ Multipurpose Cash Assistance (MPC) Requirements
- ■ Non-CVA/ MPC requirements

## CVA REQUIREMENTS BY COUNTRIES



- ■ CVA Modality Requirements
- ■ MPC Requirements
- ■ Non-CVA/ MPC requirements
- 🎒 Total requirements

**Brazil** 🎒 $125.M
$28.4 M  $12.6 M  $84 M

**Peru** 🎒 $304 M
$88.9 M  $52.4 M  $163 M

**Chile** 🎒 $59.4 M
$16.3 M  $10.2 M  $32.9 M

**Caribbean** 🎒 $68.4 M
$13.3 M  $8 M  $47.1 M

**Colombia** 🎒 $802 M
$284 M  $84.1 M  $434 M

**Central America & Mexico** 🎒 $24.0 M
$6.65 M  $2.24 M  $15.1

**Ecuador** 🎒 $288 M
$73.4 M  $26.3 M  $188 M

**Southern Cone** 🎒 $46.7 M
$6.9 M  $4.66 M  $35.1 M

## CVA REQUIREMENTS BY SECTOR



- ■ CVA Modality Requirements
- ■ Non-CVA/ MPC requirements
- 🎒 Total requirements

**Education** 🎒 $100 M
$19.4 M  $80.6 M

**Child Protection** 🎒 $53.0 M
$2.2 M  $50.8 M

**Food Security** 🎒 $283 M
$172 M  $111 M

**Gender-Based Violence (GBV)** 🎒 $44.1 M
$2.36 M  $41.7 M

**Health** 🎒 $229 M
$33.9 M  $195 M

**Human Trafficking & Smuggling** 🎒 $13.6 M
$255 K  $13.3 M

**Humanitarian Transportation** 🎒 $11.5 M
$63.8 K  $11.4 M

**Shelter** 🎒 $112 M
$12.1 M  $99.9 M

**Integration** 🎒 $380 M
$65.5 M  $315 M

**WASH** 🎒 $65.2 M
$6.36 M  $58.8 M

**Nutrition** 🎒 $8.67 M
$167 K  $8.5 M

**Multipurpose Cash Assistance (MPC)** 🎒 $201 M
$197 M  $4.00 M

**Protection** 🎒 $219 M
$5.22 M  $214 M

**Common Services** 🎒 $62.5 M
$175 K  $62.3 M

Venezuela AR_000838

# REGIONAL PLANNING ASSUMPTIONS

The outflow from Venezuela and trends in population figures throughout the region have become considerably more complex due to the COVID-19 pandemic, including as increasing vulnerabilities of refugees and migrants from Venezuela have resulted in new population movements. Where movement and travel restrictions continue to apply, refugees and migrants from Venezuela have adopted riskier coping strategies, including irregular means of travel and border crossings. Recognizing the complexity of the development of planning scenarios, the 2022 RMRP takes into account national dynamics (including country-specific socio-economic, political and response capacity-related elements) within an agreed regional planning outlook. To consolidate such a regional planning outlook, the Regional Platform conducted a survey with all R4V partners to benefit from a nuanced and inclusive read-out of expectations and assumptions for 2022. The survey, the results of which were presented and discussed during a plenary meeting of the Regional Platform in July 2021,[10] formed the basis for joint planning assumptions that apply for all 17 countries of the RMRP, while allowing for regional harmonization. It also informed the population planning figures across all 17 countries, as presented in the different chapters of the RMRP 2022. 238 responses (amongst them 55 per cent self-identifying as part of civil society) from across the region were received, which render the results representative of the overall response. The results of this survey are available _here_[11] and should be consulted for more detail on country-specific results.

Key findings of the survey include that the situation in 2022 will be characterized by continued outflows from Venezuela at an overall moderate rate. This is reflected in the population projections for each country, as validated by each of the host governments. Amongst the reasons provided for the continued, moderate flow (in relation to the numbers of refugees and migrants from Venezuela already outside of their country) are the concerning political, economic and social developments in Venezuela, and the anticipated gradual lifting of travel restrictions in 2022. Most partners considered that additional waves of COVID-19 and a corresponding impact on border controls could not be excluded, and pointed to an overall much more complex situation in the host countries, including as regards access to basic services and COVID-19 vaccinations. In sum, 68 per cent of respondents found that the number of refugees and migrants from Venezuela would be "moderately higher" in comparison to 2021, while only 12 per cent considered that the number would be significantly higher, and 21 per cent maintained that a "marginally higher" number in 2022 would be realistic (the results dashboards _can be consulted_ for more detail, including on country breakdowns).

Another key regional finding was that R4V partners at large consider that the challenges related to irregularity will further increase in 2022. Across virtually all National and Sub-

regional Platforms, R4V partners noted that regularization will necessarily be a key priority under the RMRP 2022 – with several respondents pointing to encouraging initiatives underway by a number of governments.

As a relatively new phenomenon, R4V partners pointed to secondary and/or onward movements of refugees and migrants from Venezuela, relocating from one host country to another, and on new routes, including northwards. Most R4V partners maintained, however, that outflows from Venezuela and said onward movements within the region would outnumber by far possible return movements to Venezuela. For the most part, R4V partners considered that large-scale forced returns are not expected, but that there is a possibility for some organized forms of deportations from some countries.

Finally, the survey results demonstrate a clear agreement amongst R4V partners that the inclusion of refugees and migrants from Venezuela in national economic and social COVID-19 recovery plans will need to be a key focus of the response in 2022. This finding is in line with the overall much increased number of refugees and migrants from Venezuela that have been found to be in need (see number of persons in need (PIN) under RMRP 2022 key figures).

## DEFINITION OF POPULATION GROUPS, NEEDS AND TARGETS

Since the establishment of the Regional Inter-Agency Coordination Platform (R4V) in 2018, the understanding of R4V partners of the diverse needs of different population groups across the various countries of the region has evolved considerably. The high degree of mobility, especially in the second half of 2021, has been compounded by the impact of COVID-19 and measures implemented by governments across the region intended to curb its spread, resulting in a high rate of irregular movements due to sustained border closures.

The groups referenced in this Response Plan and for whom people in-need and target estimations were derived, include:

- **In-destination:** Individuals who have left their usual place of residence to a host country with the intention to remain. Some countries in the region have incorporated an estimation of those in an irregular situation.

- **Pendular movements:** Temporary and usually repeated population movements between two countries, which may represent a movement pattern between Venezuela and another country.

[10]  See hereto: RMRP 2022 Key Resources: Planning Assumptions and Scenarios, available at: _https://www.r4v.info/en/keyresources_
[11]  Ibid.

- **Returnees:** Individuals (non-Venezuelans) who have left Venezuela in order to return to their country of origin.

- **In-transit:** Individuals who have left Venezuela and are transiting through a country prior to entering their intended country of destination; as well as persons who have left a country of destination in order to relocate to another country of destination.

- **Affected host community:** The population of a country that shares the same geographical location with refugees and migrants from Venezuela and are in need of access to similar assistance due to the presence of refugees and migrants from Venezuela.

As highlighted in the previous chapter on the key assumptions for the RMRP 2022, the number of refugees and migrants from Venezuela in irregular situations, which drastically increased throughout 2020-2021, remains a priority concern of the R4V response. Estimates regarding persons in irregular situations are substantiated by joint data collection and analysis carried out in 2020 and 2021 across the region, which also pointed to greater needs in practically all sectors, but particularly in the programming areas of food, shelter, healthcare, Water, Sanitation and Hygiene (WASH), protection, integration and education, often resulting from loss of incomes due to the impact of COVID-19 and related loss of employment. Efforts on the part of national authorities and RMRP partners to quantify and better understand the needs of those in irregular situations have permitted various national authorities to include those in irregular situations in the population statistics, allowing for more accurate response planning and targeting. For the purposes of RMRP planning, people in irregular situations are comprised of two broad categories:

- Those who have crossed international borders without complying with all the legal and administrative requirements for entry into that state. This population may not have the required documentation or resources to do so.

- Those who entered a country through regular means and their regular situation has been impacted various factors that may include but are not limited to expired visas or permits.

Both of these groups are at increased risk of refoulement, human trafficking, exploitation and more broadly at risk of abuse at the hands of criminal networks; face constraints in accessing essential services basic human rights; and face other serious protection and health risks, especially while transiting through the region. 2021 saw commendable efforts on the part of various host governments to address this situation through targeted regularization initiatives. In particular, the Government of Colombia continued extending nationality to all children born to Venezuelan parents in the country, and embarked on a largescale initiative granting a temporary protection status to all Venezuelans (see Colombia national chapter for more information). Similarly, initiatives targeting the situation of irregularity are in place in Brazil, Chile, the Dominican Republic, Peru and Trinidad and Tobago, while the Government of Ecuador is expected to launch a similar initiative in the final months of 2021.

Out of the total estimate of 8.4 million people in need of assistance (PiN) under the RMRP in 2022, some 4.6 million refugees and migrants from Venezuela are projected as being in destination, 1.12 million in pendular situations and 645,235 are returnees from Venezuela. Additionally, it is estimated that there will be 2.03 million members of host communities in need. Of these people in-need, a total of 3.81 million are targeted to receive sectoral or multisectoral assistance through this Response Plan. This target population is composed of 2.55 million in destination, 202,417 in pendular situations and 241,350 returnees. In addition, it is also estimated that 824,218 affected host community members will be targeted with some form of assistance, including particularly vulnerable host community members. R4V partners analyzed their operational and outreach capacities to estimate targets based on realistic assessments to scale-up the response in 2022.

Of the 348,433 refugees and migrants from Venezuela in-transit who will be targeted for assistance in 2022, the majority of transit movements are expected occur along the Andean Corridor (Colombia, Chile, Ecuador and Peru). Moreover, in the last year, in-transit trajectories in the Southern Cone sub-region as well as between Brazil and Peru have become more prominent. Another particularly noteworthy trend of in-transit movements appeared in the second half of 2021, witnessing individuals increasingly moving from Colombia, through the perilous Darien Gap to Panama, with a trajectory to the United States. Owing to the particular complexities of this mixed movement situation along Central America, R4V actors will pay additional attention to the developments and assistance needed along that route in 2022.

In order to avoid double-counting target populations, those in-transit are presented apart, as they will eventually form part of in-destination, pendular or returnee population groups in host countries. Therefore, a projection of this population at country level will be added to countries' planning figures and targets, wherever relevant.

The population projections, estimations of PiNs and targets were developed by National and Sub-regional Platforms with R4V partners and host governments in each country, based on common analyses of needs, and collected through various inter-agency assessments and data sources, including government-led exercises. A successful effort to arrive at age and gender disaggregated data, as well as disaggregation at the admin-level-1,[12] was made for 2022 planning. All figures were validated during dedicated workshops by R4V partners and, wherever possible, with host government stakeholders.

The various population groups included in this Response Plan reflect the diversity of movements and types of assistance required, and provide an overview for planning purposes. For the purposes of the RMRP 2022, R4V actors were engaged in substantive discussions and collaborative analysis of the diverse profiles and needs of vulnerable groups. These may include women, children, the elderly, indigenous and Lesbian, Gay, Bisexual, Transgender, Queer and Intersex (LGBTQI+) communities, who face considerable risks while on the move and in host countries.

---

[12] Admin level 1 refers to the largest sub-national administrative unit of measure within a country (examples include departments, states or provinces).

Venezuela AR_000840

# RMRP – STRATEGIC OBJECTIVES AND CONSIDERATIONS

The RMRP encourages the inclusion of refugees and migrants from Venezuela in national systems and planning, promotes self-reliance through livelihoods, education and in other ways, and helps build sustainable capacities of national and local actors to provide basic services.

Since its first iteration in 2019, the RMRP has served to channel some USD 1.55 billion to more than 200 partners to bring about positive change to the lives of vulnerable refugees and migrants from Venezuela as well as affected host communities, while strengthening the capacities of public institutions, also through the convening of the donor community in three International Donors' Conferences.

**In its fourth iteration, the Strategic Objectives of the RMRP are:**

**1.** Provide and improve safe and dignified access to essential goods and critical services in synergy with sustainable development assistance.

**2.** Enhance the prevention and mitigation of protection risks, and respond to corresponding needs through supporting the protection environment in affected countries.

**3.** Increase resilience, socio-economic integration opportunities, social cohesion, and inclusive participatory processes to improve living standards of affected populations.

These objectives aim to improve the living conditions of refugees, migrants and affected host community members, and to provide a foundation for a better future for them, in line with the UN Secretary-General's Agenda for Humanity, the 2016 New York Declaration for Refugees and Migrants, the 2030 Agenda for Sustainable Development, and the Sustainable Development Goals (SDGs), based on the comparative advantages and complementarity of 192 humanitarian and development R4V actors across the region.

Reflective of the anticipated population flows, the RMRP will ensure that humanitarian, protection and life-saving assistance is provided to those refugees and migrants who arrive in a host country, either from Venezuela directly, or as a result of secondary and/or onward movements. In parallel, and recognizing that a majority of refugees and migrants from Venezuela have spent multiple years in their host communities, the RMRP 2022 takes into account longer-term integration and development dynamics. R4V response actors are therefore engaging to a greater extent than before in the development of national and local actors' capacities, including those of host authorities.



**FUNDS CHANNELED THROUGH THE RMRP: 2019–2021\***

2019 — 55% — $738 M

2020 — 47% — $1.35 B

2021 — 45% — $1.44 B

0   500 M   1 B   1.5 B   2 B

■ Funded (US$)
■ Unmet Requirements (US$)
% Percentage Funded

*\* As reported through FTS (until December 3rd)*

To further enhance the RMRP's principles of quality, timeliness and accountability, and building on the improvements developed in 2021, the RMRP's data transparency ecosystem has been further enhanced to permit for full traceability of funding, implementation and resulting impact of R4V activities.

## RMRP 2022 AND SUSTAINABLE DEVELOPMENT GOALS (SDGs)

While the governments of all 17 countries covered by the R4V response are committed to the 2030 Agenda for Sustainable Development and the SDGs, the impact of COVID-19 on national economies and social fabric, as well as the continued assistance provided to millions of refugees and migrants from Venezuela has affected host countries' ability to deliver on the 2030 Agenda. Since its inception, the RMRP has strived to complement the efforts of host governments in their response, and to maintain a balance between immediate, life-saving humanitarian assistance, and activities that bridge the humanitarian-development-peace nexus, by responding to the longer-term resilience and integration needs of affected populations and host communities. In this respect, the RMRP builds on the overarching principle of leaving no one behind in the 2030 Agenda for Sustainable Development, and of reducing vulnerabilities and providing sustainable opportunities and

solutions for all women, men, boys and girls affected by the crisis.

National ownership, fulfillment of human rights, multi-stakeholder partnership, innovation and strong accountability and monitoring frameworks, are additional principles of the 2030 Agenda which the RMRP 2022 embodies. To demonstrate the contribution of the RMRP and the activities of R4V actors towards the SDGs and targets, the RMRP's robust and regionally coherent results framework has been complemented by an indicator framework to measure the impact of assistance provided by R4V actors drawing on the established SDG indicator framework (see cross-functional and sector-level indicators for details).

Building on enhanced collaboration with national authorities, this multi-year monitoring and evaluation outlook will permit for the alignment of humanitarian and development-oriented approaches, driving the R4V response, and complements host governments' efforts to integrate SDGs in their national development plans and strategies and to define their national SDG priorities, in turn serving to strengthen the humanitarian-development-peace nexus and to bridge humanitarian and development funding streams to cover critical gaps in the delivery of 'SDG services' across the region.

## PARTNERSHIP AND COORDINATION

Since its establishment in 2018, the Regional Inter-Agency Coordination Platform has acted as an inclusive and accountable forum that steers and monitors the operational response under the RMRP. Drawing on experiences from other mixed refugee-migrant situations around the world, and pursuant to the directions of the UN Secretary-General, it is convened by the International Organization for Migration (IOM) and the United Nations High Commissioner for Refugees (UNHCR) and brings together 192 appealing organizations of the RMRP 2022, host governments and the donor community.

The Regional Platform coordinates the inter-agency response to the unprecedented outflow of more than 6 million refugees and migrants from Venezuela, and close to 5 million alone in the Latin American and Caribbean region.[13] Over the years, significant response capacities and resources have been mobilized across the region, foremost by the affected host governments, leading at national levels and seeking common solutions at the regional level, most notably through the Quito Process as the main regional intergovernmental forum concerning the impact of the outflows of refugees and migrants from Venezuela across the region.

The RMRP 2022 intends to complement these efforts and the interventions of national and local government authorities in particular, by providing support in areas where specific assistance and expertise is required, or where the governments' own response capacities are overwhelmed. Activities under the RMRP in this regard bridge the nexus between a humanitarian emergency response and the longer-term perspective to build resilience at the individual beneficiary level as well as at the

institutional level. The growing relevance of development-oriented initiatives is reflected, *inter alia*, through the growing engagement and support by international financial institutions, notably the World (WB) and the Inter-American Development Bank (IDB).

The Regional Platform covers interventions across 17 countries of the Latin American and Caribbean region and combines the responsibilities and expertise of UN agencies, international and national NGOs, and civil society, including various diaspora organizations as well as faith-based organizations and the Red Cross Movement, to ensure robust humanitarian, protection and integration responses to the growing needs of refugees and migrants from Venezuela, as well as of affected host communities. The RMRP 2022 benefits from a notable growth in the engagement of civil society actors, in particular the inclusion of now 23 refugee- and migrant-led diaspora organizations. This is reflective of the Regional Platform's commitment to localization through a strengthening of the meaningful participation, representation, and leadership of local and national actors in humanitarian coordination and action, in support of corresponding approaches deliberated in the Inter-Agency Standing Committee's (IASC) Results Group 1 on Operational Response Sub-group on Localization and the Grand Bargain.

At national and sub-regional levels, the Regional Platform is complemented by local coordination mechanisms (National and Sub-regional Platforms) that work in close collaboration with host governments. Such dedicated National and Sub-regional Platforms, tasked with the operational coordination and implementation of the RMRP, are in place in Brazil, Chile, Colombia, Ecuador and Peru – at the national levels – and in the Caribbean, Central America & Mexico and Southern Cone – at sub-regional levels. Their configuration is based on each situational context and the operational capacities of governments and RMRP partners, taking into account existing coordination structures.

To ensure that the humanitarian, protection and integration needs of refuges and migrants from Venezuela and of impacted host communities are identified, planned for and met, sector groups focusing on education, food security, health, humanitarian transportation, integration, nutrition, protection (including the sub-sectors focused on child protection, Gender-Based Violence (GBV) and human trafficking and smuggling), shelter and WASH are established at regional and national/sub-regional levels. Corresponding to their thematic expertise and competence, sectoral groups at regional level are co-/led by close to 20 different UN agencies and NGOs/civil society actors.[14] The regional coordination team and the sector leads regularly convene with thematic focal points (on Gender; Accountability to Affected Populations (AAP); Protection from Sexual Exploitation and Abuse (PSEA); and Centrality of Protection) and the leads of the different R4V Working Groups (on Cash and Voucher Assistance[15] (CVA); Communication; Communication with Communities/Communication for

---

[13]   As of November 2021. See R4V Dashboard: https://www.r4v.info/es/refugiadosymigrantes

[14]   At the time of the drafting of this RMRP, 8 NGOs, the IFRC, and 10 UN agencies led regional Sectors, Working Groups and thematic areas.

[15]   The term as Cash and Voucher Assistance (CVA) is used throughout the RMRP 2022, but is equivalent and/or encompasses other terms used in other contexts, such as Cash-Based Interventions (CBI), Cash-Based Assistance (CBA) and Cash Transfer Programming (CTP).

Venezuela AR_000842

Development (CwC/C4D); Fundraising; and Information Management) in the framework of the regional Inter-Sector Coordination Group (ISCG).

Details on country-specific coordination arrangements, operational updates and responses, analysis on movements and other related matters are available on the R4V web portal, which since the relaunch of the webpage in 2021, also features sectoral and country-level subsites (*https://r4v.info*).

By participating in the RMRP 2022, and in order to provide timely and transparent information on the implementation of the RMRP, as well as on the use of resources, all R4V actors commit to engaging in the existing regional, sub-regional and national

coordination mechanisms, adhering to agreed standards specified in the RMRP and complementary sectoral strategies, and to report on their achievements (disaggregated by age and gender) and on funds received through the RMRP's regionally coherent monitoring and reporting framework. Monitoring and reporting procedures are agreed in consultation between the Platforms, and the corresponding data is regularly published on the R4V web portal, while continuously updated financial information is available on the website of OCHA's FTS, as well as on the R4V web portal.



NUMBER OF ORGANISATIONS PER TYPE PER RMRP

# REGIONAL SECTOR STRUCTURE: RMRP 2022



\*   These are all of the active sectors under the RMRP. Sector lead organizations only represent regional-level leadership.

## TOTAL COVID-19 REQUIREMENTS



**$1.79 B**
Total requirements

$317 M        $1.79 B

■ COVID-19 requirements*    ■ Non-COVID-19 requirements

## COVID-19 REQUIREMENTS BY COUNTRIES

■ COVID-19 response*   ■ Non COVID-19 requirements   Total requirements

| Brazil | $125 M | | Peru | $304 M |
|---|---|---|---|---|
| $66.7M | $58.3 M | | $105.M | $199 M |
| Chile | $59.4 M | | Caribbean | $68.4 M |
| $8.21M | $51.2 M | | $9.28M | $59.1 M |
| Colombia | $802 M | | Central America & Mexico | $24.0 M |
| $74.8M | $727 M | | $1.46M | $22.5 M |
| Ecuador | $288 M | | Southern Cone | $46.7 M |
| $33.8M | $254 M | | $7.91M | $38.8 M |

## COVID-19 REQUIREMENTS BY SECTOR

■ COVID-19 response*   ■ Non COVID-19 requirements   Total requirements

| Education | $100 M | | Child Protection | $53.0 M |
|---|---|---|---|---|
| $25.6M | $74.4M | | $8.59M | $44.4 M |
| Food Security | $283 M | | Gender-Based Violence (GBV) | $44.1 M |
| $13.9M | $269 M | | $6.32M | $37.8 M |
| Health | $229 M | | Human Trafficking & Smuggling | $13.6 M |
| $72.1M | $157 M | | $1.71M | $11.9 M |
| Humanitarian Transportation | $11.5 M | | Shelter | $112 M |
| $198K | $11.3 M | | $27.3M | $84.7 M |
| Integration | $380 M | | WASH | $65.2 M |
| $46.1M | $334 M | | $31.5M | $33.7 M |
| Nutrition | $8.67 M | | Multipurpose Cash Assistance (MPC) | $201 M |
| $3.17M | $5.50 M | | $48.0M | $153 M |
| Protection | $219 M | | Common Services | $62.5 M |
| $20.9M | $198 M | | $11.1M | $51.4 M |

\*   Directly related COVID-19 requirements

\**   This includes Support Spaces

# REGIONAL WORKING GROUPS AND CROSS-CUTTING THEMES

## GENDER

The Regional Inter-Agency Coordination Platform (R4V) has been developing a comprehensive gender and human rights perspective in the response to the needs of refugees and migrants from Venezuela, integrating among other measures – such as gender perspectives in sectoral programming – the Gender with Age Marker (GAM) within the RMRP planning. This tool is used to improve gender and age-equitable programming in response to needs in humanitarian or highly complex contexts. As of 2022, the GAM also includes data and indicators on disability, further strengthening intersectionality in the response.

Over the past years, R4V partners have shown an increasing commitment to integrating gender and age in their activities and in recognizing that equal rights for men and women are a pre-condition for fulfilling the principles of *leave no one behind* and *do no harm*. In the 2020 and 2021 RMRPs, 80 per cent of R4V partners reported incorporating gender equality measures in their planning. In 2022 this percentage reached 92 percent.

The GAM examines the incorporation of Gender Equality Measures (GEM) during the design of a project in four dimensions: gender analysis, tailored activities, influence on the project, and benefits adapted to different needs and barriers. The results of the 2022 GAM show a high percentage of R4V actors incorporating a thorough intersectional gender lens that considers age and/or disability indicators across all four dimensions.

The results of the GEM-G dimension, which measures the participation of the affected population in the design and implementation of a project, indicate that 96 per cent of partners disaggregate the population reached by gender. When asked about the groups they prioritize, 19 per cent consider the participation of women as a priority; 6 per cent prioritize working with LGBTQI+ persons; 2 per cent prioritize men; and 58 per cent of organizations identify "all genders" as their priority. This suggests that there is a need to further encourage organizations to use a more exhaustive gender disaggregation, since global categories, such as the latter, encumber the identification of specific needs by gender groups (women, men and LGBTQI+ persons).



**INCORPORATING GENDER, AGE AND DISABILITIES IN RMRP 2022 PLANNING: GAM SELF-ASSESSMENT RESPONSES BY ORGANIZATIONS**

- ■ Actions are intended to contribute to gender equality across all age groups and/or persons with disabilities
- ■ Actions intend to contribute to gender equality, but without attention to age groups and/or persons with disabilities
- ■ Actions intend to address age and/or disability differences, but without attention to gender equality
- ■ The actions do not respond to gender, age or disability differences; nor do they address the different needs of specific groups of interest
- ■ The proposal does not incorporate actions

*Source: GAM data- RMRP 2022*



**GENDER GROUPS THAT WILL HAVE A DIRECT INFLUENCE ON RMRP 2022 ACTIVITIES**

**58%** All Gender Groups

**19%** Females

**6%** LGBTI / Other Genders

**4%** Gender is not considered

**2%** Males

*Source: GAM data - RMRP 2022*

## THE GAM RESULTS BY COUNTRY:

- **GAM 0:** Did not use GAM
- **GAM 1:** Does not incorporate gender equality
- **GAM 2:** Age and/or disabilities, but not gender
- **GAM 3:** Gender but not age or disability
- **GAM 4:** Gender, age and disabilities

| Country | Total Submissions | Organizations that completed the GAM | GAM 4 | GAM 3 | GAM 2 | GAM 1 | GAM 0 |
|---|---|---|---|---|---|---|---|
| Colombia | 72 | 62 | 46 | 6 | 2 | 8 | 10 |
| Peru | 49 | 48 | 32 | 9 | 3 | 4 | 1 |
| Ecuador | 48 | 47 | 33 | 9 | 2 | 3 | 1 |
| Brazil | 32 | 29 | 16 | 5 | 5 | 3 | 3 |
| Dominican Republic | 13 | 13 | 4 | 4 | 0 | 4 | 0 |
| Chile | 11 | 11 | 9 | 2 | 0 | 0 | 0 |
| Argentina | 10 | 10 | 6 | 2 | 2 | 0 | 0 |
| Trinidad & Tobago | 9 | 8 | 6 | 1 | 1 | 0 | 1 |
| Uruguay | 7 | 7 | 5 | 0 | 0 | 2 | 0 |
| Bolivia | 6 | 6 | 6 | 0 | 0 | 0 | 0 |
| Guyana | 7 | 6 | 2 | 3 | 0 | 1 | 1 |
| Panama | 7 | 6 | 4 | 1 | 0 | 1 | 1 |
| Paraguay | 4 | 4 | 3 | 1 | 0 | 0 | 0 |
| Curacao | 6 | 3 | 3 | 0 | 0 | 0 | 3 |
| Costa Rica | 2 | 2 | 2 | 0 | 0 | 0 | 0 |
| Mexico | 2 | 2 | 2 | 0 | 0 | 0 | 0 |
| Venezuela | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| Regional Projects | 7 | 7 | 4 | 0 | 0 | 3 | 0 |
| Total | 293 | 272 | 184 | 43 | 15 | 30 | 21 |



The GAM incorporated three questions to analyze the use of intersectionality in the design of projects with the intention of inclusion of all groups of refugees and migrants from Venezuela, and more broadly, the reduction of discrimination. A minority of organizations (32 per cent) expect people with disabilities to have a direct influence on activities, while the indicators are more positive in relation to influence over gender roles (46 per cent) and the consideration of LGBTQI+ persons (51 per cent). These results demonstrate the need to continue using gender equality measures and intersectionality as cross-cutting pillars in the design of interventions to respond to the needs of refugees and migrants from Venezuela in all their diversity.

*Source: GAM data- RMRP 2022*



### INTERSECTIONALITY ANALYSIS OF SUBMISSIONS

Are there plans for people with disabilities to directly influence the project? — 32% | 51% | 17%

Does the analysis consider the situation of LGBTI+ / other gender groups? — 51% | 26% | 23%

Do the activities aim to modify or change gender roles and/or relations? — 46% | 33% | 22%

0%  20%  40%  60%  80%  100%

■ Yes  ■ No  ■ No response

*Source: GAM data - RMRP 2022*

The Regional Platform will continue promoting the adoption of an intersectional gender lens through gender-sensitive coordination, planning, response, monitoring and evaluation. During 2022, the R4V gender focal point will organize tailored trainings to strengthen capacities among R4V partners for mainstreaming gender across all phases of programming. Technical assistance will be provided to ensure the adoption of a gender perspective in work plans, needs assessments, information management and communication. This will include working jointly with Sector and Sub-sector leads in mainstreaming gender in their annual work, but also in fulfilling their commitment to apply the principle of Centrality of Protection with an age, gender and diversity (AGD) approach. In addition, collaboration with AAP and PSEA focal points will be fostered to ensure gender-responsive complaint and feedback accountability mechanisms. Finally, an in-depth analysis of the last three years' application of a gender lens throughout the Regional Platform will be shared with partners, reviewing best practices and challenges to advance gender mainstreaming across sectors.

## AGE AND GENDER DISAGGREGATION

### REGIONAL



**REGIONAL**

↑ **32.4%**  ↑ **34.9%**
↑ 16.0%  ↑ **16.7%**

↑ **32.4%**  ↑ **34.0%**
↑ 16.7%  ↑ **16.9%**

↑ **31.2%**  ↑ **35.2%**
↑ 17.1%  ↑ **16.5%**

### BRAZIL

↑ **29.7%**  ↑ **32.1%**
↑ 19.2%  ↑ **19.0%**

↑ **29.7%**  ↑ **32.1%**
↑ 19.2%  ↑ **19.0%**

↑ **27.6%**  ↑ **30.1%**
↑ 21.2%  ↑ **21.1%**

### CHILE

↑ **37.9%**  ↑ **41.7%**
↑ 9.90%  ↑ **10.5%**

↑ **36.8%**  ↑ **41.9%**
↑ 10.5%  ↑ **10.8%**

↑ **36.2%**  ↑ **43.7%**
↑ 9.90%  ↑ **10.2%**

### COLOMBIA

↑ **29.3%**  ↑ **32.9%**
↑ 18.3%  ↑ **19.5%**

↑ **29.4%**  ↑ **32.1%**
↑ 19.1%  ↑ **19.3%**

↑ **30.0%**  ↑ **31.0%**
↑ 19.9%  ↑ **19.1%**

### ECUADOR

↑ **28.9%**  ↑ **30.4%**
↑ 20.0%  ↑ **20.7%**

↑ **29.2%**  ↑ **30.7%**
↑ 19.8%  ↑ **20.3%**

↑ **21.8%**  ↑ **31.5%**
↑ 20.4%  ↑ **21.8%**

### PERU

↑ **44.6%**  ↑ **37.5%**
↑ 9.10%  ↑ **8.80%**

↑ **41.8%**  ↑ **35.1%**
↑ 11.4%  ↑ **11.7%**

↑ **38.2%**  ↑ **41.0%**
↑ 10.6%  ↑ **10.2%**

### CARIBBEAN

↑ **31.6%**  ↑ **40.9%**
↑ 14.2%  ↑ **13.3%**

↑ **35.3%**  ↑ **42.0%**
↑ 11.1%  ↑ **11.6%**

↑ **32.4%**  ↑ **41.4%**
↑ 12.6%  ↑ **13.6%**

### CENTRAL AMERICA & MEXICO

↑ **39.6%**  ↑ **40.6%**
↑ 9.70%  ↑ **10.2%**

↑ **39.3%**  ↑ **40.2%**
↑ 10.1%  ↑ **10.5%**

↑ **34.5%**  ↑ **44.5%**
↑ 10.5%  ↑ **10.4%**

### SOUTHERN CONE

↑ **42.4%**  ↑ **41.8%**
↑ 7.90%  ↑ **7.80%**

↑ **40.5%**  ↑ **41.2%**
↑ 9.30%  ↑ **9.00%**

↑ **44.5%**  ↑ **45.9%**
↑ 4.80%  ↑ **4.70%**

Population Projection    People in Need    People targeted    Venezuela AR_000849

# ENVIRONMENT

## PRIORITY NEEDS

The mixed movements of refugees and migrants from Venezuela and the response provided by humanitarian and development actors through this RMRP have a notable environmental footprint. COVID-19 and associated biosafety measures made it necessary for many RMRP activities to adapt their modus operandi in 2020 and 2021. For instance, to reduce physical contact, food distribution was only possible by delivering packed meals, generating additional waste. At the same time, actors became aware that other alternative approaches were possible, including those that can also benefit the environment. For example, in terms of cash and voucher assistance (CVA) provided by R4V partners, many steps were digitized and simplified, reducing paper usage, and minimizing mobilization of response actors and beneficiaries. In Brazil and Colombia, pilot projects were implemented to enable the integration of refugees and migrants into green jobs to support economic reactivation while promoting a more sustainable business model. Such experiences and lessons learned from COVID-19 adaptation processes are being incorporated into environmental mainstreaming tools for projects.[16] Based on these experiences, there is still some potential for R4V actors to reduce their own carbon footprint and minimize negative environmental impacts associated with their operations, applying more sustainable management and adapting internal procedures.

According to the environment self-assessment exercise for partners in the RMRP 2022, the highest levels of environmental mainstreaming appear in Chile, Colombia and Paraguay (over 70 per cent of all interventions per country), and among the Sectors, in Humanitarian Transportation,[17] Shelter, WASH and Food Security (all over 70 per cent per Sector), most likely since environmental criteria were already part of the project planning approaches in these Sectors. On the other hand, environmental mainstreaming is rather new for the Cash and Voucher Assistance response and the Integration Sector, with the lowest rates (50 per cent each), nevertheless representing an increase of actors planning to include environmentally sensitive approaches in comparison to previous years. Overall,

more than half of all RMRP appealing organizations at least partially considered environmental factors in the design of their activities, and over a quarter intend to carry out environmental assessments before starting implementation.

Despite the strong interest, for some partners, especially those who recently joined the RMRP (90% of R4V partners are NGOs and Civil Society Organizations (CSOs), including many local and smaller actors), environmental mainstreaming and climate action still represent new approaches, requiring greater guidance, including in Spanish and/or Portuguese, and on urban contexts, representing additional obstacles for some R4V actors. Only a few R4V partners, mostly international organizations, have access to specialized in-house expertise in this field, or can afford external technical expertise to proactively include environmental considerations into their programming, and rely on available general guidance information to mainstream environmental considerations into their activities.[18]

## RESPONSE STRATEGY

Considering the increased number of R4V partners that have submitted activities under the RMRP 2022, awareness-raising on the importance of and the need for environmental mainstreaming will continue. Improved access to context-adapted tools will be important to overcoming these challenges and to increasing the capacity of R4V partners to include climate action and environmental impact mitigation as priorities in the RMRP planning cycle. Therefore, some tools are being adapted,[19] new ones are under development[20] and existing ones will be disseminated[21] among R4V partners and Sectors to generate technical expertise and ideally facilitate strategic approaches at country levels. Close cooperation and coordination with local and national authorities, academia and the private sector, will be important for the promotion and creation of green jobs and circular economy (to support socio-economic reactivation and integration), to reduce the environmental footprint (e.g. through research and development of more sustainable materials for Shelter) and to align with local and national climate action plans (e.g. to reduce climate change-induced disaster risks[22] or environmental induced protection needs[23]).

---

[16]   In Colombia, the Cash Working Group developed the Cash & Environment Checklist (https://www.r4v.info/en/node/88431/) to mitigate the impact of cash activities on the environment. Similar tools for other Sectors to mainstream environmental considerations in humanitarian action are being adapted or are under development.

[17]   Humanitarian Transportation is the sector with the highest increase compared to the year before (52 per cent of positive answers for RMRP 2021, 77 per cent of positive answers for RMRP 2022).

[18]   See hereto: Environmental Mainstreaming Guidance for RMRP 2020 planning: https://www.r4v.info/en/keyresources#block-inline-blockfree-text—14

[19]   The Nexus Environmental Assessment Tool (NEAT+) (https://neatplus.org/) for rural environments has already been translated into Spanish. An English version for urban environments was developed by UNHCR Brazil and UNEP-OCHA Joint Environmental Unit (JEU) is being piloted.

[20]   Among others, UNEP Panama is preparing a tool called the Virtual Environmental and Humanitarian Advisor Tool (VEHA Tool) to be launched in 2022. It aims to provide automated advice to facilitate the integration of environmental considerations in common humanitarian response planning and response actions in most humanitarian sectors. It also enables Sector coordinators to identify environmental activities and indicators that are relevant in their Sector/Sub-sector strategic planning, supporting the development of a more environmentally sensitive RMRP.

[21]   E.g. Climate, Environment and Disaster Risk Reduction Integration Guidance (CEDRIG): https://cedrig.org/ and The Sphere Handbook: https://spherestandards.org/handbook-2018/

[22]   E.g. floods, landslides.

[23]   E.g. modern slavery or economic coercion related to deforestation, illicit crops and illegal mining; GBV as a means by which to control and restrict access to land and natural resources; uncontrolled use of pesticides from aircrafts affecting local communities and water quality. Venezuela AR_000850

# CENTRALITY OF PROTECTION

Protection, as per the Inter-Agency Standing Committee (IASC) *definition*,[24] includes "all activities aimed at obtaining full respect for the rights of the individual", as established by relevant bodies of international law.

In this sense, activities of all R4V partners under the different sectors of the RMRP 2022 are designed to protect the rights, safety and dignity of refugees and migrants from Venezuela, under the *Centrality of Protection* (CoP) approach[25] and beyond the sole delivery of services.

R4V partners are committed to maintaining the CoP principle, with an age, gender and diversity (AGD) lens, to incorporate special protection considerations and a rights-based approach for affected populations, based on their characteristics (including women, men, girls and boys; indigenous peoples; survivors of violence, including GBV; persons in irregular situations; and more).

## PRIORITY NEEDS

The COVID-19 pandemic has exacerbated social and economic inequalities prevailing in the region, aggravating protection risks and creating a perilous environment for refugees and migrants from Venezuela, one that is conducive to public displays of xenophobia, violent manifestations, and discrimination. This has put refugees and migrants at greater risk of violations of their rights, safety and dignity that are the result of discriminatory attitudes, combined with a lack of legal or social protection, including deportations and other expedited removal procedures, family separation and increased evictions.

Despite the continuous efforts from governments at both national and local levels to mitigate and respond to risks – often under severe budgetary constraints - the overall protection environment has been affected across the region and continues to face challenges. These include the overload of asylum systems, lack of access to regularization, and the adoption of measures restricting access to territories, with a growing number of individuals left without protection, health services, education, or livelihood opportunities.

## RESPONSE STRATEGY

In 2022, each Sector of the R4V response will take into account the specific vulnerabilities that underlie specific protection risks and all persistent barriers to access assistance and the full enjoyment of rights, highlighting the need for intersectoral approaches, thereby putting protection at the centre of the R4V work.

In particular, 2022 will see important advances on regularization initiatives by several governments in the region, where R4V partners have prioritized promoting access to documentation for refugees and migrants from Venezuela, against the backdrop of which important advances in accessing health, education, livelihoods and other rights and opportunities are expected.

In addition, both direct services as well as advocacy with host governments will be required to promote the best outcomes for refugees and migrants from Venezuela, including integration in COVID-19 vaccination programmes and other social protection mechanisms, as well as access to socio-economic rights, including the right to equal conditions of work, remuneration and fair wages, social security, housing and education, in addition to physical and mental health care.

Refugees and migrants from Venezuela with specific protection needs, including survivors of GBV and other forms of violence, victims of human trafficking, persons with disabilities, the elderly, pregnant and lactating women, young children, indigenous and Afro-descendent communities, and LGBTQI+ persons, among others, are to be prioritized in the context of the R4V response, with tailored actions required by R4V partners to respond to their special needs.

Response activities therefore continue to include strategies to meaningfully engage different groups of the affected populations in the design, implementation and evaluation phases of the response, taking into account peoples' preferences and priorities to deliver on the basis of the "do no harm" principle.

[24]  Inter-Agency Standing Committee (IASC), Policy on Protection in Humanitarian Action, 2016, "... all activities aimed at obtaining full respect for the rights of the individual in accordance with the letter and the spirit of the relevant bodies of law (i.e. International Human Rights Law (IHRL), International Humanitarian Law, International Refugee law (IRL))." *https://interagencystandingcommittee.org/system/files/iasc_policy_on_protection_in_humanitarian_action.pdf*
[25]  IASC, The Centrality of Protection in Humanitarian Action, 2013. *https://interagencystandingcommittee.org/system/files/the_centrality_of_protection_in_humanitarian_action_english_.pdf*

# PROTECTION FROM SEXUAL EXPLOITATION AND ABUSE (PSEA)

Protection from Sexual Exploitation and Abuse (PSEA) is an integral, cross-cutting component of the 2022 RMRP and the overall R4V response. SEA is recognized as a form of GBV and an egregious breach of accountability to affected people (AAP), requiring robust and coordinated organizational and collective prevention and response measures. The Regional Community of Practice on PSEA (PSEA COP) established in 2021 will promote collective, regional and in-country prevention and response approaches to SEA at both the technical and strategic levels, while strengthening partners' PSEA capacities. Building on recommendations of the regional PSEA mapping exercise (2020-2021),[26] the PSEA COP will promote and support country/sub-regional PSEA fora, comprised of designated R4V partner PSEA focal points. At the regional level, the PSEA COP will connect these fora to promote information and knowledge sharing, monitor collective PSEA achievements, and strengthen collaboration between agencies to build capacity on PSEA within R4V partners.

## RESPONSE STRATEGY

The ultimate goal of the PSEA COP[27] is to support R4V partners in implementing coordinated activities to minimize the risk of SEA, ensure effective response when incidents arise, and raise awareness of PSEA at the national/sub-regional level. The PSEA COP will develop a Regional R4V PSEA Action Plan to implement the following PSEA-related priority activities for 2022:

*For the prevention of SEA:*

1. **Conduct SEA risk assessments:** Utilizing the R4V PSEA methodology, conduct joint SEA risk assessments to have a comprehensive picture of SEA risks and response capacities in different operational sites, to inform the implementation/adjustment of response activities and PSEA programmes and interventions.

2. **Ensure that all R4V partner organizations have documented policy, strategies, and guidance in place to prevent SEA:** Train PSEA focal points; organize high-level dialogues for senior management of key stakeholders and partners; support national/sub-regional PSEA fora with capacity-building and support, including coaching and mentoring of partner organizations on key issues (e.g. PSEA policies, codes of conduct, recruitment policies,

internal reporting mechanisms and investigations) and best practice seminars.

3. **Build capacity among personnel from all R4V partners on PSEA:** Roll-out the R4V PSEA training package.[28]

4. **Provide PSEA information to affected communities:** Disseminate collective PSEA awareness-raising messages, previously co-developed with affected communities (in coordination with AAP and CwC).

5. **Promote affected communities' meaningful participation in the response:** In coordination with AAP, conduct a perception study of whether affected communities perceive the R4V response as safe, relevant and timely.

*For the response to SEA:*

6. **Establish and monitor inter-agency Community-Based Complaint Mechanisms (CBCM) at the country level:** Develop a practical step-by-step toolkit to support partners in establishing inter-agency CBCM SOPs, compliant with global good practice.[29]

7. **Provide timely, quality assistance to victims/survivors of SEA:** Undertake joint service mapping and consultations on access to and availability of multi-sectoral GBV and child protection services for SEA victims/survivors; and conduct joint advocacy for the establishment/scaling-up of services where gaps exist (in coordination with Child Protection, Gender-Based Violence and Human Trafficking & Smuggling Sub-sectors).

The PSEA COP will monitor collective R4V PSEA achievements in-country through a mid-year and end-year review. Coherence will be ensured with R4V AAP commitments.

---

[26] R4V PSEA Mapping Report, October 2020: https://www.r4v.info/es/document/r4v-protection-against-sexual-exploitation-and-abuse-psea

[27] The presence of the PSEA COP or country level networks/fora does not lessen the responsibility of individual R4V partners to develop, implement, and strengthen internal PSEA programs at the country level. Senior management within each partner organization is accountable for PSEA within their organizations.

[28] https://www.r4v.info/es/document/capacitacion-en-proteccion-contra-la-explotacion-y-abuso-sexual-peas-para-organizaciones

[29] Best Practice Guide on Inter-agency CBCMs and Global SOPs, including Spanish translation: https://interagencystandingcommittee.org/iasc-task-team-accountability-affected-populations-and-protection-sexual-exploitation-and-abuse/iasc-best-practice-guide-inter-agency-community-based-complaints-mechanisms-2016

## REGIONAL PSEA MAPPING EXERCISE

R4V partners participating in the mapping exercises report:

 **30%**
Report not having the minimum **organizational structures** to deal with SEA (a policy addressing SEA and complaint handling procedures)

**50%** 
Are not aware of whether there is a PSEA Focal Point within their organization

**Inter-agency PSEA protocols** were identified in Colombia and Ecuador and are under development in Chile and Brazil. **Inter-agency CBCMs** were only identified in Colombia 

 Argentina, Colombia, Chile and Brazil have been identified as having dedicated **PSEA inter-agency coordination groups**, while Mexico is developing a Sub-Working Group on PSEA.

 **80%**
Report being **unaware of any existing Inter-agency referral pathways** for victim assistance.

**56%** 
Report having produced **awareness-raising material** for staff and related personnel

**62%** 
Report requiring support to undertake community consultations regarding PSEA (prevention messaging, how the complaints handling process can accommodate SEA, preferred reporting channels)

**~6,400**
Personnel from R4V partner organizations reached with PSEA training in the first half of 2021

---

## ACCOUNTABILITY TO AFFECTED POPULATIONS (AAP)

### PRIORITY NEEDS

Accountability to Affected Populations (AAP) in the R4V response requires actors to provide affected populations – in this case, refugees and migrants from Venezuela and members of affected host communities – with accurate information, to listen to and respond to feedback and complaints, and include them in decisions that affect their situation and lives. AAP is an essential component of good programming to ensure assistance is relevant and effective and strengthens trust between communities and response actors. Because of its transversal nature, AAP is not the responsibility of a single team or organisation, but instead a shared responsibility of all R4V actors and personnel.

Needs across AAP were identified in 2021 through a regional mapping[30] to understand current implementation, capacities and challenges that organizations are experiencing in this area:

---

[30]  Mapping to Create an AAP Baseline for the R4V Regional Response, R4V, October 2021: *https://www.r4v.info/en/document/mapping-create-aap-baseline-r4v-regional-response*

Venezuela AR_000853

## RESPONDENTS TO THE AAP SURVEY REPORT:

**67%** Know about AAP- but almost half of the respondents never received training on the topic.

**70%** Provide information to affected populations as part of their organization's work - but rarely involve them in developing the materials.

**75%** Engage communities through consultations - mostly during needs assessments.

**62%** Collect feedback (formally or informally) - though it is rarely systematized are rarely systematized for decision-making, and organizations do not share findings or coordinate mechanisms.

Not only experts but staff with different technical backgrounds implement AAP activities.

## WHAT WE NEED TO IMPROVE:

 Better coordinate among partners and start implementing interagency solutions.

 Strenghen capacities and ensure all types of actors are involved in coordination spaces to influence AAP work.

 Involve affected populations in all phases of the response - including planning, monitoring and evaluation.

 Frame AAP work for a shared understanding and cohesive approach across the region.

## RESPONSE STRATEGY

In 2022, the R4V Regional Platform will continue mainstreaming accountability by focusing on four main areas: i) leadership, ii) participation and partnerships, iii) information, feedback and action, and iv) results.

The AAP Network, composed of regional and national R4V focal points, acts as a reference body to ensure tools and initiatives promoted at the regional level are informed by and applied at the field level. The Network will also facilitate the exchange of experiences and best practices. Three key priorities have been identified based on recommendations of the AAP mapping:

1. Capacity-building and coordination support to National and Sub-Regional R4V Platforms on AAP.

2. Implementation of collective approaches and joint initiatives on AAP.

3. Engagement with affected populations in all phases of the R4V response. Activities in these areas will include:

• Capacity-building through the roll-out of a standardized training module on AAP for all R4V personnel, and the development and implementation of a Training of Trainers (ToT) in AAP, with a focus on collective accountability approaches.

• Collecting and sharing lessons learned and best practices and disseminating these through webinars. Defining a Regional AAP Framework to guide accountability work, ensure consistency, and set minimum actions for the participation of affected populations in the R4V response.

• Reviewing existing and developing new AAP tools and guidance to support interagency action, focusing on Complaints and Feedback Mechanisms (CFMs) and participation of communities in the response, and piloting these tools in partnership with R4V National and Sub-Regional Platforms.

• In collaboration with the Communication with Communities (CwC) Working Group, developing materials on the rights of refugees and migrants vis a vis assistance delivered, such as the right to complain; commitments on PSEA; and the right to be informed on available services.

As part of efforts towards collective accountability of the R4V Platform, the AAP Network will conduct a study of affected peoples' perceptions of the R4V response, and whether they consider the assistance delivered is safe, relevant, and timely. This will help identify the response's strengths and areas of needed improvement, through a people-centric approach and understanding of the community perception of the work by R4V partners.

In 2022, the AAP Network will collaborate with Sectors and Working Groups whose work is closely interlinked with its objectives, such as the CwC and the Support Spaces Working Groups; the PSEA Community of Practice; the Protection Sector and its three Sub-sectors. Regional AAP focal points will provide technical support to inter-agency national AAP focal points for the day-to-day planning, piloting and implementation of initiatives to increase the R4V response's accountability through collective and inter-agency action.

# COMMUNICATION WITH COMMUNITIES / COMMUNICATION FOR DEVELOPMENT (CWC / C4D)

## PRIORITY NEEDS

In the midst of emergencies and complex humanitarian and development challenges – including the response to the situation of refugees and migrants from Venezuela displaced in the 17 countries of the R4V response, as well as the ongoing COVID-19 pandemic in the region – information is itself a commodity and a form of assistance. Accurate communication saves lives. The absence of information, meanwhile, can lead to unnecessary human suffering, humanitarian and development responses that do not address the most pressing needs of affected populations, and an inability of vulnerable peoples to exercise fundamental rights or access basic services, especially for people on the move in countries where they are not familiar with local customs, laws and procedures.

With this understanding, Communication with Communities (CwC) and Communication for Development (C4D) are essential components of the R4V response. R4V partners, Platforms, Sectors and Working Groups incorporate CwC/C4D across their activities and processes to ensure that refugees and migrants can meaningfully communicate with and provide input to humanitarian and development actors, and also, receive information tailored to their contexts, language and cultural backgrounds, rights and needs.

## RESPONSE STRATEGY

Based on consultations with National and Sub-regional R4V Platforms and communication assessments with affected populations conducted by the regional CwC/C4D Working Group,[31] the following are identified response priorities for 2022:

• Standardizing communication products to facilitate the work of partners at the national and sub-regional levels.

• Strengthening two-way communication channels to engage in dialogues with affected communities, to adapt communication products to their needs and improve accessibility.

• Identifying and informing R4V partners of the main information and communication needs of the affected population.

• Strengthening capacities to generate a common understanding of CwC/C4D among R4V partners, to contribute to scaling-up collective AAP efforts and increasing the overall accountability of the R4V response.

• Enhancing coordination mechanisms between CwC/ C4D and AAP, both at the regional and national levels, to

have a comprehensive and aligned vision of participatory approaches, also taking into account linkages with PSEA to collaborate and avoid duplication of efforts.

Increasing collective accountability to affected populations (AAP) has been a strategic priority of the R4V response and of the R4V Inter-Agency Coordination Platforms at the regional, sub-regional and national levels. As AAP very closely interlinks with CwC/C4D, the Working Group will work to support refugees and migrants from Venezuela with information that allows them to be empowered, to actively participate in decision-making and influence activities that affect them. Through this approach, the CwC/C4D Working Group will ensure that its work is complementary to AAP efforts, avoiding duplication and maximizing the use of resources and technical expertise.

Specific inter-agency activities of the WG will include:

1. Supporting National and Sub-Regional R4V Platforms to assess and monitor communication preferences of affected populations, and to create guidance and training materials.

2. Expanding the U-Report *Uniendo Voces* to reach additional countries, as a key interagency tool to provide information to and receive feedback from affected people.

3. Strengthening the capacities of R4V partners with regards to:

   • Providing accessible and inclusive information to affected populations according to their preferences and communication habits;

   • Involving affected people in the co-creation of materials; and

   • Complementing AAP training processes, including through the use of context-specific two-way channels to implement complaints and feedback mechanisms.

4. Sharing strategies, good practices and lessons learned through webinars and other fora.

5. Strengthening risk communication (e.g. for COVID-19 prevention, emergencies, and on other risks affected populations may face during their journeys).

---

[31]   See R4V CwC/C4D Working Group, Information Needs Assessment (2019): https://www.r4v.info/es/documents/details/73683 and a survey on Information Needs disseminated through U-Report *Uniendo Voces* in 2020: https://www.r4v.info/en/document/information-and-communication-needs-assessment-u-report-uniendo-voces-regional-poll

# CASH AND VOUCHER ASSISTANCE (CVA)

## PRIORITY NEEDS

An increasing number of refugees and migrants from Venezuela, as well as affected host communities, have been unable to meet their basic needs and achieve socio-economic integration. Lack of income, an over-reliance in the informal sector and low rates of inclusion in national social protection mechanisms – particularly in the context of simultaneous mobility restrictions, health and economic crises prompted by the COVID-19 pandemic – have increased refugees' and migrants' exposure to protection-related risks (including GBV or evictions), which are exacerbated among children, adolescents, women, people with disabilities, LGBTQI+ persons and the elderly.[32]

Across R4V countries, food, shelter/rental support and stable income sources (employment) continue to be priority needs.[33] Cash and voucher assistance (CVA) is an **appropriate** and feasible tool to respond to these needs, minimize the use of negative coping strategies, and act as a safety net for refugees and migrants from Venezuela, while supporting the reactivation and recovery of local markets. It is also the assistance modality preferred most by refugees and migrants.[34] Multipurpose cash (MPC) as an assistance modality, specifically, has enabled refugees and migrants from Venezuela to make choices about how to meet these needs, increasing dignity and flexibility of the humanitarian response.[35]

In addition, the results from a survey carried out by the Regional Cash Working Group (RCWG) show that promoting linkages between humanitarian national CVA and national social protection systems is a key priority.

## RESPONSE STRATEGY

The planned activities under CVA will respond to humanitarian needs while continuing to support local, national and regional stakeholders to identify durable solutions for refugees and migrants and affected host communities. The RCWG will prioritize the promotion of MPC and linkages between humanitarian CVA and national social protection mechanisms, for example, in countries such as Colombia and Ecuador,[36] which in 2022 are engaging in regularization processes to integrate Venezuelans in irregular situations and reduce legal barriers to accessing social services.

In the 2022 RMRP, CVA (including sectoral CVA and MPC) represents 30 per cent of the planned response. Some **USD 200,717,629** will be disbursed through MPC transfers in 2022. With the support of **55 partners** across 17 countries, the RMRP response aims to reach **1.1 million** refugees and migrants from Venezuela and host communities with MPC. The response will target vulnerable households who, due to a lack of income, are unable to meet their basic needs, are exposed to protection risks (including GBV or evictions), suffer from food insecurity, cannot access adequate and safe housing, use negative coping mechanisms to meet their needs, or are unable to engage in activities to achieve their full socio-economic integration.

The RCWG will facilitate the scale-up of MPC in the region, through support to National and Sub-regional R4V Platforms, Cash Working Groups at country-level, and regional Sectors. It will generate and share knowledge to harmonize CVA approaches through common tools and guidelines. Given the large proportion of sectoral CVA assistance planned for 2022, in addition to MPC, the RCWG will promote complementarity and coherence among the multiple sectoral CVA interventions. This includes joint work with Sectors in the design of CVA to promote intersectoral linkages, with a goal to move towards more integrated assistance.

The RCWG will strengthen its work on the humanitarian and development nexus, fostering collaboration between national Cash Working Groups and local authorities. Wherever possible, the RCWG will leverage partners' presence on the ground and their long-standing work with national systems to promote alignment and referrals, including exit strategies, into local social protection mechanisms.[37]

CVA will be provided with the objective of putting the protection of refugees and migrants at the centre of activities, including considerations for persons with specific protection needs, such as through the empowerment of people with disabilities, as well as addressing gender imbalances in the design and implementation of cash transfers. Finally, the provision of information, effective feedback mechanisms, and the promotion of active participation of refugees and migrants from Venezuela in programme design will be essential to promote AAP.

---

[32] IPC-IG, UNICEF and WFP, Social protection and Venezuelan migration, April 2021: https://www.unicef.org/lac/en/reports/social-protection-and-venezuelan-migration

[33] See JNAs in Colombia (June 2021): https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021, Ecuador (May 2021): https://www.r4v.info/es/document/grtm-ecuador-evaluacion-conjunta-necesidades-mayo-2021, Peru (May 2021, p.36): https://www.r4v.info/es/document/analisis-conjunto-de-necesidades-rmrp-2021

[34] See, e.g., R4V Colombia (GIFMM), Joint Needs Assessment for population in destination, fifth round (June 2021): https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021

[35] In 2021, CVA accounted for 28 per cent of people reached by the RMRP, and MPC accounted for 59 per cent of people reached with CVA.

[36] See the Temporary Protection Statute in Colombia (https://globalcompactrefugees.org/article/estatuto-temporal-de-proteccion-para-personas-venezolanas-etpv) and regularization announcements in Ecuador ( https://reliefweb.int/report/ecuador/ecuador-reporte-de-situaci-n-septiembre-2021).

[37] R4V Regional Cash Working Group, Open Survey to Inform 2021 & 2022 Plans, September-October 2020, https://es.surveymonkey.com/stories/SM-NY9VGJ9Y/

Venezuela AR_000856



# DATA AND INFORMATION IN THE RMRP

**Who has planned to do what/where, and how can I contact this partner?**

**The Activity Explorer 2022 has the answers.**

Over the past years, the Regional Platform has improved data availability and transparency as a means to better understand the needs of refugees and migrants from Venezuela across the 17 countries of the R4V response; and to better plan and monitor the inter-agency response.

Covering the entire programme cycle of the RMRP, relevant data - ranging from Needs Assessments, to figures on People in Need (PiN) and population projections - are transparently shared with all R4V partners and stakeholders. To further enhance the regional coherence of Joint Needs Assessments (JNA), in 2022 a regional questions library will be implemented and will permit the development of a Regional Needs Assessment Report with comparable data and indicators across the region.

The important work of each of the 192 partners in the RMRP 2022 will be available through an interactive dashboard - the RMRP Activity Explorer – showing activities implemented in each Platform, Country (at the administrative level-1) and Sector, with raw data available on the Humanitarian Data Exchange (HDX) platform. This user-friendly tool builds on the data sets provided by each R4V partner during the planning of the RMRP and the subsequent monitoring of activities, allowing for a transparent tracking of commitments made by R4V partners against their funding requirements and self-defined targets, and contributing to continued improvements of the RMRP's data accuracy and quality.

**Want to explore the needs and relating response plan in a specific location?**



**Try the RMRP Insight 2022!**

# RMRP Monitoring



# RMRP Funding 2021



## Interested in the raw data?
*https://data.humdata.org/organization/r4v*



**R4V.info**

© UNICEF/ Vanessa Romero



# EDUCATION

 **PEOPLE IN NEED**
**4.48 M**
♂ 27.9%  ♀ 30.9%
♂ 20.9%  ♀ 20.3%

 **PEOPLE TARGETED**
**806 K**
♂ 21.1%  ♀ 22.3%
♂ 30.6%  ♀ 26.0%

**TOTAL REQUIREMENTS**
**100 M**

**RMRP PARTNERS**
**67**

**SECTOR LEADS**
**SAVE THE CHILDREN-UNICEF**

## PRIORITY NEEDS

The education needs of refugees and migrants from Venezuela, and particularly challenges to the effective exercise of children's right to education, have been exacerbated by the impact of the COVID-19 pandemic across the region. For example, in Colombia, COVID-19 has negatively affected an estimated 480,000 refugees and migrants from Venezuela enrolled in education systems, while in Brazil 22 per cent of Venezuelan refugee and migrant children were reported out of school during the pandemic. Although some countries have not yet fully reopened all their schools, most students are already receiving on-site classes, including in countries like Argentina and Chile.[38] For 2022, the Education Sector estimates that some 4.5 million[39] persons will be in need, with an estimated 806,000 persons to be targeted for assistance by sector partners.

Refugee and migrant children from Venezuela face particular challenges maintaining regular attendance in schools, either online or in-person, and absenteeism is often reported, as well as the interruption of studies, aggravated by the fact that the pandemic has worsened living conditions of the most vulnerable populations concurrent with a sudden transition to remote education.[40] For this, there are several causes, including a lack of school supplies, such as uniforms, school meals, transportation, internet accessibility, and connectivity for mobile devices, as well as language barriers and xenophobia and discrimination.[41] Girls often face additional vulnerabilities and barriers to return to school, including exposure to child labour, gender-based violence, early pregnancy and a gendered division of household labour that often places a greater burden on them for activities within the home.[42]

In this context, there is an urgent need to consider the specific needs of vulnerable groups who experience additional barriers to school attendance, such as indigenous peoples, persons with specific needs, and girls, who may be affected by sexual violence and early pregnancy. The need for Mental Health and Psychosocial Support (MHPSS) services is increased by the ruptures and losses caused by movements and the lack of opportunities for families in the host countries. With schools closed and with increased levels of stress among parents and caregivers, growing numbers of children have been victims of domestic violence, neglect and abuse, including emotional, physical and sexual violence.[43]

In terms of accessing the education system, there is an urgent need to fully integrate refugee and migrant children from Venezuela into national education systems and policies, particularly for those who arrive without documentation and therefore face additional difficulties with enrolment. In addition, the significant absence of frameworks or mechanisms for the recognition, validation, and accreditation of learning outcomes of undocumented refugee and migrant children and adolescents, as well as limited access to placement tests, and shortages of enrolment slots, are barriers to access.

Coordination with the WASH, Child Protection and Health Sectors is of growing importance, as schools have started to reopen in the region (after closures due to COVID-19) and conditions for a safe return to school meet improving, so to serve as protective environments with adequate WASH services, and to reduce the risks of transmission of COVID-19 and other communicable diseases.

---

[38]  Update Reports on the COVID-19 Education Response: *https://www.unicef.org/lac/en/update-reports-covid-19-education-response*

[39]  Those in-transit are not included in these totals.

[40]  Update Reports on the COVID-19 Education Response: *https://www.unicef.org/lac/en/update-reports-covid-19-education-response*

[41]  UNICEF, Education on Hold: *https://www.unicef.org/lac/en/education-on-hold*

[42]  Ibid.

[43]  UNICEF, Education On Hold: A generation of children in Latin America and the Caribbean are missing out on schooling because of COVID-19, November 2020: *https://www.unicef.org/lac/media/18746/file/Education-on-hold-web-0711-1.pdf*

## RESPONSE STRATEGY

The main response priority for the regional Education Sector is to support refugees and migrants from Venezuela in processes of enrolment and integration into national formal and non-formal education systems, including the safe return to schools during the ongoing COVID-19 pandemic. In Peru, partners will develop information campaigns for refugee and migrant families about the school enrolment process, while in the Caribbean sub-region, partners will engage and advocate with authorities to integrate students at all levels of public education, regardless of their situation in-country. Partners will also promote education access and retention by delivering school materials, tablets, transportation, school meals and support for internet access to refugees and migrants. Another priority is to strengthen local capacities to implement strategies to recover learning losses, such as in Colombia, where partners will support the Ministry of Education, the Institute of Family Welfare, local Education Secretariats, and educational institutions for the safe return to in-person classes.

Members of the Education Sector will deliver assistance through a combination of direct service provision, in-kind assistance, and cash and voucher assistance (CVA). The latter is used to support access to internet connectivity and tablets, and to cover costs associated with the process to validate academic diplomas, to register with professional associations and to procure essential supplies. In-kind interventions include providing school supplies, school meals to support retention, and coordinating with the WASH Sector for the installation of adequate WASH infrastructure. Education partners will also provide capacity-building and support to school principals, teachers and other personnel on key issues impacting access, retention, and the overall learning experience of refugee and migrant students, as well as on xenophobia prevention and MHPSS. The response will include technical assistance for teachers on flexible educational models and formal and informal education strategies in temporary classrooms, strategies to find and re-enrol children and adolescents left outside of the education system, and enrolment management.

Education partners will coordinate with the Protection Sector on issues regarding regularization and documentation of refugee and migrant children and adolescents, and work with the Child Protection Sub-sector on issues regarding access to school for unaccompanied and separated children (UASC). Partners will coordinate with the Protection and Health Sectors to refine MHPSS protocols, including to develop the capacities of teachers and to establish clear referral routes for children who may need support from mental health community centres. Coordination with the Regional Cash Working Group will be essential regarding sectoral CVA to create conditions that enable sending children to school and improve their learning. Education partners will also coordinate with the WASH Sector to install and upgrade water and hygiene infrastructure in schools.

Accountability to Affected Populations (AAP) will be promoted by ensuring consultations during all stages of the programme cycle (including workshops, focus groups, digital feedback mechanisms, etc.), as well as through feedback to programme staff. Good programming strategies will guarantee that all actions are gender-sensitive and inclusive, while ensuring equal opportunities for refugee and migrant girls and adolescents, children with disabilities, indigenous peoples and other vulnerable groups, as well as strategies for enhancing gender equality and inclusion in cross-sectoral work. These principles are promoted by the Sector also in other fora, such as the Regional Education Working Group (REWG), which includes actions implemented at the hemispheric level aimed at supporting national education sectors by strengthening education information management systems to integrate migrants and refugees; strengthening the capacities of the national education coordination mechanisms; providing a platform for sharing lessons and good practices across the region; and promoting dialogue for the development of positive policy for education in emergencies (EiE) to ensure access and quality education in national systems.

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 262 of 344

© World Vision/ Natalie Vargas



# FOOD SECURITY

**PEOPLE IN NEED**
**6.90 M**

32.7%  34.1%
16.6%  16.6%



**PEOPLE TARGETED**
**2.11 M**

29.2%  32.7%
19.2%  18.8%

**TOTAL REQUIREMENTS**
**283 M**

**RMRP PARTNERS**
**63**

**SECTOR LEADS**
ACTION AGAINST HUNGER-WFP

## PRIORITY NEEDS

The COVID-19 pandemic is having long-lasting effects on the food security and livelihoods situation of refugees and migrants from Venezuela, as well as their host communities. The Latin American and Caribbean region has been one of the most impacted by this global health emergency, with the highest relative **increase of people in severe food insecurity**: from around 3.5 million in January 2020 to 12.3 million by August 2021, a figure that is **4 times higher than before the COVID-19 crisis.** The high dependence of refugees and migrants from Venezuela on informal economies, which have been particularly affected by this crisis, as well as the **barriers they continue to face when accessing income-generating activities[44]** or social protection networks within their host countries, associated with their often irregular status, results in an increasing inability by these populations to satisfy their essential needs.

Surveys carried out by R4V partners among refugees and migrants from Venezuela in Colombia, Ecuador, and Peru (with the three countries hosting an estimated 72 per cent of the total refugee and migrant population in the LAC region)[45] confirm that these populations are among those most affected by this crisis (particularly women and children), with 2 million refugees and migrants from Venezuela currently considered to be moderately or severely food insecure in these 3 countries alone.[46]

| N. Food Insecure | Colombia | Ecuador | Peru |
|---|---|---|---|
| Moderate | 873.000 (50%) | 214.000 (49%) | 460.000 (44%) |
| Severe | 239.000 (14%) | 70.000 (16%) | 136.000 (13%) |

As a result of unstable income sources and **limited livelihood-generation opportunities,** needs assessments show that refugees and migrants from Venezuela not only have a low capacity to obtain and consume quality foods, but are also increasingly adopting negative food-related coping strategies. According to the above-mentioned surveys, **one out of four refugees and migrants either consumed only one meal a day or spent the previous day without eating.** At least one in three refugees and migrants in these countries are also reporting they had to skip meals or restrict consumption by adults so children could eat. **Livelihoods coping strategies** are also used extensively, and if current conditions prevail, it will be harder for refugees and migrants to recover to pre-crisis levels, as many have accumulated debt, sold their assets, and used up their savings. These factors result in a growing inequality that is pushing millions of refugees and migrants towards a continuous cycle of poverty and food insecurity.

Overall, the 2022 projection associated with the number of People in Need (PiN) under the Food Security Sector at the regional level stands at 3.5 million refugees and migrants from Venezuela[47] of which 82 per cent are located in Colombia, Ecuador and Peru.

## RESPONSE STRATEGY

Regional-level activities – such as a regional assessment on food security and CVA (remote/web), and an assessment analyzing social protection-related access issues for refugees and migrants from Venezuela – are planned. These activities will ensure enhanced coordination between food security actors in the region, will facilitate the gathering and sharing of relevant information from national Food Security Sectors, and will support the identification of gaps for harmonized planning, monitoring and reporting.

[44] WFP, Food Security Update for Latin America and the Caribbean, August 2021: https://www.r4v.info/en/document/food-security-update-august-2021. Data reflected in the update corresponds to latest results from web surveys, computer-assisted telephone interviews (CATI) and Integrated Food Security Phase Classification (IPC) exercises.

[45] See also, for the Caribbean sub-region: R4V Latin America and the Caribbean, Refugiados y Migrantes Venezolanos en la Región, October 2021: https://www.r4v.info/en/document/r4v-america-latina-y-el-caribe-refugiados-y-migrantes-venezolanos-en-la-region-octubre-1 and R4V Brazil (2021) JNA. Forthcoming.

[46] WFP, Food Security Update for Latin America and the Caribbean, August 2021: https://www.r4v.info/en/document/food-security-update-august-2021

[47] This PiN figure relates only to refugees and migrants from Venezuela in-destination.

Venezuela AR_000861

**The RMRP 2022 will increase the scope of its response for the provision of immediate food assistance for highly vulnerable refugees and migrants from Venezuela residing in all countries in the region** as well as their affected host communities. This includes assistance to in-transit populations as well as to those engaging in pendular movements along the border from Venezuela and Colombia. In line with increased needs due to the pandemic's impact on the food security of vulnerable populations, the RMRP 2022 presents an overall increase of 25 per cent in the number of refugees, migrants and affected host community members that are targeted for assistance by the Food Security Sector: a total of 2.1 million in 17 countries.

Apart from increasing the number of people to be assisted by the Food Security Sector, partners will also increasingly focus on activities designed to **improve food security in the longer-term by offering sustainable,** resilience-oriented and agricultural and non-agricultural **livelihoods opportunities to refugees and migrants**, as well as to facilitate their socio-economic integration, in particular in areas with a high concentration of refugees and migrants. These interventions also include risk management capacity-strengthening that is essential for the subsistence of households and their host communities in rural areas. Food Security partners, in coordination with other Sectors, will also seek to facilitate the **inclusion of refugees and migrants in existing social protection programmes** (e.g. social safety net programmes, school feeding, livelihoods building and trainings, etc.) through increased advocacy efforts by analysing entry points for the Food Security Sector on a country-specific basis.

The response aims to maximize the welfare of the targeted affected population and accommodate their consumption preferences; therefore, **Cash and Voucher Assistance (CVA) will be prioritized** whenever feasible**.** 61 per cent of the Food Security Sector budget is allocated to the implementation of cash- and voucher-based activities.

The response also comprises other types of interventions, such as the **in-kind distribution of food kits and hot meals in community kitchens.** As required, in-kind operations will continue to address the needs of refugees and migrants from Venezuela as well as of affected host communities, under certain circumstances, including in remote areas characterized by transportation and/or market constraints, and taking into account the distinct needs of different population groups, including according to gender and age. Also, in order to address food security and livelihoods-related needs adequately under the different response modalities, these will most often complement each other. As an example, the delivery of food assistance through cash can be combined with capacity development-related initiatives like the provision of life skills training.

Food Security Sector partners have outlined links across Sectors as key to their success, especially with the Nutrition Sector in order to ensure that interventions are meeting nutritional standards, and with the Integration Sector, in order to complement livelihood strategies aiming to improve households' well-being.

The Food Security Sector will integrate its work with other Sectors providing assistance (Protection, Health, Wash, Nutrition, Education and Integration) in order to mainstream the centrality of protection and an AGD approach and in order to advocate for a wider inclusion of refugees and migrants in national social protection systems.

The Food Security Sector will, in strong collaboration with other Sectors (Protection, Health, Nutrition and Integration) ensure that food assistance adequately considers the safety of all refugees and migrants and affected members of host communities, and contributes to their integrity and dignity. Therefore, the Food Security Sector will also strengthen partnerships for the implementation of the centrality of protection, and identify joint approaches and synergies as well as begin peer-to-peer exchanges with partners and enhance inter-agency engagement, by prioritizing joint protection initiatives such as the Protection Information Management Initiative for a common/joint analytical framework; joint Complaint and Feedback Mechanisms; and joint protection capacity-building.

The Food Security Sector will improve its monitoring and accountability processes within the overall RMRP monitoring and reporting framework, given the challenges of a response in the context of populations on the move. Partners have also prioritized the need to generate evidence from Food Security interventions for advocacy work.



© UNHCR / Eugenia Paz



# HEALTH

**PEOPLE IN NEED**
## 6.81 M
32.3%   33.9%
16.8%   16.9%

**PEOPLE TARGETED**
## 2.72 M
28.6%   33.6%
19.4%   18.4%

**TOTAL REQUIREMENTS**
## 230 M

**RMRP PARTNERS**
## 86

**SECTOR LEADS**
**UNAIDS–WHO/PAHO**

## PRIORITY NEEDS

Based on the information generated by national authorities and R4V partners on the health situation of refugees and migrants from Venezuela, the Health Sector has identified the following priority needs:

- According to data shared by health ministries with the R4V National Health Sectors,[48] COVID-19 vaccines have been provided to more than 477,139 refugees and migrants from Venezuela in Bolivia, Brazil, Colombia, Ecuador, and Peru; of which 144,152 (30 per cent) have received full doses of the vaccine. These advances notwithstanding, more refugees and migrants need to access vaccinations, and greater information and awareness of refugees and migrants and their host communities is needed on how these vaccines work.

- The pandemic has increased the need for mental health and psychosocial support (MHPSS) and clinical care for survivors of rape and intimate partner violence, due to the increase in prevalence of such incidents, thereby challenging service providers' capacities to effectively deliver quality sexual and reproductive health (SRH) services for women of reproductive age and care for survivors of gender-based violence (GBV).

- As a result of the COVID-19 pandemic, countries have suffered major disruptions in the provision of health services and treatment of medical conditions. This has been compounded by shortages of medical supplies, medicines and commodities, such as modern contraceptives, as well as a decline in the demand and use of health services in priority areas, such as mental health, maternal and child health (MCH), family planning, noncommunicable diseases, immunization, tuberculosis, HIV infection, and other communicable diseases including sexually transmitted infections (STIs).

- Refugees and migrants from Venezuela continue to face challenges in accessing medical diagnostic services and treatment for cancer and noncommunicable diseases that require more complex or long-term care at secondary, tertiary, and specialized levels of care. Addressing these problems is a priority to reduce the risk of mortality and complications and requires strengthening access to medicines and continuity of medical follow-up, including cancer screening and preventive services, and the timely provision of medication.

The response to these needs requires placing special emphasis on the most vulnerable groups of refugees and migrants from Venezuela, including children and adolescents, pregnant women, the elderly, LGBTQI+ people, indigenous peoples, Afro-descendants and those with special needs. It is also necessary to strengthen health information systems in RMRP countries by incorporating the nationality variable in national registries and to advance in a greater disaggregation according to sex, age and ethnicity to better guide decision-making and the development of social protection mechanisms.

## RESPONSE STRATEGY

86 Health Sector partners operating in all 17 countries of the R4V response will target 2.7 million refugees and migrants from Venezuela and members of affected host communities to receive health assistance. The Regional Health Sector will provide specialized technical cooperation directed at authorities and in-country R4V partners to address health needs, with an emphasis on non-communicable diseases, SRH, maternal and child health care, care for people with post-COVID-19 healthcare needs, MHPSS, and comprehensive approaches for survivors of sexual and intimate partner violence.

- Increase the quality and availability of healthcare for refugees and migrants from Venezuela with COVID-19, including post-COVID-19 assistance, rapid and equitable deployment of vaccines, and mitigation of disruptions in the provision and availability of essential health services.

[48] Source: National immunization programs. Ministries of Health in Bolivia, Brazil, Colombia, Ecuador, and Peru.



© PAHO/ Karen González

• Improve access to essential health services and supplies at all levels of care, including specialized assistance for refugees and migrants from Venezuela in-transit and in-destination, that consider needs according to gender, age, ethnicity, diversity and language. In terms of the impact of the pandemic on service delivery, it is a priority to restore healthcare delivery with an emphasis on primary healthcare and comprehensive preventive services, including SRH services, referral systems and timely delivery of medicines, contraceptives and antiretrovirals.

## RESPONSE PRIORITIES

1. Generating and analysing information on health needs and the corresponding response, while conducting advocacy and actively working with authorities and partners for the coordination, management and exchange of information (disaggregated by sex, ethnicity and age, among others), as well as for the systematization of experiences and identification of good practices.
2. Strengthening coordination with the national Health Sectors, in order to achieve greater involvement of civil society organizations, especially from organized groups of refugees and migrants, and to address acute health events.
3. Strengthening of international and national frameworks that ensure greater health protection for refugees and migrants, especially in the face of highly complex health conditions, new strains and variants of COVID-19 and other health emergencies, taking into account priority groups such as children, adolescents, women, older adults, LGBTQI+ people, survivors of GBV, and indigenous and Afro-descendant communities.

These priorities will be implemented through the following modalities: development of technical documents that include guidelines and recommendations to address the health needs of refugees and migrants from Venezuela and affected host communities; regular coordination meetings between the regional Sector and the national Sectors, especially when acute health events occur, e.g. at the border areas of various countries; capacity-building and support to Health Sector partners and national Sectors through thematic sessions, non-classroom courses and dissemination of technical information; and development of joint assessments and studies among partners.

The Health Sector's response will include joint work with other Sectors, especially Protection and its Sub-sectors to address health needs arising from GBV, and ensure proper attention for UASC, and persons with specific needs; with the WASH Sector, to improve WASH services in health facilities, and to monitor the risk of sanitary conditions among refugees and migrants in the event of outbreaks of water-, food- and vector-borne diseases; and with the Food Security and Nutrition Sectors, to identify urgent care needs in the most vulnerable groups, such as pregnant women and children.

© PAHO/ Karen González

# HUMANITARIAN TRANSPORTATION

| PEOPLE IN NEED | | | PEOPLE TARGETED | | |
|---|---|---|---|---|---|
| 994 K | 36.9% | 36.1% | 103 K | 29.1% | 31.4% |
| | 13.8% | 13.2% | | 20.4% | 19.1% |

| TOTAL REQUIREMENTS | RMRP PARTNERS | SECTOR LEADS |
|---|---|---|
| 11.6 M | 21 | IOM-OXFAM-UNHCR |

## PRIORITY NEEDS

Movements of refugees and migrants from Venezuela in the region are generally expected to increase in 2022.[49] By end 2021, despite many RMRP countries having progressively reopened their borders, relaxed entry restrictions and/or other COVID-19-related travel restrictions, irregular movements significantly increased. Overall, it is anticipated that the issue of irregularity will remain a key concern in 2022.[50]

By October 2021, Venezuela's borders were still closed, leading to an estimated 94 per cent increase in the number of border crossings through unofficial points between Colombia and Venezuela,[51] with several negative consequences including the increased use of unofficial transport companies, payments to smugglers to facilitate illegal entries, increased risks of trafficking and sexual violence,[52] greater risks of exposure to extreme weather conditions, physical insecurity due to the topography and bad conditions of roads on alternatives routes and exposure to criminal groups or armed groups.[53]

The lack of documentation and financial means to pay for safe transportation[54] has caused a notable increase in the number of refugees and migrants from Venezuela spending most of their journey walking from Venezuela through countries of transit and destination. Those in-transit and walking long distances (at times referred to as '***caminantes***'[55]) are more exposed to various forms of physical violence, GBV and human trafficking.[56] In addition, in order to obtain the financial means to continue their journeys, both men and women reportedly resort to the sale or exchange of sex for food, shelter or transport.[57]

Once in-destination or while temporarily staying in a given location, many refugees and migrants from Venezuela need to move within or between cities, districts, or provinces to access protection and health services, employment, basic goods, and carry out administrative procedures related to the regularization of their situation or actions for their socio-economic integration.

Without access to safe daily local transportation, the already extremely vulnerable situation experienced by refugees and migrants from Venezuela (particularly single mothers,

[49] See R4V Planning Assumptions and Scenarios 2022 survey results for a more detailed read-out: https://bit.ly/3FK9Fmv

[50] Ibid.

[51] GIFMM Colombia: Joint Needs Assessment, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021

[52] 44 per cent of refugees and migrants surveyed declared that they had paid to cross the Colchane pass (Chile), while 50 per cent omitted the answer, and only 6 per cent declared that they had not paid. IOM Chile, Venezuelan Population Flow Monitoring 5, March 2021: https://dtm.iom.int/reports/chile-%E2%80%94-monitoreo-de-flujo-de-poblaci%C3%B3n-venezolana-5-marzo-2021. Peru - Joint Needs Analysis (RMRP), May 2021: https://www.r4v.info/es/document/analisis-conjunto-de-necesidades-rmrp-2021

[53] See Multisector GIFMM Colombia, Humanitarian Transportation: Challenges and Answers, February 2021: https://www.r4v.info/sites/default/files/2021-06/2-pager_TRANSPORTEHUMANITARIO_Multisector_compressed_%281%29.pdf and other sources such as ACAPS, Venezuela / Colombia Cambinantes: Needs and vulnerabilities of Venezuelan refugees and migrants who travel on foot, January 2021: https://www.acaps.org/sites/acaps/files/key-documents/files/20210121_acaps_thematic_report_caminantes_in_colombia_and_venezuela_spanish.pdf. For more detailed information on similar situations in various borers, please see chapters on Humanitarian Transportation in the different National Platform chapters.

[54] Mazuera-Arias, R., Albornoz-Arias, N., Freitez, A., Calderón O., (2021). Informe de movilidad humana venezolana IV. Caminantes y retornados: ilusión y decepción (1º de julio al 30 de septiembre 2021). San Cristóbal, Venezuela: Observatorio de Investigaciones Sociales en Frontera (ODISEF): https://odisef.org/wp-content/uploads/2021/10/Informe-de-Movilidad-Humana-IV.pdf

[55] ACAPS, Venezuela / Colombia Caminantes: Needs and vulnerabilities of Venezuelan refugees and migrants who travel on foot, January 2021: https://www.acaps.org/sites/acaps/files/key-documents/files/20210121_acaps_thematic_report_caminantes_in_colombia_and_venezuela_spanish.pdf

[56] 61 per cent of refuges and migrants interviewed reported having been victims of discrimination along the route between Venezuela and Chile, as well as 38 per cent victims of assaults, theft, fraud and threats. Chile, Rapid Inter-Agency Assessment, North Zone. February 2021: https://r4v-uat.info/sites/default/files/2021-06/GTRMCHILE - Evaluaci%C3%B3n R%C3%A1pida - Reporte - Mayo2021_VF.pdf

[57] Youth participating in consultative focus group discussions for the RMRP 2021 reported that young men aged 18-23 were increasingly resorting to the sale of sex as a coping mechanism. See https://www.r4v.info/es/proteccion

pregnant women, children, people traveling alone – especially women, people with disabilities, the elderly, LGBTIQ+ persons, indigenous and Afro-descendant persons and those in irregular situations[58]) is aggravated, increases their exposure to health[59] and protection risks, and their inability to locally integrate.

## RESPONSE STRATEGY

Humanitarian Transportation seeks to safeguard dignified and safe human mobility, ensuring physical well-being and access to basic transport services based on minimum standards that are focused on the prevention and mitigation of protection, health, and other physical risks. The response of the Humanitarian Transportation Sector seeks to provide assistance for border-to-border, internal and daily transportation within the internal borders of host countries[60] for the most vulnerable refugees and migrants from Venezuela, regardless of their situation in-country and working towards the following three objectives:

- **Protection**, including mitigation of the risks of human trafficking, smuggling and GBV, particularly for women, girls and LGTBQI+ persons, as well as avoiding the separation of children from their families. This also includes transportation to facilitate access to protection services.

- **Access to regularization,** and consequently **integration**, by supporting refugees and migrants from Venezuela to travel to their destinations, often urban centres with greater availability of legal assistance, government services and employment opportunities, and supporting family reunification, particularly for UASC.[61]

- **Access to basic goods and services** by providing transportation assistance to those who would not otherwise be able to access food, household items, health and MHPSS services, or education.

Activities will be adapted to COVID-19-related health restrictions, as well as to each country's migration policies. The three main forms of humanitarian transportation assistance are:

**Internal transportation** is provided between localities within the borders of a country, primarily to support family reunification, and to destinations where concerned refugees and migrants can benefit from existing support networks or employment. It also includes round-trip transportation to facilitate access to services, particularly to health services and those related to regularization and documentation processes, which are not available in the locality.

**Daily local transportation** facilitates access to services and socio-economic integration, provided within a locality or between nearby localities to facilitate round-trip mobility, generally from the peri-urban to urban centres. It supports the identification of livelihood opportunities and access to services, including administrative and regularization services. It seeks to minimize daily transportation costs for refugee and migrant households from Venezuela, allowing them to prioritize the purchase of food and other essential expenses. Generally, this is the modality with the least restrictions and the most necessary in the first weeks of arrival at destination.[62]

**Border-to-border transportation** can be provided within the borders of a country to those in-transit, only under the conditions of possessing the relevant documentation that allow entrance into a bordering country. Examples for this have included humanitarian visas, cases of family reunification, as we all as in some contexts the proven existence of support networks or possession of an employment contract. Such assistance must be carried out in close coordination between National or Sub-regional R4V Platforms and competent national authorities on both sides of the border.

The Sector will mainstream information and awareness campaigns about the risks on travel routes, as well as the conditions of available services, and norms and regulations of transit and destination countries. This will be done by developing Information, Education and Communication (IEC) materials, including key messages, for sector partners to be used during activity implementation.

The response will be implemented both in-kind – for example, through the provision of transportation via partner's buses or in collaboration with the private sector or authorities – as well as through vouchers or direct cash transfers (CVA) for the purchase of travel tickets, based on the context, depending on the protection risks associated with cash transfers and capabilities of partners, and carried out in close coordination with national and local governments.

The response will ensure intersectoral complementarity with the **Human Trafficking and Smuggling, Child Protection and GBV Sub-sectors**. Information and awareness-raising activities on human trafficking and GBV will be carried out at transportation terminals and on-board vehicles, and partners will be trained to prevent and identify cases. Mainstreaming protection in the response, in particular on access to regularization and documentation, will be coordinated with the **Protection Sector**.

[58]   See, e.g. ACAPS, Venezuela / Colombia Caminantes: Needs and vulnerabilities of Venezuelan refugees and migrants who travel on foot, January 2021: https://www.acaps.org/sites/acaps/files/key-documents/files/20210121_acaps_thematic_report_caminantes_in_colombia_and_venezuela_spanish.pdf and   Chile, Rapid Inter-Agency Assessment - North Zone, February 2021: https://r4v-uat.info/sites/default/files/2021-06/GTRMCHILE_-_Evaluaci%C3%B3n_R%C3%A1pida_-_Reporte_-_Mayo2021_VF.pdf

[59]   8 per cent of the refugees and migrants from Venezuela surveyed in Ecuador did not go to the health center when required due to lack of financial means and / or transportation. GTRM Ecuador, Joint Needs Assessment, May 2021: GTRM Ecuhttpshttps://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021ador: Joint Needs Assessment - May 2021

[60]   Following the position of the R4V Regional Platform, this type of intervention is not intended to facilitate return to Venezuela, following the Do no Harm principle. For more information see the Updated ToRs of the Humanitarian Transportation Sector (forthcoming).

[61]   The cost of transporting people to organizations to receive help and guidance with the procedures is an additional barrier to accessing documentation. OAS and R4V Protection Sector, Impact of COVID-19 on refugees and migrants from Venezuela: Evicted people, sex workers and indigenous peoples, September 2021: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

[62]   In Ecuador, humanitarian transportation is the third priority need for refugees and migrants from Venezuela with a presence in the country for less than a month, and decreases in priority over time. GTRM Ecuador, Joint Needs Assessment, May 2021: https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021



© World Vision/ Chris Huber

Close collaboration will be maintained with the **Health and WASH Sectors** to ensure the distribution of PPE and compliance with COVID-19 prevention protocols, including access to water and sanitation at transport terminals. Likewise, the distribution of household and transit safety kits on the route will be coordinated together with the **Shelter Sector;** kits may include reflective vests, whistles, canteens, and warm clothing, among other items. Collaboration with the **Integration Sector** will seek to complement initiatives related to access to livelihoods and regularization. The response also includes measures to reduce the **environmental impact** of activities.

Communication campaigns, coordinated with the **Communication Working Group**, will raise awareness on the situation of refugees and migrants from Venezuela in transit, with a focus on preventing xenophobia and different forms of discrimination suffered by people on the move.

*Response principles, good programming / collective accountability considerations*

The Sector will work with the **AAP and CwC Working Groups**, prioritizing direct consultations with the populations supported with humanitarian transportation, as well as learning about the needs, challenges and obstacles to accessing it. The Sector will also work with **PSEA focal points** for risk prevention and mitigation, to identify risks of SEA throughout refugees' and migrants' journeys from Venezuela, and incorporate this information into trainings of R4V partners.



© RET



# INTEGRATION

 **PEOPLE IN NEED**
**7.55 M**
👤 33%  👤 34.7%
👤 16.1%  👤 16.2%

 **PEOPLE TARGETED**
**950 K**
👤 40.8%  👤 44.1%
👤 7.54%  👤 7.51%

💰 **TOTAL REQUIREMENTS**
**381 M**

**RMRP PARTNERS**
**114**

**SECTOR LEADS**
**ILO-IOM**

## PRIORITY NEEDS

The **lack of recognition of academic and professional credentials** obtained abroad is one of the main barriers for refugees and migrants from Venezuela to access the formal labour market. Refugees and migrants from Venezuela tend to have educational credentials equal to or higher than those of the receiving-country population. Yet, for example, only 10 per cent of Venezuelans in Chile, Colombia and Peru report having had their academic and professional credentials recognized, as of October 2020.[63] The **need for economic recovery of refugees and migrants from the impacts of COVID-19** is the second Sector priority for 2022, particularly for women, youth, workers in the informal labour market, and businesses.

The proportion of refugees and migrants from Venezuela working in the informal labour market is higher than among nationals in host countries.[64] The pandemic exponentially affected those with informal employment, closing down previously available informal job opportunities, and with these workers outside of social protection schemes. Venezuelan women in particular worked in sectors disproportionately affected by the pandemic (including services, care work, and retail): in Chile, 31 per cent of Venezuelan women lost their jobs during the pandemic, compared to 19 per cent of Venezuelan men[65] and in Peru, 70 per cent of Venezuelans in

Lima who reported being unemployed were women.[66] Youth (persons between the ages of 15 and 24 years) were also particularly affected, due to interruptions in their educational and professional trainings.[67]

Venezuelan-owned businesses, as well as businesses that employed Venezuelan refugees and migrants, were strongly affected by the pandemic. For example, in Trinidad and Tobago, about a third of small and medium businesses closed until August 2021.[68]

Furthermore, unemployment and underemployment in the region have reduced access to adequate housing for refugees and migrants from Venezuela, in turn restricting access to integration programmes and fundamental rights.[69] Access to adequate shelter is related to improved quality of life, including both physical and mental health, as well as WASH facilities. Having decent and stable housing is central for refugees and migrants to be able to seek employment and maintain their job once they find one.

Against the above background, income-generation and employment have been identified as a top priority of refugees and migrants for 2022 in various R4V joint needs assessments.[70] Pursuant to consultations with R4V partners in shaping the regional planning assumptions, the inclusion

[63]  IOM-MPI: Socioeconomic Integration of Venezuelan Migrants and Refugees: The Cases of Brazil, Chile, Colombia, Ecuador, and Peru. Chaves-González, Amaral y Mora, 2021: *https://www.r4v.info/en/document/iom-mpi-socioeconomic-integration-venezuelan-migrants-and-refugees-cases-brazil-chile*

[64]  Ibid.

[65]  IOM, Encuesta de la Migración Venezolana en Chile – DTM, 2021: *https://displacement.iom.int/system/tdf/reports/dtm_4ta_ronda.pdf?file=1&type=node&id=11395*

[66]  UNDP, Conociendo a la población refugiada y migrante en Lima Metropolitana, 2021: *https://www.r4v.info/es/document/conociendo-la-poblacion-refugiada-y-migrante-en-lima-metropolitana*

[67]  CEPAL, Estudio Económico de América Latina y el Caribe 2021: Dinámica laboral y políticas de empleo para una recuperación sostenible e inclusiva más allá de la crisis del COVID-19, 2021: *https://www.cepal.org/es/publicaciones/47192-estudio-economico-america-latina-caribe-2021-dinamica-laboral-politicas-empleo*

[68]  Informe de Situación R4V - Caribe - agosto 2021. R4V Sitrep Caribbean, August 2021: *https://www.r4v.info/es/document/informe-de-situacion-r4v-caribe-agosto-2021*

[69]  UN-Habitat, Human Rights in Cities Handbook Series, Volume I: The Human Rights Based Approach to Housing and Slum Upgrading, 2017: *https://unhabitat.org/the-human-rights-in-cities-handbook-series-volume-i-the-human-rights-based-approach-to-housing-and-slum-upgrading*

[70]  GIFMM Colombia: Evaluación Conjunta de Necesidades, Junio 2021: *https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021* ; y GTRM Ecuador: Evaluación Conjunta Necesidades, Mayo 2021: *https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021*

Venezuela AR_000868

of refugees and migrants in national COVID-19 economic recovery plans will be crucial.[71] Finally, the Sector identified the **need to address increasing xenophobia**, especially in Brazil, Colombia, Chile, Mexico, and Panama.[72] In these countries, recent acts of violence against refugees and migrants have taken place, calling attention to the need to invest in activities that promote social cohesion and highlight how refugees and migrants contribute to the local economies, especially during the COVID-19 pandemic and recovery.[73]

## RESPONSE STRATEGY

The Integration Sector's response priorities for 2022 are aligned with those of the Regional Strategy for Socio-Economic Integration[74], endorsed by participating Quito Process states. The Sector will prioritize strengthening of processes for the **recognition of titles and skill certification**. The activities will prioritise youth and women, who in some countries have higher educational levels than men, and yet face higher levels of unemployment and underemployment.[75] The Sector will also **support livelihoods and income generation**, focusing on post-COVID-19 recovery as well as relevant emerging economic sectors**.** This will include support for new and recovering entrepreneurship and labour market integration within cities, including for specific population groups, such as women, GBV survivors and persons at risk of GBV, victims of trafficking, indigenous persons, Afro-descendants, youth, LGBTQI+ persons, and persons with specific needs. Finally, the Sector will design and implement **social cohesion activities** focused on reducing xenophobia, which will consider the needs of affected host communities and highlight how they can benefit from the integration of refugees and migrants from Venezuela in their territories.

The Sector will engage a variety of actors, including authorities, the private sector, civil society, employment agencies, public employment services, employers' and workers' organizations, the media, opinion leaders and influencers, and refugee- and migrant-led organizations, to foster dialogue, support livelihoods and promote local development and effective integration at national and local levels.

At the **national level**, the response will be comprised primarily of **capacity-building and support** (trainings, development of informational materials and guidance) for refugees and migrants from Venezuela as well as affected host communities (on vocational and soft skills and entrepreneurship); for the private sector and employers (on labour rights and fair recruitment processes); and for workers' organizations and civil society (on how to integrate refugees and migrants to their activities and consider them in their institutional design); **direct support** (in-kind or CVA) for refugees and migrants from Venezuela, to support employability and the start-up or recovery of entrepreneurship initiatives; **support to public services** (technical assistance, human resources and/or material support) to local and national

government institutions on policy design and implementation; **direct implementation** of social cohesion and community-based activities; and **studies, assessments and tools** to understand labour markets, socio-economic profiles, challenges and opportunities, including in cities.

At the **regional level**, the response will focus on facilitating the **exchange of best practices and lessons learned** through regular coordination meetings, webinars, and the dissemination of visibility materials. It will also include the development of **regional operational tools and guidance** to support National and Sub-regional R4V Platforms, refugee- and migrant-led organizations and national authorities and governments, while publications of regional **studies** on relevant integration topics will contribute to informed decision-making and programme design.

The Sector will promote a **holistic response** to integration challenges by coordinating intersectorally to ensure that multiple facets of integration are addressed (supporting income-generation with legal support, documentation, life skills and psychosocial well-being) and by involving a variety of partners in programme planning (governments, employers' and workers' organizations, civil society, etc.). The Sector will work closely with the **Cash Working Group** and the **Protection Sector**, linking to their work on emergency cash assistance and regularization as the first steps of the integration process. The Sector's focus on vulnerable persons will further involve close coordination and collaboration with the **Human Trafficking and Smuggling, Child Protection and GBV Sub-sectors** to mitigate risks faced in particular by women and the LGBTQI+ population when searching for employment or entrepreneurship opportunities, and the provision of alternative income-generating activities for refugees and migrants engaged in sex work. The Sector will also work with the **Education Sector** on the recognition of academic degrees, the **Health Sector** on occupational health and safety (OHS) of migrant and refugee workers, and the **Shelter Sector**, to link cash-for-rent to access to affordable and adequate housing to promote medium- and long-term integration.

The Sector will **strengthen the capacities** of integration partners on PSEA in programming, gender mainstreaming and meaningful participation of women, men, girls and boys in the design, implementation and monitoring of programmes, and AAP through webinars and development of relevant tools. The sector will also **develop guidance** for the integration of specific groups, such as LGBTQI+ refugees and migrants.

[71]  R4V Regional Platform, Planning Assumptions and Scenarios for 2022: *https://bit.ly/3r4yV2L*

[72]  Ibid.

[73]  ILO highlights the labour of Venezuelan migrant workers in the front line against COVID-19 in Latin America. ILO, 2021: *https://www.ilo.org/americas/sala-de-prensa/WCMS_794093/lang--es/index.htm*

[74]  ILO and UNDP, Regional Strategy for Socio-Economic Integration, February 2021: *https://www.ilo.org/wcmsp5/groups/public/---americas/---ro-lima/documents/publication/wcms_775183.pdf*. Now officially adopted by countries in the region.

[75]  Employment and Education: Obstacles and Capabilities of Migrant and Refugee Women from Venezuela. IOM, 2021: *https://reliefweb.int/sites/reliefweb.int/files/resources/2-employment%28V2%29ML.pdf*



© WFP / Luis Grimaldi

# NUTRITION

 **PEOPLE IN NEED**
## 2.83 M*

👤 28.6%  👤 33%
👤 20.1%  👤 18.2%

 **PEOPLE TARGETED**
## 188 K

👤 27.6%  👤 34.8%
👤 19.6%  👤 18%

💰 **TOTAL REQUIREMENTS**
## 8.67 M

**RMRP PARTNERS**
## 13

**SECTOR LEAD**

UNICEF

## PRIORITY NEEDS

The nutrition situation of refugee and migrant children and women from Venezuela is an issue of grave concern, including for children under five years of age (especially for children under two) as well as for adolescents (particularly girls) and pregnant and breastfeeding women, as the population groups inherently vulnerable to malnutrition compared to other population groups due to their heightened nutritional needs. The first 1,000 days of life – the time from conception to a child's second birthday – is a unique period of opportunity when the foundations of optimum health, growth, and neurodevelopment across the lifespan are established. Adolescence is a second window of opportunity for growth and development and a chance to break the intergenerational cycle of malnutrition. Without access to timely nutrition interventions to prevent, identify and treat malnutrition, these vulnerable groups face high risks of malnutrition, infection, and death, especially younger ones.

In the current emergency, refugees and migrants from Venezuela face multiple challenges in-transit and in-destination, including limited access to safe drinking water, basic health and

nutrition services, and nutritious food. The COVID-19 pandemic increased these challenges through mobility restrictions, restricted access to health services, rising unemployment, and poorer mental health, all with consequences on nutritional status. R4V Nutrition Sector partners have identified malnutrition in vulnerable groups of refugees and migrants from Venezuela:[76] for example, in Ecuador, stunting prevalence was high in 2020 both among the local population and among refugees and migrants (17% among refugee and migrant children, 25% among local children).[77] Similar tendencies were observed by the Sector in Peru,[78] Brazil,[79] and Colombia.[80] Moreover, in Colombia, the National Health Institute indicated that 19 per cent of child deaths associated with malnutrition in 2019 were among children from Venezuela, with 91 per cent of these being children under two.[81] Of those deaths associated with malnutrition of children from Venezuela in Colombia, 90 per cent were due to lack of timely health and nutrition care.[82]

## RESPONSE STRATEGY

The R4V Nutrition response has a differentiated focus, targeting population groups inherently vulnerable to malnutrition:

[76]   Data presented under Priority Needs was not obtained from surveys using representative samples, but mostly from nutritional screening or from surveillance data from national health information systems. As such, data should not be interpreted as prevalence or rates representative of the nutrition situation in a country or population group in a country.

[77]   World Bank, Retos y oportunidades de la migración venezolana en Ecuador, 2020: https://www.bancomundial.org/es/events/2020/06/17/evento-virtual-retos-y-oportunidades-de-la-migracion-venezolana-en-ecuador

[78]   61 Venezuelan children were diagnosed with acute malnutrition out of 1,135 assessed (5.4 per cent), compared with 88 (3 per cent) of Venezuelan children with acute malnutrition out of 2,910 assessed in 2020. Source: Action Against Hunger (ACH) and the Ministry of Health, National Institute of Health, Peru, 2021. Conversatorio: situación nutricional de niños y niñas refugiados y migrantes en el Perú. https://www.r4v.info/es/document/Situacion_nutricional_NN_RyM_Ago21

[79]   103 children out of 1,203 assessed (8.6 per cent) in shelters from December 2020 to March 2021 were diagnosed with acute malnutrition (83 moderate and 20 severe: 6.9 and 1.7 per cent respectively) and 262 (21.8 per cent) with chronic malnutrition (stunting). Source: UNICEF, 1st quarter of 2021 - Primary Health Care supported by UNICEF in shelters for refugees and migrants from Venezuela in Brazil.

[80]   From January to September 2021, 72 children under five were diagnosed with acute malnutrition out of 1,642 assessed in Colombia (4.3 per cent). Also, 146 (4.8 per cent) of pregnant and lactating women from Venezuela presented some type of malnutrition out of 3,046 assessed. Source: ACF- UNICEF, Nutritional Screening in Colombia, January 2021 to September 2021, unpublished data.

[81]   Sistema de Vigilancia Epidemiológica, 2020. Instituto Nacional de Salud, Colombia: https://andbit.ly/3E5oS1n Sistema de Vigilancia Epidemiológica, 2020. Instituto Nacional de Salud, Colombia: http://www.ins.gov.co/

[82]   Ibid.

*      The regional R4V Nutrition PiN covers needs that are broader than those usually targeted by nutrition responses, and has considered variables such as extreme poverty and access to food.

Venezuela AR_000870

children under five years of age, especially children under two; adolescents, particularly girls; and pregnant and breastfeeding women.[83].

In 2022, the R4V Nutrition Sector will focus their response on three main priorities:

1. **Ensure access to quality nutrition services and/or interventions for population groups vulnerable to malnutrition** to prevent, identify and treat malnutrition. This will be mainly done through local health services, in Brazil, Colombia, Ecuador, Peru, Bolivia, Guyana, and Trinidad and Tobago.

   b. Response interventions aiming at preventing malnutrition in vulnerable groups through:

      i. Nutrition counselling aimed at caregivers of children under two years of age, with a focus on infant feeding, to support breastfeeding and guide caregivers' food choices and feeding practices. This will be accompanied with fortification of children's food with vitamins and minerals in contexts of scarce food diversity, to prevent micronutrient deficiencies. Nutritional supplementation to provide energy and protein will target children under five years of age in-transit.

      ii. Nutrition counselling and micronutrient supplementation targeting adolescents and pregnant and lactating women to support their increased nutrient needs to prevent anemia and/or other forms of malnutrition.

      iii. Empowerment of caregivers of children, families and communities through timely access to culturally appropriate, gender- and age-sensitive information and interventions that promote the uptake of beneficial diets, services and practices, including improved access to information about the location and type of nutrition services that can be accessed.

   c. Response priorities will also include identification and treatment of malnutrition, particularly children under five with acute malnutrition, who have a higher risk of mortality.

2. **Generating evidence on the nutrition situation:** Characterize the nutrition situation of vulnerable population groups in order for the R4V response to have a better understanding of the severity of the impact of the crisis of movements from Venezuela, coupled with COVID-19 effects, on their nutritional status.

3. **Advocating for nutrition interventions as priority activities to save lives:** Strengthen advocacy efforts to mobilize additional support for the Nutrition Sector response, highlighting its importance, added value and lifesaving impact.

Specific efforts of regional Nutrition Sector partners will focus on:

• Technical assistance and capacity-strengthening targeting national nutrition partners regarding all aspects of the nutrition response, including knowledge-sharing among countries.

• Evidence generation regarding countries' capacities to manage acute malnutrition in children under five.

• Advocacy to make visible the nutritional risks faced by vulnerable groups and the priorities and needs of the Sector in order to mobilize additional resources for the response.

Response modalities for capacity-strengthening will include regular training of healthcare staff to conduct nutrition interventions adapted to the COVID-19 context; strengthening the nutrition workforce in health services through funding of additional nutrition experts in national healthcare institutions; and providing technical assistance to health authorities to review, update or develop protocols to manage malnutrition.

Ensuring access to specialized nutrition supplies will be an important response modality. This will include equipment to identify malnutrition, and nutrition products to prevent and treat malnutrition among vulnerable refugees and migrants from Venezuela and host communities.

Response modalities for advocacy will be determined once the advocacy strategy is finalized but it is expected to include communication tools and events with stakeholders and decision-makers.

For evidence generation, studies will be carried out to characterize the nutrition situation of vulnerable groups using standardized methods, for example SMART surveys.[84] Finally, to improve timely identification and follow-up of malnutrition cases, nutrition surveillance and monitoring systems will be strengthened.

Coordination with the Health, Protection, Food Security and WASH Sectors will be pursued to respectively ensure access to essential nutrition services and psychosocial support, ensure that specific nutrition needs of vulnerable groups are taken into account in food assistance, and guarantee quality drinking water, basic sanitation and promote hygiene practices.

---

[83]  Activities submitted by R4V Nutrition actors should reflect the agreed focus of the Regional R4V Nutrition Sector on nutrition-specific interventions, targeting children under five, pregnant and lactating women, and adolescents. See *https://scalingupnutrition.org/progress-impact/evidence-informing-action/nutrition-in-the-lancet/*.

[84]  The SMART (Standardised Monitoring and Assessment of Relief and Transitions) Methodology is a standardised, simplified, cross-sectional field survey method designed to aid the collection of quality, up-to-date and timely nutrition data necessary for decision-making. It was developed to harmonize methods for nutrition assessments, especially during emergencies.



© PAHO/ Fredy Suescún

Linkages will be sought with the Gender, Environment and accountability to affected populations (AAP) focal points regarding capacity-strengthening targeting national and sub-regional Nutrition Sectors:

• Girls and women will be supported and empowered to prevent and identify malnutrition, given that caretaking responsibilities of children with acute malnutrition disproportionately fall on women.

• The R4V Nutrition Sector will guide nutrition partners on how to integrate environmental considerations in nutrition emergency programming using the "Virtual Environmental Field Adviser" developed in 2021.[85]

• Support will be provided to National and Sub-regional Platforms to ensure feedback and accountability mechanisms are integrated into country activities.

---

[85]  R4V Virtual Environmental Field Adviser - Nutrition, 2021: *https://www.r4v.info/en/document/virtual-environment-field-adviser-virtual-efa-nutrition*

Venezuela AR_000872

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 274 of 344

©UNHCR / Catalina Betancur



# PROTECTION

**PEOPLE IN NEED**
## 6.84 M
31.6%   34%
17.2%   17.2%

**PEOPLE TARGETED**
## 1.29 M
28.3%   35.1%
18.4%   18.2%

**TOTAL REQUIREMENTS**
## 220 M

**RMRP PARTNERS**
## 109

**SECTOR LEADS**
HIAS-UNHCR




## PRIORITY NEEDS

COVID-19 pandemic-related border closures and travel restrictions have resulted in greater numbers of refugees and migrants from Venezuela entering countries irregularly while seeking protection and assistance: according to the JNA conducted in Brazil, the number of Venezuelans entering the country irregularly rose from 45 per cent to 70 per cent in 2021.[86] Similarly, 68 per cent of refugee and migrant households from Venezuela surveyed in Colombia,[87] 62 per cent of those surveyed in Ecuador[88] and 73 per cent of those surveyed in Chile[89] stated being in an irregular situation. Irregularity, lack of access to asylum and regularization pathways and lack of documentation continue to increase vulnerability to a myriad of other protection threats, such as refoulement, human trafficking and extorsion, both for the population in-transit and in-destination. Similarly, lack of documentation limits employment and income-generating prospects, leading to an inability to meet basic needs, and greater risks of eviction and homelessness. Further, situations of irregularity and lack of documentation also affect refugees' and migrants' ability to exercise fundamental rights and access public services.[90]

Closure of borders continues to increase protection risks, has strengthened trafficking and smuggling networks, and led to risks of sexual and labour exploitation, family separation, refoulement and growing illicit economies linked to irregular armed groups and organized crime. Other key challenges include increasing incidents of xenophobia and discrimination, the lack of adequate services provision, as well as limited technical capacity and gaps in identification and referral mechanisms, especially for survivors of violence. The needs for mental health support (including at the clinical level), legal assistance, representation and safe houses, as well as for resettlement pathways, have grown.

During the Sector's consultation process with its regional members, national Sectors and the Coalition for Venezuela[91] in August 2021, several key challenges were identified. In particular, since the onset of the pandemic, Protection Sector members have been facing challenges to maintain border monitoring, protection analysis and effective responses to emerging protection risks. Other challenges faced by R4V partners relate to the transition to remote guidance/assistance. This process led to the identification of the following priority needs:

1. Supporting national asylum systems and regularization processes in the region to ensure broad access and eligibility, protection against refoulement, as well as advocating for other legal stay arrangements for those who do not meet regularization criteria and who would otherwise remain in irregular situations.[92] This includes ensuring access to most affected groups, particularly indigenous peoples

[86]  Brazil R4V National Platform, Joint Needs Assessment (JNA) (November 2021). Publication forthcoming.
[87]  Colombia R4V National Platform (GIFMM), Joint Needs Assessment (JNA) for the population in destination (June 2021): *https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021* .
[88]  Ecuador R4V National Platform, Joint Needs Assessment (JNA) (May 2021): *https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021*
[89]  Displacement Tracking Matrix (DTM) IOM Chile. *https://reliefweb.int/sites/reliefweb.int/files/resources/oim-dtm-ronda5.pdf*
[90]  According to 60 per cent of refugees and migrants surveyed in Peru, lack of documentation was the main obstacle to accessing the country's public health system; and lack of documentation was one of the top two causes given for the 25 per cent of refugee and migrant children not enrolled in schools in Colombia.
[91]  Between July and August 2021, the Regional Protection Sector held a series of consultations with 138 organizations – both appealing partners and implementing organizations – participating in the RMRP 2021, as well as 58 member organizations of the Coalition for Venezuela, a network of refugee and migrant-led organizations working with Venezuelans. Available at: *https://www.r4v.info/es/proteccion*
[92]  More info: *https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021* and *https://www.r4v.info/es/document/gifmm-colombia-summary-joint-needs-assessment-round-1-2021*

Venezuela AR_000873

through culturally sensitive regularization processes, birth registration procedures and documentation.[93]

**2.** Reducing risks of eviction and homelessness, which have impeded refugees' and migrants' access to national protection systems, particularly in the context of COVID-19: of refugee and migrant households at risk of eviction who were surveyed in 7 countries, 50 per cent had already been evicted and 38 per cent were facing new eviction threats, while 50 per cent of those evicted were in an irregular situation.[94]

**3.** Offering specialized services adjusted to emerging protection risks with a differentiated and intersectoral approach, informed and developed with most affected groups consulted in the planning process for 2022.[95] Of particular relevance are services regarding legal aid and orientation (on detention, deportation and other expedited removal procedures and evictions), specialized mental health and clinical psychosocial support interventions, early parenting training, as well as information-sharing on protection risks along the routes to their destinations.

## RESPONSE STRATEGY

**1.** Strengthen identification, referral mechanisms and case management of persons at-risk by promoting effective access to rights and services (including access to territory and asylum and/or other protection pathways for heightened-risk cases) and by strengthening services provided by members of the three Sub-sectors and the Support Spaces WG. To increase services responsive to protection risks linked to COVID-19, the Sector will facilitate regional protection analyses, update inter-agency tools for border monitoring and conduct protection assessments, including community consultations.

**2.** Provide technical assistance to host governments regarding regularization processes, best practices and lessons learned through comparative analysis, including advocacy with governments through the framework of the Quito Process. Develop mitigation strategies for refugees and migrants from Venezuela who remain in irregular situations.

**3.** Support advocacy initiatives to ensure refugees and migrants from Venezuela have access to national social protection systems, particularly to prevent evictions by working in close coordination with the Integration and Shelter Sectors, and increased access to justice, legal aid and protection from violence.

Protection Sector partners will provide direct assistance to refugees and migrants from Venezuela, strengthen prioritization criteria, identification of persons in need of assistance and referral mechanisms, and conduct advocacy with key stakeholders, including donors, human rights mechanisms, Venezuelan refugee- and migrant-led organizations through high-level panel discussions, data collection and protection analysis.

The Sector will proactively engage with governments through the Quito Process, with recommendations on initiatives to improve favourable protection environments, strengthen regional approaches, and promote complementarity between actors.

Finally, the Sector will maintain capacity-support processes both for its members, as well as to key stakeholders and governments to positively influence regional agendas by highlighting the most affected populations, least supported geographical areas and most critical protection risks. Protection response and priorities will continue to be adjusted through regular and improved protection analysis and monitoring.

Response approaches have been articulated in coordination with the Sub-sectors and the Support Spaces WG to improve coherence and effective response on cross-cutting impacts and needs. The Sector promotes joint advocacy with its Sub-sectors regarding access to asylum and regularization procedures for at-risk populations and joint protection assessments and analysis with the Sub-sectors on HT&S and Child Protection on double affectation and organized crime. Close coordination with the Regional Shelter Sector will continue in 2022 on housing, land and property (HLP) matters, including the analysis of the effects on housing tenure of refugees and migrants from Venezuela, and to design alternatives for accessing durable solutions in the short, medium and long term. Efforts to strengthen regularization initiatives will be coordinated with the Integration Sector.

AAP will be at the centre of the Sector's response in 2022 by establishing community-based mechanisms by partnering with local leaders to ensure participation and inclusion, communication and transparency, feedback and response with an age, gender and diversity approach. The Regional Protection Sector will engage with grassroots organizations representing Venezuelan refugees and migrants through wider consultation processes to ensure accountability, pertinence, and legitimacy of the response. Finally, critical links between the PSEA COP and the Regional Protection Sector will be established to tackle protection gaps reported by refugees and migrants, service providers and authorities.

---

[93]  This was a priority need mentioned by indigenous peoples in Colombia, Brazil, Guyana and Trinidad and Tobago during consultations led by the Regional Protection Sector beginning in 2020. The consultations led to the identification of 8 key protection needs presented to the UN Special Rapporteur and the IACHR in a High-Level Forum in November 2021.

[94]  The Regional Protection Sector and Regional Shelter Sector survey on evictions included 1,021 households in 7 countries in Latin America and the Caribbean, with the support of 20 member organizations and five universities: https://www.r4v.info/en/evictiontools

[95]  See https://www.r4v.info/en/protection. Findings regarding COVID-19 impacts on these populations groups (including youth ages 18-23, sex workers/people in situations of prostitution, transgender women, evicted persons and indigenous peoples) can be found in the disproportionate impacts report of the Regional Protection Sector in coordination with the OAS in 9 countries of the region: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

—
# SUPPORT SPACES

## I. PRIORITY NEEDS/OBJECTIVES

The Support Spaces network is an inter-agency initiative of the R4V Platform comprising a coordinated network of currently 205 spaces operating in eight RMRP countries.[96] In Support Spaces, refugees and migrants from Venezuela receive information, orientation and basic services from a variety of Sectors that respond to their most critical needs. In 2022, Support Spaces will continue to address challenges for refugees and migrants from Venezuela that have increased exponentially over the past year due to the consequences of the COVID-19 pandemic and high levels of irregularity among refugees and migrants from Venezuela. Support Spaces play a crucial role in guaranteeing access to information about rights, essential and specialized services and assistance.[97] According to an assessment of COVID-19 impacts on refugees and migrants from Venezuela,[98] new risk and exposure scenarios have generated particular impacts on certain groups, making it necessary to strengthen the Support Spaces as a network to provide care and information along transit routes, composed of multiple actors from various sectors of society, which contribute to the identification, prevention and mitigation of risks.

## II. RESPONSE STRATEGY

In 2022, the strategic priorities of the Support Spaces network, coordinated through the Protection Sector, will focus on:

**1.** Strengthening access to in-person and virtual service provision and improving the quality of services available to refugees and migrants from Venezuela at border crossings, along transit routes and in urban areas. Strengthen the identification and referral of persons with specific needs and adapt service provision to respond to emergent needs resulting from the pandemic (e.g. health, nutrition, shelter/evictions, gender-based violence, human trafficking, education, legal assistance, and specialized services such as MHPSS). Expand coverage of Support Spaces to new locations and countries of the R4V response, in coordination with National and Sub-Regional R4V Platforms.

**2.** Implementing and monitoring the 2021 revised Support Spaces Toolkit.[99] Capacity-building for partners working in Support Spaces will be prioritized on the various components of the toolkit, reinforcing the implementation of the age, gender and diversity approach, including adapting services for persons with special protection needs and indigenous peoples. Coordination with all Sectors will be essential in order to guarantee the effective mainstreaming of protection in all Support Spaces activities.

**3.** Promoting a community-based protection approach, by working closely with community networks and community structures. The focus will be on the development of operational guidance for National and Sub-Regional R4V Platforms that can be adapted to their needs and contexts. The community approach is fundamental for sustainability of the Support Spaces, to enhance community ownership and build peaceful coexistence, in order to mitigate and prevent increasing numbers of incidents of discrimination and xenophobia, and to facilitate integration processes within communities.

---

[96]   See here: *https://espacios.r4v.info/es/map*

[97]   A key finding of the 2022 partner consultation process by the Regional Protection Sector was that the provision of services should be adapted to the needs of refugees and migrants, and linked to their intersectionality of characteristics. See: *https://www.r4v.info/es/proteccion*

[98]   R4V Regional Protection Sector and the Organization of American States (OAS), Impacts of COVID-19 on Refugees and Migrants from Venezuela, October 2021: *https://www.r4v.info/es/document/ impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela*

[99]   For more information and access to the document, go to: *https://www.r4v.info/en/supportspaces*

4. Ensuring that communication with communities (CwC) is enhanced through a multifunctional approach with the R4V CwC/C4D and Communications Working Groups, and refugees and migrants from Venezuela receive updated, useful and accessible information that responds to their needs.

5. Providing access to updated information through multiple communication channels accessible to refugees and migrants from Venezuela, including the use of digital tools such as the regional service mapping tool (https://www.r4v.info/en/supportspaces).

6. Establishing and strengthening community-based complaints and response mechanisms, committed to protection from sexual exploitation and abuse (SEA) and reinforcing overall accountability to affected populations (AAP). Monitoring the implementation of the Support Spaces initiative will be prioritized, identifying lessons learned and good practices in the region.

7. Enhancing coordination and advocacy with regional and multisectoral processes, including with the Quito Process, in order to provide follow-up and possible support to key initiatives.



© PAHO/ Karen González

Venezuela AR_000876

Case 6:23-cv-00007   Document 95-4   Filed on 03/24/23 in TXSD   Page 278 of 344



© UNHCR / Catalina Betancur

# CHILD PROTECTION

**PEOPLE IN NEED**
**2.52 M**
↑ 5.05%   ↑ 6.12%
↑ 43.9%   ↑ 44.9%

**PEOPLE TARGETED**
**306 K**
↑ 5.18%   ↑ 6.67%
↑ 44.8%   ↑ 43.3%

**TOTAL REQUIREMENTS**
**53 M**

**RMRP PARTNERS**
**48**

**SECTOR LEADS**
**UNICEF–WORLD VISION**

## PRIORITY NEEDS

Refugee and migrant children and adolescents from Venezuela face diverse challenges in-transit and in-destination, due to the lack of security and safety for them and their families. They are highly vulnerable and often encounter different forms of violence, abuse, neglect and exploitation. These include GBV, human trafficking and smuggling, recruitment by armed groups, and discrimination, among other risks that have increased with COVID-19-related lockdowns, such as domestic violence, evictions, and mental health effects on the well-being of refugee and migrant children and adolescents, especially those separated or unaccompanied.[100]

Girls and boys are particularly vulnerable to the risks associated with mixed movements, including family separation, extortion, fraud, harassment and intimidation. Unaccompanied and separated children (UASC) and undocumented children face even greater risks of abuse and exploitation, as well as numerous challenges to their inclusion in national child protection systems for access to rights and basic and specialized services. In addition, they face higher risks of being placed into a protection center (institutionalized), deprived of their liberty and without family contact.[101]

The Sub-sector's members' consultations and the Joint Needs Assessments (JNAs) of National R4V Platforms demonstrate the specific needs of UASC in particular,[102] according to their gender, age, ethnicity and disability.[103] The same assessments highlight that during the COVID-19 pandemic, the lack of a safe and protective educational environment exacerbated protection risks for refugee and migrant children, and limited possibilities for early identification and minimization of risks. Other needs highlighted by partners during consultations were the prevention of forced recruitment of children and adolescents by armed groups and criminal networks, family reunification, mental health support, and GBV age-appropriate response services.[104]

## RESPONSE STRATEGY

The Child Protection Sub-sector response aims to contribute to government, civil society, and child protection actors' efforts so that refugee and migrant children and adolescents from Venezuela are protected from violence, abuse and exploitation, and their well-being is promoted.

To accomplish this, the Sub-sector has focused the response on the following priorities:

1. **Strengthen and increase child protection actors' capacities** by ensuring that child protection standards are integrated into responses; that services are age appropriate and delivered with a child-centred approach; and that actors understand risk and protective factors for children, so they are integrated into protection programmes with the aim of preventing and mitigating violence against children. The main areas for capacity-building and support to organizations and institutional actors will be mental health and psychosocial support (MHPSS), legal orientation, child protection standards in humanitarian action, and special needs and case management of UASC and child GBV survivors, particularly girls. Based on the principle of the best interests of the child, it will be essential to strengthen organizational and state capacities in order to prevent family separation and improve alternative care arrangements for UASC.

[100] R4V, Regional Protection Sector: Regional consultations with Sector members and disproportionally impacted groups, 2021. https://www.r4v.info/es/proteccion

[101] See the respective national Child Protection Sub-sector chapters' situational analysis.

[102] https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

[103] R4V Regional Protection Sector and Regional Shelter Sector survey on evictions, 2021: https://www.r4v.info/en/evictiontools

[104] RMRP Mid-Year Report, 2021: https://www.r4v.info/en/document/rmrp-2021-mid-year-report

Venezuela AR_000877

2. **Improve prevention, mitigation and response child protection mechanisms as well as specialized services** by strengthening national child protection systems to consider the needs of refugee and migrant populations, especially mechanisms for UASC. This response will include developing tools and guidance that reinforce those mechanisms. Areas of focus will be alternative care arrangements, legal support, regularization and access to asylum, the use of CVA to support families, and MHPSS. A priority for the Sub-sector is to ensure quality services that reflect the needs of vulnerable populations, in particular children and adolescents who are indigenous, homeless or at risk of eviction and/or in situations where their parents are involved in sex work and/or for cases in which children are victims of sexual abuse or exploitation, including forced prostitution.

3. **Advocate and raise awareness of child protection risks** by conducting research and awareness-raising on issues of child protection, including on access to territory, regularization, alternative care arrangements, access to asylum and response to particularly vulnerable populations, family separation, prevention of violence and support to community-based mechanisms for the prevention of child protection risks. In addition, continuous advocacy will be pursued in forums such as the Quito Process that promote the protection of refugee and migrant children with a regional perspective, and thus have a more intentional impact by working together, for example, on family reunification processes as a concrete expression of child protection.

The Child Protection Sub-sector will develop the response through capacity-development, working with civil servants and child protection actors, and building a regional evidence base on child protection through regional studies, raising awareness, conducting campaigns and advocacy to highlight needs, risks, protection factors, roles and ways of working together to provide a comprehensive and integral response. The Sub-sector will continue fostering learning and sharing of best practices across its members, while continuing to build a vibrant online community with child protection resources in a dedicated internal virtual space. The Regional Sub-sector will support national Sub-sectors and their members in the development of child protection activities and strategies, including through technical support in the design and implementation of tools to monitor child protection trends and services.

The Child Protection Sub-sector will continue working with other Sectors, Sub-sectors and Working Groups for a complementary response, including the following:

- **Protection, GBV, Human Trafficking and Smuggling, and Support Spaces,** on centrality of protection considerations, work with child and adolescent GBV survivors, protection from sexual exploitation and abuse, response to double affectation (as vulnerable refugees and migrants, being subject to armed violence or conflict in a host country) and the MHPSS response.

- **Education,** to promote guidelines for referrals by schools to child protection services and case management processes.

- **Communication with Communities (CwC),** to elaborate and disseminate information materials and feedback mechanisms, and promote the use of regional tools such as the R4V Service Mapping[105] and *U-Report: Uniendo Voces* to engage children, adolescents and their families.

The Child Protection Sub-sector aims to integrate a child protection lens in other Sectors, to guarantee comprehensive protection and effectively achieve common goals. As an integral part of the Sub-sector's response, the gender, ethnic, age, and cultural approach will be taken.

The Child Protection Sub-sector will contribute to the Protection Sector's accountability processes and will promote the meaningful and effective engagement and participation of the population in need, especially children, to include their priorities and receive feedback. The Sub-sector will integrate PSEA commitments and work with the PSEA community of practice. Promoting the effective participation of children and adolescents throughout the programmatic cycle is one of the axes of the Sub-sector's support to National Platforms, so that their voices can be heard, and children can participate actively in processes.

---

[105] R4V Service Mapping. See: *https://espacios.r4v.info/es/map*

Venezuela AR_000878

© PAHO/ Karen González



# GENDER-BASED VIOLENCE (GBV)



**PEOPLE IN NEED**

**1.82 M**

5.49%  63.1%
3.49%  27.9%



**PEOPLE TARGETED**

**510 K**

4.67%  64.7%
2.05%  28.6%

**TOTAL REQUIREMENTS**
**44.1 M**

**RMRP PARTNERS**
**55**

**SECTOR LEADS**
HIAS-SAVE THE CHILDREN-UNFPA

## PRIORITY NEEDS

The impact of the COVID-19 pandemic has exacerbated existing gender inequalities and increased rates of gender-based violence (GBV), particularly among refugee and migrant women and girls and LGBTQI+ populations from Venezuela.[106]

1. Deteriorating socio-economic conditions coupled with challenging entry policies (including prolonged closure of borders) have forced refugees and migrants from Venezuela to increasingly use irregular border crossings. As a result, women, girls and LGBTQI+ individuals, especially those in-transit (including '*caminantes*'), have become more vulnerable to GBV, including rape, survival sex, various forms of sexual exploitation and human trafficking.[107] Young men are also increasingly resorting to the exchange of sex as a coping mechanism along the transit routes.[108]

2. Intimate partner and domestic violence are a continued concern,[109] as household tensions have increased due to food and financial insecurity as well as pandemic-related movement restrictions, which have trapped women and girls in their homes with their aggressors and reduced

access to external support. Adolescent girls are particularly vulnerable to various forms of GBV, including sexual violence perpetrated by intimate partners and family members, early and forced unions, as well as sexual exploitation[110] and human trafficking.

3. Increased risk and incidence of violence, unmet needs and xenophobia[111] have led to heightened stress and a deterioration in psychological well-being, particularly among people engaging in sex work/in situations of prostitution, transgender women and people living with HIV.[112]

4. The economic disruption caused by the ongoing COVID-19 pandemic has led to loss of livelihoods and income and a resulting increase in homelessness due to evictions. Women are both disproportionately at risk of eviction and disproportionately affected by evictions, with more than 79 per cent of women surveyed reporting that they are at risk of eviction due to informal, insecure or absence of tenancy agreements, leading to homelessness and exposing them to increased risk of sexual assault.[113]

---

[106] Caribe Afirmativos Publications, Sentir que se nos va la vida: Personas LGBTI refugiadas y migrantes de Venezuela en Chile, Colombia y Ecuador, and Desafiar la Incertidumbre: Fragmentos de Vida y Trayectorias de Personas Venezolanas LGBTI: https://caribeafirmativo.lgbt/wp-content/uploads/2021/10/desafiar-incertidumbre.pdf. For Brazil, see Humanitarian Practice Network: https://odihpn.org/blog/out-of-the-shadows-the-precarious-lives-of-venezuelan-lgbtqi-asylum-seekers-in-brazil/

[107] ACAPS, Caminantes: Needs and Vulnerabilities of Venezuelan refugees and migrants travelling on foot, Jan 2021: https://www.acaps.org/special-report/colombia-and-venezuela-needs-and-vulnerabilities-caminantes

[108] 138 focus group discussion participants in 9 countries reported that young men aged 18-23 were increasingly resorting to the sale of sex as a coping mechanism. R4V Protection Sector, Diagnóstico de necesidades de protección e impactos de la COVID-19 para las personas refugiadas y migrantes de Venezuela, page 50, 2021: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

[109] GIFMM Colombia, JNA 2021: https://www.r4v.info/es/document/gifmm-colombia-resumen-evaluacion-conjunta-de-necesidades-ronda-1-2021. See also UNHCR, Voices of Refugees in Brazil: https://www.r4v.info/es/document/voces-de-las-personas-refugiadas-en-brasil.176 per cent of indigenous persons surveyed knew of an incident of violence in their families, and gender-based violence is a common occurrence, aggravated by alcohol and unemployment (page 16).

[110] Girls under 14 are the population more frequently targeted for sexual exploitation. See Save the Children, Girls on the Move, 2020: https://resourcecentre.savethechildren.net/pdf/girls_on_the_move_venezuela_and_colombia.pdf/

[111] Mougenot, B., Amaya, E., Mezones-Holguín, E. et al. Immigration, perceived discrimination and mental health: Evidence from Venezuelan population living in Peru. Global Health 17, 8, 2021: https://globalizationandhealth.biomedcentral.com/articles/10.1186/s12992-020-00655-3.

[112] R4V GBV Sub-sector, Diagnóstico de necesidades de protección e impactos de la COVID-19 para las personas refugiadas y migrantes de Venezuela, 2021: https://www.r4v.info/sites/default/files/2021-09/VBG%20ENG.pdf. See also focus group discussion findings: https://www.r4v.info/proteccion

[113] R4V Regional Protection Sector, Regional Survey on Eviction of refugees and migrants from Venezuela, February 2021: https://www.r4v.info/es/desalojo. See also Care, Rapid Gender Analysis: https://www.r4v.info/es/documents/details/77719

Venezuela AR_000879

Political and economic constraints in host countries have limited the availability of government-led specialized GBV response services for survivors, such as clinical care, safe shelters and focused Mental Health and Psychosocial Support (MHPSS) services, especially in rural and remote areas. Further, barriers to survivors accessing available services include insufficient or unaffordable public transport and low levels of familiarity with technology. These constraints disproportionally affect marginalized women, such as transgender women and persons engaged in sex work/in situations of prostitution, who also experience discrimination from law enforcement actors.[114]

## RESPONSE STRATEGY

**Support and strengthen lifesaving GBV response services** including health, sexual and reproductive health (SRH), livelihoods, legal and regularization support, safety, MHPSS, case management and cash and voucher assistance (CVA) as part of comprehensive GBV interventions[115]. Priorities include improving regional Sub-sector support to national and sub-regional partners to fulfill core functions and deliverables;[116] increasing accessibility to clinical management of rape and other response services for marginalized sexual violence survivors (e.g. transgender women, people engaging in sex work/in situations of prostitution, male survivors, indigenous survivors); and strengthening capacity in case management, safe referrals and remote and in-person focused psychosocial support for child, adolescent and adult GBV survivors.

**Support GBV risk mitigation through self-reliance and empowerment:** The regional strategy will include working with other Sectors to design tailored economic empowerment initiatives, including the promotion of multi-purpose cash (MPC) programming with linkages to longer-term income-generation activities, and for rental support (eviction risk mitigation), to access training and multisectoral services.[117] Regional actors will also roll out empowerment and psychosocial curricula for populations-at-risk, and guidance to operate safe spaces as entry points for GBV and psychosocial programming.

**Promote and support community-based mechanisms for GBV prevention** that promote peer networks, providing spaces of emotional support and learning about sexual and reproductive rights, bodily autonomy and available GBV services. Regional actors will continue implementing campaigns that challenge the harmful gender norms that underpin GBV as well as activities to promote behavior change among men and boys and positive masculinities.

**Continue strengthening the capacity of** front-line responders, including government, civil society and NGOs, to provide timely care to survivors. The regional Sub-sector will develop training packages and deliver trainings on the Inter-agency Minimum Standards for GBV Programming in Emergencies, GBV Case Management, Psychosocial Support service provision, Clinical Management of Rape and the Guide to Supporting Survivors for non-GBV Specialists.[118]

**Advocacy before governments:** The regional Sub-sector will spearhead advocacy initiatives and information campaigns (e.g. fact sheets, panel co-facilitation) on GBV risks, needs, barriers faced by disproportionally affected yet less 'visible' groups, and respective recommendations for humanitarian actors, donors and governments.

**Assessments:** The regional Sub-sector will equip national Sub-sectors and regional partners with tools to monitor GBV trends. Regional partners will conduct multi-country assessments using innovative methodologies to gather real-time information about GBV risks. The findings of these assessments will enable GBV responders to design appropriate, evidence-based and effective multi-sectoral interventions to prevent, mitigate and respond to GBV.

Integrated response approaches will include work with:

a. The Cash Working Group on cash programming for GBV risk mitigation (e.g. sexual exploitation) and response;

b. The Integration Sector to create joint guidance on the incorporation of MHPSS and messaging on equitable gender relations in livelihoods curricula and income-generation initiatives for GBV survivors;

c. The Protection Sector on measures for survivors' access to national protection mechanisms and differentiated responses for GBV survivors who are indigenous or in contexts of armed conflict and organized crime;

d. The Child Protection and Human Trafficking and Smuggling Sub-sectors to address the needs of adolescent survivors and victims of trafficking for sexual exploitation purposes;

e. The Shelter and Humanitarian Transportation and Protection Sectors to produce guidance for safe access to humanitarian transportation and GBV risk mitigation in temporary shelter facilities;

f. The WASH Sector on mitigating GBV risks in the design and location of sanitation in collective shelter facilities;

g. The Health Sector on clinical management of rape services and strengthening the referral system between GBV responders and mental health actors; and

h. the Protection Sector and technical focal points on

---

[114] R4V Regional Protection Sector and OAS, Diagnóstico de necesidades de protección e impactos de la COVID-19 para las personas refugiadas y migrantes de Venezuela, page 36, 2021: *https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela*

[115] Cash will continue to be a programmatic tool to prevent to GBV risks and to respond to the needs of GBV survivors such as transportation, access to health, education, relocation, and allow them to recover and advance towards self-sufficiency through education, vocational training and entrepreneurship.

[116] The Regional GBV Sub-sector will support nascent national GBV coordination fora in the Caribbean and Southern Cone to fulfil core functions and produce deliverables, and will support established national GBV Sub-sectors to pilot context- specific tool kits, update national and cross-border referral systems, and roll-out regional training packages on GBV response.

[117] These initiatives shall guarantee decent work, promotion of safe conditions, prevention of harassment, and access to care services.

[118] Training packages forthcoming on *www.r4v.info*

Protection from Sexual Exploitation and Abuse (PSEA) and CoP to develop guidance that informs SEA survivors on access to GBV referral mechanisms and specialized services.

All activities will be guided by the survivor-centered approach, international best practices and GBV minimum standards and will be inclusive of marginalized populations including LGBTQI+, indigenous peoples and refugees and migrants with disabilities. The regional Sub-sector will promote sustainable partnerships with women-led and women's rights organizations and their inclusion in R4V coordination mechanisms in order to enhance meaningful participation and representation of the affected population. To ensure accountability, the Sub-sector will promote two-way communication channels that allow refugees and migrants from Venezuela who receive support to influence programming, and will work with AAP/PSEA to provide toolkits that enable them to lodge complaints, evaluate satisfaction with the services delivered and report misconduct.



© PAHO

## HUMAN TRAFFICKING AND SMUGGLING

 **PEOPLE IN NEED**
**1.46 M**

👨 36.3%   👨 35.3%
👦 14.2%   👧 14.2%

 **PEOPLE TARGETED**
**42.2 K**

👨 30.7%   👨 34.8%
👦 17.3%   👧 17.2%

💰 **TOTAL REQUIREMENTS**
**13.6 M**

⊕ **RMRP PARTNERS**
**26**

**SECTOR LEADS**
**IOM-UN WOMEN**

### PRIORITY NEEDS

Human trafficking and smuggling[119] are complex, transnational crimes[120] with serious human rights implications disproportionately affecting women – especially transgender women and those in situations of sexual exploitation,[121] girls, and adolescents. According to R4V partners' studies, the majority of identified victims of trafficking (VOTs) in the region are female: 69 per cent in South America, and 79 percent in Central America and the Caribbean. However, there is also an increase in men identified as victims. Sexual exploitation is the primary form of trafficking detected in the region, and the region has among the highest rates of sexual exploitation recorded globally.[122]

The prolonged impact of the COVID-19 pandemic has exacerbated the vulnerable situation of refugees and migrants from Venezuela. Border closures and travel restrictions adopted to mitigate the spread of the virus have caused refugees and migrants from Venezuela to increasingly use dangerous routes to avoid border controls, including through irregular crossings across closed borders, and the use of insecure means of transportation. For example, 55 per cent of Venezuelan households interviewed in Colombia entered the country through unofficial crossings, and that percent increased to 72 percent in 2020 and 94 in 2021.[123] Overall, this has led to greater dependence on transnationally operating criminal networks,

including smugglers facilitating illegal entry across borders, as well as higher risks of exploitation at the hands of traffickers taking advantage of refugees' and migrants' vulnerabilities.

Two main obstacles increase the vulnerability of refugees and migrants from Venezuela to trafficking, exploitation, abuse and violence, including various dimensions of the double impact of illegal armed actors or organized crime,[124] especially in countries such as Colombia, Brazil and Bolivia. Firstly, the worsening economic and social crises across the region have left refugees and migrants from Venezuela with less access to decent work and in increasingly vulnerable situations. Secondly, movements have been restricted, limiting access to services as well as to regularization pathways, asylum processes, humanitarian visas and specialized protection.

The Sub-sector, in coordination with the Regional Protection Sector, held a series of consultations in 2021 with R4V partners working on protection and addressing human trafficking and smuggling as well as with members of Venezuelan-led civil society organizations.[125,126] The consultations reflected the need to channel intervention strategies towards the provision of holistic responses, focusing on economic autonomy and integration; improved case management; the elaboration of diagnoses, policies and procedures; the promotion of good practices and institutional capacities; and access to specialized services with a gender perspective.

---

[119] Although the term smuggling of migrants is generally used, consistent with the United Nations Convention against Transnational Organized Crime (UNTOC), the Sub-sector recognizes that refugees are also affected.

[120] Smuggling is always transnational, while trafficking may or may not involve movement between countries.

[121] R4V Regional Protection Sector and OAS, Impacts of COVID-19 on Refugees and Migrants from Venezuela, 2021: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

[122] Please see: https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf

[123] See GIFMM Colombia, Joint Needs Assessment (JNA) for population in destination, Round 5, June 2021, full report at: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021

[124] "Double impact" refers to situations where the impact on a person and/or a community of violence by illegal armed groups and/or organized crime converges with the risks, threats and vulnerabilities that refugees and migrants generally face in the broader mobility context.

[125] Consultations held between July and August 2021 with the participation of 56 organizations from the Coalition for Venezuela and 188 members of R4V´s regional Protection Sector and regional organizations: https://www.r4v.info/es/proteccion

[126] https://www.r4v.info/es/tratytraficodepersonas

Venezuela AR_000882

## RESPONSE STRATEGY

The Human Trafficking and Smuggling Sub-sector´s work plan for 2022 seeks to promote holistic responses to human trafficking and smuggling with diverse actors, including women, girls, boys, adolescents and LGBTQI+ persons.

The strategy for counter-trafficking and smuggling will focus on the "4Ps" of prevention, protection, prosecution and partnership, adding on the experience and mandates of the Sub-sector's partners in areas related to investigation, and cross-border judicial cooperation.

**Prevention.** A regional study will be conducted on women and girls who are smuggled, to highlight vulnerabilities they face and identify risk factors for exploitation, abuse and violence. The design of strategies for risk mitigation, action plans to improve risk prevention, and the support for monitoring tools for protection and prevention will be prioritized and implemented at national levels. Activities will be implemented in coordination with the Protection, Humanitarian Transportation and Shelter Sectors that have the capacities to work in mitigation strategies. The gender perspective will be strengthened in a regional virtual workshop on trafficking and smuggling for Sub-sector members.

**Protection.** The Sub-sector will continue developing tools and technical actions[127] to ensure access to assistance and comprehensive protection services for refugees and migrants from Venezuela who are victims of trafficking and/or subjected to abuse, extortion or violence at the hands of smugglers, addressing the dimensions of gender, age, ethnicity and diversity. Through its national partners, the Sub-sector will provide urgent and immediate assistance to refugees and migrants from Venezuela who have experienced or are at risk of violence, abuse and/or exploitation for special protection and direct assistance needs.[128] In 2022, this assistance mechanism will include a pilot project to support victims of trafficking and people at risk of trafficking in the process of economic and social integration, in coordination with the Integration Sector. The protection axis also seeks to collect information to enable prevention measures, comprehensive assistance and comprehensive protection of victims, particularly those in vulnerable situations or victims of related crimes, and ensure solutions.[129]

**Prosecution.** The 2022 Workplan seeks to develop tools and actions that enable access to justice for victims of trafficking and/or subjected to abuse, extortion or violence by smugglers in the region, complementing and supporting national justice systems and incorporating a gender, ethnic, age and diversity-sensitive approach.[130] Two key strategic actions will be implemented: the development of a regional action guide to facilitate the design and operation of joint investigation teams at national level, and a coordination mechanism between regional networks of public ministries and ombudsmen for investigation and international legal cooperation in cases of human trafficking and smuggling in R4V countries.[131]

**Partnership.** The Sub-sector will support the establishment of a mechanism for intra-regional coordination among national anti-trafficking roundtables/mechanisms of R4V countries, that promote the exchange of good practices, tools and information, the creation and/or strengthening of working groups, coalitions, and/or key regional advocacy actions on human trafficking and smuggling (Quito Process, Mercosur and the Caribbean Migration Consultations).

With regards to smuggling of refugees and migrants specifically, in addition to the above, the Sub-sector will focus on **intelligence and investigation** to promote exchange mechanisms[132] among the region's countries, respecting and guaranteeing government ownership for the prevention and effective prosecution of smuggling.[133]

In line with R4V accountability commitments, the Sub-sector will promote two-way communication channels for the affected population to influence programming. The Sub-sector will work with regional AAP and PSEA COP to design and roll-out toolkits that promote feedback and complaint mechanisms – including for misconduct, evaluation of satisfaction with the services delivered, and to strengthen SEA victim assistance through protection interventions. In addition, trainings will be carried out jointly with AAP and PSEA on these issues to further strengthen regional and national Sub-sector partners' capacities.

---

[127] Including the establishment of partnerships with key government entities and other relevant stakeholders (across all Subsectors).

[128] In complementarity with other national, regional and global mechanisms and funds.

[129] This includes actions such as diagnosis/study/report to define the processes of identification of smuggled persons and victims of related crimes, mapping at institutional, national, binational, and regional levels on standards, tools, and strategic and operational instruments for the protection and assistance of smuggled refugees and migrants who have been victims of related crimes.

[130] The Sub-sector will focus on groups with disproportionate impacts, according to the consultations carried out in 2021. R4V Regional Human Trafficking and Smuggling Sub-sector, Necesidades y Propuestas para el 2022: Víctimas de trata y tráfico. https://www.r4v.info/es/document/necesidades-y-propuestas-para-el-2022-victimas-de-trata-y-trafico-subsector-de-trata-y

[131] The Sub-sector will follow up on the findings indicated in the study: R4V Regional Protection Sector and the Organization of American States (OAS), Impacts of COVID-19 on Refugees and Migrants from Venezuela, October 2021: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

[132] Exchange of information, experiences, technical issues. This includes designing communication protocols and inter-institutional coordination at the domestic and regional level, according to each country's capacities and applicable legislation, and training officials responsible for the prosecution and punishment of migrant smuggling to raise awareness.

[133] In accordance with the provisions of the Protocol against the Smuggling of Migrants by Land, Sea and Air, which complements the United Nations Convention against Transnational Organized Crime (UNTOC).

© IOM/ Hanz Rippe



# SHELTER

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | **PEOPLE IN NEED** | 👨 32.1% | 👩 33.7% |  | **PEOPLE TARGETED** | 👨 29.4% | 👩 33.6% | |

**PEOPLE IN NEED** 5.47M  👨 32.1%  👩 33.7%  👦 17.1%  👧 17.1%

**PEOPLE TARGETED** 580K  👨 29.4%  👩 33.6%  👦 18.4%  👧 18.6%

**TOTAL REQUIREMENTS** 112M

**RMRP PARTNERS** 52

**SECTOR LEADS** IOM-NRC-UNHCR

## PRIORITY NEEDS

According to various R4V assessments conducted across the region, access to shelter continues to be one of the top three priority needs among refugees and migrants from Venezuela.[134]

The economic crisis resulting from the COVID-19 pandemic has had a direct impact on the income of refugees and migrants from Venezuela and their ability to afford safe and dignified shelter. Of those surveyed at-risk of eviction in seven countries between October and November 2020, 94 per cent stated that the main cause for their eviction risk was the inability to pay rents.[135] Of these, 76 per cent stated that the consequence of evictions would be homelessness.[136] Amongst the main barriers for formalizing rental agreements, is that many refugees and migrants from Venezuela do not have access to information about tenants' rights and/or lack documentation for such agreements. For people at risk of eviction, there is a direct relationship between the lack of security of tenure and the type of agreement they have with a landlord, with 74 per cent of agreements estimated being verbal.[137] Not having

a home exposes individuals and families to greater risks of COVID-19 infection, violence, GBV, exploitation and abuse, and school dropout, especially for women and girls.[138]

Refugees and migrants from Venezuela in-transit, as well as those who have recently arrived in-destination are mainly housed in temporary collective shelters, to avoid sleeping on the streets. In countries such as Argentina, Brazil, Chile and Uruguay, they must comply with COVID-19 quarantine measures in hotels or other suitable spaces. Border closures and quarantines have led to a significant increase in irregular entries through alternative routes, where there is no consolidated network of adequate accommodation spaces, resulting in people gathering in public spaces, staying on the streets or informal settlements.[139] Gradually, temporary collective shelters have reopened, although they continue to be affected by reduced capacities due to COVID-19 infection prevention measures.[140]

Access to adequate housing, services, and infrastructure in settlements remains a priority.[141] Refugees and migrants from

[134] In Colombia the second most prioritized need is shelter support (64 per cent; with 46 per cent preferring that the support modality be via CVA). See GIFMM Colombia, Joint Needs Assessment, Round 1, 2021: https://www.r4v.info/es/document/gifmm-colombia-resumen-evaluacion-conjunta-de-necesidades-ronda-1-2021.    In Ecuador the third most prioritized need is accommodation/shelter (53 per cent), but this need reaches second place for people who have been in Ecuador for up to 6 months. See GTRM Ecuador, Joint Needs Assessment, May 2021: https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021. Shelter is the third need for those in-transit leaving from Venezuela, according to Mazuera-Arias, R., Albornoz-Arias, N., Freitez, A., Calderón O., Informe de movilidad humana venezolana IV. Caminantes y retornados: ilusión y decepción (1º de julio al 30 de septiembre 2021). San Cristóbal, Venezuela: Observatorio de Investigaciones Sociales en Frontera (ODISEF): https://odisef.org/wp-content/uploads/2021/10/Informe-de-Movilidad-Humana-IV.pdf

[135] R4V Protection Sector with the support of the IACHR, Regional Survey of Evictions of Refugees and Migrants from Venezuela, June 2021: https://www.r4v.info/es/desalojo

[136] Ibid.

[137] Ibid.

[138] Ibid.

[139] Colombia: Noor Mahtani, Children trapped on the border of Colombia and Venezuela, EL PAIS, 10 September 2021: https://elpais.com/planeta-futuro/2021-09-10/la-ninez-atrapada-en-la-frontera-de-colombia-y-venezuela.html. Brazil: CRONICA VIDA, The double banishment of Venezuelan indigenous people in Brazil, 12 October 2021: https://www.cronicaviva.com.pe/columna/el-doble-destierro-de-los-indigenas-venezolanos-en-brasil/. Chile: Anti-immigrants burn Venezuelan camps in Chile, EL TIEMPO, 26 September 2021: https://www.eltiempo.com/mundo/latinoamerica/chile-queman-carpas-de-migrantes-venezolanos-y-colombianos-620976. Important note: "Camps" in this context refers to informal settlements. Chile: UNHCR, Homeless Venezuelans facing harsh winter, 11 June 2021: https://eacnur.org/es/actualidad/videos/venezolanos-sin-techo-ante-el-duro-invierno.

[140] CARE Ecuador, The current state of the situation of migrants and refugees in temporary accommodation and shelters in Ecuador, April 2021. Table 3. Installed capacity of accommodation: https://. bit.ly/3og1yIF GTRM Peru, Joint Needs Analysis, 2021: https://bit.ly/2ZLl2eD

[141] In Colombia, 12 per cent of refugees and migrants from Venezuela live in informal settlements on private lands or for public use, their situation being more precarious. GIFMM Colombia: Joint Needs Assessment, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021.

Venezuela increasingly reside in high-density settlements, with informal or spontaneous characteristics, and in overcrowded conditions, without access to basic services and infrastructure.[142] These high-density settlements have generated increased xenophobia from host communities.[143] People living in these settlements are even more exposed to protection and health risks associated with COVID-19, as well as to a deterioration of the relationship with host communities.

## RESPONSE STRATEGY

In 2022, Shelter Sector partners will focus on three priorities:

- Providing **temporary collective shelter** through infrastructure improvements and equipment provision, as well as the expansion and opening of new structures. The mechanisms for monitoring and evaluating shelter services and their quality will be strengthened and expanded.[144] Capacity-development will be scaled-up for shelter management and coordination, emphasizing peaceful coexistence and linkages to sustainable longer-term shelter solutions.[145]

- Supporting **individual shelter solutions** for refugees and migrants in-destination to achieve durable solutions. Support will continue to be provided in the form of scaled-up rental assistance programming and adequate housing awareness programmes (on shelter improvements for habitability); rental market-based approaches, including CVA; support with housing, land, and property (HLP) issues to ensure due diligence procedures when renting or buying a property; and raising awareness on tenants' rights to prevent abuse, such as forced evictions, and conflict resolution between tenants and landlords. The Sector will also promote access to individual shelter by supporting affected host communities to adapt available housing to make more accommodation available to refugees and migrants and reduce overcrowding,[146] and supporting authorities in establishing housing action plans for refugees and migrants from Venezuela. In addition, the Sector will continue providing support for HLP matters, self-construction, and provision of construction materials and tools for those with substandard housing.[147]

- Reinforcing contextualized **Area-Based Approaches**[148] to promote social cohesion between host communities, refugees and migrants from Venezuela, and public institutions, collectively undertaking the planning of settlements and community infrastructure to facilitate access to services, integration, and socio-economic reactivation while promoting security in marginalized neighborhoods.[149]

The response will include the distribution of essential household items[150] and transit safety kits,[151] the latter predominantly for those in-transit. Priority will be given to people with specific needs such as women, children, LGBTQI+ persons, UASC, people with disabilities, elderly people, survivors of GBV, and victims of trafficking, exploitation, and/or abuse. A comprehensive response that complies with Infection Prevention and Control (IPC) measures for COVID-19 and other minimum standards will be promoted.

The Shelter Sector will prioritize CVA as a modality for rental support, procurement of construction materials and tools, and essential household items. Programmes will be designed following market-based approaches, particularly for housing market analysis. In-kind assistance will include access to temporary collective shelters, as well as the development of basic community infrastructure and facilities. The Sector will carry out capacity-building and community engagement activities, and develop technical guidelines and advocacy strategies, including information and awareness campaigns.

---

[142] "More than 62 per cent of the settlements in Norte de Santander, have a formation time between 3 and 5 years, which coincides with the length of the Venezuelan migration crisis." IMMAP Detection and Profiling of New Settlements Through Satellite Imagery and Mobile Apps, August 2020: https://immap.org/news/detection-and-profiling-of-new-settlements-through-satellite-imagery/.

[143] OAS and R4V Protection Sector, Impact of COVID-19 on refugees and migrants from Venezuela: Evicted People, Sex Workers and Indigenous Peoples, September 2021: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela; Colombia: Andres Rosales, Xenophobia, the other infection, MIGRAVENEZUELA: https://migravenezuela.com/web/articulo/xenofobia-el-otro-contagio/1842; Chile: IACHR condemns violent and xenophobic acts against Venezuelan migrants in Iquique, Chile, October 2021: https://www.oas.org/es/CIDH/jsForm/?File=/es/cidh/prensa/comunicados/2021/263.asp; Anti-immigrants burn Venezuelan camps in Chile, EL TIEMPO, 26 September 2021: https://www.eltiempo.com/mundo/latinoamerica/chile-queman-carpas-de-migrantes-venezolanos-y-colombianos-620976. Important note: "Camps" in this context refers to informal settlements.

[144] IOM, DTM Ecuador, June 2021, forthcoming. Also see GIFMM Colombia, Characterization of Temporary Collective Shelters, forthcoming; and Support Spaces service mapping: https://espacios.r4v.info/es/map

[145] "An increase in the return of the Venezuelan refugee and migrant population to collective temporary accommodation is identified in Peru due to the impact of the pandemic on access to livelihoods, making it impossible to pay rents." GTRM Peru, Joint Needs Analysis, 2021: https://www.r4v.info/es/document/analisis-conjunto-de-necesidades-rmrp-2021

[146] In Colombia, 36 per cent of the refugee and migrant population live in overcrowded conditions. GIFMM Colombia, Joint Needs Assessment, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021. In Ecuador, of the 33 per cent who report living in unsuitable housing, 46 per cent link it to overcrowding. GTRM Ecuador, Joint Needs Assessment, May 2021: https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021

[147] 0.2 per cent of Venezuelans have their own house or land in Ecuador (seeGTRM Ecuador, Joint Needs Assessment, May 2021: https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021) and 1 per cent in Colombia (see GIFMM Colombia, Joint Needs Assessment, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021).

[148] See the definition and global strategy: https://www.impact-initiatives.org/what-we-do/news/the-settlements-approach-where-boundaries-and-action-merge/ and https://cccmcluster.org/global/Area-Based-Approach-Working-Group

[149] "80 percent of refugees and migrants from Venezuela in Peru reside in Lima, in the most vulnerable districts where infrastructure conditions, particularly housing, are precarious." GTRM Peru, Joint Needs Analysis, 2021: https://www.r4v.info/es/document/analisis-conjunto-de-necesidades-rmrp-2021

[150] Essential Household Items include, among others: kitchen sets, bedding, and clothing.

[151] Transit Safety kits include, among other items: whistles, flashlights, reflective vests, document holders and warm clothing.

Venezuela AR_000885



© PAHO/ Karen González

The Sector will collaborate with the Regional **Cash Working Group**, given its focus on sectoral cash interventions for individual shelter solutions, and with the **Support Spaces Working Group**, to map services provided through temporary collective shelters and other infrastructure.[152] Collaboration with other Sectors will include joint initiatives with the **Protection Sector and its three Sub-sectors**, to respond to HLP matters (including risks from evictions), address protection risks, GBV, child protection risks and sexual exploitation and abuse; the **Health and WASH Sectors**, to ensure safe shelters with adequate access to water and sanitation and implementation of COVID-19 mitigation protocols; and the **Integration Sector**, to promote sustainable shelter solutions in the longer-term, with the inclusion of refugees and migrants from Venezuela in livelihood and social integration programmes.

The Sector will collaborate with **AAP and PSEA focal points** for joint needs assessments, risk assessments and capacity-building, based on the "do no harm" principle, as well as the implementation of complaint and feedback mechanisms. The Sector will promote the participation of refugees and migrants from Venezuela, host communities, civil society organizations and institutions throughout the programme cycle, including monitoring and evaluation of sector interventions. Co-creation of common messaging with refugees and migrants from Venezuela and two-way communication channels will be implemented to deliver a quality response and guarantee dignified assistance. Finally, the Sector will mainstream **environmental** considerations[153] to mitigate negative environmental impacts as well as disaster risk reduction and climate change adaptation measures, in order to protect the living conditions and guarantee sustainability of the Shelter response.

[152] See: *https://espacios.r4v.info/es/map*

[153] See hereto the sector-specific guidance on integrating environmental considerations in Shelter interventions: *https://www.r4v.info/en/keyresources*

Venezuela AR_000886



© PAHO/ KAREN GONZÁLEZ  • RMRP 2022 •  R4V • 65

© World Vision/ Chris Huber



## WASH

 **PEOPLE IN NEED**
**4.87M**

♂ 31.6%  ♀ 33.6%
♂ 17.3%  ♀ 17.5%

 **PEOPLE TARGETED**
**1.09M**

♂ 29.8%  ♀ 33.3%
♂ 18.4%  ♀ 18.5%

**TOTAL REQUIREMENTS**
**65.3M**

**RMRP PARTNERS**
**55**

**SECTOR LEADS**
**IFRC-UNICEF**

### PRIORITY NEEDS

In 2022, the need for adequate water, sanitation and hygiene (WASH) services and products, as well as infection prevention and control (IPC) for refugees and migrants from Venezuela and host communities, will remain a priority.[154] Refugees and migrants from Venezuela increasingly reside in high-density informal or spontaneous settlements, in overcrowded conditions which threaten their health and well-being due to the absence of or limited access to basic infrastructures, services and products.[155] Growing WASH needs are also related to the socio-economic impacts of the COVID-19 pandemic,[156] resulting in an increase of 700,000 people in need (PiN) for the Sector, from 4.1 million in 2021 to 4.8 million in 2022.[157]

Similar needs in terms of access to WASH services are encountered by the population in-transit,[158] either at border points (reception centres, Support Spaces and shelters) or along their route to their destinations. Local authorities and partners have difficulties providing and maintaining services at these points. This situation has been exacerbated by the increase in irregular crossings due to border closures in various countries due to the COVID-19 pandemic or national migration management strategies, complicating the identification of refugees and migrants from Venezuela in-need for provision of corresponding services.

Inadequate WASH facilities and products make refugees and migrants from Venezuela and host communities, especially vulnerable groups within this population (indigenous groups,[159] women, children, people living with disabilities, the elderly) more prone to faeco-oral diseases (like diarrhoea and dysenteries, hepatitis A and E); water-washed diseases (due to poor hygiene linked to lack of adequate water, such as skin infections and conjunctivitis); and also water-related insect-vector diseases (such as Dengue, Zika and Chikungunya).[160] Overcrowding and reduced access to WASH services, products and information exposes them even further to possible COVID-19 transmission in contexts where health systems are already overstretched. The lack of WASH services and products not only threatens the health of refugees and migrants but also of host communities, undermining their dignity and security. This is particularly

[154] According to the JNA, in Colombia 25 per cent of households report poor water quality, with the most significant gaps in La Guajira and Magdalena departments, and sanitation services are not private, safe, or dignified. GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021. The JNA in Ecuador found that 13 per cent of those surveyed reported having suffered a cut or interruption of the drinking water service due to non-payment. GTRM Joint Needs Assessment, May 2021: https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021. The JNA in Peru found that a total of 25 per cent of the population did not have access to a sewage system and 7 per cent did not have access to any type of excreta disposal service. GTRM Basic Needs Sub-Working Group (2021), Análisis situacional sobre necesidades de Agua, Saneamiento e Higiene de refugiados y migrantes de Venezuela y comunidad de acogida asentados en Lima y Callao, forthcoming. GTRM Peru Joint Needs Assessment, August 2021, forthcoming.

[155] See GIFMM Joint Needs Assessment for the population in destination, Fifth round, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021; GTRM Peru Joint Needs Analysis for the RMRP, December 2020: https://www.r4v.info/es/document/analisis-conjunto-de-necesidades-rmrp-2021 and GTRM Ecuador Joint Needs Analysis, May 2021: https://www.r4v.info/es/document/gtrm-ecuador-evaluacion-conjunta-necesidades-mayo-2021

[156] Organization of American States (OAS) and R4V Regional Protection Sector, Impacts of COVID-19 on Refugees and Migrants from Venezuela, October 2021: https://www.r4v.info/es/document/impactos-de-la-covid-19-en-personas-refugiadas-y-migrantes-de-venezuela

[157] RMRP 2021: https://www.r4v.info/en/document/rmrp-2021 for refugees and migrants from Venezuela. Regional Refugee and Migrant Response Plan, January – December 2021.

[158] According to the JNAs of Ecuador, Colombia and Peru, the WASH services of the migrant reception centres are insufficient, with the official shelters for migrants in the same situation. In unofficial temporary settlements, WASH services are very limited or non-existent. In addition, response activities at unofficial crossings are not possible due to the lack of information and the security concerns at these points.

[159] In Colombia as in Guyana, much of the terrain does not have public services or drinking water. In the case of Guyana and other border communities, these are located in areas far from urban centres, which makes them feel safe from acts of violence and from contagion by COVID-19 but distances them from health services, education and income sources.

[160] R4V, Guidance Note - Environment and Health for RMRP 2022: https://www.r4v.info/node/88174

concerning in the case of women and girls, for whom a lack of access to adequate WASH facilities is also linked to GBV risks.[161] Xenophobia has also been exacerbated in relation to high-density settlements, making the management of public and community services like WASH more difficult.

## RESPONSE STRATEGY

The Sector will prioritize the following activities:

- **Providing at least basic water and sanitation and IPC services and products** to refugees and migrants from Venezuela and affected host communities. These services and products will align with national and international standards, be culturally and environmentally appropriate, climate resilient, inclusive of persons with disabilities, and adapted to gender and age needs in order to prevent WASH-related diseases and reduce COVID-19 transmission. The inclusion of communities in all phases of WASH activities will be critical to respond to peoples' needs and ability to pay for services as well as to be engaged and protect related infrastructure in order to foster sustainability of services.

- **Engaging with communities and increasing participation to improve knowledge** around hygiene practices, environmental hygiene/cleaning (including solid waste management) and water-saving in constrained environments for long-term behaviour change, while also increasing access to hygiene products and services.

- **Strengthening WASH governance** of responsible host country authorities in all aspects (coordination mechanisms, strategies, budgets, monitoring, capacity-building) through a quadruple nexus approach (humanitarian, development, environment and peace) and at all administrative levels, to embed the needs of refugees and migrants from Venezuela in national and local policies, plans, budgets, and monitoring systems. To achieve this, sectoral coordination needs to be inclusive of all stakeholders of the WASH Sector (including private and academic actors as well as affected populations) and inclusive of other Sectors (e.g. Health and Education) with both a development and emergency outlook.

The most vulnerable groups and those with specific needs, including indigenous groups, women, children, LGBTQI+ persons, people with disabilities, the elderly, GBV survivors and victims of trafficking, exploitation and/or abuse, will be prioritized for WASH interventions.

The response modalities will vary depending on the country and context, and will include:

- Provision of water, sanitation and hygiene services and infrastructure, including by strengthening local and national WASH authorities and WASH service providers, providing, when necessary, hardware and software capacities to ensure the efficiency and sustainability of WASH services.

- Distribution of hygiene items to refugees and migrants from Venezuela and affected host communities, either in-kind or through direct cash transfers and/or voucher assistance (CVA), as well as market-based approaches to strengthen

supply chains for the availability of quality and affordable products and services.

- Advocacy with host governments to ensure that the fundamental rights of refugees and migrants from Venezuela, specifically in relation to WASH, are adequately considered in policies, plans and budgets.

Formal and informal settlements, temporary collective shelters, individual shelters, transit and reception centres, schools, health care facilities, and other public spaces will benefit from these improved WASH services.

The Sector will coordinate with the Health Sector to strengthen the delivery of basic and safely managed and sustained WASH in health care facilities, on IPC activities, and on health and hygiene awareness campaigns. Coordination with the Education Sector and host country authorities will be essential to disseminate hygiene education materials to students, and on plans for the safe return to school in the COVID-19 context, requiring adequate WASH facilities and supplies in schools, for which collaboration with the private sector is also needed to ensure a sustainable supply chain. Coordination with the Shelter Sector will ensure minimum WASH standards are reached and maintained in shelters, and to provide joint WASH service evaluations and training for collective shelter managers. Sector partners will work with the the Protection Sector and gender focal points to ensure that the design and location of WASH facilities "do no harm," mitigate the risks of GBV and sexual exploitation and abuse (SEA), respond to the needs of women, girls and the most vulnerable, and ensure that these services are gender and age sensitive and safely accessible for affected populations. The Sector will coordinate with the Humanitarian Transportation Sector for IPC activities in the humanitarian transportation response. Finally, the CwC/C4D Working Group will be engaged on information products on health and hygiene practices, and the Cash Working Group on available items and services.

The WASH Sector will include refugees and migrants from Venezuela in decision-making processes throughout the programme cycle (needs assessments, infrastructure design and location, user satisfaction indicators in monitoring and evaluation systems, as well as implementation). AAP and PSEA trainings will be delivered to WASH actors, including authorities and service providers, and a unique hotline will be designated for feedback and complaints by users of WASH facilities. Risk-informed programming approaches will be used with local actors and users (refugees, migrants and host communities) to understand the risks (including climate change and environmental degradation) in order to integrate them in the design and implementation of WASH infrastructures and services, allowing for more resilient and sustained service delivery, and reducing CO$_2$ emissions in operations.

---

[161] Sommer M., Ferron S., Cavill S., House S. Violence, Gender and WASH: Spurring action on a complex, under-documented and sensitive topic. Environment and Urbanization. 2015;27(1):105-116. *https://genderandenvironment.org/violence-gender-and-wash-spurring-action-on-a-complex-under-documented-and-sensitive-topic/*

Venezuela AR_000888



**BRAZIL**

Venezuela AR_000889

Case 6:23-cv-00007 Document 95-4 Filed on 03/24/23 in TXSD Page 291 of 344



© UNHCR / Allana Ferreira

# BRAZIL
## AT A GLANCE




**POPULATION PROJECTION**
## 336 K


**PEOPLE IN NEED**
## 312 K


**PEOPLE TARGETED**
## 129 K

| | | | |
|---|---|---|---|
| **VENEZUELANS IN DESTINATION** | 336 K | 285 K | 119 K |
| **HOST COMMUNITY** | – | 26.6 K | 10.2 K |
| **IN TRANSIT*** | – | – | – |

**GENDER DISAGGREGATION**



♂ **29.7%**
♀ 19.2%
♀ **32.1%**
♂ **19.0%**



♂ **29.7%**
♀ 19.2%
♀ **32.1%**
♂ **19.0%**



♂ 27.6%
♀ 21.2%
♀ **30.1%**
♂ **21.1%**


**TOTAL REQUIREMENTS**
## $126 M


**RMRP PARTNERS**
## 39

* Refugees and migrants in-transit are included in the national totals.

Venezuela AR_000890

## FUNDING REQUEST AND BENEFICIARIES TARGETED



PEOPLE TARGETED 2022

- 52 - 442
- 443 - 2.307
- 2.308 - 5.275
- 5.276 - 28.474
- 28.475 - 49.600

| PROVINCE | Population Projection | People in Need | People Targeted | Budget |
|---|---|---|---|---|
| Roraima | 75.6 K | 57.45 K | 49.6 K | $65.4 M |
| Amazonas | 49.4 K | 37.5 K | 28.5 K | $15.7 M |
| São Paulo | 43.8 K | 45.0 K | 15.1 K | $10.0 M |
| Santa Catarina | 44.6 K | 45.9 K | 5.28 K | $1.49 M |
| Rio de Janeiro | 5.99 K | 6.16 K | 5.16 K | $2.53 M |
| Paraná | 33.2 K | 34.1 K | 4.25 K | $2.12 M |
| Espírito Santo | 1.15 K | 1.18 K | 4.03 K | - |
| Pará | 3.27 K | 3.36 K | 3.26 K | $2.43 M |
| Rio Grande do Sul | 24.8 K | 25.5 K | 3.09 K | $2.00 M |
| Rondônia | 4.49 K | 4.62 K | 2.31 K | $650 K |
| Minas Gerais | 11.4 K | 11.7 K | 1.39 K | $1.61 M |
| Mato Grosso | 10.2 K | 10.5 K | 1.14 K | $671 K |
| Paraíba | 1.89 K | 1.95 K | 1.14 K | $585 K |
| Mato Grosso do Sul | 6.98 K | 7.18 K | 1.03 K | $713 K |

| PROVINCE | Population Projection | People in Need | People Targeted | Budget |
|---|---|---|---|---|
| Goiás | 5.602 | 5.77 K | 839 | $514 K |
| Pernambuco | 2.394 | 2.46 K | 812 | $432 K |
| Ceará | 1.647 | 1.69 K | 800 | $76.5 K |
| Acre | 430 | 442 | 442 | $508 K |
| Bahia | 2.487 | 2.56 K | 375 | $285 K |
| Piauí | 192 | 198 | 182 | $34.7 K |
| Rio Grande do Norte | 774 | 797 | 118 | $76.0 K |
| Amapá | 99 | 102 | 52 | $30.0 K |
| Alagoas | 172 | 177 | - | - |
| Distrito Federal | 4.273 | 4.39 K | - | $5.58 M |
| Maranhão | 602 | 619 | - | $50.0 K |
| Sergipe | 298 | 307 | - | - |
| Tocantins | 265 | 272 | - | - |

Population Projection    People in Need    People Targeted    Budget    Venezuela AR_000891

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

| | International NGOs | National NGOs / CSOs‡ | Others‡‡ | UN Agencies |
|---|---|---|---|---|
| Financial requirements | 16.5% | 0.98% | 4.80% | 77.7% |
| Organizations | 8 | 9 | 13 | 9 |

‡ Civil Society Organizations.
‡‡ Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR

| Sector | People in need (PiN) | Targeted / In need | People targeted | Financial requirements (USD) | Partners |
|---|---|---|---|---|---|
| Education | 91.4 K | | 17.9 K | 4.89 M | 9 |
| Food Security | 198 K | | 79.4 K | 16.2 M | 13 |
| Health | 174 K | | 57.2 K | 10.9 M | 16 |
| Humanitarian Transportation | 56.2 K | | 31.0 K | 6.15 M | 4 |
| Integration | 108 K | | 26.8 K | 16.5 M | 26 |
| Nutrition | 58.2 K | | 11.9 K | 1.71 M | 2 |
| Protection* | 304 K | | 93.5 K | 6.58 M | 19 |
| Child Protection | 111 K | | 40.0 K | 7.04 M | 9 |
| Gender-Based Violence (GBV) | 64.9 K | | 19.4 K | 1.86 M | 7 |
| Human Trafficking & Smuggling | 49.4 K | | 7.35 K | 625 K | 4 |
| Shelter | 103 K | | 43.4 K | 23.7 M | 12 |
| WASH | 109 K | | 46.6 K | 10.3 M | 12 |
| Multipurpose Cash Assistance | – | – | 63.6 K | 12.7 M | 8 |
| Common Services** | – | – | – | 6.39 M | 8 |

* This includes Support Spaces

** This includes AAP, Communication, Coordination, CwC/ C4D, Fundraising, Information Managent, PSEA and Reporting.

## COUNTRY OVERVIEW



© IOM/ Bruno Mancinelle

Brazil continues to receive and host a very sizable refugee and migrant population from Venezuela: as of March 2021, 144,996 Venezuelans had been granted temporary residence and 79,133 were seeking asylum[162] as well as 46,923 refugees living in the country.[163] Even as the border with Venezuela remains formally closed, in June 2021, the Brazilian Government eased entry restrictions for Venezuelans[164] and allowed for the regularization of those in vulnerable situations who had entered irregularly during the pandemic.[165] However, access to documentation remains a challenge, as the number of refugees and migrants from Venezuela in need of regularization exceeds the authorities' processing capacity. As of October 2021, an estimated 2,000 refugees and migrants from Venezuela were in a situation of homelessness on the streets of the northern border town of Pacaraima, while waiting for an appointment at the local Reception and Documentation Centre (PITRIG) for an average time of two weeks.[166]

R4V partners identified priority needs for the RMRP 2022 in Brazil through a secondary data review and a multi-sectoral joint needs assessment (JNA) conducted in July and August 2021. The JNA is based on 800 structured telephone interviews with Venezuelans across the country, with a stratified sampling by state. The findings demonstrate that refugees and migrants from Venezuela still face significant barriers to exercising their fundamental rights and accessing public services in Brazil.

The assessment shows that 21 per cent of children and 27 per cent of adolescents from Venezuela are not attending school, lack opportunities for engagement with other children of similar age and are more vulnerable to child labor, economic exploitation, early pregnancy, as well as other forms of gender-based violence (GBV).[167] The public education system is overburdened, especially in Roraima State, due to the high influx of refugees and migrants.[168] Regarding health, 61 per cent of households have a member who required medical care in the last three months before the JNA (April and June 2021), of which 31 per cent had difficulties accessing treatment, mainly

[162] Brazilian Federal Police – *Imigração Venezuela/Brasil* – March 2021.

[163] Data from CONARE and UNHCR. Accessible via Microsoft Power BI: *https://bit.ly/3DRyBrS*

[164] Federal Government, Portaria N°655 de 23 de junho de 2021. Accessible at: *https://in.gov.br/en/web/dou/-/portaria-n-655-de-23-de-junho-de-2021-327674155*

[165] Source: Federal Police.

[166] IOM, Refugee and Migrant Population from Venezuela Outside of Shelters in Pacaraima, September 2021: *https://brazil.iom.int/sites/brazil/files/Publications/OIM-0921-informe-desabrigados-pacaraima-acolhida-1.pdf*

[167] R4V Brazil, Multisectoral Joint Needs Assessment (hereafter JNA), November 2021. Publication forthcoming.

[168] UNICEF: School Exclusion Scenario in Brazil. A warning about the impacts of the COVID-19 pandemic on Education. April 2021: *https://www.unicef.org/brazil/relatorios/cenario-da-exclusao-escolar-no-brasil*

due to long waiting times for appointments (28 per cent), lack of free medication (11 per cent) and high costs of care and services (9 per cent).[169]

While the economy is recovering from the pandemic, out of those surveyed in the JNA, 26 per cent were unemployed.[170] In Roraima State – one of the poorest in Brazil – bordering Venezuela, and 60 per cent of refugees and migrants earn less than the legal minimum wage, the equivalent of USD 200 a month.[171] Due to low levels of income, coupled with rising prices for everyday goods, refugees and migrants from Venezuela struggle to meet their basic needs, especially food and rent. While more than 52 per cent of surveyed Venezuelan households experience some degree of food insecurity, families including pregnant women and children under the age of five are the most impacted (64 per cent), in a situation that exposes them to undernourishment, stunting, illness and damage to their physical and cognitive development.[172]

As regards shelter, 30 per cent of surveyed refugees and migrants reported not knowing where they would be living the following month.[173] Despite the shelters run by Operation Welcome (*Operação Acolhida*[174]) supported by R4V partners in Roraima State, an estimated 6,000 refugees and migrants live on the streets and in overcrowded spontaneous settlements, lacking access to adequate WASH services,[175] including drinking water, hygiene, and cleaning products. This situation, which is also experienced by refugees and migrants from Venezuela elsewhere in the northern regions of Brazil, increases their risks of contracting diseases such as COVID-19[176] and experiencing domestic violence, sexual exploitation, and human trafficking, and increases the risks of resorting to begging and survival sex for particularly vulnerable groups. While the majority of refugees and migrants living in shelters in Roraima want to take part in the internal relocation programme, 27 per cent would rather remain near the border and closer to Venezuela, so as to facilitate an eventual return and prevent severing ties to the country.[177]

Indigenous peoples are among the most vulnerable refugees and migrants from Venezuela.[178] With the loss of their traditional livelihoods, over 6,000 indigenous Venezuelans in Brazil face additional challenges accessing basic goods and services such as food, education, and health. Of those in shelters in Roraima, more than 80 per cent lack formal employment and only 9 per cent benefit from social assistance for low-income families.[179] In Amazonas and Pará states, 80 per cent of indigenous Warao never received any formal schooling or only partially completed basic education, and a significant proportion resort to begging to make a living.[180]

## RESPONSE STRATEGY

### Country Planning Scenario

RMRP 2022 planning for Brazil is based on the assumption that the Government will continue to assist Venezuelan refugees and migrants through the Operation Welcome response, focused on the northern states of Roraima and Amazonas, where services are provided jointly with R4V partners, and from where more than 60,000 Venezuelans have been voluntarily relocated elsewhere in Brazil since April 2018.[181] It is also anticipated that the Government will maintain overall favorable policies towards refugees and migrants from Venezuela, including *prime facie* refugee status determination (RSD) based on the expanded refugee definition under the Cartagena Declaration,[182] and residence permit issuance as per the 2017 Migration Law.

It is also anticipated that, although the border with Venezuela may remain closed and entry restrictions could be reinstated, refugees and migrants from Venezuela will continue to enter the national territory. An average of 100 refugees and migrants with exacerbated needs are expected to enter Brazil via Pacaraima daily, due to further deterioration of the situation in Venezuela, reaching an estimated total of 335,000 residing in Brazil by the end of 2022. In the eventual case of worsening conditions for Venezuelans in neighboring countries, attention will be directed to other entry points such as Assis Brasil (Acre) and Foz do Iguaçu (Paraná).

The political campaign that will precede the presidential elections in 2022 could lead to a political discourse negatively impacting the situation of refugees and migrants from Venezuela, especially in the state of Roraima, possibly exposing this population to increased discrimination and xenophobia.

[169] R4V Brazil JNA, November 2021. Publication forthcoming.

[170] Ibid.

[171] IOM, DTM Roraima 6. March 2021, p. 10. https://brazil.iom.int/sites/brazil/files/Publications/DTM-Brasil-7.pdf

[172] R4V Brazil JNA, November 2021. Publication forthcoming.

[173] Ibid.

[174] Operation Welcome (*Operação Acolhida* in Portuguese) is the federal government's response to the influx of refugees and migrants from Venezuela to Brazil.

[175] IOM, *População Refugiada e Migrante Venezuela Fora de Abrigos em Pacaraima,* September 2021, p. 3 and 5: https://brazil.iom.int/sites/brazil/files/Publications/OIM-0921-informe-desabrigados-pacaraima-acolhida-1.pdf

[176] UNICEF, Intersectoral Joint Rapid Needs Assessment with focus on children. August 2021.

[177] UNHCR, Autonomy and local integration of Venezuelan refugees and migrants living in shelters in Boa Vista, 2020, p. 36: https://www.acnur.org/portugues/wp-content/uploads/2021/07/relatorio-operacao_acolhida-Final.pdf

[178] IOM, Durable Solutions for Indigenous Refugees and Migrants in the Context of the Venezuelan Influx in Brazil, 2020: https://brazil.iom.int/sites/brazil/files/Publications/OIM%20_solucoes_duradouras_para_ind%C3%ADgenas_migrantes%20web.pdf

[179] UNHCR, Socioeconomic profile of the refugee and migrant indigenous population sheltered in Roraima, March 2021: https://www.acnur.org/portugues/wp-content/uploads/2021/03/Relatorio_socioeconomico_indigena_Roraima.pdf

[180] UNHCR, The Warao in Brasil, 2021, : https://www.acnur.org/portugues/wp-content/uploads/2021/04/WEB-Os-Warao-no-Brasil.pdf

[181] IOM and the Federal Subcommittee for Internal Relocation. August 2021: https://brazil.iom.int/sites/brazil/files/Publications/informe-de-interiorizacao-setembro-2021%20%281%29.pdf

[182] Definition expanded under Provision #3. Regional Refugee Instruments & Related, Cartagena Declaration on Refugees, Colloquium on the International Protection of Refugees in Central America, Mexico and Panama, 22 November 1984, available at: https://www.refworld.org/docid/3ae6b36ec.html

Venezuela AR_000894

*Scope of the Response and Priorities*

Given this context, the R4V response envisages implementing coordinated activities for refugees and migrants from Venezuela who largely consider Brazil as their destination, as well as the most impacted host communities. The main strategic objectives are to:

- Complement and strengthen Operation Welcome's three pillars: border management and documentation; shelter and humanitarian assistance; and internal relocation and socio-economic integration.

- Support and promote effective access to basic goods and services, including by enhancing the capacities of State and Municipal authorities in the reception of and in assistance to refugees and migrants from Venezuela throughout Brazil.

- Improve prevention, mitigation and response to protection risks and incidents, and enhance the exercise of fundamental rights, particularly for the most vulnerable and those with specific needs, including children, women and girls, survivors of GBV, persons with disabilities, persons living with HIV/AIDS, the elderly, LGBTQI+, indigenous people, and victims of human trafficking, exploitation and abuse.

- Mitigate barriers to socio-economic integration and ensure social cohesion by supporting access to dignified work and livelihoods, either in the formal labour market or through entrepreneurship, while promoting financial inclusion and preventing xenophobia.

Special attention will be given to indigenous refugees and migrants throughout Brazil in order to:

- Support the self-organization of these communities to strengthen their capacity to advocate for their rights, including collective rights, and to identify and implement their own solutions to the risks and challenges they encounter.

- Assist local and national governments to develop and implement culturally appropriate policies, including shelter exit strategies, that facilitate access to basic rights, livelihoods, and education, and foster the autonomy, self-sufficiency and resilience of indigenous communities.[183]

R4V interventions will particularly focus on the states of Roraima and Amazonas – those most affected by inflows from

Venezuela – and those states of Brazil which have a growing presence of refugees and migrants, especially through the interiorization program.

*Response Principles*

Targeting will be guided by core humanitarian principles, "do no harm," transparency and flexibility, with needs-based prioritization criteria guided by continuous vulnerability assessments that will be shared and consulted with the affected population and local authorities. Accountability to the affected population (AAP) will be achieved through the improvement of feedback and complaint mechanisms and by engaging with communities – including affected host communities – throughout the programming cycle, from needs assessment and planning, though implementation and evaluation.

Protection will be at the centre of the response, with all RMRP activities in Brazil aiming to ensure the safety, dignity, and rights of persons in need. Great attention will be given to analyzing the roles, experiences, opportunities, and barriers encountered by women, girls, and the LGBTQI+ population, to promote their participation and empowerment, as well as their equal and meaningful access to assistance, services, and rights. Inter-agency interventions to address PSEA, including trainings targeting all R4V partners and actors involved in Operation Welcome, will continue to be implemented, creating synergies with the PSEA Action Plan of the United Nations Country Team (UNCT) that is being drafted. Lastly, environmental considerations will be integrated in the response by fostering environmental consciousness among refugees and migrants from Venezuela, affected host communities and most importantly response actors, setting the framework and implementing activities to mitigate the environmental impact of the influx and the response. Innovative solutions will be strengthened to increase the sustainability of partners'interventions by reducing pollution, waste and greenhouse gas emissions (GHG) generated through the provision of goods and services. Also, R4V partners will promote livelihoods initiatives that support Venezuelans' access to the green economy and other income-generating activities with positive environmental impacts.

---

[183] As interiorization for indigenous people would raise protection risks due to the current absence of a consistent post-travel monitoring, local integration through exit strategies is currently considered as the most advisable course of action to prevent prolonged / unplanned stays in shelters.

 **EDUCATION**

 **PEOPLE IN NEED**
**91.4K**

👤 5.54%  👤 6.00%
👤 44.4%  👤 44.1%

**PEOPLE TARGETED**
**17.9K**

👤 3.41%  👤 3.68%
👤 42%  👤 50.9%

**TOTAL REQUIREMENTS**
**4.89M**

**RMRP PARTNERS**
**9**

**SECTOR LEADS**

**UNESCO-UNICEF**

## PRIORITY NEEDS

In Brazil, public education is universal and free, including for refugee and migrant children and regardless of their documentation status. However, 22 per cent of Venezuelan children and 27 per cent of adolescents have not attended school during the COVID-19 pandemic,[184] with an increase in age-grade distortion,[185] dropout rates, and underperformance in school. Among the adult population of refugees and migrants from Venezuela, only 39 per cent have completed secondary education, which limits their employment prospects.[186]

The main barriers to formal education include limited access to connectivity, lack of language skills, limited enrollment slots, lack of adapted teaching and learning materials, preferences of parents for other forms of schooling, distance from schools and difficulties for the recognition of diplomas and transfer between schools within Brazil. [187]

There is also an urgent need to consider the specific needs of vulnerable groups who experience additional barriers to school attendance, such as indigenous peoples,[188] persons with disabilities, single parents (primarily women and adolescent girls), the LGBTQI+ population, and girls, who are at greater risk of GBV and early pregnancy, and whose permanence is at risk as a result of such incidents.

Finally, as only 46 per cent of schools have basic sanitation, their safe reopening relies on municipalities' ability to put in place basic hygiene measures.[189]

## RESPONSE STRATEGY

The Education Sector's priorities for 2022 include:

• Supporting refugees and migrants from Venezuela in the processes of reinsertion, enrolment, integration, and permanence in formal and non-formal educational activities, including for internally relocated children and families.

• Promoting access to secondary, technical, and Youth and Adult Education (EJA) programmes coordinated by the Ministry of Education,[190] and supporting the process of academic recognition.

• Strengthening local capacities to guarantee the right to quality education for refugees and migrants from Venezuela and affected host communities, including by providing support for school materials, meals, and transport.

To ensure refugees' and migrants' access to education and continuity of studies, R4V partners will support states and municipalities to identify, register, accompany and monitor children and adolescents who are not enrolled in school, at risk of dropping out, and/or in need of documentation or grade placement. Through the collected data, states and municipalities will be able to develop and implement educational policies which enhance the enjoyment of the basic right of children to education.

The Education Sector will involve local educational entities and professionals in awareness-raising and capacity-support initiatives and will provide guidance and/or support to establish guidelines on more complex cases involving higher levels of vulnerability. Through advocacy with the public sector, the Sector will seek to simplify the process to recognize foreign diplomas and certificates.

[184] R4V Brazil JNA, November 2021. Publication forthcoming.

[185] Venezuelan children tend to be older than their Brazilian counterparts at lower grades. Shamsuddin, Mrittika; Acosta, Pablo Ariel; Battaglin Schwengber, Rovane; Fix, Jedediah; Pirani, Nikolas. Integration of Venezuelan Refugees and Migrants in Brazil. 2021. Policy Research Working Paper; No. 9605. World Bank, Washington, DC. : *https://openknowledge.worldbank.org/handle/10986/35358* License: CC BY 3.0 IGO. Accessed March 2021.

[186] R4V Brazil JNA, November 2021. Publication forthcoming.

[187] UNICEF, Out-of-School Children in Brazil: A warning about the impacts of the COVID-19 pandemic on Education, April 2021: *https://www.unicef.org/brazil/media/14881/file/out-of-school-children-in-brazil_a-warning-about-the-impacts-of-the-covid-19-pandemic-on-education.pdf*.

[188] For indigenous children and adolescents, these obstacles are compounded by a lack of education systems adapted to the preservation of indigenous cultures and languages. See UNHCR, The Warao in Brazil, April 2021: *https://www.acnur.org/portugues/wp-content/uploads/2021/04/WEB-Os-Warao-no-Brasil.pdf*.

[189] UNICEF, Assessment of WASH (WASH FIT for Health Facilities). 2020.

[190] EJA (Youth and Adult Education, or Educação de Jovens e Adultos) is an inclusive system coordinated by the Brazilian Federal Government to provide education for adolescents and adults who were unable to complete their education.

Interventions will focus on vulnerable groups' specific needs, including by developing learning materials for indigenous students, and delivering classes on sexual and reproductive health. Non-formal education – including activities on Brazilian culture, Portuguese and remedial classes – will be held in shelters to support the transition to formal education. In addition, the Sector will disseminate guidance on the safe reopening of schools among school managers, students, and families, fostering inclusive environments.

Education interventions on health, indigenous education, vocational and technical training, EJA, the safe reopening of schools, and internally relocated children's education will be coordinated with the Protection, Shelter, Humanitarian Transportation, Integration, Health, and WASH Sectors, and with the Indigenous Peoples Working Group.


## FOOD SECURITY

 **PEOPLE IN NEED**
**198K**     ♂ 29.7%   ♂ 32.1%
             ♀ 19.2%   ♀ 19.0%

**PEOPLE TARGETED**
**79.4K**     ♂ 29.4%   ♂ 33.2%
              ♀ 18.6%   ♀ 18.8%

 **TOTAL REQUIREMENTS**
**16.2M**

 **RMRP PARTNERS**
**13**

**SECTOR LEADS**
AVSI-IOM-UNHCR

## PRIORITY NEEDS

Inflation of food prices has been exerting growing pressure on household budgets since 2020[191] and evidence shows that more than half of the Brazilian population experiences some degree of food insecurity.[192] While food insecurity levels are reportedly high for all Venezuelan families, those led by female refugees and migrants between 20 and 40 years of age are hit the hardest, peaking at 70 per cent for the youngest heads of households.[193] Restrictions adopted during the COVID-19 pandemic have affected the economies of all regions of the country, including the richest states in the south.[194]

The three packed meals distributed daily (breakfast, lunch and dinner) in Boa Vista and Pacaraima by the Federal Government in the framework of Operation Welcome are produced in bulk and do not necessarily take into consideration the daily nutritional requirements of the most vulnerable refugees and migrants. These distributions are primarily targeted at the population in shelters, while R4V partners have been providing limited food support to some of the 6,000 refugees and migrants living on the streets and in spontaneous settlements.[195,196]

Indigenous peoples, including the Warao (the largest group in Brazil), E'ñepa, Ye'kuana, Ka'riña and Wayyu have also faced increasing challenges as a result of the loss of their traditional livelihoods, foods and diets.[197]

## RESPONSE STRATEGY

Given this context, the Food Security Sector's priorities for 2022 are to:

• Support and complement the efforts of Operation Welcome and local authorities to provide food assistance to refugees and migrants from Venezuela living on the streets, in spontaneous settlements, rented accommodations and temporary shelters, both in urban and rural areas, considering the specific nutritional needs of particularly vulnerable groups such as people with chronic illnesses, the elderly, indigenous peoples and children.

• Support indigenous communities with local food production through the provision of agricultural tools and equipment, trainings on sustainable farming and/or financial support.

• Support facilities, including community kitchens and canteens, with infrastructure assistance and management, provision of equipment and tools, and adaptation of spaces for food storage, preparation and consumption. The modalities of food assistance will include in-kind deliveries of both food baskets and prepared meals, as well as CVA, aiming to maximize the welfare of the affected population and accommodate their cultural preferences.

[191] FAO, IFAD, UNICEF, WFP and WHO. The State of Food Security and Nutrition in the World 2021: www.fao.org/3/cb4474en/cb4474en.pdf

[192] Brazilian Network for Research on Food Sovereignty in Brazil, National Survey on Food Insecurity in the Context of the Covid-19 Pandemic in Brazil, VIGISAN, Insegurança alimentar e Covid-19 no Brasil, page 35: http://olheparaafome.com.br/VIGISAN_Inseguranca_alimentar.pdf

[193] R4V Brazil JNA, November 2021. Publication forthcoming.

[194] Ibid.

[195] IOM, População desabrigada refugiada e migrantes em Boa Vista, August 2021: https://brazil.iom.int/sites/brazil/files/Publications/OIM-0821-informe-desabrigados-boa-vista-rodoviaria-acolhida-1.pdf

[196] IOM, População desabrigada refugiada e migrantes em Pacaraima, August 2021: https://brazil.iom.int/sites/brazil/files/Publications/OIM-0821-informe-desabrigados-pacaraima-acolhida-1.pdf

[197] IOM, Soluções duradouras para indígenas migrantes e refugiados no contexto do fluxo venezuelano no Brasil, 2020: https://brazil.iom.int/sites/brazil/files/Publications/OIM%20_solucoes_duradouras_para_ind%C3%ADgenas_migrantes%20web.pdf

The Sector´s response includes a joint strategy with the Protection Sector to raise awareness of and promote inclusion in social welfare programmes such as *Bolsa Família*, prioritizing female-headed households and the indigenous population living in urban areas. Links will also be strengthened with the WASH, Shelter and Nutrition Sectors to prevent diseases through the provision of clean water for cooking and the establishment of new communal kitchens in different types of shelter solutions; to create a network of food providers meeting the specific nutritional requirements of the most vulnerable; and to train community leaders and civil society organizations on the preparation of sufficient, safe, and nutritious food. With the Integration Sector, further income-generating activities will be developed to enhance the self-reliance of indigenous communities.

 **HEALTH**

 **PEOPLE IN NEED**
**174K**   29.7%   32.1%
19.2%   19.0%

 **PEOPLE TARGETED**
**57.2K**   26.6%   30.8%
21.2%   21.3%

 **TOTAL REQUIREMENTS**
**10.9M**

**RMRP PARTNERS**
**16**

**SECTOR LEADS**
**UNFPA–WHO/PAHO**

## PRIORITY NEEDS

According to the JNA, in addition to the previously noted prevalence of health needs among refugees and migrants, and their difficulties in accessing medical services, 27 per cent of responding households had members with chronic diseases, 43 per cent of whom could not access medical care; and 12 per cent of households reported at least one person with a physical or mental disability, 38 per cent of whom could not access care. Among households with sexual and reproductive health needs, 23 per cent could not access contraceptives, 16 per cent could not obtain sexually transmitted infection (STI) prevention/treatment services, and 19 per cent of pregnant and/or lactating women received no prenatal care.[198] Indigenous peoples also have specific health needs, particularly given language and cultural barriers, including on the use of traditional medicine. Respiratory diseases including pneumonia, tuberculosis and COVID-19 are among the main leading causes of mortality in those communities.[199]

## RESPONSE STRATEGY

The Health Sector will focus on three priorities in its response:

• Support the expansion of universal access to health services within the framework of Brazil's Unified Health System (SUS), including through community-based actions, with an emphasis on populations with specific needs, such as indigenous people, women (for prenatal and reproductive health), children, people living with HIV/AIDS, and the elderly.

• Support the expansion of vaccination coverage for refugees and migrants from Venezuela according to the national immunization plan, including vaccination against COVID-19.

• Strengthen the health response throughout the internal relocation and local integration processes.

The Health Sector response will be implemented in close coordination and cooperation with the Brazilian Federal Government, Operation Welcome, states and municipalities.

The Sector's strategies will include advocacy with public health officials as well as the elaboration of informative materials, handbooks, guidance documents and standard operating procedures (SOPs). Local response capacities will be strengthened by sharing best practices, training health managers and professionals, donating equipment and medicines, hiring medical staff and providing technical support.

Response modalities will also include the provision of direct support to refugees and migrants from Venezuela through monitoring and referral of people with chronic diseases and women in need of prenatal, obstetric, and maternal health care; promotion of sexual and reproductive health and rights through counselling on, and distribution of, contraceptives and HIV/STI testing; provision of mental health and psychosocial support (MHPSS) and primary care consultations; and deployment of mobile health teams and units, in coordination with the SUS. In addition, partners will carry out cross-cutting actions related to COVID-19 infection control, adopting intercultural strategies, especially targeting indigenous communities for CwC on prevention and care. Community-based actions will be implemented mainly in the states of Roraima and Amazonas, targeting people living in shelters, in spontaneous settlements, on the streets and in Documentation, Screening and Relocation

---

[198] Ibid.
[199] UNHCR, Os Warao no Brasil, April 2021, p.51: *https://www.acnur.org/portugues/wp-content/uploads/2021/04/WEB-Os-Warao-no-Brasil.pdf*

Centres (PITRIGs) and Reception and Support Centres (PRAs, by its Portuguese acronym). Refugees' and migrants' access to the public healthcare system in arrival and destination cities will be ensured through workshops and CwC materials.

To ensure a strategic response, the Health Sector will coordinate with all the sectors, especially with Protection to strengthen the response on MHPSS; with the Humanitarian Transportation and Integration Sectors to improve access to health services, including HIV testing and treatment, for relocated refugees and

migrants; and with the Indigenous Peoples Working Group to elaborate and disseminate adapted information materials with an intercultural approach.

 **HUMANITARIAN TRANSPORTATION**

| | | |
|---|---|---|
|  **PEOPLE IN NEED** 56.2K | 29.6% 32.1% 19.2% 19.1% | |
| **PEOPLE TARGETED** 31K | 30.1% 32.3% 18.8% 18.8% | |

|  **TOTAL REQUIREMENTS** 6.15M |  **RMRP PARTNERS** 4 | **SECTOR LEADS** IOM-UNHCR-WVI |
|---|---|---|

## PRIORITY NEEDS

In order to improve livelihood opportunities for Venezuelans, strengthen their socio-economic integration prospects, and relieve the pressure on overburdened public services in the northern states of Brazil that serve as reception communities, Operation Welcome's internal relocation strategy (*interiorização*) facilitates the voluntary, safe and orderly transportation of refugees and migrants from Roraima and Amazonas States to destinations elsewhere in Brazil. Since April 2018, 60,788 refugees and migrants from Venezuela have been voluntarily relocated to 26 states and the Federal District,[200] with the support of Operation Welcome and R4V partners. In their destination cities, they are matched with employment opportunities, provided with individual or collective shelter and/or reunified with family members and support networks. It is anticipated that the internal relocation programme will benefit 2,500 refugees and migrants per month in 2022, after the average monthly number of beneficiaries dropped from 3,000 in February 2020 to 1,200 between March 2020 and June 2021, owing to the impact of the COVID-19 pandemic.

Meanwhile, in towns and cities where refugees and migrants have settled, their inability to afford safe day-to-day transportation limits their access to rights and services, including protection and healthcare, imposing additional barriers to their socio-economic integration. In remote communities, precarious infrastructure and logistics force many to resort to irregular transportation services, which expose them to additional risks, such as GBV and human trafficking.

## RESPONSE STRATEGY

The priorities for the Humanitarian Transportation Sector in 2022 are:

• Providing support to all the phases of Operation Welcome's voluntary internal relocation strategy, ensuring its operability, taking into account COVID-19 prevention and response measures, and ensuring safety and protection throughout the process.

• Strengthen access to official means of transportation within or between municipalities to facilitate access to employment opportunities, goods, rights and services, considering the needs of vulnerable groups such as women, children, persons with disabilities, the elderly, indigenous people, persons at risk of or who have survived GBV or have been victims of human trafficking and exploitation, and LGBTQI+ persons.

The Humanitarian Transportation Sector will provide technical and logistical support to the internal relocation strategy, such as registration, orientation of beneficiaries and fit-for travel assessments during the pre-departure phase, accompaniment up to the destination city or purchase of commercial flight and bus tickets, and post-arrival monitoring. In addition, it will assist the Federal Government to improve procedures and protocols and provide guidance for partners and beneficiaries. The Sector will consider the Age, Gender and Diversity approach, and apply monitoring mechanisms to assess results, identify failures, and design improvements. Moreover, the Sector will strengthen the capacities of local authorities to receive refugees and migrants in destination cities by providing targeted training as well as technical and personnel support.

[200] R4V and the Ministry for Citizens' Rights, Relocation Strategy: http://aplicacoes.mds.gov.br/snas/painel-interiorizacao/.

As for local transportation, response modalities will include direct assistance to refugees and migrants from Venezuela, in the form of CVA. In addition, transportation will be provided to refugees and migrants living in the municipalities of Roraima to access regularization and documentation services in Boa Vista, the state capital.

The Humanitarian Transportation Sector will coordinate with the Protection Sector and its Sub-Sectors (Child Protection, GBV, Human Trafficking and Smuggling) to identify and monitor protection cases during the relocation process and refer them to the relevant public services according to the procedures established by the Federal Government. It will also work with the Health Sector to ensure compliance with COVID-19 preventive measures, with the Shelter Sector to promote access to temporary shelters and housing for participants in the internal relocation programme, and the Integration Sector to ensure access to livelihood opportunities in the destination cities.

 **INTEGRATION**

|  **PEOPLE IN NEED** 108K | ↑ 29.7%  ↑ 32.1% ↑ 19.2%  ↑ 19.0% | ↓↓ **PEOPLE TARGETED** 26.8K | ↑ 43.9%  ↑ 48.3% ↑ 3.82%  ↑ 3.93% |
|---|---|---|---|

|  **TOTAL REQUIREMENTS** 16.5M |  **RMRP PARTNERS** 26 | **SECTOR LEADS** **IOM-UNHCR-WVI** |
|---|---|---|

## PRIORITY NEEDS

Although refugees and migrants from Venezuela in regular situations have access to work permits and have the same labour rights as any other worker in Brazil, they face several challenges to their socio-economic integration. Amongst those surveyed in the JNA, 26 per cent of Venezuelans were unemployed.[201] Other studies find that, compared to the host population, refugees and migrants from Venezuela are 30 per cent less likely to benefit from social assistance programmes and 64 per cent less likely to be formally employed.[202] In the state of Roraima, up to 90 per cent of Venezuelans hold informal jobs, and 61 per cent are paid below minimum wage. The challenges to socio-economic integration in states like Roraima highlight the ongoing need for the internal relocation programme[203] through which refugees and migrants can access improved livelihoods opportunities throughout the country.

Additional obstacles to integration include language barriers, incidents of xenophobia and discrimination among all population groups (including children), difficulties in obtaining formal recognition of academic degrees, lack of awareness among employers of legal provisions that make it possible to hire refugees and migrants,[204] and limited access by refugees and migrants from Venezuela to financial services, including bank accounts and/or microcredits. These challenges particularly impact women, youth, the elderly, indigenous persons, and the LGBTQI+ community, in view of the high levels of social inequalities in Brazil that also affect these groups, resulting in a double affectation for refugees and migrants with these profiles.

## RESPONSE STRATEGY

The Integration Sector will foster the sustainable integration of refugees and migrants from Venezuela in their host communities. To that end, the 2022 response strategy will focus on:

• Promoting socio-economic integration through access to formal employment, entrepreneurship, and other livelihoods opportunities.

• Supporting the internal relocation strategy in an organized and sustainable manner, aiming to strengthen public institutions' capacities to integrate refugees and migrants at the local level.

• Providing information on refugees' and migrants' rights and services that foster their inclusion, while improving social cohesion through peaceful coexistence activities, including positive environmental actions in conjunction with affected host communities.

In terms of response modalities, the Sector will deliver online and in-person vocational and Portuguese language training to promote access to labour markets; support the recognition of professional degrees and certificates; increase entrepreneurs'

[201] R4V Brazil JNA, November 2021. Publicaiton forthcoming.

[202] UNHCR, Integration of Venezuelan Refugees and Migrants in Brazil, May 2021: https://www.acnur.org/portugues/wp-content/uploads/2021/05/5-pages-Integration-of-Venezuelan-Refugees-and-Migrants-in-Brazil-pt.pdf.

[203] IOM, Roraima DTM 6 Brazil, May 2021: https://brazil.iom.int/sites/brazil/files/Publications/DTM-Brasil-7.pdf

[204] UNHCR, Refugee Voices, June 2021: https://www.acnur.org/portugues/wp-content/uploads/2021/06/ACNUR-Relatorio-Vozes-das-Pessoas-Refugiadas-reduzido.pdf

visibility through online platforms; and promote access to microcredit and financial services, considering age, gender, and diversity (AGD) considerations. The Sector will raise awareness among the private sector to encourage the hiring of refugees and migrants from Venezuela, and provide support to local and federal officials on effective public policies, protection mechanisms and services to meet the needs of refugees and migrants, including through targeted training. The Sector will seek to ensure sustainability and contribute to the operationalization of environmental preservation policies, within the scope of a green circular economy. Studies will be conducted to assess the socio-economic integration of Venezuelan refugees and migrants and analyse the impact of the internal relocation strategy.

The Integration Sector will collaborate with the Education, Shelter and Protection Sectors and Sub-Sectors, and the Communication and Indigenous Peoples Working Groups. Joint efforts include delivering online training, facilitating the recognition of degrees, preventing labour exploitation and child labour, expanding access to reception facilities, creating risk-prevention and mitigation mechanisms within the relocation strategy, and developing communications materials and campaigns on public rights and services, strengthening social cohesion, and promoting indigenous peoples' self-sufficiency.

 # NUTRITION

 **PEOPLE IN NEED**
**58.2K**
↑ 5.00%   ↑ 23.8%
↑ 35.7%   ↑ 35.5%

 ↓↓ **PEOPLE TARGETED**
**11.9K**
↑ 6.20%   ↑ 29.7%
↑ 30.7%   ↑ 33.3%

**TOTAL REQUIREMENTS**
**1.71M**

**RMRP PARTNERS**
**2**

**SECTOR LEAD**
UNICEF

## PRIORITY NEEDS

Periodic nutritional assessments with refugees and migrants from Venezuela[205] carried out in five municipalities in the north of Brazil show high rates of wasting (5 to 10 per cent) and stunting (10 to 25 per cent), especially among indigenous children and those who live outside municipal or Operation Welcome shelters. There is very little information on the nutritional status of refugees and migrants living elsewhere beyond the northern region of Brazil. However, according to the JNA, 31 per cent of Venezuelan families in Brazil who needed medical treatment or health-care services – which may include treatment for conditions associated with poor nutrition – reported difficulties in accessing them.[206] Cultural issues and a lack of knowledge of their rights under the Unified Health System (SUS[207]) result in challenges in accessing public nutrition services, including preventive nutritional supplementation. Moreover, there is a shortage of nutrition professionals in SUS primary health-care services in municipalities that receive the most Venezuelan refugees and migrants, a situation that has been aggravated by the COVID-19 pandemic.

## RESPONSE STRATEGY

Given this situation, the priorities for the Nutrition Sector in 2022 are:

• Expanding the scope of nutrition surveillance and nutritional care provided by local primary health-care facilities (Unidades Básicas de Saúde, or UBS for its acronym in Portuguese) to improve access for children under the age of five and pregnant and lactating women living outside shelters, with an emphasis on populations with specific needs, such as indigenous peoples.

• Promoting strategies to prevent acute and chronic malnutrition among children under the age of five and pregnant and lactating women, including the provision of micronutrient supplementation, and the promotion of breastfeeding and healthy eating.

• Promoting the culturally sensitive integration of refugees and migrants from Venezuela into local health-care systems, ensuring they have access to the nutritional services they are entitled to under the SUS.

The capacity of nutrition surveillance and nutritional care services will be strengthened through technical training and the hiring of nutrition professionals for mobile teams, shelters,

[205] UNICEF, UNICEF-supported Primary Health Care in shelters for Venezuelan refugees and migrants, Roraima, Amazonas — Brazil, August 2021: *https://www. r4v.info/es/document/atencao-primaria-saude-apoiada-pelo-unicef-em-abrigos-de-refugiados-e-migrantes-da*

[206] R4V Brazil JNA, November 2021. Publication forthcoming.

[207] Portuguese acronym for Sistema Único de Saúde.

and primary health-care facilities (UBS). Sector partners will support municipal health departments in the planning, management, and delivery of nutrition services, incorporating ethical and cultural considerations. The Sector will promote continued provision of therapeutic inputs and access to micronutrient supplementation for the prevention of acute and chronic malnutrition. The Sector will consult communities (refugees, migrants, and host communities) during the planning, implementation and monitoring of activities, to ensure accountability to affected populations.

Comprehensive training on healthy eating will target caregivers responsible for children under five. In addition, support will be provided to create and maintain environments that may favour breastfeeding, and for the development of best practices in food preparation and handling. The Sector will work together with the Health, Shelter, Integration, WASH and Protection Sectors and Sub-sectors to plan integrated actions to ensure nutrition surveillance is integrated into primary health care provision; the provision of quality food in shelters; and access to nutritional care activities throughout the relocation process (*interiorização*). It will strengthen data collection to support the implementation of adapted nutrition policies with the Indigenous Peoples WG and seek to reduce malnutrition though increased integration with the WASH Sector.



## PROTECTION

| PEOPLE IN NEED | | | PEOPLE TARGETED | | |
|---|---|---|---|---|---|
| **304K** | 29.7% | 32.1% | **93.5K** | 30.1% | 32.7% |
| | 19.2% | 19.0% | | 18.6% | 18.6% |

|  TOTAL REQUIREMENTS |  RMRP PARTNERS | SECTOR LEADS |
|---|---|---|
| **6.58M** | **19** | JSRM-UNHCR |

### PRIORITY NEEDS

Restrictions imposed by the Brazilian Government to respond to the COVID-19 pandemic have resulted in additional protection challenges. According to the JNA, the number of Venezuelans entering Brazil irregularly rose from 45 per cent to 70 per cent over the last year.[208] Although the government in June 2021 adopted a more flexible approach to allow the regularization of Venezuelans who had entered irregularly, the demand for regularization exceeds current capacities. According to a study by R4V partners, documentation is a priority for 88 per cent of refugees and migrants in Brazil.[209] Similarly, another R4V study notes that 23 per cent had no regular documentation as of May 2021.[210]

Surveys show[211] almost half of the interviewed refugees and migrants from Venezuela having at least one specific protection need,[212] while a third reported having suffered discrimination, mainly due to their nationality.[213] Overall, studies show that a lack of knowledge of their rights as well as on available protection services limit access to assistance by refugees and migrants from Venezuela.[214] In addition, limited response and operational capacities of public service providers hamper case management, especially those involving unaccompanied and/or separated children (UASC),[215] indigenous peoples, LGBTQI+ persons, people with disabilities, the elderly, victims of trafficking and labour exploitation, and GBV survivors.

[208] R4V Brazil JNA, November 2021. Publication forthcoming.

[209] Caritas, Review of secondary data from the Protection Sector: https://migrasegura.org/2021/10/el-diagnostico-realizado-por-migrasegura-ya-esta-disponible-en-ingles-y-portugues/

[210] UNHCR Protection Monitoring Report, April/May 2021: https://www.r4v.info/es/node/88107

[211] The UNHCR Protection Monitoring Report for January/February 2021 revealed several negative coping mechanisms that have been adopted to deal with these issues, including reducing the quantity and quality of food intake, especially by adults. https://www.r4v.info/document/relatorio-de-monitoramento-de-protecao-acnur-brasil-janeiro-fevereiro2021

[212] UNHCR Protection Monitoring Report, April/May 2021: , https://www.r4v.info/es/node/88107

[213] IOM, DTM Roraima 6, May 2021: https://brazil.iom.int/sites/brazil/files/Publications/DTM-Brasil-7.pdf

[214] Caritas, Diagnostic of information needs and preferences of the Venezuelan population in Brazil and Ecuador, 2021: https://caritas.org.br/noticias/66-das-pessoas-que-migram-da-venezuela-viajam-sem-informacoes-para-o-brasil-e-para-o-equador

[215] Of the JNA sample population, 2.3 per cent were identified as potentially unaccompanied and/or separated children (UASC). R4V Brazil JNA, November 2021. Publication forthcoming.

## RESPONSE STRATEGY

In 2022, the Protection Sector will pursue the following response priorities:

- Improving access to territory, asylum procedures and regularization pathways, and facilitate access to documentation, including birth registrations and renewal of documents, especially those that expired during the pandemic or after internal relocation.[216]

Providing protection and specialized services through participatory community[217] approaches, seeking to strengthen accountability to affected populations (AAP) and peaceful coexistence with affected host communities, especially by fostering two-way communication between affected communities and R4V Partners.

- Supporting humanitarian responses at the federal, state, and municipal levels through technical cooperation with relevant actors aiming to improve access to national protection systems, while fostering complementary actions to meet basic needs and create lasting solutions.

Protection Sector partners will maintain their presence at the border to support the reception of refugees and migrants from Venezuela, share information, and monitor protection risks to provide adequate assistance. The Sector will coordinate the identification and referral of people with specific protection needs and ensure implementation of and adherence to minimum case-management standards.[218] The Sector will strive to provide a comprehensive response by strengthening the Support Spaces network and promoting joint actions to prevent and mitigate protection risks, ensuring advocacy and technical follow-up by humanitarian actors. It will enhance local protection networks through capacity-building, especially on case management and referrals.

The Sector will also promote the principle of Centrality of Protection (CoP) throughout the response, mainly by working with the Integration and Humanitarian Transportation Sectors to consolidate a risk mitigation approach for internal relocation. Joint work with the Indigenous Peoples Working Group will be strengthened through the continued exchange of good practices between Protection sectors in other countries to ensure access to national protection systems. Lastly, the partnership with the Health Sector will help promote access to the national health system while addressing protection needs.

 **CHILD PROTECTION**

|  **PEOPLE IN NEED** | **PEOPLE TARGETED**  |
|---|---|
| **111K**  5.00%  8.92%  43.2%  42.9% | ↓↓ **40K**  5.29%  9.55%  42.7%  42.4% |

|  **TOTAL REQUIREMENTS** **7.04M** | **RMRP PARTNERS** **9** | **SECTOR LEADS** **SOS CHILDREN'S VILLAGE-UNICEF** |
|---|---|---|

## PRIORITY NEEDS

Refugee and migrant children and adolescents are particularly vulnerable to psychological and physical violence, including xenophobia, child labour, sexual exploitation, and recruitment by criminal organizations. The COVID-19 pandemic has further exacerbated their socio-economic vulnerability, hampering access to documentation and regularization, causing family separation and the violation of fundamental rights, particularly affecting unaccompanied, separated, indigenous, and

homeless children. According to a needs assessment carried out in August 2021 with refugees and migrants from Venezuela in Roraima, Amazonas, and Pará, 15 per cent of respondents had witnessed psychological violence against children, and 11 per cent had witnessed physical violence, yet 37 per cent did not know how to report cases of violence.[219]

In the same assessment, another 67 per cent of respondents reported increased tension and domestic violence within families and in the community during the pandemic.[220] In

---

[216] Participants in the UNHCR Participatory Diagnostic mentioned as a significant challenge the lack of information about documentation renewal during the pandemic and the difficulty of accessing essential services with expired documentation. *https://www.r4v.info/pt/document/vozes-das-pessoas-refugiadas-no-brasil*

[217] Community here is understood as the group formed by refugees, migrants and affected host communities, with attention to their specific needs but also fostering cohesion.

[218] For principles of protection case management, see the Support Spaces Toolkit: *https://www.r4v.info/en/document/support-spaces-toolkit-november-2019-eng*. More information available here: *https://www.unfpa.org/sites/default/files/pub-pdf/19-200_Minimun_Standards_Report_ENGLISH-Nov.FINAL_.pdf* and *http://www.cpcnetwork.org/wp-content/uploads/2014/08/CM_guidelines_ENG_.pdf*

[219] UNICEF, Inter-Sectoral Multi-Partner Child Focused Rapid Needs Assessment, August 2021. Unpublished.

[220] Ibid.

addition, 38 per cent noted a need to assist UASC, while 30 per cent did not see these children receiving the necessary care. Of those who did receive care, 18 per cent stated this assistance was provided informally and only 9 per cent received care through the public protection system. Refugees and migrants from Venezuela also emphasized the importance of providing MHPSS for children and adolescents, in addition to promoting safe spaces and alternative care arrangements.

### RESPONSE STRATEGY

In 2022, the Child Protection Sub-sector will promote prevention, risk mitigation, and response actions to address violence against children and adolescents from Venezuela and affected host communities, with a special focus on gender issues. This will be achieved by developing procedures and strengthening national and local initiatives to align with the Best Interest of the Child[221] and the **Minimum Standards for Child Protection in Humanitarian Action. Priorities include:**

- Supporting access to rights and specialized services to protect refugee and migrant children and adolescents from Venezuela, especially undocumented, UASC, indigenous, and homeless children.

- Strengthening the capacities of actors within the Child and Adolescent Rights Guarantee System[222] to prevent and

address violence, abuse and neglect against refugee and migrant children and adolescents, encouraging community-based initiatives.

- Promoting the safe and meaningful engagement of Venezuelan children and adolescents as protagonists, through initiatives to strengthen accountability to affected populations, and ensuring their autonomy, self-reliance and social integration.

The Sub-sector will engage in advocacy, communication, sensitization, and capacity-support targeting the national child protection system and the community (refugees, migrants and affected host communities), to ensure the timely identification and management of cases where children are victims and witnesses of violence and provide individualized and intersectoral care beginning from the time of border crossing. For UASCs, mechanisms for family reunification will be strengthened, together with the provision of alternatives to institutional care.

Awareness-raising actions will be carried out with the Indigenous Peoples Working Group, given the specialized protection needs of indigenous children and adolescents. Collaborative interventions will also be organized with the Education Sector, as schools are essential to build a protective environment and prevent violence.

 # GENDER-BASED VIOLENCE (GBV)

| | PEOPLE IN NEED | | | | PEOPLE TARGETED | | |
|---|---|---|---|---|---|---|---|
|  | **64.9K** | ♂ 8.44% | ♀ 52.2% |  ↓↓ | **19.4K** | ♂ 6.31% | ♀ 55.5% |
| | | ♂ 8.44% | ♀ 30.9% | | | ♂ 5.75% | ♀ 32.4% |

| TOTAL REQUIREMENTS | RMRP PARTNERS | SECTOR LEADS |
|---|---|---|
| **1.86M** | **7** | **UNFPA-UNHCR** |

### PRIORITY NEEDS

The risk of gender-based violence (GBV) is much higher in emergency settings,[223] especially for women, girls, and the LGBTQI+ population. In mixed flows of refugees and migrants, GBV risks are increased due to the disruption of support and

protection networks, difficulties in accessing basic services, lack of documentation, discrimination, fear of deportation, and prevalence of survival sex as a coping mechanism.[224] The COVID-19 pandemic also exposed the level of family violence in Brazil: in 2020, an estimated 17 million women and girls suffered some type of violence in Brazil,[225] and half occurred in the context of affective and family relationships.[226] About 45

[221] Principle of the Best Interest of the Child, as per article 3 of the United Nations Convention on the Rights of the Child (1989).

[222] Pursuant to Article 86 of the Brazilian Child and Adolescent Statute, the Rights Guarantee System is the public service policy network for children and adolescents, implemented through actions and programmes involving governmental and non-governmental entities.

[223] UNFPA, Minimum interagency standards for emergency gender-based violence programmes, 2019. Available from the Gender-Based Violence Area of Responsibility: https://gbvaor.net

[224] UNHCR, Action Against Sexual and Gender-Based Violence: An Updated Strategy, 2011, p. 16: https://www.unhcr.org/protection/women/4e1d5aba9/unhcr-action-against-sexual-gender-based-violence-updated-strategy.html.

[225] Brazilian Public Security Forum: https://forumseguranca.org.br/anuario-brasileiro-seguranca-publica/.

[226] S. Bueno et al., Visible and invisible: The victimization of women in Brazil, 3rd. edition, 2021: https://dssbr.ensp.fiocruz.br/wp-content/uploads/2021/06/relatorio-visivel-e-invisivel-3ed-2021-v3.pdf

per cent of all GBV survivors did not seek protection.[227] In the case of refugees and migrants, only 10.8 per cent of survivors reported the incidents to the police, for fear of reprisals and lack of trust in the institutions, and of those, only 6 per cent received some form of protection support from the authorities.[228] Finally, LGBTQI+ refugees and migrants from Venezuela require specialized support to prevent and respond to GBV, particularly given high rates of homophobic and transphobic violence in the country, despite regulatory advances for their protection.[229]

## RESPONSE STRATEGY

The GBV Sub-sector in 2022 will prioritize:

- Strengthening and supporting public systems and humanitarian actors to ensure greater coverage of, and accessibility to, intersectoral network services that meet the biopsychosocial, legal, safety, and security needs of GBV survivors.

- Expanding initiatives related to the protection and empowerment (economic, psychosocial and community-based) of women, girls and LGBTQI+ persons.

- Promoting GBV risk-prevention and mitigation actions by providing information on the rights and services available to vulnerable groups.

The Sub-sector will conduct advocacy in partnership with local networks to promote culturally sensitive and survivor-centred

assistance without discrimination of refugees and migrants from Venezuela as well as affected host communities, and build the capacity of service providers through training on case management, psychosocial care, and clinical management of rape and sexual violence, according to national and international guidelines, as well as through joint monitoring activities.

The GBV Sub-sector intends to strengthen community resilience and peaceful coexistence by training and supporting refugee and migrant leaders (grassroots women paralegals) and other community-based protection strategies, such as peer support, self-help groups and micro-protection networks, with the aim of mitigating the effects of GBV and improving the well-being of survivors.

In addition, the Sub-sector will develop CwC strategies based on the AGD approach, facilitating broad access to information products that save lives, and developing specialized technical materials to effectively implement actions to prevent, mitigate and respond to GBV.

These interventions will be implemented in close coordination with other Sectors, such as Health, Education, Integration, Child Protection, and Human Trafficking, to achieve an intersectoral and equitable response that respects the rights and dignity of people at risk and survivors of GBV.

---

##  HUMAN TRAFFICKING AND SMUGGLING

 **PEOPLE IN NEED**
**49.4K**

♂ 29.7%   ♀ 32.1%
♂ 19.2%   ♀ 19.1%

 **PEOPLE TARGETED**
**7.35K**

♂ 41.3%   ♀ 40.9%
♂ 8.88%   ♀ 8.89%

**TOTAL REQUIREMENTS**
**625K**

**RMRP PARTNERS**
**4**

**SECTOR LEADS**
**IOM-SOS CHILDREN'S VILLAGE**

---

## PRIORITY NEEDS

The COVID-19 pandemic and its consequences increased the vulnerability of refugees and migrants to human trafficking and protection risks associated with smuggling. Increased irregular entry into Brazil since the pandemic and the lack of documentation for refugees and migrants have hindered their

access to the formal labour market and essential protection services,[230] increasing the risks of refugees and migrants from Venezuela to exploitation, abuse and/or violence by criminal networks, such as human trafficking and smuggling networks. In particular, there is evidence of an increase in human trafficking for labour exploitation among Venezuelan refugees and migrants in recent years.[231] However, both human

[227] UNFPA, UNHCR, European Union, Gender, Nationality and Race/Ethnicity Violence in Two Cities in Roraima (Executive Summary), October 2020: https://brazil.unfpa.org/sites/default/files/pub-pdf/violencia_de_genero_nacionalidade_e_raca-etnia_em_duas_cidades_de_roraima.pdf.

[228] Ibid.

[229] Brazilian Public Security Forum, Closeted Rights: LGBT-Phobia and Racism: https://forumseguranca.org.br/wp-content/uploads/2021/07/5-direitos-trancados-no-armario-lgbtfobia-e-racismo-no-brasil.pdf

[230] IOM, Diagnostic on the Situation and Incidence of Human Trafficking in Humanitarian Contexts in South America, June 2020: https://repositoryoim.org/handle/20.500.11788/2301

[231] Ibid p. 36.

trafficking and smuggling remain under-reported due to their clandestine nature, and are as such difficult to address.

Regarding human trafficking, according to civil servants and humanitarian actors involved in providing assistance to Venezuelan refugees and migrants, the highest vulnerability factors for exploitation among this group include the lack of employment opportunities (85 per cent), difficulties in meeting food and shelter needs (66 per cent), and lack of awareness on trafficking (65 per cent)[232]. Women are more vulnerable to human trafficking, followed by UASC, children and adolescents in general, and LGBTIQ+ persons.[233] Finally, lack of specialized personnel and/or units within public institutions hinders the response capacity to support victims and prevent the occurrence of human trafficking.[234]

### RESPONSE STRATEGY

The implementation of public policies and preventive actions, as well as the strengthening of coordination mechanisms at the sub-national, national and regional levels, are critical activities to reduce the risk of human trafficking and smuggling of refugees and migrants from Venezuela and increase the resilience of affected host communities. The priorities for the Sub-sector are to:

• Improve the access of victims of trafficking (VoTs) or those at risk of human trafficking and/or victims of abuse and violence at the hands of smugglers to timely identification, protection and assistance services, from an AGD perspective.

• Foster capacity-building to counter human trafficking as well as smuggling of refugees and migrants from Venezuela, targeting service providers, government officials, and

justice and public security institutions, and support the establishment and improvement of inter-institutional mechanisms, with a focus on prevention, identification, assistance, protection, and criminal prosecution.

• Ensure that refugees and migrants from Venezuela and their host communities have access to information on the prevention of human trafficking, including during the internal relocation process.

The Trafficking and Smuggling Sub-sector will work to complement the services provided across the country by government institutions, providing training and strengthening structural and operational capacities. Comprehensive, specialized and targeted assistance will be provided through a victim-centred approach, addressing the specific needs of people impacted by exploitation, abuse and violence. Response modalities will include psychological support and in-kind assistance to address immediate and medium-term needs. In addition, a key priority will be to focus on initiatives that support access to regularization procedures.

Together with public institutions, the Sub-sector will run awareness-raising campaigns, hold information sessions, and produce culturally adapted information materials that are critical to strengthening community resilience. It will also promote the exchange and dissemination of information on the dynamics of trafficking and smuggling of refugees and migrants, to contribute to improve reporting and visibility of the two phenomena. Finally, the Sub-sector will strengthen the capacity of R4V partners to identify victims of trafficking, exploitation and abuse through trainings organized in collaboration with the Protection Sector, Child Protection and GBV Sub-sectors.



## SHELTER

|  PEOPLE IN NEED **103K** | ⚥ 29.7% ⚥ 32.1% ⚥ 19.2% ⚥ 19.0% |  PEOPLE TARGETED **43.4K** | ⚥ 29.7% ⚥ 32.4% ⚥ 19.1% ⚥ 18.9% |
|---|---|---|---|
| 💰 TOTAL REQUIREMENTS **23.7M** | RMRP PARTNERS **12** | SECTOR LEADS **AVSI-IOM-UNHCR** | |

### PRIORITY NEEDS

Shelter is a priority need among refugees and migrants in Brazil: 34 per cent of Venezuelan households report not knowing where they will live the following month, which increases to 45 per cent of those who arrived since January 2021.[235]

Most refugees and migrants from Venezuela arrive to the states of Roraima, Amazonas and Pará in precarious conditions and in urgent need of shelter and humanitarian assistance. In Roraima, as of September 2021, despite the overall capacity of Operation Welcome to shelter approximately 10,000 people, and rental assistance being provided by R4V partners,

[232] UNODC, Brazil Situational Report: Trafficking in Persons in Mixed Migratory Flows, especially Venezuelans. 2020, p. 29: https://www.unodc.org/documents/lpo-brazil/Topics_TIP/Publicacoes/Relatorio_Situacional_Brasil_T4T.pdf.
[233] Ibid p. 29.
[234] Ibid p. 38.
[235] R4V Brazil JNA, November 2021. Publication forthcoming.

around 6,000 people are reported to be homeless or living in spontaneous settlements.[236] While the Operation Welcome relocation programme (*interiorização*) is the main exit strategy from collective shelters in border states, 27 per cent of refugees and migrants in collective shelters say that they would prefer to stay close to Venezuela,[237] thus creating a need for alternative solutions in these border areas.

Elsewhere in the country, access to adequate and secure housing with basic WASH facilities and accessibility for persons with disabilities is also a challenge, due especially to a 36 per cent rise in rental prices[238] in the past year, but also due to a lack of information on national housing legislation, and discrimination and xenophobia among landlords, resulting in unfair rental fees and evictions.[239,240]

## RESPONSE STRATEGY

The Shelter Sector will maintain its focus on the shelters (*abrigos*) in the states of Roraima, Amazonas and Pará, as well as transit houses (*casas de passagem*) and reception centres in other states for people relocated through interiorization or moving south by their own means. As such, the Sector's priorities will be:

1. Providing access to an adequate temporary shelter response for refugees and migrants from Venezuela through collective and individual solutions, including reception spaces and rental assistance, as well as distribution of essential shelter and household items.

2. Increasing capacities of national authorities (national, state and municipal) and R4V partners to establish, maintain and manage shelters for refugees and migrants from Venezuela (including reception spaces, emergency and transitional structures, spontaneous settlements and transit houses) promoting active participation of the affected population, as well as direct support in infrastructure and site planning for temporary shelters in the context of Operation Welcome.

3. Supporting government authorities to develop shelter exit strategies for local integration, in accordance with humanitarian standards, and considering the protection and meaningful participation of indigenous people, LGBTQI+ persons, children, the elderly, women, and people with disabilities.

The environmental impacts of shelter provision in Roraima will be reduced by employing housing units adapted to the local climate and made from locally-sourced materials for increased sustainability. Sites will improve waste management by using organic waste to produce biofertilizer for vegetable gardens and aquaponic systems which provide fresh produce to residents.

Collaboration with the Protection Sector and the CwC/AAP and Indigenous Peoples Working Groups will aim to identify and respond to the needs of specific groups. The provision of services, capacity-building and information materials will be carried out jointly with the WASH, Food Security, Nutrition and Health Sectors. Collaboration with the Integration Sector and the Cash Working Group will be essential to conduct housing market assessments, elaborate shelter exit strategies and promote durable solutions for people living in reception spaces and spontaneous settlements.

---

[236] IOM, População refugiada e migrante fora de abrigos em Boa Vista, September 2021: *https://brazil.iom.int/sites/brazil/files/Publications/OIM-0921-informe-desabrigados-boa-vista-rodoviaria-acolhida-1.pdf*

[237] UNHCR, Autonomia e integração local de refugiados(as) e migrantes venezuelanos(as) acolhidos(as) nos abrigos em Boa Vista (RR), 2020, p. 36: *www.acnur.org/portugues/wp-content/uploads/2021/07/relatorio-operacao_acolhida-Final.pdf*

[238] Rental price adjustments are based on the General Market Price Index (IGP-M, for its Portuguese acronym), calculated monthly by the IBRE (Brazilian Institute of Economics), an agency of the FGV (Fundação Getúlio Vargas). The index is based off of inflation in the price of products and services in a given period. Fundação Getúlio Vargas (FGV), *IGP-M*, May 2021: *https://portal.fgv.br/noticias/igpm-maio-2021*

[239] UNHCR, *Vozes das Pessoas Refugiadas*, June 2021, p. 20-23: *www.acnur.org/portugues/wp-content/uploads/2021/06/ACNUR-Relatorio-Vozes-das-Pessoas-Refugiadas-reduzido.pdf*

[240] According to UNHCR's CVA monitoring in 2021, at least 17 per cent of cash assistance recipients could not pay their prior month's rent and were at risk of eviction.

 WASH

**PEOPLE IN NEED**
**109K**
👤 29.7%  👤 32.1%
👤 19.2%  👤 19.1%

**PEOPLE TARGETED**
**46.6K**
👤 26.5%  👤 27.7%
👤 22.9%  👤 22.9%

**TOTAL REQUIREMENTS**
**10.3M**

**RMRP PARTNERS**
**12**

**SECTOR LEADS**
**ADRA–UNICEF**

## PRIORITY NEEDS

According to a 2021 rapid needs assessment conducted in 47 locations among shelters, spontaneous settlements, indigenous communities, and rented housing units across 7 municipalities of Roraima, Amazonas and Pará in August 2021, 41 per cent of refugees and migrants from Venezuela lacked access to private toilets, 25 per cent lacked access to adequate handwashing facilities, 33 per cent lacked access to basic hygiene items, while 50 per cent reported shortages of soap, and 14 per cent of respondents reported children playing in close proximity to raw sewage, thereby exposed to significant health risks.[241]

In shelters, WASH infrastructure requires regular monitoring, including water quality and free residual chlorine tests, as well as facilities maintenance and upgrades to ensure appropriate public and environmental health conditions. In addition, shelters should be regularly provided with cleaning and hygiene materials and adapted to meet specific needs of children and adolescents, women, girls and LGBTQI+ people, to ensure adequate menstrual hygiene management and other basic services.[242]

Regarding WASH in health and education institutions, only 47 per cent of primary public schools have access to piped sewerage, 30 per cent lack access to potable water,[243] and in the states of Amazonas, Roraima, and Pará, WASH services and infrastructure were classified as insufficient in 46 per cent of 96 assessed health centres.[244]

## RESPONSE STRATEGY

WASH interventions will target refugees and migrants from Venezuela and affected host communities (including indigenous populations) particularly in the states of Roraima, Amazonas and Pará. Priorities for 2022 are to:

1. Improve and maintain the WASH infrastructure in shelters, spontaneous settlements and communities, including shared and child-friendly spaces, with emphasis on the quality of services offered.

2. Promote strategies to prevent the spread of COVID-19 and other infectious and waterborne diseases.

3. Provide technical support to local WASH, education, and health authorities to reinforce their provision of essential public services, and to develop planning and monitoring systems in WASH services.

WASH partners will assess and propose robust, durable, and mobile WASH solutions for refugees, migrants, and affected host communities. Infrastructure activities in shelters and settlements include water and sanitation infrastructure construction, repairs and rehabilitation. Water treatment and water quality testing will be strengthened and complemented by wastewater and solid waste management. The Sector will promote actions to prevent disease transmission, including of COVID-19, by distributing hygiene kits and CVA, as well as through risk communication, community engagement and behavioral change strategies. The response will be designed together with communities (refugees, migrants and affected host communities) and adapted to their needs, considering the specific requirements of the most vulnerable groups.

The Sector will support municipalities to provide services in areas with large concentrations of refugees and migrants from Venezuela, including through the installation of safe water points, sanitation facilities, and handwashing stations in schools, guaranteeing a safe return for students, and in health and child-protection facilities. The Sector will train local authorities and service providers on quality standards with an AGD perspective, the use of the WASH-FIT diagnostic tool in health facilities, and the application of safe school reopening tools and approaches.[245]

The Sector will coordinate with the Education, Health, Protection and Shelter Sectors, and the CwC and Indigenous Peoples Working Groups, to ensure the prioritization of communities, settlements, and reception centres with the greatest needs.

[241] UNICEF, Inter-sectoral Multi-partner Child-Focused Rapid Needs Assessment, August 2021. Publication forthcoming. Conducted in 47 locations in shelters, spontaneous settlements, among indigenous communities, and in rented housing units across 7 municipalities.
[242] UNICEF, COVID-19 Brazil Humanitarian Situation Report No. 1, 2021: https://uni.cf/3DSGnBz
[243] INEP, Censo de Educação Básica, Microdados. Brasília. 2020. https://www.gov.br/inep/pt-br/acesso-a-informacao/dados-abertos/microdados/censo-escolar
[244] UNICEF, Assessment of WASH (WASH FIT for Health Facilities), 2020. Unpublished.
[245] WASH FIT is a tool designed to help health care facilities improve quality of care through water, sanitation, and hygiene. For more information, see https://bit.ly/3oP3jZ7

Venezuela AR_000908



CHILE



© UNHCR / Yhan Cancino

# CHILE
## AT A GLANCE





**POPULATION PROJECTION**

**562 K**



**PEOPLE IN NEED**

**481 K**



**PEOPLE TARGETED**

**159 K**

| | POPULATION PROJECTION | PEOPLE IN NEED | PEOPLE TARGETED |
|---|---|---|---|
| **VENEZUELANS IN DESTINATION** | 562 K | 358 K | 149 K |
| **HOST COMMUNITY** | - | 123 K | 9.28 K |
| **IN TRANSIT*** | - | - | - |

**GENDER DISAGGREGATION**



↑ **37.9%**　↑ **41.7%**
↑ 9.90 %　↑ **10.5%**



↑ **36.8%**　↑ **41.9%**
↑ 10.5%　↑ **10.8%**



↑ **36.2%**　↑ **43.7%**
↑ 9.90%　↑ **10.2%**



**TOTAL REQUIREMENTS**
## $59.5 M



**RMRP PARTNERS**
## 14

* Refugees and migrants in-transit are included in the national totals.

## FUNDING REQUEST AND BENEFICIARIES TARGETED



PEOPLE TARGETED 2022

- 44 – 448
- 449 – 1.333
- 1.334 – 2.688
- 2.689 – 5.677
- 5.678 – 134.875

Pacific Ocean

| PROVINCE | 📊 | 👥 | 👫 | 💰 |
|---|---|---|---|---|
| Región Metropolitana de Santiago | 389 K | 297 K | 135 K | $17.3 M |
| Valparaíso | 43.4 K | 40.5 K | 5.68 K | $1.02 M |
| Maule | 18.9 K | 19.6 K | 2.69 K | $252 K |
| Tarapacá | 6.01 K | 6.07 K | 2.67 K | $3.55 M |
| Antofagasta | 11.5 K | 11.5 K | 2.58 K | $525 K |
| Bío-Bío | 21.6 K | 24.9 K | 2.38 K | $399 K |
| Los Lagos | 13.2 K | 14.3 K | 1.89 K | $219 K |
| Coquimbo | 12.9 K | 13.7 K | 1.33 K | $162 K |
| Libertador General Bernardo O'Higgins | 18.6 K | 18.4 K | 1.23 K | $104 K |

| PROVINCE | 📊 | 👥 | 👫 | 💰 |
|---|---|---|---|---|
| Araucanía | 6.46 K | 10.9 K | 1.09 K | $158 K |
| Arica y Parinacota | 4.19 K | 4.23 K | 832 | $581 K |
| Los Ríos | 2.69 K | 4.42 K | 448 | $42.1 K |
| Ñuble | 5.12 K | 6.68 K | 418 | $35.5 K |
| Atacama | 3.89 K | 4.53 K | 199 | $41.1 K |
| Magallanes y Antártica Chilena | 3.54 K | 3.41 K | 189 | $16.3 K |
| Aisén del General Carlos Ibáñez del Campo | 1.10 K | 1.41 K | 44 | $4.24 K |

📊 Population Projection   👥 People in Need   👫 People Targeted   💰 Budget   Venezuela AR_000911

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

| | International NGOs | National NGOs / CSOs‡ | Others‡‡ | UN Agencies |
|---|---|---|---|---|
| Financial requirements | – | 1.22% | 2.60% | 96.2% |
| Organizations | – | 4 | 3 | 7 |

‡ Civil Society Organizations.

‡‡ Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR

| Sector | People in need (PiN) | Targeted / In need | People targeted | Financial requirements (USD) | Partners |
|---|---|---|---|---|---|
| Education | 196 K | | 5.73 K | 1.91 M | 5 |
| Food Security | 211 K | | 50.6 K | 3.57 M | 4 |
| Health | 160 K | | 5.92 K | 2.82 M | 6 |
| Humanitarian Transportation | 211 K | | 300 | 150 K | 1 |
| Integration | 388 K | | 47.3 K | 12.1 M | 10 |
| Nutrition | 340 K | | – | – | – |
| Protection* | 442 K | | 40.1 K | 10.8 M | 8 |
| Child Protection | 154 K | | 540 | 364 K | 4 |
| Gender-Based Violence (GBV) | 99.6 K | | – | 280 K | 1 |
| Human Trafficking & Smuggling | 64.1 K | | 240 | 455 K | 2 |
| Shelter | 110 K | | 54.4 K | 7.13 M | 4 |
| WASH | 157 K | | 42.8 K | 7.50 M | 3 |
| Multipurpose Cash Assistance | – | – | 50.8 K | 10.2 M | 3 |
| Common Services** | – | – | – | 2.22M | 3 |

* This includes Support Spaces

** This includes AAP, Communication, Coordination, CwC/ C4D, Fundraising, Information Managent, PSEA and Reporting.

# COUNTRY OVERVIEW



© IOM / Rocío Sanhueza

In 2021, Chile experienced challenging political dynamics that also directly impacted refugees and migrants from Venezuela. In particular, the increase of irregular entries through the northern borders, linked to border closures following the onset of the COVID-19 pandemic and related border management policies, resulted in greater protection risks for refugees and migrants from Venezuela.[246] Moreover, although the vaccination campaign against COVID-19 includes all foreigners in the country,[247] and extends to those in an irregular situation,[248] there are reports of refugees and migrants from Venezuela whose documents were not accepted[249] representing a practical obstacle for full inclusion.

Despite border closures and lockdowns, refugees and migrants from Venezuela arrived in Chile seeking protection, access to basic rights and services, and integration opportunities, at times propelled by pandemic-induced economic downturns in neighboring countries.[250]

Although the country´s economy grew between 6 per cent and 7 per cent in 2021, this has not translated into employment growth: only half of the jobs lost in 2020 have been recovered to-date.[251] Considering signs of deterioration of the labour conditions of refugees and migrants from Venezuela, the outlook for their reintegration and access to the formal labour market is concerning,[252] the rate of informal employment has risen nationally by 5.3 percentage points over the pre-pandemic period, and an even greater increase of this indicator has been reported in the northern regions, where there was an increase of 15.5 percentage points.[253]

[246] Humanitarian Crisis in Northern Chile: Militarization and Expulsion of Migrants, Oxford University, Faculty of Law, 15 April 2021: https://www.law.ox.ac.uk/research-subject-groups/centre-criminology/centreborder-criminologies/blog/2021/04/humanitarian

[247] How Chile became the leader in vaccination against Covid-19 in Latin America, BBC News Mundo, 3 March 2021: https://www.bbc.com/mundo/noticias-america-latina-56267103 also see Ministry of Health in Chile: "We are inoculating all refugees and migrants", Voice of America, 3 April 2021: https://www.vozdeamerica.com/a/america-latina_ministro-de-salud-de-chile-estamos-vacunando-todos-los-migrantes/6072868.html

[248] Ministry of Health will be available for everyone regardless of their immigration status, La Tercera, 3 February 2021: https://www.t13.cl/noticia/nacional/paris-confirma-vacuna-covid-19-migrantes-rut-inscribirse-pasaporte-03-02-2021

[249] The obstacles of migrants to access the vaccine against Covid-19, La Tercera, 30 April 2021: https://www.latercera.com/la-tercera-sabado/noticia/las-trabas-de-los-migrantes-para-acceder-a-la-vacuna-contra-el-covid-19/VJPQO7WZFRE3TEPHTQIOMS6MIQ/

[250] The End of the "Chilean Dream"? Migrants Fight to Stay in a Country Where Doors are Closed, BBC News, 27 May 2021: https://www.bbc.com/mundo/noticias-america-latina-56999711

[251] Chile at two speeds: Economy recovers, employment stagnates, Pauta, 9 May 2021: https://www.pauta.cl/economia/chile-2021-economia-reactivacion-empleo-estancamiento

[252] ,Labour Approach n°6: Focus on the immigrant labour market in northern Chile, October 2021: https://ocec.udp.cl/cms/wp-content/uploads/2021/10/Enfoque-Laboral-6-VF_compressed.pdf.

[253] Ibid.

The R4V National Platform's joint needs analysis (JNA)[254] yielded key insights into the specific and overarching needs across all response sectors. It evidences an increase of theft, intimidation and exploitative practices committed against refugees and migrants from Venezuela reaching Chile; obstacles in administrative procedures for refugee status determination (RSD); and delays in visa renewal processes due to national lockdowns.[255] Around 73 per cent of refugees and migrants from Venezuela are in an irregular situation in Chile.[256] The JNA also highlighted that 13 per cent of Venezuelans in Chile live under the poverty line,[257] that many work informally and are overqualified for jobs in which they often earn less than the minimum wage. There are also reports of discrimination and xenophobia in the workplace.[258] Refugees and migrants from Venezuela's access to primary healthcare services, including mental health, is often restricted by limited capacities of health facilities, costs of medical expenses, and lack of information regarding the functioning of the health system.[259]

The JNA shows that 64 per cent of refugees and migrants from Venezuela in the northern regions are living in highly vulnerable conditions.[260] However, the northern regions are mainly transit areas to most refugees and migrants, who choose to settle in the Metropolitan Region of Santiago. However, in this region, their living conditions remain difficult and characterized by high density housing,[261] with precarious conditions and exposure to constant risks.

According to an R4V partner's report, 48 per cent of refugees and migrants from Venezuela in Chile are female and 52 per cent are male.[262] There is a large cohort (55 per cent) of Venezuelans aged 18 through 29, a cohort (35 per cent) between 30 to 65,[263] and a small percentage of people over 65 (2 per cent). Among the populations with specific needs are pregnant women, unaccompanied and separated children (UASC), people with disabilities, people with chronic illnesses, people living with HIV/AIDS, and LGBTQI+ people.

## RESPONSE STRATEGY

### Country Planning Scenario

The National Platform is expecting a moderate increase in the number of refugees and migrants from Venezuela arriving to Chile in 2022. This analysis takes into consideration the political scenario and government policies towards Venezuelans that have been applied or have been under debate for the greater part of 2021, such as incidents of deportations,[264] revisions to migration policies, health restrictions, and polarization around the presidential elections at the end of 2021.

The scenario has also considered possible effects of the implementation of new regulations related to refugees and migrants following the entry into force of the new Migration Bill in early 2022. Particularly, a regularization process affecting those who entered through official border points before 18 March 2020 is expected in 2022.[265] An increase in family reunification requests and procedures is also expected.

The National Platform in Chile will increase its efforts to support refugees and migrants from Venezuela as well as affected host communities in 2022, especially in the wake of xenophobic incidents and demonstrations having taken place in 2021, requiring complementary efforts by R4V actors, host communities and national authorities, in support of social cohesion and peaceful coexistence.

### Scope of the Response and Priorities

R4V partners in Chile will prioritize the border areas with Bolivia and Perú for interventions. This includes Arica and Parinacota and Tarapaca regions, and the main destination locations of the Metropolitan Region of Santiago, Valparaiso, and Bío Bío, where over 80 per cent[266] of refugees and migrants from Venezuela are settled in Chile. At the same time, partners will also undertake activities in other areas of Chile where there are currently limited institutional capacities to respond to the needs of refugees and migrants from Venezuela. The response foresees the provision of humanitarian assistance, protection, access to healthcare, education, and promotes socio-economic and cultural integration.

The response strategy prioritizes the protection and socio-economic as well as cultural integration of refugees and migrants from Venezuela, including through the provision of technical support and assistance to local authorities.

[254] R4V Chile, Joint Needs Assessment, 2021. Publication forthcoming.

[255] IOM Chile, Displacement Tracking Matrix (DTM) 5th Round, March 2021: https://dtm.iom.int/reports/chile-%E2%80%94-monitoreo-de-flujo-de-poblaci%C3%B3n-venezolana-5-marzo-2021

[256] IOM Chile, Displacement Tracking Matrix (DTM) 5th Round, March 2021: https://dtm.iom.int/reports/chile-%E2%80%94-monitoreo-de-flujo-de-poblaci%C3%B3n-venezolana-5-marzo-2021

[257] CASEN Pandemic Survey 2020, Ministry of Social Development and Family, July 2021: www.ministeriodesarrollosocial.gob.cl

[258] Ibid.

[259] PAHO, Immigration in Chile: A multidimensional view, Chapter 5: Health inequalities and gaps in access between locals and migrants, 2019: https://healthandmigration.paho.org/handle/123456789/533

[260] Antofagasta, Iquique, Arica and Parinacota.

[261] 65 per cent of refugees and migrants who arrive in Iquique then travel to Santiago (Metropolitan Region), El Día National Press, 28 September 2021. Print version.

[262] IOM Chile, Displacement Tracking Matrix (DTM) 5th Round, March 2021: https://dtm.iom.int/reports/chile-%E2%80%94-monitoreo-de-flujo-de-poblaci%C3%B3n-venezolana-5-marzo-2021

[263] Ibid.

[264] In February 2021, the Interior Minister, Raul Delgado launched the "Plan Colchane" that includes provisions for deportations. See Migration in Chile, March 2021: https://www.migracionenchile.cl/delgado-impulsa-plan-colchane-y-se-inicia-expulsion-de-los-primeros-100-extranjeros/

[265] Government of Chile, Migratory Regularization 2021, Chile Atiende, 4 November 2021: https://www.chileatiende.gob.cl/fichas/91519-regularizacion-migratoria-2021

[266] According to data obtained by the R4V National Platform in Chile from the persons in-need (PIN) and population projection calculations during the Joint Needs Assessment process.

Priorities in these areas will include strengthening initiatives to ensure refugees and migrants from Venezuela can enter Chile safely and access procedures to claim asylum, request family reunification visas, or regularize their migration status. Improving access to information is key to raising awareness of refugees' and migrants' rights. Partners will collaborate closely to prevent and mitigate protection risks among the most vulnerable population groups (e.g. women, UASC, LGBTQI+ persons), such as human trafficking, smuggling, sexual exploitation, labour exploitation, gender-based violence (GBV) and others. Finally, interventions will include an anti-xenophobia and anti-discrimination social media campaign to raise awareness among and sensitize members of the host community.

Additionally, the response will provide training on labour inclusion, financial support for regularization processes, access to and permanence in education, and inclusion in national social protection programmes to ensure livelihood opportunities for the Venezuelan population and their host communities. Furthermore, information on regularization and professional certification processes will be provided.

To address the immediate needs and expand Venezuelans' ability to enjoy their rights regarding healthcare, shelter, food and education, R4V partners will in particular improve effective access to medical emergency and primary healthcare, including mental health and psychosocial support (MHPSS); access to medication through cash and voucher assistance (CVA); and increase availability of information on health services for refugees and migrants. The response will further deliver shelter solutions for temporary emergency shelter and provide rental subsidies for the most vulnerable families as a longer-term shelter solution. To cover the immediate needs of the Venezuelan population and protect their well-being, R4V partners will deliver food and non-food items, including hygiene kits and warm clothes during the winter season. Children and their parents will be provided with information about enrollment in the public education system in Chile, regardless of their situation in-country. Partners will provide technical assistance for the recognition of academic diplomas and qualifications, as well as deliver tablets to refugees and migrants to facilitate their participation in virtual learning modalities.

To define the target population, the results of the JNA were considered, combined with available data and information published by the Government of Chile, including the results of a Pandemic 2020 survey[267] and recent studies by R4V partners. The results were validated by each Sector co-lead and were presented in planning workshops with the aim of using these indicators for the definition of the target population. Finally, the number of refugees and migrants from Venezuela targeted to receive assistance was aligned to the strategic objectives and planning of activities of each Sector.

### Response Principles

Considerations related to gender, accountability to affected populations (AAP), and centrality of protection were assessed during the development of this Response Plan. All R4V partners in Chile completed the Gender with Age Marker (GAM), in a total of 14 submissions during the planning phase, pursuant to which all R4V partners' activities will incorporate actions to reduce gender inequality.

Accountability to refugees and migrants from Venezuela constitutes a cornerstone of the Response Plan, and all partners will work closely to ensure that assistance is targeted to reach the most vulnerable members of the affected population. To achieve this, by 2022 the R4V National Platform in Chile will seek to establish a working group with all R4V partners to ensure that response efforts are aligned with the results of consultations carried out with refugees and migrants from Venezuela. Likewise, the Platform's work will focus on putting affected communities at the centre to provide a timely, safe and meaningful humanitarian response. In relation to PSEA, tools will be designed working together with the R4V regional PSEA focal points.

[267] CASEN Pandemic Survey 2020, Ministry of Social Development and Family, July 2021: http://observatorio.ministeriodesarrollosocial.gob.cl/storage/docs/casen/2020/Resumen_de_resultados_de_Pobreza_por_Ingresos_y_Distribucion_de_Ingresos.pdf

 **EDUCATION**

 **PEOPLE IN NEED**
**196 K**

⬆ 37.3%   ⬆ 41.8%
⬆ 10.2%   ⬆ 10.7%

 **PEOPLE TARGETED**
**5.73 K**

⬆ 19.2%   ⬆ 49.2%
⬆ 13.1%   ⬆ 18.4%

**TOTAL REQUIREMENTS**
**1.91 M**

**RMRP PARTNERS**
**5**

**SECTOR LEADS**
**UNESCO-UNICEF**

## PRIORITY NEEDS

Despite efforts by the Government of Chile and the Ministry of Education (MINEDUC) to include refugees and migrants in the education system, through the Provisional School Identifier (IPE for its Spanish acronym)[268] regardless of their situation in-country, there are still unmet needs regarding access to education for refugees and migrants from Venezuela. First, the lack of inclusive and equitable access for refugees and migrants from Venezuela to formal education (11.9 per cent do not attend school[269]) demonstrates a significant inequality in the current COVID-19 pandemic context compared to the host community. Among the main causes of this is the lack of an intercultural perspective on education,[270] unequal access to scholarships, as well as administrative barriers to access state benefits and lack of training for teachers and educational actors in order to prevent and address xenophobia.[271] Second, Venezuelan students lack regular internet connectivity[272] and technology needed to participate in distance learning, preventing them from accessing online education during the closure of schools in the context of the pandemic. Moreover, the interruption in the provision of school meals[273] has negatively affected the nutritional situation of many refugee and migrant students. Finally, the lack of recognition of foreign academic degrees and certificates of refugee and migrant students from Venezuela, due to problematic certification mechanisms and the high costs associated with these processes, hinder access to further educational or employment opportunities.

## RESPONSE STRATEGY

The Education Sector response for 2022 will focus on providing specialized technical assistance at the national level to improve Venezuelan refugees' and migrants' access to the education system. These initiatives will be implemented through advocacy with the government, focusing on addressing the obstacles to accessing state benefits linked to the education system, such as school passes, school insurance and scholarships for food and school books and texts;[274] close coordination with the MINEDUC in the Regional Monitoring System for students in-transit; and establishing a reception centre in the cities of Colchane and Iquique, in coordination with the MINDES, where information and support will be provided to refugee and migrant households from Venezuela about effective access to the national school system.

Regarding access to alternative and distance education modalities, tablets and internet connectivity devices will be delivered to children and adolescents, as will educational kits (e.g. tablets, notebooks, pen and pencils) to refugee and migrant students in different regions of Chile, focusing primary on the reception centres[275] located in the cities of Colchane and Iquique, which will be a space where families with children can use as a day transit centre while they wait for their transfer to their next and, in some cases, final destination. Also, advocacy activities will be carried out in close coordination with MINEDUC to promote programmes that focus on refugee and migrant children who are falling behind in their education.

[268] The Provisional School Identifier (IPE) is a unique number given by the Ministry of Education (Mineduc) to foreign children and adolescents of school age, who do not have a RUN, and who wish to join the Chilean school system – more information at: https://www.chileatiende.gob.cl/fichas/49443-identificador-provisorio-escolar-ipe-e-identificador-provisorio-del-apoderado-ipa-para-personas-extranjeras

[269] CASEN Pandemic Survey 2020, Ministry of Social Development and Family, July 2021: http://observatorio.ministeriodesarrollosocial.gob.cl/encuesta-casen-en-pandemia-2020

[270] UNESCO, Right to education under pressure: Main challenges and innovated actions in the educational response for mixed migratory flow of the Venezuelan Population in Chile, 2021: https://unesdoc.unesco.org/inicio

[271] Ibid.

[272] CEPAL-UNESCO, Report: Education in COVID-19 pandemic times, August 2020: https://repositorio.cepal.org/bitstream/handle/11362/45904/1/S2000510_es.pdf

[273] For a description of the problem in Chile, see: CIPER, 19 thousand students with malnutrition signs: Stories that are lived in schools where cases increased, May 2021: https://www.ciperchile.cl/2021/05/06/19-mil-escolares-con-senales-de-desnutricion-las-historias-que-se-viven-en-las-escuelas-donde-aumentaron-los-casos/

[274] Jesuit Migrant Service (SJM), Migrants' Right to Education: Information Guide for Migrants' Families, 2020: https://sjmchile.org/wp-content/uploads/2020/08/brochure-libro-centrado.pdf

[275] The first reception centre will be a project in coordination with the Ministry of Social Development and Family and the Child Protection Sub-sector as a response for refugee and migrant children who arrive in Colchane in very vulnerable conditions and require humanitarian assistance (food, hygiene kits, information, and health services).

To address barriers for the recognition of foreign academic degrees, professional certificates and vocational training, informative online workshops will be held on recognition and validation processes; preparatory courses for taking validation exams, especially in medicine, law and pedagogy will be provided to refugees and migrants; and advocacy will be conducted with the incoming Government of Chile to sign on to the Regional Agreement for the Recognition of Higher Education Studies, Degrees and Diplomas in Latin America and the Caribbean.[276]

The response strategy contemplates activities in coordination with the Integration Sector to jointly address issues with the recognition of academic degrees and professional and vocational certificates. Meanwhile, activities regarding children and adolescents' protection will require a joint effort with the Child Protection Sub-sector, especially in the implementation of the reception centres and the provision of safe education spaces free of xenophobia and discrimination.



## FOOD SECURITY

 **PEOPLE IN NEED**
**211 K**
👤 35.9%  👤 42%
👤 11.0%  👤 11.1%

**PEOPLE TARGETED**
**50.6 K**
👤 36.4%  👤 40.2%
👤 11.5%  👤 11.9%

 **TOTAL REQUIREMENTS**
**3.57 M**

 **RMRP PARTNERS**
**4**

**SECTOR LEADS**
**IOM–UNHCR**

### PRIORITY NEEDS

The main barriers for refugees and migrants from Venezuela – both in-destination and in-transit – to secure regular and sufficient quantities of healthy food are low income and high living costs. During the pandemic, the percentage of refugees and migrants in the five most vulnerable deciles in terms of income went from 39 to 46 per cent.[277] This is explained by a 14 per cent decrease in earnings for refugee and migrant workers[278] and by this population receiving, in proportion, less state aid[279] during the pandemic than Chileans.[280] More than half of lower-income households in Chile spend over 40 per cent of their income on rent.[281] With the costs of basic services in 2021 rising,[282] compounded by the observation that refugees and migrants from Venezuela are paid an average of 28 per cent less than Chileans,[283] food has become less affordable

for many refugees and migrants.[284] The situation tends to be more precarious for those in the north of the country, where 14 per cent of the refugee and migrant population from Venezuela resides,[285] and for those who recently entered the country. Refugees and migrants from Venezuela arrive with few resources and uncertain prospects, with 19 per cent having had to reduce their food portions and 14 per cent having ran out of food entirely during their travels to reach the country, according to an R4V partner's monitoring exercise conducted in the Tarapacá region in Chile.[286] Given these conditions, refugees and migrants from Venezuela resort to poor eating habits by consuming high-calorie low-nutrition inexpensive food items, compounding their vulnerability to negative effects of inadequate diets.[287]

[276] UNESCO, Regional Agreement for the Recognition of Higher Education Studies, Degrees and Diplomas in Latin America and the Caribbean: https://www.un.org/en/development/desa/population/migration/generalassembly/docs/globalcompact/UNESCO_C_LAC.pdf

[277] Servicio Jesuita de Migrantes, Report1 - CASEN and Migration: A characterization of poverty, employment and social security of the migrant population, 2021: https://www.migracionenchile.cl/wp-content/uploads/2021/10/Informe-CASEN_compressed-2.pdf

[278] Ibid. This is mainly due to an increase in the refugee and migrant workforce with higher education who could not access jobs commensurate with their qualifications.

[279] Family Income for Emergency (IFE). More information available at: https://www.ingresodeemergencia.cl/

[280] Servicio Jesuita de Migrantes, Report1 - CASEN and Migration: A characterization of poverty, employment and social security of the migrant population, 2021: https://www.migracionenchile.cl/wp-content/uploads/2021/10/Informe-CASEN_compressed-2.pdf

[281] OCDE, More than half of low-income households in Chile spend over 40 per cent of their income on rent, 17 June 2021: https://infoinvi.uchilefau.cl/ocde-mas-de-la-mitad-de-hogares-de-menores-ingresos-de-chile-gastan-sobre-40-de-sus-ingresos-en-arriendo/

[282] In August 2021, the Consumer Price Index (CPI) recorded a monthly increase of 0.4 per cent, accumulating 3.2 per cent and 4.8 per cent at twelve months for shelter, basic services, restaurants and hotels. Instituto Nacional de Estadísticas,(INE), 8 September 2021.

[283] The average salary for Chileans was found to be USD 860 and for Venezuelans USD 620. CASEN Pandemic Survey 2020, Ministry of Social Development and Family, July 2021: http://observatorio.ministeriodesarrollosocial.gob.cl/encuesta-casen-en-pandemia-2020

[284] The cost of the basic food basket in January 2021 was USD 60. Ministry of Social Development and Family, Valor de la Canasta Básica de Alimentos y Líneas de Pobreza, January 2021: http://observatorio.ministeriodesarrollosocial.gob.cl/storage/docs/cba/nueva_serie/2021/Valor_CBA_y_LPs_21.01.pdf

[285] Population Estimates. National Institute of Statistics (INE) and Foreign and Migration Department (DEM): https://www.ine.cl/prensa/2021/08/27/el-61-9-de-la-poblaci%C3%B3n-extranjera-que-vive-en-chile-se-concentra-en-la-regi%C3%B3n-metropolitana

[286] IOM Chile, Displacement Tracking Matrix (DTM) 5th Round, March 2021: https://dtm.iom.int/reports/chile-%E2%80%94-monitoreo-de-flujo-de-poblaci%C3%B3n-venezolana-5-marzo-2021

[287] Ministry of Health, National Survey of Food Consumption, January 2021: https://www.minsal.cl/sites/default/files/Informe...

## RESPONSE STRATEGY

The response strategy of the Food Security Sector in Chile will prioritize meeting urgent food-consumption needs of refugees and migrants from Venezuela to prevent hunger and malnutrition. Partners will provide direct food assistance across the country to those settled in Chile, as well as to those in-transit. Food assistance will be delivered both in-kind, for those in shelters or in health quarantine facilities, and through cash or voucher assistance (CVA) for those identified to have unencumbered access to markets. These activities are also designed to ensure that those with specific protection needs, such as children, pregnant and lactating women, and people with serious diseases or disabilities, who are not able to address their food needs through national social protection programmes, due to their legal status, are prioritized to receive assistance.

Advocacy will be conducted with authorities at all administrative levels to include refugees and migrants in national social protection networks, which will have long-term positive impacts for refugees and migrants, freeing up some of their household budgets for other expenses and allowing for the humanitarian response to invest more of its resources on the nutritional aspects of food consumption habits. Furthermore, a study will be conducted to improve information on the specific food security situation of refugees and migrants from Venezuela in Chile; this activity will require coordination with other Sectors such as Integration and Education.

 **HEALTH**

 **PEOPLE IN NEED** 160 K — 35.9% / 42% / 11.0% / 11.1%

 **PEOPLE TARGETED** 5.92 K — 32.4% / 47.7% / 9.75% / 10.2%

 **TOTAL REQUIREMENTS** 2.82 M

**RMRP PARTNERS** 6

**SECTOR LEADS** IFRC-WHO/PAHO

## PRIORITY NEEDS

The Chilean Government is committed to guaranteeing access to healthcare for all refugees and migrants regardless of their situation in-country. Since 2003, the Ministry of Health has taken special protection measures for foreign nationals, especially for pregnant women. Progress has been made to provide free access to healthcare for refugees and migrants from Venezuela. 14.2 percent of the Venezuelan population have had some medical treatment in 2021.[288] Regarding access to medical services, data from the Ministry of Social Development and Family showed that 11 percent of refugees and migrants do not have any medical insurance[289] leading to a financial barrier for health access, while other factors further affect access to the health system. Among them is the lack of information by refugees and migrants on access to available healthcare services,[290] fear of being discriminated against, administrative requirements, concerns about resulting financial costs, and a tendency to postpone medical care amidst competing priorities and needs, such as finding a job or housing.[291]

Most refugees and migrants from Venezuela arrive to Chile through unofficial border points, facing grave health and protection risks. According to reports from an R4V partner, 20 percent of refugees and migrants from Venezuela received medical assistance in the northern regions in 2021.[292]

## RESPONSE STRATEGY

Considering the health needs of refugees and migrants from Venezuela identified by R4V partners, and the resources and response capacities of the national health system, the three response priorities of the Health Sector are to:

1. Facilitate access to primary healthcare, including mental health, by preparing and disseminating information for refugees and migrants on administrative procedures and formalities for refugees and migrants to access health services; strengthen the capacities of local health services to meet the needs of the refugee and migrant population through an intercultural approach; provide direct assistance to refugees and migrants from Venezuela,

[288] CASEN Pandemic Survey 2020, Ministry of Social Development and Family, July 2021: http://observatorio.ministeriodesarrollosocial.gob.cl/encuesta-casen-en-pandemia-2020

[289] Ibid.

[290] PAHO, Immigration in Chile: A multidimensional view, Chapter 5: Health inequalities and gaps in access between locals and migrants, 2019: https://healthandmigration.paho.org/handle/123456789/533

[291] Ibid.

[292] UNHCR, High Frequency Survey, November 2021: https://www.r4v.info/es/document/encuesta-de-alta-frecuencia-venezolanos-en-chile-2021.

including psychosocial support; develop communication campaigns on the prevention of COVID-19, influenza and other communicable diseases, mental health and self-care; and implement trainings and workshops for refugees and migrants on sexual and reproductive health, prevention and management of HIV / sexually transmitted infections (STIs).

2. Improve communication channels for emergency care assistance for consultation and guidance on health rights, including mental health and emergency care for refugees and migrants.

3. Conduct a survey in coordination with the Ministry of Health on the effective use of health services by refugees and migrants in Chile. This will serve to improve the Sector response, and contribute to improved coordination of health activities between public institutions and R4V actors.

The Sector's response will focus on promoting access and use of health services by refugees and migrants from Venezuela, especially for those in vulnerable conditions (pregnant women, children, and carriers of sexually transmitted infections). Additionally, capacity-support to the national health system will be implemented through the provision of equipment, human resources and medical supplies; education and training of health staff; and the development of advocacy strategies, including information and awareness campaigns.

Response activities will be developed at the national and local levels with a greater presence of refugees and migrants from Venezuela, such as the Metropolitan Region, Valparaíso, Antofagasta, Atacama, Biobío, Coquimbo, La Araucanía, Tarapacá and Arica-Parinacota. Intersectoral collaboration will be implemented with the Protection Sector (and its Child Protection and GBV Sub-sectors) concerning activities focusing on healthcare for minors and women who have been victims of abuse.

 # HUMANITARIAN TRANSPORTATION

 **PEOPLE IN NEED**
**211 K**   37.9%   41.7%
9.90%   10.5%

 **PEOPLE TARGETED**
**300**   35.0%   35.0%
15.0%   15.0%

**TOTAL REQUIREMENTS**
**150 K**

**RMRP PARTNERS**
**1**

**SECTOR LEAD**
IOM

## PRIORITY NEEDS

Government travel restrictions and closed borders, due in part to the COVID-19 pandemic, have driven refugees and migrants from Venezuela to use unofficial border points. Upon arrival, those who lack the means to pay for safe transportation are forced to walk long distances in extreme weather conditions and expose themselves to risks such as robberies, scams, and family separation. Some travel using informal transportation[293] and remain exposed to criminality, including smuggling and trafficking.[294]

In addition, throughout 2021, all persons entering Chile who self-reported to the authorities have had to adhere to strict health procedures, which include 5-to-7-day quarantines. Only after this period, and in possession of a medical clearance document, have refugees and migrants been able to purchase

tickets to resume their journeys.[295] Those who do not follow these procedures, or lack the financial means to pay for formal transportation, usually wait on the streets until they identify an affordable means of irregular transportation (such as spaces of commercial transportation trucks), so to avoid control points by national authorities, where those without valid documentation and medical clearance documents face arrest.[296] Priority needs therefore include improving access to information for refugees and migrants on administrative procedures and requirements for movement in the country, and support to official initiatives that offer safe transportation.

## RESPONSE STRATEGY

Sector partners will strengthen the humanitarian transportation response by improving access to safe and dignified means of transport for refugees and migrants from Venezuela that minimize their exposure to risks and hazards during their

---

[293] Carabineros arrested a bus driver in Colchane for migrant smuggling, La Tercera, September 2021: https://www.latercera.com/nacional/noticia/carabineros-detuvo-a-conductor-de-bus-en-colchane-por-trafico-de-migrantes/U662HNKLM5E2TBF47ODJB7MRJM/

[294] Migration Crisis: Carabineros detect that 80 per cent of those who entered through illegal routes did so through the Tarapacá Region, La Tercera, September 2021: https://www.latercera.com/la-tercera-pm/noticia/crisis-migratoria-carabineros-detecta-que-el-80-de-quienes-ingresaron-por-pasos-ilegales-lo-hizo-por-la-region-de-tarapaca/GX4SA3LYHVEFLBHEHVBX23CRLU/

[295] Regular bus lines are only allowed to sell tickets to clients who produce the required medical clearance paperwork.

[296] Information collected during a R4V partner visit to the region of Tarapacá from 18 - 20 October 2021. Some families arriving in the city of Colchane negotiate with drivers of irregular transports for transfers to the city of Iquique, claiming that if they waited, the police would arrest them.

journeys. In this regard, R4V partners will improve information among refugees and migrants by preparing and disseminating key messages about the use of formal and safe transportation. This will include support to meeting national requirements, including quarantine processes. This will be carried out in border areas of the country such as Tarapacá, Arica and Parinacota and Antofagasta.

Moreover, R4V partners will provide direct support for transportation through cash and voucher assistance (CVA), including cards and money transfers. This will enable refugees and migrants from Venezuela to purchase regular bus tickets, and thus avoid either long, risky journeys on foot or using irregular transportation.

To carry out the response in an integrated manner, coordination with local and regional authorities and other R4V Sectors, such as Protection and Health, will be strengthened, with a special focus on cases in which transportation is needed for family reunification purposes. This type of support will be targeted to the northern areas of the country where the main entry points used by Venezuelan refugees and migrants are located.



## INTEGRATION

**PEOPLE IN NEED**
**388 K**   37%   41.9%   10.4%   10.8%

**PEOPLE TARGETED**
**47.3 K**   36.4%   47.2%   7.90%   8.53%

**TOTAL REQUIREMENTS**
**12.1 M**

**RMRP PARTNERS**
**10**

**SECTOR LEADS**
CARITAS CHILE-ILO-IOM

## PRIORITY NEEDS

The most pressing need of the growing number of refugees and migrants from Venezuela seeking protection and longer-term integration opportunities in Chile is access to reliable and decent work, which is particularly important considering that Chile is a country of destination. Among the barriers to achieve this objective are a lack of information regarding labour opportunities, high costs of professional training, and the often unclear and costly processes of professional and academic accreditation.[297] Moreover, misconceptions and inaccurate information regarding the Venezuelan population in Chile has led to discrimination in the workplace: 34.9 per cent of surveyed refugees and migrants from Venezuela have felt discriminated against in the workplace due to their nationality and legal status.[298] Taken together, these issues have resulted in a reduction of refugees' and migrants' ability to find work in the formal sector, increasing informality, with fewer labour protections. An October 2021 study estimates an 8 per cent increase on average since February 2020 in engagement in informal work among refugees and migrants in the northern regions, and 36.2 per cent in salaries lower than the minimum wage.[299] Furthermore, 62.5 per cent of those with a university degree are performing low-skilled jobs and/or are exposed to poor working conditions.[300]

## RESPONSE STRATEGY

One of the causes identified for the high level of refugees' and migrants' engagement in informal work is the lack of information available on formal work opportunities. To remedy that, Integration Sector partners will focus on creating better and more widely accessible communication channels between refugee and migrant job seekers and potential employers. The Sector will aim to secure a large and sustained adoption of these communication channels by the host community, especially by the private sector, and will leverage non-traditional media to expand reach and permeability. This will be done in tandem with market research to identify trends and to guide refugees and migrants towards the sectors most in need of labor. Direct support to refugees and migrants from Venezuela will include the provision of CVA for professional training, and provision of information about other sources of financial support.

Another avenue of the Integration Sector response will focus on enhancing the potential for self-reliance by refugees and migrants through support for the creation of small businesses. To this end, seed capital will be provided to qualifying refugees and migrants from Venezuela. R4V partners will identify those with the adequate skills, especially targeting women and youth, and provide them with the appropriate financial and technical training. This initiative will be designed and implemented

[297] , Labour market insertion of professional Venezuelan immigrants in northern chile: Precariousness and discrimination through the lens of migration policy,Rev. Interdiscip. Mobil. Hum., Brasília, v. 29, n. 62, August 2021, p. 117-132.

[298] CASEN Pandemic Survey 2020, Ministry of Social Development and Family, July 2021: http://observatorio.ministeriodesarrollosocial.gob.cl/encuesta-casen-en-pandemia-2020

[299] OCEC, Labour Approach nº6: Focus on the immigrant labour market in northern Chile, October 2021: https://ocec.udp.cl/cms/wp-content/uploads/2021/10/Enfoque-Laboral-6-VF_compressed.pdf.

[300] Ibid.

based on the results of labour market research that will provide an indication of which economic sectors have the greatest potential for success of new small businesses.

An integral part of the response will be advocacy and technical support to authorities, when needed, for recognition of titles and degrees. This intervention will be conducted in close coordination with the Education Sector and will aim to achieve an accreditation policy that facilitates validation of prior degrees

and credentials at all educational and professional levels. Lastly, partners will conduct studies to gather information to understand the integration situation of refugees and migrants in the country, and promote integration activities with host communities, including the private sector, labour unions and employer´s organization.

 **PROTECTION**

 **PEOPLE IN NEED**
**442 K**

♂ 37.1%   ♂ 41.8%
♀ 10.3%   ♀ 10.7%

 **PEOPLE TARGETED**
**40.1 K**

♂ 37.8%   ♂ 45.4%
♀ 8.15%   ♀ 8.59%

💰 **TOTAL REQUIREMENTS**
**10.8 M**

⊚ **RMRP PARTNERS**
**8**

**SECTOR LEADS**
UNHCR-WVI

## PRIORITY NEEDS

The main protection challenges for refugees and migrants from Venezuela in Chile relate to difficulties in accessing the territory and the lack of identification and adequate referral mechanisms for people in need of international protection and/or other forms of specialized protection. In addition, Venezuelans entering Chile through unofficial border points have no possibility to regularize their situation in order to access services and rights. During 2021, the government increased its administrative controls and presence along the northern border with military and law enforcement personnel, and implemented deportations of foreigners in irregular situations, including of more than 200 Venezuelans, drawing criticism from various stakeholders.[301] In 2021 alone, it is estimated that over 23,600 refugees and migrants entered the country irregularly,[302] including by using dangerous and remote routes in order to avoid detection by the authorities, out of fear of detention and deportation. Tragically reflecting the more dangerous travel, by October 2021, some 15 refugees and migrants, including one baby, had died on their journeys through the high-altitude deserts between Peru, Bolivia and Chile.[303]

Against the above background, an increase in cases of smuggling[304] into the country has been observed, while refugees and migrants in the country report a lack of information on asylum and migratory regularization procedures.[305]

## RESPONSE STRATEGY

Out of an identified 358,084 persons in-need of protection assistance in 2021, the Protection Sector will target 50,000 refugees and migrants from Venezuela to receive support. Priority response areas will include addressing widespread irregularity through enhancing information and guidance on regularization initiatives available, including asylum procedures and migratory residencies and visas; improving access to accurate information about regularization procedures and rights; and advocating for access to territory.

Sector partners will advocate with national authorities to ensure the adoption of pragmatic protection mechanisms within existing administrative procedures, and to provide them with trainings on rights, information access and provision of services for refugees and migrants. Partners will provide technical support to the Constitutional Assembly to ensure that the draft Constitution contains a strong foundation for the protection of refugees and migrants in the country. In line with the commitments of the Quito Process, Sector partners will support the government to enhance secure access to the territory, refugee status determination (RSD) procedures, migratory regularization procedures, and basic services throughout the country for refugees and migrants.

[301] UN High Commissioner for Human Rights (UNHCHR), Chile: Arbitrary and collective expulsion of migrants must stop, 19 May 2021: https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=27103&LangID=E

[302] SJM Chile, Entry through unofficial border points in 2021 reached an all-time high, 6 September 2021: https://sjmchile.org/2021/09/06/ingreso-por-paso-no-habilitado-en-2021-llega-a-su-maximo-historico/

[303] Migration Crisis: 15 known deaths in Colchane, with three this weekend, EMOL, 9 November 2021: https://www.emol.com/noticias/Nacional/2021/10/12/1035155/muertes-crisis-migratoria-colchane.html

[304] Amy Franklin Casanova, How the gang that illegally moved at least 1,000 refugees and migrants broke down, 12 October 2021: http://www.puroperiodismo.cl/como-se-desbarato-la-banda-que-movio-ilegalmente-a-al-menos-1-000-migrantes/

[305] UNHCR Chile High Frequency Survey, March 2021: https://www.r4v.info/es/document/encuesta-de-alta-frecuencia-venezolanos-en-chile-2021

Partners will further provide direct assistance to refugees and migrants from Venezuela, primarily in the northern regions where a sustained inflow of refugees and migrants is expected for 2022, and in the Metropolitan Region of Santiago, where 62 per cent of refugees and migrants are based.[306] Partners will engage in information campaigns and web-based solutions to provide information about rights and access to services at the national and local levels; protection monitoring through a strengthened presence of R4V partners at entry points in the northern regions; the provision of legal assistance and representation; and expansion of the network of Support Spaces in which integrated services are provided. The community-ased element of the response will ensure engagement and consultations with representatives of Venezuelan refugee and migrant communities and their host communities throughout the activities' implementation, and advocacy will be developed in conjunction with other sectoral priorities such as anti-xenophobia, together with the Integration Sector, or support for access to adequate shelter, with the multisector group, to ensure a coherent and unified response.

 **CHILD PROTECTION**

 **PEOPLE IN NEED**
**154 K**
👨 36.8%  👩 41.9%
👦 10.5%  👧 10.8%

 **PEOPLE TARGETED**
**540**
👨 10.2%  👩 17.6%
👦 36.1%  👧 36.1%

💰 **TOTAL REQUIREMENTS**
**364 K**

**RMRP PARTNERS**
**4**

**SECTOR LEADS**
**UNHCR-WVI**

## PRIORITY NEEDS

The new Migration Bill and a panel (convened by the Supreme Court) to prepare a protocol for the protection of unaccompanied and separated children are, in many aspects, positive advances for the protection of vulnerable refugee and migrant children in Chile.[307] Yet they still do not fully address all of their needs. The Bill forbids the denial of entry at the border, but it contains limited mechanisms to identify comprehensive protection needs for referral to adequate response actors. Vulnerable children who are admitted to the country remain exposed to multiple risks, such as child labor, exploitation, and abuse, including GBV, which also affects those refugee and migrant children already in the country.[308] While the Bill also foresees a guarantee to a visa for foreign children and adolescents, and grants them access to social benefits, regardless of their father, mother or guardian's situation in-country, the regulatory framework to establish processing times and procedures is still to be defined. On the other hand, the protocol does strengthen mechanisms for public institutions to ensure that children´s rights are upheld,[309] but its success depends both on the technical and budgetary commitments from national institutions.

Against this background, the situation on the northern border of the country requires an urgent response. According to the military police, from January to September 2021, 2,012 children and adolescents entered the country through unofficial border points, and have been identified as having grave humanitarian needs.[310,311] The absence of protocols to facilitate regularization, documentation and to ensure adequate reception conditions further compounds their needs.[312]

## RESPONSE STRATEGY

The Child Protection Sub-sector will focus its response in three main areas:

1. **Provide technical assistance to relevant authorities for the preparation and implementation of protection protocols for refugee and migrant children.** R4V partners will provide assistance to the Supreme Court for the implementation of the UASC protocols.

2. **Advocacy to improve regulations and policies for ensuring access to child rights.** Likewise, R4V partners will advocate to strengthen the procedure to obtain the family reunification visa; for adequate documentation and regularization

[306] Instituto Nacional de Estadística (INE), 61.9 per cent of the foreign population living in Chile resides in the Metropolitan Region, 27 August 2021: *https://ellibero.cl/alerta/la-region-metropolitana-concentra-la-mayor-cantidad-de-personas-extranjeras-que-viven-en-chile/*

[307] Law 21.325: *https://www.bcn.cl/leychile/navegar?idNorma=1158549*

[308] Centro de Estudios de la Realidad Social, Derechos humanos, gobierno, legislativo, migración, institucionalidad e infancia migrante en chile: La vulneración a la niñez migrante, 24 May 2021: *https://ongceres.cl/2021/05/24/institucionalidad-e-infancia-migrante-en-chile-la-vulneracion-a-la-ninez-migrante/*

[309] Poder Judicial, Corte Suprema envía a Senado tercer informe sobre proyecto de ley de protección integral de la niñez y adolescencia, 23 July 2021: *https://www.pjud.cl/prensa-y-comunicaciones/noticias-del-poder-judicial/58202*

[310] *https://www.emol.com/noticias/Nacional/2021/09/27/1033723/aumenta-ingreso-ninos-migrantes-chile.html*

[311] Más de dos mil niños migrantes han ingresado a Chile a través de pasos no habilitados de Colchane este año, El Mostrador, 22 August 2021: *https://www.elmostrador.cl/noticias/2021/08/22/mas-de-dos-mil-ninos-migrantes-han-ingresado-a-chile-a-traves-de-pasos-no-habilitados-de-colchane-este-ano/*

[312] Niñez migrante en situación irregular: la precarización que le impone la nueva Ley de Migraciones, Diario U Chile, 20 March 2021: *Niñez migrante en situación irregular: la precarización que le impone la nueva Ley de Migraciones « Diario y Radio Universidad Chile (uchile.cl)*

mechanisms for refugee and migrant children; and for the inclusion of refugee and migrant children from Venezuela in public policies for education and health. Finally, it will advocate for the non-criminalization of irregular entry and for the cessation of immigration detention.

**3. Provide direct assistance to children and adolescents and their families.** Two reception areas will be established in the Tarapacá Region. The first will be a family-friendly waiting area in the city of Colchane where humanitarian assistance will be provided. The second will be a reception centre,

where food, temporary shelter (rental subsidies), clothing, psychosocial support, legal orientation, referral to the state support system and assistance for family reunification will be provided for 15 days. Finally, partners will improve procedures for welcoming families and strengthen parental tools to provide protection and mental health assistance for children and adolescents. These activities will be closely coordinated with the Shelter, WASH, and Food Security Sectors.

## GENDER-BASED VIOLENCE (GBV)

 **PEOPLE IN NEED**
**99.6 K**

 35.6%   42.1%
11.2%   11.2%

**PEOPLE TARGETED**
_

 –   –   –
–   –   –

**TOTAL REQUIREMENTS**
**280 K**

**RMRP PARTNERS**
**1**

**SECTOR LEADS**
UNHCR-WVI

### PRIORITY NEEDS

There are three main interconnected issues with direct implications for the prevention and response to gender-based violence (GBV) in Chile: the weakness of the public sector network to provide protection to girls, women and LGBTQI+ survivors of GBV;[313] the absence of an intersectional perspective and lack of intercultural sensitivity in public programmes; and insufficient civil society support networks for girls, women and LGBTQI+ people who are experiencing GBV. This is explained in part by the limited legal mandates of the respective government ministries involved in the response, a narrow focus of public interventions which do not sufficiently consider refugees and migrants, and inadequate funds to support specialized civil society organizations. These kinds of support are needed to address the especially hard consequences of the pandemic on girls and women.[314] Furthermore, in testimonies from participatory assessments carried out by R4V partners, adult women mentioned the need to have support groups and regular meetings to share traumatic experiences and feel supported.[315] Also, reports from R4V partners indicate a high incidence of GBV among people hosted in temporary shelters in the northern regions, as well as difficulties in facilitating access to specialized services due, in part, to the absence of referral pathways.

### RESPONSE STRATEGY

To remedy this situation, the focus of the GBV Sub-sector in 2022 will be to support and strengthen the work of specialized government and civil society organizations. It will work on decision-making, strategic planning, monitoring and evaluation, capacity development and advocacy.

To support and strengthen institutions working on GBV, it will conduct advocacy activities with legislative and executive authorities so that the prevention of and response to GBV policies and programmes include refugees and migrants. Additionally, trainings and workshops on GBV will be provided to civil society organizations working in the field as first responders, and collective sites personnel will be trained on GBV core concepts, GBV risk mitigation and how to respond to a disclosure of GBV.

Partners will promote an intersectional approach to public policy, with special attention on interculturality, and survivors living in poverty, focusing especially on carrying out research on levels of inclusion of refugees and migrants in GBV public policies from an intercultural perspective.

To strengthen the civil society support networks and support service delivery, partners will map existing organizations and networks working specifically on issues of GBV for refugees

[313] CIPER, Complaints regarding violence against women fell 9.6 per cent during quarantine and calls for help increased 43.8 per cent, 9 March 2021: https://www.ciperchile.cl/2021/03/09/violencia-contra-la-mujer-en-la-cuarentena-denuncias-bajaron-96-y-llamadas-de-auxilio-aumentaron-438/

[314] Red Chilena contra la violencia hacia las mujeres, Informative Dossier: 2020-2021, Violence against women in Chile, August 2021: http://www.nomasviolenciacontramujeres.cl/wp-content/uploads/2021/08/Dossier-Informativo-Violencia-contra-Mujeres-2020-2021-Red-Chilena.pdf

[315] UNHCR, Results of Participatory Diagnostics and Interviews, 2020: https://www.r4v.info/es/document/resultados-diagnosticos-participativos-y-entrevistas-personas-adultas

and migrants. R4V partners will support and generate information for GBV survivors, as well as seek to increase financial support for care programmes and organizations.

Lastly, to raise awareness of the issue among survivors as well as witnesses, information-awareness campaigns will be developed to support those who experience GBV.

 # HUMAN TRAFFICKING AND SMUGGLING

 **PEOPLE IN NEED**
**64.1 K**

36.1%   42%
10.9%   11.0%

 **PEOPLE TARGETED**
**240**

20.0%   30.0%
35.0%   15.0%

**TOTAL REQUIREMENTS**
**455 K**

**RMRP PARTNERS**
**2**

**SECTOR LEAD**
IOM

## PRIORITY NEEDS

Several cases of human trafficking[316] and smuggling[317] into Chile were reported in 2021, and due to the increase in irregularity, refugees and migrants from Venezuela are at greater risk than before of trafficking, exploitation, abuse and violence by criminal networks. R4V partners report that refugees and migrants from Venezuela increasingly resort to smuggling networks as they do not have regular access to the country, and out of fear of being identified by border officials. Meanwhile, there are reports of refugees' and migrants' vulnerability to trafficking increasing during the pandemic, with more than 30 per cent experiencing job loss with limited alternatives amid regional movement restrictions and stricter immigration laws.[318]

Upon arrival in Chile, many refugees and migrants from Venezuela lack resources to settle in decent conditions, or information about the existence of support networks and how to access them. In addition, the prevalence of irregular situations also reduces access to services and opportunities, such as professional training and formal work, as well as regular medical care, education, and shelter, with many in a homeless situation and dependent on aid.[319] The scale of the phenomenon of human trafficking and smuggling in Chile is yet to be better analyzed, as research on both phenomena, especially regarding the Venezuelan refugee and migrant population in the country, is out of date.

## RESPONSE STRATEGY

Considering the cross-border dimension of smuggling, R4V partners will implement a communications campaign to prevent smuggling, and reach out to Venezuelans abroad with information regarding entry requirements for Chile and the dangers of resorting to smugglers, with a goal to reduce cases of smuggling as well as to prevent trafficking. Information will also be made available regarding the location of Support Spaces in Chile and services provided by partners for victims of trafficking as well as to victims of abuse and violence.

As part of the response to victims of trafficking, R4V partners will promote actions for their protection and integration. Programmes include support and legal advice and other actions such as family reunification, psychosocial support, crisis management and socio-economic integration, providing access to employment initiatives (micro-entrepreneurship, job readiness training, professional training, etc.), education and other life skills.

The long-term response to counter human trafficking will be developed through capacity development provided to investigative and law enforcement bodies, as well as civil society organizations in the country. Partners will develop a training curriculum and promote research on human trafficking and forced labour addressed to public officials, trade union organizations and employers' organizations, with a special focus on refugees and migrants from Venezuela, and support spaces for the exchange of information and periodic reports on the situation of human trafficking and smuggling.

[316] The anti-trafficking police unit opened 30 new investigations in 2020 (21 for sex trafficking and nine for labour trafficking), compared with 92 new investigations in 2019, 39 in 2018, and 21 in 2017. US Department of State, Trafficking in Persons (TiP) Report, June 2021, page 173: https://www.state.gov/reports/2021-trafficking-in-persons-report/

[317] The Chilean Military Police report 27 arrests for smuggling in 2020 and 86 in 2021. See, e.g., Detenciones por tráfico de migrantes aumentaron en un 438 por ciento respecto al año pasado, El Dinamo, 24 August 2021: https://www.eldinamo.cl/pais/2021/08/24/detenciones-por-trafico-de-migrantes-aumentaron-en-un-438-en-relacion-al-ano-pasado/. Figures of refugees and migrants having resorted to smugglers are unreliable, but one report citing an investigation by prosecutors in the Tarapacá region indicates that one gang may have facilitated the entry of 3,600 refugees and migrants into Chile.

[318] Socio-Labour Characterization of Refugees and Migrants from Venezuela in Chile, Talca University, 27 October 2021: http://www.cenem.utalca.cl/docs/pdf/Estudio Caracterizacion Sociolaboral de la Poblacion Refugiada y Migrante Venezolana en Chile con la colaboracion de ACNUR.pdf. See also US Department of State, Trafficking in Persons (TiP) Report, June 2021, page 174: https://www.state.gov/reports/2021-trafficking-in-persons-report/

[319] SJM Chile, Migrantes pernoctan en calles y playas, y ministro sostiene que el ingreso irregular es más bajo que en el Verano, 29 August 2021: https://sjmchile.org/2021/08/29/migrantes-pernoctan-en-calles-y-playas-y-ministro-sostiene-que-el-ingreso-irregular-es-mas-bajo-que-en-el-verano/

Partners will implement the response throughout the country, with a particular focus on the Metropolitan Region of Santiago as the location where most refugees and migrants from Venezuela are located, expanding the response to other priority regions of the country as the year progresses.


# SHELTER


**PEOPLE IN NEED**
**110 K**
| 👨 36.3% | 👩 42.0% |
| 👦 10.8% | 👧 11.0% |

**PEOPLE TARGETED**
**54.4 K**
| 37.8% | 41.8% |
| 9.90% | 10.5% |


**TOTAL REQUIREMENTS**
**7.13 M**


**RMRP PARTNERS**
**4**

**SECTOR LEADS**
**IOM-UNHCR**

## PRIORITY NEEDS

Refugees and migrants from Venezuela who enter Chile through unofficial border points often require an immediate shelter response to avoid living on the streets.[320] The main shelter needs are related to the constant increase in demand for both emergency accommodation and rental subsidies. After exhausting their resources reaching Chile, most refugees and migrants from Venezuela can neither afford to pay for transportation to their intended destination in the country (primarily Santiago) nor temporary accommodation, leading to a high prevalence of homelessness of refugees and migrants sheltering in public spaces in cities in the northern border region.[321] Shelter needs are compounded by limited available shelter solutions in reception areas in the north, due to a lack of hostels or other similar lodgings in the regions where Venezuelans are transiting, a shortage of collective shelters, and, in many cases, an inability to produce valid documentation to enter into a rental agreement.[322] At the same time, many of those who are in the country for a longer period need support with rent because they lack the resources to achieve economic self-sufficiency, particularly due to the high cost of accommodations, also resulting more recently in homelessness in urban areas such as Santiago.[323] Furthermore, the quality of affordable housing solutions is poor, as public policies for housing do not adequately address issues arising from substandard high-density housing solutions,[324] and public officials at times lack of cultural sensitivity when working with this population.

## RESPONSE STRATEGY

The Shelter Sector response will focus primarily on reducing the number of refugees and migrants who cannot access temporary shelter or long-term dignified housing solutions. To achieve this objective, partners will work to increase the availability of emergency accommodations and rental subsidies, and will advocate with authorities for the installation and operation of temporary shelters in reception communities in the north and in the main destinations, especially within the Metropolitan Region as well as in regions in the south of Chile. Sector partners will also provide technical support for the management of overcrowded situations and the establishment of temporary collective shelters, both in territories where the supply of accommodation is low or has not yet caught up with the increase in demand.

Shelter support will be complemented through intersectoral activities, such as the delivery of food, hygiene and winter kits, in coordination with the WASH and Food Security Sectors, as well as in coordination with the Cash Working Group for the provision of direct cash transfers and multipurpose vouchers (CVA) for rental costs. This will facilitate families' autonomous access to essential household items and will also help compensate for other expenses they incur. These activities will target families with specific protection needs, especially those who have recently arrived. The Sector will also provide technical advice to and coordinate closely with local, regional and national authorities and with other key actors, such as non-governmental organizations, to strengthen the institutional response for shelter issues.

[320] Aline Bravo y Carolina Stefoni, More asylum, less oppression. CIPER, 4 October 2021: https://www.ciperchile.cl/2021/10/04/mas-asilo-menos-opresion/

[321] Eviction of migrants from Plaza Brazil in Iquique: Children's Ombudsman and SJM Reject "violence as a response to a humanitarian problem," El Mostrador, September 2021: https://www.elmostrador.cl/destacado/2021/09/24/desalojo-de-migrantes-en-plaza-brasil-de-iquique-defensoria-de-la-ninez-y-sjm-rechazan-violencia-como-respuesta-a-un-problema-humanitario-y-gobierno-se-defiende/

[322] Up to 969 camps in Chile and TECHO calls for a radical turnaround, Migración en Chile, 25 March 2021: https://www.migracionenchile.cl/campamentos-suben-a-969-en-chile-y-techo-pide-un-giro-radical/

[323] The average rent for an 80 square meter home would have a monthly value of 498,477 Chilean Pesos (or USD 612) in Huechuraba, which has the lowest rental value per square meter in the Santiago Metropolitan Region. More than half of lower-income households in Chile spend over 40 per cent of their income on rent. OCDE, 17 June 2021: https://infoinvi.uchilefau.cl/ocde-mas-de-la-mitad-de-hogares-de-menores-ingresos-de-chile-gastan-sobre-40-de-sus-ingresos-en-arriendo/

[324] National Camps Register 2020 – 2021: https://ceschile.org/wp-content/uploads/2020/11/Informe%20Ejecutivo_Catastro%20campamentos%202020-2021.pdf

Venezuela AR_000925

 **WASH**

 **PEOPLE IN NEED** | 36.8% | 41.9% |
**157 K** | 10.5% | 10.8% |

**PEOPLE TARGETED** | 34.7% | 35.4% |
**42.8 K** | 14.9% | 15.0% |

 **TOTAL REQUIREMENTS** | **RMRP PARTNERS** | **SECTOR LEADS** |
**7.5 M** | **3** | **IOM-UNHCR** |

## PRIORITY NEEDS

Refugees and migrants from Venezuela have unmet WASH needs in Chile, including while transiting to their final destinations. R4V partners have observed that border facilities have limited infrastructure, with few transitory shelters available along travel routes, and many settling in substandard shelter conditions. Local authorities face difficulties in allocating resources to such services, including distributing hygiene products to refugees and migrants from Venezuela.

Access to water is closely connected to living conditions. Many have little choice but to settle in informal settlements[325] of which only 6.7 per cent are connected to treated water systems[326] and 31.3 per cent are supplied by cistern trucks. Of those in transit, 35 per cent report not having access to water.[327] This situation is particularly concerning for women who have more demanding hygiene needs, such as menstrual hygiene.[328]

Sanitary conditions can be equally challenging. Refugees and migrants from Venezuela who enter through unofficial border points usually arrive in the country after traveling great distances, for days without access to toilets or showers.[329] Those who end up living in informal settlements find that only 7 per cent of houses are connected to the sewage system and 43.7 per cent use cesspools, ditches, or canals.[330] These conditions have various immediate and long-term implications for refugees and migrants, especially regarding their health and well-being, which include the risk of contracting transmittable diseases (e.g. cholera, diarrhea, dysentery, hepatitis A, typhoid and poliomyelitis[331]).

## RESPONSE STRATEGY

Sector partners will prioritize interventions to improve WASH services and facilities for refugees and migrants from Venezuela in the northern part of the country (e.g. Arica, Antofagasta and Iquique) where refugees and migrants in-transit require access to quality and safe water, sanitation and hygiene services. Assistance to host communities will also be provided by R4V partners in Chile, with a special focus on schools and healthcare centres, in order in order to improve WASH services, which will be coordinated with the Education Sector.

Partners will seek to improve these services through the delivery of hygiene kits, including feminine hygiene products; provision of cash transfers (CVA); workshops on good hygiene practices; and coordination with local public institutions for the implementation of projects related to personal and menstrual hygiene, in close coordination with the Protection Sector.

At transit points, mainly in the northern region, partners will provide bottled water and hygiene items to refugees and migrants and will install equipment such as chemical toilets, showers and water tanks, which will be coordinated with the Shelter Sector. Partners will also provide water and sanitation services to refugee and migrant households in temporary shelters and informal settlements, especially those living in substandard conditions. Other coordinated activities also include distribution of kits specially designed for women and girls, coordinated with the GBV Sub-sector.

[325] Referred to as *tomas* in Chile. For more information, see, e.g. Andrea Pino Vásquez & Lautaro Ojeda Ledesma, Ciudad y hábitat informal: Las tomas de terreno y la autoconstrucción en las quebradas de Valparaíso, 2013. Revista INVI, 28(78), 109-140. Available at: https://www.scielo.cl/scielo.php?script=sci_arttext&pid=S0718-83582013000200004

[326] TECHO-Chile, Camps National Registry 2020-2021, Historical rise of families living in camps, 25 March 2021: https://www.techo.org/chile/techo-al-dia/catastro-nacional-de-campamentos-2020-2021-de-techo-chile-historica-alza-de-familias-viviendo-en-campamentos/

[327] IOM Chile, Displacement Matrix (DTM), March 2021: https://dtm.iom.int/chile

[328] UNHCR/IOM/UN Women, Refugee and Migrant Women in the COVID-19 context, 2020: https://www.acnur.org/es-mx/5eb5ac714.pdf

[329] For example, an R4V partner interviewed a Venezuelan family in the city of Colchane, and the family noted last having used a bathroom with all fixtures when they left their dwelling in Lima two weeks prior to their arrival on 19 October 2021.

[330] TECHO-Chile, Camps National Registry 2020-2021, Historical rise of families living in camps, 25 March 2021: https://www.techo.org/chile/techo-al-dia/catastro-nacional-de-campamentos-2020-2021-de-techo-chile-historica-alza-de-familias-viviendo-en-campamentos/

[331] World Health Organization, 18 June 2019: https://www.who.int/es/news-room/fact-sheets/detail/drinking-water0



COLOMBIA

Venezuela AR_000927



© PAHO / Karen González

# COLOMBIA
## AT A GLANCE





**POPULATION PROJECTION**

## 5.51 M



**PEOPLE IN NEED**

## 4.83 M



**PEOPLE TARGETED**

## 2.14 M

| | | | |
|---|---|---|---|
| **VENEZUELANS IN DESTINATION** | 2.45 M | 2.01 M | 1.16 M |
| **VENZUELANS PENDULAR** | 1.87 M | 1.12 M | 2.02 K |
| **COLOMBIAN RETURNEES** | 980 K | 645 K | 241 K |
| **HOST COMMUNITY** | – | 876 K | 364 K |
| **IN TRANSIT\*** | 211 K | 179 K | 172 K |

**GENDER DISAGGREGATION**



29.3% 👨  32.9% 👩
18.3% 👦  19.5% 👧



29.4% 👨  32.1% 👩
19.1% 👦  19.3% 👧



30.0% 👨  31.0% 👩
19.9% 👦  19.1% 👧



**TOTAL REQUIREMENTS**
## $803 M



**RMRP PARTNERS**
## 78

\* Refugees and migrants in-transit are included in the national totals.

## FUNDING REQUEST AND BENEFICIARIES TARGETED



PEOPLE TARGETED
2022

- 75 - 8.871
- 8.872 - 29.532
- 29.533 - 76.237
- 76.238 - 130.261
- 130.262 - 246.649

| PROVINCE | Population Projection | People in Need | People Targeted | Budget |
|---|---|---|---|---|
| Bogotá. D.C. | 149 K | 689 K | 344 K | $128 M |
| Norte de Santander | 38.7 K | 810 K | 247 K | $139 M |
| Antioquia | 478 K | 419 K | 209 K | $37.9 M |
| La Guajira | 30.1 K | 550 K | 168 K | $119 M |
| Valle del Cauca | 8.96 K | 261 K | 130 K | $37.8 M |
| Atlántico | 218 K | 216 K | 108 K | $60.9 M |
| Cundinamarca | 79.1 K | 209 K | 105 K | $26.7 M |
| Arauca | 12.3 K | 383 K | 98.4 K | $60.4 M |
| Santander | 22.0 K | 153 K | 76.2 K | $36.1 M |
| Bolívar | 289 K | 149 K | 74.1 K | $16.6 M |
| Magdalena | 37.9 K | 124 K | 62.1 K | $26.9 M |
| Cesar | 86.2 K | 114.3 K | 57.0 K | $17.4 M |
| Meta | 32.8 K | 59.2 K | 29.5 K | $2.92 M |
| Córdoba | 103 K | 55.9 K | 27.9 K | $220 K |
| Risaralda | 34.1 K | 54.8 K | 27.3 K | $1.84 M |
| Quindio | 24.9 K | 49.2 K | 24.5 K | $864 K |
| Sucre | 41.0 K | 47.5 K | 23.7 K | $50.0 K |

| PROVINCE | Population Projection | People in Need | People Targeted | Budget |
|---|---|---|---|---|
| Boyacá | 149 K | 47.4 K | 23.617 | $5.25 M |
| Casanare | 4.93 K | 43.5 K | 21.673 | $8.06 M |
| Nariño | 28.8 K | 41.6 K | 20.746 | $41.7 M |
| Caldas | 106 K | 39.0 K | 19.464 | $849 M |
| Tolima | 27.0 K | 36.0 K | 17.952 | $1.85 M |
| Cauca | 181 K | 31.8 K | 15.874 | $4.35 M |
| Huila | 32.9 K | 17.8 K | 8.871 | - |
| Guainía | 7.23 K | 12.9 K | 6.452 | $3.28 M |
| Caquetá | 145 K | 10.4 K | 5.208 | $1.16 M |
| Chocó | 63.6 K | 9.19 K | 4.580 | $3.13 M |
| Vichada | 104 | 7.13 K | 3.556 | $5.96 M |
| Putumayo | 4.80 K | 6.94 K | 3.458 | $10.7 M |
| Amazonas | 6.36 K | 1.95 K | 971 | $209 K |
| Guaviare | 514 | 741 | 372 | $405 K |
| San Andrés y Providencia | 1.35 K | 734 | 369 | - |
| Vaupés | 509 | 148 | 75 | - |

Population Projection   People in Need   People Targeted   Budget   Venezuela AR_000929

## NUMBER OF ORGANIZATIONS AND FINANCIAL REQUIREMENTS BY ORGANIZATION TYPE

| | International NGOs | National NGOs / CSOs‡ | Others‡‡ | UN Agencies |
|---|---|---|---|---|
| **Financial requirements** | 24.2% | 1.31% | 5.80% | 68.6% |
| **Organizations** | 41 | 17 | 7 | 13 |

‡ Civil Society Organizations.
‡‡ Others include the Red Cross Movement, academia and faith based organizations.

The list of organizations only includes appealing organizations under the RMRP, many of which collaborate with implementing partners to carry out RMRP activities.

## POPULATION IN NEED AND TARGET, FINANCIAL REQUIREMENTS AND NUMBER OF PARTNERS BY SECTOR

| Sector | People in need (PiN)* | Targeted / In need | People targeted* | Financial requirements (USD) | Partners |
|---|---|---|---|---|---|
| Education | 3.11 M | | 449 K | 50.2 M | 25 |
| Food Security | 4.41 M | | 1.58 M | 173 M | 13 |
| Health | 4.56 M | | 2.02 M | 154 M | 40 |
| Humanitarian Transportation | 445 K | | 89.9 K | 3.26 M | 11 |
| Integration | 4.59 M | | 152 K | 134 M | 37 |
| Nutrition | 1.93 M | | 125 K | 4.32 M | 8 |
| Protection** | 4.42 M | | 503 K | 78.6 M | 43 |
| Child Protection | 1.69 M | | 148 K | 24.4 M | 21 |
| Gender-Based Violence (GBV) | 909 K | | 304 K | 15.7 M | 26 |
| Human Trafficking & Smuggling | 677 K | | 34.3 K | 4.38 M | 8 |
| Shelter | 3.93 M | | 303 K | 33.7 M | 16 |
| WASH | 3.61 M | | 545 K | 29.1 M | 32 |
| Multipurpose Cash Assistance | - | - | 605 K | 84.1 M | 26 |
| Common Services*** | - | - | - | 14.4 M | 14 |

\*   Refugees and migrants in-transit are included in the national totals.

\*\*   This includes Support Spaces

\*\*\*   This includes AAP, Communication, Coordination, CwC/ C4D, Fundraising, Information Managent, PSEA and Reporting.

Venezuela AR_000930

# COUNTRY OVERVIEW



© UNHCR / Santiago Escobar

As of August 2021, Colombia hosted 1.84 million refugees and migrants from Venezuela, more than any other country in the region.[332] Still impacted from an economic downturn caused by the consequences of the COVID-19 pandemic, and even though measures to curb the spread of the virus were progressively lifted throughout 2021, refugees and migrants from Venezuela – which includes Colombian returnees – face obstacles to access public services, earn livelihoods and meet their basic needs, all of which are aggravated by a lack of documentation and widespread irregularity. According to the National R4V Platform in Colombia (GIFMM[333])'s *Joint Needs Assessment (JNA)* conducted in June 2021, 77 per cent of Venezuelan refugee and migrant households surveyed lacked access to healthcare; 26 per cent of children in surveyed of households were not attending school; 24 per cent of households faced food insecurity; 25 per cent consumed poor quality water; 36

per cent lived in overcrowded conditions; and 31 per cent were at risk of eviction due to their inability to pay rent and utilities.[334] Inclusion of Venezuelans in the national COVID-19 response also remains a challenge: although Colombian authorities have offered refugees and migrants from Venezuela access to COVID-19 vaccinations regardless of their legal situation in the country, vaccination coverage for Venezuelans in Colombia remains modest, with only an estimated 5.3 per cent of the population having received at least one dose.[335]

In addition to socio-economic conditions and lack of documentation, refugees and migrants from Venezuela in Colombia are exposed to protection risks as a result of natural disasters and armed violence, as well as increasing reports of incidents of discrimination[336] and xenophobia.[337] Protection needs and risks arising from irregular border crossings and

[332] According to Migration Colombia, the official figure of Venezuelans in Colombia as of 31 August 2021 was 1,842,390. See https://bit.ly/3vLqERQ and see *r4v.info* for regularly updated figures for all 17 RMRP countries. In Colombia there are additional official sources that speak to the number of Venezuelans in Colombia; for example, see the Integrated Household Survey - GEIH by the National Administrative Department of Statistics (DANE) for August 2021, available at *https://bit.ly/3jZ2Q8c*. Both sources apply different collection and calculation methodologies.

[333] GIFMM stands for 'Grupo Interagencial sobre Flujos Migratorios Mixtos'.

[334] GIFMM Joint Needs Assessment for population in destination (hereinafter JNA), Round 5, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021. The sample of 2,161 households surveyed via telephone was drawn from the databases of 20 participating GIFMM organizations. Since the households surveyed have access to humanitarian assistance, these results are not necessarily representative of all Venezuelan refugees and migrants in Colombia.

[335] Resolution 1255 of the Ministry of Health: https://www.minsalud.gov.co/Normatividad_Nuevo/Resoluci%C3%B3n%20No.%201255%20de%202021.pdf; see also Ministry of Health and Social Protection. Vaccine data shared by the Ministry of Health with GIFMM, as of 28 October 2021.

[336] According to the JNA, 26 per cent of refugees and migrants from Venezuela interviewed had experienced discrimination on the basis of their nationality during the year.

[337] In the Evaluation of UNHCR Colombia's *Somos Panas* campaign (see report at *https://www.r4v.info/es/document/colombia-informe-sobre-la-campana-somos-panas-de-acnur-colombia-diciembre-2017-diciembre*), the Colombian host community had a xenophobia indicator of 0.46 (on a scale of 0 to 1) and, while 66 per cent agreed on equal rights for refugees and migrants, 52 per cent held stereotypes such as Venezuelans being 'lazy'.

transit through the country have also increased: results of the GIFMM's *Joint Characterization of Mixed Movements*[338] in 2021 indicate that one-third of those in-transit (including the so-called '*caminantes*'[339]) faced protection risks during their journeys, mainly robberies, physical violence, and threats, which was nearly double compared to 2020.[340] Women, unaccompanied and separated children (UASC) and people with disabilities have been particularly impacted. Those engaging in pendular movements, who maintain back-and-forth movements across borders in search of access to goods, rights, and services, have also been exposed to these risks.[341]

In this challenging context, and responsive to the large-scale irregularity of refugees and migrants from Venezuela, the Government announced and began registration for the Temporary Protection Status for Venezuelans (TPS, or ETPV, per its Spanish acronym), which will provide eligible Venezuelans with a 10-year residence permit.[342] By expanding access to documentation and regular status, the TPS will enhance Venezuelans' protection and ability to exercise fundamental rights, as well as their access to public services and essential goods, thereby promoting their socio-economic integration in Colombia. The regularization of Venezuelans through the TPS offers an opportunity to improve effective access and protection of their rights and socio-economic integration. Integration and inclusion are thus cross-cutting priorities in this RMRP. Given the TPS' long-term socio-economic development implications, Colombian institutions will face increasing demand for services and guarantees of the rights of refugees and migrants from Venezuela at national and local levels. The magnitude of these demands also highlights the need for close collaboration with the private sector, as an engine of economic growth for the integration and socio-economic inclusion of refugees and migrants from Venezuela.

## RESPONSE STRATEGY

### Country Planning Scenario

By the end of 2022, an estimated 2.45 million refugees and migrants from Venezuela will be residing in Colombia, of whom 2.01 million will be in need of assistance. An estimated 645,000 out of 980,000 Colombian and binational returnees will need support. An estimated 211,000 people will be in transit to third countries through Colombia, including movements of Venezuelans entering from Ecuador with the intention of returning to Venezuela; 179,000 of them are expected to be

in need. Another 1.87 million Venezuelans are expected to continue crossing the border in pendular movements between Venezuela and Colombia, 1.12 million of them in need. 876,000 members of affected host communities have also been included in the population in need of assistance.

Through consultations with R4V partners and sectors in Colombia, new cross-border dynamics have been identified which are anticipated to continue in 2022, including increased arrivals from Peru and Ecuador and new northward-oriented travel routes (through Panama) amidst transcontinental mixed movements.

GIFMM partners' response in Colombia will take place in a challenging and evolving context in 2022. While R4V partners will support the Government in the implementation of the TPS to expand access to documentation, health, education, integration and social protection for refugees and migrants from Venezuela, humanitarian assistance will continue to be needed, including for those who are not eligible for the TPS and cannot access other regularization paths (e.g. because they arrived irregularly through an unofficial border point after 31 January 2021, or for those whose cases are pending). Presidential elections and related political campaigning in 2022 raise the need to reinforce initiatives and narratives to prevent xenophobia.

New transit routes as well as situations related to armed violence in some areas could increase protection risks. As for the routes used by those in-transit, a key operational challenge is providing humanitarian transportation, including the fact that a potential increase in movements could overwhelm the capacity of temporary collective shelters. Finally, the occurrence of severe weather events and natural disasters can expose refugees and migrants from Venezuela, located in at-risk areas, to increased humanitarian needs and secondary and/or onward movements.

---

[338] GIFMM Joint Characterization of Mixed Movements (hereinafter JCMM) for January - August 2021: https://www.r4v.info/es/document/gifmm-colombia-caracterizacion-conjunta-sobre-movimientos-mixtos-enero-agosto-2021. 16 GIFMM organizations and four local authorities interviewed 641 travel groups (representing 2,268 refugees and migrants in transit) at >45 key points in 12 departments. This information is only relevant for the period of data collection and for the movements present in the points where the interviews were conducted; therefore, it cannot be extrapolated to all people in transit in Colombia.

[339] "*Caminantes*" are refugees and migrants from Venezuela in-transit who make their journey by walking partially or completely to their final destination.

[340] According to the JCMM, 29 per cent of travel groups entering Colombia and 31 per cent of those returning to Venezuela faced risks during their journeys in 2021, mainly robbery, physical violence and threats; in 2020 this proportion ranged between 9 per cent and 13 per cent.

[341] GIFMM Joint Needs Assessment for pendular populations (hereinafter JNA-P), June-July 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-para-poblacion-pendular-junio-julio-2021. 22 GIFMM organizations conducted 488 face-to-face surveys with refugees and migrants engaging in pendular movements across borders in the departments of Arauca, La Guajira and Norte de Santander. In the absence of a sampling frame, a mixed methods sampling was used, which implies that the results are not necessarily representative of all persons coming from Venezuela in pendular movements in Colombia. 15 per cent of those interviewed reported facing insecurity during their transit, particularly those traveling with children.

[342] The TPS is a regularization mechanism which is complementary to the international refugee protection regime. Refugees and migrants from Venezuela who entered Colombia through an official border point before 31 January 2021 or in the next two years, as well as Venezuelans who entered irregularly but can demonstrate being in Colombia before 31 January 2021, will be eligible for the TPS, which is officialised through the issuance of a Temporary Protection Permit (PPT per its Spanish acronym). Consequently, those who entered Colombia through irregular border crossings and are unable to demonstrate being in Colombia before 31 January 2021 cannot access the TPS. See https://bit.ly/3wcso6B. By 8 November 2021, according to Migration Colombia, 1.45 million individuals had completed their virtual pre-registration, and the first permit was issued on 13 October 2021.

### Scope of the Response and Priorities

This Plan foresees a comprehensive and coordinated response in 29 of Colombia's 32 departments and the Capital District, implemented through 79 partners.[343] Priority is given to border areas with high concentrations of refugees and migrants from Venezuela, and to regions with access constraints and limited institutional response capacities. Considering the importance of promoting refugees' and migrants' access to regularization and documentation processes, including to international protection, R4V partners will amplify information-sharing and technical guidance on access to the asylum system, the TPS and the Temporary Protection Permit (PPT).

The RMRP will enhance **socio-economic and cultural integration** by promoting peaceful coexistence between refugees and migrants and their host communities, highlighting the contributions of the Venezuelan population in Colombia, while providing opportunities for formal employment and entrepreneurship, support services for insertion in the labour market and effective access to the social protection system.

While integration is a long-term perspective, in the shorter term, **humanitarian assistance** to Venezuelans will remain a key component of the RMRP in Colombia. Partners will promote refugees' and migrants' fundamental rights and dignified and effective access to essential goods and services through food and nutrition assistance, installation and delivery of WASH services and items, physical and mental health services (with a special focus on effective access to COVID-19 vaccination), temporary shelter solutions, and education. Similarly, partners aim to prevent and respond to protection risks and incidents during transit and stay in Colombia, particularly for persons with specific needs,[344] using comprehensive and integrated strategies (e.g. humanitarian transportation and the network of Support Spaces and attention points).

### Response Principles

The RMRP incorporates cross-cutting principles of gender, environment, centrality of protection (COP), protection from sexual exploitation and abuse (PSEA), and accountability to affected populations (AAP); as well as disaggregated data in all PiN and target calculations according to considerations such as population profile, age and gender, to facilitate specific monitoring and analysis. The Gender with Age Marker (GAM) and environmental marker have enabled R4V partners to identify and anticipate these considerations during response planning and implementation.[345] The principle of centrality of protection will be mainstreamed across Sectors through intersectoral training for partners, to ensure the safety and dignity of all people reached, to promote their exercise of fundamental rights and safe access to services without discrimination (in particular for persons with specific needs) and their participation in decision-making, and to follow the principle of "do no harm."

Finally, the RMRP 2022 in Colombia ensures accountability to affected populations through: i) the integration of perspectives of people assisted through feedback in joint needs assessments, in which interviewees prioritize their needs and share their opinions on the response; and ii) the active participation of civil society organizations in needs analysis during the planning phase of the RMRP.[346] Furthermore, for the first time in Colombia, 14 Venezuelan refugee- and migrant-led diaspora organizations are also partners in the RMRP. The RMRP 2022 also integrates actions to prevent sexual exploitation and abuse (SEA) in line with IASC minimum operating standards; raises awareness on SEA with GIFMM partners and host communities; identifies and mitigates SEA risks; and establishes safe, confidential and accessible complaint mechanisms for reporting (suspected) cases of SEA and timely case management and response to survivors. Finally, intersectoral matters throughout the response are jointly developed and followed-up in the Inter-Sector Coordination Group, with the participation of leaders of all Sectors, Sub-sectors, Task Forces and Working Groups.

---

[343] Vaupés, San Andrés, and Huila are the only departments with no RMRP coverage, mainly because of a very low presence of refugees and migrants from Venezuela and, therefore, of humanitarian actors.

[344] Including indigenous and Afro-descendant peoples; pregnant/nursing women and female heads of households; children; people at risk of statelessness; GBV/SEA survivors; people affected by human trafficking and smuggling; refugees, migrants and returnees affected by armed violence; the elderly; people with disabilities, reduced mobility and/or chronic diseases; and LGBTQI+ people.

[345] According to the Gender with Age (GAM) marker self-assessments, 68 per cent of R4V 2022 partners in Colombia incorporated considerations of gender equity according to age and/or disability in their activities, while 8 per cent expect to contribute to gender equity without incorporating age and/or disability.

[346] As part of the RMRP 2022 planning process, a specific workshop for Venezuelan civil society organizations (CSOs) in Colombia was carried out, with the participation of 37 CSOs working in 21 departments.

# CASH AND VOUCHER ASSISTANCE (CVA)

## PRIORITY NEEDS

According to the JNA, refugees' and migrants' top three priority needs in Colombia are food (85 per cent), shelter (64 per cent) and employment/livelihoods (46 per cent). CVA is the preferred assistance modality for Venezuelans for both shelter (79 per cent) and food (46 per cent).[347]

According to the Quantification of People in a Situation of Socioeconomic Vulnerability,[348] 68 per cent of Venezuelans intending to stay in Colombia face income constraints and financial barriers to access basic goods, services, and rights. Sixty per cent of those in this situation additionally report preferring cash or vouchers as a modality of assistance, reflecting the importance of Multipurpose Cash Transfers (MPC).

Limited access to employment results in insufficient economic resources to meet basic needs and leads households to resort to negative coping mechanisms; CVA, as a tool oriented to accomplish multiple sectoral objectives, is intended to help households meet those needs.

## RESPONSE STRATEGY

The main priorities of MPC interventions are:

1. Assist refugee and migrant households meet their basic needs.

2. Avoid negative coping mechanisms.

3. Contribute to the achievement of sectoral objectives.

4. Promote access to sustainable livelihoods and solutions.

The use of CVA, including sectoral and MPC programmes, will be promoted countrywide. The target population will be identified through vulnerability surveys, a sectoral referral system, and the TPS' socio-economic characterization process. MPC and sectoral cash assistance will respond to socio-economic vulnerabilities, facilitate integration and prioritize linkages to national social protection systems. Partners distributing CVA will endeavour to complement actions of government institutions, including the Department for Social Prosperity, the Ministries of Labour and Housing, and Border Management and Migration Colombia, who are responsible for promoting access to social services in the context of the TPS.

The Cash Working Group will coordinate the implementation of CVA, taking into consideration guidelines developed by the Colombian Government (e.g. on amounts). Actions aimed at enhancing the participation and co-responsibility of refugees and migrants will promote access to public services, raise awareness and provide training on issues such as GBV, regularization, access to asylum, nutrition, legal counselling, education, entrepreneurship, and access to the labour market.

---

[347] See GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021 and results summary infographic: https://www.r4v.info/es/document/gifmm-colombia-summary-joint-needs-assessment-round-1-2021.

[348] See GIFMM-Cash Working Group, Quantification of People in Situations of Socioeconomic Vulnerability who can be assisted through Multipurpose Cash Transfers, September 2021: https://www.r4v.info/es/document/gifmm-colombia-cuantificacion-de-personas-en-vulnerabilidad-economica-que-pueden-atenderse.



# COMMUNICATION WITH COMMUNITIES (CWC)/ ACCOUNTABILITY TO AFFECTED POPULATIONS (AAP)

## PRIORITY NEEDS

Affected people at the centre of humanitarian and development actions have the right to be informed and participate in decisions that affect them. They also have skills that can help them address the challenges they face. Considering this, the **CwC/AAP Task Force** will focus on sharing key messages with affected populations and their host communities, promoting their effective participation, and building two-way channels to provide permanent feedback on the response.

Partners have identified the need to inform the population in an accessible and concise manner on topics such as rights and services; opportunities for legal representation; regularization pathways; the refugee status determination process; protection risks along the route of those in-transit/'*caminantes*' and those that arise in the contexts of armed violence. Messages aimed at affected host communities are also necessary to reduce xenophobia.

Joint needs assessments enable refugees and migrants from Venezuela as well as affected host communities to be informed about the results and scope of their participation: according to the _JNA_, 63 per cent of households would like to use a hotline or suggestion box to share their opinions.[349] Finally, communications challenges of misinformation, fraud and xenophobia will arise, in particular in the context of the regularization mechanisms.

## RESPONSE STRATEGY

- Strengthen CwC participative information needs assessments, support and disseminate key messages, develop two-way communication strategies, and create tools to measure the impact of these actions, together with national and local authorities.

- Encourage community participation to enable communities to advocate for their rights and interests and shape the humanitarian and development response.

- Establish permanent, contextualized, and secure feedback and response mechanisms for refugees' and migrants' complaints, to pose questions and share opinions.

- Advocate for refugees and migrants from Venezuela to participate in the design of public policy that affects them, in coordination with local authorities.

Finally, intersectoral coordination will strengthen partners' knowledge on accountability, joint identification of information needs and coordination initiatives to prevent crises, support solutions, mitigate xenophobia and promote integration.

---

[349] GIFMM JNA, June 2021: _https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021_.

 # EDUCATION

| | | |
|---|---|---|
| **PEOPLE IN NEED** <br> **3.11 M** | 29.1%   31.7% <br> 19.9%   19.3% | |

| | |
|---|---|
| **PEOPLE TARGETED** <br> **449 K** | 29.2%   31.5% <br> 20.1%   19.3% |

**TOTAL REQUIREMENTS**
**50.2 M**

**RMRP PARTNERS**
**25**

**SECTOR LEADS**
NRC-SAVE THE CHILDREN-
UNICEF

## PRIORITY NEEDS

In Colombia, COVID-19 has negatively affected the education of 488,497 Venezuelan children enrolled in the education system;[350] in addition, 25 per cent of children (ages 6 – 17) of surveyed refugee and migrant households were not enrolled in schools as of June 2021.[351] According to the *JNA* and Sector surveys,[352] identified needs are: i) access to education; ii) access to the internet, mobile devices and school meals, as well as uniforms and teaching materials (these being the most frequent barriers to school access and retention); iii) access to early childhood education[353] iv) flexible educational models adapted to the needs of refugee and migrant children from Venezuela, including those in-transit, in order to deal with the age-grade gap[354] and the need for remedial education; v) monitoring to ensure attendance and retention in the education system;[355] and vi) access to tertiary, vocational and/or technical education, in coordination with the National Learning Service and other entities.

It is also necessary to improve conditions for the safe return to schools in the context of COVID-19, establishing the school as a protective environment.

## RESPONSE STRATEGY

The Education Sector's response priorities are to:

1. Promote access to and retention in education, through the provision of school meals, implementation of flexible learning pedagogies, increased educational resources and opportunities for distance and virtual learning, and strategies to recover learning loss, in coordination with the Ministry of Education.

2. Support documentation and regularization for children through technical support and coordination with the Ministry of Education, local Education Secretariats, Migration Colombia, educational institutions, and host communities.

3. Promote conditions for safe return to the classroom through capacity-building with teachers and caregivers, support to students, coordination to improve WASH infrastructure, hygiene and COVID-19 prevention practices.

The response will include technical assistance on flexible educational models and formal and informal education strategies in temporary classrooms, strategies to find and re-enroll children from Venezuela outside of the education system, and enrollment management. Other interventions include direct support to schools, by providing supplies and school meals for retention, coordination with the WASH sector to install adequate WASH infrastructure, and training teachers in xenophobia prevention. The Sector will also implement MPC strategies to promote school attendance, in accordance with the criteria of the Cash Working Group. Priority will be given to strengthening the capacities of the Ministry of Education, the Colombian Institute of Family Welfare, local Secretariats of Education, and educational institutions including the National Learning Service (SENA, for its acronym in Spanish) for vocational training.

The Sector will integrate pedagogical and cross-cutting approaches adapted to gender, ethnicity, disability, and environment considerations, and will coordinate with:

- **WASH** to implement COVID-19 prevention measures and rehabilitation of school sanitary infrastructure.

- **Health** to implement socio-emotional and mental health strengthening strategies.

[350] Ministry of Education - Integrated Enrolment System (SIMAT, per its Spanish acronym), as of 30 September 2021: https://bit.ly/2Y5Sgoe. For more information on educational impacts for refugee and migrant children, see the sectoral SitRep: https://www.r4v.info/es/document/gifmm-colombia-reporte-situacional-de-educacion-enero-marzo-2021 and the Social Pulse Survey by DANE (supported by UNICEF): https://bit.ly/3kh0Uqg.
[351] GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021
[352] GIFMM Education Sector, Perception Survey, August 2021: https://bit.ly/3FfbeZJ.
[353] According to the JNA, only 5 per cent of 1,704 children identified were attending preschool at the time of data collection in June 2021.
[354] The gap between age and grade, which occurs when a child is 2-3 years older than the average for their grade. See Ministry of National Education: https://bit.ly/3kLq82m.
[355] According to the Integrated Enrolment System of the Ministry of National Education (SIMAT), it is estimated that as of June 2021, more than 16,200 children did not remain in the educational system.

- **Integration** to promote the obtainment/recognition of academic degrees and the development of technical skills.
- Food Security and **Nutrition** through school meals for vulnerable children.

- **Protection** to promote children's access to documentation and regularization (including refugee status determination, PPT and the TPS) and to develop comprehensive educational materials to prevent violence, child recruitment and xenophobia.

 **FOOD SECURITY**

|  **PEOPLE IN NEED** 4.41 M | 👨 29% 👨 32.4% 👨 19.2% 👨 19.4% |  **PEOPLE TARGETED** 1.58 M | 👨 29.2% 👨 31.3% 👨 20.3% 👨 19.2% |

| **TOTAL REQUIREMENTS** 173 M | **RMRP PARTNERS** 13 | **SECTOR LEADS** FAO–UNICEF–WFP |

## PRIORITY NEEDS

A key issu refugees and migrants from Venezuela in Colombia is insufficient and untimely access to diverse and nutritious food: according to the JNA, 54 per cent of Venezuelan refugee and migrant households are moderately or severely food insecure, have low capacities to obtain and consume quality food, and face periods of hunger.[356] Twice as many households (59 per cent) had only two meals a day or less in 2021, compared to before the pandemic.[357] Those in-transit and households headed by a woman or a person with a disability have the greatest needs, as do pregnant women, children, and the elderly. Geographically, needs are most acute in the departments of Atlántico, Bolívar, Nariño, La Guajira, and Arauca[358].Limited productive and agricultural livelihood generation capacities, including among returnees and affected host communities, jeopardize their resilience and integration.

Furthermore, there is a need for greater information and needs assessments, particularly sectoral assessments and systems to identify gaps in rural areas, which are important to address negative coping mechanisms of families who lack food and income, and protection risks incurred to obtain food, considering that 94 per cent of households earn less than the minimum wage and 31 per cent resort to emergency strategies to obtain food.[359]

## RESPONSE STRATEGY

The Food Security Sector's response priorities are:

- **Provision of immediate food assistance for highly vulnerable persons** and their host communities, people in-transit and in border areas (including '*caminantes*') and those engaging in pendular movements.

- **Rapid recovery of productive capacities and agricultural livelihoods,** which is essential for household and host community subsistence in areas with a high concentration of refugees and migrants. Partners will apply a comprehensive and differential approach (including for AGD and ethnic diversity), based on risk management (including environmental management plans) and socio-economic integration approaches.

- **Capacity-development of refugees and migrants from Venezuela,** increasing their resilience through information on social programmes, food and nutrition education and involvement in accountability processes in the departments with the highest concentrations of Venezuelans.

The response modalities include:

- **Food assistance** through CVA (vouchers and MPC) for the population in-destination, returnees, and host families; in-kind assistance, such as monthly food rations for families in areas with limited or no access to functional markets; highly nutritious food for children, pregnant/ lactating women, and elderly persons; and food rations/ prepared meals for the in-transit population and those engaging in pendular movements.

- **Delivery of agricultural supplies and technical assistance for rapid food production** (both at family and community levels), closing critical food gaps. These will include emergency agriculture interventions and unconditional cash transfers, followed by the provision of productive assets and capacity-building.

[356] GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021.
[357] GIFMM, Joint Needs Assessment for the population in destination, Round 2, June 2020: https://www.r4v.info/es/documents/details/78013.
[358] See GIFMM's Food Security and Nutrition Analysis of Secondary Sources 2019-2021: https://colombia.immap.org/san-gifmm-analisis-de-fuentes-secundarias/.
[359] Ibid.

Intersectoral actions will be carried out with:

- **Education**, prioritizing interventions in early childhood education spaces and educational institutions.

- **Protection,** to mitigate negative coping mechanisms and risks of GBV and human trafficking, prevent and respond to SEA, and to support orientation activities on regularization initiatives (incl. refugee status determination, the PPT and the TPS).

- **Health**, supporting interventions in mental health and sexual and reproductive rights.

- **WASH,** promoting adequate hygiene and food preparation practices.

- **CVA** for joint market analysis.

- **Integration**, promoting a development approach and links to economic, social and employment programmes offered locally.

Articulation with the Intersectoral Commission for Food Security and Nutrition (CISAN)[360] and with civil society organizations will strengthen the efficiency and sustainability of interventions.



# HEALTH

 **PEOPLE IN NEED**
**4.56 M**

 29.0% ♂ 32.4%
19.2% ♂ 19.4%

**PEOPLE TARGETED**
**2.02 M**

29.2% ♂ 31.3%
20.3% ♂ 19.2%

 **TOTAL REQUIREMENTS**
**154 M**

 **RMRP PARTNERS**
**40**

**SECTOR LEADS**
**MINISTRY OF HEALTH-WHO/PAHO**

## PRIORITY NEEDS

In 2022, support for effective access to health services will be a key priority, particularly for the estimated 77 per cent of interviewed refugees and migrants from Venezuela who are not affiliated with the national health insurance system,[361] and the 26 per cent of households with at least one member diagnosed with a chronic disease.[362] Priority health needs include: i) sexual and reproductive health (SRH), including maternal and perinatal care, information on voluntary interruption of pregnancy, contraception and gynecological services, STI prevention and management and response to sexual violence; ii) chronic non-communicable diseases (NCDs), including high-cost diseases, such as HIV/AIDS or cancer; iii) mental health[363]; iv) COVID-19 response and vaccination; v) children's health; and vi) preventive health at the community level to reduce the burden on the health system caused by COVID-19. Identified needs are most acute in border areas and departments with a high concentration of refugees and migrants in destination, in transit, those engaging in pendular movements, returnees,

and affected host communities, as well as areas with low population density and health response capacities.

## RESPONSE STRATEGY

The Health Sector's response priorities are to:

1. Promote effective access and healthcare through interventions in prioritized areas, prioritizing vulnerable populations,[364] care packages[365] and intersectoral coordination in low-populated areas and territories with limited access to services[366] and in border areas and departments with a high concentration of refugees and migrants from Venezuela.

2. Increase affiliation to the national healthcare system[367] through institutional strengthening, enhancing communication on access to insurance, identification of non-affiliated persons, and campaigns against discrimination in the process of affiliation.

---

[360] The CISAN is composed of Colombian government institutions involved in food security and nutrition affairs.

[361] According to data from the JNA in June 2021, more than 75 per cent of members of surveyed households were not currently affiliated to any of the health regimes; additionally, the lack of health affiliation (65 per cent) was the main limitation for accessing treatment.

[362] GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021. The cost of treatment (43 per cent) and lack of documentation (26 per cent) were other limitations to accessing health services.

[363] 38 per cent of interviewees reported anxiety, depression, crying episodes or reduced sleep hours. GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021

[364] Pregnant and lactating women, and children, among other profiles.

[365] Care packages comprise a minimum of access to services: from diagnosis or control, to care, basic and specialized diagnostic tests, follow-up, and access to medicines.

[366] Such as Arauca, Cauca, Caquetá, Chocó, Guainía, Guaviare, Meta, Nariño, and Vichada departments.

[367] In line with the Ten-Year Public Health Plan 2022 – 2031 (currently being formulated) and with national regularization efforts for Venezuelan refugees and migrants through the TPS. See more at: https://bit.ly/3oc4S81.

Venezuela AR_000938

**3.** Promote emergency and preventative healthcare for those in-transit and engaging in pendular movements, as well as capacity development at the local and community level.[368]

Partners will coordinate with health authorities to provide a complementary and sustainable response, expanding access to health services through direct care and activities reaching communities,[369] and monitoring the health situation and needs of refugees and migrants. Also, partners will improve access to services for refugees and migrants, and support institutions and communities[370] through equipment donations to public hospitals, provision of healthcare personnel and technical support to identify gaps and barriers, to expand access to the national health insurance system,[371] and to provide health benefit plan services for non-affiliated refugees and migrants from Venezuela, involving key institutions (e.g. National Civil Registry Office, Migration Colombia and DNP/SISBEN[372]). The Sector will strengthen local capacities for a comprehensive health response, considering AGD, disability, ethnicity, and protection approaches.

The response will include joint interventions with:

• **Protection and GBV,** to ensure effective exercise of the right to health, dissemination of information on affiliation mechanisms, legal support and case management for GBV survivors.

• **Shelter** and **Humanitarian Transportation,** to accompany emergency responses through support in these areas.

• **Cash Working Group,** to identify vulnerable profiles to then provide with assistance for access to healthcare and sanitation services.

• **Food Security and Nutrition,** to offer support to children, pregnant women, and people with medical conditions and acute nutritional risks, and distribute guidelines on nutritional health, breastfeeding and prevention of malnutrition.

• **WASH,** to coordinate strategies on sanitation and hygiene (to prevent waterborne diseases) in health facilities, and an integrated emergency response.

# 🚌 HUMANITARIAN TRANSPORTATION

 **PEOPLE IN NEED**
**445 K**
29.3%   30.6%
21.1%   19.0%

 **PEOPLE TARGETED**
**89.9 K**
29.3%   30.6%
21.1%   19.0%

**TOTAL REQUIREMENTS**
**3.26 M**

**RMRP PARTNERS**
**11**

**SECTOR LEADS**
IOM–NAT. RED CROSS SOCIETY–UNHCR

## PRIORITY NEEDS

Humanitarian transportation seeks to ensure that refugees and migrants from Venezuela can relocate in an orderly, dignified and safe manner to a destination within the country. This includes transportation to locations other than the current destination location, including for integration and family reunification; daily local transportation to access services and employment; and border-to-border transportation for the in-transit population. All these are subject to agreement with the Government of Colombia, and ongoing advocacy efforts are taking place. The main barriers refugees and migrants

from Venezuela face in accessing safe means of transport are a lack of financial resources and their irregular situation, as transporters are not allowed to provide services to those in irregular situations. According to the *JCMM*, 96 per cent of those in transit in Colombia as of August 2021 were in an irregular situation.[373,374]

As a result, refugees and migrants from Venezuela have resorted to walking or taking unofficial means of transportation in difficult geographic and climatic conditions. According to the JCMM, 62 per cent of those entering or re-entering Colombia mainly transit on foot. One third of those entering from or

---

[368] Which should include technical support, medical equipment supplies, and health staff reinforcement, particularly in areas with less institutional development, such as border areas and low-budget municipalities.

[369] Especially for preventative and problem-solving care, including cases in which direct care in health institutions is required.

[370] Support from partners focuses on strengthening community health and community-based surveillance to improve the monitoring of public health events and effective access to health services.

[371] Known as the General System of Social Security in Health (SGSSS), of the Ministry of Health and Social Protection. See Affiliation to the General Health System: *https://bit.ly/2XUNsIl*.

[372] The System for the Identification of Potential Beneficiaries of Social Programs (SISBEN) is administered by the National Planning Department (DNP). See more at: *https://bit.ly/3uyDiCV*.

[373] JCMM, January - August 2021: *https://www.r4v.info/es/document/gifmm-colombia-caracterizacion-conjunta-sobre-movimientos-mixtos-enero-agosto-2021*

[374] According to the REACH Rapid Needs Assessment - People in Transit, during 2021, only 4 per cent of key informants reported that they or their travel group had entered Colombia through an official border crossing. See *https://bit.ly/2WnopGY*. Colombia complete repository at: *https://bit.ly/3IXX6b9*.

Venezuela AR_000939

returning to Venezuela reported having experienced security risks during their transit in Colombia, mainly robbery, physical violence, and threats.[375] They are also exposed to risks of GBV, forced recruitment by armed actors, child abuse, human trafficking, smuggling and health incidents. In addition to these risks for the population in transit, for refugees and migrants in destination, their vulnerability increases due to difficulties in accessing safe day-to-day transportation to obtain goods and services within cities or municipalities.

## RESPONSE STRATEGY

The Sector's response will be closely coordinated with national and local authorities for all types of humanitarian transportation assistance provided, whether internal or local. Priorities will be to:

1. **Expand the provision of humanitarian transportation services** for the population in transit, prioritizing the most at-risk profiles, such as pregnant and lactating women, families with children and UASC, people with disabilities, people with critical health problems and the elderly, while avoiding family separation.

2. **Increase local transportation assistance (within municipalities)**, facilitating access to goods and services, especially for people with specific health and protection

needs, and enabling transportation of refugees and migrants to access documentation and regularization procedures.

In close coordination and agreement with national and local authorities, transportation assistance will be provided through direct services and CVA (vouchers and tickets, as well as multipurpose and restricted cash transfers) accompanied by in-kind complementary assistance. The Sector will also work to support partners' and local institutions' operational and technical capacities to strengthen planning, preparation, departure, transit, and arrival processes.

The Humanitarian Transportation response will be coordinated with the following sectors and working groups:

- **Protection**, through case management and referral, as well as prioritization of vulnerable profiles.

- **Cash Working Group**, to coordinate assistance provided through the CVA modality.

- **Health**, for joint management of and solutions to health cases as required, and to strengthen COVID-19 preventative actions such as pre-departure screening.

- **Shelter**, for joint assistance to prioritized vulnerable profiles, exit strategies and relocation.



# INTEGRATION

 **PEOPLE IN NEED**
**4.59 M**   ↑ 29.0%  ↑ 32.3%
             ↑ 19.2%  ↑ 19.4%

**PEOPLE TARGETED**
**152 K**   ↑ 29.1%  ↑ 32.1%
            ↑ 19.5%  ↑ 19.4%

 **TOTAL REQUIREMENTS**
**134 M**

 **RMRP PARTNERS**
**37**

**SECTOR LEADS**
**IOM-PADF-UNDP**

## PRIORITY NEEDS

The 2021 economic reactivation has not benefited all people equally. According to the Colombian National Administrative Statistics Department, the unemployment rate for Venezuelans in destination (18 per cent) and Colombian returnees (17 per cent) is higher than the national average (15.8 per cent).[376] Also, the JNA[377] shows that refugees and migrants from Venezuela largely have no access to the formal labour market, and less than 20 per cent of those employed have social security coverage.

One in three work more than 48 hours per week, and more than 50 per cent earn less than the minimum wage. In terms of social cohesion, one in four respondents felt discriminated against in their community or workplace. Likewise, challenges persist in financial inclusion: less than 15 per cent of Venezuelan households have access to formal banking.[378]

The main barriers to socio-economic integration in Colombia are: i) lack of employment opportunities in the formal sector; ii) limited knowledge among employers about the skills and

[375] JCMM, January - August 2021: https://www.r4v.info/es/document/gifmm-colombia-caracterizacion-conjunta-sobre-movimientos-mixtos-enero-agosto-2021

[376] National Administrative Statistics Department (DANE), Technical Bulletin on Labour Market - Comprehensive Household Survey, March 2021: https://bit.ly/3oG94gH.

[377] GIFMM JNA, June 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021.

[378] Ibid.

profiles of refugees and migrants; iii) difficulties in academic degree recognition; iv) limited availability of skills certification; v) lack of support for entrepreneurs; and vi) xenophobia and discrimination, aggravated by the deterioration of the country's economic conditions.

## RESPONSE STRATEGY

The Sector's response priorities are:

1. Improve access for refugees, migrants, and host communities (particularly youth, women, LGBTQI+ and indigenous peoples) to formal employment opportunities, as facilitated through a regular situation, through support services for insertion into the formal labour market and the social protection system.

2. Promote access to entrepreneurship and financial inclusion, contributing to economic reactivation, particularly in regions already identified with particular potential for the inclusion of refugees and migrants.[379]

3. Promote social cohesion, peaceful coexistence and the development of institutional capacities, as well as host and Venezuelan community capacities to facilitate socio-economic integration.

4. Support the Colombian Government's income generation strategy, which has a strong focus on the TPS, including the Integration Centres in main cities.

The sectoral response will be provided mainly **in-kind** and through capacity development with local and national authorities, as well as service provision, knowledge management and technical assistance for those in need of employment, entrepreneurship, and social cohesion. Also, **CVA** interventions through MPC (e.g. cash for work, cash for productivity, cash for results, and cash for purpose,[380] including for documentation fees and recognition of diplomas or professional credentials) will mitigate barriers to labour insertion.

The response will be coordinated with the following Sectors and Working Groups:

- **Protection,** through strategies to prevent xenophobia and discrimination, provide assistance and livelihood recovery for survivors of GBV and SEA, reduce labour exploitation, prevent child labour, and disseminate information on regularization opportunities and their benefits for integration.

- **Education,** through strategies for job training, xenophobia prevention and the promotion of social cohesion in educational centres; and validation of diplomas and issuance of professional licenses.[381]

- **Cash Working Group,** linking the humanitarian response and longer-term stabilization processes through conditional cash transfers and the promotion of financial inclusion.

- **Food Security,** promoting agricultural livelihoods, reactivation of local markets for labour inclusion and enterprise development, including green jobs.

- **Health,** by promoting access to national health systems.

- **CwC,** through the dissemination of positive integration messages and information on access to services.

---

[379] Particularly main cities such as Bogotá, Medellín, Cúcuta, Barranquilla, Cali, Bucaramanga and Cartagena, where ~50 per cent of the Venezuelan population is concentrated, according to official figures, will be targeted in this respect.

[380] See more about these modalities in the Cash Learning Partnership (CaLP) Glossary of Terms: *https://bit.ly/3CY0ei0.*

[381] In Colombia, the professional card accredits the academic training and professional suitability of an individual in a specific area of knowledge and is an indispensable requirement to practice professions that imply a social risk.



# NUTRITION

**PEOPLE IN NEED\*** ♂ 25.9% ♀ 30.3%
## 1.93 M ♂ 23.3% ♀ 20.5%

 **PEOPLE TARGETED** ♂ 26.4% ♀ 30.3%
## 125 K ♂ 23.0% ♀ 20.3%

**TOTAL REQUIREMENTS**
## 4.32 M

**RMRP PARTNERS**
## 8

**SECTOR LEADS**
**FAO–UNICEF–WFP**

*This sectoral PiN covers needs that are broader than those usually targeted by nutrition responses, and has considered variables such as extreme poverty.*

## PRIORITY NEEDS

**Malnutrition among children, adolescents, pregnant and lactating women, and the elderly is a critical concern to be addressed.** According to the JNA on the pendular population, among refugees and migrants engaged in pendular movements, 45 per cent of pregnant women were malnourished, 11 per cent of children under five were at risk of acute malnutrition, 4.5 per cent were overweight, and 23 per cent were stunted.[382] Regarding people in transit, based on nutrition partners' programmatic data, 32 per cent of children between 6 and 59 months had anemia and 20 per cent of pregnant women were underweight.[383] There was limited information on the nutritional status of elderly refugees and migrants.[384]

**There are limited institutional, community and family capacities to support breastfeeding, complementary feeding, and critical nutrition practices**, including information gaps for humanitarian workers and local institutions, communities and families. In general, breastfeeding tends to be exclusive only for infants up to two months of age, far below the international recommendation for exclusive breastfeeding in the first six months, and the use of nursing bottles to feed babies is frequent.[385]

## RESPONSE STRATEGY

The Nutrition Sector's response priorities are to:

- **Provide nutritional assistance**, including nutritional assessment, micronutrient supplementation for children and pregnant/lactating women, and preventive management of acute undernutrition, with ready-to-use supplements in departments with a high concentration and transit of refugees and migrants.

- **Support health and social protection services to identify and treat acute undernutrition** in children under five years of age, underweight pregnant women, and elderly adults (to be included in needs assessments) at nutritional risk in the departments with the highest transit and permanence of refugees and migrants.

- **Capacity-building** in breastfeeding, complementary feeding, and infant nutrition for mothers, fathers, caregivers, and health workers.

- Nutrition Sector partners will provide **service support to health institutions** for i) nutritional assessments to identify malnutrition and micronutrient deficiencies; ii) micronutrient and LNS (Lipid-based Nutrient) supplementation for undernutrition; and iii) medical and nutritional care to identify, manage, and follow-up on acute malnutrition cases in children under five and pregnant and lactating women. Sector partners will also **build capacities and raise awareness** of families, community agents and health workers in breastfeeding, complementary feeding, and essential nutrition practices.

The Sector will integrate actions with the following Sectors:

- **Education** and **Protection**, by complementing actions, particularly in early childhood spaces, reducing the risk of GBV and SEA, and supporting the orientation of refugees and migrants regarding regularization opportunities.

- **Health**, by complementing strategies for maternal and child health, mental health, and sexual and reproductive rights.

- **WASH**, by promoting handwashing and hygiene practices in relevant settings for refugees and migrants**.**

- **Food Security**, by complementing actions regarding food and nutrition education, micronutrient supplementation and infant and young child feeding practices (IYCF) counselling in food assistance delivery points.

Coordination with committees such as the CISAN and civil society organizations, supporting the efficiency and sustainability of interventions and promoting the inclusion of refugees and migrants from Venezuela in Colombia's social protection systems will also be key components of the nutrition response.

[382] GIFMM JNA-P, June-July 2021: https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-para-poblacion-pendular-junio-julio-2021.

[383] Internal data on nutritional care for children, pregnant and lactating women in Colombia reflecting the period of December 2020 - March 2021 and as provided by UNICEF Colombia. Please notice that this information is not statistically representative.

[384] GIFMM Secondary Data Review 2019-2021: https://colombia.immap.org/san-gifmm-analisis-de-fuentes-secundarias/.

[385] PAHO/WHO, Fact Sheet: Infant and Young Child Feeding, June 2021: https://bit.ly/3CWN84u.



# PROTECTION

**PEOPLE IN NEED**
## 4.42 M
29.0% ♂ 32.3% ♂
19.3% ♀ 19.4% ♀

 **PEOPLE TARGETED**
## 503 K
29.1% ♂ 32.1% ♂
19.5% ♀ 19.4% ♀

**TOTAL REQUIREMENTS**
## 78.6 M

**RMRP PARTNERS**
## 43

**SECTOR LEADS**
DRC-NRC-UNHCR

## PRIORITY NEEDS

According to the JNA, 68 per cent of refugees and migrants from Venezuela surveyed were in an irregular situation, undermining the exercise of their rights and access to basic services, including security of rental tenure.[386] Regularization is key to reducing vulnerabilities to such protection threats and risks, including for indigenous persons, Afro-descendants and UASC. Despite important efforts by the Colombian Government and R4V partners throughout 2021, barriers persist for refugees and migrants from Venezuela to regularize their situation through civil documentation, nationality procedures, and asylum and residency processes (including the TPS).[387]

Especially for those refugees and migrants from Venezuela who entered Colombia irregularly after 31 January 2021, and who are therefore not eligible for the TPS, resolution of their situations of irregularity remains of particular concern, and will be considered under existing asylum and migratory regularization procedures.

Refugees and migrants in vulnerable situations, especially those in-transit (including '*caminantes*'), those using irregular border crossings in remote locations and engaging in pendular movements, as well as women-headed households and UASC, are exposed to additional protection risks posed by irregular armed groups.[388] Overall, refugees and migrants from Venezuela in Colombia have been affected by forced displacement, forced recruitment, trafficking, abuse and exploitation. According to the JNA, 13 per cent of surveyed households had to leave their homes in Colombia in 2021 for reasons related to violence and discrimination.[389]

## RESPONSE STRATEGY

The Protection Sector's response priorities are to:

1. Ensure access to regularization, including the TPS, through assisted pre-registration and actions to promote biometric registration, while also ensuring access to the refugee status determination (RSD)/asylum procedures for those with international protection concerns; provide legal assistance to Venezuelans during regularization and asylum procedures; and promote information dissemination to prevent fraud in these processes.

2. Strengthen orientation, registration and referral services to assist refugees and migrants with specific protection needs (including indigenous people and those who are not eligible for the TPS) at the border, along the transit route and in rural areas, including through Support Spaces and temporary shelters.

3. Develop two-way communication strategies with refugees, migrants and host communities, to reduce gaps in access to rights and services, promote local integration and reduce xenophobia through peaceful coexistence projects.

The Protection Sector will provide direct technical assistance to refugees and migrants from Venezuela, in particular to assist with accessing regularization opportunities. The Sector will provide MPC and other CVA interventions to refugees and migrants with specific protection needs (see hereto also Protection Sub-sector chapters).[390] Inter-agency protection responses for access to regularization initiatives, case management and community protection mechanisms will be implemented through Support Spaces, mobile units, community-based protection networks and mechanisms. Capacity-building and technical support will be provided to

[386] 32 per cent of households surveyed in June 2021 were at risk of eviction; this situation is mainly associated with the lack of inability to pay rent (85 per cent) and/or utilities. GIFMM JNA, June 2021: *https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021*.

[387] See Danish Refugee Council (DRC), July 2021, Considerations on progress and barriers to access to Colombian Nationality for the population coming from Venezuela: *https://bit.ly/2Xumm4a*. Also see GIFMM JNA, June 2021, full report at: *https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021.* Refugees and migrants in an irregular situation have a lower probability of completing the TPS/ETPV process: 31 per cent vs. 41 per cent of the population in a regular situation.

[388] Attacks against the civilian population rose by 38 per cent in 2021, due to the increased presence of multiple armed non-state actors. Humanitarian Advisory Team, 30 August 2021, Humanitarian Impact and Trends between January and July 2021: *https://bit.ly/3AnQ0GO*.

[389] GIFMM JNA, June 2021: *https://www.r4v.info/es/document/gifmm-colombia-evaluacion-conjunta-de-necesidades-junio-2021*.

[390] According to partners' activities, CVA will be targeted to the population in destination and host communities, and mainly women at risk, children with specific needs (such as UASC), elder persons at risk, indigenous peoples, and to address legal and physical protection needs.