UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al. | ) ) ) | |
| Plaintiffs | ) | |
| v. | ) ) | No. 6:23-cv-00007 |
| DEPARTMENT OF HOMELAND SECURITY., et al. | ) ) ) ) | |
| Defendants. | ) | |

DEFENDANTS' MOTION FOR LIMITED DISCOVERY

In Administrative Procedure Act (APA) cases, the Court reviews the administrative record to determine whether an agency has complied with the APA. *See, e.g.*, *Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). "In reviewing administrative agency decisions, the function of the district court is to determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did." *Texas Comm. on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002). "Nor are courts permitted to consider evidence outside the administrative record" with respect to APA claims. *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). Notwithstanding the fact that discovery is not typically permitted into the merits of an APA case, "jurisdictional discovery may be warranted if the issue of subject matter jurisdiction turns on a disputed fact." *In re MPF Holdings US LLC*, 701 F.3d 449, 457 (5th Cir. 2012); *see also Texas v. Mayorkas*, No. 22-cv-94 (N.D. Tex.), ECF No. 72

1

(jurisdictional discovery, even before an answer or motion to dismiss is filed, is appropriate where a party intends to raise a factual attack on a party's Article III standing).

Accordingly, Defendants hereby move for an order permitting limited, expedited jurisdictional discovery into Plaintiffs' standing to bring this case, and seek such discovery prior to responding to the Amended Complaint or responding to Plaintiffs' motion for a preliminary injunction. Good cause supports this request.

## BACKGROUND

Plaintiffs, 20 States, including Texas, have sued Defendants—the Department of Homeland Security (DHS), its component agencies, and leadership—challenging four, similar processes, through which certain nationals of Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members may seek authorization to travel to the United States to seek parole, on case-by-case basis, under, under 8 U.S.C. § 1182(d)(5).[1] These four processes provide a means for noncitizens from these countries, who are vetted and have financial supporters, to fly to an airport in the United States, where they will be considered for parole on a case-by-case basis for a time-limited period. 88 Fed. Reg. at 1,246; 88 Fed. Reg. at 1,256; 88 Fed. Reg. at 1,267, 87 Fed Reg. at 63,507. In response to Defendants' implementation of these processes, the Government of Mexico agreed—for the first time—to accept returns at the Southwest Border of nationals from these four

---

[1] *See* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1,255 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1,279 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

countries who do not avail themselves of these new parole processes. *See* DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes, *available at* *https://www.dhs.gov/news/2023/01/05/dhscontinues-prepare-end-title-42-announces-new-border-enforcement-measures-and* (last accessed Jan. 25, 2023). Absent Mexico's agreement to accept returns of such individuals, the United States is often left with no means of returning nationals of these four countries, because Cuba, Nicaragua, and Venezuela generally will not accept, or generally place strict limits on, the return of their citizens from the United States, while the security situation in Haiti limits DHS's ability to return Haitians. 88 Fed. Reg. at 12,46; 88 Fed. Reg. at 1,256; 88 Fed. Reg. at 1,267.

The new parole processes that Plaintiffs challenge have led to a significant decline in the number of Cubans, Haitians, Nicaraguans and Venezuelans seeking to cross illegally into the United States. Of note, the numbers of Cubans, Haitians, Nicaraguans and Venezuelans encountered between ports of entry at the southwest border declined 97% from early December to late January, from a seven-day average of 3,367 per day on December 11, 2022 to a seven-day average of just 115 on January 24, 2023. *Unlawful Southwest Border Crossings Plummet Under New Border Enforcement* (https://www.dhs.gov/news/2023/01/25/unlawful-southwest-border-crossings-plummet-under-new-border-enforcement-measures). And by February 28, 2023, the seven-day-average fell even further to just 46 on February 28, 2023. *See* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update.

Plaintiffs claim that that these processes violate the Immigration and Nationality Act (INA), and the Administrative Procedure Act (APA), and are ultra vires. Amended Complaint, ECF No. 22, ¶¶ 133-36.

On February 14, 2023, Plaintiffs filed a motion for a preliminary injunction. ECF No. 22. While the Amended Complaint bases standing upon alleged harms suffered by all 20 States, the Motion for a Preliminary Injunction bases Article III standing solely upon harms allegedly sustained by the State of Texas. *Id*. at 10-12. And yet, despite basing standing in the preliminary injunction upon harm to a single State—Texas—Plaintiffs ask for relief not just in Texas, or even in the Plaintiff States, but nationwide. *See* ECF No. 22, at 27.

On February 21, 2023, the parties appeared before the Court for a scheduling conference and oral argument on the Government's motion to transfer. During argument, Plaintiff Texas indicated its intention to limit its arguments for Article III standing to just Texas. Tr. 12:17-22. Defendants, however, indicated their view that in order to obtain relief on behalf of any Plaintiff, that each Plaintiff was required to demonstrate injury. Tr. 12:24-14:4. Thereafter, Plaintiffs served proposed discovery demands upon Defendants, and those demands sought documents and data relevant to each Plaintiff State.

## ARGUMENT

In its February 27, 2023 scheduling order, ECF No. 71, the Court stated "[i]f the Court retains this case, the Court intends to advance to a final trial on the merits under Rule 65(a)(2)." Accordingly, one of the issues the Court will need to adjudicate is not only whether Plaintiffs adequately pleaded facts sufficient to invoke this Court's jurisdiction,

but whether Plaintiffs can prove facts sufficient for purposes of Article III standing at the trial stage. Stated differently, a federal court generally may not reach the merits of a case without first determining that it has jurisdiction over the cause and the parties. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 100-01 (1998); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431, (2007) (holding that courts "may not assume jurisdiction for the purpose of deciding the merits of the case"); *see, e.g.*, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983) (noting case "must survive both facial and factual attacks before the district court can address the merits of the claim"); *In re Roberts*, 556 B.R. 226, 273 (Bankr. S.D. Miss 2016) ("The Court of Appeals for the Fifth Circuit has held that before turning to the merits of a case, a court must first address a challenge to its subject matter jurisdiction.").

The Plaintiffs bear the burden of establishing standing and may not rely on mere allegations when the Court is resolving the case on the merits, particularly where Defendants have raised a factual attack on standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."). Additionally, under Rule 65, consolidation of a preliminary injunction with the merits is appropriate only if it permits both parties a full and fair opportunity to present their respective cases. *See* Wright & Miller, § 2950 Relationship of the Preliminary Injunction Hearing to the Trial on the Merits, 11A Fed. Prac. & Proc. Civ. § 2950 (3d ed.) (collecting cases).

Defendants should, therefore, be permitted discovery into Plaintiffs' standing and have an opportunity to address that evidence in their response brief and, if necessary, at any trial or evidentiary hearing. *Id.*; *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Dillon v. Bay City Const. Co.*, 512 F.2d 801, 804 (5th Cir. 1975) (holding that district court abused its discretion in proceeding to a trial on the merits under Rule 65 and preventing party from fully presenting its case by denying it time to conduct discovery it was entitled to under the federal rules); *Paris v. U.S. Dep't of Hous. & Urb. Dev.*, 713 F.2d 1341, 1346 (7th Cir. 1983) (finding consolidation inappropriate where it prejudiced defendant agency by preventing defendant from having sufficient time to complete discovery and assemble administrative record).

Indeed, even when courts are not proceeding to the merits under Rule 65, courts in this Circuit generally allow expedited discovery when good cause exists. *See, e.g.*, *Equistar Chemicals, LP v. Maschinenfabrik Alfing Kessler GmbH*, No. 2:13-CV-02642, 2014 WL 3735219, at *1 (W.D. La. July 28, 2014) (collecting cases). Good cause exists where the need for expedited discovery outweighs the prejudice to the responding party. *Id.*

"[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) (citing Note, The Use of Discovery to Obtain Jurisdictional Facts, 59 Va.L.Rev. 533 (1973)); *see In re MPF Holdings US LLC*, 701 F.3d 449, 457 (5th Cir. 2012) (noting, "some jurisdictional discovery may be warranted if the issue of subject matter jurisdiction turns on a disputed fact"). Accordingly, courts in this circuit have recently authorized threshold jurisdictional discovery into plaintiffs' Article III standing in other

6

State-challenges to federal immigration actions, especially in cases involving parole under 8 U.S.C. § 1182(d)(5), and have extended the deadline for a responsive pleading to permit such discovery. *See* Order, *Texas v. Mayorkas*, 2:22-cv-094 (N.D. Tex. Aug. 3, 2022) (Kacsmaryk, J.) (extending deadline to respond to the complaint and staying deadline to respond to a motion for preliminary to allow parties to complete jurisdictional discovery); *Id.*, ECF No. 60 (N.D. Tex. May 31, 2022) (ordering parties to "complete limited jurisdictional discovery into Texas's alleged injuries and standing to sue"); Order, *Texas v. Biden*, 3:22-cv-00780 (N.D. Tex. Aug. 22, 2022) (Lynn, J.) (staying deadline to allow time for jurisdictional discovery); Order, *Indiana v. Biden*, 1:22-cv-00192 (N.D. Ind. Sept. 19, 2022) (Brady, J.) (same); *Arizona et al. v. Garland et al.*, No. 6:22-cv-01130 (W.D. La. May 18, 2022) (Joseph, J.), ECF No. 24 (while preliminary injunction motion was pending, providing a period for limited discovery after which plaintiff States "must clearly show that they are 'likely' to obtain each element of Article III standing").

Here, discovery is necessary because the harms to the Plaintiff States from the four processes they challenge are not apparent from the face of the Amended Complaint. In fact, Plaintiffs' allegations as to standing are speculative, at best. First, Plaintiffs allege injury from the four processes primarily in the form of costs to each respective State from "illegal aliens." ECF No. 20 ¶ 64 ("Texas spends significant amounts of money providing services to illegal aliens because of the federal government's violations of and refusal to enforce federal law."); *accord id.* ¶¶ 74-139 (alleging similar injuries to individual plaintiff States). However, the Fifth Circuit has held that generalized information showing "illegal immigration is costing the state money" is insufficient to confer standing. *Crane v.*

7

*Johnson*, 783 F.3d 244, 252 (5th Cir. 2015). A state must put forth "concrete evidence" that demonstrate "costs had increased or will increase as a result" of the particular challenged action; otherwise traceability is "purely speculative." *Id.* Second, although Plaintiffs claim to suffer costs from the entry of "illegal" noncitizens into the country, Am. Compl. ECF No. 20, e.g. ¶¶ 64-70, noncitizens from Cuba, Haiti, Nicaragua and Venezuela who are paroled into the United States under the four processes do not enter unlawfully. *See* 8 U.S.C. §§ 1182(d)(5), 1641(b)(4). Rather, they are inspected and paroled into the United States by the federal Government, *see* 8 U.S.C. § 1225(a)(3), and so the costs associated with "illegal" noncitizens, as referenced in the Amended Complaint, have no bearing on this case—except to the extent that illegal migration from the four countries has dramatically slowed in the wake of the parole processes' implementation.

Plaintiffs' theory of harm is apparently based on the unsupported assumption that the parole processes they challenge will lead to the presence of more people in Texas who will seek driver's licenses, need education and health care, and create law enforcement, correctional, and social costs. ECF No. 22 (Motion for Preliminary Injunction) at 11-14.[2] The evidence thus far shows, however, that these processes have instead led to a significant *decline* in the number of individuals seeking to enter to the United States at the Southwest border from the four countries covered by the challenged processes. *See, e.g.*, 88 Fed. Reg. at 1,279 (explaining that "[w]ithin a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the [southwest border] fell from over

---

[2] Plaintiffs limited their theory of harm in the motion for preliminary injunction to Texas.

1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day"); *see also id.* ("The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration throughout the Western Hemisphere," reducing the "number of Venezuelans" traveling north through the Darién Gap "from 40,593 in October 2022 to just 668 in November."); *see e.g.* https://www.cbp.gov/newsroom/stats/nationwide-encounters (showing a precipitous decline in total Southwest border encounters at ports and entry and between ports of entry for Cuban, Haitian, Nicaraguan and Venezuelan noncitizens since the four challenged parole processes implemented); https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update (showing a 98% drop in the 7-day encounter rate of Cubans, Haitians, Nicaraguans and Venezuelans from January 5, 2023 to February 28, 2023). Defendants expect discovery to show that per month the total number of Cuban, Haitian, Nicaraguan and Venezuelan nationals entering the country (legally or otherwise) since the four challenged parole processes were implemented, is less than the totals seen before the implementation of the new processes. Assuming this is true, even accepting Plaintiffs' statements about the costs such noncitizens pose at face value, Plaintiffs lack Article III standing, and the case would need to be dismissed. Accordingly, this data strongly suggests that Plaintiffs lack Article III standing.

Furthermore, standing, to the extent it can be based on future migratory patterns and

alleged injury therefrom,[3] requires substantial speculation as to the independent choices of those paroled under these processes as to where to live and how to act once they enter the United States. Standing is substantially more difficult to establish "where a causal relation between injury and challenged action depends upon the decision of an independent third party[.]" *Texas v. California*, 141 S. Ct. 2104, 2117 (2021) (internal quotation omitted). Neither the Amended Complaint nor the motion for preliminary injunction alleges facts sufficient to satisfy this heightened bar.

Given these substantial factual questions and the need to "affirmatively ascertain subject-matter jurisdiction before adjudicating [this] suit," *Bank of La.*, 919 F.3d at 922, Defendants should be permitted discovery into whether Plaintiffs' have standing. *See Equistar Chemicals*, 2014 WL 3735219, at *1.

To prove standing, Plaintiffs must show "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The injury must be "certainly impending"—speculative or merely "possible" future injury is not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2014). But the Amended Complaint does not allege any increase in costs due to these four processes specifically, as opposed to immigration generally, and

---

[3] The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 830 (1989) (emphasis added).

so discovery is necessary to determine if the requisite causal connection exists. Even assuming that Plaintiffs' theory of harm could support standing—a point Defendants do not concede—establishing such a causal connection will require the States to prove: first, that noncitizens from Cuba, Haiti, Nicaragua, and Venezuela, paroled into the United States under the four challenged processes, have moved into the Plaintiff State; second, that those individuals have consumed, or are likely to consume, State resources that result in a non-reimbursable cost to the State; third, that these costs to the State are greater than any costs the State previously incurred as a result of Cubans, Haitians, Nicaraguans, and Venezuelans consuming State resources prior to the commencement of the challenged processes, when DHS had limited ability to return any individuals from these four countries; and fourth, that any costs that the State is incurring as a result of Cubans, Haitians, Nicaraguans and Venezuelans consuming State resources exceed any revenue that that the State may be earning from the presence of those individuals in the State. Further, each State must show that it has incurred injuries attributable to each of the four populations (Cubans, Haitians, Nicaraguans and Venezuelans) paroled into the country to challenge each of the four processes. In other words, if, for example, Texas can show only that it sustained injury in fact caused by the presence of paroled Cubans in its State (and redressable by a judicial order), then it cannot challenge the parole processes for Haitians, Nicaraguans, or Venezuelans. *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("[n]or does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.").

Defendants targeted discovery demands and interrogatories will address each of these four links in the causal chain, as to each population of noncitizen (Cuban, Haitian, Nicaraguan, and Venezuelan) participating in the parole processes. *See e.g.*, *Defendants' [Proposed] Requests for Production (RFP)*, *Interrogatories (ROG)*, *and Requests for Admission (RFA)*, attached as Exhibit A, at RFP ¶ 3, ROG ¶¶ 2, 4 (seeking documents and information that show that individuals paroled into the country under the four challenged processes reside in the State); RFP ¶¶ 4-8, ROGs ¶¶ 7-12 (seeking documents and information that show Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the country under the four challenged processes have caused the State to incur expenses including but not limited to medical care, educational, public safety, drivers' licensing, and law enforcement programs and expenditures); RFP ¶¶ 4-8, ROGS ¶¶ 7-12 (seeking documents and information that indicate the costs to the State from the use of resources by noncitizen nationals of Cuba, Haiti, Nicaragua, or Venezuela, present in the State under any immigration status or without immigration status, both before and after the implementation of the four challenged processes; RFP ¶ 10, ROG ¶ 15 (seeking documents and information that indicate the revenue derived to the State from the economic activity of noncitizen nationals of Cuba, Haiti, Nicaragua, or Venezuela, present in the State under any immigration status or without immigration status, both before and after the implementation of the four challenged processes). Defendants will also request admissions from Plaintiffs that, by month, fewer Cubans, Haitians, Nicaraguans, and Venezuelans have been encountered at the Southwest border since the four challenged parole processes were implemented than before they were implemented. *Id.* at RFA ¶¶ 15-18, 20.

Defendants will also request admissions that fewer Cubans, Haitians, Nicaraguans and Venezuelans have been released into the country, monthly, since the four challenged parole processes were implemented than monthly before the processes were implemented. *Id*. at FRA ¶¶ 19.

Defendants should be permitted to seek this discovery from Texas because the preliminary injunction is based solely upon alleged injuries to Texas. *See* ECF No. 22, at 10-14. In addition, Defendants should be permitted to seek this discovery from each of the Plaintiff States because Plaintiffs are seeking not just relief on behalf of Texas, but each Plaintiff State and even nationwide relief. Article III requires that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's particular injury*." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (emphasis added); *DHS v. New York*, 140 S. Ct. 599 (2020) (Gorsuch, J., concurring); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the party, even though the court's judgment may benefit others collaterally."). Further, a federal court's authority to award injunctive relief is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999); *see id.* at 318-319. Bedrock rules of equity support the same requirement that injunctions be no broader than "necessary to provide complete *relief to the plaintiff*[]." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Accordingly, the Supreme Court has narrowed injunctions that "improper[ly]" "grant[ed] a remedy beyond what was necessary to provide relief to [the injured parties]." *Lewis v. Casey*, 518 U.S. 343, 358

(1996).

Here, the Court cannot assess what complete relief looks like as to parties (or non-party States that may similarly be subject to a nationwide injunction) for whom injury and standing are never established. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("a plaintiff must demonstrate standing for each claim he seeks to press."). Stated differently, merely because Texas assembled nineteen other plaintiff States into one case does not mean the court can find injury *en masse* for remedy purposes. *In re Gee*, 941 F.3d 153, 161–62 (5th Cir. 2019) (standing may not be "dispensed in gross."). Accordingly, Defendants are entitled to discovery not just from Texas, but all Plaintiff States concerning whether they in fact have suffered injury for purposes of Article III, and whether they are entitled to any relief from this Court.

## CONCLUSION

Defendants request that the Court permit Defendants limited jurisdictional discovery, consisting of 11 requests for production, 16 interrogatories, and 23 requests to admit.

Date: March 24, 2023                    Respectfully submitted,

                                                  BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

                                                  WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Elissa Fudim*
Elissa Fudim
Erin Ryan
Joseph Darrow
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-6073
Email: elissa.p.fudim@usdoj.gov