**United States District Court**
**Southern District of Texas**
**Victoria Division**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br>    *Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>    SECURITY, *et al.*,<br>    *Defendants*,<br>and<br>VALERIE LAVEUS, *et al.*,<br>    *Intervenor-Defendants*. | Case 6:23-cv-7 |

### PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Four years ago, a former DHS Secretary who had served with then-former-Vice President Biden described 1,000 illegal crossings per day at the Southwest Border as a "relatively bad number" and 4,000 such crossings is a "crisis."[1] Under now-President Biden, that number has ballooned: Border Patrol "[a]gents have been encountering over 10,000 migrants a day since Monday [May 8], and there are no signs of that slowing down with the looming end of Title 42, which is expected to bring an even bigger wave with it."[2] Whatever the product of 2.5 × crisis is, it is happening at the U.S.-Mexico border—and it is projected to get worse.

The Defendants' solution? Delay until the last minute, then issue a policy that ignores the legally required procedure, attempts to erase the limits Congress wrote into the law, and ignores relevant facts that contradict its desired solution. That is, as the saying goes, no way to run a railroad; it is certainly no way to protect the

---

[1] Tim Hains, *Obama DHS Secretary Jeh Johnson: "We Are Truly In A Crisis" On Southern Border*, REAL CLEAR POLITICS, (Mar. 29, 2019), https://tinyurl.com/4ef9wsys.

[2] Adam Shaw and Bill Melugin, *Border Patrol chief authorizes release of migrants into US without court dates as Title 42 ends*, FOX NEWS, (May 11, 2023), https://tinyurl.com/32vfur78.

integrity of the nation's borders. The law demands more of them, and the Court should hold them to what the law demands. Because the Defendants' Parole with Conditions program was adopted without the required procedures, was adopted without considering all the relevant facts, and contradicts the governing law, the Court should either stay its effective date or temporarily enjoin the Defendants from implementing or operating it.

## BACKGROUND

### I. The INA authorizes a limited parole authority that must be exercised on a case-by-case basis.

The INA gives DHS the power to parole aliens into the United States, but "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

Congress adopted the current version of Section 1182(d)(5) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (abbreviated to the visually offensive but sonically lilting "IIRIRA," pronounced "eye-*ree*-rah"). The changes it made to Section 1182 make plain Congress's intent to constrain sharply the discretion of DHS. Pre-IIRIRA, the INA granted broad parole authority to the Attorney General "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5) (1996). IIRIRA amended the INA "by striking 'for emergent reasons or for reasons deemed strictly in the public interest' and inserting 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" IIRIRA, PL 104–208, September 30, 1996, 110 Stat 3009, § 602.

The post-IIRIRA INA strictly limited the conditions under which parole could be granted, and specifically forbade programmatic parole policies, instead requiring that parole be granted "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5). The power is

limited because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy;" IIRIRA therefore "specifically narrowed the executive's discretion ... to grant 'parole into the United States.'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). To squelch even the small chance that this language could be read as anything but a circumscription, Congress entitled this portion of IIRIRA "limitation on use of parole." Pub. L. No. 104-208, 110 Stat. 3009, § 602.

## II. The Defendants adopt the Parole with Conditions policy, which paroles illegal immigrants *en masse*.

The policy was issued on May 10, 2023, and scheduled to go into effect simultaneously with the expiration of the Title 42 public-health order—at midnight on May 12.

Under the policy, Defendants will "parole" otherwise illegal immigrants into the United States after an "individual assessment" that will include, among other things, a "biometric identity verification," an evaluation of the alien's "immigration background," and "vetting for any national security or criminal concerns." *Id.* at 5–6. The policy requires Border Patrol to collect and document a physical address but does not appear to require any verification of the legitimacy of the address provided. The alien is required to schedule an appointment with ICE to receive a Notice to Appear and initiate immigration proceedings but may go online to request an NTA by mail. *Id.* at 2. However, the grant of parole under the policy does not place any restrictions on where the alien may go or require electronic monitoring or any other means to track the alien's location once released. The "initial" grant of parole "should generally be for 60 days," but apparently the parole grant may be extended or renewed without limitation. *Id.* at 5. The memo promulgating the policy does not discuss harms to third parties, individuals, or the States; it does not discuss what other alternatives were considered; and it does not justify the policy on any grounds other than overcrowding

3

of detention facilities as a result of resource constraints. *Id.* at 2–3. And while the policy may not be implemented unless the Border Patrol has apprehended "7,000 noncitizens per day across the [Southwest Border] over a 72-hour period" and permission to use it has been "specifically requested by a sector and authorized by the CBP Commissioner," *id.* at 3–4, the Defendants admit that the former is already the case, *id.* at 7, and have, on information and belief, granted permission to each Border Patrol sector in Texas.

## LEGAL STANDARD

"The standard for deciding whether to issue a preliminary injunction is the same standard used to issue a temporary restraining order." *Texas v. United States (100-Day Pause)*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (granting TRO against illegal DHS actions). And each of the preliminary injunction requirements are satisfied here.

To obtain a preliminary injunction, the States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Each factor weighs in the States' favor.

## ARGUMENT

### I. The States have standing.

First, the States have standing because they are injured financially. The Court has already recognized that the States incur increased education, healthcare, incarceration, and state-services costs from an increase in illegal immigration. *See Texas v. United States (Texas Prioritization)*, 606 F. Supp. 3d 437, 467 (S.D. Tex.

2021); s*ee also Texas v. Biden (Texas MPP)*, 20 F.4th 928, 969 (5th Cir. 2021), *cert. granted* 142 S. Ct. 1098 (2022) ("*if* the total number of in-State aliens increases, the States will spend more on healthcare"). And the Fifth Circuit has recognized not only that those harms confer standing upon the States, but that programs like Parole with Conditions are "precisely the sort of large-scale polic[ies] that [are] amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents," data that "robustly support[s]" the States' standing. *Id.* at 671.

Second, the States have standing because they are "entitled to special solicitude in" when they are suing to protect their "procedural right[s] and ... [their] quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

## II. The Court has jurisdiction.

The INA itself "deprives courts of the power to ... enjoin or restrain the operation of" a small number of its sections: "sections 1221 through 1232." *Biden v. Texas (Texas MPP)*, 142 S. Ct. 2528, 2539 (2022) (cleaned up) (citing 8 U.S.C. § 1252(f)(1)). But the parole power does not rest in one of the gated-off sections, but in Section 1182. And though some portions of the Parole with Conditions purport to derive their authority from section 1225, none of the relief the States seek here would "enjoin or restrain" the "operation" of section 1225. The Court therefore retains its standard power to issue injunctions preventing violations of the law.

## III. Texas is likely to succeed on the merits.

### A. The memo setting out the program is a substantive rule that was not issued through notice and comment.

Under the APA, rules are subject to notice-and-comment rulemaking unless they fall within one of the APA's exceptions, 5 U.S.C. § 553(b)(A), which "must be narrowly construed." *Texas DAPA*, 809 F.3d at 171 (quoting *Profls. & Patients for Customized*

5

*Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)). The memo wasn't adopted with any notice and comment, and it is not subject to any of the exceptions. It is therefore unlawful.

*First*, the memo is not a mere policy statement because it imposes legal rights and obligations. Generally, the difference between a rule and a policy statement depends on "two criteria: whether the [agency action] (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas DAPA*, 809 F.3d at 171 (cleaned up). A court making that determination must be "mindful but suspicious of the agency's own characterization," and its primary consideration is whether the action "has binding effect on agency discretion or severely restricts it." *Id*.

Here, the memo is certainly imposes rights and obligations by instructing agents how to exercise their discretionary authority, setting criteria for granting parole, affecting the States' obligations to provide public benefits to certain aliens, and establishing a framework for the showing required to parole thousands of aliens into the country. *See, e.g.*, *Texas v. United States* (*Texas DACA*), 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (DACA is not a policy statement, for some of same reasons). And although the Secretary of DHS retains "discretion" to end the framework established under the memo, the relevant question is whether "*DHS personnel[]*" have "discretion to stray from the guidance," *Texas MPP*, 40 F.4th at 229 (emphasis added), but there is no "evidence of discretion by the individuals processing [parole] applications," *Texas DACA*, 328 F. Supp. 3d at 732. Moreover, the notices announcing the Program are "much more substantive than a general statement of policy," confirming notice-and-comment was required. *Texas MPP*, 40 F.4th at 229.

*Second*, Defendants cannot escape notice-and-comment requirements under the "good cause" exception. The "good cause" exception to notice-and-comment is narrowly construed and only reluctantly countenanced, to be used only "on a break-

6

glass-in-case-of-an-emergency basis[.]" *Natl. Horsemen's Benevolent & Protective Assn. v. Black*, 53 F.4th 869, 883 & n.26 (5th Cir. 2022). But here, the glass broke a while ago. After all, the Defendants anticipated a surge in illegal immigration at the Southwest Border of the United States as a result of the shuttering of Title 42 even before the January 30, 2023, announcement that the Title 42 policy would be shuttered. *See* Press Release, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023). Therefore, the steady rising of border crossings—of which the Defendants are aware—hardly rises to the level of sudden or urgent action that overcomes the strong presumption of notice-and-comment. And whatever exigencies supposedly created good cause to abandon notice-and-comment are entirely of the Defendants' own making; the Defendants were perfectly capable of issuing notice of, receiving comment on, and finalizing other rules between the announcement of Title 42's end and its actual end date. See Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (proposed Feb. 23, 2023) (to be codified at 8 C.F.R. pts 208 and 1208); Circumvention of Lawful Pathways (May 10, 2023) (unpublished final rule) (to be published on May 16, 2023), https://public-inspection.federalregister.gov/2023-10146.pdf.

### B. The *en masse* parole authorized by the program exceeds the Defendants' statutory authority.

The Supreme Court recently emphasized that the federal government's parole power is "not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Texas MPP*, 142 S. Ct. at 2543 (quoting 8 U.S.C. § 1182(d)(5)(A)); *accord id.* at 2549 (Kavanaugh, J., concurring). The Parole with Conditions program flouts that limitation, justifying parole based on resource limitations. But that runs headlong into the INA's language and Fifth Circuit precedent barring the Defendants' reading.

7

Although it claims to require analysis and parole on a case-by-case basis, the Defendants' new policy is actually an attempted avoidance of the INA's prohibition of programmatic parole. The Defendants justify the "humanitarian" and "public benefit" of the Parole with Conditions program based on resource limitations. But unlike the statutory factors, which focus on particular individuals and the particular costs and benefits of paroling them, resource limitations are inherently blind to individual circumstances. Whether Alien A is paroled instead of Alien B has nothing to do with whether one of them has a humanitarian need to be admitted to the United States or whether the nation would particularly benefit from one of them being present; it depends entirely on their place in line. Resource limitations have nothing to do with the individual alien's characteristics; they have everything to do with the Defendants' characteristics. In short, if there is no urgent humanitarian reason or significant public benefit to parole Alien A into the United States if he is first in line in the morning when ICE's holding tank is empty, there is no such reason or benefit if he is directly behind the alien whose detention depletes ICE's available detention resources. Alien A is paroled, that is, because ICE has programmatically defined the depletion of detention resources as a "significant public benefit" or "urgent humanitarian need" that warrants parole.

Accordingly, the Parole with Conditions program runs into the teeth of the Fifth Circuit's holding that programmatic parole violates § 1182(d)(5)(A): "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *Texas MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id.* at 997. As the Fifth Circuit has held, the "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Id.* at 947.

Those are necessarily individual factors that must be evaluated on a case-by-case basis; they have nothing to do with the Defendants or their resources. The Parole with Conditions program does just what IIRIRA was designed to prevent.

### C. The Parole with Conditions policy is arbitrary and capricious.

The Parole with Conditions policy is also arbitrary and capricious for several independently sufficient reasons.

*First*, the Memo utterly neglects to consider State reliance interests on the previous regime and the harm to States in the *en masse* parole of aliens, causing harms that are further discussed below.

*Second*, Defendants have failed to analyze and consider how their own failure to maintain detention capacity affects the purported need to parole aliens into the United States. For example, at the same time Defendants claim that their detention facilities are over capacity, the Administration's Fiscal Year 2024 budget includes "a reduction of 9,000 adult [Average Daily Population detained] from the FY 2023 Enactment," which would decrease DHS's alien detention capacity by more than 25%.[3] The federal government further affirmatively degraded its detention capacity by canceling contracts with private detention facilities and by closing detention facilities.[4] In addition, even where DHS has capacity, it has often failed to utilize it. For example, an April 12, 2022, DHS Inspector General Report explains how DHS acquired detention capacity from hotels through no-bid contracts and then inexplicably failed to use it: indeed, DHS "spent approximately $17 million for hotel space and services at six hotels that went largely unused between April and June

---

[3]   DEPT. OF HOMELAND SEC., FY 2024 Budget in Brief, https://tinyurl.com/2p8v5yyx, p. 39.

[4]   Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, NEW YORK TIMES (Mar. 25, 2022), https://nyti.ms/3vOI00F; Priscilla Alvarez, *Biden administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol.

2021" and "did not adequately justify the need for the sole source contract to house migrant families."[5]

*Third*, the Defendants did not explore other alternatives or explain why they selected this one—which breaks the law. In particularly the Defendants did not explain why they did not consider an expansion of the Migrant Protection Protocols program that still remains in effect.

*Fourth*, the Defendants neither considered nor explained why they did not account for relevant considerations such as:

- How the Defendants can realistically determine whether persons considered for parole under "exigent circumstances" are risks to national security or pose risks of committing serious crimes in the United States;

- How illegal aliens paroled into the United States who break their promise to appear can be located, apprehended, and removed;

- Alternatives to this almost literal catch-and-release program;

- Whether and to what extent the policy creates incentives for even more illegal aliens to travel to the Southwest Border, not only further increasing the number—and perhaps rate—of illegal immigrants entering the country but in fact exacerbating the very "exigent circumstances" the policy is designed to combat.

Any of these reasons would be sufficient to set the policy aside. All of them combined are more than sufficient to do so.

## IV. There is a substantial threat of irreparable harm.

The States, using Texas as an example, will suffer irreparable harm without a TRO. The States "bear[] many of the consequences of unlawful immigration," *Arizona*

---

[5] DHS Off. of Inspector Gen., *ICE Spent Funds on Unused Beds, Missed COVID-19 Protocols and Detention Standards while Housing Migrant Families in Hotels* at 3, 5 (April 12, 2022) https://www.oig.dhs.gov/sites/default/files/assets/2022-04/OIG-22-37-Apr22.pdf.

*v. United States*, 567 U.S. 387, 397 (2012), and those consequences here are both harmful and irreparable. The burdens are not merely hypothetical and will be significantly increased by Defendants' current mass parole of aliens into the United States. The States use Texas as an example.

*First*, the release of illegal aliens into Texas will cause it to "incur significant costs in issuing driver's licenses." *Texas v. United States (Texas DAPA)*, 809 F.3d 134, 155 (5th Cir. 2015). Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Id.* (quoting Tex. Transp. Code § 521.142(a)). Aliens paroled into the United States are eligible for subsidized driver's licenses; by increasing the number of aliens who can secure subsidized licenses, the Defendants impose financial harm on Texas. Exh. E; *Texas DAPA*, 809 F.3d at 155.

*Second*, the *en masse* parole of aliens into Texas will incentivize increased illegal immigration. It is not just basic economics and common sense; DHS and federal courts have concluded that incentives matter: Increasing the likelihood that an alien will be released into the United States increases the number of aliens who attempt to enter the United States illegally. *Texas v. Biden (Texas MPP)*, 554 F. Supp.3d 818, 834, 847–48 (N.D. Tex. 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting). ("An alien … has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility."). Both the increased numbers of illegal aliens present in Texas immediately due to increased paroles and future increases in those numbers due to new incentives to attempt illegal entry will force Texas to spend additional funds on law enforcement, education, and healthcare—often due to federal mandates. *See, e.g.*, *Texas MPP*, 20 F.4th at 969, *rev'd on other grounds* 142 S. Ct. 2528 (2022).

For example, Texas must spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c). Texas's emergency medical providers deliver tens of millions of dollars in medical services to illegal aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves. *See* Exh. B. And illegal aliens in Texas are far more likely to be uninsured and below the poverty line.[6] Illegal aliens in Texas are thus much more likely to use public services and force the State to incur significant expense. If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

Furthermore, under federal law, aliens granted parole or asylum become eligible for a variety of benefits after five years in the United States.[7] These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). Because these benefits are paid by Texas state agencies and are partially financed from Texas's state budget, the *en masse* parole of aliens into Texas will increase its costs because increased numbers of aliens receiving grants of parole or asylum will cause more individuals to claim benefits.

The Emergency Medicaid program costs Texas tens of millions of dollars annually. The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens. The Texas's Children's Health Insurance Program offers low-cost health

---

[6] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX (69% of illegal aliens in Texas are uninsured and 29% are below the poverty level).

[7] *See* 8 U.S.C. § 1641(b)(2), (4) (defining a "qualified alien" as "an alien who is paroled into the United States … for a period of at least 1 year" or "an alien who is granted asylum"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States").

coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens. Further, Texas faces the costs of uncompensated care provided by state public hospital districts to illegal aliens which results in expenditures of hundreds of millions of dollars per year. *See* Exh. B.

Similarly, Texas and its subsidiary local governments pay for the costs of educating both illegal-immigrant minors and the children of illegal immigrants. *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (education mandate). Those costs run to the hundreds of millions of dollars per year. Exh. C. And Texas and its subsidiary local governments pay tens of millions of dollars each year to incarcerate illegal-alien criminals. Exh. D.

Due to sovereign immunity, Texas cannot recover damages from the federal government. Texas's unrecoverable injuries thus constitute irreparable harm. *See, e.g., Texas MPP,* 20 F.4th at 1001; *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). That's why the Fifth Circuit has squarely recognized economic harms resulting from unlawful federal immigration policy to constitute irreparable harm. *See Texas DAPA*, 809 F.3d at 186.

### V. The balance of the equities and the public interest favor a TRO.

The remaining factors also support issuing a TRO motion. In general, the balance-of-equities and public-interest elements merge when government interests are play, and the Court should consider them together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging these two elements); *Texas DAPA*, 809 F.3d at 187 (same). It should weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

Here, the balance is particularly in favor of the States. A TRO prohibiting the Defendants from paroling and releasing aliens *en masse* into the United States will not only avoid harm to the States, but also prevent the Executive Branch from perpetrating the harm of violating federal immigration law. Those harms to the federal government—as well as the harms to the State—can be completely averted by staying, restraining, the Parole with Conditions program or entering a preliminary injunction. This case is truly rare in that a TRO will avoid harms to all sides. Here there is no balancing to be had, because all the harms are on one side of the scale.

The public interest also favors the States: "The 'public interest is in having governmental agencies abide by the federal laws that govern their existence and operations.' And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021). Because the Parole with Conditions program violates the INA and the APA multiple times over, the public interest favors enjoining it.

## VI. A TRO should apply nationwide.

Should the Court issue a TRO, that order should be effective nationwide, not just in Texas (whose evidence supports this motion) or the States (who bring this motion). "[T]he Fifth Circuit's precedent in this area is applicable and controlling." *Texas 100-Day Pause*, 524 F. Supp. 3d at 667. As in other immigration cases, "a geographically-limited injunction would be ineffective" since once migrants cross into the United States, they are "free to move among states." *Texas DAPA*, 809 F.3d at 188. Further, "immigration policy" is supposed to be "a comprehensive and unified system." *Id.* And because Texas has the largest share of the southwestern border, a TRO limited to Texas in particular would merely divert the most direct and immediate of the harms caused by the program to Texas's sister States.

## CONCLUSION

The States respectfully request that the Court stay or delay the effective date of the Parole with Conditions program or issue a temporary restraining order preventing the Defendants from implementing or operating that program.

Dated May 12, 2023.                                Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771
aaron.reitz@oag.texas.gov

/s/ Leif A. Olson
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

STEVE MARSHALL
Alabama Attorney General
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

BRENNA BIRD
Attorney General of Iowa
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-5164
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

DANIEL CAMERON
Attorney General of Kentucky
MARC MANLEY
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

TIM GRIFFIN
Arkansas Attorney General
NICHOLAS J. BRONNI
Arkansas Solicitor General
HANNAH L. TEMPLIN
Assistant Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201

*Counsel for the State of Arkansas*

KRIS KOBACH
Attorney General of Kansas
JESSE A. BURRIS, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

JEFF LANDRY
Attorney General of Louisiana
ELIZABETH B. MURRILL (La #20685)
Solicitor General
JOSEPH SCOTT ST. JOHN (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

17

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*


Dave Yost
Ohio Attorney General
Sylvia May Mailman
Ohio Deputy Solicitor General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
May.Mailman@OhioAGO.gov

*Counsel for the State of Ohio*


Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Clark L. Hildabrand
Assistant Solicitor General
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*


Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Charles F. Capps, Mo. Bar #72734
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*


Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

 *Counsel for the State of South Carolina*


Patrick Morrisey
Attorney General of West Virginia
Lindsay See
Solicitor General
Michael R. Williams
Senior Deputy Solicitor General
Office of the West Virginia
 Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

## CERTIFICATE OF CONFERENCE

On May 12, 2023, Defendants' counsel Erez Reuveni informed Texas's counsel that the Defendants oppose this motion. Texas's counsel did not receive a response from the Intervenor Defendants' counsel before filing.

/s/ Leif A. Olson
LEIF A. OLSON

## CERTIFICATE OF SERVICE

I certify that on, this May 12, 2023, this supplemental complaint was filed through the Court's CM/ECF system, which served it upon all counsel of record.

/s/ Leif A. Olson
LEIF A. OLSON