```
                    UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS (CORPUS CHRISTI)

STATE OF TEXAS, et al.,          .
                                 .  Case No. 6:23-cv-00007
                 Plaintiffs,     .
                                 .
       v.                        .
                                 .
U.S. DEPARTMENT OF HOMELAND      .  1133 N. Shoreline Blvd.
SECURITY, et al.,                .  Corpus Christi, TX 78401
                                 .
                 Defendants.     .  Friday, May 12, 2023
                                 .  4:02 p.m.
. . . . . . . . . . . . . . . . .
```

```
                    TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE DREW B. TIPTON
               UNITED STATES DISTRICT COURT JUDGE
```

APPEARANCES:

For the Plaintiffs:          Office of the Attorney General
                             By:  LEIF A. OLSON, ESQ.
                                  M. DAVID BRYANT JR., ESQ.
                             P.O. Box 12548 (MC-009)
                             Capitol Station
                             Austin, TX 78711-2548
                             (512) 463-4139

For the Defendants:          United States Department of Justice
                             By:  EREZ REUVENI, ESQ.
                             450 5th Street NW, Room 6047
                             Washington, DC 20009
                             (202) 307-4293

APPEARANCES CONTINUED.

Audio Operator:              Sasha Ozuna, ECR

Transcription Company:       Access Transcripts, LLC
                             10110 Youngwood Lane
                             Fishers, IN 46048
                             (855) 873-2223
                             www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):


For the Intervenors:          UCLA School of Law
                              Center of Immigration Law and Policy
                              By:  MONIKA Y. LANGARICA, ESQ.
                              385 Charles E. Young Drive
                              Los Angeles, CA 90095
                              (619) 518-5357

                              Justice Action Center
                              By:  ESTHER SUNG, ESQ.
                                   LAUREN WILFONG, ESQ.
                              P.O. Box 27280
                              Los Angeles, CA 90027
                              (323) 536-3850

```
 1          (Proceedings commence at 4:02 p.m.)

 2               THE CLERK:  Court calls Civil Action 6:23-cv-7, State

 3  of Texas, et al. v. U.S. Department of Homeland Security, et

 4  al.  May I have appearances by counsel?

 5               THE COURT:  Mr. Olson, you are muted.  And you remain

 6  muted.

 7               MR. OLSON:  Sorry, Your Honor.  I didn't know which

 8  screen to click on --

 9               THE COURT:  That's all right.

10               MR. OLSON:  -- to make the space bar work.  Leif

11  Olson, on behalf of the plaintiff states.

12               MR. BRYANT:  David Bryant, also on behalf of the

13  plaintiff states.

14               MR. REUVENI:  Good afternoon, Your Honor.  You've got

15  Erez Reuveni, on behalf of the defendants.  I also have my

16  colleague, Joseph Garrett, who has not yet entered an

17  appearance in this case, but to his misfortune, or fortune,

18  depending on how you look at it, may be doing so imminently.

19               MS. LANGARICA:  Good afternoon, Your Honor.  Monika

20  Langarica for intervenors in the case.  And I am joined by

21  counsel of colleagues.

22               THE COURT:  Okay.  We are here today to acknowledge,

23  I guess, that there is an addendum to the Federal Rules of

24  Civil Procedure that requires that all TRO requests be filed on

25  Friday afternoon, as close to a holiday as possible.  We --
```

1   everybody has complied with that request.  So I do have the

2   motion to supplement the complaint, and I do have a motion for

3   the temporary restraining order.  I also have seen the filings

4   by the Department of Justice talking about the case in Florida.

5   We have since read the briefing and filings that are in

6   Florida, as well.

7         So with that in mind, Mr. Olson, it's your motion, go

8   ahead.

9         MR. OLSON:  Your Honor, the states in this case

10   believe that this TRO can be answered with two simple

11   questions:  Is this a programmatic grant of parole, and if so

12   is it permitted by the Immigration and Naturalization Act?

13   That is the same question that's being asked in the underlying

14   dispute that's currently live in the amended complaint.  That's

15   what we're asking the Court to take up in the supplemental

16   complaint, and that's what we're asking the Court to decide as

17   it looks at the TRO.

18         The program in this case grants parole to persons who

19   appear at the border based not on individual characteristics,

20   but because of characteristics of agencies that apprehend them.

21   They do not look to the individuals to determine whether or not

22   the individual has an urgent humanitarian need to be admitted

23   into the United States.  They do not look to the individual to

24   see whether or not the individual being released into the

25   United States would be of significant public benefit.  Instead,

1  they are looking to themselves to determine whether it is a

2  significant public benefit for the agency to do the releasing.

3  That is not the way that the Immigration and Naturalization Act

4  is supposed to work.

5         When Congress passed the IIRIRA, they specifically

6  limited the parole authority to urgent humanitarian need and to

7  significant public benefit so that the executive could no

8  longer dodge the requires of immigration law through aggressive

9  use of the parole power.  The Fifth Circuit has told us that

10 the paradigmatic cases for the use of the parole power are

11 someone who urgently needs medication attention that can be

12 obtained only in the United States and a person who qualifies

13 for a visa, but there simply are not a numerically sufficient

14 number of visas and they have to wait for their place in line

15 to come up.  That is not what CBP is doing here.

16        What CBP is doing here is announcing they are simply

17 overwhelmed and thus they are going to stop obeying law.  That

18 is not how the law works.  That has never been how the law

19 works.  It is not up to CBP to determine what the law is or

20 whether to comply with it.  It is up to CBP to comply with it,

21 and we are asking that the Court temporarily restrain its

22 operation of the Parole with Conditions program so that it

23 complies with the law, rather than flouts it.

24        THE COURT:  All right.  Mr. Reuveni, Mr. Darrow,

25 which one is taking the lead on this?

 1          MR. REUVENI:  It's me, Your Honor, and I'll note that

 2 the sun is still up and I'll hope it remains up as we --

 3          THE COURT:  I guarantee you that the sun will be up

 4 when we're done with this hearing.

 5          MR. REUVENI:  So, Your Honor, I appreciate Mr. Olson

 6 jumped right into this TRO, and I appreciate your getting us on

 7 calendar here on short notice to talk these issues through.  I

 8 think there's a lot of preliminary stuff that we need to get

 9 through before we talk about this TRO, and I'd like to talk a

10 little about that if the Court will indulge me.

11          The -- for starters, we have a -- well, we have a

12 nationwide injunction right now.  I mean, everyone, every party

13 in this case, every person in the country, every party in the

14 country who doesn't care for this policy is covered.  Granted,

15 it was issued as a TRO, it lasts for 14 days.  Yes, the

16 Government may or may not appeal that.  You know, that's still

17 under consideration.  But right now, as of the moment,

18 plaintiffs have filed this TRO at four o'clock on a Friday.

19 They are protected, they cannot argue irreparable harm.  They

20 knew about this -- oh, I'm sorry.  I'm echoing.  Is -- are you

21 getting that echo?  Is that me?

22          THE COURT:  Yeah, that's normally because somebody

23 else has their volume on.  It may be me, so I'll go ahead and

24 mute myself.  Go ahead.

25          MR. REUVENI:  All right.  Test, test, looks like

1    that's working now.  Oh no, I'm still echoing.  I can continue,

2    Your Honor, if you don't mind the echo.

3            THE COURT:  Yeah, yeah.  It's very mild on my end.

4    Go ahead.

5            MR. REUVENI:  Okay.  So as of right now, Texas, all

6    the other plaintiffs, everyone who doesn't like this policy

7    cannot go to any court and say they're suffering irreparable

8    harm.  There is no irreparable harm anyone can argue because

9    this policy, for all intents and purposes, is in -- doesn't

10   exist.  It doesn't -- it's enjoined, it doesn't apply to

11   anyone.

12           So I'm a little bit -- frankly, I don't know why

13   we're here right now.  I mean, plaintiffs reached out to us,

14   and we had this conversation.  I -- I'm -- certainly have not

15   been under a rock for the past 24 hours.  They've known about

16   this injunction.  And even if they didn't, we told them about

17   it.  We said, hey what's the rush here, let's talk.

18           They filed their motion.  They didn't mention the

19   TRO -- I'm sorry, the TRO here, the decision.  They -- that

20   seems an odd omission in a TRO motion, bringing everyone

21   together on a Friday at five o'clock.  They're claiming there's

22   a extreme emergency that requires us to be here.  So there's no

23   basis to issue a TRO right now.  That's the first thing.

24           I think, second, we have this case in Florida.  Is

25   the federal government happy with the result there?  No, we

1  were enjoined.  But Judge Wetherell there is very, very

2  familiar with these issues, not just this new policy, but the

3  prior policy and prior policies that have been implementing

4  sort of decongestion approaches to CBP border facilities.  And

5  he wrote a 107-page decision after a trial on the merits.  If

6  there's any situation that calls out for comity between the

7  courts and the court in the later-filed case maybe slowing down

8  or deferring to the earlier-filed case, exactly as Your Honor

9  did in the Title 42 companion cases that we discussed at one of

10  our hearings earlier in this case, it's this case.  I mean,

11  these claims aren't even in this case yet, which is very

12  different from the Title 42 situation where they filed a

13  lawsuit that actually raised the relevant claims.

14         We're going to trial in a month on the actual claims

15  in this case.  It seems to me that if -- and there are very

16  good reasons to deny outright the amendment and just direct

17  Texas to file a new lawsuit or go join the one in Florida.  I

18  would direct the Court to Fifth Circuit precedent on this.

19  They've moved to supplement.  Leave to supplement should not be

20  granted where the, quote, "transaction, occurrence, or event,"

21  end quote, is unrelated to the original cause of action.  There

22  is -- that's 158 F.3d 343 (5th Cir. 1998) and the rule, Federal

23  Rule of Civil Procedure 15(d).  There's a good number of cases

24  saying the same thing.

25         There's no arguable connection between this new

1    policy and the policy at issue in this case.  They do very

2    different things.  They apply to very different groups.

3    They're implemented by different agencies.  So right there, we

4    should just maybe focus on that, slow things down, brief that

5    issue if we need to, although we think, respectfully, you can

6    just deny the motion right here right now, save us all the rest

7    of the afternoon.  And plaintiffs -- they can file their

8    lawsuit.  If they feel strongly that they also need to get a

9    TRO of a policy that's already been enjoined, they can file a

10   new lawsuit or they can go join their -- go join the case down

11   in Florida.  We'll be in Pensacola next week on a preliminary

12   injunction hearing in that case after the 14-day -- and the

13   14-day TRO likely is extended while that preliminary injunction

14   is decided.  So I welcome them to join us there.

15              I'd also add there's a bit of an anomaly here.

16   Florida is a party in this case, and Florida is a party in the

17   other case.  Florida got a TRO in the other case, so there's

18   also sort of a serious first-to-file issue now.  I mean, is

19   Florida going to drop out of this case?  I -- it's just very --

20   the procedure here is very odd.

21              And then a couple more just table-setting points

22   before we talk about the actual underlying merits here, if we

23   have to at all:  Let's say you amend the -- now, let's say you

24   grant to leave to amend, notwithstanding that there is no

25   connection between this policy and the policy already at issue

1  in this case.  I know I'm a bit of broken record player on

2  this, Your Honor, and I have to try at least once here, but

3  plaintiffs say in their complaint this won't affect the

4  schedule.  That's just -- that's not serious.  That's not

5  credible.

6          We're going to go to trial on the 15th on all these

7  claims?  We're going to have to do new discovery.  We're going

8  to have to do new briefing.  We're going to have new pretrial

9  filings.  Like, do we really want to derail the schedule we

10 have in this case on this specific and unique policy to have

11 this second case essentially glommed on here, glued at the

12 elbow or wherever and join this case?  That -- it just doesn't

13 really make any sense at all, and it would really derail this

14 case.

15         We're already facing a situation in this case where

16 -- and, of course, Mr. Olson can speak to this, too, but we've

17 had numerous conferrals with Texas, with the plaintiffs, with

18 the intervenors, where Texas has asked us a number of times --

19 and the intervenors, although I'll let them speak to it, as

20 well -- they -- tell us who your witnesses are so we decided if

21 we need to call witnesses.  Our witness list isn't due till the

22 2nd.  It seems to me highly likely, even without the

23 amendments, that they're -- Texas is seeking to make to their

24 complaint at this late -- to this case -- and it's going to

25 come around June 2nd.  There's going to be motions to compel.

1   There's going to be disputes over whether we need to --

2   depositions of witnesses.

3            A very good reason to deny a motion to supplement or

4   amend in this is exactly that:  It will completely upend the

5   case and the schedule we have in place.  And so really where

6   there's no colorable argument for irreparable harm whatsoever

7   right now, really where there's a very clear precedent on

8   Texas, then plaintiffs should not be able to supplement the

9   complaint in the way that they're trying to here and then,

10  based on that supplementation, seek the TRO.  I really think

11  you should deny the TRO (audio interference) prejudice.  They

12  can refile it should they feel the need to.

13           We should brief these issues about the motion to

14  supplement, whether it's appropriate to grant it.  And should

15  you agree that it is appropriate to grant it, at that time, and

16  only at that time, is it really appropriate to talk about a

17  motion for a TRO or a motion for preliminary injunction on

18  claims because now they're part of the case.  They're not part

19  of the case now in that -- we haven't had a chance to brief

20  this, but I have seen this before.  We have controlling Supreme

21  Court precedent you can't actually enter a TRO in a situation

22  like this unless and until the amendment has been granted.  For

23  that I would point the Court to 325 U.S. 219, De Beers

24  Consolidated Mines versus, again, the United States.

25           That's my sort of table-setting.  I'd like to pause

1  there.  I don't know if I've moved the Court at all there or if

2  there's any questions about that before we actually talk about

3  the TRO.  I think there's a lot of off-ramps before we get to

4  the TRO that we need to get through before we talk about the

5  TRO, and so I'll stop there.

6         THE COURT:  Is -- I noticed in the footnote of the

7  temporary restraining order that there was an invitation, or I

8  guess a suggestion, to convert I to a preliminary injunction so

9  that you could go ahead and take it up on -- first off, are --

10  is it -- do you consider the TRO itself to be appealable?

11         MR. REUVENI:  Well --

12         THE COURT:  And I -- and either Mr. Darrow or you can

13  answer.  I understand -- I think I saw his name on some of the

14  pleadings in the Florida case, so --

15         MR. REUVENI:  Yeah.  Thank you, Your Honor.  No, I --

16  some of these questions I can't answer because these are

17  discussions that reveal sort of like the internal deliberations

18  of the solicitor general's office.

19         THE COURT:  Okay.

20         MR. REUVENI:  I mean, is it beyond -- is it possible?

21  Yes, it's possible.  Like, we -- could we appeal this?  Like,

22  this -- we're enjoined nationwide in doing something that we

23  have told courts under penalty of perjury that we believe we

24  need to be able to do right now.  So, like, we stand by that.

25  But in terms of whether we think that's appealable, I can't

1   tell you that right now.  I have to wait for my marching orders

2   from the solicitor general's office.

3           THE COURT:  Right.  Mr. Olson, can I ask you a couple

4   of questions?

5           And Mr. Reuveni, I'll double back.  Remember, I'm

6   famous for letting people talk, so --

7           And then, Mr. Langarica -- I'm sorry --

8   Ms. Langarica, did I say your last name correct?  Okay, great.

9   And so -- I'll tell you what, before I ask Mr. Olson questions,

10  could I get you to weigh in on that subject before we get to

11  the merits of the TRO, if you -- I don't know if you have

12  something.

13          MS. LANGARICA:  Absolutely, Your Honor.  I thank you.

14  And so I -- Mr. Reuveni explained that we think it's incredibly

15  relevant that Florida, which is a plaintiff in this case as

16  well, obtained this nationwide injunction last night, blocking

17  the exact same policy that they're seeking to now challenge

18  through this case.  We also, you know, do not understand why

19  we're here at 4 p.m. on a Friday where there is just no urgency

20  to this motion because that injunction is in place.

21          As a very initial matter, you know, we urge the Court

22  to set a briefing schedule and even, you know, expediate it as

23  the Court sees is needed.  But as intervenors, we need to have

24  an opportunity to brief and to argue why the supplementation,

25  even as a threshold issue, is not appropriate in this case.

1    And just to sort of preview, again, these issues that we would

2    be very willing to brief at greater length, we think this is

3    really complicated as to the question of whether, you know --

4    or as to the issue of Florida being a plaintiff both in that

5    case and in this one.  Not only is that not in the interest of

6    judicial economy, but we really do raise the risk of competing

7    judgments or orders if this case -- if Your Honor allows the

8    supplementation and then also goes forward on any of the claims

9    that they have raised.

10         There are also issues with supplementing -- again,

11   just coming back to why need to properly brief this issue,

12   there are additional matters here.  There is the fact that the

13   standing issues may be different as to the claims in the

14   original complaint here and compared to the ones proposed in

15   the motion to supplement.  The underlying facts are different,

16   Your Honor, and we could tell all the reasons why that's true

17   in a proper brief.

18         And as Mr. Reuveni has mentioned, this would shift

19   the entire case, including the timeline, discovery, briefing,

20   for -- again, for the reasons Mr. Reuveni has mentioned.

21         There is also a -- you know, an arbitrary capricious

22   thing that we saw that we think would require a different

23   administrative record.  And, you know, ultimately if Texas

24   wants to raise its own -- or Texas and the other plaintiffs

25   that have joined want to raise their own injury as to this

1   policy in a separate case from the Florida case, you know, and

2   understanding the fact that they could obtain completing

3   judgments or orders, you know, then they could go to the wheel.

4   We're not in a position where this is the exclusive vehicle for

5   them to pursue that, even considering -- or notwithstanding the

6   Florida case.

7          We also -- you know, as a -- as to the threshold

8   issue, we would urge and invite Your Honor to deny the motion

9   to supplement the complaint and also to deny the motion for the

10  TRO.  But I understand that we're not going to get --

11         THE COURT:  Right.  I'm glad to hear everybody is

12  fighting to keep that trial schedule that, a few weeks ago, we

13  were having a serious discussion about whether not it was going

14  to work.

15         But anyway, Mr. Olson, what connection does this May

16  10th memo have to the parole program that deals with the four

17  countries in this case?

18         MR. OLSON:  The connection, Your Honor, is the

19  underlying legality.  They both depend on the same subsection

20  of the INA.  They both depend on Section 1252(d).  And they

21  both depend on the interpretation of whether or not something

22  constitutes a significant public benefit or an urgent

23  humanitarian need.  They are operated as two separate programs,

24  but deciding the scope of the meaning of those terms decides

25  both of the programs' legality.

1          Our concern with bringing this as a new lawsuit -- I

2    don't know, Your Honor, if you remember in the prioritization

3    case, DOJ argued there that we were claim splitting because we

4    had -- already had the previous Title 42 case pending in front

5    of Judge Kacsmaryk, and both of those cases had raised the

6    issue of whether or not detention was mandatory under

7    particular parts of the INA.  We wanted to avoid arguments over

8    claim splitting by having two separate cases over parole

9    programs, instead have them together in a single case.  That's

10   why the supplementation is here as opposed to a filing a new

11   lawsuit on the completely separate program.

12          THE COURT:  Well, what relief are you seeking in the

13   TRO that is different than the relief that Judge Wetherell

14   ordered last night?

15          MR. OLSON:  The relief is identical; the bases for

16   the relief are not.

17          THE COURT:  Well, I understand.  So -- but isn't one

18   of the requirements for a TRO irreparable harm?  And if the

19   program can't be implemented at least for 14 days, does that

20   mean at least immediately -- in other words, there's plenty of

21   time for us to proceed a little bit more thoughtfully than you

22   typically do in a TRO stance.

23          MR. OLSON:  I agree with that, Your Honor.

24          THE COURT:  Okay.

25          MR. OLSON:  At least as long as Judge Wetherell's TRO

1  is in place, there is -- there's no need for the Court to rush

2  out a ruling.  Our concern is if that does get stayed, either

3  by Judge Wetherell himself, by the Eleventh Circuit, by the

4  Supreme Court, then the defendants simply restart the program.

5  We don't want the defendants to restart the program.  We would

6  like the program to be set aside, or at the very least, stayed

7  until the merits of the case are decided.

8         That's why this -- and I do want to very quickly

9  address what Mr. Reuveni said, that it was strange that we did

10  not address the Florida TRO in our own filings.  I agree that

11  was very strange.  I thought that we had done that right up

12  until I reviewed everything after we had filed it.  Because we

13  were in such a rush, it got taken out as part of the editing

14  process and never got pasted back in from the editing document

15  into the filing document.  And I --

16         THE COURT:  Well, we -- you can rest easy.  I read

17  the Florida case notwithstanding and -- including the March

18  decision, the briefing, and the response by the DOJ, as well as

19  the TRO.  So you agree then that the immediacy of the

20  irreparable harm is not at issue now because that is in place

21  at least for the next 13 days?

22         MR. OLSON:  Yes, Your Honor.

23         THE COURT:  All right.  Since Florida is a

24  coplaintiff in this case, is there any particular reason why

25  you didn't join the case in Florida?  It's obviously -- it's

1   obvious that the two of you talk.

2          MR. OLSON:  We do talk, Your Honor.  And to my

3   knowledge, no one reached out to our office to see if we would

4   like to join that case.  We reached out to our coplaintiffs

5   last night to see if they would -- we realized that this was a

6   different program than the program we had been challenging.  So

7   despite Texas's concerns about claim splitting, other states

8   might not have that concern.  They might want to pursue their

9   own claims.  We reached out to our coplaintiffs to see if they

10  wanted to join us in the supplementation.  Florida notified us,

11  no, thank you, we have our own thing going on.  If there was --

12  it was --

13         THE COURT:  So is there going to be a separate

14  administrative record for this?  Or is this going to be the

15  same administrative record for the current parole program that

16  we've got going?

17         MR. OLSON:  I suspect it would be a separate

18  administrative record.  They will probably likely contain many

19  of the same documents.  But I would anticipate --

20         THE COURT:  Well, we're --

21         MR. OLSON:  -- separate.

22         THE COURT:  We're a month out from trial.  I don't

23  see how we can keep a -- the current trial setting with a new

24  administrative record that has to be produced and, I guess,

25  incorporated into the new trial.  You would agree that the June

1   trial setting is at risk, at best?

2          MR. OLSON:  Without knowing from the defendants how

3   long they think it would take to produce the administrative

4   record, I would agree that there is the potential for it to be

5   (audio interference).

6          THE COURT:  So one thing I guess I hadn't thought of

7   is that you said Florida has not joined in the motion to

8   supplement, so they would be a plaintiff as to some claims, but

9   not this particular claim?

10         MR. OLSON:  They would be a plaintiff as to the four-

11  nation parole program, but not this program.

12         THE COURT:  All right.  Since we have established, I

13  think, that the immediacy element is not an issue at this

14  particular time, I would like to ask the parties how they would

15  like to proceed so that we could get some briefing on, I guess,

16  first the -- and I'm open to consolidating it for the motion

17  for leave to supplement or -- and the motion for TRO, or have

18  them filed separately.  It seems to me that the first thing we

19  need to find out is whether or not it makes sense to allow the

20  supplementation.

21         So I will say this:  For the Title 42 case that was

22  filed in Judge Summerhays's court in Louisiana and then was

23  filed in my court, one of the important things that I thought

24  of was that's within the same circuit.  So if you have

25  competing pieces of litigation that are going to the same Fifth

1    Circuit, it didn't make sense to me to proceed.  I understand

2    that this is two different circuits, and so that's a little

3    less of a concern.  If the preliminary injunction is -- if the

4    TRO is turned into a preliminary injunction, I would be

5    interested to know what the parties think about, again, what's

6    the point if that is in place pending a trial setting.

7             And so I guess those are just kind of my

8    stream-of-consciousness thoughts.  How would the parties --

9    Mr. Reuveni, I see you're anxious to jump in.  Go ahead.

10            MR. REUVENI:  Yes, thank you, Your Honor.  I am a --

11   I am somewhat anxious to jump in here.  I really think we need

12   to brief the supplementation issues, and we need to put a pin

13   in the TRO and/or treat it as a PI or whatever.  Like, we need

14   to know why these claims should even be here and, in fact, that

15   they are.  And let me just -- back to that for a minute.

16            Let's assume worst-case scenario for Mr. Olson and

17   his -- the other plaintiffs.  Somehow Judge Wetherell stays his

18   decision, or the government decides to appeal and the Eleventh

19   Circuit stays their decision, they have their TRO on file.  At

20   that time, I think you make -- you could order the parties to

21   respond quickly because, you know, we asked for it, we asked

22   you not to decide this right now, and we would do so.  I mean,

23   you already have our briefing.  We could put together new

24   briefing.  I mean, I think we'd love to have the admin record

25   before we do any briefing, frankly.  But let me talk about that

1  in a minute.

2          THE COURT:  Wouldn't that --

3          MR. REUVENI:  But from the government's perspective

4  -- oh, sorry.

5          THE COURT:  Wouldn't that only happen if I granted

6  leave to supplement though?

7          MR. REUVENI:  Right, which is why I think you should

8  just put a pin in the TRO and litigate the motion to

9  supplement.  I mean, if you -- like, that comes before.  I

10  think Texas is putting the cart before the horse here.

11          We have really, really compelling arguments why there

12  should not be supplementation.  And let me say two things about

13  this.  First, I heard Mr. Olson say it's related because it

14  involves parole, but especially saying it's related because it

15  involves immigration law.  Like, that's literally not how the

16  test -- transactional tests work.

17          The test is, is it the same transaction, occurrence,

18  or event?  Is this the same parole memo?  No.  Does it use the

19  same statute?  Yes.  So does hundreds of other things the

20  government does.  That doesn't mean that in a single case that

21  Texas brings, then that becomes the court in which every single

22  one of those policies that arise under the immigration laws are

23  now decided.  That's not -- that's definitely not how that

24  works.  It's -- the Court should reject that.  I -- it -- this

25  is not the same policy and that's really -- that's the test.

 1             I'm happy to brief this and give you some more cases

 2    on this that support us.  We did some quick research before the

 3    hearing and the Fifth Circuit law is pretty clear on this.  So

 4    I don't see how we even begin to talk about whether we're

 5    briefing a TRO, whether we're producing a record, whether we're

 6    doing discovery, whether we're delaying the trial until we

 7    brief that.  So we think we should brief the motion to

 8    supplement.

 9             If Texas truly thinks that its interest are being

10    harmed in the event that, say, the TRO in Judge Wetherell's

11    court is somehow stayed or the PI -- it's not converted into a

12    PI, or a higher court does something, Texas is not without

13    relief.  They can file sue in any court in the Fifth Circuit if

14    their concern is the Fifth Circuit.  They have -- as they've

15    told you in this case, they can file in any of the 28 divisions

16    that they're -- and as you found, they're a resident in every

17    single one of those divisions.

18             So it's a little unclear to me.  I haven't really

19    heard an explanation beyond this involves the parole statute

20    why we're here.  If they truly think their interests are at

21    stake, file a new lawsuit.  Maybe it gets assigned to you,

22    maybe it gets to -- assigned to somebody else, but they have

23    their TRO.  It's written, they can file it.  That judge, free

24    of these overarching distractions of whether there's

25    supplementation, whether there's a trial happening in a month,

1   whether we have all these deadline that are now going to get

2   backed up and delayed should supplementation be granted, can

3   deal with it neat and clean.  And they'll file a TRO --

4          THE COURT:  So let me ask you this --

5          MR. REUVENI:  -- and we'll oppose it (indiscernible).

6          THE COURT:  Let me you this, cause it -- this was

7   more about the scheduling of it -- the motion's on file, how

8   much time would you like to be able to file a response to the

9   motion -- if it's -- if we're putting a pin in the TRO?

10          MR. REUVENI:  But I want to be reasonable, and I

11   don't want to be greedy.  I mean, what do we -- I think we're

12   entitled to two weeks under your rules.  I think I would ask

13   for the two weeks.  If the Court wants -- that means we should

14   expedite that for whatever reason, I -- we can give you a brief

15   in a little less time.  I just -- speaking for the government

16   at least -- and I know some of my colleagues are on the phone

17   right now, it's a busy time.

18          THE COURT:  Yeah.

19          MR. REUVENI:  It's a busy, busy time.  And I know

20   that's true for Texas.  I know that's true for the other

21   plaintiffs.  I know that's true for the intervenors.  Some

22   things in the news occurred recently, so we're all very busy.

23   So we would certainly appreciate as much time as we can get.

24   And if we can get two weeks, that's what I would ask for.  I

25   understand if the Court wants to move it more quickly.

1          The thing that's important for us, the federal

2    defendants, is put a pin in the TRO.  Let's brief the

3    supplementation issues.  And again, if the need ripens, there's

4    -- the other order somehow is disturbed, is stayed, whatever,

5    we can be right back in front of you next Friday and do it all

6    over again.

7          THE COURT:  Let me ask you this -- and I've -- I just

8    kind of thought of this so this is stream of consciousness and

9    I don't know what we think.  But what about kind of bifurcating

10   this issue, kind of put -- setting it to the side so that we

11   can keep our current trial schedule, find out what happens in

12   Florida; and then, when that's resolved, bring that back up

13   separately?

14         MR. REUVENI:  I -- if I'm understanding what you're

15   saying it is -- you're saying let's plead this motion --

16         THE COURT:  Just --

17         MR. REUVENI:  -- (audio interference) for now.  I

18   think that works, just talking about essentially what is a

19   stay, officially or unofficially, of these motions, and then

20   they can -- should they ripen in the future, we can revisit.  I

21   think that works.

22         THE COURT:  Right.  And so the reason why is because

23   on the Title 42 case -- so on the border wall case, I just

24   transferred that sua sponte, but that was within the division.

25   The Title 42 case, I stayed it pending resolution because the

1   TRO was in place at that time and the preliminary injunction

2   hearing was set, but there was nothing else going on.

3          The difference in this case is we've got a trial on

4   different claims, so I would be splitting this so that we'd

5   keep our current trial schedule and just kind of carrying this.

6   And if, out of Florida, we still get nationwide relief that is

7   what Texas is already asking for, then there's really nothing

8   to litigate, I would think.  But those are just kind of (audio

9   interference) if that part is stayed, but we'd continue with

10  the trial as is.  That's, like I said, just kind of thinking

11  out loud.

12          MR. REUVENI:  May I, Your Honor?  I --

13          THE COURT:  Sure.

14          MR. REUVENI:  -- think from a practical standpoint,

15  that makes a lot of sense.  I'm not sure that I've fully

16  thought through what that might mean though in terms of if that

17  -- those claims are hanging on.  Let's say we go to trial.  You

18  roll one way or the other, somebody's going to want to appeal.

19  We're going to want a final judgment, but if those claims are

20  still hanging around --

21          THE COURT:  Well, can't I (audio interference) at

22  that point?

23          MR. REUVENI:  You could stay them.  You could dismiss

24  them without prejudice.  They could refile it should they need

25  to since you've dismissed without prejudice, I guess.

1          THE COURT:  Could I sever them and open up a new

2     matter?

3          MR. REUVENI:  If you believe that they are entitled

4     to supplement, then grant that motion.

5          THE COURT:  So I'm not -- I'm trying to not get the

6     cart before horse.  If the TRO that's in effect now ultimately

7     becomes a preliminary or permanent injunction, what I don't

8     want is for everybody -- because Texas would get the relief

9     they're seeking, right?  To me, I was making sure everybody

10     agreed what has happened in Florida is the same relief that

11     Texas is looking for here.  I don't want everybody -- I don't

12     want anybody to have to double up their work here if that's

13     going to be fully litigated in Florida.  So I'm just trying to

14     figure out ways to be efficient.

15          MR. REUVENI:  It will be litigated one way or the

16     other.  When we -- we can notify this Court when the government

17     makes a decision one way or the other if it's appealing.  And,

18     of course, if something were to happen to the injunction, we'll

19     let -- we can let the Court know.  I still think, though, at

20     that point, let's say that happens -- let's say this case, with

21     Texas's position, the Eleventh Circuit stays the injunction if

22     we seek a stay and if we appeal.  So all the -- I have to speak

23     in hypotheticals for (audio interference).

24          THE COURT:  Right.

25          MR. REUVENI:  And then, so there's a stay, and then

1   we're right back here where we started, and then they're going

2   to say, oh, we have the TRO, we need a decision, but there's

3   still the supplementation issue that's hanging here.  Like,

4   they cannot get the TRO in this case until you grant leave to

5   supplement.

6                  THE COURT:  Right.

7                  MR. REUVENI:  And for reasons that, you know, we've

8   discussed, they have a really hard argument to make there.  So

9   again, I just wondered if maybe you'd dismiss -- the simplest

10  thing is dismiss without prejudice, they file a new lawsuit

11  wherever they choose, wherever -- and they're ready to go to

12  get their TRO, should they need to.

13                  THE COURT:  Well, I don't --

14                  MR. REUVENI:  And we'd obviously tell that new judge

15  -- oh, I'm sorry.

16                  THE COURT:  I don't know that I would dismiss.  I

17  would just deny the leave to supplement the complaint.

18                  MR. REUVENI:  Right.

19                  THE COURT:  So --

20                  MR. REUVENI:  I'm sorry, I misspoke.  That's what I

21  meant, right.  And, of course, to be clear, I mean, if they

22  file a new lawsuit, should you do that, if you deny leave to

23  supplement, we're going to tell that other judge, whoever that

24  may be, you shouldn't issue a TRO for the same reasons I just

25  told you, but at least they'll have their vehicle to seek their

1    relief should they feel they need to seek relief, depending on

2    what happens in the Eleventh Circuit case.

3              THE COURT:  All right.  Mr. Olson, we've been talking

4    about you in front of your back, so do you have any -- want to

5    weigh in on any of those thoughts?

6              MR. OLSON:  I will start with the most recent thing

7    that was being discussed.  I think bifurcating the issue would

8    be a practical solution, Your Honor, if you do allow us to

9    supplement the claims.  I know there are -- and I'm being a bad

10   appellate lawyer now.  I don't believe -- it's not partial

11   final judgment, but I know that there are methods within the

12   federal rules that allow a judgment to be entered and appeal

13   taken as to some claims while other claims remain pending in

14   the trial court.  So --

15             THE COURT:  Well, the reason why -- what I'm trying

16   to do -- Mr. Reuveni, are you litigating the Florida case?

17             MR. REUVENI:  Yes, myself, Mr. Darrow, some others.

18             THE COURT:  All right.  So I guess I hadn't seen your

19   name on that.

20             So what I'm trying to do is he's -- Mr. Reuveni's

21   getting ready for a trial in this case in June.  I don't want

22   to jam him up over the course of the next week or two filing a

23   response to this if the relief that you've requested is in

24   place.  And so what I'm trying to do is figure out a way to

25   keep him from having to respond to these while that relief is

1  in place while keeping our current trial schedule.

2          MR. OLSON:  I understand, Your Honor, and as a bad

3  appellate lawyer now and a good trial lawyer, I would urge you,

4  as a tactical matter, to please don't worry about jamming

5  Mr. Reuveni up.  I'm sure he's more than capable of handling as

6  many things as we need to throw at him.  But more

7  realistically, Your Honor, I agree that the urgency is not

8  present as long as the TRO is in place in Florida.  And that

9  would extend through if there is a temporary injunction that

10  remains in place in the case in Florida.  So when it comes to

11  that, I agree that either bifurcating or leaving some claims in

12  an abeyance posture would be a more efficient way to resolve --

13          THE COURT:  All right.  How about this?  Mr. Reuveni

14  asked for two weeks.  So the two weeks, like I said -- you

15  know, I think Mr. Reuveni is probably an accurate Nostradamus

16  on the fact that the TRO is very likely to be extended while

17  the judge works on the results of the preliminary injunction

18  hearing, so -- and if I get -- do you have any problem with two

19  weeks for him to respond to your motion for leave to

20  supplement?

21          MR. OLSON:  No, Your Honor.

22          THE COURT:  Okay.  Well, then if we do that -- now,

23  Mr. Reuveni, does that free you up sufficiently?  That's what

24  you asked for, so --

25          MR. REUVENI:  Yes, Your Honor.  We asked for it, we

1   can give you a response in two weeks on that.

2            THE COURT:  Well, don't ask for it and then whine

3   about it.  Come on now, so --

4            MR. REUVENI:  I didn't realize I was whining, Your

5   Honor.  I --

6            THE COURT:  No, I'm kidding, I'm kidding.

7            MR. REUVENI:  -- I think you'll know when I'm

8   whining.

9            THE COURT:  No.

10           MR. REUVENI:  It's (indiscernible).

11           THE COURT:  No, I'm kidding.  I am sensitive.  I

12   remember it wasn't that long ago to where I had multiple

13   settings, and I'm sensitive to the fact that you're getting

14   ready -- there's a lot of moving parts in this.

15           So why don't we do this?  Why don't -- now, I don't

16   want to leave out the intervenors.  Ms. Langarica, what do you

17   think about having that briefing schedule?

18           MS. LANGARICA:  Your Honor, as to the motion to

19   supplement the complaint, I think -- we agree that, at minimum,

20   we need to be able to brief this fully.  We would, you know, be

21   okay with a default briefing schedule.  As to that motion, we -

22   - you know, if the Court wanted to stay the motion and deal

23   with it at a later time for all the reasons that Your Honor

24   discussed, you know, we would be okay with that, too.

25           As to the TRO motion that is before the Court today,

1   the plaintiff states who filed it have conceded that there's no

2   irreparable harm here and there's no urgency, and so, you know,

3   Your Honor is in a position to -- and we think that the Court

4   should deny that TRO motion today.  Again, you know, the

5   federal rules do not allow for anticipatory TROs.  And so

6   there's no irreparable harm.  You know, if and when that

7   irreparable harm does arise, then the states could refile that

8   motion.  But we just want to be very clear that the TRO could

9   be -- should -- must be denied today because that element is

10  not met.

11           And as to the supplementing the -- the motion to

12  supplement the complaint, I think, again, we're okay with the

13  default briefing schedule and also would be okay with staying

14  this until a later date.

15           THE COURT:  All right.  Well, I would encourage the

16  parties, I guess, to try to figure out a way -- to the extent

17  that it makes sense to even have the claim, what -- first off,

18  I'm not encouraging the DOJ or the intervenors to agree to

19  allow the supplementation, but maybe to have an alternative

20  that says, if this happens, in order to keep our trial setting,

21  you know, we could bifurcate -- bifurcate, stay, sever, I don't

22  even know if those are options.  What I was trying to do,

23  Mr. Reuveni, quite frankly, with that suggestion was to keep

24  you from having to respond to the motion for leave to

25  supplement so that we could carry that so that you were getting

1  ready for trial.  So --

2           MR. REUVENI:  Well, I appreciate that, Your Honor.

3  I'm -- all I'm saying on behalf of the United States here is we

4  are fine with responding to the motion to supplement in two

5  weeks, so long as the TRO has a pin in it.  And I agree with

6  the intervenors, there's no basis to grant it, and there's

7  really no basis to hold it in abeyance.  There's no irreparable

8  harm, so you should really deny it without prejudice.  They can

9  refile it should the need arise.

10          Look, would we want to file a brief in two weeks

11 versus two months from now?  Obviously, we're always going to

12 want more time, but I did tell you we'd be happy to give you a

13 brief in two weeks.  But I do agree, it does make some sense,

14 if you deny the TRO, to delay briefing on the motion for

15 supplementation.

16          THE COURT:  Well, I can tell you this.  I certainly

17 would not grant the TRO until I had signed an order allowing

18 the supplementation.  To me, the TRO is not even ripe until the

19 complaint allows for the further relief requested.  The relief

20 requested in the active complaint deals with the four

21 countries, the parole program.  So, to me, the TRO's not even

22 ripe at this point.

23          So why don't we do that?  Today is the 12th.  Why

24 don't we have the intervenors and the DOJ respond, the

25 defendants respond, on May -- is it 26th?

```
1              MR. REUVENI:  Let's see here.  That does look like
2   the 26th, Your Honor, another Friday before a holiday.
3              THE COURT:  Is it?  What's that one?
4              MR. REUVENI:  That's Memorial Day.
5              THE COURT:  It's in the rules, I told you.  It's an
6   addendum, so -- so I would -- all right.  So we will have the
7   responses to those.  The TRO, as I've said, in my mind, is not
8   ripe to be ruled on until there is an active complaint that
9   supports it, and so I haven't allowed that at this point.  So
10  that's where we are on that.  In the meantime, I guess we will
11  find out if Judge Wetherell is either going to grant or deny an
12  extension on the TRO and/or the preliminary injunction, maybe
13  be in a little better position to decide how to proceed.
14             Does that sound reasonable to everyone?
15             MR. REUVENI:  Yes, Your Honor, for the --
16             MR. OLSON:  Yes, Your Honor.
17             MR. REUVENI:  -- for the defendants, that is
18  reasonable.
19             MS. LANGARICA:  Yes, Your Honor.  That's okay with
20  us.  Thank you.
21             THE COURT:  All right.  So just on the case in
22  general, an unexpected status check, how are things proceeding?
23  Discovery, witnesses, all of that.  Are things proceeding so
24  far, or is there anything that we need to anticipate having to
25  address?
```

```
 1              MR. REUVENI:  For the --

 2              MR. OLSON:  Speaking for -- oh, I'm sorry, go ahead.

 3              MR. REUVENI:  No, no, go ahead.  Go ahead, Mr. Olson.

 4              MR. OLSON:  No, I was going to say, Your Honor, from

 5  the states' point of view, we've had a lot of really productive

 6  discussions with the defendants and with the intervenors about

 7  discovery that all parties are seeking and about coming to

 8  agreements on how quickly to do it and the scope of what's

 9  going to need to be produced.  And even when we haven't come to

10  an agreement, we have been working and playing nicely with each

11  other.  And so I can tell you that we are not poisoning any

12  relationships ahead of the trial date, so we anticipate that

13  we're going to be able to put this on for you professionally

14  and timely and hopefully with Mr. Reuveni as jammed up as

15  possible.

16              THE COURT:  All right.  That turned into a little bit

17  of a commercial, okay.

18              MR. REUVENI:  Mr. Olson, my wife and son would like a

19  word, but we can handle that offline.

20              THE COURT:  So I'll say, Mr. Reuveni, when I made the

21  comment about whining, you knew, of course, that I was joking.

22  I forgot that there's a lot of other people watching that.  I

23  don't consider anything that you have done to be that.  I, when

24  I was an attorney, did that quite frequently, so -- but anyway,

25  your thoughts on how the discovery is proceeding and whether or
```

1  not court intervention is anticipated?

2          MR. REUVENI:  I mean, I'd like -- I believe we should

3  be on track, but I honestly don't -- I can't say with certainty

4  if Texas plaintiffs will be happy with our production.  But,

5  you know, our clients are doing what they are -- they need to

6  do and are expected to do to meet the deadlines and do it with

7  -- in good faith and due diligence.  And we have worked out a

8  protective order to avoid having to fight about privileged

9  information or protected information that the parties -- or at

10  least defendants will be getting on file soon.  We reached out

11  -- Texas has agreed.  we've reached out to the intervenors

12  about that.  I don't anticipate any issues there.  And we'll

13  produce our discovery on the 19th and get our brief on file on

14  the 2nd.

15          THE COURT:  All right.  So far, so good then is what

16  I'm hearing.

17          Ms. Langarica.

18          MS. LANGARICA:  Yes, Your Honor.  Thank you.  One

19  outstanding question that we have for intervenors is whether

20  the states intend to depose or otherwise live examine any of

21  our experts.  I know we had some discussion about sort of, you

22  know, who our experts will be because we are not due to file

23  those things until the 2nd.  We remain unclear on that.

24          THE COURT:  All right.  Well, I'll leave you to, I

25  guess, negotiate that with the plaintiffs' attorney if --

1   Mr. Olson.  If that becomes an issue, don't hesitate to reach

2   out so that we can settle it quickly.  Obviously, like I said,

3   I don't want any of the -- any discovery disputes to hold the

4   case development up, so --

5           So is there anything else, I guess, from the states

6   that we need to bring up or address at this point?

7           MR. OLSON:  Not -- no, nothing else from the states,

8   Your Honor.  From me personally, I realized I misspoke when I

9   was discussing the previous prioritization trial.  It -- the

10  government's position there was that it was the MPP case

11  pending in front of Judge Kacsmaryk --

12          THE COURT:  Right.

13          MR. OLSON:  -- not the Title 42 case that had been

14  pending in front of Judge Pittman.

15          THE COURT:  No, I was aware, but that's okay.  I

16  appreciate that clarification.

17          Anything from the federal defendants?

18          MR. REUVENI:  Nothing further, Your Honor, and you

19  were right, still sunny out there.

20          THE COURT:  I'm a man of my word.

21          And from the intervenors?

22          MS. LANGARICA:  Nothing further, Your Honor.  Thank

23  you.

24          THE COURT:  All right.  Thank you very much.  Like I

25  said, don't hesitate to reach out.  We can set these up as

1    quickly as necessary to address any issues.

2              MR. REUVENI:  All right, Your Honor.

3              THE COURT:  Have a good weekend.

4              MS. LANGARICA:  Thank you.

5         (Proceedings concluded at 4:48 p.m.)

6                         * * * * *

7

8

9

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16         I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE: May 22, 2023

25   ACCESS TRANSCRIPTS, LLC