# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING,

§
§
§
§
§
§
§
§   Civil Action No. 6:23-CV-00007
§
§   Judge Drew M. Tipton
§
§
§
§
§
§
§
§
§
§
§

     *Plaintiffs,*

§
§
§

v.

§
§

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

     *Defendants,* and

§
§
§
§

VALERIE LAVEUS; FRANCIS ARAUZ;                §
PAUL ZITO; ERIC SYPE; KATE                    §
SUGARMAN; NAN LANGOWITZ; and                  §
GERMAN CADENAS,                               §
                                              §
        *Intervenor Defendants.*              §


**INTERVENOR DEFENDANTS' OPPOSITION TO PLAINTIFF STATES'
CHALLENGE TO PAROLE PATHWAYS AND TO MOTION FOR
PERMANENT NATIONWIDE INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................ 1

FACTUAL BACKGROUND ......................................................................... 2

I.     Parole Pathways ............................................................................. 2

II.    Application Process ....................................................................... 3

     A.    Supporter submits Form I-134A ....................................... 3

     B.    Supporter and potential parolee undergo extensive background checks ........................................................................ 5

     C.    If approved, a two-year grant of parole issues ................... 5

III.   Humanitarian and Public Benefits ............................................... 5

SUMMARY OF ARGUMENT ...................................................................... 8

ARGUMENT ................................................................................................. 9

I.     Texas Lacks Standing .................................................................... 9

II.    Texas Cannot Prevail on the Merits ........................................... 12

     A.    The Parole Pathways are consistent with § 1182(d)(5)(A) ................. 12

          1.    The plain text establishes the lawfulness of the Parole Pathways ...................................................... 12

          2.    Decades of executive and congressional action confirm the lawfulness of the Parole Pathways ............................................. 15

     B.    The Parole Pathways Aren't "Arbitrary and Capricious" .................... 18

          1.    Texas hasn't shown parolee "costs" were ignored ..................... 18

          2.    Texas's other assertions are equally baseless ............................ 22

III.   Texas is Not Entitled to an Injunction or Vacatur ......................... 23

     A.    Texas cannot establish irreparable harm ............................ 24

          1.    Texas cannot establish injury for which money damages would be insufficient ....................................... 24

          2.    Texas's claimed injury is discriminatory and thus not legally cognizable ..................................................... 25

     B.    The balance of equities and public interest weigh against an injunction ..................................................................... 27

CONCLUSION ............................................................................................ 29

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
480 U.S. 531 (1987) .................................................................... 29

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................. 28, 29

*Bailey v. State of Alabama,*
219 U.S. 219 (1911) ..................................................................... 26

*Beame v. Friends of the Earth,*
434 U.S. 1310 (1977) ............................................................ 24, 28

*Biden v. Texas,*
142 S. Ct. 2528 (2022) .............................. 2, 8, 12, 16, 18

*California v. Texas,*
141 S. Ct. 2104 (2021) ................................... 10, 11, 20

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................... 10

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
140 S. Ct. 1891 (2020) ................................................................ 22

*E.T. v. Paxton,*
41 F.4th 709 (5th Cir. 2022)..................................................... 11

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ............................................................. 23, 24

*Edmonson v. Leesville Concrete Co.,*
500 U.S. 614 (1991) .................................................................... 26

*Exodus Refugee Immigr., Inc. v. Pence,*
838 F.3d 902 (7th Cir. 2016) .................................................... 26

*FPL Energy Me. Hydro LLC v. FERC,*
287 F.3d 1151 (D.C. Cir. 2002).............................................. 22

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) .................................................................... 14

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ...................................................................... 28

*Louisiana ex rel. Landry v. Biden*,
   64 F.4th 674 (5th Cir. 2023) ....................................................... 11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................... 9

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................... 29

*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020) .................................................................. 23

*Quilloin v. Walcott*,
   434 U.S. 246 (1978) .................................................................... 29

*Ramirez v. Collier*,
   142 S. Ct. 1264 (2022) ............................................................... 26

*Salazar v. Maimon*,
   750 F.3d 514 (5th Cir. 2014) ..................................................... 15

*Shannon v. United States*,
   512 U.S. 573 (1994) .................................................................... 15

*Shaw v. Reno*,
   509 U.S. 630 (1993) .................................................................... 26

*Texans for Free Enterprise v. Texas Ethics Com'n*,
   732 F.3d 535 (5th Cir. 2013) ..................................................... 28

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ...................................................... 12

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ................................................................. 9

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ..................................................... 25

*Wheeler v. Pilgrim's Pride Corp.*,
   591 F.3d 355 (5th Cir. 2009) (en banc) ..................................... 15

*Worldcall Interconnect, Inc. v. F.C.C.*,
   907 F.3d 810 (5th Cir. 2018) ..................................................... 18

## **Statutes**

8 U.S.C. § 1182(d)(5)(A) .......................................................2, 12, 13, 14, 16, 18, 20, 22

8 U.S.C. § 1229a(a)(3) ................................................................................. 23

Immigration and Nationality Act Section 1182(d)(5) (INA) ............. 1, 2, 9, 12, 13, 16

## LIST OF SUPPORTING DECLARATIONS

**Exhibit Declaration:**

- Declaration of Esther H. Sung, dated June 20, 2023 ("**Sung Decl.**")

    o Attaches Exhibits 1–50 to Intervenor Defendants' Opposition

**Fact Declarations by Intervenor Defendants:**

A. Declaration of Dr. Germán A. Cadenas, dated March 27, 2023 (previously filed at ECF 106-8 ("**Cadenas Decl.**")

B. Supplemental Declaration of Dr. Germán A. Cadenas, dated June 13, 2023 ("**Supplemental Cadenas Decl.**")

C. Declaration of Dr. Nan Langowitz, dated March 27, 2023 (previously filed at ECF 106-7) ("**Langowitz Decl.**")

D. Supplemental Declaration of Dr. Nan Langowitz, dated June 13, 2023 ("**Langowitz Supp. Decl.**")

E. Declaration of Anne Valerie Daniel–Laveus, dated March 27, 2023 (previously filed at ECF 106-2) ("**Laveus Decl.**")

F. Supplemental Declaration of Anne Valerie Daniel–Laveus, dated June 14, 2023 ("**Laveus Supp. Decl.**")

G. Declaration of Francis Margarita Arauz Ramirez, dated March 27, 2023 (previously filed at ECF 106-4) ("**Arauz Decl.**")

H. Supplemental Declaration of Francis Margarita Arauz Ramirez, dated June 13, 2023 ("**Arauz Supp. Decl.**")

I. Declaration of Eric Sype, dated March 26, 2023 (previously filed at ECF 106-5) ("**Sype Decl.**")

J. Supplemental Declaration of Eric Sype, dated June 13, 2023 ("**Sype Supp. Decl.**")

K. Declaration of Dr. Kate Sugarman, dated March 29, 2023 (previously filed at ECF 106-6) ("**Sugarman Decl.**")

L. Supplemental Declaration of Dr. Kate Sugarman, dated June 13, 2023 ("**Sugarman Supp. Decl.**")

M. Declaration of Paul Zito, dated March 27, 2023 (previously filed at ECF 106-3) ("**Zito Decl.**")

N. Supplemental Declaration of Paul Zito, dated June 9, 2023 ("**Zito Supp. Decl.**")


**Additional Fact Declarations:**

O. Declaration of Morton H. Halperin, dated June 16, 2023 ("**Halperin Decl.**")

P. Declaration of Eduardo Jose Rodriguez Hernandez, dated June 1, 2023 ("**Rodriguez Decl.**")

Q. Declaration of Heather Scanlon, dated June 17, 2023 ("**Scanlon Decl.**")

R. Declaration of Eric P. Schwartz, dated June 19, 2023 ("**Schwartz Decl.**").

S. Declaration of Jocelyn Wyatt, CEO of Alight, dated June 15, 2023 ("**Wyatt Decl.**")


**Expert Declarations:**

T. Joint Expert Declaration of Patricia Gándara, Ph.D. and Gary Orfield, Ph.D., dated June 14, 2023 ("**Gándara & Orfield Expert Decl.**")

U. Expert Declaration of Jennifer Hunt, dated June 18, 2023 ("**Hunt Expert Decl.**")

V. Expert Declaration of Leighton Ku, Ph.D., MPH, dated June 16, 2023 ("**Ku Expert Decl.**")

W. Expert Declaration of Charis Kubrin, dated June 10, 2023 ("**Kubrin Expert Decl.**")

X. Expert Declaration of Cyierra Roldan, dated June 16, 2023 ("**Roldan Expert Decl.**")

Y. Expert Declaration of Yael Schacher, dated June 19, 2023 ("**Schacher Expert Decl.**")

**INTRODUCTION**

This case concerns a set of processes that provide a pathway for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela—all experiencing humanitarian crises—to travel safely to the United States to be considered for a limited period of parole (the "Parole Pathways"). Consistent with statutory authority, the Parole Pathways provide for case-by-case consideration of potential parolees before a discretionary grant of parole may ultimately provide individuals life-saving protection, reunify families, help businesses in search of workers, and improve lives.

Texas cannot justify the extraordinary, nationwide relief it seeks. *See* ECF 22.

*First*, Texas can't establish standing to challenge the Parole Pathways because it hasn't shown injury. *Second*, the Parole Pathways plainly comport with the Immigration and Nationality Act ("INA") and Administrative Procedures Act ("APA"), defeating Texas's claims. *Third*, Texas fails to establish irreparable harm, complaining only of the routine expenses of ordinary governance—which it can't even prove have or will increase *at all* because of the Parole Pathways—while simultaneously ignoring the monetary and other benefits that more than offset any purported costs. *Fourth*, the balance of equities and public interest are plainly against equitable relief: Texas hasn't substantiated a single dollar of costs resulting from the Parole Pathways, yet the public benefits they provide are incontestably widespread and deeply felt.

Texas's motion should be denied.

## FACTUAL BACKGROUND

### I.    Parole Pathways

The Parole Pathways were implemented pursuant to Section 1182(d)(5) of the INA, which gives the executive branch broad discretion to parole noncitizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The Parole Pathways allow Americans to sponsor qualifying Cuban, Haitian, Nicaraguan, and Venezuelan nationals to be considered on an individualized basis for parole up to two years.

The Department of Homeland Security ("DHS") has explained that Cuba, Haiti, Nicaragua, and Venezuela were identified for inclusion in the Parole Pathways due to "humanitarian crises" in each nation. ECF 22-1 at 1–2. According to DHS, the Parole Pathways assist with "border enforcement measures" by providing a process for nationals of these countries to lawfully "apply to come to the United States, without having to make the dangerous journey to the border." *Id.* at 2. They also advance foreign relations with the Government of Mexico. *Id.* at 2.

For decades, presidential administrations have routinely exercised their parole authority in ways that can't be meaningfully distinguished from the Parole Pathways. "[E]very Administration, beginning in the late 1990s, has relied heavily on the parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden." *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring). In fact, the federal government has recently implemented virtually identical processes for Ukrainian and Afghan nationals that Texas hasn't challenged. *See infra* 28.

## II.    Application Process

## A.    Supporter submits Form I-134A

A supporter within the United States must first apply to DHS to sponsor a particular qualifying national. By design, the program depends on the interest of committed Americans hoping to support and welcome every paroled individual. Intervenors, all of whom are U.S. citizens, exemplify this:

- **Dr. Germán Cadenas**, a university professor who resides in Pennsylvania, is sponsoring his uncle, whom he views as a "second father." In Venezuela, his uncle struggled to find work after being fired for speaking out about government corruption. Ex. A (Cadenas Decl.) ¶¶ 2, 5, 7, 11.

- **Paul Zito**, a Christian entrepreneur residing in Texas, sees it as a "calling from God" to sponsor a Cuban family he befriended on mission trips. In Cuba, the family faces harassment and the father risks incarceration due to their Christian faith. Ex. N (Zito Decl.) ¶¶ 1–5, 9, 12, 14.

- **Valerie Laveus**, a Florida schoolteacher, has applied to sponsor her brother and nephew from Haiti. Living in constant fear of violence, her brother survived being shot in the head, and her nephew was recently the victim of a kidnapping attempt. Ex. E (Laveus Decl.) ¶¶ 2, 4, 6, 8, 16.

- **Eric Sype**, a Californian working for a nonprofit, has applied to sponsor his longtime friend from Nicaragua, where available work is often dangerous and exploitative. Ex. I (Sype Decl.) ¶¶ 2, 9; Ex. J (Sype Suppl. Decl.) ¶ 2.

- **Francis Arauz**, a truck driver in California, has sponsored her husband from Nicaragua, helping him to reunite with her and their son. Ex. G (Arauz Decl.) ¶¶ 3–4, 8.

- **Dr. Kate Sugarman**, a family physician residing in Maryland, has applied to sponsor the Venezuelan mother of a young woman in the United States suffering from life-threatening neurologic disorders, who needs her mother for care. Ex. K (Sugarman Decl.) ¶¶ 2–3, 5.

- **Dr. Nan Langowitz**, a business school professor in Massachusetts, is sponsoring a family who was forced to flee Venezuela because of the mother's human rights activism. Ex. C (Langowitz Decl.) ¶¶ 3, 12–13.

3

The aspiring supporter must submit a 13-page form, Form I-134A, "Declaration of Financial Support." Ex. 1. The supporter must disclose their own personal information and that of the proposed parolee, including evidence of the sponsor's and proposed parolee's income and assets that would support the parolee in the United States. The supporter, who will be "responsible for receiving, maintaining, and supporting" the parolee, including by assisting the parolee in "securing employment opportunities once authorized for work," must also include a written statement of how they intend to comply with these duties. *Id.* The supporter must certify, under penalty of perjury, "to assure the U.S. Government that the [parolee] will be financially supported while in the United States":

> **Part 5. Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary** (continued)
>
> I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.
>
> That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.
>
> That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.
>
> I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

Each of the Intervenors completed this application and provided detailed supporting evidence. **Ms. Laveus** spent a week gathering the required materials, including verification letters from her bank and employer. Ex. E. ¶ 21. **Mr. Sype's** parents had their house appraised to list it as an asset that could be used to support his proposed parolee. Ex. J. ¶ 3. **Dr. Cadenas** and his spouse submitted bank and retirement account information to prove their ability to sponsor. Ex. A ¶ 14. **Dr.**

**Langowitz** acknowledges that her commitment of support extends to health care costs. Ex. C ¶ 12.

### B.  Supporter and potential parolee undergo extensive background checks

After receiving a completed Form I-134A, USCIS performs a background check and vets the supporter to ensure they can financially support the proposed parolee. Ex. 2. If USCIS confirms an applicant's fitness to sponsor, USCIS contacts the potential parolee. *Id.* That individual must also apply, providing detailed biographical information and submitting to a background check. *Id.*

If USCIS decides to provide advance travel authorization, the potential parolee must secure their own travel to an airport within the United States. *Id.* Once at the port of entry, U.S. Customs and Border Protection ("CBP") undertakes additional screening and vetting before CBP ultimately decides whether to grant parole. *Id.*

### C.  If approved, a two-year grant of parole issues

Individuals granted parole through the Parole Pathways are given a two-year period of parole, during which time some may choose to apply for asylum, visas, or other authorization to extend their stay. Ex. 3. Parolees are also eligible to apply for employment authorization during their period of parole. *Id.*

### III.  Humanitarian and Public Benefits

The humanitarian crises contributing to migrants fleeing Cuba, Haiti, Nicaragua, and Venezuela—including instability and violence—are well-known and documented. Exs. 4–8 (DHS memoranda documenting humanitarian issues informing decision to implement Parole Processes).

The individuals whom Intervenors are sponsoring have suffered these conditions first-hand. **Ms. Laveus's** brother recently rushed to pick his son up from school because of nearby riots in which several people were burned alive. Ex. F ¶ 12. The Cuban family **Mr. Zito** has applied to sponsor risk incarceration due to their Christian faith. Ex. M ¶¶ 5, 12. The family **Dr. Langowitz** has sponsored was forced to flee Venezuela after speaking out about government corruption. Ex. C ¶¶ 12–13.

People fleeing violence and insecurity go to great lengths to seek safety for themselves and their families, even in the absence of safe pathways. Exs. 15, 16; *see also* Ex. Q (Scanlon Decl.) ¶¶ 4–6. There's no evidence that harsher immigration policies deter irregular migration, but plenty demonstrates that such policies make it more dangerous. Exs. 17, 18. Through the Parole Pathways, proposed parolees receive decisions before leaving their home countries, allowing them to avoid treacherous journeys and dangerous conditions at the border. Against this backdrop, the humanitarian benefits of the Parole Pathways can't be overstated. *See*, *e.g.*, Ex. Q (Scanlon Decl.) ¶¶ 14–20.

The Parole Pathways also promote family reunification, religious expression, community building, and economic growth, and further important foreign policy goals. The ability to work allows parolees to be self-supporting, generates tax revenue, and helps fill labor shortages, including in Texas, which as of December 2022 had 829,000 unfilled jobs. Exs. 3, 9. All of these are significant public benefits.

The Intervenors' experiences again illustrate this clearly. Three of the Intervenors applied to support close family members. For example, **Ms. Arauz** has

made her family whole by reunifying with her husband and bringing him home to their son. Ex. H ¶¶ 4–5. **Ms. Laveus** seeks to reunite her brother and nephew with her elderly mother and herself. Ex. E ¶ 22. Other supporters' stories are equally compelling. World Series champion Eduardo Rodríguez seeks to reunite with his Venezuelan parents and other family members so they can experience his success as a family. Ex. P ¶¶ 2, 4, 12. Through eight years playing Major League Baseball, his parents and family have only been able to watch him play on television. *Id.* ¶ 10. Mr. Rodríguez is "so excited" they may finally see him play in person; mostly he "look[s] forward to just being a family together." *Id.* ¶¶ 11–12.

The Parole Pathways also facilitate community building and the free exercise of religion. **Mr. Zito**, a devout Christian, seeks to answer a "calling from God" in sponsoring Abel, his close friend who has experienced religious persecution in Cuba. Ex. M ¶¶ 8, 12, 14. Similarly, **Dr. Langowitz's** synagogue, whose members work together to sponsor and support families seeking parole, has grown closer through their collective efforts to welcome families. Ex. D ¶ 14.

The Parole Pathways additionally foster economic growth. For example, **Mr. Sype's** cousin, facing a perpetual labor shortage on his farm, is excited to employ **Mr. Sype's** proposed parolee, Oldrys, once he is authorized to work. Ex. J ¶ 4. Economists across the political spectrum agree that immigration increases such growth. Ex. U (Hunt Expert Decl.) ¶ 6. Immigrants of all skill and education levels contribute to the economy by "increasing specialization and productivity" and contribute billions to Texas's Gross Domestic Product each year. *Id.* ¶ 8. One recent study assessing the

impacts of parole concluded that "people recently granted parole—largely from Afghanistan, Ukraine, and Latin American countries—have had a profoundly positive impact on our economy" and many, including in Texas, "are likely working in industries with labor shortages[.]" Ex. 19; *see also id.* Exs. 20–34; Ex. S (Wyatt Decl.) ¶ 5 (matching paroled individuals with labor needs).

Finally, the Parole Pathways advance United States foreign policy goals. Ex. 35 (USCIS memorandum articulating policy objectives for Pathways). Presidential administrations have used parole as an important foreign relations tool for decades, *see generally* Ex. R (Schwartz Decl.); Ex. O (Halperin Decl.); *cf.* Ex. Y (Schacher Decl.) ¶¶ 42–61—and in ways that can't be materially distinguished from the Parole Pathways. *See Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring) (urging deference "to the President's foreign-policy judgment" because "every Administration . . . has relied heavily on the parole option").

## SUMMARY OF ARGUMENT

Texas's challenge to the Parole Pathways should be rejected. As a threshold matter, Texas hasn't met its burden to establish standing. Even if it could, Texas can't show that the Parole Pathways violate the INA or APA. Finally, Texas can't meet its heavy burden to show that equitable relief—let alone nationwide relief—would be justified or appropriate here.

8

## ARGUMENT

### I.    Texas Lacks Standing

Texas, the only Plaintiff State to even attempt to establish standing or injury,[1] must demonstrate (1) injury in fact that is (2) fairly traceable to the challenged conduct **and** (3) likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Texas failed to carry its burden.[2]

*First*, Texas's claims of injury aren't concrete, actual, or imminent. Its asserted injuries are irrelevant to the Parole Pathways challenged here. In its Motion, Texas complains that it "spends significant amounts of money providing services to [undocumented immigrants]." ECF 20 ¶ 64. But this lawsuit doesn't concern undocumented immigrants. It concerns individuals who are or would be lawfully present in the United States and eligible for work authorization, each of whom has cleared thorough background checks and has a supporter who swears to support them financially.

Despite having disclosed 3,265 pages in discovery in response to requests seeking evidence of standing, ECF 101 at 2, Texas hasn't produced anything

---

[1] The other twenty States who had sought to challenge the Parole Pathways have confirmed they will not attempt to prove they have standing or experience injury. ECF 139 at 1.

[2] To the extent additional discovery or the Supreme Court's forthcoming decision in *U.S. v. Texas* (Priorities) impacts the parties' arguments, Intervenors will address any developments through supplemental briefing.

connecting a Parole Pathways decision to an injury to Texas. Additionally, Texas ignores offsetting revenue and countervailing benefits in connection with the alleged harms. *See infra* 18–21. Indeed, Texas admits that it ***doesn't even attempt to collect*** data relating to parolees through the Parole Pathways. Exs. 36–37. Instead, Texas offers only supposition: that parolees ***may*** settle in Texas; that, notwithstanding work authorization and supporters' guarantees of financial support, they ***may*** nonetheless enroll in state programs such as Medicaid; and do so in sufficiently high numbers that they ***may*** "strain[] Texas's finances and hamper[] its ability to provide essential services." ECF 22 at 25. This is far too speculative and attenuated to establish Article III standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[A] theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement" of actual or impending injury).

*Second*, Texas hasn't established that its alleged injury is fairly traceable to the Parole Pathways. It hasn't produced a single piece of evidence showing that a parolee under the Pathways residing in Texas has utilized *any* uncompensated services as Texas alleges—for example, state-funded healthcare or special educational services. *California v. Texas*, 141 S. Ct. 2104, 2116–17 (2021) (finding no standing where Texas didn't establish that its "pocketbook injury in the form of the increased use of (and therefore cost to) state-operated medical insurance programs" and other "expenses" was "fairly traceable" "to any actual or possible unlawful Government conduct"). And while Texas's unsupported assertions regarding injury are false (for example regarding increased crime and unemployment) *see infra* 19–20,

10

they fail even on their own terms: Texas's evidence relates solely to undocumented immigration, which is not relevant here. Texas's failure to even try to prove causation is a "fatal weakness." *California*, 141 S. Ct. at 2116–17.

*Finally*, Texas confirms its alleged injury isn't redressable, conceding that an injunction would only curtail "a particular set of procedures" but wouldn't prevent the same individuals from entering a different way. ECF 127 at 6; *see also* Ex. 37 (conceding same individuals could "be admitted through other means of parole or another program"). In short, Texas would still be exposed "to the exact same risks they otherwise impute to [the Parole Pathways], and no amount of equitable relief . . . will redress anything." *E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022).

No other theories establish Texas's standing. Even if Texas were entitled to "special solicitude" here (it isn't), this wouldn't cure its failure to establish injury in fact. *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683–84 (5th Cir. 2023) ("Regardless of the applicability of the special solicitude, [states] must still satisfy the basic requirements of standing."). And Texas can't invoke *parens patriae* standing because the Parole Pathways don't implicate a "quasi-sovereign interest[.]" *See id.* (finding Louisiana had no standing to challenge federal policy that applied "only to federal executive departments and agencies" and provided "no substantial pressure for [states] to change *their* laws") (emphasis in original).

Moreover, Texas has no "quasi-sovereign interest" in discriminating against a group of its residents: nationals of certain countries lawfully residing in Texas through humanitarian parole. A state's interests are in the "the well-being of its

*populace.* These include interests in the health and well-being—both physical and economic—of its *residents*[.]" *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) (emphases added) (internal quotations omitted). Texas can't warp *parens patriae* to assert injury based on the provision of services on the same basis to all its residents.

## II.   Texas Cannot Prevail on the Merits

Even if Texas could establish standing, its substantive challenge to the Parole Pathways fails. The Parole Pathways comport with the plain text of the INA, and Texas can't show that adoption of the Parole Pathways was arbitrary and capricious.

### A.   The Parole Pathways are consistent with § 1182(d)(5)(A)

Section 1182(d)(5) of the INA provides that the Attorney General may . . . "[1] *in his discretion* parole into the United States temporarily *under such conditions as he may prescribe* only [2] *on a case-by-case-basis* for [3] *urgent humanitarian reasons or significant public benefit* any [noncitizen] applying for admission to the United States." (emphases added). Especially as to policies issued under the parole statute, courts "must be deferential to the President's Article II foreign-policy judgment." *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). Intervenors incorporate Federal Defendants' arguments that the Parole Pathways comport with the INA, and in addition observe as follows.

#### 1.   The plain text establishes the lawfulness of the Parole Pathways

Texas's primary objection is based on unfounded skepticism that an agency with over 20,000 employees can process 30,000 applications per month on a "case-by-case basis," as § 1182(d)(5)(A) requires. Ex. 38 at 9. Case-by-case review isn't fundamentally incompatible with a relatively large-scale program. Mere suspicion

12

can't overcome evidence showing that, far from admitting parolees "en masse," the federal government considers each applicant, including detailed financial and background information, before making a determination. *See supra* 3–5; Exs. 2–8. Texas asks this Court to read limits into the statute that simply aren't there. The statute doesn't define "case-by-case" review and contains ***no numerical cap***.

Texas's complaint that the Pathways' stated purposes—to manage the border, meet foreign policy goals, and provide a safe pathway to the United States—somehow contravene the INA is also unfounded. By its plain terms, § 1182(d)(5)(A) accords broad discretion to the executive to determine what constitutes humanitarian and public benefit. Ex. Y (Schacher Expert Decl.) ¶ 20.

Texas makes the baffling contention that the Parole Pathways aren't being utilized for "urgent humanitarian reasons or significant public benefit" because one of the federal government's stated objectives was to deter attempts at unauthorized entry by providing "a meaningful incentive to seek a safe, orderly means of traveling to the United States." ECF 22 at 16–17. Obviously, there are ***substantial*** humanitarian and public benefits to providing safe migration pathways. *Supra* 5–8. Redirecting irregular migration to safe and legal pathways is a classic use of the parole authority. *See, e.g.*, Ex. O (Halperin Decl.) ¶ 23 & Ex. C at 5 ("normalizing the immigration flow between Cuba and the US" justified the mid- to late-1990s Cuban parole program as "part of an overall effort to redirect an abnormal flow into a legal one").

The Parole Pathways provide other benefits as well. The countries implicated in this program are experiencing humanitarian crises. *Supra* 5–8. And there are substantial benefits to reuniting paroled individuals with their loved ones. *Id.*

Remarkably, Texas's statutory argument turns largely on legislative history for proposed amendments that Congress ***rejected***. ECF 22 at 15–18. The failed amendments would have sharply narrowed the scope of § 1182(d)(5)(A) by defining the terms "urgent humanitarian reasons" and "significant public benefit" to encompass only very limited criteria. Ex. Y (Schacher Expert Decl.) ¶ 21. But Congress declined to enact any such limitations or define those terms. *Id.* It opted instead in 1996 to make explicit that parole grants must be case-by-case—which was arguably unnecessary, given that the Executive had long understood the parole authority to require case-by-case consideration—and rephrased the substantive criteria only in minor ways. *Id.* ¶ 22. Congress addressed concerns about the use of the parole authority reflected in the congressional report Texas cites not by limiting executive discretion or instituting numerical caps on the number of parolees, but instead by "requiring that nearly all long-term parolees who have yet to become legal permanent residents be counted against annual numerical caps on family-sponsored immigration . . . such that long-term parolees do not result in a net increase in immigration." *Id.* ¶ 19.

Congress's rejection of this stringent criteria that Texas wishes were law underscores that those criteria don't reflect Congressional intent. *Hamdan v. Rumsfeld,* 548 U.S. 557, 579–80 (2006) (""Congress' rejection of the very language

14

that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."); *see also Shannon v. United States,* 512 U.S. 573, 584 (1994) ("[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point."); Abbe R. Gluck, *Imperfect Statutes, Imperfect Courts: Understanding Congress's Plan in the Era of Unorthodox Lawmaking*, 129 Harv. L. Rev. 62, 77 n.90 (2015) ("[The Supreme Court] has long applied a 'rejected proposal rule,' under which it refuses to construe statutes to incorporate provisions that Congress has expressly rejected.").

Rather, Congress's intent to leave undisturbed the Executive's ability to use the parole authority programmatically is demonstrated by its choice to largely leave it as originally constructed. *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 361–62 (5th Cir. 2009) (en banc) (holding Congress's failure to amend a statute despite opportunities to do so upheld the statute's traditional interpretation); *see also* Ex. Y (Schacher Expert Decl.) ¶¶ 12–29 (describing consistent use of parole authority before and after the 1996 amendment).

        2.   <u>Decades of executive and congressional action confirm the lawfulness of the Parole Pathways</u>

Despite the unambiguous meaning of the plain text confirming the Parole Pathways satisfy the INA, to the extent the Court finds the "statute is subject to differing interpretations," then "the court must 'examine its legislative history, predecessor statutes, pertinent court decisions, and post-enactment administrative interpretations,'" *Salazar v. Maimon*, 750 F.3d 514, 519 (5th Cir. 2014), each of which further substantiates the lawfulness of the Parole Pathways.

15

Both before and after the 1996 amendments, presidential administrations have repeatedly invoked § 1182(d)(5)(A) to promulgate policies substantially similar to the Parole Pathways, under which tens of thousands of immigrants have been paroled. *See generally* Ex. Y (Schacher Expert Decl.). These prior policies were motivated by concerns analogous to the Pathways, including the need to relieve certain groups of the limitations of other immigration statutes, manage the land or maritime borders, fulfill important foreign policy goals, promote family reunification, and disincentivize use of dangerous pathways to the United States. *Id.* "[E]very Administration . . . has relied heavily on the parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden." *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). None of these applications have ever been found to exceed § 1182(d)(5)(A).

These include, most recently, the 2022 U4U Parole Process under which more than 123,000 Ukrainian individuals were paroled into the United States, including thousands to Texas. Exs. 39–41. This ongoing process is materially indistinguishable from the Parole Pathways, as it was the model for the Parole Pathways, as Texas acknowledges. ECF 20 ¶ 43. If anything, U4U is less restrictive as it has *no* numerical cap, whereas the Parole Pathways impose a monthly limit. Ex. Y (Schacher Expert Decl.) ¶ 62. Yet Texas hasn't challenged the U4U Parole Process, nor has any court found it unlawful.

The same is true of numerous similar programs, including:

- 2021: Allies Welcome program, under which DHS paroled nearly 76,000 Afghan nationals into the United States in less than one year.

16

- 2016: Filipino World War II Veterans Parole policy, which facilitated parole of certain family members of World War II Filipino veterans.

- 2014: Haitian Family Reunification Parole Program, which enabled family reunification faster than visas would become available and was justified by promoting safe migration to the United States.

- 2007: Cuba Family Reunification Parole program, which enabled family reunification faster than visas would become available and was justified by meeting commitments under international agreements, avoiding numerical caps on family-based visas, and reducing irregular migration.

- 2006: Cuban Medical Professionals Parole program, which allowed Cuban doctors and other medical professionals to request parole and was justified by foreign relations interests.

- 1994–98: Special Cuban Migration Program, notably spanning the 1996 amendments to the parole authority with no change, permitted the parole of several thousand Cuban nationals per year and was justified by foreign policy considerations and promoting safe migration.

*See generally* Ex. Y (Schacher Decl.), Ex. O (Halperin Decl.), & Ex. R (Schwartz Decl.). DHS's explanations for these programs are consistent with those for the Parole Pathways. Ex. Y (Schacher Expert Decl.) ¶¶ 62–67. Given this history, Texas's claims—that the Parole Pathways violate the parole authority because they are "programmatic" or not justified by urgent humanitarian reasons or significant public benefit—are meritless.

Far from indicating disapproval, Congress has consistently ratified programmatic uses of the parole authority, including recent examples that are materially indistinguishable from the Parole Pathways. Less than two years ago, for example, Congress voted to extend various benefits to Afghan nationals whom DHS had paroled, *and could continue to parole*, through Operation Allies Welcome—with no cap. *Id.* ¶ 29. Congress also ratified U4U by extending certain forward-looking

17

benefits to Ukrainian parolees, numbers of whom could also continue to grow with the continuing operation of the program. *Id*. There is a long history of similar ratifications of programmatic uses of parole. *Id*. ¶¶ 13, 16, 18–19, 28, 34. Texas ignores law and logic in arguing that this use of parole exceeds congressional authority when Congress has consistently, including recently, expressed its approval of using the statute in this way.

**B.   The Parole Pathways Aren't "Arbitrary and Capricious"**

Texas's argument that the Parole Pathways are an "arbitrary and capricious" application of parole authority of § 1182(d)(5)(A) is equally meritless.

An action isn't arbitrary and capricious if, as here, there's a rational connection between the facts the agency found and the decision it made. *Worldcall Interconnect, Inc. v. F.C.C.*, 907 F.3d 810, 817 (5th Cir. 2018). An agency is afforded additional deference in the context of policies issued pursuant to the parole statute, as courts "must be deferential to the President's Article II foreign-policy judgment." *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring).

1.   Texas hasn't shown parolee "costs" were ignored

Texas's primary complaint is that Federal Defendants implemented the Parole Pathways despite knowing "the costs imposed on states like Texas as a result of increased [undocumented] immigration." ECF 22 at 23. But this critique is nonsensical because ***the Parole Pathways are not undocumented immigration***. *Supra* 5–9. Not one piece of data in Texas's entire discussion of costs pertains to the Parole Pathways. Rather, Texas argues about the purported costs of undocumented

18

immigration from all nations. *See* ECF 22 at 11–14, 23–27. And even that data is fundamentally flawed. *See infra* 24–25.

Texas persistently ignores the specifics of the Parole Pathways under which individuals are admitted only after background checks, security vetting, and a supporter's sworn declaration of financial support. In short, the Parole Pathways take into account the very "costs" Texas claims were ignored. *See, e.g.*, Ex. 42 (accounting for the impact on communities and state and local governments in Venezuela parole process, on which processes for Cuba, Haiti, and Nicaragua were later based). Texas likewise ignores that the Parole Pathways allow parolees to work, contributing meaningfully to the economy, filling critical labor shortages, and broadening Texas's tax base. *Supra* 5–8. Texas's perverse complaint that parolees "would be eligible to receive work authorization," ECF 22 at 23, contradicts its larger argument about costs the state may bear when immigrants cannot work.

None of Texas's specific arguments as to costs provide any reasonable basis to conclude that the Parole Pathways are an arbitrary or capricious application of the substantial discretion accorded the government under § 1182(d)(5)(A):

***Public Safety.*** Texas's purported fears of "increased crime . . . due to [undocumented] immigration," ECF 22 at 12–13, 25, are unfounded. Texas ignores that parole beneficiaries are, by definition, not undocumented immigrants, and that parole applicants undergo background checks—confirming this concern was taken into account.

Even as to immigrants generally, including undocumented immigrants, Texas's claim is unsupported by evidence and resoundingly contradicted by well-established empirical research. Ex. W (Kubrin Expert Decl.) ¶ 19 ("[H]igher or increased immigration does not lead to more crime" and "often suppresses it"). "[B]ased on the collective research, including studies conducted in Texas specifically, immigrants, including undocumented immigrants, are disproportionately less likely to engage in crime compared to their native-born counterparts." *Id.* ¶ 24.

***Education.*** Texas hasn't produced a single document substantiating any educational costs resulting from the Parole Pathways. Texas relies almost entirely on declarations created for entirely different lawsuits challenging entirely different policies. *See* ECF 22-3 (originally filed in 2:22-cv-00094); 22-4, 22-5, and 22-6 (originally filed in 6:21-cv-00016). Texas's complaint that DHS ignored educational costs that Texas doesn't even attempt to show exist (let alone would increase), should be disregarded on this basis alone.

Notwithstanding its lack of evidence, Texas estimates multimillion-dollar gross educational costs due to the Parole Pathways based on yet another unrepresentative population: unaccompanied immigrant children, i.e., children who arrive in the United States without a parent or guardian. ECF 22 at 11–12. But unaccompanied minors ***aren't eligible*** for the Parole Pathways, Ex. 3, so these costs aren't evidence of harms attributable to the policy Texas is challenging. *California*, 141 S. Ct. at 2116–17 (2021). Texas hasn't provided ***any*** evidentiary support for its

cost estimates for bilingual services, or any showing regarding how many children paroled under the Parole Pathways would need them.

In reality, the educational costs Texas complains of tend to be close to zero. Ex. T (Gándara & Orfield Expert Decl.) ¶¶ 13–14. Texas also ignores that it receives federal compensation for students likely to receive bilingual education—as well as the value of education as an investment from which the state and its residents benefit. *Id.* at ¶¶17–19. Texas likewise fails to account for the fact that parolees residing in Texas will contribute to school costs through tax revenues.

***Healthcare.*** Texas's claims about costs to provide medical care to undocumented immigrants are equally inapt. Parolees aren't undocumented immigrants, and their supporters bear financial responsibility for their care. *Supra* 3–5. Even as to undocumented immigrants, Texas's figures are unsupported and contradicted by data. The medical costs for undocumented immigrants "are trivial and so small that they do not displace services for other needy people, as asserted by the States." Ex. V (Ku Expert Decl.) ¶ 15. And, again, Texas's claims ignore federal compensation and policies that benefit Texas. *Id.* ¶¶ 12–14.

***Driver's Licenses.*** Texas's argument regarding driver's license costs is likewise untethered to actual costs incurred in connection with Parole Pathways beneficiaries. ECF 22 at 11. It is also fundamentally flawed and incomplete, ignoring direct revenues and net fiscal benefits to states of increasing driver's license access— as multiple studies have shown. Ex. X (Roldan Expert Decl.) ¶¶ 22–24.

2.   <u>Texas's other assertions are equally baseless</u>

Even if the Court credits Texas's unfounded cost claims, Texas doesn't attempt to explain how those costs undermine its "reliance interests," ECF 22 at 22–23, nor could it. Reliance interests are implicated when an agency "changes course" from "longstanding policies." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020). No such change occurred here; to the contrary, Texas admits that the Parole Pathways copied an existing parole pathway, U4U. *Supra* 16. Texas couldn't possibly articulate what policy it had relied upon (because Texas didn't detrimentally rely on any prior policy), or how DHS changed course (because DHS didn't change course)—so Texas doesn't even try.

Texas separately complains that there is insufficient evidence of a "sudden surge of migrants from several specific countries," and that the Parole Pathways are therefore an arbitrary and capricious application of government discretion under § 1182(d)(5)(A). ECF 22 at 23. But this is thoroughly disproven by DHS data in the record. *See e.g.*, Exs. 14, 43. A federal policy must be upheld if it is supported by "substantial evidence," which is "***less than*** a preponderance." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (emphasis added). Substantial evidence is easily present here.

Finally, Texas complains about lack of a specific removal mechanism after the two-year parole period lapses. ECF 22 at 23–24. But Texas doesn't explain why a new mechanism is needed (given existing removal processes) or authorized (given 8 U.S.C. § 1229a(a)(3) ("*Exclusive* [removal] procedures")) (emphasis added). Moreover, a primary purpose of parole is to permit the recipient to reside in the United States

while continuing to pursue a visa application—a fact that Texas ignores. *Supra* 5, 17; Ex. Y (Schacher Expert Decl.) ¶¶ 54, 61.

Texas's claims of arbitrary and capricious agency action are themselves untethered to the facts, not the other way around.

### III.   Texas is Not Entitled to an Injunction or Vacatur

To obtain a permanent injunction or vacatur, Texas must first prevail on the merits by showing a violation of the APA, which Texas can't do.

But even if Texas could otherwise prevail on the merits (it can't), an injunction of any kind—let alone a nationwide injunction—would be inappropriate here. Texas must prove that "(1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiffs and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Failure to meet any one of these criteria requires denial of injunctive relief. *Id.*

Because Texas seeks a nationwide injunction—i.e., relief that profoundly affects millions of nonparties, including millions who will never reside in Texas—the showing Texas must make is heightened further still. "Universal injunctions have little basis in traditional equitable practice.*" Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

A.      **Texas cannot establish irreparable harm**

Texas can't meet its burden to establish irreparable harm. Its speculative pocketbook injury is unsupported and refuted by evidence. Even if Texas experiences some fiscal outlays, immigrants' net contributions to the state offset any such costs. There is no legal basis for ignoring those benefits. And Texas's claimed injury is discriminatory and thus isn't legally cognizable. Each of these reasons is sufficient to defeat Texas's request.

1.      <u>Texas cannot establish injury for which money damages would be insufficient</u>

Texas hasn't shown any harm deriving from the Parole Pathways. *Supra* 9–11. But even if the Court credits the unsubstantiated expenses Texas relies on to find that Texas has ***standing***, that wouldn't satisfy Texas' burden to show ***irreparable*** injury. Irreparable injury requires the absence of adequate compensation. *eBay Inc.*, 547 U.S. at 391. Texas can't claim an irreparable fiscal injury by estimating ***expenses*** on one side of the ledger, while refusing to consider ***revenues*** on the other side. Ex. 37. In other words, Texas can't presume irreparable injury by cherry picking only negative data points.

Moreover, Texas's purported pocketbook injury isn't irreparable because it is offset by the corresponding *gains* Texas ignores. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (weighing the "economic benefits" of a challenged program against its costs when balancing the parties' hardships). Across its claimed injuries, Texas overlooks revenues and other benefits that would flow from the same conduct it attacks.

For example, economists across the political spectrum agree that immigration increases economic growth. Ex. U (Hunt Expert Decl.) ¶ 7; *supra* 7–8. Texas ignores fees and taxes that offset driver's license costs, as well as documented fiscal benefits to states and their populace of increasing driver's license access. Ex. X (Roldan Expert Decl.) ¶¶ 22–24. Texas's estimated education costs likewise ignore federal compensation for students likely to receive bilingual education and overlooks the value of education as an investment from which the state benefits. Ex. T (Gándara & Orfield Expert Decl.) ¶¶ 17–19. Texas ignores that increased immigration often suppresses crime. Ex. W (Kubrin Expert Decl.) ¶ 19. And Texas's claims about uncompensated healthcare ignore federal compensation that benefits Texas. Ex. V (Ku Expert Decl.) ¶¶ 12–14.

Texas hasn't satisfied its burden to prove that its fiscal burden, if any, is irreparable.

2.  <u>Texas's claimed injury is discriminatory and thus not legally cognizable</u>

Texas's alleged injuries are based on harmful stereotypes, erroneous comparisons, and are contradicted by widely available empirical evidence. *Supra* 18–23; Ex. U (Hunt Expert Decl.) ¶ 3 (the assertion that "immigrants threaten domestic jobs and wages and the nation's economy has been thoroughly debunked"); Ex. W (Kubrin Expert Decl.) ¶ 19 ("[H]igher or increased immigration does not lead to more crime.").

Not only do these shortcomings fail to establish irreparable harm, *supra* 24–26, they suggest discriminatory intent. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th

Cir. 2016) (evidence of discriminatory intent exists where the purported problem "was almost nonexistent"); *Exodus Refugee Immigr., Inc. v. Pence*, 838 F.3d 902, 904–05 (7th Cir. 2016) (excluding Syrian refugees was discriminatory because it was "based solely on the [perceived] threat . . . they pose to the safety of the residents of Indiana.").

Even if credited, Texas complains only of costs associated with a growing population; but Texas has welcomed population growth for years. Exs. 44–46. To the extent Texas is injured by the presence of Cuban, Haitian, Nicaraguan, and Venezuelan parolees within its borders, it would be equally injured by Ukrainian parolees in Texas—yet Texas does not seek to exclude Ukrainian parolee residents present through the materially identical U4U program on which the Parole Pathways were modeled, ECF 20 at ¶ 44. Texas has provided no explanation for this discrepancy. *See Shaw v. Reno*, 509 U.S. 630, 643 (1993) (a facially neutral act that is "unexplainable on grounds other than race" violates equal protection without proof the discrimination was necessary to achieve a compelling government interest).

Racial or national origin discrimination can't form the justification for a claim of irreparable injury, as Texas can't do indirectly what it cannot do directly. *Bailey v. State of Alabama*, 219 U.S. 219, 239, 244–45 (1911). Neither should this Court "plac[e its] power, property and prestige behind the [alleged] discrimination." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624 (1991) (citation omitted); *accord Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) ("[A] party's inequitable conduct can make equitable relief inappropriate").

## B.     The balance of equities and public interest weigh against an injunction

The Parole Pathways represent a "bright spot" in the immigration system. Ex. J (Sype Suppl. Decl.) ¶ 10. The requisite balancing of the parties' equities and the public interest, *Winter*, 555 U.S. at 24, weighs heavily against Texas's request for extraordinary relief, which would undermine deeply held national values, extinguish families' hopes to reunite, and cut short the Pathways' contributions to stability and safety in immigration, economic growth, and community-building. Thousands of Texans enthusiastically support the Parole Pathways: Texas ranks among the top five states based on numbers of residents supporting parolees. Ex. 39. This support is no mystery. The Parole Pathways promote family reunification and religious expression—including for Texans. Ex. M (Zito Decl.) ¶ 14.

*Humanitarian protections*. The Parole Pathways stand to save lives by creating a safe pathway for displaced individuals, including those who may qualify for asylum but who would otherwise be unable to access the asylum system. Exs. 3, 47; Ex. Q (Scanlon Decl.) ¶¶ 4–6, 14–19; Ex. M (Zito Decl.) ¶ 12 ("Abel has been harassed and has risked incarceration because of his faith . . . ."); Ex. F (Laveus Suppl. Decl.) ¶ 12 ("Over the course of just a few months this year, the conditions in Haiti have continued to deteriorate as civic unrest and violence persist virtually unchecked."). The humanitarian and public interest inherent in creating programs that discourage use of unsafe pathways has been recognized (and unchallenged) for decades and across party lines. *Supra* 12–18.

***Religious liberty.*** The Parole Pathways are also intertwined with the free exercise of religious faiths. Ex. 48. This inextricable link is evidenced in several Intervenors' stories. *Supra* 3–7; Ex. M (Zito Decl.) ¶ 14; Ex. D (Langowitz Supp. Decl.) ¶ 14. Preserving religious freedom as is enshrined in our nation's fundamental texts and practices is undoubtedly in the public interest. *See Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535, 539 (5th Cir. 2013) (injunctions protecting First Amendment freedoms are in the public interest).

***Economic growth.*** The Parole Pathways contribute to economic growth, Ex. U (Hunt Expert Decl.) ¶¶ 6–7, address labor shortages, Exs. 20–34, and also allow immigrants, employers, and communities to plan ahead, creating the conditions for orderly and safe integration. Ex. S (Wyatt Decl.) ¶¶ 6, 9–11.

***Foreign Policy.*** The Parole Pathways advance United States foreign policy goals. Exs. 4–8. For decades, parole has been used as an important foreign relations tool that courts shouldn't undermine. *See generally* Ex. R (Schwartz Decl.); Ex. O (Halperin Decl.); *see also Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115–16 (2013) (cautioning courts not to interfere "in the conduct of foreign policy"); *Arizona v. United States,* , 567 U.S. 387, 397 (2012) ("[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy.").

Texas's entirely speculative harms don't come close to outweighing these interests. *Friends of the Earth*, 434 U.S. at 1313–14 ("[A]ny adverse economic effect of the Plan's partial implementation over the next two months is balanced to some

considerable extent by the irreparable injury that air pollution may cause during that period"). An injunction would pose significant hardship to Intervenors and all other Americans directly impacted by the Parole Pathways, while deeply undermining the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987) (a federal judge isn't "obligated to grant an injunction for every violation of law" and must also "balance the competing claims of injury and must consider the effect [of an injunction] on each party").

Texas's requested relief would deny Intervenors and other prospective supporters the ability to sponsor their families and friends; provide them safety; reunite grandparents, parents, and children; exercise freely their religious beliefs; and so much more. *See supra* 3–8. These equities are unquestionably in the public interest. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (the relationship between parent and child is "constitutionally protected"); Ex. 49 ("reunifying families is in the national interest"). Confirming the breadth and depth of the national public interest in maintaining the Parole Pathways, DHS has received over 1.5 million applications from U.S. supporters hoping to welcome Cuban, Haitian, Nicaraguan, and Venezuelan nationals. Ex. 39 (Federal Defendants' Response to Interrogatory No. 1); Ex. 50; *Arizona*, 567 U.S. at 416 ("The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here.").

## CONCLUSION

Texas's claims are meritless and, in any event, Texas hasn't shown that it has standing or would sustain the irreparable injury required to obtain the nationwide

injunction that it seeks. On the other hand, Intervenors, their friends, families, and communities, and the public interest nationwide benefit immensely from the Parole Pathways. For all of these reasons, Intervenors respectfully submit that Texas's challenge to the Parole Pathways should be denied.

Dated: June 20, 2023

Respectfully submitted,

*/s/ Monika Y. Langarica*
**Monika Y. Langarica\***
California Bar No. 308518
langarica@law.ucla.edu

**Ahilan T. Arulanantham\***
California Bar No. 237841
arulanantham@law.ucla.edu

**CENTER FOR IMMIGRATION LAW AND POLICY**
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

**Esther H. Sung (Attorney-In-Charge)\***
California Bar No. 255962
*Application for Admission pending*
esther.sung@justiceactioncenter.org

**Karen C. Tumlin\***
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Jane Bentrott\***
California Bar No. 323562
D.C. Bar No. 1029681
Virginia Bar No. 87903
jane.bentrott@justiceactioncenter.org

**Lauren Michel Wilfong\***
New York Bar No. 5975529
New Jersey Bar No. 378382021
*Not admitted to practice law in California*
lauren.wilfong@justiceactioncenter.org

**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

**Daniel Hatoum**
Texas Bar No. 24099136
New York Bar No. 5598339
daniel.hatoum@raicestexas.org

**Vanessa Rivas-Bernardy\***
California Bar No. 341464
vanessa.rivas@raicestexas.org

**THE REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (RAICES)**
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
Telephone: (210) 960-3206
Facsimile: (210) 634-1279

*\*admitted pro hac vice*

**Kate Kaufmann Shih**
Texas Bar No. 24066065
Federal Bar No. 1214426
kateshih@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713)221-7100

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that the word count for this brief, not including the case caption, table of contents, table of authorities, signature block, and certificates, is 7,473 words.

/s/ *Kate Shih*
Kate Shih

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing instrument was served via ECF pursuant to the Federal Rules of Civil Procedure on the 20th day of June 2023, upon all counsel of record in this matter.

/s/ *Kate Shih*
Kate Shih