PRE-DECISIONAL/DELIBERATIVE

**EXHIBIT 8**

U.S. Department of Homeland Security
Washington, DC 20528



December 22, 2022

## ACTION

## MEMORANDUM FOR THE SECRETARY

| | | |
|---|---|---|
| FROM: | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans | ROBERT P SILVERS<br>Digitally signed by ROBERT P SILVERS<br>Date: 2022.12.22 18:05:25 -05'00' |
| | Troy Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection | TROY A MILLER<br>Digitally signed by TROY A MILLER<br>Date: 2022.12.22 19:39:13 -05'00' |
| | Ur M. Jaddou<br>Director<br>U.S. Citizenship and Immigration Services | UR M JADDOU<br>Digitally signed by UR M JADDOU<br>Date: 2022.12.22 18:36:35 -05'00' |
| SUBJECT: | **Updates to the Parole Process for Certain Venezuelan Nationals** | |

### I. Summary

On October 12, 2022, PLCY, CBP, and USCIS recommended, and you approved, a new process for Venezuelans that provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at the port of entry, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.[1] This process is contingent on DHS's ability to impose a consequence on such individuals for entering the United States without authorization along the Southwest Border (SWB). Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] It also has led to a precipitous decline in Venezuelan irregular migration

---

[1] *See* Memorandum for the Secretary from Under Secretary for Strategy, Policy, and Plans Silvers et al, re Parole Process for Certain Venezuelan Nationals, Oct. 12, 2022; DHS, DHS Announces New Migration Enforcement Process for Venezuelans, Oct. 12, 2022, https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000144

PRE-DECISIONAL/DELIBERATIVE

throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap was down from 40,593 in October to just 668 in November.[3]

For the reasons described in the October 12 memo, and based on the demonstrated success of the process, DHS would like to ensure its continuation, including to account for the expected transition from enforcing the Centers for Disease Control and Prevention's (CDC) public health Order issued pursuant to Title 42 authorities to immigration processing pursuant to Title 8 authorities. As such, the purpose of this memo is to recommend two changes to the existing process for Venezuelans:

1) Removing the 24,000 limit on travel authorizations for Venezuelans. This would be replaced with a monthly cap of 30,000 travel authorizations across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate memoranda sent to you today). Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

    This change reflects the fact that DHS has received about 100,000 supporter applications over the first two months of the process. It would, as a result, allow DHS to continue to maintain a strong incentive for Venezuelan nationals to wait in safe locations and apply and be vetted to fly directly to the U.S., rather than entering without authorization at the SWB. This change further accounts for DHS establishing similar—but separate and independent— parole processes for nationals of Cuba, Haiti, and Nicaragua.

2) Updating the eligibility criteria by including an exception that would enable Venezuelans, who crossed without authorization into the United States at the SWB and were subsequently authorized a one-time option to voluntarily depart or voluntarily withdraw their application for admission, to still maintain their eligibility to participate in this parole process. This change would preserve resources that otherwise would be expended on processing individuals through expedited removal or full removal proceedings, and allow more individuals the option to seek parole through this process. This change would also update the dual nationality ineligibility provision to accommodate the implementation of other similar parole processes.

DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing irregular migration at our border and throughout the hemisphere, and instead channels these flows into a safe, secure, and orderly process that is sufficiently robust to continue to incentivize migrants to use it.

## II. Background

---

[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

Venezuela AR_000145

On October 19, 2022, DHS published a Federal Register Notice to describe a new effort to address the high number of Venezuelans encountered at the SWB.[4] To date, Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization, are either expelled to Mexico pursuant to the CDC's Title 42 public health Order or, if not expelled, processed for removal proceedings or the initiation of such proceedings.

Upon the termination of the Title 42 public health Order, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. For this process to continue to be effective, the Government of Mexico (GOM) will need to make an independent decision to accept the return of Venezuelan nationals under Title 8 processes—thus continuing to maintain, and expand, on the success of the Venezuela process to date.

*Eligibility to Participate in the Process*

Pursuant to the October 12 memorandum, DHS implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela; as a conforming change, this memorandum seeks your approval to limit this "dual national ineligibility provision" such that it does not apply if DHS operates a similar parole process for the additional country's nationals. Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### III. Assessment of the Process to Date

The Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can yield a meaningful change of migratory flows. The new parole process for Venezuelans enables those who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for such individuals to make a dangerous journey to the SWB. Meanwhile, the GOM made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health

---

[4] *Id.*

PRE-DECISIONAL/DELIBERATIVE

order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process.

Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day.[5] As of the week ending December 4, the number has fallen further, to an average of 86 a day.[6] With the vast majority of those encountered returned to Mexico, fewer releases has freed up DHS resources that would otherwise be used to process these individuals; it also means fewer individuals for state and local governments, as supported by civil society, to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién Gap have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[7] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[8] And still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[9]

DHS has seen strong interest in this parole process. As of December 12, 2022, DHS has received almost 96,000 supporter applications, confirmed more than 18,600 of them, and authorized travel for more than 14,700 Venezuelan beneficiaries. Already more than half of the available number of travel authorizations have been approved.[10] Of those authorized to travel to the United States, more than 8,400 have arrived and were paroled into the country.[11] Nearly 2,800 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 1,900 came from Venezuela, 1,200 from Mexico, and 2,500 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[12]

## IV. Proposed Changes

---

[5] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[6] *Id.*
[7] La Prensa Latina Media, *More Than 4,000 Migrants Voluntarily Returned to Venezuela from Panama*, Nov. 9 2022, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, (last viewed Dec. 8, 2022).
[8] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, Oct. 14, 2022, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, (last viewed Dec. 8, 2022).
[9] Axios, *Biden's New border Policy Throws Venezuelan Migrants into Limbo*, Nov. 7 2022, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap, (last viewed Dec. 8, 2022).
[10] Department of Homeland Security, Daily Venezuela Report, Dec. 12, 2022.
[11] *Id.*
[12] *Id.*

4

PRE-DECISIONAL/DELIBERATIVE

Given the early success of the process, DHS is seeking two changes to the process to ensure its continued viability, particularly as we prepare for an eventual transition from Title 42 processing to full Title 8 processing at the border.

*Replace the 24,000 limit on travel authorizations*

As provided for in the October 12 memorandum and described in the October 19 *Federal Register* Notice, there is a limit of 24,000 travel authorizations issued as part of the Venezuela process. The demand has exceeded the limit. As of December 12, in less than two months of operation, DHS has received more than 96,000 applications from supporters, and has approved well more than half of the available travel authorizations (14,700 of 24,000). When DHS reaches the numerical cap, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see an increased irregular migration of Venezuelans as a result.

Accordingly, we recommend that you replace the numerical limit on travel authorizations for Venezuelans. We recommend that you replace it with a monthly cap of 30,000 travel authorizations spread across this process and the separate and independent processes recommended for nationals of Cuba, Haiti, and Nicaragua. Under this change, DHS would continue to intake applications and process travel authorizations at a pace that could accommodate up to 30,000 each month, but would retain flexibility within that cap in terms of how the authorizations are considered and processed. This recommended change is based on DHS's experience with the pre-existing Venezuela process, taking into account a combination of DHS resource limitations, supporter and beneficiary demand, and an assessment of the effect on migratory flows. We recommend that the Department continue to evaluate this cap and make adjustments if needed over time.

As before, the Secretary would retain the sole discretion to terminate the process at any point. Although the monthly limit on the number of travel authorizations granted under this process would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans, each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

*Update eligibility criteria*

With the GOM's independent decision to accept returns of Venezuelans, DHS is currently expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[13]

---

[13] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

5

Venezuela AR_000148

When the Title 42 public health order is no longer in place, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8 authorities, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to INA § 240B, 8 U.S.C. § 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4), or may be ordered removed. DHS assesses that this change will, in addition to providing migrants a one-time opportunity to continue to access a parole process about which they may not have been fully informed, be appreciated by the GOM and inform their internal decision making as they consider whether to make an independent decision to accept the return of migrants processed pursuant to Title 8. In addition, permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

If the proposed change is put into effect, individuals would, in general, continue to be ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization along the SWB after October 19, 2022. The change would, however, introduce the following exception: individuals who have been permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) would still maintain their eligibility to participate in the parole process. This change would only be applicable for those individuals who crossed into the United States after December 20, 2022.

DHS considered not implementing this request but decided that it was needed to inform the Government of Mexico's independent decision to accept the return of Venezuelan nationals under Title 8 processes. This in turn is critical to our ability to continue combining the Venezuela process with a consequence for those who fail to pursue this process and instead cross the SWB without authorization; this change is in the Department's interest at this time.

## VI. Administrative Procedure Act

The October 12 memorandum authorizing this process explained that implementation of this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[14] (2) the process pertains to a foreign affairs function of the United States,[15] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[16] The changes recommended in this memorandum are amenable to immediate issuance and implementation for the same reasons.

---

[14] 5 U.S.C. § 553(b)(A).

[15] 5 U.S.C. § 553(a)(1).

[16] 5 U.S.C. § 553(b)(B).

6

PRE-DECISIONAL/DELIBERATIVE

First, these changes relate to a general statement of policy, *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, these changes continue to pertain to a foreign affairs function of the United States, as described in the October 12 decision memorandum, and are directly responsive to ongoing conversations with, and requests from, foreign partners. Specifically, the GOM has urged the U.S. to consider lifting the 24,000 limit,[18] which would allow more Venezuelans able to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's willingness to continue to accept returns under Title 8 processes and produce undesirable international consequences. Absent these changes, once the Title 42 public health order is lifted, DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere, and to our border.

Finally, even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration. Specifically, as noted above, absent the implementation of these changes DHS would not be able to seamlessly transition the Venezuela process to Title 8 authorities after the Title 42 public health order ceases to be in effect. This would, in turn, undermine the substantial improvement to border security that has been achieved through the dramatic reduction of unauthorized entries that has resulted from the implementation of the Venezuela process to date. For these reasons, DHS cannot delay in issuing the FRN associated with this process.

---

[17] *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'*, Dec. 13, 2022, https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/, (last viewed Dec. 14, 2022)

7

## Recommendation

For the reasons described in this memo, we recommend that you approve the two changes to the process for Venezuelans, announced on October 12, 2022 and implemented on October 19, 2022.

1. Remove the 24,000 limit on travel authorizations put in place by the prior *Federal Register* notice and instead establish a monthly limit that would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans, and shall not exceed 30,000 each month.

2. Update the eligibility criteria in the previous *Federal Register* notice by including an exception that would permit Venezuelans who crossed without authorization into the United States after December 20, 2022, who have been permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c, or a single voluntary withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4), to maintain their eligibility to participate in this parole process. This change also updates the dual nationality ineligibility provision to accommodate the implementation of other similar parole processes.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

This memorandum, once approved, would, together with the October 12 memorandum, be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

Approve/date _____ [redacted] _____ rove/date _____

DEC 2 2 2022

Modify/date _____ Needs discussion/date _____

8

Venezuela AR_000151