| | |
|---|---|
| **From:** | Ryan Walters <Ryan.Walters@oag.texas.gov> |
| **Sent:** | Tuesday, June 13, 2023 11:43 PM |
| **To:** | Jane Bentrott; David Bryant; Leif Olson |
| **Cc:** | Monika Langarica; Karen Tumlin; Esther Sung; Vanessa Rivas; 'brian.c.ward@usdoj.gov'; 'elissa.p.fudim@usdoj.gov'; 'erin.t.ryan@usdoj.gov'; 'erez.r.reuveni@usdoj.gov'; Ryan Walters |
| **Subject:** | RE: TX v. DHS (Parole), TX Discovery Response Discussion |

All—here is our follow-up response to Defendant-Intervenors' questions about our responses to Federal Defendants' discovery requests:

- **You noted that the indicated costs the state provided related to education are "exclusive of any federal funds provided to the State." Is the same true for the other categories of costs Texas has identified? I.e., none of the cost information in Texas's production reflects federal reimbursements or other funds provided to the State?**

Yes; where Texas has indicated costs, the numbers do not reflect any federal funds provided to the State unless specifically referenced.

- **With respect to RFP 10, does Texas have in its possession any documents and data that reflect revenues generated to the State based on any of the populations reflected in Texas's other discovery responses?**
    - **If so, Intervenor Defendants respectfully request that Texas produce such documents and data.**

After inquiries to the Texas Comptroller of Public Accounts, the Texas Demographic Center, and the Texas Workforce Commission--as well as inquiries around the State to determine which agencies were most likely to have such information—Texas does not have any documents responsive to this request, which we do not interpret to seek information of offsets to State benefits like fees or federal funds; such fees or funds that merely offset costs paid by the State would not "contribute economic value to the State," as RFP No. 10 states, and none of the examples in that request–"paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives"—indicate that such information is being requested here.* Unless the information produced indicates specific offsetting revenues (for example, declarations of Sheri Gipson for the Texas Department of Public Safety referencing fees received for driver license applications), the costs to the State in the information produced do not reflect any offsetting fees or federal funding or reimbursement.

- **Does Texas maintain any relevant data stating or reflecting revenues or reimbursements with respect to the four categories of costs you've identified – education, driver's licenses, public safety, and healthcare?**
    - **If so, Intervenor Defendants respectfully request that Texas produce this data.**

The discovery requests did not seek information from Texas regarding offsetting fees or federal funding or reimbursements relating to Texas's costs:

    RFP No. 4 seeks "costs to your State from providing *unreimbursed* medical care" (emphasis added)
    RFP No. 5 seeks "the cost to your State from providing public education"—with no request for offsetting revenues
    RFP No. 7 seeks "the costs to your State from providing driver's licenses or other identification documents"—with no request for offsetting revenues
    RFP No. 8 seeks "the cost to your State associated with law enforcement"—with no request for offsetting revenues

1

**EXHIBIT 37**

ROG No. 7 seeks only numbers of CHNV nationals "convicted of crimes in your State"—with no request for costs or offsetting revenues

ROG No. 8 seeks "how much money did *you spend* on such [healthcare and medical] services" (emphasis added)—with no request for offsetting revenues

ROG No. 9 seeks "how much money was *spent* [on *state*-subsidized education]" (emphases added)—with no request for offsetting revenues

ROG No. 10 seeks "[w]hat costs, if any, has your State incurred from issuing driver's licenses or Stater-identification documents"—with no request for offsetting revenues

*The *noscitur a sociis* canon—*see* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (Associated-Words Canon)—makes this the best interpretation here:

> As explained in *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), we rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." Id., at 575 (internal quotation marks omitted). See also *United States v. Williams,* 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) ("a word is given more precise content by the neighboring words with which it is associated"). In *Gustafson,* we interpreted the word "communication" in § 2(10) of the Securities Act of 1933 to refer to a public communication, rather than any communication, because the word appeared in a list with other words, notably "notice, circular, [and] advertisement," making it "apparent that the list refer[red] to documents of wide dissemination." 513 U.S., at 575–576, 115 S.Ct. 1061. And we did so even though the list began with the word "any."

*Yates v. United States*, 574 U.S. 528, 543 (2015). "The 'common quality' in a list that is the focus of the *noscitur a sociis* inquiry 'should be its most general quality — the least common denominator, so to speak — relevant to the context.'" *In re Crocker*, 941 F.3d 206, 219 (5th Cir. 2019) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 196 (2012)).

!



**Ryan D. Walters**
Deputy Chief
Special Litigation Division
Office of the Texas Attorney General
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
Ryan.Walters@oag.texas.gov

---

**From:** Jane Bentrott <Jane.Bentrott@justiceactioncenter.org>
**Sent:** Tuesday, June 13, 2023 11:27 AM
**To:** Ryan Walters <Ryan.Walters@oag.texas.gov>; David Bryant <David.Bryant@oag.texas.gov>; Leif Olson <Leif.Olson@oag.texas.gov>
**Cc:** Monika Langarica <langarica@law.ucla.edu>; Karen Tumlin <karen.tumlin@justiceactioncenter.org>; Esther Sung <Esther.Sung@justiceactioncenter.org>; Vanessa Rivas <vanessa.rivas@raicestexas.org>; 'brian.c.ward@usdoj.gov' <brian.c.ward@usdoj.gov>; 'elissa.p.fudim@usdoj.gov' <elissa.p.fudim@usdoj.gov>; 'erin.t.ryan@usdoj.gov'

<erin.t.ryan@usdoj.gov>; 'erez.r.reuveni@usdoj.gov' <erez.r.reuveni@usdoj.gov>
**Subject:** RE: TX v. DHS (Parole), TX Discovery Response Discussion

Thank you for providing these clarifications and responses, Ryan.

It does not look like your email addressed a couple of our outstanding questions – mindful that Friday is the discovery cutoff, could you please respond to these remaining questions today?

- You noted that the indicated costs the state provided related to education are "exclusive of any federal funds provided to the State." Is the same true for the other categories of costs Texas has identified? I.e., none of the cost information in Texas's production reflects federal reimbursements or other funds provided to the State?
- With respect to RFP 10, does Texas have in its possession any documents and data that reflect revenues generated to the State based on any of the populations reflected in Texas's other discovery responses?
    - If so, Intervenor Defendants respectfully request that Texas produce such documents and data.
- Does Texas maintain any relevant data stating or reflecting revenues or reimbursements with respect to the four categories of costs you've identified – education, driver's licenses, public safety, and healthcare?
    - If so, Intervenor Defendants respectfully request that Texas produce this data.

Best regards,
Jane



**Jane Bentrott** (she/her)
*Counsel*

Justice Action Center
323-504-3165
jane.bentrott@justiceactioncenter.org

*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender and delete this message and its attachments, if any.*

---

**From:** Ryan Walters <Ryan.Walters@oag.texas.gov>
**Sent:** Tuesday, June 13, 2023 1:09 AM
**To:** Jane Bentrott <Jane.Bentrott@justiceactioncenter.org>; David Bryant <David.Bryant@oag.texas.gov>; Leif Olson <Leif.Olson@oag.texas.gov>
**Cc:** Monika Langarica <langarica@law.ucla.edu>; Karen Tumlin <karen.tumlin@justiceactioncenter.org>; Esther Sung <Esther.Sung@justiceactioncenter.org>; Vanessa Rivas <vanessa.rivas@raicestexas.org>; 'brian.c.ward@usdoj.gov' <brian.c.ward@usdoj.gov>; 'elissa.p.fudim@usdoj.gov' <elissa.p.fudim@usdoj.gov>; 'erin.t.ryan@usdoj.gov' <erin.t.ryan@usdoj.gov>; 'erez.r.reuveni@usdoj.gov' <erez.r.reuveni@usdoj.gov>
**Subject:** RE: TX v. DHS (Parole), TX Discovery Response Discussion

Everyone, after making further inquiries to various State agencies, these are our responses to the questions we received from Defendant-Intervenors relating to our discovery responses.

Texas used the term "illegal alien" with imprecision several times in its responses—we have attached a supplemental response that clarifies them.

Regarding Texas's responses to Request for Production No. 10 that indicated that neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks the requested information by national origin—We have since

3

made an additional inquiry of the Texas Workforce Commission, which has indicated it does not track taxes or maintain data by national origin.

Regarding the sources of evidence of costs for various social services Texas provides to aliens:

### Education:
The indicated costs to the State for educating each child, and the added cost for Bilingual and Compensatory Education, are exclusive of any federal funds provided to the State.

### Driver Licenses:
The Texas Department of Public Safety ran a query against the Driver License System (DLS) to determine how many transactions have been processed for non-citizens where the birth country of the driver license or ID holder is Cuba, Haiti, Nicaragua, or Venezuela. The birth country is the only piece of data DPS maintains in a searchable format within DLS related to country of origin. DPS cannot run a query to identify the current country of citizenship. The licensing process for non-citizens involves an in-person transaction during which current identification and immigration documentation is presented and verified through the federal SAVE system. A license is not issued to non-citizens without SAVE verification.  As such, information about a holder's  current country of citizenship is presented during the transaction but is not a datapoint captured in DLS. The overall process is designed to determine if someone has US citizenship, and if not, to verify through SAVE they are lawfully in the country and identify the period they are authorized to be in the US. So it is possible that some of the data points represent individuals who are no longer citizens of their country of birth.

At TEXAS_000022, we indicated that since 2019 DPS has processed over 200,000 transactions for non-citizens in this data set. These figures do not represent the actual number of separate individuals who have applied for a driver license or ID, but represents the number of transactions performed.  Many non-citizen driver license/ ID holders have to return to the DPS offices on a much more frequent basis than a US citizen as the term of a non-citizen license holder is tied to his term of lawful presence. So some individuals represented in the data could have been in the office multiple times during the years represented. With each transaction, whether an original or renewal, DPS still runs the documentation through the required verification processes at a cost, see TEXAS_000019.

### Public Safety:
When it takes custody of an inmate who is suspected of being foreign born, the Texas Department of Criminal Justice (TDCJ) informs U.S. Immigration and Customs Enforcement (ICE). ICE then conducts further investigation and may issue a detainer request to TDCJ to ensure that ICE can take custody of any such individual for removal proceedings when the inmate is scheduled to be released from TDCJ custody.

TDCJ maintains records of inmates in its custody in a database referred to as the mainframe computer system. This database includes inmate identifying information, records of conviction and sentencing, and records of when a detainer is placed on an inmate in TDCJ custody, and when a detainer is rescinded. These records are kept in the usual course of TDCJ operations, and they are generally accurate and reliable. Only employees of TDCJ or, in limited circumstances, the Texas Board of Pardons and Paroles, can input or update the information in the database.

TDCJ searched this database for inmates and confinees who were confirmed by ICE to be citizens of Cuba, Haiti, Nicaragua, or Venezuela and produced this data at TEXAS_000172—173. For information how costs are calculated per inmate per day of incarceration, see ECF No. 22-6 (Ex. F, Declaration of Rebecca Waltz).

### Healthcare:
The data at TEXAS_000162 reflects actual expenditures for the State of Texas for Emergency Medicaid and CHIP-Perinatal for nationals of Cuba, Haiti, Nicaragua, and Venezuela. This is based on data in the Texas Integrated Eligibility Redesign System (TIERS), which is used to determine the financial eligibility of people applying for services provided by the Texas Health and Human Services Commission.

HHSC used TIERS data to produce estimates of expenditures for Emergency Medicaid services provided to non-citizens from Cuba, Haiti, Nicaragua, and Venezuela. The expenditure calculations reflect the sum of paid amounts on Emergency Medicaid claims for services to individuals with a country of origin listed as one of those four countries,

regardless of documentation status. This spreadsheet indicates both the overall Federal-State expenses for these categories as well as the amounts paid by the State.

      HHSC used TIERS data to produce estimates of expenditures for CHIP Perinate services provided to non-citizens from Cuba, Haiti, Nicaragua, and Venezuela. The expenditure calculations reflect the sum of capitation payments for individuals with a country of origin listed as one of those four countries, regardless of documentation status. This spreadsheet indicates both the overall Federal-State expenses for these categories as well as the amounts paid by the State.



**Ryan D. Walters**
Deputy Chief
Special Litigation Division
Office of the Texas Attorney General
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
Ryan.Walters@oag.texas.gov

---

**From:** Jane Bentrott <Jane.Bentrott@justiceactioncenter.org>
**Sent:** Thursday, May 25, 2023 5:30 PM
**To:** Ryan Walters <Ryan.Walters@oag.texas.gov>; David Bryant <David.Bryant@oag.texas.gov>; Leif Olson <Leif.Olson@oag.texas.gov>
**Cc:** Monika Langarica <langarica@law.ucla.edu>; Karen Tumlin <karen.tumlin@justiceactioncenter.org>; Esther Sung <Esther.Sung@justiceactioncenter.org>; Vanessa Rivas <vanessa.rivas@raicestexas.org>; brian.c.ward@usdoj.gov; elissa.p.fudim@usdoj.gov; erin.t.ryan@usdoj.gov; erez.r.reuveni@usdoj.gov
**Subject:** TX v. DHS (Parole), TX Discovery Response Discussion

Hi Ryan,

Thanks again for a productive conversation today regarding Texas's discovery responses. I always like to make sure we're on the same page – let me know if any of my understandings reflected below are off base!

Regarding Intervenors' questions about definitions in Texas's discovery responses, you explained that, as it's used in Texas's responses, "illegal alien" refers to noncitizens who are not documented or authorized to be in the United States and does not include other noncitizens including lawful permanent residents, noncitizens with parole, noncitizens with DACA, etc.

As to our questions about Texas's documents reflecting data, costs, and revenues:
- You explained that some of Texas's documents were derived from the State of Texas's central database that stores certain information. Texas queried the database pursuant to certain parameters in response to the discovery requests, and produced corresponding spreadsheets. Any costs in these sheets would be gross, not net costs; they would also reflect actual costs, not estimates.
- As to other documents in Texas's production that reflect costs, for example we discussed the declarations and certain documents related to driver's licenses, educational expenses, and medical costs, you will follow up to confirm (where it's not already obvious): 1) which numbers reflect actuals vs estimates; 2) whether the numbers as disclosed reflect net or gross costs, i.e., whether they incorporate any offsetting reimbursements or revenues; and 3) whether Texas maintains any relevant data stating or reflecting revenues or reimbursements with respect to the four categories of costs you've identified – education, driver's licenses, public safety, and healthcare.

- With respect to Interrogatory 13, you will look into whether you can provide Intervenors with more specific explanations as to the sources and methodology for the data and cost responses Texas produced as reflected in Interrogatories 7-11 where they are not already provided.

As to our questions about why Texas did not admit Requests for Admission 2 and 5, you explained that you don't know how many individuals are in Texas as a result of the CHNV parole processes but you can rely on statistics and probabilities to estimate the costs associated with the challenged processes, and Texas can assume that some of those people will partake in the specified benefits, like applying for driver's licenses. As to why Texas cannot admit RFA 5, you explained that just because someone wouldn't be admitted through these particular parole processes doesn't mean they wouldn't be admitted through other means of parole or another program and so, because of the multitude of factors and variables baked into the question, Texas cannot admit or deny that RFA.

Finally, and I sincerely apologize for forgetting to bring this up on our call and am happy to hop on another call to discuss if that would be helpful – I forgot to ask our question about Texas's response to RFP 10. Does Texas have in its possession any documents and data that reflect revenues generated to the State based on any of the populations reflected in Texas's other discovery responses?

Thanks again, and I hope you have a nice long weekend coming up.
Best,
Jane



**Jane Bentrott** (she/her)
*Counsel*

[Justice Action Center](#)
323-504-3165
[jane.bentrott@justiceactioncenter.org](mailto:jane.bentrott@justiceactioncenter.org)

*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender and delete this message and its attachments, if any.*