## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

EXHIBIT
O

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton |
| *Plaintiffs,* | § § § § | **DECLARATION OF MORTON H. HALPERIN** |
| v. | § § § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in | § § § § § § § § § § § § | |

| | |
|---|---|
| his official capacity, | § |
| | § |
| *Defendants*, and | § |
| | § |
| VALERIE LAVEUS; FRANCIS ARAUZ; | § |
| PAUL ZITO; ERIC SYPE; KATE | § |
| SUGARMAN; NAN LANGOWITZ; and | § |
| GERMAN CADENAS, | § |
| | § |
| *Intervenors.* | § |

## <u>DECLARATION OF MORTON H. HALPERIN</u>

MORTON H. HALPERIN declares pursuant to 28 U.S.C. § 1746:

1.      After a six-decade career in national security, foreign policy, and democracy work, I recently retired and am continuing to support the causes in which I believe through such roles as Chair of the Executive Board of the Center for Ethics and the Rule of Law at the University of Pennsylvania, member of the Board of Directors of The ONE Campaign and ONE Action, and member of the Board of J Street.

2.      During my career in public service, I worked as a national security advisor in the Johnson, Nixon, and Clinton administrations.  During the period of time most relevant to this declaration, from 1994 to 1996, I served as a Special Assistant to President Clinton and Senior Director for Democracy at the National Security Council ("NSC").

3.      In that capacity, I had the opportunity to see how the statutory parole authority provided the executive with a critically needed tool to advance the public interest by furthering foreign policy objectives of great importance to the president and the nation.

4.      At the NSC during the Clinton administration, from August 1994 until May 1995 I was the lead official in the White House working day-to-day on all issues related to Cuba, including guiding U.S. policy and diplomacy to respond to a dramatic spike in Cuban migrants taking to the sea in hopes of reaching the United States.  In the period following the Mariel boatlift, when more than 125,000 Cubans left the island with the encouragement of Fidel Castro and arrived in the United States between April and October 1980, relatively few Cubans attempted to make this journey by sea.  In 1989 and 1990 that figure began to rise, reaching several thousand people annually in 1992 and 1993 before jumping to more than 37,000 in 1994.

5.      The large majority of this increase took place beginning in August 1994. As civil unrest began to grow in Cuba, Castro blamed the United States government for his difficulties and threatened to once again remove his restrictions on Cubans leaving the country so that many Cubans could depart for the United States by boat.   Eventually that was precisely what he did. Within the administration, this was viewed as a tactic by Castro to attempt to gain leverage over United States foreign policy and to essentially dictate our immigration policy as well. It was also viewed as a way for him to distract from the poor social and economic

conditions in Cuba, as well as to encourage dissidents and others who exacerbated his political challenges to leave, allowing him to better consolidate power. Finally, it was incredibly cruel to the migrants themselves, who placed their lives in jeopardy every time they left on unsafe vessels; U.S. Coast Guard personnel began to encounter boats with Cuban migrants who had lost their lives as well as empty boats, suggesting that some migrants drowned, and their bodies could not be recovered.

6.      The Clinton administration focused significant attention on how to address this situation, recognizing that U.S.-Cuba relations were complicated and delicate. President Clinton was committed to the policy contained in the Cuban Democracy Act, legislation that was signed by President George H.W. Bush in October 1992. The legislation sought to capitalize on the fall of the Soviet Union, which removed a powerful supporter of the Castro government, and it promoted a two-track approach—on the one hand strengthening the diplomatic, political, and economic isolation of the Cuban government, particularly through the economic embargo, and on the other opening the possibility for humanitarian assistance and increased information-flow to the people of Cuba to promote the transition to democracy.

7.      By the middle of August 1994, hundreds of Cuban migrants were being interdicted at sea by the Coast Guard each day and the number kept growing.

8.      Senior officials in the administration from various government agencies and within the White House proposed options for addressing the rising crisis. **Exhibit A** is an example of one kind of "options" paper that would have been

circulated within the administration; it is a true and correct copy of a memorandum that I obtained via a records request to the William J. Clinton Presidential Library, which is administered by the National Archives and Records Administration (NARA), except that phone and fax numbers on the first page have been redacted.

9.      On August 18, 1994, I convened a meeting at the White House of senior officials from the relevant agencies, including the Department of State, the Department of Defense, and the Department of Justice, to discuss options to stop the flow of Cuban traveling by sea.  There was agreement at the meeting that dramatic action was needed, and consensus was reached on recommending to the President that the Coast Guard begin taking Cubans picked up in international waters to the U.S Naval Base at Guantanamo Bay, Cuba.  The Defense Department agreed to accept them.

10.      Immediately after the meeting I drafted a short memo to the President reporting this consensus and recommending that he approve the recommendation.  The Deputy National Security Advisor and the National Security Advisor approved the memo and it was immediately sent to the President.  Early in the evening I was informed by the Staff Secretary that the President had approved the recommendation.  I immediately informed the relevant Cabinet Offices. The Attorney General came to the White House and held a late-night press conference announcing the new policy which took effect immediately.

11.      The following day, on August 19, 1994, President Clinton gave a press conference announcing the significant change in the U.S. Government's

approach to Cubans interdicted at sea.  Up until that time—and for three decades—Cuban nationals who were interdicted at sea, frequently on makeshift boats that were unseaworthy, were brought to the United States and paroled into the country using the Attorney General's statutory parole authority.  Those who reached the United States on their own and set foot on dry land were similarly paroled into the country. Because of the Cuban Adjustment Act, legislation enacted in 1966, such individuals typically would be able to apply for lawful permanent resident status one year later.

12.    President Clinton announced that effective immediately, Cubans interdicted at sea would instead be taken to a safe haven at Guantanamo where they would be free to voluntarily return to Cuba proper but would also be free to remain on the U.S. base and receive basic subsistence from the Department of Defense.  The Cubans brought to the U.S. base would not be allowed entry into the United States. The message we were sending to Cubans was clear: do not attempt to come to the United States by boat.

13.    In the days following the August 19 policy change, interdictions of Cubans at sea continued to rise dramatically—more than 1,000 on August 20 and 21 and more than 2,500 and 3,000 on August 22 and 23, respectively.

14.    President Clinton understood that given Castro's active encouragement of these migration flows, there were limits to what we could achieve unilaterally to prevent a repeat of the Mariel boatlift.  As a result, it would be necessary to engage in diplomatic talks with Cuba.  But because public outreach to Cuba would be seen by many as legitimizing Castro's government and a premature

turn toward normalization of diplomatic relations with the country without securing critical democracy and human rights reforms, including the release of political prisoners, outreach had to be done carefully.

15.     President Clinton made quiet contact with Castro through President Salinas of Mexico, sending the message that he would be willing to negotiate changes in the embargo that was putting so much pressure on the Castro Government's hold on the country but not until the countries worked together to fix the migration situation.  Moreover, negotiations over the embargo could not be tied to negotiations over migration, which we made explicit in public comments.  **Exhibit B**, for example—which is true and correct copy of a document I obtained via a records request to the William J. Clinton Presidential Library—shows edits that I made to draft talking points to ensure that they were consistent with administration policy toward Cuba.  The edits emphasize how central resolving the issue of migration was to U.S. foreign policy toward Cuba during this time period.

16.     The Cuban Government accepted the proposal to engage in talks focused exclusively on migration and the American government explained to the public that such talks were a continuation of migration negotiations that began during the Reagan Administration in 1984.  At that earlier time, the United States committed to issuing up to 20,000 preference-based immigrant visas each year to Cuban nationals in Cuba, not counting immigrant visas for Cuban parents, spouses, and children under the age of 21 of United States citizens and Cuba agreed to accept

the return of 2,746 Cuban nationals who arrived during the Mariel boatlift and who had been deemed ineligible to enter the United States.

17.     The 1984 agreement was suspended by Cuba shortly after it was reached and although it was restarted several years later, the United States never came close to issuing 20,000 preference-based immigrant visas each year.

18.     In advance of the 1994 negotiations with Cuba, I convened an interagency meeting and proposed that we agree to allow a certain number of Cubans to come to the United States legally each year.  Someone in the meeting said that we should not put such a number on the table in negotiations because we had never met the commitment we made in 1984.  I responded that the difference between now and then was that this time we would actually do it.  The decision to provide entry to up to 20,000 Cuban nationals that was ultimately included in the 1994 agreement was therefore not only motivated by the need to deal with the immediate flow of people migrating via makeshift rafts from the island, but also as a way of getting the Cuban government to see that we intended to live up to our agreement.  That was an important step in advancing the United States' foreign policy interests.

19.     The negotiations were conducted between the Cuban delegation to the United Nations and an inter-agency U.S. Government team.  The fact of the negotiations was public.  The talks were held in secret.  I took no part in these negotiations.

20.     On September 9, 1994, the United States and Cuba issued a joint communique announcing the completion of talks regarding our countries' "mutual

interest in normalizing migration procedures" and agreement "to take measures to ensure that migration between the two countries is safe, legal, and orderly."  Among other things, the United States committed to using provisions of United States law to ensure that a minimum of 20,000 Cubans could migrate legally to the United States each year, not counting the immediate relatives of United States citizens. Cuba agreed to "take effective measures in every way it possibly can to prevent unsafe departures using mainly persuasive measures."  Both parties agreed to continue facilitating the voluntary return to Cuba of individuals who arrived in the United States or at safe havens outside the United States following the August 19, 1994, policy change announced by the Clinton administration, and to continue discussing the non-voluntary return of Cuban nationals who were ordered excluded from the United States.

21.     To reach the 20,000 figure, the U.S. increased visa processing out of the Special Interests Section in Havana.  We also expanded our in-country refugee process out of the Special Interests Section.  As individuals in Cuba were issued family-based immigrant visas and were identified as refugees for admission to the United States, the United States decided to parole family members of these individuals—unmarried sons and daughters and extended family members in the same household and economic unit—who would not have counted as derivatives on their applications into the United States.  Parole also would be used to allow into the United States certain Cuban nationals waiting for immigrant visas to become available.  But still more was needed.

9

22.     During the negotiations that took place at the U.N. in New York, Cuban officials focused not only on making sure the United States would meet the 20,000 figure that we had proposed, but also that some of these slots would be available to those who fit the "rafter" profile (i.e., people who may not have had family members in the United States who could sponsor them and who may not have had refugee claims, and who might risk trying to come to the United States on an unsafe boat or raft). We provided assurances that some such people would be included within the 20,000 figure. The Special Cuban Migration Program that we created to allow an estimated 5,000 Cuban nationals to enter the United States each year through parole was therefore critical to reaching the agreement with Cuba through which we successfully abated the unsafe and disorderly flow of Cuban migrants.

23.     As explained in materials prepared following the agreement, the use of parole in the Special Cuban Migration Program and for family members of immigrants and refugees beyond spouses and minor children who would ordinarily be allowed to travel together as a family advanced the public interest by helping to normalize the immigration flow from Cuba to the United States as part of a broader effort to "redirect the abnormal flow into a legal one." **Exhibit C** is an example of these materials; it is undated but I believe it is from October 1994. It is a true and correct copy of a document that I obtained via a records request to the William J. Clinton Presidential Library.

24.     In the months that followed, irregular migration dropped precipitously as Cubans understood both that they would be taken to Guantanamo

and not the United States if they were interdicted at sea and that there were other options available to them.  However, there were around 20,000 Cubans at the Guantanamo Bay safe haven and thousands more at a safe haven that we had negotiated with the government of Panama to establish there who did not want to return to Cuba.

25.    Some proposed allowing all of them to come to the United States, but we expected that that would undo the progress we had made in dramatically reducing the number of boats leaving Cuba since August and September.

26.    Another option would have been to try to return them all to Cuba, but that would have required securing Cuba's agreement to take them as well as significant assurances that they would be kept safe upon their return.

27.    The U.S. Government explored opportunities to resettle these Cuban nationals in third countries.  By April 1995, more than 4,000 Cubans at Guantanamo had expressed interest in being resettled in 75 different countries around the world, but efforts to secure agreements from such third countries were hitting significant setbacks.

28.    To address a portion of the Cubans held at the safe havens, in late 1994, we established criteria to allow certain people to be considered for parole into the United States.  This included individuals with certain medical needs and elderly people over the age of 70, together with their family members, and unaccompanied children.  State Department officials at Guantanamo reported that Cubans at the safe haven were optimistic about these parole processes and were hopeful that a

broader parole process would be announced for mothers and children. The State Department officials cautioned that if no such process was created, people could become despairful. Over time, thousands of Cubans were paroled from the safe havens into the United States under these policies, but the vast majority remained.

29.     But by April 1995, the situation at Guantanamo had become unsustainable. Not only was the U.S. Government paying approximately $1 million each day to maintain the facility for its residents, but the Acting Chairman of the Joint Chiefs of Staff warned the White House that once the particularly vulnerable people were paroled into the United States from Guantanamo Bay, the remaining 14,500 Cubans could become despairful and that could lead to anger and violence as well as self-mutilations and suicides. Riots at the Panama safe haven in late 1994—which were prompted by concerns that the targeted parole processes were changing and becoming less effective—resulted in injuries to 300 U.S. personnel and the deaths of two Cuban nationals. This situation posed a growing risk to the safety of the residents at Guantanamo and U.S. military personnel, and could have led to concerns about mistreatment of the Cubans at Guantanamo, which would have jeopardized the interests of the country and undermined our ongoing efforts to reengage with the Cuban government. There were also reports that Castro might again encourage unsafe and uncontrolled migration from Cuba. **Exhibit D** is a true and correct copy of an unedited transcript of an April 12, 1995, Department of State press briefing that I obtained via a records request to the William J. Clinton Presidential Library.

30.     To find a path forward, the United States once more entered into negotiations with Cuban officials.  As with the negotiations that resulted in the September 1994 agreement, the United States made clear in public statements that talks would be focused on normalizing migration.  But consistent with the two-track approach to Cuban relations contained in the Cuban Democracy Act, we entered the April negotiations with the longer-term goal of advancing Track II measures once the migration agreement was reached and encouraging the Cuban government to take steps toward democracy, including by freeing political dissidents.

31.     I conducted some of the negotiations myself, meeting informally with senior Cuban officials who were in the United States.  The key negotiating session between a senior State Department official and a senior official of the Cuban government was held in Canada in great secrecy over a weekend.  It resulted in agreement on a joint statement to be issued by the two governments once approved by the two leaders—Castro and Clinton.  I drafted the instructions for our negotiator. When he returned with an agreed text, I sent it to the President with a recommendation that he approve.  Once again the memo came out of the Oval Office quickly with the "approved" box checked.

32.     The agreed joint statement was released on May 2, 1995, reaffirming the 1994 agreement and modifying it in certain respects.  To deal with the Cubans at Guantanamo, the United States agreed to use its parole authority to allow approximately 15,000 individuals to enter the United States.  We secured the agreement of Cuba that no more than 5,000 of these parolees each year would count

against the 20,000 figure to which we had committed in September 1994.  Cuba agreed to accept the return of those individuals at Guantanamo deemed ineligible for parole for certain reasons.  **Exhibit E** is a true and correct copy of talking points and anticipated questions and answers prepared in advance of the May 2, 1995, announcement that I obtained via a records request to the William J. Clinton Presidential Library.

33.     With respect to the use of parole in the agreement, Attorney General Reno explained that such decisions would continue to be made on a case-by-case basis, and sponsorship and resettlement assistance would be secured prior to entry.  **Exhibit F** is a true and correct copy of the transcript of the May 2, 1995, White House press briefing that I obtained via a records request to the William J. Clinton Presidential Library.

34.     A key agreement between the two countries was that Cubans interdicted at sea would no longer be transferred to Guantanamo but would instead be returned directly by the Coast Guard to Cuba after receiving a shipboard fear screening.  The Cuban government agreed to specific procedures to ensure the safety of such returnees, including that such returnees would land on Cuban beaches in U.S. Coast Guard ships and first be met at the Cuban port by U.S. officials who could apprise them of their ability to go to the Special Interests Section to pursue a refugee determination or to register for some other legal pathway to the United States.

35.     Once more, the ability to use the statutory parole authority to advance the public interest—as determined by the executive—was critical to securing

an agreement that furthered foreign relations priorities of great importance to the president and the country.

I declare under the penalty of perjury that the foregoing is true and correct.

Morton H. Halperin

Executed in Washington, DC, on June 16, 2023.

AUG 18 '94 09:42 FE110 71



**U.S. Department of Justice**

Immigration and Naturalization Service

---

425 Eye Street N.W.
Washington, D.C. 20536

AUG 18 1994

URGENT........URGENT.......URGENT........URGENT......URGENT......

TO:   Capt. James Carmichael
      Office of the Coast Guard
      ██████████████████

      SECURE FAX: ███████████████

      John Goetchius
      Joint Chiefs of Staff

      SECURE FAX: ████████████

      Dennis Hays
      Mark Susser
      Department of State

      SECURE FAX: ███████████

      Ray Ruga
      Department of Defense

      SECURE FAX: ████████████

*Tim Atkin   NSC*

██████████████████

FROM:   T. Alexander Aleinikoff
        General Counsel
        Immigration & Naturalization Service

Subject:  Options Paper on Cuba

        Attached is a very rough draft of an options paper.  Please
        take an immediate look and fax comments by 11:00 a.m.

        OFFICE PHONE: ████████████
        Office fax number: █████████████████
        Secure fax number is: ████████████████

> **EXHIBIT**
>
> **A**

CLINTON LIBRARY PHOTOCOPY

AUG 18 '94 09:43 P2110 T1

## Options on the Cuban Flow

We are currently witnessing a flow of more than 300 Cuban migrants a day. The usual procedure is for the Coast Guard to pick up the migrants on the high seas and transport them to Key West for INS processing. This memo explores options for reducing the Cuban flow.

### 1. Negotiate with Castro to prevent outflows

It is apparent that the increased flow of rafters is attributable in large part to Castro's instructions to the Cuban Coast Guard that it tolerate departures. The surest way to abate the flow would be a decision by Castro that it should end. Accordingly, the US could attempt to induce Castro to stop the flow, either by entering into some form of negotiations or by unilaterally adopting policies that meet his goals.

Leaving aside the obvious issue of whether the USG wants to be in a negotiation, it is the State Department's view that there is little that we would be willing to offer at this point that would produce a fruitful negotiation. On the immigration front, Castro is likely to seek return of migrants who have hijacked vessels or committed acts of violence and repeal of policies permitting Cubans entry and granting lawful residence. State further believes that Castro's goals go far beyond immigration issues; what he seeks is what he has sought for years: an end to the embargo and to "hostile" broadcasts from the US. If these are in fact Castro's terms, then there appears to be no point to seeking any sort of negotiation. [It should be added that State believes that it still may be worthwhile to have private contact with Castro to allow him to vent frustration in a non-public forum.]

### 2. Direct return of migrants to Cuba

Coast Guard advises that this option can not be effected with the consent of the Cuban government. Cutters can not turn around rafts or escort them back to Cuban territorial waters without serious risk to the lives of the rafters. Safe return can only be accomplished if cutters are permitted to dock in Cuban ports--an option clearly within the control of Castro.

### 3. Long-term Detention of Cubans in the US

Currently Cuban migrants know that if they are picked up at sea they will be brought to the US and quickly released. Institution of a policy of detention (as is used for Chinese involved in smuggling operations) is likely to have a significant impact on decisions to leave Cuba. If an emergency is declared and Operation Distant Shore is invoked, then long-term detention

CLINTON LIBRARY PHOTOCOPY

could occur in DOD facilities. Such a policy would be costly and
would no doubt bring demands for release of Cubans with close
family members in the US. It would also be subject to the
criticism that it is unreasonable to detain aliens whom we have
no prospect of returning to their country of origin; we currently
continue to detain Mariel Cubans--some for years--who have
committed crimes in the US but whom Castro will not accept back.

[Although attention has been focussed on the Cuban Adjustment
Act, it is not obvious that repeal of the Act (or a decision by
the Attorney General not to exercise her authority under the Act
to adjust paroled Cubans) would materially affect the flow of
rafters. Because of the inability of the USG to return Cubans
without Castro's consent, any Cuban who gets to the US may
anticipate an indefinite stay. Moreover, any Cuban present in
the US may file for political asylum and remain here while that
claim is being adjudicated.]

### 4.  Safe Haven in a Third Country

Cubans intercepted at sea could be taken to safe havens in
third countries. As we have witnessed with the Haitian flow,
denying migrants a chance to come to the US provides a major
disincentive to take to boats. Safe haven offers protection and
non-return and requires no negotiation with Castro. The
difficulty with this option is the identification of third
countries willing to take Cubans. It may also impose significant
costs if camps are to be constructed (although it is possible
that countries in the region would accept Cubans without
requiring they be detained).

### 5.  Safe Haven at GTMO

We currently have capacity for 23,000 migrants at GTMO. The
Haitian population is now below 15,000, leaving some 8000 spaces
for Cubans. Use of GTMO would likely be viewed as provocative by
Castro, who could simply remove the Cuban guards outside GTMO and
permit tens of thousands of Cubans to enter in a short period of
time.

CLINTON LIBRARY PHOTOCOPY

*It would not be*
*possible to consider*
*talking about*

### TALKING POINTS

-- This is a critical moment in relations between our countries. The migration crisis has produced a situation which must be resolved quickly because, if it is not, pressures on both governments will increase. If, on the other hand, a mutually satisfactory result is achieved on migration issues, it might be possible for the United States and Cuba to talk about other issues that been discussed between us in the past. For example, your representative at the December 1993 migration talks suggested that we discuss narcotics issues. Telecommunications is another such subject. That would be a good idea.

-- However, this will not be possible unless the migration issue is resolved.

-- I would also like to mention Guantanamo, a subject which Ambassador Skol told me you and he agreed was an important one for both Cuba and the United States. Neither of us want to have a large number of Cubans held indefinitely in Guantanamo and we are ready to begin moving Cubans out of Guantanamo to other safe havens in the region. However, unless this matter is resolved quickly and the flow cutoff, we may have no choice but to provide haven for large numbers of Cubans in Guantanamo and to begin making improvements in the facilities for Cubans there.

*little*

-- I understand that you are working on your version of a proposed joint communiqué. As long as it is confined to migration issues, Mike is ready to work with you constructively and we hope that agreement can be reached quickly.

*It would not be possible to consider*
*talking about other issues we have*
*discussed in the past unless the*
*migration issue is resolved.*

**EXHIBIT**
**B**

CLINTON LIBRARY PHOTOCOPY

TALKING POINTS

-- This is a critical moment in relations between our countries.
The migration crisis has produced a situation which must be
resolved quickly because, if it is not, pressures on both
governments will increase.  It would not be possible to consider
talking about other issues we have discussed in the past, such as
narcotics and telecommunications, unless the migration issue is
resolved.

-- I would also like to mention Guantanamo, a subject which
Ambassador Skol told me you and he agreed was an important one
for both Cuba and the United States.  Neither of us want to have
a large number of Cubans held indefinitely in Guantanamo and we
are ready to begin moving Cubans out of Guantanamo to other safe
havens in the region.  However, unless this matter is resolved
quickly and the flow cutoff, we may have little choice but to
provide haven for large numbers of Cubans in Guantanamo and to
begin making improvements in the facilities for Cubans there.

--   I understand that you are working on your version of a
proposed joint communiqué.  As long as it is confined to
migration issues, Mike is ready to work with you constructively
and we hope that agreement can be reached quickly.

CLINTON LIBRARY PHOTOCOPY

<u>Cuba Legal Migration Program</u>
<u>Qs and A's</u>

## I.    LOTTERY

Q.:  How does one apply for the lottery?

A.:  All details of the lottery - how to apply, when to apply,
etc. - will be well advertised in the US, Cuba proper, and the
safehavens by November 1st.  The lottery is designed to offer
Cubans who might not qualify under previously existing programs
an opportunity to come to the US.  We will be looking for people
who can be self-sufficient and have manifested an interest in
coming to the US.

Q.: Will having family ties be a requirement for selection in the
lottery?

No.  Legal migration will be available to people with no direct
family ties in the United States.

Q.: Will Cubans in safehavens be able to participate in the
lottery?

Yes.  Cubans in safehavens will have to return home to
participate in the lottery, but we will make sure that they do
not suffer any disadvantage if they cannot return in a timely
fashion. We anticipate that many Cubans in safehavens will meet
some of the criteria we are looking for.


## II.  Refugee Processing

Q.:  Who is eligible to qualify for refugee status?

A.:  Refugee status in the US may be granted to persons who have
a well-founded fear of persecution on account of race, religion,
nationality, membership in a particular social group, or
political opinion.

Q.:  In what way have the interview criteria been expanded?

A.:  Eligibility for the in-country program in Havana originally
was limited to former political prisoners.  The program now gives
priority to Cubans who are (1) former political prisoners; (2)
members of persecuted religious minorities; (3) human rights
activists; (4) forced labor conscripts during the period 1965-
1968; (5) persons deprived of their professional credentials or
subjected to other disproportionately harsh or discriminatory

EXHIBIT
C

CLINTON LIBRARY PHOTOCOPY

treatment resulting from their perceived or actual political or
religious beliefs; and (6)others who appear to have a credible
claim that they will face persecution as defined in the United
Nations Refugee Convention.

Q.: If a Cuban already has applied for refugee status and did
not qualify, can (s)he apply again?

A.: Any person denied refugee status can ask to have his or her
case reconsidered on the basis of new information. A Cuban who
was denied a refugee interview under the old criteria might be
eligible under the new criteria. The USG will review pending and
previously denied refugee cases to identify those qualifying
under the expanded criteria.

Q.: What about Cubans in safehavens?

A.: If a Cuban chooses to return home and believes that (s)he
qualifies for the refugee program, (s)he should contact USINT in
Havana for a determination of eligibility. US government
representatives in the safehavens will provide general
information on the program.

Q.: What about Cubans in safehavens who fear persecution in Cuba
if they return?

A.: Our policy is clear: Nobody will be forced or encouraged to
return. Persons who fear persecution, like all other Cubans in
safehavens, can remain in a safehaven if they so choose. Efforts
are continuing to be made to improve quality of life in
Guantanamo and Panama. We share the desire to find durable
solutions for bona fide refugees in safehavens who fear returning
home. For this reason, we also will be exploring with UNHCR
alternatives for such people as the situation develops, including
voluntary resettlement in third countries.

## III. Parole of Additional Family of Refugees and Visa Beneficiaries.

Q.: What is new about the additional family parole?

Typically, immigrants are only allowed to bring in their spouse
and minor unmarried children. Under this new program, we are
extending the group of family members who can accompany a Cuban
issued an immigrant visa or granted refugee status to include:
(1) family members who reside in the same household and are part
of the same economic unit as the immigrant or refugee; (2)
unmarried sons and daughters of the immigrant or refugee
regardless of age or place of residence.

CLINTON LIBRARY PHOTOCOPY

Q.: How will this program work?

Cubans to whom it is possible to issue immigrant visas in fiscal
year 1995 are being informed by USINT of their new opportunity to
bring additional family members with them.  The USG will make
other efforts to identify and contact possible beneficiaries of
this program.

Q.:  Can Cubans in safehavens benefit from this program?

Yes, if they choose to return home.  Cubans in Guantanamo and
Panama will be provided information about this program by US
representatives.  The USG will try to assist Cubans in safehavens
with this program.  If a Cuban in a safehaven believes he or she
might be eligible under this program, (s)he should contact a USG
representative.

IV.   Immigrant Visas and Visa Waiting List

Q.:  How does one get an immigrant visa?

A.:  The U.S. is continuing to issue immigrant visas to qualified
Cubans, and relatives in the US are encouraged to file visa
petitions on behalf of their family members in Cuba.  Visa
petition forms (I-130's) are available by calling the INS toll-
free number, 1-800-755-0777.  They also can be picked up in the
US Federal Building in Miami, located at 51 SW 1st Avenue, Room
630, or at any INS office in the United States.

Q.:  What is being done with the backlog?

A.:  USINT has received names and addresses of all those on the
immigrant visa waiting list.  Efforts have begun to notify Cubans
who are eligible.

Q.:  Can Cubans in safehavens benefit from this program?

Yes, if they choose to return home.  Cubans in Guantanamo and
Panama will be provided information about this program by US
representatives.  If a Cuban in a safehaven believes that a
relative has filed a petition for him or her, and that (s)he
might be on the waiting list, (s)he should contact a USG
representative.

V.   Voluntary Return

Q.:  How many Cubans who requested to return have been able to do
so?

CLINTON LIBRARY PHOTOCOPY

A.:  An initial group of 17 Cubans who chose to go home were returned on October 7.  They were flown from Guantanamo to Havana.  We are anticipating the return of Cubans who have made the request to proceed on a regular basis.

Q.:  How many Cubans have requested to return?

A.:  Several hundred

Q.:  Will Cubans in safehavens be forced to return?

A.:  No.  They can remain in the safehavens indefinitely.

Q.:  Is the US government encouraging Cubans to return?

A.:  No.  We have provided Cubans in safehavens full information about their options, including the possibility of going back home or of remaining in the safehavens.

Q.:  How can we be sure that Cubans who choose to return will not be persecuted when they do?

A.:  As part of the Cuba/US talks, we made clear that people who wish to return should not be subject to negative treatment.  These migration talks will be ongoing, and will next be resumed at the end of the month.  This is a subject that can and will be monitored.

Q.:  If individuals are not cleared for return by the Cuban authorities, what will be their eligibility for migration to the US?

A.:  We will do our very best to ensure that individuals who wish to return are able to go home.  We also will ensure that all individuals who are eligible to migrate legally to the US will have an opportunity to do so.

VI.  Parole (in general)

Q.:  Will any conditions be placed on paroled Cubans?  Will there be any time limit?

A.:  No.  They will be paroled into the US for a two-year period. After one year, they will be eligible to apply for permanent residence.

Q.:  How many Cubans do you anticipate will be receiving parole?

CLINTON LIBRARY PHOTOCOPY

We will be using a combination of our programs to reach the 20,000 figure in the agreement.

## VII. Legal Authority

Q.: What legal authority does the Attorney General have to exercise her parole authority in this way?

A.: Under section 212(d) (5) of the Immigration and Nationality Act, the Attorney General is given the authority, at her discretion, to parole aliens into the US "for reasons deemed strictly in the public interest." Normalizing the immigration flow between Cuba and the US is "strictly in the public interest." The parole program is part of an overall effort to redirect an abnormal flow into a legal one.

Q.: Doesn't such a parole program intrude upon Congress' law-making authority?

A.: No. The purpose of the program is to facilitate a normalization of migration between the two countries. It is perfectly consistent with overall congressional goals to stem irregular migration and promote legal migration.

Q.: Isn't the parole program inconsistent with the 1980 Refugee Act which provides that the AG "may not parole into the US an alien who is a refugee . . . except in compelling, individual circumstances"?

A.: No. People admitted as refugees will not be paroled. The US has operated for a number of years - and will continue to operate - an in-country refugee program in Havana under which several thousand Cubans are admitted into the US each year.

Q.: Why isn't a similar program being established for Haitians?

Historically we have had a special migration relationship with Cuba. We did not regularly parole in and legalize virtually every Haitian who reached our shores. The Cuban Adjustement Act is unique to Cubans. Moreover, we expect conditions that have produced large irregular migration from Haiti to change with the restoration of democratic government.

## VIII. Cubans at Krome and Port Isabel

Q.: What are the plans for Cubans in Florida and Texas?

CLINTON LIBRARY PHOTOCOPY

A.: Cubans at Krome and Port Isabel have been placed in normal immigration proceedings.

Q. How many Cubans have been paroled in from Krome and Port Isabelle?

A.: Children and their caregivers have been paroled in.

CLINTON LIBRARY PHOTOCOPY

UNEDITED

U.S. DEPARTMENT OF STATE
DAILY PRESS BRIEFING

EXHIBIT
D

DPC #50

WEDNESDAY, APRIL 12, 1995, 1:28 P. M.
(ON THE RECORD UNLESS OTHERWISE NOTED)


        MR. BURNS:  Good afternoon, ladies and gentlemen.
Welcome to the State Department briefing.  I apologize for
being late.  We'll try not to make a habit of that.  I don't
have any prepared statements for you, so I'm glad to go
directly to your questions.

        Q       Do you have any reaction -- today is the
parliament-in-exile they're establishing in The Netherlands.

        MR. BURNS:  Excuse me, I didn't hear the last part of
your question.

        Q       The Kurdish parliament-in-exile -- do you have
any reaction.  They established today.

        MR. BURNS:  We have seen the reports that the PKK
Parliament-in-exile will be meeting in The Netherlands.
We've expressed our views both to the Government of Turkey
and to the Government of The Netherlands that we think that
the PKK is a brutal terrorist organization, and we obviously
don't support the creation of any kind of
parliament-in-exile that is associated with the PKK.

        We've made those views known to both governments in
the last 24 hours.

        Q       Are you expected to ask The Netherlands to
somehow make it impossible for this parliament to have its
meeting there?  I mean, did you make any representations to
that effect?

        MR. BURNS:  I don't have details on our conversations
with the Dutch Government, and I leave it to them to
characterize their views on this.  But I believe that the
organization -- the people who will be meeting have not
violated -- at least we understand they have not violated
Dutch law, and therefore there wasn't any grounds to deny
them the right to meet.

OPTIONAL FORM 99 (7-90)

FAX TRANSMITTAL   # of pages ▸  3

To  _____   From  _____
Dept/Agency           Phone #

Fax #                 Fax #

NSN 7540-01-317-7388    5099-101   GENERAL SERVICES ADMINISTRATION

Cuba portion begins
page 2
CLINTON LIBRARY PHOTOCOPY

-2-                                    Wednesday, 4/12/95

But I do want to reaffirm that it's our position that this is a brutal terrorist organization, and we obviously don't support the convening of a parliament of this nature in any way.

Q        There's a story in the Post today that suggests that the Cubans are upset about the Helms' proposal and that a new exodus of migrants could be unleashed if it's approved. Do you have any comment? And I should mention that this is what the Cubans have informed the State Department.

MR. BURNS: I do have a comment. I have a general comment about our policy towards -- on the migration talks that I think might help with this question, George.

I'll just take you back to last September and remind you that the measures announced by President Clinton last September provide for a safe and orderly flow of migrants from Cuba to the United States.

We have an agreement with Cuba that is being implemented by the United States and by Cuba. We are on track to meet our commitments under this September 9 migration agreement, and we certainly expect the Cuban Government to meet its own obligations, and we believe it is meeting its obligations.

Remember that we pledged to issue 20,000 travel documents. I believe it's 16,000 people -- Cubans have been approved for migration, 11,000 of whom fall under this category to receive benefits under the 20,000 number.

It remains our policy that Cubans intercepted attempting unauthorized migration will not be taken into the United States but will be offered safehaven at Guantanamo. This policy has discouraged over many months, and we believe that it will continue to discourage unsafe voyages.

The Cuban Government has not communicated to us any message about a looming large-scale migrant problem. If you have any specific questions on the numbers of people at Guantanamo or who has been paroled and who hasn't, I've got some figures for you. But let me take the next question, George, if you have one.

Q        In effect, then you seem to be denying a point in this Post story which was that the Cubans informed the United States or warned the United States that if the Helms' legislation were to go through, that would result in a large-scale exodus, uncontrollable exodus. Are you saying that they didn't say that?

CLINTON LIBRARY PHOTOCOPY

-3-                           Wednesday, 4/12/95

        MR. BURNS: I checked with our experts this morning,
the people who deal with the Cubans every day, and I
understand that we have not received any such kind of a dire
warning from the Cuban Government on this issue.

        Q      Is this something short of a dire warning, Nick?

        MR. BURNS:  No --

        Q      Has there been any concern -- I mean, use any
word you want, but has there been any sort of communication
that might indicate they would do that?

        MR. BURNS:  Our general view is that this agreement
is in force; that both sides are meeting it; that the
refugees -- excuse me -- the migrants are being handled in a
constructive and orderly way, and that there isn't a
large-scale problem here, and we have not heard anything of
the kind from the Cuban Government in our private
discussions with them.

        Q      Can I just try that another way. Have they
told you that a refugee outflow would be "difficult to
control" if the Helms' measure was passed?

        MR. BURNS:  I have not been in discussions with the
Cuban Government on this issue, so I can't speak to
everything that has been said. But after seeing the piece
this morning, we certainly looked into this and discussed it
with a lot of people, including those people who are
responsible for Cuban affairs, and I'm giving you in essence
this morning a quite categorical  response to the story.

        Q      Are there any major issues concerning this
September 9th agreement still pending that the United States
expects to raise when the migration talks resume next week?

        MR. BURNS:  The migration talks will resume -- will
take place next week in New York. I think we announced that
last week.  This provides an opportunity for the United
State and Cuba to review -- and we've done this a couple of
times since this September 9th agreement -- review the major
issues surrounding the migrant program, to review the status
of the individuals who are still at Guantanamo -- and I
think there are a little over 22,000 Cuban migrants who are
still in Guantanamo -- and we look forward to the review.

        Q      Nick, can I try again from another angle, as
Carol said.  Regardless of what the Cubans may or may not
have told you, it's not brain surgery to know that they
don't like the Helms' amendment, and the threat of migration
is their only trump card in this sort of thing.

CLINTON LIBRARY PHOTOCOPY

-4-                          Wednesday, 4/12/95

Are you folks worried about the Helms' amendment passing and what that might mean for possibly a migration?

MR. BURNS: I can't speak to the Cuban view of the Helms-Burton legislation, but I can speak to an American Government view. As you know, we have been discussing this legislation for some time with interested members of Congress. Our policy towards Cuba is based on the Cuban Democracy Act of 1992. We believe that is a very good foundation for our policy.

Some aspects of the Helms-Burton legislation support the Cuban Democracy Act, are beneficial, and we could support some aspects. There are other aspects that are troubling to us, and we have made our views known to the interested members of Congress.

Q        (Inaudible)

MR. BURNS: I don't think it's wise for me to go into our discussions with the members of Congress on the bill in detail. I think a general response really suffices for the moment.

Q        And it's fair to say also you have gotten a number of letters and complaints from allied governments on this, have you not?

MR. BURNS: I think certainly some allied governments have spoken publicly about potential problems that they see in this legislation. Some of those problems are problems that we have identified, and we've made our views known directly to the interested members of Congress.

Q        I'd like to switch subjects if there are no other questions on that.

Q        Wait. I have one more question.

MR. BURNS: Betsy.

Q        Has there been any planning or thinking in this building about what to do to Guantanamo? I mean, are you just going to leave twenty-some thousand people there or less? I mean, has there been any kind of long-range planning at all as to what to do with that facility? If you keep taking Cubans there, there must be some kind of permanent housing or something.

MR. BURNS: It's obviously a very difficult situation, and the status of the people at Guantanamo is of great concern to us. We have made one clear decision, and

CLINTON LIBRARY PHOTOCOPY

-5-                                    Wednesday, 4/12/95

that is we are not going to compel anyone to leave Guantanamo. No one will be required by force to leave.

I can give you some background on the status of the people there. I believe that nearly 9,000 Cuban migrants have been paroled into the United States of humanitarian grounds or have been medically evacuated to the United States since this agreement came into effect in early September.

Roughly 7700 of those people are from Guantanamo and roughly 1200 from Panama. There are no longer any Cuban migrants in Panama.

We are operating under the provisions of humanitarian parole. Humanitarian parole is granted by the Attorney General on a case-by-case basis, so I'm unable really to tell you how many more Cubans at Guantanamo will be paroled into the United States, because it's done on a case-by-case basis. We don't have set numbers and set targets, but they will be eligible for humanitarian parole in accordance with criteria that the President set down many months ago, and I can get into that if you'd like.

Q     I asked at the beginning of the week. Christine said it was being investigated. An article in The New York Times on Saturday said that Iran had shipped two oil rigs enroute to Serbia in violation of U.N. sanctions. Have you got anything on that?

MR. BURNS: We're interested in that question. We are looking into it, and we don't have anything for you on it. But on the question of sanctions in general, obviously we're still committed to the sanctions against Serbia. That question has sparked our interest, and I hope to get something for you, but I don't have anything for you today.

Q     Since we're on the subject of Serbia, the Contact Group meeting in -- Mr. Milosevic, has he accepted the deal now, so on and so forth?

MR. BURNS: I have something, yes. The Contact Group representatives met in Belgrade yesterday, as you know, with the Serbian President. That meeting gave no cause for optimism regarding early movement towards the mutual recognition among the former Yugoslav republics or really any optimism about a Bosnian cease-fire.

As you know, the group had to cancel its planned travel to Bosnia today, April 12, because the Serbs in the region would not guarantee the security of the Contact Group's plane to land at Sarajevo airport.

CLINTON LIBRARY PHOTOCOPY

EXHIBIT
E

### TALKING POINTS

--    At 12:00 noon, the United States and Cuba will be announcing that they have agreed to modifications of the September 9, 1994 migration agreement.

--    The statement will present the broad outlines of the new agreement soon to be finalized.

--    The new agreement represents an important step towards regularizing migration procedures with Cuba, finding a humanitarian solution to the situation at Guantanamo, and preventing another uncontrolled and dangerous outflow from Cuba.

--    Our general policy toward Cuba remains committed to the Cuban Democracy Act and to its central goal - promoting a peaceful transition to democracy in Cuba.  We will continue to enfoce the economic embargo to pressure the Cuban regime to reform.  We will continue to reach out to the Cuban people through private humanitarian assistance and through the free flow of ideas and information to strengthen Cuba's fledgling civil society as presented under Track II of the Cuban Democracy Act. And we remain ready to respond in carefully calibrated ways to meaningful steps toward political and economic reform in Cuba.

PAROLE FROM GUANTANAMO

--    The new agreement will provide for the continued humanitarian parole of migrants currently at Guantanamo after the current program has been completed.  There will be about 15,000 Cuban migrants remaining at Guantanamo this summer, once we complete the parole process on the basis of existing criteria. Many of them were caught in the midst of a changing migration policy, have been living in difficult conditions, at a cost to the U.S. of $1 million per day, and with security risks for U.S. personnel.

--    The Joint Staff has expressed its concern at the continued presence of thousands of Cuban migrants at Guantanamo.

--    As in the case of prior parole programs for children, the elderly, and medical hardship cases, we will proceed carefully, on a case by case basis.  We will seek adequate sponsorship guarantees for the parolees and verify their criminal and medical backgrounds.  Every effort will be made to minimize the impact of the parole program on state and local economies.

--    Beginning in September 1995 and over the following three years, Cubans paroled from Guantanamo under this agreement will count toward meeting the minimum of 20,000 Cubans which we agreed

CLINTON LIBRARY PHOTOCOPY

to admit every year from Cuba under the September 9, 1994
agreement.  To be concrete: We will parole into the U.S. Cubans
currently at Guantanamo who do not meet existing parole criteria.
In order to lessen the burden on state and local economies, we
will reduce the number of Cubans allowed to migrate legally from
Cuba to the U.S. over the next three years to reflect this added
influx from Guantanamo.  As agreed with the Cuban government, we
will be able to offset up to 5,000 Cubans paroled into the U.S.
under this agreement (regardless of when they are paroled)
against the 20,000 we had agreed to admit legally from Cuba.

--    Cuba has agreed to take back those Cubans who would be
ineligible for admission into the United States, based either on
their criminal record, their medical condition, or the commission
of acts of violence while at Guantanamo.

## UNSAFE, IRREGULAR DEPARTURES FROM CUBA

--    At the same time, in order to ensure against a resumption of
dangerous, irregular migration from Cuba to the U.S., the two
countries have agreed that, effective immediately, migrants
intercepted at sea by the United States and who are attempting to
enter the U.S. as well as Cubans who enter Guantanamo illegally,
would be taken back to Cuba.  The Cuban government will continue
to take appropriate steps to prevent irregular departures from
Cuba, in accordance with the September 9 agreement.

--    Of course, the United States will continue to abide by its
international responsibilities with regard to *bona fide* refugees,
and we will take appropriate steps to ensure their protection.
U.S. policy in this regard will conform as much as possible to
our practices towards migrants from other countries.

--    Cuban migrants who make it to the United States will be
placed in deportation proceedings, consistent with U.S. policy
towards other illegal migrants.

--    We have a commitment from the Cuban government that no
migrant taken back to Cuba will suffer reprisals, be prosecuted,
lose any type of benefit, or be prejudiced in any manner, as a
result either of an attempted irregular departure or of applying
for refugee status at the U.S. Interests Section.  US officials
in Cuba will monitor this situation carefully.

--    U.S. officials will be at the dock upon the return of Cuban
migrants to provide assistance for asylum applicants.  Cuba has
agreed to this procedure as well as to U.S. monitoring of the
treatment of Cuban nationals who are taken back to Cuba.

CLINTON LIBRARY PHOTOCOPY

3

-- Cubans must know that nobody leaving Cuba irregularly by boat will be resettled in the United States. The only way to come to the U.S. is through the migration process in Cuba which includes in-country refugee processing, our new lottery program, and expanded opportunities for family members of immigrant visa beneficiaries. That process is now well underway.

-- In particular, Cubans who believe they have a valid asylum claim should apply at the U.S. Interests Section. Cuba is one of only three countries in which the U.S. offers in-country processing for asylum claimants, and we are making great efforts to meet the needs of Cubans who fear persecution. The Administration has vastly increased the number of Cubans who can be admitted to the U.S. as refugees each year. It is now approximately 7,000.

CLINTON LIBRARY PHOTOCOPY

## Q's and A's

Q1.  Are there any secret, side agreements with Cuba?

A.    No.

Q2.  Were any other topics discussed?

A.    In the course of our conversations with the Cuban
representatives, we have made clear our intention to continue
with Track II efforts to increase contacts between our two
people.  We also explained the Administration's position on the
Helms/Burton bill, which we had previously communicated to the
Congress.  Finally, we reiterated our willingness to respond to
meaningful steps towards economic and political reform in a
carefully calibrated manner.  In that context, we indicated that
we were following the state of the recently allowed farmers
markets.  If progress were to continue, we would consider
appropriate steps, consistent with the Cuban Democracy Act.  We
made clear that any additional steps would have to await changes
more significant than we have seen to date.

Q3.  How were these discussions conducted?

A.    Through diplomatic channels.

Q4.  Doesn't this represent a total reversal of policy?

A.    Our goal was and remains the establishment of safe, legal,
and orderly migration.  The Guantanamo safehaven was one element
toward that goal.  But, as we know, it raised significant
problems -- in humanitarian terms, in financial terms, and in
safety terms.  This new approach permits us to find a
humanitarian solution to the situation at Guantanamo without
encouraging a new unsafe and uncontrolled migration, and
preserving the broad legal migration program for Cubans in Cuba.
The approach furthers our goal and U.S. national interests.

Q5.  How will you ensure the protection of migrants who claim
refugee status?

A.    Any Cuban with a legitimate political asylum claim should go
to the U.S. Interests Section in Havana where such claim will be
processed.  As for Cubans intercepted at sea, as I have said, we
will take adequate measures to ensure that cases of those with a
genuine need for protection will be examined before return.

I also want to emphasize that Cuba is one of the very few
countries in the world in which we maintain an in-country
processing center.  The Cuban government has given us assurances

CLINTON LIBRARY PHOTOCOPY

that returnees will not suffer reprisals (including persecution, withholding of benefit or other detrimental action) for applying for refugee status. The situation of refugee applicants will be followed by U.S. officials to ensure that the Cuban government lives up to its commitment.

Q6.   What form of screening will take place on the Coast Guard cutters?

A.   As we have said, we will ensure that the rights of individuals to claim refugee status is fully protected and we will deal with each situation as it arises.  We will develop whatever procedures are appropriate given our experience under this new program.  Our firm intention is to provide each migrant who so desires an opportunity to make an asylum claim in a setting free of coercion.  Beyond that, I see no purpose in getting into the details of the procedures we will be applying to ensure such protection.

Q7.   Will all Cubans at Guantanamo be paroled into the U.S.?

A.   The Cuban government has agreed that we could parole as many Cubans currently at Guantanamo as we deem necessary on humanitarian grounds.  Cuba also has agreed to the return of migrants who would be ineligible for admission into the U.S. This would include Cubans previously deported from the U.S., Cubans with a criminal record, or Cubans responsible for acts of violence at Guantanamo.

As we have done in the case of children, the elderly and medical hardship cases, we will assess the situation of Cuban migrants on a case-by-case basis, bearing in mind the impact of paroles on state and local economies and the need for adequate sponsorship. In particular, no migrants will be brought from Guantanamo until sponsorship and resettlement assistance has been obtained through the Justice Department's Community Relations Service and the national voluntary agencies with which CRS works.  That is why we have given ourselves up to a year to complete this process.

Q8:   I don't really understand what you are saying about the Guantanamo population.   Will people in the safe haven be returned to Cuba against their will?

A:   Cubans in the safe haven who are ineligible for entry into the United States -- such as those who have serious criminal histories, who were previously removed from the United States for committing crimes, or who committed violent acts in Guantanamo -- may be returned to Cuba.

CLINTON LIBRARY PHOTOCOPY

Q9:   Isn't this going to pose a great burden on the State of Florida?

A:   We think precisely to the contrary.  By reducing further the risk of uncontrolled migration, this program further minimizes the greatest burden on the state and its subdivisions.   Moreover, migrants are brought in from Guantanamo in a manner that is quite deliberately designed to minimize the impact on Florida.  No one is brought in without sponsorship arranged in advance, and migrants without direct family links in Florida are resettled elsewhere in the United States.

Of course, we are sympathetic to the burden that the State of Florida is carrying with regard to migration from Cuba, and we will be considering steps we can take to come to Florida's assistance.

Q10. Are you prepared to use force in case Cubans intercepted at sea refuse to return to Cuba?

A.   The Coast Guard will apply its regular guidelines regarding the return of migrants rescued at sea.  We expect that, given expanded possibilities for legal migration from Cuba and our commitment to facilitate the processing of refugee claims in Havana, Cuban migrants rescued at sea will cooperate with U.S. Coast Guard.

Q11. If Cuba is the repressive, outlaw regime our government says it is, how can you justify returning people who are fleeing for their lives?

A:   This program is in no way an endorsement of the Castro regime. The United States has an obligation both to protect itself against uncontrolled and illegal immigration and to protect the rights of refugees in accordance with international law.   We believe the program we are implementing today represents a significant step in furtherance of both goals.

Q12: You have said that Cubans who reach the United States illegally will be placed in exclusion proceedings, detained, and treated like illegal migrants from other countries.  Does this mean you are going to go after Cubans who previously arrived illegally?

A:   The vast majority of Cubans now in this country are here legally.   We will treat those who are already here and have violated the terms of their admissions consistent with the policy that has been in effect until this day.

Q13: The Cuban government has long expressed interest in the return to Cuba of certain people now living in the United States who

CLINTON LIBRARY PHOTOCOPY

are accused of crimes in Cuba. Will you now return those people against their will?

A:    Cubans who are legally in this country and who have not violated the terms of their admission will not be returned. [We have no extradition treaty with Cuba.]

Q14: Does this mean you now favor repeal of the Cuban Adjustment Act?

A:    No.

CLINTON LIBRARY PHOTOCOPY

Cuba Call List

<u>NSC</u>

SANDY BERGER
CALLS:

To be made at 8:30
in order to
precede calls made
by Sen. Graham:

Mack
Torricelli

Other calls to be
made by Sandy:

Rangel
Mfume

Other NSC calls:

Dole
Daschle
Specter
Kerrey
Gingrich
Gephardt
Armey
Bonior
DeLay
Combest
Dicks
Meek
Young
Gibbons
Canady
Miller
Dave Weldon
Mark Foley
Meek
Shaw

<u>STATE</u>

Calls to be made
by Tarnoff or
Watson at 8:30 to

precede Graham
calls:

Menedez
Ros-Lehtinen
Diaz-Balart
Goss

Other State calls:

Helms-P
Pell
Coverdell-P
Dodd-P
Leahy
McConnell
Gilman
Hamilton
Burton-P
Obey
Livingston
Hastings
Deutsch-P
Johnston-P
Payne-P

<u>DOD</u>

Thurmond
Nunn
Stevens
Inouye
Spence
Dellums
Young-P
Murtha
McDade

<u>DoJ</u>

Hatch-P
Biden-P
Simpson-P
Kennedy-P
Hyde-P
Conyers-P
Lamar Smith-P
Bryant-P
McCollum-P
Schumer-P

P-- Principal
call, other calls
staff or principal

Briefings should
be offered to
SFRC, HIRC,
Judiciary
Committees and
Fla. delegation.

Calls that we will
ask Sen. Graham to
make beginning at
9 am:

Mack
Torricelli
Menendez
Diaz-Balart
Goss

CLINTON LIBRARY PHOTOCOPY

THE WHITE HOUSE

Office of the Press Secretary

EXHIBIT

F

---

For Immediate Release                                         May 2, 1995

PRESS BRIEFING
BY ATTORNEY GENERAL JANET RENO,
GENERAL JOHN SHEEHAN, COMMANDER IN CHIEF OF
THE U.S. ATLANTIC COMMAND,
AND UNDER SECRETARY OF STATE
FOR POLITICAL AFFAIRS PETER TARNOFF

12:15 P.M. EDT

MR. MCCURRY: Good afternoon, everybody. As you know, we're here to discuss some matters related to Cuban migration policy. But I know a lot of you have got interest in the Oklahoma City investigation. For that reason, I've asked the Attorney General to start with just a very brief statement on that subject. She's not in a position to take many questions. We will then move on to the Cuban migration discussion.

Attorney General.

ATTORNEY GENERAL RENO: At approximately 6:45 a.m. this morning, the FBI arrested Robert Jacks and Gary Land in Carthage, Missouri based on material witness warrants issued by a magistrate judge in Oklahoma, based on probable cause to believe that they possessed information concerning the April 19, 1995 bombing in Oklahoma City. The arrest occurred without incident. Jacks and Land are cooperating with the FBI in the investigation, and have agreed to be interviewed and provided consent to search their property. The investigation is continuing.

Also today, at the request of Director Freeh, I have approved his appointment, Larry Potts as the Director of the FBI. Director Freeh's recommendation was based on Mr. Potts's long and distinguished career in law enforcement and the confidence the Director has in him.

Director Freeh has described Mr. Potts as the very best the FBI has. Mr. Potts has been directing the investigation of the Oklahoma City bombing, and the results to date are a tribute to his ability to coordinate a complex, nationwide, multi-agency investigation.

Q        How did you find those guys?

CLINTON LIBRARY PHOTOCOPY

2

Q        Madam Attorney General, are these two considered suspects in the bombing?

ATTORNEY GENERAL RENO:  I would not comment and I would ask everyone to let the investigation proceed and not jump to conclusions.

Q        Well, is either believed to be John Doe II?

ATTORNEY GENERAL RENO:  Again, I would not comment and would reiterate my concern.

Q        General Reno, is the search --

Q        Can you tell us how they were discovered, how you found them?  Could you tell us how you found them?  Did they give themselves up, or did you get an informant tip, or how were they discovered?

ATTORNEY GENERAL RENO:  Again, as I have told you all, it's just not right for me to comment on how the investigation is conducted, what leads us to a certain point, because that can only lead to an interruption of the investigation, and I know we want to have it proceed as --

Q        In other words, you're not going to say anything? (Laughter.)

ATTORNEY GENERAL RENO:  I have told you again and again that I don't comment on pending investigations, because I think --

Q        Ma'am can you tell us please why Potts was named and what's the reason -- and the head of -- the Assistant Director of FBI --

Q        Could you tell us how the search for John Doe II is proceeding?

ATTORNEY GENERAL RENO:  Again, as I have said before, we are following every lead, and there are many.  The people of this country are cooperating in an extraordinary fashion, and the investigation is proceeding.

Q        And you're looking for others, are you?

Q        Are there other suspects that you are still looking for at this point?

ATTORNEY GENERAL RENO:  I think it's fair to say that we're following every lead with respect to any information that would lead us to anybody responsible for this bombing.

CLINTON LIBRARY PHOTOCOPY

3

        Q       Ms. Reno, could you talk about the death threats you've been getting?

        MR. MCCURRY:  I think that's about all.  We want to move on.

        Q       Well, I think she might answer my question, which was fully on the floor.  I want to know why Mr. Potts's named and have we had a man like this designated in the FBI before and what's the reason for this?

        ATTORNEY GENERAL:  As Director Freeh has said, he appointed Mr. Potts as the Deputy Director of the FBI based on his very distinguished career in law enforcement.  Larry Potts is an extraordinary agent, a dedicated law enforcement official.  He has been the person responsible in this instance for the day-to-day operation of the Oklahoma City investigation, and I think it has been a landmark for law enforcement efforts.

        Q       Ms. Reno, can you talk about the death threats?

        MR. MCCURRY:  Okay, we're going to move on now to the subject of Cuba.  At this hour, the United States and the Republic of Cuba are releasing a joint statement on agreements that they have reached to regularize further their migration relationship.  That's what our cast here is to talk about.  I'm going to ask Attorney General Reno to open with a statement on that.  We will have a copy of the joint statement that we are issuing along with the Republic of Cuba.  That will be available to you at the conclusion of the briefing.

        Attorney General Reno will speak and then I've also asked General John Sheehan, who is the Commander In Chief of the U.S. Atlantic Command, to talk a little bit about Guantanamo Bay and some aspects of the migration agreement.  We also have Doris Meissner, the Commissioner of the Immigration and Naturalization Service, Admiral Kramek, who is the Commandant of the Coast Guard, and Under Secretary of State for Political Affairs, Peter Tarnoff, who is here as well.  And they're available as you might have any questions related to the agreement that we discussed today.  So I'll start again with Attorney General Reno.

        ATTORNEY GENERAL RENO:  It has long been the policy of the United States that Cubans who wish to migrate to the United States should do so by legal means.  The U.S. interest section in Havana accepts and processes requests for visas, and it also operates an in-country program for those Cubans who seek refugee status for entry into the United States.

        Pursuant to this policy, last August I announced that Cubans attempting a regular means of migration to the United

CLINTON LIBRARY PHOTOCOPY

4

States on boats and rafts would not be allowed to enter this country, but, rather, would be brought to the United States Naval Base at Guantanamo Bay where they would be offered safe haven.

Last September, following negotiations with representatives of the Cuban government, the United States announced that it would increase Cuban migration to the United States to permit 20,000 legal entrants per year. This program, which includes immigrant visas, refugee applications and a special Cuban migration program designed to broaden the pool of potential entrants, is on target, and we expect to continue Cuban legal migration at this level in the years to come. This year alone, we expect to bring 7,000 Cuban refugees to the United States through our in-country program in Havana.

The United States is now prepared to make another important step towards regularizing Cuban migration between Cuba and the United States. First, with respect to Guantanamo, we will continue to bring to the United States those persons who are eligible for special humanitarian parole under the guidelines announced by the President last October and December.

The government of Cuba has agreed to accept all Cuban nationals in Guantanamo who wish to return home, as well as persons who have previously been deported from the United States and persons who would be ineligible for admission to the United States because of criminal record, medical, physical or mental condition, or commission of acts of violence while at Guantanamo.

All other Cubans in the safe haven will be admitted into the United States on a case-by-case basis as special Guantanamo entrants, bearing in mind the impact of paroles on state and local economies and the need for adequate sponsorships. As has been true for all Cubans and Haitians previously paroled into the United States from Guantanamo, sponsorship and resettlement assistance will be obtained prior to entry. The number of these special Guantanamo entrants admitted to the United States will be credited against the 20,000 annual Cuban migration figure. Thus, there will be no net increase in Cuban migration.

Effective immediately, Cuban migrants intercepted at sea, attempting to enter the United States or who enter Guantanamo illegally will be taken to Cuba where U.S. consular officers will assist those who wish to apply to come to the United States through already-established mechanisms. Cubans must know that the only way to come to the United States is by applying in Cuba.

All returnees will be permitted to apply for refugee status at the U.S. interest section in Havana. Cuba is one of only three countries in the world in which the United States conducts in-country processing for refugees. The government of Cuba has committed to the government of the United States that no

CLINTON LIBRARY PHOTOCOPY

5

one will suffer reprisals, lose benefits or be prejudiced in any manner, either because he or she sought to depart irregularly, or because he or she has applied for refugee status at the United States interest section.

The Cuban government made a similar commitment in the context of the September, 1994 agreement and we are satisfied that it has been honored. Moreover, the government of Cuba will permit monitoring by U.S. consular officers of the treatment of all returnees.

Migrants intercepted at sea or in Guantanamo will be advised that they will be taken back to Cuba where U.S. consular officials will meet them at the dock and assist those who wish to apply for refugee admission to the United States at the interest section in Havana. They will be told that the government of Cuba has provided a commitment to the United States government that they will suffer no adverse consequences or reprisals of any sort, and that U.S. consular officers will monitor their treatment. they will also be told that those persons who seek resettlement in the United States as refugees must use the in-country refugee program.

Measures will be taken to ensure that persons who claim a genuine need for protection which they believe cannot be satisfied by applying at the U.S. interest section will be examined before return. Cubans who reach the United States through irregular means will be placed in exclusion proceedings and treated as are all illegal migrants from other countries, including giving them the opportunity to apply for asylum.

The United States government reiterates its opposition to the use of violence in connection with departure from Cuba and its determination to prosecute cases of hijacking and alien smuggling.

These new procedures represent another step towards regularizing migration procedures with Cuba, finding a humanitarian solution to the situation at Guantanamo and preventing another uncontrolled and dangerous outflow from Cuba.

I want to make clear that the United States policy towards Cuba remains the same. We remain committed to the Cuban Democracy Act and its central goal -- promoting a peaceful transition to democracy in Cuba. We will continue to enforce the economic embargo to pressure the Cuban regime to reform.

We will continue to reach out to the Cuban people through private humanitarian assistance and through the free flow of ideas and information to strengthen Cuba's fledgling civil society. And we remain ready to respond in carefully calibrated

CLINTON LIBRARY PHOTOCOPY

6

ways to meaningful steps towards political and economic reform in Cuba.

UNDER SECRETARY TARNOFF: Thank you very much. I would like to applaud the effort on the part of the Attorney General to regularize this process for three very simple reasons -- first, the safety of the 6,000 American servicemen that are serving in Guantanamo Bay, Cuba. As you know, we were moving down a trail where there was distinct possibility of some of those servicemen and some of those Cubans being hurt.

Second, from a military perspective, it's costing us $1 million a day to run the camps at Guantanamo Bay, Cuba. That money now can be turned -- and once we return these servicemen back to the parent units, back into the readiness accounts and we can start plussing up the readiness capability to military forces. In addition to that, we're about ready to spend $100 million to make the camps more permanent, and so all of these collective things, I think, go, and I would like to truly applaud the efforts on the part of the Attorney General to regularize this process.

MR. MCCURRY: Let me just add one closing comment before we go to questions. In developing the approach that the administration has outlined today, we have consulted very closely with both Governor Chiles and with Senator Graham. And I must say that the President is grateful for the fact that they have both authorized the White House to indicate that they are fully supportive of the policy that we are reviewing today with you.

With that, let's go to questions and you can direct them anywhere.

Q       How about Senator Mack?

MR. MCCURRY: Well, we will continue consultations. There have been consultations ongoing this morning with other members as well.

Q       Was this policy forced because it was about to blow up on Guantanamo?

ATTORNEY GENERAL RENO: What we have tried to do from the beginning is regularize migration from Cuba so that anybody who came to this country came legally and safely. It was clear as we put the process into effect that it was beginning to work. We now have a track record since September of legal migration procedures working so that people can apply safely for refugee status. Over 6,000 have been determined to be refugees; 800 have all ready been brought to this country; and I think people can understand that legal migration does work.

CLINTON LIBRARY PHOTOCOPY

7

At the same --

Q        That's not an answer to my question.  The General indicated safety --

ATTORNEY GENERAL RENO:  You asked what prompted this, and I'm --

Q        No, I didn't ask what prompted it.  He indicated there was a safety problem.

ATTORNEY GENERAL RENO:  Well, I'm telling you what prompted the particular change.  Seeing that worked, seeing however, that the migrants at Guantanamo had been dislocated, had lost their jobs, had not been able to watch firsthand how it was working, I think that this represents a humanitarian way to address the issue while putting everybody on notice that legal migration processes are working and that they will be utilized.

Q        Well, General, you said that any Cubans who tried to leave Cuba now must do so through the Cuban interest section, will be intercepted at sea and brought back to Cuba.  But you were equally as firm last summer, as was the President, in saying that this is not the way to get to the United States and that those who were in Guantanamo would never be admitted to the United States.  Why should anybody in Cuba believe the new policy when the old policy was reversed?

ATTORNEY GENERAL RENO:  One of the things that we have tried to do in this whole process is avert a mass migration to this country and to avoid a tremendous outflow of illegal immigrants.  What we did then was to put into place a system that we knew worked.  Obviously, it was not that convincing to those at Guantanamo, but it has been convincing to people in Havana, in Cuba who can see that it's worked and who are utilizing those processes now.  We think that this is the best way to move forward to further regularize migration from Cuba.

Q        General, how long would you anticipate this will take?  You said all of those there now would be eligible, but you said on a case-by-case basis.  Which is it?

ATTORNEY GENERAL RENO:  Not all.  Those with --

Q        I understand.  All who qualify, but -- but basically, you've got a large number of people --

ATTORNEY GENERAL RENO:  What we want to do is to admit those that are not excludable that don't have criminal histories.  We want to admit them in an orderly way based on appropriate sponsorships, based on concern for the community that they're going to.  What we have been doing to date is paroling in on a

CLINTON LIBRARY PHOTOCOPY

8

humanitarian basis the children and their families at roughly 500
a week, and I would expect that rate would continue.

Q        That it would continue to be 500 a week until
you've emptied the compound there at Guantanamo?  Is that the --

ATTORNEY GENERAL RENO:  Again, what we want to do -- it
may be that, or it may be as we formulate it and see just what's
involved, that we can speed it up, but we want to make sure that
it's done in an orderly way.

Q        Can the General tell us a question, please?  You
said, sir, I believe I understood you to say that you were going
to spend $100 million making permanent the camps down there?

GENERAL SHEEHAN:  That's correct.

Q        Well, if you're taking these people away from
there and back to Cuba, why do you need to spend $100 million on
camps if it was already perfect there?

GENERAL SHEEHAN:  What I said was that this act, on the
part of regularizing the process has averted that $100 million
that we can use now to put back into the readiness O & M accounts
so the readiness of the forces will not suffer as a result of
this housing migrants.

Q        Yes, but you said you were going to spend $100
million on making permanent the camps.

Q        No, no, no.

GENERAL SHEEHAN:  No.  What I said was, it averts that
$100 million cost.

Q        General, how explosive was the situation in the
camps there?  You alluded to that at --

GENERAL SHEEHAN:  I think the Attorney General has a
right.  This is a process of a lot of dynamics.  There are 6,000
people in the camps right now who are in the process of coming
into the United States at a rate that the Attorney General has
spoken about.  As we saw this summer going down and the protocols
ran out, where there was no exit strategy for the camps; then
clearly, the frustration level on the camps was going to be very
high.  These were essentially young males, 15 to 32 years old,
very, very talented people.

I think that you need to understand that better than 50
percent of these kids are high school graduates, but nine percent
of college degrees and two percent have graduate degrees.  There

CLINTON LIBRARY PHOTOCOPY

9

are 127 doctors in the camps; but, yet, if there's no exit
strategy for them, they're frustrated.

Q        But how did you see that frustration become
manifested?

GENERAL SHEEHAN:  It's manifested itself twice in
Guantanamo previously and once in Panama when the Cubans who were
there thought they were going to be -- end up in a permanent
internment process.

Q        So there is a threat of violence.  Is that what
you're saying?

GENERAL SHEEHAN:  There is always a threat of violence in
that type of situation.  I would call it civil disturbance as
opposed to violence, but there is some violence probability, yes.

Q        Can you tell us a little bit about how this was
negotiated, who did the negotiating for the U.S. and who did the
negotiation for the Cubans?

UNDER SECRETARY TARNOFF:  I think all I'd like to say is
that this was negotiated through normal diplomatic channels and
not go into the details of how the conversation was --

Q        Well, we don't really have such normal diplomatic
relations with the Cubans.

UNDER SECRETARY TARNOFF:  Yes, we do.  We have a U.S.
interest section in Havana, there is a Cuban interest section
here, and we have regular migration talks, the last of which
occurred, I think, a couple of weeks ago in New York.

Q        Was this, Mr. Tarnoff, negotiated in the context
of those migration talks, or was this a separate, secret
negotiation?

UNDER SECRETARY TARNOFF:  I'd rather not go into the
details of how this was actually conducted, because this was,
again, done in diplomatic channels, but it certainly was
consistent with the administration's policy decided last summer
to be in touch with the Cubans on migration matters.

Q        Did anyone from the U.S. have a direct discussion
with Fidel Castro?

UNDER SECRETARY TARNOFF:  I'm not going to talk about the
specifics of what the exchanges were, but I can say that what
happened was fully consistent with and in the context of the
migration talks that we've been having with the Cubans over the
last nine years.

CLINTON LIBRARY PHOTOCOPY

10

Q        Has Cuba been provided with any assurances that
any of the sanctions added last August would be rolled back?

UNDER SECRETARY TARNOFF:  None whatsoever.

Q        -- or, these sanctions would be eased in any way?

UNDER SECRETARY TARNOFF:  None whatsoever.

Q        How about that the administration will oppose the
Helms bill?

UNDER SECRETARY TARNOFF:  The administration stated its
position on the Helms-Burton legislation.  At the end of last
week, the State Department informed Chairman Gilman of the House
International Relations Committee that, while we supported many
of the objectives of the Helms-Burton draft legislation as we see
it, namely the promotion of an acceleration of democracy in Cuba,
the endorsement of the continued vigilance and reinforcement of
the embargo, the other provisions of the Cuban Democracy Act, and
also features of that bill which allow the United States to begin
assistance to a transition government in Cuba, all of those we
regard as quite positive.  There are, nonetheless, certain other
aspects of the bill, the extraterritoriality of it and other
things which do causes problems, but we are available to have
discussions with sponsors of the bill on the legislation.

Q        Mr. Secretary, does this agreement between the
United States and Cuba improve the relationship between the two
countries?

UNDER SECRETARY TARNOFF:  I don't believe the overall
relationship is affected.  This is a narrow agreement on
migration matters that is a direct result of the September 9,
1994 accord between us, and it's a natural extension from that,
and limited to migration matters.

Q        To follow up, has there ever been a case where
the United States has forcibly returned refugees to a communist
country?

UNDER SECRETARY TARNOFF:  Well, let me talk to the
Attorney General or the -- but we do have policies in other
countries with respect to returning nationals to those countries.

Q        Has the U.S. ever returned forcibly any refugee
to a communist country?

ATTORNEY GENERAL RENO:  We are trying to make sure that
our policy with respect to returns are consistent.  As you have
seen, there have been situations with respect to Chinese boats

CLINTON LIBRARY PHOTOCOPY

11

that have come within or near our shores, and we're trying to make sure that everybody understands that we need to address the problem through legal migration standards.

Q        Was there any agreement on the part of the Cubans to crack down on boat people?

ATTORNEY GENERAL RENO:   There was no agreement, other than the September agreement.

Q        A question for General Reno.  How long have the Guantanamo Bay Cubans -- how long has the process of admitting them been going on?  Do I understand that 500 a week --

ATTORNEY GENERAL RENO:   As you will recall, the President, early on in October, noted that there were humanitarian cases of the elderly, of people who were ill, and we started addressing those acute humanitarian concerns.  We all were concerned with the status of the children at Guantanamo, and in December the President made clear that we were going to try to review each case and bring in the children and their immediate families.

Q        But have you gone past those humanitarian concerns already?

ATTORNEY GENERAL RENO:   No.  We are still bringing the children out in an orderly way, trying to do it -- and as a person reaches 70 or as a medical problem develops, we've tried to address those humanitarian concerns and will continue to do so.  But when we reach the end of that group, then we will admit all others who are not excludable because of criminal records or other factors and bring them in, again in an orderly way, on a case-by-case basis.

Q        And how many would you think that will be?

ATTORNEY GENERAL RENO:   We're going to start reviewing the whole process and be geared up to do it in as orderly a way as possible.

Q        How many Haitians are still in Guantanamo?

Q        How many will be coming into the U.S.?  How many will go back to Cuba?  Do you have any figures?

ATTORNEY GENERAL RENO:   I wouldn't speculate on that. We'll just see as the process works out.  But again, I would stress that it is not an increase that will not produce a net increase in legal migration from Cuba.

CLINTON LIBRARY PHOTOCOPY

12

Q        Will Cuba continue to curb the exodus of migrants as they promised last September, or is that null and void now?

ATTORNEY GENERAL RENO:  Cuba made that commitment last September, has honored that commitment, and every indication is that it will continue to honor that commitment.

Q        What do you mean --

Q        Does that mean that you will slow the influx of Cubans from Cuba, the legal migration to reward these people who fled their country and were taken to Guantanamo.

ATTORNEY GENERAL RENO:  What we've tried to do is address the issue of those who seek immigrant visas, those who have applied for refugee status, and even then, through the legal migration process there are others.  We have then developed the special program for Cuba that establishes the lottery, and these would be part of the lottery, in effect.

Q    .    General Reno, where are these people going to end up, and who is going to pay for their relocation and for the rest of -- until they get settled?

ATTORNEY GENERAL RENO:  We have worked with people in the community to develop sponsorships.  The community relations service works with various groups to ensure proper sponsorship, works with families, and where they end up will depend on where families are located across this country.

Q        Do you expect them mostly, however, in Florida -- Miami area?

ATTORNEY GENERAL RENO:  I think Florida will certainly be a place that many of them seek to reside, and the community has pulled together in an extraordinary way in trying to develop sponsorships.  They have worked closely with the community relations service in arranging for sponsorships for those people that are currently being brought in for humanitarian concerns.

Q        Will any federal resettlement funds be made available for these people?

ATTORNEY GENERAL RENO:  There are provisions now for Cuban Haitian resettlement, and we will work with the states as we try to work with all states to address the issue.

Q        Could you talk for a second?  We understand you're under increased death threats -- numerous ones.  Are you doing anything about it?  Is it true?  Can you talk at all about them?

CLINTON LIBRARY PHOTOCOPY

13

ATTORNEY GENERAL RENO: I don't know. I'll let you talk to the FBI. I don't pay any attention to it.

Q       Secretary Tarnoff, if Cuba is a safe and democratic enough place to forcibly repatriate --

Q       General, what have you done to bring Governor Chiles and Senator Graham on board? They're obviously concerned about the effect on Florida of this influx. What steps have you taken to appease them?

ATTORNEY GENERAL RENO: We have worked with everybody concerned by our efforts beginning last summer to regularize migration from Cuba. What we have tried to avoid is a massive flow into South Florida in ways that could adversely affect the community, just in terms of a vast number of people coming in, in a short period of time. We have worked with the Governor, with the Senator in trying to address these problems and trying to make sure that what we do regularizes migration so that people can understand where they stand, that we do so in accordance with humanitarian interests and that we maintain an adherence to international migration policy, and I think we've been able to do it, and I appreciate both the Governor's and the Senator's great assistance in this effort.

Q       General Reno, what happened with the Haitians that are in Guantanamo now? Do you foresee any similar policy in the future for them?

ATTORNEY GENERAL RENO: What we're doing right now with respect to the unaccompanied minors in Haiti, we worked with United States -- United Nations High Commission for Refugees. We asked them to become involved so that we could relocate the children based on what was in the best interest of the child. We are attempting to place them with their families in Haiti. Where families are not located, we're trying to see what is in the best interest. And so that we made sure we did everything consistent with international migration policy, we have been working with the U.N. High Commission on Refugee Status.

Q       How many Haitians are there in --

ATTORNEY GENERAL RENO: I don't know the last number. A little over 400 the General tells me.

Q       General, Representative Tauzin from Louisiana says he has -- he thinks he has voluntary with the fertilizer industries to neutralize their product so it can't be used to make bombs. Does that sound like a good idea to you, or do you think we still may need the legislation, perhaps like Europe, so fertilizer cannot be used for bomb-making?

CLINTON LIBRARY PHOTOCOPY

14

ATTORNEY GENERAL RENO:  I think what we need to do is what we have all ready initiated -- a thoughtful, good, bipartisan discussion on what needs to be done.  The ATF will look at the situation -- I certainly think they would consider such legislation -- see what can be done to minimize the use of these otherwise legal products in terms of bomb manufacture.

Q        Attorney General Reno, you're talking about regularizing migration, why not regularize something else?

Q        What happened to your recommendation on easing -- lifting the -- sanctions, for instance?

UNDER SECRETARY TARNOFF:  Well, our policy has been consistent in support of the Cuban Democracy Act which involves strict monitoring of the embargo and pursuit of what is called Track 2, and that is programs of direct benefit to the Cuban people.  And we are continually seeking to implement that, to find new ways to strengthen both parts of that.

But this migration agreement has nothing to do with that. It's a separate -- and I might add that the reason we have to conclude these migration agreements with Cuba is because Cuba is not a free society, it's not a democratic society, it has not offered hope to its people, and only when Cuba is well on the road to democracy could our relationship improve significantly and will this migration problem disappear.

Q        There's an older law which is to grant Cubans asylum.  So that is essentially being superseded by what the Attorney General did, by intercepting them and forcibly repatriating them.

ATTORNEY GENERAL RENO:  We will continue, and I have stressed in my remarks, that we will continue to provide the opportunity for refugee status which is asylum in-country, and for those who think that there are extreme circumstances that warrant asylum processing or refugee processing otherwise, we are going to continue to adhere to international migration policy with respect to refugees and asylum.

Q        Secretary Tarnoff, this shows, obviously, that you can cut a worthwhile deal with Castro.  Why not use this as a basis for broader negotiations on appropriation of property, the embargo and the transition to democracy?

UNDER SECRETARY TARNOFF:  Again, let me go back to my statement and to say that this agreement builds on what we concluded with the Cubans last summer.  It was in the interest of the United States to regularize migration in Cuba, from Cuba, and this is a further step which goes in that direction.

CLINTON LIBRARY PHOTOCOPY

15 ·

Our policy mark with respect to all other aspects of Cuban policy and U.S. attitudes toward Cuba remains the same. And there is nothing in this agreement which affects in any way, shape or form our overall approach to Cuba, which is the one I described beforehand.

Q        Secretary Tarnoff, you just said that Cuba is not a democratic society.  What guarantees have you received from that government that U.S. officers there, consular officers there will be able to monitor the Cubans that are repatriated or caught at sea and repatriated to their country?

UNDER SECRETARY TARNOFF:  We had understandings last summer in connection with the September 9th agreement that Cuba would do nothing to impede the attempts by Cuban nationals to go to the interest section and to apply for admission to the United States.  There have also bee 1,600 Cubans who have returned from Guantanamo voluntarily, over 200 of whom have also applied for regular admission status at the interest section.  So it was based on our experience with the Cubans, our ability to have people on the ground, more people, if necessary, to monitor the situation that the Attorney General concluded that it was possible for us to have this kind of an agreement with a high degree of assurance that the Cubans would continue to honor it.

Q·        Mr. Tarnoff, how can you justify in moral terms the repatriation, the forced repatriation of people to a society that by the administration's own reckoning does not value basic human rights.

UNDER SECRETARY TARNOFF:  The rationale that we are using is for the purposes of legal migration to the United States.  We believe we have not only a commitment by the government of Cuba, but experience with that government over the last nine months that they will not interfere with the ability of these people to either return to their homes, resume their lives, or come to the interest section and begin the process of legal migration to the United States.  This has nothing to do with the broader reaches of Cuban society where the attitudes of the United States is well-known.

MR. MCCURRY:  Thank you.  I want to thank everyone for the briefing.  I've got copies here of the joint statement that has been simultaneously issued in Havana and will be issued here.

THE PRESS:  Thank you.

END

12:48 P.M. EDT

CLINTON LIBRARY PHOTOCOPY