|  |  | **EXHIBIT R** |
|---|---|---|

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton<br><br>**DECLARATION OF ERIC SCHWARTZ** |

| | |
|---|---|
| his official capacity, | § |
| | § |
| *Defendants*, and | § |
| | § |
| VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; and GERMAN CADENAS, | § § § |
| | § |
| *Intervenors*. | § |
| | § |

## DECLARATION OF ERIC P. SCHWARTZ

ERIC P. SCHWARTZ declares pursuant to 28 U.S.C. § 1746:

**Background**

1. I am currently a Professor of Public Affairs at the Hubert H. Humphrey School of Public Affairs at the University of Minnesota. From 2011 to 2017, I was both a professor and the dean of the Humphrey School.

2. Between 2017 and 2022, I served as the President of Refugees International, an independent nonprofit organization that advocates for assistance and protection for forcibly displaced persons, while on leave from the Humphrey School and the University of Minnesota.

3. Prior to academia, much of my career was spent working for the federal government, principally in the executive branch, although my career in government began as a Congressional Subcommittee staff member. Throughout my time in government, I focused on matters of migration and humanitarian protection, particularly as it intersects with foreign policy.

2

4. From July 2009 to October 2011, I served as Assistant Secretary of State for the Bureau of Population, Refugees, and Migration ("PRM"). Before that, from 1993 to 2001, I served as the principal human rights and humanitarian official on the National Security Council ("NSC") staff, ultimately in the role of Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs. Prior to that I served from 1989 to 1993 as staff consultant to the U.S. House of Representatives Foreign Affairs Subcommittee on Asian and Pacific Affairs.

5. The Assistant Secretary of State for PRM is the senior-most State Department official devoted primarily to migration, refugee, and humanitarian issues. The Assistant Secretary is also the senior-most State Department official for whom a principal focus, day-in and day-out, is diplomacy on U.S. foreign policy issues involving international migration and humanitarian objectives. In that role, I regularly interacted with the heads of offices and agencies such as the International Committee of the Red Cross, the UN High Commissioner for Refugees, the UN Office for the Coordination of Humanitarian Affairs, and the UN Relief and Works Agency for Palestine Refugees in the Near East, among others. I pursued U.S. foreign and international humanitarian objectives not only with leaders of these international organizations, but also with heads of state and other senior officials in countries dealing with issues of forcible displacement. During my tenure as Assistant Secretary, the Bureau I led had an annual budget of about $1.85 billion.

6. During the eight years that I served in the White House, I was the principal official on the NSC staff overseeing refugee- and international migration-related issues. In that role I was involved in a broad array of issues that impacted U.S. national security interests and were of deep concern to the NSC, such as forced migration from Haiti connected to political

violence in that country, U.S. refuge and/or resettlement of Kosovars in the context of the Serbian government attack on that population, and emigration of asylum-seekers from Vietnam, among many other issues.

7. During the more than three years I served on the staff of the House of Representatives Foreign Affairs Subcommittee on Asian and Pacific Affairs, I advised Members of Congress, including the subcommittee's chairman, Representative Stephen J. Solarz, on a range of migration-related issues. This included working on legislative proposals to expand access to refugee resettlement to certain nationals from the former Soviet Union to also include nationals from Vietnam, Cambodia, and Laos.

8. Based on my experience as Assistant Secretary of State for PRM, my years on the NSC and with the House Foreign Affairs Subcommittee, and my career focused on humanitarian and migration issues, I understand that foreign relations matters are frequently complex, delicate, and of great importance to the national interest. This is particularly true when such matters involve sensitive, fragile, and often tense bilateral or multilateral negotiations with foreign governments in which all parties are working to secure an agreement that advances their own foreign policy priorities.

9. As I have seen, when engaging in negotiations with a foreign government(s), it is critical for the Executive to have as many legislative and administrative tools at its disposal as possible. This is especially the case in the humanitarian context, when flexibility in particular can be critical to ensuring life-saving and life-sustaining action that furthers human rights objectives long-articulated by executive and legislative branches.

10. The development and implementation of migration policy frequently has significant impacts beyond the borders of the United States and, as a result, on U.S. objectives around the world.

11. Based on my professional experience, the ability to make commitments regarding migration policy that are within the purview of the Executive can be a powerful foreign policy tool to promote the interests of the United States, through advancing negotiating objectives with foreign governments, and through achieving humanitarian, human rights, anti-trafficking, and regional security goals, among others. I am aware of the periodic use of the statutory parole authority by past administrations to advance this nation's foreign policy interests, and I have had personal experience with several of those instances. I believe that in each of these instances, parole was the only reasonable approach to serve urgent humanitarian needs or to otherwise advance the national interest. Other options were, as a practicable matter, unavailable due, for example, to constraints related to access to affected populations and the need to move quickly to secure foreign policy and national security objectives.

**The Cuban Migration Accords and Parole**

12. During my tenure on the NSC, I was involved in White House and agency deliberations around Cuban migration, including migration accords between the United States and Cuba.

13. Early during the administration in 1994, we began to see a significant increase in the departure of boats from Cuba filled with would-be migrants headed to the United States. Cuba was experiencing economic and political turmoil, due in large part to the end of financial support that the country had been receiving from the Soviet Union prior to its collapse. As conditions in the country worsened, Cuban president Fidel Castro criticized what he claimed

5

were inadequate U.S. efforts to stem hijacking and loosened restrictions on people seeking to leave, which resulted in tens of thousands of Cubans taking to the seas en route to the United States.

14. This migration was irregular and disorderly, and it not only posed a significant risk to the lives of these migrants but also consumed Coast Guard resources due to interdiction and rescue efforts.

15. As Castro had decades earlier deployed a similar tactic that spurred a tremendous out-migration from Cuba culminating in the 1980 Mariel boatlift, this renewed wave of Cuban nationals taking to the sea created significant tensions between the United States and Cuba.

16. This was a topic of great public concern in the United States that represented a major humanitarian and border management challenge. It was of great importance to the administration and to the country that the Clinton Administration find some way of directing Cuban migration into safe, legal, and orderly channels.

17. After months of negotiations, in September 1994 the United States agreed to provide a minimum of 20,000 travel documents each year to Cuban nationals interested in immigrating to the United States, not including the immediate relatives of U.S. citizens, in exchange for the Cuban government's commitment to discourage irregular and unsafe departures by sea. Both countries also agreed to continue to discuss Cuba's willingness to accept the return of Cuban nationals excludable from the United States. Communique Between the United States of America and Cuba, 94-909, signed at New York Sept. 9, 1994, entered into force Sept. 9, 1994.

18. The United States understood at the time that some share of the 20,000 figure would come through immigrant visa programs and an in-country refugee program operated out of the U.S. Interests Section in Havana, Cuba. The United States also understood that we

6

would have to rely heavily on the ability of the Attorney General to use the statutory authority to parole a significant number of Cuban nationals into the country in order to meet the U.S. government's commitment.

19. Shortly after this agreement was reached, the Immigration and Naturalization Service ("INS"), in partnership with the Department of State, created the Special Cuban Migration Program ("SCMP") to select applicants who met certain, preset requirements for parole in an effort to meet the 20,000 figure to which we had committed.

20. Individuals interested in participating in the SCMP would register and be selected randomly to receive individualized consideration of their application. Potential parolees had to meet certain criteria established by the Executive, and several were based on education, work experience, and/or U.S. family ties. Of course, the program was open only to Cuban nationals. Registration periods for the program took place in fiscal years 1994, 1996, and 1998, and enough individuals registered during those periods that individuals could continue to be selected, interviewed, and paroled for many years after that.

21. If the U.S. Government had not been able to rely upon the statutory parole authority when it negotiated the 20,000 figure with the Government of Cuba, it is not clear that the agreement could have been reached and it is not clear that Fidel Castro would have taken steps to discourage continued largescale irregular migration to the United States by boat.

22. Similarly, if the U.S. Government had not been able to utilize parole effectively in the years following the agreement it is all but certain that the U.S. Government would have failed to uphold its commitment and diplomatic relations between the countries would have been diminished. That would have caused significant harm to U.S. foreign policy interests,

including by potentially triggering an increase once more in largescale Cuban migration to the United States by sea.

23. Had the executive's ability to use its statutory parole authority been unduly constrained, it also would have likely interfered with the U.S. government's ability to reach a second migration-related agreement with Cuba in May 1995 in which the United States began returning to Cuba certain Cuban nationals interdicted at sea or apprehended entering the U.S. Naval Base at Guantanamo Bay and Cuba agreed not to take any punitive actions against such people. In that agreement, the United States and Cuba also reached an understanding about how the United States would proceed with the approximately 20,000 Cuban nationals who had been interdicted at sea beginning in August 1994 and taken to a safe haven at the U.S. Naval Base at Guantanamo Bay. Although a small number who met certain specified criteria were already being paroled into the United States on a case-by-case basis and a small number had agreed to voluntarily return to Cuba, the large majority remained at Guantanamo and the situation required resolution.

24. In the May 1995 Joint Statement on Migration, both countries agreed that the limited criteria for Cuban nationals remaining at Guantanamo to be considered for parole would need to be expanded and that up to 5,000 paroles could be counted each year toward the 20,000 annual figure provided in the September 1994 agreement. The United States anticipated that the large majority of Cubans at Guantanamo—about 15,000 people—would be paroled into the United States, also on a case-by-case basis, and the remainder would be returned to Cuba with negotiated assurances that such individuals would face no reprisals for their decision to leave Cuba. The same assurances would apply to Cuban nationals interdicted at sea en route to the United

States who similarly would be returned to Cuba after first being screened for refugee status. Office of Public Affairs, U.S.-Cuba Joint Statement on Migration, White House, May 2, 1995.[1]

25. As the then-NSC director for human rights, refugees, and migration, in the NSC Office of Global Affairs and Multilateral program, I worked closely with the NSC Office of Democracy, led by my colleague Morton Halperin, in the evolution of the overall approaches on Cuban migration.

**The Rescue and Resettlement of Kurds in Northern Iraq Using Parole**

26. A dramatic and compelling example of the critical importance of the parole authority involved the 1996 rescue and resettlement of Kurds affiliated with U.S. non-governmental organizations who fled northern Iraq. These individuals were at risk of persecution and/or death at the hands of Saddam Hussein, and the administration initiated a large-scale evacuation following Cabinet-level deliberations in which I was directly involved. Ultimately, some five thousand or more individuals were assisted by U.S. agencies and paroled into the United States.

27. Having this quick and flexible authority was absolutely critical to the administration's capacity to achieve critical foreign policy objectives—including the avoidance of atrocities against individuals who had been affiliated with U.S. agencies. Needless to say, the United States not only had a moral interest in achieving this objective, but also an interest related to communicating to others that the United States will stand by—and not abandon—those who seek to promote humanitarian and human rights objectives.

---

[1] *Available at* https://www.american.edu/centers/latin-american-latino-studies/upload/1995-migration-agreement.pdf.

**The Resettlement Opportunity for Vietnamese Returnees Initiative and Parole**

28. Also during my tenure on the NSC and beginning in around 1996, I led a U.S. government effort to establish the Resettlement Opportunity for Vietnamese Returnees ("ROVR") initiative. Along with State Department officials, I was also involved in negotiations with the Government of Vietnam on this initiative. And I advised the U.S. National Security Advisor, Anthony Lake, who was also involved in efforts to secure the program.

29. For many years preceding the establishment of ROVR, the United States had used a variety of migration pathways—including both refugee admissions and parole—to bring large numbers of Vietnamese nationals and their family members to the United States. There were critically important foreign policy objectives that were served through these efforts: international humanitarian goals that are critical components of U.S. foreign policy as well as communicating to others around the world that the United States government will not walk away from those who have in been associated with the U.S. government or U.S. government agencies. And in fact, the effective execution of such programs also helped to lay the groundwork for normalization of relations with Vietnam, and to support countries in the region that were hosting large numbers of Vietnamese nationals for long periods of time.

30. As countries in southeast Asia that had long hosted Vietnamese refugees worked to close their camps and repatriate Vietnamese nationals back to their home country—most of whom at this point had already been screened by the United Nations High Commissioner for Human Rights and others and determined not to be refugees—the United States wanted to provide one final opportunity to consider these individuals for resettlement in the United States.

31. During our efforts to establish ROVR, it became clear that U.S. processing directly from host countries would not be possible, in large measure because governments of these

countries would have been concerned that it could draw additional refugees into the camps from other areas or countries. That would run counter to their efforts to close the camps. As a result, we worked with the Government of Vietnam to facilitate prompt interviews for U.S. resettlement for these individuals upon their return to Vietnam.

32. The United States would submit lists of names to the Government of Vietnam in order for them to be cleared for interviews by U.S. personnel. Due to various cumbersome requirements initially imposed by the Government of Vietnam, things got off to a slow start, but we negotiated efficiencies and the program improved.

33. Although ROVR was primarily a refugee admissions program, as with other parole programs, individuals who were determined not to be refugees were considered for parole and many ultimately were paroled into the United States in furtherance of the United States's important foreign policy objectives.

34. More broadly, through the pre-existing Orderly Departure Program for resettlement of Vietnamese that was established in 1979, many thousands of people who were denied refugee status in the United States were favorably considered for parole and allowed to travel to the United States if they paid for their own travel and had affidavits of support from relatives or organizations in the United States.

35. For all programs of resettlement from Vietnam after the conflict had ended, parole was an important tool—and its absence would have created significant foreign policy challenges. In particular, it would have undermined the United States' ability to meet our humanitarian objectives and risked causing additional and unnecessary friction with the Government of Vietnam as we sought to move our bilateral relationship in a new direction.

**The Lautenberg Refugee Program and Parole**

36. As staff consultant to the House Foreign Affairs Subcommittee on Asian and Pacific Affairs, I was involved in the evolution of legislation that was enacted in 1989 that both (a) relied upon the continued and expanded use of parole for certain populations that were of particular interest to U.S. foreign policy; and (b) extended to these individuals the ability to adjust their status in the United States to that of a lawful permanent resident (i.e., a "green card" holder).

37. Specifically, in 1988, then-Attorney General Edwin Meese wrote in a letter to the White House that he had determined that Soviet refugee applicants were being processed at the U.S. Embassy in Moscow in a manner inconsistent with the Refugee Act of 1980 and that he was sending INS personnel to the Embassy to address the issue. *See* Letter from Edwin Meese III, Attorney General, to Lt. Gen. Colin Powell, Assistant to the President for National Security Affairs, Aug. 4, 1988.[2] Although his particular concern was left unstated in the letter, I recall that he believed refugee status determinations—in which refugee officers determine whether or not an individual meets the legal definition of a "refugee," which is the same one that is used in the asylum context—needed to be made on more of a case-by-case basis rather than with a presumption of refugee status based on proof that an individual is a member of a persecuted group. Attorney General Meese was clear that the changes he would be implementing likely would decrease the refugee grant rate, but he committed to using his parole authority to allow potentially a "significant number of emigrants" determined not to be refugees to nevertheless enter the United States.

38. The refugee grant rate did, in fact, drop significantly for these Soviet refugee applicants, and many who were denied were Jews, Evangelical Christians, and others and who nonetheless risked discrimination in the Soviet Union. This was of great concern to many

---

[2] *Available at* https://archive.org/details/sovietrefugeeshe00unit/page/128/mode/2up.

12

humanitarians and humanitarian organizations, as well as to Members of Congress. As a result, Members began work on legislation to provide for more favorable treatment for these individuals in the refugee status determination process. In particular, the legislation effectively created presumptions of refugee status for members of historically persecuted groups mentioned in the legislation. The chair of the House Foreign Affairs Subcommittee for which I worked supported similarly heightened humanitarian protection for other populations of particular concern to U.S. foreign policy interests—Vietnamese, Cambodians, and Laotians.

39. In 1989, Congress enacted legislation commonly referred to as the Lautenberg Amendment that modified the refugee status determination process for certain nationals of the Soviet Union, Vietnam, Cambodia, and Laos. Moreover, the legislation authorized individuals from these countries denied refugee status who had been paroled into the country—and those who still would be paroled into the country in the remainder of the fiscal year—to adjust their status to that of a lawful permanent resident.

40. Congress has repeatedly reauthorized and extended that legislation, demonstrating congressional approval not only of the modified refugee status determination process for these individuals, but also for the continued use of parole for individuals determined not to meet the legal definition of a "refugee" and for the continued ability of those parolees to become lawful permanent residents (and ultimately, the opportunity to apply for U.S. citizenship).

41. The flexibility provided by Congress to the executive in deciding when, whether, and how to use the parole authority—within certain specified constraints—has been of great value to the advancement of U.S. foreign policy interests. In particular, after winning often hard-fought concessions from foreign governments to permit the emigration of their nationals, parole has enabled the United States to meet its undertakings to those governments about our

13

willingness accept individuals who have been forced to flee but who might not have met all the requirements for refugee status. In addition, it has demonstrated that the United States will not break faith with those who have been subject to discrimination and abuse, communicating U.S. global credibility as a proponent of human rights and humanitarian values.

**The Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes**

42. I am very familiar with the Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes that the Department of Homeland Security recently began to implement as part of a broader suite of migration management policies. I understand that these processes were adopted—and are continuing to be implemented—in furtherance of extensive bilateral negotiations with the Government of Mexico regarding the management of migration at the U.S.-Mexico border and throughout South and Central America, and that the United States Government has specifically secured a commitment from the Government of Mexico that while the former will parole up to 30,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela each month, the latter will accept the removal or return of up to 30,000 nationals from these countries each month. I further understand that these processes were adopted to advance commitments made by the U.S. Government as part of the Los Angeles Declaration on Migration and Protection and that other countries that are signatories to that Declaration have similarly enacted laws and adopted policies in furtherance of their commitments.

43. The stated goal of the Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes—to facilitate safe, legal, and orderly migration and discourage dangerous irregular migration, in partnership with foreign governments in the region—is essentially the same goal that the United States pursued nearly 30 years ago when it agreed to use the statutory parole authority as part of the 1994 and 1995 agreements with Cuba. *See* Joint Communiqué on Migration, U.S.-

14

Cuba (Sept. 9, 1994) ("Representatives of the United States of American and the Republic of Cuba today concluded talks concerning their mutual interest in normalizing migration procedures and agreed to take measures to ensure that migration between the two countries is safe, legal, and orderly."); Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) ("The United States of America and the Republic of Cuba have reached agreement on steps to normalize further their migration relationship.  These steps build upon the September 9, 1994 agreement and seek to address safety and humanitarian concerns and to ensure that migration between the countries is safe, legal, and orderly.").

44. It is also the very same goal reflected in the George W. Bush administration's decision in 2007 to create the Cuban Family Reunification Parole Program that remains in place today. *See* Department of Homeland Security, Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) ("The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.").

45. And just as decreasing dangerous arrivals by boat was a priority of the U.S. Government in negotiating agreements with Cuba in the mid-1990s and in adopting the Cuban Family Reunification Parole Program, the recent modifications to the Cuban and Haitian Parole Processes that disqualify people for parole consideration if they are interdicted at sea subsequent to the modifications demonstrate how important this priority remains to the Government of the United States. *See, e.g.*, Department of Homeland Security, Implementation of a Change to the Parole Process for Cubans, 88 FR 26329, 26331 (Apr. 28, 2023) ("In response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, DHS will make individuals who have been

interdicted at sea after April 27, 2023 ineligible for the parole process for Cubans. Further, DHS expects this change in eligibility criteria to materially reduce the number of maritime interdictions, by incentivizing migrants to use safe and orderly means to access the United States.").

46. I further understand that the new Cuban Parole Process was created in part to support United States Government negotiations with the Government of Cuba to "reactivate the Migration Accords." Department of Homeland Security, Implementation of a Parole Process for Cubans, 88 FR 1266, 1270 (Jan. 9, 2023). The U.S. Government's stated reason for seeking to reactivate the Migration Accords is that it could help the United States secure the cooperation of the Cuban government in accepting the repatriation of many more of its nationals who are ordered removed from the United States after attempting entry without authorization, which, in turn, is expected to decrease further irregular migration and instead channel people through various safe, legal, and orderly pathways. *Id.* at 1270-71. The Cuban Parole Process in particular, therefore, is very clearly grounded in a complex and shifting diplomatic relationship with the Government of Cuba that has been ongoing for nearly 30 years—and certainly longer.

I declare under the penalty of perjury that the foregoing is true and correct.

*/s/ Eric P. Schwartz*
Eric P. Schwartz

Executed in Silver Spring, Maryland, on June 19, 2023.