

**EXHIBIT Y**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton |
| *Plaintiffs*, | | |
| v. | | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | | **EXPERT DECLARATION OF YAEL SCHACHER** |
| *Defendants*, and | | |
| VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; and GERMAN CADENAS, | | |
| *Intervenors*. | | |

## EXPERT DECLARATION OF YAEL SCHACHER

I, YAEL SCHACHER, hereby declare pursuant to 28 U.S.C. § 1746:

### BACKGROUND

1.      I am an historian of immigration to the United States and I currently serve as the Director for the Americas and Europe at Refugees International, a non-partisan, non-profit organization founded in 1979.

2.      I have published peer reviewed academic articles on immigration law and policy in, for example, the *Journal of American History* and *Whose America?: U.S. Immigration Policy Since 1980* (University of Illinois Press). A list of all publications I have authored in the past ten years is attached to this declaration. I have also taught courses on United States immigration history at the University of Connecticut and at Georgetown University. I have not testified as an expert witness in the last four years.

3.      My academic focus is on the relationship between foreign policy and migration policy, particularly as it relates to humanitarian protection. As part of my doctoral (Harvard University Ph.D., 2016) and postdoctoral (University of Texas at Austin, 2017-2018) work, I have conducted extensive archival research on the Executive branch's use of the statutory parole authority.

4.      My archival research has focused particularly on parole programs whereby the Executive defines a group (typically by nationality plus additional factors) whose entry on parole may be justified by humanitarian and/or public benefit reasons, with applications of individuals therein considered on a case-by-case basis. I refer to this below as "programmatic" uses of parole.

5.    I have been retained by counsel for the Intervenor Defendants to explain and summarize the legislative and administrative history of parole programs under 8 U.S.C. § 1182(d)(5), with particular focus on the programmatic use of parole, including after the statute was revised in 1980 and 1996, and how the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole processes compare to past parole programs.

6.    In preparing this declaration I reviewed the following documents:

a.  Plaintiffs' complaint

b.  Federal Register Notices for the CHNV, U4U, and other past parole programs

c.  DHS policy documents about parole programs

d.  Congressional hearings and reports relating to parole

e.  Documents compiled in *Foreign Relations of the United States*

f.  State and Justice Department (including Immigration and Naturalization Service) records at the National Archives relating to parole

g.  Documents from the USCIS Historical Library relating to parole

h.  Documents from papers of members of Congress and Presidential libraries

i.  Articles and books about U.S. parole and refugee programs

**SUMMARY OF OPINIONS**

7.    Overall, my research shows that parole has for many decades been an important, flexible, and frequently used tool of successive administrations of both political parties to facilitate entry into the United States of large groups of non-citizens.

8.    Congress has frequently responded to parole programs by seeming to approve of the Executive's programmatic use of parole by, for example, extending immigration and other benefits to individuals who were or will be paroled through a program; and by declining

to amend the parole provision to limit the use of parole to narrow, highly prescriptive circumstances that likely would significantly constrain its programmatic use.

9.      Most recently, Congress amended the parole statute in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 to state that parole may be granted "only on a case-by-case basis."  Long before 1996, however, the Executive made case by case determinations for parole even in the context of parole programs. The executive specified classes of people to apply for parole and then assessed each applicant individually. The addition of the "case-by-case" language thus did not materially change the way Executives have used parole programmatically. Since 1996, just as before, Congress has several times extended benefits to large numbers of parolees who have (or will) come to the United States through parole programs.

10.     Although the specific humanitarian and/or public benefit justification has varied, programmatic uses of parole have frequently been heavily influenced by U.S. foreign policy and humanitarian objectives. Especially since 1980, these have prominently included (though have not been limited to) deterring dangerous irregular migration, promoting the reception and protection of migrants by other countries, and family unification.

11.     The Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) Parole Processes—as well as the ongoing Uniting for Ukraine Parole Process, on which they were modelled, and through which the Biden Administration has paroled more than 120,000 Ukrainians—are well within this historical tradition of the programmatic use of parole.

**Congress and the Executive on Parole**

12.     Section 212(d)(5) of the 1952 Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1182(d)(5), established that "the Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent

reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." Congress did not define the terms "emergent" or "public interest" reasons and did not modify the wording of the parole provision for 28 years. Congress did, however, extend benefits to noncitizens who came in through multiple different parole programs, such as the ability to become lawful permanent residents (e.g., "green card" holders) who would eventually be eligible to naturalize.

13.     For example, in late 1956 and early 1957, President Dwight D. Eisenhower directed his Attorney General to parole about 32,000 Hungarian nationals who had fled Soviet repression of the Hungarian Revolution. Each parolee was personally screened before entry to the United States. In 1958, Congress enacted legislation (Public Law 85-559) enabling Hungarian parolees to become lawful permanent residents.

14.     Parole of Cubans into the United States began in 1961, with almost 100,000 Cubans paroled into the United States in just a three-year period, from 1961 to 1963.

15.     In 1965, members of Congress expressed awareness of (and some concern about) large parole programs, but in amending the INA that year, Congress made no changes to the parole statute. Overall, between 1965 and 1975, about 310,000 Cubans—coming directly from Cuba or from third countries—were paroled into the United States after individual screening.

16.     In 1966, Congress enacted the Cuban Adjustment Act (CAA), which granted past and future Cuban parolees the ability to adjust status to lawful permanent residence.

17.     In the midst of a complicated Vietnamese displacement crisis further discussed below, Congress added a restriction to the parole authority in the Refugee Act of 1980 (Public Law § 203(f)): "The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest

with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

18.     Beginning in 1988, the Attorney General authorized the parole of people from Vietnam, Laos or Cambodia and the Soviet Union who had been *denied* refugee status. Congress, in 1989, passed a law (Public Law 101-167 § 599E) providing that such parolees could adjust their status to lawful permanent resident after one year. The same law specified that certain categories of people from the Soviet Union, Vietnam, Laos and Cambodia could be granted refugee status on a lower evidentiary burden. The latter is referred to as the "Lautenberg amendment."

19.     Some in Congress became concerned that parole was being used to allow large groups of noncitizens who may not have had a path to permanent legal status to remain in the United States for long periods. Congress addressed this concern in IIRIRA in a provision that limits immigration because of the presence of long-term parolees. Section 603 of the IIRIRA requires that nearly all long-term parolees who have yet to become legal permanent residents be counted against annual numerical caps on family-sponsored immigration, thereby diminishing the available number of family-based visas from a particular country by the same number of its nationals who are long-term parolees in the United States.

20.     IIRIRA also mandated annual reporting to Congress on the Executive's use of parole and replaced the "emergent reasons or for reasons deemed strictly in the public interest" language that had been in the parole criteria since 1952 with "urgent humanitarian reasons or significant public benefit." As before, Congress left those terms undefined and therefore up to interpretation by the executive.

21.     In contrast, an alternative proposal that the House Judiciary Committee considered would have defined those terms with great particularity. *See* H. Rep. 104-469 (1996) at

77-78. That proposal defined the "urgent humanitarian reasons" basis for parole to refer only to certain medical emergencies (i.e., the parolee donating an organ or visiting a dying relative) and defined the "strictly in the public interest" basis as applying only where the parolee assisted the U.S. Government in a law enforcement activity or was to be criminally prosecuted. It also would have explicitly prohibited using parole for noncitizens "who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply." To explain the proposed extensive amendments to the parole statute, the report criticized the programmatic use of parole, including the Clinton Administration's September 1994 migration agreement with Cuba discussed more below. This House Judiciary Committee report's parole amendment proposal *did not become law*; the provisions defining and restricting when parole could be used were removed from the legislation even before the bill was considered by the full House.

22.     IIRIRA also amended the parole statute to specify that parole must be granted "only on a case-by-case basis."  As described above, it had long been understood by the Executive that, even when used programmatically, the statutory parole authority required assessing individual applicants for parole.

23.     There were times before the passage of IIRIRA when this individualized assessment was explicitly referred to as "case by case." For example, a September 30, 1994, INS Focus pamphlet from the Office of the Commissioner of the Immigration and Naturalization Service (INS) explained that "the INS authorizes parole, under delegated authority from the Attorney General, on a case-by-case basis." A September 1995 GAO report on the parole of Cubans in 1994 (available at www.gao.gov/assets/nsiad-95-211.pdf) likewise referred to it as a "case-by-case" process.

24.     In the nearly 30 years since the parole authority was amended to include the "case-by-case" language, the Executive and Congress have continued to indicate that the statute permits programmatic uses of the parole.

25.     In June 2001, for example, INS General Counsel Bo Cooper issued a legal opinion on the continued INS authority to parole individuals from the former Soviet Union who are denied refugee status (I understand that this opinion is in the administrative records for the CHNV litigation). Cooper concluded:

> "Designating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with the 'case-by-case' decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case. . . . So long as individual consideration is given to parole decisions, the Service's determination—that it is generally in the public interest to parole denied refugee applicants from Moscow who belong to groups specified in the Lautenberg amendment--—does not violate the case-by-case requirement."

26.     After the passage of IIRIRA, the Executive has continued to use parole programmatically, where individual members of a group or class defined by agency policy to be considered on a case-by-case basis. Such programs include, for example, the Central American Minors Program whereby at-risk children from El Salvador, Honduras, and Guatemala are individually considered for parole if denied refugee status.

27.     Also since the passage of IIRIRA, Congress has taken a number of legislative actions that seem to endorse the programmatic use of parole by the Executive.

28.     For example, in section 1758 of the 2020 National Defense Authorization Act (Public Law 116-92), Congress essentially mandated as a legislative matter a parole program that had been created years earlier by the Executive. Like the Executive-created program, the legislation defined a class (certain family members of those in the military) and then ordered case-by-case consideration of requests for parole of individual members of that class.

29.     In 2021 (Public Law 117-43) and 2022 (Public Law 117-128), Congress extended benefits to Afghans and Ukrainians, respectively, who had already been paroled in through one of the programs created by the Biden Administration, and to certain Afghans and Ukrainians who might be paroled into the United States sometime in the future.

### The Use of Parole as a Tool of Foreign Policy

30.     Regardless of the particular statutory language, administrations have been heavily influenced by matters of foreign policy and diplomatic relations when deciding whether and how to use parole on a programmatic basis.

31.     The Eisenhower administration used parole for tens of thousands of Hungarians, for example, in order to support opponents of communism non-militarily, shore up Cold War alliances (especially with Austria and Yugoslavia, where most Hungarians initially fled), and reassert America's moral leadership by promoting solutions to refugee and migration crises.

32.     In the wake of the passage of the Refugee Act of 1980 and IIRIRA in 1996, parole programs for Vietnamese and Cubans helped achieve important foreign policy objectives, as discussed below. Most prominent among them were promoting orderly (and safe) migration and encouraging other countries to receive migrants as well.

### The Use of Parole from Vietnam

33.     In the wake of the war in Vietnam, the United States made extensive use of its parole authority for twenty five years. Parole was used to effectively control and collaboratively manage irregular migration, to ensure countries of first asylum in Southeast Asia (not signatories to the UN Refugee Convention and Protocol) would shelter refugees, and to ensure Vietnamese of concern to the United States (including Amerasian children and those released from re-education camps) could enter the United States with their relatives.

34.     Congress was well informed of the extensive use of parole authority to achieve these goals and, not only in 1989 (as mentioned above) but several additional times, including in the Indochinese Parole Adjustment Act of 2000, provided for the adjustment to permanent status of Vietnamese paroled into the United States through the late 1990s. As discussed below, the Executive's programmatic use of parole was crucial to achieving long-term foreign policy objectives.

35.     As Congress in 1979 debated the legislation that ultimately became the Refugee Act of 1980, the number of people leaving Vietnam to seek refuge in other countries in the region (i.e., overland to Thailand, by boat to Malaysia) increased dramatically. The Office of the United Nations High Commissioner for Refugees (UNHCR) and Vietnamese officials signed a memorandum of understanding to try to better control migration called the Orderly Departure Program (ODP). At a conference in Geneva in the summer of 1979, the Vietnamese government agreed to stop boats from embarking while the United States (and other nations such as Canada, France, and Australia) agreed to receive individuals directly from Vietnam through ODP. By 1985, more Vietnamese were leaving via the ODP process than were arriving by boat in countries of first asylum in the region thus indicating that the program was successfully working to bring order to Vietnamese migration.

36.     But, in 1986, the Vietnamese government suspended the ODP program, accusing the United States of not following through on its responsibility to process applicants, stating an applicant backlog had developed of thousands of people wishing to unite with family in the United States.

37.     At this time, the United States—to fulfill a law passed by Congress—wanted to process Amerasians in Vietnam for resettlement in the United States. The Vietnamese

government insisted that Amerasians were not refugees but American children, yet most Amerasians in Vietnam were not claimed by American fathers and also had mothers and siblings in Vietnam who needed to be processed with them lest families be separated.

38.     To ensure the continuing cooperation of the Vietnamese government with the ODP (and especially the issuing of exit permits) and release and emigration to the United States of those imprisoned in reeducation camps as a result of their close association with the United States (a population of unanimous concern to the Senate as indicated in Resolution 205 of May 1, 1987) it was crucial to use the parole authority.

39.     Between 1990 and 1995, over 45,000 Vietnamese—mostly family members of Vietnamese ineligible for immigrant visas, former United States government employees and former reeducation prisoners denied refugee status, and accompanying relatives of Amerasians and former prisoners—were paroled into the United States as part of the Orderly Departure Program. In the decade and a half after the passage of the 1980 Refugee Act, the continued use of parole *alongside* refugee resettlement to unite Vietnamese families and allow for the migration of Amerasians and prisoners with their relatives was crucial to the normalization of U.S.-Vietnam relations, especially the United States' decisions to permit international financial institutions to lend to Vietnam in July 1993, lift the embargo in February 1994, and establish formal diplomatic relations in July 1995.

40.     In 1995, first countries of asylum insisted on closing camps of screened-out refugees (i.e., individuals who had been determined *not* to meet the refugee definition) and on pushing back all future Vietnamese boat arrivals. In response, the United States and Vietnam negotiated an agreement called Resettlement Opportunity for Vietnamese Returnees (ROVR). The

program accepted the requirement that all screened-out migrants return to Vietnam but offered returnees one more chance to apply for resettlement to the United States from Vietnam.

41.     The use of parole continued alongside resettlement in the ROVR program; over an eight-month period ending in April 1998, nearly 20 percent of the Vietnamese who came to the United States through ROVR were paroled. The existence of the program prevented forced repatriation in the region and upheld a commitment to resettle families together. Ending the program at the end of the millennium honorably brought to a close a 20-year U.S. engagement on the Vietnamese refugee crisis and paved the way to the U.S. awarding Vietnam most favored nation status in late 2021.

### Parole Programs for Cuban Nationals

42.     The use of parole to advance important U.S. foreign policy interests, both before and after the 1996 changes to the parole authority, can also be seen in the longstanding and robust use of parole for certain Cuban nationals.

43.     Parole programs for Cubans put in place during the Clinton and George W. Bush administrations were designed to regularize migration, promote family unification, and put pressure on Cuba to promote political and economic reform and transition to democracy.

44.     In late 1984, the United States and Cuba negotiated an agreement whereby Cuba would accept the return of a certain number of Cubans excluded from the United States and would allow for the emigration of 3,000 political prisoners and their families, while the United States would issue 20,000 visas for Cubans to immigrate to the United States annually.

45.     In 1985, after the United States launched Radio Marti, a U.S. sponsored broadcaster that transmits to Cuba, Castro suspended implementation of the agreement. Though the agreement was restarted in 1987, the United States interests section in Havana issued only

11,222 visas between 1988 and 1994. In 1993 and 1994, when the United States issued fewer than 1,000 visas annually, the number of Cubans arriving in the United States by raft more than doubled (to over 4000 annually from less than 2000 in 1991, during the first half of which Representative Lawrence J. Smith said Florida found approximately 860 corpses along its coasts).

46.     In the spring and summer of 1994 there was a huge uptick in irregular sea migration from Cuba; there were more than 3,000 Cubans interdicted by the Coast Guard on some days in August. The Clinton administration was determined not to allow a repeat of the Mariel boatlift of 1980, when more than 125,000 Cubans traveled by sea to the United States over a period of months, so it adopted a policy of interdicting Cubans heading to Miami and bringing them to the U.S. Naval Base in Guantanamo Bay. Although the U.S. Government wanted to return many of these individuals to Cuba in order to deter irregular journeys by sea, it also was concerned about the safety of such people upon being returned.

47.     In September 1994, the United States and Cuba came to an agreement. The Cuban government agreed to take steps to discourage Cuban nationals from departing by boat in exchange for the Clinton administration allowing 20,000 Cubans to enter the United States annually, not counting the immediate relatives of U.S. citizens.

48.     To get to the annual 20,000 migrants and to include among them people likely to migrate irregularly via rafts, the Attorney General created several programmatic parole programs for Cuban nationals in Cuba, most notably the Special Cuban Migration Program through which those between the ages of 18 and 55 who met specified criteria could register for a parole lottery. Those selected in the lottery were then interviewed about their qualifications and to ensure they met medical, criminal and public charge requirements. This was done in the public

interest of stemming irregular migration and promoting "safe, legal, and orderly" migration from Cuba.

49.     In early 1995, the two countries reached another agreement, memorialized in a joint statement, that specifically addressed how Cubans paroled from Guantanamo would be counted toward the 20,000 figure. As the United States decided to no longer transport interdicted Cuban migrants to Guantanamo but to instead generally repatriate them to Cuba, the agreement also included certain assurances that no actions would be taken against repatriated individuals. Between May 1995 and the end of June 1997, the U.S. Coast Guard interdicted only 771 Cuban migrants attempting to migrate to the United States, the lowest Cuban interdiction rates since the late 1980s.

50.     Due to the success of the programmatic parole programs from Cuba, Castro was unable to use the threat of irregular migration to push for change in other U.S. policies towards Cuba, such as the embargo.

51.     Congress seems to have appreciated this approach of using parole to advance foreign policy: in section 606 of IIRIRA, Congress reaffirmed (rather than repealed, as was considered and rejected by Congress) the Cuban Adjustment Act of 1966, mandating that it stay in place until the President determines that a democratically elected government in Cuba is in power. As mentioned above, the Cuban Adjustment Act permits Cubans paroled into the United States the ability to become lawful permanent residents after one year.

52.     Between January 2004 and June 2009, the Department of State cancelled talks with Cuba because it was not abiding by the agreements by refusing to discuss the issuance of exit permits, to allow registration for the Special Cuban Migration Program, to permit U.S.

diplomats to travel to monitor returned migrants, and to accept the return of Cuban nationals the United States wished to deport.

53.     It was in this context that the United States once more turned to the statutory parole authority to advance a significant public benefit in the eyes of the Executive and to support U.S. foreign policy objectives with respect to Cuba.

54.     The George W. Bush administration created two parole programs for Cubans. The Cuban Family Reunification Parole Program (CFRP) was designed to "expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." The program allowed Cuban nationals in Cuba who were the beneficiaries of approved relative visa petitions for which visas were not yet available to be considered for parole on a case-by-case basis.

55.     The Bush administration also created the Cuban Medical Professionals Parole (CMPP) Program, which allowed Cuban doctors and other medical professionals working in third countries such as Venezuela or Namibia to request that they and their dependents be paroled into the United States. The Cuban Medical Professionals Parole Program served U.S. foreign policy interests by undermining Cuba's efforts to cultivate foreign influence through its medical aid program. More than 9,000 Cuban medical professionals and their family members were paroled into the United States under the program before its termination in 2017.

56.     The Obama's administration's decision to terminate that parole program in early 2017 illustrates how the changing landscape on foreign policy shifted the U.S. government's analysis of whether the parole of Cuban medical professionals advanced a significant public benefit to the United States. By that point, the United States had worked with Cuban doctors to

respond to humanitarian needs in Haiti in the wake of that country's 2010 earthquake and as part of other public health efforts.

57.     The U.S. Government was also rethinking its policy toward Cubans who traveled by land to the U.S.-Mexico border (under the so-called "wet foot/dry foot" policy, whereby Cubans caught attempting to enter the United States by sea would be returned to Cuba or to a third country, but if apprehended on land would get a chance to remain in the United States). This was partially in response to complaints by several countries in South and Central America through which Cubans traveled to the border that the policy encouraged irregular and unsafe migration, increased smuggling and trafficking among Cubans en route, as well as insecurity and humanitarian needs among those stranded in transit.

58.     As a step toward normalizing relations with Cuba and toward a more regional and multilateral approach to managing migration and forced displacement, the Obama Administration decided in January 2017 to terminate both the Cuban Medical Professionals Parole Program and its longstanding wet foot/dry foot policy.

59.     Parole programs established by the Obama administration in 2014—the Central American Minors (CAM) Program and the Haitian Family Reunification Parole Program (HFRP)—were designed to unite families and address humanitarian and protection needs in origin countries while stopping dangerous migration in the hands of smugglers by land (through several transit countries) and sea. In response to a rise in child arrivals at the U.S. border and as part of a multifaceted effort to stop children from taking "irregular" and "dangerous" journeys through Mexico, the Obama administration announced the creation of the Central American Minors program in its late 2014 Report to Congress on 2015 refugee admissions.

60.     The CAM Program continues today; it allows certain parents and legal guardians with authorized presence in the United States to request that their unmarried children in El Salvador, Guatemala, and Honduras under the age of 21, as well as some of the child's relatives, receive a refugee resettlement interview. When those interviewed are not deemed to be a refugee but nonetheless determined to be at risk of harm in their country, USCIS decides whether each person merits a grant of parole. As with the parole of Vietnamese nationals through the Orderly Departure Program, commitments of support from a U.S.-based supporter are required to be considered for parole through CAM.

61.     The Haitian Family Reunification Parole (HFRP) Program, like its Cuban predecessor, is for certain beneficiaries of approved family-based immigrant visa petitions. The Federal Register Notice on the program explains that "[b]y expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States." The Notice additionally recognized that using parole for HFRP Program beneficiaries would facilitate the ability of beneficiaries to more quickly work lawfully in the United States and earn money that could be sent back to Haiti in the form of remittances to help fund the "rebuilding and development of a safe and economically strong Haiti," a multi-year project and "a priority for the United States." Approximately 8,300 applications for parole have been approved through the HFRP program.

**CHNV Processes Resemble Previous Uses of Parole**

62.     In the wake of Russia's invasion of Ukraine, over twenty thousand Ukrainians traveled to Mexico in order to come to the United States via the land border. The Biden administration started the Uniting for Ukraine parole program to provide an alternative, more orderly pathway for displaced Ukrainians to come to the United States directly through airports.

Just as with Hungarians and Vietnamese, parole is being used for Ukrainians alongside refugee resettlement and to complement the reception of displaced people in other countries.   Similar to several other parole programs discussed above—most notably the Orderly Departure Program and the CAM Parole Program—Ukrainian nationals seeking parole through the program must be supported by one or more individuals or entities in the United States who have demonstrated to USCIS that they have sufficient income or immediate access to sufficient financial resources to support the parole beneficiaries for the duration of the parole (typically two years). Unlike the CHNV parole programs, the Ukrainian parole program does not have any monthly numerical caps.

   63. The justifications provided in the Federal Register Notices for the CHNV Parole Processes are similar in many respects to the humanitarian, foreign policy, and migration control goals of past parole programs.

   64. The CHNV processes are designed to provide a safe pathway for migrants from four countries experiencing humanitarian and human rights crises—and from which in-country consular processing, and to which removals, are a challenge, if not impossible—to enter the United States through an airport, as an alternative to them coming to the U.S.-Mexico border. Just like the parole programs for Vietnamese and Cubans discussed above, the CHNV programs are designed to deter dangerous irregular migration frequently facilitated by smugglers. Each potential parolee is assessed on a case-by-case basis, as the Executive has long understood the parole statute to require, as discussed above. Each must have a financial supporter in the United States, as was the case with the Orderly Departure Program and the Uniting for Ukraine, and each must pass background checks, as was the case with individuals paroled through all the past programs discussed in this declaration.

65.     Consistent with the historical use of the parole statute discussed above, CHNV is also part of a broader foreign policy strategy—articulated at the 2022 Summit of the Americas and through collaborative engagement on the L.A. Declaration on Migration and Protection—to address the unprecedented challenge of displacement in the Western Hemisphere. Like the handling of Vietnamese discussed above, this effort involves the United States taking the lead in working with key allied countries and international organizations towards resolution of a regional displacement crisis. Just as with the Uniting for Ukraine program, the Biden administration is planning also to resettle Cubans, Haitians, Nicaraguans and Venezuelans as refugees and the CHNV processes complement the reception of, for example, Nicaraguans in Costa Rica and Venezuelans in Colombia.  Since the start of the CHNV processes, the United States has continued to work with Colombia and Costa Rica to curb irregular migration of CHNV nationals.

66.     Like in several prominent past parole programs, such as those related to parolees from Vietnam and Cuba discussed above, the number of people considered for parole is linked to relations and negotiations with foreign governments, including origin and transit or regional countries. Regarding the current program, the number of people from Cuba, Haiti, Nicaragua, and Venezuela that may be paroled into the United States (30,000 per month) is tied directly to the number of people of the same four nationalities that Mexico has agreed to accept for removal.

67.     Through the parole of Cubans in the CHNV program, the United States is also reviving migration talks with Cuba to accept return of its nationals—in April of this year, deportations to Cuba were restarted for the first time in two years—similar to how parole programs have been used by past administrations as a tool to achieve foreign policy objectives in a bilateral context.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Yael Schacher

Executed on June 19, 2023 in Washington, D.C.

## Appendix – Publications of Yael Schacher

A list of Yael Schacher's publications for Refugees International can be found here: https://refugeesintpro.wpengine.com/authors/yael-schacher/

"Misreading History: The United States Supreme Court and the Thwarting of the U.S. Asylum System since the 1980s," *Whose America?: U.S. Immigration Policy since 1980*, ed. Maddalena Marinari and Maria Cristina Garcia, Univ. of Illinois Press, 2023, 209-236.

Review of *The Deportation Machine* by Adam Goodman, *Federal History,* Issue 15 (2023), 132-135, https://shfg.wildapricot.org/page-18388

"The Wedge of the Refugee As Worker: Litigation over Asylum Seeker Work Authorization in the United States, 1974-2021," *Global Labor Migration: New Directions,* ed. Julie Greene, Eileen Boris, Heidi Gottfried, and Joo-Cheong Tham, Univ. of Illinois Press, 2022, 171-189.

"Return of the Repressed," *Journal of American History*, Vol. 109, Issue 2, Sept. 2022, 375–387.

"Exclusions and Exceptions: The History of Asylum in the United States," *The State of Human Rights: Historical Genealogies, Political Controversies, and Cultural Imaginaries,* ed. Kerstin Schmidt, Universitatsverlag Winter, 2020, 71-84.

"Family Separation and Lives in Limbo," *Annals of the American Academy of Political and Social Science*, Vol. 690, July 2020, 192-199.

"'I Hate to See Human Beings Kicked Around by Fate & by Law:' Edith Lowenstein's Asylum Advocacy in the 1950s and 1960s," *Journal of American Ethnic History*, Vol. 30, No. 3, Spring 2020, 49-74.

"Diversity in American Letters," *American Literature in Transition: The 1930s,* ed. Ichiro Takayoshi (Cambridge UP, 2018), 177-197.

Review of *Making Refuge: Somali Bantu Refugees and Lewiston, Maine* by Catherine Besteman, *Border Criminologies*, July 13, 2018, https://www.law.ox.ac.uk/research-subject-groups/centre-criminology/centreborder-criminologies/blog/2018/07/book-review

Review of "A View from the Bridge," Nov. 20, 2017, *Not Even Past* (UT Austin), https://notevenpast.org/a-view-from-the-bridge-directed-by-sidney-lumet-1962.

Review of *Captivity Beyond Prisons: Criminalization Experiences of Latina (Im)migrants*, by Martha D. Escobar, *Journal of American Ethnic History,* Vol. 37, No.1, Fall 2017, 92-95.

"Refugees and Restrictionism: Armenian Women Immigrants to the United States in the Post WWI Era" in *Gender, Migration, and Categorisation,* eds. Marlou Schrover and Deirdre Maloney, Amsterdam Univ. Press, 2013, 55-74.