**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| | ) | |
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:23-cv-00007 |
| | ) | |
| U.S. DEPARTMENT OF | ) | |
| HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION
TO THE MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

STANDARD .................................................................................................................. 7

ARGUMENT ................................................................................................................ 7

I.    This Court Lacks Jurisdiction to Grant the Relief Plaintiffs Seek. ..................... 7

    A.  The States cannot demonstrate standing, let alone irreparable harm. ........... 7

II.   Plaintiffs Cannot State a Claim Under the APA. ............................................ 154

    A.  The parole processes are not final agency actions under the APA ............... 14

    B.  Parole decisions are committed to agency discretion ................................... 16

    C.  The States are not in the zone of interests. ................................................... 19

III.  Plaintiffs Cannot Succeed on the Merits of their APA claim. ........................... 20

    A.  The parole processes are authorized by statute ........................................... 21

    B.  The processes are not arbitrary and capricious. ........................................... 31

IV.  Plaintiffs Cannot Succeed on a Notice-and-Comment Claim ........................... 31

    A.  The parole processes are not legislative rules .............................................. 38

    B.  The processes are exempt from notice-and-comment procedures because
they involve a foreign affairs function and because there was good cause ......................... 41

V.    The Remaining Factors Weigh Strongly Against Granting a Preliminary Injunction. ......... 48

VI.  If the Court Grants Relief, It Must be Sharply Limited. ...................................... 50

CONCLUSION ............................................................................................................ 52

# TABLE OF AUTHORITIES

## Cases

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) ................................................. 49

*Allied-Signal, Inc. v. United States NRC*,
  988 F.2d 146 (1993) ................................................. 50

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985) ................................................. 41, 42

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................. 13, 18

*Arpaio v. Obama*,
  27 F. Supp. 3d 185 (D.D.C. 2014) ................................................. 13

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ................................................. 11, 12, 13

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) ................................................. 31

*Ayuda, Inc. v. Reno*,
  7 F.3d 246 (D.C. Cir. 1993) ................................................. 20

*Azar v. Allina Health Services*,
  139 S. Ct. 1804 (2019) ................................................. 24

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................. 14, 19

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ................................................. 30

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) ................................................. 52

*California v. Texas*,
  141 S. Ct. 2104 (2021) ................................................. 11, 39

*Campaign Legal Ctr. v. Scott*,
  49 F.4th 931 (5th Cir. 2022) ................................................. 7

*Capital Area Immigrants' Rights. Coal. v. Trump,*
    471 F. Supp. 3d 25, 53 (D.D.C. 2020) ) ................................................................ 43

*Cent. & S. W. Servs. v. EPA,*
    220 F.3d 683 (5th Cir. 2000) ................................................................................. 50

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ............................................................................................... 27

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2014) ........................................................................................ 11, 13

*Clarke v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) ............................................................................................... 19

*Crane v. Johnson,*
    783 F.3d 244 (5th Cir. 2015) ................................................................................. 12

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ........................................................................................ 12, 51

*Davis v. F.E.C.,*
    554 U.S. 724 (2008) ............................................................................................... 12

*Deep v. Barr,*
    967 F.3d 498 (5th Cir. 2020) ................................................................................. 25

*Delgado-Sobalvarro v. Att'y Gen.,*
    625 F.3d 782 (3d Cir. 2010) .................................................................................. 24

*DHS v. New York,*
    140 S. Ct. 599 (2020) ............................................................................................. 50

*DHS v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020) ........................................................................................... 34

*Doe v. Chao,*
    540 U.S. 614 (2004) ............................................................................................... 24

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ................................................................................. 46

*E. Bay Sanctuary Covenant v. Trump,*
    909 F.3d 1219 (9th Cir. 2018) ......................................................................... 44, 45

*Encino Motorcars v. Navarro*,
    136 S. Ct. 2117 (2016) ............................................................................. 33

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ............................................................ 19, 20

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) .................................................................. 51

*FERC v. Electric Power Supply Ass'n*,
    577 U.S. 260 (2016) ......................................................................... 31, 36

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1973) .............................................................................. 31

*Garcia-Mir v. Smith*,
    766 F.2d 1478 (11th Cir. 1985) ....................................................... 32, 33

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ............................................................. 51

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .......................................................................... 50

*Haaland v. Brackeen*,
    No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023) ........................... 13

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) .............................................................................. 24

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) .............................................................................. 18

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ......................................................................... 16, 18

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) .......................................................................... 13, 22

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .................................................................................. 48

*I.N.S. v. Legalization Assistance Project*,
    510 U.S. 1301 (1993) ............................................................................ 20

v

*Innovation Law Lab v. McAleenan*,
  924 F.3d 503 (9th Cir. 2019) ............................................... 40, 49

*Innovation Law Lab v. Wolf*,
  951 F.3d 1073 (9th Cir. 2020) ...................................................... 46

*INS v. Abudu*,
  485 U.S. 94 (1988)............................................................... 27, 32

*INS v. Aguirre-Aguirre*,
  526 U.S. 415 (1999) ................................................................... 27

*Int'l Bhd. of Teamsters v. Pena*,
  17 F.3d 1478 (D.C. Cir. 1994) ...................................................... 42

*Jama v. Immigr. & Customs*,
  *Enf't*, 543 U.S. 335 (2005) ........................................................ 16

*James Hurson Assocs., Inc. v. Glickman*,
  229 F.3d 277 (D.C. Cir. 2000)...................................................... 40

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) .................................................... 46

*Kaplan v. Tod*,
  267 U.S. 228 (1925)................................................................... 3

*Knauff v. Shaughnessy*,
  338 U.S. 537 (1950)............................................................... 3, 18

*Kucana v. Holder*,
  558 U.S. 233 (2010) ................................................................. 17

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ...................................................... 43

*Leng May Ma v. Barber*,
  357 U.S. 185 ............................................................................. 3

*Lewis v. Casey*,
  518 U.S. 343 (1996).................................................................. 12

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)......................................................... 16, 37, 40

*Loa-Herrera v. Trominski,*
   231 F.3d 984 (5th Cir. 2000) ........................................................ 17, 25, 36

*Lorillard v. Pons,*
   434 U.S. 575 (1978) ............................................................................... 30

*Louisiana v. Becerra,*
   20 F.4th 260 (5th Cir. 2021) ............................................................. 52

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ....................................................................... 7, 8, 12

*Mack Trucks, Inc. v. E.P.A.,*
   682 F.3d 87 (D.C. Cir. 2012) ......................................................... 45, 46

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ............................................................................... 50

*Mak v. INS,*
   435 F.2d 728 (2d Cir. 1970) ............................................................... 28

*Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.,*
   602 F.3d 687 (5th Cir. 2010) ............................................................. 31

*Mobil Oil Corp. v. Dep't of Energy,*
   728 F.2d 1477 (TECA 1983) ............................................................. 45

*Moore v. Tangipahoa Par. Sch. Bd.,*
   507 F. App'x 389 (5th Cir. 2013) .................................................... 49

*Morice v. Hosp. Serv. Dist. #3,*
   No. 18-cv-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019) ............... 51

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................... 31

*Murphy v. NCAA,*
   138 S. Ct. 1461 (2018) ....................................................................... 13

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron,*
   416 U.S. 267 (1974) ............................................................................... 34

*Nat'l Min. Ass'n v. McCarthy,*
   758 F.3d 243 (D.C. Cir. 2014) ..................................................... 16, 40

*Nat'l Sec. Couns. v. C.I.A.*,
  931 F. Supp. 2d 77 (D.D.C. 2013) ................................................................. 40

*New York v. Permanent Mission of India to United Nations*,
  618 F.3d 172 (2d Cir. 2010) ....................................................................... 43

*New York v. United States*,
  505 U.S. 144 (1992) ..................................................................................... 13

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892) ....................................................................................... 3

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................................... 50

*Oceana, Inc. v. Locke*,
  674 F. Supp. 2d 39 (D.D.C. 2009) ............................................................. 31

*Patel v. Garland*,
  142 S. Ct. 1614 (2022) ................................................................................. 17

*Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995) ........................................................................ 40

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) ..................................................................................... 14

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ................................................................................. 34, 35

*Raines v. Byrd*,
  521 U.S. 811 (1997) ..................................................................................... 13

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ..................................................................................... 19

*Reno v. Flores*,
  507 U.S. 292 (1993) ..................................................................................... 28

*Roe v. Mayorkas*,
  2023 WL 3466327 (D. Mass. May 12, 2023) ............................................. 43

*Rosa v. McAleenan*,
  583 F. Supp. 3d 850 (S.D. Tex. 2019) ........................................................ 49

*Sampson v. Murray*,
    415 U.S. 61 (1974) ............................................................................... 49

*State of Fla. v. Mellon*,
    273 U.S. 12 (1927) ......................................................................... 14, 25

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ............................................................. 38

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) .............................................................. 50

*Texas Oil & Gas Ass'n v. EPA*,
    161 F.3d 923 (5th Cir. 1998) ........................................................ 36, 37

*Texas v. Biden*,
    142 S. Ct. 2528 (2022) ........................................... 15, 19, 36, 44, 49

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) .............................................................. 15

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) .............................................. 26

*Texas v. Equal Emp. Opportunity Comm'n*,
    933 F.3d ......................................................................................... 16, 38

*Texas v. United States*,
    106 F.3d 661, 667 (5th Cir. 1997) ................................................ 14, 18

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ......................................................... 38, 39

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ...................................................... passim

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................... 18

*U.S. Chamber of Commerce v. S.E.C.*,
    443 F.3d 890 (D.C. Cir. 2006) ........................................................... 44

*U.S. Dep't of Lab. v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) ........................................................... 40

*United Motorcoach Ass'n, Inc. v. City of Austin*,
   851 F.3d 489 (5th Cir. 2017) ................................................................. 7

*United States v. Coney*,
   689 F.3d 365 (5th Cir. 2012) ................................................................. 31

*United States v. Cortez*,
   449 U.S. 411 (1981) ................................................................................ 48

*United States v. Fausto*,
   484 U.S. 439 (1988) ................................................................................ 20

*United States v. Penn. Indus. Chem. Corp.*,
   411 U.S. 655 (1973) ................................................................................ 34

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ................................................................................ 51

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 7

*Yang v. INS*,
   79 F.3d 932 (9th Cir. 1996) ................................................................... 28

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ............................................................... 42, 44

**Statutes**

5 U.S.C. § 553(a)(1) ..................................................................................... 43

5 U.S.C. § 553(b)(3)(A) ....................................................................... 37, 40, 41

5 U.S.C. § 553(b)(3)(B) ............................................................................... 41

5 U.S.C. § 553(d) ......................................................................................... 47

5 U.S.C. § 701(a)(2) ..................................................................................... 16

5 U.S.C. § 704 ............................................................................................. 14

6 U.S.C. § 202(4) ..................................................................................... 3, 27

8 U.S.C. § 701(a)(1) ..................................................................................... 17

8 U.S.C. § 1103(a)(1) ......................................................................................... 3, 27

8 U.S.C. § 1151(c) ..................................................................................................... 25

8 U.S.C. § 1182(d)(5) ............................................................................................... 38

8 U.S.C. § 1182(d)(5)(A) ............................................................................... 3, 17, 20

8 U.S.C. § 1225(b)(2)(C) .......................................................................................... 46

8 U.S.C. § 1226(e) .................................................................................................... 20

Pub. L. No. 96-422 ................................................................................................... 29

Pub. L. No. 100-461 ................................................................................................. 29

Pub. L. No. 111-294 ................................................................................................. 29

Pub. L. No. 116-92 ................................................................................................... 29

Pub. L. No. 117-128 ................................................................................................. 29

Pub. L. No. 117-43 ................................................................................................... 30

**Regulations**

8 C.F.R. § 274a.12(c)(11) ........................................................................................ 39

**INTRODUCTION**

This Court should deny Plaintiffs' request for an injunction that would halt critical enforcement measures designed to improve border security and limit irregular migration. On January 5, 2023, the Department of Homeland Security (DHS) announced new parole processes for Cubans, Haitians, and Nicaraguans and updated a similar, highly successful process for Venezuelans. These processes were modeled after the Venezuelan parole process and a similar process created for Ukrainians following the Russian invasion, which have been tremendously successful at reducing the number of border encounters, unlawful border crossings, and the strain on agency resources at the southwest border. In the short time the new parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans have been in place, these processes have shown similar success at reducing migration to the southwest border. Since these processes began, conditional releases of individuals from these countries have declined by 90 percent, from 2,356 individuals per day prior to implementation of these processes to 239 per day in the months since. Ex. 1, Declaration of DHS Assistant Secretary for Border and Immigration Policy Blas Nuñez-Neto, at ¶ 29; *see also* DHS, Fact Sheet: Updated on DHS Planning for Southwest Border Security Measures as the Title 42 Public Health Order Ends (May 1, 2023), https://www.dhs.gov/news/2023/05/01/fact-sheet-update-dhs-planning-southwest-border-security-measures-title-42-public. These processes were adopted following extensive negotiations with Mexico and are a central component of DHS's plan to enhance border security and address historically high levels of irregular migration and the potential for additional increases in border encounters that were expected following the end of the Title 42 public health order.

Plaintiffs seek to enjoin these new parole processes but cannot meet the high burden for an injunction that would limit DHS's authority to manage and secure the border. First, Plaintiffs

cannot demonstrate standing based on wholly speculative assertions of harm that are directly contradicted by the evidence.

These parole processes have substantially reduced border encounters for the covered groups, leading to an overall reduction in arrivals from these countries and foreclosing Plaintiffs' theory of harm and standing. *See* Ex. 1, ¶¶ 29-31. Second, Plaintiffs do not have a cause of action under the Administrative Procedure Act (APA), because use of parole is committed to agency discretion, the processes they challenge are not final agency actions, and Plaintiffs are not within the zone of interests of Section 1182(d)(5)(A). Third, Plaintiffs cannot succeed on the merits because DHS is statutorily authorized to use parole in its discretion on a case-by-case basis for urgent humanitarian reasons or significant public benefit. DHS has reasonably explained why an immigration official could conclude that parole of a noncitizen from one of the covered countries would address an urgent humanitarian need or provide a significant public benefit. These benefits include enhancing border security and national security, reducing the strain on DHS personnel and resources, and fulfilling important foreign policy goals. Plaintiffs have not identified any factor the agencies improperly failed to consider, and DHS's conclusions with respect to each of these processes are supported by a substantial record. *See* ECF Nos. 92, 93, 94, 95. These processes— which are statements of policy about how DHS plans to process parole requests and exercise its parole authority that do not direct the outcome in any individual case—are not required to go through notice-and-comment rulemaking. And, in any event, both the foreign affairs and good cause exceptions to the notice-and-comment requirement apply here.

All the remaining factors weigh strongly against granting an injunction barring DHS from using its statutory parole authority to enhance border security and incentivize safe, lawful, and orderly migration following the lifting of the Title 42 public health order. The agency's assessment

of how best to implement its parole authority to advance national security and foreign affairs is entitled to deference, and the positive effects of these parole processes are already well documented. These processes have substantially reduced unauthorized entries from the four countries at issue and imposed new consequences for noncitizens who do enter unlawfully. Plaintiffs have identified no harms that tip the balance in their favor or outweigh the harms to the government and the public that would result from an injunction. The public interest thus favors allowing these processes to remain in effect. Finally, even if an injunction were justified, Plaintiffs' request to enjoin these processes beyond Texas is grossly overbroad.

Accordingly, this Court should deny Plaintiffs' request for an injunction.

## BACKGROUND

Parole. The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(4); 8 U.S.C. § 1103(a)(1), (3). Among other things, the Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, "in his discretion," to "parole" applicants for admission "under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). This statutory authority accords with the Executive Branch's authority over management of the border and foreign affairs, including its historical discretion to grant parole. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229 (1925) (describing parole of noncitizen who could not be removed due to international conflicts); *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892) (describing noncitizen's shore release pending decision on right to land). In 1952, Congress generally "codif[ied]" the Executive's longstanding "administrative [parole] practice" in the INA's original version of Section 1182(d)(5). *Leng May Ma v. Barber*, 357 U.S. 185, 188-190 (referencing ch. 477, § 212(d)(5), 66 Stat. 188). For decades, the Executive Branch has

exercised its authority under Section 1182(d)(5)(A) to advance foreign affairs goals and has reasonably interpreted Section 1182(d)(5) to authorize case-by-case parole for that purpose where it would advance humanitarian goals or provide other significant public benefits, such as controlling irregular migration to the United States. *See Infra* at 27-30.

Parole Processes. For years, DHS has sought Mexico's agreement to accept the removal of individuals from certain countries where the United States cannot send removable noncitizens, either because of conditions in those countries or because those countries refuse to accept individuals ordered removed from the United States. *See, e.g.*, Venezuela AR 134; 87 Fed. Reg. 63507-08. Through negotiations with Mexico on how to address irregular migration through Mexico to the southwest border, DHS developed a parole process for Venezuelans to provide an avenue for safe and orderly processing of noncitizens away from the United States-Mexico border, allowing eligible individuals to avoid traveling through Mexico. *Id*. At the same time, Mexico made an independent decision to accept the removal of Venezuelan nationals who failed to follow this parole process, allowing DHS to impose consequences on and enforce the immigration laws against otherwise unremovable noncitizens. *Id.*

On October 19, 2022, DHS published a Federal Register Notice describing this new effort to address the high number of Venezuelans being encountered at the southwest border. 87 Fed. Reg. 63,507. Under this process, individuals may be eligible to seek consideration for parole on a case-by-case basis if they have a supporter in the United States who agrees to provide financial support, if they pass national security and public safety vetting, and if they agree to fly at their own expense to an interior U.S. port of entry rather than entering at a land port of entry. *Id*. at 63,508; 63,515. Individuals are ineligible if they have been ordered removed from the United States in the previous five years, have entered the United States, Mexico, or Panama without authorization after

October 19, 2022, or have immigration status in a third country in addition to Venezuela. *Id*. at 63,515. Venezuelans who do not take advantage of this process and instead attempt to enter at the southwest border without authorization are subject to removal to Mexico. *Id*. at 63,508. The process was modeled on the similar Uniting for Ukraine (U4U) parole process, which had shown success at ensuring orderly immigration processing and reduced the strain on agency resources at the southwest border. *Id*. at 63,507-08.

 Given the immediate success of the parole process for Venezuelans at reducing irregular migration and border encounters, DHS sought to expand its ability to remove to Mexico noncitizens from other countries where it faced barriers to removal, but had not been able to obtain Mexico's agreement to accept other nationalities until it implemented a similar parole process for those countries. On January 9, 2023, DHS announced a continued parole process for Venezuelans with minor modifications, and new similar parole processes for nationals of Cuba, Haiti, and Nicaragua. 88 Fed. Reg. 1,243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1,255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1,266 (Implementation of Parole Process for Cubans); 88 Fed. Reg. 1,279 (Implementation of Changes to the Parole Process for Venezuelans). DHS explained that, as demonstrated by the Venezuelan process, combining a clear and meaningful consequence for unauthorized entry with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States had significant results in controlling the flow of migration and reducing irregular migration. 88 Fed. Reg. at 1,279. "Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the [southwest border] fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day." *Id.* "The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in

Venezuelan irregular migration throughout the Western Hemisphere." *Id*. For example, the "number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November." *Id*.

Accordingly, each of these four processes sets out a similar incentive structure. Individuals who meet certain eligibility requirements, such as identifying a U.S.-based supporter who can provide financial support, who pass national security and public safety vetting, and who agree to fly at their own expense to an interior port of entry rather than entering at a land port of entry on the southwest border may be granted advance travel authorization to seek parole into the United States for a limited period not to exceed two years. 88 Fed. Reg. at 1,252, 1,263, 1,276, 1,279. However, individuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully or irregularly crossed the Mexican or Panamanian border after January 9, 2023. *Id*. at 1,252, 1,263, 1,276, 1,279. Individuals from the covered countries who do not avail themselves of these parole processes and instead seek to enter the United States without authorization may be removed to Mexico. *Id*. at 1,243-44, 1,256, 1,267-68, 1,279. DHS otherwise has limited ability to remove noncitizens to these four countries, either because of country conditions or because the country's government refuses to accept the return of its citizens from the United States. *Id*. at 1,247, 1,259, 1,270-01; 87 Fed. Reg. at 63,509. The ability to return individuals from these four countries to Mexico if they enter the United States irregularly thus "impose[s] a consequence on irregular entry that currently does not exist" for individuals who cannot otherwise be removed from the United States. 87 Fed. Reg. at 63,511.

<u>This Case</u>. On February 14, 2023, Plaintiffs filed an amended complaint challenging the parole processes under the APA on three grounds, arguing that the parole processes: (1) violate DHS's statutory parole authority, (2) cannot be implemented without going through notice-and-

comment rulemaking, and (3) are arbitrary and capricious. ECF No. 20, ¶¶ 140-41. Plaintiffs also argued the parole processes are ultra vires. *Id*. at ¶¶ 142-143. That same day, Plaintiffs moved for a preliminary injunction on their APA claims. ECF No. 22.

STANDARD

The Court is consolidating its ruling on the preliminary injunction motion with a ruling on the merits. *See* ECF No. 134 at 2. Accordingly, Plaintiffs must meet a higher standard than merely showing a likelihood of success on the merits and other factors that apply to preliminary injunctions under *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). To obtain a permanent injunction, a party "must show (1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest." *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492-93 (5th Cir. 2017). Plaintiffs must also meet the higher burden of proof necessary to succeed on the merits, and "prove standing by a preponderance of the evidence." *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting the "burden of proof" increases with "successive stages of litigation").

ARGUMENT

I. **This Court Lacks Jurisdiction to Grant the Relief Plaintiffs Seek.**

A. **The States cannot demonstrate standing, let alone irreparable harm.**

Plaintiffs argue that Texas is harmed by the parole processes based on speculation that the processes may lead to more migrants who will seek driver's licenses, require education or healthcare, impose law enforcement or correctional costs, or depress wages. Mot. 10-14.[1]

---

[1] Plaintiffs' motion contains a background section on alleged costs to the States but does not make any arguments on standing. Plaintiffs have separately stipulated that in this case they are only

Plaintiffs, however, cannot point to any evidence of increased migration or costs despite having competed discovery; the available evidence on encounters and parole since the implementation of these processes directly contradicts Plaintiffs' theory of harm; and even if Plaintiffs could identify some marginal change in State expenditures, it would not represent an injury sufficient to satisfy Article III.

Plaintiffs' theory of harm is based entirely on speculation that the parole processes will lead to more Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals in Texas, but the evidence shows just the opposite. These processes have shown tremendous success at reducing unlawful border crossings and the number of border encounters by combining orderly processes for seeking parole with consequences for individuals who do not take advantage of those processes. For example, "[w]ithin a week of the October 12, 2022 announcement of [the Venezuelan] process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day." 88 Fed. Reg. at 1,279. And the effects were not limited to the border but included significant reductions in irregular migration through countries to the south. "The number of Venezuelans attempting to enter Panama through the Darién [Gap] was down from 40,593 in October 2022 to just 668 in November." *Id*. The positive effects of these parole processes have continued since that time. "In the seven-plus months following the implementation of the [Venezuelan] process," conditional releases of Venezuelans "decrease[d] by 64 percent" compared to the five-plus months prior to that process. Ex. 1, ¶ 30. And "[i]n the nearly five months following the implementation of the CHN processes CBP conditionally released an average of just 32 [Cubans, Haitians, and Nicaraguans] per day, a

---

"seek[ing] to establish Article III injury based on alleged injuries to Texas and that they will not submit any evidence as to injury for any other State Plaintiff." ECF No. 139.

98 percent reduction" compared to "the five-plus months prior to the implementation of the processes for those countries." *Id*. ¶ 31. *See also* DHS Press Release, Unlawful Southwest Border Crossings Plummet Under New Border Enforcement Measures (Jan. 25, 2023), https://www.dhs.gov/news/2023/01/25/unlawfulsouthwest-border-crossings-plummet-under-new-border-enforcement-measures ("Encounters of Cuban, Haitian, Nicaraguan, and Venezuelan non-citizens attempting to cross the southwest border unlawfully has decreased drastically since President Biden announced an expanded parole program for these individuals, putting the month of January on track to see the lowest levels of monthly border encounters since February 2021."); https://www.cbsnews.com/news/immigration-us-mexico-border-numbers-january-2023-migrant-expulsions/ (noting the "number of migrants apprehended by U.S. Border Patrol after illegally crossing the southern border dropped by roughly 40% in January"); https://www.cbsnews.com/news/immigration-border-crossings-us-mexico-february-2-year-low/ (illegal border crossings at two-year low).

The evidence shows that the parole processes are succeeding at reducing irregular migration, leading to a decrease in border encounters for the covered groups and thus an overall decrease in the number of people being paroled from these four countries. "As a result of the measures taken by DHS arrivals of noncitizens from CHNV countries have decreased significantly," such that "conditional releases of CHNV nationals crossing unlawfully between POEs, or without authorization at POEs, fell from 2,356 per day in the months before the parole processes were implemented to 239 per day in the months following their implementation, a 90 percent reduction." Ex. 1, ¶ 31, n.16. "Accounting for individuals who came to the United States through a safe, orderly process—either because they are processed at a POE after making an appointment through the CBP One application (297 per day), or because they are granted a case-

by-case determination of parole through the CHNV processes (791 per day)—total CHNV arrivals fell to approximately 1,326 per day, a 44 percent reduction from their pre-CHNV process levels." *Id*. Also, rather than attempting entry at the border, individuals seeking parole under these processes must fly into the interior of the United States, further undermining any argument that these processes are increasing arrivals at the border or in Texas. *Id*. ¶¶ 19, 28. Plaintiffs' arguments for harm, which depend on alleged costs associated with "increased illegal immigration," Mot. 27, are foreclosed by data showing a decrease in irregular migration and a decrease in overall migration from the covered countries.

Any costs that might be associated with individuals who are paroled under these processes cannot be considered in isolation because there has been a significant overall *decrease* in arrivals from these countries. That is by design: part of the justification for implementing these processes for these particular countries is that the United States has extremely limited ability to remove noncitizens to Cuba, Haiti, Venezuela, and Nicaragua. Ex. 1, ¶¶ 11-16. The parole processes have allowed DHS to create a new possible consequence for CHNV nationals that did not previously exist—removal to Mexico—creating a disincentive for irregular migration for these groups. If the parole processes are enjoined, DHS will likely lose the ability to remove many unauthorized migrants to Mexico, and given limits on DHS's detention capacity and ability to detain noncitizens who cannot be removed, many are likely to be released in the United States as a result. Ex. 1, ¶¶ 15, 36-38. Accordingly, the net effect of the parole processes is less migration to the Plaintiff States by CHNV nationals. If Plaintiffs obtain the injunction they seek and halt DHS's ability to remove CHNV nationals to Mexico, the result will almost certainly be more CHNV nationals in Texas, not fewer.

Even if Plaintiffs could show an increase in migration to Texas that was traceable to the parole processes, their allegations of associated harms are unsupported. They have put forth no evidence that shows Texas's costs with respect to driver's licenses, education, healthcare, or law enforcement have increased because of the parole processes or that there has been any economic impact on the State. Nor does the evidence they have provided support a conclusion that additional noncitizens would necessarily increase costs. For example, Texas argues that "[e]ach additional customer seeking a Texas driver's license imposes a cost on Texas," claiming that Texas incurs additional costs "for each non-citizen who seeks a limited-time license." Mot. 11 (citing Ex. C). But that cost estimate is based on unsupported speculation about costs that might occur if the increase in requests for driver's licenses grew by tens of thousands of individuals, requiring the State to build and staff entirely new facilities for issuing licenses—even though overall demand for limited-term driver's licenses in the two most recently reported years was lower than previous highs. Ex. C ¶¶ 6, 9. Moreover, driver's licenses are a money maker for Texas: actual verification services and card production for limited-term driver's licenses cost Texas $3.60 per license, *id*. ¶ 9, far less than the $33 Texas charges individuals for each limited-term license, *see* https://www.dps.texas.gov/section/driver-license/driver-license-fees. Since these "offsetting benefits … arise from the same transaction as the costs," they must be considered in the standing analysis. *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015).

Similarly, Texas's argument regarding education costs is based on speculated costs associated with an increased number of "unaccompanied children." Mot. Ex. D ¶¶ 4-7. Again, there is no evidence there has been any increase in unaccompanied children, but even if there were, any associated costs could not be traced to the parole processes. Any individual "determine[d] to be an unaccompanied child" "is ineligible for advance authorization to travel to the United States

as well as parole under this process," 88 Fed. Reg. at 1,276, so this evidence has no relation to the parole processes. Plaintiffs' arguments with respect to healthcare are based solely on speculation about noncitizens entering unlawfully and using healthcare services, Mot. at 12, and their arguments about law enforcement and correctional costs, *id*. at 12-13, are based on nothing but mere speculation that parolees will commit crimes. Even if the Court were to "assume" that a policy change "increase[s] unlawful immigration," it "cannot further infer that [it] increase[s] crime," *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015), particularly with processes like these that include "national security and public safety vetting," 88 Fed. Reg. at 1,267. Unsupported speculation such as this about some "*possible* future injury" is not sufficient to establish standing, especially where it "rests on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 (2014); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party … 'standing … is ordinarily 'substantially more difficult' to establish.'" (quoting *Lujan*, 504 U.S. at 562)).

Finally, as to the economic impact of immigrants, Mot. 13-14, research has shown that immigrants have a positive net fiscal impact on communities where they resettle. *See* https://www.cato.org/white-paper/fiscal-impact-immigration-united-states. For example, immigrants pay $ 1.40 in taxes for every $ 1.00 received in benefits, and contribute a larger net-fiscal gain to State and local governments than to the Federal government. *Id*. at Table 25.

Plaintiffs cite other cases where courts have found that Texas had standing to challenge a federal policy. Mot. 11. But a party's ability to establish standing to challenge one government action does not mean it automatically has standing to challenge other government actions. *Davis v. F.E.C.*, 554 U.S. 724, 733 (2008). "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518

U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). This burden includes the requirement to identify a concrete injury that is traceable directly to the challenged action, and thus redressable by a favorable decision. *Lujan*, 504 U.S. at 561. Plaintiffs cannot meet that burden here. General arguments that "*illegal immigration* is costing the state money" are insufficient to confer standing. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no standing where State failed to trace claimed injury directly to challenged policy, and noting "[i]t could be that the reallocation of DHS's assets is resulting in removal of immigrants that impose a greater financial burden on the state" such that "the net effect would be a reduction in the fiscal burden on the state"); *see also Arpaio*, 797 F.3d at 20.

Even assuming Plaintiffs identify some downstream costs, finding standing wherever a policy might arguably have some incidental costs to a State would allow States to challenge any change in immigration policy, and improperly draw courts into all sorts of generalized grievances on behalf of States who were unable to obtain their preferred policy outcomes through the political process. That is precisely what Plaintiffs seek here, judicial enforcement of a policy preference based on a generalized grievance. Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner. *Clapper*, 568 U.S. at 408; *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Framers instead established a national government with the power to act directly on individuals, replacing a system where the government had to act through the States. *New York v. United States*, 505 U.S. 144, 162-66 (1992); *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018).

The absence of suits like this one during the vast majority of our Nation's history is powerful evidence that such suits are incompatible with our constitutional structure, which

13

"contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *Cf. Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951, at *19 (U.S. June 15, 2023) (noting limits on State standing to raise claims against the Federal government). And holding Plaintiffs to their burden under Article III to show some concrete harm before permitting individual States to try to enforce their unique policy preferences is particularly important in the context of immigration, which is inherently a subject of national concern. *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941). Thus, a "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

Finally, to the extent Plaintiffs allege harm based on State benefits their respective legislatures have agreed to provide to paroled individuals, these alleged injuries also are not cognizable harms for Article III purposes because they are self-inflicted and not traceable to the government's actions. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"); *State of Fla. v. Mellon*, 273 U.S. 12, 17-18 (1927) (States may sue the United States only if they have suffered a "*direct* injury"). As the Fifth Circuit explained, State expenditures as a result of immigration are typically caused by the State's own laws, or the State's decision to opt into federal programs like Medicaid to obtain a benefit—but they are not dictated by federal policy. *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997). While this conclusion was part of that court's Tenth Amendment analysis, *id.*, the causal reasoning

is equally true in the standing context and applicable to any injuries alleged on the basis of compliance with the State's own laws, such as provision of driver's licenses to immigrants under State law. *See* Tex. Transp. Code § 521.142(a).

Accordingly, Plaintiffs lack standing to challenge the parole processes.

## II.    Plaintiffs Cannot State a Claim Under the APA.

### A.    The parole processes are not final agency actions under the APA.

To raise an APA claim, Plaintiffs must challenge "final" agency action. 5 U.S.C. § 704. Agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" and also determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Here, the parole processes set out the general manner in which DHS plans to process parole requests and implement its discretionary parole authority in Section 1182(d)(5)(A), but it is the statute, not the parole processes, which creates the authority and requirements for parole. *See, e.g.*, 87 Fed. Reg. at 63,516. The processes do not bind DHS to any particular course with respect to any individual or class of noncitizens— those decisions continue to be made on a case-by-case basis by individual officials making decisions on particular noncitizens. It is only in making those individual decisions that the agency completes its decision-making process in a way that determines rights and produces legal consequences.

Plaintiffs do not explain how the parole processes are final agency actions, nor could they. The parole processes do not guarantee parole even if a noncitizen follows the process and is granted approval to travel to the United States. A U.S. Customs and Border Protection (CBP) official at the port of entry still ultimately decides whether parole should be granted, exercising his discretion. *See, e.g.*, 87 Fed. Reg. at 63,516 (granting of "advance authorization to travel does not guarantee parole into the United States"—"parole is a discretionary determination made by CBP at the [port

of entry]"). Nor do the processes restrict a CBP official's ability to deny parole in an individual case, which distinguishes these processes from the Fifth Circuit's characterization of the Migrant Protection Protocols (MPP), which it held was "final agency action under the principle that, where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." *Texas v. Biden*, 20 F.4th 928, 948 (5th Cir. 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) (quotation marks and citation omitted).

The parole processes do not create a right for anyone to enter the United States or obtain any immigration benefit, and immigration officials retain the same authority and discretion to grant or deny parole under Section 1182(d)(5)(A) that they had before the parole processes were in place. *See, e.g.*, 88 Fed. Reg. at 1,277 ("This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter"). An agency process or guidance such as this does not become reviewable "final agency action" unless and until it is applied "in a particular situation" to an individual or regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d at 441 (similar).

### B. Parole decisions are committed to agency discretion.

The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2). Parole decisions under Section 1182(d)(5)(A) are a textbook example of wholly discretionary decisions that are not subject to judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Congress made clear in Section 1182(d)(5)(A) that the Secretary "may" in "*his discretion* parole into the United States temporarily *under such conditions as he may prescribe*" noncitizens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.*

16

(emphasis added). The statute thus explicitly places the parole authority in the Secretary's "discretion." *Id.*; *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) (noting that "[t]he word 'may'" also "customarily connotes discretion."); *Heckler*, 470 U.S. at 831. The parole processes do not restrict this discretion or the agency's ability to deny parole in any individual case, bringing these processes well within the bar to APA review of action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Congress also separately barred review of the Secretary's discretionary decisions with respect to how to carry out the immigration laws when it enacted 8 U.S.C. § 1252(a)(2)(B)(ii). Under that provision, "[n]otwithstanding any other provision of law," "no court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the ... Secretary." This provision applies when the relevant decision is "specified by statute to be in the discretion of the [Secretary]," *Kucana v. Holder*, 558 U.S. 233, 248 (2010), and parole decisions are specified in Section 1182(d)(5)(A) to be "in [the Secretary's] discretion," 8 U.S.C. § 1182(d)(5)(A); *see also* 8 U.S.C. § 701(a)(1) (barring review under the APA "to the extent that statutes preclude judicial review").

As the Fifth Circuit has held, the limits on reviewing the "discretionary judgment regarding the application of parole" also bar challenges to "the *manner* in which that discretionary judgment is exercised" and to "whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints." *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (quotation marks and citation omitted); *see also id.* at 990 n.12 (citing 8 U.S.C. § 1182(d)(5)(A)). The statute gives the Secretary discretionary authority to grant parole "under such conditions as he may prescribe," and otherwise sets no standard for how requests for parole should be submitted

or processed, creating no standard against which courts can review these parole processes. As the Supreme Court recently explained in construing Section 1252(a)(2)(B)(i), that provision, which strips courts of jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions, bars review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment." *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022). This bar to review thus "encompasses not just the granting of relief but also any judgment relating to the granting of relief." *Id*. This reasoning also applies to Section 1252(a)(2)(B)(ii). As the Supreme Court explained in *Kucana*, 558 U.S. at 247, "[o]ther decisions specified by statute 'to be in the discretion of the Attorney General,' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind" to those covered by Section 1252(a)(2)(B)(i). Accordingly, Section 1252(a)(2)(B)(ii)'s jurisdictional bar extends not just to final decisions or actions, but "any [decision or action] relating to the granting of relief." *Patel*, 142 S. Ct. at 1622.

It is no surprise that Congress would commit the parole power to the Secretary's discretion. The "broad discretion exercised by immigration officials" is a "principal feature of the removal system," *Arizona*, 567 U.S. at 396, and is particularly important in the immigration context where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *Shaughnessy*, 338 U.S. at 543 (emphasizing Executive's broad discretion over "decisions[s] to admit or to exclude an alien"). As demonstrated by the parole processes, which are part of larger discussions with our regional partners on how best to manage irregular migration and are central to Mexico's decision to accept noncitizens the United States cannot otherwise remove, because immigration policy implicates the "dynamic nature of relations with other countries," the Executive must retain flexibility and discretion to alter its approach to be "consistent with this Nation's foreign policy." *Id.* at 397; *see also Harisiades v. Shaughnessy*,

342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations."); *Heckler*, 470 U.S. at 831. "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (citation omitted).

The decision to implement these parole processes is inextricably intertwined with the United States' foreign policy, in particular negotiations with Mexico, which has now agreed to accept nationals from these four countries. Such foreign policy decisions are plainly committed to Executive discretion and are unreviewable under the APA because there is "no workable standard against which to judge the agency's exercise of discretion." *Texas*, 106 F.3d at 667. "[T]he immigration statutes afford substantial discretion to the Executive, [and] different Presidents may exercise that discretion differently." *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). When "the President chooses the parole option … for foreign-policy reasons, a court … must be deferential to the President's Article II foreign-policy judgment." *Id*.

### C.  The States are not in the zone of interests.

Plaintiffs are not within the zone of interests of Section 1182, and thus lack a cause of action to enforce that provision. The zone-of-interests inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action—which the States are not—and its interests are "marginally related to or inconsistent with the purposes implicit in the statute," then the plaintiff lacks a right of review. *Id.* at 399.

Nothing in the text, structure, or purpose of Section 1182(d)(5)—or the INA generally— suggests that Congress intended to permit a State to invoke attenuated financial impacts of

immigration policies to contest those policies. *See Bennett*, 520 U.S. at 175-77 (noting that zone of interests "is to be determined not by reference to the overall purpose of the Act in question … but by reference to the particular provision of law upon which the plaintiff relies"); *Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("*FAIR*"). *FAIR* rejected a similar challenge that the federal government's "scheme for parole" of inadmissible noncitizens violated statutory limits on parole authority, holding the plaintiff was not within the zone of interests as there was nothing in the "language of the statutes on which it relies" nor the "legislative history that even hints at a concern about regional impact" of immigration. *Id*. at 900-01. That reasoning squarely applies to the Plaintiffs and claims here.

Congress has enacted provisions broadly aimed at protecting the Executive's discretion in implementing the INA, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486–87 (1999), making clear that only noncitizens may bring challenges, and only to certain types of decisions and only through their removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id*. §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g). A detailed review scheme that allows challenges by particular parties is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988); *see also Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993). A plaintiff's interest in "limiting immigration" or a disagreement with the government's "scheme for parole" thus does not bring a party within the zone of interests of the INA. *See FAIR*, 93 F.3d at 900-01; *accord I.N.S. v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers).

## III.   Plaintiffs Cannot Succeed on the Merits of their APA claim.

Plaintiffs argue the parole processes exceed DHS's statutory parole authority and are arbitrary and capricious. Both arguments lack merit.

20

### A.      The parole processes are authorized by statute.

Plaintiffs argue the parole processes exceed DHS's statutory parole authority under Section

1182(d)(5). Mot. 15-18. The parole processes, however, comply with the statutory text and fit well

within DHS's authority under Section 1182(d)(5). Section 1182(d)(5)(A) authorizes parole if

decisions are made on a case-by-case basis and parole is granted either for urgent humanitarian

reasons or significant public benefit:

> The [Secretary] may … in his discretion parole into the United States temporarily
> under such conditions as he may prescribe only on a case-by-case basis for urgent
> humanitarian reasons or significant public benefit any alien applying for admission
> to the United States.

8 U.S.C. § 1182(d)(5)(A).

The individual parole decisions made under the parole processes satisfy each of these

requirements. Each process requires case-by-case consideration of the parole request, and sets out

reasons why an immigration official may conclude that parole of a noncitizen from one of the

covered countries might address an urgent humanitarian need or provide a significant public

benefit. These processes thus fall squarely within the historical use of the parole authority to

advance foreign affairs goals related to particular countries. Congress has repeatedly affirmed this

statutory authority by rejecting attempts to narrow Section 1182(d)(5)(A), and by expressing

support for parole to certain categories or groups of noncitizens.

First, individuals seeking parole under these processes are evaluated on a case-by-case

basis to determine whether granting parole is merited. 87 Fed. Reg. 63,516; 88 Fed. Reg. at 1,253,

1,264, 1,276. DHS first reviews information submitted by a potential supporter, vets that supporter,

and then reviews information provided by the parole applicant before granting travel authorization

to that particular applicant. *See, e.g.*, 88 Fed. Reg. 1,252; https://www.uscis.gov/CHNV.

Moreover, travel authorization does not guarantee parole will be granted upon arrival—a CBP

officer at a port of entry must still inspect the individual and consider whether it is appropriate to grant parole to that individual. 87 Fed. Reg. 63,516; 88 Fed. Reg. at 1,253, 1,264, 1,276. Accordingly, no one is entitled to parole under these processes, even after they have been authorized to fly to the United States to seek parole at a port of entry. *See, e.g.*, 87 Fed. Reg. at 63,516 (granting of "advance authorization to travel does not guarantee parole into the United States"—"parole is a discretionary determination made by CBP at the [port of entry]"). These processes place no restrictions on an immigration official's discretion to deny parole in any individual case.

Second, as DHS explained when it initially announced the Venezuela process, there are a number of significant public benefits of channeling parole requests through this process. "The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between [ports of entry] with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons," including:

(i)    enhancing the security of our border by reducing irregular migration of Venezuelan nationals;
(ii)   enhancing border security and national security by vetting individuals before they arrive at our border;
(iii)  reducing the strain on DHS personnel and resources;
(iv)   minimizing the domestic impact of Venezuelan irregular migration;
(v)    disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and
(vi)   fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

87 Fed. Reg. 63,511; *see also id.* at 63,512-15 (setting out in detail how parole of eligible individuals on a case-by-case basis pursuant to this process can provide each of these benefits).

DHS also explained at length how similar processes for Haiti, Nicaragua, and Cuba would provide similar significant benefits. *See* 88 Fed. Reg. at 1,248-51 (findings for Haitian process); 88 Fed. Reg. at 1,260-62 (Nicaraguan process); 88 Fed. Reg. at 1272-75 (Cuban process).

In addition to these significant public benefits, each process also sets out urgent humanitarian reasons that may justify parole in particular cases for individuals from these four countries. For Venezuela, this includes "the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro" and preventing "Venezuelan nationals who seek to leave their home country" from having to take a "dangerous journey to the United States." 87 Fed. Reg. at 63,515. For Nicaragua, the process addresses the "urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua" because "[t]he Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions," 88 Fed. Reg. at 1,262-63, and for Cuba addresses "the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba" where the government "continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions," 88 Fed. Reg. at 1,275. Finally, many Haitians face urgent humanitarian needs based on "escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak" which "have worsened already concerning political, economic, and social conditions in Haiti." 88 Fed. Reg. at 1,251-52. The parole "process provides a safe mechanism for Haitian nationals who seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea." *Id*.

Plaintiffs do not address or directly challenge these significant public benefits or

humanitarian justifications. Instead, they argue the processes violate the statute's requirement for case-by-case parole by citing legislative history they argue shows the parole authority is "narrow" and cannot be used to admit "entire categories of aliens." Mot. 15 (quoting H.R. Rep. No. 104-496, at 140 (1996)). However, the House Report they cite is not a proper basis for interpreting Section 1182(d)(5)(A) because Congress *rejected* the proposed amendments constraining parole authority discussed in that report, which would have tightly limited the substantive grounds for parole, indicating that Congress did not agree with such limitations. Instead, the House "recede[d] to [the] Senate['s] amendment" to Section 1182(d)(5)(A), which proposed essentially the current standard more broadly authorizing parole of non-refugees to provide significant public benefits or for humanitarian reasons. *See* H.R. Rep. No. 104-828, at 245 (1996) (anticipating that "categories of aliens" would be "paroled into the United States" under the version of Section 1182(d)(5)(A) that was enacted and providing for reporting on those categories). That Congress rejected the proposed restrictions on the Secretary's authority "weighs heavily" against the narrow interpretation Plaintiffs advance. *See e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result . . . urge[d] here weighs heavily against th[at] interpretation.") (citing *Doe v. Chao*, 540 U.S. 614, 621-623 (2004)).

The legislative history Plaintiffs cite acknowledges that the parole authority had long been used "to admit entire categories of aliens" prior to 1996, and proposed amendments to limit that approach. By rejecting those amendments, Congress rejected the narrower view of the parole authority Plaintiffs now advance. Legislative history cannot impose limitations on parole authority beyond those that were actually adopted in the statutory text, *see Azar v. Allina Health Services*, 139 S. Ct. 1804, 1814 (2019), and that principle should have even greater force with legislative history of amendments Congress rejected. Even if the legislative history Plaintiffs cite had any

24

force for interpretative purposes, it would still not be relevant here because it was specifically concerned with using parole to allow noncitizens to "remain permanently in the United States." H.R. Rep. No. 104-496, at 140; *see Delgado-Sobalvarro v. Att'y Gen*., 625 F.3d 782, 786 (3d Cir. 2010). That is not an issue here where parole is expressly limited to a maximum "period of up to two years." 88 Fed. Reg. 1,276. "Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires." *Id*. at 1268.[2]

In any event, the parole processes do require case-by-case consideration of the parole request, as explained above. *Supra* at 21. To counter that conclusion, Plaintiffs advance a now-familiar straw-man argument. While acknowledging that "[t]he Parole Program facially invokes" "language" requiring "case-by-case" adjudication, Plaintiffs urge the Court to ignore this language and instead assume these processes do the opposite, and find them unlawful on that basis. Mot. 15-16. Plaintiffs note that the parole processes authorize up to "30,000 parolees," a number they argue is "so high" that the Court should assume DHS is granting parole "*en masse*" rather than reviewing each case individually. *Id*. But they cite nothing showing the agency is not making decisions on a case-by-case basis, as the parole processes require, and have proffered no evidence to rebut the "presumption of regularity" that attaches to agency statements about the actions they

---

[2] Also, at the same time Congress amended Section 1182(d)(5), it amended 8 U.S.C. § 1151(c) to provide "that aliens paroled into the United States in the second previous fiscal year who do not depart within 365 days and who have not yet become permanent resident aliens … will be counted towards the worldwide level of family-sponsored immigrants," H.R. Rep. No. 104-828, at 245, indicating that Congress anticipated that parolees would often remain in the United States for multiple years and dealt with this issue not by restricting parole authority, but by counting them towards the annual cap on migration. *See also* S. Rep. No. 104-249, at 34 (1996) (discussing amendments adopted related to "counting of long-term parolees").

have taken or will take. *See, e.g. Deep v. Barr*, 967 F.3d 498, 503 (5th Cir. 2020).

Section 1182(d)(5)(A) sets no numerical limit on the number of individuals who can be paroled, so long as each parole decision is made on a case-by-case basis. Accordingly, the total number of parolees is not a basis to find the processes unlawful. As to the feasibility of considering this number of applications individually, there are various steps in the parole process that a noncitizen cannot move past without an immigration official making a decision related to that particular noncitizen. For example, before seeking parole through these processes, immigration officials must vet a supporter for the individual parole applicant, and find the applicant eligible for and grant advance travel authorization for that particular individual. Even after traveling to the United States, the applicant still must satisfy a CBP officer during inspection prior to entry at a U.S. airport that he or she is eligible for parole and merits a favorable exercise of discretion. Plaintiffs' argument that these processes actually involve no case-by-case consideration is contrary to the basic requirements of these processes.

Plaintiffs next argue that "parole is not 'intended to replace established refugee processing channels.'" Mot. 16 (citing *Texas v. Biden*, 554 F. Supp. 3d 818, 852 (N.D. Tex. 2021), which was reversed on appeal). The parole processes are not used, however, for processing refugees. *See, e.g.*, 88 Fed. Reg. 1,279 ("Venezuelan nationals also are generally ineligible" for parole under this process if they "hold refugee status in any country other than Venezuela"). Congress did place specific limits on the use of parole for individuals who have already been granted refugee status, but those limits are in Section 1182(d)(5)(B) rather than Section 1182(d)(5)(A), the authority at issue here. Section 1182(d)(5)(B) governs "parole into the United States [of] an alien who is a refugee" and includes additional requirements that Congress did not include in the adjacent provision at Section 1182(d)(5)(A), such as the requirement for a "determin[ation] that compelling

reasons in the public interest with respect to that particular alien require that the alien be paroled." Section 1182(d)(5)(A) differs in numerous respects, including that it instead authorizes parole for "urgent humanitarian reasons or significant public benefit" for any noncitizen who has not been granted refugee status.

Plaintiffs point to nothing in the statutory text or elsewhere that limits DHS's ability to use its expertise to interpret "urgent humanitarian reasons" or "significant public benefit" to include the types of humanitarian needs and public benefits DHS has identified here. Congress did not define "urgent humanitarian reasons" or "significant public benefit," and instead delegated the job of fleshing out these terms to the agency. *See* 8 U.S.C. § 1103(a)(1), (3) (authorizing the Secretary to "issue such instructions" and "perform such other acts as he deems necessary for carrying out his authority" under the INA); 6 U.S.C. § 202(4) ("The Secretary shall be responsible for …[e]stablishing and administering rules … governing the granting of … forms of permission, including parole, to enter the United States"); *cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842 (1984). DHS's interpretation and application of these terms are thus entitled to deference. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988))). Moreover, Plaintiffs do not dispute that a number of individuals might present similar urgent humanitarian needs, particularly when such needs are generated by natural disasters or repressive governments, as is the case here. Nothing in Section 1182(d)(5)(A) says that once parole has been granted to an individual because of some humanitarian need or public benefit that DHS cannot also find that another individual presents the same need or would contribute to the same benefit. Under the

27

statute Congress enacted, parole decisions must be made case by case, but there is no limit on how widespread a humanitarian need or potential public benefit may be as long as the agency determines it applies in an individual case.

As a result, the Executive has for decades used its authority to interpret urgent humanitarian reasons and significant public benefits to include various foreign affairs goals, and to identify certain groups that should be considered for parole on a case-by-case basis. As the former Immigration and Naturalization Service long ago explained, "[d]esignating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with a 'case-by-case' decision requirement since the adjudicator must individually determine whether the person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case." *See* Cuba AR at 92 (Memo from General Counsel of INS, *Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status*, June 15, 2001). That understanding of the Secretary's authority under Section 1182(d)(5) is consistent with decades of case law addressing similar immigration authorities. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting agency need not "forswear use of reasonable presumptions and generic rules" even where statue required "some level of individualized determination"); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir. 1996) (similar); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar).

The Executive Branch has long used parole in this manner without Congress taking action to restrict or question this authority. For example, in the Cuban Family Reunification Parole Program, 72 Fed. Reg. 65,588 (2007), DHS authorized use of "its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members." *Id*. The goal of this program was "to expedite family reunification through safe, legal, and orderly

28

channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." *Id*. Like the parole processes at issue in this case, the decision "[w]hether to parole a particular" noncitizen ultimately remained "a case-by-case, discretionary determination." *Id*. DHS also used the parole authority in 2006 to create the Cuban Medical Professionals Parole Program with foreign policy aims, encouraging Cuban doctors to come to the United States to limit the ability of the Cuban government to use medical professionals for its own foreign policy goals. *See, e.g.*, https://www.uscis.gov/sites/default/files/document/foia/Cuban_Medical_Professional_Parole_Program-Representative_Schultz.pdf; https://www.pbs.org/newshour/show/u-s-mulls-ending-program-that-urges-cuban-doctors-to-defect. That program was ended when U.S. foreign policy shifted to normalizing relations with Cuba. *Id*. Congress has repeatedly passed legislation that expressed support for this approach to parole for particular groups, such as the large numbers of Cubans paroled into the United States at various times. *See, e.g.*, Cuban Adjustment Act, Pub. L. No. 89-732 (authorizing granting permanent residence to Cubans being paroled into the country); Refugee Education Assistance Act of 1980, Pub. L. No. 96-422 (providing benefits for Haitians and Cubans paroled under Section 1182(d)(5)).

DHS adopted a similar approach for Ukrainian citizens and their family members who were displaced by the war with Russia by providing them an opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole. *See* Uniting for Ukraine Parole Process, 87 Fed. Reg. 25,040. Again, Congress passed appropriations supporting individuals entering the United States through this type of parole process. *See* Ukraine Supplemental Appropriations Act of 2022, Pub. L. No. 117-128 (providing benefits to Ukrainians paroled under Section 1182(d)(5)(A); *see also* Help HAITI Act of 2010, Pub. L.

No. 111-294 (providing for adjustment of status for Haitians paroled under DHS's Humanitarian Parole Policy for Certain Haitian Orphans).[3] The Senate Appropriations Committee has in fact encouraged DHS to explore using its parole authority in the same manner for other groups. *See* Senate Appropriations Committee, Explanatory Statement for the Homeland Security Appropriations Bill of 2023, *available at* https://www.appropriations.senate.gov/download/dhsfy23rpt. Recognizing the success of the Uniting for Ukraine parole process at reducing the strain on CBP personnel, thus allowing them to focus on other important responsibilities, "the Committee encourage[d] the Department to explore whether such approaches can be expended further," and "direct[ed] the Secretary to examine whether a model similar to what was used for Ukrainian nationals, as well as the Central American Minors program, may be employed to process some noncitizens in advance to help deter individuals from making dangerous and costly journeys to the U.S." *Id*. at 5.

DHS's approach is thus fully consistent with the parole authority set out in the statutory text. Congress not only rejected any further restrictions on the parole authority—such as the restraints Plaintiffs seek to add to the statute here—when it amended the statute in 1996, Congress has also supported using that authority in ways that may apply broadly to particular groups and support for the type of parole processes at issue here. *See Lorillard v. Pons*, 434 U.S. 575, 580

---

[3] *See also* Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1989, Pub. L. No. 100-461 (authorizing granting permanent residence to parolees from Soviet Union, Vietnam, Laos, and Cambodia); Omnibus Appropriations Act, Pub. L. No. 104-208 (providing for adjustment of status for noncitizens from Poland and Hungary who had been denied refugee status but who had "inspected and granted parole into the United States"); National Defense Authorization Act of 2020, Pub. L. No. 116-92 (expressing congressional support for an ongoing parole program for relatives of U.S. military members and considering in each case-by-case determination whether parole would advance family unity that would constitute a significant public benefit); Extending Government Funding and Delivering Emergency Assistance Act of 2021, Pub. L. No. 117-43 (providing refugee benefits to Afghans paroled under Section 1182(d)(5) and funds to support those benefits).

(1978) ("Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence").

Plaintiffs thus cannot succeed on the merits of their statutory claim.[4]

### B.     The processes are not arbitrary and capricious.

Plaintiffs next argue that the parole processes are arbitrary and capricious. Mot. 21-24. This claim also lacks merit.

The parole processes easily satisfy the APA's "highly deferential" standard of review. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). Under the "narrow" scope of review permitted "under the 'arbitrary and capricious' standard" a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, in assessing the agency action, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, to satisfy judicial scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). The agency's decision must also be judged based on the record that was before the agency at the time of the decision, meaning Plaintiffs cannot rely on extra-record evidence to argue the decision was

---

[4] Plaintiffs did not separately move for an injunction on their ultra vires claim, but they cannot raise such a claim to begin with, and even if they could, it would fail for all these same reasons and others.

arbitrary or capricious. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 243-44 (1973); *Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010).[5]

The parole processes easily meet this deferential standard, particularly since "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grant of authority is "nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985). The parole processes use this authority to combine "a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States." Venezuela AR 146. Because country conditions or diplomatic relations in certain countries such as Venezuela limit DHS's ability to remove individuals, DHS's options for imposing such consequences are limited. *Id*. at 137-41. As DHS explained, through negotiations with Mexico on how to address irregular migration through Mexico to the southwest border, DHS implemented the parole process for Venezuelans to reduce the strain on the border and create a parole pathway that allows for orderly processing of noncitizens away from the border. *Id*. at 132-35. As a result, Mexico agreed to accept the removal of Venezuelan nationals who fail to follow lawful pathways to the United States. *Id*. The process was an immediate and dramatic success at reducing irregular migration, border encounters, and unlawful border crossings. *Id*. at 146-47. By creating a consequence for individuals who do not follow the parole process or take other lawful avenues to seek entry, DHS created a disincentive for unauthorized entry that reduced border encounters significantly,

---

[5] To the extent Plaintiffs seek to rely on extra-record evidence in support of the merits of any of their claims, the Court should strike or at the least disregard those citations. *See, e.g.*, *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012); *Oceana, Inc. v. Locke*, 674 F. Supp. 2d 39, 44-45 (D.D.C. 2009).

alleviated the strain on DHS personnel and limited resources to detain arriving noncitizens at the border, and reduced the overall use of parole for Venezuelans. *Id.*

DHS also reasonably explained when adopting similar processes for Cuba, Nicaragua, and Haiti why those countries presented similar barriers to removal, and how imposing a similar incentive structure would thus likely have similar results. Cuba AR 127, Haiti AR 98, Nicaragua AR 127. These processes are thus each modeled on the recent success of this approach in encouraging individuals to choose safe, orderly, and lawful paths to the United States, while reducing unauthorized border crossings by obtaining Mexico's agreement to accept—and thus imposing new consequences for—individuals who enter without authorization. *Id*. In each case, DHS addressed the available evidence, including compelling evidence of recent success from the Venezuelan Parole Process, and explained how the processes would advance DHS's ability to enforce the immigration laws against individuals who enter without authorization, reduce strain on the border and limited agency resources, and advance foreign relations. *Id*. Nothing more is required.

Plaintiffs nonetheless argue the parole processes are arbitrary and capricious. They first argue "Defendants addressed only the benefits that might obtain from the *accumulated* effect of paroling thousands of aliens," did not show "that admitting each *individual* parolee will yield a humanitarian or public benefit," and did "not require applicants to explain why their parole *specifically* would yield humanitarian or public benefits." Mot. 22. Plaintiffs do not explain why it is arbitrary or capricious to consider the cumulative effect of these processes. Nothing in Section 1182(d)(5)(A) or the APA prohibits aggregating the benefits of individual parole decisions and weighing those positive results, and Plaintiffs do not dispute that securing the border, encouraging individuals to migrate through lawful means, and developing previously unavailable consequences

for those who otherwise could not be removed are public benefits.

Second, Plaintiffs argue the parole processes are arbitrary and capricious because "Defendants did not consider and account for the Plaintiff States' reliance interests." Mot. 22. Plaintiffs, however, do not identify any reliance interest DHS should have considered. Reliance interests are implicated when a regulatory change directly affects a regulated entity. *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (addressing regulatory change that upset "decades of industry reliance," resulting in "substantial" and potentially "retroactive" legal "liability" for the regulated entities).[6] States are not directly regulated by the processes. Nor can they point to any action they took in reliance on the prior approach, which led to a greater number of arrivals at the border and a greater need to use parole, given constraints on DHS's detention capacity and inability to remove CHNV nationals to their home countries.

Plaintiffs cite alleged "costs" from "increased illegal immigration," Mot. 23, but as noted above, the parole processes have decreased unlawful entries and given DHS greater ability to enforce the immigration laws against individuals from these countries, who otherwise generally could not be removed. *See*, *e.g.*, 88 Fed. Reg. at 1,272 (evaluating these potential benefits). The ability to remove these individuals is contingent on obtaining Mexico's agreement to take them, something DHS was able to secure specifically for individuals who do not follow the parole processes. Whatever alleged costs Plaintiffs associate with nationals of these four countries, an

---

[6] *See also DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914-15 (2020) (noting reliance interests of regulated entities on longstanding policies, *e.g.*, individuals covered by DACA, who had taken actions in reliance on the program and would need to "reorder their affairs" because they may be in the middle of a "course of study," "military service," or "a medical treatment regimen"). Cases typically require that a policy change would lead to some unexpected civil or criminal liability for a regulated industry or individuals before reliance interests are cognizable. *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015).

injunction will undermine DHS's ability to remove these individuals and encourage more unlawful entries. Plaintiffs cannot have a reliance interest in something that was previously impossible and that would be less possible if the processes are enjoined, nor can they identify increased costs from processes that have decreased migration.[7] At bottom, Plaintiffs' claims amount to an assertion that they have a reliance interest in the higher level of migration to their states that existed under the status quo prior to these processes, which is inconsistent with their theory of harm.

Plaintiffs next argue that "Defendants did not explain or analyze how they would remove from the United States" noncitizens "paroled through their program at the end of any period of authorized parole." Mot. 23. Plaintiffs assert that DHS "generally has difficulty in removing such" noncitizens. *Id*. The difficulty in removing CHNV nationals is, however, not an issue created by the parole processes. DHS has limited ability to remove noncitizens to these four countries either because of conditions in those countries or because a country will not accept the return of its citizens from United States—issues that predate the parole processes. *See* 88 Fed. Reg. at 1,247, 1,259, 1,270-01; 87 Fed. Reg. at 63,509. As a result, without the parole processes, DHS would have difficulty removing most noncitizens from these countries, and would likely have to release many of those individuals into the United States. DHS now has the ability to remove these individuals to Mexico, "impos[ing] a consequence on irregular entry that currently does not exist." 87 Fed. Reg. at 63,511. The ability to remove is thus contingent on Mexico's concurrent decision to accept removal of individuals who do not follow the parole processes.

---

[7] Plaintiffs' third argument for why these processes are arbitrary and capricious is that the "sudden surge of migrants from several specific countries" does not justify adopting these processes as an "emergency measure" rather than going through "notice-and-comment rulemaking." Mot. 23. Defendants address this argument below in response to Plaintiffs' other arguments for why they believe these processes can only be adopted through notice-and-comment procedures. *See infra* at 44-47.

In addition, under each parole process, individuals who do not depart when their period of authorized parole lapses may be placed in removal proceedings if they have not obtained some other status or basis to stay in the United States. 87 Fed. Reg. at 63,508. DHS does have the ability to remove a small number of individuals to each of these countries, which could be used for this purpose. Ex. 1, ¶¶ 12-13. DHS's ability to remove more CHNV nationals would depend on improved conditions—diplomatic or otherwise—in Cuba, Haiti, Nicaragua, and Venezuela, or alternatively Mexico's (or some other country's) willingness to accept them at that time. Although it is possible that DHS will not be able to remove every parolee who has not obtained status once their parole period ends, an agency action is not arbitrary and capricious simply because it does not fully eliminate a problem, especially when more comprehensive solutions are not readily available or will depend on further diplomatic negotiation with foreign nations. *See FERC*, 577 U.S. at 292 (agency need not adopt perfect solution or even the best of available alternatives to survive APA review); *Texas*, 142 S. Ct. at 2543 (noting deference due to Executive decisions that depend on or are limited by foreign affairs and the ability to secure agreements from Mexico or other nations). As long as "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld," *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998), and the parole processes are a rational solution to this issue, with demonstrated success.

Plaintiffs next argue that DHS did "not explain or analyze how the 'sponsor' requirement for applicants will be enforced." Mot. 24. Such a claim is not a basis to find the parole processes arbitrary and capricious. First, prospective supporters do not simply state they will support a parolee—they must establish they have status in the United States, "pass security and background vetting," and "demonstrate sufficient financial resources to receive, maintain, and support the

intended beneficiary whom they commit to support for the duration of their parole period." 87 Fed. Reg. at 63,515. Potential supporters must submit the required information on a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, *id*., "to assure the U.S. Government that the [intended beneficiary] will be financially supported while in the United States," and sign the form "under penalty of perjury," Cuba AR at 1221; *see also id.* 1211-24; https://www.uscis.gov/i-134A. "The supporter will then be vetted by USCIS … to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support." 87 Fed. Reg. at 63,515.

Using a Form I-134A to ensure financial support for potential parolees is not a new process. It is similar to the process the agency has used in other contexts, such as the Uniting for Ukraine process, *see* https://www.uscis.gov/ukraine. And ultimately, although DHS has implemented this process to ensure financial support for parolees, the statute does not require a supporter before granting parole. Section 1182(d)(5)(A) says nothing about financial support, let alone creating an enforcement mechanism for private support of parolees. Rather, the statute leaves any additional requirements for granting parole to the Secretary's discretion, authorizing parole in "*his discretion … under such conditions as he may prescribe.*" *Id.* (emphasis added). DHS's careful consideration of an issue that is not even required by the statute is the opposite of arbitrary-and-capricious decisionmaking. And the opportunity to vet potential supporters to ensure that a potential beneficiary will have adequate financial support before any consideration for parole is only possible because of the orderly advance process DHS has instituted for these four countries.

Plaintiffs cannot show that they are likely to succeed on a claim that the parole processes are arbitrary and capricious.

**IV.    Plaintiffs Cannot Succeed on a Notice-and-Comment Claim.**

Contrary to Plaintiffs' arguments, *see* Mot. 18-21, the parole processes were not required to go through notice-and-comment rulemaking.

**A.    The parole processes are not legislative rules**

Notice-and-comment procedures are not required when an agency issues "general statements of policy," 5 U.S.C. § 553(b)(3)(A), that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197. "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach," and the "agency retains the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). In this Circuit, whether agency action is a general statement of policy turns on "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas v. United States* (*"Texas DACA"*), 50 F.4th 498, 522 (5th Cir. 2022). The primary focus of this inquiry is "whether the rule has binding effect on agency discretion or severely restricts it." *Id.*; *accord Texas*, 933 F.3d at 441 ("The primary distinction between a substantive rule ... and a general statement of policy ... turns on whether an agency intends to bind itself to a particular legal position."). The parole processes are general statements of policy.

The parole processes do not have the force and effect of law and do not "grant rights, impose obligations, or produce other significant effects on private interests." *Texas DACA*, 50 F.4th at 522. The parole processes set out the general manner in which DHS plans to implement its discretionary parole authority in Section 1182(d)(5)(A), but it is the statute, not the parole processes which creates the authority and requirements for parole. *See, e.g.*, 87 Fed. Reg. at 63,516

(noting that "the Department is merely adopting a general statement of policy … to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power"). The processes do not bind DHS to any particular course with respect to any noncitizen—those decisions continue to be made on a case-by-case basis by individual officials—and they provide no assurance that parole will be granted in any specific case, even once a noncitizen travels to the United States and presents for inspection at an interior port of entry. *See, e.g.*, 87 Fed. Reg. at 63,516. The processes thus do not provide CHNV nationals any additional rights or obligations beyond those already provided by the statute. *See* 8 U.S.C. § 1182(d)(5). Thus, each process provides it is "being implemented as a matter of the Secretary's discretion," and is "not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." 88 Fed. Reg. at 1,277.

That parolees might apply for work authorization does not change this analysis. Work authorization is collateral to the parole processes because it flows from regulations (issued after notice-and-comment rulemaking) that existed prior to and independent of the parole processes and apply to all noncitizens who have been granted parole. *See* 8 C.F.R. § 274a.12(c)(11). Thus, even if the parole processes did not exist, paroled CHNV nationals could still apply for work authorization just like any other parolee in the United States. *Id.* Plaintiffs do not—and indeed could not, given the statute of limitations—challenge the work authorization regulation, and so may not assert injury tied to the effect of that regulation. *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021).

The parole processes simply "announc[e] motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a substantive question of regulation." *Texas DACA*, 50 F.4th at 522. Officers are not required to grant parole in any

individual case, and DHS retains discretion to rescind or amend the parole processes at any time for any reason. Accordingly, the processes neither "appear[] on [their] face to be binding," nor are they "applied by the agency in a way that indicates [they are] binding." *Texas DACA*, 50 F.4th at 524.

The parole processes are thus distinguishable from the memoranda in *Texas DACA*, which the Court viewed as "narrow[ing] and channel[ing]" general discretionary authority by "list[ing] a fixed set of criteria that should be satisfied before an individual is considered for an exercise of prosecutorial discretion" and "dictates what that discretion should be used to do." *Id.* By contrast, the parole processes at issue here do not narrow or deviate from the statutory and regulatory procedures governing discretionary parole determinations that are made when an individual arrives at a port of entry. These processes thus fall comfortably within the longstanding rule that agency policies or procedures that inform the public of the agency's current enforcement or adjudicatory approach with respect to discretionary decisions are statements of policy. *See, e.g.*, *Lincoln*, 508 U.S. at 197; *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019) (explaining that agency policy which directed immigration officers to consider whether they "may return" a noncitizen to Mexico pending removal proceedings was a statement of policy "because immigration officers designate applicants for return on a discretionary case-by-case basis"); *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions).

Alternatively, the parole processes are exempt from notice-and-comment requirements as rules of agency "procedure." 5 U.S.C. § 553(b)(3)(A). Procedural rules "cover[ ] agency actions that do not themselves alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency." *National Mining Ass'n*,

758 F.3d at 250; *see U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984). As explained, the processes at issue here do not restrict a CBP officer's authority and discretion to "approve or deny" a parole request. *James Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000). With respect to covered nationals, these procedures govern "the manner in which the parties present" a request "to the agency." *National Mining Ass'n*, 758 F.3d at 250; *see also Texas*, 809 F.3d at 176-77 ("rules are generally considered procedural so long as they do not 'change the *substantive standards* by which the [agency] evaluates' applications" (quoting *Nat'l Sec. Couns. v. C.I.A.*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)). Because the parole processes do not modify substantive rights or guarantee anyone parole or any other status in the United States, these processes do not have the type of substantial impact that would require notice and comment. *Texas*, 809 F.3d at 176. Plaintiffs do not address whether the parole processes are "rules of agency … procedure" under Section 553(b)(3)(A), or offer any argument for why they should not be exempt from rulemaking requirements on that basis. *See generally* Mot. 18-21.

### B. The processes are exempt from notice-and-comment procedures because they involve a foreign affairs function and because there was good cause.

Even assuming the parole processes are legislative rules, they are nevertheless exempt from the APA's notice-and-comment and publication requirements because they "involve ... [a] foreign affairs function of the United States," *id.* § 553(a)(1), and because "the agency for good cause" has found "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(3)(B), (d)(3). Both exceptions apply here, as has been the case with similar agency actions affecting the border.

<u>Foreign Affairs.</u> The foreign-affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249

41

(Fed. Cir. 1985).

DHS properly invoked this exception. As DHS explained, the parole processes are necessary to advance the "Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships." 88 Fed. Reg. at 1,253, 1,265, 1,277; 87 Fed. Reg. at 63,516. In particular, Cuba, Nicaragua, and Venezuela generally will not accept, or place limits on, the return of their citizens from the United States, while the security situation in Haiti limits DHS's ability to return Haitians. 88 Fed. Reg. at 1,246, 1,256, 1,267; 87 Fed. Reg. at 63,509. The parole processes are part of a larger negotiation with Mexico, which has agreed, for the first time, to accept "remov[als]" of covered "nationals who enter the United States without authorization across the [southwest border]," *id.*, but only if the United States "provide[s] a lawful process for" covered "nationals to enter the United States" without first traversing Mexico. 88 Fed. Reg. at 1253. "Thus, initiating and managing this process," which DHS anticipated would dramatically decrease attempted illegal entries at the southern border, "will require careful, deliberate, and regular assessment of [Mexico's] responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements." 88 Fed. Reg. at 1,253 As DHS further explained, "[d]elaying issuance and implementation of this process to undertake rulemaking" "would complicate broader discussions and negotiations about migration management," jeopardizing Mexico's decision "to accept the return or removal of" covered nationals. *Id.*

The parole processes—which promote the interlocking goals of securing the border and upholding our commitments to other countries—is thus "linked intimately with the government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters*, 751 F.2d at 1249; *see, e.g.*, *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1486 (D.C. Cir. 1994)

(exception applied to implementation of diplomatic agreements). The Executive's choice—to provide for parole on a case-by-case basis to covered nationals in exchange for Mexico accepting removal of previously unremovable individuals—is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980).

Relying on out-of-circuit authority, Plaintiffs argue that DHS "must make a strong showing that" a notice-and-comment period "will provoke definitely undesirable international consequences." Mot. 19-20. The statute requires no such showing. The foreign-affairs exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm. 5 U.S.C. § 553(a)(1). The proper question is whether the agency's action directly "involve[s]" a "foreign affairs function," 5 U.S.C. § 553(a)(1), such as where the agency's action is part of, and necessary to, ongoing diplomatic negotiations and commitments. If it does, it is inappropriate to require anything more than what is required by the foreign-affairs exception's text. "[T]he phrase 'provoke definitely undesirable international consequences'" is merely "an illustration given in the APA's legislative history;" it is not "the definition for 'foreign affairs function.'" *New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) (quoting H.R. Rep. No. 79–1980, at 23 (1946)). There is thus no textual basis for interpreting the phrase "involve[s] a … foreign affairs function" as requiring a showing of definitely undesirable international consequences. *See id.*; *Capital Area Immigrants' Rights. Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (noting that such an interpretation would be "unmoored from the legislative text"); *cf. Roe v. Mayorkas*, 2023 WL 3466327, at *17 (D. Mass. May 12, 2023) ("Where, as [with changes to the process for Afghan humanitarian parole], actions

43

involve core foreign policy functions, the Court finds they fall within the [foreign affairs] exception without an analysis of the specific undesirable consequences." (quotation marks omitted)). Indeed, such a requirement would make the foreign affairs exception superfluous because the good-cause exception would apply where taking public comment would lead to negative international consequences. *CAIR*, 471 F. Supp. 3d at 53 (noting this point). It would also require courts to evaluate how serious a particular international consequence would be, which is "generally beyond the authority or competency of a court's adjudicative powers." *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008).

Regardless, assuming some showing of "undesirable consequences" were required, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018). And even if an agency were required to identify harm that would occur between the announcement of a policy and the end of a comment period, the notices set out the potential harm. Such a delay would encourage a surge in arrivals during any comment period that could overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration through Mexico to the border that these processes seek to decrease, undermining the United States' negotiations with its foreign partners. 88 Fed. Reg. at 1,253; Cuba AR 187[8]; *Yassini*, 618 F.2d at 1360 (holding exception applied to Immigration and Naturalization Service action given need for "prompt response" to foreign affairs crisis). Plaintiffs assert that the government has not provided "evidence" of the negative consequences that will result from notice-

---

[8] Many documents appear in all four administrative records. In such cases Defendants have cited one copy of a relevant document rather than provide duplicate citations to the same information.

and-comment, Mot. 20, but the record refutes that that view, *see, e.g.*, Cuba AR 147-49, 188 (noting concern of Mexico and other countries about anticipated surged in migration following end of Title 42, and that their willingness to cooperate in accepting "increased returns of migrants was contingent on expanding the model provided by U4U and the Venezuela process"), 1276, 1733. And regardless, the heightened evidentiary requirement Plaintiffs demand constitutes "unwarranted judicial interference in the conduct of foreign policy. *Texas*, 142 S. Ct. at 2543.

Good Cause. The good-cause exception applies "when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *U.S. Chamber of Commerce v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) (citing *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983)); *see E. Bay*, 909 F.3d at 1253 (good cause where "an announcement of a proposed rule creates an incentive for those affected to act prior to a final administrative determination."); *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir. 2012) (good cause where "announcement of a proposed rule would enable the sort of [harm] the rule sought to prevent").

Consistent with these principles, the agency recognized that pre-promulgation notice and comment or a delayed effective date "would greatly exacerbate an urgent border and national security challenge" by "incentiviz[ing] even more irregular migration of [covered] nationals seeking to enter the United States before the process would take effect." 88 Fed. Reg. at 1,252. Here, the "Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges." *Id.* The Department explained that it is "well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy" and their "experience has

45

been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States." *Id.* Moreover, "[s]mugglers routinely prey on migrants in response to changes in domestic immigration law." *Id.*

The record bears out DHS's concerns. As DHS explained, "implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans," and "had the parole process been announced prior to a notice-and-comment period" it likely would have had the opposite effect. 88 Fed. Reg. at 1,254. Moreover, DHS has repeatedly witnessed such surges in response to changes in immigration law. For example, in the immediate aftermath of a court vacating the Title 42 public health order related to the COVID-19 pandemic, which had limited the ability of noncitizens to seek entry, total encounters at the southern border reached 9,112 in a single day on November 17, 2022, a *15 percent* increase from the day before. Cuba AR 1286, 1564. Likewise, on February 28, 2020, immediately after the Ninth Circuit (*Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1095 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021)) lifted a stay of a nationwide injunction against the Migrant Protection Protocols (MPP), a program implementing the contiguous-territory return authority under 8 U.S.C. § 1225(b)(2)(C) and impacting asylum seekers, thousands of individuals sought to enter the United States and hundreds crossed the border illegally, many evading capture. *See* Cuba AR 83-91, Haiti AR 1285. Ports of entry were so overwhelmed that CBP was forced to shut down border crossings and divert resources from other critical responsibilities focused, for example, on detecting and confiscating illicit materials and protecting national security. *Id.* at 90. The record is replete with

46

similar experiences. AR Cuba AR 387-417,490, 1536, 1564 1606. That clear record evidence readily supports a finding of good cause. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 675 (9th Cir. 2021); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

Plaintiffs argue that neither the good cause nor the foreign affairs exception applies because DHS could have instead "immediately barred from the Program—similar to what the Program already says," "anyone attempting to cross illegally after that date," and at the same time "opened a notice-and-comment period." Mot. 20-21. However, to put consequences in place immediately to prevent a surge in arrivals while a comment period was pending, DHS would have had to implement the processes as temporary final rules. But under the statute DHS also needs to identify "good cause" to do so, otherwise it cannot have a rule to take effect immediately without waiting for the comment period to conclude. *See* 5 U.S.C. § 553(d) (providing that substantive rule must be published "not less than 30 days before its effective date" unless the agency finds "good cause" for making it effective without waiting for this period). If, as Plaintiffs seem to concede, it was necessary to impose consequences immediately, then there was "good cause" under Section 553 that exempts the processes from notice-and-comment requirements, and there is nothing in the statute that requires the agency to provide a comment period in that circumstance.

Simply stating that individuals who attempted to enter unlawfully after January 9, 2023 would be ineligible for the parole processes, as Plaintiffs suggest, *see* Mot. 20-21, would do little to prevent a surge in arrivals seeking to enter from these countries before the processes were implemented and DHS gained the ability to remove these individuals to Mexico. For these four countries, DHS cannot otherwise remove such individuals, meaning that any noncitizens who entered during the comment period could not be removed at all. Those individuals would have no need to avail themselves of the parole processes at that point, and barring them from the processes

would be a meaningless consequence with no deterrent effect on unlawful entry. But the strong incentive to enter before DHS could remove these noncitizens to Mexico would remain under this approach. Plaintiffs are simply wrong that this approach "would have had the same effect." Mot. 21.

Finally, Plaintiffs assert there was no urgency here because various events that have contributed to increased irregular migration occurred more than a year ago. Mot. 21. But this argument does not address the surge in arrivals from these countries DHS reasonably anticipated would occur between the announcement of the parole processes and the effective dates if those were delayed to allow for notice and comment. As the Supreme Court has explained, courts are ill-equipped to second-guess these types of prospective judgments by the Executive Branch with respect to foreign affairs and national security. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010).

## V.   The Remaining Factors Weigh Strongly Against Granting a Preliminary Injunction.

The balance of equities weighs strongly against granting an injunction. An injunction would irreparably harm the United States and the public by frustrating the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). Here, the Executive Branch has identified an emergent situation at the southwest border—record numbers of noncitizens seeking to enter our country unlawfully, potentially overwhelming the immigration system and risking lives—and has taken targeted measures to address the situation that allow DHS, with support from Mexico, to create consequences for unlawful entry for noncitizens who would otherwise be unremovable. The public interest is served by encouraging noncitizens to avail themselves of lawful, orderly pathways to entering, and by DHS's increased ability to enforce the immigration laws as a result of cooperation from Mexico that is dependent on keeping the parole processes in place. An injunction would thus

48

undermine "sensitive and weighty interests of … foreign affairs," *Humanitarian Law Project*, 561 U.S. at 33-34, by enjoining agency actions that result from and support ongoing diplomatic negotiations.

Against this, Plaintiffs cannot identify any harm they would face if the parole processes remain in place. They cite only costs based on a speculative theory of harm related to increased migration that is directly contradicted by the evidence. Mot. 24-26. As set out above, *supra* 8-10, the parole processes have decreased the number of arrivals at the southwest border, the number of unlawful entries, and the number of noncitizens from the covered countries released into the United States, such that the "harm" Plaintiffs rely on would be *increased* by enjoining the parole processes and avoided by allowing them to stand. *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 885 (S.D. Tex. 2019) (finding no irreparable injury where the number of noncitizens arriving had decreased as of the time of the preliminary injunction hearing). Even if that were not true, the speculative, minor financial costs Plaintiffs identify cannot establish irreparable injury. *See Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 397-98 (5th Cir. 2013) ("general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" insufficient to establish irreparable harm).

There is no basis here for "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). Nor is there any basis for an injunction that would interfere with foreign affairs. *See Texas*, 142 S. Ct. at 2543 (emphasizing courts should give substantial weight to potential foreign affairs consequences when considering challenges to immigration policy and take great care to avoid "the danger of unwarranted judicial interference

in the conduct of foreign policy"); *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring) (When "the President chooses the parole option … for foreign-policy reasons, a court … must be deferential to the President's Article II foreign-policy judgment … Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations."). An injunction would thus interfere with a core constitutional power conferred on the Executive, which itself establishes irreparable harm. *See, e.g.*, *Adams*, 570 F.2d at 954. Accordingly, an injunction would cause direct, irreparable injury to the interests of the government and the public, which "merge" in suits against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## VI. If the Court Grants Relief, It Must be Sharply Limited.

If the Court rules in Plaintiffs' favor, the appropriate relief is, at most, remand without vacatur to allow the agency to address any deficiencies the Court identifies, while avoiding the disruption vacatur or an injunction might cause. *See* Ex. 1, ¶¶ 27-53. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," and "[o]nly in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). Remand without vacatur is especially appropriate where, as here, vacatur could produce "disruptive consequences," including to foreign policy and the security of the border. *Allied-Signal, Inc. v. United States NRC*, 988 F.2d 146, 150 (1993) (citation omitted); *see also Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

Relief should also be limited to the particular Plaintiff States who have put forth concrete

50

evidence of irreparable harm. While no Plaintiff has done so, Plaintiffs stipulated that they are only seeking to establish harm to Texas, ECF No. 139, so at a minimum relief cannot extend beyond Texas. Plaintiffs argue that "unlawful agency actions are ordinarily" vacated as a whole rather than limiting their application to the plaintiffs. Mot. 27. But Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). *See also DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Any relief must be narrowly tailored to remedying concrete harms that particular Plaintiff States have established. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also DaimlerChrysler*, 547 U.S. at 352 (A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought."); *Morice v. Hosp. Serv. Dist. #3*, No. 18-cv-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (plaintiff "lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit"). Plaintiffs have the burden "to *prove* that whatever injunction they request" is "no broader" than necessary "to protect against their proven injuries." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023).

Plaintiffs argue that geographically-limited relief would be ineffective because noncitizens could "be paroled into the United States through a non-party State," Mot. 27, but they do not explain how individuals being paroled into non-Plaintiff States harms Texas or justifies an injunction that extends beyond the parties to this case. A central feature of these parole processes is that they allow individuals to fly into the interior of the United States to seek parole on their way to their final destination, reducing strain on the border. There is thus no basis to conclude that

individuals would seek parole at airports outside of Texas if their intended destination was actually within Texas. Nor is there any basis to extend relief to the majority of States that have elected not to join this lawsuit, and who may support the parole processes remaining in place.

Plaintiffs also argue for uniformity in the immigration laws. Mot. 27. But immigration law is not a special context that warrants a different rule. All injunctions—even those involving "national rules and policies"—must be narrowly tailored to remedy the specific harm shown. *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022). Plaintiffs have not shown that "complete relief" could not be provided by limiting it to Texas, the only State that attempted to show evidence of harm. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (noting "scope of the remedy must be no broader … than necessary to redress the injury shown" and narrowing relief "to the plaintiff states"); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (narrowing injunction to plaintiff states by staying "application to any other jurisdiction").

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for an injunction.

Dated: June 20, 2023                     Respectfully submitted,


ALAMDAR S. HAMDANI                  BRIAN M. BOYNTON
*United States Attorney*                 *Principal Deputy Assistant Attorney General*

                                         WILLIAM C. PEACHEY
                                         *Director*
                                         Office of Immigration Litigation
                                         District Court Section

                                         EREZ REUVENI
                                         *Assistant Director*

                                         */s/ Brian C. Ward*
                                         BRIAN C. WARD
                                         *Senior Litigation Counsel*
                                         U.S. Department of Justice
                                         Civil Division

Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 616-9121
Email: brian.c.ward@usdoj.gov

*Counsel for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief contains 16,857 words, as counted by Microsoft Word.

> */s/ Brian C. Ward*
> BRIAN C. WARD
> U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

> */s/ Brian C. Ward*
> BRIAN C. WARD
> U.S. Department of Justice