```
                    UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS (CORPUS CHRISTI)

STATE OF TEXAS, et al.,           .
                                  .   Case No. 6:23-cv-00007
                 Plaintiffs,      .
                                  .
        v.                        .
                                  .
U.S. DEPARTMENT OF HOMELAND       .   1133 N. Shoreline Blvd.
SECURITY, et al.,                 .   Corpus Christi, TX 78401
                                  .
                 Defendants.      .   Friday, July 7, 2023
                                  .   2:02 p.m.
. . . . . . . . . . . . . . . . . .
```

                    TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE DREW B. TIPTON
                  UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Plaintiffs:          Office of the Attorney General
                             By:  LEIF A. OLSON, ESQ.
                             P.O. Box 12548 (MC-009)
                             Capitol Station
                             Austin, TX 78711-2548
                             (512) 463-4139


For the Intervenor           Justice Action Center
Defendants:                  By:  ESTHER HSIAO-IN SUNG, ESQ.
                             P.O. Box 27280
                             Los Angeles, CA 90027
                             (323) 316-0944

APPEARANCES CONTINUED.

Audio Operator:              Rochelle A. Limon, ECR

Transcription Company:       Access Transcripts, LLC
                             10110 Youngwood Lane
                             Fishers, IN 46048
                             (855) 873-2223
                             www.accesstranscripts.com


        Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the United States:

DOJ-Civ
By:  ELISSA P. FUDIM, ESQ.
     ERIN RYAN, ESQ.
     BRIAN C. WARD, ESQ.
Post Office Box 868
Ben Franklin Station
Washington, DC 20044
(202) 451-7460

1          (Proceedings commence at 2:02 p.m.)

2          THE CLERK:  Calls Civil Action, 6:23-cv-7, State of

3   Texas, et al. v. U.S. Department of Homeland Security, et al.

4   May I have appearances by counsel?

5          MR. OLSON:  Leif Olson for the plaintiffs.

6          THE COURT:  Who do we have for the United States?

7          MS. FUDIM:  Elissa Fudim, Your Honor, for the United

8   States.  And I believe also on the line, though not on camera,

9   are my colleagues, Brian Ward and Erin Ryan, Your Honor.

10          THE COURT:  Okay.  I can see Mr. Ward.  All right.

11   Okay.

12          MS. SUNG:  Esther Sung.  Hi.  Esther Sung for the

13   intervenor defendants, Your Honor.

14          THE COURT:  Okay.  So we're here for a couple of

15   matters.  One is to address a discovery issue that has arisen

16   between the intervenor defendants and the State of Texas, or I

17   guess, the plaintiff states in general.  Also, I am -- I'm

18   aware of the joint motion to amend the scheduling order that

19   was filed earlier today, and I've read that.  I've read all of

20   the briefings with that.

21          Ms. Sung, it's your request, so I guess -- first off

22   on the discovery issues, why don't you go ahead?

23          MS. SUNG:  Sure.  And thank you so much Your Honor.

24   I mean, we're here because Texas and the intervenor defendants

25   don't agree on whether Texas needs to provide information about

 1   any offsetting revenues, such as fees or reimbursements, when

 2   it provides evidence of the cost that it claims that it incurs

 3   in connection with medical care, education, driver's licenses,

 4   law enforcement.

 5          It's our position that evidence and information about

 6   these offsetting revenues is clearly covered by a plain and

 7   common sense reading of the requests.  The requests seek

 8   information about Texas's costs.  You know, how much in the red

 9   Texas is, as well as how foreign nationals contribute economic

10   value in any way to the State.  It's also our position that

11   this reading of the discovery requests makes sense because it

12   is indisputable that offsetting benefits, offsetting revenues,

13   and fees are relevant to the question of what harm Texas has

14   actually sustained.  That is, in turn, relevant to the question

15   of Texas's standing, the balance of equities, the propriety of

16   an injunction in this case, what the scope of any such

17   injunction would be.

18          And the -- actually, the recent Supreme Court

19   decision in United States v. Texas has bearing on this.  The

20   majority decision acknowledged that federal policies frequently

21   generate indirect effects on state revenues or state spending,

22   and that when a state asserts that a federal law has produced

23   only those kinds of indirect effects, the State's claim for

24   standing can become more attenuated.

25          And so we would submit that when an outlay of state

1  spending is offset or (audio interference) otherwise

2  compensated in some -- then the impact of that of that state

3  spending is less direct.  It is blunted.  And so Texas's claim

4  for standing should be considered to be more attenuated if

5  there are offsetting revenues that blunt the impact of any

6  outlay of state spending.

7           THE COURT:  Okay.  I just wanted to let you know that

8  you've froze there for a second, but it appeared that you

9  picked right back up, and I don't think we missed anything, but

10 I just wanted to let you know that, so --

11          MS. SUNG:  Okay.

12          THE COURT:  -- and --

13          MS. SUNG:  Sorry about that, Your Honor.

14          THE COURT:  No, that's alright.  Before we move -- go

15 on, I guess I need to make sure I know the scope of everything

16 that's in dispute.

17          Mr. Olson, does Texas or any of the plaintiff states

18 have any discovery disputes or issues or concerns?

19          MR. OLSON:  No, Your Honor.

20          THE COURT:  All right.  And Ms. -- and I apologize.

21 Is it Ms. Fudim?  Is that how you pronounce it?  You're muted.

22 No, the iPhones can be difficult.  Are you on your iPhone?  If

23 you tap it and click the -- there you go.

24          MS. FUDIM:  Yes, sorry.  I am.

25          THE COURT:  Okay.  Yeah.

 1            MS. FUDIM:  I tried to get on using our federally

 2   issued device, but it wouldn't work for me.  It was the -- it

 3   was blocked, so I did have the call in --

 4            THE COURT:  Yeah, okay.

 5            MS. FUDIM:  -- on my iPhone and it just froze.  Sorry

 6   about that.

 7            THE COURT: I am familiar with the federally issued

 8   device and so --

 9            MS. FUDIM:  Yes, thank you.  Yes, it is Fudim.

10            THE COURT:  Okay.  And so I just wanted to confirm

11   that whether or not the federal defendants have any of this --

12   I'm obviously aware of your motion to amend the scheduling

13   order, but do you have any discovery disputes?

14            MS. FUDIM:  No, Your Honor.

15            THE COURT:  Okay.  Alright.  Ms. Sung, did -- had you

16   completed your argument?

17            MS. SUNG:  No, I mean, I can go on or --

18            THE COURT:  No, no.

19            MS. SUNG:  -- answer the questions.

20            THE COURT:  That -- that's fine.  You had paused and

21   I think, like I said, the screen had frozen, but I couldn't

22   tell if that was the conclusion of your argument or if you

23   still had more to go.  So please go ahead.

24            MS. SUNG:  Sure.  Thank you, Your Honor.  I'd just

25   make, probably, three extra points here.  The first is that if

1  you take Texas's position here on its cost to its logical

2  conclusion, I think that helps prove our point because it's

3  Texas's position that, even if it were fully compensated for

4  costs associated with, you know, for example, providing

5  emergency Medicaid, then the fact that Texas had an initial

6  outlay of expense, before being fully reimbursed by the federal

7  government, that would be sufficient to support its standing to

8  seek an injunction that would shut down a nationwide federal

9  program and that just doesn't make any sense.

10         The second point I'd make is that information about

11  these offsetting revenues is also relevant for the Court's

12  analysis of the balance of equities and for the propriety of

13  injunctive relief, equitable relief.  And here, Texas is

14  basically taking the position that, in considering the balance

15  of equities, the Court can consider nothing on the other side

16  of the ledger, and that's not a balancing of anything.  That's

17  just heads, I win, tails, you lose.

18         And then finally, the procedural issue, we did inform

19  the Court this morning, you know, out of an abundance of

20  caution, we did serve identical discovery requests on Texas

21  last Friday.  They're exactly the same as the requests that the

22  federal defendants propounded.  We were surprised by Texas's

23  technical argument that we aren't parties to discovery after

24  our prior court conference with you clarifying that we would

25  participate in the discovery process, with the request as

1  propounded by the federal defendants, and because Texas engaged

2  in multiple meet and confers with us over the completeness of

3  their responses and to narrow out discovery disputes.

4       And so we would submit that Texas should be estopped

5  from claiming that we don't have any standing to move to compel

6  a more complete discovery response from Texas, or that the

7  Court should recognize that we've cured this technical issue by

8  serving Texas with the exact same discovery requests.

9       THE COURT:  Okay.  All right, Mr. Olson?

10      MR. OLSON:  Thank you, Your Honor.  The plain reading

11 of what is asked for here is costs.  It is not net costs.  It

12 is not costs plus offsets.  It is not costs plus income.  It is

13 costs.  And that is the information that Texas furnished.  The

14 federal government has not had a problem with it.  It is the

15 party that did not serve the discovery that had a problem it.

16      And contrary to what you've just heard, the

17 intervenors did not propound that discovery, not until weeks

18 after the cutoff, and at that point without leave of Court,

19 trying to cure the problem that they've (indiscernible)

20 recognized that they had incurred, and a problem that, in fact,

21 they stepped into the case willingly knowing they had incurred.

22 They were not granted intervention until after the deadline to

23 request extra record discovery.  When they came into the case,

24 they came into the case with the knowledge they were coming

25 into the case as it stood, and they came into the case with the

1    representation that they were not going to delay the case and

2    that --

3              THE COURT: You just muted yourself, Mr. Olson.

4              MR. OLSON:  I'm sorry, Your Honor.

5              THE COURT:  Can you --

6              MR. OLSON:  Let me -- I'm trying the spacebar trick

7    and I don't think I'm holding it down hard enough and long

8    enough.

9              THE COURT:  All right.

10             MR. OLSON:  They came into the case after the

11   deadline to request discovery, and having represented that

12   their presence in the case was not going to create discovery

13   disputes and was not going to result in a postponement due to

14   discovery.  I think what the Court will see when it looks back

15   at the transcript is not that Texas agreed that the intervenors

16   could participate in discovery -- that is, participate as

17   parties or participate to serve discovery -- but that Texas

18   would serve discovery responses upon them, which Texas is

19   required to do already under the federal rules.  That was why I

20   expressed surprise when Ms. Sung said she had dealt with

21   parties in the past who had responded to discover requests

22   without including them.  I could not then and cannot now

23   imagine a party simply ignoring its responsibilities under the

24   federal rules to do so.

25             The other arguments that come forward, the United

 1 | <u>States v. Texas</u> case that just came down was indeed about

 2 | standing, but we know that standing is not an accounting

 3 | exercise.  Any dollar of harm that Texas incurs is sufficient

 4 | to give it standing.

 5 |         I would also point out that Texas is, in fact, not

 6 | making the arguments that are being attributed to it.  Texas is

 7 | not saying that nobody is entitled to put on evidence of

 8 | countervailing fees or offsets.  Texas is not saying that the

 9 | Court can't consider that.  Texas is saying that nobody asked

10 | for it until after the deadline, and that therefore, it's time

11 | to proceed to trial with the evidence that we have now.

12 |         THE COURT:  All right?  Ms. Fudim, did you have

13 | anything that you wanted to weigh in or is this not your fight?

14 |         MS. FUDIM:  We take no position with respect to the

15 | motion.  We would only say that, at the time that we propounded

16 | the discovery request, we had understood the word "costs" to

17 | include offsets, but how -- it is how we intended it, but for

18 | various of our own reasons, we've decided not to pursue it via

19 | a motion to compel.  And so as a result, we take no position

20 | with respect to the intervenor's motion.

21 |         THE COURT: All right.  Ms. Sung, did you want to

22 | respond to anything that you'd heard?

23 |         MS. SUNG:  Yeah, sure.  With regards to, you know,

24 | what Mr. Olson's saying about delay, et cetera, I think that's

25 | a mischaracterization of events here.  According to the Court's

1  scheduling order, which we and all the parties have complied

2  with in every way, all the parties were instructed to resolve

3  any disputes about extra record discovery by a date certain.

4  There was a, you know, extension of that of that deadline by

5  agreement of all the parties.  And so the intervenor defendants

6  have complied with this Court's order.  We have raised this

7  dispute timely with the Court.  We have introduced no delay

8  into the proceedings.

9         I think the other point I would simply emphasize

10  again is that Texas, here, is in the best position.  It is the

11  keeper of this information.  You know, intervenor defendants

12  are not in anywhere near as good a position to be able to point

13  to, for example, the fees that residents pay to get driver's

14  licenses.  And Texas is in unique control of that information.

15  And so, while mister Olsen says, we as intervenor defendants

16  are free to introduce evidence of offsetting fees, offsetting

17  revenues, it's a little bit hard to do that when Texas is in

18  control of all that information.

19         And so I think that's why the discovery request asked

20  for costs, the outlay, what -- like what puts Texas in the red.

21  And in addition to that, even if the Court doesn't think that

22  "costs" means net cost, as Mr. Olson is arguing.  It's

23  Interrogatory 15, and there's a corresponding request for

24  production -- I can't -- I don't have the number, but I can --

25  it -- it's in our letter brief.  Those requests ask for any

1    economic value of any kind that the State benefits from because

2    of foreign nationals or because of nationals from the CHNV

3    countries, and fees that people pay for driver's licenses,

4    federal reimbursements for emergency Medicaid, that has

5    economic value.  And so we would submit that those requests do

6    cover the offsetting benefits that we think that Texas needs to

7    be producing here.

8              THE COURT:  Okay.  All right.  Moving to the motion

9    to amend the scheduling order, Ms. Fudim, are you taking the

10   lead on that?

11             MS. FUDIM:  I don't know.  We haven't discussed it,

12   but I'm happy to speak to it and if Esther -- if Ms. Sung has

13   anything to add, I'm sure she can jump in.

14             THE COURT:  Sure.

15             MS. FUDIM:  Our position is, you know, as I said in

16   the letter that we believe that standing should be decided at

17   the earliest possible juncture in a case, particularly that

18   that's been under -- that was underscored in the Supreme

19   Court's most recent decision, and that we believe it makes

20   sense to stay the trial and permit the parties to brief

21   standing and get a decision on standing before moving forward.

22             You know, certainly, I think that, you know, to the

23   extent that the intervenor defendants have made their argument

24   that they've made with respect to the discovery, that discovery

25   goes to standing.  So I mean, I think there is some length

1    there, so we would have to figure out whether the Court's

2    inclined to grant or deny that motion and that the dates might

3    be different that we'd be seeking in terms of a briefing

4    schedule based thereon.  But it remains our position that,

5    because standing provides the entry into a lawsuit, that it's

6    something that should be adjudicated prior to a joint trial on

7    the PI and the merits, Your Honor.

8              And I would defer to Ms. Sung if I missed anything.

9              THE COURT:  All right.  Ms. Sung?

10             MS. SUNG:  No, thank you, Ms. Fudim.  I don't have

11   anything to add that wouldn't be repetitive.  Thank you.

12             THE COURT:  Okay.  Mr. Olson, on that one?

13             MR. OLSON:  On that one, Your Honor, I think the

14   situation will be different if that decision had come down a

15   couple of months ago.  But at this point, we're only a month

16   out from the trial date, and I think it's more efficient for

17   the parties and for the Court to simply include the revised

18   standing arguments as part of the post-trial briefing that the

19   Court was anticipating receiving already.  I think simply

20   kicking back the trial date at this point is just inviting

21   another flurry of paper before we get to a potential trial.

22             And for the sake of efficiency and for the sake of

23   wrapping everything neatly with a bow, I think it would be

24   easier for the parties and easier for the Court if the Court,

25   even if it decides there is no standing, could say, but if

1  there were, this is how I would have come down on the merits.

2  That way, we can avoid having to go up and come back down and

3  then go back up again.

4       Like I said, this might be different, had the

5  decision come down a couple of months ago.  But where we are

6  now, only four weeks out from trial, I don't see the benefit in

7  efficiency to pushing everything back simply for the sake of

8  briefing that is going to be occurring anyway.

9       THE COURT:  So, it would --

10      MS. FUDIM:  May I --

11      THE COURT:  Go ahead, Ms. Fudim.

12      MS. FUDIM:  Sorry.

13      THE COURT:  Go ahead.

14      MS. FUDIM:  I would just respond, Your Honor, that

15  standing is not a question of efficiency.  Standing is a

16  question of jurisdiction.  And so to put standing after a trial

17  and have it briefed after the merits so that the Court can say,

18  while there isn't standing, but had there been standing, I

19  would have found X, Y, (audio interference) a request for an

20  advisory opinion, which the courts are not in the business of

21  giving.  There is case and controversies requirement to access

22  our legal system.  And the Court, obviously, is in the business

23  of making merits decisions, but the Court is also in the

24  business as acting as a gatekeeper.

25          And so I think whatever efficiencies there are -- and

1   I would submit that we're not asking for a great inefficiency

2   here.  You know, we've proposed a fairly quick schedule with

3   respect to briefing and would be ready to go to trial as soon

4   as the Court issued an order.

5           But putting efficiencies aside, I would just

6   respectfully note that standing goes to jurisdiction.  So it's

7   really not something that supposed to be balanced with respect

8   to efficiency.  It's a key to unlock the door, respectfully,

9   Your Honor.

10          THE COURT:  Let me let me answer this, Ms. Fudim:

11  You know, typically, what'll happen when we have the standalone

12  preliminary injunction is the U.S. will challenge standing and

13  then move on to the merits, and then a court will address, you

14  know, the standing, and then if they find that they don't have

15  standing, they, as you said, they'll typically reach the

16  merits, but that's done at the preliminary injunction stage --

17  kind of merits withstanding.  Since the preliminary injunction

18  has been carried with and is going to be decided at the trial

19  on the merits, why wouldn't we do the exact same thing, since

20  it's basically the preliminary injunction being carried with,

21  and then that's the way that you normally present those

22  arguments?

23          MS. FUDIM:  Yeah, I mean, I still think that, given

24  the language that was in the SCOTUS decision from a week or

25  week and a half ago now, reminding courts across the country

1   that standing should be decided at the outset, that

2   notwithstanding the Court's decision to adjudicate together

3   under Rule 65, that now that we have had a decision from the

4   Supreme Court directly on point to the issues that are going to

5   be before the Court -- particularly because, you know, with

6   respect to the PI we did file -- our opposition intervenor

7   defendants filed papers as well, but that was before the

8   Supreme Court issued its decision.  And I understand, you know,

9   at some level, we could brief standing on the merits in

10  post-trial briefing, but with respect to the PI at least, we

11  did not have an opportunity to bring in briefing on the Supreme

12  Court's decision.  And it's our position that we should

13  adjudicate standing first, and then if we're able to go

14  forward, then go forward after there.

15          THE COURT:  Right.  So looking at that, it's Justice

16  Gorsuch, and the -- it may not surprise anyone to find that I

17  actually read that decision for some unknown reason.  So I see

18  Judge Gorsuch's concurrence where he says, "A plaintiff must

19  demonstrate redressable injury in support of standing from the

20  outset of its suit."  So is that saying that it has to be in

21  the -- that there has to be evidence attached to the complaint,

22  proving up standing in the complaint, or do we go from the

23  allegations that are in the complaint?

24          MS. FUDIM:  Well, I think it becomes a question of

25  whether or not there's a challenge at the facial or factual

1 | level.  I mean, I think, yes, there have to be allegations as
2 | to standing in the complaint and then the defendant would have
3 | the opportunity to either facially or factually challenge the
4 | allegations of standing, if I'm understanding right, the
5 | Court's --
6 |         THE COURT:  What I'm trying to focus in on --
7 | actually you actually put it in your motion as well, it says,
8 | "from the outset of its suit", so the way that I read that --
9 | and I'd be interested to know your response -- which is, from
10 | the outset of your suit, it's just like any case, you have to
11 | satisfy the elements.  You'd have to make allegations that
12 | would make in this -- and what Justice Gorsuch is talking
13 | about -- a redressable injury.  Once those allegations are made
14 | there, isn't it then, I guess, at the motion for summary
15 | judgment stage or at the trial on the merits that you would
16 | say, well, you haven't produced evidence of that?
17 |         MS. FUDIM:  Well, no, I think that there would still
18 | be -- and I think it's, you know, there's two points there.
19 | One is that standing is addressed at the outset of the suit in
20 | terms of there must be standing at the time the suit is filed.
21 | You can't subsequently obtain standing if, at the time the
22 | complaint is issued, there is no standing.
23 |     And secondly, I could say that --
24 |         THE COURT:  How would you determine that, though, if
25 | it's -- if you're not required to attach evidence to the

1  complaint?

2        MS. FUDIM:  Well, I think because the Court has

3  allowed jurisdictional discovery into standing because the

4  defendants advised the Court that we intended to make a

5  factual --

6        THE COURT:  Right.

7        MS. FUDIM:  -- challenge to standing, the Court

8  allowed jurisdiction discovery.  And so now, the way that we've

9  seen this play out in cases is they allege certain facts that

10  would go to standing, we take issue with those facts and say

11  that we would seek jurisdictional discovery to make it a

12  factual challenge as to jurisdiction, and then have an

13  opportunity to move under Rule 12 with respect to standing at

14  that juncture.

15        THE COURT:  Okay.  Are you looking at, I guess,

16  U.S. v. Texas as -- let me ask Mr. Olson this question:

17  Looking at the conclusion Justice Kavanaugh wrote -- he said,

18  "In some, the states have brought an extraordinarily unusual

19  lawsuit.  They want a federal court to order the executive

20  branch to alter its arrest policy so as to make more arrests.

21  Federal courts have traditionally not entertained that kind of

22  lawsuit."  And then, earlier, it said, "A challenge to an

23  executive branch policy that involves both the executive

24  branch's arrest or prosecution priorities, and the executives

25  branch's provision of legal benefits or legal status could lead

1  to a different standing analysis."

2          So my question is to you, are you -- is this suit

3  about the executive branch's arrest or prosecution priorities

4  or is it about the provision of legal benefits or legal status?

5          MR. OLSON:  No, Your Honor.  This case is not about

6  arrest or prosecution or detention priorities.  This case is

7  about the status of persons who are applying to come into the

8  country.  And I think that that hit the nail on the head, that

9  this is not a case where the states are --

10          THE COURT:  But what -- but before you move on, what

11  are the benefit -- what are the legal benefits or legal status

12  that you say are the underlying basis to this claim?

13          MR. OLSON:  Well, the distinction -- that's the

14  defense has drawn between legal presence and legal status.

15  Their illegal presence entitles them to things like the

16  driver's licenses, to things like access to emergency Medicare,

17  but the -- as far as the benefits go, the benefit to the

18  applicant is the mere presence in the United States.  We're not

19  seeking an order requiring detention.  We're not seeking to

20  alter prosecution priorities.  The state is asking for an

21  interpretation of the law that would prohibit people from

22  entering into the United States to receive those benefits in

23  the first instance.  It is not asking the federal government to

24  decide which persons need to go into detention and decide which

25  persons need to get picked up at the jailhouse door to be taken

1   to the other jailhouse door.  It is simply asking for

2   enforcement of the law as it regards persons entering the

3   country in the first instance.

4          THE COURT:  Okay.  Ms. Fudim, can you, I guess,

5   respond to that?  It's always interesting when I ask a question

6   to watch all of you start communicating with each other

7   electronically.  So I always know that I'm stirring the pot, so

8   anyway -- so, that question -- so the U.S. v. Texas, you know,

9   saying that this was an extraordinarily unusual lawsuit, that

10  basically said that the states were trying to make the federal

11  government arrest more people.

12         And I did see the sentence, and I'll read it again.

13  It says, "A challenge to an executive branch policy that

14  involves both the executive branch's arrest or prosecution

15  priorities and the executive branch's provision of legal

16  benefits or legal status could lead to a different standing

17  analysis."  And so do you agree that this is a case that is

18  about more than just the executive branch's arrest for

19  prosecution priorities?

20         MS. FUDIM:  Well, I think that's really the merits

21  question that we'd get to with respect to additional briefing

22  on standing, so I'm hesitant to commit the federal government

23  to what its final position is --

24         THE COURT:  Right.

25         MS. FUDIM:  -- before we brief it.  But I certainly

1  think that there's arguments that can be made that there is a

2  nexus between this case and the Texas case that perhaps would

3  be -- that this would be more similar to the Texas case than,

4  for example, like the DACA case where there is --

5         THE COURT:  Right.

6         MS. FUDIM:  -- a very (audio interference) benefit

7  that's been given.  I don't know that simply saying allowing

8  someone to be paroled into the country, which is a temporary

9  grant while -- is the same thing as conferring legal benefits.

10  I mean, I think they (audio interference) --

11        THE COURT:  Well, is that legal status, because

12  it's -- the -- what Justice Kavanaugh said, "The executive

13  branch's provision of legal benefits or legal status could lead

14  to a different standing analysis."  Is that parole release a

15  legal status?

16        MS. FUDIM:  You know, I'm hesitant to firmly commit

17  because I'm not super familiar with all the intricacies that

18  the agency has placed in terms of word choice.  I mean, I would

19  say no, it's a temporary grant to be permitted into the

20  country.  And you know, unlike DACA, which is clearly a

21  benefits program, or I shouldn't say "clearly a benefits

22  program", but certainly is more dissimilar from Texas than this

23  case, I would feel more comfortable saying.  I think that there

24  are arguments to be made with respect to, you know, these

25  programs and why they're being used has to do with arrest

1    priorities at the border.  If this -- if these programs weren't

2    in effect, there would be more individuals illegally crossing

3    the border and there would have to be more discretionary

4    determinations as to who to arrest, who to detain, what to do

5    with these people.

6          I think one of the other big conclusions that we can

7    pull from the Texas case does have to do with the special

8    solicitude piece and its applicability in cases like this one.

9          You know, I guess the last thing I would say, which

10   is perhaps -- I'm not sure how to characterize it, but perhaps

11   a bit of disagreement with the Court's opinion, at least, with

12   the concurrence is that this is such an unusual case.  I mean,

13   the fact of the matter is it's -- it -- it's not as -- the

14   Texas case is perhaps not as unusual as the Court believed.  I

15   mean, there are a number of cases pending where states are

16   trying to challenge, you know, wholesale immigration policies

17   based on indirect financial effects from having more people in

18   their states.  I mean, we've got a number of them.  So --

19          THE COURT:  Right.

20          MS. FUDIM:  -- I think there's a lot of --

21          THE COURT:  No, I can see that the indirect or direct

22   costs are pretty much the gateway that most of the states have

23   been using to be able to sue, under the Administrative

24   Procedure Act, the federal government in these immigration

25   cases.

1          It's just that the way that I was, I guess, initially

2  reading this U.S. v. Texas case -- or at least I'd be

3  interested to know your thoughts as to this one is different

4  because it deals specifically with arrest and detention, which

5  is a prosecution arm of the executive branch, as opposed to the

6  benefits and status awarding side, which they -- it seemed

7  like -- it looked like they were cracking the door open that

8  maybe these -- the traditional standing analysis still applies.

9  But it sounds like you're -- y'all are still navigating that.

10          Are you involved in the Florida case?

11          MS. FUDIM:  I tried the Florida case and --

12          THE COURT:  Oh, okay.  Well, then you would -- so I

13  know that --

14          MS. FUDIM:  And (audio interference) yes, Your Honor.

15          THE COURT:  Yeah, that's like asking me if I'm

16  familiar with U.S. v. Texas.

17          So the case that is on appeal right now, I think it

18  has been fully briefed.  Is the same standing issue being

19  presented to the Eleventh Circuit?

20          MS. FUDIM:  Yes, Your Honor.  I mean, I think that

21  there, you know, might be nuances between this case and that

22  case, but yes, we did raise, the United States, the Texas case

23  in our reply brief.  It was not -- it hadn't yet been

24  adjudicated at the time that we filed our moving brief, but it

25  was addressed in our reply brief, which was filed on Monday.

```
 1              THE COURT:  Right.

 2              MS. FUDIM:  And Your Honor, just -- I think a lot of

 3    these issues that you're noting are -- you know, we are still

 4    navigating them.  It's a relatively new decision.  We are still

 5    thinking about them.  And I think that they're important issues

 6    that perhaps the Supreme Court will continue to carve.

 7              I mean, I would note that the language and the

 8    concurrence -- or excuse me, in the majority opinion, did say

 9    "arguably might present a different situation".  And I -- you

10    know, "arguably might" is, you know, maybe it does, maybe it

11    doesn't.  I think these are issues that we all have to

12    seriously think about, and I think that that particularly

13    underscores why the parties should have the opportunity to

14    address standing in a very direct way with, you know,

15    sufficient pages to do so and to really focus on it from the

16    outset, and then move forward from there.

17              THE COURT:  Has oral argument been set in the

18    Eleventh Circuit case?

19              MS. FUDIM:  Not yet, Your Honor.

20              THE COURT:  Okay.  Ms. Sung, you haven't weighed in

21    on any of this.  I wanted to give you the opportunity to.

22              MS. SUNG:  Yeah, I mean, I would echo here what

23    Ms. Fudim is saying about -- this line of questioning, I think,

24    indicates that the briefing to the Court would be valuable

25    where the parties get to navigate the implications of the
```

1   <u>United States v. Texas</u> decision.

2         In addition to that, Mr. Olson mentioned that what's

3   the issue here is a program that allows people to come to the

4   United States.  He's admitted that the beneficiaries of the of

5   the CHNV parole pathways are legal -- that -- and so, if the

6   program is enjoined, there's no more redressability here.  And

7   that's -- like, that goes to what the Supreme Court was

8   grappling with in <u>United States v. Texas</u>.  The Supreme Court

9   said that there must be injury, in fact, at the outset, and

10  it's not -- there must be a redressable injury, in fact, and

11  it's not a hoop-jumping exercise to determine standing.

12        THE COURT:  Uh-huh.

13        MS. SUNG:  And here -- so again, the CHNV parole

14  pathways are providing a legal pathway here for people to come

15  to the country.  If the program is enjoined, all of the harms

16  that Texas is complaining about and all the evidence that

17  they've provided of costs related to undocumented individuals,

18  those harms and costs would not go away with the injunction of

19  this program.

20        And so the -- it seems that there's a redressability

21  problem here for Texas.  And that, among all the other issues

22  that we've been discussing here, are -- we think weigh in favor

23  of the Court allowing us to provide extra briefing on this and

24  having the Court decide this important threshold issue of

25  standing first before we turn to the merits of what I think,

 1  you know, the parties briefing and evidence and declarations,

 2  all indicate it's a very complex case.

 3          THE COURT:  Mr. Olson?

 4          MR. OLSON:  Yes, Your Honor.  That, in fact, is the

 5  problem with this case, is these people are not here legally.

 6  Calling something legal does not necessarily make it so and

 7  that is why the defendants draw the distinction between legal

 8  status and legal presence.

 9          Now, I'll be honest, like Ms. Fudim, I frequently get

10  which particular one indicates, for instance, lawful permanent

11  resident status as opposed to a person who has been granted

12  parole or a person who has been waived into the country -- W-A-

13  I-V-E-D into the country on asylum request.  But that's why the

14  defendants have to draw that distinction.

15          And if that is going to be the distinction that the

16  parties want to draw at the standing stage, then they are

17  telling you that standing and the merits are so interrelated

18  that we cannot decide the one without deciding the other.  In

19  that case, there's no reason not to proceed directed to the

20  trial on the merits.

21          THE COURT:  Okay.  All right.  On the discovery

22  issue, one of the -- first off, the intervenors bring an

23  important perspective to the Court.  I've let them in previous

24  cases and I -- they deal with this, and they bring a

25  perspective that nobody else does to the case.  And so that's

1  why I was more than happy to let them participate so that they

2  can broaden what I will -- you know, will soak in, as I

3  struggle with the issues in this case.

4        The discovery that we are talking about though from

5  the intervenor defendants isn't really related to that issue.

6  That's more of the procedural issue, which is the standing

7  issue, which obviously the federal defendants and the

8  intervenor defendants can bring to my attention.

9        And one of the things that I noted in letting the

10 intervenor defendants in was is that I didn't want them to --

11 for anything associated with that to hold up the case.  And so

12 if we -- if I'd -- if we allow the intervenor defendants now to

13 serve this discovery, which is identical to what the federal

14 defendants have served, and which -- with which the federal

15 defendants should not have a problem, it is going to

16 necessitate some delay in the case.

17       So I will say this though, having listened to the

18 oral argument -- I think it was in the U.S. v. Texas case and I

19 don't know if it was from that or from something that I had

20 read, at least one or two of the justices have been talking

21 about this -- I'm calling it net costs as opposed to gross

22 costs.  So it's an issue.  So I will tell Texas, you're on

23 notice.  I mean, you know what's coming with the standing issue

24 on costs.

25       And I -- I've never had to make that decision before.

1    I've never had to decide gross cost versus net cost or -- and

2    so you can decide whether or not it's something that you want

3    to supplement with so that you're able to defend against it or,

4    if you're comfortable enough that your understanding of cost is

5    what it is, I'm just telling you you're on notice.

6          And so I'm -- I will deny the intervenor defendants'

7    motion to participate in the discovery.  But I will make sure

8    that all of the parties understand that, to the extent that

9    that is a necessary ingredient to establish standing, it will

10   impact my analysis.

11         With respect to scheduling, you know, this case was

12   already supposed to be tried.  We were supposed to have already

13   tried the case in June.  We rescheduled it a couple of months,

14   mostly to accommodate the attorneys in the case.

15         And you know, dealing with standing and the merits at

16   this point, hopefully, like I said -- I think, you know, the

17   Eleventh Circuit, hopefully, will be coming out with its

18   decision between now and the resolution of the case.  It kind

19   of goes back to what I was talking to you about, Ms. Fudim,

20   which is, is that if we normally address deficiencies in

21   standing along with the merits in a preliminary injunction

22   motion, that preliminary injunction motion has been carried to

23   the final trial on the merits, so that same motion is now being

24   decided kind of in total with one opinion.  I can tell you that

25   if I don't find standing, I'm very unlikely to want to address

1  anything past standing.

2         And so I think that the better course at this

3  point -- we've already been continued once.  It was a fairly

4  substantial continuance from June to August at the joint

5  request of the parties, but I don't think I'm inclined to bump

6  that back anymore.

7         I am, obviously, going to be looking carefully and

8  reading closely the standing arguments that are made in general

9  in light of what just happened with U.S. v. Texas, and with the

10  costs and also, in particular, with what has been brought to my

11  attention.

12         And so with the wrapping the trial up, what I don't

13  want to do is, you know, write on standing, then write on the

14  merits, and then -- you know, in a preliminary injunction, and

15  then do a final trial on the merits, if -- assuming it goes

16  that way.  Then you're writing three opinions, when you could

17  get it done once and get finality to this at one time.  So I

18  think, for efficiency's sake, writing once on these cases is

19  the most effective way to do it, which is normally why -- I

20  mean, I consolidated the preliminary injunction with the trial

21  on the merits even though none of the parties wanted to.  So I

22  think it just makes sense just to get to finality for that.

23         So is there any, I guess, question about what the

24  status is?  Right now, we're just keeping the same trial

25  status.  Texas is on notice about the net costs issue,

1  standing -- well, certainly, you can brief -- anybody can file

2  whatever supplemental briefing you want to between now and

3  trial to educate me on the U.S. v. Texas and the net costs

4  issue, or you can wait and do it afterwards, as well.  So I'm

5  open to any of that.

6           So, Mr. Olson, did you have anything?

7           MR. OLSON:  Nothing from the states, Your Honor.

8           THE COURT:  All right.  Ms. Fudim?

9           MS. FUDIM:  Nothing further from defendants, Your

10  Honor.

11          THE COURT:  Alright.  Ms. Sung?

12          MS. SUNG:  Actually, Your Honor, with your

13  indulgence, we just had -- because we are all here on the Zoom

14  together at the same time --

15          THE COURT:  Okay.

16          MS. SUNG:  We had two housekeeping matters that we've

17  been waiting to bring to your attention just to inquire.  The

18  first is simply that the scheduling order -- the operative

19  scheduling order, in this case, incorporates deadlines for

20  motions in limine.  But the Court's courtroom procedures that

21  are online instruct that parties should not bring motions in

22  limine for bench trials.  I believe it's court procedure

23  Number 23.

24          THE COURT:  Right.

25          MS. SUNG:  And so we wanted to clarify with the

1  Court --

2           THE COURT: Right.

3           MS. SUNG:  -- which controls here.

4           THE COURT:  Yeah, most -- so first off, the specific

5  order in this case to the extent it is -- it diverges from

6  anything in my local procedures, the specific order would

7  govern.  Motions in limine in a bench trial don't really make a

8  lot of sense anyway.  The whole point of a motion in limine is

9  so that the jury doesn't hear about it.  Well, you know, I'm

10 kind of the jury, so I'll hear about it in deciding the motion

11 in limine.  So I think that that is more along the lines of

12 trying to keep evidence out, and so -- objecting motions to

13 exclude evidence and things like that.  So --

14          MS. SUNG:  So just to clarify, Your Honor would

15 entertain motions to exclude evidence according to the deadline

16 set in the Court's order?

17          THE COURT:  I -- yes, I can do that.

18          MS. SUNG:  Okay.

19          THE COURT:  And let me -- wait -- just generally,

20 practically speaking, when you do a bench trial, you can either

21 ask to exclude it ahead of time or you can wait for the other

22 party to offer it.  I think what will typically happen is, day

23 before the bench trial, we'll all meet.  We will try to premark

24 and preadmit everything that we can.  You don't have to file a

25 motion to exclude.  You can just object and say, we don't agree

1  to that, because if it's objected to, I'm not gonna admit it.

2  And then the other party can offer it up during trial, and then

3  you can hear your objections which is tantamount to a motion to

4  exclude.

5        MS. SUNG:  Okay.  Thank you, Your Honor.  Understood.

6  The second issue that we just wanted to inquire about is, we

7  were wondering if the Court would allow remote testimony by

8  witnesses?  This is because some of our intervenor defendant

9  clients would like to testify and tell their story to the

10  Court, but they may not be able to travel to Victoria on the

11  trial dates due to work schedules and other things like that.

12  And so we understand that it is an in-person trial, and if the

13  Court does not want to accommodate that, that's fine.  But we

14  just wanted to inquire about the possibility of the Court

15  allowing some intervenor defendants possibly to testify by Zoom

16  or some other remote means.

17        THE COURT:  Are these parties or are these third

18  parties?

19        MS. SUNG:  Yes, parties, intervenor defendants.

20        THE COURT:  Well, I mean, I'll let you confer with

21  the United States and the State of Texas, but it's typical --

22  first off, I don't like, really, remote appearing at all.  I

23  think it's important for me as I size up credibility.  It's

24  just really hard to do that via Zoom.  There's something about

25  being in court in person, being able to see the body language,

1  and all of that as you're assessing credibility.  And I --

2  typically, when it comes to parties, I would be very reluctant

3  to allow them to participate remotely, as opposed to third-

4  party witnesses who have a really good excuse.  So --

5  MS. SUNG:  And -- but -- so certainly we can raise

6  this with the other parties.  But -- well, I suppose we are

7  also considering third-party witnesses, other people who are

8  seeking to sponsor beneficiaries through the CHNV parole

9  pathways.  And so would the Court potentially be more amenable

10  to remote testimony from a third-party witness?

11  THE COURT:  Well, I -- I'll -- so this is kind of

12  putting me on the spot.  Why don't you confer and let me know

13  about that?  That's not really a discovery dispute, that's more

14  of trial practicality issue.

15  I will tell you that my strong preference -- I've

16  never had -- I've never permitted someone to testify remotely.

17  I've played depos and things like that, which kind of are the

18  same thing.  We've played video depos and had depos read, but

19  when it comes to live testimony, I've always had them in court.

20  I will let you, obviously, confer.  I -- that doesn't

21  mean that I will defer to the parties, but I -- I'd like to

22  have -- give the parties the ability to weigh in.  So that's

23  a -- that is a way of saying, I can't really commit at this

24  point.  So --

25  MS. SUNG:  Okay.  Thank you, Your Honor.  I -- we

1   appreciate it.

2           THE COURT:  You bet.  Anything else?

3           MR. OLSON:  No, Your Honor.

4           THE COURT:  All right.  Thank you very much.

5   Appreciate it.  Everyone have a good weekend.

6           MS. SUNG:  Thank you.

7           MR. OLSON:  Thank you, sir.

8       (Proceedings concluded at 2:47 p.m.)

9                           * * * * *

10

11

12

13

14               **C E R T I F I C A T I O N**

15

16       I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428    DATE: July 14, 2023

25   ACCESS TRANSCRIPTS, LLC