Case No. 6:23-cv-00007

In The

# United States District Court for the Southern District of Texas

————————

State of Texas, et al.,

v.

Department of Homeland Security, Alejandro N. Mayorkas, Secretary of Homeland Security, in his official capacity, et al.,

————————

**BRIEF OF *AMICI CURIAE* THE CATO INSTITUTE, MEDGLOBAL, AND PROFESSOR ILYA SOMIN IN SUPPORT OF DEFENDANTS**

————————

Ilya Somin
    *Counsel of Record*
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
703-993-8069
isomin@gmu.edu
*Counsel for amici curiae*

Dated:  July 31, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................................. 1

SUMMARY OF ARGUMENT ..................................................................... 3

ARGUMENT ........................................................................................... 5

    I.    THE CNVH PAROLE POLICY IS BACKED BY "URGENT HUMANITARIAN REASONS" ................................................ 5

    II.   THE CNVH PAROLE POLICY PRODUCES THE "SIGNIFICANT PUBLIC BENEFIT" OF REDUCING PRESSURE ON THE SOUTHERN BORDER ................................................................. 9

    III.  THE CNVH PAROLE PROGRAM DOES NOT VIOLATE THE REQUIREMENT THAT PAROLE BE GRANTED ON A "CASE-BY-CASE BASIS". ...................................................................... 11

        A.    Plaintiffs' theory is at odds with statutory text and Supreme Court precedent. ........................................................ 12

        B.    Plaintiffs' theory violates the canon against absurdity ............. 15

        C.    Plaintiffs' theory violates the meaningful-variation canon. ..... 16

        D.    Plaintiffs' narrow interpretation of "case-by-case" does not invalidate the "urgent humanitarian reasons" rationale for the CNVH parole program. ........................................... 19

    IV.  IF PLAINTIFFS PREVAIL IN THIS CASE, IT WILL IMPERIL THE UNITING FOR UKRAINE PROGRAM. ................................. 20

CONCLUSION ....................................................................................... 22

i

# TABLE OF AUTHORITIES

## Cases

*Biden v. Texas*, 142 S. Ct. 2528 (2022) ............................................................ 12, 14

*Green v. Bock Laundry Co.*, 490 U.S. 504 (1989)....................................................15

*Southwest Airlines Co. v. Saxon*, 142 S.Ct. 1783 (2022)........................................16

*Vazquez Romero v. Garland*, 999 F.3d 656 (9th Cir. 2021)....................................18

## Statutes

8 U.S.C. § 1103(a)(1)..................................................................................................4

8 U.S.C. § 1182(d)(5)(A) ................................................................................. passim

8 U.S.C. § 1182(d)(5)(B) ..........................................................................................16

## Other Authorities

ADAM COX & CRISTINA RODRIGUEZ, THE PRESIDENT AND IMMIGRATION LAW (2020) ....................................................................................................................13

Alex Nowrasteh, *Biden's Border Immigration Policy Is Still Reducing Border Crossings and Illegal Immigration,* CATO INST. (Mar. 29, 2023) .......................10

ANTONIN SCALIA & BRYAN GARNER, READING LAW (2012)............................ 15, 16

Bernd Debusmann, Jr., *US Immigration: "They'd Rather Die than Return to Nicaragua"*, BBC (Dec. 12, 2022) .........................................................................8

*Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023) ..........................................................................3

CARL J. BON TEMPO, AMERICANS AT THE GATE: THE UNITED STATES AND REFUGEES DURING THE COLD WAR (2008)............................................................13

Carl J. Bon Tempo, *The Ukrainian Parole Policy in Historical Perspective*, NISKANEN CTR. (Sept. 22, 2022) ..........................................................................13

Daniel Allott & Jordan Allott, *Inside the Great Cuban Exodus*, WASH. EXAMINER (June 23, 2023) ....................................................................................8

Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, MANHATTAN INST. (May 25, 2023) ................................................................ 10, 21

David Bier,*126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, CATO INST. (July 17, 2023) ....................................13

EXPERT DECLARATION OF YAEL SCHACHER................................................................13

Ilya Somin, *Biden Expands Uniting for Ukraine Private Refugee Sponsorship Model to Include up to 30,000 Migrants Per Month from Cuba, Nicaragua, Venezuela, and Haiti,* REASON (Jan. 5, 2023)....................................... 3, 20

Ilya Somin, *Twenty Red States File Badly Flawed Lawsuit Seeking to Terminate Private Sponsorship Program for People Fleeing Socialism and Oppression in Four Latin American Nations,* REASON (Jan. 25, 2023. 4:15 PM)..................................................................................................................7

Ilya Somin, *We Sponsored Refugees Under a New Biden Program. The Results Were Astonishing*, WASH. POST (Jan. 3, 2023) .................................... 2, 21

Jorge Duany, *Cuban Migration: A Postrevolution Exodus Ebbs and Flows,* MIGRATION POL'Y INST. (July 6, 2017) ...................................................................7

Letter from Gov. Greg Abbot to President Joseph R. Biden (Dec. 20, 2022)...........9

Press Release, *Governor DeSantis Lambasts Biden Administration's Engagement with Maduro Regime and Its Destructive Domestic Energy Policies,* RON DESANTIS, 46TH GOVERNOR OF FLORIDA (Mar. 11, 2022) .............6

*Prison or Exile Cuba's Systematic Repression of July 2021 Demonstrators*, HUMAN RIGHTS WATCH (July 11, 2022)...................................................................7

RICHARD L. RHODES, THE MAKING OF THE ATOMIC BOMB (1986).........................15

Richard Luscombe, *DeSantis Signs Bill For Florida Students to Learn About 'Victims of Communism,* THE GUARDIAN (May 10, 2022) ....................................7

Ron DeSantis (@GovRonDeSantis), TWITTER (Aug. 5, 2021, 5:07 PM)................8

Rosevale Supreme, *This is the Worst Crisis I've Seen in Haiti*, NEWSWEEK (Nov. 1, 2022, 7:00 AM) .......................................................................................9

U.S. CITIZENSHIP & IMMIGR. SERVS., PROCESSES FOR CUBANS, HAITIANS, NICARAGUANS, AND VENEZUELANS ....................................................................19

U.S. CITIZENSHIP & IMMIGR. SERVS., UNITING FOR UKRAINE.................................20

U.S. CITIZENSHIP & IMMIGR. SERVS., USCIS FORM I-134A, ONLINE REQUEST TO BE A SUPPORTER AND DECLARATION OF FINANCIAL SUPPORT.........................19

U.S. CUSTOMS & BORDER PROT., NATIONWIDE ENCOUNTERS (July 18, 2023) .......10

Vanda Felbab-Brown, *Haiti in 2023: Political Abyss and Vicious Gangs*, BROOKINGS INST. (Feb. 3, 2023) ............................................................................9

Vanessa Buschschlüter *Venezuela Crisis: 7.1m Leave Country Since 2015*, BBC (Oct. 17, 2022) ...................................................................................6

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The Cato Institute, established in 1977, is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books, studies, and the annual *Cato Supreme Court Review*, and conducts conferences and forums. This case interests Cato because the Institute has long had a focus on both immigration policy and separation of powers.

MedGlobal is a humanitarian charitable non-governmental organization that provides emergency response and health programs to build resilience among vulnerable communities around the world. Its health programs support victims of wars and disasters, refugees, internally displaced persons, and marginalized communities in disaster-affected and low-resource settings. MedGlobal has provided medical and other humanitarian assistance to migrants and refugees from the four countries covered by the parole program at issue in the present case.

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money intended to fund the brief's preparation or submission.

1

Ilya Somin is Professor of Law at the Scalia Law School, George Mason University and B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. He writes extensively on constitutional law and immigration law and policy, as well as separation of powers. His amicus briefs and other writings have been cited by the United States Supreme Court, lower federal courts, multiple state supreme courts, and the Supreme Court of Israel. He is the author of multiple books on constitutional law and migration rights, including *Free to Move: Foot Voting, Migration, and Political Freedom* (Oxford University Press, rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government is Smarter* (Stanford University Press, 2nd. ed. 2016), and *The Grasping Hand:* Kelo v. City of New London *and the Limits of Eminent Domain* (University of Chicago Press, 2015). Professor Somin has sponsored four Ukrainian parole recipients under the Uniting for Ukraine program, which is the model for the parole policy at issue in the present case. *See* Ilya Somin, *We Sponsored Refugees Under a New Biden Program. The Results Were Astonishing*, WASH. POST (Jan. 3, 2023).[2]

---

[2] Since publishing this article, which discusses his initial sponsorees, Professor Somin has secured approval to sponsor an additional Ukrainian under this program.

## SUMMARY OF ARGUMENT

In January, the Department of Homeland Security established a program under which citizens of Cuba, Nicaragua, Venezuela, and Haiti ("CNVH") are eligible for two years of humanitarian parole in the United States if they have a US citizen or permanent resident who is willing to sponsor them and commit to providing financial and other support. See *Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023).[3] The policy is based on the highly successful Uniting for Ukraine parole program, with the important difference that the number of CNVH parolees is capped at a total of 30,000 per month. *Id*.[4]

The Plaintiffs in the present case claim the CNVH program is not authorized by Congress. They could hardly be more wrong. The program is authorized by the Immigration and Naturalization Act of 1952 (as later amended), which states that "[t]he Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission

---

[3] Available at https://bit.ly/3Noi1pv.

[4] On the connections between the CVNH program and Uniting for Ukraine, see Ilya Somin, *Biden Expands Uniting for Ukraine Private Refugee Sponsorship Model to Include up to 30,000 Migrants Per Month from Cuba, Nicaragua, Venezuela, and Haiti,* REASON (Jan. 5, 2023), available at https://bit.ly/3XsVhsQ.

to the United States." 8 U.S.C. § 1182(d)(5)(A). This authority has since been transferred to the Secretary of the Department of Homeland Security (DHS). *See* 6 U.S.C. § 202(4).

With the exception of constraints not relevant to the present case, the statute unequivocally authorizes the DHS Secretary to temporarily admit *any* alien into the United States, so long as it is for either "urgent humanitarian reasons *or* significant public benefit." *Id.* (emphasis added). One of these two reasons is sufficient. In this case, we have both – in spades.

In Part I of this brief, *amici* demonstrate that migrants from the CNVH countries indeed have "urgent humanitarian reasons" to seek refuge in the United States. They are fleeing a combination of rampant violence, brutal oppression by authoritarian socialist regimes, and severe economic crises. So great is the humanitarian need here, that even the leaders of some of the states that are Plaintiffs in the present case, have recognized and denounced the horrific conditions in these countries.

In Part II, we show that paroling CNVH migrants also creates a major "public benefit." That benefit is reducing pressure and disorder on America's southern border. Here, too, some of the Plaintiff states have themselves recognized the importance of this benefit, and indeed have loudly called for measures to achieve it. The CNVH program has already massively reduced cross-border illegal migration

4

by citizens of the four nations it covers.

Part III explains why the parole program is consistent with the statutory requirement that parole be conducted on a "case by case basis." 8 U.S.C. § 1182(d)(5)(A). The Plaintiffs' position on this point is inconsistent with statutory text, Supreme Court precedent, and basic principles of statutory interpretation. It would also lead to absurd results.

Finally, Part IV shows that, while the Plaintiffs have limited their lawsuit to challenging the CNVH program, if the court accepts their position it would also imperil Uniting for Ukraine. The latter relies on the same legal authority as the former.

In sum, this lawsuit deserves to fail for reasons well-articulated by leaders of some of the very same states that filed it.

## ARGUMENT

### I.   THE CNVH PAROLE POLICY IS BACKED BY "URGENT HUMANITARIAN REASONS"

The "urgent humanitarian reasons" for granting parole to migrants from the CNVH countries are undeniable. 8 U.S.C. § 1182(d)(5)(A). These people are threatened by a combination of severe repression, rampant violence, and economic crisis. Indeed, leaders of the Plaintiff states are among those who have highlighted the dire straits these migrants seek to escape.

Three of the four nations included in the program – Cuba, Nicaragua, and Venezuela - are ruled by oppressive socialist dictators, whose policies have created horrific conditions. Few have put it better than Florida Governor Ron DeSantis, whose state is one of the Plaintiffs in the present case. As he said last year, Venezuela's socialist president Nicolas Maduro is a "murderous tyrant" who "is responsible for countless atrocities and has driven Venezuela into the ground." Press Release, *Governor DeSantis Lambasts Biden Administration's Engagement with Maduro Regime and Its Destructive Domestic Energy Policies,* RON DESANTIS, 46TH GOVERNOR OF FLORIDA (Mar. 11, 2022).[5]

Governor DeSantis went on to say that "people [in Venezuela] are really hurting," due to the government's policies. *Id.* It is indeed true that Venezuelan socialism has resulted in widespread oppression, poverty, and hyperinflation, leading to the biggest refugee crisis in the history of the Western hemisphere, with some 7 million people fleeing. Vanessa Buschschlüter, *Venezuela Crisis: 7.1m Leave Country Since 2015*, BBC (Oct. 17, 2022).[6]

[.] Texas Governor Greg Abbott, whose state is spearheading the present lawsuit, has also noted the severe economic crisis in Venezuela, which he (rightly) blames on socialism. *See* Ilya Somin, *Twenty Red States File Badly Flawed Lawsuit*

---

[5] Available at https://bit.ly/3JygbRF.
[6] Available at https://bit.ly/3Np3MAF.

*Seeking to Terminate Private Sponsorship Program for People Fleeing Socialism and Oppression in Four Latin American Nations,* REASON (Jan. 25, 2023. 4:15 PM).[7]

In 2021, Governor DeSantis signed into law a statute requiring Florida public schools to provide 45 minutes of instruction each year on the injustices of Communist regimes, including that of Cuba, which the Governor correctly described as responsible for "poverty, starvation, migration, systemic lethal violence, and suppression of speech." Richard Luscombe, *DeSantis Signs Bill For Florida Students to Learn About 'Victims of Communism,* THE GUARDIAN (May 10, 2022).[8] Cuba inflicts severe poverty and oppression on its people, including recent brutal suppression of protests in July 2021. *Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators*, HUMAN RIGHTS WATCH (July 11, 2022).[9] It is no accident that, before the recent Venezuela crisis, the biggest refugee flow in the history of the Western Hemisphere was that of people fleeing Cuban communism beginning with Fidel Castro's seizure of power in 1959. Jorge Duany, *Cuban Migration: A Postrevolution Exodus Ebbs and Flows,* MIGRATION POL'Y INST. (July 6, 2017).[10] The communist regime remains brutally oppressive, and many of its victims continue to seek freedom in the United States. *Cf.* Daniel Allott & Jordan

---

[7] Available at https://bit.ly/44fprlK.
[8] Available at https://bit.ly/42ZSKI1.
[9] Available at https://bit.ly/3pr2Qnt.
[10] Available at https://bit.ly/3CP1s1c.

Allott, *Inside the Great Cuban Exodus*, WASH. EXAMINER (June 23, 2023).[11] (describing recent Cuban exodus ad heightened repression causing it in detail).

Nicaragua under the increasingly authoritarian socialist rule of President Daniel Ortega, is a similar story. Ortega's repression has deepened already severe poverty and created what even the left-leaning BBC describes as an "atmosphere of terror." Bernd Debusmann, Jr., *US Immigration: "They'd Rather Die than Return to Nicaragua"*, BBC (Dec. 12, 2022).[12] That is why many Nicaraguans have sought refuge in the United States. As one Nicaraguan human rights activist puts it, conditions are so bad that "[t]hey'd rather die than return to Nicaragua." *Id*. Governor DeSantis has recognized the evils of the Nicaraguan regime as well, pointing out that "American dissidents [who have fled] from Marxist regimes in Venezuela, Cuba and Nicaragua understand the evils of communism and the gift of freedom." Ron DeSantis (@GovRonDeSantis), TWITTER (Aug. 5, 2021, 5:07 PM).[13]

Haiti, the one nation with a non-socialist government included in the program, has long been one of the poorest and most dysfunctional states in the world. Over the last year, conditions have gotten even worse, with intensifying violence and shortages of basic necessities. *See, e.g.*, Rosevale Supreme, *This is the Worst Crisis*

---

[11] Available at https://bit.ly/3pZsUGN.

[12] Available at https://bbc.in/3NtNjLy.

[13] Available at https://bit.ly/3JBtKjl.

*I've Seen in Haiti*, NEWSWEEK (Nov. 1, 2022, 7:00 AM) (documenting widespread violence and suffering)[14]; Vanda Felbab-Brown*, Haiti in 2023: Political Abyss and Vicious Gangs*, BROOKINGS INST. (Feb. 3, 2023) (same).[15]  It is impossible to deny that Haitians, too, have "urgent humanitarian reasons" to seek refuge in the United States.

## II.     THE CNVH PAROLE POLICY PRODUCES THE "SIGNIFICANT PUBLIC BENEFIT" OF REDUCING PRESSURE ON THE SOUTHERN BORDER.

In addition to humanitarian reasons, the INA also allows the attorney general to grant parole when there is a "significant public benefit" to doing so. 8 U.S.C. § 1182(d)(5)(A). In this case, the significant public benefit is alleviating what the Plaintiff states themselves claim is a massive crisis at the border. On December 20, 2022, Texas Gov. Greg Abbott sent a public letter to President Biden urging him to immediately address what he called a "terrible crisis for border communities" caused by many thousands of migrants illegally crossing the border. Letter from Gov. Greg Abbot to President Joseph R. Biden (Dec. 20, 2022).[16]

The CNVH parole policy does exactly that. Many of the migrants seeking entry at the border come from the four nations covered by program. Parole enables them to enter with advance authorization by ship or plane, and thereby bypass the

---

[14] Available at https://bit.ly/3pgZvHI.
[15] Available at https://bit.ly/3PxtUfA.
[16] Available at https://bit.ly/44kLZBo.

border entirely, thus relieving pressure at the border and alleviating the "crisis" that Governor Abbot complained of. A recent report by the conservative Manhattan Institute finds that "[t]he CHNV parole program…. has reduced combined illegal immigration by more than 98,000 immigrants per month." Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, MANHATTAN INST. (May 25, 2023).[17]

The Federal Customs and Border Protection agency reports that between the announcement of the parole program on January 5 and March 31, average daily encounters outside ports of entry with migrants from the four countries covered declined by 72%. US CUSTOMS & BORDER PROT., CBP RELEASES MARCH 2023 MONTHLY OPERATIONAL UPDATE (Apr. 17, 2023).[18] No other policy change that occurred between January 5 and March 31 can account for this decline. The number of encounters with CNVH migrants increased somewhat in April and May 2023 (about 30,000 in each month), but then fell again to 13,927 in June.[19] At

---

[17] Available at https://bit.ly/3r1XwaG.

[18] Available at https://bit.ly/3CMC5gj. *Cf.* Alex Nowrasteh, *Biden's Border Immigration Policy Is Still Reducing Border Crossings and Illegal Immigration,* CATO INST. (Mar. 29, 2023), available at https://bit.ly/43Yxfsm (reaching similar conclusions).

[19] Data calculated from U.S. CUSTOMS & BORDER PROT., NATIONWIDE ENCOUNTERS (July 18, 2023), available at https://bit.ly/3KfaSqA. While the figures include encounters at all borders, CNVH migrant encounters actually occur almost entirely at the southern border, as opposed to the northern one.

no point was it anywhere near as high as the figures in the months before the introduction of CNVH (85,590 in December 2022).

Plaintiff states may prefer to address the border situation through increasing exclusion and deportation, rather than by making legal entry easier. But this political dispute is not one that can be resolved through litigation. The relevant law only requires that parole produce a "substantial public benefit," not that it be the only way or even the best possible way of achieving it.

## III.   THE CNVH PAROLE PROGRAM DOES NOT VIOLATE THE REQUIREMENT THAT PAROLE BE GRANTED ON A "CASE-BY-CASE BASIS".

Plaintiffs contend  the parole program is illegal because it does not engage in "case-by-case" determinations of eligibility, as required by the statute. Plaintiffs' Motion for Preliminary Injunction at 15-18 (citing 8 U.S.C. § 1182(d)(5)(A)). They assert that "rather than focus on how DHS personnel should determine whether a *specific* alien's parole would yield a humanitarian or public benefit, as one might expect for a proper usage of the parole power, the Defendants repeatedly measure such supposed benefits *in toto*, by accumulating them across hundreds of thousands of paroled aliens." *Id.* at 17.  They further contend that parole can only be used to admit "small numbers" of aliens. *Id.*

This cramped construction of the parole power has no basis in the statutory text. It also goes against Supreme Court precedent and violates the canon against

absurdity and the meaning-variation canon. Finally, Plaintiffs' interpretation of the meaning of "case-by-case" – even if correct – would not invalidate the humanitarian need rationale for the CNVH program.

### A. Plaintiffs' theory is at odds with statutory text and Supreme Court precedent.

Despite Plaintiffs' claims, under the text of the statute, there is no numerical cap on the number of migrants eligible for parole. Imposing such a cap by limiting parole to "small numbers" of migrants would be an arbitrary judicial mandate unsupported by statutory text and at odds with Supreme Court precedent. As the Supreme Court noted in *Biden v. Texas*, 142 S. Ct. 2528, 2543–44 (2022), "[e]very administration, including the Trump and Biden administrations, has utilized [parole] authority to some extent" and they have done so without imposing numerical limits confining parole to small numbers. *Cf. id.* at 2548–49 (Kavanaugh, J., concurring) ("every President since the late 1990s has employed the parole option . . . . Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101.").

During the Cold War, parole was repeatedly used to admit many thousands of refugees fleeing oppressive communist regimes in Cuba, Hungary, and Indochina. *See* Carl J. Bon Tempo, *The Ukrainian Parole Policy in Historical Perspective*,

Niskanen Ctr. (Sept. 22, 2022)[20]; Carl J. Bon Tempo, Americans at the Gate: The United States and Refugees during the Cold War (2008); *See also* Expert Declaration of Yael Schacher, at 4-6, 9-16 (summarizing large-scale use of parole for Cuban, Hungarian, and Vietnamese migrants fleeing communism). All told, there have been at least 126 uses of the parole power, many of them involving thousands of migrants at a time. *See* David Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Inst. (July 17, 2023) (providing a detailed overview).[21]

In 1996, Congress tightened the requirements of parole by adding the "case-by-case" language to the statute and requiring that parole be used only for "urgent humanitarian reasons or significant public benefit," as opposed to the more permissive previous standard allowing parole "for emergent reasons or for reasons deemed strictly in the public interest." Adam Cox & Cristina Rodriguez, The President and Immigration Law 67 (2020). But the revised language did not impose a numerical limit or forbid aggregation in the calculation of relevant public benefits.

The Plaintiffs' position is also at odds with the Supreme Court's holding in *Biden v. Texas* that "the availability of the parole option additionally makes clear

---

[20] Available at https://bit.ly/437ykgo.
[21] Available at https://bit.ly/3rFsAx4.

that the Court of Appeals erred in holding that the INA required the Government to continue implementing MPP [the Migrant Protection Protocols policy, often referred to as 'Remain in Mexico']". 142 S. Ct. at 2544. The Biden Administration used parole as an alternative to MPP in order to reduce pressure at the border and alleviate the problem of insufficient detention capacity for migrants. *Id.* at 2528, 2535–36. As Justice Kavanaugh explained in his concurring opinion, "in general, when there is insufficient detention capacity, both the parole option and the return-to-Mexico option are legally permissible options under the immigration statutes." *Id.* at 2548 (Kavanaugh, J., concurring).

Under the Supreme Court's reasoning, alleviating pressure at the border and dealing with insufficient detention capacity qualify as "significant public benefits" justifying the use of parole. That could not possibly be true under the Plaintiffs' approach where parole power can only be used if an individual alien's inclusion by itself creates a significant public benefit and aggregation is forbidden. Plaintiffs' Motion for Preliminary Injunction at 17.  Paroling a single migrant, or even a small group, cannot meaningfully reduce pressure at the border or alleviate a shortage of detention capacity. Only granting parole to a large number is likely to have that effect. While the Supreme Court did not definitively resolve the question of whether the executive's use of parole in *Biden v. Texas* was justified,[22] its reasoning makes

---

[22] *See Biden v. Texas*, 142 S. Ct. at 2544 (noting this point).

14

clear that the Court endorsed the use of aggregate analysis in assessing public benefits.

### B. Plaintiffs' theory violates the canon against absurdity

The Plaintiffs' insistence that a "substantial public benefit" is only present when the parole of a "specific" individual alien by itself creates such a benefit also violates the canon against absurdity. As Justice Scalia has explained, courts must avoid interpreting statutes in ways that would lead to an "absurd…result." *Green v. Bock Laundry Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring); cf. ANTONIN SCALIA & BRYAN GARNER, READING LAW 235 (2012) (discussing role of this canon).

In this case, requiring the parole of each individual alien to *by itself* provide a "substantial public benefit" leads to the absurd result that there will be no cognizable benefit when the inclusion of two or more migrants would create even truly enormous benefits for the United States that could not be realized by a single migrant on his or her own. For example, consider the parole of a team of scientists who, working together, could make enormous scientific breakthroughs, but might not be able to achieve much working alone. The admission of multiple scientists fleeing Nazi Germany and Fascist Italy who played a key role in the Manhattan Project is a prominent historical example. See RICHARD L. RHODES, THE MAKING OF THE ATOMIC BOMB (1986) (discussing the extensive role of teams of refugee scientists in the Manhattan Project). It is highly unlikely that any one of these scientists could,

on their own, have enabled the United States to become the first nation to develop the atomic bomb on his own. Under the Plaintiffs' interpretation of the statute, such scientists could not have been paroled unless it could be proven that a single individual would make a decisive difference to the project by himself.

### C. Plaintiffs' theory violates the meaningful-variation canon.

In addition to violating the canon against absurdity, the Plaintiffs' theory also goes against the "meaningful-variation canon," which requires that "'where [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'" *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (quoting SCALIA & GARNER, *supra*, at 170).

In this case, Subsection 1182(d)(5)(A) authorizes the use of parole to admit any alien "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The very next subsection of the statute states that "[t]he Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to *that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title." 8 U.S.C. § 1182(d)(5)(B) (emphasis added). Subsection B specifies that, in the case of refugees, the "compelling reasons in the public interest"

that justify his parole must arise from  "that particular alien," presumably because he or she could also just be admitted as a refugee. The existence of this alternative option avoids the absurd result of barring refugees who might create enormous public benefits in combination with others. *Cf.* § III.B, *supra*.

By contrast, such particularity is *not* mandated with respect to non-refugee migrants covered by Subsection A. The contrast between the two subsections is an obvious example of meaningful variation. Aggregation of benefits is permitted for non-refugee migrants covered by A, but not when it comes to the "compelling reasons in the public interest" that might justify using parole to admit refugees under Subsection B.

Obviously, officials administering the CNVH parole program cannot precisely estimate each individual migrant's potential contribution to a significant public benefit, or the precise degree to which each individual has an urgent humanitarian need for refuge. But unless it is going to be completely arbitrary or random, case-by-case discretion must be guided by general rules and presumptions that constrain officials' discretion. And, as a general presumption, migrants fleeing these four countries are likely to face severe oppression and privation if they are forced to return. *See* Part I, *supra*. Thus, their parole is justified by "urgent humanitarian reasons." 8 U.S.C. § 1182(d)(5)(A). Similarly, because migrants from these countries have been major contributors to congestion at the southern border, it

is highly likely that giving them access to parole will contribute to the "significant public benefit" of alleviating that problem. And the program has already achieved enormous benefits in that regard. *See* Part II, *supra*.

The "case-by-case basis" standard is satisfied so long as the executive establishes plausible criteria for meeting the requirement that the grant of parole is justified by "urgent humanitarian reasons" or a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The statute imposes few, if any, constraints on the Secretary's discretion in determining what kinds of rules and presumptions should be used in assessing migrants' eligibility for parole. It "gives the government broad parole discretion, without mentioning any threshold standard that the government must meet or the timing of when a decision as to admissibility must be made." *Vazquez Romero v. Garland*, 999 F.3d 656, 664 (9th Cir. 2021).

Under the CNVH program, merely being a citizen of one of the four covered nations does not automatically qualify a migrant for parole. It is a necessary, but not sufficient condition. There are additional requirements that are also factored into the case-by-case determination of parole eligibility. Each parolee must also have a US sponsor able to provide financial support and assistance with accessing housing and employment. This further ensures that the parolees will quickly go to the interior of the country and avoid contributing to congestion at the border. USCIS Form I-134A, which sponsors must submit in order to be approved, requires a presentation of

evidence that sponsors are able to provide necessary financial support and assistance with searching for jobs and housing. U.S. CITIZENSHIP & IMMIGR. SERVS., USCIS FORM I-134A, ONLINE REQUEST TO BE A SUPPORTER AND DECLARATION OF FINANCIAL SUPPORT. [23] In addition, parolees must "[u]ndergo and clear robust security vetting." U.S. CITIZENSHIP & IMMIGR. SERVS., PROCESSES FOR CUBANS, HAITIANS, NICARAGUANS, AND VENEZUELANS.[24]

### D. Plaintiffs' narrow interpretation of "case-by-case" does not invalidate the "urgent humanitarian reasons" rationale for the CNVH parole program.

Even if the Plaintiffs' very narrow interpretation of "case-by-case" were to be accepted by this court, it would not invalidate the "urgent humanitarian reasons" authorization for the CNVH program. While the "significant public benefit" justification may require aggregation across multiple beneficiaries (*see* § III.C, *supra*), the humanitarian reasons one does not.

Even assessed as individuals in isolation from each other, migrants fleeing the CNVH countries meet the "urgent humanitarian reasons" standard. That is because, if forced to return to their countries of origin, each of these individuals is likely to face the horrific conditions of violence, poverty, and oppression that prevail there. *See* Part I, *supra*. While most individual migrants may not be able to provide a

---

[23] Available at https://bit.ly/43PX1Pr.
[24] Available at https://bit.ly/3NuQNgS.

"significant public benefit" on their own, they most definitely can and do have "urgent humanitarian reasons" for seeking refuge in the United States. 8 U.S.C. § 1182(d)(5)(A).

## IV.   IF PLAINTIFFS PREVAIL IN THIS CASE, IT WILL IMPERIL THE UNITING FOR UKRAINE PROGRAM.

It is notable that the Plaintiff states have sued to terminate the CNVH private sponsorship parole program for the four Latin American countries, but not the Uniting for Ukraine program, despite the fact that the latter is the model for the former and rests on the exact same statutory authority. *See* U.S. CITIZENSHIP & IMMIGR. SERVS., UNITING FOR UKRAINE (describing the Uniting for Ukraine program). [25] ;Somin, *Biden Expands Uniting for Ukraine, supra* (describing connection between the Uniting for Ukraine parole program and the CNVH program).

Whatever the Plaintiffs' motives for distinguishing between Uniting for Ukraine and CNVH, if they prevail Uniting for Ukraine is likely to be imperiled, as well as the program they are challenging. The legal justifications for the two are close to identical. Even if the Plaintiff states would prefer to spare Uniting for Ukraine, that may not preserve it against challenges by other potential litigants who might choose to come forward should the Plaintiffs prevail in the present case.

---

[25] Available at https://bit.ly/3r21NuK.

The enormously successful Uniting for Ukraine program has, with the help of American private sponsors, given refuge to over 123,000 Ukrainians fleeing the brutal Russian invasion of their country. Di Martino, *supra*. It has helped save these people from horrific violence and oppression and enabled them to contribute to the US economy by granting them two-year residency and work permits on the same terms as those now extended to CVNH parolees. *See* Somin, *We Sponsored Refugees, supra* (providing an overview of the Uniting for Ukraine program and its benefits).

Like CVNH, Uniting for Ukraine is not limited to "small numbers of migrants" and it does not have significantly more extensive case-by-case assessment than the former program. Thus, the Court should be aware that any judgment in favor of the Plaintiffs in the present case is also likely to become a precedent endangering Uniting for Ukraine.

## CONCLUSION

For these reasons, this court should rule in favor of the defendants.

Respectfully submitted,

/s/ Ilya Somin
Ilya Somin
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
703-993-8069
isomin@gmu.edu

*Counsel for amici curiae*

Dated: July 31, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2023, a true and accurate copy of the foregoing

document was filed electronically via CM/ECF and served on all counsel of record.

Respectfully submitted,

/s/ Ilya Somin
Ilya Somin
*Counsel of Record*
Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
703-993-8069
isomin@gmu.edu

*Counsel for amici curiae*