United States Courts
Southern District of Texas
FILED

*August 14, 2023*

Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

---

STATE OF TEXAS, et al.,

        Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

        Defendants.

Civil Action No. 6:23-cv-00007

---

**MEMORANDUM OF LAW OF DRS. STAN VEUGER, TARA WATSON, DOUGLAS
HOLTZ-EAKIN, & LEAH BOUSTAN AS *AMICI CURIAE* IN OPPOSITION TO
PLAINTIFFS' REQUEST FOR INJUNCTIVE & OTHER EQUITABLE RELIEF**

COVINGTON & BURLING LLP

Brandon R. Gould*
Carolyn F. Corwin
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
ccorwin@cov.com
bgould@cov.com

Gawon Go
Abigail Kertzman
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
ggo@cov.com
akertzman@cov.com

*Counsel for* Amici Curiae
*Drs. Stan Veuger, Tara Watson*
*Douglas Holtz-Eakin, & Leah Boustan*

*Attorney-in-charge, admitted *pro hac vice*

## <u>TABLE OF CONTENTS</u>

**INTERESTS OF THE AMICI** ........................................................................ ii

**TABLE OF AUTHORITIES** ........................................................................ iv

**INTRODUCTION** ........................................................................................ 1

**BACKGROUND** .......................................................................................... 1

**ARGUMENT** ............................................................................................... 3

I.      **The CHNV Program Benefits the States by Reducing Unauthorized Southwest Border Crossings.** ............................................................. 4

II.     **The States Cannot Assume the Program Increases CHNV Immigration Levels and Any Associated Costs.** ................................................... 9

III.    **The States' Claims Regarding Individual Cost Categories Are Unsupported.** ......... 13

       **CONCLUSION** ....................................................................... 18

i

## INTERESTS OF THE AMICI

Dr. Stan Veuger is a senior fellow in economic policy studies at the American Enterprise Institute and was a Campbell Visiting Fellow at the Hoover Institution in May 2022.  He earned a Ph.D. and an A.M. degree in economics from Harvard University.  He also holds degrees from Erasmus University Rotterdam, Universitat Pompeu Fabra, University of London, and Utrecht University.  Dr. Veuger's research on economics and immigration policy has been published in leading academic and professional journals, including the Journal of Monetary Economics, the Quarterly Journal of Economics, and the Review of Economics and Statistics.

Dr. Tara Watson is professor of economics at Williams College and the Director of the Brookings Institution's Center for Economic Security and Opportunity, where she is a David F. Rubenstein Fellow in Economic Studies.  She is a research associate of the National Bureau of Economic Research and a co-editor of the Journal of Human Resources.  In 2015-2016, Dr. Watson served as deputy assistant secretary for microeconomic analysis in the U.S. Treasury Department's Office of Economic Policy.  Dr. Watson earned her Ph.D. in economics from Harvard University.  Her research focuses on economic analysis of the social safety net, health, and immigration policies.

Dr. Douglas Holtz-Eakin is the President of the American Action Forum.  He previously served as a professor of economics at Princeton University, Columbia University, and Syracuse University.  From 2001-2002, he was the Chief Economist of the President's Council of Economic Advisors, and from 2003-2005 he served as the director of the Congressional Budget Office.  During 2007 and 2008, he was the Director of Domestic and Economic Policy for the John McCain presidential campaign, and he later served as a Commissioner on the Financial Crisis Inquiry Commission.  Dr. Holtz-Eakin earned his Ph. D. in economics from Princeton.  He has extensive expertise in economic and fiscal policy analysis, including on matters of U.S. immigration policy.

ii

Dr. Leah Boustan is a Professor of Economics at Princeton University, where she also serves as the Director of Princeton's Industrial Relations Section.  Dr. Boustan is co-director of the Development of the American Economy Program at the National Bureau of Economic Research, and she serves as co-editor at the American Economic Journal: Applied Economics.  Her research lies at the intersection between economic history and labor economics, and she has authored several books and scholarly articles on migration trends in the U.S.  Dr. Boustan earned her Ph.D. in economics from Harvard University.

Drs. Veuger, Watson, Holtz-Eakin, and Boustan have researched and written extensively on the subjects of fiscal policy and immigration.  Their expertise in these matters and their familiarity with relevant data will assist the Court in evaluating the fiscal and other economic impacts of the parole program at issue in this case.

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ................................................................................18

*Holland Am. Ins. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) ................................................................................18

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923).............................................................................................17

**Administrative Sources**

87 Fed. Reg. 25040, *Implementation of the Uniting for Ukraine Parole Process*
    (Apr. 27, 2022)......................................................................................................7

87 Fed. Reg. 63507, *Implementation of a Parole Process for Venezuelans*
    (Oct. 19, 2022) ............................................................................................ *passim*

87 Fed. Reg. 74429, *Federal Financial Participation in State Assistance*
    *Expenditures; Federal Matching Shares for Medicaid, the Children's Health*
    *Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for*
    *October 1, 2023 Through September 30, 2024*
    (Dec. 5, 2022) .....................................................................................................16

88 Fed. Reg. 1243, *Implementation of a Parole Process for Haitians*
    (Jan. 9, 2023)...................................................................................................3, 5

88 Fed. Reg. 1255, *Implementation of a Parole Process for Nicaraguans*
    (Jan. 9, 2023)............................................................................................. *passim*

88 Fed. Reg. 1266, *Implementation of a Parole Process for Cubans*
    (Jan. 9, 2023)............................................................................................. *passim*

88 Fed. Reg. 31314, *Circumvention of Lawful Pathways*
    (May 16, 2023)......................................................................................................3

**Other Materials**

Gregory Abbot, *Ltr. to Hon. David Saucedo*,
    (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/Colonel_Steven_
    McCraw_Major_General_Thomas_Suelzer.pdf................................................8, 15

Gregory Abbott, *Ltr. to the Nation's Governors*
    (May 16, 2023), https://gov.texas.gov/uploads/files/press/Governors_Letter_
    Border_Support_1.pd..........................................................................................7

David Bier, *77% of Drug Traffickers Are U.S. Citizens, Not Illegal Immigrants*,
CATO INST., https://www.cato.org/blog/77-drug-traffickers-are-us-citizens-
not-illegal-immigrants (July 3, 2019) ............................................................................9

Jessica Bither and Astrid Ziebarth, *Creating Legal Pathways to Reduce Irregular
Migration? What We Can Learn from Germany's "Western Balkan
Regulation"*,
MIGRATION STRATEGY GROUP (2018) https://www.bosch-
stiftung.de/sites/default/files/publications/pdf/2019-
01/Creating%20Legal%20Pathways%20to%20Reduce%20Irregular%20Migr
ation.pdf ....................................................................................................................6, 12

Francine Blau and Christopher Mackie, *The Economic and Fiscal Consequences
of Immigration*,
NAT'L ACADS. OF SCIS., ENGINEERING, AND MEDICINE (2017) ................................17

Steven Camarota and Karen Ziegler, *Immigrants Coming to America at Older
Ages,*
CENTER FOR IMMIGRATION STUDIES (2021),
https://cis.org/sites/default/files/2021-03/camarota-aging-21_0.pdf .......................16

Michael Clemens and Kate Gough, *Can Regular Migration Channels Reduce
Irregular Migration?*,
Ctr. for Global Development (2018),
https://www.cgdev.org/sites/default/files/can-regular-migration-channels-
reduce-irregular-migration.pdf ...............................................................................6, 13

*DHS Announces New Border Enforcement Measures and Additional Safe and
Orderly Processes*,
DHS (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-
prepare-end-title-42-announces-new-border-enforcement-measures-and .................3

Adam Isaacson, *10 Things to Know About the End of Title 42*,
WASHINGTON OFFICE ON LATIN AMERICA (May 9, 2023),
https://www.wola.org/analysis/end-title-42/ ..............................................................3

*Undocumented Immigrants' State & Local Tax Contributions*, INST. ON TAXATION
& ECON. POLICY (2017),
https://itep.sfo2.digitaloceanspaces.com/immigration2017.pdf ...............................14

Michael Light, et al., *Comparing crime rates between undocumented immigrants,
legal immigrants, and native-born US citizens in Texas*,
117 PNAS 32,340 (2020),
https://www.pnas.org/doi/10.1073/pnas.2014704117 .............................................15

*The Integration of Immigrants into American Society*,
NAT'L ACAD. OF SCIENCES (2015) ............................................................................15

Pia Orrenius, *Enforcement and Illegal Migration: Enforcement Deters Immigration but with Unintended Consequences*, 81 IZA WORLD OF LABOR 1 (2014), https://wol.iza.org/uploads/articles/81/pdfs/enforcement-and-illegal-migration.pdf..............................................................................................................6

Jose Rodriguez-Sanchez, *Undocumented Immigrants in Texas:  A Cost-Benefit Assessment*, CTR. FOR U.S. & MEXICO (2020), https://www.immigrationresearch.org/system/files/usmx-pub-undocumentedresidents-050620.pd.....................................................14

Joel Rose, *Who is sneaking fentanyl across the southern border? Hint: it's not the migrants*, NAT'L PUB. RADIO (Aug. 9, 2023), https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs............................................9

*Biennial Revenue Estimate*, TEXAS COMPTROLLER OF PUBLIC ACCOUNTS (2021), https://comptroller.texas.gov/transparency/reports/biennial-revenue-estimate/2022-23/ ...............................................................................................................14

*Nation Continues to Age as It Becomes More Diverse* U.S. CENSUS BUREAU (2022), https://www.census.gov/newsroom/press-releases/2022/population-estimates-characteristics.html.......................................16

*Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, U.S. CITIZENSHIP AND IMMIGRATION SERVS., https://www.uscis.gov/CHNV ...........................2

Ruth Wasem, *Cuban Migration to the United States:  Policy and Trends*, CONG. RSCH. SERV. (2009), https://sgp.fas.org/crs/row/R40566.pdf .......................................7

*Fact Sheet: Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/05/fact-sheet-biden-harris-administration-announces-new-border-enforcement-actions/............................................................3

## **INTRODUCTION**

In early 2023, the Department of Homeland Security ("DHS") launched the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" (the "CHNV Program" or "Program") in conjunction with various interrelated enforcement policies in an effort to reduce unauthorized immigration and increase security at the Southwest land border.  The Program and those policies combine tougher consequences for unauthorized immigration with a safe, legal, and orderly process for CHNV nationals to apply for parole and lawfully enter the U.S.  In the months following policy implementation, unauthorized entries at the Southwest border have dropped precipitously, relieving strain on border enforcement resources and strengthening border security.

A coalition of states led by Texas (the "States") allege that the Program will increase immigration from CHNV countries, thereby increasing the States' costs of providing social services.  In fact, the opposite is true:  As with unauthorized border entries, the overall level of immigration by CHNV nationals (legal plus unauthorized) has plummeted since the Program began.  Therefore, even if the States' speculative (and inflated) cost estimates are taken at face value, the Program has significantly reduced their expenditures, benefiting – not harming – the States.

## **BACKGROUND**

In recent years, tens of thousands of noncitizens from nations other than Mexico have attempted to cross the Southwest border without authorization each month, with CHNV nationals representing up to half of that total.  Most of these unauthorized migrants could not be swiftly removed because many fled political or other forms of persecution and thus had credible asylum claims, and others came from countries with oppressive regimes that will not accept their return. 87 Fed. Reg. 63507, 63508–09.

1

The States allege these large border flows, driven predominantly by CHNV entries, placed enormous strain on border state communities and law enforcement resources.  Am. Compl. ¶¶71–72 (ECF 20).  They also claim these flows imposed costs beyond the border, as overwhelmed border enforcers struggled to prevent border-related crimes from spreading into the interior of the country.  *Id.* ¶¶77, 94, 99, 118-19, 134.

In January 2023, DHS simultaneously announced the CHNV Program and several interrelated enforcement policies with the goal of decreasing unauthorized entries by CHNV nationals at the Southwest border.  *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, U.S. CITIZENSHIP AND IMMIGRATION SERVS., https://www.uscis.gov/CHNV.  Those policies seek to deter border crossings by toughening consequences for unauthorized entries while providing a safe, legal, and orderly alternative for approved CHNV nationals to enter the interior of the country on parole.  *See, e.g.*, 87 Fed. Reg. 63507, 63511.

The Program imposes stringent requirements on parole applicants.  Applicants must be sponsored by a U.S. resident who can "demonstrate sufficient financial resources to receive, maintain, and support" them after their arrival.  *See, e.g.*, 88 Fed. Reg. 1255, 1263.  Applicants must submit to a rigorous criminal and national security background check while outside the U.S.  *Id.* at 1263–1264.  If preliminarily approved, a maximum of 30,000 applicants per month may then fly – at their own expense – to U.S. airports where they undergo further biometric and security screening.  *Id.* at 1264.  Approved parolees may enter and remain in the U.S. for up to two years and apply for work authorization and long-term immigration status such as asylum during that period.  *Id.*

The Program and related enforcement policies penalize CHNV nationals who fail to seek lawful parole and instead attempt to cross the border without prior authorization.  Before the

Program, DHS effectively could not remove many CHNV border crossers because neither Mexico nor many migrants' home countries would accept their return.  88 Fed. Reg. 1266, 1275; 88 Fed. Reg. 1255, 1259; 88 Fed. Reg. 1243, 1253; ECF 154, at 5 n.2.  In a diplomatic breakthrough, Mexico has now agreed to accept up to 30,000 CHNV removals per month contingent on the U.S. implementing the Program.  88 Fed. Reg. 1266, 1275; *Fact Sheet: Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/05/fact-sheet-biden-harris-administration-announces-new-border-enforcement-actions/.  As a result, expulsions to Mexico have increased exponentially.[1]  When the Program launched, DHS also announced that migrants who eschewed the new parole pathway would be presumptively ineligible for asylum and, if removed, subject to a five-year ban and potential criminal prosecution on any attempted reentry.  *DHS Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, DHS (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and; 88 Fed. Reg. 31314.

As explained below, DHS data show that encounters with CHNV nationals at the Southwest border and total CHNV entries nationwide (both legal and unauthorized) have declined significantly since the Program began.  App'x ¶1.[2]

## ARGUMENT

The States contend they will incur additional costs from the CHNV Program.  That position

---

[1]  Isaacson, *10 Things to Know About the End of Title 42*, WOLA (May 9, 2023), https://www.wola.org/analysis/end-title-42/ (showing that expulsions of CHNV nationals increased from near-zero to over 10,000 in the months after the Program and its Venezuela-specific predecessor began); Nuñez-Neto Decl. ¶¶12-15, 29-31 (ECF 176-1).

[2] Sources and methodologies for calculating statistics presented in this brief appear in a technical appendix.

(a) ignores the benefits they enjoy from fewer unauthorized entries and greater border security; (b) assumes the Program will increase overall CHNV migration when the data show the opposite; and (c) relies on inflated, speculative, and incomplete analyses of the fiscal impacts of CHNV migration.  Their arguments should be rejected.

I.      **The CHNV Program Benefits the States by Reducing Unauthorized Southwest Border Crossings.**

The CHNV Program and the interrelated enforcement policies collectively aim to deter unauthorized crossings by CHNV migrants at the Southwest border through two mutually reinforcing strategies:  (1) providing a safe, lawful, and orderly process for CHNV migrants to apply for parole from abroad into the interior of the U.S., and (2) imposing strict consequences on migrants who instead cross the border without authorization.  88 Fed. Reg. 1266, 1268.  Combined, these policies radically changed the costs and benefits CHNV nationals must consider in deciding whether, when, and how to migrate, resulting in thousands of migrants applying and waiting for lawful parole rather than attempting to enter without authorization.

These changes in migrants' decisions affect costs incurred by governments, both at the border and in the U.S. interior.  Lower levels of unauthorized entries reduce border-related costs for all levels of government, and all states reap significant benefits from a more secure, stable border.  The States disregard these benefits.  Their allegations are therefore incomplete and misleading as a matter of economics.

Before the CHNV Program, most CHNV migrants had no opportunity to enter the U.S. through a legal channel.  Instead, many attempted unauthorized border crossings knowing they likely could not be removed to Mexico or their home countries.  Now, most prospective CHNV migrants face a stark choice:  apply for lawful parole; or travel to the border, often a long, costly, and perilous journey, and risk apprehension, detention, removal to Mexico, and long-term

4

exclusion from the U.S. if they attempt an unauthorized entry.  DHS expected that, consistent with rational human decision-making, this combination of tougher consequences with a new legal pathway would deter migrants from unauthorized border crossing in favor of applying for lawful parole.  88 Fed. Reg. 1243, 1245.

DHS's expectation was borne out following the Program's implementation on January 6, 2023.  In December 2022, DHS experienced a record-high 83,176 Southwest border encounters with Cuban, Nicaraguan, and Haitian nationals.[3]   In January, the number of these nationals' unauthorized border crossings cratered, falling 84.3 percent to levels DHS had not seen since 2021. At the same time, the share of those nationals entering lawfully through airports around the country soared from miniscule levels to eventually surpass the share entering without authorization at the border. The graph below shows these dramatic shifts.  App'x ¶2.



Location of Entry of Cubans, Haitians, and Nicaraguans

---

[3] These numbers (and those in Section II) exclude Venezuelans because, as of October 2022, Venezuelans were eligible for parole under a predecessor parole program.

These results confirm that the Program has "fundamentally changed the calculus" for CHNV migrants. 88 Fed. Reg. 1255, 1257. This is hardly surprising as a matter of economics. Migrants (like anyone else) weigh costs against benefits when making important decisions. On one hand, a migrant choosing to cross the border without authorization now faces a long and dangerous journey, typically relying on expensive smugglers, and risks detention, removal, and long-term exclusion upon arrival. Those who evaded apprehension at the border would then live in the shadows, working in informal jobs to avoid immigration enforcement. On the other hand, the Program creates a legal, safe, and orderly way to enter the U.S., avoiding a dangerous, expensive, and uncertain border crossing. Once paroled, migrants can apply for work authorization and access superior legal employment opportunities. In short, the costs of unauthorized entry have risen, while the CHNV Program offers the benefit of a new legal entry alternative. As a matter of economic theory – and common sense – many CHNV migrants will decide to forgo unauthorized border crossing to apply and await a grant of lawful parole.[4]

Results from three previous parole programs confirm that the Program's success in deterring unauthorized border entries was predictable and is not a short-term anomaly. In late

---

[4] Academic scholarship supports this conclusion. Clemens and Gough, *Can Regular Migration Channels Reduce Irregular Migration?*, Ctr. for Global Development, at 2-4 (2018) ("*Regular Migration Channels*"), https://www.cgdev.org/sites/default/files/can-regular-migration-channels-reduce-irregular-migration.pdf (presenting evidence involving Mexican immigrants across seven decades that "lawful channels … coupled with enhanced immigration enforcement" can "effectively alter the incentives and ultimately suppress irregular flows"); Orrenius, *Enforcement and Illegal Migration: Enforcement Deters Immigration but with Unintended Consequences*, 81 IZA WORLD OF LABOR 1, 9 (2014), https://wol.iza.org/uploads/articles/81/pdfs/enforcement-and-illegal-migration.pdf ("[E]fforts to create legal pathways for migration with improvements in enforcement methods can ease pressure at the border and in the interior."); Bither and Ziebarth, *Creating Legal Pathways to Reduce Irregular Migration?  What We Can Learn from Germany's "Western Balkan Regulation"*, MIGRATION STRATEGY GROUP, at 6 (2018) ("*German Legal Pathways*"), https://www.bosch-stiftung.de/sites/default/files/publications/pdf/2019-01/Creating %20Legal%20Pathways%20to%20Reduce%20Irregular%20Migration.pdf (finding that unauthorized border flows of asylum seekers fell 90 percent after Germany created new employment-based legal pathways).

April 2022, DHS created the "Uniting for Ukraine" program after Southwest border encounters with Ukrainians spiked to 20,118 that month.  87 Fed. Reg. 25040.  One month later, unauthorized border encounters with Ukrainians nearly vanished, falling to 375 and remaining lower thereafter. App'x ¶3.  In late October 2022, DHS launched the "Parole Process for Venezuelans" after months of rising Venezuelan border crossings.  87 Fed. Reg. 63507.  The following month, Venezuelan border encounters plummeted 76 percent, from a high of 33,804 in September to 8,023 by November 2022.  App'x ¶4.  Finally, nearly three decades ago, the Government combined new lawful pathways (including parole) with tougher enforcement against unauthorized migrants to halt the Cuban "Balsero Crisis," causing Coast Guard apprehensions of unauthorized Cuban migrants to plummet from nearly 40,000 in 1994 to a few hundred annually in 1995-1997.  Wasem, *Cuban Migration to the United States:  Policy and Trends*, CONG. RSCH. SERV. 1-3, 9-10 (2009), https://sgp.fas.org/crs/row/R40566.pdf.

The drastic reductions in unauthorized border crossings following initiation of parole programs benefit all states and levels of government.  Benefits at the Southwest border are particularly pronounced.  When border enforcers are overwhelmed, border-related threats are exacerbated.  In May 2023, DHS admitted that it "lacks the resources" to apprehend, detain, and deport all unauthorized Southwest border crossers who lack viable claims for relief, while still pursuing its many other border-related missions.  *See Florida v. United States*, No. 3:21-cv-01066 (N.D. Fla.), ECF 163 at 3, 7-10; Nuñez-Neto Decl. ¶¶4, 28.  Texas Governor Greg Abbott has similarly claimed that "drug cartels and other … criminal enterprises profit off [border] chaos," for example, by "smuggling people and dangerous drugs like fentanyl into" the U.S.  Abbott, *Ltr. to the Nation's Governors*, at 1 (May 16, 2023), https://gov.texas.gov/uploads/files/press/ Governors_Letter_Border_Support_1.pdf.   Accordingly, Governor Abbot asserts Texas has

diverted its own law enforcement resources to the border and spent billions to fill federal enforcement gaps.  Abbot, *Ltr. to Hon. David Saucedo*, at 2 (Nov. 16, 2022), https://gov.texas.gov/ uploads/files/press/Colonel_Steven_McCraw_Major_General_Thomas_Suelzer.pdf ("*Gov. Abbott-Saucedo Letter*").

The CHNV Program alleviates these pressures on border states by significantly reducing unauthorized entries at the Southwest border.  In December 2022, CHNV migrants accounted for over a third of all DHS border encounters, but by February 2023 that number had dropped by roughly 77,000, to less than 10 percent of that greatly reduced total.  App'x ¶5.  This sudden decline immediately saved huge amounts of federal and state resources that would otherwise have been used to manage tens of thousands of CHNV migrants.  For example, 77,000 fewer border encounters potentially saved DHS over $310 million in monthly immigrant detention costs alone. *Id.* ¶¶5-6.  As DHS anticipated, fewer border crossers "free[s] up resources" and "allow[s] for the removal of more noncitizens … faster," further reducing costs to all governments that incur border-related expenses.  88 Fed. Reg. 1266, 1272.  With fewer crossings, federal and state law enforcers can also refocus attention on other border priorities, such as intercepting illegal drugs, preventing human trafficking, disrupting smuggling networks, and interdicting national security threats.[5]

A more secure Southwest border, in turn, benefits all states.  That is, in part, because threats at the border may spread to the U.S. interior.  For example, Missouri alleges it suffers from a "fentanyl crisis" that causes countless "drug-related" crimes, "devastating the lives and health of Missouri's citizens," which Missouri claims is driven by "[d]rug smugglers unlawfully entering

---

[5] 88 Fed. Reg. 1266, 1273-74 (explaining the Program "will allow USCG to better balance its other important missions, including its counter-drug smuggling operations" and "undermine the profits and operations of the dangerous T[ransnational] C[riminal] O[rganizations]" and "human-smuggling networks").

the United States through the southern border."[6]  Am. Compl. ¶119.  Similarly, Iowa alleges it sits

at "a hot spot for [human] trafficking activity" and "bears the additional costs of combating

trafficking associated with illegal immigration."  *Id.* ¶94.  Accepting these allegations arguendo,

by reducing CHNV Southwest border crossings, the Program reduces these alleged costs.

Although the States recognize that a more secure border benefits them (*id.* ¶141(e)), their

challenge to the Program entirely disregards the benefits of reduced CHNV border crossings.

Their claim that the Program will "impose[] millions of dollars of costs upon the States" (PI Mot.

10 (ECF 22)) is thus both incomplete and misleading.  Absent consideration of *both* the costs and

benefits, the Court should reject the States' cost arguments.

## II.     The States Cannot Assume the Program Increases CHNV Immigration Levels and Any Associated Costs.

Beyond disregarding the benefits of reduced border crossings, there is a more fundamental

flaw in the States' allegations:  They assume that the Program will increase overall CHNV

immigration.  Increased immigration, the States argue, will increase their total costs of providing

public services.  But they offer no evidence for their bedrock assumption of increased immigration,

and the actual data contradict it.

The States' complaint asserts that the Program will "*potentially*" allow "hundreds of

thousands of *additional* aliens to enter" the U.S.  Am. Compl. ¶5 (emphases added).  Their briefs

and supporting declarations likewise assume that parole grants will increase "the number of illegal

---

[6] In fact, the "vast majority" of drug smugglers on the Southwest border are U.S. citizens.  Bier, *77% of Drug Traffickers Are U.S. Citizens, Not Illegal Immigrants*, Cato Inst., https://www.cato.org/blog/77-drug-traffickers-are-us-citizens-not-illegal-immigrants (July 3, 2019).  Specifically, most fentanyl is trafficked by U.S. citizens through legal ports of entry, not via migrants surreptitiously crossing between those ports.  Rose, *Who is sneaking fentanyl across the southern border? Hint: it's not the migrants*, NPR (Aug. 9, 2023), https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs.

aliens in the State[s]," raising their costs of providing various social services.  PI Mot. 12; *cf.* PI

Reply 4 (ECF 179) ("it is *possible*" that an injunction will "reduce the number of … illegal aliens

[] present in the Plaintiff States") (emphasis added).[7]  But the States admit their costs will increase

only "***to the extent that***" the Program causes *total* CHNV immigration to rise.  *See, e.g.*, Terry

Decl. ¶7 (ECF 141-3); Lopez Decl. ¶7 (ECF 22-4) (emphasis added).  Conversely, applying the

States' reasoning, "*__If__* [fewer] illegal aliens enter the State[s]," their costs will fall.  *Cf.* Am. Compl.

¶77 (Alaska), ¶101 (Kansas), ¶112 (Mississippi), ¶¶133-39 (Wyoming) (emphasis added).

Although it is critical to their cost claims, the States offer no evidence that the Program will

actually increase total CHNV immigration.

    In fact, the available data show that, like Southwest border encounters, total CHNV

immigration plummeted following implementation of the Program and its Venezuela-specific

predecessor.  When the Program was announced, immigration encounters with Cuban, Haitian,

and Nicaraguan nationals had escalated for seven straight months, reaching an all-time peak of

84,961 migrants in December 2022.  In January 2023, the month the Program went into effect, the

number of migrants from those countries (both legal and unauthorized) encountered by DHS fell

by over 64,000 to less than a quarter of December's total.[8]   Indeed, January 2023 marked the

---

[7] *See also* Am. Compl. ¶64 (Texas), ¶76 (Alabama), ¶77 (Alaska), ¶78 (Arkansas), ¶¶87, 89 (Idaho), ¶93 (Iowa), ¶¶98-101 (Kansas), ¶¶102-05 (Kentucky), ¶108 (Louisiana), ¶¶111-12 (Mississippi), ¶¶115-16, 119-20 (Missouri), ¶130 (South Carolina), ¶131 (Tennessee), ¶134 (Utah), ¶¶137-39 (Wyoming).

Of course, authorized parolees enter the country legally and therefore are not "illegal aliens."

[8] If anything, these numbers *understate* the reduction in the number of CHNV nationals who ultimately reside in the U.S. because DHS can (and does) now remove unauthorized CHNV border crossers to Mexico.  *Supra* 2-3.  Before the Program and its Venezuela-specific predecessor, DHS conditionally released into the U.S. approximately 90 percent of apprehended CHNV border crossers, but releases dropped by 90 percent after implementation of the parole programs.  Nuñez-Neto Decl. ¶¶15, 29-31.

largest monthly drop in Cuban, Haitian, and Nicaraguan migration in the history of DHS's data – more than *doubling* the previous record decline.[9]  The chart below shows this precipitous drop. App'x ¶7.



Likewise, after DHS launched the "Parole Process for Venezuelans" (now part of the CHNV Program) in late October 2022, total Venezuelan migration (both unauthorized and legal) fell by over 20,000 migrants per month from its September peak to November 2022.  *Id.* ¶8.  These steep drops in CHNV migration are no surprise.  After DHS initiated the "Uniting for Ukraine" program in late April 2022 following Russia's February invasion, total Ukrainian immigration (not

---

[9] Seasonal variation cannot explain the large drop in January 2023.  From December 2021 to January 2022, CHN encounters fell only slightly, and they *rose* 38 percent from December 2020 to January 2021.  App'x ¶7.

just Ukrainian immigration at the Southwest border) fell by nearly two thirds from a peak of 21,154 in April to 7,246 in May 2022. *Id.* ¶9. Similarly, in late 2015, Germany responded to growing numbers of arriving Balkan asylum seekers by creating a legal employment-based immigration pathway. In the following two years, total annual migration of Balkan nationals dropped by nearly two thirds. *German Legal Pathways*, at 6, 19-20.

These steep declines are consistent with economic incentives. As explained in Section I, standard economic theory teaches that potential migrants will weigh costs and benefits when deciding how, when, and whether to travel to the U.S. Even with the monthly cap of 30,000 parolees, a level lower than monthly CHNV entry attempts over the prior year, many migrants are likely to conclude that applying for parole and waiting for its approval is still a better option than risking a costly, dangerous, and uncertain attempt to cross the border without authorization.

DHS anticipated this dynamic. It explained that the Program will give CHNV nationals "a significant incentive" to apply for parole and "wait where they are" pending approval. 88 Fed. Reg. 1266, 1268. This, DHS predicted, will result in "a meaningful change in migratory flows." *Id.* That is exactly what had happened with the earlier Venezuelan parole program. That program, DHS explained, "fundamentally changed the calculus for Venezuelan migrants." *Id.* Thousands who had already started the long journey to the U.S. "turned around and headed back" while "[s]till others who were intending to migrate north … stay[ed] where they [were] to apply for th[e] parole process." *Id.* When many CHNV nationals stay in their home countries and wait their turn for legal permission, total migration flows will decrease, especially if improving source country conditions induce some not to immigrate at all.

Both economic theory and available data thus counter the States' assumption that the Program will increase total CHNV immigration.  And if the Program does not cause more immigration, the States' cost claims collapse.  By their own argument, the huge drop in CHNV migration since December 2022 must mean the States spent *less* money on newly arrived CHNV nationals than they did before the Program went into effect.  *Supra* 9-10 & n.7.  For example, if each "additional" migrant really costs Texas roughly $12,000 in education and driver's license expenses (Terry Decl. ¶¶3-4; Gipson Decl. ¶¶7-9 (ECF 22-3)), then in December 2022, the State incurred up to $428.8 million in those expenses from new CHNV migrants.  App'x ¶10.  But, again accepting Texas's figures for the sake of argument, the drop in new CHNV entrants following implementation of the Program *saved* Texas up to roughly $1 ***billion*** from January through March 2023 compared to its December costs. *Id.* ¶11.[10]   Texas thus reaps fiscal benefits – not harms – from the Program.[11]

## III.    The States' Claims Regarding Individual Cost Categories Are Unsupported.

Even if the States could assume the Program would result in increased CHNV immigration levels (the data show it has not), their cost allegations are incomplete, unsupported, and often inconsistent with economic scholarship.  At this stage, their only cost evidence is four declarations speculating that Texas will spend more on law enforcement, healthcare, education, and other social

---

[10] Texas does not estimate the costs per migrant for healthcare and law enforcement services, but by its argument, Texas would save on those expenses too.

[11] To the extent that Texas contends that *any* CHNV parolee increases its costs above what it would have spent but-for the CHNV Program, this argument raises a misleading baseline.  The Court's decision of whether to enjoin the CHNV Program is not a choice "between regular migration and no migration" at all.  *Cf. Regular Migration Channels*, at 5.  That illusory tradeoff is "made impossible by overwhelming demographic, economic, geographic, and historic realities" that drive CHNV migration, both legal and unauthorized.  *Id.*  Therefore, enjoining the Program will only return Texas to its pre-2023 status quo of higher CHNV migration flows across a less-secure border at greater fiscal costs.

services if the number of CHNV migrants living in Texas rises.  These bare assertions overstate Texas's costs and disregard the fiscal benefits Texas receives from the Program.

Section I above highlights the many benefits the States enjoy from fewer unauthorized CHNV border crossings.  Section II explains that the drop in the total number of CHNV migrants entering the U.S. after the Program began would reduce any costs of providing social services to new entrants.

The States' narrow focus on the *costs* of providing services to new CHNV residents also disregards the *revenues* they receive (both tax revenues and federal transfer payments) attributable to those same migrants.  Those revenues finance the States' social services and typically *exceed* the expenditures attributable to immigrants.  Rodriguez-Sanchez, *Undocumented Immigrants in Texas:  A Cost-Benefit Assessment*, CTR. FOR U.S. & MEXICO, at 28 (2020),  https://www. immigrationresearch.org/system/files/usmx-pub-undocumentedresidents-050620.pdf      ("[F]or every dollar spent on public services for undocumented immigrants, they provide $1.21 in fiscal revenue for the state of Texas.").  Moreover, State tax revenues per CHNV migrant are likely to rise due to the Program:  CHNV parolees may obtain employment authorization from DHS, allowing them to work in the formal economy, earn higher wages, make more purchases (generating sales tax revenue), and pay State income-related taxes, unlike many unauthorized migrants who labor (sometimes untaxed) in informal jobs.  *Undocumented Immigrants' State & Local Tax Contributions*, INST. ON TAXATION & ECON. POLICY, at 3 (2017), https://itep.sfo2.digitaloceanspaces.com/immigration2017.pdf (estimating Texas's tax revenues would increase $156 million if its unauthorized residents shifted from informal to formal employment).  And the States admit they receive federal transfer payments that, in part, offset their law enforcement, education, public safety, and healthcare costs.  Waltz Decl. ¶¶3-5 (ECF 22-6)

(correctional expenditures); Bricker Decl. ¶6 (ECF 22-5) (Emergency Medicaid); *see also Biennial Revenue Estimate*, Texas Comptroller of Public Accounts, at 28 (2021), https://comptroller.texas.gov/transparency/reports/biennial-revenue-estimate/2022-23/ (estimating that Texas will receive $46.3 billion in payments from the federal government for, *inter alia*, criminal justice, public safety and highways, education, and healthcare in 2023).

The States ignore these benefits and instead recite a litany of costs that the Program allegedly might impose. Apart from incorrectly assuming the Program will increase migration, these costs are factually unsupported:

**Law Enforcement.** Texas asserts that it "spends tens of millions of dollars" annually in law enforcement and correctional costs that "will increase as the number of illegal aliens in the State increases." PI Mot. at 12-13. But, as discussed above, Texas could avoid or reallocate these expenditures given the 80,106 fewer total CHNV entrants (both legal and unauthorized) arriving in Texas during the first full month CHNV nationals could apply for parole. *Supra* §§I-II; App'x ¶12. Texas disregards these savings and speculates the Program will lead it to incarcerate more CHNV nationals. PI Mot. 12-13. To the extent Texas decides to arrest or detain new, unauthorized CHNV border crossers, *see, e.g.*, *Gov. Abbott-Saucedo Letter*, fewer border crossings free up federal immigration enforcement capacity and would reduce any alleged burden that Texas chose to shoulder. *Cf.* 88 Fed. Reg. 1266, 1272-73. As for lawful CHNV parolees who may reside in Texas, studies show that immigrants, on average, commit far fewer crimes than U.S. citizens,[12]

---

[12] Light, et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*, 117 PNAS 32,340 (2020), https://www.pnas.org/doi/10.1073/pnas.2014704117 (native Texans are over twice as likely to be arrested for violent, drug, and property crimes than undocumented immigrants); *The Integration of Immigrants into American Society,* Nat'l Acad. of Sciences, at 33 (2015) (concluding that "immigration [is] inversely related to crime").

even though both migrants' and citizens' taxes help finance Texas's criminal justice system.  By requiring rigorous background checks and biometric screening, the Program likely further lowers the incidence of crime among CHNV parolees.  87 Fed. Reg. 63507.

**Healthcare.**  Texas alleges that as the number of migrants in Texas rises it will incur additional costs to fund or reimburse healthcare services for low-income residents.  Am. Compl. ¶64; PI Mot. 12.  Texas, however, ignores that the Program requires all parolees to be sponsored by a U.S. resident with "sufficient financial resources" to support the applicant "for the duration of their parole period."  88 Fed. Reg. 1255, 1263.  Moreover, parolees who obtain formal work authorization may gain employer-provided health insurance, further limiting their reliance on public healthcare.  87 Fed. Reg. 63507.  CHNV migrants also pay their share of the state, local, and federal taxes that finance public healthcare programs, even though on average they are younger, healthier, and require less care than U.S. citizens.[13]  And around 60 percent of Texas's health-care costs for low-income residents is covered by federal Medicaid and CHIP reimbursement.  87 Fed. Reg. 74429, 74431.

**Driver's Licenses.**  Texas claims that many migrants "released or paroled into Texas will obtain Texas driver's licenses," allegedly costing the State roughly $200 for each additional migrant who seeks a license.  PI Mot. 11.  These costs are speculative and inflated, in part because Texas conflates the fixed and variable costs of issuing licenses.  At most, the Program theoretically could have led Texas to process 833 license applications from CHNV parolees arriving in January 2023, presumably not all in the same part of the State.  App'x ¶¶13-14.  Although this is roughly

---

[13] *Compare* Camarota and Ziegler, *Immigrants Coming to America at Older Ages,* CENTER FOR IMMIGRATION STUDIES 2 (2021), https://cis.org/sites/default/files/2021-03/camarota-aging-21_0.pdf (average age of newly arrived migrants is 30.6 years) *with Nation Continues to Age as It Becomes More Diverse*, U.S. CENSUS BUREAU (2022), https://www.census.gov/newsroom/press-releases/2022/population-estimates-characteristics.html (national median age is 38.8).

0.01 percent of the nearly 7.5 million licenses issued statewide in 2018 (*id.*), Texas claims it "*may*" have to "open additional driver license offices" and hire "[a]dditional [e]mployees" to meet this demand.  Gipson Decl. ¶¶6, 9 (emphasis added).  But those speculative facility and hiring costs, which account for over 98 percent of the $200 estimate (PI Mot. 11; App'x ¶¶13-14), are unlikely to rise with such small increases in the number of license applicants.  In any event, Texas's license application fees ($33/license) and gasoline taxes paid by CHNV residents far exceed the remaining alleged $3.60 in variable costs per license. *Id.*

 **Education.**  Texas conflates the fixed costs of building new schools and hiring new teachers with the relatively low variable costs of educating, at most, a few hundred additional children each month scattered amongst the over 5.4 million students enrolled across thousands of Texas public schools. *Id.* ¶15.  Texas even admits it "cannot quantify the number of illegal aliens or children of illegal aliens in its schools" (PI Mot. 11), thus conceding its cost allegations are speculative.  And it ignores that migrants' taxes and federal transfers help finance Texas schools, not to mention the benefits to Texas of a more educated CHNV population.

 **Wages.**  Without citing evidence, Texas suggests that employed CHNV parolees will lower Texans' wages.  PI Mot. 13-14.  The weight of economic scholarship, however, concludes that the "impact of immigration on the wages of natives overall is very small."  Blau and Mackie, *The Economic and Fiscal Consequences of Immigration*, NAT'L ACADS. OF SCIS., ENGINEERING, & MEDICINE, at 267 (2017) (surveying "decades" of economic research).  Regardless, the effect (if any) of the Program on wages is irrelevant because Texas's citizens – not the State itself – bear any such costs. *Massachusetts v. Mellon*, 262 U.S. 447, 479, 485-86 (1923) (states lack *parens patriae* standing to challenge federal policies).

## **<u>CONCLUSION</u>**

The available data, economic scholarship, and even its own allegations undermine any claim that Texas (or the other States) will incur increased costs from the CHNV Program.  This economic logic has legal consequences.  Without any concrete evidence establishing harm, the States' alleged injuries are "purely speculative" and therefore cannot establish either Article III standing or irreparable harm for an injunction.  *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015): *Holland Am. Ins. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).  The Court should apply the economic perspectives *Amici* provide here when analyzing the States' standing and irreparable injury claims.

Dated: August 11, 2023                    Respectfully submitted,

**COVINGTON & BURLING LLP**

By: /s/ Brandon R. Gould

Brandon R. Gould*                         Gawon Go
Carolyn F. Corwin                         Abigail Kertzman
850 Tenth Street, N.W.                    The New York Times Building
Washington, D.C. 20001                    620 Eighth Avenue
Telephone: (202) 662-6000                 New York, New York 10018
bgould@cov.com                            Telephone: (212) 841-1000
ccorwin@cov.com                           ggo@cov.com
                                          akertzman@cov.com

*Counsel for* Amici Curiae
*Drs. Stan Veuger, Tara Watson*
*Douglas Holtz-Eakin, & Leah Boustan*

\**Attorney-in-charge, admitted* pro hac vice

*Certificate of Word Count:*
This memorandum contains 4,997 words, as
calculated by Microsoft Word.

19

## CERTIFICATE OF SERVICE

I certify that a Copy of the foregoing instrument was served via ECF pursuant to the Federal

Rules of Civil Procedure on the 11th day of August, 2023, upon all counsel of record in this matter.


By: */s/ Brandon R. Gould*
Brandon R. Gould