## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

STATE OF TEXAS, *et al.*,

        *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

Case No. 6:23-cv-00007

## <u>MEMORANDUM OF LAW OF HAITIAN-AMERICANS UNITED, INC. AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Haitian-Americans United, Inc. states that it is a non-profit corporation with no parent corporations, and with no stock, and therefore with no publicly held company owning 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................ ii

TABLE OF AUTHORITIES ................................................................................... iv

INTEREST OF AMICUS CURIAE ........................................................................ 1

RELEVANT BACKGROUND ............................................................................... 2

ARGUMENT ......................................................................................................... 4

    I.   THE PLAINTIFFS LACK STANDING TO BRING THIS LAWSUIT ......................... 4

    II.  THE PLAINTIFFS CANNOT SATISFY THEIR BURDEN TO PROVE THE FOUR REQUIRED ELEMENTS OF A MOTION FOR PRELIMINARY INJUNCTION ....... 6

        A.  The Plaintiffs Cannot Satisfy Their Burden To Prove That There Is A Substantial Threat Of Irreparable Injury To Them If The Preliminary Injunction Is Not Granted. ........................................................................................... 6

            1.  The Costs Asserted By The Plaintiffs Are Insufficient To Prove Irreparable Harm Because They Are Irrelevant, Or, At Best, Speculative. ................. 7

            2.  The Plaintiffs' Cost Analysis Is Insufficient To Prove Irreparable Harm Because The Plaintiffs Failed To Consider Countervailing Benefits ........ 9

        B.  The Plaintiffs Cannot Satisfy Their Burden To Prove That The Threatened Injury To The Plaintiffs Outweighs The Threatened Harm To The Defendants Or That The Injunctive Relief Would Not Disserve The Public. ...................................... 13

CONCLUSION .................................................................................................... 15

CERTIFICATE OF SERVICE ............................................................................ 17

CERTIFICATE OF AMICUS CURIAE RELATING TO FUNDING .......................... 17

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>                                                                 <u>**Page(s)**</u>

*City of Dallas v. Delta Air Lines, Inc.,*
    847 F.3d 279 (5th Cir. 2017) ...................................................................................6

*Devose v. Herrington,*
    42 F.3d 470 (8th Cir. 1994) .....................................................................................9

*Flores v. Sanders,*
    2022 WL 18276842 (E.D. Tex. May 12, 2022)....................................................8, 9

*Friends of Lydia Ann Channel v. United States Army Corps of Engineers,*
    701 Fed. App'x 352 (5th Cir. 2017) ......................................................................15

*Holland Am. Ins. Co. v. Succession of Roy,*
    777 F.2d 992 (5th Cir. 1985) ...........................................................................6, 7, 9

*Humana Inc. v. Jacobson,*
    804 F.2d 1390 (5th Cir. 1986) ............................................................................6, 7

*Jinghua Zhang v. Sessions,*
    734 Fed. App'x 75 (2d Cir. 2018)...........................................................................8

*Jones v. National Conference of Bar Examiners,*
    801 F. Supp. 2d 270 (D. Vt. 2011)..........................................................................9

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)................................................................................................4

*Nken v. Holder,*
    556 U.S. 418 (2009)..............................................................................................13

*Optimus Steel, LLC v. U.S. Army Corps of Engineers,*
    492 F. Supp. 3d 701 (E.D. Tex. 2020)....................................6, 7, 9, 13, 14, 15

*Raines v. Byrd,*
    521 U.S. 811 (1997)................................................................................................4

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998) ............................................................................15

*Sierra Club v. United States Army Corps of Engineers,*
    990 F. Supp. 2d 9 (D.D.C. 2013) ..........................................................................13

*Sure-Tan, Inc. v. National Labor Relations Bd.*,
   467 U.S. 883 (1984)..........................................................................................5, 6

*United States v. Texas*,
   599 U.S. __ (2023)............................................................................................4, 5

*Valley v. Rapides Parish School Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ...........................................................................13

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)............................................................................................13

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)....................................................................................7, 9, 13

**Statutes**

8 U.S.C. § 1182(d)(5)(A) .......................................................................................1

**Other Authorities**

Implementation of a Parole Process for Cubans,
   88 Fed. Reg. 1266 (Jan. 9, 2023) .......................................................................1

Implementation of a Parole Process for Haitians,
   88 Fed. Reg. 1243 (Jan. 9, 2023) .........................................................1, 2, 3, 4

Implementation of a Parole Process for Nicaraguans,
   88 Fed. Reg. 1255 (Jan. 9, 2023) .......................................................................1

Implementation of a Parole Process for Venezuelans,
   87 Fed. Reg. 63507 (Oct. 19, 2022).................................................................1, 8

Implementation of Changes to the Parole Process for Venezuelans,
   88 Fed. Reg. 1279 (Jan. 9, 2023) ....................................................................1, 8

Implementation of the Uniting for Ukraine Parole Process,
   87 Fed. Reg. 25040 (Apr. 27, 2022) ...................................................................8

v

## INTEREST OF AMICUS CURIAE

Haitian-Americans United, Inc. ("HAU") is a Massachusetts nonprofit organization that focuses on community empowerment and cultural development for Haitians and Haitian-Americans, including reuniting recent immigrants with their families in the United States. More than 80,000 Haitians live in Massachusetts – the second largest Haitian population by state in the U.S. – most of whom live in Boston and adjacent cities.[1] HAU, as a community group, works directly with many of the individuals and families who would benefit from the Parole Program.[2]

The Parole Program, implemented by the Department of Homeland Security ("DHS"), permits Haitian nationals, among others, to temporarily enter the United States in a lawful, safe, humane, and orderly way to escape life-or-death conditions in their home country.[3] HAU helps these individuals and families, and others seeking immigration protection and relief, to facilitate family reunification, housing, employment, and other community-related issues associated with entry into the United States. HAU thus has first-hand knowledge of the positive impact such

---

[1] *See* "A Prosperous Boston for All," https://www.bostonplans.org/getattachment/c1a82525-5c19-45d5-8601-ccd51c99e154; "Haitian Population by State 2023," World Population Review, https://worldpopulationreview.com/state-rankings/haitian-population-by-state.

[2] The "Parole Program," as used throughout this Memorandum, refers to the Executive Branch's implementation of parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans, pursuant to 8 U.S.C. § 1182(d). *See* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022); and Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023). The Department of Homeland Security ("DHS") is authorized to implement the Parole Program pursuant to Section 212(d)(5)(A) of the Immigration and Nationality Act.

[3] *See* U.S. Citizenship and Immigration Services, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, https://www.uscis.gov/CHNV (noting that "DHS has announced processes through which nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members, may request to come to the United States in a safe and orderly way.").

1

humanitarian programs have on the economy and communities. As such, HAU and its members have a significant interest in the continuation of the Parole Program.

Ending the Parole Program would have catastrophic effects, subjecting individuals and families to dangerous and often fatal social, political, and economic conditions in their home countries. The injunction that Plaintiffs seek would harm numerous, vulnerable third parties, who would otherwise positively contribute to the U.S. economy and society, and the Plaintiffs cannot make the requisite showing of Article III standing or for a preliminary injunction. The Court should deny the Plaintiffs' motion and allow this humanitarian Parole Program to continue.

## **RELEVANT BACKGROUND**

The Parole Program, which is a statutorily-authorized program operated by DHS, is a "new border enforcement measure[] to improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to lawfully come to the United States."[4] The Parole Program applies to nationals of Haiti, Cuba, Nicaragua, and Venezuela, and their family members. *See id.*

The recent deplorable and dangerous conditions in Haiti have led tens of thousands of Haitians to migrate to the United States. *See* 88 Fed. Reg. 1243 (Jan. 9, 2023).

> Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse. The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019. This recent surge in gang violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and

---

[4] U.S. Department of Homeland Security, "DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes," (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

> medicines. Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, had caused 8,146 hospitalizations and 188 deaths.

*Id.* In addition to these violent conditions, on August 14, 2021, a 7.2 magnitude earthquake in Haiti "kill[ed] more than 2,200 people, injur[ed] over 12,000 more, destroy[ed] tens of thousands of homes, and crippl[ed] Haiti's already fragile infrastructure." *Id*. Days later, a tropical storm "hamper[ed] the continuing rescue efforts for those impacted by the earthquake." *Id*. Within a month of the earthquake, more than 650,000 Haitians, including more than 260,000 children, needed humanitarian assistance. *See id.* "The World Bank estimates that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP." *Id.* As a result of the "political, security, and environmental crises," Haiti's economy collapsed, but even before the events of 2021, Haiti was the "poorest country in the Americas and one of the poorest in the world." *Id.* On October 7, 2022, the Haitian government asked for international military assistance to help resolve the unstable conditions. *Id.* Even when Haitians are able to leave the country and seek shelter in the U.S., they often take routes and use means that pose dangerous risks to their lives, including traveling in "makeshift boats." *Id.* The Parole Program incentivizes parolees to use less dangerous means of travel to the U.S.

The Parole Program involves a host of eligibility criteria and prerequisite procedures before one can participate. Individuals and families allowed into the U.S. under the Parole Program must be sponsored by an individual who: (1) is a "U.S. citizen, national, or lawful permanent resident," or holds "a lawful status in the United States," or is "a parolee or recipient of deferred action or Deferred Enforced Departure"; (2) has passed "security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns"; and (3) has demonstrated "sufficient financial resources to receive, maintain, and support the intended

3

beneficiary whom they commit to support for the duration of their parole period." *Id.* These sponsors and supporters are also often family members of the individuals and families seeking parole, further incentivizing compliance with the Parole Program requirements so that their families can be reunited in the United States. After people are paroled into the United States under the Parole Program, they are eligible to apply for employment authorization from U.S. Citizenship and Immigration Services by submitting a formal, written application.[5] The Parole Program limits a participant's stay in the U.S. to two years.

<u>**ARGUMENT**</u>

## I.     **THE PLAINTIFFS LACK STANDING TO BRING THIS LAWSUIT.**

A threshold question in every case is "whether the States have standing under Article III to maintain [the] suit," *United States v. Texas*, 599 U.S. __ (2023), slip op. 4. Here, the Plaintiffs do not have such standing. "To establish standing, a plaintiff must show an injury in fact caused by the defendant[.]" *Id.* The Supreme Court has "stressed that the alleged injury must be legally and judicially cognizable." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). When the Executive Branch's action does not involve "coercive power" over a plaintiff's "liberty or property," that action "does not infringe upon interests that courts often are called upon to protect." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). "And for standing purposes, the absence of coercive power over the plaintiff makes a difference: When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing." *Id.*, slip op. 6 (quoting *Lujan*, 504 U.S. at 562).

---

[5] *See* U.S. Citizenship and Immigration Services, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, https://www.uscis.gov/CHNV (describing process for seeking work authorization).

The Parole Program involves the Executive Branch's regulation of qualified foreign nationals, and notably does not involve the exercise of any "coercive power" over the Plaintiffs. Therefore, the Executive Branch's action "does not infringe upon interests that courts often are called upon to protect." *Id.*, slip op. 4. And because the Plaintiffs' asserted injury "arises from the government's allegedly unlawful regulation of someone else" – allowing parole for certain qualified foreign nationals – the Plaintiffs are subject to a higher showing for purposes of standing, and the Plaintiffs cannot satisfy that burden. *Id.*, slip op. 6.

Here, the Plaintiffs assert that the Executive Branch's implementation and enforcement of immigration laws, *i.e.,* the Parole Program, causes the Plaintiffs indirect, monetary injuries. *See* Plaintiffs' Motion for Preliminary Injunction ("Pl. Motion"), pp. 10-14 (asserting that the Parole Program results in costs spent on driver's licenses, education, healthcare, as well as law enforcement, correctional, and social costs). However, these types of alleged indirect costs are insufficient to confer standing on States as plaintiffs. *See* 599 U.S. __ (2023), n.3 ("[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated."). Further, the Supreme Court has noted that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.*

The Supreme Court's recent conclusion in *United States v. Texas* is equally applicable here: "[i]n short, none of the various theories of standing[,] [including the alleged indirect costs argument] asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit." *Id.*; *see also Sure-Tan, Inc. v. National Labor Relations Bd.*, 467 U.S. 883, 897 (1984) (petitioners had "no judicially cognizable interest in procuring enforcement of the immigration

laws" by the Executive Branch). The Plaintiffs in this case cannot demonstrate standing, and, as such, the Plaintiffs' Complaint should be dismissed.

## II.   THE PLAINTIFFS CANNOT SATISFY THEIR BURDEN TO PROVE THE FOUR REQUIRED ELEMENTS OF A MOTION FOR PRELIMINARY INJUNCTION.

Even if the Plaintiffs had standing, they have not satisfied their burden to demonstrate that a preliminary injunction should issue. A preliminary injunction is an "extraordinary remedy" that should not be granted "unless the movant has clearly carried the burden of persuasion on four requirements": "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (citation omitted); *see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion."). "Failure to sufficiently establish any one of the four factors requires this Court to deny the movant's request for a preliminary injunction." *City of Dallas*, 847 F.3d at 285. The Plaintiffs cannot satisfy their burden on *any* of the four elements, and, here, HAU addresses prongs two, three, and four.

### A.   The Plaintiffs Cannot Satisfy Their Burden To Prove That There Is A Substantial Threat Of Irreparable Injury To Them If The Preliminary Injunction Is Not Granted.

The Plaintiffs must show that irreparable harm would result if the injunction were not granted. *City of Dallas*, 847 F.3d at 285. To qualify as "irreparable harm," "there must be 'a significant threat of injury from the impending action,' the injury must be 'imminent,' and 'money damages cannot fully repair the harm.'" *Optimus Steel, LLC v. U.S. Army Corps of Engineers*, 492 F. Supp. 3d 701, 724 (E.D. Tex. 2020) (quoting *Humana Inc. v. Jacobson*, 804 F.2d 1390, 1394

(5th Cir. 1986)).  The movant must prove that the alleged irreparable harm "is not merely possible, but 'likely.'" *Optimus*, 492 F. Supp. 3d at 724 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Succession of Roy*, 777 F.2d at 997.

        1.   <u>The Costs Asserted By The Plaintiffs Are Insufficient To Prove Irreparable Harm Because They Are Irrelevant, Or, At Best, Speculative.</u>

The Plaintiffs have produced no competent evidence to show irreparable harm from the Parole Program, relying solely on alleged costs from "[u]nchecked migration" and "illegal aliens." *See* Pl. Motion, pp. 10-14 (asserting that "unchecked migration" imposes costs spent on driver's licenses, education, healthcare, as well as law enforcement, correctional, and social costs). However, even if the Plaintiffs' cited cost estimates were accurate, the Parole Program does not involve "unchecked migration." Instead, the Parole Program is specifically designed to include safeguards and prerequisite checks on the participating individuals and families to create an orderly path to lawful entry into the United States. By requiring every participant to be sponsored and providing for work authorization, the Parole Program already accounts for the needs of participating individuals and families after they arrive. The Parole Program is "shifting the composition of immigrants so that they are more self-sufficient and reliant on their existing social networks…." "Biden's Immigration Parole Programs Are Working," Manhattan Institute, Daniel Di Martino (May 25, 2023), [https://manhattan.institute/article/bidens-immigration-parole-programs-are-working](https://manhattan.institute/article/bidens-immigration-parole-programs-are-working). Further, participants are limited to a two-year stay. Thus, the Parole Program actually reduces what Plaintiffs refer to as "unchecked migration," which serves as the sole basis for their showing of irreparable harm.

While the Plaintiffs cite to data relating to "unchecked migration," which is irrelevant here, they neglect to cite to available, relevant data derived from analogous humanitarian parole

programs, such as those implemented in 2022 for Ukraine and Venezuela.[6] *Cf. Jinghua Zhang v. Sessions*, 734 Fed. App'x 75, 77 (2d Cir. 2018) (where relevant evidence is available, but not cited, courts may consider the party's failure to produce such evidence). The Ukraine and Venezuela parole programs have similar eligibility requirements, safeguards, and checks as the Parole Program at issue here, including sponsorship requirements, work authorization, and a limited duration of parole, to address similar problems – migrants fleeing war and violent and unstable conditions. *See* 87 Fed. Reg. 25040; 87 Fed. Reg. 63507. Data from these existing parole programs shows that migration has become safer and more orderly, and the programs have benefited the States.[7]

Instead of directing the Court to these analogous programs and data to support their allegations of costs, the Plaintiffs cite declarations from various State officials. *See* Dkt. 22, Exhibits C-F. However, none of the costs described in any of these declarations relate specifically to the Parole Program. Instead, like the Plaintiffs' Motion, the declarations provide only generalized data relating to what the Plaintiffs refer to as unchecked migration. Those conditions are not the subject of this case, as this case involves a highly regulated, lawful migration program. Because the Plaintiffs' alleged costs are based on a set of circumstances not alleged in the Complaint, those alleged costs are irrelevant, and cannot serve as evidence of irreparable harm

---

[6] *See* Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 27, 2022); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022).

[7] *See* "How those fleeing Ukraine inspired US border policies," Associated Press News, Colleen Long & Elliot Spagat (May 9, 2023), https://apnews.com/article/biden-immigration-ukraine-border-af1fb374771da55b83d88a1598621a84 (Ukraine parole program alleviated concerns "that Ukrainians could be unsafe in their travels and [that] their circuitous route to the U.S. was further straining border resources"); *see also* 88 Fed. Reg. 1279 (The initial Venezuela parole program has "reduced the number of individuals states and local governments, as supported by civil society, have had to receive and assist.").

8

resulting specifically from the Parole Program. *See Flores v. Sanders*, 2022 WL 18276842, at *2 (E.D. Tex. May 12, 2022) ("The courts have held that a request for a preliminary injunction must be based on allegations related to the claims in the complaint."); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").[8]

    With no viable evidence of irreparable harm, the Plaintiffs cannot satisfy their burden, and the Court should deny their motion. *See Succession of Roy*, 777 F.2d at 997 (injunctive relief should be granted only when the movant makes a "clear showing" that they satisfied the elements).

### 2. The Plaintiffs' Cost Analysis Is Insufficient To Prove Irreparable Harm Because The Plaintiffs Failed To Consider Countervailing Benefits.

    The Plaintiffs' cost analysis is also flawed because it fails to account for the substantial benefits to the Plaintiffs from the Parole Program. *See Jones v. Nat'l Conference of Bar Examiners*, 801 F. Supp. 2d 270, 286-87 (D. Vt. 2011) (in evaluating irreparable harm, courts consider "countervailing benefits" to the plaintiff). Here, the benefits to the Plaintiffs far outweigh the speculative harm that they allege. Specifically, the Parole Program will save numerous lives, reduce "unchecked migration,"[9] *and* be a boon to the economy. *See* George W. Bush Institute, The

---

[8] Any attempt to analogize the data contained in the Plaintiffs' motion to potential data that would result under the Parole Program would be too speculative to rely on for the purpose of granting injunctive relief. *See Optimus*, 492 F. Supp. 3d at 724 (quoting *Winter*, 555 U.S. at 22) (movant must show that alleged irreparable harm "is not merely possible, but likely"); *Succession of Roy*, 777 F.2d at 997 ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

[9] *See, e.g.*, "The Biden Administration's Use of Immigration Parole Authority is Both Lawful and Smart," Center for American Progress, Tom Jawetz (May 10, 2023), https://www.americanprogress.org/article/the-biden-administrations-use-of-immigration-parole-authority-is-both-lawful-and-smart/ (noting that data shows sharp declines in U.S. Border Patrol encounters with Venezuelan, Haitian, Cuban, and Nicaraguan nationals as a result of the Parole Program).

Catalyst, "Benefits of Immigration Outweigh the Costs," Issue 02 (Spring 2016), https://www.bushcenter.org/catalyst/north-american-century/benefits-of-immigration-outweigh-costs#:~:text=Immigration%20fuels%20the%20economy.,so%20do%20those%20of%20natives (noting that "[i]mmigration has net benefits").

In addition to supporting themselves financially through work authorization, participants in the Parole Program will provide a substantial benefit to the economy. For example, in 2017 in Boston alone, where HAU focuses its efforts, the Haitian community: "earned $511 million in income"; had a consumer demand that "supported an additional 1,674 jobs"; "contributed $256 million to Boston's gross city product"; "contributed $26 million in state income taxes"; and "contributed $8.4 million in state sales taxes." *See* "A Prosperous Boston for All," Haitians, Mayor Martin J. Walsh, Boston Planning & Development Agency, https://www.bostonplans.org/getattachment/c1a82525-5c19-45d5-8601-ccd51c99e154.

Immigrants contribute to the U.S. economy in a direct, financial way, and the absence of their spending power would devastate the economy. *See* FWD.us, "Immigration Facts: The Positive Economic Impact of Immigration, Immigrants and Immigration Mythbusters: Addressing Common Misconceptions," (July 21, 2020), https://www.fwd.us/news/immigration-facts-the-positive-economic-impact-of-immigration/. For example, "[i]mmigrants added $2 trillion to the U.S. GDP in 2016 and $458.7 billion to state, local, and federal taxes in 2018." *Id.* These tax dollars collected from immigrants "fund our schools, hospitals, emergency response services, highways, and other essential services." *Id.* Further, "[i]n 2018, after immigrants spent billions of dollars on state and local, and federal taxes, they were left with $1.2 trillion in spending power, which they used to purchase goods and services, stimulating local business activity." *Id.* Notably, "[p]roposed cuts to our legal immigration system would have devastating effects on our economy, decreasing

10

GDP by 2% over twenty years, shrinking growth by 12.5%, and cutting 4.6 million jobs. Rust Belt states would be hit particularly hard, as they rely on immigration to stabilize their populations and revive their economies." *Id.* "Additionally, immigrants make enormous contributions to Social Security. If the current legal immigration levels were cut by 50%, the Social Security fund would lose $1.5 trillion in revenue over the next 75 years." *Id.*

Immigrants also make substantial contributions to the workforce. As of June 30, 2023, there were nearly 10 million job openings in the United States. *See* U.S. Bureau of Labor Statistics, "Job Openings and Labor Turnover Summary," (Aug. 1, 2023), https://www.bls.gov/news.release/jolts.nr0.htm. Nearly half of this gap can be attributed to two years of lost immigration during the COVID-19 pandemic. *See* Abha Bhattarai & Lauren Kaori Gurley, "Trump, Covid Slowed Down Immigration. Now Employers Can't Find Workers," Washington Post (Dec. 15, 2022), https://www.washingtonpost.com/business/2022/12/15/immigration-reform-congress-worker-shortage/. And while immigrants comprise a small percentage of all U.S. workers, they reflect a large share of workers in important occupations and industries, such as health care, farming, fishing, forestry, building and grounds cleaning, maintenance work, and hotel work. *See* Center on Budget and Policy Priorities: "Immigrants Contribute Greatly to U.S. Economy, Despite Administration's 'Public Charge' Rule Rationale," (Aug. 15, 2019), https://www.cbpp.org/research/poverty-and-inequality/immigrants-contribute-greatly-to-us-economy-despite-administrations. In fact, nearly 450,000 parolees, including those from Ukraine, currently work in industries with critical labor shortages, including health care. *See* Philip Connor, "Immigration Parole Has Added 450,000 Workers to Industries with Critical Labor Shortages," FWD.us (Apr. 20, 2023), https://wp.fwd.us/news/immigration-labor-shortages/.

11

In particular, the circumstances of the COVID-19 pandemic demonstrate the significant contribution that immigrants have made to the health care industry, and, in turn, the economy, while risking their own health and well-being. *See* Jeane Batalova, "Immigrant Health-Care Workers in the United States," (May 14, 2020), https://www.migrationpolicy.org/article/immigrant-health-care-workers-united-states-2018 ("Immigrants represent disproportionately high shares of U.S. workers in many essential occupations, including in health care—a fact underscored during the coronavirus pandemic as the foreign born have played a significant role in frontline pandemic-response sectors. In 2018, more than 2.6 million immigrants, including 314,000 refugees, were employed as health-care workers, with 1.5 million of them working as doctors, registered nurses, and pharmacists.").

Further, "immigrants appear to be taking low-skilled jobs that natives are either not available [for] or unwilling to take." *See* Center on Budget and Policy Priorities: "Immigrants Contribute Greatly to U.S. Economy, Despite Administration's 'Public Charge' Rule Rationale," (Aug. 15, 2019), https://www.cbpp.org/research/poverty-and-inequality/immigrants-contribute-greatly-to-us-economy-despite-administrations. In fact, "immigrants tend to be unusually mobile workers, quicker than their native-born peers to move around the country in response to shortages that appear in local labor markets. This helps native-born workers by filling gaps that could otherwise make their jobs impossible or reduce their productivity and lower their wages." *Id.* The economic and social contributions of immigrants cannot be overstated.

The Plaintiffs also fail to account for the fact that, as noted above, individuals and families participating in the Parole Program will not only have work authorization, but they will also have sponsors for the duration of their parole period. In other words, these individuals and families will be able to support and provide for themselves.

When these benefits of the Parole Program are considered in the irreparable harm equation, the Plaintiffs cannot satisfy their burden of showing that there is a "significant threat of injury." *Optimus*, 492 F. Supp. 3d at 724. Because the Plaintiffs have not carried their burden of demonstrating irreparable harm, the Court should deny the Plaintiffs' motion.

**B.   The Plaintiffs Cannot Satisfy Their Burden To Prove That The Threatened Injury To The Plaintiffs Outweighs The Threatened Harm To The Defendants Or That The Injunctive Relief Would Not Disserve The Public.**

The Plaintiffs must show that "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and that "the injunction will not undermine the public interest." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). When the government is the non-moving party, as here, these two factors "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). "When balancing the competing claims of an injury, the Court must consider the effect on each party of the granting or withholding of the requested relief." *Optimus*, 492 F. Supp. 3d at 726 (quoting *Winter*, 555 U.S. at 24). While a movant may allege harms resulting from the absence of an injunction, "harm can also flow from enjoining an activity." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). As here, "the public may benefit most from permitting an activity to continue." *Optimus*, 492 F. Supp. 3d at 726.

Enjoining the Defendants from continuing the Parole Program would significantly harm the Defendants and the public whom the Defendants represent. The Parole Program is a direct response to humanitarian crises in the covered countries. Individuals and families are fleeing these countries in desperation, to escape horrific social, political, and economic conditions, including natural disasters, widespread illness, gang violence, and food shortages resulting in pervasive

13

hunger. Entry into the United States is a life-saving measure for many. Through its work with recent Haitian immigrants, HAU has seen first-hand the devastation that its members experience in their home countries, and then the positive effects that those individuals confer on the U.S. economy and local communities once they arrive through an orderly immigration process.

The Plaintiffs have failed to address any of these ways in which the Parole Program positively serves the public interest. The public interest is certainly served by facilitating the reunion of families and the strengthening of communities, both of which are made possible by the Parole Program. *See* FWD.us, "Immigration Facts: The Positive Economic Impact of Immigration, Immigrants and Immigration Mythbusters: Addressing Common Misconceptions," (July 21, 2020),        https://www.fwd.us/news/immigration-facts-the-positive-economic-impact-of-immigration/ ("Family-based immigration promotes family unity and integration, all core principles of American values."). Those who agree to sponsor applicants for the Parole Program are often family members of the applicants, and they are seeking to reunite their families, as well as save their family members from the dangerous conditions present in their home countries. Eliminating the Parole Program by granting the Plaintiffs' motion would also eliminate these opportunities to reunite families, strengthen family values, build communities, and save lives. Moreover, if the Parole Program were eliminated, HAU, the population it serves, and the country as a whole would be deprived of the significant economic benefits that accompany immigration programs that allow for work authorization. *See Optimus*, 492 F. Supp. 3d at 727 (program serves the public interest when it will positively impact the job market and will benefit the economy).

The Plaintiffs' sole argument on the issue of the public interest is that "the public is served when the law is followed, and there is generally no public interest in the perpetuation of unlawful agency action." Pl. Motion, p. 27. This assertion is conclusory. It improperly assumes unlawful

action by the Defendants to justify the claim that the public interest will be served by eliminating the Parole Program. As explained in the Defendants' Opposition, the Plaintiffs cannot show a likelihood of success on the merits because the Defendants followed the law. There is no unlawful agency action, thus negating the Plaintiffs' entire argument about the public interest. *See Friends of Lydia Ann Channel v. U.S. Army Corps of Engineers*, 701 Fed. App'x 352, 357 (5th Cir. 2017) (vacating preliminary injunction where other factors were "totally dependent" on plaintiff's flawed merits theory); *Optimus*, 492 F. Supp. 3d at 727-28 (denying motion for preliminary injunction; "Plaintiff argues that there is a significant public interest in ensuring that federal agencies comply with their statutory duties. This may be so. But, here, there is no 'clear' violation of the law as Plaintiff contends. Plaintiff's public interest arguments depend in large part on the success of its merits arguments. Plaintiff at this point is not likely to succeed on the merits of its claims."); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (finding that the plaintiff's public interest argument offered plaintiff "no support because it [was] inextricably linked with the merits of the case."). Further, the Plaintiffs' statement – that "the public is served when the law is followed" – is a general, blanket statement that could be applied in *any* case involving government action. It does not address the impact that the requested injunction would have on the public.

The Court's recognition in *Optimus* – that "the public may benefit most from permitting an activity to continue" – is particularly true here. 492 F. Supp. 3d at 726. As such, the Plaintiffs cannot satisfy their burden of demonstrating that the balance of harms weighs in their favor, or that granting the injunction would not disserve the public interest.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Plaintiffs' motion.

Respectfully submitted on behalf of *amicus curiae*,

HAITIAN-AMERICANS UNITED, INC.,

By its attorneys,

*/s/ Michael A. Kippins*
Michael A. Kippins
Oren M. Sellstrom
Erika Richmond
Iván Espinoza-Madrigal
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 482-1145
mkippins@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org

Dated: August 16, 2023

## CERTIFICATE OF SERVICE

I hereby certify that, on August 16, 2023, I served on all counsel of record a true and accurate copy of the foregoing document electronically (via CM/ECF).

/s/ Michael A. Kippins

## CERTIFICATE OF AMICUS CURIAE RELATING TO FUNDING

I hereby certify that: (1) no party's counsel authored the brief in whole or in part; (2) no party or a party's counsel contributed money that was intended to fund the preparation or submission of this memorandum; and (3) no person – other than the *amicus curiae*, its members, or its counsel – contributed money that was intended to fund the preparation or submission of this memorandum.

/s/ Michael A. Kippins