United States Courts
Southern District of Texas
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

*August 16, 2023*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| STATE OF TEXAS, et al.,<br><br>                    Plaintiffs,<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et. al.,<br><br>                    Defendants. | Civil Action No. 6:23-cv-00007 |

**MEMORANDUM OF LAW OF**
**LUTHERAN IMMIGRATION AND REFUGEE SERVICE**
**AS *AMICUS CURIAE* IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR AN INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT OF INTEREST ............................................................................ 1

SUMMARY OF ARGUMENT ........................................................................... 2

ARGUMENT ...................................................................................................... 2

I.     The Plaintiffs Have Failed to Demonstrate They Are Likely to Suffer Irreparable Harm .......................................................................................................... 3

II.    The Balance of Harms Weighs Strongly Against an Injunction. ................ 6

       A.    An Injunction Would Cause Irreparable Harm to the Migrants Who Benefit from the Opportunity to Seek Parole. ............................ 6

       B.    An Injunction Would Harm Amicus LIRS. ............................... 11

III.    An Injunction Would Harm the Public Interest .................................. 13

CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

CASES

*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987)................................3

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ...................................................................4

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018)..........................4, 5, 14

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).....................2, 3

OTHER AUTHORITIES

Priscilla Alvarez, *More Cubans are Coming to the US by Sea Than Any Time Since the 1990s*, CNN (Sept. 23, 2022), https://bit.ly/3YveoTT .......................................9

Rachel Clarke et al., *Texas Troopers Told to Push Back Migrants Into Rio Grande, Report Says Texas*, CNN (July 18, 2023), https://cbsn.ws/3Yx2yZs .....................10

Bernd Debusmann Jr., *US Immigration: 'They'd Rather Die Than Return to Nicaragua'*, BBC (Dec. 12, 2022), https://bbc.in/3qu41TK......................................10

Will Freeman, *Why the Situation in Cuba Is Deteriorating*, Council on Foreign Relations (last updated Apr. 25, 2023), https://on.cfr.org/3QDlmUN.......................7

*Haiti Conflict Puts Over 100,000 Kids at Risk of Starving to Death*, UN Says, Reuters (May 11, 2023), https://reut.rs/3YwYAQk..................................................7

Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023)......................13

Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023) ...................13

Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023) ......................................................................................................................13

Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022) ............................................................................................................13

Megan Janetsky, *Cubans Search for Holiday Food Amid Deepening Crisis*, Associated Press (Mar. 14, 2023), https://bit.ly/44nVhwt.......................................7

Maureen Mackey, *Migrants Crossing the Southern Border Show Signs of 'Worsening Trauma,' Including Sexual Assault: Report*, Fox News (Jan. 1, 2023), https://bit.ly/3OTKqWh..................................................................................9

*Nicaragua Orders Closure of Red Cross in Continuing Crackdown*, Al Jazeera (May 11, 2023)..........................................................................................................8

Alex Nowrasteh, *New Research on Illegal Immigration and Crime*, CATO Inst. BLOG (Oct. 2020, 4:16 PM), https://bit.ly/3OV3KTa ............................................................5

Press Release, Dep't of Homeland Security, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly* (Jan. 5, 2023), https://bit.ly/3s6SOc5 ............................................................6, 14

Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.*, Council on Foreign Relations (June 22, 2022), https://on.cfr.org/3s3kkqS ...................9

Nouran Salahieh, *This Is What the Crisis Along the US Border Looks Like*, CNN (Dec. 21, 2022), https://cnn.it/3KGOuqt ................................................................10

Vivian Sequera, *Venezuela Poverty Rate Falls to 50.5% in 2022 - Study*, Reuters (Nov. 10, 2022), https://reut.rs/3s9OYir .................................................................8

Elliot Spagat, *Why Nationalities Matter as US Braces for Migration Surge*, Associated Press (Mar. 14, 2023), https://bit.ly/3OTKcyp.................................9, 10

Florencia Trucco & Michael Rios, *Nicaragua Expels Two Nuns in Latest Crackdown on Catholic Church and Opposition*, CNN (Apr. 13, 2023), https://cnn.it/45o7F0b ..............................................................................................8

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Cuba*, https://bit.ly/3s29e5u (last visited Aug. 14, 2023)...................................................6

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Haiti*, https://bit.ly/3sbYDFn (last visited Aug. 14, 2023)..................................................7

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Nicaragua*, https://bit.ly/45KFadt (last visited Aug. 14, 2023) ..................................................8

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Venezuela*, https://bit.ly/3DSBmL4 (last visited Aug. 14, 2023).................................................8

*Venezuela: Events of 2021*, Human Rights Watch, https://bit.ly/3DZLO3i (last visited Aug. 14, 2023).........................................................................................8

Karl Vick, *The Long Way to America*, Time, https://bit.ly/3KD16ip (last visited Aug. 14, 2023) ..........................................................................................10

Paulina Villegas, *For Exiled Nicaraguans, Freedom Rings Hollow in the U.S. They Were Starved and Tortured. And Yet, They Dream of Going Back to Nicaragua.*, Wash. Post (May 12, 2023), https://wapo.st/3DRykqy ........................................7

Nick Paton Walsh et al., *On One of the World's Most Dangerous Migrant Routes, a Cartel Makes Millions off the American Dream*, CNN (Apr. 17, 2023), https://cnn.it/47sv7LF ...............................................................................................9

World Food Programme, *Nicaragua Country Brief,* https://bit.ly/44aPiuK (last visited Aug. 14, 2023) ................................................................................................................................8

## STATEMENT OF INTEREST

Lutheran Immigration and Refugee Service ("LIRS"), founded in 1939, is a faith-based 501(c)(3) nonprofit organization which has assisted more than half a million vulnerable immigrants, asylum seekers, and refugees in the United States.[1]  LIRS additionally serves as a coordinating body for 60 organizations with federally and privately funded immigration programs.

Rooted in Christian faith and bound by Scripture, LIRS is compelled to help migrants who seek reunification with loved ones and safety in the United States through processes like the parole processes for Cuban, Haitian, Nicaraguan, and Venezuelan nationals at issue in this case (the "CHNV parole processes" or "CHNV").  LIRS embraces the Bible's teachings about the sanctity of family and its commands to treat others as we wish to be treated, to honor the inherent dignity and worth of each individual, and to welcome the stranger, particularly in times of crisis.  These tenets are central to LIRS's faith and its mission to do God's work by assisting migrants, regardless of color or native country, particularly in their hour of need.  LIRS does this work by providing services to migrants who have been granted parole, including migrants paroled through the CHNV parole processes at issue in this case, as well as providing guidance to those seeking to sponsor individuals so they may be eligible for the parole processes.

---

[1] While there is no Local Rule in the Southern District of Texas on the filing of *amicus* briefs, pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici curiae certify that this brief was authored entirely by counsel for amici curiae and not by counsel for any party, in whole or part; no party or counsel for any party contributed money to fund preparing or submitting this brief; and apart from amici curiae and their counsel, no other person contributed money to fund preparing or submitting this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Plaintiff Texas, Defendants, and Intervenors have consented to the filing of this brief.  As of the date of filing, the Plaintiffs other than Texas have not responded to LIRS.

## SUMMARY OF ARGUMENT

Plaintiffs fail to meet their burden to demonstrate irreparable harm, that the balance of equities tips in favor of an injunction, or that the public interest favors an injunction. Each of these is a required element that Plaintiffs must establish before an injunction can be granted.

Plaintiffs' allegations of irreparable harm fall far short of the standard. They are speculative and disconnected from the policy they challenge. Moreover, the balance of equities points strongly against an injunction. An injunction would irreparably harm the migrants whom CHNV benefits, as well as Intervenors and many others who seek to sponsor and support such migrants. Second, LIRS would also be grievously harmed by an injunction as it and organizations like it rely on CHNV for the work they do. LIRS has a significant reliance interest on CHNV, as it has allowed LIRS to focus its finite resources on reunification, resettlement, and support, rather than on emergency support and trauma care. An injunction would also harm the public interest in creating a safer and more humane border. Accordingly, Plaintiffs' request for an injunction should be denied.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 698-90 (2008)). To justify the grant of such an "extraordinary remedy," the burden is on Plaintiffs to establish: (1) They are likely to succeed on the merits; (2) They are likely to suffer irreparable harm in the absence of relief; (3) The balance of equities tips in their favor; and (4) An injunction is in the public interest. *Winter*, 555 U.S. at 20.

To determine whether the balance of equities favors Plaintiffs, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). The Supreme Court has explicitly recognized the particular importance of this element and the public interest element in the injunction analysis. *Winter*, 555 U.S. at 26 (recognizing "the importance of assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction"); *Amoco Prod. Co.*, 480 U.S. at 545 (noting and re-affirming "the important role of the 'public interest' in the exercise of equitable discretion").

The standards for assessing whether a preliminary or permanent injunction should be granted are "essentially the same…with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success" for a preliminary injunction. *Amoco Prod. Co.*, 480 U.S. at 546 n.12.

Here, the Plaintiffs have failed to meet their burden. They have not demonstrated a likelihood of success—much less actually prevailed—on the merits for the reasons given by the Federal Defendants. Nor have Plaintiffs satisfied the remaining three factors for injunctive relief. Their alleged harms are speculative, cursory, and not irreparable. They ignore the extreme hardship an injunction would cause to migrants, their families in the United States, and to organizations like LIRS. And the public interest is served by a more humane and orderly border, which CHNV is achieving. The motion for an injunction should be denied.

## I.  The Plaintiffs Have Failed to Demonstrate They Are Likely to Suffer Irreparable Harm

Texas alleges monetary harms, asserting: "…Texas spends millions upon millions of dollars providing services to illegal aliens because of the United States government's failure to enforce federal law." Pl. Prelim. Inj. Br. at 25, Dkt. 22. It also cites costs for various social programs, including that "[m]any illegal aliens released or paroled into Texas will obtain Texas driver's licenses," education costs for "illegal aliens in [Texas] schools" which Texas admits it

"cannot quantify," and healthcare programs that Texas says "require significant expenditures to cover illegal aliens." *Id.* at 11-12. For alleged harms to the other States, Plaintiffs cite to their complaint which alleges harms due to generalized or estimated total social spending on "illegal aliens." *Id.* at 25; Am. Compl. ¶¶ 74-139, Dkt. No. 20.

Notably, Plaintiffs attribute all these costs to "illegal" immigrants. However, all of the entrants under CHNV are lawfully present, having been individually approved for temporary parole pursuant to statutory authority. Moreover, the CHNV parole processes require that a recipient of parole must have a "supporter in the United States who commits to providing financial and other support." Am. Compl. ¶ 46. And, unlike unauthorized immigrants, those authorized for parole under CHNV may file for a work permit immediately upon their entry into the United States, allowing them to quickly enter the workforce, contribute to the local economy through spending, and pay taxes which would go towards paying for the very programs Plaintiffs erroneously attempt to cite as injuries.

Plaintiffs' bare assertions of monetary injuries are thus wholly unrelated to CHNV. They are focused on "illegal" immigrants, not those like CHNV parolees who are lawfully present with sponsors who will provide financial support and who are eligible for employment authorization. Generalized and irrelevant allegations cannot establish irreparable harm sufficient for an injunction. Because the alleged harms are "projected costs … not based on the actual policy being challenged," Plaintiffs have failed to show irreparable injury that would entitle them to an injunction. *Texas v. United States*, 328 F. Supp. 3d 662, 736 (S.D. Tex. 2018).

Instead, Plaintiffs must show a "likelihood of substantial and immediate irreparable injury" without an injunction, and the "inadequacy of remedies at law." *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). "Speculative injuries are not enough to satisfy this factor," nor is "'the possibility of

some remote future injury.'" *See Texas*, 328 F. Supp. 3d at 736 (quoting 11A Charles Alan Wright et. al., *Federal Practice and Procedure* § 2948.1 (3d ed. 2013). As noted above, Plaintiffs have failed to tie *any* of their alleged injuries to CHNV, much less establish that the harms themselves are anything more than speculative.

Plaintiffs also make generalized assertions regarding "increased crime" and "social disorder." Pl. Prelim. Inj. Br. at 12-13. These assertions likewise are wholly disconnected from the actual parole processes at issue in this case, which involve immigrants who are lawfully present pursuant to a grant of parole, and who have sponsors and immediate access to work authorization. Moreover, the Cato Institute found that, in a 2018 study performed in Texas, the crime rate for legal immigrants was 535 per 100,000 compared with a crime rate of 1,422 per 100,000 for native-born Americans.[2] In other words, Plaintiffs' speculative claim of "increased crime" is belied by the fact that immigrants are in fact *less likely* to commit crimes than their native-born counterparts.

Plaintiffs further argue that the balance of equities favors them because they have a "significant interest in maintaining the health and safety of their residents." Pl. Prelim. Inj. Br. at 27. Yet Plaintiffs nowhere cite in their brief any evidence that the immigrants paroled under CHNV will affect the health and safety of their residents. They cite no evidence because no such evidence exists.[3] Nor do they provide any evidence for their claims of "increased … unemployment" and "environmental harm." Such bare assertions cannot be credited by the Court.[4]

---

[2] Alex Nowrasteh, *New Research on Illegal Immigration and Crime*, CATO Inst. BLOG (Oct. 2020, 4:16 PM), https://bit.ly/3OV3KTa; *See also* Kubrin Decl., ECF No. 175-74.
[3] *See* Ku Decl., ECF No. 175-73; Kubrin Decl., ECF No. 175-74.
[4] For similar reasons, Plaintiffs' alleged injuries are not sufficient for standing. *See* Def. Opp. Br., 7- 15, ECF No. 176.

## II.      The Balance of Harms Weighs Strongly Against an Injunction.

The balance of harms supports maintaining the parole processes and denying the motion for an injunction.

### A.      An Injunction Would Cause Irreparable Harm to the Migrants Who Benefit from the Opportunity to Seek Parole.

The Department of Homeland Security implemented the parole processes at issue in this case to "improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to lawfully come to the United States."[5]  The processes allow for individuals from Cuba, Haiti, Nicaragua, and Venezuela to submit their name for consideration for advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, provided they pass rigorous biometric and biographic national security and public safety screening, have a supporter in the United States, and complete public health requirements.

The humanitarian situation in these four countries is particularly dire:

*Cuba*.  Cubans face widespread human rights abuses.  The State Department calls Cuba an "authoritarian state" in which the "Communist Part is the only legal political party."[6]  It has found credible reports of state-sponsored "unlawful or arbitrary killings,…torture,…[and] harsh and life-threatening prison conditions…" particularly against political dissidents.[7]  There is widespread impunity for perpetrators of this violence.

---

[5] Press Release, Dep't of Homeland Security, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly* (Jan. 5, 2023), https://bit.ly/3s6SOc5.
[6] U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Cuba*, https://bit.ly/3s29e5u (last visited Aug. 14, 2023).
[7] *Id.*

As the economy has worsened and inflation has increased, food prices have soared, making purchasing food difficult or impossible for Cubans whose state salary was approximately $29/month in late 2022.[8]  This economic instability has forced hundreds of thousands of Cubans to flee the island.[9]

**Haiti.**  Haiti is experiencing extreme violence and food insecurity.  Heavily armed gangs have violently taken control of large areas of the country.  The United Nations estimates that in April alone, more than 600 Haitians were killed in the violence.  The State Department has noted that some gangs "allegedly received support from political and economic elites" and have been responsible for "killings, brutal attacks on citizens, targeted instances of sexual violence, mutilation of human remains, widespread displacement, and the destruction of homes and property."[10]

The violence has led to catastrophic food insecurity on the island.  More than 115,000 children are expected to suffer from malnutrition this year.  The United Nations Children's Fund has warned that because of this "the lives of more than 100,000 children [are] at risk of immediate death."[11]

**Nicaragua.**  Nicaragua experiences rampant political violence.  The country's authoritarian rulers have detained thousands of political prisoners.[12]  They have also expelled members of the

---

[8] Megan Janetsky, *Cubans Search for Holiday Food Amid Deepening Crisis*, Associated Press (Mar. 14, 2023), https://bit.ly/44nVhwt.
[9] Will Freeman, *Why the Situation in Cuba Is Deteriorating*, Council on Foreign Relations (last updated Apr. 25, 2023), https://on.cfr.org/3QDlmUN.
[10] U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Haiti*, https://bit.ly/3sbYDFn (last visited Aug. 14, 2023).
[11] *Haiti Conflict Puts Over 100,000 Kids at Risk of Starving to Death, UN Says*, Reuters (May 11, 2023), https://reut.rs/3YwYAQk
[12] Paulina Villegas, *For Exiled Nicaraguans, Freedom Rings Hollow in the U.S. They Were Starved and Tortured. And Yet, They Dream of Going Back to Nicaragua.*, Wash. Post (May 12, 2023), https://wapo.st/3DRykqy.

Catholic Church and humanitarian organizations like the Red Cross.[13]  Government officials have been responsible for at least 355 killings and hundreds of disappearances since pro-democracy uprisings in 2018, and no steps have been taken to hold those actors accountable.  In fact, the State Department notes that the current President of Nicaragua, Daniel Ortega, has "strengthened impunity for human rights abusers who were loyal to him."[14]

Meanwhile, much of the population goes hungry.  Thirty percent of the country lives in poverty and fourteen percent of the country suffers from chronic undernutrition, with that number rising to thirty percent in some regions.  Almost one in five children under five suffer from chronic malnutrition.  Nicaragua is additionally highly vulnerable to recurrent natural disasters, ranking 21st in the world in the 2022 World Risk Report.[15]

*Venezuela.*  The government of Venezuela has engaged in extrajudicial executions, forced disappearances, and torture.  It particularly targets political dissidents and those who attempt to address human rights or social and economic problems in the country for these practices.  Nongovernmental organizations estimate that the current regime carried out hundreds of such killings in 2022.[16]  Many Venezuelans lack access to basic healthcare, adequate nutrition, and safe drinking water.[17]  Half of the population lives in poverty and almost eighty percent of homes in the country are worried about running out of food.[18]

---

[13] Florencia Trucco & Michael Rios, *Nicaragua Expels Two Nuns in Latest Crackdown on Catholic Church and Opposition*, CNN (Apr. 13, 2023), https://cnn.it/45o7F0b; *Nicaragua Orders Closure of Red Cross in Continuing Crackdown*, Al Jazeera (May 11, 2023).

[14]   U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Nicaragua*, https://bit.ly/45KFadt (last visited Aug. 14, 2023).

[15] World Food Programme, *Nicaragua Country Brief*, https://bit.ly/44aPiuK (last visited Aug. 14, 2023).

[16]   U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Venezuela*, https://bit.ly/3DSBmL4 (last visited Aug. 14, 2023).

[17]  *Venezuela: Events of 2021*, Human Rights Watch, https://bit.ly/3DZLO3i (last visited Aug. 14, 2023).

[18] Vivian Sequera, *Venezuela Poverty Rate Falls to 50.5% in 2022 - Study*, Reuters (Nov. 10, 2022), https://reut.rs/3s9OYir.

Individuals from these nations have sought refuge in the U.S. because of these significant humanitarian crises in their home countries.  In December 2022, prior to the CHNV parole processes, individuals from these four countries accounted for forty percent of all people stopped at the United States border. [19]

Those making the dangerous journey from these countries to the United States border face violence, including sexual assault, kidnappings, and even murder, as well as the risks attendant to journeying through jungle.[20]  In 2022, more than 248,000 migrants to the United States, many from Venezuela and Haiti, attempted to cross the Darien Gap, a remote crossing on the border of Colombia and Panama, containing 60 miles of rainforest, mountains, and swamps.  On the journey, migrants face food and water shortages, extortion, sexual violence, and landslides.  Cartels and human traffickers make millions of dollars charging individuals for access to the Gap and to help carry bags and children along the route when migrants suffer from exhaustion.  According to the United Nations Children's Fund, half of the children who crossed the Gap in 2022 were under five years old, and at least one thousand were unaccompanied or separated.[21]

Nicaraguans and Cubans face similar harrowing journeys to reach the United States.  Many attempt to make the days-long journey by sea, and have been found floating on surfboards tied together or on boats with limited provisions and no navigation system.  Some arrive in boats so overcrowded that they are forced to urinate and defecate where they stand.[22]

---

[19] Elliot Spagat, *Why Nationalities Matter as US Braces for Migration Surge*, Associated Press (Mar. 14, 2023), https://bit.ly/3OTKcyp.

[20] Maureen Mackey, *Migrants Crossing the Southern Border Show Signs of 'Worsening Trauma,' Including Sexual Assault: Report*, Fox News (Jan. 1, 2023), https://bit.ly/3OTKqWh.

[21] Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.*, Council on Foreign Relations (June 22, 2022), https://on.cfr.org/3s3kkqS; Nick Paton Walsh et al., *On One of the World's Most Dangerous Migrant Routes, a Cartel Makes Millions off the American Dream*, CNN (Apr. 17, 2023), https://cnn.it/47sv7LF.

[22] Priscilla Alvarez, *More Cubans are Coming to the US by Sea Than Any Time Since the 1990s*, CNN (Sept. 23, 2022), https://bit.ly/3YveoTT.

Others attempt the journey by land.  Some Cubans fly to South American countries like Guyana, traveling from there through South and Central America to the Darien Gap, where they face the dangers attendant to the route.  The journey is approximately 8,000 miles and can take more than 50 days to complete.[23]  Migrants from Nicaragua taking a land route to the United States must survive the journey through Mexico with limited provisions, during which they face sweltering heat, corrupt police officers who steal from them or charge them bribes, and crossing the deadly waters of the Rio Grande, which just in early July of this year took the lives of a mother and two children attempting to cross it.[24]

Moreover, upon arrival, migrants are placed in overcrowded U.S. border facilities. In December of 2022 in El Paso, Texas, shelters became so full that migrants slept on the streets in below-freezing conditions.[25]

Since the implementation of the CHNV parole processes, the dangers these journeys present to individuals from these four countries have become far less common.[26]  By March of 2023, individuals from these countries made up only three percent of those stopped at the border, a thirty-seven percent drop from December.[27]  CHNV is helping to create a more orderly, and humane system, which benefits migrants and the public alike.  CHNV has also decreased the burden on border communities, allowing migrants lawfully approved through the program to go where their sponsors live and to find lawful, gainful employment.

---

[23] Karl Vick, *The Long Way to America*, Time, https://bit.ly/3KD16ip (last visited Aug. 14, 2023).

[24] Bernd Debusmann Jr., *US Immigration: 'They'd Rather Die Than Return to Nicaragua'*, BBC (Dec. 12, 2022), https://bbc.in/3qu41TK; Rachel Clarke et al., *Texas Troopers Told to Push Back Migrants Into Rio Grande, Report Says Texas*, CNN (July 18, 2023), https://cbsn.ws/3Yx2yZs.

[25] Nouran Salahieh, *This Is What the Crisis Along the US Border Looks Like*, CNN (Dec. 21, 2022), https://cnn.it/3KGOuqt.

[26] *See Nunez-Neto* Decl., ¶¶ 20-23, 26, ECF No 176-1.

[27] Elliot Spagat, *Why Nationalities Matter as US Braces for Migration Surge*, Associated Press (Mar. 14, 2023), https://bit.ly/3OTKcyp.

An injunction would foreclose this pathway to migrants seeking relief from humanitarian crises, and many would, as they did in December of 2022, undertake these dangerous journeys in the hope of gaining even temporary refuge.  It would also increase crowding at border facilities, which can lead to health and security concerns for the migrants housed there.

**B.**    **An Injunction Would Harm Amicus LIRS.**

An injunction would also greatly harm LIRS and other organizations like it.  LIRS has a significant reliance interest in the CHNV parole processes continuing.  Since the start of the CNHV parole processes, LIRS has devoted significant resources to providing services to migrants and families in need who are approved for parole.

For example, one of LIRS's clients came to the United States from Nicaragua through the Nicaraguan parole process.  In Nicaragua, she had lived through political turmoil, wars, poverty, and natural disasters.  She tried in 2012 to apply for a United States' visitor visa but was unsuccessful.  Due to the new parole process for Nicaraguans and sponsorship by her sister and nephews, she was able to legally enter the United States.  Once she arrived in the U.S., LIRS was able to provide her with a legal screening and assistance obtaining employment authorization.  LIRS is currently assisting her with social services and in obtaining English as a Second Language classes.  LIRS would not have been able to provide these services to this client without the new Nicaraguan parole process.

LIRS was able to assist another one of its clients, a man who migrated to United States from Venezuela through the updated parole process for Venezuelan nationals, by providing him with rental assistance.  It currently has its career team ready to help him obtain employment as his employment authorization is approved.

11

Additionally, by preventing harrowing journeys to the US border, and the detention of migrants thereafter, CHNV allows LIRS to focus its finite resources on reunification, resettlement, and support rather than the emergency humanitarian support and trauma care that has been necessary for these migrants. An LIRS client (referred to here as "Ana") from Venezuela recently immigrated to the United States through the updated Venezuelan parole process. Ana is a single mother with two boys, one five-years-old and the other two. Ana's mother left Venezuela eight years ago searching for a better life in the United States. To get to the U.S., Ana's mother risked her life in a trek from Venezuela across multiple countries to the United States' border. As the humanitarian situation in Venezuela worsened for Ana and her boys, the updated parole process for Venezuelan nationals allowed them to immigrate to the United States without risking the same harrowing journey that Ana's mother undertook. Not only has a family been reunited after eight years, but LIRS has had the opportunity to help provide Ana and her boys with healthcare and legal services.

In this way, CHNV allows LIRS to better fulfill its mission of doing God's work to assist those in need and welcome the stranger.

LIRS has already raised funds and hired staff to meet the added needs of individuals entering or residing in the United States under the CHNV parole processes. An injunction would prevent LIRS from providing support for many vulnerable migrants yet to be paroled under CHNV, frustrating its mission and the purpose of these recent investments. When the harms to migrants and LIRS are weighed against Plaintiffs' claimed harms, there can be no doubt that the equities tip strongly in favor of the Defendant-Intervenors—not in favor of Plaintiffs.

### III.     An Injunction Would Harm the Public Interest

The public interest likewise weighs heavily against an injunction.  The Government faces significant humanitarian needs at the border, which CHNV helps to alleviate by allowing individuals from the four specified countries to apply from their home countries for advanced authorization to travel for consideration for parole rather than forcing them to travel to the border to request asylum.

In its notices in the Federal Register, the government noted that the implementation of the parole processes was intended to "enhance border security" by reducing the significant increases in Cuban, Haitian, Nicaraguan, and Venezuelan migrants entering the United States between ports of entry, reduce travel "to the United States via dangerous routes that pose serious risks to migrants' lives and safety," and provide a process by which individuals from these countries in humanitarian crisis could "lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole" provided they passed certain health and security screenings. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1267 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1255 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1243 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507, 63,507 (Oct. 19, 2022). These are all significant public interests which would be frustrated by an injunction.

An injunction would undo the progress made since December of 2022, when forty percent of all those stopped at the border were from these four countries, and would exacerbate overcrowding and unsafe conditions in federal government facilities.

There is a strong public interest in an orderly and humane immigration system, as CHNV is intended to achieve and is achieving in fact.  CHNV has led to a dramatic decline in individuals

from these countries entering without authorization between ports of entry.  It has provided an alternative to those who, fleeing humanitarian crises, would otherwise risk their lives making a dangerous journey to the United States border.  Secretary Mayorkas has noted the public interest in such a system: "Individuals who are provided a safe, orderly and lawful path to the United States are less likely to risk their lives traversing thousands of miles in the hands of ruthless smugglers, only to arrive at our southern border and face the legal consequences of unlawful entry."[28]

It also serves the public's interest in having pathways to provide humanitarian relief to those in need.  The requirement to have a supporter gives the American public and American organizations ways to individually assist individuals and families in crisis that they do not otherwise have.  An injunction would prevent everyday Americans who wish to individually take action to provide refuge for those in need from fulfilling that desire.  It would also prevent U.S.-based family members of migrants eligible for CHNV from providing refuge to their loved ones through sponsorship.

Plaintiffs argue that an injunction is in the public interest because "the public is served when the law is followed," but that argument is circular and would make the public interest factor derivative of the likelihood to succeed on the merits.  In reality, the public interest is a separate element necessary for a plaintiff to establish on a motion for an injunction, because the public interest can support maintaining the status quo even when a plaintiff shows a likelihood of or actual success on the merits.

*Texas v. United States* proves this point.  There, the Court found, in assessing a motion for a preliminary injunction, "the Plaintiff States have made a clear showing they are likely to succeed on the merits at trial."  *Texas*, 328 F. Supp. 3d at 735.  Despite that, the Court denied the request

---

[28] Press Release, Dep't of Homeland Security, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly* (Jan. 5, 2023), https://bit.ly/3s6SOc5.

for an injunction because it found the balance of equities and public interest "favor[ed] maintaining the status quo and denying the injunction." *Id.* at 741. LIRS does not believe the Plaintiffs likely to succeed on the merits here but, even if the Court disagrees, it should deny an injunction based on the public interest in allowing the CHNV parole processes to continue.

## CONCLUSION

For the foregoing reasons, the motion for an injunction should be denied.


Dated: August 16, 2023

                                              */s/ Matthew E. Price*

                                              Matthew E. Price
                                              *Counsel for* Amicus Curiae
                                              *Lead Attorney, Pro Hac Vice*

                                              Caroline C. Cease, *of counsel*
                                              Katherine B. Johnson, *of counsel*
                                              Samuel H. White, *of counsel*

                                              JENNER & BLOCK LLP
                                              1099 New York Ave., NW, Suite 900
                                              Washington, DC 20001
                                              Telephone:  (202) 639-6000
                                              MPrice@jenner.com

## **Certificate of Word Count**

This memorandum contains 4,539 words, as calculated by Microsoft Word.


## **Certificate of Service**

I certify that a Copy of the foregoing instrument was served via ECF pursuant to the Federal Rules of Civil Procedure on the 16th day of August, 2023, upon all counsel of record in this matter.

By: _/s/ Matthew E. Price_
Matthew E. Price