**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,        ) | |
|        ) | |
|    *Plaintiffs,*      ) | |
|        ) | |
|    v.       ) | Civil Action No. 6:23-cv-00007 |
|        ) | |
| U.S. DEPARTMENT OF    ) | |
| HOMELAND SECURITY, *et al.*,  ) | |
|        ) | |
|    *Defendants.*    ) | |

**<u>DEFENDANTS' PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

PROPOSED FINDINGS OF FACT ........................................................................................ 1

PROPOSED CONCLUSIONS OF LAW ............................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ........................................................................... 74, 75

*Allied-Signal, Inc. v. United States NRC*,
988 F.2d 146 (1993) ............................................................................................ 75

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ..................................................................... 65, 66

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................................................... 76

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................... 25, 26, 34, 35

*Arpaio v. Obama*,
27 F. Supp. 3d 185 (D.D.C. 2014) ...................................................................... 26

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .................................................................. 23, 26, 29

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
715 F.2d 897 (5th Cir. 1983) .............................................................................. 52

*Ayuda, Inc. v. Reno*,
7 F.3d 246 (D.C. Cir. 1993) ............................................................................... 37

*Azar v. Allina Health Services*,
139 S. Ct. 1804 (2019) ........................................................................................ 43

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................................... 30, 36

*Biden v. Texas*,
142 S. Ct. 2528 (2022) ................................................................................. passim

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ............................................................................................ 37

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ............................................................................................ 49

*California v. Azar*,
 911 F.3d 558 (9th Cir. 2018) ............................................................... 78

*California v. Texas*,
 141 S. Ct. 2104 (2021) ............................................................... 29, 63

*Campaign Legal Ctr. v. Scott*,
 49 F.4th 931 (5th Cir. 2022) ............................................................... 23

*Capital Area Immigrants' Rights. Coal. v. Trump*,
 471 F. Supp. 3d 25 (D.D.C. 2020) ............................................................... 67

*Cent. & S. W. Servs. v. EPA*,
 220 F.3d 683 (5th Cir. 2000) ............................................................... 75

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
 467 U.S. 837 (1984) ............................................................... 46

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2014) ............................................................... 26, 29

*Clarke v. Sec. Indus. Ass'n*,
 479 U.S. 388 (1987) ............................................................... 36

*Crane v. Johnson*,
 783 F.3d 244 (5th Cir. 2015) ............................................................... 23

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) ............................................................... 23, 77

*Dames & Moore v. Regan*,
 453 U.S. 654 (1981) ............................................................... 49

*Davis v. F.E.C.*,
 554 U.S. 724 (2008) ............................................................... 23

*Deep v. Barr*,
 967 F.3d 498 (5th Cir. 2020) ............................................................... 45

*DHS v. New York*,
 140 S. Ct. 599 (2020) ............................................................... 76, 77

*DHS v. Regents of the Univ. of California*,
 140 S. Ct. 1891 (2020) ............................................................... 56

iv

*Doe v. Chao*,
    540 U.S. 614 (2004) .................................................................................. 42

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ................................................................... 71

*E. Bay Sanctuary Covenant v. Trump*,
    909 F.3d 1219 (9th Cir. 2018) ........................................................... 68, 69

*E. V. v. Robinson*,
    906 F.3d 1082 (9th Cir. 2018) .................................................................. 51

*Encino Motorcars v. Navarro*,
    136 S. Ct. 2117 (2016) .............................................................................. 56

*F.C.C. v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ......................................................................... 52, 60

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) .............................................................. 36, 38

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) .................................................................... 77

*FERC v. Electric Power Supply Ass'n*,
    577 U.S. 260 (2016) ............................................................................. 52, 59

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1973) .................................................................................. 53

*Garcia-Mir v. Smith*,
    766 F.2d 1478 (11th Cir. 1985) .......................................................... 53, 54

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ................................................................ 78

*Geyen v. Marsh*,
    775 F.2d 1303 (5th Cir. 1985) ................................................................. 51

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .............................................................................. 76

*Green Valley Special Util. Dist. v. City of Schertz, Texas*,
    969 F.3d 460 (5th Cir. 2020) ................................................................... 50

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020) ................................................................ 45

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ................................................................ 25, 28

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ................................................................ 42

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ................................................................ 35

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................ 32, 33, 35

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................ 25, 40

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................ 72, 73

*I.N.S. v. Legalization Assistance Project*,
    510 U.S. 1301 (1993) ................................................................ 38

*Indep. Turtle Farmers of Louisiana, Inc. v. United States*,
    703 F. Supp. 2d 604 (W.D. La. 2010) ................................................................ 51

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) ................................................................ 63, 74

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020) ................................................................ 70

*INS v. Abudu*,
    485 U.S. 94 (1988) ................................................................ 46

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ................................................................ 46

*Int'l Bhd. of Teamsters v. Pena*,
    17 F.3d 1478 (D.C. Cir. 1994) ................................................................ 66

*Jama v. Immigr. & Customs*,
    *Enf't*, 543 U.S. 335 (2005) ................................................................ 33

*James Hurson Assocs., Inc. v. Glickman*,
   229 F.3d 277 (D.C. Cir. 2000) ................................................. 64

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) ................................................. 71

*Kaplan v. Tod*,
   267 U.S. 228 (1925) ................................................................... 22

*Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ........................................................... 22, 34

*Kucana v. Holder*,
   558 U.S. 233 (2010) ........................................................... 33, 34

*Landry v. Biden*,
   64 F.4th 674 (5th Cir. 2023) ..................................................... 29

*Lane v. Halliburton*,
   529 F.3d 548 (5th Cir. 2008) ..................................................... 68

*Leng May Ma v. Barber*,
   357 U.S. 185 ............................................................................. 22

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................... 23

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ....................................................... 32, 61, 63

*Linda R. S. v. Richard D.*,
   410 U.S. 614 (1973) ................................................................... 30

*Loa-Herrera v. Trominski*,
   231 F.3d 984 (5th Cir. 2000) ........................................... 25, 33, 43

*Locke v. Warren*,
   No. 19-61056-CIV, 2019 WL 4805716 (S.D. Fla. Oct. 1, 2019) ........... 51

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ................................................................... 49

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021) ..................................................... 78

vii

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................ 23, 29, 30

*Mack Trucks, Inc. v. E.P.A.*,
  682 F.3d 87 (D.C. Cir. 2012) ........................................................ 69, 70

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ........................................................................ 76

*Mak v. INS*,
  435 F.2d 728 (2d Cir. 1970)............................................................. 47

*Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*,
  602 F.3d 687 (5th Cir. 2010) .......................................................... 53

*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (TECA 1983) ........................................................... 69

*Moore v. Tangipahoa Par. Sch. Bd.*,
  507 F. App'x 389 (5th Cir. 2013) .................................................... 74

*Morice v. Hosp. Serv. Dist. #3*, No.,
  18-cv-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019) ..................... 77

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................... 52

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018) ................................................................... 26

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
  416 U.S. 267 (1974) ....................................................................... 56

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ..................................................... 32, 64

*Nat'l Sec. Couns. v. C.I.A.*,
  931 F. Supp. 2d 77 (D.D.C. 2013) ................................................... 64

*New York v. Permanent Mission of India to United Nations*,
  618 F.3d 172 (2d Cir. 2010).......................................................... 67

*New York v. United States*,
  505 U.S. 144 (1992)....................................................................... 26

*Nishimura Ekiu v. United States*,
   142 U.S. 651 (1892) ........................................................................ 22

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................ 75

*Oceana, Inc. v. Locke*,
   674 F. Supp. 2d 39 (D.D.C. 2009) ................................................. 53

*Patel v. Garland*,
   142 S. Ct. 1614 (2022) ................................................................... 34

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) ........................................................................ 27

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) .......................................................................... 56

*Presbyterian Church (U.S.A.) v. United States*,
   870 F.2d 518 (9th Cir. 1989) .......................................................... 51

*Professionals & Patients for Customized Care v. Shalala*,
   56 F.3d 592 (5th Cir. 1995) ............................................................ 64

*Raines v. Byrd*,
   521 U.S. 811 (1997) ........................................................................ 25

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ................................................................. 26, 37

*Reno v. Flores*,
   507 U.S. 292 (1993) ........................................................................ 47

*Roe v. Mayorkas*,
   2023 WL 3466327 (D. Mass. May 12, 2023) ................................ 67

*Rosa v. McAleenan*,
   583 F. Supp. 3d 850 (S.D. Tex. 2019) ........................................... 74

*Sampson v. Murray*,
   415 U.S. 61 (1974) .......................................................................... 74

*Simmat v. U.S. Bureau of Prisons*,
   413 F.3d 1225 (10th Cir. 2005) ...................................................... 51

*State of Fla. v. Mellon*,
   273 U.S. 12 (1927) .................................................................................... 27

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ..................................................................... 61

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*,
   989 F.3d 368 (5th Cir. 2021) ..................................................................... 75

*Texas ex rel. Falkner v. Nat'l Bank of Com. of San Antonio*,
   290 F.2d 229 (5th Cir. 1961) ..................................................................... 49

*Texas Oil & Gas Ass'n v. EPA*,
   161 F.3d 923 (5th Cir. 1998) ............................................................... 59, 60

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ...................................................................... 31

*Texas v. Equal Emp. Opportunity Comm'n*,
   933 F.3d ............................................................................................. 32, 61

*Texas v. United States,*
   50 F.4th 498 (5th Cir. 2022) ................................................................ 61, 63

*Texas v. United States,*
   106 F.3d 661 (5th Cir. 1997) .................................................. 24, 27, 35, 46

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .............................................................. 29, 32, 64
*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) .............................................................................. 35

*U.S. Chamber of Commerce v. S.E.C.*,
   443 F.3d 890 (D.C. Cir. 2006) ................................................................... 69

*U.S. Dep't of Lab. v. Kast Metals Corp.*,
   744 F.2d 1145 (5th Cir. 1984) ................................................................... 64

*United Motorcoach Ass'n, Inc. v. City of Austin*,
   851 F.3d 489 (5th Cir. 2017) ..................................................................... 22

*United States v. Coney*,
   689 F.3d 365 (5th Cir. 2012) ..................................................................... 53

*United States v. Cortez*,
   449 U.S. 411 (1981) .................................................................................. 73

x

*United States v. Fausto,*
   484 U.S. 439 (1988) ......................................................................... 37

*United States v. Midwest Oil Co.,*
   236 U.S. 459 (1915) ......................................................................... 49

*United States v. Penn. Indus. Chem. Corp.,*
   411 U.S. 655 (1973) ......................................................................... 56

*United States v. Texas,*
   143 S. Ct. 1964 (2023) ............................................................... passim

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) ......................................................................... 77

*Warth v. Seldin,*
   422 U.S. 490 (1975) ......................................................................... 26

*Yang v. INS,*
   79 F.3d 932 (9th Cir. 1996) ............................................................. 47

*Yassini v. Crosland,*
   618 F.2d 1356 (9th Cir. 1980) .................................................. 66, 68

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ........................................................................... 4

**Statutes**

5 U.S.C. § 553(a)(1) ................................................................... 65, 67

5 U.S.C. § 553(b)(A) .................................................................. 61, 64

5 U.S.C. § 553(d) ....................................................................... 71, 72

5 U.S.C. § 701(a)(2) ................................................................... 32, 33

5 U.S.C. § 704 ................................................................................. 30

5 U.S.C. § 706(2)(C) .................................................................. 51, 52

6 U.S.C. § 202(4) ....................................................................... 22, 46

8 U.S.C. § 701(a)(1) ......................................................................... 33

8 U.S.C. § 1103(a)(1) ................................................................. 22, 46

8 U.S.C. § 1151(c) ...................................................................................... 44

8 U.S.C. § 1182 ......................................................................................... 43

8 U.S.C. § 1182(d)(5) .......................................................................... 52, 62

8 U.S.C. § 1182(d)(5)(A) ..................................................... 4, 22, 33, 34, 38

8 U.S.C. § 1225(b)(2)(C) ............................................................................ 70

8 U.S.C. § 1226 ...................................................................................... 4, 37

## Regulations

8 C.F.R. § 274a.12(c)(11) ..................................................................... 27, 62

## INTRODUCTION

Pursuant to the Court's June 5, 2023 scheduling order, Dkt. No. 159, Defendants submit the following proposed findings of fact and conclusions of law for the Court's resolution of this case on the merits.

## PROPOSED FINDINGS OF FACT

### Background

1.      Economic and political instability around the world is fueling the highest levels of migration since World War II, testing the immigration systems of many nations, including the United States. Defendants' Ex. HH (Declaration of DHS Assistant Secretary Nuñez-Neto) ¶ 3.

2.      This challenge is compounded by the fact that the Department of Homeland Security ("DHS") is operating within an outdated immigration and asylum system that was not built to handle the shifting demographics being encountered at the border today. Ex. HH, ¶ 3.

3.      Surges in migration and encounters at the southwest border have occurred during the last three Administrations under Presidents of both parties. Ex. HH, ¶ 8

4.       In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the southwest border reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017. This low point followed decades during which annual encounters routinely numbered in the millions. Ex. HH, ¶ 8.

5.      Even during this period of relatively low encounters at the southwest border, however, DHS experienced surges of unaccompanied children in 2014 and families in 2016 that significantly strained its operations given the unique vulnerabilities of those demographics. Between 2017 and 2019, encounters along the southwest border more than doubled, and— following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world—continued to increase in 2021 and 2022. Ex. HH, ¶ 8.

6.      Over the last two years, increases in migration at the southwest border have at times strained DHS's operational capacity. These increases, or surges, have been driven, in large part, by a significant increase in migration from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV")—countries from which DHS has never encountered migration at these levels in its history. This increase has been especially challenging because nationals from CHNV countries are difficult for DHS to remove to their home countries. Ex. HH, ¶ 4.

7.      In fiscal year ("FY") 2021, encounters at the southwest border reached levels not seen since the early 2000s with U.S. Border Patrol ("USBP") making 1.7 million encounters. Encounters of CHNV nationals increased throughout FY 2021, totaling 181,264, compared to an average of 6,409 total encounters for those nationalities in the pre-pandemic period (FY 2014–FY 2019). USBP encounters of CHNV nationals more than doubled from February (6,225) to March (13,016) and continued to rise through the end of the fiscal year, averaging more than 24,000 a month from March to October. Ex. HH, ¶ 9.

8.      In FY 2022, DHS reached a high-water mark for encounters at the southwest border, with total USBP encounters exceeding 2.2 million. The continued surge in migration from CHNV nationals accounted for most of the increase in encounters from FY 2021 to FY 2022. USBP encounters of CHNV nationals increased by 441,694 between FY 2021 and 2022, versus an increase of 202,568 for all other nationalities combined. Encounters of CHNV nationals more than tripled from 184,716 in FY 2021 to 626,410 in FY 2022, comprising 26 percent of overall FY 2022 encounters and 35 percent of unique FY 2022 encounters. In fact, in FY 2022, unique encounters of CHNV nationals exceeded unique encounters of Mexican nationals, as well as nationals of El Salvador, Guatemala, and Honduras, for the first time in history. Ex. HH, ¶ 10.

9.      The ability to impose consequences, including removal, on those who do not establish a legal basis to remain the United States is a key tenet of the U.S. immigration system. The U.S. immigration system has limited enforcement options available for noncitizens who are ordered removed but come from countries whose governments do not accept the timely return of their nationals. Ex. HH, ¶ 11.

10.     DHS's ability to remove CHNV nationals to their home countries under Title 8 authorities is generally limited. Venezuela currently does not allow repatriations via charter flights, which significantly limits DHS's ability to remove Venezuelan nationals. Nicaragua currently allows only one charter removal flight every 15 days, equivalent to two percent of Nicaraguan encounters in FY 2022. And while DHS has recently restarted removal flights to Cuba, conducting a flight on April 24, 2023, and another on May 10, 2023—following a pause in operations since February 2020 as a result of the COVID-19 pandemic—the cadence and volume at which DHS can facilitate such removals would not keep pace with the number of Cuban nationals DHS has encountered at times. While DHS can operate removal flights to Haiti, the precarious security situation on the ground there, including the security situation at the airport, has at times raised operational challenges in doing so. Ex. HH, ¶ 12.

11.     In FY 2022, despite best efforts, DHS removed, returned, or expelled to their home countries (either under Title 8, or under Title 42 based on the Centers for Disease Control and Prevention's Title 42 public health order related to the COVID-19 pandemic) a total of 176 Cubans, 3,024 Nicaraguans, 987 Venezuelans, and 18,449 Haitians—or 0.1 percent of Cuban encounters, 1.8 percent of Nicaraguan encounters, 0.5 percent of Venezuelan encounters, and 34 percent of Haitian encounters. This means that, prior to the implementation of the CHNV processes and Mexico's decision to accept the return of nationals from these countries at the southwest border

under Title 42, the vast majority of CHNV nationals (i.e., 96 percent in FY 2022) could not be expelled under the Title 42 public health order and were instead generally excepted from the Order and processed pursuant to Title 8. Ex. HH, ¶ 6, 13.

12.     Because of the difficulties in removing CHNV nationals, CHNV nationals typically have not been processed for expedited removal—the main consequence available to DHS under Title 8 authorities at the border. Instead, CHNV nationals processed under Title 8 authorities were generally either placed in removal proceedings under section 240 of the Immigration and Nationality Act ("INA") and conditionally released with a Notice to Appear ("NTA"), or, prior to March 8, 2023, when certain thresholds were met, conditionally released and required to report to U.S. Immigration and Customs Enforcement ("ICE") pending the issuance of an appropriate charging document on Parole plus Alternatives to Detention ("P+ATD"), or on May 10 and 11, 2023, conditionally released and required to schedule an appointment with ICE or request service of an NTA by mail for Parole with Conditions ("PWC"). Conditional releases includes both individuals released under 8 U.S.C. § 1226 and under 8 U.S.C. § 1182(d)(5)(A). Ex. HH, ¶ 14.

13.     DHS generally lacks the authority to indefinitely detain noncitizens whom it cannot remove from the United States. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 699-701 (2001) (limiting detention of noncitizens with final removal orders unless there is a significant likelihood of removal in the reasonably foreseeable future).

14.     As a result of these factors—the inability to expel or remove CHNV nationals from the United States, and legal restrictions on DHS's authority to detain noncitizens where removal is not significantly likely in the reasonably foreseeable future—DHS conditionally released most noncitizens who were encountered. Of the approximately 113,229 Venezuelan nationals encountered at the southwest border in the five-plus months between May 1 and October 17—just

4

before the Venezuela process went into effect—approximately 99,055 (87 percent) were conditionally released. Together, CHNV nationals accounted for 354,177 conditional releases in the months leading up to the Venezuelan parole process, 73 percent of the total during this period of 486,436. By comparison, countries whose nationals DHS can more effectively return, either to their country of origin or to Mexico, have a much lower rate of conditional release. In the same period, just 9 percent of conditional releases were of nationals of Mexico or Northern Central America (18,384 Mexicans, 16,784 Hondurans, 5,044 El Salvadorans, and 4,187 Guatemalans). Similarly, in the five-plus months between August 1, 2022 and January 5, 2023—when the parole processes for Cuba, Haiti, and Nicaragua were created—approximately 280,238 out of 305,458 CHN encounters (92 percent) were conditionally released, with CHNV countries together accounting for 57 percent of the total of 619,113 during that period. Ex. HH, ¶ 15.

**CHNV parole processes**

15.     For years, DHS has sought Mexico's agreement to accept the removal of individuals from certain countries where the United States cannot send removable noncitizens, either because of conditions in those countries or because those countries refuse to accept individuals ordered removed from the United States. *See, e.g.*, Venezuela AR 134; 87 Fed. Reg. 63507-08.

16.     Through negotiations with Mexico on how to address irregular migration through Mexico to the southwest border, in October 2022, DHS developed a parole process for Venezuelans to provide an avenue for safe and orderly processing of noncitizens away from the United States-Mexico border, allowing eligible individuals to avoid traveling through Mexico. *See, e.g.*, Venezuela AR 134; 87 Fed. Reg. 63507-08.

5

17.     At the same time, Mexico—for the first time in its history—decided to accept the return or removal of Venezuelan nationals who failed to follow this parole process, allowing DHS to impose consequences on and enforce the immigration laws against otherwise unremovable noncitizens. *See, e.g.*, Venezuela AR 134; 87 Fed. Reg. 63507-08; Ex. HH, ¶ 18.

18.     On October 19, 2022, DHS published a Federal Register Notice describing this new effort to address the high number of Venezuelans being encountered at the southwest border. 87 Fed. Reg. 63,507.

19.     Under this process, individuals may be eligible to request consideration for parole on a case-by-case basis if they have a supporter in the United States who agrees to provide financial support, if they pass rigorous national security and public safety vetting, and if they agree to fly at their own expense to an interior U.S. port of entry rather than entering at a land port of entry. *Id*. at 63,508; 63,515. Ex. HH, ¶ 17.

20.     Individuals are generally ineligible if they have been ordered removed from the United States in the previous five years, have entered the United States, Mexico, or Panama without authorization after October 19, 2022, or have immigration status in a third country in addition to Venezuela. *Id*. at 63,515.

21.     Venezuelans who do not take advantage of this process and instead attempt to enter at the southwest border without authorization may be subject to return or removal to Mexico. *Id*. at 63,508.

22.     The process was modeled on the similar Uniting for Ukraine (U4U) parole process, which had shown success at ensuring orderly immigration processing and reduced the strain on agency resources at the southwest border. *Id*. at 63,507-08.

23.     The Venezuela process immediately reduced irregular migration to the southwest border. Ex. HH, ¶¶ 18-20.

24.     The Venezuela process fundamentally changed the migratory patterns of Venezuelan nationals. Prior to the announcement of the Venezuela process on October 12, DHS was encountering an average of 1,100 Venezuelan nationals a day along the southwest border and the Government of Panama was encountering almost 4,000 Venezuelans a day on its border with Colombia. Within a week of the announcement of the Venezuelan process on October 12, 2022, the number of Venezuelans encountered at the southwest border fell sharply, from an average of over 1,100 a day from October 5–11 to under 200 per day from October 18–24, and further declined to 67 per day as of the week ending November 29, 2022, and 28 per day the week ending January 22, 2023. Ex. HH, ¶ 20; 88 Fed. Reg. at 1,279.

25.     The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration throughout the Western Hemisphere. 88 Fed. Reg. at 1,279. For example, the number of Venezuelans attempting to enter Panama through the Darién Gap was down from 40,593 in October 2022 to just 668 in November. *Id.*

26.     From January through October 2022, the Government of Panama encountered 211,355 irregular migrants having crossed through the Darién Gap—a dangerous 100-kilometer stretch of inhospitable and dense jungle between Colombia and Panama, which is particularly notorious for the violence of the human smugglers operating in lawless stretches of jungle—with 59,773 migrants crossing into Panama irregularly via the Darién Gap in October 2022 alone, a sharp increase compared to the 4,702 migrants encountered in January 2022. Of the 59,773, Venezuelan nationals comprised 40,593, or 68 percent of total irregular migrants reported in October. Following the October DHS announcement of the Venezuelan parole process, the number

of Venezuelans attempting to enter Panama through the Darién Gap fell substantially to just 668 in November and have generally continued at significantly lower levels. Ex. HH, ¶ 21.

27.     Following the end of the Title 42 public health order, and the imposition of stiffened consequences for irregular migration in place at the land border as a result of the return to processing all noncitizens under Title 8 authorities—including a new condition on asylum eligibility, at least a five-year bar on admission to the United States, and the potential for criminal prosecution for repeat illegal entries—as well as the continuing expansion of lawful processes for noncitizens to access the United States, encounters of Venezuelan migrants between ports of entry again significantly declined. Ex. HH, ¶ 23.

28.     Given the immediate success of the parole process for Venezuelans at reducing irregular migration and border encounters, DHS sought to expand its ability to return or remove to Mexico noncitizens from other countries where it faced barriers to removal. On January 9, 2023, DHS announced a continued parole process for Venezuelans with minor modifications, and new similar parole processes for nationals of Cuba, Haiti, and Nicaragua. 88 Fed. Reg. 1,243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1,255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1,266 (Implementation of Parole Process for Cubans); 88 Fed. Reg. 1,279 (Implementation of Changes to the Parole Process for Venezuelans).

29.     After DHS created these similar processes for eligible nationals of Cuba, Haiti, and Nicaragua, Mexico again made implementation of these processes possible by making a decision to begin accepting returns of nationals from Cuba, Haiti, and Nicaragua who do not follow the parole processes. Ex. HH, ¶¶ 24-25.

30.     As was the case following the implementation of the parole process for Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between ports

of entry dropped significantly after DHS introduced the new processes, from a seven-day average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven-day average of 205 just two weeks later. This represented a significant decline of 94 percent from the peak CHNV encounters of 3,644 on December 10, 2022. The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop. Ex. HH, ¶ 26.

31.     DHS explained that, as demonstrated by the Venezuelan process, combining a clear and meaningful consequence for unauthorized entry with a significant incentive for migrants to wait where they are and use a lawful and orderly process to come to the United States had significant results in controlling the flow of migration and reducing irregular migration. 88 Fed. Reg. at 1,279.

32.     Each of the four parole processes sets out a similar incentive structure. Individuals who meet certain eligibility requirements, such as identifying a U.S.-based supporter who can provide financial support, who pass national security and public safety vetting, and who agree to fly at their own expense to an interior port of entry rather than entering at a land port of entry on the southwest border may be granted advance travel authorization to seek parole into the United States for a limited period not to exceed two years. 88 Fed. Reg. at 1,252, 1,263, 1,276, 1,279.

33.     In July 2023, DHS updated the supporter form for the CHNV processes to include a new question: "A grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Please explain why a favorable exercise of discretion is merited for this individual." Both USCIS and U.S. Customs and Border Protection ("CBP") Office of Field Operations officers have access to the response to this question to inform their decision making. Defendants' Ex. II (Supplemental Declaration of DHS Assistant

Secretary Nuñez-Neto) ¶ 3; *see also* Defendants' Ex. K (CHNV Guidance to Reviewers), L (CHNV Parole Processes Form I-134A Training).

34.     Even after travel authorization is granted, a CBP officer considers the request for parole at the port of entry on an individualized, case-by-case basis. Ex. II, ¶ 3. CBP has, when making this determination, denied parole for noncitizens who traveled with advance travel authorization pursuant to the CHNV process. *Id.*

35.     Individuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully or irregularly crossed the Mexican or Panamanian border after January 9, 2023. 88 Fed. Reg. at 1,252, 1,263, 1,276, 1,279.

36.     Individuals from the covered countries who do not avail themselves of these parole processes and instead seek to enter the United States without authorization may be returned or removed to Mexico. *Id.* at 1,243-44, 1,256, 1,267-68, 1,279.

37.     DHS otherwise has limited ability to remove noncitizens to these four countries, either because of country conditions or because the country's government refuses to accept the return of its citizens from the United States. *Id.* at 1,247, 1,259, 1,270-01; 87 Fed. Reg. at 63,509.

38.     The parole processes are dependent on Mexico's willingness to accept the return of nationals of covered countries who do not avail themselves of the parole processes. Ex. HH, ¶¶ 6, 17.

39.     This is the first time in the bilateral history of the United States and Mexico that Mexico is allowing the United States to systematically return or remove to Mexico non-Mexican nationals encountered at the border. Ex. HH, ¶ 6.

40.     The ability to return or remove individuals from these four countries to Mexico if they enter the United States irregularly thus "impose[s] a consequence on irregular entry that

10

currently does not exist" for individuals who cannot otherwise be removed from the United States. 87 Fed. Reg. at 63,511.

41.     The CHNV processes free up limited DHS resources; enhance security by allowing DHS to vet individuals from those countries before they travel to the United States, allowing DHS to identify individuals who pose threats to national security or public safety earlier in the process and deny them authorization to travel to the United States; require individuals to travel at their own expense to an interior port of entry to seek parole, reducing arrivals and strain on resources at the southwest border; and allow DHS to focus resources on other critical aspects of the DHS mission, including allowing more frontline CBP personnel to return to their primary border security mission. Prior to the CHNV parole processes, during previous increases in CHNV encounters at the southwest border, CBP had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions. This, in turn, decreased CBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress. Ex. HH, ¶¶ 27-28.

42.     The CHNV processes have significantly reduced both encounters at the border and conditional releases of CHNV nationals into border communities. Since these processes began, conditional releases of individuals from these countries have declined by 90 percent, from 2,356 individuals per day in the five-plus months prior to implementation of these processes to 245 per day in the months between when these processes were implemented and June 30, 2023. Ex. II, ¶ 4; Ex. HH, ¶ 29; *see also* DHS, Fact Sheet: Updated on DHS Planning for Southwest Border Security Measures as the Title 42 Public Health Order Ends (May 1, 2023), https://www.dhs.gov/news/2023/05/01/fact-sheet-update-dhs-planning-southwest-border-security-measures-title-42-public. Conditional release numbers include both noncitizens who were

encountered after crossing unlawfully between ports of entry, or without authorization at a port of entry. Ex. HH, n.5.

43.    In the five-plus months prior to the Venezuela process being implemented in October 2022, CBP conditionally released an average of 583 Venezuelans encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day at the border. By contrast, in the eight-plus months following implementation of the process, DHS conditionally released 217 such Venezuelans per day, a decrease of 63 percent. Ex. II, ¶ 5; Ex. HH, ¶ 30.

44.    Implementation of the CHNV processes had an even larger impact on conditional releases of Cubans, Haitians, and Nicaraguans. In the five-plus months prior to the implementation of the processes for those countries in January 2023, CBP conditionally released an average of 1,774 nationals of these three countries encountered between ports of entry, or at ports of entry not using CBP One per day. In the nearly six months following implementation of the CHN processes CBP conditionally released an average of just 28 per day, a 98 percent reduction. Ex. II, ¶ 6; Ex. HH, ¶ 31.

45.    Accounting for individuals who came to the United States through a safe, orderly process—either because they are processed at a port of entry after making an appointment through the CBP One application (333 per day), or because they are granted a case-by-case determination of parole through the CHNV processes (823 per day)—total CHNV arrivals fell to approximately 1,401 per day, a 41 percent reduction from their pre-CHNV process levels. Ex. II, ¶ 6 n.2; Ex. HH, ¶ 31 n.16.

46.    In sum, in the five-plus months leading up to the CHNV parole processes, DHS was conditionally releasing an average of 2,356 CHNV nationals per day. Ex. II, ¶¶ 4, 6 n.2; Ex.

HH, ¶ 29. In the months following the implementation of the CHNV parole processes, DHS was conditionally releasing an average of 245 CHNV nationals per day, Ex. II, ¶¶ 4, 6 n.2, an additional 333 CHNV nationals were arriving through the new CBP One process per day on average, *id.* ¶ 6 n.2, and an additional 823 CHNV nationals were being paroled through the new CHNV processes per day on average, *id.* ¶ 6 n.2, for a total of 1,401 arrivals of CHNV nationals on average per day, *id*. The total number of CHNV nationals released through all avenues thus declined from an average of 2,356 per day prior to the CHNV processes to 1,401 per day in the months after the parole processes, a 41 percent reduction. Ex. II, ¶ 6 n.2.

47.    As part of the CHNV processes, DHS has, after a case-by-case determination by an officer at an air port of entry, allowed 50,345 Venezuelan nationals and 110,312 Cubans, Haitians, and Nicaraguans, who have passed rigorous national security and public safety vetting, and who have financial supporters who have committed to providing whatever support is required, to enter the United States in a safe and orderly manner—an average of 832 each day through June 30, 2023. DHS has also permitted 29,114 Venezuelans, and 38,535 Cubans, Haitians, and Nicaraguans, who may wish to claim asylum to enter the United States to schedule an appointment via the CBP One app to be processed at a land border port of entry—an average of 333 a day since the implementation of the CHNV processes. Ex. II, ¶ 7; Ex. HH, ¶ 33.

48.    The CHNV processes are reducing impacts on communities. Ex. HH, ¶¶ 34-35.

49.    Cooperation and coordination with Mexico are critical components of these efforts, given the difficulties DHS has removing CHNV nationals to their home countries, and the CHNV processes are "directly responsive to requests made by the Government of Mexico and other key foreign partners throughout the hemisphere to address irregular migration through shared

responsibilities and require close coordination between foreign governments to successfully implement." Ex. HH, ¶¶ 36-37.

50.     Mexico has made clear that its willingness to continue to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States. If DHS cannot provide lawful processes for some CHNV nationals to come directly to the United States, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the southwest border. Ex. HH, ¶¶ 7, 38.

51.     As a result of this reality, the CHNV processes are critical to DHS's ability to effectively manage migratory flows from these countries. The CHNV processes, which have provided a lawful means for nationals of these countries to come to the United States, and Mexico's decision to accept the return of nationals from these countries at the southwest border under Title 42, and now removal of CHNV nationals under Title 8, as a result, fundamentally changed migratory flows not just to the United States, but throughout the region. Ex. HH, ¶ 16.

52.     DHS has implemented these innovative processes to disincentivize unlawful and unauthorized entries at the southwest border by pairing a consequence—namely, return or removal to Mexico—with a substantial incentive to use lawful, safe, and orderly pathways and processes to come directly to the United States. Ex. HH, ¶ 5.

53.     DHS expects that without both the incentives *and* disincentives associated with the CHNV processes that have led individuals from those countries to wait for lawful, safe and orderly pathways and processes to come to the United States, there will be significant surge in migration at the southwest border—the precise outcome that Plaintiffs allegedly seek to avoid. Ex. HH, ¶¶ 7, 38-44.

54.     The CHNV processes, like prior parole processes, are a critical tool for the Executive Branch's conduct of foreign policy. Ex. HH, ¶¶ 45-53.

**Historical use of parole**

55.     The United States has used parole processes similar to the CHNV processes for decades, including under administrations of both parties since the parole statute was amended in 1996, to address surges in migration and humanitarian concerns. *See* Defendants' Ex. T-GG, Ex. HH, ¶¶ 45-47.

a.  Parole has long been understood as a tool that provides the U.S. Government with flexibility to address emergent situations, many of which have foreign policy implications. Ex. HH, ¶ 45.

b.  Early historical examples of the U.S. Government's exercise of parole authority include, in 1956 and 1957, the parole of 31,915 Hungarian nationals who were fleeing revolution and unrest. Ex. HH, ¶ 45.

c.  In the early 1960s, the United States paroled approximately 5,000 refugees into the country under the Fair Share Refugee Act of July 14, 1960. In 1962, the United States implemented the Hong Kong Parole Program, which allowed for the parole of approximately 15,000 Chinese refugees. In fiscal year 1972, the United States paroled 17,109 Cubans into the country via airlift. And from 1975 to 1979, the United States paroled nearly 360,000 nationals from Vietnam, Cambodia, and Laos who were fleeing years of military and political conflict. Ex. HH, ¶ 45, Ex. T, U; *see also* Ex. X-AA.

d.  More recent examples of the U.S. Government's exercise of parole authority include the Cuban Family Reunification Parole ("CFRP") process. This parole

process was established in 2007, in part, due to the U.S. Coast Guard's increased interdictions of Cuban nationals. CFRP, much like the CHNV processes, was implemented to disincentivize Cuban nationals from undertaking dangerous maritime crossings and to meet the U.S. Government's commitment on legal Cuban migration levels under the 1994 U.S.-Cuban Migration Agreement. Ex. HH, ¶ 46, Ex. CC; *see also* Ex. DD, EE, GG.

e.   The Haitian Family Reunification Parole ("HFRP") process was similarly implemented in 2015 to "provid[e] the opportunity for certain eligible Haitians to safely and legally immigrate sooner to the United States." Ex. HH, ¶ 46, Ex. V; *see also* Ex. BB.

f.   The Uniting for Ukraine ("U4U") process, established in April 2022, was put in place in the wake of Russia's unprovoked invasion of Ukraine that caused thousands of Ukrainian migrants to spontaneously arrive at southwest-border ports of entry. Like the CHNV processes, U4U allowed U.S.-based financial supporters to file applications on behalf of Ukrainian nationals who, after they passed the requisite national security and public safety vetting, were allowed to travel directly to the United States to be considered, on a case-by-case basis, for parole upon their arrival. Once U4U was implemented, unauthorized arrivals of Ukrainians at the southwest border fell sharply as Ukrainians seeking to come to the United States utilized a safe and orderly process to do so. Ex. HH, ¶ 47, Ex. W.

**Plaintiffs' standing to challenge the parole processes**

56.   Texas has not put forth any evidence of an increase in CHNV nationals in Texas since the CHNV processes were put in place. In fact, the number of CHNV nationals released into

the United States, including those through the CHNV process and otherwise, has *decreased* since the CHNV processes were implemented. *See supra* ¶ 46.

57.     Consistent with the fact that fewer CHNV nationals have been released into the United States since the CHNV processes were implemented, Texas has not put forth any evidence of increased costs to the State since the CHNV processes were put in place—let alone evidence of increased costs traceable to the CHNV processes. *See generally* Defendants' Ex. O (Texas's Responses to Defendants' Discovery Requests).

**Driver's Licenses:**

58.     Texas has not put forward evidence of increased costs related to driver's licenses. Defendants' Ex. O at 5, 9-10, 14, 17-18, 21-27.

59.     Texas suggests that the CHNV processes will result in increased costs to the State by virtue of issuing driver's licenses to CHNV nationals based on a series of speculative conclusions that are refuted by the evidence.

      a.   First, Texas's evidence with respect to costs for driver's licenses is based on unsupported speculation that present demand for driver's licenses will increase by tens of thousands of individuals. Pl.'s Ex. 4, ¶ 8. Texas has not shown that there has been any actual increase in the demand for driver's licenses since the CHNV processes were put in place, and provides no evidence to support the assertion that any speculative increase in demand for driver's licenses will be driven by an influx of CHNV nationals rather than the growth of its own population. *Id*. There is no evidence that Texas has seen an increase in CHNV nationals in its State since the CHNV processes were implemented, let alone that the demand for driver's licenses by CHNV nationals has increased. *Id*.

b.  Second, Texas speculates that if the demand for driver's licenses increases by tens of thousands of individuals, it will have to build new facilities and hire more staff. Pl.'s Ex. 4, ¶ 8. Texas does not claim that such expenditures have occurred and has provided no evidence to show that such expenditures are imminent, likely, or would be caused by the CHNV processes. *Id.*

c.  Third, Texas has further inflated the speculated costs for providing limited-term driver's licenses by reporting costs per additional 10,000 individuals and doubling the costs to report them as biennial costs. Pl.'s Ex. 4, ¶ 8.

60.  The actual costs for verification services for one limited-term driver's license is $0.45. Pl.'s Ex. 4, ¶ 8. The actual costs for card production for one limited term driver's license is $1.35. *Id.*; *see also* Defendants' Ex. S (Contract amendment listing production cost of $1.35). Combining the costs for verification and production of limited term driver's licenses, each license costs Texas $1.80.

61.  Texas charges $33 for each limited-term license. Defendants' Ex. R (Texas Driver License Fees).

62.  Texas makes a profit from issuing limited term driver's licenses.

**Education:**

63.  Texas has not put forward evidence of increased costs related to education. Defendants' Ex. O at 5, 8-9, 14-16, 21-27.

64.  Texas has not put forth evidence that more CHNV national children have enrolled in Texas public schools since the CHNV processes were implemented. Pl.'s Ex. 6.

18

65.     Texas's evidence with respect to costs for education is based entirely on speculated costs that would result if Texas had to educate additional "unaccompanied children." Pl.'s Ex. 6, ¶¶ 4-7.

66.     The CHNV parole processes do not apply to unaccompanied children. Any individual "determine[d] to be an unaccompanied child" "is ineligible for advance authorization to travel to the United States as well as parole under this process." 88 Fed. Reg. at 1,252, 1,263, 1,276; 87 Fed. Reg. 63,515 & n.52.

**Healthcare:**

67.     Texas has not put forward evidence of increased costs related to healthcare attributable to the CHNV processes. Defendants' Ex. O at 5, 7-8, 14-15, 21-27.

68.     Texas's evidence with respect to healthcare costs is based solely on speculation about noncitizens entering unlawfully and using healthcare services. Pl.'s Ex. 7.

69.     Texas has not put forth evidence showing that more CHNV nationals have used public healthcare in the State since the CHNV processes were implemented. Pl.'s Ex. 7.

70.     Texas has provided estimates of its costs to provide emergency Medicaid to undocumented immigrants in 2019, 2020, 2021 and 2022. Pl.'s Ex. 7, ¶ 8. These estimates are irrelevant.

     a.  First, as Texas admits, the figures are simply estimates. *Id*.

     b.  Second, the figures are not limited to CHNV nationals. *Id*.

     c.  Third, the figures predate the implementation of the CHNV processes. *Id*.

     d.  Fourth, the figures show a *decrease* in emergency Medical expenditures by the State. *Id*.

e.  Fifth, the figures are related to undocumented immigrants. *Id*. Individuals paroled into the United States under the CHNV processes have lawful presence for the duration of their parole.

f.  Finally, Texas does not provide any evidence to show that its expenses have increased since the CHNV processes were implemented, let alone that any increase was caused by an influx of medical claims by those paroled into the country under the CHNV processes.

71.  Texas also provides estimates for the cost to the State for providing Emergency Medicaid for claims for services made by individuals with a country of origin of Cuba, Haiti, Nicaragua, and Venezuela, regardless of documentation status. Pl.'s Ex. 7, ¶ 9.

72.  This data shows that Texas's costs for Emergency Medicaid to this population substantially decreased from 2022, before the CHNV processes were implemented, to 2023, after the CHNV processes were implemented. In 2022, the estimated cost was $178,000. Pl.'s Ex. 7, ¶ 9. From January to May 2023, it was $30,000. *Id*. Even doubling that figure—even tripling it—to account for the remainder of the year, the cost to Texas from providing Emergency Medicaid to individuals with a country of origin of Cuba, Haiti, Nicaragua and Venezuela has dramatically decreased since the implementation of the CHNV processes. *Id*. That makes sense, since fewer CHNV nationals have been released into the United States since the processes were implemented.

**Law Enforcement:**

73.  Texas has not put forward evidence of increased law enforcement or correctional costs attributable to the CHNV processes. Defendants' Ex. O at 5, 6-7, 14, 18-19, 21-27.

74.  In fact, the only data that Texas has presented with respect to its law enforcement and correctional costs predates the implementation of the CHNV processes. Pl.'s Ex. 5.

75.     Texas's evidence with respect to law enforcement and correctional costs is also based only on speculation that parolees will commit crimes and need to be detained in criminal custody. Pl.'s Ex. 5.

76.     Under the State Criminal Alien Assistance Program ("SCAAP"), the federal government reimburses states for certain costs associated with the detention of undocumented criminal noncitizens. Pl.'s Ex. 5, ¶¶ 3-4.

77.     Texas has provided the Court with data on the number of undocumented criminal noncitizens eligible for such reimbursement incarcerated in the State, the number of days they were incarcerated, the cost per inmate per day for such incarceration, the total cost to the State for incarcerating those eligible noncitizens, and the amount of money reimbursed to the State by the Federal Government. They have provided such data for July 1, 2020 through June 30, 2021. *Id*, ¶ 6. This data pre-dates the implementation of all four of the CHNV processes. Plaintiffs have not supplemented the data to include data from after the implementation of the CHNV processes, and thus there is no comparator to indicate whether such costs have increased or decreased since the CHNV processes were implemented.

78.     Additionally, the data pertains solely to undocumented noncitizens, and is not confined to nationals from CHNV countries. *Id*.

79.     Further, to assume that Texas will incur any increased law enforcement costs as a result of the CHNV processes, the Court would need to assume not only that more CHNV nationals have been released into the State (which the evidence firmly refutes) but further speculate that those individuals will commit crimes and need to be detained in criminal custody. Texas has not provided any evidence to support that supposition. *See generally* Pl.'s Ex. 5.

## PROPOSED CONCLUSIONS OF LAW

### I.      Standard

1.      To obtain a permanent injunction, a party "must show (1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest." *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 492-93 (5th Cir. 2017).

### II.     Parole authority

2.      The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(4); 8 U.S.C. § 1103(a)(1), (3).

3.      The INA authorizes the Secretary of Homeland Security, "in his discretion," to "parole" applicants for admission "under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

4.      This statutory authority accords with the Executive Branch's authority over management of the border and foreign affairs, including its historical discretion to grant parole. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229 (1925) (describing parole of noncitizen who could not be removed due to international conflicts); *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892) (describing noncitizen's shore release pending decision on right to land).

5.      In 1952, Congress generally "codif[ied]" the Executive's longstanding "administrative [parole] practice" in the INA's original version of Section 1182(d)(5). *Leng May Ma v. Barber*, 357 U.S. 185, 188-190 (referencing ch. 477, § 212(d)(5), 66 Stat. 188).

### III.    Standing

6.      To have standing, a plaintiff must suffer an injury-in-fact caused by the challenged action, traceable to the challenged action, and redressable by a court order. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992).

7.      Plaintiffs must meet the higher burden of proof necessary to succeed on the merits, and "prove standing by a preponderance of the evidence." *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022); *see also Lujan*, 504 U.S. at 561 (noting the "burden of proof" increases with "successive stages of litigation").

8.      This burden includes the requirement to identify a concrete injury that is traceable directly to the challenged action, and thus redressable by a favorable decision. *Lujan*, 504 U.S. at 561.

9.      "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.5 (1996), and Plaintiffs bear the burden to "demonstrate standing separately for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). *See also Davis v. F.E.C.*, 554 U.S. 724, 733 (2008).

10.     General arguments that "*illegal immigration* is costing the state money" are insufficient to confer standing. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no standing where State failed to trace claimed injury directly to challenged policy, and noting "[i]t could be that the reallocation of DHS's assets is resulting in removal of immigrants that impose a greater financial burden on the state" such that "the net effect would be a reduction in the fiscal burden on the state"); *see also Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).

11.     Indeed, "federal policies frequently generate indirect effects on state revenues or state spending." *United States v. Texas*, 143 S. Ct. 1964, 1973, n.6 (2023), and when a state's claim

to standing is based "only [on] those kinds of indirect effects," the state's claim for standing becomes "more attenuated." *Id*.

12.      Standing doctrine helps safeguard the Judiciary's proper, limited role in our constitutional system, and by ensuring that a plaintiff has standing to sue, federal courts prevent the judicial process from being used to usurp the powers of the political branches. *Texas*, 143 S. Ct. at 1969.

13.      Plaintiffs have stipulated that they are only "seek[ing] to establish Article III injury based on alleged injuries to Texas and that they will not submit any evidence as to injury for any other State Plaintiff." ECF No. 139.

14.      Texas has not established it has standing to challenge the parole processes.

15.      Plaintiffs' challenge to DHS's use of its discretionary parole authority is not a dispute "traditionally thought capable of resolution through the judicial process" and the "asserted injury" is not one that "is traditionally redressable in federal court." *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023).

16.      In making this determination, courts must examine "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023) (citation omitted).

17.      Just as was the case in *United States v. Texas*, 143 S. Ct. 1964 (2023), the "States have not cited any precedent, history or tradition of courts" reviewing or ordering the Executive to change its use of its discretionary parole authority, *id*. at 1970. *See also Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) ("Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty."); *id*. at 667 ("The State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting

24

therefrom is not subject to judicial review."); *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th

Cir. 2000) ("In sum, [t]he Attorney General's discretionary judgment regarding the application of

parole—including the *manner* in which that discretionary judgment is exercised, and whether the

procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints—is not

…   subject   to   review."   (citation   and   quotation   marks   omitted));

*Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) (When "the President

chooses the parole option … for foreign-policy reasons, a court … must be deferential to the

President's Article II foreign-policy judgment … Nothing in the relevant immigration statutes at

issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the

President's Article II judgment ….").

18.     The absence of suits like this one during the vast majority of our Nation's history

is powerful evidence that such suits are incompatible with our constitutional structure, which

"contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828

(1997); *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023) (noting limits on State standing to

raise claims against the Federal government).

19.     Holding Plaintiffs to their burden under Article III to show concrete harm before

permitting individual States to try to enforce their unique policy preferences is particularly

important in the context of immigration, which is inherently a subject of national concern.

*See Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 62-

63 (1941).

20.     "The principle of enforcement discretion … extends to the immigration context,"

where the Supreme Court "has stressed that the Executive's enforcement discretion implicates not

only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Texas*,

143 S. Ct. at 1971-72 (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)). The Supreme Court has further "declared that the Executive Branch also retains discretion over whether to remove a noncitizen from the United States." *Texas*, 143 S. Ct. at 1972 (citing *Arizona v. United States*, 567 U.S. 387 (2012)); *see also Arizona*, 567 U.S. at 396 ("Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

21.     Thus, even if Texas could identify some concrete harms or costs from the parole processes, Texas still could not establish standing to bring this suit. *See Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (A "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws.").

22.     Finding standing wherever a policy might arguably have some incidental costs to a State would allow States to challenge any change in immigration policy, and improperly draw courts into all sorts of generalized grievances on behalf of States who were unable to obtain their preferred policy outcomes through the political process.

23.     Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2014); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975).

24.     The Framers instead established a national government with the power to act directly on individuals, replacing a system where the government had to act through the States. *New York v. United States*, 505 U.S. 144, 162-66 (1992); *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018).

25.    To the extent Plaintiffs allege harm based on State benefits their respective legislatures have agreed to provide to paroled individuals, these alleged injuries also are not cognizable harms for Article III purposes because they are self-inflicted and not traceable to the government's actions. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"); *State of Fla. v. Mellon*, 273 U.S. 12, 17-18 (1927) (States may sue the United States only if they have suffered a "*direct* injury").

26.    State expenditures as a result of immigration are typically caused by the State's own laws, or the State's decision to opt into federal programs like Medicaid to obtain a benefit— but they are not dictated by federal policy. *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997).

27.    This case does not fall into the potential distinction in *Texas*, 143 S. Ct. at 1974, for policies that provide "legal benefits or legal status." *See also id.* (noting that the Court "did not resolve" whether such a distinction would actually have "Article III consequences"). The parole processes do not provide legal benefits or legal status. 143 S. Ct. at 1974. The authority for parole remains the statute, Section 1182(d)(5)(A). Any legal benefits from parole flow from the individual decision at a port of entry by a CBP officer to parole an individual into the United States, and that authority to grant parole under Section 1182(d)(5)(A), and any associated benefits, would remain even without the parole processes. Work authorization is available to parolees not based on any provision of the parole processes, but because parolees are generally able to apply for work authorization under long-standing regulations Plaintiffs do not challenge here. *See* 8 C.F.R. § 274a.12(c)(11); *see also infra* ¶¶ 159-161. Work authorization would be available to individuals paroled into the United States under Section 1182(d)(5)(A) even without the parole processes.

Thus, both parole and work authorization for parolees would be available independent of the parole processes. *Cf. Texas*, 143 S. Ct. at 1978-79 2548 (Gorsuch, J., concurring) (explaining that States lack standing where a judicial decree setting aside an immigration policy would not change the fact that federal officials would possess the same underlying discretion without the policy).

28.     States have the same burden to establish standing that individual plaintiffs do. *Texas*, 143 S. Ct. at 1970, 1976; *id*. at 1977 (Gorsuch, J., concurring); *Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023).

29.     Even if Plaintiffs could base their allegations of injury and arguments for standing on DHS's use of its discretionary parole authority, Plaintiffs still have not identified concrete harm traceable to the parole processes. *See* Prop. Facts ¶¶ 56-57.

30.     Plaintiffs' theory of harm is based entirely on speculation that the parole processes will lead to more CHNV nationals in Texas, and the evidence firmly contradicts that assertion. *See* Prop. Facts ¶¶ 56-57.

31.     Because the number of CHNV nationals being released into Texas is lower now than before the parole processes, Plaintiffs cannot show that any costs associated with CHNV nationals have increased following the implementation of the parole processes. *See* Prop. Facts ¶¶ 56-79.

32.     Even if Plaintiffs could show an increase in migration to Texas that was traceable to the parole processes, there is no evidence that Texas's costs with respect to driver's licenses, education, healthcare, or law enforcement have increased because of the parole processes. *See* Prop. Facts ¶¶ 58-79.

33.     Unsupported speculation about some "*possible* future injury" is not sufficient to establish standing, especially where it "rests on speculation about the decisions of independent

actors." *Clapper*, 568 U.S. at 409, 414; *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021)

("[W]here a causal relation between injury and challenged action depends upon the decision of an

independent third party ... 'standing ... is ordinarily substantially more difficult to establish.'"

(quoting *Lujan*, 504 U.S. at 562)).

34.      To the extent Plaintiffs base their argument for standing on speculative overhead

costs for services that include the costs of building additional buildings or hiring additional staff

to service speculative increases in population in the State, Plaintiffs "cannot manufacture standing

by choosing to make expenditures based on hypothetical future harm that is not certainly

impending." *Clapper*, 568 U.S. at 402; *see also Louisiana by & through Landry v. Biden*, 64 F.4th

674, 677-78 (5th Cir. 2023) (States cannot base standing "on a chain of hypotheticals" that "federal

agencies may (*or may not*)" take certain actions that "may (*or may not*) burden the States.")

35.      To the extent Plaintiffs base their argument for standing on services for which it

charges offsetting fees, the revenue Texas generates from those services must be considered as

part of the standing analysis since these "offsetting benefits ... arise from the same transaction as

the costs." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015).

36.      To the extent Plaintiffs base their argument for standing on law enforcement costs,

even if the Court were to "assume" that a policy change "increase[s] unlawful immigration," it

"cannot further infer that [it] increase[s] crime," *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir.

2015), particularly with processes like these that include "national security and public safety

vetting," 88 Fed. Reg. at 1,267.

37.      To the extent Plaintiffs base their argument for standing on the belief that the

Executive should use some other statutory authority to detain and attempt to remove CHNV

nationals, or challenge the Executive's plan to remove to Mexico individuals who do not follow

the parole processes, a plaintiff "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see Texas*, 143 S. Ct. at 1968.

38.    Even if Plaintiffs could establish costs traceable to the use of parole, and such costs could be considered an injury for purposes of standing, that injury would still not be redressable by relief related to the CHNV processes. Even without the parole processes, immigration officials would retain the authority and discretion to parole CHNV nationals into the United States under the parole statute, Section 1182(d)(5)(A). Plaintiffs have not shown that fewer CHNV nationals would be paroled or released into Texas without the parole processes. Plaintiffs thus have not established that their alleged injuries are traceable directly to the parole processes or redressable by a favorable decision. *See Lujan*, 504 U.S. at 561; *Texas*, 143 S. Ct. at 1978-79 (Gorsuch, J., concurring) (explaining that redressability has not been established where a "judicial decree rendering" guidance "a nullity does nothing to change the fact that federal officials possess the same underlying" discretion without the relevant guidance).

39.    Plaintiffs lack standing to challenge the parole processes.

## IV.    Plaintiffs Cannot State a Claim Under the APA.

### a.    The parole processes are not final agency actions under the APA.

40.    To raise an APA claim, Plaintiffs must challenge "final" agency action. 5 U.S.C. § 704. Agency action is "final" under the APA only if it both "consummate[es] the agency's decisionmaking process" and also determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

41.    The parole processes set out the general manner in which DHS plans to process parole requests and implement its discretionary parole authority in Section 1182(d)(5)(A), but it is

the statute, not the parole processes, which creates the authority and requirements for parole. *See, e.g.*, 87 Fed. Reg. at 63,516.

42.     The processes do not bind DHS to any particular course with respect to any individual or class of noncitizens—those decisions continue to be made on a case-by-case basis by CBP officials at ports of entry making decisions specific to individual noncitizens—and it is only in making those individual decisions that the agency completes its decision-making process in a way that determines rights and produces legal consequences. *See* Prop. Facts ¶¶ 33-34.

43.     The parole processes do not guarantee parole even if a noncitizen follows the process and is granted authorization to travel to the United States to request parole.

44.     A CBP official at the port of entry still ultimately decides whether parole should be granted, exercising his discretion. *See, e.g.*, 87 Fed. Reg. at 63,516 (granting of "advance authorization to travel does not guarantee parole into the United States"—"parole is a discretionary determination made by CBP at the [port of entry]"); *see also* Ex. II, ¶ 3 (noting CBP has denied parole for noncitizens who have traveled to a port of entry with advance travel authorization pursuant to the CHNV process).

45.     The processes do not restrict a CBP official's ability to deny parole in an individual case, which distinguishes these processes from the Fifth Circuit's characterization of the Migrant Protection Protocols ("MPP"), which it held was "final agency action under the principle that, where agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action." *Texas v. Biden*, 20 F.4th 928, 948 (5th Cir. 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) (quotation marks and citation omitted).

46.     The parole processes do not create a right for anyone to enter the United States or obtain any immigration benefit, and immigration officials retain the same authority and discretion to grant or deny parole under Section 1182(d)(5)(A) that they had before the parole processes were in place. *See, e.g.*, 88 Fed. Reg. at 1,277 ("This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter").

47.     An agency process or guidance such as this does not become reviewable "final agency action" unless and until it is applied "in a particular situation" to an individual or regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d at 441 (similar).

**b.      Parole decisions are committed to agency discretion.**

48.     The APA precludes review "of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Texas*, 809 F.3d at 165 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *see* 5 U.S.C. § 701(a)(2).

49.     Parole decisions under Section 1182(d)(5)(A) are a textbook example of wholly discretionary decisions that are not subject to judicial review. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

50.     Congress made clear in Section 1182(d)(5)(A) that the Secretary "may" in "*his discretion* parole into the United States temporarily *under such conditions as he may prescribe*" noncitizens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* (emphasis added).

32

51. The statute explicitly places the parole authority in the Secretary's "discretion." *Id.*; *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) (noting that "[t]he word 'may'" also "customarily connotes discretion."); *Heckler*, 470 U.S. at 831.

52. The parole processes do not restrict this discretion or the agency's ability to deny parole in any individual case, bringing these processes well within the bar to APA review of action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

53. Congress separately barred review of the Secretary's discretionary decisions with respect to how to carry out the immigration laws when it enacted 8 U.S.C. § 1252(a)(2)(B)(ii). Under that provision, "[n]otwithstanding any other provision of law," "no court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the ... Secretary."

54. Section 1252(a)(2)(B)(ii) applies when the relevant decision is "specified by statute to be in the discretion of the [Secretary]," *Kucana v. Holder*, 558 U.S. 233, 248 (2010), and parole decisions are specified in Section 1182(d)(5)(A) to be "in [the Secretary's] discretion," 8 U.S.C. § 1182(d)(5)(A); *see also* 8 U.S.C. § 701(a)(1) (barring review under the APA "to the extent that statutes preclude judicial review").

55. The Fifth Circuit has held that the limits on reviewing the "discretionary judgment regarding the application of parole" also bar challenges to "the *manner* in which that discretionary judgment is exercised" and to "whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints." *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (quotation marks and citation omitted); *see also id.* at 990 n.12 (citing 8 U.S.C. § 1182(d)(5)(A)).

56.     The statute gives the Secretary discretionary authority to grant parole "under such conditions as he may prescribe," and otherwise sets no standard for how requests for parole should be submitted or processed, creating no standard against which courts can review these parole processes. *See* 8 U.S.C. § 1182(d)(5)(A).

57.     The Supreme Court recently explained in construing the preceding subsection, Section 1252(a)(2)(B)(i), that this provision strips courts of jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions, including review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment." *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022). This bar to review thus "encompasses not just the granting of relief but also any judgment relating to the granting of relief." *Id*. This reasoning also applies to Section 1252(a)(2)(B)(ii).

58.     The Supreme Court explained in *Kucana*, 558 U.S. at 247, that "[o]ther decisions specified by statute 'to be in the discretion of the Attorney General,' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind" to those covered by Section 1252(a)(2)(B)(i). Accordingly, Section 1252(a)(2)(B)(ii)'s jurisdictional bar also extends not just to final decisions or actions, but "any [decision or action] relating to the granting of relief." *Patel*, 142 S. Ct. at 1622.

59.     The "broad discretion exercised by immigration officials" is a "principal feature of the removal system," *Arizona*, 567 U.S. at 396, and is particularly important in the immigration context where "flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *Knauff*, 338 U.S. at 543 (emphasizing Executive's broad discretion over "decisions[s] to admit or to exclude an alien").

60.     Because immigration policy implicates the "dynamic nature of relations with other countries," the Executive must retain flexibility and discretion to alter its approach to be "consistent with this Nation's foreign policy." *Id.* at 397; *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations."); *Heckler*, 470 U.S. at 831. "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (citation omitted).

61.     The decision to implement the parole processes is inextricably intertwined with the United States' foreign policy, in particular negotiations with Mexico, which has now agreed to accept nationals from these four countries. The parole processes are thus part of the Executive's larger discussions with our regional partners on how best to manage irregular migration and are central to Mexico's decision to accept noncitizens the United States cannot otherwise remove.

62.     Such foreign policy decisions are committed to Executive discretion and are unreviewable under the APA because there is "no workable standard against which to judge the agency's exercise of discretion." *Texas*, 106 F.3d at 667.

63.     "[T]he immigration statutes afford substantial discretion to the Executive, [and] different Presidents may exercise that discretion differently." *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). When "the President chooses the parole option … for foreign-policy reasons, a court … must be deferential to the President's Article II foreign-policy judgment." *Id.*

### c.   The States are not in the zone of interests.

64.     Plaintiffs are not within the zone of interests of Section 1182, and thus lack a cause of action to enforce that provision.

65.     To satisfy the zone-of-interests inquiry Plaintiffs must show that Congress intended for that particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

66.     If a plaintiff is not the object of a challenged regulatory action and its interests are "marginally related to or inconsistent with the purposes implicit in the statute," then the plaintiff lacks a right of review. *Id.* at 399.

67.     Plaintiffs here are not the object of the challenged regulatory actions.

68.     Nothing in the text, structure, or purpose of Section 1182(d)(5) or the INA generally suggests that Congress intended to permit a State to invoke attenuated financial impacts of immigration policies to contest those policies. *See Bennett*, 520 U.S. at 175-77 (noting that zone of interests "is to be determined not by reference to the overall purpose of the Act in question … but by reference to the particular provision of law upon which the plaintiff relies"); *Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("*FAIR*").

69.     The court in *FAIR*, 93 F.3d 897 (D.C. Cir. 1996), rejected a similar challenge that the federal government's "scheme for parole" of inadmissible noncitizens violated statutory limits on parole authority, holding the plaintiff was not within the zone of interests as there was nothing in the "language of the statutes on which it relies" nor the "legislative history that even hints at a concern about regional impact" of immigration. *Id*. at 900-01.

70.     Nothing in the language of Section 1182 contemplates a concern about the impact of immigration on States or that States might sue to challenge the use of Section 1182 based on

allegations of any such impact. Congress did not, in the parole statute, give any indication that it intended to make the allegations of harm Plaintiffs raise here "legally cognizable injuries redressable by a federal court." *Texas*, 143 S. Ct. at 1973 (explaining that States might be able to raise claims where Congress "specifically authorize[s] suits against the Executive Branch by a defined set of plaintiffs who have suffered concrete harms" and "specifically authorize[s] the Judiciary to enter appropriate orders" to enforce a statutory provision).

71.     Congress has enacted various provisions broadly aimed at protecting the Executive's discretion in implementing the INA, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486–87 (1999), making clear that only noncitizens may bring challenges, and only to certain types of decisions and only through their removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1226(e);  1252(a)(2)(B)(ii),  1252(a)(5),  (b)(9),  (g);  *see also id.*  §§  1226a(b)(1),  1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g).

72.     A detailed review scheme that allows challenges by particular parties—such as the scheme that Congress provided in the INA—is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (holding that "organizational plaintiff could not undermine the statutory scheme by suing to challenge [immigration] policies or statutory interpretations that bear on" a noncitizens).

73.     A plaintiff's interest in "limiting immigration" or a disagreement with the government's "scheme for parole" thus does not bring a party within the zone of interests of the

INA. *See FAIR*, 93 F.3d at 900-01; *accord I.N.S. v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers).

74.     Plaintiffs thus are not within the zone of interests of the statute that forms the basis of their claims.

**V.      Plaintiffs' APA Claims Fail on the Merits.**

        **a.      The parole processes are authorized by statute.**

75.     The parole processes comply with the statutory text and fit within DHS's authority under Section 1182(d)(5).

76.     Section 1182(d)(5)(A) authorizes parole if decisions are made on a case-by-case basis and parole is granted either for urgent humanitarian reasons or significant public benefit: "The [Secretary] may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

77.     The parole decisions made under the parole processes satisfy each of these requirements because each process (1) requires case-by-case consideration of the parole request, and (2) sets out reasons why an immigration official might conclude that parole of a noncitizen from one of the covered countries would address an urgent humanitarian need or provide a significant public benefit.

78.     Individuals seeking parole under these processes are evaluated on a case-by-case basis to determine whether granting parole is merited. 87 Fed. Reg. 63,516; 88 Fed. Reg. at 1,253, 1,264, 1,276.

79.     DHS first reviews information submitted by a potential supporter, vets that supporter, and then reviews information provided by the parole applicant before granting travel authorization to that particular applicant. *See, e.g.*, 88 Fed. Reg. 1,252; https://www.uscis.gov/CHNV. Among other things, the supporter form notes that a grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit, and asks for an explanation for why a favorable exercise of discretion is merited for the parole applicant. *See* Prop. Facts ¶¶ 33-34. Both USCIS and CBP officers have access to the information provided in response to this question. *Id.*

80.     Even if DHS grants an individual travel authorization, travel authorization does not guarantee parole will be granted upon arrival—a CBP officer at a port of entry must still inspect the individual and consider whether it is appropriate to grant parole to that individual. 87 Fed. Reg. 63,516; 88 Fed. Reg. at 1,253, 1,264, 1,276.

81.     No one is entitled to parole under these processes, even after they have been authorized to fly to the United States to seek parole at a port of entry. *See, e.g.*, 87 Fed. Reg. at 63,516 (granting of "advance authorization to travel does not guarantee parole into the United States"—"parole is a discretionary determination made by CBP at the [port of entry]").

82.     The parole processes place no restrictions on an immigration officer's discretion to deny parole in any individual case. *See* Prop. Facts ¶¶ 33-34.

83.     As DHS explained when it initially announced the Venezuela process, there are a number of significant public benefits of channeling parole requests through this process. "The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between [ports of entry] with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to

the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons," including:

    a.   enhancing the security of our border by reducing irregular migration of Venezuelan nationals;

    b.   enhancing border security and national security by vetting individuals before they arrive at our border;

    c.   reducing the strain on DHS personnel and resources;

    d.   minimizing the domestic impact of Venezuelan irregular migration;

    e.   disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks;

    f.   and, fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, establishing additional processing pathways from within the region to discourage irregular migration. 87 Fed. Reg. 63,511; *see also id*. at 63,512-15 (setting out in detail how parole of eligible individuals on a case-by-case basis pursuant to this process can provide each of these benefits).

84.    DHS identified similar public benefits that would be provided by similar processes for Haiti, Nicaragua, and Cuba. *See* 88 Fed. Reg. at 1,248-51 (findings for Haitian process); 88 Fed. Reg. at 1,260-62 (Nicaraguan process); 88 Fed. Reg. at 1272-75 (Cuban process).

85.    Each parole process also sets out urgent humanitarian reasons that may justify parole for individuals from these four countries.

    a.   For Venezuela, this includes "the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro" and preventing

"Venezuelan nationals who seek to leave their home country" from having to take a "dangerous journey to the United States." 87 Fed. Reg. at 63,515.

b.  For Nicaragua, the process addresses the "urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua" because "[t]he Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions," 88 Fed. Reg. at 1,262-63.

c.  For Cuba, the process addresses "the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba" where the government "continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions," 88 Fed. Reg. at 1,275.

d.  For Haiti, the process addresses the many Haitians who have urgent humanitarian needs based on "escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak" which "have worsened already concerning political, economic, and social conditions in Haiti." 88 Fed. Reg. at 1,251-52. The parole "process provides a safe mechanism for Haitian nationals who seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea." *Id*.

86.  Plaintiffs' argument that the parole authority must be interpreted narrowly to bar the parole processes challenged here, ECF No. 22 at 15, fails because it is based on legislative history for amendments to the parole statute that were rejected. The House report they rely on,

H.R. Rep. No. 104-469, at 140 (1996)), is therefore not a proper basis for interpreting Section 1182(d)(5)(A).

87.     Congress rejected the proposed amendments constraining parole authority discussed in that report that would have limited the substantive grounds for parole. *See* H.R. Rep. No. 104-469, at 78, subsection (B) (seeking to amend Section 1182(d)(5)(A) to limit the definition of "urgent humanitarian reason" to "a medical emergency," "organ or other tissue" donations to a family member, or "imminent" death of "a close family member in the United States"); *id.* subsection (C) (seeking to amend Section 1182(d)(5)(A) to limit the definition of "public interest" to apply to noncitizens assisting the United States Government in a law enforcement activity, or noncitizens who will be prosecuted for a crime in the United States).

88.     Congress rejected this proposed narrowing of the parole authority, and the House instead "recede[d] to [the] Senate['s] amendment" to Section 1182(d)(5)(A), which proposed essentially the current standard more broadly authorizing parole of non-refugees to provide significant public benefits or for humanitarian reasons. *See* H.R. Rep. No. 104-828, at 245 (1996).

89.     Congress's rejection of additional restrictions on the Secretary's authority indicates that Congress did not agree with restraining the broad discretionary authority provided by the statute, and "weighs heavily" against a narrower interpretation of that authority that Plaintiffs advance. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result . . . urge[d] here weighs heavily against th[at] interpretation.") (citing *Doe v. Chao*, 540 U.S. 614, 621-623 (2004)).

90.     The legislative history Plaintiffs cite also acknowledged that the proposed amendments were intended to narrow the parole authority, which had been used "to admit entire categories of aliens." H.R. Rep. No. 104-469, at 140 (noting that the proposed "specific limitations

on the Attorney General's discretion are necessary" to limit this practice, which had been used, for example, to implement a "migration agreement" with Cuba that had used the parole authority for tens of thousands of Cubans).

91.     By rejecting the proposed amendments, Congress rejected the type of specific limitations on the parole authority that Plaintiffs advance.

92.     Legislative history cannot impose limitations on parole authority beyond those that were actually adopted in the statutory text, *see Azar v. Allina Health Services*, 139 S. Ct. 1804, 1814 (2019), and that principle should have even greater force with legislative history of amendments Congress rejected.

93.     The legislative history of the version of Section 1182(d)(5)(A) that Congress ultimately adopted anticipated that "categories of aliens" would be "paroled into the United States" under Section 1182(d)(5)(A) and provided for reporting to Congress on the categories and numbers of parolees. H.R. Rep. No. 104-828, at 162, 245 (1996); 8 U.S.C. § 1182 Note, Pub. L. 104-208, Div. C, Title VI, § 602(b) (1996).

94.     Even if the legislative history Plaintiffs cite had any force for interpretative purposes, it would still not be relevant here because the proposed amendments and the associated legislative history for those rejected amendments was concerned with using parole to allow noncitizens to "remain permanently in the United States." H.R. Rep. No. 104-496, at 140. That is not an issue here where parole is expressly limited to a maximum "period of up to two years." 88 Fed. Reg. 1,276. "Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires." *Id*. at 1268.

95.     At the same time Congress amended Section 1182(d)(5), it amended 8 U.S.C. § 1151(c) to provide "that aliens paroled into the United States in the second previous fiscal year who do not depart within 365 days and who have not yet become permanent resident aliens … will be counted towards the worldwide level of family-sponsored immigrants," indicating that Congress anticipated that parolees would often remain in the United States for multiple years and dealt with this issue not by restricting parole authority, but by counting them towards the annual cap on migration. H.R. Rep. No. 104-828, at 162, 245 ("Treatment of Long-Term Parolees in Applying Worldwide Numerical Limitations"); *see also* S. Rep. No. 104-249, at 34 (1996) (discussing amendments adopted related to "counting of long-term parolees").

96.     The parole processes are not used for processing refugees and do not replace established refugee processing channels. *See, e.g.*, 88 Fed. Reg. 1,279 ("Venezuelan nationals also are generally ineligible" for parole under this process if they "hold refugee status in any country other than Venezuela").

97.     Congress did place specific limits on the use of parole for individuals who have already been granted refugee status, but those limits are in Section 1182(d)(5)(B) rather than Section 1182(d)(5)(A), the authority at issue here.

98.     Section 1182(d)(5)(B) governs "parole into the United States [of] an alien who is a refugee" and includes additional requirements that Congress did not include in the adjacent provision at Section 1182(d)(5)(A), such as the requirement for a "determin[ation] that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled." (emphasis added). Section 1182(d)(5)(A) differs in numerous respects, including that it instead authorizes parole for "urgent humanitarian reasons or significant public benefit" for any noncitizen who has not been granted refugee status.

44

99.     By requiring findings "with respect to" a "particular alien" to grant parole under Section 1182(d)(5)(B), but not requiring findings limited to a "particular alien" in the adjacent section at issue here, Congress left open the possibility that urgent humanitarian reasons and significant public benefits under Section 1182(d)(5)(A) might be presented by many similarly situated noncitizens, and that the Executive could consider the aggregate benefits of paroling noncitizens because they fall within certain groups. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020) ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely.").

100.    Section 1182(d)(5)(A) sets no numerical limit on the number of individuals who can be paroled, so long as each parole decision is made on a case-by-case basis. Accordingly, the total number of parolees is not a basis to find the processes unlawful.

101.    Section 1182(d)(5)(A) sets no limit on how widespread an urgent humanitarian reason or significant public benefit may be as long as the agency determines it applies in an individual case.

102.    Plaintiffs have not shown that the agency is not making decisions on a case-by-case basis, as the parole processes require, and have proffered no evidence to rebut the "presumption of regularity" that attaches to agency statements about the actions they have taken or will take. *See, e.g.*, *Deep v. Barr*, 967 F.3d 498, 503 (5th Cir. 2020).

103.    There is no dispute that multiple individuals might contribute to similar significant public benefits or present similar urgent humanitarian reasons, particularly when such needs are generated by natural disasters or repressive governments.

104.     Nothing in Section 1182(d)(5)(A) suggests that there is any limit on the number of individuals that DHS can find present similar urgent humanitarian reasons or significant public benefits.

105.     Congress did not define "urgent humanitarian reasons" or "significant public benefit," and instead delegated the job of defining these terms to the agency. *See* 8 U.S.C. § 1103(a)(1), (3) (authorizing the Secretary to "issue such instructions" and "perform such other acts as he deems necessary for carrying out his authority" under the INA); 6 U.S.C. § 202(4) ("The Secretary shall be responsible for …[e]stablishing and administering rules … governing the granting of … forms of permission, including parole, to enter the United States"); *cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

106.     DHS's interpretation and application of these terms are entitled to deference. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999) ("[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988))); *Texas v. United States*, 106 F.3d 661, 665 (5th Cir. 1997) ("Courts must give special deference to congressional and executive branch policy choices pertaining to immigration.").

107.     The Executive has for decades used its authority to interpret urgent humanitarian reasons and significant public benefits to include various foreign affairs goals, and to identify certain groups that should be considered for parole on a case-by-case basis. *See* Defendants' Ex. T-GG. As the former Immigration and Naturalization Service long ago explained, "[d]esignating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with a 'case-by-case' decision requirement since the

46

adjudicator must individually determine whether the person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case." *See* Cuba AR at 92 (Memo from General Counsel of INS, *Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status*, June 15, 2001).

108.   That understanding of the Secretary's authority under Section 1182(d)(5)(A) is consistent with decades of case law addressing similar immigration authorities. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting agency need not "forswear use of reasonable presumptions and generic rules" even where statue required "some level of individualized determination"); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir. 1996) (similar); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar).

109.   The Executive Branch has long used parole in this manner without Congress taking action to restrict or question this authority. *See* Prop. Facts ¶ 55.

110.   For example, in the Cuban Family Reunification Parole Program, 72 Fed. Reg. 65,588 (2007), DHS authorized use of "its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members." *Id*. The goal of this program was "to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." *Id*. Like the parole processes at issue in this case, the decision "[w]hether to parole a particular" noncitizen ultimately remained "a case-by-case, discretionary determination." *Id*.; *see* Defendants' Ex. CC.

111.   DHS also used the parole authority in 2006 to create the Cuban Medical Professionals Parole Program with foreign policy aims, encouraging Cuban doctors to come to the United States to limit the ability of the Cuban government to use medical professionals for its own

foreign policy goals—a program was ended when U.S. foreign policy shifted to normalizing relations with Cuba. *Id*.; *see* Defendants' Ex. DD.

112.     DHS adopted a similar approach for Ukrainian citizens and their immediate family members who were displaced by the war with Russia by providing them an opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole. *See* Uniting for Ukraine Parole Process, 87 Fed. Reg. 25,040 (2022); *see also* Defendants' Ex. W.

113.     Congress has repeatedly affirmed this statutory authority by rejecting attempts to narrow Section 1182(d)(5)(A), and by passing legislation that expressed support for this approach to parole for particular groups, such as the large numbers of Cubans paroled into the United States at various times. *See, e.g.*, Cuban Adjustment Act, Pub. L. No. 89-732 (authorizing granting permanent residence to Cubans being paroled into the country); Refugee Education Assistance Act of 1980, Pub. L. No. 96-422 (providing benefits for Haitians and Cubans paroled under Section 1182(d)(5)).

114.     Congress expressed similar support of individuals paroled through the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25,040, by passing appropriations supporting individuals entering the United States through this type of parole process. *See* Ukraine Supplemental Appropriations Act of 2022, Pub. L. No. 117-128 (providing benefits to Ukrainians paroled under Section 1182(d)(5)(A)); *see also* Help HAITI Act of 2010, Pub. L. No. 111-294 (providing for adjustment of status for Haitians paroled under DHS's Humanitarian Parole Policy for Certain Haitian Orphans).

115.     There are many similar historical examples of Congress passing legislation that expressed support for this approach to parole for particular groups. *See also, e.g.*, Foreign

Operations, Export Financing, and Related Programs Appropriations Act of 1989, Pub. L. No. 100-461 (authorizing granting permanent residence to parolees from the Soviet Union, Vietnam, Laos, and Cambodia); Omnibus Appropriations Act, Pub. L. No. 104-208 (providing for adjustment of status for noncitizens from Poland and Hungary who had been denied refugee status but who had "inspected and granted parole into the United States"); National Defense Authorization Act of 2020, Pub. L. No. 116-92 (expressing congressional support for an ongoing parole program for relatives of U.S. military members and considering in each case-by-case determination whether parole would advance family unity that would constitute a significant public benefit); Extending Government Funding and Delivering Emergency Assistance Act of 2021, Pub. L. No. 117-43 (providing refugee benefits to Afghans paroled under Section 1182(d)(5) and funds to support those benefits).

116.    "Congress is presumed to be aware of an administrative … interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

117.    Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence." *Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983). Congress's awareness of and "long acquiescence in [] Executive action" without "repudiate[ion]" also constitutes "tacit consent." *United States v. Midwest Oil Co.*, 236 U.S. 459, 481, 491 (1915); *Dames & Moore v. Regan*, 453 U.S. 654, 678-79 (1981); *Texas ex rel. Falkner v. Nat'l Bank of Com. of San Antonio*, 290 F.2d 229, 233 (5th Cir. 1961) ("Congress has long been apprised of this construction, and the fact that Congress has failed to enact legislation specifically repudiating the practice or placing the

practice in a definite legislative scheme is sufficient indication that Congress has given its tacit approval.").

118.     The parole processes at issue in this case fall squarely within the historical use of the parole authority to advance foreign affairs goals related to particular countries.

119.     The Senate Appropriations Committee has encouraged DHS to explore using its parole authority in this manner. *See* Senate Appropriations Committee, Explanatory Statement for the Homeland Security Appropriations Bill of 2023, *available at* https://www.appropriations.senate.gov/download/dhsfy23rpt. Recognizing the success of the Uniting for Ukraine parole process at reducing the strain on CBP personnel, thus allowing them to focus on other important responsibilities, "the Committee encourage[d] the Department to explore whether such approaches can be expended further," and "direct[ed] the Secretary to examine whether a model similar to what was used for Ukrainian nationals, as well as the Central American Minors program, may be employed to process some noncitizens in advance to help deter individuals from making dangerous and costly journeys to the U.S." *Id*. at 5.

120.     The parole processes are fully consistent with the parole authority set out in the statutory text.

**b.      Plaintiffs cannot raise an ultra vires claim.**

121.     Plaintiffs cannot raise an ultra vires claim, but even if they could, because this claim simply repeats Plaintiffs' statutory claim under the APA, it would fail for all the same reasons.

122.     Plaintiffs cannot bring a claim "at equity" for governmental official action outside of the authorization of federal law because such a cause of action exists only against a *State* official violating an individual right under the Constitution, and, therefore, is inapplicable in this case. *See Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 471, 475 (5th Cir.

2020) (stating a cause of action "*at equity*" must "name individual state officials" engaged in "an ongoing violation of federal law"); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231-32 (10th Cir. 2005) (courts, "in a proper case in equity, may enjoin a State officer from executing a State law in conflict with the Constitution").

123.    Even if Plaintiffs could assert an ultra vires claim at equity against federal officers and agencies, the claim would still not be cognizable against Defendants because Plaintiffs have not identified a waiver of sovereign immunity that permits such a claim against the federal government outside of APA claims.

124.    The APA offers its own vehicle to challenge unconstitutional and otherwise ultra vires executive action. 5 U.S.C. § 706(2)(C) (permitting court to review and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); *see, e.g.*, *Indep. Turtle Farmers of Louisiana, Inc. v. United States*, 703 F. Supp. 2d 604, 618 (W.D. La. 2010).

125.    The 1976 amendment to the APA was intended "to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer[,]" *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989). "The principal purpose of this amendment was to do away with the ultra vires doctrine." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

126.    "[S]ince 1976 federal courts have looked to [5 U.S.C.] § 702 ... to serve the purposes of the [ultra vires doctrine] in suits against federal officers." *E. V. v. Robinson*, 906 F.3d 1082, 1092 (9th Cir. 2018) (internal quotation omitted); *see, e.g., Locke v. Warren*, No. 19-61056-CIV, 2019 WL 4805716, at *4 (S.D. Fla. Oct. 1, 2019) (collecting cases).

127.     Any claim for equitable relief arising from alleged ultra vires action by Defendants must now be brought under, and only as permitted by, the APA and its procedures.

128.     Plaintiffs' ultra vires claim—that "Defendants' parole program exceeds their statutory parole authority under 8 U.S.C. § 1182(d)(5)," ECF No. 20 ¶ 143—duplicates their APA claim nearly word for word. *See id.* ¶ 141(a) (arguing that "Defendants' parole program should be held unlawful" under the APA because "[t]he program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5)").

129.     Plaintiffs' claim that Defendants' parole actions are "in excess of [their] statutory … authority" is the exact type that the APA contemplates will be brought, if at all, only to the extent permitted under the APA. 5 U.S.C. § 706(2)(C).

### c.     The processes are not arbitrary and capricious.

130.     The parole processes easily satisfy the APA's "highly deferential" standard of review. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983).

131.     Under the "narrow" scope of review permitted "under the 'arbitrary and capricious' standard," a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

132.     In assessing the agency action, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016); *see also F.C.C. v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Instead, to satisfy judicial scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted).

133.     The agency's decision must also be judged based on the record that was before the agency at the time of the decision, and Plaintiffs cannot rely on extra-record evidence to argue the decision was arbitrary or capricious. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 243-44 (1973); *Medina Cty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010); *see also, e.g.*, *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012); *Oceana, Inc. v. Locke*, 674 F. Supp. 2d 39, 44-45 (D.D.C. 2009).

134.     The range of reasonable policy choices under the parole statute is broad, as "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grant of authority is "nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985).

135.     The parole processes reasonably explain that DHS is using the parole authority to combine "a clear and meaningful consequence for unauthorized entry along the southwest border with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States." Venezuela AR 146.

136.     DHS explained that, because country conditions or diplomatic relations in certain countries such as Venezuela limit DHS's ability to remove individuals there, DHS's options for imposing such consequences are limited. Venezuela AR 146 at 137-41.

137.     DHS explained that, as part of negotiations with Mexico on how to address irregular migration through Mexico to the southwest border, DHS implemented the parole process for Venezuelans to reduce the strain on the border and create a parole process that allows for orderly processing of noncitizens away from the border. Venezuela AR at 132-35.

138.     As a result, Mexico agreed to accept the return or removal of Venezuelan nationals who fail to follow lawful pathways to the United States. Venezuela AR at 132-35.

139.    As DHS explained when it later amended the Venezuelan process and created similar processes for Cuba, Nicaragua, and Haiti, the Venezuelan parole process was an immediate success at achieving the goals DHS intended, *e.g.*, reducing irregular migration, border encounters, and unlawful border crossings. Venezuela AR at 146-47. By creating a consequence for individuals who do not follow the new parole process or take other lawful avenues to seek entry, DHS created a disincentive for unauthorized entry that reduced border encounters significantly, alleviated the strain on DHS personnel and limited resources to detain arriving noncitizens at the border, and reduced the overall use of parole for Venezuelans. *Id.*

140.    DHS reasonably explained when adopting similar processes for Cuba, Nicaragua, and Haiti why those countries presented similar barriers to removal, and how imposing a similar incentive structure would thus likely have similar results. Cuba AR 127, Haiti AR 99, Nicaragua AR 127. These processes are each modeled on the recent success of this approach in encouraging individuals to choose safe, orderly, and lawful pathways to the United States, while reducing unauthorized border crossings by obtaining Mexico's agreement to accept—and thus imposing new consequences for—individuals who enter without authorization. *Id.*

141.    For each of these processes, DHS addressed the available evidence, including compelling evidence of recent success from the Venezuelan Parole Process, and explained how the processes would advance DHS's ability to enforce the immigration laws against individuals who enter without authorization, reduce strain on the border and limited agency resources, and advance foreign relations.

142.    Plaintiffs' arguments that these processes are arbitrary or capricious lack merit.

54

143.    There is no merit to Plaintiffs' argument that the parole processes are arbitrary and capricious because they consider the accumulated benefits of paroling noncitizens from these four countries. ECF No. 22 at 22.

a.    Nothing in Section 1182(d)(5)(A) or the APA prohibits aggregating the benefits of individual parole decisions and weighing those positive results.

b.    Unlike Section 1182(d)(5)(B), Section 1182(d)(5)(A) does not include language requiring findings "with respect to" a "particular alien," indicating Congress left open the possibility that the Executive could consider the aggregate benefits of paroling certain groups.

c.    Plaintiffs do not dispute that securing the border, encouraging individuals to migrate through lawful means, and developing previously unavailable consequences for those who do not and otherwise could not be removed are public benefits.

d.    The parole processes are based not only on significant public benefits, but also on urgent humanitarian needs of individuals from these countries.

e.    These urgent humanitarian reasons will apply to multiple noncitizens because they result from repressive governments, crippling economic conditions, social unrest, natural disasters, diseases, and the dangerous journey from these countries to the United States. 87 Fed. Reg. at 63,515; 88 Fed. Reg. at 1,262-63; 88 Fed. Reg. at 1,275; 88 Fed. Reg. at 1,251-52.

f.    Plaintiffs do not dispute that such conditions might create urgent humanitarian needs for certain groups of noncitizens.

144.    There is no merit to Plaintiffs' argument that the parole processes are arbitrary and capricious for failing to consider Plaintiff States' reliance interests. ECF No. 22 at 22.

a.  Plaintiffs do not identify any reliance interest DHS should have considered.

b.  Reliance interests are implicated when a regulatory change directly affects a regulated entity. *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (addressing regulatory change that upset "decades of industry reliance," resulting in "substantial" and potentially "retroactive" legal "liability" for the regulated entities); *see also DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914-15 (2020) (noting reliance interests of regulated entities on longstanding policies, *e.g.*, individuals covered by DACA, who had taken actions in reliance on the program and would need to "reorder their affairs" because they may be in the middle of a "course of study," "military service," or "a medical treatment regimen").

c.  Cases typically require that a policy change would lead to some unexpected civil or criminal liability for a regulated industry or individuals before reliance interests are cognizable. *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105-06 (2015).

d.  States are not directly regulated by the parole processes.

e.  The States have not identified any particular action they took in reliance on the prior approach, which led to a greater number of arrivals at the border and a greater need to use parole, given constraints on DHS's detention capacity and inability to remove CHNV nationals to their home countries.

56

f.   The parole processes have decreased unlawful entries and given DHS greater ability to enforce the immigration laws against individuals from CHNV countries, who otherwise generally could not be removed. *See*, *e.g.*, 88 Fed. Reg. at 1,272 (evaluating these potential benefits). The ability to remove these individuals is contingent on obtaining Mexico's agreement to take them, something DHS was able to secure specifically for individuals who do not follow the parole processes, and an enforcement mechanism that would be lost without these processes.

g.   The decrease in arrivals at the border, unlawful entries at the border, and releases of CHNV nationals into border States and communities foreclose Plaintiffs' argument that these processes are imposing costs on the States that DHS failed to consider, and their argument that Plaintiffs had a reliance interest in the prior approach.

145.   There is no merit to Plaintiffs' argument that DHS failed to explain how noncitizens paroled under these processes would be removed at the end of their period of authorized parole. ECF No. 22 at 23.

a.   Under each parole process, individuals are expected to depart on their own at the end of their period of parole. *See, e.g.*, 88 Fed. Reg. 1,268 ("Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.").

b.   Under each parole process individuals who do not depart when their period of authorized parole lapses may be placed in removal proceedings if they have not

obtained some other basis to stay in the United States. *See, e.g.*, 87 Fed. Reg. at 63,508; 88 Fed. Reg. 1,268.

c.  To the extent individuals do not leave on their own at the conclusion of their period of authorized parole, DHS has the ability to remove a small number of individuals to each of these countries, which could be used for this purpose. Defendants' Ex. HH, ¶¶ 12-13.

d.  DHS's ability to remove more CHNV nationals may also change between now and when the authorized period of parole under these processes ends if conditions in these countries change or if Mexico or some other country agrees to accept the removal of CHNV nationals that do not depart at the end of their parole.

e.  Even if some individuals do not depart on their own at the end of their period of parole and cannot be removed, DHS's limited ability to remove noncitizens to these four countries predates and is not caused by the parole processes. Rather it is based on conditions in those countries or because a country will not accept the return of its citizens from United States. *See* 88 Fed. Reg. at 1,247, 1,259, 1,270-01; 87 Fed. Reg. at 63,509.

f.  Without the parole processes, DHS would have difficulty removing most noncitizens from these countries, and would likely have to release many of those individuals into the United States. The parole processes allow DHS to remove more CHNV nationals because they can now be removed to Mexico, "impos[ing] a consequence on irregular entry that currently does not exist." 87 Fed. Reg. at 63,511.

g.  Even if the parole processes do not completely solve the problem of unremovable

CHNV nationals, an agency action is not arbitrary and capricious simply because it does not fully eliminate a problem, especially when more comprehensive solutions are not readily available or will depend on further diplomatic negotiation with foreign nations. *See FERC*, 577 U.S. at 292 (agency need not adopt perfect solution or even the best of available alternatives to survive APA review); *Texas*, 142 S. Ct. at 2543 (noting deference due to Executive decisions that depend on or are limited by foreign affairs and the ability to secure agreements from Mexico or other nations).

h. As long as "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld," *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998), and the parole processes are a rational solution to this issue, with demonstrated success.

146. There is no merit to Plaintiffs' argument that DHS failed to explain or analyze how the supporter requirement for applicants will be enforced. ECF No. 22 at 24.

a. Such a claim is not a basis to find the parole processes arbitrary and capricious.

b. Section 1182(d)(5)(A) gives authorizes the Secretary "discretion" to "parole" individuals into the United States "under such conditions as he may prescribe."

c. Section 1182(d)(5)(A) does not require a supporter before granting parole. The statute says nothing about financial support, let alone creating an enforcement mechanism for private support of parolees.

d. The statute thus does not require DHS to consider or design any particular enforcement scheme if DHS elects to condition parole on obtaining a supporter.

e. The process DHS adopted is a reasonable approach to encourage financial support

59

for parolees.

f.   Prospective supporters must establish they have status in the United States, "pass security and background vetting," and "demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period." 87 Fed. Reg. at 63,515.

g.   Potential supporters must submit the required information on a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, *id.*, "to assure the U.S. Government that the [intended beneficiary] will be financially supported while in the United States," and sign the form "under penalty of perjury," Cuba AR at 1221; *see also id.* 1211-24; https://www.uscis.gov/i-134A.

h.   Each supporter is "then [ ] vetted by USCIS … to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support." 87 Fed. Reg. at 63,515.

i.   Using a Form I-134A to ensure financial support for potential parolees is similar to the process the agency has used in other contexts, such as the Uniting for Ukraine process, *see* https://www.uscis.gov/ukraine.

j.   The opportunity to vet potential supporters to ensure that a potential beneficiary will have adequate financial support before any consideration for parole is only possible because of the orderly advance process DHS has instituted for these four countries through the parole processes.

k.   DHS's careful consideration of encouraging financial support for parolees even though not required by the statute is the opposite of arbitrary-and-capricious decision-making.

60

## VI.     Plaintiffs' notice-and-comment claim fails.

147.    The parole processes were not required to go through notice-and-comment rulemaking.

148.    Notice-and-comment procedures are not required when an agency issues "general statements of policy," 5 U.S.C. § 553(b)(A), that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197.

149.    "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach," and the "agency retains the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).

150.    In this Circuit, whether agency action is a general statement of policy turns on "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas v. United States* (*"Texas DACA"*), 50 F.4th 498, 522 (5th Cir. 2022).

151.    The primary focus of this inquiry is "whether the rule has binding effect on agency discretion or severely restricts it." *Id.*; *accord Texas*, 933 F.3d at 441 ("The primary distinction between a substantive rule ... and a general statement of policy ... turns on whether an agency intends to bind itself to a particular legal position.").

### a.     The parole processes are not legislative rules.

152.    The parole processes are general statements of policy, not legislative rules.

153.    The parole processes do not have the force and effect of law and do not "grant rights, impose obligations, or produce other significant effects on private interests." *Texas DACA*, 50 F.4th at 522.

61

154.     The parole processes set out the general manner in which DHS plans to implement its discretionary parole authority in Section 1182(d)(5)(A), but it is the statute, not the parole processes which creates the authority and requirements for parole. *See, e.g.*, 87 Fed. Reg. at 63,516 (noting that "the Department is merely adopting a general statement of policy … to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power").

155.     The processes do not bind DHS to any particular course with respect to any noncitizen—those decisions continue to be made on a case-by-case basis by individual officials— and they provide no assurance that parole will be granted in any specific case, even once a noncitizen travels to the United States and presents for inspection at an interior port of entry. *See, e.g.*, 87 Fed. Reg. at 63,516.

156.     The processes thus do not provide CHNV nationals any additional rights or obligations beyond those already provided by the statute. *See* 8 U.S.C. § 1182(d)(5).

157.     Each process is "being implemented as a matter of the Secretary's discretion," and is "not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." 88 Fed. Reg. at 1,277.

158.     That parolees might apply for work authorization does not change this analysis.

159.     Work authorization is collateral to the parole processes because it flows from regulations (issued after notice-and-comment rulemaking) that existed prior to and independent of the parole processes and apply to all noncitizens who have been granted parole. *See* 8 C.F.R. § 274a.12(c)(11).

160.     Even if the parole processes did not exist, paroled CHNV nationals could still apply for work authorization just like any other parolee in the United States. 8 C.F.R. § 274a.12(c)(11).

161.    Plaintiffs do not, and cannot given the statute of limitations, challenge the work authorization regulation, and so may not assert injury tied to the effect of that regulation. *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021).

162.    The parole processes simply "announc[e] motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a substantive question of regulation." *Texas DACA*, 50 F.4th at 522.

163.    Officers are not required to grant parole in any individual case, and DHS retains discretion to rescind or amend the parole processes at any time for any reason. The processes neither "appear[] on [their] face to be binding," nor are they "applied by the agency in a way that indicates [they are] binding." *Texas DACA*, 50 F.4th at 524.

164.    The parole processes are thus distinguishable from the memoranda in *Texas DACA*, which the Fifth Circuit viewed as "narrow[ing] and channel[ing]" general discretionary authority by "list[ing] a fixed set of criteria that should be satisfied before an individual is considered for an exercise of prosecutorial discretion" and "dictat[ing] what that discretion should be used to do." *Id.*

165.    The parole processes in contrast do not narrow or deviate from the statutory and regulatory procedures governing discretionary parole determinations that are made when an individual arrives at a port of entry. *See* Prop. Facts ¶¶ 33-34.

166.    The parole processes fall within the longstanding rule that agency policies or procedures that inform the public of the agency's current enforcement or adjudicatory approach with respect to discretionary decisions are statements of policy. *See, e.g.*, *Lincoln*, 508 U.S. at 197; *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019) (explaining that agency policy which directed immigration officers to consider whether they "may return" a noncitizen to

Mexico pending removal proceedings was a statement of policy "because immigration officers designate applicants for return on a discretionary case-by-case basis"); *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions).

167.    The parole processes are also exempt from notice-and-comment requirements as rules of agency "procedure." 5 U.S.C. § 553(b)(A).

168.    Procedural rules "cover[ ] agency actions that do not themselves alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency." *Nat'l Mining Ass'n*, 758 F.3d at 250; *see U.S. Dep't of Lab. v. Kast Metals Corp*., 744 F.2d 1145, 1153 (5th Cir. 1984).

169.    The parole processes do not restrict a CBP officer's authority and discretion to "approve or deny" a parole request. *James Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

170.    These procedures govern "the manner in which the parties present" a request "to the agency." *Nat'l Mining Ass'n*, 758 F.3d at 250; *see also Texas*, 809 F.3d at 176-77 ("rules are generally considered procedural so long as they do not 'change the *substantive standards* by which the [agency] evaluates' applications" (quoting *Nat'l Sec. Couns. v. C.I.A*., 931 F. Supp. 2d 77, 107 (D.D.C. 2013)).

171.    The parole processes do not modify substantive rights, do not guarantee anyone parole, and thus do not have the type of impact that would require notice and comment. *Texas*, 809 F.3d at 176.

     **b.**     **The processes are exempt from notice-and-comment procedures because they involve a foreign affairs function and because there was good cause.**

172.     Even if the parole processes were legislative rules, they would be exempt from the APA's notice-and-comment and publication requirements because they "involve ... [a] foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), and because "the agency for good cause" has found "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," *id*. § 553(b)(B), (d)(3).

173.     The foreign-affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985).

174.     DHS properly invoked the foreign affairs exception for the parole processes.

175.     The parole processes advance the "Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships." 88 Fed. Reg. at 1,253, 1,265, 1,277; 87 Fed. Reg. at 63,516.

176.     Cuba, Nicaragua, and Venezuela generally will not accept, or place limits on, the return of their citizens from the United States, while the security situation in Haiti limits DHS's ability to return Haitians. 88 Fed. Reg. at 1,246, 1,256, 1,267; 87 Fed. Reg. at 63,509.

177.     The parole processes are part of a larger negotiation with Mexico, which has agreed, for the first time, to accept "remov[als]" of covered "nationals who enter the United States without authorization across the [southwest border]," *id.*, but only if the United States "provide[s] a lawful process for" covered "nationals to enter the United States" without first traversing Mexico. 88 Fed. Reg. at 1253.

178.    "Thus, initiating and managing this process," which DHS anticipated would dramatically decrease attempted illegal entries at the southwest border, "will require careful, deliberate, and regular assessment of [Mexico's] responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements." 88 Fed. Reg. at 1,253.

179.    "Delaying issuance and implementation of this process to undertake rulemaking" "would complicate broader discussions and negotiations about migration management," jeopardizing Mexico's decision "to accept the return or removal of" covered nationals. 88 Fed. Reg. at 1,253

180.    The parole processes promote the interlocking goals of securing the border and upholding our commitments to other countries and are "linked intimately with the government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters*, 751 F.2d at 1249; *see, e.g.*, *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (exception applied to implementation of diplomatic agreements).

181.    The Executive's choice—to provide for parole on a case-by-case basis to covered nationals in exchange for Mexico accepting removal of previously unremovable individuals—is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980).

182.    Contrary to Plaintiffs' argument, ECF No. 22 at 19-20, DHS is not required in this circuit to show that notice-and-comment rulemaking "will provoke definitely undesirable international consequences." ECF No. 22 at 19-20.

183.    The foreign-affairs exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm and does not require a showing of definitely undesirable international consequences. 5 U.S.C. § 553(a)(1).

184.    The proper question is whether the agency's action "involve[s]" a "foreign affairs function," 5 U.S.C. § 553(a)(1), such as where the agency's action is part of, and necessary to, ongoing diplomatic negotiations and commitments. If it does, it is inappropriate to require anything more than what is required by the foreign-affairs exception's text.

185.    "[T]he phrase 'provoke definitely undesirable international consequences'" is merely "an illustration given in the APA's legislative history;" it is not "the definition for 'foreign affairs function.'" *New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) (quoting H.R. Rep. No. 79–1980, at 23 (1946)).

186.    There is no textual basis for interpreting the phrase "involve[s] a … foreign affairs function" as requiring a showing of definitely undesirable international consequences. *See id.*; *Capital Area Immigrants' Rights. Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (noting that such an interpretation would be "unmoored from the legislative text"); *cf. Roe v. Mayorkas*, 2023 WL 3466327, at *17 (D. Mass. May 12, 2023) ("Where, as [with changes to the process for Afghan humanitarian parole], actions involve core foreign policy functions, the Court finds they fall within the [foreign affairs] exception without an analysis of the specific undesirable consequences." (quotation marks omitted)).

187.    Such a requirement would make the foreign affairs exception superfluous because the good-cause exception would apply where taking public comment would lead to negative international consequences. *CAIR*, 471 F. Supp. 3d at 53 (noting this point).

188.     Such a requirement would also require courts to evaluate how serious a particular international consequence would be, which is "generally beyond the authority or competency of a court's adjudicative powers." *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008).

189.     Even if some showing of "undesirable consequences" were required, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018).

190.     Even if an agency were required to identify harm that would occur between the announcement of a policy and the end of a comment period, DHS explained that such a delay in the case of the parole processes would encourage a surge in arrivals during any comment period that could overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration through Mexico to the border that these processes seek to decrease, undermining the United States' negotiations with its foreign partners. 88 Fed. Reg. at 1,253; Cuba AR 187[1]; *Yassini*, 618 F.2d at 1360 (holding exception applied to Immigration and Naturalization Service action given need for "prompt response" to foreign affairs crisis).

191.     The record provides evidence that supports DHS's conclusion that negative consequences will result from notice-and-comment. *See, e.g.*, Cuba AR 147-49, 188 (noting concern of Mexico and other countries about anticipated surged in migration following end of Title 42, and that their willingness to cooperate in accepting "increased returns of migrants was contingent on expanding the model provided by U4U and the Venezuela process"), 1276, 1733.

---

[1] For documents that appear in all four administrative records, Defendants have cited one copy of the document rather than provided duplicative citations to the same information.

192.     The heightened evidentiary requirement Plaintiffs seek to impose on the Executive would constitute "unwarranted judicial interference in the conduct of foreign policy." *Texas*, 142 S. Ct. at 2543.

193.     The good-cause exception applies "when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *U.S. Chamber of Commerce v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) (citing *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983)); *see E. Bay*, 909 F.3d at 1253 (good cause where "an announcement of a proposed rule creates an incentive for those affected to act prior to a final administrative determination."); *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir. 2012) (good cause where "announcement of a proposed rule would enable the sort of [harm] the rule sought to prevent").

194.     DHS correctly recognized that, consistent with these principles, the pre-promulgation notice and comment or a delayed effective date "would greatly exacerbate an urgent border and national security challenge" by "incentiviz[ing] even more irregular migration of [covered] nationals seeking to enter the United States before the process would take effect." 88 Fed. Reg. at 1,252.

195.     DHS was "responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges." 88 Fed. Reg. at 1,252. DHS explained that it is "well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy" and their "experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to

immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States." *Id.* Moreover, "[s]mugglers routinely prey on migrants in response to changes in domestic immigration law." *Id.*

196.    The record supports DHS's concerns and conclusions.

197.    As DHS explained, "implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans," and "had the parole process been announced prior to a notice-and-comment period" it likely would have had the opposite effect. 88 Fed. Reg. at 1,254.

198.    DHS has repeatedly witnessed such surges in response to changes in immigration law. For example, in the immediate aftermath of a court vacating the Title 42 public health order related to the COVID-19 pandemic, which had limited the ability of noncitizens to seek entry, total encounters at the southern border reached 9,112 in a single day on November 17, 2022, a *15 percent* increase from the day before. Cuba AR 1286, 1564. On February 28, 2020, immediately after the Ninth Circuit (*Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1095 (9th Cir. 2020), *vacated as moot*, 5 F.4th 1099 (9th Cir. 2021)) lifted a stay of a nationwide injunction against the Migrant Protection Protocols (MPP), a program implementing the contiguous-territory return authority under 8 U.S.C. § 1225(b)(2)(C), thousands of individuals sought to enter the United States and hundreds crossed the border illegally, many evading capture. *See* Cuba AR 83-91, Haiti AR 1285. Ports of entry were so overwhelmed that CBP was forced to shut down border crossings and divert resources from other critical responsibilities focused, for example, on detecting and confiscating illicit materials and protecting national security. *Id.* at 90.

199.    The record is replete with similar examples of surges in response to changes in immigration law. AR Cuba AR 387-417,490, 1536, 1564 1606.

200.    The record evidence clearly supports a finding of good cause. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 675 (9th Cir. 2021); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

201.    Plaintiffs' argument that DHS could have instead "immediately barred from the Program—similar to what the Program already says," "anyone attempting to cross illegally after that date," and at the same time "opened a notice-and-comment period," ECF No. 22 at 20-21, is not a true alternative because, under Plaintiffs' view of the parole processes, it would still have required good cause.

202.    Under Plaintiffs' view of the parole processes, to put consequences in place immediately to prevent a surge in arrivals while a comment period was pending DHS would have had to implement the processes as temporary final rules, which also require "good cause" to have a rule to take effect immediately without waiting for the comment period to conclude. *See* 5 U.S.C. § 553(d) (providing that substantive rule must be published "not less than 30 days before its effective date" unless the agency finds "good cause" for making it effective without waiting for this period).

203.    If it was necessary to impose consequences immediately—a point Plaintiffs do not contest—then there was "good cause" under Section 553 that exempts the processes from notice-and-comment requirements, and there is nothing in the statute that requires the agency to provide a comment period in that circumstance.

204.    Plaintiffs' argument that DHS could have instead made individuals who attempted to enter unlawfully after January 9, 2023 ineligible for the parole processes, *see* ECF No. 22 at 20-

21, is not a viable alternative approach because it would do nothing to prevent a surge in arrivals seeking to enter from these countries before the processes were implemented and DHS gained the ability to remove these individuals to Mexico.

205.    DHS generally could not remove CHNV nationals prior to the parole processes. *See* Prop. Facts ¶¶ 10-12.

206.    CHNV nationals who entered during a comment period before the parole processes took effect generally could not be removed. *Id*.

207.    Those individuals would have no need to avail themselves of the parole processes at that point, and barring them from the processes would be a meaningless consequence with no deterrent effect on unlawful entry.

208.    There would be a strong incentive to enter before DHS could remove these noncitizens to Mexico under this approach, making it an ineffective alternative. *See, e.g.*, 88 Fed. Reg. at 1,254.

209.    As the Supreme Court has explained, courts are ill-equipped to second-guess prospective judgments by the Executive Branch with respect to foreign affairs and national security, *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010), and that reasoning extends to DHS's reasonable conclusion that arrivals of CHNV nationals would likely surge between the announcement of the parole processes and the effective dates if those were delayed to allow for notice and comment.

## VII.    The Remaining Factors Weigh Strongly Against Granting an Injunction or Other Relief.

210.    The balance of equities weighs strongly against granting an injunction.

211.     An injunction would irreparably harm the United States and the public by frustrating the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

212.     The Executive Branch has identified an emergent situation at the southwest border—record numbers of noncitizens seeking to enter our country unlawfully, potentially overwhelming the immigration system and risking lives—and has taken targeted measures to address the situation that allows DHS, with support from Mexico, to create consequences for unlawful entry for noncitizens who would otherwise be unremovable. *See* Prop. Facts ¶¶ 6-54.

213.     The public interest is served by encouraging noncitizens to avail themselves of safe, lawful, and orderly pathways to entering, and by DHS's increased ability to enforce the immigration laws as a result of cooperation from Mexico that is dependent on keeping the parole processes in place. *See* Prop. Facts ¶¶ 6-54.

214.     An injunction would thus undermine "sensitive and weighty interests of … foreign affairs," *Humanitarian Law Project*, 561 U.S. at 33-34, by enjoining agency actions that result from and support ongoing diplomatic negotiations.

215.     Plaintiffs have not identified any harm they would face if the parole processes remain in place. *See* Prop. Facts ¶¶ 56-79.

216.     Plaintiffs' argument for harm with respect to costs associated with CHNV nationals is contradicted by the evidence and fails for the same reason their arguments for standing on this basis fails. *See* Prop. Facts ¶¶ 56-79. Because the parole processes have decreased the number of arrivals at the southwest border, the number of unlawful entries, and the number of noncitizens released into the United States from the covered countries, the "harm" Plaintiffs identify is actually mitigated by the parole processes.

73

217.   Plaintiffs have not identified any harm that supports granting them an injunction. *See Rosa v. McAleenan*, 583 F. Supp. 3d 850, 885 (S.D. Tex. 2019) (finding no irreparable injury where the number of noncitizens arriving had decreased as of the time of the preliminary injunction hearing). Even if that were not true, the speculative, minor financial costs Plaintiffs identify cannot establish irreparable injury. *See Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 397-98 (5th Cir. 2013) ("general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" insufficient to establish irreparable harm).

218.   Plaintiffs have not identified any basis for "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

219.   Plaintiffs have not identified any basis for an injunction that would interfere with foreign affairs. *See Texas*, 142 S. Ct. at 2543 (emphasizing courts should give substantial weight to potential foreign affairs consequences when considering challenges to immigration policy and take great care to avoid "the danger of unwarranted judicial interference in the conduct of foreign policy"); *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring) (When "the President chooses the parole option … for foreign-policy reasons, a court … must be deferential to the President's Article II foreign-policy judgment … Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations.").

220.    Plaintiffs have not identified any basis for an injunction that would interfere with a core constitutional power conferred on the Executive, which itself establishes irreparable harm. *See, e.g.*, *Adams*, 570 F.2d at 954.

221.    An injunction would cause direct, irreparable injury to the interests of the government and the public, which "merge" in suits against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## VIII.   Any Relief Must be Sharply Limited.

222.    Even if the Court were to grant relief to Plaintiffs on their claims, the appropriate relief is, at most, remand without vacatur to allow the agency to address deficiencies identified by the Court, to avoid the disruption vacatur or an injunction might cause. *See* Prop. Facts ¶¶ 41-50, 53-54.

223.    "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," and "[o]nly in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021).

224.    Remand without vacatur is especially appropriate here, where vacatur could produce "disruptive consequences," including to foreign policy and the security of the border. *Allied-Signal, Inc. v. United States NRC*, 988 F.2d 146, 150 (1993) (citation omitted); *see also Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

225.    Relief must also be limited to the particular Plaintiff States who have put forth concrete evidence of irreparable harm.

226. Plaintiffs stipulated that they are seeking to establish harm only to Texas, ECF No. 139, so at a minimum relief cannot extend beyond Texas.

227. "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *Texas*, 143 S. Ct. at 1980-85 (Gorsuch, J., concurring) (questioning the authority for universal injunctions or vacatur).

228. Courts that have vacated policies as a whole have improperly relied on Section 706 of the APA, which does not use the term "vacate" and which is concerned with the scope of review under the APA rather than the remedies available for APA claims. *Texas*, 143 S. Ct. at 1981-82 (Gorsuch, J., concurring).

229. Section 703 of the APA, which addresses the remedies available for APA claims, does not authorize vacatur. *Texas*, 143 S. Ct. at 1983.

230. Even if vacatur were a permissible remedy, vacating or enjoining the processes in their entirety is improper where such sweeping relief is not necessary to redress injures that are limited to Texas. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). The rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). *See also DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

231. Universal remedies contradict Article III and traditional equitable principles, which limit courts to "case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). And as three Justices recently emphasized, even if district courts were empowered to issue such universal remedies, at the very

least they must "'think twice—and perhaps twice again—before granting' such sweeping relief." *Texas*, 143 S. Ct. at 1985 (Gorsuch, J., concurring) (citation omitted).

232.    Universal relief also creates other constitutional, legal, and practical problems. It "strains our separation of powers" by "allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Texas*, 143 S. Ct. at 1985 (Gorsuch, J., concurring). It circumvents the procedural rules governing joinder and class actions. *Id.* at 1981. It encourages forum shopping by empowering a single district judge to nullify the decisions of other courts upholding the challenged agency action. *Id.* at 1986. And it operates asymmetrically: The government must prevail in every suit to keep its policy in force, but plaintiffs can derail a federal regulation or policy nationwide with a single district court victory. *See DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring).

233.    Relief must be narrowly tailored to remedy concrete harms that particular Plaintiff States have established. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also DaimlerChrysler*, 547 U.S. at 352 (A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought."); *Morice v. Hosp. Serv. Dist. #3*, No. 18-cv-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (plaintiff "lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit").

234.    Plaintiffs have the burden "to *prove* that whatever injunction they request" is "no broader" than necessary "to protect against their proven injuries," *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023), and Plaintiffs have not provided proof that relief that extends beyond Texas is necessary to address injuries to Texas.

235.    Plaintiffs have provided no evidence that individuals would seek parole in other states though the parole processes if their ultimate destination was Texas.

236.     There is no basis to extend relief to the majority of States that elected not to join this lawsuit, and who may support the parole processes remaining in place.

237.     Plaintiffs have not shown that "complete relief" cannot be provided by limiting any relief, at most, to Texas, the only State that attempted to show evidence of harm. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (noting "scope of the remedy must be no broader … than necessary to redress the injury shown" and narrowing relief "to the plaintiff states"); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (narrowing injunction to plaintiff states by staying "application to any other jurisdiction").

238.     There is no merit to Plaintiffs' argument that uniformity in the immigration laws justifies broader relief. *See* ECF No. 22 at 27. Immigration law is not a special context that warrants a different rule. All injunctions, including those involving "national rules and policies," must be narrowly tailored to remedy the specific harm shown. *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022).

Dated: August 16, 2023                    Respectfully submitted,


ALAMDAR S. HAMDANI                        BRIAN M. BOYNTON
*United States Attorney*                   *Principal Deputy Assistant Attorney General*

                                          WILLIAM C. PEACHEY
                                          *Director*
                                          Office of Immigration Litigation
                                          District Court Section

                                          EREZ REUVENI
                                          *Assistant Director*

                                          ELISSA FUDIM
                                          *Trial Attorney*

                                          */s/ Brian C. Ward*
                                          BRIAN C. WARD
                                          *Senior Litigation Counsel*
                                          U.S. Department of Justice
                                          Civil Division
                                          Office of Immigration Litigation
                                          District Court Section
                                          P.O. Box 868, Ben Franklin Station
                                          Washington, DC 20044
                                          Tel.: (202) 616-9121
                                          Email: brian.c.ward@usdoj.gov


                                          *Counsel for Defendants*

79

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2023, I electronically filed this document with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Brian C. Ward*
BRIAN C. WARD
U.S. Department of Justice
