**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | CIVIL ACTION NO. |
| *Plaintiffs*, | § | 6:23-CV-00007 |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | JUDGE DREW B. TIPTON |
| | § | |
| *Federal Defendants,* and | § | |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

**INTERVENOR DEFENDANTS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Findings of Fact ..................................................................................................................1

A.    Creation and Implementation of the Parole Pathways for Cubans, Haitians, Nicaraguans, and Venezuelans ..................................................................1

B.    Background on Migration from Cuba, Haiti, Nicaragua, and Venezuela..........................7

C.    The Parole Pathways Application Process.........................................................11

D.    The Parole Pathways Facilitate Sponsorship for a Wide Range of Reasons ....................14

E.    The CHNV Parole Pathways Draw Upon DHS's Statutory and Historical Parole Authority ...........................................................................................19

F.    The Scope and Impacts of the CHNV Pathways ................................................49

G.    Texas' Alleged Injuries from the CHNV Pathways. ..........................................53

Conclusions of Law ..........................................................................................................68

A.    Texas Lacks Standing ....................................................................................68

B.    The Plaintiff States Other than Texas Also Lack Standing ................................77

C.    Plaintiff States Fail on the Merits of their APA Claims ...................................77

D.    Decades of executive and congressional action confirm the lawfulness of the pathways. .............................................................................................81

E.    The CHNV Parole Pathways Are Not Arbitrary and Capricious ....................82

F.    The Remaining Factors Do Not Support Injunctive Relief .............................86

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Adams v. Vance,*
570 F.2d 950 (D.C. Cir. 1978) ................................................................................89

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ................................................................................................77

*Arizona Christian Sch. Tuition Org. v. Winn,*
563 U.S. 125 (2011) ................................................................................................69

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ..................................................................................76

*Arizona v. United States,*
567 U.S. 398 (2012) ................................................................................................91

*Bailey v. State of Alabama,*
219 U.S. 219 (1911) ................................................................................................92

*Biden v. Missouri,*
142 S. Ct. 647 (2022) .........................................................................................84, 89

*Biden v. Texas,*
142 S. Ct. 2528 (2022) (Kavanaugh, J., concurring) ................................75, 80, 83

*California v. Texas,*
141 S. Ct. 2104 (2021) .......................................................................................72, 87

*In re Chan Kam-Shu,*
477 F.2d 333 (5th Cir. 1973) ................................................................................90

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ..........................................................................................79, 80

*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
333 U.S. 103 (1948) ................................................................................................91

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ................................................................................................92

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .......................................................................................69, 72, 73

*Cole v. General Motors Corp.*,
  484 F.3d 717 (5th Cir. 2007) ........................................................68

*Costanzo v. Tillinghast*,
  287 U.S. 341 (1932)....................................................................82

*Crain v. City of Selma*,
  952 F.3d 634 (5th Cir. 2020) ........................................................92

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ...................................................72, 73

*Croft v. Governor of Texas*,
  562 F.3d 735 (5th Cir. 2009) ...............................70, 71, 72, 73, 76, 77

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)....................................................................93

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) (Gorsuch, J. concurring)...................................92

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct. 1891 (2020)............................................................84, 85

*E.T. v. Paxton*,
  41 F.4th 709 (5th Cir. 2022) .........................................................75

*eBay Beame v. Friends of the Earth*,
  434 U.S. 1310 (1977)...................................................................87

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)....................................................................86

*Edmonson v. Leesville Concrete Co.*,
  500 U.S. 614 (1991)....................................................................92

*Env't Conservation Org. v. City of Dallas*,
  529 F.3d 519 (5th Cir. 2008) ........................................................69

*Exodus Refugee Immigr., Inc. v. Pence*,
  838 F.3d 902 (7th Cir. 2016) ........................................................91

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021)................................................................84

*Florida v. Mellon*,
  273 U.S. 12 (1927).....................................................................70

*FPL Energy Me. Hydro LLC v. FERC*,
    287 F.3d 1151 (D.C. Cir. 2002) ............................................................................. 85

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................................................ 93

*Hamdan v. Rumsfeld*,
    **548 U.S. 557 (2006)** .............................................................................................. 80

*Hawaii v. Trump*,
    878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, *Trump v. Hawaii*, 138
    S. Ct. 2392 (2018) ........................................................................................... 88, 90

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ........................................................................... 89, 90

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) ...................................................................... 86, 87, 88

*I.N.S. v. Aguirre Aguirre*,
    526 U.S. 415 (1999) ................................................................................................ 80

*INS v. Abudu*,
    485 U.S. 94 (1988) .................................................................................................. 80

*Knapp v. U.S. Dep't of Agric.*,
    796 F.3d 445 (5th Cir. 2015) ............................................................................. 82, 83

*Louisiana ex rel. Landry v. Biden*,
    64 F.4th 674 (5th Cir. 2023) .............................................................................. 76, 77

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................................ 70

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................................................................. 71

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................. 68, 70, 71, 74

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1992) ........................................................................ 70, 72, 73, 76, 78

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ................................................................................................ 93

*Massachusetts v. Laird*,
    400 U.S. 866 (1970) ................................................................................................ 70

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 ................................................................................................92

*Moore v. Tangipahoa Par. Sch. Bd.*,
   507 F. App'x 389 (5th Cir. 2013) ...............................................................87

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...........................................................................83, 84, 86

*O'Donnell v. Harris Cty.*,
   892 F.3d 147 (5th Cir. 2018), *overruled on other grounds by Daves v. Dallas
   County*, 22 F. 4th 522 (5th Cir. 2022).........................................................93

*Pickett v. Hous. Auth. of Cook City*,
   114 F. Supp. 3d 663 (N.D. Ill. 2015) ..........................................................90

*Quillen v. Walcott*,
   434 U.S. 246 (1978).................................................................................88, 90

*Raines v. Byrd*,
   521 U.S. 811 (1997).................................................................................69, 70

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1990)......................................................................................75

*Rogers v. San Antonio*,
   392 F.3d 758 (5th Cir. 2004) .......................................................................81

*S.A. v. Trump*,
   No. 18-cv-0353-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019).............40

*Salazar v. Bruno*,
   559 U.S. 700 (2010)......................................................................................90

*Salazar v. Maimon*,
   750 F.3d 514 (5th Cir. 2014) ..................................................................81, 82

*Sampson v. Murray*,
   415 U.S. 61 (1974)........................................................................................87

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974)......................................................................................93

*Shannon v. United States*,
   512 U.S. 573 (1994)......................................................................................80

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976)........................................................................................74

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007).............................................................................78

*Sprint Commc'ns Co. v. APCC Services, Inc.*,
    554 U.S. 269 (2008).............................................................................70

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009).............................................................................71

*Texans for Free Enterprise v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ...........................................................89, 91

*Texas Ass'n of Mfrs. V. United States Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ...............................................................94

*Texas v. Biden*,
    No. 3:22-cv-780-X (N.D. Tex. filed Jan. 28, 2022).................................40

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017).............................................................................92

*United States v. Texas*,
    143 S. Ct. 1964 (2023)...................................69, 70, 71, 73, 75, 76, 77, 90, 93

*Valley Forge Christian College v. Americans United for Separation of Church
    and State, Inc.*,
    454 U.S. 464 (1982).............................................................................69

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ...............................................................91

*Village of Arlington Heights v. Metropolitan Housing Devt. Corp.*,
    429 U.S. 252 (1977).............................................................................92

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982).........................................................................89, 94

*Wheeler v. Pilgrim's Pride Corp.*,
    591 F.3d 355 (5th Cir. 2009) (en banc) ..................................................81

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990).............................................................................71

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)............................................................................88, 89

*Worldcall Interconnect, Inc. v. F.C.C.*,
    907 F.3d 810 (5th Cir. 2018) ...........................................................82, 85

**Statutes**

8 U.S.C. 1182(d)(5) ................................................................................................81

8 U.S.C. § 1182(d)(5) .........................................................................................78, 80

8 U.S.C. § 1229a(a)(3) ...........................................................................................86

Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136
   Stat. 1211 (May 21, 2022) ...........................................................25, 26, 43

Afghanistan Supplemental Appropriations Act ........................................................42

Because the Cuban Adjustment Act ........................................................................37

CAA ....................................................................................................................34

Cuban Adjustment Act ...........................................................................................29

Cuban Adjustment Act ......................................................................................34, 36

Cuban Adjustment Act of 1966 ..............................................................................26

Cuban Adjustment Act, Pub. L. No. 89-732, §§ 1–2, 80 Stat. 1161 (1966)..............29, 34, 36, 37

Extending Government Funding and Delivering Emergency Assistance Act, 135
   Stat. ................................................................................................42

Extending Government Funding and Delivering Emergency Assistance Act, Pub.
   L. No. 117-43, Div. C, 135 Stat. 344, 372-379 (Sept. 30, 2021)............................25

Foreign Operations, Export Financing, and Related Programs Appropriations Act,
   Pub. L. No. 101-167, § 599E, 103 Stat. 1195, 1263–64 (1989) ...........................32

Hungarian Refugees Relief Act Pub. L. No. 85-559, § 2, 72 Stat. 419, 420 (1958) ...................29

IIRIRA ..........................................................................21, 22, 23, 24, 25, 26, 34

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 .....................21

Immigration and Nationality Act, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163,
   182-188 (1952)...........................................................................................19

Immigration and Nationality Act section 212(d)(5) ...................................19, 20, 22, 26

Immigration and Nationality Act Section 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A) ..18, 19, 75, 78,
   79, 82

Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689 (1996) ...................................................21

INA ....................................................................................................19, 21, 26, 27, 29, 89

INA § 212(d)(5)(B) .........................................................................................................20

National Defense Authorization Act of 2020 ..................................................................39

Parole Statute .......................................................................................................78, 79, 80

Pub. L. No. 104-208, Division C ................................................................................21, 26

Pub. L. No. 104-208, Division C, § 602, 110 Stat. ........................................................23

Pub. L. No. 104-208, Division C, § 603, 110 Stat. ........................................................21

Pub. L. No. 104-208, Div C, § 646, 110 Stat. 3009-546, 3009-709 ..............................25

Pub. L. No. 116-92, § 1758, 133 Stat. 1198, 1860–61 (2019)............................25, 26, 39

Refugee Act .....................................................................................................................20

Refugee Act of 1980 ...................................................................................................19, 30

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) .....................................20

Refugee Education Assistance Act of 1980. The Refugee Education Assistance Act of 1980, Pub. L. No. 96-422, 94 Stat. 1799 (1980)............................................31

September Act...................................................................................................................42

89 Stat. 87 (1975)............................................................................................................30

110 Stat. ...........................................................................................................................21

110 Stat. § 602 .................................................................................................................22

110 Stat. § 646 .................................................................................................................26

U.S. Citizenship and Immigration Servs., Policy Memorandum: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i), PM-602-0091 (Nov. 15, 2013) .......................................................38

U.S. Code Title 8 .............................................................................................................67

## Other Authorities

8 C.F.R. § 274a.12 ...................................................................................................84

79 Fed. Reg. 7,5579, 75,582 (Dec. 18, 2014) .........................................................41

81 Fed. Reg. 60130, 60135 (Aug. 31, 2016)............................................................38

87 Fed. Reg. 25040 (Apr. 27, 2022) ....................................................................1, 2

87 Fed. Reg. 63507 (Oct. 19, 2022).........................................................................2

87 Fed. Reg. 63507 ...............................................................................................3, 46

87 Fed. Reg. 63507, 63508-09................................................................................53

87 Fed. Reg. 63507, 63509 .....................................................................................10

87 Fed. Reg. 63507 at 63509 ..................................................................................11

87 Fed. Reg. 63507, 63512-13................................................................................48

88 Fed. Reg. 1243 (Jan. 9, 2023)..............................................................................1

88 Fed. Reg. 1243 ..........................................................................................4, 5, 45

88 Fed. Reg. 1243, 1244 .........................................................................................46

88 Fed. Reg. 1243, 1246 ...........................................................................................8

88 Fed. Reg. 1243, 1248 ...........................................................................................5

88 Fed. Reg.1243, 1250-51......................................................................................48

88 Fed. Reg. at 1246 ...........................................................................................4, 8

88 Fed. Reg. 1255 ..........................................................................................4, 5, 45

88 Fed. Reg. 1255, 1256 ....................................................................................5, 46

88 Fed. Reg. 1255, 1258 (Jan. 9, 2023) ...................................................................1

88 Fed. Reg. 1255, 1258 ......................................................................................8, 9

88 Fed. Reg. 1255 at 1258 ..................................................................................9, 10

88 Fed. Reg. 1255, 1260-61 .....................................................................................7

88 Fed. Reg. 1255, 1261-62.....................................................................................48

88 Fed. Reg. 1266 (Jan. 9, 2023) ........................................................................1

88 Fed. Reg. 1266 ...............................................................................4, 5, 45

88 Fed. Reg. 1266, 1267 ....................................................................................46

88 Fed. Reg. 1266, 1270 ................................................................................7, 67

88 Fed. Reg. 1266, 1272 .....................................................................................5

88 Fed. Reg. 1266, 1273-74 ..............................................................................48

88 Fed. Reg. 1279 (Jan. 9, 2023) ........................................................................1

88 Fed. Reg. 1279 ...............................................................................4, 5, 45

88 Fed. Reg. 1279, 1279-1280 .............................................................................7

88 Fed. Reg. 31314 (May 16, 2023) .....................................................................6

Abbe R. Gluck, *Imperfect Statutes, Imperfect Courts: Understanding Congress's Plan in the Era of Unorthodox Lawmaking*, 129 Harv. L. Rev. 62, 77 n.90 (2015) .........................................................................................................81

*Active Troops*, NPR (June 27, 2019), https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-deportation-protections-for-families-of-active-troops .............................................39

First Amendment .........................................................................................89

*Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, U.S. Dep't of Homeland Sec. (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and .....................................1, 2

*Annual Report of the Immigration and Naturalization Serv.* 2–3 (1957) ....................28

*Biden,* CBS News (July 18, 2023), https://www.cbsnews.com/news/immigration-parole-migrants-us-expansion-biden/ .............................................................43

CBS News (May 22, 2023), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/ ....................................18

Cong., *Review of U.S. Refugee Resettlement Programs and Policies* 9 (Comm. Print 1980) ......................................................................................20

*Democracy*, U.S. INST. PEACE (Oct. 7, 2022), https://www.usip.org/publications/2022/10/nicaragua-crackdown-religious-actors-further-imperils-return-democracy..................................................................9

Denelle Confair, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* ................................................................................52

*Global Displacement*, UNHCR, https://www.unhcr.org/spotlight/2023/01/2023-a-moment-of-truth-for-global-displacement/ (last visited June 19, 2023) ...................................15

Guam. U.S. Customs and Border Protection, *Russian Citizens Now Eligible to Travel to Guam Visa-Free* (Jan. 26, 2012), https://www.cbp.gov/newsroom/national-media-release/russian-citizens-now-eligible-travel-to-guam-visa-free ........................................................................38

H.R. Rep. No. 96-781 (1980) ...............................................................................20

H.R. Rep. No. 104-469, pt. 1 (1995) ....................................................................22

H.R. Rep. No. 104-469, pt. 1 ...............................................................................22

H.R. Rep. No. 104-469, pt. 1 ...............................................................................22

*Haiti Held Hostage*, NEW YORKER (July 17, 2023), https://www.newyorker.com/magazine/2023/07/24 /haiti-held-hostag .................8

Immigration and Naturalization Service, *INS Focus: What is Immigration Parole?* (1994) ....................................................................................................23, 24

*Immigration parole has added 450,000 workers to industries with critical labor shortages* (April 20, 2023), https://wp.fwd.us/news/immigration-labor-shortages/ ................................................................................................17, 18

Indochina Migration and Refugee Assistance Act. The Indochina Migration and Refugee Assistance Act of 1975, Pub. L. No. 94-23, §§ 1–2 ...................30

*July and September 2019*, WORLD FOOD PROGRAMME (Feb. 23, 2020), https://reliefweb.int/report/venezuela-bolivarian-republic/wfp-venezuela-food-security-assessment-main-findings-data; .............................................10

Mariel Boatlift. Mirta Ojito, *The Long Voyage from Mariel Ends*, NEW YORK TIMES (Jan. 16, 2005) .......................................................................30

*Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022) ...............................52

*Migration Surge*, AP News (May 3, 2023), https://apnews.com/article/immigration-asylum-title-42-biden-border-aed92da15e23875a8049d413ca3b4eef ......................................................51

*Operation Allies Welcome Afghan Parolee and Benefits Report* (May 8, 2023), https://www.dhs.gov/allieswelcome ...........................................................42

*Program* (June 23, 2023), https://www.uscis.gov/CAM ...............................................40

*Refugee Program: The Orderly Departure Program from Vietnam* 2 (April 1990),
    https://www.gao.gov/assets/nsiad-90-137.pdf ..........................................32

*Report to the President on 902 Consultations Related to the DHS Discretionary
    Parole Program* (2019).............................................................................37

Ruth Marcus, *U.S. Moves to Ease Soviet Emigres' Way*, WASHINGTON POST (Dec.
    9, 1988) ....................................................................................................31

State, *Cuban Haitian Arrivals in the U.S.* (1980),
    https://ia802208.us.archive.org/28/items/current-policy-193/1980-06-193.pdf....................30

*Statement by Secretary Johnson on the Continued Normalization of our Migration
    Relationship with Cuba* (Jan. 12, 2017),
    https://www.dhs.gov/news/2017/01/12/statement-secretary-johnson-
    continued-normalization-our-migration-relationship-cuba.....................36

U.S. Citizenship and Immigration Services, *DHS To Implement Haitian Family
    Reunification Parole Program* (October 17, 2014) ................................47

U.S. Citizenship & Immigration Services, *Frequently Asked Questions About the
    Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (June 14,
    2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-
    the-processes-for-cubans-haitians-nicaraguans-and-venezuelans ...........46

U.S. Customs and Border Protection, *Important Update in Entry Requirements:
    Parole for Citizens of the Russian Federation and the People's Republic of
    China for the CNMI Only* (Nov. 16,
    2009),https://www.justice.gov/sites/default/files/eoir/legacy/2014/08/15/CNM
    I%20CLP%20Bulletin.pdf ........................................................................37

*U.S. Immigration Policy on Haitian Migrants*, CRS Report for Congress 1 n.1.........................31

*Understanding America's Labor Shortage: The Most Impacted States*, U.S.
    Chamber of Commerce (May 2, 2023),
    https://www.uschamber.com/workforce/the-states-suffering-most-from-the-
    labor-shortage?state= .................................................................................18

*World Report 2022: Nicaragua*, HUM. RTS. WATCH, https://www.hrw.org/world-
    report/2022/country-chapters/nicaragua ....................................................9

*World Report 2022: Venezuela*, HUM. RTS. WATCH, https://www.hrw.org/world-
    report/2022/country-chapters/venezuela...................................................10

## Introduction

Pursuant to the Court's June 5, 2023, scheduling order, Dkt. No. 159, Intervenor Defendants submit the following proposed findings of fact and conclusions of law for the Court's resolution of this case on the merits.

## Findings of Fact

**A.      Creation and Implementation of the Parole Pathways for Cubans, Haitians, Nicaraguans, and Venezuelans**

1.      The Department of Homeland Security ("DHS") announced and implemented dedicated parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV Pathways") in January 2023.  Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1258 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).[1]

2.      The CHNV Pathways allow up to 30,000 total qualifying individuals from these four countries combined each month to obtain authorization to travel to a port of entry in the United States where they may be considered for parole.  *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, U.S. Dep't of Homeland Sec. (Jan. 5,

---

[1] Intervenor Defendants have not specified "stipulated or agreed facts," ECF 159 at 4, because the Parties have not so stipulated or agreed. Should the Parties reach agreement, Intervenor Defendants will specify stipulated facts in their post-trial filing.

2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and, ECF 22-1.

3.      The CHNV Pathways were modeled on the popular and successful April 2022 Uniting for Ukraine Parole Process, Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 27, 2022), Administrative Record, Cuba AR_000069, Federal Defendants' ("Fed. Defs'") Trial Exhibit ("Tr. Ex.") A, and the October 2022 Parole Process for Venezuelans, Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022), Administrative Record, Cuba AR_000073, Fed. Defs' Tr. Ex. A.  Amended Complaint, ECF 20 ¶ 43; *see also DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, U.S. Dep't of Homeland Sec. (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and, Pls' Tr. Ex. ECF 22-1.

4.      DHS, U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE") (collectively, "Federal Defendants") announced and implemented the Uniting for Ukraine Parole Process in April 2022 to respond to an unprecedented spike in Southwest border encounters with Ukrainian nationals following Russia's invasion of Ukraine in February 2022.  Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 27, 2022), Administrative Record, Cuba AR_000069,  Fed. Defs' Tr. Ex. A.

5.     Following the implementation of the Uniting for Ukraine Parole Process, unauthorized border encounters with Ukrainians swiftly declined to levels seen before Russia's invasion of Ukraine.  *See, e.g.*, Ukrainian SW Border Encounters for FY 2022, Tr. Ex. 56; Ukrainian SW Border Encounters for FY 2023, Tr. Ex. 57.

6.     Likewise, Federal Defendants announced and implemented the Parole Process for Venezuelans ("Venezuelan Parole Process") in October 2022 to respond to a dramatic rise in Southwest border encounters with Venezuelan nationals in the summer and early fall of 2022.  87 Fed. Reg. 63507 (Implementation of a Parole Process for Venezuelans); *see also* Administrative Record, Cuba AR_000073, Fed. Defs' Tr. Ex. A.

7.     For years, DHS had unsuccessfully sought Mexico's agreement to accept the removal of individuals from certain countries where the United States cannot send removable noncitizens, including, for example, Venezuelans.   Defendants' Response in Opposition to the Motion for Preliminary Injunction ("Defs' P.I. Opp."); *see also* Declaration of Blas Nuñez-Neto Declaration ("Nuñez-Neto Decl.") Fed. Defs' Tr. Ex. HH ¶ 11-16.

8.     Through negotiations with Mexico, DHS was able to develop the Venezuelan Parole Process to provide an avenue for safe and orderly processing of noncitizens away from the United States-Mexico border, allowing eligible individuals to avoid traveling through Mexico.  *Id.*

9.     In exchange, Mexico agreed to accept the removal of Venezuelan nationals who failed to follow the Venezuelan Parole Process.  *Id.*

10.    Thus, the Venezuelan Parole Process provided a mechanism that allowed DHS to remove otherwise unremovable noncitizens.  *Id.*

11.    Within a week of announcement of the Venezuelan Parole Process, the number of Venezuelans encountered at the Southwest border fell from over 1,100 per day to under 200 per day; and as of the week ending December 4, to an average of 86 per day.  88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelans).

12.    The Venezuelan Parole Process also led to a decline in Venezuelans making the hazardous journey through the Darién Gap.  *Id.* (dropping from 40,593 in October 2022 to just 668 in November); *see also* Nuñez-Neto Decl. Fed. Defs' Tr. Ex. HH ¶ 21.

13.    Because the Venezuelan Parole Process decreased dangerous migration patterns, reduced border encounters, and increased DHS's ability to remove certain noncitizens, DHS sought to create similar processes that would have similar effects.  Nuñez-Neto Decl. Fed. Defs' Tr. Ex. HH ¶ 11-16.

14.    Thus, on January 9, 2023, DHS announced a continued parole process for Venezuelans with minor modifications, and new similar parole processes for nationals of Cuba, Haiti, and Nicaragua.  Nuñez-Neto Decl. Fed. Defs' Tr. Ex. HH ¶ 18;  88 Fed. Reg. 1266 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelans).

15.     The CHNV Pathways established a process by which supporters with legal status in the United States could apply to sponsor qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members, to obtain advance authorization to travel to the United States and be considered for temporary parole for up to two years.  *See, e.g.*, 88 Fed. Reg. at 1246 (Implementation of a Parole Process for Haitians).

16.     In addition to reiterating the basic parameters of the CHNV Pathways outlined in the DHS Press Release and the USCIS webpage, the Federal Register notices offer detailed explanations for the creation of the Parole Pathways. *See, e.g.*, 88 Fed. Reg. 1266 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelans).

17.     DHS's explanations for creating CHNV Pathways includes that they would provide significant public benefits, address urgent humanitarian objectives, and further important foreign policy objectives.  88 Fed. Reg. 1266 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelans).

18.     For example, the Cuban and Haitian Process notices cite the following objectives:

> [I]mprove vetting for national security and public safety . . . reduce the strain on DHS personnel and resources . . . minimize the domestic impact of irregular migration from [Cuba/Haiti] . . . disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches

smuggling networks . . . [and] fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

88 Fed. Reg. 1266, 1272 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243, 1248 (Implementation of a Parole Process for Haitians). The Nicaraguan Parole Process notice contains nearly identical language. *See* 88 Fed. Reg. 1255, 1256.

19. The CHNV Pathways are also the result of diplomatic engagement with regional partner countries who have requested that the United States help manage irregular migration in the Western Hemisphere. Nuñez-Neto Decl. Fed. Defs' Tr. Ex. HH ¶¶ 48-61.

20. The CHNV Parole Pathways are one way the United States has sought to fulfill its diplomatic commitments to expand access to regular pathways for migrants and refugees, including commitments made in the Los Angeles Declaration on Migration and Protection, which was endorsed in June 2022 by the United States and 20 other partner countries. *Id*.

21. The diplomatic community focused on the CHNV countries in part because conditions in each of these four countries are prompting irregular migration throughout the Western Hemisphere. *Id*. at ¶ 50.

22. The CHNV Pathways are accompanied by corresponding "significant consequences for those who fail to use those pathways," including presumptive ineligibility for asylum; potential removal to Mexico, which will accept returns of 30,000 individuals per month who fail to use the CHNV Pathways; and, if removed, a five-year ban and potential criminal prosecution on any attempted reentry. *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement*

6

*Measures and Additional Safe and Orderly Processes*, (Jan. 5, 2023), ECF 22-1; *see also* Circumvention of Lawful Pathways, 88 Fed. Reg. 31314 (May 16, 2023).

23.     The Administrative Record reflects additional factors DHS considered in developing the CHNV Pathways, including the expectation that they would reduce the burdens caused by irregular migration; the impact of the processes on state and local communities; public safety and financial vetting; and the ability of parolees to apply for work authorization in order to be financially independent. *See*, *e.g*., 88 Fed. Reg. 1279, 1279-1280 (Implementation of Changes to the Parole Process for Venezuelans); 88 Fed. Reg. 1255, 1260-61 (Implementation of a Parole Process for Nicaraguans).

**B.     Background on Migration from Cuba, Haiti, Nicaragua, and Venezuela**

24.     **Cuba.** Cuba has a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which restricts freedoms of expression, association, peaceful assembly, and other human rights.   88 Fed. Reg. 1266, 1270 (Implementation of a Parole Process for Cubans).

25.     Since late 2020, the human rights situation in Cuba has deteriorated considerably, with the Cuban government employing arbitrary detention and military deployment to harass critics, activists, and political opponents; prosecutions without fair trial guarantees; restrictions on social media and messaging platforms; and beatings that amount to torture.  *Id.*

26.     These forms of government repression are rapidly worsening.  *Id.*

27.  Cuba is also currently experiencing its worst economic crisis since the 1990s, resulting in mass shortages of basic goods, rolling blackouts, and untenable conditions.  *Id.*

28.  Cubans are fleeing the island in record numbers, surpassing even the Mariel exodus of 1980.  *Id.* at 1269.

29.  **Haiti.**  In recent years, Haiti has experienced a cataclysmic series of events including natural disasters, economic crisis, pervasive hunger, political assassinations, and widespread gang violence.   88 Fed. Reg. 1243, 1246 (Implementation of a Parole Process for Haitians).

30.  In 2021, Haiti experienced a 7.2 magnitude earthquake and Tropical Storm Grace within days of one another, leaving over 650,000 Haitians requiring humanitarian assistance and causing damage of over $1.6 billion—eleven percent of Haiti's GDP. *Id.*

31.  On July 7, 2021, assassins killed Haitian President Jovenel Moïse.  *Id.*

32.  Gangs have filled the resulting power vacuum, carrying out thousands of documented killings and even more kidnappings.  *Id.*

33.  Gang violence has shuttered businesses, destroyed essential infrastructure like water networks, hampered attempts to control a serious cholera outbreak, and left Haitians struggling to find basic necessities like food, water, and medicine.  *Id.* at 1246–47.

34.  "An estimated two hundred gangs are now active in Haiti, and they dominate as much as ninety per cent of the capital."  Jon Lee Anderson, *Haiti Held Hostage*,

NEW YORKER (July 17, 2023), https://www.newyorker.com/magazine/2023/07/24/haiti-held-hostage.

35.    Because of these compounding crises, increasing numbers of Haitians have been forced to leave the island. *See* 88 Fed. Reg. at 1246.

36.    **Nicaragua.** Since 2007, Nicaraguan President Daniel Ortega's administration has consolidated control over the country's institutions and dismantled the rule of law. 88 Fed. Reg. 1255, 1258 (Implementation of a Parole Process for Nicaraguans).

37.    The Ortega administration has particularly targeted non-governmental organizations, causing thousands linked to political parties, academic, and religious spaces to be shut down. *Id.*

38.    Recently, Nicaragua's government began cracking down on the Catholic Church, shutting down radio stations, terminating church-affiliated organizations, detaining and exiling church officials, and branding church leadership as coup-mongers. Maria Montes & Savarni Sanka, *In Nicaragua, Crackdown on Religious Actors Further Imperils Return to Democracy*, U.S. INST. PEACE (Oct. 7, 2022), https://www.usip.org/publications/2022/10/nicaragua-crackdown-religious-actors-further-imperils-return-democracy.

39.    The Nicaraguan government's efforts to shut down non-governmental organizations are "part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists." 88 Fed. Reg. 1255 at 1258.

40.     The government targets human rights defenders and other critics with death threats; assaults; police intimidation, harassment, and surveillance; online defamation campaigns; and arbitrary detention and prosecution. *World Report 2022: Nicaragua*, HUM. RTS. WATCH, https://www.hrw.org/world-report/2022/country-chapters/nicaragua (last visited July 27, 2023).

41.     Political repression and poverty exacerbate significant food insecurity and hunger in Nicaragua.  88 Fed. Reg. 1255 at 1258.

42.     For these reasons, the number of individuals fleeing Nicaragua has increased. *See id*.

43.     **Venezuela.** "A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of [President] Nicolás Maduro have caused nearly 7 million Venezuelans [or more than one quarter of the country's population] to flee their country."  87 Fed. Reg. 63507, 63509 (Implementation of a Parole Process for Venezuelans).

44.     President Maduro's repressive tactics, including extrajudicial executions, forced disappearances, jailing political opponents, prosecuting civilians in military courts, torturing detainees, and cracking down on protestors and journalists, are serious enough for a U.N. factfinding mission to find they constitute crimes against humanity.  *World Report 2022: Venezuela*, HUM. RTS. WATCH, https://www.hrw.org/world-report/2022/country-chapters/venezuela (last visited July 27, 2023).

45.     Venezuela's healthcare system has collapsed, and millions in Venezuela cannot access basic nutrition. *WFP Venezuela Food Security Assessment Main Findings | Data Collected between July and September 2019*, WORLD FOOD PROGRAMME (Feb. 23, 2020), https://reliefweb.int/report/venezuela-bolivarian-republic/wfp-venezuela-food-security-assessment-main-findings-data; *World Report 2022: Venezuela*, HUM. RTS. WATCH, https://www.hrw.org/world-report/2022/country-chapters/venezuela (last visited July 27, 2023).

46.     Consequently, Venezuela has become the second-largest external displacement crisis in the world.  87 Fed. Reg. 63507 at 63509.

## C.      The Parole Pathways Application Process

47.     To be eligible for the CHNV Pathways, noncitizen beneficiaries must: (1) pass rigorous biometric and biographic national security and public safety screening and vetting; (2) have a supporter in the United States who commits to providing financial and other support; (3) complete vaccinations and other public health requirements; and (4) warrant a favorable exercise of discretion for urgent humanitarian reasons or significant public benefit. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated July 12, 2023), ECF 175-3.

48.     Individuals are ineligible for the Parole Pathways if they: (1) fail to pass security or public safety vetting, (2) are deemed not to merit a favorable exercise of discretion, (3) have been ordered removed from the United States within the prior five years or are subject to a bar to admissibility based on a prior removal order, (4) have crossed without authorization into the United States, between Ports of

Entry, after the date the relevant Parole Pathway was announced, (5) have crossed the Mexican or Panamanian border without authorization after the date the relevant Parole Pathway was announced, (6) are Cuban or Haitian and have been interdicted at sea after April 27, 2023, (7) are an unaccompanied immigrant child (someone under 18 and not traveling with a parent or legal guardian), or (8) are a dual national or permanent resident of, or hold refugee status in, another country, unless DHS operates a similar parole process for the country's nationals.  *Id.*

49.     Noncitizens cannot directly apply to these programs. Instead, a supporter with legal status in the United States who is willing and able to financially support the parolee must file the application.  *Id.*

50.     Supporters can be individuals filing independently, with other individuals, or on behalf of organizations, businesses, or other entities.  *Id.*

51.     Supporters must also pass background vetting including for public safety and national security concerns, to protect against abuse, and to ensure that they are able to financially support the beneficiary they are applying to support.  *Id.*

52.     Supporters swear under the penalty of perjury that they will receive the parolee in the United States; ensure safe housing; help complete applications for employment authorization and a Social Security card; ensure the parolee's health needs are met; and assist them in accessing education, learning English, and securing employment. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated July 12, 2023), ECF 175-3.

53.     To begin the application process, the supporter first submits a Form I-134A, "Online Request to be a Supporter and Declaration of Financial Support," with

USCIS.  *Form  I-134A,  Declaration  of  Financial  Support*,  USCIS, https://www.uscis.gov/sites/default/files/document/forms/i-134a.pdf, ECF 175-2.

54.  USCIS requires a separate form for each beneficiary a person intends to sponsor. *Processes  for  Cubans,  Haitians,  Nicaraguans,  and  Venezuelans*,  USCIS, https://www.uscis.gov/CHNV (last updated July 12, 2023).

55.  The I-134A application is fourteen pages long and solicits detailed financial information for both the supporter and beneficiary, including salary information, complete lists of assets owned, and other financial obligations.  *Form I-134A, Declaration of Financial Support*, USCIS, https://www.uscis.gov/sites/default /files/document/forms/i-134a.pdf, ECF 175-2.

56.  The required financial information is required to verify and confirm that the supporter has sufficient financial resources to receive, maintain, and support the individual(s) they are agreeing to support for the duration of their parole period. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated July 12, 2023), ECF 175-3.

57.  Upon receipt of the I-134A application, USCIS performs its first round of vetting. *Id.*

58.  If USCIS "confirms a supporter," meaning the sponsor and intended beneficiary have passed the first round of the vetting process, the intended beneficiary receives an email from USCIS with instructions to use the CBP One mobile application to submit their biographic information and a photo.  *Id.*

59.  After USCIS processes the second round of submitted information, the beneficiary receives a notice confirming whether USCIS will provide them with advance

authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. *Id.*

60.    If approved, the beneficiary may only make the trip via air to a U.S. port of entry. *Id.*

61.    The beneficiary has 90 days to secure their own travel following USCIS's preliminary approval. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated July 12, 2023), ECF 175-3.

62.    Upon arriving at a U.S. port of entry, CBP performs additional screening and vetting of the beneficiary, including fingerprint biometric vetting. *Id.*

63.    CBP then considers the individual for a grant of discretionary parole on a case-by-case basis. *Id.*

64.    If the individual is approved, they are paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. *Id.*

**D.    The Parole Pathways Facilitate Sponsorship for a Wide Range of Reasons**

65.    Thousands of Texans support the Parole Pathways: Texas ranks among the top five states based on numbers of residents supporting parolees. Fed. Defs' Responses and Objections to Pls' [Revised] First Set of Discovery Requests, ECF 175-40.

66.    Including for Texans, the Parole Pathways promote humanitarianism, stability and safety, family reunification, religious expression, community building, and economic prosperity. Declaration of Paul Zito ("Zito Decl."), ECF 175-64.

67.  Cuba, Haiti, Nicaragua, and Venezuela are experiencing humanitarian crises. *Supra*
     ¶¶ 24-46.

68.  The individuals whom Intervenors are sponsoring have suffered these conditions
     first-hand.  *See, e.g.*, Declaration of Dr. Germán A. Cadenas ("Cadenas Decl."),
     ECF 175-52; Supplemental Declaration of  Dr. Germán A. Cadenas  ("Supp.
     Cadenas Decl."), ECF 175-53; Declaration of Dr. Nan Langowitz ("Langowitz
     Decl."), ECF 175-54; Supplemental Declaration of Dr. Nan Langowitz ("Supp.
     Langowitz Decl."), ECF 175-55; Declaration of Anne Valerie Daniel-Laveus
     ("Laveus Decl."), ECF 175-56; Supplemental Declaration of Anne Valerie Daniel-
     Laveus ("Supp. Laveus Decl."), ECF 175-57; Declaration of Francis Margarita
     Arauz Ramirez ("Arauz Decl."), ECF 175-58; Supplemental Declaration of Francis
     Margarita Arauz Ramirez ("Supp. Arauz Decl."), ECF 175-59; Declaration of Eric
     Sype ("Sype Decl."), ECF 175-60; Supplemental Declaration of  Eric Sype ("Supp.
     Sype Decl."), ECF 175-61; Declaration of Dr. Kate Sugarman ("Sugarman Decl."),
     ECF 175-62; Supplemental Declaration of Dr. Kate Sugarman ("Supp. Sugarman
     Decl."), ECF 175-63; Zito Decl., ECF 175-64; Supplemental Declaration of Paul
     Zito ("Supp. Zito Decl."), ECF 175-65.

69.  Ms. Laveus's nephew was recently at risk in Haiti because of nearby riots in which
     several people were burned alive.  Supp. Laveus Decl., ECF 175-57 ¶ 12.

70.  The Cuban family Mr. Zito has applied to sponsor risks incarceration due to their
     Christian faith.  Zito Decl., ECF 175-64 ¶ 12.

71.  The family Dr. Langowitz sponsored was forced to flee Venezuela after speaking
     out about government corruption.  Langowitz Decl., ECF 175-54 ¶ 12.

72. The absence of safe pathways does not prevent the migration of individuals seeking safety and security for themselves and their families.  *See, e.g.*, *2023: A Moment of Truth for Global Displacement*, UNHCR, https://www.unhcr.org/spotlight/2023/01/2023-a-moment-of-truth-for-global-displacement/ (last visited June 19, 2023), ECF 175-16; *Seven-fold increase in the number of children walking through the Panamanian jungle towards North America this Year*, UNICEF (Mar. 30, 2023), https://www.unicef.org/press-releases/seven-fold-increase-number-children-walking-through-panamanian-jungle-towards-north, ECF 175-17; Declaration of Heather Scanlon ("Scanlon Decl."), ECF 175-68.

73. The CHNV Pathways promote access to safety.  *See, e.g.*, Supp. Laveus Decl., ECF 175-57; Zito Decl., ECF 175-64; Langowitz Decl., ECF 175-54.

74. Through the CHNV Pathways, proposed parolees receive travel authorization before leaving their home countries, allowing them to avoid treacherous journeys and dangerous conditions at the border.  *See, e.g.*, Scanlon Decl., ECF 175-68 ¶¶ 14–20.

75. The Parole Pathways also allow family reunification.  *See, e.g.*, Cadenas Decl., ECF 175-52; Laveus Decl., ECF 175-56; Arauz Decl., ECF 175-58.

76. Three of the Intervenors applied to support their family members.  *Id.*

77. Ms. Arauz made her family whole by reunifying with her husband and bringing him home to their son.  Supp. Arauz Decl., ECF 175-59 ¶¶ 4–5.

78. Ms. Laveus reunited her brother and nephew with her elderly mother and herself.  Laveus Decl., ECF 175-56 ¶ 22.

79. World Series champion Eduardo Rodríguez has applied to sponsor his Venezuelan parents and other family members so they can reunite after eight years of seeing him play Major League Baseball only on television.  Declaration of Eduardo Jose Rodriguez Hernandez ("Hernandez Decl."), ECF 175-67 ¶¶ 2, 4, 10, 12.

80. The Parole Pathways also facilitate community building and the free exercise of religion.  *See, e.g.*, Langowitz Decl., ECF 175-54; Zito Decl., ECF 175-64.

81. Mr. Zito, a devout Christian, seeks to answer a "calling from God" in sponsoring Abel, his close friend who has experienced religious persecution in Cuba.  Zito Decl., ECF 175-64 ¶¶ 8, 12, 14.

82. Similarly, Dr. Langowitz's synagogue, whose members work together to sponsor and support families seeking parole, has grown closer through their collective efforts to welcome families.  Langowitz Decl., ECF 175-55 ¶ 14.

83. The Parole Pathways additionally foster economic growth.  *See, e.g.*, Sype Decl., ECF 175-60; Supp. Sype Decl., ECF 175-61; Expert Declaration of Jennifer Hunt ("Hunt Decl."), ECF 175-72; Declaration of Jocelyn Wyatt ("Wyatt Decl."), ECF 175-70.

84. Mr. Sype's cousin will experience relief from a perennial labor shortage on his farm when he can employ Mr. Sype's parolee and friend, Oldrys. Supp. Sype Decl., ECF 175-61 ¶ 4.

85. There is broad-based consensus among economists that immigration increases economic growth.  Hunt Decl., ECF 175-72 ¶ 6.

86.     Immigrants of all skill and education levels contribute to the economy by increasing specialization and productivity and contribute billions to Texas's Gross Domestic Product each year.  *Id.* at ¶ 8.

87.     One recent study assessing the impacts of parole concluded that "people recently granted parole—largely from Afghanistan, Ukraine, and Latin American countries—have had a profoundly positive impact on our economy" and many, including in Texas, "are likely working in industries with labor shortages." *Immigration parole has added 450,000 workers to industries with critical labor shortages*, fwd.us (April 20, 2023), https://wp.fwd.us/news/immigration-labor-shortages/, ECF 175-20 at 2; *see, e.g.*, ECF 175-21–34 (articles on labor shortages and needs in the United States and how immigrants are key to addressing this issue); *see also* Wyatt Decl., ECF 175-70 ¶ 5 (matching paroled individuals with labor needs).

88.     The ability to receive work authorization allows parolees to be self-supporting, generates tax revenue, and helps fill labor shortages, including in Texas—which as of December 2022, had 829,000 unfilled jobs.  *See, e.g.*, *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (May 2, 2023), https://www.uschamber.com/workforce/the-states-suffering-most-from-the-labor-shortage?state=, ECF 175-10; *Immigration parole has added 450,000 workers to industries with critical labor shortages*, fwd.us (April 20, 2023), https://wp.fwd.us/news/immigration-labor-shortages/, ECF 175-20 at 2.

89.     USCIS has received over 1.5 million applications from U.S. supporters seeking to sponsor individuals under the CHNV Pathways.  *See, e.g.*, *1.5 million apply for*

*U.S. migrant sponsorship program with 30,000 monthly cap*, CBS News (May 22, 2023), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/, ECF 175-51.

**E.   The CHNV Parole Pathways Draw Upon DHS's Statutory and Historical Parole Authority**

*The Legislative History of the Parole Authority*

90.   Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any [noncitizen] applying for admission to the United States."

91.   The INA does not include definitions for "case-by-case," "urgent humanitarian reasons," or "significant public benefit."  *See* 8 U.S.C. § 1182(d)(5)(A).

92.   The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "the Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." Immigration and Nationality Act, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 182-188 (1952), Tr. Ex. 6; *see also* Expert Declaration of Yael Schacher ("Schacher Decl."), ECF 175-76 ¶ 12.

93.   Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision for 28 years until the passage of the Refugee Act of 1980.  Schacher Decl., ECF 175-76 ¶ 12.

19

94.     Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees into the United States, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—*i.e.*, by defining a group, typically by nationality plus additional factors, whose entry may be justified by humanitarian and/or public benefit reasons, with applications of individuals therein considered on a case-by-case basis. *See, e.g.*, *id.* at ¶ 4.

95.     The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution. S. Comm. On the Judiciary, 96th Cong., *Review of U.S. Refugee Resettlement Programs and Policies* 9 (Comm. Print 1980), Tr. Ex. 7.

96.     In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980), Tr. Ex. 8.

97.     In passing the Refugee Act, and in recognition of the fact that refugees now had their own unique legal pathway to come to the United States, Congress added a restriction to the parole authority, codified at INA § 212(d)(5)(B), preventing the Attorney General from paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee." *Id.* § 212(d)(5)(B), 94 Stat. at 108, Tr. Ex. 8; *see also* Schacher Decl., ECF 175-76 ¶ 17.

20

98. The conference report adopted by both chambers accompanying the final legislation explained that "[t]he conferees, in accepting the House limitation on the parole of refugees, recognize that it does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees." H.R. Rep. No. 96-781, at 20 (1980) (Conf. Rep.), Tr. Ex. 9.

99. The last time that Congress amended the parole authority was in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689 (1996), Tr. Ex. 10; *see also* Schacher Decl., ECF 175-76 ¶¶ 19–20, 22.

100. In relevant part, IIRIRA struck from the INA the language that allowed the Attorney General to grant parole for "emergent reasons or for reasons deemed strictly in the public interest" and replaced it with language allowing the Attorney General to grant parole for "urgent humanitarian reasons or significant public benefit." IIRIRA, Pub. L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689, Tr. Ex. 10; *see also* Schacher Decl., ECF 175-76 ¶ 20.

101. In addition, in an attempt to address the concern that parole was allowing large groups of non-citizens to remain in the United States for long periods of time regardless of whether they had a path to permanent legal status, Congress required that long-term parolees who have yet to become lawful permanent residents be counted against numerical caps on family-sponsored immigration. IIRIRA, Pub.

L. No. 104-208, Division C, § 603, 110 Stat. at 3009-690, Tr. Ex. 10; *see also* Schacher Decl., ECF 175-76 ¶ 19.

102.    IIRIRA also amended the parole statute to specify that parole must be granted "only on a case-by-case basis."  IIRIRA, Pub. L. No. 104-208, Division C, at § 602(a), 110 Stat. at 3009-546, Tr. Ex. 10; *see also* Schacher Decl., ECF 175-76 ¶ 22.

103.    As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee considered a proposal that would have instead authorized parole for "an urgent humanitarian reason" or "for a reason deemed strictly in the public interest," and which contained precise definitions of each of those phrases. H.R. Rep. No. 104-469, pt. 1, at 77-78 (1995), Tr. Ex. 11; *see also* Schacher Decl., ECF 175-76 ¶ 21.

104.    Under the proposal considered by the Judiciary Committee, parole could be used for an "urgent humanitarian reason" only in cases involving certain medical emergencies, and would be authorized as "strictly in the public interest" only where the parolee assisted the U.S. government in a law enforcement activity and was either needed in the United States or their life would have been threatened outside the country, or where the parolee was to be criminally prosecuted. H.R. Rep. No. 104-469, pt. 1, at 347-48, Tr. Ex. 11; *see also* Schacher Decl., ECF 175-76 ¶ 21.

105.    In connection with and in support of these proposed narrowing definitions, the House Judiciary Committee Report records language, which the Plaintiff States cite in their briefing,  Plaintiff States' Motion for Preliminary Injunction ("Pls' P.I.") ECF 22 at 7 & 11, that criticizes the executive's use of the parole authority "to admit entire categories of aliens who do not qualify for admission under any other

category in immigration law," in "contravene[tion of ] the intent of section 212(d)(5)." H.R. Rep. No. 104-469, pt. 1, at 140, Tr. Ex. 11.

106. However, before the bill was brought to the Floor of the U.S. House of Representatives for a vote, the language defining and restricting when parole could be used was stripped from the bill.  *Compare* H.R. Rep. No. 104-469, pt. 1, at 140, Tr. Ex. 11 *with* IIRIRA, § 602, 110 Stat. at 3009-689, Tr. Ex. 10.

107. The legislation that ultimately passed both chambers and was signed into law as IIRIRA left the terms "urgent humanitarian reasons" and "significant public benefit" undefined.  IIRIRA, Pub. L. No. 104-208, Division C, § 602, 110 Stat. at 3009-689, Tr. Ex. 10; *see also* Schacher Decl. ECF 175-76 ¶ 21.

108. Although IIRIRA also added the specification that parole should be granted on a "case-by-case basis," the manner in which the executive exercised parole authority in practice remained consistent before and after the enactment of IIRIRA.  *See, e.g.*, Schacher Decl., ECF 175-76 ¶ 9.

109. Both before and after the enactment of IIRIRA, successive administrations used parole in a programmatic manner by identifying a group of people whose entry through parole could be warranted for emergent or urgent humanitarian reasons or would be in the public interest or advance a significant public benefit, and then allowing eligible members of that group to apply and be considered on a case-by-case basis.  *Id.*

110. Both before IIRIRA expressly imposed the requirement as well as after, contemporaneous documents reflect the executive's understanding that parole was granted on a case-by-case basis.  *See, e.g.*, Immigration and Naturalization Service,

*INS Focus: What is Immigration Parole?* (1994), Tr. Ex. 12; United States General Accounting Office (GAO), *Cuba: U.S. Response to the 1994 Cuban Migration Crisis*, p. 4 (Sept. 1995), Tr. Ex. 13.

111.   For example, in 1994—before the 1996 passage of IIRIRA—a publication from the Office of the Commissioner of the Immigration and Naturalization Service ("INS") explained that "the INS authorizes parole, under delegated authority from the Attorney General, on a case-by-case basis."   Immigration and Naturalization Service, *INS Focus: What is Immigration Parole?* (1994), Tr. Ex. 12; *see also* Schacher Decl., ECF 175-76 ¶ 22.

112.   A September 1995 GAO report on the parole of Cubans in 1994 likewise referred to the granting of parole as a "case-by-case" process.   United States General Accounting Office (GAO), *Cuba: U.S. Response to the 1994 Cuban Migration Crisis*,  p. 4 (Sept. 1995), Tr. Ex. 13.

113.   After the passage of IIRIRA, in June 2001, INS General Counsel Bo Cooper issued a legal opinion on whether the 1996 amendments to the parole authority limited the INS's authority to parole into the United States individuals from the former Soviet Union who are denied refugee status.   Administrative Record, Cuba AR_000092, ECF 92, Fed. Defs Tr. Ex. A; *see also* Schacher Decl., ECF 175-76 ¶ 25.

114.   Cooper wrote that "a class whose members generally would be considered appropriate candidates for parole does not conflict with the 'case-by-case' decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole

authority in the particular case."  ECF 92 at Cuba AR_000097, Fed. Defs' Tr. Ex. A; *see also* Schacher Decl., ECF 175-76 ¶ 25.

115. The memo concluded that "[s]o long as individual consideration is given to parole decisions," the agency's determination "that it is generally in the public interest" to parole members of the designated class into the United States "does not violate the case-by-case requirement."  ECF 92 at Cuba AR_000097, Fed. Defs' Tr. Ex. A; *see also* Schacher Decl., ECF 175-76 ¶ 25.

116. After the passage of IIRIRA, successive administrations continued to use parole in a programmatic fashion.  Schacher Decl., ECF 175-76 ¶¶ 26–27.

117. Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created parole programs to allow, for example, the parole of groups of Cubans; Haitians; Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam; family members of U.S. military service members; minor children from El Salvador, Guatemala, and Honduras; family members of Filipino World War II veterans; Afghan allies; and Ukrainians. *See e.g.*, Schacher Decl., ECF 175-76; Declaration of Morton H. Halperin ("Halperin Decl."), ECF 175-66; Declaration of Eric Schwartz ("Schwartz Decl."), ECF 175-69.

118. Likewise, both before and after the passage of IIRIRA, Congress has passed legislation extending parole, or various benefits and services, to individuals benefitting from the executive's programmatic or large-scale uses of parole. *See, e.g.*, IIRIRA, Pub. L. No. 104-208, Div C, § 646, 110 Stat. 3009-546, 3009-709 , Tr. Ex. 10; National Defense Authorization for Fiscal Year 2020, Pub. L. No. 116-

92, § 1758, 133 Stat. 1198, 1860–61 (2019), Tr. Ex. 14; Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43, Div. C, 135 Stat. 344, 372-379 (Sept. 30, 2021), Tr. Ex. 15; Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136 Stat. 1211 (May 21, 2022), Tr. Ex. 16.

119. For example, in IIRIRA itself, Congress granted a group of Polish and Hungarian people who were paroled into the United States between 1989 and 1991 the ability to adjust their status to lawful permanent residence.  IIRIRA, § 646, 110 Stat. at 3009-709, Tr. Ex. 10.

120. When passing IIRIRA, Congress also reaffirmed and reauthorized the Cuban Adjustment Act of 1966, which allowed Cuban parolees to become lawful permanent residents after a year.  Schacher Decl., ECF 175-76 ¶ 51.

121. In 2019, Congress ratified the military family parole program created years earlier by the Obama administration and effectively mandated its continuation through legislation that defined a class (certain family members of U.S. service members) and ordered case-by-case consideration of requests for parole of individual members of that class.  National Defense Authorization for Fiscal Year 2020, § 1758, 133 Stat. at 1860–61, Tr. Ex. 14; *see also* Schacher Decl., ECF 175-76 ¶ 28.

122. In 2021 and 2022, Congress extended benefits to Afghans and Ukrainians who had received, or who would in the future receive, parole through parole programs created by the Biden administration.  *See* Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43, Div. C., 135 Stat. at

372-379, Tr. Ex. 15; Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136 Stat. 1211 (May 21, 2022), Tr. Ex. 16.

### *Historical Uses of the Parole Authority*

123.   Ever since the parole authority was codified in Section 212(d)(5) of the 1952 INA, parole has been a frequently used tool of successive administrations to advance the public interest by furthering important foreign policy goals.  *See, e.g.*, Schacher Decl., ECF 175-76 ¶ 7; Halperin Decl., ECF 175-66 ¶ 3; Schwartz Decl., ECF 175-69 ¶ 11; *see infra* ¶¶ 148-151.

124.   For example, the parole authority has been used multiple times to facilitate the entry of nationals of Cuba during and after the Cold War, as well as nationals of Vietnam and other Southeast Asian countries following the Vietnam War, all in the interest of furthering key foreign policy goals.  *See, e.g.*, Schacher Decl., ECF 175-76 ¶¶ 33, 42–43; Halperin Decl., ECF 175-66 ¶¶ 11, 21–23, 28, 32–33, 35; Schwartz Decl., ECF 175-69 ¶¶ 13, 19–20, 22, 29.

125.   The parole authority has enabled administrations to serve urgent humanitarian needs and promote the national interest through advancing negotiating objectives with foreign governments, and through achieving humanitarian, human rights, anti-trafficking, and regional security goals, among others.  *See, e.g.*, Schwartz Decl., ECF 175-69 ¶¶ 8-11, 41; Halperin Decl., ECF 175-66 ¶¶ 3, 35.

126.   Throughout the seven decades since codifying the parole authority in the 1952 INA, Congress has extended various immigration benefits and other related benefits to individuals who were or will be paroled into the United States through a parole program.  Schacher Decl., ECF 175-76 ¶ 8.

127.	Throughout the seven decades since codifying the parole authority in the 1952 INA, Congress has never once revoked parole granted to individuals who were paroled into the United States through a parole program created by any administration. *Cf. id*. at ¶ 8.

128.	Throughout the seven decades since codifying the parole authority in the 1952 INA, Congress has never taken action to halt the executive's programmatic use of the parole authority or to otherwise constrain the executive's authority to so use that authority. *Cf. id.* at ¶ 8.

129.	Even when Congress has not affirmatively extended benefits or otherwise expressed approval of a specific exercise of the parole authority by the executive, it has consistently refused to amend the statutory parole provision to limit the executive's programmatic use of parole.  *Id.* at ¶ 8.

130.	Although Congress has broadly outlined the reasons why the executive may parole individuals into the country—*e.g.*, for "urgent humanitarian reasons or significant public benefit"—Congress has declined to delineate with more specificity the circumstances under which the executive may grant parole, leaving those circumstances up to the discretion of the executive.  *Id.* at ¶¶ 8, 21.

131.	No programmatic exercise of the parole authority has ever been subsequently held unlawful by a court.  Schacher Decl., ECF 175-76 ¶ 8.

132.	Historical uses of the executive parole authority and subsequent congressional action expressing approval of executive parole programs include, but are not limited to:

a.   Hungarian Parole (1956): In 1956, President Dwight D. Eisenhower began issuing a series of orders that ultimately resulted in the parole of approximately 30,000 Hungarian nationals fleeing Soviet repression of the Hungarian Revolution. *See, e.g.*, Dep't of Justice, Immigration and Naturalization Serv., *Annual Report of the Immigration and Naturalization Serv.* 2–3 (1957), Tr. Ex. 17; Schacher Decl., ECF 175-76 ¶¶ 13, 31.

b.   The goal of this early parole program was to support opponents of communism in a non-military fashion, shore up Cold War alliances (especially with Austria and Yugoslavia, where most Hungarians initially fled), and reassert America's moral leadership by promoting solutions to refugee and migration crises.  Schacher Decl., ECF 175-76 ¶¶ 13, 31.

c.   In 1958, Congress enacted legislation to allow these Hungarian parolees to become lawful permanent residents (and eventually, U.S. citizens).  *Id.*; *see also* Hungarian Refugees Relief Act Pub. L. No. 85-559, § 2, 72 Stat. 419, 420 (1958), Tr. Ex. 18.

d.   Cuban Parole (1961-1975): Beginning with the Kennedy administration in 1961 and lasting through the Ford administration in 1975, more than 400,000 Cubans were paroled into the United States.  Schacher Decl., ECF 175-76 ¶¶ 14–15.

e.   In 1965, Congress amended the INA and expressed awareness of large parole programs, but did not numerically limit or make any other changes to the parole statute.  *Id.* at ¶ 15.

f.   In 1966, Congress enacted the Cuban Adjustment Act ("CAA"), which granted past and future Cuban parolees the ability to adjust status to lawful permanent residence after one year.  *Id*. at ¶ 16; *see also* The Cuban Adjustment Act, Pub. L. No. 89-732, §§ 1–2, 80 Stat. 1161 (1966), Tr. Ex. 19.

g.   <u>Vietnamese, Cambodian, and Laotian Parole (1975-1998)</u>: In the aftermath of the Vietnam War, the United States government paroled Vietnamese nationals (and subsequently also Cambodian and Laotian nationals) through a series of programs adopted over the course of more than two decades as part of a broader international effort to better manage the migration of Vietnamese people seeking to leave the country.  Schacher Decl., ECF 175-76 ¶¶ 33-41.

h.   In 1975, Congress ratified the first of multiple parole programs created by the executive for Vietnamese nationals by funding the parole processing of over 100,000 individuals through the Indochina Migration and Refugee Assistance Act.  The Indochina Migration and Refugee Assistance Act of 1975, Pub. L. No. 94-23, §§ 1–2, 89 Stat. 87 (1975), Tr. Ex. 20.

i.   <u>Cuban/Haitian Entrant Parole (1980)</u>: In April 1980, thousands of Cubans began arriving in Florida from Mariel, Cuba, in what eventually became known as the Mariel Boatlift.  Mirta Ojito, *The Long Voyage from Mariel Ends*, NEW YORK TIMES (Jan. 16, 2005), https://www.nytimes.com/2005/01/16/weekinreview/the-long-voyage-from-mariel-ends.html, Tr. Ex. 21.

j.  Initially, these individuals were granted parole for 60 days and allowed to seek asylum under the procedures of the newly enacted Refugee Act of 1980.  U.S. Dep't of State, *Cuban Haitian Arrivals in the U.S.* (1980), , Tr. Ex. 22. As more Cubans and Haitians continued to arrive and the crisis escalated, INS announced within a span of four months that it would extend and then re-extend six-month grants of parole to already-arrived Cubans and Haitians.  *Id.*

k.  More than 125,000 Cubans and 25,000 Haitians were paroled.  *See* Ruth Ellen Wasem, *U.S. Immigration Policy on Haitian Migrants*, CRS Report for Congress 1 n.1 (last updated Jan. 22, 2007), https://www.fosterglobal.com/policy_papers/CRSUSPolicyTowardHaitian Immigrants.pdf, Tr. Ex. 23.

l.  Congress subsequently authorized benefits for both past and future Cuban and Haitian parolees in the Refugee Education Assistance Act of 1980. The Refugee Education Assistance Act of 1980, Pub. L. No. 96-422, 94 Stat. 1799 (1980), Tr. Ex. 24.

m.  Lautenberg Parole Program (1988 – 2012): In 1988, under the Reagan administration, the Attorney General began paroling people from the Soviet Union who had been denied refugee status, but whose parole he deemed to be in the public interest—particularly members of historically persecuted groups, such as Soviet Jews and Evangelical Christians.  Schwartz Decl. ECF 175-69 ¶ 38; *see also* Ruth Marcus, *U.S. Moves to Ease Soviet Emigres' Way*, WASHINGTON POST (Dec. 9, 1988),

31

https://www.washingtonpost.com/archive/politics/1988/12/09/us-moves-to-ease-soviet-emigres-way/fa59b7a5-d203-42d5-8f40-e9da4d60eab8/, Tr. Ex. 25.

n.      That parole program was subsequently extended to other populations of particular concern to U.S. foreign policy interests, namely nationals of Vietnam, Cambodia, and Laos. *See, e.g.*, Schwartz Decl., ECF 175-69 ¶ 38; Schacher Decl., ECF 175-76 ¶ 18.

o.      In 1989, as part of an annual appropriations bill, Congress enacted legislation (the "Lautenberg Amendment") that modified the refugee status determination process for certain nationals of the Soviet Union, Vietnam, Cambodia, and Laos, and that additionally authorized individuals from these countries who had been denied refugee status but paroled into the country to adjust their status to that of a lawful permanent resident after one year.   Foreign Operations, Export Financing, and Related Programs Appropriations Act, Pub. L. No. 101-167, § 599E, 103 Stat. 1195, 1263–64 (1989), Tr. Ex. 26.

p.      Notwithstanding occasional lapses, Congress has generally reauthorized and extended the Lautenberg Amendment as part of its annual appropriations process, demonstrating Congressional approval of the continued use of parole for individuals determined not to meet the legal definition of a refugee and for the continued ability of those parolees to become lawful permanent residents and, eventually, United States citizens. Schwartz Decl., ECF 175-69 ¶ 40.

32

q.     "Orderly Departure Program" for Vietnamese Parole (1989-1999): Because the continued displacement of Vietnamese nationals during and following the Vietnam War was destabilizing to neighboring countries, the United Nations High Commissioner for Refugees worked with the Vietnamese government and other countries to create the Orderly Departure Program ("ODP") to try and better manage migration.  Schacher Decl., ECF 175-76 ¶ 35; *see also* United States General Accounting Office (GAO), *Refugee Program: The Orderly Departure Program from Vietnam* 2 (April 1990), , Tr. Ex. 27.

r.     Under the ODP, the United States and other western countries committed to receive Vietnamese nationals directly from Vietnam, while Vietnam itself committed to deter irregular (and dangerous) migration by boat. Schacher Decl., ECF 175-76 ¶ 39.

s.     Between 1990 and 1994, over 45,000 Vietnamese nationals—mostly family members of Vietnamese ineligible for immigrant visas, former United States government employees, former reeducation prisoners denied refugee status, and accompanying relatives—were paroled into the United States under the ODP.  *Id.*

t.     Cuban Migration Accords Parole (1994 - present): In September 1994, in response to a sharp increase in irregular sea migration from Cuba, the United States and Cuba jointly agreed to pursue policies designed to reduce such irregular migration of Cubans to the United States, including a pledge from the United States to allow a minimum level of 20,000 Cubans to

migrate legally to the United States each year, not counting the immediate relatives of United States citizens. *See, e.g.*, Halperin Decl., ECF 175-66 ¶ 20; Schacher Decl., ECF 175-76 ¶¶ 46-48; Schwartz Decl., ECF 175-69 ¶¶ 13-17.

u.   To help achieve this, and to include people likely to migrate irregularly via sea, the Attorney General created a Special Cuban Migration Program in 1994 to allow approximately 5,000 Cuban nationals between the ages of 18 and 55 to enter the United States each year through a parole lottery. *See, e.g.*, Halperin Decl., ECF 175-66 ¶¶ 18-23; Schacher Decl., ECF 175-76 ¶¶ 47-48; Schwartz Decl., ECF 175-69 ¶ 19-20.

v.   In 1996, when passing IIRIRA, Congress reaffirmed the Cuban Adjustment Act that allowed Cuban parolees to become lawful permanent residents after a year if they are admissible at that time, mandating that the CAA stay in place until the President determines that a democratically elected government in Cuba is in power.  Schacher Decl., ECF 175-76 ¶ 51.

w.   The Cuban Adjustment Act remains in effect today and applies to all Cubans paroled into the United States (including Cubans who are paroled through the CHNV Parole Pathways).  *See* Cuban Adjustment Act, §§ 1–2, 80 Stat. 1161, Tr. Ex. 19.

x.   Resettlement Opportunity for Vietnamese Returnees (1995): In 1995, countries where displaced Vietnamese nationals had first sought refuge after the Vietnam War took steps to close refugee camps and repatriate to Vietnam individuals whom those and other countries and the United

34

Nations High Commissioner for Refugees had determined did not meet the refugee definition.  Schacher Decl., ECF 175-76 ¶ 40.

y.  In response, the United States and Vietnam negotiated an agreement called the Resettlement Opportunity for Vietnamese Returnees ("ROVR"), which required Vietnamese nationals to return to Vietnam (thereby facilitating efforts to close refugee camps in neighboring countries) to apply to be resettled in the United States as a refugee or, failing that, to enter the United States as a parolee.  *See, e.g.*, Schwartz Decl., ECF 175-69 ¶¶ 31-33; Schacher Decl. ECF, 175-76 ¶¶ 40-41.

z.  By allowing the reunification of Vietnamese families in the United States and the resettlement of key populations of interest to the United States, the ROVR program contributed crucially to the normalization of U.S.-Vietnam relations.  *See, e.g.*, Schacher Decl., ECF 175-76 ¶¶ 35-41; Schwartz Decl., ECF 175-69 ¶¶ 33-35.

aa.  Cuban Medical Professionals Parole ("CMPP") Program (2006-2017): As relations with Cuba soured in the early 2000s, the George W. Bush administration created a parole program in 2006 to allow Cuban doctors and other medical professionals working in third countries to request that they and their dependents be paroled into the United States. *See* Michael H. Erisman, Brain Drain Politics: The Cuban Medical Professional Parole Programme, International Journal of Cuban Studies, Vol. 4, No. 3/4, 2012, at 269–90, https://www.jstor.org/stable/41946012, Tr. Ex. 29.

bb.   The "Cuban Medical Professionals Parole" program, as it was called, was designed to undermine Cuba's efforts to cultivate foreign influence through its international medical aid program, by trying to divert the medical professionals central to that program to the United States instead.  Schacher Decl., ECF 175-76 ¶ 52-53, 55.

Approximately 7,000 Cubans were paroled into the United States before the CMPP Program was wound down in January 2017 as a step toward normalizing relations with Cuba and toward a more regional and multilateral approach to managing migration and forced displacement. *Id.* at ¶ 58; *see also* Dep't of Homeland Sec., *Statement by Secretary Johnson on the Continued Normalization of our Migration Relationship with Cuba* (Jan. 12, 2017), Tr. Ex. 28.

cc.   Individuals who were paroled into the United States through the CMPP Program were eligible to adjust status to lawful permanent residence after one year pursuant to the Cuban Adjustment Act. *See* Cuban Adjustment Act, §§ 1–2, 80 Stat. 1161, Tr. Ex. 19.

dd.   Cuban Family Reunification Parole ("CFRP") Program (2007-2017; 2021 – present): In 2007, the George W. Bush administration created a parole program that would invite the Cuban national beneficiaries of certain approved family-based immigrant visa petitions to request parole so that they could reunify with their family in the United States rather than waiting in Cuba, separated from their family, for a visa number to become available. Administrative Record, Cuba AR_000001, ECF 92, Fed. Defs' Tr. Ex. A.

ee.   In the Federal Register Notice establishing the program, USCIS explained that the parole program "serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States." *Id.*

ff.   Because the Cuban Adjustment Act provides an independent statutory authority for Cuban parolees to adjust status one year after entry, those paroled into the United States under the CFRP Program may adjust status even before their family-based immigrant visa number is immediately available. *See* Cuban Adjustment Act, §§ 1–2, 80 Stat. 1161, Tr. Ex. 19.

gg.   Commonwealth of the Northern Mariana Islands/Guam Parole (2009-2019): Under the Obama administration, DHS announced that CBP generally would look favorably upon 45-day parole requests by Chinese and Russian nationals who wished to travel to the Commonwealth of the Northern Mariana Islands ("CNMI") for business or pleasure.  U.S. Customs and Border Protection, *Important Update in Entry Requirements: Parole for Citizens of the Russian Federation and the People's Republic of China for the CNMI Only* (Nov. 16, 2009), Tr. Ex. 31; *see also* Special Representatives of the United States and the Commonwealth of the Northern Mariana Islands, *Report to the President on 902 Consultations Related to the DHS Discretionary Parole Program* (2019), Tr. Ex. 32.

hh.  DHS subsequently extended the parole policy for CNMI in 2012 to include requests by Russian nationals seeking parole to enter Guam.  U.S. Customs and Border Protection, *Russian Citizens Now Eligible to Travel to Guam Visa-Free* (Jan. 26, 2012), https://www.cbp.gov/newsroom/national-media-release/russian-citizens-now-eligible-travel-guam-visa-free, Tr. Ex. 33.

ii.  According to DHS, the policy "was justified on the economic benefit such workers and visitors would provide to the U.S. territory."  International Entrepreneur Rule, 81 Fed. Reg. 60130, 60135 (Aug. 31, 2016), Tr. Ex. 34.

jj.  Military Families Parole (2013 – present): In 2013, the Obama administration issued a policy memorandum allowing for the paroling-in-place of spouses, children, and parents of active-duty military personnel and veterans who had not previously been admitted or paroled into the United States.  *See* U.S. Citizenship and Immigration Servs., Policy Memorandum: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i), PM-602-0091 (Nov. 15, 2013), Tr. Ex. 35.

kk.  The memorandum creating the military families parole program observed that "[m]ilitary preparedness can potentially be adversely affected if active members [of the U.S. military] . . . worry about the immigration status of their spouses, parents, and children."  *Id.*

ll.   Amid public reports that the Trump administration was considering ending the parole policy for military families, Congress included a provision in the National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole in place reinforces the objective of military family unity" and expressly directed the Secretary of Homeland Security to "consider, on a case-by-case basis, whether granting [a request for parole-in-place by a member of the Armed forces] would enable military family unity that would constitute a significant public benefit."  National Defense Authorization Act for Fiscal Year 2020, § 1758, 133 Stat.  at 1860, Tr. Ex. 37; Franco Ordoñez, *Trump Wants To Withdraw Deportation Protections For Families of Active Troops*, NPR (June 27, 2019), https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-deportation-protections-for-families-of-active-troops, Tr. Ex. 36.

mm.   Central American Minors Parole (2014 –present): In 2014, the Obama Administration created the Central American Minors ("CAM") Refugee and Parole Program, which allowed certain lawfully present individuals in the United States to financially sponsor their minor unmarried children in El Salvador, Guatemala, and Honduras and request that those children receive a refugee resettlement interview for potential resettlement in the United States. Schacher Decl., ECF 175-76 ¶¶ 59-60; *see also* U.S. Citizenship and Immigration Servs., *Central American Minors (CAM) Program* (June 23, 2023), Tr. Ex. 38.

39

nn.     Where an applicant to the CAM program was not deemed to be a refugee but was nonetheless determined to be at risk of harm in their country, USCIS would consider whether the child merited a grant of parole as a matter of discretion.  Schacher Decl., ECF 175-76 ¶ 60.

oo.     The Trump administration sought to terminate the CAM Parole Program in 2017 but was enjoined from doing so.  *See S.A. v. Trump*, No. 18-cv-0353-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019).

pp.     A subset of Plaintiff States have filed a lawsuit challenging the legality of the Biden administration's attempt in 2021 to reimplement and expand the CAM program, but the program has not been enjoined or vacated and otherwise remains operational.  *Texas v. Biden*, No. 3:22-cv-780-X (N.D. Tex. filed Jan. 28, 2022).

qq.     Haitian Family Reunification Parole ("HFRP") Program (2014 - present): In 2014, the Obama administration created a program to allow the Haitian national beneficiaries of certain approved family-based immigrant visa petitions to be paroled into the United States to reunify with their family and adjust status to that of a lawful permanent resident, rather than waiting in Haiti, separated from their family, for the visa to become available.  *See* Administrative Record, Cuba AR_000002, ECF 92, Fed. Defs' Tr. Ex. A; Schacher Decl., ECF 175-76 ¶ 61.

rr.     Like the similar Cuban Family Reunification Parole Program, the HFRP Program recognized that "[b]y expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by

promoting safe, legal, and orderly migration to the United States."  Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 Fed. Reg. 7,5579, 75,582 (Dec. 18, 2014).

ss.     The Federal Register Notice about the program also acknowledged that the program would promote family unity and expedite the ability of parole beneficiaries to obtain employment authorization and earn wages that could be returned to Haiti through remittances to help fund "the rebuilding and development of a safe and economically strong Haiti," a "priority for the United States."  *Id.*

tt.     Approximately 8,300 applications for parole have been approved through the HFRP Program.  Schacher Decl. ECF 175-76 ¶ 61.

uu.     <u>Filipino World War II Veterans Parole ("FWVP") Program (2016 – present)</u>: In 2016, the Obama administration created a parole program that would facilitate the case-by-case, discretionary parole into the United States of certain family members of approximately 2,000 to 6,000 surviving U.S. citizens or lawful permanent residents of Filipino descent who served in the U.S. military during World War II.   Administrative Record, Cuba AR_000006, ECF 92, Fed. Defs' Tr. Ex. A.

vv.     The administration identified as the significant public benefit of the FWVP program that it would "recognize[] the extraordinary contributions and sacrifices of Filipino veterans who fought for the United States during World War II" and also "enhance[] the ability of such elderly veterans and

41

their spouses to obtain care and support from their family members abroad"
thereby addressing urgent humanitarian concerns.  *Id.*

ww.  Operation Allies Refuge/Operation Allies Welcome (2021 - present): As the
U.S. government wound down its military presence in Afghanistan, the
Biden administration adopted a parole process for Afghan nationals
evacuated from the country, including journalists, human rights activists,
humanitarian workers, the family members of American citizens and lawful
permanent residents, and individuals at risk because of their valuable
service to the United States during its military presence in Afghanistan.
Dep't of Homeland Sec., *Operation Allies Welcome Afghan Parolee and
Benefits Report* (May 8, 2023), Tr. Ex. 39.

xx.  In September 2021, Congress enacted the Afghanistan Supplemental
Appropriations Act, which made paroled Afghan nationals eligible for
various benefits and services. Extending Government Funding and
Delivering Emergency Assistance Act, 135 Stat. at 372-379, Tr. Ex. 40.

yy.  As of March 2023, more than 90,000 Afghan nationals had been welcomed
to the United States through Operation Allies Welcome and more than
76,000 were eligible for the benefits made available in the September Act.
Dep't of Homeland Sec., *Operation Allies Welcome Afghan Parolee and
Benefits Report* (May 8, 2023), Tr. Ex. 41.

zz.  Uniting for Ukraine ("U4U") Parole Process (2022 – present): Following
Russia's unprovoked invasion of Ukraine in February 2022, the Biden
administration created the U4U Parole Process to facilitate the parole into

42

the United States of certain displaced Ukrainian nationals and their immediate family members because of a dramatically sharp increase in asylum-seeking Ukrainian nationals presenting at the southwest border in March and April 2022.  Administrative Record, Cuba AR_000069, ECF 92, Fed. Defs' Tr. Ex. A.

aaa.    Ukrainian nationals seeking parole through the program must be supported by one or more individuals or entities in the United States who have demonstrated to USCIS that they have sufficient income and resources to support the parole beneficiary for two years.   ECF 92-1 at Cuba AR_000070–71; Schacher Decl., ECF 175-76 ¶ 62.

bbb.    In May 2022, Congress passed legislation to provide various benefits and services to Ukrainian parolees.  Additional Ukraine Supplemental Appropriations Act, 136 Stat. 1211, Tr. Ex. 42.

ccc.    As of July 13, 2023, approximately 141,200 Ukrainian nationals had been welcomed into the United States through the U4U process.  Camilo Montoya-Galvez, *U.S. has welcomed more than 500,000 migrants as part of historic expansion of legal immigration under Biden,* CBS News (July 18, 2023),  https://www.cbsnews.com/news/immigration-parole-migrants-us-expansion-biden/.

ddd.    <u>Parole Process for Venezuelans (2022)</u>: Based on the success of the U4U Parole Process, the Biden administration announced a Parole Process for Venezuelans in October 2022.  Administrative Record, Cuba AR_000073, ECF 92, Fed. Defs' Tr. Ex. A.

eee. Like U4U, the Venezuela Parole Process required a financial sponsor present in the United States to commit to supporting the parole beneficiary for two years.  Administrative Record, Cuba AR_000074, ECF 92, Fed. Defs' Tr. Ex. A.

fff. Unlike U4U, which contained no numerical limitation, the Venezuela Parole Process was capped at 24,000 grants of parole.  *Id.*

ggg. The Federal Register Notice about the program emphasized that the temporary and case-by-case parole of Venezuelan nationals "will provide a significant public benefit for the United States" by enhancing border security, reducing irregular migration, allowing the vetting of individuals before they arrive in the United States, reducing strain on DHS personnel and resources at the border, disincentivizing a dangerous journey that endangers migrants and enriches smuggling networks, and fulfilling important foreign policy goals to manage migration collaboratively with regional partners.  *Id.*

### The CHNV Parole Pathways as Compared to Prior Parole Programs

133. As the FRN for each CHNV Pathway states, each "will provide a significant public benefit" by "reducing unauthorized entries;" "reducing irregular migration" and "vetting individuals prior to their arrival at a U.S. [Port of Entry];" "minimize[ing] the domestic impact of irregular migration;" "disincentiviz[ing] a dangerous and irregular journey that puts migrant lives and safety at risk and enriches smuggling networks;" and "fulfill[ing] important foreign policy goals to manage migration collaboratively in the hemisphere."  88 Fed. Reg. 1266 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243 (Implementation of a Parole Process for

Haitians); 88 Fed. Reg. 1255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelan).

134.    The justifications provided in the Federal Register Notices for the CHNV Parole Pathways are similar in many respects to the humanitarian, foreign policy, and migration control goals of prior parole programs.  Schacher Decl., ECF 175-76 ¶ 63.

135.    *Reducing irregular migration*: The statutory parole authority has historically been used to manage and control migration challenges—frequently at the Southwest border and in coastal waterways—in a flexible way.  Schwartz Decl., ECF 175-69 ¶¶ 9, 11; *see also* Halperin Decl., ECF 175-66 ¶ 35.

136.    For example, multiple parole programs were created as part of the Cuban Migration Accords to address a dramatic increase in Cubans attempting to leave the country by boat in the early- to mid-1990s.  Halperin Decl., ECF 175-66 ¶ 4.

137.    It was a priority of the Clinton administration to direct Cuban migration into safe, legal, and orderly channels because irregular migration by sea posed a significant risk to the lives of the migrants and also consumed Coast Guard resources due to interdiction and rescue efforts.  Schwartz Decl., ECF 175-69 ¶ 14-16.

138.    Similarly, both the 2022 Ukraine and Venezuela Parole Processes were adopted in response to sharp increases in encounters with nationals of those countries at the Southwest border.  *See supra* ¶¶ 3, 5, 10, 132.zz-ggg.

139.    The Federal Register Notices for the CHNV Parole Pathways acknowledge "increasing numbers of encounters" at the nation's borders and identify as a

significant public benefit the channeling of dangerous and irregular migration into safer pathways. *See, e.g.*, 88 Fed. Reg. 1255, 1256 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1266, 1267 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243, 1244 (Implementation of a Parole Process for Haitians); 87 Fed. Reg.  63507 (Implementation of a Parole Process for Venezuelans).

140.    *Vetting individuals prior to entry.* The CHNV Parole Pathways require potential parole beneficiaries to apply, be vetted, and qualify for travel authorization before coming to the United States and presenting themselves at an interior port of entry for inspection and consideration for discretionary parole.  U.S. Citizenship & Immigration Services, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (June 14, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans, ECF 175-3.

141.    In a similar fashion, the United States worked with the Government of Vietnam to adopt screening and processing capability within Vietnam during the ROVR program so that Vietnamese nationals could be vetted and come to the United States directly from Vietnam rather than embark on dangerous journeys to transit countries where they would live in refugee camps.  Schwartz Decl., ECF 175-69 ¶¶ 31-33; Schacher Decl., ECF 175-76 ¶¶ 40-41.

142.    Like all previous parole programs, each potential parole beneficiary for the CHNV Pathways is assessed on a case-by-case basis and must pass background checks. Schacher Decl., ECF 175-76 ¶ 64.

143. In addition, like the CAM program for Central American Minors, ODP for Vietnamese nationals, and the 2022 Ukrainian and Venezuelan parole programs, the CHNV Pathways require each parole beneficiary to have a financial supporter in the United States whose application must be approved before parole can be granted. *Id*. ¶¶ 59-60, 64; *see also* U.S. Citizenship and Immigration Servs., *Central American Minors (CAM) Program* (June 23, 2023), Tr. Ex. 38; Administrative Record, Cuba AR_000069-72, ECF 92, Fed. Defs' Tr. Ex. A; *id.* at Cuba AR_000073–83.

144. *Disincentivizing irregular travel that endangers migrants and enriches smugglers.* Irregular migration puts migrants' lives at risk and can be frequently facilitated by smugglers. Schacher Decl. ECF 175-76 ¶ 64.

145. DHS has cited the reduction of irregular migration that endangers migrants as a significant public benefit justifying prior parole programs, including the Cuban Family Reunification Parole Program and the Haitian Family Reunification Parole Program. Administrative Record, Cuba AR_000001, ECF 92, Fed. Defs' Tr. Ex. A; U.S. Citizenship and Immigration Services, *DHS To Implement Haitian Family Reunification Parole Program* (October 17, 2014), Tr. Ex. 43.

146. The Federal Register Notices for the CHNV Pathways identify as a significant public benefit the reduction and deterrence of irregular migration that enriches smuggling networks and endangers vulnerable migrants. *See, e.g.*, 88 Fed. Reg. 1255, 1261-62 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1266, 1273-74 (Implementation of a Parole Process for Cubans); 88 Fed. Reg.1243,

1250-51 (Implementation of a Parole Process for Haitians); 87 Fed. Reg.  63507, 63512-13 (Implementation of a Parole Process for Venezuelans).

147.  *Fulfilling important foreign policy goals.*   Consistent with prior parole programs, the CHNV Pathways are part of a broader foreign policy strategy to enhance cooperation and burden-sharing throughout the Americas to address common migration challenges.  Schacher Decl. ECF 175-76 ¶ 65;  Nuñez-Neto Decl. Fed. Defs' Tr. Ex. HH ¶ 48-51.

148.  Like the ODP and ROVR programs that worked with other stakeholder countries and the United Nations High Commissioner on Refugees to allow the parole of Vietnamese nationals directly into the United States, the CHNV Pathways are part of a broader collaborative foreign policy strategy intended to encourage safe migration pathways and work with key regional allies to stabilize migrants in host communities experiencing high outward migration.  Nuñez-Neto Decl. Fed. Def's Tr. Ex. HH ¶ 49; *see also* The White House, Los Angeles Declaration on Migration and Protection (June 10, 2022),  (endorsed in June 2022 by 21 countries), Tr. Ex. 44.

149.  Like the Uniting for Ukraine program, the federal government is employing the CHNV Pathways in combination with efforts to increase the resettlement in the United States of refugees from Cuba, Haiti, Nicaragua, and Venezuela, and in support of efforts by other countries in the region to host and extend protections to similar groups.  Schacher Decl., ECF 175-76 ¶ 65.

150.  In addition, the CHNV Pathways are similar to other parole programs, such as those pertaining to the parole of Vietnamese and Cuban nationals, wherein the number of

people considered for parole is linked to relations and negotiations with foreign governments, including origin and transit or regional countries. *Id.* at ¶ 66.

F.     **The Scope and Impacts of the CHNV Pathways**

151.   *Uniting for Ukraine.* Southwest border encounters with Ukrainians ballooned from a couple hundred per month in the first quarter of 2022 to over 20,000 in April 2022. Ukrainian SW Border Encounters for FY2022, Tr. Ex. 56.

152.   Within a month of the announcement and adoption of the Uniting for Ukraine program, border encounters with Ukrainians fell by over 80% and have remained lower than recent levels ever since. *Id.*; Ukrainian SW Border Encounters for FY 2023, Tr. Ex. 57.

153.   *Irregular migration.* For FY 2021, FY 2022, and the first quarter of FY2023, CBP data show increasing border encounters with Cuban, Haitian, Nicaraguan, and Venezuelan nationals that reached a peak of over 90,000 encounters in December 2022.  CHNV SW Border Encounters for FY2021, Tr. Ex. 53, CHNV SW Border Encounters for FY 2022, Tr. Ex. 54.

154.   In January 2023, when the CHNV Pathways were implemented, border encounters with nationals from these four countries dropped by over 75%.  CHNV SW Border Encounters for FY2023, Tr. Ex. 55.

155.   Since the CHNV Pathways were implemented, border encounters with nationals from those four countries have remained at levels well below the numbers of southwest border encounters recorded in FY2022. CHNV SW Border Encounters for FY2023, Tr. Ex. 55.

156.   "As was the case following the implementation of the parole process for Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between ports of entry dropped significantly after DHS introduced the new processes, from a seven-day average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven-day average of 205 just two weeks later." Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶ 26.

157.   "The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop and represented a significant decline of 94 percent from the peak [Cuban, Haitian, Nicaraguan, and Venezuelan] encounters of 3,644 on December 10, 2022." *Id.*

158.   Encounters with nationals of Cuba, Haiti, Nicaragua, and Venezuela at the Southwest border have since remained below the levels recorded for most of FY2022.  Tr. Ex. 50.

159.   Since the implementation of the CHNV Pathways, the release (subject to strict conditions) of nationals of Cuba, Haiti, Nicaragua, and Venezuela have been reduced by over 90%, from over 2,300 per day to less than 300 per day. *See* Nuñez-Neto Decl. Fed. Defs' Tr. Ex. HH ¶¶ 29, 30–31.

160.   The CHNV Parole Pathways have reduced the number of conditional releases of nationals of Cuba, Haiti, Nicaragua, and Venezuela. *Id.*

161.   The reduction of irregular migration by Cuban, Haitian, Nicaraguan, and Venezuelan nationals since the creation of the CHNV Pathways has in turn reduced pressure on the Southwest border in general, as border encounters with nationals of those four countries represented a significant percentage of all Southwest border

encounters before the CHNV Parole Pathways were adopted. *Compare* SW Border Encounters, All Nationalities, for FY 2021 and 2022, Tr. Ex. 48, 49 *with* SW Border Encounters, All Nationalities, for FY 2023, Tr. Ex. 50.

162.    By March of 2023, individuals from all the CHNV Pathway countries made up only 3% of those stopped at the border, a 37-percentage point drop from December. Elliot Spagat, *Why Nationalities Matter As U.S. Braces for Migration Surge*, AP News (May 3, 2023), https://apnews.com/article/immigration-asylum-title-42-biden-border-aed92da15e23875a8049d413ca3b4eef.

163.    Although the Parole Pathways limit grants of travel authorization to a total of 30,000 individuals per month, they have produced a much larger corresponding decrease in net migration. Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶¶ 20, 26, 33; *see* Mem. of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief, ECF 222 at 10-12.

164.    The significant reduction in Southwest border encounters has allowed DHS to focus more of its resources on its primary mission: border security.  Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶ 28.

165.    The reduction in border encounters with, and conditional releases of, Cuban, Haitian, Nicaraguan, and Venezuelan nationals has also alleviated pressures on border communities and the non-governmental organizations ("NGOs") who serve those communities.  *Id.* at ¶ 34.

166.    Before the CHNV Pathways were adopted, local officials and NGOs reported concerns that shelters established to provide housing and support to noncitizens

apprehended at the border would reach capacity, which would limit key services to support noncitizens once they were processed out of DHS custody. Raquel Torres, *Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022), Tr. Ex. 60; Denelle Confair, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day*, KGUN9 Tucson (Sep. 22, 2022), Tr. Ex. 62.

167.   *Overall arrivals to the United States.* Nationwide encounters—of any kind—of nationals from Cuba, Haiti, Nicaragua, and Venezuela trended upward through FY2021, FY2022, and the first quarter of FY2023, peaking at nearly 100,000 encounters in December 2023. Mem. of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief, ECF 222 at 10-12.

168.   In January 2023, when the CHNV Pathways began operation alongside the already-implemented Venezuela Parole Pathway, nationwide encounters of nationals from these four countries dropped by over 64,000 to less than a quarter of the previous month's total, and has since remained well below the levels observed at the high-water mark in December 2022. *Id.* at 10-11.

169.   Since their adoption in October 2022 (for the Venezuela Parole Pathway) and January 2023 (for the Cuba, Haiti, and Nicaragua Parole Pathways), the CHNV Pathways have reduced total arrivals to the United States, including through irregular migration, of nationals of these four countries.  Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶¶ 18–28.

170.    The impact of the CHNV Pathways in reducing irregular as well as overall migration from Cuba, Haiti, Nicaragua, and Venezuela is similar to that of the Uniting for Ukraine Parole Process, launched in April 2022. *See id.*; *see also* 87 Fed. Reg.  63507, 63508-09 (Implementation of a Parole Process for Venezuelans); Mem. of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief, ECF 222 at 6-7.

**G.    Texas' Alleged Injuries from the CHNV Pathways.**

171.    Texas is the only Plaintiff State that has offered or will offer any evidence of alleged injury caused by the CHNV Pathways.  Joint Notice of Stipulations ("Joint Stip.") ECF 139.

172.    Texas claims injury based on four asserted areas of harm: (1) "each" person seeking a driver's license in Texas creates an expense for Texas; (2) that, as the population of undocumented immigrants in Texas increases, "the education costs to the State will increase"; (3) that "some" undocumented immigrants "admitted through the Program will require [as many as three state-funded healthcare] services, causing Texas to incur [unspecified] costs"; and (4) the costs of "increased law enforcement as its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to [undocumented] immigration." Pl's P.I. ECF 22 at 10-14.

173.    Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the increased presence of noncitizens in Texas.  Fed. Defs' Tr. Ex. O at 12.

174. Texas has not asserted that more Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Pathways than were entering prior to the promulgation of these processes. *Id*. at 24.

175. Texas admits it cannot assert that more Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Pathways than were entering prior to the promulgation of these processes. *Id*.

176. Texas admits it has no basis to deny the Federal Defendants' data establishing that fewer Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Pathways than were entering prior to the promulgation of these processes. *Id*. at 15-20, 24-26.

177. Thus, Texas's injury is solely attributable to the claim that Texas is experiencing population increase due to the CHNV Pathways. *Id*.

178. Since the CHNV Pathways were initiated, the number of documented and undocumented migrants from CHNV countries has decreased. Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶¶ 26, 29, 31 n.16.

179. Texas is not suffering increased costs attributable to the CHNV Pathways. *See supra* ¶¶ 173-178.

180. The introduction of the CHNV Pathways has reduced undocumented and overall migration from CHNV countries. Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶¶ 26, 29, 31 n.16.

181. The CHNV Pathways have not created a significant threat of increased costs to Texas.

182. Texas has admitted that it does not collect data about CHNV parolees. ECF 175-37; 175-38.

183. Texas's claims of injury are not tied to any individual who has been granted parole under the CHNV Pathways.

184. Texas refers frequently to "illegal aliens" when it is indeed referring to undocumented immigrants. *See, e.g.*, Pls' P.I., ECF 22 at 12-13.

185. Texas has not produced any evidence that costs associated with other populations of immigrants, including undocumented immigrants, unaccompanied immigrant children, and CHNV nationals generally, are attributable to costs associated with the CHNV Pathways.

186. Texas has not produced any evidence that costs associated with other populations of immigrants, including undocumented immigrants, unaccompanied immigrant children, and CHNV nationals generally, are representative of costs associated with the CHNV Pathways.

187. In other words, Texas's claims of harm stem from the fiscal costs incurred by Texas by virtue of providing governmental services to those residing within its borders. Tr. Ex. 22 at 10-14.

188. Texas's allegations of injury suggest discriminatory intent because they propagate false stereotypes about immigrants that are unsupported by the factual record and based on irrelevant comparisons, *compare* Pls' P.I, ECF 22 *with* Pls' Tr. Ex. 4-7, and contradicted by widely available empirical evidence. *See, e.g.*, Joint Expert

Declaration of Patricia Gándara and Gary Orfield ("Gándara and Orfield Decl.") ECF 175-71; Hunt Decl. 175-72; Expert Declaration of Leighton Ku ("Ku Decl.") 175-73; Expert Declaration of Charis Kubrin ("Kubrin Decl.") 175-74; Expert Declaration of Cyierra Roldan ("Roldan Decl.") 175-75.

189.   Texas has not produced evidence of offsetting fees, reimbursements, and other countervailing benefits directly associated with its claims of alleged financial injury. *See e.g.*, Pls' Tr. Ex. 4-7.

### Texas's Alleged Costs

#### Drivers' licenses

190.   Texas has not provided evidence that it has or will incur any driver license costs attributable to CHNV Pathways parolees. *See* Pls' Tr. Ex. 4; ECF 22-3.

191.   Texas provides an improbably high estimate of the likely cost to the state of issuing drivers licenses to paroled individuals from Cuba, Haiti, Nicaragua, and Venezuela who may reside in Texas. Roldan Decl., ECF 175-75 ¶ 3.

192.   Texas estimates that the cost of issuing drivers' licenses to new Texas residents is $200 per person on a biennial basis, but attributes the vast majority of that estimated cost—approximately $197.89—to additional technology, staff, and office space. *Id.* ¶¶ 10, 13.

193.   Texas has only calculated estimated expenses to provide driver's licenses and has not incorporated revenues Texas receives for providing driver's licenses. *Id.* at ¶ 25.

194.   Many of Texas's DMV offices "are already at a staffing level that would allow them to handle an increase [in customers] …since no [single] Department of Motor Vehicle office will be serving all the newly admitted residents." *Id.* at ¶ 14.

56

195. Texas has already allotted funding for 175 additional DMV staffers to meet expected demand, and those positions have not yet been filled.  *Id*. at ¶¶ 17–20.

196. Texas has extant excess DMV capacity to handle population flows.  Roldan Decl., ECF 175-75 at ¶¶ 17–20.

197. Texas has not proven that its projected infrastructure estimates are realistic, likely, or reliable.

198. Texas has not proven that it will incur a financial loss from the provision of driver's licenses to additional Texas residents present through the CHNV Pathways.

199. Texas is "among the nation's fastest-growing, largest-gaining states" with the majority of its population growth since 2000 resulting from "natural increases (more births than deaths)" and net domestic migration gains.  Tr. Ex. 64.

200. The 10,000 additional driver's licenses Texas estimates it will have to issue as a result of the CHNV Pathways pale in comparison to those it issues to the approximately 385,000 intra-country migrants that move to Texas, which Texas has welcomed, and the 425,000 Texas residents who turn 16 every year.  Roldan Decl., ECF 175-75 at ¶ 16; *see also* ECF 175-45; ECF 175-46; ECF 175-47.

201. Texas has also failed to factor in additional offsetting fees resulting from issuing drivers' licenses to new residents, including title and registration fees, and transit authority surcharges.  *Id.* at ¶¶ 23-24.

202. Texas has failed to factor in additional revenues to the state when individuals who are issued driver's licenses subsequently purchase vehicles.  *Id.* at ¶¶ 26-29.

### *Education*

203.   Texas has not provided evidence that it has or will incur costs associated with the education of individuals who enter the state through the CHNV Pathways.  *See* Pls' Tr. Ex. 6; ECF 22-4.

204.   Texas's claims of financial injury stemming from education services concern its own estimated costs of providing "bilingual and compensatory" education. Pls' Tr. Ex. 6 ¶ 3; ECF 22-4 ¶ 4.

205.   Texas does not explain the sources or methodology it used to arrive at its estimated projections, nor does it provide supporting financial documents. Gándara and Orfield Decl., ECF 175-71 ¶¶ 12-13.

206.   Texas has not proven that its projected educational cost estimates are realistic, likely, or reliable. *See* Pls' Tr. Ex. 6.

207.   The actual costs associated with educating English language learners can be "as low as zero, depending on a myriad [of] factors," including existing infrastructure and resources and the distribution of students at a particular school.  Gándara and Orfield Decl., ECF 175-71 at ¶ 14.

208.   In Texas, bilingual education is an *opt-in* program that is only available in Texas through the Fifth Grade.  *Id.* at ¶ 15.

209.   Texas relies on estimated educational costs associated with Unaccompanied Immigrant Children ("UCs") to support its alleged injury.  Pls' Tr. Ex. 6; ECF 22-4.

210.    UCs are excluded from eligibility for the CHNV Pathways. United States Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 12, 2023), ECF 175-3.

211.   Children who may reside in Texas after entering through the CHNV Pathways will have done so with their parents and with financial sponsorship.   Gándara and Orfield Decl., ECF 175-71 ¶ 16.

212.   Texas has not provided evidence that the estimated costs it relies on are reliable indicators of costs that will likely be attributable to the CHNV Pathways.

213.   Texas has not factored in documented federal reimbursements in the form of major compensatory education funds for low-income and English language learner students.   Gándara and Orfield Decl., ECF 175-71 at ¶ 18.

214.   The provision of bilingual education benefits Texas by increasing the probability of students' graduation, which raises employment and income and in turn provides substantial benefits to the state and local economy and tax revenue.   Fluency in two languages is additionally a labor market advantage, and "immigrant students who speak a non-English language fluently make these programs possible for more U.S. English-only students," who greatly benefit from these programs as well.   *Id.* at ¶ 22.

*Law Enforcement*

215.   Texas has not provided evidence that it has or will incur any law enforcement related costs as a result of the CHNV Pathways.   *See* Pls' Tr. Ex. 5; ECF 22-6.

216.   Texas produced documents concerning crime and undocumented immigration, but none of these documents supports the conclusion that crime in Texas will increase as a result of the CHNV Pathways.   *See* Pls' Tr. Ex. 5; ECF 22-6.

217.   People who are granted parole under the CHNV Pathways undergo extensive vetting and enter the United States with lawful status, financial sponsorship, and

eligibility for employment authorization.  Roldan Decl., ECF 175-75 ¶¶ 9, 11; *see also* ECF 175-3.

218.  Texas receives corresponding federal reimbursements, including documented reimbursements through the federal State Criminal Alien Assistance Program, which Texas confirms participation in.  Pls' Tr. Ex. 5 ¶¶ 5-7, 11; Tr. Ex. 63.

219.  The idea that citizens suffer increased crime as a result of undocumented immigration is untrue and has been disproven.  Kubrin Decl., ECF 175-74 ¶ 9.

220.  Research has consistently concluded that immigrants are less likely to be involved in crime compared to non-immigrants.  *Id.* at ¶ 11.

221.  Both documented and undocumented immigrants are incarcerated at lower rates than individuals who are U.S.-born.  *Id.* at ¶ 15.

222.  In Texas, research has shown higher homicide incarceration rates for U.S.-born people compared to foreign-born individuals.  *Id.* at ¶ 16.

223.  Increased immigration does not increase crime.  *Id.* at ¶¶ 17-20.

224.  If anything, immigration decreases crime.  Kubrin Decl., ECF 175-74 ¶¶ 17-20.

***Health care***

225.  Texas has not provided evidence that it has or will incur any healthcare-related costs as a result of the CHNV Pathways.

226.  Texas bases its healthcare-related injury on costs associated with undocumented immigrants who do not qualify for the Parole Pathways.  *See, e.g.*, Ku Decl., ECF 175-73 ¶ 11; *see also* ECF 175-3.

227.  Individuals who enter through the CHNV Pathways do so with authorization and financial sponsorship by individuals who assume financial responsibility, including for healthcare costs, in addition to employment authorization.  *Id.*

228.   Texas' proffered evidence purporting to show its costs for Children's Health Insurance Program ("CHIP") and non-Emergency Medicaid as a result of undocumented immigration are flawed and unreliable because undocumented immigrants are not eligible to be beneficiaries of those programs.  Ku Decl., ECF 175-73 ¶ 12.

229.   Texas also relies on evidence of claims under Emergency Medicaid and CHIP associated with all nationals from Cuba, Haiti, Nicaragua, and Venezuela, irrespective of documentation status.  Ku Decl., ECF 175-73 ¶ 11; *see also* Pls' Tr. Ex. 7 ¶ 9.

230.   Texas provides no evidence to indicate that these estimates would be reliable to determine costs it has or will incur as to individuals who are resident in Texas through the CHNV Pathways.

231.   Even so, the number of people Texas identifies would amount to only 0.007% of Texas Medicaid beneficiaries and .2% of CHIP beneficiaries—representing a "miniscule share" of Texas's beneficiaries under these programs.  *Id.*

232.   Medical cost burdens for recent immigrants from Cuba, Haiti, Nicaragua, and Venezuela are so small that they do not displace services for other needy people. *Id.* at ¶¶ 15-18.

233.   Texas has failed to produce evidence that it incurs any net costs after direct reimbursements, despite the fact that federal reimbursements enable Texas to recoup much of the state public hospitals' uncompensated care expenditure on all persons, irrespective of immigration status and regardless of ability to pay.  *Id.* at ¶¶ 13-14.

*Wages*

234. Texas has offered no evidence in support of its allegations related to wages.  *See* Pls' Tr. Ex. 4-7.

235. Texas's briefing claims an alleged relationship between undocumented individuals and wages, but individuals who may enter and reside in Texas through the CHNV Pathways do so with eligibility for employment authorization. and thus any impact of undocumented immigration on wages has no bearing here.  Hunt Decl., ECF 175-72 ¶ 4; ECF 175-3.

236. Any theoretical impact of undocumented immigration on wages has no bearing on the effects of the CHNV Pathways on Texas.

237. When populations grow, markets grow, because new residents consume goods and services, causing businesses to increase capital and hire new workers.  Hunt Decl., ECF 175-72. ¶¶ 5-7.

238. Economists across the political spectrum agree that immigration increases economic growth.  *Id.* at ¶ 6.

*Strained Finances and Ability to Provide Services*

239. Texas has provided no evidence of strained finances or hampered ability to provide essential services.  Pls' P.I., ECF 22 at 25.

240. Texas has provided no evidence that the CHNV Pathways have resulted or will result in strained finances or a hampered ability to provide essential services.  *Id.* at 25.

*Additional Program Benefits*

241. Texas fails to account for the numerous additional benefits wrought by the CHNV Pathways.  *See id.*; Texas' Responses to Defendants' Discovery Requests, Fed

Defs' Tr. Ex. M; Texas' [Corrected] Response to Defendants' Discovery Requests, Fed Defs' Tr. Ex. N.

242. The CHNV Pathways provide critical benefits to U.S.-based sponsors, including to Intervenor Defendants, residents of Texas and other Plaintiff States, and to parolees. *See, e.g.*, Zito Decl., ECF 175-64; Laveus Decl., ECF 175-56.

243. An order enjoining or vacating the CHNV Pathways would cast uncertainty on the future for all Intervenor Defendants and their parole beneficiaries, as well as many others similarly positioned, including sponsors who are waiting to welcome their intended beneficiaries to the United States, *see, e.g.*, Sugarman Decl., ECF 175-62, sponsors who are supporting their parole beneficiaries while they await work authorization to be granted, *see, e.g.,* Supp. Arauz Decl., ECF 175-59, and parole beneficiaries who are lawfully seeking pathways to longer-term or permanent legal status in the United States, or awaiting the issuance of an immigrant visa. *See, e.g.*, Laveus Decl., ECF 175-56.

*Family Reunification*

244. Through the CHNV Pathways, U.S. citizen and university professor Dr. Germán Cadenas reunited with his Venezuelan uncle who "was like a second father" to him. Cadenas Decl., ECF 175-52 ¶¶ 2, 11.

245. Through the CHNV Pathways, U.S. citizen and Florida schoolteacher, Ms. Valerie Laveus, has reunited with her Haitian brother and nephew who had faced extreme harm in Haiti. Laveus Decl., ECF 175-56 ¶¶ 4, 6, 8. Now "[their] family would finally be together, and [her brother and nephew] could start building a new life for themselves." Supp. Laveus Decl., ECF 175-57 ¶ 15.

246. Under the Pathways, a truckdriver with the Port of Oakland was finally able to reunite with her Nicaraguan husband and their U.S. citizen son who lives with a learning disability. *See* Arauz Decl., ECF 175-58 ¶ 4, 13; Supp. Arauz Decl., ECF 175-59 ¶ 6. The reunification has improved conditions for all of them, confirmed by her own statement: "I need my son's dad to help me manage [my son's special needs], and I know my son needs the love, support, guidance of his father, just like I need it from my husband, who I love deeply." Arauz Decl., ECF 175-58 ¶ 13.

247. A Major League Baseball player—a starting pitcher with the Detroit Tigers—seeks to avail himself of CHNV Pathways to reunite with his parents so that they can finally see their son pitch in the Major Leagues. Hernandez Decl., ECF 175-67 ¶¶ 1-2, 8.

*Access to Safety and Medical Care*

248. Before Mr. Cadenas's uncle was granted parole under the CHNV Pathways, he faced "political repression" in Venezuela as an opponent of the Hugo Chavez and Nicolas Maduro regimes. Cadenas Decl., ECF 175-52 ¶¶ 7. He was fired from his job in 2007 after raising corruption concerns and has since struggled to find work and access to basic necessities. *Id.* at ¶¶ 6-7.

249. Before Ms. Laveus's sponsorship application was approved, her brother was "shot [] in the head at point-blank range" at the hands of a police officer, obstructed access to critical medical care following the attack, and her nephew was the victim of an attempted kidnapping while on his way home from school. Laveus Decl., ECF 175-56 ¶¶ 8-9, 10, 16.

250. The CHNV Pathways gave Dr. Nan Langowitz an opportunity to sponsor the family of a Venezuelan political scientist and human rights advocate who faced

persecution and harassment by the Venezuelan government.  Langowitz Decl., ECF 175-54 ¶ 12.

251.    For Dr. Kate Sugarman, a Maryland family physician, sponsorship through the CHNV Pathways will allow her to facilitate access to life-saving surgery for a young woman who is "rapidly deteriorating" as she suffers "from various rare and life-threatening medical conditions, including progressive neurologic disorders that can cause the compression of the spinal cord and brain stem, which in turn can cause the loss of movement, numbness, pain, and problems with breathing." Sugarman Decl., ECF 175-62 ¶ 3-5, 7.  The young woman needs "immediate corrective surgery," but the doctors will not perform it until she has someone who can provide full-time after care, which the young woman's Venezuelan mother can provide if she is granted parole under the CHNV Pathways.  *Id.* at ¶ 7.

252.    Heather Scanlon's experience providing humanitarian support to migrants documents the exploitation faced by migrants without access to the CHNV Pathways as compared to the safe housing and financial sponsorship waiting in the United States for those who enter through the CHNV Pathways.  Scanlon Decl., ECF 175-68 ¶ 18.

### *Free Exercise of Religion*

253.    The CHNV Pathways allowed Paul Zito, a Texas native, businessman, and devout Christian, to sponsor the family of a "devout Christian" whom he met on trips to Cuba with a charity that seeks to "facilitate the adoption of orphaned children into families within the churches and seminaries."  Zito Decl., ECF 175-64 ¶¶ 7-9.

254.    In Mr. Zito's words, he "connected with Abel on a deep level because as believers, [they] are called to one another."  *Id.* at ¶ 10.  Mr. Zito believes "God put Abel

before [him]" and sees the opportunity to sponsor him as "a calling from God."  *Id.* at ¶¶ 10, 14.

255.  For Dr. Langowitz, the opportunity to sponsor is connected to her Jewish faith and a tribute to the people who helped her own family when they were forced to flee to the United States because of religious persecution.  Langowitz Decl., ECF 175-54 ¶¶ 5-6.  Dr. Langowitz's synagogue has committed to assist with efforts to welcome under the CHNV Pathways.  *Id.* at ¶ 14.

### *Foreign Policy*

256.  The CHNV Pathways advance United States foreign policy goals.  ECF 175-36.

257.  The CHNV Pathways respond to requests from regional partner countries to help manage irregular migration in the Western Hemisphere and to fulfill the United States' international commitments.  Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶¶ 37, 48.

258.  Indeed, the CHNV Pathways are "directly responsive to requests made by the Government of Mexico and other key foreign partners throughout the hemisphere to "address irregular migration through shared responsibilities and require close coordination," which aligns with U.S. commitments outlined in international commitments including the Los Angeles Declaration on Migration and Protection, which has been endorsed by 21 countries.  *Id.* at ¶ 37.

259.  The CHNV Pathways are a tool in negotiations between the United States and the Government of Mexico.  *Id.* at ¶ 31 n.16.

260.  The CHNV Pathways are a component of the Government of Mexico's first-ever agreement with the United States to receive individuals from Cuba, Haiti,

Nicaragua, and Venezuela who are removed under Title 8 of the U.S. Code.  *Id.* at ¶¶ 6-7.

261.   The Government of Mexico has made clear that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come to the United States.  *Id.* at ¶ 7.

262.   If the United States is unable to provide lawful processes through the CHNV Pathways, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the border.  Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶ 38.

263.   The Cuban Parole Pathway also supports ongoing negotiations with the Government of Cuba to reactivate the Migration Accords, through which the United States Government aims to fulfill its commitment to facilitate the lawful entry into the United States of 20,000 Cuban nationals each year, and the Cuban government will in turn accept the repatriation of Cuban nationals encountered entering the United States without authorization. 88 Fed. Reg. 1266, 1270 (Implementation of a Parole Process for Cubans).

### *Other Economic Benefits*

264.   Mr. Eric Sype's sponsorship of his close friend will also benefit Mr. Sype's cousin, whose farm faces labor shortages and will benefit from the opportunity to employ Mr. Sype's friend once he is authorized for employment.  Supp. Sype Decl., ECF 175-61 ¶¶ 4, 10.

265.   Other industries with labor shortage needs also benefit from opportunities to employ individuals granted parole through programs like the CHNV Pathways. Wyatt Decl., ECF 175-70 ¶¶ 9-10.

266. Nonprofit organizations like Alight "work with employers to identify specific fields where labor shortages exist" and facilitate thoughtful connections with newcomers who arrive in the United States through parole programs like the CHNV Pathways. *Id.* at ¶ 6.

267. "[T]he U.S. has huge labor needs that cannot be met solely by hiring domestic workers," making it a "win-win situation to match the talents of paroled individuals with U.S. labor needs." *Id.* at ¶ 5.

268. Economic consensus holds that immigration increases economic growth.  Hunt Decl., ECF 175-72 ¶ 6.

269. Immigrants of all skill and education levels contribute to the economy by "increasing specialization and productivity" and contribute billions to Texas's Gross Domestic Product each year.  *Id.* at ¶ 8.

## Conclusions of Law

A. **Texas Lacks Standing**

1. Standing is "an irreducible constitutional minimum," *Cole v. General Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), that courts are "obliged to resolve" as a "threshold matter of jurisdiction." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008).

2. Article III standing is "'not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'" *United States v. Texas*, 143 S. Ct. 1964 (2023) (hereinafter

"*Texas*") (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 476 (1982)); *see also Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011) ("In an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so.").

3. The "[s]tanding doctrine helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system.  By ensuring that a plaintiff has standing to sue, federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'"  *Texas*, 143 S. Ct. at 1969 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

4. Standing is of utmost importance in cases where the judiciary is asked to usurp decisions by the political branches.  *Raines v. Byrd,* 521 U.S. 811, 819–20 (1997).

5. Courts look to "'history and tradition,' among other things, as 'a meaningful guide to the types of cases that Article III empowers federal courts to consider.'" *Texas*, 143 S. Ct. at 1970 (quoting *Sprint Commc'ns Co. v. APCC Services, Inc*., 554 U.S. 269, 274 (2008)).

6. "When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, *much more* is needed' to establish standing."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)) (emphasis added).

7.   When states complain only of "indirect effects on state revenues or state spending
. . . standing can become more attenuated."  *Id.* at 1972 n.3; *see also Massachusetts
v. Laird*, 400 U.S. 866 (1970); *Florida v. Mellon*, 273 U.S. 12, 16-18 (1927).

8.   The burden of establishing standing lies with the plaintiffs, *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 561 (1992), and the burden to prove standing grows as the
stages of litigation progress.  *Lewis v. Casey*, 518 U.S. 343, 357-58 (1996).

9.   Article III standing requires a plaintiff to show "(1) an 'injury in fact' that is (a)
concrete and particularized and (b) actual or imminent (2) a causal connection
between the injury and the conduct complained of; and (3) the likelihood that a
favorable decision will redress the injury."  *Croft v. Governor of Texas*, 562 F.3d
735, 745 (5th Cir. 2009) (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1992)).

10.   To be redressable, a plaintiff's "alleged injury [also] must be legally and judicially
cognizable."  *Texas*, 143 S. Ct.  at 1970 (quoting *Raines v. Byrd*, 521 U.S. 811, 819
(1997).

11.   Texas's claimed injury is not cognizable because Texas complains exclusively of
"attenuated" indirect effects over state coffers, "including as a result of having to
"incarcerate or supply social services such as healthcare and education to
noncitizens," and because this case implicates an immigration policy that (1)
implements the Executive's discretionary authority and foreign policy and (2) does
not exercise coercive power over the state.  *Texas* 143 S. Ct. at 1968-69, 1972 n.3.

***Texas Failed to Prove Injury in Fact.***

12.   Texas has not met its burden to prove its alleged pocketbook injuries are concrete
or actual. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Whitmore*

*v. Arkansas*, 495 U.S. 149, 158 (1990); *see also* ECF 175 at 9-10; ECF 197 at 12-14.

13.     To establish its alleged injury, Texas would need to establish increased costs associated with an increase of people from the CHNV countries.  Pls P.I. ECF 22 at 10-12, 23; *supra* PFOF ¶¶ 179-189.

14.     As Texas admits it cannot demonstrate increased presence of noncitizens from CHNV countries, Texas has not met its burden to establish injury in fact.  *Supra* PFOF ¶¶ 174-176. Texas fails to satisfy Article III standing on this basis alone. *Croft*, 562 F.3d at 745; *see also Lujan*, 504 U.S. at 560.

15.     Because the evidence shows CHNV Pathways have not resulted in an increase of people from the CHNV countries, Texas has failed to establish injury in fact. Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶ 31, n.16; *supra* PFOF ¶¶ 176, 178, 180; *see also Lujan*, 504 U.S. at 560 (to satisfy standing, the plaintiff must show it suffered an "injury in fact" that is "actual or imminent, not 'conjectural' or 'hypothetical'") (quoting *Los Angeles v. Lyons*, 461 U.S. 95 (1983).

16.     Texas has also failed to establish concrete and actual injury because it does not collect data about CHNV parolees and instead claims financial harms stemming exclusively from populations that are not at issue in this case and are not reasonable proxies for the population that are.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[A] theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement" of actual or impending injury).

17.     Texas has also failed to establish concrete and actual injury because its alleged injury from increased costs associated with an alleged increase of people from the

CHNV countries is undercut by offsetting reimbursements, revenues, fees, and other countervailing benefits in each category of alleged cost. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no standing where plaintiff state's claim of monetary injury was unsupported by the facts and thus "purely speculative").

18.    Texas has failed to establish Article III standing because it has failed to show "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent . . . ." *Croft*, 562 F.3d at 745 (citing *Lujan v. Nat'l Wildlife Fed*., 497 U.S. 871 (1992)).

***Texas Shows No Causal Connection Between its Alleged Injury and the CHNV Pathways***

19.    Texas's asserted injuries—estimated, indirect costs tied to population increases as a result of immigration generally—are not traceable to the CHNV Pathways.  ECF 175 at 10-11; ECF 176 at 11-14; ECF 197 at 11-12.

20.    Texas's complaints of costs associated with undocumented immigrants and unaccompanied minors do not satisfy the traceability requirement of Article III standing because Texas has failed to establish that undocumented immigrants and unaccompanied minors are reasonable proxies to assess the costs associated with CHNV parolees. *California v. Texas*, 141 S. Ct. 2104, 2116-17 (2021) (finding no standing where Texas could not establish that its "pocketbook injury in the form of the increased use of (and therefore cost to) state-operated medical insurance programs" and other "expenses" was "fairly traceable" "to any actual or possible unlawful Government conduct").

21.    Texas also has not shown any injury traceable to the CHNV Parole Pathways because Texas has not produced evidence showing that a CHNV parolee residing

72

in Texas has utilized *any* uncompensated services as Texas alleges. *Crane*, 783 F.3d at 252 (finding no standing where State failed to trace claimed injury directly to challenged policy as opposed to undocumented immigration generally).

22.    Texas has failed to establish an injury traceable to the CHNV Parole Pathways because it can only speculate that some unspecified number of parolees may settle in Texas; that, notwithstanding eligibility for work authorization and supporters' guarantees of financial support, they may nonetheless enroll in state programs; and do so in sufficiently high numbers that they may strain Texas's finances.  *See* ECF 175-37; 175-38; *see also Clapper*, 568 at 413 (finding "speculative" theory of injury could not satisfy the "fairly traceable" requirement" of standing); *Texas*, 143 S. Ct. at 1972 n.3 (warning "federal courts must remain mindful of bedrock Article III constraints" where States attempt to assert standing based on "indirect effects on state revenues or state spending").

23.    Texas has failed to establish Article III standing because it has failed to show "a causal connection between the injury and the conduct complained of . . . ." *Croft*, 562 F.3d at 745 (citing *Lujan v. Nat'l Wildlife Fed*., 497 U.S. 871 (1992).

### Texas's Alleged Injury is Not Redressable

24.    The injury Texas claims here is not redressable.

25.    Texas has failed to show any redressable injury because the record evidence shows *the CHNV Pathways themselves* reduce the alleged harms Texas complains of by "reducing irregular migration" and reducing the ***total arrivals*** of people from Cuba, Haiti, Nicaragua, and Venezuela, such that any order from this court enjoining the CHNV Parole Pathways would not reduce the costs associated with general migration that Texas complains of.  *See Simon v. E. Ky. Welfare Rights Org.*, 426

U.S. 26, 38 (1976) ("[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.").

26. Texas additionally fails to satisfy redressability because it complains of alleged costs incurred from ordinary governance, including that which results from general immigration, and mostly from undocumented immigration—not any costs resulting from the CHNV Parole Pathways themselves—which an order in this case would not address. *See Lujan*, 504 U.S. at 561 ("[[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (internal punctuation and citation omitted).

27. Texas also fails to satisfy the redressability requirement because, as Texas acknowledges, the relief it seeks would—at best—only curtail "a particular set of procedures" available to parolees, but would not prevent the same individuals from seeking parole or other lawful entry to the United States through different avenues, leaving Texas exposed to the same risks it imputes to the CHNV Pathways.  ECF 127 at 6 (conceding that, with or without CHNV Pathways, individuals seeking parole through the Pathways could "be admitted through other means of parole or another program"); *see also E.T. v. Paxton*, 41 F.4th 709, 721 (5th Cir. 2022) (dismissing for lack of Article III standing where remedy sought still "expose[d] plaintiffs to the exact same risks they otherwise impute[d] to [the policy at issue]").

28. Texas has also failed to articulate a redressable injury because this Court cannot disrupt this discretionary authority of the executive on which the CHNV Pathways are premised and which implicates foreign relations.  *Texas*, 143 S. Ct. at 1971-73

(courts may not impermissibly "run up against the Executive's Article II authority to enforce federal law," including in immigration policies that implicate "foreign policy objectives," (citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-491 (1990); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[T]he Attorney General may . . . in his discretion, parole . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit any [noncitizen] applying for admission to the United States . . . .").

29.    Further, where five different presidential administrations over seven decades have utilized the parole authority in a programmatic manner without a successful legal challenge, *supra* PFOF ¶¶ 123-132, Texas does not and cannot "cite precedent, history, or tradition of federal courts entertaining lawsuits of this kind." *Texas*, 143 S. Ct. at 1966; *see*, *e.g.*, *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) ("[E]very Administration beginning in the late 1990s has relied heavily on the parole option, including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden.").

30.    Here, as in *Texas*, history and tradition of federal courts declining to entertain challenges to the Executive's parole authority contradict Texas's standing theory. *Texas*, 143 S. Ct. at 1970.

31.    Texas has failed to establish Article III standing because it has failed to establish "the likelihood that a favorable decision will redress the injury." *Texas*, 143 S. Ct. at 1970; *Croft*, 562 F.3d at 745 (citing *Lujan v. Nat'l Wildlife Fed*., 497 U.S. 871 (1992)).

75

***No Other Special Standing Theories Apply***

32.    Because Texas has failed to establish each of the basic Article III standing requirements, it cannot invoke special solicitude to cure the patent defects in its underlying legal theory. *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683–84 (5th Cir. 2023) ("Regardless of the applicability of the special solicitude, [states] must still satisfy the basic requirements of standing."); *see also Arizona v. Biden*, 40 F.4th 375, 385-86 (6th Cir. 2022) (special solicitude "does not allow [plaintiff states] to bypass proof of injury" required by Article III); *Louisiana Dep't of Wildlife & Fisheries*, 70 F.4th at 882 ("[Special solicitude] is not a standing shortcut when standing is otherwise lacking . . . [It] does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and particularized.").

33.    Further, given the waning significance of special solicitude in the "years since" *Massachusetts v. EPA*, the propriety of invoking special solicitude has been called into question altogether. *Texas*, 143 S. Ct. at 1977 (Gorsuch, J., concurring) ("[I]t's hard not to think . . . that lower courts should just leave that idea [of special solicitude] on the shelf in future [years].") (internal citations omitted).

34.    This case also "lacks the hallmarks of a state's 'special solicitude'" because the CHNV Pathways do not have a "direct effect on Plaintiffs' law or policy." *Louisiana v. Biden*, 64 F.4th at 683 (finding Louisiana had no standing to challenge federal policy that applied "only to federal executive departments and agencies" and provided "no substantial pressure for [states] to change *their* laws").

35.     To invoke *parens patriae* to sue on behalf of Texas's residents based on their health and well-being, a state must claim a quasi-sovereign interest in the wellbeing of its "residents in general," and may not claim such an interest only in a particular subset thereof.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982).

36.     Because Texas's asserted injury is based on the provision of basic services to a subset of its residents that are generally available to all its residents, Texas may not invoke *parens patriae* in support of its injury here. *Id.*

**B.     The Plaintiff States Other than Texas Also Lack Standing**

37.     The other Plaintiff States fail to establish standing because they fail to show they have suffered, or will suffer, an injury due to the CHNV Pathways that may be redressed by any relief the Court may enter for the Plaintiffs.  *See* Intervenor Defendants' Motion to Dismiss, ECF 197 at 14-16.

38.     Because Plaintiff States only "seek to establish Article III injury based on alleged injuries to Texas" and do "not submit any evidence as to injury for any other State Plaintiff," Joint Stip. ECF 139, the other Plaintiff States have not met their burden and lack standing.  *Texas*, 143 S. Ct. at 1970; *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1992)).

**C.     Plaintiff States Fail on the Merits of their APA Claims**

39.     Because Plaintiffs lack standing, this Court lacks Article III jurisdiction to reach the merits of Plaintiffs' claims.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) ("'Without jurisdiction the court cannot proceed at all

in any cause'; it may not assume jurisdiction for the purpose of deciding the merits

of the case.") (citation omitted).

40.    Plaintiff States additionally fail on the merits of their claims.

### The CHNV Pathways Are Authorized by Statute

41.    The parole statute authorizes the Executive to grant parole on a "case-by-case"

basis for "urgent humanitarian reasons or significant public benefits." 8 U.S.C.

§ 1182(d)(5) (the "Parole Statute").

42.    The Parole Statute does not define "case-by-case" review.  Defs' P.I. Opp., ECF

176 at 21-26; 8 U.S.C. § 1182(d)(5)(A).

43.    The Parole Statute does not contain a numerical cap.  Defs' P.I. Opp., ECF 176 at

21-26; 8 U.S.C. § 1182(d)(5)(A).

44.    The CHNV Pathways comport with the statutory requirement that parole be granted

on a "case-by-case" basis because DHS considers each CHNV Pathway applicant

individually on a case-by-case basis.  *Id*; *see Supra*, section B.  Neither defines

"case-by-case" review nor contains a numerical cap.  Defs' P.I. Opp., ECF 176 at

21-26; *see also* 8 U.S.C. § 1182(d)(5)(A).

45.    The Parole Statute does not define "urgent humanitarian reasons or significant

public benefit."   Defs' P.I. Opp., ECF 176 at 21-26; *see also* 8 U.S.C.

§ 1182(d)(5)(A).

46.    The Parole Statute accords broad discretion to the Executive to determine what

constitutes an urgent humanitarian reason or significant public benefit.  Defs' P.I.

Opp.,ECF 176 at 21-26; *see also* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney

General may, except as provided in subparagraph (B) or in section 1184(f) of this

title, *in his discretion* parole into the United States temporarily *under such conditions as he may prescribe…*") (emphases added).

47. The CHNV Pathways comport with the statutory requirement that parole be granted for "urgent humanitarian reasons or significant public benefit" where the record reflects that DHS determined the CHNV Pathways are justified by urgent humanitarian reasons and confer significant public benefits. Defs' P.I. Opp., ECF 176 at 23-26; *see also* 8 U.S.C. § 1182(d)(5)(A); *supra* PFOF ¶¶ 241-269.

48. Because the CHNV Pathways comport with the Parole Statute's plain text, "that is the end of the matter." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842 (1984).

49. However, even if the Parole Statute is "silent or ambiguous," "[c]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id*. at 844.

50. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

51. Federal Defendants are owed "deference" for their "administrative interpretation" where the record reflects a well-reasoned interpretation of its statutory authority. *Id.*; *supra* PFOF ¶¶ 133-150.

52. In the context of policies issued pursuant to the Parole Statute that are justified by underlying foreign policy needs, courts "must be deferential to the President's Article II foreign-policy judgment." *Biden v. Texas*, 142 S.Ct. at 2548 (Kavanaugh, J., concurring).

53.    "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *I.N.S. v. Aguirre Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988).

54.    Federal Defendants are entitled to judicial deference in their interpretation of the Parole Statute because the CHNV Pathways implicate matters of foreign policy, including historic negotiations with the Government of Mexico, and the role of the United States in a collaborative regional approach to migration in the western hemisphere. *Texas*, 142 S. Ct. at 2548; *supra* PFOF ¶¶ 256-263.

55.    Texas improperly relies on congressional history of *failed* amendments to § 1182(d)(5) that *would have* imposed limits to the statute by defining the terms "urgent humanitarian reason" and "strictly in the public interest" to encompass only very limited criteria; that history does not and cannot reflect congressional intent. *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."); *see also Shannon v. United States,* 512 U.S. 573, 584 (1994) ("[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point."); Abbe R. Gluck, *Imperfect Statutes, Imperfect Courts: Understanding Congress's Plan in the Era of Unorthodox Lawmaking*, 129 Harv. L. Rev. 62, 77 n.90 (2015) ("[The Supreme Court] has long applied a 'rejected proposal rule,' under which it refuses to construe statutes to incorporate provisions that Congress has expressly rejected.").

56.     Congress's intent to leave undisturbed the Executive's ability to use the parole authority programmatically is demonstrated by its choice to largely leave it as originally constructed by opting for a 1996 amendment that left key terms undefined. *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 361–62 (5th Cir. 2009) (en banc) (holding Congress's failure to amend a statute despite opportunities to do so upheld the statute's traditional interpretation).

57.     Thus, the CHNV Pathways are confirmed by the unambiguous text of 8 U.S.C. 1182(d)(5).

**D.      Decades of executive and congressional action confirm the lawfulness of the pathways.**

58.     Even if the Court were to read any ambiguity into the statute, the statute's post-enactment administrative interpretations confirm the lawfulness of the CHNV Pathways. *Salazar v. Maimon*, 750 F.3d 514, 519 (5th Cir. 2014) (to the extent a court finds a "statute is subject to differing interpretations," then it "must 'examine its legislative history, predecessor statutes, pertinent court decisions, and post-enactment administrative interpretations'") (quoting *Rogers v. San Antonio*, 392 F.3d 758, 761 (5th Cir. 2004)).

59.     The lawfulness of the CHNV Pathways is confirmed by past agency interpretation where presidential administrations have repeatedly invoked § 1182(d)(5)(A) to promulgate programmatic parole policies substantially similar to the Parole Pathways: identifying a group of people whose entry through parole could be warranted for emergent or urgent humanitarian reasons or would be in the public interest or advance a significant public benefit, and then allowing eligible members of that group to apply and be considered on a case-by-case basis. Those policies

were motivated by analogous concerns, including the need to relieve certain groups

of the limitations of other immigration statutes, manage the land or maritime

borders, fulfill important foreign policy goals, promote family reunification, and

disincentivize use of dangerous pathways to the United States.  *See supra* PFOF ¶¶

133-150.  None of these applications of the parole authority has ever been found to

exceed § 1182(d)(5)(A).  *See e.g.*, *Salazar*, 750 F.3d at 519

60.    Far from indicating disapproval, Congress has repeatedly ratified programmatic

uses of the parole authority, *supra* PFOF ¶¶ 126-132, further confirming the

lawfulness of the CHNV Pathways.  *See Costanzo v. Tillinghast*, 287 U.S. 341

(1932) ("The failure of Congress to alter or amend . . . creates a presumption in

favor of the administrative interpretation. . . .").[2]

**E.    The CHNV Parole Pathways Are Not Arbitrary and Capricious**

61.    "The arbitrary and capricious standard is highly deferential."  *Knapp v. U.S. Dep't

of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015).

62.    An action is not arbitrary and capricious if there's a rational connection between

the facts the agency found and the decision it made.  *Worldcall Interconnect, Inc.

v. F.C.C.*, 907 F.3d 810, 817 (5th Cir. 2018).

63.    "The scope of review under the 'arbitrary and capricious' standard is narrow and a

court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs.

Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

64.    Because Federal Defendants considered extensive data, country conditions, and the

success of prior iterations of programmatic parole to develop the CHNV Pathways,

---

[2] For the same reasons, Texas additionally fails on the merits of its ultra vires claim.

they "examine[d] the relevant data," and explained "'a rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43; *Knapp*, 796 F.3d at 453; *supra* PFOF ¶¶ 13-14, 16-20, 23-28, 29-33, 35, 36-39, 41-43, 46.

65.   Therefore, the CHNV Pathways satisfy the "highly deferential" arbitrary and capricious standard. *Id*.

66.   Because the CHNV Pathways are justified by several additional foreign policy reasons, including historic negotiations with the Government of Mexico, and the role of the CHNV Pathways as part of a collaborative regional approach to migration in the western hemisphere, additional deference to the executive's statutory interpretation is warranted, as courts "must be deferential to the President's Article II foreign-policy judgment." *Biden v. Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring); *supra* PFOF ¶¶ 256-263.

67.   Texas additionally fails on its arbitrary and capricious claim that Federal Defendants implemented the CHNV Pathways despite knowing "the costs imposed on states like Texas as a result of increased [undocumented] immigration," ECF 22 at 23, because it has failed to substantiate either increased migration as a result of the CHNV or corresponding increased costs. *Supra* PFOF ¶¶ 171-240.

68.   Further undermining Texas's claims of costs, individuals granted parole through the CHNV Pathways are eligible under existing regulations to apply for work authorization for the duration of their period of parole, which allows them to contribute to the economy. *Supra* PFOF ¶¶ 23, 88; 8 C.F.R. § 274a.12.

69.   Even if Texas had established that the CHNV Pathways imposed the costs it claims (it has not, *supra* PFOF ¶¶ 171-189), the record reflects that DHS did consider such potential costs.  *Supra* PFOF ¶¶ 23.

70.   As DHS did consider the factors Texas complains it did not, this is sufficient to satisfy *State Farm*, 463 U.S. at 43 ("[A] court is not to substitute its judgment for that of the agency. . . ."); *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) ("[T]he role of courts in reviewing arbitrary and capricious challenges is to 'simply ensur[e] that the agency has acted within a zone of reasonableness.'") (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

71.   Texas also has not established how any costs undermine its "reliance interests." ECF 22 at 22-23, which are implicated when an agency "changes course" from "longstanding policies."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

72.   Reliance interests are more than regular interests; rather, they refer to "legitimate reliance" on a longstanding program that has caused those affected to make decisions "all in reliance on" the existence of that program.  *Id.* at 1914.

73.   Texas fails to prove that Federal Defendants did not consider their reliance interests because Texas has not articulated a policy it had relied upon in order to make any particular decisions.  *Id.*

74.   Texas also fails to prove that Federal Defendants did not consider their reliance interests when "chang[ing] course" because no such change occurred here; Texas admits that the CHNV Pathways built upon U4U, which DHS had been

implementing for months, and the CHNV Pathways resemble decades of similar parole processes. *Supra* PFOF ¶¶ 133-150.

75.  As DHS did consider Texas's interests in developing the CHNV Pathways, and Texas has no reliance interests that DHS failed to consider, the CHNV Pathways satisfy this aspect of arbitrary and capricious review.

76.  Texas's complaint that the CHNV Pathways are arbitrary and capricious because there is insufficient evidence of a "sudden surge of migrants from several specific countries," Pls' P.I., ECF 22 at 23, is disproven by DHS data in the record.  *See e.g*., Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH; *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (A federal policy must be upheld if it is supported by "substantial evidence," which is "something *less than* a preponderance."  (emphasis added)). This again evinces a rational connection between the facts the agency found and the decision it made.  *Worldcall Interconnect, Inc.*, 907 F.3d at 817.

77.  Finally, Texas's complaint about lack of a specific removal mechanism after the two-year parole period lapses, Pls' P.I., ECF 22 at 23-24, fails because Texas does not explain why a new mechanism is needed or authorized in light of exclusive removal procedures prescribed at 8 U.S.C. § 1229a(a)(3).  Moreover, a primary purpose of parole is to permit the recipient to reside in the United States while continuing to pursue a visa application, illustrating once more "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

78. Texas's claims of arbitrary and capricious agency action are thus unsupported by the record.

**F.     The Remaining Factors Do Not Support Injunctive Relief**

79. To obtain injunctive relief of any nature or scope, Texas must prove that: "(1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiffs and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

80. Texas is not entitled to injunctive relief, including a nationwide injunction, because Texas has not made the "clear showing" to carry its "burden of persuasion" that it has met each criteria to obtain such relief. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

*Texas Has Not Established Irreparable Injury*

81. Texas has not established any actual injury caused by the CHNV Parole Pathways because the unrebutted record evidence shows that the CHNV Parole Pathways have *reduced* total migration from Cuba, Haiti, Nicaragua, and Venezuela, which in turn *reduces*, rather than increases, the costs that Texas claims it sustains due to nationals of those countries resettling within its borders.  Nuñez-Neto Decl., Fed. Defs' Tr. Ex. HH ¶ 31, n.16; *see Am. Holland Ins. Co.*, 777 F.2d at 997 ("The record does not substantiate the granting of an injunction. [The Plaintiff] has failed to make a clear showing of irreparable harm.").

82. Texas also has not established irreparable injury because it claims fiscal injury based only on speculative financial costs that it cannot tie to the CHNV Pathways.

*See California v. Texas*, 141 S. Ct. 2104, 2117-20 (2021) (holding that the Plaintiff States "have failed to show how [their alleged] injury is directly traceable to any actual or possible unlawful Government conduct"); *see supra* COL Section A ¶ 2.

83. Texas also has not shown irreparable injury because it has provided no evidence as to CHNV parole beneficiaries. *See Am. Holland Ins. Co.*, 777 F.2d at 997.

84. Texas also has not shown irreparable injury because it has provided no evidence to support its assertions that sufficient numbers of CHNV parole beneficiaries will resettle within Texas and, despite having work authorization and financial support from sponsors, will enroll in state programs in sufficiently high numbers that they will strain Texas's ability to provide essential services to other Texas residents. *See Sampson v. Murray*, 415 U.S. 61, 89 (1974); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 397–98 (5th Cir. 2013) (finding "general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" is insufficient to establish irreparable harm).

85. Texas has not established that any injury is irreparable, because Texas admits that revenues, fees, and other countervailing benefits offset those alleged costs. *See eBay Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (weighing the "economic benefits" of a challenged program against its costs when balancing the parties' hardships).

***The Balance of Hardships Does Not Weigh in Favor of Injunctive Relief***

86. The balance of hardships weighs against an injunction because the evidence shows that a lack of injunction would pose no harm to Texas, and in fact would benefit Texas, whereas an injunction would inflict significant harm on the Intervenor and Federal Defendants. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("[C]ourts must

balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" when considering whether to award injunctive relief) (citation and internal punctuation omitted).

87. The balance of hardships does not weigh in favor of an injunction because Texas has not established that it would suffer any injury, much less irreparable injury, in the absence of an injunction. *Holland Am.*, 777 F.2d at 998 ("In the absence of irreparable injury to [the Plaintiff], the injunction must be overturned.").

88. An injunction would pose significant harm to the Intervenor Defendants by cutting off the safe, lawful, and orderly pathway to the United States that the CHNV Pathways would afford to those who continue awaiting approval of their applications; and it would cast uncertainty on the future for Intervenor Defendants, as well as others similarly positioned, who are supporting their parole beneficiaries while they await work authorization to be granted, or while they pursue applications for longer-term or permanent legal status in the United States. *Supra* PFOF ¶ 243; ECF 175-52—175-65; *see*, *e.g.*, *Quillen v. Walcott*, 434 U.S. 246, 255 (1978) (collecting cases holding that the relationship between parent and child is "constitutionally protected"); *Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017) (finding that prolonged separation of family members outweighs any national security interests articulated by the government), *rev'd on other grounds*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *Texans for Free Enterprise v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (injunctions protecting First Amendment freedoms are in the public interest); *see also Hernandez v. Sessions*, 872 F.3d 976, 966 (9th Cir. 2017) (considering the "indirect hardship to friends and family

members" separated from the Plaintiffs when evaluating the hardships an injunction

would impose).

89.     Nor does the balance of hardships support an injunction that would interfere with

the executive's conduct of foreign affairs, especially with respect to a statutory tool

whose use by the executive Congress has repeatedly ratified and also declined to

constrain since its codification in the 1952 INA.  *See Texas*, 142 S. Ct. at 2543

(warning against "unwarranted judicial interference in the conduct of foreign policy

. . . without the affirmative intention of the Congress clearly expressed," including

"in the context of immigration law, where the dynamic nature of relations with

other countries requires the Executive Branch to ensure that enforcement policies

are consistent with this Nation's foreign policy.") (internal punctuation and citation

omitted)); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978).

***The Public Interest Does Not Support Injunctive Relief***

90.     "In exercising their sound discretion, courts of equity should pay particular regard

for the public consequences in employing the extraordinary remedy of injunction."

*Winter*, 55 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312

(1982)).

91.     The public interest does not support an injunction of the CHNV Pathways because

an injunction would harm multiple significant public interests.  *Salazar v. Bruno*,

559 U.S. 700, 714 (2010) ("[A] court should be particularly cautious when

contemplating relief that implicates public interests.") (citations omitted)); *see also*

*Quillen*, 434 U.S. at 255.

92.     An injunction of the CHNV Pathways would disserve the significant public interest

in stability and safety in immigration to the United States. PFOF ¶¶ 18-21, 23, 74,

133, 135, 139, 146; *cf. In re Chan Kam-Shu*, 477 F.2d 333, 338 (5th Cir. 1973) (affirming parole of noncitizen because the "physical protection" of a noncitizen is "within the public interest").

93.    An injunction of the CHNV Pathways would disserve the significant public interest in the reunification of families. PFOF ¶¶ 66, 75-79, 244-247; *see also Hawaii*, 878 F.3d at 699; *Hernandez*, 872 F.3d at 966 (9th Cir. 2017); *Pickett v. Hous. Auth. of Cook City*, 114 F. Supp. 3d 663 (N.D. Ill. 2015) ("[T]he public interest is seriously disserved by [Plaintiff] family's separation.").

94.    An injunction of the CHNV Pathways would harm the more than 1.5 million individuals in the United States who have applied to sponsor parole beneficiaries through the CHNV Pathways, as well as their communities, and disserve the significant public interest in the enrichment of local economies and communities. PFOF ¶¶ 66, 80, 83-89; *see Texas*, 143 S. Ct. at 1985 (warning against broad relief that would "purport to define the rights and duties of sometimes millions of people who are not parties before them" or that "can also sweep up nonparties who may not wish to receive the benefit of the court's decision") (Gorsuch, J., concurring).

95.    An injunction of the CHNV Pathways would disserve the significant public interest in the free exercise of and expression of sincerely held religious beliefs. PFOF ¶¶ 66, 80-82, 253-255; *Texans for Free Enterprise*, 732 F.3d at 539.

96.    An injunction of the CHNV Pathways would disserve the executive's discretion in the conduct of foreign relations. PFOF ¶¶ 17-18, 123-125, 147-151; *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial . . . They are

decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."); *see also Arizona v. United States*, 567 U.S. 398, 397 (2012).

### Texas's Claims Are Discriminatory and Not Legally Cognizable

97. Texas's allegations of injury suggest discriminatory intent because they propagate false stereotypes about immigrants that are unsupported by the factual record, based on irrelevant comparisons, and contradicted by widely available empirical evidence. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (circumstantial evidence of discriminatory intent exists where the purported problem to be addressed "was almost nonexistent"); *Exodus Refugee Immigr., Inc. v. Pence*, 838 F.3d 902, 904-05 (7th Cir. 2016) (policy excluding Syrian refugees was discriminatory because it was "based solely on the threat . . . they pose to the safety of the residents of Indiana. But . . . targeting Syrian refugees is discrimination on the basis of nationality"); *see also supra* PFOF ¶¶ 188, 190-238.

98. By singling out parole beneficiaries of the CHNV Pathways for imposing costs on the state to which all Texas residents contribute, alleging injury where Texas actually benefits, relying on disproven racial stereotypes, and challenging only programs that benefit parole beneficiaries of color while declining to challenge a virtually identical program that benefits white parole beneficiaries, Texas's claims and allegations in this lawsuit suggest discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Devt. Corp.*, 429 U.S. 252, 270 (1977); *Crain v. City of Selma,* 952 F.3d 634, 641 (5th Cir. 2020).

91

99.   Racial or national origin discrimination cannot form the justification for a claim of irreparable injury, as the equal protection clause forbids states from discriminating on that basis in almost all circumstances.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

100.  Texas cannot do indirectly through this lawsuit what it cannot do directly, *Bailey v. State of Alabama*, 219 U.S. 219, 239, 244-45 (1911), and this court cannot "plac[e its] power, property and prestige behind the [alleged] discrimination." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624 (1991) (citation omitted).

***Nationwide Relief Is Not Supported by the Evidence***

101.  The evidence adduced at trial does not support nationwide equitable relief, either in the form of an injunction or vacatur.

102.  An injunction is inappropriate relief in this APA suit.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 2010).

103.  To the extent any injunction is issued, it would properly be limited to the State of Texas.  *Town of Chester v. Laroe Ests., Inc*., 581 U.S. 433, 438 (2017); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J. concurring), *denying modification*, 140 S. Ct. 2709 (2020).  The twenty Plaintiff States that affirmed that they would "not submit any evidence as to injury" in this matter, Joint Stip. ECF 139, have failed to establish standing and have failed to establish any irreparable injury that would support the extension of any equitable relief to them.  *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) ("[T]he absence of standing . . . suffices to prevent the power of the federal judiciary from being invoked by the complaining party."); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (A "plaintiff must

demonstrate standing for each claim he seeks to press" and "each form of relief sought"). Only Texas has proffered evidence of alleged harm, so at a minimum, relief cannot extend beyond Texas. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

104. To the extent any injunctive relief is appropriate, any such relief must be limited to what is necessary to effectuate relief from the legal injury. *O'Donnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) ("[A] district court abuses its discretion if it does not narrowly tailor an injunction to remedy the specific action which gives rise to the order.") (internal quotations omitted), *overruled on other grounds by Daves v. Dallas County*, 22 F. 4th 522 (5th Cir. 2022). Texas's proffered evidence does not justify a nationwide injunction blocking the CHNV Parole Pathways. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

105. Nationwide relief is also unwarranted because it would create problems for "nonparties who may not wish to receive the benefit of the court's decision," including the "[d]ozens of states, counties, and cities" that do not wish to be bound by the district court's order. 143 S. Ct. at 1985 (Gorsuch, J., concurring).

106. Promoting uniformity in immigration enforcement, Pls' P.I., ECF 22 at 27, does not justify nationwide relief here, especially in light of the significant hardships that an injunction would impose on the Federal and Intervenor Defendants; on non-parties, including the 1.5 million individuals who have applied as CHNV Pathways sponsors and their intended parole beneficiaries; and on the weighty public interest

in providing safe, orderly, legal and humane pathways to the United States, reunifying families, honoring the free exercise of religion, enriching our local communities and economies, and advancing important foreign policy goals. *See Weinberger*, 456 U.S. at 312 ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

107.    To the extent that the Court finds any relief for the States is appropriate, the appropriate relief in this case is remand without vacatur. *Cent. & S.W. Servs., Inc.*, 220 F.3d at 692.

108.    "Remand, not vacatur," is "generally appropriate relief" in an APA suit. *Texas Ass'n of Mfrs. V. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 369 (5th Cir. 2021).

109.    Remand, not vacatur, "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive." *Cent. & S.W. Servs.,* 220 F.3d at 692 (5th Cir. 2000).

110.    To the extent the Court finds that the States are entitled to a vacatur of, or an injunction against, the CHNV Parole Pathways, it is appropriate to stay this relief "until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court." *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021); appeal filed No. 21-40680 (5th Cir. Sept. 16, 2021); *Texas v. United States*, 352 F. Supp. 3d 665, 690 N.D. Tex. 2018), *aff'd in part, vacated in part, remanded*, 945 F.3d 355 (5th Cir. 2019).

Respectfully submitted,

*/s/ Vanessa Rivas-Bernardy*
**Vanessa Rivas-Bernardy***
California Bar No. 341464
vanessa.rivas@raicestexas.org

**Brandon Galli-Graves***
Texas Bar No. 24132050
brandon.galli-graves@raicestexas.org

**THE REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES (RAICES)**
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
Telephone: (210) 960-3206
Facsimile: (210) 634-1279

**Monika Y. Langarica***
California Bar No. 308518
langarica@law.ucla.edu

**Ahilan T. Arulanantham***
California Bar No. 237841
arulanantham@law.ucla.edu

**Talia Inlender***
California Bar No. 253796
inlender@law.ucla.edu

**CENTER FOR IMMIGRATION LAW AND POLICY**
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

**Esther H. Sung (Attorney-In-Charge)***
California Bar No. 255962
*Application for Admission pending*
esther.sung@justiceactioncenter.org

**Karen C. Tumlin***

California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Jane Bentrott\***
California Bar No. 323562
D.C. Bar No. 1029681
Virginia Bar No. 87903
jane.bentrott@justiceactioncenter.org

**Lauren Michel Wilfong\***
New York Bar No. 5975529
New Jersey Bar No. 378382021
*Not admitted to practice law in California*
lauren.wilfong@justiceactioncenter.org

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

*\*admitted pro hac vice*

**Kate Kaufmann Shih**
Texas Bar No. 24066065
Federal Bar No. 1214426
kateshih@quinnemanuel.com

QUINN EMANUEL URQUHART & SULLIVAN LLP
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713)221-7100

## CERTIFICATE OF SERVICE

I certify that on August 16, 2023, I filed this motion through the Court's

CM/ECF system, which served it on all counsel of record.

*/s/ Esther Sung*