UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

United States Courts
Southern District of Texas
FILED

*August 17, 2023*

Nathan Ochsner, Clerk of Court

STATE OF TEXAS, et al.,

                     *Plaintiffs,*

        *v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

                   *Defendants.*

Case No. 6:23-cv-00007

**BRIEF FOR AMICI CURIAE STATES OF NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF AMICI CURIAE ................................................................... 1

STATEMENT .................................................................................................. 3

SUMMARY OF ARGUMENT ...................................................................... 8

ARGUMENT

    THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH HEAVILY
    AGAINST ENJOINING THE PAROLE PATHWAYS ........................................... 9

        A.    Immigrants Are Key Contributors to the Economies of Amici
            States. ..................................................................................... 10

        B.    Enjoining the Parole Pathways Would Separate Families and
            Subject Parolees to Danger. ................................................... 14

        C.    Plaintiffs' Assessment of the Public Interest and the Equities Is
            Fundamentally Flawed. .......................................................... 19

CONCLUSION ............................................................................................. 22

i

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Amoco Prod. Co. v. Village of Gambell,*
    480 U.S. 531 (1987) ............................................................... 9

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................... 9

*Moore v. City of East Cleveland,*
    431 U.S. 494 (1977) ............................................................. 16

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................. 9

**Laws**

8 U.S.C. § 1182(d)(5)(A) ............................................................. 3, 9

**Administrative Sources** (*by date*)

Implementation of a Parole Process for Venezuelans,
    87 Fed. Reg. 63,507 (Oct. 19, 2022) ................................... 4-5, 18

Implementation of a Parole Process for Cubans,
    88 Fed. Reg. 1,266 (Jan. 9, 2023) ...................................... 5, 18

Implementation of a Parole Process for Haitians,
    88 Fed. Reg. 1,243 (Jan. 9, 2023) ...................................... 5, 17

Implementation of a Parole Process for Nicaraguans,
    88 Fed. Reg. 1,255 (Jan. 9, 2023) ................................... 5, 17-18

Implementation of Changes to the Parole Process for Venezuelans,
    88 Fed. Reg. 1,279 (Jan. 9, 2023) ........................................ 5

**Miscellaneous Authorities**[*]

Abha Bhattarai, *Worker Shortages Are Fueling America's Biggest Labor
    Crises*, Wash. Post (Sept. 16, 2022),
    https://www.washingtonpost.com/business/2022/09/16/worker-
    shortage-strikes-economy/ ................................................... 14

_____

[*]All websites last visited August 16, 2023

**Miscellaneous Authorities**                                                               **Page(s)**

Allison Abrams, *Damage of Separating Families*, Psychology Today (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families ................................................... 15

Am. Immigr. Council, *Immigrants in California*, https://map.americanimmigrationcouncil.org/locations/california/ ................. 11-12

Am. Immigr. Council, *Immigrants in District of Columbia*, https://map.americanimmigrationcouncil.org/locations/district-of-columbia ................................................................................................................ 11-12

Am. Immigr. Council, *Immigrants in New York*, https://map.americanimmigrationcouncil.org/locations/new-york/ ................. 11-12

Am. Immigr. Council, *Immigrants in United States of America* https://map.americanimmigrationcouncil.org/locations/national/ ....................... 10

Am. Immigr. Council, *Immigrants in Washington*, https://map.americanimmigrationcouncil.org/locations/washington .............. 11-12

Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* (Oct. 15, 2020), https://crsreports.congress.gov/product/pdf/R/R46570 ............................. 3-4

Bureau of Consular Affs., U.S. Dep't of State, *Haiti Travel Advisory* (July 27, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html ................... 17

Bureau of Consular Affs., U.S. Dep't of State, *Nicaragua Travel Advisory* (July 17, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Nicaragua.html ............................................................................................................ 18

Bureau of Consular Affs., U.S. Dep't of State, *Venezuela Travel Advisory* (July 17, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html ......... 18

Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 1 (July 2019), https://tinyurl.com/NCFRpolicybrief ........................... 15

Dan Kosten, Nat'l Immigr. F., *Immigrants as Economic Contributors: They Are the New American Workforce* (June 5, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-they-are-the-new-american-workforce ........................................... 12

iii

**Miscellaneous Authorities**                                                          **Page(s)**

Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*,
    Manhattan Inst. (May 25, 2023),
    https://manhattan.institute/article/bidens-immigration-parole-
    programs-are-working ................................................................................ 21

Darrell M. West, *The Costs and Benefits of Immigration*, 126 Pol. Sci. Q.
    427 (2011), www.jstor.org/stable/23056953 ........................................... 10

FWD.us, *Immigration Parole Has Added 450,000 Workers to Industries
    with Critical Labor Shortages* (Apr. 20, 2023),
    https://www.fwd.us/news/immigration-labor-shortages/ ........................... 13

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents
    and Their Young Children* (2011) ........................................................... 16

Howard Schneider, *Fed's Barkin: Labor Shortages May Persist*, Reuters
    (Feb. 17, 2023), https://www.reuters.com/markets/us/feds-barkin-labor-
    shortages-may-persist-2023-02-17/ .......................................................... 14

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are
    Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017),
    https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-
    reporting-20171009-story.html ................................................................ 21

Lydia DePillis, *Immigration Rebound Eases Shortage of Workers, Up to a
    Point*, N.Y. Times (Feb. 6, 2023),
    https://www.nytimes.com/2023/02/06/business/economy/immigration-
    labor.html .............................................................................................. 12

New Am. Econ., *New Study Shows the Economic Power of Immigrants in
    Los Angeles* (Feb. 8, 2017), http://www.newamericaneconomy.org/wp-
    content/uploads/2017/02/LA_Brief_V8.pdf ............................................ 11

New York City Mayor's Office of Immigr. Affs., *State of Our Immigrant City*
    (2021), https://www.nyc.gov/assets/immigrants/downloads/pdf/MOIA-
    Annual-Report-for-2020.pdf .................................................................. 11

Nik Theodore, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi., *Insecure
    Communities: Latino Perceptions of Police Involvement in Immigration
    Enforcement* (May 2013),
    https://www.policylink.org/sites/default/files/INSECURE_COMMUNITI
    ES_REPORT_FINAL.PDF ...................................................................... 21

## Miscellaneous Authorities                                          Page(s)

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Sec. 577 (2017), http://journals.sagepub.com/doi/pdf/10.1177/233150241700500302 ................... 13

Safia Samee Ali, *Farmers Push for Immigration Reform to Counter Labor Shortages and Rising Food Prices*, NBC News (Sept. 5, 2022), https://www.nbcnews.com/news/us-news/farmers-pushing-immigration-reform-counter-labor-shortages-escalating-rcna45741 ......................................... 14

Stephanie Ferguson, *Understanding America's Labor Shortage*, U.S. Chamber of Com. (Aug. 10, 2023), https://www.uschamber.com/workforce/understanding-americas-labor-shortage .............................................................................................. 14

Stuart Anderson, *GOP State Lawsuit Could Stop Sound Way to Reduce Illegal Immigration*, Forbes (Mar. 21, 2023), https://www.forbes.com/sites/stuartanderson/2023/03/21/gop-state-lawsuit-could-end-effective-immigration-parole-programs/?sh=32d8e58b5c19 .................. 21

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ......................................................... 21

Tom K. Wong et al., *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship*, Ctr. for Am. Progress (Feb. 3, 2022), https://tinyurl.com/3crd9h4a ........................................................ 13

U.S. Citizenship & Immigr. Servs., *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated June 14, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans ....................... 20

U.S. Citizenship & Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 12, 2023), https://www.uscis.gov/CHNV ........................................................................ 5-7, 19

U.S. Citizenship & Immigr. Servs., *Uniting for Ukraine* (last updated July 12, 2023), https://www.uscis.gov/ukraine .............................................................. 4

**Miscellaneous Authorities**                                           **Page(s)**

U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007), https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/87xx/doc8711/12-6-immigration.pdf .......... 20

U.S. Customs & Border Prot., *CBP Releases April 2023 Monthly Operational Update* (May 17, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-april-2023-monthly-operational-update .......... 7

U.S. Customs & Border Prot., *CBP Releases January 2023 Monthly Operational Update* (Feb. 10, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update .......... 7

U.S. Dep't of Lab., Bureau of Lab. Stat., *Economic News Release: Labor Force Characteristics of Foreign-Born Workers Summary* (May 18, 2023), https://www.bls.gov/news.release/forbrn.nr0.htm .......... 10

U.S. Dep't of Homeland Sec., *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-an .......... 5

U.S. Dep't of Homeland Sec., *Operations Allies Welcome* (Aug. 29, 2021), https://www.dhs.gov/sites/default/files/publications/21_0903_oaw-fact-sheet_508.pdf .......... 4

U.S. Select Comm'n on Immigr. & Refugee Pol'y, *U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission of Immigration & Refugee Policy* (Mar. 1, 1981), https://babel.hathitrust.org/cgi/pt?id=txu.059173024374848&view=1up&seq=9 .......... 16

Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* 2-4 (Mar. 2018), https://www.clasp.org/sites/default/files/publications/2018/03/2018_ourchildrensfears.pdf .......... 15

Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 26, 2019), https://tinyurl.com/TorbatiReuters .......... 16

**Miscellaneous Authorities**                                        **Page(s)**

Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417 (2017), https://cmsny.org/publications/jmhs-case-for-family-unity/ ................................. 15

## INTEREST OF AMICI CURIAE

In this case, plaintiffs seek to enjoin the U.S. Department of Homeland Security (DHS) from continuing to implement parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("parole processes" or "parole pathways"), under which the government may grant advance authorization to up to 30,000 noncitizens from these countries each month to travel to a port of entry and seek a two-year period of parole in the United States. Amici States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, and Washington, and the District of Columbia submit this brief in support of DHS and in opposition to plaintiffs' motion for a preliminary injunction. This Court has consolidated consideration of plaintiffs' motion for a preliminary injunction with the trial on the merits, and Amici States' arguments support denial of both the preliminary and permanent injunctive relief that plaintiffs request.

Amici States write to emphasize that enjoining the parole pathways would inflict severe harms on communities within our respective jurisdictions and across the Nation. These harms to the public interest—which plaintiffs ignore—warrant denial of plaintiffs' requests for injunctive relief.

Amici States have a strong interest in preserving and encouraging legal immigration through programs like the parole pathways challenged here. Amici States are home to many thousands of immigrants from Cuba, Haiti, Nicaragua, and Venezuela. Immigrants from these countries and other countries are essential to the

fabric of our communities and are key contributors to our economies. They work in critical jobs, pay billions of dollars in taxes, and wield considerable spending power. Indeed, over the past several years, recipients of immigration parole have filled key positions in industries with labor shortages. The parole pathways challenged here similarly allow parole recipients to seek employment authorization and contribute to state and local economies.

Enjoining the parole pathways would not only deprive Amici States of these significant economic and social benefits but would also cause severe public harms. For example, enjoining the parole pathways would place current parolees at immediate risk of removal from the United States to countries with exceptionally dangerous living conditions. Moreover, enjoining the parole pathways would result in family separations and prevent the reunification of families that currently have members living in Amici States' communities. These many public harms confirm that plaintiffs have failed to establish that the public interest or balance of the equities weigh in favor of enjoining the parole pathways—as plaintiffs must establish to obtain preliminary or permanent injunctive relief.

## STATEMENT

The Immigration and Nationality Act gives the Attorney General discretion to grant immigration parole to noncitizens applying for admission to the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" until the purposes of such parole have been served. 8 U.S.C. § 1182(d)(5)(A). "Parole is one of several authorities that allow foreign nationals to live and work in the United States without being formally admitted to the country and without having a set pathway to a permanent immigration status."[1] In this respect, parole shares characteristics of other immigration programs, such as Temporary Protected Status (TPS) and Deferred Action for Childhood Arrivals (DACA).[2]

Over the years, the United States has frequently exercised its parole authority to provide safe harbor to migrants in danger and to reunify separated families. Past parole programs have benefitted various groups, including refugees from Southeast Asia, Cuban nationals, minor children ineligible for refugee status, and family of U.S. military servicemembers.[3] For example, between 1998 and 2003 (the most recent six-year period for which DHS published such data), the United States admitted between 235,000 and 300,000 parolees annually.[4]

---

[1] Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* 1 (Oct. 15, 2020), https://crsreports.congress.gov/product/pdf/R/R46570.

[2] *Id.* at 3.

[3] *Id.* at 1.

[4] *Id.* at 4-5.

3

More recently, the United States has created parole pathways for certain Central American minor children of parents residing in the United States,[5] vulnerable Afghan nationals through Operation Allies Welcome,[6] and Ukrainian citizens and their immediate family members. The United States announced the Uniting for Ukraine parole pathway in 2022, in the wake of the Russian invasion. That pathway makes it possible for eventual parole recipients to stay in the United States for a two-year period, provided that a sponsor "agrees to provide them with financial support for the duration of their stay."[7] The pathway successfully curbed a sudden influx of thousands of Ukrainian immigrants who had started arriving at ports of entry along the southwest border of the United States and shifted such prospective immigrants into a safe and orderly process.[8]

In October 2022, following the success of Uniting for Ukraine, the United States implemented a similar parole pathway for Venezuelans.[9] This pathway drastically "decreased the number of Venezuelan nationals making the dangerous

---

[5] *Id.* at 9.

[6] DHS, *Operations Allies Welcome* 1-2 (Aug. 29, 2021), https://www.dhs.gov/sites/default/files/publications/21_0903_oaw-fact-sheet_508.pdf; *see also* Intervenor Defs.' Opp'n to Pl. States' Challenge to Parole Pathways and to Mot. for Permanent Nationwide Inj. 16-18 (June 20, 2023), ECF No. 175 (detailing similar programs).

[7] U.S. Citizenship & Immigr. Servs. (USCIS), *Uniting for Ukraine* (last updated July 12, 2023), https://www.uscis.gov/ukraine.

[8] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507, 63,508 (Oct. 19, 2022).

[9] *Id.* at 63,507.

journey to and being encountered along" the southwest border.[10] For example, prior to the pathway's implementation, DHS encountered over 1,100 Venezuelan nationals daily on the border between ports of entry; within two months of the pathway's announcement, that number fell to an average of 86 per day.[11]

In January 2023, the United States announced that the parole pathway for Venezuelans would continue and announced similar parole pathways for Cubans, Haitians, and Nicaraguans modeled on the successful processes for Venezuelans and Ukrainians.[12] These parole pathways, which are detailed in the Federal Register,[13] allow qualifying nationals of these countries, along with their spouses and qualifying children, to "request to come to the United States in a safe and orderly way" for a period of up to two years.[14]

---

[10] Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266, 1,268 (Jan. 9, 2023).

[11] *See id.*

[12] DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

[13] *See* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1,255 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1,279 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[14] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 12, 2023), https://www.uscis.gov/CHNV.

The parole pathways allow the United States to "grant advance travel authorization to up to 30,000 noncitizens each month to seek parole on a case-by-case basis."[15] To participate, prospective parolees must "have a supporter in the United States who agrees to provide them with financial support for the duration of their parole in the United States," and can "[d]emonstrate sufficient financial resources to receive, maintain, and support" the applicant, including ensuring that the applicant's health and medical needs are met and assisting the applicant with accessing education and securing employment.[16] After U.S. Citizenship and Immigration Services (USCIS) vets the supporter, the applicant must submit biographic information. USCIS may then, in its discretion, grant the applicant "advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis."[17] When a prospective parolee arrives at a port of entry, USCIS performs "additional screening and vetting" to determine whether to grant parole.[18]

Before parole is granted, the applicant must pass a "robust" national-security screening and public-safety vetting, demonstrate that their parole "is warranted based on significant public benefit or urgent humanitarian reasons," and satisfy other eligibility criteria.[19] Individuals recently removed from the United States, found to

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

have crossed into the United States irregularly after the announcement of the parole pathways, or who are subject to an admissibility bar based on a prior removal order are not eligible to participate.[20]

If an individual is granted parole, he or she is eligible to apply for employment authorization.[21] Parole terminates when the parole period expires or the parole recipient leaves the United States without first securing appropriate documentation.[22]

In January 2023, 11,637 Cubans, Haitians, Nicaraguans, and Venezuelans (including immediate family members if applicable) were paroled into the United States under the parole pathways.[23] Since then, the monthly number of individuals receiving parole through the pathways at issue here has increased, reaching 28,738 individuals in April 2023.[24] As of May 31, 2023, more than 130,000 individuals have entered the United States through the parole pathways.[25]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] U.S. Customs & Border Prot., *CBP Releases January 2023 Monthly Operational Update* (Feb. 10, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update.

[24] *See* U.S. Customs & Border Prot., *CBP Releases April 2023 Monthly Operational Update* (May 17, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-april-2023-monthly-operational-update.

[25] Defs.' Resp. in Opp'n to Mot. for Prelim. Inj., Ex. 1, Decl. of Blas Nuñez-Neto ¶ 33 (June 20, 2023), ECF No. 176-1.

## SUMMARY OF ARGUMENT

Because the public interest and balance of the equities weigh heavily against ending the parole pathways, plaintiffs' request for injunctive relief should be denied.

*First*, enjoining the parole pathways would deprive Amici States of the substantial economic and social contributions that parolees have brought and will continue to bring to state and local economies and communities throughout the Nation. Immigrants pay substantial sums in state and local taxes and wield significant spending power. And parolees in particular hold key jobs in state and local workforces, including in industries facing labor shortages.

*Second*, enjoining the parole pathways would separate families and endanger parolees. In many cases, current or potential parolees will be family members and friends of individuals who are already living in Amici States' communities. Terminating the parole pathways—which would terminate current parolees' status and foreclose future applications—would result in family separations, prevent the reunification of families, and force current or potential parolees to suffer dangerous conditions in their countries of origin.

*Third*, plaintiffs are wrong to argue that the parole pathways increase crime and impose certain costs on States. Plaintiffs ignore key features of the parole pathways that serve to enhance public safety and decrease the costs of services such as healthcare.

8

## ARGUMENT

### THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH HEAVILY AGAINST ENJOINING THE PAROLE PATHWAYS

For the reasons set forth in the applicable policy announcements and defendants' and intervenors' submissions, DHS acted well within its broad discretion in implementing the parole pathways challenged here. Amici States write to highlight another, independent reason to deny plaintiffs' requests for injunctive relief: granting such relief would severely harm the public interest and would be inequitable.

The balance of equities and consideration of the public interest are important factors in assessing the propriety of any injunctive relief, preliminary or permanent. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). Moreover, the fact that the parole pathways serve important humanitarian purposes and benefit the public confirms that DHS acted within the scope of its statutory authority to grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," *see* 8 U.S.C. § 1182(d)(5)(A), and that its implementation of the pathways was neither arbitrary nor capricious. *See* Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. 21-37 (June 20, 2023), ECF No. 176.

Enjoining the continued operation of the challenged parole pathways nationwide, as plaintiffs request, *see* Pl. States' Mot. for Prelim. Inj. ("PI Mot.") 27-28

9

(Feb. 14, 2023), ECF No. 22, would severely harm the public interest in communities within Amici States' respective jurisdictions. Indeed, plaintiffs present a one-sided and inaccurate accounting of the equities and public interest at stake.

## A.   Immigrants Are Key Contributors to the Economies of Amici States.

In the experience of Amici States, the benefits of immigration are profound. Not only do immigrants benefit from the opportunities associated with living in the United States, but the States and the Nation as a whole benefit from immigrants' contributions to our economies and communities. Immigrants enrich the Nation's economic, social, and cultural life; offer pathbreaking contributions in science, technology, and other fields; and ultimately make our diverse communities more desirable places to live.[26]

Immigrants contribute to national, state, and local economies in many ways, including by paying taxes, starting businesses, contributing to state and local labor forces, and consuming goods and services. Approximately 18% of the American workforce is foreign born.[27] Nationally, immigrants pay over $467 billion in taxes, and immigrant-owned companies employ millions of workers.[28] Immigrants' economic

---

[26] Darrell M. West, *The Costs and Benefits of Immigration*, 126 Pol. Sci. Q. 427, 437-41 (2011), www.jstor.org/stable/23056953.

[27] U.S. Dep't of Lab., Bureau of Lab. Stat., *Economic News Release: Labor Force Characteristics of Foreign-Born Workers Summary* (May 18, 2023), https://www.bls.gov/news.release/forbrn.nr0.htm.

[28] Am. Immigr. Council, *Immigrants in United States of America*, https://map.americanimmigrationcouncil.org/locations/national/.

contributions to Amici States are staggering. In New York alone, immigrant-led households paid approximately $23.5 billion in state and local taxes in 2019 and wielded $132.9 billion in spending power.[29] And in 2019, immigrants contributed $244 billion to New York City's gross domestic product (GDP), or about 23% of the city's total GDP.[30] Immigrant-led households in California paid $42.6 billion in state and local taxes in 2019 and exercised $324.1 billion in spending power.[31] In 2014, immigrants in Los Angeles contributed $232.9 billion to the county's GDP, almost 36% of the total.[32] In Washington, immigrant-led households paid $4.4 billion in state and local taxes in 2019 and wielded $39.9 billion in spending power.[33] And in the District of Columbia, immigrant-led households paid $481.1 million in state and local taxes in 2019 and wielded $3.4 billion in spending power.[34]

---

[29] Am. Immigr. Council, *Immigrants in New York*, https://map.american immigrationcouncil.org/locations/new-york/#.

[30] N.Y.C. Mayor's Office of Immigr. Affs., *State of Our Immigrant City* 32 (2021), https://www.nyc.gov/assets/immigrants/downloads/pdf/MOIA-Annual-Report -for-2020.pdf.

[31] Am. Immigr. Council, *Immigrants in California*, https://map.american immigrationcouncil.org/locations/california/#.

[32] New Am. Econ., *New Study Shows the Economic Power of Immigrants in Los Angeles* (Feb. 8, 2017), http://www.newamericaneconomy.org/wp-content/uploads/ 2017/02/LA_Brief_V8.pdf.

[33] Am. Immigr. Council, *Immigrants in Washington*, https://map.american immigrationcouncil.org/locations/washington/.

[34] Am. Immigr. Council, *Immigrants in District of Columbia*, https://map. americanimmigrationcouncil.org/locations/district-of-columbia/.

Immigrants often fill important but low-wage jobs that other workers may decline to take, especially in burgeoning sectors such as at-home healthcare.[35] For example, in New York, immigrants made up 27.1% of the labor force in 2019 and held 55.7% of healthcare aide jobs and 59.1% of building cleaning and maintenance jobs.[36] In California, immigrants made up 32.6% of the labor force in 2019, and held 68% of crop production jobs, 70.2% of apparel manufacturing jobs, and 45.5% of healthcare aide jobs.[37] Immigrants account for similarly substantial portions of the labor forces of other States and localities.[38]

The parole pathways at issue here make an important contribution to these benefits to national, state, and local economies. The parole pathways allow individuals who are ultimately granted parole to seek employment authorization, and the pathways further require supporters to assist the parolees that they sponsor in locating employment. See *supra* at __. As a result, people who enter the country through immigration parole—together with other immigrants who have work authorization—have helped to ease worker shortages in critical industries.[39]

---

[35] Dan Kosten, Nat'l Immigr. F., *Immigrants as Economic Contributors: They Are the New American Workforce* (June 5, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-they-are-the-new-american-workforce/.

[36] Am. Immigr. Council, *Immigrants in New York*, *supra*.

[37] Am. Immigr. Council, *Immigrants in California*, *supra*.

[38] *See, e.g.*, Am. Immigr. Council, *Immigrants in Washington*, *supra*; Am. Immigr. Council, *Immigrants in District of Columbia*, *supra*.

[39] Lydia DePillis, *Immigration Rebound Eases Shortage of Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023), https://www.nytimes.com/2023/02/06/business/economy/immigration-labor.html.

According to one estimate, "some 450,000 paroled adults who entered the U.S. in 2021 and 2022 are likely working in industries with labor shortages," such as construction, food services, retail, professional and business services, manufacturing, transportation, warehousing, utilities, and healthcare.[40] And by 2023, recipients of immigration parole helped to reduce job openings in these industries by as much as 25%—"all without displacing American workers."[41]

Parole recipients' contributions to national, state, and local economies join the already significant contributions of immigrants who obtained temporary legal status through other programs. For example, in a 2021 survey of DACA recipients, nine out of ten individuals reported that they were employed or in school.[42] Similarly, more than eight in ten TPS recipients from El Salvador, Honduras, and Haiti participate in the labor force.[43]

Enjoining the parole pathways at issue here would harm Amici States and the public interest. Decreasing the number of immigrants who enter the country legally through these pathways would prevent the entry of individuals who contribute

---

[40] FWD.us, *Immigration Parole Has Added 450,000 Workers to Industries with Critical Labor Shortages* (Apr. 20, 2023), https://www.fwd.us/news/immigration-labor-shortages/.

[41] *Id.*

[42] Tom K. Wong et al., *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship*, Ctr. for Am. Progress (Feb. 3, 2022), https://tinyurl.com/3crd9h4a.

[43] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Sec. 577, 577 (2017), http://journals.sagepub.com/doi/pdf/10.1177/ 233150241700500302.

positively to our workforces and grow our economies. Such harms weigh heavily against injunctive relief, especially when businesses around the country are facing persistent labor shortages.[44]

## B.   Enjoining the Parole Pathways Would Separate Families and Subject Parolees to Danger.

Amici States have a strong interest in fostering the reunification of community members with family in danger abroad and preventing the many harms that would result from separating families that have already been reunited through the parole pathways. All parole recipients must have supporters in the United States who have agreed to provide them with financial support for the duration of their parole period. And in many cases, these supporters are family members and close friends. Thus, enjoining the parole pathways will separate families and prevent reunification. It would also upend the lives of children granted parole as the immediate family members of parolees. And it would place current and prospective parolees in danger.

---

[44] *See, e.g.*, Stephanie Ferguson, *Understanding America's Labor Shortage*, U.S. Chamber of Com. (Aug. 10, 2023), https://www.uschamber.com/workforce/understanding-americas-labor-shortage (listing low immigration rate as factor contributing to labor shortage); Howard Schneider, *Fed's Barkin: Labor Shortages May Persist*, Reuters (Feb. 17, 2023), https://www.reuters.com/markets/us/feds-barkin-labor-shortages-may-persist-2023-02-17/ (same); Abha Bhattarai, *Worker Shortages Are Fueling America's Biggest Labor Crises*, Wash. Post (Sept. 16, 2022), https://www.washingtonpost.com/business/2022/09/16/worker-shortage-strikes-economy/ (same); *see also* Safia Samee Ali, *Farmers Push for Immigration Reform to Counter Labor Shortages and Rising Food Prices*, NBC News (Sept. 5, 2022), https://www.nbcnews.com/news/us-news/farmers-pushing-immigration-reform-counter-labor-shortages-escalating-rcna45741.

Prolonged or permanent family separations have a devastating impact on the welfare of our communities. Multiple studies illustrate that family reunification benefits the economic, social, and psychological well-being of the affected individuals,[45] while family separation results in myriad harms. Separating family members from each other can result in negative health outcomes, including mental- and behavioral-health issues, such as severe stress and symptoms of post-traumatic stress disorder.[46] Separation can be particularly traumatizing to children, resulting in a greater risk of cognitive impairment and developing mental-health disorders such as depression, anxiety, and attention-deficit/hyperactivity disorder.[47] Trauma can also have negative physical effects on children, such as loss of appetite, stomachaches, and headaches, which can become chronic if left untreated.[48] A child's concern about his or her parents' immigration status can also impair socioemotional and cognitive

---

[45] Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417, 423 (2017), https://cmsny.org/publications/jmhs-case-for-family-unity/.

[46] *See* Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 1, 2-3 (July 2019), https://tinyurl.com/NCFRpolicybrief.

[47] Allison Abrams, *Damage of Separating Families*, Psychology Today (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families.

[48] *Id.*; *see also* Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* 2-4 (Mar. 2018), https://www.clasp.org/sites/default/files/publications/2018/03/2018_ourchildrensfears.pdf.

development.[49] Similarly, spousal separation can cause fear, anxiety, and depression.[50]

Amici States will also feel the impact of such harms on their residents. Intact families provide crucial social support, which strengthens not only the family unit but also the neighborhood, community, and civic society at large. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) ("It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."). The Select Commission on Immigration and Refugee Policy, a congressionally appointed commission tasked with studying immigration policy, expounded upon the necessity of family reunification in 1981:

> The reunification of families serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and well-being of the nation. Psychologically and socially, the reunion of family members with their close relatives promotes the health and welfare of the United States.[51]

By contrast, denying families the ability to reunite contradicts the foundations of our immigration system and will irreparably harm our families, neighborhoods, and

---

[49] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120-36 (2011).

[50] *See, e.g.,* Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 26, 2019), https://tinyurl.com/TorbatiReuters (stating that the separation of a U.S. citizen from his non-citizen wife caused them both to "break down psychologically").

[51] U.S. Select Comm'n on Immigr. & Refugee Pol'y, *U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission of Immigration & Refugee Policy* 112 (Mar. 1, 1981), https://babel.hathitrust.org/cgi/pt?id=txu.059173024374848&view=1up&seq=9.

communities. Removing a family's wage-earners from the labor force—either through removal to a foreign country or termination of parole status—also leads to economic hardship for families in Amici States' communities.

Moreover, enjoining the parole pathways would also expose many current parole recipients to grave personal danger by forcing them to return to the dangerous conditions from which they fled. It would similarly place in danger tens of thousands of individuals who would otherwise be entitled to seek relief. For example, "Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country." Implementation of a Parole Process for Haitians, 88 Fed. Reg. at 1,246. Collectively, these crises have led to the collapse of Haiti's economy and the proliferation of gangs, which carry out hundreds of killings, assaults, and kidnappings, and have left "Haitians struggling to find basic products including food, water, and medicines." *Id.* at 1246-47. Haiti is currently subject to a level 4 "do not travel" advisory (the highest level) "due to kidnapping, crime, civil unrest, and poor health care infrastructure."[52]

Likewise, Nicaraguan nationals flee "political, economic, and humanitarian crises," including the government's "regime of terror and . . . suppression of all freedoms." Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. at 1,258

---

[52] Bureau of Consular Affs., U.S. Dep't of State, *Haiti Travel Advisory* (July 27, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html.

(quotation marks omitted). "Nicaragua is one of the poorest countries in Latin America," with almost 30% of families living in poverty, *id.*, and is currently subject to a level 3 travel advisory due to arbitrary law enforcement, wrongful detention, crime, and limited healthcare.[53]

In Venezuela, the combination of "[a] complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country." Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. at 63,509. Venezuela is currently subject to a level 4 "do not travel" advisory due to civil unrest, crime, kidnapping, arbitrary law enforcement, terrorism, and limited healthcare.[54]

And Cuban nationals also face multiple challenges, including Cuba's "worst economic crisis in decades," marked by "[m]ass shortages of dairy and other basic goods," and "[d]eepening poverty." Implementation of a Parole Process for Cubans, 88 Fed. Reg. at 1,269-70. The Cuban government has resorted to "repressive tactics to manage public discontent," including restricting "freedoms of expression, association, peaceful assembly, and other human rights." *Id.* at 1270.

---

[53] Bureau of Consular Affs., U.S. Dep't of State, *Nicaragua Travel Advisory* (July 17, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Nicaragua.html.

[54] Bureau of Consular Affs., U.S. Dep't of State, *Venezuela Travel Advisory* (July 17, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html.

For individuals who have already been granted parole, ending the parole pathways would mean returning to these dangerous, violent, and repressive conditions. And preventing prospective parole recipients from accessing relief means narrowing any chance of escape. Amici States and the public at large have strong interests in avoiding such harms, as well as in preventing the many harms that would result from family separation.

## C. Plaintiffs' Assessment of the Public Interest and the Equities Is Fundamentally Flawed.

Not only do plaintiffs fail to account for the contributions and harms discussed above (*see* PI Mot. at 26-27), they also incorrectly argue that the parole pathways increase crime and impose certain costs on States. This argument ignores key features of the policies that expressly address plaintiffs' purported concerns. Indeed, continuing the parole pathways will likely *decrease* both crime and costs to States for law enforcement, healthcare, and other services.

For example, plaintiffs' argument that the parole pathways would increase healthcare costs (PI Mot. at 12) disregards the increased costs that would ultimately result from ending the program. Not only must parole pathways applicants have supporters who commit to ensuring that parolees' "health care and medical needs are met for the duration of the parole,"[55] but those granted parole through these processes are eligible for work authorization and employer-sponsored healthcare. For individ-

---

[55] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, *supra.*

uals already paroled into the United States, losing their parole status would take away their access to work authorization, leaving them without a way to receive health insurance for themselves and their families. Thus, terminating the parole pathways would increase Amici States' costs to provide care to uninsured residents—including emergency health services and funding for public health programs that serve underinsured patients.[56]

Plaintiffs' arguments regarding law enforcement and correctional costs (PI Mot. at 12-13) are also misguided. The parole pathways require applicants to "[p]ass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns."[57] This screening includes the collection of biographic and biometric information, including fingerprinting upon arrival.[58] DHS's ability to screen parole recipients helps to mitigate the risk of crime. Because the parole pathways have significantly reduced illegal border crossings into the United States, DHS can better ensure that individuals entering the country do not pose national-security or public-safety concerns. Indeed, commentators across the ideological spectrum have observed that the parole pathways "have been extraordina-

---

[56] *See* U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007), https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/87xx/doc8711/12-6-immigration.pdf.

[57] USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated June 14, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.

[58] *Id.*

rily effective in reducing illegal entry,"[59] as DHS's statistics confirm.[60] Moreover, if the pathways were terminated, any current parolees who remain would be less likely to report crime due to fear of removal, or of having a family or community member removed.[61] And when law enforcement is unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers.[62]

 For these reasons, the parole pathways account for and mitigate the alleged harms that plaintiffs identify, and the public interest weighs in favor of allowing the pathways to stay in place.

---

[59] *See* Stuart Anderson, *GOP State Lawsuit Could Stop Sound Way to Reduce Illegal Immigration*, Forbes (Mar. 21, 2023), https://www.forbes.com/sites/stuart anderson/2023/03/21/gop-state-lawsuit-could-end-effective-immigration-parole-progr ams/?sh=32d8e58b5c19; Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, Manhattan Inst. (May 25, 2023), https://manhattan.institute/article/ bidens-immigration-parole-programs-are-working.

[60] Decl. of Blas Nuñez-Neto, *supra*, ¶¶ 18-31.

[61] *See, e.g.*, Nik Theodore, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 14 (May 2013), https://www.policylink.org/sites/default/files/ INSECURE_COMMUNITIES_REPORT_FINAL.PDF; James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.

[62] *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/ article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (sanctuary counties have lower crime rates than comparable nonsanctuary counties).

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated:    New York, New York
          August 16, 2023

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*

                              By:   */s/ Stephen J. Yanni*
                                        STEPHEN J. YANNI
                                        Assistant Solicitor General
                                        Attorney-in-Charge
                                        New York Bar No. 5482070
                                        S.D. Tex. Bar No.:
                                        *Admitted pro hac vice*

BARBARA D. UNDERWOOD                    28 Liberty Street
  *Solicitor General*                   New York, NY 10005
JUDITH N. VALE                          Telephone: (212) 416-6184
  *Deputy Solicitor General*            Facsimile:  (212) 416-8962
STEPHEN J. YANNI
  *Assistant Solicitor General*
        *of Counsel*

*(Counsel listing continues on next page.)*

22

ROB BONTA
*Attorney General*
*State of California*

WILLIAM TONG
*Attorney General*
*State of Connecticut*

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*

KWAME RAOUL
*Attorney General*
*State of Illinois*

AARON M. FREY
*Attorney General*
*State of Maine*

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General*
*State of Michigan*

KEITH ELLISON
*Attorney General*
*State of Minnesota*

AARON D. FORD
*Attorney General*
*State of Nevada*

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*

ROBERT FERGUSON
*Attorney General*
*State of Washington*

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

23

## CERTIFICATE OF WORD COUNT

Pursuant to Court Procedure 16(c), I hereby certify that, according to the word count feature of the word processing program used to prepare this document, the document contains 4,783 words and otherwise complies with the Court's formatting requirements.

 /s/  Stephen J. Yanni