United States Courts
Southern District of Texas
FILED

*August 17, 2023*

Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

STATE OF TEXAS, et al.,

                    Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

                    Defendants.

Civil Action No. 6:23-cv-00007

**BRIEF OF *AMICUS CURIAE* LEGAL INFORMATION NETWORK
FOR UKRAINE IN SUPPORT OF INTERVENOR DEFENDANTS**

———————————————————————

Edmund Polubinski
*Counsel for* Amicus Curiae
*Attorney in Charge*
New York Bar No. 3022332
Southern District Bar No. 3498419

Nishan Bhaumik, *of counsel*
Maya Kapelnikova, *of counsel*
Michael Kucharski, *of counsel*
Amelia T.R. Starr, *of counsel*
Jaclyn M. Willner, *of counsel*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4695
edmund.polubinski@davispolk.com

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES …………………………………………………....4

STATEMENT OF INTEREST OF AMICUS CURIAE ………………………….....7

SUMMARY OF ARGUMENT…………………………………………………...8

ARGUMENT ………………………………………………………………10

A. Uniting for Ukraine has been championed, across the political spectrum, as one of the most successful immigration programs……………………….…10

B. The Uniting for Ukraine program is materially indistinguishable from the Parole Programs provided for Cuba, Haiti, Nicaragua, and Venezuela……...13

C. The U4U Program is a Successful Model of Country-Specific Humanitarian Protection……………………………………………………………16

D. Structure and Similarities Between U4U and CHNV Make Any Challenge to CHNV Inconsistent………………………………………………..…20

    a. Security and Vetting of Applicants…………………………………21

    b. Mandatory Private Financial Sponsorship Reduces Burden on Public Services …………….…………………………………….........22

    c. Case-by-case Determination …………………….…………………23

E. U4U Successfully Serves Public and Government Interest. By Design, CHNV Successfully Serves the Same Interests.…………………………….........25

    a. U4U Serves Public Interests by Fostering Family Reunification, a Longstanding Value in US Immigration Law ………………………25

    b. Just as the U4U program addresses the humanitarian crisis resulting from the war in Ukraine, the CHNV program addresses US government findings of the widespread urgent humanitarian crisis in Cuba, Haiti, Nicaragua, and Venezuela. ……………………………26

    c. Both Programs are a Far More Efficient and Streamlined Solution to Serve United States' Obligation and Policy to Provide Humanitarian Support to People Fleeing Danger …………………………………28

    d. Both parole programs ensure rigorous security and vetting through a case-by-case adjudication …………………………………………...……..29

  e. Both parole programs bolster struggling state economies and support individual economic self-sufficiency ……………………….........30

UNITING FOR UKRAINE EXAMPLES …………………………………………...32

  A. Yelizaveta Marushchak – Successful family reunification and protection from war crimes. ……………………………………………………………..32

  B. Valentyna Veretska – International Professional Athlete and American Business Owner ………………………………………………………..33

  C. Yuliia Aksaniuk – Successful family reunification, gainfully employed, rejected public benefits, and is now "an honest taxpayer" …………………35

  D. Polina Herman – Talented filmmaker who is producing films in Los Angeles and is enrolled in a professional program for producers at UCLA. …………37

CONCLUSION ……………………………………………………………………39

## TABLE OF AUTHORITIES

### STATUTES

8 U.S.C. § 1182(d)(5)(A).

### OTHER AUTHORITIES

Alexandra Ciullo, "*Humanitarian Parole: A Tale of Two Crises,*" 37 Geo. Immigr. L.J. 493 (Spring 2023)……………………………………………………………..……15

Ashley Murray, *Ukrainians by the Thousands Arrive in States, but with a Time Limit*, NJM (Jan. 20, 2023)…………………………………………………………………...10

Camilo Montoya-Galvez, *1.5 Million Apply for U.S. Migrant Sponsorship Program With 30,000 Monthly Cap*, (May 22, 2023) …………………………………………………...23

Congressional Research Service, R4315, *U.S. Family-Based Immigration Policy* (2018)……………………………………………………………………………………25

Daniel Di Martino, *Biden's Immigration Parole Programs are Working*, Manhattan Inst. (May 25, 2023)…………………………………………………………………………11, 28

Flores, *The US asylum backlog is nearing 1.6 million, the highest number on record*, CNN, Dec. 26, 2022…………………………………………………………………...8

Gil Guerra, *Uniting for Ukraine has Been a Resounding Success. Here's what we've Learned*, Niskanen Center (Feb. 7, 2023) …………………………………………………11

*Immigrants Contribute Greatly to U.S. Economy Despite Administration's Public Charge Rule,* Center on Budget and Policy Priorities (August 15, 2019)……………………..29

*Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1266, 1270 (Jan. 9, 2023) ………………………………………………………...17, 19, 20, 21, 23, 26

*Implementation of a Parole Process for Haitians*, 88 Fed. Ref. 1243, 1246 (Jan. 9, 2023) ………………………………………………………………………20, 26

*Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255, 1259 (Jan. 9, 2023)………………………………………………………………………..20, 26

*Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25040, 25040 (Apr. 27, 2022)……………………………………………………………...12

*Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63507, 63509 (Oct. 19, 2022)……………………………………………………………………...20, 26

Johanna Burke, *Are Refugees Bad or Good for the Economy?*, ICMC (July 14, 2020)…………………………………………………………………………27, 30

Julia Ainsley, *U.S. has Admitted 271,000 Ukrainian Refugees Since Russian Invasion, Far Above Biden's Goal of 100,000*, NBC News (Feb. 24, 2023) …………………..23

Philip E. Wolgin, *Family Reunification is the Bedrock of U.S. Immigration Policy*, Center for American Progress (Feb. 12, 2018)……………………………………………..24

Press Release, *Homeland Security, Statement from Secretary Mayorkas on the Anniversary of Russia's Unprovoked Invasion of Ukraine* (Feb. 24, 2023) ………...10, 13

Refugee Resettlement, *Benefits for Ukrainian Humanitarian Parolees: Fact Sheet* (May 2022) ……………………………………………………………………….…22

Refugee Resettlement, *Policy Letter 16-01: Documentation Requirements for the Refugee Resettlement Program* (Nov. 29, 2022) …………………………………………………22

Robin Dunn Marcos, *Dear Colleague Letter 23-13: Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, Admin. Child. & Fams. (Jan. 6, 2023) …20, 22

Stef W. Knight, *Scenes from the Border: Chaos, Desperation*, Axios (May 10, 2023) …………………………………………………………………………28

U.S. Citizenship and Immigr. Servs*., Asylum*……………………………………………28

U.S. Citizenship & Immigr. Servs., *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (June 14, 2023)…………………..…19

U.S. Citizenship & Immigr. Servs., *Frequently Asked Questions About Uniting for Ukraine*, (June 14, 2023)………………………………………………..…...14, 24

U.S. Citizenship & Immigr. Servs., Process for Cubans, Haitians, Nicaraguans, and Venezuelans*,* (July 12, 2023)………………………………………...18, 20, 21, 24

U.S. Citizenship & Immigr. Servs, *Uniting for Ukraine*………………………..29

U.S. Customs and Border Protection, *Uniting for Ukraine*, Publishing No. 1719-0422 (April 21, 2022)………………………………………………………………………10

U.S. Department of Homeland Security, *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows That Lawful Pathways Work* (July 25, 2023) ………………………………………22, 23, 24

U.S. Department of Homeland Security, *Uniting for Ukraine*………...…….. 8, 10, 11, 13

YMCA of Greater N.Y., *Uniting for Ukraine* …………………………..………..20, 21

[Intentionally left blank]

## STATEMENT OF INTEREST OF AMICUS CURIAE

Legal Information Network for Ukraine (LINU) is a legal resources organization born out of an urgent need to provide timely and accurate US immigration information to all those fleeing their homes as a result of the war in Ukraine, and to those unable to return to their homes because of ongoing military action or fear of persecution. Their immediate objective is to offer legal information to those displaced by the war in Ukraine who are seeking entry to the United States. Their mission is to create clarity and transparency into the current legal processes, outline options and, when possible and needed, connect those seeking support with legal providers and resources. Much of LINU's services involve assisting Ukrainians understand their options under Uniting for Ukraine ("U4U"), temporary protected status for Ukrainians, asylum, humanitarian parole, family-based immigration, employment-based immigration, and Lautenberg Program options. LINU also provides support for those seeking to sponsor Ukrainians and those who need assistance navigating the various benefits that might be available to them, such as refugee benefits, or benefits designated for Ukrainian Humanitarian Parole.

As one of the few dedicated Ukrainian legal resource providers, LINU is uniquely positioned by having a legal team staffed with senior immigration law experts and volunteers with decades of combined experience in immigration law and policy, who are also leaders in local and national advocacy efforts and are active in the American Immigration Lawyers Association.  Their services have a wide reach assisting ***thousands*** of Ukrainians across the United States seeking safety and sanctuary. As of August 14, 2023, LINU has hosted 52 informational sessions or webinars that attracted approximately 2,539 registrants from individuals, to non-profits, and community leaders,

and supported approximately over 600 people with their request for legal information and support.   It is through this large network of Ukrainians who have fled the war and have benefited from parole programs such as United for Ukraine and other humanitarian programs such as Temporary Protected Status and asylum, that they are able to draw information and experiences to authoritatively highlight the deep impact and resounding success of the parole program known as United for Ukraine.

### SUMMARY OF ARGUMENT

On April 21, 2022, President Biden announced *Uniting for Ukraine* ("U4U"), a new streamlined process to provide Ukrainian citizens who have fled Russia's unprovoked war of aggression opportunities to come to the United States. https://www.dhs.gov/ukraine. Uniting for Ukraine builds on the robust history of humanitarian assistance provided by the U.S. government while also ensuring that those entering the United States meet stringent eligibility criteria to be considered for parole. As The Department of Homeland Security describes, all applicants must have an eligible US-based financial guarantor submit to a vetting process by the US Government that protects against exploitation and abuse as well as verifies the financial ability to support the applicant. *See* U.S. Department of Homeland Security, *Uniting for Ukraine*, available at www.dhs.gov/ukraine.  Only after financial support is vetted, applicants may then proceed through multiple additional rigorous vetting requirements: Applicants must present valid identity documents, must complete vaccinations and public heath requirements, and must pass rigorous biographic screening, vetting, and security checks.

*Id.*; *see also* U.S. Customs and Border Protection, Uniting for Ukraine, Publishing No. 1719-0422 (April 21, 2022).[1]

The Uniting for Ukraine program has been widely celebrated by progressives and conservatives as an exemplary model that provides efficient, reasonable, secure, and expedient processing of refugees fleeing persecution.  In comparison to the asylum backlog of nearly 1.6 million applications pending in US immigration courts and at US Citizenship and Immigration Services, the Uniting for Ukraine program presents an astonishingly common-sense approach that supports refugees, ensures the safety of participants and communities, dramatically reduces financial costs to the taxpayer, and minimizes the burden on social services. *See* Flores, The US asylum backlog is nearing 1.6 million, the highest number on record, CNN, Dec. 26, 2022.

Built on the remarkable success and bipartisan support of the Uniting for Ukraine program, the Government announced a similar program to support the humanitarian crisis occurring in Cuba, Haiti, Nicaragua, and Venezuela.  As Texas has agreed, the parole options for citizens from Cuba, Haiti, Nicaragua, and Venezuela, are nearly indistinguishable from the lauded Uniting for Ukraine program.  ECF 20 ¶ 43.  In fact, as discussed below, the Uniting for Ukraine program has fewer limitations, whereas the parole programs currently being challenged have more restrictions and monthly limits on approvals.

In summary, the below analysis and client stories that follow, show the inconsistency of championing the Uniting for Ukraine program as a successful

---

[1] U.S. Customs and Border Protection, Uniting for Ukraine, Publishing No. 1719-0422 (April 21, 2022), available at https://www.cbp.gov/sites/default/files/assets/documents/2022-Apr/Uniting%20for%20Ukraine%2020220421.pdf

immigration and refugee model, while challenging the materially indistinguishable parole programs available to citizens fleeing Cuba, Haiti, Nicaragua, and Venezuela.  Plaintiff's challenge, therefore, must similarly fail.

## I.    ARGUMENT

### A.  Uniting for Ukraine has been championed, across the political spectrum, as one of the most successful immigration programs.

"On April 21, 2022, the United States announced a key step toward fulfilling President Biden's commitment to welcome Ukrainians fleeing Russia's invasion." *Uniting for Ukraine*, USCIS, https://www.uscis.gov/ukraine (last visited Aug. 6, 2023). Uniting for Ukraine, or "U4U," provided an immediate, and expedited option for Ukrainian citizens living outside of the United States to come to the United States and escape the harmful effects of Russia's invasion of Ukraine.  *Id.*  Under U4U, the participating individuals may temporarily stay for a two-year period.  *Id.*  U4U created a "new streamlined process" for Ukrainian citizens to escape Russia's "unprovoked" war in Ukraine.  *Uniting for Ukraine*, DHS (last updated Apr. 28, 2023), https://www.dhs.gov/ukraine.

To participate in the program, the individual seeking parole under U4U must have "a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States."  *Id.*[2]  Further, this program also allows the

---

[2] A "supporter" is defined as:

> An individual who holds lawful status in the United States or is a parolee or beneficiary of deferred action or Deferred Enforced Departure (DED) who has passed security and background vetting and demonstrated sufficient financial resources to receive, maintain, and support the individuals whom they commit to support for the duration of their stay in the United States.  *Id.*

To become a supporter, the supporter submits a Form I-134A, which is an online request to be a supporter and where the supporter declares their financial support.  *Id.*

"beneficiary"—the individual receiving parole under U4U—to also bring their "immediate family members," which includes their spouse and unmarried children under the age of 21 who are non-Ukrainian citizens.[3]  By tying membership in the program to the consent of a supporter, U4U sought to limit the number of crossings at the United States' southern border.  *See Uniting for Ukraine*, DHS ("From April 25, 2022, Ukrainian nationals who present at U.S. Southwest border land ports of entry without a valid visa or without pre-authorization to travel to the United States through Uniting for Ukraine may be denied entry and referred to apply through this process.").

The program so far has been a success.  In the first ten months of the program, over 115,000 Ukrainians were admitted to the United States under the U4U program.  Press Release, Homeland Sec., Statement from Secretary Mayorkas on the Anniversary of Russia's Unprovoked Invasion of Ukraine (Feb. 24, 2023), https://www.dhs.gov/news/2023/02/24/statement-secretary-mayorkas-anniversary-russias-unprovoked-invasion-ukraine.  Over 200,000 supporters have submitted applications to sponsor Ukrainian individuals fleeing the war during this same time period.  Ashley Murray, *Ukrainians by the Thousands Arrive in States, but with a Time Limit*, NJM (Jan. 20, 2023) https://newjerseymonitor.com/2023/01/20/ukrainians-by-the-thousands-arrive-in-states-but-with-a-time-limit/.  The supporters have been widespread: "[t]he 10 states with the most sponsors per capita include Democratic strongholds in the Pacific northwest (Washington and Oregon), solidly red states on either end of the country (Alaska and Florida), and battleground states in the Mid-Atlantic and Midwest

---

[3] *Id.*  Immediate family members are not automatically included.  Instead, the supporter must file separate 134As for each person.

(Pennsylvania and Ohio)."  Gil Guerra, *Uniting for Ukraine has Been a Resounding Success. Here's what we've Learned*, NISKANEN CTR. (Feb. 7, 2023), https://www.niskanencenter.org/uniting-for-ukraine-has-been-a-resounding-success-heres-what-weve-learned/.  Ultimately, the supporters do not reside in any one specific area of the country.

U4U has also dramatically decreased southern border crossings by Ukrainians. After Russia's invasion, "Ukrainian encounter numbers [at the southern border] climbed dramatically," *id.*, peaking at 20,118 in April 2022, which was substantially higher than the "2021 average of nearly 400 Ukrainian encounter[s] at the border every month." Daniel Di Martino, *Biden's Immigration Parole Programs are Working*, MANHATTAN INST. (May 25, 2023), https://manhattan.institute/article/bidens-immigration-parole-programs-are-working.  Following the implementation of U4U, encounters in May dropped significantly to 375—or in essence, "***a staggering 98% drop in the span of a month***."  Gil Guerra, *Uniting for Ukraine has Been a Resounding Success. Here's what we've Learned*.



Fig. 1. Daniel Di Martino, *Biden's Immigration Parole Programs are Working*, at Fig. 10.

Additionally, for the rest of 2022, Ukrainian encounters at the southern border averaged 92 per month, which is a figure much lower than that for Russians (3,624) and Romanians (368) during the same time period. *Id.*

### B. The Uniting for Ukraine program is materially indistinguishable from the Parole Programs provided for Cuba, Haiti, Nicaragua, and Venezuela.

The Uniting for Ukraine Parole Program, established through a Federal Register notice in April 2022, allows qualifying Ukrainian citizens and their immediate family members, to obtain advance authorization to travel to the United States and be considered for temporary parole and employment authorization for up to two years. Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040, 25040 (Apr. 27, 2022). The Department of Homeland Security ("DHS") established this parole program in response to the displacement of Ukrainians stemming from Russia's "war of aggression" in Ukraine. *Id.* The parole process is meant to provide a "safe, legal, and orderly pathway to support vulnerable Ukrainian citizens and their immediate family members in Europe who have been displaced from their country as a result of Russia's unprovoked invasion." *Id.* In line with its goal of creating a safe, legal, and orderly pathway, DHS has indicated that following its establishment of Uniting for Ukraine, Ukrainians who attempt to enter the United States at the Southwest border will be denied entry there. *Uniting for Ukraine*, DHS, https://www.dhs.gov/ukraine (last updated Apr. 28, 2023).

While President Biden committed to providing refuge to 100,000 displaced Ukrainians, there is no cap on the number of individuals that can be paroled through Uniting for Ukraine. *Id.* Rather, DHS has indicated that the "generosity of supporters in the United States" will drive demand for the pathway and thus determine whether the

United States meets or exceeds its goal. *Id.* In fact, Secretary of Homeland Security Alejandro Mayorkas indicated that the US welcomed over 115,000 Ukrainians through the parole program between April 2022 and February 2023.  Press Release, Homeland Sec., Statement from Secretary Mayorkas on the Anniversary of Russia's Unprovoked Invasion of Ukraine.

Decisions on whether to grant parole are made on a case-by-case status, and parole is granted where there are "urgent humanitarian reasons or significant public health" justifications. 87 Fed. Reg. at 25040; *see also* 8 U.S.C. § 1182(d)(5)(A). Additionally, parolees must pass biometric and biographic vetting, have sufficient financial support in the United States, and meet a series of additional criteria. 87 Fed. Reg. at 25040. For example, parolees must have been physically present in Ukraine immediately before Russia's invasion of Ukraine (as of February 11, 2022), and Ukrainians who are already present in the US are not eligible for parole under Uniting for Ukraine. U.S. Citizenship & Immigr. Servs., *Frequently Asked Questions About Uniting for Ukraine*, (June 14, 2023). Additionally, Ukrainian beneficiaries must possess a valid Ukrainian passport (or be a child included on a parent's passport). *Id.* Those who are seeking parole but are not Ukrainian citizens, must be immediate family members of a Ukrainian citizen beneficiary of Uniting for Ukraine with a valid passport. Uniting for Ukraine¸ USCIS, https://www.uscis.gov/ukraine (last updated Jul. 12, 2023). Children seeking parole without their parent or legal guardian are ineligible for Uniting for Ukraine. *Id.*

Parolees must also have a US-based "supporter" who agrees to financially support the parolee. Furthermore, Uniting for Ukraine requires that supporters, rather than the

individuals seeking refuge, initiate the application process. USCIS conducts background checks on supporters "to protect against exploitation and abuse and to determine the supporters' financial suitability to support beneficiaries." 87 Fed. Reg. at 25042-43. Beneficiaries themselves are vetted against national security and law enforcement databases. *Id.*

Once Ukrainian beneficiaries are cleared, they are authorized for a period of ninety days to travel to the United States. *Id.* Beneficiaries are responsible for arranging and paying for their own travel. *Id.* However, an authorization to travel to the United States does not guarantee parole status—parole decisions are made at ports of entry, and Ukrainians who arrive at ports of entry without adequate travel documents, for example, will be refused entry. *See id.* At ports of entry, U.S. Customs and Border Protection officers conduct inspections of those seeking refuge and make final determinations on whether to grant parole. *Id.*

Paroled individuals are authorized to work in the United States. Uniting for Ukraine¸ USCIS, https://www.uscis.gov/ukraine (last updated Jul. 12, 2023). Parolees may also be entitled to certain federal "mainstream" benefits, such as cash assistance, health insurance through Medicaid, and food assistance through SNAP. Those who are not entitled to these mainstream benefits might instead be eligible for benefits through state agencies. Furthermore, parolees can be eligible for employment assistance through Refugee Support Services (RSS) which provides services including, but not limited to, English language training, job training, and transportation services.

Uniting for Ukraine has been viewed as an overwhelmingly successful program "that demonstrates USCIS's ability to respond to a massive humanitarian crisis rapidly

and innovatively [and] [t]his response also shows the willingness of Americans to support Ukrainian refugees. Ciullo, "Humanitarian Parole: A Tale of Two Crises," 37 Geo. Immigr. L.J. 493 (Spring 2023). Indeed, the success of Uniting for Ukraine, is further evidenced by DHS modeling the parole programs for nationals from Cuba, Haiti, Nicaragua, and Venezuela after Uniting for Ukraine.

### C.  THE U4U PROGRAM IS A SUCCESSFUL MODEL OF COUNTRY-SPECIFIC HUMANITARIAN PROTECTION

Since its implementation, the U4U program has proved to be a remarkable success and has provided refuge to many Ukrainians fleeing the conflict in Ukraine. Following this successful model, on January 9, 2023, the Biden Administration announced that it would be implementing a special 2-year humanitarian parole option specifically for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") in response to an alleged surge of migrants from these four nations at the border. The Biden Administration consciously modelled this policy on the successful U4U program. The CHNV program is meant only for migrants that were located outside the United States and required that migrants apply for the program before reaching the United States border. In addition, the program had the following legal requirements for all migrants:

1) Have a financial supporter in the United States;

2) Undergo and clear a robust security vetting;

3) Meet other eligibility criteria, including being a national of the CHNV countries; and

4) Warrant a favorable exercise of discretion to all parole into the United States.

This program has significant and meaningful differences from both the existent forms of limited humanitarian protections for nationals of specific countries (e.g., Temporary Protected Status – or "TPS"), as well as general American asylum law.

First, the CHNV program has imposed a financial sponsorship requirement for nationals of these four select countries, requiring that a US-based individual provided substantial financial information and agree to be financially responsible for the individual.

Second, it imposes a number of significant non-legal barriers to access for the program.  Most notably, it requires a prospective humanitarian parolee to both have a passport and travel by air at their own expense to a US port of entry for consideration.

While the program has some issues with implementation, it has been highly successfully in adequately vetting individuals and being cost effective for the federal government to operate.  Firstly, the U4U program requires all applicants to undergo a security vetting *before* they are accepted into the program and eligible to come to the United States.  This mechanism allows the American authorities to ensure that individuals seeking protection do not pose a threat to national security.  Secondly, the program is highly cost effective for the federal government to operate.  The U4U program is largely self-funded and does not require significant further investment from the federal government to implement.  Overall, despite the challenges that some face in utilizing the U4U program, it is a model of a highly successful, country-specific humanitarian program that has been successful at assisting a large number of individual seeking protection from a specific war-torn country.

The U4U program has been so successful that it has become a standard and model for further country-specific humanitarian programs, most notably the Cubans, Nicaraguan, Haitian, and Venezuelan program ("CHNV"). As explained below, the CHNV program borrows heavily from the U4U program to provide a legal pathway for individuals from a number of countries to seek protection in the United States.

The CHNV program allows the U.S. government to grant advance travel authorization to up to 30,000 Cuban, Haitian, Nicaraguan, and Venezuelan nationals and their immediate family members to seek parole on a case-by-case basis.[4] Eligible beneficiaries are required to be supported by someone with lawful status in the United States, who must file a Form I-134A application on their behalf. In the application, the supporter must demonstrate that they are able to financially support the beneficiaries they agree to support for the duration of the beneficiary's stay in the United States.[5]

The beneficiaries must also meet certain criteria, including being outside the United States at the time of their application; providing for their own commercial travel to a U.S. port of entry and final destination; undergoing and passing required national security and public safety vetting; and complying with vaccination requirements and other public health guidelines.[6]

An individual may also be deemed ineligible to be considered for parole under the CHNV program. For example, an individual is ineligible if they are also a national, permanent resident, or refugee of another country whose nationals are not entitled to a

---

[4] U.S. Citizen & Immig. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (July 12, 2023), https://www.uscis.gov/CHNV.

[5] *Id.*

[6] *Id.*

similar parole process; if they fail to pass a national security and public safety vetting; if they are determined not to warrant a favorable exercise of discretion; if they have been ordered removed from the U.S. within the prior five years or are subject to a bar of admissibility based on a prior removal order; if they irregularly crossed into the United States, between ports of entry, or irregularly crossed the Mexican or Panamanian border after the date the process was announced, with limited exceptions; if they are Cuban or Haitian and have been interdicted at sea after April 27, 2023; or if they are under 18 and not traveling through the process accompanied by a parent or legal guardian.[7]

If the beneficiary is determined to warrant a favorable exercise of discretion and the application is successful, the beneficiary receives advanced authorization to travel and if granted parole at the port of entry, a temporary period of stay in the United States for up to two years for urgent humanitarian reasons or significant public benefit.[8]  Once paroled into the United States, the beneficiary is able to apply for discretionary employment authorization and obtain a social security number and card.  The Department of Homeland security may terminate parole at any time at its discretion, including if the beneficiary violates any U.S. laws.[9]  After the two-year parole period, the beneficiary may be able to pursue other lawful immigration pathways, including an extension of parole, immigrant and nonimmigrant visas, asylum, and Temporary Protected Status (TPS), that certain parolees may be eligible for in accordance with U.S. laws.[10]

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] U.S. Citizen & Immig. Servs., *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (June 14, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.

As is clear from the above, the U4U program laid the foundation for CHNV, and both programs share a number of similarities.[11]  Like in the U4U program, the CHNV program allows sponsors to support a family or individual from the relevant countries by filling out the same I-134A application form with the same type of information. Sponsors must pass security and background checks and must demonstrate that they can provide financial support for the beneficiaries upon arrival, if needed, or that they have identified an organization, institution, or employer that would help with financial and housing support.  If the beneficiary receives parole, sponsors are required provide financial support and help their beneficiaries with navigating employment and housing.

As with the U4U program, beneficiaries through the CHNV program must meet a number of requirements, as discussed above, before they are granted parole. Beneficiaries of CHNV, like those of U4U, are granted humanitarian parole, which lasts for two years post arrival.

### D.  STRUCTURE AND SIMILARITIES BETWEEN U4U AND CHNV MAKE ANY CHALLENGE TO CHNV INCONSISTENT

---

[11] U.S. Citizen & Immig. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (July 12, 2023), https://www.uscis.gov/CHNV; *see* YMCA of Greater N.Y., *Uniting for Ukraine*, https://ymcanyc.org/uniting-ukraine

Our own government has publicly recognized the similarities between the CHNV and Uniting for Ukraine program, both in promulgating the CHNV program[12] and in subsequent discussions of both programs.[13]

Indeed, the programs are largely identical insofar to the extent that they provide vital humanitarian relief to their beneficiaries, evaluate applications for parole on a case-by-case basis, and incorporate significant safeguards that protect the United States from a national security, public safety, public health, and financial perspective.[14]

### 1. Security and Vetting of Applicants

Both programs involve robust security safety vetting process for potential beneficiaries and non-U.S. citizen sponsors and require potential beneficiaries to meet

---

[12] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022) (describing the implementation of "a process . . . for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner" as "modeled on the successful Uniting for Ukraine (U4U) parole process"); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023) ("Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB . . . ."); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023) (describing implementation of a process "modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans"); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023) (same).

[13] *See, e.g.*, Robin Dunn Marcos, *Dear Colleague Letter 23-13: Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, Admin. Child. & Fams. (Jan. 6, 2023), https://www.acf.hhs.gov/sites/default/files/documents/orr/DCL-23-13-New-USCIS-Parole-Process-CHNV.pdf (describing CHNV as a "supporter-based parole process . . . similar to the USCIS Uniting for Ukraine program"); Circumvention of Lawful Pathways, 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 CFR 208, 1003, 1208) ("DHS's successful Uniting for Ukraine ('U4U') and CHNV parole processes—under which DHS coupled a mechanism for noncitizens from these countries to seek entry to the United States in a lawful, safe, and orderly manner with the imposition of new consequences for those who cross the SWB without authorization—have demonstrated that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can incentivize the use of lawful pathways and undermine transnational criminal organizations, such as smuggling operations.").

[14] *Compare* Uniting for Ukraine, DHS, https://www.dhs.gov/ukraine (last updated Apr. 28, 2023), *with* U.S. Citizen & Immig. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (July 12, 2023), https://www.uscis.gov/CHNV; *see* YMCA of Greater N.Y., *Uniting for Ukraine*, https://ymcanyc.org/uniting-ukraine.

certain public health guidelines.[15]  Furthermore, the availability of the programs themselves provide a broader improvement to public safety by reducing irregular migration; the CHNV program contributed to an 89 percent drop in a seven-day average of unlawful encounters at the Southwest Border with individuals the four relevant countries between mid-December 2022 and the end of June 2023.[16]

### 2. Mandatory Private Financial Sponsorship Reduces Burden on Public Services

Both programs require the same type of information about sponsors and beneficiaries, using the same application form, and make the same demands of sponsors to demonstrate and take responsibility for financially supporting their beneficiaries if necessary, so as to reduce the burden on the state.  In addition to certifying that they are "willing and able to receive, maintain, and support the [beneficiary] to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States," the sponsor is required to attest on Form I-134A to their income, assets, support obligations regarding other U4U beneficiaries, and the nature and duration of specific contributions, such as housing and money, that the sponsor intends to provide the beneficiary.

Another partial difference between the two programs is that, while Cuban and Haitian CHNV beneficiaries—like Ukrainian U4U beneficiaries—are eligible to receive

---

[15] *Compare* Uniting for Ukraine, DHS, https://www.dhs.gov/ukraine (last updated Apr. 28, 2023), *with* U.S. Citizen & Immig. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (July 12, 2023), https://www.uscis.gov/CHNV.

[16] Dep't Homeland Sec., *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows That Lawful Pathways Work* (July 25, 2023), https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and.

benefits and services from the Office of Refugee Resettlement ("ORR") (such as Refugee Cash Assistance, ORR Matching Grant Program, Refugee Medical Assistance, Domestic Medical Screening, or Refugee Support Services),[17] Nicaraguan and Venezuelan CHNV beneficiaries are not.[18]

Both the requirement of a mandatory private financial sponsor—often one known to the beneficiary, with whom they may already share a familiar or deep relationship— and the availability of federal ORR programs for certain beneficiaries, drastically reduces or eliminates any financial burden on state for paroled beneficiaries.

### 3. Case-by-case Determination

Importantly, as affirmed by each U.S. government document regarding the promulgation and implementation of the programs, both programs are resolved with discretionary decisions made on a case-by-case basis about a potential beneficiary's eligibility and whether that beneficiary warrants a favorable exercise of discretion based on the information provided. One key difference between the U4U program and the CHNV program is that the latter includes constraints on the number of beneficiaries it will consider. While there is no numerical limit on requests for travel authorization or

---

[17] Off. Refugee Resettlement, Policy Letter 16-01: Documentation Requirements for the Refugee Resettlement Program (Nov. 29, 2022), https://www.acf.hhs.gov/orr/policy-guidance/documentation-requirements-refugee-resettlement-program; Off. Refugee Resettlement, *Benefits for Ukrainian Humanitarian Parolees: Fact Sheet* (May 2022), https://www.acf.hhs.gov/orr/fact-sheet/benefits-ukrainian-humanitarian-parolees.

[18] Robin Dunn Marcos, Dear Colleague Letter 23-13: Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Admin. Child. & Fams. (Jan. 6, 2023), https://www.acf.hhs.gov/sites/default/files/documents/orr/DCL-23-13-New-USCIS-Parole-Process-CHNV.pdf ("While this supporter-based parole process is similar to the USCIS Uniting for Ukraine program, Nicaraguan and Venezuelan parolees are not currently eligible for ORR-funded refugee benefits and services.").

parole under the U4U program,[19] CHNV limits the number of eligible noncitizens from those four countries who can seek parole to 30,000 per month,[20] protecting the review process from being overloaded.  As discussed above, as of February 2023, the United States successfully reviewed application for, and admitted, over 117,000 Ukrainians through the U4U program within the program's first ten months.[21] Within the first few months of the CHNV program, the U.S. received over 1.5 million requests for parole.[22] Yet, through June 2023, the CHNV program provided a pathway for only 160,000 Cubans, Haitians, Nicaraguans, and Venezuelans to arrive lawfully under the CHNV process, reflecting the government's consideration of and decisions on a fraction of the applications received, due to the mandated cap.[23]

---

[19] U.S. Citizen & Immig. Servs., *Frequently Asked Questions About Uniting for Ukraine*, June 14, 2023, https://www.uscis.gov/humanitarian/uniting-for-ukraine/frequently-asked-questions-about-uniting-for-ukraine.

[20] U.S. Citizen & Immig. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (July 12, 2023), https://www.uscis.gov/CHNV.

[21] Julia Ainsley, *U.S. has Admitted 271,000 Ukrainian Refugees Since Russian Invasion, Far Above Biden's Goal of 100,000*, NBC News (Feb. 24, 2023), https://www.nbcnews.com/politics/immigration/us-admits-271000-ukrainian-refugees-russia-invasion-biden-rcna72177.

[22] Dep't Homeland Sec., *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows That Lawful Pathways Work* (July 25, 2023), https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and; *see* Camilo Montoya-Galvez, *1.5 Million Apply for U.S. Migrant Sponsorship Program With 30,000 Monthly Cap* (May 22, 2023), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/ (noting that within the first few months of the CHNV program, the U.S. received over 1.5 million requests, and describing internal Department of Homeland Security documents noting that "less than three days' worth of applications were processed per month due to the 30,000 monthly cap").

[23] *Id.*

Because of the significant similarities between the structure of these two programs, any challenge to CHNV—the more restrictive of the two programs—is inconsistent with the continued existence of the U4U program.

**E.   U4U SUCCESSFULLY SERVES PUBLIC AND GOVERNMENT INTERESTS.  BY DESIGN, CHNV SUCCESSFULLY SERVES THE SAME INTERESTS.**

  a.   **U4U Serves Public Interests by Fostering Family Reunification, a Longstanding Value in US Immigration Law**

U4U, and in turn the CHNV programs modeled after U4U, serve both public and government interests. First, the parole programs serve the public interest by fostering family reunification, a longstanding value of US immigration and public policy. These parole programs are broader and more flexible than family-based immigrant visas and thus provide another indispensable avenue to reunite families.

Family reunification has been a core principle of US immigration law since the 1800s. Philip E. Wolgin, *Family Reunification is the Bedrock of U.S. Immigration Policy*, CTR. FOR AM. PROGRESS (Feb. 12, 2018), https://www.americanprogress.org/article/family-reunification-bedrock-u-s-immigration-policy/. Historically, in passing laws that limited or restricted immigration, Congress has still recognized the importance of keeping families united and has often carved out exceptions that fostered this goal, even for the most restrictive immigration laws. *Id.* For example, during World War II, Congress passed a series of laws that allowed the spouses and fiancées of US soldiers whose partners were not previously able to enter due to their race or nationality, come to the United States. These laws largely benefited Asian women who were previously barred from entering the United States due to a number of restrictive immigration policies. Speaking of the reform, Senator Richard Russell Jr.

noted the importance of family reunification, asserting that "this was the least we can do for the men who fought our wars overseas . . . and who now wish to have their wives join them in this country." *Id.*

In 1965, Congress passed the Immigration and Nationality Act, which put in place the modern system of immigration that emphasizes the importance of family reunification. *Id.* Prior to the passage of the act, visas were split equally between employment and family reunification categories. *Id.* Today, family reunification remains a core value in immigration policy.  As of 2018, family-based immigration made up two-thirds of all legal permanent immigration. CONG. RESEARCH SERV., R4315, U.S. FAMILY-BASED IMMIGRATION POLICY at 1 (2018).

The U4U and CHNV parole programs provide an important mechanism to help separated families come together. The broader nature of the programs also provides families the opportunity to reunite with family members who might not be able to benefit from visa-based immigration. The family-based visa process often requires years-long waits, even after prospective immigrants' petitions have been approved. Additionally, the INA only allows U.S. citizens and lawful permanent residents ("LPRs") to sponsor spouses and unmarried children. CONG. RESEARCH SERV., R4315, U.S. FAMILY-BASED IMMIGRATION POLICY at 21-22 (2018). U.S. citizens can also sponsor parents, married adult children, and siblings. *Id.* However, neither U.S. citizens nor LPRS may sponsor other relatives such as grandparents, grandchildren, cousins, aunts, or uncles. *Id*

> **b.  Just as the U4U program addresses the humanitarian crisis resulting from the war in Ukraine, the CHNV program addresses US government findings of the widespread urgent humanitarian crisis in Cuba, Haiti, Nicaragua, and Venezuela.**

Additionally, just as thousands of Ukrainians have been forced to flee from their homes for safety, individuals in Cuba, Haiti, Nicaragua, and Venezuela have been similarly subjected to unsafe conditions that have left thousands of individuals with no choice but to seek refuge in the United States. In Cuba, the "one-party authoritarian regime under the Communist Party of Cuba (PCC) government, [] continues to restrict freedoms of expression, association, peaceful assembly, and other human rights." Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1270 (Jan. 9, 2023). Individuals are subjected to arbitrary detention, military deployment, and torture. *Id.* In Haiti, "[i]n recent years, Haiti[ans] ha[ve] experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country . . . [leading] tens of thousands of Haitians to lose hope and attempt to migrate." Implementation of a Parole Process for Haitians, 88 Fed. Ref. 1243, 1246 (Jan. 9, 2023). After a 7.2 magnitude earthquake hit Haiti in August 2021, followed by a tropical storm just days later, "over 650,000 Haitians required humanitarian assistance, including 260,000 children." *Id.* In Nicaragua, "Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief[.]" Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255, 1259 (Jan. 9, 2023). Finally in Venezuela, "[a] complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of [President] Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country." Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63509 (Oct. 19, 2022). Like in

Ukraine, the people of Cuba, Haiti, Nicaragua, and Venezuela have found themselves

hopeless and unsafe in their home countries.

> **c. Both Programs are a Far More Efficient and Streamlined Solution to Serve United States' Obligation and Policy to Provide Humanitarian Support to People Fleeing Danger.**

U4U and CHNV offer programs that are far more efficient and streamlined than

other counterparts.  Other USCIS programs, such as asylum, require the individual to be

physically present in the United States to file an application.  *Asylum*, USCIS,

https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last visited Aug. 15,

2023).  Even President Biden recently remarked that changes to the United States'

asylum policy will be "chaotic for a while."  Stef W. Knight, *Scenes from the Border:*

*Chaos, Desperation*, AXIOS (May 10, 2023), https://www.axios.com/2023/05/10/scenes-

from-border-chaos-desperation.  Programs that require a physical presence in the United

States lead to greater border crossings, which hampers the United States' ability to

sufficiently process every applicant.

Conversely, U4U and CHNV provide for a quicker processing time due to the

simplicity of the I-134A and offer a mechanism that reduces traffic at the border.

Because both of these programs have largely diminished the number of crossings at the

southern border, U4U and CHNV give the United States the ability to scale back its tax

dollars spent on immigration control.[24]  All in all, U4U and CHNV provide the United

States with the potential to meet its obligation and policy to provide humanitarian support

---

[24] For example, in 2021, the U.S. Border Patrol's budget was just under $5 billion, and U.S. Immigration and Customs Enforcement (ICE) had a budget of $8.3 billion.  Johanna Burke, *Are Refugees Bad or Good for the Economy?*.

to people fleeing danger via an efficient process that limits costs and cuts down on enforcement and processing.

### d. Both parole programs ensure rigorous security and vetting through a case-by-case adjudication.

U4U and CHNV both reduce the United States' need to militarize the border. Indeed, both programs have significantly reduced the number of border crossings[25] which in turn helps reduce the burden on border officers and restore order at the border. Additionally, both programs involve a strong safety screening process, which includes the requirement of meeting certain public health guidelines.[26]  Ultimately, both programs reflect that taking security measures prior to any individual actually making the journey to the United States are more effective at reducing the United States' overall burden to ensure its borders are safe.

Further, both U4U and CHNV utilize unique, discretionary decisions made on a case-by-case basis about a potential beneficiary's eligibility and whether that beneficiary should be granted parole.  This selective process helps ensure that individuals who have been previously vetted enter the United States.  Accordingly, the United States' has an interest to timely adjudicate applications and know who is entering the country, rather than have people enter the country without any vetting, and languish for years in the backlog, without a sense of the community they are connected to.

---

[25] See Daniel Di Martino, *Biden's Immigration Parole Programs are Working*, MANHATTAN INST. (May 25, 2023), https://manhattan.institute/article/bidens-immigration-parole-programs-are-working (noting that the CHNV program has helped result in a 95% reduction of border encounters for Venezuelans, Cubans, Haitians, and Nicaraguans, as well as a greater than 95% reduction in border encounters for Ukrainians).

[26] *Compare* Uniting for Ukraine, DHS, https://www.dhs.gov/ukraine (last updated Apr. 28, 2023), *with* U.S. Citizen & Immig. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (July 12, 2023), https://www.uscis.gov/CHNV.

**e.  Both parole programs bolster struggling state economies and support individual economic self-sufficiency**

By its very design the U4U program, as well as the CHNV program, encourages economic self-sufficiency in the individuals that are authorized to enter the United States. Both programs require mandatory private financial sponsorship, which helps to ensure that recipients are encouraged to begin working as soon as possible; thereby reducing recipients need for economic assistance.  The mandatory private financial sponsorship is particularly effective at ensuring rapid integration into the economic life of the receiving community.  In particular, a private financial sponsor is required, among other things, to apply for an applicant to receive a Employment Authorization Documented ("EAD" a/k/a a work permit), Social Security card, as well as assisting the applicant with obtaining employment and/or English language class to ensure the applicant's quick and effective integration into the economy of the host community.

Further, the program also bolsters state economies as the individuals receive federal funding through the Office of Refugees and Resettlement.  This federal funding is directed to state economies as the individuals will spend these federal funds across the various states.  In addition, despite the perceived cost of hosting migrants, including for example paying for education, hospitals, and other public services, the statistics do not show a drain on states' resources.  On the contrary, foreign-born residents have a higher labor force participation rate than native born individuals.[27] Indeed, many U.S. industries rely upon foreign-born labor to ensure their continued competitiveness.  Additionally,

---

[27] *See Immigrants Contribute Greatly to U.S. Economy Despite Administration's Public Charge Rule,* Center on Budget and Policy Priorities, August 15, 2019, https://www.cbpp.org/research/poverty-and-inequality/immigrants-contribute-greatly-to-us-economy-despite-administrations

providing humanitarian support to these individuals fleeing danger and strife helps provide workers to support an aging population.  Johanna Burke, *Are Refugees Bad or Good for the Economy?*, ICMC (July 14, 2020), https://www.icmc.net/2020/07/14/refugees-good-or-bad-for-economy/.  The United States, like most high-income countries, has a large percentage of the population that is out of the workforce, whereas, in comparison, the percentage of refugees who are out of the workforce is much lower.  *See id.* (identifying that in 2015, "only 49.7% of the native-born population was of working age as compared to 77.1% of the refugee population").  Thus, individuals who enter the United States under both U4U and CHNV programs will have the potential to "fill the jobs vacated by older Americans and sustain the economy."  *Id.*

Further, despite the ostensibly high costs of resettling people fleeing their countries, refugees typically pay on average "$21,000 more in taxes than they cost the government."  *Id* .  Even in the case where migrants do receive public benefits, such as the Supplemental Nutrition Assistance Program ("SNAP" a/k/a food stamps), the overwhelming majority are employed after receiving these benefits and are employed at higher rates to native born recipients of similar entitlement programs. [28]  As such, bringing more migrants through programs such as U4U and CHNV rather than burdening states or local communities is often a driving force for economic growth.

---

[28] *Id.*

Both the U4U and CHNV programs provide significant public benefit by encouraging economic self-sufficiency from migrants through stringent private financial sponsorship requirements.  In addition, migrants are a net benefit to the U.S. economy as a whole and states' economies more specifically as the data shows that even migrants that receive financial benefits ultimately contribute economically at a higher-than-average rate.  Overall, these programs are net financial benefits to the communities in which the migrants find themselves.

## II.        Uniting for Ukraine Examples

Uniting for Ukraine parolees exemplify the value, success, and benefit of parole programs.  The following four stories demonstrate the humanitarian need to sustain these programs, as well as the immense contribution to society that parolees provide.

### A.  Yelizaveta Marushchak – Successful family reunification and protection from war crimes committed in Ukraine

Yelizaveta Marushchak exemplifies the unique benefits of the U4U program, as Yelizaveta and her family were able to reunite with her U.S. citizen sister in New Jersey and provide protection for an entire family of five.  Yelizaveta and her family receiving protection in the United States directly serves the public interest as Yelizaveta is a relative of a US citizen and is a highly trained individual that can contribute to the American economy.

Yelizaveta lived with her husband, 3-year-old daughter, and newborn son when Russia invaded Ukraine.  She feared for her life.  While Yelizaveta was worried for her own safety, she was most worried about the safety of Alexey, her 15-year-old stepson.  Alexey lived in the town of Bucha, a name that has now become synonymous with the horrific war crimes that Russia has committed in Ukraine during its invasion.  For two

long weeks, Yelizaveta and her husband were unable to get in contact with Alexey and feared that he had been captured by Russian soldiers.  Fortunately, once Bucha was liberated from Russia, Alexey was able to reunite with Yelizaveta and his father, traumatized but otherwise unharmed.

At this point, Yelizaveta and her husband made the painful decision to take their newborn son and young daughter to leave Ukraine to seek safety with Yelizaveta's sister in the United States.  Despite the difficulties faced by the family in their new home, they are extremely grateful to be safe.  Indeed, there is no possibility for them to return to Ukraine in the foreseeable future, as Ukraine remains an active warzone with regular Russian air strikes on civilian populations even far from the frontlines to this day.  In addition, Yelizaveta is deeply emotionally scarred from the time spent fearing for her life at the beginning of the war.  In particular, Yelizaveta heard horrific stories from friends that were trapped in Mariupol of many young women and girls being brought to the hospital following being gang-raped by Russian soldiers.

In short, Yelizaveta and her family demonstrate the unique value that the U4U program provides, as well as the public interest it serves.  Yelizaveta was able to successfully receive protection for her entire family and reunite with her American citizen sister quickly and orderly after the initial Russian invasion of Ukraine.

### B.  Valentyna Veretska – International Professional Athlete and new American Business Owner

Valentyna Veretska is a professional athlete who has won international championships, including in the United States.  Valentyna, her husband, Pavlo, and their 13-year-old daughter, came to the United States through the U4U program in November 2022.

Valentyna had first learned about the U4U program in late 2022 from a *Voice of America* interviewer she met after running a marathon in Israel.  By October, an athlete friend of Valentyna's in the United States offered to sponsor her for the U4U program. The offer was appealing to Valentyna and her husband, both of whom knew the United States as country of opportunity, and who were afraid to start life in Ukraine again from scratch after twice losing their home—during the Russian invasion in 2014, and again now.  Within a matter of days, Valentyna received a positive response from USCIS.

After receiving parole, Valentyna and her family stayed with a friend from New York for a short period of time before finding an apartment of their own to rent.  The woman who interviewed Valentyna for *Voice of America* reached out to Valentyna and invited her to come and visit Princeton for a half-marathon.  While Valentyna ran the half-marathon, the woman who had invited them spread the news of Valentyna's story, and by the time the race had ended and Valentyna had received her award, having won with a course record, people had joined together to collect housing essentials Valentyna had yet to purchase.

After arriving to the United States, Pavlo began working as a truck driver, after which he was able to leverage his experience from building the family's house in Ukraine to work in construction.  Their daughter has been loving school since starting seventh grade, and won a lottery to attend a school camp, where she has participated in different activities relating to math, science, and other subjects.

In addition to running and continuing to place in competitions, Valentyna began working as a personal trainer after arriving to the United States.  When the word began to spread about Valentyna's experience and skills, she began to get more clients.  Valentyna

plans to continue her personal training and massage business, but also would like to create a running club in the future, where she can help put into practice her ideas to help motivate children who may become the next future successful athletes.

Because of the U4U program, Valentyna is finally able to advance her career as a professional athlete, enrich her community through training other athletes, and pursue her goals of helping shape future athletes. Valentyna's husband is able to help literally build up their neighborhood, and their daughter is an active part of her school community. Finally, in the United States, Valentyna and her family are able to find a place in their communities without fearing that they will once again lose their home and the life they have established to war with Russia.

### C. Yuliia Aksaniuk – Successful family reunification, gainfully employed and independent, who is now most proud to be "an honest taxpayer."

Yuliia Aksaniuk and her family were a typical, middle class Ukrainian family. Yuliia and her husband, Oleksandr, both had successful careers, and their three children were thriving. The family lived in Odesa, a city in southern Ukraine on the Black Sea. On April 8, 2022, after the fighting continued to get closer, and Odesa was at risk of ending up under siege, Yuliia and her family fled their home—and their lives—in Ukraine.

Not only did Yuliia and the rest of her family leave behind her oldest son, their home, and their lives—she and her husband left behind their successful careers. Yuliia is a public relations and marketing specialist and used to run her own advertising agency. She is also a popular author, who recently received a cultural diplomacy award from Ukraine for her work in promoting Jewish and Ukrainian culture in her books.

Yuliia's husband, Oleksandr, has had a tremendous career as an engineer.  He has three degrees—two bachelor's and one master's—and has over thirty years of experience. Prior to fleeing Ukraine, Oleksandr, managed a company in Kyiv that dealt with electrical equipment for shopping centers, train stations, and residential buildings.

Upon arrival in the United States, the family hit the ground running.  They used the last of their available savings to expedite the processing of their SSN cards and work authorization so Yuliia and Oleksandr could work as soon as possible.  Yuliia, who speaks English well, began work as a kitchen assistant at an adult day care center, where she formed strong bonds with her clients and provided emotional support.  After a few weeks on the job, Yuliia, applying her creative background, started a newspaper for the individuals at the day care center, where they could publish their own stories and talk about their lives.  A few months ago, Yuliia, looking to work in an industry more similar to her past experience, moved on to work at a small event agency that specializes in event decoration.  However, she still keeps up her connection with the adult day care center, and on her off day, goes back to make sure that the newspaper is still functioning.

Additionally, Oleksandr has had an effect in the community as well.  He received a job offer at his first interview and performs highly skilled electrical work for a construction company, which specializes in commercial buildings.  Yuliia's children have both acclimated well to the United States.  Yuliia's daughter, graduated high school at the age of 17 and enrolled in community college.  After one semester, Oleksandra has done very well and is one of the top students in her class, and now receives a scholarship for her tuition.  Yuliia's younger son, Savva, has also performed well academically, and recently broke a three-year old record for the highest score at his school.

Yuliia is also very proud that her family has been able to contribute to the United States, and has done so without additional aid.  Not only does her family now live in their own three-bedroom apartment, but her family has never used any government benefits or food stamps, and Oleksandr says "[l]et's leave them for those who need them more.  We will not rely on those who kindly accepted us and will be able to support ourselves."

Ultimately, not only have Yuliia and her family successfully escaped the Russian war in Ukraine, but they have also already contributed to the community in New York.  The children are involved at school, and both Yuliia and Oleksandr are working hard in their jobs to support their community.  Indeed, Yuliia and Oleksandr proudly filed their first United States' tax return in April 2023, and now, Yuliia can say what she terms as the "legendary" American phrase: "I am an honest taxpayer."

### D.  Polina Herman – Filmmaker in Los Angeles, enrolled in a professional program for producers at UCLA, sharing the experiences of Ukrainians during the war.

Polina Herman lived in Kyiv with her thirteen-year-old son when the war started.  Shortly after the first week of the war, once the shock wore off and reality set in, Polina realized she had to flee for her and her son's safety.  Although she had a successful film production business in Ukraine, she had to leave her life behind and quickly decide where to relocate.

With the help of Julia Zagachin, the founder of Jobs Not War, Polina was able to find a sponsor.  On May 19, 2022, she and her son arrived, in one of the first groups of Ukrainians to benefit from the Uniting for Ukraine program.  By October 2022, Polina was renting her own apartment in Los Angeles.  Since arriving to the United States, Polina has also been taking English classes and has enrolled in a professional program for

producers at UCLA.  Simultaneously, she works in film production, both in the United States and with her team in Ukraine via Zoom.

Polina has also applied for a talent visa which she hopes will allow her to stay in the United States and further build her career by allowing her to travel to film festivals and events in Europe.  Through her films, Polina aspires to create bridges between Americans and Ukrainians. She believes that it is important, for both groups, to highlight in her films the experiences of Ukrainians during the war.

Within her local community, Polina started the Dovzhenko League, which brings together a group of Ukrainian filmmakers in Los Angeles.  The group focuses on providing support to Ukrainians trying to integrate into the American film industry. Polina also looks forward to continuing to contribute to her new community in Los Angeles through the unique perspective she provides in her films.  Indeed, one of Polina's greatest priorities is to assimilate, sharpen her English skills, and feel connected to the Americans in her community.  She dreams of winning an Oscar, and her son, who recently completed middle school and is an avid basketball player, dreams of going pro. Polina is grateful for the safety and opportunities U4U has provided her—she believes it is an excellent and indispensable program for Ukrainians.

[Intentionally left blank]

## F.  CONCLUSION

For the reasons stated above, the Court should rule in favor of the defendants and intervenor-defendants.

Respectfully submitted,

 /s/ *Edmund Polubinski*

Edmund Polubinski
*Counsel for* Amicus Curiae
*Attorney in Charge*
New York Bar No. 3022332
Southern District Bar No. 3498419

Nishan Bhaumik, *of counsel*
Maya Kapelnikova, *of counsel*
Michael Kucharski, *of counsel*
Amelia T.R. Starr, *of counsel*
Jaclyn M. Willner, *of counsel*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4695
edmund.polubinski@davispolk.com

## CERTIFICATE OF WORD COUNT

I certify that the word count for this brief, not including the case caption, table of contents, table of authorities, signature block, and certificates, is  8,686 words.


/s/ Edmund Polubinski_____

Edmund Polubinski

**PROOF OF SERVICE**

I hereby certify that on August 16, 2023, a true and accurate copy of the foregoing document was filed electronically via CM/ECF and served on all counsel of record.

Respectfully submitted,

/s/ *Edmund Polubinski*

Edmund Polubinski
*Counsel for* Amicus Curiae
*Attorney in Charge*
New York Bar No. 3022332
Southern District Bar No. 3498419

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4695
edmund.polubinski@davispolk.com