**United States District Court**
**Southern District of Texas**
**Victoria Division**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case 6:23-cv-00007 |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants.* | |

**PLAINTIFF STATES' OPPOSITION TO INTERVENOR DEFENDANTS' MOTION TO DISMISS**

### TABLE OF CONTENTS

Plaintiff States' Opposition to Intervenor Defendants' Motion to Dismiss.................................. i

Table of Contents .......................................................................................................................... ii

Table of Authorities......................................................................................................................iii

Standard of Review ....................................................................................................................... 6

I.   *Prioritization* should not affect this Court's determination of the States' standing to challenge the Parole Program...........................................................................................7

    A.    The rule articulated in *Prioritization* does not apply to this case..................................7

    B.    Texas has demonstrated direct injuries that are legally cognizable because the Parole Program constitutes affirmative immigration relief and eligibility for benefits...................... 9

    C.    Even were the general rule in *Prioritization* to apply to this case, two exceptions would grant the States standing to challenge the Parole Program. ....................................................13

II.   Standing is determined by facts in existence when the complaint is filed......................18

III.   Texas is not required to tie its injuries to specific beneficiaries of the Parole Program. .18

IV.   Supposed offsetting benefits cannot defeat standing. .................................................. 20

V.   The remaining Plaintiff States should not be dismissed.................................................. 22

Conclusion ...................................................................................................................................25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
No. 23-10362, 2023 WL 5266026 (5th Cir. Aug. 16, 2023) ...................................................23

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ........................................................................................... 12, 13

*Carr v. Alta Verde Indus., Inc.*,
931 F.2d 1055 (5th Cir. 1991) ...................................................................................18

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019)................................................................................................12

*DHS v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020)...........................................................................................11, 16

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023) (en banc) ..................................................................... 24

*Gen. Land Off. v. Biden*,
71 F.4th 264 (5th Cir. 2023)......................................................................... 18, 21, 22

*Heckler v. Chaney*,
470 U.S. 821 (1985)..............................................................................................11, 15

*L.A. Haven Hospice, Inc. v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) .....................................................................................21

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973) ...................................................................................................16

*Little v. KPMG LLP*,
575 F.3d 533 (5th Cir. 2009)........................................................................................7

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................................7, 18

*Markva v. Haveman*,
317 F.3d 547 (6th Cir.2003) ......................................................................................21

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981) .............................................................................6

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ............................................................................6

*Scenic Am., Inc. v. United States Dep't of Transportation*,
    836 F.3d 42 (D.C. Cir. 2016) ...........................................................................17

*Sutton v. St. Jude Med. S.C., Inc.*,
    419 F.3d 568 (6th Cir. 2005) ...........................................................................21

*Texas v. Biden (MPP)*,
    20 F.4th 928 (5th Cir. 2021) ...................................................................*passim*

*Texas v. Biden*,
    No. 2:21-cv-067-Z, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022)
    (Kacsmaryk, J.) ....................................................................................... 14, 23

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ..........................................................................19

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .......................................................................... 24

*Texas v. United States*,
    549 F. Supp. 3d 572 (S.D. Tex. 2021) (Hanen, J.) ......................................12, 15, 23

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) (Hanen, J.) ....................................... 15

*Texas v. United States (DACA)*,
    50 F.4th 498 (5th Cir. 2022) ...................................................................*passim*

*Texas v. United States (DAPA)*,
    809 F.3d 134 (5th Cir. 2015) ..................................................................*passim*

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) .......................................................................................23

*United States v. Texas (Prioritization)*,
    143 S. Ct. 1964 (2023) .............................................................................*passim*

**Statutes**

8 U.S.C. § 1641(b)(4) .........................................................................................16

8 U.S.C. § 1182(d)(5) ..................................................................................................16, 17

8 U.S.C. § 1252(f)(1) ........................................................................................................ 17

8 U.S.C. § 1612 (2)(L) ...................................................................................................... 16

8 U.S.C. § 1613(a) ............................................................................................................ 16

## Other Authorities

Rule 12(b)(1) ........................................................................................................................6

The Intervenors argue that the Supreme Court's recent decision in *United States v. Texas (Prioritization)*, 143 S. Ct. 1964 (2023), undermines the Plaintiff States' standing in this case. ECF No. 197 at 6–14. Intervenors give that ruling a broad interpretation, but the majority opinion repeatedly emphasizes how narrow it is and how it does not apply to cases like this one.

Intervenors also argue that Texas does not have standing because (1) facts after the filing of this suit show that unlawful immigration has reduced after implementation of the Parole Program; (2) its evidence of injury is not tied specifically to beneficiaries of the Program; and (3) the Court should consider supposed offsetting benefits of the Program to the State. Finally, Intervenors argue that the other Plaintiff States should be dismissed because only Texas has provided evidence of injury.

The motion to dismiss should be denied.

### STANDARD OF REVIEW

"Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim that would entitle plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

A facial attack, which consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence, challenges jurisdiction based solely on the pleadings. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When ruling on a facial attack, the court must presume that factual allegations in the complaint are true and determine whether they establish subject-matter jurisdiction. *Id*. By contrast, a Rule 12(b)(1) motion presents a factual attack when the motion is accompanied by supporting evidence that contradicts the jurisdictional allegations in the complaint. *Id*.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted); *see also Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) ("At the pleading stage, allegations of injury are liberally construed.").

I.   *Prioritization* **should not affect this Court's determination of the States' standing to challenge the Parole Program.**

A.   **The rule articulated in *Prioritization* does not apply to this case.**

*Prioritization* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Prioritization*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id*. The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id*. The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id*. (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal

statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

8

**B. Texas has demonstrated direct injuries that are legally cognizable because the Parole Program constitutes affirmative immigration relief and eligibility for benefits.**

The Court noted, "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable[1] by a court order." *Id*. at 1970 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 560–561 (1992)). The Court did not dispute that Texas and Louisiana suffered injuries; rather, "[t]he District Court found that the States would incur additional costs because the Federal Government is not arresting more noncitizens. Monetary costs are of course an injury." *Id*.

But the *Prioritization C*ourt found that the States' acknowledged monetary injuries nevertheless did not give them standing because "the alleged injury must be legally and judicially cognizable," which "requires, among other things, that the dispute is traditionally thought to be capable of resolution through the judicial process—in other words, that the asserted injury is traditionally redressable in federal court." *Id*. (cleaned up). "The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit." *Id*.

This case, by contrast, does not involve any attempt to compel the arrest or prosecution of anyone, so *Prioritization* does not undermine standing here. Plaintiff States here do not ask for an injunction ordering DHS to take any sort of enforcement action against aliens eligible for the Parole

---

[1] The *Prioritization* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied. *Prioritization*, 143 S. Ct. at 1970–71; *id*. at 1995 (Alito, J. dissenting). That decision therefore has no effect on those two prongs of the standing analysis, leaving the previous holdings of this Court and the Fifth Circuit the law of the case.

Program. And none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any aliens who are eligible for the Parole Program, whether applicants or beneficiaries.

The *Prioritization* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up; citations omitted).

The *Prioritization* Court recognized that the States had asserted an injury due to monetary costs, *see id.* at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But those injuries were not "judicially cognizable" because they were *indirect* costs because they arose from the Federal Government's *failure* to arrest certain criminal aliens. *Id.* at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody").

But those injuries were not judicially cognizable in *Prioritization* because those costs were incurred solely because of the lack of arrest by the Federal Government. 143 S. Ct. at 1970. That is

also why the Court describes those costs as "indirect"—they were not based on anything the agency did, but what it failed to do. *Id.* at 1972 n.3.

Here, the Plaintiff States' injuries are not based on a mere failure to arrest particular parole-eligible aliens—instead, a grant of parole is not mere non-enforcement but constitutes "affirmative immigration relief," as explained by the Supreme Court when determining that DACA was a reviewable agency action:

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated).[2]

This is why this Court and the Fifth Circuit have described Plaintiff States' injuries in the DACA litigation as *direct*—rather than "indirect"—costs. *See Texas v. United States* (*DACA*), 50

---

[2] Note that this "affirmative immigration relief" included the grant of deferred action—categorical forbearance from removal with lawful presence—all by itself, with eligibility for benefits only providing "*further* confirmation that DACA is more than simply a non-enforcement policy." *Regents*, 140 S. Ct. at 1906 (emphasis added). Similarly, an affirmative program to accept applications for advance parole, adjudicate those applications and grant the affirmative immigration relief of parole, *see* ECF No. 20 ¶¶42–54 (describing process), is not mere refusal to enforce the law, and constitutes judicially cognizable injury and leads to *direct* injuries to Texas.

F.4th 498, 517 (5th Cir. 2022) ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").[3]

The Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) reinforces that the costs to the States in this case are direct rather than indirect. That case upheld the State of Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id.* at 2365, and it interacted with the federal government to service student loans and received administrative fees for these services, *id.* The loss of those fees was "an injury in fact directly traceable to the" loan forgiveness program, *id.*, as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself," *id.* at 2366 (emphasis added).

This is most closely analogous to the driver's license costs imposed on the State of Texas

---

[3] Regardless, *Prioritization* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Prioritization*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)).

by the Parole Program. Texas interacts with the federal government through the REAL ID Act, *see Texas v. United States (DAPA)*, 809 F.3d 134, 155 n.58 (5th Cir. 2015), and ties eligibility for subsidized licenses to lawful presence—as aliens with parole status are eligible to receive subsidized licenses from Texas, Pls. Ex. 4 ¶5, and "[b]ecause driving is a practical necessity in most of the state, there's little doubt many newly paroled aliens have applied—and without the district court's injunction, will apply in the future—for Texas driver's licenses." *MPP*, 20 F.4th at 970–71 (citing *DAPA*, 809 F.3d at 156).

Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366, the financial injuries imposed on Texas by the Parole Program are direct rather than indirect.

### C. Even were the general rule in *Prioritization* to apply to this case, two exceptions would grant the States standing to challenge the Parole Program.

The Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Prioritization*, 143 S. Ct. at 1973. Although the *Prioritization* rule does not apply to this challenge to the Parole Program because the States do not seek judicial relief ordering the Federal Defendants to arrest parole-eligible aliens, two exceptions articulated by the Court would apply even if it did.

#### 1. The States have standing because the Parole Program constitutes an abdication of Federal Defendants' statutory responsibilities.

The *Prioritization* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* at 1973–74 (citing

*Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. "But the States have not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

The Parole Program is just such an extreme example that constitutes abdication of the Federal Defendants' statutory responsibilities to grant parole only on a case-by-case basis for significant public benefit or urgent humanitarian reasons. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP,* 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse.*" *Id.* at 997. Yet the Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

While "the parole statute does not set any limit on the number of individuals DHS can decide to release on parole," "the number of aliens paroled each month ... gives rise to a strong inference that the Government is not really making these parole decisions on a case-by-case basis." *Texas v. Biden*, No. 2:21-cv-067-Z, 2022 WL 17718634, at *12 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) (cleaned up) (quoting *Biden,* 142 S. Ct. at 2554 (Alito, J., dissenting)), *appeal dismissed,* No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The number cited by Justice Alito as giving rise to this inference—and relied on by Judge Kacsmaryk in finding that DHS failed to examine whether its rescission of the MPP program caused it to violate the limits on its parole power—was 27,000 a month, *id.* at *13—fewer than the 30,000 a month authorized by the Parole Program.

Judge Hanen had previously found that the Plaintiff States had standing to challenge DAPA based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id*. at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, Judge Hanen relied on APA reviewability under *Heckler v. Chaney, id.* at 641, to also find standing—the same analysis adopted by the *Prioritization* majority.

The *Prioritization* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes." 143 S. Ct. at 1974. But here, the Parole Program "prevents immigration officials from enforcing these [limiting] provisions of the" parole statute. *Texas*, 549 F. Supp. 3d at 608.

Abdication standing was not addressed by the Fifth Circuit in the *DAPA* case, and the reviewing courts did not address it in the challenge to the DACA Memorandum. Now that the Supreme Court has explicitly approved this basis for standing, the Court should find standing for the States to challenge the Parole Program here on this additional ground.

**2. The States have standing because the Parole Program is not a mere policy of nonenforcement because it provides affirmative immigration relief and eligibility for federal and state benefits.**

The *Prioritization* majority also noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id.* at 1974.   The Court cited two cases challenging DACA as exemplars of this

15

exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

This applies to this case. The Parole Program makes its recipients eligible for various federal and state benefits. Under federal law, aliens paroled into the United States become eligible for various benefits after five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States"). Beneficiaries of the Parole Program are also eligible for employment authorization to work in the United States.

Because the State of Texas pays these benefits and they are partially financed from the state budget, the Parole Program will increase Texas's costs because more aliens being paroled into the United States will cause more individuals to claim benefits in Texas. This causes quantifiable financial harm to Texas.

And that the *Prioritization* majority cited the Fifth Circuit's *DAPA* case—which found standing solely based on the costs to Texas of providing subsidized driver's licenses, *DAPA*, 809 F.3d at 150 (States' "standing is plain, based on the driver's-license rationale, so we need not

16

address the other possible grounds for standing")—as how States could show standing to challenge federal agency action relating to immigration. This provides a roadmap for this Court to analyze standing in a way blessed by Justice Kavanaugh's analysis for the majority in *Prioritization*: the driver's license rationale.

### 3. Nothing in *Prioritization* raises questions about traceability or redressability in this case.

Justice Gorsuch, for himself and two other Justices, questioned the majority's holding on legally cognizable injury in fact, but would have ruled against Texas on redressability grounds.[4] He noted that 8 U.S.C. § 1252(f)(1) provides that "'no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of' certain immigration laws, including the very laws the States seek to have enforced in this case," *Prioritization*, 143 S. Ct. at 1978 (Gorsuch, J., concurring in the judgment); that vacatur of the prioritization policy without injunctive relief would not redress Texas's injury, *id.*; and that the APA might not empower courts to vacate agency action, *id.* at 1978–85 ("I do not pretend that the matter is open and shut.").

All of this discussion in Justice Gorsuch's opinion is irrelevant because 8 U.S.C. § 1252(f)(1) does not apply to *this* case because the parole provision—8 U.S.C. § 1182(d)(5)—is not within the sections of the INA  (8 U.S.C. §§ 1221–1232) subject to its limitations on injunctive relief, *see DACA*, 50 F.4th at 528–29—and the consequent availability of injunctive relief therefore makes Justice Gorsuch's concerns about redressability by vacatur alone inapplicable here.

---

[4] "[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016).

**II.    Standing is determined by facts in existence when the complaint is filed.**

Intervenors cite to facts purporting to show that illegal immigration has decreased after adoption of the Parole Program. ECF No. 197 at 9. But "[t]he existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction."). This suit was filed on January 24, 2023. ECF No. 1. None of the facts cited by Plaintiff can serve to retroactively defeat standing. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) ("As this action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing in a motion to dismiss).

**III.    Texas is not required to tie its injuries to specific beneficiaries of the Parole Program.**

Intervenors assert that Texas's evidence of injury is not specifically tied to any beneficiaries of the Parole Program. ECF No. 197 at 11–12. But Texas need not show that any actual Parole Program beneficiaries partake of any of these benefits to show standing, and standing is not defeated by the fact that some of the beneficiaries could have been paroled under a different circumstance. As the Fifth Circuit explained:

> The Government says [showing that the challenged agency action would increase the number of aliens paroled into Texas is] not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that

18

have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP.[5] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971. "To the contrary, given both MPP's effect of increasing the number of parolees and the fact that many of those parolees will apply for Texas licenses, it's impossible to imagine how the Government could terminate MPP *without* costing Texas any money." *Id.* So Texas only needs to show that the challenged Program increases parolees into Texas—the Parole Program itself, not any other aspects of federal immigration policies (as discussed in the next section relating to purported offsetting benefits in the standing inquiry).

Intervenors also argue that because Texas's evidence is related to illegal aliens,[6] the fact that parole is a lawful status makes it irrelevant as a comparator. ECF No. 197 at 11. But data of costs from illegal aliens is relevant here because courts "assume, for purposes of the standing analysis, that Texas is correct on the merits of its claim[s]," *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). If the Parole Program is unlawful, then aliens paroled under its auspices have no basis to be considered lawfully present in the United States and would be removable as any other illegal alien. *See DACA*, 50 F.4th at 520 ("Those presently subject to DACA would be removable if the

---

[5] This shows the folly of Intervenors' claim that there is no redressability here because any particular beneficiary of the Parole Program could also possibly be granted parole on some other basis. ECF No. 197 at 11. The *MPP* Court found standing even though it explicitly acknowledged in this passage that the parolees there could have been paroled even absent the termination of the MPP program.

[6] Texas driver's license costs, however, do not depend on evidence regarding illegal aliens—indeed, they are not eligible for a driver's license in Texas.

DACA program were ended" by judicial relief, despite having received deferred action status); *id.* at 508 (referring to DACA recipients as "illegal aliens" despite having "documented" deferred action status). And, of course, Texas relied on the same evidence of costs imposed by illegal aliens in the *MPP* case, which involved injuries from aliens granted parole. *MPP*, 20 F.4th at 971.

## IV.   Supposed offsetting benefits cannot defeat standing.

Any purported offsetting benefits Texas could receive from the operation of the Parole Program, ECF No. 197 at 13–14, whether from the paroled aliens themselves or reduced entry of other aliens outs=ide the direct operation of the program, is irrelevant to the standing inquiry. The Fifth Circuit has addressed this exact point in this context:

> Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state. It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and buy auto insurance, reducing the expenses associated with uninsured motorists. The government suggests employment authorization would lead to increased tax revenue and decreased reliance on social services.
>
> Even if the government is correct, that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs. "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.

*DAPA*, 809 F.3d at 155–56. And the court further explained:

> Here, none of the benefits the government identifies is sufficiently connected to the costs to qualify as an offset. The only benefits that are conceivably relevant are the increase in vehicle registration and the decrease in uninsured motorists, but even those are based on the independent decisions of DAPA beneficiaries and are not a direct result of the issuance of licenses. Analogously, the Third Circuit held that sports leagues had standing to challenge New Jersey's decision to license sports gambling, explaining that damage to the leagues' reputations was a cognizable injury despite evidence that more people would have watched sports had betting been allowed. *NCAA,* 730 F.3d at 222–24. The diminished public perception of the

leagues and the greater interest in sports were attributable to the licensing plan but did not arise out of the same transaction and so could not be compared.

In the instant case, the states have alleged an injury, and the government predicts that the later decisions of DAPA beneficiaries would produce offsetting benefits. Weighing those costs and benefits is precisely the type of "accounting exercise," *id.* at 223, in which we cannot engage. Texas has shown injury.

*Id.* at 155–56; *see also L.A. Haven Hospice, Inc. v. Sebelius,* 638 F.3d 644, 656–59 (9th Cir. 2011) (holding that a hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); *Sutton v. St. Jude Med. S.C., Inc.,* 419 F.3d 568, 570–75 (6th Cir. 2005) (concluding that a patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman,* 317 F.3d 547, 557–58 (6th Cir.2003) (deciding that grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

The Fifth Circuit recently examined this principle in litigation over the failure of the Biden Administration to comply with congressional commands to build a border wall. The agency there argued that its alternatives to the border wall caused a net decrease in illegal entries, depriving Texas of standing. *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023). The Fifth Circuit rejected this because "even if the installation of system-enhancing technology assists in border control, "that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *Id.* at 273 (citing *DAPA,*

21

809 F.3d at 155). No purported offset can serve to affect Texas's standing to challenge the Parole Program.

## V.   The remaining Plaintiff States should not be dismissed.

The Intervenors ask this Court to dismiss Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, South Carolina, Tennessee, Utah, West Virginia, and Wyoming (collectively, the "Remaining Plaintiff States") because (1) these additional states have purportedly failed to prove standing, and (2) it would be "fair" and judicially economical to dismiss such parties. *See* ECF No. 197 at 14–18. But the Intervenors are mistaken.

As an initial matter, the active Amended Complaint—which is purportedly what Intervenors are trying to dismiss—contains allegations of injury for every Plaintiff State. *See* ECF No. 20 ¶¶ 64–139. Intervenors never address any of these allegations of injury, and a motion to dismiss is directed at the adequacy of the Complaint, not any subsequent litigation decisions.

While Intervenors concede that "courts have sometimes bypassed the question of additional plaintiffs' standing when one plaintiff has established it," ECF No. 197 at 15 (citing *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 44–45 (1974)), they nonetheless proceed to argue the untenable position that binding Fifth Circuit precedent is "not required," ECF No. 197 at 15–16.

And while the Intervenors alleged that every Plaintiff State in this case is required to prove standing, *see* ECF No. 197 at 14–16, binding precedent from the Fifth Circuit and even the Supreme Court says just the opposite. Indeed, "a group of plaintiffs *need not* show that more than *one* of them is likely to be injured." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 23-10362, 2023 WL 5266026, at *7 (5th Cir. Aug. 16, 2023). This means that "[i]f at least one plaintiff has

22

standing, the suit may proceed." *Id.* (first quoting *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023); and then citing *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). Therefore, because only "*one* plaintiff *must* have standing," *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (emphasis added), the Intervenors are effectively asking this Court to engage in an unnecessary judicial exercise on the eve of trial that has zero consequences on the relief afforded (*i.e.*, nationwide relief). *See, e.g.*, *Texas v. United States*, No. 1:18-CV-00068, 549 F.Supp.3d 572, 596 (S.D. Tex. July 16, 2021) (Hanen, J.) ("Texas has standing. Since one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff.") *see also Texas v. United States (DACA)*, 50 F.4th 498, 514, 530–31 (5th Cir. 2022) (noting "Texas is the only state [of nine] that has attempted to demonstrate standing," but upholding nationwide injunctive relief applicable to all States); *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (5th Cir. 2021) ("Texas and Missouri each contend they have standing. But because only one of the States must have standing, we focus on Texas.").

It is irrelevant because the relief will be identical whether it involves Texas alone or combined with other States. Bin the immigration context, relief applying only within the boundaries of Texas alone would not provide even Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [Parole Program] beneficiaries would be free to move among states." *DAPA*, 809 F.3d at 188; *see also Texas v. Biden*, No. 2:21-cv-067-Z, 2022 WL 17718634, at *18 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) ("'[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State.") (brackets in original, quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th

Cir. 2022)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022).

That this incidentally benefits the other Plaintiff States (and other States as well) is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (quotation omitted).

Because "[t]he Constitution requires 'an uniform Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id*. at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id*. at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)), meaning that "[p]artial implementation of [the Parole Program] would "detract[ ] from the 'integrated scheme of regulation' created by Congress," *id*.(quoting *Arizona*, 567 U.S. at 401). This Court would not be acting within the confines of equity if its remedy undercut constitutional and statutory requirements of national uniformity in this area. Therefore, there is no justification for this Court to act contrary to the standard practice within this Circuit of refusing to disturb the presence of other Plaintiff States when it finds that Texas has demonstrated standing and the scope of relief will not be affected.

## CONCLUSION

Intervenors' motion to dismiss should be denied.

Dated: August 18, 2023

ANGELA COLMENERO
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

Respectfully submitted,

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Deputy Chief, Special Litigation Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

LUIS A. SUAREZ
Assistant Attorney General
Texas Bar No. 24117110
Southern District of Texas No. 3697939
luis.suarez@oag.texas.gov

GENE P. HAMILTON
JAMES K. ROGERS
America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
james.rogers@aflegal.org

*Counsel for the State of Texas*

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*

Raúl R. Labrador
Attorney General of Idaho
Lincoln Davis Wilson, ISB No. 11860
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
lincoln.wilson@ag.idaho.gov

*Counsel for the State of Idaho*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

27

Kris Kobach
Attorney General of Kansas
Jesse A. Burris, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

Jeff Landry
Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
Solicitor General
Joseph Scott St. John (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

Daniel Cameron
Attorney General of Kentucky
Marc Manley
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*


Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Clark L. Hildabrand
Senior Counsel
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*


Sean D. Reyes
Utah Attorney General
Melissa Holyoak
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

Patrick Morrisey
Attorney General of West Virginia
Lindsay See
Solicitor General
Michael R. Williams
Senior Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

## Certificate of Compliance

I certify that the total of words in this motion, exclusive of the matters designated for omission, is 6,211, as counted by Microsoft Word.

*/s/ Ryan D. Walters*

## Certificate of Service

I certify that on August 18, 2023, I filed this motion through the Court's CM/ECF system, which served it on all counsel of record.

*/s/ Ryan D. Walters*