**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 2



PLAINTIFF'S EXHIBIT

Case 6:23-cv-00007   Document 263   Filed on 08/25/23 in TXSD   Page 2 of 101

2/13/23, 9:53 PM          Case 6:23-cv-00007   Document 42-1   Filed on 02/14/23 in TXSD ...DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Pr...

 Homeland
Security

U.S. Department of Homeland Security

# DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes

**Release Date:** January 5, 2023

**En español**      **Lu an Kreyòl**

WASHINGTON – The Department of Homeland Security (DHS) continues to prepare for the end of the Title 42 public health order, which is currently the subject of multiple court orders, and a return to processing all noncitizens under the Department's Title 8 immigration authorities. To that end, DHS today announced new border enforcement measures to improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to lawfully come to the United States. These measures, taken together, are concrete steps to enhance the security of our border while the Title 42 public health order is in place, and that DHS will continue to build on in preparation for the Title 42 order being lifted.

- DHS is establishing new parole processes for Cubans, Haitians, and Nicaraguans, modeled on the successful processes for Venezuelans and Ukrainians, which combine safe, orderly, and lawful pathways to the United States, including authorization to work, with significant consequences for those who fail to use those pathways. We are also continuing the process with respect to Venezuelans.
- Through the CBP One app, we are also providing a new mechanism for noncitizens to schedule appointments to present themselves at ports of entry, facilitating safe and orderly arrivals. Initially this will be used for those seeking an exception from the Title 42 public health order. Once the Title 42 order is no longer in place, CBP One will be used to help ensure safe and orderly processing at ports of entry.
- DHS is increasing and enhancing the use of expedited removal under Title 8 authorities for those who cannot be processed under the Title 42 public health order. These efforts include surging personnel and resources and enrolling individuals under the asylum processing interim final rule published in March 2022.
- As a complement to these efforts, and in response to the unprecedented surge in migration across the hemisphere and to reduce encounters at our border, DHS and the Department of Justice (DOJ) intend to shortly issue a proposed rule that will, subject to public comment, incentivize the use of the new and existing lawful processes available in the Unites States and partner nations, and place certain conditions on asylum eligibility for those who fail to do so.

DHS will continue to monitor developments on the southwest border and will accelerate or implement additional measures, as needed, consistent with applicable court orders.

"We can provide humanitarian relief consistent with our values, cut out vicious smuggling organizations, and enforce our laws," said **Secretary Alejandro N. Mayorkas**. "Individuals without a legal basis to remain in the United States will be subject to prompt expulsion or removal. Individuals who are provided a safe, orderly, and lawful path to the United States are less likely to risk their lives traversing thousands of miles in the hands of ruthless smugglers, only to arrive at our southern border and face the legal consequences of unlawful entry."

As required by a combination of the Supreme Court's December 27 order and a separate district court injunction prohibiting the implementation of the CDC termination of the Title 42 public health order, the Title 42 order remains in effect, and individuals who attempt to enter the United States without authorization will continue to be expelled.

**Country-Specific Enforcement Processes**

Building upon the success of Uniting for Ukraine (https://www.uscis.gov/ukraine) and the process for Venezuelans (https://www.uscis.gov/venezuela) announced in October – which combine a safe and lawful pathway with a consequence for failing to use that pathway – today's announcement establishes similar processes for Cuban, Haitian, and Nicaraguan nationals who face unique challenges in their home countries. The Venezuelan process also will continue; Border Patrol saw a dramatic drop – 90 percent – in the number of Venezuelans encountered at the border following the establishment of the program in October. Nationals from Venezuela, Cuba, Haiti, and Nicaragua who do not avail themselves of this process, attempt to enter the United States without authorization, and cannot establish a legal basis to remain will be removed or returned to Mexico, which will accept returns of 30,000 individuals per month who fail to use these new pathways. The expansion of the Venezuela process to Cuba, Haiti, and Nicaragua is contingent

on the Government of Mexico's willingness to accept the return or removal of nationals from those countries. It also is responsive to a request from the Government of Mexico to provide additional legal pathways for migrants, and it advances both countries' interests in addressing the effects throughout the hemisphere of deteriorated conditions in these countries.

Specifically, these processes will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border. Through a fully online process, individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization, provided that they: pass rigorous biometric and biographic national security and public safety screening and vetting; have a supporter in the United States who commits to providing financial and other support; and complete vaccinations and other public health requirements. Individuals who enter the United States, Mexico, or Panama without authorization following today's announcement will generally be ineligible for these processes. These processes will allow up to 30,000 qualifying nationals per month from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period.

Starting tomorrow, potential supporters can apply to DHS to support eligible individuals via www.uscis.gov/CHNV (http://www.uscis.gov/CHNV) . Individuals and representatives of organizations seeking to apply as supporters must declare their financial support, and they must pass security background checks to protect against exploitation and abuse.

**Safe and Orderly Processes at Ports of Entry**

To facilitate the safe and orderly arrival of noncitizens seeking an exception from the Title 42 public health order, DHS is expanding use of the free CBP One mobile app for noncitizens to schedule arrival times at ports of entry. Individuals do not need to be at the border to schedule an appointment; expanded access to the app in Central Mexico is designed to discourage noncitizens from congregating near the border in unsafe conditions. Initially, this new scheduling function will allow noncitizens to schedule a time and place to come to a port of entry to seek an exception from the Title 42 public health order for humanitarian reasons based on an individualized assessment of vulnerability. This will replace the current process for individuals seeking exceptions from the Title 42 public health order, which requires noncitizens to submit requests through third party organizations located near the border.

Once the Title 42 public health order is no longer in place, this scheduling mechanism will be available for noncitizens, including those who seek to make asylum claims, to schedule a time to present themselves at a port of entry for inspection and processing, rather than arriving unannounced at a port of entry or attempting to cross in-between ports of entry. Those who use this process will generally be eligible for work authorization during their period of authorized stay.

Individuals who use the CBP One app will be able to schedule an appointment to present themselves at the following ports of entry:

- Arizona: Nogales;
- Texas: Brownsville, Hidalgo, Laredo, Eagle Pass, and El Paso (Paso Del Norte); and
- California: Calexico and San Ysidro (Pedestrian West – El Chaparral).

During their inspection process, noncitizens must verbally attest to their COVID-19 vaccination status and provide, upon request, proof of vaccination against COVID-19 in accordance with Title 19 vaccination requirements.

Individuals will be able to schedule appointments in CBP One in the coming days. The CBP One application is free to download and available in the Apple and Google App Stores as well as at https://www.cbp.gov/about/mobile-apps-directory/cbpone (https://www.cbp.gov/about/mobile-apps-directory/cbpone) .

**Enhanced Use of Expedited Removal**

We will comply with the court orders that require us to continue enforcing the Title 42 public health order. There are, however, migrants who cannot be expelled pursuant to Title 42 authorities and as a result are processed under Title 8 authorities. For those processed under Title 8, we are increasing and enhancing our use of expedited removal, which allows for the prompt removal of those who do not claim a fear of persecution or torture or are determined not to have a credible fear after an interview with an Asylum Officer, in accordance with established procedures.

This enhanced expedited removal process will include: dedicating additional resources including personnel, transportation, and facilities; optimizing processes across DHS and DOJ; and working with the State Department and countries in the region to increase repatriations. We also will continue to process individuals under the interim final rule published in March 2022 outlining procedures for U.S. Citizenship and Immigration Services to process asylum requests for noncitizens found to have a credible fear. Together, these measures will allow for the prompt removal of those who do not have a

legal basis to stay and improve our overall preparedness for when the Title 42 public health order is lifted. Individuals removed under Title 8 are subject to a five-year bar on admission and potential criminal prosecution should they seek to reenter.

**Notice of Proposed Rulemaking**

As a complement to these efforts, and in response to the unprecedented surge in migration across the hemisphere and to reduce encounters at our border, DHS and DOJ intend to issue a proposed rule to provide that individuals who circumvent available, established pathways to lawful migration, and also fail to seek protection in a country through which they traveled on their way to the United States, will be subject to a rebuttable presumption of asylum ineligibility in the United States unless they meet exceptions that will be specified. Individuals who cannot establish a valid claim to protection under the standards set out in the new rule will be subject to prompt removal under Title 8 authorities, which carries a five-year ban on reentry. DHS and DOJ will invite public comment on the proposed rule.

Overall, through today's announcements, DHS is strengthening the availability of legal, orderly pathways to the United States while imposing consequences on those who fail to use pathways made available to them by the United States and its regional partners.

These new measures complement ongoing efforts to increase refugee resettlement from the Western Hemisphere. The U.S. Government intends to welcome at least 20,000 refugees from Latin America and the Caribbean in Fiscal Year 2023 and 2024, putting the United States on pace to more than triple refugee admissions from the Western Hemisphere this Fiscal Year alone. This delivers on the President's commitment under the Los Angeles Declaration for Migration and Protection to scale up refugee admissions from the Western Hemisphere.

Taken together, these efforts will: reduce irregular migration by disincentivizing migrants from taking the dangerous journey to the southwest border of the United States and attempting to cross without authorization; significantly expand lawful pathways to the United States for vetted individuals; and reduce the role for – and profits of – smuggling networks that callously endanger migrants' lives for personal gain.

The Department is taking these measures in light of Congress's failure to pass the comprehensive immigration reform measures President Biden proposed on his first day in office and the economic and political instability around the world that is fueling the highest levels of migration since World War II, including throughout the Western Hemisphere. The surge in global migration is testing many nations' immigration systems, including that of the United States. The actions announced today are part of the Biden-Harris Administration's ongoing commitment to enforce our laws and build a fair, orderly, and humane immigration system, and build on efforts outlined in the Department's December 2022 Update on Southwest Border Security and Preparedness (/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42). Today's announcements also show the imperative of partner countries working together, as agreed in the Los Angeles Declaration following the Summit of the Americas, to take action against smugglers and provide protection to asylum seekers. Hemispheric challenges require hemispheric solutions.

Everyone agrees that we are operating within a fundamentally broken immigration system. The steps we are taking reflect the constraints of our outdated statutes, which have not been updated in decades and were designed to address a fundamentally different migratory reality than that which exists today along the southwest border and around the world. As it has since its first day in office, the Biden-Harris Administration continues to call on Congress to pass legislation that strengthens border security, holistically addresses the root causes of migration, and improves legal pathways. We also encourage Congress to provide critical funding and advance bipartisan efforts to create a fair, fast, and functioning asylum system – enabling those who merit protection to quickly receive it, and those who do not to quickly be removed. In the absence of such action, the Administration is committed to pursuing every avenue within its authority to secure our borders, enforce our laws, and stay true to our values as we build safe, orderly, and humane processes.

###

**Topics**

BORDER SECURITY (/TOPICS/BORDER-SECURITY)   CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)
INTERNATIONAL ENGAGEMENT (/TOPICS/INTERNATIONAL-ENGAGEMENT)

**Keywords**

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)   IMMIGRATION (/KEYWORDS/IMMIGRATION)
IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT)   SECRETARY ALEJANDRO MAYORKAS (/KEYWORDS/SECRETARY-ALEJANDRO-MAYORKAS)

Last Updated: 01/05/2023

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

EXHIBIT 3



Case 6:23-cv-00007  Document 263  Filed on 08/25/23 in TXSD  Page 6 of 101
2/13/23, 9:52 PM   Case 6:23-cv-00007   Document 22-2   Filed on 02/14/23 in TXSD   Page 1 of 15
USCIS Response to Coronavirus (COVID-19)

 **U.S. Citizenship
and Immigration
Services**

Home > Humanitarian > Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

# Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

English | Kreyòl Ayisyen |

> ⓘ **ALERT:** Starting Jan. 6, 2023, you must submit Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, if you are a potential supporter of a:
>
> - Ukrainian or their immediate family member as part of Uniting for Ukraine; or
> - Cuban, Haitian, Nicaraguan, or Venezuelan or their immediate family member as part of the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.
>
> You should not file Form I-134, Declaration of Financial Support, if you are a potential supporter of an individual under Uniting for Ukraine or the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.
>
> If you submitted Form I-134 online before Jan. 6, 2023, under Uniting for Ukraine or the Process for Venezuelans, your case will continue to process and no further action is required. You should **not** submit a Form I-134A.

> ⓘ **ALERT:** Access to the processes is free. Neither the U.S.-based supporter nor the beneficiary is required to pay the U.S. government a fee to file the Form I-134A, be considered for travel authorization, or parole. Beware of any scams or potential exploitation by anyone who asks for money associated with participation in this process.

DHS has announced processes through which nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members, may request to come to the United States in a safe and orderly way. Qualified beneficiaries who are outside the United States and lack U.S. entry documents may be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for up to two years for urgent humanitarian reasons or significant public benefit. To participate, eligible beneficiaries must:

- Have a supporter in the United States;
- Undergo and clear robust security vetting;

- Meet other eligibility criteria; and
- Warrant a favorable exercise of discretion.

Individuals participating in these processes must have a supporter in the United States who agrees to provide them with financial support for the duration of their parole in the United States. The first step in the process is for the U.S.-based supporter to file a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS for each beneficiary they seek to support, including minor children. The U.S. government will then review the supporter information provided in the Form I-134A to ensure that they are able to financially support the beneficiaries they are agreeing to support.

See below for additional information on the processes and country specific eligibility requirements. Additional information is also available on our Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page.

↗ Close All   ↙ Open All

## Eligibility   ⌃

| Term | Definition |
|---|---|
| Supporter | An individual who holds lawful status in the United States or is a parolee or beneficiary of deferred action or Deferred Enforced Departure (DED) who has passed security and background vetting and demonstrated sufficient financial resources to receive, maintain, and support the individual(s) whom they commit to supporting for the duration of their stay in the United States.<br><br>Examples of individuals who meet the supporter requirement include:<br><br>• U.S. citizens and nationals;<br>• Lawful permanent residents, lawful temporary residents, and conditional permanent residents;<br>• Nonimmigrants in lawful status (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status);<br>• Asylees, refugees, and parolees;<br>• Individuals granted Temporary Protected Status (TPS); and<br><br>Beneficiaries of deferred action (including deferred action for childhood arrivals) or DED. |

| Term | Definition |
|------|------------|
| Beneficiary | A national of Cuba, Haiti, Nicaragua, or Venezuela (or their immediate family member of any nationality) who is outside the United States and who may be considered for parole under these processes.<br><br>Immediate family members of any nationality in these processes include:<br><br>• A spouse or common-law partner; and<br><br>• Unmarried child(ren) under the age of 21. NOTE: If a child is under 18, they must be traveling with a parent or legal guardian in order to use this process. |

**Who May be Considered for Advance Travel Authorization**

In order to be eligible to request and ultimately be considered for an advance authorization to travel to the United States to seek parole under these processes, beneficiaries must:

- Be outside the United States;
- Be a national of Cuba, Haiti, Nicaragua, or Venezuela; or be an immediate family member (spouse, common-law partner, and/or unmarried child under the age of 21) who is traveling with an eligible Cuban, Haitian, Nicaraguan, or Venezuelan;
- Have a U.S.-based supporter who filed a Form I-134A on their behalf that USCIS has vetted and confirmed;
- Possess an unexpired passport valid for international travel;
- Provide for their own commercial travel to an air U.S. POE and final U.S. destination;
- Undergo and pass required national security and public safety vetting;
- Comply with all additional requirements, including vaccination requirements and other public health guidelines; and
- Demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, and that a favorable exercise of discretion is otherwise merited.

An individual is ineligible to be considered for parole under these processes if that person is a dual national or permanent resident of, or holds refugee status in, another country, unless DHS operates a similar parole process for the country's nationals. This requirement does not apply to immediate family members (spouse, common-law partner, or unmarried child under the age of 21) of an eligible national of Cuba, Haiti, Nicaragua, or Venezuela with whom they are traveling.

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under these processes if that person:

- Fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- Has been ordered removed from the United States within the prior five years or is subject to a bar to inadmissibility based on a prior removal order;

- Has crossed irregularly into the United States, between the POEs, after the date the process was announced (for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023), except individuals permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) will remain eligible;

- Has irregularly crossed the Mexican or Panamanian border after the date the process was announced (for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023); or

- Is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.

**Important Note about Venezuelan Passports**

The beneficiary must have a valid, unexpired passport. Certified extensions of passport validity serve to meet this requirement. If a beneficiary's passport validity has been extended, the expiration date of the extension should be reflected as the passport expiration date. CBP will not authorize travel if the beneficiary's passport or extension is expired.

Consistent with the National Assembly decree of May 21, 2019, certain expired Venezuelan passports remain valid. A Venezuelan passport:

- Issued before June 7, 2019 (even if expired before this date), without a passport extension ("prórroga"), is considered valid and unexpired for five years beyond the expiration date printed in the passport.

- Issued before June 7, 2019 (even if expired before this date), with a "prórroga" issued before June 7, 2019, is considered valid and unexpired for five years beyond the expiration date of the "prórroga."

- Issued before June 7, 2019 (even if expired before this date), with a "prórroga" issued on or after June 7, 2019, is considered valid and unexpired through the expiration date of the "prórroga" or for five years beyond the expiration date printed in the passport, whichever is later.

- Issued on or after June 7, 2019, without a "prórroga" is not considered valid beyond the expiration date printed in the passport.

- Issued on or after June 7, 2019, with a "prórroga" issued on or after June 7, 2019, is considered valid and unexpired through the expiration date of the "prórroga."

---

## Unaccompanied Children ⌃

**Children under the age of 18 traveling without their parent or legal guardian are not eligible for advance authorization to travel or parole under these processes.** Upon arrival at a U.S. port of entry, a child who is not traveling with their parent or legal guardian may be transferred to the custody of the Department of Health and Human Services (HHS), as required by law under the Trafficking Victims Protection Reauthorization Act of 2008. For more information, please visit the HHS Unaccompanied Children webpage.

Since they are ineligible to pursue travel authorization under these processes, children who are not traveling with a parent or legal guardian but are coming to the United States to meet a parent or legal guardian may instead seek parole through the standard Form I-131 parole process. In the Form I-131 parole process, children who wish to travel without a parent or legal guardian will need written permission from all adults with legal custody of the child (including parents or legal guardians) to travel to the United States.

Evidence to accompany the Form I-131 will need to include the duration of the stay in the United States and evidence of relationship between the child and the parent or legal guardian in the United States. If the legal guardian is providing the written permission, the requestor must include proof of legal guardianship issued by a government authority. In addition, the application should include a statement about the relationship of the child to the person filing the Form I-131, and if they intend to provide care and custody of the child in the United States or reunite the child with a parent or legal guardian in the United States. For more information, please see our Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole page, which has information about the requirements for requesting parole for children.

You may request a fee waiver when submitting a Form I-131 for a child as described in the above paragraph. For more information on how to request a fee waiver, please see the Form I-912, Request for Fee Waiver, webpage.

## Who Can be a Supporter                                                        ⌃

U.S.-based supporters will initiate an online request on behalf of a named beneficiary, by submitting a Form I-134A to USCIS for each beneficiary, including minor children. Supporters can be individuals filing independently, filing with other individuals, or filing on behalf of organizations, businesses, or other entities. There is no fee required to file Form I-134A. The supporter will be vetted by the U.S. government to protect against exploitation and abuse and to ensure that they are able to financially support the beneficiary they are agreeing to support.

To serve as a supporter, an individual or individual representing an entity must:

- Be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States such as Temporary Protected Status or asylum; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

- Pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

- Demonstrate sufficient financial resources to receive, maintain, and support the individual(s) they are agreeing to support for the duration of their parole period.

Supporters who file Form I-134A on behalf of a beneficiary under these processes must be willing and able to receive, maintain, and support the beneficiary listed in Form I-134A for the duration of their parole. Examples of the types of support for beneficiaries that supporters should keep in mind when considering their ability to meet this commitment include:

- Receiving the beneficiary upon arrival in the United States and transporting them to initial housing;

- Ensuring that the beneficiary has safe and appropriate housing for the duration of their parole and initial basic necessities;

- As appropriate, helping the beneficiary complete necessary paperwork such as for employment authorization, for a Social Security card, and for services for which they may be eligible;

- Ensuring that the beneficiary's health care and medical needs are met for the duration of the parole; and

- As appropriate, assisting the beneficiary with accessing education, learning English, securing employment, and enrolling children in school.

Supporters must include the name of the beneficiary on Form I-134A. Supporters may not file a Form I-134A on behalf of an unnamed beneficiary. A supporter may agree to support more than one beneficiary, such as for different members of a family group, but must file a separate Form I-134A for each beneficiary.

**Supporters must file a separate Form I-134A for each beneficiary, even minor children.** Multiple supporters may join together to support a beneficiary. In this case, a supporter should file a Form I-134A and in the filing include supplementary evidence demonstrating the identity of, and resources to be provided by, the additional supporters and attach a statement explaining the intent to share responsibility to support the beneficiary. These supporters' ability to support a beneficiary will be assessed collectively.

Organizations, businesses, and other entities can play a critical role in providing support for beneficiaries arriving through this process. Although an individual is required to file and sign the Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all of the necessary support to the beneficiary. Individual supporters filing with or on behalf of an organization, business, or other entity should submit evidence of the entity's commitment to support the beneficiary when they file the Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other credible representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary. Individuals who are filing in association with an organization, business, or other entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary.

Organizations outside of the government may be able to help potential supporters and beneficiaries to prepare for this process. Two organizations that specialize in providing the public with information about providing welcome to newcomers and resources to support participation in these processes are listed below.

- Welcome.us provides information on welcoming and supporting newcomer populations.

- Community Sponsorship Hub has established the Sponsor Circle Program, which can provide resources and ongoing guidance to supporters.

This information is provided for informational purposes only. DHS does not endorse these entities. Using these entities in lieu of any other entity does not give any parolee preferential treatment in the adjudication of their application.

## Process Steps ⌃

Beneficiaries cannot directly apply for these processes. A supporter in the United States must first complete and file Form I-134A with USCIS on behalf of a beneficiary and include information about them and contact details, such as an email address. If we deem the Form I-134A sufficient, in our discretion, we will send the beneficiary information about the next step in the process to be considered for authorization to travel to the United States and parole consideration at an airport of entry.

Once beneficiaries receive their travel authorization, they should arrange to fly directly to their final destination in the United States. Upon arrival at the interior port of entry, individuals will be inspected by CBP and required to submit additional information, to include fingerprints, for further biometric vetting, and then be considered for a discretionary grant of parole. Those who attempt to enter the U.S. at land ports of entry will not be considered for parole through this process and will generally be denied entry.

The key steps in the processes include:

### *Step 1: Financial Support*

- A U.S.-based supporter will submit a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I-134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I-134A for each beneficiary they are seeking to support, including immediate family members and minor children.

- USCIS will then vet the supporter to ensure that they are able to financially support the individual they are agreeing to support and to protect against exploitation and abuse. USCIS, in our discretion, must vet and confirm supporters before they move forward in the process.

### *Step 2: Submit Biographic Information*

- If USCIS confirms a supporter, the listed beneficiary will receive an email from USCIS with instructions on how to create a USCIS online account and other next steps. The beneficiary must confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

- As part of confirming eligibility in their online account, individuals who seek authorization to travel to the United States must confirm that they meet public health requirements, including certain vaccination requirements.

### *Step 3: Submit Request in CBP One Mobile Application*

- After confirming biographic information in their online account and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS on how to access the CBP One mobile application (PDF, 771.55 KB). The beneficiary must enter their biographic information into CBP One and provide a photo.

### *Step 4: Advance Travel Authorization to the United States*

- After completing Step 3, the beneficiary will receive a notice in their online account confirming whether CBP will, in its discretion, provide them with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis.

- If approved, this authorization is valid for 90 days. Beneficiaries are responsible for securing their own travel via air to the United States. Approval of advance authorization to travel does not guarantee entry or parole into the United States at a U.S. port of entry. Parole is a discretionary determination made by CBP at the port of entry, based on a finding that parole is warranted due to urgent humanitarian reasons or significant public benefit.

### Step 5: Seeking Parole at the Port of Entry

- When a beneficiary arrives a port of entry, CBP will inspect them and consider them for a grant of discretionary parole on a case-by-case basis.

- As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspection process. Individuals who are determined to pose a national security or public safety threat, or otherwise not warrant parole as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE).

### Step 6: Parole

- Individuals granted parole under these processes generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations.

- Individuals granted parole may request work authorization from USCIS by filing a Form I-765, Application for Employment Authorization, either online or via mail.

---

## What to Expect After Filing Form I-134A                                    ⌃

After the supporter files the Form I-134A with USCIS, we will review the form and supporting evidence to ensure that the supporter has sufficient financial resources to support the beneficiary for the duration of the parole period and conduct background checks on the supporter. We will determine whether the Form I-134A is sufficient, and we may request additional evidence to make our determination. If approved, beneficiaries will receive an email from USCIS with instructions on how to set up a USCIS online account and other next steps. Individuals should check their email, including spam and junk folders, for important messages from USCIS.

### If the Form I-134A is Sufficient

If we confirm in our discretion that the Form I-134A is sufficient, the beneficiary will receive an email from USCIS with instructions on how to set up a USCIS online account and next steps. The beneficiary must confirm their biographic information on myUSCIS and attest to completion of all requirements, including:

- An attestation affirming that

- you are not a permanent resident or dual national of any country other than your country of nationality, and that you do not currently hold refugee status in any country, unless DHS operates a similar parole process for the country's nationals; or

- you are the spouse, common-law partner, or unmarried child under the age of 21 and traveling with an eligible national;

- An <u>attestation</u> to certify understanding of the family relationship requirements for children under 18; and

- An attestation that you have completed vaccine requirements or are eligible for an exception to vaccine requirements for measles, polio, and the first dose of a COVID-19 vaccine <u>approved or authorized by the U.S. Food and Drug Administration (FDA)</u> or <u>Emergency Use Listed (EUL) by the World Health Organization (WHO)</u>.

After arriving in the United States, the beneficiary must attest to receiving a medical screening for tuberculosis, including an Interferon-Gamma Release Assay (IGRA) test, within 90 days.

Find more information on vaccine requirements on the <u>preview of the vaccine attestation page</u>.

**If the Form I-134A is Insufficient**

If we are unable to confirm the Form I-134A is sufficient, that decision is final. The beneficiary will receive an email from USCIS notifying them that we determined the Form I-134A filed on their behalf was insufficient. We will not consider the beneficiary for parole under this parole process based on the insufficient Form I-134A. However, the supporter may file a new Form I-134A on behalf of the same or another beneficiary, or a different supporter may file a Form I-134A on behalf of the beneficiary.

**Authorization to Travel to the United States**

Once the beneficiary has confirmed their biographic information and attested to completing all other requirements, we will process their case further. Beneficiaries will receive an email instructing them to check their online account in myUSCIS for the result of their authorization to travel. This authorization is valid for 90 days.

If the beneficiary has been authorized to travel to the United States, they must arrange and fund their own travel. Beneficiaries must arrange to fly to the United States by air directly to an interior port of entry and their final destination.

---

## After the Beneficiary is Paroled into the United States ⌃

**Applying for Employment Authorization**

After you (the beneficiary) are paroled into the United States, you are eligible to apply for discretionary employment authorization from USCIS. To apply for an Employment Authorization Document (EAD), you must submit <u>Form I-765, Application for Employment Authorization</u>, using the (c)(11) category code with the required fee or apply for a fee waiver.

To file Form I-765 online, eligible applicants will access their USCIS online account at <u>my.uscis.gov</u>.

Applicants who are requesting a waiver of the Form I-765 filing fee must submit Form I-765 by mail.

**Obtaining a Social Security Number and Card**

We encourage you to apply for a Social Security number (SSN) using Form I-765, Application for Employment Authorization, and following the form instructions. If you request an SSN in Part 2 (Items 13.a-17.b) of your Form I-765, and your application is approved, USCIS will electronically transmit that data to the Social Security Administration (SSA), and SSA will assign you an SSN and issue you a Social Security card. SSA will mail your Social Security card directly to the address you provide on Form I-765. Social Security numbers generally are assigned to people who are authorized to work in the United States. Social Security numbers are used to report your wages to the government and to determine eligibility for Social Security benefits.

If you do not request an SSN on your Form I-765, you can apply for an SSN after you receive your EAD from USCIS using the instructions on SSA's Social Security Number and Card webpage.

**Address Updates**

If you are residing in the United States longer than 30 days, you must report your physical address in the United States. You can change your address online and update your address on any pending applications and petitions at the same time using the USCIS Online Change of Address system. You must report a change of address within 10 days of moving within the United States or its territories.

The above method of changing your address will update the address on file with USCIS for all pending applications, petitions, or requests that you include receipt numbers for on the form.

It is important to include the receipt number for any pending cases with USCIS with your address change request, so we can update the address associated with those cases. We will mail secure documents to the address on file. You can find the receipt number on the receipt notice (Form I-797C, Notice of Action) that we issued after you filed your application or petition. We send receipt notices to the address listed on the application or petition.

**Terminating Your Parole**

If you have already been paroled into the United States, your parole will automatically be terminated if:

- You depart the United States; or
- Your parole period expires.

DHS may also decide to terminate your parole in its discretion for other reasons, such as violating any laws of the United States. Individuals with expired parole are expected to depart the country of their own accord. Individuals in the United States encountered after their parole has terminated generally will be placed in removal proceedings.

## Contacting USCIS About Form I-134A                                          ⌃

We recommend that you submit inquiries by sending a secure message from your USCIS online account. You may call the USCIS Contact Center at 800-375-5283 (TTY 800-767-1833). The number for those outside the United States is 212-620-3418. For more information, below are responses to frequently asked questions.

**Q. What if I have an issue with account access or need a password reset?**
A. Please use our underline need help form.

**Q. If I need to submit an inquiry on my case or have a general question about my account, how can I contact USCIS?**
A. The best way to contact us depends on the type of inquiry. If you need to correct information on Form I-134A, you should send a secure message using your USCIS online account. For general questions or inquiries about status of a Form I-134A, you can send a secure message from your USCIS account or call the USCIS Contact Center at 800-375-5283 (TTY 800-767-1833). If you are outside the United States, you can reach the USCIS Contact Center at +1-212-620-3418.

**Q. If I (a supporter) entered an incorrect email address for the beneficiary on Form I-134A, what is the fastest way to submit the correction and get USCIS to resend the Account Access email to the beneficiary?**
A. Log into your USCIS online account, go to the Notices tab, and use the Unsolicited Evidence feature to upload a letter the supporter has signed by hand (not electronically). The letter should:

- Explain that the email address for the beneficiary they entered on Form I-134A was incorrect; and

- Request that USCIS update the beneficiary's email address and send the USCIS Account Notice to the beneficiary's correct email address.

Note: The letter should list both the original, incorrect email address provided on the Form I-134A and the updated, correct email address for the beneficiary. Keep the original signed letter in case we ask for it later.

You should then send a secure message from your USCIS online account:

1. Log in to your online account, select the MyAccount dropdown, then select Inbox;

2. Select "New message," then "A case already filed online";

3. Select your receipt number for Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, from the drop-down menu; and

4. State in your message that the beneficiary's email address needs to be changed and that you have uploaded unsolicited evidence. Your message should include both the original, incorrect email address and the updated, correct email address for the beneficiary.

We will review the request, make appropriate updates, and issue the beneficiary a copy of the USCIS Account Notice using the updated, correct email address. We will also notify you by email that the issue has been resolved.

**Q. How can I correct my passport information on Form I-134A?**
A. If we have already confirmed the Form I-134A submitted by your supporter, and your passport information is incorrect, you will need to use your online account to:

- Upload a copy of your valid, unexpired passport as Unsolicited Evidence in your Notices tab; and
- Send USCIS a message from your Inbox. In the message, you must indicate that you have submitted evidence to correct passport information.

You will receive a response in your inbox. Do not submit your attestations to CBP until we respond to the request to update your passport information. Submitting the attestations before you receive a response from USCIS could affect your travel authorization and request for parole.

**Q. USCIS has confirmed my Form I-134A, but you have not contacted my beneficiary yet. What should I do?**
A. If your beneficiary has not received the emailed notices, you should review the Form I-134A and ensure you provided the correct email address. If the email address is correct, the beneficiary should check their spam and junk mail folders. While we cannot address case-specific questions, in general, in situations where the beneficiary has not received their Account Notice, call the USCIS Contact Center. The number for those outside the United States is +1-212-620-3418. Alternatively, the supporter can send USCIS a secure message regarding the issue through their own USCIS online account, and after we complete the verification process, we can email the Account Notice to the beneficiary's email that we have on file.

If the email address is incorrect, log in to your USCIS online account, go to the Notices tab, and use the Unsolicited Evidence feature to upload a letter you have signed by hand (not electronically). The letter should:

- Explain that the email address for the beneficiary you entered on Form I-134A was incorrect; and
- Request that USCIS update the beneficiary's email address and send the USCIS Account Notice to the beneficiary's correct email address.

Note: Your letter should list both the original, incorrect email address provided on the Form I-134A and the updated, correct email address for the beneficiary. You must also keep the original signed letter in case we ask for it later.

If a beneficiary still cannot find the notices, they should call the USCIS Contact Center at 800-375-5283. The number for those outside the United States is +1-212-620-3418.

---

## Resources for Victims of Abuse, Violence, or Exploitation    ⌃

Please note that beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for filing Form I-134A on their behalf or for providing financial support while they are in the United States.

Access to these processes is free. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the Form I-134A. Beware of any scams or potential exploitation by anyone who asks for money associated with the Form I-134A or participation in these processes.

DHS recommends the following actions to avoid intimidating situations:

- Avoid individuals who promise to "get you to the United States quickly" if you pay an exorbitant sum of money.

- Keep your passport and other identity documents in your possession at all times.

- If you are concerned that the individual who filed Form I-134A on your behalf is not a legitimate organization or entity or legal representative, see the Scams, Fraud, and Misconduct webpage.

Call the 24-hour National Human Trafficking Hotline at 1-888-373-7888 or report an emergency to law enforcement by calling 911. Trafficking victims, whether or not U.S. citizens, are eligible for services and immigration assistance.

There are many forms of abuse and exploitation, including domestic violence, forced marriage, and human trafficking. In the United States, there are laws that may help you avoid or escape an abusive situation.

- **Domestic Violence** is a pattern of behavior in a relationship that is used to gain or maintain power and control over an intimate partner, parent, or child. Domestic abuse can involve physical, sexual, emotional, financial, or psychological abuse or threats.

- **Forced marriage** is a marriage that takes place without the consent of one or both people in the marriage. Consent means that you have given your full, free, and informed agreement to marry your intended spouse and to the timing of the marriage. Forced marriage may occur when family members or others use physical or emotional abuse, threats, or deception to force you to marry without your consent. For additional information on forced marriage, please visit the Forced Marriage webpage.

- **Human Trafficking** involves exploiting someone to compel a commercial sex act or forced labor. Generally, this exploitation must involve force, fraud, or coercion to be considered human trafficking. However, if someone under 18 years old is induced to perform a commercial sex act, that is considered human trafficking even if there is no force, fraud, or coercion.

If you have experienced or fear forced marriage, domestic violence, human trafficking, or other abuse, please contact the resources below to receive free help in your language:

- **National Domestic Violence Hotline:** 800-799-7233, 800-787-3224 (TTY), www.ndvh.org⊠

- **National Center for Missing and Exploited Children:** 800-843-5678, www.missingkids.com⊠

- **The National Center for Victims of Crime:** 800-394-2255, 800-211-7996 (TTY), www.victimsofcrime.org⊠

- **National Human Trafficking Hotline:** 888-373-7888, Text: 233733

For more information and additional resources related to gender-based violence, see the DHS Gender-Based Violence Pamphlets.

## Protect Yourself from Immigration Scams ⌃

- We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney or accredited representative working for a Department of Justice recognized

organization can give you legal advice. Visit the Avoid Scams page for information and resources.

Some common scams to be aware of include:

- **Government impersonators:** Look out for individuals who pose as USCIS officials. USCIS will only contact you through official government channels and will not contact you through your personal social media accounts (such as Facebook, Twitter, LinkedIn, etc.).

- **Misleading offers of support:** Look out for individuals who attempt to contact you online or through your social media accounts to offer to be your supporter or connect you to a supporter in exchange for a fee or other form of compensation. Similarly, look out for individuals seeking biographic information from you, such as your passport number or date of birth, through your social media accounts, to offer to support you for parole. Supporters should be able to provide financial support to beneficiaries for up to a 2-year period of parole. Beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for the potential supporter submitting Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on their behalf or for providing financial support while they are in the United States. Find more information on potential exploitation and abuse in the Understand Your Rights (PDF) guide.

- **Scam Websites:** Some websites claim to be affiliated with USCIS and offer step-by-step guidance on completing a USCIS application or petition. Make sure your information is from uscis.gov, dhs.gov, or is affiliated with uscis.gov. Make sure the website address ends with .gov.

- **Payments by Phone or Email:** USCIS will never ask you to transfer money to an individual. We do not accept Western Union, MoneyGram, PayPal, or gift cards as payment for immigration fees. In addition, we will never ask you to pay fees to a person on the phone or by email.

- **Notarios Públicos and unauthorized practitioners of immigration law:** In the United States, a notario público is not authorized to provide you with any legal services related to immigration benefits. Only an attorney or an accredited representative working for a Department of Justice (DOJ)-recognized organization can give you legal advice. For more information about finding legal services, visit our website.

## Related Links ∧

- Form I-134A, Online Request to be a Supporter and Declaration of Financial Support

- Form I-134A, Online Request to be a Supporter and Declaration of Financial Support (PDF, 556.5 KB)

- Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

⤢ Close All   ⤢ Open All

Last Reviewed/Updated: 02/03/2023

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 4


PLAINTIFF'S EXHIBIT

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.,*
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
*et al.,*
    *Defendants.*

Case 6:23-cv-00007

## DECLARATION OF SHERI GIPSON

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.    I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2.    I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020. I have worked for the Driver License Division of DPS for 40 years.

3.    Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section 521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."

4.      Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual applying for an original personal identification certificate "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas Transportation Code provides that DPS "may not deny a personal identification certificate to an application who complies with Subsection (f-2) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.      If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action), and otherwise meets eligibility requirements, DPS will issue a limited term driver license or personal identification certificate to a non-citizen resident of Texas.[1] A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence.  In fiscal year 2023 (September 2022 through April 2023), DPS issued 312,837 limited term licenses and identification certificates. In fiscal year 2022 (September 2021 through August 2022), DPS issued 414,567 limited term licenses and identification certificates.

6.      For each non-citizen resident of Texas who seeks a limited term driver license or personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per

---

[1] DPS maintains a list of documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13) (also attached to as Ex. A), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawful presence.pdf.

transaction.

7.        For each non-United States citizen resident of Texas who seeks a limited term

driver license, DPS verifies the individual's social security number and that person's eligibility

through Social Security Online Verification ("SSOLV") and the American Association of Motor

Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if

applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas

currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of

$0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.        Each additional customer seeking a limited term driver license or personal

identification certificate imposes a cost on DPS that exceeds $33. Furthermore, DPS estimates that

for an additional 10,000 driver license customers seeking a limited term license, DPS would incur

a biennial cost of approximately $2,014,870.80. The table below outlines the estimated costs that

DPS would incur based on the additional number of customers per year for employee hiring and

training, office space, office equipment, verification services, and card production cost. For every

10,000 additional customers above the 10,000-customer threshold, DPS may have to open

additional driver license offices or expand current facilities to meet that increase in customer

demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.     The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of July, 2023.

_____
SHERI GIPSON

# Declaration of Sheri Gipson
# Exhibit A:
# Verifying Lawful Presence



# Verifying Lawful Presence

An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US.  The table on the following pages describes the acceptable documents for each type of applicant attempting to verify lawful presence.  All documentation must show the applicant's name and date of birth.  The applicant must validate a name change or other inconsistent information through additional documentation such as a marriage license, divorce decree or court order.

The department must verify applicable lawful presence documentation through the US Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program.  Verification through SAVE is often instantaneous, but when it is not, receipt of the DL/ID may be delayed for up to 30 days.  If SAVE cannot verify on the first attempt, SAVE will permit two additional stages of verification.  Each stage may require additional documentation from the applicant.  After each stage, the applicant will receive instructions either verbally or by mail on how to proceed with the transaction.  To avoid further delay, the applicant should comply with the instructions fully and as soon as possible.  If the applicant provides timely responses, the process timeline generally occurs as follows.

| Stage | DLD receives response from DHS | DLD response to applicant |
|---|---|---|
| First | Within a few seconds | If verified, card issued |
| Second | 3 to 5 business days | Instruction letter issued within 48 hours after DHS response received by DLD |
| Third | Up to 20 additional business days after second response received from DHS | Instruction letter issued within 48 hours after DHS response received by DLD |

### Temporary Visitor/Limited Term Issuance

An applicant may be issued a limited term DL/ID if he or she is NOT:

- A US citizen;
- A US national;
- A lawful permanent resident;
- A refugee; or
- An asylee.

A limited term DL/ID will expire with the applicant's lawful presence as determined by DHS.

### Commercial Driver Licenses

This guide does not apply to commercial driver licenses.  A person who is a US citizen, US national, lawful permanent resident, refugee or asylee may apply for a commercial driver license.  All others may apply for a nonresident commercial driver license, if eligible.  Refer to http://www.dps.texas.gov/DriverLicense/CommercialLicense.htm or Chapter 522 of the Transportation Code for application and eligibility requirements.

**(Rev. 7-13)**

| Category | Acceptable Documents |
|---|---|
| U.S. Citizen | ❖ Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S.<br>❖ Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad<br>❖ Certificate of U.S. Citizenship<br>❖ Certificate of Naturalization<br>❖ U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179)<br>❖ Northern Mariana Card (I-873)<br>❖ U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN"<br>❖ U.S. passport card |
| U.S. National | U.S. passport book that indicates on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" |
| Kickapoo Traditional Tribe of Texas ("KIC") (U.S. citizen) | American Indian Card (form I-872) which indicates "KIC" |
| Kickapoo Traditional Tribe of Texas ("KIP") (non-U.S. citizen) | American Indian Card (form I-872) which indicates "KIP" |
| American Indian born in Canada (First Nations) | An applicant may refer to the Jay Treaty, 8 U.S.C. § 1359, or 8 C.F.R. § 289.2 and may present a variety of documents. Issuance cannot occur without approval of the documents by Austin headquarters. DLD Personnel: make copies of documentation and seek approval through the chain of command. |
| Lawful Permanent Resident | ❖ Permanent Resident Card (I-551)<br>❖ Resident Alien Card (I-551) – card issued without expiration date<br>❖ Valid Immigrant Visa (with adit stamp) and unexpired foreign passport<br>❖ Unexpired foreign passport stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ I-94 stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ Re-entry Permit I-327<br><br>Note: I-151, the predecessor to I-551, is not acceptable as proof of permanent resident status. |
| Immigrant Visa with Temporary I-551 language | A valid Immigrant Visa within one year of endorsement (i.e. stamped by Customs and Border Protection – adit stamp) and an unexpired passport |
| Conditional entrants | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 or other document showing admission under Section 203(a)(7), "refugee conditional entry"<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |

2

| Category | Acceptable Documents |
|---|---|
| Asylee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 208" or "asylee"<br>❖ Unexpired foreign passport with annotation "Section 208" or "asylee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(5)<br>❖ I-766 with category A5 or A05 |
| Refugee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 207" or "refugee"<br>❖ Unexpired foreign passport with annotation "Section 207" or "refugee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |
| Temporary Protected Status (TPS) | Immigration documentation with an alien number or I-94 number indicating this status or Employment Authorization Document (EAD) (I-766) with category A12 or C19 |
| Applicant with Employment Authorization Document | Employment Authorization Document (EAD)( I-766) |
| Applicants for adjustment of status<br><br>Note: These are individuals applying to become lawful permanent residents. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating pending I-485 or pending application for adjustment of status. |
| Applicants for extension of status, change of status, petition for non-immigrant worker, with a pending I-918 application, or other pending category | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating a pending application for an extension of status, change of status, petition for non-immigrant worker, or other pending category. |
| Citizens of the Republic of Palau | Unexpired foreign passport or I -94 with annotation "CFA/PAL" or other annotation indicating the Compact of Free Association/Palau<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Citizens of the Republic of the Marshall Islands | Unexpired foreign passport or I -94 with annotation "CFA/RMI" or other annotation indicating the Compact of Free Association/Republic of Marshall Islands<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |

3

| Category | Acceptable Documents |
|---|---|
| Citizens of the Federated States of Micronesia | Unexpired foreign passport or I -94 with annotation "CFA/FSM" or other annotation indicating the Compact of Free Association/Federated States of Micronesia<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Cuban/Haitian entrants | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "Cuban/Haitian entrant" |
| Lawful temporary residents | Immigration documentation with an alien number or I-94 number |
| Self-petitioning abused spouses or children, parents of abused children, or children of abused spouses<br><br>(Applicants with Violence Against Women Act (**VAWA**) petitions) | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to I-797 indicating approved, pending, or prima facie determination of I-360 or an approved or pending I-360 or an I-766 with category C31. |
| Parolees | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "parole" or "paroled pursuant to Section 212(d)(5)." |
| Person granted **deferred action** | Immigration documentation with an alien number or I-94 number |
| Persons granted **deferred enforcement departure** (DED) | Immigration documentation with an alien number or I-94 number or Employment Authorization Document (EAD) (I-766) with category A11<br><br>Note: Individuals in this status may have been granted an extension to the period of authorized stay that is not reflected on the current EAD.  Notifications regarding any extensions to this category will be distributed by Austin headquarters. |
| Person granted **family unity** | Immigration documentation with an alien number or I-94 number |
| Persons under an **order of supervision** | Immigration documentation with an alien number or I-94 number |
| Persons granted **extended or voluntary departure** | Immigration documentation with an alien number or I-94 number |

| Category | Acceptable Documents |
|---|---|
| Persons granted withholding of deportation or removal | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 or passport with annotation "Section 243(h)" or a letter or order from USCIS or court granting withholding of deportation or removal. |
| Persons in removal or deportation proceedings | Immigration documentation with an alien number or I-94 number |
| Persons granted a stay of deportation | Immigration documentation with an alien number or I-94 number |
| Persons granted voluntary departure | Immigration documentation with an alien number or I-94 number |
| A-1, A-2, and A-3 | Unexpired foreign passport or I-94<br><br>**Note:** Issuance **cannot occur unless** applicant presents a letter from U.S. Department of State with original signature <u>indicating ineligibility for Department of State issued driver license or requesting issuance of a state issued identification card.</u> |
| B1/B2 Visa/BCC with I-94<br><br>(Border Crosser Card, DSP-150, or "laser visa") | All of the following:<br>♦ Unexpired foreign passport,<br>♦ Visa (border crosser card), **and**<br>♦ **I -94**<br>Note:  Applicant must have an I-94 to be eligible because of the time and distance from the border restrictions for applicants who do not obtain an I-94. |
| B-1, B-2, C-1, C-3, D-1, and D-2 | Unexpired foreign passport or I-94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| C-2<br><br>Alien in transit to U.N. Headquarters district.  Travel limited to 25 miles radius of Columbus Circle in New York, NY | This status is restricted to New York, NY and not eligible for a Texas driver license under the domicile/residency requirements. |
| E-1, E-2, and E-3 | Unexpired foreign passport or I-94 |
| E-2 CNMI<br><br>Treaty-Investor and dependents in Commonwealth of the Northern Mariana Islands | This status is limited to persons entering the Commonwealth of the Northern Mariana Islands (CNMI) and is not eligible for a Texas driver license (8 CFR § 214.2(3)(23)). |
| F-1<br><br>Foreign academic student | Unexpired foreign passport or I-94 or I-20 |

| Category | Acceptable Documents |
|---|---|
| F-2<br>Dependent on F-1 | Unexpired foreign passport or I -94 |
| F-3<br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| G-1, G-2, G-3, G-4, and G-5 | Unexpired foreign passport or I -94<br><br>Note: Issuance cannot occur unless applicant presents a letter from US Department of State approving the issuance of a DL/ID. |
| H-1B, H-1B1, H-1C, H-2A, H-2B, H-2R, H-3, H-4, and I | Unexpired foreign passport or I -94 |
| J-1<br>Exchange visitor (may be student, trainee, work/travel, au pair, etc.) | Unexpired foreign passport or I -94 or DS-2019 |
| J-2<br>Dependent of J-1 exchange visitor | Unexpired foreign passport or I -94 |
| K-1, K-2, K-3, K-4, L-1, L-1A, L-1B, and L-2 | Unexpired foreign passport or I -94 |
| M-1<br>Non-academic student | Unexpired foreign passport or I -94 or I-20 |
| M-2<br>Dependents of non-academic students | Unexpired foreign passport or I -94 |
| M-3<br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| N-1 through N-7 (NATO)<br>North American Treaty Organization Representatives and dependents | Unexpired foreign passport or I -94 |
| N-8, N-9, O-1, O-2, O-3, P-1, P-2, P-3, P-4, Q-1, Q-2, Q-3, R-1, R-2, S-5, S-6, S-7, T-1, T-2, T-3, T-4, T-5, TN-1, TN-2, TD, U-1, U-2, U-3, U-4, U-5, V-1, V-2, and V-3 | Unexpired foreign passport or I -94 |

| Category | Acceptable Documents |
|---|---|
| **WB\*** <br> Visitor for business (visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I-94 <br><br> Note: The applicant may not be able meet residency/domicile requirements. |
| **WT\*** <br> Visitor for pleasure (tourist in visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I-94 <br><br> Note: The applicant may not be able meet residency/domicile requirements. |

\*Visa waiver program countries: Andorra, Australia, Austria, Belgium, Brunei, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.,*
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.,*
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 5



**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

    *Defendants.*

Case 6:23-cv-00007

## DECLARATION OF REBECCA WALTZ

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.    I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.    I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.    The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens with at least one felony or two misdemeanor convictions for

violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.      As a part of my employment with TDCJ, I am responsible for compiling the data to be included in TDCJ's application for federal reimbursement to the State Criminal Alien Assistance Program. These data sets include the number of correctional officers and their salary expenditures ( correctional officer is defined as a person whose primary employment responsibility is to maintain custody of individuals held in custody in a correctional facility) for the reporting period, information regarding maximum bed counts and inmate days, and information about the eligible inmates - (1) whom the agency incarcerated for at least four consecutive days during the reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably and in good faith believes were undocumented criminal aliens.

5.      TDCJ has sought reimbursement from the federal government through SCAAP since 1998.

6.      For the most recently completed SCAAP application (reporting period of July 1, 2020 through June 30, 2021), TDCJ reported data for 7,058 eligible inmates and total of 1,984,597 days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2022 ($77.49) as reported by the Texas Legislative Budget Board by the number of days.  For example ($77.49 x 1,984,597 days = $153,786,422).

7.      Of this estimated amount, TDCJ was reimbursed $17,364,520 by SCAAP.

9.      It is my belief that to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.

10.     Whether incarcerating criminal aliens or having them on parole or mandatory supervision, TDCJ incurs costs. Keeping detainees in TDCJ custody, or adding them to parole or mandatory supervision, imposes costs on TDCJ for housing, supervising, and providing health care. An estimate of the cost of parole or mandatory supervision for these inmates can be calculated by multiplying the average cost per inmate for active parole supervision for Fiscal Year 2022 ($4.69) as reported by the Texas Legislative Budget Board by the number of days. For example ($4.69 x 1,984,597 days = $9,307,760).

11.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25 day of May 2023.

REBECCA WALTZ

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 6



United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,

    *Defendants.*

Case 6:23-cv-00007

## DECLARATION OF JAMES TERRY

My name is James Terry, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.    I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA") with 30 years of experience at the school district level. I have worked for TEA in this capacity since December 1, 2022, having previously served as the Chief Financial Officer for Third Future Schools and the Chief Financial Officer at Dallas Independent School District from 2013 to 2017. Previously I served as the Executive Director of Finance for the North East Independent School District from 1999 to 2011.

2.    In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3.     TEA estimates that the average funding entitlement for fiscal year 2023 will be $9,564 per student in attendance for an entire school year. If a student qualified for the additional Bilingual and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would cost the State $11,781 to educate each student in attendance for the entire school year.

4.     TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement (accessed on May 24, 2023 at 1:09 a.m. CST at   https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state) (attached as Exhibit 1), indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020; 15,341 UAC were released during the 12-month period covering October 2020 through September 2021; and 19,071 UAC were released during the 12-month period covering October 2021 through September 2022. If each of these children is educated

in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be roughly $9,573, $9,639, $9,841, $10,330, $11,323, $11,536, $11,719, and $11,781, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, $26.95 million, $179.78 million, and $224.67 million, respectively.

5.    School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 15,000 students in enrollment growth across Texas each year.

6.    The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent.

7.    Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

8.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24 day of May 2023.

JAMES TERRY

Listen

# Unaccompanied Children Released to Sponsors by State

**Current as of:** April 28, 2023

When a child who is not accompanied by a parent or legal guardian is apprehended by immigration authorities, the child is transferred to the care and custody of the Office of Refugee Resettlement (ORR). Federal law requires that ORR feed, shelter, and provide medical care for unaccompanied children until it is able to release them to safe settings with sponsors (usually family members), while they await immigration proceedings. These sponsors live in many states.

Sponsors are adults who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. All sponsors must pass a background check. The sponsor must agree to ensure the child's presence at all future immigration proceedings. They also must agree to ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

HHS is engaging with state officials to address concerns they may have about the care or impact of unaccompanied children in their states, while making sure the children are treated humanely and consistent with the law as they go through immigration court proceedings that will determine whether they will be removed and repatriated, or qualify for some form of relief.

HHS has strong policies in place to ensure the privacy and safety of unaccompanied children by maintaining the confidentiality of their personal information. These children may have histories of abuse or may be seeking safety from threats of violence. They may have been trafficked or smuggled. HHS cannot release information about individual children that could compromise the child's location or identity.

The data in the table below shows **state-by-state** data of unaccompanied children released to sponsors as of March 31, 2023. ACF will update this data each month. **Additional data on unaccompanied children released to sponsors by state is available on the HHS website** ☑.

**View unaccompanied children released to sponsors by county.**

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and

SHARES

https://www⁄ ⁻s.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state

FY2017 release data were updated May 22, 2018. The FY2018 release data were updated December 3, 2019. Questions may be addressed to ORR directly, at (202) 401-9246.

# Unaccompanied Children Release Data

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY14 (OCT. 2014 — SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 — SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY23 (OCT. 2022 — MAR. 2023) |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 736 | 1,111 | 247 | 1,946 | 2,378 | 1,076 |
| Alaska | 2 | 5 | 3 | 0 | 4 | 0 | 4 | 6 | 4 |
| Arizona | 167 | 330 | 322 | 258 | 493 | 162 | 631 | 782 | 446 |
| Arkansas | 186 | 309 | 272 | 193 | 359 | 87 | 790 | 926 | 496 |
| California | 3,629 | 7,381 | 6,268 | 4,675 | 8,447 | 2,225 | 10,773 | 13,730 | 5,956 |
| Colorado | 248 | 427 | 379 | 313 | 714 | 172 | 1,088 | 1,424 | 765 |
| Connecticut | 206 | 454 | 412 | 332 | 959 | 260 | 1,447 | 1,302 | 614 |
| Delaware | 152 | 275 | 178 | 222 | 383 | 107 | 519 | 573 | 282 |
| DC | 201 | 432 | 294 | 138 | 322 | 48 | 307 | 421 | 160 |
| Florida | 2,908 | 5,281 | 4,059 | 4,131 | 7,408 | 1,523 | 11,145 | 13,195 | 6,431 |
| Georgia | 1,041 | 1,735 | 1,350 | 1,261 | 2,558 | 559 | 4,358 | 5,233 | 2,470 |

SHARES

Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 — SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY23 (OCT. 2022 — MAR. 2023) |
|---|---|---|---|---|---|---|---|---|---|
| Idaho | 11 | 39 | 11 | 28 | 62 | 19 | 84 | 125 | 74 |
| Illinois | 312 | 519 | 462 | 475 | 863 | 211 | 1,712 | 2,930 | 1,734 |
| Indiana | 240 | 354 | 366 | 394 | 794 | 209 | 1,593 | 1,867 | 919 |
| Iowa | 201 | 352 | 277 | 238 | 489 | 119 | 677 | 820 | 401 |
| Kansas | 245 | 326 | 289 | 305 | 453 | 95 | 718 | 807 | 399 |
| Kentucky | 274 | 503 | 364 | 370 | 710 | 158 | 1,042 | 1,242 | 605 |
| Louisiana | 480 | 973 | 1,043 | 931 | 1,966 | 355 | 2,851 | 3,420 | 1,375 |
| Maine | 4 | 9 | 11 | 22 | 26 | 11 | 64 | 96 | 63 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,723 | 4,671 | 825 | 5,471 | 6,062 | 2,512 |
| Massachusetts | 738 | 1,541 | 1,077 | 814 | 1,756 | 448 | 2,549 | 2,700 | 1,166 |
| Michigan | 132 | 227 | 160 | 136 | 248 | 74 | 451 | 673 | 341 |
| Minnesota | 243 | 318 | 320 | 294 | 624 | 151 | 1,002 | 1,071 | 607 |
| Mississippi | 207 | 300 | 237 | 299 | 482 | 108 | 707 | 745 | 313 |
| Missouri | 170 | 261 | 234 | 203 | 431 | 93 | 794 | 1,008 | 528 |

SHARES

Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 – SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 – SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 – SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 – SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 – SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 – SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 – SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 – SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY23 (OCT. 2022 – MAR. 2023) |
|---|---|---|---|---|---|---|---|---|---|
| Nebraska | 293 | 486 | 355 | 374 | 563 | 130 | 889 | 919 | 403 |
| Nevada | 137 | 283 | 229 | 132 | 324 | 79 | 465 | 616 | 291 |
| New Hampshire | 14 | 25 | 27 | 20 | 25 | 8 | 67 | 61 | 26 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,877 | 4,236 | 921 | 5,911 | 6,648 | 2,794 |
| New Mexico | 19 | 65 | 46 | 43 | 89 | 34 | 116 | 141 | 98 |
| New York | 2,630 | 4,985 | 3,938 | 2,845 | 6,367 | 1,663 | 8,534 | 8,543 | 4,329 |
| North Carolina | 844 | 1,493 | 1,290 | 1,110 | 2,522 | 610 | 4,249 | 4,888 | 2,295 |
| North Dakota | 2 | 10 | 3 | 2 | 10 | 1 | 14 | 19 | 7 |
| Ohio | 483 | 693 | 584 | 547 | 1,091 | 260 | 1,675 | 1,993 | 980 |
| Oklahoma | 225 | 301 | 267 | 286 | 581 | 120 | 906 | 1,062 | 437 |
| Oregon | 122 | 188 | 170 | 200 | 318 | 71 | 438 | 562 | 307 |
| Pennsylvania | 333 | 604 | 501 | 563 | 1,229 | 271 | 2,103 | 2,518 | 1,781 |
| PR | 0 | 0 | 0 | 1 | 3 | 3 | 0 | 3 | 2 |

SHARES

5/24/23, 1:21 PM

Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 — SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY23 (OCT. 2022 — MAR. 2023) |
|---|---|---|---|---|---|---|---|---|---|
| South Carolina | 294 | 562 | 483 | 508 | 1,012 | 255 | 1,743 | 2,251 | 1,089 |
| South Dakota | 61 | 81 | 81 | 96 | 149 | 44 | 233 | 272 | 122 |
| Tennessee | 765 | 1,354 | 1,066 | 1,173 | 2,191 | 510 | 4,267 | 4,821 | 2,213 |
| Texas | 3,272 | 6,550 | 5,391 | 4,136 | 9,900 | 2,336 | 15,341 | 19,071 | 8,273 |
| Utah | 62 | 126 | 99 | 97 | 179 | 75 | 307 | 491 | 245 |
| Vermont | 1 | 1 | 0 | 2 | 6 | 1 | 8 | 4 | 4 |
| Virginia | 1,694 | 3,728 | 2,888 | 1,650 | 4,215 | 770 | 5,400 | 6,213 | 2,495 |
| Washington | 283 | 476 | 494 | 435 | 723 | 237 | 1,113 | 1,301 | 640 |
| West Virginia | 12 | 26 | 23 | 23 | 41 | 4 | 60 | 89 | 26 |
| Wisconsin | 38 | 85 | 94 | 98 | 246 | 62 | 531 | 721 | 339 |
| Wyoming | 6 | 23 | 14 | 15 | 15 | 6 | 22 | 34 | 16 |
| Virgin Islands | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 1 | 1 |
| **TOTAL** | 27,840 | 52,147 | 42,497 | 34,953 | 72,837 | 16,837 | 107,686 | 127,447 | 58,654 |

*The FY2015 numbers have been reconciled.

SHARES

https://www.[ ].gov/orr/grant-funding/unaccompanied-children-released-sponsors-state

5/24/23, 1:2

Unaccompanied Children Released . ...isors by State | The Administration for Children and Families

*The FY2017 numbers have been reconciled.

*The FY2018 numbers have been reconciled.

*The FY2021 numbers have been reconciled.

For more information, please read **ORR's reunification policy.**

**Topics:**
**Unaccompanied Children (UC)**

**Types:**
**grant**

**Audiences:**
**Unaccompanied Children (UC)**

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 7



**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
    *et al.*,

    *Defendants.*

Case 6:23-cv-00007

## DECLARATION OF SUSAN BRICKER

1.    My name is Susan Bricker. I am an adult and competent to testify. The information and opinions contained in this declaration are based upon my personal knowledge, my review of the relevant documents, and my knowledge, skills, training, and experience.

2.    I am currently the manager (Manager V) of the Health Program Outcomes and Epidemiology Team ("HPOE") within the Office of Data, Analytics and Performance ("DAP") (the office formerly known as the Center for Analytics and Decision Support--CADS) at the Texas Health and Human Services Commission ("HHSC").

3.    Except for a brief eight-month period in 2014 when I worked in the private sector, I've been employed at HHSC since 2007. In that time, I have worked as an Epidemiologist II (2007-2012), Research Specialist V (2012-Jan. 2014), a Research Specialist V (Sept. 2014-Apr. 2018), a Program Specialist VII (May 2018-May 2021), and Manager V (June 2021-current). The HPOE Team conducts and/or coordinates legislative and HHS-directed research on health care utilization,

demographic trends, and enrollment patterns for the state's health care and human service programs.

4.     In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

5.     HHSC provided three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage (a/k/a "CHIP Perinate") for Rider 59 and subsequent versions. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State. In the 2008 and 2010 versions of the Rider 59 Report, HHSC provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

6.     In September 2022, HHSC updated the methodology for calculating the fraction of the Texas' Medicaid Type Program 30 (Emergency Medicaid) clients and CHIP Perinate clients that are likely to be undocumented immigrants. The newer

methodology is described in paragraphs 8 and 11. These estimates are calculated for calendar years (CY) 2019 through 2022. Due to the change in methodology and the shift from state fiscal year to calendar year, the current estimates do not match the estimates provided in previous testimony. In May 2023, this method was adapted to produce estimates of expenditures attributable to individuals from Cuba, Haiti, Nicaragua, and Venezuela. This is described in paragraphs 9 and 12.

7.      Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. To produce Rider 59 cost estimates for the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive-age females in Texas who have not attained some form of legal permanent resident status. The method based on Census data was used because HHSC Medicaid claims data do not conclusively identify an individual's residency status. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

8.      In September of 2022, HHSC analysts identified a secondary data source that could be used in combination with claims data to better estimate the fraction of Emergency Medicaid services provided to undocumented immigrants. The updated method relies on enrollment data collected by the Texas Integrated Eligibility

Redesign System (TIERS), which contains a variable related to documentation status. Using the percentage of Emergency Medicaid clients with 'UN' (for "undocumented") alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS, HHSC estimated the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; and $72.2 million in CY 2022.[1] Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

9.    In May 2023, HHSC used TIERS data to produce estimates of expenditures for Emergency Medicaid services provided to non-citizens from Cuba, Haiti, Nicaragua, and Venezuela. The expenditure calculations reflect the sum of paid amounts on Emergency Medicaid claims for services to individuals with a country of origin listed as one of those four countries, regardless of documentation status. The total estimated cost to the state was approximately $207,000 in CY 2019; $141,000 in CY 2020; $123,000 in 2021; $178,000 in CY 2022, and $30,000 in CY2023 (as of May 5, 2023). Attached as Exhibit 2 is a report providing detailed expenditure data by country of origin. HHSC also calculated expenditures since October 1, 2022, for

---

[1] Administrative claims and MCO encounter data for CY 2022 were downloaded on January 11, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

services provided to individuals from Venezuela ($8,115) and since January 6, 2023, for services provided to individuals from Cuba, Haiti, and Nicaragua ($25,660).[2]

10.     Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. To produce Rider 59 cost estimates for the portion of CHIP Perinate expenditures attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive age females in Texas who have not attained some form of legal permanent resident status. The method based on Census data was used because there is no way to definitively report the number of undocumented immigrants served by CHIP Perinate as the program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

11.     The September 2022 estimate for the cost of CHIP Perinate benefits provided to undocumented immigrants used TIERS data in combination with capitation payments to better estimate the fraction of CHIP Perinate expenditures attributable to undocumented immigrants. The updated method uses the percentage of CHIP Perinate clients with 'UN' alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS to estimate the portion of CHIP Perinate capitation payments attributable to undocumented immigrants in Texas.

---

[2] Administrative claims and MCO encounter data for CY 2022 were downloaded on May 9, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 and CY 2023 do not reflect complete expenditure data for those years.

The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $11.1 million in CY 2019; $16.9 million in CY2020; $25.8 million in CY 2021; and $30.9 million in CY2022.   Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

12.   In May 2023, HHSC used TIERS data to produce estimates of expenditures for CHIP Perinate services provided to non-citizens from Cuba, Haiti, Nicaragua, and Venezuela. The expenditure calculations reflect the sum of capitation payments for individuals with a country of origin listed as one of those four countries, regardless of documentation status. The total estimated cost to the state was approximately $28,000 in CY 2019; $37,000 in CY 2020; $64,000 in 2021; $80,000 in CY 2022, and $51,000 in CY2023 (as of May 5, 2023).   Attached as Exhibit 2 is a report providing detailed expenditure data by country of origin. HHSC also calculated expenditures since October 1, 2022, for services provided to individuals from Venezuela ($16,500), and since January 6, 2023, for services provided to individuals from Cuba, Haiti, and Nicaragua ($31,000).

13.   For Emergency Medicaid and CHIP Perinate, the total estimated cost to the State each year is affected by both the volume and cost of services provided and annual changes in the percentage of expenditures matched by the federal government (i.e., Federal Medical Assistance Percentage (FMAP) and Enhanced Federal Medical Assistance Percentage (E-FMAP)), which determines the state share of overall Medicaid and CHIP expenditures. It is important to note that documentation status is missing or unknown for some individuals enrolled in these programs. Additionally,

an Alien Type Code of 'UN' (undocumented) may result from a failure to provide proper documentation at the time an application is submitted. Although all of these cost estimates include some margin of uncertainty, it is clear that both of these programs have some positive cost to the State of Texas due to utilization by non-citizens, including undocumented immigrants.

14.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30th day of May 2023.

*Susan K Bricker*

SUSAN BRICKER

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 1

# Population-based Method for Estimating the Percentage of Undocumented Clients in Texas

## Original Rider 59 Estimates

Previously, HHSC relied on different methods to estimate the percentage of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

HHSC relied on a method that used two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Subsequent Estimates (2014 – 2022)

Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

## Calculation for Estimated Percent Undocumented

**((0.7\*176,000 + 0.4\*270,000) / (446,000)) \* 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs in reports prior to 2023.

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 2

**Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Medicaid and CHIP-Perinate Programs, CY 2019 - 2022**

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas Emergency Medicaid | $116,000,000 | $88,300,000 | $95,600,000 | $72,200,000* |
| Texas Children's Health Insurance Program (CHIP) Perinatal Coverage | $11,100,000 | $16,900,000 | $25,800,000 | $30,900,000 |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | **$127,100,000** | **$105,200,000** | **$121,400,000** | **$103,100,000** |

Notes:

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8 month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants, CY 2019 - 2022**

| Texas Emergency Medicaid Expenditures[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Total | $379,408,384 | $357,752,477 | $379,965,247 | $257,913,172 |

| Texas' Share of TP 30 Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Texas' Share of Federal Medical Assistance Percentage (FMAP)[2] | 41.14% | 32.68% | 32.24% | 34.78% |
| Texas' Share of TP 30 Expenditures | $156,088,609 | $116,913,510 | $122,500,796 | $89,702,201 |

| Estimated Percentage of TP30 Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| TIERS estimate[3] | 74.3% | 75.5% | 78.0% | 80.5% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Total | $115,973,837 | $88,269,700 | $95,550,621 | $72,210,272 |

Data Sources:

[1] TMHP, AHQP Medicaid Claims

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
   FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
   FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
   FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.

[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants is estimated based on TIERS eligibility data. The TIERS estimate is the percentage of Emergency Medicaid clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8 month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas, CY 2019 - 2022**

| Texas CHIP Perinatal Coverage expenditures[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Total | $175,103,677 | $154,717,301 | $150,341,871 | $161,628,934 |

| Texas' Share of CHIP Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas' Share of Enhanced Federal Medical Assistance Percentage (EFMAP)[2] | 8.67% | 14.25% | 22.57% | 24.35% |
| Texas' Share of CHIP-Perinate Expenditures | $15,181,489 | $22,047,215 | $33,932,160 | $39,356,645 |

| Estimated Percentage of CHIP-Pernate Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| TIERS estimate[3] | 73.3% | 76.6% | 76.1% | 78.4% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Total | $11,128,031 | $16,888,167 | $25,822,374 | $30,855,610 |

Data Sources:

[1] HHSC, DAP SQL Server, CHIP_hx file

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.

FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.

FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.

FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.

[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated using TIERS eligibility data. The TIERS method is based on the percentage of CHIP-Perinate clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

Texas Emergency Medicaid Expenditures, Type Program 30, for Non-Citizens from Cuba, Haiti, Nicaragua or Venezuela, CY 2019-2023 [1,2]

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 | Total | Oct 2022-Current | Jan 6,2023-Current |
|---|---|---|---|---|---|---|---|---|
| Cuba | $419,450 | $365,440 | $339,721 | $370,427 | $64,513 | $1,560,551 | | $61,302 |
| Haiti | $19,173 | $43,409 | $25,219 | $13,644 | $0 | $101,445 | | $0 |
| Nicaragua | $27,485 | $0 | $6,927 | $64,105 | $2,998 | $101,514 | | $2,641 |
| Venezuela | $37,997 | $21,718 | $10,889 | $64,410 | $7,281 | $142,297 | $20,221 | |
| Total | $504,105 | $431,567 | $382,756 | $512,586 | $74,792 | $1,905,807 | $20,221 | $63,943 |

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 | | CY 2023 | CY 2023 |
|---|---|---|---|---|---|---|---|---|
| Texas's Share of TP 30 Expenditures | | | | | | | | |
| Texas's Share of Federal Medical Assistance Percentage (FMAP)[3] | 41.14% | 32.68% | 32.24% | 34.78% | 40.13% | | 40.13% | 40.13% |

Estimated Cost of Services Provided to Non-Citizens from Cuba, Haiti, Nicaragua or Venezuela

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 | Total | Oct 2022-Current | Jan 6,2023-Current |
|---|---|---|---|---|---|---|---|---|
| Cuba | $172,562 | $119,753 | $109,526 | $128,835 | $25,889 | $556,564 | | $24,600 |
| Haiti | $7,888 | $14,186 | $8,131 | $4,745 | $0 | $34,950 | | $0 |
| Nicaragua | $11,307 | $0 | $2,233 | $22,296 | $1,203 | $37,039 | | $1,060 |
| Venezuela | $15,632 | $7,097 | $3,511 | $22,402 | $2,922 | $51,564 | $8,115 | |
| Total | $207,389 | $141,036 | $123,401 | $178,277 | $30,014 | $680,117 | $8,115 | $25,660 |

Data Sources

[1] Expenditures based on Medicaid claims and encounters: TMHP, AHCP Medicaid Claims
[2] Nationality is based on country of origin recorded in the Texas Integrated Eligibility Redesign System (TIERS)
[3] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 223, November 28, 2018.
FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.
FFY 2023 rates retrieved from https://www.federalregister.gov/d/2021-25798, 6/18/2023.

Notes

Data were retrieved on 5/9/2023. Inpatient, outpatient and professional costs are as of 5/9/23. Data are subject to an eight-month time lag for claims adjudication. Therefore, expenditures for client services from September 2022 to current do not reflect complete expenditure data.
HHSC only has nationality for documented individuals. Expenditures are based on claims in which the client type was listed as TP30 (Emergency Medicaid), however documentation status at the time the services were rendered is not known.

Texas CHIP-Perinatal Coverage Capitation Payments for Non-Citizens from Cuba, Haiti, Nicaragua or Venezuela, CY 2019-2023 [1,2]

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 | Total | Oct 2022-Current | Jan 6,2023-Current |
|---|---|---|---|---|---|---|---|---|
| Cuba | $258,946 | $227,118 | $247,989 | $259,638 | $115,215 | $1,108,906 | | $94,717 |
| Haiti | 0 | $1,143 | $6,286 | $3,715 | $3,687 | $14,831 | | $3,133 |
| Nicaragua | $11,531 | $4,983 | $6,183 | $24,416 | $12,659 | $59,772 | | $10,019 |
| Venezuela | $57,865 | $28,563 | $21,896 | $41,796 | $44,652 | $194,773 | $56,784 | $56,784 |
| Total | $328,342 | $261,807 | $282,354 | $329,565 | $176,213 | $1,378,282 | $56,784 | $107,669 |

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 | | Oct 2022-Current | Jan 6,2023-Current |
|---|---|---|---|---|---|---|---|---|
| Texas Share of CHIP Expenditures | | | | | | | | |
| Texas' Share of Enhanced Federal Medical Assistance Percentage (EFMAP)[3] | 8.67% | 14.25% | 22.57% | 24.35% | 29.09% | | 29.09% | 29.09% |

| Estimated Cost of Services Provided to Non-Citizens from Cuba, Haiti, Nicaragua or Venezuela | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 | Total | Oct 2022-Current | Jan 6,2023-Current |
|---|---|---|---|---|---|---|---|---|
| Cuba | $22,451 | $32,364 | $55,971 | $63,222 | $33,516 | $207,524 | | $27,553 |
| Haiti | 50 | $163 | $1,419 | $905 | $1,073 | $3,559 | | $911 |
| Nicaragua | $1,000 | $710 | $1,395 | $5,945 | $3,683 | $12,733 | | $2,915 |
| Venezuela | $5,017 | $4,070 | $4,942 | $10,177 | $12,989 | $37,196 | $16,518 | $16,518 |
| Total | $28,467 | $37,307 | $63,727 | $80,249 | $51,260 | $261,011 | $16,518 | $31,379 |

Data Sources:
[1] HHSC, DAP SQL Server, CHIP_txx file
[2] Texas Integrated Eligibility Redesign System (TIERS)
[3] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 239, November 30, 2020.
FFY 2023 rates retrieved from https://www.federalregister.gov/d/2021-25785, 5/18/2023.

Chip Perinate costs are as of May 2023.
HHSC only has nationality for documented individuals.

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 8



## **Muster**

**Date:**              October 17, 2022

**Topic:**            Processing of Venezuelan Nationals Arriving to the United States with
                       Advance Travel Authorization

**HQ POC/Office:**   Admissibility and Passenger Programs

This muster outlines the considerations for processing noncitizens arriving in the United States without appropriate documents sufficient for entry but who have obtained advance authorization to travel to the United States to seek parole under the Department of Homeland Security (DHS) established Venezuela parole process.

- This process implements the use of the DHS Secretary's authority to consider the parole of certain Venezuelan nationals and their qualifying immediate family members[1] into the United States, for urgent humanitarian reasons and significant public benefit.

- Parole may only be considered on a case-by-case basis, for urgent humanitarian reasons or significant public benefit, and only after appropriate vetting.

- Parole under this process will utilize the "VHP – *Venezuelan Humanitarian Parole*" disposition in Unified Secondary (USEC).

- Noncitizens encountered without travel documents sufficient for entry and without having participated in this DHS-approved process will be processed as appropriate, consistent with established policy and procedure, and may not be considered for parole under this process.

  - VHP may not be used for any individual without an approved corresponding travel authorization under this process as verified in CBP systems and a valid, unexpired passport.
    - Where appropriate, CBP officers may accept an expired passport and issue VHP when the passport has expired within 90 days of the CBP encounter.

- It is expected that individuals arriving to the United States under this process will be in possession of a valid passport.

  - Consistent with Admissibility and Passenger Programs (APP) guidance issued on June 7, 2019, CBP will recognize as valid, Venezuelan passports that have been issued a passport extension ("prorroga"), until the expiration of the extension.

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of 21. Family members must travel with the principal noncitizen to be considered parole under this process upon arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Venezuelan Nationals Arriving to the United States with Advance Travel Authorization
Page 2

- Noncitizens may not have their inspection deferred in order to allow them to obtain advance travel authorization under this process post-arrival in the United States.

- Consistent with current policy, CBP officers (CBPOs) will refer undocumented noncitizens who appear to be inadmissible to the United States for secondary admissibility inspection. Generally, noncitizens arriving under this process are expected to be lacking sufficient entry documents and therefore must be referred for secondary admissibility inspection.

- Neither Simplified Arrival (SA) Air nor SA Pedestrian will display an approved advance authorization to travel to the United States to seek parole. However, USEC will display an approved travel authorization in the Subject Details and as part of the Subject System Checks in the secondary referral.

- Noncitizens determined to be unaccompanied noncitizen children (UC), consistent with 6 U.S.C. § 279(g)(2), are not eligible for parole under this process.

  - UC may be processed for other available processing dispositions, including but not limited to issuance of a Notice to Appear (NTA).
  - Under no circumstance is a UC to be released from CBP custody to a non-parent or non-legal guardian.
  - Consistent with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), UC must be turned over to the custody of the U.S. Department of Health and Human Services (HHS).

- Moreover, for all noncitizens arriving as part of a family unit, CBPOs are reminded that the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction in Ms. L. v. ICE" issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on Separation of Family Units Due to 8 U.S.C § 1326 Prosecutions or Related Criminal History" remain in effect.

- Venezuelan nationals encountered at a land border port of entry (POE) without travel documents sufficient for entry will be processed as appropriate, consistent with established policy and procedure.

  - Venezuelan nationals subject to the Centers for Disease Control and Prevention's (CDC's) *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* ("CDC Order") Order may be prevented entry at the international boundary or be expelled from the United States pursuant to the CDC Order.
  - POEs may continue to except noncitizens, regardless of citizenship, from the CDC Order on a case-by-case basis.
  - Noncitizens arriving at land POEs may be required to demonstrate proof of vaccination against COVID-19.

For Official Use Only
Law Enforcement Sensitive

Processing of Venezuelan Nationals Arriving to the United States with Advance Travel Authorization
Page 3

- Consistent with current practice, POEs should coordinate with the National Targeting Center (NTC) where noncitizens arriving under this process are determined to be possible matches to national security records or who present a public safety risk upon arrival in the United States.

    o Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if appropriate.
    o Those with positive vetting results may not be paroled pursuant to this guidance. Instead, they must be processed consistent with established policy and procedure.

- CBPOs will determine the appropriate processing disposition for each noncitizen on a case-by-case-basis at the time the noncitizen presents themselves at the POE.

- Where parole for this population is appropriate, CBPOs will initiate a USEC event with the appropriate program specific disposition and complete all necessary case processing, to include recordation of the A-number in the event and the issuance of an electronic I-94.

    o CBPOs should utilize the "A-number Validation" search in USEC to validate if an A-number was previously issued by United States Citizenship and Immigration Services (USCIS). *Note: All individuals arriving under this process are expected to have an existing A-number.*
        ▪ If no A-number was issued, CBPOs must issue an A-number following current processing procedures prior to completion of processing for parole under this process.
    o Parole under this process must include biometric capture (search & enroll) and review of results for all noncitizens age 14-79 considered in scope for biometric collection or for whom collection is otherwise warranted.
    o To be considered for parole under this process, each individual must have their own travel authorization approval.
    o Individuals not independently eligible under this process must be traveling with their principal family member to be considered for parole under this process as a dependent.
    o Noncitizens for whom parole is appropriate under this guidance should generally be paroled for a period of two years.
    o CBPOs are reminded to ensure both the A-number and the passport number are correct prior to issuance of an electronic I-94.
    o CBP will provide a *Ukraine and Venezuela Parole Information* tear sheet to all noncitizens paroled under this process.

Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

For Official Use Only
Law Enforcement Sensitive

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 9





1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

October 17, 2022

MEMORANDUM FOR:   Directors, Field Operations
                  Office of Field Operations

FROM:             Executive Director
                  Admissibility and Passenger Programs
                  Office of Field Operations

SUBJECT:          Processing of Venezuelan Nationals Arriving to the United States
                  with Advance Travel Authorization

In an effort to alleviate the continued strain experienced by U.S. Customs and Border Protection
(CBP) along the southwest border (SWB) as the result of a sustained influx of undocumented
noncitizens, the Department of Homeland Security (DHS) has established a new process that
provides certain nationals of Venezuela lacking United States entry documents, and their
qualifying immediate family members[1], the opportunity to request advance authorization to
travel to the United States to seek parole.  This process implements the use of the DHS
Secretary's authority to consider the parole of certain Venezuelan nationals and their qualifying
immediate family members into the United States, for significant public benefit and urgent
humanitarian reasons.

This process will provide a streamlined way for Venezuelan nationals to submit certain personal
information to U.S Citizenship and Immigration Services (USCIS) and CBP to facilitate the
issuance of an advance authorization to travel to the United States to seek parole.  Venezuelan
nationals arriving to the United States under this process may be considered, on a case-by-case
basis, for a temporary period of parole for up to two years, provided that they: have a USCIS
approved supporter in the United States; possess a valid passport for international travel; clear
robust security vetting; provide for their own commercial travel to an interior air port of entry
(POE); meet other specified criteria, including vaccination requirements and other public health
guidelines; and warrant a favorable exercise of discretion.  These criteria will also apply to the
immediate family members of noncitizens not independently eligible under this process.

Beginning October 18, 2022, U.S. based persons or entities may begin to submit an I-134,
*Declaration of Financial Support*, to USCIS on behalf of individuals for whom advance
authorization to travel under this process may be appropriate.  Following USCIS vetting of the

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of
21. Family members must travel with the principal noncitizen to be considered for parole under this process upon
arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

**23-cv-00007_0004**

Processing of Venezuelan Nationals Arriving to the United States with Advance Travel
Authorization
Page 2

supporter, confirmation of the beneficiary's biographic information, and the beneficiary's
attestation of vaccination against measles, polio, and COVID-19, the beneficiary will submit
biometric information, specifically a facial photograph, to CBP using the CBP One™ mobile
application.  Available biographic and biometric information will be vetted by CBP against
selected security and law enforcement databases at DHS and other federal agencies, for national
security, border security, public health, and safety.  Following completion of vetting of the
potential beneficiary, an approval or denial of advance authorization to travel to the United
States to seek parole will be issued.

To relieve pressure at the SWB POEs currently experiencing an influx of undocumented
noncitizens, beneficiaries with approved advance authorization to travel to the United States to
seek parole will be required to travel to the United States on commercial flights.  Noncitizens
traveling under this process by air must adhere to the Centers for Disease Control and Prevention
(CDC) guidelines regarding COVID-19 testing but will not be required to demonstrate proof of
COVID-19 vaccination at time of boarding.

Venezuelan nationals encountered at a land border POE without travel documents sufficient for
entry will be processed as appropriate, consistent with established policy and procedure.
Venezuelan nationals subject to the CDC's *Order Suspending the Right to Introduce Certain
Persons from Countries Where a Quarantinable Communicable Disease Exists* ("CDC Order"),
may be prevented entry at the international boundary or be expelled from the United States
pursuant to the CDC Order.  POEs may continue to except noncitizens, regardless of citizenship,
from the CDC Order on a case-by-case basis and process them in accordance with all applicable
law and policy.  Noncitizens arriving at land POEs may be required to demonstrate proof of
vaccination against COVID-19.

This memorandum outlines how CBP Office of Field Operations (OFO) may consider exercising
discretionary authority under Section 212(d)(5) of the Immigration and Nationality Act (INA) to
parole certain noncitizens into the United States under this process pursuant to DHS Under
Secretary Robert Silvers' October 12, 2022 memorandum *Parole Process for Certain
Venezuelan Nationals*.  This guidance outlines the considerations for processing noncitizens
arriving in the United States without appropriate documents sufficient for entry but who have
obtained advance authorization to travel to the United States to seek parole under this process.

Noncitizens determined to be unaccompanied noncitizen children (UC), consistent with 6 U.S.C.
§ 279(g)(2), are not eligible for parole under this process.  UC may be processed for other
available processing dispositions and must be turned over to the custody of the U.S. Department
of Health and Human Services (HHS) under established policy and procedure and consistent
with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA).  Moreover, for
all noncitizens arriving as part of a family unit, CBP officers are reminded that the guidance
implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction in *Ms. L.* v. *ICE*"
issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on

Processing of Venezuelan Nationals Arriving to the United States with Advance Travel
Authorization
Page 3

Separation of Family Units Due to 8 U.S.C. § 1326 Prosecutions or Related Criminal History"
remain in effect.

Consistent with current practice, POEs should coordinate with the National Targeting Center
(NTC) where noncitizens arriving under this process are determined to be possible matches to
national security records or who present a public safety risk upon arrival in the United States.
Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if
appropriate.  Those with positive vetting results may not be paroled pursuant to this
memorandum.  Instead, they must be processed consistent with established policy and procedure.

The attached muster contains specific processing guidance.  Nothing in this guidance supersedes
the local exercise of discretionary authority and the ability of the port to make determinations
regarding appropriate processing, on a case-by-case basis considering the totality of the
circumstances.

Please ensure that this memorandum and muster are disseminated to all POEs within your field
office.  Should you have any questions or require additional information, please contact Katrina
Deyo, (A) Director, Enforcement Programs Division at (202) 344-1742.

Attachments:   Muster, *Processing of Venezuelan Nationals Arriving to the United States with
Advance Travel Authorization*, Admissibility and Passenger Programs, October
17, 2022

For Official Use Only
Law Enforcement Sensitive

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
   SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 10





1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

January 5, 2023

MEMORANDUM FOR:   Directors, Field Operations
Office of Field Operations

FROM:                        Executive Director
Admissibility and Passenger Programs
Office of Field Operations

SUBJECT:                  Processing of Cuban Nationals Arriving to the United States with
Advance Travel Authorization

In an effort to alleviate the continued strain experienced by U.S. Customs and Border Protection
(CBP) along the southwest border (SWB) as the result of a sustained influx of noncitizens
without appropriate documents for admission, and building on the success of other advance
travel authorization processes, the Department of Homeland Security (DHS) has established a
process that provides certain nationals of Cuba, and their qualifying immediate family members[1],
the opportunity to request advance authorization to travel to the United States to seek a
discretionary grant of parole.  This process implements the use of the Secretary of Homeland
Security's authority to consider the parole of certain Cuban nationals and their qualifying
immediate family members into the United States, for significant public benefit and urgent
humanitarian reasons.  The number of advance travel authorizations issued under this process is
subject to a monthly limit, which is applicable across multiple parole processes.

This process will provide a streamlined way for Cuban nationals to submit certain personal
information to U.S. Citizenship and Immigration Services (USCIS) and CBP to facilitate the
issuance of an advance authorization to travel to the United States to seek parole.  Cuban
nationals arriving to the United States under this process may be considered, on a case-by-case
basis, for a temporary period of parole for up to two years, provided that they: have a USCIS
approved supporter in the United States; possess a valid passport for international travel; clear
robust security vetting; provide for their own commercial travel to an interior air port of entry
(POE); meet other specified criteria, including vaccination requirements and other public health
guidelines; and warrant a favorable exercise of discretion.  These criteria will also apply to the
immediate family members of noncitizens not independently eligible under this process.

Under this process, beginning January 6, 2023, U.S. based persons or entities may submit an I-
134A, *Online Request to be a Supporter and Declaration of Financial Support*, to USCIS on
behalf of individuals for whom advance authorization to travel under this process may be
appropriate.  Following USCIS vetting of the supporter, confirmation of the beneficiary's

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of
21. Family members must travel with the principal noncitizen to be considered for parole under this process upon
arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Cuban Nationals Arriving to the United States with Advance Travel Authorization
Page 2

biographic information, and the beneficiary's attestation of vaccination against measles, polio, and COVID-19, the beneficiary will submit biometric information, specifically a facial photograph, to CBP using the CBP One™ mobile application. Available biographic and biometric information will be vetted by CBP against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety. Following completion of vetting of the potential beneficiary, CBP will issue an approval or denial of advance authorization to travel to the United States to seek parole.

To relieve pressure at the SWB POEs currently experiencing an influx of undocumented noncitizens, beneficiaries with approved advance authorization to travel to the United States to seek parole will be required to travel to the United States on commercial flights. Noncitizens traveling under this process by air must adhere to all applicable Centers for Disease Control and Prevention (CDC) COVID-19 guidance.

This memorandum outlines how the Office of Field Operations (OFO) may consider exercising discretionary authority under Section 212(d)(5) of the Immigration and Nationality Act (INA) to consider parole for certain noncitizens into the United States under this process pursuant to a December 22, 2022 memorandum, approved by the Secretary of Homeland Security, entitled *Parole Process for Certain Cuban Nationals*. This guidance outlines the considerations for processing noncitizens arriving in the United States at an air POE without appropriate documents sufficient for entry but who have obtained advance authorization to travel to the United States to seek parole under this process.

Noncitizens determined to be unaccompanied noncitizen children (UC), as described in 6 U.S.C. § 279(g)(2), are not eligible for parole under this process. UC may be processed for other available processing dispositions and must be turned over to the custody of the U.S. Department of Health and Human Services (HHS) under established policy and procedure and consistent with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Moreover, for all noncitizens arriving as part of a family unit, CBP officers are reminded that the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction in *Ms. L*. v. *ICE*" issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on Separation of Family Units Due to 8 U.S.C. § 1326 Prosecutions or Related Criminal History" remain in effect.

Consistent with current practice, POEs should coordinate with the National Targeting Center (NTC) where noncitizens arriving under this process are determined to be possible matches to national security records or who present a public safety risk upon arrival in the United States. Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if appropriate. Those with positive vetting results may not be paroled pursuant to this memorandum. Instead, they must be processed consistent with established policy and procedure. Cuban nationals encountered at a land border POE without travel documents sufficient for entry will be processed as appropriate, consistent with established policy and procedure, and may not be considered for parole under this DHS designated process. Noncitizens arriving at land POEs may be required to demonstrate proof of vaccination against COVID-19.

For Official Use Only
Law Enforcement Sensitive

Processing of Cuban Nationals Arriving to the United States with Advance Travel Authorization
Page 3

While the CDC's *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* ("CDC Order") remains in effect, Cuban nationals may be prevented entry at the international boundary or be expelled from the United States pursuant to the CDC Order. POEs may continue to except noncitizens, regardless of citizenship, from the CDC Order on a case-by-case basis and process them in accordance with all applicable law and policy. Following the cessation of the enforcement of the CDC Order, OFO will inspect and process all noncitizens pursuant to Title 8 authorities.

Cuban nationals encountered by CBP at the SWB and processed under Title 8, may, in the exercise of discretion, be permitted to voluntarily withdraw their application for admission and return to Mexico and still be eligible for the parole process, provided that such voluntary withdrawal would be their first with CBP, whether U.S. Border Patrol (USBP) or OFO, after the announcement of this process. When processing Cuban nationals who are determined to be amenable to withdrawal, officers must read the subject the advisal outlined in the *Withdrawal Statement for Noncitizen Potentially Eligibly for Advance Travel Authorization*, which informs the individual that the decision to withdraw is voluntary. Officers are reminded that, when processing a Cuban national for a withdrawal of their application for admission, the provisions of CBP Directive No. 3340-043 *The Exercise of Discretionary Authority* remain in effect.

The attached muster contains specific processing guidance. Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

Please ensure that this memorandum and muster are disseminated to all POEs within your field office. Should you have any questions or require additional information, please contact Katrina Deyo, (A) Director, Enforcement Programs Division at (202) 344-1742.

Attachments:   Muster, *Processing of Cuban Nationals Arriving to the United States with Advance Travel Authorization*, Admissibility and Passenger Programs, January 5, 2023

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.,*
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.,*
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 11





1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

January 5, 2023

MEMORANDUM FOR:   Directors, Field Operations
Office of Field Operations

FROM:                       Executive Director
Admissibility and Passenger Programs
Office of Field Operations

SUBJECT:                 Processing of Haitian Nationals Arriving to the United States with
Advance Travel Authorization

In an effort to alleviate the continued strain experienced by U.S. Customs and Border Protection
(CBP) along the southwest border (SWB) as the result of a sustained influx of noncitizens
without appropriate documents for admission, and building on the success of other advance
travel authorization processes, the Department of Homeland Security (DHS) has established a
process that provides certain nationals of Haiti, and their qualifying immediate family members[1],
the opportunity to request advance authorization to travel to the United States to seek a
discretionary grant of parole.  This process implements the use of the Secretary of Homeland
Security's authority to consider the parole of certain Haitian nationals and their qualifying
immediate family members into the United States, for significant public benefit and urgent
humanitarian reasons.  The number of advance travel authorizations issued under this process is
subject to a monthly limit, which is applicable across multiple parole processes.

This process will provide a streamlined way for Haitian nationals to submit certain personal
information to U.S. Citizenship and Immigration Services (USCIS) and CBP to facilitate the
issuance of an advance authorization to travel to the United States to seek parole.  Haitian
nationals arriving to the United States under this process may be considered, on a case-by-case
basis, for a temporary period of parole for up to two years, provided that they: have a USCIS
approved supporter in the United States; possess a valid passport for international travel; clear
robust security vetting; provide for their own commercial travel to an interior air port of entry
(POE); meet other specified criteria, including vaccination requirements and other public health
guidelines; and warrant a favorable exercise of discretion.  These criteria will also apply to the
immediate family members of noncitizens not independently eligible under this process.

Under this process, beginning January 6, 2023, U.S. based persons or entities may submit an I-
134A, *Online Request to be a Supporter and Declaration of Financial Support*, to USCIS on
behalf of individuals for whom advance authorization to travel under this process may be
appropriate.  Following USCIS vetting of the supporter, confirmation of the beneficiary's

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of
21.  Family members must travel with the principal noncitizen to be considered for parole under this process upon
arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Haitian Nationals Arriving to the United States with Advance Travel Authorization
Page 2

biographic information, and the beneficiary's attestation of vaccination against measles, polio, and COVID-19, the beneficiary will submit biometric information, specifically a facial photograph, to CBP using the CBP One™ mobile application. Available biographic and biometric information will be vetted by CBP against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety. Following completion of vetting of the potential beneficiary, CBP will issue an approval or denial of advance authorization to travel to the United States to seek parole.

To relieve pressure at the SWB POEs currently experiencing an influx of undocumented noncitizens, beneficiaries with approved advance authorization to travel to the United States to seek parole will be required to travel to the United States on commercial flights. Noncitizens traveling under this process by air must adhere to all applicable Centers for Disease Control and Prevention (CDC) COVID-19 guidance.

This memorandum outlines how the Office of Field Operations (OFO) may consider exercising discretionary authority under Section 212(d)(5) of the Immigration and Nationality Act (INA) to consider parole for certain noncitizens into the United States under this process pursuant to a December 22, 2022 memorandum, approved by the Secretary of Homeland Security, entitled *Parole Process for Certain Haitian Nationals*. This guidance outlines the considerations for processing noncitizens arriving in the United States at an air POE without appropriate documents sufficient for entry but who have obtained advance authorization to travel to the United States to seek parole under this process.

Noncitizens determined to be unaccompanied noncitizen children (UC), as described in 6 U.S.C. § 279(g)(2), are not eligible for parole under this process. UC may be processed for other available processing dispositions and must be turned over to the custody of the U.S. Department of Health and Human Services (HHS) under established policy and procedure and consistent with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Moreover, for all noncitizens arriving as part of a family unit, CBP officers are reminded that the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction in *Ms. L*. v. *ICE*" issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on Separation of Family Units Due to 8 U.S.C. § 1326 Prosecutions or Related Criminal History" remain in effect.

Consistent with current practice, POEs should coordinate with the National Targeting Center (NTC) where noncitizens arriving under this process are determined to be possible matches to national security records or who present a public safety risk upon arrival in the United States. Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if appropriate. Those with positive vetting results may not be paroled pursuant to this memorandum. Instead, they must be processed consistent with established policy and procedure. Haitian nationals encountered at a land border POE without travel documents sufficient for entry will be processed as appropriate, consistent with established policy and procedure, and may not be considered for parole under this DHS designated process. Noncitizens arriving at land POEs may be required to demonstrate proof of vaccination against COVID-19.

For Official Use Only
Law Enforcement Sensitive

Processing of Haitian Nationals Arriving to the United States with Advance Travel Authorization
Page 3

While the CDC's *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* ("CDC Order") remains in effect, Haitian nationals may be prevented entry at the international boundary or be expelled from the United States pursuant to the CDC Order. POEs may continue to except noncitizens, regardless of citizenship, from the CDC Order on a case-by-case basis and process them in accordance with all applicable law and policy. Following the cessation of the enforcement of the CDC Order, OFO will inspect and process all noncitizens pursuant to Title 8 authorities.

Haitian nationals encountered by CBP at the SWB and processed under Title 8, may, in the exercise of discretion, be permitted to voluntarily withdraw their application for admission and return to Mexico and still be eligible for the parole process, provided that such voluntary withdrawal would be their first voluntary withdrawal with CBP, whether U.S. Border Patrol (USBP) or OFO, after the announcement of this process. When processing Haitian nationals who are determined to be amenable to withdrawal, officers must read the subject the advisal outlined in the *Withdrawal Statement for Noncitizen Potentially Eligibly for Advance Travel Authorization,* which informs the individual that the decision to withdraw is voluntary. Officers are reminded that, when processing a Haitian national for a withdrawal of their application for admission, the provisions of CBP Directive No. 3340-043 *The Exercise of Discretionary Authority* remain in effect.

The attached muster contains specific processing guidance. Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

Please ensure that this memorandum and muster are disseminated to all POEs within your field office. Should you have any questions or require additional information, please contact Katrina Deyo, (A) Director, Enforcement Programs Division at (202) 344-1742.

Attachments:   Muster, *Processing of Haitian Nationals Arriving to the United States with Advance Travel Authorization*, Admissibility and Passenger Programs, January 5, 2023

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
  *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
  SECURITY, *et al.*,
  *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 12





1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

January 5, 2023

MEMORANDUM FOR:   Directors, Field Operations
                             Office of Field Operations

FROM:                   Executive Director
                             Admissibility and Passenger Programs
                             Office of Field Operations

SUBJECT:            Processing of Nicaraguan Nationals Arriving to the United States
                             with Advance Travel Authorization

In an effort to alleviate the continued strain experienced by U.S. Customs and Border Protection (CBP) along the southwest border (SWB) as the result of a sustained influx of noncitizens without appropriate documents for admission, and building on the success of other advance travel authorization processes, the Department of Homeland Security (DHS) has established a process that provides certain nationals of Nicaragua, and their qualifying immediate family members[1], the opportunity to request advance authorization to travel to the United States to seek a discretionary grant of parole. This process implements the use of the Secretary of Homeland Security's authority to consider the parole of certain Nicaraguan nationals and their qualifying immediate family members into the United States, for significant public benefit and urgent humanitarian reasons. The number of advance travel authorizations issued under this process is subject to a monthly limit, which is applicable across multiple parole processes.

This process will provide a streamlined way for Nicaraguan nationals to submit certain personal information to U.S. Citizenship and Immigration Services (USCIS) and CBP to facilitate the issuance of an advance authorization to travel to the United States to seek parole. Nicaraguan nationals arriving to the United States under this process may be considered, on a case-by-case basis, for a temporary period of parole for up to two years, provided that they: have a USCIS approved supporter in the United States; possess a valid passport for international travel; clear robust security vetting; provide for their own commercial travel to an interior air port of entry (POE); meet other specified criteria, including vaccination requirements and other public health guidelines; and warrant a favorable exercise of discretion. These criteria will also apply to the immediate family members of noncitizens not independently eligible under this process.

Under this process, beginning January 6, 2023, U.S. based persons or entities may submit an I-134A, *Online Request to be a Supporter and Declaration of Financial Support*, to USCIS on behalf of individuals for whom advance authorization to travel under this process may be appropriate. Following USCIS vetting of the supporter, confirmation of the beneficiary's

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of 21. Family members must travel with the principal noncitizen to be considered for parole under this process upon arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Nicaraguan Nationals Arriving to the United States with Advance Travel Authorization
Page 2

biographic information, and the beneficiary's attestation of vaccination against measles, polio, and COVID-19, the beneficiary will submit biometric information, specifically a facial photograph, to CBP using the CBP One™ mobile application. Available biographic and biometric information will be vetted by CBP against selected security and law enforcement databases at DHS and other federal agencies, for national security, border security, public health, and safety. Following completion of vetting of the potential beneficiary, CBP will issue an approval or denial of advance authorization to travel to the United States to seek parole.

To relieve pressure at the SWB POEs currently experiencing an influx of undocumented noncitizens, beneficiaries with approved advance authorization to travel to the United States to seek parole will be required to travel to the United States on commercial flights. Noncitizens traveling under this process by air must adhere to all applicable Centers for Disease Control and Prevention (CDC) COVID-19 guidance.

This memorandum outlines how the Office of Field Operations (OFO) may consider exercising discretionary authority under Section 212(d)(5) of the Immigration and Nationality Act (INA) to consider parole for certain noncitizens into the United States under this process pursuant to a December 22, 2022 memorandum, approved by the Secretary of Homeland Security, entitled *Parole Process for Certain Nicaraguan Nationals*. This guidance outlines the considerations for processing noncitizens arriving in the United States at an air POE without appropriate documents sufficient for entry but who have obtained advance authorization to travel to the United States to seek parole under this process.

Noncitizens determined to be unaccompanied noncitizen children (UC), as described in 6 U.S.C. § 279(g)(2), are not eligible for parole under this process. UC may be processed for other available processing dispositions and must be turned over to the custody of the U.S. Department of Health and Human Services (HHS) under established policy and procedure and consistent with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Moreover, for all noncitizens arriving as part of a family unit, CBP officers are reminded that the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction in *Ms. L.* v. *ICE*" issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on Separation of Family Units Due to 8 U.S.C. § 1326 Prosecutions or Related Criminal History" remain in effect.

Consistent with current practice, POEs should coordinate with the National Targeting Center (NTC) where noncitizens arriving under this process are determined to be possible matches to national security records or who present a public safety risk upon arrival in the United States. Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if appropriate. Those with positive vetting results may not be paroled pursuant to this memorandum. Instead, they must be processed consistent with established policy and procedure. Nicaraguan nationals encountered at a land border POE without travel documents sufficient for entry will be processed as appropriate, consistent with established policy and procedure, and may not be considered for parole under this DHS designated process. Noncitizens arriving at land POEs may be required to demonstrate proof of vaccination against COVID-19.

For Official Use Only
Law Enforcement Sensitive

Processing of Nicaraguan Nationals Arriving to the United States with Advance Travel Authorization
Page 3

While the CDC's *Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists* ("CDC Order") remains in effect, Nicaraguan nationals may be prevented entry at the international boundary or be expelled from the United States pursuant to the CDC Order. POEs may continue to except noncitizens, regardless of citizenship, from the CDC Order on a case-by-case basis and process them in accordance with all applicable law and policy. Following the cessation of the enforcement of the CDC Order, OFO will inspect and process all noncitizens pursuant to Title 8 authorities.

Nicaraguan nationals encountered by CBP at the SWB and processed under Title 8, may, in the exercise of discretion, be permitted to voluntarily withdraw their application for admission and return to Mexico and still be eligible for the parole process, provided that such voluntary withdrawal would be their first with CBP, whether U.S. Border Patrol (USBP) or OFO, after the announcement of this process. When processing Nicaraguan nationals who are determined to be amenable to withdrawal, officers must read the subject the advisal outlined in the *Withdrawal Statement for Noncitizen Potentially Eligibly for Advance Travel Authorization*, which informs the individual that the decision to withdraw is voluntary. Officers are reminded that, when processing a Nicaraguan national for a withdrawal of their application for admission, the provisions of CBP Directive No. 3340-043 *The Exercise of Discretionary Authority* remain in effect.

The attached muster contains specific processing guidance. Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

Please ensure that this memorandum and muster are disseminated to all POEs within your field office. Should you have any questions or require additional information, please contact Katrina Deyo, (A) Director, Enforcement Programs Division at (202) 344-1742.

Attachments:   Muster, *Processing of Nicaraguan Nationals Arriving to the United States with Advance Travel Authorization*, Admissibility and Passenger Programs, January 5, 2023

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 13





1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

January 5, 2023

MEMORANDUM FOR:   Directors, Field Operations
                  Office of Field Operations

FROM:             Executive Director
                  Admissibility and Passenger Programs
                  Office of Field Operations

SUBJECT:          Updated Processing of Venezuelan Nationals Arriving to the United
                  States with Advance Travel Authorization

In an effort to alleviate the continued strain experienced by U.S. Customs and Border Protection
(CBP) along the southwest border (SWB) as the result of a sustained influx of noncitizens
without appropriate documents for admission, the Department of Homeland Security (DHS)
established a process that provides certain nationals of Venezuela, and their qualifying
immediate family members[1], the opportunity to request advance authorization to travel to the
United States to seek a discretionary grant of parole under Section 212(d)(5) of the Immigration
and Nationality Act (INA). This process implements the use of the Secretary of Homeland
Security's authority to consider the parole of certain Venezuelan nationals and their qualifying
immediate family members into the United States, for significant public benefit or urgent
humanitarian reasons. Previously, DHS had set a numerical cap on the number of noncitizens
able to travel to the United States under this process; however, that cap now has been removed in
favor of a monthly limit applicable across multiple parole processes.

This process provides a streamlined way for Venezuelan nationals to submit certain personal
information to U.S. Citizenship and Immigration Services (USCIS) and CBP to facilitate the
issuance of an advance authorization to travel to the United States to seek parole. Venezuelan
nationals arriving to the United States under this process may be considered, on a case-by-case
basis, for a temporary period of parole for up to two years, provided that they: have a USCIS
approved supporter in the United States; possess a valid passport for international travel; clear
robust security vetting; provide for their own commercial travel to an interior air port of entry
(POE); meet other specified criteria, including vaccination requirements and other public health
guidelines; and warrant a favorable exercise of discretion. These criteria will also apply to the
immediate family members of noncitizens not independently eligible under this process.

Under this process, U.S. based persons or entities may submit to USCIS an I-134, *Declaration of
Financial Support*, or, beginning January 6, 2023, an I-134A, *Online Request to be a Supporter
and Declaration of Financial Support*, on behalf of individuals for whom advance authorization

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of
21. Family members must travel with the principal noncitizen to be considered for parole under this process upon
arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Updated Processing of Venezuelan Nationals Arriving to the United States with Advance Travel
Authorization
Page 2

to travel under this process may be appropriate.  Following USCIS vetting of the supporter,
confirmation of the beneficiary's biographic information, and the beneficiary's attestation of
vaccination against measles, polio, and COVID-19, the beneficiary will submit biometric
information, specifically a facial photograph, to CBP using the CBP One™ mobile application.
Available biographic and biometric information will be vetted by CBP against selected security
and law enforcement databases at DHS and other federal agencies, for national security, border
security, public health, and safety.  Following completion of vetting of the potential beneficiary,
CBP will issue an approval or denial of advance authorization to travel to the United States to
seek parole.

To relieve pressure at the SWB POEs currently experiencing an influx of undocumented
noncitizens, beneficiaries with approved advance authorization to travel to the United States to
seek parole will be required to travel to the United States on commercial flights.  Noncitizens
traveling under this process by air must adhere to all applicable Centers for Disease Control and
Prevention (CDC) COVID-19 guidance.

This memorandum outlines how OFO may consider exercising discretionary authority under
Section 212(d)(5) of the INA to consider parole for certain noncitizens into the United States
under this process pursuant to an October 12, 2022 memorandum approved by the Secretary of
Homeland Security, entitled *Parole Process for Certain Venezuelan Nationals* and a December
22, 2022 memorandum, approved by the Secretary of Homeland Security, entitled *Updates to the
Parole Process for Certain Venezuelan Nationals*.  This guidance outlines the considerations for
processing noncitizens arriving in the United States at an air POE without appropriate documents
sufficient for entry, but who have obtained advance authorization to travel to the United States to
seek parole under this process.

Noncitizens determined to be unaccompanied noncitizen children (UC), as described in 6 U.S.C.
§ 279(g)(2), are not eligible for parole under this process.  UC may be processed for other
available processing dispositions and must be turned over to the custody of the U.S. Department
of Health and Human Services (HHS) under established policy and procedure and consistent
with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA).  Moreover, for
all noncitizens arriving as part of a family unit, CBP officers are reminded that the guidance
implementing *Ms. L.*, including "Interim Guidance on Preliminary Injunction in *Ms. L. v. ICE*"
issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on
Separation of Family Units Due to 8 U.S.C. § 1326 Prosecutions or Related Criminal History"
remain in effect.

Consistent with current practice, POEs should coordinate with the National Targeting Center
(NTC) where noncitizens arriving under this process are determined to be possible matches to
national security records or who present a public safety risk upon arrival in the United States.
Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if
appropriate.  Those with positive vetting results may not be paroled pursuant to this
memorandum.  Instead, they must be processed consistent with established policy and procedure.
Venezuelan nationals encountered at a land border POE without travel documents sufficient for
entry will be processed as appropriate, consistent with established policy and procedure, and may

For Official Use Only
Law Enforcement Sensitive

Updated Processing of Venezuelan Nationals Arriving to the United States with Advance Travel
Authorization
Page 3

not be considered for parole under this DHS-designated process. Noncitizens arriving at land
POEs may be required to demonstrate proof of vaccination against COVID-19.

While the CDC's *Order Suspending the Right to Introduce Certain Persons from Countries
Where a Quarantinable Communicable Disease Exists* ("CDC Order") remains in effect,
Venezuelan nationals may be prevented entry at the international boundary or be expelled from
the United States pursuant to the CDC Order. POEs may continue to except noncitizens,
regardless of citizenship, from the CDC Order on a case-by-case basis and process them in
accordance with all applicable law and policy. Following the cessation of the enforcement of the
CDC Order, OFO will inspect and process all noncitizens pursuant to Title 8 authorities.

Venezuelan nationals encountered by CBP at the SWB and processed under Title 8 may, in the
exercise of discretion, be permitted to voluntarily withdraw their application for admission and
return to Mexico and still be eligible for the parole process, provided that such withdrawal would
be their first with CBP, whether U.S. Border Patrol (USBP) or the Office of Field Operations
(OFO), after December 20, 2022. When processing Venezuelan nationals who are determined to
be amenable to withdrawal, officers must read the subject the advisal outlined in the *Withdrawal
Statement for Noncitizen Potentially Eligibly for Advance Travel Authorization*, which informs
the individual that the decision to withdraw is voluntary. Officers are reminded that, when
processing a Venezuelan national for a withdrawal of their application for admission, the
provisions of CBP Directive No. 3340-043 *The Exercise of Discretionary Authority* remain in
effect.

The attached muster contains specific processing guidance. This guidance supersedes the
October 17, 2022 Admissibility and Passenger Programs issued *Processing of Venezuelan
Nationals Arriving to the United States with Advance Travel Authorization* memorandum and
muster. Nothing in this guidance supersedes the local exercise of discretionary authority and the
ability of the port to make determinations regarding appropriate processing, on a case-by-case
basis considering the totality of the circumstances.

Please ensure that this memorandum and muster are disseminated to all POEs within your field
office. Should you have any questions or require additional information, please contact Katrina
Deyo, (A) Director, Enforcement Programs Division at (202) 344-1742.

Attachments:  Muster, *Updated Processing of Venezuelan Nationals Arriving to the United
States with Advance Travel Authorization*, Admissibility and Passenger Programs,
January 5, 2023

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.,*
　　*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
　　SECURITY, *et al.,*
　　*Defendants.*

Case 6:23-cv-00007

# EXHIBIT 14



**Muster**

**Date:**               January 5, 2023

**Topic:**            Processing of Cuban Nationals Arriving to the United States with Advance Travel Authorization

**HQ POC/Office:**    Admissibility and Passenger Programs

This muster outlines the considerations for processing noncitizens arriving in the United States who have obtained advance authorization to travel to the United States to seek parole under the Department of Homeland Security (DHS) established Cuba parole process.

- This process implements the use of the DHS Secretary's authority to consider the parole of certain Cuban nationals and their qualifying immediate family members[1] into the United States, based on significant public benefit and urgent humanitarian reasons.

- Parole may only be considered on a case-by-case basis, for urgent humanitarian reasons or significant public benefit, and only after appropriate vetting.

- Parole under this process will utilize the "CHP – *Cuban Humanitarian Parole*" disposition in Unified Secondary (USEC).

- Noncitizens encountered without travel documents sufficient for entry who have not received advance authorization to travel under this process will be processed as appropriate, consistent with established policy and procedure, and may <u>not</u> be considered for parole under this process.

  - CHP may not be used for any noncitizen without an approved corresponding travel authorization under this process as verified in CBP systems and a valid, unexpired passport.
  - CHP may not be used for noncitizens arriving at any location other than an air port of entry (POE).

- Noncitizens may not have their inspection deferred in order to allow them to obtain advance travel authorization under this process post-arrival in the United States.

- Consistent with current policy, CBP officers (CBPOs) will refer undocumented noncitizens who appear to be inadmissible to the United States for secondary admissibility inspection.  Generally, noncitizens arriving under this process are expected

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of 21.  Family members must travel with the principal noncitizen to be considered for parole under this process upon arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Cuban Nationals Arriving to the United States with Advance Travel Authorization
Page 2

to be lacking documents sufficient for admission and therefore must be referred for
secondary admissibility inspection.

- Simplified Arrival (SA) does not currently display an approved advance authorization to
travel to the United States to seek parole. However, USEC will display an approved
travel authorization in the Subject Details and as part of the Subject System Checks in the
secondary referral.

- Noncitizens determined to be unaccompanied noncitizen children (UC), consistent with 6
U.S.C. § 279(g)(2), are not eligible for parole under this process.

  o UC may be processed for other available processing dispositions, including but
  not limited to issuance of a Notice to Appear (NTA).
  o Under no circumstance is a UC to be released from CBP custody to a non-parent
  or non-legal guardian.
  o Consistent with the Trafficking Victims Protection Reauthorization Act of 2008
  (TVPRA), UC must be turned over to the custody of the U.S. Department of
  Health and Human Services (HHS).

- Moreover, for all noncitizens arriving as part of a family unit, CBPOs are reminded that
the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction
in Ms. L. v. ICE" issued on June 27, 2018, as well as the June 1, 2021, memorandum
"Clarifying Guidance on Separation of Family Units Due to 8 U.S.C § 1326 Prosecutions
or Related Criminal History" remain in effect.

- Consistent with current practice, POEs should coordinate with the National Targeting
Center (NTC) where noncitizens arriving under this process are determined to be possible
matches to national security records or who present a public safety risk upon arrival in
the United States.

  o Those with a final negative vetting from NTC may be paroled, consistent with this
  guidance, if appropriate.
  o Those with positive vetting results may not be paroled pursuant to this guidance.
  Instead, they must be processed consistent with established policy and procedure.

- CBPOs will determine the appropriate processing disposition for each noncitizen on a
case-by-case-basis at the time the noncitizen presents themselves at the POE.

- Where parole for this population is appropriate, CBPOs will initiate a USEC event with
the appropriate program specific disposition and complete all necessary case processing,
to include recordation of the A-number in the event and the issuance of an electronic I-94.

  o CBPOs should utilize the "A-number Validation" search in USEC to validate if an
  A-number was previously issued by United States Citizenship and Immigration
  Services (USCIS). *Note: All individuals arriving under this process are expected
  to have an existing A-number.*

For Official Use Only
Law Enforcement Sensitive

Processing of Cuban Nationals Arriving to the United States with Advance Travel Authorization
Page 3

- ▪ If no A-number was issued, CBPOs must issue an A-number following current processing procedures prior to completion of processing for parole under this process.
  - o Parole under this process must include biometric capture (search & enroll) and review of results for all noncitizens age 14-79 considered in scope for biometric collection or for whom collection is otherwise warranted.
  - o To be considered for parole under this process, each individual must have their own travel authorization approval.
  - o Individuals not independently eligible under this process <u>must be traveling with</u> their principal family member to be considered for parole under this process as a dependent.
  - o Noncitizens for whom parole is appropriate under this guidance should generally be paroled for a period of two years.
  - o CBPOs are reminded to ensure both the A-number and the passport number are correct prior to issuance of an electronic I-94.
  - o CBP will provide a *Parole Information For Certain Nationals of: Cuba, Haiti, Nicaragua, Ukraine, Venezuela* tear sheet to all noncitizens paroled under this process.

Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

For Official Use Only
Law Enforcement Sensitive

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

# EXHIBIT 15


PLAINTIFF'S EXHIBIT

**Muster**

| | |
|---|---|
| **Date:** | January 5, 2023 |
| **Topic:** | Processing of Haitian Nationals Arriving to the United States with Advance Travel Authorization |
| **HQ POC/Office:** | Admissibility and Passenger Programs |

This muster outlines the considerations for processing noncitizens arriving in the United States who have obtained advance authorization to travel to the United States to seek parole under the Department of Homeland Security (DHS) established Haiti parole process.

- This process implements the use of the DHS Secretary's authority to consider the parole of certain Haitian nationals and their qualifying immediate family members[1] into the United States, based on significant public benefit and urgent humanitarian reasons.

- Parole may only be considered on a case-by-case basis, for urgent humanitarian reasons or significant public benefit, and only after appropriate vetting.

- Parole under this process will utilize the "HHP – *Haitian Humanitarian Parole*" disposition in Unified Secondary (USEC).

- Noncitizens encountered without travel documents sufficient for entry who have not received advance authorization to travel under this process will be processed as appropriate, consistent with established policy and procedure, and may <u>not</u> be considered for parole under this process.

    o  HHP may not be used for any noncitizen without an approved corresponding travel authorization under this process as verified in CBP systems and a valid, unexpired passport.
    o  HHP may not be used for noncitizens arriving at any location other than an air port of entry (POE).

- Noncitizens may not have their inspection deferred in order to allow them to obtain advance travel authorization under this process post-arrival in the United States.

- Consistent with current policy, CBP officers (CBPOs) will refer undocumented noncitizens who appear to be inadmissible to the United States for secondary admissibility inspection.  Generally, noncitizens arriving under this process are expected

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of 21. Family members must travel with the principal noncitizen to be considered for parole under this process upon arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Haitian Nationals Arriving to the United States with Advance Travel Authorization
Page 2

to be lacking documents sufficient for admission and therefore must be referred for secondary admissibility inspection.

- Simplified Arrival (SA) does not currently display an approved advance authorization to travel to the United States to seek parole. However, USEC will display an approved travel authorization in the Subject Details and as part of the Subject System Checks in the secondary referral.

- Noncitizens determined to be unaccompanied noncitizen children (UC), consistent with 6 U.S.C. § 279(g)(2), are <u>not eligible</u> for parole under this process.

   o UC may be processed for other available processing dispositions, including but not limited to issuance of a Notice to Appear (NTA).
   o Under no circumstance is a UC to be released from CBP custody to a non-parent or non-legal guardian.
   o Consistent with the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), UC must be turned over to the custody of the U.S. Department of Health and Human Services (HHS).

- Moreover, for all noncitizens arriving as part of a family unit, CBPOs are reminded that the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction in Ms. L. v. ICE" issued on June 27, 2018, as well as the June 1, 2021, memorandum "Clarifying Guidance on Separation of Family Units Due to 8 U.S.C § 1326 Prosecutions or Related Criminal History" remain in effect.

- Consistent with current practice, POEs should coordinate with the National Targeting Center (NTC) where noncitizens arriving under this process are determined to be possible matches to national security records or who present a public safety risk upon arrival in the United States.

   o Those with a final negative vetting from NTC may be paroled, consistent with this guidance, if appropriate.
   o Those with positive vetting results may not be paroled pursuant to this guidance. Instead, they must be processed consistent with established policy and procedure.

- CBPOs will determine the appropriate processing disposition for each noncitizen on a case-by-case-basis at the time the noncitizen presents themselves at the POE.

- Where parole for this population is appropriate, CBPOs will initiate a USEC event with the appropriate program specific disposition and complete all necessary case processing, to include recordation of the A-number in the event and the issuance of an electronic I-94.

   o CBPOs should utilize the "A-number Validation" search in USEC to validate if an A-number was previously issued by United States Citizenship and Immigration Services (USCIS). *Note: All individuals arriving under this process are expected to have an existing A-number.*

For Official Use Only
Law Enforcement Sensitive

Processing of Haitian Nationals Arriving to the United States with Advance Travel Authorization
Page 3

- If no A-number was issued, CBPOs must issue an A-number following current processing procedures prior to completion of processing for parole under this process.
  - Parole under this process must include biometric capture (search & enroll) and review of results for all noncitizens age 14-79 considered in scope for biometric collection or for whom collection is otherwise warranted.
  - To be considered for parole under this process, each individual must have their own travel authorization approval.
  - Individuals not independently eligible under this process must be traveling with their principal family member to be considered for parole under this process as a dependent.
  - Noncitizens for whom parole is appropriate under this guidance should generally be paroled for a period of two years.
  - CBPOs are reminded to ensure both the A-number and the passport number are correct prior to issuance of an electronic I-94.
  - CBP will provide a *Parole Information For Certain Nationals of: Cuba, Haiti, Nicaragua, Ukraine, Venezuela* tear sheet to all noncitizens paroled under this process.

Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

For Official Use Only
Law Enforcement Sensitive

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

EXHIBIT 16



**Muster**

**Date:**            January 5, 2023

**Topic:**           Processing of Nicaraguan Nationals Arriving to the United States with
                     Advance Travel Authorization

**HQ POC/Office:**   Admissibility and Passenger Programs

This muster outlines the considerations for processing noncitizens arriving in the United States
who have obtained advance authorization to travel to the United States to seek parole under the
Department of Homeland Security (DHS) established Nicaragua parole process.

- This process implements the use of the DHS Secretary's authority to consider the parole
  of certain Nicaraguan nationals and their qualifying immediate family members[1] into the
  United States, based on significant public benefit and urgent humanitarian reasons.

- Parole may only be considered on a case-by-case basis, for urgent humanitarian reasons
  or significant public benefit, and only after appropriate vetting.

- Parole under this process will utilize the "NHP – *Nicaraguan Humanitarian Parole*"
  disposition in Unified Secondary (USEC).

- Noncitizens encountered without travel documents sufficient for entry who have not
  received advance authorization to travel under this process will be processed as
  appropriate, consistent with established policy and procedure, and may <u>not</u> be considered
  for parole under this process.

  - NHP may not be used for any noncitizen without an approved corresponding
    travel authorization under this process as verified in CBP systems and a valid,
    unexpired passport.
  - NHP may not be used for noncitizens arriving at any location other than an air
    port of entry (POE).

- Noncitizens may not have their inspection deferred in order to allow them to obtain
  advance travel authorization under this process post-arrival in the United States.

- Consistent with current policy, CBP officers (CBPOs) will refer undocumented
  noncitizens who appear to be inadmissible to the United States for secondary
  admissibility inspection.  Generally, noncitizens arriving under this process are expected

---

[1] Immediate family members are limited to spouse or common-law partner and unmarried children under the age of
21. Family members must travel with the principal noncitizen to be considered for parole under this process upon
arrival in the United States.

For Official Use Only
Law Enforcement Sensitive

Processing of Nicaraguan Nationals Arriving to the United States with Advance Travel Authorization
Page 2

to be lacking documents sufficient for admission and therefore must be referred for
secondary admissibility inspection.

- Simplified Arrival (SA) does not currently display an approved advance authorization to
  travel to the United States to seek parole.  However, USEC will display an approved
  travel authorization in the Subject Details and as part of the Subject System Checks in the
  secondary referral.

- Noncitizens determined to be unaccompanied noncitizen children (UC), consistent with 6
  U.S.C. § 279(g)(2), are <u>not eligible</u> for parole under this process.

  - o UC may be processed for other available processing dispositions, including but
    not limited to issuance of a Notice to Appear (NTA).
  - o Under no circumstance is a UC to be released from CBP custody to a non-parent
    or non-legal guardian.
  - o Consistent with the Trafficking Victims Protection Reauthorization Act of 2008
    (TVPRA), UC must be turned over to the custody of the U.S. Department of
    Health and Human Services (HHS).

- Moreover, for all noncitizens arriving as part of a family unit, CBPOs are reminded that
  the guidance implementing *Ms. L*, including "Interim Guidance on Preliminary Injunction
  in Ms. L. v. ICE" issued on June 27, 2018, as well as the June 1, 2021, memorandum
  "Clarifying Guidance on Separation of Family Units Due to 8 U.S.C § 1326 Prosecutions
  or Related Criminal History" remain in effect.

- Consistent with current practice, POEs should coordinate with the National Targeting
  Center (NTC) where noncitizens arriving under this process are determined to be possible
  matches to national security records or who present a public safety risk upon arrival in
  the United States.

  - o Those with a final negative vetting from NTC may be paroled, consistent with this
    guidance, if appropriate.
  - o Those with positive vetting results may not be paroled pursuant to this guidance.
    Instead, they must be processed consistent with established policy and procedure.

- CBPOs will determine the appropriate processing disposition for each noncitizen on a
  case-by-case-basis at the time the noncitizen presents themselves at the POE.

- Where parole for this population is appropriate, CBPOs will initiate a USEC event with
  the appropriate program specific disposition and complete all necessary case processing,
  to include recordation of the A-number in the event and the issuance of an electronic I-94.

  - o CBPOs should utilize the "A-number Validation" search in USEC to validate if an
    A-number was previously issued by United States Citizenship and Immigration
    Services (USCIS). *Note: All individuals arriving under this process are expected
    to have an existing A-number.*

For Official Use Only
Law Enforcement Sensitive

Processing of Nicaraguan Nationals Arriving to the United States with Advance Travel Authorization
Page 3

- ▪ If no A-number was issued, CBPOs must issue an A-number following current processing procedures prior to completion of processing for parole under this process.
- o Parole under this process must include biometric capture (search & enroll) and review of results for all noncitizens age 14-79 considered in scope for biometric collection or for whom collection is otherwise warranted.
- o To be considered for parole under this process, each individual must have their own travel authorization approval.
- o Individuals not independently eligible under this process <u>must be traveling with</u> their principal family member to be considered for parole under this process as a dependent.
- o Noncitizens for whom parole is appropriate under this guidance should generally be paroled for a period of two years.
- o CBPOs are reminded to ensure both the A-number and the passport number are correct prior to issuance of an electronic I-94.
- o CBP will provide a *Parole Information For Certain Nationals of: Cuba, Haiti, Nicaragua, Ukraine, Venezuela* tear sheet to all noncitizens paroled under this process.

Nothing in this guidance supersedes the local exercise of discretionary authority and the ability of the port to make determinations regarding appropriate processing, on a case-by-case basis considering the totality of the circumstances.

For Official Use Only
Law Enforcement Sensitive