**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*        ) <br>        ) <br>             Plaintiffs      ) <br>        ) <br>     v.                 ) <br>        ) <br> DEPARTMENT OF HOMELAND    ) <br> SECURTY, *et al.*             ) <br>        ) <br>            Defendants.     ) | No. 6:23-cv-00007 |

**NOTICE OF FILING OF ADMINISTRATIVE RECORD**

Defendants hereby provide notice that they are filing the administrative record for Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266 (Jan. 9, 2023). With this notice, Defendants also attach (1) the certification of each administrative record in this action; and (2) the index of the contents of each administrative record; and (3) the administrative record for the Cuban Parole Process. *See* Attachments.

//

//

1

Defendant's Exhibit A
6:23-cv-0007

Dated: March 24, 2023

ALAMDAR S. HAMDANI
*United States Attorney*

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

/s/ *Erez Reuveni*
EREZ REUVENI
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 307-4293
erez.r.reuveni@usdoj.gov

BRIAN WARD
*Senior Litigation Counsel*

2

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Erez Reuveni*
EREZ REUVENI
U.S. Department of Justice

Defendant's Exhibit A
6:23-cv-0007

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATION OF ADMINISTRATIVE RECORD FOR
## THE IMPLEMENTATION OF A PAROLE PROCESS FOR CUBANS

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since August 2019.

I am the custodian of the Department of Homeland Security's *Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1,266 (Jan. 9, 2023), and of a copy of the administrative record for the decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered.

**JULIANA J BLACKWELL**
Digitally signed by
JULIANA J BLACKWELL
Date: 2023.03.17 21:51:56
-04'00'

Juliana Blackwell
Executed this 17th day of March, 2023 in Washington, D.C.

## Implementation of a Parole Process for Cubans: Certified Administrative Record Index

| | | Bates Number(s) |
|---|---|---|
| | **Federal Register Sources (Chronological Order)** | |
| 1. | *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007), https://www.federalregister.gov/documents/2007/11/21/E7-22679/cuban-family-reunification-parole-program. | Cuba AR_000001 |
| 2. | *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581 (Dec. 18, 2014), https://www.federalregister.gov/documents/2014/12/18/2014-29531/implementation-of-haitian-family-reunification-parole-program. | Cuba AR_000002 |
| 3. | *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended*, 81 Fed. Reg. 7,454 (Feb. 12, 2016), https://www.federalregister.gov/documents/2016/02/12/2016-02962/visas-documentation-of-nonimmigrants-under-the-immigration-and-nationality-act-as-amended. | Cuba AR_000005 |
| 4. | *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 2,809 (May. 9, 2016), https://www.federalregister.gov/documents/2016/05/09/2016-10750/filipino-world-war-ii-veterans-parole-policy. | Cuba AR_000006 |
| 5. | *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4,769 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00915/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-arriving-by-air. | Cuba AR_000010 |
| 6. | *Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00914/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-encountered-in-the-united. | Cuba AR_000013 |
| 7. | *International Entrepreneur Rule*, 82 Fed. Reg. 5,238 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00481/international-entrepreneur-rule. | Cuba AR_000017 |
| 8. | *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25,040 (Apr. 27, 2022), https://www.federalregister.gov/documents/2022/04/27/2022-09087/implementation-of-the-uniting-for-ukraine-parole-process. | Cuba AR_000069 |
| 9. | *Implementation of a Parole Process Venezuelans*, 87 Fed. Reg. 63,507 (Oct. 19, 2022), https://www.federalregister.gov/documents/2022/10/19/2022-22739/implementation-of-a-parole-process-for-venezuelans. | Cuba AR_000073 |
| | **U.S. Government Sources (Alphabetical Order)** | |

Defendants' Exhibit A

1 6:23-cv-0007

| No. | Description | Bates |
|---|---|---|
| 10. | Declaration of Robert E. Perez, Deputy Comm'r, U.S. Customs and Border Protection (Mar. 3, 2020). | Cuba AR_000083 |
| 11. | Memorandum for Jeffrey L. Weiss, Dir., U.S. Dep't of Justice, Immigration and Naturalization Service, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001). | Cuba AR_000092 |
| 12. | Memorandum for the Sec'y through John W. Priddy, Acting Dir., Joint Task Force-East, John K. Tien, Deputy Sec'y, and from Brendan C. McPherson, Director, Homeland Sec. Task Force-Southeast, *Operation Vigilant Sentry (OVS) Phase 1B* (Aug. 21, 2022). | Cuba AR_000098 |
| 13. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Christopher Magnus, Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Venezuelan Nationals* (Oct. 12, 2022). | Cuba AR_000100 |
| 14. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Troy Miller, Acting Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Cuban Nationals* (Dec. 22, 2022). | Cuba AR_000127 |
| 15. | Memorandum from Adam Hunter, Sec'y for Immigration Policy, Office of Strategy, Policy, and Plans, *Data on Maritime Migration*, (Dec. 22, 2022). | Cuba AR_000161 |
| 16. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | Cuba AR_000163 |
| 17. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec, *DHS Plan for Southwest Border Security and Preparedness*, (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf | Cuba AR_000167 |
| 18. | Memorandum from Blas Nuñez-Neto, Acting Sec'y for Border and Immigration Policy, *Data on Migration Through Costa Rica, Ecuador, and Colombia* (Dec. 20, 2022). | Cuba AR_000187 |
| 19. | Sullivan, Mark P. *Cuba: U.S. Policy in the 117th Congress*, Cong. Research Serv. (Sept. 22, 2022). | Cuba AR_000190 |
| 20. | Sullivan, Mark P., *, Cuba: U.S. Policy Overview*, Cong. Research Serv. (Nov. 17, 2022). | Cuba AR_000238 |
| 21. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces More than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas* (June 10, 2022), https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela | Cuba AR_000241 |
| 22. | U.S. Department of Homeland Security and U.S. Department of Defense, *Joint Brief on Mass Maritime Migration* (August 2022). | Cuba AR_000243 |
| 23. | U.S. Dep't of Homeland Security, Email, *Heads-Up on Assistance Needed* (Dec. 13, 2022). | Cuba AR_000252 |

Defendants' Exhibit A
26 007

Case 6:23-cv-00007 Document 92-1 ...d on 03/24/23 in TXSD Page 4 of 102

| # | | |
|---|---|---|
| 24. | U.S. Dep't of Homeland Security, Memorandum, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf. | Cuba AR_000255 |
| 25. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Cuba Memo Documentation Data* (Dec. 19, 2022). | Cuba AR_000294 |
| 26. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Total Monthly SWB Encounters*, (Dec. 14, 2022). | Cuba AR_000343 |
| 27. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Persons Naturalized by Region and Country of Birth: Fiscal Years 2011-2020.* | Cuba AR_000351 |
| 28. | U.S. Dep't of Homeland Security, Press Release, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th. | Cuba AR_000356 |
| 29. | U.S. Dep't of Homeland Security, Southwest Border Task Force, *Executive Leadership Report* (Sept. 23, 2022). | Cuba AR_000358 |
| 30. | U.S. Dep't of Homeland Security, *Eligible to Naturalize Overview - Cubans* (Aug 12, 2022). | Cuba AR_000372 |
| 31. | U.S. Dep't of Homeland Security, *Uniting for Ukraine* (Sept. 23, 2022). | Cuba AR_000373 |
| 32. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *USCIS Resumes Cuban Family Reunification Parole Program Operations* (Sept. 1, 2022), https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations. | Cuba AR_000375 |
| 33. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Policy Memorandum, *Parole of Spouses, Children and Parents of Active US Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and the Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility Under the Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013). | Cuba AR_000377 |
| 34. | U.S. Dep't of Homeland Security, U.S. Coast Guard, *Maritime Migration – Leadership Brief 01-08 Dec 2022.* | Cuba AR_000386 |
| 35. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *After Action Report (AAR) Mass Migration Event (MME) Del Rio, Texas September 8, 2021-September 24, 2021* (Oct. 7, 2021). | Cuba AR_000387 |
| 36. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *FY21-FY22 Unaccompanied Children.* | Cuba AR_000418 |

Defendant's Exhibit A
3:6:23-cv-0007

Case 6:23-cv-00007   Document 92-1   Filed on 03/24/23 in TXSD   Page 5 of 102

| | |
|---|---|
| 37. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains Fiscal Year 2022 Report to Congress* (Mar. 29, 2022). | Cuba AR_000423 |
| 38. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Southwest Land Border Encounters and Credible Fear Since 2000*. | Cuba AR_000443 |
| 39. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Email, *Decompression* (Dec. 11, 2022). | Cuba AR_001743 |
| 40. | U.S. Dep't of State, *Cuba 2021 Human Rights Report*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/. | Cuba AR_000445 |
| 41. | U.S. Dep't of State, Mexico: *Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico* (Dec. 1, 2022). | Cuba AR_000490 |
| 42. | U.S. Dep't of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/reports/2021-trafficking-in-persons-report/ | Cuba AR_000493 |
| 43. | U.S. Dep't of State, Media Note, *Migration Talks with the Government of Cuba* (Nov. 15, 2022), https://www.state.gov/migration-talks-with-the-government-of-cuba-2/ | Cuba AR_001129 |
| 44. | The White House, *Collaborative Migration Management Strategy*, (July 29, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery | Cuba AR_001133 |
| 45. | The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Gov't and Foreign Partner Deliverables*, (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/ | Cuba AR_001147 |
| 46. | The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/ | Cuba AR_001154 |
| 47. | The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2022), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf | Cuba AR_001159 |
| | **OMB & Related Documents** | |
| | ***Financial Support*** | |
| 48. | Memorandum from Samantha Deshommes, Chief Regulatory Officer, U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Office of Policy and Strategy, *Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form I-134A, Online Request to be a Supporter and Declaration of Financial* | Cuba AR_001179 |

Defendants' Exhibit A
46
007

Case 6:23-cv-00007  Document 92-1  ...ed on 03/24/23 in TXSD  Page 6 of 102

| | |
|---|---|
| | *Support; and USCIS Form I-134, Declaration of Financial Support (Dec. 29, 2022).* |
| 49. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support.* | Cuba AR_001182 |
| 50. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support, Instructions.* | Cuba AR_001195 |
| 51. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support, Supporting Statement.* | Cuba AR_001203 |
| 52. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134A, Online Request to be a Supporting and Declaration of Financial Support.* | Cuba AR_001211 |
| | ***Advance Travel Authorization*** | |
| 53. | Memorandum from Matthew S. Davies, Executive Dir., U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Emergency Approval Request for Advance Travel Authorization Capability Under the Paperwork Reduction Act* (Dec. 15, 2022). | Cuba AR_001225 |
| 54. | U.S. Dep't of Homeland Security, Email, *ATA Burden Estimate* (Dec. 19, 2022). | Cuba AR_001226 |
| 55. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Advance Travel Authorization, Supporting Statement.* | Cuba AR_001230 |
| 56. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Statistics Division, *Enforcement Encounters – Northern Border FY 22.* | Cuba AR_001237 |
| 57. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Statistics Division, *Enforcement Encounters – Southern Border FY 22.* | Cuba AR_001240 |
| | **Non-U.S. Government Sources (Alphabetical Order)** | |
| 58. | Abi-Habib, Maria and Eileen Sullivan, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat,* The New York Times (May 3, 2022), https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html. | Cuba AR_001243 |
| 59. | Alvarez, Priscilla, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border,* CNN (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html. | Cuba AR_001250 |
| 60. | Amnesty International, *Cuba: Tactics of Repression Must Not be Repeated* (Oct. 5, 2022), https://www.amnesty.org/en/latest/news/2022/10/cuba-repression-must-not-be-repeated/. | Cuba AR_001259 |
| 61. | Augustin, Ed and Robles France, *'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future,* The New York Times (Dec. 10, 2022), https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html | Cuba AR_001264 |

| | | |
|---|---|---|
| 62. | Confair, Denelle, *Local Migrant Shelter Reaching Max Capacity as it Reaches Hundreds Per Day*, KGUN 9 Tucson (Sept. 22, 2022), https://headtopics.com/us/local-migrant-shelter-reaching-max-capacity-as-it-reaches-hundreds-per-day-30112122 | Cuba AR_001272 |
| 63. | Corchado, Alfredo, *Ahead of Title 42's End, U.S.-Mexico Negotiations Called "Intense," "Round-the-Clock,"* Dallas Morning News (Dec. 14, 2022), https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/ | Cuba AR_001276 |
| 64. | Cox, Ashley, *More Than 180 People Rescued From Overloaded Vessel in Florida Keys*, CBS News (Nov. 22, 2022), https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/ | Cuba AR_001284 |
| 65. | Dell'Orto, Giavanna, *US Court Rejects Maintaining COVID-19 Asylum Restrictions*, WTOL (Dec. 16, 2022), https://abcnews.go.com/US/wireStory/us-court-rejects-maintaining-covid-19-asylum-restrictions-95464922 | Cuba AR_001286 |
| 66. | Durand, Jorge, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," The Journal of American History Vol. 86, No. 2 (Sept. 1999). http://www.catedrajorgedurand.udg.mx/sites/default/files/1999_the_new_era_of_mexican_migration_to_the_us.pdf. | Cuba AR_001292 |
| 67. | Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, The New York Times (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html | Cuba AR_001312 |
| 68. | The Economist, *Cuba is Facing Its Worst Shortage of Food Since the 1990s*, https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s. | Cuba AR_001316 |
| 69. | Elamroussi, Aya and Adrienne Winston, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States*, CNN (Sept. 21, 2022), https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office/index.html. | Cuba AR_001321 |
| 70. | Garcia, Jacob, *Migrant Truck Crashes in Mexico Killing 54*, Reuters (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R | Cuba AR_001334 |
| 71. | Gonzalez, Valerie, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'*, The Guardian (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream | Cuba AR_001342 |
| 72. | Gov't of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU* (Oct. 25, 2022), https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu. | Cuba AR_001354 |
| 73. | Gov't of Panama, *Cuadro No. 001 Tránsito Irregular de Extranjeros por la Frontera con Colombia Por Región Seguridad Orden De Importancia: Año 2022,* | Cuba AR_001358 |

Case 6:23-cv-00007   Document 92-1   ...d on 03/24/23 in TXSD   Page 8 of 102

| | | |
|---|---|---|
| | https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20DARI%C3%89N_NOVIE MBRE_2022.pdf. | Cuba AR_001360 |
| 74. | Greenfield, Victoria A., Blas Nunez-Neto, Ian Mitch, Joseph C. Chang, and Etienne Rosas, *Human Smuggling and Associated Revenues*, Homeland Security Operational Analysis Center (2019), https://www.rand.org/pubs/research_reports/RR2852.html | Cuba AR_001438 |
| 75. | Human Rights Watch, *Cuba Events of 2021* (Aug. 7, 2021), https://www.hrw.org/world-report/2022/country-chapters/cuba | Cuba AR_001447 |
| 76. | Human Rights Watch, *Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators* (July 2022), https://www.hrw.org/report/2022/07/11/prison-or-exile/cubas-systematic-repression-july-2021-demonstrators. | Cuba AR_001488 |
| 77. | Inter-American Commission on Human Rights, *Annual Report 2021, Chapter IV.B Cuba*. | Cuba AR_001536 |
| 78. | Jordan, Miriam, *Smuggling at the Border Now a Billion-Dollar Business*, The New York Times (July 25, 2022) https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html | Cuba AR_001543 |
| 79. | Kinosian Sarah, *As United States' 'Remain in Mexico' Plan Begins, Mexico Plans to Shut Its 'Too Successful' Humanitarian Visa Program*, (Jan. 24, 2019) https://theworld.org/stories/2019-01-24/united-states-remain-mexico-plan-begins-mexico-plans-shut-its-too-successful | Cuba AR_001554 |
| 80. | La Prensa Latina, *More Than 4,000 Migrants Voluntarily Returned to Venezuela From Panama* (Nov. 9, 2022), https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/ | Cuba AR_001557 |
| 81. | Licon, Gomez Adriana, *Coast Guard Suspends Search for Migrants off Florida*, AP News (Jan. 27, 2022) https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239 | Cuba AR_001559 |
| 82. | Licon, Gomez Adriana, *Situation 'Dire' as Coast Guard Seeks 38 Missing off Florida*, AP News (Jan. 26, 2022), https://apnews.com/article/florida-capsized-boat-live-updates-l251d7d279b6c1fe06430474b0c3a3019 | Cuba AR_001562 |
| 83. | Meneghini, Alexandre, *Nicaragua Eliminates Visa Requirement for Cubans*, Reuters (Nov. 23, 2021), https://www.reuters.com/world/americas/nicaragua-eliminates-visa-requirement-cubans-2021-11-23/ | Cuba AR_001564 |
| 84. | Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, Los Angeles Times (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | Cuba AR_001580 |
| 85. | Miroff, Nick and Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, The Washington Post (Oct. 24, 2018), https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aec063e14538_story.html. | Cuba AR_001589 |
| 86. | Nunez, Claudia, *"It Would Have Been Better to Let Me Die," on the Other Side of the Darien, Hundreds Survive the Nightmare of Death*, The Los Angeles Times (Mar. 4, 2022), https://www.latimes.com/espanol/internacional/articulo/2022-03-04/al-otro-lado-del-darien-cientos-sobreviven-la-pesadilla-de-la-muerte. | |

Defendants' Exhibit A
7623-cv-0007

Case 6:23-cv-00007   Document 92-1   Filed on 03/24/23 in TXSD   Page 9 of 102

| | | |
|---|---|---|
| 87. | Oppmann, Patrick, *Cubans Are Arriving to the US in Record Numbers. Smugglers Are Profiting From the Exodus*, CNN (May 12. 2022) https://www.cnn.com/2022/05/12/americas/cuba-mass-migration-intl-latam/index.html. | Cuba AR_001606 |
| 88. | Organization of American States, Inter-American Commission on Human Rights, *Annual Report 2021-Chapter IV.B Cuba*. | Cuba AR_001613 |
| 89. | Rosenberg, Mica, Kristina Cooke and Daniel Trotta, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. From Mexico*, Reuters (July 22, 2022) https://www.reuters.com/investigates/special-report/usa-immigration-border-deaths/ | Cuba AR_001621 |
| 90. | Sheridan, Mary Beth, *In Cuba, A Frantic Search for Milk*, Reuters (May 21, 2022), https://www.washingtonpost.com/world/interactive/2022/cuba-economy-milk-shortage | Cuba AR_001624 |
| 91. | Sherwood, Dave, *Banging Pots, Cuban's Stage Rare Protests Over Hurricane Ian Blackouts*, Reuters (Sept. 30, 2022), https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/ | Cuba AR_001682 |
| 92. | The Caribbean Council, *Gil Says Economic Recovery Gradual, Inflation Must be Better Addressed* (July 22, 2022), https://www.caribbean-council.org/gil-says-economic-recovery-gradual-inflation-must-be-better-addressed/ | Cuba AR_001686 |
| 93. | Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022) https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media | Cuba AR_001690 |
| 94. | Torres, Nora Gamez, *As Cubans Demand Freedom, President Díaz-Canel Says He Will not Tolerate 'Illegitimate' Protests*, Miami Herald (Oct. 3, 2022) https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html | Cuba AR_001705 |
| 95. | Torres, Raquel, *Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022) https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help | Cuba AR_001708 |
| 96. | United Nations High Comm'r for Refugees, Fact Sheet, *Americas August 2022* (Aug. 22, 2022), https://data.unhcr.org/en/documents/details/95054. | Cuba AR_001712 |
| 97. | Venancio, Mariakarla Nodarse, *U.S.-Cuba Relations: The Old, the New and What Should Come Next*, WOLA (Dec. 16, 2022), https://www.wola.org/analysis/us-cuba-relations-old-new-should-come-next/ | Cuba AR_001719 |
| 98. | Vicent, Maurico, *The Cuban Migration Crisis: Biggest Exodus in History Holds Key to Havana-Washington Relations*, El País (Dec. 15, 2022), https://english.elpais.com/international/2022-12-15/the-cuban-migration-crisis-biggest-exodus-in-history-holds-key-to-havana-washington-relations.html | Cuba AR_001725 |
| 99. | Voice of America, *US Policy Prompts Some Venezuelan Migrants to Change Route* (Oct. 14, 2022), https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route | Cuba AR_001733 |

Defendants' Exhibit A
007

| 100 | Whelan, Robbie, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program: Migrants Seeking Shelter in the U.S. Under Trump Administration Policy Report Rising Numbers of Kidnappings by Criminal Groups,* Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. | Cuba AR_001736 |

Defendant's Exhibit A
9 6:23-cv-0007

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF FILING OF ADMINISTRATIVE RECORD

Defendants hereby provide notice that they are filing the administrative record for Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243 (Jan. 9, 2023). With this notice, Defendants also attach (1) the certification of each administrative record in this action; and (2) the index of the contents of each administrative record; and (3) the administrative record for the Haitian Parole Process. *See* Attachments.

//

//

1

Defendant's Exhibit B
6:23-cv-00007

Dated: March 24, 2023

Respectfully submitted,

ALAMDAR S. HAMDANI
*United States Attorney*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

/s/ *Erez Reuveni*
EREZ REUVENI
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 307-4293
erez.r.reuveni@usdoj.gov

BRIAN WARD
*Senior Litigation Counsel*

2

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, I electronically filed this brief with the Clerk of

the Court for the United States District Court for the Southern District of Texas by using the

CM/ECF system. Counsel in the case are registered CM/ECF users and service will be

accomplished by the CM/ECF system.

/s/ *Erez Reuveni*
EREZ REUVENI
U.S. Department of Justice

3

Defendant's Exhibit B
6:23-cv-00007

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

</div>

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

<div align="center">

**CERTIFICATION OF ADMINISTRATIVE RECORD FOR**
**THE IMPLEMENTATION OF A PAROLE PROCESS FOR HAITIANS**

</div>

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since August 2019.

I am the custodian of the Department of Homeland Security's *Implementation of a Parole Process for Haitians*, 88 Fed. Reg. 1,243 (Jan. 9, 2023), and of a copy of the administrative record for the decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered.

JULIANA J
BLACKWELL

Digitally signed by JULIANA J
BLACKWELL
Date: 2023.03.17 21:49:23
-04'00'

<div align="right">

Juliana Blackwell
Executed this 17th day of March, 2023 in Washington, D.C.

</div>

<div align="center">

Defendant's Exhibit B
6:23-cv-00007

</div>

Case 6:23-cv-00007   Document 93-1   ...d on 03/24/23 in TXSD   Page 2 of 105

## Implementation of a Parole Process for Haiti
### Certified Administrative Record Index

| | Federal Register Sources (Chronological Order) | Bates Numbers |
|---|---|---|
| 1. | *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007), https://www.federalregister.gov/documents/2007/11/21/E7-22679/cuban-family-reunification-parole-program. | Haiti AR_000001 |
| 2. | *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581 (Dec. 18, 2014), https://www.federalregister.gov/documents/2014/12/18/2014-29533/implementation-of-haitian-family-reunification-parole-program. | Haiti AR_000002 |
| 3. | *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended*, 81 Fed. Reg. 7,454 (Feb. 12, 2016), https://www.federalregister.gov/documents/2016/02/12/2016-02962/visas-documentation-of-nonimmigrants-under-the-immigration-and-nationality-act-as-amended. | Haiti AR_000005 |
| 4. | *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 2,809 (May. 9, 2016), https://www.federalregister.gov/documents/2016/05/09/2016-10750/filipino-world-war-ii-veterans-parole-policy. | Haiti AR_000006 |
| 5. | *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4,769 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00915/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-arriving-by-air. | Haiti AR_000010 |
| 6. | *Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00914/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-encountered-in-the-united. | Haiti AR_000012 |
| 7. | *International Entrepreneur Rule*, 82 Fed. Reg. 5,238 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00481/international-entrepreneur-rule. | Haiti AR_000017 |
| 8. | *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25,040 (Apr. 27, 2022), https://www.federalregister.gov/documents/2022/04/27/2022-09087/implementation-of-the-uniting-for-ukraine-parole-process. | Haiti AR_000069 |
| 9. | *Implementation of a Parole Process Venezuelans*, 87 Fed. Reg. 63,507 (Oct. 19, 2022), https://www.federalregister.gov/documents/2022/10/19/2022-22739/implementation-of-a-parole-process-for-venezuelans. | Haiti AR_000073 |
| | **U.S. Government Sources (Alphabetical Order)** | |

Defendant's Exhibit B
j6:23-cv-00007

| | | |
|---|---|---|
| 10. | Declaration of Robert E. Perez, Deputy Comm'r, U.S. Customs and Border Protection (Mar. 3, 2020). | Haiti AR_000084 |
| 11. | Memorandum for Jeffrey L. Weiss, Dir., U.S. Dep't of Justice, Immigration and Naturalization Service, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001). | Haiti AR_000092 |
| 12. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Troy Miller, Acting Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Haitian Nationals*, (Dec. 22, 2022). | Haiti AR_000098 |
| 13. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Christopher Magnus, Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Venezuelan Nationals* (Oct. 12, 2022). | Haiti AR_000133 |
| 14. | Memorandum for the Sec'y through John W. Priddy, Acting Dir., Joint Task Force-East, John K. Tien, Deputy Sec., and from Brendan C. McPherson, Director, Homeland Sec. Task Force-Southeast, *Operation Vigilant Sentry (OVS) Phase 1B* (Aug. 21, 2022). | Haiti AR_000160 |
| 15. | Memorandum from Adam Hunter, Deputy Assistant Sec'y for Immigration Policy, *Data on Maritime Migration* (Dec. 22, 2022). | Haiti AR_000163 |
| 16. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf. | Haiti AR_000165 |
| 17. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | Haiti AR_000185 |
| 18. | Memorandum from Blas Nuñez-Neto, Acting Sec'y for Border and Immigration Policy, *Data on Migration Through Costa Rica, Ecuador, and Colombia* (Dec. 20, 2022). | Haiti AR_000189 |
| 19. | Seelke, Clare Ribando and Maureen Taft-Morales, *Haiti: Political Conflict and U.S. Policy Overview*, Cong. Research Serv. (Version 2 Aug. 2, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12182. | Haiti AR_000192 |
| 20. | U.S. Agency for Int'l Dev., *Haiti-Complex Emergency* (July 8, 2022), https://reliefweb.int/report/haiti/haiti-complex-emergency-fact-sheet-6-fiscal-year-fy-2022. | Haiti AR_000195 |
| 21. | U.S. Agency for Int'l Dev., *Haiti: Nutrition Profile* (May 2021). | Haiti AR_000202 |
| 22. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces More than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas* (June 10, 2022), https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela | Haiti AR_000208 |

Case 6:23-cv-00007   Document 93-1   ...d on 03/24/23 in TXSD   Page 4 of 105

| 23. | U.S. Department of Homeland Security and U.S. Department of Defense, *Joint Brief on Mass Maritime Migration* (August 2022). | Haiti AR_000210 |
| 24. | U.S. Dep't of Homeland Security, *Eligible to Naturalize Overview - Haiti* (Aug 12, 2022). | Haiti AR_000219 |
| 25. | U.S. Dep't of Homeland Security, *Uniting for Ukraine* (Sept. 23, 2022). | Haiti AR_000220 |
| 26. | U.S. Dep't of Homeland Security, Data Pull, *Haiti Memo Documentation* 12.20.22. | Haiti AR_000222 |
| 27. | U.S. Dep't of Homeland Security, Email, *Humanitarian Visas in Mexico* (Dec. 14, 2022). | Haiti AR_000259 |
| 28. | U.S. Dep't of Homeland Security, Memorandum, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf. | Haiti AR_000260 |
| 29. | U.S. Dep't of Homeland Security, Press Release, *CBP and Coast Guard respond to a Haitian Smuggling Venture that Resulted in Fatalities in Mona Island* (July 29, 2022), https://www.cbp.gov/newsroom/local-media-release/cbp-and-coast-guard-respond-haitian-smuggling-venture-resulted. | Haiti AR_000299 |
| 30. | U.S. Dep't of Homeland Security, Press Release, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th. | Haiti AR_000304 |
| 31. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Total Monthly SWB Encounters* (Dec. 14, 2022). | Haiti AR_000306 |
| 32. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Persons Naturalized by Region and Country of Birth: Fiscal Years 2011-2020.* | Haiti AR_000314 |
| 33. | U.S. Dep't of Homeland Security, Southwest Border Task Force, *Executive Leadership Report* (Sept. 23, 2022). | Haiti AR_000319 |
| 34. | U.S. Dep't of Homeland Security, U.S. Border Patrol, *Maritime Smuggling Event Involving 104 Migrants*, Tweet (Oct. 18, 2022). | Haiti AR_000333 |
| 35. | U.S. Dep't of Homeland Security, U.S. Border Patrol, *Nationwide Apprehensions Data by Citizenship and Sector in FY2007.* | Haiti AR_000334 |
| 36. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Policy Memorandum, *Parole of Spouses, Children and Parents of Active US Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and the Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility Under the Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013). | Haiti AR_00376 |

Defendants' Exhibit B
3:23-cv-00007

| | | |
|---|---|---|
| 37. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Refugee, Asylum and Int'l Operations Research Unit, *Haiti Country Conditions Update* (Oct. 13, 2022). | Haiti AR_000385 |
| 38. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Refugee, Asylum and Int'l Operations Research Unit, *Temporary Protected Status (TPS) Considerations Haiti June 2021–July 2022*. | Haiti AR_000390 |
| 39. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *After Action Report (AAR) Mass Migration Event (MME) Del Rio, Texas September 8, 2021–September 24, 2021* (Oct. 7, 2021). | Haiti AR_000403 |
| 40. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains Fiscal Year 2022 Report to Congress*. | Haiti AR_000434 |
| 41. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Southwest Land Border Encounters and Credible Fear Since 2000*. | Haiti AR_000454 |
| 42. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Email, *Decompression* (Dec. 11, 2022). | Haiti AR_000456 |
| 43. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Press Release, *CBP, Law Enforcement Assist 42 Haitian Migrants After Landing in Key Biscayne* (Aug. 25, 2021), https://www.cbp.gov/newsroom/local-media-release/cbp-law-enforcement-assist-42-haitian-migrants-after-landing-key. | Haiti AR_000459 |
| 44. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Press Release, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters. | Haiti AR_000461 |
| 45. | U.S. Dep't of Homeland Sec., U.S. Customs and Border Protection, Press Release, *US Border Patrol Apprehends 64 Haitians Who Were Abandoned by Smugglers in Mona Island* (Oct. 19, 2022), https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-apprehends-64-haitians-who-were-abandoned-smugglers. | Haiti AR_000467 |
| 46. | U.S. Dep't of Homeland Security, U.S. Immigration and Customs Enforcement, Enforcement Removal Operations, *Data on Haitian Repatriations FY 2022–FY 2023 YTD*. | Haiti AR_000469 |
| 47. | U.S. Dep't of State, Press Release, *Steps to Address the Humanitarian and Security Situation in Haiti* (Oct. 12, 2022), https://www.state.gov/steps-to-address-the-humanitarian-and-security-situation-in-haiti/. | Haiti AR_000470 |
| 48. | U.S. Dep't of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/reports/2021-trafficking-in-persons-report/. | Haiti AR_000474 |
| 49. | U.S. Embassy in Haiti, *Haiti September 22, Fewer Protests, Some Looting, Continued Fuel and Other Shortages Due to Blockades, but Business and Daily Activities Resuming* (Sept. 22,2022). | Haiti AR_001110 |
| 50. | U.S. Embassy in Haiti, *Haiti: October 1, Calm Reigns Over Haiti, But the Lights Might Go Out* (Oct. 2, 2022). | Haiti AR_001117 |
| 51. | U.S Embassy in Haiti, *Haiti Fuel Shortages and Port Blockages Increase Food Insecurity* (Oct. 17, 2022). | Haiti AR_001121 |

Defendant's Exhibit B
0007

Case 6:23-cv-00007 Document 93-1 ̇̇̇̇d on 03/24/23 in TXSD Page 6 of 105

| 52. | U.S Embassy in Haiti, *Haiti Relative Calm Continues, First Suspected Case of Cholera Detected in the Dominican Republic* (Oct. 21, 2022). | Haiti AR_001125 |
| 53. | U.S. Embassy in Mexico, *Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico* (Dec.1, 2022). | Haiti AR_001130 |
| 54. | U.S. Mission to the United Nations, *Remarks by Ambassador Linda Thomas-Greenfield at the UN Security Council Debate on Haiti*, (Oct. 21, 2022), https://usun.usmission.gov/remarks-by-ambassador-linda-thomas-greenfield-at-the-un-security-council-debate-on-haiti/ | Haiti AR_001133 |
| 55. | The White House, *Collaborative Migration Management Strategy*, (July 29, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery | Haiti AR_001137 |
| 56. | The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Gov't and Foreign Partner Deliverables*, (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/ | Haiti AR_001151 |
| 57. | The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/ | Haiti AR_001158 |
| 58. | The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2022), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf | Haiti AR_001163 |
| | **OMB & Related Documents** | |
| | ***Financial Support*** | |
| 59. | Memorandum from Samantha Deshommes, Chief Regulatory Officer, U.S. Citizenship and Immigration Services, Office of Policy and Strategy, *Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form I-134A, Online Request to be a Supporter and Declaration of Financial Support; and USCIS Form I-134, Declaration of Financial Support* (Dec. 29, 2022). | Haiti AR_001183 |
| 60. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support*. | Haiti AR_001186 |
| 61. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support, Instructions*. | Haiti AR_001199 |
| 62. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support, Supporting Statement*. | Haiti AR_001207 |

Defendant's Exhibit B
§6:23-cv-00007

Case 6:23-cv-00007   Document 93-1   Filed on 03/24/23 in TXSD   Page 7 of 105

| | | |
|---|---|---|
| 63. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-1344, Online Request to be a Supporting and Declaration of Financial Support*. | Haiti AR_001215 |
| | **Advance Travel Authorization** | |
| 64. | Memorandum from Matthew S. Davies, Executive Dir., U.S. Customs and Border Protection, *Emergency Approval Request for Advance Travel Authorization Capability Under the Paperwork Reduction Act* (Dec. 14, 2022). | Haiti AR_001229 |
| 65. | U.S. Dep't of Homeland Security, Email, *ATA Burden Estimate* (Dec. 19, 2022). | Haiti AR_001233 |
| 66. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Advance Travel Authorization, Supporting Statement*. | Haiti AR_001234 |
| 67. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Statistics Division, *Encounters – Northern Border FY 22*. | Haiti AR_001241 |
| 68. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Statistics Division, *Encounters – Southern Border FY 22*. | Haiti AR_001244 |
| | **Non-U.S. Government Sources (Alphabetical Order)** | |
| 69. | Alden, Edward, and Alex Tippett, *Why Are Haitian Migrants Gathering at the U.S. Border*, Council on Foreign Relations (Oct. 1, 2021), https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border. | Haiti AR_001247 |
| 70. | Al Jazeera, Migration News, *More than 100 Haitian migrants found on island near Puerto Rico* (Oct. 18, 2022), https://www.aljazeera.com/news/2022/10/18/more-than-100-haitian-migrants-found-on-island-near-puerto-rico. | Haiti AR_001253 |
| 71. | Alvarez, Priscilla, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border*, CNN (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html#:~:text=CNN%20Store-,First%20on%20CNN%3A%20A%20record%20number%20of%20migrants%20have.crossing%20the%20US%2DMexico%20border&text=Nearly%20750%20migrants%20have%20died.Security%20figures%20shared%20with%20CNN. | Haiti AR_001256 |
| 72. | Buschschlüter, Vanessa, *Haiti Gang Violence, 209 Killed in Cité Soleil in 10 days* (July 26, 2022), https://www.bbc.com/news/world-latin-america-62292007 | Haiti AR_001261 |
| 73. | Cappucci, Matthew, *Tropical Depression Grace Drenching Haiti Days After Major Earthquake*, The Washington Post (Aug. 16, 2021), https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/. | Haiti AR_001269 |
| 74. | Confair, Denelle, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds Per Day*, KGUN9 Tucson (Sept. 22, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity- | Haiti AR_001272 |

Defendants' Exhibit B
0007

Case 6:23-cv-00007   Document 93-1   ...d on 03/24/23 in TXSD   Page 8 of 105

| | | |
|---|---|---|
| | as-it-receives-hundreds-per-day. | |
| 75. | Cox, Ashley, *More Than 180 People Rescued From Overloaded Vessel in Florida Keys*, CBS News (Nov. 22, 2022), https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/. | Haiti AR_001276 |
| 76. | Crowley, Michael and Catherine Porter, *Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation*, The New York Times (Oct 18, 2021), https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html | Haiti AR_001281 |
| 77. | Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, The New York Times (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html | Haiti AR_001285 |
| 78. | Doña-Reveco, Cristián, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome*, Migration Policy Institute (May 2021), https://www.migrationpolicy.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/. | Haiti AR_001289 |
| 79. | Dupain, Etant and Hande Atay Alam, *Haiti Government Asks for International Military Assistance*, CNN (Oct. 7, 2022), https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html. | Haiti AR_001292 |
| 80. | Durand, Jorge, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," The Journal of American History Vol. 86, No. 2 (Sept. 1999). http://www.catedrajorgedurand.udg.mx/sites/default/files/1999_the_new_era_of_mexican_migration_to_the_us.pdf | Haiti AR_001302 |
| 81. | Eckstein, David Vera Künzel, Laura Schäfer, *Global Climate Risk Index 2021* (Jan. 2021), https://www.germanwatch.org/en/19777 | Haiti AR_001322 |
| 82. | Elamroussi, Aya and Adrienne Winston, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States*, CNN (Sept. 21, 2022), https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office. | Haiti AR_001374 |
| 83. | Ford, Alessandro *Insight Crime Haiti Gangs Recruiting, Arming More Children* (June. 3 2022), https://insightcrime.org/news/haiti-gangs-recruiting-arming-more-children/ | Haiti AR_001384 |
| 84. | Ford, Alessandro, *Scandal at Haiti Customs After Over 100,000 Rounds of Smuggled Ammunition Seized*, Insight Crime (July 8, 2022), https://insightcrime.org/news/scandal-at-haiti-customs-after-over-100000-rounds-of-smuggled-ammunition-seized. | Haiti AR_001387 |
| 85. | Freedom House, *Freedom in the World 2022: Haiti*, https://freedomhouse.org/country/haiti/freedom-world/2022 | Haiti AR_001390 |

Defendant's Exhibit B
6:23-cv-00007

| | | |
|---|---|---|
| 86. | Garcia, Jacob, *Migrant Truck Crashes in Mexico Killing 54*, Reuters (Dec. 10, 2021), https://www.reuters.com/world/americas/least-49-people-killed-mexico-trailer-accident-officials-say-2021-12-09/. | Haiti AR_001408 |
| 87. | Gonzalez, Valeria, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream*, (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream. | Haiti AR_001418 |
| 88. | Gov't of Mexico, *Ley De Migración Nueva Ley Publicada en el Diario Oficial de la Federación el 25 de Mayo de 2011* (Apr. 29, 2022), https://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra.pdf. | Haiti AR_001430 |
| 89. | Gov't of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU* (Oct. 25, 2022), https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu. | Haiti AR_001497 |
| 90. | Gov't of Mexico, *Mexico Commission for Assistance of Refugee Data*, https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022_1-Dic_.pdf. | Haiti AR_001501 |
| 91. | Gov't of Panama, *Cuadro No. 001 Tránsito Irregular de Extranjeros por la Frontera con Colombia Por Región Seguridad Orden De Importancia: Año 2022*, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVI EMBRE_2022.pdf. | Haiti AR_001502 |
| 92. | Gov't of Panama, *Irregulares en Tránsito Por Darién Por País* (Dec. 2021). | Haiti AR_001504 |
| 93. | Gov't of Panama, *Irregulares en Tránsito Por Darién Por País* (Sept. 2022). | Haiti AR_001506 |
| 94. | Greenfield, Victoria A., Blas Nunez-Neto, Ian Mitch, Joseph C. Chang, and Etienne Rosas, *Human Smuggling and Associated Revenues*, Homeland Security Operational Analysis Center (2019), https://www.rand.org/pubs/research_reports/RR2852.html | Haiti AR_001507 |
| 95. | Harvard Law School Int'l Human Rights Clinic, *Killing With Impunity: State Sanctioned Massacres in Haiti* (April 2022). | Haiti AR_001585 |
| 96. | Human Rights Watch, *Haiti Events of 2021* (Oct. 21, 2021), https://www.hrw.org/world-report/2022/country-chapters/haiti. | Haiti AR_001642 |
| 97. | Int'l Organization for Migration, *IOM Assists Over 10,800 Haitians Returned from the US, Mexico, and Caribbean in the Past Month* (Oct. 22, 2021), https://www.iom.int/news/iom-assists-over-10800-haitians-returned-us-mexico-and-caribbean-past-month#:~:text=Port%2Dau%2DPrince%20%E2%80%93%93The.returned%20by%20the%20Coast%20Guard. | Haiti AR_001652 |

| # | Citation | |
|---|---|---|
| 98. | Int'l Organization for Migration, *IOM Haiti: Displacement Dashboard #1* (June 2021). | Haiti AR_001654 |
| 99. | Int'l Organization for Migration, *IOM Condemns Violence and Looting of Humanitarian Supplies in Haiti* (Sept. 24, 2022), https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti. | Haiti AR_001656 |
| 100. | Jordan, Miriam, *Smuggling at the Border Now a Billion- Dollar Business*, The New York Times (July 25, 2022) https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html. | Haiti AR_001659 |
| 101. | Kinosian Sarah, *As United States' Remain in Mexico' Plan Begins, Mexico Plans to Shut Its 'Too Successful' Humanitarian Visa Program*, (Jan. 24, 2019) https://theworld.org/stories/2019-01-24/united-states-remain-mexico-plan-begins-mexico-plans-shut-its-too-successful | Haiti AR_001666 |
| 102. | Kitroeff Natalie, *Gang Warfare Cripples Haiti's Fight Against Cholera*, The New York Times (Nov. 29, 2022) https://www.nytimes.com/2022/11/19/world/americas/haiti-cholera-gang-violence.html | Haiti AR_001677 |
| 103. | Labrador, Rocio Cara and Diana Roy, *Haiti's Troubled Path to Development*, Council on Foreign Relations (Sept. 9, 2022) https://www.cfr.org/backgrounder/haitis-troubled-path-development | Haiti AR_001678 |
| 104. | La Prensa Latina, *More than 4,000 Migrants Voluntarily Returned to Venezuela from Panama* (Nov. 9, 2022), https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/. | Haiti AR_001687 |
| 105. | Licon, Adriana Gomez, *Situation 'Dire' as Coast Guard Seeks 38 Missing Off Florida*, Press Herald (Jan. 26, 2022), https://www.pressherald.com/2022/01/26/situation-dire-as-coast-guard-seeks-38-missing-off-florida/. | Haiti AR_001690 |
| 106. | Licon, Adriana Gomez, *U.S Coast Guard Suspends Search for Migrants Off Florida*, AP News (Jan. 28, 2022), https://apnews.com/article/florida-lost-at-sea-79253e1c65c5708f19a97b6875ae239. | Haiti AR_001694 |
| 107. | Luxama, Pierre-Richard, *Key Fuel Depot in Haiti Reopens For 1st Time Since September*, AP News (Nov. 8, 2022), https://apnews.com/article/business-caribbean-port-au-prince-haiti-e4b94cc01d116618cc1a960778 3e0b1. | Haiti AR_001703 |
| 108. | Lynch, Jamiel Melissa Alonso & Leyla Santiago, *More than 180 People Rescued From Overloaded Vessel in Florida Keys* (Nov. 22, 2022), https://www.cnn.com/2022/11/21/us/migrants-rescued-overloaded-vessel-florida-keys/index.html | Haiti AR_001707 |
| 109. | Medecins San Frontiers/Doctors without Borders, *Haiti, Attacks on Medical Staff Leave Many People Without Health Care* (May 22, 2022) https://www.doctorswithoutborders.org/latest/haiti-attacks-medical-staff-leave-many-people-without-health-care | Haiti AR_001712 |
| 110. | Medecins Sans Frontiers/Doctors Without Borders, *Returning to Haiti Means Death* (Aug. 12, 2022), https://www.doctorswithoutborders.org/latest/returning-haiti-means-death. | Haiti AR_001716 |
| 111. | Medecins Sans Frontieres/Doctors Without Borders, *"We Are Tired and Desperate": Stories From Families Who Survived the Darien Gap* (June 18, 2022), https://www.doctorswithoutborders.org/latest/we-are-tired-and-desperate-stories-families-who-survived-darien-gap | Haiti AR_001723 |

Defendants' Exhibit B
6:23-cv-00007

| 112. | Mérancourt, Widlore, Kelly Kasulis Cho & Amanda Coletta, *Cholera Resurfaces in Haiti as Gangs Hinder Access to Water, Hospitals.*, The Washington Post (Oct. 3, 2022), https://www.washingtonpost.com/world/2022/10/03/haiti-cholera-gang-violence-water/ | Haiti AR_001729 |
|------|---|---|
| 113. | Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, Los Angeles Times (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | Haiti AR_001732 |
| 114. | Moreno, Elida, *Thousands of Mostly Haitian Migrants Traverse Panama on Way to United States*, Reuters (Sept. 26, 2021), https://www.reuters.com/world/americas/thousands-mostly-haitian-migrants-traverse-panama-way-united-states-2021-09-26/. | Haiti AR_001746 |
| 115. | NPR, *Dozens of Haitian Migrants Were Rescued While Trying to Reach the Florida Keys* (Nov. 22, 2022), https://www.npr.org/2022/11/22/1138555844/dozens-of-haitian-migrants-were-rescued-while-trying-to-reach-the-florida-keys | Haiti AR_001756 |
| 116. | Nunez, Claudia, *"I Would Have Been Better to Let Me Die," on the Other Side of the Darien, Hundreds Survive the Nightmare of Death*, The Los Angeles Times (Mar. 4, 2022), https://www.latimes.com/espanol/internacional/articulo/2022-03-04/al-otro-lado-del-darien-cientos-sobreviven-la-pesadilla-de-la-muerte. | Haiti AR_001765 |
| 117. | Pan American Health Organization, *Cholera Outbreak in Haiti 2022 – Situation Report 1* (Oct. 13, 2022), https://www.paho.org/en/documents/cholera-outbreak-haiti-2022-situation-report-1. | Haiti AR_001782 |
| 118. | Pan American Health Organization, *Cholera Outbreak in Hispaniola 2022 – Situation Report # 6* (Nov. 17, 2022), https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6. | Haiti AR_001786 |
| 119. | Pazmiño, Liz Briceño, *Biden's New Border Policy Throws Venezuela Migrants Into Limbo* (Nov. 7, 2022), https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap. | Haiti AR_001790 |
| 120. | Reuters, *Haiti's Situation is Dire and Cannot Persist, State Department Says*, (Dec. 11, 2022), https://www.reuters.com/world/americas/haitis-situation-is-dire-cannot-persist-state-department-says-2022-10-11/ | Haiti AR_001799 |
| 121. | Rin, Diego Da, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, Int'l Crisis Group (July 27, 2022), https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists. | Haiti AR_001809 |
| 122. | Rosenberg, Mica, Kristina Cole, and Daniel Trotta, *The Border's Toll: Migrants Increasingly Die Crossing Into U.S. From Mexico*, Reuters (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X. | Haiti AR_001816 |
| 123. | Roy, Diana, *Ten Graphics That Explain the U.S. Struggle with Migrant Flows in 2022*, Council on Foreign Relations (Dec. 1, 2022), https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022. | Haiti AR_001828 |
| 124. | Sanon, Evens & Danica Cot, *Cholera Overwhelms Haiti, Experts Warn Outbreak Could Worsen as Fuel Blockade Lifts*, PBS News Hour (Nov. 16, 2022) https://www.pbs.org/newshour/world/cholera-overwhelms- | Haiti AR_001843 |

Case 6:23-cv-00007   Document 93-1    d on 03/24/23 in TXSD   Page 12 of 105

| | | |
|---|---|---|
| | haiti-experts-warn-outbreak-could-worsen-as-fuel-blockade-lifts | |
| 125. | Sparks, Hayden, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio*, The Texan (Oct. 7, 2021), https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/. | Haiti AR_001846 |
| 126. | Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media | Haiti AR_001850 |
| 127. | Torres, Raquel, *Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/. | Haiti AR_001865 |
| 128. | United Nations Children's Fund, *Gang Violence Pushes Half a Million Children Out of the Classroom in Port-au-Prince* (May 6, 2022), https://www.unicef.org/lac/en/press-releases/haiti-gang-violence-pushes-half-a-million-children-out-classroom-in-port-au-prince. | Haiti AR_001871 |
| 129. | United Nations Children's Fund, *Massive Earthquake Leaves Devastation in Haiti* (Oct. 4, 2021), https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti. | Haiti AR_001879 |
| 130. | United Nations Children's Fund, *One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance* (Sept. 15, 2021), https://www.unicef.org/press-releases/one-month-after-haiti-earthquake-260000-children-still-need-humanitarian-assistance. | Haiti AR_001892 |
| 131. | United Nation Development Programme, *The Human Development Index (HDI) Summary Data Reports*. | Haiti AR_001901 |
| 132. | United Nations High Comm'r of Refugees, *Haiti: Bachelet Deeply Disturbed by Human Rights Impact of Deteriorating Security Situation in Port-au-Prince* (May 17, 2022), https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security. | Haiti AR_001940 |
| 133. | United Nations High Comm'r of Refugees, *Sexual Violence in Port-au-Prince: A Weapon Used by Gangs to Instill Fear* (Oct. 14, 2022), https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear | Haiti AR_001910 |
| 134. | United Nations High Comm'r for Refugees, *Fact Sheet, Americas August 2022* (Aug. 22, 2022), https://data.unhcr.org/en/documents/details/95054` | Haiti AR_001935 |
| 135. | United Nations High Comm'r of Refugees, Global Focus, Mexico 2022, https://reporting.unhcr.org/mexico?year=2022. | Haiti AR_001942 |
| 136. | United Nations, News, *'Catastrophic' Hunger Recorded in Haiti for First Time, UN Warns* (Oct. 14, 2022) https://news.un.org/en/story/2022/10/1129537#:~:text=According%20to%20the%20latest%20IPC,in%20Catastrophe%20phase%2C%20phase%205. | Haiti AR_001946 |

| | | |
|---|---|---|
| 137. | United Nations, News, *Security Council Urged to Act in Face of 'Humanitarian Catastrophe' in Haiti*, (Sept. 26, 2022), https://news.un.org/en/story/2022/09/1128051. | Haiti AR_001957 |
| 138. | United Nations Office for the Coordination of Humanitarian Affairs, *Haiti 2022 Cholera Flash Appeal (Mid October 2022-Mid Apr 2023)* (Nov. 15, 2022), https://reliefweb.int/report/haiti/haiti-2022-cholera-flash-appeal-mid-oct-2022-mid-apr-2023 | Haiti AR_001962 |
| 139. | U.S News, *5 Dead, 68 Haitians Rescued From Waters Near Puerto Rico* (July, 28. 2022), https://www.usnews.com/news/world/articles/2022-07-28/5-dead-66-migrants-rescued-from-waters-near-puerto-rico | Haiti AR_001962 |
| 140. | Vigdor, Neil, *Coast Guard Ends Search After Finding Bodies of 5 Migrants from Capsized Boat*, The New York Times, (Jan. 27, 2022), https://www.nytimes.com/2022/01/27/us/capsized-boat-search-suspended.html. | Haiti AR_001965 |
| 141. | Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route* (Oct. 14, 2022), https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html. | Haiti AR_001968 |
| 142. | The World Bank, *The World Bank in Haiti* (Nov. 8, 2022), https://www.worldbank.org/en/country/haiti/overview | Haiti AR_001971 |
| 143. | World Food Program, *Haiti Country Brief, Sept.2022* (Oct. 25, 2022) https://reliefweb.int/report/haiti/wfp-haiti-country-brief-september-2022 | Haiti AR_001977 |
| 144. | World Health Organization, *Cholera – Haiti* (Dec. 13, 2022) https://www.who.int/emergencies/disease-outbreak-news/item/2022-DON427. | Haiti AR_001979 |
| 145. | Yates, Caitlyn, *Haitian Migration Through the Americas: A Decade in the Making*, Migration Policy Institute (Sept. 30, 2021), https://www.migrationpolicy.org/article/haitian-migration-through-americas. | Haiti AR_001987 |

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF FILING OF ADMINISTRATIVE RECORD

Defendants hereby provide notice that they are filing the administrative record for Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1,255 (Jan. 9, 2023). With this notice, Defendants also attach (1) the certification of each administrative record in this action; and (2) the index of the contents of each administrative record; and (3) the administrative record for the Nicaraguan Parole Process. *See* Attachments.

//

//

1

Defendant's Exhibit C
6:23-cv-00007

Dated: March 24, 2023

ALAMDAR S. HAMDANI
*United States Attorney*

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

/s/ *Erez Reuveni*
EREZ REUVENI
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 307-4293
erez.r.reuveni@usdoj.gov

BRIAN WARD
*Senior Litigation Counsel*

2

Defendant's Exhibit C
6:23-cv-00007

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, I electronically filed this brief with the Clerk of

the Court for the United States District Court for the Southern District of Texas by using the

CM/ECF system. Counsel in the case are registered CM/ECF users and service will be

accomplished by the CM/ECF system.

/s/ *Erez Reuveni*
EREZ REUVENI
U.S. Department of Justice

3

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATION OF ADMINISTRATIVE RECORD FOR
## THE IMPLEMENTATION OF A PAROLE PROCESS FOR NICARAGUANS

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since August 2019.

I am the custodian of the Department of Homeland Security's *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1255 (Jan. 9, 2023), and of a copy of the administrative record for the decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered.

JULIANA J
BLACKWELL

Digitally signed by
JULIANA J BLACKWELL
Date: 2023.03.17
21:47:22 -04'00'

Juliana Blackwell
Executed this 17th day of March, 2023 in Washington, D.C.

Case 6:23-cv-00007  Document 94-1   ...ed on 03/24/23 in TXSD   Page 2 of 102

## Implementation of a Parole Process for Nicaraguans
## Certified Administrative Record Index

| | Federal Register Sources (Chronological Order) | Bates Number(s) |
|---|---|---|
| 1. | *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007), https://www.federalregister.gov/documents/2007/11/21/E7-22679/cuban-family-reunification-parole-program. | Nicaragua AR_ 000001 |
| 2. | *Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581 (Dec. 18, 2014), https://www.federalregister.gov/documents/2014/12/18/2014-29533/implementation-of-haitian-family-reunification-parole-program. | Nicaragua AR_ 000002 |
| 3. | *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended*, 81 Fed. Reg. 7,454 (Feb. 12, 2016), https://www.federalregister.gov/documents/2016/02/12/2016-02962/visas-documentation-of-nonimmigrants-under-the-immigration-and-nationality-act-as-amended. | Nicaragua AR_ 000005 |
| 4. | *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 2,809 (May. 9, 2016), https://www.federalregister.gov/documents/2016/05/09/2016-10750/filipino-world-war-ii-veterans-parole-policy. | Nicaragua AR_ 000006 |
| 5. | *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4,769 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00915/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-arriving-by-air. | Nicaragua AR_ 000010 |
| 6. | *Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00914/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-encountered-in-the-united. | Nicaragua AR_ 000013 |
| 7. | *International Entrepreneur Rule*, 82 Fed. Reg. 5,238 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00481/international-entrepreneur-rule. | Nicaragua AR_ 000017 |
| 8. | *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25,040 (Apr. 27, 2022), https://www.federalregister.gov/documents/2022/04/27/2022-09087/implementation-of-the-uniting-for-ukraine-parole-process. | Nicaragua AR_ 000069 |
| 9. | *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63,507 (Oct. 19, 2022), https://www.federalregister.gov/documents/2022/10/19/2022-22739/implementation-of-a-parole-process-for-venezuelans. | Nicaragua AR_ 000073 |
| | **U.S. Government Sources (Alphabetical Order)** | |

Defendant's Exhibit C
6:23-cv-00007

Case 6:23-cv-00007   Document 94-1   Filed on 03/24/23 in TXSD   Page 3 of 102

| | | |
|---|---|---|
| 10. | Declaration of Robert E. Perez, Deputy Comm'r, U.S. Customs and Border Protection (Mar. 3, 2020). | Nicaragua AR_ 000084 |
| 11. | Memorandum for Jeffrey L. Weiss, Dir., U.S. Dep't of Justice, Immigration and Naturalization Service, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001). | Nicaragua AR_ 000092 |
| 12. | Memorandum for the Sec'y through John W. Priddy, Acting Dir., Joint Task Force-East, John K. Tien, Deputy Sec'y, and from Brendan C. McPherson, Director, Homeland Sec. Task Force-Southeast, *Operation Vigilant Sentry (OVS) Phase 1B* (Aug. 21, 2022). | Nicaragua AR_ 000098 |
| 13. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Christopher Magnus, Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Venezuelan Nationals* (Oct. 12, 2022). | Nicaragua AR_ 000100 |
| 14. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Troy Miller, Acting Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Nicaraguan Nationals* (Dec. 22, 2022). | Nicaragua AR_ 000127 |
| 15. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | Nicaragua AR_ 000159 |
| 16. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec, *DHS Plan for Southwest Border Security and Preparedness*, (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf | Nicaragua AR_ 000163 |
| 17. | Memorandum from Blas Nuñez-Neto, Acting Sec'y for Border and Immigration Policy, *Data on Migration Through Costa Rica, Ecuador, and Colombia* (Dec. 20, 2022). | Nicaragua AR_ 000183 |
| 18. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces More than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas* (June 10, 2022), https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela | Nicaragua AR_ 000186 |
| 19. | U.S. Dep't of Homeland Security, *Nicaragua Memo Documentation Data* (Dec. 19, 2022). | Nicaragua AR_ 000188 |
| 20. | U.S. Dep't of Homeland Security, Memorandum, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf. | Nicaragua AR_ 000222 |
| 21. | U.S. Dep't of Homeland Security, News, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th. | Nicaragua AR_ 000261 |

Case 6:23-cv-00007   Document 94-1   ...d on 03/24/23 in TXSD   Page 4 of 102

| | | |
|---|---|---|
| 22. | U.S. Dep't of Homeland Security, News, *Update on Southwest Border Security and Preparedness Ahead of Court- Ordered Lifting of Title 42* (Dec. 12, 2022), https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42. | Nicaragua AR_000263 |
| 23. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Persons Naturalized by Region and Country of Birth: Fiscal Years 2011-2020.* | Nicaragua AR_000264 |
| 24. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Total Monthly SWB Encounters*, (Dec. 14, 2022). | Nicaragua AR_000269 |
| 25. | U.S. Dep't of Homeland Security, Office of Intelligence and Analysis, *Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States*, (June 6, 2022). | Nicaragua AR_000277 |
| 26. | U.S. Dep't of Homeland Security, Office of Intelligence Enterprise, *Migrations Indications and Warning Cell Updates* (Dec. 14, 2022). | Nicaragua AR_000282 |
| 27. | U.S. Dep't of Homeland Security, Southwest Border Task Force, *Executive Leadership Report* (Sept. 23, 2022). | Nicaragua AR_000287 |
| 28. | U.S. Dep't of Homeland Security, *Uniting for Ukraine* (Sept. 23, 2022). | Nicaragua AR_000301 |
| 29. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Policy Memorandum, *Parole of Spouses, Children and Parents of Active U.S Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and the Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility Under the Immigration and Nationality Act §212(a)(6)(A)(i)* (Nov. 15, 2013). | Nicaragua AR_00303 |
| 30. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Refugee, Asylum and Int'l Operations Research Div., *Socio-Political & Human Rights Crisis -Nicaragua* (June 15, 2022). | Nicaragua AR_000312 |
| 31. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Refugee, Asylum and Int'l Operations Research Div., *Soci-Political & Human Rights Crisis – Nicaragua* (Oct. 31, 2022). | Nicaragua AR_000322 |
| 32. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *After Action Report (AAR) Mass Migration Event (MME) Del Rio, Texas September 8, 2021-September 24, 2021* (Oct. 7, 2021). | Nicaragua AR_000332 |
| 33. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *FY21-FY22 Unaccompanied Children.* | Nicaragua AR_000363 |
| 34. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains Fiscal Year 2022 Report to Congress* (Mar. 29, 2022). | Nicaragua AR_000368 |
| 35. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Southwest Land Border Encounters and Credible Fear Since 2000.* | Nicaragua AR_000388 |

Defendant's Exhibit C
6:23-cv-00007

| | |
|---|---|
| 36. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Email, *Decompression* (Dec. 11, 2022). | Nicaragua AR_000390 |
| 37. | U.S. Dep't of State, *Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico* (Dec. 1, 2022). | Nicaragua AR_000393 |
| 38. | U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Nicaragua*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/nicaragua/ | Nicaragua AR_000396 |
| 39. | U.S. Dep't of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/reports/2021-trafficking-in-persons-report/ | Nicaragua AR_000443 |
| 40. | U.S. Dep't of Treasury, Assistant Sec'y Harris Benjamin & Deputy Assistant Neil Mehrotra, *The U.S Economic Recovery in International Context* (Dec. 12, 2022) | Nicaragua AR_001079 |
| 41. | The White House, *Collaborative Migration Management Strategy*, (July 29, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery | Nicaragua AR_001088 |
| 42. | The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Gov't and Foreign Partner Deliverables*, (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/ | Nicaragua AR_001103 |
| 43. | The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/ | Nicaragua AR_001110 |
| 44. | The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2022), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf | Nicaragua AR_001115 |
| | **OMB & Related Documents** | |
| | ***Financial Support*** | |
| 45. | Memorandum from Samantha Deshommes, Chief Regulatory Officer, U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Office of Policy and Strategy, *Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form I-134A, Online Request to be a Supporter and Declaration of Financial Support; and USCIS Form I-134, Declaration of Financial Support* (Dec. 29, 2022). | Nicaragua AR_001135 |
| 46. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Form I-134, *Declaration of Financial Support*. | Nicaragua AR_001138 |

Defendant's Exhibit C
6:     0007

Case 6:23-cv-00007   Document 94-1   ed on 03/24/23 in TXSD   Page 6 of 102

| 47. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support, Instructions.* | Nicaragua AR_001151 |
|---|---|---|
| 48. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134, Declaration of Financial Support, Supporting Statement.* | Nicaragua AR_001159 |
| 49. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Form I-134A, Online Request to be a Supporting and Declaration of Financial Support.* | Nicaragua AR_001167 |
| | ***Advance Travel Authorization*** | |
| 50. | Memorandum from Matthew S. Davies, Executive Dir., U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Emergency Approval Request for Advance Travel Authorization Capability Under the Paperwork Reduction Act* (Dec. 15, 2022). | Nicaragua AR_001181 |
| 51. | U.S. Dep't of Homeland Security, Email, *ATA Burden Estimate* (Dec. 19, 2022). | Nicaragua AR_001185 |
| 52. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Advance Travel Authorization, Supporting Statement.* | Nicaragua AR_001186 |
| 53. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Statistics Division, *Enforcement Encounters – Northern Border FY 22.* | Nicaragua AR_001192 |
| 54. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Statistics Division, *Enforcement Encounters – Southern Border FY 22.* | Nicaragua AR_001196 |
| | **Non-U.S. Government Sources (Alphabetical Order)** | |
| 55. | Alvarez, Priscilla, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border,* CNN (Sept. 7, 2022) https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html | Nicaragua AR_001199 |
| 56. | Castillo, Moises and Christopher Sherman, *Fleeing Nicaraguans strain Costa Rica's Asylum System,* AP News (Sept. 2, 2022), https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c6c6c7459a5. | Nicaragua AR_001208 |
| 57. | Central Bank of Nicaragua, *Remesas Por Pais de Origen* (Dec. 12, 2022), https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm | Nicaragua AR_001218 |
| 58. | Confair, Denelle, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds Per Day,* Tucson News 9 (Sept. 22, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day. | Nicaragua AR_001219 |
| 59. | Corchado, Alfredo, *Ahead of Title 42's End, U.S.-Mexico Negotiations Called "Intense," "Round-the-Clock," Dallas Morning News* (Dec. 14, 2022), https://www.dallasnews.com/news/2022/12/13/ahead-of-title- | Nicaragua AR_001223 |

Defendants' Exhibit C
6:23-cv-00007

Case 6:23-cv-00007   Document 94-1   Filed on 03/24/23 in TXSD   Page 7 of 102

| | | |
|---|---|---|
| | 42s-end-us-mexico-negotiations-called-intense-round-the-clock/ | |
| 60. | Dell'Orto Giovanna, *US Court Rejects Maintaining COVID-19 Asylum Restrictions*, (Dec. 16, 2022), https://www.wtol.com/article/news/nation-world/migrants-mexico-us-border-asylum-limits-end/507-02a353b7-d61f-4536-b3e9-bb45c3fbb388 | Nicaragua AR_001231 |
| 61. | Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, The New York Times (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html | Nicaragua AR_001237 |
| 62. | Durand, Jorge, Douglas S. Massey, and Emilio A. Parrado, ''The New Era of Mexican Migration to the United States,'' The Journal of American History Vol. 86, No. 2 (Sept. 1999). http://www.catedrajorgedurand.udg.mx/sites/default/files/1999_the_new_era_of_mexican_migration_to_the_us.pdf | Nicaragua AR_001241 |
| 63. | Elamroussi, Aya and Winston Adrienne, *DC Approves Creation of New Agency to Provide Services for Migrants Arriving from other States* (Sept. 21, 2022) https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office/index.html | Nicaragua AR_001261 |
| 64. | Garcia, Jacob, *Migrants Truck Crashes in Mexico killing 54*, Reuters (Dec. 10, 2021), https://www.reuters.com/world/americas/least-49-people-killed-mexico-trailer-accident-officials-say-2021-12-09/ | Nicaragua AR_001270 |
| 65. | Gonzalez, Valeria, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream,'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream. | Nicaragua AR_001278 |
| 66. | Gov't of Mexico, *Finaliza el programa de estancias migratorias en Mexico bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU* (Oct. 25, 2022), https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidadde-ee-uu. | Nicaragua AR_001291 |
| 67. | Gov't of Mexico, *Mexico Commission for Assistance of Refugee Data*, https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022__1-Dic__.pdf. | Nicaragua AR_001295 |
| 68. | Gov't of Panama, *Cuadro No. 001 Tránsito Irregular de Extranjeros por la Frontera con Colombia Por Región Según Orden De Importancia: Año 2022*, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf | Nicaragua AR_001296 |
| 69. | Greenfield, Victoria A., Blas Nunez-Neto, Ian Mitch, Joseph C. Chang, and Etienne Rosas, *Human Smuggling and Associated Revenues*, Homeland Security Operational Analysis Center (2019), | Nicaragua AR_001298 |

Defendants' Exhibit C
6:    0007

Case 6:23-cv-00007 Document 94-1 ...d on 03/24/23 in TXSD Page 8 of 102

| | |
|---|---|
| | https://www.rand.org/pubs/research_reports/RR2852.html |
| 70. | Human Rights Watch, *Nicaragua Gov't Dismantles Civil Society* (July 19, 2022) https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society. | Nicaragua AR_001376 |
| 71. | Inter-American Comm'n on Human Rights, *Concentration of Power and the Undermining of the Rule of Law* (Oct. 25, 2021), https://www.oas.org/en/iachr/reports/pdfs/2021_NicaraguaEN.pdf. | Nicaragua AR_001383 |
| 72. | Inter-American Comm'n on Human Rights, *2021 Annual Report on Nicaragua* (Oct. 25, 2021), https://www.oas.org/en/iachr/docs/annual/2021/Chapters/IA2021cap4B.Nicaragua-en.pdf. | Nicaragua AR_001451 |
| 73. | Jordan, Miriam, *Smuggling at the Border Now a Billion-Dollar Business*, The New York Times (July, 25, 2022) https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html | Nicaragua AR_001504 |
| 74. | Kinosian Sarah, *As United States' 'Remain in Mexico' plan begins, Mexico plans to shut its 'too successful' humanitarian visa program*, (Jan. 24, 2019) https://theworld.org/stories/2019-01-24/united-states-remain-mexico-plan-begins-mexico-plans-shut-its-too-successful | Nicaragua AR_001511 |
| 75. | La Prensa Latina, *More than 4,000 Migrants Voluntarily Returned to Venezuela from Panama* (Nov. 9, 2022), https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/. | Nicaragua AR_001522 |
| 76. | Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, Los Angeles Times (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | Nicaragua AR_001525 |
| 77. | Miroff, Nick and Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, The Washington Post (Oct. 24, 2018), https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html. | Nicaragua AR_001542 |
| 78. | Nunez, Claudia, *"It Would Have Been Better to Let Me Die," on the Other Side of the Darien, Hundreds Survive the Nightmare of Death*, The Los Angeles Times (Mar. 4, 2022), https://www.latimes.com/espanol/internacional/articulo/2022-03-04/al-otro-lado-del-darien-cientos-sobreviven-la-pesadilla-de-la-muerte. | Nicaragua AR_001550 |
| 79. | Organization of American States, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua* (Dec. 21, 2021), https://www.oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/346.asp | Nicaragua AR_001567 |
| 80. | Organization of American States, *In Light of Serious Allegations Regarding the Closure of Civic Spaces in Nicaragua* (Sept. 28, 2022), https://www.oas.org/en/iachr/expression/showarticle.asp?lID=1&artID=1257. | Nicaragua AR_001589 |
| 81. | Pazmiño, Liz Briceño, *Biden's New Border Policy Throws Venezuelan Migrants Into Limbo*, Axios (Nov. 7, 2022), https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap. | Nicaragua AR_001571 |

| | | |
|---|---|---|
| 82. | Politico, *Sandinistas Complete Their Political Domination of Nicaragua* (Nov. 8, 2022), https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603. | Nicaragua AR_001580 |
| 83. | Reuters, *Costa Rica Prepares Plan to Regularize Status of 200,000 Mostly Nicaraguan Migrants*, (Aug. 10, 2022), https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/. | Nicaragua AR_001583 |
| 84. | Reuters, *Ortega's Path to Run for Fourth Straight Re-Election as Nicaraguan President* (Nov. 3, 2021), https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/ | Nicaragua AR_001599 |
| 85. | Rosenberg, Mica, Kristina Cooke and Daniel Trotta, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. From Mexico*, Reuters (July 22, 2022) https://www.reuters.com/investigates/special-report/usa-immigration-border-deaths/ | Nicaragua AR_000615 |
| 86. | Selser Gabriela, *Sandinistas Complete their Political Domination of Nicaragua following Local Elections*, Los Angeles Times (Nov. 8, 2022), https://wOctww.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections. | Nicaragua AR_001628 |
| 87. | Sheridan, Mary Beth, Ismael López Ocampo and Ana Vanessa Herrero, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent*, The Washington Post (Aug. 19, 2022) https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/. | Nicaragua AR_001636 |
| 88. | Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media | Nicaragua AR_001638 |
| 89. | Torres, Raquel, *Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, *San Antonio Report* (Apr. 27, 2022) https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/ | Nicaragua AR_001653 |
| 90. | United Nations High Comm'r of Refugees, *Displacement in Central America*, (June 16, 2022) https://www.unhcr.org/en-us/displacement-in-central-america.html | Nicaragua AR_001659 |
| 91. | United Nations High Comm'r of Refugees, *Global Trends Forced Displacement in 2021* (June 16, 2022), https://www.unhcr.org/en-us/publications/brochures/62a9d1494/global-trends-report-2021.html. | Nicaragua AR_001663 |
| 92. | United Nations High Comm'r of Refugees, *Number of Displaced Nicaraguans in Costa Rica Doubles in Less Than a Year* (Mar. 25, 2022), https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costarica-doubles-year.html. | Nicaragua AR_001711 |
| 93. | United Nations High Comm'r of Refugees, *Presentation of Report on the Human Rights Situation in Nicaragua* (Sept. 13, 2022), https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua | Nicaragua AR_001716 |

Defendants' Exhibit C
6   0007

Case 6:23-cv-00007   Document 94-1     ˙d on 03/24/23 in TXSD   Page 10 of 102

| 94. | United Nations Human Rights Council, *Annual Report on the Human Rights Situation in Nicaragua* (Sept. 2, 2022). | Nicaragua AR_001721 |
| 95. | United Nations, UN News, *'Sharp Rise' in Nicaraguans Fleeing to Costa Rica, Strains Asylum System* (Mar. 25, 2022), https://news.un.org/en/story/2022/03/1114792. | Nicaragua AR_001737 |
| 96. | Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the US* (July 29, 2021), https://news.un.org/en/story/2022/03/1114792. | Nicaragua AR_001744 |
| 97. | Voice of America, *US Policy Prompts Some Venezuelan Migrants to Change Route* (Oct. 14, 2022), https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html. | Nicaragua AR_001748 |
| 98. | Wallace Alicia, *US Economy Added a Robust 263,000 Jobs in November*, CNN (Dec. 2, 2022), https://www.cnn.com/2022/12/02/economy/november-jobs-report/index.html. | Nicaragua AR_001750 |
| 99. | Whelan, Robbie, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program: Migrants Seeking Shelter in the U.S. Under Trump Administration Policy Report Rising Numbers of Kidnappings by Criminal Groups*, Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. | Nicaragua AR_001763 |
| 100 | World Bank, *GDP Per Capita (Current US$) – Latin America & Caribbean, Nicaragua*, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false. | Nicaragua AR_001770 |
| 101 | World Food Program, *Nicaragua Country Brief Sept. 2022* (Oct. 31, 2022) https://reliefweb.int/report/nicaragua/wfp-nicaragua-country-brief-september-2022 | Nicaragua AR_001776 |

Defendant's Exhibit C
6:23-cv-00007

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF FILING OF ADMINISTRATIVE RECORD

Defendants hereby provide notice that they are filing the administrative record for Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1,279 (Jan. 9, 2023). With this notice, Defendants also attach (1) the certification of each administrative record in this action; and (2) the index of the contents of each administrative record; and (3) the administrative record for the Venezuelan Parole Process. *See* Attachments.

//

//

1

Defendant's Exhibit D
6:23-cv-00007

Dated: March 24, 2023

ALAMDAR S. HAMDANI
*United States Attorney*

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

/s/ *Erez Reuveni*
EREZ REUVENI
*Assistant Director*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 307-4293
erez.r.reuveni@usdoj.gov

BRIAN WARD
*Senior Litigation Counsel*

2

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Erez Reuveni*
EREZ REUVENI
U.S. Department of Justice

3

Defendant's Exhibit D
6:23-cv-00007

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURTY., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATION OF ADMINISTRATIVE RECORD FOR THE IMPLEMENTATION OF CHANGES TO THE PAROLE PROCESS FOR VENEZUELANS

My name is Juliana Blackwell. I am employed with the U.S. Department of Homeland Security, as the Deputy Executive Secretary. I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records. I have held this position since August 2019.

I am the custodian of the Department of Homeland Security's *Implementation of Changes to the Parole Process for Venezuelans*, 88 Fed. Reg. 1,279 (Jan. 9, 2023), and of a copy of the administrative record for the decision for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index contains the non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered.

JULIANA J BLACKWELL

Digitally signed by
JULIANA J BLACKWELL
Date: 2023.03.17 21:45:36
-04'00'

Juliana Blackwell
Executed this 17th day of March, 2023 in Washington, D.C.

Document 95-1 ... ed on 03/24/23 in TXSD   Page 2 of 104

**Implementation of Changes to the Parole Process for Venezuelans**
**Certified Administrative Record Index**

| | Executive Orders & Federal Register Sources (Chronological Order) | Bates Number(s) |
|---|---|---|
| 1. | *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007), https://www.federalregister.gov/documents/2007/11/21/E7-22679/cuban-family-reunification-parole-program. | Venezuela AR_000001 |
| 2. | *Implementation of Haitian Family Reunification Parole Program*, 79 Red. Reg. 75,581 (Dec. 18, 2014), https://www.federalregister.gov/documents/2014/12/18/2014-29533/implementation-of-haitian-family-reunification-parole-program. | Venezuela AR_000002 |
| 3. | *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended*, 81 Fed. Reg. 5,906 (Feb. 4, 2016), https://www.federalregister.gov/documents/2016/02/04/2016-02191/visas-documentation-of-nonimmigrants-under-the-immigration-and-nationality-act-as-amended. | Venezuela AR_000005 |
| 4. | *Filipino World War II Veterans Parole Policy*, 81 Fed. Reg. 28,097 (May 9, 2017), https://www.federalregister.gov/documents/2016/05/09/2016-10750/filipino-world-war-ii-veterans-parole-policy. | Venezuela AR_000006 |
| 5. | *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4,769 (Jan. 17, 2017, https://www.federalregister.gov/documents/2017/01/17/2017-00915/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-arriving-by-air. | Venezuela AR_000010 |
| 6. | *Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea*, 82 Fed. Reg. 4,902 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00914/eliminating-exception-to-expedited-removal-authority-for-cuban-nationals-encountered-in-the-united. | Venezuela AR_000013 |
| 7. | *International Entrepreneur Rule*, 82 Fed. Reg. 5,238 (Jan. 17, 2017), https://www.federalregister.gov/documents/2017/01/17/2017-00481/international-entrepreneur-rule. | Venezuela AR_000017 |
| 8. | *Implementation of the Uniting for Ukraine Parole Process*, 87 Fed. Reg. 25,040 (Apr. 27, 2022), https://www.federalregister.gov/documents/2022/04/27/2022-09087/implementation-of-the-uniting-for-ukraine-parole-process. | Venezuela AR_000069 |
| 9. | *Implementation of a Parole Process for Venezuelans*, 87 Fed Reg. 63,507 (Oct. 19, 2022), https://www.federalregister.gov/documents/2022/10/19/2022-22739/implementation-of-a-parole-process-for-venezuelans. | Venezuela AR_000073 |
| | **U.S. Government Sources (Alphabetical Order)** | |

Defendants' Exhibit D
j6:23-cv-00007

| 10. | Declaration of Robert E. Perez, Deputy Comm'r, U.S. Customs and Border Protection (Mar. 3, 2020). | Venezuela AR_ 000084 |
|---|---|---|
| 11. | Letter from Alexandria Ocasio-Cortez and Adriano Espaillat, U.S. Congress, House of Representatives (Aug 5, 2022). | Venezuela AR_ 000092 |
| 12. | Letter from the Hon. Lucille Roybal-Allard & the Hon. Chuck Fleischmann, U.S. Congress, House Subcommittee on Homeland Sec. (Sept. 9, 2022). | Venezuela AR_ 000094 |
| 13. | Letter from Antony J. Blinken, Sec'y of State, *Temporary Protected Status Designation - Venezuela* (Apr. 25, 2022). | Venezuela AR_ 000096 |
| 14. | Memorandum for Jeffrey L. Weiss, Dir., U.S. Dep't of Justice, Immigration and Naturalization Service, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001). | Venezuela AR_ 000111 |
| 15. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y of Homeland Sec., Office of Strategy, Policy, and Plans, Christopher Magnus, Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Parole Process for Certain Venezuelan Nationals* (Oct. 12, 2022). | Venezuela AR_000117 |
| 16. | Memorandum for the Sec'y from Robert Silvers, Under Sec'y, Office of Strategy, Policy, and Plans, Troy Miller, Acting Comm'r, U.S. Customs and Border Protection, Ur M. Jaddou, Dir., U.S. Citizenship and Immigration Services, *Updates to the Parole Process for Certain Venezuelan Nationals* (Dec. 22, 2022). | Venezuela AR_ 000144 |
| 17. | Memorandum for the Sec'y through John W. Priddy, Acting Dir., Joint Task Force-East, John K. Tien, Deputy Sec., and from Brendan C. McPherson, Director, Homeland Sec. Task Force-Southeast, *Operation Vigilant Sentry (OVS) Phase 21, 2022).* | Venezuela AR_ 000152 |
| 18. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec, *DHS Plan for Southwest Border Security and Preparedness*, (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf | Venezuela AR_ 000154 |
| 19. | Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | Venezuela AR_ 000174 |
| 20. | Memorandum from Blas Nuñez-Neto, Acting Sec'y for Border and Immigration Policy, *Data on Migration Through Costa Rica, Ecuador, and Colombia* (Dec. 20, 2022). | Venezuela AR_ 000178 |
| 21. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces More than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas* (June 10, 2022), https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-stabilization-efforts-venezuela. | Venezuela AR_ 000181 |
| 22. | U.S. Agency for Int'l Dev., Press Release, *The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region* (Sept. 22, | Venezuela AR_ 000183 |

Case 6:23-cv-00007    Document 95-1[  ]d on 03/24/23 in TXSD    Page 4 of 104

|  | | |
|---|---|---|
| | 2022), https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela. | |
| 23. | U.S. Census Bureau, *Selected Population Profile in the United States; Venezuelan 2021.* | Venezuela AR_ 000188 |
| 24. | U.S. Department of Homeland Security and U.S. Department of Defense, *Joint Brief on Mass Maritime Migration* (August 2022). | Venezuela AR_ 000206 |
| 25. | U.S. Dep't of Homeland Security, *DHS Drawdown Plan.* | Venezuela AR_ 000215 |
| 26. | U.S. Dep't of Homeland Security, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf. | Venezuela AR_ 000220 |
| 27. | U.S. Dep't of Homeland Security, *Table 21. Persons Naturalized by Region and Country of Birth: Fiscal Years 2011 to 2020.* | Venezuela AR_ 000259 |
| 28. | U.S. Dep't of Homeland Security, *Uniting for Ukraine* (Sept. 23, 2022). | Venezuela AR_ 000264 |
| 29. | U.S. Dep't of Homeland Security, Homeland Security Task Force Southeast, *Operation Vigilant Sentry Phases: Prevent, Deter, and Respond to Illegal and Unsafe Maritime Migration* (July 13, 2021). | Venezuela AR_ 000266 |
| 30. | U.S. Dep't of Homeland Security, Office of Immigration Policy, *CHNV Displacement Statistics 2018-2021.* | Venezuela AR_ 000268 |
| 31. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Annual Flow Report, U.S. Naturalizations: 2021* (June 2022). | Venezuela AR_ 000276 |
| 32. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *U.S. Border Patrol Encounters of Venezuelan Nationals* (Dec. 5, 2022). | Venezuela AR_ 000282 |
| 33. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Total Monthly SWB Encounters,* (Dec. 14, 2022). | Venezuela AR_ 000285 |
| 34. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *2020 Naturalizations-Venezuela.* | Venezuela AR_ 000293 |
| 35. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Process for Venezuelans, Daily Report* (Dec. 8, 2022). | Venezuela AR_ 000297 |
| 36. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Process for Venezuelans, Daily Report* (Dec. 12, 2022). | Venezuela AR_ 000300 |
| 37. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Process for Venezuelans, Daily Report* (Dec. 27, 2022). | Venezuela AR_ 000304 |

Defendant's Exhibit D
6:23-cv-00007

Case 6:23-cv-00007   Document 95-1   Filed on 03/24/23 in TXSD   Page 5 of 104

| No. | Citation | Bates |
|---|---|---|
| 38. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Venezuela Analysis 10.7.22.* | Venezuela AR_000306 |
| 39. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Venezuela Encounter Trends* (Sept. 23, 2022). | Venezuela AR_000333 |
| 40. | U.S. Dep't of Homeland Security, Office of Immigration Statistics, *Venezuela Slides* (Sept. 22, 2022). | Venezuela AR_000336 |
| 41. | U.S. Dep't of Homeland Security, Office of Intelligence and Analysis, *Human Smugglers Using Social Media to Broaden Access to Illicit Pathways to the United States* (June 6, 2022). | Venezuela AR_000340 |
| 42. | U.S Dep't of Homeland Security, Office of Intelligence and Analysis, *Venezuelans React to US Immigration Policies; Flow Probably Will Increase in Early 2023* (Dec. 12, 2022). | Venezuela AR_000345 |
| 43. | U.S. Dep't of Homeland Security, Press Release, *DHS Announces New Migration Enforcement Process for Venezuelans: Venezuelans Who Seek to Enter the U.S. Illegally Will be Returned to Mexico; New Lawful Pathway Created for Some Venezuelans* (Oct. 12, 2022), https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans. | Venezuela AR_000350 |
| 44. | U.S. Dep't of Homeland Security, Southwest Border Task Force, *Executive Leadership Report* (Sept. 23, 2022). | Venezuela AR_000352 |
| 45. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Eligible to Naturalize Overview* (Aug. 12, 2022). | Venezuela AR_000366 |
| 46. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Policy Memorandum, *Parole of Spouses, Children and Parents of Active U.S Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and the Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility Under the Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013). | Venezuela AR_000367 |
| 47. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Daily Venezuela Report* (Dec. 8, 2022). | Venezuela AR_000376 |
| 48. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Daily Venezuela Report* (Dec. 12, 2022). | Venezuela AR_000379 |
| 49. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Daily Venezuela Report* (Dec. 27, 2022). | Venezuela AR_000382 |
| 50. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *FY21-FY22 Unaccompanied Children.* | Venezuela AR_000385 |
| 51. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains Fiscal Year 2022 Report to Congress* (Mar. 29, 2022). | Venezuela AR_000390 |

Defendants' Exhibit D
0007

| | | |
|---|---|---|
| 52. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Southwest Land Border Encounters and Credible Fear Since 2000*. | Venezuela AR_000410 |
| 53. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Email, *Decompression* (Dec. 11, 2022). | Venezuela AR_000412 |
| 54. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, Office of Field Operations, *Ukrainian Arrivals Snapshot* (May 9, 2022). | Venezuela AR_000415 |
| 55. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, U.S. Border Patrol, *Del Rio Sector After Action Report Mass Migration Event Sept. 8, 2021–Sept. 24, 2021* (Oct. 7, 2021). | Venezuela AR_000422 |
| 56. | U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/. | Venezuela AR_000453 |
| 57. | U.S. Dep't of State, *2022 Trafficking in Persons Report: Venezuela*, https://www.state.gov/reports/2022-trafficking-in-persons-report/venezuela/#:~:text=NGOs%20reported%20an%20increased%20incidence.with%205.6%20per%201% 2C000%20people. | Venezuela AR_000518 |
| 58. | U.S. Dep't of State, Cable, *Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico* (Dec. 1, 2022). | Venezuela AR_000526 |
| 59. | U.S. Dep't of State, Email, *Costa Rica Struggles to Cope with Surge of Venezuelan Migrants* (Sept. 20, 2022). | Venezuela AR_000529 |
| 60. | U.S. Dep't of State, Email, *Migration Update: UNHCR Highlights Continuing Surge in Venezuelan Migration* (Sept. 30, 2022). | Venezuela AR_000533 |
| 61. | U.S. Dep't of State, Email, *Panama: Mid-Year, Irregular Migrant Entrants at Panama-Colombia Border Outpacing 2021 by 85 Percent* (July 12, 2022). | Venezuela AR_000538 |
| 62. | U.S. Dep't of State, Email, *Venezuelan Reporting – November 30* (Nov. 30, 2022). | Venezuela AR_000544 |
| 63. | The White House, *Collaborative Migration Management Strategy*, (July 29, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery | Venezuela AR_000549 |
| 64. | The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Gov't and Foreign Partner Deliverables*, (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/ | Venezuela AR_000563 |
| 65. | The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/ | Venezuela AR_000570 |

Defendants' Exhibit D
6:23-cv-00007

**OMB & Related Documents**

| | | |
|---|---|---|
| 66. | The White House, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2022), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf | Venezuela AR_000575 |

***Financial Support***

| | | |
|---|---|---|
| 67. | Memorandum from Samantha Deshommes, Regulatory Coordination Division Chief, U.S. Citizenship and Immigration Services, Office of Policy and Strategy, *Request for Emergency OMB Paperwork Reduction Act Clearance – Form I-134, Declaration of Financial Support* (Oct. 17, 2022). | Venezuela AR_000595 |
| 68. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Form I-134, *Declaration of Financial Support*. | Venezuela AR_000599 |
| 69. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Form I-134 Instructions, *Declaration of Financial Support*. | Venezuela AR_000612 |
| 70. | U.S. Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Supporting Statement for Declaration of Financial Support*. | Venezuela AR_000620 |

***Advance Travel Authorization***

| | | |
|---|---|---|
| 71. | Memorandum from Matthew S. Davies, Executive Dir., U.S. Customs and Border Protection, *Emergency Approval Request for Advance Travel Authorization Capability Under the Paperwork Reduction Act* (Oct. 17, 2022). | Venezuela AR_000632 |
| 72. | U.S. Dep't of Homeland Security, U.S. Customs and Border Protection, *Travel Authorization Supporting Statement* (Oct. 13, 2022). | Venezuela AR_000636 |

**Non U.S. Government Sources**

| | | |
|---|---|---|
| 73. | Amnesty International, *Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions* (Feb. 10, 2022). | Venezuela AR_000641 |
| 74. | Alvarez, Priscilla, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border*, CNN (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html#:~:text=CNN%20Store-,First%20on%20CNN%3A%20A%20record%20number%20of%20migrants%20have,crossing%20the%20U S%2DMexico%20border&text=Nearly%20750%20migrants%20have%20died,Security%20figures%20share d%20with%20CNN. | Venezuela AR_000699 |
| 75. | Bertelsmann Stiftung, *BTI 2022 Country Report – Venezuela*, https://bti-project.org/en/reports/country-report/VEN. | Venezuela AR_000706 |

Defendants' Exhibit D
0007

Case 6:23-cv-00007   Document 95-1   ... on 03/24/23 in TXSD   Page 8 of 104

| 76. | City of San Diego Office of Immigration Affairs, Email, *Concern With Asylum Seekers at Our Border* (Sept. 26, 2022). | Venezuela AR_000771 |
| 77. | Confair, Denelle, *Local migrant shelter reaching max capacity as it receives hundreds per day*, KGUN9 Tuscon (Sept. 23, 2022), available at https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day. | Venezuela AR_000773 |
| 78. | Corchado, Alfredo, *Ahead of Title 42's End, U.S.-Mexico Negotiations Called "Intense," "Round-the-Clock,"* Dallas Morning News (Dec. 14, 2022), https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/. | Venezuela AR_000777 |
| 79. | Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, The New York Times (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html. | Venezuela AR_000785 |
| 80. | Elamroussi, Aya and Winston, Adrienne, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving from Other States*, CNN (Sept. 21, 2022). | Venezuela AR_000789 |
| 81. | Garcia, Jacob, *Migrant truck crashes in Mexico killing*, Reuters (Dec. 10, 2022), available at https://www.reuters.com/world/americas/least-49-people-killed-mexico-trailer-accident-officials-say-2021-12-09. | Venezuela AR_000798 |
| 82. | Gonzalez, Valerie, *Migrants risk death crossing treacherous Rio Grande river for "American Dream"*, the Guardian (Sept. 5, 2022), available at https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream | Venezuela AR_000806 |
| 83. | Gov't of Panama, *Cuadro No. 001 Transito Irregular de Extranjeros por la Frontera con Colombia por Region Segun Orden de Importancia: Ano 2022*, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES %20POR %20DARI%C3%89N NO VIEMBRE 2022.pdf. | Venezuela AR_000819 |
| 84. | Human Rights First, *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico* (Sept. 15, 2022), https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico. | Venezuela AR_000821 |
| 85. | Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela, *Regional Refugee and Migrant Response Plan January-December 2022* (Dec. 9, 2021), https://www.r4v.info/en/document/rmrp-2022. | Venezuela AR_000822 |
| 86. | Kinosian, Sarah, *As United States' 'Remain in Mexico' Plan Begins, Mexico Plans to Shut Its 'Too Successful' Humanitarian Visa Program*, Global Post (Jan. 24, 2019), https://theworld.org/stories/2019-01-24/united-states-remain-mexico-plan-begins-mexico-plans-shut-its-too-successful. | Venezuela AR_001091 |
| 87. | La Prensa Latina, *More Than 4,000 Migrants Voluntarily Returned to Venezuela from Panama* (Nov. 9, 2022), https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from- | Venezuela AR_001102 |

Defendant's Exhibit D
6:23-cv-00007

| | panama/. | |
|---|---|---|
| 88. | Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, Los Angeles Times (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | Venezuela AR_001105 |
| 89. | Miroff, Nick and Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, The Washington Post (Oct. 24, 2018), https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html. | Venezuela AR_001121 |
| 90. | Nunez, Claudia, *"I Would Have Been Better to Let Me Die," on the Other Side of the Darien, Hundreds Survive the Nightmare of Death*, The Los Angeles Times (Mar. 4, 2022). https://www.latimes.com/espanol/internacional/articulo/2022-03-04/al-otro-lado-del-darien-cientos-sobreviven-la-pesadilla-de-la-muerte. | Venezuela AR_001130 |
| 91. | Pazmiño, Liz Briceño, *Biden's New Border Policy Throws Venezuelan Migrants Into Limbo*, Axios (Nov. 7, 2022), https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap. | Venezuela AR_001147 |
| 92. | Rosenberg, Mica, Cooke, Kristina, and Trotta, Daniel, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X. | Venezuela AR_001156 |
| 93. | Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media. | Venezuela AR_001164 |
| 94. | United Nations, Dep't of Economic and Social Affairs, *International Migration 2020 Highlights* (Jan. 25, 2021), https://www.un.org/en/desa/international-migration-2020-highlights. | Venezuela AR_001179 |
| 95. | United Nations Children's Fund, *2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S.* (Oct. 11, 2022), https://www.unicef.org/lac/en/press-releases/record-number-of-children-crossing-darien-gap-towards-us-this-year#:~:text=From%20January%20to%20October%2C%20some,quadrupling%20the%20previous%20year%27s%20total. | Venezuela AR_001239 |
| 96. | United Nations High Comm'n for Refugees, *Global Trends Forced Displacement in 2018* (June 19, 2019), https://www.unhcr.org/globaltrends2018/. | Venezuela AR_001247 |
| 97. | United Nations High Comm'n for Refugees, *Global Trends Forced Displacement in 2021* (June 16, 2022), https://www.unhcr.org/en-us/publications/brochures/62a9d1494/global-trends-report-2021.html. | Venezuela AR_001323 |
| 98. | United Nations High Comm'n for Refugees / International Office of Migration, Joint Press Release, *Venezuela Outflow Continues Unabated, Stands Now at 3.4 Million* (Feb. 22, 2019), https://www.unhcr.org/en-us/news/press/2019/2/5c6fb2d04/venezuelan-outflow-continues-unabated-stands-34-million.html. | Venezuela AR_001371 |

Defer······ Exhibit D
0007

Case 6:23-cv-00007   Document 95-1   ...d on 03/24/23 in TXSD   Page 10 of 104

| 99. | United Nations High Comm'r for Refugees, Fact Sheet, *Americas August 2022* (Aug. 22, 2022), https://data.unhcr.org/en/documents/details/95054. | Venezuela AR_001374 |
|---|---|---|
| 100. | United Nations High Comm'r for Refugees, *Venezuela Situation*, https://www.unhcr.org/en-us/venezuela-emergency.html. | Venezuela AR_001381 |
| 101. | United Nations High Comm'r for Refugees, *Venezuela Situation May-September 2021* (Nov. 3, 2021), https://data.unhcr.org/en/documents/details/89782. | Venezuela AR_001385 |
| 102. | United Nations High Comm'n for Refugees, Fact Sheet, *Venezuela Situation June 2022* (June 15, 2022), https://data.unhcr.org/en/documents/details/93629. | Venezuela AR_001387 |
| 103. | Voice of America, *US Policy Prompts Some Venezuelan Migrants to Change Route* (Oct. 14, 2022), https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html. | Venezuela AR_001391 |
| 104. | Villagran, Lauren, *El Paso struggles to keep up with Venezuelan migrants: 5 key things to know*, El Paso Times (Sept. 14, 2022), available at https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007. | Venezuela AR_001394 |
| 105. | Whelan, Robbie, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program: Migrants Seeking Shelter in the U.S. Under Trump Administration Policy Report Rising Numbers of Kidnappings by Criminal Groups*, Wall Street Journal (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. | Venezuela AR_001399 |

Defendant's Exhibit D
6:23-cv-00007

# ERO LESA Statistical Tracking Unit

For Official Use Only (FOUO)/Pre-decisional

**Texas v. DHS (CHNV Parole Litigation) - Discovery Request for Production - 05/18/2023**

## Footnotes

Criminal History Data are updated through 05/06/2023 (IIDS run as of 05/08/2023; EID as of 05/06/2023).

¹Parole Beneficiaries by Nationality: January 20, 2021 - March 31, 2023¹ provided by DHS Office of Immigration Statistics on 04/25/2023. USCIS Data as of 4/11/2023. OFO data as of 4/7/2023.

*Tab RFP 5*

Criminal history records are as entered in the Crime Entry Screen by the Officer and may not reflect the full criminal history for the noncitizen.

Criminal history records are inclusive of all records available in the system and not limited to just ICE records.

While criminal history records are associated with the provided Parole Beneficiaries A Numbers, ERO cannot confirm that these criminal records have any direct relationship to the Parole Program.

Of the provided 71,168 Parole Program AFNs, criminal history records for 2 AFNs were found in the system.

Defendant's Exhibit E
6:23-cv-00007

Parole Program Beneficiaries of School Age: October 18, 2022 - March 31, 2023

| Program Country | Age 6-17 |
|---|---|
| Cuba | 1,878 |
| Haiti | 1,318 |
| Nicaragua | 823 |
| Venezuela | 4,866 |
| Total | 8,885 |

Notes: School age is defined as individuals aged 6-17. USCIS Data as of 4/11/2023. OFO data as of 4/7/2023.

Source: DHS Office of Immigration Statistics analysis of OFO and USCIS data.

Defendants' Exhibit E
6:_____ 0007

Unauthorized Immigrants Encountered by USBP at the
Southwest Border by Select Nationality: January 20, 2021 -
March 31, 2023

| Nationality | Individuals |
|-------------|-------------|
| Cuba | 355,951 |
| Haiti | 70,646 |
| Nicaragua | 298,633 |
| Venezuela | 270,691 |
| Total | 995,921 |

Note: Data as of 4/21/2023.

Source: DHS Office of Immigration Statistics.

23-cv-00007_0147

Defendant's Exhibit E
6:23-cv-00007

Unauthorized Immigrants of School Age Encountered by USBP at the
Southwest Border by Select Nationality: January 20, 2021 - March
31, 2023

| Nationality | Age 6-17 |
|---|---|
| Cuba | 28,874 |
| Haiti | 4,786 |
| Nicaragua | 26,160 |
| Venezuela | 33,952 |
| Total | 93,772 |

Notes: School age is defined as individuals aged 6-17. Data as of 4/21/2023.
Source: DHS Office of Immigration Statistics.

Criminal Unauthorized Immigrants Encountered by USBP at the
Southwest Border by Select Nationality: January 20, 2021 -
March 31, 2023

| Nationality | Individuals |
|-------------|-------------|
| Cuba | 137 |
| Haiti | 14 |
| Nicaragua | 862 |
| Venezuela | 36 |
| Total | 1,049 |

Note: Data as of 4/21/2023.
Source: DHS Office of Immigration Statistics.

Criminal Unauthorized Immigrants of School Age Encountered by
USBP at the Southwest Border by Select Nationality: January 20,
2021 - March 31, 2023

| Nationality | Age 6-17 |
|-------------|----------|
| Cuba | 0 |
| Haiti | 0 |
| Nicaragua | 0 |
| Venezuela | 0 |
| Total | 0 |

Notes: School age is defined as individuals aged 6-17. Data as of 4/21/2023.
Source: DHS Office of Immigration Statistics.

## RESPONSE TO INTERROGATORY NO. 6

Unauthorized Immigrants Encountered by USBP at the
Southwest Border by Select Nationality: October 18, 2022 -
March 31, 2023 and January 6, 2023 - March 31, 2023

| Nationaltiy | Individuals |
|---|---|
| Cuba | 3,571 |
| Haiti | 220 |
| Nicaragua | 2,571 |
| Venezuela | 19,985 |
| Total | 26,347 |

Note: Data as of 4/21/2023. Venezuelan numbers start
October 18, 2022, the date the Venezuelan parole program
started. All other numbers start January 6, 2023, the date the
Cuban, Haitian, and Nicaraguan parole processes started.
Source: DHS Office of Immigration Statistics.

## RESPONSE TO INTERROGATORY NO. 1

CHNV Parole Process Applications by Month and Status: October 18, 2022 - March 31, 2023 and January 6, 2023 - March 31, 2023

| Month | Venezuela | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 37,452 | 8,997 | 8,661 | 322 | 4 |
| November 2022 | 7,158 | 6,606 | 6,380 | 197 | 11 |
| December 2022 | 1,853 | 2,062 | 2,018 | 42 | 5 |
| January 2023 | 4,934 | 13,235 | 12,996 | 236 | 68 |
| February 2023 | 1,420 | 6,216 | 6,085 | 127 | 30 |
| March 2023 | 901 | 6,044 | 5,931 | 111 | 150 |
| Total | 53,718 | 43,160 | 42,071 | 1,035 | 268 |

| Month | Nicaragua | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 0 | 0 | 0 | 0 | 0 |
| November 2022 | 0 | 0 | 0 | 0 | 0 |
| December 2022 | 0 | 0 | 0 | 0 | 0 |
| January 2023 | 6,064 | 1,900 | 1,839 | 61 | 7 |
| February 2023 | 12,695 | 5,881 | 5,730 | 151 | 16 |
| March 2023 | 1,319 | 6,017 | 5,888 | 129 | 74 |
| Total | 20,078 | 13,798 | 13,457 | 341 | 97 |

| Month | Haiti | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 0 | 0 | 0 | 0 | 0 |
| November 2022 | 0 | 0 | 0 | 0 | 0 |
| December 2022 | 0 | 0 | 0 | 0 | 0 |
| January 2023 | 27,448 | 4,098 | 4,024 | 73 | 9 |
| February 2023 | 8,148 | 11,698 | 11,543 | 153 | 37 |
| March 2023 | 4,266 | 13,266 | 13,131 | 134 | 106 |
| Total | 39,862 | 29,062 | 28,698 | 360 | 152 |

| Month | Cuba | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 0 | 0 | 0 | 0 | 0 |
| November 2022 | 0 | 0 | 0 | 0 | 0 |
| December 2022 | 0 | 0 | 0 | 0 | 0 |
| January 2023 | 17,803 | 5,814 | 5,735 | 78 | 10 |
| February 2023 | 5,217 | 5,964 | 5,799 | 165 | 21 |
| March 2023 | 2,057 | 8,176 | 8,103 | 73 | 105 |
| Total | 25,077 | 19,954 | 19,637 | 316 | 136 |

Notes: Data as of 4/14/2023. "Applications received" pertains to CHNV beneficiaries (i.e., people with my USCIS accounts). Due to datasource differences, the number of USCIS applications received is not equal to the sum of those OFO adjudicates and labels as pending. Adjudicated applications include expired applications, in addition to approved and denied applications. Data are preliminary and subject to change. Data do not include individuals with multiple nationalities. Applications approved are those that have not expired due to failure to travel within a 90-day window and have not been cancelled. Includes approved applications for people that have already entered the United States. The Venezuela parole process started October 18, 2022 so numbers start then. The Cuba, Haiti, and Nicaragua parole processes started January 6, 2023 so CHN numbers start then.

Source: DHS Office of Immigration Statistics analysis of USCIS and OFO data.

## RESPONSE TO INTERROGATORY NO. 1

| I-765, Application for Employment Authorization For CHNV Approvals and Denials, by year and month Through March, 2023 | | | | U.S. Citizenship and Immigration Services | |
|---|---|---|---|---|---|
| Country | Year | Month | Approval | Denial | Total |
| Grand Total | | | 10,675 | -18 | 10,693 |
| Cuba | | | 3,216 | 4 | 3,220 |
| Cuba | 2023 | Feb | 967 | - | 967 |
| Cuba | 2023 | Mar | 2,249 | 4 | 2,253 |
| Haiti | | | 2,683 | 1 | 2,684 |
| Haiti | 2023 | Feb | 290 | - | 290 |
| Haiti | 2023 | Mar | 2,393 | 1 | 2,394 |
| Nicaragua | | | 333 | - | 333 |
| Nicaragua | 2023 | Feb | 32 | - | 32 |
| Nicaragua | 2023 | Mar | 301 | - | 301 |
| Venezuela | | | 4,443 | 13 | 4,456 |
| Venezuela | 2022 | Nov | 47 | - | 47 |
| Venezuela | 2022 | Dec | 850 | - | 850 |
| Venezuela | 2023 | Jan | 790 | 1 | 791 |
| Venezuela | 2023 | Feb | 787 | 3 | 790 |
| Venezuela | 2023 | Mar | 1,969 | 9 | 1,978 |

Notes:

1) This report reflects the most up to date data available at the time the database is queried

2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes

Source:

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

## RESPONSE TO INTERROGATORY NO. 2

| Country | Average Processing Time (In months) | Total Completions |
|---|---|---|
| **CNHV** | **1.2** | **138,254** |
| Cuba | 0.8 | 24,279 |
| Haiti | 0.9 | 38,523 |
| Nicaragua | 0.6 | 17,961 |
| Venezuela | 1.7 | 57,491 |

**CHNV Process Amendment**
**Guidance to IRIS Reviewers**

Background:

Because the demand for the Processes for Cuba, Haiti, Nicaragua, and Venezuela (CHNV) far outstrips the monthly limit of 30,000 travel authorizations, DHS is instituting a case prioritization mechanism based upon an open-ended question added to the Form I-134A, *Online Request to be a Supporter and Declaration of Financial Support*:

**"A grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit.  Please explain why a favorable exercise of discretion is merited for this individual."**

This question will be answered by the supporter in an open text field.  There is a minimum required character count of 750 and a maximum of 1500 characters (approximately 150-250 words). This question is a required field; thus, it is not possible to submit the form with this field left blank.

This question and guidance will only apply to cases filed with USCIS on or after July 13, 2023. USCIS is not requesting supporters who have previously filed a Form I-134A to amend their pending application.

The USCIS I-134A Reviewer will read this answer as part of the Form I-134A review and consider, taking into account the considerations described below, whether the explanation supports prioritization. If the Reviewer determines that the case warrants a confirmation and that the provided explanation is sufficient for prioritization, the case will proceed to the next step where the beneficiary will be invited to enter the online system and complete their stage of the process, including attesting that the explanation supporting the prioritization that was provided by the supporter on the I-134A is accurate. On the other hand, if the explanation provided by the supporter is not sufficient to support prioritization of the case, the case will be placed on hold and not permitted to proceed through to the next step of the process.

Considerations:

When considering whether a case should be prioritized based on the supporter's response to Part 2, Question 4, the reviewer should take the below considerations into account.

- Does the response demonstrate the need for pressing or immediate action or attention?
- Does the response demonstrate a concern for the beneficiary's welfare?
- Does the response demonstrate that parole would be helpful to a community or population?

The reviewer may also take into account how the reason expressed in the response compares to the reasons expressed in other responses.

For example, the Reviewer may consider whether the response references any of the following:

- o  General civil strife or political unrest;
- o  Rejoining with family;
- o  Medical needs or treatment;
- o  Vulnerabilities of either the beneficiary or a US-based person, including the need to provide caregiving assistance;
- o  Severe economic hardship

<u>Process</u>

- The I-134A Reviewer will review each I-134A per existing guidance.
- If, after review of the form and all accompanying evidence, the Reviewer determines that a non-confirmation is warranted for any reason under existing guidance, the non-confirmation should be issued, and the response to Part 2, Question 4 will not need to be considered.
- If, after review of the form and all accompanying evidence, the Reviewer determines that a confirmation is warranted under existing guidance, for Forms I-134A which include Part 2, Question 4, the Reviewer should proceed to consider whether the case should be prioritized.
  - o  If a need for prioritization has been articulated, the Reviewer should confirm the I-134A, and the case will proceed through the process.
    If an individualized need for prioritization has not been articulated, the reviewer should deprioritize the case by putting the case on hold and neither issuing a confirmation nor a non-confirmation.  When placing a case on Hold, please select **Other** and enter **"Eligible for Confirmation, being held for lack of prioritization."**



23-cv-00007_0179

Defendant's Exhibit L
6:23-cv-00007

# CHNV Parole Processes Change in Form I-134A

## Additional Question - Review

July 2023



U.S. Citizenship and Immigration Services

# Overview

1. Addition of New Question

2. Expected Review

23-cv-00007_0190

Defendant's Exhibit L
6:      0007

**U.S. Citizenship and Immigration Services**

# Form I-134A – New Question

Part 2. Information about the Beneficiary

Complete Part 2, regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

1. Beneficiary's Current Legal Name (Do not provide a nickname.)

Family Name (Last Name)    Given Name (First Name)    Middle Name

2. Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames. If you need extra space to complete this section, use the space provided in Part 8. Additional Information.

Family Name (Last Name)    Given Name (First Name)    Middle Name

3. If "Family Reunification Program" selected in Part 1, Item Number 2. Is this the individual listed as the    Yes  No principal beneficiary in your Family Reunification Parole Process invitation letter?

4. A grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Please explain why a favorable exercise of discretion is merited for this individual.

- New Question was added under Part 2, Question 4.

- "A grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Please explain why a favorable exercise of discretion is merited for this individual."

Defendant's Exhibit L
6:23-cv-00007

23-cv-00007_0181



# Form I-134A – New Question

- This question and guidance will only apply to cases filed with USCIS on or after July 13, 2023. USCIS is not requesting supporters who have previously filed a Form I-134A to amend their pending application.

- This question will be answered by the supporter in an open text field. There is a minimum required count of 150-250 words.

- This question is a required field; thus, it is not possible to submit the form with this field left blank.

23-cv-00007_0182

Defendant's Exhibit L
6:        0007



# Form I-134A ~ So what does this mean?

- The I-134A Reviewer will review each I-134A per existing guidance.

- If, after review of the form and all accompanying evidence, the Reviewer determines that a non-confirmation is warranted for any reason under existing guidance, the non-confirmation should be issued, and the response to Part 2, Question 4 will not need to be considered.

Defendant's Exhibit L
6:23-cv-00007

23-cv-00007_0183



# Form I-134A ~ So what does this mean

- If the Reviewer determines that a confirmation is warranted under existing guidance, for Forms I-134A which include Part 2, Question 4, the Reviewer should proceed to consider whether the case should be prioritized.

  - If a need for prioritization has been articulated, the Reviewer should confirm the I-134A, and the case will proceed through the process.

- If an individualized need for prioritization has not been articulated, the reviewer should deprioritize the case by putting the case on hold and neither issuing a confirmation nor a non-confirmation.

  - When placing a case on Hold, please select **Other** and enter **"Eligible for Confirmation, being held for lack of prioritization."**

  - In addition, place the confirmable case that is not being prioritized on the **Tracker**



Defendants Exhibit L
6:       0007



# Form I-134A ~ What is needed?

- You should look at:
  - Does the response demonstrate the need for pressing or immediate action or attention?
  - Does the response demonstrate a concern for the beneficiary's welfare?
  - Does the response demonstrate that parole would be helpful to a community or population?

- For example, the Reviewer may consider whether the response references any of the following:
  - General civil strife or political unrest;
  - Rejoining with family;
  - Medical needs or treatment;
  - Vulnerabilities of either the beneficiary or a US-based person, including the need to provide caregiving assistance;
  - Severe economic hardship

Defendant's Exhibit L
6:23-cv-00007

23-cv-00007_0185



**U.S. Citizenship and Immigration Services**

# Disclaimer

This training module is intended solely to provide training. It is not intended to, does not, and may not be relied upon to create or confer any right(s) or benefit(s), substantive or procedural, enforceable at law by any individual or other party in benefit applications before USCIS, in removal proceedings, in litigation with the United States, or in any other form or manner. This training module does not have the force of law, or of a DHS directive.

23-cv-00007_0186

Defendant's Exhibit L
6: 0007



U.S. Citizenship
and Immigration
Services

# Dissemination



This presentation may not be reproduced or further disseminated without the express written consent of the Office of Policy & Strategy (OP&S) and Immigration Records and Identity Services (IRIS).

Defendant's Exhibit L
6:23-cv-00007

23-cv-00007_0187

# United States District Court
## Southern District of Texas
### Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## TEXAS'S RESPONSE TO DEFENDANTS' DISCOVERY REQUESTS

Texas serves the following Responses and Objections to Defendants' First Set of Requests for Production, Interrogatories, and Requests for Admission to Plaintiffs.

Dated May 19, 2023.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

*/s/ Leif A. Olson*
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Deputy Chief, Special Litigation
Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation

1

Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

### CERTIFICATE OF SERVICE

I certify that on May 19, 2023, I served a copy of this document by electronic mail to all counsel listed below:

EREZ REUVENI
Assistant Director
Erez.R.Reuveni@usdoj.gov

BRIAN WARD
Senior Litigation Counsel
Brian.C.Ward@usdoj.gov

JOSEPH A. DARROW
Joseph.A.Darrow@usdoj.gov

ELISSA P. FUDIM
Elissa.P.Fudim@usdoj.gov

ERIN T. RYAN
Erin.T.Ryan@usdoj.gov
Trial Attorneys

U.S. DEPARTMENT OF JUSTICE
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 307-4293

*Counsel for Federal Defendants*

Esther H. Sung
esther.sung@justiceactioncenter.org
Karen C. Tumlin
karen.tumlin@justiceactioncenter.org
Jane Bentrott
jane.bentrott@justiceactioncenter.org
Lauren Michel Wilfong*
lauren.wilfong@justiceactioncenter.org
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272

Daniel Hatoum
daniel.hatoum@raicestexas.org
Vanessa Rivas-Bernardy
vanessa.rivas@raicestexas.org
The Refugee and Immigrant Center
for Education and Legal Services
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
(210) 960-3206

Monika Y. Langarica
langarica@law.ucla.edu

2

Defendant's Exhibit M
6:23-cv-00007

Ahilan T. Arulanantham
arulanantham@law.ucla.edu
Center for Immigration Law and
Policy
UCLA School of Law
385 Charles E. Young Dr. E., Box
951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

*Counsel for Intervenors*

*/s/ Ryan D. Walters*

3

Defendant's Exhibit M
6:23-cv-00007

## OBJECTION TO DEFINITION

Texas objects to Defendants' definition of the term "You" as " any Plaintiff State, including all its agencies, subdivisions, and officers acting in official capacity."

"A party to a cause of action is a person who is both named as a party and subject to the court's jurisdiction." *Nagle v. Lee*, 807 F.2d 435, 440 (5th Cir. 1987). Texas's executive department is not like the federal executive branch— a complete unit with "one man" wielding the entire executive power to whom all "lesser officers must" be accountable. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) (quotations omitted). "[U]nlike the federal constitution, the Texas Constitution does not vest the executive power solely in one chief executive. Instead, the executive power is spread across several distinct elected offices." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022). The design creates a "decentralize[d] executive authority." *State v. Brabson*, 976 S.W.2d 182, 186 (Tex. Crim. App. 2012) (Womack, J., concurring).

The Attorney General of Texas, who brought this suit on Texas's behalf, does not have a free-floating Executive power to direct State agencies to take any action. Texas's "Executive" is non-unitary to the point where "neither the Governor nor the Attorney General has statutory authority [even] to directly control" the actions of many non-elected departments. *In re Abbott*, 645 S.W.3d at 281.Under Texas law, the Attorney General represents "the state *qua* state and as *parens patriae*." *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997). Texas's discovery obligations are limited to information or documents in the possession or control of the Attorney General of Texas.

Additionally, the State of Texas has more than 320,000 full-time employees and thousands more part-time employees spread across the general government, health and human services, public education, higher education, the judiciary, public safety and criminal justice, natural resources, business and economic development, regulatory and other state agencies, the legislature, and the Office of the Attorney General. This extends even more broadly to political subdivisions within the State. It is impossible to represent, even after a reasonable and diligent search, that all, each, or every bit of information falling within a description can or has been assembled.

However, Texas has made diligent efforts to obtain responsive information and documents from what it has determined would be the most likely sources.

4

Such information or documents now in the possession of the Attorney General of Texas will be noted in each response.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1:** How many Cuban, Haitian, and Nicaraguan noncitizens live in your State? Provide this data for each of these populations for the relevant period, by year and month, and since January 6, 2023.

> **Answer to Interrogatory No. 1:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 1.

**Interrogatory No. 2:** How many Cuba, Haitian, and Nicaraguan noncitizens paroled into the country under the Cuban, Haitian, and Nicaraguan Parole Processes live in your State?

> **Answer to Interrogatory No. 2:** Texas does not track this information.

**Interrogatory No. 3:** How many Venezuelan noncitizens live in your State? Provide this data for the relevant period, by year and month, and since October 18, 2022.

> **Answer to Interrogatory No. 3:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 2.

**Interrogatory No. 4:** How many Venezuelan noncitizens paroled into the country under the Venezuelan Parole Process live in your State?

> **Answer to Interrogatory No. 4:** Texas does not track this information.

**Interrogatory No. 5:** For each of Interrogatories No. 1 and 3, state how many of these individuals were paroled into the United States under the CHNV Parole Processes and how many entered the United States through a process other than the CHNV Parole Processes.

> **Answer to Interrogatory No. 5:** Texas does not track this information.

Defendant's Exhibit M
6:23-cv-00007

**Interrogatory No. 6:** Describe your means of tracking the data requested in Interrogatories No. 1 to 5. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 6:** Texas has responded to this in its Responses to Interrogatories No. 1 to 5.

**Interrogatory No. 7:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have been convicted of crimes in your State during the relevant period? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 7:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order:

Subject to and without waiving these objections, a list of citizens of Cuba, Haiti, Nicaragua, and Venezuela who have been incarcerated or confined by the Texas Department of Criminal Justice (with dates of sentence for the former) are produced at TEXAS_000172–TEXAS_000173.

**Interrogatory No. 8:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received healthcare and medical services for which some or all the cost has been paid by your State without reimbursement, and how much money did you spend on such services. Provide data for expenditures which occurred during the relevant period, by year, and since the Effective Dates.

6

**Answer to Interrogatory No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, Texas states that neither it nor the Texas Health and Human Services Commission tracks the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000162. As to uncompensated care for illegal aliens by state public hospital districts, the Texas Health and Human Services Commission has tracked those costs for the relevant time periods.

**Interrogatory No. 9:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received state-subsidized

7

public education and how much money was spent on providing such services? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 9:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency tracks this information.

**Interrogatory No. 10:** What costs, if any, has your State incurred from issuing drivers' licenses or State-identification-documents to Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State? Provide data for the relevant period, by year, and since the Effective Dates.

8

**Answer to Interrogatory No. 10:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: While the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are U.S. citizens or not)—see also the documents at TEXAS_000022.

**Interrogatory No. 11:** What costs, if any, has your State incurred from providing family and child welfare social services to Cuban, Haitian, Nicaraguan and Venezuelan noncitizens who live in your State. Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 11:** Texas objects that it is not alleging injury on this basis for standing purposes. Texas also objects that it is

<div align="center">9</div>

entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: the Texas Department of Family and Protective Services tracks costs incurred for noncitizens born in Cuba, Haiti, Nicaragua, and Venezuela. *See* documents produced at TEXAS_000001.

**Interrogatory No. 12:** For each of Interrogatories No. 7 to 11, state how many of the individuals were paroled into the United States under the CHNV Parole Processes, how many entered the United States other than through the CHNV Parole Processes, and your means of tracking such data. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 12:** Texas does not track this information.

Defendant's Exhibit M
6:23-cv-00007

**Interrogatory No. 13:** For each of Interrogatories No. 7 to 11, state your means of tracking the data. Identify all sources of data and their author(s).

 **Answer to Interrogatory No. 13:** Texas has responded to this Interrogatory in its Responses to Interrogatories No. 7 to 11.

**Interrogatory No. 14:** Describe your injury with respect to each of your claims for relief in the Amended Complaint, broken down by claim. Identify which documents you have provided in response to these Requests support each claim.

 **Answer to Interrogatory No. 14:** Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the increased presence of aliens in Texas. In addition to the declarations Texas has submitted in its motion for preliminary injunction briefing (and supplemental ones it is entitled to submit before trial), Texas has produced documents relating to costs relating to driver licenses (produced at TEXAS_000002–TEXAS_000099), education (produced at TEXAS_003239–TEXAS_003255), healthcare (produced at TEXAS_000100–TEXAS_000162), law enforcement (produced at TEXAS_000163–TEXAS_003238), and family protective services (produced at TEXAS_000001).

**Interrogatory No. 15:** To what extent do noncitizens present in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives. Specify the categories of economic value and the amount of money earned from each category. To the extent possible, specify the economic contribution by Cubans, Haitians, Nicaraguans and Venezuelans nationals specifically.

 **Answer to Interrogatory No. 15:** Texas objects to this request. Any purported benefits Plaintiff receives as a result of the challenged policies are irrelevant to Plaintiff's standing based on its injuries from the same. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and

<div align="center">11</div>

citations omitted). Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks this information.

**Interrogatory No. 16:** For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

**Answer to Interrogatory No. 16:** Texas denies Request No. 22 because an injury sufficient for standing is not undermined by an offset in benefits. *See Texas v. United States*, 555 F. Supp. 3d 351, 382 (S.D. Tex. 2021) ("even if the Government *could* demonstrate that increased enforcement in the prioritized categories might displace a drop in the total number of detained aliens resulting from the deprioritized categories, this "offset" would be irrelevant as a matter of law.") (Tipton, J.), *appeal dismissed,* No. 21-40618, 2022 WL 517281 (5th Cir. Feb. 11, 2022). Texas also denies Request No. 22 because a hypothetical situation where fewer aliens from those countries came to live in Texas after institution of the CHNV Parole Processes would not necessarily mean that the latter caused the former.

Texas partially denies Request Nos. 8 & 9 on the bases identified in those responses.

OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:** Provide all documents and data that show the number of Cubans, Haitians, and Nicaraguans who live in your State, by year, during the relevant period and since January 6, 2023, broken down by nationality.

**Response to Request No. 1:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 2:** Provide all documents and data that show the number of Venezuelans who live in your State, by year, during the relevant period and since October 18, 2022.

**Response to Request No. 2:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines

Defendant's Exhibit M
6:23-cv-00007

federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 3:** Provide all documents and data that show the number of Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States under the CHNV Parole Processes specifically, who live in your State.

**Response to Request No. 3:** Texas does not track this information.

**Request for Production No. 4:** Provide all documents and data that show the cost to your State from providing unreimbursed medical care to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 4:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But] MPP is precisely the sort of large-scale policy that's amenable to challenge

13

using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Health and Human Services Commission does not track the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000100–TEXAS_000162.

**Request for Production No. 5:** Provide all documents and data that show the cost to your State from providing public education to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 5:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis,* it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

14

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency does not track this information but see documents produced at TEXAS_003239–TEXAS_003255.

**Request for Production No. 6:** Provide all documents and data that show the cost to your State from providing social services to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group, and the type of social service.

**Response to Request No. 6:** Texas objects to this request. It is unduly burdensome and not proportional to the needs of the case. It is impossible for Texas to describe each and every "social service" as requested in the interrogatory. It also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But]

15

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving its objections, Texas has submitted the evidence of the social services provided to illegal aliens that it intends to rely on and is entitled to supplement that evidence before trial. Texas provides driver licenses, education, health care, and law-enforcement services to illegal aliens in the State.

**Request for Production No. 7:** Provide all documents and data that show the cost to your State from providing driver's licenses or other identification documents to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 7:** Texas also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling Texas.

Plaintiff also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

16

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, while the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are US citizens or not). Documents are being produced at TEXAS_000002–TEXAS_000099.

**Request for Production No. 8:** Provide all documents and data that show the cost to your State associated with law enforcement related to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But]

17

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, documents are being produced at TEXAS_000163–TEXAS_003238, particularly TEXAS_000172–TEXAS_000173.

**Request for Production No. 9:** Provide all documents relating to any and all additional injuries that you allege have been caused, or will be caused, to you by noncitizens who enter the United States pursuant to the CHNV Parole Processes.

**Response to Request No. 9:** Texas objects to this request as the scheduling order allows supplementation of submitted declarations before trial. Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order—Texas provides driver licenses, education, healthcare, and law-enforcement services to illegal aliens in the State.

**Request for Production No. 10:** Provide all documents and data that indicate to what extent Cubans, Haitians, Nicaraguans, and Venezuelans who live in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives, by year, during the relevant time and since the Effective Dates.

**Response to Request No. 10:** Texas objects to this request. Any purported benefits Texas receives from the challenged policies are irrelevant to its standing based on its injuries caused by those policies. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and citations omitted).

18

Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks this information.

**Request for Production No. 11:** Provide all documents and data consulted or relied upon in responding to Defendants' accompanying Interrogatories and Requests for Admission.

**Response to Request No. 11:** Copies of all such documents and data are included in the responses to the other Requests for Production of Documents. Communications that constitute attorney-client privilege and work product are not being produced for any responses.

## RESPONSES TO REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Cubans, Haitians, Nicaraguans and Venezuelans paroled into the United States pursuant to the CHNV Parole Processes have been inspected by immigration authorities and permitted to enter the United States.

**Response to Request No. 1:** Texas can neither admit nor deny this request as it does not have knowledge of Defendants' actions regarding any inspections of Cubans, Haitians, Nicaraguans, and Venezuelans made during implementation of the CHNV Parole Processes.

**Request for Admission No. 2:** You lack any basis to assess the cost to your State caused by any Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States pursuant to the CHNV Parole Processes since the Effective Dates.

**Response to Request No. 2:** Texas can neither admit nor deny this request as it does not have knowledge of how many aliens from those countries have been paroled into Texas pursuant to the CHNV Parole Processes.

**Request for Admission No. 3:** You have no evidence that you incurred more costs from Cubans, Haitians, and Nicaraguans entering your State each month since January 6, 2023 than you incurred each month in 2022 from the same populations.

**Response to Request No. 3:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered Texas during these time periods.

19

**Request for Admission No. 4:** You have no evidence that you incurred more costs from Venezuelans entering your State each month since October 18, 2022 than you incurred each earlier month in 2022 from the same population.

> **Response to Request No. 4:** Texas can neither admit nor deny this request as it does not have knowledge of how many Venezuelans have entered Texas during these time periods.

**Request for Admission No. 5:** You cannot quantify how much money your State would save if no Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens granted parole through the CHNV Parole Processes were present in your State.

> **Response to Request No. 5:** Texas can neither admit nor deny this request as it concerns a future event contingent on many factors; the request does not concern facts that have ever been in existence. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny. The request therefore does not fall within either of the two categories of information for which requests for admission may be made. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to "(A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents.").

**Request for Admission No. 6:** You do not track unreimbursed medical expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

> **Response to Request No. 6:** Texas admits that it does not track this information and denies that the Texas Health and Human Services Commission does not have information regarding unreimbursed Emergency Medicaid of CHIP-Perinatal payments for citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000162).

**Request for Admission No. 7:** You do not track unreimbursed educational expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

20

**Response to Request No. 7:** Texas admits that neither it nor the Texas Education Agency tracks either category of information.

**Request for Admission No. 8:** You do not track unreimbursed family and child welfare service expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 8:** Texas admits that it does not track such information. Texas denies that the Texas Department of Family and Protective Services does not track unreimbursed family and child welfare service expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000001) but admits that it does not track such expenses for those released under the CHNV Parole processes specifically.

**Request for Admission No. 9:** You do not track unreimbursed law enforcement expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 9:** Texas admits that it does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally, or under the CHNV Parole Processes specifically. Texas denies that the Texas Department of Criminal Justice does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally (see documents produced at TEXAS_000172–TEXAS_000173) but admits that the Texas Department of Criminal Justice does not track such information under the CHNV Parole Processes specifically.

**Request for Admission No. 10:** You do not track unreimbursed drivers' licensing and state-identification-document expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 10:** Texas admits that it does not track unreimbursed driver licensing and state-identification-document expenditures made specifically on behalf of citizens of Cuba, Haiti,

21

Nicaragua, and Venezuela, either released into the country generally or under the CHNV Parole Processes. Texas admits that the Texas Department of Public Safety does not track the citizenship of driver license or state-identification-document holders, including for citizens of Cuba, Haiti, Nicaragua, and Venezuela (but does track country of birth and whether they are citizens of the United States, see documents produced at TEXAS_000022), whether released into the country generally or under the CHNV Parole Processes.

**Request for Admission No. 11:** You have not made any changes to State budgeting, programs, or services in response to Defendants' implementation of the CHNV Parole Processes.

**Response to Request No. 11:** Texas can neither admit nor deny this request as it is contingent on many factors, including the motivations of each member of the State Legislature and whether such a motivation can be attributed to the Legislature as a whole, or motivations within other State agencies outside its control. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny.

**Request for Admission No. 12:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's revenue by paying taxes.

**Response to Request No. 12:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 13:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's economy through their labor and purchase of goods or services.

**Response to Request No. 13:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 14:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Parole Processes than were entering prior to the promulgation of these processes.

Defendant's Exhibit M
6:23-cv-00007

**Response to Request No. 14:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered the United States during these time periods.

**Request for Admission No. 15:** From September 2022 to February 2023, the number of unique encounters of Venezuelans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: September 33,494, October 20,804, November 6,253, December 6,067, January 2,552, February 1,172, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Venezuelans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: September 33,804, October, 22,037, November 7,955, December 8,166, January 9,100, February 5,559, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 15:** Texas admits that the referred-to web pages say that, but it can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 16:** From December 2022 to February 2023, the number of unique encounters of Cubans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 42,183, January 6,053, February 140, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Cubans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 34,710, January 6,433, February 753, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 16:** Texas admits that the press release says that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 17:** From December 2022 to February 2023, the number unique encounters of Haitians at the Southwest border (in. other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 3,928, January 2,238, February 168, *see* https://www.cbp.gov/newsroom/national- media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Haitians encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 5,138, January 3,174,

Defendant's Exhibit M
6:23-cv-00007

February 7,430, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 17:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 18:** From December 2022 to February 2023, the number of unique encounters of Nicaraguans encountered at the Southwest border, (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 34,868, January 3,223, February 279, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Nicaraguans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 35,387, January 3,377, February 639, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 18:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 19:** Following the implementation of the CHNV Parole Processes for Cuban, Haitian, and Nicaraguan noncitizens, and changes to the implementation of the process for Venezuelans, Border Patrol encounters with Cubans, Haitians, Nicaraguans, and Venezuelans between ports of entry at the southwest border declined from a 7-day average of 1,231 on January 5, to 59 on January 31 (a 95% drop in just three weeks), *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, to just 46 on February 28—a drop of 98% in just two months. *See* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update.

**Response to Request No. 19:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 20:** You have no basis for disputing the accuracy of the data set forth on the following government websites: https://www.cbp.gov/newsroom/national-media- release/cbp-releases-february-

24

2023-monthly-operational-update,        https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update,  https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 20:** Texas admits that it has no basis to dispute the accuracy of the data on the listed web pages but can neither admit nor deny that they are accurate.

**Request for Admission No. 21:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have come to live in your State in the three months since the promulgation of the CHNV Parole Processes than did in the three months prior to the promulgation of these processes.

**Response to Request No. 21:** Texas can neither admit nor deny this because the information that would allow it to do so is in Defendants' possession.

**Request for Admission No. 22:** If fewer Cubans, Haitians, Nicaraguans, and Venezuelans were paroled or otherwise allowed to enter the country after the CHNV Parole Processes were instituted than before the CHNV Parole Processes were instituted, and as a result fewer Cubans, Haitians, Nicaraguans, and Venezuelans came to live in your States, you have no injury, and thus no standing in this case.

**Response to Request No. 22:** Denied.

**Request for Admission No. 23:** Fewer Cuban, Haitian, Nicaraguan and Venezuelan nationals are released into the United States as a result of Mexico agreeing to accept the returns of Cuban, Haitian, Nicaraguan and Venezuelan nationals.

**Response to Request No. 23:** Texas does not have sufficient information to admit or deny.

25

Defendant's Exhibit M
6:23-cv-00007

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## TEXAS'S [CORRECTED] RESPONSE TO DEFENDANTS' DISCOVERY REQUESTS

    Texas serves the following Responses and Objections to Defendants' First Set of Requests for Production, Interrogatories, and Requests for Admission to Plaintiffs.

Dated May 23, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

Respectfully submitted.

*/s/ Leif A. Olson*
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Deputy Chief, Special Litigation
Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON

1

America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

## CERTIFICATE OF SERVICE

I certify that on May 23, 2023, I served a copy of this document by
electronic mail to all counsel listed below:

EREZ REUVENI
Assistant Director
Erez.R.Reuveni@usdoj.gov

BRIAN WARD
Senior Litigation Counsel
Brian.C.Ward@usdoj.gov

JOSEPH A. DARROW
Joseph.A.Darrow@usdoj.gov

ELISSA P. FUDIM
Elissa.P.Fudim@usdoj.gov

ERIN T. RYAN
Erin.T.Ryan@usdoj.gov
Trial Attorneys

U.S. DEPARTMENT OF JUSTICE
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 307-4293

*Counsel for Federal Defendants*

Esther H. Sung
esther.sung@justiceactioncenter.org
Karen C. Tumlin
karen.tumlin@justiceactioncenter.org
Jane Bentrott
jane.bentrott@justiceactioncenter.org
Lauren Michel Wilfong*
lauren.wilfong@justiceactioncenter.org
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272

Daniel Hatoum
daniel.hatoum@raicestexas.org
Vanessa Rivas-Bernardy
vanessa.rivas@raicestexas.org
The Refugee and Immigrant Center
for Education and Legal Services
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
(210) 960-3206

Monika Y. Langarica

2

Defendant's Exhibit N
6:23-cv-00007

langarica@law.ucla.edu
Ahilan T. Arulanantham
arulanantham@law.ucla.edu
Center for Immigration Law and
Policy
UCLA School of Law
385 Charles E. Young Dr. E., Box
951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

*Counsel for Intervenors*

*/s/ Ryan D. Walters*

3

Defendant's Exhibit N
6:23-cv-00007

## OBJECTION TO DEFINITION

Texas objects to Defendants' definition of the term "You" as " any Plaintiff State, including all its agencies, subdivisions, and officers acting in official capacity."

"A party to a cause of action is a person who is both named as a party and subject to the court's jurisdiction." *Nagle v. Lee*, 807 F.2d 435, 440 (5th Cir. 1987). Texas's executive department is not like the federal executive branch— a complete unit with "one man" wielding the entire executive power to whom all "lesser officers must" be accountable. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) (quotations omitted). "[U]nlike the federal constitution, the Texas Constitution does not vest the executive power solely in one chief executive. Instead, the executive power is spread across several distinct elected offices." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022). The design creates a "decentralize[d] executive authority." *State v. Brabson*, 976 S.W.2d 182, 186 (Tex. Crim. App. 2012) (Womack, J., concurring).

The Attorney General of Texas, who brought this suit on Texas's behalf, does not have a free-floating Executive power to direct State agencies to take any action. Texas's "Executive" is non-unitary to the point where "neither the Governor nor the Attorney General has statutory authority [even] to directly control" the actions of many non-elected departments. *In re Abbott*, 645 S.W.3d at 281.Under Texas law, the Attorney General represents "the state *qua* state and as *parens patriae*." *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997). Texas's discovery obligations are limited to information or documents in the possession or control of the Attorney General of Texas.

Additionally, the State of Texas has more than 320,000 full-time employees and thousands more part-time employees spread across the general government, health and human services, public education, higher education, the judiciary, public safety and criminal justice, natural resources, business and economic development, regulatory and other state agencies, the legislature, and the Office of the Attorney General. This extends even more broadly to political subdivisions within the State. It is impossible to represent, even after a reasonable and diligent search, that all, each, or every bit of information falling within a description can or has been assembled.

However, Texas has made diligent efforts to obtain responsive information and documents from what it has determined would be the most likely sources.

Defendant's Exhibit N
6:23-cv-00007

Such information or documents now in the possession of the Attorney General of Texas will be noted in each response.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1:** How many Cuban, Haitian, and Nicaraguan noncitizens live in your State? Provide this data for each of these populations for the relevant period, by year and month, and since January 6, 2023.

> **Answer to Interrogatory No. 1:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 1.

**Interrogatory No. 2:** How many Cuba, Haitian, and Nicaraguan noncitizens paroled into the country under the Cuban, Haitian, and Nicaraguan Parole Processes live in your State?

> **Answer to Interrogatory No. 2:** Texas does not track this information.

**Interrogatory No. 3:** How many Venezuelan noncitizens live in your State? Provide this data for the relevant period, by year and month, and since October 18, 2022.

> **Answer to Interrogatory No. 3:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 2.

**Interrogatory No. 4:** How many Venezuelan noncitizens paroled into the country under the Venezuelan Parole Process live in your State?

> **Answer to Interrogatory No. 4:** Texas does not track this information.

**Interrogatory No. 5:** For each of Interrogatories No. 1 and 3, state how many of these individuals were paroled into the United States under the CHNV Parole Processes and how many entered the United States through a process other than the CHNV Parole Processes.

> **Answer to Interrogatory No. 5:** Texas does not track this information.

5

**Interrogatory No. 6:** Describe your means of tracking the data requested in Interrogatories No. 1 to 5. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 6:** Texas has responded to this in its Responses to Interrogatories No. 1 to 5.

**Interrogatory No. 7:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have been convicted of crimes in your State during the relevant period? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 7:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Subject to and without waiving these objections, a list of citizens of Cuba, Haiti, Nicaragua, and Venezuela who have been incarcerated or confined by the Texas Department of Criminal Justice (with dates of sentence for the former) are produced at TEXAS_000172–TEXAS_000173.

**Interrogatory No. 8:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received healthcare and medical services for which some or all the cost has been paid by your State without reimbursement, and how much money did you spend on such services. Provide data for expenditures which occurred during the relevant period, by year, and since the Effective Dates.

6

Defendant's Exhibit N
6:23-cv-00007

**Answer to Interrogatory No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts' for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, Texas states that neither it nor the Texas Health and Human Services Commission tracks the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000162. As to uncompensated care for illegal aliens by state public hospital districts, the Texas Health and Human Services Commission has not tracked those costs for the relevant time periods.

**Interrogatory No. 9:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received state-subsidized

7

public education and how much money was spent on providing such services? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 9:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency does not track this information.

**Interrogatory No. 10:** What costs, if any, has your State incurred from issuing drivers' licenses or State-identification-documents to Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State? Provide data for the relevant period, by year, and since the Effective Dates.

Defendant's Exhibit N
6:23-cv-00007

**Answer to Interrogatory No. 10:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: While the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are U.S. citizens or not)—see also the documents at TEXAS_000022.

**Interrogatory No. 11:** What costs, if any, has your State incurred from providing family and child welfare social services to Cuban, Haitian, Nicaraguan and Venezuelan noncitizens who live in your State. Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 11:** Texas objects that it is not alleging injury on this basis for standing purposes. Texas also objects that it is

<div align="center">9</div>

entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: the Texas Department of Family and Protective Services tracks costs incurred for noncitizens born in Cuba, Haiti, Nicaragua, and Venezuela. *See* documents produced at TEXAS_000001.

**Interrogatory No. 12:** For each of Interrogatories No. 7 to 11, state how many of the individuals were paroled into the United States under the CHNV Parole Processes, how many entered the United States other than through the CHNV Parole Processes, and your means of tracking such data. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 12:** Texas does not track this information.

10

**Interrogatory No. 13:** For each of Interrogatories No. 7 to 11, state your means of tracking the data. Identify all sources of data and their author(s).

> **Answer to Interrogatory No. 13:** Texas has responded to this Interrogatory in its Responses to Interrogatories No. 7 to 11.

**Interrogatory No. 14:** Describe your injury with respect to each of your claims for relief in the Amended Complaint, broken down by claim. Identify which documents you have provided in response to these Requests support each claim.

> **Answer to Interrogatory No. 14:** Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the increased presence of aliens in Texas. In addition to the declarations Texas has submitted in its motion for preliminary injunction briefing (and supplemental ones it is entitled to submit before trial), Texas has produced documents relating to costs relating to driver licenses (produced at TEXAS_000002–TEXAS_000099), education (produced at TEXAS_003239–TEXAS_003255), healthcare (produced at TEXAS_000100–TEXAS_000162), law enforcement (produced at TEXAS_000163–TEXAS_003238), and family protective services (produced at TEXAS_000001).

**Interrogatory No. 15:** To what extent do noncitizens present in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives. Specify the categories of economic value and the amount of money earned from each category. To the extent possible, specify the economic contribution by Cubans, Haitians, Nicaraguans and Venezuelans nationals specifically.

> **Answer to Interrogatory No. 15:** Texas objects to this request. Any purported benefits Plaintiff receives as a result of the challenged policies are irrelevant to Plaintiff's standing based on its injuries from the same. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and

<div align="center">11</div>

citations omitted). Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks this information.

**Interrogatory No. 16:** For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

**Answer to Interrogatory No. 16:** Texas denies Request No. 22 because an injury sufficient for standing is not undermined by an offset in benefits. *See Texas v. United States*, 555 F. Supp. 3d 351, 382 (S.D. Tex. 2021) ("even if the Government *could* demonstrate that increased enforcement in the prioritized categories might displace a drop in the total number of detained aliens resulting from the deprioritized categories, this "offset" would be irrelevant as a matter of law.") (Tipton, J.), *appeal dismissed,* No. 21-40618, 2022 WL 517281 (5th Cir. Feb. 11, 2022). Texas also denies Request No. 22 because a hypothetical situation where fewer aliens from those countries came to live in Texas after institution of the CHNV Parole Processes would not necessarily mean that the latter caused the former.

Texas partially denies Request Nos. 8 & 9 on the bases identified in those responses.

### OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:** Provide all documents and data that show the number of Cubans, Haitians, and Nicaraguans who live in your State, by year, during the relevant period and since January 6, 2023, broken down by nationality.

**Response to Request No. 1:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 2:** Provide all documents and data that show the number of Venezuelans who live in your State, by year, during the relevant period and since October 18, 2022.

**Response to Request No. 2:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines

<div align="center">12</div>

federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 3:** Provide all documents and data that show the number of Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States under the CHNV Parole Processes specifically, who live in your State.

**Response to Request No. 3:** Texas does not track this information.

**Request for Production No. 4:** Provide all documents and data that show the cost to your State from providing unreimbursed medical care to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 4:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.")  (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis,* it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden,* 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge

13

using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Health and Human Services Commission does not track the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000100–TEXAS_000162.

**Request for Production No. 5:** Provide all documents and data that show the cost to your State from providing public education to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 5:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But]

14

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency does not track this information but see documents produced at TEXAS_003239–TEXAS_003255.

**Request for Production No. 6:** Provide all documents and data that show the cost to your State from providing social services to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group, and the type of social service.

**Response to Request No. 6:** Texas objects to this request. It is unduly burdensome and not proportional to the needs of the case. It is impossible for Texas to describe each and every "social service" as requested in the interrogatory. It also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

Defendant's Exhibit N
6:23-cv-00007

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving its objections, Texas has submitted the evidence of the social services provided to illegal aliens that it intends to rely on and is entitled to supplement that evidence before trial. Texas provides driver licenses, education, health care, and law-enforcement services to illegal aliens in the State.

**Request for Production No. 7:** Provide all documents and data that show the cost to your State from providing driver's licenses or other identification documents to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 7:** Texas also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas,* 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis,* it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling Texas.

Plaintiff also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden,* 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But]

16

Defendant's Exhibit N
6:23-cv-00007

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, while the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are US citizens or not). Documents are being produced at TEXAS_000002–TEXAS_000099.

**Request for Production No. 8:** Provide all documents and data that show the cost to your State associated with law enforcement related to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262. 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

17

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, documents are being produced at TEXAS_000163–TEXAS_003238, particularly TEXAS_000172–TEXAS_000173.

**Request for Production No. 9:** Provide all documents relating to any and all additional injuries that you allege have been caused, or will be caused, to you by noncitizens who enter the United States pursuant to the CHNV Parole Processes.

**Response to Request No. 9:** Texas objects to this request as the scheduling order allows supplementation of submitted declarations before trial. Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order—Texas provides driver licenses, education, healthcare, and law-enforcement services to illegal aliens in the State.

**Request for Production No. 10:** Provide all documents and data that indicate to what extent Cubans, Haitians, Nicaraguans, and Venezuelans who live in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives, by year, during the relevant time and since the Effective Dates.

**Response to Request No. 10:** Texas objects to this request. Any purported benefits Texas receives from the challenged policies are irrelevant to its standing based on its injuries caused by those policies. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and citations omitted).

18

Subject to and without waiving this objection, neither the Texas
Comptroller of Public Accounts nor the Texas Demographic Center tracks
this information.

**Request for Production No. 11:** Provide all documents and data consulted
or relied upon in responding to Defendants' accompanying Interrogatories and
Requests for Admission.

> **Response to Request No. 11:** Copies of all such documents and data are
> included in the responses to the other Requests for Production of
> Documents. Communications that constitute attorney-client privilege and
> work product are not being produced for any responses.

## RESPONSES TO REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Cubans, Haitians, Nicaraguans and
Venezuelans paroled into the United States pursuant to the CHNV Parole
Processes have been inspected by immigration authorities and permitted to
enter the United States.

> **Response to Request No. 1:** Texas can neither admit nor deny this
> request as it does not have knowledge of Defendants' actions regarding
> any inspections of Cubans, Haitians, Nicaraguans, and Venezuelans made
> during implementation of the CHNV Parole Processes.

**Request for Admission No. 2:** You lack any basis to assess the cost to your
State caused by any Cubans, Haitians, Nicaraguans, and Venezuelans paroled
into the United States pursuant to the CHNV Parole Processes since the
Effective Dates.

> **Response to Request No. 2:** Texas can neither admit nor deny this
> request as it does not have knowledge of how many aliens from those
> countries have been paroled into Texas pursuant to the CHNV Parole
> Processes.

**Request for Admission No. 3:** You have no evidence that you incurred more
costs from Cubans, Haitians, and Nicaraguans entering your State each month
since January 6, 2023 than you incurred each month in 2022 from the same
populations.

> **Response to Request No. 3:** Texas can neither admit nor deny this
> request as it does not have knowledge of how many Cubans, Haitians, and
> Nicaraguans have entered Texas during these time periods.

Defendant's Exhibit N
6:23-cv-00007

**Request for Admission No. 4:** You have no evidence that you incurred more costs from Venezuelans entering your State each month since October 18, 2022 than you incurred each earlier month in 2022 from the same population.

> **Response to Request No. 4:** Texas can neither admit nor deny this request as it does not have knowledge of how many Venezuelans have entered Texas during these time periods.

**Request for Admission No. 5:** You cannot quantify how much money your State would save if no Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens granted parole through the CHNV Parole Processes were present in your State.

> **Response to Request No. 5:** Texas can neither admit nor deny this request as it concerns a future event contingent on many factors; the request does not concern facts that have ever been in existence. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny. The request therefore does not fall within either of the two categories of information for which requests for admission may be made. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to "(A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents.").

**Request for Admission No. 6:** You do not track unreimbursed medical expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

> **Response to Request No. 6:** Texas admits that it does not track this information and denies that the Texas Health and Human Services Commission does not have information regarding unreimbursed Emergency Medicaid of CHIP-Perinatal payments for citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000162).

**Request for Admission No. 7:** You do not track unreimbursed educational expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

Defendant's Exhibit N
6:23-cv-00007

**Response to Request No. 7:** Texas admits that neither it nor the Texas Education Agency tracks either category of information.

**Request for Admission No. 8:** You do not track unreimbursed family and child welfare service expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 8:** Texas admits that it does not track such information. Texas denies that the Texas Department of Family and Protective Services does not track unreimbursed family and child welfare service expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000001) but admits that it does not track such expenses for those released under the CHNV Parole processes specifically.

**Request for Admission No. 9:** You do not track unreimbursed law enforcement expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 9:** Texas admits that it does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally, or under the CHNV Parole Processes specifically. Texas denies that the Texas Department of Criminal Justice does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally (see documents produced at TEXAS_000172– TEXAS_000173) but admits that the Texas Department of Criminal Justice does not track such information under the CHNV Parole Processes specifically.

**Request for Admission No. 10:** You do not track unreimbursed drivers' licensing and state-identification-document expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 10:** Texas admits that it does not track unreimbursed driver licensing and state-identification-document expenditures made specifically on behalf of citizens of Cuba, Haiti,

Defendant's Exhibit N
6:23-cv-00007

Nicaragua, and Venezuela, either released into the country generally or under the CHNV Parole Processes. Texas admits that the Texas Department of Public Safety does not track the citizenship of driver license or state-identification-document holders, including for citizens of Cuba, Haiti, Nicaragua, and Venezuela (but does track country of birth and whether they are citizens of the United States, see documents produced at TEXAS_000022), whether released into the country generally or under the CHNV Parole Processes.

**Request for Admission No. 11:** You have not made any changes to State budgeting, programs, or services in response to Defendants' implementation of the CHNV Parole Processes.

**Response to Request No. 11:** Texas can neither admit nor deny this request as it is contingent on many factors, including the motivations of each member of the State Legislature and whether such a motivation can be attributed to the Legislature as a whole, or motivations within other State agencies outside its control. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny.

**Request for Admission No. 12:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's revenue by paying taxes.

**Response to Request No. 12:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 13:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's economy through their labor and purchase of goods or services.

**Response to Request No. 13:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 14:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Parole Processes than were entering prior to the promulgation of these processes.

22

**Response to Request No. 14:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered the United States during these time periods.

**Request for Admission No. 15:** From September 2022 to February 2023, the number of unique encounters of Venezuelans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: September 33,494, October 20,804, November 6,253, December 6,067, January 2,552, February 1,172, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Venezuelans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: September 33,804, October, 22,037, November 7,955, December 8,166, January 9,100, February 5,559, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 15:** Texas admits that the referred-to web pages say that, but it can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 16:** From December 2022 to February 2023, the number of unique encounters of Cubans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 42,183, January 6,053, February 140, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Cubans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 34,710, January 6,433, February 753, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 16:** Texas admits that the press release says that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 17:** From December 2022 to February 2023, the number unique encounters of Haitians at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 3,928, January 2,238, February 168, *see* https://www.cbp.gov/newsroom/national- media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Haitians encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 5,138, January 3,174,

Defendant's Exhibit N
6:23-cv-00007

February 7,430, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 17:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 18:** From December 2022 to February 2023, the number of unique encounters of Nicaraguans encountered at the Southwest border, (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 34,868, January 3,223, February 279, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Nicaraguans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 35,387, January 3,377, February 639, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 18:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 19:** Following the implementation of the CHNV Parole Processes for Cuban, Haitian, and Nicaraguan noncitizens, and changes to the implementation of the process for Venezuelans, Border Patrol encounters with Cubans, Haitians, Nicaraguans, and Venezuelans between ports of entry at the southwest border declined from a 7-day average of 1,231 on January 5, to 59 on January 31 (a 95% drop in just three weeks), *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, to just 46 on February 28—a drop of 98% in just two months. *See* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update.

> **Response to Request No. 19:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 20:** You have no basis for disputing the accuracy of the data set forth on the following government websites: https://www.cbp.gov/newsroom/national-media- release/cbp-releases-february-

Defendant's Exhibit N
6:23-cv-00007

2023-monthly-operational-update, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 20:** Texas admits that it has no basis to dispute the accuracy of the data on the listed web pages but can neither admit nor deny that they are accurate.

**Request for Admission No. 21:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have come to live in your State in the three months since the promulgation of the CHNV Parole Processes than did in the three months prior to the promulgation of these processes.

**Response to Request No. 21:** Texas can neither admit nor deny this because the information that would allow it to do so is in Defendants' possession.

**Request for Admission No. 22:** If fewer Cubans, Haitians, Nicaraguans, and Venezuelans were paroled or otherwise allowed to enter the country after the CHNV Parole Processes were instituted than before the CHNV Parole Processes were instituted, and as a result fewer Cubans, Haitians, Nicaraguans, and Venezuelans came to live in your States, you have no injury, and thus no standing in this case.

**Response to Request No. 22:** Denied.

**Request for Admission No. 23:** Fewer Cuban, Haitian, Nicaraguan and Venezuelan nationals are released into the United States as a result of Mexico agreeing to accept the returns of Cuban, Haitian, Nicaraguan and Venezuelan nationals.

**Response to Request No. 23:** Texas does not have sufficient information to admit or deny.

Defendant's Exhibit N
6:23-cv-00007

# United States District Court
## Southern District of Texas
### Victoria Division

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## TEXAS'S UPDATED RESPONSE
## TO DEFENDANTS' DISCOVERY REQUESTS

    Texas serves the following Responses and Objections to Defendants' First Set of Requests for Production, Interrogatories, and Requests for Admission to Plaintiffs. These supersede previous Responses and Objections and incorporate earlier supplemental responses.

Dated June 30, 2023.

JOHN SCOTT
Provisional Attorney General
of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

RALPH MOLINA
Deputy Attorney General
for Legal Strategy


OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

Respectfully submitted,

LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Deputy Chief, Special Litigation
Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON

1

Defendant's Exhibit O
6:23-cv-00007

AMERICA FIRST LEGAL FOUNDATION
Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

## CERTIFICATE OF SERVICE

I certify that on June 30, 2023, I served a copy of this document by electronic mail to all counsel listed below:

EREZ REUVENI
Assistant Director
Erez.R.Reuveni@usdoj.gov

BRIAN WARD
Senior Litigation Counsel
Brian.C.Ward@usdoj.gov

JOSEPH A. DARROW
Joseph.A.Darrow@usdoj.gov

ELISSA P. FUDIM
Elissa.P.Fudim@usdoj.gov

ERIN T. RYAN
Erin.T.Ryan@usdoj.gov
Trial Attorneys

U.S. DEPARTMENT OF JUSTICE
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 307-4293

*Counsel for Federal Defendants*

Esther H. Sung
esther.sung@justiceactioncenter.org
Karen C. Tumlin
karen.tumlin@justiceactioncenter.org
Jane Bentrott
jane.bentrott@justiceactioncenter.org
Lauren Michel Wilfong*
lauren.wilfong@justiceactioncenter.org

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272

Daniel Hatoum
daniel.hatoum@raicestexas.org
Vanessa Rivas-Bernardy
vanessa.rivas@raicestexas.org

The Refugee and Immigrant Center
for Education and Legal Services
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
(210) 960-3206

2

Monika Y. Langarica
langarica@law.ucla.edu
Ahilan T. Arulanantham
arulanantham@law.ucla.edu

CENTER FOR IMMIGRATION LAW AND
POLICY
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box
951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

*Counsel for Intervenors*

*/s/ Ryan D. Walters*

3

Defendant's Exhibit O
6:23-cv-00007

## OBJECTION TO DEFINITION

Texas objects to Defendants' definition of the term "You" as " any Plaintiff State, including all its agencies, subdivisions, and officers acting in official capacity."

"A party to a cause of action is a person who is both named as a party and subject to the court's jurisdiction." *Nagle v. Lee*, 807 F.2d 435, 440 (5th Cir. 1987). Texas's executive department is not like the federal executive branch— a complete unit with "one man" wielding the entire executive power to whom all "lesser officers must" be accountable. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) (quotations omitted). "[U]nlike the federal constitution, the Texas Constitution does not vest the executive power solely in one chief executive. Instead, the executive power is spread across several distinct elected offices." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022). The design creates a "decentralize[d] executive authority." *State v. Brabson*, 976 S.W.2d 182, 186 (Tex. Crim. App. 2012) (Womack, J., concurring).

The Attorney General of Texas, who brought this suit on Texas's behalf, does not have a free-floating Executive power to direct State agencies to take any action. Texas's "Executive" is non-unitary to the point where "neither the Governor nor the Attorney General has statutory authority [even] to directly control" the actions of many non-elected departments. *In re Abbott*, 645 S.W.3d at 281.Under Texas law, the Attorney General represents "the state *qua* state and as *parens patriae*." *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997). Texas's discovery obligations are limited to information or documents in the possession or control of the Attorney General of Texas.

Additionally, the State of Texas has more than 320,000 full-time employees and thousands more part-time employees spread across the general government, health and human services, public education, higher education, the judiciary, public safety and criminal justice, natural resources, business and economic development, regulatory and other state agencies, the legislature, and the Office of the Attorney General. This extends even more broadly to political subdivisions within the State.

Notwithstanding this objection, the Texas Attorney General represents the responding agencies for purposes of responding to these discovery requests and no responsive materials are being withheld on the basis of this objection.

Defendant's Exhibit O
6:23-cv-00007

## Objections and Responses to Interrogatories

**Interrogatory No. 1:** How many Cuban, Haitian, and Nicaraguan noncitizens live in your State? Provide this data for each of these populations for the relevant period, by year and month, and since January 6, 2023.

> **Answer to Interrogatory No. 1:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 1.

**Interrogatory No. 2:** How many Cuba, Haitian, and Nicaraguan noncitizens paroled into the country under the Cuban, Haitian, and Nicaraguan Parole Processes live in your State?

> **Answer to Interrogatory No. 2:** Texas does not track this information.

**Interrogatory No. 3:** How many Venezuelan noncitizens live in your State? Provide this data for the relevant period, by year and month, and since October 18, 2022.

> **Answer to Interrogatory No. 3:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 2.

**Interrogatory No. 4:** How many Venezuelan noncitizens paroled into the country under the Venezuelan Parole Process live in your State?

> **Answer to Interrogatory No. 4:** Texas does not track this information.

**Interrogatory No. 5:** For each of Interrogatories No. 1 and 3, state how many of these individuals were paroled into the United States under the CHNV Parole Processes and how many entered the United States through a process other than the CHNV Parole Processes.

> **Answer to Interrogatory No. 5:** Texas does not track this information.

**Interrogatory No. 6:** Describe your means of tracking the data requested in Interrogatories No. 1 to 5. Identify all sources of data and their author(s).

Defendant's Exhibit O
6:23-cv-00007

**Answer to Interrogatory No. 6:** Texas has responded to this in its Responses to Interrogatories No. 1 to 5.

**Interrogatory No. 7:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have been convicted of crimes in your State during the relevant period? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 7:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas,* 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis,* it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Subject to and without waiving these objections, a list of citizens of Cuba, Haiti, Nicaragua, and Venezuela who have been incarcerated or confined by the Texas Department of Criminal Justice (with dates of sentence for the former) are produced at TEXAS_000172–TEXAS_000173.

When it takes custody of an inmate who is suspected of being foreign born, the Texas Department of Criminal Justice (TDCJ) informs U.S. Immigration and Customs Enforcement (ICE). ICE then conducts further investigation and may issue a detainer request to TDCJ to ensure that ICE can take custody of any such individual for removal proceedings when the inmate is scheduled to be released from TDCJ custody.

TDCJ maintains records of inmates in its custody in a database referred to as the mainframe computer system. This database includes inmate identifying information, records of conviction and sentencing, and records of when a detainer is placed on an inmate in TDCJ custody, and

6

when a detainer is rescinded. These records are kept in the usual course of TDCJ operations, and they are generally accurate and reliable. Only employees of TDCJ or, in limited circumstances, the Texas Board of Pardons and Paroles, can input or update the information in the database.

TDCJ searched this database for inmates and confinees who were confirmed by ICE to be citizens of Cuba, Haiti, Nicaragua, or Venezuela and produced this data at TEXAS_000172—173. For information how costs are calculated per inmate per day of incarceration, see ECF No. 22-6 (Ex. F, Declaration of Rebecca Waltz).

**Interrogatory No. 8:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received healthcare and medical services for which some or all the cost has been paid by your State without reimbursement, and how much money did you spend on such services. Provide data for expenditures which occurred during the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not

7

enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, Texas states that neither it nor the Texas Health and Human Services Commission tracks the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000162. As to uncompensated care for aliens by state public hospital districts, the Texas Health and Human Services Commission has not tracked those costs for the relevant time periods.

**Interrogatory No. 9:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received state-subsidized public education and how much money was spent on providing such services? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 9:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas,* 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-

scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency does not track this information.

**Interrogatory No. 10:** What costs, if any, has your State incurred from issuing drivers' licenses or State-identification-documents to Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 10:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

9

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: While the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are U.S. citizens or not)—see also the documents at TEXAS_000022.

The Texas Department of Public Safety ran a query against the Driver License System (DLS) to determine how many transactions have been processed for non-citizens where the birth country of the driver license or ID holder is Cuba, Haiti, Nicaragua, or Venezuela. The birth country is the only piece of data DPS maintains in a searchable format within DLS related to country of origin. DPS cannot run a query to identify the current country of citizenship. The licensing process for non-citizens involves an in-person transaction during which current identification and immigration documentation is presented and verified through the federal SAVE system. A license is not issued to non-citizens without SAVE verification. As such, information about a holder's current country of citizenship is presented during the transaction but is not a datapoint captured in DLS. The overall process is designed to determine if someone has US citizenship, and if not, to verify through SAVE they are lawfully in the country and identify the period they are authorized to be in the US. So it is possible that some of the data points represent individuals who are no longer citizens of their country of birth.

At TEXAS_000022, DPS indicated that since 2019 DPS has processed over 200,000 transactions for non-citizens in this data set. These figures do not represent the actual number of separate individuals who have applied for a driver license or ID, but represent the number of transactions performed. Many non-citizen driver license/ ID holders have to return to the DPS offices on a much more frequent basis than a US citizen as the term of a non-citizen license holder is tied to his term of lawful presence. So some individuals represented in the data could have been in the office multiple times during the years represented. With each transaction, whether an original or renewal, DPS still runs the documentation through the required verification processes at a cost, *see* TEXAS_000019.

10

**Interrogatory No. 11:** What costs, if any, has your State incurred from providing family and child welfare social services to Cuban, Haitian, Nicaraguan and Venezuelan noncitizens who live in your State. Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 11:** Texas objects that it is not alleging injury on this basis for standing purposes. Texas also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: the Texas Department of Family and Protective Services tracks costs incurred for noncitizens born in Cuba, Haiti, Nicaragua, and Venezuela. *See* documents produced at TEXAS_000001, which are intended for internal purposes and reflect

point-in-time data information in the PAC, funding stream, service, and amount columns, which are subject to change.

**Interrogatory No. 12:** For each of Interrogatories No. 7 to 11, state how many of the individuals were paroled into the United States under the CHNV Parole Processes, how many entered the United States other than through the CHNV Parole Processes, and your means of tracking such data. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 12:** Texas does not track this information.

**Interrogatory No. 13:** For each of Interrogatories No. 7 to 11, state your means of tracking the data. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 13:** Texas has responded to this Interrogatory in its Responses to Interrogatories No. 7 to 11.

**Interrogatory No. 14:** Describe your injury with respect to each of your claims for relief in the Amended Complaint, broken down by claim. Identify which documents you have provided in response to these Requests support each claim.

**Answer to Interrogatory No. 14:** Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the increased presence of aliens in Texas. In addition to the declarations Texas has submitted in its motion for preliminary injunction briefing (and supplemental ones it is entitled to submit before trial), Texas has produced documents relating to costs relating to driver licenses (produced at TEXAS_000002–TEXAS_000099), education (produced at TEXAS_003239–TEXAS_003255), healthcare (produced at TEXAS_000100–TEXAS_000162), law enforcement (produced at TEXAS_000163–TEXAS_003238), and family protective services (produced at TEXAS_000001).

**Interrogatory No. 15:** To what extent do noncitizens present in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives. Specify the categories of economic value and the amount of money earned from each category. To the extent possible, specify the economic contribution by Cubans, Haitians, Nicaraguans and Venezuelans nationals specifically.

Defendant's Exhibit O
6:23-cv-00007

**Answer to Interrogatory No. 15:** Texas objects to this request. Any purported benefits Plaintiff receives as a result of the challenged policies are irrelevant to Plaintiff's standing based on its injuries from the same. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and citations omitted). Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts, the Texas Workforce Commission, nor the Texas Demographic Center tracks this information.

**Interrogatory No. 16:** For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

**Answer to Interrogatory No. 16:** Texas denies Request No. 22 because an injury sufficient for standing is not undermined by an offset in benefits. *See Texas v. United States*, 555 F. Supp. 3d 351, 382 (S.D. Tex. 2021) ("even if the Government *could* demonstrate that increased enforcement in the prioritized categories might displace a drop in the total number of detained aliens resulting from the deprioritized categories, this "offset" would be irrelevant as a matter of law.") (Tipton, J.), *appeal dismissed,* No. 21-40618, 2022 WL 517281 (5th Cir. Feb. 11, 2022). Texas also denies Request No. 22 because a hypothetical situation where fewer aliens from those countries came to live in Texas after institution of the CHNV Parole Processes would not necessarily mean that the latter caused the former.

Texas partially denies Request Nos. 8 & 9 on the bases identified in those responses.

Defendant's Exhibit O
6:23-cv-00007

## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:** Provide all documents and data that show the number of Cubans, Haitians, and Nicaraguans who live in your State, by year, during the relevant period and since January 6, 2023, broken down by nationality.

> **Response to Request No. 1:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 2:** Provide all documents and data that show the number of Venezuelans who live in your State, by year, during the relevant period and since October 18, 2022.

> **Response to Request No. 2:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 3:** Provide all documents and data that show the number of Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States under the CHNV Parole Processes specifically, who live in your State.

> **Response to Request No. 3:** Texas does not track this information.

**Request for Production No. 4:** Provide all documents and data that show the cost to your State from providing unreimbursed medical care to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

> **Response to Request No. 4:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is

14

also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis,* it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden,* 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Health and Human Services Commission does not track the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000100–TEXAS_000162.

**Request for Production No. 5:** Provide all documents and data that show the cost to your State from providing public education to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 5:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas,* 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'")

Defendant's Exhibit O
6:23-cv-00007

(internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency does not track this information but see documents produced at TEXAS_003239–TEXAS_003255.

**Request for Production No. 6:** Provide all documents and data that show the cost to your State from providing social services to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group, and the type of social service.

**Response to Request No. 6:** Texas objects to this request. It is unduly burdensome and not proportional to the needs of the case. It is impossible for Texas to describe each and every "social service" as requested in the interrogatory. It also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it

16

need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving its objections, Texas has submitted the evidence of the social services provided to illegal aliens that it intends to rely on and is entitled to supplement that evidence before trial. Texas provides education, health care, and law-enforcement services to aliens in the State, regardless of legal status or legal presence, and provides driver licenses to alien parolees.

**Request for Production No. 7:** Provide all documents and data that show the cost to your State from providing driver's licenses or other identification documents to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 7:** Texas also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need

17

not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis,* it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans,* 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling Texas.

Plaintiff also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden,* 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, while the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are US citizens or not). Documents are being produced at TEXAS_000002–TEXAS_000099.

**Request for Production No. 8:** Provide all documents and data that show the cost to your State associated with law enforcement related to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas,* 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be

substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, documents are being produced at TEXAS_000163–TEXAS_003238, particularly TEXAS_000172–TEXAS_000173.

**Request for Production No. 9:** Provide all documents relating to any and all additional injuries that you allege have been caused, or will be caused, to you by noncitizens who enter the United States pursuant to the CHNV Parole Processes.

> **Response to Request No. 9:** Texas objects to this request as the scheduling order allows supplementation of submitted declarations before trial. Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order—Texas provides education, healthcare, and law-enforcement services to aliens in the State, regardless of legal status or legal presence and provides driver licenses to alien parolees.

19

**Request for Production No. 10:** Provide all documents and data that indicate to what extent Cubans, Haitians, Nicaraguans, and Venezuelans who live in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives, by year, during the relevant time and since the Effective Dates.

**Response to Request No. 10:** Texas objects to this request. Any purported benefits Texas receives from the challenged policies are irrelevant to its standing based on its injuries caused by those policies. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and citations omitted).

Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks this information.

**Request for Production No. 11:** Provide all documents and data consulted or relied upon in responding to Defendants' accompanying Interrogatories and Requests for Admission.

**Response to Request No. 11:** Copies of all such documents and data are included in the responses to the other Requests for Production of Documents. Communications that constitute attorney-client privilege and work product are not being produced for any responses.

### RESPONSES TO REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Cubans, Haitians, Nicaraguans and Venezuelans paroled into the United States pursuant to the CHNV Parole Processes have been inspected by immigration authorities and permitted to enter the United States.

**Response to Request No. 1:** Texas can neither admit nor deny this request as it does not have knowledge of Defendants' actions regarding

20

Defendant's Exhibit O
6:23-cv-00007

any inspections of Cubans, Haitians, Nicaraguans, and Venezuelans made during implementation of the CHNV Parole Processes.

**Request for Admission No. 2:** You lack any basis to assess the cost to your State caused by any Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States pursuant to the CHNV Parole Processes since the Effective Dates.

**Response to Request No. 2:** Texas can neither admit nor deny this request as it does not have knowledge of how many aliens from those countries have been paroled into Texas pursuant to the CHNV Parole Processes.

**Request for Admission No. 3:** You have no evidence that you incurred more costs from Cubans, Haitians, and Nicaraguans entering your State each month since January 6, 2023 than you incurred each month in 2022 from the same populations.

**Response to Request No. 3:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered Texas during these time periods.

**Request for Admission No. 4:** You have no evidence that you incurred more costs from Venezuelans entering your State each month since October 18, 2022 than you incurred each earlier month in 2022 from the same population.

**Response to Request No. 4:** Texas can neither admit nor deny this request as it does not have knowledge of how many Venezuelans have entered Texas during these time periods.

**Request for Admission No. 5:** You cannot quantify how much money your State would save if no Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens granted parole through the CHNV Parole Processes were present in your State.

**Response to Request No. 5:** Texas can neither admit nor deny this request as it concerns a future event contingent on many factors; the request does not concern facts that have ever been in existence. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny. The request therefore does not fall within either of the two categories of information for which requests for admission may be made. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other

21

party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to "(A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents.").

**Request for Admission No. 6:** You do not track unreimbursed medical expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

> **Response to Request No. 6:** Texas admits that it does not track this information and denies that the Texas Health and Human Services Commission does not have information regarding unreimbursed Emergency Medicaid of CHIP-Perinatal payments for citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000162).

**Request for Admission No. 7:** You do not track unreimbursed educational expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

> **Response to Request No. 7:** Texas admits that neither it nor the Texas Education Agency tracks either category of information.

**Request for Admission No. 8:** You do not track unreimbursed family and child welfare service expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

> **Response to Request No. 8:** Texas admits that it does not track such information. Texas denies that the Texas Department of Family and Protective Services does not track unreimbursed family and child welfare service expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000001) but admits that it does not track such expenses for those released under the CHNV Parole processes specifically.

**Request for Admission No. 9:** You do not track unreimbursed law enforcement expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

Defendant's Exhibit O
6:23-cv-00007

**Response to Request No. 9:** Texas admits that it does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally, or under the CHNV Parole Processes specifically. Texas denies that the Texas Department of Criminal Justice does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally (see documents produced at TEXAS_000172–TEXAS_000173) but admits that the Texas Department of Criminal Justice does not track such information under the CHNV Parole Processes specifically.

**Request for Admission No. 10:** You do not track unreimbursed drivers' licensing and state-identification-document expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 10:** Texas admits that it does not track unreimbursed driver licensing and state-identification-document expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela, either released into the country generally or under the CHNV Parole Processes. Texas admits that the Texas Department of Public Safety does not track the citizenship of driver license or state-identification-document holders, including for citizens of Cuba, Haiti, Nicaragua, and Venezuela (but does track country of birth and whether they are citizens of the United States, see documents produced at TEXAS_000022), whether released into the country generally or under the CHNV Parole Processes.

**Request for Admission No. 11:** You have not made any changes to State budgeting, programs, or services in response to Defendants' implementation of the CHNV Parole Processes.

**Response to Request No. 11:** Texas can neither admit nor deny this request as it is contingent on many factors, including the motivations of each member of the State Legislature and whether such a motivation can be attributed to the Legislature as a whole, or motivations within other State agencies outside its control. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny.

23

**Request for Admission No. 12:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's revenue by paying taxes.

> **Response to Request No. 12:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 13:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's economy through their labor and purchase of goods or services.

> **Response to Request No. 13:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 14:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Parole Processes than were entering prior to the promulgation of these processes.

> **Response to Request No. 14:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered the United States during these time periods.

**Request for Admission No. 15:** From September 2022 to February 2023, the number of unique encounters of Venezuelans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: September 33,494, October 20,804, November 6,253, December 6,067, January 2,552, February 1,172, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Venezuelans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: September 33,804, October, 22,037, November 7,955, December 8,166, January 9,100, February 5,559, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 15:** Texas admits that the referred-to web pages say that, but it can neither admit nor deny the accuracy of these numbers.

24

**Request for Admission No. 16:** From December 2022 to February 2023, the number of unique encounters of Cubans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 42,183, January 6,053, February 140, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Cubans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 34,710, January 6,433, February 753, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 16:** Texas admits that the press release says that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 17:** From December 2022 to February 2023, the number unique encounters of Haitians at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 3,928, January 2,238, February 168, *see* https://www.cbp.gov/newsroom/national- media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Haitians encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 5,138, January 3,174, February 7,430, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 17:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 18:** From December 2022 to February 2023, the number of unique encounters of Nicaraguans encountered at the Southwest border, (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 34,868, January 3,223, February 279, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Nicaraguans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 35,387, January 3,377, February 639, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

Defendant's Exhibit O
6:23-cv-00007

**Response to Request No. 18:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 19:** Following the implementation of the CHNV Parole Processes for Cuban, Haitian, and Nicaraguan noncitizens, and changes to the implementation of the process for Venezuelans, Border Patrol encounters with Cubans, Haitians, Nicaraguans, and Venezuelans between ports of entry at the southwest border declined from a 7-day average of 1,231 on January 5, to 59 on January 31 (a 95% drop in just three weeks), *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, to just 46 on February 28—a drop of 98% in just two months. *See* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update.

**Response to Request No. 19:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 20:** You have no basis for disputing the accuracy of the data set forth on the following government websites: https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 20:** Texas admits that it has no basis to dispute the accuracy of the data on the listed web pages but can neither admit nor deny that they are accurate.

**Request for Admission No. 21:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have come to live in your State in the three months since the promulgation of the CHNV Parole Processes than did in the three months prior to the promulgation of these processes.

**Response to Request No. 21:** Texas can neither admit nor deny this because the information that would allow it to do so is in Defendants' possession.

**Request for Admission No. 22:** If fewer Cubans, Haitians, Nicaraguans, and Venezuelans were paroled or otherwise allowed to enter the country after

26

the CHNV Parole Processes were instituted than before the CHNV Parole Processes were instituted, and as a result fewer Cubans, Haitians, Nicaraguans, and Venezuelans came to live in your States, you have no injury, and thus no standing in this case.

   **Response to Request No. 22:** Denied.

**Request for Admission No. 23:** Fewer Cuban, Haitian, Nicaraguan and Venezuelan nationals are released into the United States as a result of Mexico agreeing to accept the returns of Cuban, Haitian, Nicaraguan and Venezuelan nationals.

   **Response to Request No. 23:** Texas does not have sufficient information to admit or deny.

27

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
    *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## **CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS**

I, Murl E. Miller, hereby declare that I am the Chief Counsel for General Litigation of the Texas Comptroller of Public Accounts. Based upon reasonable inquiry, I certify that the information contained in the Comptroller's responses to Interrogatory Nos. 1, 2, 3, 4, 5, 6, and 15, and any supplemental responses to them are true and correct to the best of my knowledge, information, and belief.

Dated: June 26, 2023.

Murl E. Miller
Chief Counsel for General Litigation
Texas Comptroller of Public Accounts

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
    *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

I, Lloyd Potter, hereby declare that I am the Director of the Texas Demographic Center.

Based upon reasonable inquiry, I certify that the information contained in the Center's responses

to Interrogatory Nos. 1, 2, 3, 4, 5, 6, and 15, and any supplemental responses to them are true and

correct to the best of my knowledge, information, and belief.

Dated: June 23, 2023.

State Demographer
Director, Texas Demographic Center

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

    I Kaysie Taccetta, hereby declare that I am the Director of Client Services, Federal Funds and Forecasting of the Texas Department of Family and Protective Services. Based upon reasonable inquiry, I certify that the information contained in the Department's responses to Interrogatory Nos. 11, 12, 13, and 14 and any supplemental responses to them are true and correct to the best of my knowledge, information, and belief.

Dated: June 29, 2023.

*Kaysie E. Taccetta*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Kaysie E. Taccetta
Director of Client Services, Federal Funds, & Forecasting

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.,*
 *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
 *et al.,*
 *Defendants.*

Case 6:23-cv-00007

### CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

  I, Sheri Gipson, hereby declare that I am the Chief of the Driver License Division of the Texas Department of Public Safety. Based upon reasonable inquiry, I certify that the information contained in the State's responses to Interrogatory No. 10 and any supplemental responses are true and correct to the best of my knowledge, information, and belief. I further certify that the information contained in the State's responses to Interrogatory No. 12, 13, and 14 and any supplemental responses as those responses relate to the Texas Department of Public Safety, specifically documents providedTEXAS_000002–TEXAS_000099, are true and correct to the best of my knowledge, information, and belief.

Dated: June 26, 2023.

*Sheri Gipson*
      Sheri Gipson
      Chief, Driver License Division
      Texas Department of Public Safety

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.                                                    Case 6:23-cv-00007

U.S. DEPARTMENT OF HOMELAND SECURITY,
    *et al.,*
    *Defendants.*

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

I Susan Bricker, hereby declare that I am the manager (Manager V) of the Health Program Outcomes and Epidemiology Team ("HPOE") within the Office of Data, Analytics and Decision Support (DAP) of the Texas Health and Human Services Commission (Commission). Based upon reasonable inquiry, I certify that the information contained in the Commission's responses to Interrogatory Nos. 8 and 14 [only for healthcare data (TEXAS_000100 – TEXAS_ 000162)] and any supplemental responses to them are true and correct to the best of my knowledge, information, and belief.

Dated: June 27, 2023.

*[signature]*

Susan Bricker, Manager,
HHSC, Health Program Outcomes and Epidemiology

United States District Court
Southern District of Texas
Victoria Division

STATE OF TEXAS, et al.,
   Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
   et al.,
   Defendants.

Case 6:23-cv-00007

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

I Karen Hall, hereby declare that I am the Deputy Chief of Staff of the Texas Department of Criminal Justice. Based upon reasonable inquiry and with the exception of the cost information provided in TDCJ's response to Interrogatory 7 and any supplemental response thereto, I certify that the remaining information contained in TDCJ's responses to Interrogatory Nos. 7, 12, 13, and 14, and any supplemental responses to them are true and correct to the best of my knowledge, information, and belief.

Dated: June 27, 2023.

Karen Hall
Deputy Chief of Staff

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

I Rebecca Waltz, hereby declare that I am the Budget Director of the Texas Department of Criminal Justice. Based upon reasonable inquiry, I certify that the cost information contained in TDCJ's responses to Interrogatory No. 7, and any supplemental responses thereto is true and correct to the best of my knowledge, information, and belief.

Dated: June 27, 2023.

Rebecca Waltz, Budget Director

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

    I, Christina J. Villarreal, hereby declare that I am the Executive Director for Grant Funding and Reporting in the Department of Grant Compliance and Administration of the Texas Education Agency. Based upon reasonable inquiry, I certify that the information contained in the Agency's responses to Interrogatory Nos. 9, 12, 13, and 14 and any supplemental responses to them are true and correct to the best of my knowledge, information, and belief.

Dated: June 26, 2023.

Christina J. Villarreal, Executive Director
Grant Funding and Reporting
Grant Compliance and Administration

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## CERTIFICATION OF PLAINTIFF'S RESPONSES TO DEFENDANTS' INTERROGATORY REQUESTS

I, Corra Dunigan, hereby declare that I am an Assistant General Counsel of the Texas

Workforce Commission. Based upon reasonable inquiry, I certify that the information contained

in the Commission's responses to Interrogatory Nos. 1, 2, 3, 4, 5, 6, and 15 and any supplemental

responses to them are true and correct to the best of my knowledge, information, and belief.

Dated: June 29, 2023.

_____
Assistant General Counsel

Defendant's Exhibit O
6:23-cv-00007

6/19/23, 7:29 PM   Gov. Greg Abbott on Twitter: "A growing population is a sign of a healthy economy! The Lone Star State has long led the nation in ...

Explore

Settings

**Tweet**

Search Twitter

**Gov. Greg Abbott** ✓
@GovAbbott

A growing population is a sign of a healthy economy!

The Lone Star State has long led the nation in population growth, adding 4 million new Texans between 2010 and 2020. And almost half of that growth was newborn Texans. #TexasWorks

> "Our greatest natural resource is the people of the Lone Star State. They are the number one reason businesses grow here."
>
> —Governor Abbott

4:15 PM · Aug 8, 2022

28 Retweets   7 Quotes   130 Likes

New to Twitter?

Sign up now to get your own pers

Sign up with G

Sign up with /

Create accour

By signing up, you agree to the Te Privacy Policy, including Cookie U

**Relevant people**

**Gov. Greg Abbott** ✓
@GovAbbott
Official news from th Governor Greg Abbc the governor's perso @GregAbbott_TX

Zeflo88 @Ains1181 · Aug 8, 2022
Fix the power grid.
1   5

F blanch @Fab7555 · Aug 8, 2022
Too bad you did not plan for all of us to have electricity. #FIXTHEDAMNGRID
1   3

Porchlandrea @Porchlandrea · Aug 8, 2022
Forcing people to give birth to boast about population growth. Cool.
1   5

Calvin Miyatake @MiyatakeCalvin · Aug 8, 2022
Abbott abdicating his border problem to the north. The problem that "he and Trump" could not solve in 2016/2017/2018 when they both controlled the Congress, judges, courts. They even had $$ to complete the WALL. Why didn't they finish the wall?
1   3

Celeste @MyDearAuntSally · Aug 8, 2022
Our electrical grid is powered by a hamster running in a wheel and you wanna talk about population growth.
4

ResistUSA 🌊🟦 @ResistVA · Aug 8, 2022

Zola4Beto 🏃 @Zola4B · Aug 3, 2022

**What's happening**

MLB · LIVE
**Cubs at Pirates**

Sports · Trending
**#WWERaw**
Trending with Ciampa, NO ONE

Politics · Trending
**Taiwan**
105K Tweets

Trending in United States
**#BlackInkCrew**

Trending in United States
**#BlackMusicHonors**

Show more

Terms of Service   Privacy Policy
Accessibility   Ads info   More ···

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   S

EXHIBIT
44

Abbott.

#BetoForGovernor



Jason Talbott @HisMajestyJason · Aug 8, 2022

A growing pop. by birth occurs when workers have needs met and feel comfortable.

You're bragging about growth from existing corporations dragging their employees to Texas, to backfill all the people who DIED because you utterly failed as a leader during a public health crisis



**Don't miss what's happening**
People on Twitter are the first to know.

Log in

Explore

Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

| Office of the Texas Governor

gov.texas.gov/top-texas-touts-people



## Top Texas Touts:  People

- Jobs magnet: Our skilled, young, diverse, and growing workforce is more than 14.6 million strong.
- Texas is again the top state for population growth, for the 17th year in a row, and has surpassed 30 million in total population for the first time.
- Texas is younger and faster growing than the nation.
- Texas gains about 1,000 people every day, including newly born Texans and people moving from other states and other countries.
- Texas is by far the "stickiest" state: More than 82 percent of those born here stay here.
- Texas is the top state for attracting young adults, age 25-39, the nation's emerging workforce.
- Texas is home to more than 1.7 million veterans and serving military members, including active duty, reserve, and National Guard.
- Texas is home to more women veterans than any other state.
- Our greatest natural resource is the people of the Lone Star State; they are why businesses relocate here.

Back to the main Top Texas Touts page

Defendant's Exhibit Q
6:23-cv-00007

EXHIBIT
**46**

Home  >  Driver License  >  Driver License Fees

# Driver License Fees



**Driver License Division Fees**

| Driver license offices now accept credit cards as well as cash, checks and money orders. |
| --- |

**Driver License Fees:**

*A $1 administrative fee is included in the following fee amounts.*
*The $1 administrative fee is not charged for transactions conducted through the mail.*

| License type | *Fee | Information |
| --- | --- | --- |
| Driver license (Class A, B or C) | | |
| Under 18: new | $16 | Expires on your 18th birthday |
| Age 18 to 84: new | $33 | Expires after eight years (on your birthday) |
| Age 18 to 84: renewal | $33 | Expires eight years after previous expiration date |
| Age 85 and older: new | $9 | Expires after two years (on your birthday) |
| Age 85 and older: renewal | $9 | Expires two years after previous expiration date |
| Disabled veterans (60%): new or renewal | Free | Requirements for fee exemption |
| Replacement driver license | $11 | Current expiration date does not change |
| Replace a lost, stolen, or damaged license | | |
| Change address or name | | |
| Test to add or remove restrictions | | |
| Learner license—under 18 | | |
| New | $16 | Expires on your 18th birthday |
| Motorcycle with driver license (Class AM, BM or CM) | | |
| Adding motorcycle to your existing driver license | $16 | Expiration date on driver license does not change |
| Obtaining a new Texas driver license and adding motorcycle | $48 | Expires when your driver license expires (depends on age; see driver license section) |
| Renewing a Texas driver license with Motorcycle | $44 | |
| Motorcycle license (Class M) only | | |

Defendant's Exhibit R
6:23-cv-00007

1/4

| License type | *Fee | Information |
|---|---|---|
| New | $33 | Expiration date depends on age; see driver license section |
| Renewal | $44 | Expiration date depends on age; see driver license section |
| **Learner license for motorcycle (Class M) only** | | |
| Under 18 | $16 | Expires on your 18th birthday |
| **Limited term driver license**<br>*For temporary visitors to the US* | $33 | Expires when period of <u>lawful presence</u> expires, or in one year if lawful presence period is "duration of status" |
| **Occupational driver license** | | |
| New or renewal | $10<br>per<br>year | Issued up to two years<br>Must <u>pay reinstatement fees</u> first |
| **Add interlock restriction to driver license** | $10 | Must <u>pay reinstatement fees</u> first |
| **Driver license for individuals registered under <u>Chapter 62, CCP</u>** | | |
| New or renewal | $21 | Expires one year after previous expiration date |

## Identification Card (ID) Fees:

*A $1 administrative fee is included in the following fee amounts.*
*The $1 administrative fee is not charged for transactions conducted through the mail.*

| ID type | *Fee | Information |
|---|---|---|
| **Identification (ID) card** | | |
| Age 59 and younger: new | $16 | Expires after six years (on your birthday) |
| Age 59 and younger: renewal | $16 | Expires six years after previous expiration date |
| Age 60 and older: new or renewal | $6 | Expires after six years (on your birthday) |
| **Replacement ID card**<br>Replace a lost, stolen, or damaged ID card<br>Change address or name | $11 | Current expiration date does not change |
| **Limited term ID card**<br>*For temporary visitors to the U.S.* | $16 | Expires when period of <u>lawful presence</u> expires, or in one year if lawful presence period is "duration of status" |
| **ID card for individuals registered under <u>Chapter 62, CCP</u>** | | |
| New or renewal | $21 | Expires one year after previous expiration date |

## Commercial Driver License (CDL) Fees:

*A $1 administrative fee is included in the following fee amounts.*
*The $1 administrative fee is not charged for transactions conducted through the mail.*

Defendant's Exhibit R
6:23-cv-00007

| CDL type | *Fee | Information |
|---|---|---|
| **Commercial driver license (CDL)** | | |
| Age 18 to 84: new | $97 | Expires in eight years |
| Age 18 to 84: renewal | $97 | Expires eight years after previous expiration date |
| Age 18 to 84: new (with Hazardous Materials Endorsement) | $61 | Expires in five years |
| Age 18 to 84: renewal (with Hazardous Materials Endorsement) | $61 | Expires in five years |
| Age 85 and older: new | $26 | Expires after two years (on your birthday) |
| Age 85 and older: renewal | $26 | Expires two years after previous expiration date |
| **Replacement CDL / CLP** | $11 | Current expiration date does not change |
| Replace a lost, stolen, or damaged CDL | | |
| Change address or name | | |
| Test to add or remove endorsements or restrictions | | |
| **Commercial Learners Permit - CLP** | | |
| Original | $25 | Expires 180 days from issuance |
| Renewal | $25 | Must be renewed prior to expiration date |
| **Motorcycle with CDL** | | |
| New—add this to CDL fee | $15 | Expires when CDL expires (depends on age; see CDL section) |
| Renewal—add this to CDL renewal fee | $8 | Expires when CDL expires (depends on age; see CDL section) |
| Add motorcycle to existing CDL | $16 | Expiration date on CDL does not change |
| **Non-domiciled CDL** | | |
| New or renewal<br>*For non-U.S. residents* | $121 | Expires when period of lawful presence expires, as determined by U.S. Department of Homeland Security |
| **CDL for individuals registered under Chapter 62, CCP** | | |
| New or renewal | $21 | Expires one year after previous expiration date |

---

## Follow DPS

## Keep Texas Safe

Report Suspicious Activity

### Policies

Site Policies

Accessibility

The Governor's Committee on

### Texas Sites

Texas Homeland Security

Texas Veterans Portal

Texas State Library & Archives

### Feedback

Customer Feedback

Report Fraud, Waste, or Abuse

Complaints & Compliments

### Helpful Links

Outlook Web Access

CAPPS Login

ERR Entry

Defendant's Exhibit R
6:23-cv-00007

People with Disabilities

Statement on Telemarketing

Texas Fusion Center Privacy
Policy

Public Information Act

Privacy Notice

Public Safety Commission

texas.gov

The 1836 Project: Telling the
Texas Story

Compact with Texans

© 2023 Texas Department of Public Safety. PDF files require Adobe Reader or compatible.

Defendant's Exhibit R
6:23-cv-00007

DocuSign Envelope ID: F758EF3C-D899-45AF-9BAF-EB3A8DDB68E9

## CONTRACT AMENDMENT

| Contract No. | Order No. | Amendment No. | Effective Date |
|---|---|---|---|
| 00000000000000000000000369 | n/a | 3 | Execution Date |

### I.  AUTHORITY

DPS and Contractor agree to amend the Contract as provided for in Exhibit G.1, Standard Terms and Conditions Section 3.1, Amendments; No Amounts Paid for Unauthorized Performance; No Conflict with the Laws of the State of Texas; and Section 3.4, Contractor Changes (Includes Successors and Assignees).

### II.  BACKGROUND AND PURPOSE

This Contract provides identification documents or articles related to Driver, Identification, and Regulated Services throughout the State of Texas. This amendment updates the legal name of the Contractor based on corporate organizational structure changes. The amendment also updates the cost per article due to a change in production site from onsite at DPS HQ to offsite in Atlanta, GA.

### III.  DESCRIPTION

A.  Upon Execution of this Amendment, Contractor name is changed from Gemalto, Inc. to Thales DIS USA, Inc.

B.  Effective 1/1/2021, Contractor will invoice and DPS will pay the revised article costs for card production and mailing in accordance with the following table.

| Article Type | Cost Per Article if produced On-Site at DPS (7/10/2019–12/31/2020) | Cost Per Article if produced Outside the State of Texas (1/1/2021–life of the Contract) |
|---|---|---|
| DL (with security features from AMD 1) | $1.47 | $1.35 |
| ID (with security features from AMD 1) | $1.47 | $1.35 |
| EI (with security features from AMD 1) | $1.47 | $1.35 |
| EIC (with security features from AMD 1) | $1.47 | $1.35 |
| IDC (with security features from AMD 1) | $1.47 | $1.35 |
| LTC (Polycarbonate Card) | $1.27 | $1.17 |
| PSB (Polycarbonate Card) | $1.27 | $1.17 |

Contractor must sign and return to DPS timely. The Contract, as amended, represents the entire agreement between the parties. The signatories have full authority to enter into this Amendment on behalf of the respective parties named.

| Issued By | Name and Address of Contractor |
|---|---|
| Department of Public Safety<br>Procurement and Contract Services MSC 0266<br>Building A, 1st Floor<br>5805 North Lamar Blvd.<br>Austin, Texas 78752 | Thales DIS USA, Inc. (f.k.a. Gemalto, Inc.)<br>9442 Capital of Texas Highway North<br>Plaza II, Suite 2-400<br>Austin TX, 78759 |
| **Authorized Representative**<br>Steven C. McCraw, Director | **Authorized Representative**<br>Antonio Lo Brutto, President |
| DocuSigned by:<br>*Steven McCraw*<br>Signature of Authorized Representative<br>Date: 12/29/2020 | <br>Signature of Authorized Representative<br>Date: 12/29/20 |

OGC Reviewed

Defendant's Exhibit S
6:23-cv-00007

TEXAS_000002

504                          PUBLIC LAW 86-648–JULY 14, 1960                [74 STAT.

Public Law 86-648

July 14, 1960
[H. J. Res. 397]

JOINT RESOLUTION
To enable the United States to participate in the resettlement of certain refugees, and for other purposes.

Refugees.
Resettlement.
66 Stat. 188.
8 USC 1182.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That under the terms of section 212(d)(5) of the Immigration and Nationality Act the Attorney General may parole into the United States, pursuant to such regulations as he may prescribe, an alien refugee-escapee defined in section 15(c)(1) of the Act of September 11, 1957 (71 Stat. 643) if such alien (1) applies for parole while physically present within the limits of any country which is not Communist, Communist-dominated, or Communist-occupied, (2) is not a national of the area in which the application is made, and (3) is within the mandate of the United Nations High Commissioner for Refugees.

Secretary of State.
Advisory report.

SEC. 2. (a) The Secretary of State is hereby directed to submit to the Attorney General, as soon as practicable following the date of the enactment of this Act, an advisory report indicating the number of refugee-escapees, as specified in section 1 of this Act, who within the period beginning July 1, 1959, and ending June 30, 1960, have availed themselves of resettlement opportunities offered by nations other than the United States; and, thereafter, prior to January 1, and July 1 of each year to submit such an advisory report to the Attorney General indicating the number of such refugee-escapees who within the preceding six months period have availed themselves of such resettlement opportunities. The Attorney General shall not parole into the United States pursuant to section 1 of this Act, in any six months period immediately following the submission of the Secretary of State's advisory report, a number of refugee-escapees exceeding twenty-five per centum of the number of such refugee-escapees indicated in such advisory report as having been resettled outside of the United States. The Attorney General shall submit to the Congress

Report to Congress.

a report containing complete and detailed statement of facts in the case of each alien paroled into the United States pursuant to section 1 of this Act. Such reports shall be submitted on or before January 15 and June 15 of each year. If within ninety days immediately following the submission of such report, either the Senate or the House of Representatives passes a resolution stating in substance that it does not favor the continuation of the authority vested in the Attorney General under section 1 of this Act, the Attorney General shall, not later than at the expiration of sixty days immediately following the adoption of such resolution by either the Senate or the House of Representatives, discontinue the paroling into the United States of such refugee-escapees. The Attorney General shall discontinue paroling refugee-escapees pursuant to section 1 of this Act on July 1, 1962.

Limitation.

(b) The Attorney General may, within the numerical limitation prescribed by subsection (a) of this section, parole into the United States pursuant to section 1 of this Act not to exceed five hundred refugee-escapees listed by the United Nations High Commissioner for Refugees as "difficult to resettle": *Provided,* That no refugee-escapee may be paroled into the United States pursuant to this subsection if he suffers from conditions requiring institutionalization: *Provided further,* That in the case of each such refugee-escapee, the Attorney General receives and approves a finding by a voluntary relief or welfare organization recognized for this purpose by the Attorney General, that such refugee-escapee can, with some assistance, become self-


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Defendant's Exhibit T
6:23-cv-00007

supporting, or is a member of a family unit capable of becoming self-supporting.

Sec. 3. Any alien who was paroled into the United States as a refugee-escapee, pursuant to section 1 of this Act, whose parole has not theretofore been terminated by the Attorney General pursuant to such regulations as he may prescribe under the authority of section 212(d)(5) of the Immigration and Nationality Act; and who has been in the United States for at least two years, and who has not acquired permanent residence, shall forthwith return or be returned to the custody of the Immigration and Naturalization Service and shall thereupon be inspected and examined for admission into the United States, and his case dealt with in accordance with the provisions of section 235, 236, and 237 of the Immigration and Nationality Act. `8 USC 1182.` `8 USC 1225-1227.`

Sec. 4. Any alien who, pursuant to section 3 of this Act, is found, upon inspection by the immigration officer or after hearing before a special inquiry officer, to be admissible as an immigrant under the Immigration and Nationality Act at the time of his inspection and examination, except for the fact that he was not and is not in possession of the documents required by section 212(a)(20) of the said Act, shall be regarded as lawfully admitted to the United States for permanent residence as of the date of his arrival. `66 Stat. 163.` `8 USC 1101 note.` `8 USC 1182.`

Sec. 5. Section 1 of the Act of September 2, 1958 (72 Stat. 1712), is hereby amended by substituting the words "two thousand" for the words "fifteen hundred" and by substituting the words "total of the annual quota for two years" for the words "annual quota."

Sec. 6. Section 7 of the Act of September 2, 1958 (72 Stat. 1713), is hereby amended by substituting "June 30, 1962" for "June 30, 1960."

Sec. 7. Section 4(a) of the Act of September 11, 1957 (71 Stat. 639–640), as amended by section 2 of the Act of September 9, 1959 (73 Stat. 490), is hereby amended by substituting "June 30, 1961" for "June 30, 1960". `8 USC 1205.`

Sec. 8. Section 212(a)(23) of the Immigration and Nationality Act, as amended (66 Stat. 184; 70 Stat. 575; 8 U.S.C. 1182(a)(23)), is further amended by changing the language "narcotic drugs," to read "narcotic drugs or marihuana,".

Sec. 9. Section 241(a)(11) of the Immigration and Nationality Act, as amended (66 Stat. 206, 70 Stat. 575; 8 U.S.C. 1251(a)(11)), is further amended by changing the language "narcotic drugs," to read "narcotic drugs or marihuana,".

Sec. 10. Section 245(a) of the Immigration and Nationality Act, as amended (66 Stat. 217, 72 Stat. 699, 8 U.S.C. 1255(a)), is further amended to read as follows:

"(a) The status of an alien, other than an alien crewman, who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is approved."

Sec. 11. Nothing contained in this Act shall be held to repeal, amend, alter, modify, affect, or restrict the powers, duties, functions, or authority of the Attorney General in the administration and enforcement of the Immigration and Nationality Act or any other law relating to immigration, nationality, or naturalization. `66 Stat. 163.` `8 USC 1101 note.`

Approved July 14, 1960.

Defendant's Exhibit T
6:23-cv-00007

PUBLIC LAW 95–412—OCT. 5, 1978     92 STAT. 907

**Public Law 95–412**
**95th Congress**

## An Act

To amend section 201(a), 202(c) and 203(a) of the Immigration and Nationality
Act, as amended, and to establish a Select Commission on Immigration and
Refugee Policy.

<div align="right">

Oct. 5, 1978
[H.R. 12443]

</div>

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That section 201(a)
of the Immigration and Nationality Act is amended to read as follows:
  "SEC. 201. (a) Exclusive of special immigrants defined in section
101(a) (27), and immediate relatives of United States citizens as speci-
fied in subsection (b) of this section, the number of aliens born in any
foreign state or dependent area who may be issued immigrant visas or
who may otherwise acquire the status of an alien lawfully admitted to
the United States for permanent residence, or who may, pursuant to
section 203(a) (7), enter conditionally, shall not in any of the first
three quarters of any fiscal year exceed a total of seventy-seven thou-
sand and shall not in any fiscal year exceed a total of two hundred and
ninety thousand.".
  SEC. 2. Section 202(c) of the Immigration and Nationality Act is
amended to read as follows:
  "(c) Any immigrant born in a colony or other component or depend-
ent area of a foreign state overseas from the foreign state, other than a
special immigrant, as defined in section 101(a) (27), or an immediate
relative of a United States citizen, as defined in section 201(b), shall be
chargeable for the purpose of the limitation set forth in section 202(a),
to the foreign state, and the number of immigrant visas available to
each such colony or other component or dependent area shall not exceed
six hundred in any one fiscal year.".
  SEC. 3. Section 203(a) of the Immigration and Nationality Act is
amended to delete "201(a) (1) or (2)" each place it appears in para-
graphs one through seven and by substituting in lieu thereof "201(a)".
  SEC. 4. (a) There is established a Select Commission on Immigra-
tion and Refugee Policy (hereinafter in this section referred to as the
"Commission") which shall be composed of—
    (1) four members appointed by the President, one of whom
  shall be designated by the President as Chairman;
    (2) the Secretary of State, the Attorney General, the Secretary
  of Labor, and the Secretary of Health, Education, and Welfare;
    (3) four members appointed by the Speaker of the House of
  Representatives from the membership of the House Committee on
  the Judiciary; and
    (4) four members appointed by the President pro tempore of
  the Senate from the membership of the Senate Committee on the
  Judiciary.
  (b) (1) A majority of the Commission shall constitute a quorum for
the transaction of its business, but the Commission may provide for
the taking of testimony and the reception of evidence at meetings at
which there are present not less than four members of the Commission.
  (2) Each member of the Commission who is not otherwise in the
service of the Government of the United States shall receive the sum of
$100 for each day spent in the work of the Commission, shall be paid
actual travel expenses, and per diem in lieu of subsistence expenses,

<div align="right">

Immigration and
Nationality Act,
amendment.
8 USC 1151.
8 USC 1101.

8 USC 1153.

8 USC 1152.

8 USC 1153.

Select
Commission on
Immigration and
Refugee Policy.
Establishment.
8 USC 1151 note.

</div>

Defendant's Exhibit U
6:23-cv-00007

**92 STAT. 908**                    **PUBLIC LAW 95–412—OCT. 5, 1978**

5 USC 5701
*et seq.*

when away from his usual place of residence, in accordance with chapter 57 of title 5, United States Code. Each member of the Commission who is otherwise in the service of the Government of the United States shall serve without compensation in addition to that received for such other service, but while engaged in the work of the Commission shall be paid actual travel expenses, when away from his usual place of residence, in accordance with chapter 57 of title 5, United States Code.

Study and
evaluation.
Recommendations
to President and
Congress.

(c) It shall be the duty of the Commission to study and evaluate, in accordance with subsection (d), existing laws, policies, and procedures governing the admission of immigrants and refugees to the United States and to make such administrative and legislative recommendations to the President and to the Congress as are appropriate.

(d) In particular, the Commission shall—

8 USC 1101
note.

(1) conduct a study and analysis of the effect of the provisions of the Immigration and Nationality Act (and administrative interpretations thereof) on (A) social, economic, and political conditions in the United States; (B) demographic trends; (C) present and projected unemployment in the United States; and (D) the conduct of foreign policy;

(2) conduct a study and analysis of whether and to what extent the Immigration and Nationality Act should apply to the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Northern Mariana Islands, and the other territories and possessions of the United States;

(3) review, and make recommendations with respect to the numerical limitations (and exemptions therefrom) of the Immigration and Nationality Act on the admission of permanent resident aliens;

(4) assess the social, economic, political, and demographic impact of previous refugee programs and review the criteria for, and numerical limitations on, the admission of refugees to the United States;

(5) conduct a comprehensive review of the provisions of the Immigration and Nationality Act and make legislative recommendations to simplify and clarify such provisions;

(6) make semiannual reports to each House of Congress during the period before publication of its final report (described in paragraph (7)); and

Report to
President and
Congress.

Compensation.

(7) make a final report of its findings and recommendations to the President and each House of Congress, which report shall be published not later than September 30, 1980.

(e)(1) The Commission is authorized to appoint and fix the compensation of a staff director and such other additional personnel as may be necessary to enable the Commission to carry out its functions without regard to the civil service laws, rules, and regulations. Any Federal employee subject to those laws, rules, and regulations may be detailed to the Commission, and such detail shall be without interruption or loss of civil service status or privilege.

(2) Staff members of the Committee on the Judiciary of the Senate or of the Committee on the Judiciary of the House of Representatives may be detailed to serve on the staff of the Commission by the chairman of the respective committee. Staff members so detailed shall serve on the staff of the Commission without additional compensation except that they may receive such reimbursement of expenses incurred by them as the Commission may authorize.

Defendant's Exhibit U
6:23-cv-00007

PUBLIC LAW 95–412—OCT. 5, 1978          92 STAT. 909

(f) The Commission may call upon the head of any Federal department or agency to furnish information and assistance which the Commission deems necessary for the performance of its functions, and the heads of such departments and agencies shall furnish such assistance and information, unless prohibited under law, without reimbursement.

(g) The Commission is authorized to make grants and enter into contracts for the conduct of research and studies which will assist it in performing its duties under this section.
<span style="float:right">Grants and contracts.</span>

(h) The Commission shall cease to exist upon the filing of its final report, except that the Commission may continue to function for up to sixty days thereafter for the purpose of winding up its affairs.
<span style="float:right">Termination.</span>

(i) There is authorized to be appropriated the sum of $700,000 to carry out the provisions of this section.
<span style="float:right">Appropriation authorization.</span>

(j) Notwithstanding any other provision of this Act, no payment, or authorization to make payments or to enter into contracts under this Act, shall be effective except to such extent, or in such amounts, as are provided in advance in appropriations Acts.

Sec. 5. Notwithstanding any other provision of law, any refugee, not otherwise eligible for retroactive adjustment of status, who was or is paroled into the United States by the Attorney General pursuant to section 212(d)(5) of the Immigration and Nationality Act before September 30, 1980, shall have his status adjusted pursuant to the provisions of section 203 (g) and (h) of that Act.
<span style="float:right">8 USC 1182 note.<br>8 USC 1182.<br>8 USC 1153.</span>

Approved October 5, 1978.

LEGISLATIVE HISTORY:

HOUSE REPORT No. 95–1206 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 124 (1978):
    July 18, considered and passed House.
    Sept. 20, considered and passed Senate.

Defendant's Exhibit U
6:23-cv-00007

and file the Form I–131 in effect at the time of filing—and follow any additional instructions included in the program eligibility notice they receive from either USCIS or the NVC in submitting their application. A completed Form I–131 and fee or fee waiver request must be filed for each individual on whose behalf parole is being requested.

### III. Participation in the CFRP Program and Application Process

USCIS offers participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries—including any eligible spouse and child accompanying or following-to-join the principal beneficiaries (*see* INA sec. 203(d), 8 U.S.C. 1153(d))—of an approved Form I–130, Petition for Alien Relative, but for whom an immigrant visa is not immediately available. Participation in the CFRP Program is voluntary.

Prior to the date of this notice, the NVC mailed written notice to eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 indicating their beneficiaries' eligibility to participate in the CFRP Program. The notice invited an interested petitioner to submit to the NVC a copy of their approved Form I–130 and other supporting documents to opt in to the CFRP Program and begin the process of requesting parole. No formal application form or fee was required to apply. As of the date of this notice, the NVC will no longer issue CFRP Program eligibility notices that do not have a form and fee to apply. Petitioners with CFRP Program eligibility notices dated prior to December 18, 2014 must submit to the NVC the complete required documentation to opt in to the CFRP Program prior to February 17, 2015 in order to be grandfathered and considered for processing without a form and fee.

On or after February 17, 2015, participation in the CFRP Program will be predicated on submission of a Form I–131 and the requisite fee(s) or request for fee waiver that has been approved by USCIS. A U.S.C. or LPR petitioner in the United States with an approved Form I–130 that was filed on behalf of a beneficiary relative residing in Cuba, for whom a visa is not anticipated to be available during the CFRP processing time, will receive a written invitation from the NVC regarding the beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131 and submit the required fee(s) or fee waiver

request to apply for the program. USCIS will reject a request for parole under the CFRP Program submitted without the required form and fee(s) or a request for a fee waiver.

USCIS officers or Department of State consular officers will interview qualified beneficiaries in Havana to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to authorize parole under the CFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States and seek parole by U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family member. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident after he or she has been physically present in the United States for one year as provided by the Cuban Adjustment Act, Pub. L. 89–732, 80 Stat. 1161 (8 U.S.C. 1255 note), or once the beneficiary's visa becomes available, whichever comes first.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of the immigrant visa petitions filed on their behalf.

For eligible beneficiaries who are not "immediate relatives," if an immigrant visa becomes available while the Form I–131 is pending, the beneficiary will be able to proceed with the parole process to completion, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

### IV. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The Application for Travel Document, Form I–131, has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to the Form in connection with the CFRP Program and this notice; however, USCIS estimates that this notice will result in an annual

average of 13,000–15,000 Form I–131 filings per year. The current OMB-approved estimate of the number of annual respondents filing a Form I–131 is 940,671. USCIS has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file for the CFRP Program will be covered within the 940,671 estimated. USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice. Therefore, USCIS is not publishing a notice under the PRA or making revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the CFRP Program and the application process will be posted on the USCIS Web site at *www.uscis.gov*.

Dated: December 11, 2014.

**León Rodríguez**
*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29486 Filed 12–17–14; 8:45 am]
BILLING CODE 9111–97–P

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2548–14; DHS Docket No. USCIS–2014–0013]

### Implementation of Haitian Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Haitian Family Reunification Parole (HFRP) Program. Under this program, USCIS offers certain Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014 an opportunity to receive a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available, rather than remain in Haiti awaiting availability of their immigrant visas. The program is intended to expedite family reunification through safe, legal, and orderly channels of migration to the United States, increase existing avenues for legal migration from Haiti, and help Haiti continue to recover from the devastation and damage suffered in the January 12, 2010 earthquake.

**DATES:**

Defendant's Exhibit V
6:23-cv-00007

75582    Federal Register / Vol. 79, No. 243 / Thursday, December 18, 2014 / Notices

• The HFRP Program will only be available to Haitian beneficiaries of family-based immigrant petitions approved on or before December 18, 2014.

• On or after February 2, 2015, the Department of State's National Visa Center (NVC) will begin sending to eligible petitioners written invitations to apply to the HFRP Program.

**FOR FURTHER INFORMATION CONTACT:**
Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone (202) 272–1892.

**SUPPLEMENTARY INFORMATION:**

## I. Background of the HFRP Program

The rebuilding and development of a safe and economically strong Haiti is a priority for the United States. While progress has been made since the 2010 earthquake that devastated parts of the country, Haiti continues to face significant development challenges. Reconstruction and development in Haiti will continue for many years.[1]

With the exception of "immediate relatives" of U.S. citizens (USCs) (*i.e.*, parent, spouse and unmarried child(ren) under 21 years of age), *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* INA secs. 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. These statutory limits have resulted in long waiting periods before family members remaining in Haiti may join the U.S.C. and lawful permanent resident (LPR) family members in the United States who petitioned for them.

Under the HFRP Program, USCIS will exercise its discretionary parole authority[2] to permit certain eligible Haitians in Haiti to join their family members in the United States up to approximately two years before their immigrant visas become available, thereby promoting family unity. By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States.

Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development. Once paroled into the United States, HFRP Program beneficiaries will be eligible to apply for employment authorization, and those who are able to work may contribute to Haiti's post-earthquake reconstruction and development through remittances. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

## II. Participation in the HFRP Program and Application Process

USCIS offers participation in the HFRP Program to eligible Haitians: (1) In Haiti; (2) who are the beneficiaries (including any accompanying or following-to-join spouse and children[3]) of Forms I–130, Petition for Alien Relative, that were approved on or before the date of publication of this notice; (3) whose immigrant visas are not available, but are expected to become available within approximately 18 to 30 months; and (4) whose petitioning relatives in the United States have received a written invitation to apply for the HFRP Program on their behalf from the Department of State's National Visa Center (NVC).

The NVC will issue a written invitation to petitioners of approved Forms I–130 based upon the date when the immigrant visas for their beneficiary relatives are expected to become available. Each year the NVC will identify approved Forms I–130 whose filing dates (priority dates) are expected to become current in approximately the next 18 to 30 months, meaning that the immigrant visas for those cases are expected to become available within that timeframe. The NVC will prioritize the issuance of invitations to petitioners within that group, beginning with the oldest Form I–130 filing date and working forward to the most recent filing date. The number of HFRP Program invitations may be limited annually based on U.S. Government operational capacity in Haiti and the availability of U.S. Government resources to aid program beneficiaries. Initially, the U.S. Government will seek to interview approximately 5,000 HFRP Program beneficiaries in Haiti per year. Petitioners will be given a deadline by which they must apply to have their beneficiary relatives considered for parole under the program. Participation in the HFRP Program is voluntary.

On or after February 2, 2015, eligible U.S.-based U.S.C. and LPR petitioners with approved Forms I–130 filed on behalf of a beneficiary relative in Haiti

for whom a visa is not available but expected to become available within approximately 18 to 30 months, will receive a written notice from the NVC regarding the beneficiary's eligibility to participate in the HFRP Program and the procedures for requesting parole, if desired. The notice will instruct the recipient on how to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request to apply for parole under the HFRP Program on behalf of each beneficiary. USCIS will reject a request for parole under the HFRP Program that is not submitted as instructed, without the required completed form, or without the fee(s) or a request for a fee waiver.

USCIS or Department of State consular officers will interview qualified beneficiaries in Port au Prince, Haiti, to verify their eligibility for the program. Beneficiaries may also have their biometrics collected. If USCIS exercises its discretion to grant parole under the HFRP Program, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in Haiti. These travel documents will enable the beneficiary to travel to the United States and seek parole from U.S. Customs and Border Protection (CBP) at a U.S. port-of-entry to join his or her family. A beneficiary who is paroled into the United States would then be eligible to apply to adjust status to that of lawful permanent resident once the beneficiary's immigrant visa becomes available.

Participation in the HFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). Such aliens may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. If, however, an immigrant visa becomes available for a beneficiary who is not an "immediate relative" while the Form I–131 is pending, the beneficiary will still be able to complete the parole process, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the visa and admissible by CBP at the port of entry.

## III. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they

---

[1] *http://www.state.gov/s/hsc/factsheets/2014/219539.htm.*

[2] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for establishing conditions of parole and for terminating parole).

[3] *See* INA sec. 203(d), 8 U.S.C. 1153(d).

Defendant's Exhibit V
6:23-cv-00007

impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is making no changes to this form in connection with the implementation of the HFRP Program and this notice. USCIS estimates that the HFRP Program will result in an average of 5,000 Form I–131 filings per year. The current OMB-approved estimated number of annual respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a HFRP Program-related request will be covered within the 940,671 estimated. Because USCIS is not changing the collection instrument or increasing its burden estimates in connection with this notice, it is publishing no notice under the PRA and making no revisions to the currently approved burden for OMB control number 1615–0013.

Additional information about the HFRP program and the application process will be posted on the USCIS Web site at *www.uscis.gov.*

Dated: December 11, 2014.

**León Rodríguez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2014–29533 Filed 12–17–14; 8:45 am]

BILLING CODE 9111–97–P

---

**DEPARTMENT OF THE INTERIOR**

[Docket No. ONRR–2014–0002; DS63610000 DR2PS0000.CH7000 145D0102R2]

**Office of Natural Resources Revenue; Agency Information Collection Activities: Proposed Collection–United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection, Comment Request**

**AGENCY:** Office of Natural Resources Revenue (ONRR), Interior.

**ACTION:** Notice of a new information collection.

**SUMMARY:** To comply with the Paperwork Reduction Act of 1995 (PRA), we are inviting comments on an information request that we will submit to the Office of Management and Budget (OMB) for review and approval. This Information Collection Request (ICR) covers the voluntary paperwork requirements for participation in the United States' implementation of the Extractive Industries Transparency Initiative (EITI). It encompasses

upcoming requests that certain companies voluntarily provide information on the amount of revenue which they have paid to the Federal government for extracting Federally-owned natural resources.

**DATES:** Submit written comments on or before February 17, 2015.

**ADDRESSES:** You may submit comments on this ICR to ONRR by using one of the following three methods (please use ONRR 2014–0002 as an identifier in your comment):

1. Electronically, go to *http://www.regulations.gov.* In the entry titled "Enter Keyword or ID," enter ONRR–2014–0002 and then click "Search." Follow the instructions to submit public comments. ONRR will post all comments.

2. Mail comments to Mr. Luis Aguilar, Regulatory Specialist, ONRR, P.O. Box 25165, MS 61030A, Denver, Colorado 80225–0165.

3. Hand-carry or mail comments, using an overnight courier service, to ONRR. Our courier address is Building 85, Room A–614, Denver Federal Center, West 6th Ave. and Kipling St., Denver, Colorado 80225.

**FOR FURTHER INFORMATION CONTACT:** For questions on technical issues, contact Mr. Jon Swedin, Program Analyst, at (303) 231–3028, or email *Jonathan.Swedin@onrr.gov.* For other questions, contact Mr. Luis Aguilar, telephone (303) 231–3418, or email *Luis.Aguilar@onrr.gov.* You may also contact Mr. Aguilar to obtain copies, at no cost, of (1) the ICR, (2) any associated form, and (3) the regulations that require us to collect the information.

**SUPPLEMENTARY INFORMATION:**

*Title:* United States Extractive Industries Transparency Initiative (USEITI) Revenue Information Collection.

*OMB Control Number:* 1012—0NEW.

*Bureau Form Number:* United States Extractive Industries Transparency Initiative (USEITI) Company Payment Reporting Template.

*Abstract:* The Secretary of the U.S. Department of the Interior is responsible for mineral resource development on Federal and Indian lands and the Outer Continental Shelf (OCS). Under various laws, the Secretary's responsibility is to manage mineral resources production on Federal and Indian lands and the OCS, collect the royalties and other mineral revenues due, and distribute the funds collected under those laws. ONRR performs the royalty management functions and assists the Secretary in carrying out the Department's responsibility. We have posted those laws pertaining to mineral leases on

Federal and Indian lands and the OCS at *http://www.onrr.gov/Laws_R_D/PubLaws/default.htm.*

In September 2011, President Obama announced the U.S. commitment to domestic implementation of EITI, a key element of the President's Open Government Partnership commitments. President Obama appointed the Secretary of the Interior as the senior U.S. official to lead USEITI implementation. EITI is a voluntary global effort designed to strengthen transparency, accountability, and public trust for the revenues paid and received for a country's oil, gas, and mineral resources. The Administration renewed its commitment to implement EITI in the December 2013 U.S. Open Government National Action Plan. By signing onto the global EITI standard, the U.S. Government will help ensure that American taxpayers are receiving every dollar due for the extraction of these valuable public resources. The EITI Standard contains the set of requirements that countries need to meet in order to be recognized first as an EITI Candidate and, ultimately, an EITI-Compliant Country. In March 2014, the U.S. became the first G7 country to achieve Candidate Country status. When fully implemented, EITI will ensure more transparency in how the country's natural resources are governed and also will provide full disclosure of government revenues from its extractive sector.

The following laws and executive initiative are applicable to USEITI, including the Secretary's and ONRR's management of mineral resource production, revenue, and information disclosure obligations:

- U.S. Open Government National Action Plan
- Freedom of Information Act, as amended (5 U.S.C. 552)
- Outer Continental Shelf Lands Act, as amended (43 U.S.C. 1331–56b), including provisions of the Energy Policy Act of 2005 (42 U.S.C. 15801 et seq.)
- Federal Oil and Gas Royalty Management Act of 1982 as amended by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. 1701–1759).
- Geothermal Steam Act of 1970 (30 U.S.C. 1001–28)
- Mineral Leasing Act (30 U.S.C. 181–287)
- Mineral Leasing Act for Acquired Lands (30 U.S.C. 351–60)

**General Information**

International EITI requirements direct participating governments to publish annual reports to help citizens

Defendant's Exhibit V
6:23-cv-00007

for approval. All comments will become a matter of public record.

## Overview of This Information Collection

*Title:* Record of Vessel Foreign Repair or Equipment Purchase.

*OMB Number:* 1651–0027.

*Form Number:* CBP Form 226.

*Current Actions:* Revision of an existing information collection.

*Type of Review:* Revision.

*Affected Public:* Businesses.

*Abstract:* 19 U.S.C. 1466(a) provides for a 50 percent *ad valorem* duty assessed on a vessel master or owner for any repairs, purchases, or expenses incurred in a foreign country by a commercial vessel registered in the United States. CBP Form 226, Record of Vessel Foreign Repair or Equipment Purchase, is used by the master or owner of a vessel to declare and file entry on equipment, repairs, parts, or materials purchased for the vessel in a foreign country. This information enables CBP to assess duties on these foreign repairs, parts, or materials. CBP Form 226 is provided for by 19 CFR 4.7 and 4.14 and is accessible at: *https:// www.cbp.gov/document/forms/form-226-record-vessel-foreign-repair-or-equipment-purchase.*

### Proposed Change

This form is anticipated to be submitted electronically as part of the maritime forms automation project through the Vessel Entrance and Clearance System (VECS), which will eliminate the need for any paper submission of any vessel entrance or clearance requirements under the above referenced statutes and regulations. VECS will still collect and maintain the same data, but will automate the capture of data to reduce or eliminate redundancy with other data collected by CBP.

*Type of Information Collection:* Record of Vessel Foreign Repair or Equipment Purchase.

*Estimated Number of Respondents:* 421.

*Estimated Number of Annual Responses per Respondent:* 28.

*Estimated Number of Total Annual Responses:* 11,788.

*Estimated Time per Response:* 2 hours.

*Estimated Total Annual Burden Hours:* 23,576.

Dated: April 22, 2022.

**Seth D. Renkema,**

*Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.*

[FR Doc. 2022–08983 Filed 4–26–22; 8:45 am]

**BILLING CODE 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of the Uniting for Ukraine Parole Process

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of a U.S. Department of Homeland Security (DHS) parole process called *Uniting for Ukraine.* Pursuant to this process, DHS will offer certain Ukrainian citizens and their immediate family members who were recently displaced by Russia's war of aggression in Ukraine, pass biometric and biographic vetting, have sufficient financial support in the United States, and meet other eligibility requirements, an opportunity to apply for and receive advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole for urgent humanitarian reasons or significant public benefit for up to two years. The process is intended to be a safe, legal, and orderly pathway to support vulnerable Ukrainian citizens and their immediate family members in Europe who have been displaced from their country as a result of Russia's unprovoked invasion.

**DATES:** DHS will make the *Uniting for Ukraine* parole process available on April 25, 2022.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King, Jr. Avenue SE, Washington, DC 20528–0445

**SUPPLEMENTARY INFORMATION:**

### I. Background

On February 24, 2022, Russia's military launched an unprovoked full-scale invasion of the sovereign nation of Ukraine, marking the largest conventional military action in Europe since World War II[1] and causing the fastest growing refugee crisis in modern history. As of April 10, 2022, nearly 12 million people have fled Russia's invasion, including seven million displaced inside Ukraine.[2] Russia's

forces have continued to engage in significant, sustained bombardment of major cities, indiscriminately targeting civilian populations and causing widespread terror.[3] While most of those fleeing the violence remain in Europe,[4] the United States has committed to welcoming up to 100,000 displaced Ukrainians and others fleeing Russian aggression.[5] Among other legal pathways, the United States will consider, on a case-by-case basis, granting Ukrainians advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole for urgent humanitarian reasons or significant public benefit.[6]

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis, for "urgent humanitarian reasons or significant public benefit." INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States. INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may set the duration of the parole based on the purpose for granting the parole request, and may impose reasonable conditions on parole. INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS may terminate parole in its discretion at any time. *See* 8 CFR 212.5(e). Individuals who are paroled into the United States generally may apply for employment authorization. *See* 8 CFR 274a.12(c)(11).

---

[1] "Russia invades Ukraine on multiple fronts in 'brutal act of war'," *PBS,* Feb. 24, 2022, available at: *https://www.pbs.org/newshour/world/russia-invades-ukraine-on-multiple-fronts-in-brutal-act-of-war* (last visited Apr. 20, 2022); Natalia Zinets and Aleksandar Vasovic, "Missiles rain down around Ukraine," *Reuters,* Feb. 24, 2022, available at: *https://www.reuters.com/world/europe/putin-orders-military-operations-ukraine-demands-kyiv-forces-surrender-2022-03-24/* (last visited Apr. 20, 2022).

[2] "Russia's invasion of Ukraine in maps—latest updates," *Financial Times,* Apr. 20, 2022, available

at: *https://www.ft.com/content/4351d5b0-0888-4b47-9368-6bc4dfbccbf5* (last visited Apr. 20, 2022).

[3] Ukraine: Humanitarian Impact Situation Report No. 1, United Nations Office for the Coordination of Humanitarian Affairs, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[4] Map: Where Ukraine refugees are heading, *ABC News,* Mar. 30, 2022, available at *https://abcnews.go.com/International/map-ukrainian-refugees-heading/story?id=83178031.*

[5] *FACT SHEET: The Biden Administration Announces New Humanitarian, Development, and Democracy Assistance to Ukraine and the Surrounding Region,* White House Briefing Room, Mar. 24, 2022, available at *https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/24/fact-sheet-the-biden-administration-announces-new-humanitarian-development-and-democracy-assistance-to-ukraine-and-the-surrounding-region/* (last visited Apr. 20, 2022).

[6] *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5); 8 CFR 212.5(f).

Defendant's Exhibit W
6:23-cv-00007

*Uniting for Ukraine* establishes a process by which eligible Ukrainian citizens and their immediate family members, if supported by an individual or entity in the United States, can apply for advance authorization to travel to the United States for the purpose of seeking a discretionary grant of parole. If advance authorization is granted, the recipient will be permitted to board a flight to the United States for the purpose of requesting parole. This notice outlines the process by which U.S.-based persons can apply to financially support eligible Ukrainian citizens and their immediate family members, the process by which those Ukrainians may request advance authorization to travel to the United States, and the relevant screening and vetting that is required prior to issuance of such travel authorization and any grant of parole.

The decision to parole a noncitizen into the United States is made at the port of entry, on a case-by-case basis, pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A); as a result, approval of travel authorization to apply for parole at a U.S. port of entry, *see* 8 CFR 212.5(f), does not guarantee that the individual will be paroled. If parole is granted pursuant to this process, it will generally be for a term of up to two years.

## II. Ongoing Armed Conflict, Human Rights Abuses, and Humanitarian Situation in Ukraine

Russia's full-scale military invasion of Ukraine, beginning on February 24, 2022, has indiscriminately targeted civilian populations, placing civilians throughout the country at significant risk of physical harm.[7] As of mid-April 2022, Russian forces continue sustained shelling campaigns of cities and towns across Ukraine that have harmed, killed, and injured civilians and struck hospitals, schools, and apartment buildings.[8] Artillery attacks and air strikes by Russia's military forces have become regular occurrences in cities across Ukraine since the start of the February 2022 invasion.[9] Aerial bombardments in and around major

cities have been reported as Russia's forces continue to target critical infrastructure.[10] In an April 13, 2022 update, the United Nations (UN) Office of the High Commissioner for Human Rights (OHCHR) reported 4,521 civilian casualties during the ongoing Russian invasion of Ukraine, with more casualties expected as the fighting continues.[11] OHCHR also notes that these estimates likely significantly undercount civilian fatalities.[12]

Russia's unprovoked war against Ukraine continues to "generate further population displacement, damage civilian infrastructure, and exacerbate humanitarian needs across the country."[13] Since February 24, significant infrastructural damage in Ukraine from Russia's air strikes has "left hundreds of thousands of people without electricity or water, while bridges and roads damaged by shelling have left communities cut off from markets for food and other basic supplies."[14] In February 2022, the U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA) estimated that millions of Ukrainian nationals were in need of water, sanitation and hygiene assistance.[15] Those without access to alternative water sources have been most heavily impacted.[16]

Food security remains an ongoing is concern in Ukraine, with more than one million Ukrainian nationals in need of food assistance—including a significant number that are severely or moderately

food insecure.[17] The impact on women has been particularly pronounced: "available data show that female-headed households are an estimated 1.3 times more often experiencing food insecurity, compared to the overall population."[18] According to the United Nations, women and girls also face "higher risks of human rights violations and sexual exploitation and abuse, including transactional sex, survival sex and conflict-related sexual violence."[19]

Critical medicines, health supplies and equipment, and shelter and protection for those displaced from their home are also in short supply.[20] According to the United Nations, more than a million Ukrainian nationals were in need of health care assistance, even prior to the initiation of conflict; the conflict has significantly exacerbated these challenges.[21] Hospitals have struggled with the volume of COVID cases and Ukraine has one of the lowest vaccination rates in Europe.

These factors, coupled with the ongoing violence, have led to large scale displacements of Ukrainians. Since Russia invaded Ukraine, over five million people have, as of April 19, 2022, fled Ukraine for Poland, Hungary, Slovakia, Romania, and Moldova.[22] Another seven million have been internally displaced inside Ukraine.[23]

---

[10] "Russia's invasion of Ukraine in maps—latest updates," *Financial Times*, Apr. 20, 2022, available at: *https://www.ft.com/content/4351d5b0-0888-4b47-9368-6bc4dfbccbf5* (last visited Apr. 20, 2022).

[11] UN OHCHR, "Ukraine: civilian casualty update 13 April 2022," Apr. 13. 2022, available at: *https://www.ohchr.org/en/news/2022/04/ukraine-civilian-casualty-update-13-april-2022* (last visited Apr. 20, 2022).

[12] *See supra* note 7.

[13] *Ukraine—Complex Emergency,* U.S. Agency for International Development, Mar. 25, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-03-25_USG_Ukraine_Complex_Emergency_Fact_Sheet_8.pdf* (last visited Apr. 20, 2022).

[14] *Ukraine: Humanitarian Impact, Situation Report No. 01,* UNOCHA Ukraine, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[15] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 73, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[16] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 39, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[17] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 79, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[18] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 51, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022).

[19] *Rapid Gender Analysis of Ukraine: Secondary data review,* UNHCR, Mar. 29, 2022, *https://data2.unhcr.org/en/documents/details/91723* (last visited Apr. 20, 2022).

[20] *Ukraine: Humanitarian Impact, Situation Report No. 01,* UNOCHA Ukraine, Feb. 26, 2022, available at: *https://reliefweb.int/report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022* (last visited Apr. 20, 2022).

[21] *2022 Humanitarian Needs Overview—Ukraine,* UNOCHA, p. 87, Feb. 11, 2022, available at: *https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ukraine_2022_hno_eng_2022-02-11.pdf* (last visited Apr. 20, 2022); and *Impact of Health Reform on the Primary Healthcare Level in Conflict-Affected Areas of Donetsk and Luhansk Oblasts,* Médicos del Mundo, June 2021, available at: *https://reliefweb.int/report/ukraine/impact-healthcare-reform-primary-healthcare-level-conflict-affected-areas-donetsk-and* (last visited Apr. 20, 2022).

[22] Operational Data Portal, UNHCR, Apr. 19, 2022, available at: *https://data2.unhcr.org/en/situations/ukraine* (last visited Apr. 20, 2022).

[23] *One in Six People Internally Displaced in Ukraine,* International Organization on Migration, Apr. 21, 2022, available at: *https://reliefweb.int/*
Continued

---

[7] *Press briefing notes on Ukraine,* UN OHCHR, Mar. 8, 2022, available at: *https://www.ohchr.org/en/press-briefing-notes/2022/03/press-briefing-notes-ukraine* (last visited Apr. 20, 2022).

[8] *War Crimes by Russia's Forces in Ukraine, Press Statement,* U.S. Secretary of State Antony J. Blinken, Mar. 23, 2022, available at: *https://www.state.gov/war-crimes-by-russias-forces-in-ukraine/* (last visited Apr. 20, 2022).

[9] "Fear, darkness and newborn babies: inside Ukraine's underground shelters," *The Guardian*, Feb. 26, 2022, available at: *https://www.theguardian.com/world/2022/feb/26/fear-darkness-and-newborn-babies-inside-ukraine-underground-shelters* (last visited Apr. 20, 2022).

Defendant's Exhibit W
6:23-cv-00007

## III. Uniting for Ukraine

Pursuant to the process established by *Uniting for Ukraine,* U.S.-based individuals who agree to provide financial support to Ukrainian citizens and their immediate family members (supporters) will be able to initiate a process that will ultimately allow those Ukrainian citizens and their immediate family members (Ukrainian beneficiaries) to seek advance authorization to travel to the United States for the purpose of seeking parole into the United States at a U.S. port of entry. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of a noncitizen into the United States for urgent humanitarian reasons or significant public benefit); 8 CFR 212.5(f). The determination as to whether to parole a particular noncitizen who presents such authorization remains a case-by-case, discretionary determination made upon arrival at the port of entry.

## IV. Participation in Uniting for Ukraine and Filing Process

### 1. Eligibility

Certain Ukrainian citizens, and certain non-Ukrainian immediate family members,[24] who were physically present in Ukraine as of February 11, 2022 and have a U.S.-based supporter are eligible for this process. The process is triggered when a prospective supporter files a Form I–134, *Declaration of Financial Support,* with U.S. Citizenship and Immigration Services (USCIS) through an online portal. USCIS will review that form in order to verify and vet the information submitted. Once USCIS determines that the Form I–134 includes sufficient evidence of financial support, the relevant Ukrainian beneficiary will be notified and will be prompted to submit any additional required information. To be eligible, the Ukrainian beneficiary must possess a valid Ukrainian passport, or if a child without their own passport, be included in a parent's passport. At this time, only children

traveling with a parent or a legal guardian will be eligible for *Uniting for Ukraine.* Individuals who are not eligible for *Uniting for Ukraine* may make an appointment at the nearest U.S. Embassy or consulate for additional information about available options.

The Ukrainian beneficiary also must clear biographic and biometric background checks, and will need to meet public health requirements, including, as appropriate, proof of required vaccinations, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention (CDC). Pursuant to these requirements, Ukrainian beneficiaries must demonstrate proof of first doses of measles, polio, and COVID–19 vaccines and must complete a screening for tuberculosis for all individuals two years of age or older. These requirements may be adjusted in accordance with evolving public health needs; the most up-to-date requirements will be available at *www.dhs.gov/ukraine.*

### 2. Processing Steps

*Filing and confirmation of financial support:* The process is initiated when a supporter—either an individual or an individual acting on behalf of an organization—files a Form I–134, *Declaration of Financial Support,* online using the myUSCIS platform. This declaration must include biographic and financial information on the supporter, and biographic identifying information on the Ukrainian beneficiary.

The individual who submits and signs the Form I–134 must be a U.S.-based person in lawful status, a parolee, or a beneficiary of deferred action or Deferred Enforced Departure. The individual can, however, represent an organization. If the individual is acting on behalf of an organization, and if that organization is providing the financial or other services to support the Ukrainian beneficiary, this information should be provided as part of the evidence submitted with the Form I–134.

USCIS will conduct background checks on the supporter to protect against exploitation and abuse and to determine the supporters' financial suitability to support beneficiaries. If the supporter is approved, USCIS will notify the Ukrainian beneficiary electronically with an invitation to create a myUSCIS account.

*Ukrainian beneficiary account registration:* Following USCIS's approval of the named supporter, the Ukrainian beneficiary will receive an electronic communication from USCIS

with instructions on how to set up an account with myUSCIS and other next steps. The Ukrainian beneficiary will be required to confirm their biographic information on myUSCIS and attest to completion of all other requirements, including the required vaccinations and screening listed above.

*Vetting and Clearance:* Biographic information provided by the prospective Ukrainian beneficiary will be vetted against national security and law enforcement databases. The my USCIS system will transmit biographic information for Ukrainian beneficiaries directly to U.S. Customs and Border Protection (CBP) and into CBP's Automated Targeting System (ATS) for vetting. Only Ukrainian beneficiaries who complete all the requirements, including vaccinations, and clear the vetting of their biographic information will receive the necessary advanced authorization to travel to the United States to seek parole

Once vetting is complete and advance authorization to travel has been approved, Ukrainian beneficiaries will receive a notification in myUSCIS in an automated manner. Cleared individuals will be authorized to travel via commercial routes to the United States for a period of 90 days. Carriers utilizing CBP's Document Validation program will be able to access this authorization to facilitate generation of a boarding pass. Carriers who are not participants in the Document Validation program will utilize manual verification mechanisms to generate a boarding pass.

*Travel and public health related requirements:* Ukrainian beneficiaries who receive advance authorization to travel to the United States will be responsible for arranging and funding their travel to the United States. In addition, Ukrainian beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel,[25] including

---

report/ukraine/ukraine-humanitarian-impact-situation-report-no-1-500-pm-26-february-2022 (last visited Apr. 24, 2022).

[24] Ukrainians' immediate family members who are not Ukrainian citizens may also be considered for parole under *Uniting for Ukraine.* Immediate family members, for the purposes of *Uniting for Ukraine,* include: the spouse or common-law partner of a Ukrainian citizen; and their unmarried children under the age of 21. Non-Ukrainian immediate family members authorized to travel with this process must accompany the principal Ukrainian when completing travel to the United States. Unaccompanied minors and family groups that include minors traveling with adults that are not the child's parent or legal guardian are not currently eligible for this process.

[25] Changes to requirements for travel by air were implemented by, *inter alia,* Presidential Proclamation 10294 of October 25, 2021, 86 FR 59603 (Oct. 28, 2021) ("Presidential Proclamation"), and a related CDC action, 86 FR 61224 (Nov. 5, 2021) and 87 FR 20405 (Apr. 7, 2022). *See also* CDC, *Requirement for Proof of Negative COVID–19 Test or Recovery from COVID–19 for All Air Passengers Arriving in the United States, https://www.cdc.gov/quarantine/pdf/Global-Testing-Order-10-25-21-p.pdf* (Oct. 25, 2021); *Requirement for Airlines and Operators to Collect Contact Information for All Passengers Arriving into the United States, https://www.cdc.gov/quarantine/pdf/CDC-Global-Contact-Tracing-Order-10-25-2021-p.pdf* (Oct. 25, 2021). CDC later amended its testing order following developments related to the Omicron variant. *See* CDC, *Requirement for Proof of Negative COVID–19 Test Result or Recovery from COVID–19 for All Airline Passengers Arriving into the United States, https://www.cdc.gov/quarantine/*

Defendant's Exhibit W
6:23-cv-00007

vaccination and/or testing requirements for diseases like COVID–19, polio, measles, and tuberculosis.

*Parole determination at a U.S. port of entry:* Upon arrival at a port of entry, Ukrainian beneficiaries will be inspected by a CBP officer who will make a case-by-case processing determination, to include consideration of parole. Individuals granted parole pursuant to this process will generally be paroled for a period of up two years. Individuals granted parole under this process will be eligible to apply for employment authorization with USCIS.

## V. Paperwork Reduction Act

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. OMB has approved USCIS Form I–134, *Declaration of Financial Support,* and assigned the revision to OMB control number 1615–0014.

USCIS is making some changes to this form in connection with the implementation of the *Uniting for Ukraine* process and has submitted a request to OMB for emergency approval of the required changes under 5 CFR 1320.13. Following OMB approval of the emergency request, USCIS will publish a notice under the PRA and will make some revisions to the currently approved burden for OMB control number 1615–0014.

## VI. Implementation

This process will be implemented beginning on April 25, 2022.

Alejandro N. Mayorkas,
*Secretary of Homeland Security.*
[FR Doc. 2022–09087 Filed 4–25–22; 4:15 pm]
**BILLING CODE 9110–9M–P**

## DEPARTMENT OF THE INTERIOR

### Geological Survey

[GX22EE000101100]

### Public Meeting of the National Geospatial Advisory Committee

**AGENCY:** Department of Interior.
**ACTION:** Notice of public meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act of 1972, the U.S. Geological Survey (USGS) is publishing this notice to announce that a Federal Advisory

Committee meeting of the National Geospatial Advisory Committee (NGAC) will take place.

**DATES:** The meeting will be held as a webinar on Wednesday, May 18, 2022, from 1:00 p.m. to 5:00 p.m., and on Thursday, May 19, 2022, from 1:00 p.m. to 5:00 p.m. (Eastern Daylight Time).

**ADDRESSES:** The meeting will be held on-line and via teleconference. Instructions for accessing the meeting will be posted at *www.fgdc.gov/ngac.* Comments can be sent to Ms. Dionne Duncan-Hughes, Group Federal Officer by email to *gs-faca@usgs.gov.*

**FOR FURTHER INFORMATION CONTACT:** Mr. John Mahoney, Federal Geographic Data Committee (FGDC), USGS, by mail at 909 First Avenue, Room 703, Seattle, WA 98104; by email at *jmahoney@usgs.gov;* or by telephone at (206) 375–2565.

**SUPPLEMENTARY INFORMATION:** This meeting is being held under the provisions of the Federal Advisory Committee Act of 1972 (5 U.S.C., Appendix 2), the Government in the Sunshine Act of 1976 (5 U.S.C. 552B, as amended), and 41 CFR 102–3.140 and 102–3.150.

*Purpose of the Meeting:* The NGAC provides advice and recommendations related to management of Federal and national geospatial programs, the development of the National Spatial Data Infrastructure (NSDI), and the implementation of the Geospatial Data Act of 2018 (GDA) and the Office of Management and Budget Circular A–16. The NGAC reviews and comments on geospatial policy and management issues and provides a forum to convey views representative of non-federal stakeholders in the geospatial community. The NGAC meeting is one of the primary ways that the FGDC collaborates with its broad network of partners. Additional information about the NGAC meeting is available at: *www.fgdc.gov/ngac.*

*Agenda Topics:*
—FGDC Update
—GDA Reporting
—Landsat Advisory Group
—Partnerships/Stakeholder Engagement
—3D Elevation Program
—Executive Order 14008/Climate Mapping Initiative
—Public Comment

*Meeting Accessibility/Special Accommodations:* The webinar meeting is open to the public and will take place from 1:00 p.m. to 5:00 p.m. on May 18, 2022, and from 1:00 p.m. to 5:00 p.m. on May 19, 2022. Members of the public wishing to attend the meeting should visit *www.fgdc.gov/ngac* or contact Mr.

John Mahoney (see **FOR FURTHER INFORMATION CONTACT**). Webinar/ conference line instructions will be provided to registered attendees prior to the meeting. Individuals requiring special accommodations to access the public meeting should contact Mr. John Mahoney (see **FOR FURTHER INFORMATION CONTACT**) at least five (5) business days prior to the meeting so that appropriate arrangements can be made.

*Public Disclosure of Comments:* There will be an opportunity for public comment during both days of the meeting. Depending on the number of people who wish to speak and the time available, the time for individual comments may be limited. Written comments may also be sent to the Committee for consideration. To allow for full consideration of information by the Committee members, written comments must be provided to John Mahoney (see **FOR FURTHER INFORMATION CONTACT**) at least three (3) business days prior to the meeting. Any written comments received will be provided to the committee members before the meeting.

Before including your address, phone number, email address, or other personally identifiable information (PII) in your comment, you should be aware that your entire comment—including your PII—may be made publicly available at any time. While you may ask us in your comment to withhold your PII from public review, we cannot guarantee that we will be able to do so.

*Authority:* 5 U.S.C. Appendix 2.

Kenneth Shaffer,
*Deputy Executive Director, Federal Geographic Data Committee.*
[FR Doc. 2022–08924 Filed 4–26–22; 8:45 am]
**BILLING CODE 4338–11–P**

## INTERNATIONAL TRADE COMMISSION

### Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** International Trade Commission.
**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain CPAP Pillows, DN 3615;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission,

*pdf/Amended-Global-Testing-Order_12-02-2021-p.pdf* (Dec. 2, 2021).

Defendant's Exhibit W
6:23-cv-00007

136 STAT. 1218     PUBLIC LAW 117–128—MAY 21, 2022

GENERAL PROVISION—THIS TITLE

8 USC 1101 note.

SEC. 401. (a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Ukraine (or a person who last habitually resided in Ukraine) shall be eligible for the benefits described in subsection (b) if—

(1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—

Time period.

(A) paroled into the United States between February 24, 2022 and September 30, 2023; or

Effective date.

(B) paroled into the United States after September 30, 2023 and—

(i) is the spouse or child of an individual described in subparagraph (A); or

Determination.

(ii) is the parent, legal guardian, or primary caregiver of an individual described in subparagraph (A) who is determined to be an unaccompanied child under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)) or section 412(d)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)(B)); and

(2) such individual's parole has not been terminated by the Secretary of Homeland Security.

(b) BENEFITS.—An individual described in subsection (a) shall be eligible for—

(1) resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) to the same extent as such refugees, but shall not be eligible for the program of initial resettlement authorized by section 412(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1522(b)(1)); and

(2) services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)).

(c) CLARIFICATIONS.—

(1) Nothing in this section shall be interpreted to:

(A) preclude an individual described in subsection (a) from applying for or receiving any immigration benefits to which such individual is otherwise eligible; or

(B) entitle a person described in subsection (a) to lawful permanent resident status.

(2) Section 421(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) shall not apply with respect to determining the eligibility and the amount of benefits made available pursuant to subsection (b).

(d) NON-APPLICATION OF THE PAPERWORK REDUCTION ACT.— Chapter 35 of title 44, United States Code (commonly referred to as the Paperwork Reduction Act of 1995), shall not apply to any action taken to implement this section that involves translating a currently approved collection of information into a new language.

Defendant's Exhibit W
6:23-cv-00007

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1219

TITLE V

DEPARTMENT OF STATE AND RELATED AGENCY

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

DIPLOMATIC PROGRAMS

For an additional amount for "Diplomatic Programs", $190,000,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

CAPITAL INVESTMENT FUND

For an additional amount for "Capital Investment Fund", $10,000,000, to remain available until expended, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $4,000,000, to remain available until September 30, 2024.

EMBASSY SECURITY, CONSTRUCTION, AND MAINTENANCE

For an additional amount for "Embassy Security, Construction, and Maintenance", $110,000,000, to remain available until expended, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT

FUNDS APPROPRIATED TO THE PRESIDENT

OPERATING EXPENSES

For an additional amount for "Operating Expenses", $17,000,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $1,000,000, to remain available until September 30, 2024.

BILATERAL ECONOMIC ASSISTANCE

FUNDS APPROPRIATED TO THE PRESIDENT

INTERNATIONAL DISASTER ASSISTANCE

For an additional amount for "International Disaster Assistance", $4,348,000,000, to remain available until expended, to

respond to humanitarian needs in Ukraine and in countries impacted by the situation in Ukraine, including the provision of emergency food and shelter, and for assistance for other vulnerable populations and communities, including through local and international nongovernmental organizations.

### ECONOMIC SUPPORT FUND

For an additional amount for "Economic Support Fund", $8,766,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine, including for programs to combat human trafficking, of which up to $760,000,000 may be made available to prevent and respond to food insecurity: *Provided*, That funds appropriated under this heading in this Act may be made available notwithstanding any other provision of law that restricts assistance to foreign countries and may be made available as contributions.

### DEPARTMENT OF STATE

#### MIGRATION AND REFUGEE ASSISTANCE

For an additional amount for "Migration and Refugee Assistance", $350,000,000, to remain available until expended, to address humanitarian needs in, and to assist refugees from, Ukraine, and for additional support for countries in the Eastern European region impacted by the situation in Ukraine.

## INTERNATIONAL SECURITY ASSISTANCE

### DEPARTMENT OF STATE

#### INTERNATIONAL NARCOTICS CONTROL AND LAW ENFORCEMENT

For an additional amount for "International Narcotics Control and Law Enforcement", $400,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine, including for programs to combat human trafficking and to document and collect evidence of war crimes and crimes against humanity committed by the Government of the Russian Federation in Ukraine.

#### NONPROLIFERATION, ANTI-TERRORISM, DEMINING AND RELATED PROGRAMS

For an additional amount for "Nonproliferation, Anti-terrorism, Demining and Related Programs", $100,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine.

### FUNDS APPROPRIATED TO THE PRESIDENT

#### FOREIGN MILITARY FINANCING PROGRAM

For an additional amount for "Foreign Military Financing Program", $4,000,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine.

Defendant's Exhibit W
6:23-cv-00007

PUBLIC LAW 117–128—MAY 21, 2022      136 STAT. 1221

MULTILATERAL ASSISTANCE

INTERNATIONAL FINANCIAL INSTITUTIONS

CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND
DEVELOPMENT

For payment by the Secretary of the Treasury to the European
Bank for Reconstruction and Development and its trust funds and
facilities, $500,000,000, to remain available until expended, for
assistance and related programs for Ukraine and countries impacted
by the situation in Ukraine: *Provided*, That such amount shall
be subject to the same authorities and conditions as if such amount
was made available by title V of the Department of State, Foreign
Operations, and Related Programs Appropriations Act, 2022 (divi-
sion K of Public Law 117–103).

GLOBAL AGRICULTURE AND FOOD SECURITY PROGRAM

For an additional payment to the Global Agriculture and Food
Security Program by the Secretary of the Treasury, $150,000,000,
to remain available until expended.

GENERAL PROVISIONS—THIS TITLE

(INCLUDING TRANSFERS OF FUNDS)

SEC. 501. During fiscal year 2022, section 506(a)(1) of the      Applicability.
Foreign Assistance Act of 1961 (22 U.S.C. 2318(a)(1)) shall be
applied by substituting "$11,000,000,000" for "$100,000,000".

SEC. 502. During fiscal year 2022, section 614 of the Foreign      Applicability.
Assistance Act of 1961 (22 U.S.C. 2364) shall be applied—
    (1) in subsection (a)(4)(A)(ii), by substituting
"$1,000,000,000" for "$250,000,000"; and
    (2) in subsection (a)(4)(C), by substituting "$200,000,000"
for "$50,000,000", "$1,000,000,000" for "$250,000,000",
"$1,000,000,000" for "$500,000,000", and "$1,750,000,000" for
"$1,000,000,000".

SEC. 503. During fiscal year 2022, section 552(c) of the Foreign      Applicability.
Assistance Act of 1961 (22 U.S.C. 2348a(c)) shall be applied by
substituting "$100,000,000" for "$25,000,000".

SEC. 504. (a) Section 2606(a) of the Ukraine Supplemental      *Ante*, p. 785.
Appropriations Act, 2022 (division N of Public Law 117–103) is      Time period.
amended by striking "fiscal year 2022" and inserting "fiscal years
2022 through 2024": *Provided*, That funds made available under
the heading "Foreign Military Financing Program" in this title
shall be available for loans under such section.

(b) During fiscal years 2022 and 2023, funds made available
under the heading "Foreign Military Financing Program" in this
Act and prior Acts making appropriations for the Department of
State, foreign operations, and related programs may be utilized
by Ukraine for the procurement of defense articles, defense services,
or design and construction services that are not sold by the United
States Government under the Arms Export Control Act (22 U.S.C.
2751 et seq.): *Provided*, That such procurements shall be subject      Contracts.
to the applicable notification requirements of section 38 of the      Notification.
Arms Export Control Act (22 U.S.C. 2778).

Defendant's Exhibit W
6:23-cv-00007

LM141353

United States General Accounting Office

# GAO

Report to the Chairman, Subcommittee on Immigration, Refugees, and International Law, Committee on the Judiciary, House of Representatives

RESTRICTED——Not to be released outside the
General Accounting Office unless specifically
approved by the Office of Congressional
Relations.

548249 / 141353

United States General Accounting Office

# GAO

Report to the Chairman, Subcommittee
on Immigration, Refugees, and
International Law, Committee on the
Judiciary, House of Representatives

April 1990

# REFUGEE PROGRAM

# The Orderly Departure Program From Vietnam



RESTRICTED——Not to be released outside the
General Accounting Office unless specifically
approved by the Office of Congressional
Relations.

5482·9/141·35·3



**GAO**

United States
General Accounting Office
Washington, D.C. 20548

National Security and
International Affairs Division

B-238006

April 11, 1990

The Honorable Bruce A. Morrison
Chairman, Subcommittee on Immigration,
    Refugees, and International Law
Committee on the Judiciary
House of Representatives

Dear Mr. Chairman:

This report responds to your request that we evaluate the Immigration and Naturalization Service's (INS) practices and procedures for adjudicating the cases of Vietnamese refugee applicants. You asked us to (1) determine why approval rates for Vietnamese refugee applicants were apparently low, (2) evaluate the quality and consistency of the INS adjudication process, and (3) determine if denied refugee applicants' files adequately reflected the bases for the examiners' decisions. We also determined whether Vietnamese of special interest to the United States were being interviewed by INS examiners.

## Results in Brief

We found that approval rates for Vietnamese refugee applicants dropped from 100 percent during October 1988 through January 1989 to an average of about 36 percent during the next 6 months beginning in February 1989. This drop in approval rates occurred because of an August 1988 decision by the Attorney General that the INS should begin applying its worldwide guidance for overseas refugee processing in granting refugee status to Vietnamese applicants. The Attorney General's decision meant that Vietnamese applicants would no longer be given an automatic presumption of refugee status simply because they were living in Vietnam, but would have to assert fear of persecution and a credible basis for such a fear.

Although the Attorney General's decision resulted in a drop in the number of applicants granted refugee status, it did not result in fewer Vietnamese being offered entry into the United States. Most of those denied refugee status were offered entry into the United States as Public Interest Parolees.

We found that the INS refugee adjudication process in Vietnam was generally thorough and consistent, and performed by experienced and well-trained examiners. Our review indicated that reasons for denial of refugee status were documented in the files for 87 percent of the cases we

Defendant's Exhibit X
6:23-cv-00007

B-238006

reviewed and INS officials informed us that they have taken action to assure that subsequent denial decisions are adequately documented.

At the time of our visit to Vietnam in July 1989, many Vietnamese of special concern to the United States, such as individuals with a previously close association with the United States who had been detained in Vietnamese re-education camps, were not being allowed by the Vietnamese government to be interviewed by INS examiners. However, an agreement was reached on July 30, 1989, between the U.S. and Vietnamese governments that, beginning in October 1989, INS examiners could interview such individuals. Department of State and INS officials reported that about 4,830 such individuals were interviewed from October 1989 through January 1990.

## The Orderly Departure Program

The Orderly Departure Program (ODP) was established under a 1979 Memorandum of Understanding between the United Nations High Commissioner for Refugees and the government of Vietnam to provide a safe and legal means for people to leave Vietnam rather than clandestinely by boat. The agreement provides for the departure of immigrants and refugees for family reunion and humanitarian reasons. In addition to serving as an orderly, predictable means for those wishing to depart the country, it also serves to relieve the flow of refugees into first asylum countries and to save the Vietnamese government the embarrassment of the uncontrolled illegal exodus of thousands of its citizens.

The Memorandum of Understanding established a selection process for those authorized to depart Vietnam based on exchanges of lists between the Vietnamese government and the receiving countries, such as the United States. Under the process, receiving countries submit to the Vietnamese government a list of those for whom entry visas would be granted. Vietnam, in turn, provides the country with a list of those eligible for exit visas. The United States processes for entry only those whose names appear on both lists. Individuals whose names appear on only one of the two lists could be subject to discussions between the Vietnamese and U.S. governments.

Vietnamese can travel to the United States under the ODP as immigrants, following normal U.S. visa issuance procedures, or as refugees. The Departments of State and Justice developed three basic categories of Vietnamese refugees eligible for entry under the ODP.

Defendant's Exhibit X
6:23-cv-00007

B-238006

| Category I: | Family members of persons in the United States not currently eligible for immigrant visas. |
|---|---|
| Category II: | Former employees of the U.S. government. |
| Category III: | Other persons closely associated or identified with the United States' presence in Vietnam before 1975,[1] including children of American citizens in Vietnam (Amerasians) and their immediate family members. |

## ODP Application Procedures

The ODP Office at the U.S. Embassy in Bangkok, Thailand, administers the program, augmented by staff of the International Catholic Migration Commission. Vietnamese who rely on normal immigration channels must have a relative in the United States obtain and file immigrant visa petitions (INS Form I-130) with their local INS office. Approved petitions, along with affidavits of relationships and other documents from sponsoring relatives, are then sent to the ODP Office in Bangkok to serve as immigrant visa case files. Refugee applicants still in Vietnam or their relatives in the United States may directly petition the ODP Office in Bangkok for refugee status. (Refugees already in the United States may petition to have their spouses and children join them by filing a Visa 93 petition with their local INS office.)

After receiving the petitions, the ODP Office in Bangkok issues Letters of Introduction to immigrant applicants in Vietnam. This occurs when their visa eligibility dates become effective or are nearing the effective dates. Refugee applicants whose case files indicate their eligibility for refugee status, are also sent Letters of Introduction. A Letter of Introduction is a document which states that the United States is willing to interview the individual for possible acceptance and movement through ODP, but it is not a guarantee of approval. Letter of Introduction holders normally present the documents to the Vietnamese authorities as a preliminary step in obtaining exit permissions and pre-departure interviews with INS and State officials.

The ODP Office periodically receives from the Vietnamese government names of people it will allow the INS and consular officials in Ho Chi Minh City (previously Saigon) to interview. Upon receipt of these names, ODP staff in Bangkok review the cases to determine which ones

---

[1]The United States withdrew its remaining military forces and civilian presence from Vietnam after the fall of the South Vietnamese government in April 1975.

Defendant's Exhibit X
6:23-cv-00007

GAO/NSIAD-90-137 Refugee Program

B-238006

are eligible for the ODP and what further documents or information are necessary. Once the files are complete, the ODP Office requests the Vietnamese government to make those applicants available for interview during one of the upcoming interview sessions.

Teams of INS and State consular officers travel to Ho Chi Minh City each month to interview ODP applicants made available to them by the Vietnamese authorities. Those applicants with successful interviews must also undergo a medical examination. If the successful applicants pass the medical examinations, the ODP Office in Bangkok transmits final approval of the applicants' petitions to the Vietnamese authorities through the United Nations High Commissioner for Refugees. Approved applicants are then booked on a flight to Bangkok by the Vietnamese government. Amerasians and some refugee applicants are booked on direct flights from Vietnam to Manila to attend the English as Second Language/Cultural Orientation program in the Philippines.

Vietnamese can enter the United States under ODP for family reunification reasons as immigrants or for humanitarian reasons as refugees. Those found ineligible for refugee status can also enter as Public Interest Parolees, a humanitarian program implemented in February 1989 under the authority of the Attorney General and available to those able to prepay their travel expenses and obtain affidavits of support from sponsors in the United States.

Many of those traveling under the ODP are Amerasians and their immediate families. Public Law 100-202, Section 584, often referred to as the Amerasian Homecoming Act, provides that Amerasians and their qualifying family members leaving Vietnam within a 2-year period after March 21, 1988, are entitled to enter the United States as immigrants, but are eligible for all benefits offered refugees, including resettlement and training benefits. To be eligible for admission under the act, Amerasians must have been residing in Vietnam on December 22, 1987, the date the legislation was enacted, and must be able to establish that they were born in Vietnam after January 1, 1962, and before January 1, 1976, and had American citizen fathers.

## Fiscal Year 1989 Vietnamese Arrivals

Each year executive branch officials, after consulting with the Congress, establish refugee admissions allocations for the next fiscal year. The fiscal year 1989 ODP allocation was 22,000 admissions to the United States. A total of 17,685 Vietnamese refugees were admitted during the fiscal

Defendant's Exhibit X
6:23-cv-00007

B-238006

year, a shortfall of 4,315. The fiscal year 1990 ODP refugee admissions level has been set at 26,500.

State officials informed us that the fiscal year 1989 admissions shortfall resulted from fewer former re-education camp detainees and U.S. government employees being interviewed for refugee status than anticipated, and from the unforeseen award of Public Interest Parole to many who, before February 1989, would have been awarded refugee status. (Parolees do not count against refugee admission allocations.)

Until February 1989, INS officers conferred refugee status on virtually all applicants in Vietnam based on the presumption that they met the definition of a refugee as specified in the Immigration-Nationality Act of 1980. However, in February 1989, INS began to apply worldwide standards for refugee determination. This change resulted from an August 1988 decision by the Attorney General that INS should uniformly apply the regulations of existing statutes regulating immigration processing. The change meant that INS would no longer work from a presumption that Vietnamese applying for ODP meet the definition of refugee. The decision also provided that those not granted refugee status could be considered for entry to the United States under the Attorney General's parole authority.

## Refugee Denial Rates Do Not Reflect a Drop in ODP Activity

The Attorney General's decision to adjudicate refugee cases strictly in accordance with INS Worldwide Guidance for Overseas Refugees Processing resulted in a sharp drop in the number of applicants granted refugee status. However, most of those denied refugee status did not originally apply to ODP as refugees. Most would have been immigrant visa applicants but their visa petitions were not yet current, and were considered for refugee status for family reunification reasons. Those denied refugee status were offered Public Interest Parole.[2] Thus, simply because refugee denial rates were up does not mean that fewer Vietnamese were leaving Vietnam under the ODP.

While no refugee applicants were denied refugee status during INS' first three interview trips in fiscal year 1989, the denial rate averaged 63.6 percent during the next six trips. However, our analysis of agency data, as reflected in Table 1.1, shows that during this latter period the

---

[2]Those offered parole are primarily the sons and daughters of immigrants and former re-education camp detainees holding current visa petitions, according to State Department officials.

Defendant's Exhibit X
6:23-cv-00007

B-238006

number of immigrant approvals increased and those not adjudicated as refugees were granted parole.

**Table 1.1: Orderly Departure Program Decisions**

| Interview trips, FY 1989 | Approved immigrants | Refugee Adjudications | | | | Total[a] |
| | | Refugee approvals | Percentage | Parole offers | Percentage | |
|---|---|---|---|---|---|---|
| Oct. 1988 | 601 | 1,180 | 100 | — | — | 1,781 |
| Nov. 1988 | 513 | 1,123 | 100 | — | — | 1,636 |
| Jan. 1989 | 195 | 335 | 100 | — | — | 530 |
| Feb. 1989 | 1,100 | 198 | 26 | 551 | 74 | 1,849 |
| Mar. 1989 | 863 | 169 | 20 | 661 | 80 | 1,693 |
| Apr. 1989 | 871 | 193 | 35 | 363 | 65 | 1,427 |
| May 1989 | 625 | 225 | 49 | 234 | 51 | 1,084 |
| Jun. 1989 | 826 | 352 | 46 | 416 | 54 | 1,594 |
| Jul. 1989 | 1,110 | 386 | 42 | 526 | 58 | 2,022 |
| | 6,704 | 4,161 | | 2,751 | | 13,616 |

[a]Excludes pending cases and those found to be ineligible for the ODP program for reasons such as health or failure to meet basic qualifications. Figures also exclude approved Amerasians and their relatives. (They are accounted for as a separate program element.)

We found that those denied refugee status beginning in February 1989 were routinely offered Public Interest Parole giving them the opportunity to travel to the United States, provided they prepaid airline tickets and had affidavits of support from relatives or agency organizations in the United States. ODP officials in Bangkok informed us that most of those offered Public Interest Parole program were accepting the offers. Table 1.2, based on agency information available as of July 1989, gives an indication of the proportion of Vietnamese accepting the parole offer.

**Table 1.2: Eligible Vietnamese Offered and Accepting Parole as of July 1989**

| 1989 Interviews | Number departed | Travel expenses paid, not yet departed | Travel expenses not yet paid | Total approved for parole |
|---|---|---|---|---|
| February | 117 | 376 | 57 | 550 |
| March | 59 | 402 | 180 | 641 |
| April | 0 | 285 | 55 | 340 |
| May | 0 | 200 | 33 | 233 |
| Total | 176 | 1,263 | 325 | 1,764 |

INS and State officials told us that the majority of the refugees emigrating to the United States through ODP were category I immigrant visa petitioners, adjudicated as refugees for family reunification purposes. Relatively few were categories II or III individuals. According to State

Defendant's Exhibit X
6:23-cv-00007

B-238006

officials, individuals in these latter categories are at risk of being perse-
cuted by Vietnamese authorities, and were being generally barred from
access to INS interviewers by the Vietnamese government. State Depart-
ment statistics show that during fiscal year 1989 a total of 9,018 refu-
gees were admitted through the ODP. This included 132 former U.S.
government employees, and 64 former re-education camp prisoners,
along with 253 accompanying relatives.

We observed 41 INS interviews of ODP applicant families in Vietnam dur-
ing July 14 to 20, 1989. The cases involved a total of 248 persons. The
petitioners were U.S. citizens in 34 cases, and permanent resident aliens
in the other 7. Table 1.3 shows how the 248 persons were processed.

**Table 1.3: Our July 1989 Observations of ODP Applicants**

| Disposition | Number | Percent |
|---|---|---|
| Approved for immigrant visas | 57 | 23 |
| Approved as refugees | 71 | 29 |
| Offered Public Interest Parole | 105 | 42 |
| Decision pending more information | 11 | 4 |
| Not qualified under INS status | 4 | 2 |
| | 248 | 100 |

INS officers in Vietnam told us that before February 1989, individuals
who were denied immigrant status, but were otherwise eligible, would
have been interviewed as refugees for family reunification reasons and
approved for entry into the United States. However, because of the
Attorney General's decision, only 71, or 29 percent, were granted refu-
gee status after February 1989.

## U.S. and Vietnam Governments Negotiated Access to Refugees

Although ODP was intended to provide a means of emigration for both
family reunification and humanitarian reasons, most cases made availa-
ble by the Vietnamese government were those involving family reunifi-
cation. U.S. officials told us that only about 300 categories II and III
refugees were gaining access to ODP per year, and that the Vietnamese
government was controlling the number allowed to emigrate.

In July 1989, representatives of the governments of the United States
and Vietnam negotiated an agreement whereby more individuals would
be released from re-education centers and their families would be
allowed to emigrate. The agreement, announced on July 30, 1989, pro-
vided for the United States to begin interviewing former re-education

Defendant's Exhibit X
6:23-cv-00007

B-238006

center detainees in October 1989. The agreement set a goal of 3,000 former detainees and dependents to be interviewed before the end of 1989, and 12,000 more were expected to be interviewed in 1990.

INS officers confirmed that the October 1989 ODP interview team began interviewing former detainees in Vietnam in accordance with the July 30 agreement. State Department's Bureau of Refugee Programs figures indicate that officials interviewed a total of 4,830 former detainees from October 1989 through January 1990, thus meeting initial expectations. Bureau of Refugee Programs and INS officials told us that the program was proceeding smoothly.

The Bush administration has established a fiscal year 1990 admissions ceiling of 26,500 for those departing Vietnam under ODP. This is an increase of 4,500 over the fiscal year 1989 allocation of 22,000, due partly to expected increased accessions of former re-education detainees and their accompanying relatives.

## ODP Applicant Processing Thorough and Consistent, but Decisions Not Always Documented

The ODP interview team we accompanied to Vietnam in July 1989 included three officers from INS' District Office in Bangkok.[3] We interviewed the officers to determine their experience, training, and qualifications for adjudicating ODP refugee cases, and observed a total of 41 cases to determine if the officers asked similar questions and used similar bases for adjudicating their assigned cases.

Each officer was trained and experienced in refugee processing procedures, and knowledgeable about country conditions in Vietnam and throughout Southeast Asia. The officers averaged 18 years of service with INS, each had previous interview team assignments in Vietnam, and had recently received refresher training in Bangkok, including State Department briefings on country conditions in Vietnam and Southeast Asia.

The officers uniformly applied INS and ODP guidelines in adjudicating their cases. Each asked a variety of questions designed to elicit information about family relationships, living conditions, work and educational circumstances, government policies and practices, and the individuals' statements on, or fears of, persecution. In addition, we observed various

---

[3] A fourth accompanying senior examiner, assigned to INS Headquarters and on an ODP familiarization visit, adjudicated some cases. The officer was an experienced examiner, with prior refugee adjudication experience in Europe and Thailand.

Defendant's Exhibit X
6:23-cv-00007

B-238006

instances of the officers conferring with each other on complex or difficult cases.

INS Headquarters and District Office instructions, as well as ODP Office guidance, require the examiners to document the rationale for their decisions to deny refugee status. Our sample of 364 case files of applicants denied refugee status between February and July 1989 revealed that, while most contained sufficient explanations of the examiners' decisions, some did not. For the case files in our study, approximately 87 percent contained adequate bases for the decisions.

Our study showed that 73 percent of the denied applicants were category I immigrant visa petitioners adjudicated as refugees, another 26 percent were Amerasians or their close relatives. Only one denied applicant was a pre-1975 U.S. government employee, which reinforced INS officers' statements to us that virtually no categories II or III refugee applicants were denied refugees status.

Senior INS officials informed us that in light of the number of denied case files without sufficient rationale for the decisions, the Bangkok District Office has begun sampling ODP interview teams' case files upon their return from Vietnam. We were told that the limited sampling procedure was designed as a quality assurance mechanism to ensure that all denied case files contain adequate explanations of the decisions.

## Conclusions

The high refugee denial rates in the ODP are not an accurate indicator of the treatment of refugees under the program. INS refugee approvals, or denials with accompanying offers of parole, are primarily mechanisms for resettling Vietnamese families unable to travel under immigrant visas. Almost none of those applying for resettlement on the basis of refugee characteristics were being denied refugee status.

Until recently, few former re-education camp detainees and others of special interest to the United States, who may be eligible for refugee status, were given access to INS interviewers by Vietnamese authorities. The Vietnamese government agreed in July 1989 to allow former re-education detainee and their families to emigrate to the United States. INS officers began interviewing former detainees in October 1989, and the program appears to be proceeding smoothly.

Defendant's Exhibit X
6:23-cv-00007

B-238006

INS officials from the Bangkok District Office were experienced and well-trained, and were processing ODP cases in Vietnam thoroughly and consistently at the time of our visit. Refugee applicants' case files contained the bases for the examiners' decisions in 87 percent of the cases we reviewed, and the INS District office has implemented a file review process, which should further ensure the documentation of denial decisions by its examiners.

## Scope and Methodology

We analyzed available agency data on the ODP decisions made during nine trips to Vietnam, covering October 24, 1988 to July 21, 1989, to determine whether approval rates for Vietnamese refugee applicants had dropped during 1989, and if so, why the decline had occurred and whether those denied refugee status were also being denied entry into the United States.

To evaluate the quality and consistency of adjudication processes for Vietnamese immigrants and refugees, we reviewed pertinent legislation and regulations; interviewed officials and reviewed records at INS and Department of State in Washington, D.C., the U.S. Embassy in Bangkok, Thailand, and in Ho Chi Minh City, Vietnam. We analyzed 364 denied refugee case files to determine whether the reasons for denials of refugee status were well documented. In July 1989, we had firsthand observations of the program in Vietnam. We determined the nature and extent of the background and experience of involved INS examiners. We obtained information on access to Vietnamese of special interest to the U.S. government through discussions with State Department, INS, and embassy officials. Our review was performed between June 1989 and December 1989, and was conducted in accordance with generally accepted government auditing standards.

We did not obtain written comments on this report from agency officials. However, we obtained their oral comments and incorporated them as appropriate in the text.

We are sending copies of this report to the Chairmen, House and Senate Committees on the Judiciary; the Attorney General; the Commissioner of INS; and the Director, Office of Management and Budget. We will also make copies available to others upon request.

GAO staff members Harvey J. Finberg, Computer Systems Analyst, and Leroy W. Richardson and David R. Martin, Assistant Directors in the

Defendant's Exhibit X
6:23-cv-00007

B-238006

National Security and International Affairs Division, Washington, D.C., made major contributions to this report. If you or your staff have any questions, please call me at (202) 275-5790.

Sincerely yours,

Harold J. Johnson

Harold J. Johnson
Director, Foreign Economic
   Assistance Issues

Defendant's Exhibit X
6:23-cv-00007



Defendant's Exhibit X
6:23-cv-00007

United States
General Accounting Office
Washington, D.C. 20548

First Class Mail
Postage & Fees Paid
GAO

PUBLIC LAW 101–167—NOV. 21, 1989          103 STAT. 1195

Public Law 101–167
101st Congress

## An Act

Making appropriations for foreign operations, export financing, and related programs for the fiscal year ending September 30, 1990, and for other purposes.

Nov. 21, 1989
[H.R. 3743]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for foreign operations, export financing, and related programs for the fiscal year ending September 30, 1990, and for other purposes, namely:

Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990.

### TITLE I—MULTILATERAL ECONOMIC ASSISTANCE

#### FUNDS APPROPRIATED TO THE PRESIDENT

#### INTERNATIONAL FINANCIAL INSTITUTIONS

#### CONTRIBUTIONS FOR ARREARAGES

#### CONTRIBUTION TO THE INTERNATIONAL DEVELOPMENT ASSOCIATION

For payment to the International Development Association by the Secretary of the Treasury, $6,666,667, for the United States contribution to the replenishments, to remain available until expended: *Provided,* That no such payment may be made while the United States Executive Director to the International Bank for Reconstruction and Development is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while the alternate United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

#### CONTRIBUTION TO THE INTERNATIONAL FINANCE CORPORATION

For payment to the International Finance Corporation by the Secretary of the Treasury, $75,000,000, for the United States share of the increase in subscriptions to capital stock, to remain available until expended: *Provided,* That of this amount not more than $24,544,000 may be expended for the purchase of such stock in fiscal year 1990.

#### CONTRIBUTION TO THE INTER-AMERICAN DEVELOPMENT BANK

For payment to the Inter-American Development Bank by the Secretary of the Treasury for the United States share of the paid-in share portion of the increase in capital stock, $31,617,983, and for the United States share of the increases in the resources of the Fund for Special Operations, $63,724,629, to remain available until ex-


Defendant's Exhibit Y
6:23-cv-00007

103 STAT. 1196          PUBLIC LAW 101-167—NOV. 21, 1989

Discrimination, prohibition.

pended: *Provided,* That the funds made available under this heading shall be withheld from obligation until the Secretary of the Treasury certifies that the Board of Executive Directors of the Inter-American Development Bank has adopted policies to ensure that all recipients of assistance must agree in writing that in general any procurement of goods or services utilizing Bank funds shall be conducted in a manner that does not discriminate on the basis of nationality against any member country, firm or person interested in providing such goods or services: *Provided further,* That the Secretary of the Treasury shall instruct the United States Executive Director of the Inter-American Development Bank to use the voice and vote of the United States to oppose any assistance by the Bank to any recipient of assistance who refuses to agree in writing that in general any procurement of goods or services utilizing Bank funds shall be conducted in a manner that does not discriminate on the basis of nationality against any member country, firm or person interested in providing such goods or services: *Provided further,* That no such payment may be made while the United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while the alternate United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increases in resources of the Asian Development Fund, as authorized by the Asian Development Bank Act, as amended (Public Law 89–369), $137,948,091, to remain available until expended: *Provided,* That no such payment may be made while the United States Executive Director to the Bank is compensated by the Bank at a rate which, together with whatever compensation such Director receives from the United States, is in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while any alternate United States Director to the Bank is compensated by the Bank in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

### CONTRIBUTION TO THE AFRICAN DEVELOPMENT BANK

For payment to the African Development Bank by the Secretary of the Treasury, for the paid-in share portion of the United States share of the increase in capital stock, $1,654,000, to remain available until expended: *Provided,* That no such payment may be made while the United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while the alternate United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual

occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

## ANNUAL CONTRIBUTIONS TO INTERNATIONAL FINANCIAL INSTITUTIONS

### CONTRIBUTION TO THE INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment to the International Bank for Reconstruction and Development by the Secretary of the Treasury, for the United States share of the paid-in share portion of the increases in capital stock, for the General Capital Increase, $50,000,795, to remain available until expended: *Provided,* That no such payment may be made while the United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while the alternate United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

### CONTRIBUTION TO THE INTERNATIONAL DEVELOPMENT ASSOCIATION

For payment to the International Development Association by the Secretary of the Treasury, $958,333,333, for the United States contribution to the replenishment, to remain available until expended: *Provided,* That $115,000,000 of the funds made available under this heading shall be withheld from obligation until January 1, 1990: *Provided further,* That such funds withheld from obligation may be obligated after January 1, 1990, only if the President certifies: (1) that the International Development Association has not provided any new loans to China since June 27, 1989, or (2) that, if such loans have been provided, the United States Government believes that such loans will support the process of increasing individual freedoms and improving human rights in China: *Provided further,* That fifteen days prior to any obligation of funds for the International Development Association, the President shall report his certification to the Committees on Appropriations of the House and Senate, and the Committee on Banking, Finance and Urban Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate: *Provided further,* That no such payment may be made while the United States Executive Director to the International Bank for Reconstruction and Development is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while the alternate United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

China.
Loans.
Human rights.

President of U.S.
Reports.

### CONTRIBUTION TO THE ASIAN DEVELOPMENT FUND

For the United States contribution by the Secretary of the Treasury to the increases in resources of the Asian Development Fund, as authorized by the Asian Development Bank Act, as amended (Public Law 89–369), $40,000,000, to remain available until expended: *Pro-*

Defendant's Exhibit Y
6:23-cv-00007

*vided,* That no such contribution may be made while the United States Executive Director to the Asian Development Bank is compensated by the Bank at a rate which, together with whatever compensation such Director receives from the United States, is in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while any alternate United States Director to the Bank is compensated by the Bank in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

#### CONTRIBUTION TO THE AFRICAN DEVELOPMENT FUND

For payment to the African Development Fund by the Secretary of the Treasury, $105,000,000, for the United States contribution to the fifth replenishment of the African Development Fund, to remain available until expended.

#### CONTRIBUTION TO THE AFRICAN DEVELOPMENT BANK

For payment to the African Development Bank by the Secretary of the Treasury, for the paid-in share portion of the United States share of the increase in capital stock, $7,987,308 to remain available until expended: *Provided,* That no such payment may be made while the United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level IV of the Executive Schedule under section 5315 of title 5, United States Code, or while the alternate United States Executive Director to the Bank is compensated by the Bank at a rate in excess of the rate provided for an individual occupying a position at level V of the Executive Schedule under section 5316 of title 5, United States Code.

#### LIMITATION ON CALLABLE CAPITAL SUBSCRIPTIONS

The United States Governor of the African Development Bank may subscribe without fiscal year limitation to the callable capital portion of the United States share of such capital stock in an amount not to exceed $134,809,613.

#### CONTRIBUTION TO THE ENHANCED STRUCTURAL ADJUSTMENT FACILITY OF THE INTERNATIONAL MONETARY FUND

For payment to the Interest Subsidy Account of the Enhanced Structural Adjustment Facility of the International Monetary Fund, $140,000,000 to remain available until expended: *Provided,* That such funds are available subject to authorization: *Provided further,* That none of the funds made available by this paragraph shall be available for obligation or disbursement until the Secretary of the Treasury has assured the Committees on Appropriations in writing that the current policy of the International Monetary Fund (IMF) and the United States Government requiring that all congressional inquiries to IMF employees be cleared through the office of the United States Executive Director of the IMF has been reversed thereby allowing unmonitored and unfettered contact between Congress and IMF employees.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989       103 STAT. 1199

### INTERNATIONAL ORGANIZATIONS AND PROGRAMS

For necessary expenses to carry out the provisions of sections 301 and 103(g) of the Foreign Assistance Act of 1961, and of section 2 of the United Nations Environment Program Participation Act of 1983, $265,115,000: *Provided,* That no funds shall be available for the United Nations Fund for Science and Technology: *Provided further,* That the total amount of funds appropriated under this heading shall be made available only as follows: $109,510,000 for the United Nations Development Program; $65,400,000 for the United Nations Children's Fund, of which amount 75 per centum (less amounts withheld consistent with section 307 of the Foreign Assistance Act of 1961 and section 526 of this Act) shall be obligated and expended no later than thirty days after the date of enactment of this Act and 25 per centum of which shall be expended within thirty days from the start of the United Nations Children's Fund fourth quarter of operations for 1990; $980,000 for the World Food Program; $1,500,000 for the United Nations Capital Development Fund; $800,000 for the United Nations Voluntary Fund for the Decade for Women; $200,000 for the United Nations International Research and Training Institute for the Advancement of Women; $100,000 for the Intergovernmental Panel on Climate Change; $2,000,000 for the International Convention and Scientific Organization Contributions; $2,000,000 for the World Meteorological Organization Voluntary Cooperation Program; $22,000,000 for the International Atomic Energy Agency; $12,000,000 for the United Nations Environment Program; $800,000 for the United Nations Educational and Training Program for Southern Africa; $110,000 for the United Nations Institute for Namibia; $500,000 for the United Nations Trust Fund for South Africa; $750,000 for the Convention on International Trade in Endangered Species; $220,000 for the World Heritage Fund; $100,000 for the United Nations Voluntary Fund for Victims of Torture; $245,000 for the United Nations Fellowship Program; $400,000 for the United Nations Center on Human Settlements; $500,000 for the UNIDO Investment Promotion Service; $10,000,000 for the Organization of American States; and $35,000,000 for the United States contributions to the third replenishment of the International Fund for Agricultural Development: *Provided,* That none of the funds appropriated under this heading shall be made available for the International Fund for Agricultural Development until agreement has been reached on the third replenishment of the Fund: *Provided further,* That funds appropriated under this heading may be made available for the International Atomic Energy Agency only if the Secretary of State determines (and so reports to the Congress) that Israel is not being denied its right to participate in the activities of that Agency.

### TITLE II—BILATERAL ECONOMIC ASSISTANCE

#### FUNDS APPROPRIATED TO THE PRESIDENT

For expenses necessary to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes, to remain available until September 30, 1990, unless otherwise specified herein, as follows:

Defendant's Exhibit Y
6:23-cv-00007

## AGENCY FOR INTERNATIONAL DEVELOPMENT

### AGRICULTURE, RURAL DEVELOPMENT, AND NUTRITION, DEVELOPMENT ASSISTANCE

For necessary expenses to carry out the provisions of section 103, $483,715,000: *Provided,* That up to $5,000,000 shall be provided for new development projects of private entities and cooperatives utilizing surplus dairy products: *Provided further,* That not less than $8,000,000 shall be provided for the Vitamin A Deficiency Program: *Provided further,* That, notwithstanding any other provision of law, up to $10,000,000 of the funds appropriated under this heading shall be made available, and remain available until expended, for agricultural activities in Poland which are managed by the Polish Catholic Church or other nongovernmental organizations: *Provided further,* That not less than $1,000,000 shall be available for a Farmer-to-Farmer program for Poland, notwithstanding any other provision of law.

### POPULATION, DEVELOPMENT ASSISTANCE

Abortion.

For necessary expenses to carry out the provisions of section 104(b), $220,000,000: *Provided,* That none of the funds made available in this Act nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization: *Provided further,* That none of the funds made available under this heading may be used to pay for the performance of abortion as a method of family planning or to motivate or coerce any person to practice abortions; and that in order to reduce reliance on abortion in developing nations, funds shall be available only to voluntary family planning projects which offer, either directly or through referral to, or information about access to, a broad range of family planning methods and services: *Provided further,* That in awarding grants for natural family planning under section 104 of the Foreign Assistance Act no applicant shall be discriminated against because of such applicant's religious or conscientious commitment to offer only natural family planning; and, additionally, all such applicants shall comply with the requirements of the previous proviso: *Provided further,* That nothing in this subsection shall be construed to alter any existing statutory prohibitions against abortion under section 104 of the Foreign Assistance Act.

Grants.
Discrimination.
prohibition.

### HEALTH, DEVELOPMENT ASSISTANCE

For necessary expenses to carry out the provisions of section 104(c), $125,994,000.

### INTERNATIONAL AIDS PREVENTION AND CONTROL PROGRAM

For necessary expenses to carry out the provisions of chapter 1 of part I of the Foreign Assistance Act of 1961, $42,000,000, which shall be made available only for activities relating to research on, and the treatment and control of, acquired immune deficiency syndrome (AIDS) in developing countries: *Provided,* That of the funds made available under this heading $21,000,000 shall be provided directly to the World Health Organization for its use in financing the Global

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989     103 STAT. 1201

Program on AIDS, including activities implemented by the Pan American Health Organization.

### CHILD SURVIVAL FUND

For necessary expenses to carry out the provisions of section 104(c)(2), $71,000,000.

### EDUCATION AND HUMAN RESOURCES

### DEVELOPMENT, DEVELOPMENT ASSISTANCE

For necessary expenses to carry out the provisions of section 105, $134,541,000: *Provided,* That $1,500,000 of the funds appropriated under this heading shall be made available for the Caribbean Law Institute: *Provided further,* That not less than $67,270,000 of the funds appropriated under this heading and under the heading "Sub-Saharan Africa, Development Assistance" shall be available only for programs in basic primary and secondary education: *Provided further,* That in fiscal year 1990 the Agency for International Development shall initiate three new bilateral projects in basic primary and secondary education, at least two of which shall be initiated in Sub-Saharan Africa: *Provided further,* That not less than $20,000,000 of the funds appropriated under this heading shall be made available for the International Student Exchange Program, of which $2,000,000 shall be available, notwithstanding any other provision of law, for students from Poland and Hungary: *Provided further,* That not less than $1,200,000 of the funds appropriated under this heading shall be made available for leadership programs for the Americas that have a demonstrated record of performance: *Provided further,* That not less than $2,000,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, for technical training for the people of Poland and Hungary in skills which would foster the development of a market economy and the private sector, including training in management and agricultural extension: *Provided further,* That not less than $3,000,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, for educational and cultural exchanges with Poland and Hungary, which shall be undertaken in cooperation with the United States Information Agency.

### PRIVATE SECTOR, ENVIRONMENT, AND ENERGY, DEVELOPMENT ASSISTANCE

For necessary expenses to carry out the provisions of section 106, $149,209,000: *Provided,* That not less than $7,500,000 shall be made available only for cooperative projects among the United States, Israel and developing countries of which not less than $5,000,000 shall be made available for the Cooperative Development Program, and of which not less than $2,500,000 shall be made available for cooperative development research projects: *Provided further,* That not less than $5,000,000 shall be made available only for the Central American Rural Electrification Support project: *Provided further,* That not less than $2,000,000 of the funds appropriated under this heading or under the heading "Sub-Saharan Africa, Development Assistance", shall be made available for assistance in support of elephant conservation and preservation: *Provided further,* That not

Defendant's Exhibit Y
6:23-cv-00007

less than $3,300,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, for assistance to establish an air quality monitoring network in the Krakow, Poland metropolitan area, to improve water quality and the availability of drinking water in the Krakow metropolitan area, and to establish and support a regional environmental center in Budapest, Hungary for facilitating cooperative environmental activities, which activities shall be undertaken in cooperation with the Environmental Protection Agency: *Provided further,* That not less than $10,000,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, for support for retrofitting a coal-fired commercial plant in the Krakow, Poland region with clean coal technology and for assistance to assess and develop the capability within Poland to manufacture or modify equipment that will enable industrial activities within Poland to use fossil fuels cleanly, which activities shall be undertaken in cooperation with the Department of Energy: *Provided further,* That the Administrator of the Agency for International Development or his designee may vest title in any property acquired under the previous two provisos in an entity other than the United States: *Provided further,* That not less than $1,500,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, for the provision of technical assistance to Poland and Hungary (1) for the implementation of labor market reforms, and (2) to facilitate adjustment during the period of transition to free labor markets and labor organizations, which activities shall be undertaken in cooperation with the Department of Labor and United States labor and business representatives.

### SCIENCE AND TECHNOLOGY, DEVELOPMENT ASSISTANCE

For necessary expenses to carry out the provisions of section 106, $8,662,000.

### MICRO-ENTERPRISE DEVELOPMENT

Of the funds appropriated by this Act to carry out chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, not less than $75,000,000 shall be made available for programs of credit and other assistance for micro-enterprises in developing countries: *Provided,* That local currencies which accrue as a result of assistance provided to carry out the provisions of the Foreign Assistance Act of 1961 and the Agricultural Trade Development and Assistance Act of 1954 may be used for assistance for micro-enterprises: *Provided further,* That such local currencies which are used for this purpose shall be in lieu of funds earmarked under this heading and shall reduce the amount earmarked for assistance for micro-enterprises by an equal amount.

### POLAND AND HUNGARY

Notwithstanding any other provision of law, of the funds appropriated by this Act to carry out chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, not less than $45,000,000 shall be made available for Poland and not less than $5,000,000 shall be made available for Hungary, which funds shall be used in support of the private sector and other economic develop-

ment programs: *Provided,* That funds made available under this heading shall remain available until September 30, 1991.

### SUB-SAHARAN AFRICA, DEVELOPMENT ASSISTANCE

For necessary expenses to carry out the provisions of sections 103 through 106 and section 121 of the Foreign Assistance Act of 1961, $565,000,000, for assistance only for Sub-Saharan Africa, which shall be in addition to any amounts otherwise available for such purposes: *Provided,* That the authorities contained under this heading in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 (Public Law 100-461), shall be applicable to amounts appropriated under this heading until an Act authorizing assistance for such purposes for the fiscal year 1990 is enacted into law: *Provided further,* That not less than $50,000,000 of the funds appropriated under this heading shall be made available only to assist activities supported by the Southern Africa Development Coordination Conference: *Provided further,* That funds appropriated under this heading which are made available for activities supported by the Southern Africa Development Coordination Conference shall be made available notwithstanding section 518 of this Act and section 620(q) of the Foreign Assistance Act of 1961.

### ZAIRE

Funds appropriated to carry out chapter 1 of part I which are allocated for Zaire shall be made available through private and voluntary organizations to the maximum extent practicable.

### ASSISTANCE FOR DISPLACED CHILDREN

Of the aggregate of the funds appropriated by this Act to carry out part I of the Foreign Assistance Act of 1961, not less than $3,000,000 shall be made available for programs and activities for children who have become orphans as a result of the effects of drought, civil strife, and other natural and man-made disasters: *Provided,* That assistance under this heading shall be made available in accordance with the policies and general authorities contained in section 491 of the Foreign Assistance Act of 1961.

### ASSISTANCE FOR VICTIMS OF WAR

Of the aggregate of the funds appropriated by this Act to carry out part I and chapter 4 of part II of the Foreign Assistance Act of 1961, not less than $5,000,000 shall be made available, notwithstanding any other provision of law, for assistance for the provision of prostheses and related assistance for civilians who have been injured as a result of civil strife and warfare: *Provided,* That this amount shall be derived in equal amounts from part I and from chapter 4 of part II.

### WOMEN IN DEVELOPMENT

In recognition that the full participation of women in, and the full contribution of women to, the development process are essential to achieving economic growth, a higher quality of life, and sustainable development in developing countries, not less than $5,000,000 of the funds appropriated by this Act to carry out part I of the Foreign Assistance Act of 1961, in addition to funds otherwise available for

Defendant's Exhibit Y
6:23-cv-00007

such purposes, shall be used to encourage and promote the participation and integration of women as equal partners in the development process in developing countries, of which not less than $3,000,000 shall be made available as matching funds to support the activities of the Agency for International Development's field missions to integrate women into their programs: *Provided,* That the Agency for International Development shall seek to ensure that country strategies, projects, and programs are designed so that the percentage of women participants will be demonstrably increased.

### PRIVATE AND VOLUNTARY ORGANIZATIONS

22 USC 2151u
note.

None of the funds appropriated or otherwise made available by this Act for development assistance may be made available to any United States private and voluntary organization, except any cooperative development organization, which obtains less than 20 per centum of its total annual funding for international activities from sources other than the United States Government: *Provided,* That the requirements of the provisions of section 123(g) of the Foreign Assistance Act of 1961 and the provisions on private and voluntary organizations in title II of the "Foreign Assistance and Related Programs Appropriations Act, 1985" (as enacted in Public Law 98-473) shall be superseded by the provisions of this section.

### PRIVATE SECTOR REVOLVING FUND

#### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses to carry out the provisions of section 108 of the Foreign Assistance Act of 1961, not to exceed $5,000,000 to be derived by transfer from funds appropriated to carry out the provisions of chapter 1 of part I of such Act, to remain available until expended. During fiscal year 1990, obligations for assistance from amounts in the revolving fund account under section 108 shall not exceed $3,500,000.

During fiscal year 1990, total commitments to guarantee loans shall not exceed $46,115,020 of contingent liability for loan principal.

### AMERICAN SCHOOLS AND HOSPITALS ABROAD

For necessary expenses to carry out the provisions of section 214, $35,000,000.

### INTERNATIONAL DISASTER ASSISTANCE

For necessary expenses to carry out the provisions of section 491, $25,000,000, to remain available until expended: *Provided,* That not less than $500,000 of the funds appropriated under this heading may be made available for assistance for children who have become orphans as a result of natural disasters.

### PAYMENT TO THE FOREIGN SERVICE RETIREMENT AND DISABILITY FUND

For payment to the "Foreign Service Retirement and Disability Fund", as authorized by the Foreign Service Act of 1980, $40,147,000.

PUBLIC LAW 101–167—NOV. 21, 1989     103 STAT. 1205

### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT

For necessary expenses to carry out the provisions of section 667, $437,000,000: *Provided,* That not more than $15,000,000 (except that payment may be made under this limitation only for those categories of services for which charges have been made under Foreign Affairs Administrative Support both in prior years and in the current year) of this amount shall be for Foreign Affairs Administrative Support.

### OPERATING EXPENSES OF THE AGENCY FOR INTERNATIONAL DEVELOPMENT OFFICE OF INSPECTOR GENERAL

For necessary expenses to carry out the provisions of section 667, $31,000,000, which sum shall be available only for the operating expenses of the Office of the Inspector General notwithstanding section 451 or 614 of the Foreign Assistance Act of 1961 or any other provision of law: *Provided,* That up to 3 per centum of the amount made available under the heading "Operating Expenses of the Agency for International Development" may be transferred to and merged and consolidated with amounts made available under this heading: *Provided further,* That except as may be required by an emergency evacuation affecting the United States diplomatic missions of which they are a component element, none of the funds in this Act, or any other Act, may be used to relocate the overseas Regional Offices of the Inspector General to a location within the United States without the express approval of the Inspector General: *Provided further,* That the total number of positions authorized for the Office of Inspector General in Washington and overseas shall be not less than two hundred and forty at September 30, 1990.

### HOUSING AND OTHER CREDIT GUARANTY PROGRAMS

During the fiscal year 1990, total commitments to guarantee loans shall not exceed $125,000,000 of contingent liability for loan principal: *Provided,* That the President shall enter into commitments to guarantee such loans in the full amount provided under this heading, subject only to the availability of qualified applicants for such guarantees: *Provided further,* That guarantees issued under this heading shall guarantee 100 per centum of the principal and interest payable on such loans: *Provided further,* That no loans guaranteed under this heading shall be issued or held by the Federal Financing Bank: *Provided further,* That pursuant to section 223(e)(2) of the Foreign Assistance Act of 1961 borrowing authority provided therein may be exercised in such amounts as may be necessary to retain an adequate level of contingency reserves for the fiscal year 1990: *Provided further,* That section 222(a) of the Foreign Assistance Act of 1961 is amended by striking out "September 30, 1990" and inserting in lieu thereof "September 30, 1991": *Provided further,* That notwithstanding the prior limitation on total commitments to guarantee loans at not to exceed $125,000,000, during the fiscal year 1990, total commitments to guarantee loans shall not exceed $100,000,000 of contingent liability for loan principal.

President of U.S. Loans.

22 USC 2182.

### ECONOMIC SUPPORT FUND

For necessary expenses to carry out the provisions of chapter 4 of part II, $3,205,000,000: *Provided,* That of the funds appropriated under this heading, not less than $1,200,000,000 shall be available only for Israel, which sum shall be available on a grant basis as a cash transfer and shall be disbursed within thirty days of enactment of this Act or by October 31, 1989, whichever is later: *Provided further,* That not less than $815,000,000 shall be available only for Egypt, which sum shall be provided on a grant basis, and of which sum cash transfer assistance may be provided, with the understanding that Egypt will undertake significant economic reforms which are additional to those which were undertaken in previous fiscal years, and of which not less than $200,000,000 shall be provided as Commodity Import Program assistance: *Provided further,* That suffi-

Egypt.

cient Egyptian pounds generated from funds made available under this heading or any other heading of this Act shall be made available to the United States pursuant to the United States-Egypt Economic, Technical and Related Assistance Agreements of 1978 (which provide for local currency requirement for programs of the United States in Egypt to be made available to the United States in the manner requested by the United States Government), to enable the United States Embassy in Cairo to restore the endowment entitled "U.S. Government Trustee" to the Egyptian pound equivalent level, at the commercial rate of exchange, of $50,000,000, the level of endowment established by Congress in Public Law 99–88: *Provided further,* That an additional 20,000,000 Egyptian pounds generated from the same sources shall be made available pursuant to the same agreements to enable the United States Embassy in Cairo to establish an endowment to support other United States

President of U.S.

educational programs in Egypt: *Provided further,* That in exercising the authority to provide cash transfer assistance for Israel and Egypt, the President shall ensure that the level of such assistance does not cause an adverse impact on the total level of nonmilitary exports from the United States to each such country: *Provided further,* That it is the sense of the Congress that the recommended levels of assistance for Egypt and Israel are based in great measure upon their continued participation in the Camp David Accords and upon the Egyptian-Israeli peace treaty: *Provided further,* That of the funds appropriated under this heading and allocated for El Salvador, up to $1,500,000 (or the equivalent in local currencies generated with funds provided to El Salvador under this heading) may be made available, notwithstanding section 660 of the Foreign Assistance Act of 1961, to assist the Government of El Salvador's Special Investigative Unit, including for the purpose of bringing to justice those responsible for the murders of United States citizens in El Salvador: *Provided further,* That section 534(e) of the Foreign

22 USC 2346c.

Assistance Act of 1961 is amended by (1) striking "each of fiscal years 1988 and 1989" and inserting in lieu thereof "fiscal year 1990"; and (2) striking "September 30, 1989" and inserting in lieu thereof "September 30, 1990": *Provided further,* That not less than $12,000,000 of the funds appropriated under this heading shall be made available for the West Bank and Gaza Program through the Asia and Near East regional program: *Provided further,* That not less than $35,000,000 of the funds appropriated under this heading shall be made available for Jordan: *Provided further,* That not less than $15,000,000 of the funds appropriated under this heading shall

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989          103 STAT. 1207

be made available for Cyprus: *Provided further,* That not less than
$230,000,000 of the funds appropriated under this heading shall be
made available for Pakistan: *Provided further,* That not less than
$20,000,000 of the funds appropriated under this heading shall be
made available for Morocco: *Provided further,* That none of the
funds appropriated under this heading shall be made available for
Zaire: *Provided further,* That prior to the initial obligation of assist-
ance for El Salvador from funds appropriated under this heading,
the President shall report to the Congress to the extent to which the
Government of El Salvador has made demonstrable progress in
settling outstanding expropriation claims of American citizens in
compliance with the judgment of the Supreme Court of El Salvador:
*Provided further,* That the total amount of assistance provided for
any country in Central America under this heading and to carry out
the provisions of sections 103 through 106 of the Foreign Assistance
Act of 1961 shall not be reduced, from amounts allocated to such
country for such purposes for fiscal year 1989, by a percentage
greater than the percentage reduction from amounts allocated for
any other country in Central America for such purposes for such
fiscal year: *Provided further,* That if funds made available under
this heading are provided to a foreign country as cash transfer
assistance, that country shall be required to maintain these funds in
a separate account and not commingle them with any other funds:
*Provided further,* That such funds may be obligated and expended
notwithstanding provisions of law which are inconsistent with the
nature of this assistance including provisions which are referenced
in the Joint Explanatory Statement of the Committee of Conference
accompanying House Joint Resolution 648 (H. Rept. No. 98-1159):
*Provided further,* That all local currencies that may be generated
with such funds shall be treated in accordance with section 592 of
this Act: *Provided further,* That at least fifteen days prior to obligat-
ing any such assistance to a foreign country under this heading, the
President shall submit a notification through the regular notifica-
tion procedures of the Committees on Appropriations, the Commit-
tee on Foreign Affairs of the House of Representatives and the
Committee on Foreign Relations of the Senate, which shall include a
detailed description of how the funds proposed to be made available
will be used, with a discussion of the United States interests that
will be served by the assistance (including, as appropriate, a descrip-
tion of the economic policy reforms that will be promoted by such
assistance): *Provided further,* That not more than $5,000,000 of the
funds appropriated under this heading may be made available to
finance tied aid credits, unless the President determines it is in the
national interest to provide in excess of $5,000,000 and so notifies
the Committees on Appropriations through the regular notification
procedures of the Committees on Appropriations: *Provided further,*
That notwithstanding any other provision of law, none of the funds
appropriated under this heading may be used for tied aid credits
without the prior approval of the Administrator of the Agency for
International Development: *Provided further,* That, except as pro-
vided by this Act, none of the funds appropriated under this heading
by this Act or prior foreign assistance appropriations Acts, shall be
made available for tied aid credits in accordance with any provision
of law enacted after May 19, 1988: *Provided further,* That not less
than $5,000,000 of the funds appropriated under this heading shall
be made available, notwithstanding any other provision of law, for
the humanitarian relief, medical treatment, education and voca-

President of U.S.
Reports.
Claims.

22 USC 2346
note.

President of U.S.

Defendant's Exhibit Y
6:23-cv-00007

tional training of victims of the Armenian earthquake of December 7, 1988, which amount shall be channeled through United States private and voluntary organizations and other United States non-governmental organizations: *Provided further,* That $2,000,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, for the provision of medical supplies and hospital equipment to Poland, including expenses of purchasing, transporting, and distributing such supplies and equipment, and for training Polish medical personnel: *Provided further,* That $1,500,000 of the funds appropriated under this heading shall be made available, notwithstanding any other provision of law, only to support Solidarity through the AFL-CIO's Free Trade Union Institute to promote democratic activities in Poland: *Provided further,* That not less than $200,000,000 of the funds appropriated under this heading shall be available, notwithstanding any other provision of law, for Poland: *Provided further,* That $2,500,000 of the funds appropriated under this heading shall be available, notwithstanding any other provision of law, to support independent, democratic organizations and activities in Poland and Hungary: *Provided further,* That funds made available under this heading shall remain available until September 30, 1991.

### INTERNATIONAL FUND FOR IRELAND

For necessary expenses to carry out the provisions of chapter 4 of part II, $20,000,000, which shall be available for the United States contribution to the International Fund for Ireland and shall be made available in accordance with the provisions of the Anglo-Irish Agreement Support Act of 1986 (Public Law 99-415): *Provided,* That such amount shall be expended at the minimum rate necessary to make timely payment for projects and activities: *Provided further,* That funds made available under this heading shall remain available until expended.

### MULTILATERAL ASSISTANCE INITIATIVE FOR THE PHILIPPINES

For necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961, $160,000,000, which shall be available for the Multilateral Assistance Initiative for the Philippines: *Provided,* That not less than 75 per centum of the funds appropriated under this heading shall be made available for project and sector activities consistent with the purposes of sections 103 through 106 of such Act: *Provided further,* That the President shall seek to channel through indigenous and United States private voluntary organizations and cooperatives not less than $20,000,000 of the funds appropriated under this heading and of the funds appropriated and allocated for the Philippines to carry out sections 103 through 106 of such Act: *Provided further,* That up to a total of $40,000,000 of the funds appropriated to carry out sections 103 through 106 and chapter 4 of part II of such Act may be transferred to and consolidated and merged with the funds appropriated under this heading notwithstanding the limitations on transfers between accounts contained in section 514 of this Act and sections 109 and 610 of the Foreign Assistance Act of 1961: *Provided further,* That any funds transferred to carry out the purposes of this heading shall be made available only for projects and activities which are consistent with the purposes of those funds as initially appropriated: *Provided further,* That

President of U.S.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989        103 STAT. 1209

of the total amount of funds transferred to carry out the purposes of this heading not less than 50 per centum shall be derived from funds appropriated to carry out chapter 4 of part II of the Foreign Assistance Act: *Provided further,* That transfers of any funds to carry out the purposes of this heading shall be subject to the regular notification procedures of the Committees on Appropriations: *Provided further,* That funds made available under this heading shall remain available until September 30, 1991: *Provided further,* That none of the funds appropriated under this heading shall be made available except as provided through the regular notification procedures of the Committees on Appropriations.

### INDEPENDENT AGENCIES

#### AFRICAN DEVELOPMENT FOUNDATION

For necessary expenses to carry out the provisions of title V of the International Security and Development Cooperation Act of 1980, Public Law 96–533, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 9104, title 31, United States Code, $9,000,000: *Provided,* That, when, with the permission of the Foundation, funds made available to a grantee under this heading are invested pending disbursement, the resulting interest is not required to be deposited in the United States Treasury if the grantee uses the resulting interest for the purpose for which the grant was made. This provision applies with respect to both interest earned before and interest earned after the enactment of this provision: *Provided further,* That section 507(a)(1) of the African Development Foundation Act is amended by adding at the end thereof the following: "Members of the Board shall be appointed so that no more than four members of the Board are members of any one political party.": *Provided further,* That the amendment to section 507(a)(1) of such Act shall not affect an appointment made to the Board prior to the date of enactment of this Act: *Provided further,* That section 511 of the African Development Foundation Act is repealed.

22 USC 209h–5.

22 USC 290h–5 note.

22 USC 290h–9.

#### INTER-AMERICAN FOUNDATION

##### (INCLUDING TRANSFER OF FUNDS)

For expenses necessary to carry out the functions of the Inter-American Foundation in accordance with the provisions of section 401 of the Foreign Assistance Act of 1969, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 9104, title 31, United States Code, $16,932,000.

#### OVERSEAS PRIVATE INVESTMENT CORPORATION

The Overseas Private Investment Corporation is authorized to make such expenditures within the limits of funds available to it and in accordance with law (including not to exceed $35,000 for official reception and representation expenses), and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 9104 of title 31, United States Code, as may be necessary in carrying out the program set forth in the budget for the current fiscal year.

During the fiscal year 1990 and within the resources and authority available, gross obligations for the amount of direct loans shall not exceed $20,000,000.

During the fiscal year 1990, total commitments to guarantee loans shall not exceed $215,000,000 of contingent liability for loan principal: *Provided,* That not less than $40,000,000 of such amount shall be used for projects for Poland, notwithstanding any other provision of law.

Loans.

Except as provided in this Act, no provision of any other Act not enacted into law by May 19, 1988, shall be construed to require the exercise of authority to provide direct loans or to make commitments to guarantee loans contrary to the limitations contained under this heading.

### PEACE CORPS

For expenses necessary to carry out the provisions of the Peace Corps Act (75 Stat. 612), $168,614,000, including the purchase of not to exceed five passenger motor vehicles for administrative purposes for use outside of the United States: *Provided,* That none of the funds appropriated under this heading shall be used to pay for abortions.

Abortion.

### DEPARTMENT OF STATE

#### INTERNATIONAL NARCOTICS CONTROL

For necessary expenses to carry out the provisions of section 481 of the Foreign Assistance Act of 1961, $115,000,000: *Provided,* That in carrying out the provisions of section 481, increased emphasis should be placed on (1) further intensifying United States efforts in the eradication and interdiction of illicit narcotics, and (2) seeking international cooperation on narcotics enforcement matters such as in the areas of extradition treaties, mutual legal assistance to combat money laundering, sharing of evidence, and other initiatives for cooperative narcotics enforcement efforts: *Provided further,* That of the funds made available under this heading, such funds as the President deems necessary may be made available for the funding of United States participation in a multilateral anti-narcotics strike force not including any Communist or Warsaw Pact troops: *Provided further,* That funds for such a force may only be provided if the Committees on Appropriations of the House of Representatives and of the Senate are notified at least 15 days in advance of the obligation of funds.

#### MIGRATION AND REFUGEE ASSISTANCE

For expenses, not otherwise provided for, necessary to enable the Secretary of State to provide, as authorized by law, a contribution to the International Committee of the Red Cross and assistance to refugees, including contributions to the Intergovernmental Committee for Migration and the United Nations High Commissioner for Refugees; salaries and expenses of personnel and dependents as authorized by the Foreign Service Act of 1980; allowances as authorized by sections 5921 through 5925 of title 5, United States Code; hire of passenger motor vehicles; and services as authorized by section 3109 of title 5, United States Code; $370,000,000: *Provided,* That not less than $25,000,000 shall be available for Soviet, Eastern European and other refugees resettling in Israel: *Provided further,*

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989      103 STAT. 1211

That funds appropriated under this heading shall be administered in a manner that ensures equity in the treatment of all refugees receiving Federal assistance: *Provided further,* That no funds herein appropriated shall be used to assist directly in the migration to any nation in the Western Hemisphere of any person not having a security clearance based on reasonable standards to ensure against Communist infiltration in the Western Hemisphere: *Provided further,* That of the funds appropriated under this heading not less than $15,000,000 shall be available for Refugee Entrant Assistance: *Provided further,* That of the funds appropriated under this heading not less than $46,000,000 shall be made available for the refugee admission program for first asylum refugees from East Asia: *Provided further,* That section 584(a)(3) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in section 101(e) of Public Law 100–202), is amended by striking "8 months" and inserting "one year": *Provided further,* That of the funds appropriated under this heading not less than $1,500,000 shall be made available for a Thailand-Cambodia border refugee protection program: *Provided further,* That of the funds appropriated under this heading not less than $1,500,000 shall be made available for the antipiracy program, none of which funds shall be used by any government to deny asylum to individuals seeking asylum: *Provided further,* That not less than $10,000,000 shall be made available to the Republic of Turkey for assistance for shelter, food and other basic needs to ethnic Turkish refugees fleeing the People's Republic of Bulgaria and resettling on the sovereign territory of Turkey: *Provided further,* That section 584(a)(1)(B) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in section 101(e) of Public Law 100–202), is amended by striking "during the 2-year period beginning 90 days after the date of the enactment of this Act" and inserting "during the period beginning on March 22, 1988, and ending on September 30, 1990": *Provided further,* That the sixth proviso under Migration and Refugee Assistance, Department of State, in title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989 is amended by striking "before the end of the 2-year period" and inserting "before the end of the period": *Provided further,* That not more than $8,250,000 of the funds appropriated under this heading shall be available for the administrative expenses of the Office of Refugee Programs of the Department of State: *Provided further,* That of the funds appropriated under this heading, $250,000 shall be made available, notwithstanding any other provision of law, for food, medicine, medical supplies, medical training, clothing, and other humanitarian assistance for displaced Burmese students at camps on the border with Thailand.

8 USC 1101 note.

8 USC 1101 note.

### UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For necessary expenses to carry out the provisions of section 2(c) of the Migration and Refugee Assistance Act of 1962, as amended (22 U.S.C. 260(c)), $50,000,000, to remain available until expended: *Provided,* That the funds made available under this heading are appropriated notwithstanding the provisions contained in section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 which would limit the amount of funds which could be appropriated for this purpose.

Case 6:23-cv-00007   Document 264   Filed on 08/25/23 in TXSD   Page 221 of 342

ANTI-TERRORISM ASSISTANCE

For necessary expenses to carry out the provisions of chapter 8 of part II of the Foreign Assistance Act of 1961, $10,017,000.

## TITLE III—MILITARY ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

#### INTERNATIONAL MILITARY EDUCATION AND TRAINING

For necessary expenses to carry out the provisions of section 541, $47,400,000: *Provided,* That none of the funds appropriated under this heading shall be made available for grant financed military education and training for any country whose annual per capita GNP exceeds $2,349 unless that country agrees to fund from its own resources the transportation cost and living allowances of its students.

#### FOREIGN MILITARY FINANCING PROGRAM

For expenses necessary for grants to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $4,297,404,194: *Provided,* That of the funds appropriated by this paragraph not less than $1,800,000,000 shall be available for grants only for Israel, not less than $1,300,000,000 shall be available for grants only for Egypt, not less than $230,000,000 shall be available for grants only for Pakistan, and not less than $48,000,000 shall be available for grants only for Jordan: *Provided further,* That to the extent that the Government of Israel requests that funds be used for such purposes, grants made available for Israel by this paragraph shall, as agreed by Israel and the United States, be available for advanced fighter aircraft programs or for other advanced weapons systems, as follows: (1) up to $150,000,000 shall be available for research and development in the United States; and (2) not less than $400,000,000 shall be available for the procurement in Israel of defense articles and defense services, including research and devel-
Grants.
opment: *Provided further,* That grants provided with funds made available by this paragraph shall be implemented by grant documents which do not include a requirement to repay the United States Government, notwithstanding any requirement in section 23 of the Arms Export Control Act.

For expenses necessary for loans to enable the President to carry out the provisions of section 23 of the Arms Export Control Act, $406,000,000: *Provided,* That any funds made available by this paragraph, except as otherwise specified, may be made available at concessional rates of interest: *Provided further,* That the concessional rate of interest on Foreign Military Financing Program loans shall be not less than 5 per centum per year: *Provided further,* That all country and funding level changes in requested concessional financing allocations shall be submitted through the regular notification procedures: *Provided further,* That during fiscal year 1990, gross obligations for the principal amount of direct loans under this heading, exclusive of loan guarantee defaults, shall not exceed $406,000,000.

Of the funds appropriated under this heading $500,000,000 only shall be available for Turkey and $350,000,000 only shall be available for Greece and, if Turkey receives any funds under this heading

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989          103 STAT. 1213

on a grant basis then not less than $30,000,000 of the funds provided for Greece shall be made available as grants: *Provided,* That funds previously obligated for the Philippines under the heading "Foreign Military Credit Sales" but uncommitted on the date of enactment of this Act shall be used at any time hereafter only to finance sales made under the Arms Export Control Act: *Provided further,* That of the funds appropriated under this heading not more than $85,000,000 shall be available for El Salvador: *Provided further,* That of the funds appropriated under this heading not more than $9,000,000 shall be available for non-lethal assistance for Guatemala: *Provided further,* That of the funds appropriated under this heading, except through the regular notification procedures of the Committees on Appropriations, not more than $3,000,000 shall be available for Zaire: *Provided further,* That of the funds appropriated under this heading $43,000,000 shall be available for Morocco: *Provided further,* That of the funds appropriated under this heading $30,000,000 shall be available for countries in sub-Saharan Africa: *Provided further,* That none of the funds appropriated under this heading shall be available for Sudan or Somalia, except through the regular notification procedures of the Committees on Appropriations: *Provided further,* That not more than $687,404,194 of the funds made available under this heading shall be available for use in financing the procurement of defense articles, defense services, or design and construction services that are not sold by the United States Government under the Arms Export Control Act to countries other than Israel and Egypt: *Provided further,* That only those countries for which assistance was justified for the "Foreign Military Sales Financing Program" in the fiscal year 1989 congressional presentation for security assistance programs may utilize funds made available under this heading for procurement of defense articles, defense services or design and construction services that are not sold by the United States Government under the Arms Export Control Act: *Provided further,* That any material assistance provided with funds appropriated under this heading for Haiti shall be limited to non-lethal items such as transportation and communications equipment and uniforms: *Provided further,* That funds made available under this heading for Haiti shall be made available only through the regular notification procedures of the Committees on Appropriations: *Provided further,* That funds appropriated under this heading shall be expended at the minimum rate necessary to make timely payment for defense articles and services: *Provided further,* That the Department of Defense shall conduct during the current fiscal year nonreimbursable audits of private firms whose contracts are made directly with foreign governments and are financed with funds made available under this heading (as well as subcontractors thereunder) as requested by the Defense Security Assistance Agency: *Provided further,* That any reference in title V of this Act to "Foreign Military Credit Sales" shall be deemed to be a reference to grants and loans pursuant to the Foreign Military Financing Program under this heading: *Provided further,* That not more than $39,000,000 of the funds appropriated under this heading may be obligated for necesary expenses, including the purchase of passenger motor vehicles for replacement only for use outside of the United States, for the general costs of administering military assistance and sales: *Provided further,* That section 515(d) of the Foreign Assistance Act of 1961 is amended by inserting immediately after the word "chapter" the phrase "or the Arms Export Control Act",

<div style="float:right">Contracts.</div>

<div style="float:right">22 USC 2321i.</div>

103 STAT. 1214          PUBLIC LAW 101–167—NOV. 21, 1989

22 USC 2396.

and section 636(g) of that Act is amended by inserting immediately after the phrase "for the purposes of part II" the phrase "or the Arms Export Control Act".

FOREIGN MILITARY SALES DEBT REFORM

22 USC 2764 note.

Funds made available by the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988, for obligation and expenditure after October 1, 1988, subject to a Presidential budget request, under the heading "Foreign Military Sales Debt Reform", subsection (b) "Interest Rate Reduction" shall be available, subject to the same conditions and provisos, only after October 1, 1990: *Provided,* That such subsection and subsection (a) under such heading are amended by striking "ten" in all places in which that word appears and inserting in lieu thereof "eight".

22 USC 2764 note.

Securities.

GUARANTY RESERVE FUND

If during fiscal year 1990 the funds available in the Guaranty Reserve Fund (Fund) are insufficient to enable the Secretary of Defense (Secretary) to discharge his responsibilities, as guarantor of loans guaranteed pursuant to section 24 of the Arms Export Control Act (AECA) or pursuant to the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988, under the heading "Foreign Military Sales Debt Reform", the Secretary shall issue to the Secretary of the Treasury notes or other obligations in such forms and denominations, bearing such maturities, and subject to such terms and conditions, as may be prescribed by the Secretary of the Treasury. Such notes or obligations may be redeemed by the Secretary from appropriations and other funds available, including repayments by the borrowers of amounts paid pursuant to guarantees issued under section 24 of the AECA. Such notes or other obligations shall bear interest at a rate determined by the Secretary of the Treasury, taking into consideration the average market yield on outstanding marketable obligations of the United States of comparable maturities during the month preceding the issuance of the notes or other obligations. The Secretary of the Treasury shall purchase any notes or other obligations issued hereunder and for that purpose he is authorized to use as a public debt transaction the proceeds from the sale of any securities issued under the Second Liberty Bond Act, and the purposes for which securities may be issued under the Second Liberty Bond Act are extended to include any purchase of such notes or obligations. The Secretary of the Treasury may at any time sell any of the notes or other obligations acquired by him under this heading. All redemptions, purchases, and sales by the Secretary of the Treasury of such notes or other obligations shall be treated as public debt transactions of the United States.

Public debt.

SPECIAL DEFENSE ACQUISITION FUND

(LIMITATION ON OBLIGATIONS)

Not to exceed $280,000,000 may be obligated pursuant to section 51(c)(2) of the Arms Export Control Act for the purposes of the Special Defense Acquisition Fund during fiscal year 1990, to remain available for obligation until September 30, 1992: *Provided,* That section 632(d) of the Foreign Assistance Act of 1961 shall be applicable to the transfer to countries pursuant to chapter 2 of part II

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989   103 STAT. 1215

of that Act of defense articles and defense services acquired under chapter 5 of the Arms Export Control Act.

### PEACEKEEPING OPERATIONS

For necessary expenses to carry out the provisions of section 551, $33,377,000.

## TITLE IV—EXPORT ASSISTANCE

### EXPORT-IMPORT BANK OF THE UNITED STATES

The Export-Import Bank of the United States is authorized to make such expenditures within the limits of funds and borrowing authority available to such corporation, and in accordance with law, and to make such contracts and commitments without regard to fiscal year limitations, as provided by section 104 of the Government Corporation Control Act, as may be necessary in carrying out the program for the current fiscal year for such corporation: *Provided,* That none of the funds available during the current fiscal year may be used to make expenditures, contracts, or commitments for the export of nuclear equipment, fuel, or technology to any country other than a nuclear-weapon State as defined in article IX of the Treaty on the Non-Proliferation of Nuclear Weapons eligible to receive economic or military assistance under this Act that has detonated a nuclear explosive after the date of enactment of this Act.

Contracts.

### LIMITATION ON PROGRAM ACTIVITY

During the fiscal year 1990 and within the resources and authority available, gross obligations for the principal amount of direct loans shall not exceed $615,000,000: *Provided,* That gross obligations for the principal amount of direct loans pursuant to the medium-term financing program shall not exceed $215,000,000: *Provided further,* That the interest subsidy authority and the tied aid grants authority provided under this heading are subject to authorization: *Provided further,* That there are hereby appropriated $110,000,000 to be made available for tied aid grants in accordance with section 15 of the Export-Import Bank Act of 1945, as amended, or, at the discretion of the Chairman of the Export-Import Bank, in accordance with the Trade and Development Enhancement Act of 1983, as amended: *Provided further,* That there are hereby appropriated $20,000,000 to be made available for interest subsidy payments in accordance with the Export-Import Bank Act of 1945, as amended: *Provided further,* That none of the funds appropriated under this heading for interest subsidy payments may be used in conjunction with any loan guaranteed from authority provided under this heading: *Provided further,* That the funds made available under this heading for both grant and subsidy purposes shall be subject to the regular notification procedures of the Committees on Appropriations of the House of Representatives and the Senate: *Provided further,* That $110,000,000 of the funds made available for tied aid grant purposes and $20,000,000 of the funds made available for interest subsidy payments shall be subject to the limitation on the gross obligations for the principal amount of direct loans specified under this heading: *Provided further,* That funds made available for grants or interest subsidy payments shall be made available only as

authorized by law: *Provided further,* That loan guarantee authority available to the Export-Import Bank of the United States may be used by the Bank to participate in the financing of commercial sales of defense articles and services destined for Greece and Turkey, notwithstanding any other provision of law: *Provided further,* That the authority provided by the previous proviso shall not be used for the procurement of defense articles or services for use on Cyprus: *Provided further,* That during the fiscal year 1990, total commitments to guarantee loans shall not exceed $10,384,000,000 of contingent liability for loan principal: *Provided further,* That the direct loan, tied aid grant and interest subsidy authority provided under this heading shall remain available until September 30, 1991.

### LIMITATION ON ADMINISTRATIVE EXPENSES

Not to exceed $22,000,000 (to be computed on an accrual basis) shall be available during fiscal year 1990 for administrative expenses, including hire of passenger motor vehicles and services as authorized by section 3109 of title 5, United States Code, and not to exceed $16,000 for official reception and representation expenses for members of the Board of Directors: *Provided,* That (1) fees or dues to international organizations of credit institutions engaged in financing foreign trade, (2) necessary expenses (including special services performed on a contract or a fee basis, but not including other personal services) in connection with the acquisition, operation, maintenance, improvement, or disposition of any real or personal property belonging to the Export-Import Bank or in which it has an interest, including expenses of collections of pledged collateral, or the investigation or appraisal of any property in respect to which an application for a loan has been made, and (3) expenses (other than internal expenses of the Export-Import Bank) incurred in connection with the issuance and servicing of guarantees, insurance, and reinsurance, shall be considered as nonadministrative expenses for the purposes of this heading.

### FUNDS APPROPRIATED TO THE PRESIDENT

#### TRADE AND DEVELOPMENT PROGRAM

For necessary expenses to carry out the provisions of section 661 of the Foreign Assistance Act of 1961, $30,000,000: *Provided,* That except as provided in this or any other Act appropriating funds for foreign operations, export financing, and related programs, no provision of law enacted after May 19, 1988, may transfer funds to, or otherwise make available funds for, the Trade and Development Program.

### AGENCY FOR INTERNATIONAL DEVELOPMENT

#### TRADE CREDIT INSURANCE PROGRAM

During fiscal year 1990, total commitments to guarantee or insure loans for the "Trade Credit Insurance Program" shall not exceed $200,000,000 of contingent liability for loan principal for Central America and, notwithstanding any other provision of law, not to exceed $200,000,000 of contingent liability for loan principal for Poland pursuant to the authorities of section 224 of the Foreign Assistance Act of 1961: *Provided,* That section 224(c) of the Foreign

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989          103 STAT. 1217

Assistance Act of 1961 is amended by striking out "September 30,   22 USC 2184.
1989" and inserting in lieu thereof "September 30, 1990".

## TITLE V—GENERAL PROVISIONS

### COST BENEFIT STUDIES

SEC. 501. None of the funds appropriated in this Act (other than
funds appropriated for "International Organizations and Pro-
grams") shall be used to finance the construction of any new flood
control, reclamation, or other water or related land resource project
or program which has not met the standards and criteria used in
determining the feasibility of flood control, reclamation, and other
water and related land resource programs and projects proposed for
construction within the United States of America under the prin-
ciples, standards and procedures established pursuant to the Water
Resources Planning Act (42 U.S.C. 1962, et seq.) or Acts amendatory
or supplementary thereto.

### OBLIGATIONS DURING LAST MONTH OF AVAILABILITY

SEC. 502. Except for the appropriations entitled "International
Disaster Assistance", and "United States Emergency Refugee and
Migration Assistance Fund", not more than 15 per centum of any
appropriation item made available by this Act shall be obligated
during the last month of availability.

### PROHIBITION AGAINST PAY TO FOREIGN ARMED SERVICE MEMBER

SEC. 503. None of the funds appropriated in this Act nor any of the
counterpart funds generated as a result of assistance hereunder or
any prior Act shall be used to pay pensions, annuities, retirement
pay, or adjusted service compensation for any person heretofore or
hereafter serving in the armed forces of any recipient country.

### TERMINATION FOR CONVENIENCE

SEC. 504. None of the funds appropriated or made available pursu-   Contracts.
ant to this Act for carrying out the Foreign Assistance Act of 1961,
may be used for making payments on any contract for procurement
to which the United States is a party entered into after the date of
enactment of this Act which does not contain a provision authoriz-
ing the termination of such contract for the convenience of the
United States.

### PROHIBITION OF PAYMENTS TO UNITED NATIONS MEMBERS

SEC. 505. None of the funds appropriated or made available pursu-
ant to this Act for carrying out the Foreign Assistance Act of 1961,
may be used to pay in whole or in part any assessments, arrearages,
or dues of any member of the United Nations.

### PROHIBITION OF BILATERAL FUNDING FOR INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 506. None of the funds contained in title II of this Act may be
used to carry out the provisions of section 209(d) of the Foreign
Assistance Act of 1961.

### AID RESIDENCE EXPENSES

SEC. 507. Of the funds appropriated or made available pursuant to this Act, not to exceed $126,500 shall be for official residence expenses of the Agency for International Development during the current fiscal year: *Provided,* That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars.

### AID ENTERTAINMENT EXPENSES

SEC. 508. Of the funds appropriated or made available pursuant to this Act, not to exceed $11,500 shall be for entertainment expenses of the Agency for International Development during the current fiscal year.

### REPRESENTATIONAL ALLOWANCES

SEC. 509. Of the funds appropriated or made available pursuant to this Act, not to exceed $115,000 shall be available for representation allowances for the Agency for International Development during the current fiscal year: *Provided,* That appropriate steps shall be taken to assure that, to the maximum extent possible, United States-owned foreign currencies are utilized in lieu of dollars: *Provided further,* That of the funds made available by this Act for general costs of administering military assistance and sales under the heading "Foreign Military Financing Program", not to exceed $2,875 shall be available for entertainment expenses and not to exceed $75,000 shall be available for representation allowances: *Provided further,* That of the funds made available by this Act under the heading "International Military Education and Training", not to exceed $125,000 shall be available for entertainment allowances: *Provided further,* That of the funds made available by this Act for the Inter-American Foundation, not to exceed $2,875 shall be available for entertainment and representation allowances: *Provided further,* That of the funds made available by this Act for the Peace Corps, not to exceed a total of $4,600 shall be available for entertainment expenses: *Provided further,* That of the funds made available by this Act under the heading "Trade and Development Program", not to exceed $2,300 shall be available for representation and entertainment allowances.

### PROHIBITION ON FINANCING NUCLEAR GOODS

SEC. 510. None of the funds appropriated or made available (other than funds for "International Organizations and Programs") pursuant to this Act, for carrying out the Foreign Assistance Act of 1961, may be used to finance the export of nuclear equipment, fuel, or technology.

### HUMAN RIGHTS

SEC. 511. Funds appropriated by this Act may not be obligated or expended to provide assistance to any country for the purpose of aiding the efforts of the government of such country to repress the legitimate rights of the population of such country contrary to the Universal Declaration of Human Rights.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989    103 STAT. 1219

### PROHIBITION AGAINST DIRECT FUNDING FOR CERTAIN COUNTRIES

SEC. 512. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance or reparations to Angola, Cambodia, Cuba, Iraq, Libya, the Socialist Republic of Vietnam, South Yemen, Iran, or Syria: *Provided,* That for purposes of this section, the prohibition on obligations or expenditures shall include direct loans, credits, insurance and guarantees of the Export-Import Bank or its agents: *Provided further,* That such prohibition shall not apply to the Export-Import Bank or its agents if in the judgment of the President its application is not in the national interest of the United States and so reports to Congress.

Loans.
Insurance.
Reports.

### MILITARY COUPS

SEC. 513. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to finance directly any assistance to any country whose duly elected Head of Government is deposed by military coup or decree: *Provided,* That assistance may be resumed to such country if the President determines and reports to the Committees on Appropriations that subsequent to the termination of assistance a democratically elected government has taken office.

### TRANSFERS BETWEEN ACCOUNTS

SEC. 514. None of the funds made available by this Act may be obligated under an appropriation account to which they were not appropriated, unless the President, prior to the exercise of any authority contained in the Foreign Assistance Act of 1961 to transfer funds, consults with and provides a written policy justification to the Committees on Appropriations of the House of Representatives and the Senate: *Provided further,* That the exercise of such authority shall be subject to the regular notification procedures of the Committees on Appropriations.

### DEOBLIGATION/REOBLIGATION AUTHORITY

SEC. 515. Amounts certified pursuant to section 1311 of the Supplemental Appropriations Act, 1955, as having been obligated against appropriations heretofore made under the authority of the Foreign Assistance Act of 1961 for the same general purpose as any of the headings under the "Agency for International Development" are, if deobligated, hereby continued available for the same period as the respective appropriations under such headings or until September 30, 1990, whichever is later, and for the same general purpose, and for countries within the same region as originally obligated: *Provided,* That the Appropriations Committees of both Houses of the Congress are notified fifteen days in advance of the deobligation and reobligation of such funds in accordance with regular notification procedures of the Committees on Appropriations.

### PROHIBITION ON PUBLICITY OR PROPAGANDA

SEC. 516. No part of any appropriation contained in this Act shall be used for publicity or propaganda purposes within the United

States not authorized before the date of enactment of this Act by the Congress.

## AVAILABILITY OF FUNDS

SEC. 517. No part of any appropriation contained in this Act shall remain available for obligation after the expiration of the current fiscal year unless expressly so provided in this Act: *Provided,* That funds appropriated for the purposes of chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961, as amended, shall remain available until expended if such funds are initially obligated before the expiration of their respective periods of availability contained in this Act: *Provided further,* That, notwithstanding any other provision of this Act, any funds made available for the purposes of chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated or obligated for cash disbursements in order to address balance of payments or economic policy reform objectives, shall remain available until expended: *Provided further,* That the report required by section 653(a) of the Foreign Assistance Act of 1961 shall designate for each country, to the extent known at the time of submission of such report, those funds allocated for cash disbursement for balance of payment and economic policy reform purposes.

## LIMITATION ON ASSISTANCE TO COUNTRIES IN DEFAULT

Loans.

SEC. 518. No part of any appropriation contained in this Act shall be used to furnish assistance to any country which is in default during a period in excess of one calendar year in payment to the United States of principal or interest on any loan made to such country by the United States pursuant to a program for which funds are appropriated under this Act: *Provided,* That this section and section 620(q) of the Foreign Assistance Act of 1961 shall not apply to funds made available in this Act for any narcotics-related activities in Colombia, Bolivia, and Peru authorized by the Foreign Assistance Act of 1961, as amended, or the Arms Export Control Act.

## FINANCIAL INSTITUTIONS—NAMES OF BORROWERS

Loans.

SEC. 519. None of the funds appropriated or made available pursuant to this Act shall be available to any international financial institution whose United States governor or representative cannot upon request obtain the amounts and the names of borrowers for all loans of the international financial institution, including loans to employees of the institution, or the compensation and related benefits of employees of the institution.

## FINANCIAL INSTITUTIONS—DOCUMENTATION

Classified information.

SEC. 520. None of the funds appropriated or made available pursuant to this Act shall be available to any international financial institution whose United States governor or representative cannot upon request obtain any document developed by or in the possession of the management of the international financial institution, unless the United States governor or representative of the institution certifies to the Committees on Appropriations that the confidentiality of the information is essential to the operation of the institution.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989        103 STAT. 1221

### COMMERCE AND TRADE

SEC. 521. None of the funds appropriated or made available pursuant to this Act for direct assistance and none of the funds otherwise made available pursuant to this Act to the Export-Import Bank and the Overseas Private Investment Corporation shall be obligated or expended to finance any loan, any assistance or any other financial commitments for establishing or expanding production of any commodity for export by any country other than the United States, if the commodity is likely to be in surplus on world markets at the time the resulting productive capacity is expected to become operative and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity: *Provided,* That such prohibition shall not apply to the Export-Import Bank if in the judgment of its Board of Directors the benefits to industry and employment in the United States are likely to outweigh the injury to United States producers of the same, similar, or competing commodity.

Loans.

### SURPLUS COMMODITIES

SEC. 522. The Secretary of the Treasury shall instruct the United States Executive Directors of the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Inter-American Development Bank, the International Monetary Fund, the Asian Development Bank, the Inter-American Investment Corporation, the African Development Bank, and the African Development Fund to use the voice and vote of the United States to oppose any assistance by these institutions, using funds appropriated or made available pursuant to this Act, for the production or extraction of any commodity or mineral for export, if it is in surplus on world markets and if the assistance will cause substantial injury to United States producers of the same, similar, or competing commodity.

Minerals and mining.
Exports.
22 USC 262h.

### NOTIFICATION REQUIREMENTS

SEC. 523. For the purposes of providing the Executive Branch with the necessary administrative flexibility, none of the funds made available under this Act for "Agriculture, rural development, and nutrition, Development Assistance", "Population, Development Assistance", "Child Survival Fund", "Health, Development Assistance", "International AIDS Prevention and Control Program", "Education and human resources development, Development Assistance", "Private Sector, environment, and energy, Development Assistance", "Science and technology, Development Assistance", "Sub-Saharan Africa, Development Assistance", "International organizations and programs", "American schools and hospitals abroad", "Trade and development program", "International narcotics control", "Economic support fund", "Peacekeeping operations", "Operating expenses of the Agency for International Development", "Operating expenses of the Agency for International Development Office of Inspector General", "Anti-terrorism assistance", "Foreign Military Financing Program", "International military education and training", "Inter-American Foundation", "African Development Foundation", "Peace Corps", or "Migration and refugee assistance", shall be available for obligation for activities, programs, projects, type of materiel assistance, countries, or other operation

Defendant's Exhibit Y
6:23-cv-00007

not justified or in excess of the amount justified to the Appropriations Committees for obligation under any of these specific headings for the current fiscal year unless the Appropriations Committees of both Houses of Congress are previously notified fifteen days in advance: *Provided,* That the President shall not enter into any commitment of funds appropriated for the purposes of chapter 2 of part II of the Foreign Assistance Act of 1961 or of funds appropriated for the purposes of section 23 of the Arms Export Control Act for the provision of major defense equipment, other than conventional ammunition, or other major defense items defined to be aircraft, ships, missiles, or combat vehicles, not previously justified to Congress or 20 per centum in excess of the quantities justified to Congress unless the Committees on Appropriations are notified fifteen days in advance of such commitment: *Provided further,* That this section shall not apply to any reprogramming for an activity, program, or project under chapter 1 of part I of the Foreign Assistance Act of 1961 of less than 20 per centum of the amount previously justified to the Congress for obligation for such activity, program, or project for the current fiscal year.

### CONSULTING SERVICES

Contracts.

SEC. 524. The expenditure of any appropriation under this Act for any consulting service through procurement contract, pursuant to section 3109 of title 5, United States Code, shall be limited to those contracts where such expenditures are a matter of public record and available for public inspection, except where otherwise provided under existing law, or under existing Executive order pursuant to existing law.

### PROHIBITION ON ABORTION LOBBYING

SEC. 525. None of the funds appropriated under this Act may be used to lobby for abortion.

### LIMITATION ON AVAILABILITY OF FUNDS FOR INTERNATIONAL ORGANIZATIONS AND PROGRAMS

SEC. 526. (a) Notwithstanding any other provision of law or of this Act, none of the funds provided for "International Organizations and Programs" shall be available for the United States proportionate share for any programs for the Palestine Liberation Organization (or for projects whose purpose is to provide benefits to the Palestine Liberation Organization or entities associated with it), the Southwest Africa People's Organization, Libya, Iran, or, at the discretion of the President, Communist countries listed in section 620(f) of the Foreign Assistance Act of 1961, as amended: *Provided,* That, subject to the regular notification procedures of the Committees on Appropriations, funds appropriated under this Act or any previously enacted Act making appropriations for foreign operations, export financing, and related programs, which are returned or not made available for organizations and programs because of the implementation of this section or any similar provision of law, shall remain available for obligation through September 30, 1991.

(b) The United States shall not make any voluntary or assessed contribution—

(1) to any affiliated organization of the United Nations which grants full membership as a state to any organization or group

PUBLIC LAW 101-167—NOV. 21, 1989    103 STAT. 1223

that does not have the internationally recognized attributes of statehood, or

(2) to the United Nations, if the United Nations grants full membership as a state in the United Nations to any organization or group that does not have the internationally recognized attributes of statehood,

during any period in which such membership is effective.

### UNITED NATIONS VOTING RECORD

SEC. 527. (a) IN GENERAL.—Not later than March 31 of each year, the Secretary of State shall transmit to the Speaker of the House of Representatives and the President of the Senate a full and complete annual report which assesses for the prior calendar year, with respect to each foreign country member of the United Nations, the voting practices of the governments of such countries at the United Nations, and evaluates General Assembly and Security Council actions and the responsiveness of those governments to United States policy on issues of special importance to the United States.

Reports.
22 USC 2414a.

(b) INFORMATION ON VOTING PRACTICES IN THE UNITED NATIONS.— Such report shall include, with respect to voting practices and plenary actions in the United Nations during the preceding year, information to be compiled and supplied by the Permanent Representative of the United States to the United Nations, consisting of—

(1) an analysis and discussion, prepared in consultation with the Secretary of State, of the extent to which member countries supported United States policy objectives at the United Nations;

(2) an analysis and discussion, prepared in consultation with the Secretary of State, of actions taken by the United Nations by consensus;

(3) with respect to plenary votes of the United Nations General Assembly—

(A) a listing of all such votes on issues which directly affected important United States interests and on which the United States lobbied extensively and a brief description of the issues involved in each such vote;

(B) a listing of the votes described in subparagraph (A) which provides a comparison of the vote cast by each member country with the vote cast by the United States;

(C) a country-by-country listing of votes described in subparagraph (A); and

(D) a listing of votes described in subparagraph (A) displayed in terms of United Nations regional caucus groups;

(4) a listing of all plenary votes cast by member countries of the United Nations in the General Assembly which provides a comparison of the vote cast by each member country with the vote cast by the United States;

(5) an analysis and discussion, prepared in consultation with the Secretary of State, of the extent to which other members supported United States policy objectives in the Security Council and a separate listing of all Security Council votes of each member country in comparison with the United States; and

(6) a side-by-side comparison of agreement on important and overall votes for each member country and the United States.

(c) FORMAT.—Information required pursuant to subsection (b)(3) shall also be submitted, together with an explanation of the statis-

Defendant's Exhibit Y
6:23-cv-00007

tical methodology, in a format identical to that contained in chapter II of the March 14, 1988, Report to Congress on Voting Practices in the United Nations.

(d) STATEMENT BY THE SECRETARY OF STATE.—Each report under subsection (a) shall contain a statement by the Secretary of State discussing the measures which have been taken to inform United States diplomatic missions of United Nations General Assembly and Security Council activities.

(e) TECHNICAL AND CONFORMING AMENDMENTS.—The following provisions of law are repealed:

22 USC 2414a.

(1) The second undesignated paragraph of section 101(b)(1) of the Foreign Assistance and Related Programs Appropriations Act, 1984 (Public Law 98–151; 97 Stat. 964).

22 USC 2414a.

(2) Section 530 of the Foreign Assistance and Related Programs Appropriations Act, 1985 (Public Law 98–473, 98 Stat. 1837).

22 USC 2414a.

(3) Section 529 of the Foreign Assistance and Related Programs Appropriations Act, 1986, as enacted by Public Law 99–190 (99 Stat. 1185).

22 USC 2414a.

(4) Section 528 of the Foreign Assistance and Related Programs Appropriations Act, 1987, as enacted by Public Law 99–500 (100 Stat. 1783) and Public Law 99–591 (100 Stat. 3341).

22 USC 2414a.

(5) Section 528 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988, as enacted by Public Law 100–202 (101 Stat. 1329).

22 USC 2414a.

(6) Section 527 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, as enacted by Public Law 100–461 (101 Stat. 2268).

### LOANS TO ISRAEL UNDER ARMS EXPORT CONTROL ACT

SEC. 528. Notwithstanding any other provision of law, Israel may utilize any loan which is or was made available under the Arms Export Control Act and for which repayment is or was forgiven before utilizing any other loan made available under the Arms Export Control Act.

### PROHIBITION AGAINST UNITED STATES EMPLOYEES RECOGNIZING OR NEGOTIATING WITH PLO

SEC. 529. In reaffirmation of the 1975 memorandum of agreement between the United States and Israel, and in accordance with section 1302 of the International Security and Development Cooperation Act of 1985 (Public Law 99–83), no employee of or individual acting on behalf of the United States Government shall recognize or negotiate with the Palestine Liberation Organization or representatives thereof, so long as the Palestine Liberation Organization does not recognize Israel's right to exist, does not accept Security Council Resolutions 242 and 338, and does not renounce the use of terrorism.

### ECONOMIC SUPPORT FUND ASSISTANCE FOR ISRAEL

SEC. 530. The Congress finds that progress on the peace process in the Middle East is vitally important to United States security interests in the region. The Congress recognizes that, in fulfilling its obligations under the Treaty of Peace Between the Arab Republic of Egypt and the State of Israel, done at Washington on March 26,

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989       103 STAT. 1225

1979, Israel incurred severe economic burdens. Furthermore, the Congress recognizes that an economically and militarily secure Israel serves the security interests of the United States, for a secure Israel is an Israel which has the incentive and confidence to continue pursuing the peace process. Therefore, the Congress declares that it is the policy and the intention of the United States that the funds provided in annual appropriations for the Economic Support Fund which are allocated to Israel shall not be less than the annual debt repayment (interest and principal) from Israel to the United States Government in recognition that such a principle serves United States interests in the region.

### CEILINGS AND EARMARKS

SEC. 531. Ceilings and earmarks contained in this Act shall not be applicable to funds or authorities appropriated or otherwise made available by any subsequent Act unless such Act specifically so directs.

### NOTIFICATION CONCERNING AIRCRAFT IN CENTRAL AMERICA

SEC. 532. (a) During the current fiscal year, the authorities of part II of the Foreign Assistance Act of 1961 and the Arms Export Control Act may not be used to make available any helicopters or other aircraft for military use, and licenses may not be issued under section 38 of the Arms Export Control Act for the export of any such aircraft, to any country in Central America unless the Committees on Appropriations, the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate are notified in writing at least fifteen days in advance.

(b) During the current fiscal year, the Secretary of State shall promptly notify the committees designated in subsection (a) whenever any helicopters or other aircraft for military use are provided to any country in Central America by any foreign country.

### ENVIRONMENTAL CONCERNS

SEC. 533. (a) It is the policy of the United States that sustainable economic growth must be predicated on the sustainable management of natural resources. The Secretary of the Treasury shall instruct the United States Executive Directors of each multilateral development bank (MDB) to promote vigorously within each MDB the expansion of programs in areas which address the problems of global climate change through requirements to—

Conservation.
Energy.
22 USC 262l.

(1) augment and expand the professional staff of each MDB with expertise in end-use energy efficiency and conservation and renewable energy;

(2) develop methodologies which allow borrowing countries to include investments in end-use energy efficiency and renewable energy as explicit alternatives in the "least cost" energy sector investments plans they prepare with MDB assistance. Such plans shall give priority to projects and programs which support energy conservation, end-use efficiency and renewable energy sources in major economic sectors, and shall compare the economic and environmental costs of those actions with the economic and environmental costs of investments in conventional energy supplies;

Defendant's Exhibit Y
6:23-cv-00007

(3) provide analysis for each proposed loan to support additional power generating capacity, comparing the economic and environmental costs of investments in demand reduction, including energy conservation and end-use energy efficiency, with the economic and environmental costs of the proposal;

(4) assure that systematic, detailed environmental impact assessments (EIA) of proposed energy projects, or projects with potential significant environmental impacts, are conducted early in the project cycle. Assessments should include but not be limited to—

(A) consideration of a wide range of alternatives to the proposed project including, where feasible, alternative investments in end-use energy efficiency and non-conventional renewable energy; and

(B) encouragement and adoption of policies which allow for public participation in the EIA process;

(5) include environmental costs in the economic assessment of the proposed projects with significant potential environmental impacts, or power projects, and if possible for all projects which involve expansion of generating capacity of more than 10 MW, develop a standard increase in project cost as a surrogate for the environmental costs;

(6) encourage and promote end-use energy efficiency and renewable energy in negotiations of policy-based energy sector lending, and MDBs should consider not proceeding with policy-based sector loans which do not contain commitments from the borrowing country to devote a significant portion of its sector investments toward energy efficiency and renewable energy;

(7) provide technical assistance as a component of all energy sector lending to help borrowing countries identify and pursue end-use energy efficiency investments. This technical assistance shall include support for detailed audits of energy use and the development of institutional capacity to promote end-use energy efficiency and conservation;

(8) work with borrowing countries, with input from the public in both borrowing and donor countries, to develop loans for end-use energy efficiency and renewable energy, where possible "bundling" small projects into larger, more easily financed projects; and

(9) seek the convening of a special seminar for board members and senior staff of each MDB concerning alternate energy investment opportunities and end-use energy efficiency and conservation.

(b) The Secretary of the Treasury as a part of the annual report to the Congress shall describe in detail, progress made by each of the MDBs in adopting and implementing programs meeting the standards set out in subsection (a), including in particular—

(1) efforts by the Department of Treasury to assure implementation by each of the MDBs of programs substantially equivalent to those set out in this section, and results of such efforts;

(2) progress made by each MDB in drafting and implementing least cost energy plans for each recipient country which meets requirements outlined in subsection (a)(2);

(3) the absolute dollar amounts, and proportion of total lending in the energy sector, of loans and portions of loans, approved by each MDB in the previous year for projects or programs of

Defendant's Exhibit Y
6:23-cv-00007

end-use energy efficiency and conservation and renewable energy.

(c) Not later than April 1, 1990, the Secretary of the Treasury shall request each MDB to prepare an analysis of the impact its current forestry sector loans will have on borrowing country emissions of $CO_2$ and the status of proposals for specific forestry sector activities to reduce $CO_2$ emissions.

(d)(1) The Administrator of the Agency for International Development shall issue guidance to all Agency missions and bureaus detailing the elements of a "Global Warming Initiative" which will emphasize the need to reduce emissions of greenhouse gases, especially $CO_2$, through strategies consistent with their continued economic development. This initiative shall emphasize the need to accelerate sustainable development strategies in areas such as reforestation, biodiversity, end-use energy efficiency, least-cost energy planning, and renewable energy, and shall encourage mission directors to incorporate the elements of this initiative in developing their country programs.

(2) The Agency for International Development shall—

(A) increase the number and expertise of personnel devoted to end-use energy efficiency, renewable energy, and environmental activities in all bureaus and missions;

(B) devote increased resources to technical training of mission directors, in energy planning, energy conservation, end-use energy efficiency, renewable energy, reforestation, and biodiversity;

(C) accelerate the activities of the Multi-Agency Working Group on Power Sector Innovation to enable completion of case studies of at least ten countries in fiscal year 1990; and

(D) devote at least 10 percent of the resources allocated for forestry activities to the preservation and restoration (as opposed to management for extraction) of natural forests.

(3) Funds appropriated by this Act to carry out the provisions of sections 103 to 106 of the Foreign Assistance Act of 1961 may be used to reimburse the full cost of technical personnel detailed or assigned to, or contracted by, the Agency for International Development to provide expertise in the environmental sector.

(4)(A) Section 119(b) of the Foreign Assistance Act of 1961 is amended by inserting ", notwithstanding section 660," after "this part".

22 USC 2151g.

(B) Not less than $10,000,000 of the funds appropriated to carry out the provisions of sections 103 through 106 of such Act (including funds for sub-Saharan Africa) shall be made available for biological diversity activities, of which $2,000,000 shall be made available for the Parks in Peril project, pursuant to the authority of section 119(b) and $1,000,000 shall be available for the National Science Foundation's international biological diversity program.

(C) Funds obligated in prior fiscal years pursuant to the authority of section 119(b) may be expended in fiscal year 1990 pursuant to the authority of such section as amended by subparagraph (A).

(e) The Secretary of the Treasury shall—

(1) instruct the United States Executive Directors to the International Bank for Reconstruction and Development, the International Development Association, the Inter-American Development Bank, the African Development Bank, the Asian Development Bank, and the International Monetary Fund, to actively support lending portfolios which allow debtor develop-

Defendant's Exhibit Y
6:23-cv-00007

ing countries to reduce or restructure debt in concert with the sustainable use of their natural resources. As a part of any such debt restructuring program, the United States Executive Director should require a thorough review of opportunities this initiative may offer for providing additional financial resources for the management of natural resources. The Secretary shall submit a report to the Committees on Appropriations on the progress of this program by April 30, 1990;

*Reports.*

(2) instruct the United States Executive Directors to the international financial institutions to seek the support of other donor countries in the implementation of this policy; and

(3) instruct the United States Executive Director to the International Bank for Reconstruction and Development to actively seek the implementation by the World Bank of the recommendations set forth in its April 1, 1988, report on "Debt-for-Nature swaps", including the setting up of a pilot debt-for-nature swap program in one or more interested countries. The Secretary shall submit a progress report on the implementation of this program to the Committees on Appropriations by April 1, 1990.

*Reports.*

(f) The Secretary of the Treasury shall seek to incorporate natural resource management initiatives throughout the implementation of the Brady Plan. The Secretary shall submit to the Committees on Appropriations a report by April 15, 1990, describing how such initiatives have been incorporated into the Brady Plan and identifying any such initiatives undertaken to date.

*Reports.*

(g) The Secretary of the Treasury shall instruct the United States Executive Director to the Inter-American Development Bank to—

(1) seek implementation of the environmental reform measures agreed to as part of the Bank's 7th Replenishment;

(2) seek adoption of Bank policies regarding indigenous people, relations with nongovernmental organizations, and the protection of wildlife and unique natural and cultural features:

(3) require the Bank to demonstrate how it has improved, and will improve, the monitoring of environmental and social components of loans; and

(4) within four months after the date of enactment of this Act report to the Committees on Appropriations on the progress the Bank has made in implementing each of these reforms.

*Reports.*

## GLOBAL WARMING INITIATIVE

*Developing countries.*

SEC. 534. (a) TROPICAL FORESTRY ASSISTANCE.—(1) In order to achieve the maximum impact from activities relating to tropical forestry, the Agency for International Development shall focus tropical forestry assistance programs on the key middle- and low-income developing countries (hereinafter "key countries") which are projected to contribute large amounts of greenhouse gases related to global warming as a result of industrialization and the burning of fossil fuels, and destruction of tropical forests.

(2) Funds appropriated to carry out the provisions of sections 103 and 106 of the Foreign Assistance Act of 1961, as amended, may be used by the Agency for International Development, notwithstanding any other provision of law, for the purpose of supporting tropical forestry programs aimed at reducing emissions of greenhouse gases with regard to the key countries in which deforestation makes a significant contribution to global warming, except that such assist-

Defendant's Exhibit Y
6:23-cv-00007

ance shall be subject to sections 116, 502B, and 620A of the Foreign Assistance Act of 1961.

(3) In providing assistance relating to tropical forests, the Administrator of that Agency shall, to the extent feasible and appropriate, assist countries in developing a systematic analysis of the appropriate use of their total tropical forest resources, with the goal of developing a national program for sustainable forestry.

(b) ENERGY ASSISTANCE.—(1) In order to achieve the maximum impact from activities relating to energy, the Agency for International Development shall focus energy assistance activities on the key countries, where assistance would have the greatest impact on reducing emissions from greenhouse gases. Such assistance shall be focused on improved energy efficiency, increased use of renewable energy resources and national energy plans (such as least-cost energy plans) which include investment in end-use efficiency and renewable energy resources.

(2) Funds appropriated to carry out the provisions of sections 103 and 106 of the Foreign Assistance Act of 1961, as amended, may be used by the Agency for International Development, notwithstanding any other provision of law, for the purpose of supporting energy programs aimed at reducing emissions of greenhouse gases related to global warming with regard to the key countries, except that such assistance shall be subject to sections 116, 502B, and 620A of the Foreign Assistance Act of 1961.

(3) It is the sense of the Congress that the Agency for International Development should increase its efforts in the fields of energy efficiency, renewable energy, and energy planning. Such increase should take place with respect to key countries and countries with large Economic Support Fund project assistance. Such efforts should include—

(A) an increase in the number of Agency for International Development staff with energy expertise, including staff with expertise in renewable energy technologies and end-use efficiency;

(B) assistance to develop analyses of energy-sector actions that could minimize emissions of greenhouse gases at least cost, while at the same time meeting basic economic and social development needs. Such assistance should include country-specific analyses which compare the economic and environmental costs of actions to promote energy efficiency and nonconventional renewable energy with the economic and environmental costs of investments to provide additional conventional energy supplies;

(C) assistance to develop energy-sector plans that employ end-use analysis and other techniques to identify the most cost-effective actions to minimize increased reliance on fossil fuels, ensuring to the maximum extent feasible that nongovernmental organizations and academic institutions are involved in this planning;

(D) insuring that AID energy assistance—including support for private-sector initiatives—is consistent with the analyses and plans described in subparagraphs (B) and (C) above, and that environmental impacts (including that on global warming) and alternatives have been fully analyzed;

(E) assistance to improve efficiency in the production, transmission, distribution, and use of energy. Such assistance should focus on the development of institutions to (i) promote energy

Defendant's Exhibit Y
6:23-cv-00007

efficiency in all sectors of energy production and use, (ii) provide training and technical assistance to help energy producers and users identify cost-effective actions to improve energy efficiency, (iii) finance specific investments in energy efficiency in all sectors of energy production and use, and (iv) improve local capabilities in the research, development, and sale of energy efficient technologies;

(F) assistance in exploiting nonconventional renewable energy resources, including wind, solar, small-hydro, geothermal, and advanced biomass systems. This assistance should also promote efficient use of traditional biomass fuels through improved fuelwood management and improved methods of charcoal production;

(G) expanding efforts to meet the energy needs of the rural poor through the methods described in subparagraphs (E) and (F). Specifically these efforts should promote improved efficiency in the use of biomass fuels for household energy, improved systems of fuelwood management, and the development of the nonconventional renewable energy systems described in subparagraph (F);

(H) encouraging host countries to sponsor meetings with officials from the United States utility sector who are leaders in energy efficiency and other United States experts to discuss the application of least-cost planning techniques;

(I) developing a cadre of United States experts from industry, academia, nonprofit organizations, and government agencies capable of providing technical assistance to developing countries concerning energy policy and planning, energy efficiency and renewable energy resources;

(J) in cooperation with the Department of Energy, the Environmental Protection Agency, the World Bank, and the Development Assistance Committee of the OECD, supporting research concerning the ways developing nations can meet their energy needs while minimizing global warming and how to meet those needs; and

(K) strengthening the Agency for International Development's partnership with the Department of Energy in order to ensure that the Agency's energy efforts take full advantage of United States expertise and technology.

(c) REPORTS AND AUTHORITIES.—(1) The Agency for International Development, in consultation with the Environmental Protection Agency (EPA), the Department of State, and other appropriate agencies, shall submit to Congress no later than April 15, 1990, a report which (1) examines the potential contributions of developing countries to future global emissions of greenhouse gases under different economic growth scenarios, (2) estimates the relative contributions of those countries to global greenhouse gas emissions, and (3) identifies specific key countries which stand to contribute significantly to global greenhouse gas emissions, and in which actions to promote energy efficiency, reliance on renewable energy resources, and conservation of forest resources could significantly reduce emissions of greenhouse gases. This report should utilize existing data, including the models and methodologies already developed by the EPA for their report to Congress on policy options for stabilizing global climate.

(2) Of the funds appropriated to carry out the provisions of sections 103 and 106 of the Foreign Assistance Act of 1961, as

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989      103 STAT. 1231

amended, the Agency for International Development may use such amounts as may be necessary to reimburse United States Government agencies, agencies of State governments, and institutions of higher learning for the full costs of employees detailed or assigned to the Agency for International Development for the purpose of carrying out activities relating to forestry and energy programs aimed at reducing emissions of greenhouse gases related to global warming. Personnel who are detailed or assigned for the purposes of this section shall not be included within any personnel ceiling applicable to any United States Government agency during the period of detail or assignment.

Government organization and employees.

(d). EXPORT-IMPORT BANK.—(1) Of the financing provided by the Export-Import Bank that is utilized for the support of exports for the energy sector, the Bank shall seek to provide not less than 5 per centum of such financing for renewable energy projects.

Energy. 12 USC 635g note.

(2) The Export-Import Bank shall take all appropriate steps to finance information exchanges and training whose purpose it is to help link United States producers in the renewable energy sector with assistance programs and potential foreign customers.

(3) Beginning on April 15, 1990, the Chairman of the Export-Import Bank shall submit an annual report to the Committees on Appropriations on the Bank's implementation of this subsection.

Reports.

PROHIBITION CONCERNING ABORTIONS AND INVOLUNTARY STERILIZATION

SEC. 535. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for the performance of involuntary sterilization as a method of family planning or to coerce or provide any financial incentive to any person to undergo sterilizations. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be used to pay for any biomedical research which relates in whole or in part, to methods of, or the performance of, abortions or involuntary sterilization as a means of family planning. None of the funds made available to carry out part I of the Foreign Assistance Act of 1961, as amended, may be obligated or expended for any country or organization if the President certifies that the use of these funds by any such country or organization would violate any of the above provisions related to abortions and involuntary sterilizations. The Congress reaffirms its commitments to Population, Development Assistance and to the need for informed voluntary family planning.

AFGHANISTAN—HUMANITARIAN ASSISTANCE

SEC. 536. Of the aggregate amount of funds appropriated by this Act, to be derived in equal parts from the funds appropriated to carry out the provisions of chapter 1 of part I of the Foreign Assistance Act of 1961, and chapter 4 of part II of that Act, not less than $70,000,000 shall be made available for the provision of food, medicine, or other humanitarian assistance to the Afghan people, notwithstanding any other provision of law: *Provided,* That of the funds appropriated under the heading "Private Sector, Environ-

Defendant's Exhibit Y
6:23-cv-00007

103 STAT. 1232        PUBLIC LAW 101-167—NOV. 21, 1989

ment, and Energy, Development Assistance", $13,500,000 shall be transferred to "International Organizations and Programs" and made available only for the United Nations Afghanistan Emergency Trust Fund.

### PRIVATE VOLUNTARY ORGANIZATIONS—DOCUMENTATION

SEC. 537. None of the funds appropriated or made available pursuant to this Act shall be available to a private voluntary organization which fails to provide upon timely request any document, file, or record necessary to the auditing requirements of the Agency for International Development, nor shall any of the funds appropriated by this Act be made available to any private voluntary organization which is not registered with the Agency for International Development.

### EL SALVADOR—INVESTIGATION OF MURDERS

President of U.S. Reports. Michael Hammer. Mark Pearlman. Jose Rodolfo Viera.

SEC. 538. Of the amounts made available by this Act for military assistance and financing for El Salvador under chapters 2 and 5 of part II of the Foreign Assistance Act of 1961 and under the Arms Export Control Act, $5,000,000 may not be expended until the President reports, following the conclusion of the Appeals process in the case of Captain Avila, to the Committees on Appropriations that the Government of El Salvador has (1) substantially concluded all investigative action with respect to those responsible for the January 1981 deaths of the two United States land reform consultants Michael Hammer and Mark Pearlman and the Salvadoran Land Reform Institute Director Jose Rodolfo Viera, (2) pursued all legal avenues to bring to trial and obtain a verdict of those who ordered and carried out the January 1981 murders, and (3) pursued all legal avenues to bring to trial those who ordered and carried out the September 1988 massacre of ten peasants near the town of San Francisco, El Salvador, and to obtain a verdict.

### REFUGEE RESETTLEMENT

SEC. 539. It is the sense of the Congress that all countries receiving United States foreign assistance under the "Economic Support Fund", "Foreign Military Financing Program", "International Military Education and Training", the Agricultural Trade Development and Assistance Act of 1954 (Public Law 480), development assistance programs, or trade promotion programs should fully cooperate with the international refugee assistance organizations, the United States, and other governments in facilitating lasting solutions to refugee situations. Further, where resettlement to other countries is the appropriate solution, such resettlement should be expedited in cooperation with the country of asylum without respect to race, sex, religion, or national origin.

### IMMUNIZATIONS FOR CHILDREN

SEC. 540. The Congress calls upon the President to direct the Agency for International Development, working through the Centers for Disease Control and other appropriate Federal agencies, to work in a global effort to provide enhanced support toward achieving the goal of universal access to childhood immunization by 1990.

Defendant's Exhibit Y
6:23-cv-00007

ETHIOPIA—FORCED RESETTLEMENT, VILLAGIZATION

SEC. 541. None of the funds appropriated in this Act shall be made available for any costs associated with the Government of Ethiopia's forced resettlement or villagization programs.

SUDAN, SOMALIA, LEBANON, LIBERIA, AND ZAIRE NOTIFICATION REQUIREMENTS

SEC. 542. None of the funds appropriated in this Act shall be obligated or expended for Sudan, Uganda, Liberia, Lebanon, Zaire, or Somalia except as provided through the regular notification procedures of the Committees on Appropriations.

DEFINITION OF PROGRAM, PROJECT, AND ACTIVITY

SEC. 543. For the purpose of this Act, "program, project, and activity" shall be defined at the Appropriations Act account level and shall include all Appropriations and Authorizations Acts earmarks, ceilings, and limitations with the exception that for the following accounts: Economic Support Fund and Foreign Military Financing Program, "program, project, and activity" shall also be considered to include country, regional, and central program level funding within each such account; for the development assistance accounts of the Agency for International Development "program, project, and activity" shall also be considered to include central program level funding, either as (1) justified to the Congress, or (2) allocated by the executive branch in accordance with a report, to be provided to the Committees on Appropriations within thirty days of enactment of this Act, as required by section 653(a) of the Foreign Assistance Act of 1961, as amended.

CHILD SURVIVAL AND AIDS ACTIVITIES

SEC. 544. Of the funds made available by this Act for assistance for health, child survival, and AIDS, up to $6,000,000 may be used to reimburse United States Government agencies, agencies of State governments, and institutions of higher learning for the full cost of employees detailed or assigned, as the case may be, to the Agency for International Development for the purpose of carrying out child survival activities and activities relating to research on, and the treatment and control of, acquired immune deficiency syndrome in developing countries: *Provided*, That personnel who are detailed or assigned for the purposes of this section shall not be included within any personnel ceiling applicable to any United States Government agency during the period of detail or assignment.

Government organization and employees.

CHILE—LOANS FROM MULTILATERAL DEVELOPMENT INSTITUTIONS

SEC. 545. (a) It is the sense of Congress that pursuant to section 701 of the International Financial Institutions Act of 1977, the United States Government should oppose all loans to Chile from international financial institutions, except for those for basic human needs, until—

(1) the Government of Chile has ended its practice and pattern of gross abuse of internationally recognized human rights;

(2) significant steps have been taken by the Government of Chile to restore democracy, including—

(A) the implementation of political reforms which are essential to the development of democracy, such as the legalization of political parties, the enactment of election laws, the establishment of freedom of speech and the press, and the fair and prompt administration of justice; and

(B) a precise and reasonable timetable has been established for the transition to democracy.

(b) Except for programs under section 534(b) (4) or (6) of the Foreign Assistance Act of 1961 to support the efforts of private groups and individuals seeking to develop a national consensus on the importance of an independent judiciary and the administration of justice generally in a democratic society, assistance for which programs may be made available notwithstanding section 726 of the International Security and Development Cooperation Act of 1981, and assistance under subsection (c) of this section, none of the funds made available by this Act for "Economic Support Fund" or for title III shall be obligated or expended for Chile.

(c)(1) The Congress supports the democratic transition underway in Chile, and intends to assist the new democratically elected government, following its inauguration in March of 1990, with assistance to—

(A) strengthen democratic institutions; and

(B) establish a new relationship with the Chilean armed forces appropriate to a democratic system of government.

(2) Of the funds appropriated by this Act under the heading "International Military Education and Training", up to $50,000 may be made available for Chile for fiscal year 1990, subject to the following conditions—

(A) a civilian, democratically elected President is in power in Chile and has requested such funds;

(B) internationally recognized human rights are being respected and the civilian government is exercising independent and effective authority; and

Orlando Letelier. Ronni Moffitt.

(C) the Government of Chile is making good-faith efforts in attempting to resolve the murders of Orlando Letelier and Ronni Moffitt.

(3) Assistance may be provided under paragraph (2) without regard to the requirements of section 726(b) of the International Security and Development Cooperation Act of 1981.

COMMODITY COMPETITION

Agriculture and agricultural commodities. Exports.

SEC. 546. None of the funds appropriated by this or any other Act to carry out chapter 1 of part I of the Foreign Assistance Act of 1961 shall be available for any testing or breeding feasibility study, variety improvement or introduction, consultancy, publication, conference, or training in connection with the growth or production in a foreign country of an agricultural commodity for export which would compete with a similar commodity grown or produced in the United States: *Provided*, That this section shall not prohibit:

Developing countries.

(1) activities designed to increase food security in developing countries where such activities will not have a significant impact in the export of agricultural commodities of the United States; or

Research and development.

(2) research activities intended primarily to benefit American producers.

PUBLIC LAW 101–167—NOV. 21, 1989          103 STAT. 1235

### PROHIBITION OF FUNDING RELATED TO COMPETITION WITH UNITED STATES EXPORTS

SEC. 547. None of the funds provided in this Act to the Agency for International Development, other than funds made available to carry out Caribbean Basin Initiative programs under the Tariff Schedules of the United States, section 1202 of title 19, United States Code, schedule 8, part I, subpart B, item 807.00, shall be obligated or expended—

(1) to procure directly feasibility studies or prefeasibility studies for, or project profiles of potential investment in, the manufacture, for export to the United States or to third country markets in direct competition with United States exports, of import-sensitive articles as defined by section 503(c)(1) (A) and (E) of the Tariff Act of 1930 (19 U.S.C. 2463(c)(1) (A) and (E)); or

(2) to assist directly in the establishment of facilities specifically designed for the manufacture, for export to the United States or to third country markets in direct competition with United States exports, of import-sensitive articles as defined in section 503(c)(1) (A) and (E) of the Tariff Act of 1930 (19 U.S.C. 2463(c)(1) (A) and (E)).

### PROHIBITION AGAINST INDIRECT FUNDING TO CERTAIN COUNTRIES

SEC. 548. None of the funds appropriated or otherwise made available pursuant to this Act shall be obligated to finance indirectly any assistance or reparations to Angola, Cambodia, Cuba, Iraq, Libya, the Socialist Republic of Vietnam, South Yemen, Iran, or Syria unless the President of the United States certifies that the withholding of these funds is contrary to the national interest of the United States.

### ASSISTANCE FOR LIBERIA

SEC. 549. (a) During fiscal year 1990, in determining whether to furnish economic support fund assistance and foreign military financing under the Foreign Assistance Act of 1961 to Liberia, the President shall take into account whether the Government of Liberia—                                        President of U.S.

(1) has demonstrated its commitment to economic reform, including taking steps to fundamentally change the current financial practice of making extra-budgetary expenditures, including steps to channel the revenues from such major sources as the Liberia Petroleum Refinery Corporation and the Forestry Development Authority through the normal budgetary process; and

(2) has taken significant steps to increase respect for internationally recognized human rights including—

(A) the removal of all restrictions on the right of political parties to operate freely;

(B) the lifting of restrictions on freedom of the press; and

(C) the restoration of an independent judiciary.

### RECIPROCAL LEASING

SEC. 550. Section 61(a) of the Arms Export Control Act is amended by striking out "1989" and inserting in lieu thereof "1990".          22 USC 2796.

DEFENSE EQUIPMENT DRAWDOWN

SEC. 551. (a) Defense articles, services and training drawn down under the authority of section 506(a) of the Foreign Assistance Act of 1961, shall not be furnished to a recipient unless such articles are delivered to, and such services and training initiated for, the recipient country or international organization not more than one hundred and twenty days from the date on which Congress received notification of the intention to exercise the authority of that section: *Provided,* That if defense articles have not been delivered or services and training initiated by the period specified in this section, a new notification pursuant to section 506(b) of such Act shall be provided, which shall include an explanation for the delay in furnishing such articles, services, and training, before such articles, services, or training may be furnished.

22 USC 2318.    (b) Section 506(a) of the Foreign Assistance Act of 1961 is amended by—

(1) inserting "(1)" after "(a)";

(2) striking "(1)" and "(2)" and inserting in lieu thereof "(A)" and "(B)", respectively; and

(3) inserting the following new paragraph:

"(2)(A) If the President determines and reports to the Congress in accordance with section 652 of this Act that it is in the national interest of the United States to draw down defense articles from the stocks of the Department of Defense, defense services of the Department of Defense, and military education and training, he may direct—

"(i) the drawdown of such articles, services, and the provision of such training for the purposes and under the authorities of chapters 8 and 9 of part I, as the case may be; and

"(ii) the drawdown of defense services for the purposes and under the authorities of the Migration and Refugee Assistance Act of 1962.

"(B) An aggregate value of not to exceed $75,000,000 in any fiscal year of defense articles, defense services, and military education and training may be provided pursuant to subparagraph (A) of this paragraph.".

(c) Drawdowns made pursuant to section 506(a)(2) of the Foreign Assistance Act of 1961 shall be subject to the regular notification procedures of the Committees on Appropriations.

NOTIFICATION ON EXCESS DEFENSE EQUIPMENT

SEC. 552. Prior to providing excess Department of Defense articles in accordance with section 516(a) of the Foreign Assistance Act of 1961, the Department of Defense shall notify the Committees on Appropriations to the same extent and under the same conditions as are other committees pursuant to subsection (c) of that section: *Provided,* That such Committees shall also be informed of the original acquisition cost of such defense articles.

AUTHORIZATION REQUIREMENT

SEC. 553. Funds appropriated by this Act may be obligated and expended notwithstanding section 10 of Public Law 91–672 and section 15 of the State Department Basic Authorities Act of 1956: *Provided,* That of the funds appropriated by this Act for the "Eco-

PUBLIC LAW 101-167—NOV. 21, 1989    103 STAT. 1237

nomic Support Fund" and "Foreign Military Financing Program" accounts, not more than 33⅓ percent of the amounts made available by this Act for each such account excluding amounts made available for Israel, Egypt, Poland, and Hungary, may be obligated and expended prior to March 1, 1990, unless an Act authorizing appropriations for such account has been enacted

### NOTIFICATION CONCERNING EL SALVADOR

SEC. 554. (a) The Congress expects that—
  (1) the Government of El Salvador and the armed opposition forces and their political representatives will be willing to pursue a dialog for the purposes of achieving an equitable political settlement of the conflict, including free and fair elections;
  (2) the elected civilian government will be in control of the Salvadoran military and security forces, and those forces will comply with applicable rules of international law and with Presidential directives pertaining to the protection of civilians during combat operations, including Presidential directive C-111-03-984 (relating to aerial fire support);
  (3) the Government of El Salvador will make demonstrated progress, during the period covered by each report pursuant to subsection (b), in ending the activities of the death squads;
  (4) the Government of El Salvador will make demonstrated progress, during the period covered by each report pursuant to subsection (b), in establishing an effective judicial system; and
  (5) the Government of El Salvador will make demonstrated progress, during the period covered by each report pursuant to subsection (b), in implementing the land reform program.

(b) REPORTS.—On April 1, 1990, and September 30, 1990, the President shall report to the Speaker of the House of Representatives, the Committees on Appropriations and the chairman of the Committee on Foreign Relations of the Senate on the extent to which the objectives described in subsection (a) are being met. With respect to the objective described in paragraph (4) of that subsection, each report shall specify the status of all cases presented to the Salvadoran courts involving human rights violations against civilians by members of the Salvadoran security forces, including military officers and other military personnel and civil patrolmen. <span>President of U.S.</span>

### NOTIFICATION TO CONGRESS ON DEBT RELIEF AGREEMENTS

SEC. 555. The Secretary of State shall transmit to the Appropriations Committees of the Congress and to such other Committees as appropriate, a copy of the text of any agreement with any foreign government which would result in any debt relief no less than thirty days prior to its entry into force, other than one entered into pursuant to this Act, together with a detailed justification of the interest of the United States in the proposed debt relief: *Provided,* That the term "debt relief" shall include any and all debt prepayment, debt rescheduling, and debt restructuring proposals and agreements. <span>22 USC 2395a note.</span>

### MIDDLE EAST REGIONAL COOPERATION AND ISRAELI-ARAB SCHOLARSHIPS

SEC. 556. (a) Middle East regional cooperative programs which have been carried out in accordance with section 202(c) of the

Defendant's Exhibit Y
6:23-cv-00007

International Security and Development Cooperation Act of 1985 shall continue to be funded at a level of not less than $7,000,000 from funds appropriated under the heading "Economic Support Fund".

(b) Of the funds made available under the heading "Economic Support Fund", $5,000,000 shall be available only for a grant to assist in capitalizing an endowment whose income will be used for scholarships to enable Israeli Arabs to attend institutions of higher education in the United States: *Provided*, That such endowment and scholarship program shall be administered by an organization located in the United States: *Provided further*, That a grant may be made to capitalize such endowment only if private sector contributions of at least $5,000,000 have been made by September 30, 1990, to assist in capitalizing the endowment: *Provided further*, That if the requirement for private sector contributions is not met, funds earmarked for the purpose of the endowment shall be reprogrammed within the Economic Support Fund account.

### MEMBERSHIP DESIGNATION IN ASIAN DEVELOPMENT BANK

Sec. 557. It is the sense of the Congress that the United States Government should use its influence in the Asian Development Bank to secure reconsideration of that institution's decision to designate Taiwan (the Republic of China) as "Taipei, China". It is further the sense of the Congress, that the Asian Development Bank should resolve this dispute in a fashion that is acceptable to Taiwan (the Republic of China).

### DEPLETED URANIUM

Sec. 558. None of the funds provided in this or any other Act may be made available to facilitate in any way the sale of M-833 antitank shells or any comparable antitank shells containing a depleted uranium penetrating component to any country other than (1) countries which are members of NATO, (2) countries which have been designated as a major non-NATO ally for purposes of section 1105 of the National Defense Authorization Act for Fiscal Year 1987 or, (3) Pakistan.

### EARMARKS

Sec. 559. Funds appropriated by this Act which are earmarked may be reprogrammed for other programs within the same account notwithstanding the earmark if compliance with the earmark is made impossible by operation of any provision of this or any other Act or, with respect to a country with which the United States has an agreement providing the United States with base rights or base access in that country, if the President determines that the recipient for which funds are earmarked has significantly reduced its military or economic cooperation with the United States since enactment of the Foreign Operations, Export Financing, and Related Programs

President of U.S.

Appropriations Act, 1989; however, before exercising the authority of this section with regard to a base rights or base access country which has significantly reduced its military or economic cooperation with the United States, the President shall consult with, and shall provide a written policy justification to the Committees on Appropriations: *Provided*, That any such reprogramming shall be subject to the regular notification procedures of the Committees on Appro-

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989          103 STAT. 1239

priations: *Provided further,* That assistance that is reprogrammed pursuant to this section shall be made available under the same terms and conditions as originally provided.

### HAITI

SEC. 560. (a) SUSPENSION OF ASSISTANCE.—During fiscal year 1990, none of the funds made available by this Act or by any other Act or joint resolution may be obligated or expended to provide United States assistance (including any such assistance appropriated and previously obligated) for Haiti (other than the assistance described in subsection (b) of this section) unless the Government of Haiti has embarked upon a credible transition to democracy—

(1) by restoring the 1987 Constitution;

(2) by appointing a genuinely independent electoral commission to conduct free, fair, and open elections as soon as possible at all levels, and by giving that commission adequate support; and

(3) by taking adequate steps to provide electoral security.

(b) EXCEPTIONS.—The term "United States assistance" does not include—

(1) assistance, provided through private and voluntary organizations or other nongovernmental agencies, to meet humanitarian and developmental needs or to promote respect for human rights and the transition to democracy;

(2) disaster relief assistance (including any assistance under chapter 9 of part I of the Foreign Assistance Act of 1961);

(3) assistance for refugees;

(4) assistance under the Inter-American Foundation Act; the Peace Corps Act; and under title IV, chapter 2 of part I, of the Foreign Assistance Act of 1961 (relating to the Overseas Private Investment Corporation);

(5) assistance necessary for the continued financing of education for Haitians in the United States;

(6) assistance provided in order to enable the continuation of migrant and narcotics interdiction operations;

(7) assistance to a genuinely independent electoral commission that is responsible for the holding of elections consistent with the 1987 Constitution;

(8) assistance for the prevention of HIV infection and the control of Haiti's AIDS epidemic and for family planning assistance; or

(9) assistance necessary for the control and eradication of swine flu.

(c) NOTIFICATIONS.—None of the funds appropriated in this Act shall be obligated or expended for Haiti except as provided through the regular notification procedures of the Committees on Appropriations.

(d) DETERMINATION.—Funds may be obligated and expended notwithstanding subsection (a) if the President determines that it is in the national interest of the United States to do so.

### ASSISTANCE FOR PANAMA

SEC. 561. (a) Unless the President certifies to Congress that—          22 USC 2151 note.

(1) the Government of Panama has demonstrated substantial progress in assuring civilian control of the armed forces and

Defendant's Exhibit Y
6:23-cv-00007

that the Panama Defense Forces and its leaders have been removed from nonmilitary activities and institutions;

(2) an impartial investigation into allegations of illegal actions by members of the Panama Defense Force is being conducted;

(3) a satisfactory agreement has been reached between the governing authorities and representatives of the opposition forces on conditions for free and fair elections; and

(4) freedom of the press and other constitutional guarantees, including due process of law, are being restored to the Panamanian people;

then no United States assistance (including any such assistance appropriated and previously obligated) shall be obligated or expended for programs, projects, or activities which assist or lend support for the Noriega regime, or ministries of government under the control of the Noriega regime, or any successor regime that does not meet the criteria specified in subsection (a) of this section in this fiscal year and any fiscal year thereafter, and none of the funds appropriated or otherwise made available in this Act, or any other Act, shall be used to finance any participation of the United States in joint military exercises conducted in Panama during the fiscal year 1990.

(b) It is the sense of the Congress that if the conditions described in paragraphs (1) through (4) of subsection (a) have been certified as having been met, then not only will United States assistance be restored, but increased levels of such assistance should be considered for Panama.

(c) For purposes of this section, the term "United States assistance" means assistance of any kind which is provided by grant, sale, loan, lease, credit, guaranty, or insurance, or by any other means, by any agency or instrumentality of the United States Government, including—

(1) assistance under the Foreign Assistance Act of 1961 (including programs under title IV of chapter 2 of part I of such Act);

(2) sales, credits, and guarantees under the Arms Export Control Act;

(3) sales under title I or III and donations under title II of the Agricultural Trade Development and Assistance Act of 1954 of nonfood commodities;

(4) other financing programs of the Commodity Credit Corporation for export sales of nonfood commodities;

(5) financing under the Export-Import Bank Act of 1945; and

(6) assistance provided by the Central Intelligence Agency or assistance provided by any other entity or component of the United States Government if such assistance is carried out in connection with, or for purposes of conducting, intelligence or intelligence-related activities except that this shall not include activities undertaken solely to collect necessary intelligence;

except that the term "United States assistance" does not include (A) assistance under chapter 1 of part I of the Foreign Assistance Act of 1961 insofar as such assistance is provided through private and voluntary organizations or other nongovernmental agencies, (B) assistance which involves the donations of food or medicine, (C) disaster relief assistance (including any assistance under chapter 9 of part I of the Foreign Assistance Act of 1961), (D) assistance for refugees, (E) assistance under the Inter-American Foundation Act,

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989     103 STAT. 1241

(F) assistance necessary for the purpose of continuing participant training programs (including scholarships) already being supported as of the date of any prohibition of assistance otherwise applicable to Panama, or (G) assistance made available for termination costs arising from the requirements of this section.

(d) The Secretary of the Treasury shall instruct the United States Executive Directors to the International Financial Institutions (the International Bank for Reconstruction and Development, the International Finance Corporation, and the Inter-American Development Bank) to vote against any loan to Panama, unless the President has certified in advance that the conditions set forth in subsection (a) of this section have been met.

*Loans.*

### ELIMINATION OF THE SUGAR QUOTA ALLOCATION OF PANAMA

*Imports.*

SEC. 562. (a) IN GENERAL.—Notwithstanding any other provision of law, no sugars, sirups, or molasses that are products of Panama may be imported into the United States after the date of enactment of this Act during any period for which a limitation is imposed by authorities provided under any other law on the total quantity of sugars, sirups, and molasses that may be imported into the United States: *Provided,* That such products may be imported after the beginning of the last week of any quota year if the President certifies that for the entire duration of the quota year, freedom of the press and other constitutional guarantees, including due process of law, have been restored to the Panamanian people.

7 USC 3602 note.

(b) REALLOCATION OF QUOTA AMOUNTS.—For any quota year for which the President does not certify for the entire duration of the quota year, freedom of the press and all other constitutional guarantees, including due process of law, have been restored to the Panamanian people, no later than the last week of such quota year, the United States Trade Representative shall reallocate among other foreign countries (but, primarily, among beneficiary countries of the Caribbean Basin Initiative and Bolivia) the quantity of sugar, sirup, and molasses products of Panama that could have been imported into the United States before the date of enactment of this Act under any limitation imposed by other law on the total quantity of sugars, sirups, and molasses that may be imported into the United States during any period: *Provided,* That no one country may receive more than 20 per centum of such reallocation.

(c) CERTIFICATION.—The provisions of subsections (a) and (b), and the amendments made by subsection (c) of section 571 of the Foreign Operations, Export Financing, and Related Programs, Appropriations Act, 1988, shall cease to apply if the President certifies to Congress pursuant to section 561(a) of this Act.

### OPPOSITION TO ASSISTANCE TO TERRORIST COUNTRIES BY INTERNATIONAL FINANCIAL INSTITUTIONS

SEC. 563. (a) INSTRUCTIONS FOR UNITED STATES EXECUTIVE DIRECTORS.—The Secretary of the Treasury shall instruct the United States Executive Director of each international financial institution to vote against any loan or other use of the funds of the respective institution to or for a country for which the Secretary of State has made a determination under section 6(j) of the Export Administration Act of 1979.

*Loans.*

Defendant's Exhibit Y
6:23-cv-00007

(b) DEFINITION.—For purposes of this section, the term "international financial institution" includes—

(1) the International Bank for Reconstruction and Development, the International Development Association, and the International Monetary Fund; and

(2) wherever applicable, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, and the African Development Fund.

PROHIBITION ON BILATERAL ASSISTANCE TO TERRORIST COUNTRIES

SEC. 564. (a) Notwithstanding any other provision of law, funds appropriated for bilateral assistance under any heading of this Act and funds appropriated under any such heading in a provision of law enacted prior to fiscal year 1990, shall not be made available to any country which the President determines—

(1) grants sanctuary from prosecution to any individual or group which has committed an act of international terrorism, or

(2) otherwise supports international terrorism.

President of U.S.
Federal
Register,
publication.

(b) The President may waive the application of subsection (a) to a country if the President determines that national security or humanitarian reasons justify such waiver. The President shall publish each waiver in the Federal Register and, at least fifteen days before the waiver takes effect, shall notify the Committees on Appropriations of the waiver (including the justification for the waiver) in accordance with the regular notification procedures of the Committees on Appropriations.

DETENTION OF CHILDREN

SEC. 565. It is the sense of the Congress that the practice of detaining children without charge or trial is unjust, inhumane, and is an affront to civilized principles. The Congress further believes that it should be the policy of the United States to make the ending of the practice of detaining children without charge or trial a matter of the highest priority. Therefore, the Congress believes the Secretary of State should convey to all international organizations that ending the practice of detaining children without charge or trial should be a policy of the highest priority for those organizations.

MILITARY ASSISTANCE TO MOZAMBIQUE

SEC. 566. Notwithstanding any other provision of law, none of the funds appropriated or otherwise made available pursuant to this Act may be used to provide military assistance to Mozambique.

HONDURAS—RAMIREZ CASE

SEC. 567. It is the sense of the Congress that, pursuant to the procedures contained in section (j) under the heading "Assistance for Central America" enacted in Public Law 100-71, the Honduran Government appears to have made a reasonable and good faith settlement offer based on a factual analysis by third parties, and the owner of the property in question is strongly encouraged to accept the proposed settlement. Therefore, notwithstanding the provisions of such section, $5,000,000 of the Economic Support Fund assistance made available by Public Law 100-71 for Honduras but withheld from expenditure shall be available for expenditure upon enactment

of this Act: *Provided,* That if a settlement is reached on the property in question, then the additional $10,000,000 withheld from expenditure pursuant to such section shall then be available for expenditure.

### SOUTH AFRICA—SCHOLARSHIPS

SEC. 568. Of the funds made available by this Act under the heading "Economic Support Fund", not less than $10,000,000 shall be made available for scholarships for disadvantaged South Africans.

### NARCOTICS CONTROL PROGRAM

SEC. 569. (a)(1) Of the funds appropriated by this Act under the heading "Economic Support Fund" $69,000,000 may be made available for Bolivia, Ecuador, Jamaica, and Peru.

(2) Of the funds appropriated by this Act under the heading "Foreign Military Financing Program", $35,000,000 may be made available for Bolivia, Ecuador, Jamaica, and Colombia.

(3) Of the funds appropriated by this Act under the heading "Foreign Military Financing Program", $3,500,000 shall be made available in accordance with the general authorities contained in section 481(a) of the Foreign Assistance Act of 1961, only for the procurement of weapons or ammunition for foreign law enforcement agencies, and paramilitary units organized for the specific purposes of narcotics enforcement, for use in narcotics control, eradication, and interdiction efforts: *Provided,* That funds made available under this paragraph shall be made available only for Bolivia, Peru, Colombia, Ecuador, and shall be in addition to any amounts provided for the countries contained in paragraph (2) of this subsection.

(4) Of the funds appropriated by this Act to carry out the provisions of section 481 of the Foreign Assistance Act of 1961, not less than $500,000 shall be made available to finance the testing and use of safe and effective herbicides for use in the aerial eradication of coca.

(5) Of the funds appropriated by this Act under the heading "Foreign Military Financing Program", $1,000,000 shall be made available to arm, for defensive purposes, aircraft used in narcotics control, eradication or interdiction efforts: *Provided,* That such funds may only be used to arm aircraft already in the inventory of the recipient country, and may not be used for the purchase of new aircraft.

(6)(A) Of the funds appropriated by this Act to carry out the provisions of section 541 of the Foreign Assistance Act of 1961, up to $2,000,000, except through the regular notification procedures of the Committees on Appropriations, may be made available for Bolivia, Peru, Colombia, and Ecuador, notwithstanding section 660 of such Act, for—

(i) education and training in the operation and maintenance of equipment used in narcotics control interdiction and eradication efforts; and

(ii) the expenses of deploying, upon the request of the government of such foreign country, Department of Defense mobile training teams in that foreign country to conduct training in military-related individual and collective skills that will enhance that country's ability to conduct tactical operations in narcotics interdiction.

Defendant's Exhibit Y
6:23-cv-00007

(B) Education and training under this paragraph may be provided only for foreign law enforcement agencies, or other units, that are organized for the specific purpose of narcotics enforcement.

(7) Funds made available under this subsection shall be available for obligation consistent with the provisions of section 481(h) of the Foreign Assistance Act of 1961 (relating to International Narcotics Control) except as provided in paragraph (3) of this subsection.

(b) None of the funds appropriated or otherwise made available under this Act may be available for any country during any three-month period beginning on or after October 1, 1989, immediately following a certification by the President to the Congress that the government of such country is failing to take adequate measures (including satisfying the goals agreed to in applicable bilateral narcotics agreements as defined in section 481(h)(2)(B) of the Foreign Assistance Act of 1961) to prevent narcotic drugs or other controlled substances (as listed in the schedules in section 202 of the Comprehensive Drug Abuse and Prevention Control Act of 1971 (21 U.S.C. 812)) which are cultivated, produced, or processed illicitly, in whole or in part, in such country, or transported through such country from being sold illegally within the jurisdiction of such country to United States Government personnel or their dependents or from entering the United States unlawfully.

President of U.S. Bolivia. Colombia. Equador. Peru.

(c) In making determinations with respect to Bolivia, Colombia, Ecuador, and Peru pursuant to section 481(h)(2)(A)(i) of the Foreign Assistance Act of 1961, the President shall take into account the extent to which the Government of each country is sufficiently responsive to United States Government concerns on coca control and whether the provision of assistance for that country is in the national interest of the United States.

President of U.S. 22 USC 2291 note.

(d)(1) If any funds made available for any fiscal year for security assistance are not used for assistance for the country for which those funds were allocated because of any provision of law requiring the withholding of assistance for countries that have not taken adequate steps to halt illicit drug production of trafficking, the President shall use those funds for additional assistance for those countries which have met their illicit drug eradication targets or have otherwise taken significant steps to halt illicit drug production or trafficking, as follows:

(A) Those funds may be transferred to and consolidated with the funds made available to carry out section 481 of the Foreign Assistance Act of 1961 in order to provide additional narcotics control assistance for those countries. Funds transferred under this paragraph may only be used to provide increased funds for activities previously justified to the Congress. Transfers may be made under this paragraph without regard to the 20-percent increase limitation contained in section 610 of the Foreign Assistance Act.

(B) Any such funds not used under subparagraph (A) shall be reprogrammed within the account for which they were appropriated (subject to the regular reprogramming procedures of the Committees on Appropriations) in order to provide additional security assistance for those countries.

(2) As used in this section, the term "security assistance" means economic support fund assistance, foreign military financing, and international military education and training.

(e) Of the funds appropriated under title II of this Act for the Agency for International Development, up to $10,000,000 should be

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989     103 STAT. 1245

made available for narcotics education and awareness programs (including public diplomacy programs) of the Agency for International Development, and $40,000,000 of the funds appropriated under title II of this Act should be made available for narcotics related economic assistance activities.

(f) In order to maximize the participation of other countries in the effort to promote international narcotics control, the Secretary of State is directed to urge the United Nations Fund for Drug Abuse Control to develop a more comprehensive program for enlisting greater multilateral support for coca control programs and related development activities in South America.

### TURKISH AND GREEK MILITARY FORCES ON CYPRUS

SEC. 570. Any agreement for the sale or provision of any article on the United States Munitions List (established pursuant to section 38 of the Arms Export Control Act) entered into by the United States after the enactment of this section shall expressly state that the article is being provided by the United States only with the understanding that it will not be transferred to Cyprus or otherwise used to further the severance or division of Cyprus. The President shall report to Congress any substantial evidence that equipment provided under any such agreement has been used in a manner inconsistent with the purposes of this section.

22 USC 2873 note.

President of U.S. Reports.

### COMMERCIAL LEASING OF DEFENSE ARTICLES

SEC. 571. Notwithstanding any other provision of law, and subject to the regular notification requirements of the Committees on Appropriations, the authority of section 23(a) of the Arms Export Control Act may be used to provide financing to Israel and Egypt and NATO and major non-NATO allies for the procurement by leasing (including leasing with an option to purchase) of defense articles from United States commercial suppliers, not including Major Defense Equipment (other than helicopters and other types of aircraft having possible civilian application), if the President determines that there are compelling foreign policy or national security reasons for those defense articles being provided by commercial lease rather than by government-to-government sale under such Act.

22 USC 2763 note.

### CAMBODIAN NONCOMMUNIST RESISTANCE FORCES

SEC. 572. If the President makes available funds appropriated by this Act for the Cambodian non-Communist resistance forces, not to exceed $7,000,000 may be made available for such purpose, and such funds shall be derived from funds appropriated under the headings "Foreign Military Financing Program" and "Economic Support Fund", and shall be made available notwithstanding any other provision of law: *Provided,* That funds made available for this purpose shall be obligated in accordance with the provisions of section 906 of the International Security and Development Cooperation Act of 1985 (Public Law 99-83): *Provided further,* That, to the maximum extent possible, all funds made available under the authority of this section shall be administered directly by the United States Government.

Defendant's Exhibit Y
6:23-cv-00007

MODERNIZATION OF MILITARY CAPABILITIES OF CERTAIN COUNTRIES

President of U.S.
22 USC 2321j
note.

SEC. 573. (a) AUTHORITY TO TRANSFER EXCESS DEFENSE ARTICLES.—
(1) NATO SOUTHERN FLANK COUNTRIES.—The President may transfer—

(A) to any NATO southern flank country which is eligible for United States security assistance and which is integrated into NATO's military structure; and

(B) to any major non-NATO ally on the southern and southeastern flank of NATO which is eligible for United States security assistance, such excess defense articles as may be necessary to help modernize the defense capabilities of such country.

(2) MAJOR ILLICIT DRUG PRODUCING COUNTRIES.—Subject to subsection (f), the President may transfer to any country—

(A) which is a major illicit drug producing country,

(B) which has a democratic government, and

(C) whose armed forces do not engage in a consistent pattern of gross violations of internationally recognized human rights, such excess defense articles as may be necessary to carry out subsection (f)(1).

(3) TERMS OF TRANSFERS.—Excess defense articles may be transferred under this section without cost to the recipient country.

(b) LIMITATIONS ON TRANSFERS.—The President may transfer excess defense articles under this section only if—

(1) they are drawn from existing stocks of the Department of Defense;

(2) funds available to the Department of Defense for the procurement of defense equipment are not expended in connection with the transfer; and

(3) the President determines that the transfer of the excess defense articles will not have an adverse impact on the military readiness of the United States.

(c) NOTIFICATION TO CONGRESS.—

(1) ADVANCE NOTICE.—The President may not transfer excess defense articles under this section until thirty days after the President has provided notice of the proposed transfer to the committees specified in paragraph (2). This notification shall include—

(A) a certification of the need for the transfer;

(B) an assessment of the impact of the transfer on the military readiness of the United States; and

(C) the value of the excess defense articles to be transferred.

(2) COMMITTEES TO BE NOTIFIED.—Notice shall be provided pursuant to paragraph (1) to the Committee on Foreign Affairs, and the Committee on Appropriations of the House of Representatives and the Committee on Armed Services, the Committee on Foreign Relations, and the Committee on Appropriations of the Senate.

(d) WAIVER OF REQUIREMENT FOR REIMBURSEMENT OF DOD EXPENSES.—Section 632(d) of the Foreign Assistance Act of 1961 does not apply with respect to transfers of excess defense articles under this section.

(e) MAINTENANCE OF MILITARY BALANCE IN EASTERN MEDITERRANEAN.—

PUBLIC LAW 101–167—NOV. 21, 1989     103 STAT. 1247

(1) UNITED STATES POLICY.—The Congress intends that excess defense articles be made available under this section consistent with the United States policy, established by section 841 of the International Cooperation Act of 1989, of maintaining the military balance in the Eastern Mediterranean.

(2) MAINTENANCE OF BALANCE.—Accordingly, the President shall ensure that, over the three-year period beginning on October 1, 1989, the ratio of—

(A) the value of excess defense articles made available for Turkey under this section, to

(B) the value of excess defense articles made available for Greece under this section, closely approximates the ratio of—

(i) the amount of foreign military financing provided for Turkey, to

(ii) the amount of foreign military financing provided for Greece.

(3) EXCEPTION TO REQUIREMENT.—This subsection shall not apply if either Greece or Turkey ceases to be eligible to receive excess defense articles under subsection (a).

(f) MAJOR ILLICIT DRUG PRODUCING COUNTRIES IN LATIN AMERICA AND THE CARIBBEAN.—

(1) PURPOSE.—Excess defense articles shall be transferred under subsection (a)(2) for the purpose of encouraging the military forces of an eligible country in Latin America and the Caribbean to participate with local law enforcement agencies in a comprehensive national antinarcotics program, conceived and developed by the government of that country, by conducting activities within that country and on the high seas to prevent the production, processing, trafficking, transportation, and consumption of illicit narcotic or psychotrophic drugs or other controlled substances.

(2) USES OF EXCESS DEFENSE ARTICLES.—Excess defense articles may be furnished to a country under subsection (a)(2) only if that country ensures that those excess defense articles will be used only in support of antinarcotics activities.

(3) ROLE OF THE SECRETARY OF STATE.—The Secretary of State shall determine the eligibility of countries to receive excess defense articles under subsection (a)(2) and insure that any transfer is coordinated with other antinarcotics enforcement programs assisted by the United States Government.

(4) LIMITATION.—The aggregate value of excess defense articles transferred to a country under subsection (a)(2) in any fiscal year may not exceed $10,000,000.

(g) DEFINITIONS.—As used in this section—

(1) the term "excess defense article" has the meaning given that term by section 644(g);

(2) the term "made available" means that a good faith offer is made by the United States to furnish the excess defense articles to a country;

(3) the term "major non-NATO ally" includes Australia, Egypt, Israel, Japan, and New Zealand;

(4) the term "NATO" means the North Atlantic Treaty Organization; and

(5) the term "NATO southern flank countries" means Greece, Italy, Portugal, Spain, and Turkey.

Defendant's Exhibit Y
6:23-cv-00007

Case 6:23-cv-00007   Document 264   Filed on 08/25/23 in TXSD   Page 257 of 342

#### COMPETITIVE INSURANCE

SEC. 574. All Agency for International Development contracts and solicitations, and subcontracts entered into under such contracts, shall include a clause requiring that United States marine insurance companies have a fair opportunity to bid for marine insurance when such insurance is necessary or appropriate.

#### PAY RAISES

SEC. 575. Such sums as may be necessary for fiscal year 1990 pay raises for programs funded by this Act shall be absorbed within the levels appropriated in this Act.

#### IRELAND

SEC. 576. It is the sense of the Congress that of the funds appropriated or otherwise made available for the International Fund for Ireland, the Board of the International Fund for Ireland should give great weight in the allocation of such funds to projects which will create permanent, full time jobs in the areas that have suffered most severely from the consequences of the instability of recent years. Areas that have suffered most severely from the consequences of the instability of recent years shall be defined as areas that have high rates of unemployment.

#### ASSISTANCE TO AFGHANISTAN

SEC. 577. Funds appropriated by this Act may not be made available, directly or for the United States proportionate share of programs funded under the heading "International Organizations and Programs", for assistance to be provided inside Afghanistan if that assistance would be provided through the Soviet-controlled government of Afghanistan. This section shall not be construed as limiting the United States contributions to international organizations for humanitarian assistance.

#### EL SALVADOR ECONOMIC SUPPORT FUNDS

SEC. 578. Not less than 25 per centum of the Economic Support Funds made available for El Salvador by this Act shall be used for projects and activities in accordance with the provisions applicable to assistance under chapter 1 of part I of the Foreign Assistance Act of 1961.

#### DISADVANTAGED ENTERPRISES

Africa.

SEC. 579. (a) Except to the extent that the Administrator of the Agency for International Development of the Foreign Assistance Act of 1961 determines otherwise, not less than 10 percent of the aggregate amount made available for the fiscal year 1990 for development assistance and assistance for famine recovery and development in Africa shall be made available only for activities of United States organizations and individuals that are—

(1) business concerns owned and controlled by socially and economically disadvantaged individuals,

(2) historically black colleges and universities,

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989      103 STAT. 1249

(3) colleges and universities having a student body in which more than 40 percent of the students are Hispanic American, and

(4) private voluntary organizations which are controlled by individuals who are socially and economically disadvantaged.

(b)(1) In addition to other actions taken to carry out this section, the actions described in paragraphs (2) through (5) shall be taken with respect to development assistance and assistance for famine recovery and development in Africa for fiscal year 1990.

(2) Notwithstanding any other provision of law, in order to achieve the goals of this section, the Administrator—

(A) to the maximum extent practicable, shall utilize the authority of section 8(a) of the Small Business Act (15 U.S.C. 637(a));

(B) to the maximum extent practicable, shall enter into contracts with small business concerns owned and controlled by socially and economically disadvantaged individuals—  *Contracts.*

(i) using less than full and open competitive procedures under such terms and conditions as the Administrator deems appropriate, and

(ii) using an administrative system for justifications and approvals that, in the Administrator's discretion, may best achieve the purpose of this section; and

(C) shall issue regulations to require that any contract in  *Regulations.*
excess of $500,000 contain a provision requiring that no less than 10 percent of the dollar value of the contract be subcontracted to entities described in subsection (a), except—

(i) to the extent the Administrator determines otherwise on a case-by-case or category-of-contract basis; and

(ii) this subparagraph does not apply to any prime contractor that is an entity described in subsection (a).

(3) Each person with contracting authority who is attached to the agency's headquarters in Washington, as well as all agency missions and regional offices, shall notify the agency's Office of Small and Disadvantaged Business Utilization at least 7 business days before advertising a contract in excess of $100,000, except to the extent that the Administrator determines otherwise on a case-by-case or category-of-contract basis.

(4) The Administrator shall include, as part of the performance evaluation of any mission director of the agency, the mission director's efforts to carry out this section.

(5) The Administrator shall submit to the Congress annual reports  *Reports.*
on the implementation of this section. Each such report shall specify the number and dollar value or amount (as the case may be) of prime contracts, subcontracts, grants, and cooperative agreements awarded to entities described in subsection (a) during the preceding fiscal year.

(6) The Administrator shall issue interim regulations to carry out  *Regulations.*
this section within ninety days after the date of the enactment of this Act and final regulations within one hundred and eighty days after that date.

(c) As used in this section, the term "socially and economically disadvantaged individuals" has the same meaning that term is given for purposes of section 133(c)(5) of the International Development and Food Assistance Act of 1977, except that the term includes women.

Defendant's Exhibit Y
6:23-cv-00007

STINGERS IN THE PERSIAN GULF REGION

SEC. 580. Except as provided in section 581, the United States may not sell or otherwise make available any Stingers to any country bordering the Persian Gulf under the Arms Export Control Act or chapter 2 of part II of the Foreign Assistance Act of 1961.

STINGERS FOR BAHRAIN

SEC. 581. (a) PREVIOUSLY TRANSFERRED STINGERS.—Notwithstanding section 580, section 573(b)(4) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988, and section 566(b)(4) of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, shall cease to apply with respect to Stingers made available to Bahrain under those sections if the President determines, and notifies the Committees on Appropriations and the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate, that—

(1) the Stingers are needed by Bahrain to counter an immediate air threat or to contribute to the protection of United States personnel, facilities, equipment, or operations;

(2) no other appropriate system is available from the United States;

(3) Bahrain has agreed, in writing, to such safeguards to protect against diversion of the Stingers as may be required by the United States; and

(4) Bahrain has agreed in writing to return to the possession and control of the United States all Stingers made available under those sections and subsection (b) of this section, other than Stingers which have been fired or otherwise destroyed, at any time the United States determines, subject to subsection (c).

(b) REPLACEMENT STINGERS.—Notwithstanding section 580, Stingers may be made available to Bahrain under the Arms Export Control Act or the Foreign Assistance Act of 1961 after September 30, 1989, in order to replace, on a one-for-one basis, Stingers previously made available under this subsection, section 573 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988, or section 566 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, that have been fired or otherwise destroyed, subject to the following conditions:

(1) DETERMINATIONS.—Replacement Stingers may be made available to Bahrain pursuant to this subsection only if the President makes the determinations specified in paragraphs (1) through (4) of subsection (a).

(2) NOTICE TO CONGRESS BEFORE STINGERS ARE TRANSFERRED.—At least 30 days before making any replacement Stingers available to Bahrain pursuant to this subsection, the President shall notify the committees designated in subsection (a) that he has made the determinations required by paragraph (1). Any such notification shall include the information required in a certification under section 36(b) of the Arms Export Control Act. This paragraph applies without regard to the value of the Stingers to be made available.

(c) RETURN OF STINGERS TO THE UNITED STATES.—All Stingers made available to Bahrain pursuant to subsections (a) and (b), other

Defendant's Exhibit Y
6:23-cv-00007

than those fired or otherwise destroyed, shall be returned to the possession and control of the United States not later than September 30, 1991, unless the President—

(1) determines that each of the conditions specified in subsection (a) continues to apply; and

(2) notifies the committees designated in subsection (a) not later than September 15, 1991, in accordance with the regular reprogramming procedures of such committees, that the United States intends to waive the requirement that the Stingers be returned to the United States by the date specified in the subsection.

### PROHIBITION ON LEVERAGING AND DIVERSION OF UNITED STATES ASSISTANCE

SEC. 582. (a) None of the funds appropriated by this Act may be provided to any foreign government (including any instrumentality or agency thereof), foreign person, or United States person in exchange for that foreign government or person undertaking any action which is, if carried out by the United States Government, a United States official or employee, expressly prohibited by a provision of United States law.

(b) For the purposes of this section the term "funds appropriated by this Act" includes only (1) assistance of any kind under the Foreign Assistance Act of 1961; and (2) credits, and guaranties under the Arms Export Control Act.

(c) Nothing in this section shall be construed to limit—

(1) the ability of the President, the Vice President, or any official or employee of the United States to make statements or otherwise express their views to any party on any subject;

(2) the ability of an official or employee of the United States to express the policies of the President; or

(3) the ability of an official or employee of the United States to communicate with any foreign country government, group or individual, either directly or through a third party, with respect to the prohibitions of this section including the reasons for such prohibitions, and the actions, terms, or conditions which might lead to the removal of the prohibitions of this section.

### APPROPRIATIONS OF EXCESS CURRENCIES

SEC. 583. The provisions of section 1306 of title 31, United States Code, shall not be waived to carry out the provisions of the Foreign Assistance Act of 1961 by any provision of law enacted after the date of enactment of this Act unless such provision makes specific reference to this section.

31 USC 1306 note.

### DEBT-FOR-DEVELOPMENT

SEC. 584. In order to enhance the continued participation of nongovernmental organizations in economic assistance activities under the Foreign Assistance Act of 1961, including debt-for-development and debt-for-nature exchanges, a nongovernmental organization may invest local currencies which accrue to that organization as a result of economic assistance provided under the heading "Agency for International Development" and any interest earned on such investment may be used, including for the establish-

ment of an endowment, for the purpose for which the assistance was provided to that organization.

### LEBANON

SEC. 585. Of the funds appropriated by this Act to carry out chapter 1 of part I and chapter 4 of part II of the Foreign Assistance Act of 1961 not less than $7,500,000 shall be made available for Lebanon: *Provided,* That such funds may be provided in accordance with the general authorities contained in section 491 of the Foreign Assistance Act of 1961.

### JOB-RELATED CRIMES

22 USC 4136.

SEC. 586. (a) Section 1106(8) of the Foreign Service Act of 1980 is amended by inserting at the end thereof the following sentence: "Notwithstanding the first sentence of this paragraph, the Board's authority to suspend such action shall not extend to instances where the Secretary, or his designee, has determined that there is reasonable cause to believe that a grievant has committed a job-related crime for which a sentence of imprisonment may be imposed and has taken action to suspend the grievant without pay pending a final resolution of the underlying matter.".

22 USC 4010.

(b) Section 610(a) of the Foreign Service Act of 1980 is amended by inserting the following new paragraphs:

"(3) Notwithstanding the hearing required by this section, or procedures under any other provision of law, where there is reasonable cause to believe that a member has committed a crime for which a sentence of imprisonment may be imposed, and there is a nexus to the efficiency of the Service, the Secretary, or his designee, may suspend such member without pay pending final resolution of the underlying matter, subject to reinstatement with back pay if cause for separation is not established in a hearing before the Board.

"(4) Any member suspended pursuant to subsection (a)(3) of this section shall be entitled to—

"(A) advance written notice of the specific reasons for such suspension, including the grounds for reasonable cause to believe a crime has been committed;

"(B) a reasonable time, not less than seven days, to answer orally and in writing;

"(C) be represented by an attorney or other representative; and

"(D) a final written decision.

"(5) Any member suspended pursuant to subsection (a)(3) of this section shall be entitled to grieve such action in accordance with procedures applicable to grievances under chapter 11. The Board review, however, shall be limited only to a determination of whether there exists reasonable cause to believe a crime has been committed for which a sentence of imprisonment may be imposed, and whether there is a nexus between the conduct and the efficiency of the Service.".

22 USC 4010 note.

(c) For purposes of the amendments made by subsections (a) and (b) of this section, reasonable cause to believe that a member has committed a crime for which a sentence of imprisonment may be imposed shall be defined as a member of the Service having been

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989     103 STAT. 1253

convicted of, and sentence of imprisonment having been imposed for, a job-related crime.

### LOCATION OF STOCKPILES

SEC. 587. (a) Except for stockpiles located in the Republic of Korea, Thailand, a country which is a member of the North Atlantic Treaty Organization, or a country which is a major non-NATO ally, no stockpile may be located outside the boundaries of a United States military base or a military base used primarily by the United States.

(b) Section 514 of the Foreign Assistance Act of 1961 (22 U.S.C. 2321h) is amended—

(1) in subsection (b)(1), by striking out "greater than" and inserting in lieu thereof "that"; and

(2) in subsection (b)(2), by striking out "$77,000,000 for fiscal year 1989" and inserting in lieu thereof "$165,000,000 for fiscal year 1990".

### HONG KONG

SEC. 588. It is the sense of the Congress that the President and Secretary of State should convey to the People's Republic of China and the United Kingdom strong concerns over the absence of full direct elections in the colony and lack of independent human rights guarantees in the draft Basic Law, pending the colony's scheduled reversion to China in 1997.

### RESCISSION

SEC. 589. Of the funds appropriated by the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, under the heading "Economic Support Fund", $50,000,000 of such funds are hereby rescinded: *Provided,* That such rescission may be derived only from unearmarked funds and funds earmarked under such heading for Sub-Saharan Africa and allocated for Sudan, Somalia, and Liberia.

### WEST BANK SCHOOLS

SEC. 590. The United States Congress commends Israel's decision to open schools on the West Bank beginning July 22, 1989.

The Congress expresses the hope that all schools will be opened at an early date and will remain open, will not be used for political purposes, and will be respected and regarded as places of learning, not as places from which to further violent activity.

### ASSISTANCE FOR PAKISTAN

SEC. 591. Section 620E(d) of the Foreign Assistance Act of 1961 is amended by striking out "April 1, 1990" and inserting in lieu thereof "April 1, 1991".

22 USC 2375.

### SEPARATE ACCOUNTS

SEC. 592. (a) SEPARATE ACCOUNTS FOR LOCAL CURRENCIES.—(1) If assistance is furnished to the government of a foreign country under chapter 1 of part I (including assistance for Sub-Saharan Africa) or chapter 4 of part II of the Foreign Assistance Act of 1961 under arrangements which result in the generation of local currencies of

Defendant's Exhibit Y
6:23-cv-00007

that country, the Administrator of the Agency for International Development shall—

Contracts.

(A) require that local currencies be deposited in a separate account established by that government;

(B) enter into an agreement with that government which sets forth—

(i) the amount of the local currencies to be generated, and

(ii) the terms and conditions under which the currencies so deposited may be utilized, consistent with this section; and

(C) established by agreement with that government the responsibilities of the Agency for International Development and that government to monitor and account for deposits into and disbursements from the separate account.

(2) USES OF LOCAL CURRENCIES.—As may be agreed upon with the foreign government, local currencies deposited in a separate account pursuant to subsection (a), or an equivalent amount of local currencies, shall be used only—

(A) to carry out chapter 1 of part I or chapter 4 of part II (as the case may be), or

(B) for the administrative requirements of the United States Government.

(3) PROGRAMMING ACCOUNTABILITY.—The Agency for International Development shall take all appropriate steps to ensure that the equivalent of the local currencies disbursed pursuant to subsection (a)(2)(A) from the separate account established pursuant to subsection (a)(1) are used for the purposes agreed upon pursuant to subsection (a)(2).

(4) TERMINATION OF ASSISTANCE PROGRAMS.—Upon termination of assistance to a country under chapter 1 of part I or chapter 4 of part II (as the case may be), any unencumbered balances of funds which remain in a separate account established pursuant to subsection (a) shall be disposed of for such purposes as may be agreed to by the government of that country and the United States Government.

(b) SEPARATE ACCOUNTS FOR CASH TRANSFERS.—(1) If assistance is made available to the government of a foreign country, under chapter 1 of part I (including assistance for Sub-Saharan Africa) or chapter 4 of part II of the Foreign Assistance Act of 1961, as cash transfer assistance or as nonproject sector assistance, that country shall be required to maintain such funds in a separate account and not commingle them with any other funds.

(2) APPLICABILITY OF OTHER PROVISIONS OF LAW.—Such funds may be obligated and expended notwithstanding provisions of law which are inconsistent with the nature of this assistance including provisions which are referenced in the Joint Explanatory Statement of the Committee of Conference accompanying House Joint Resolution 648 (H. Report No. 98-1159).

President of U.S.

(3) NOTIFICATION.—At least fifteen days prior to obligating any such cash transfer or nonproject sector assistance, the President shall submit a notification through the regular notification procedures of the Committees on Appropriations, which shall include a detailed description of how the funds proposed to be made available will be used, with a discussion of the United States interests that will be served by the assistance (including, as appropriate, a description of the economic policy reforms that will be promoted by such assistance).

Defendant's Exhibit Y
6:23-cv-00007

(4) Exemption.—Nonproject sector assistance funds may be exempt from the requirements of subsection (b)(1) only through the notification procedures of the Committees on Appropriations.

### GLOBAL REDUCTION OF PROVERTY

Sec. 593. (a) The Congress finds that the reduction of poverty on a global basis is a fundamental goal of United States foreign assistance. Therefore, to measure progress toward that goal, the Administrator of the Agency for International Development shall, in consultation with the Congress and other appropriate governmental agencies and nongovernmental agencies and nongovernmental organizations, establish a system of quantitative and qualitative indicators of poverty reduction, which shall be established on a country-by-country basis. These indicators shall include the percentage of persons living below the absolute poverty level, rates of infant and child mortality, rates of literacy for men and women, per capita income and purchasing power, rate of employment, and other factors measuring poverty reduction and economic growth as the Administrator of the Agency for International Development shall deem appropriate.

(b) As part of its annual congressional presentation to Congress, the Agency for International Development shall identify those poverty reduction objectives that have been set for each country receiving development assistance, and the progress that has been achieved in past years and future steps to be taken to achieve them.

### INTERNATIONAL MONETARY FUND

Sec. 594. (a) The Secretary of the Treasury shall instruct the United States Executive Director to the International Monetary Fund (IMF) to regularly and vigorously promote the following policy and staffing changes through formal initiatives before the Board and management of the IMF and through bilateral discussions with other member nations:

(1) The addition to the IMF's staff of natural resource experts, and development economists trained in analyzing the linkages between macro-economic conditions and the short- and long-term impacts on sustainable management of natural resources.

(2) In a manner consistent with the purposes of the IMF, the establishment in the IMF of a systematic process to review in advance, and take into account in policy formation, projected impacts of each IMF lending agreement on the long-term sustainable management of natural resources, the environment, public health and poverty.

(3) The creation of criteria to consider concessional and favorable lending terms to promote sustainable management of natural resources. Such capacity should seek the reduction of the debt burden of developing countries in recognition of domestic investments in conservation and environmental management.

(b) The Secretary of the Treasury shall prepare an annual report to the Congress on the progress made by the United States Executive Director to the IMF in implementing the reforms encompassed in this section.

Reports.

Defendant's Exhibit Y
6:23-cv-00007

EL SALVADOR

SEC. 595. With respect to the ongoing political unrest and armed conflict in El Salvador, the Congress hereby—

(1) welcomes the negotiating process set in motion on September 13, 1989 in Mexico City by the Government of El Salvador and the leadership of the Farabundo Marti National Liberation Front and the expressed willingness of both parties to continue this process;

(2) urges the parties to these negotiations to achieve, as quickly as possible—

(A) a cessation of hostilities; and

(B) an overall political settlement of the ten-year old conflict; and

(3) calls upon the Secretary of State to consult frequently with the Congress on the status of the Salvadoran negotiations and on the efforts being undertaken by the President to support these negotiations.

CENTRAL AMERICAN DEVELOPMENT COORDINATION COMMISSION

SEC. 596. (a) FINDINGS.—The Congress finds that multi-donor foreign assistance funds made available to the Central America region should be channeled through regional institutions which have strong participation in decision-making by Central Americans to ensure adequate coordination among donors.

President of U.S.

(b) ASSISTANCE FOR CADCC.—Upon the request of the governments of Central America, the President shall provide appropriate support and assistance in the development of a coordination mechanism agreed to by the governments of Central America, which shall be designated as the Central American Development Coordination Commission (CADCC). In providing such support and assistance, the President shall, in concert with the governments of Central America, with other nations providing assistance, with the United Nations, and with other concerned international and regional organizations—

(1) encourage and participate in the creation of a multi-donor, multi-sectoral coordinating mechanism known as the CADCC; and

(2) provide not less than $500,000 or more than $1,000,000 of funds appropriated to carry out chapter 4 of part II of the Foreign Assistance Act of 1961 (relating to the Economic Support Fund) to be used to assist in the implementation of such Commission, and United States participation therein.

(c) FACTORS IN ESTABLISHING CADCC.—In establishing the CADCC, consideration should be given to:

(1) involving representatives from both the public and private sectors, including representatives from the trade unions and business communities, and nongovernmental organizations at the regional level;

(2) involving regional institutions and multilateral organizations such as the Inter-American Bank, the Central American Bank for Economic Integration (CABEI), the Central American Monetary Council (CMCA), the Economic Commission for Latin America (ECLAC), the International Bank for Reconstruction and Development, and the United Nations in project design, implementation, and coordination; and

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101–167—NOV. 21, 1989          103 STAT. 1257

(3) establishing in each country a National Recovery and Development Commission, modeled after the National Reconciliation Commissions called for in the Esquipulas II Accords agreed to by the presidents of the five countries of Central America in Guatemala on August 6–7, 1987.

(d) SECRETARIAT OF THE CADCC.—The United Nations Development Programme shall be designated as the social service and refugee and displaced persons technical assistance secretariat for the CADCC.

(e) ELIGIBILITY FOR ASSISTANCE.—The President is authorized to furnish assistance under this section to each country in Central America which is in compliance with the Esquipulas II Accords.

(f)(1) ENCOURAGEMENT OF MULTILATERAL CONTRIBUTIONS.—The Congress urges the President to take the necessary steps to encourage and secure greater international cooperation in, and support for, implementing the recommendations of the International Commission for Central American Recovery and Development.

(2) It is the sense of the Congress that, in carrying out paragraph (1), the President should exert leadership in multilateral and regional forums, and at economic summits to further a multidonor, multisector solution to the crisis in Central America.

## ELIGIBILITY OF POLAND AND HUNGARY FOR OVERSEAS PRIVATE INVESTMENT CORPORATION

SEC. 597. (a) PROGRAMS.—Section 239(f) of the Foreign Assistance Act of 1961 is amended by inserting "Poland, Hungary," after "Yugoslavia,".

22 USC 2199.

(b) PARTICIPATION BY NONGOVERNMENTAL SECTOR.—(1) In accordance with its mandate to foster private initiative and competition and enhance the ability of private enterprise to make its full contribution to the development process, the Overseas Private Investment Corporation shall support projects in Poland and Hungary which will result in enhancement of the nongovernmental sector and reduction of state involvement in the economy.

(2) For purposes of this subsection, the term "nongovernmental sector" in Poland and Hungary includes private enterprises, cooperatives (insofar as they are not administered by the Governments of Poland or Hungary), joint ventures (including partners which are not the Governments of Poland or Hungary or instrumentalities thereof), businesses in Poland or Hungary that are wholly or partly owned by United States citizens, including those of Polish or Hungarian descent, religious and ethnic groups (including the Catholic Church), and other independent social organizations.

(c) DEFINITION OF ELIGIBLE INVESTOR.—Notwithstanding subsection (b), the term "eligible investor" with respect to OPIC's programs in Poland and Hungary has the same meaning as contained in section 238(c) of the Foreign Assistance Act of 1961.

(d) EFFECTIVE DATE.—The authority of the Overseas Private Investment Corporation to issue insurance, reinsurance, guarantees, and to provide any assistance under its direct loan and equity programs with respect to projects undertaken in Poland and Hungary shall take effect upon the date of enactment of this Act and shall remain in effect until September 30, 1992.

Defendant's Exhibit Y
6:23-cv-00007

INTERNATIONAL COFFEE AGREEMENT

SEC. 598. It is the Sense of the Congress that the International Coffee Agreement is an important measure in promoting economic and political stability in many developing countries, including Colombia, that the collapse of the Agreement would seriously undermine Colombia's efforts at fighting illegal drugs, and that the Administration should undertake every possible effort to successfully conclude a renewal of the Agreement.

LATVIA, ESTONIA, AND LITHUANIA

SEC. 599. (a) The Congress finds that—

(1) the Baltic states of Latvia, Estonia, and Lithuania gained their independence from the Russian Socialist Federative Soviet Republic in 1918, a fact recognized by the government of the Russian Socialist Federative Soviet Republic in 1920;

(2) the governments of the Latvian Democratic Republic and the Russian Socialist Federative Soviet Republic (RSFSR) signed a Treaty of Peace in Riga, Latvia on August 11, 1920, in which the RSFSR "establishes the right of self-determination for all nations, even to the point of total separation from the States with which they have been incorporated" and declares that "Russia unreservedly recognizes the independence, self-subsistency and sovereignty of the Latvian State and voluntarily and forever renounces all sovereign rights over the Latvian people and territory which formerly belonged to Russia";

(3) similar treaties were signed by both the Republic of Estonia and the Republic of Lithuania with the RSFSR on February 2, 1920 and July 12, 1920, respectively";

(4) the independent republics of Latvia, Estonia, and Lithuania swiftly recovered from the ravages of World War I and became active in the World community, gaining membership in the League of Nations on September 22, 1921 and full recognition by the United States on July 28, 1922;

(5) the sovereign rights of the independent states of Latvia, Estonia, and Lithuania were violated by the Union of Soviet Socialist Republics in a Secret Protocol to the Nazi-Soviet Treaty of Nonaggression of August 23, 1939, which divided Eastern Europe into Nazi and Soviet "spheres of influence";

(6) the Union of Soviet Socialist Republics coerced the governments of Latvia, Estonia, and Lithuania to sign Pacts of Mutual Assistance in October 1939, which stipulated that the "contracting parties undertake not to enter into any alliances or to participate in any coalitions directed against one of the contracting parties" and that "the carrying into effect of the present pact must in no way affect the sovereign rights of the contracting parties, in particular their political structure, their economic and social system, and their military measures";

(7) the Union of Soviet Socialist Republics violated not only those bilateral agreements with the independent Baltic states but also international conventions on the changing of international borders by force when the Soviet Union issued ultimatums to the three independent nations on June 15-16, 1940, demanding the formation of governments to their liking, fol-

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989      103 STAT. 1259

lowed by armed invasions of Lithuania, Latvia, and Estonia on June 16-17, 1940;

(8) the occupation of the Baltic states was confirmed on July 14-15, 1940, with the irregular and illegal "election" of new parliaments, which then petitioned for admission into the Soviet Union, and these petitions were accepted by the Soviet Union, as follows: Lithuania's on August 3, 1940, Latvia's on August 4, 1940, and Estonia's on August 5, 1940;

(9) the Government of the United States continues its policy of standing by the 1922 recognition of the de jure independent governments in the Baltic states, and of refusing to recognize the forced incorporation of the Baltic states into the Soviet Union;

(10) the peoples of Latvia, Estonia, and Lithuania have never accepted the occupation of their native lands, and have demonstrated their resolve on numerous occasions since 1940, most notably in the last three years. The most striking demonstration of the desires of the Baltic people took place on August 23, 1989, the fiftieth anniversary of the Nazi-Soviet Treaty of Nonaggression, when nearly two million citizens of Latvia, Estonia, and Lithuania joined hands in a four-hundred-mile human chain stretching across the Baltic states from the Estonian capital of Tallinn, through the Latvian capital, Riga, to the Lithuanian capital of Vilninus;

(11) the people of the Baltic states, through their elected representatives in the Popular Front of Latvia, the Popular Front of Estonia, and the Lithuanian Movement in Support of Perestroika "Sajudis", have declared their desire for the restoration of independence in the Baltic states; and

(12) even the Communist officials and regimes in each of the Baltic states have begun to respond to the drive for more autonomy.

(b) The Congress urges the President—

(1) to raise the issue of the political rights of the Baltic peoples in all diplomatic contacts with the Soviet Union including during the meeting between President Bush and President Gorbachev in December, 1989 and during the Presidential summit scheduled in 1990 between the United States and the Soviet Union; and

(2) to call upon the Soviet Union—

(A) to honor the international agreements it has voluntarily entered into, such as the Final Act of the Helsinki Conference on Security and Cooperation in Europe and the United Nations Declaration of Human Rights, as well as the bilateral agreements it has voluntarily entered into with the independent governments of Latvia, Estonia, and Lithuania,

(B) to allow the people of Latvia, Estonia, and Lithuania their right of self-determination, as guaranteed by the RSFSR in 1920 as well as by the current constitution of the Soviet Union,

(C) to recognize the human rights of all peoples both within the Soviet Union and under Soviet influence, and

(D) to replace the policy of aggressive industrialization in the Baltic states, which has poisoned the land, air, and water of Latvia, Estonia, and Lithuania, with one of environmental responsibility.

IMPORTATION OF CERTAIN DEFENSE ARTICLES FROM POLAND,
CZECHOSLOVAKIA, AND HUNGARY

SEC. 599A. Notwithstanding section 38 of the Arms Export Control
Act (22 U.S.C. 2278) or any other provision of law, any article that—

(1) is a defense article for purposes of section 38 of the Arms
Export Control Act,

(2) is from Poland, Hungary, or Czechoslovakia,

(3) was imported or temporarily imported into the United
States before June 30, 1989, by, or on behalf of, a museum or
educational institution that is described in section 501(c)(3) of
the Internal Revenue Code of 1986 and exempt from tax under
section 501(a) of such Code,

(4) was manufactured at least 20 years before its importation
into the United States,

(5) has been disabled so that no weapon or weapons system is
functional, and

(6) is to be used only for display to the public by the museum
or educational institution for educational purposes,

shall be considered to have been lawfully imported into the United
States and shall be permitted to remain in the United States, and
the museum or educational institution shall not be subject to any
penalty by reason of such importation.

HUMAN RIGHTS IN CUBA

SEC. 599B. (1) FINDINGS.—The Congress finds that—

(A) the United Nations in 1989 issued its first report on
humans rights in Cuba this year, the result of a year-long
investigation that concluded on the 30th year of Fidel Castro's
rise to power;

(B) the report extensively documented across-the-board
human rights abuses that include cases of torture, missing
people, religious persecution, violations of civil and political
rights and violations of economic and social rights;

(C) the United Nations received 137 complaints of "torture,
cruel, inhuman or degrading treatment or punishment";

(D) among the abuses reported to the United Nations were
sensory deprivation, immersion in a pit latrine, mock execu-
tions, overcrowding in special cells, deafening loudspeakers,
keeping prisoners naked in front of relatives, and forcing a
prisoner about to be executed to carry his own coffin or dig his
own grave;

(E) the United Nations commissioners also charged the Cuban
regime with carrying out reprisals against Cuban citizens who
offered testimony to the United Nations group, a clear violation
of the Castro's government's promise not to harass those who
complained about human rights;

(F) at least 22 Cuban human rights activists who were
arrested are currently serving prison sentences or being held
without trial;

(G) the Human Rights Commission approved a resolution on
March 9, 1989, calling on the Cuban government to cooperate
with the Secretary General of the United Nations in settling
unresolved issues raised by the human rights study group;

(H) since March 9, 1989, the United Nations has failed to take
any substantive action to follow up on the March 9 resolution.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989        103 STAT. 1261

The United Nations also has failed to intervene on behalf of those who are now imprisoned because of their attempts to testify before the United Nations human rights investigative group last fall.

(2) STATEMENT OF POLICY.—In the interest of promoting respect for human rights in Cuba, the Congress—

(A) calls on the Secretary General of the United Nations to act upon the resolution approved by the Commission on Human Rights March 9, 1989, calling on the Secretary General to take appropriate follow up action on the Commission's report;

(B) calls on the Secretary General to specifically urge the Cuban government to release the 22 persons still being held in detention because of their human rights activities;

(C) calls on the United States Ambassador to the United Nations to make known in the strongest terms the dissatisfaction of the United States with the failure by the United Nations to continue to act on its own resolution; and

(D) calls on the Secretary of the United Nations to expand the United Nation's investigation of Cuba to include an examination of labor rights in recognition of current Cuban law which prohibits the formation of independent unions and which has led to the imprisonment of those Cuban workers who have tried to organize themselves.

### ASSISTANCE FOR POLAND AND HUNGARY

SEC. 599C. (a) In addition to amounts appropriated under the heading "Trade and Development Program", there is hereby appropriated $2,000,000, to remain available until expended, to carry out the provisions of section 661 of the Foreign Assistance Act of 1961, notwithstanding any other provision of law.

(b) Notwithstanding any other provision of this Act, any funds made available by this Act for a specific activity for Poland or Hungary instead may be obligated for Poland or Hungary for an activity with a similar purpose. The authority of section 515 of this Act may also be used to deobligate such funds and reobligate them for Poland or Hungary for an activity with a similar purpose: *Provided,* That the authority of this subsection shall be exercised subject to the regular notification procedures of the Committees on Appropriations.

(c) Funds made available by this Act and obligated for the Government of Poland shall not be expended if the President of Poland, or any other Polish official, initiates martial law without the consent of the Polish Senate and Sejm, or if members of the Polish Senate or the Sejm are removed from office or are arrested through extra-constitutional processes: *Provided,* That, notwithstanding the restriction on expenditures contained in this subsection, the President of the United States may continue to expend funds made available to Poland if he determines and certifies to Congress that it is in the foreign policy interest of the United States to do so.

### ESTABLISHING CATEGORIES OF ALIENS FOR PURPOSES OF REFUGEE DETERMINATIONS

SEC. 599D. (a) IN GENERAL.—In the case of an alien who is within a category of aliens established under subsection (b), the alien may establish, for purposes of admission as a refugee under section 207 of

8 USC 1157 note.

Defendant's Exhibit Y
6:23-cv-00007

the Immigration and Nationality Act, that the alien has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion by asserting such a fear and asserting a credible basis for concern about the possibility of such persecution.

(b) ESTABLISHMENT OF CATEGORIES.—

(1) For purposes of subsection (a), the Attorney General, in consultation with the Secretary of State and the Coordinator for Refugee Affairs, shall establish—

(A) one or more categories of aliens who are or were nationals and residents of the Soviet Union and who share common characteristics that identify them as targets of persecution in the Soviet Union on account of race, religion, nationality, membership in a particular social group, or political opinion, and

(B) one or more categories of aliens who are or were nationals and residents of Vietnam, Laos, or Cambodia and who share common characteristics that identify them as targets of persecution in such respective foreign state on such an account.

(2)(A) Aliens who are (or were) nationals and residents of the Soviet Union and who are Jews or Evangelical Christians shall be deemed a category of alien established under paragraph (1)(A).

(B) Aliens who are (or were) nationals of the Soviet Union and who are current members of, and demonstrate public, active, and continuous participation (or attempted participation) in the religious activities of, the Ukrainian Catholic Church or the Ukrainian Orthodox Church, shall be deemed a category of alien established under paragraph (1)(A).

(C) Aliens who are (or were) nationals and residents of Vietnam, Laos, or Cambodia and who are members of categories of individuals determined, by the Attorney General in accordance with "Immigration and Naturalization Service Worldwide Guidelines for Overseas Refugee Processing" (issued by the Immigration and Naturalization Service in August 1983) shall be deemed a category of alien established under paragraph (1)(B).

(3) Within the number of admissions of refugees allocated for fiscal year 1990 for refugees who are nationals of the Soviet Union under section 207(a)(3) of the Immigration and Nationality Act, notwithstanding any other provision of law, the President shall allocate one thousand of such admissions for such fiscal year to refugees who are within the category of aliens described in paragraph (2)(B).

(c) WRITTEN REASONS FOR DENIALS OF REFUGEE STATUS.—Each decision to deny an application for refugee status of an alien who is within a category established under this section shall be in writing and shall state, to the maximum extent feasible, the reason for the denial.

(d) PERMITTING CERTAIN ALIENS WITHIN CATEGORIES TO REAPPLY FOR REFUGEE STATUS.—Each alien who is within a category established under this section and who (after August 14, 1988, and before the date of the enactment of this Act) was denied refugee status shall be permitted to reapply for such status. Such an application shall be determined taking into account the application of this section.

PUBLIC LAW 101-167—NOV. 21, 1989     103 STAT. 1263

(e) PERIOD OF APPLICATION.— <span>Effective dates.</span>

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act and shall only apply to applications for refugee status submitted before October 1, 1990.

(2) Subsection (c) shall apply to decisions made after the date of the enactment of this Act and before October 1, 1990.

(3) Subsection (d) shall take effect on the date of the enactment of this Act and shall only apply to reapplications for refugee status submitted before October 1, 1990.

(f) GAO REPORTS ON SOVIET REFUGEE PROCESSING.—

(1) The Comptroller General shall submit to the Committees on the Judiciary of the Senate and of the House of Representatives reports on the implementation of this section in Italy and the Soviet Union. Such reports shall include a review of—

(A) the timeliness and length of individual interviews,

(B) the adequacy of staffing and funding by the Department of State, the Immigration and Naturalization Service, and voluntary agencies, including the adequacy of staffing, computerization, and administration of the processing center in Washington,

(C) the sufficiency of the proposed Soviet refugee processing system within the United States,

(D) backlogs (if any) by ethnic or religious groups and the reasons any such backlogs exist,

(E) the sufficiency of the means of distributing and receiving applications for refugee status in Moscow,

(F) to the extent possible, a comparison of the cost of conducting refugee processing only in Moscow and such cost of processing in both Moscow and in Italy, and

(G) an evaluation of efforts to phase out Soviet refugee processing in Italy.

(2) The Comptroller shall submit a preliminary report under paragraph (1) by December 31, 1989, and a final report by March 31, 1990. The final report shall include any recommendations which the Comptroller General may have regarding the need, if any, to revise or extend the application of this section.

### ADJUSTMENT OF STATUS FOR CERTAIN SOVIET AND INDOCHINESE PAROLEES

SEC. 599E. (a) IN GENERAL.—The Attorney General shall adjust the status of an alien described in subsection (b) to that of an alien lawfully admitted for permanent residence if the alien— <span>8 USC 1255 note.</span>

(1) applies for such adjustment,

(2) has been physically present in the United States for at least 1 year and is physically present in the United States on the date the application for such adjustment is filed,

(3) is admissible to the United States as an immigrant, except as provided in subsection (c), and

(4) pays a fee (determined by the Attorney General) for the processing of such application.

(b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided in subsection (a) shall only apply to an alien who—

(1) was a national of the Soviet Union, Vietnam, Laos, or Cambodia, and

Defendant's Exhibit Y
6:23-cv-00007

103 STAT. 1264          PUBLIC LAW 101-167—NOV. 21, 1989

(2) was inspected and granted parole into the United States during the period beginning on August 15, 1988, and ending on September 30, 1990, after being denied refugee status.

(c) Waiver of Certain Grounds for Inadmissibility.—The provisions of paragraphs (14), (15), (20), (21), (25), (28) (other than subparagraph (F)), and (32) of section 212(a) of the Immigration and Nationality Act shall not apply to adjustment of status under this section and the Attorney General may waive any other provision of such section (other than paragraph (23)(B), (27), (29), or (33)) with respect to such an adjustment for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

*Records.*

(d) Date of Approval.—Upon the approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission as a lawful permanent resident as of the date of the alien's inspection and parole described in subsection (b)(2).

(e) No Offset in Number of Visas Available.—When an alien is granted the status of having been lawfully admitted for permanent residence under this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act.

### REPEAL OF PROVISION

*Ante, p. 988.*

Sec. 599F. (a) The following provision under the heading "Salaries and Expenses, General Legal Activities", contained in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (H.R. 2991), as enacted into law, is hereby repealed: ": *Provided further,* That for fiscal year 1990 and hereafter the Attorney General may establish and collect fees to cover the cost of identifying, copying and distributing copies of tax decisions rendered by the Federal Judiciary and that any such fees shall be credited to this appropriation notwithstanding the provisions of 31 U.S.C. 3302".

*Effective date.*

(b) The provisions of subsection (a) shall take effect upon the date of the enactment into law of the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (H.R. 2991).

### CONDITIONAL ASSISTANCE FOR EL SALVADOR FOR POLICE TRAINING

Sec. 599G. (a) Conditional Assistance.—In order to promote the professional development of the security forces of El Salvador and to encourage the separation of the law enforcement forces from the armed forces of El Salvador, funds made available under chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated to El Salvador may, notwithstanding section 660 of that Act, be provided to El Salvador for fiscal year 1990 for purposes otherwise prohibited by section 660 of the Act, if the following conditions are met:

(1) The training provided with such assistance is provided by United States civilian law enforcement personnel.

(2)(A) The assistance is to be used for the purposes of professional development and training of the security forces of El Salvador in such areas as human rights, civil law, investigative and civilian law enforcement techniques, and urban law enforcement training.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 101-167—NOV. 21, 1989      103 STAT. 1265

(B) Any such assistance that is made available for equipment for these forces is intended to be used for the purchase of equipment such as communication devices, transportation equipment, forensic equipment, and personal protection gear. No such assistance may be used for the purchase of any lethal equipment, except for small arms ammunition and rifle ammunition solely for training purposes.

(3) At least thirty days before obligating such assistance, the President certifies to the Committee of Foreign Affairs and the Committee on Appropriations of the House of Representatives and the Committee of Foreign Relations and the Committee on Appropriations of the Senate that the Government of El Salvador has made significant progress during the preceding 6 months in eliminating any human rights violations, including torture, incommunicado detention, detention of persons solely for their political views, or prolonged detention without trial. Any such certification shall include a full description of the assistance which is proposed to be provided and of the purposes to which it is to be directed. Any such certification shall also include a report on the status of all investigative action and prosecutions with respect to those responsible for the 1980 murders of Archbishop Oscar Romero and the four American churchwomen, the recent murder of Ana Casanova, the recent bombings of the headquarters of the FENASTRAS union and the office of COMADRES, a human rights organization, and the recent murder of six Jesuit priests and their associates.

*Reports.*
*Oscar Romero.*
*Ana Casanova.*

(4) REPROGRAMMING.—Funds made available under this subsection shall be subject to the regular reprogramming procedures of the Committees on Appropriations.

(b) DEFINITION.—For purposes of this section, the term "civilian law enforcement personnel" means individuals who are not members of the United States Armed Forces.

(c) Not more than $5,000,000 shall be made available in fiscal year 1990 to carry out the provisions of this section. Not less than $7,000,000 of the funds made available to carry out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961 for fiscal year 1990 shall be made available for the purposes of subsection 534(b)(3) of the Foreign Assistance Act of 1961.

### CROPS IN PERU, BOLIVIA AND JAMAICA

SEC. 599H. Notwithstanding any other provision of law, the President may provide assistance under chapter 1 of part I or chapter 4 of part II of the Foreign Assistance Act of 1961 for Peru, Bolivia and Jamaica to promote the production, processing, or marketing of all crops which can be economically grown in areas of those countries which currently produce crops from which narcotic and psychotropic drugs are derived.

### LAND REFORM IN EL SALVADOR

SEC. 599I. (a) It is the sense of the Congress that the success and continuation of land reform in El Salvador is vital to United States policy and to political stability, economic development and maintenance of democratic institutions in that country.

(b) Therefore, when allocating Economic Support Funds to El Salvador, the President shall take into consideration progress in the Salvadoran Land Reform Program.

## TITLE VI—FUNDING ADJUSTMENTS

### REDUCTION OF APPROPRIATIONS

SEC. 601. Each appropriation item, direct loan obligation limit, loan guarantee commitment limit, or obligation limit provided by this Act shall be reduced by 0.43 per centum: *Provided,* That such reduction shall be applied proportionally to each program, project, and activity as set forth in section 543 of this Act: *Provided further,* That programs and activities exempt from sequestration under section 255 of the Deficit Control Act of 1985 shall be exempt from the uniform reduction required by this paragraph.

### COUNTER-NARCOTICS PROGRAMS

SEC. 602. For expenses necessary to enable the President to carry out the provisions of the Foreign Assistance Act of 1961 and the Arms Export Control Act, $125,000,000, which shall be made available only for counter-narcotics programs: *Provided,* That none of the funds appropriated under this heading shall be made available except as provided through the regular notification procedures of the Committees on Appropriations.

This Act may be cited as the "Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990".

Approved November 21, 1989.

LEGISLATIVE HISTORY—H.R. 3743:

CONGRESSIONAL RECORD, Vol. 135 (1989):
    Nov. 20, considered and passed House and Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 25 (1989):
    Nov. 21, Presidential statement.

Defendant's Exhibit Y
6:23-cv-00007

PUBLIC LAW 105–277—OCT. 21, 1998          112 STAT. 2681

*Public Law 105–277
105th Congress

An Act

Making omnibus consolidated and emergency appropriations for the fiscal year ending September 30, 1999, and for other purposes.

Oct. 21, 1998
[H.R. 4328]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.

DIVISION A—OMNIBUS CONSOLIDATED APPROPRIATIONS

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1999, and for other purposes, namely:

SEC. 101. (a) For programs, projects or activities in the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies programs for the fiscal year ending September 30, 1999, and for other purposes.

Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999.

TITLE I

AGRICULTURAL PROGRAMS

PRODUCTION, PROCESSING, AND MARKETING

OFFICE OF THE SECRETARY

(INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of the Office of the Secretary of Agriculture, and not to exceed $75,000 for employment under 5 U.S.C. 3109, $2,836,000: *Provided*, That not to exceed $11,000 of this amount, along with any unobligated balances of representation funds in the Foreign Agricultural Service, shall be available for official reception and representation expenses, not otherwise provided for, as determined by the Secretary: *Provided further*, That none of the funds appropriated or otherwise made available by this Act may be used to pay the salaries and expenses of personnel of the Department of Agriculture to carry out section 793(c)(1)(C) of Public Law 104–127: *Provided further*, That none of the funds made available by this Act may be used to enforce section 793(d) of Public Law 104–127.

---

*Note: This is a typeset print of the original hand enrollment as signed by the President on October 21, 1998. The text is printed without corrections.

Defendant's Exhibit Z
6:23-cv-00007

unless a verdict of liability has been entered against that person; and

(2) the home address, home phone number, social security number, identity of family members, personal tax returns, and personal banking information of a person described in paragraph (1), and any other records or information of a similar nature relating to that person, shall not be subject to disclosure without the written consent of that person, or pursuant to a court order.

SEC. 128. (a) The numerical limitation set forth in section 209(b) of the Immigration and Nationality Act (8 U.S.C. 1159(b)) shall not apply to any alien described in subsection (b).

(b) An alien described in subsection (a) is an alien who was a United States Government employee, employee of a nongovernmental organization based in the United States, or other Iraqi national who was moved to Guam by the United States Government in 1996 or 1997 pursuant to an arrangement made by the United States Government, and who was granted asylum in the United States under section 208(a) of the Immigration and Nationality Act (8 U.S.C. 1158(a)).

SEC. 129. (a) AMENDMENTS TO JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT OF 1974.—

(1) IN GENERAL.—Section 103 of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5603) is amended—

(A) by striking paragraph (8) and inserting the following:

"(8) the term 'unit of local government' means—

"(A) any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a State;

"(B) any law enforcement district or judicial enforcement district that—

"(i) is established under applicable State law; and

"(ii) has the authority to, in a manner independent of other State entities, establish a budget and raise revenues;

"(C) an Indian Tribe that performs law enforcement functions, as determined by the Secretary of the Interior; or

"(D) for the purposes of assistance eligibility, any agency of the government of the District of Columbia or the Federal Government that performs law enforcement functions in and for—

"(i) the District of Columbia; or

"(ii) any Trust Territory of the United States;"; and

(B) in paragraph (9), by striking "units of general local government" and inserting "units of local government".

(2) CONFORMING AMENDMENTS.—

(A) Section 221(a) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5631(a)) is amended by striking "units of general local government" each place that term appears and inserting "units of local government".

(B) Section 222(c) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5632(c)) is

Defendant's Exhibit Z
6:23-cv-00007

---

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part II. Admission Qualifications for Aliens; Travel Control of Citizens and Aliens

8 U.S.C.A. § 1187

§ 1187. Visa waiver program for certain visitors

Effective: March 15, 2022
Currentness

**(a) Establishment of program**

The Secretary of Homeland Security and the Secretary of State are authorized to establish a program (hereinafter in this section referred to as the "program") under which the requirement of paragraph (7)(B)(i)(II) of section 1182(a) of this title may be waived by the Secretary of Homeland Security, in consultation with the Secretary of State and in accordance with this section, in the case of an alien who meets the following requirements:

**(1) Seeking entry as tourist for 90 days or less**

The alien is applying for admission during the program as a nonimmigrant visitor (described in section 1101(a)(15)(B) of this title) for a period not exceeding 90 days.

**(2) National of program country**

The alien is a national of, and presents a passport issued by, a country which--

**(A)** extends (or agrees to extend), either on its own or in conjunction with one or more other countries that are described in subparagraph (B) and that have established with it a common area for immigration admissions, reciprocal privileges to citizens and nationals of the United States, and

**(B)** is designated as a pilot program country under subsection (c).

**(3) Passport requirements**

The alien, at the time of application for admission, is in possession of a valid unexpired passport that satisfies the following:

**(A) Machine readable**

The passport is a machine-readable passport that is tamper-resistant, incorporates document authentication identifiers, and otherwise satisfies the internationally accepted standard for machine readability.

---

Defendants Exhibit AA
6:23-cv-00007

§ 1187. Visa waiver program for certain visitors, 8 USCA § 1187

**(B) Electronic**

Beginning on April 1, 2016, the passport is an electronic passport that is fraud-resistant, contains relevant biographic and biometric information (as determined by the Secretary of Homeland Security), and otherwise satisfies internationally accepted standards for electronic passports.

**(4) Executes immigration forms**

The alien before the time of such admission completes such immigration form as the Secretary of Homeland Security shall establish.

**(5) Entry into the United States**

If arriving by sea or air, the alien arrives at the port of entry into the United States on a carrier, including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations, or a noncommercial aircraft that is owned or operated by a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations [1] which has entered into an agreement with the Secretary of Homeland Security pursuant to subsection (e). The Secretary of Homeland Security is authorized to require a carrier conducting operations under part 135 of title 14, Code of Federal Regulations, or a domestic corporation conducting operations under part 91 of that title, to give suitable and proper bond, in such reasonable amount and containing such conditions as the Secretary of Homeland Security may deem sufficient to ensure compliance with the indemnification requirements of this section, as a term of such an agreement.

**(6) Not a safety threat**

The alien has been determined not to represent a threat to the welfare, health, safety, or security of the United States.

**(7) No previous violation**

If the alien previously was admitted without a visa under this section, the alien must not have failed to comply with the conditions of any previous admission as such a nonimmigrant.

**(8) Round-trip ticket**

The alien is in possession of a round-trip transportation ticket (unless this requirement is waived by the Secretary of Homeland Security under regulations or the alien is arriving at the port of entry on an aircraft operated under part 135 of title 14, Code of Federal Regulations, or a noncommercial aircraft that is owned or operated by a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations).

**(9) Automated system check**

The identity of the alien has been checked using an automated electronic database containing information about the inadmissibility of aliens to uncover any grounds on which the alien may be inadmissible to the United States, and no such ground has been found.

Defendant's Exhibit AA
6:23-cv-00007

**(10) Electronic transmission of identification information**

Operators of aircraft under part 135 of title 14, Code of Federal Regulations, or operators of noncommercial aircraft that are owned or operated by a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations, carrying any alien passenger who will apply for admission under this section shall furnish such information as the Secretary of Homeland Security by regulation shall prescribe as necessary for the identification of any alien passenger being transported and for the enforcement of the immigration laws. Such information shall be electronically transmitted not less than one hour prior to arrival at the port of entry for purposes of checking for inadmissibility using the automated electronic database.

**(11) Eligibility determination under the electronic system for travel authorization**

Beginning on the date on which the electronic system for travel authorization developed under subsection (h)(3) is fully operational, each alien traveling under the program shall, before applying for admission to the United States, electronically provide to the system biographical information and such other information as the Secretary of Homeland Security shall determine necessary to determine the eligibility of, and whether there exists a law enforcement or security risk in permitting, the alien to travel to the United States. Upon review of such biographical information, the Secretary of Homeland Security shall determine whether the alien is eligible to travel to the United States under the program.

**(12) Not present in Iraq, Syria, or any other country or area of concern**

**(A) In general**

Except as provided in subparagraphs (B) and (C)--

(i) the alien has not been present, at any time on or after March 1, 2011--

(I) in Iraq or Syria;

(II) in a country that is designated by the Secretary of State under section 4605(j) of Title 50 (as continued in effect under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)), section 2780 of Title 22, section 2371 of Title 22, or any other provision of law, as a country, the government of which has repeatedly provided support of acts of international terrorism; or

(III) in any other country or area of concern designated by the Secretary of Homeland Security under subparagraph (D); and

(ii) regardless of whether the alien is a national of a program country, the alien is not a national of--

(I) Iraq or Syria;

Defendant's Exhibit AA
6:23-cv-00007

(II) a country that is designated, at the time the alien applies for admission, by the Secretary of State under section 4605(j) of Title 50 (as continued in effect under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)), section 2780 of Title 22, section 2371 of Title 22, or any other provision of law, as a country, the government of which has repeatedly provided support of acts of international terrorism; or

(III) any other country that is designated, at the time the alien applies for admission, by the Secretary of Homeland Security under subparagraph (D).

**(B) Certain military personnel and government employees**

Subparagraph (A)(i) shall not apply in the case of an alien if the Secretary of Homeland Security determines that the alien was present--

(i) in order to perform military service in the armed forces of a program country; or

(ii) in order to carry out official duties as a full time employee of the government of a program country.

**(C) Waiver**

The Secretary of Homeland Security may waive the application of subparagraph (A) to an alien if the Secretary determines that such a waiver is in the law enforcement or national security interests of the United States.

**(D) Countries or areas of concern**

**(i) In general**

Not later than 60 days after December 18, 2015, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall determine whether the requirement under subparagraph (A) shall apply to any other country or area.

**(ii) Criteria**

In making a determination under clause (i), the Secretary shall consider--

(I) whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States;

(II) whether a foreign terrorist organization has a significant presence in the country or area; and

(III) whether the country or area is a safe haven for terrorists.

Defendant's Exhibit AA
6:23-cv-00007

**(iii) Annual review**

The Secretary shall conduct a review, on an annual basis, of any determination made under clause (i).

**(E) Report**

Beginning not later than one year after December 18, 2015, and annually thereafter, the Secretary of Homeland Security shall submit to the Committee on Homeland Security, the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, and the Committee on the Judiciary of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Select Committee on Intelligence, and the Committee on the Judiciary of the Senate a report on each instance in which the Secretary exercised the waiver authority under subparagraph (C) during the previous year.

**(b) Waiver of rights**

An alien may not be provided a waiver under the program unless the alien has waived any right--

**(1)** to review or appeal under this chapter of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or

**(2)** to contest, other than on the basis of an application for asylum, any action for removal of the alien.

**(c) Designation of program countries**

**(1) In general**

The Secretary of Homeland Security, in consultation with the Secretary of State, may designate any country as a program country if it meets the requirements of paragraph (2).

**(2) Qualifications**

Except as provided in subsection (f), a country may not be designated as a program country unless the following requirements are met:

**(A) Low nonimmigrant visa refusal rate**

Either--

**(i)** the average number of refusals of nonimmigrant visitor visas for nationals of that country during--

Defendant's Exhibit AA
6:23-cv-00007

**(I)** the two previous full fiscal years was less than 2.0 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years; and

**(II)** either of such two previous full fiscal years was less than 2.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year; or

**(ii)** such refusal rate for nationals of that country during the previous full fiscal year was less than 3.0 percent.

**(B) Passport program**

**(i) Issuance of passports**

The government of the country certifies that it issues to its citizens passports described in subparagraph (A) of subsection (a)(3), and on or after April 1, 2016, passports described in subparagraph (B) of subsection (a)(3).

**(ii) Validation of passports**

Not later than October 1, 2016, the government of the country certifies that it has in place mechanisms to validate passports described in subparagraphs (A) and (B) of subsection (a)(3) at each key port of entry into that country. This requirement shall not apply to travel between countries which fall within the Schengen Zone.

**(C) Law enforcement and security interests**

The Secretary of Homeland Security, in consultation with the Secretary of State--

**(i)** evaluates the effect that the country's designation would have on the law enforcement and security interests of the United States (including the interest in enforcement of the immigration laws of the United States and the existence and effectiveness of its agreements and procedures for extraditing to the United States individuals, including its own nationals, who commit crimes that violate United States law);

**(ii)** determines that such interests would not be compromised by the designation of the country; and

**(iii)** submits a written report to the Committee on the Judiciary, the Committee on Foreign Affairs, and the Committee on Homeland Security of the House of Representatives and the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate regarding the country's qualification for designation that includes an explanation of such determination.

**(D) Reporting lost and stolen passports**

The government of the country enters into an agreement with the United States to report, or make available through Interpol or other means as designated by the Secretary of Homeland Security, to the United States Government information about

Defendant's Exhibit AA
6:23-cv-00007

the theft or loss of passports not later than 24 hours after becoming aware of the theft or loss and in a manner specified in the agreement.

**(E) Repatriation of aliens**

The government of the country accepts for repatriation any citizen, former citizen, or national of the country against whom a final executable order of removal is issued not later than three weeks after the issuance of the final order of removal. Nothing in this subparagraph creates any duty for the United States or any right for any alien with respect to removal or release. Nothing in this subparagraph gives rise to any cause of action or claim under this paragraph or any other law against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

**(F) Passenger information exchange**

The government of the country enters into an agreement with the United States to share information regarding whether citizens and nationals of that country traveling to the United States represent a threat to the security or welfare of the United States or its citizens, and fully implements such agreement.

**(G) Interpol screening**

Not later than 270 days after December 18, 2015, except in the case of a country in which there is not an international airport, the government of the country certifies to the Secretary of Homeland Security that, to the maximum extent allowed under the laws of the country, it is screening, for unlawful activity, each person who is not a citizen or national of that country who is admitted to or departs that country, by using relevant databases and notices maintained by Interpol, or other means designated by the Secretary of Homeland Security. This requirement shall not apply to travel between countries which fall within the Schengen Zone.

**(3) Continuing and subsequent qualifications**

For each fiscal year after the initial period--

**(A) Continuing qualification**

In the case of a country which was a program country in the previous fiscal year, a country may not be designated as a program country unless the sum of--

(i) the total of the number of nationals of that country who were denied admission at the time of arrival or withdrew their application for admission during such previous fiscal year as a nonimmigrant visitor, and

(ii) the total number of nationals of that country who were admitted as nonimmigrant visitors during such previous fiscal year and who violated the terms of such admission,

was less than 2 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during such previous fiscal year.

Defendants Exhibit AA
6:23-cv-00007

**(B) New countries**

In the case of another country, the country may not be designated as a program country unless the following requirements are met:

**(i) Low nonimmigrant visa refusal rate in previous 2-year period**

The average number of refusals of nonimmigrant visitor visas for nationals of that country during the two previous full fiscal years was less than 2 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years.

**(ii) Low nonimmigrant visa refusal rate in each of the 2 previous years**

The average number of refusals of nonimmigrant visitor visas for nationals of that country during either of such two previous full fiscal years was less than 2.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year.

**(4) Initial period**

For purposes of paragraphs (2) and (3), the term "initial period" means the period beginning at the end of the 30-day period described in subsection (b)(1) and ending on the last day of the first fiscal year which begins after such 30-day period.

**(5) Written reports on continuing qualification; designation terminations**

**(A) Periodic evaluations**

**(i) In general**

The Secretary of Homeland Security, in consultation with the Secretary of State, periodically (but not less than once every 2 years)--

**(I)** shall evaluate the effect of each program country's continued designation on the law enforcement and security interests of the United States (including the interest in enforcement of the immigration laws of the United States and the existence and effectiveness of its agreements and procedures for extraditing to the United States individuals, including its own nationals, who commit crimes that violate United States law);

**(II)** shall determine, based upon the evaluation in subclause (I), whether any such designation ought to be continued or terminated under subsection (d);

**(III)** shall submit a written report to the Committee on the Judiciary, the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, and the Committee on Homeland Security, of the House of Representatives and

Defendant's Exhibit AA
6:23-cv-00007

the Committee on the Judiciary, the Committee on Foreign Relations, the Select Committee on Intelligence and the Committee on Homeland Security and Governmental Affairs of the Senate regarding the continuation or termination of the country's designation that includes an explanation of such determination and the effects described in subclause (I);

(IV) shall submit to Congress a report regarding the implementation of the electronic system for travel authorization under subsection (h)(3) and the participation of new countries in the program through a waiver under paragraph (8); and

(V) shall submit to the committees described in subclause (III), a report that includes an assessment of the threat to the national security of the United States of the designation of each country designated as a program country, including the compliance of the government of each such country with the requirements under subparagraphs (D) and (F) of paragraph (2), as well as each such government's capacity to comply with such requirements.

### (ii) Effective date

A termination of the designation of a country under this subparagraph shall take effect on the date determined by the Secretary of Homeland Security, in consultation with the Secretary of State.

### (iii) Redesignation

In the case of a termination under this subparagraph, the Secretary of Homeland Security shall redesignate the country as a program country, without regard to subsection (f) or paragraph (2) or (3), when the Secretary of Homeland Security, in consultation with the Secretary of State, determines that all causes of the termination have been eliminated.

## (B) Emergency termination

### (i) In general

In the case of a program country in which an emergency occurs that the Secretary of Homeland Security, in consultation with the Secretary of State, determines threatens the law enforcement or security interests of the United States (including the interest in enforcement of the immigration laws of the United States), the Secretary of Homeland Security shall immediately terminate the designation of the country as a program country.

### (ii) Definition

For purposes of clause (i), the term "emergency" means--

(I) the overthrow of a democratically elected government;

(II) war (including undeclared war, civil war, or other military activity) on the territory of the program country;

Defendant's Exhibit AA
6:23-cv-00007

**(III)** a severe breakdown in law and order affecting a significant portion of the program country's territory;

**(IV)** a severe economic collapse in the program country; or

**(V)** any other extraordinary event in the program country that threatens the law enforcement or security interests of the United States (including the interest in enforcement of the immigration laws of the United States) and where the country's participation in the program could contribute to that threat.

### (iii) Redesignation

The Secretary of Homeland Security may redesignate the country as a program country, without regard to subsection (f) or paragraph (2) or (3), when the Secretary of Homeland Security, in consultation with the Secretary of State, determines that--

**(I)** at least 6 months have elapsed since the effective date of the termination;

**(II)** the emergency that caused the termination has ended; and

**(III)** the average number of refusals of nonimmigrant visitor visas for nationals of that country during the period of termination under this subparagraph was less than 3.0 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during such period.

### (iv) Program suspension authority

The Director of National Intelligence shall immediately inform the Secretary of Homeland Security of any current and credible threat which poses an imminent danger to the United States or its citizens and originates from a country participating in the visa waiver program. Upon receiving such notification, the Secretary, in consultation with the Secretary of State--

**(I)** may suspend a country from the visa waiver program without prior notice;

**(II)** shall notify any country suspended under subclause (I) and, to the extent practicable without disclosing sensitive intelligence sources and methods, provide justification for the suspension; and

**(III)** shall restore the suspended country's participation in the visa waiver program upon a determination that the threat no longer poses an imminent danger to the United States or its citizens.

### (C) Treatment of nationals after termination

For purposes of this paragraph--

Defendant's Exhibit AA
6:23-cv-00007

(i) nationals of a country whose designation is terminated under subparagraph (A) or (B) shall remain eligible for a waiver under subsection (a) until the effective date of such termination; and

(ii) a waiver under this section that is provided to such a national for a period described in subsection (a)(1) shall not, by such termination, be deemed to have been rescinded or otherwise rendered invalid, if the waiver is granted prior to such termination.

**(6) Computation of visa refusal rates**

For purposes of determining the eligibility of a country to be designated as a program country, the calculation of visa refusal rates shall not include any visa refusals which incorporate any procedures based on, or are otherwise based on, race, sex, or disability, unless otherwise specifically authorized by law or regulation. No court shall have jurisdiction under this paragraph to review any visa refusal, the denial of admission to the United States of any alien by the Secretary of Homeland Security, the Secretary's computation of the visa refusal rate, or the designation or nondesignation of any country.

**(7) Visa waiver information**

**(A) In general**

In refusing the application of nationals of a program country for United States visas, or the applications of nationals of a country seeking entry into the visa waiver program, a consular officer shall not knowingly or intentionally classify the refusal of the visa under a category that is not included in the calculation of the visa refusal rate only so that the percentage of that country's visa refusals is less than the percentage limitation applicable to qualification for participation in the visa waiver program.

**(B) Reporting requirement**

On May 1 of each year, for each country under consideration for inclusion in the visa waiver program, the Secretary of State shall provide to the appropriate congressional committees--

(i) the total number of nationals of that country that applied for United States visas in that country during the previous calendar year;

(ii) the total number of such nationals who received United States visas during the previous calendar year;

(iii) the total number of such nationals who were refused United States visas during the previous calendar year;

(iv) the total number of such nationals who were refused United States visas during the previous calendar year under each provision of this chapter under which the visas were refused; and

Defendants Exhibit AA
6:23-cv-00007

(v) the number of such nationals that were refused under section 1184(b) of this title as a percentage of the visas that were issued to such nationals.

**(C) Certification**

Not later than May 1 of each year, the United States chief of mission, acting or permanent, to each country under consideration for inclusion in the visa waiver program shall certify to the appropriate congressional committees that the information described in subparagraph (B) is accurate and provide a copy of that certification to those committees.

**(D) Consideration of countries in the visa waiver program**

Upon notification to the Secretary of Homeland Security that a country is under consideration for inclusion in the visa waiver program, the Secretary of State shall provide all of the information described in subparagraph (B) to the Secretary of Homeland Security.

**(E) Definition**

In this paragraph, the term "appropriate congressional committees" means the Committee on the Judiciary and the Committee on Foreign Relations of the Senate and the Committee on the Judiciary and the Committee on International Relations of the House of Representatives.

**(8) Nonimmigrant visa refusal rate flexibility**

**(A) Certification**

**(i) In general**

On the date on which an air exit system is in place that can verify the departure of not less than 97 percent of foreign nationals who exit through airports of the United States and the electronic system for travel authorization required under subsection (h)(3) is fully operational, the Secretary of Homeland Security shall certify to Congress that such air exit system and electronic system for travel authorization are in place.

**(ii) Notification to Congress**

The Secretary shall notify Congress in writing of the date on which the air exit system under clause (i) fully satisfies the biometric requirements specified in subsection (i).

**(iii) Temporary suspension of waiver authority**

Notwithstanding any certification made under clause (i), if the Secretary has not notified Congress in accordance with clause (ii) by June 30, 2009, the Secretary's waiver authority under subparagraph (B) shall be suspended beginning on July 1, 2009, until such time as the Secretary makes such notification.

Defendant's Exhibit AA
6:23-cv-00007

§ 1187. Visa waiver program for certain visitors, 8 USCA § 1187

**(iv) Rule of construction**

Nothing in this paragraph shall be construed as in any way abrogating the reporting requirements under subsection (i)(3).

**(B) Waiver**

After certification by the Secretary under subparagraph (A), the Secretary, in consultation with the Secretary of State, may waive the application of paragraph (2)(A) for a country if--

(i) the country meets all security requirements of this section;

(ii) the Secretary of Homeland Security determines that the totality of the country's security risk mitigation measures provide assurance that the country's participation in the program would not compromise the law enforcement, security interests, or enforcement of the immigration laws of the United States;

(iii) there has been a sustained reduction in the rate of refusals for nonimmigrant visas for nationals of the country and conditions exist to continue such reduction;

(iv) the country cooperated with the Government of the United States on counterterrorism initiatives, information sharing, and preventing terrorist travel before the date of its designation as a program country, and the Secretary of Homeland Security and the Secretary of State determine that such cooperation will continue; and

(v)(I) the rate of refusals for nonimmigrant visitor visas for nationals of the country during the previous full fiscal year was not more than ten percent; or

(II) the visa overstay rate for the country for the previous full fiscal year does not exceed the maximum visa overstay rate, once such rate is established under subparagraph (C).

**(C) Maximum visa overstay rate**

**(i) Requirement to establish**

After certification by the Secretary under subparagraph (A), the Secretary and the Secretary of State jointly shall use information from the air exit system referred to in such subparagraph to establish a maximum visa overstay rate for countries participating in the program pursuant to a waiver under subparagraph (B). The Secretary of Homeland Security shall certify to Congress that such rate would not compromise the law enforcement, security interests, or enforcement of the immigration laws of the United States.

**(ii) Visa overstay rate defined**

In this paragraph the term "visa overstay rate" means, with respect to a country, the ratio of--

Defendant's Exhibit AA
6:23-cv-00007

(I) the total number of nationals of that country who were admitted to the United States on the basis of a nonimmigrant visa whose periods of authorized stays ended during a fiscal year but who remained unlawfully in the United States beyond such periods; to

(II) the total number of nationals of that country who were admitted to the United States on the basis of a nonimmigrant visa during that fiscal year.

### (iii) Report and publication

The Secretary of Homeland Security shall on the same date submit to Congress and publish in the Federal Register information relating to the maximum visa overstay rate established under clause (i). Not later than 60 days after such date, the Secretary shall issue a final maximum visa overstay rate above which a country may not participate in the program.

## (9) Discretionary security-related considerations

In determining whether to waive the application of paragraph (2)(A) for a country, pursuant to paragraph (8), the Secretary of Homeland Security, in consultation with the Secretary of State, shall take into consideration other factors affecting the security of the United States, including--

(A) airport security standards in the country;

(B) whether the country assists in the operation of an effective air marshal program;

(C) the standards of passports and travel documents issued by the country; and

(D) other security-related factors, including the country's cooperation with the United States' initiatives toward combating terrorism and the country's cooperation with the United States intelligence community in sharing information regarding terrorist threats.

## (10) Technical assistance

The Secretary of Homeland Security, in consultation with the Secretary of State, shall provide technical assistance to program countries to assist those countries in meeting the requirements under this section. The Secretary of Homeland Security shall ensure that the program office within the Department of Homeland Security is adequately staffed and has resources to be able to provide such technical assistance, in addition to its duties to effectively monitor compliance of the countries participating in the program with all the requirements of the program.

## (11) Independent review

### (A) In general

Defendant's Exhibit AA
6:23-cv-00007

Prior to the admission of a new country into the program under this section, and in conjunction with the periodic evaluations required under subsection (c)(5)(A), the Director of National Intelligence shall conduct an independent intelligence assessment of a nominated country and member of the program.

**(B) Reporting requirement**

The Director shall provide to the Secretary of Homeland Security, the Secretary of State, and the Attorney General the independent intelligence assessment required under subparagraph (A).

**(C) Contents**

The independent intelligence assessment conducted by the Director shall include--

(i) a review of all current, credible terrorist threats of the subject country;

(ii) an evaluation of the subject country's counterterrorism efforts;

(iii) an evaluation as to the extent of the country's sharing of information beneficial to suppressing terrorist movements, financing, or actions;

(iv) an assessment of the risks associated with including the subject country in the program; and

(v) recommendations to mitigate the risks identified in clause (iv).

**(12) Designation of high risk program countries**

**(A) In general**

The Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Secretary of State, shall evaluate program countries on an annual basis based on the criteria described in subparagraph (B) and shall identify any program country, the admission of nationals from which under the visa waiver program under this section, the Secretary determines presents a high risk to the national security of the United States.

**(B) Criteria**

In evaluating program countries under subparagraph (A), the Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Secretary of State, shall consider the following criteria:

(i) The number of nationals of the country determined to be ineligible to travel to the United States under the program during the previous year.

Defendant's Exhibit AA
6:23-cv-00007

**(ii)** The number of nationals of the country who were identified in United States Government databases related to the identities of known or suspected terrorists during the previous year.

**(iii)** The estimated number of nationals of the country who have traveled to Iraq or Syria at any time on or after March 1, 2011 to engage in terrorism.

**(iv)** The capacity of the country to combat passport fraud.

**(v)** The level of cooperation of the country with the counter-terrorism efforts of the United States.

**(vi)** The adequacy of the border and immigration control of the country.

**(vii)** Any other criteria the Secretary of Homeland Security determines to be appropriate.

**(C) Suspension of designation**

The Secretary of Homeland Security, in consultation with the Secretary of State, may suspend the designation of a program country based on a determination that the country presents a high risk to the national security of the United States under subparagraph (A) until such time as the Secretary determines that the country no longer presents such a risk.

**(D) Report**

Not later than 60 days after December 18, 2015, and annually thereafter, the Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Secretary of State, shall submit to the Committee on Homeland Security, the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, and the Committee on the Judiciary of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Select Committee on Intelligence, and the Committee on the Judiciary of the Senate a report, which includes an evaluation and threat assessment of each country determined to present a high risk to the national security of the United States under subparagraph (A).

**(d) Authority**

Notwithstanding any other provision of this section, the Secretary of Homeland Security, in consultation with the Secretary of State, may for any reason (including national security) refrain from waiving the visa requirement in respect to nationals of any country which may otherwise qualify for designation or may, at any time, rescind any waiver or designation previously granted under this section. The Secretary of Homeland Security may not waive any eligibility requirement under this section unless the Secretary notifies, with respect to the House of Representatives, the Committee on Homeland Security, the Committee on the Judiciary, the Committee on Foreign Affairs, and the Committee on Appropriations, and with respect to the Senate, the Committee on Homeland Security and Governmental Affairs, the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Appropriations not later than 30 days before the effective date of such waiver.

Defendant's Exhibit AA
6:23-cv-00007

**(e) Carrier agreements**

**(1) In general**

The agreement referred to in subsection (a)(4) is an agreement between a carrier (including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title and the Secretary of Homeland Security under which the carrier (including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title agrees, in consideration of the waiver of the visa requirement with respect to a nonimmigrant visitor under the program--

**(A)** to indemnify the United States against any costs for the transportation of the alien from the United States if the visitor is refused admission to the United States or remains in the United States unlawfully after the 90-day period described in subsection (a)(1)(A),

**(B)** to submit daily to immigration officers any immigration forms received with respect to nonimmigrant visitors provided a waiver under the program,

**(C)** to be subject to the imposition of fines resulting from the transporting into the United States of a national of a designated country without a passport pursuant to regulations promulgated by the Secretary of Homeland Security, and

**(D)** to collect, provide, and share passenger data as required under subsection (h)(1)(B).

**(2) Termination of agreements**

The Secretary of Homeland Security may terminate an agreement under paragraph (1) with five days' notice to the carrier (including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title for the failure by a carrier (including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title to meet the terms of such agreement.

**(3) Business aircraft requirements**

**(A) In general**

For purposes of this section, a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations [1] that owns or operates a noncommercial aircraft is a corporation that is organized under the laws of any of the States of the United States or the District of Columbia and is accredited by or a member of a national organization that sets business aviation standards. The Secretary of Homeland Security shall prescribe by regulation the provision of such information as the Secretary of Homeland Security deems necessary to identify the domestic corporation, its officers, employees, shareholders, its place of business, and its business activities.

**(B) Collections**

Defendant's Exhibit AA
6:23-cv-00007

In addition to any other fee authorized by law, the Secretary of Homeland Security is authorized to charge and collect, on a periodic basis, an amount from each domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations, for nonimmigrant visa waiver admissions on noncommercial aircraft owned or operated by such domestic corporation equal to the total amount of fees assessed for issuance of nonimmigrant visa waiver arrival/departure forms at land border ports of entry. All fees collected under this paragraph shall be deposited into the Immigration User Fee Account established under section 1356(h) of this title.

**(f) Duration and termination of designation**

**(1) In general**

**(A) Determination and notification of disqualification rate**

Upon determination by the Secretary of Homeland Security that a program country's disqualification rate is 2 percent or more, the Secretary of Homeland Security shall notify the Secretary of State.

**(B) Probationary status**

If the program country's disqualification rate is greater than 2 percent but less than 3.5 percent, the Secretary of Homeland Security shall place the program country in probationary status for a period not to exceed 2 full fiscal years following the year in which the determination under subparagraph (A) is made.

**(C) Termination of designation**

Subject to paragraph (3), if the program country's disqualification rate is 3.5 percent or more, the Secretary of Homeland Security shall terminate the country's designation as a program country effective at the beginning of the second fiscal year following the fiscal year in which the determination under subparagraph (A) is made.

**(2) Termination of probationary status**

**(A) In general**

If the Secretary of Homeland Security determines at the end of the probationary period described in paragraph (1)(B) that the program country placed in probationary status under such paragraph has failed to develop a machine-readable passport program as required by section [2] (c)(2)(C), or has a disqualification rate of 2 percent or more, the Secretary of Homeland Security shall terminate the designation of the country as a program country. If the Secretary of Homeland Security determines that the program country has developed a machine-readable passport program and has a disqualification rate of less than 2 percent, the Secretary of Homeland Security shall redesignate the country as a program country.

**(B) Effective date**

Defendant's Exhibit AA
6:23-cv-00007

A termination of the designation of a country under subparagraph (A) shall take effect on the first day of the first fiscal year following the fiscal year in which the determination under such subparagraph is made. Until such date, nationals of the country shall remain eligible for a waiver under subsection (a).

**(3) Nonapplicability of certain provisions**

Paragraph (1)(C) shall not apply unless the total number of nationals of a program country described in paragraph (4)(A) exceeds 100.

**(4) "Disqualification rate" defined**

For purposes of this subsection, the term "disqualification rate" means the percentage which--

    **(A)** the total number of nationals of the program country who were--

        **(i)** denied admission at the time of arrival or withdrew their application for admission during the most recent fiscal year for which data are available; and

        **(ii)** admitted as nonimmigrant visitors during such fiscal year and who violated the terms of such admission; bears to

    **(B)** the total number of nationals of such country who applied for admission as nonimmigrant visitors during such fiscal year.

**(5) Failure to report passport thefts**

If the Secretary of Homeland Security and the Secretary of State jointly determine that the program country is not reporting the theft or loss of passports, as required by subsection (c)(2)(D), the Secretary of Homeland Security shall terminate the designation of the country as a program country.

**(6) Failure to share information**

    **(A) In general**

If the Secretary of Homeland Security and the Secretary of State jointly determine that the program country is not sharing information, as required by subsection (c)(2)(F), the Secretary of Homeland Security shall terminate the designation of the country as a program country.

    **(B) Redesignation**

In the case of a termination under this paragraph, the Secretary of Homeland Security shall redesignate the country as a program country, without regard to paragraph (2) or (3) of subsection (c) or paragraphs (1) through (4), when the Secretary

Defendant's Exhibit AA
6:23-cv-00007

of Homeland Security, in consultation with the Secretary of State, determines that the country is sharing information, as required by subsection (c)(2)(F).

**(7) Failure to screen**

**(A) In general**

Beginning on the date that is 270 days after December 18, 2015, if the Secretary of Homeland Security and the Secretary of State jointly determine that the program country is not conducting the screening required by subsection (c)(2)(G), the Secretary of Homeland Security shall terminate the designation of the country as a program country.

**(B) Redesignation**

In the case of a termination under this paragraph, the Secretary of Homeland Security shall redesignate the country as a program country, without regard to paragraph (2) or (3) of subsection (c) or paragraphs (1) through (4), when the Secretary of Homeland Security, in consultation with the Secretary of State, determines that the country is conducting the screening required by subsection (c)(2)(G).

**(g) Visa application sole method to dispute denial of waiver based on a ground of inadmissibility**

In the case of an alien denied a waiver under the program by reason of a ground of inadmissibility described in section 1182(a) of this title that is discovered at the time of the alien's application for the waiver or through the use of an automated electronic database required under subsection (a)(9), the alien may apply for a visa at an appropriate consular office outside the United States. There shall be no other means of administrative or judicial review of such a denial, and no court or person otherwise shall have jurisdiction to consider any claim attacking the validity of such a denial.

**(h) Use of information technology systems**

**(1) Automated entry-exit control system**

**(A) System**

Not later than October 1, 2001, the Secretary of Homeland Security shall develop and implement a fully automated entry and exit control system that will collect a record of arrival and departure for every alien who arrives and departs by sea or air at a port of entry into the United States and is provided a waiver under the program.

**(B) Requirements**

The system under subparagraph (A) shall satisfy the following requirements:

**(i) Data collection by carriers**

Defendant's Exhibit AA
6:23-cv-00007

Not later than October 1, 2001, the records of arrival and departure described in subparagraph (A) shall be based, to the maximum extent practicable, on passenger data collected and electronically transmitted to the automated entry and exit control system by each carrier that has an agreement under subsection (a)(4).

### (ii) Data provision by carriers

Not later than October 1, 2002, no waiver may be provided under this section to an alien arriving by sea or air at a port of entry into the United States on a carrier unless the carrier is electronically transmitting to the automated entry and exit control system passenger data determined by the Secretary of Homeland Security to be sufficient to permit the Secretary of Homeland Security to carry out this paragraph.

### (iii) Calculation

The system shall contain sufficient data to permit the Secretary of Homeland Security to calculate, for each program country and each fiscal year, the portion of nationals of that country who are described in subparagraph (A) and for whom no record of departure exists, expressed as a percentage of the total number of such nationals who are so described.

## (C) Reporting

### (i) Percentage of nationals lacking departure record

As part of the annual report required to be submitted under section 1365a(e)(1) of this title, the Secretary of Homeland Security shall include a section containing the calculation described in subparagraph (B)(iii) for each program country for the previous fiscal year, together with an analysis of that information.

### (ii) System effectiveness

Not later than December 31, 2004, the Secretary of Homeland Security shall submit a written report to the Committee on the Judiciary of the United States House of Representatives and of the Senate containing the following:

**(I)** The conclusions of the Secretary of Homeland Security regarding the effectiveness of the automated entry and exit control system to be developed and implemented under this paragraph.

**(II)** The recommendations of the Secretary of Homeland Security regarding the use of the calculation described in subparagraph (B)(iii) as a basis for evaluating whether to terminate or continue the designation of a country as a program country.

The report required by this clause may be combined with the annual report required to be submitted on that date under section 1365a(e)(1) of this title.

## (2) Automated data sharing system

### (A) System

Defendant's Exhibit AA
6:23-cv-00007

The Secretary of Homeland Security and the Secretary of State shall develop and implement an automated data sharing system that will permit them to share data in electronic form from their respective records systems regarding the admissibility of aliens who are nationals of a program country.

**(B) Requirements**

The system under subparagraph (A) shall satisfy the following requirements:

**(i) Supplying information to immigration officers conducting inspections at ports of entry**

Not later than October 1, 2002, the system shall enable immigration officers conducting inspections at ports of entry under section 1225 of this title to obtain from the system, with respect to aliens seeking a waiver under the program--

**(I)** any photograph of the alien that may be contained in the records of the Department of State or the Service; and

**(II)** information on whether the alien has ever been determined to be ineligible to receive a visa or ineligible to be admitted to the United States.

**(ii) Supplying photographs of inadmissible aliens**

The system shall permit the Secretary of Homeland Security electronically to obtain any photograph contained in the records of the Secretary of State pertaining to an alien who is a national of a program country and has been determined to be ineligible to receive a visa.

**(iii) Maintaining records on applications for admission**

The system shall maintain, for a minimum of 10 years, information about each application for admission made by an alien seeking a waiver under the program, including the following:

**(I)** The name or Service identification number of each immigration officer conducting the inspection of the alien at the port of entry.

**(II)** Any information described in clause (i) that is obtained from the system by any such officer.

**(III)** The results of the application.

**(3) Electronic system for travel authorization**

**(A) System**

Defendant's Exhibit AA
6:23-cv-00007

The Secretary of Homeland Security, in consultation with the Secretary of State, shall develop and implement a fully automated electronic system for travel authorization (referred to in this paragraph as the "System") to collect such biographical and other information as the Secretary of Homeland Security determines necessary to determine, in advance of travel, the eligibility of, and whether there exists a law enforcement or security risk in permitting, the [3] alien to travel to the United States.

**(B) Fees**

**(i) In general**

No later than 6 months after March 4, 2010, the Secretary of Homeland Security shall establish a fee for the use of the System and begin assessment and collection of that fee. The initial fee shall be the sum of--

  **(I)** $17 per travel authorization; and

  **(II)** an amount that will at least ensure recovery of the full costs of providing and administering the System, as determined by the Secretary.

**(ii) Disposition of amounts collected**

Amounts collected under clause (i)(I) shall be credited to the Travel Promotion Fund established by subsection (d) of section 2131 of Title 22. Amounts collected under clause (i)(II) shall be transferred to the general fund of the Treasury and made available to pay the costs incurred to administer the System.

**(iii) Sunset of Travel Promotion Fund fee**

The Secretary may not collect the fee authorized by clause (i)(I) for fiscal years beginning after October 31, 2028.

**(C) Validity**

**(i) Period**

The Secretary of Homeland Security, in consultation with the Secretary of State, shall prescribe regulations that provide for a period, not to exceed three years, during which a determination of eligibility to travel under the program will be valid. Notwithstanding any other provision under this section, the Secretary of Homeland Security may revoke any such determination or shorten the period of eligibility under any such determination at any time and for any reason.

**(ii) Limitation**

A determination by the Secretary of Homeland Security that an alien is eligible to travel to the United States under the program is not a determination that the alien is admissible to the United States.

Defendant's Exhibit AA
6:23-cv-00007

**(iii) Not a determination of visa eligibility**

A determination by the Secretary of Homeland Security that an alien who applied for authorization to travel to the United States through the System is not eligible to travel under the program is not a determination of eligibility for a visa to travel to the United States and shall not preclude the alien from applying for a visa.

**(iv) Judicial review**

Notwithstanding any other provision of law, no court shall have jurisdiction to review an eligibility determination under the System.

**(D) Fraud detection**

The Secretary of Homeland Security shall research opportunities to incorporate into the System technology that will detect and prevent fraud and deception in the System.

**(E) Additional and previous countries of citizenship**

The Secretary of Homeland Security shall collect from an applicant for admission pursuant to this section information on any additional or previous countries of citizenship of that applicant. The Secretary shall take any information so collected into account when making determinations as to the eligibility of the alien for admission pursuant to this section.

**(F) Report on certain limitations on travel**

Not later than 30 days after December 18, 2015, and annually thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the Committee on Homeland Security, the Committee on the Judiciary, and the Committee on Foreign Affairs of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs, the Committee on the Judiciary, and the Committee on Foreign Relations of the Senate a report on the number of individuals who were denied eligibility to travel under the program, or whose eligibility for such travel was revoked during the previous year, and the number of such individuals determined, in accordance with subsection (a)(6), to represent a threat to the national security of the United States, and shall include the country or countries of citizenship of each such individual.

**(i) Exit system**

**(1) In general**

Not later than one year after August 3, 2007, the Secretary of Homeland Security shall establish an exit system that records the departure on a flight leaving the United States of every alien participating in the visa waiver program established under this section.

**(2) System requirements**

Defendant's Exhibit AA
6:23-cv-00007

The system established under paragraph (1) shall--

(A) match biometric information of the alien against relevant watch lists and immigration information; and

(B) compare such biometric information against manifest information collected by air carriers on passengers departing the United States to confirm such aliens have departed the United States.

**(3) Report**

Not later than 180 days after August 3, 2007, the Secretary shall submit to Congress a report that describes--

(A) the progress made in developing and deploying the exit system established under this subsection; and

(B) the procedures by which the Secretary shall improve the method of calculating the rates of nonimmigrants who overstay their authorized period of stay in the United States.

<div align="center">

**CREDIT(S)**
</div>

(June 27, 1952, c. 477, Title II, c. 2, § 217, as added Pub.L. 99-603, Title III, § 313(a), Nov. 6, 1986, 100 Stat. 3435; amended Pub.L. 100-525, § 2(p)(1), (2), Oct. 24, 1988, 102 Stat. 2613; Pub.L. 101-649, Title II, § 201(a), Nov. 29, 1990, 104 Stat. 5012; Pub.L. 102-232, Title III, §§ 303(a)(1), (2), 307(l)(3), Dec. 12, 1991, 105 Stat. 1746, 1756; Pub.L. 103-415, § 1(m), Oct. 25, 1994, 108 Stat. 4301; Pub.L. 103-416, Title II, §§ 210, 211, Oct. 25, 1994, 108 Stat. 4312, 4313; Pub.L. 104-208, Div. C, Title III, § 308(d)(4)(F), (e)(9), Title VI, § 635(a) to (c)(1), (3), Sept. 30, 1996, 110 Stat. 3009-618, 3009-620, 3009-702, 3009-703; Pub.L. 105-119, Title I, § 125, Nov. 26, 1997, 111 Stat. 2471; Pub.L. 105-173, §§ 1, 3, Apr. 27, 1998, 112 Stat. 56; Pub.L. 106-396, Title I, § 101(a), Title II, §§ 201 to 207, Title IV, § 403(a) to (d), Oct. 30, 2000, 114 Stat. 1637 to 1644, 1647, 1648; Pub.L. 107-56, Title IV, § 417(c), (d), Oct. 26, 2001, 115 Stat. 355; Pub.L. 107-173, Title III, § 307(a), May 14, 2002, 116 Stat. 556; Pub.L. 110-53, Title VII, § 711(c), (d)(1), Aug. 3, 2007, 121 Stat. 339, 341; Pub.L. 111-145, § 9(h), formerly § 9(e), Mar. 4, 2010, 124 Stat. 62, renumbered Pub.L. 113-235, Div. B, Title VI, § 606(1), Dec. 16, 2014, 128 Stat. 2219; Pub.L. 111-198, § 5(a), July 2, 2010, 124 Stat. 1357; Pub.L. 113-235, Div. B, Title VI, § 605(b), Dec. 16, 2014, 128 Stat. 2219; Pub.L. 114-113, Div. O, Title II, §§ 202(a), (b), 203 to 205(a), 206, 207(a), 209, Dec. 18, 2015, 129 Stat. 2989 to 2995; Pub.L. 115-123, Div. C, Title II, § 30203(a), Feb. 9, 2018, 132 Stat. 126; Pub.L. 116-94, Div. I, Title VIII, § 806, Dec. 20, 2019, 133 Stat. 3029; Pub.L. 117-103, Div. EE, § 101, Mar. 15, 2022, 136 Stat. 1111.)

<div align="center">

**Footnotes**
</div>

1       So in original. Probably should be followed by a comma.

2   ·   So in original. Probably should be "subsection".

3       So in original. Probably should be "an".

8 U.S.C.A. § 1187, 8 USCA § 1187

Defendant's Exhibit AA
6:23-cv-00007

§ 1187. Visa waiver program for certain visitors, 8 USCA § 1187

Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works

Defendant's Exhibit AA
6:23-cv-00007

PUBLIC LAW 111–293—DEC. 9, 2010          124 STAT. 3175

Public Law 111–293
111th Congress

An Act

To provide for adjustment of status for certain Haitian orphans paroled into the United States after the earthquake of January 12, 2010.

Dec. 9, 2010
[H.R. 5283]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as—

(1) the "Help Haitian Adoptees Immediately to Integrate Act of 2010"; or

(2) the "Help HAITI Act of 2010".

Help Haitian
Adoptees
Immediately to
Integrate Act of
2010.
8 USC 1255 note.

**SEC. 2. ADJUSTMENT OF STATUS FOR CERTAIN HAITIAN ORPHANS.**

(a) IN GENERAL.—The Secretary of Homeland Security may adjust the status of an alien to that of an alien lawfully admitted for permanent residence if the alien—

(1) was inspected and granted parole into the United States pursuant to the humanitarian parole policy for certain Haitian orphans announced by the Secretary of Homeland Security on January 18, 2010, and suspended as to new applications on April 15, 2010;

(2) is physically present in the United States;

(3) is admissible to the United States as an immigrant, except as provided in subsection (c); and

(4) files an application for an adjustment of status under this section not later than 3 years after the date of the enactment of this Act.

Deadline.

(b) NUMERICAL LIMITATION.—The number of aliens who are granted the status of an alien lawfully admitted for permanent residence under this section shall not exceed 1400.

(c) GROUNDS OF INADMISSIBILITY.—Section 212(a)(7)(A) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(7)(A)) shall not apply to an alien seeking an adjustment of status under this section.

(d) VISA AVAILABILITY.—The Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.) for any alien granted the status of having been lawfully admitted for permanent residence under this section.

(e) ALIENS DEEMED TO MEET DEFINITION OF CHILD.—An unmarried alien described in subsection (a) who is under the age of 18 years shall be deemed to satisfy the requirements applicable to adopted children under section 101(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1101(b)(1)) if—

(1) the alien obtained adjustment of status under this section; and

(2) a citizen of the United States adopted the alien prior to, on, or after the date of the decision granting such adjustment of status.

(f) NO IMMIGRATION BENEFITS FOR BIRTH PARENTS.—No birth parent of an alien who obtains adjustment of status under this section shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this section or the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

## SEC. 3. COMPLIANCE WITH PAYGO.

The budgetary effects of this Act, for the purpose of complying with the Statutory Pay-As-You-Go-Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, submitted for printing in the Congressional Record by the Chairman of the Senate Budget Committee, provided that such statement has been submitted prior to the vote on passage.

Approved December 9, 2010.

---

LEGISLATIVE HISTORY—H.R. 5283:
CONGRESSIONAL RECORD, Vol. 156 (2010):
    July 20, considered and passed House.
    Aug. 4, considered and passed Senate, amended.
    Dec. 1, House concurred in Senate amendment.

○

Defendant's Exhibit BB
6:23-cv-00007

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

BILLING CODE 4410–10–P

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]

RIN 1615–ZA61

## Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:** Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

### I. Background

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter "Migration Accords")). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel

documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/ diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of "immediate relatives" (*e.g.,* spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

### II. The CFRP Program

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains,

however, a case-by-case, discretionary determination.

### III. Participation in the CFRP Program

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, "Petition for Alien Relative," that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

BILLING CODE 4410–10–P

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–5123–N–16]

## Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

Defendant's Exhibit CC
6:23-cv-00007

You are viewing:

# **ARCHIVED** CONTENT

·formation released online from January 20, 2009 to January 20, 2017.

**..OTE:** Content in this archive site is **NOT UPDATED**, and links may not function. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

<u>Go to the current State.gov website for up-to-date information. (http://www.state.gov/)</u>

# U.S. Department of State
## Diplomacy in Action

# Cuban Medical Professional Parole Program

Fact Sheet
BUREAU OF WESTERN HEMISPHERE AFFAIRS
January 26, 2009

On August 11, 2006, the Department of Homeland Security announced, in conjunction with the Department of State, that it would allow Cuban medical personnel conscripted to study or work in a third country under the.direction of the Cuban government to enter the United States. This program is known as the Cuban Medical Professional Parole (CMPP) Program.

**What is the statutory authority that allows the Department of Homeland Security to parole Cubans into the United States?** Within the Department of Homeland Security, United States Citizenship and Immigration Services (USCIS) may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole)

**How does a Cuban Medical Professional qualify for consideration of parole?** Cuban Medical Professionals must meet the following criteria:(1)must be a Cuban national or citizen, (2) must be a medical professional currently conscripted to study or work in a third country under the direction of the Government of Cuba, and (3) must not have any ineligibilities that would prevent admission into the United States.

**Who are Cuban Medical Professionals?** Cuban Medical Professionals are those health-care providers who are sent by the Castro regime to work or study in third countries. Under Cuban Resolution 54, these same Medical Professionals are often denied exit permission by the Cuban Government to come to the United States when they qualify under other established legal channels to migrate from Cuba. Doctors, nurses, paramedics, physical therapists, lab technicians and sports trainers are examples of groups that may qualify for the CMPP program.

**Are family members eligible to enter the United States under the CMPP?** The spouse and/or unmarried children accompanying the primary applicant in the third country may also be considered for parole at the same time the CMPP .application is being made. An approved CMPP applicant in the United States may file an application with USCIS to permit 
3 or her spouse and/or unmarried children to enter the United States.

**What should interested persons be required to submit?** Interested persons will be required to submit Department of State Forms DS-156, DS-157, DS-158 and a USCIS questionnaire. In addition, applicants will be required to submit to a

Defendant's Exhibit DD
6:23-cv-00007

consular officer at an Embassy or Consulate overseas proof of nationality, proof of their profession and evidence of their conscription. If there is a USCIS office in the third country, the applicant must submit the documentation to that office. Adjudication of the parole request by USCIS may take up to four to six weeks. In some cases, adjudication of the CMPP application may take longer depending on completion of security checks. If approved, travel costs and arrangements (including obtaining exit visas from any third country) are the responsibility of the CMPP applicant.

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

 U.S. Embassy in Cuba

# Cuban Family Reunification Parole (CFRP) Program

1. Applying

2. Appointments

3. Interview Documents

4. Interview

5. Expedited Requests

6. Fees

7. Appeals

---

> *The State Department and the Department of Homeland Security are determining arrangements for processing applications under the Cuban Family Reunification Parole Program (CFRP). Due to staff reductions at the U.S. Embassy in Havana, Cuba, USCIS has suspended operations at its field office in Havana. Inquiries about the parole program and can be made to Havanauscis@dhs.gov or by calling 1-800-375-5283 toll free from the United States. Callers outside the United States may call the USCIS Field Office in Mexico City at +52-55-5080-2000.*

Created in 2007, the CFRP program allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Cuba. If granted parole, these family members may come to the United States without waiting for their immigrant visa priority dates to become current. Once in the United States, CFRP program beneficiaries may apply for work authorization while they wait to apply for lawful permanent resident status.

Visit the USCIS website for information about CFRP eligibility and application procedures.

---

# Next
Applying

8/3/23, 12:40 PM                          Cuban Family Reunification Parole (CFRP) Program - U.S. Embassy in Cuba

This is the official website of the U.S. Embassy in Cuba. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.



Federal Register / Vol. 84, No. 170 / Tuesday, September 3, 2019 / Notices     **46029**

(Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.]

Pete Gaynor,

*Acting Administrator, Federal Emergency Management Agency.*

[FR Doc. 2019–18879 Filed 8–30–19; 8:45 am]

BILLING CODE 9111–23–P

---

# DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4438–DR; Docket ID FEMA–2019–0001]

## Oklahoma; Amendment No. 8 to Notice of a Major Disaster Declaration

AGENCY: Federal Emergency Management Agency, DHS.

ACTION: Notice.

SUMMARY: This notice amends the notice of a major disaster declaration for the State of Oklahoma (FEMA–4438–DR), dated June 1, 2019, and related determinations.

DATES: This amendment was issued August 13, 2019.

FOR FURTHER INFORMATION CONTACT: Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

SUPPLEMENTARY INFORMATION: The notice of a major disaster declaration for the State of Oklahoma is hereby amended to include the following areas among those areas determined to have been adversely affected by the event declared a major disaster by the President in his declaration of June 1, 2019.

Tillman County for Public Assistance [Categories A–G], including direct federal assistance, under the Public Assistance program.

Okmulgee and Ottawa Counties for Public Assistance [Categories A–G], including direct federal assistance, under the Public Assistance program (already designated for Individual Assistance).

Noble County for Public Assistance [Categories A–G] (already designated for Individual Assistance and assistance for emergency protective measures [Category B], limited to direct federal assistance under the Public assistance program).

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049,

Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050 Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

Pete Gaynor,

*Acting Administrator, Federal Emergency Management Agency.*

[FR Doc. 2019–18885 Filed 8–30–19; 8:45 am]

BILLING CODE 9111–23–P

---

# DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

[Internal Agency Docket No. FEMA–4420–DR; Docket ID FEMA–2019–0001]

## Nebraska; Amendment No. 10 to Notice of a Major Disaster Declaration

AGENCY: Federal Emergency Management Agency, DHS.

ACTION: Notice.

SUMMARY: This notice amends the notice of a major disaster declaration for the State of Nebraska (FEMA–4420–DR), dated March 21, 2019, and related determinations.

DATES: This amendment was issued August 13, 2019.

FOR FURTHER INFORMATION CONTACT: Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

SUPPLEMENTARY INFORMATION: The notice of a major disaster declaration for the State of Nebraska is hereby amended to include the following area among those areas determined to have been adversely affected by the event declared a major disaster by the President in his declaration of March 21, 2019.

Dawson County for Individual Assistance (already designated for Public Assistance).

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050 Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance

(Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

Pete Gaynor,

*Acting Administrator, Federal Emergency Management Agency.*

[FR Doc. 2019–18887 Filed 8–30–19; 8:45 am]

BILLING CODE 9111–23–P

---

# DEPARTMENT OF HOMELAND SECURITY

## Rescission of Discretionary Parole Policies Relating to Nationals of the Russian Federation Seeking Entry Into Guam and/or the Commonwealth of the Northern Mariana Islands for a Temporary Visit for Business or Pleasure

AGENCY: Department of Homeland Security.

ACTION: Notice.

SUMMARY: Under discretionary parole policies, Department of Homeland Security (DHS) has granted parole on a case-by-case basis to nationals of the Russian Federation (Russia) to enter Guam and the Commonwealth of the Northern Mariana Islands (CNMI) for temporary visits for business or pleasure for up to 45 days provided the traveler meets certain conditions. DHS is publishing this notice to announce to the public that it plans to end this discretionary parole policy. This discretionary change in policy does not preclude affected individuals from applying for parole, which DHS will grant on a case-by-case basis only where the applicant demonstrates an urgent humanitarian or a significant public benefit reason for parole and the applicant merits a favorable exercise of discretion.

DATES: DHS will be ending these uses of its discretionary parole authority as of October 3, 2019.

FOR FURTHER INFORMATION CONTACT: Michael T. Dougherty, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445.

SUPPLEMENTARY INFORMATION:

### Background

On October 21, 2009, former Secretary of Homeland Security Janet Napolitano announced that, effective November 28, 2009, DHS would favorably consider, on a case-by-case basis, requests for discretionary parole into the CNMI from eligible nationals of Russia who are temporary visitors for business or pleasure. Effective January 15, 2012, this policy was extended to Russian visitors to Guam.

Defendant's Exhibit FF
6:23-cv-00007

Secretary Napolitano justified this exercise of parole based on her discretionary parole authority and the authority to administer the Nation's immigration laws. *See* Immigration and Nationality Act, as amended (INA) secs. 103(a), 212(d)(5); 8 U.S.C. 1103(a), 1182(d)(5). Although parole is an authorized entry into the United States, it does not constitute an admission to the United States. INA secs. 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A). Parole may be granted to an alien, regardless of her or his inadmissibility, as a matter of discretion "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

Under the 2009 and 2012 discretionary parole policies, nationals of Russia may be allowed to enter Guam and the CNMI and to travel between Guam and the CNMI, visa-free for a period of stay up to 45 days, provided the traveler meets certain conditions. Pursuant to these policies, nationals of Russia seeking entry are required to: (i) Possess a valid, unexpired machine-readable passport; (ii) not have previously violated the terms of any prior travel to the United States; and (iii) present a valid completed CBP Form I–94, Arrival/Departure Record and Form I–736, Guam-CNMI Visa Waiver Information. Visitors who are paroled under this authority may not engage in local employment or labor for hire. Parole authorization is limited to Guam and the CNMI only and does not permit travel to another location within the United States.

After careful consideration, and consistent with the President's directive in Executive Order (E.O.) 13767 of January 25, 2017, *Border Security and Immigration Enforcement Improvements,* 82 FR 8793 (Jan. 30, 2017), as well as authorities under the Consolidated Natural Resources Act of 2008 (CNRA), Public Law 110–229, which, among other things, established the Guam-CNMI Visa Waiver Program (GCVWP), the Secretary of Homeland Security has decided to terminate the 2009 and 2012 policies concerning the exercise of discretionary parole authority for Russian nationals.

In Executive Order 13767, the President directed the Secretary of Homeland Security to "take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole."

Pursuant to E.O. 13767, the Secretary has reviewed this use of discretionary parole authority and concluded that the policy should be terminated, for numerous reasons, effective October 3, 2019. The previous announcement allowing for parole effectively has invited nationals of Russia to seek parole to visit Guam and the CNMI rather than having them obtain visas. The policy broadly announced to this population that a visitor visa would not be required to travel to Guam and the CNMI if the alien met the specified requirements. Under this policy, the parole authority effectively has been used as a substitute for the visa process.

Moreover, the Guam-CNMI parole policy for Russian nationals was designed as a temporary measure to support tourism in Guam and the CNMI while allowing for due consideration of Russia as a potential participating country under the GCVWP. *See* INA sec. 212(l)(3), 8 U.S.C. 1182(l)(3). In the nearly 10-year period since the parole policies were announced, Russia has not been considered eligible for the GCVWP.

And the parole authority has been exercised far too expansively than originally intended. For Guam, parole accounted for approximately 99 percent of all Russian visitors in 2012 and 85 percent of all Russian visitors in 2017. Similarly, parole accounted for approximately 90 percent of all Russian visitors to the CNMI in 2010 and 82 percent of all Russian visitors in 2017.

Since the 2012 expansion of the discretionary parole authority for Russian nationals seeking entry into Guam, overstays increased from 26 in FY 2012 to 147 in FY 2017, or by 465 percent. While this represents a relatively small percentage of overall Russian visitors in the CNMI and Guam, the increase in overstays is in and of itself a security concern for DHS.

*Benefits of Requiring Nonimmigrant Visas*

Discontinuing discretionary parole and requiring Russian nationals to obtain a visa to visit the United States for business or pleasure enhances U.S. safety and national security because it requires visa applicants to be screened by the U.S. Department of State. As a result, these visa applicants generally will undergo advance screening and recurrent vetting that includes an in-person visa interview. The perceived negative economic impact of discontinuing discretionary parole Russian nationals in the CNMI and Guam would be offset by admission of

the availability of traditional B–1 visas for business and B–2 visas for pleasure. Currently, the vast majority of applications by Russian nationals for B–1/B–2 visas are approved. If admitted in B–1 or B–2 status, individuals generally will be afforded an authorized period of stay of approximately 180 days—four times longer than the current 45-day cap under the more restrictive parole authority.

DHS acknowledges that certain businesses in Guam and the CNMI may have been formed in reliance on commerce and tourism arising out of this parole policy and could be negatively impacted by its termination. Likewise, Russian nationals may have developed business or personal connections to Guam or the CNMI pursuant to the policy and may be inconvenienced by its termination. DHS believes, however, that any such impacts should be largely mitigated by the fact that bona fide visitors for business or pleasure from Russia generally would be able to obtain a visa to allow them to visit Guam or the CNMI. To the extent that travelers from Russia are deterred from travel to Guam and the CNMI due to the visa requirement, however, DHS believes that the security, immigration, and border management interests of the United States outweigh the potential economic or personal interests that may be adversely affected.

**Notice of Rescission of Discretionary Parole Policy Relating to Nationals of Russia Seeking Entry Into Guam and/or the CNMI for a Temporary Visit for Business or Pleasure**

This notice announces to the public that as of October 3, 2019, DHS rescinds its policy relating to the exercise of its discretionary parole authority for nationals of Russia who are seeking entry into Guam or the CNMI solely for a temporary visit for business or pleasure.

As of October 3, 2019, CBP will no longer give favorable consideration to parole requests simply because the individual is a national of Russia seeking to enter CNMI or Guam for tourism or a business visit. Individuals who have already been paroled into Guam and/or the CNMI will maintain parole until the expiration of that parole period unless there are other grounds for parole termination consistent with DHS regulations at 8 CFR 212.5(e).

As of October 3, 2019, nationals from Russia traveling to Guam and/or the CNMI for a temporary visit for business or pleasure should consider seeking a B–1 or B–2 nonimmigrant visa from a

Defendant's Exhibit FF
6:23-cv-00007

U.S. Embassy or Consulate, prior to their travel to Guam.

This discretionary change in policy does not preclude affected individuals from applying for parole by filing USCIS Form I–131, Application for Travel Document, consistent with the instructions for that form. In accordance with section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)), parole will only be issued on a case-by-case basis and only where the applicant demonstrates an urgent humanitarian or a significant public benefit reason for parole and that applicant merits a favorable exercise of discretion. Any alien may request parole to travel to the United States, but an alien does not have a right to parole.

**Kevin K. McAleenan,**

*Acting Secretary.*

[FR Doc. 2019–18841 Filed 8–30–19; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

[FWS–R8–ES–2019–N079;
FXES11140800000–190–FF08ECAR00]

**Receipt of Incidental Take Permit Application and Proposed Habitat Conservation Plan for the San Bernardino Kangaroo Rat, City of Highland, San Bernardino County, CA; Categorical Exclusion**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of availability; request for comments and information.

**SUMMARY:** We, the Fish and Wildlife Service (Service), announce receipt of an application from the City of Highland (applicant) for an incidental take permit (ITP) under the Endangered Species Act. The applicant requests the ITP to take the federally endangered San Bernardino kangaroo rat incidental to construction in San Bernardino County, California. We request public comment on the application, which includes the applicant's proposed habitat conservation plan (HCP) and the Service's preliminary determination that this HCP qualifies as "low-effect," categorically excluded under the National Environmental Policy Act. To make this determination, we used our environmental action statement and low-effect screening form, which is also available for review.

**DATES:** We must receive your written comments on or before October 3, 2019.

**ADDRESSES:**

*Obtaining Documents:* You may obtain copies of the documents by the following methods:

• *Internet: https://www.fws.gov/ carlsbad/HCPs/HCP_Docs.html.*
• *Telephone:* 760–322–2070.
• *U.S. Mail:* Attn: Assistant Field Supervisor, Palm Springs Fish and Wildlife Office, U.S. Fish and Wildlife Service, 777 East Tahquitz Canyon Way, Suite 208, Palm Springs, CA 92262.
• *In-Person:* You may examine the documents by appointment during regular business hours at the Palm Springs Fish and Wildlife Office (address above). Please call to make an appointment (see **FOR FURTHER INFORMATION CONTACT**).

*Submitting Comments:* If you wish to submit comments on any of the documents, you may do so in writing by any of the following methods:

• *Online: https://www.fws.gov/ carlsbad/HCPs/HCP_Docs.html.*
• *Email: fw8cfwocomments@fws.gov.*
• *U.S. mail or hand-delivery:* Palm Springs Fish and Wildlife Office (address above).
• *Fax:* 760–322–4648.

**FOR FURTHER INFORMATION CONTACT:** Karin Cleary-Rose, by telephone at 760–322–2070, ext. 406, via email at *karin_cleary-rose@fws.gov*, or via the Federal Relay Service at 800–877–8339.

**SUPPLEMENTARY INFORMATION:** We, the Fish and Wildlife Service (Service), announce receipt of an application from the City of Highland, California (applicant), for an incidental take permit (ITP) under the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et seq.*). The applicant requests an ITP to take the federally endangered San Bernardino kangaroo rat (*Dipodomys merriami parvus*) incidental to the construction of a storm drain outlet (project) in San Bernardino County, California. We request public comment on the application, which includes the applicant's proposed habitat conservation plan (HCP) and the Service's preliminary determination that the HCP qualifies as "low-effect," categorically excluded under the National Environmental Policy Act (NEPA; 42 U.S.C. 4321 *et seq.*). To make this determination, we used our environmental action statement and low-effect screening form, which is also available for public review.

**Project**

The applicant requests a 5-year ITP to take the San Bernardino kangaroo rat (SBKR) incidental to the temporary impact of 0.10 acres (ac) of occupied SBKR foraging and sheltering habitat for the construction of storm drain outlet

located on a 21-ac parcel, Assessor's Parcel Numbers 1201–321–36 and 1201–311–01, in Sections 4, Township 1 South, Range 3 West, San Bernardino County, California. The applicant proposes to mitigate for take of the SBKR through (1) relocation of all SBKR captured on the project area by live-trapping and release into pre-established artificial burrows immediately outside of the project area and (2) restoration and/or enhancement of 0.14 ac of SBKR habitat on the project site.

**Public Availability of Comments**

Before including your address, phone number, email address, or other personal identifying information in your comment, be aware that your entire comment—including your personal identifying information—may be made available to the public. While you may request that we withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

**Our Preliminary Determination**

The Service has made a preliminary determination that the applicant's project, including land clearing, infrastructure building, and the proposed mitigation and minimization measures, would individually and cumulatively have a minor or negligible effect on the SBKR and the environment. Therefore, we have preliminarily concluded that the ITP for this project would qualify for categorical exclusion and the HCP is low effect under our NEPA regulations at 43 CFR 46.205 and 46. 210. A low-effect HCP is one that would result in (1) minor or negligible effects on federally listed, proposed, and candidate species and their habitats; (2) minor or negligible effects on other environmental values or resources; and (3) impacts that, when considered together with the impacts of other past, present, and reasonably foreseeable similarly situated projects, would not over time result in significant cumulative effects to environmental values or resources.

**Next Steps**

The Service will evaluate the application and the comments received to determine whether to issue the requested permit. We will also conduct an intra-Service consultation pursuant to section 7 of the ESA to evaluate the effects of the proposed take. After considering the above findings, we will determine whether the permit issuance criteria of section 10(a)(1)(B) of the ESA have been met. If met, the Service will issue the permit to the City of Highland.

Defendant's Exhibit FF
6:23-cv-00007

80 STAT. ]        PUBLIC LAW 89-732–NOV. 2, 1966        1161

Public Law 89-732

## AN ACT

To adjust the status of Cuban refugees to that of lawful permanent residents of the United States, and for other purposes.

November 2, 1966
[H. R. 15183]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, notwithstanding the provisions of section 245(c) of the Immigration and Nationality Act, the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence. Upon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later. The provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States.

Cuban refugees.
Adjustment of status.
79 Stat. 919.
8 USC 1255.

SEC. 2. In the case of any alien described in section 1 of this Act who, prior to the effective date thereof, has been lawfully admitted into the United States for permanent residence, the Attorney General shall, upon application, record his admission for permanent residence as of the date the alien originally arrived in the United States as a nonimmigrant or as a parolee, or a date thirty months prior to the date of enactment of this Act, whichever date is later.

SEC. 3. Section 13 of the Act entitled "An Act to amend the Immigration and Nationality Act, and for other purposes", approved October 3, 1965 (Public Law 89-236), is amended by adding at the end thereof the following new subsection:

8 USC 1255.

"(c) Nothing contained in subsection (b) of this section shall be construed to affect the validity of any application for adjustment under section 245 filed with the Attorney General prior to December 1, 1965, which would have been valid on that date; but as to all such applications the statutes or parts of statutes repealed or amended by this Act are, unless otherwise specifically provided therein, continued in force and effect."

SEC. 4. Except as otherwise specifically provided in this Act, the definitions contained in section 101(a) and (b) of the Immigration and Nationality Act shall apply in the administration of this Act. Nothing contained in this Act shall be held to repeal, amend, alter, modify, affect, or restrict the powers, duties, functions, or authority of the Attorney General in the administration and enforcement of the Immigration and Nationality Act or any other law relating to immigration, nationality, or naturalization.

8 USC 1101.

Approved November 2, 1966.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.* ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Case No. 6:23-cv-00007 |
| ) | |
| DEPARTMENT OF HOMELAND ) | |
| SECURITY, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge and documents and information made known or available to me from official

records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Assistant Secretary for Border and Immigration Policy with the U.S.

Department of Homeland Security ("DHS") and have served in this role since March 26, 2023. I

previously served as the Acting Assistant Secretary for Border and Immigration Policy since

October 1, 2021.  Prior to this acting role, I served as the Chief Operating Officer for U.S.

Customs and Border Protection ("CBP"), a DHS component, since March 5, 2021. In a prior

administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil

Kerlikowske, from January 12, 2015 to January 16, 2017.

2.      This Declaration pertains to four parole processes that fall within DHS authority:

Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022);[1]

---

[1] *See also* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

1

Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023);[2]

Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); and

Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023).[3]

**Background**

3.      Economic and political instability around the world is fueling the highest levels

of migration since World War II, testing the immigration systems of many nations, including

our own.  This challenge is compounded by the fact that DHS is operating within a broken and

outdated immigration and asylum system that was not built to handle the shifting

demographics being encountered at the border today.

4.      Over the last two years, DHS has responded to increases in migration at the

Southwest Border ("SWB") that have at times strained DHS's operational capacity.  These

increases, or surges, have been driven, in large part, by a significant increase in migration

from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV")—countries that DHS has never

encountered at these levels in its history.  This increase has been especially challenging

because nationals from CHNV countries are difficult for DHS to remove to their home

countries.

5.      In response, DHS has implemented innovative processes that seek to

disincentivize unlawful and unauthorized entries at the SWB by pairing a consequence—

namely, return or removal to Mexico—with a substantial incentive to use lawful, safe, and

orderly pathways and processes to come directly to the United States.[4]  These measures have

---

[2] *See also* Implementation of a Change to the Parole Process for Haitians, 88 Fed. Reg. 26,327 (Apr. 28, 2023).
[3] *See also* Implementation of a Change to the Parole Process for Cubans, 88 Fed. Reg. 26,329 (Apr. 28, 2023).
[4] Consequences are, by themselves, not sufficient to deter irregular migration.  Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States.  To be effective, the consequences applied must be paired with incentives for migrants to use lawful processes.  Thus, DHS has overseen a historic increase in access to lawful processes for migrants to come to the United States in a safe,

2

worked.  Encounters of CHNV nationals have, as detailed below, decreased significantly since

DHS implemented the process for Venezuelans in October 2022 and processes for Cubans,

Haitians, and Venezuelans in January 2023 (collectively, "CHNV processes").  This decrease

in encounters has occurred despite the fact that the underlying conditions driving migration

from these four countries have not changed.  As detailed more fully below, conditional

releases[5] of CHNV nationals into the United States have also declined significantly as a result

of these processes.

6.      The CHNV processes are dependent on the Government of Mexico's

willingness to accept the return at the SWB of CHNV nationals who do not avail themselves

of these lawful, safe, and orderly pathways and processes to come directly to the United

States.  At the processes' inception, these returns took place under the Centers for Disease

Control and Prevention's ("CDC") Title 42 public health Order, which DHS was required to

implement at the land border on behalf of the CDC.  In recognition of the significant reduction

in irregular migration as a result of the CHNV processes, and to ensure that they continued

after Title 42 ended, on May 2, 2023, the Government of Mexico announced[6] it would

continue to accept returns or removals of CHNV nationals encountered at the SWB under

---

orderly, and lawful manner.  But similarly, incentives without consequences are insufficient to deter irregular
migration—they must go hand-in-hand. This is why DHS has implemented, for example, the CHNV processes.
[5] For the purpose of this declaration, a "conditional release" refers to the fact that noncitizens released from DHS
custody are subject to strict conditions, with limited exceptions.  Individuals who are released from DHS custody
and issued a Notice to Appear are required to appear before an immigration judge for their removal
proceedings.  Individuals who were encountered between ports of entry and released via parole are required to
request a charging document by mail or to report to an U.S. Immigration and Customs Enforcement facility in order
to be issued a charging document, as appropriate, with limited exceptions.  The discussion of conditional release
numbers in this document refers to noncitizens who were encountered after crossing unlawfully between ports of
entry, or without authorization at a port of entry.
[6] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023),
https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-
joint-humanitarian-plan-on-migration/; U.S. Dep't of Homeland Sec., *DHS and DOJ Finalize Rule to Incentivize
Use of Lawful Immigration Pathways* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/dhs-and-doj-finalize-
rule-incentivize-use-lawful-immigration-pathways.

3

Title 8 authorities. This is the first time in the bilateral history of the United States and Mexico that the Government of Mexico is allowing the United States to systematically return or remove non-Mexican nationals at the border.

7.      The Government of Mexico has made clear that its willingness to continue to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States. In other words, if DHS cannot provide lawful processes for some CHNV nationals to come directly to the United States, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the SWB. DHS expects, in turn, that without both the incentives *and* disincentives associated with the CHNV processes that have led individuals from those countries to wait for lawful, safe and orderly pathways and processes to come to the United States, there will be another increase in migration at the SWB—the precise outcome that Plaintiffs allegedly seek to avoid.

**Increase in Migration Driven by CHNV Nationals**

8.      Surges in migration and encounters at the SWB have occurred during the last three Administrations under Presidents of both parties. In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017. This followed decades during which annual encounters routinely numbered in the millions.[7] Even during this period of relatively low encounters at the border, however, DHS experienced surges of unaccompanied children in 2014 and families in 2016 that significantly strained its operations given the unique vulnerabilities of those demographics. Between 2017 and 2019, encounters along the SWB more

---

[7] From 1980 – 2006, the USBP averaged 1.14 million encounters per year along the SW Border, exceeding one million encounters in 19 out of those 27 years.

Defendant's Exhibit HH
6:23-cv-00007

than doubled, and—following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world—continued to increase in 2021 and 2022.

9.      In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s with U.S. Border Patrol ("USBP") making 1.7 million encounters.  Encounters of CHNV nationals increased throughout FY 2021, totaling 181,264 compared to an average of 6,409 total encounters in the pre-pandemic period (FY 2014– FY 2019).  USBP encounters of CHNV nationals more than doubled from February (6,225) to March (13,016) and continued to rise through the end of the fiscal year, averaging more than 24,000 a month from March to October.

10.      In FY 2022, DHS reached a high-water mark for encounters at the SWB, with total USBP encounters exceeding 2.2 million.  The continued surge in migration from CHNV nationals accounted for most of the increase in encounters from FY 2021 to FY 2022.[8] Encounters of CHNV nationals more than tripled from 184,716 in FY 2021 to 626,410 in FY 2022, comprising 26 percent of overall FY 2022 encounters and 35 percent of unique[9] FY 2022 encounters.  In fact, in FY 2022, unique encounters of CHNV nationals exceeded unique encounters of Mexican nationals, as well as nationals of El Salvador, Guatemala, and Honduras, for the first time in history.

**Difficulties in Removing CHNV Nationals**

11.      The ability to impose consequences on those who do not establish a legal basis to remain the United States is a key tenet of the U.S. immigration system.  The U.S. immigration system has limited enforcement options available for noncitizens who are ordered removed but

---

[8] USBP encounters of CHNV nationals increased by 441,694 between FY 2021 and 2022, versus an increase of 202,568 for all other nationalities combined.
[9] The term "unique" is meant to distinguish between "repeat" encounters of the same noncitizen.

5

Defendant's Exhibit HH
6:23-cv-00007

come from countries whose governments do not abide by international law and do not accept the timely return of their nationals.

12.     DHS's ability to remove CHNV nationals to their home countries under Title 8 authorities is generally limited, just as it was while the CDC's Title 42 public health Order was in effect.  Venezuela currently does not allow repatriations via charter flights, which significantly limits DHS's ability to remove Venezuelan nationals.  Nicaragua currently allows only one charter removal flight every 15 days, equivalent to two percent of Nicaraguan encounters in FY 2022.  And while DHS has recently restarted removal flights to Cuba, conducting a flight on April 24, 2023, and another on May 10, 2023—following a pause in operations since February 2020 as a result of the COVID-19 pandemic—the cadence and volume at which DHS can facilitate such removals would not keep pace with the number of Cuban nationals DHS has encountered at times.  While DHS can operate removal flights to Haiti, the precarious security situation on the ground there, including the security situation at the airport, has at times raised operational challenges in doing so.

13.     In FY 2022, despite best efforts, DHS removed, returned, or expelled to their home countries (under Title 8 and Title 42 authorities) a total of 176 Cubans, 3,024 Nicaraguans, 987 Venezuelans, and 18,449 Haitians—or 0.1 percent of Cuban encounters, 1.8 percent of Nicaraguan encounters, 0.5 percent of Venezuelan encounters, and 34 percent of Haitian encounters.[10]  This means that, prior to the implementation of the CHNV processes and Mexico's independent decision to accept the return of nationals from these countries at the SWB under Title 42, the vast majority of CHNV nationals (i.e., 96 percent in FY 2022) could not be

---

[10] Data in this paragraph include Title 42 expulsions to home countries and all Title 8 removals and returns.  A portion of Title 8 removals and returns may have been returned to points of embarkation rather than to home countries, in which case the total number of repatriations to home countries was even lower than the rates reported here.

6

expelled under the Title 42 public health Order and were instead generally excepted from the

Order and processed pursuant to Title 8.

14.     Additionally, because of the difficulties in removing CHNV nationals, CHNV

nationals typically have not been processed for expedited removal—the main consequence

available to DHS under Title 8 authorities at the border.  Instead, CHNV nationals processed

under Title 8 authorities were generally either placed in removal proceedings under section 240

of the Immigration and Nationality Act ("INA") and conditionally released with a Notice to

Appear ("NTA"), or, prior to March 8, 2023, when certain thresholds were met, conditionally

released and required to report to U.S. Immigration and Customs Enforcement pending the

issuance of an appropriate charging document on Parole plus Alternatives to Detention

("P+ATD"), or on May 10 and 11, 2023, conditionally released and required to schedule an

appointment with ICE or request service of an NTA by mail for on Parole with Conditions

("PWC").

15.     As a result of these factors—the inability to expel or remove CHNV nationals

from the United States, and legal restrictions on DHS's ability to detain noncitizens where a

removal is not feasible in the reasonably foreseeable future—DHS conditionally released most

noncitizens who were encountered.  Of the approximately 113,229 Venezuelan nationals

encountered at the SWB in the five-plus months between May 1 and October 17—just before the

Venezuela process went into effect—approximately 99,055 (87 percent) were conditionally

released.  Together, CHNV nationals accounted for 354,177 conditional releases in the months

leading up to the Venezuelan parole process, 73 percent of the total during this period of

486,436.  By comparison, countries whose nationals DHS can more effectively return, either to

their country of origin or to Mexico, have a much lower rate of conditional release.  In the same

7

time period, just 9 percent of conditional releases were of nationals of Mexico or Northern

Central America (18,384 Mexicans, 16,784 Hondurans, 5,044 El Salvadorans, and 4,187

Guatemalans). Similarly, in the five-plus months between August 1, 2022 and January 5, 2023,

when the Venezuelan process was expanded into the CHNV processes, approximately 280,238

out of 305,458 CHN encounters (92 percent) were conditionally released, with CHNV countries

together accounting for 57 percent of the total of 619,113 during that period.

16.    This reality is why the CHNV processes are critical to DHS's ability to effectively

manage migratory flows from these countries. The CHNV processes, which have provided a

lawful means for nationals of these countries to come to the United States, and Mexico's

independent decision to accept the return of nationals from these countries at the SWB under

Title 42, and now Title 8, as a result, fundamentally changed migratory flows not just to the

United States, but throughout the region.

**The CHNV Processes**

17.    The CHNV processes provide a lawful and streamlined way for qualifying

nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States,

without making the dangerous journey to the border. Through a fully online process, individuals

can seek advance authorization to travel to the United States and be considered, on a case-by-

case basis, for a temporary grant of parole for up to two years, as well as employment

authorization, provided that they: pass rigorous biometric and biographic national security and

public safety screening and vetting; have a supporter in the United States who commits to

providing financial and other support; and complete vaccinations and other public health

requirements. As described above, implementation of the CHNV processes is contingent on

Mexico accepting the return or removal to Mexico of CHNV nationals seeking to enter the

Defendant's Exhibit HH
6:23-cv-00007

United States without authorization at the SWB.

**a.      The Venezuela Process Immediately Reduced Irregular Migration**

18.      On October 12, 2022, DHS announced coordinated enforcement actions with the Government of Mexico to effectively reduce the number of noncitizens arriving at the SWB and simultaneously establish a more orderly and safe process for nationals of Venezuela.[11]  The Venezuela process was specifically designed to disincentivize Venezuelan nationals from making the dangerous journey to the SWB by imposing significant consequences for those who chose not to avail themselves of the lawful process.[12]  Namely, the Government of Mexico made an independent decision to accept the return of Venezuelan nationals to Mexico at the border, initially under the Title 42 public health Order, and later under Title 8.

19.      To participate in this process, nationals of Venezuela must have a financial supporter in the United States, meet established eligibility criteria, pass rigorous biometric and biographic national security and public safety screening and vetting, and arrange their own air travel to a domestic airport in the United States.  The process was specifically designed to relieve the strain on DHS frontline resources and border communities of irregular arrivals at the border by requiring Venezuelans who receive travel authorization to fly to an interior port of entry to be considered for a grant of parole on a case-by-case basis.  It also disincentivizes Venezuelans from putting their lives in the hands of smuggling organizations who are looking to exploit them for profit.

20.      The Venezuela process delivered results immediately, fundamentally changing

---

[11] Gov't of Mexico, *Mexico is Coordinating With the US a New Approach to Orderly, Safe, and Humane Migration in the Region* (Oct. 12, 2022), https://www.gob.mx/sre/prensa/mexico-is-coordinating-with-the-us-a-new-approach-to-orderly-safe-regular-and-humane-migration-in-the-region?idiom=en.

[12] Building upon the success of the Uniting for Ukraine parole process, which significantly decreased flows of Ukrainian nationals at the SWB following Russia's invasion of Ukraine, DHS established a similar parole process for nationals of Venezuela and their qualifying immediate family members to come to the United States in a safe, orderly, and lawful manner.

Defendant's Exhibit HH
6:23-cv-00007

the migratory patterns of Venezuelan nationals. Prior to the October 12 announcement, DHS was encountering an average of 1,100 Venezuelan nationals a day along the SWB and the Government of Panama was encountering almost 4,000 Venezuelans a day on its border with Colombia.[13] Within a week of the announcement of the Venezuelan process on October 12, 2022, the number of Venezuelans encountered at the SWB fell sharply, from an average of over 1,100 a day from October 5–11 to under 200 per day from October 18–24, and further declined to 67 per day as of the week ending November 29, 2022, and 28 per day the week ending January 22, 2023.

21.     Venezuelan arrivals to Panama similarly decreased. From January through October 2022, the Government of Panama encountered 211,355 irregular migrants having crossed through the Darién Gap—a dangerous 100-kilometer stretch of inhospitable and dense jungle between Colombia and Panama, which is particularly notorious for the violence of the human smugglers operating in lawless stretches of jungle—with 59,773 migrants crossing into Panama irregularly via the Darién Gap in October 2022 alone, a sharp increase compared to the 4,702 migrants encountered in January 2022. Of the 59,773, Venezuelan nationals comprised 40,593, or 68 percent of total irregular migrants reported in October. Following the October DHS announcement of the Venezuelan parole process, the number of Venezuelans attempting to enter Panama through the Darién Gap fell substantially to just 668 in November and have generally continued at significantly lower levels.

22.     DHS acknowledges, however, that from mid-April until the Title 42 public health Order ended on May 12, there was a temporary increase in encounters of Venezuelan nationals at the SWB. Notably, during this same period, encounters of Cubans, Haitians, and Nicaraguans

---

[13] República de Panamá, Panamá Migración, *Irregulares en Tránsito Frontera Panamá—Colombia 2022*, https://www.migracion.gob.pa/inicio/estadisticas.

Defendant's Exhibit HH
6:23-cv-00007

remained low. The increase in Venezuelan migration experienced in early May can likely be
attributed to a number of factors, including: misinformation campaigns by smugglers, the
aftermath of the fire in a Mexican government facility that killed a number of Venezuelan
migrants in March and impacted enforcement efforts in Mexico, and the limited number of
available CBP One appointments to present at a port of entry to seek an exception from the Title
42 public health Order while it was in effect.[14]

23.     After the end of the Title 42 public health Order, however, and the imposition of
stiffened consequences for irregular migration in place at the land border as a result of the return
to processing all noncitizens under Title 8 authorities—including a new condition on asylum
eligibility, at least a five-year bar on admission to the United States, and the potential for
criminal prosecution for repeat illegal entries—as well as the continuing expansion of lawful
processes for noncitizens to access the United States, encounters of Venezuelan migrants
between ports of entry once again significantly declined.

**b.      Expansion of Processes to Include Nationals of Cuba, Haiti, and
Nicaragua Have Led to Similar Decreases in Irregular Migration**

24.     On January 5, 2023, building upon the success of the process for Venezuelans,
DHS established similar processes for eligible nationals of Cuba, Haiti, and Nicaragua, and their
immediate family members who have a U.S.-based supporter and pass national security and
public safety vetting to seek advance authorization to travel to the United States and be
considered, on a case-by-case basis, for a temporary grant of parole for up to two years. Once
paroled into the United States, noncitizens are eligible to apply for employment authorization to
work legally throughout the duration of their parole.

---

[14] Nicole Acevedo & Albinson Linares, *Misinformation Fuels False Hopes Among Migrants after Deadly Fire in
Mexico,* NBC News, Mar. 30, 2023, https://www.nbcnews.com/news/latino/misinformation-fuels-false-hopes-
migrants-mexico-fire-rcna77398.

11

Defendant's Exhibit HH
6:23-cv-00007

25.     This announcement again coupled a lawful, safe, and orderly process for such

nationals to seek parole in the United States with consequences—in the form of returns to

Mexico—for those who nonetheless crossed the SWB unlawfully or without authorization. This

was again made possible by the Government of Mexico's independent decision to begin

accepting returns of nationals from Cuba, Haiti, and Nicaragua—and their continued acceptance

of Venezuelan nationals—expelled under the Title 42 public health order.

26.     As was the case following the implementation of the parole process for

Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between

ports of entry dropped significantly after DHS introduced the new processes, from a seven-day

average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven-

day average of 205 just two weeks later. The reduction occurred even as encounters of other

noncitizens began to rebound from their typical seasonal drop and represented a significant

decline of 94 percent from the peak CHNV encounters of 3,644 on December 10, 2022.

c.      **The CHNV Processes Free Up Limited DHS Resources**

27.     The positive impacts of these processes are felt in numerous ways, particularly

along the SWB. The CHNV processes enhance security by allowing DHS to vet individuals

from those countries who seek to come the United States before they travel. Through the CHNV

screening and vetting processes, noncitizens who could pose threats to national security or public

safety are identified earlier in the processes—that is, before they arrive at a port of entry—and

can be denied authorization to travel to the United States. Noncitizens who wish to travel to the

United States to seek parole under these processes are required to submit to DHS certain

biographic information and a live facial photograph. The information submitted is vetted against

national security and public safety systems at DHS and other federal agencies to identify

12

Defendant's Exhibit HH
6:23-cv-00007

noncitizens who may pose a threat.

28.     After receiving advance authorization to travel to the United States to seek parole, noncitizens are required to arrange their own air travel to an interior port of entry as opposed to seeking entry at a land port of entry along the SWB.  DHS deliberately required participants to travel to an interior port of entry to avoid negatively impacting DHS operations at the SWB.  The significant reduction in encounters of CHNV nationals along the SWB has allowed DHS has to free up resources to focus on other critical aspects of the DHS mission, including allowing more frontline CBP personnel to return to their primary border security mission.  This is because, during previous increases in CHNV encounters at the SWB, CBP had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions.  This, in turn, decreased CBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.

**d.     The CHNV Processes Significantly Reduced Border Releases**

29.     The CHNV processes did not just significantly reduce encounters at the border—they also significantly reduced conditional releases of CHNV nationals into border communities. In the five-plus months prior to the implementation of the CHNV processes, DHS conditionally released 2,356 CHNV noncitizens encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day.  Since the CHNV processes were implemented, conditional releases of CHNV nationals declined by 90 percent to 239 per day.[15]

30.     In the five-plus months prior to the Venezuela process being implemented in October 2022, CBP conditionally released an average of 583 Venezuelans encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day at the

---

[15] For the purpose of this analysis, the pre-Venezuelan process is defined as May 1 – October 17, 2022, and the post-implementation period is defined as October 18, 2022 – May 31, 2023.

Defendant's Exhibit HH
6:23-cv-00007

border. By contrast, in the seven-plus months following implementation of the process, DHS conditionally released 208 such Venezuelans per day, a decrease of 64 percent.

31. Implementation of the CHNV processes had an even larger impact on conditional releases of Cubans, Haitians, and Nicaraguans. In the five-plus months prior to the implementation of the processes for those countries in January 2023, CBP conditionally released an average of 1,774 nationals of these three countries encountered between ports of entry, or at ports of entry not using CBP One per day. In the nearly five months following implementation of the CHN processes CBP conditionally released an average of just 32 per day, a 98 percent reduction.[16]

**e.    The CHNV Processes Provide a Safe, Orderly, and Lawful Option**

32. A key component of DHS's strategy for managing migratory flows is to provide expanded access to safe, orderly, and lawful pathways and processes for individuals who are seeking protection, or opportunity, in the United States—even as DHS is committed to imposing consequences on those who cross the border unlawfully between POEs, or without authorization at POEs.

33. As part of the CHNV processes, DHS has, after a case-by-case determination by an officer at an air port of entry, allowed 43,823 Venezuelan nationals and 86,995 Cubans, Haitians, and Nicaraguans, who have passed rigorous national security and public safety vetting, and who have financial supporters who have committed to providing whatever support is

---

[16] As a result of the measures taken by DHS arrivals of noncitizens from CHNV countries have decreased significantly. As noted above, conditional releases of CHNV nationals crossing unlawfully between POEs, or without authorization at POEs, fell from 2,356 per day in the months before the parole processes were implemented to 239 per day in the months following their implementation, a 90 percent reduction. Accounting for individuals who came to the United States through a safe, orderly process—either because they are processed at a POE after making an appointment through the CBP One application (297 per day), or because they are granted a case-by-case determination of parole through the CHNV processes (791 per day)—total CHNV arrivals fell to approximately 1,326 per day, a 44 percent reduction from their pre-CHNV process levels (Note that these numbers may not add due to rounding).

Defendant's Exhibit HH
6:23-cv-00007

required, to enter the United States in a safe and orderly manner—an average of 791 each day.[17]

DHS has also permitted 22,398 Venezuelans, and 28,756 Cubans, Haitians, and Nicaraguans,

who may wish to claim asylum to enter the United States to schedule an appointment via the

CBP One app to be processed at a land border port of entry—an average of 297 a day since the

implementation of the CHNV processes.[18]

### f.    The CHNV Processes Are Reducing the Impact to Communities

34.   Prior to the implementation of these processes, local officials and non-

governmental organization ("NGO") partners alike reported concerns that shelters established to

house noncitizens and provide support would soon reach full bed space capacity,[19] effectively

limiting key services to support noncitizens once they were processed out of DHS custody.[20]

The sharp decrease in conditional releases of CHNV nationals at the border has helped mitigate

many of these challenges.

35.   Additionally, DHS deliberately designed the CHNV processes to require a U.S.-

based supporter to attest and provide financial responsibility for a potential beneficiary of the

processes.  Supporters must agree to provide financial and other support as needed to

beneficiaries, further reducing the possibility that these noncitizens may need to rely on public

assistance and pose a burden to communities across the United States.  Moreover, upon arrival to

the United States, CHNV nationals are immediately eligible to request employment authorization

by filing a Form I-765, Application for Employment Authorization, with U.S. Citizenship and

---

[17] Data is current through May 31, 2023.

[18] Data is current through May 31, 2023.

[19] Raquel Torres, *Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[20] Denelle Confair, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day*, KGUN 9 Tucson (Sept. 23, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

Defendant's Exhibit HH
6:23-cv-00007

Immigration Services ("USCIS") to legally work throughout the duration of their parole period. USCIS has generally processed these applications within weeks of receipt, allowing for CHNV nationals to begin employment and contributing to the economy.

**g.    The Government of Mexico is Unlikely to Accept Returns if the CHNV Processes are Enjoined**

36.    DHS's implementation of these processes relies on enforcement actions that serve as a deterrent to migrants who are thinking of making the dangerous journey to the SWB— something that, prior to the CHNV processes, was challenging.  Cooperation and coordination with the Government of Mexico has been a critical component of these efforts, given the difficulties DHS has returning CHNV nationals to their home countries.  As noted above, Mexico announced on May 2, 2023 that it would accept the return or removal of CHNV nationals at the SWB from the United States under Title 8 processes—the first time in United States and Mexico's bilateral history that the Government of Mexico has indicated its willingness to accept the systemic removal of third country nationals at the border.[21]

37.    The CHNV processes are also directly responsive to requests made by the Government of Mexico and other key foreign partners throughout the hemisphere to address irregular migration through shared responsibilities and require close coordination between foreign governments to successfully implement.  This collaborative approach further aligns with U.S. commitments outlined by three policy-setting documents: U.S. Strategy for Addressing the Root Causes of Migration in Central America ("Root Causes Strategy"); the Collaborative Migration Management Strategy ("CMMS"); and the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was endorsed in June 2022 by 21 countries.

---

[21] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration*, May 2, 2023. www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration.

Defendant's Exhibit HH
6:23-cv-00007

38.     The Government of Mexico has also made clear its willingness to accept returns or removals of CHNV nationals encountered at the SWB is contingent on the United States providing lawful processes for nationals of these countries to come to the United States without needing to make the dangerous journey to cross unlawfully between ports of entry, or without authorization at ports of entry.  As discussed above, if the United States is unable to provide lawful processes for CHNV nationals to come to the United States, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the border.  Given DHS's continuing inability to repatriate nationals of these countries in large numbers to their home countries, the large number of CHNV nationals currently in Mexico—estimated at more than 100,000, and the well-worn paths from their home countries to the border, this, in turn, will likely result in a surge of migration from these countries.

### h.     Stopping the CHNV Processes Will Lead to a Surge in CHNV Migrants at the Southwest Border

39.     The data presented here show that migrants who are presented with a lawful and orderly option to come to the United States are more inclined to avail themselves of these safer options and far less inclined to place their lives in the hands of smugglers who exploit them for profit to cross unlawfully at the SWB.  This assessment is informed by compelling evidence over the past year that combining effective disincentives for migrants to cross unlawfully between ports of entry, or without authorization at ports of entry, with incentives for migrants to use safe, orderly processes can meaningfully shift migration patterns in the region and to the SWB.

40.     If these lawful processes are unavailable, as noted above, DHS expects that Mexico will be unlikely to accept the return of CHNV nationals at the border.  This will lead to two interconnected outcomes. First, because there will no longer be lawful process for CHNV nationals to come to the United States or a meaningful consequence that can be rapidly applied at

17

the border to those who do not establish a legal basis to remain in the United States, there will likely be a surge in encounters of CHNV nationals crossing unlawfully at the SWB between ports of entry, or without authorization at a port of entry. Second, this surge would, in turn, significantly increase the number of CHNV nationals that would be conditionally released into the United States because of DHS's continuing difficulty in removing those who do not establish a legal basis to remain in the United States to their home countries.

41.    The ability to quickly apply consequences at the border—the very thing that the existence of these processes permits—is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit.[22]  These criminal organizations intentionally twist information about U.S. immigration policy for the express purposes of encouraging would-be migrants to use their services—services that regularly result in tragedy.  Because profit is the motivating factor, criminal organizations have no qualms when it comes to exploiting migrants through false promises—particularly when there are changes in the United States' immigration policy or border operations.  This familiar pattern was seen in the weeks leading up to the lifting of Title 42.

42.    DHS relies on and works closely with its foreign partners to manage migration throughout the region.  The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—something that is reflected by the intensive diplomatic efforts that DHS and the Department of State have been

---

[22] *See* U.S. Dep't of Justice, Press Release, *Defendants Indicted in Tractor Trailer Smuggling Incident That Resulted in 53 Deaths* (July 20, 2022), https://www.justice.gov/usao-wdtx/pr/defendants-indicted-tractor-trailer-smuggling-incident-resulted-53-deaths; U.S. Dep't of Justice, Press Release, *Cuban National Sentenced to Over 38 Years in Prison for Drug Trafficking and Other Crimes after Using His Border Ranch as a Criminal Corridor* (Mar. 9, 2022), https://www.justice.gov/usao-wdtx/pr/cuban-national-sentenced-over-38-years-prison-drug-trafficking-and-other-crimes-after.

18

making to engage with partners throughout the Western Hemisphere. Regional partner countries have encouraged and supported DHS's approach to address irregular migration through the application of disincentives for unlawful entry—through increased enforcement and consequences—coupled with incentives to provide intending migrants with expanded lawful pathways and processes, including humanitarian protection, innovative parole processes, and labor migration.

43.     Regional partner countries have repeatedly expressed concerns about the ways in which recent migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries. Following the development of the enforcement process for Venezuelans announced in October 2022, regional partners urged the United States to continue building on this approach, which couples processes for noncitizens to find protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes. But the lawful processes and regional protection mechanisms by themselves are not sufficient, as described above—DHS's ability to implement its border-management strategy is predicated on its ability to impose consequences on those who do not take advantage of lawful processes to access opportunity and protection in the United States.

44.     Thus, in seeking to prevent DHS from operating these processes, which will likely result in another increase in migration from these countries, Plaintiffs are undermining DHS's efforts to work with foreign partners to collectively address the challenges we face from CHNV migration.

19

Defendant's Exhibit HH
6:23-cv-00007

**The CHNV Processes, Like Prior Parole Processes, are a Critical Tool in the Executive Branch's Foreign Policy Toolbox**

45.     Parole has long been understood as a tool that provides the U.S. Government with flexibility to address emergent situations, many of which have foreign policy implications. DHS's implementation of the CHNV processes is not so different from many historical exercises of parole authority, both pre-Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") and post-IIRIRA.[23] Early historical examples of the U.S. Government's exercise of parole authority include, in 1956 and 1957, the parole of 31,915 Hungarian nationals who were fleeing revolution and unrest.[24] In the early 1960s, the United States paroled approximately 5,000 refugees into the country under the Fair Share Refugee Act of July 14, 1960.[25] In May 1962, the United States implemented the Hong Kong Parole Program, which allowed for the parole of approximately 15,000 Chinese refugees.[26] In fiscal year 1972, the United States paroled 17,109 Cubans into the country via airlift.[27] From 1975 to 1979, the United States paroled nearly 360,000 nationals from Vietnam, Cambodia, and Laos who were fleeing years of military and political conflict.[28]

46.     More recent examples of the U.S. Government's exercise of parole authority include the Cuban Family Reunification Parole ("CFRP") process. This parole process was established in 2007, in part, due to the U.S. Coast Guard's increased interdictions of Cuban

---

[23] The Illegal Immigration Reform and Immigration Responsibility Act of 1996 replaced the original 1952 parole language, "for emergent reasons or for reasons deemed strictly in the public interest," with the current language specifying "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163, 188 (1952).

[24] *Annual Report of the Immigration and Naturalization Service* (June 30, 1958).

[25] U.S. Citizenship and Immigration Services, *Refugee Timeline* (Feb. 7, 2023), https://www.uscis.gov/about-us/our-history/history-office-and-library/featured-stories-from-the-uscis-history-office-and-library/refugee-timeline#:~:text=In%20recognition%2C%20Congress%20passed%20the,two%20years%20in%20the%20U.S.

[26] *Id.*

[27] American Immigration Counsel, *Executive Grants of Temporary Immigration Relief 1956 to Present* (Oct. 2014).

[28] *Id.*

Defendant's Exhibit HH
6:23-cv-00007

nationals. CFRP, much like the CHNV processes, was implemented to disincentivize Cuban nationals from undertaking dangerous maritime crossings and to meet the U.S. Government's commitment on legal Cuban migration levels under the 1994 U.S.-Cuban Migration Agreement. The Haitian Family Reunification Parole ("HFRP") process was similarly implemented in 2015 to "provid[e] the opportunity for certain eligible Haitians to safely and legally immigrate sooner to the United States."[29]

47.     The Uniting for Ukraine ("U4U") process, established in April 2022, was put in place in the wake of Russia's unprovoked invasion of Ukraine that caused thousands of Ukrainian migrants to spontaneously arrive at SWB ports of entry. Like the CHNV processes, U4U allowed U.S.-based financial supporters to file applications on behalf of Ukrainian nationals who, after they passed the requisite national security and public safety vetting, were allowed to travel directly to the United States to be considered, on a case-by-case basis, for parole upon their arrival. Once U4U was implemented, unauthorized arrivals of Ukrainians at the SWB fell sharply as Ukrainians seeking to come to the United States utilized a safe and orderly process to do so.[30]

48.     As noted above, the CHNV processes were implemented in close coordination with the Government of Mexico and are responsive to requests from regional partner countries to help manage irregular migration in the Western Hemisphere and to create lawful pathways for intending migrants. Promoting a safe, orderly, legal, and humane migration strategy throughout

---

[29] Remarks of Deputy Secretary of Homeland Security Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Press Release, *DHS To Implement Haitian Family Reunification Parole Program* (Oct. 14, 2014).

[30] CBP encountered an average of 938 Ukrainians nationals per day in the two weeks prior to the announcement of the U4U Process on April 20, 2022. After U4U launched and Ukrainian citizens with advance travel authorization were provided the option to fly directly into the United States—coupled with the application of the Title 42 public health Order to Ukrainians who sought to cross at the land border—by May 10, 2022 daily SWB encounters of Ukrainians dropped to a two-week average of just twelve per day, a drop of 99 percent.

21

the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America; the Collaborative Migration Management Strategy; and the Los Angeles Declaration on Migration and Protection, which was endorsed in June 2022 by 21 countries.

49.     The Collaborative Migration Management Strategy and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the Western Hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."

50.     In support of these goals, the United States and other regional partner countries have undertaken several efforts to provide humanitarian assistance and stabilization to nationals of CHNV countries, among other initiatives. To stabilize displaced populations throughout the Western Hemisphere, Colombia continues to implement temporary protected status for Venezuelans, and Costa Rica plans to renew temporary protection for Cubans, Nicaraguans, and Venezuelans. On June 1, 2022, the Government of Ecuador authorized a second regularization process for certain Venezuelans, thereby providing certain Venezuelans a two-year temporary residency visa. On June 10, 2022, the U.S. Department of State and the U.S. Agency for International Development ("USAID") announced $314 million in new funding for humanitarian

22

and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region. And on September 22, 2022, the United States, through USAID, announced nearly $376 million in additional humanitarian assistance which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region, further contributing to stabilizations to address humanitarian crisis in the region. Canada is also investing nearly $27 million in migration and protection-related capacity building in the Americas. The United States, Canada, Guatemala, and Mexico also are working together to build circular and seasonal lawful labor and protection pathways, including allocating a certain number of temporary work visas for certain countries in the region.

51.     The CHNV processes have allowed the United States to lead by example as it continues to urge other governments to take affirmative steps to tackle irregular migration and provide much needed humanitarian relief. These processes have been a critical foreign policy tool that demonstrates the U.S. Government's commitment to meeting the goals laid out in the Los Angeles Declaration and provides proof of the U.S. Government's willingness to share in the burden of responding to the migratory challenges posed by nationals of these countries—challenges that confront the entire region.

**Conclusion**

52.     The CHNV processes' combination of an incentive for noncitizens to use lawful, safe, and orderly pathways and processes to come to the United States, with significant consequences at the border for those who cross unlawfully, or without authorization, has worked. The CHNV processes have successfully changed migratory flows from these four countries, not

23

just at our shared border with Mexico, but throughout the region. These processes have significantly reduced encounters along the SWB, allowing frontline DHS personnel to return to their primary border security missions. They have significantly reduced conditional releases of CHNV nationals at the SWB, relieving the pressure on local communities and NGOs. And they have provided lawful processes for noncitizens from those four countries to come to the United States in a safe and orderly manner, undermining the pernicious criminal organizations that put migrant lives at risk for profit.

53.     If DHS cannot continue to provide lawful processes for CHNV nationals to come directly to the United States, Mexico will almost certainly no longer accept the removal of those who do not establish a legal basis to remain in the United States at the border. Given the continuing difficulty that the United States has in effectuating removals of CHNV nationals to their home countries, DHS anticipates that the lack of lawful processes or meaningful consequence will once again lead to a surge in migration from CHNV nationals. If Plaintiffs succeed in this litigation, they will likely achieve the exact opposite of what they claim to want—a sharp increase in encounters at the SWB and conditional releases of CHNV nationals into border communities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 20th day of June, 2023.



Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security

24

Defendant's Exhibit HH
6:23-cv-00007

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | Case No. 6:23-cv-00007 |
| DEPARTMENT OF HOMELAND SECURITY, *et al.,* | ) ) ) | |
| *Defendants.* | ) ) | |

## DECLARATION OF BLAS NUÑEZ-NETO

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge and documents and information made known or available to me from official

records and reasonably relied upon in the course of my employment, hereby declare as follows:

   1.    I am the Assistant Secretary for Border and Immigration Policy with the U.S.

Department of Homeland Security ("DHS") and have served in this role since March 26, 2023. I

am also the Acting Assistant Secretary for International Affairs and have served in this role since

June 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration

Policy since October 1, 2021. Prior to this acting role, I served as the Chief Operating Officer

for U.S. Customs and Border Protection ("CBP"), a DHS component, since March 5, 2021. In a

prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil

Kerlikowske, from January 12, 2015 to January 16, 2017.

   2.    This declaration supplements my previous declaration, dated June 20, 2023,

submitted in this case.

3.   Paragraph 17 of the June 20, 2023 declaration is supplemented as follows: The CHNV processes provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without making the dangerous journey to the border.  Through a fully online process, individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, as well as employment authorization, provided that they: pass rigorous biometric and biographic national security and public safety screening and vetting; have a supporter in the United States who commits to providing financial and other support; and complete vaccinations and other public health requirements.  Parole is granted by CBP at the port of entry on an individualized, case-by-case basis.   CBP has, when making this determination, denied parole for noncitizens who traveled with advance travel authorization pursuant to the CHNV process.  In July 2023, DHS added a new question to the supporter form for the CHNV process:  "A grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Please explain why a favorable exercise of discretion is merited for this individual."  USCIS personnel and CBP Office of Field Operations officers have access to the response to this question to inform their decision making.  Additionally, as described above, implementation of the CHNV processes is contingent on Mexico accepting the return or removal to Mexico of CHNV nationals seeking to enter the United States without authorization at the SWB.

4.   Paragraph 29 of the June 20, 2023 declaration is supplemented as follows: The CHNV processes did not just significantly reduce encounters at the border—they also significantly reduced conditional releases of CHNV nationals into border communities.  In the five-plus months prior to the implementation of the CHNV processes, DHS conditionally

released 2,356 CHNV noncitizens encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day. Since the CHNV processes were implemented, conditional releases of CHNV nationals declined by 90 percent to 245 per day.[1]

5.      Paragraph 30 of the June 20, 2023 declaration is supplemented as follows: In the five-plus months prior to the Venezuela process being implemented in October 2022, CBP conditionally released an average of 583 Venezuelans encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day at the border. By contrast, in the eight-plus months following implementation of the process, DHS conditionally released 217 such Venezuelans per day, a decrease of 63 percent.

6.      Paragraph 31 of the June 20, 2023 declaration is supplemented as follows: Implementation of the CHNV processes had an even larger impact on conditional releases of Cubans, Haitians, and Nicaraguans. In the five-plus months prior to the implementation of the processes for those countries in January 2023, CBP conditionally released an average of 1,774 nationals of these three countries encountered between ports of entry, or at ports of entry not using CBP One per day. In the nearly six months following implementation of the CHN processes CBP conditionally released an average of just 28 per day, a 98 percent reduction.[2]

7.      Paragraph 33 of the June 20, 2023 declaration is supplemented as follows: As part

---

[1] For the purpose of this analysis, the pre-CHNV process is defined as May 1 – October 17, 2022 for Venezuelans and August 1, 2022 – January 5, 2023 for Cubans, Haitians, and Nicaraguans; and the post-implementation period is defined as October 18, 2022 – June 30, 2023 for Venezuelans and as January 6 – June 30, 3023 for Cubans, Haitians, and Nicaraguans.

[2] As a result of the measures taken by DHS arrivals of noncitizens from CHNV countries have decreased significantly. As noted above, conditional releases of CHNV nationals crossing unlawfully between POEs, or without authorization at POEs, fell from 2,356 per day in the months before the parole processes were implemented to 245 per day in the months following their implementation, a 90 percent reduction. Accounting for individuals who came to the United States through a safe, orderly process—either because they are processed at a POE after making an appointment through the CBP One application (333 per day), or because they are granted a case-by-case determination of parole through the CHNV processes (823 per day)—total CHNV arrivals fell to approximately 1,401 per day, a 41 percent reduction from their pre-CHNV process levels (Note that these numbers may not add due to rounding).

of the CHNV processes, DHS has, after a case-by-case determination by an officer at an air port

of entry, allowed 50,345 Venezuelan nationals and 110,312 Cubans, Haitians, and Nicaraguans,

who have passed rigorous national security and public safety vetting, and who have financial

supporters who have committed to providing whatever support is required, to enter the United

States in a safe and orderly manner—an average of 823 each day.[3]  DHS has also permitted

29,114 Venezuelans, and 38,535 Cubans, Haitians, and Nicaraguans, who may wish to claim

asylum to enter the United States to schedule an appointment via the CBP One app to be

processed at a land border port of entry—an average of 333 a day since the implementation of

the CHNV processes.[4]


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.  Executed on this 11th day of August, 2023.

Blas Nuñez-Neto
Assistant Secretary, Border and Immigration Policy
(A) Assistant Secretary, International Affairs
U.S. Department of Homeland Security

---

[3] Data is for October 18, 2022 - June 30, 2023 for Venezuelans and for January 6 – June 30, 2023 for Cubans, Haitians, and Nicaraguans.
[4] Data is current through June 30, 2023.