

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton<br><br>**EXPERT   DECLARATION   OF LEIGHTON KU** |
| *Plaintiffs,* | § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | § § § § § § § § § § § | |

|  | § |
| --- | --- |
| *Defendants*, and | § |
|  | § |
| VALERIE LAVEUS; FRANCIS ARAUZ; | § |
| PAUL ZITO; ERIC SYPE; KATE | § |
| SUGARMAN; NAN LANGOWITZ; and | § |
| GERMAN CADENAS, | § |
|  | § |
| *Intervenors.* | § |

## EXPERT DECLARATION OF LEIGHTON KU

LEIGHTON KU declares pursuant to 28 U.S.C. § 1746:

1.   I have personal knowledge of and could testify in Court concerning the following statements of fact.

2.   I am a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University, in Washington, DC.  I have attached my Curriculum Vitae as Exhibit A to this Declaration.

3.   I am a nationally known health policy researcher with over twenty-five years of experience.  I have conducted substantial research about immigrant health and about health care and costs.  I have authored or co-authored more than a dozen articles and reports about immigrant health issues, including articles in peer-reviewed journals such as Health Affairs and American Journal of Public Health, as well as scholarly reports published by diverse non-profit organizations including the Social Science Research Network, the Migration Policy Institute, the Cato Institute and the Commonwealth Fund.  I have testified before the U.S. Senate Finance

Committee about immigrant health issues and provided analyses and advice on immigrant health to various state governments and non-governmental organizations.

4.      I have expertise in health and public policy and in quantitative and economic data analysis. I have conducted quantitative analyses for most of my career, including analyses for a federal agency, two think tanks, and now at a university. I have taught statistical analysis and research methods at the graduate school level for over twenty-five years, training hundreds of graduate students. I have authored or co-authored more than 100 papers in peer-reviewed journals and hundreds of other reports, most of which were quantitative analyses. I have consulted with the Congressional Budget Office and numerous federal and state agencies.

5.      I have served as a health expert in various immigration-related federal court cases. I provided an expert declaration about the effects of terminating Deferred Action for Childhood Arrivals on health insurance coverage and states in *State of New York, et al. v Trump, et al.*[1] in November 2017 and in *State of Texas v. United States, et al. and Karla Perez, et al.* in June 2018.[2] In September 2019, I provided three versions of an expert declaration regarding public health effects of the Department of Homeland Security's "public charge" rule in *La Clinica de la Raza, et al. v Donald Trump, et al.*, in the U.S. District Court, Northern District of California, *Make the Road, et al. v Kenneth Cucinelli, et al.* and in *State of New York, et al. v U.S. Department of Homeland Security* in the U.S. District Court, Southern District of New York. In May 2020, I provided an expert declaration on the impact of paid leave amid the coronavirus pandemic in *State of New York v. U.S. Dep't of Labor, et al.*[3] On July 29, 2020, I provided an expert declaration in

---

[1] Declaration of Leighton Ku in *State of New York, et al. v Donald Trump, et al.* in U.S. District Court for the Eastern District of New York, Nov. 22, 2017.
[2] Declaration of Leighton Ku in *State of Texas v. United States of America, et al. and Karla Perez, et al., Defendant-Intervenor* in U.S. District Court for the Southern District of Texas, Brownsville Division, June 14, 2018.
[3] Declaration of Leighton Ku in *State of New York v. U.S. Dep't of Labor et al.* in U.S. District Court for the Eastern District of New York, May 5, 2020.

*Domingo Gomez v. Donald J. Trump* (regarding a Presidential Proclamation about limiting entry of immigrants in light of COVID-19 pandemic) in the U.S. District Court, District of Columbia.[4] On September 1, 2020, I wrote an expert declaration in *State of New York v. Donald J. Trump* (regarding health harm of postal service delays) in the U.S. District Court, District of Columbia.[5] I have not provided testimony in any other court cases in the past four years.

6.      I also have knowledge of health insurance and employment through my role as a voluntary (unpaid, appointed) Executive Board member for the District of Columbia's Health Benefits Exchange Authority, which governs the District's health insurance marketplace formed under the federal ACA. This includes oversight of health insurance for small businesses as well as individual health insurance in the District of Columbia.

7.      I have a PhD. in Health Policy from Boston University (1990) and Master of Public Health and Master of Science degrees from the University of California at Berkeley (1979). Prior to becoming a faculty member at George Washington University, I was on the staff of the Urban Institute and the Center on Budget and Policy Priorities.

8. I have been engaged by counsel for the Intervenors in this case to evaluate certain assertions made by the Plaintiff States in *Texas v. Department of Homeland Security*, filed in the Southern District of Texas, Victoria Division, on January 24, 2023. The lawsuit challenges four new humanitarian parole programs, announced and implemented at the beginning of this year, which allow U.S. citizens and other residents with lawful status to sponsor nationals of Cuba, Haiti, Nicaragua, and Venezuela, for advance authorization to travel to the United States, and to be considered for temporary parole and employment authorization for up to two years. *See, e.g.,*

---

[4] Declaration of Leighton Ku in *Gomez v. Trump* in U.S. District Court for the District of Columbia, July 31, 2020.
[5] Declaration of Leighton Ku in *State of New York v. Donald J. Trump*, in U.S. District Court for the District of Columbia, Sept. 1, 2020.

Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1246 (Jan. 9, 2023). I have

agreed to receive payment in the amount of $1,500 total to compensate for my expert analysis.

**Plaintiff States' Claims Regarding Health Harm Posed by the New Parole Policy**

9.      In their Motion for Preliminary Injunction (filed Feb. 14, 2023) the Plaintiff

States assert that Texas sustains harms because it "funds three healthcare programs that require

significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family

Violence Program, and the Texas Children's Health Insurance Program" (page 12).   They also

assert that "Texas also incurs costs for uncompensated care provided by state public hospital

districts to illegal aliens" (page 12).   More detailed information was provided in a declaration

from Ms. Susan Bricker, a manager at the Texas Health and Human Services Commission (signed

Jan. 7, 2023, Exhibit E filed by the States) who addressed expenses borne by Texas for care

provided by undocumented immigrants.   I have also reviewed a number of documents submitted

by the Plaintiff States that appear to be additional documentation for Ms. Bricker's declaration,

contained in a file called "Custodian-HHSC docs.zip." These are mostly repetitive documents

related to declarations submitted by other Texas officials between 2019 and 2021, similar in nature

to Ms. Bricker's declaration.

10.      First of all, it is important to note that the Biden Administration's parole

policy concerns granting temporary legal status under a two-year parole to specified classes of

immigrants from Cuba, Haiti, Nicaragua and Venezuela, who: (1) have supporters in the U.S. who

agree to be financially responsible for the parolees, (2) undergo security vetting, (3) meet other

eligibility criteria such as medical testing, and (4) warrant a favorable exercise of discretion. Since

the policy provides for temporary legal status, the States' concerns about undocumented or illegal

immigrants are irrelevant.   The parolee status means they have legal status and are not

undocumented.  In addition, the parolees are far fewer in number than the number of undocumented immigrants and have different characteristics, so the information is not applicable to this case.

      11.    A new affidavit by Ms. Bricker, entitled "Exhibit 7" and dated May 30, 2023, provides more information about the state's estimates of costs of care for undocumented immigrants and also details information about emergency Medicaid and CHIP-Perinatal costs specifically for non-citizens from Cuba, Haiti, Nicaragua and Venezuela. *These data demonstrate that costs associated with immigrants from these four nations are a very miniscule share of the total burdens of the costs of care for undocumented immigrants, claimed by the Plaintiffs. The costs associated with immigrants from these four nations constitute between 0.13 to 0.26 percent of the total costs attributed to undocumented immigrants, depending on the year.* I note that the data from Texas do not provide further information about the legal status of non-citizen immigrants (for example, were they seeking asylee or refugee status) or length of residency from the four nations.  Her new affidavit estimates that emergency Medicaid costs by immigrants from these four nations cost $207,000 in 2019, $141,000 in 2020, $123,000 in 2021, $178,000 in 2022 and $30,000 in 2023 (as of May 5, 2023).  These amounts are equal to 0.18 percent of the estimated costs for undocumented immigrants in general in 2019, 0.16 percent in 2020, 0.13 percent in 2021, and 0.25 percent in 2022; this percentage cannot be calculated for 2023 because there is no corresponding total undocumented immigrant cost for 2023 (through May).   For the CHIP-Perinate program, Ms. Bricker estimates that the costs of non-citizen immigrants from Cuba, Haiti, Nicaragua and Venezuela cost $28,000 in 2019, $37,000 in 2020, $64,000 in 2021, $80,000 in 2022 and $51,000 in 2023 (as of May 5, 2023).  This corresponds to 0.25 percent of total 2019 undocumented immigrant costs in the CHIP-Perinate program, 0.22 percent in 2020, 0.25 percent

in 2021, and 0.26 percent in 2022. Again, I cannot estimate an equivalent percentage for 2023 due to lack of an equivalent total for undocumented immigrants in 2023 (through May).

12.     These new estimates are consistent with data earlier provided by the Plaintiff States in an Excel spreadsheet titled TEXAS_00162.xlsx, that contained estimates of the number of non-citizen immigrants from Cuba, Haiti, Nicaragua or Venezuela with at least one paid claim for Emergency Medicaid (371 persons) or CHIP-Perinate services (625 persons) on or after Jan. 2019. As of January 2023, Texas had 5,508,856 Medicaid beneficiaries and 304,952 CHIP beneficiaries (according to data reported by the state to the federal government (https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html). That is, the Cuban/Haitian/Nicaraguan/Venezuelan people that have been tabulated by the state constituted 0.007% of Texas Medicaid beneficiaries and 0.2% of CHIP beneficiaries; they constitute a very miniscule share of Texas' Medicaid or CHIP cost burdens.

13.     Moreover, the claims about emergency Medicaid, the Children's Health Insurance Program (CHIP) and uncompensated care provided by state public hospitals are misleading. Federal policies benefit Texas and other States, not hurt them. Except for emergency Medicaid services, undocumented immigrants are not eligible for Medicaid or CHIP services under federal law and policy.[6] In some circumstances, such as those described by Ms. Bricker (page 3), a pregnant teenager who is undocumented may be eligible for Medicaid or CHIP prenatal coverage if the state has adopted an "unborn child" coverage policy; this can authorize prenatal care for the immigrant mother to benefit her unborn child, who will be born in the United States and therefore

---

[6] Kaiser Family Foundation. Health Coverage and Care of Immigrants. Dec. 20, 2022. https://www.kff.org/racial-equity-and-health-policy/fact-sheet/health-coverage-and-care-of-immigrants/#:~:text=Undocumented%20immigrants%20are%20not%20eligible,coverage%20through%20the%20ACA%20Marketplaces.

will be a native-born citizen.  Under this policy, the unborn child -- who will be a citizen and directly eligible for Medicaid or CHIP -- is the intended beneficiary and prenatal care is offered to the mother in order to protect the health of the unborn child; the undocumented mother is not otherwise eligible for Medicaid or CHIP coverage.[7]

14.     The Plaintiff States appear to count both the costs of emergency Medicaid as well as the costs of uncompensated care in state public hospitals as costs borne by Texas for care of undocumented immigrants.   In addition to the fact that the parolees under the Administration's program will not be undocumented  immigrants, there are other flaws in the States' reasoning. First, the States are more than double-counting Texas's expenses.  For example, if a state public hospital incurs $10,000 in uncompensated care costs for a low-income undocumented immigrant, the state could recoup about $10,000 in emergency Medicaid payments for that care, of which the federal government will pay about 60 percent (based on Texas' Medicaid federal medical assistance percentage under Medicaid) and the state will pay about 40 percent (the remaining state share).  But the States presume that both the $10,000 in uncompensated care costs and the $10,000 in emergency Medicaid expenses count as burdens borne by the State, for a total of $20,000 in state costs.  In reality, the net state cost is only $4,000, since the $10,000 spent by the state hospital will be paid back with $6,000 in federal funding, leaving $4,000 to come from state funds.

15.     The States and Ms. Bricker misconstrue these costs as being exclusively related to undocumented immigrants; the real explanation is quite different.  An older federal law, the Emergency Medical Treatment and Active Labor Act (EMTALA, enacted in 1985), requires

---

[7] Clark M. Medicaid and CHIP Coverage for Pregnant Women: Federal Requirements, State Options. Georgetown University. Center for Children and Families.  November 2020.  https://ccf.georgetown.edu/wp-content/uploads/2020/11/Pregnancy-primary-v6.pdf

that hospitals provide emergency care – at least to the level of stabilizing patients' conditions -- to all persons who need emergency medical care, including labor and delivery, regardless of the patients' ability to pay. Immigration status is not directly relevant to the EMTALA requirement; the obligation for care applies to anyone who lacks insurance coverage, whether a citizen or not. EMTALA does not require that these services be offered without charge. Those without insurance or with inadequate insurance protection may still be billed for care (and typically are), but the hospital may incur some uncompensated medical care costs if the patient is unable to pay. Emergency Medicaid eligibility is available to help provide Medicaid reimbursement to the hospital for care rendered to the low-income emergency patients who would not otherwise qualify for Medicaid, which may include undocumented immigrants, other immigrants with some kind of legal status that keep them from being on Medicaid, and even citizens who are unable or unwilling to document their eligibility. Since Texas state public hospitals must already provide emergency services under EMTALA, emergency Medicaid effectively subsidizes the hospital by providing federal Medicaid funding for the care that it was otherwise already obligated to provide. While Texas also pays a share of the Medicaid cost, this is offset by the reduction in state hospitals' uncompensated care burdens. The federal government bears the majority of the cost which enables Texas to recoup much of the state public hospitals' uncompensated care expenditure.

16.     A broader issue is that the States assert "the rise in illegal immigration thus strains Texas's finances and hampers its ability to provide essential services, such as emergency medical care . . . ." (Motion for Preliminary Injunction at 25). Again, in addition to the fact that those paroled through the CHNV program are not undocumented, the States make this assertion without providing substantial evidence. Moreover, we note that Ms. Bricker, the expert for the States on these costs, does not make the claim that these costs hamper Texas' ability to provide

9

care for others.  Does care for immigrants, particularly recent immigrants from Cuba, Haiti, Nicaragua or Venezuela, actually create an unsustainable burden for Texas (or other states) that jeopardizes care for others?  The data provided by Ms. Bricker (see paragraphs 11 and 12 above), as well as my own analysis (below) based on data from a highly respected federal survey and statistics from the Department of Homeland Security, show that the medical cost burdens for these populations are trivial and are so small that they do not displace services for other needy people, as asserted by the States.

17.     My analysis is based on data from the 2020 Medical Expenditure Panel Survey, a nationally representative survey conducted by the federal Agency for Healthcare Research and Quality (AHRQ)[8] and 2021 immigration statistics from the Department of Homeland Security (DHS).[9]  The table below estimates that there were about 308,000 recent immigrants from Cuba, Haiti, Nicaragua or Venezuela, defined as those who entered in the past 5 years (based on the date of the survey); they are about 0.10% of the total U.S. population. DHS immigration statistics show that persons from these four countries are about 8.2% percent of all recent immigrants (i.e., lawful permanent residents, refuges and asylees who entered in the past five years).  About 1.07% of the U.S. population are recent immigrants from other countries and 98.83% are persons who are not recent immigrants, such as those born in the U.S. or immigrants who entered more than five years ago.

| Group | Population Size | % of Total |
|---|---|---|
| All Persons Who Are Not Recent Immigrants (including US-born) | 318.87 million | 98.83% |
| Recent Immigrants from Other Countries | 3.45 million | 1.07% |

[8] Agency for Healthcare Research and Quality.  Medical Expenditure Panel Survey Home.  No date. https://meps.ahrq.gov/mepsweb. MEPS does not provide further detail about legal status of surveyed individuals, so the recent immigrants captured in the survey include lawful permanent residents, naturalized citizens, those with temporary legal status, such as those with student or work visas, and undocumented immigrants.
[9] Dept. of Homeland Security.  2021 Yearbook of Immigration Statistics.  Specifically, Tables 3, 14 and 17. https://www.dhs.gov/immigration-statistics/yearbook/2021

| | | |
|---|---|---|
| Recent Immigrants from Cuba, Haiti, Nicaragua or Venezuela | 308 thousand | 0.10% |
| Total U.S. Population | 322.63 million | 100.00% |

18.      The table below shows data from the 2020 Medical Expenditure Survey to estimate the average annual medical expenditures for recent immigrants and those who are not recent immigrants (i.e., US-born and immigrants who arrived more than five years before)  As seen,  recent immigrants have much lower average medical expenditures than the rest of the population.  The average total annual cost of medical care for a recent immigrant is $3,644 per person, compared to $6,126 for those who are not recent immigrants.  Recent immigrants tend to use medical care sparingly.

| Group | Total Medical Expenditures per Person | Inpatient Hospital Expenditures per Person | Emergency Dept. Expenditures per Person | Other Medical Expenditures per Person |
|---|---|---|---|---|
| All Persons Who Are Not Recent Immigrants (including citizens) | $6,126 | $1,213 | $189 | $4,724 |
| Recent Immigrants (past five years) | $3,644 | $1,288 | $163 | $2,193 |

19.      Finally, the table below uses the population percentages (% of Total) from the first table and the average expenditures per person from the second table to compute the share of total national expenditures spent for medical care for recently admitted Cuban, Haitian, Nicaraguan or Venezuelan immigrants. (Note: The Medical Expenditure Panel Survey lacked data about per person medical expenditures for immigrants from the four parole countries, so the analysis makes the simple assumption that their average per person expenditures are the roughly the same as for other recent immigrants.) *These analyses demonstrate that the medical costs of care for recent immigrants from Cuba, Haiti, Nicaragua or Venezuela are less than one-tenth*

11

*of one percent of total medical expenses*, as well as inpatient hospital, emergency department or other medical care expenses. These percentages are so small that they are barely noticeable. Care provided for recent immigrants from Cuba, Haiti, Nicaragua, or Venezuela does not threaten the care for other patients, contrary to the assertion made by the States. While these statistics are drawn from national data, there is no reason to believe that distributions in the State of Texas would be very different. In fact, the mysterious spreadsheet provided by the Plaintiff States (see paragraph #11 in my declaration) indicates that people from Cuba, Haiti, Nicaragua and Venezuela who used emergency Medicaid were just 0.007% of Texas Medicaid beneficiaries and just 0.2% of CHIP beneficiaries. The number of people using Medicaid or CHIP benefits from these four nations is essentially trivial and does not pose a threat to essential services that can be provided by the State of Texas, contrary to the assertion made by the Plaintiff States.

| Group | Share of Total Medical Expenditures | Share of Inpatient Hospital Expenditures | Share of Emergency Dept. Expenditures | Share of Other Medical Expenditures |
|---|---|---|---|---|
| All Persons Who Are Not Recent Immigrants (including US-born) | 99.4% | 98.9% | 99.1% | 99.5% |
| Recent Immigrants from Other Countries | 0.6% | 1.1% | 0.9% | 0.5% |
| Recent Immigrants from Cuba, Haiti, Nicaragua or Venezuela | 0.05% | 0.09% | 0.08% | 0.04% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

20.     Furthermore, it is important to note that the parole offered under this program offers the opportunity for work authorization. Having work authorization enhances the ability of these immigrants to work legally and therefore contribute tax revenue to the States. Immigrants tend to have very high labor force participation and employment rates. The U.S.

Department of Labor has noted that immigrant men and women have much higher labor force and employment rates than US-born men and women.[10] This, in turn, helps immigrants gain private health insurance for themselves and their dependents, so that they are not uninsured and are less reliant on public insurance. Given the current labor shortages in the U.S., parolees ought to have high rates of employment and private insurance coverage, much higher than those who are undocumented immigrants. Combined with the affidavits of support that the parolees' supporters must complete, there will be a very low risk that parolees will become a drain on public resources, as feared by the Plaintiff States.

21. There is evidence that the Administration's Cuba, Haiti, Nicaragua and Venezuela parole program has not increased potential burdens associated with undocumented immigrants but reduced them A recent report by the Manhattan Institute found that "The Biden administration's parole programs are successfully reducing both illegal immigration and total immigration into the U.S. and they are shifting the composition of immigrants so that they are more self-sufficient and reliant on their existing social networks, rather than dependent on government assistance." [11] The report finds that about 102,000 people were paroled into the U.S. from these four nations from October 2022 to April 2023 and that the most recent data indicate the program prevented the entry of more than 380,000 undocumented immigrants into the U.S. In turn, this should lower the number of undocumented immigrants who may obtain assistance from the emergency Medicaid, CHIP-Perinate or related health programs from Texas or other states. It is reasonable to conclude that the parole program is reducing, rather than increasing, health burdens

---

[10] Bureau of Labor Statistics. Foreign-Born Workers: Labor Force Characteristics — 2021. May 18, 2022. https://www.bls.gov/news.release/pdf/forbrn.pdf

[11] Daniel Di Martino, "Biden's Immigration Parole Programs Are Working." Manhattan Institute. May 25, 2023. https://media4.manhattan-institute.org/wp-content/uploads/Bidens-Immigration-Parole-Programs-Are-Working.pdf

associated with undocumented immigrants from these four nations, as alleged by the Plaintiff States.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Leighton Ku, Ph.D., MPH

Executed at Washington, DC on August 2, 2023.

14



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-Cv-0007

EXHIBIT
NO. 0002

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 2

Search

Home  ▸ Publications

# In Nicaragua, Crackdown on Religious Actors Further Imperils Return to Democracy

## Regime's assault on the Catholic Church is part of a campaign to consolidate power and chill dissent.

Friday, October 7, 2022   /   BY:   Maria Antonia Montes ;  Savarni Sanka

PUBLICATION TYPE:   Analysis and Commentary

Print the Page

In recent months, Nicaragua's government has escalated its effort to silence dissent by waging a systematic campaign of repression against the Catholic Church. Nicaraguan President Daniel Ortega and Vice President Rosario Murillo's crackdown on clergy and church-affiliated organizations critical of their authoritarian regime not only threatens Nicaragua's religious freedom but also erects significant roadblocks to the country's return to peace and democracy.



Xiomara Tinoco prays at the Matagalpa Cathedral, in Matagalpa, Nicaragua, Aug. 4, 2022. The arrest of Bishop Rolando Álvarez was the latest move by Nicaragua's president, Daniel Ortega, against the Roman Catholic Church. (Inti Ocón/The New York Times)

# Historic Hostilities between Civil Society and the Nicaraguan Government

In August, Nicaraguan police forcibly closed seven Catholic radio stations and detained several clergymen who had spoken out against the Ortega regime. Rolando Álvarez, the bishop of Matagalpa, was among those detained for "organizing violent groups" and "carrying out acts of hate against the population." Earlier this year, the Ortega regime expelled the papal nuncio, Waldemar Stanislaw Sommertag, and terminated the legal status of multiple church-affiliated civil society groups on dubious grounds.

Hostilities between the church and the Ortega regime started escalating following Nicaragua's 2018 political crisis. In April of that year, anti-government protests erupted

countrywide calling for democratic reforms to a myriad of economic and social issues, as well as Ortega's resignation. The Nicaraguan government responded with brutal force, with human rights groups recording extralegal detentions, torture of political prisoners, attacks on independent media and hundreds of deaths. By the year's end, Ortega had suppressed the anti-government movement and began doubling down on efforts to secure his tenure as president for life. Government agents continued to curtail press freedom and dismantled more than 1,000 civil society groups through an abusive "foreign agents" law.

Before the 2018 crisis, with notable exceptions, the Nicaraguan government recognized clergy members' freedom of conscience and role as respected authorities for many Nicaraguans. Indeed, Ortega initially asked the church to mediate dialogues between his government and the protesters calling for its ouster. However, when churches became sanctuaries for nonviolent action against the government and individual clergy grew vocal in their criticism of the government's democratic backsliding, the Ortega regime branded the church an enemy. Prominent prelates such as Bishops Silvio Baez and Abelardo Mata Guevara faced death threats and charges of insurrection, forcing some to restrict their pastoral work and others into exile. Churches and parishioners who provided humanitarian relief to anti-government protesters, notably young people and students, were attacked and intimidated by government agents and their citizen allies.

In 2021, Ortega won re-election in a landslide after jailing his opponents and disbanding their political parties. Since then, the regime has assaulted the church as part of its campaign to consolidate power. The recent detention of Álvarez, an influential religious leader and symbolic voice of the opposition nationally, is just one example of how far the Ortega regime has been willing go to silence its critics. In another act of hostility toward the church just a week before Álvarez's detention, Nicaraguan police banned a major Catholic processional for "internal security reasons," a cancellation unprecedented in the last three decades. Further, in addition to forcing Catholic radio stations off the airwaves, Nicaragua's government stripped funding from and terminated the legal status of several church-affiliated civil society actors. The affected organizations include the Missionaries of

Charity, an order established by Mother Theresa, and the Jesuit Universidad Centroamericana (UCA), an epicenter of anti-government demonstrations in 2018.

Earlier this year, the Ortega-controlled National Assembly sanctioned a report branding church leadership as coup mongers and paving the way for the government to prosecute clergy who "sow hate" for the regime among their congregations.

# Return to Peace and Democracy in Doubt

The Nicaraguan government's assault on the church casts a shadow on an already grim outlook for Nicaragua's return to peace and democracy. The regime's hostility toward clergy and church organizations is part of a larger project to consolidate power and produce a chilling effect on dissent. By targeting influential, highly visible critics like Álvarez and sowing fear among parishioners through church surveillance, government actors are sending a clear message to the Nicaraguan public about the dangers of speaking out. Meanwhile, the government's attacks on religious spaces of political deliberation and protest, including the Catholic press and universities, undercut democratic infrastructures that could one day support Nicaragua's transition out of authoritarianism and post-conflict peacebuilding.

Indeed, the church has at times played a critical role in Nicaragua and other Latin American countries as a defender of peace amidst conditions of repression. In Nicaragua, where 90% of the population is Christian, of whom 73% identify as Catholic, the Catholic Church has historically enjoyed widespread public confidence. As such, at critical junctures in Nicaraguan history, clergy have been able to mediate conflicts across political divides. For example, while the church initially backed the Somoza dictatorship that governed Nicaragua from 1936 to 1979, clergy like the late Bishop Miguel Obando y Bravo negotiated prisoner swaps between the Somozas and their Sandinista opponents and eventually helped delegitimize the Somoza regime through prominent pastoral letters. Following the 2018 protests, it was church leaders (many of whom now face persecution)

who mediated and witnessed two national dialogues between government and opposition actors.

# Religious Actors Have Played a Key Role in the Transition from War to Peace

The church and clergy have played a similar peacebuilding role outside Nicaragua. For instance, the Vatican has successfully mediated sensitive disputes across the globe, from deescalating military clashes between Chile and Argentina over the Beagle Channel in 1985 to interrupting 40 years of political impasse to facilitate the 2014 thaw in U.S.-Cuba relations. Through religious orders, universities and faith-based organizations, clergy and faithful have also played a key role in protecting pockets of peace and justice in times of conflict. For example, female peacebuilders in Colombia, the Democratic Republic of Congo and the Philippines worked to train their communities in nonviolent action and support victims' healing during conflicts in those countries in the 20th and 21st centuries. Finally, religious actors have often lent legitimacy and solemnity to post-conflict transitional justice processes. For instance, clergy were the impetus or stood at the helm of truth commissions in Guatemala, Colombia and South Africa.

These examples, just few of many, illustrate how religious actors are often uniquely poised as symbolic and practical leaders in peacebuilding, peacemaking and in reconciliation processes. The Ortega regime's hostility toward the church, one of the last remaining institutional bastions of opposition against the regime, is therefore especially concerning.

Still, even amid increasingly repressive conditions, the Nicaraguan Church continues to find opportunities to defend peace and democracy. Local clergy continue to protect religious forums of organization and protest in acts of resistance against the government's increasing co-optation and disruption of religious space. For example, after the government banned the annual procession of the Virgin of Fatima, hundreds of Nicaraguans attended a heavily policed mass in Managua after which Cardinal Leopoldo Brenes asked the faithful to "forgive them Lord, because they know not what they do." Meanwhile, Nicaraguan clergy in exile and prelates from North and South America and

Spain have raised their voices to call for democracy in Nicaragua and the release of Álvarez and his colleagues, several of whom have now been jailed in the notorious El Chipote prison.

# Looking Toward Peace and Inclusion in Nicaragua

The Vatican had been notably silent on Nicaragua until Álvarez's detention, after which both Pope Francis and the Vatican's permanent observer to the Organization of American States, Monsignor Juan Antonio Cruz Serrano, called for peaceful dialogue in the country. The Holy See seemed to shy away from a forceful condemnation of the Ortega regime, a fact that was met with public criticism but could reflect the pope's desire to keep diplomatic back channels open with the Nicaraguan government should future opportunities for dialogue arise.

External support for Nicaraguan peacebuilders — both lay and religious, at home and in exile — is vital. It will be these civil society actors who will continue to hold the Ortega regime accountable for its abuses and who will form the backbone of a future peaceful, democratic Nicaragua.

*Savarni Sanka is a visiting research assistant for the Latin America Program at the U.S. Institute of Peace.*

ISSUE AREAS

Democracy & Governance ▶

Religion ▶

## COUNTRIES

Nicaragua ▶

---

## STAY INFORMED

USIP has a variety of newsletters and announcements with the latest analysis, publications and events.

Sign up!

---

## RELATED PUBLICATIONS



# Lavrov in Latin America: Russia's Bid for a Multipolar World

Thursday, April 27, 2023

**By:** Kirk Randolph

This past week, Russian Foreign Minister Sergey Lavrov completed a four-country tour of Latin America to reinforce Moscow's alliances and foster growing partnerships in the region. During the trip, Lavrov met with the heads of state of Brazil, Venezuela, Nicaragua and Cuba in their respective countries, as well as another meeting with Bolivian emissaries during his stop in Venezuela. Lavrov used the opportunity to emphasize the key tenet of Russia's newest foreign policy concept that was launched in the past month and is shared by regional powers like Brazil: The world is experiencing a revolution in which Western power is weakening and a new multipolar world is emerging.

**Type:** Analysis and Commentary

Global Policy

8/1/23, 3:05 PM                    In Nicaragua, Crackdown on Religious Actors Further Imperils Return to Democracy | United States Institute of Peace



# To Secure Shared Environments, We Must Protect Indigenous Peacebuilders

Thursday, April 20, 2023

**By:** Mona Hein;  Emmanuel Davalillo Hidalgo;  Binalakshmi Nepram

Humanity observes our 53rd annual Earth Day this week while worsening our assault on our planetary home. Arguably our most critical protectors against this self-harm are Indigenous people who, only about 6 percent of us, protect 80 percent of Earth's biodiversity. Yet powerful elites, armed groups and business interests attack and kill politically marginalized Indigenous environmentalists to continue clawing wealth out of ecosystems from the Amazon and Congo basins to the Himalayas. Any real hope of reversing our environmental degradation will require U.S. and international policymakers to strengthen protections for Indigenous environmentalists.

**Type:** Analysis and Commentary

     Environment;  Human Rights



## ¿Seguirán otros líderes centroamericanos el liderazgo autoritario de Nicaragua?

Tuesday, August 30, 2022

**By:** Arturo Matute;  Mary Speck, Ph.D.

El gobierno de Nicaragua ha intensificado su enfrentamiento con una de las instituciones de mayor arraigo e históricamente poderosas del país: la Iglesia Católica. La policía allanó la rectoría episcopal en la ciudad norteña de Matagalpa el 19 de agosto y arrestó a un obispo, cinco sacerdotes y dos seminaristas. En las últimas semanas, el presidente Daniel Ortega cerró siete estaciones de radio católicas, expulsó a misioneras y prohibió las procesiones religiosas en un esfuerzo por silenciar a la disidencia, incluso arriesgando contrariar a la fervientemente católica población del país.

**Type:** Analysis and Commentary

Democracy & Governance



## Will Other Central American Leaders Follow Nicaragua's Authoritarian Lead?

Tuesday, August 30, 2022

**By:** Arturo Matute;  Mary Speck, Ph.D.

The Nicaraguan government has intensified its confrontation with one of the country's most popular and historically powerful institutions: the Catholic Church. Police raided the episcopal rectory in the northern city of Matagalpa on August 19, placing a bishop, five priests and two seminarians under arrest. In recent weeks, President Daniel Ortega has shut down seven Catholic radio stations, expelled missionaries and banned religious processions in an effort to silence dissent — even at the risk of alienating the country's fervently Catholic population.

**Type:** Analysis and Commentary

Democracy & Governance

View All Publications   ›

LATEST NEWS

Two Americans reportedly kidnapped in Haiti - NBC News Now

Tuesday, August 1, 2023

Political Storm Brews in Election-Bound Bangladesh - The Diplomat

Monday, July 31, 2023

At least 44 killed in Pakistan after explosion at Islamist political rally - BBC News TV

Monday, July 31, 2023

ISIS Affiliate Claims Responsibility for Deadly Attack at Rally in Pakistan - The New York Times

Monday, July 31, 2023

View All News   ›

2301 Constitution Avenue NW, Washington, DC 20037

Tel: +1.202.457.1700

Experts

Regions

Issue Areas

Education & Training

Events

About        Publications        Projects        Grants & Fellowships        Visit        Connect        Press

Blog

The United States Institute of Peace

Legal and Privacy Information | FOIA Inquiries



AO389-B

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 003

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 3



HUMAN
RIGHTS
WATCH

LANGUAGES     DONATE NOW



Riot police stand guard outside the house of Cristiana Chamorro, former
director of the Violeta Barrios de Chamorro Foundation and opposition
presidential candidate, in Managua on June 2, 2021, the day Nicaraguan
police raided her home without a warrant and placed her under house
arrest.
© 2021 Inti Ocon/AFP via Getty Images

AVAILABLE IN

 

Since taking office in 2007, the government of President Daniel Ortega has dismantled nearly
all institutional checks on presidential power. The Electoral Council, stacked with the
president's supporters, removed opposition lawmakers in 2016 and has barred opposition
political parties ahead of the 2021 presidential elections. A constitutional amendment approved
by President Ortega's party, which controls the National Assembly, abolished term limits in
2014. President Ortega was elected to a fourth consecutive term in November amid
government repression of critics and the political opposition. Many governments from the
region and Europe said the elections had not met minimum guarantees to be considered free
and fair.

To pave the way for his re-election, authorities arbitrarily arrested and prosecuted government
critics and political opponents, including presidential candidates, journalists, lawyers, and
leaders of community, business, and student groups.



DONATE NOW

Persistent problems include severe restrictions on freedom of expression and association, political discrimination, and stringent restrictions on abortion.

## Detention and Prosecution of Critics

Between late May and October 2021, authorities arbitrarily detained 7 presidential candidates and 32 prominent government critics. Prosecutors opened investigations against most on alleged "treason" charges.

Since February, an amendment to the Code of Criminal Procedure has allowed prosecutors to request detentions of up to 90 days without charge; in most cases involving critics, courts have permitted them.

In August, the Attorney General's Office filed charges against most of the detainees, in criminal proceedings that lacked basic due process guarantees. Charges, carrying prison sentences of 15 to 25 years, ranged from money laundering to, most commonly, "conspiracy to undermine national integrity." Prosecutors failed to identify specific acts by the defendants to support the charges in at least 14 cases.

Most critics have been held incommunicado and subjected to abuses in detention, including daily interrogations, prolonged solitary confinement, and insufficient food. Authorities have barred critics' lawyers from participating in public hearings, assigning public defenders instead. Despite repeated requests, most lawyers had no access to court documents for months.

## Right to Vote and Run for Office

Election-related changes and laws adopted between October 2020 and February 2021  have been used to deter critical speech, inhibit opposition participation in elections, and keep critics in prison without formal charges, to prevent or limit their political participation.

In December 2020, the National Assembly passed the Law for the Defense of People's Rights to Independence, Sovereignty, and Self-determination for Peace, prohibiting so-called "traitors" from running for or holding public office. The law defines "traitors" in sweeping terms to include, for example, people who "undermine independence, sovereignty and self-determination" or "damage the supreme interests of the nation."

**HUMAN RIGHTS WATCH**

DONATE NOW

does not require independent domestic or international electoral observation, which the Organization of American States and the United Nations Human Rights Council deemed essential to ensure credible scrutiny of the elections; and allows the National Police to authorize demonstrations in public spaces, including public campaign events.

After the National Assembly, which is allied with Ortega, appointed new Supreme Electoral Council members in May, the Council stripped legal registration from the main opposition parties.

## Covid-19 Response

Denial, inaction, and opacity have characterized the government's response to the Covid-19 pandemic. The government took no emergency measures in response to the pandemic, kept schools open, and fired doctors critical of the government who disagreed with its management of the Covid-19 response.

While the government reported over 13,000 cases and more than 200 deaths, as of September 2021, the nongovernmental organization (NGO) Covid-19 Citizen Observatory registered almost twice as many suspected cases and 4,500 suspected deaths. The government has accused the organization and critical doctors of promoting "health terrorism." The Inter-American Commission on Human Rights (IACHR) reported that "state agents" were persecuting and harassing members of the Observatory, as well as from the medical associations Nicaraguan Medical Unit (UMN) and Interdisciplinary Scientific Committee.

As of October 2021, just over 8 percent of the population was fully vaccinated.

During the 2018 crackdown, at least 405 doctors, nurses, and other health workers were fired from public hospitals, seemingly for providing care to protesters or criticizing the government.

No specific policies to diminish the negative economic impact of the pandemic were enacted.

## Crackdown on Protesters

Police, in coordination with armed pro-government groups, brutally repressed massive anti-government protests in 2018, leaving at least 328 dead, some 2,000 injured, and hundreds detained. Authorities reported 21 police officers killed in the context of demonstrations.

HUMAN
RIGHTS
WATCH

DONATE NOW

of due process and other rights marred prosecutions.

A broad amnesty that released many protestors in 2019 has contributed to immunity from prosecution for those responsible for human rights violations related to the crackdown. In 2019, President Ortega promoted top officials implicated in abuses. Impunity for human rights violations by the police continues.

In addition to the 39 detentions carried out since late May 2021, Nicaraguan rights groups reported that over 100 perceived critics detained earlier remained under custody as of October. Many had been held for over a year, under abusive conditions.

## Attacks on Human Rights Defenders and Independent Media

Human rights defenders and other critics are targets of death threats, assaults, intimidation, harassment, surveillance, online defamation campaigns, and arbitrary detention and prosecution. Police frequently station themselves outside the houses of government critics, preventing them from leaving, in what amounts to arbitrary arrest. Those harassed are unable to visit friends and family, attend meetings, go to work, or participate in protests or political activities. Some have been detained repeatedly—sometimes being abused during detention—for periods ranging from several days to several months.

The government restricts freedom of expression for journalists and media outlets through threats, physical attacks, detentions, arbitrary financial investigations, arbitrary prosecutions, and forced closures.

Between July 28 and August 26, 2021, authorities ordered the closure of 45 NGOs, including women's groups, international aid organizations, and several medical associations. Ten others had been closed since 2018. In 2019, Army Commander in Chief Julio César Avilés Castillo called NGOs "coup-plotters".

Other organizations have announced their suspension of activities after the Law for the Regulation of Foreign Agents went into effect in 2020, requiring the registration of people and groups receiving foreign funding as "foreign agents" and preventing them from running for office.

Police raided the offices of the newspaper *Confidencial* in May 2021, confiscating equipment and detaining a journalist for several hours without providing warrants for the detention or

**HUMAN
RIGHTS
WATCH**

DONATE NOW

Prosecutor's Office later raided its facilities, seizing items and arresting the newspaper's general manager.

Between January and October 2021, authorities had arbitrarily arrested and prosecuted three journalists and brought charges or initiated investigations against several journalists who were abroad. At least 16 journalists have been summoned as witnesses in a money laundering investigation into Cristiana Chamorro, a detained presidential candidate who, until its closure, headed an NGO dedicated to press freedom.

Doctors and journalists have been threatened with charges under Nicaragua's cybercrime law during interviews with prosecutors, according to news media. The law, passed in October 2020, criminalizes a wide range of online communications, including by punishing with sentences of up to five years the "publication" or "dissemination" of "false" or "distorted" information on the internet that is "likely to spread anxiety, anguish or fear."

On September 7, 2021, the Attorney General's Office charged activist Amaru Ruíz under the cybercrime law. He was accused of "dissemination of false information" to "instill instability and insecurity that endangers national sovereignty" after he allegedly said "the state and its institutions had deliberately failed to investigate" the murders of Indigenous persons in the North Caribbean Coast in 2020 and 2021.

Defense lawyers have experienced escalating harassment and prosecutions. Some remain in the country, facing threats, and others have fled. Two were arrested and prosecuted for "conspiracy to undermine national integrity."

The Human Rights Collective "Nicaragua Nunca +", an NGO based in Costa Rica that documents human rights abuses in Nicaragua, reported that the Ortega government's sustained "persecution, harassment, and prosecution" had forced at least 100 journalists into exile, including 25 in 2021.

In August 2021, at least nine Indigenous persons were reportedly killed, and two women sexually abused, in an attack related to a dispute over gold mining in the Mayangna Sauni As Indigenous territory. The government granted the mining concession without prior consultation with the community. Homicides and aggressions "related to territorial disputes" in the area since January 2020 "remain unpunished," the United Nations Office of the High Commissioner for Human Rights (OHCHR) reported. Both OHCHR and the IACHR point to a larger, persistent failure of the Nicaraguan government to title and protect Indigenous territories from invasions.

HUMAN
RIGHTS
WATCH

DONATE NOW

Nicaragua has prohibited abortion under all circumstances since 2006, even when a pregnancy is life-threatening or results from rape or incest. Those who have abortions face prison sentences of up to two years; medical professionals who perform them can face up to six years. The ban forces women and girls confronting unwanted pregnancies to seek illegal and unsafe abortions, risking their health and lives.

Rates of domestic abuse, violence against women, and femicide, defined in Nicaraguan law as a crime committed by a man who murders a woman "in the public or private sphere," have increased since 2019, OHCHR reported in February 2021.

## Nicaraguan Asylum Seekers

From April 2018 through June 2021, more than 110,000 people fled Nicaragua, the UN High Commissioner for Refugees reported. Costa Rica hosts some 80,000 Nicaraguan refugees and asylum seekers. Thousands more live in Mexico, Panama, Europe, and the United States.

## Key International Actors

No international monitoring bodies have been allowed into the country since 2018, when the government expelled the IACHR Special Monitoring Mechanism for Nicaragua, the IACHR-appointed Interdisciplinary Group of Independent Experts, and OHCHR.

In February 2021, OHCHR urged the government to enact meaningful electoral reforms, end arbitrary arrests, guarantee freedoms to civil society, investigate and prosecute rights abuses in the context of protests, and amend laws that seriously restrict rights to freedom of expression and association and could undermine free and fair elections. The IACHR has also continued to monitor the situation from afar.

The UN Human Rights Council adopted a resolution in March urging the government to repeal or amend legislation that undermines fundamental rights and to adopt electoral reforms to ensure free and fair elections with international oversight.

In June, the OAS Permanent Council expressed concern that the Ortega regime had not implemented electoral reforms consistent with international standards before a deadline set for May. The resolution condemned harassment and arbitrary restrictions on presidential candidates, opposition parties, and independent media. In November, the OAS Permanent Council condemned the elections saying they "were not free, fair or transparent, and lack[ed] democratic legitimacy."

**HUMAN RIGHTS WATCH**

DONATE NOW

pursuant to the Global Magnitsky Act of 2016, which allows for sanctions against human rights violators. Of the 26, 6 were also sanctioned pursuant to the Nicaraguan Human Rights and Corruption Act of 2018. The Treasury Department has also sanctioned nine entities, including financial and state security institutions.

In November, the US Congress passed the RENACER Act to monitor, report on, and address corruption by the Ortega government, as well as human rights abuses by Nicaraguan security forces. The law had been approved by the Senate in August.

The European Parliament, in July, condemned the Ortega government's repression of opposition groups and other opponents and called for the release of arbitrarily detained political prisoners, including presidential candidates. In August, the EU imposed targeted sanctions on eight more Nicaraguans accused of "serious human rights violations" and undermining democracy, including Vice President Rosario Murillo, for a total of 14 Nicaraguans sanctioned since 2020. Sanctions against all 14 were renewed for another year in October 2021. Following EU foreign ministers' discussions in October, EU foreign policy chief Josep Borrell once again condemned the Nicaraguan government's repression, referring to it as 'one of the worst dictatorships in the world', whose scheduled elections were going to be 'fake'.

In July, Canada imposed targeted sanctions on 15 government officials implicated in human rights violations, for a total of 24 sanctioned.

## Browse Countries

Choose



DONATE NOW

Keynote



**With Autocrats on the Defensive, Can Democrats Rise to the Occasion?**



**Kenneth Roth**
Former Executive Director

## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**





DONATE NOW

Updates On Rights Issues From Around The Globe

Enter an email address          Sign Up

## Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Site Map | Child Safeguarding

© 2023 Human Rights Watch

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | **t** 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808



A0386-B
**DEFENDANT'S EXHIBIT**

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 004

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 4



LANGUAGES          DONATE NOW



A man casts his vote during regional elections, at a polling station in
Caracas, Venezuela, on November 21, 2021.
© 2021 AP Photo/Ariana Cubillos.

AVAILABLE IN



The Nicolás Maduro government and its security forces are responsible for extrajudicial
executions and short-term forced disappearances and have jailed opponents, prosecuted
civilians in military courts, tortured detainees, and cracked down on protesters. They used a
state of emergency implemented in response to Covid-19 as a pretext to intensify their control
over the population. The lack of judicial independence contributed to impunity for these
crimes. Judicial authorities have participated or been complicit in the abuses.

A United Nations Fact-Finding Mission (FFM) identified patterns of violations and crimes that
were part of a widespread and systematic course of conduct that it concluded amounted to
crimes against humanity. In November 2021, International Criminal Court (ICC) prosecutor
Karim Khan announced his decision to open an investigation into possible crimes against
humanity committed in Venezuela.

Venezuela is facing a severe humanitarian emergency, with millions unable to access basic
healthcare and adequate nutrition. Limited access to safe water in homes and healthcare
centers and a vaccination plan marred by opacity may have contributed to the spread of Covid-
19.

**HUMAN RIGHTS WATCH**

DONATE NOW

law, humanitarian aid, and political rights. The government withdrew from negotiations in October, following the extradition to the United States of Colombian businessman Alex Saab, a close government ally. The negotiations had not resumed at time of writing.

Prior to the negotiations, the government had made limited concessions, largely due to increased international pressure, including naming new National Electoral Council members and allowing the World Food Program (WFP) to deploy.

An independent EU electoral mission that monitored the November regional elections reported that political opponents remained arbitrarily disqualified from running for office, there had been unequal access to the media, and the lack of judicial independence and of respect for the rule of law had undermined the election's impartiality and transparency.

Persistent concerns include brutal policing practices, abject prison conditions, impunity for human rights violations, and harassment of human rights defenders and independent media.

The exodus of Venezuelans fleeing repression and the humanitarian emergency represents the largest migration crisis in recent Latin American history.

## Persecution of Political Opponents, Arrests, and Torture

The government has jailed political opponents and disqualified them from running for office. As of October 25, there were 254 political prisoners, the Penal Forum, a network of pro-bono defense lawyers, reported. While some detainees were released or transferred from intelligence installations to common prisons, a revolving door persists, with new critics being subject to arbitrary prosecutions.

Security agents arbitrarily detained Freddy Guevara, of the Popular Will party, on July 12. Officials accused him of working with gangs that had engaged in a deadly standoff with police in Caracas, and charged him with terrorism, attacking the constitutional order, conspiracy to commit a crime, and treason. He was held incommunicado at the Bolivarian National Intelligence Service (SEBIN) headquarters until August 15 and released following the first round of negotiations in Mexico on the condition that he appear in court every 30 days.

Intelligence and security forces have tortured various detainees and their family members. In 2020, the UN Office of the High Commissioner for Human Rights (OHCHR) reported cases of alleged torture and ill-treatment including severe beatings with boards, suffocation with plastic



DONATE NOW

During several crackdowns since 2014, security forces and pro-government armed groups known as *colectivos* have attacked demonstrations. Security forces have severely injured and occasionally killed demonstrators they had deliberately shot at point-blank range with riot-control munitions, brutally beaten others who offered no resistance, and staged violent raids on apartment buildings.

Of the 15,756 people arbitrarily arrested since 2014, 9,406 had been conditionally released as of July 2021, but remained subject to prosecution, and 872 had been prosecuted in military courts, according to the Penal Forum. .

In June 2021, OHCHR reported continuing torture, ill-treatment, enforced disappearances, and arbitrary detentions.

## Alleged Extrajudicial Killings

Between 2016 and 2019, police and other security forces killed more than 19,000 people, alleging "resistance to authority." In June 2021, OHCHR reported that killings by security forces had slightly declined but continued. Many of these were consistent with previous patterns of extrajudicial executions, OHCHR said.

Agents of FAES, a special police force, and others have killed and tortured with impunity in low-income communities, instilling fear and maintaining social control. Previously, military and police raids in low-income communities, called "Operations to Liberate the People" by authorities, resulted in widespread allegations of extrajudicial killings, arbitrary detentions, mistreatment of detainees, and forced evictions.

## Armed Groups

Armed groups—including the National Liberation Army (ELN), Patriotic Forces of National Liberation (FPLN), and groups that emerged from the Revolutionary Armed Forces of Colombia (FARC)—operate mostly in border states. In Apure, they establish and brutally enforce curfews; prohibitions on rape, theft, and murder; and regulations governing everyday activities. Impunity is the norm, and residents say security forces and local authorities often collude with armed groups.

Starting in March 2021, Venezuelan security forces committed egregious abuses against Apure residents during a weeks-long operation against a FARC dissident group known as the Martin

**HUMAN RIGHTS WATCH**

DONATE NOW

collaborating with armed groups. Hundreds were forcibly displaced within Venezuela and at least 5,800 people fled to Colombia, according to the Office of the United Nations High Commissioner for Refugees (UNHCR). Most had returned to Venezuela by August, but confrontations continued.

## Environment and Human Rights

Mining is the leading driver of deforestation in the Venezuelan Amazon, after agriculture. After President Maduro illegally declared the creation in 2016 of a special mining zone in the north of Bolívar state that covers 24 percent of the country's Amazon rainforest, the area has lost more than 230,000 hectares of forest cover, according to a study by the non-governmental organization SOS Orinoco. Analysis of satellite imagery suggests mining operations currently occupy at least 20,000 hectares of the special zone.

The special mining zone encompasses 14 Indigenous territories, whose residents were reportedly not consulted before its creation. People in multiple riverside Indigenous communities within and downstream from the mining zone are reportedly experiencing severe mercury poisoning, a toxic substance used to separate gold from impurities.

Bolívar state is the epicenter of malaria in Venezuela, accounting for 55 percent of all cases, and there is a high prevalence of malaria among gold miners, whose high mobility represents an important vector of contagion. Pools of stagnant and polluted water resulting from mining activity have also become malaria breeding grounds, OHCHR reported.

Illegal gold mining in Bolívar state is largely controlled by criminal groups—"syndicates"— and Colombian armed groups which police citizens, impose abusive working conditions, and viciously treat those accused of theft and other offenses, sometimes dismembering and killing them in front of others. The syndicates operate with government acquiescence and sometimes involvement. In September, the Organisation for Economic Co-operation and Development (OECD) reported that the Venezuelan military and political elites, Colombian armed groups, and domestic gangs continued to be key actors in the gold trade.

## Judicial Independence and Impunity for Abuses

The judiciary stopped functioning as an independent branch of government when former President Hugo Chávez and supporters in the National Assembly took over the Supreme Court in 2004. Supreme Court justices have openly rejected the separation of powers and consistently upheld abusive policies and practices.

**HUMAN RIGHTS WATCH**

DONATE NOW

of Venezuelan high-level authorities. Judicial authorities have been complicit in the abuses, the UN Fact-Finding Mission reported in September 2021, including by issuing retrospective arrest warrants for illegal arrests, routinely ordering pre-trial detention, upholding detentions based on flimsy evidence, and failing to protect victims of torture. Judges allowed significant procedural delays and interfered with the right to choose one's own lawyer.

The Attorney General's Office reported that between August 2017 and May 2021, 716 officials were charged with crimes connected with human rights violations, 1,064 were indicted, 540 arrested and 153 convicted. The Fact-Finding Mission noted some discrepancies in the numbers provided by Venezuelan authorities and found that there was no evidence that authorities were carrying out investigations into responsibility for violations further up the chains of command.

In June, Maduro announced a legal reform of the judicial system, creating a special commission headed by his wife and National Assembly deputy Diosdado Cabello. The focus of the reform so far has been on reducing overcrowding in pretrial detention centers, which held 38,736 people in June 2021, up from 22,759 in May 2016.

## Right to Vote

In December 2020, government supporters gained control of the National Assembly in elections of widely disputed legitimacy. The government disbanded a National Constituent Assembly established in 2017 to rewrite the constitution, which had effectively replaced the National Assembly.

In 2020, the Supreme Court orchestrated the takeover of several opposition political parties, replacing their leadership with government supporters ahead of the December elections. In 2021, the new National Electoral Council announced that some opposition political parties would be able to participate in November 2021 elections. The opposition confirmed its participation as the Unitary Platform. The European Union, a delegation of members of the European Parliament, the Carter Center, and the United Nations monitored elections.

## Humanitarian Emergency and Covid-19

The WFP estimates that one in three Venezuelans is food insecure and in need of assistance. In 2019, 9.3 million Venezuelans suffered from food insecurity, which was projected to increase significantly. UNICEF reported 5.8 percent of children screened between January and June 2021 with acute malnutrition, including 1.5 percent with severe acute malnutrition.

HUMAN
RIGHTS
WATCH

DONATE NOW

transplants. Shortages of medications and supplies, interruptions of utilities at healthcare centers, and the emigration of healthcare workers have led to a decline in operational capacity.

OHCHR expressed concern over the absence of public data to monitor and adequately inform public health policies. The government has not published epidemiological data since 2017.

School attendance, already low due to the humanitarian emergency, has declined further because of Covid-19 and related restrictions. UNICEF reported that 6.9 million students in Venezuela missed almost all classroom instruction between March 2020 and February 2021. In-person classes resumed in October 2021, but with limited attendance.

As of October 28, Venezuela had confirmed 403,318 cases of Covid-19 and 4,848 deaths. Given limited availability of reliable testing, lack of government transparency, and persecution of medical professionals and journalists who report on the pandemic, the actual numbers are probably much higher. Access to maternal health and sexual and reproductive services, already dire, has further deteriorated with the pandemic as the government failed to ensure access to services.

Monitor Salud, a nongovernmental organization (NGO), reported 83 percent of hospitals have insufficient or no access to personal protective equipment such as masks and gloves, and 95 percent similarly lack sufficient cleaning supplies, including soap and disinfectant. As of October 28, 779 doctors and nurses had reportedly died from Covid-19.

Venezuela's Covid-19 vaccination has been marred by corruption allegations and opacity regarding the acquisition and distribution of vaccines and other medical supplies. The government scheduled vaccinations using the "Fatherland ID," a document provided to Venezuelans since 2017 to access public benefits, which has been used to exercise social and political control, especially during elections.

On October 27, the government reported that 61.6 percent of Venezuelans had received at least one dose of the Covid-19 vaccines. Yet only 21.6 percent of Venezuelans were fully vaccinated as of that date, according to the Pan American Health Organization, and 25 to 28 percent of health professionals were still waiting for their second vaccine shot in August.

## Refugee Crisis

Some 5.9 million Venezuelans, approximately 20 percent of the country's estimated total population, have fled their country since 2014, the Inter-Agency Coordination Platform for

HUMAN
RIGHTS
WATCH

DONATE NOW

While many neighboring governments welcomed Venezuelans, lack of a coordinated regional strategy left many stranded in inadequate conditions or unable to receive refugee status or other legal protections. In some countries, Venezuelans are being deported or facing xenophobia and difficulties obtaining affordable health care, education, or legal status that would allow them to work.

The economic impact of the pandemic and host government lockdowns led an estimated 151,000 Venezuelans to return home between March 2020 and March 2021, the United Nations System reported. Returnees were held in overcrowded, unsanitary quarantine centers, suffering threats, harassment, and abuse by Venezuelan authorities and *colectivos.*

## Freedom of Expression

The government has expanded and abused its power to regulate media and close dissenting outlets and carried out campaigns of stigmatization, harassment, and repression against the media. While a few newspapers, websites, and radio stations criticize authorities, fear of reprisals has made self-censorship a serious problem.

In May, authorities seized the headquarters of newspaper *El Nacional,* after the Supreme Court ordered it to pay more than US$13 million in damages for alleged defamation of Diosdado Cabello. The move appears intended to silence one of the few remaining independent outlets in Venezuela.

In 2017, the Constituent Assembly passed a vague Law Against Hatred, forbidding political parties that "promote fascism, hatred, and intolerance," and establishing prison sentences of up to 20 years for publishing "messages of intolerance and hatred." During the Covid-19 state of emergency, many people sharing or publishing information on social media questioning officials or policies have been charged with incitement to hatred and other crimes.

## Human Rights Defenders

In 2010, the Supreme Court ruled that individuals or organizations receiving foreign funding can be prosecuted for treason, and the National Assembly prohibited international assistance to organizations that "defend political rights" or "monitor the performance of public bodies."

Starting in November 2020, Venezuelan authorities and security forces have conducted a systematic campaign against human rights and humanitarian groups, freezing bank accounts, issuing arrest warrants, and raiding offices, as well as detaining members for questioning. They



DONATE NOW

In July, police detained three members of FundaRedes after they reported harassment by intelligence services and unidentified armed men to the prosecutor's office in Falcon state. The group had recently accused Venezuelan authorities of links to armed groups in Apure state. The activists were charged with treason, terrorism, and incitement to hatred, based on publications on social media and the organization's website. Two of them were released on October 26 on the condition that they appear in court every eight days; the organization's director was still being held incommunicado at the SEBIN headquarters at time of writing.

## Prison Conditions

Corruption, weak security, deteriorating infrastructure, overcrowding, insufficient staffing, and improperly trained guards allow armed gangs effectively to control detainees. Excessive use of pretrial detention contributes to overcrowding.

Lack of access to clean water and sufficient, nutritious food, as well as low quality hygiene and medical services, have contributed to a high incidence of hunger and disease in prisons. The Venezuelan Observatory of Prisons (OVP) reported that 73 percent of detainee deaths due to health conditions in the first half of 2021 were from malnutrition or tuberculosis, both of which are preventable. Inadequate conditions may have also contributed to the spread of the virus that causes Covid-19. Based on official statements, the OVP reported 135 cases of Covid-19 in prisons and detention centers in 2020, and two deaths. Given insufficient testing, the real numbers are likely much higher.

## Key International Actors

During a visit to Venezuela in November 2021, ICC Prosecutor Karim Khan announced that his office would open an investigation into possible crimes against humanity committed in the country. The situation in the Venezuela had been under preliminary examination by the Office of the Prosecutor since February 2018. A June 2021 prosecution filing before the ICC, made public in August, reported the office's conclusion that Venezuelan authorities were unwilling to genuinely investigate and prosecute relevant cases.

In September, the United Nations Fact-Finding Mission on Venezuela found that the justice system has played a significant role in the repression of opponents. Procedural irregularities and interference in the judiciary, including by high-ranking authorities such as Maduro and Diosdado Cabello, have ensured impunity for human rights violations. A previous report



OHCHR maintains an in-country presence, which increased to 12 officers in 2021. The office updated the UN Human Rights Council in 2021 on continuing abuses. In June, it found Venezuela had made limited progress towards the implementation of its recommendations from previous reports. Both OHCHR and the UN special rapporteur on unilateral coercive measures highlighted in September that unilateral sectorial sanctions have exacerbated Venezuela's pre-existing economic and social crises, although OHCHR also pointed to other problems, including lack of official information and the need to investigate allegations of discrimination in food and health care access.

In April, after more than a year of negotiations, the WFP announced an agreement with the Maduro government, allowing it to supply food to young children. The agency started delivering aid in July and planned to reach 185,000 children by the end of 2021.

In March 2021, the US government granted temporary protected status for 18 months to Venezuelans already in the US. The decision followed the Colombian government's landmark announcement, in February, granting 10 years of legal status to the estimated 1.7 million Venezuelans there, and to those who enter Colombia legally during the next two years.

Several governments and institutions have imposed targeted sanctions on Venezuelan officials implicated in human rights abuses and corruption by canceling their visas and freezing their funds abroad. Others imposed financial sanctions, including the US, which during the administration of then-President Donald Trump imposed a ban on dealings in new stocks and bonds issued by the Venezuelan government and its state oil company. They remained in effect at time of writing. Despite a humanitarian exception, these sanctions could exacerbate the humanitarian emergency which predates them, due to overcompliance.

The administration of US President Joe Biden has publicly criticized human rights abuses by the Maduro government and expressed willingness to lift sanctions in exchange for concrete progress during the Mexico negotiations.

In addition to adopting targeted sanctions, the European Union has consistently condemned abuses by the Venezuelan government, including at the UN Human Rights Council, and plays a leading role in the International Contact Group, which seeks a political solution to the Venezuelan crisis and works to lay the groundwork for credible elections. Norway facilitated the Mexico talks, in which the Netherlands and Russia participated as guarantors.

HUMAN
RIGHTS
WATCH

DONATE NOW

4.5 million of the most vulnerable Venezuelans. As of October 28, more than $210 million had
been disbursed, and from January through July, 2.5 million people had received assistance.
International organizations continued to face limitations importing humanitarian supplies,
obtaining visas for personnel, acquiring movement permits, and accessing gasoline. This often
led to delay or suspension of activities.

As a member of the UN Human Rights Council, Venezuela votes regularly to prevent scrutiny
of human rights violations, including in Syria, Yemen, Belarus, Burundi, Eritrea, and Iran.

The Inter-American Commission on Human Rights continues to monitor Venezuela, applying
the American Declaration of the Rights and Duties of Man, after Venezuela withdrew from the
American Convention on Human Rights in 2013.

Browse Countries

Choose

## Keynote

DONATE NOW



With Autocrats on the Defensive, Can Democrats Rise to the Occasion?



**Kenneth Roth**
Former Executive Director

## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**



## Get Updates On Rights Issues From Around The Globe



DONATE NOW

# Connect With Us

Contact Us | Corrections | Privacy Policy | Permissions | Site Map | Child Safeguarding

© 2023 Human Rights Watch

**Human Rights Watch | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | t 1.212.290.4700**

**Human Rights Watch is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808**



DEFENDANT'S EXHIBIT

CASE
NO. 6:23-cv-0007

EXHIBIT
NO. 005

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 5

**Venezuela(/country/ven)**

# WFP Venezuela Food Security Assessment Main Findings | Data Collected between July and September 2019

Assessment

**Source:** WFP(/organization/wfp)

**Posted:** 23 Feb 2020

**Originally published:** 23 Feb 2020



### Download Report

(PDF | 286.55 KB)
(/attachments/ff2a4d5c-8627-
39cc-a086-4bf1cba2fc57/Mai
n%20Findings%20WFP%20Fo
od%20Security%20Assessme
nt%20in%20Venezuela_Januar
y%202020-2.pdf)

**Background**

The World Food Programme (WFP) was invited by the Government of Venezuela to conduct a Food Security Assessment (FSA) to estimate the needs and vulnerabilities of Venezuelan households. WFP had full independence to design and implement the assessment, and had access countrywide allowing the collection

of household-level data without impediment.

The Venezuela FSA follows the standard WFP Emergency Food Security Assessment (EFSA) methodology and the Consolidated Approach to Reporting Indicators of Food Security (CARI). The assessment is based on the analysis of primary data collected at household level and at community level.

At the end of the assessment, 8,375 valid questionnaires were collected, ensuring statistical representativity at state level.

**How Many People Are Food Insecure?**

The assessment estimates that 7.9 percent of the population in Venezuela (2.3 million) is severely food insecure. An additional 24.4 percent (7 million) is found to be moderately food insecure. Based on the CARI approach, WFP estimates that one out of three Venezuelans (32.3%) is food insecure and in need of assistance.

**Food Security Classification**

The prevalence of food insecurity in Venezuela was obtained by analysing food consumption patterns, food and livelihood coping strategies and economic vulnerability. Indicators have different behaviours; the table below shows the food consumption indicator (FCS) performs better (17.8% of food insecurity) than the livelihood coping strategies indicator (61.3% of food insecurity). This means that, at the time of the survey, many families were still able to cover their food needs but at the great cost of sacrificing their assets and endangering their livelihoods.

The analysis of the FCS indicates that nearly one household out of five (17.8%) has an unacceptable level of food consumption, of which 12.3 percent have borderline food consumption and 5.5 percent poor food consumption.

The lack of dietary diversity is of major concern. Venezuelan families consume cereals, roots or tubers on a daily basis, and complement the daily intake of cereals with pulses (beans, lentils) three days a week and dairy products four days a week. The overall consumption of meat, fish, eggs, vegetables and fruits is below three days a week for each of these food groups. The lack of dietary diversity indicates inadequate nutritional intake.

**Coping Strategies**

Seventy-four percent of families have engaged in food-related coping strategies, reducing the variety and the quality of the food they eat; 60 percent of the households reported reducing the portion size of their meals.

Three out of four families engaged in at least one livelihood-related coping strategy and, on average, families adopted at least four strategies in the 30 days preceding the survey. In order to survive, 33 percent of households accept working for food as payment and 20 percent have sold family assets to cover basic needs. Six out of 10 families have spent their savings to buy food.

As families deplete the coping mechanisms they have been using to sustain basic food consumption, there are great concerns that nutritional needs will not be met in the short term. This will affect the most vulnerable, including children, pregnant and lactating women, and the elderly.

**Perceived Food Availability**

Seven out of 10 Venezuelans report that food is always available. However, access to food is difficult as the prices are too high when compared to household income.

**Income Sources**

Hyperinflation is affecting the ability of families to secure food and other basic needs. Fifty-nine percent of households have insufficient income to buy food and 65 percent are unable to buy other essential items such as hygiene products, clothes and shoes.

When asked about how the current situation in Venezuela has impacted the sources of income of the household, half of the respondents declared a partial loss (51%), such as reduced salaries or the loss of one of two jobs. More than a third of respondents (37%) have experienced a total loss of their income, such as losing their only job or losing their business.

Results show 18 percent of households rely on government assistance and social protection systems. The constant outflow of migrants, whilst allowing families to rely on remittances, translates into a concerning human capital and social capacity loss, including reduced numbers of teachers, doctors, scientists and other skilled workers.

**Basic Services**

The survey collected data on access to basic services (water, sanitation, housing, electricity, cooking facilities) to understand living conditions. The results show families are strongly concerned on the deterioration of basic services. At the time of the survey, four out of 10 households had daily interruptions in the electrical service and 72 percent had an irregular gas supply. Four out of 10 households have recurrent interruptions in the water service; as a result, families use alternative strategies to gain access to potable water such as buying bottled water or using water trucking services. Twenty-five percent of the households do not have sustainable access to potable water.

**Primary country:**

Venezuela (Bolivarian Republic of)(/country/ven)

**Source:**

World Food Programme(/organization/wfp)

**Format:**

Assessment(/updates?list=Assessment%20Updates&advanced-search=%28F5%29)

**Themes:**

Food and Nutrition(/updates?list=Food%20and%20Nutrition%20Updates&advanced-search=%28T4593%29) / Water Sanitation Hygiene(/updates?list=Water%20Sanitation%20Hygiene%20Updates&advanced-search=%28T4604%29)

**Language:**

English(/updates?list=English%20Updates&advanced-search=%28L267%29)

# Related Content

Venezuela(/country/ven)   **ACAPS Anticipatory note: Venezuela - Anticipation of flooding, 20 July 2023(https://reliefweb.int/report/venezuela-bolivarian-republic/acaps-anticipatory-note-venezuela-anticipation-flooding-20-july-2023)**

Analysis

**Source:** ACAPS(/organization/acaps)

**Posted:** 21 Jul 2023

**Originally published:** 20 Jul 2023

Venezuela(/country/ven)   **Venezuela en Emergencia Humanitaria Compleja: Colapso y brechas de privación social en comunidades, junio 2023(https://reliefweb.int/report/venezuela-bolivarian-republic/venezuela-en-emergencia-humanitaria-compleja-colapso-y-brechas-de-privacion-social-en-comunidades-junio-2023)**

Assessment

**Source:** HumVenezuela(/organization/humvenezuela)

**Posted:** 19 Jul 2023

**Originally published:** 19 Jul 2023

**Venezuela(/country/ven)    Plan de Contingencia: Foro de Coordinación de Zulia -
Emergencias por inundaciones en el estado Zulia (Actualizado 27 de junio 2023)
(https://reliefweb.int/report/venezuela-bolivarian-republic/plan-de-contingencia-foro-
de-coordinacion-de-zulia-emergencias-por-inundaciones-en-el-estado-zulia-
actualizado-27-de-junio-2023)**

Situation Report

**Source:** OCHA(/organization/ocha)

**Posted:** 17 Jul 2023

**Originally published:** 27 Jun 2023

**Venezuela(/country/ven)    Plan de Contingencia: Anzoátegui - Inundaciones por
Lluvias(Mayo de 2023)(https://reliefweb.int/report/venezuela-bolivarian-republic/plan-
de-contingencia-anzoategui-inundaciones-por-lluviasmayo-de-2023)**

Manual and Guideline

**Source:** OCHA(/organization/ocha)

**Posted:** 17 Jul 2023

**Originally published:** 31 May 2023



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV-00007

EXHIBIT NO. 006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 6

66 STAT.]     PUBLIC LAW 414—JUNE 27, 1952     163

Public Law 414     CHAPTER 477

AN ACT

To revise the laws relating to immigration, naturalization, and nationality; and for other purposes.

June 27, 1952
[H. R. 5678]

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act, divided into titles, chapters, and sections according to the following table of contents, may be cited as the "Immigration and Nationality Act".

Immigration and Nationality Act.

TABLE OF CONTENTS

TITLE I—GENERAL

Sec. 101. Definitions.
Sec. 102. Applicability of title II to certain nonimmigrants.
Sec. 103. Powers and duties of the Attorney General and the Commissioner.
Sec. 104. Powers and duties of the Secretary of State; Bureau of Security and Consular Affairs.
Sec. 105. Liaison with internal security officers.

TITLE II—IMMIGRATION

CHAPTER 1—QUOTA SYSTEM

Sec. 201. Numerical limitations; annual quota based upon national origin; minimum quotas.
Sec. 202. Determination of quota to which an immigrant is chargeable.
Sec. 203. Allocation of immigrant visas within quotas.
Sec. 204. Procedure for granting immigrant status under section 101 (a) (27) (F) (i) or 203 (a) (1) (A).
Sec. 205. Procedure for granting nonquota status or preference by reason of relationship.
Sec. 206. Revocation of approval of petitions.
Sec. 207. Unused quota immigrant visas.

CHAPTER 2—QUALIFICATIONS FOR ADMISSION OF ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

Sec. 211. Documentary requirements.
Sec. 212. General classes of aliens ineligible to receive visas and excluded from admission.
Sec. 213. Admission of aliens on giving bond or cash deposit.
Sec. 214. Admission of nonimmigrants.
Sec. 215. Travel control of aliens and citizens in time of war or national emergency.

CHAPTER 3—ISSUANCE ON ENTRY DOCUMENTS

Sec. 221. Issuance of visas.
Sec. 222. Applications for visas.
Sec. 223. Reentry permits.
Sec. 224. Nonquota immigrant visas.

CHAPTER 4—PROVISIONS RELATING TO ENTRY AND EXCLUSION

Sec. 231. Lists of aliens and citizen passengers arriving or departing; record of resident aliens and citizens leaving permanently for foreign country.
Sec. 232. Detention of aliens for observation and examination.
Sec. 233. Temporary removal for examination upon arrival.
Sec. 234. Physical and mental examination.
Sec. 235. Inspection by immigrant officers.
Sec. 236. Exclusion of aliens.
Sec. 237. Immediate deportation of aliens excluded from admission or entering in violation of law.
Sec. 238. Entry through or from foreign contiguous territory and adjacent islands; landing stations.
Sec. 239. Designation of ports of entry for aliens arriving by civil aircraft.
Sec. 240. Records of admission.

CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS

Sec. 241. General classes of deportable aliens.
Sec. 242. Apprehension and deportation of aliens.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

TABLE OF CONTENTS—Continued

TITLE II—IMMIGRATION—Continued

CHAPTER 5—DEPORTATION; ADJUSTMENT OF STATUS—Continued

Sec. 243. Countries to which aliens shall be deported; cost of deportation.
Sec. 244. Suspension of deportation; voluntary departure.
Sec. 245. Adjustment of status of nonimmigrant to that of person admitted for permanent residence.
Sec. 246. Rescission of adjustment of status.
Sec. 247. Adjustment of status of certain resident aliens to nonimmigrant status.
Sec. 248. Change of nonimmigrant classification.
Sec. 249. Record of admission for permanent residence in the case of certain aliens who entered prior to July 1, 1924.
Sec. 250. Removal of aliens who have fallen into distress.

CHAPTER 6—SPECIAL PROVISIONS RELATING TO ALIEN CREWMEN

Sec. 251. Lists of alien crewmen; reports of illegal landings.
Sec. 252. Conditional permits to land temporarily.
Sec. 253. Hospital treatment of alien crewmen afflicted with certain diseases.
Sec. 254. Control of alien crewmen.
Sec. 255. Employment on passenger vessels of aliens afflicted with certain disabilities.
Sec. 256. Discharge of alien crewmen.
Sec. 257. Bringing in alien crewmen into United States with intent to evade immigration laws.

CHAPTER 7—REGISTRATION OF ALIENS

Sec. 261. Aliens seeking entry into the United States.
Sec. 262. Registration of aliens in the United States.
Sec. 263. Provisions governing registration of special groups.
Sec. 264. Forms and procedure.
Sec. 265. Notices of change of address.
Sec. 266. Penalties.

CHAPTER 8—GENERAL PENALTY PROVISIONS

Sec. 271. Prevention of unauthorized landing of aliens.
Sec. 272. Bringing in alien subject to disability or afflicted with disease.
Sec. 273. Unlawful bringing of aliens into United States.
Sec. 274. Bringing in and harboring certain aliens.
Sec. 275. Entry of alien at improper time or place; misrepresentation and concealment of facts.
Sec. 276. Reentry of deported alien.
Sec. 277. Aiding or assisting subversive alien to enter the United States.
Sec. 278. Importation of aliens for immoral purposes.
Sec. 279. Jurisdiction of district courts.
Sec. 280. Collection of penalties and expenses.

CHAPTER 9—MISCELLANEOUS

Sec. 281. Schedule of fees.
Sec. 282. Printing of reentry permits and blank forms of manifests and crew lists.
Sec. 283. Travel expenses and expense of transporting remains of immigration officers and employees who die outside the United States.
Sec. 284. Members of the Armed Forces.
Sec. 285. Disposal of privileges at immigrant stations.
Sec. 286. Disposition of moneys collected under the provisions of this title.
Sec. 287. Powers of immigration officers and employees.
Sec. 288. Local jurisdiction over immigrant stations.
Sec. 289. American Indians born in Canada.
Sec. 290. Central file; information from other departments and agencies.
Sec. 291. Burden of proof.
Sec. 292. Right to counsel.

TITLE III—NATIONALITY AND NATURALIZATION

CHAPTER 1—NATIONALITY AT BIRTH AND BY COLLECTIVE NATURALIZATION

Sec. 301. Nationals and citizens at birth.
Sec. 302. Persons born in Puerto Rico.
Sec. 303. Persons born in the Canal Zone.

TABLE OF CONTENTS—Continued

Title III—Nationality and Naturalization—Continued

Chapter 1—Nationality at Birth and by Collective Naturalization—Continued

Sec. 304. Persons born in Alaska.
Sec. 305. Persons born in Hawaii.
Sec. 306. Persons living in and born in the Virgin Islands.
Sec. 307. Persons living in and born in Guam.
Sec. 308. Nationals but not citizens at birth.
Sec. 309. Children born out of wedlock.

CHAPTER 2—NATIONALITY THROUGH NATURALIZATION

Sec. 310. Jurisdiction to naturalize.
Sec. 311. Eligibility for naturalization.
Sec. 312. Requirements as to understanding the English language, history, principles and form of government of the United States.
Sec. 313. Prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government.
Sec. 314. Ineligibility to naturalization of deserters from the Armed Forces of the United States.
Sec. 315. Alien relieved from training and service in the Armed Forces of the United States because of alienage barred from citizenship.
Sec. 316. Requirements as to residence, good moral character, attachment to the principles of the Constitution, and favorable disposition to the United States.
Sec. 317. Temporary absence of persons performing religious duties.
Sec. 318. Prerequisites to naturalization—burden of proof.
Sec. 319. Married persons.
Sec. 320. Children born outside of United States of one alien and one citizen parent.
Sec. 321. Children born outside of United States of alien parent.
Sec. 322. Child born outside of United States; naturalization on petition of citizen parent; requirements and exemptions.
Sec. 323. Children adopted by United States citizens.
Sec. 324. Former citizens regaining United States citizenship.
Sec. 325. Nationals but not citizens of the United States; residence within outlying possessions.
Sec. 326. Resident Philippine citizens excepted from certain requirements.
Sec. 327. Former United States citizens losing citizenship by entering the armed forces of foreign countries during World War II.
Sec. 328. Naturalization through service in the Armed Forces of the United States.
Sec. 329. Naturalization through active-duty service in Armed Forces during World War I or World War II.
Sec. 330. Constructive residence through service on certain United States vessels.
Sec. 331. Alien enemies; naturalization under specified conditions and procedure.
Sec. 332. Procedural and administrative provisions; executive functions.
Sec. 333. Photographs.
Sec. 334. Petition for naturalization; declaration of intention.
Sec. 335. Investigation of petitioners; preliminary examinations on petitions.
Sec. 336. Final hearing in open court; examination of petitioner before the court.
Sec. 337. Oath of renunciation and allegiance.
Sec. 338. Certificate of naturalization; contents.
Sec. 339. Functions and duties of clerks.
Sec. 340. Revocation of naturalization.
Sec. 341. Certificates of citizenship; procedure.
Sec. 342. Cancellation of certificates not to affect citizenship status.
Sec. 343. Documents and copies issued by the Attorney General.
Sec. 344. Fiscal provisions.
Sec. 345. Mail relating to naturalization transmitted free of postage and registered.
Sec. 346. Publication and distribution of citizenship textbooks from naturalization fees.
Sec. 347. Compilation of naturalization statistics and payment for equipment.
Sec. 348. Admissibility in evidence of testimony as to statements voluntarily made to officers or employees in the course of their official duties.

CHAPTER 3—LOSS OF NATIONALITY

Sec. 349. Loss of nationality by native-born or naturalized citizen.
Sec. 350. Dual nationals; divestiture of foreign nationality.
Sec. 351. Restrictions on expatriation.

TABLE OF CONTENTS—Continued

TITLE III—NATIONALITY AND NATURALIZATION—Continued

CHAPTER 3—LOSS OF NATIONALITY—Continued

Sec. 352. Loss of nationality by naturalized national.
Sec. 353. Section 352 not effective as to certain persons.
Sec. 354. Section 352 (a) (2) not effective as to certain persons.
Sec. 355. Loss of American nationality through parent's expatriation; not effective until person attains age of twenty-five years.
Sec. 356. Nationality lost solely from performance of acts or fulfillment of conditions.
Sec. 357. Application of treaties: exceptions.

CHAPTER 4—MISCELLANEOUS

Sec. 358. Certificate of diplomatic or consular officer as to loss of American nationality.
Sec. 359. Certificate of nationality for a person not a naturalized citizen for use in proceedings of a foreign state.
Sec. 360. Judicial proceedings for declaration of United States nationality in event of denial of rights and privileges as national.

TITLE IV—MISCELLANEOUS

Sec. 401. Joint Congressional Committee.
Sec. 402. Amendments to other laws.
Sec. 403. Laws repealed.
Sec. 404. Authorization of appropriations.
Sec. 405. Savings clauses.
Sec. 406. Separability.
Sec. 407. Effective date.

# TITLE I—GENERAL

### DEFINITIONS

SECTION 101. (a) As used in this Act—

(1) The term "administrator" means the administrator of the Bureau of Security and Consular Affairs of the Department of State.

(2) The term "advocates" includes, but is not limited to, advises, recommends, furthers by overt act, and admits belief in.

"Alien."

(3) The term "alien" means any person not a citizen or national of the United States.

(4) The term "application for admission" has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.

(5) The term "Attorney General" means the Attorney General of the United States.

(6) The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations.

(7) The term "clerk of court" means a clerk of a naturalization court.

(8) The terms "Commissioner" and "Deputy Commissioner" mean the Commissioner of Immigration and Naturalization and a Deputy Commissioner of Immigration and Naturalization, respectively.

(9) The term "consular officer" means any consular, diplomatic, or other officer of the United States designated under regulations prescribed under authority contained in this Act, for the purpose of issuing immigrant or nonimmigrant visas. In cases of aliens, in the

If such entire number of immigrant visas has not been issued, the Secretary of State, upon notification by the Attorney General of the admission under subsection (c) of a quota immigrant within clause (2) or (3) of subsection (a), shall reduce by one the number of immigrant visas which may be issued to quota immigrants under the same quota during the fiscal year in which such immigrant is admitted, or, if the entire number of immigrant visas which may be issued to quota immigrants under the same quota for the fiscal year has been issued, then during the next following fiscal year.

(e)  Every alien making application for admission as an immigrant shall present a valid unexpired passport, or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General.

### GENERAL CLASSES OF ALIENS INELIGIBLE TO RECEIVE VISAS AND EXCLUDED FROM ADMISSION

Sec. 212. (a)  Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

(1)  Aliens who are feeble-minded;

(2)  Aliens who are insane;

(3)  Aliens who have had one or more attacks of insanity;

(4)  Aliens afflicted with psychopathic personality, epilepsy, or a mental defect;

(5)  Aliens who are narcotic drug addicts or chronic alcoholics;

(6)  Aliens who are afflicted with tuberculosis in any form, or with leprosy, or any dangerous contagious disease;

(7)  Aliens not comprehended within any of the foregoing classes who are certified by the examining surgeon as having a physical defect, disease, or disability, when determined by the consular or immigration officer to be of such a nature that it may affect the ability of the alien to earn a living, unless the alien affirmatively establishes that he will not have to earn a living;

(8)  Aliens who are paupers, professional beggars, or vagrants;

(9)  Aliens who have been convicted of a crime involving moral turpitude (other than a purely political offense), or aliens who admit having committed such a crime, or aliens who admit committing acts which constitute the essential elements of such a crime; except that aliens who have committed only one such crime while under the age of eighteen years may be granted a visa and admitted if the crime was committed more than five years prior to the date of the application for a visa or other documentation, and more than five years prior to date of application for admission to the United States, unless the crime resulted in confinement in a prison or correctional institution, in which case such alien must have been released from such confinement more than five years prior to the date of the application for a visa or other documentation, and for admission, to the United States;

(10)  Aliens who have been convicted of two or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement actually imposed were five years or more;

(11)  Aliens who are polygamists or who practice polygamy or advocate the practice of polygamy;

(12)  Aliens who are prostitutes or who have engaged in prostitution, or aliens coming to the United States solely, principally, or incidentally to engage in prostitution; aliens who directly or indirectly

procure or attempt to procure, or who have procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution or for any other immoral purpose; and aliens who are or have been supported by, or receive or have received, in whole or in part, the proceeds of prostitution or aliens coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution;

(13) Aliens coming to the United States to engage in any immoral sexual act;

(14) Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, if the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) sufficient workers in the United States who are able, willing, and qualified are available at the time (of application for a visa and for admission to the United States) and place (to which the alien is destined) to perform such skilled or unskilled labor, or (B) the employment of such aliens will adversely affect the wages and working conditions of the workers in the United States similarly employed. The exclusion of aliens under this paragraph shall apply only to the following classes: (i) those aliens described in the non-preference category of section 203 (a) (4); (ii) those aliens described in section 101 (a) (27) (C), (27) (D), or (27) (E) (other than the parents, spouses, or children of United States citizens or of aliens lawfully admitted to the United States for permanent residence), unless their services are determined by the Attorney General to be needed urgently in the United States because of the high education, technical training, specialized experience, or exceptional ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interest or welfare of the United States;

(15) Aliens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges;

(16) Aliens who have been excluded from admission and deported and who again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Attorney General has consented to their reapplying for admission;

(17) Aliens who have been arrested and deported, or who have fallen into distress and have been removed pursuant to this or any prior act, or who have been removed as alien enemies, or who have been removed at Government expense in lieu of deportation pursuant to section 242 (b), unless prior to their embarkation or reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Attorney General has consented to their applying or reapplying for admission;

(18) Aliens who are stowaways;

(19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact;

(20) Except as otherwise specifically provided in this Act, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality, if such document

is required under the regulations issued by the Attorney General pursuant to section 211 (e) ;

(21) Except as otherwise specifically provided in this Act, any quota immigrant at the time of application for admission whose visa has been issued without compliance with the provisions of section 203;

(22) Aliens who are ineligible to citizenship, except aliens seeking to enter as nonimmigrants; or persons who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time of war or a period declared by the President to be a national emergency, except aliens who were at the time of such departure nonimmigrant aliens and who seek to reenter the United States as nonimmigrants;

(23) Any alien who has been convicted of a violation of any law or regulation relating to the illicit traffic in narcotic drugs, or who has been convicted of a violation of any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation or exportation of opium, coca leaves, heroin, marihuana, or any salt derivative or preparation of opium or coca leaves, or isonipecaine or any addiction-forming or addiction-sustaining opiate; or any alien who the consular officer or immigration officers know or have reason to believe is or has been an illicit trafficker in any of the aforementioned drugs;

(24) Aliens (other than those aliens who are native-born citizens of countries enumerated in section 101 (a) (27) (C) and aliens described in section 101 (a) (27) (B)) who seek admission from foreign contiguous territory or adjacent islands, having arrived there on a vessel or aircraft of a nonsignatory line, or if signatory, a noncomplying transportation line under section 238 (a) and who have not resided for at least two years subsequent to such arrival in such territory or adjacent islands;

(25) Aliens (other than aliens who have been lawfully admitted for permanent residence and who are returning from a temporary visit abroad) over sixteen years of age, physically capable of reading, who cannot read and understand some language or dialect;

(26) Any nonimmigrant who is not in possession of (A) a passport valid for a minimum period of six months from the date of the expiration of the initial period of his admission or contemplated initial period of stay authorizing him to return to the country from which he came or to proceed to and enter some other country during such period; and (B) at the time of application for admission a valid nonimmigrant visa or border crossing identification card;

(27) Aliens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States;

(28) Aliens who are, or at any time have been, members of any of the following classes:

(A) Aliens who are anarchists;

(B) Aliens who advocate or teach, or who are members of or affiliated with any organization that advocates or teaches, opposition to all organized government;

(C) Aliens who are members of or affiliated with (i) the Communist Party of the United States, (ii) any other totalitarian party of the United States, (iii) the Communist Political Association, (iv) the Communist or any other totalitarian party of any

State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state, (v) any section, subsidiary, branch, affiliate, or subdivision of any such association or party, or (vi) the direct predecessors or successors of any such association or party, regardless of what name such group or organization may have used, may now bear, or may hereafter adopt: *Provided*, That nothing in this paragraph, or in any other provision of this Act, shall be construed as declaring that the Communist Party does not advocate the overthrow of the Government of the United States by force, violence, or other unconstitutional means;

(D) Aliens not within any of the other provisions of this paragraph who advocate the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with any organization that advocates the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, either through its own utterances or through any written or printed publications issued or published by or with the permission or consent of or under the authority of such organization or paid for by the funds of, or funds furnished by, such organization;

(E) Aliens not within any of the other provisions of this paragraph, who are members of or affiliated with any organization during the time it is registered or required to be registered under section 7 of the Subversive Activities Control Act of 1950, unless such aliens establish that they did not have knowledge or reason to believe at the time they became members of or affiliated with such an organization (and did not thereafter and prior to the date upon which such organization was so registered or so required to be registered have such knowledge or reason to believe) that such organization was a Communist organization;

(F) Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage;

(G) Aliens who write or publish, or cause to be written or published, or who knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed, or who knowingly have in their possession for the purpose of circulation, publication, distribution, or display, any written or printed matter, advocating or teaching opposition to all organized government, or advocating or teaching (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage; or (v) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship;

64 Stat. 993.
50 USC 786.

(H) Aliens who are members of or affiliated with any organization that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in paragraph (G);

(I) Any alien who is within any of the classes described in subparagraphs (B), (C), (D), (E), (F), (G), and (H) of this paragraph because of membership in or affiliation with a party or organization or a section, subsidiary, branch, affiliate, or subdivision thereof, may, if not otherwise ineligible, be issued a visa if such alien establishes to the satisfaction of the consular officer when applying for a visa and the consular officer finds that (i) such membership or affiliation is or was involuntary, or is or was solely when under sixteen years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and where necessary for such purposes, or (ii) (a) since the termination of such membership or affiliation, such alien is and has been, for at least five years prior to the date of the application for a visa, actively opposed to the doctrine, program, principles, and ideology of such party or organization or the section, subsidiary, branch, or affiliate or subdivision thereof, and (b) the admission of such alien into the United States would be in the public interest.  Any such alien to whom a visa has been issued under the provisions of this subparagraph may, if not otherwise inadmissible, be admitted into the United States if he shall establish to the satisfaction of the Attorney General when applying for admission to the United States and the Attorney General finds that (i) such membership or affiliation is or was involuntary, or is or was solely when under sixteen years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and when necessary for such purposes, or (ii) (a) since the termination of such membership or affiliation, such alien is and has been, for at least five years prior to the date of the application for admission actively opposed to the doctrine, program, principles, and ideology of such party or organization or the section, subsidiary, branch, or affiliate or subdivision thereof, and (b) the admission of such alien into the United States would be in the public interest.  The Attorney General shall promptly make a detailed report to the Congress in the case of each alien who is or shall be admitted into the United States under (ii) of this subparagraph;

(29) Aliens with respect to whom the consular officer or the Attorney General knows or has reasonable ground to believe probably would, after entry, (A) engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activity subversive to the national security, (B) engage in any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means, or (C) join, affiliate with, or participate in the activities of any organization which is registered or required to be registered under section 7 of the Subversive Activities Control Act of 1950;

64 Stat. 993.
50 USC 786.

(30) Any alien accompanying another alien ordered to be excluded and deported and certified to be helpless from sickness or mental or physical disability or infancy pursuant to section 237 (e), whose protection or guardianship is required by the alien ordered excluded and deported;

(31) Any alien who at any time shall have, knowingly and for gain, encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law.

(b) The provisions of paragraph (25) of subsection (a) shall not be applicable to any alien who (1) is the parent, grandparent, spouse, daughter, or son of an admissible alien, or any alien lawfully admitted for permanent residence, or any citizen of the United States, if accompanying such admissible alien, or coming to join such citizen or alien lawfully admitted, and if otherwise admissible, or (2) proves that he is seeking admission to the United States to avoid religious persecution in the country of his last permanent residence, whether such persecution be evidenced by overt acts or by laws or governmental regulations that discriminate against such alien or any group to which he belongs because of his religious faith.   For the purpose of ascertaining whether an alien can read under paragraph (25) of subsection (a), the consular officers and immigration officers shall be furnished with slips of uniform size, prepared under direction of the Attorney General, each containing not less than thirty nor more than forty words in ordinary use, printed in plainly legible type, in one of the various languages or dialects of immigrants.   Each alien may designate the particular language or dialect in which he desires the examination to be made and shall be required to read and understand the words printed on the slip in such language or dialect. Nonapplicability.

(c) Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of paragraph (1) through (25) and paragraphs (30) and (31) of subsection (a).   Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 211 (b).

(d) (1) The provisions of paragraphs (11) and (25) of subsection (a) shall not be applicable to any alien who in good faith is seeking to enter the United States as a nonimmigrant.

(2) The provisions of paragraph (28) of subsection (a) of this section shall not be applicable to any alien who is seeking to enter the United States temporarily as a nonimmigrant under paragraph (15) (A) (iii) or (15) (G) (iv) of section 101 (a).

(3) Except as provided in this subsection, an alien (A) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under one or more of the paragraphs enumerated in subsection (a) (other than paragraphs (27) and (29)), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (B) who is inadmissible under one or more of the paragraphs enumerated in subsection (a) (other than paragraphs (27) and (29)), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General.

(4) Either or both of the requirements of paragraph (26) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands and Waiver of requirements.

residents thereof having a common nationality with such nationals, or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 238 (d).

Parole of aliens.

(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(6) The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of excludable aliens applying for temporary

Report to Congress.

admission under this subsection. The Attorney General shall make a detailed report to the Congress in any case in which he exercises his authority under paragraph (3) of this subsection on behalf of any alien excludable under paragraphs (9), (10), and (28) of subsection (a).

(7) The provisions of subsection (a) of this section, except paragraphs (20), (21), and (26), shall be applicable to any alien who shall leave Hawaii, Alaska, Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States: *Provided*, That persons who were admitted to Hawaii under the last sentence of section 8 (a) (1) of the Act of March 24, 1934, as amended (48 Stat. 456), and aliens who were admitted to Hawaii as nationals of the United States shall not be excepted by this paragraph from the application of paragraphs (20) and (21) of subsection (a) of this section, unless they belong to a class declared to be nonquota immigrants under the provisions of section 101 (a) (27) of this Act, other than subparagraph (C) thereof, or unless they were admitted to Hawaii with an immigration visa. The Attorney General shall by regulations provide a method and procedure for the temporary admission to the United States of the aliens described in this proviso. Any alien described in this paragraph, who is excluded from admission to the United States, shall be immediately deported in the manner provided by section 237 (a) of this Act.

(8) Upon a basis of reciprocity accredited officials of foreign governments, their immediate families, attendants, servants, and personal employees may be admitted in immediate and continuous transit through the United States without regard to the provisions of this section except paragraphs (26), (27), and (29) of subsection (a) of this section.

Suspension of entry by President.

(e) Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

ADMISSION OF ALIENS ON GIVING BOND OR CASH DEPOSIT

SEC. 213. Any alien excludable because he is likely to become a public charge or because of physical disability other than tuberculosis in any form, leprosy, or a dangerous contagious disease may, if other-



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 007

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.,* § | |
| § | |
| *Plaintiffs,* § | |
| § | |
| vs. § | CIVIL ACTION NO. |
| § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF § | |
| HOMELAND SECURITY, *et al.,* § | |
| § | |
| *Defendants,* and § | JUDGE DREW S. TIPTON |
| § | |
| VALERIE LAVEUS, *et al.,* § | |
| § | |
| *Intervenor Defendants.* § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 7

DOCUMENT RESUME

ED 206 779                                             UD 021 643

AUTHOR          Moore, Charlotte J.
TITLE           Review of U.S. Refugee Resettlement Programs and
                Policies. A Report. Revised.
INSTITUTION     Library of Congress, Washington, D.C. Congressional
                Research Service.
REPORT NO       SN-052-070-05409-3
PUB DATE        80
NOTE            350p.; Prepared at the request of Senator Edward M.
                Kennedy, Chairman, Committee on the Judiciary United
                States Senate by the Congressional Research Service,
                Library of Congress, 96th Congress, 2nd Session. Not
                available in paper copy due to reproduction quality
                of original document.
AVAILABLE FROM  Superintendent of Documents, U.S. Government Printing
                Office, Washington, DC 20402 ($6.50).

EDRS PRICE      MF01 Plus Postage. PC Not Available from EDRS.
DESCRIPTORS     Cubans; *Federal Legislation; *Federal Programs;
                *Immigrants; Indochinese; *Land Settlement;
                *Refugees; *Relocation; Social Services
IDENTIFIERS     Chileans; Hungarians; Kurds; Russians

ABSTRACT
        This government report reviews U.S. refugee
resettlement programs and policies. Part I of the book provides an
overview of U.S. refugee admissions programs and discusses refugee
admissions policies for two time frames: 1945 to 1965, and 1965 to
the present. In Part II an analysis of Federal assistance programs
for domestic resettlement of refugees is found. This section
describes assistance offered to refugees resettling in the U.S. and
the legislation and programs authorizing such assistance. The Refugee
Act of 1980 is covered in Part III. Major issues of the act are
outlined along with its legislative history. The section concludes
with a section-by-section summary of the Act. Appendices contain the
complete text of the 1980 Refugee Act, a conference report and
analysis of the Act, and a report on refugee resettlement in the U.S.
by the TransCentury Foundation. The TransCentury report presents
information regarding the Cuban, Hungarian, Indochinese, Chilean,
Kurdish, and Soviet resettlement efforts, resettlement organizations,
the needs of refugees, and resettlement models of other western
nations. Recommendations are offered and suggestions are made for
refocusing efforts in some areas. (APM)

**********************************************************************
*    Reproductions supplied by EDRS are the best that can be made    *
*                    from the original document.                     *
**********************************************************************



96th Congress }
2d Session }    **COMMITTEE PRINT**

# REVIEW OF U.S. REFUGEE RESETTLEMENT PROGRAMS AND POLICIES

## A REPORT

PREPARED AT THE REQUEST OF

Senator EDWARD M. KENNEDY, *Chairman*

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

BY THE

### CONGRESSIONAL RESEARCH SERVICE
### LIBRARY OF CONGRESS
### NINETY-SIXTH CONGRESS

SECOND SESSION



**U.S. DEPARTMENT OF EDUCATION**
NATIONAL INSTITUTE OF EDUCATION
EDUCATIONAL RESOURCES INFORMATION
CENTER (ERIC)

✓ This document has been reproduced as received from the person or organization originating it

Minor changes have been made to improve reproduction quality

• Points of view or opinions stated in this document do not necessarily represent official NIE position or policy

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON 1980

66-439 O

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402



## COMMITTEE ON THE JUDICIARY

EDWARD M. KENNEDY, Massachusetts, *Chairman*

BIRCH BAYH, Indiana
ROBERT C. BYRD, West Virginia
JOSEPH R. BIDEN, Jr., Delaware
JOHN C. CULVER, Iowa
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
MAX BAUCUS, Montana
HOWELL HEFLIN, Alabama

STROM THURMOND, South Carolina
CHARLES McC. MATHIAS, Jr., Maryland
PAUL LAXALT, Nevada
ORRIN G. HATCH, Utah
ROBERT DOLE, Kansas
THAD COCHRAN, Mississippi
ALAN K. SIMPSON, Wyoming

STEPHEN BREYER, *Chief Counsel*
EMORY SNEEDEN, *Minority Chief Counsel*
JERRY M. TINKER, *Counsel for Immigration and Refugee Affairs*

(II)

*3*



## FOREWORD

America has been a haven for the world's homeless since the first colonists reached these shores four centuries ago. Since then, the American people have a record of accomplishment in offering a helping hand to refugees that is unsurpassed by any other nation.

We can be proud of this record. Over many years we have responded generously and compassionately to the needs of the homeless, and our national policy of welcome has served our country and our traditions well.

But for too long our policy toward refugee assistance and resettlement lacked effective programing and planning. We admitted refugees in fits and starts because our immigration law was inadequate and out of date. Once refugees arrived, our resettlement programs and policies were inconsistent and out of touch with today's needs.

To bring some long overdue reform to our country's refugee policies and programs, Congress has enacted "The Refugee Act of 1980." As stated in the first title of the act, the objectives of the act were "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."

The new law accomplishes six basic objectives:

1. It repeals the previous law's discriminatory treatment of refugees by providing a new definition of a refugee—moving us away from only accepting refugees "from communism" or certain areas of the Middle East—to all who meet the test of the U N. Convention and Protocol on the Status of Refugees.

2. It raises the annual limitation on regular refugee admissions from 17,400 to 50,000 each fiscal year.

3. It provides for an orderly but flexible procedure to deal with emergency refugee situations if the resettlement needs of refugees of "special humanitarian concern" to the United States cannot be met within the regular ceiling established prior to the beginning of the fiscal year.

4. It replaces the former use of the "parole authority" contained in section 212(d)(5) of the Immigration and Nationality Act—which has been governed only by custom and practice—with new statutory language asserting congressional control (i.e., formal "consultations") over the entire process of admitting refugees.

5. It establishes an explicit asylum provision in our immigration law for the first time.

6. It provides for a full range of Federal programs to assist in the resettlement process, and statutorily creates the Office of Refugee Resettlement to monitor, coordinate, and implement refugee resettlement programs.

(III)

4

IV

Together, these provisions will enable the United States to meet any refugee situation, anywhere, and to deal with it more effectively and efficiently. The new law ends years of ad hoc programs and differing policies toward different refugees, and puts our refugee programs on a firmer footing.

To give some perspective to this new law, I asked the Library of Congress to update an earlier study on U.S. refugee resettlement programs, and to review for the committee the evolution of U.S. refugee law and policy. A revised edition of that study has now been submitted to the committee by the Congressional Research Service and is printed in this volume, along with other background material on refugee programs and policies.

The committee hopes this report will contribute to a better public understanding of U.S. refugee programs.

EDWARD M. KENNEDY,
*Chairman, Committee on the Judiciary.*



# LETTER OF SUBMITTAL

CONGRESSIONAL RESEARCH SERVICE,
THE LIBRARY OF CONGRESS,
*August 8, 1980.*

Senator EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR MR. CHAIRMAN : I am pleased to submit a report on U.S. refugee resettlement law and policy which was prepared at your request by the Congressional Research Service.

The report was written by Charlotte J. Moore, analyst in social legislation, of our Education and Public Welfare Division. It is a revised and updated version of a 1979 CRS paper of the same title by Catherine McHugh. Since that time, major legislation, the Refugee Act of 1980, was enacted by Congress. Ms. Moore's update focuses on the development of the Refugee Act in the context of past U.S. refugee admission and resettlement programs and policies.

We hope that this report will serve the needs of the Committee on the Judiciary, as well as the needs of other committees and Members of Congress concerned with U.S. refugee policy.

Sincerely,

GILBERT GUDE,
*Director.*

(v)



# CONTENTS

|  | Page |
|---|---|
| Forward by Senator Kennedy | III |
| Letter of Submittal | V |
| Introduction | 1 |
| Part I. Overview of U.S. refugee admissions programs | 3 |
| I. Legislative and administrative actions affecting refugee admissions: 1945–65 | 7 |
| A. Presidential directive of December 22, 1945 | 7 |
| B. Displaced Persons Act of 1948 | 7 |
| C. Immigration and Nationality Act of 1952 | 7 |
| 1. Defector provision | 7 |
| 2. Parole provision | 8 |
| 3. Withholding deportation because of anticipated persecution | 8 |
| D. Act of July 29, 1953 | 8 |
| E. The Refugee Relief Act of 1953 | 8 |
| F. Hungarian refugee program | 8 |
| G. Refugee-Escapee Act | 9 |
| H. Act of September 2, 1958 | 9 |
| I. Refugee fair share law | 10 |
| II. Refugee admissions legislation and procedure after 1965 | 10 |
| A. Conditional entry | 11 |
| B. Parole | 11 |
| C. Withholding deportation | 12 |
| D. Asylum | 15 |
| E. Special legislation providing permanent resident status to refugees | 15 |
| F. Other legislation impacting on refugee admissions | 16 |
| Part II. Federal assistance for domestic resettlement of refugees | 17 |
| I. Assistance to refugees resettling in the United States: A historical overview | 19 |
| A. The involvement of the private sector | 19 |
| B. Federal involvement in assisting refugee resettlement | 19 |
| 1. State Department | 22 |
| 2. The Department of Health, Education, and Welfare | 23 |
| 3. The Department of Justice | 25 |
| 4. Other agencies offering refugee assistance | 25 |
| 5. U.S. coordinator for refugee affairs | 25 |
| II. Legislation and programs authorizing refugee resettlement assistance | 26 |
| A. Migration and Refugee Assistance Act of 1962 | 26 |
| B. Indochina Migration and Refugee Assistance Act | 28 |
| C. Indochina Refugee Children Assistance Act of 1976 | 32 |
| D. Assistance for Soviets and other refugees | 33 |
| E. Initial reception and placement grants | 34 |
| Part III. The Refugee Act of 1980 | 35 |
| I. Major issues | 36 |
| A. Definition of refugee | 37 |
| B. Numerical limitations on refugee admissions | 38 |
| C. Consultation | 39 |
| D. Entry status | 41 |
| E. The use of the parole authority to admit refugees | 42 |
| F. Domestic resettlement assistance: Administration | 43 |
| G. Coordinating office | 44 |
| H. Domestic resettlement assistance: Duration | 45 |
| I. Domestic resettlement assistance: Phasedown of the Cuban program | 46 |

(VII)



VIII

| | Page |
|---|---|
| Part III. The Refugee Act of 1980—Continued | |
| II. Legislative history | 47 |
| A. Senate action | 47 |
| B. House action | 48 |
| C. Conference action | 50 |
| III. Section-by-section summary of the Refugee Act of 1980 | 51 |
| A. Title I—Purpose | 51 |
| B. Title II—Admission of refugees | 51 |
| C. Title III—U.S coordinator for refugee affairs and assistance for effective resettlement of refugees in the United States | 56 |
| D. Title IV—Social services for certain applicants for asylum | 60 |

### APPENDIX

| | |
|---|---|
| I. The Refugee Act of 1980 | 62 |
| II. Conference report and analysis of the Refugee Act | 80 |
| III. Refugee resettlement in the United States: Time for a new focus, a report by New TransCentury Foundation | 114 |



# INTRODUCTION

The Refugee Act,[1] enacted March 17, 1980, is the first comprehensive Federal statute affecting the admission and resettlement of refugees. The legislation amends the Immigration and Nationality Act to set forth new procedures for the regular and emergency admission of refugees into the United States, and provides a uniform authorization for Federal resettlement assistance. The major impetus for the legislation was the need to end an ad hoc approach that had characterized U.S. refugee policy since World War II.

Refugees, as distinct from immigrants, are aliens who flee their country of nationality generally because of persecution or fear of persecution. Immigrants, in contrast, leave their country of nationality voluntarily to seek family reunification, economic, or other benefits through reestablishing permanent residence in some other country of their choice.

From the beginning of our Nation's history, the United States has been a haven for oppressed peoples. Until the 20th century, there were few restrictions on immigration, and this country was equally open to those seeking freedom and those seeking their fortune. However, significant limitations on immigration were enacted by Congress which changed this. For example, the Immigration Act of 1917[2] set forth qualitative grounds for exclusion of aliens; the Immigration Act of 1924[3] established numerical quotas, primarily based on national origin, limiting immigration. With a few exceptions, refugees were indistinct from immigrants under these immigration laws.

Millions of people were uprooted during or following World War II, which required extraordinary measures to reduce the human suffering and disruption it brought about. During the postwar years, the United States adopted a series of special refugee admissions programs outside the regular immigration law under which thousands of refugees and other persons displaced by the war became permanently resettled here.

The United States continued a largely ad hoc approach to refugee admissions into the 1970's. Although some refugees entered the United States under normal immigration procedures, the bulk of refugee admissions were authorized outside the normal immigration channels by special programs. This was true for the Hungarians in the 1950's, the Cubans in the 1960's, and the Indochinese in the 1970's. The immigration law was not sufficiently flexible to bring in large groups of refugees in emergency situations. Instead, the Attorney General's discretionary authority to parole aliens into the country temporarily became the initial vehicle for admission, and special legislation was then generally required to adjust their status to permanent resident.

[1] Public Law 96-212. Act of Mar. 17, 1980. 94 Stat. 102.
[2] Act of Feb. 5, 1917. 39 Stat. 874.
[3] Act of May 26 1924. 43 Stat. 153.

(1)



2

Voluntary agencies and organizations were primarily responsible for refugee resettlement for a number of years. As the admission of large groups of refugees became more frequent, the Federal Government became increasingly responsible for providing assistance and services to aid in refugee resettlement and assimilation into our society. The special assistance programs that were enacted by the Federal Government for refugees were, like the admissions programs, designed to meet immediate needs rather than to establish a fundamental policy.

The Refugee Act of 1980 was drafted by Congress in cooperation with the Carter administration to establish by statute a permanent U.S. refugee policy. To a great extent the act reflects the experiences of the United States in recent years in coping with massive refugee migrations. It also affirms that this Nation has a fundamental commitment to providing sanctuary to refugees as part of its immigration policy.





## PART I. OVERVIEW OF U.S. REFUGEE ADMISSIONS PROGRAMS

The United States has traditionally been regarded as a place of asylum for persons fleeing religious or political persecution. It was not until World War II, however, that immigration programs were established which specifically provided for the admission of refugees. Prior to that time, refugees were subject to the same restrictions that were imposed on immigrants generally, except that persons fleeing religious or political persecution were exempted from the literacy test requirement of the law. Otherwise, admissions were limited by national origin quotas; by mental, moral and physical requirements; and by the prohibition against aliens' becoming public charges.

Immigration to the United States was relatively unrestricted until the 1880's when the first Chinese exclusion and contract labor laws were enacted. Immigration was restricted by quotas based on national origin which were established temporarily in 1921 and permanently in 1924. Although immigration law was subsequently amended, national origin quotas remained a fundamental component of the law until the enactment of the Immigration and Nationality Act Amendments of 1965.

The 1965 amendments to the Immigration and Nationality Act represented a fundamental revision of U.S. immigration policy, rejecting nationality and ethnic background as determinants of admission and substituting a system of priorities based primarily on reunification of families and on the alien's skills.[4] Built into this preference system was a permanent statutory basis for the admission of refugees, the so-called conditional entry provision of the Immigration and Nationality Act.[5]

Between World War II and 1965 there had been a series of specific programs under which refugees were admitted outside the regular immigration law. Under the 1965 amendments, with the new preference category for the conditional entry of refugees, it was the intent of Congress that such specific admissions programs would cease.

Since 1965 however, the vast majority of refugees admitted to the United States continued to do so outside the regular procedure prescribed by the Immigration and Nationality Act. There was considerable disparity in the treatment of refugees who entered the United States at different periods of time, who had come from different parts of the world, or who were fleeing from different kinds of political regimes under the irregular procedure that has governed their admission. This uneven means of admitting refugees was the major factor leading to the development of the admissions provisions of the Refugee Act.

The following section summarizes U.S. refugee admissions activities since World War II. Particular attention is devoted to the legislation

---

[4] U.S. Congress. Senate. Committee on the Judiciary. U.S. Immigration Law and Policy: 1952–1979 Committee Print, 96th Cong. 1st sess. Washington. U.S. Government Printing Office, 1979, p. 51.
[5] 8 U.S.C. 1153(a)(7).

(3)



11

4

and admissions procedures since 1965 which formed the backdrop for the evolution of the Refugee Act.

As an overview, table I indicates that 1,324,699 refugees were admitted to the United States for permanent residence between fiscal years 1946 and 1978 under special refugee legislation and under the conditional entry provision. Refugees whose status was not adjusted to that of permanent resident alien as of September 30, 1978, and those who were admitted under other provisions of immigration law are not included in the table. If these latter numbers are taken into account, the total number of refugees accepted by the United States for permanent resettlement since 1945 is about 2 million.

12

TABLE 1.—REFUGEES ADMITTED BY COUNTRY OR REGION OF BIRTH YEARS ENDED JUNE 30, 1946–76 JULY SEPTEMBER 1976 AND YEARS ENDED SEPT. 30, 1977–78

| Country or region of birth | Number admitted | President's directive of Dec. 22, 1945 | Displaced Persons Act of 1948 — Displaced persons admitted | Displaced persons adjusting under sec. 4 | German ethnics | Refugee Relief Act of 1953 | Act of July 29, 1953 (orphans) | Act of Sept 11 1957 (secs 4 and 15) | Act of July 25 1958 (Hungarian parolees) | Act of Sept. 2 1958 (Azores and Netherlands refugees) | Act of Sept 2 1959 (sec. 6) (refugee relatives) | Act of July 14 1960 (refugee escapees) | Act of Oct. 3 1965 (Conditional entries by refugees) [1] | Act of Nov. 2 1966 (Cuban refugees) | Act of Oct. 30 1977 (Indochinese refugees) [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All countries | 1,324,699 | 40,324 | 352,260 | 3,670 | 53,786 | 189,021 | 466 | 29,462 | 30,751 | 22,213 | 1,820 | 19,783 | 116,397 | 370,620 | 94,146 |
| Europe | 778,688 | 39,802 | 349,751 | 1,794 | 53,689 | 171,689 | 140 | 16,833 | 30,712 | 9,896 | 1,376 | 15,893 | 79,499 | 7,551 | 63 |
| Austria | 16,684 | 2,015 | 6,425 | 2 | 2,529 | 4,658 | 75 | 532 | 102 | 2 | | 74 | 259 | 10 | 1 |
| Belgium | 1,694 | 147 | 947 | 1 | 3 | 451 | | 8 | 3 | 3 | | 94 | 28 | 4 | |
| Bulgaria | 4,124 | 22 | 567 | 10 | 12 | 478 | | 197 | 8 | | | 4 | 2,315 | 3 | |
| Czechoslovakia | 27,580 | 3,386 | 9,522 | 277 | 2,839 | 2,916 | | 53 | 180 | 1 | | 515 | 8,321 | 3 | 1 |
| Denmark | 115 | 11 | 115 | | 7 | 24 | | 18 | | | | 82 | | 2 | |
| Estonia | 11,262 | 145 | 9,943 | | 55 | 657 | | 18 | | | | 12 | 1 | | |
| Finland | 163 | 12 | 93 | | | 18 | | 36 | | | | | | | |
| France | 2,404 | 157 | 791 | 221 | 8 | 660 | | 198 | 10 | 5 | 5 | 256 | 279 | 41 | |
| Germany | 100,295 | 16,071 | 52,049 | | 10,069 | 20,922 | 1 | 598 | 29 | 5 | | 216 | 204 | 29 | 4 |
| Greece | 29,602 | | 10,272 | 3 | 2 | 16,922 | 54 | 598 | 12 | 7 | 390 | 80 | 367 | 25 | |
| Hungary | 69,684 | 885 | 12,826 | 297 | 3,504 | 9,659 | | 5,172 | 29,905 | 5 | 1 | 1,605 | 5,811 | 13 | |
| Ireland | 65 | 7 | 31 | | | 18 | | 1 | | | | | | | |
| Italy | 827 | 157 | 2,217 | 1 | 19 | 57,026 | 4 | 1,685 | 2 | | | 168 | 476 | 88 | 3 |
| Latvia | 38,263 | 538 | 35,150 | 12 | 645 | 1,657 | | 85 | | 953 | 3 | 47 | 9 | | |
| Lithuania | 27,352 | 790 | 23,202 | 211 | 1,478 | 1,557 | | 94 | | 3 | | 21 | 28 | 38 | 1 |
| Netherlands | 17,608 | 116 | 53 | 2 | | 11,337 | | 1,031 | | 5,033 | | 2 | 10 | 17 | |
| Norway | | 8 | 25 | | | | | | | | | | | | |
| Poland | 167,077 | 11,660 | 128,569 | 341 | 6,952 | 11,912 | 14 | 1,139 | 14 | 4,811 | 4 | 776 | 5,086 | 464 | 21 |
| Portugal | 5,040 | 8 | 14 | 136 | | 34 | | 125 | | 3 | 9 | 1 | 13 | 46 | |
| Romania | 28,421 | 535 | 5,129 | 5 | 5,353 | 4,369 | 5 | 482 | 274 | | | 4,438 | 7,547 | 41 | |
| Spain | 9,420 | | 31 | | | 173 | | 173 | | 3 | | 21 | 2,602 | 6,460 | |
| Sweden | 450 | 10 | 31 | | | 73 | | 59 | | | | | | 8 | |
| Switzerland | 331 | 66 | 131 | 51 | 38 | 38 | | 186 | 1 | 9 | | 6 | 6 | 9 | |
| U.S.S.R. | 64,356 | 1,982 | 31,333 | | 4,323 | 5,827 | | 186 | 9 | | | 251 | 20,159 | 105 | 6 |
| United Kingdom | 2,834 | 183 | 1,819 | | 77 | 679 | | 25 | 9 | 3 | | 21 | 973 | 1 | |
| Yugoslavia | 84,110 | 756 | 738 | 193 | 15,936 | 17,425 | | 3,002 | 154 | | | 6,443 | 22,973 | 1 | 5 |
| Other Europe | 6,940 | 154 | 904 | 4 | 270 | 2,184 | 2 | 415 | 4 | 2 | 1 | 762 | 2,099 | 139 | |

See footnotes at end of table

ERIC

TABLE I.—REFUGEES ADMITTED BY COUNTRY OR REGION OF BIRTH YEARS ENDED JUNE 30, 1946–76, JULY SEPTEMBER 1976, AND YEARS ENDED SEPT. 30, 1977–78—Continued

| Country or region of birth | Number admitted | President's directive of Dec. 22, 1945 | Displaced Persons Act of 1948 — Displaced persons admitted | Displaced persons adjusting under sec. 4 | German ethnics | Refugee Relief Act of 1953 | Act of July 29, 1953 (orphans) | Act of Sept. 11, 1957 (sec. 4 and 15) | Act of July 25, 1958 (Hungarian parolees) | Act of Sept. 2, 1958 (Azores and Netherlands refugees) | Act of Sept. 22, 1959 (sec. 6) (refugee relatives) | Act of July 14, 1960 (refugee escapees) refugees[1] | Act of Oct. 3, 1965 (conditional entries by refugees)[2] | Act of Nov. 2, 1966 (Cuban refugees)[1] | Act of Oct. 30, 1977 (Indochinese refugees)[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asia | 172,585 | 416 | 2,157 | 1,848 | 11 | 16,333 | 324 | 20,869 | 4 | 12,262 | 431 | 795 | 32,078 | 1,041 | 94,017 |
| China and Taiwan | 28,692 | 204 | 909 | 1,729 |  | 6,903 | 3 | 2,826 |  | 7 | 115 | 23 | 15,047 | 620 | 223 |
| India | 140 | 4 |  |  | 4 |  | 2 | 21 |  |  |  |  | 36 | 9 | 2 |
| Indonesia | 15,595 |  |  |  |  | 46 |  |  |  | 12,133 |  |  | 35 | 9 | 2 |
| Israel | 870 |  | 2 | 8 |  | 3,148 |  | 612 |  |  | 2 | 2 | 92 | 11 |  |
| Japan | 4,384 | 3 | 16 | 2 | 2 | 521 |  | 210 |  | 1 | 269 |  | 96 | 1 | 1 |
| Korea | 4,482 |  | 9 |  |  | 2,268 | 287 | 1,505 |  |  |  | 2 | 13 | 6 | 37 |
| Palestine | 1,098 | 40 | 77 | 46 |  | 630 |  | 3,793 |  |  |  |  | 9 | 10 |  |
| Philippines | 477 |  |  |  |  | 607 |  | 170 |  |  |  | 34 | 106 | 26 | 1 |
| Other Asia | 116,453 | 82 | 1,118 | 99 |  | 121 | 15 | 187 |  | 1 | 3 |  | 7 | 344 | 85 |
| North America | 363,081 | 50 | 228 | 3 | 2 | 2,089 | 18 | 1,591 | 3 | 4 | 39 | 726 | 16,672 | 361,128 | 93,655 |
| Canada | 134 |  | 27 |  | 57 | 486 |  | 191 | 35 | 100 | 11 |  | 836 | 315 | 32 |
| Mexico | 317 |  | 3 |  | 8 | 15 |  |  |  | 22 |  |  |  |  | 6 |
| West Indies | 361,399 |  |  |  |  | 5 |  |  |  | 18 |  |  | 825 | 360,318 | 10 |
| Cuba | 360,772 |  |  |  |  | 50 |  | 164 |  | 18 |  | 1 | 818 | 359,953 | 11 |
| Other West Indies | 627 | 5 | 1 | 1 |  | 7 |  | 3 |  |  |  |  | 7 | 365 |  |
| Central America | 884 | 4 |  |  |  | 409 |  | 164 |  | 18 | 4 |  | 3 | 302 | 10 |
| Other North America | 998 | 38 | 204 | 47 |  | 43 |  | 16 | 34 |  | 2 |  | 5 | 121 | 3 |
| South America | 9,126 | 24 | 15 | 1 | 4 | 405 |  | 1,492 |  | 9 | 2 | 3,091 | 14 | 835 | 3 |
| Africa | 9,126 | 15 | 28 | 25 | 1 | 405 |  | 1,492 |  | 9 |  | 3,091 | 3,960 | 40 | 14 |
| Other countries | 220 | 17 | 31 |  |  | 65 | 1 | 55 |  | 23 |  |  | 10 | 5 | 11 |

[1] Includes 6,130 Hungarian refugees.
[2] Includes 102,217 aliens who conditionally entered the United States and 14,190 refugees whose status was adjusted to permanent residents after 2 yr continuous physical presence in the United States. The 102,217 conditional entrants include those who have been accorded lawful permanent resident status.
[3] Includes 3,566 for Cambodia, 4,205 for Laos and 83,651 for Vietnam.

Source: U.S. Department of Justice, Immigration and Naturalization Service.


ERIC

7

## I. Legislative and Administrative Actions Affecting Refugee Admissions: 1945–65

### A. *Presidential Directive of December 22, 1945*

In 1945, President Truman announced new administrative procedures would be instituted to facilitate the immigration of displaced persons under existing immigration quotas, with emphasis on reestablishing European consular operations disrupted by World War II. This program was carried out through June 10, 1948, when the Displaced Persons Act went into effect.

### B. *Displaced Persons Act of 1948*

In his state of the Union message to Congress in January 1947, President Truman referred to the inadequacy of the attempt to admit displaced persons within the existing immigration quotas. He proposed emergency legislation which was eventually enacted in the Displaced Persons Act of 1948, the first significant refugee legislation in U.S. history.

The Displaced Persons Act of 1948 as amended [a] provided for the admission of over 400,000 displaced persons through December 31, 1951. This was accomplished by charging the admissions of displaced persons to the national immigration quotas of their country of origin and, if oversubscribed, the admission was charged to the future annual quotas of the country in question, or "mortgaged."

The Displaced Persons Act originally provided for the admission of 100,000 persons uprooted during or following World War II, 3,000 orphans, and 2,000 Czechs who fled the 1948 Communist coup, through June 30, 1950; and provided for the adjustment to permanent resident status of 15,000 displaced persons already in the United States. In 1950, the categories of eligible aliens were expanded, possible admissions under the Displaced Persons Act were increased to 415,000, and the act was extended through June 30, 1951, except for certain provisions concerning orphans and persons of German ethnic origin which were effective through June 30, 1952. In 1951, the Displaced Persons Act was extended again, through December 31, 1951.

In order to be admitted under the Displaced Persons Act, an alien had to provide assurances that he would be able to obtain employment and housing without displacing an American, and that he would not become a public charge. Regular immigration requirements were imposed, as well as other eligibility requirements designed to keep out politically undesirable aliens, such as Communists. The assurances needed by aliens seeking admission to the United States were generally provided by private nonprofit voluntary agencies. The admission of refugees under the sponsorship of voluntary agencies has remained one of the principal features of U.S. refugee programs.

### C. *Immigration and Nationality Act of 1952*

One of the primary purposes of the Immigration and Nationality Act of 1952 [b] was to consolidate previous immigration laws into one statute. Although the Immigration and Nationality Act has been amended substantially since 1952, it remains the basic law governing immigration to the United States.

---

[a] Act of June 25, 1948, 62 Stat 1009; as amended by act of June 16, 1950, 64 Stat 219; and act of June 28, 1951, 65 Stat 96.
[b] Act of June 27, 1952, 66 Stat. 163.



8

As originally enacted, the Immigration and Nationality Act did not specifically provide for the admission of refugees. Three of its provisions which remain in effect today and relate to the admission of refugees are discussed below.

*1. Defector provision.*—Section 212(a)(28)(I)(ii) of the Immigration and Nationality Act permits the immigration of former Communist Party members or other persons affiliated with proscribed organizations if they can demonstrate that their membership was involuntary and was terminated at least 5 years prior to application for a visa. Without this provision, certain persons fleeing communism would be unable to enter the United States.

*2. Parole provision.*—The parole provision of the Immigration and Nationality Act, section 212(d)(5), incorporated into statutory law a provision authorizing the temporary parole of aliens into the United States, which had been an administrative practice of long standing. This provision authorizes the Attorney General in his discretion to parole any alien into the United States temporarily, under such conditions as the Attorney General may prescribe, in emergencies or for reasons deemed strictly in the public interest. Parole is not regarded as admission to the United States. When the purposes of parole have been served, the alien returns to the status from which he was paroled and is dealt with in the same manner as any other applicant for admission to the United States. Congress originally intended that parole would be used on a case-by-case basis on behalf of individual aliens. Parole has since been used as the primary basis for entry of large numbers of refugees. Section 212(d)(5) was amended by the Refugee Act to limit its use for the admission of refugees.

*3. Withholding deportation because of anticipated persecution.*—The Internal Security Act of 1950 [8] authorized withholding the deportation of an alien to any country where the Attorney General finds the alien would be subject to physical persecution. This provision was incorporated into the Immigration and Nationality Act as section 243(h).

Section 243(h) was subsequently amended, [9] most recently by the Refugee Act of 1980, expanding the grounds for relief from deportation.

## D. Act of July 29, 1953

The act of July 29, 1953, [10] permitted the entry of 500 orphans adopted, or coming to be adopted, by certain U.S. citizens.

## E. The Refugee Relief Act of 1953

At the height of the Cold War and after the expiration of the Displaced Persons Act, Congress enacted the Refugee Relief Act of 1953 primarily to expedite the admission into the United States of refugees escaping Iron Curtain countries.

The act, as amended, [11] authorized the admission of 214,000 refugees and was in force between August 7, 1953 and December 31, 1956. In contrast to the Displaced Persons Act, the admissions were authorized

[8] Act of Sept. 23, 1950, 64 Stat. 987
[9] Section 243(h) was amended by the 1965 amendments to the Immigration and Nationality Act (Act of Oct. 3, 1965, 79 Stat. 913) in part to conform with the language of the conditional entry provision adopted at that time
[10] 67 Stat. 229.
[11] Act of Aug. 7, 1953, 67 Stat. 400, as amended by the act of Aug. 31, 1954, 68 Stat. 1044.



9

outside the existing immigration quotas. Visas were made available by categories of refugees, for example, 4,000 to war orphans; 55,000 to German expellees; 15,000 to Italian refugees; 15,000 to Greek and Dutch refugees, et cetera. As a departure from the immigration policy that had existed practically excluding Asians, there was provision for the admission of refugees from the Far East. The Refugee Relief Act also permitted the adjustment of status of up to 5,000 aliens already in the United States.

The Refugee Relief Act incorporated safeguards to prevent the immigration of undesirable aliens. In addition, aliens were required to have assurances of employment and housing.

Some 6,500 unused Refugee Relief Act visas were made available at the direction of President Eisenhower for Hungarian refugees before the Refugee Relief Act program expired. A total of 189,000 persons were admitted or adjusted their status under the act.

A related measure, the act of September 22, 1959,[12] was designed in part to facilitate family reunification by enabling the spouses and children of certain aliens admitted under the Refugee Relief Act to be issued visas outside existing immigration quotas.

*F. Hungarian refugee program*

In late 1956, President Eisenhower announced that the United States would accept 21,500 refugees who had fled Hungary following the revolution of October 1956. About 6,500 refugees were to be admitted using visas available under the Refugee Relief Act, and the President directed the Attorney General to permit the entry of 15,000 Hungarian refugees under the parole provision of the Immigration and Nationality Act. This was the first use of the parole provision on behalf of a group of refugees. By 1958, 38,000 Hungarian refugees had entered the United States, 32,000 of them under the parole provision. At that time, an alien paroled into the United States was not eligible to adjust his status to that of a permanent resident.

The act of July 25, 1958,[13] provided for the adjustment of status of Hungarian refugees who had been in the United States for at least 2 years. These refugees were exempted from the documentary requirements for immigration; and the date of admission for permanent residence was recorded as of the date of the alien's arrival in the United States.

*G. Refugee Escapee Act*

The act of September 11, 1957,[14] is sometimes referred to as the Refugee Escapee Act.

Section 15 of this act authorized 18,656 special nonquota immigrant visas that had been made available under the Refugee Relief Act but remained unused at the expiration of that act, to be made available to "refugee-escapees" defined as victims of racial, religious, or political persecution fleeing Communist or Communist-occupied or dominated countries or a country in the area of the Middle East. This was the origin of the eligibility standard for conditional entrants adopted in the 1965 amendments to the Immigration and Nationality Act.

[12] 73 Stat. 644
[13] 72 Stat. 419
[14] 71 Stat. 639



17



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 008

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 8

94 STAT. 102        PUBLIC LAW 96-212—MAR. 17, 1980

Public Law 96-212
96th Congress

## An Act

Mar. 17, 1980
[S. 643]

To amend the Immigration and Nationality Act to revise the procedures for the admission of refugees, to amend the Migration and Refugee Assistance Act of 1962 to establish a more uniform basis for the provision of assistance to refugees, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Refugee Act of 1980".

Refugee Act of 1980.
8 USC 1101 note.

### TITLE I—PURPOSE

8 USC 1521 note.

SEC. 101. (a) The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States. The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.

(b) The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

### TITLE II—ADMISSION OF REFUGEES

SEC. 201. (a) Section 101(a) of the Immigration and Nationality Act (8 U.S.C. 1101(a)) is amended by adding after paragraph (41) the following new paragraph:

"Refugee."

"(42) The term 'refugee' means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 207(e) of this Act) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on

*Post,* p. 103.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

PUBLIC LAW 96–212—MAR. 17, 1980          94 STAT. 107

year exceed a total of seventy-two thousand and shall not in any fiscal
year exceed two hundred and seventy thousand.".

(b) Section 202 of such Act (8 U.S.C. 1152) is amended—
    (1) by striking out "and the number of conditional entries" in
subsection (a);
    (2) by striking out "(8)" in subsection (a) and inserting in lieu
thereof "(7)";
    (3) by striking out "or conditional entries" and "and condi-
tional entries" in subsection (e);
    (4) by striking out "20 per centum" in subsection (e)(2) and
inserting in lieu thereof "26 per centum";
    (5) by striking out paragraph (7) of subsection (e);
    (6) by striking out "(7)" in paragraph (8) of subsection (e) and
inserting in lieu thereof "(6)"; and
    (7) by redesignating paragraph (8) of subsection (e) as para-
graph (7).

(c) Section 203 of such Act (8 U.S.C. 1153) is amended—
    (1) by striking out "or their conditional entry authorized, as the
case may be," in subsection (a);
    (2) by striking out "20 per centum" in subsection (a)(2) and
inserting in lieu thereof "26 per centum";
    (3) by striking out paragraph (7) of subsection (a);
    (4) by striking out "and less the number of conditional entries
and visas available pursuant to paragraph (7)" in subsection
(a)(8);
    (5) by striking out "or to conditional entry under paragraphs
(1) through (8)" in subsection (a)(9) and inserting in lieu thereof
"under paragraphs (1) through (7)";
    (6) by redesignating paragraphs (8) and (9) of subsection (a) as
paragraphs (7) and (8), respectively;
    (7) by striking out "(7)" in subsection (d) and inserting in lieu
thereof "(6)"; and
    (8) by striking out subsections (f), (g), and (h).

(d) Sections 212(a)(14), 212(a)(32), and 244(d) of such Act (8 U.S.C.
1182(a)(14), 1182(a)(32), 1254(d)) are each amended by striking out
"section 203(a)(8)" and inserting in lieu thereof "section 203(a)(7)".

(e) Subsection (h) of section 243 of such Act (8 U.S.C. 1253) is
amended to read as follows:

"(h)(1) The Attorney General shall not deport or return any alien   Deportation.
(other than an alien described in section 241(a)(19)) to a country if the  8 USC 1251.
Attorney General determines that such alien's life or freedom would
be threatened in such country on account of race, religion, national-
ity, membership in a particular social group, or political opinion.

"(2) Paragraph (1) shall not apply to any alien if the Attorney
General determines that—
    "(A) the alien ordered, incited, assisted, or otherwise partici-
pated in the persecution of any person on account of race,
religion, nationality, membership in a particular social group, or
political opinion;
    "(B) the alien, having been convicted by a final judgment of a
particularly serious crime, constitutes a danger to the com-
munity of the United States;
    "(C) there are serious reasons for considering that the alien has
committed a serious nonpolitical crime outside the United States
prior to the arrival of the alien in the United States; or
    "(D) there are reasonable grounds for regarding the alien as a
danger to the security of the United States.".

(f) Section 212(d)(5) of such Act (8 U.S.C. 1182(d)(5)) is amended—

94 STAT. 108          PUBLIC LAW 96–212—MAR. 17, 1980

(1) by inserting "(A)" after "(5)";

(2) by inserting ", except as provided in subparagraph (B)," after "Attorney General may"; and

(3) by adding at the end thereof the following new subparagraph:

Parole into United States.

"(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.".

Ante, p. 103.

(g) Section 5 of Public Law 95–412 (8 U.S.C. 1182 note) is amended by striking out "September 30, 1980" and inserting in lieu thereof "April 1, 1980".

8 USC 1153 note.
8 USC 1101 note.
9 USC 1153.

(h) Any reference in any law (other than the Immigration and Nationality Act or this Act) in effect on April 1, 1980, to section 203(a)(7) of the Immigration and Nationality Act shall be deemed to be a reference to such section as in effect before such date and to sections 207 and 208 of the Immigration and Nationality Act.

Ante, p. 105.

(i) Section 203(g) of such Act (8 U.S.C. 1153(g)), section 101(a)(3) of Public Law 95–145, and the first section of Public Law 89–732 are each amended by striking out "two years" and inserting in lieu thereof "one year".

8 USC 1255 note.

Effective date.
8 USC 1101 note.

SEC. 204. (a) Except as provided in subsections (b) and (c), this title and the amendments made by this title shall take effect on the date of the enactment of this Act, and shall apply to fiscal years beginning with the fiscal year beginning October 1, 1979.

Ante, p. 102.
Ante, p. 106.

(b)(1)(A) Section 207(c) of the Immigration and Nationality Act (as added by section 201(b) of this Act) and the amendments made by subsections (b), (c), and (d) of section 203 of this Act shall take effect on April 1, 1980.

(B) The amendments made by section 203(f) shall apply to aliens paroled into the United States on or after the sixtieth day after the date of the enactment of this Act.

(C) The amendments made by section 203(i) shall take effect immediately before April 1, 1980.

Ante, p. 105.

(2) Notwithstanding sections 207(a) and 209(b) of the Immigration and Nationality Act (as added by section 201(b) of this Act), the fifty thousand and five thousand numerical limitations specified in such respective sections shall, for fiscal year 1980, be equal to 25,000 and 2,500, respectively.

(3) Notwithstanding any other provision of law, for fiscal year 1980—

8 USC 1151.

(A) the fiscal year numerical limitation specified in section 201(a) of the Immigration and Nationality Act shall be equal to 280,000, and

8 USC 1153, 1152.

(B) for the purpose of determining the number of immigrant visas and adjustments of status which may be made available under sections 203(a)(2) and 202(e)(2) of such Act, the granting of a conditional entry or adjustment of status under section 203(a)(7) or 202(e)(7) of such Act after September 30, 1979, and before April 1, 1980, shall be considered to be the granting of an immigrant visa under section 203(a)(2) or 202(e)(2), respectively, of such Act during such period.

Conditional entrant status.

(c)(1) The repeal of subsections (g) and (h) of section 203 of the Immigration and Nationality Act, made by section 203(c)(8) of this title, shall not apply with respect to any individual who before April 1, 1980, was granted a conditional entry under section 203(a)(7) of the Immigration and Nationality Act (and under section 202(e)(7) of such

Ante, p. 107.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 009

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|                                              |     |                                        |
| -------------------------------------------- | --- | -------------------------------------- |
| STATE OF TEXAS, *et al.*,                    | §   |                                        |
|                                              | §   |                                        |
| *Plaintiffs,*                                | §   |                                        |
|                                              | §   |                                        |
| vs.                                          | §   | CIVIL ACTION NO.                       |
|                                              | §   | 6:23-CV-00007                          |
| UNITED STATES DEPARTMENT OF                  | §   |                                        |
| HOMELAND SECURITY, *et al.*,                 | §   |                                        |
|                                              | §   |                                        |
| *Defendants,* and                            | §   | JUDGE DREW S. TIPTON                    |
|                                              | §   |                                        |
| VALERIE LAVEUS, *et al.*,                    | §   |                                        |
|                                              | §   |                                        |
| *Intervenor Defendants.*                     | §   |                                        |

# INTERVENOR DEFENDANTS'
# EXHIBIT 9

H.R. CONF. REP. 96-781, H.R. Conf. Rep. No. 781, 96TH Cong.,
2ND Sess. 1980, 1980 U.S.C.C.A.N. 160, 1980 WL 13134 (Leg.Hist.)
P.L. 96-212, REFUGEE ACT OF 1980
SEE PAGE 94 STAT. 102
SENATE REPORT (JUDICIARY COMMITTEE) NO. 96-256, JULY 23,
1979 (TO ACCOMPANY S. 643)
HOUSE REPORT (JUDICIARY COMMITTEE) NO. 96-608, NOV. 9, 1979
(TO ACCOMPANY H.R. 2816)
HOUSE CONFERENCE REPORT NO. 96-781, FEB. 22, 1980 (TO
ACCOMPANY S. 643)
SENATE CONFERENCE REPORT NO. 96-590, FEB. 25, 1980 (TO
ACCOMPANY S. 643)
CONG. RECORD VOL. 125 (1979)
CONG. RECORD VOL. 126 (1980)
DATES OF CONSIDERATION AND PASSAGE
SENATE SEPTEMBER 6, 1979; FEBRUARY 26, 1980
HOUSE DECEMBER 20, 1979; MARCH 4, 1980
THE SENATE BILL WAS PASSED IN LIEU OF THE HOUSE BILL.
THE SENATE REPORT (THIS PAGE) AND THE HOUSE CONFERENCE
REPORT (PAGE 160) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE CONFERENCE REPORT NO. 96-781

FEB. 22, 1980

* * * *

**\*19** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

**\*\*160** THE MANAGERS ON THE PART OF THE HOUSE AND THE SENATE AT THE CONFERENCE ON THE DISAGREEING VOTES OF THE TWO HOUSES ON THE AMENDMENT OF THE HOUSE TO THE BILL (S. 643) TO AMEND THE IMMIGRATION AND NATIONALITY ACT TO REVISE THE PROCEDURES FOR THE ADMISSION OF REFUGEES, TO AMEND THE MIGRATION AND REFUGEE ASSISTANCE ACT OF 1962 TO ESTABLISH A MORE UNIFORM BASIS FOR THE PROVISION OF ASSISTANCE TO REFUGEES, AND FOR OTHER PURPOSES, SUBMIT THE FOLLOWING JOINT STATEMENT TO THE HOUSE AND THE SENATE IN EXPLANATION OF THE EFFECT OF THE ACTION AGREED UPON BY THE MANAGERS AND RECOMMENDED IN THE ACCOMPANYING CONFERENCE REPORT:

THE HOUSE AMENDMENT STRUCK OUT ALL OF THE SENATE BILL AFTER THE ENACTING CLAUSE AND INSERTED A SUBSTITUTE TEXT.

THE SENATE RECEDES FROM ITS DISAGREEMENT TO THE AMENDMENT OF THE HOUSE WITH AN AMENDMENT WHICH IS A SUBSTITUTE FOR THE SENATE BILL AND THE HOUSE AMENDMENT. THE DIFFERENCES BETWEEN THE SENATE BILL, THE HOUSE AMENDMENT, AND THE SUBSTITUTE AGREED TO IN CONFERENCE ARE NOTED BELOW, EXCEPT FOR CLERICAL CORRECTIONS, CONFORMING CHANGES MADE NECESSARY BY AGREEMENTS REACHED BY THE CONFEREES, AND MINOR DRAFTING AND CLARIFYING CHANGES.

DEFINITION OF 'REFUGEE'

THE SENATE BILL INCORPORATED THE INTERNATIONALLY-ACCEPTED DEFINITION OF REFUGEE CONTAINED IN THE U.N. CONVENTION AND PROTOCOL RELATING TO THE STATUS OF REFUGEES. IT ALSO COVERED PERSONS WHO ARE IN THEIR OWN COUNTRY DISPLACED BY MILITARY OR CIVIL DISTURBANCES OR WHO ARE UNROOTED BY ARBITRARY DETENTION AND UNABLE TO RETURN TO THEIR USUAL PLACE OF ABODE.

THE HOUSE AMENDMENT INCORPORATED THE U.N. DEFINITION, AS WELL AS PRESIDENTIALLY-SPECIFIED PERSONS WITHIN THEIR OWN COUNTRY WHO ARE BEING PERSECUTED OR WHO FEAR PERSECUTION. THE HOUSE AMENDMENT SPECIFICALLY EXCLUDED FROM THE DEFINITION PERSONS WHO THEMSELVES HAVE ENGAGED IN PERSECUTION.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION. IT IS THE EXPECTATION OF THE CONFEREES THAT A DETERMINATION OF WHETHER A REFUGEE IS 'FIRMLY RESETTLED ' UNDER THE STATUTORY DEFINITION SHOULD BE GOVERNED BY REGULATIONS PROMULGATED BY THE ATTORNEY GENERAL IN CONSULTATION WITH THE SECRETARY OF STATE. THE CONFEREES ALSO DIRECT THE ATTORNEY GENERAL TO SUBMIT PERIODIC REPORTS DETAILING THE NUMBERS, COUNTRY OF ORIGIN, AND FACTUAL CIRCUMSTANCES CONCERNING THOSE REFUGEES WHO ARE DENIED ADMISSION UNDER THE 'FIRMLY RESETTLED' CRITERIA OR WHO ARE ADMITTED TO THE UNITED STATES AFTER HAVING TRAVELLED TO ANOTHER COUNTRY FOR RESETTLEMENT.

**161  NUMERICAL LIMITATION ON NORMAL FLOW

THE SENATE BILL PROVIDED FOR AN ANNUAL FLOW OF REFUGEES OF 50,000 FOR FISCAL YEARS 1980, 1981, AND 1982, WITH A LIMITATION THEREAFTER TO BE DETERMINED AS THE RESULT OF CONSULTATION WITH THE CONGRESS.

*20  THE HOUSE AMENDMENT PROVIDED FOR AN ANNUAL FLOW OF REFUGEES OF 50,000 FOR FISCAL YEARS 1980, 1981 AND 1982, WITH AN ANNUAL LIMIT OF 17,400 THEREAFTER.

THE CONFERENCE SUBSTITUTE ADOPTS THE SENATE PROVISION. IT IS THE INTENT OF THE CONFEREES THAT PRIOR TO FISCAL YEAR 1983, CONGRESS WILL REVIEW THE 50,000 ANNUAL NUMERICAL LIMITATION AND TAKE APPROPRIATE ACTION TO RETAIN OR ADJUST THIS FIGURE.

COMMITTEE CONGRESSIONAL PROCEDURES ON ADMISSIONS OF REFUGEES

THE SENATE BILL REQUIRED A HEARING AND REPORT BY THE JUDICIARY COMMITTEES WITHIN THIRTY DAYS OF A CONTINUOUS SESSION OF CONGRESS ON PROPOSALS TO INCREASE REFUGEE ADMISSIONS BEYOND THE 50,000 NORMAL FLOW.

THE HOUSE AMENDMENT REQUIRED THE SUBSTANCE OF CONSULTATIONS BETWEEN THE ATTORNEY GENERAL AND THE JUDICIARY COMMITTEES ON PROPOSALS TO INCREASE THE NORMAL FLOW, AS WELL AS IN EMERGENCY SITUATIONS, TO BE PRINTED IN THE CONGRESSIONAL RECORD. THE HOUSE AMENDMENT ALSO REQUIRES A HEARING ON PROPOSALS TO INCREASE THE NORMAL FLOW, AND, IF POSSIBLE, IN EMERGENCY SITUATIONS, AND PROVIDED FOR A ONE-HOUSE VETO OF A PRESIDENTIAL DETERMINATION TO INCREASE THE NORMAL FLOW OF REFUGEES BEYOND 50,000.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION CONCERNING THE PRINTING OF THE SUBSTANCE OF CONSULTATIONS AND THE CONDUCT OF HEARINGS, BUT DELETES THE ONE-HOUSE VETO PROCEDURE.

## ASYLUM AND WITHHOLDING OF DEPORTATION

THE SENATE BILL PROVIDED FOR WITHHOLDING DEPORTATION OF ALIENS TO COUNTRIES WHERE THEY WOULD FACE PERSECUTION, UNLESS THEIR DEPORTATION WOULD BE PERMITTED UNDER THE U.N. CONVENTION AND PROTOCOL RELATING TO THE STATUS OF REFUGEES.

THE HOUSE AMENDMENT PROVIDED A SIMILAR WITHHOLDING PROCEDURE UNLESS ANY OF THE FOUR SPECIFIC CONDITIONS (THOSE SET FORTH IN THE AFOREMENTIONED INTERNATIONAL AGREEMENTS) WERE MET.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION WITH THE UNDERSTANDING THAT IT IS BASED DIRECTLY UPON THE LANGUAGE OF THE PROTOCOL AND IT IS INTENDED THAT THE PROVISION BE CONSTRUED CONSISTENT WITH THE PROTOCOL. THE CONFEREES DIRECT THE ATTORNEY GENERAL TO ESTABLISH A NEW UNIFORM ASYLUM PROCEDURE UNDER THE PROVISIONS OF THIS LEGISLATION.

## LIMITATION ON PAROLE

THE HOUSE AMENDMENT LIMITED THE USE OF PAROLE TO INDIVIDUAL REFUGEES AND DETERMINED THAT IN UTILIZING PAROLE, THE ATTORNEY GENERAL MUST DETERMINE THAT 'COMPELLING REASONS IN THE PUBLIC INTEREST . . . REQUIRE THAT THE ALIEN BE PAROLED INTO THE UNITED STATES RATHER THAN BE ADMITTED AS A REFUGEE.'

**162 THE SENATE BILL HAD NO COMPARABLE PROVISION.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE VERSION AND PROVIDES FOR A SIXTY DAY DELAYED EFFECTIVE DATE ON THE PAROLE LIMITATION. THE CONFEREES, IN ACCEPTING THE HOUSE LIMITATION ON THE PAROLE OF REFUGEES, RECOGNIZE THAT IT DOES NOT AFFECT THE ATTORNEY GENERAL'S AUTHORITY UNDER SECTION 212(D)(5) OF THE IMMIGRATION AND NATIONALITY ACT TO PAROLE ALIENS WHO ARE NOT DEEMED TO BE REFUGEES. IN ADOPTING THE DELAYED *21 EFFECTIVE DATE, THE CONFEREES WISH TO MAKE IT CLEAR THAT EXISTING REFUGEE PAROLE PROGRAMS WILL CONTINUE UNTIL A CONSULTATION ON FUTURE REFUGEE ADMISSION PROGRAMS IS HELD UNDER THE TERMS OF THIS LEGISLATION.

## ADMISSION STATUS OF REFUGEES

THE SENATE BILL PROVIDED THAT REFUGEES ENTERING THE UNITED STATES UNDER NORMAL FLOW OR ADDITIONS TO NORMAL FLOW PROCEDURES WOULD BE ADMITTED AS LAWFUL PERMANENT RESIDENTS. THOSE ENTERING IN EMERGENCY SITUATIONS WOULD BE ADMITTED CONDITIONALLY OR AS LAWFUL PERMANENT RESIDENTS IN THE DISCRETION OF THE ATTORNEY GENERAL.

THE HOUSE AMENDMENT PROVIDED THAT ALL REFUGEES ENTERING THE UNITED STATES BE ADMITTED CONDITIONALLY AS 'REFUGEES' WITH RETROACTIVE ADJUSTMENT OF STATUS TO LAWFUL PERMANENT RESIDENTS AFTER TWO YEARS.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE VERSION WITH ADJUSTMENT OF STATUS PERMITTED AFTER A PERIOD OF ONE YEAR. IT IS THE INTENT OF THE CONFEREES, IN CREATING THIS NEW 'REFUGEE' STATUS, THAT SUCH INDIVIDUALS NOT BE SUBJECTED TO EMPLOYMENT DISCRIMINATION AS A RESULT OF STATE OR LOCAL LICENSING LAWS AND THAT FOR PURPOSES OF SUCH LAWS, THEY SHOULD BE VIEWED AS HAVING THE STATUS OF PERMANENT RESIDENT ALIENS.

## U.S. COORDINATOR FOR REFUGEE AFFAIRS

THE HOUSE AMENDMENT PROVIDED FOR THE ESTABLISHMENT OF A STATUTORY OFFICE OF REFUGEE POLICY IN THE EXECUTIVE OFFICE OF THE PRESIDENT RESPONSIBLE FOR THE DEVELOPMENT AND COORDINATION OF U.S. REFUGEE POLICY.

THE SENATE BILL HAD NO COMPARABLE POSITION AND WOULD HAVE PERMITTED THE STATUS QUO. (AT THE CURRENT TIME, UNDER PRESIDENTIAL DIRECTIVE, THE OFFICE OF THE U.S. COORDINATOR FOR REFUGEE AFFAIRS, HEADED BY AN AMBASSADOR AT LARGE, IS LOCATED WITHIN THE DEPARTMENT OF STATE.)

THE CONFERENCE SUBSTITUTE PROVIDES FOR A STATUTORY U.S. COORDINATOR FOR REFUGEE AFFAIRS WITH THE RANK OF AMBASSADOR AT LARGE, TO BE APPOINTED BY THE PRESIDENT, BY AND WITH THE ADVICE AND CONSENT OF THE SENATE. GIVEN THE VARIOUS AGENCIES INVOLVED IN REFUGEE ASSISTANCE, BOTH FOREIGN AND DOMESTIC, THE CONFEREES REQUEST THAT THE PRESIDENT REVIEW THE QUESTION OF THE LOCATION OF THE OFFICE OF THE U.S. COORDINATOR FOR REFUGEE AFFAIRS, AND ADVISE THE CONGRESS WITHIN ONE YEAR OF DATE OF ENACTMENT OF THIS LEGISLATION OF HIS DECISION CONCERNING THE APPROPRIATE LOCATION FOR SUCH OFFICE.

## HEW OFFICE OF REFUGEE RESETTLEMENT

THE HOUSE BILL ESTABLISHED AN OFFICE OF REFUGEE RESETTLEMENT WITHIN THE DEPARTMENT OF HEW (HEALTH AND HUMAN SERVICES).

THE SENATE HAD NO COMPARABLE PROVISION AND WOULD HAVE PERMITTED THE PRESIDENT UNDER EXISTING LAW TO DESIGNATE WHICH AGENCY SHOULD BE RESPONSIBLE FOR REFUGEE RESETTLEMENT ACTIVITIES.

**163 THE CONFERENCE SUBSTITUTE FOLLOWS THE HOUSE PROVISION, BUT DOES NOT REQUIRE THAT THE DIRECTOR REPORT DIRECTLY TO THE SECRETARY. HOWEVER, IT IS THE INTENTION OF THE CONFEREES THAT THE DIRECTOR SHOULD, UNLESS AND UNTIL A REORGANIZATION OF THE DEPARTMENT OCCURS, REPORT DIRECTLY TO THE SECRETARY; THE CONFEREES DESIRE TO MAINTAIN SOME FLEXIBILITY IN THE STATUTE FOR FUTURE ADMINISTRATIVE CHANGES JUSTIFIED BY EXPERIENCE. THE CONFEREES HAVE PROVIDED THAT THE FUNCTION OF THE OFFICE AND ITS DIRECTOR *22 ARE TO BE CARRIED OUT IN CONSULTATION WITH AND UNDER THE GENERAL POLICY GUIDANCE OF THE U.S. COORDINATOR FOR REFUGEE AFFAIRS.

## PROGRAM OF INITIAL RESETTLEMENT

THE SENATE BILL RETAINED CONTRACTING AUTHORITY FOR RECEPTION AND PLACEMENT GRANTS IN THE DEPARTMENT OF STATE.

THE HOUSE AMENDMENT TRANSFERRED THE AUTHORITY FOR RESETTLEMENT AND PLACEMENT GRANTS FROM THE DEPARTMENT OF STATE TO THE DEPARTMENT OF HEW (HEALTH AND HUMAN SERVICES) IN FY 1982. DURING FY 1980 AND FY 1981 THE HOUSE REQUIRED COORDINATION BETWEEN THE DEPARTMENT OF STATE AND THE DEPARTMENT OF HEW.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE AMENDMENT WITH THE FOLLOWING ADDITION: THE PRESIDENT IS REQUIRED TO PROVIDE FOR A STUDY OF WHICH AGENCY IS BEST ABLE TO ADMINISTER THE RESETTLEMENT GRANT PROGRAM AND TO REPORT, NOT LATER THAN MARCH 1, 1981, TO THE CONGRESS ON SUCH STUDY. IF THE PRESIDENT DETERMINES AFTER SUCH STUDY THAT THE DIRECTOR SHOULD NOT ADMINISTER THE PROGRAM HE IS AUTHORIZED TO DESIGNATE THE APPROPRIATE AGENCY AND/OR OFFICIAL TO CARRY OUT SUCH RESPONSIBILITY.

### SUPPORTIVE SERVICES

THE SENATE BILL AUTHORIZED NECESSARY FUNDS FOR PROJECTS AND PROGRAMS DESIGNED TO ASSIST REFUGEES IN BECOMING SELF-RELIANT (INCLUDING ENGLISH LANGUAGE AND OTHER TRAINING, AND SOCIAL AND EMPLOYMENT SERVICES.) THE SENATE BILL ALSO ALLOCATED $40 MILLION ANNUALLY FOR SPECIAL PROJECTS.

THE HOUSE AMENDMENT AUTHORIZED $200 MILLION OVER TWO FISCAL YEARS TO FUND REFUGEE SERVICES, SUCH AS ENGLISH LANGUAGE TRAINING, EMPLOYMENT AND SOCIAL SERVICE TRAINING, HEALTH, SOCIAL, AND EDUCATIONAL SERVICES.

THE CONFERENCE SUBSTITUTE AUTHORIZES $200 MILLION ANNUALLY FOR SUPPORTIVE SERVICES TO BE FUNDED THROUGH DISCRETIONARY GRANTS AND CONTRACTS. THE CONFEREES INTEND THAT, WHEREVER APPROPRIATE, THE DIRECTOR MAY EXPEND CERTAIN OF THESE FUNDS THROUGH SPECIAL PROJECTS WHICH PROVIDE ESSENTIAL, COORDINATED, AND EFFECTIVE RESETTLEMENT SERVICES. IT IS THE INTENT OF THE CONFEREES THAT THE TERM 'PUBLIC OR PRIVATE NON PROFIT AGENCIES' SHALL INCLUDE STATE AND LOCAL GOVERNMENT AGENCIES, PRIVATE VOLUNTARY AGENCIES, POST-SECONDARY EDUCATIONAL INSTITUTIONS, AS WELL AS OTHER QUALIFIED PRIVATE NON PROFIT AGENCIES.

### CASH AND MEDICAL ASSISTANCE

THE SENATE BILL AUTHORIZED FEDERAL REIMBURSEMENT FOR CASH AND MEDICAL ASSISTANCE PROVIDED TO REFUGEES FOR TWO YEARS AFTER THE REFUGEE'S ARRIVAL. THE TWO YEAR LIMITATION DID NOT APPLY DURING FY 1980.

**164 THE HOUSE AMENDMENT AUTHORIZED SIMILAR REIMBURSEMENT FOR A FOUR YEAR PERIOD AFTER THE REFUGEE'S ARRIVAL AND THE LIMITATION DID NOT APPLY DURING FY 1980 AND 1981.

THE CONFERENCE SUBSTITUTE ADOPTS A REIMBURSEMENT PERIOD OF THREE YEARS FOLLOWING THE REFUGEE'S ARRIVAL AND THE THREE YEAR LIMITATION DOES NOT APPLY FOR FY 1980 AND THE FIRST SIX MONTHS OF FY 1981.

THE CONFEREES INTEND TO PROVIDE THE DIRECTOR SUFFICIENT FLETBILITY, IN PROVIDING CASH AND MEDICAL ASSISTANCE AND OTHER ASSISTANCE, TO RESPOND *23 TO THE DIFFERENT PROBLEMS AND

NEEDS OF THE VARIOUS REFUGEE GROUPS AND TO UTILIZE PROVEN RESETTLEMENT TECHNIQUES SUCH AS THE CURRENT RESETTLEMENT PROGRAM FOR SOVIET JEWS.

## CUBAN REFUGEE PROGRAM

THE SENATE BILL PROVIDED FOR THE CONTINUED PHASE DOWN OF THE CUBAN REFUGEE PROGRAM THROUGH FY 1983.

THE HOUSE AMENDMENT HAD NO COMPARABLE PROVISION.

THE CONFERENCE SUBSTITUTE ADOPTS THE SENATE PROVISION.

## AUTHORIZATION PERIOD

THE SENATE BILL PROVIDED FOR AN OPEN-ENDED AUTHORIZATION OF FUNDS FOR DOMESTIC RESETTLEMENT ACTIVITIES.

THE HOUSE AMENDMENT PROVIDED FOR A TWO YEAR AUTHORIZATION OF FUNDS FOR DOMESTIC RESETTLEMENT ACTIVITIES.

THE CONFERENCE SUBSTITUTE ADOPTS A THREE YEAR AUTHORIZATION PERIOD.

## SOCIAL SERVICES FOR CERTAIN ASYLUM APPLICANTS

THE HOUSE AMENDMENT AUTHORIZED REIMBURSEMENT OF STATE AND LOCAL PUBLIC AGENCIES FOR ASSISTANCE PROVIDED TO ALIENS WHO APPLIED FOR ASYLUM BEFORE NOVEMBER 1, 1979 AND WHO ARE AWAITING DETERMINATION OF THEIR CLAIMS. THE HOUSE AMENDMENT ALSO AUTHORIZED THE ATTORNEY GENERAL TO GRANT PERMISSION TO ENGAGE IN EMPLOYMENT TO THESE INDIVIDUALS PENDING DETERMINATION OF THEIR CLAIMS.

THE SENATE BILL HAD NO COMPARABLE PROVISION.

THE CONFERENCE SUBSTITUTE ADOPTS THE HOUSE PROVISION.

PETER W. RODINO,

ELIZABETH HOLTZMAN,

GEORGE E. DANIELSON,

SAM B. HALL, JR.,

HERBERT E. HARRIS II,

MICHAEL D. BARNES,

CLEMENT J. ZABLOCKI,

H.R. CONF. REP. 96-781, H.R. CONF. REP. 96-781 (1980)

DANTE B. FASCELL,

HAMILTON FISH, JR.,

JOHN BUCHANAN,

MANAGERS ON THE PART OF THE HOUSE.

EDWARD M. KENNEDY,

BIRCH BAYH,

DENNIS DECONCINI,

STROM THURMOND,

AL SIMPSON,

MANAGERS ON THE PART OF THE SENATE.

(Note: 1. PORTIONS OF THE SENATE. HOUSE AND CONFERENCE REPORTS. WHICH ARE DUPLICATIVE
OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED.
OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A
PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER. e.g., TO(99-495))

H.R. CONF. REP. 96-781, H.R. Conf. Rep. No. 781, 96TH Cong., 2ND Sess. 1980, 1980 U.S.C.C.A.N. 160, 1980 WL 13134
(Leg.Hist.)



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 10

PUBLIC LAW 104–208—SEPT. 30, 1996      110 STAT. 3009–546

# DIVISION C—ILLEGAL IMMIGRATION REFORM AND IMMIGRANT RESPONSIBILITY ACT OF 1996

Illegal
Immigration
Reform and
Immigrant
Responsibility
Act of 1996.

### SEC. 1. SHORT TITLE OF DIVISION; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; APPLICATION OF DEFINITIONS OF SUCH ACT; TABLE OF CONTENTS OF DIVISION; SEVERABILITY.

(a) SHORT TITLE.—This division may be cited as the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996".

8 USC 1101 note.

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.— Except as otherwise specifically provided—

8 USC 1101 note.

(1) whenever in this division an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered to be made to that section or provision in the Immigration and Nationality Act; and

(2) amendments to a section or other provision are to such section or other provision before any amendment made to such section or other provision elsewhere in this division.

(c) APPLICATION OF CERTAIN DEFINITIONS.—Except as otherwise specifically provided in this division, for purposes of titles I and VI of this division, the terms "alien", "Attorney General", "border crossing identification card", "entry", "immigrant", "immigrant visa", "lawfully admitted for permanent residence", "national", "naturalization", "refugee", "State", and "United States" shall have the meaning given such terms in section 101(a) of the Immigration and Nationality Act.

8 USC 1101 note.

(d) TABLE OF CONTENTS OF DIVISION.—The table of contents of this division is as follows:

Sec. 1. Short title of division; amendments to Immigration and Nationality Act; application of definitions of such Act; table of contents of division; severability.

TITLE I—IMPROVEMENTS TO BORDER CONTROL, FACILITATION OF LEGAL ENTRY, AND INTERIOR ENFORCEMENT

Subtitle A—Improved Enforcement at the Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Hiring and training standards.
Sec. 107. Report on border strategy.
Sec. 108. Criminal penalties for high speed flights from immigration checkpoints.
Sec. 109. Joint study of automated data collection.
Sec. 110. Automated entry-exit control system.
Sec. 111. Submission of final plan on realignment of border patrol positions

110 STAT. 3009–689   PUBLIC LAW 104–208—SEPT. 30, 1996

(2) the term "child" shall have the meaning given such term in section 101(c) of the Immigration and Nationality Act.

# TITLE VI—MISCELLANEOUS PROVISIONS

## Subtitle A—Refugees, Parole, and Asylum

### SEC. 601. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.

(a) DEFINITION OF REFUGEE.—

(1) Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended by adding at the end the following: "For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.".

8 USC 1101 note.

(2) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and countries of origin of aliens granted refugee status or asylum under determinations pursuant to the amendment made by paragraph (1). Each such report shall also contain projections regarding the number and countries of origin of aliens that are likely to be granted refugee status or asylum for the subsequent 2 fiscal years.

(b) NUMERICAL LIMITATION.—Section 207(a) (8 U.S.C. 1157(a)) is amended by adding at the end the following new paragraph:

"(5) For any fiscal year, not more than a total of 1,000 refugees may be admitted under this subsection or granted asylum under section 208 pursuant to a determination under the third sentence of section 101(a)(42) (relating to persecution for resistance to coercive population control methods).".

### SEC. 602. LIMITATION ON USE OF PAROLE.

(a) PAROLE AUTHORITY.—Section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)) is amended by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit".

8 USC 1182 note.

(b) REPORT TO CONGRESS.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate describing the number and categories of aliens paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act. Each such report shall provide the total number of aliens paroled into and residing in the United States and shall contain information

PUBLIC LAW 104–208—SEPT. 30, 1996      110 STAT. 3009–690

and data for each country of origin concerning the number and categories of aliens paroled, the duration of parole, the current status of aliens paroled, and the number and categories of aliens returned to the custody from which they were paroled during the preceding fiscal year.

**SEC. 603. TREATMENT OF LONG-TERM PAROLEES IN APPLYING WORLDWIDE NUMERICAL LIMITATIONS.**

Section 201(c) (8 U.S.C. 1151(c)) is amended—

(1) by amending paragraph (1)(A)(ii) to read as follows:

"(ii) the sum of the number computed under paragraph (2) and the number computed under paragraph (4), plus"; and

(2) by adding at the end the following new paragraphs:

"(4) The number computed under this paragraph for a fiscal year (beginning with fiscal year 1999) is the number of aliens who were paroled into the United States under section 212(d)(5) in the second preceding fiscal year—

"(A) who did not depart from the United States (without advance parole) within 365 days; and

"(B) who (i) did not acquire the status of aliens lawfully admitted to the United States for permanent residence in the two preceding fiscal years, or (ii) acquired such status in such years under a provision of law (other than section 201(b)) which exempts such adjustment from the numerical limitation on the worldwide level of immigration under this section.

"(5) If any alien described in paragraph (4) (other than an alien described in paragraph (4)(B)(ii)) is subsequently admitted as an alien lawfully admitted for permanent residence, such alien shall not again be considered for purposes of paragraph (1).".

**SEC. 604. ASYLUM REFORM.**

(a) ASYLUM REFORM.—Section 208 (8 U.S.C. 1158) is amended to read as follows:

"ASYLUM

"SEC. 208. (a) AUTHORITY TO APPLY FOR ASYLUM.—

"(1) IN GENERAL.—Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b).

"(2) EXCEPTIONS.—

"(A) SAFE THIRD COUNTRY.—Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds

110 STAT. 3009–709   PUBLIC LAW 104–208—SEPT. 30, 1996

under the first amendment to the Constitution or under any other law; and

(6) Congress has the affirmative power under section 8 of article I, the necessary and proper clause, section 5 of the fourteenth Amendment, as well as under the treaty clause, to the Constitution to enact such legislation.

(b) CRIME.—

(1) IN GENERAL.—Chapter 7 of title 18, United States Code, is amended by adding at the end the following:

## "§ 116. Female genital mutilation

"(a) Except as provided in subsection (b), whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years shall be fined under this title or imprisoned not more than 5 years, or both.

"(b) A surgical operation is not a violation of this section if the operation is—

"(1) necessary to the health of the person on whom it is performed, and is performed by a person licensed in the place of its performance as a medical practitioner; or

"(2) performed on a person in labor or who has just given birth and is performed for medical purposes connected with that labor or birth by a person licensed in the place it is performed as a medical practitioner, midwife, or person in training to become such a practitioner or midwife.

"(c) In applying subsection (b)(1), no account shall be taken of the effect on the person on whom the operation is to be performed of any belief on the part of that person, or any other person, that the operation is required as a matter of custom or ritual.".

(2) CONFORMING AMENDMENT.—The table of sections at the beginning of chapter 7 of title 18, United States Code, is amended by adding at the end the following new item:

"116. Female genital mutilation.".

18 USC 116 note.    (c) EFFECTIVE DATE.—The amendments made by subsection (b) shall take effect on the date that is 180 days after the date of the enactment of this Act.

8 USC 1255 note.    **SEC. 646. ADJUSTMENT OF STATUS FOR CERTAIN POLISH AND HUNGARIAN PAROLEES.**

(a) IN GENERAL.—The Attorney General shall adjust the status of an alien described in subsection (b) to that of an alien lawfully admitted for permanent residence if the alien—

(1) applies for such adjustment;

(2) has been physically present in the United States for at least 1 year and is physically present in the United States on the date the application for such adjustment is filed;

(3) is admissible to the United States as an immigrant, except as provided in subsection (c); and

(4) pays a fee (determined by the Attorney General) for the processing of such application.

(b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided in subsection (a) shall only apply to an alien who—

(1) was a national of Poland or Hungary; and

(2) was inspected and granted parole into the United States during the period beginning on November 1, 1989, and ending on December 31, 1991, after being denied refugee status.

(c) WAIVER OF CERTAIN GROUNDS FOR INADMISSIBILITY.—The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) of the Immigration and Nationality Act shall not apply to adjustment of status under this section and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) and subparagraphs (A), (B), (C), or (E) of paragraph (3)) with respect to such an adjustment for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

(d) DATE OF APPROVAL.—Upon the approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission as an alien lawfully admitted for permanent residence as of the date of the alien's inspection and parole described in subsection (b)(2).

(e) NO OFFSET IN NUMBER OF VISAS AVAILABLE.—When an alien is granted the status of having been lawfully admitted for permanent residence under this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act.

**SEC. 647. SUPPORT OF DEMONSTRATION PROJECTS.**                    8 USC 1448 note.

(a) IN GENERAL.—The Attorney General shall make available funds under this section, in each of fiscal years 1997 through 2001, to the Commissioner of Immigration and Naturalization or to other public or private nonprofit entities to support demonstration projects under this section at 10 sites throughout the United States. Each such project shall be designed to provide for the administration of the oath of allegiance under section 337(a) of the Immigration and Nationality Act on a business day around Independence Day to approximately 500 people whose application for naturalization has been approved. Each project shall provide for appropriate outreach and ceremonial and celebratory activities.

(b) SELECTION OF SITES.—The Attorney General shall, in the Attorney General's discretion, select diverse locations for sites on the basis of the number of naturalization applicants living in proximity to each site and the degree of local community participation and support in the project to be held at the site. Not more than 2 sites may be located in the same State. The Attorney General shall consider changing the sites selected from year to year.

(c) AMOUNTS AVAILABLE; USE OF FUNDS.—

(1) AMOUNT.—The amount made available under this section with respect to any single site for a year shall not exceed $5,000.

(2) USE.—Funds made available under this section may be used only to cover expenses incurred in carrying out oath administration ceremonies at the demonstration sites under subsection (a), including expenses for—

(A) cost of personnel of the Immigration and Naturalization Service (including travel and overtime expenses);

(B) rental of space; and

(C) costs of printing appropriate brochures and other information about the ceremonies.