

AO386-B

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO.    011

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 11

1

| 104TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPT. 104–469 Part 1 |
|---|---|---|

# IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ON

## H.R. 2202

together with

ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1996

22–948

# C O N T E N T S

| | Page |
|---|---|
| The Amendment .................................................................................................... | 1 |
| Explanation of Amendment .................................................................................. | 106 |
| Purpose and Summary .......................................................................................... | 106 |
| Background and Need for Legislation ............................................................... | 110 |
| Hearings ................................................................................................................ | 182 |
| Committee Consideration .................................................................................... | 182 |
| Vote of the Committee ........................................................................................ | 182 |
| Committee Oversight Findings ........................................................................... | 205 |
| Committee on Government Reform and Oversight Findings ........................... | 205 |
| New Budget Authority and Tax Expenditures ................................................. | 205 |
| Congressional Budget Office Cost Estimate .................................................... | 205 |
| Inflationary Impact Statement .......................................................................... | 218 |
| Section-by-Section Analysis and Discussion ................................................... | 219 |
| Agency Views ........................................................................................................ | 278 |
| Changes in Existing Law Made by the Bill, as Reported ............................... | 282 |
| Additional/Minority Views ................................................................................. | 512 |

| 104TH CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |
| --- | --- | --- |

# IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

MARCH 4, 1996.—Ordered to be printed

Mr. HYDE, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## ADDITIONAL AND DISSENTING VIEWS

[To accompany H.R. 2202]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 2202) to amend the Immigration and Nationality Act to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Immigration in the National Interest Act of 1995".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—

(1) whenever in this Act an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered

2

to be made to that section or provision in the Immigration and Nationality Act, and

    (2) amendments to a section or other provision are to such section or other provision as in effect on the date of the enactment of this Act and before any amendment made to such section or other provision elsewhere in this Act.

(c) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; amendments to Immigration and Nationality Act; table of contents.

### TITLE I—DETERRENCE OF ILLEGAL IMMIGRATION THROUGH IMPROVED BORDER ENFORCEMENT, PILOT PROGRAMS, AND INTERIOR ENFORCEMENT

#### Subtitle A—Improved Enforcement at Border

Sec. 101. Border patrol agents and support personnel.
Sec. 102. Improvement of barriers at border.
Sec. 103. Improved border equipment and technology.
Sec. 104. Improvement in border crossing identification card.
Sec. 105. Civil penalties for illegal entry.
Sec. 106. Prosecution of aliens repeatedly reentering the United States unlawfully.
Sec. 107. Inservice training for the border patrol.

#### Subtitle B—Pilot Programs

Sec. 111. Pilot program on interior repatriation.
Sec. 112. Pilot program on use of closed military bases for the detention of inadmissible or deportable aliens.
Sec. 113. Pilot program to collect records of departing passengers.

#### Subtitle C—Interior Enforcement

Sec. 121. Increase in personnel for interior enforcement.

### TITLE II—ENHANCED ENFORCEMENT AND PENALTIES AGAINST ALIEN SMUGGLING; DOCUMENT FRAUD

#### Subtitle A—Enhanced Enforcement and Penalties against Alien Smuggling

Sec. 201. Wiretap authority for alien smuggling investigations.
Sec. 202. Racketeering offenses relating to alien smuggling.
Sec. 203. Increased criminal penalties for alien smuggling.
Sec. 204. Increased number of Assistant United States Attorneys.
Sec. 205. Undercover investigation authority.

#### Subtitle B—Deterrence of Document Fraud

Sec. 211. Increased criminal penalties for fraudulent use of government-issued documents.
Sec. 212. New civil penalties for document fraud.
Sec. 213. New civil penalty for failure to present documents and for preparing immigration documents without authorization.
Sec. 214. New criminal penalties for failure to disclose role as preparer of false application for asylum and for preparing certain post-conviction applications.
Sec. 215. Criminal penalty for knowingly presenting document which fails to contain reasonable basis in law or fact.
Sec. 216. Criminal penalties for false claim to citizenship.

#### Subtitle C—Asset Forfeiture for Passport and Visa Offenses

Sec. 221. Criminal forfeiture for passport and visa related offenses.
Sec. 222. Subpoenas for bank records.
Sec. 223. Effective date.

### TITLE III—INSPECTION, APPREHENSION, DETENTION, ADJUDICATION, AND REMOVAL OF INADMISSIBLE AND DEPORTABLE ALIENS

#### Subtitle A—Revision of Procedures for Removal of Aliens

Sec. 300. Overview of changes in removal procedures.
Sec. 301. Treating persons present in the United States without authorization as not admitted.
Sec. 302. Inspection of aliens: expedited removal of inadmissible arriving aliens; referral for hearing (revised section 235).
Sec. 303. Apprehension and detention of aliens not lawfully in the United States (revised section 236).
Sec. 304. Removal proceedings; cancellation of removal and adjustment of status; voluntary departure (revised and new sections 239 to 240C).
Sec. 305. Detention and removal of aliens ordered removed (new section 241).
Sec. 306. Appeals from orders of removal (new section 242).
Sec. 307. Penalties relating to removal (revised section 243).
Sec. 308. Redesignation and reorganization of other provisions; additional conforming amendments.
Sec. 309. Effective dates; transition.

#### Subtitle B—Removal of Alien Terrorists

##### PART 1—REMOVAL PROCEDURES FOR ALIEN TERRORISTS

Sec. 321. Removal procedures for alien terrorists.

##### "TITLE V—SPECIAL REMOVAL PROCEDURES FOR ALIEN TERRORISTS

"Sec. 501. Definitions.
"Sec. 502. Establishment of special removal court; panel of attorneys to assist with classified information.
"Sec. 503. Application for initiation of special removal proceeding.
"Sec. 504. Consideration of application.
"Sec. 505. Special removal hearings.

3

"Sec. 506. Consideration of classified information.
"Sec. 507. Appeals.
"Sec. 508. Detention and custody.
Sec. 322. Funding for detention and removal of alien terrorists.

PART 2—INADMISSIBILITY AND DENIAL OF RELIEF FOR ALIEN TERRORISTS

Sec. 331. Membership in terrorist organization as ground of inadmissibility.
Sec. 332. Denial of relief for alien terrorists.

Subtitle C—Deterring Transportation of Unlawful Aliens to the United States

Sec. 341. Definition of stowaway.
Sec. 342. List of alien and citizen passengers arriving.

Subtitle D—Additional Provisions

Sec. 351. Definition of conviction.
Sec. 352. Immigration judges and compensation.
Sec. 353. Rescission of lawful permanent resident status.
Sec. 354. Civil penalties for failure to depart.
Sec. 355. Clarification of district court jurisdiction.
Sec. 356. Use of retired Federal employees for institutional hearing program.
Sec. 357. Enhanced penalties for failure to depart, illegal reentry, and passport and visa fraud.
Sec. 358. Authorization of additional funds for removal of aliens.
Sec. 359. Application of additional civil penalties to enforcement.
Sec. 360. Prisoner transfer treaties.
Sec. 361. Criminal alien identification system.
Sec. 362. Waiver of exclusion and deportation ground for certain section 274C violators.
Sec. 363. Authorizing registration of aliens on criminal probation or criminal parole.
Sec. 364. Confidentiality provision for certain alien battered spouses and children.

TITLE IV—ENFORCEMENT OF RESTRICTIONS AGAINST EMPLOYMENT

Sec. 401. Strengthened enforcement of the employer sanctions provisions.
Sec. 402. Strengthened enforcement of wage and hour laws.
Sec. 403. Changes in the employer sanctions program.
Sec. 404. Reports on earnings of aliens not authorized to work.
Sec. 405. Authorizing maintenance of certain information on aliens.
Sec. 406. Limiting liability for certain technical violations of paperwork requirements.
Sec. 407. Unfair immigration-related employment practices.

TITLE V—REFORM OF LEGAL IMMIGRATION SYSTEM

Sec. 500. Overview of new legal immigration system.

Subtitle A—Worldwide Numerical Limits

Sec. 501. Worldwide numerical limitation on family-sponsored immigrants.
Sec. 502. Worldwide numerical limitation on employment-based immigrants.
Sec. 503. Worldwide numerical limitation on diversity immigrants.
Sec. 504. Establishment of numerical limitation on humanitarian immigrants.
Sec. 505. Requiring congressional review and reauthorization of worldwide levels every 5 years.

Subtitle B—Changes in Preference System

Sec. 511. Limitation of immediate relatives to spouses and children.
Sec. 512. Change in family-sponsored classification.
Sec. 513. Change in employment-based classification.
Sec. 514. Changes in diversity immigrant program.
Sec. 515. Authorization to require periodic confirmation of classification petitions.
Sec. 516. Changes in special immigrant status.
Sec. 517. Requirements for removal of conditional status of entrepreneurs.
Sec. 518. Adult disabled children.
Sec. 519. Miscellaneous conforming amendments.

Subtitle C—Refugees, Parole, and Humanitarian Admissions

Sec. 521. Changes in refugee annual admissions.
Sec. 522. Persecution for resistance to coercive population control methods.
Sec. 523. Parole available only on a case-by-case basis for humanitarian reasons or significant public benefit.
Sec. 524. Admission of humanitarian immigrants.

Subtitle D—Asylum Reform

Sec. 531. Asylum reform.
Sec. 532. Fixing numerical adjustments for asylees at 10,000 each year.
Sec. 533. Increased resources for reducing asylum application backlogs.

Subtitle E—General Effective Date; Transition Provisions

Sec. 551. General effective date.
Sec. 552. General transition for current classification petitions.
Sec. 553. Special transition for certain backlogged spouses and children of lawful permanent resident aliens.
Sec. 554. Special treatment of certain disadvantaged family first preference immigrants.
Sec. 555. Authorization of reimbursement of petitioners for eliminated family-sponsored categories.

TITLE VI—RESTRICTIONS ON BENEFITS FOR ALIENS

Sec. 600. Statements of national policy concerning welfare and immigration.

Subtitle A—Eligibility of Illegal Aliens for Public Benefits

PART 1—PUBLIC BENEFITS GENERALLY

Sec. 601. Making illegal aliens ineligible for public assistance, contracts, and licenses.

4

Sec. 602. Making unauthorized aliens ineligible for unemployment benefits.
Sec. 603. General exceptions.
Sec. 604. Treatment of expenses subject to emergency medical services exception.
Sec. 605. Report on disqualification of illegal aliens from housing assistance programs.
Sec. 606. Verification of student eligibility for postsecondary Federal student financial assistance.
Sec. 607. Payment of public assistance benefits.
Sec. 608. Definitions.
Sec. 609. Regulations and effective dates.

PART 2—EARNED INCOME TAX CREDIT

Sec. 611. Earned income tax credit denied to individuals not authorized to be employed in the United States.

Subtitle B—Expansion of Disqualification From Immigration Benefits on the Basis of Public Charge

Sec. 621. Ground for inadmissibility.
Sec. 622. Ground for deportability.

Subtitle C—Attribution of Income and Affidavits of Support

Sec. 631. Attribution of sponsor's income and resources to family-sponsored immigrants.
Sec. 632. Requirements for sponsor's affidavit of support.

TITLE VII—FACILITATION OF LEGAL ENTRY

Sec. 701. Additional land border inspectors; infrastructure improvements.
Sec. 702. Commuter lane pilot programs.
Sec. 703. Preinspection at foreign airports.
Sec. 704. Training of airline personnel in detection of fraudulent documents.

TITLE VIII—MISCELLANEOUS PROVISIONS

Subtitle A—Amendments to the Immigration and Nationality Act

Sec. 801. Nonimmigrant status for spouses and children of members of the Armed Services.
Sec. 802. Amended definition of aggravated felony.
Sec. 803. Authority to determine visa processing procedures.
Sec. 804. Waiver authority concerning notice of denial of application for visas.
Sec. 805. Treatment of Canadian landed immigrants.
Sec. 806. Changes relating to H–1B nonimmigrants.
Sec. 807. Validity of period of visas.
Sec. 808. Limitation on adjustment of status of individuals not lawfully present in the United States.
Sec. 809. Limited access to certain confidential INS files.
Sec. 810. Change of nonimmigrant classification.

Subtitle B—Other Provisions

Sec. 831. Commission report on fraud associated with birth certificates.
Sec. 832. Uniform vital statistics.
Sec. 833. Communication between State and local government agencies, and the Immigration and Naturaliza-
       tion Service.
Sec. 834. Criminal alien reimbursement costs.
Sec. 835. Female genital mutilation.
Sec. 836. Designation of Portugal as a visa waiver pilot program country with probationary status.

Subtitle C—Technical Corrections

Sec. 851. Miscellaneous technical corrections.

# TITLE I—DETERRENCE OF ILLEGAL IMMIGRA-
# TION THROUGH IMPROVED BORDER EN-
# FORCEMENT, PILOT PROGRAMS, AND INTE-
# RIOR ENFORCEMENT

## Subtitle A—Improved Enforcement at Border

**SEC. 101. BORDER PATROL AGENTS AND SUPPORT PERSONNEL.**

(a) INCREASED NUMBER OF BORDER PATROL POSITIONS.—The number of border pa-
trol agents shall be increased, for each fiscal year beginning with the fiscal year
1996 and ending with the fiscal year 2000, by 1,000 full-time equivalent positions
above the number of equivalent positions as of September 30, 1994.

(b) INCREASE IN SUPPORT PERSONNEL.—The number of full-time support positions
for personnel in support of border enforcement, investigation, detention and deporta-
tion, intelligence, information and records; legal proceedings, and management and
administration in the Immigration and Naturalization Service shall be increased,
beginning with fiscal year 1996, by 800 positions above the number of equivalent
positions as of September 30, 1994.

(c) DEPLOYMENT OF NEW BORDER PATROL AGENTS.—The Attorney General shall,
to the maximum extent practicable, ensure that the border patrol agents hired pur-
suant to subsection (a) shall—

77

(d) REPEAL OF CERTAIN OUTDATED PROVISIONS.—The following provisions of law
are repealed:
      (1) Section 9 of Public Law 94–571 (90 Stat. 2707).
      (2) Section 19 of Public Law 97-116 (95 Stat. 1621).

## Subtitle C—Refugees, Parole, and Humanitarian Admissions

**SEC. 521. CHANGES IN REFUGEE ANNUAL ADMISSIONS.**

(a) IN GENERAL.—Paragraphs (1) and (2) of section 207(a) (8 U.S.C. 1157(a)) are
amended to read as follows:

"(1) Except as provided in paragraph (2) and subsection (b), the number of refu-
gees who may be admitted under this section in any fiscal year shall be such num-
ber as the President determines, before the beginning of the fiscal year and after
appropriate consultation, is justified by humanitarian concerns or is otherwise in
the national interest.

"(2)(A) Except as provided in subparagraph (B), the number determined under
paragraph (1) for a fiscal year may not exceed—
      "(i) 75,000 in the case of fiscal year 1997, or
      "(ii) 50,000 in the case of any succeeding fiscal year.

"(B) The number determined under paragraph (1) for a fiscal year may exceed the
limit specified under subparagraph (A) if Congress enacts a law providing for a
higher number.".

(b) ADMISSIONS IN EMERGENCY REFUGEE SITUATIONS AND TIMING OF THE REFUGEE
CONSULTATION PROCESS.—
      (1) Section 207(b) (8 U.S.C. 1157(b)) and section 207(d)(3)(B) (8 U.S.C.
1157(d)(3)(B)) are amended by striking "unforeseen".
      (2) Section 207(d)(1) (8 U.S.C. 1157(d)(1)) is amended by striking "Before the
start of each fiscal year" and inserting "Before June 1 of the preceding fiscal
year".
      (3) Section 207(e) (8 U.S.C. 1157(e)) is amended by adding at the end the fol-
lowing:
"Such discussions shall occur before July 1 of the fiscal year preceding the fiscal
year of admissions, except that discussions relating to an emergency refugee situa-
tion shall occur not more than 30 days after the President proposes admissions in
response to the emergency.".

(c) EFFECTIVE DATE.—The amendments made by subsections (a) and (b) shall
apply beginning with fiscal year 1997.

**SEC. 522. PERSECUTION FOR RESISTANCE TO COERCIVE POPULATION CONTROL METHODS.**

(a) DEFINITION OF REFUGEE.—Section 101(a)(42) (8 U.S.C. 1101(a)(42)) is amended
by adding at the end the following: "For purposes of determinations under this Act,
a person who has been forced to abort a pregnancy or to undergo involuntary steri-
lization, or who has been persecuted for failure or refusal to undergo such a proce-
dure or for other resistance to a coercive population control program, shall be
deemed to have been persecuted on account of political opinion, and a person who
has a well founded fear that he or she will be forced to undergo such a procedure
or subject to persecution for such failure, refusal, or resistance shall be deemed to
have a well founded fear of persecution on account of political opinion.".

(b) NUMERICAL LIMITATION.—Section 207(a) (8 U.S.C. 1157(a)), as amended by
section 532(b), is amended by adding at the end the following new paragraph:

"(4) For any fiscal year, not more than a total of 1,000 refugees may be admitted
under this subsection or granted asylum under section 208 pursuant to a determina-
tion under the last sentence of section 101(a)(42) (relating to persecution for resist-
ance to coercive population control methods).".

**SEC. 523. PAROLE AVAILABLE ONLY ON A CASE-BY-CASE BASIS FOR HUMANITARIAN REASONS
OR SIGNIFICANT PUBLIC BENEFIT.**

(a) IN GENERAL.—Paragraph (5) of section 212(d) (8 U.S.C. 1182(d)) is amended
to read as follows:

"(5)(A) Subject to the provisions of this paragraph and section 214(f)(2), the Attor-
ney General, in the sole discretion of the Attorney General, may on a case-by-case
basis parole an alien into the United States temporarily, under such conditions as
the Attorney General may prescribe, only—
      "(i) for an urgent humanitarian reason (as described under subparagraph (B));
or

78

"(ii) for a reason deemed strictly in the public interest (as described under subparagraph (C)).

"(B) The Attorney General may parole an alien based on an urgent humanitarian reason described in this subparagraph only if—

"(i) the alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted through the normal visa process;

"(ii) the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member; or

"(iii) the alien has a close family member in the United States whose death is imminent and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted through the normal visa process.

"(C) The Attorney General may parole an alien based on a reason deemed strictly in the public interest described in this subparagraph only if—

"(i) the alien has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States; or

"(ii) the alien is to be prosecuted in the United States for a crime.

"(D) The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.

"(E) Parole of an alien under this paragraph shall not be considered an admission of the alien into the United states. When the purposes of the parole of an alien have been served, as determined by the Attorney General, the alien shall immediately return or be returned to the custody from which the alien was paroled and the alien shall be considered for admission to the United States on the same basis as other similarly situated applicants for admission.

"(F) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and the Senate describing the number and categories of aliens paroled into the United States under this paragraph. Each such report shall contain information and data concerning the number and categories of aliens paroled, the duration of parole, and the current status of aliens paroled during the preceding fiscal year.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to individuals paroled into the United States on or after the first day of the first month beginning more than 60 days after the date of the enactment of this Act.

SEC. 524. ADMISSION OF HUMANITARIAN IMMIGRANTS.

(a) IN GENERAL.—Section 203 (8 U.S.C. 1153) is amended—

(1) by redesignating subsections (d) through (g) as subsections (e) through (h), respectively, and

(2) by inserting after subsection (c) the following new subsection:

"(d) HUMANITARIAN IMMIGRANTS.—

"(1) IN GENERAL.—Aliens subject to the worldwide humanitarian level specified in section 201(e) shall be allotted visas only if the aliens have been selected by the Attorney General under paragraph (2) as of special humanitarian concern to the United States.

"(2) SELECTION OF IMMIGRANTS.—

"(A) IN GENERAL.—The Attorney General shall, on a case-by-case basis and based on humanitarian concerns and the public interest, select aliens for purposes of this subsection.

"(B) RESTRICTION.—The Attorney General may not select an alien under this paragraph if the alien is a refugee (within the meaning of section 101(a)(42)) unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be admitted into the United States as a humanitarian immigrant under this subsection rather than as a refugee under section 207.

"(3) ANNUAL REPORT.—Not later than 90 days after the end of each fiscal year, the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report describing the number of immigrant visas issued under this subsection and the individuals to whom the visas were issued.".

140

through one or more countries in which comparable asylum proce-
dures and protection are available.

Third, despite greater efficiency in the process, there are no firm
targets for completion of asylum cases. The problem with delay in
the asylum system has been so pervasive that nothing short of
firm, legislated deadlines will be sufficient to ensure that this prob-
lem does not persist into the future.

Fourth, legislation is required to ensure that illegal aliens denied
asylum are actually removed from the U.S. The reforms in Title III
of this bill address this concern.

Finally, asylum legislation should codify the best features of the
administrative reforms of the asylum process, including the new
rules on employment authorization. This will clarify the firm Con-
gressional support for asylum reform and prevent court challenges
to the administrative reforms on the grounds that they have not
been authorized by Congress.

*Reform of parole*

Section 212(d)(5) of the INA grants the Attorney General broad
discretion to "temporarily" parole aliens applying for admission to
the United States into the country for "emergent reasons or rea-
sons deemed strictly in the public interest." Under this section, pa-
role is not to be regarded as an admission of the alien. Once the
purposes for such parole are served, the alien must be returned to
the custody from which he or she was paroled.

The text of section 212(d)(5) is clear that the parole authority
was intended to be used on a case-by-case basis to meet specific
needs, and not as a supplement to Congressionally-established im-
migration policy. In recent years, however, parole has been used in-
creasingly to admit entire categories of aliens who do not qualify
for admission under any other category in immigration law, with
the intent that they will remain permanently in the United States.
This contravenes the intent of section 212(d)(5), but also illustrates
why further, specific limitations on the Attorney General's discre-
tion are necessary.

Additionally, the Attorney General has not kept accurate records
in the past of the way in which parole authority is used. Con-
sequently, Congress has no way to effectively exercise its oversight
authority over the use of parole. Without an effective control mech-
anism, the Attorney General can continue to use the parole author-
ity to implement immigration policy without Congressional knowl-
edge or approval.

An example of a recent abuse of the parole authority stems from
the September 1994 migration agreement negotiated by the Clinton
Administration with Cuba. To implement this agreement, the Ad-
ministration is using the parole authority to admit up to 20,000
Cuban nationals annually. The paroled Cubans will eventually be
entitled to adjust to permanent resident status.[60]

---

[60] Under the provisions of the Cuban Adjustment Act of 1966, natives or citizens of Cuba who
are admitted or paroled into the United States after Jan. 1, 1959 are eligible to adjust to perma-
nent resident status without leaving the U.S. after residing in the country for a period of one
year. See Act of Nov. 2, 1966, 80 Stat. 1161, H.R. Rep. No. 89–178, 89th Cong., 2d Sess. 3
(1966).

141

In this case, the use of parole to fulfill the terms of the Cuban migration agreement is a misuse and intentionally admits, on a permanent basis, aliens who are not otherwise eligible for immigrant visas. According to the Supreme Court, Congress has plenary power over immigration policy: a power that is largely immune from interference.[61] Such use of the parole authority has not been authorized by Congress. Indeed, the Clinton Administration did not even attempt to consult with Congress in negotiating the Cuban migration agreement.

Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

*The need for humanitarian admissions*

The United States has traditionally admitted immigrants who are of special humanitarian concern to our nation. While provisions exist in the law to admit refugees and aliens granted asylum, there are aliens of humanitarian concern to the U.S. that do not meet the definition of a refugee. The lack of a single, transparent category for the admission of such aliens has also contributed to the improper use of parole authority by the Attorney General, as in the case of the implementation of the Cuban migration agreement. If a category existed in the law to provide for a limited number of humanitarian visas each year at the discretion of the Attorney General, migration agreements such as the recent agreement with Cuba could be negotiated without violating other existing provisions in immigration law.

C. Reform Proposals

*Commission on immigration reform*

The Commission on Immigration Reform has recommended a significant redefinition of priorities and a reallocation of existing admission numbers to ensure that immigration continues to serve our national interests. The Commission defined several principles that should guide immigration policy: the establishment of clear goals and priorities; the enforcement of immigration limits; regular periodic review; clarity and efficiency; enforcement of the financial responsibility of sponsors to prevent immigrants from becoming dependent on public benefits; protection of American workers; coherence; and "Americanization"—the assimilation of immigrants to become effective citizens.

The Commission recommended that there be three major categories of legal immigration—family-based, skills-based, and refugees. The current category for diversity admissions would be eliminated.

Within the family category, the spouses and minor children of U.S. citizens would be admitted on an unlimited basis, as under

---

[61] Harisiades v. Shaughnessy, 342 U.S. 580 (1952); Fiallo v. Bell, 430 U.S. 787 (1977); Plyler v. Doe, 457 U.S. 202 (1982).

347

was not disclosed to the Attorney General prior to the alien's admission as a nonimmigrant under section 101(a)(15)(S).

(3) Except as provided in this subsection, an alien (A) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (B) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of [excludable] *inadmissible* aliens applying for temporary admission under this paragraph.

(4) Either or both of the requirements of paragraph (7)(B)(i) of subsection (a) may be waived by the Attorney General and the Secretary of State acting jointly (A) on the basis of unforeseen emergency in individual cases, or (B) on the basis of reciprocity with respect to nationals of foreign contiguous territory or of adjacent islands [and residents], *residents* thereof having a common nationality with such [nationals,] *nationals, and aliens who are granted permanent residence by the government of the foreign contiguous territory and who are residing in that territory* or (C) in the case of aliens proceeding in immediate and continuous transit through the United States under contracts authorized in section 238(c).

[(5)(A) The Attorney General may, except as provided in subparagraph (B) or in section 214(f), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

[(B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.]

*(5)(A) Subject to the provisions of this paragraph and section 214(f)(2), the Attorney General, in the sole discretion of the Attorney General, may on a case-by-case basis parole an alien into the United States temporarily, under such conditions as the Attorney General may prescribe, only—*

348

  *(i) for an urgent humanitarian reason (as described under subparagraph (B)); or*
  *(ii) for a reason deemed strictly in the public interest (as described under subparagraph (C)).*
 *(B) The Attorney General may parole an alien based on an urgent humanitarian reason described in this subparagraph only if—*
  *(i) the alien has a medical emergency and the alien cannot obtain necessary treatment in the foreign state in which the alien is residing or the medical emergency is life-threatening and there is insufficient time for the alien to be admitted through the normal visa process;*
  *(ii) the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member; or*
  *(iii) the alien has a close family member in the United States whose death is imminent and the alien could not arrive in the United States in time to see such family member alive if the alien were to be admitted through the normal visa process.*
 *(C) The Attorney General may parole an alien based on a reason deemed strictly in the public interest described in this subparagraph only if—*
  *(i) the alien has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States; or*
  *(ii) the alien is to be prosecuted in the United States for a crime.*
 *(D) The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.*
 *(E) Parole of an alien under this paragraph shall not be considered an admission of the alien into the United States. When the purposes of the parole of an alien have been served, as determined by the Attorney General, the alien shall immediately return or be returned to the custody from which the alien was paroled and the alien shall be considered for admission to the United States on the same basis as other similarly situated applicants for admission.*
 *(F) Not later than 90 days after the end of each fiscal year, the Attorney General shall submit a report to the Committees on the Judiciary of the House of Representatives and the Senate describing the number and categories of aliens paroled into the United States under this paragraph. Each such report shall contain information and data concerning the number and categories of aliens paroled, the duration of parole, and the current status of aliens paroled during the preceding fiscal year.*
 (7) The provisions of subsection (a) (other than paragraph (7)) shall be applicable to any alien who shall leave Guam, Puerto Rico, or the Virgin Islands of the United States, and who seeks to enter the continental United States or any other place under the jurisdiction of the United States. Any alien described in this paragraph,



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 12



# INS focus...
### From the Office of the Commissioner

September 30, 1994

# What is Immigration Parole?

Under immigration law, parole is an extraordinary authorization or permission for an otherwise inadmissible alien to enter the United States temporarily, or to be released from detention within the country, for humanitarian or other compelling reasons. Specifically, Section 212(d)(5) of the Immigration and Nationality Act provides that

> The Attorney General may... in his (her) discretion parole into the United States temporarily under such conditions as he (she) may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

Generally, parole may be granted to an alien in any of three different situations: (1) outside the United States seeking entry; (2) within the United States in an unlawful status and in government custody; and (3) within the United States in a lawful but restricted status.

## PAROLE TO PERMIT ENTRY

Aliens outside the United States may be granted "humanitarian" or "public interest" parole in response to specific requests from family members, attorneys, or government agencies. Humanitarian parole is requested usually in situations where restrictions of immigration law prevent the alien from obtaining needed medical treatment or other relief from personal harm or anguish. Public interest parole is requested usually for an alien who must be brought into the United States for some law enforcement purpose such as standing trial or serving as a witness. Parole may be granted also at a port of entry to an arriving alien who may or may not be admissible but whose status may be ascertained at another INS office, where the alien is scheduled for a deferred inspection or further processing.

## RELEASE FROM CUSTODY

Aliens in an unlawful status who are in the custody of the Immigration and Naturalization Service (INS) may be paroled out of detention if they pose no security risk and are not likely to abscond. Such parole may be granted for humanitarian reasons, as above, or when the continued detention of the alien is not appropriate. For example, minor children, pregnant women, disabled persons, and certain asylum-seekers are usually paroled out of detention by INS. In all cases, parole is conditional and may be revoked if the alien fails to meet the conditions of the parole.

*(continued on next page)*

**ADVANCE PAROLE**

is requested by aliens present in the United States who plan to travel outside the United States with the intention of returning. For example, aliens who have married U.S. citizens may seek advance parole if they want to travel outside the country temporarily while their applications for green cards are pending.

The INS authorizes parole, under delegated authority from the Attorney General, on a case-by-case basis. Parole requests for aliens outside the United States usually go through INS District Directors overseas—in Bangkok, Thailand; Rome, Italy; and Mexico City, Mexico—under policy direction from the Headquarters Office of International Affairs (HQIAO). District Directors in the United States authorize parole for aliens within the United States, including aliens in INS custody. Because decisions concerning parole are totally discretionary, the decisions are final and there is no appeal procedure.





DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 13

United States General Accounting Office

# GAO

## Report to Congressional Requesters

September 1995

# CUBA

# U.S. Response to the 1994 Cuban Migration Crisis





United States
General Accounting Office
Washington, D.C. 20548

National Security and
International Affairs Division

B-265830

September 18, 1995

The Honorable Jose E. Serrano
The Honorable Lamar Smith
House of Representatives

In response to your request, we reviewed the U.S. government's actions to address the mass exodus of people from Cuba in the summer of 1994. Our objectives were to (1) describe how U.S. policy toward those seeking to leave Cuba has changed since that time, (2) identify the agencies and costs to the U.S. government associated with the exodus of Cubans, (3) assess the capabilities of the U.S. Interests Section in Havana to process applicants seeking legal entry into the United States, and (4) evaluate the adequacy of living conditions at the Cuban safe haven camps at the U.S. Naval Station, Guantanamo Bay.

We briefed your staff on the results of our review on June 30, 1995. This report summarizes and updates the information provided during that briefing.

## Results in Brief

For over 30 years, fleeing Cubans had been welcomed to the United States. However, the U.S. government reversed this policy on August 19, 1994, when President Clinton announced that Cuban rafters interdicted at sea would no longer be brought to the United States. Instead, they would be taken to safe haven camps at the U.S. Naval Station, Guantanamo Bay, Cuba, with no opportunity for eventual entry into the United States other than by returning to Havana to apply for entry through legal channels at the U.S. Interests Section. On September 9, 1994, the U.S. and Cuban governments agreed that the United States would allow at least 20,000 Cubans to enter annually in exchange for Cuba's pledge to prevent further unlawful departures by rafters. On May 2, 1995, a White House announcement was released stating that Cubans interdicted at sea would not be taken to a safe haven but would be returned to Cuba where they could apply for entry into the United States at the Interests Section in Havana. The announcement also stated that eligible Cubans in the safe

B-265830

haven camps would be paroled into the United States[1] and that those found to be ineligible for parole would be returned to Cuba.[2]

Several U.S. agencies have been involved in implementing the U.S. policy regarding Cubans wishing to leave their country. The predominant agencies are (1) the Department of Defense, which will spend about $434 million from August 1994 through September 1995 operating the safe haven camps; (2) the U.S. Coast Guard, which spent about $7.8 million interdicting Cubans at sea from August 1994 to the present; (3) the Department of Justice's Immigration and Naturalization Service (INS) and Community Relations Service (CRS), which together will spend about $48.3 million for the Cuban migration crisis from August 1994 through September 1995; and (4) the Department of State, which will spend an estimated $7.1 million during this same period.[3]

The U.S. Interests Section in Havana has been able to meet the workload of processing applicants seeking legal entry into the United States. As of June 9, 1995, it had approved 16,305 Cubans for U.S. entry. However, not all those approved for travel will leave Cuba by September 1995, the anniversary of the September 1994 agreement.

The Cubans' living conditions at the Guantanamo Bay safe haven camps are difficult but, we believe, adequate based on our observations at the camps. We found no internationally accepted standards of what the living conditions should be at refugee camps, but we noted that conditions in all camps generally exceeded U.N. inspection guidelines for minimal shelter, food, and water.

## U.S. Policy Toward Fleeing Cubans

For decades Cubans have fled Cuba, often by raft, seeking freedom in the United States. For example, during the first 6 months of 1993, the U.S. Coast Guard picked up about 1,300 rafters and brought them to the United States. This number increased to about 4,700 during the same period in

---

[1]The Immigration and Nationality Act of 1952, as amended, 8 U.S.C. sec. 1182, grants the Attorney General the discretionary authority to temporarily parole aliens into the United States for humanitarian or public interest reasons. Under the Cuban Adjustment Act of 1966, Cuban parolees may apply for permanent resident alien status after 1 year in the United States. Permanent resident aliens are generally eligible to apply for U.S. citizenship after 5 years residence in the United States.

[2]In accordance with 8 U.S.C. sec. 1182 (the Immigration and Nationality Act of 1952, as amended), camp residents can be determined ineligible for parole for reasons such as criminal history; medical, physical, or mental conditions; or commission of acts of violence while in the camps.

[3]These figures represent incremental costs that would not have been incurred had there been no migration operation.

B-265830

1994. At that time, Cuba was maintaining its strict policy of forbidding its citizens from illegally exiting the country.

In June 1994, violence by both the Cuban authorities and would-be asylum seekers escalated when, for example, Cuban authorities shot and killed a Cuban who was attempting to escape the island. From July 13 through August 8, 1994, at least 37 asylum seekers and 2 Cuban officials were killed in a series of boat hijackings. In addition, a riot erupted in Havana on August 5 when police attempted to disperse a crowd that had gathered when a false rumor circulated that a flotilla of boats was on its way to pick up people seeking to leave. On August 13, Fidel Castro gave a televised speech blaming the United States for the riots and violence and threatened to remove restrictions on Cubans exiting the country if the United States did not take steps to deter boat departures and return those hijackers who had reached the United States.

Not receiving the response he anticipated from the United States, Castro indicated he would not prevent Cubans from leaving. Over the next week, Cubans flocked to the beaches, where they constructed make-shift vessels and set out to sea.

As the flow of rafters increased, President Clinton announced on August 19, 1994, that the Coast Guard would no longer bring interdicted Cubans to the United States but would hold them at Guantanamo Bay. The President and the Attorney General indicated at that time that those Cubans taken to Guantanamo Bay would have no opportunity for eventual entry into the United States. This announcement reversed a 3-decade policy of welcoming Cubans seeking refuge into the United States. Many Cubans did not believe that the United States would actually enforce the new policy and consequently continued to leave Cuba. About 33,000 Cubans were picked up at sea and taken to Guantanamo Bay.[4]

Concerned about the continuing exodus, on September 9, 1994, the United States and Cuba signed an accord under which the United States agreed to admit at least 20,000 Cubans per year directly from Cuba through legal channels.[5] The U.S. Interests Section in Havana estimated that this number

---

[4]This number included 8,763 who were subsequently transferred to a Panama safe haven from September 1994 through February 1995.

[5]The United States also agreed that during the first year of the agreement, it would parole those currently on the immigrant visa waiting list, raising the total to be admitted in 1995 to about 26,700.

B-265830

would comprise approximately 7,000 refugees and family members,[6] 8,000 immigrant visa recipients and their families, and 5,000 paroled through the Special Cuban Migration Program—a special lottery. The Cuban government agreed "to prevent unsafe departures using mainly persuasive methods." Within days the Cuban police again were patrolling the roads leading to the beaches, under orders to arrest persons carrying rafts or the materials to build them, and Cubans stopped departing by raft.

The United States later began granting parole to certain categories of Cubans in the safe haven camps at Guantanamo Bay. On October 14, 1994, President Clinton announced that parole would be granted to those over age 70, unaccompanied minors, or those with serious medical conditions and their caregivers. On December 2, 1994, the Attorney General announced that parole would be considered on a case-by-case basis for children and their immediate families who would be adversely affected by long-term presence in safe havens. These four categories became known as the "four protocols."

On May 2, 1995, the White House Press Secretary announced that Cubans interdicted at sea would no longer be taken to safe haven at Guantanamo Bay but would be returned to Cuba where they could apply for entry into the United States through legal channels at the U.S. Interests Section. In discussing this announcement, the Attorney General stated that measures would be taken to ensure that persons who claimed a genuine need for protection, which they believed could not be satisfied by applying at the U.S. Interests Section, would be examined before their return to Cuba. She also announced at that time that remaining Cubans at Guantanamo Bay—about 18,500 as of June 7, 1995—would be considered for parole into the United States, excluding those found to be ineligible for parole due to criminal activity in Cuba, in the United States, or while in safe haven and those with certain serious medical conditions.

## Agencies Involved With Cuban Migration

Within the executive branch, an interagency working group is responsible for developing strategies for implementing the Cuban migration policy. The working group is chaired by the National Security Council and includes representatives from the State Department's Bureaus for Inter-American Affairs and Population, Refugees, and Migration and the Legal Advisor's Office; the Department of Justice's INS and CRS; the Defense

---

[6]In 8 U.S.C. sec. 1101 (a) (42) a refugee is defined as a person who has fled his or her home country because of persecution, or a well-founded fear of persecution, for reasons of race, religion, nationality, membership in a particular social group, or political opinion.

B-265830

Department's Offices of the Secretary of Defense (Humanitarian and Refugee Affairs) and Joint Chiefs of Staff; and the Coast Guard.

The U.S. Interests Section in Havana is responsible for processing the more than 20,000 expected Cuban applicants for U.S. entry, annually. As of August 1995, the Interests Section had increased its processing staff to 6 full-time consular officers and about 3 temporary-duty consular officers, 4 INS officers, about 40 local nationals, and 4 U.S. and third country contract hires. Consular officers at the Interests Section process immigrant visa applications and prescreen parole applicants; the Refugee Coordinator prescreens refugee applicants. INS adjudicates refugee and parole applications in Havana and parole applications at Guantanamo Bay.

The Defense Department is responsible for carrying out the safe haven program at Guantanamo Bay. The Office of the Secretary of Defense and the Joint Chiefs of Staff oversee safe haven operations, and the U.S. Atlantic Command has operational responsibility. Joint Task Force (JTF)-160 executes the safe haven mission at Guantanamo—caring for the inhabitants, providing for their security and protection, and preparing them for travel to the United States. JTF-160 is also charged with the safety and security of U.S. personnel at Guantanamo Bay and the security of the station itself. The U.S. Coast Guard interdicts rafters at sea and, until May 2, 1995, it took them to safe haven at Guantanamo Bay. Since May 2, 1995, most Cubans interdicted at sea have been returned by the Coast Guard to Cuba.

Civilian agencies implement various components of the safe haven program. The Department of State's Bureau for Population, Refugees, and Migration provides assistance to the safe haven population at Guantanamo Bay through a grant to the World Relief Corporation. At Guantanamo Bay, CRS assists in parole processing and provides human resource services, such as family reunification, conciliation and mediation assistance and training, and recreation and education. CRS also provides resettlement assistance to parolees when they arrive in the United States. The State Department also maintains an officer in Guantanamo Bay as a liaison with the military and civilian agencies.

Other organizations are also involved in Cuban migration operations at Guantanamo Bay. The World Relief Corporation, a nongovernmental organization, provides public health and social services, vocational training, mail services, and coordination of private donations. The International Organization for Migration (IOM), an intergovernmental

B-265830

organization based in Geneva, Switzerland, arranges resettlement for Cubans wishing to migrate to countries other than the United States. Pursuant to an agreement with the Cuban government to allow some voluntary repatriation over land rather than flying to Havana, IOM also arranges voluntary repatriation through the station's Northeast Gate. IOM was also working with the remaining Haitians in camps at Guantanamo Bay.

Considerable military and civilian personnel resources are at Guantanamo Bay to support the safe haven operation. As shown in table 1, more than 5,000 personnel were providing security and services to Cubans in the safe haven camp at the time of our visit in June 1995.

**Table 1: Organization and Assigned Personnel Providing Security and Services at the Cuban Guantanamo Bay Safe Haven Camps**

| Organization | Assigned personnel |
|---|---:|
| Department of Defense (JTF-160) | 4,897 |
| Department of Justice | |
|   INS | 13 |
|   CRS | 57 |
| Department of State | 1 |
| World Relief Corporation | 40 |
| IOM | 15 |
| **Total** | **5,023** |

INS planned to increase its personnel to at least 18 by the end of summer to augment parole eligibility determination. IOM, on the other hand, expects to decrease its presence to six as the remaining Haitians are repatriated or allowed entry into the United States.

## Costs Associated With Cuban Migration

We estimate that the total cost of the U.S. response to the Cuban exodus from August 1994 through fiscal year 1995 will exceed $497 million (see table 2). This represents incremental costs, which are costs that agencies would not have incurred had there been no Cuban migration crisis.

B-265830

**Table 2: Estimated Costs of Cuban Migrant Operations From August 1, 1994, Through September 30, 1995**

Dollars in millions

| Agency | Cost |
|---|---|
| Defense Department | $434.0 |
| Coast Guard | 7.8 |
| State Department | 7.1 |
| INS | 8.8 |
| CRS | 39.5 |
| **Total** | **$497.2** |

Defense costs include procuring construction materials, food, medical supplies, and miscellaneous items for camps at Guantanamo Bay and in Panama; shipping food and supplies; transporting military personnel to the camps and about 500 to 550 parolees to Homestead Air Force Base, Florida, each week; and moving 8,763 Cubans from Guantanamo Bay to Panama in September 1994 and 7,291 back again in February 1995. Defense does not budget for such migrant operations, and it requested a $370-million supplemental appropriation for fiscal year 1995 to minimize the impact of these activities on military operations. Coast Guard expenses cover the costs of patrolling the waters between Cuba and Florida and bringing people to Guantanamo Bay and Cuba. CRS' costs primarily cover resettlement assistance to parolees arriving in the United States (about $31.3 million). State Department costs include expanding consular processing in Havana and providing a liaison officer at Guantanamo Bay and a grant to the World Relief Corporation to provide services at the safe haven camps.

## Processing Capability in Havana

Our review of the processing workload at the Interests Section indicates that it will process 20,000 applicants for U.S. entry and the additional 6,700 applicants on the waiting list by September 8, 1995—the end of the first year under the agreement.[7] As of June 9, 1995, the Interests Section had approved 16,305 for entry into the United States. This number included 7,693 refugees, 40 paroled family members of refugees, 3,601 immigrant visas, 3,073 paroled family members of immigrant visa recipients, and 1,898 parolees selected through a lottery. An additional 4,451 applicants for immigrant visas who were on the noncurrent preference lists had been approved for parole and 1,269 of their immediate relatives had been issued immigrant visas, pursuant to the September 1994 agreement. From 1996 through 1998, the workload will be somewhat

---

[7]On August 21, 1995, the U.S. Interest Section announced that the first-year commitment agreed to in the Migration Accord had been achieved as of August 15.

B-265830

reduced because the 20,000-person requirement will be offset each year for 3 years by up to 5,000 as a result of the May 2 announcement that all eligible Guantanamo Bay camp applicants would be paroled into the United States.

## Resettlement From Guantanamo Bay

Resettlement processing continues, as about 500 to 550 Cubans enter the United States from Guantanamo Bay each week. As of June 27, 1995, 14,746 had been paroled into the United States under the four humanitarian protocols, including 1,270 paroled from the temporary Howard Air Force Base safe haven in Panama from October 1994 through February 1995. Another 622 had returned to Cuba through diplomatic channels, 139 had resettled in third countries, and 1,000 had returned to Cuba on their own, either over land or by water. Sixty Cuban rafters had been interdicted and repatriated to Cuba as of that date, pursuant to the May 2 announcement that such individuals would be returned to Cuba.

At the time of our visit to Guantanamo Bay, 18,802 Cubans remained in the camps. Of these, 5,856 qualified for parole under the four protocols, and 12,946 were eligible to apply for parole consideration under the May 2 announcement. The INS officer-in-charge noted that JTF-160 had compiled about 4,500 camp incident reports involving camp infractions that INS staff will review for impact on individual parole eligibility. However, INS estimates that only a small number of those involved will be ineligible for parole.

## Conditions at the Guantanamo Bay Camps

While detention in safe haven camps is undoubtedly difficult, our review at the Guantanamo Bay camps indicated that living conditions were adequate. While we found no internationally accepted criteria for minimal refugee living standards,[8] we noted that the U.S. Atlantic Command had developed standards for safe haven conditions based on inspection guidelines of the United Nations High Commissioner for Refugees (UNHCR) and standard military regulations and manuals' requirements. The Command developed a camp construction model for migrant operations based on a population of 10,000 that could be adapted for population changes and issued corresponding operational guidelines, including camp organization, services, construction, and logistics.

We found that conditions generally met or exceeded Atlantic Command standards and UNHCR inspection guidelines. For example, minimal UNHCR

---

[8]Refugees: Living Conditions are Marginal (GAO/NSIAD-91-258, Sept. 11, 1991).

B-265830

inspection guidelines include 3.5 square meters of living space per migrant. Using this as guidance, the Command recommended using medium-sized tents to house up to 15 Cubans.[9] We found no indication that these tents housed more than 15 persons.

Camp conditions have improved since the influx of Cubans in the summer of 1994, due to decreasing population density and a Defense Department "Quality of Life" facilities upgrade. In late August 1994, thousands of people were arriving daily at the Guantanamo Bay camps. Together with about 12,000 Haitians, the camps' population totaled about 45,000 in September 1994. At that time, living conditions were marginal, according to Atlantic Command officials, as JTF-160 was erecting tents and installing portable toilets as quickly as people arrived. Crowded conditions began easing as most Haitians were repatriated to Haiti following President Aristide's return in October 1994, and more than 8,000 Cubans were relocated to safe haven camps in Panama for 6 months. Also, Cubans began leaving via parole following the October and December protocol announcements.

The Defense Department had intended to spend almost $35 million to upgrade facilities to accommodate a longer term camp operation. However, the May 2 announcement that most camp inhabitants would be eligible for parole lessened the urgency to improve conditions. As a result, the Defense Department spent about $25.3 million for its upgrade program.[10] Not all camps were upgraded; some camps were scheduled to be disassembled as populations decreased. Upgrades included elevated hardback tents, plumbing, tension fabric structures as multipurpose buildings, and electricity. (See figs. 1 through 3.)

---

[9]The military services use medium-sized tents to house 10 to 20 personnel, depending upon the quality of life desired.

[10]The upgrade program, begun in December 1994, was well underway when the May 2 announcement altered the program's scope.

B-265830

**Figure 1: Elevated Hardback Tents**



**Figure 2: Tension Fabric Structure**



B-265830

Figure 3: Women's Rest Room



In general, those who are expected to be paroled in late 1995 and early 1996 are located in the newer camps. Those eligible for parole under the first four protocols are scheduled to leave by the end of summer 1995 and, for the most part, are located in the camps that have not been upgraded (see fig. 4).

B-265830

**Figure 4: Non-Upgraded Camp Area**



In addition to adequate shelter, camp residents receive breakfast, a hot dinner prepared by Cuban cooks, and Meals Ready to Eat (MRE) for lunch. Cubans with whom we spoke said that the food was better than when they first arrived, when they mostly received rice. They also receive medical treatment at camp clinics and in military medical and surgical units as necessary. Recreational activities include baseball, basketball, pool, ping-pong, movies, music, arts and crafts, and libraries. In addition, adults can attend English and vocational classes coordinated by World Relief. Most children have left the camps, but the few remaining receive basic schooling organized by CRS. Many of these services are provided by camp residents with special skills.

Security is professional but not overtly oppressive. Camp residents are relatively free to move around within camp areas. When they first arrived, the Cubans were restricted to smaller areas behind razor concertina wire. According to military personnel, tensions have eased since the May 2 announcement that the Cubans would not be detained indefinitely but could apply for parole.

B-265830

# Travel From Cuba to the United States Is Being Delayed

Although by September 1995 the Interests Section will likely have processed for U.S. entry the 20,000 Cubans called for in the September 9, 1994, agreement as well as the 6,700 on the noncurrent immigrant visa preference list,[11] it is unlikely that this number will travel to the United States by that date. Of the 7,693 refugees approved for travel, only 1,494 had left as of June 9, 1995. While this partly reflects the normal lag in obtaining sponsorship for approved refugees, the relatively small number who have left also reflects the adverse impact of steep Cuban government-imposed air fare increases and fees for migration-related services. In February 1995, the Cuban government raised the one-way fare from Havana to Miami from $150 to $990.[12] When the rate was increased, the Interests Section refused to pay the higher amount and negotiated rates with commercial airlines for regularly scheduled flights to Miami through Mexico and Costa Rica. The number of such seats was limited, resulting in 5,267 refugees waiting to travel at the time of our visit. The remaining 932 refugees had been adjudicated but had not yet obtained all documents required for travel.

Unlike refugees, immigrant visa holders and parolees must arrange and pay for their own transportation to the United States. Because they arrange their own travel, the Interests Section does not track the number that has departed from Cuba. Although INS will report in 1997 on numbers of Cubans coming through U.S. ports of entry in 1995, these numbers will reflect country of nationality, not country of departure.

The U.S. government repeatedly voiced its concern to the Cuban government about the exorbitant airfare. Cuba agreed to lower the fare; however, it also imposed additional fees in June 1995, including $400 for the medical examination required for all people seeking U.S. entry ($250 for children), $250 for an exit permit and related documents, and $50 for a passport. U.S. officials told us that they believe that some fees for these previously free services may be reasonable, but the fees imposed (even with reduced air charters) will pose serious obstacles for Cubans seeking to emigrate.

At the time of our visit to Guantanamo Bay, the backlog of those approved for travel from there was estimated by INS at about 1,200. Parolees leave Guantanamo Bay on three charter flights each week, and depending on the

---

[11]According to the U.S. Interests Section, the first-year commitment agreed to in the Migration Accord was achieved as of August 15.

[12]The U.S. government normally provides transportation for refugees who sign a promissory note to reimburse the government for these costs within 4 years.

B-265830

size of the aircraft, 500 to 550 parolees depart each week. At this rate, the camps should be empty by March 15, 1996. However, the availability of transportation is not the limiting factor in more rapidly reducing the camps' population. Despite the backlog and the continuing cost to operate the camps, the weekly departure rates are not expected to increase. According to Defense, State, and Justice officials, state of Florida officials maintain that the state can accommodate no more than 550 parolees per week. Defense, State, and Justice officials said that senior Clinton administration officials have agreed not to exceed that figure. According to Defense Department officials, if departures could be accelerated to 690 per week, they could empty the camps by December 15, 1995, and save about $22.2 million in operating expenses.

## Agency Comments and Our Evaluation

The Departments of Defense, Justice, and State provided oral comments on this report. Their technical comments have been incorporated where appropriate. State Department officials suggested that it would have been useful to have compared costs incurred with those that might have been incurred by both the federal and state of Florida governments had no action been taken to stem the flow of Cubans to the United States. Such an analysis may be interesting, but it was not within the scope of work we were requested to perform. Furthermore, such analysis would be highly subjective because the cost would depend on many unknown factors such as the number of Cubans who would have fled to the United States had no action been taken to stem the flow, and what benefits and services would have been provided. Also, we found no evidence that the decision to reverse a 30-year policy of welcoming fleeing Cubans to the United States was based on cost consideration.

## Scope and Methodology

We identified U.S. policies toward Cubans seeking U.S. entry through discussions with State, INS, and CRS officials and reviewing documentation such as agreements with the Cuban government, joint communiques, administration announcements of parole and safe haven positions, and pertinent legislation. To determine the processing capabilities of the Interests Section, we interviewed INS officials in Washington, D.C., and visited the Interests Section in Havana. In Havana, we discussed with consular, INS, and senior post officials the various screening and adjudication processes for refugees, immigrants, and parolees; reviewed sample case files; and observed ongoing screenings.

B-265830

To determine living conditions at Guantanamo Bay, we visited the U.S. Atlantic Command in Norfolk, Virginia, to discuss its oversight of migrant operations and how it developed criteria for living standards. We also visited Guantanamo Bay, where we observed camp conditions, examined the parole processing procedures, and monitored the weekly meeting with the JTF Commander and the Cuban representatives from each camp. In addition, we met with JTF-160 operations and logistics officers and officials from CRS, INS, State, World Relief Corporation, IOM, and UNHCR to discuss their activities at Guantanamo Bay.

To determine program costs, we obtained estimated actual and projected Cuban migrant program incremental cost data for fiscal years 1994 and 1995 from the Departments of Defense and State, INS, CRS, and the Coast Guard. We did not verify the accuracy of the agencies' estimates.

We conducted our review between April and August 1995 in accordance with generally accepted government auditing standards.

Unless you announce its contents earlier, we plan no further distribution of this report until 15 days after its issue date. At that time, we will send copies to the Departments of State, Defense, and Justice and to interested congressional committees, and to others upon request.

If you or your staff have any questions concerning this report, please contact me at (202) 512-4128. Major contributors to this report were David R. Martin, Assistant Director, and Audrey E. Solis, Senior Evaluator.

Harold J. Johnson, Director
International Affairs Issues

Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20884-6015

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000 or by using fax number (301) 258-4066, or TDD (301) 413-0006.

Each day, GAO issues a list of newly available reports and testimony.  To receive facsimile copies of the daily list or any list from the past 30 days, please call (301) 258-4097 using a touchtone phone.  A recorded menu will provide information on how to obtain these lists.

For information on how to access GAO reports on the INTERNET, send an e-mail message with "info" in the body to:

info@www.gao.gov

PRINTED ON     RECYCLED PAPER

**United States**
**General Accounting Office**
Washington, D.C. 20548-0001

Bulk Rate
Postage & Fees Paid
GAO
Permit No. G100

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO.     014

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 14



PUBLIC LAW 116–92—DEC. 20, 2019

NATIONAL DEFENSE AUTHORIZATION
ACT FOR FISCAL YEAR 2020

133 STAT. 1198          PUBLIC LAW 116–92—DEC. 20, 2019

Public Law 116–92
116th Congress

## An Act

Dec. 20, 2019
[S. 1790]

To authorize appropriations for fiscal year 2020 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

National Defense
Authorization
Act for Fiscal
Year 2020.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2020".

**SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.**

(a) Divisions.—This Act is organized into four divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.
(4) Division D—Funding Tables.
(5) Division E—Intelligence Authorizations for Fiscal Years 2018, 2019, and 2020.
(6) Division F—Other Matters.

(b) Table of Contents.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees.
Sec. 4. Budgetary effects of this Act.

DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization Of Appropriations

Sec. 101. Authorization of appropriations.

Subtitle B—Army Programs

Sec. 111. Authority of the Secretary of the Army to waive certain limitations related to the Distributed Common Ground System-Army Increment 1.

Subtitle C—Navy Programs

Sec. 121. Ford-class aircraft carrier cost limitation baselines.
Sec. 122. Modification of annual report on cost targets for certain aircraft carriers.
Sec. 123. Refueling and complex overhauls of the U.S.S. John C. Stennis and U.S.S. Harry S. Truman.
Sec. 124. Ford class aircraft carrier support for F–35C aircraft.
Sec. 125. Prohibition on use of funds for reduction of aircraft carrier force structure.

133 STAT. 1860        PUBLIC LAW 116–92—DEC. 20, 2019

50 USC 3551.

**SEC. 1757. IMPROVING QUALITY OF INFORMATION IN BACKGROUND INVESTIGATION REQUEST PACKAGES.**

Consultation.

(a) REPORT ON METRICS AND BEST PRACTICES.—Not later than 180 days after the date of the enactment of this Act, the Director of the Defense Counterintelligence and Security Agency, which serves as the primary executive branch service provider for background investigations for eligibility for access to classified information, eligibility to hold a sensitive position, and for suitability and fitness for other matters pursuant to Executive Order 13467 (50 U.S.C. 3161 note; relating to reforming processes related to suitability for Government employment, fitness for contractor employees, and eligibility for access to classified national security information), shall, in consultation with the Security, Suitability, and Credentialing Performance Accountability Council established under such executive order, submit to Congress a report on—

(1) metrics for assessing the completeness and quality of packages for background investigations submitted by agencies requesting background investigations from the Defense Counterintelligence and Security Agency;

(2) rejection rates of background investigation submission packages due to incomplete or erroneous data, by agency; and

(3) best practices for ensuring full and complete information in background investigation requests.

(b) ANNUAL REPORT ON PERFORMANCE.—Not later than 270 days after the date of the enactment of this Act and not less frequently than once each year thereafter, the Security, Suitability, and Credentialing Performance Accountability Council shall submit to Congress a report on performance against the metrics and return rates identified in paragraphs (1) and (2) of subsection (a).

Deadlines.

(c) IMPROVEMENT PLANS.—

(1) IDENTIFICATION.—Not later than one year after the date of the enactment of this Act, executive agents under Executive Order 13467 (50 U.S.C. 3161 note) shall identify agencies in need of improvement with respect to the quality of the information in the background investigation submissions of the agencies as reported in subsection (b).

(2) PLANS.—Not later than 90 days after an agency is identified under paragraph (1), the head of the agency shall provide the executive agents referred to in such paragraph with a plan to improve the performance of the agency with respect to the quality of the information in the agency's background investigation submissions.

8 USC 1182 note.

**SEC. 1758. PAROLE IN PLACE FOR MEMBERS OF THE ARMED FORCES AND CERTAIN MILITARY DEPENDENTS.**

(a) IN GENERAL.—In evaluating a request from a covered individual for parole in place under section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), the Secretary of Homeland Security shall consider, on a case-by-case basis, whether granting the request would enable military family unity that would constitute a significant public benefit.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) parole in place reinforces the objective of military family unity;

(2) except as required in furtherance of the missions of the Armed Forces, disruption to military family unity should be minimized in order to enhance military readiness and allow

PUBLIC LAW 116–92—DEC. 20, 2019          133 STAT. 1861

members of the Armed Forces to focus on the faithful execution of their military missions and objectives, with peace of mind regarding the well-being of their family members; and

(3) the importance of the parole in place authority of the Secretary of Homeland Security is reaffirmed.

(c) COVERED INDIVIDUAL DEFINED.—In this section, the term "covered individual" means an alien who—

(1) is a member of the Armed Forces;

(2) is the spouse, son, or daughter of a member of the Armed Forces;

(3) is the parent of a member of the Armed Forces who supports the request of such parent for parole in place; or

(4) is the widow, widower, parent, son, or daughter of a deceased member of the Armed Forces.

## SEC. 1759. REPORT ON REDUCING THE BACKLOG IN LEGALLY REQUIRED HISTORICAL DECLASSIFICATION OBLIGATIONS OF THE DEPARTMENT OF DEFENSE.

(a) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report detailing the progress made by the Secretary toward reducing the backlog in legally required historical declassification obligations of the Department of Defense.

(b) ELEMENTS.—The report under subsection (a) shall include, with respect to the Department of Defense, the following:

(1) A plan to achieve legally mandated historical declassification requirements and reduce backlogs. <span>Plan.</span>

(2) A plan to incorporate new technologies, such as artificial intelligence, that would increase productivity and reduce cost in implementing the plan under paragraph (1). <span>Plan.</span>

(3) A detailed assessment of the documents released in each of the proceeding three years before the date of the report, broken out by program, such as the 25 and 50 year programs. <span>Assessment. Time period.</span>

(4) A detailed assessment of the documents awaiting review for release and an estimate of how many documents will be released in each of the next three years. <span>Assessment. Time period.</span>

(5) Potential policy, resource, and other options available to the Secretary to reduce backlogs.

(6) The progress and objectives of the Secretary with respect to the release of documents for publication in the Foreign Relations of the United States series or to facilitate the public accessibility of such documents at the National Archives, presidential libraries, or both. <span>Publication. Public information. National Archives.</span>

(c) FORM AND AVAILABILITY.—The report under subsection (a) shall be submitted in unclassified form, which shall be made publicly available, but may include a classified annex.

## SEC. 1760. MILITARY TYPE CERTIFICATION FOR LIGHT ATTACK EXPERIMENTATION AIRCRAFT.

The Secretary of the Air Force shall make available and conduct military type certifications for light attack experimentation aircraft as needed, pursuant to the Department of Defense Directive on Military Type Certificates, 5030.61.



DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 015

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 15



PUBLIC LAW 117–43—SEPT. 30, 2021

# EXTENDING GOVERNMENT FUNDING AND DELIVERING EMERGENCY ASSISTANCE ACT

135 STAT. 344        PUBLIC LAW 117–43—SEPT. 30, 2021

Public Law 117–43
117th Congress

## An Act

Sept. 30, 2021
[H.R. 5305]

Making continuing appropriations for the fiscal year ending September 30, 2022, and for providing emergency assistance, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Extending
Government
Funding and
Delivering
Emergency
Assistance Act.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Extending Government Funding and Delivering Emergency Assistance Act".

**SEC. 2. TABLE OF CONTENTS.**

Sec. 1.  Short Title
Sec. 2.  Table of Contents.
Sec. 3.  References.

DIVISION A—CONTINUING APPROPRIATIONS ACT, 2022

DIVISION B—DISASTER RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2022

DIVISION C–-AFGHANISTAN SUPPLEMENTAL APPROPRIATIONS ACT, 2022

. DIVISION D—OTHER MATTERS

Title I—Extensions, Technical Corrections, and Other Matters
Title II—Budgetary Effects

1 USC 1 note.

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

Continuing
Appropriations
Act, 2022.

## DIVISION A—CONTINUING APPROPRIATIONS ACT, 2022

The following sums are hereby appropriated, out of any money in the Treasury not otherwise appropriated, and out of applicable corporate or other revenues, receipts, and funds, for the several departments, agencies, corporations, and other organizational units of Government for fiscal year 2022, and for other purposes, namely:

SEC. 101. Such amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2021 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2021, and for which appropriations, funds, or other authority were made available in the following appropriations Acts:

(1) The Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2021

135 STAT. 372          PUBLIC LAW 117–43—SEPT. 30, 2021

TITLE IX

GENERAL PROVISIONS—THIS ACT

SEC. 1901. Each amount appropriated or made available by
this Act is in addition to amounts otherwise appropriated for the
fiscal year involved.

SEC. 1902. No part of any appropriation contained in this
Act shall remain available for obligation beyond the current fiscal
year unless expressly so provided herein.

SEC. 1903. Unless otherwise provided for by this Act, the addi-
tional amounts appropriated by this Act to appropriations accounts
shall be available under the authorities and conditions applicable
to such appropriations accounts for fiscal year 2022.

SEC. 1904. Each amount provided by this division is designated
by the Congress as being for an emergency requirement pursuant
to section 4001(a)(1) and section 4001(b) of S. Con. Res. 14 (117th
Congress), the concurrent resolution on the budget for fiscal year
2022.

This division may be cited as the "Disaster Relief Supplemental
Appropriations Act, 2022".

Afghanistan
Supplemental
Appropriations
Act, 2022.

**DIVISION C—AFGHANISTAN SUPPLEMENTAL
APPROPRIATIONS ACT, 2022**

The following sums are appropriated, out of any money in
the Treasury not otherwise appropriated, for the fiscal year ending
September 30, 2022, and for other purposes, namely:

TITLE I

DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF INVESTIGATION

SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses",
$50,000,000, to remain available until September 30, 2022, for
investigative activities associated with Afghan resettlement oper-
ations.

TITLE II

DEPARTMENT OF DEFENSE

OPERATION AND MAINTENANCE

OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID

For an additional amount for "Overseas Humanitarian, Dis-
aster, and Civic Aid", $2,200,000,000, to remain available until
September 30, 2023, for support of Operation Allies Welcome by
the Department of Defense.

GENERAL PROVISIONS—THIS TITLE

Reports.

SEC. 2201. Not later than 30 days after the date of enactment
of this Act, and every 30 days thereafter through fiscal year 2022,

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 373

the Secretary of Defense shall provide a written report to the congressional defense committees describing the execution of funds provided in this title, including the amounts obligated and expended, in total and since the previous report; the nature of the costs incurred or services provided by such funds; and any reimbursements or funds transferred by another Federal agency to the Department of Defense which relates to the purpose of the funds provided by this title.

SEC. 2202. Notwithstanding any other provision of law, funds provided by this title shall only be for the purposes specified, and shall not be subject to any transfer authority provided by law.

SEC. 2203. The Inspector General of the Department of Defense shall carry out reviews of the activities of the Department of Defense to transport and care for Afghans, including but not limited to, the humane treatment and living conditions of Afghans at any Department of Defense facility; the use of funds by the Department of Defense to support such persons, including the monitoring of potential waste, fraud, or abuse of such funds; and any related issues that the Inspector General may direct: *Provided*, That the Inspector General shall provide to the congressional defense committees periodic updates on such oversight efforts and a written report to such committees not later than 60 days after the date of enactment of this Act.   <span style="float:right">Reviews.</span>  <span style="float:right">Updates.<br>Reports.</span>

SEC. 2204. Title IX of division C of Public Law 116–260 is amended under the heading "Afghanistan Security Forces Fund" by inserting the following before the penultimate proviso: "*Provided further*, That the Secretary of Defense may obligate and expend funds made available under this heading for costs associated with the termination of contracts previously funded with amounts provided under this heading in prior Acts, and to pay valid invoices in satisfaction of liabilities under such contracts for which the applicable prior appropriation cannot be identified:".   <span style="float:right">134 Stat. 1341.</span>  <span style="float:right">Contracts.</span>

SEC. 2205. Not later than 90 days after the date of enactment of this Act, the Secretary of Defense, in consultation with the Service Secretaries and the Commander of United States Central Command, shall submit to the congressional defense committees a report regarding the disposition of United States property, equipment, and supplies, including property, equipment, and supplies provided to the Afghanistan National Security Forces, which were destroyed, taken out of Afghanistan, or remain in Afghanistan in connection with the United States military withdrawal: *Provided*, That such report shall include information on the future plans of the Department of Defense regarding any such items.   <span style="float:right">Consultation.<br>Reports.</span>

## TITLE III

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

#### CENTERS FOR DISEASE CONTROL AND PREVENTION

##### CDC–WIDE ACTIVITIES AND PROGRAM SUPPORT

For an additional amount for "CDC–Wide Activities and Program Support", $21,500,000, for support of Operation Allies Welcome, to remain available until September 30, 2022, for medical support, screening, and other related public health activities related to Afghan arrivals and refugees.

135 STAT. 374        PUBLIC LAW 117–43—SEPT. 30, 2021

ADMINISTRATION FOR CHILDREN AND FAMILIES

REFUGEE AND ENTRANT ASSISTANCE

For an additional amount for "Refugee and Entrant Assistance", $1,680,000,000, to remain available until September 30, 2023, for support of Operation Allies Welcome for carrying out refugee and entrant assistance activities in support of citizens or nationals of Afghanistan paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act and citizens or nationals of Afghanistan for whom such refugee and entrant assistance activities are authorized: *Provided*, That amounts made available under this heading in this Act may be used for grants or contracts with qualified nonprofit organizations to provide culturally and linguistically appropriate services, including wrap-around services during temporary housing and after resettlement, housing assistance, medical assistance, legal assistance, and case management assistance: *Provided further*, That the Director of the Office of Refugee Resettlement, in carrying out section 412(c)(1)(A) of the Immigration and Nationality Act with amounts made available under this heading in this Act, may allocate such amounts among the States in a manner that accounts for the most current data available.

CHILDREN AND FAMILIES SERVICES PROGRAMS

For an additional amount for "Children and Families Services Programs", $7,773,000, to remain available until September 30, 2022, for support of Operation Allies Welcome for necessary administrative expenses to carry out refugee and entrant assistance activities in support of citizens or nationals of Afghanistan.

GENERAL PROVISION—THIS TITLE

Deadline.
Strategy.

SEC. 2301. (a) Not later than 45 days after the date of enactment of this Act, the Secretary of Health and Human Services, the Secretary of State, and the Secretary of Homeland Security shall jointly submit a strategy on Afghan evacuee resettlement to the appropriate congressional committees and leadership describing agency roles and responsibilities, vetting, immigration status of each Afghan, and anticipated costs associated with implementing such strategy.

(b) DEFINITION OF AFGHAN EVACUEE.—In this section, the term "Afghan evacuee" means a person whose evacuation from Afghanistan to the United States, or a location overseas controlled by the United States, was facilitated by the United States as part of Operation Allies Refuge.

TITLE IV

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

For an additional amount for "Emergencies in the Diplomatic and Consular Service", $276,900,000, to remain available until

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 375

expended, for support for Operation Allies Welcome and related efforts by the Department of State, including additional relocations of individuals at risk as a result of the situation in Afghanistan and related expenses, and to reimburse the account under this heading in prior acts making appropriations for the Department of State, foreign operations, and related programs for obligations previously incurred.

## BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

#### INTERNATIONAL DISASTER ASSISTANCE

For an additional amount for "International Disaster Assistance", $400,000,000, to remain available until expended, to address humanitarian needs in Afghanistan and the region impacted by the situation in Afghanistan.

### DEPARTMENT OF STATE

#### MIGRATION AND REFUGEE ASSISTANCE

For an additional amount for "Migration and Refugee Assistance", $415,000,000, to remain available until expended, to address humanitarian needs in, and to assist refugees from, Afghanistan.

#### UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For an additional amount for "United States Emergency Refugee and Migration Assistance Fund", $1,076,100,000, to remain available until expended, notwithstanding section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601(c)(2)), of which $976,100,000 is for support for Operation Allies Welcome and related efforts by the Department of State, including additional relocations of individuals at risk as a result of the situation in Afghanistan and related expenses, and $100,000,000 is to respond to other unexpected and urgent humanitarian emergencies.

### GENERAL PROVISIONS—THIS TITLE

SEC. 2401. During fiscal years 2022 and 2023, notwithstanding any applicable restrictions on the ability of the Department of State and the United States Agency for International Development to enter into personal services contracts, including section 704 of the Financial Services and General Government Appropriations Act, 2021 (division E of Public Law 116–260) as continued by section 101 of division A of this Act (and any successor provision in a subsequently enacted appropriations Act), the authorities of section 2(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2669(c)), section 636(a)(3) of the Foreign Assistance Act of 1961 (22 U.S.C. 2396(a)(3)), and section 5(a)(6) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2605(a)(6)) may be exercised, without regard to the geographic limitations referenced therein, particularly to enter into, extend, and maintain contracts with individuals who have served as locally employed staff of the United States mission in Afghanistan.

Time period.
Contracts.

135 STAT. 376          PUBLIC LAW 117–43—SEPT. 30, 2021

Consultation.
Reports.

SEC. 2402. The Secretary of State, in consultation with the Administrator of the United States Agency for International Development, shall submit to the Committees on Appropriations, not later than 45 days after the date of enactment of this Act, a report on the proposed uses of funds appropriated by this title under the headings "Emergencies in the Diplomatic and Consular Service" and "United States Emergency Refugee and Migration Assistance Fund", by program, project, and activity, for which the obligation of funds is anticipated: *Provided*, That such report shall be updated (including any changes in proposed uses from the initial plan) and submitted to the Committees on Appropriations every 45 days until September 30, 2023.

Updates.

Reports.
Consultation.

SEC. 2403. Not later than 45 days after the date of enactment of this Act, the Secretary of State, in consultation with the Secretary of Homeland Security and the heads of other relevant Federal agencies, shall submit to the Committees on Appropriations a report on the status of the Priority 2 (P–2) designation granting United States Refugee Admissions Program (USRAP) access for certain at risk Afghan nationals and their eligible family members that was announced by the Department of State on August 2, 2021: *Provided*, That such report shall include the approximate number of Afghan nationals and their eligible family members who have been referred to the program, the number of Afghan nationals who have contacted a Resettlement Support Center to begin processing of their P–2 referral, the estimated time for processing such applications, an assessment of the obstacles facing P–2 eligible individuals seeking to leave Afghanistan, and a plan for augmenting personnel needed for refugee processing or humanitarian parole: *Provided further*, That such report shall be submitted in unclassified form, but may be accompanied by a classified annex.

Taliban.

SEC. 2404. None of the funds appropriated in this title and made available for assistance for Afghanistan may be made available for direct assistance to the Taliban.

TITLE V

GENERAL PROVISIONS—THIS ACT

SEC. 2501. In addition to amounts otherwise made available, there is appropriated for "U.S. Citizenship and Immigration Services—Immigration Examinations Fee Account", $193,000,000, to remain available until expended, for necessary expenses in support of Operation Allies Welcome, to be deposited and used as provided in section 286(n) of the Immigration and Nationality Act (8 U.S.C. 1356(n)): *Provided*, That such amounts shall be in addition to any other amounts made available for such purposes and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)): *Provided further*, That amounts provided in this section shall only be for the purposes specified, and notwithstanding any other provision of law are not available for non-expenditure transfer or reprogramming: *Provided further*, That within 15 days of the date of enactment of this Act, U.S. Citizenship and Immigration Services shall provide to the Committees on Appropriations and the Committees on the Judiciary of the Senate and the House of Representatives an expenditure plan for the funds provided under this paragraph, and every 30 days thereafter shall provide updated execution data

Deadlines.
Expenditure
plan.
Updates.
Data.

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 377

to such Committees for such funds: *Provided further,* That the
reporting requirement in the previous proviso shall end on September 30, 2026.

SEC. 2502. (a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Afghanistan (or a person with no nationality who last habitually resided in Afghanistan) shall be eligible for the benefits described in subsections (b) and (c) if—

(1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—

(A) paroled into the United States between July 31, 2021, and September 30, 2022; or

(B) paroled into the United States after September 30, 2022, and—

(i) is the spouse or child (as such term is defined under section 101(b) of the Immigration and Nationality Act (8 U.S.C. 1101(b)) of an individual described in subparagraph (A); or

(ii) is the parent or legal guardian of an individual described in subparagraph (A) who is determined to be an unaccompanied child under 6 U.S.C. 279(g)(2); and

(2) such individual's parole has not been terminated by the Secretary of Homeland Security.

(b) BENEFITS.—An individual described in subsection (a) shall be eligible for—

(1) resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) until March 31, 2023, or the term of parole granted under subsection (a), whichever is later;

(2) services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under 6 U.S.C. 279(g)(2); and

(3) a driver's license or identification card under section 202 of the REAL ID Act of 2005 (division B of Public Law 109–13; 49 U.S.C. 30301 note), notwithstanding subsection (c)(2)(B) of such Act.

(c) EXPEDITIOUS ADJUDICATION OF ASYLUM APPLICATIONS.—With respect to an application for asylum under section 208 of the Immigration and Nationality Act (8 U.S.C. 1158) filed by an individual described in subsection (a), the Secretary of Homeland Security shall—

(1) conduct the initial interview on the asylum application not later than 45 days after the date on which the application is filed; and

(2) in the absence of exceptional circumstances, issue a final administrative adjudication on the asylum application within 150 days after the date the application is filed.

(d) CLARIFICATION.—Notwithstanding any other provision of law, nothing in this act shall be interpreted to—

(1) preclude an individual described in subsection (a), from applying for or receiving any immigration benefits to which such individual is otherwise eligible; or

*Termination date.*

*Eligibility.*
*8 USC 1101 note.*

*Time period.*

*Effective date.*

*Expiration date.*

*Deadlines.*

(2) entitle a person described in subsection (a) to lawful permanent resident status.

Time period.
Consultation.

(e) REPORT.—Not later than 120 days after the date of enactment of this Act, and every 3 months thereafter, the Secretary of Homeland Security, in consultation with the Secretary of Defense and the Secretary of State, shall submit a report to Congress detailing the number of individuals described in subsection (a); the number of individuals receiving benefits in subsection (b), including their eligibility for benefits as refugees notwithstanding this Act; and any other information deemed relevant by the Secretary.

### REPORTING REQUIREMENT

Coordination.
Time period.
Reports.

SEC. 2503. (a) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, and quarterly thereafter through September 30, 2023, the Secretary of Homeland Security, in coordination with the head of any other applicable Federal agency, shall submit to Congress a report that includes the elements described in subsection (b).

(b) ELEMENTS.—The report required by subsection (a) shall include the following:

Summary.

(1) A summary of the status of Afghan evacuees, including—

(A) the number of the Afghan evacuees present in the United States, located at overseas bases of the United States Armed Forces, or located in third countries who are not located at such a base including—

(i) the number who are U.S. lawful permanent residents;

(ii) the number who are Special Immigrant Visa holders;

(iii) the number who are Special Immigrant Visa applicants;

(iv) the number who are in possession of a valid nonimmigrant visa to enter the United States;

(v) the number who are employees of a U.S. Government agency;

(vi) the number who are employees of a U.S. funded partner organization, media, or non-profit;

(vii) the number of Priority 1 refugee referrals;

(viii) the number of Priority 2 refugee referrals;

(ix) the number who have been relocated from the United States to a third country, and the country to which they were relocated; and

(x) the number who do not fall into any of the above categories;

(B) the number of Afghan evacuees at overseas bases or other official staging areas who have been flagged as potential security concerns or risks or included on the United States no-fly list and who were therefore denied clearance to enter the United States; and

(C) the number of the Afghan evacuees who have been paroled into the United States—

(i) the number whose parole was terminated; and

(ii) the number whose parole has been extended.

(2) The number of Afghan evacuees who have been interviewed by U.S. Citizenship and Immigration Services in connection with an application or petition for immigration benefits, including—

(A) the number of such interviews conducted since the United States withdrawal;

(B) the rate at which individuals were granted or refused the benefits that formed the basis for such interviews;

(C) the number of individuals who did not appear at a scheduled interview; and

(D) a description of the procedures for screening for and detecting child marriage, human trafficking, gender-based violence, and marriages entered into or relationships as fiancee or fiance claimed for the sole purpose of securing evacuation.

(3) For each Federal department and agency involved in Operation Allies Welcome—

(A) as of the date of the report, the costs incurred; and

(B) an identification of the source of appropriated or other funds used to fund the effort.

(c) DEFINITION OF AFGHAN EVACUEE.—In this section, the term "Afghan evacuee" means a person whose evacuation from Afghanistan to the United States, or a location overseas controlled by the United States, was facilitated by the United States as part of Operation Allies Refuge.

SEC. 2504. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 2505. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 2506. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2022.

SEC. 2507. Each amount provided by this division is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) and section 4001(b) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022.

This division may be cited as the "Afghanistan Supplemental Appropriations Act, 2022".

# DIVISION D—OTHER MATTERS

# TITLE I—EXTENSIONS, TECHNICAL CORRECTIONS, AND OTHER MATTERS

### SEC. 3101. EXTENSION OF AUTHORITY TO MAKE CERTAIN APPOINTMENTS FOR NATIONAL DISASTER MEDICAL SYSTEM.

Section 2812(c)(4)(B) of the Public Health Service Act (42 U.S.C. 300hh–11(c)(4)(B)) is amended by striking "September 30, 2021" and inserting "December 3, 2021".