

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO.   016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION No. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 16



PUBLIC LAW 117–128—MAY 21, 2022        136 STAT. 1211

Public Law 117–128
117th Congress

## An Act

Making emergency supplemental appropriations for assistance for the situation in Ukraine for the fiscal year ending September 30, 2022, and for other purposes.

May 21, 2022
[H.R. 7691]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2022, and for other purposes, namely:

Additional Ukraine Supplemental Appropriations Act, 2022.

### TITLE I

### DEPARTMENT OF JUSTICE

#### GENERAL ADMINISTRATION

##### SALARIES AND EXPENSES

###### (INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Salaries and Expenses", $67,000,000, to remain available until expended, for expenses authorized by section 524(c) of title 28, United States Code, to respond to the situation in Ukraine and for related expenses: *Provided*, That amounts provided under this heading in this Act may not be used to increase the number of permanent positions: *Provided further*, That amounts provided under this heading in this Act may be transferred to, and merged with, other appropriation accounts of the Department of Justice, to respond to the situation in Ukraine and for related expenses: *Provided further*, That amounts provided under this heading in this Act may be used to investigate, seize, detain, forfeit, inventory, safeguard, maintain, advertise, sell, or dispose of any property, real or personal, tangible or intangible, related to Russian aggression, including Russian aggression toward Ukraine, or for any other necessary expense incident to the seizure, detention, forfeiture, or disposal of such property: *Provided further*, That the authorities included in the preceding proviso are in addition to any other authority provided by law.

Russia.

136 STAT. 1212        PUBLIC LAW 117–128—MAY 21, 2022

## TITLE II

### DEPARTMENT OF DEFENSE

#### MILITARY PERSONNEL

##### MILITARY PERSONNEL, ARMY

For an additional amount for "Military Personnel, Army", $12,750,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

##### MILITARY PERSONNEL, NAVY

For an additional amount for "Military Personnel, Navy", $37,500, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

##### MILITARY PERSONNEL, MARINE CORPS

For an additional amount for "Military Personnel, Marine Corps", $675,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

##### MILITARY PERSONNEL, AIR FORCE

For an additional amount for "Military Personnel, Air Force", $1,590,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

#### OPERATION AND MAINTENANCE

##### OPERATION AND MAINTENANCE, ARMY

For an additional amount for "Operation and Maintenance, Army", $1,493,532,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

##### OPERATION AND MAINTENANCE, NAVY

For an additional amount for "Operation and Maintenance, Navy", $939,779,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

##### OPERATION AND MAINTENANCE, AIR FORCE

For an additional amount for "Operation and Maintenance, Air Force", $195,262,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

PUBLIC LAW 117–128—MAY 21, 2022        136 STAT. 1213

OPERATION AND MAINTENANCE, SPACE FORCE

For an additional amount for "Operation and Maintenance, Space Force", $800,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

OPERATION AND MAINTENANCE, DEFENSE-WIDE

(INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Operation and Maintenance, Defense-Wide", $15,256,824,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses: *Provided,* That of the total amount provided under this heading in this Act, $6,000,000,000, to remain available until September 30, 2023, shall be for the Ukraine Security Assistance Initiative: *Provided further,* That such funds for the Ukraine Security Assistance Initiative shall be available to the Secretary of Defense under the same terms and conditions as are provided for in section 8139 of the Department of Defense Appropriations Act, 2022 (division C of Public Law 117–103): *Provided further,* That of the total amount provided under this heading in this Act, up to $9,050,000,000, to remain available until September 30, 2023, may be transferred to accounts under the headings "Operation and Maintenance" and "Procurement" for replacement of defense articles from the stocks of the Department of Defense, and for reimbursement for defense services of the Department of Defense and military education and training, provided to the Government of Ukraine or to foreign countries that have provided support to Ukraine at the request of the United States: *Provided further,* That funds transferred pursuant to the preceding proviso shall be merged with and available for the same purposes and for the same time period as the appropriations to which the funds are transferred: *Provided further,* That the Secretary of Defense shall notify the congressional defense committees of the details of such transfers not less than 15 days before any such transfer: *Provided further,* That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back and merged with this appropriation: *Provided further,* That the transfer authority provided herein is in addition to any other transfer authority provided by law.

PROCUREMENT

MISSILE PROCUREMENT, ARMY

For an additional amount for "Missile Procurement, Army", $350,970,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY

For an additional amount for "Procurement of Weapons and Tracked Combat Vehicles, Army", $255,000, to remain available

136 STAT. 1214          PUBLIC LAW 117–128—MAY 21, 2022

until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### PROCUREMENT OF AMMUNITION, ARMY

For an additional amount for "Procurement of Ammunition, Army", $45,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### OTHER PROCUREMENT, ARMY

For an additional amount for "Other Procurement, Army", $113,440,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### OTHER PROCUREMENT, NAVY

For an additional amount for "Other Procurement, Navy", $1,250,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### AIRCRAFT PROCUREMENT, AIR FORCE

For an additional amount for "Aircraft Procurement, Air Force", $28,500,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### OTHER PROCUREMENT, AIR FORCE

For an additional amount for "Other Procurement, Air Force", $155,382,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### PROCUREMENT, DEFENSE-WIDE

For an additional amount for "Procurement, Defense-Wide", $24,218,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### DEFENSE PRODUCTION ACT PURCHASES

For an additional amount for "Defense Production Act Purchases", $600,000,000, to remain available until expended, to respond to the situation in Ukraine and for related expenses.

## RESEARCH, DEVELOPMENT, TEST AND EVALUATION

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, ARMY

For an additional amount for "Research, Development, Test and Evaluation, Army", $128,700,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1215

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, NAVY

For an additional amount for "Research, Development, Test and Evaluation, Navy", $43,000,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, AIR FORCE

For an additional amount for "Research, Development, Test and Evaluation, Air Force", $119,815,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, DEFENSE-WIDE

For an additional amount for "Research, Development, Test and Evaluation, Defense-Wide", $72,103,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

REVOLVING AND MANAGEMENT FUNDS

DEFENSE WORKING CAPITAL FUNDS

For an additional amount for "Defense Working Capital Funds", $965,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

OTHER DEPARTMENT OF DEFENSE PROGRAMS

DEFENSE HEALTH PROGRAM

For an additional amount for "Defense Health Program", $13,900,000, to remain available until September 30, 2022, which shall be for operation and maintenance to respond to the situation in Ukraine and for related expenses.

GENERAL PROVISIONS—THIS TITLE

(INCLUDING TRANSFERS OF FUNDS)

SEC. 201. In addition to any other funds made available for such purposes, $500,000,000 is hereby appropriated for an additional amount for the Department of Defense and made available for transfer to "Missile Procurement, Army", "Procurement of Ammunition, Navy and Marine Corps", "Weapons Procurement, Navy", "Missile Procurement, Air Force", and "Procurement of Ammunition, Air Force", only for the procurement of critical munitions to increase stocks of the Department of Defense: *Provided,* That none of the funds provided under this section in this Act may be obligated or expended until 60 days after the Secretary of Defense provides to the congressional defense committees an execution plan: *Provided further,* That not less than 30 days prior to any transfer of funds, the Secretary of Defense shall notify the congressional defense committees of the details of any such transfer: *Provided further,* That upon transfer, the funds shall be merged with and be available for the same purposes, and for the same time period, as the appropriation to which transferred:

Time period.
Execution plan.

Deadline.
Notification.

136 STAT. 1216        PUBLIC LAW 117–128—MAY 21, 2022

*Provided further*, That the transfer authority provided under this section is in addition to any other transfer authority provided by law.

SEC. 202. In addition to any other funds made available for such purposes, $50,000,000 is hereby appropriated for an additional amount for the Department of Defense and made available for transfer to "Research, Development, Test and Evaluation, Defense-Wide", only to develop program protection strategies for Department of Defense systems identified for possible future export, to design and incorporate exportability features into such systems during the research and development phases of such systems, and to integrate design features that enhance interoperability of such systems with those of friendly foreign countries: *Provided*, That none of the funds provided under this section in this Act may be obligated or expended until 60 days after the Secretary of Defense provides to the congressional defense committees an execution plan: *Provided further*, That not less than 30 days prior to any transfer of funds, the Secretary of Defense shall notify the congressional defense committees of the details of any such transfer: *Provided further*, That upon transfer, the funds shall be merged with and be available for the same purposes, and for the same time period, as the appropriation to which transferred: *Provided further*, That the transfer authority provided under this section is in addition to any other transfer authority provided by law.

SEC. 203. During fiscal year 2022, section 331(g)(1) of title 10, United States Code, shall be applied by substituting "$950,000,000" for "$450,000,000".

SEC. 204. The Inspector General of the Department of Defense shall carry out reviews of the activities of the Department of Defense to execute funds appropriated in this title, including assistance provided to Ukraine: *Provided*, That the Inspector General shall provide to the congressional defense committees a written report not later than 120 days after the date of enactment of this Act.

SEC. 205. Not later than 45 days after the date of enactment of this Act, the Secretary of Defense, in coordination with the Secretary of State, shall submit a report to the Committees on Appropriations, Armed Services, and Foreign Affairs of the House of Representatives and the Committees on Appropriations, Armed Services, and Foreign Relations of the Senate on measures being taken to account for United States defense articles designated for Ukraine since the February 24, 2022, Russian invasion of Ukraine, particularly measures with regard to such articles that require enhanced end-use monitoring; measures to ensure that such articles reach their intended recipients and are used for their intended purposes; and any other measures to promote accountability for the use of such articles.

SEC. 206. Not later than 30 days after the date of enactment of this Act, and every 30 days thereafter through fiscal year 2023, the Secretary of Defense, in coordination with the Secretary of State, shall provide a written report to the Committees on Appropriations, Armed Services, and Foreign Affairs of the House of Representatives and the Committees on Appropriations, Armed Services, and Foreign Relations of the Senate describing United States security assistance provided to Ukraine since the February 24, 2022, Russian invasion of Ukraine, including a comprehensive list of the defense articles and services provided to Ukraine and the associated authority and funding used to provide such articles

*Marginal notes:*
Time period.
Execution plan.

Deadline.
Notification.

Applicability.

Reviews.

Reports.

Coordination.
Reports.

Time period.
Coordination.
Reports.
List.

PUBLIC LAW 117–128—MAY 21, 2022       136 STAT. 1217

and services: *Provided*, That such report shall be submitted in unclassified form, but may be accompanied by a classified annex.

## TITLE III

## INDEPENDENT AGENCIES

### NUCLEAR REGULATORY COMMISSION

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $2,000,000, to remain available until expended, to provide regulatory and technical support related to the situation in Ukraine: *Provided*, That, notwithstanding section 102 of the Nuclear Energy Innovation and Modernization Act (42 U.S.C. 2215), such amount shall not be derived from fee revenue.

## TITLE IV

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### CENTERS FOR DISEASE CONTROL AND PREVENTION

#### CDC-WIDE ACTIVITIES AND PROGRAM SUPPORT

For an additional amount for "CDC-Wide Activities and Program Support", $54,000,000, to remain available until September 30, 2023, for carrying out public health and disease detection activities related to the situation in Ukraine, and for medical support, screening, and other public health activities related to populations displaced from Ukraine, both domestically and internationally.

### ADMINISTRATION FOR CHILDREN AND FAMILIES

#### REFUGEE AND ENTRANT ASSISTANCE

For an additional amount for "Refugee and Entrant Assistance", $900,000,000, to remain available until September 30, 2023, for carrying out refugee and entrant assistance activities in support of citizens or nationals of Ukraine, or a person who last habitually resided in Ukraine, for whom such refugee and entrant assistance activities are authorized: *Provided*, That amounts made available under this heading in this Act may be used for grants or contracts with qualified organizations, including nonprofit entities, to provide culturally and linguistically appropriate services, including wraparound services, housing assistance, medical assistance, legal assistance, and case management assistance: *Provided further*, That amounts made available under this heading in this Act may be used by the Director of the Office of Refugee Resettlement (Director) to issue awards or supplement awards previously made by the Director: *Provided further*, That the Director, in carrying out section 412(c)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1522(c)(1)(A)) with amounts made available under this heading in this Act, may allocate such amounts among the States in a manner that accounts for the most current data available.

Grants.
Contracts.

Allocations.

136 STAT. 1218        PUBLIC LAW 117–128—MAY 21, 2022

GENERAL PROVISION—THIS TITLE

8 USC 1101 note.

SEC. 401. (a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Ukraine (or a person who last habitually resided in Ukraine) shall be eligible for the benefits described in subsection (b) if—

(1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—

Time period.

(A) paroled into the United States between February 24, 2022 and September 30, 2023; or

Effective date.

(B) paroled into the United States after September 30, 2023 and—

(i) is the spouse or child of an individual described in subparagraph (A); or

Determination.

(ii) is the parent, legal guardian, or primary caregiver of an individual described in subparagraph (A) who is determined to be an unaccompanied child under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)) or section 412(d)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)(B)); and

(2) such individual's parole has not been terminated by the Secretary of Homeland Security.

(b) BENEFITS.—An individual described in subsection (a) shall be eligible for—

(1) resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) to the same extent as such refugees, but shall not be eligible for the program of initial resettlement authorized by section 412(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1522(b)(1)); and

(2) services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)).

(c) CLARIFICATIONS.—

(1) Nothing in this section shall be interpreted to:

(A) preclude an individual described in subsection (a) from applying for or receiving any immigration benefits to which such individual is otherwise eligible; or

(B) entitle a person described in subsection (a) to lawful permanent resident status.

(2) Section 421(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) shall not apply with respect to determining the eligibility and the amount of benefits made available pursuant to subsection (b).

(d) NON-APPLICATION OF THE PAPERWORK REDUCTION ACT.—Chapter 35 of title 44, United States Code (commonly referred to as the Paperwork Reduction Act of 1995), shall not apply to any action taken to implement this section that involves translating a currently approved collection of information into a new language.

PUBLIC LAW 117–128—MAY 21, 2022      136 STAT. 1219

TITLE V

DEPARTMENT OF STATE AND RELATED AGENCY

DEPARTMENT OF STATE

Administration of Foreign Affairs

DIPLOMATIC PROGRAMS

For an additional amount for "Diplomatic Programs", $190,000,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

CAPITAL INVESTMENT FUND

For an additional amount for "Capital Investment Fund", $10,000,000, to remain available until expended, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $4,000,000, to remain available until September 30, 2024.

EMBASSY SECURITY, CONSTRUCTION, AND MAINTENANCE

For an additional amount for "Embassy Security, Construction, and Maintenance", $110,000,000, to remain available until expended, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT

Funds Appropriated to the President

OPERATING EXPENSES

For an additional amount for "Operating Expenses", $17,000,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $1,000,000, to remain available until September 30, 2024.

BILATERAL ECONOMIC ASSISTANCE

Funds Appropriated to the President

INTERNATIONAL DISASTER ASSISTANCE

For an additional amount for "International Disaster Assistance", $4,348,000,000, to remain available until expended, to

136 STAT. 1220          PUBLIC LAW 117–128—MAY 21, 2022

respond to humanitarian needs in Ukraine and in countries impacted by the situation in Ukraine, including the provision of emergency food and shelter, and for assistance for other vulnerable populations and communities, including through local and international nongovernmental organizations.

### ECONOMIC SUPPORT FUND

For an additional amount for "Economic Support Fund", $8,766,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine, including for programs to combat human trafficking, of which up to $760,000,000 may be made available to prevent and respond to food insecurity: *Provided*, That funds appropriated under this heading in this Act may be made available notwithstanding any other provision of law that restricts assistance to foreign countries and may be made available as contributions.

### DEPARTMENT OF STATE

#### MIGRATION AND REFUGEE ASSISTANCE

For an additional amount for "Migration and Refugee Assistance", $350,000,000, to remain available until expended, to address humanitarian needs in, and to assist refugees from, Ukraine, and for additional support for countries in the Eastern European region impacted by the situation in Ukraine.

## INTERNATIONAL SECURITY ASSISTANCE

### DEPARTMENT OF STATE

#### INTERNATIONAL NARCOTICS CONTROL AND LAW ENFORCEMENT

For an additional amount for "International Narcotics Control and Law Enforcement", $400,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine, including for programs to combat human trafficking and to document and collect evidence of war crimes and crimes against humanity committed by the Government of the Russian Federation in Ukraine.

#### NONPROLIFERATION, ANTI-TERRORISM, DEMINING AND RELATED PROGRAMS

For an additional amount for "Nonproliferation, Anti-terrorism, Demining and Related Programs", $100,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine.

### FUNDS APPROPRIATED TO THE PRESIDENT

#### FOREIGN MILITARY FINANCING PROGRAM

For an additional amount for "Foreign Military Financing Program", $4,000,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1221

## MULTILATERAL ASSISTANCE

### INTERNATIONAL FINANCIAL INSTITUTIONS

#### CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND DEVELOPMENT

For payment by the Secretary of the Treasury to the European Bank for Reconstruction and Development and its trust funds and facilities, $500,000,000, to remain available until expended, for assistance and related programs for Ukraine and countries impacted by the situation in Ukraine: *Provided*, That such amount shall be subject to the same authorities and conditions as if such amount was made available by title V of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022 (division K of Public Law 117–103).

#### GLOBAL AGRICULTURE AND FOOD SECURITY PROGRAM

For an additional payment to the Global Agriculture and Food Security Program by the Secretary of the Treasury, $150,000,000, to remain available until expended.

### GENERAL PROVISIONS—THIS TITLE

#### (INCLUDING TRANSFERS OF FUNDS)

SEC. 501. During fiscal year 2022, section 506(a)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2318(a)(1)) shall be applied by substituting "$11,000,000,000" for "$100,000,000". <span style="float:right">Applicability.</span>

SEC. 502. During fiscal year 2022, section 614 of the Foreign Assistance Act of 1961 (22 U.S.C. 2364) shall be applied— <span style="float:right">Applicability.</span>
    (1) in subsection (a)(4)(A)(ii), by substituting "$1,000,000,000" for "$250,000,000"; and
    (2) in subsection (a)(4)(C), by substituting "$200,000,000" for "$50,000,000", "$1,000,000,000" for "$250,000,000", "$1,000,000,000" for "$500,000,000", and "$1,750,000,000" for "$1,000,000,000".

SEC. 503. During fiscal year 2022, section 552(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2348a(c)) shall be applied by substituting "$100,000,000" for "$25,000,000". <span style="float:right">Applicability.</span>

SEC. 504. (a) Section 2606(a) of the Ukraine Supplemental Appropriations Act, 2022 (division N of Public Law 117–103) is amended by striking "fiscal year 2022" and inserting "fiscal years 2022 through 2024": *Provided*, That funds made available under the heading "Foreign Military Financing Program" in this title shall be available for loans under such section. <span style="float:right">*Ante*, p. 785.<br>Time period.</span>

(b) During fiscal years 2022 and 2023, funds made available under the heading "Foreign Military Financing Program" in this Act and prior Acts making appropriations for the Department of State, foreign operations, and related programs may be utilized by Ukraine for the procurement of defense articles, defense services, or design and construction services that are not sold by the United States Government under the Arms Export Control Act (22 U.S.C. 2751 et seq.): *Provided*, That such procurements shall be subject to the applicable notification requirements of section 38 of the Arms Export Control Act (22 U.S.C. 2778). <span style="float:right">Contracts.<br>Notification.</span>

136 STAT. 1222          PUBLIC LAW 117–128—MAY 21, 2022

SEC. 505. (a) Funds appropriated by this title under the headings "Diplomatic Programs", "Capital Investment Fund", "Embassy Security, Construction, and Maintenance", and "Operating Expenses" may be transferred to, and merged with, funds available under such headings and with funds available under the heading "Educational and Cultural Exchange Programs" to respond to the situation in Ukraine and countries impacted by the situation in Ukraine.

(b) Funds appropriated by this title under the headings "International Disaster Assistance" and "Migration and Refugee Assistance" may be transferred to, and merged with, funds appropriated by this title under such headings.

(c) Funds appropriated by this title under the heading "Economic Support Fund" may be transferred to, and merged with, funds available under the heading "Assistance for Europe, Eurasia and Central Asia" for assistance and related programs for Ukraine and other countries identified in section 3 of the FREEDOM Support Act (22 U.S.C. 5801) and section 3(c) of the Support for East European Democracy (SEED) Act of 1989 (22 U.S.C. 5402(c)) and under the headings "Transition Initiatives" and "Complex Crises Fund" to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

(d) Funds appropriated by this title under the headings "International Narcotics Control and Law Enforcement", "Nonproliferation, Anti-terrorism, Demining and Related Programs", and "Foreign Military Financing Program" may be transferred to, and merged with, funds appropriated by this title under such headings to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

(e) The transfer authorities provided by this title are in addition to any other transfer authority provided by law.

<span style="float:left">Consultation.<br>Notifications.</span>(f) The exercise of the transfer authorities provided by this title shall be subject to prior consultation with, and the regular notification procedures of, the Committees on Appropriations.

<span style="float:left">Determination.</span>(g) Upon a determination that all or part of the funds transferred pursuant to the authorities provided by this title are not necessary for such purposes, such amounts may be transferred back to such appropriations.

<span style="float:left">Reports.</span>SEC. 506. Not later than 30 days after the date of enactment of this Act, the Secretary of State and Administrator of the United States Agency for International Development shall jointly submit a report to the Committees on Appropriations on the proposed uses of funds appropriated by this title, with the exception of funds appropriated under the heading "Multilateral Assistance": *Provided*, That the Secretary of the Treasury shall submit a separate report, not later than 30 days after the date of enactment of this Act, for funds appropriated under the heading "Multilateral <span style="float:left">Updates.<br>Time periods.<br>Termination<br>date.</span>Assistance": *Provided further*, That such reports shall be updated and submitted to the Committees on Appropriations every 60 days thereafter until September 30, 2024, and every 120 days thereafter until all funds have been expended.

SEC. 507. (a) Funds made available by this title under the heading "Economic Support Fund" may be made available for direct financial support for the Government of Ukraine, and such funds shall be matched, to the maximum extent practicable, by sources other than the United States Government.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1223

(b) Funds made available to the Government of Ukraine as a cash transfer under subsection (a) shall be subject to a memorandum of understanding that describes how the funds proposed to be made available will be used and includes appropriate safeguards for transparency and accountability: *Provided*, That such assistance shall be maintained in a separate, auditable account and may not be comingled with any other funds.

*Memorandum.*

(c) At least 15 days prior to the initial obligation of funds made available for the purposes of subsection (a), the Secretary of State or the Administrator of the United States Agency for International Development, as appropriate, shall submit to the appropriate congressional committees a report detailing procedures and processes to ensure such funds are used by the Government of Ukraine in the manner agreed to by such Government, including details on the memorandum of understanding and appropriate safeguards for transparency and accountability required by subsection (b), if applicable: *Provided*, That such report shall be updated every six months following the submission of the first report and shall be submitted until funds made available for such direct financial support are expended.

*Time periods.*
*Reports.*

*Updates.*

(d) The Secretary of State or the Administrator of the United States Agency for International Development, as appropriate, shall report to the appropriate congressional committees on the uses of any funds provided for direct financial support to the Government of Ukraine pursuant to subsection (a) and the results achieved, not later than 90 days after the date of enactment of this Act and every 90 days thereafter until September 30, 2025: *Provided*, That such report shall also include the metrics established to measure such results.

*Reports.*
*Time period.*
*Termination date.*

(e) Funds made available for the purposes of subsection (a) by this title shall be subject to the regular notification procedures of the Committees on Appropriations.

*Notifications.*

## TITLE VI

### GENERAL PROVISIONS—THIS ACT

#### (INCLUDING TRANSFER OF FUNDS)

SEC. 601. There is hereby appropriated to the Secretary of Agriculture $20,000,000, to remain available until expended, to carry out the Bill Emerson Humanitarian Trust, as authorized by the Bill Emerson Humanitarian Trust Act (7 U.S.C. 1736f–1).

SEC. 602. In addition to the amounts otherwise available to the Department of the Treasury, $52,000,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses: *Provided*, That funds appropriated in this section in this Act may be transferred to other appropriation accounts of the Department of the Treasury, to respond to the situation in Ukraine and for related expenses: *Provided further*, That such transfer authority is in addition to any other transfer authority provided by law.

SEC. 603. For payment to Anne Garland Walton, beneficiary of Don Young, late a Representative from the State of Alaska, $174,000.

*Anne Garland Walton.*

SEC. 604. Funds appropriated by this Act for intelligence or intelligence related activities are deemed to be specifically authorized by the Congress for purposes of section 504(a)(1) of the National Security Act of 1947 (50 U.S.C. 3094(a)(1)).

SEC. 605. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 606. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 607. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2022.

SEC. 608. Each amount provided by this Act is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) and section 4001(b) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022.

This Act may be cited as the "Additional Ukraine Supplemental Appropriations Act, 2022".

Approved May 21, 2022.

---

LEGISLATIVE HISTORY—H.R. 7691:

CONGRESSIONAL RECORD, Vol. 168 (2022):
    May 10, considered and passed House.
    May 17, 19, considered and passed Senate.

○



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007
EXHIBIT
NO. 017

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 17

JV
6414
.A2
1957

# ANNUAL

# REPORT *of the*

## *Immigration and Naturalization Service*



*Washington, D. C.*   1957

JV
6414
A2
1957

JV
6414
.A2
1957

# UNITED STATES DEPARTMENT OF JUSTICE
### IMMIGRATION AND NATURALIZATION SERVICE
Washington 25, D. C.

## REPORT OF THE COMMISSIONER
## OF IMMIGRATION AND NATURALIZATION

THE ATTORNEY GENERAL
UNITED STATES DEPARTMENT OF JUSTICE

SIR: I have the honor to submit the Annual Report of the Immigration and Naturalization Service for the year ended June 30, 1957.

This report narrates our accomplishments of the past year and some of our aims for the future.

Respectfully submitted,

J. M. SWING
*Commissioner*

Immigration and Naturalization Service

# TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| ADMISSIONS TO THE UNITED STATES | 1 |
| Hungarian refugees | 2 |
| Immigrants | 4 |
| Quota immigrants | 4 |
| Nonquota immigrants | 5 |
| Nonimmigrants | 5 |
| Temporary admissions | 5 |
| Agricultural laborers | 5 |
| Crewmen | 6 |
| Alien border crossers | 6 |
| Admission of otherwise inadmissible aliens | 6 |
| Citizens | 6 |
| EXCLUSIONS | 7 |
| ALIEN ADDRESS REPORTS | 7 |
| ADJUSTMENT OF STATUS | 7 |
| CITIZENSHIP | 8 |
| ENFORCEMENT | 11 |
| Illegal entries | 11 |
| Land borders | 11 |
| Sea and air | 11 |
| Anti-subversive and anti-criminal operations | 12 |
| Documentary frauds | 12 |
| Deportations and prosecutions | 13 |
| Order to show cause | 13 |
| Special inquiry hearings | 13 |
| Detention and parole | 13 |
| Unexecuted orders of deportation | 13 |
| Deportation and voluntary departure | 13 |
| Prosecutions | 14 |
| ADMINISTRATION | 15 |

## TABLES

|  |  | Page |
|---|---|---|
| 1. | Immigration to the United States: 1820–1957 . . . . . . . . . . . | 16 |
| 2. | Aliens and citizens admitted and departed, by months: Years ended June 30, 1956 and 1957 . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 3. | Aliens and citizens admitted at United States ports of entry: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 4. | Aliens admitted, by classes under the immigration laws: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| 5. | Immigrant aliens admitted and emigrant aliens departed, by port or district: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . | 19 |
| 6. | Immigrant aliens admitted, by classes under the immigration laws and country or region of birth: Year ended June 30, 1957 . . . . . . . | 20 |
| 6A. | Immigrant aliens admitted, by classes under the immigration laws and country or region of last permanent residence: Year ended June 30, 1957 . | 21 |
| 6B. | Maximum visas authorized and immigrant aliens admitted to the United States under the Refugee Relief Act of 1953: Years ended June 30, 1954–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| 6C. | Immigrant aliens admitted under the Refugee Relief Act of 1953, by class of admission and country or region of birth: Years ended June 30, 1954–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 7. | Annual quotas and quota immigrants admitted: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 7A. | Quota immigrants admitted, by quota area and quota preferences: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| 8. | Immigrant aliens admitted, by country or region of birth and major occupation group: Year ended June 30, 1957 . . . . . . . . . . . . | 26 |
| 9. | Immigrant aliens admitted, by country or region of birth, sex, marital status, and age: Year ended June 30, 1957 . . . . . . . . . . . . . | 27 |
| 10. | Immigrant aliens admitted by race, sex, and age: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| 10A. | Immigrant aliens admitted and emigrant aliens departed, by sex, age, illiteracy, and major occupation group: Years ended June 30, 1953–1957 . | 29 |
| 10B. | Recent Hungarian refugees and parolees admitted, by sex, marital status, age, and major occupation group: Year ended June 30, 1957 . . . . . . | 30 |
| 11. | Aliens and citizens admitted and departed: Years ended June 30, 1908–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| 12. | Immigrant aliens admitted and emigrant aliens departed, by State of intended future or last permanent residence: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 |
| 12A. | Immigrant aliens admitted, by specified countries of birth and State of intended future permanent residence: Year ended June 30, 1957 . . . . | 33 |
| 12B. | Immigrant aliens admitted, by specified countries of birth and rural and urban area and city: Year ended June 30, 1957 . . . . . . . . . . . | 34 |
| 12C. | Immigrant aliens admitted to the United States under the Refugee Relief Act of 1953, by State of future permanent residence: Years ended June 30, 1954–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
| 13. | Immigrant aliens admitted and emigrant aliens departed by country or region of last or intended future permanent residence: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
| 13A. | Immigrant aliens admitted, by country or region of birth: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . . . . . | 37 |

iv

TABLES—Continued

*Page*

14. Emigrant aliens departed, by race, sex, and age: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

14A. Emigrant aliens departed, by country or region of birth and major occupation group: Year ended June 30, 1957 . . . . . . . . . . . . . 39

15. Emigrant aliens departed, by country or region of birth, sex, and age: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . 40

16. Nonimmigrant aliens admitted, by classes under the immigration laws and country or region of birth: Year ended June 30, 1957 . . . . . . . 41

17. Nonimmigrant aliens admitted, by classes under the immigration laws and country or region of last permanent residence: Year ended June 30, 1957 . 42

18. Agricultural laborers admitted to the United States: Years ended June 30, 1950–1957 . . . . . . . . . . . . . . . . . . . . . . . 42

19. Entries of alien and citizen border crossers over international land boundaries, by State and port: Year ended June 30, 1957 . . . . . . . . . 43

20. Entries of alien and citizen border crossers over international land boundaries: Years ended June 30, 1928–1957 . . . . . . . . . . . . . 45

21. Aliens excluded from the United States: Years ended June 30, 1892–1957 . . . . . . . . . . . . . . . . . . . . . . . . . 46

22. Aliens excluded, by country or region of birth and cause: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . 47

23. Aliens excluded from the United States, by cause: Years ended June 30, 1951–1957 . . . . . . . . . . . . . . . . . . . . . . . 48

24. Aliens deported, by country to which deported and cause: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . 49

24A. Aliens apprehended, aliens deported, and aliens departing voluntarily: Years ended June 30, 1892–1957 . . . . . . . . . . . . . . . . 50

25. Aliens deported, by country to which deported and deportation expense: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . 51

26. Aliens deported, by cause: Years ended June 30, 1908–1957 . . . . . 52

27. Aliens deported, by year of entry and status at entry: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . . . . . . 53

28. Alien crewmen deserted at United States air and seaports, by nationality and flag of carrier: Year ended June 30, 1957 . . . . . . . . . . 53

29. Vessels and airplanes inspected, crewmen admitted, and stowaways arrived, by regions and districts: Year ended June 30, 1957 . . . . . . 54

30. Principal activities and accomplishments of Immigration Border Patrol: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . 55

31. Passengers arrived in the United States from foreign countries, by country of embarkation: Year ended June 30, 1957 . . . . . . . . . . . 56

32. Passengers departed from the United States to foreign countries, by country of debarkation: Year ended June 30, 1957 . . . . . . . . . . . 60

33. Passenger travel between the United States and foreign countries, by port of arrival or departure: Year ended June 30, 1957 . . . . . . . . . 63

34. Passenger travel by air and by sea between Puerto Rico and continental United States (mainland) and the Virgin Islands: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . . . . 64

35. Passenger travel by air and sea between Hawaii and continental United States (mainland) and insular or outlying possessions: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . . . 65

36. Aliens who reported under the Alien Address Program, by selected nationalities and States of residence: During 1957 . . . . . . . . . . . 66

v

TABLES—Continued

*Page*

37. Declarations of intention filed, petitions for naturalization filed, and persons naturalized: Years ended June 30, 1907–1957 . . . . . . . . .   67
38. Persons naturalized, by general and special naturalization provisions and country or region of former allegiance: Year ended June 30, 1957 . . . .   68
39. Persons naturalized, by country or region of former allegiance: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . .   69
40. Persons naturalized, by country or region of former allegiance and major occupation group: Year ended June 30, 1957 . . . . . . . . . . . .   70
41. Persons naturalized and petitions for naturalization denied: Years ended June 30, 1907–1957 . . . . . . . . . . . . . . . . . .   72
42. Persons naturalized, by sex and marital status, with comparative percent of total: Years ended June 30, 1949–1957 . . . . . . . . . . . .   73
43. Persons naturalized, by sex and age: Years ended June 30, 1949–1957 . .   74
44. Persons naturalized, by States and Territories of residence: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . . . . . . . . .   75
45. Persons naturalized, by country or region of birth and year of entry: Year ended June 30, 1957 . . . . . . . . . . . . . . . . . . . .   76
46. Persons naturalized, by specified countries of former allegiance and by rural and urban area and city: Year ended June 30, 1957 . . . . . . .   78
47. Persons naturalized, by general and special naturalization provisions: Years ended June 30, 1953–1957 . . . . . . . . . . . . . . . .   79
48. Prosecutions for immigration and nationality violations: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . . .   80
49. Writs of habeas corpus in exclusion and deportation cases: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . .   81
49A. Convictions for immigration and nationality violations: Years ended June 30, 1948–1957 . . . . . . . . . . . . . . . . . . . . .   81
50. Private immigration and nationality bills introduced and laws enacted, 75th Congress–85th Congress, First Session . . . . . . . . . . . . .   82
51. Petitions for naturalization denied, by reason: Years ended June 30, 1952–1957 . . . . . . . . . . . . . . . . . . . . . . . .   82
52. Certificates of naturalization revoked, by grounds: Years ended June 30, 1952–1957 . . . . . . . . . . . . . . . . . . . . . .   83
53. Persons expatriated, by grounds: Years ended June 30, 1952–1957 . . .   83
54. Persons repatriated: Years ended June 30, 1952–1957 . . . . . . . .   83
55. Certificates of derivative citizenship granted, by country or region of birth: Years ended June 30, 1954–1957 . . . . . . . . . . . .   84

# Annual Report of J. M. Swing, Commissioner of Immigration and Naturalization

## INTRODUCTION

Each year, when the Immigration and Naturalization Service totals its accomplishments, the attraction of the United States for peoples of other lands is evident.

Fiscal year 1957 emphasized this as immigration reached a 30-year high, and visitors, students, crewmen, and others temporarily admitted exceeded all previous records.

Most dramatic of the alien admissions was that of the Hungarian refugees. Their coming challenged every operation of the Service to make their admissions as fast and simple as possible, and at the same time to protect the security and safety of the United States.

With the flow of illegal agricultural laborers cut off, farmers and workers alike cooperated to bring more agricultural laborers to the United States than in any previous year.

While the number of apprehensions of aliens illegally entering the United States or found in the United States in violation of immigration and nationality laws was a fraction of the apprehensions in 1954 and previous years, the accomplishments in the area of enforcement were more gratifying because they represented a program of prevention of illegal entry.

Enforcement operations were improved by the transfer of immigration officers from the southern to the northern border to meet problems there resulting from increased European migration to Canada; mobile search teams were organized with headquarters at major seaports to better combat smuggling attempts and possible desertions by crewmen; intelligence officers increased dissemination of information of value to enforcement operations.

Improvement in procedures for inspections, inquiry hearings, and administrative operations brought the Service to year's end with only minor arrearages, although workloads were heavy and the personnel force was not increased.

## ADMISSIONS TO THE UNITED STATES

The revolution in Hungary; the reduction in travel rates; the continued influx of foreign agricultural workers; the youth of the world seeking education; the drawing power of the United States for immigrants; the daily border crossings over our long borders; all these contributed to inward movement of more than 144 million citizens and aliens through our ports of entry. As usual, the greater portion of this traffic, 95 percent, passed through land border ports.

The immigration officers were able to handle the increased workload in stride because of the techniques developed to expedite inspection. One practice that met with immediate popular acclaim was the extension of preinspection (the practice of inspecting aliens and citizens before they board the plane or vessel) to vessels plying between Honolulu and the mainland.

Another inspection technique was streamlined when new laminated cards were issued to 400,791 Mexican alien border crossers last year. The laminated card is practically indestructible and

1

unalterable. Its unlimited validity will save time formerly needed to extend the validity or to reissue border crossing cards. Next year, similar non-resident border crossing cards will be issued on the Canadian border.

Other documentation has been simplified. With the publication of revised regulations on manifesting on December 19, 1956, a single manifest form replaced eight other forms used by this Service and other Government agencies. The number of items on Form I–94, Temporary Entry Permit, was reduced. At the same time, it replaced two other Service forms and State Department Temporary Visa Form FS 257.

Notice of proposed rule making was given, looking to an even greater simplification in that Form I–94 will become an arrival-departure card prepared as to each passenger. This will eliminate a separate manifest for aircraft arrivals and departures.

Certainly not a technique, but a major contributing factor in improved inspection process was the appointment, in September 1956, of port receptionists. These young ladies, carefully chosen for their tact and ability, are now employed in New York, Miami, and Honolulu. The public good will engendered and the operational effi-ciency gained have demonstrated the unqualified success of this program.

## Hungarian Refugees

On October 23, 1956, the revolution against the Communist government in Hungary flared up in Budapest. When, shortly thereafter, the revolution was ruthlessly crushed, thousands of Hungarians, faced with deportation or extinction, fled into Austria. That small country was soon overwhelmed by the magnitude of the refugee problem. The United States was 1 of over 20 free nations that immediately offered asylum to the refugees in Austria.

On November 8, 1956, the President announced that 5,000 of the refugees would be admitted to the United States. On November 13, 1956, an order was entered providing for the bringing into the United States of that number under the parole provisions of section 212 (d) (5) of the Immigration and Nationality Act. Since there were approximately 6,100 special nonquota immigrant visa numbers still available for escapees from Communist areas of Europe under section 4 (a) (2) of the Refugee Relief Act of 1953, it was decided



PORT RECEPTIONIST: The port receptionist works at busy international ports. She frequently acts as an interpreter. She welcomes the incoming passengers, routes them to the inspector, arranges documents in proper order, helps mothers with children, and calms nervous immigrants or impatient citizens.



HUNGARIAN REFUGEES LEAVE FOR THE UNITED STATES: Refugees were transported by sea and air under the auspices of the Intergovernmental Committee for European Migration.

Acknowledgment: Jean Marquis, Magnum Photos, Inc., New York, N. Y.

to make these numbers available for the Hungarian refugees. The first visas were issued on November 19, 1956, and were exhausted by December 1, 1956. On December 1, 1956, the President announced that an additional 15,000 Hungarians would be brought to the United States under the parole procedure. The order of November 13, 1956, that 5,000 be paroled was amended by increasing the number to 15,000. On January 2, 1957, the numeric limitations on parole were lifted.

By June 30, 1957, 6,130 immigrants and 27,435 parolees had been brought to the United States. Since the special nonquota visas were all used by December 1, most of the refugees had to be admitted under the parole provisions of section 212 (d) (5) of the Immigration and Nationality Act. This is the first time that the parole provision has been applied to relatively large numbers of people. The parole authority is vested in the Attorney General; the Service, as his delegate, had the entire responsibility for processing the parolees. Immigration officers, many of them already in Europe on the Refugee Program, were stationed in Vienna and Salzburg to review documents, interview applicants, and to determine their eligibility for parole into the United States.

The voluntary agencies played an invaluable role in the visa and parole programs. They assisted the Hungarian refugees in dealing with the government representatives of the United States and the other countries in arranging for

admission to the country to which the refugee sought to go. The agencies cooperated with the governments in obtaining facts from the refugees and in presenting them at government offices. They assisted the refugees in finding new homes and employment after they reached the United States or other country of destination.

Vice President Nixon, after his return from Hungary, concluded that "the countries which accept these refugees will find that, rather than having assumed a liability, they have acquired a valuable national asset." The Hungarian refugees who came to the United States bear this out. They are largely young, vigorous people. Half of those admitted were adult males. Nearly three-fourths of the refugees who reported an occupation are professional workers, craftsmen, or other skilled workers.

As a further precautionary measure the Service undertook an immediate investigation of every allegation, rumor, or complaint concerning any Hungarian refugee. As of June 30, 1957, 2,346 such investigations were initiated and 1,618 of them had been completed. The effectiveness of the screening processes utilized is demonstrated by the fact that only 45 refugees were returned to Austria—16 by reason of Communist affiliations and 29 for having obtained admission by fraud. Twenty-eight close relatives elected to accompany refugees expelled and 119 other Hungarians chose to return for the most part to rejoin relatives in Hungary.



STAGE SHOW AT KILMER RECEP-
TION CENTER: Most of the refu-
gees were taken to the Joyce
Kilmer Reception Center, Camp
Kilmer, N. J., which was reacti-
vated in November 1956. Here
a Special Services show is put on
at one of the recreation centers
for the enjoyment of Hungarians
temporarily housed there.

Acknowledgment: U. S. Army photograph.

## Immigrants

The attraction of the United States as a country of immigration extended not only to the Hungarians, whose need for asylum was great, but to thousands of other people throughout the world. The 6,130 visaed refugees comprised but a small part of the total 326,867 immigrants who came to the United States as permanent residents during fiscal year 1957.

All immigrants must meet certain standards of health, morals, and economics. Beyond these criteria are two broad categories of admission for immigrants: (1) those whose admission is controlled numerically by the established quotas for countries except those in the Western Hemisphere, and (2) those who either by birth in a Western Hemisphere country, marriage to a United States citizen, or for other reasons fall within the legal definition of nonquota immigrants—i. e., those whose admission is not numerically controlled.

*Quota immigrants.* 97,178 quota immigrants entered the United States in 1957, an increase of 9 percent over last year.

There are two major reasons why the whole



IMMIGRATION TO THE UNITED STATES
1820 — 1957

THOUSANDS

Legend:
- Total Immigrants Admitted
- Europe (Southern and Eastern)
- " (Northern and Western)

4

quota of 154,857 was not used. In the first place, under the national origins plan, Great Britain was allotted 42 percent of total quota or 65,361 quota numbers, but only 28,914 immigrants were charged to that quota; and secondly, most of the countries of southern and eastern Europe have 50 percent of their quotas mortgaged, as an aftermath of the Displaced Persons Act. (Legislation passed after the close of the fiscal year will forgive these mortgages—thus freeing approximately 8,200 quota numbers per year.)

Within the quotas are certain preference groups, who receive priority in the assignment of quota numbers. For these people visa petitions must be filed with this Service. 5,739 were approved for highly skilled or technical persons, and 2,992 such persons were admitted, accompanied by 2,739 wives and children. The increase of 54 percent over last year appears to indicate that the American businessman is beginning to use this



IMMIGRANTS ADMITTED 1948 - 1957

Immigration since World War II has been influenced by special legislation passed for the benefit of persons caught in the aftermath of war. Quota immigration was high from 1950–1952 because of the Displaced Persons Act. Nonquota immigration went up in 1956–1957, in part due to the Refugee Relief Act.

section of the law. Outstanding doctors, engineers to aid in the jet airplane program, and many other highly skilled and trained persons have been able to come to the United States because of this priority. Second, third, and fourth preferences relate to parents of United States citizens, spouses and children of resident aliens, and brothers, sisters, sons, and daughters of United States

citizens. 28,051 visa petitions were approved, and 13,466 immigrants were admitted under these priorities. In some countries with tight quotas, such as Italy and Greece, practically the whole quota is absorbed by the first three preferences.

*Nonquota immigrants.* The principle of uniting families shows up not only in the preference quota classes, but also in the nonquota groups. Wives, husbands, and children of United States citizens accounted for 32,359 of the 229,689 nonquota immigrants. 111,344 of the total were natives of Western Hemisphere countries.

The Refugee Relief Act of 1953 provided for the admission of 209,000 nonquota immigrants by December 31, 1956. In total 187,740 immigrants were admitted (82,444 of them in fiscal year 1957), leaving about 18,000 unused visas. (The act approved September 11, 1957, provides for the use of these unused allotments.)

## Nonimmigrants

*Temporary admissions.* Visitors for business or pleasure numbering 537,760 pushed the total of persons admitted for temporary periods to a new high of 758,858. There were 107,399 nonimmigrants admitted in transit. Simplified procedures for the inspection of persons in continuous transit no doubt contributed to the increase of 65 percent over the fiscal year 1956 in the number of such temporary admissions.

*Agricultural laborers.* As Mexican illegal entries continued to decrease, admission of Mexican agricultural laborers reached an all-time high of 450,422.

About 16,000 workers came from the British West Indies (8,244), Canada (7,015), and Japan (1,000). The importation of these workers has proved highly satisfactory, both to the employers and employees. The programs have been policed by the agencies of the United States and the appropriate foreign government, in order to insure that the workers are paid prevailing wages, and also to make sure that the employment of these workers has not affected adversely similar categories of workers in the United States.

A program was also inaugurated to import Spanish sheepherders as nonimmigrants. It is anticipated that approximately 400 workers will be needed.

5



MEXICAN RECEIVING MICA: The Service has now issued laminated identification cards (micas) to 600,000 Mexican nationals who have been security screened and whose identity is established.   The issuance of the mica has proven itself both as a security measure and as an expedient in processing large numbers of workers for admission into the United States.



CREWMEN EXAMINED: Crewmen presenting their documents for examination on the *Queen Elizabeth*.  These are a few of the 1,688,749 alien crewmen who came to the United States in pursuit of their calling in fiscal year 1957.

Acknowledgment: David Workman, New York, N. Y.

*Crewmen.*  The number of vessels boarded on arrival in 1957 was 69,716, an increase of 4,545 over fiscal year 1956; planes boarded (147,404) increased by 19,532.  There were 1,688,749 alien and 972,875 citizen crewmen examinations.

*Alien border crossers.*  74,271,162 alien crossings of the land borders were made in the past year, or more than two per second, every second of the year.  Sixty-two percent entered over the southern border and 38 percent over the northern border.

## Admission of Otherwise Inadmissible Aliens

The Immigration and Nationality Act provides in section 212 (d) (3) that grounds of inadmissibility may be waived by the Attorney General for the temporary admission of aliens.  To facilitate the travel of deserving individuals, or individuals whose temporary admission is in the national interest, this discretionary authority has been exercised in behalf of 544 persons during the course of the year.

Under section 212(a)(28)(I)(ii) of the act, aliens who are inadmissible because of former membership or affiliation with pro-Communist organizations may be admitted as defectors if it is found they have disaffiliated themselves from the Communist cause for a period of at least 5 years, have been actively opposed to that cause, and that their admission to the United States would be in the public interest.  During this fiscal year this authority has been favorably exercised in behalf of 161 persons.

One of the most poignant humane functions performed by the Service involved the admission of orphans under the parole procedure, since they, like the Hungarian refugees, had no visas available to them.  Nine hundred and twenty-three orphans were paroled into the custody of their adoptive parents.  (The status of these orphans will be adjusted to that of permanent residents under the Act of September 11, 1957.)

## Citizens

There were 63,319,099 citizen border crossings, 2,436,154 other citizen arrivals from foreign countries, and 972,875 citizen crewmen inspections during the year.



DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,      §
                              §
    *Plaintiffs,*      §
                              §
vs.                           §      CIVIL ACTION NO.
                              §      6:23-CV-00007
UNITED STATES DEPARTMENT OF   §
HOMELAND SECURITY, *et al.*,  §
                              §
    *Defendants,* and      §      JUDGE DREW S. TIPTON
                              §
VALERIE LAVEUS, *et al.*,     §
                              §
    *Intervenor Defendants.*      §


# INTERVENOR DEFENDANTS' EXHIBIT 18

before set forth whenever in their judgment such action is necessary to prevent frauds or evasions."

SEC. 3. Section 23 (e) of the District of Columbia Alcoholic Beverage Control Act, as amended (48 Stat. 332; sec. 25-124 (e), D. C. Code), is amended by striking out the words "beverage" and "beverages" wherever they appear and substituting in lieu thereof the words "spirits or alcohol". *48 Stat. 655.*

SEC. 4. Section 23 (i) of the District of Columbia Alcoholic Beverage Control Act, as amended (48 Stat. 332; sec. 25-124 (i), D. C. Code), is amended by striking out the words "beverage" and "beverages" wherever they appear and substituting in lieu thereof the words "spirits or alcohol". *48 Stat. 655.*

SEC. 5. The last sentence of section 23 (k) of the District of Columbia Alcoholic Beverage Control Act, as amended (48 Stat. 332; sec. 25-124 (k), D. C. Code), is amended to read as follows: "Each holder of such a license shall, on or before the tenth day of each month, forward to the Board on a form to be prescribed by the Commissioners, a statement under oath, showing the quantity of each kind of beverage, except beer and wine (wine containing 14 per centum or less of alcoholic content, wine containing more than 14 per centum of alcoholic content, champagne, sparkling wine and any wine artificially carbonated) sold under such license in the District of Columbia during the preceding calendar month, to which said statement shall be attached stamps denoting the payment of the tax imposed under this Act upon the spirits or alcohol set forth in said report and such statement shall be accompanied by payment of any tax imposed under this Act upon any such wines as set forth in said report." *Statement.* *49 Stat. 901.*

SEC. 6. Nothing in this Act shall be construed so as to affect the authority vested in the Board of Commissioners of the District of Columbia by Reorganization Plan Numbered 5 of 1952 (66 Stat. 824). The performance of any function vested by this Act in the Board of Commissioners or in any office or agency under the jurisdiction and control of said Board of Commissioners may be delegated by said Board of Commissioners in accordance with section 3 of such plan. *D.C. Code Title 1 app.*

SEC. 7. This Act shall take effect on the first day of the calendar month beginning not less than sixty days after the date of approval of this Act. *Effective date.*

Approved July 25, 1958.

---

Public Law 85-559

## AN ACT

To authorize the creation of record of admission for permanent residence in the case of certain Hungarian refugees.

*July 25, 1958*
*[H.R. 11033]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any alien who was paroled into the United States as a refugee from the Hungarian revolution under section 212 (d) (5) of the Immigration and Nationality Act subsequent to October 23, 1956, who has been in the United States for at least two years, and who has not acquired permanent residence, shall forthwith return or be returned to the custody of the Immigration and Naturalization Service, and shall thereupon be inspected and examined for admission into the United States, and his case dealt with in accordance with the provisions of sections 235, 236 and 237 of that Act. *Hungarian refugees. Relief. 66 Stat. 182. 8 USC 1182.* *8 USC 1225, 1226, 1227.*

SEC. 2. Any such alien who, pursuant to section 1 of this Act, is found, upon inspection by an immigration officer or after hearing before a special inquiry officer, to have been and to be admissible as

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

420              PUBLIC LAW 85-560—JULY 25, 1958        [72 STAT.

8 USC 1182.

an immigrant at the time of his arrival in the United States and at the time of his inspection and examination, except for the fact that he was not and is not in possession of the documents required by section 212 (a) (20) of the Immigration and Nationality Act, shall be regarded as lawfully admitted to the United States for permanent residence as of the date of his arrival.

SEC. 3. Nothing contained in this Act shall be held to repeal, amend, alter, modify, affect, or restrict the powers, duties, functions, or authority of the Attorney General in the administration and enforcement of the Immigration and Nationality Act or any other law relating to immigration, nationality, or naturalization.

Approved July 25, 1958.

## Public Law 85-560

July 25, 1958
[H. R. 10320]

### AN ACT

To provide for additional charges to reflect certain costs in the acceptance of business reply cards, letters in business reply envelopes, and other matter under business reply labels for transmission in the mails without prepayment of postage, and for other purposes.

Postal service.
Business reply
mail.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2 of the Act of May 29, 1928 (45 Stat. 940; 39 U. S. C. 303), is amended to read as follows:

"ADDITIONAL CHARGES FOR TRANSMISSION OF CERTAIN MAIL MATTERS WITHOUT PREPAYMENT OF POSTAGE

"SEC. 2. Under such regulations and conditions as the Postmaster General may prescribe, it shall be lawful to accept for transmission in the mails, without prepayment of postage, business reply cards, letters in business reply envelopes, and any other matter under business reply labels. Postage thereon at the regular first-class rate, and an additional charge thereon of 2 cents for each piece weighing two ounces or less and 5 cents for each piece weighing more than two ounces, shall be collected on delivery."

Effective date.

SEC. 2. The amendment made by the first section of this Act shall become effective on August 1, 1958.

Franking privi-
lege.
48 Stat. 1018.

SEC. 3. (a) Section 85 of the Act of January 12, 1895 (39 U. S. C. 326), is amended by inserting after the words "Secretary of the Senate," wherever they appear the words "Sergeant at Arms of the Senate,".

33 Stat. 441.

(b) (1) Section 7 of the Act of April 28, 1904 (39 U. S. C. 327), is amended by inserting after the word "Congress," the following: "and the Secretary of the Senate and the Sergeant at Arms of the Senate".

(2) Such section is further amended by adding at the end thereof the following: "In the event of a vacancy in the office of Secretary of the Senate or Sergeant at Arms of the Senate, such privilege may be exercised in such officer's name during the period of such vacancy by any authorized person."

(c) Section 2 of the Act entitled "An Act to reimburse the Post Office Department for the transmission of official Government-mail matter", approved August 15, 1953 (67 Stat. 614; 39 U. S. C. 321o), is amended by inserting after the words "Secretary of the Senate," the words "the Sergeant at Arms of the Senate,".

Approved July 25, 1958.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 19

Public Law 89-732

### AN ACT

To adjust the status of Cuban refugees to that of lawful permanent residents
of the United States, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That, notwithstand-
ing the provisions of section 245(c) of the Immigration and Nation-
ality Act, the status of any alien who is a native or citizen of Cuba
and who has been inspected and admitted or paroled into the United
States subsequent to January 1, 1959 and has been physically present
in the United States for at least two years, may be adjusted by the
Attorney General, in his discretion and under such regulations as he
may prescribe, to that of an alien lawfully admitted for permanent
residence if the alien makes an application for such adjustment, and
the alien is eligible to receive an immigrant visa and is admissible to
the United States for permanent residence.   Upon approval of such
an application for adjustment of status, the Attorney General shall
create a record of the alien's admission for permanent residence as of
a date thirty months prior to the filing of such an application or the
date of his last arrival into the United States, whichever date is later.
The provisions of this Act shall be applicable to the spouse and child
of any alien described in this subsection, regardless of their citizenship
and place of birth, who are residing with such alien in the United
States.

SEC. 2. In the case of any alien described in section 1 of this Act
who, prior to the effective date thereof, has been lawfully admitted
into the United States for permanent residence, the Attorney General
shall, upon application, record his admission for permanent residence
as of the date the alien originally arrived in the United States as a
nonimmigrant or as a parolee, or a date thirty months prior to the
date of enactment of this Act, whichever date is later.

SEC. 3. Section 13 of the Act entitled "An Act to amend the Immi-
gration and Nationality Act, and for other purposes", approved Octo-
ber 3, 1965 (Public Law 89-236), is amended by adding at the end
thereof the following new subsection:

"(c) Nothing contained in subsection (b) of this section shall be
construed to affect the validity of any application for adjustment
under section 245 filed with the Attorney General prior to December 1,
1965, which would have been valid on that date; but as to all such
applications the statutes or parts of statutes repealed or amended by
this Act are, unless otherwise specifically provided therein, continued
in force and effect."

SEC. 4. Except as otherwise specifically provided in this Act, the
definitions contained in section 101 (a) and (b) of the Immigration
and Nationality Act shall apply in the administration of this Act.
Nothing contained in this Act shall be held to repeal, amend, alter,
modify, affect, or restrict the powers, duties, functions, or authority
of the Attorney General in the administration and enforcement of the
Immigration and Nationality Act or any other law relating to immi-
gration, nationality, or naturalization.

Approved November 2, 1966.

November 2, 1966
[H. R. 15183]

Cuban refugees.
Adjustment of
status.
79 Stat. 919.
8 USC 1255.

8 USC 1255.

8 USC 1101.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 020

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 20

PUBLIC LAW 94-23—MAY 23, 1975          89 STAT. 87

Public Law 94-23
94th Congress

## An Act

To enable the United States to render assistance to, or in behalf of, certain
migrants and refugees.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That this Act may be
cited as "The Indochina Migration and Refugee Assistance Act of
1975".

SEC. 2. (a) Subject to the provisions of subsection (b) there are
hereby authorized to be appropriated, in addition to amounts other-
wise available for such purposes, $155,000,000 for the performance of
functions set forth in the Migration and Refugee Assistance Act of
1962 (76 Stat. 121), as amended, with respect to aliens who have fled
from Cambodia or Vietnam, such sums to remain available in accord-
ance with the provisions of subsection (b) of this section.

(b) None of the funds authorized to be appropriated by this Act
shall be available for the performance of functions after June 30, 1976,
other than for carrying out the provisions of clauses (3), (4), (5),
and (6) of section 2(b) of the Migration and Refugee Assistance Act
of 1962, as amended. None of such funds shall be available for obliga-
tion for any purpose after September 30, 1977.

SEC. 3. In carrying out functions utilizing the funds made available
under this Act, the term "refugee" as defined in section 2(b)(3) of
the Migration and Refugee Assistance Act of 1962, as amended, shall
be deemed to include aliens who (A) because of persecution or fear of
persecution on account of race, religion, or political opinion, fled from
Cambodia or Vietnam; (B) cannot return there because of fear of
persecution on account of race, religion, or political opinion; and
(C) are in urgent need of assistance for the essentials of life.

SEC. 4. (a) The President shall consult with and keep the Com-
mittees on the Judiciary, Appropriations, and International Relations
of the House of Representatives and the Committees on Foreign Rela-
tions, Appropriations and Judiciary of the Senate fully and currently
informed of the use of funds and the exercise of functions authorized
in this Act.

(b) Not more than thirty days after the date of enactment of this
Act, the President shall transmit to such Committees a report describ-
ing fully and completely the status of refugees from Cambodia and
South Vietnam. Such report shall set forth, in addition—

(1) a plan for the resettlement of those refugees remaining in
receiving or staging centers;

(2) the number of refugees who have indicated an interest in
returning to their homeland or being resettled in a third country,
together with (A) a description of the plan for their return or
resettlement and the steps taken to carry out such return or
resettlement, and (B) any initiatives that have been made with
respect to the Office of the High Commissioner for Refugees of
the United Nations; and

(3) a full and complete description of the steps the President
has taken to retrieve and deposit in the Treasury as miscellaneous
receipts all amounts previously authorized and appropriated for
assistance to South Vietnam and Cambodia but not expended for
such purpose, exclusive of the $98,000,000 of Indochina Postwar
Reconstruction funds allocated to the Department of State for
movement and maintenance of refugees prior to the date of enact-
ment of this Act.

May 23, 1975
[H.R. 6755]

The Indochina
Migration and
Refugee
Assistance Act of
1975.
22 USC 2601
note.
Appropriation
authorization.
22 USC 2601
note.

22 USC 2601

22 USC 2601
note.

Presidential
consultation with
congressional
committees.

22 USC 2601
note.
Report to
congressional
committees.



89 STAT. 88                    PUBLIC LAW 94–23—MAY 23, 1975

Supplementary
reports.

   (c) Supplementary reports setting forth recent information with respect to each of the items referred to in this section shall be transmitted not more than ninety days after the date of transmittal of the report referred to in subsection (b) of this section and not later than the end of each ninety-day period thereafter. Such reports shall continue until September 30, 1977, and a final report shall be submitted no later than December 31, 1977.

   Approved May 23, 1975.

---

LEGISLATIVE HISTORY:

HOUSE REPORTS: No. 94–197 (Comm. on the Judiciary) and No. 94–230 (Comm. of
    Conference).
SENATE REPORT No. 94–119 accompanying S. 1661 (Comm. on Foreign Relations).
CONGRESSIONAL RECORD, Vol. 121 (1975):
    May 14, considered and passed House.
    May 16, considered and passed Senate, amended, in lieu of S. 1661.
    May 21, Senate and House agreed to conference report.



AO386-B
**DEFENDANT'S EXHIBIT**

CASE NO. 6:23-cv-00007
EXHIBIT NO. 021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,               §
                                        §
        *Plaintiffs,*                   §
                                        §
    vs.                                 §    CIVIL ACTION NO.
                                        §    6:23-CV-00007
UNITED STATES DEPARTMENT OF             §
HOMELAND SECURITY, *et al.*,            §
                                        §
        *Defendants,* and               §    JUDGE DREW S. TIPTON
                                        §
VALERIE LAVEUS, *et al.*,               §
                                        §
        *Intervenor Defendants.*        §

# INTERVENOR DEFENDANTS'
# EXHIBIT 21

**The New York Times** | https://www.nytimes.com/2005/01/16/weekinreview/the-long-voyage-from-mariel-ends.html

# The Long Voyage From Mariel Ends

**By Mirta Ojito**

Jan. 16, 2005

AT dawn on May 11, 1980, the 20th day of the Mariel boatlift, a boat called America reached Key West, carrying on her three decks more than 700 Cuban refugees, about half of them looking suspiciously subdued and weary. Some, toothless and tattooed, wore crisp-looking khaki clothes bearing creases typical of clothing that has been folded and stored too long. They didn't cheer or cry and kept their eyes on the ground. To anyone paying attention it was obvious that these men had been in jail or in an asylum.

Others like them had arrived earlier in the boatlift and gone unnoticed by most Americans, though not by the authorities. But the America's arrival was captured on film and videotape by journalists alerted by a front-page article that day in The New York Times, reporting its departure from Mariel under a headline that said "retarded people and criminals" were being included in the boatlift. Almost immediately, the way Americans perceived the boatlift darkened, casting a pall on the future of the more than 125,000 Cubans -- most of them law-abiding -- who, by September of that year, would arrive in the United States.

For 25 years now, the Marielitos, as Mariel refugees were called, have quietly chipped away at the stereotype they were saddled with. According to American immigration statistics, more than 90 percent of them worked hard, paid taxes and stayed out of trouble, becoming like any other Cuban exile, except for one legal distinction.

The distinction was this: Up until last week, any Mariel refugee who had not become an American citizen or legal resident could be detained indefinitely after completing a jail term for even the smallest crime. The lack of normal relations with Cuba makes it impossible for them to be sent back, unless they were on a 1984 list that allowed for the deportation of 2,700 (most of whom have been deported). That deceptively small detail left many Mariel Cubans feeling stigmatized and especially vulnerable -- no longer in Cuba but not fully accepted in the United States, either. In the eyes of the law, in fact, Marielitos had technically never reached American shores -- they had simply been saved from the sea.

Last week the Supreme Court changed that, ruling that open-ended detention of Mariel Cubans was illegal. This may seem like the mere correction of an anachronism, affecting only the 750 people still in detention, but for Mariel Cubans it was a hugely important and

emotional event: The highest court of the land they have chosen as their own has validated the status not only of those convicted of crimes but of all Cubans who in 1980 set sail for the United States.

That such a legal distinction could survive so long for a class of people defined only by the name of the port from which they sailed is a testament to the enduring power of a negative stereotype.

After May 11, 1980, editorial pages of The Miami Herald and other newspapers began to question the wisdom of uncontrolled immigration. It wasn't just a reaction to the hundreds of pictures taken that day. May 11 also broke all previous records for daily arrivals: 4,588 refugees aboard 58 boats. By nightfall, the total number of refugees that had been clocked in Key West since April 21, when the first boat arrived, had reached 37,000, a number equal to 10 percent of Miami's total population at the time.

Thus, the narrative of Mariel shifted from one in which thousands of Cubans were fleeing Communism in pursuit of freedom to one in which, in the words of the New York Times columnist James Reston, Fidel Castro was "exporting his failures."

Before the year was out, President Jimmy Carter had lost his bid for re-election; so had Gov. Bill Clinton of Arkansas, in part because many of the refugees had ended up in his state, at Fort Chaffee. And the Mariel Cubans soon realized they were unwanted. Then, in 1983, came "Scarface," starring Al Pacino as the violent, cocaine-crazed Mariel refugee, Tony Montana. To this day, some Mariel Cubans don't admit that they left Cuba in 1980.

There is no doubt that Castro sent criminals in the boatlift. He did it, by most accounts, for three reasons: to get rid of malcontents and misfits; to try to show that those who wanted to abandon his revolution were the scum of society, not hardworking revolutionaries; and to punish the United States, as part of his longstanding antagonism toward Washington.

Statistics released by the Immigration and Naturalization Service at the time revealed that 600 people with serious mental problems and 1,200 who were suspected of committing serious crimes in Cuba were among the 125,000 Cubans who arrived in the boatlift. But, by 1987, 3,800 Mariel Cubans were serving sentences for crimes committed in the United States, and another 3,800 were in indefinite detention after completing sentences.

About 2,300 of those ended up in federal prisons in Oakdale, La., and Atlanta. In 1987, when the government announced that it was ready to resume the deportation of those included in the 1984 list, the detainees took over the prisons and rioted for days, ceasing only when the Justice Department agreed to establish review panels to examine each case and release those who were fit to rejoin society.

Though flawed, the panels freed thousands of people who otherwise would have languished in jail for life, including a woman named Agrispina Manzo Guevara, who was in detention for 11 years but had never been convicted of a crime in the United States; instead, her unruly behavior in detention camps and later in jail led her to be deemed a danger to society.

For Marielitos seeking an equal place among America's immigrants, the Supreme Court decision last week ends the final leg of a long journey. Twenty-five years after these Cubans left Mariel, they may have finally reached the shore.

Mirta Ojito, who arrived from Cuba in the Mariel boatlift, is the author of "Finding Mañana: a Memoir of a Cuban Exodus," to be published in April by the Penguin Press.

A version of this article appears in print on , Section 4, Page 3 of the National edition with the headline: The Nation; The Long Voyage From Mariel Ends



**DEFENDANT'S EXHIBIT**

CASE NO. 6:23-cv-00007

EXHIBIT NO. 022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 22

51.71/4:175

Current
Policy No. 193

# Cuban-Haitian Arrivals in U.S.

June 20, 1980



United States Department of State
*Bureau of Public Affairs*
Washington, D.C.



U. S. DEPOSITORY DOCUMENT
JUL 14 1980
CONNECTICUT COLLEGE LIBRARY
NEW LONDON, CT 06320

*Following is a statement by Victor H. Palmieri, U.S. Coordinator for Refugee Affairs, at a State Department press briefing on June 20, 1980.*

For more than two decades south Florida has been providing a haven for Cubans fleeing from Castro's repressive policies and Cuba's failing economy. In recent years, it has also become an entry point for thousands of Haitian "boat people." In the last 2 months, more than 114,000 Cubans have entered south Florida by boat.

The sudden and disorderly arrival of these Cubans on our shores without proper documentation has presented this country with an unprecedented political and humanitarian challenge. Under international law, we have an obligation to provide temporary refuge to arrivals claiming a well-founded fear of persecution in their homeland. Under previous U.S. law, we did in fact provide a permanent haven to almost 800,000 Cubans fleeing communism under Castro. Several factors, however, have determined the way we have responded to this extraordinary emergency and the strains it has created in south Florida.

First, those Cubans admitted in past years arrived under an orderly departure program that involved interviews and reviews of documentation before departure from Cuba. This allowed a careful screening process in accordance with U.S. immigration laws. This has not occurred with the current Cuban or Haitian entrants.

Second, our refugee and asylum provisions are now governed by new legislation, the Refugee Act of 1980, which came

into effect on April 1 of this year. The Refugee Act established a framework for selecting groups of refugees overseas for admission to the United States, as well as for granting asylum to individuals already in this country who can demonstrate a well-founded fear of persecution if they were to return to their country of origin. But this legislation did not contemplate the kind of situation we face now, with a sudden massive influx, without overseas processing and valid documentation. The procedures for dealing with asylum seekers in this country require lengthy examinations on a case-by-case basis that would leave many arrivals in limbo status for long periods, without eligibility for federally funded assistance. And the strict standards for asylum would prevent many of the Cubans and Haitians from qualifying for admission under that category.

This is clearly an intolerable situation for the Cuban and Haitian entrants as well as for the States that are receiving and resettling them, particularly the State of Florida. To date, the Cuban-American community and the voluntary resettlement agencies have generously assisted these exiles. But they can no longer bear this burden alone, especially since those being released from the processing centers are increasingly persons without relatives in this country. The size of this special population and the difficulty of returning them to their homelands or resettling them in other countries make it all the more important to clarify their status and eligibility for some forms of federally funded assistance.

In order to redress this extraordinary situation, yet maintain the integrity of our refugee laws for those applying for admission in the prescribed manner, the President has decided to seek special legislation regularizing the status of Cuban-Haitian entrants. This legislation will allow them to remain in the United States and will make them eligible for certain benefits, but it will not provide the status or benefits accorded to those admitted as refugees or granted political asylum.

## U.S. Steps

Until this legislation is enacted, we will take the following steps to deal with the special needs of the communities in which the Cuban-Haitian entrants relocate and to prevent the occurrence of such crises in the future.

• Cubans who have arrived in the United States during the period April 21-June 19, 1980, and who are in Immigration and Naturalization Service (INS) proceedings as of June 19, 1980, and all Haitians who are in INS proceedings as of June 19, 1980, will have their parole into the country renewed for a 6-month period as "Cuban-Haitian entrants (status pending)."

• Under this 6-month parole, these Cubans and Haitians will be eligible, if they otherwise qualify, for Supplemental Security Income (SSI—for the elderly and handicapped), Medicaid, Aid to Families with Dependent Children (AFDC), and emergency assistance under the rules of the States in which they are

residing and with normal Federal-State matching of funds. In order to qualify, Cuban-Haitian entrants must first report to the INS for their new parole documents. Procedures for applying for these benefits will be announced by INS and the Department of Health and Human Services next Friday, June 27.

• Minor children in camps without close relatives in this country will be provided English-language training, health services, counseling, and individualized planning for permanent placement.

• Per capita grants will be provided to private resettlement agencies for all persons leaving processing centers after June 19, 1980, and for Cuban-Haitian entrants being relocated out of the south Florida area after that date. In addition, funds will be provided to the resettlement agencies to provide employment counseling and referral services to all Cuban-Haitian entrants already released from camps or resettled directly into the Miami area.

• The President has already sought funding totaling $385 million to finance reception, processing, care and maintenance, transportation, initial relocation, health services, and educational costs as part of the FY 1980 supplemental appropriation. The Administration will seek necessary funding for the continuation of this program in FY 1981.

• Special legislation will be submitted to the Congress as soon as possible to:

—Establish a "Cuban-Haitian entrant" status for recently arrived Cubans and Haitians;

—Define services and benefits for these arrivals for 1 year after release from processing centers;

—Provide SSI, Medicaid, AFDC, and emergency assistance under the rules of the States in which they are residing and with normal Federal-State matching of funds; and authorize retroactive reimbursement to States and localities for 75% of the total cost of other general assistance, medical assistance, special educational programs, and social services for 1 year;

—Provide for conversion to permanent resident alien status after 2 years;

—Improve future asylum processing, both to expedite case-by-case review, including exclusion and deportation, and to reduce the likelihood of future problems of this nature;

—Provide minor children without close relatives in this country English-language training, health services, counseling, and individualized planning for permanent placement. States will be reimbursed for 100% of the costs of maintenance and services provided to such unaccompanied minors until they reach the age of majority; and

—Seek a method to identify and extend "Cuban-Haitian entrant status" to those other Haitian "boat people" who have arrived in Florida prior to June 19, 1980, but who are not in INS proceedings.

• Criminals continue to be subject to detention and exclusion or deportation from the United States.

• Processing of applications for asylum will continue. Those who are granted asylum status will be eligible to adjust to permanent resident alien status after 1 year.

• U.S. Government enforcement agencies will continue to interdict boats bringing undocumented aliens into the United States. Enforcement will be maintained to prevent future illegal arrivals, and violators will be subject to civil or criminal prosecution in accordance with the President's declaration of May 14, 1980. Persons who arrive illegally after June 19, 1980, will not be eligible for the program and will be subject to exclusion or deportation in accordance with U.S. immigration laws.

All of these steps are consonant with the policy that the President outlined on May 14. Throughout this emergency, our objectives have been to uphold our international obligations and protect the integrity of our immigration and refugee laws. We have therefore sought to treat the arriving Cubans and Haitians in an equitable way by providing them temporary safehaven until their status can be resolved in this country or until they are offered resettlement in other countries.

In the case of the Cubans, we have also tried to limit both the inhumane and hazardous conditions of their journey and their impact on communities in Florida by deterring the Cuban-American community from illegally bringing in any more undocumented Cubans. At the same time, we have pursued international efforts to negotiate with Castro to establish an orderly departure program to allow the humane and manageable departure of Cubans who qualify for admission to the United States under the Refugee Act of 1980.

To date, our efforts have virtually stopped the boat flotilla from Cuba. We hope that our enforcement measures will discourage others from undertaking the long and dangerous journey by boat in violation of our laws. The problem of undocumented aliens in the United States is clearly broader than the current Cuban-Haitian entrants, and it will have to be the subject of future policy decisions made in consultation with the Congress. We expect that the Select Commission on Immigration and Refugee Policy will be addressing the situation of Haitians who are not covered by the President's decisions I have announced today, as well as other documented aliens in this country.

## Summary

In summary, the current Cuban-Haitian crisis is but a symptom of a worldwide trend toward greater dislocation and migration. In the past, the American people have responded generously to the plight of the uprooted. And our laws provide for the acceptance of large numbers of immigrants and refugees. In fact, we will be admitting over 600,000 this year.

However, there are millions more who would like to begin new lives in this country than we can accept. Our laws therefore establish numerical limits and require careful selection and processing prior to admission. Many applicants for admission have waited for years, and on arrival they have managed with little or no assistance from the Federal Government.

In the case of Cuba, we have long been the country of preferred asylum. We cannot stand by in silent witness to the unsafe and uncontrolled exodus from Cuba, yet our laws do not allow us to accept for permanent resettlement any Cuban or Haitian who arrives here in this manner. While we work for the eventual return of those who are found inadmissable under our laws, particularly criminals, we must now find ways to resettle those whom common decency compels us to receive. ∎

Published by the United States Department of State • Bureau of Public Affairs • Office of Public Communication • Editorial Division • Washington, D.C. • June 1980 • Editor: Colleen Sussman • This material is in the public domain and may be reproduced without permission; citation of this source would be appreciated.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-0007

EXHIBIT
NO. 023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 23

Order Code RS21349
Updated January 22, 2007



# CRS Report for Congress

# U.S. Immigration Policy on Haitian Migrants

Ruth Ellen Wasem
Specialist in Immigration Policy
Domestic Social Policy Division

## Summary

The environmental, social, and political conditions in Haiti have long prompted congressional interest in U.S. policy on Haitian migrants, particularly those attempting to reach the United States surreptitiously by boat. While some observers assert that such arrivals by Haitians are a breach in border security, others maintain that these Haitians are asylum seekers following a 30-year practice of Haitians coming by boat without legal immigration documents. Migrant interdiction and mandatory detention are key components of U.S. policy toward Haitian migrants, but human rights advocates express concern that Haitians are not afforded the same treatment as other asylum seekers arriving in the United States. This report does not track legislation but will be updated if policies are revised.

## Migration Trends

The dilemma of Haitians coming to the United States by boat without proper travel documents dates back at least 30 years. An estimated 25,000 Haitians were among the mass migration of over 150,000 asylum seekers who arrived in South Florida in 1980 during the Mariel boatlift.[1] The U.S. Coast Guard, as described below, has been interdicting vessels carrying Haitians since 1981. **Figure 1** presents the U.S. Coast Guard data on Haitian migrants that the Coast Guard has encountered on boats and rafts in the years following the Mariel boatlift. Most notably, there was a drop of migrants after the Haitian elections in 1990 followed by a dramatic upturn after the 1991 coup (discussed below). As country conditions in Haiti[2] and U.S. policy responses to the surges in Haitian boat people are considered, the spikes and valleys in **Figure 1** become more understandable.

---

[1] During a seven-month period in 1980, approximately 125,000 Cubans and 25,000 Haitians arrived by boats to South Florida. This mass migration became known as the Mariel boatlift because most of the Cubans departed from Mariel Harbor in Cuba.

[2] For analysis of conditions in Haiti, see CRS Report RL32294, *Haiti: Developments and U.S. Policy Since 1991 and Current Congressional Concerns*, by Maureen Taft-Morales.

CRS-2

Since FY1998, the Coast Guard had interdicted over 1,000 Haitians each year with 1,850 in FY2005 and 1,198 in FY2006. As of January 10, 2007, the Coast Guard has interdicted 262 Haitians in FY2007.[3]

**Figure 1. U.S. Coast Guard Interdiction of Haitians, 1982-2006**



Source: CRS presentation of U.S. Coast Guard data.

Not all Haitian migrants are interdicted by the Coast Guard, as was apparent in the widely televised landing of over 200 Haitians in Biscayne Bay, Florida, in October 2002. Another noteworthy incident occurred in December 2001 when a boat bringing 167 Haitians ran aground in South Florida.

## Policy Evolution

**Post-Mariel Policy.** The Carter Administration labeled Haitians as well as Cubans who had come to the United States during the 1980 Mariel Boatlift as "Cuban-Haitian Entrants" and used the discretionary authority of the Attorney General to admit them. It appeared that the vast majority of Haitians who arrived in South Florida did not qualify for asylum according to the newly-enacted individualized definition of persecution in §207-208 of the Immigration and Nationality Act (INA, as amended by the Refugee Act of 1980).[4]   Subsequently, an adjustment of status provision was included in the Immigration Reform and Control Act (IRCA) of 1986 that enabled Cuban-Haitian Entrants to become legal permanent residents (LPRs).[5]

**Interdiction Agreement.** In 1981, the Reagan Administration reacted to the mass migration of asylum seekers who arrived in boats from Haiti by establishing a program to interdict (i.e., stop and search certain vessels suspected of transporting undocumented Haitians). This agreement, made with then-dictator Jean-Claude Duvalier, authorized the U.S. Coast Guard to board and inspect private Haitian vessels on the high seas and to interrogate the passengers. At that time, the United States generally viewed Haitian boat people as economic migrants deserting one of the poorest countries in the world.

Under the original agreement, an inspector from the former Immigration and Naturalization Service (INS) and Coast Guard official, working together, would check the

---

[3] For interdiction data, see [http://www.uscg.mil/hq/g-o/g-opl/AMIO/AMIO.htm].

[4] Aliens must demonstrate a well-founded fear that if returned home, they will be persecuted based upon one of five characteristics: race, religion, nationality, membership in a particular social group, or political opinion.

[5] §202 of the Immigration Reform and Control Act of 1986 (P.L. 99-603).

CRS-3

immigration status of the passengers and return those passengers deemed to be undocumented Haitians. An alien in question must have volunteered information to the Coast Guard or INS inspector that she or he would be persecuted if returned to Haiti in order for the interdicted Haitian to be considered for asylum. Ultimately, INS would determine the immigration status of the alien in question. From 1981 through 1990, 22,940 Haitians were interdicted at sea. Of this number, INS considered 11 Haitians qualified to apply for asylum in the United States.

**Crisis After the Coup.**  The 1991 military *coup d'etat* deposing Haiti's first democratically elected President, Jean Bertrand Aristide, however, challenged the assumption that all Haitian boat people were economic migrants. The State Department reportedly hesitated on whether the Haitians should be forced to return given the strong condemnation of the *coup* by the United States and the Organization of American States. By November 11, 1991, approximately 450 Haitians were being held on Coast Guard cutters while the administration of then-President George H. W. Bush considered the options. The former Bush Administration lobbied for a regional solution to the outflow of Haitian boat people, and the United Nations High Commissioner for Refugees (UNHCR) arranged for several countries in the region — Belize, Honduras, Trinidad and Tobago, and Venezuela — to temporarily provide a safe haven for Haitians interdicted by the Coast Guard. Some of the other countries in the region were each willing to provide safe haven for only several hundred Haitians. Meanwhile, the Coast Guard cutters were becoming severely overcrowded, and on November 18, 1991, the United States forcibly returned 538 Haitians to Haiti.

**Pre-Screening and Repatriation.**  The options for safe havens in third countries in the region proved inadequate for the sheer numbers of Haitians fleeing their country, and the former Bush Administration began treating the Haitians fleeing by boat as asylum seekers. The Coast Guard took them to the U.S. naval base in Guantanamo, Cuba, where they were pre-screened for asylum in the United States. During this period, there were approximately 10,490 Haitians who were paroled into the United States after a pre-screening interview at Guantanamo determined that they had a credible fear of persecution if returned to Haiti. On May 24, 1992, citing the surge of Haitians that month, then-President Bush ordered the Coast Guard to intercept all Haitians in boats and immediately return them without interviews to determine whether they were at risk of persecution. The Administration offered those repatriated the option of in-country refugee processing.[6]

**Safe Haven and Refugee Processing.**  The repatriation policy continued for two years, until then-President Bill Clinton announced that interdicted Haitians would be taken to a location in the region where they would be processed as potential refugees. The refugee processing policy lasted only a few weeks — June 15 to July 5, 1994. Much like the former Bush Administration, the Clinton Administration cited the exodus of Haitian boat people as a reason for suspending refugee processing. Instead, the new policy became one of regional "safe havens" where interdicted Haitians who expressed a fear of persecution could stay, but they would not be allowed to come to the United States. In 1993, in-country refugee processing was further expanded to Les Cayes and Cape Haiten.

---

[6] CRS Report 93-233, *Asylum Seekers: Haitians in Comparative Context*, by Ruth Ellen Wasem. (Archived report available from author.)

CRS-4

In December 1997, President Clinton instructed the Attorney General to grant deferred enforced departure (DED) to Haitians for one year.

Currently interdicted Haitians who expressed a fear of persecution are taken for a credible fear hearing at the Guantanamo Bay detention center. If deemed a refugee, they are resettled in the third country. In 2005, only 9 of the 1,850 interdicted Haitians received a credible fear hearing and, of those — one man was granted refugee status.[7]

**Haitian Refugee Immigration Fairness Act (HRIFA).** When Congress enacted the Nicaraguan Adjustment and Central American Relief Act (NACARA) in November 1997 that enabled Nicaraguans and Cubans to become legal permanent residents and permitted certain unsuccessful Central American and East European asylum applicants to seek another form of immigration relief, it opted not to include Haitian asylum seekers. The following year, Congress enacted the Haitian Refugee Immigration Fairness Act (HRIFA) of 1998 (S. 1504/H.R. 3049) that enabled Haitians who filed asylum claims or who were paroled into the United States before December 31, 1995, to adjust to legal permanent residence. HRIFA was added to the FY1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act (P.L. 105-277) at the close of the 105th Congress.[8] According to the most recent data available, over 22,500 Haitians have adjusted under HRIFA through FY2005.

**Mandatory Detention of Aliens in Expedited Removal.** Since enactment of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 (P.L. 104-208), aliens arriving in the United States without proper immigration documents are immediately placed in expedited removal. If an alien expresses a fear of being forced to return home, the immigration inspector refers the alien to a asylum officer who determines whether the person has a "credible fear." IIRIRA requires that those aliens must be kept in detention while their "credible fear" cases are pending.[9] As a result, those Haitians who do make it to U.S. shores and do express a fear of repatriation are placed in detention. After the credible fear determination, the case is referred to an Executive Office for Immigration Review (EOIR) immigration judge for an asylum and removal hearing, (during which time there is no statutory requirement that aliens be detained). EOIR granted asylum to 563 Haitians and denied asylum to 2,778 Haitians in FY2005.[10]

**National Security Risk.** The former INS published a notice clarifying that certain aliens arriving by sea who are not admitted or paroled are to be placed in expedited removal proceedings and detained (subject to humanitarian parole) in November 2002.[11] This notice concluded that illegal mass migration by sea threatened national security because it diverts the Coast Guard and other resources from their homeland security

---

[7] *Miami Herald*, "U.S. Policy Unjust to Haitians Fleeing Violence," Jan. 9, 2006; data confirmed in telephone conversation with DHS officials, Jan. 12, 2006.

[8] CRS Report 98-270, *Immigration: Haitian Relief Issues and Legislation*, by Ruth Ellen Wasem.

[9] CRS Report RL33109, *Immigration Policy on Expedited Removal of Aliens*, by Alison Siskin and Ruth Ellen Wasem.

[10] U.S. Department of Justice, Executive Office for Immigration Review, *FY2005 Statistical Yearbook*.

[11] *Federal Register*, vol. 67, no. 219, pp. 68923-68926 (Nov. 13, 2002).

CRS-5

duties. The Attorney General expanded on this rationale in his April 17, 2003 ruling that instructs EOIR immigration judges to consider "national security interests implicated by the encouragement of further unlawful mass migrations..." in making bond determinations regarding release from detention of unauthorized migrants who arrive in "the United States by sea seeking to evade inspection."[12] The case involved a Haitian who had come ashore in Biscayne Bay, Florida, on October 29, 2002, and had been released on bond by an immigration judge. EOIR's Board of Immigration Appeals (BIA) had upheld his release, but the Attorney General vacated the BIA decision.[13]

**Revised Administrative Roles.**  The Homeland Security Act of 2002 (P.L. 107-296) abolished INS and transferred most of its functions from the Department of Justice (DOJ) to the Department of Homeland Security (DHS).  At least five federal agencies now handle Haitian migrants: DHS's Coast Guard (interdiction); Customs and Border Protection (apprehensions and inspections); Immigration and Customs Enforcement (detention); U.S. Citizenship and Immigration Services (credible fear determination); and DOJ's EOIR (asylum and removal hearings).

## Current Issues

**Parole from Detention.**  DOJ acknowledges that it instructed field operations "to adjust parole criteria with respect to all inadmissible Haitians arriving in South Florida after December 3, 2001, and that none of them should be paroled without the approval of headquarters."[14]  The Administration maintains that paroling Haitians (as is typically done for aliens who meet the credible fear threshold) may encourage other Haitians to embark on the "risky sea travel" and "potentially trigger a mass asylum from Haiti to the United States." The Administration further argues that all migrants who arrive by sea pose a risk to national security and warns that terrorists may pose as Haitian asylum seekers.

Critics of the Administration's Haitian parole policy focus on the 167 Haitians detained after their boat ran aground in South Florida on December 3, 2001, a majority of whom reportedly passed the initial credible fear hearing.  Critics maintain that the Haitians are being singled out for more restrictive treatment.[15]  They challenge the view that Haitians pose a risk to national security and assert that the term is being construed too broadly, being applied arbitrarily to Haitians, and wasting limited resources.[16]

**Access to Legal Counsel.**  Concern has also arisen that the detention of Haitians is interfering with access to legal counsel to aid with their asylum cases.  According to

---

[12] 23 I&N Dec. 572 (A.G. 2003).

[13] CRS Report RL32369, *Immigration-Related Detention: Current Legislative Issues*, by Alison Siskin.

[14] Letter from Daniel J. Bryant, Assistant Attorney General, to Sens. Edward Kennedy and Sam Brownback, dated Sept. 25, 2002.

[15] U.S. Senate, Committee on the Judiciary, Subcommittee on Immigration, *Hearing on the Detention and Treatment of Haitian Asylum Seekers*, Oct. 1, 2002.  (Hereafter cited as Senate Subcommittee on Immigration, *Hearing on Haitian Asylum Seekers*.)

[16] George Lardner Jr., "More Illegal Immigrants Can Be Held Ashcroft's Ruling Cites National Security Issues," *The Washington Post*, Apr. 25, 2003, p. A6.

CRS-6

congressional testimony, attorneys in South Florida for the detained Haitians maintain that they face various obstacles, including restricted hours to meet with clients and a serious lack of adequate visitation space. Pro bono lawyers working with Haitians argued that they experienced long delays waiting to see clients.[17] Others point out that the expedited removal provisions in INA were enacted to do just that — *expedite removals.* Aliens without proper immigration documents who try to enter the United States, they argue, should not be afforded the same procedural and legal rights as aliens who enter legally.

**Contrast with Cubans.** U.S. immigration policy toward migrants from Cuba and Haiti are often discussed in tandem because there are several key points of comparison.[18] Both nations have a history of repressive governments with documented human rights violations. Both countries have a history of sending asylum seekers to the United States by boats. Finally, although U.S. immigration law is generally applied neutrally without regard to country of origin, there are special laws and agreements pertaining to both Cubans and Haitians (as discussed above). Despite these points of similarity, the treatment of Cubans fleeing to the United States differs from that of Haitians. Cuban migration policy is embodied in the Cuban Adjustment Act (CAA) of 1966 (P.L. 89-73), as amended, which provides that certain Cubans who have been physically present in the United States for at least one year may adjust to permanent residence status. As a consequence of special migration agreements with Cuba, a "wet foot/dry foot" practice toward Cuban migrants has evolved. Put simply, Cubans who do not reach the shore (i.e., dry land) are interdicted and returned to Cuba unless they cite fears of persecution. Those Cubans who successfully reach the shore are inspected for entry by DHS and generally permitted to stay and adjust under CAA the following year.

**Temporary Protected Status.** Some have called for DHS to grant Temporary Protected Status (TPS) to Haitians in the United States.[19] For example, they point out that the U.S. Ambassador declared Haiti a disaster in September 2004 due to the magnitude of the effects of Tropical Storm Jeanne. The massive storm and flooding killed almost 2,000 people and left over 200,000 people homeless. An estimated 80% of crops were destroyed. They maintained that Haiti could not handle the return of nationals due to the environmental disaster and that there are extraordinary and temporary conditions in Haiti that prevent Haitians from returning safely. Others state that conditions in Haiti do not warrant TPS. They warned that any policy shift to provide immigration relief would prompt a mass exodus of Haitians, which in turn would divert and strain homeland security resources. Legislation that would provide TPS to Haitians was introduced in the 109th Congress, and similar legislation has been introduced in the 110th Congress.

[17] Senate Subcommittee on Immigration, *Hearing on Haitian Asylum Seekers*

[18] CRS Report RS20468, *Cuban Migration Policy and Issues*, by Ruth Ellen Wasem.

[19] TPS is blanket relief from removal that the Administration may grant for humanitarian reasons. CRS Report RS20844, *Temporary Protected Status: Current Immigration Policy and Issues*, by Ruth Ellen Wasem and Karma Ester.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 024

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 24

PUBLIC LAW 96–422—OCT. 10, 1980 94 STAT. 1799

Public Law 96–422
96th Congress

## An Act

To provide general assistance to local educational agencies for the education of Cuban and Haitian refugee children, to provide special impact aid to such agencies for the education of Cuban and Haitian refugee children and Indochinese refugee children, and to provide assistance to State educational agencies for the education of Cuban and Haitian refugee adults.

Oct. 10, 1980
[H.R. 7859]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Refugee Education Assistance Act of 1980".

Refugee Education Assistance Act of 1980. 8 USC 1522 note.

### TITLE I—GENERAL PROVISIONS

#### DEFINITIONS

Sec. 101. As used in this Act—

(1) The terms "Cuban and Haitian refugee adults" and "Cuban and Haitian refugee children" mean aliens who have fled from Cuba or Haiti and who—

(A) on or after November 1, 1979—

(i) have been admitted into the United States as refugees under section 207 of the Immigration and Nationality Act;

(ii) have been paroled into the United States by the Attorney General pursuant to section 212(d)(5) of such Act; or

(iii) are applicants for asylum, or have been granted asylum, in the United States; or

(B) are Cuban-Haitian entrants (status pending) who entered the United States on or after November 1, 1979.

For purposes of this paragraph, any person who is a Cuban-Haitian entrant as described in subparagraph (B) at any time after the date of the enactment of this Act shall be considered to maintain such status for purposes of this Act regardless of any subsequent change in status under any other law.

(2) The terms "elementary school", "local educational agency", "secondary school", "State", and "State educational agency" have the meanings given such terms under section 198(a) of the Elementary and Secondary Education Act of 1965.

(3) The term "elementary or secondary nonpublic schools" means schools which comply with the compulsory education laws of the State and which are exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1954.

(4) The term "Indochinese refugee children" means aliens who have fled from Cambodia, Vietnam, or Laos, and, on or after January 1, 1979—

(A) have been admitted into the United States as refugees under section 207 of the Immigration and Nationality Act;

8 USC 1522 note.

*Ante,* p. 103.

*Ante,* p. 107.

20 USC 2854.

26 USC 501.

*Ante,* p. 103.



94 STAT. 1800        PUBLIC LAW 96-422—OCT 10, 1980

Ante, p. 107.

(B) have been paroled into the United States by the Attorney General pursuant to section 212(d)(5) of such Act; or

(C) are applicants for asylum, or have been granted asylum, in the United States.

(5) The term "Secretary" means the Secretary of Education.

AUTHORIZATIONS AND ALLOCATION OF APPROPRIATIONS

8 USC 1522 note.

SEC. 102. (a) There are authorized to be appropriated for each of the fiscal years 1981, 1982, and 1983, but only in a lump sum for all programs under this Act, subject to allocation in accordance with subsection (b), such sums as may be necessary to make payments to which State educational agencies are entitled under this Act and payments for administration under section 104.

(b)(1) If the sums appropriated for any fiscal year to make payments to States under this Act are not sufficient to pay in full the sum of the amounts which State educational agencies are entitled to receive under titles II through IV for such year, the allocations to State educational agencies under each of such titles shall be ratably reduced by the same percentage to the extent necessary to bring the aggregate of such allocations within the limits of the amounts so appropriated.

Post, pp. 1801, 1803, 1807.

(2) In the event that funds become available for making payments under this Act for any period after allocations have been made under paragraph (1) of this subsection for such period, the amounts reduced under such paragraph shall be increased on the same basis as they were reduced.

TREATMENT OF CERTAIN JURISDICTIONS

8 USC 1522 note.

SEC. 103. (a) The jurisdictions to which this section applies are Guam, American Samoa, the Virgin Islands, the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

Grants.

(b)(1) Each jurisdiction to which this section applies shall be entitled to grants for the purposes set forth in sections 201(a), 302, and 402 in amounts equal to amounts determined by the Secretary in accordance with criteria established by the Secretary, except that the aggregate of the amount to which such jurisdictions are so entitled for any period—

(A) for the purposes set forth in section 201(a), shall not exceed an amount equal to 1 percent of the aggregate of the amounts to which all States are entitled under section 201 for that period;

(B) for the purposes set forth in section 302, shall not exceed an amount equal to 1 percent of the aggregate of the amounts to which all States are entitled under section 301 for that period; and

(C) for the purposes set forth in section 402, shall not exceed an amount equal to 1 percent of the aggregate of the amounts to which all States are entitled under section 401 for that period.

Aggregate amount reduction.

(2) If the aggregate of the amounts determined by the Secretary pursuant to paragraph (1) to be so needed for any period exceeds an amount equal to such 1 percent limitation, the entitlement of each such jurisdiction shall be reduced proportionately until such aggregate does not exceed such limitation.

PUBLIC LAW 96-422—OCT. 10, 1980      94 STAT. 1801

### STATE ADMINISTRATIVE COSTS

SEC. 104. The Secretary is authorized to pay to each State educational agency amounts equal to the amounts expended by it for the proper and efficient administration of its functions under this Act, except that the total of such payments for any period shall not exceed 1 percent of the amounts which that State educational agency is entitled to receive for that period under this Act.

*8 USC 1522 note.*

### WITHHOLDING

SEC. 105. Whenever the Secretary, after reasonable notice and opportunity for a hearing to any State educational agency, finds that there is a failure to meet the requirements of any title of this Act, the Secretary shall notify that agency that further payments will not be made to the agency under such title, or in the discretion of the Secretary, that the State educational agency shall not make further payments under such title to specified local educational agencies or other entities (in the case of funds under title IV) whose actions cause or are involved in such failure until the Secretary is satisfied that there is no longer any such failure to comply. Until the Secretary is so satisfied, no further payments shall be made to the State educational agency under such title, or payments by the State educational agency under such title shall be limited to local educational agencies or other entities (in the case of funds under title IV) whose actions did not cause or were not involved in the failure, as the case may be.

*Notice and hearing.*
*8 USC 1522 note.*

*Post, p. 1807.*

## TITLE II—GENERAL ASSISTANCE FOR LOCAL EDUCATIONAL AGENCIES

### STATE ENTITLEMENTS

SEC. 201. (a) The Secretary shall, in accordance with the provisions of this title, make payments to State educational agencies for each of the fiscal years 1981, 1982, and 1983 for the purpose of assisting local educational agencies of that State in providing basic education for Cuban and Haitian refugee children. Payments made under this title to any State shall be used in accordance with applications approved under section 202 for public educational services for Cuban and Haitian refugee children enrolled in the elementary and secondary public schools under the jurisdiction of the local educational agencies of that State.

*Cuban and Haitian refugee children.*
*8 USC 1522 note.*

(b)(1) Except as provided in paragraph (2) and in subsection (c), the amount of the grant to which a State educational agency is entitled under this title, for any fiscal year described in subsection (a), shall be equal to the product of—

*Grants.*

　(A) the number of Cuban and Haitian refugee children enrolled in elementary or secondary public schools under the jurisdiction of each local educational agency within that State during the period for which the determination is made;
multiplied by—
　(B) $450.

(2) The amount of the grant to which a State educational agency is otherwise entitled for any fiscal year, as determined under paragraph (1), shall be reduced by the amounts made available for such fiscal year under any other Federal law for expenditure within the State for the same purposes as those for which funds are made available under this title, except that the reduction shall be made only to the

*Grant reductions.*

94 STAT. 1802          PUBLIC LAW 96-422—OCT 10, 1980

extent that such amounts (A) are allocated to the State (or to agencies or entities providing services within the State) on the basis of a statutory formula, and (B) are made available for such purposes specifically because of the refugee, parolee, or asylee status of the individuals to be served by such funds. The amount of the reduction required under this paragraph shall be determined by the Secretary in a manner consistent with subsection (c).

"State."

(3) For the purpose of this subsection, the term "State" does not include Guam, American Samoa, the Virgin Islands, the Northern Mariana Islands, and the Trust Territory of the Pacific Islands. The entitlements of such jurisdictions shall be determined in the manner specified in section 103, but for purposes of this title and section 105 any payments made under section 103 for the purposes set forth in section 201(a) shall be considered to be payments under this title.

Determinations.

(c) Determinations by the Secretary under this title for any period with respect to the number of Cuban and Haitian refugee children and the amount of the reduction under subsection (b)(2) shall be made, whenever actual satisfactory data are not available, on the basis of estimates. No such determination shall operate because of an underestimate or overestimate to deprive any State educational agency of its entitlement to any payment (or the amount thereof) under this title to which such agency would be entitled had such determination been made on the basis of accurate data.

### APPLICATIONS

8 USC 1522 note.

SEC. 202. (a) No State educational agency shall be entitled to any payment under this title for any period unless that agency submits an application to the Secretary at such time, in such manner, and containing or accompanied by such information, as the Secretary may reasonably require. Each such application shall—

(1) provide that the payments under this title will be used for the purposes set forth in section 201(a);

(2) provide assurances that such payments will be distributed among local educational agencies within that State in accordance with section 201;

(3) provide assurances that the State educational agency will not finally disapprove in whole or in part any application for funds received under this title without first affording the local educational agency submitting the application for such funds reasonable notice and opportunity for a hearing; and

Reports.

(4) provide for making such reports as the Secretary may reasonably require to carry out this title.

Approval or disapproval.

(b) The Secretary shall approve an application which meets the requirements of subsection (a). The Secretary shall not finally disapprove an application of a State educational agency except after reasonable notice and opportunity for a hearing on the record to such agency.

### PAYMENTS

8 USC 1522 note.

SEC. 203. The Secretary shall pay to each State educational agency having an application approved under section 202 the amount which that State is entitled to receive under this title.

TITLE III—SPECIAL IMPACT ASSISTANCE FOR SUBSTANTIAL
INCREASES IN REFUGEE ATTENDANCE

### STATE ENTITLEMENTS

SEC. 301. (a) The Secretary shall, in accordance with the provisions of this title, make payments to State educational agencies for each of the fiscal years 1981, 1982, and 1983 for the purpose set forth in section 302.

Payments.
8 USC 1522 note.

(b)(1) Except as provided in paragraph (3) and in subsections (c) and (d) of this section, the amount of the grant to which a State educational agency is entitled under this title—

Educational
agency grants.

(A) for fiscal year 1981, shall be equal to the product of (i) the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled during such fiscal year in elementary or secondary public schools under the jurisdiction of each local educational agency described under paragraph (2) within that State, or in any elementary or secondary nonpublic school within the districts served by each such local educational agency, multiplied by (ii) $750;

(B) for fiscal year 1982, shall be equal to the sum of—

(i) the amount equal to the product of (I) the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled during fiscal year 1982 in elementary or secondary public schools under the jurisdiction of each local educational agency described under paragraph (2) within that State, or in any elementary or secondary nonpublic school within the districts served by each such local educational agency, who were not enrolled in such schools during fiscal year 1981, multiplied by (II) $750; and

(ii) the amount equal to the product of (I) the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled during fiscal year 1982 in elementary or secondary public schools under the jurisdiction of each local educational agency described under paragraph (2) within that State, or in any elementary or secondary nonpublic school within the districts served by each such local educational agency, who were enrolled in such schools during fiscal year 1981, multiplied by (II) $500; and

(C) for fiscal year 1983, shall be equal to the sum of—

(i) the amount equal to the product of (I) the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled during fiscal year 1983 in elementary or secondary public schools under the jurisdiction of each local educational agency described under paragraph (2) within that State, or in any elementary or secondary nonpublic school within the districts served by each such local educational agency, who were not enrolled in such schools during either fiscal year 1981 or fiscal year 1982, multiplied by (II) $750;

(ii) the amount equal to the product of (I) the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled during fiscal year 1983 in elementary or secondary public schools under the jurisdiction of each local educational agency described under paragraph (2) within that State, or in any elementary or secondary nonpublic school within the districts served by each such local educational agency, who were enrolled in such schools

94 STAT. 1804          PUBLIC LAW 96-422—OCT 10, 1980

during either fiscal year 1981 or fiscal year 1982 (but not during both such fiscal years), multiplied by (II) $500; and

(iii) the amount equal to the product of (I) the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled during fiscal year 1983 in elementary or secondary public schools under the jurisdiction of each local educational agency described under paragraph (2) within that State, or in any elementary or secondary non-public school within the districts served by each such local educational agency, who were enrolled in such schools during both of the fiscal years 1981 and 1982, multiplied by (II) $350.

Local educational agencies.

(2) The local educational agencies referred to in paragraph (1) are those local educational agencies in which the sum of the number of Cuban and Haitian refugee children and Indochinese refugee children who are enrolled in elementary or secondary public schools under the jurisdiction of such agencies, or in elementary or secondary nonpublic schools within the districts served by such agencies, during the fiscal year for which the payments are to be made under this title, and are receiving supplementary educational services during such period, is equal to—

(A) at least 500; or

(B) at least 5 percent of the total number of students enrolled in such public or nonpublic schools during such fiscal year;

whichever number is less. Notwithstanding the provisions of this paragraph, the local educational agencies referred to in paragraph (1) shall include local educational agencies eligible to receive assistance by reason of the last sentence of section 3(b) and section 3(c)(2)(B) of the Act of September 30, 1950 (Public Law 874, Eighty-first Congress), relating to Federal impact aid, subject to paragraph (5) of this subsection.

Grant reductions.

(3) The amount of the grant to which a State educational agency is otherwise entitled for any fiscal year, as determined under paragraph (1), shall be reduced by the amounts made available under any other Federal law to agencies or other entities for educational, or education-related, services or activities within the State because of the significant concentration of Cuban and Haitian refugee children or Indochinese refugee children, except that the reduction shall be made only to the extent that such amounts are allocated to the State, or to such agencies or entities, on the basis of a statutory formula. The amount of the reduction required under this paragraph shall be determined by the Secretary in a manner consistent with subsection (c).

"State."

(4) For the purpose of this subsection, the term "State" does not include Guam, American Samoa, the Virgin Islands, the Northern Mariana Islands, and the Trust Territory of the Pacific Islands. The entitlements of such jurisdictions shall be determined in the manner specified in section 103, but for purposes of this title and section 105 any payments made under section 103 for the purposes set forth in section 302 shall be considered to be payments under this title.

(5) The amount of the grant to which a State educational agency is entitled as a result of the last sentence of paragraph (2) shall be limited to Cuban and Haitian refugee children who meet the requirements of section 101(1).

Determinations.

(c) Determinations by the Secretary under this title for any period with respect to the number of Cuban and Haitian refugee children and Indochinese refugee children and the amount of the reduction under subsection (b)(3) shall be made, whenever actual satisfactory

PUBLIC LAW 96–422—OCT. 10, 1980        94 STAT. 1805

data are not available, on the basis of estimates. No such determination shall operate because of an underestimate or overestimate to deprive any State educational agency of its entitlement to any payment (or the amount thereof) under this title to which such agency would be entitled had such determination been made on the basis of accurate data.

(d) Whenever the Secretary determines that any amount of a payment made to a State under this title for a fiscal year will not be used by such State for carrying out the purpose for which the payment was made, the Secretary shall make such amount available for carrying out such purpose to one or more other States to the extent the Secretary determines that such other States will be able to use such additional amount for carrying out such purpose. Any amount made available to a State from an appropriation for a fiscal year in accordance with the preceding sentence shall, for purposes of this title, be regarded as part of such State's payment (as determined under subsection (b)) for such year, but shall remain available until the end of the succeeding fiscal year.

*Unused payments.*

## USES OF FUNDS

SEC. 302. (a) Payments made under this title to any State may be used in accordance with applications approved under section 303 for supplementary educational services and costs, as described under subsection (b) of this section, for Cuban and Haitian refugee children and Indochinese refugee children enrolled in the elementary and secondary public schools under the jurisdiction of the local educational agencies of the State described in section 301(b)(2) and in elementary and secondary nonpublic schools of that State within the districts served by such agencies.

*Refugee children, school enrollment. 8 USC 1522 note.*

(b) Financial assistance provided under this title shall be available to meet the costs of providing Cuban and Haitian refugee children and Indochinese refugee children supplementary educational services, including but not limited to—

*Supplementary educational services.*

(1) supplementary educational services necessary to enable those children to achieve a satisfactory level of performance, including—

(A) English language instruction;
(B) other bilingual educational services; and
(C) special materials and supplies;

(2) additional basic instructional services which are directly attributable to the presence in the school district of Cuban and Haitian refugee children and Indochinese refugee children, including the costs of providing additional classroom supplies, overhead costs, costs of construction, acquisition or rental of space, costs of transportation, or such other costs as are directly attributable to such additional basic instructional services; and

(3) special inservice training for personnel who will be providing instruction described in either paragraph (1) or (2) of this subsection.

## APPLICATIONS

SEC. 303. (a) No State educational agency shall be entitled to any payment under this title for any period unless that agency submits an application to the Secretary at such time, in such manner, and containing or accompanied by such information, as the Secretary may reasonably require. Each such application shall—

*8 USC 1522 note.*

94 STAT. 1806        PUBLIC LAW 96-422—OCT 10, 1980

(1) provide that the educational programs, services and activities for which payments under this title are made will be administered by or under the supervision of the agency;

(2) provide assurances that payments under this title will be used for purposes set forth in section 302;

(3) provide assurances that such payments will be distributed among local educational agencies within that State in accordance with section 301;

(4) provide assurances that the State educational agency will not finally disapprove in whole or in part any application for funds received under this title without first affording the local educational agency submitting an application for such funds reasonable notice and opportunity for a hearing;

Reports.
(5) provide for making such reports as the Secretary may reasonably require to perform his functions under this Act; and

(6) provide assurances—

(A) that to the extent consistent with the number of Cuban and Haitian refugee children and Indochinese refugee children enrolled in the elementary or secondary nonpublic schools within the district served by a local educational agency, such agency, after consultation with appropriate officials of such schools, shall provide for the benefit of these children secular, neutral, and nonideological services, materials, and equipment necessary for the education of such children;

(B) that the control of funds provided under this paragraph and the title to any materials, equipment, and property repaired, remodeled, or constructed with those funds shall be in a public agency for the uses and purposes provided in this title, and a public agency shall administer such funds and property; and

(C) that the provision of services pursuant to this paragraph shall be provided by employees of a public agency or through contract by such public agency with a person, association, agency or corporation who or which, in the provision of such services, is independent of such elementary or secondary nonpublic school and of any religious organization; and such employment or contract shall be under the control and supervision of such public agency, and the funds provided under this paragraph shall not be commingled with State or local funds.

Approval or disapproval.
(b) The Secretary shall approve an application which meets the requirements of subsection (a). The Secretary shall not finally disapprove an application of a State educational agency except after reasonable notice and opportunity for a hearing on the record to such agency.

PAYMENTS

8 USC 1522 note.
SEC. 304. (a) The Secretary shall pay to each State educational agency having an application approved under section 303 the amount which that State is entitled to receive under this title.

Waiver.
(b) If a State is prohibited by law from providing public educational services for children enrolled in elementary and secondary nonpublic schools, as required by section 303(a)(6), or if the Secretary determines that a local educational agency has substantially failed or is unwilling to provide for the participation on an equitable basis of children enrolled in such schools, the Secretary may waive such requirement and shall arrange for the provision of services to such

PUBLIC LAW 96-422—OCT. 10, 1980        94 STAT. 1807

children through arrangements which shall be subject to the requirements of this Act.

### TITLE IV—ADULT EDUCATION PROGRAMS

#### STATE ENTITLEMENTS

SEC. 401. (a) The Secretary shall, in accordance with the provisions of this title, make payments to State educational agencies for each of the fiscal years 1982 and 1983 for the purposes of providing for the operation of adult education programs as described under section 402 for Cuban and Haitian refugee adults aged 16 or older. Payments made under this title to any State shall be used in accordance with applications approved under section 403.

*Cuban and Haitian refugee adults.*
*8 USC 1522 note.*

(b)(1) Except as provided in subsection (c) of this section, the amount of the grant to which a State educational agency is entitled under this Act, for any fiscal year described in subsection (a), shall be equal to the product of—

*Grants.*

    (A) the number of Cuban and Haitian refugee adults aged 16 or older who are enrolled, during the period for which the determination is made, in programs of instruction referred to in section 402 which are offered within that State, other than any such refugees who are enrolled in elementary or secondary public schools under the jurisdiction of local educational agencies; multiplied by—

    (B) $300.

(2) The amount of the grant to which a State educational agency is otherwise entitled for any fiscal year, as determined under paragraph (1), shall be reduced by the amounts made available for such fiscal year under any other Federal law for expenditure within the State for the same purposes as those for which funds are made available under this title, except that the reduction shall be made only to the extent that such amounts (A) are allocated to the State (or to agencies or entities providing services within the State) on the basis of a statutory formula, and (B) are made available for such purposes specifically because of the refugee, parolee, or asylee status of the individuals to be served by such funds. The amount of the reduction required under this paragraph shall be determined by the Secretary in a manner consistent with subsection (c).

*Grant reductions.*

(3) For the purpose of this subsection, the term "State" does not include Guam, American Samoa, the Virgin Islands, the Northern Mariana Islands, and the Trust Territory of the Pacific Islands. The entitlements of such jurisdictions shall be determined in the manner specified in section 103, but for purposes of this title and section 105 any payments made under section 103 for the purposes set forth in section 402 shall be considered to be payments under this title.

*"State."*

(c) Determinations by the Secretary under this title for any period with respect to the number of Cuban and Haitian refugee adults and the amount of the reduction under subsection (b)(2) shall be made, whenever actual satisfactory data are not available, on the basis of estimates. No such determination shall operate because of an underestimate or overestimate to deprive any State educational agency of its entitlement to any payment (or the amount thereof) under this title to which such agency would be entitled had such determination been made on the basis of accurate data.

*Determinations.*

94 STAT. 1808          PUBLIC LAW 96–422—OCT 10, 1980

### USE OF FUNDS

Refugee adults,
school
enrollment.
8 USC 1522 note.

SEC. 402. (a) Funds made available to State educational agencies under this title shall be used by such agencies to provide for programs of adult education and adult basic education to Haitian and Cuban refugee adults aged 16 or older in need of such services who are not enrolled in elementary or secondary public schools under the jurisdiction of local educational agencies. Such programs may be provided directly by the State educational agency, or such agency may make grants, or enter into contracts, with local educational agencies, and other public or private nonprofit agencies, organizations, or institutions to provide for such programs. Funds available under this title may be used for—

(1) programs of instruction of such adult refugees in basic reading and mathematics, in development and enhancement of necessary skills, and for the promotion of literacy among such refugees;

(2) administrative costs of planning and operating such programs of instruction;

(3) educational support services which meet the need of such adult refugees, including guidance and counseling with regard to educational, career, and employment opportunities; and

(4) special projects designed to operate in conjunction with existing Federal and non-Federal programs and activities to develop occupational and related skills for individuals, particularly programs authorized under the Comprehensive Employment and Training Act of 1973 or under the Vocational Education Act of 1963.

29 USC 801 note.
20 USC 2301
note.

20 USC 1205.

(b) The State educational agency shall review applications for grants and contracts in a manner consistent with the purposes of paragraphs (12) and (13) of section 306(b) of the Adult Education Act.

(c) The State educational agency shall provide for the use of funds made available under this title in such manner that the maximum number of Haitian and Cuban refugee adults aged 16 or older residing within the State receive education under the programs of instruction described under subsection (a).

### APPLICATIONS

8 USC 1522 note.

SEC. 403. (a) No State educational agency shall be entitled to any payment under this title for any period unless that agency submits an application to the Secretary at such time, in such manner, and containing or accompanied by such information, as the Secretary may reasonably require. Each such application shall—

(1) provide that payments made under this title will be used only for the purposes, and in the manner, set forth in section 402;

(2) provide assurances that the State educational agency will not finally disapprove in whole or in part any application for funds received under this title without first affording the entity submitting an application for such funds reasonable notice and opportunity for a hearing; and

Reports.

(3) provide for making periodic reports to the Secretary evaluating the effectiveness of the payments made under this title, and such other reports as the Secretary may reasonably require to perform his functions under this Act.

Approval or
disapproval.

(b) The Secretary shall approve an application which meets the requirements of subsection (a). The Secretary shall not finally disapprove an application of a State educational agency except after

PUBLIC LAW 96–422—OCT. 10, 1980          94 STAT. 1809

reasonable notice and opportunity for a hearing on the record to such agency.

## TITLE V—OTHER PROVISIONS RELATING TO CUBAN AND HAITIAN ENTRANTS

### AUTHORITIES FOR OTHER PROGRAMS AND ACTIVITIES

Sec. 501. (a)(1) The President shall exercise authorities with respect to Cuban and Haitian entrants which are identical to the authorities which are exercised under chapter 2 of title IV of the Immigration and Nationality Act. The authorizations provided in section 414 of that Act shall be available to carry out this section without regard to the dollar limitation contained in section 414(a)(2).

*8 USC 1522 note.*

*Ante,* p. 110.
*Ante,* p. 116.

(2) Any reference in chapter III of title I of the Supplemental Appropriations and Rescission Act, 1980, to section 405(c)(2) of the International Security and Development Assistance Act of 1980 or to the International Security Act of 1980 shall be construed to be a reference to paragraph (1) of this subsection.

*Ante,* p. 865.

(b) In addition, the President may, by regulation, provide that benefits granted under any law of the United States (other than the Immigration and Nationality Act) with respect to individuals admitted to the United States under section 207(c) of the Immigration and Nationality Act shall be granted in the same manner and to the same extent with respect to Cuban and Haitian entrants.

*Ante,* p. 103.

(c)(1)(A) Any Federal agency may, under the direction of the President, provide assistance (in the form of materials, supplies, equipment, work, services, facilities, or otherwise) for the processing, care, maintenance, security, transportation, and initial reception and placement in the United States of Cuban and Haitian entrants. Such assistance shall be provided on such terms and conditions as the President may determine.

(B) Funds available to carry out this subsection shall be used to reimburse State and local governments for expenses which they incur for the purposes described in subparagraph (A). Such funds may be used to reimburse Federal agencies for assistance which they provide under subparagraph (A).

*Reimbursements.*

(2) The President may direct the head of any Federal agency to detail personnel of that agency, on either a reimbursable or nonreimbursable basis, for temporary duty with any Federal agency directed to provide supervision and management for purposes of this subsection.

(3) The furnishing of assistance or other exercise of functions under this subsection shall not be considered a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

*42 USC 4321 note.*

(4) Funds to carry out this subsection may be available until expended.

(5) To facilitate the transfer of the functions described in paragraph (1) from the Federal Emergency Management Agency to other Federal agencies pursuant to this subsection, the purposes for which the funds appropriated to the President in the first paragraph under the heading "FEDERAL EMERGENCY MANAGEMENT AGENCY" in chapter VII of title I of the Supplemental Appropriations and Rescission Act, 1980, are available may be construed to include use in carrying out this subsection to the extent that those funds are allocated for use for any of the purposes described in paragraph (1) of this subsection.

*Ante,* p. 873.

94 STAT. 1810        PUBLIC LAW 96-422—OCT 10, 1980

(d) The authorities provided in this section are applicable to assistance and services provided with respect to Cuban or Haitian entrants at any time after their arrival in the United States, including periods prior to the enactment of this section.

"Cuban and Haitian entrant."

(e) As used in this section, the term "Cuban and Haitian entrant" means—

(1) any individual granted parole status as a Cuban/Haitian Entrant (Status Pending) or granted any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided; and

(2) any other national of Cuba or Haiti—

(A) who—

8 USC 1101 note.

(i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act;

(ii) is the subject of exclusion or deportation proceedings under the Immigration and Nationality Act; or

(iii) has an application for asylum pending with the Immigration and Naturalization Service; and

(B) with respect to whom a final, nonappealable, and legally enforceable order of deportation or exclusion has not been entered.

Approved October 10, 1980.

LEGISLATIVE HISTORY:

HOUSE REPORT No. 96-1218 (Comm. on Education and Labor).
CONGRESSIONAL RECORD, Vol. 126 (1980):
    Aug. 18, considered and passed House.
    Sept. 25, considered and passed Senate, amended.
    Sept. 30, Oct. 1, House concurred in Senate amendments.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 16, No. 42:
    Oct. 10, Presidential statement.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 025

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 25

The Washington Post

# U.S. MOVES TO EASE SOVIET EMIGRES' WAY

By Ruth Marcus
December 9, 1988

Attorney General Dick Thornburgh, responding to the wave of refugee applications from Soviet Jews and other Soviet citizens, moved yesterday to ease the way for emigres to enter the United States.

Thornburgh announced he was expanding the attorney general's "parole authority" to admit up to 2,000 Soviet emigres per month from Moscow in addition to all Soviet emigres awaiting processing in Rome, who cannot be admitted under current conditions.

Thornburgh said he took the step in response to a request from Secretary of State George P. Shultz and as an "interim measure," awaiting legislation that would establish a "special immigrant class" to permit easier entry. He also said the Immigration and Naturalization Service (INS) will take "immediate steps" to transfer an INS officer to the Moscow embassy -- which has a backlog of 6,000 requests -- to begin processing refugee applications.

As the Soviet Union under President Mikhail Gorbachev has eased restrictions on emigration, legal and budgetary problems have snarled emigres' ability to enter the United States. Thornburgh's move was designed to permit entry of Soviet emigres who cannot enter the country as refugees, a legal term for those who have demonstrated a "well-founded fear of persecution."

Under a formula worked out with Congress, the administration has limited the number of refugees from Eastern Europe and the Soviet Union this year to 24,500, including about 16,000 Soviet Jews. Justice Department officials said refugee requests from the Soviet Union alone have been running about 2,000 per month.

The administration changed its visa policy last summer to stop granting automatic political refugee status to Soviet Jews and other Soviet citizens, principally Soviet Armenians who also have been emigrating in large numbers. Jewish organizations have protested the change, saying that 187 Soviet Jews in Rome have been denied refugee status since September and that a growing number of other Jews seeking visas from the U.S. Embassy in Moscow have been told by U.S. diplomats there to expect delays of a year or more.

Refugee status entitles immigrants to federal aid for transportation and resettlement and permits them to seek to become citizens. Those who enter the country on parole status -- including former Philippine president Ferdinand Marcos and the Mariel Cubans -- do not have those benefits and must line up a relative or other sponsor who agrees to provide financial support for at least a year.

Some Jewish groups and a member of the House Judiciary immigration subcommittee criticized the move as an inadequate remedy and a troublesome signal that the United States believes Jews are not persecuted in the Soviet Union.

However, there is no unanimity among Jewish groups about how to approach the problem. The National Conference on Soviet Jewry, whose main interest is obtaining liberalized emigration, has indicated that it wants to work harmoniously with the administration. Its officials yesterday declined comment on the parole question.

"I respect the attorney general's intentions, but his actions are woefully inadequate," said Rep. Charles E. Schumer (D-N.Y.), of the House Judiciary subcommittee on immigration, refugees and international law. "It sends an incorrect message that Jews are not being persecuted in the Soviet Union. Parole status leaves them in a state of limbo, with limited funding, an inability to unite their families, and denies them a chance to make the United States a permanent home."

"It is the wrong and inaccurate signal for America to be saying -- by denying refugee status to Soviet Jews -- that Jews are not as a group subject to persecution in the Soviet Union," said Karl Zukerman, executive vice president of the Hebrew Immigrant Aid Society.

"The ultimate goal is to help gain freedom for Soviet Jews but not to make their lives more difficult when they come out," said Mark Talisman, director of the Washington Office of the Council of Jewish Federations. "The distinction on approach to citizenship obviously is troubling."

Murray Dickman, an assistant to Thornburgh, defended the move as a "humanitarian" gesture that offers immediate hope of permitting Jews and others to leave the Soviet Union and emphasized that new legislation is needed.

"For us not to use the process and authority we presently have would be unfair to these people who are trying to come to this country . . . that otherwise would not be able to come," he said. "We're very proud of this action."

The number of Jews allowed to leave the Soviet Union has surged from 681 in 1986 to 15,640 through this November. Zukerman said that the State Department has informed his group that it will have only about $27 million available during fiscal 1989, enough to pay for transporting and settling about 12,000 Soviet Jews.

Staff writer John M. Goshko contributed to this report.

💬 **Comments**

**Ruth Marcus**
Ruth Marcus is an associate editor and columnist for The Post. Follow 🐦