

AO386-B
DEFENDANT'S
EXHIBIT
CASE
NO.
EXHIBIT
NO.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants*. | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 26

Effective dates.

(e) PERIOD OF APPLICATION.—

(1) Subsections (a) and (b) shall take effect on the date of the enactment of this Act and shall only apply to applications for refugee status submitted before October 1, 1990.

(2) Subsection (c) shall apply to decisions made after the date of the enactment of this Act and before October 1, 1990.

(3) Subsection (d) shall take effect on the date of the enactment of this Act and shall only apply to reapplications for refugee status submitted before October 1, 1990.

(f) GAO REPORTS ON SOVIET REFUGEE PROCESSING.—

(1) The Comptroller General shall submit to the Committees on the Judiciary of the Senate and of the House of Representatives reports on the implementation of this section in Italy and the Soviet Union. Such reports shall include a review of—

(A) the timeliness and length of individual interviews,

(B) the adequacy of staffing and funding by the Department of State, the Immigration and Naturalization Service, and voluntary agencies, including the adequacy of staffing, computerization, and administration of the processing center in Washington,

(C) the sufficiency of the proposed Soviet refugee processing system within the United States,

(D) backlogs (if any) by ethnic or religious groups and the reasons any such backlogs exist,

(E) the sufficiency of the means of distributing and receiving applications for refugee status in Moscow,

(F) to the extent possible, a comparison of the cost of conducting refugee processing only in Moscow and such cost of processing in both Moscow and in Italy, and

(G) an evaluation of efforts to phase out Soviet refugee processing in Italy.

(2) The Comptroller shall submit a preliminary report under paragraph (1) by December 31, 1989, and a final report by March 31, 1990. The final report shall include any recommendations which the Comptroller General may have regarding the need, if any, to revise or extend the application of this section.

ADJUSTMENT OF STATUS FOR CERTAIN SOVIET AND INDOCHINESE PAROLEES

8 USC 1255 note.

SEC. 599E. (a) IN GENERAL.—The Attorney General shall adjust the status of an alien described in subsection (b) to that of an alien lawfully admitted for permanent residence if the alien—

(1) applies for such adjustment,

(2) has been physically present in the United States for at least 1 year and is physically present in the United States on the date the application for such adjustment is filed,

(3) is admissible to the United States as an immigrant, except as provided in subsection (c), and

(4) pays a fee (determined by the Attorney General) for the processing of such application.

(b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STATUS.—The benefits provided in subsection (a) shall only apply to an alien who—

(1) was a national of the Soviet Union, Vietnam, Laos, or Cambodia, and

(2) was inspected and granted parole into the United States during the period beginning on August 15, 1988, and ending on September 30, 1990, after being denied refugee status.

(c) WAIVER OF CERTAIN GROUNDS FOR INADMISSIBILITY.—The provisions of paragraphs (14), (15), (20), (21), (25), (28) (other than subparagraph (F)), and (32) of section 212(a) of the Immigration and Nationality Act shall not apply to adjustment of status under this section and the Attorney General may waive any other provision of such section (other than paragraph (23)(B), (27), (29), or (33)) with respect to such an adjustment for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

Records.

(d) DATE OF APPROVAL.—Upon the approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission as a lawful permanent resident as of the date of the alien's inspection and parole described in subsection (b)(2).

(e) NO OFFSET IN NUMBER OF VISAS AVAILABLE.—When an alien is granted the status of having been lawfully admitted for permanent residence under this section, the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under the Immigration and Nationality Act.

REPEAL OF PROVISION

*Ante*, p. 988.

SEC. 599F. (a) The following provision under the heading "Salaries and Expenses, General Legal Activities", contained in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (H.R. 2991), as enacted into law, is hereby repealed: ": *Provided further,* That for fiscal year 1990 and hereafter the Attorney General may establish and collect fees to cover the cost of identifying, copying and distributing copies of tax decisions rendered by the Federal Judiciary and that any such fees shall be credited to this appropriation notwithstanding the provisions of 31 U.S.C. 3302".

Effective date.

(b) The provisions of subsection (a) shall take effect upon the date of the enactment into law of the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (H.R. 2991).

CONDITIONAL ASSISTANCE FOR EL SALVADOR FOR POLICE TRAINING

SEC. 599G. (a) CONDITIONAL ASSISTANCE.—In order to promote the professional development of the security forces of El Salvador and to encourage the separation of the law enforcement forces from the armed forces of El Salvador, funds made available under chapter 4 of part II of the Foreign Assistance Act of 1961 which are allocated to El Salvador may, notwithstanding section 660 of that Act, be provided to El Salvador for fiscal year 1990 for purposes otherwise prohibited by section 660 of the Act, if the following conditions are met:

(1) The training provided with such assistance is provided by United States civilian law enforcement personnel.

(2)(A) The assistance is to be used for the purposes of professional development and training of the security forces of El Salvador in such areas as human rights, civil law, investigative and civilian law enforcement techniques, and urban law enforcement training.



AO336-B
DEFENDANT'S
EXHIBIT
CASE
NO. 6:23-cv-00007
EXHIBIT
NO. 627

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 27



LM141353

United States General Accounting Office

GAO

Report to the Chairman, Subcommittee on Immigration, Refugees, and International Law, Committee on the Judiciary, House of Representatives

# REFUGEE PROGRAM

RESTRICTED——Not to be released outside the General Accounting Office unless specifically approved by the Office of Congressional Relations.

548249 / 141353

GAO/NSIAD-90-137

United States General Accounting Office

GAO

Report to the Chairman, Subcommittee on Immigration, Refugees, and International Law, Committee on the Judiciary, House of Representatives

April 1990

# REFUGEE PROGRAM

# The Orderly Departure Program From Vietnam

RESTRICTED——Not to be released outside the General Accounting Office unless specifically approved by the Office of Congressional Relations.

548249/141353

GAO NSIAD-90-13?



# GAO

United States
General Accounting Office
Washington, D.C. 20548

National Security and
International Affairs Division

B-238006

April 11, 1990

The Honorable Bruce A. Morrison
Chairman, Subcommittee on Immigration,
Refugees, and International Law
Committee on the Judiciary
House of Representatives

Dear Mr. Chairman:

This report responds to your request that we evaluate the Immigration and Naturalization Service's (INS) practices and procedures for adjudicating the cases of Vietnamese refugee applicants. You asked us to (1) determine why approval rates for Vietnamese refugee applicants were apparently low, (2) evaluate the quality and consistency of the INS adjudication process, and (3) determine if denied refugee applicants' files adequately reflected the bases for the examiners' decisions. We also determined whether Vietnamese of special interest to the United States were being interviewed by INS examiners.

## Results in Brief

We found that approval rates for Vietnamese refugee applicants dropped from 100 percent during October 1988 through January 1989 to an average of about 36 percent during the next 6 months beginning in February 1989. This drop in approval rates occurred because of an August 1988 decision by the Attorney General that the INS should begin applying its worldwide guidance for overseas refugee processing in granting refugee status to Vietnamese applicants. The Attorney General's decision meant that Vietnamese applicants would no longer be given an automatic presumption of refugee status simply because they were living in Vietnam, but would have to assert fear of persecution and a credible basis for such a fear.

Although the Attorney General's decision resulted in a drop in the number of applicants granted refugee status, it did not result in fewer Vietnamese being offered entry into the United States. Most of those denied refugee status were offered entry into the United States as Public Interest Parolees.

We found that the INS refugee adjudication process in Vietnam was generally thorough and consistent, and performed by experienced and well-trained examiners. Our review indicated that reasons for denial of refugee status were documented in the files for 87 percent of the cases we

reviewed and INS officials informed us that they have taken action to assure that subsequent denial decisions are adequately documented.

At the time of our visit to Vietnam in July 1989, many Vietnamese of special concern to the United States, such as individuals with a previously close association with the United States who had been detained in Vietnamese re-education camps, were not being allowed by the Vietnamese government to be interviewed by INS examiners. However, an agreement was reached on July 30, 1989, between the U.S. and Vietnamese governments that, beginning in October 1989, INS examiners could interview such individuals. Department of State and INS officials reported that about 4,830 such individuals were interviewed from October 1989 through January 1990.

## The Orderly Departure Program

The Orderly Departure Program (ODP) was established under a 1979 Memorandum of Understanding between the United Nations High Commissioner for Refugees and the government of Vietnam to provide a safe and legal means for people to leave Vietnam rather than clandestinely by boat. The agreement provides for the departure of immigrants and refugees for family reunion and humanitarian reasons. In addition to serving as an orderly, predictable means for those wishing to depart the country, it also serves to relieve the flow of refugees into first asylum countries and to save the Vietnamese government the embarrassment of the uncontrolled illegal exodus of thousands of its citizens.

The Memorandum of Understanding established a selection process for those authorized to depart Vietnam based on exchanges of lists between the Vietnamese government and the receiving countries, such as the United States. Under the process, receiving countries submit to the Vietnamese government a list of those for whom entry visas would be granted. Vietnam, in turn, provides the country with a list of those eligible for exit visas. The United States processes for entry only those whose names appear on both lists. Individuals whose names appear on only one of the two lists could be subject to discussions between the Vietnamese and U.S. governments.

Vietnamese can travel to the United States under the ODP as immigrants, following normal U.S. visa issuance procedures, or as refugees. The Departments of State and Justice developed three basic categories of Vietnamese refugees eligible for entry under the ODP.

Category I: Family members of persons in the United States not currently eligible for immigrant visas.

Category II: Former employees of the U.S. government.

Category III: Other persons closely associated or identified with the United States' presence in Vietnam before 1975,[1] including children of American citizens in Vietnam (Amerasians) and their immediate family members.

## ODP Application Procedures

The ODP Office at the U.S. Embassy in Bangkok, Thailand, administers the program, augmented by staff of the International Catholic Migration Commission. Vietnamese who rely on normal immigration channels must have a relative in the United States obtain and file immigrant visa petitions (INS Form I-130) with their local INS office. Approved petitions, along with affidavits of relationships and other documents from sponsoring relatives, are then sent to the ODP Office in Bangkok to serve as immigrant visa case files. Refugee applicants still in Vietnam or their relatives in the United States may directly petition the ODP Office in Bangkok for refugee status. (Refugees already in the United States may petition to have their spouses and children join them by filing a Visa 93 petition with their local INS office.)

After receiving the petitions, the ODP Office in Bangkok issues Letters of Introduction to immigrant applicants in Vietnam. This occurs when their visa eligibility dates become effective or are nearing the effective dates. Refugee applicants whose case files indicate their eligibility for refugee status, are also sent Letters of Introduction. A Letter of Introduction is a document which states that the United States is willing to interview the individual for possible acceptance and movement through ODP, but it is not a guarantee of approval. Letter of Introduction holders normally present the documents to the Vietnamese authorities as a preliminary step in obtaining exit permissions and pre-departure interviews with INS and State officials.

The ODP Office periodically receives from the Vietnamese government names of people it will allow the INS and consular officials in Ho Chi Minh City (previously Saigon) to interview. Upon receipt of these names, ODP staff in Bangkok review the cases to determine which ones

[1]The United States withdrew its remaining military forces and civilian presence from Vietnam after the fall of the South Vietnamese government in April 1975.

are eligible for the ODP and what further documents or information are necessary. Once the files are complete, the ODP Office requests the Vietnamese government to make those applicants available for interview during one of the upcoming interview sessions.

Teams of INS and State consular officers travel to Ho Chi Minh City each month to interview ODP applicants made available to them by the Vietnamese authorities. Those applicants with successful interviews must also undergo a medical examination. If the successful applicants pass the medical examinations, the ODP Office in Bangkok transmits final approval of the applicants' petitions to the Vietnamese authorities through the United Nations High Commissioner for Refugees. Approved applicants are then booked on a flight to Bangkok by the Vietnamese government. Amerasians and some refugee applicants are booked on direct flights from Vietnam to Manila to attend the English as Second Language/Cultural Orientation program in the Philippines.

Vietnamese can enter the United States under ODP for family reunification reasons as immigrants or for humanitarian reasons as refugees. Those found ineligible for refugee status can also enter as Public Interest Parolees, a humanitarian program implemented in February 1989 under the authority of the Attorney General and available to those able to prepay their travel expenses and obtain affidavits of support from sponsors in the United States.

Many of those traveling under the ODP are Amerasians and their immediate families. Public Law 100-202, Section 584, often referred to as the Amerasian Homecoming Act, provides that Amerasians and their qualifying family members leaving Vietnam within a 2-year period after March 21, 1988, are entitled to enter the United States as immigrants, but are eligible for all benefits offered refugees, including resettlement and training benefits. To be eligible for admission under the act, Amerasians must have been residing in Vietnam on December 22, 1987, the date the legislation was enacted, and must be able to establish that they were born in Vietnam after January 1, 1962, and before January 1, 1976, and had American citizen fathers.

## Fiscal Year 1989 Vietnamese Arrivals

Each year executive branch officials, after consulting with the Congress, establish refugee admissions allocations for the next fiscal year. The fiscal year 1989 ODP allocation was 22,000 admissions to the United States. A total of 17,685 Vietnamese refugees were admitted during the fiscal

year, a shortfall of 4,315. The fiscal year 1990 ODP refugee admissions level has been set at 26,500.

State officials informed us that the fiscal year 1989 admissions shortfall resulted from fewer former re-education camp detainees and U.S. government employees being interviewed for refugee status than anticipated, and from the unforeseen award of Public Interest Parole to many who, before February 1989, would have been awarded refugee status. (Parolees do not count against refugee admission allocations.)

Until February 1989, INS officers conferred refugee status on virtually all applicants in Vietnam based on the presumption that they met the definition of a refugee as specified in the Immigration-Nationality Act of 1980. However, in February 1989, INS began to apply worldwide standards for refugee determination. This change resulted from an August 1988 decision by the Attorney General that INS should uniformly apply the regulations of existing statutes regulating immigration processing. The change meant that INS would no longer work from a presumption that Vietnamese applying for ODP meet the definition of refugee. The decision also provided that those not granted refugee status could be considered for entry to the United States under the Attorney General's parole authority.

## Refugee Denial Rates Do Not Reflect a Drop in ODP Activity

The Attorney General's decision to adjudicate refugee cases strictly in accordance with INS Worldwide Guidance for Overseas Refugees Processing resulted in a sharp drop in the number of applicants granted refugee status. However, most of those denied refugee status did not originally apply to ODP as refugees. Most would have been immigrant visa applicants but their visa petitions were not yet current, and were considered for refugee status for family reunification reasons. Those denied refugee status were offered Public Interest Parole.[2] Thus, simply because refugee denial rates were up does not mean that fewer Vietnamese were leaving Vietnam under the ODP.

While no refugee applicants were denied refugee status during INS' first three interview trips in fiscal year 1989, the denial rate averaged 63.6 percent during the next six trips. However, our analysis of agency data, as reflected in Table 1.1, shows that during this latter period the

[2]Those offered parole are primarily the sons and daughters of immigrants and former re-education camp detainees holding current visa petitions, according to State Department officials.

number of immigrant approvals increased and those not adjudicated as refugees were granted parole.

**Table 1.1: Orderly Departure Program Decisions**

| Interview trips, FY 1989 | Approved immigrants | Refugee Adjudications: Refugee approvals | Percentage | Parole offers | Percentage | Total[a] |
|---|---|---|---|---|---|---|
| Oct. 1988 | 601 | 1,180 | 100 | — | — | **1,781** |
| Nov. 1988 | 513 | 1,123 | 100 | — | — | **1,636** |
| Jan. 1989 | 195 | 335 | 100 | — | — | **530** |
| Feb. 1989 | 1,100 | 198 | 26 | 551 | 74 | **1,849** |
| Mar. 1989 | 863 | 169 | 20 | 661 | 80 | **1,693** |
| Apr. 1989 | 871 | 193 | 35 | 363 | 65 | **1,427** |
| May 1989 | 625 | 225 | 49 | 234 | 51 | **1,084** |
| Jun. 1989 | 826 | 352 | 46 | 416 | 54 | **1,594** |
| Jul. 1989 | 1,110 | 386 | 42 | 526 | 58 | **2,022** |
| | **6,704** | **4,161** | | **2,751** | | **13,616** |

[a]Excludes pending cases and those found to be ineligible for the ODP program for reasons such as health or failure to meet basic qualifications. Figures also exclude approved Amerasians and their relatives. (They are accounted for as a separate program element.)

We found that those denied refugee status beginning in February 1989 were routinely offered Public Interest Parole giving them the opportunity to travel to the United States, provided they prepaid airline tickets and had affidavits of support from relatives or agency organizations in the United States. ODP officials in Bangkok informed us that most of those offered Public Interest Parole program were accepting the offers. Table 1.2, based on agency information available as of July 1989, gives an indication of the proportion of Vietnamese accepting the parole offer.

**Table 1.2: Eligible Vietnamese Offered and Accepting Parole as of July 1989**

| 1989 Interviews | Number departed | Travel expenses paid, not yet departed | Travel expenses not yet paid | Total approved for parole |
|---|---|---|---|---|
| February | 117 | 376 | 57 | 550 |
| March | 59 | 402 | 180 | 641 |
| April | 0 | 285 | 55 | 340 |
| May | 0 | 200 | 33 | 233 |
| **Total** | **176** | **1,263** | **325** | **1,764** |

INS and State officials told us that the majority of the refugees emigrating to the United States through ODP were category I immigrant visa petitioners, adjudicated as refugees for family reunification purposes. Relatively few were categories II or III individuals. According to State

officials, individuals in these latter categories are at risk of being persecuted by Vietnamese authorities, and were being generally barred from access to INS interviewers by the Vietnamese government. State Department statistics show that during fiscal year 1989 a total of 9,018 refugees were admitted through the ODP. This included 132 former U.S. government employees, and 64 former re-education camp prisoners, along with 253 accompanying relatives.

We observed 41 INS interviews of ODP applicant families in Vietnam during July 14 to 20, 1989. The cases involved a total of 248 persons. The petitioners were U.S. citizens in 34 cases, and permanent resident aliens in the other 7. Table 1.3 shows how the 248 persons were processed.

**Table 1.3: Our July 1989 Observations of ODP Applicants**

| Disposition | Number | Percent |
|---|---|---|
| Approved for immigrant visas | 57 | 23 |
| Approved as refugees | 71 | 29 |
| Offered Public Interest Parole | 105 | 42 |
| Decision pending more information | 11 | 4 |
| Not qualified under INS status | 4 | 2 |
| | **248** | **100** |

INS officers in Vietnam told us that before February 1989, individuals who were denied immigrant status, but were otherwise eligible, would have been interviewed as refugees for family reunification reasons and approved for entry into the United States. However, because of the Attorney General's decision, only 71, or 29 percent, were granted refugee status after February 1989.

## U.S. and Vietnam Governments Negotiated Access to Refugees

Although ODP was intended to provide a means of emigration for both family reunification and humanitarian reasons, most cases made available by the Vietnamese government were those involving family reunification. U.S. officials told us that only about 300 categories II and III refugees were gaining access to ODP per year, and that the Vietnamese government was controlling the number allowed to emigrate.

In July 1989, representatives of the governments of the United States and Vietnam negotiated an agreement whereby more individuals would be released from re-education centers and their families would be allowed to emigrate. The agreement, announced on July 30, 1989, provided for the United States to begin interviewing former re-education

center detainees in October 1989. The agreement set a goal of 3,000 former detainees and dependents to be interviewed before the end of 1989, and 12,000 more were expected to be interviewed in 1990.

INS officers confirmed that the October 1989 ODP interview team began interviewing former detainees in Vietnam in accordance with the July 30 agreement. State Department's Bureau of Refugee Programs figures indicate that officials interviewed a total of 4,830 former detainees from October 1989 through January 1990, thus meeting initial expectations. Bureau of Refugee Programs and INS officials told us that the program was proceeding smoothly.

The Bush administration has established a fiscal year 1990 admissions ceiling of 26,500 for those departing Vietnam under ODP. This is an increase of 4,500 over the fiscal year 1989 allocation of 22,000, due partly to expected increased accessions of former re-education detainees and their accompanying relatives.

## ODP Applicant Processing Thorough and Consistent, but Decisions Not Always Documented

The ODP interview team we accompanied to Vietnam in July 1989 included three officers from INS' District Office in Bangkok.[3] We interviewed the officers to determine their experience, training, and qualifications for adjudicating ODP refugee cases, and observed a total of 41 cases to determine if the officers asked similar questions and used similar bases for adjudicating their assigned cases.

Each officer was trained and experienced in refugee processing procedures, and knowledgeable about country conditions in Vietnam and throughout Southeast Asia. The officers averaged 18 years of service with INS, each had previous interview team assignments in Vietnam, and had recently received refresher training in Bangkok, including State Department briefings on country conditions in Vietnam and Southeast Asia.

The officers uniformly applied INS and ODP guidelines in adjudicating their cases. Each asked a variety of questions designed to elicit information about family relationships, living conditions, work and educational circumstances, government policies and practices, and the individuals' statements on, or fears of, persecution. In addition, we observed various

[3] A fourth accompanying senior examiner, assigned to INS Headquarters and on an ODP familiarization visit, adjudicated some cases. The officer was an experienced examiner, with prior refugee adjudication experience in Europe and Thailand.

instances of the officers conferring with each other on complex or difficult cases.

INS Headquarters and District Office instructions, as well as ODP Office guidance, require the examiners to document the rationale for their decisions to deny refugee status. Our sample of 364 case files of applicants denied refugee status between February and July 1989 revealed that, while most contained sufficient explanations of the examiners' decisions, some did not. For the case files in our study, approximately 87 percent contained adequate bases for the decisions.

Our study showed that 73 percent of the denied applicants were category I immigrant visa petitioners adjudicated as refugees, another 26 percent were Amerasians or their close relatives. Only one denied applicant was a pre-1975 U.S. government employee, which reinforced INS officers' statements to us that virtually no categories II or III refugee applicants were denied refugees status.

Senior INS officials informed us that in light of the number of denied case files without sufficient rationale for the decisions, the Bangkok District Office has begun sampling ODP interview teams' case files upon their return from Vietnam. We were told that the limited sampling procedure was designed as a quality assurance mechanism to ensure that all denied case files contain adequate explanations of the decisions.

## Conclusions

The high refugee denial rates in the ODP are not an accurate indicator of the treatment of refugees under the program. INS refugee approvals, or denials with accompanying offers of parole, are primarily mechanisms for resettling Vietnamese families unable to travel under immigrant visas. Almost none of those applying for resettlement on the basis of refugee characteristics were being denied refugee status.

Until recently, few former re-education camp detainees and others of special interest to the United States, who may be eligible for refugee status, were given access to INS interviewers by Vietnamese authorities. The Vietnamese government agreed in July 1989 to allow former re-education detainee and their families to emigrate to the United States. INS officers began interviewing former detainees in October 1989, and the program appears to be proceeding smoothly.

INS officials from the Bangkok District Office were experienced and well-trained, and were processing ODP cases in Vietnam thoroughly and consistently at the time of our visit. Refugee applicants' case files contained the bases for the examiners' decisions in 87 percent of the cases we reviewed, and the INS District office has implemented a file review process, which should further ensure the documentation of denial decisions by its examiners.

## Scope and Methodology

We analyzed available agency data on the ODP decisions made during nine trips to Vietnam, covering October 24, 1988 to July 21, 1989, to determine whether approval rates for Vietnamese refugee applicants had dropped during 1989, and if so, why the decline had occurred and whether those denied refugee status were also being denied entry into the United States.

To evaluate the quality and consistency of adjudication processes for Vietnamese immigrants and refugees, we reviewed pertinent legislation and regulations; interviewed officials and reviewed records at INS and Department of State in Washington, D.C., the U.S. Embassy in Bangkok, Thailand, and in Ho Chi Minh City, Vietnam. We analyzed 364 denied refugee case files to determine whether the reasons for denials of refugee status were well documented. In July 1989, we had firsthand observations of the program in Vietnam. We determined the nature and extent of the background and experience of involved INS examiners. We obtained information on access to Vietnamese of special interest to the U.S. government through discussions with State Department, INS, and embassy officials. Our review was performed between June 1989 and December 1989, and was conducted in accordance with generally accepted government auditing standards.

We did not obtain written comments on this report from agency officials. However, we obtained their oral comments and incorporated them as appropriate in the text.

We are sending copies of this report to the Chairmen, House and Senate Committees on the Judiciary; the Attorney General; the Commissioner of INS; and the Director, Office of Management and Budget. We will also make copies available to others upon request.

GAO staff members Harvey J. Finberg, Computer Systems Analyst, and Leroy W. Richardson and David R. Martin, Assistant Directors in the

National Security and International Affairs Division, Washington, D.C., made major contributions to this report. If you or your staff have any questions, please call me at (202) 275-5790.

Sincerely yours,

Harold J. Johnson

Harold J. Johnson
Director, Foreign Economic
Assistance Issues





United States
General Accounting Office
Washington, D.C. 20548
First-Class Mail
Postage & Fees Paid
GAO



AO388-B
DEFENDANT'S EXHIBIT
CASE NO. 6:23-cv-00007
EXHIBIT NO. 028

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 6:23-CV-00007 |
| | § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 28

Homeland
Security

U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Statement by Secretary Johnson on the Continued Normalization of our Migration Relationship with Cuba

**Release Date:** January 12, 2017

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

The United States is revoking the so-called "wet-foot/dry-foot" policy for Cuban migrants that has been in place since the mid-1990s. Effective immediately, Cuban nationals who attempt to illegally enter the United States will be subject to removal, consistent with our enforcement priorities. The United States is also ending the special Cuban Medical Professional Parole program.

These actions are part of the ongoing normalization of relations between the governments of the United States and Cuba, and reflect a commitment to have a broader immigration policy in which we treat people from different countries consistently. To the extent permitted by the current laws of our two countries, the United States will now treat Cuban migrants in a manner consistent with how it treats others; unauthorized migrants can expect to be removed unless they qualify for humanitarian relief under our laws.

The Government of Cuba has agreed to begin to accept the return of Cuban nationals who have been ordered removed. Cuba and the United States will work to further discourage unlawful migration to the United States and promote bilateral cooperation to prevent and prosecute alien smuggling and other crimes related to illegal migration.

Though the Cuban Adjustment Act and certain Cuban laws remain in effect, today's announcement goes a long way to putting our relationship with Cuba on equal terms with our relationships with other neighbors.

To view the Joint Statement of the United States and Cuban governments, please click here (/publication/joint-statement-between-government-united-states-and-cuba). To view the Fact Sheet, please click here (/publication/changes-parole-and-expedited-removal-policies-affecting-cuban-nationals).

###

12 de enero de 2017

Contacto: Oficina de prensa del DHS, 202-282-8010

**DECLARACIÓN DEL SECRETARIO JOHNSON CON RELACIÓN AL PROCESO CONTINUO DE NORMALIZACIÓN DE NUESTRA RELACIÓN MIGRATORIA CON CUBA**

Los Estados Unidos revocan hoy la llamada política de "pies secos/pies mojados" para migrantes cubanos, vigente desde la mitad de los años 90. Con efecto inmediato, los nacionales cubanos que intenten entrar ilegalmente a los Estados Unidos estarán sujetos a ser devueltos a Cuba, en consonancia con nuestras prioridades de aplicación de la ley. Los Estados Unidos también ponen fin al programa especial "Cuban Medical Professional Parole" (admisión provisional para profesionales cubanos de la salud).

Estas acciones forman parte del proceso continuo de normalización de las relaciones entre los Gobiernos de los Estados Unidos y de Cuba, y reflejan el compromiso de contar con una política de inmigración más amplia que trata de manera consistente a personas de diferentes países. Hasta donde permiten las leyes actuales de nuestros dos países, los Estados Unidos tratarán ahora a los migrantes cubanos en concordancia con la forma que tratan a los ciudadanos de otros países. Asimismo, los migrantes no autorizados pueden esperar ser devueltos a menos que cumplan los requisitos para poder recibir socorro humanitario conforme a nuestras leyes.

El Gobierno de Cuba está de acuerdo en comenzar a aceptar el regreso de nacionales cubanos con órdenes de retorno. Cuba y los Estados Unidos seguirán colaborando para desalentar aún más la migración ilegal a los Estados Unidos y fomentar la cooperación bilateral para prevenir y procesar el contrabando de personas y otros delitos relacionados con la migración ilegal.

Aunque la Ley de Ajuste Cubano y ciertas leyes cubanas siguen vigentes, la declaración hecha hoy contribuye considerablemente a que nuestra relación con Cuba logre estar en igualdad de condiciones con respecto a nuestras relaciones con otros países vecinos.

###

**Keywords**

SECRETARY JEH JOHNSON (/KEYWORDS/SECRETARY-JEH-JOHNSON)

Last Updated: 09/20/2018



DEFENDANT'S EXHIBIT
CASE NO. 6:23-cv-00007
EXHIBIT NO. 029

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 29



BRAIN DRAIN POLITICS: THE CUBAN MEDICAL PROFESSIONAL PAROLE PROGRAMME

Author(s): H. Michael Erisman

Source: *International Journal of Cuban Studies*, Autumn/Winter 2012, Vol. 4, No. 3/4, Special double issue: Cuba in the 21st Century (Autumn/Winter 2012), pp. 269-290

Published by: Pluto Journals

Stable URL: https://www.jstor.org/stable/41946012

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms

*Pluto Journals* is collaborating with JSTOR to digitize, preserve and extend access to *International Journal of Cuban Studies*

JSTOR

This content downloaded from 162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

# BRAIN DRAIN POLITICS: THE CUBAN MEDICAL PROFESSIONAL PAROLE PROGRAMME

*H. Michael Erisman*
*Indiana State University*

## Abstract

Cuba's international medical aid programmes are more extensive than those of any other country or international organisation in the world. Washington, fearing that such aid activities will generate increased international political influence (i.e., soft power) for Havana and thereby complicate US efforts to bring about regime change there, has responded with its own countermeasures. The primary US initiative has been the Cuban Medical Professional Parole (CMPP) programme, which is designed to encourage and facilitate defections to the US by Cuban medical personnel assigned to overseas aid missions. The dynamics and impact of the CMPP programme will be the main focus of this article.

Operating within a policy analysis format, the article provides a summary of Cuba's medical aid programmes. For comparative purposes, similar summary data will be provided regarding US medical aid activities. It provides detailed background information about the formation and operation of Washington's CMPP programme. It also analyses the extent to which the CMPP programme has succeeded in persuading Cuban medical internationalists to defect and how far it has undermined Havana's medical aid programmes.

Keywords: defection, medical aid, soft power, CMPP (Cuban Medical Professional Parole programme), ELAM (Latin American Medical School), GHI (Global Health Initiative), public diplomacy, Pogo Syndrome

## Introduction

'Soft power' is an idea which lately has attracted increasing attention in foreign policy circles. Joseph Nye, who first popularised the concept, summarises it as follows:

> Power is the ability to alter the behavior of others to get what you want. There are basically three ways to do that: coercion (sticks), payments (carrots), and attraction (soft power).... A country's soft power can come from three resources: its culture (in places where it is attractive to others), its political values (when it lives up to them both at

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 26 of 105

> home and abroad), and its foreign policies (when they are seen as legitimate and having moral authority).[1]

While soft power, which might be viewed in more traditional terms as 'influence', has always represented a dimension of Havana's international personality, it has become more prominent in recent years and has clearly overshadowed a tradition of Cuban hard power politics which emerged during the Cold War era.[2] At the epicentre of this phenomenon are Havana's medical aid programmes, which began in the early 1960s and which today are the most extensive in the world.[3]

An often unstated assumption by observers of international affairs is that participation in serious power politics, whether of the hard or soft variety, is essentially the purview of the world's larger, more economically developed states that enjoy significant resource/technological advantages over other actors on the international stage. In this instance, however, that assumption does not hold. Cuba is a small nation of 11 million people whose level of economic development falls squarely into the LDC (Less Developed Country) category. Nevertheless, Havana's medical aid programmes have been widely recognised as an ambitious and indeed highly effective foray into soft power politics, as is illustrated by President Obama's comments in a press conference at the 2009 Summit of the Americas meeting in Trinidad:

> One thing that I thought was interesting – and I knew this in a more abstract way but it was interesting in very specific terms – was hearing from these leaders who when they spoke about Cuba talked very specifically about the thousands of doctors from Cuba that are dispersed all throughout the region, and upon which many of these countries heavily depend. And it's a reminder for us in the United States that if our only interaction with many of these countries is drug interdiction, if our only interaction is military, then we may not be developing the connections that can, over time, increase our influence and have a beneficial effect when we need to try to move policies that are of concern to us forward in the region.[4]

Basically what these comments represent is an acknowledgement on Washington's part that Havana's medical aid programmes constitute a major source of competition in the realm of soft power politics. An unusual and highly controversial aspect of the US response to this challenge is the Cuban Medical Professional Parole (CMPP) programme, the main focus of which is to encourage and facilitate defections by Cuban medical aid personnel who are posted abroad. In short, Washington is resorting to 'brain drain politics' in an effort to undermine Havana's aid programmes and the soft power which can flow from them.

Although there have been occasional references to the CMPP in the press and in a few academic publications, the programme has for the most part flown under

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

the radar. To help remedy this situation, this inquiry will explore the CMPP and the brain drain politics swirling around it by focusing on the three following key considerations:

- Providing a comparative overview of Cuban and US medical aid programmes.
- Describing the genesis and nature of the CMPP programme.
- Analysing/evaluating the effectiveness and impact of the CMPP programme.

In the process we will attempt to address such policy-related questions and issues as:

- To what extent has the CMPP initiative been successful in seriously undermining Havana's medical aid programmes?
- To what extent has or can the CMPP programme negatively impact the larger dynamics of US–Cuban relations (e.g., does it represent a major impediment to improved relations or is it merely a minor irritant)?
- What implications might the CMPP programme have within the larger context of US–Latin American relations?

Finally, based on the foregoing material, the ultimate conundrum of any policy analysis will be confronted – should the CMPP programme be maintained, revised, or discontinued?

### Cuban and US Medical Aid: A Brief Comparative Overview

Practically all the major differences, at least in a macro-quantitative sense, between the Cuban and US medical aid programmes can be traced to the idiosyncratic perspective each utilises in approaching the enterprise. In a nutshell, the two strategies can be summarised as follows:

- Havana's model is *labour intensive*, relying primarily on people to achieve its goals. Specifically, it emphasises dispatching its own medical personnel on overseas assignments and bringing foreign students to the island for free medical training who are then returned home to serve as the core of their countries' public health systems.
- Washington's model is *capital intensive*, replying primarily on disbursing funds to support government and/or private sector health activities in recipient countries.

A dramatic illustration of these distinctions can be provided by looking at the per capita aid personnel figures for both countries (see Table 1). Recognise, as

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 28 of 105

noted in the text at the bottom of the table, that the per capita disparities are in fact greater than indicated since the US data include people who are not involved in medical aid activities. In any case, even if this fact is ignored, Cuba's much greater willingness to draw upon its reservoir of trained medical personnel as the mainstay of its aid programmes is obvious.

*Table 1* Per capita aid personnel*

| | *Cuba* | *United States* |
|---|---|---|
| Mid-1980s | 1 for every 625 citizens | 1 for every 34,700 citizens |
| 2007 | 1 for every 374 citizens | 1 for every 42,056 citizens |
| 2011 | 1 for every 241 citizens | 1 for every 23,372 citizens |

* Medical aid personnel in Cuba's case and US AID/Peace Corps personnel in the US case. Note that not all AID/Peace Corps personnel are involved in medical/health activities (e.g. 23% in the 2011 Peace Corps case).

Source: Table created by the author based on calculation of data gleaned from various governmental sources.

Cuba's first major medical aid initiative occurred in May 1963 when Havana dispatched a medical mission of 35 doctors/dentists and 23 nurses/technicians to Algeria, which had finally won its independence from France in July 1962 following a brutal anti-colonial struggle during which over a million Algerians were killed. Over the years, as might be expected, the scope and geographical focus of such programmes waxed and waned as Cuba made adjustments in its foreign policies to changing international conditions. During the 1970s and 1980s, sub-Saharan Africa emerged as the primary venue for Cuban medical and other developmental assistance initiatives; at its height in 1978, approximately 11,000 Cuban developmental aid personnel were posted there (which represented roughly 87 per cent of Havana's overall international contingent). But such programmes were significantly downsized during the 1990s as the disintegration of the Soviet bloc plunged the island into a desperate era of austerity and sacrifice known as the 'Special Period'. By 1999, for example, the total number of Cuban international medical aid personnel had shrunk to 3,600. Ultimately, however, the island's economy as well as the society's innate vitality overcame such challenges, as did its medical aid programmes which have developed to the point where they are more extensive than those of any other country or international organisation (see Figure 1 for recent growth trends with respect to Cuban medical aid personnel assigned overseas). Today, in contrast to earlier periods, the main recipients of Cuban medical aid can be found in the Western Hemisphere, with Venezuela hosting the largest contingent.

More impressive than the number of internationalists involved in these programmes is the impact that they have had on people's lives and well-being

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms



Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 29 of 105

*Figure 1* Number of Cuban medical aid personnel assigned overseas

Source: Created by the author using data gleaned from various IGO and media sources. An especially useful source of data and information about Cuban medical aid activities are the various issues of *MEDICC Review* available at http://www.medicc.org/index.php

(see Table 2). Such accomplishments assume an even greater lustre when one takes into consideration the fact that the Cuban brigades almost invariably operate where the most rudimentary medical services have long been essentially non-existent and they do so at no cost whatsoever to the recipients. In other words, they are dispatched to urban slums (often termed '*barrios*' in Spanish) and to isolated rural areas that the local medical providers have avoided, often because there is little available to them there in terms of monetary rewards. Without Havana's help, these people would have been in dire public health straits and in many cases (beyond the 1.7 million listed as lives saved) would probably not have survived.

*Table 2* Cuban medical aid totals (1961–2009)

| | |
|---|---|
| Countries served | 107 |
| Overseas medical aid personnel | 134,849 |
| Patients treated | 130 million+ |
| Surgeries performed | 2.97 million+ |
| Persons vaccinated | 9.8 million+ |
| Persons sight saved/restored | 1.8 million |
| Lives saved | 1.97 million+ |

Source: Julie M. Feinsilver, 'Fifty Years of Cuba's Medical Diplomacy: From Idealism to Pragmatism', *Cuban Studies* 41 (2010): 96–7.

As impressive as are the achievements of the international brigades, their work as on-site providers of grassroots medical services does not and indeed is not designed to come directly to grips with the larger developmental issue of

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

creating a truly effective, broad-based *national* public health system in their host countries. It is precisely here, however, where another key element of the Cuban aid equation comes into play – its medical training programmes. Havana has and continues to provide totally free medical education, both in Cuba and in their home countries, to tens of thousands of students, almost all of whom come from impoverished Third World nations and are committed to serve marginalised communities in their native lands once their studies are completed. The flagship institution in these endeavours is ELAM (the Spanish acronym for the Latin American Medical School), which was established in 1999 and is located in Havana. A sister institution serving French-speaking students (approximately 500) operates at the Medical Sciences Institute in Santiago. It is probably not an exaggeration to suggest that the magnitude of these programmes can, for a small country such as Cuba, be characterised as spectacular. In the 2008–09 academic year, for example, more than 24,000 international scholarship students were studying medicine in Cuba – approximately 7,900 at ELAM and more than 14,000 at other sites scattered throughout the island. Taking into account individuals being trained in their home countries as well those studying in Cuba, the total number of foreign medical trainees for the 2009–10 year was over 50,000.[5]

Current US medical aid efforts revolve around the Global Health Initiative (GHI), which is a six-year, $63 billion programme launched by President Obama in May 2009 (see Figure 2 for funding data thus far). Its essential nature differs markedly from Havana's, preferring to focus mainly on providing financial support for programmes operating within the recipient country's governmental or private sector rather than taking primary responsibility (as do the Cubans) for directly delivering services or training. This orientation is deeply embedded into the GHI's key principles, which among other things state that it is committed to[6]

- strengthening key multilateral organisations, health partnerships, and private sector engagement;
- encouraging country ownership and investing in country-led plans;
- building upon existing plans and programmes.

The five US government agencies that receive GHI funding are the United States Agency for International Development (USAID), the State Department, the National Institutes of Health (NIH), the Centers for Disease Control and Prevention (CDC), and the Defense Department, with the State Department receiving the largest allocation (approximately 60 per cent in recent years).

With respect to the global distribution of these funds, sub-Saharan Africa clearly outstrips all other regions with its 84 per cent share (see Figure 3 for 2010 figures). The top ten list of recipients similarly reflects such domination, with Haiti

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 31 of 105

BRAIN DRAIN POLITICS: THE CMPP PROGRAMME 275

Billions
$8.36
$8.92
$8.83
$8.83
$8.52
FY 2009 Final
FY 2010 Final
FY 2011 Final
FY 2012 Estimated
FY 2013 Request

*Figure 2* Global Health Initiative (GHI) funding, FY 2009 to FY 2013

Source: US Global Health Policy, Fact Sheet (February 2012), 'U.S. Funding for the Global Health Initiative (GHI): The President's FY 2013 Budget Request'; available at http://www.kff.org/globalhealth/upload/8160-02.pdf

Asia/Mid East Region 0.1%
Near East 0.1%
Europe and Eurasia 0.7%
East Asia and Pacific 4.2%
Western Hemisphere 5.3%
South and Central Asia 5.6%

*Figure 3* Global Health Initiative (GHI) country funding by region, FY 2010

Source: The Kaiser Family Foundation, 'Kaiser Fast Facts Home' webpage; available at http://facts.kff.org/chart.aspx?ch=2003

IJCS Produced and distributed by Pluto Journals www.plutojournals.com/ijcs/

This content downloaded from 162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 32 of 105

being the only country outside of Africa included in this inner circle (see Figure 4 for 2010 figures). Finally, in terms of issue prioritisation, the AIDS problem stands head and shoulders above everything else on Washington's agenda as it routinely receives roughly 60 per cent of the total GHI appropriations. In 2012, for example, it was allocated 57 per cent of the GHI budget.

Millions
Kenya
$600.3
South Africa
$560.5
Nigeria
$540.3
Tanzania
$422.5
Ethiopia
$410.9
Uganda
$362.4
Zambia
$334.6
Mozambique
$326.1
Rwanda
$161.6
Haiti
$146.6

*Figure 4* Top 10 Global Health Initiative (GHI) countries, FY 2010 funding

Source: The Kaiser Family Foundation, 'Kaiser Fast Facts Home' webpage; available at http://facts.kff.org/chart.aspx?ch=2004

Moving beyond the GHI, there are only two US programmes which bear even a faint resemblance to Cuba's massive labour-intensive approach to medical aid. In both instances, however, these deployments are very short-term when compared to their Havana counterparts and in only one case do they reach into the interior areas of the recipient countries where the need is often the greatest.

The longest-running of the two is MEDRETEs (Medical Readiness Training Exercises), which have operated under the aegis of the US Southern Command since 1993. As explained by Lorraine Murphy, MEDRETEs

- conducts training exercises in 'austere environments' whereby civilians are provided free medical care;
- operates in some of the most isolated areas of Central America and the Caribbean, providing care to thousands of people living in countries that at times lack the money to afford sufficient staff, equipment, medicine and supplies in their medical facilities.

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

A typical deployment involves setting up a temporary (usually two-week) clinic where patients can receive a variety of treatments including dental care, optometry, plastic surgery for cleft lip, palate, and burns, hand reconstruction, and orthopaedic surgery. Thus far more than 225 MEDRETEs teams have been dispatched which have treated more than 328,000 patients.[7]

The Navy's contribution to Washington's medical aid efforts in the Western Hemisphere has involved the tours of the USNS *Comfort*, which is a converted oil tanker equipped with twelve operating rooms and a 1,000-bed hospital where over 200,000 patients have been treated primarily in ports scattered throughout the Caribbean Basin area (although it has sometimes sailed south to destinations such as Peru). Thus far the *Comfort* has made only three cruises (in 2007, 2009, and 2011), although more are planned for the future.

While any attempt to enhance medical services for poor people in developing nations is commendable, it soon becomes obvious that Havana's efforts clearly overshadow those of the US by a wide margin. Peter Hakim, president of the Inter-American Dialogue which is a policy-research group headquartered in Washington, summarised the situation with respect to the *Comfort* as follows:

> It's hard for the U.S. to compete with Cuba…in this way. It makes us look like we're trying to imitate them. Cuba's doctors aren't docked at port for a couple days, but are in the country for years.[8]

The same could be said of the MEDRETEs deployments, which leads to the overall conclusion that Washington simply cannot compare with Havana in terms of putting 'boots on the ground' when it comes to medical aid programmes.

## Brain Drain Politics: The CMPP as a Response to Cuban Medical Aid

For over 50 years, Washington's policy toward Havana has been dominated by efforts to isolate, delegitimise, and undermine the Revolution. Cuba's medical aid programmes have, beyond their purely humanitarian dimensions, served as an antidote to help counter all of these political initiatives. They have, for example, contributed not only to broadening the geographical scope of Cuba's presence among the countries of the world, but likewise to increasing the depth of that presence by establishing direct contact with millions of marginalised people in less developed nations. Moreover, the success of these programmes in addressing some of the most basic and important human needs on a massive scale (see Table 2) have undoubtedly enhanced Havana's reputation as a 'good neighbour', thereby strengthening the Revolution's aura of legitimacy and expanding its reservoir of political capital (i.e., soft power). As such, they represent one component of a larger menu of countermeasures that have functioned to frustrate US efforts to

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

destabilise and ultimately destroy the island's government. Washington has not, of course, been naive with respect to these political realities; its response has been the Cuban Medical Professional Parole (CMPP) programme.

The CMPP was launched during the Bush administration on 11 August 2006 when the US Department of Homeland Security announced that it would henceforth be cooperating with the State Department to facilitate the defection and entry into the United States of personnel (especially doctors) serving in Cuban overseas medical aid contingents. The driving force behind its formation was, according to the *Wall Street Journal*,

> ...Cuba-born diplomat Emilio González, director of the U.S. Citizen & Immigration Services from 2006 to 2008. A former colonel in the U.S. Army, Mr. González is a staunchly anti-Castro exile. He has characterized Cuba's policy of sending doctors and other health workers abroad as 'state-sponsored human trafficking'.[9]

The basic mechanics of the programme are fairly simple. Doctors, nurses, and other Cuban health care personnel who are dispatched overseas can apply for asylum at any US embassy. Once accepted, they receive a visa and are guaranteed permanent residence status once they reach the United States.

Responsibility for and control of the CMPP rests solely within the Executive Branch of the US Government; specifically, it is a joint venture of the departments of State and Homeland Security. The State Department handles the overseas operations, its embassies and other offices serving as the first point of contact with potential defectors where initial processing of their asylum petitions occurs. Ultimately, however, it is Homeland Security which is vested with the statutory authority to render final decisions on the applications, as noted in a fact sheet issued by the State Department's Bureau of Western Hemisphere Affairs:

> Within the Department of Homeland Security, United States Citizenship and Immigration Services (USCIS) may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States.[10]

The CMPP's executive nature means that it could, unlike some other dimensions of US Cuban policy that are governed by Congressional legislation (e.g., various aspects of the economic sanctions), be discontinued by Presidential fiat.

To qualify for participation in the programme, a person must:[11]

- *be a Cuban national or citizen;*
- *be a medical professional currently assigned to study or work in a third country under the direction of the Cuban government.*
  The term 'medical professionals' refers to doctors, nurses, paramedics, physical therapists, lab technicians and sports trainers as examples of

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

persons who may qualify. (Note: physicians are, of course, considered the 'prize catches' and are the programme's main targets.)

- *not have any ineligibility that would prevent admission into the United States.*

The spouse and minor children of those meeting the above criteria can also be granted asylum. These family members may be living with the potential defectors in a third country or may still be residing in Cuba.

The CMPP programme occupies a distinctive policy niche in the sense that it is empowered to extend special, preferential treatment to a particular Cuban occupational group. Normally Cubans who wish to immigrate to the United States must either: (a) apply for and receive a US immigration visa, which currently are limited to 20,000 per year, while still in Cuba; (b) defect while they are in the US legally on a temporary visa (e.g., performing artists or athletes on tour with their team); or (c) reach the US *mainland* by illegal means (e.g., rafters). The CMPP programme, on the other hand, allows (and indeed encourages) Cuban medical personnel to come to the US from wherever they may happen to be in the world. There do not appear to be any other Cuban citizens who, as a *specially designated group*, are accorded such preferential treatment.

Washington insists that the CMPP is not motivated by political considerations, vehemently rejecting, for instance, speculation such as that which has suggested that it encourages defections in order to

> ...weaken popular support for the host nations' leftist leaders – who are generally at odds with Washington. The leftist governments of Venezuela and Bolivia, for example, have hailed the work of the Cubans, who are often cited by observers as important factors in the popularity of both nations' presidents.[12]

Instead, the programme has been presented as an exercise in humanitarianism. The two key points around which this rationale revolves are the contentions that:

- Havana's medical aid personnel are victims of state-sponsored human trafficking which reduces them to a status of indentured servitude because the Cuban government reaps momentary benefits from their overseas services (i.e., payments that host countries may, but often do not, make to Havana to help support the programmes).

  The key elements of the definition of human trafficking found in the international Trafficking Protocol which seem to apply to the US charge against Cuba are as follows: '...the recruitment, transportation, transfer, harboring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 36 of 105

of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of...forced labor or services,...or practices similar to...servitude....'

- Cuban medical personnel are subjected to unreasonable discrimination because they are not allowed to emigrate via normal channels and procedures. Specifically, Washington accuses Havana of denying medical personnel the right to apply for exit visas or for any of the 20,000 US immigration visas that are available annually.

Until these problems (especially the visa issue) are resolved to its satisfaction, says the US, humanitarian considerations require that the CMPP programme be maintained; in other words, responsibility for its discontinuance rests with Havana.

Although officially the CMPP is a purely governmental initiative, the reality is that the anti-revolutionary Miami community has become involved by providing what might be called support services. The two organisations that have played the most prominent roles are CANF (the Cuban-American National Foundation) and Solidaridad sin Fronteras (Solidarity without Borders). CANF, of course, has long been a leading actor in anti-Castro politics, functioning as an often very effective lobbying group for hard-line counterrevolutionary elements within the US Cuban exile community and sometimes even serving as Washington's surrogate in field operations. Solidaridad has emerged more recently on the activist scene, having been organised in 2005 by a group of Cuban doctors in the US to promote and facilitate defections by Havana's medical internationalists. The two groups formed a partnership in 2006, cooperating to provide potential defectors with money, 'safe houses' where they can, if necessary, hide from authorities who might be trying to prevent them from emigrating, and assistance with the CMPP application process.[13]

Essentially, then, the CMPP along with its NGO supporters represents the primary US response to Havana's massive medical aid programmes. But whether this exercise in brain drain politics has been effective and whether it is a foreign policy asset for Washington remain matters of considerable controversy.

## Brain Drain Politics: Analysing the CMPP's Effectiveness

Many organisations and especially government programmes measure their success in terms of numbers (e.g., how many members have they attracted, how many people have they served, how much money have they raised, etc., etc.). The CMPP's tally sheet shows, according to the *Wall Street Journal*,[14] that 1,574 defectors from

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

65 countries have been processed through the programme as of early 2011.[15] In terms of geographic distribution, almost all have defected from somewhere in the Western Hemisphere and especially from Venezuela (see Figure 5), which is not particularly surprising since most Cuban medical aid personnel currently have hemispheric postings with Venezuela hosting the largest contingent. At first glance these figures look respectable and perhaps even impressive, the average annual number of defectors being in the 390–400 range. A much more modest picture emerges, however, when one considers percentages rather than gross totals, as did a 2011 commentary by a Venezuelan-based Cuban doctor in the *South Journal* which noted with respect to the *Wall Street Journal* article that

> If we consider – as the publication says – that only in 2010 there were more than 37,000 Cuban health professionals abroad and that such a mission period...usually takes two years, in the period the article refers to Cuba would have sent at least 83,000 doctors. So, the 1,574 recruited professionals would stand for 1.89 percent of the total.[16]

This estimate compares favourably with others, including those by Cuban government officials, which put the defection rate at about 2 per cent. Such figures do not bode well for Washington, at least insofar as it might hope that the CMPP can exert a significant negative impact on Havana's ability to provide quality medical aid. The reason for such pessimism is quite simple – the Cubans build a 2–3 per cent defection rate into their programmes. Thus, while there may be short-term local disruptions if aid workers abandon their posts, the negative

*Figure 5* Defecting doctors: Cuban health workers arriving in the US since 2006, by departure point

Note: The above total is 1,333. These figures are from a 2010 Homeland Security report.

Source: Joel Millman, 'New Prize in the Cold War: Cuban Doctors', *Wall Street Journal*, 15 January 2011; available at http://online.wsj.com/article/SB10001424052970203731004576045640711118766.html

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 38 of 105

potential is neutralised from a long-term macroperspective since replacements for the defectors will always be readily available from the extra cadres who have been built into the personnel·equation.

Moving to a more personal level, those who have been attracted to the CMPP programme have discovered that it does not always provide as smooth a transition to professional life in the United States as they have hoped (and assumed) it would. Instead, they have confronted various qualification and assimilation problems.

The initial obstacle that many confront is the stipulation in the programme's admission criteria which states that applicants must not have anything on their record that would render them ineligible as immigrants to the United States. Membership in a communist party constitutes such a disqualifying factor, for according to federal law people who have belonged to the Communist Party or affiliated organisations within ten years immediately preceding the filing of a naturalisation petition or within five years for a residence application are barred from citizenship and residency. In Cuba, however, such membership is the norm, particularly for individuals in high profile, high status professions such as medicine. But what is a matter of occupational routine on the island can become a serious political handicap when dealing with the US Citizenship and Immigration Services who must approve a CMPP application for admission to the country. Thus, says Alfonso Chardy of the *Miami Herald*,

> Dozens of Cuban doctors encouraged to defect to the United States now face delays in obtaining green cards and citizenship because they joined the Communist Party or affiliated organizations in Cuba when they were young.... The delays are an unexpected problem for some of the doctors who had hoped to be received with open arms under [the CMPP] programme...[17]

Those defectors with such political baggage can find themselves stranded abroad with little in the way of either survival resources or prospects for the fast-track US visa approval which they had assumed would be forthcoming, at which point they often must turn to groups like CANF or Solidaridad for assistance.

Even if these entry hurdles are overcome, doctors in particular have discovered that professional assimilation can be quite arduous due to the requirement that they must pass the same four exams taken by anyone aspiring to practise medicine in the United States. This usually is, says Julie Feinsilver, a difficult proposition because

- they are handicapped by the fact that the exams are in English, a language which they did not use in studying medicine and in which many are not fluent; and
- the medical education and training that they received in Cuba, which emphasises preventive primary care, does not prepare them very well for

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

the exams which tend to reflect the US curative/high technology approach to public health.[18]

The bottom line, then, is that many defectors experience long delays in getting recertified and some never do so, which suggests that the CMPP programme has some flaws in terms of both meeting the immigrants' professional aspirations and smoothly expanding the pool of public health expertise in the United States.

Adopting a somewhat broader policy perspective, the CMPP raises questions about the optimal way for the US to implement its public diplomacy efforts. According to the State Department, the function of public diplomacy (which can be seen as a way to acquire soft power) is to 'support the achievement of U.S. foreign policy goals...by informing and influencing foreign publics and by expanding and strengthening the relationship between the people and government of the United States and citizens of the rest of the world'.[19] The techniques employed in pursuing these ends include cultural exchanges, media engagements, academic grants, and other forms of outreach. During George W. Bush's administration, however, a much more negative, confrontational strategy gained increasing favour, as illustrated by the contention of James Glassman, his Undersecretary of State for Public Diplomacy, that 'In the war of ideas, it's often more effective to destroy [U.S. adversaries'] brand than build up ours.'[20] Such sentiments are, not surprisingly, anathema to devotees of the conventional approach to public diplomacy. Consequently the CMPP, which is a creature of Bush's minions, can be seen as an epicentre of the clash between these two orientations. Thus far the Obama administration has been ambivalent. On the one hand, its willingness to continue the programme would seem to indicate that it sees the CMPP model as an effective way to pursue public diplomacy. Yet Obama's 2009 Port-of-Spain comments (quoted above) suggest that the CMPP paradigm will accomplish little, will alienate large segments of the international community, and therefore it would be best to repudiate it. It is likely that Obama's heart and mind tell him that repudiation is the better option, but clearly he is not yet willing to expend the political capital necessary to implement it.

## Brain Drain Politics: Analysing the CMPP's Impact

With respect to US–Cuban relations, the CMPP does not appear to represent a *major* complication. Certainly it does not, as far as Havana is concerned, have comparable status on its Washington agenda to such issues as, for example, the economic sanctions that the US continues to impose on the island or even potential disputes over exploitation of what are believed to be significant offshore oil deposits in the narrow Straits of Florida separating the two countries. But even if

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

one considers the CMPP to be more of an irritant than a major source of tension in the tangled relationship that has long existed between the two governments, it still can in specific instances exert a crucial disruptive influence, as occurred following the 12 January 2010 earthquake which devastated Haiti.

Experts in negotiating processes frequently stress the need for 'confidence-building' measures as a necessary precondition for progress toward normalisation of relations in long-term, highly contentious situations and some observers felt that such an opportunity presented itself in the aftermath of the Haitian earthquake as both Havana and Washington launched relief operations in which health care played a central role. Cuba was in a particularly advantageous position to help because it had been operating medical aid programmes in Haiti for years and thus already had approximately 350 doctors plus other public health specialists on the island when the earthquake struck. Ultimately the Cuban medical aid contingent in Haiti would peak at about 1,500 total personnel.[21] While some US medical aid personnel were deployed (e.g., the USNS *Comfort* made a seven-week tour), Washington's effort was less labour-intensive, concentrating more on providing supplies and logistical support to the on-site operations of both US-based groups and international organisations like Doctors Without Borders.

US–Cuban cooperation began rather modestly, the initial step coming on 15 January 2010 when an agreement was announced whereby Havana would allow US planes involved in the Haitian aid effort to fly through Cuban airspace. Subsequently Washington offered to help provision Cuba's Haiti operations, a move that Havana welcomed, but never officially accepted. In any case, as noted by María Werlau,

> On March 31 [2010], high-ranking diplomats of both countries met to discuss additional cooperation, the highest level of contact in years. The Chief of Staff to U.S. Secretary of State Clinton met with Cuba's Foreign Minister during a donor conference for Haiti at the U.N. to coordinate medical help for Haiti. Cuba issued a communiqué confirming the meeting that said: 'We would hope that future exchanges of this nature are a possibility.'[22]

That hope never materialised and no further attempts at cooperation were ever undertaken. No explanation for this impasse was forthcoming from either government, although the author was told during various interviews in Washington that Cuba was unwilling to facilitate US contacts with its aid personnel as long as the CMPP programme loomed in the background and Washington stood firm in refusing to discontinue it. Thus a (major?) confidence-building opportunity was lost.

According to observers in Washington, such intransigence on the Obama administration's part rests on two main pillars, which are:

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

- It feels it has already made significant concessions toward better relations by loosening restrictions on travel to the island and is not willing to go any further.
- The Alan Gross case, involving a US citizen imprisoned in Cuba on charges of subversion, is casting such a pall over current relations that no US initiatives/concessions will be forthcoming until the case is resolved (i.e., Gross is released).

It would appear, then, that there is in the foreseeable future little likelihood that the White House, whether occupied by Obama or Romney, will voluntarily abandon the CMPP programme.

Shifting to the larger regional scene, the Obama administration seems to feel that CMPP is having no significant negative impact on US relations with hemispheric nations. To the contrary, one official who characterised Havana's aid activities as 'trafficking' in doctors for profit suggested to the author that some Latin American governments harbour very cynical attitudes toward Cuba's programmes because, he contended, Havana makes large amounts of money from them. More critical observers, however, would tend to downplay such charges as being largely lacking in merit[23] and to concentrate instead on highlighting the CMPP's potential as a liability for Washington in hemispheric affairs, focusing on such key concerns as:

- *the resentment toward the US that the programme may generate in countries where Cuban aid represents a significant contribution to the delivery of basic public health services, especially to the poorer sectors of society.*
  Representative James McGovern (Democrat-Massachusetts) articulated such reservations when, during a visit to Colombia in March 2007, he said 'The idea that we're going in to try to lure away Cuban doctors who are trying to administer to poor people in Latin America is cynical and I think is counter productive. A lot of poor people who did not have health care now have health care. What's wrong with that? Why should we be trying to undermine that programme? We should have a similar programme.'[24]
  Put in its starkest terms, the US willingness to play (hardball) brain drain politics in these situations and thereby obstruct Havana's aid activities could be seen as ruthlessness and heartlessness in their most brutal forms. The resulting reservoir of hemispheric ill will would hardly engender a climate conducive to good relations with the United States.
- *the difficulties that the programme might create with respect to the credibility of US public diplomacy efforts.*
  The more conventional practitioners of public diplomacy will tend to see the CMPP as a prime example of what they consider to be the ill-advised strategy

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 42 of 105

of 'brand-bashing' advocated by James Glassman (see above). 'Ripping down others' brands has not typically been, historically, at the center of the public diplomacy agenda', said Michael Doran, a former high-level public diplomacy official at the Pentagon.[25] Yet this is, intentional or not, an integral aspect of the CMPP and as such can raise serious doubts about the integrity of Washington's public diplomacy programmes in Latin America and elsewhere.

- *the extent to which the CMPP might undermine US efforts to acquire and exercise soft power in hemispheric affairs.*

  To appreciate the problem here, one need only refer back to Nye's comments at the very beginning of this article regarding the sources of soft power. In particular, he mentions the attractiveness to others of a country's culture and the extent to which its foreign policies are seen as legitimate and having moral authority. Despite Washington's insistence that the programme is rooted in humanitarian concerns, the CMPP does not in many respects appear to serve as a very good ambassador for US culture or to represent a policy steeped in moral authority, as illustrated by Congressman McGovern's caustic critique quoted above. Such egregious flaws are very likely to cause the programme to be viewed as illegitimate in many hemispheric quarters, which in turn would render it useless and indeed even counterproductive to any soft power aspirations that Washington might have with respect to dealing with its southern neighbours.

It is concerns such as these which lead inevitably to the question of the CMPP's viability as a component within the US foreign policy equation.

## Conclusion: The CMPP and the Pogo Syndrome

Like any controversial undertaking, the CMPP has both passionate supporters and detractors. With respect to the former, their case is not terribly persuasive, resting essentially on two shaky pillars. The first, representing the position routinely adopted in such public forums as media interviews and fact sheets published by government agencies, emphasises the programme's humanitarian goals of aiding Cuban citizens who are forced into involuntary servitude abroad and who suffer from discriminatory emigration policies at home (as discussed above). Yet when subjected to close scrutiny, both of these characterisations/accusations emerge as exaggerated at best and duplicitous at worst.

Turning first to the question of involuntary servitude, there may very well be some cases where individuals are pressured into accepting overseas assignments, but most evidence indicates that the overwhelming majority are motivated by philosophical and/or pragmatic considerations. In the first instance, one needs to

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

Case 6:23-cv-00007 Document 265-3 Filed on 08/25/23 in TXSD Page 43 of 105

understand that the Cuban medical profession, unlike its counterparts in countries like the United States, is permeated by norms which stress self-sacrifice and service to the community, both at home and abroad. At the core of this ethos is the principle, which is firmly entrenched in the curriculum of the island's medical schools and reinforced throughout one's career, that health care should not be seen as a business driven by a profit motive, but rather as a human right that medical personnel have an unconditional duty to protect.[26] Such convictions often underlie participation in the medical aid brigades. There are, however, also some pragmatic factors that can come into play. Overseas service could, for example, help to further one's professional aspirations and for some assignments the total remuneration involved is more generous than what is available back in Cuba. Recognising that these are the considerations which apply to the vast majority of people involved in Havana's medical aid programmes and that none of them fall within the scope of involuntary servitude, Washington's accusations thereof stand as little more than inflammatory rhetoric rather than a reasonable justification for the CMPP programme.

The issue of discrimination with regard to emigration visas likewise has little substance. It is true that medical personnel, especially doctors, are not allowed by Havana to apply for authorisation to emigrate whenever they wish. They can, however, do so after having provided three to five years of post-graduation service in Cuba, a provision which Washington is highly prone to conveniently overlook and which certainly is not unreasonable given the fact that medical educations are completely free there. Indeed it is not unusual to find programmes in the United States and other comparable countries where the government provides educational support to students and in return demands a mandatory period of public service. Hence the claim that the CMPP is justified as a remedy for a policy of unreasonable discrimination which in reality does not exist makes little sense.

The second support pillar, which is seldom officially acknowledged, sees the CMPP as a highly efficient tactical tool for achieving the strategic goal of undermining Cuba's medical aid programmes and thereby shutting down a major source of soft power for Havana. The problem here, of course, is that this simply has not proven to be the case, for as we have already seen, the CMPP is plagued by serious inadequacies in terms of

- *producing a significant level of defections.*
  The less than 2 per cent rate is extremely low and is neutralised by the 2–3 per cent offset that Cuba builds into its medical aid programmes.
- *creating a situation conducive to defections.*
  Its long-term attractiveness to Cuban medical internationalists is extremely questionable given the eligibility and professional assimilation problems involved.

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

A policy like the CMPP whose flaws pose major obstacles to its ability to attain its ends constitutes at minimum a recipe for frustration. But if it likewise exhibits a capability to produce harmful side effects, then one is moving into the realm of severe dysfunctionality. The combined negative potential which the CMPP has displayed with regard to its impact on US–Cuban relations, US hemispheric relations, US public diplomacy programmes, and Washington's efforts to acquire soft power certainly falls into this category. Compounding this dreary situation is the fact that the Obama administration can be seen to have tarnished its diplomatic reputation by refusing to abandon the programme even though it could easily do so since the CMPP is a creature of and under the authority of the Executive Branch.

Taking into account all of these considerations as a whole, what we have here is a classic example of the Pogo Syndrome. In its simplest sense, the Pogo Syndrome refers to a phenomenon whereby one's attempts to achieve certain goals turn out to be self-defeating and in many cases result in outcomes which are detrimental to one's interests. The essence of this paradox was captured in the statement by a character in the *Pogo* comic strip[27] that 'We have met the enemy and THEY ARE US!!' Applying this observation to the CMPP programme, the 'us' turns out to be the US and its headstrong determination to pursue a policy whose shortcomings are so debilitating as to produce the ultimate irony of the Pogo Syndrome where Washington becomes its own worst enemy. Hopefully the next US administration, whether headed by Obama or Romney, will come to grips with this harsh reality and recognise that to continue the CMPP programme puts the United States in an absurd no-win situation, for in Pogo politics you are inevitably on the losing side.

### Notes

1. Joseph Nye, 'Think Again', *Foreign Policy*, March 2006; available at http://yaleglobal.yale.edu/display.article?id=7059
2. Examples of such Cold War hard power politics on Havana's part would include its support for guerrilla movements and armed struggles (e.g., in Latin America during the 1960s and continuing in Central America during the 1970s and 1980s) and its conventional overseas military campaigns in sub-Saharan Africa (i.e., in Ethiopia and Angola).
3. For an overview of Havana's long tradition of medical aid, see John M. Kirk and H. Michael Erisman, *Cuban Medical Internationalism: Origins, Evolution, and Goals* (New York: Palgrave Macmillan, 2009).
4. Quoted from a transcript of his 19 April 2009 press conference; available at http://www.realclearpolitics.com/articles/2009/04/19/obama_summit_americas_press_conference_96076.html
5. These figures come from Julie M. Feinsilver, 'Fifty Years of Cuba's Medical Diplomacy: From Idealism to Pragmatism', *Cuban Studies* 41 (2010), p. 94. Interestingly enough, a few US citizens, primarily from minority communities, have been admitted to ELAM.

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

6. USAID, 'Fact Sheet: The U.S. Government's Global Health Initiative'; available at http://transition.usaid.gov/ghi/factsheet.html
7. This information is drawn from Lorraine Murphy, 'Medical Readiness Training Exercises Provide a Win-Win Situation', *The Griffon*, 19 February 2010; available at http://www.thegriffon108.com/articles/article-detail/articleid/474/medical-readiness-training-exercises-provide-a-win-win-situation.aspx
8. Quoted in William Blum, 'Targeting Cuba's Health-Care System', *Consortium News*, 7 June 2011; available at http://www.axisoflogic.com/artman/publish/printer_63155.shtml
9. Joel Millman, 'New Prize in Cold War: Cuban Doctors', *Wall Street Journal*, 15 January 2011; available at http://online.wsj.com/article/SB10001424052970203731004576045640711118766.html. Note that the hard-line rhetoric of the Bush administration – i.e., Gonzalez's characterisation of Cuba's medical aid programmes as 'human trafficking' – has remained the norm in the Obama administration. When State Department officials were interviewed for this article, they used exactly the same language to describe Cuba's medical aid programmes.
10. US Department of State, Diplomacy in Action, 'Cuban Medical Professional Parole Programme', 26 January 2009; available at http://www.state.gov/p/wha/rls/fs/2009/115414.htm
11. Ibid.
12. Mike Ceaser, 'Cuban Doctors Abroad Helped to Defect by New U.S. Visa Policy', *World Politics Review*, 1 August 2007; available at http://groups.yahoo.com/group/CubaNews/message/120587
13. More information about these activities can be found on Solidaridad's website, BarrioAfuera.com (available only in Spanish).
14. Millman, 'New Prize in Cold War'.
15. Note that only individuals who have been granted asylum and entry to the United States are counted here. The total does not include those who have not yet made application or whose applications have not yet been approved; there does not appear to be any reliable information about how many people might fall into these categories.
16. Article entitled 'Scandal: U.S. Program Against Cuban Medical Assistance' from the *South Journal*. Reprinted in RealCuba's Blog of 3 April 2011; available at http://realcuba.wordpress.com/2011/04/03/scandal-us-program-against-cuban-medical-assistance
17. Alfonso Chardy, 'Newly Arrived Cuban Doctors Face Immigration Delays', *Miami Herald*, 23 April 2011; available at http://www.miamiherald.com/2011/04/23/2182407/newly-arrived-cuban-doctors-face.html
18. See Feinsilver, 'Fifty Years of Cuba's Medical Diplomacy', pp. 95–6.
19. Quoted from the State Department's Public Diplomacy website, http://www.state.gov/r/
20. Quoted in Spencer Ackerman, 'Future of Public Diplomacy', *Washington Independent*, 17 February 2009; available at http://www.washingtonindependent.com/3040/future-of-public-diplomacy-unsettled-at-state
21. These figures come from Emily and John Kirk, 'One of the World's Best Kept Secrets: Cuban Medical Aid to Haiti', *Counterpunch*, 1 April 2010; available at http://www.counterpunch.org/2010/04/01/cuban-medical-aid-to-haiti

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms

22. María C. Werlau, 'Cuba's Business of Humanitarianism: The Medical Mission in Haiti', *Cuba in Transition: Volume 21* (2010), p. 205; available at http://www.ascecuba.org/publications/proceedings/volume21/

23. For an example of this perspective as well as information on various aspects of the financial arrangements involved in Cuba's medical aid programmes, see Kirk and Erisman, *Cuban Medical Internationalism*, pp. 2–5, 67, 75–6, 85–7, and 163–8.

24. Quoted in Ceaser, 'Cuban Doctors Abroad Helped to Defect by New U.S. Visa Policy'.

25. Quoted in Ackerman, 'Future of Public Diplomacy'.

26. For an extended discussion of this ethos which in many respects is unique to Cuba, see Kirk and Erisman, *Cuban Medical Internationalism*, chapters 2 and 6.

27. *Pogo* was a very popular comic strip appearing in US newspapers from 1949 to 1975. One of its specialties was wry political commentary, the 'Enemy' soliloquy by its main character being one of its most famous examples.

This content downloaded from
162.199.23.48 on Tue, 01 Aug 2023 05:04:52 +00:00
All use subject to https://about.jstor.org/terms



DEFENDANT'S
EXHIBIT
CASE NO. 6:23-cv-00007
EXHIBIT NO. 030

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*,<br><br>*Plaintiffs*,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*, and<br><br>VALERIE LAVEUS, *et al.*,<br><br>*Intervenor Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br>6:23-CV-00007<br><br>JUDGE DREW S. TIPTON |

# INTERVENOR DEFENDANTS' EXHIBIT 30

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

BILLING CODE 4410–10–P

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]

RIN 1615–ZA61

### Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:** Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

#### I. Background

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter "Migration Accords")). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of "immediate relatives" (*e.g.*, spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

#### II. The CFRP Program

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

#### III. Participation in the CFRP Program

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, "Petition for Alien Relative," that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

BILLING CODE 4410–10–P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–5123–N–16]

### Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

A03809
DEFENDANT'S EXHIBIT
CV
CASE NO. 6:23-00007
EXHIBIT NO. 031

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 31



# *U.S. Customs and Border Protection*

*Carrier Liaison Program - 2009 CLP Bulletin*

**November 16, 2009** **CLP@dhs.gov**

## IMPORTANT UPDATE IN ENTRY REQUIREMENTS PAROLE FOR CITIZENS OF THE RUSSIAN FEDERATION AND THE PEOPLE'S REPUBLIC OF CHINA FOR THE CNMI ONLY

On October 21, 2009, the Secretary of Homeland Security announced that she will exercise her discretionary authority to parole into the Commonwealth of the Northern Mariana Islands (CNMI) visitors for business or pleasure who are nationals of the Russian Federation and the People's Republic of China. Parole will be authorized only for entry into the CNMI and will not extend to other areas of the United States.

**What are the requirements for the carriers?**

To be eligible to transport eligible nonimmigrant nationals from the Russian Federation and the People's Republic of China into the United States, the carrier must:

- Already be signatory to the Guam-CNMI Visa Waiver Program*
- Ensure that travelers meet the eligibility requirements for the CNMI-Only Parole

*Carriers that are not currently signatory must complete CBP Form I-760 and initiate the process with CBP no later than November 23, 2009 to be eligible by the November 28, 2009 implementation date.

**CBP will not initiate fines against the carrier under Section 273 of the INA for boarding such nonimmigrant aliens without a valid U.S. visa, provided the carrier is signatory to the Guam-CNMI Visa Waiver Agreement and the carrier acknowledges its responsibility for the removal of such aliens if they are determined to be inadmissible to the United States on grounds other than INA 212(a)(7)(B)(i)(II).**

**What are the eligibility requirements for visitors from the Russian Federation and the People's Republic of China for the CNMI-Only Parole?**

To be eligible for the parole provision, prior to embarking on a carrier for travel to the CNMI, each nonimmigrant alien must:

- Be a national of the People's Republic of China or the Russian Federation;
- Be solely entering and staying in the CNMI for a period not to exceed forty-five days;
- Be in possession of a round trip ticket that is nonrefundable and nontransferable and bears a confirmed departure date not exceeding forty-five days from the date of entry to the CNMI;
- Be in possession of a completed and signed Guam-CNMI Visa Waiver Information form (CBP Form I-736);
- Be in possession of a completed I-94, Arrival-Departure Record (CBP Form I-94); and
- Be in possession of a valid unexpired ICAO-compliant, machine readable passport.

For additional information on CNMI related matters, please contact CBP's primary point of contact (POC) at Cheryl.C.Peters@dhs.gov.



DEFENDANT'S
EXHIBIT
CASE NO. 6:23-cv-00007
EXHIBIT NO. 032

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| *Plaintiffs*, | § | |
| vs. | § | CIVIL ACTION NO. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| VALERIE LAVEUS, *et al.*, | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 32

# REPORT TO THE PRESIDENT ON 902 CONSULTATIONS RELATED TO THE DHS DISCRETIONARY PAROLE PROGRAM

**Special Representatives of the United States and the Commonwealth of the Northern Mariana Islands**

**May 15, 2019**

 

# About the 902 Consultation Process Between the United States and the Commonwealth of the Northern Mariana Islands

The Covenant to Establish the Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Covenant) governs relations between the United States and the Commonwealth of the Northern Mariana Islands (CNMI).

Section 902 of the Covenant provides that the Federal Government of the United States and the Government of the Northern Mariana Islands "will designate special representatives to meet and consider in good faith such issues affecting the relationship between the Northern Mariana Islands and the United States as may be designated by either Government and to make a report and recommendations with respect thereto." These intermittent discussions between the United States Federal Government and the CNMI have become known as 902 Consultations.

By letter dated October 19, 2018, CNMI Governor Ralph DLG Torres requested U.S. President Donald J. Trump initiate the 902 Consultation process regarding discretionary parole policies of the U.S. Department of Homeland Security. Super Typhoon Yutu impacted CNMI on October 25, 2018, and CNMI requested a delay in the consultation to allow them to focus on response and recovery from the typhoon. On February 26, 2019, President Trump designated Douglas W. Domenech, U.S. Department of the Interior Assistant Secretary Insular and International Affairs, as the Special Representative for the United States Federal Government for this 902 Consultation. Governor Torres was designated the Special Representative for the CNMI.

## Special Representatives and Team Members of the United States Federal Government and the Commonwealth of the Northern Mariana Islands

### Special Representatives

**Douglas W. Domenech**
Assistant Secretary
Insular and International Affairs
U.S. Department of the Interior

**Ralph DLG. Torres**
Governor
Commonwealth of the Northern Mariana Islands (CNMI)

### U.S. Team Members

**Michael Dougherty**
Assistant Secretary
Border, Immigration, and Trade Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security

**Douglas Hoelscher**
Deputy Assistant to the President and Director
White House Office of Intergovernmental Affairs
Executive Office of the President

**Theo Wold**
Special Assistant to the President for Domestic Policy
White House Domestic Policy Council
Executive Office of the President

**Paul Ray**
Acting Administrator
Office of Information and Regulatory Affairs
Office of Management and Budget
Executive Office of the President

**Shannon Joyce**
Senior Policy Advisor
Office of Information and Regulatory Affairs
Office of Management and Budget
Executive Office of the President

**Steven Menashi**
Special Assistant to the President and Associate White House Counsel
Office of the White House Counsel
Executive Office of the President

**Julie Stufft**
Director for Immigration
National Security Council
Executive Office of the President

**Carl Risch**
Assistant Secretary
Consular Affairs
U.S. Department of State

**Allison Sands**
Deputy Assistant Secretary of Defense for Basing
Office of the Secretary of Defense
U.S. Department of Defense

**Rear Admiral Shoshana Chatfield**
Commander
Joint Region Marianas
U.S. Department of Defense

**Jewell Evans**
Acting Minister Counselor
Consular Affairs
U.S. Embassy Beijing
U.S. Department of State

**Nikolao Pula**
Director
Office of Insular Affairs
U.S. Department of the Interior

**Cheryl Peters**
Program Manager
Office of Field Operations
U.S. Customs and Border Protection
U.S. Department of Homeland Security

**Timothy Murphy**
Assistant Solicitor
Office of the Solicitor
U.S. Department of the Interior

**Brian Humphrey**
Director
Field Operations
U.S. Customs and Border Protection
U.S. Department of Homeland Security

**Bruce Murley**
Area Port Director
U.S. Customs and Border Protection
U.S. Department of Homeland Security

**Sarah Rehberg**
Deputy Assistant Secretary for
Immigration Policy
U.S. Department of Homeland Security

**Francisco Taitano**
CNMI Desk Officer
Office of Insular Affairs
U.S. Department of the Interior

**Harry Blanco**
CNMI Field Representative
Office of Insular Affairs
U.S. Department of the Interior

**Sarah Jorgenson**
Senior Advisor to the Assistant Secretary
Office of Insular & International Affairs
U.S. Department of the Interior

## CNMI Team Members

**Arnold Indalecio Palacios**
Lieutenant Governor
CNMI

**Angel Demapan**
Chief of Staff to the Governor

**Victoria Benavente**
Secretary of Labor
CNMI

**Gil Birnbrich**
General Counsel to the Governor

**Matthew Deleon Guerrero**
Senior Advisor to the Governor

**Glenna Palacios-Reyes**
Senior Policy Advisor to the Governor

**Janina Maratita**
Policy Analyst and Legal Counsel to the
Governor

**Edwin Aldan**
Mayor of Tinian

**Jason Osborne**
Director
CNMI Washington, DC Office

**Viola Alepuyo**
Board Member
Northern Mariana Islands Business Alliance
and
Senior Vice President
Imperial Pacific International, LLC

**Kimberlyn King-Hinds**
Chairwoman, Board of Directors
Commonwealth Ports Authority
and
Counsel
Law Office of Kimberlyn King-Hinds

**Alex Sablan**
Chair
Northern Mariana Islands Business Alliance
and
Vice President
Tan Holdings

**Igor Timofeyev**
Attorney
Paul Hastings Law Firm

## Letter to the President from Special Representatives with Signatures

May 15, 2019

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear Mr. President:

We are pleased to send you this report on Section 902 Consultations between the United States Federal Government and the Commonwealth of the Northern Mariana Islands (CNMI). This report offers recommendations on how the Federal Government can help to strengthen the CNMI's economy in the long-term while safeguarding important national security and public safety objectives.

The United States and CNMI Special Representatives and their teams developed these recommendations over the course of two consultation meetings; site visits to the Commonwealth by the 902 Federal team; and Federal team discussions with CNMI officials, community leaders, and businesses. Based on these discussions, the Special Representatives identified several recommendations that reflect shared opinions.

We are grateful you provided the opportunity for 902 Consultations between the United States Federal Government and the Commonwealth of the Northern Mariana Islands and present these recommendations to you. We urge that steps be taken to support implementation of the recommendations and that this report and its recommendations be transmitted to the United States Congress.

Sincerely,

Douglas W. Domenech
U.S. Special Representative

Ralph DLG. Torres
CNMI Special Representative

# Background on 902 Consultations

## *The Commonwealth of the Northern Mariana Islands*

The Commonwealth of the Northern Mariana Islands (CNMI) is a U.S. territory located in Micronesia in the western Pacific Ocean. The CNMI is comprised of fourteen of the fifteen islands in the Mariana Islands archipelago; the southernmost island in the archipelago is Guam, another U.S. territory. Less than 50 miles north of Guam is Rota, the most southern island of the CNMI. From there, the archipelago stretches in a northward arc toward Japan spanning 300 miles with a total land area of 183.5 square miles. The principal inhabited islands are Saipan, Rota, and Tinian, in the southern end of the archipelago. The northern islands include the largely uninhabited islands of Farallon de Medinilla and Pagan as well as additional uninhabited islands.

According to the 2010 U.S. Census, the CNMI has a population of 53,900 people, a 22.2% population decline from the previous census in 2000. About 90% of residents live on Saipan, the largest island and the capital of CNMI.

The Federal Government's relationship with the CNMI is of the utmost importance. We are connected through a shared identity as American citizens, a storied history, common values as well as a shared desire to see the CNMI prosper. Our relationship with the CNMI is also of strategic importance in the Pacific and a continued positive relationship remains in the best interest of our national defense strategy and of Americans everywhere.

## *CNMI Covenant and Section 902 Consultations*

After World War II, the Northern Mariana Islands were part of the Trust Territory of the Pacific Islands, administered by the United States on behalf of the United Nations. On February 15, 1975, representatives of the United States and the Marianas Political Status Commission signed the Covenant to Establish the Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Covenant). That same year, the people of the Northern Mariana Islands voted to become a territory of the United States and overwhelmingly supported the Covenant in a plebiscite, with 78.8% voting in favor of it. The U.S. Congress subsequently passed the Covenant and President Gerald Ford signed it into law on March 24, 1976, as Public Law 94-241.[1] In accordance with Section 1003 of the Covenant, certain sections became effective in 1976 and in 1978. On November 3, 1986,

[1] See 48 U.S.C. 1801.

President Ronald Reagan issued Presidential Proclamation 5564, placing the Covenant into full force and effectively establishing the CNMI as a part of the American family.

Section 902 of Article IX of the Covenant provides: "The Government of the United States and the Government of the Northern Mariana Islands will consult regularly on all matters affecting the relationship between them. At the request of either Government, and not less frequently than every ten years, the President of the United States and the Governor of the Northern Mariana Islands will designate Special Representatives to meet and consider in good faith such issues affecting the relationship between the Northern Mariana Islands and the United States as may be designated by either Government and to make a report and recommendations with respect thereto."

Section 902 primarily provides the CNMI a process allowing for formal discussions on any issue concerning the federal government, upon concurrence by the United States, which culminates in a report to the President. Through the years, 902 Consultations have been used as a means to address issues involving the CNMI and federal laws, regulations, and actions.

### *History of 902 Consultations*

Although either the President or CNMI Governor can request a 902 Consultation, to date, the CNMI governors have initiated all requests for consultations. Prior to 2019, seven different individuals have been designated by the United States as Special Representatives for 902 Consultations, spanning five presidential administrations. These Special Representatives often had other individuals from various federal agencies present at the meetings in order to help address the issues raised by the CNMI. The CNMI has sometimes appointed several Special Representatives for a single 902 Consultation and designated one spokesperson for the group.

The first 902 Consultation began in 1986, during the Reagan Administration. Since then, there have been at least fifteen meetings associated with 902 Consultations. The locations for the meetings have varied, occurring in the CNMI, Washington, D.C., Hawaii, and other locations in the continental United States.

Past 902 Consultations involved a variety of issues, often within a single meeting. Issues have ranged from sovereignty and self-government, Micronesian war claims, submerged lands ownership, fisheries, tariffs, immigration and labor issues, essential air service, banking regulations and laws, military activities, and a non-voting delegate for the CNMI.

Compilations of documents from past 902 Consultations indicate that discussions have resulted in U.S. position papers, proposed legislative or regulatory changes, or interagency agreements. However, only the consultation that occurred in 2016 resulted in an official final report being issued to the President or Congress.

## The Current 902 Consultation Process

### *Appointment of Special Representatives*

By letter dated October 19, 2018, CNMI Governor Ralph DLG Torres requested U.S. President Donald J. Trump initiate the 902 Consultation process regarding discretionary parole policies of the U.S. Department of Homeland Security. Due to Super Typhoon Yutu, CNMI officials asked the federal government to delay the request to allow for CNMI officials to focus on response and recovery issues. On February 26, 2019, President Trump designated Douglas W. Domenech, U.S. Department of the Interior Assistant Secretary, Insular and International Affairs, as the Special Representative for the United States for this 902 Consultation, while Governor Torres was designated to serve as the CNMI Special Representative.

In order to address the CNMI's issues comprehensively, the U.S. Special Representative solicited the support of the U.S. Departments of the Interior, Homeland Security, State, Defense, and several Executive Office of the President personnel from the Office of Management and Budget, National Security Council, Domestic Policy Counsel, White House Counsel, and White House Intergovernmental Affairs. All offices designated high-level officials to work as part of the U.S. team with U.S. Special Representative Domenech.

### *Summary of Issues*

The CNMI letter to President Trump requesting this 902 Consultation identified the primary issue as the impact of a possible revocation of the existing parole policy for Chinese nationals would have on the CNMI's access to the Chinese tourist market and how it would imperil the CNMI's economic survival. At the first consultation meeting on February 26, 2019, the Special Representatives identified this issue as the focus of this 902 Consultation.

### *Procedures Governing 902 Consultations*

At the onset of the first 902 Consultation meeting on September 30, 1986, representatives of the United States Federal Government and the CNMI agreed to procedures to govern the 902 Consultations process. These procedures generally lay out the structure for meetings, the delineation of issues, and the process for creating a report and recommendations that are the final product of any 902 Consultations process.

The report would discuss the issues that are the subject of the consultations and the Special Representatives' recommendations on the resolution of those issues. If the Special

Representatives conclude they cannot agree on a recommendation or language for a recommendation, the draft report shall contain the separate views of the parties, which are not subject to approval by the other side.

On completion of a draft report, the Special Representatives circulate the draft to the CNMI Governor, Legislature, and relevant CNMI agencies, and to any officers or agencies of the Executive Branch of the Federal Government that must approve the report. Once approved, the report is prepared in final form, signed by both parties, and submitted to the President of the United States, with a recommendation to submit the report to the Congress of the United States and to the Governor of the CNMI. If approved by the President, the report is then officially transmitted. As stated earlier, only one report to the President from prior 902 Consultations has ever been submitted.

These 902 procedures may be amended at any time by mutual agreement of the parties.

### *Timeline of Consultations*

This 902 Consultation process involved two rounds of meetings between the Special Representatives. The first meeting occurred at the Department of the Interior on February 26, 2019, and consisted of the CNMI team presenting its position paper on the parole issue and various related issues and challenges.

On April 2-3, 2019, the Federal team traveled to the CNMI to conduct another round of 902 Consultation meetings, and participated in site visits on the islands of Saipan and Tinian. The consultation involved the U.S. team's presentation of its position paper and discussion among the teams, as well as panel presentations by representatives of local law enforcement, the tourism industry, the CNMI legislature, and the Commonwealth Healthcare Corporation. These discussions and site visits provided critical firsthand information about the economic, environmental, health, and social challenges facing the CNMI people, private industry, and government. Adding to these challenges is ongoing recovery from recent storms, Typhoon Mangkhut and Super Typhoon Yutu.

After the second round of meetings, and based on the fruitful discussions at those meetings, the U.S. Special Representative began writing the initial draft report for circulation to the CNMI Special Representative and to both teams. The U.S. and CNMI Special Representatives then engaged in follow-on communications to resolve any concerns with the initial draft and offered edits where desired. The Special Representatives settled on mutually agreeable language.

## Parole Policy in the CNMI

### *Background on Parole in CNMI*

On May 8, 2008, Public Law 110-229, the Consolidated Natural Resources Act of 2008 (CNRA), became law, ushering in a significant change in the nature of immigration to the CNMI. Subtitle A of Title VII of the CNRA brought the CNMI under the jurisdiction of U.S. immigration law, removing the CNMI's authority to control its own immigration policies and programs. These change made it necessary for foreign visitors to the CNMI to obtain visas from the Department of State or be covered by the Guam-CNMI Visa Waiver Program (GCVWP), which allows visa-free entry into Guam or the CNMI for citizens of certain countries.

The People's Republic of China (PRC), however, is not among the countries covered by the GCVWP. On January 16, 2009, DHS published interim final regulations for the GCVWP. DHS concluded that travel by Chinese nationals provide a "significant economic benefit," as defined in the CNRA, which would ordinarily mandate the PRC inclusion among countries eligible for visa-free travel. DHS, however, concluded that political and security concerns weighed against including the PRC in the Guam-CNMI VWP, although DHS left open the possibility of doing so at a later point after introducing additional security measures, such as electronic travel authorization to screen and approve potential visitors. The omission of the PRC from the GCVWP meant that travel by its nationals to the CNMI would be more time-consuming and restricted than prior to the enactment of the CNRA.

On October 21, 2009, nearly a year after the decision to exclude the PRC from the GCVWP, former Secretary of Homeland Security Janet Napolitano announced that she would exercise her discretionary authority to parole into the CNMI visitors, for business or pleasure, who are nationals of the PRC and Russia. Parole would be authorized for PRC and Russian nationals for a period not to exceed 45 days into CNMI, and CNMI only. The carriers transporting the PRC nationals traveling to the CNMI would be responsible to ensure that such travelers have a nonrefundable and nontransferable roundtrip ticket, complete necessary forms, and have a valid machine readable passport. Effective January 15, 2012, this policy was extended to include Russian visitors to Guam.

Secretary Napolitano justified this exercise of parole based on her discretionary parole authority and the authority to administer the Nation's immigration laws. See Immigration and Nationality Act, as amended (INA) secs. 103(a), 212(d)(5); 8 U.S.C. 1103(a), 1182(d)(5). Although parole is an authorized entry into the United States, it does not constitute an admission to the United States. INA secs. 101(a)(13)(B), 212(d)(5)(A); 8 U.S.C. 1101 (a)(13)(B), 1182(d)(5)(A). Parole may be granted to an alien, regardless of her or his

inadmissibility, as a matter of discretion "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Under the 2009 and 2012 discretionary parole policies, nationals of Russia may be allowed to enter Guam and the CNMI and travel between Guam and the CNMI, and nationals of the PRC may be allowed to enter the CNMI, visa-free for a period of stay up to 45 days, provided the traveler meets certain conditions.

Pursuant to these policies, nationals of Russia and the PRC seeking entry are required to: i) possess a valid, unexpired machine-readable passport; ii) not have previously violated the terms of any prior travel to the United States; and iii) obtain a valid completed Customs and Border Protection (CBP) Form I-94, Arrival/Departure Record, and Form I-736, Guam-CNMI Visa Waiver Information.

Visitors who are paroled under this authority may not engage in local employment or labor for hire. Parole authorization is limited to Guam and the CNMI only and does not permit travel to another location within the United States.

### *Impact of Parole on the CNMI*

The grant of parole to PRC nationals has had a significant positive impact on the CNMI economy and the CNMI government believes that Chinese tourism is essential to its survival. By 2009, due to the elimination of import tariffs as a result of multilateral trade agreements, all of the garment manufacturing factories that used to be the mainstay of the CNMI economy went out of business and the island's economy was in its sixth consecutive year of economic decline. In the year following the CNRA's enactment, the CNMI's GDP decreased by 17.5% and Gross Business Revenues declined by approximately 9%. The 2010 decennial census produced by the U.S. Census Bureau registered a dramatic reduction in the CNMI's population, which shrunk by 22% since 2000, and 51% of the population was at or below the federal poverty line.

The resulting economic collapse saw a period of prolonged government austerity, largescale unemployment, and dramatic increases in the rates of poverty among the population. Only recently has the CNMI begun to emerge from this collapse, driven by increased visitor arrivals, including those from the PRC. The CNMI economy has just recently rebounded to pre-depression levels but is just 5% the size of the smallest U.S. mainland state's economy. Wages are now on average above $12 per hour, yet the CNMI wages still lag far behind that in the United States. The median income of individuals in the CNMI is $18,000 lower than the national average. Rates of those without health insurance is 37% higher in the CNMI than the nation and the poverty rate is 39% higher than the national average.

Tourism remains the only industry remaining that is contributing to economic growth, employment, and government revenues. Today, Korea represents the largest source country

for tourists to the CNMI, representing 49% of total arrivals in 2018 - a total of 295,260 in 2018. China is now the second largest, with 39% of total arrivals and 236,577 tourists from China arriving in 2018. According to data collected by the Marianas Visitors Authority, the average visitor from China spends $758.20 per trip to the CNMI. In 2018, the direct impact of Chinese arrivals amounted to $183,736,155 and directly provided $31,497,372 in government revenue – or 12.2% of the government's budgetary resources.[2] Total economic impact provided by the Chinese market amounts to $526,138,807, or 33% of total economic activity in the CNMI.[3]

CNMI perceives that the existence of parole allows it to effectively compete for the tourism business of PRC nationals, primarily as it allows visitors to avoid delays and expenses associated with obtaining the otherwise-required B-2 tourist visa. The majority of PRC travelers arrive on charter aircraft operated by travel companies that directly market the speed and ease of short term visits to the CNMI. The CNMI believes that PRC tourists who take the additional steps to obtain a B-2 visa will simply bypass the CNMI for other U.S. destinations, such as Hawaii or the mainland U.S., so that the loss of parole status would lead to significant negative economic impacts for the CNMI, along with the essential government services that the PRC tourist dollars support.

One of the challenges tied to the existence of CNMI Parole is a recent increase in Chinese "birth tourism." Birth tourism involves pregnant alien women visiting a nation temporarily to have a child that would acquire that nation's citizenship through *jus soli*, commonly known as birthright citizenship. Overall births in the CNMI have been falling, but operational intelligence and media reports have indicated that births to visitors from the PRC rose 175 percent between 2010 and 2012,[4] and last year outnumbered those of any other ethnicity. Media reports further state that from January 2014 to October 2016, a total of 1,034 births of Chinese parents were recorded, comprising 32.92 percent of total births on Saipan.[5] This represents a substantial increase since 2009, when there were reportedly only eight births to Chinese parents.[6]

In 2017, a federal indictment charged a Chinese national with harboring illegal aliens, unlawfully employing aliens, and money laundering, all tied to allegedly operating an unlicensed business that offered trip packages to the CNMI for pregnant women seeking to give birth in the U.S.[7]

---

[2] CNMI Public Law 20-67
[3] Based on CNMI 2017 Nominal GDP figures provided by the U.S. Bureau of Labor Statistics
[4] https://cis.org/North/More-BirthTourism-Births-Indigenous-Births-CNMI
[5] https://www.saipantribune.com/index.php/births-foreign-parents-raise-questions/
[6] *Ibid*, https://www.saipantribune.com/index.php/births-foreign-parents-raise-questions/
[7] https://www.saipantribune.com/index.php/fbis-informant-physician/

The rise of birth tourism has had deleterious effects for CNMI residents, including a diminishment of available resources at the Commonwealth Healthcare Corporation and the fiscal costs associated with tourists who fail to pay the costs of natal treatment.

## The Way Forward

### *Review of U.S. Parole Policies*

President Trump signed Executive Order (EO) 13767 on January 25, 2017, directing the Secretary of Homeland Security to "take appropriate action to ensure that parole authority under section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole."[8]

In compliance with EO 13767, DHS is reviewing a broad spectrum of existing parole policies, and therefore reviewed the parole policy applicable to the CNMI. The CNMI requested the 902 Consultation to discuss the impact of this review on the CNMI.

### *Recommendations by the Special Representatives*

The following recommendations by the Special Representatives are based on the information provided above, information contained in each party's position paper, information presented at the formal 902 Consultation meetings, and information presented during related meetings and site visits in the CNMI. These informative and productive interactions resulted in a finding by both Special Representatives that the CNMI's access to the PRC tourist market is of critical importance to the CNMI's economy and should be facilitated to the greatest degree possible, while at the same time recognizing that national security, public safety, and immigration concerns warrant certain modifications be made to either the parole system or the existing GCVWP visa waiver program. With that as a basis, the Special Representatives agree to the following recommendations:

**RECOMMENDATION #1 – Modify Parole Program with Enhanced Security Provisions**

Modify the current parole program to include reducing the maximum period of parole from 45 days to 14 days and electronic screening and vetting prior to arrival at the port of entry. These enhancements will allow for information exchange and cooperation to combat human trafficking and unlawful employment. This will be an interim step until the completion of the addition of the People's Republic of China to the CNMI Economic Vitality & Security Travel Authorization Program (see Recommendation 2). Until the modifications are enacted, current

[8] https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/

parole policies will remain in place. DHS will work with CNMI officials to ensure a smooth transition.

**RECOMMENDATION #2 – Create CNMI Economic Vitality & Security Travel Authorization Program (EVS-TAP) as a Sub-Program of the GCVWP**

The Special Representatives support creation of a new sub-program of the Guam-CNMI Visa Waiver Program (GCVWP) that balances visitor ease with enhanced security provisions and transparency. The GCVWP provides for the addition of countries to the program. The Secretary of Homeland Security may grant a request by the Governor of Guam and the Governor of the CNMI to add a country to the program and initiate the lengthy and complex process to "promulgate regulations with respect to the inclusion of that country and any special requirements the Secretary of Homeland Security, in the Secretary's sole discretion, may impose prior to allowing nationals of that country to obtain the waiver provided by this subsection." 8 U.S.C. § §1182(l)(6). That authority would allow the Secretary to impose additional conditions, such as installing an electronic automated screening platform for use by PRC nationals entering into the CNMI under the GCVWP.

Within CBP regulations, the Special Representatives recommend that DHS create a restricted travel authorization program under the authorities of the GCVWP and add the People's Republic of China to this sub-program. The sub-program, the CNMI Economic Vitality & Security Travel Authorization Program (EVS-TAP), would include additional restrictions that do not currently pertain to the rest of the GCVWP. Under this visa-free travel program, travelers would only be allowed to enter the CNMI and would not be permitted to enter Guam, the mainland, or any other U.S. location. Travelers under the EVS-TAP will be subject to electronic screening and vetting prior to entry as in the previous recommendation. The U.S. will explore adding bonding requirements as discussed in the Consolidated Natural Resources Act of 2008. 8 U.S.C. § 1182(l)(3)(b). Travel authorization under the EVS-TAP would be for a maximum of 14 days in lieu of exceptional circumstances.

**RECOMMENDATION #3 – Pursue 287(g) Agreement and Additional Ways to Collaborate on Immigration Enforcement**

The U.S. Department of Homeland Security will begin negotiations with the Commonwealth of the Northern Mariana Islands to enter into a 287(g) agreement as defined in the Immigration and Nationality Act (INA § 287(g)). A 287(g) formal written agreement deputizes selected state and local law enforcement officers to perform the functions of federal immigration agents under the supervision of Immigration and Customs Enforcement (ICE). Additionally, the Administration assumes that DHS and the Commonwealth will be able to collaborate and onboard pilot programs designed to improve security protocols and visa integrity.

As each side had concerns about the practice of birth tourism in the CNMI, that issue may be addressed in a collaborative manner between the governments, with each government taking appropriate steps within its jurisdiction and both sides acting together when necessary.

**RECOMMENDATION #4 – Elevate Focus on U.S. Territories in the Pacific by Engaging the President's Advisory Commission on Asian Americans and Pacific Islanders**

Under the President's Advisory Commission on Asian Americans and Pacific Islanders, the U.S. Federal Government and the Government of the CNMI, along with other U.S. territories in the Pacific, will maintain a long-term dialogue on domestic policy issues affecting the Pacific territories. The CNMI-focused discussion will convene with the goal of working collaboratively toward a robust and diversified CNMI economy.



A0885
DEFENDANT'S
EXHIBIT
CASE
NO. 6:23-CV-00007
EXHIBIT
NO. 033

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 6:23-CV-00007 |
| | § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants*. | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 33

Russian Citizens Now Eligible to Travel to Guam Visa-Free | U.S. Customs and Border Protection

An official website of the United States government

U.S. Customs and Border Protection

Menu

**Archived Content**

In an effort to keep CBP.gov current, the archive contains content from a previous administration or is otherwise outdated.

Home » Newsroom » National Media Release »

Russian Citizens Now Eligible to Travel to Guam Visa-Free

Newsroom

# Russian Citizens Now Eligible to Travel to Guam Visa-Free

**Release Date:** Thu, 01/26/2012

**WASHINGTON, D.C.**—Effective January 15, citizens of Russia are eligible to travel to Guam without a visa. On November 15, 2011, the Secretary of the Department of Homeland Security (DHS) signed a decision that allows U.S. Customs and Border Protection (CBP) to exercise discretionary parole authority on a case-by-case basis to permit Russian nationals to travel to Guam visa-free.

The new eligibility allows citizens of Russia to enter Guam visa-free and travel between Guam and the CNMI as nonimmigrant visitors for business or pleasure for a period of stay up to 45 days, provided the traveler meets certain conditions.

Russian citizens seeking admission to Guam under this program must possess a valid, unexpired machine-readable passport, have not previously violated the terms of any prior admission to the U.S. and present a valid completed CBP Form I-94, Arrival/Departure Record and Form I-736, CNMI Visa Waiver Information. Visitors who are paroled under this authority may not engage in local employment or labor for hire.

Parole authorization is limited to Guam and the CNMI only and does not include the benefit of travel to

https://www.cbp.gov/newsroom/national-media-release/russian-citizens-now-eligible-travel-guam-visa-free[8/2/2023 2:10:42 PM]

another location within the United States.

Previously, on October 21, 2009, DHS announced that citizens of the People's Republic of China and Russia would be permitted to travel to the Commonwealth of the Northern Mariana Islands (CNMI) visa-free, and those travelers would be paroled into the CNMI, based on the Secretary's discretionary parole authority, on a case-by-case basis. This benefit became effective November 28, 2009.

CBP works to facilitate travel to the United States while securing our borders from terrorists and terrorist weapons that may cause harm. CBP also works to ensure the safety of international travelers who come to visit, study, and conduct legitimate business in our country.

This program is different from the general U.S. Visa Waiver Program under Section 217 of the Immigration and Nationalization Act (INA), which authorizes the admission of visitors from approved countries for up to 90 days without a visa to any part of the United States (including Guam).

For additional information please visit www.CBP.gov.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the management, control and protection of our nation's borders at and between the official ports of entry. CBP is charged with keeping terrorists and terrorist weapons out of the country while enforcing hundreds of U.S. laws.*

**Tags:**
**Travel**
,
**Archive Media Releases**

**Last Modified: February 3, 2021**

Click 'Share This Page' button to display social media links.

 Share This Page.

# Media Contacts

## Office of Public Affairs



DEFENDANT'S
EXHIBIT
CASE NO. 6:23-CV-00007
EXHIBIT NO. 034

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| *Plaintiffs*, | § | |
| vs. | § | CIVIL ACTION NO. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| VALERIE LAVEUS, *et al.*, | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 34



60130 Federal Register / Vol. 81, No. 169 / Wednesday, August 31, 2016 / Proposed Rules

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103, 212, and 274a**

**[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]**

**RIN 1615–AC04**

## International Entrepreneur Rule

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Homeland Security (DHS) proposes to amend its regulations implementing the Secretary of Homeland Security's discretionary parole authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. The proposed rule would add new regulatory provisions guiding the use of parole on a case-by-case basis with respect to entrepreneurs of start-up entities whose entry into the United States would provide a significant public benefit through the substantial and demonstrated potential for rapid business growth and job creation. Such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. If granted, parole would provide a temporary initial stay of up to 2 years (which may be extended by up to an additional 3 years) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States. A subsequent request for re-parole would be considered only when the entrepreneur and his or her start-up entity continues to provide a significant public benefit as evidenced by substantial increases in capital investment, revenue, or job creation. DHS believes that a regulatory process for seeking and granting parole in this business-creation context—including by establishing criteria for evaluating individual parole applications on a case-by-case basis—is important given the complexities involved in such adjudications and the need for guidance regarding the general criteria for eligibility by the start-up entrepreneurs, entities, and investors involved.

**DATES:** Written comments must be received on or before October 17, 2016.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2015–0006, by any one of the following methods:

- *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the Web site instructions for submitting comments.
- *Email:* You may submit comments directly to U.S. Citizenship and Immigration Services (USCIS) by email at *uscisfrcomment@dhs.gov.* Please include DHS docket number USCIS–2015–0006 in the subject line of the message.
- *Mail:* You may submit comments directly to USCIS by mail by sending correspondence to Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529. To ensure proper handling, please reference DHS Docket No. USCIS–2015–0006 in your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.
- *Hand Delivery/Courier:* You may submit comments directly to USCIS through hand delivery to: Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529; Telephone (202) 272–8377. To ensure proper handling, please reference DHS Docket No. USCIS–2015–0006 in your correspondence.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Public Participation
II. Executive Summary
A. Purpose of the Regulatory Action
B. Legal Authority
C. Summary of Proposed Amendments
D. Costs and Benefits
III. Background
A. Discretionary Parole Authority
B. Historical Uses of Parole
C. Significant Public Benefit of Attracting Foreign Entrepreneurs to the United States
D. Proposal for Parole for Entrepreneurs
IV. Proposed Changes
A. Overview of Parole for Entrepreneurs
B. Criteria for Initial Parole
1. Recent Formation of a Start-Up Entity
2. Applicant is an Entrepreneur Who Is Well-Positioned To Advance the Entity's Business
3. Capital Investment or Government Funding Criteria
C. Application Requirements for Initial Period of Parole
1. Filing the Application for Entrepreneur Parole (Form I–941)
2. Requirement To Appear for Submission of Biometric Information
3. Income-Related Condition on Parole
4. Adjudication of Applications
5. Limitation on Number of Entrepreneur Parolees Per Start-Up Entity
6. Authorized Period for Initial Grant of Entrepreneur Parole
7. Spouses and Minor Children
D. Employment Authorization
1. Employment Authorization Incident to Parole With a Specific Employer
2. Employment Authorization Eligibility for Spouses
3. Documentation for Employment Eligibility Verification (Form I–9)
4. Technical Changes
E. Material Change Reporting
F. Re-Parole
1. Criteria for Re-Parole
2. Application Requirements for Re-Parole
3. Ensuring Continuous Employment Authorization
G. Termination of Parole
1. Automatic Termination
2. Termination on Notice
H. Automatic Adjustment of Investment and Revenue Amount Requirements
I. Technical Change
V. Statutory and Regulatory Requirements
A. Unfunded Mandates Reform Act of 1995
B. Small Business Regulatory Enforcement Fairness Act of 1996
C. Executive Orders 12866 and 13563
1. Summary
2. Background and Purpose of the Proposed Rule
3. Population of Entrepreneurs Potentially Eligible
4. Costs
5. Benefits
D. Regulatory Flexibility Act
E. Executive Order 13132
F. Executive Order 12988
G. Paperwork Reduction Act

### I. Public Participation

DHS invites comments, data, and information from all interested parties, including advocacy groups, nongovernmental organizations, community-based organizations, entrepreneurs, investors, other entities in the entrepreneurial ecosystem of the United States, and legal representatives who specialize in immigration law on any and all aspects of this proposed rule. Comments that will provide the most assistance to DHS in developing these procedures will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authorities that support such recommended change. DHS is generally seeking comments on:

A. Proposed filing requirements and procedures;

B. Proposed definitions and criteria for evaluating parole applications,

including investment, award, revenue, job creation, and alternative criteria;

C. Proposed conditions, including limits on the number of entrepreneur parolees per start-up entity and time limits on parole periods;

D. Proposed provisions establishing employment authorization for entrepreneurs incident to parole;

E. Proposed provisions regarding termination of parole; and

F. Proposed opportunity to request re-parole, length of period for re-parole, and limitation on number of re-parole opportunities.

DHS also invites comments on the economic analysis supporting this rule and the proposed new parole request form for entrepreneurs.

*Instructions:* All submissions must include the agency name and the DHS Docket No. USCIS–2015–0006 for this rulemaking. Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.*

**II. Executive Summary**

*A. Purpose of the Regulatory Action*

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole individuals into the United States, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS proposes to amend its regulations implementing this authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. As described in more detail below, the proposed rule would establish general criteria for the use of parole with respect to entrepreneurs of start-up entities whose entry into the United States would provide a significant public benefit through the substantial and demonstrated potential for rapid growth and job creation. In all cases, whether to parole a particular individual under this rule would be a discretionary determination that would be made on a case-by-case basis.

Given the complexities involved in adjudicating applications in this context and the need for guidance regarding the criteria for exercising parole in this area, DHS has decided to establish by regulation the criteria for the case-by-case evaluation of parole applications filed by entrepreneurs of start-up entities. By including such criteria in regulation, as well as establishing application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis, DHS expects to facilitate the use of parole in this area.

As discussed, the proposed rule would establish criteria for seeking and obtaining parole based on the creation of a start-up entity in the United States. DHS proposes that to be considered for parole under this rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation. DHS proposes that such potential would be indicated by, among other things, the receipt of (1) significant capital financing from U.S. investors with established records of successful investments or (2) significant awards or grants from certain Federal, State or local government entities. DHS also proposes alternative criteria for applicants who partially meet the proposed thresholds for capital financing or government awards or grants and who can provide additional reliable and compelling evidence of their entities' significant potential for rapid growth and job creation. An applicant would qualify for further consideration by showing that he or she has a substantial ownership interest in such an entity, has an active and central role in the entity's operations, and would substantially further the entity's ability to engage in research and development or otherwise conduct and grow its business in the United States. The grant of parole is intended to facilitate the applicant's ability to oversee and grow the start-up entity.

DHS believes that this proposal would encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation and dynamism. Particularly in light of the complex considerations involved in entrepreneur-based parole requests, DHS also believes that this proposal will provide a transparent framework by which DHS will exercise its discretion to adjudicate such requests on a case-by-case basis under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

*B. Legal Authority*

The Secretary of Homeland Security's authority for the proposed regulatory amendments can be found in various provisions of the immigration laws. Section 402(4) of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 202(4), provides the Secretary the authority to administer and enforce the immigration and nationality laws. Sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), expressly authorize the Secretary to establish rules and regulations governing parole. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole for urgent humanitarian reasons or significant public benefit to applicants for admission on a case-by-case basis.[1] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's general authority to extend employment authorization to noncitizens in the United States. And section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

*C. Summary of Proposed Amendments*

DHS is proposing to add a new section 8 CFR 212.19 to provide guidance with respect to the use of parole for entrepreneurs of start-up entities based upon significant public

[1] In sections 402 and 451 of the HSA, Congress transferred from the Attorney General to the Secretary of Homeland Security the general authority to enforce and administer the immigration laws, including those pertaining to parole. In accordance with section 1517 of title XV of the HSA, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the HSA, tit. XV, section 1517). Authorities and functions of DHS to administer and enforce the immigration laws are appropriately delegated to DHS employees and others in accordance with section 102(b)(1) of the HSA, 6 U.S.C. 112(b)(1); section 103(a) of the INA, 8 U.S.C. 1103(a); and 8 CFR 2.1.

benefit. An individual seeking to operate and grow his or her start-up entity in the United States would generally need to demonstrate the following to be considered for a discretionary grant of parole under this proposed rule:

1. *Formation of New Start-Up Entity.* The applicant has recently formed a new entity in the United States that has lawfully done business since its creation and has substantial potential for rapid growth and job creation. DHS proposes that an entity may be generally considered recently formed if it was created within the 3 years preceding the date of the filing of the initial parole application.

2. *Applicant is an Entrepreneur.* The applicant is an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. DHS proposes that an applicant may generally meet this standard by providing evidence that he or she: (1) Possesses a significant (at least 15 percent) ownership interest in the entity at the time of adjudication of the initial grant of parole; and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. Such an applicant cannot be a mere investor.

3. *Significant U.S. Capital Investment or Government Funding.* The applicant can further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation. DHS proposes that an applicant may be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments. DHS proposes that an applicant would generally be able to meet this standard by demonstrating that the start-up entity has received investments of capital totaling $345,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.

b. *Government grants.* The applicant may show that the start-up entity has received significant awards or grants from Federal, State or local government entities with expertise in economic development, research and development, and/or job creation. DHS proposes that an applicant would generally be able to meet this standard by demonstrating that the start-up entity has received monetary awards or grants totaling $100,000 or more from government entities that typically provide such funding to U.S. businesses for economic, research and development, or job creation purposes.

c. *Alternative criteria.* DHS further proposes alternative criteria under which an applicant who partially meets one or more of the above sub-criteria related to capital investment or government funding may be considered for parole under this rule if he or she provides additional reliable and

compelling evidence that his or her entry would provide a significant public benefit to the United States. Such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

DHS proposes that an applicant who meets the above criteria (and his or her spouse and minor, unmarried children, if any) generally may be considered under this rule for a discretionary grant of parole lasting up to 2 years based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. An applicant would be required to file a new application specifically tailored for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit under this rule, along with proposed fees. Applicants would also be required to appear for collection of biometric information. DHS further proposes that no more than three entrepreneurs may receive parole with respect to any one qualifying entity.

USCIS adjudicators would be required to consider the totality of the evidence, including evidence obtained by USCIS through background checks and other means, to determine whether the applicant has satisfied the above criteria, whether the specific applicant's parole would provide a significant public benefit, and whether negative factors exist that warrant denial of parole as a matter of discretion. To grant parole, adjudicators would be required to conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion.

DHS further proposes that if parole is granted, the entrepreneur would be authorized for employment incident to the grant of parole, but only with respect to the entrepreneur's start-up entity. The entrepreneur's spouse and children, if any, would not be authorized for employment incident to the grant of parole, but the entrepreneur's spouse, if paroled into the United States pursuant to 8 CFR 212.19, would be permitted to apply for employment authorization consistent with proposed 8 CFR 274a.12(c)(34). DHS retains the right to revoke any such grant of parole at any time as a matter of discretion or if the Department determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the application involves fraud or misrepresentation.

As noted, the purpose of the proposed parole process is to provide qualified entrepreneurs of high-potential start-up entities in the United States with the improved ability to conduct research and development and expand the entities' operations in the United States so that our nation's economy may benefit from such development and expansion, including through increased capital expenditures, innovation and job creation. DHS proposes to allow individuals granted parole under this rule to be considered for re-parole for an additional period of up to 3 years if, and only if, they can demonstrate that their entities have shown signs of significant growth since the initial grant of parole and such entities continue to have substantial potential for rapid growth and job creation. As proposed, an applicant under this rule would generally need to demonstrate the following to be considered for a discretionary grant of an additional period of parole:

1. *Continuation of Start-Up Entity.* The entity continues to be a start-up entity as defined by the proposed rule. For purposes of seeking re-parole, an applicant would be able to meet this standard by showing that the entity: (a) Has been lawfully operating in the United States during the period of parole; and (b) continues to have substantial potential for rapid growth and job creation.

2. *Applicant Continues to Be an Entrepreneur.* The applicant continues to be an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. DHS proposes that an applicant may generally meet this standard by providing evidence that he or she: (a) Continues to possess a significant (at least 10 percent) ownership interest in the entity; and (b) continues to have an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and continuing to grow its business in the United States. This reduced ownership amount takes into account the need of some successful start-up entities to raise additional venture capital financing by selling ownership interest during their initial years of operation.

3. *Significant U.S. Investment/Revenue/Job Creation.* The applicant can further validate, through reliable supporting evidence, the start-up entity's continued potential for rapid growth and job creation. DHS proposes that an applicant would be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that during the initial period of parole the start-up entity received additional substantial investments of capital, including through qualified investments from U.S. investors with established records of successful investments; significant awards or grants from government entities that regularly provide such funding to start-up entities; or

a combination of both. DHS proposes that an applicant would generally be expected to demonstrate that the entity received at least $500,000 in additional qualifying funding during the initial parole period. As noted previously, any private investments must be made by qualified U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. Government awards or grants must be from Federal, State or local government entities with expertise in economic development, research and development, and/or job creation.

b. *Revenue generation.* The applicant may show that the start-up entity has generated substantial and rapidly increasing revenue in the United States during the initial parole period. DHS proposes that an applicant would generally be expected to demonstrate that the entity reached at least $500,000 in annual revenue, with average annualized revenue growth of at least 20 percent, during the initial parole period.

c. *Job creation.* The applicant may show that the start-up entity has demonstrated substantial job creation in the United States during the initial parole period. DHS proposes that an applicant would generally be expected to demonstrate that the entity created at least 10 full-time jobs for U.S. workers during the initial parole period.

d. *Alternative criteria.* As with initial parole, DHS further proposes alternative criteria under which an applicant who partially meets one or more of the above sub-criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would continue to provide a significant public benefit. As discussed above, such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

DHS proposes that an applicant who generally meets the above criteria may be considered for one additional grant of parole to work with the same start-up entity based on the significant public benefit that would be served by his or her continued parole in the United States, if the applicant also merits a favorable exercise of discretion. If granted, re-parole may be for up to 3 years, for a total maximum period of 5 years for parole under 8 CFR 212.19. No more than three entrepreneurs (and their spouses and children) may receive such additional periods of parole with respect to any one qualifying entity.

As with initial parole applications, USCIS adjudicators would be required to consider the totality of the evidence, including evidence obtained by USCIS through verification methods, to determine whether the applicant has satisfied the above criteria and whether his or her continued parole would provide a significant public benefit. To re-parole, adjudicators would be required to conclude, based on the totality of the circumstances, both: (1) That the applicant's continued parole would provide a significant public benefit, and (2) that the applicant continues to merit parole as a matter of discretion. If re-paroled, DHS retains the right to revoke parole at any time as a matter of discretion or if the Department determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the applicant committed fraud or made material misrepresentations.

Finally, DHS is proposing conforming changes to the employment authorization regulations at 8 CFR 274a.12(b) and (c), the employment eligibility verification regulations at 8 CFR 274a.2(b), and fee regulations at 8 CFR 103.7(b)(i). The proposed rule would amend 8 CFR 274a.12(b) by: (1) Adding entrepreneur parolees to the classes of aliens authorized for employment incident to their immigration status or parole, and (2) providing for temporary employment authorization for those applying for re-parole. The proposed rule would amend 8 CFR 274a.12(c) by extending eligibility for employment authorization to the spouse of an entrepreneur paroled into the United States under 8 CFR 212.19. The proposed rule would amend 8 CFR 274a.2(b) by designating the entrepreneur's foreign passport and Arrival/Departure Record (Form I–94) indicating entrepreneur parole as acceptable evidence for employment eligibility verification (Form I–9) purposes.[2] Finally, the proposed rule would amend 8 CFR 103.7(b)(i) by including the fee for the new proposed application form.

### *D. Costs and Benefits*

DHS does not anticipate that this rule, if finalized, would generate significant costs and burdens to private or public entities. Costs of the rule would stem from filing fees and opportunity costs associated with applying for parole, and the requirement that the entrepreneur alert DHS to any material changes.

DHS estimates that 2,940 entrepreneurs could be eligible for parole annually. Each applicant for parole would face a total filing cost—including the application form fee, biometric filing fee, travel costs, and associated opportunity costs—of $1,480, resulting in a total cost of $4,349,827 (undiscounted) for the first full year the rule could take effect and any subsequent year. Additionally, dependent family members (spouses and children) seeking parole with the principal applicant would be required to file an Application for Travel Document (Form I–131) and submit biographical information and biometrics. DHS estimates approximately 3,234 dependent spouses and children could seek parole based on the base estimate of 2,940 principal applicants. Each spouse and child 14 years of age and older seeking parole would face a total cost of $550 per applicant, for a total aggregate cost of $1,779,604.[3] Additionally, spouses who apply for work authorization via a Form I–765 application would incur a total additional cost of $416.20 each. Based on the same number of entrepreneurs, the estimated 2,940 spouses[4] would incur total costs of $1,223,630 (undiscounted). The total cost of the rule to include direct filing costs and monetized non-filing costs is estimated to be $7,353,061 annually.

DHS anticipates that establishing a parole process for those entrepreneurs who stand to provide a significant public benefit would advance the U.S. economy by enhancing innovation, generating capital investments, and creating jobs. DHS does not expect significant negative consequences or labor market impacts from this rule; indeed, DHS believes this proposal would encourage entrepreneurs to pursue business opportunities in the United States rather than abroad, which can be expected to generate significant scientific, research and development, and technological impacts that could create new products and produce positive spillover effects to other businesses and sectors. The impacts stand to benefit the economy by supporting and strengthening high-growth, job-creating businesses in the United States.

## III. Background

### *A. Discretionary Parole Authority*

The Secretary of Homeland Security has discretionary authority to grant temporary parole "under conditions as he may prescribe only on a case-by-case

[2] Additionally, DHS is also proposing a technical change to this section to add the Department of State (DOS) Consular Report of Birth Abroad (Form FS–240, or successor form) to the "List C" column of acceptable documents for Form I–9 purposes.

[3] For parole requests for children under the age of 14, only the filing fee will be required, as they do not appear for biometric collection. Applicants under the age of 14 and over the age of 79 are not required to be fingerprinted. However, they may still be required to attend a biometrics appointment in order to have their photograph and signature captured.

[4] DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 1,813 spouses, the same number as entrepreneur parolees.

basis for urgent humanitarian reasons or significant public benefit [to] any individual applying for admission to the United States." INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[5] The Secretary's parole authority is expansive. Congress did not define the phrase "urgent humanitarian reasons or significant public benefit," entrusting interpretation and application of those standards to the Secretary. Aside from requiring case-by-case determinations, Congress limited the parole authority by prohibiting its use with respect to two classes of applicants for admissions: (1) Aliens who are refugees (unless the Secretary determines that parole is required for a particular alien for compelling reasons in the public interest), *see* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B); and (2) alien crewmen during certain labor disputes, *see* INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A).

Parole decisions are discretionary determinations and must be made on a case-by-case basis consistent with the INA. DHS may exercise its authority to determine that an individual's parole into the United States is justified by urgent humanitarian reasons or significant public benefit. Even when one of those standards would be met, DHS may nevertheless deny parole as a matter of discretion based on other factors.[6] In making such discretionary determinations, USCIS considers all relevant information, including any criminal history or other serious adverse factors that would weigh against a favorable exercise of discretion.

Parole is not an admission to the United States. *See* INA section 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B); 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Parole may also be terminated at any time in DHS's discretion, consistent with existing regulations; in those cases, the individual is "restored to the status that he or she had at the time of parole." 8 CFR 212.5(e); *see also* INA section 212(d)(5), 8 U.S.C. 1182(d)(5).

DHS regulations at 8 CFR 212.5 describe DHS's discretionary parole authority for arriving aliens to the United States (other than detained aliens), including the authority to set the terms and conditions of parole. Some conditions are described in the regulations, including requiring reasonable assurances that the parolee will appear at all hearings and will depart from the United States when required to do so. *See* 8 CFR 212.5(d).

Each of the DHS immigration components—USCIS, U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE)—has been delegated the authority to parole applicants for admission in accordance with section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). *See* 8 CFR 212.5(a). The parole authority is often utilized to permit an alien who is outside the United States to travel to and come into the United States without a visa. USCIS, however, also accepts requests for "advance parole" by aliens who seek authorization to depart the United States and return to the country pursuant to parole in the future.[7] *See* 8 CFR 212.5(f); Application for Travel Document (Form I–131). Advance authorization of parole by USCIS does not guarantee that the alien will be paroled by CBP upon his or her appearance at a port of entry. Rather, with a grant of advance parole, the alien is issued a document authorizing travel (in lieu of a visa) indicating the presumption that CBP will favorably exercise discretion to parole the alien in the future (so long as material circumstances do not change).

Currently, upon an alien's arrival to the United States with a parole travel document (*e.g.*, a Department of State (DOS) foil, Authorization for Parole of an Alien into the United States (Form I–512L), or an Employment Authorization Document (Form I–766)), a CBP officer at a port of entry inspects the prospective parolee. If parole is authorized, the CBP officer issues an Arrival/Departure Record (Form I–94) documenting the grant of parole and the length of the parolee's authorized parole period. *See* 8 CFR 235.1(h)(2). Importantly, CBP retains the authority to deny parole to a parole applicant or to modify the length of advance parole authorized by USCIS. *See* 8 CFR 212.5(c).

Because parole does not constitute an admission, individuals may be paroled into the United States even if they are inadmissible. *See* section 212(a) of the INA, 8 U.S.C. 1182(a). Further, parole does not confer any immigration "status." *See* section 101(a)(13)(B) of the INA, 8 U.S.C. 1101(a)(13)(B); section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A). Parole does not provide a parolee with temporary nonimmigrant status or lawful permanent resident status. Nor does it provide the parolee with a basis for changing status to that of a nonimmigrant or adjusting status to that of a lawful permanent resident, unless the parolee is otherwise eligible.

Under current regulations, once paroled into the United States, a parolee is eligible to request employment authorization from USCIS by filing an Application for Employment Authorization (Form I–765) with USCIS. *See* 8 CFR 274a.12(c)(11). If employment authorization is granted, USCIS issues the parolee an EAD with an expiration date that is commensurate with the period of parole on the parolee's Arrival/Departure Record (Form I–94). The parolee may use this EAD to demonstrate identity and employment authorization to an employer for Form I–9 verification purposes as required by section 274A(a) and (b) of the INA, 8 U.S.C. 1324a(a) and (b). Under current regulations, the parolee is not employment authorized by virtue of being paroled, but instead only after receiving a discretionary grant of employment authorization from USCIS based on the Application for Employment Authorization.

Parole may terminate automatically upon the expiration of the authorized parole period or upon the departure of the individual from the United States. *See* 8 CFR 212.5(e)(1). Parole also may be terminated on written notice when DHS determines that the individual no longer warrants parole or through the service of a Notice to Appear (NTA). *See* 8 CFR 212.5(e)(2)(i).

### *B. Historical Uses of Parole*

DHS and the former Immigration and Naturalization Service (INS) have long extended parole to individuals for urgent humanitarian reasons or significant public benefit. The authority has been exercised on behalf of individuals on an ad hoc basis, as well as through policy guidance or regulations identifying classes of individuals to be considered for parole through individualized case-by-case adjudications. For example, parole has long been used on an ad hoc basis for individuals with serious medical conditions who need to come into the United States for medical treatment, individuals subject to prosecution or who are required to testify in court, individuals cooperating with law enforcement agencies, volunteers offering assistance in response to

[5] Although section 212(d)(5) continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Arrabally*, 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).

[6] The denial of parole is not subject to judicial review. *See* INA section 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii).

[7] Aliens who seek parole as entrepreneurs under this rule may need to apply for advance parole if at the time of application they are present in the United States after admission in a nonimmigrant classification, as USCIS is unable to grant parole to aliens who are not "applicants for admission." *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5).

natural or other disasters, and foreign officials and other dignitaries who are inadmissible but seek to attend events in the country. Depending on the circumstances, such uses of parole have been justified on "urgent humanitarian" or "significant public benefit" grounds, or both.

Parole has also long been exercised on a case-by-case basis with respect to individuals falling within certain designated parameters, as defined through regulation or policy guidance. Longstanding regulations, for example, provide discretionary criteria and other guidance for the use of parole with respect to arriving aliens detained in the United States. *See* 8 CFR 212.5. Those regulations provide that parole from immigration custody generally would be "justified" on a case-by-case basis if an individual falls within one of several specific categories, including individuals with serious medical conditions, pregnant women, juveniles, or individuals whose "continued detention is not in the public interest" as determined by certain listed officials. *Id.* Through longstanding policy memoranda or other guidance, DHS and the former INS have also provided instructions on the use of parole for other individuals, including certain vulnerable individuals who have been denied refugee status.

More recently, DHS has provided guidance on the case-by-case exercise of the parole authority through policy memoranda or notices in the **Federal Register**, including, for example, on behalf of certain Cuban nationals, certain individuals seeking to enter the Commonwealth of the Northern Mariana Islands (CNMI), and certain family members of U.S. military personnel:

- In 2007, DHS implemented the Cuban Family Reunification Parole Program to promote safe, legal, and orderly migration as an alternative to maritime crossings from Cuba. This program offers Cuban beneficiaries of approved family-based immigrant visa petitions an opportunity to apply for parole rather than remain in Cuba while awaiting the availability of an immigrant visa number.[8] USCIS implemented the program based on the significant public benefit rationales of "enabling the United States to meet its commitments under the Migration Accords" and "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States."[9]
- In 2009, DHS announced a policy on the use of parole into the CNMI for certain foreign workers, as well as visitors from the Russian Federation and the People's Republic of China.[10] The parole policy was justified based on the economic benefit such workers and visitors would provide to the U.S. territory.
- In 2013, DHS issued guidance encouraging the use of parole for spouses, children, and parents of active duty members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve, and individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve.[11] The cited benefits included mitigating the adverse effects on Service Members and military preparedness stemming from the stress and anxiety of their immediate family members due to immigration concerns.

### *C. Significant Public Benefit From Attracting Foreign Entrepreneurs to the United States*

DHS believes that enabling foreign entrepreneurs to establish and grow their start-up entities in the United States, rather than abroad, would yield a significant public benefit in certain cases. This would be expected to promote entrepreneurship and investment; facilitate research and development and other forms of innovation; support the continued growth of the U.S. economy; and lead to job creation for U.S. workers. To this end, DHS has considered the economic benefits of foreign entrepreneurs.

Evidence indicates that young business ventures, especially new start-up businesses, are important economic drivers and that the U.S. economy significantly benefits from the economic activity generated by entrepreneurs who start and grow new businesses here rather than abroad.[12] Indeed, evidence suggests that future economic and job growth for nations will hinge heavily on their ability to attract entrepreneurs, including those from abroad.[13] As entrepreneurs have increasing opportunities to establish and operate their start-up entities around the world, the need to create conditions that reduce barriers to entry and attract entrepreneurs has become a priority policy goal for a number of economically advanced and less economically advanced nations.[14] To compete for talented entrepreneurs, these countries have, or are planning to have, processes similar to that proposed in this rule.[15]

---

[8] Cuban Family Reunification Parole Program, 72 FR 65,588 (Nov. 21, 2007); see also Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014).

[9] *Id.*

[10] *See* 8 CFR 214.2(w)(1)(v); USCIS, Commonwealth of the Northern Mariana Islands (CNMI) Federalization of Immigration Law (Sept. 22, 2014), *available at http://www.uscis.gov/laws/immigration-commonwealth-northern-mariana-islands-cnmi/commonwealth-northern-mariana-islands-cnmi-federalization-immigration-law;* USCIS, Extending Parole in the CNMI (Jan. 30, 2012), *available at http://www.uscis.gov/laws/immigration-commonwealth-northern-mariana-islands-cnmi/extending-parole-cnmi.*

[11] *See* USCIS Policy Mem. PM–602–0091, Parole of Spouses, Children and Parents of Active Duty Members of the U. S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i) at 2–3 (Nov. 13, 2013), *available at http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-1115_Parole_in_Place_Memo_.pdf.*

[12] *See, e.g.* Edward L. Glaeser, Sari Pekkala Kerr, and William R. Kerr "Entrepreneurship And Urban Growth: An Empirical Assessment With Historical Mines" (2013). Working Papers 13–15, Center for Economic Studies, U.S. Census Bureau. (Finding that increasing the proportion of startup employment within a region increases the growth rate of overall employment and wages.); John C. Haltiwanger, Ron S. Jarmin, Javier Miranda, "Who Creates Jobs? Small vs. Large vs. Young" NBER Working Paper No. 16300, August 2010, available at *http://www.nber.org/papers/w16300* (Findings "highlight the important role of business startups and young businesses in U.S. job creation."); Jose Plehn-Dujowich, "Product Innovations by Young and Small Firms," Small Business Administration, Research Summary No. 408 available at *http://www.sba.gov/advocacy/7540/621871* (Finding that "innovation is characteristic of both young and small firms"); Tim Kane, "The Importance of Startups in Job Creation and Job Destruction," July 2010 Kauffman Foundation Research Series: Firm Formation and Economic Growth, available at *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2010/07/firm_formation_importance_of_startups.pdf* (showing the importance of startups for net job growth in the U.S. economy).

[13] Council of Economic Advisers The Economic Effects of Administrative Action on Immigration, 18 (November 2014, updated February 2015), available at *https://www.whitehouse.gov/sites/defaulUfiles/docs/economic_effects_of_immigration_ea_february_2015_update_final_v2.pdf* ("A body of academic research conducted over the past ten years has found that high-skilled immigration has positive effects on innovation (as measured by patenting) and on total factor productivity."); Robert Litan, *Start-Up Slowdown;* Council on Foreign Relation, Jan./Feb. 2015, available at *https://www.foreignaffairs.com/articles/americas/2014-12-15/start-slowdown;* Robert Fairlie, *Kauffman Index of Entrepreneurial Activity, 1996–2011,* Ewing Marion Kauffman Foundation, March 19, 2012, *http://www.kauffman.org/uploadedfiles/kiea_2012_report.pdf* (finding that immigrants were more than twice as likely as Americans to start new businesses in 2011); Madeleine Sumption, "Visas for Entrepreneurs: How Countries Are Seeking Out Immigrant Job Creators," June 13, 2012 Migration Information Source, Migration Institute, available at *http://www.migrationpolicy.org/article/visas-entrepreneurs-how-countries-are-seeking-out-immigrant-job-creators.*

[14] Robert Litan, "Start-Up Slowdown"; Council on Foreign Relation, Jan./Feb. 2015, available at *https://www.foreignaffairs.com/articles/americas/2014-12-15/start-slowdown;* Madeleine Sumption, "Visas for Entrepreneurs: How Countries Are Seeking Out Immigrant Job Creators," June 13, 2012 Migration Information Source, Migration Institute, available at *http://www.migrationpolicy.org/article/visas-entrepreneurs-how-countries-are-seeking-out-immigrant-job-creators.*

[15] Canada Start-up Visa, *http://www.cic.gc.ca/english/immigrate/business/start-up/;* UK Tier 1 (Entrepreneur) visa, *https://www.gov.uk/tier-1-entrepreneur/overview.*



DEFENDANT'S
EXHIBIT
CASE
NO. 6:23-CV-00007
EXHIBIT
NO. 035

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| *Plaintiffs*, | § | |
| vs. | § | CIVIL ACTION NO. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| VALERIE LAVEUS, *et al.*, | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 35

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

U.S. Citizenship and Immigration Services

**November 15, 2013** **PM-602-0091**

# Policy Memorandum

SUBJECT: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

## Purpose

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to ensure consistent adjudication of parole requests made on behalf of aliens who are present without admission or parole and who are spouses, children and parents of those serving on active duty in the U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S. Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i). This amendment to AFM chapter 40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

## Scope

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS) employees.

## Authority

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(d)(5)(A), 1225(a), and 1255(a), (c)

## Background

**Parole of Spouses, children and parents of Armed Forces personnel**

- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives to assist military members, veterans, and their families to navigate our complex immigration system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 2

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.
- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them. It is a commitment that begins at enlistment, and continues as they become veterans.
- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families. The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible." Among the tools listed was "parole ... to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]
- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States. Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called "parole in place." The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2] That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3] In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4] The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States." INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).

[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.

[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).

[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under INA § 236(a)(2)(B) (so-called "conditional parole"), *see Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues. The first is a policy question: Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve? The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)? That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, parole <u>in place</u> is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual. If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled." This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States). Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]." Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection. As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate. In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

[5] ICE and CBP also have parole authority. "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008). Their decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7] In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8] In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense. Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous. Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9] Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies. First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous. Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended. The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence. If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct. *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined ... to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added). Other grounds cover only events that have occurred in the past (up to and including the present time). *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added). Still others cover only predictions of future activity. *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure ... prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist ... party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit ..."); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong. If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one. It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States." But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived." There is no apparent legal basis or policy reason to interpret "arrives" in that way.

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless. One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years. That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole. Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection). Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i). It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States." INA § 245(c)(2). Parole does not erase any periods of prior unlawful status. Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**

AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞ 1. A new section 21.1(c) is added to read:

**21.1 General Information About Relative Petitions**

* * * * *

(c) Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve. The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, USCIS grants parole in place only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual. If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

- Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));
- Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or less, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

- Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);
- Two identical, color, passport style photographs; and
- Evidence of any additional favorable discretionary factors that the requestor wishes considered.

2. Chapter 40.6.2(a) of the AFM is revised:

   a. By amending Chapter 40.6.2(a)(1);
   b. By deleting Chapter 40.6.2(a)(3)(ii);
   c. By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and
   d. By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

**40.6.2 <u>Individual Grounds of Inadmissibility Under INA Section 212(a)(6)</u>**

(a) **<u>INA Section 212(a)(6)(A): Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place</u>**

(1) <u>General</u>. INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled." This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]." Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.* An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a). The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility.  An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

 (4) Exemptions and Waivers

* * * * *

 (ii) Waivers.  There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞ 3. The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:

| | | |
|---|---|---|
| AFM Update AD12-30<br>11/15/2013 | **Chapter 21.1(c)**<br>**Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate.



DEFENDANT'S
EXHIBIT
CASE NO. 6:23-cv-00007
EXHIBIT NO. 036

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| *Plaintiffs*, | § | |
| vs. | § | CIVIL ACTION NO. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| *Defendants*, and | § | JUDGE DREW S. TIPTON |
| VALERIE LAVEUS, *et al.*, | § | |
| *Intervenor Defendants*. | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 36





PLAYLIST

npr

DONATE

POLITICS

# Trump Wants To Withdraw Deportation Protections For Families Of Active Troops

June 27, 2019 · 5:00 AM ET
Heard on Morning Edition

**3-Minute Listen**

PLAYLIST Download

Transcript

The funeral of Lance Cpl. Jose Antonio Gutierrez in 2003. Gutierrez was born in Guatemala and served in the Marine Corps until he was killed in Iraq — one of a number of immigrants in the military.

*Moises Castillo/AP*

The Trump administration wants to scale back a program that protects undocumented family members of active-duty troops from being deported, according to attorneys familiar with those plans.

The attorneys are racing to submit applications for what is known as parole in place after hearing from the wives and loved ones of deployed soldiers who have been told that option is "being terminated."

The protections will only be available under rare circumstances, the lawyers said they've been told.

"It's going to create chaos in the military," said Margaret Stock, an immigration attorney who represents recruits and veterans in deportation proceedings. "The troops can't concentrate on their military jobs when they're worried about their family members being deported."

POLITICS

**Senate Passes $4.6 Billion Emergency Border Funding Bill Signalling Battle With House**

Officials with U.S. Citizenship and Immigration Services, which offers parole in place as a "discretionary option," declined to discuss questions about the ending of the program.

Defense Department and military service officials didn't immediately respond to questions about the program.

## Parole in place

The program the Trump administration wants to curtail does not protect all immigrants facing removal proceedings from being deported.

It specifically allows military family members who have come to the country illegally —

and can't adjust their immigration status — to stay in the U.S. temporarily. A spouse who overstayed a visa, for example, would not be protected under the program.

The original objective of the policy was to minimize disruption to the life of a soldier, sailor, airman or Marine whose family member might have been subject to deportation.

Parole in place enables a soldier serving in Afghanistan, for instance, not to worry that a spouse at home who entered the U.S. illegally might be thrown out of the country while the soldier is deployed.

NATIONAL

**People Are Trying To Donate To Detained Migrants. Border Patrol Won't Accept It**

The spouse has the ability to receive "parole" within the U.S. and apply for a green card — unlike someone without that privilege, who might be deported and required to wait for years to apply.

It wasn't immediately clear how many people are using this now or have in the past.

## New battle within broader immigration war

The procedures are changing as the U.S. government ramps up enforcement proceedings, including against veterans and their family members — sometimes in ways that violate the government's own procedures.

For example, a federal watchdog reported earlier this month that U.S. Immigration and Customs Enforcement did not follow its own policies on deporting former service members since 2013, which included during the Obama administration.

NATIONAL

**A Father And Daughter Who Drowned At The Border Put Attention On Immigration**

Immigrants have always served in the military and often become citizens. Nearly 130,000 troops have been naturalized from more than 30 foreign countries since Oct. 1, 2001.

Service doesn't necessarily guarantee citizenship for troops, but it can offer them a path to that, as well as some benefits for people related to those serving, such as the parole privilege.

**Activists scramble before end to privilege**

One government lawyer is urging immigration lawyers to act quickly before the program is officially terminated next month.

"I would advise clients that if they are eligible for [parole in place] to submit it ASAP," a government lawyer warned other attorneys in a message obtained by NPR, adding later: "Wish there was better news to share. Big take-away is that no group is 'safe' any longer."

Carlos Luna, founder and president of a green card veteran chapter of the League of Latin American Citizens, said the ending of parole in place is yet another example of what he called the Trump administration's "war against immigrants."

POLITICS

**Trump Delays Immigration Raids, Giving Democrats 'Two Weeks' To Change Asylum Laws**

"There are less and less opportunities for these people serving the country and their veteran family to go through the 'legal channels' and stay here in the country, which for many is the only place they've ever known," Luna said.

Luna cited the Trump administration's decision this year to close all of its international field offices and the fact that military recruits now must serve 180 days of active duty before becoming eligible to apply for naturalization — unless they're in a combat zone.

Previously they only had to wait a day.

**Separating the link between service and citizenship**

The Trump administration has also made it harder for some immigrants to enlist in the military with hopes their service would lead to an expedited path to citizenship.

Last year, the Pentagon began discharging immigrants recruited under a special program started by President George W. Bush.

The program, known as Military Accessions Vital to the National Interest program, or MAVNI, aimed at bringing in medical specialists, fluent speakers of challenging languages and other special skills.

Between 2008 and 2016, 10,400 individuals enlisted in the U.S. military through the MAVNI program, according to Defense Department data.

NATIONAL

**Service Members, Not Citizens: Meet The Veterans Who Have Been Deported**

A federal judge in Seattle later ordered the Defense Department to stop discriminating against naturalized citizens who volunteered to serve in the military under the program.

The White House hasn't addressed the parole-in-place changes specifically, but information about them is reaching immigration attorneys against the backdrop of the ongoing political war over the southern border.

Trump, who has made immigration and the border his signature issue, urged Congress on Wednesday to close what he called the "loopholes" that remain.

> The Republican Senate just passed bipartisan humanitarian assistance for our Southern Border, 84-8! In addition to aid, Congress must close the catastrophic loopholes that are driving the Crisis. We must end incentives for Smuggling

Children, Trafficking Women, and Selling Drugs.
— Donald J. Trump (@realDonaldTrump) June 26, 2019

Stock, the immigration attorney, meanwhile said she thought it might be corrosive to military readiness if troops overseas must begin worrying that their family members back home might be deported.

"I don't think people really understand we have a global military that has a multitude of immigration problems because of the fact that we deploy immigrants overseas all the time and we recruit immigrants and we recruit U.S. citizens who are married to immigrants and have immigrant parents," Stock said. "The military is very international, and if you got rid of everybody in the military who had a connection to a foreigner — you wouldn't have anyone in the military."

## More Stories From NPR

POLITICS

**GOP support for Trump softens as the former president's legal troubles mount**



ELECTIONS
**Who is Will Hurd, the 45 year-old Republican presidential hopeful?**



NATIONAL SECURITY
**As living memories of the Korean War fade, its consequences become clearer**



POLITICS

**House and Senate on a collision course toward a government shutdown (again)**

ELECTIONS

**Trump still leads the pack in Iowa. But other Republicans are hoping for an opening**



Trump Wants To Withdraw Deportation Protections For Spouses Of Act... https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-...

BUSINESS

**As these farmworkers' children seek a different future, who will pick the crops?**

## Popular on NPR.org

BUSINESS

9 of 16 7/31/2023, 10:46 PM

Trump Wants To Withdraw Deportation Protections For Spouses Of Act... https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-...

**The Yellow trucking company meltdown, explained**

SPORTS

**What time is the U.S. playing Portugal in the Women's World Cup? Not when you think**

SPORTS

10 of 16 7/31/2023, 10:46 PM

**Top American cyclist Magnus White, 17, dies after being hit by a car**



BUSINESS
**Twitter's 'X' sign is taken down in San Francisco after neighbors filed 24 complaints**



ANIMALS
**A worm that survived 46,000 years in permafrost wows scientists**



WORLD

**Latest in Ukraine: Ukraine's counteroffensive makes some gains**

## NPR Editors' Picks



Trump Wants To Withdraw Deportation Protections For Spouses Of Act... https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-...

MOVIES

**'Open the pod bay door, HAL' — here's how AI became a movie villain**

TELEVISION

**Parents share what they learned from watching 'Bluey'**

TELEVISION

**Leanne Morgan, the 'Mrs. Maisel of Appalachia,' jokes about motherhood and**

13 of 16 7/31/2023, 10:46 PM

**menopause**

GLOBAL HEALTH

**A man dressed as a tsetse fly came to a soccer game. And he definitely had a goal**

LIFE KIT

**4 questions to ask yourself if you're considering going back to school**



HEALTH

**These scientists explain the power of music to spark awe**

READ & LISTEN

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**Accessibility**

**Ethics**

**Finances**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2023 npr