

DEFENDANT'S
EXHIBIT

CASE
NO. **6:23 - CV - 00007**

EXHIBIT
NO. **037**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 37



PUBLIC LAW 116–92—DEC. 20, 2019

NATIONAL DEFENSE AUTHORIZATION
ACT FOR FISCAL YEAR 2020

133 STAT. 1198          PUBLIC LAW 116–92—DEC. 20, 2019

Public Law 116–92
116th Congress

## An Act

Dec. 20, 2019
[S. 1790]

To authorize appropriations for fiscal year 2020 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

National Defense Authorization Act for Fiscal Year 2020.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2020".

**SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.**

(a) DIVISIONS.—This Act is organized into four divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.
(4) Division D—Funding Tables.
(5) Division E—Intelligence Authorizations for Fiscal Years 2018, 2019, and 2020.
(6) Division F—Other Matters.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees.
Sec. 4. Budgetary effects of this Act.

DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

TITLE I—PROCUREMENT

Subtitle A—Authorization Of Appropriations
Sec. 101. Authorization of appropriations.

Subtitle B—Army Programs
Sec. 111. Authority of the Secretary of the Army to waive certain limitations related to the Distributed Common Ground System-Army Increment 1.

Subtitle C—Navy Programs
Sec. 121. Ford-class aircraft carrier cost limitation baselines.
Sec. 122. Modification of annual report on cost targets for certain aircraft carriers.
Sec. 123. Refueling and complex overhauls of the U.S.S. John C. Stennis and U.S.S. Harry S. Truman.
Sec. 124. Ford class aircraft carrier support for F–35C aircraft.
Sec. 125. Prohibition on use of funds for reduction of aircraft carrier force structure.

133 STAT. 1860          PUBLIC LAW 116–92—DEC. 20, 2019

50 USC 3551.

### SEC. 1757. IMPROVING QUALITY OF INFORMATION IN BACKGROUND INVESTIGATION REQUEST PACKAGES.

Consultation.

(a) REPORT ON METRICS AND BEST PRACTICES.—Not later than 180 days after the date of the enactment of this Act, the Director of the Defense Counterintelligence and Security Agency, which serves as the primary executive branch service provider for background investigations for eligibility for access to classified information, eligibility to hold a sensitive position, and for suitability and fitness for other matters pursuant to Executive Order 13467 (50 U.S.C. 3161 note; relating to reforming processes related to suitability for Government employment, fitness for contractor employees, and eligibility for access to classified national security information), shall, in consultation with the Security, Suitability, and Credentialing Performance Accountability Council established under such executive order, submit to Congress a report on—

(1) metrics for assessing the completeness and quality of packages for background investigations submitted by agencies requesting background investigations from the Defense Counterintelligence and Security Agency;

(2) rejection rates of background investigation submission packages due to incomplete or erroneous data, by agency; and

(3) best practices for ensuring full and complete information in background investigation requests.

(b) ANNUAL REPORT ON PERFORMANCE.—Not later than 270 days after the date of the enactment of this Act and not less frequently than once each year thereafter, the Security, Suitability, and Credentialing Performance Accountability Council shall submit to Congress a report on performance against the metrics and return rates identified in paragraphs (1) and (2) of subsection (a).

Deadlines.

(c) IMPROVEMENT PLANS.—

(1) IDENTIFICATION.—Not later than one year after the date of the enactment of this Act, executive agents under Executive Order 13467 (50 U.S.C. 3161 note) shall identify agencies in need of improvement with respect to the quality of the information in the background investigation submissions of the agencies as reported in subsection (b).

(2) PLANS.—Not later than 90 days after an agency is identified under paragraph (1), the head of the agency shall provide the executive agents referred to in such paragraph with a plan to improve the performance of the agency with respect to the quality of the information in the agency's background investigation submissions.

8 USC 1182 note.

### SEC. 1758. PAROLE IN PLACE FOR MEMBERS OF THE ARMED FORCES AND CERTAIN MILITARY DEPENDENTS.

(a) IN GENERAL.—In evaluating a request from a covered individual for parole in place under section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), the Secretary of Homeland Security shall consider, on a case-by-case basis, whether granting the request would enable military family unity that would constitute a significant public benefit.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) parole in place reinforces the objective of military family unity;

(2) except as required in furtherance of the missions of the Armed Forces, disruption to military family unity should be minimized in order to enhance military readiness and allow

PUBLIC LAW 116–92—DEC. 20, 2019          133 STAT. 1861

members of the Armed Forces to focus on the faithful execution of their military missions and objectives, with peace of mind regarding the well-being of their family members; and

(3) the importance of the parole in place authority of the Secretary of Homeland Security is reaffirmed.

(c) COVERED INDIVIDUAL DEFINED.—In this section, the term "covered individual" means an alien who—

(1) is a member of the Armed Forces;

(2) is the spouse, son, or daughter of a member of the Armed Forces;

(3) is the parent of a member of the Armed Forces who supports the request of such parent for parole in place; or

(4) is the widow, widower, parent, son, or daughter of a deceased member of the Armed Forces.

## SEC. 1759. REPORT ON REDUCING THE BACKLOG IN LEGALLY REQUIRED HISTORICAL DECLASSIFICATION OBLIGATIONS OF THE DEPARTMENT OF DEFENSE.

(a) REPORT.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report detailing the progress made by the Secretary toward reducing the backlog in legally required historical declassification obligations of the Department of Defense.

(b) ELEMENTS.—The report under subsection (a) shall include, with respect to the Department of Defense, the following:

(1) A plan to achieve legally mandated historical declassification requirements and reduce backlogs.  *Plan.*

(2) A plan to incorporate new technologies, such as artificial intelligence, that would increase productivity and reduce cost in implementing the plan under paragraph (1).  *Plan.*

(3) A detailed assessment of the documents released in each of the proceeding three years before the date of the report, broken out by program, such as the 25 and 50 year programs.  *Assessment. Time period.*

(4) A detailed assessment of the documents awaiting review for release and an estimate of how many documents will be released in each of the next three years.  *Assessment. Time period.*

(5) Potential policy, resource, and other options available to the Secretary to reduce backlogs.

(6) The progress and objectives of the Secretary with respect to the release of documents for publication in the Foreign Relations of the United States series or to facilitate the public accessibility of such documents at the National Archives, presidential libraries, or both.  *Publication. Public information. National Archives.*

(c) FORM AND AVAILABILITY.—The report under subsection (a) shall be submitted in unclassified form, which shall be made publicly available, but may include a classified annex.

## SEC. 1760. MILITARY TYPE CERTIFICATION FOR LIGHT ATTACK EXPERIMENTATION AIRCRAFT.

The Secretary of the Air Force shall make available and conduct military type certifications for light attack experimentation aircraft as needed, pursuant to the Department of Defense Directive on Military Type Certificates, 5030.61.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 CV-00007

EXHIBIT
NO. 038

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 38

Central American Minors (CAM) Program | USCIS                              https://www.uscis.gov/CAM



**U.S. Citizenship
and Immigration
Services**

Home > Humanitarian > Refugees and Asylum > Refugees > Central American Minors (CAM) Program

# Central American Minors (CAM) Program

> ❶ **Alert:** Updates
>
> **See more** ⌄

> ❶ **Alert:** On June 13, 2018, a complaint was filed in the Northern District of California, S.A. v. Trump, 18-cv-03539, challenging an August 2017 decision to terminate CAM parole and related issues.
>
> **See more** ⌄

**About the Program**

The CAM program provides certain qualified children who are nationals of El Salvador, Guatemala, and Honduras, as well as certain family members of those children an opportunity to seek refugee status and possible resettlement in the United States.

Only certain parents or legal guardians who are lawfully present in the United States may request access to the program for qualifying children. A qualified child must be unmarried, under the age of 21, and a national of El Salvador, Guatemala, or Honduras. In some cases, an in-country parent of the qualifying child may also qualify for access. Children of a qualifying child or of other eligible family members may also qualify if those children are under the age of 21 and unmarried.

If you receive access to the CAM program, but we find you ineligible for refugee status, we will consider you for parole. Parole does not lead to a permanent immigration status, but it does allow you to lawfully enter and live temporarily in the United States and to apply for work authorization. We will generally approve parole under CAM for a 3-year period. U.S. Customs and Border Protection makes the ultimate determination whether to parole an individual into the United States at a port of entry.

⤢ Close All   ⤡ Open All

| Background | ⌃ |
|---|---|

The CAM program was established in 2014.

On Aug. 16, 2017, USCIS published a Federal Register notice announcing the termination of the parole component of the CAM program. As part of the review of the U.S. Refugee Admissions Program for fiscal year 2018, the CAM program was terminated. On Nov. 9, 2017, State stopped accepting new submissions of Form DS-7699, Affidavit of Relationship for Minors Who Are Nationals of El Salvador, Guatemala, and Honduras (AOR), and on Jan. 31, 2018, USCIS stopped interviewing new CAM cases. We continued to process cases of people we interviewed before that date.

On March 10, 2021, State <u>announced</u> the reopening of the CAM program in 2 phases. Phase 1 began in March 2021 and focuses on reopening and processing eligible AORs that were closed when the program was terminated in 2018. During Phase 1, DOS was not accepting new AORs. Domestic resettlement agencies  contacted parents who previously submitted an AOR to verify eligibility and determine whether they wish to reopen the case.

On June 15, 2021, State and DHS jointly announced the details of Phase 2 of the reopening. Beginning in Phase 2, eligibility to petition expanded to include legal guardians (in addition to parents) who are in the United States under any of the following qualifying categories:

- Lawful permanent residence;
- Temporary Protected Status;
- Parole;
- Deferred action;
- Deferred enforced departure; or
- Withholding of removal.

In addition, this expansion of eligibility to request access included certain U.S.-based parents or legal guardians with a pending asylum application or a pending U visa petition filed before May 15, 2021.

On April 11, 2023, DHS and State published a Federal Register notice announcing enhancements for the CAM program. The notice provided the following enhancements:

- At the time of a CAM parole adjudication, if the qualifying individual filing for a minor child is not that child's biological or adoptive parent or legal guardian (e.g., a step-parent), USCIS will gather additional information to evaluate and confirm whether the child has such a parent or legal guardian in the United States who intends to remain available to provide for the child's care and physical custody if the child were paroled into the United States. USCIS will share this information with U.S. Customs and Border Protection (CBP) as part of CAM parole processing. Absent new information or circumstances, CBP may rely upon the information gathered by USCIS to reunite these children with their families by facilitating direct reunification of minor beneficiaries with their U.S.-based relatives in all appropriate instances.
- Some individuals requested access to CAM for their children and certain qualifying family members before February 2018, and the beneficiaries were interviewed but were not

https://www.uscis.gov/CAM

afforded a parole determination or an opportunity to complete parole processing. They will now be able to pursue CAM parole processing.

- USCIS will no longer require the Form I-134, Declaration of Financial Support, as evidence of financial support and will allow financial supporters to provide a sworn statement or other evidence of financial support for those CAM cases which require such evidence.

- Eligibility to request access for their children will now include certain U.S.-based parents or legal guardians who have a pending asylum application, pending petition for U nonimmigrant status (U-visa), or pending application for T nonimmigrant status (T-visa) filed on or before April 11, 2023.

If you are interested in applying for a qualifying family member via the CAM program, please contact a domestic Resettlement Agency⊠.

Note: If you were previously paroled into the United States under CAM, refer to Requesting Re-Parole to learn more about the process for requesting re-parole (a new parole period) under the restarted CAM program.

## Eligibility ⌃

**Qualifying Criteria**

## Qualifying Criteria

| | |
|---|---|
| **Qualifying Parent or Legal Guardian** | The U.S.-based qualifying parent or legal guardian must be at least 18 years old and in the United States in 1 of the following categories:<br><br>• Lawful permanent resident;<br>• Temporary Protected Status;<br>• Parole (for a minimum of 1 year);<br>• Deferred action (for a minimum of 1 year);<br>• Deferred enforced departure (DED);<br>• Withholding of Removal;<br>• With a pending asylum application filed on or before May 15, 2021;* or<br>• With a pending U visa petition filed on or before May 15, 2021.*<br><br>*NOTE: Changes to the program eligibility were announced in the recent April 11, 2023 Federal Register Notice. However, new Affidavits of Relationship consistent with new dates and categories are contingent upon approval of the updated DS-7699, Affidavit of Relationship (AOR) for Minors Who are Nationals of El Salvador, Guatemala, or Honduras.*<br><br>The U.S.-based qualifying parent or legal guardian must be in 1 of these categories when they file the AOR. In addition, for the qualifying child and other eligible family members to be approved for parole, the qualifying parent or legal guardian must still be in 1 of the categories listed above or have received asylum or had their U visa petition or T visa application approved.<br><br>Note on Qualifying Parents or Legal Guardians with Parole and Deferred Action: Parolees and individuals with deferred action must have been authorized parole or deferred action for a minimum of 1 year. |

**Qualifying Criteria**

| | |
|---|---|
| **Qualifying Child** | The qualifying child, at the time the AOR is filed, must be:<br><br>• The child (genetic, step, or legally adopted) of the qualifying parent;<br>• Unmarried;<br>• Under the age of 21;<br>• Physically located in El Salvador, Guatemala, or Honduras; and<br>• A national of El Salvador, Guatemala, or Honduras.<br><br>Note: If a qualifying parent submitted an AOR before Nov. 9, 2017, and their qualifying child later reached the age of 21, the child is still eligible for the purposes of current adjudication. |

Central American Minors (CAM) Program | USCIS                    https://www.uscis.gov/CAM

## Qualifying Criteria

|  |  |
|---|---|
| **Eligible** Family Members | In some cases, the following eligible family members may have access to the program when included with a qualifying child:<br><br>• Unmarried children of the qualifying child who are located in-country and under 21 may be included as a derivative to the qualifying child's CAM case; and<br><br>• An in-country parent of the qualifying child may be included if they:<br>  ○ Are part of the same household and economic unit as the qualifying child;<br>  ○ Are legally married to the qualifying parent in the United States at the time the qualifying parent files the AOR; and<br>  ○ Continue to be legally married to the qualifying parent at the time of admission or parole to the United States.<br><br>If an in-country parent of the qualifying child is not legally married to the qualifying parent in the United States, the in-country parent may be included if they are:<br><br>• The biological parent of the qualifying child; and<br>• Part of the same household and economic unit as the qualifying child.<br><br>In-country parents who qualify under either scenario listed above have their own case and can include their unmarried children under 21 who are not the child of the U.S.-based qualifying parent. Those children would be listed as derivatives on the in-country parent's case. The qualifying child's biological parent who is not legally married to the qualifying parent in the United States may also include their legal spouse as a derivative on their case.<br><br>If a legal guardian is filing the AOR for a qualifying child, the legal guardian cannot include an in-country parent of the qualifying child.<br><br>Children of the U.S.-based, qualifying parent, who are married or 21 years of age or older<br><br>If the U.S.-based qualifying parent has children who are married or 21 years of age or older, those children have their own case and can include their legal spouse and unmarried children under the age of 21 on their case as derivatives.<br><br>If a legal guardian is filing the AOR for a qualifying child, the legal guardian can include siblings of the qualifying child.<br><br>Primary caregiver of the qualifying child |

Central American Minors (CAM) Program | USCIS                    https://www.uscis.gov/CAM

**Qualifying Criteria**

A caregiver may be given access to the CAM program if they are related to:

- The U.S.-based qualifying parent biologically or by legal marriage; or
- The qualifying child via a biological, step, or adoptive relationship.

The caregiver must also be the qualifying child's primary caregiver and part of the same household and economic unit as the qualifying child.

A legal guardian filing the AOR for a qualifying child can include a primary caregiver of the qualifying child only if the primary caregiver is related to the qualifying child.

## Application Process                                                

A qualifying parent or legal guardian in the United States may file an AOR with the assistance of a designated resettlement agency. For more information on contacting a designated resettlement agency, see the Department of State's FAQs.

There is no fee to apply for this program, and no one may charge a fee to complete the form.

Once an applicant receives access to the program, specially trained USCIS officers will interview the qualifying child and eligible family members to determine who may be approved for classification as a refugee. We determine eligibility for refugee status on a case-by-case basis. The qualifying child – as well as certain eligible family members – must establish an independent refugee claim to be granted refugee status.

- For more information about refugees and seeking status as a refugee in the United States, see the Refugees webpage. For a legal definition of "refugee," see Section 101(a)(42) of the Immigration and Nationality Act (INA).

Additionally, DNA relationship testing is required between individuals claiming a biological parent-child relationship. If we determine you are a refugee through this program, you will undergo a medical examination. If we approve you for travel, you will receive cultural orientation and assistance with travel arrangements to the city where your U.S.-based qualifying parent resides.

If you receive access to the program, but we find you ineligible for refugee status, we will consider on a case-by-case basis whether to parole you into the United States for urgent humanitarian reasons or significant public benefit. In considering parole, we may require you to submit additional information or documentation. This may include documentation that you will have a means of support if we parole you into the United States, which may include a sworn statement, and supporting evidence from adult and married qualifying family members, guardians, or

caregivers.

If you are conditionally eligible for referral for further parole processing under the CAM program, you must meet the following additional requirements:

- All applicants considered for parole must obtain and pay for a medical examination.
- All applicants approved for parole must book travel through an approved USCIS process and pay for the flight(s) to the United States.

We make parole determinations on a case-by-case basis, depending on each individual's unique circumstances. Parole does not provide an immigration status, but it does allow you to be lawfully present in the United States temporarily and to apply for an Employment Authorization Document (EAD). CAM applicants may be authorized for 3 years of parole.

## Requests for Review of the Refugee Application 

There is no appeal for a denial of an application for refugee status. However, USCIS may exercise its discretion to review a case upon timely receipt of a Request for Review (RFR) from the principal applicant or a third party if the principal applicant waives their rights to confidentiality.

| If ... | You may file an RFR of a denied refugee case... |
|---|---|
| USCIS denied the refugee case and conditionally approved parole* | Within 90 days from the date of the refugee status denial notice |
| USCIS denied the refugee case, but did not conditionally approve parole* | Within 90 days from the date of the parole denial notice |

* Potential impact of an RFR on the process for parole:

- USCIS will adjudicate an RFR independently of a parole case. However, we will consider an RFR abandoned if you enter the United States as a parolee. Additionally, if we approve an RFR and Form I-590 after your medical examination has concluded, we will not refund those costs. We will refund plane ticket costs (minus a refund fee and any applicable penalties).
- If we consider you for further parole processing, you may decide not to pay for the medical examination or plane ticket(s) until after the RFR decision. If you are waiting for the RFR decision, contact USCIS directly. We will pause processing your parole case until after the RFR decision.

## Case Closures 

Central American Minors (CAM) Program | USCIS                                    https://www.uscis.gov/CAM

If we administratively closed a parole case due to a Class A medical condition, inability to pay for medical examination or travel expenses, or for any other reason, you may contact us to request that we reopen the case.

## Requesting Re-Parole 

If you have already been paroled under CAM but have not requested or received an immigration status in the United States, you must request re-parole (an additional parole period) to lawfully remain in the United States past the date that your initial parole expires. We will consider CAM re-parole requests on a case-by-case basis under the same criteria used for CAM. Submit re-parole requests at least 90 days before the parole expiration date to allow time for processing. If you did not apply for re-parole due to the previous termination of CAM parole, you may apply now that CAM parole has restarted. Include an explanation about why you did not submit the application for re-parole earlier.

Steps for requesting re-parole (an additional parole period):

- File Form I-131, Application for Travel Document, and pay the required fee (or request a fee waiver);
- Check Box 1.e. or 1.f. in Part 2 of the form and complete section 2.a. – 2.p., if applicable;
- Write "CAM re-parole" across the top of the application;
- Include any evidence to support re-parole, including an explanation of why you need to stay in the United States and documents supporting your explanation;
- Include a Form I-134, Declaration of Financial Support, and supporting evidence; and
- Mail the I-131 form, payment, and supporting documents together to the address provided on the Filing Addresses for Form I-131 webpage for Humanitarian Parole applicants.

Find additional information on how to apply for re-parole on the Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States webpage.

## Termination of Parole 

If you receive parole under CAM, you will maintain parole until your parole period expires or you depart the United States, unless we terminate parole for other grounds under DHS regulations at 8 CFR § 212.5(e). We may revoke parole at any time if we determine that parole is no longer necessary or the parolee fails to comply with any conditions on the parole.

## Related Links 

- I-94 Website
- USCIS fee schedule
- Filing Addresses for Form I-131
- Additional Information on Filing a Fee Waiver
- Form Filing Tips
- Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States
- Case Check for Central American Minors Parole Program (settlement)
- Request for Review Tip Sheet
- Central American Minors (CAM) Program (Department of State)

**Forms**

- Form I-131, Application for Travel Document
- Form I-912, Request for Fee Waiver
- Form I-134, Declaration of Financial Support
- Form I-765, Application for Employment Authorization

⤢ Close All   ⤢ Open All

Last Reviewed/Updated: 06/23/2023



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV-0000 7

EXHIBIT NO. 039

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 39

Operation Allies Welcome | Homeland Security                                      https://www.dhs.gov/allieswelcome


Homeland Security

U.S. Department of Homeland Security

# Operation Allies Welcome

On August 29, 2021, President Biden directed the Department of Homeland Security (DHS) to lead and coordinate ongoing efforts across the federal government to support vulnerable Afghans, including those who worked alongside us in Afghanistan for the past two decades, as they safely resettle in the United States. At the President's direction, the Secretary of Homeland Security is working with representatives from across the government to coordinate our response and ensure unity of effort.

To lead the effort in support of Operation Allies Welcome, DHS established a Unified Coordination Group (UCG). The UCG reports directly to the Secretary of Homeland Security and coordinates the implementation of a broad range of services, including initial processing, COVID-19 testing, isolation of COVID-positive individuals, vaccinations, additional medical services, and screening and support for individuals who are neither U.S. citizens nor lawful permanent residents. This support includes initial processing at pre-designated U.S. military bases prior to being connected with non-governmental organizations for resettlement into communities. The work of the UCG is undertaken in close collaboration with partners in state and local government, non-governmental organizations, and the private sector.



*Washington (Sept. 3, 2021) Homeland Security Secretary Alejandro Mayorkas conducts a press conference to provide updates on Operation Allies Welcome, the department-led effort to resettle Afghan refugees. Bob Fenton, selected by the secretary to oversee the operation, also delivered remarks. (DHS Photo by Zachary Hupp/Released)*

⤢ Close all    ⤢ Open all

## Operational Phases

### Screening and Vetting Prior to Arrival in the United States

The U.S. government is working around the clock to conduct the security screening and vetting of vulnerable Afghans before they are permitted entry into the United States, consistent with the dual goals of protecting national security and providing protection for our Afghan allies. As with any population entering the United States, DHS, in coordination with interagency vetting partners, takes multiple steps to ensure that those seeking entry do not pose a national security or public safety risk.

DHS deployed approximately 400 personnel from U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement, the Transportation Security Administration, United States Coast Guard, and United States Secret Service to Bahrain, Germany, Kuwait, Italy, Qatar, Spain, and the United Arab Emirates to conduct processing, screening, and vetting in coordination with the Departments of Defense (DOD) and State (DOS) and other federal agencies, and to conduct interviews as needed, with the goal of bringing to the United States Afghan nationals who worked for the United States, as well as other vulnerable Afghans.

The rigorous screening and vetting process, which is multi-layered and ongoing, involves biometric and biographic screenings conducted by intelligence, law enforcement, and counterterrorism professionals from DHS and DOD, as well as the Federal Bureau of Investigation (FBI), National Counterterrorism Center (NCTC), and additional intelligence community partners. This process includes reviewing fingerprints, photos, and other biometric and biographic data for every single Afghan before they are cleared to travel to the United States. As with other arrivals at U.S. ports of entry, Afghan nationals undergo a primary inspection when they arrive at a U.S. airport, and a secondary inspection is conducted as the circumstances require.

### Humanitarian Parole

Most Afghan nationals arriving as part of the evacuation effort will be paroled into the United States on a case-by-case basis, for humanitarian reasons, for a period of two years. As noted above, parole is only issued subsequent to required screening and vetting. Afghan nationals have conditions placed on their parole, including requiring them to receive medical screening, critical vaccinations, and other reporting requirements. Failure to fulfill these conditions may cause individuals to have their work authorization denied, and potentially to have their parole terminated, which could lead to detention and removal proceedings. Afghan parolees may be eligible to apply for immigration benefits through U.S. Citizenship and Immigration Services (USCIS).

## Special Immigrant Visas

Afghans who have completed the Special Immigrant Visa (SIV) process and who possess visas, and their dependents, will be admitted as lawful permanent residents and assisted by DOS and non-governmental organizations to begin their resettlement process. Those individuals who have not finished the SIV application process are paroled in by DHS. They can continue to pursue special immigrant status (and ultimately lawful permanent residency) or they may apply for another immigration status through USCIS. Such individuals will be eligible to apply for work authorization.

More than 40 percent of Afghans who have arrived as a part of Operation Allies Welcome are eligible for Special Immigrant Visas (SIVs) because they took significant risks to support our military and civilian personnel in Afghanistan, employed by or on behalf of the U.S. government in Afghanistan or our coalition forces, or are a family member of someone who did. Some are SIV applicants who were already in the SIV pipeline.

It is important to note that not every Afghan who is eligible for the SIV program has applied for it, and the SIV program as it is currently designed does not cover every Afghan who supported the United States in Afghanistan. Additionally, the United States evacuated journalists, human rights activists, humanitarian workers, and other Afghans whose careers put them at risk, as well as family members of American citizens and lawful permanent residents.

## COVID-19 Testing, Vaccinations, and Other Medical Services

The U.S. government continues to take every precaution to stop the spread of COVID-19 and other communicable diseases consistent with CDC guidance. All those who enter – U.S. citizens, lawful permanent residents, and Afghan nationals – are tested for COVID-19.

Additionally, Afghan nationals who are paroled into the United States are required to complete vaccinations for MMR, varicella, polio, COVID-19, and other age-appropriate vaccinations, as well as medical exams and health screenings, as a condition of their humanitarian parole. All testing, vaccinations, and other medical services are available at no cost.

## Processing at U.S. Military Facilities

After they finish processing at the port of entry, U.S. citizens, lawful permanent residents, and SIV holders may depart the airport, while SIV applicants and other vulnerable Afghan allies who were granted humanitarian parole are provided transportation to U.S. military facilities where they receive a full medical screening and a variety of services before moving onto their next destination. DOD is providing temporary housing facilities for SIV applicants and other vulnerable Afghans at eight installations: Marine Corps Base Quantico, Virginia; Fort Pickett, Virginia; Fort Lee, Virginia; Holloman Air Force Base, New Mexico; Fort McCoy, Wisconsin; Fort Bliss, Texas; Joint Base McGuire-Dix-Lakehurst, New Jersey; and Camp Atterbury, Indiana. While on these bases, Afghans have access to a range of services, including medical care and mental health services. During this step in the process, Afghan nationals are able to apply for work authorization with USCIS personnel and are connected to resettlement services.

The Department of State (DOS) works closely with DOD and DHS to coordinate the civilian and non-governmental staff working at the military bases to ensure Afghans receive basic support and can finalize processing on base in order to transition to resettlement.Once Afghans have completed all processing steps, DOS works with its resettlement agency partners to assign and transfer them to their final destination.

## Applying for Immigration Status, Work Authorization, and Essential Coverage

USCIS personnel are adjudicating applications for employment authorization, conducting other immigration processing, and providing administrative support, including translation services, to expedite the processing of applications for immigrant status and work authorization. DOS and the Department of Health and Human Services' Office of Refugee Resettlement (ORR) are working to provide initial relocation support to Afghans granted parole and to ensure that those Afghans arriving in American communities have initial support, including health insurance. Provisions in the Continuing Resolution passed by Congress on September 30, 2021 authorized Afghan parolees to receive the same benefits and services as refugees.

## Resettlement Processing

Arriving Afghans are connected to resettlement agencies and community partners for initial resettlement assistance. DOS is leading this effort in close coordination with more than 200 local resettlement affiliates around the country. The local affiliates conduct extensive engagement with local communities to develop resources and support.

Through the Afghan Placement and Assistance Program (APA), individuals are placed in communities across the country to begin rebuilding their lives. As with traditional resettlement processes, placement of individuals considers U.S.-based family and friends, housing availability, community capacity, and the needs and characteristics of each case.

During the resettlement process, Afghan nationals are provided with briefings on the conditions of their parole and that violating the law violates their parole. These briefings include information on U.S. laws and rights, including that illegal actions or activities could lead to prosecution and imprisonment and may jeopardize an individual's immigration status.

In addition to Operation Allies Welcome, DOS is managing referrals to the U.S. Refugee Admissions Program for Afghans who assisted or were associated with the United States in Afghanistan, so that they can be considered for U.S. refugee resettlement from a third country if they have already left or leave Afghanistan. For more information on Afghan refugee processing, see the State Department Fact Sheet: U.S. Refugee Admissions Program Priority 2 Designation for Afghan Nationals.

## How You Can Help

In coordination with other federal agencies and private sector and non-profit partners, DOS is collaborating with Welcome.US, a national non-profit initiative that launched in September 2021 to channel support from the American public and the private sector to newly arrived Afghans and their families. People who are interested in assisting arriving Afghans can go to Welcome.US to learn about ways to get involved.

In addition, DOS is working with the Community Sponsorship Hub to support the launch of the Sponsor Circle Program for Afghans, a new program which enables groups of individuals and community organizations across the country to directly support Afghans who have been relocated to the United States under Operation Allies Welcome. The program will enable groups of individuals to apply to be vetted, trained, and certified to form sponsor circles to provide initial resettlement assistance to Afghans as they arrive and build new lives in local communities across the country. For more information on the Sponsor Circle Program and to learn how to apply to form a sponsor circle to support arriving Afghans, visit www.sponsorcircles.org (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.sponsorcircles.org%2F&back_url=https%3A%2F%2Fwww.dhs.gov%2Fal]lieswelcome) .

## Press Releases and Statements

- May 5, 2023: DHS Announces Upcoming Re-parole Process for Afghan Nationals (/news/2023/05/05/dhs-announces-upcoming-re-parole-process-afghan-nationals)
- September 27, 2022: Operation Allies Welcome Announces Departure of All Afghan Nationals from the National Conference Center Safe Haven in Leesburg, VA (/news/2022/09/27/operation-allies-welcome-announces-departure-all-afghan-nationals-national)
- July 18, 2022: Statement by Secretaries Antony J. Blinken and Alejandro N. Mayorkas - Ongoing Efforts to Support Afghan Special Immigrant Visa Applicants (/news/2022/07/18/statement-secretaries-antony-j-blinken-and-alejandro-n-mayorkas-ongoing-efforts)
- June 14, 2022: DHS and DOS Announce Exemptions Allowing Eligible Afghans to Qualify for Protection and Immigration Benefits (/news /2022/06/14/dhs-and-dos-announce-exemptions-allowing-eligible-afghans-qualify-protection-and)
- March 16, 2022: Secretary Mayorkas Designates Afghanistan for Temporary Protected Status (/news/2022/03/16/secretary-mayorkas-designates-afghanistan-temporary-protected-status)
- February 19, 2022: Operation Allies Welcome Announces Departure of All Afghan Nationals from U.S. Military Bases (/news/2022/02 /19/operation-allies-welcome-announces-departure-all-afghan-nationals-us-military-bases)
- February 15, 2022: Operation Allies Welcome Announces Departure of Last Afghan Nationals from Fort McCoy, Wisconsin (/news/2022/02 /15/operation-allies-welcome-announces-departure-last-afghan-nationals-fort-mccoy)
- February 2, 2022: Operation Allies Welcome Announces Departure of Last Afghan Nationals from Fort Pickett, Virginia (/news/2022/02 /02/operation-allies-welcome-announces-departure-last-afghan-nationals-fort-pickett-virginia)
- January 26, 2022: Operation Allies Welcome Announces Departure of Last Afghan Nationals from Camp Atterbury, Indiana (/news/01/26 /operation-allies-welcome-announces-departure-last-afghan-nationals-camp-atterbury)
- January 26, 2022: Operation Allies Welcome Announces Departure of Last Afghan Nationals from Holloman Air Force Base, New Mexico (/news/01/26/operation-allies-welcome-announces-departure-last-afghan-nationals-holloman-air-force)
- December 31, 2021: Operation Allies Welcome Announces Departure of Last Afghan Nationals from Fort Bliss, Texas

Operation Allies Welcome | Homeland Security                                    https://www.dhs.gov/allieswelcome

- December 23, 2021: Operation Allies Welcome Announces Departure of Last Afghan Nationals from Marine Corps Base Quantico, Virginia (/news/12/23/operation-allies-welcome-announces-departure-last-afghan-nationals-marine-corps-base)
- November 17, 2021: Operation Allies Welcome Announces Departure and Resettlement of Last Afghan Nationals from Fort Lee, Virginia (/news/11/17/operation-allies-welcome-announces-departure-and-resettlement-last-afghan-nationals-fort)
- November 8, 2021: DHS Announces Fee Exemptions, Streamlined Processing for Afghan Nationals as They Resettle in the U.S. (/news/2021/11/08/dhs-announces-fee-exemptions-streamlined-processing-afghan-nationals-they-resettle)
- October 26, 2021: Readout of Private Sector Roundtable on Operation Allies Welcome (https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/26/readout-of-private-sector-roundtable-on-operation-allies-welcome/) | WhiteHouse.gov
- October 25, 2021: Memorandum for the Secretary of State on Unexpected Urgent Refugee and Migration Needs (https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/22/memorandum-for-the-secretary-of-state-on-unexpected-urgent-refugee-and-migration-needs-3/) | WhiteHouse.gov
- October 4, 2021: Operation Allies Welcome Completes Vaccination Campaign for Measles and Varicella for Afghan Evacuees (/news/2021/10/04/operation-allies-welcome-completes-vaccination-campaign-measles-and-varicella-afghan)
- September 24, 2021: On-the-Record Press Call with the Regional Reporters Association by White House Coordinator for Operation Allies Welcome Jack Markell and Secretary of Homeland Security Alejandro Mayorkas on Operation Allies Welcome (https://www.whitehouse.gov/briefing-room/press-briefings/2021/09/24/on-the-record-press-call-with-the-regional-reporters-association-by-white-house-coordinator-for-operation-allies-welcome-jack-markell-and-secretary-of-homeland-security-alejandro-mayorkas-on-operation/) | WhiteHouse.gov
- September 15, 2021: Readout of Senior White House Meeting with Faith Leaders on Efforts to Relocate Afghan Allies (https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/15/readout-of-senior-white-house-meeting-with-faith-leaders-on-efforts-to-relocate-afghan-allies/) | WhiteHouse.gov
- September 3, 2021: Secretary Mayorkas Delivers Remarks on Operation Allies Welcome (/news/2021/09/03/secretary-mayorkas-delivers-remarks-operation-allies-welcome)
- September 3, 2021: Readout of Secretary Mayorkas's Engagement with Community Leaders Regarding Operation Allies Welcome (/news/2021/09/03/readout-secretary-mayorkas-s-engagement-community-leaders-regarding-operation-allies)
- August 29, 2021: Memorandum on the Designation of the Department of Homeland Security as Lead Federal Department for Facilitating the Entry of Vulnerable Afghans into the United States (https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/29/memorandum-on-the-designation-of-the-department-of-homeland-security-as-lead-federal-department-for-facilitating-the-entry-of-vulnerable-afghans-into-the-united-states/) | WhiteHouse.gov
- August 29, 2021: DHS to Serve as Lead Federal Agency Coordinating Efforts to Resettle Vulnerable Afghans (/news/2021/08/29/dhs-serve-lead-federal-agency-coordinating-efforts-resettle-vulnerable-afghans)
- August 28, 2021: Statement by President Joe Biden on the Evacuation Mission in Kabul (https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/28/statement-by-president-joe-biden-on-the-evacuation-mission-in-kabul/) | WhiteHouse.gov
- August 27, 2021: Press Briefing by Press Secretary Jen Psaki (https://www.whitehouse.gov/briefing-room/press-briefings/2021/08/27/press-briefing-by-press-secretary-jen-psaki-august-27-2021/) | WhiteHouse.gov

## Presidential Memorandum

- August 29, 2021: Memorandum on the Designation of the Department of Homeland Security as Lead Federal Department for Facilitating the Entry of Vulnerable Afghans into the United States (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/08/29/memorandum-on-the-designation-of-the-department-of-homeland-security-as-lead-federal-department-for-facilitating-the-entry-of-vulnerable-afghans-into-the-united-states/) · WhiteHouse.gov

## Frequently Asked Questions

### Question: How are you vetting Afghan nationals who are arriving in the U.S.? How do you know they don't pose security risks?

- The screening and vetting process involves biometric and biographic screenings conducted by intelligence, law enforcement, and counterterrorism professionals from the Departments of Homeland Security and Defense, as well as the Federal Bureau of Investigation (FBI), National Counterterrorism Center (NCTC), and additional intelligence community partners prior to their arrival in the United States.
- If someone fails these checks while they are still overseas, they will not be permitted to board a flight to the United States. Additionally, all Afghans are required to undergo the same process as other persons arriving from outside the US: namely, additional inspection upon arrival and a secondary inspection as the circumstances require. If, upon landing in the United States, further security vetting at the port

of entry raises a concern about a person, CBP has the authority to not grant them entry into the United States.

## Question: How many of the Afghan nationals who resettle are SIVs?

- We know that more than 40% of Afghans are eligible for Special Immigrant Visas (SIVs) because they took significant risks to support our military and civilian personnel in Afghanistan, working for or on behalf of the U.S. government in Afghanistan or our coalition forces, or are a family member of someone who did. Some are SIV applicants who were already in the SIV pipeline.
- Additionally, others worked as journalists, human rights activists, or humanitarian workers and had careers that put them at risk. And many are family members of American citizens and LPRs.

## Question: Are vaccines mandatory for everyone who arrives as a part of Operation Allies Welcome?

- The U.S. government continues to take every precaution to stop the spread of COVID-19 and other diseases, consistent with CDC guidance. All arrivals – U.S. citizens, lawful permanent residents, and Afghan nationals – are being tested for COVID-19 upon arriving in the United States. These individuals will also have the option to receive COVID-19 and other vaccines either at U.S. government-run sites near Washington Dulles International Airport and Philadelphia International Airport, or at a Department of Defense facility.  All testing, vaccinations, and other services are available at no cost.
- For Afghan nationals who are paroled into the United States, receiving the first dose of the following vaccinations and undergoing medical screening are conditions of the parole, absent a case-by-case determination that the following are not medically appropriate:
    - MMR (measles, mumps, rubella) vaccination, absent proof of prior vaccination;
    - Polio vaccination, absent proof of prior vaccination;
    - COVID-19 vaccination, absent proof of prior vaccination;
    - Other age-appropriate vaccinations, as determined by the Centers for Disease Control and Prevention, absent proof of prior vaccinations;
    - A tuberculosis screening; it will be required to take appropriate isolation and treatment measures if the tuberculosis test is positive.

## Question: Where are Afghan nationals going when they arrive?

- DOD is providing temporary housing facilities for SIV applicants and other vulnerable Afghans at eight installations: Marine Corps Base Quantico, Virginia; Fort Pickett, Virginia; Fort Lee, Virginia; Holloman Air Force Base, New Mexico; Fort McCoy, Wisconsin; Fort Bliss, Texas; Joint Base McGuire-Dix-Lakehurst, New Jersey; and Camp Atterbury, Indiana. While on these bases, Afghans have access to a range of services, including medical care and mental health services. During this step in the process, Afghan nationals are able to apply for work authorization with USCIS personnel and are connected to resettlement services.

## Question: What is the process for Afghan nationals paroled under OAW to request extensions?

- DHS remains committed to supporting Afghan nationals paroled under Operation Allies Welcome, and we continue to explore opportunities to provide avenues for humanitarian relief. We are working to provide guidance to those paroled under Operation Allies Welcome as soon as possible.

**Benefits for Humanitarian Parolees**

## Are you an Afghan individual who has been granted humanitarian parole?

- You may be eligible for cash assistance, medical assistance, employment preparation, job placement, English language training, and other services offered through the Office of Refugee Resettlement (ORR). You may also be eligible for federal "mainstream" (non-ORR funded) benefits, such as cash assistance through Supplemental Security In-come (SSI) or Temporary Assistance for Needy Families (TANF), health insurance through Medicaid, and food assistance through Supple-mental Nutrition Assistance Program (SNAP). This document focuses on the benefits and services funded by ORR.
- Some Afghan humanitarian parolees can also receive Afghan Placement and Assistance (APA) services from local refugee resettlement agencies. To find a local refugee resettlement agency, visit: https://www.wrapsnet.org/rp-agency-contacts/ (https://www.dhs.gov/now-leaving?external_url=https%3A%2F%2Fwww.wrapsnet.org%2Frp-agency-contacts&back_url=https%3A%2F%2Fwww.dhs.gov%2Fallieswelcome)

## Who are Afghans with humanitarian parole?

- Certain Afghan individuals have been or will be granted humanitarian parole by the U.S. Department of Homeland Security, in response

Operation Allies Welcome | Homeland Security                                                 https://www.dhs.gov/allieswelcome

to their need for rapid evacuation and relocation under Operation Allies Refuge/Operation Allies Welcome. Afghan humanitarian parolees paroled into the U.S. between July 31, 2021, through September 30, 2022, are eligible to apply for main-stream benefits, resettlement assistance, and other benefits available to refugees, until March 31, 2023, or the end of their parole term, whichever is later. Spouses or children of these individuals paroled into the U.S after September 30, 2022, are also eligible to apply for these benefits.

### Where do I apply for ORR benefits/ services after I arrive in the U.S.?

- ORR provides funding to state governments, resettlement agencies, and other nonprofit community-based organizations to provide benefits and services for eligible individuals. You can apply at the state government benefits office or closest resettlement agency in your state beginning on or after the date that you received humanitarian parole. For a list of state contacts go to: https://www.acf.hhs.gov /orr/grant-funding/key-state-contacts (https://www.acf.hhs.gov/orr/grant-funding/key-state-contacts) .

### When should I apply for ORR benefits/services?

- Now. Do not wait. Your benefits and services are only available for a limited time. ORR-funded cash and medical assistance are limited to a maximum of eight months from your date of eligibility. For most employment services and other services aimed at economic self-sufficiency, the eligibility period is five years from your date of eligibility.

### What should I bring with me?

- You should bring proof of your humanitarian parole and the date you received it. Types of proof include
- a Form I-94 noting Humanitarian Parole (per INA section 212(d)(5)(A)), a foreign passport with DHS/CBP admission stamp noting "OAR," or a foreign passport with DHS/CBP admission stamp noting "OAW." Each individual in a family applying for ORR benefits and services should bring their own proof and the date their humanitarian parole (or other ORR-eligible status) was granted.

### What are some of the benefits and services I can receive as an Afghan humanitarian parolee?

- Some Afghan humanitarian parolees are eligible to apply for federal mainstream benefits in their state, such as cash assistance through Supplemental Security Income (SSI) or Temporary Assistance for Needy Families (TANF), health insurance through Medicaid, and food assistance through Supplemental Nutrition Assistance Program (SNAP).

**Fact Sheets**

- February 11, 2022: Fact Sheet: Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan (https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/) | WhiteHouse.gov
- November 5, 2021: Fact Sheet on Operation Allies Welcome (/publication/fact-sheet-operation-allies-welcome)
- October 26, 2021: Fact Sheet: Private Sector Leaders Are Stepping Up to Welcome Afghans (https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/26/fact-sheet-private-sector-leaders-are-stepping-up-to-welcome-afghans/) | WhiteHouse.gov
- October 1, 2021: Benefits for Afghan Humanitarian Parolees (https://www.acf.hhs.gov/sites/default/files/documents/orr/Benefits-for-Afghan-Humanitarian-Parolees.pdf) | HHS.gov
- October 25, 2021: Information Sheet for Afghan Parolees Departing Safe Havens - English (PDF, 211.48 KB) (https://www.uscis.gov/sites/default/files/document/fact-sheets/Information_Sheet_for_Afghans_Departing_Safe_Havens-English.pdf) | USCIS
- October 25, 2021: Information Sheet for Afghan Parolees Departing Safe Havens – Special Immigrant Visa Attachment – English (PDF, 130.29 KB) (https://www.uscis.gov/sites/default/files/document/fact-sheets/Information_Sheet_for_Afghans_Departing_Safe_Havens-Special_Immigrant_Attachment-English.pdf) | USCIS
- October 25, 2021: Information Sheet for Afghan Parolees Departing Safe Havens - Dari (PDF, 170.27 KB) (https://www.uscis.gov/sites/default/files/document/fact-sheets/Information%20Sheet%20for%20Afghans%20Departing%20Safe%20Havens%20-%20Dari.pdf) | USCIS
- November 2, 2021: Information Sheet for Afghan Parolees Departing Safe Havens – Special Immigrant Visa Attachment – Dari (PDF, 132.56 KB) (https://www.uscis.gov/sites/default/files/document/fact-sheets/Information_Sheet_for_Afghans_Departing_Safe_Havens-Special_Immigrant_Attachment-Dari.pdf) | USCIS
- October 25, 2021: Information Sheet for Afghan Parolees Departing Safe Havens - Pashto (PDF, 170.84 KB) (https://www.uscis.gov/sites/default/files/document/fact-sheets/Information_Sheet_for_Afghans_Departing_Safe_Havens-Pashto.pdf) | USCIS
- October 25, 2021: Information Sheet for Afghan Parolees Departing Safe Havens – Special Immigrant Visa Attachment – Pashto (PDF, 149.34 KB) (https://www.uscis.gov/sites/default/files/document/fact-sheets/Information_Sheet_for_Afghans_Departing_Safe_Havens-Special_Immigrant_Attachment-Pashto.pdf) | USCIS

Operation Allies Welcome | Homeland Security                                    https://www.dhs.gov/allieswelcome

## Welcome Centers

In coordination with state and local partners, OAW is coordinating with United States Citizenship and Immigration Services (USCIS) and Federal Emergency Management Agency (FEMA) to set up OAW Welcome Center events as part of the continued effort to help Afghan evacuees integrate successfully and safely into their new communities.

These events provide a centralized location for Afghans to access a wide variety of information and services, which include information and resources regarding public health, education, legal assistance, employment, social services, housing, and the U.S. immigration system. Each event is intended to facilitate coordination and information sharing with the Afghan evacuee community. Interpreters are located on site and are available to assist at no charge.

The first Welcome Center events were held in California. The next events will take place in Maryland and Virginia.

Welcome Center events offer unique opportunities for Afghan evacuees and those assisting them to access targeted wrap-around social services and information at a single and convenient location.

### Welcome Center Event Locations and Dates

| City and State | Event Location | Dates |
|---|---|---|
| Los Angeles, CA | L.A. City College | April 11 – 16, 2022 |
| Los Angeles, CA | N. Hollywood Recreation Center | April 19 – 30, 2022 |
| San Diego, CA | Courtyard Marriott San Diego El Cajon | May 9 – 21, 2022 |
| Sacramento, CA | Cal Expo Center Building 5 | June 6 – June 18, 2022 |
| College Park, MD | University of Maryland, Ritchie Coliseum | August 9 – August 13, 2022 |
| Baltimore, MD | Baltimore Convention Center | August 16 – August 20, 2022 |
| Lorton, VA | The River View at Occoquan | August 16 – August 18, 2022<br>August 29 – August 31, 2022 |
| Richmond, VA | Hilton Richmond Downtown | September 26 – September 28, 2022 |

*Additional locations to be announced.

## Multimedia

- Operation Allies Welcome (/medialibrary/collections/27325/grid)
- U.S. Central Command - Afghanistan Evacuation (https://www.dvidshub.net/feature/Afghanevacuation) [ DVIDSHub.net
  - Photos (https://www.dvidshub.net/search/?filter[type]=image&filter[tags][]=afghanevacuation&sort=date)
  - Videos (https://www.dvidshub.net/search/?filter[type]=video&filter[tags][]=afghanevacuation&sort=date)
  - Stories (https://www.dvidshub.net/search/?q=&filter%5Btype%5D=news&filter%5Btags%5D%5B0%5D=afghanevacuation&view=grid&sort=date)
- U.S. Northern Command - Operation Allies Refuge (https://www.dvidshub.net/unit/oar) [ DVIDSHub.net
  - Photos (https://www.dvidshub.net/search/?filter%5Bunit%5D=OAR&filter%5Btype%5D=image&sort=date)
  - Videos (https://www.dvidshub.net/search/?filter%5Bunit%5D=OAR&filter%5Btype%5D=video&sort=date)
  - Stories (https://www.dvidshub.net/search/?q=&filter%5Bunit%5D=OAR&filter%5Btype%5D=news&view=grid&sort=date)

## For More Information

7/31/2023, 9:55 PM

Operation Allies Welcome | Homeland Security                                      https://www.dhs.gov/allieswelcome

- Media: mediainquiry@hq.dhs.gov (mailto:mediainquiry@hq.dhs.gov)

## Disclaimer

This website links to websites created and maintained by other public and/or private organizations. DHS provides these links as a service to you, the users. When you link to an outside website, you are leaving the DHS website and are subject to the privacy and security policies of the owners/sponsors of the outside website(s). Access to outside websites is provided with the following conditions:

1. The Department of Homeland Security does not control or guarantee the accuracy, relevance, timeliness or completeness of information contained on a linked website.
2. The Department of Homeland Security does not endorse the organizations sponsoring linked websites and we do not endorse the views they express or the products/services they offer.
3. The Department of Homeland Security does not and cannot authorize the use of copyrighted materials contained in linked websites. Users must request such authorization from the sponsor of the linked website.
4. The Department of Homeland Security is not responsible for transmissions users receive from linked websites.
5. The Department of Homeland Security does not guarantee that outside websites comply with the requirements of Section 508 (Accessibility Requirements) of the Rehabilitation Act.
6. The Department of Homeland Security will not link to any website that exhibits hate, bias or discrimination and reserves the right to deny or remove any links for the following reasons: (a) A linked website contains misleading information or unsubstantiated claims or is determined to be in conflict with Department of Homeland Security's mission or policies; (b) At the Department of Homeland Security's sole discretion.

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)       INTERNATIONAL ENGAGEMENT (/TOPICS/INTERNATIONAL-ENGAGEMENT)

## Keywords

INTERNATIONAL (/KEYWORDS/INTERNATIONAL)       OPERATION ALLIES WELCOME (/KEYWORDS/OPERATION-ALLIES-WELCOME)

Last Updated: 05/08/2023

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 040

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 40

135 STAT. 372          PUBLIC LAW 117–43—SEPT. 30, 2021

### TITLE IX

### GENERAL PROVISIONS—THIS ACT

SEC. 1901. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 1902. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 1903. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2022.

SEC. 1904. Each amount provided by this division is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) and section 4001(b) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022.

This division may be cited as the "Disaster Relief Supplemental Appropriations Act, 2022".

Afghanistan
Supplemental
Appropriations
Act, 2022.

### DIVISION C—AFGHANISTAN SUPPLEMENTAL APPROPRIATIONS ACT, 2022

The following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2022, and for other purposes, namely:

### TITLE I

### DEPARTMENT OF JUSTICE

#### FEDERAL BUREAU OF INVESTIGATION

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $50,000,000, to remain available until September 30, 2022, for investigative activities associated with Afghan resettlement operations.

### TITLE II

### DEPARTMENT OF DEFENSE

#### OPERATION AND MAINTENANCE

#### OVERSEAS HUMANITARIAN, DISASTER, AND CIVIC AID

For an additional amount for "Overseas Humanitarian, Disaster, and Civic Aid", $2,200,000,000, to remain available until September 30, 2023, for support of Operation Allies Welcome by the Department of Defense.

### GENERAL PROVISIONS—THIS TITLE

Reports.

SEC. 2201. Not later than 30 days after the date of enactment of this Act, and every 30 days thereafter through fiscal year 2022,

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 373

the Secretary of Defense shall provide a written report to the congressional defense committees describing the execution of funds provided in this title, including the amounts obligated and expended, in total and since the previous report; the nature of the costs incurred or services provided by such funds; and any reimbursements or funds transferred by another Federal agency to the Department of Defense which relates to the purpose of the funds provided by this title.

SEC. 2202. Notwithstanding any other provision of law, funds provided by this title shall only be for the purposes specified, and shall not be subject to any transfer authority provided by law.

SEC. 2203. The Inspector General of the Department of Defense shall carry out reviews of the activities of the Department of Defense to transport and care for Afghans, including but not limited to, the humane treatment and living conditions of Afghans at any Department of Defense facility; the use of funds by the Department of Defense to support such persons, including the monitoring of potential waste, fraud, or abuse of such funds; and any related issues that the Inspector General may direct: *Provided*, That the Inspector General shall provide to the congressional defense committees periodic updates on such oversight efforts and a written report to such committees not later than 60 days after the date of enactment of this Act. — *Reviews.* / *Updates.* / *Reports.*

SEC. 2204. Title IX of division C of Public Law 116–260 is amended under the heading "Afghanistan Security Forces Fund" by inserting the following before the penultimate proviso: "*Provided further*, That the Secretary of Defense may obligate and expend funds made available under this heading for costs associated with the termination of contracts previously funded with amounts provided under this heading in prior Acts, and to pay valid invoices in satisfaction of liabilities under such contracts for which the applicable prior appropriation cannot be identified:". — *134 Stat. 1341.* / *Contracts.*

SEC. 2205. Not later than 90 days after the date of enactment of this Act, the Secretary of Defense, in consultation with the Service Secretaries and the Commander of United States Central Command, shall submit to the congressional defense committees a report regarding the disposition of United States property, equipment, and supplies, including property, equipment, and supplies provided to the Afghanistan National Security Forces, which were destroyed, taken out of Afghanistan, or remain in Afghanistan in connection with the United States military withdrawal: *Provided*, That such report shall include information on the future plans of the Department of Defense regarding any such items. — *Consultation.* / *Reports.*

## TITLE III

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

#### CENTERS FOR DISEASE CONTROL AND PREVENTION

##### CDC–WIDE ACTIVITIES AND PROGRAM SUPPORT

For an additional amount for "CDC–Wide Activities and Program Support", $21,500,000, for support of Operation Allies Welcome, to remain available until September 30, 2022, for medical support, screening, and other related public health activities related to Afghan arrivals and refugees.

ADMINISTRATION FOR CHILDREN AND FAMILIES

REFUGEE AND ENTRANT ASSISTANCE

For an additional amount for "Refugee and Entrant Assistance", $1,680,000,000, to remain available until September 30, 2023, for support of Operation Allies Welcome for carrying out refugee and entrant assistance activities in support of citizens or nationals of Afghanistan paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act and citizens or nationals of Afghanistan for whom such refugee and entrant assistance activities are authorized: *Provided*, That amounts made available under this heading in this Act may be used for grants or contracts with qualified nonprofit organizations to provide culturally and linguistically appropriate services, including wrap-around services during temporary housing and after resettlement, housing assistance, medical assistance, legal assistance, and case management assistance: *Provided further*, That the Director of the Office of Refugee Resettlement, in carrying out section 412(c)(1)(A) of the Immigration and Nationality Act with amounts made available under this heading in this Act, may allocate such amounts among the States in a manner that accounts for the most current data available.

CHILDREN AND FAMILIES SERVICES PROGRAMS

For an additional amount for "Children and Families Services Programs", $7,773,000, to remain available until September 30, 2022, for support of Operation Allies Welcome for necessary administrative expenses to carry out refugee and entrant assistance activities in support of citizens or nationals of Afghanistan.

GENERAL PROVISION—THIS TITLE

Deadline.
Strategy.

SEC. 2301. (a) Not later than 45 days after the date of enactment of this Act, the Secretary of Health and Human Services, the Secretary of State, and the Secretary of Homeland Security shall jointly submit a strategy on Afghan evacuee resettlement to the appropriate congressional committees and leadership describing agency roles and responsibilities, vetting, immigration status of each Afghan, and anticipated costs associated with implementing such strategy.

(b) DEFINITION OF AFGHAN EVACUEE.—In this section, the term "Afghan evacuee" means a person whose evacuation from Afghanistan to the United States, or a location overseas controlled by the United States, was facilitated by the United States as part of Operation Allies Refuge.

TITLE IV

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

EMERGENCIES IN THE DIPLOMATIC AND CONSULAR SERVICE

For an additional amount for "Emergencies in the Diplomatic and Consular Service", $276,900,000, to remain available until

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 375

expended, for support for Operation Allies Welcome and related efforts by the Department of State, including additional relocations of individuals at risk as a result of the situation in Afghanistan and related expenses, and to reimburse the account under this heading in prior acts making appropriations for the Department of State, foreign operations, and related programs for obligations previously incurred.

## BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

#### INTERNATIONAL DISASTER ASSISTANCE

For an additional amount for "International Disaster Assistance", $400,000,000, to remain available until expended, to address humanitarian needs in Afghanistan and the region impacted by the situation in Afghanistan.

### DEPARTMENT OF STATE

#### MIGRATION AND REFUGEE ASSISTANCE

For an additional amount for "Migration and Refugee Assistance", $415,000,000, to remain available until expended, to address humanitarian needs in, and to assist refugees from, Afghanistan.

#### UNITED STATES EMERGENCY REFUGEE AND MIGRATION ASSISTANCE FUND

For an additional amount for "United States Emergency Refugee and Migration Assistance Fund", $1,076,100,000, to remain available until expended, notwithstanding section 2(c)(2) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601(c)(2)), of which $976,100,000 is for support for Operation Allies Welcome and related efforts by the Department of State, including additional relocations of individuals at risk as a result of the situation in Afghanistan and related expenses, and $100,000,000 is to respond to other unexpected and urgent humanitarian emergencies.

## GENERAL PROVISIONS—THIS TITLE

SEC. 2401. During fiscal years 2022 and 2023, notwithstanding any applicable restrictions on the ability of the Department of State and the United States Agency for International Development to enter into personal services contracts, including section 704 of the Financial Services and General Government Appropriations Act, 2021 (division E of Public Law 116–260) as continued by section 101 of division A of this Act (and any successor provision in a subsequently enacted appropriations Act), the authorities of section 2(c) of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2669(c)), section 636(a)(3) of the Foreign Assistance Act of 1961 (22 U.S.C. 2396(a)(3)), and section 5(a)(6) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2605(a)(6)) may be exercised, without regard to the geographic limitations referenced therein, particularly to enter into, extend, and maintain contracts with individuals who have served as locally employed staff of the United States mission in Afghanistan.

Time period.
Contracts.

135 STAT. 376          PUBLIC LAW 117–43—SEPT. 30, 2021

Consultation.
Reports.

SEC. 2402. The Secretary of State, in consultation with the Administrator of the United States Agency for International Development, shall submit to the Committees on Appropriations, not later than 45 days after the date of enactment of this Act, a report on the proposed uses of funds appropriated by this title under the headings "Emergencies in the Diplomatic and Consular Service" and "United States Emergency Refugee and Migration Assistance Fund", by program, project, and activity, for which the obligation of funds is anticipated: *Provided*, That such report shall be updated (including any changes in proposed uses from the initial plan) and submitted to the Committees on Appropriations every 45 days until September 30, 2023.

Updates.

Reports.
Consultation.

SEC. 2403. Not later than 45 days after the date of enactment of this Act, the Secretary of State, in consultation with the Secretary of Homeland Security and the heads of other relevant Federal agencies, shall submit to the Committees on Appropriations a report on the status of the Priority 2 (P–2) designation granting United States Refugee Admissions Program (USRAP) access for certain at risk Afghan nationals and their eligible family members that was announced by the Department of State on August 2, 2021: *Provided*, That such report shall include the approximate number of Afghan nationals and their eligible family members who have been referred to the program, the number of Afghan nationals who have contacted a Resettlement Support Center to begin processing of their P–2 referral, the estimated time for processing such applications, an assessment of the obstacles facing P–2 eligible individuals seeking to leave Afghanistan, and a plan for augmenting personnel needed for refugee processing or humanitarian parole: *Provided further*, That such report shall be submitted in unclassified form, but may be accompanied by a classified annex.

Taliban.

SEC. 2404. None of the funds appropriated in this title and made available for assistance for Afghanistan may be made available for direct assistance to the Taliban.

TITLE V

GENERAL PROVISIONS—THIS ACT

SEC. 2501. In addition to amounts otherwise made available, there is appropriated for "U.S. Citizenship and Immigration Services—Immigration Examinations Fee Account", $193,000,000, to remain available until expended, for necessary expenses in support of Operation Allies Welcome, to be deposited and used as provided in section 286(n) of the Immigration and Nationality Act (8 U.S.C. 1356(n)): *Provided*, That such amounts shall be in addition to any other amounts made available for such purposes and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)): *Provided further*, That amounts provided in this section shall only be for the purposes specified, and notwithstanding any other provision of law are not available for non-expenditure transfer or reprogramming: *Provided further*, That within 15 days of the date of enactment of this Act, U.S. Citizenship and Immigration Services shall provide to the Committees on Appropriations and the Committees on the Judiciary of the Senate and the House of Representatives an expenditure plan for the funds provided under this paragraph, and every 30 days thereafter shall provide updated execution data

Deadlines.
Expenditure
plan.
Updates.
Data.

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 377

to such Committees for such funds: *Provided further*, That the reporting requirement in the previous proviso shall end on September 30, 2026.

Termination date.

SEC. 2502. (a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Afghanistan (or a person with no nationality who last habitually resided in Afghanistan) shall be eligible for the benefits described in subsections (b) and (c) if—

Eligibility.
8 USC 1101 note.

(1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—

(A) paroled into the United States between July 31, 2021, and September 30, 2022; or

Time period.

(B) paroled into the United States after September 30, 2022, and—

Effective date.

(i) is the spouse or child (as such term is defined under section 101(b) of the Immigration and Nationality Act (8 U.S.C. 1101(b)) of an individual described in subparagraph (A); or

(ii) is the parent or legal guardian of an individual described in subparagraph (A) who is determined to be an unaccompanied child under 6 U.S.C. 279(g)(2); and

(2) such individual's parole has not been terminated by the Secretary of Homeland Security.

(b) BENEFITS.—An individual described in subsection (a) shall be eligible for—

(1) resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) until March 31, 2023, or the term of parole granted under subsection (a), whichever is later;

Expiration date.

(2) services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under 6 U.S.C. 279(g)(2); and

(3) a driver's license or identification card under section 202 of the REAL ID Act of 2005 (division B of Public Law 109–13; 49 U.S.C. 30301 note), notwithstanding subsection (c)(2)(B) of such Act.

(c) EXPEDITIOUS ADJUDICATION OF ASYLUM APPLICATIONS.— With respect to an application for asylum under section 208 of the Immigration and Nationality Act (8 U.S.C. 1158) filed by an individual described in subsection (a), the Secretary of Homeland Security shall—

(1) conduct the initial interview on the asylum application not later than 45 days after the date on which the application is filed; and

Deadlines.

(2) in the absence of exceptional circumstances, issue a final administrative adjudication on the asylum application within 150 days after the date the application is filed.

(d) CLARIFICATION.—Notwithstanding any other provision of law, nothing in this act shall be interpreted to—

(1) preclude an individual described in subsection (a), from applying for or receiving any immigration benefits to which such individual is otherwise eligible; or

(2) entitle a person described in subsection (a) to lawful permanent resident status.

*Time period.*
*Consultation.*
(e) REPORT.—Not later than 120 days after the date of enactment of this Act, and every 3 months thereafter, the Secretary of Homeland Security, in consultation with the Secretary of Defense and the Secretary of State, shall submit a report to Congress detailing the number of individuals described in subsection (a); the number of individuals receiving benefits in subsection (b), including their eligibility for benefits as refugees notwithstanding this Act; and any other information deemed relevant by the Secretary.

### REPORTING REQUIREMENT

*Coordination.*
*Time period.*
*Reports.*
SEC. 2503. (a) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, and quarterly thereafter through September 30, 2023, the Secretary of Homeland Security, in coordination with the head of any other applicable Federal agency, shall submit to Congress a report that includes the elements described in subsection (b).

(b) ELEMENTS.—The report required by subsection (a) shall include the following:

*Summary.*
(1) A summary of the status of Afghan evacuees, including—

(A) the number of the Afghan evacuees present in the United States, located at overseas bases of the United States Armed Forces, or located in third countries who are not located at such a base including—

(i) the number who are U.S. lawful permanent residents;

(ii) the number who are Special Immigrant Visa holders;

(iii) the number who are Special Immigrant Visa applicants;

(iv) the number who are in possession of a valid nonimmigrant visa to enter the United States;

(v) the number who are employees of a U.S. Government agency;

(vi) the number who are employees of a U.S. funded partner organization, media, or non-profit;

(vii) the number of Priority 1 refugee referrals;

(viii) the number of Priority 2 refugee referrals;

(ix) the number who have been relocated from the United States to a third country, and the country to which they were relocated; and

(x) the number who do not fall into any of the above categories;

(B) the number of Afghan evacuees at overseas bases or other official staging areas who have been flagged as potential security concerns or risks or included on the United States no-fly list and who were therefore denied clearance to enter the United States; and

(C) the number of the Afghan evacuees who have been paroled into the United States—

(i) the number whose parole was terminated; and

(ii) the number whose parole has been extended.

(2) The number of Afghan evacuees who have been interviewed by U.S. Citizenship and Immigration Services in connection with an application or petition for immigration benefits, including—

(A) the number of such interviews conducted since the United States withdrawal;

(B) the rate at which individuals were granted or refused the benefits that formed the basis for such interviews;

(C) the number of individuals who did not appear at a scheduled interview; and

(D) a description of the procedures for screening for and detecting child marriage, human trafficking, gender-based violence, and marriages entered into or relationships as fiancee or fiance claimed for the sole purpose of securing evacuation.

(3) For each Federal department and agency involved in Operation Allies Welcome—

(A) as of the date of the report, the costs incurred; and

(B) an identification of the source of appropriated or other funds used to fund the effort.

(c) DEFINITION OF AFGHAN EVACUEE.—In this section, the term "Afghan evacuee" means a person whose evacuation from Afghanistan to the United States, or a location overseas controlled by the United States, was facilitated by the United States as part of Operation Allies Refuge.

SEC. 2504. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 2505. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 2506. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2022.

SEC. 2507. Each amount provided by this division is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) and section 4001(b) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022.

This division may be cited as the "Afghanistan Supplemental Appropriations Act, 2022".

# DIVISION D—OTHER MATTERS

## TITLE I—EXTENSIONS, TECHNICAL CORRECTIONS, AND OTHER MATTERS

### SEC. 3101. EXTENSION OF AUTHORITY TO MAKE CERTAIN APPOINTMENTS FOR NATIONAL DISASTER MEDICAL SYSTEM.

Section 2812(c)(4)(B) of the Public Health Service Act (42 U.S.C. 300hh–11(c)(4)(B)) is amended by striking "September 30, 2021" and inserting "December 3, 2021".



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 CV-00007

EXHIBIT
NO. 041

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | Civil Action No. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | Judge Drew S. Tipton |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 41



# Department of Homeland Security Operation Allies Welcome Afghan Parolee and Benefits Report

*March 10, 2023*
Fiscal Year 2022 Report to Congress



## Message from the Secretary

March 10, 2023

I am pleased to submit this *Department of Homeland Security Operation Allies Welcome Afghan Parolee and Benefits Report* prepared by the Department of Homeland Security (DHS) Office of Strategy, Policy, and Plans.



The report was compiled pursuant to *the Afghanistan Supplemental Appropriations Act, 2022* (P.L. 117-43). The report provides available information on the requested topics and was coordinated with the Department of State, the Department of Defense, the Department of Health and Human Services, and the Office of Management and Budget.

Pursuant to congressional requirements, this report is provided to the following:

> The Honorable Kevin McCarthy
> Speaker of the House of Representatives
>
> The Honorable Kamala Harris
> The Vice President of the United States
> President of the Senate

Inquiries relating to this report may be directed to the DHS Office of Legislative Affairs at (202) 447-5890. Thank you for your continued support of the Department of Homeland Security.

Sincerely,

Alejandro N. Mayorkas
Secretary

2



# Department of Homeland Security
## Operation Allies Welcome
## Afghan Parolee and Benefits Report
## March 2023

## Table of Contents

I.    Legislative Language ..................................................................................................4

II.   Introduction ..............................................................................................................5

III.  § 2502(e) Reporting Requirements ...........................................................................6

      **The number of individuals described in § 2502(a):** ..........................................6

      **The number of individuals receiving benefits in § 2502(b):** ...........................6

          § 2502(b)(1): .................................................................................... 6
          § 2502(b)(2): .................................................................................... 6
          § 2502(b)(3): .................................................................................... 7

IV.   Conclusion .................................................................................................................8

3

# I.   Legislative Language

This document was compiled in response to Section 2502 of *the Afghanistan Supplemental Appropriations Act, 2022* (P.L. 117-43), signed into law September 30, 2021, subsection (e) of which states:

> Not later than 120 days after the date of enactment of this Act, and every 3 months thereafter, the Secretary of Homeland Security, in consultation with the Secretary of Defense and the Secretary of State, shall submit a report to Congress detailing the number of individuals described in subsection (a); the number of individuals receiving benefits in subsection (b), including their eligibility for benefits as refugees notwithstanding this Act; and any other information deemed relevant by the Secretary.

Subsections (a) and (b) referenced above read:

> (a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Afghanistan (or a person with no nationality who last habitually resided in Afghanistan) shall be eligible for the benefits described in subsections (b) and (c) if—
>    (1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—
>       (A) paroled into the United States between July 31, 2021, and September 30, 2022; or
>       (B) paroled into the United States after September 30, 2022, and—
>          (i) is the spouse or child (as such term is defined under section 101(b) of the Immigration and Nationality Act (8 U.S.C. 1101(b)) of an individual described in subparagraph (A); or
>          (ii) is the parent or legal guardian of an individual described in subparagraph (A) who is determined to be an unaccompanied child under 6 U.S.C. 279(g)(2); and
>    (2) such individual's parole has not been terminated by the Secretary of Homeland Security.
> (b) BENEFITS.—An individual described in subsection (a) shall be eligible for—
>    (1) resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) until March 31, 2023, or the term of parole granted under subsection (a), whichever is later;
>    (2) services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under 6 U.S.C. 279(g)(2); and
>    (3) a driver's license or identification card under section 202 of the REAL ID Act of 2005 (division B of Public Law 109–13; 49 U.S.C. 30301 note), notwithstanding subsection (c)(2)(B) of such Act."

# II.  Introduction

On August 29, 2021, President Biden directed the U.S. Department of Homeland Security (DHS) to lead and coordinate ongoing efforts across the Federal Government to support at-risk Afghans, including those who worked in Afghanistan alongside the United States during the past two decades, as they safely resettle in the United States.  DHS established a Unified Coordination Group (UCG), which reports directly to the Secretary of Homeland Security, to coordinate the implementation of a broad range of services, including medical services, immigration processing, and resettlement support.  The work of the UCG is undertaken in close collaboration with partners across every level of government, nongovernmental organizations, and the private sector.  Through Operation Allies Welcome (OAW), we welcomed 90,000 Afghans to the United States and we are prepared to welcome additional qualifying Afghans as part of Enduring Welcome.

This report includes data on Afghans paroled into the United States following relocation[1] and those eligible for refugee resettlement assistance.  The report is based on DHS Office of Immigration Statistics analysis of data provided through U.S. Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), Department of State, and the Department of Health and Human Services (HHS).

---

[1] This report includes data only on Afghan parolees, and does not include other Afghans welcomed through OAW, such as those who were lawful permanent residents of the United States–including Special Immigrant Visa holders-- or those admitted as refugees.

# III.  § 2502(e) Reporting Requirements

This data includes only Afghan parolees.  Parolees are eligible to receive resettlement assistance through the Afghan Placement and Assistance program.  Special Immigrant Visa (SIV) holders and Afghans admitted with refugee status are separately eligible to receive resettlement assistance through those programs.  Many Afghan parolees are awaiting adjudication of SIV applications.

**The number of individuals described in § 2502(a):**

Citizens or nationals of Afghanistan (or a person with no nationality who last habitually resided in Afghanistan) eligible for benefits described in subsections (b) and (c): **76,160**

**NOTES:**  Data are based on CBP admissions and parole data, are valid as of November 1, 2022, and cover the period July 30, 2021 to September 30, 2022.  These data include all parole codes, including those issued through OAW and those issued outside the scope of OAW and through USCIS.

**The number of individuals receiving benefits in § 2502(b):**

§ 2502(b)(1):

Those receiving resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) until March 31, 2023, or the term of parole granted under subsection (a), whichever is later: **73,163**

**NOTES:**  Data are based on Department of State (DOS) resettlement agency assignment information and only include those relocated under OAW prior to June 30, 2022.  Data are valid as of November 23, 2022, and cover those assigned resettlement agencies during the period July 30, 2021 to September 30, 2022.  DHS does not have data on the number of Afghans enrolled in specific entitlement programs and other benefits available to refugees other than information on resettlement agency assignment.

§ 2502(b)(2):

Those receiving services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under 6 U.S.C. 279(g)(2):

The HHS Office of Refugee Resettlement (ORR) received **1,556** Afghan unaccompanied child (UC) referrals, of whom:

**456** were referred into ORR care, of whom:

6

> **81** are currently in ORR care.
> **375** were discharged from ORR care, of whom:
> > **127** were enrolled in the Unaccompanied Refugee Minors (URM) program.[2]
> **1,100** were directly unified with family members (a) in third country locations controlled by the United States, (b) at ports of entry, or (c) at safe haven facilities within the United States set up to house and support individuals following their arrival within the United States.[3]

**NOTES:** Data on unaccompanied children are from HHS, are valid as of November 28, 2022, and cover the period July 30, 2021 to September 30, 2022.

> § 2502(b)(3):

> > Those receiving a driver's license or identification card under section 202 of the REAL ID Act of 2005 (division B of Public Law 109–13; 49 U.S.C. 30301 note), notwithstanding subsection (c)(2)(B) of such Act: **See "Notes" section below.**

**NOTES:** Driver's licenses and identification cards are issued under the authority of U.S. states and territories. There is no REAL ID requirement that states and territories provide any issuance data specific to any class of individuals, including Afghan parolees. While states may be able to collect this data on an individual basis, there is no requirement and no system to report this metric to DHS.

---

[2] Children enrolled in the URM program are considered "Reunified (Program/Facility)" (i.e., discharged from the UC Program to another long-term, state-operated program). Other discharge types include Reunified with an ORR-approved individual sponsor, Age Out (i.e., UC attained 18 years old), Age Redetermination (i.e., updated information determines that the individual is not a minor).

[3] For more information about HHS ORR programs supporting unaccompanied minors and unaccompanied refugee minors, see Unaccompanied Refugee Minors Program | The Administration for Children and Families (hhs.gov).

# IV. Conclusion

This report provides the most complete and current data available to respond to the requirements of Section 2502 of the Afghan Supplemental Appropriations Act, 2022. DHS will continue to work with its interagency partners to provide updated information about Afghan parolees in future editions of this report.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23- cv-
00007

EXHIBIT
NO. 042

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

STATE OF TEXAS, *et al.*,                                §
                                                         §
    *Plaintiffs,*                     §
                                                         §
    vs.                               §   CIVIL ACTION NO.
                                                         §   6:23-CV-00007
UNITED STATES DEPARTMENT OF                              §
HOMELAND SECURITY, *et al.*,                             §
                                                         §
    *Defendants,* and                 §   JUDGE DREW S. TIPTON
                                                         §
VALERIE LAVEUS, *et al.*,                                §
                                                         §
    *Intervenor Defendants.*          §


# INTERVENOR DEFENDANTS'
# EXHIBIT 42



PUBLIC LAW 117–128—MAY 21, 2022        136 STAT. 1211

Public Law 117–128
117th Congress

## An Act

Making emergency supplemental appropriations for assistance for the situation in Ukraine for the fiscal year ending September 30, 2022, and for other purposes.

<div align="right">

May 21, 2022

[H.R. 7691]

</div>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2022, and for other purposes, namely:

<div align="right">

Additional Ukraine Supplemental Appropriations Act, 2022.

</div>

### TITLE I

### DEPARTMENT OF JUSTICE

GENERAL ADMINISTRATION

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Salaries and Expenses", $67,000,000, to remain available until expended, for expenses authorized by section 524(c) of title 28, United States Code, to respond to the situation in Ukraine and for related expenses: *Provided,* That amounts provided under this heading in this Act may not be used to increase the number of permanent positions: *Provided further,* That amounts provided under this heading in this Act may be transferred to, and merged with, other appropriation accounts of the Department of Justice, to respond to the situation in Ukraine and for related expenses: *Provided further,* That amounts provided under this heading in this Act may be used to investigate, seize, detain, forfeit, inventory, safeguard, maintain, advertise, sell, or dispose of any property, real or personal, tangible or intangible, related to Russian aggression, including Russian aggression toward Ukraine, or for any other necessary expense incident to the seizure, detention, forfeiture, or disposal of such property: *Provided further,* That the authorities included in the preceding proviso are in addition to any other authority provided by law.

<div align="right">

Russia.

</div>

PUBLIC LAW 117–128—MAY 21, 2022

## TITLE II

## DEPARTMENT OF DEFENSE

## MILITARY PERSONNEL

### MILITARY PERSONNEL, ARMY

For an additional amount for "Military Personnel, Army", $12,750,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

### MILITARY PERSONNEL, NAVY

For an additional amount for "Military Personnel, Navy", $37,500, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

### MILITARY PERSONNEL, MARINE CORPS

For an additional amount for "Military Personnel, Marine Corps", $675,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

### MILITARY PERSONNEL, AIR FORCE

For an additional amount for "Military Personnel, Air Force", $1,590,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses, including for hardship duty pay.

## OPERATION AND MAINTENANCE

### OPERATION AND MAINTENANCE, ARMY

For an additional amount for "Operation and Maintenance, Army", $1,493,532,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

### OPERATION AND MAINTENANCE, NAVY

For an additional amount for "Operation and Maintenance, Navy", $939,779,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

### OPERATION AND MAINTENANCE, AIR FORCE

For an additional amount for "Operation and Maintenance, Air Force", $195,262,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1213

OPERATION AND MAINTENANCE, SPACE FORCE

For an additional amount for "Operation and Maintenance, Space Force", $800,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

OPERATION AND MAINTENANCE, DEFENSE-WIDE

(INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Operation and Maintenance, Defense-Wide", $15,256,824,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses: *Provided*, That of the total amount provided under this heading in this Act, $6,000,000,000, to remain available until September 30, 2023, shall be for the Ukraine Security Assistance Initiative: *Provided further*, That such funds for the Ukraine Security Assistance Initiative shall be available to the Secretary of Defense under the same terms and conditions as are provided for in section 8139 of the Department of Defense Appropriations Act, 2022 (division C of Public Law 117–103): *Provided further*, That of the total amount provided under this heading in this Act, up to $9,050,000,000, to remain available until September 30, 2023, may be transferred to accounts under the headings "Operation and Maintenance" and "Procurement" for replacement of defense articles from the stocks of the Department of Defense, and for reimbursement for defense services of the Department of Defense and military education and training, provided to the Government of Ukraine or to foreign countries that have provided support to Ukraine at the request of the United States: *Provided further*, That funds transferred pursuant to the preceding proviso shall be merged with and available for the same purposes and for the same time period as the appropriations to which the funds are transferred: *Provided further*, That the Secretary of Defense shall notify the congressional defense committees of the details of such transfers not less than 15 days before any such transfer: *Provided further*, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back and merged with this appropriation: *Provided further*, That the transfer authority provided herein is in addition to any other transfer authority provided by law.

<div style="float:right">Notification.<br>Deadline.<br><br>Determination.</div>

PROCUREMENT

MISSILE PROCUREMENT, ARMY

For an additional amount for "Missile Procurement, Army", $350,970,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

PROCUREMENT OF WEAPONS AND TRACKED COMBAT VEHICLES, ARMY

For an additional amount for "Procurement of Weapons and Tracked Combat Vehicles, Army", $255,000, to remain available

136 STAT. 1214          PUBLIC LAW 117–128—MAY 21, 2022

until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### PROCUREMENT OF AMMUNITION, ARMY

For an additional amount for "Procurement of Ammunition, Army", $45,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### OTHER PROCUREMENT, ARMY

For an additional amount for "Other Procurement, Army", $113,440,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### OTHER PROCUREMENT, NAVY

For an additional amount for "Other Procurement, Navy", $1,250,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### AIRCRAFT PROCUREMENT, AIR FORCE

For an additional amount for "Aircraft Procurement, Air Force", $28,500,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### OTHER PROCUREMENT, AIR FORCE

For an additional amount for "Other Procurement, Air Force", $155,382,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### PROCUREMENT, DEFENSE-WIDE

For an additional amount for "Procurement, Defense-Wide", $24,218,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and for related expenses.

### DEFENSE PRODUCTION ACT PURCHASES

For an additional amount for "Defense Production Act Purchases", $600,000,000, to remain available until expended, to respond to the situation in Ukraine and for related expenses.

## RESEARCH, DEVELOPMENT, TEST AND EVALUATION

### RESEARCH, DEVELOPMENT, TEST AND EVALUATION, ARMY

For an additional amount for "Research, Development, Test and Evaluation, Army", $128,700,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1215

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, NAVY

For an additional amount for "Research, Development, Test and Evaluation, Navy", $43,000,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, AIR FORCE

For an additional amount for "Research, Development, Test and Evaluation, Air Force", $119,815,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, DEFENSE-WIDE

For an additional amount for "Research, Development, Test and Evaluation, Defense-Wide", $72,103,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses.

REVOLVING AND MANAGEMENT FUNDS

DEFENSE WORKING CAPITAL FUNDS

For an additional amount for "Defense Working Capital Funds", $965,000, to remain available until September 30, 2022, to respond to the situation in Ukraine and for related expenses.

OTHER DEPARTMENT OF DEFENSE PROGRAMS

DEFENSE HEALTH PROGRAM

For an additional amount for "Defense Health Program", $13,900,000, to remain available until September 30, 2022, which shall be for operation and maintenance to respond to the situation in Ukraine and for related expenses.

GENERAL PROVISIONS—THIS TITLE

(INCLUDING TRANSFERS OF FUNDS)

SEC. 201. In addition to any other funds made available for such purposes, $500,000,000 is hereby appropriated for an additional amount for the Department of Defense and made available for transfer to "Missile Procurement, Army", "Procurement of Ammunition, Navy and Marine Corps", "Weapons Procurement, Navy", "Missile Procurement, Air Force", and "Procurement of Ammunition, Air Force", only for the procurement of critical munitions to increase stocks of the Department of Defense: *Provided*, That none of the funds provided under this section in this Act may be obligated or expended until 60 days after the Secretary of Defense provides to the congressional defense committees an execution plan: *Provided further*, That not less than 30 days prior to any transfer of funds, the Secretary of Defense shall notify the congressional defense committees of the details of any such transfer: *Provided further*, That upon transfer, the funds shall be merged with and be available for the same purposes, and for the same time period, as the appropriation to which transferred:

Time period.
Execution plan.

Deadline.
Notification.

*Provided further,* That the transfer authority provided under this section is in addition to any other transfer authority provided by law.

SEC. 202. In addition to any other funds made available for such purposes, $50,000,000 is hereby appropriated for an additional amount for the Department of Defense and made available for transfer to "Research, Development, Test and Evaluation, Defense-Wide", only to develop program protection strategies for Department of Defense systems identified for possible future export, to design and incorporate exportability features into such systems during the research and development phases of such systems, and to integrate design features that enhance interoperability of such systems with those of friendly foreign countries: *Provided,* That none of the funds provided under this section in this Act may be obligated or expended until 60 days after the Secretary of Defense provides to the congressional defense committees an execution plan: *Provided further,* That not less than 30 days prior to any transfer of funds, the Secretary of Defense shall notify the congressional defense committees of the details of any such transfer: *Provided further,* That upon transfer, the funds shall be merged with and be available for the same purposes, and for the same time period, as the appropriation to which transferred: *Provided further,* That the transfer authority provided under this section is in addition to any other transfer authority provided by law.

*Time period. Execution plan.*

*Deadline. Notification.*

SEC. 203. During fiscal year 2022, section 331(g)(1) of title 10, United States Code, shall be applied by substituting "$950,000,000" for "$450,000,000".

*Applicability.*

SEC. 204. The Inspector General of the Department of Defense shall carry out reviews of the activities of the Department of Defense to execute funds appropriated in this title, including assistance provided to Ukraine: *Provided,* That the Inspector General shall provide to the congressional defense committees a written report not later than 120 days after the date of enactment of this Act.

*Reviews.*

*Reports.*

SEC. 205. Not later than 45 days after the date of enactment of this Act, the Secretary of Defense, in coordination with the Secretary of State, shall submit a report to the Committees on Appropriations, Armed Services, and Foreign Affairs of the House of Representatives and the Committees on Appropriations, Armed Services, and Foreign Relations of the Senate on measures being taken to account for United States defense articles designated for Ukraine since the February 24, 2022, Russian invasion of Ukraine, particularly measures with regard to such articles that require enhanced end-use monitoring; measures to ensure that such articles reach their intended recipients and are used for their intended purposes; and any other measures to promote accountability for the use of such articles.

*Coordination. Reports.*

SEC. 206. Not later than 30 days after the date of enactment of this Act, and every 30 days thereafter through fiscal year 2023, the Secretary of Defense, in coordination with the Secretary of State, shall provide a written report to the Committees on Appropriations, Armed Services, and Foreign Affairs of the House of Representatives and the Committees on Appropriations, Armed Services, and Foreign Relations of the Senate describing United States security assistance provided to Ukraine since the February 24, 2022, Russian invasion of Ukraine, including a comprehensive list of the defense articles and services provided to Ukraine and the associated authority and funding used to provide such articles

*Time period. Coordination. Reports. List.*

PUBLIC LAW 117–128—MAY 21, 2022      136 STAT. 1217

and services: *Provided*, That such report shall be submitted in unclassified form, but may be accompanied by a classified annex.

## TITLE III

## INDEPENDENT AGENCIES

### NUCLEAR REGULATORY COMMISSION

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $2,000,000, to remain available until expended, to provide regulatory and technical support related to the situation in Ukraine: *Provided*, That, notwithstanding section 102 of the Nuclear Energy Innovation and Modernization Act (42 U.S.C. 2215), such amount shall not be derived from fee revenue.

## TITLE IV

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### CENTERS FOR DISEASE CONTROL AND PREVENTION

#### CDC-WIDE ACTIVITIES AND PROGRAM SUPPORT

For an additional amount for "CDC-Wide Activities and Program Support", $54,000,000, to remain available until September 30, 2023, for carrying out public health and disease detection activities related to the situation in Ukraine, and for medical support, screening, and other public health activities related to populations displaced from Ukraine, both domestically and internationally.

### ADMINISTRATION FOR CHILDREN AND FAMILIES

#### REFUGEE AND ENTRANT ASSISTANCE

For an additional amount for "Refugee and Entrant Assistance", $900,000,000, to remain available until September 30, 2023, for carrying out refugee and entrant assistance activities in support of citizens or nationals of Ukraine, or a person who last habitually resided in Ukraine, for whom such refugee and entrant assistance activities are authorized: *Provided*, That amounts made available under this heading in this Act may be used for grants or contracts with qualified organizations, including nonprofit entities, to provide culturally and linguistically appropriate services, including wrap-around services, housing assistance, medical assistance, legal assistance, and case management assistance: *Provided further*, That amounts made available under this heading in this Act may be used by the Director of the Office of Refugee Resettlement (Director) to issue awards or supplement awards previously made by the Director: *Provided further*, That the Director, in carrying out section 412(c)(1)(A) of the Immigration and Nationality Act (8 U.S.C. 1522(c)(1)(A)) with amounts made available under this heading in this Act, may allocate such amounts among the States in a manner that accounts for the most current data available.

Grants.
Contracts.

Allocations.

GENERAL PROVISION—THIS TITLE

8 USC 1101 note.    SEC. 401. (a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Ukraine (or a person who last habitually resided in Ukraine) shall be eligible for the benefits described in subsection (b) if—

(1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—

Time period.        (A) paroled into the United States between February 24, 2022 and September 30, 2023; or

Effective date.        (B) paroled into the United States after September 30, 2023 and—

(i) is the spouse or child of an individual described in subparagraph (A); or

Determination.            (ii) is the parent, legal guardian, or primary caregiver of an individual described in subparagraph (A) who is determined to be an unaccompanied child under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)) or section 412(d)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)(B)); and

(2) such individual's parole has not been terminated by the Secretary of Homeland Security.

(b) BENEFITS.—An individual described in subsection (a) shall be eligible for—

(1) resettlement assistance, entitlement programs, and other benefits available to refugees admitted under section 207 of the Immigration and Nationality Act (8 U.S.C. 1157) to the same extent as such refugees, but shall not be eligible for the program of initial resettlement authorized by section 412(b)(1) of the Immigration and Nationality Act (8 U.S.C. 1522(b)(1)); and

(2) services described under section 412(d)(2) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)), subject to subparagraph (B) of such section, if such individual is an unaccompanied alien child as defined under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)).

(c) CLARIFICATIONS.—

(1) Nothing in this section shall be interpreted to:

(A) preclude an individual described in subsection (a) from applying for or receiving any immigration benefits to which such individual is otherwise eligible; or

(B) entitle a person described in subsection (a) to lawful permanent resident status.

(2) Section 421(a) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) shall not apply with respect to determining the eligibility and the amount of benefits made available pursuant to subsection (b).

(d) NON-APPLICATION OF THE PAPERWORK REDUCTION ACT.—Chapter 35 of title 44, United States Code (commonly referred to as the Paperwork Reduction Act of 1995), shall not apply to any action taken to implement this section that involves translating a currently approved collection of information into a new language.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1219

TITLE V

DEPARTMENT OF STATE AND RELATED AGENCY

DEPARTMENT OF STATE

ADMINISTRATION OF FOREIGN AFFAIRS

DIPLOMATIC PROGRAMS

For an additional amount for "Diplomatic Programs", $190,000,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

CAPITAL INVESTMENT FUND

For an additional amount for "Capital Investment Fund", $10,000,000, to remain available until expended, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $4,000,000, to remain available until September 30, 2024.

EMBASSY SECURITY, CONSTRUCTION, AND MAINTENANCE

For an additional amount for "Embassy Security, Construction, and Maintenance", $110,000,000, to remain available until expended, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT

FUNDS APPROPRIATED TO THE PRESIDENT

OPERATING EXPENSES

For an additional amount for "Operating Expenses", $17,000,000, to remain available until September 30, 2024, to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

OFFICE OF INSPECTOR GENERAL

For an additional amount for "Office of Inspector General", $1,000,000, to remain available until September 30, 2024.

BILATERAL ECONOMIC ASSISTANCE

FUNDS APPROPRIATED TO THE PRESIDENT

INTERNATIONAL DISASTER ASSISTANCE

For an additional amount for "International Disaster Assistance", $4,348,000,000, to remain available until expended, to

respond to humanitarian needs in Ukraine and in countries impacted by the situation in Ukraine, including the provision of emergency food and shelter, and for assistance for other vulnerable populations and communities, including through local and international nongovernmental organizations.

### ECONOMIC SUPPORT FUND

For an additional amount for "Economic Support Fund", $8,766,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine, including for programs to combat human trafficking, of which up to $760,000,000 may be made available to prevent and respond to food insecurity: *Provided*, That funds appropriated under this heading in this Act may be made available notwithstanding any other provision of law that restricts assistance to foreign countries and may be made available as contributions.

### DEPARTMENT OF STATE

#### MIGRATION AND REFUGEE ASSISTANCE

For an additional amount for "Migration and Refugee Assistance", $350,000,000, to remain available until expended, to address humanitarian needs in, and to assist refugees from, Ukraine, and for additional support for countries in the Eastern European region impacted by the situation in Ukraine.

## INTERNATIONAL SECURITY ASSISTANCE

### DEPARTMENT OF STATE

#### INTERNATIONAL NARCOTICS CONTROL AND LAW ENFORCEMENT

For an additional amount for "International Narcotics Control and Law Enforcement", $400,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine, including for programs to combat human trafficking and to document and collect evidence of war crimes and crimes against humanity committed by the Government of the Russian Federation in Ukraine.

#### NONPROLIFERATION, ANTI-TERRORISM, DEMINING AND RELATED PROGRAMS

For an additional amount for "Nonproliferation, Anti-terrorism, Demining and Related Programs", $100,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine.

### FUNDS APPROPRIATED TO THE PRESIDENT

#### FOREIGN MILITARY FINANCING PROGRAM

For an additional amount for "Foreign Military Financing Program", $4,000,000,000, to remain available until September 30, 2024, for assistance for Ukraine and countries impacted by the situation in Ukraine.

PUBLIC LAW 117–128—MAY 21, 2022      136 STAT. 1221

MULTILATERAL ASSISTANCE

INTERNATIONAL FINANCIAL INSTITUTIONS

CONTRIBUTION TO THE EUROPEAN BANK FOR RECONSTRUCTION AND
DEVELOPMENT

For payment by the Secretary of the Treasury to the European
Bank for Reconstruction and Development and its trust funds and
facilities, $500,000,000, to remain available until expended, for
assistance and related programs for Ukraine and countries impacted
by the situation in Ukraine: *Provided*, That such amount shall
be subject to the same authorities and conditions as if such amount
was made available by title V of the Department of State, Foreign
Operations, and Related Programs Appropriations Act, 2022 (division K of Public Law 117–103).

GLOBAL AGRICULTURE AND FOOD SECURITY PROGRAM

For an additional payment to the Global Agriculture and Food
Security Program by the Secretary of the Treasury, $150,000,000,
to remain available until expended.

GENERAL PROVISIONS—THIS TITLE

(INCLUDING TRANSFERS OF FUNDS)

SEC. 501. During fiscal year 2022, section 506(a)(1) of the
Foreign Assistance Act of 1961 (22 U.S.C. 2318(a)(1)) shall be
applied by substituting "$11,000,000,000" for "$100,000,000".      *Applicability.*

SEC. 502. During fiscal year 2022, section 614 of the Foreign
Assistance Act of 1961 (22 U.S.C. 2364) shall be applied—      *Applicability.*

    (1) in subsection (a)(4)(A)(ii), by substituting
"$1,000,000,000" for "$250,000,000"; and

    (2) in subsection (a)(4)(C), by substituting "$200,000,000"
for "$50,000,000", "$1,000,000,000" for "$250,000,000",
"$1,000,000,000" for "$500,000,000", and "$1,750,000,000" for
"$1,000,000,000".

SEC. 503. During fiscal year 2022, section 552(c) of the Foreign
Assistance Act of 1961 (22 U.S.C. 2348a(c)) shall be applied by
substituting "$100,000,000" for "$25,000,000".      *Applicability.*

SEC. 504. (a) Section 2606(a) of the Ukraine Supplemental
Appropriations Act, 2022 (division N of Public Law 117–103) is
amended by striking "fiscal year 2022" and inserting "fiscal years
2022 through 2024": *Provided*, That funds made available under
the heading "Foreign Military Financing Program" in this title
shall be available for loans under such section.      *Ante,* p. 785.
*Time period.*

(b) During fiscal years 2022 and 2023, funds made available
under the heading "Foreign Military Financing Program" in this
Act and prior Acts making appropriations for the Department of
State, foreign operations, and related programs may be utilized
by Ukraine for the procurement of defense articles, defense services,
or design and construction services that are not sold by the United
States Government under the Arms Export Control Act (22 U.S.C.
2751 et seq.): *Provided*, That such procurements shall be subject      *Contracts.*
*Notification.*
to the applicable notification requirements of section 38 of the
Arms Export Control Act (22 U.S.C. 2778).

136 STAT. 1222          PUBLIC LAW 117–128—MAY 21, 2022

SEC. 505. (a) Funds appropriated by this title under the headings "Diplomatic Programs", "Capital Investment Fund", "Embassy Security, Construction, and Maintenance", and "Operating Expenses" may be transferred to, and merged with, funds available under such headings and with funds available under the heading "Educational and Cultural Exchange Programs" to respond to the situation in Ukraine and countries impacted by the situation in Ukraine.

(b) Funds appropriated by this title under the headings "International Disaster Assistance" and "Migration and Refugee Assistance" may be transferred to, and merged with, funds appropriated by this title under such headings.

(c) Funds appropriated by this title under the heading "Economic Support Fund" may be transferred to, and merged with, funds available under the heading "Assistance for Europe, Eurasia and Central Asia" for assistance and related programs for Ukraine and other countries identified in section 3 of the FREEDOM Support Act (22 U.S.C. 5801) and section 3(c) of the Support for East European Democracy (SEED) Act of 1989 (22 U.S.C. 5402(c)) and under the headings "Transition Initiatives" and "Complex Crises Fund" to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

(d) Funds appropriated by this title under the headings "International Narcotics Control and Law Enforcement", "Nonproliferation, Anti-terrorism, Demining and Related Programs", and "Foreign Military Financing Program" may be transferred to, and merged with, funds appropriated by this title under such headings to respond to the situation in Ukraine and in countries impacted by the situation in Ukraine.

(e) The transfer authorities provided by this title are in addition to any other transfer authority provided by law.

*Consultation.*
*Notifications.*

(f) The exercise of the transfer authorities provided by this title shall be subject to prior consultation with, and the regular notification procedures of, the Committees on Appropriations.

*Determination.*

(g) Upon a determination that all or part of the funds transferred pursuant to the authorities provided by this title are not necessary for such purposes, such amounts may be transferred back to such appropriations.

*Reports.*

SEC. 506. Not later than 30 days after the date of enactment of this Act, the Secretary of State and Administrator of the United States Agency for International Development shall jointly submit a report to the Committees on Appropriations on the proposed uses of funds appropriated by this title, with the exception of funds appropriated under the heading "Multilateral Assistance": *Provided,* That the Secretary of the Treasury shall submit a separate report, not later than 30 days after the date of enactment of this Act, for funds appropriated under the heading "Multilateral Assistance": *Provided further,* That such reports shall be updated and submitted to the Committees on Appropriations every 60 days thereafter until September 30, 2024, and every 120 days thereafter until all funds have been expended.

*Updates.*
*Time periods.*
*Termination date.*

SEC. 507. (a) Funds made available by this title under the heading "Economic Support Fund" may be made available for direct financial support for the Government of Ukraine, and such funds shall be matched, to the maximum extent practicable, by sources other than the United States Government.

PUBLIC LAW 117–128—MAY 21, 2022          136 STAT. 1223

(b) Funds made available to the Government of Ukraine as a cash transfer under subsection (a) shall be subject to a memorandum of understanding that describes how the funds proposed to be made available will be used and includes appropriate safeguards for transparency and accountability: *Provided*, That such assistance shall be maintained in a separate, auditable account and may not be comingled with any other funds.

*Memorandum.*

(c) At least 15 days prior to the initial obligation of funds made available for the purposes of subsection (a), the Secretary of State or the Administrator of the United States Agency for International Development, as appropriate, shall submit to the appropriate congressional committees a report detailing procedures and processes to ensure such funds are used by the Government of Ukraine in the manner agreed to by such Government, including details on the memorandum of understanding and appropriate safeguards for transparency and accountability required by subsection (b), if applicable: *Provided*, That such report shall be updated every six months following the submission of the first report and shall be submitted until funds made available for such direct financial support are expended.

*Time periods. Reports.*

*Updates.*

(d) The Secretary of State or the Administrator of the United States Agency for International Development, as appropriate, shall report to the appropriate congressional committees on the uses of any funds provided for direct financial support to the Government of Ukraine pursuant to subsection (a) and the results achieved, not later than 90 days after the date of enactment of this Act and every 90 days thereafter until September 30, 2025: *Provided*, That such report shall also include the metrics established to measure such results.

*Reports. Time period. Termination date.*

(e) Funds made available for the purposes of subsection (a) by this title shall be subject to the regular notification procedures of the Committees on Appropriations.

*Notifications.*

## TITLE VI

### GENERAL PROVISIONS—THIS ACT

#### (INCLUDING TRANSFER OF FUNDS)

SEC. 601. There is hereby appropriated to the Secretary of Agriculture $20,000,000, to remain available until expended, to carry out the Bill Emerson Humanitarian Trust, as authorized by the Bill Emerson Humanitarian Trust Act (7 U.S.C. 1736f–1).

SEC. 602. In addition to the amounts otherwise available to the Department of the Treasury, $52,000,000, to remain available until September 30, 2023, to respond to the situation in Ukraine and for related expenses: *Provided*, That funds appropriated in this section in this Act may be transferred to other appropriation accounts of the Department of the Treasury, to respond to the situation in Ukraine and for related expenses: *Provided further*, That such transfer authority is in addition to any other transfer authority provided by law.

SEC. 603. For payment to Anne Garland Walton, beneficiary of Don Young, late a Representative from the State of Alaska, $174,000.

*Anne Garland Walton.*

136 STAT. 1224        PUBLIC LAW 117–128—MAY 21, 2022

SEC. 604. Funds appropriated by this Act for intelligence or intelligence related activities are deemed to be specifically authorized by the Congress for purposes of section 504(a)(1) of the National Security Act of 1947 (50 U.S.C. 3094(a)(1)).

SEC. 605. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 606. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 607. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2022.

SEC. 608. Each amount provided by this Act is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) and section 4001(b) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022.

This Act may be cited as the "Additional Ukraine Supplemental Appropriations Act, 2022".

Approved May 21, 2022.

LEGISLATIVE HISTORY—H.R. 7691:

CONGRESSIONAL RECORD, Vol. 168 (2022):
    May 10, considered and passed House.
    May 17, 19, considered and passed Senate.

○



**DEFENDANT'S EXHIBIT**

CASE NO. 6:23 cv-00007

EXHIBIT NO. 043

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 43



U.S. Citizenship
and Immigration
Services

Home > Archive > DHS To Implement Haitian Family Reunification Parole Program

# DHS To Implement Haitian Family Reunification Parole Program

 **⚠ Archived Content**

The information on this page is out of date. However, some of the content may still be useful, so we have archived the page.

Release Date : 10/17/2014

**WASHINGTON**—Starting in early 2015, the Department of Homeland Security (DHS) will begin implementation of a Haitian Family Reunification Parole (HFRP) Program to expedite family reunification for certain eligible Haitian family members of U.S. citizens and lawful permanent residents of the U.S. and to promote safe, legal and orderly migration from Haiti to the United States.

Under this program U.S. Citizenship and Immigration Services (USCIS) will offer certain eligible Haitian beneficiaries of already approved family-based immigrant visa petitions, who are currently in Haiti, an opportunity to come to the United States up to approximately two years before their immigrant visa priority dates become current.

"The rebuilding and development of a safe and economically strong Haiti is a priority for the United States. The Haitian Family Reunification Parole program promotes a fundamental underlying goal of our immigration system – family reunification. It also supports broader U.S. goals for Haiti's reconstruction and development by providing the opportunity for certain eligible Haitians to safely and legally immigrate sooner to the United States," said Deputy Secretary of Homeland Security Alejandro Mayorkas. "The United States strongly discourages individuals in Haiti from undertaking life-threatening and illegal maritime journeys to the United States. Such individuals will not qualify for the HFRP program and if located at sea may be returned to Haiti."

Legal authority for the HFRP program is provided under the Immigration and Nationality Act which authorizes the Secretary of Homeland Security to parole into the United States certain individuals, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. This is the same legal authority used to establish the Cuban Family Reunification Parole program in 2007.

USCIS is not currently accepting HFRP program applications, and potential beneficiaries should not take any action at this time. USCIS will provide full program details before the end of this calendar year and stakeholder engagements will take place shortly thereafter. In early 2015, the Department of State

National Visa Center (NVC) will begin contacting certain U.S. citizens or lawful permanent residents with approved petitions for Haitian family members, offer them the opportunity to apply to the program, and provide instructions on how to apply. Only individuals who receive a written notice of program eligibility from NVC will be eligible to apply.

Under the Haitian Family Reunification Parole program, Haitians authorized parole will be allowed to enter the United States and apply for work permits but will not receive permanent resident status any earlier.  Visit www.uscis.gov/avoidscams for tips on filing forms, reporting scams, and finding accredited legal services. Remember, the Wrong Help Can Hurt! An informational brochure (PDF) and flyer (PDF, 463.45 KB) are also available on www.uscis.gov.

For more information on USCIS and its programs, please visit www.uscis.gov or follow us on Twitter (@uscis⊠), YouTube (/uscis⊠), Facebook(/uscis⊠), and the USCIS blog *The Beacon*.

Last Reviewed/Updated: 10/17/2014



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |


# INTERVENOR DEFENDANTS' EXHIBIT 44

JUNE 10, 2022

# Los Angeles Declaration on Migration and Protection

We, the Heads of State and Government of the Argentine Republic, Barbados, Belize, the Federative Republic of Brazil, Canada, the Republic of Chile, the Republic of Colombia, the Republic of Costa Rica, the Republic of Ecuador, the Republic of El Salvador, the Republic of Guatemala, Co-operative Republic of Guyana, the Republic of Haiti, the Republic of Honduras, Jamaica, the United Mexican States, the Republic of Panama, the Republic of Paraguay, the Republic of Peru, the United States of America, and the Oriental Republic of Uruguay, gathered in Los Angeles on the margins of the Ninth Summit of the Americas, reiterate our will to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration and to strengthen frameworks for international protection and cooperation.

We embrace the need to promote the political, economic, security, social, and environmental conditions for people to lead peaceful, productive, and dignified lives in their countries of origin.  Migration should be a voluntary, informed choice and not a necessity.

We are committed to protecting the safety and dignity of all migrants, refugees, asylum seekers, and stateless persons, regardless of their migratory status, and respecting their human rights and fundamental freedoms.  We intend to cooperate closely to facilitate safe, orderly, humane, and regular migration and, as appropriate, promote safe and dignified returns, consistent with national legislation, the principle of non-refoulement, and our respective obligations under international law.

We acknowledge that addressing irregular international migration requires a regional approach, and that ongoing health, social, and economic challenges of the pandemic exacerbate the root causes driving irregular migration,

including the vulnerabilities of many migrants and their communities.

We value the tradition of our region in welcoming refugees and migrants and showing solidarity with our neighbors.  We recognize the positive contributions of refugees and migrants to the socio-economic development of their host communities.  We recognize the sustained efforts of States in our hemisphere in hosting refugees, providing regular migration pathways, promoting local economic and social integration, facilitating safe, dignified, and voluntary return, and supporting the sustainable reintegration of returnees.

We remain committed to collectively leveraging the benefits of migration while addressing its challenges in countries and communities of origin, transit, destination, and return.  We do so in a spirit of collaboration, solidarity, and shared responsibility among States and in partnership with civil society and international organizations.  We reaffirm our shared commitment to supporting host communities; strengthening and expanding regular pathways and access to international protection; fostering opportunities for decent work; facilitating regularization and access to basic services; and promoting principles of safe, orderly, humane, and regular migration.

We also intend to strengthen the institutions that are responsible for migration management in our countries and exchange best practices in order to provide efficient and adequate care to migrants and access to protection for refugees.

**Promoting Stability and Assistance for Communities of Destination, Origin, Transit, and Return**

We affirm that countries of origin and countries and communities hosting large numbers of migrants and refugees may need international financing and assistance related to development, basic humanitarian needs, protection, security, public health, education, financial inclusion, and employment, among others.  We support efforts that allow all migrants, refugees, asylum seekers, and persons in situations of vulnerability to integrate into host countries and access legal identity, regular status, dignified employment, public services, and international protection, when appropriate and in

accordance with national legislation, to rebuild their lives and contribute to those communities. We plan to continue efforts to prevent and reduce statelessness. We intend to expand efforts to address the root causes of irregular migration throughout our hemisphere, improving conditions and opportunities in countries of origin and promoting respect for human rights. We reaffirm the importance of safe, dignified, and sustainable return, readmission, and reintegration of migrants to help them reestablish themselves in their communities of origin. We further reaffirm the importance of ensuring all foreign nationals receive prompt consular assistance when needed or requested, and returnees are treated humanely and in a dignified manner, regardless of their immigration status, including in the process of their repatriation and return.

**Promoting Regular Pathways for Migration and International Protection**

We affirm that regular pathways, including circular and seasonal labor migration opportunities, family reunification, temporary migration mechanisms, and regularization programs promote safer and more orderly migration. We intend to strengthen fair labor migration opportunities in the region, integrating robust safeguards to ensure ethical recruitment and employment free of exploitation, violence, and discrimination, consistent with respect for human rights and with a gender perspective. We intend to promote, in accordance with national legislation, the recognition of qualifications and the portability of social benefits. We intend to pursue accountability for those who commit human rights violations and abuses. We plan to promote access to protection and complementary pathways for asylum seekers, refugees, and stateless persons in accordance with national legislation and with respect for the principle of non-refoulement. We seek to promote border security and management processes that respect human rights and encourage and facilitate lawful, safe, and secure travel within the region. We commit to guarantee human rights to individuals in vulnerable situations and to provide access to international protection, as appropriate. We further intend to provide specialized and gender-responsive attention to individuals in situations of vulnerability.

**Promoting Humane Migration Management**

Renewing our commitment to respect and ensure the human rights of all

migrants and persons in need of international protection, we recognize each country's responsibility to manage mixed movements across international borders in a secure, humane, orderly, and regular manner. We intend to expand collaborative efforts to save lives, address violence and discrimination, counter xenophobia, and combat smuggling of migrants and trafficking in persons. This includes expanded collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks. We commit to provide appropriate protection and assistance to victimized individuals. We intend, in accordance with national legislation, to improve and facilitate regional law enforcement information sharing, with the purpose of supporting the investigation and prosecution of crimes. We intend to explore new mechanisms, while preserving and leveraging existing regional, subregional, hemispheric, and global fora, to strengthen cooperation on border management and apply current mechanisms on visa regimes and regularization processes to combat exploitation by criminal groups. In the instance of foreign nationals without a need for international protection and without a legal basis to remain in their country of presence, we commit to conduct any returns in a manner consistent with our respective obligations under international human rights law and international refugee law, and that respects the dignity of the individual, integrates safeguards to prevent refoulement, and promotes the return of children to safe conditions.

**Promoting a Coordinated Emergency Response**

Recognizing the imperative of promoting safe, orderly, and regular migration, and the safety of migrants, refugees, and asylum seekers in the region, we intend to work to cooperate in emergency response and humanitarian assistance in situations of mass migration and refugee movements. We plan to strengthen existing regional coordination mechanisms and, as appropriate, the participation of civil society and international organizations to advance those aims. This includes strengthening information sharing, as appropriate and in accordance with national legislation, enhancing early warning systems, leveraging existing relevant fora and processes, and defining a common set of triggers that activate a coordinated response.

**A Shared Approach to Reduce and Manage Irregular Migration**

To advance the common goals laid out in this Declaration and create the conditions for safe, orderly, humane, and regular migration through robust responsibility sharing, we intend to work together across the hemisphere to:

- Convene multilateral development banks, international financial institutions, and traditional and non-traditional donors to review financial support instruments for countries hosting migrant populations and facing other migration challenges, without prejudice to existing financing priorities and programs.

- Improve regional cooperation mechanisms for law enforcement cooperation, information sharing, protection-sensitive border management, visa regimes, and regularization processes, as appropriate and in accordance with national legislation.

- Strengthen and expand temporary labor migration pathways, as feasible, that benefit countries across the region, including through new programs promoting connections between employers and migrant workers, robust safeguards for ethical recruitment, and legal protections for workers' rights.

- Improve access to public and private services for all migrants, refugees, and stateless persons to promote their full social and economic inclusion in host communities.

- Expand access to regular pathways for migrants and refugees to include family reunification options where appropriate and feasible, in accordance with national legislation.

————————————

This Declaration builds upon existing efforts and international commitments and advances the vision set forth in the Global Compact on Refugees and the Global Compact for Safe, Orderly and Regular Migration (GCM) anchored in the 2030 Agenda for Sustainable Development. We acknowledge the progress noted in the International Migration Review Forum Progress Declaration for the GCM. We affirm the fundamental work that continues under the Comprehensive Regional Protection and Solutions Framework (MIRPS), the Regional Conference on Migration (RCM), and the South

American Conference on Migration (SACM), as key regional bodies to facilitate the implementation of this Declaration, as well as the Quito Process and the Regional Inter-agency Coordination Platform for refugees and migrants from Venezuela.  The United Nations 1951 Refugee Convention; its 1967 Protocol; the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; the Geneva Conventions of 1949 and International Humanitarian Law; the United Nations Convention against Transnational Organized Crime; its Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children; its Protocol against the Smuggling of Migrants by Land, Sea and Air; the United Nations Convention on the Rights of the Child; the International Convention on the Protection of the Rights of all Migrant Workers and Members of their Families; as well as other international conventions, remain binding on Parties to those conventions that endorse this Declaration.  This Declaration aligns with States' commitments in the International Labour Organization's Declaration on Fundamental Principles and Rights at Work and its General Principles and Operational Guidelines for Fair Recruitment.  We reiterate the importance and meaning of the principle of non-refoulement as a cornerstone of the international protection of refugees.  We applaud efforts throughout the region to provide a coordinated and comprehensive response to all migrants, returnees, refugees, asylum seekers, and stateless persons.  We make this Declaration of non-legally binding commitments to enhance cooperation and shared responsibilities on managing migration and protection in ways grounded in human rights, transparency, nondiscrimination, and State sovereignty.

###



DEFENDANT'S EXHIBIT

CASE NO. 6:23·cv-00007

EXHIBIT NO. 045

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,          §
                                   §
    *Plaintiffs,*              §
                                   §
    vs.                        §        CIVIL ACTION NO.
                                   §        6:23-CV-00007
UNITED STATES DEPARTMENT OF        §
HOMELAND SECURITY, *et al.*,       §
                                   §
    *Defendants,* and          §        JUDGE DREW S. TIPTON
                                   §
VALERIE LAVEUS, *et al.*,          §
                                   §
    *Intervenor Defendants.*   §


# INTERVENOR DEFENDANTS' EXHIBIT 45

U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

Choose Region
Nationwide

Demographic
All

FY

FY
2021

Citizenship
All

Component
All

Title of Authority
All

Area of Responsibility
All

State
All

Reset
Filters



FY Nationwide Encounters by Month





FY Comparison by Demographic

Source: USBP and OFO official year end reporting for FY20-FY22, USBP and OFO month end reporting for FY23 to date. Data
is current as of 7/5/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 2,310,987 | **2,310,987** |
| 2022 | 2,003,794 | **2,766,582** |
| 2021 | 1,277,735 | **1,956,519** |
| 2020 | 453,582 | **646,822** |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 46

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |


# INTERVENOR DEFENDANTS'
# EXHIBIT 46

U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Nationwide | 2022 | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | All | All | All |

FY   ▓ 2022

Reset Filters




### FY Nationwide Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 167,136 | 198,563 | 205,091 | 186,500 | 166,076 | 260,464 | 262,109 | 274,692 | 247,523 | 238,929 | 261,531 | 272,335 | 2,765,882 |



### FY Comparison by Demographic

Single Adults — 1,993,694 — 2022
FMUA — 614,023 — 2022
UC / Single Minors — 152,880 — 2022
Accompanied Minors — 5,985 — 2022

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 2,310,987 | **2,310,987** |
| 2022 | 2,003,794 | **2,766,582** |
| 2021 | 1,277,735 | **1,956,519** |
| 2020 | 453,582 | **646,822** |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 00007

EXHIBIT
NO. 047

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 47

**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

| Choose Region | FY | Demographic | Citizenship | Title of Authority | Component | State | Area of Responsibility |
|---|---|---|---|---|---|---|---|
| Nationwide | 2023 (FYTD) | All | All | All | All | All | All |

Demographic
All

FY
All   ■ 2023 (FYTD)

**Reset Filters**



FY Nationwide Encounters by Month

Encounter Count

300K
200K
100K
0K

OCT  NOV  DEC  JAN  FEB  MAR  APR  MAY  JUN  JUL  AUG  SEP  Total

2023 (FYTD)  278,350  284,680  302,423  213,540  259,527  270,076  275,245  211,576                      2,310,987



FY Comparison by Demographic

Encounter Count

1500K
1000K
500K

| Single Adults 1,591,806 | FMUA 614,173 | UC / Single Minors 99,174 | Accompanied Minors 5,834 |
|---|---|---|---|
| 2023 (FYTD) | 2023 (FYTD) | 2023 (FYTD) | 2023 (FYTD) |

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 2,310,987 | **2,310,987** |
| 2022 | 2,003,794 | **2,766,582** |
| 2021 | 1,277,735 | **1,956,519** |
| 2020 | 453,582 | **646,822** |



FY Nationwide Encounters by Month



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23- CV- 00007

EXHIBIT
NO. 048

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 48

## U.S. Customs and Border Protection (CBP) Encounters
### Nationwide, Southwest Land Border,
### and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and Border Protection

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | 2021 | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | All | All | All |

FY  ■ 2021

**Reset Filters**



### FY Southwest Land Border Encounters by Month

Encounter Count: 200K, 150K, 100K, 50K, 0K

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | 71,929 | 72,113 | 73,594 | 78,414 | 101,099 | 173,277 | 178,795 | 182,597 | 189,034 | 213,593 | 209,840 | 192,001 | 1,734,686 |



### FY Comparison by Demographic

Encounter Count: 1000K, 500K

Single Adults: 1,105,925 (2021)
FMUA: 479,728 (2021)
UC / Single Minors: 146,925 (2021)
Accompanied Minors: 2,108 (2021)

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 1,789,605 | 1,789,605 |
| 2022 | 1,747,148 | 2,378,944 |
| 2021 | 1,119,252 | 1,734,686 |
| 2020 | 309,471 | 458,088 |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 049

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Action No. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | Judge Drew S. Tipton |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 49

U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

| Choose Region Southwest Land Border | FY 2022 | Component All | Area of Responsibility All | | Reset Filters |
|---|---|---|---|---|---|

| Demographic All | Citizenship All | Title of Authority All | State All | |

FY ■ 2022



### FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 164,837 | 174,845 | 179,253 | 154,864 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | 2,378,944 |



### FY Comparison by Demographic

Single Adults 1,663,278 — 2022
FMUA 560,646 — 2022
UC / Single Minors 152,057 — 2022
Accompanied Minors 2,963 — 2022

Source: USBP and OFO official year end reporting for FY20-FY22, USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 1,789,605 | **1,789,605** |
| 2022 | 1,747,148 | **2,378,944** |
| 2021 | 1,119,252 | **1,734,686** |
| 2020 | 309,471 | **458,088** |



FY Nationwide Encounters by Month



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 050

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 50



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

FY Southwest Land Border Encounters by Month

FY Comparison by Demographic

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

## Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 1,789,605 | 1,789,605 |
| 2022 | 1,747,148 | 2,378,944 |
| 2021 | 1,119,252 | 1,734,686 |
| 2020 | 309,471 | 458,088 |

