

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 cu-00007

EXHIBIT
NO.   051

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 51

## U.S. Customs and Border Protection (CBP) Encounters
### Nationwide, Southwest Land Border, and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and Border Protection

**Choose Region**
Southwest Land Border

**Component:**
All

**FY**
2021

**Area of Responsibility**
All

**Demographic**
All

**Citizenship**
Multiple values

**Title of Authority**
All

**State**
All

**FY** ■ 2021

Reset Filters



### FY Southwest Land Border Encounters by Month

| FY | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | 2,671 | 2,238 | 3,150 | 4,446 | 6,204 | 13,260 | 13,660 | 17,394 | 23,994 | 28,692 | 28,345 | 40,562 | 184,716 |



### FY Comparison by Demographic

| Single Adults | FMUA | UC / Single Minors | Accompanied Minors |
|---|---|---|---|
| 108,918 | 73,408 | 2,364 | 26 |
| 2021 | 2021 | 2021 | 2021 |

Sources: USBP and OFO official year end reporting for FY20-FY22, USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

## Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 419,794 | 419,794 |
| 2022 | 425,147 | 626,410 |
| 2021 | 87,147 | 184,716 |
| 2020 | 15,265 | 23,023 |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 CV-00007

EXHIBIT
NO. 052

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 52

U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Title of Authority | Area of Responsibility |
|---|---|---|---|---|
| Southwest Land Border | 2022 | All | All | All |

| Demographic | Citizenship | State |
|---|---|---|
| All | Multiple values | All |

FY | 2022 | Reset Filters



**FY Southwest Land Border Encounters by Month**

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 28,475 | 41,642 | 55,228 | 47,436 | 34,933 | 54,334 | 57,250 | 60,278 | 44,640 | 55,198 | 62,721 | 83,344 | 436,419 |



**FY Comparison by Demographic**

Single Adults: 441,499 (2022)
FMUA: 179,322 (2022)
UC / Single Minors: 5,546 (2022)
Accompanied Minors: 43 (2022)

Source: USBP and OFO official year end reporting for FY20-FY22, USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

## Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 419,794 | 419,794 |
| 2022 | 425,147 | 626,410 |
| 2021 | 87,147 | 184,716 |
| 2020 | 15,265 | 23,023 |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 cv 00007

EXHIBIT
NO. 053

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 53

**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and
Border Protection

| Choose Region | FY | Component | Area of Responsibility |
| Southwest Land Border | 2023 (FYTD) | All | All |

| Demographic | Citizenship | Title of Authority | State |
| All | Multiple values | All | All |

FY   ■ 2023 (FYTD)

Reset Filters



### FY Southwest Land Border Encounters by Month

Encounter Count: 80K, 60K, 40K, 20K, 0K

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
| 2023 (FYTD) | 78,551 | 82,454 | 91,369 | 22,120 | 14,362 | 14,544 | 44,027 | 41,432 | 39,515 | | | | 418,794 |



### FY Comparison by Demographic

Encounter Count: 300K, 200K, 100K

Single Adults: 287,638 — 2023 (FYTD)
FMUA: 127,281 — 2023 (FYTD)
UC / Single Minors: 4,757 — 2023 (FYTD)
Accompanied Minors: 118 — 2023 (FYTD)

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

|              | FYTD    | Total   |
| ------------ | ------- | ------- |
| 2023 (FYTD)  | 419,794 | 419,794 |
| 2022         | 425,147 | 626,410 |
| 2021         | 87,147  | 184,716 |
| 2020         | 15,265  | 23,023  |



FY Nationwide Encounters by Month

FY
■ 2023 (FYTD)



DEFENDANT'S
EXHIBIT

CASE
NO. 6.23 00007

EXHIBIT
NO. 054

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 54

## U.S. Customs and Border Protection (CBP) Encounters
### Nationwide, Southwest Land Border,
### and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | | FY | Component | Title of Authority | Area of Responsibility |
|---|---|---|---|---|---|
| Southwest Land Border | | 2022 | All | All | All |
| Demographic | | Citizenship | | State | |
| All | | Multiple values | | All | |

FY  ■ 2022

**Reset Filters**



### FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 18,899 | 21,254 | 30,427 | 24,657 | 31,730 | 50,341 | 53,143 | 55,191 | 31,441 | 37,551 | 37,350 | 46,540 | 438,684 |



### FY Comparison by Demographic

Single Adults — 321,291 — 2022

FMUA — 112,979 — 2022

UC / Single Minors — 4,407 — 2022

Accompanied Minors — 17 — 2022

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

|  | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 270,708 | 270,708 |
| 2022 | 314,243 | 438,694 |
| 2021 | 61,710 | 136,038 |
| 2020 | 12,609 | 20,236 |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 CV-00007

EXHIBIT
NO. 055

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION No. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 55

## U.S. Customs and Border Protection (CBP) Encounters
### Nationwide, Southwest Land Border, and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and Border Protection

| Choose Region | FY | Component | Title of Authority | Area of Responsibility |
| --- | --- | --- | --- | --- |
| Southwest Land Border | 2023 (FYTD) | All | All | All |

| Demographic | Citizenship | | State |
| --- | --- | --- | --- |
| All | Multiple values | | All |

FY ■ 2023 (FYTD)

Reset Filters



### FY Southwest Land Border Encounters by Month

Encounter Count (80K, 60K, 40K, 20K, 0K)

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2023 (FYTD) | 56,461 | 74,431 | 83,178 | 13,049 | 9,817 | 9,222 | 9,391 | 9,606 | 10,460 | | | | 278,768 |



### FY Comparison by Demographic

Encounter Count (200K, 100K)

| Single Adults | FMUA | UC / Single Minors | Accompanied Minors |
| --- | --- | --- | --- |
| 195,279 | 72,199 | 3,197 | 33 |
| 2023 (FYTD) | 2023 (FYTD) | 2023 (FYTD) | 2023 (FYTD) |

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/07/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 270,708 | **270,708** |
| 2022 | 314,243 | **438,694** |
| 2021 | 61,710 | **136,038** |
| 2020 | 12,609 | **20,236** |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 cv 00007

EXHIBIT
NO. 056

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| Defendants, and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| Intervenor Defendants. | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 56

U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and Border Protection

| Choose Region | Demographic | FY | Citizenship | Component | Title of Authority | Area of Responsibility | State |
|---|---|---|---|---|---|---|---|
| Southwest Land Border | All | 2022 | UKRAINE | All | All | All | All |

FY: ■ 2022

Reset Filters



### FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 198 | 227 | 359 | 248 | 272 | 3,274 | 20,118 | 376 | 116 | 93 | 37 | 50 | 25,344 |

Encounter Count
20K / 15K / 10K / 5K / 0K



### FY Comparison by Demographic

Single Adults: 9,559 (2022)
FMUA: 15,592 (2022)
Accompanied Minors: 88 (2022)
UC / Single Minors: 125 (2022)

Encounter Count
15K / 10K / 5K

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

|  | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 187 | 187 |
| 2022 | 25,184 | 25,364 |
| 2021 | 184 | 676 |
| 2020 | 79 | 93 |



FY Nationwide Encounters by Month

FY
2022

Encounter Count



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23- cv-0007

EXHIBIT
NO. 057

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

STATE OF TEXAS, *et al.,*                          §
                                                   §
    *Plaintiffs,*                        §
                                                   §
    vs.                                  §   CIVIL ACTION NO.
                                                   §   6:23-CV-00007
UNITED STATES DEPARTMENT OF                        §
HOMELAND SECURITY, *et al.,*                       §
                                                   §
    *Defendants,* and                    §   JUDGE DREW S. TIPTON
                                                   §
VALERIE LAVEUS, *et al.,*                          §
                                                   §
    *Intervenor Defendants.*             §


# INTERVENOR DEFENDANTS'
# EXHIBIT 57

**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | 2023 (FYTD) | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | UKRAINE | All | All |

FY

Reset Filters



FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 25 | 12 | 26 | 10 | 14 | 31 | 21 | 23 | 24 | | | | 187 |



FY Comparison by Demographic

Single Adults 123 | FMUA 58 | Accompanied Minors 5 | UC / Single Minors 1
2023 (FYTD)

Source: USBP and OFO official year end reporting for FY20-FY22, USBP and OFO month end end reporting for FY23 to date. Data is current as of 7/6/2023.

## Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 187 | 187 |
| 2022 | 25,184 | 25,364 |
| 2021 | 184 | 676 |
| 2020 | 79 | 93 |





DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 58

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 58

U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
| Southwest Land Border | 2022 | All | All |

| Demographic | Citizenship | Title of Authority | State |
| All | VENEZUELA | All | All |

FY ■ 2022

**Reset Filters**



### FY Southwest Land Border Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
| 2022 | 13,416 | 20,388 | 24,901 | 22,779 | 3,073 | 4,663 | 4,167 | 5,688 | 13,199 | 17,647 | 25,361 | 33,694 | 187,716 |



### FY Comparison by Demographic

Single Adults 120,208 — 2022
FMUA 66,343 — 2022
UC / Single Minors 1,139 — 2022
Accompanied Minors 26 — 2022

Source: USBP and OFO official year end reporting for FY20-FY22. USBP and OFO month end reporting for FY23 to date. Data is current as of 7/6/2023.

Table (3)

| | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 149,086 | 149,086 |
| 2022 | 110,904 | 187,716 |
| 2021 | 25,437 | 48,678 |
| 2020 | 2,656 | 2,787 |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 059

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 59

**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

U.S. Customs and Border Protection

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Southwest Land Border | 2023 (FYTD) | All | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | VENEZUELA | All | All |

FY ■ 2023 (FYTD)

Reset Filters



**FY Southwest Land Border Encounters by Month**

Encounter Count: 30K, 20K, 10K, 0K

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 (FYTD) | 22,060 | 8,023 | 8,190 | 9,101 | 5,565 | 8,322 | 34,638 | 32,734 | 20,455 | | | | 149,086 |



**FY Comparison by Demographic**

Encounter Count: 100K, 50K

| Single Adults | FMUA | UC / Single Minors | Accompanied Minors |
|---|---|---|---|
| 92,359 | 55,082 | 1,560 | 85 |
| 2023 (FYTD) | 2023 (FYTD) | 2023 (FYTD) | 2023 (FYTD) |

Source: USBP and OFO official year end reporting for FY20-FY22; USBP and OFO month end reporting for FY23 to date. Data is current as of 7/5/2023.

Table (3)

|  | FYTD | Total |
|---|---|---|
| 2023 (FYTD) | 149,086 | 149,086 |
| 2022 | 110,904 | 187,716 |
| 2021 | 25,437 | 48,678 |
| 2020 | 2,656 | 2,787 |





DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 060

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 60



**DATA & SOCIETY**

# Migrant aid groups stretched thin as city officials seek federal help for expected wave

 by **Raquel Torres**
April 27, 2022



Fermina Brizo Pavón sorts through clothes while her children, Angel and Valeria Mejia Brizo, play together at a downtown shelter on Thursday. Pavón and her husband were granted asylum in the United States after living near the border in Mexico for a year. Credit: Nick Wagner / San Antonio Report

While the immediate fate of Title 42 is unclear, those assisting migrants passing through San Antonio say the flow is already increasing.

As nonprofits work to offer shelter and guidance, Mayor Ron Nirenberg has requested additional federal aid to handle the massive flow expected with the end of Title 42.

President Joe Biden has sought to end the pandemic-era policy that turned away asylum seekers at the U.S. border, but on Monday, a federal judge in Louisiana temporarily **blocked** the administration's efforts. Texas Attorney General Ken Paxton has also **filed a lawsuit** aiming to stop the rule from being lifted.

In the past two weeks alone, more than 8,000 migrants have arrived in San Antonio, according to the city's Human Services department. Almost three-quarters arrived at the airport, the rest at bus stations; some arrive without plans for where to go or what to do next.

Last month, Nirenberg wrote a letter to the Department of Homeland Security (DHS) requesting "immediate action to increase funding for humanitarian infrastructure and resources."

The letter was **obtained by CNN**; Nirenberg's office declined to immediately provide a copy to the San Antonio Report and said CNN did not receive the letter from the mayor's office.

Nirenberg said in a statement that his office is in regular communication with federal officials.

"There might be some who are eager to politicize a change in federal policy," he wrote. "But in San Antonio, we just want to ensure that the migrants passing through our city are treated as humanely as possible, while guaranteeing that our local partners and resources are not stretched beyond their limits."

It's unclear if or how DHS responded to the mayor's letter.

"DHS values the partnership of communities along the southwest border and their feedback as we work together," officials wrote in a statement to the Report. "They are critical to ensuring we can enforce our immigration laws and process asylum claims in a safe, orderly and humane manner."

Meanwhile, on the ground in San Antonio, nonprofit and religious organizations are working to address the needs of the thousands of migrants passing through the city. Leaders say they have sufficient resources — for now.



Migrant aid groups stretched thin as San Antonio seeks federal help                    https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-offic...



A migrant uses his phone at a downtown shelter organized by Corazón San Antonio on Thursday. Credit: Nick Wagner / San Antonio Report

Catholic Charities of San Antonio, the **Interfaith Welcome Coalition** and **Corazón San Antonio** are working together to assist migrants in getting transportation to the airport, getting hotel rooms, getting overnight shelter, food from the **San Antonio Food Bank** and other necessities, such as children's clothing.

Last week, 700 migrants were provided local hotel rooms as they journeyed to various host cities, said Antonio Fernandez, CEO of **Catholic Charities**. The organization has spent "hundreds of thousands of dollars" since January doing the same for other migrants, said Fernandez.

"How do we prepare and provide services to so many people coming? That's what keeps me awake at night," he said.

Fernandez said he fears aid groups' resources will be overwhelmed when — or if — Title 42 ends.

"Resources are always going to be a huge issue. Housing is a big issue. We need places to put the people. ... At the end of the day, if we have Title 42 [ending], I don't know if anyone knows where we're going to be able to put people," said Fernandez.

The Interfaith Welcome Coalition needs volunteers, said Coordinating Director Victoria Salas. The coalition

works to help migrants get from bus stations into either a hotel with Catholic Charities, or to Corazón San Antonio's center at Travis Park United Methodist Church.

Corazón's migrant center reopened just three weeks ago after being closed during the pandemic and because of the Remain-in-Mexico order, said Gavin Rogers, executive director of the nonprofit and associate pastor at Travis Park Church.

In 2019, Corazón served 23,000 people, Rogers said, and the center is on track to see more migrants now than it did in 2019. Most are coming from Honduras, Guatemala, El Salvador, Nicaragua, as well as Venezuela, Cuba, Haiti and Mexico, he said.

Olbin Funez and his family of four were among those seeking shelter at the center on Thursday. He and his family escaped Honduras in 2018 and fled to Mexico due to threats of gang violence. The family never planned to leave the country, Funez said, but even after relocating to different states within Honduras and even fleeing to Mexico, it was impossible to escape the gang violence of their home country.

"There were four of us brothers, and because we didn't want to work with [the gangs], they decided to kill us, and because they couldn't … it was more dangerous," Funez said.

In Mexico, Funez found a **humanitarian aid group, Al Otro Lado,** which offers legal resources to migrants. The family signed up for help getting into the U.S.

After waiting a full year, the family received permission to enter the country through Eagle Pass. They were only spending a few hours in San Antonio before leaving for California by bus Friday morning.



Migrant aid groups stretched thin as San Antonio seeks federal help                    https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-offic...



Valeria Mejia Brizo, 3, tucks her stuffed toys into bed at a downtown shelter on Thursday. Valeria, her brother and parents were granted asylum in the United States after living near the border in Mexico for a year. Credit: Nick Wagner / San Antonio Report

The family now awaits their court hearing, during which they hope to be granted legal status.

"Being over here... I feel that I can sleep peacefully, get around peacefully, without the fear of anything," said Funez in Spanish. "This is one [story] of many and worse you'll hear. Independently, everyone fights a battle."

According to the **Migration Policy Institute**, since its implementation in March 2020, 1.7 million immigrants have been denied asylum through February 2022. Since January 2021, more than half of migrant encounters at the border have led to expulsions, allowing some to seek asylum.

Rogers said that despite city concerns about how to care for the wave of migrants expected to flow across the border, he believes the resources are plenty, if the will can be found.

"If we actually share and team up in communities ... not just in San Antonio. If Houston steps up, if Austin steps up, if this nation steps up, we will have plenty of resources to serve those in need," said **Rogers**.

© 2023 Nonprofit journalism for an informed community.
Proudly powered by Newspack by Automattic

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-0007

EXHIBIT
NO. 061



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

STATE OF TEXAS, *et al.*,                           §
                                                    §
    *Plaintiffs*,                §
                                                    §
vs.                                                 §     CIVIL ACTION NO.
                                                    §     6:23-CV-00007
UNITED STATES DEPARTMENT OF                         §
HOMELAND SECURITY, *et al.*,                        §
                                                    §
    *Defendants,* and            §     JUDGE DREW S. TIPTON
                                                    §
VALERIE LAVEUS, *et al.*,                           §
                                                    §
    *Intervenor Defendants.*      §


# INTERVENOR DEFENDANTS'
# EXHIBIT 61

# El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity

One Venezuelan couple slept on a sidewalk after a perilous trip through seven countries with their baby. After two days in El Paso, they boarded a city-funded charter bus to New York City.

BY **URIEL J. GARCÍA**    SEPT. 20, 2022    12 PM CENTRAL

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

*Editor's note: This story contains explicit language.*

EL PASO — Soon after a Border Patrol van dropped off Albeleis Arteaga, his wife and 4-month-old baby downtown on a recent Monday evening, it began to rain. Arteaga and his family didn't know where to go, so they joined dozens of other migrants, most of them fellow Venezuelans, who have been sleeping outdoors next to a charter bus station.

The couple had spent nearly two months traveling with their baby from Chile to the Texas-Mexico border, passing through the treacherous Darién Gap in South America. Now they were using borrowed bed sheets to cover themselves from the rain as they tried to sleep. But the drenched sheets made it hard to rest, Arteaga said.

"If I had any money right now, I wouldn't be out here putting my family through this," said Arteaga, 29, wearing sweatpants and a black T-shirt as he sat on a sidewalk, leaning against an abandoned brick building. "My head throbs not knowing what to do next or how to get out of here."

Less than two weeks before the end of the federal fiscal year, encounters between migrants and Border Patrol agents on the U.S.-Mexico border have already surpassed 2 million — a new record. According to federal government statistics, immigration agents encountered nearly 154,000 Venezuelans along the U.S.-Mexico border in the first 11 months of this fiscal year — a 216% increase from the entire previous fiscal year.

In recent weeks, Venezuelans have arrived in increasing numbers to the El Paso-Ciudad Juárez region. Shelters are so full in El Paso that Border Patrol officials have released

migrants on the street. Migrants who are apprehended or surrender at the border are processed and held while agents determine whether they can be sent to Mexico under the emergency health order known as Title 42.

But Venezuelans can't be sent across the border because they're on the list of nationalities Mexico won't accept. And they can't be deported back to their country because the U.S. severed diplomatic ties with Venezuela in 2019. Instead, they are released to local shelters.

But with no space at the shelters, for the past two weeks, dozens of migrants have slept on the sidewalk next to the bus station, many of them wearing sweatpants, dirt-covered T-shirts and sandals. Some have tents where they can get out of the sun and rain. The area, just south of a baseball stadium where the El Paso Chihuahuas minor league baseball team plays, smells of body odor, of urine and "like someone took a shit," as Arteaga's wife put it.

Good Samaritans and volunteers with local aid groups go to the site to give bottled water, sandwiches, bags of chips and clothing to the migrants.

The growing numbers have sent the city scrambling to respond. El Paso opened a welcome center nearly a month ago to help some migrants find lodging at local hotels until they can get transportation to their final destination.

Since Aug. 23, the city has chartered at least 60 buses to take nearly 3,000 migrants to New York City and Chicago. El Paso has a $2 million contract with a charter bus company to provide up to five buses per day to transport migrants out of the city. It will seek reimbursement from the federal government for the bus trips.

"What we're doing here at the city of El Paso is we continue to take care of the individual," El Paso Deputy City Manager Mario D'Agostino said at a news conference last week. "These are human beings, they're passing through our community, and it's just part of their journey."

Hundreds of migrants crowded inside the welcome center late last week, charging their cellphones so they could call family members or lining up to board charter buses. Angel Morano, a 21-year-old who also fled Venezuela, anxiously waited outside for immigration officials to drop off two friends who had traveled with him to the border. He said he left his country because it's hard to make a living, but he missed his parents.

"It was hard to say goodbye because it's not easy leaving family behind knowing you won't be able to see them for a long time," he said.

Venezuela has been going through social unrest and political turmoil since 2014, when the country's economy — which depends heavily on oil revenues — began to collapse. What was one of the wealthiest nations in Latin America has fallen into chaos because of falling oil prices, political corruption, and American sanctions against the country's oil and mining industries and the Central Bank of Venezuela. The sanctions are aimed at ousting the country's president, Nicolás Maduro, who has been accused of election fraud, human rights violations and running an authoritarian government.

As a result, 7 million Venezuelans have fled, more than a fifth of the country's population — the largest displacement of people in the Western Hemisphere — to seek jobs and safety in other South American countries and the U.S.

The U.S. Department of Homeland Security and other federal agencies "continue to work with Mexico and other countries in the region to address migration challenges throughout the Western Hemisphere," said Carlos Rivera, a spokesperson for U.S. Border Patrol. "In El Paso, CBP [Customs and Border Protection] is encountering a significant number of Cuban and Venezuelan migrants who have fled the repressive, authoritarian regimes in those countries."

## Bodies on the jungle trail

Growing up in Venezuela, Arteaga said, life was stable. His mother worked cleaning houses and his father operated a street sweeper, while he played basketball on his high school team, traveling across the country for tournaments. He played shooting guard and was a Chicago Bulls fan.

As an adult, he got a job as a construction worker, building houses. He then met his wife, Daniela Arias, 25, who like him had a child from a previous relationship. After the economy crashed in Venezuela, the couple moved to Chile, where he continued to work in construction and where their son was born. Arteaga was able to save up $1,500, money he planned to use to return to Venezuela and open a small grocery store.

His family in Venezuela dissuaded him, telling him the country was still struggling and he shouldn't come back. In early August, the couple decided to go north with the baby, who was 2 months old at the time. They decided to leave as Chile's economy worsened, he said.

"Thank God he made it out alive," Arteaga said as he held his son, who had been sleeping on a pillowcase beneath a tree next to the bus station.

After leaving Chile, the family traveled through seven countries over a month and a half to

get to El Paso. They walked through Peru's deserts into Colombia, he said, then hiked through the Darién Gap, a 66-mile roadless stretch of jungle, mountains and rivers between Colombia and Panama. He said they didn't hire a guide and followed a group of what he guessed were 200 other people.

Arteaga said he saw disoriented people who got left behind or separated from their family members. He saw two bodies, which he assumed were migrants who died on the journey. Throughout the trip, he carried a 5-liter jug of water and a backpack filled with bread, canned tuna and instant soup that he made by starting a fire to boil water. Arias carried the baby, who was 2 months old, throughout the trek.

At night, the family would sleep in a tent and continue to walk early in the morning through the jungle heat over slippery, muddy ground.

"You couldn't get tired," Arteaga said. "You had to find the will to continue, otherwise you'd get left behind and die."

It took them seven days to get through the jungle and reach a road in Panama.

Not every country accepted their Venezuelan passports, so in some cases they snuck past immigration checkpoints, he said.

The family eventually got to Mexico, where they used what little money they had left to catch buses until they arrived in Ciudad Juárez. They crossed the Rio Grande and surrendered to Border Patrol agents, asking for asylum.

After two days in Border Patrol custody, they were released on that rainy Monday night last week. The next morning, they went to a local shelter that helped them get on the list for an El Paso-funded charter bus to New York City, where the couple had friends from Venezuela who migrated earlier this year.

On Tuesday, they spent most of the day in the makeshift migrant camp.

The next day, Arteaga said, they joined dozens of other migrants on the charter bus at the city's migrant welcome center.

On Friday night, they arrived in New York City. For the past few days, he said, he's been walking around the city, looking for a job.

Arteaga said he's looking forward to starting a new life. He said he's going to take whatever job is available and hopes to send money to his family in Venezuela. He's pinning his hopes

on being given asylum — he wants to raise his son in the U.S. so the child can get a good education and play basketball like he did as a boy.

"I just can't picture myself returning to Venezuela," he said.

---

*The Texas Tribune Festival is almost here! From Thursday through Saturday, Sept. 22-24, in downtown Austin, TribFest attendees will enjoy three days full of mind-expanding events, conversations and panels featuring more than 350 big names including* **Chris Bosh, Pete Buttigieg, Liz Cheney, Annette Gordon-Reed** *and many others. Join us for Texas' biggest politics and policy event when you* **buy your tickets today.**

Could not connect to the reCAPTCHA service. Please check your internet connection and reload to get a reCAPTCHA challenge.



**DEFENDANT'S EXHIBIT**

CASE NO. 6:23-cv-00007

EXHIBIT NO. 062

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 62

Local migrant shelter reaching max capacity                    https://www.kgun9.com/news/local-news/local-migrant-shelter-reachin...





**KGUN 9 ON YOUR SIDE** ❯ **NEWS** ❯ **LOCAL NEWS**

# Local migrant shelter reaching max capacity as it receives hundreds per day

*Posted: 3:00 PM, Sep 22, 2022 Updated: 10:42 AM, Sep 23, 2022*

 By: Denelle Confair

Casa Alitas is reaching max capacity.

TUCSON

Watch Now

releases for migrants in their custody.

The influx the shelter has been seeing is putting a strain on their resources. Shelter workers describe the increased numbers as hectic and are hoping for relief.

"Unfortunately, the reality is that's increased our numbers past the point that Alitas is able to welcome all of these folks and it could result in straight releases here in Tucson," said Executive Director of Casa Alitas Teresa Cavendish.

Several buses were seen dropping off an upwards of 50 people at the Tucson shelter on Thursday.

At Casa Alitas, they are given COVID tests along with food, water and travel arrangements but with the influx of guests, workers say they just can't keep up.

"We're tapped out on how many we can receive safely, where it is safe for both our guests, for our volunteers and for our staff. And so anything in excess of our maximum numbers are what they call community releases," explained Cavendish.

For the past three weeks, she says they have been receiving about 400 to 450 migrants a day. The shelter usually receives an average of 300 guests a day.

From men and women to infants, some may start to be turned away. Despite the challenges, volunteers here just do what they can, for the people they can help.

"All of us somewhere in our background. Most likely grandparents more than anything are coming from Europe after World War II or God only knows where," said Laurence Olivier, a volunteer at Casa Alitas.

Casa Alitas is in need of volunteers, as well as supplies such as clothing and toiletries. For more information on donating, check out the Casa Alitas website.

——-

Local migrant shelter reaching max capacity                    https://www.kgun9.com/news/local-news/local-migrant-shelter-reachin...



*continue to use her storytelling for the greater good. Share your story ideas and important issues with Denelle by emailing* **denelle.confair@kgun9.com** *or by connecting on* *Facebook,* *and* *Twitter.*

  

News   Weather   Traffic   You Ask. We Investigate.™

Support

Scripps Local Media
© 2023 Scripps Media, Inc

Sitemap   Privacy Policy   Privacy Center

*Give Light and the People Will Find Their Own Way*

Journalism Ethics Guidelines   Terms of Use   EEO   Careers
KGUN FCC Public File   KWBA FCC Public File
FCC Application   Public File Contact
Accessibility Statement   Closed Captioning Contact



DEFENDANT'S EXHIBIT

CASE NO. 6.23-cv-00007

EXHIBIT NO. 063

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Action No. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | Judge Drew S. Tipton |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' EXHIBIT 63

 An official website of the United States government, Department of Justice.
Here's how you know



Home / Funding & Awards

# FY21 State Criminal Alien Assistance Program (SCAAP)

## Award Information

**Awardee:** TEXAS DEPARTMENT OF CRIMINAL JUSTICE
**Award #:** 15PBJA-21-RR-05251-SCAA
**Location:** HUNTSVILLE, TX
**Awardee County:** Texas
**Congressional District:** 8
**Status:** Closed
**Funding First Awarded:** 2021
**Total funding (to date):** $17,364,520
**Original Solicitation:** FY 2021 State Criminal Alien Assistance Program

## Description of original award (Fiscal Year 2021, $17,364,520)

*Date Created: November 2, 2022*

## Similar Awards 🔗

FY 2021 State Criminal Alien Assistance Program (SCAAP)

SCAAP FY 2021

FY 2021 State Criminal Alien Assistance Program for Spotsylvania County



**U.S. DEPARTMENT OF JUSTICE**
OFFICE OF JUSTICE PROGRAMS



**DEFENDANT'S EXHIBIT**

CASE NO. 6 23-CV-00007

EXHIBIT NO. 064

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW S. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# EXHIBIT 64

An official website of the United States government
Here's how you know



# Texas Population Passes the 30-Million Mark in 2022

## Texas Joins California as State with 30-Million-Plus Population

March 30, 2023

**Written by:** Kristie Wilder

Texas is now one of only two U.S. states with a population of 30 million or more: the nation's second-most-populous state reached a population milestone by passing the 30-million threshold.

Texas's population in 2022 was 30,029,572, second only to California (39,029,342), not surprising given its consistent place in recent years among the nation's fastest-growing, largest-gaining states.

From 2000 to 2022, the population of 11 of Texas's 254 counties more than doubled, according to July 1, 2022 population estimates released today.

> **Unlike Florida, where growth stemmed mainly from domestic migration, Texas**

## Related America Counts Stories

America Counts Story

**Two Years Into Pandemic, Domestic Migration Trends Shifted**

Domestic migration rebounded in some of the nation's most populous counties that saw steep outmigration

Is this page helpful?   ✕

👍 Yes   👎 No

**experienced moderate increases across all components of population change.**

earlier in pandemic.

[/library/stories/2023/03/domestic-migration-trends-shifted.html]

### Net Domestic Migration Increased in Many U.S. Counties in 2021

The population of Texas, the largest in land area among the Lower 48 states, increased by 470,708 in 2022, continuing a steady uptick. From 2000 to 2022, the state gained 9,085,073 residents, more than any other state and almost 3 million more than Florida, the next largest-gaining state.

That's a 43% jump, which made Texas the fourth fastest-growing state in the country, behind Nevada, Utah, and Idaho.

Unlike Florida, where growth stemmed mainly from domestic migration, Texas experienced moderate increases across all components of population change.

About half of Texas's population gain since 2000 resulted from natural increase (more births than deaths); around 29% from net domestic migration gains; and 22% from net international migration gains.

Smaller counties were more likely to experience net domestic migration gains and larger counties declines last year, possibly due to the pandemic.

[/library/stories/2023/03/net-domestic-migration-increased-counties-2021.html]

### What Has Driven Population Change in U.S. Counties?

In most counties, domestic migration played a larger role in population growth than births, deaths and international migration, possibly due to the pandemic.

[/library/stories/2022/03/what-has-driven-population-change-in-united-states-counties.html]



[/content/dam/Census/library/stories/2023/03/texas-population-passes-the-30-million-mark-in-2022-figure-1.jpg]

## Growth Among Texas Counties

Harris County, home to Houston, was Texas's largest-gaining county, adding a net 1,366,674 people during the 22-year period. And the population of Rockwall, the state's fastest-growing county, nearly tripled (182% growth).

Harris County added the most residents but several counties within the Dallas-Fort Worth-Arlington metro area had

Is this page helpful?    ✕    👍 Yes    👎 No

significant gains, too. Most notably
Tarrant, Kaufman, Collin, and Denton
counties:

- Tarrant County gained the second-largest
  number of people in the state (almost 700,000).
- Kaufman County's population rose by 139%,
  making it the state's fifth fastest-growing county.
- Collin County grew by 132% or 659,578
  residents, while Denton added a net 538,490
  people — a 123% increase — making these
  counties two of the fastest-growing, largest-
  gaining counties in Texas from 2000 to 2022.



[/content/dam/Census/library/stories/2023/03/texa
s-population-passes-the-30-million-mark-in-2022-
figure-2.jpg]

## How Texas Population Gains Compare

Texas counties led the nation in growth.

Rockwall County was not only the fastest-
growing county in Texas but also the
second-fastest growing county in the
nation, behind Lincoln County, South
Dakota.

Eight other Texas counties (Hays,
Williamson, Fort Bend, Kaufman, Comal,
Collin, Montgomery and Denton) ranked
among the nation's 25 fastest-growing
counties between 2000 and 2022, when
all saw their populations double.

Ten Texas counties (Harris, Tarrant, Bexar,
Collin, Denton, Fort Bend, Travis,
Williamson, Montgomery, and Dallas)
were also top gainers nationally during
this period.

Harris County was the nation's second
largest-gaining county after Maricopa
County, Arizona.

Is this page helpful?    ✕

👍 Yes    👎 No

Texas gained an average 412,958 residents annually between 2000 and 2022.

In 2010, the population of Texas was just two-thirds that of California. By 2022, it was more than three-fourths that of California. In 1930, Texas had *more* people than California — and the 2030 Census will show where both states stand a century later.

The population estimates release [/newsroom/press-releases/2023/population-estimates-counties.html] provides growth data for all U.S. counties.

*Kristie Wilder is a demographer in the Census Bureau's Population Estimates Branch.*

This story was filed under:

Migration [/library/stories.html?tagfilter_List_1528215085=Census:Topic/ThePopulation/Migration#List_1528215085]

Population [/library/stories.html?tagfilter_List_1528215085=Census:Topic/ThePopulation#List_1528215085]

Population Estimates [/library/stories.html?tagfilter_List_1528215085=Census:Topic/ThePopulation/Population-estimates#List_1528215085].

## Related Statistics

Stats for Stories

## Texas 175th Anniversary of Statehood (1845): December 29, 2020

December 29, 2020

Texas joined the Union on December 29, 1845 as the 28th state. Nickname: The Lone Star State. Motto: Friendship. Now, Texas is the 2nd most populous state.



[/newsroom/stories/texas.html]

Stats for Stories

Is this page helpful?   ✕

👍 Yes   👎 No

## New Year's Day 2023: January 1, 2023

January 01, 2023

The U.S. Census Bureau projects the U.S. population will be 334,233,854 on Jan. 1, 2023. This is an annual increase of 1,571,393, or 0.47%, from Jan. 1, 2022.



[/newsroom/stories/new-years-day.html]

Press Kit,

## Press Kit: Vintage 2022 County Population Estimates

March 30, 2023

More than 73% (2,297) of U.S. counties experienced natural decrease in 2021 according to the Vintage 2021 estimates released today.



[/newsroom/press-kits/2023/pop-estimates-county.html]

# Subscribe

Our email newsletter is sent out on the day we publish a story. Get an alert directly in your inbox to read, share and blog about our newest stories.

SIGN U...

Contact our Public Information Office [/newsroom/about.html] for media inquiries or interviews.

# More stories

| Families and Living Arrangements | Families and Living Arrangements | Health | Housing |
|---|---|---|---|
| Same-Sex Married Couples Less Likely to Be Same | Multiple Partners, Multiple Kids | Public Health Emergencies and Mental Health | Younger Householders Drove Rebound in U.S. Homeownership |



Is this page helpful?    ✕

👍 Yes    👎 No

**Age, Race, Ethnicity**

Survey data reveal patterns of social and economic similarity between same- and opposite-sex spouses.

[/library/stories/2023/08/same-sex-married-couples-age-race-ethnicity.html]

A new U.S. Census Bureau report looks at patterns of multiple partner fertility among married and unmarried couples.

[/library/stories/2023/08/multiple-partners-multiple-children.html]

Last Revised - March 30, 2023

The opioid crisis, COVID-19 pandemic, and legislative changes may have contributed to a rise in revenue for mental health care service providers.

[/library/stories/2023/07/public-health-emergencies-and-mental-health.html]

Housing Vacancy Survey found homeownership rates, especially among those age 44 and younger, improved in all regions.

[/library/stories/2023/07/younger-householders-drove-rebound-in-homeownership.html]

Is this page helpful?   ✕

👍 Yes   👎 No



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00067

EXHIBIT
NO. 065

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,           §
                                    §
    *Plaintiffs,*                 §
                                    §
    vs.                           §     CIVIL ACTION NO.
                                    §     6:23-CV-00007
UNITED STATES DEPARTMENT OF         §
HOMELAND SECURITY, *et al.*,        §
                                    §
    *Defendants,* and             §     JUDGE DREW S. TIPTON
                                    §
VALERIE LAVEUS, *et al.*,           §
                                    §
    *Intervenor Defendants.*      §

# INTERVENOR DEFENDANTS' EXHIBIT 65

LETTER FROM PORT-AU-PRINCE

# HAITI HELD HOSTAGE

*Gangs control the capital. Foreign help is scarce. Can the embattled island nation save itself?*

**By Jon Lee Anderson**

July 17, 2023



For decades, gangs have been enmeshed in Haitian politics. After the country's President was assassinated, the balance of power tipped their way.  Photograph by Giovanni Porzio / Contrasto / Redux

 Save this story



Listen to this article.

L ast September, Ralph Senecal, the owner of a private ambulance company in Port-au-Prince, drove a friend who needed kidney dialysis to the Dominican Republic, where the hospitals are better than they are on the Haitian side of the border. On the way home, as he passed through the town of Croix-des-Bouquets, a few miles east of the capital, a group of men with guns blocked the road and forced him to pull over. The men belonged to a gang called 400 Mawozo—in Haitian Creole, the 400 Simpletons.

Senecal was taken to a brick building in the countryside, where he was held captive, sharing two rooms with some thirty other hostages. The structure had a metal roof, which seemed to concentrate the sun. "It was the kind of heat that gets you sweating at eight in the morning," Senecal told me. His hands and feet were kept tied. He was released only to relieve himself in a pit outside and, every three or four days, to bathe in a bucket of water.

A fit, ebullient man of sixty-two, Senecal splits his time between Haiti and the United States and previously served as a sergeant in the U.S. Army. Once his abductors learned of his military experience, they kept him under closer watch, worried that he might try to overpower them, or to escape. Senecal suspected that the gang members were connected to Haitian politicians. They had M16s, which he felt sure they could not otherwise have afforded, and they carried hand grenades. The leader was known as Lanmò San Jou—Death Without Warning. They were part of the same group that made headlines in 2021, when it abducted sixteen American missionaries and held them for two months.

The gang seemed to have chosen its captives without much concern for whether they could afford to pay ransom. About half of the people Senecal was held with were women and children, and few seemed rich. "There was even a guy who worked loading trucks," he recalled. The captives did their best to reassure one

another. "We talked and cried together," Senecal said. "But we couldn't pray." The guards refused to allow it, because they were adherents of vodou.

Senecal was released after seventeen days; his family had paid the kidnappers more than two hundred thousand dollars, wiping out his savings and leaving him in debt. Still, he considered himself lucky. One of the men who guarded him was a previous kidnapping victim who had been held so long that he decided his best hope was to join the gang.

Violent crime has long beset Haiti, but in the past two years it has risen to an unprecedented level. In 2021, President Jovenel Moïse was assassinated, and the country spiralled into chaos. Since then, an unelected government has struggled to maintain order with an inadequate and corrupt police force, as the gangs that once operated exclusively in the slums have expanded across the capital and into the countryside beyond. An estimated two hundred gangs are now active in Haiti, and they dominate as much as ninety per cent of the capital.

In a nation of twelve million people, there have been at least a dozen massacres by gangs fighting over turf, killing more than a thousand Haitians last year alone. Women are routinely raped and men murdered; many of the victims are burned alive in their homes. Since the beginning of the year, according to a U.N. report, another thousand people have been kidnapped, and at least two thousand killed, including thirty-four police officers. Last fall, a gangster known as Barbecue took over the city's main fuel port for nearly two months, causing devastating shortages of gas, food, and water, with half of Haiti's population afflicted by acute hunger.

The beleaguered Prime Minister, Ariel Henry, appealed to the international community to send a "specialized armed force" to break the gangs' control. The U.N. Secretary-General António Guterres promised to "stand by Haiti," and recommended that the Security Council consider a deployment. But no international force has been willing to incur the risk and expense of an intervention. The United States and Canada, which have often led past efforts to

provide relief and security assistance, have made largely symbolic gestures, including sanctions against politicians and suspected gang leaders and programs to train the police. "The Americans and Canadians say they are our friends, but if they were they'd come and help us," Senecal said. "If I had the cash, I'd run for President. This country needs someone strong."

Exasperated by the international inaction, Haitians have begun taking the law into their own hands, led by a vigilante movement called Bwa Kale, from a phrase that translates roughly as Shaft up the Ass. In its first week of operation, Bwa Kale reportedly killed at least a hundred and sixty gang members. At the same time, though, gangs were reportedly sending out teams to avenge their dead comrades. Few people seem to believe that the Haitian government, weakened by decades of corruption, can bring the country under control. When I asked Prime Minister Henry recently how he planned to resolve the situation, he smiled and threw up his hands. "Haitians are very resourceful," he said. "Maybe they will invent something."

One morning in Port-au-Prince, I came upon a young man's body in the middle of a residential street, where houses sat behind garden walls laden with pink bougainvillea. He lay on his side, wearing jeans and a red shirt but no shoes. Blood had flowed onto the pavement from a wound in his head. In Haiti, it is not uncommon to see the bodies of people murdered by gang members and left in public as a warning to rivals. Some are charred after being set on fire. Others show signs of having been beaten or shot or hacked with machetes.

Another morning, under a brilliant blue sky, I saw the bodies of two young men sprawled at a busy commercial intersection. They had been hacked to death, but their wounds had stopped bleeding, so it appeared that they had been killed elsewhere and then dumped on the street. People walking by gave expressionless glances; the passing traffic did not slow down. A pickup truck arrived with armed policemen, who took up watchful positions but did not remove the bodies.

Everyone seemed to understand that it was unsafe to show too much interest in the dead men.

During my visits this spring, I made my way through Port-au-Prince with a security detail of Haitian guards and former French Foreign Legionnaires. Most of the people I spoke to would agree to meet only inside walled homes. A few were willing to come to my securely guarded hotel, but only in daylight. There was an unofficial nighttime curfew, and most of the city shut down in the late afternoon. After dark, there were periodic gunshots, as unexplained as the bodies on the streets.

The places that were free of violence seemed to have been pacified by force. People in the capital were talking about a government prosecutor, Jean Ernest Muscadin, who had "solved" the gang problem in Nippes, a rural province west of Port-au-Prince, using what they referred to half admiringly as "tough methods." Muscadin's reputation had grown swiftly after a video circulated of him shooting a gang suspect to death. When a Haitian human-rights advocate criticized him for the killing, Muscadin threatened to arrest her, and thousands of people took to the streets to support him. On social media, some of his fans began acclaiming him as the next President and touting his methods as a model for securing the capital. Commissaire Muscadin's headquarters are in Miragoâne, the sunstruck coastal town that is the capital of Nippes. It was impossible to travel there overland from

Port-au-Prince, because gangs controlled the roads in and out of the city, but, after we arranged a meeting, I found a ride in a U.N. helicopter.

A trim man in his forties with a shaved head, Muscadin arrived in an S.U.V., with a pair of fierce-looking guards and his own assault rifle. Despite being introduced to me as the savior of Nippes, Muscadin scowled and avoided eye contact. When I asked how he had rid the province of its *bandits*, as gang members are called in Haiti, he replied evasively: "We chased them. There were a few that were absent. They were missing, but we also caught some." He said that there had been between a hundred and fifty and two hundred bandits in the region. And now? "Zero."

He attributed some of his efficacy to temperament. If *commissaires* elsewhere had failed, he said, it was because "they're not as brave, or not crazy enough." He also said that he had studied counterterror techniques—especially the Americans' search for the fugitive Iraqi leader Saddam Hussein, in which Special Forces mounted a ruthless campaign of strikes and interrogations around his home town. When I noted that the U.S. had lost the war in Iraq, Muscadin shot back, "Yes, but they got *him*."

Muscadin insisted that the gangs had been permanently expunged from Nippes. "With my force and rigor and discipline, there is no way they can return," he told me. When I asked where the missing bandits had gone, he gave a mirthless laugh. "They're just absent," he said.

For half a century, Haitians have endured a condition of menacing societal ambiguity, in which state power is inextricably intertwined with violence. It began during the Presidency of François (Papa Doc) Duvalier—a former doctor who won the country's elections in 1957. Duvalier took office promising to break a legacy of subjugation. Haiti had been dominated by the colonial French until a revolutionary uprising swept them out in 1804, and afterward it was forced to pay crippling reparations to its former overlords; in the early twentieth century, it was

occupied by the U.S. military. Then as now, Haitians, who are mostly descended from enslaved Africans brought by colonists, were the poorest people in the Western Hemisphere. Appealing to Black pride, Papa Doc advocated a credo known as *noirisme,* which called for seizing power from the mixed-race Haitians who made up the country's élite. He handled the American government cannily, offering to help contain Cuba, and secured significant financial aid—much of which he and his cronies embezzled.

In office, Duvalier had himself declared President for Life. After a furtive coup tried to force him out, he formed a paramilitary force known as the Tonton Macoutes, a name borrowed from a bogeyman figure of Haitian myth. The Tonton Macoutes, heavily armed and backed by vodou priests, kidnapped political rivals and terrorized the populace with murders and rapes. The country's democratic institutions never recovered.

When Duvalier died, in 1971, the Presidency was handed to his nineteen-year-old son, Jean-Claude. Baby Doc, as he was known, ran a hapless and corrupt administration, further aided by the Tonton Macoutes. Over time, the Duvaliers' enforcers killed an estimated sixty thousand Haitians and drove countless others into exile. Public unrest finally forced Baby Doc from office in 1986, but the collapse of the dynasty did not bring peace. Instead, vengeful mobs set upon regime loyalists and torched their homes. Hundreds of shops and businesses were looted, and entire swaths of downtown Port-au-Prince blighted.

The Tonton Macoutes lived on, with some of their veterans forming the core of successor groups. When the country was ruled by a series of military dictatorships, starting in the late nineteen-eighties, they were known as *attachés*, because they were attached to the Army and the police, who gave them their weapons and their orders. After the charismatic leftist priest Jean-Bertrand Aristide became President, he disbanded the abusive Army and recruited his own enforcers from the vast slum of Cité Soleil; these became known as the Chimères—the Ghouls.

As Aristide encouraged them in coded speeches, they deployed their own forms of terror, including one known as necklacing: executions in which victims were yoked with tires doused in gasoline and set alight. The practice has become widespread in Haiti, as a growing array of gangs have taken up the methods of the Chimères. People killed in other ways are set afire on the streets, in a gruesome display of dominance.

Haiti's most successful gang members lead lives of minor celebrity. The gangs not only outnumber the police; they're better armed, and they benefit from connections to the powerful élite who use them to secure influence. In YouTube videos, they brazenly celebrate their activities, often without bothering to obscure their faces. According to human-rights organizations, the gang leader known as Izo controls a port in the capital, from which he runs drugs and weapons. Ti Makak created a kidnapping ring that, in two years, raised him from obscurity to notoriety, before he was killed in fighting. Vitel'Homme, a former political activist, expanded his gang's ambit into the middle-class suburbs, where he looted guns and bulletproof vests from the police and burned down their stations.

Gangs tend to flourish when the state is weak, and the state was weakened profoundly in 2010, when an earthquake devastated Haiti. A large section of Port-au-Prince was destroyed, and more than two hundred thousand people were killed. Even the Presidential Palace collapsed. In the chaos that ensued, the police dispatched death squads to pursue prisoners who had escaped from the city's jail. In some cases, civilians struck out at looters, and at others who seemed like a threat. I arrived in Port-au-Prince soon after the earthquake, and came upon the body of a young man tied to a wooden post. A group of displaced people had spotted him wandering in the street near where their families were sleeping, and, fearing that he was a zombie, they had tied him to the post and stoned him to death.

A semblance of order was imposed by several thousand U.N. peacekeeping troops. The force had been deployed in 2004, when Aristide was ousted from the Presidency, to aid the country's minuscule security forces. They were not popular in Haiti. In July, 2005, hundreds of peacekeepers engaged in a seven-hour firefight with gang members in Cité Soleil, reportedly firing more than twenty-two thousand bullets and killing as many as fifty people, including women and children. The U.N. force commander, Lieutenant General Augusto Heleno, offered no apologies. (Heleno later served as the national-security adviser to Brazil's far-right President Jair Bolsonaro.)

In addition to the Cité Soleil massacre, the peacekeepers were accused of sexual misconduct—and also caused a cholera epidemic, by dumping raw sewage into a river. Though ten thousand Haitians died, the U.N. never formally acknowledged responsibility, let alone compensated the victims' families. When the U.N. finally withdrew its soldiers, in 2017, it left behind a sense that Haiti had been betrayed by the international community. It also left a security vacuum, which the gangs quickly moved to fill.

The year after the earthquake, the popular *konpa* musician Michel (Sweet Micky) Martelly came to power, promising to accelerate reconstruction; he also appealed to national pride by calling for Haiti's Army to be restored. The elections were disputed, and Martelly carried traces of scandal, including admissions of past drug use and a brother-in-law reputed to be a narco-trafficker. But he was charismatic, with unabashedly pro-American and pro-business views, and he had the support of the United States.

I interviewed Martelly in 2015, and he took me to a portside slum in Port-au-Prince called Wharf Jérémie, where he was unveiling a food market he'd had built. The area was under gang control, and, from the look of the watchful young men who formed a perimeter around Martelly's security cordon, some arrangement had evidently been struck. Martelly never explicitly admitted to dealing with gangs, but a former government adviser confirmed to me at the time that his

people had made payments to them. The adviser, who had gone on to work with another political party, noted with a shrug that it, too, was paying off gangs. If you wanted to succeed in Haitian politics, you had to do business with them; whoever controls the neighborhood also controls the votes.

Ariel Henry, a former neurosurgeon who is now Haiti's unelected leader, confesses that he has no solution to the security problems. "Haitians are very resourceful," he says. "Maybe they will invent something."  Photograph by Matias Delacroix / AP

One evening during my visit, Martelly gave a raucous outdoor concert, delighting the crowd by pantomiming a giant phallus and teasingly asking if he should take off his pants. In mid-set, he paused to introduce his chosen successor, Jovenel Moïse. The two men were unlikely allies. Where Martelly was a famously gifted performer, Moïse was a previously obscure banana exporter who seemed a little bashful about his campaign nickname, Banana Man. But Martelly insisted that he was the kind of homegrown entrepreneur that Haiti needed. After the concert, he flew me in the Presidential helicopter to visit Moïse's plantation in the far north of the country. Haitian Presidents are forbidden to serve consecutive terms, but Moïse, a skinny, serious man, revealed that he and Martelly had agreed to a twenty-year plan, in which they would alternate terms in office. Haiti needed that kind of stability, he said.

Instead, the country's instability grew worse. Moïse claimed victory in the subsequent election, but an opponent alleged fraud, spurring violent protests, and Parliament installed an interim President. After Moïse was finally sworn in, two years later, the capital was riven by confrontations between police and protesters, mostly over fuel price hikes and allegations of official corruption.

Moïse ceded little ground: he raised taxes, and, after a stalled electoral process effectively closed Congress, he ruled by decree, while pushing for a constitutional referendum that would allow him to extend his time in office. He ended up managing to alienate many of Haiti's élite—including Martelly, whom he angered by enabling one of his adversaries to run against him in the next Presidential election.

As protests continued, gangs that were apparently aligned with Moïse tried to disrupt them with attacks, human-rights observers told me. Other gangs linked to Moïse's rivals struck back, erecting barricades, burning vehicles, and looting. Amid the violence, Moïse evidently forged an alliance with the country's top gang leader —a former police officer named Jimmy Chérizier, more widely known as Barbecue.

Haiti Held Hostage | The New Yorker

Barbecue lives in the central district of Delmas, a commercial strip that runs about a hundred blocks from the center of Port-au-Prince up into the surrounding hills. He was born and raised there, amid a warren of houses cobbled together from brick, concrete, and tin. Now in his mid-forties, he claims to have acquired his nickname as a child, when his mother sold chicken on the street, though a persistent rumor maintains that the name derives from his treatment of enemies. Barbecue joined the police as a young man, and rose to become a member of a special corps known as the Departmental Unit for the Maintenance of Order—but, like many other officers, he apparently determined that working with the gangs was more profitable. In December, 2018, he was fired after being implicated in a massacre in La Saline, a slum near his home, in which at least seventy-one people were killed and more than four hundred houses were burned.

During Moïse's Presidency, Barbecue seized control of many districts of Port-au-Prince and built a reputation as a merciless overlord of the slums. In June, 2020, he posted a YouTube video announcing a new alliance of nine gangs, under his control: the Revolutionary Forces of the G-9 Family and Allies. Since Moïse's assassination, the G-9 has reportedly grown to more than a dozen gangs.

When I was in Haiti, Barbecue agreed to meet me, and one morning I was taken to a corner in his neighborhood and told to wait. After ten minutes, he appeared —a stocky, hard-faced man, surrounded by a cordon of teen-age boys with semi-automatic weapons. He wore black sweatpants with a colorful shirt, and carried a pistol loosely in one hand. Barbecue introduced himself, then immediately stepped away, saying that he needed to take a shower. He wandered into a house across the road, where a woman lingered in the doorway.

When Barbecue returned, he was wearing a black turtleneck and black jeans, and had traded the pistol for an iPad. Waving his bodyguards to sit in the shade nearby, he led me to a set of plastic chairs, next to a small house with a peeling pink façade and grilles on the windows—his home.

For several minutes, Barbecue studiously ignored me, apparently absorbed by his iPad. I asked him what he was reading. "I read the news," he said, looking up briefly. Any particular kind? "Nothing special," he said. "Everything."

He finally put down his iPad when I asked about the allegations against him; several human-rights organizations had concluded that, as he fought for turf, he was involved in a series of vicious attacks, in close coördination with senior police officers. "Let them prove it," he said. "The La Saline massacre. False. I was never in La Saline. Bel Air massacre. False. Massacre, massacre, massacre. False. All of these accusations are made because they can't control me politically." Barbecue argued that he had been unfairly fired from the police force: "That is the cause of misfortune that led to where I am today, but it also made me realize I had been a slave of that system and that I had to fight against it. Today, I feel much more useful than when I was a member of the Haitian police. There are a lot of people who depend on me." During our meeting, he walked into the road and ostentatiously handed a big bag of rice to an elderly woman. "Every two weeks, she comes to me to ask for food," he told me. "If I have rice or peas, I give it away. The little kids, I pay for their school. And the young girls, fourteen or fifteen years old, I must watch over them to prevent them from being sexually abused. The community has been there for me, and I for them."

Barbecue became animated as he talked about his heroes—a series of nation-building revolutionaries. He mentioned Jean-Jacques Dessalines, Haiti's iconic first ruler, as well as the Burkinabe revolutionary Thomas Sankara, Fidel Castro, and Malcolm X. "I like Martin Luther King, too, but he didn't like fighting with guns, and I fight with guns," he said, with a short, explosive laugh.

Barbecue wore his ideology almost literally on his sleeve. He had on a large gold pendant and a matching ring with Masonic symbols, which he said marked him as "someone who was seeking the truth." On his cell-phone cover was a Pop Art image depicting him as Che Guevara, complete with beret. "I'm not a

Communist," he explained. "I just like their philosophy. People who love their country. People who see the need to develop their country."

This was the root of his affinity with Dessalines, he said: "His dream was to share the country's riches with the little people. Today, a tiny group controls all the land, all its resources, its entire economy, while the majority lives in misery, in grime. Look at this neighborhood: we all live in misery, in grime. We have to fight to change that." Castro had pursued the same goals, he said: "He built schools, hospitals, universities."

When I asked Barbecue if he was evolving into a political figure, he gave another staccato laugh and pointed skyward. "That's the big architect who has all the power," he said. "I'm just one person who has a vision for my country. Haiti is a country of Blacks, but Haiti is a racist country. For example, there's never a Black who can have a supermarket, a Black who can own a house and a car. All those government posts, there's never a Black that has access to them; there's all this money, but it never comes back to them."

Barbecue blamed the island's inequities on what he called "the Lebanese"— Haitians of Syrian and Lebanese descent who constitute much of the economic élite, including food and fuel importers, bankers, and merchants. "We need to create a Black bourgeoisie," he said. "But all the riches of the country are in the hands of the five per cent, the oligarchs, the Lebanese." He complained that there wasn't even a good hospital in Port-au-Prince, "because when the oligarchs get sick they take private jets straight to Miami, where they are treated in Jackson Memorial Hospital." He added, "It's those people we need to eliminate and come with another group in our country, who are credible—who are Haitian above all. *Those* people aren't Haitians, and they don't even like Haitians."

It is indisputably true that Black Haitians have suffered centuries of disenfranchisement. But, when Barbecue speaks of fighting on their behalf against the light-skinned élite, it inevitably evokes Duvalier, who used the tenets of

*noirisme* to justify his violent rule. Indeed, Barbecue has spoken of admiring Papa Doc.

Last fall, as part of what Barbecue describes as his "fight for a better life," he led an armed blockade against the main Port-au-Prince fuel terminal of Varreux. For nearly two months, the capital suffered devastating fuel shortages and growing famine, even as a cholera epidemic spread. The blockade was ostensibly aimed at forcing Ariel Henry to resign, but all indications are that Barbecue was aiming to enrich his gang. Some Haitians speculate that he released the port only after reaching a secret agreement with Henry to supply government jobs for some of his men and to lift arrest warrants; others say that Henry simply paid him. (Both men deny this.) Someone with knowledge of the port's operations told me that the company that runs it didn't pay off Barbecue, but that it took care to hire its stevedores from areas he controlled, paying twice the going rate. He added that the stevedores "tithed" to their community leaders.

Although Barbecue presents himself as an enemy of the state, he is widely believed to have been linked to Moïse. He carried out his attacks on turf associated with Moïse's political rivals. And though he was a wanted criminal, he lived openly in Delmas, occasionally making public appearances with active-duty policemen. When I asked how he felt about the police, he gave a confiding look and said, "Once a policeman, always a policeman."

A diplomat in the region told me, "We had a strong suspicion that there was a connection between the gangs and the government at the highest level." Barbecue denied any links to Moïse. "I never met him, I never liked him," he told me, laughing roughly. "I liked him when he *died*." But after the assassination Barbecue appeared at a mourning ceremony attended by more than a thousand people. Dressed in a white suit and a black tie, he led a procession of gang members as they circled a bonfire and cast in salt to honor Moïse's memory.

In the course of our conversation, Barbecue told me that he had just one regret. "There are people who I don't want to see still alive," he said. He smirked, then offered a clarification: "I don't want to see them continuing to hurt Haiti." Despite his claims of nation-building, he seemed more like a bandit than like a revolutionary. "The notion of good and bad doesn't exist for me," he told me. "I do good for one group of people. I do bad for another. That's the law of life. The black and white. The equilibrium."

Barbecue blames Pierre Esperance, the executive director of the independent National Human Rights Defense Network, for the "false accusations" that cost him his job with the police. A sociologist by training, Esperance, a sturdy, bald-headed man of sixty, has been documenting abuses in Haiti for twenty-eight years. Having survived thus far, he is as outspoken as he is impatient. He describes Barbecue as "a killer, a gangster, a rapist," and as "a danger to human rights and democracy."

Esperance's headquarters, a squat villa in central Port-au-Prince, whirls with activity, as staffers attend to people who have come seeking help. In his office, I met a group of women from the community of Cabaret, an hour north of Port-au-Prince, who had survived an attack last November, as a gang sought revenge for the murder of one of its members by a local man. The women's stories had a terrible sameness. Gang members arrived suddenly at their houses, and took their brothers, husbands, fathers—and sometimes their mothers—into the street and

murdered them. About fifty people in all were killed. The women were kept inside and raped in front of their children or their younger siblings. Afterward, the gang members torched the neighborhood. The women wept as they spoke of their desolation; all were living on the charity of friends or relatives in other slums, surviving by washing clothes or by selling candy on the streets.

A young woman named Claudette, from the Port-au-Prince slum of Bel Air, told me that her district had been riven by fighting for several weeks, as a gang in Barbecue's G-9 alliance moved to take over a coveted well. Her family and their neighbors had been sleeping on the street, for protection. When I asked why it was safer outside, Claudette gave a surprised look and said, "Because when they come they burn our houses, and if we are inside we will burn, too."

Catherine, a strongly built woman with a baby girl in her arms, told me that she was from a section of Cité Soleil known as Brooklyn. In August, 2021, she was a twenty-seven-year-old widow with two young children, working in an industrial park. One evening, she was riding home in a group taxi when cars pulled in front of it and blocked the road. Masked gunmen leaped out and forced the passengers into the street. In an empty lot, the men started shooting, killing a little boy. Catherine cried softly as she recounted what happened next: the gang members beat her, yanked off her clothes, and raped her, over and over, for several hours. Catherine touched a scar on her face, where they had hit her with a gun. She didn't know who her tormentors were, because they wore masks. "There were other women raped at the same time," she said quietly. "One didn't make it."

Catherine spoke of the gangs that fought over Brooklyn without mentioning their names; it seemed not to matter much who they were, since they all behaved the same. But she deduced that the men who had raped her were from "the new gang," which had recently moved in. After displacing the previous gang, it blockaded the neighborhood, allowing no one in or out. "Since we couldn't leave and had no water, we drank sewage water," Catherine said. "Some people got cholera." The gang continued killing people and burning houses. Pierre Esperance

said that his office had documented fifty-seven cases of rape in the neighborhood during that period.

When Catherine was finally able to leave Brooklyn, a month later, she walked to a facility run by Médecins Sans Frontières, where doctors told her that she was pregnant and that she had contracted syphilis. Catherine received medical treatment and psychiatric counselling, but she could not imagine bearing a child. In despair, she jumped from the roof of a two-story house, the highest elevation she could find. It was Mother's Day, 2022. When she woke up, she was in hospital, giving birth.

As it turned out, Catherine's baby was healthy except for a facial injury sustained during her mother's suicide attempt. "When she was four months old, I tried to give her away at a hospital," Catherine said. "A counsellor helped me. She told me I had a pretty baby." Catherine spoke plainly, allowing herself no sentiment. "Now I love this baby."

Her greatest hope, she said, was for "someone to help me." She had two other children who needed protection, so she had moved in with a man, but he was beating her. She pointed to places where he had hit her. "If I get help, I can move out and take care of my children," she said. "I am intelligent."

Haitians looking for official help are perpetually disappointed. The country has only about nine thousand police officers, many of whom are believed to be involved with gangs. "The police force is at the scale of the state—about five per cent of the needed capacity," the diplomat in the region said. The Army is effectively nonexistent, with some two thousand active troops. What spending the government can afford often goes to patronage. Despite a dismal economy, the diplomat added, "the employees of the civil service have increased by thirty per cent in the past five years, the result of the governments stacking the civil service with their party militants."

The Trump Administration showed little interest in Haiti. In an Oval Office meeting in 2018, Trump asked why the U.S. had to accept immigrants from Haiti and other "shithole countries." Joe Biden, during his long political career, has demonstrated little more concern. In 1994, when President Clinton was considering an intervention, Biden counselled against it: "If Haiti—a God-awful thing to say—if Haiti just quietly sunk into the Caribbean, or rose up three hundred feet, it wouldn't matter a whole lot in terms of our interests." During his Presidency, officials I've asked about the Administration's priorities in the Western Hemisphere tend to list Mexico, Brazil, and Venezuela—and to throw up their hands when I mention Haiti.

The gang leader Jimmy (Barbecue) Chérizier speaks at a ceremony mourning President Jovenel Moïse. Barbecue, who has been accused of complicity in several massacres, says, "The notion of good and bad doesn't exist for me."  Photograph by Victor Moriyama / NYT / Redux

When I recently asked Brian Nichols, the Assistant Secretary of State for Western Hemisphere Affairs, about Henry's plea for security assistance, he said that the Administration was working to build support in the U.N. Security

Council, while remaining focussed on "insuring that the Haitian people be the protagonists in their own future." (A senior government official working in the region put it more directly: "Everyone agrees it has to be a Haitian solution, because if it is delivered from abroad everyone will say, 'The white man has spoken,' and it would be doomed not to last.") In mid-July, the Security Council agreed to develop options for consideration within thirty days. In the meantime, the U.S. is training some police, and has levied sanctions on various actors, including Barbecue—though sanctions are unlikely to produce an immediate effect on the street. When I mentioned them to Barbecue, he scoffed: "Morally, they don't bother me. Economically, they don't bother me, either, because I've never left Haiti."

Dan Foote, the former U.S. special envoy to Haiti, acknowledged that the situation was tenuous: "It's so bad now that people look wistfully back on the days of the Tonton Macoutes, when garbage was collected and their children played in the streets." Still, he noted that an intervention couldn't succeed unless the Haitian state was strengthened. "We try to build a government without a stable foundation and then it just fucks up," he said. "Haiti is going to be a generational challenge, but it's not insurmountable. We just need to help the Haitian people unfuck themselves. All they need is a leader."

Ariel Henry is a reticent figure who has given few interviews since assuming his post, but he agreed to meet me in a secure government compound above Port-au-Prince. A tall man with a clipped salt-and-pepper beard, he was dressed soberly, in a black suit and glasses. Despite having served briefly as interior minister under Martelly, Henry is best known as Haiti's foremost neurosurgeon. For years, he was the island's equivalent of Anthony Fauci—the preëminent medical authority during the cholera epidemic that began in 2010, and again during the recent outbreak of COVID-19.

In a darkened living room with gold-and-silver curtains drawn over the windows, Henry spoke for nearly two hours. He said that he "never imagined" he would become Prime Minister, until Moïse approached him about the post in 2021. Early that July, they'd had a long meeting, talking about the realities of governance: COVID-19, joblessness, forthcoming elections. "He said security was not an issue, that he had some plan for how to fight the gangs," Henry recalled. Moïse, who had only a few months left in office, seemed eager to maintain his influence, and asked to name two ministers in Henry's government. His wife, Martine, also asked to name one. At 11 o'clock on July 6th, Moïse called, sounding agitated, and asked why Henry hadn't finished assembling the new cabinet. "I told him it was because I hadn't been named yet," Henry recalled. A few hours later, he said, he was awakened by another call. There had been a break-in at the Presidential residence; Moïse had been shot twelve times.

It emerged that a group of assailants, including Colombian mercenaries, had made their way in with help from paid-off security men. Most of the mercenaries were soon captured, though three were killed in a firefight. The survivors said that they believed they were part of a "C.I.A. operation." Investigators eventually found that the operation was funded by a Haitian Chilean former drug trafficker, Rodolphe Jaar. Last month, Jaar was sentenced to life imprisonment in a Miami courtroom.

Still, rumors circulate in Haiti that others may have been involved. Moïse's wife, Martine, who was injured but not killed in the raid, has been the subject of speculation, as has Martelly, his estranged ally. (A lawyer for Martine denies that she had any involvement, or that she asked to name a minister. Martelly could not be reached for comment.) Ariel Henry has also been the object of suspicion. People mention that, in the hours after the killing, he spoke to Joseph Felix Badio, a former justice official who has been alleged to be a key architect of the plot. The diplomat in the region told me, "Henry has explained in a very awkward way that he doesn't remember the call." But, the diplomat added, this doesn't provide evidence of conspiracy. "He was already nominated to be Prime Minister," he said.

"He's wealthy. He'd done surgery on everyone in Haiti. What would be his motivation?"

After Moïse's assassination, Henry quickly went into hiding. "If he had done something that led people to think the only solution was to kill him, then the same thing could happen to me," he said. He explained that this was why he had avoided media contacts. "Times were turbulent," he said. "There was a big campaign to associate me with the assassination. I had just become Prime Minister, and suddenly I was a criminal. I wasn't prepared for it. Now my skin is thicker," he said, laughing.

Henry's many critics regard him as illegitimate. When he took office, he displaced an ambitious young nationalist named Claude Joseph—a change that Moïse agreed to only under pressure from Martelly. Dan Foote, the former special envoy to Haiti, told me, "Martelly had been coming and going from Miami, where he was living, busting Moïse's balls. They have a meeting, after which Moïse basically signs the paper Martelly has handed him, naming Henry as his Prime Minister. He goes home after that and gets killed."

According to Foote and other observers, the U.S. Ambassador helped insure that Henry was appointed. "Henry is compliant," Foote said. "He gets in there, looks good, knows how to tie a tie." He has coöperated with the Biden White House to accept deportations of Haitian immigrants; he has assured I.M.F. officers that he is working to shore up the economy. The diplomat in the region told me, "He is trying to restore some institutionality in this country at a time when most institutions are no longer functioning. Justice is completely broken. There have been no criminal trials in five years. Education is very damaged."

Public sentiment is against him, though. Around the capital, you see graffiti reading, "Down with Henry!" He has been promising new elections for the past eighteen months, but no one seems to believe that he will hold them. Foote told me, "There is no social contract between the Haitian people and Henry, and, as long as he's in there, the crisis will continue. Every time he tries to engage with

the gangs, they take his money and tell him to fuck off. The Haitians are embarrassed by him, because he can't get shit done."

In our conversation, Henry confessed to having no solution for the security problems in Port-au-Prince. He noted, with strained politeness, that Haiti had purchased some armored personnel carriers from a Canadian company, but they hadn't all arrived yet. "There have been quite a few—what do you call them, private contractors?—who have been offering their services," he said. He declined to give specifics, but said that they included some Americans and some Haitian Americans who had served in the U.S. military. "They are not proud of what's going on here, and they want to put together a force to fix the country," he said. "But we cannot accept. If you start there, you cannot predict the end."

When I asked how long Haiti could endure the current strife, he said, "Yesterday some industrialists came to see me, and they asked the same question. I said I couldn't speculate, but I didn't think we could go on for too much longer." Still, Henry said that he took comfort from a "deep feeling that the Haitian people can come up and astonish the world." He couldn't explain exactly what he meant, but said he felt hopeful that "peace would first take shape through a single spark and go on from there."

Other Haitian officials seemed less hopeful. One morning, I went to see Mirlande Manigat, one of the country's most respected public figures. Madame Manigat, as she is known, is eighty-two, an expert in constitutional law and the widow of a President who served for four months in the eighties before being ousted by the military. In 2010, Manigat ran for President herself, but lost to Martelly. She was now a co-leader of a Presidential transition council, whose office occupies an entire floor of a ministry in Port-au-Prince. When I arrived, the vast space was unfurnished except for a desk, a chair, and the Haitian flag. Manigat gave a mockingly expansive wave around and said, "We understand that others are looking to us and saying, 'What are you doing?' "

Her council's task, to propose changes to the electoral process and to the constitution, was stalled. "Nothing can be achieved until security is established, but security is nonexistent," she said. "If I were in power, I would declare a state of emergency." Henry had not done so, but she thought that the justice department might have the power to do it without him. "We are in an urgent situation," she said. "We need the government to adopt certain measures, even if they are illegal." Manigat feared that it was "already too late."

Because of the sour legacy of the U.N. peacekeeping forces, she did not favor an international stabilization force. "The idea demoralizes Haitians," she said. "We know what happens." In any case, Manigat said, it was clear that the countries that had previously aided Haiti were now principally concerned with Ukraine. "We watch the news," she said. "We understand that the international community doesn't want to send troops to Haiti, to send their kids to die here—and I don't blame them."

Manigat believed that the Haitian military needed to be reconstituted to restore order. She had grown up in an Army family, she said, and didn't "suffer from the same revulsion many people have toward the military." But there were obstacles, including the fact that the U.S. Congress had placed an arms embargo on the Haitian military. Manigat argued that the U.S. could ask other countries—she

mentioned Israel and Egypt—to provide arms. Wryly, she added, "We don't have a very sophisticated Army, so the Army wouldn't need very sophisticated weapons."

She was unconcerned by the possibility of human-rights violations. "When you are dealing with bandits, human rights don't apply," she said. "What do we have to do, implore them for mercy? No, we should show them no consideration, just as they do with us." Manigat spoke about Che Guevara, who died in Bolivia, in a battle with forces supported by the U.S. "His cadaver was exposed, and everyone saw that Guevara had died," she said. "Here the bandits have names—we all know who they are—and their bodies need to be exposed as well, so as to shock the population. The body dies from the head."

Nearly everyone I spoke to in Haiti agreed that defeating the gangs would require loosening laws. The country's interim justice minister, a novelist named Emmelie Prophète, met me at a café on the grounds of a luxury hotel where the U.N. has its headquarters. Prophète was guarded by two edgy-seeming security men.

I asked about a controversial recent statement, in which she had said that citizens should be allowed to take the law into their own hands in self-defense. Prophète laughed and nodded. "It was after a series of brutal home invasions and kidnappings," she explained. "A lot of people had been raped and killed, and many people had been writing me to ask whether, if they had weapons, they could defend themselves. I said yes!" Prophète added, "People are fed up with politics. People want security."

In April, reports of vigilante groups began to emerge. Civilians sealed off their streets and prepared to fight. In Port-au-Prince, people began lynching and burning gang members. The Bwa Kale movement was born.

Bwa Kale touts itself as a spontaneous civic phenomenon, but it clearly has backing from the police. In videos of the most explosive early attack, in which

fourteen suspected gang members were beaten and burned alive, uniformed policemen can be seen kicking prostrate men as a jeering crowd gathers to throw tires on top of them. Foote confirmed that the police supported Bwa Kale: "They're outgunned, so they have no other options."

One afternoon, the head of the National Union of Haitian Police, Lionel Lazarre, came to my hotel, just after attending a funeral for three policemen who had been killed by gangs. He confirmed that gangs controlled as much as ninety-five per cent of the capital, and conceded that the police were incapable of defeating them. But, he said, if the population supported them, and if the private sector and the government could "put their hands in their pockets to get them the resources they needed," things could improve. (The diplomat in the region reluctantly agreed: "If we can get a military intervention force here in a reasonable amount of time, we can have some results. The gangs will not be defeated in twenty-four hours, but they will take a step back. If there isn't one, then we have no choice but to rebuild the police.")

I asked about Muscadin, the regional authority who had reportedly defeated the gangs by indiscriminate force. "I don't have a problem with his work," Lazarre said. "Of course, people's rights need to be respected. But some people say if we had several Muscadins maybe we wouldn't have the problems we have today." Yet he declined to disavow Barbecue. "He was pushed into what he is now by human-rights organizations," he said. "I can't judge that one way or the other. But life has its turnarounds, and, because of the situation we're in, it could be that there may be those who could ask for an amnesty for him, in return for a change in his behavior."

The advent of Bwa Kale had put Barbecue in a curious position. Though the vigilantes had pledged to fight the gangs, many of those they fought were also Barbecue's enemies. And the police, to whom he had at least a sentimental allegiance, seemed to support them. When we spoke, I asked whether he was going to align himself with Bwa Kale. Laughing, he said, "That's a strategic

question." Rather than expanding, he spoke enigmatically about how the conflict might play out: "It was vodou that gave Haiti its independence, and it will liberate this country again." Gesturing broadly, he said, "The spirits of our ancestors, despite everything that's been done, continue to watch over us. Haiti will shake off all the dirt and once more become the Pearl of the Antilles."

On May 18th, Flag Day in Haiti, Barbecue appeared before a crowd, wearing a T-shirt emblazoned with "Bwa Kale." He gave an impassioned speech saluting the heroes of independence, describing his alliance of gangs as an extension of their struggle. He also hailed Bwa Kale, though he warned its members to "avoid collateral damage." He assured the crowd, "If there is any collateral damage, that's not us."

Barbecue went on, "We G-9 have no problem with Bwa Kale. I say to the people, 'Stay firm with Bwa Kale, because Bwa Kale is giving results.' There's no team that will give results like Bwa Kale. Bwa Kale all the way!"

In the weeks after Bwa Kale formed, kidnappings declined in the capital, and there was a surge of wary optimism. But the presence of another armed group seems unlikely to bring an enduring peace to Haiti. "The basic truth is that there is no state," the diplomat in the region said. "It is gone, and to rebuild it will be very slow."

One of the most contested front lines in the gang wars that have reshaped Port-au-Prince runs through Cité Soleil—a sprawling slum, which came into being in the nineteen-fifties, when American companies built factories in Haiti without also erecting housing for the workers. Barbecue's turf borders an area dominated by an enemy gang called G-Pep. One afternoon, I was escorted there by Sean Roubens Jean Sacra, a Haitian journalist who had cultivated a relationship with members of the gang. We made our way by a little-used road, bounded by weedy vacant land and an old concrete wall that marked a no man's land between the

gangs' territories. Near a crude lookout tower, young men with guns surrounded the car threateningly, until Sacra explained in Creole that their leader had sanctioned our trip.

Down the road, in front of a wall painted with a portrait of a dead gang member, G-Pep members hustled us onto motorbikes, and we roared off into the slum, riding for ten minutes through a trough with a deep sluice of raw sewage. People with bundles on their heads leaped aside as we passed, but nobody complained to the gang members, or even dared to make eye contact.

The sewer opened into a stretch of roadside shanty-shops, where a heavyset young man was waiting—G-Pep's third-in-command. He was in cell-phone contact with the leader, Gabriel Jean-Pierre, but our presence had evidently not been entirely approved. Soon after we arrived, a crew of young men rode up on motorbikes and began to argue with the local boss.

Sacra told us to stay out of sight during the negotiations, so we stood behind a cinder-block hut, where a man was burning charcoal in an oil drum. In the shade, a woman cut a young man's hair; he held a broken piece of mirror to review her handiwork. A mentally impaired man wandered through the alley. Children swarmed around.

After fifteen minutes, we were allowed to proceed to a packed neighborhood of shacks built out of corrugated tin and scrap metal. While the gang members kept watch outside, we were allowed in. The shacks had dirt floors, with open fires in the corners, rudimentary beds, and shelves for a few possessions. The heat inside was ferocious.

The residents, nearly all women, said that they didn't have enough food, and that they faced persistent danger. One of them, a sixty-year-old former domestic worker, who wore a faded tunic decorated with pink roses, explained, "We can't sleep well. There is no water—we get a little when it rains. There is no

government presence here. We live like animals. The only way in and out is the sewer, the way you came in, but you can get killed if you try and leave. These guys"—she waved toward the street—"can take you and kill you behind the wall." The killing was done at the corner where we had met the G-Pep sentinels. "We are prisoners here. Animals have more value than we do." (In the days after our visit, fighting nearby killed more than eighty people, as Barbecue forced out a rival leader.)

Outside, the gang leader was waiting to escort us to the front line. Gesturing for silence, he led the way through a labyrinth of narrow alleys until we reached an open area, bounded on one side by the ocean, still and dank, and on the other by a clutch of bullet-riddled tin houses. In front of us was the front line, marked by a jerry-built cinder-block wall, about ten feet high, that ran all the way to the sea.

The gang leader hustled us to the wall, looking out for enemy fighters. At the base was a small vodou altar: an effigy of a Catholic saint, surrounded by conch shells. Nearby, several of his men sat in the shade of a small blockhouse, holding automatic weapons. A hole in the wall gave a view of a copse of trees and a few oil-storage silos—G-9 territory, Barbecue's turf.

One of the guards, a skinny young man whose face was obscured by a mask patterned with an American flag, came out of the guardhouse, carrying a sawed-off shotgun. I asked if he was a fighter at the front line. He nodded, and said that he was. When I asked what he was fighting for, he paused for a moment and then mumbled in Creole. Sacra translated: "He said he doesn't know why. He is just here." ♦

Haiti Held Hostage | The New Yorker

A lookout scouts for rival gang members in downtown Port-au-Prince.

Photograph by Rodrigo Abd / AP

*Published in the print edition of the July 24, 2023, issue, with the headline "A Land Held Hostage."*

# NEW YORKER FAVORITES

- The rebranding of MDMA.

- What COVID revealed about American psychiatry.

- How to handle climate emotions.

- The changing role of the therapist on television.

- Reinventing the E.R. for America's mental-health crisis.

- Giving away my twin at her wedding.

- Nearly a century of New Yorker cartoons about therapy.

Sign up for our daily newsletter to receive the best stories from *The New Yorker.*



*Jon Lee Anderson, a staff writer, began contributing to The New Yorker in 1998. He is the author of several books, including "Che Guevara: A Revolutionary Life."*

# WEEKLY

Your guide to the latest magazine and our biggest stories of the week, plus highlights from podcasts, humor, and more.

E-mail address

**E-mail address**

| Sign up |
|---|

By signing up, you agree to our Under Agreement and Privacy Policy & Cookie Statement. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

## Read More

A CRITIC AT LARGE

## THE RISE AND FALL OF NEOLIBERALISM

The free market used to be touted as the cure for all our problems; now it's taken to be the cause of them.

**By Louis Menand**

SPORTS

## MELCHIE DUMORNAY IS THE REVELATION OF THE WORLD CUP SO FAR

Although Haiti did not make it past the group stage, the team's star has been the tournament's most exciting player.

**By Louisa Thomas**

BOOKS

## THE CIVIL-RIGHTS SHOWDOWN NOBODY REMEMBERS

Clinton High was the first Southern school to be integrated by court order. Why did reluctant acceptance turn to violence?

**By Louis Menand**

DAILY COMMENT

## IS IT HOT ENOUGH YET FOR POLITICIANS TO TAKE REAL ACTION?

The latest record temperatures are driving, again precisely as scientists have predicted, a cascading series of disasters around the world.

**By Bill McKibben**

Cookies Settings



DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 066

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 66, ECF 175-1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS et al., | § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al., | § § § | Judge Drew M. Tipton |
| *Defendants,* and | § § | |
| VALERIE LAVEUS et al., | § § | |
| *Intervenor Defendants.* | § | |

### DECLARATION OF ESTHER H. SUNG
### IN SUPPORT OF INTERVENOR DEFENDANTS' OPPOSITION TO
### PLAINTIFF STATES' CHALLENGE TO PAROLE PATHWAYS AND
### TO MOTION FOR PERMANENT NATIONWIDE INJUNCTION

1.      My name is Esther H. Sung, my date of birth is March 12, 1980, and my business address is P.O. Box 27280, Los Angeles, CA 90027.

2.      I am the legal director of Justice Action Center, counsel of record for the Intervenor Defendants in the above-captioned action. I am a member in good standing of the State Bar of California and have applied for admission to the Southern District of Texas. I have been admitted pro hac vice in this action.

3.      I respectfully submit this declaration in connection with Intervenor Defendants' Opposition to Plaintiff States' Challenge to Parole Pathways and to Motion for Permanent Nationwide Injunction ("Opposition"). The purpose of this declaration is to authenticate the exhibits cited in the Opposition.

1

4.     The exhibits to the Opposition, which I describe below, are drawn exclusively from (1) the administrative record, (2) the public record, and (3) discovery produced in this case and emails between the parties concerning that discovery.

5.     **Exhibit 1** is a true and correct copy of Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS") Form I-134A, "Declaration of Financial Support." The form is available online at https://www.uscis.gov/sites/default/files/document/forms/i-134.pdf (last accessed June 19, 2023).

6.     **Exhibit 2** is a true and correct copy of a page from the USCIS website titled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," available at https://www.uscis.gov/CHNV (last accessed June 19, 2023).

7.     **Exhibit 3** is a true and correct copy of a page from the USCIS website titled "Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," located at https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans (last accessed June 19, 2023).

8.     **Exhibit 4** is a true and correct copy of a memorandum prepared by the U.S. Department of Homeland Security, dated December 22, 2022, titled "Parole Process for Certain Cuban Nationals." The document is part of the administrative record, located at Cuba AR_000127–160.

9.     **Exhibit 5** is a true and correct copy of a memorandum prepared by the U.S. Department of Homeland Security, dated December 22, 2022, titled "Parole Process for Certain Haitian Nationals." The document is part of the administrative record, located at Haiti AR_000098–132.

2

10. **Exhibit 6** is a true and correct copy of a memorandum prepared by the U.S. Department of Homeland Security, dated December 22, 2022, titled "Parole Process for Certain Nicaraguan Nationals. The document is part of the administrative record, located at Nicaragua AR_000127–158.

11. **Exhibit 7** is a true and correct copy of a memorandum prepared by the U.S. Department of Homeland Security, dated October 12, 2022, titled "Parole Process for Certain Venezuelan Nationals." The document is part of the administrative record for this case, located at Venezuela AR_000117–143.

12. **Exhibit 8** is a true and correct copy of a memorandum prepared by the U.S. Department of Homeland Security, dated December 22, 2022, titled "Updates to the Parole Process for Certain Venezuelan Nationals." The document is part of the administrative record for this case, located at Venezuela AR_000144–151.

13. **Exhibit 9** is a true and correct copy of a U.S. Chamber of Commerce webpage titled "Understanding America's Labor Shortage: The Most Impacted States," located at https://www.uschamber.com/workforce/the-states-suffering-most-from-the-labor-shortage?state= (last accessed June 19, 2023).

14. **Exhibit 10** is a true and correct copy of a Congressional Research Service report, dated September 22, 2022, titled "Cuba: U.S. Policy in the 117th Congress." This document is part of the administrative record, located at Cuba AR_000190–240.

15. **Exhibit 11** is a true and correct copy of a Congressional Research Service report, dated August 2, 2022, titled "Haiti: Political Conflict and U.S. Policy Overview." This document is part of the administrative record, located at Haiti AR_000191–194.

16.     **Exhibit 12** is a true and correct copy of a USCIS report, dated June 15, 2022, titled "Nicaragua: COI Update." This document is part of the administrative record, located at Nicaragua AR_000312–321.

17.     **Exhibit 13** is a true and correct coy of a USCIS report, dated October 31, 2022, titled "Nicaragua: COI Update." This document is part of the administrative record, located at Nicaragua AR_000322–331.

18.     **Exhibit 14** is a true and correct copy of a USAID report titled "CHNV Displacement Data (2018–2021)." This document is part of the administrative record, located at Venezuela AR_000268–275.

19.     **Exhibit 15** is a true and correct copy of a UNHCR webpage titled "2023: A Moment of Truth for Global Displacement," located at https://www.unhcr.org/spotlight/2023/01/2023-a-moment-of-truth-for-global-displacement/ (last accessed June 19, 2023).

20.     **Exhibit 16** is a true and correct copy of a UNICEF press release, dated March 30, 2023, titled "Seven-fold increase in the number of children walking through the Panamanian jungle towards North America this Year," located at https://www.unicef.org/press-releases/seven-fold-increase-number-children-walking-through-panamanian-jungle-towards-north (last accessed June 19, 2023).

21.     **Exhibit 17** is a true and correct copy of a Forbes article by Stuart Anderson, dated March 21, 2023, titled "GOP State Lawsuit Could Stop Sound Way to Reduce Illegal Immigration," located at https://www.forbes.com/sites/stuartanderson/2023/03/21/gop-state-lawsuit-could-end-effective-immigration-parole-programs/?sh=6c0aa4915c19 (last accessed June 19, 2023).

22.     **Exhibit 18** is a true and correct copy of a National Foundation for American Policy whitepaper by Stuart Anderson, dated January 31, 2023, titled "The Historic Refugee Crisis in the Western Hemisphere," available at The-Historic-Refugee-Crisis.NFAP-Policy-Brief.January-2023.pdf (last accessed June 19, 2023).

23.     **Exhibit 19** is a true and correct copy of a fwd.us article, dated April 20, 2023, titled "Immigration parole has added 450,000 workers to industries with critical labor shortages," available at https://wp.fwd.us/news/immigration-labor-shortages/ (last accessed June 19, 2023).

24.     **Exhibit 20** is a true and correct copy of an article from the Austin American-Statesman by Justin Yancy, dated July 8, 2022, titled "The tools to tackle Texas' labor shortage," available at https://www.statesman.com/story/opinion/columns/your-voice/2022/07/08/opinion-the-tools-to-tackle-texas-labor-shortage/7815265001/ (last accessed June 19, 2023).

25.     **Exhibit 21** is a true and correct copy of an article from Axios Austin by Nicole Cobler, dated September 19, 2022, titled "Restaurants face labor shortages amid back-to-school season," available at https://www.axios.com/local/austin/2022/09/19/restaurants-labor-shortages-back-to-school-season (last accessed June 19, 2023).

26.     **Exhibit 22** is a true and correct copy of an article by the Federal Reserve Bank of Dallas by Laila Assanie and Carlee Crocker, dated Jun 24, 2021, titled "Supply Chain Woes Slow Texas Recovery," available at https://www.dallasfed.org/research/economics/2021/0624 (last accessed June 19, 2023).

27.     **Exhibit 23** is a true and correct copy of a press release by the Texas Health Care Association, dated September 14, 2021, titled "Texas Nursing Home Associations Ask Legislature to Address Critical Workforce Shortage," available at https://txhca.org/press_room/texas-nursing-

home-associations-ask-the-legislature-to-address-critical-workforce-shortage/ (last accessed June 19, 2023).

28.    **Exhibit 24** is a true and correct copy of an article from KUT 90.5 by Sergio Martinez-Beltran, dated December 12, 2021, titled "Without enough workers in the U.S. to fill jobs, ranches and farms in Texas look abroad," available at https://www.kut.org/politics/2022-12-21/without-enough-workers-in-the-u-s-to-fill-jobs-ranches-and-farms-in-texas-look-abroad    (last accessed June 19, 2023).

29.    **Exhibit 25** is a true and correct copy of an article from The Texas Tribune by Pooja Salhotra, dated February 14, 2023, titled "As Texas booms, local governments—especially in small towns—struggle to find workers," available at https://www.texastribune.org/2023/02/14/texas-local-government-hiring-trouble-economy/ (last accessed June 19, 2023).

30.    **Exhibit 26** is a true and correct copy of an article from the National Association of Manufacturers, dated May 4, 2021, titled "2.1 Million Manufacturing Jobs Could Go Unfilled by 2023," available at https://www.nam.org/2-1-million-manufacturing-jobs-could-go-unfilled-by-2030-13743/ (last accessed June 19, 2023).

31.    **Exhibit 27** is a true and correct copy of an article by the U.S. Chamber of Commerce by Lindsay Cates and Stephane Ferguson, dated May 2, 2023, titled "Understanding America's Labor Shortage:    The    Most    Impacted    States,"    available    at https://www.uschamber.com/workforce/the-states-suffering-most-from-the-labor-shortage    (last accessed June 19, 2023).

32.    **Exhibit 28** is a true and correct copy of a Rice University Baker Institute for Public Policy article by Jose Ivan Rodriguez-Sanchez, dated June 14, 2022, titled "Immigrants in Strategic Sectors    of    the    U.S.    Economy    and    America's    Labor    Shortage    Crisis,"    available    at

https://www.bakerinstitute.org/research/immigrants-in-strategic-sectors-of-the-us-economy-and-americas-labor-shortage-crisis (last accessed June 19, 2023).

33.     **Exhibit 29** is a true and correct copy of a Boston Globe article by Kara Miller, dated January 31, 2023, titled "America is running out of working-age adults. Here's how to solve the labor shortage," available at https://www.bostonglobe.com/2023/01/31/business/how-do-we-solve-labor-shortage-bring-more-immigrants/ (last accessed June 19, 2023).

34.     **Exhibit 30** is a true and correct copy of an opinion article from The Hill by Rebecca Shi, dated August 29, 2022, titled "Opinion: Immigrants are key to addressing America's labor shortage, lowering inflation, and growing our economy," available at https://thehill.com/opinion/congress-blog/3619410-immigrants-are-key-to-addressing-americas-labor-shortage-lowering-inflation-and-growing-our-economy/ (last accessed June 19, 2023).

35.     **Exhibit 31** is a true and correct copy of a Brookings article by Dany Bahar and Pedro Casas-Alatriste, dated July 14, 2022, titled "Who are the 1 million missing workers that could solve America's labor shortages?" available at https://www.brookings.edu/blog/up-front/2022/07/14/who-are-the-1-million-missing-workers-that-could-solve-americas-labor-shortages/ (last accessed June 19, 2023).

36.     **Exhibit 32** is a true and correct copy of a Partnership for a New American Economy whitepaper by Stephen G. Bronars, Ph.D., dated July 2015, titled "A Vanishing Breed: How the Decline in U.S. Farm Laborers Over the Last Decade Has Hurt the U.S. Economy and Slowed Production on American Farms," available at https://www.newamericaneconomy.org/wp-content/uploads/2015/08/PNAE_FarmLabor_August-3-3.pdf (last accessed June 19, 2023).

7

37.   **Exhibit 33** is a true and correct copy of a report by HBI, from Fall 2021, titled "The HBI Construction Labor Market Report," available at https://hbi.org/wp-content/uploads/HBI_Fall_Construction_Labor_Market_Report.pdf (last accessed June 19, 2023).

38.   **Exhibit 34** is a true and correct copy of an Associated Builders and Contractors Press Release, dated February 9, 2023, titled "Construction Workforce Shortage Tops Half a Million in 2023," available at https://www.abc.org/News-Media/News-Releases/entryid/19777/construction-workforce-shortage-tops-half-a-million-in-2023-says-abc (last accessed June 19, 2023).

39.   **Exhibit 35** is a true and correct copy of a USCIS memorandum, dated December 29, 2022, titled "Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form I-134A, Online Request to be a Supporter and Declaration of Financial Support." This document is part of the administrative record, located at Cuba_AR001179–1181.

40.   **Exhibit 36** is a true and correct copy of Texas's Response to Defendants' Discovery Requests in this matter, dated May 19, 2023.

41.   **Exhibit 37** is a true and correct copy of an email chain from Ryan Walters, counsel for Texas, to Jane Bentrott, counsel for Intervenor Defendants, dated from May 25, 2023 to June 13, 2023, titled "TX v. DHS (Parole), TX Discovery Response Discussion."

42.   **Exhibit 38** is a true and correct copy of a USCIS presentation titled "Fiscal Year 2023, Congressional Justification," available at https://www.uscis.gov/sites/default/files/document/reports/U.S._Citizenship_and_Immigration_Services%E2%80%99_Budget_Overview_Document_for%20Fiscal_Year_2023.pdf (last accessed June 19, 2023).

43.     **Exhibit 39** is a true and correct copy of the Federal Defendants' Responses and Objections to Plaintiffs' [Revised] First Set of Discovery Requests in this matter, dated May 19, 2023.

44.     **Exhibit 40** is a true and correct copy of a USCIS webpage titled "Uniting for Ukraine," available at https://www.uscis.gov/ukraine (last visited June 19, 2023).

45.     **Exhibit 41** is a true and correct copy of a CBS News article by Camilo Montoya–Galvez, dated February 24, 2023, titled "A year into war, U.S. sponsors apply to welcome 216,000 Ukrainian refugees under Biden policy," available at https://www.cbsnews.com/news/a-year-into-war-u-s-sponsors-apply-to-welcome-216000-ukrainian-refugees-under-biden-policy/ (last accessed June 19, 2023).

46.     **Exhibit 42** is a true and correct copy of 87 Fed. Reg. 63,507 (Oct. 19, 2022), titled "Implementation of a Parole Process for Venezuelans." This document is part of the administrative record at Venezuela AR_000073–83.

47.     **Exhibit 43** is a true and correct copy of a report by the United States Border Patrol, Del Rio Sector, dated October 7, 2021, titled "After Action Report (AAR) Mass Migration Event (MME) Del Rio, Texas September 8, 2021–September 24, 2021." This document is part of the administrative record at Haiti_000403–433.

48.     **Exhibit 44** is a true and correct copy of a tweet by Governor Greg Abbott, dated August 8, 2022 at 5:15 PM, available at https://twitter.com/GovAbbott/status/1556750876525707266 (last accessed June 19, 2023).

49.     **Exhibit 45** is a true and correct copy of a tweet by Governor Greg Abbott, dated December 26, 2018, at 1:17 AM, available at https://twitter.com/GregAbbott_TX/status/1077810690063163392 (last accessed June 19, 2023).

50.     **Exhibit 46** is a true and correct copy of an article published by the Texas Office of the Governor, titled "Top Texas Touts: People," available at https://gov.texas.gov/top-texas-touts-people (last accessed June 19, 2023).

51.     **Exhibit 47** is a true and correct copy of a New York Times article by Eileen Sullivan and Steve Fisher, dated March 10, 2023, titled "At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy," available at https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html (last accessed June 19, 2023).

52.     **Exhibit 48** is a true and correct copy of a UNHCR webpage titled "Welcoming the Stranger: Affirmations for Faith Leaders," available at https://www.unhcr.org/media/welcoming-stranger-affirmations-faith-leaders (last accessed June 19, 2023).

53.     **Exhibit 49** is a true and correct copy of an Executive Order, dated February 4, 2021, titled "Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration," available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/04/executive-order-on-rebuilding-and-enhancing-programs-to-resettle-refugees-and-planning-for-the-impact-of-climate-change-on-migration/ (last accessed June 19, 2023).

54.     **Exhibit 50** is a true and correct copy of a CBS News article by Camilo Montoya-Galvez, dated May 22, 2023, titled "1.5 million apply for U.S. migrant sponsorship program with 30,000 monthly cap," available at https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/ (last accessed June 19, 2023).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on this 20th day of June, 2023.

_____ /s/ Esther H. Sung _____
Esther H. Sung, Declarant
California Bar No. 255962
Admitted Pro Hac Vice
Application for S.D. Tex. Admission Pending
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276
esther.sung@justiceactioncenter.org

11



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 067

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,              §
                                        §
    *Plaintiffs,*                    §
                                        §
    vs.                              §      CIVIL ACTION NO.
                                        §      6:23-CV-00007
UNITED STATES DEPARTMENT OF             §
HOMELAND SECURITY, *et al.*,            §
                                        §
    *Defendants,* and                §      JUDGE DREW B. TIPTON
                                        §
VALERIE LAVEUS, *et al.*,               §
                                        §
    *Intervenor Defendants.*         §

# INTERVENOR DEFENDANTS' TAB 67, ECF 175-2



# Declaration of Financial Support

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 07/31/2023

▶ **START HERE - Type or print in black ink.**

## Part 1. Basis for Filing

1. I am filing this form on behalf of: ☐ Myself as the beneficiary. ☐ Another individual who is the beneficiary.

## Part 2. Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

1. Beneficiary's Current Legal Name (**Do not** provide a nickname.)

   | Family Name (Last Name) | Given Name (First Name) | Middle Name |
   |---|---|---|
   |  |  |  |

2. Other Names Used

   Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames. If you need extra space to complete this section, use the space provided in **Part 8. Additional Information.**

   | Family Name (Last Name) | Given Name (First Name) | Middle Name |
   |---|---|---|
   |  |  |  |
   |  |  |  |

3. Date of Birth (mm/dd/yyyy)  
4. Gender  ☐ Male  ☐ Female  
5. Alien Registration Number (A-Number) (if any)  ▶ A-

6. Place of Birth

   City or Town

   State or Province

   Country

7. Country of Citizenship or Nationality

8. Marital Status

   ☐ Single, Never Married  ☐ Married  ☐ Divorced  ☐ Widowed  ☐ Legally Separated  ☐ Marriage Annulled

   ☐ Other (Explain):

**EXHIBIT 1**

**Part 2.  Information about the Beneficiary** (continued)

9.   Beneficiary's Mailing Address

In Care Of Name (if any)

Street Number and Name                                                    Apt. Ste. Flr.   Number
☐ ☐ ☐

City or Town                                                    State      ZIP Code

Province                          Postal Code            Country

10.   Are the beneficiary's mailing address and physical address the same?                    ☐ Yes ☐ No

If you answered "No" to **Item Number 10.**, provide your physical address in **Item Number 11.**

11.   Beneficiary's Physical Address

In Care Of Name (if any)

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.)   Apt. Ste. Flr.   Number
☐ ☐ ☐

City or Town                                                    State      ZIP Code

Province                          Postal Code            Country

## *Beneficiary's Anticipated Length of Stay*

12.   Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐ (mm/dd/yyyy)

☐ No End Date

---

| Part 2. **Information about the Beneficiary** (continued) |
|---|

### *Beneficiary's Financial Information*

Provide information about the beneficiary's income and assets. If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information.**

**Beneficiary's Income**

13. Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**). Information about assets that are not based on employment should be added in **Item Number 16.** and not in **Item Number 13.**

| Individual's Full Name (First, Middle, Last) (do not include any individuals named in **Part 3.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Beneficiary (Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | Income contribution to the beneficiary annually (if none, type or print $0) |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | Total Number of Dependents | |
| | | Total Income | $ |

14. Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?   ☐ Yes   ☐ No

15. If you answered "Yes" to **Item Number 14.**, what amount of the beneficiary's total income comes from an illegal activity or source?   $ [        ]

| **Part 2. Information about the Beneficiary** (continued) |
|---|

**Beneficiary's Assets**

**16.**   In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder (First, Middle, Last) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
| | ▼ | |
| | ▼ | |
| | ▼ | |
| | ▼ | |
| | ▼ | |
| | ▼ | |
| | ▼ | |
| | Current Cash Value (U.S. dollars) $ | |
| | TOTAL (U.S. dollars) $ | |

| **Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** |
|---|

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

**1.**   Current Legal Name (**Do not** provide a nickname.)

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

**2.**   Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information.**

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |
| | | |

**3.**   Current Mailing Address

In Care Of Name (if any)

Street Number and Name                Apt.Ste. Flr.   Number

City or Town                          State   ZIP Code

Province          Postal Code          Country

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2. (continued)**

4.  Is your current mailing address the same as your current physical address?  ☐ Yes  ☐ No

   If you answered "No" to **Item Number 4.**, provide your current physical address in **Item Numbers 5.**

5.  Physical Address

   In Care Of Name (if any)

   [                                                                    ]

   Street Number and Name                                    Apt.Ste. Flr.  Number

   [                                                    ]  ☐ ☐ ☐  [                    ]

   City or Town                                    State   ZIP Code

   [                                        ]  [   ▼]  [                    ]

   Province                      Postal Code          Country

   [                    ]  [                ]  [                            ]

*Other Information*

6.  Date of Birth (mm/dd/yyyy)  [                    ]

7.  Place of Birth

   City or Town                              State or Province

   [                            ]  [                            ]

   Country

   [                            ]

8.  Alien Registration Number (A-Number) (if any)   9.   USCIS Online Account Number (if any)

   ► A- [                        ]      ► [                        ]

*Immigration Status*

10.  What is your current immigration status?  Provide documentation as provided in the instructions.

   ☐ U.S. Citizen

   ☐ U.S. National

   ☐ Lawful Permanent Resident   A-Number

   ► A- [                        ]

   ☐ Nonimmigrant  Form I-94 Arrival-Departure Record Number

   ► [                        ]

   Other (Explain):

   [                                                                    ]

**Part 3. Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

*Employment Information*

11.  Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)   ☐ Unemployed or Not Employed   ☐ Retired

☐ Other (Explain): _____

If you indicated that you are employed in **Item Number 11.**, provide the information requested in **Item Numbers 12. - 13.**

12.  **A.**  ☐ I am currently employed as a/an                    Name of Employer

_____          _____

**B.**  ☐ I am currently self-employed as a/an

_____

13.  Current Employer's Address

| Street Number and Name | Apt.Ste.Flr. | Number |

City or Town                                                      State      ZIP Code

Province              Postal Code              Country

*Financial Information*

Provide information about your income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information.**

**Income**

14.  Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**).  Information about assets that are not based on employment should be added in **Item Number 17.** and not in **Item Number 14.**

| Full Name (First, Middle, Last) (do not include any individuals named in **Part 2.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Individual Agreeing to Financially Support (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | Income Contribution to the Beneficiary Annually (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | Total Number of Dependents |  |
|  |  | Total Income $ |  |

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

15.  Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?   ☐ Yes   ☐ No

16.  If you answered "Yes" to **Item Number 15.**, what amount of income comes from an illegal activity?   $ [          ]

**Assets**

17.  Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | | Amount (Cash Value) (U.S. dollars) |
|---|---|---|---|
| | | ▾ | |
| | | ▾ | |
| | | ▾ | |
| | | ▾ | |
| | | ▾ | |
| | | ▾ | |
| | | ▾ | |
| | Current Cash Value (U.S. dollars) $ | | |
| | TOTAL (U.S. dollars) $ | | |

*Financial Responsibility for Other Beneficiaries*

18.  Have you previously submitted a Form I-134 on behalf of a person other than the beneficiary listed on this Form I-134?   ☐ Yes   ☐ No

If you answered "Yes" to **Item Number 18.**, provide the information requested in **Item Numbers 19. - 20.** If you need additional space to complete this section, use the space provided in **Part 8. Additional Information.**

19.  Person 1

Family Name (Last Name)  |  Given Name (First Name)  |  Middle Name
[                    ]   |   [                    ]   |   [                    ]

A-Number  |  Date Submitted (mm/dd/yyyy)
► A- [               ]  |  [                    ]

20.  Person 2

Family Name (Last Name)  |  Given Name (First Name)  |  Middle Name
[                    ]   |   [                    ]   |   [                    ]

A-Number  |  Date Submitted (mm/dd/yyyy)
► A- [               ]  |  [                    ]

---

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2. (continued)**

*Intent to Provide Specific Contributions to the Beneficiary*

21.   I   ☐ intend   ☐ do not intend to make specific contributions to the support of the beneficiary named in **Part 2.**

Explain the contribution.  For example, if you intend to furnish room and board, state for how long.  If you intend to provide money, state the amount in U.S. dollars and whether it is to be given in a lump sum, weekly, or monthly, and for how long.  If you need additional space, use **Part 8. Additional Information.**

---

**Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf)**

If you are the beneficiary and are filing Form I-134 on your own behalf, complete and sign **Part 4.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

*Beneficiary's Statement*

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

1.   I, as the beneficiary, certify the following:

   **A.**   ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

   **B.**   ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in [                    ], a language in which I am fluent and I understood everything.

2.   ☐  At my request, the preparer named in **Part 7.,** [                    ], prepared this declaration for me based only upon information I provided or authorized.

*Beneficiary's Contact Information*

3.   Beneficiary's Daytime Telephone Number

4.   Beneficiary's Mobile Telephone Number (if any)

5.   Beneficiary's Email Address (if any)

*Beneficiary's Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

---

**Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf)** (continued)

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

    **1)**  I reviewed and provided or authorized all of the information in my declaration;

    **2)**  I understood all of the information contained in, and submitted with, my declaration; and

    **3)**  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

*Beneficiary's Signature*

**6.**  Beneficiary's Signature                                            Date of Signature (mm/dd/yyyy)

➡️

**Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary**

If you are filing Form I-134 on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:** Read the **Penalties** section of the Form I-134 Instructions before completing this section.

*Statement of Individual Agreeing to Financially Support the Beneficiary*

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**  I, as the individual agreeing to financially support the beneficiary, certify the following:

    **A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

    **B.**  ☐  The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in [＿＿＿＿＿＿＿＿＿＿], a language in which I am fluent and I understood

**2.**  ☐  At my request, the preparer named in **Part 7.**, [＿＿＿＿＿＿＿＿＿＿], prepared this declaration for me based only upon information I provided or authorized.

*Contact Information of Individual Agreeing to Financially Support the Beneficiary*

**3.**  Daytime Telephone Number           **4.**  Mobile Telephone Number (if any)

**5.**  Email Address (if any)

---

**Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary** (continued)

*Certification of Individual Agreeing to Financially Support the Beneficiary*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

    1)  I reviewed and provided or authorized all of the information in my declaration;

    2)  I understood all of the information contained in, and submitted with, my declaration; and

    3)  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

*Signature of Individual Agreeing to Financially Support the Beneficiary*

| 6. | Signature | Date of Signature (mm/dd/yyyy) |
|---|---|---|
| ➡ | | |

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:** If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

---

**Part 6.  Interpreter's Contact Information, Certification, and Signature**

Provide the following information about the interpreter.

*Interpreter's Full Name*

| 1. | Interpreter's Family Name (Last Name) | Interpreter's Given Name (First Name) |
|---|---|---|
| | | |

| 2. | Interpreter's Business or Organization Name (if any) |
|---|---|
| | |

---

| Part 6. Interpreter's Contact Information, Certification, and Signature (continued) |
|---|

### *Interpreter's Mailing Address*

3. Street Number and Name                                    Apt. Ste. Flr.  Number

☐ ☐ ☐

City or Town                                                 State    ZIP Code

Province                    Postal Code         Country

### *Interpreter's Contact Information*

4. Interpreter's Daytime Telephone Number      5. Interpreter's Mobile Telephone Number (if any)

6. Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and [                    ] which is the same language specified in **Part 4.**
or in **Part 5., Item B. in Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the
identified language every question and instruction on this declaration and his or her answer to every question. The individual agreeing
to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the
declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the
accuracy of every answer.

### *Interpreter's Signature*

7. Interpreter's Signature                                   Date of Signature (mm/dd/yyyy)

| Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary |
|---|

Provide the following information about the preparer.

### *Preparer's Full Name*

1. Preparer's Family Name (Last Name)          Preparer's Given Name (First Name)

2. Preparer's Business or Organization Name (if any)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### *Preparer's Mailing Address*

3.  Street Number and Name                                                       Apt. Ste. Flr.  Number

    City or Town                                                                 State   ZIP Code

    Province                    Postal Code              Country

### *Preparer's Contact Information*

4.  Preparer's Daytime Telephone Number          5.  Preparer's Mobile Telephone Number

6.  Preparer's Email Address (if any)

### *Preparer's Statement*

7.  **A.** ☐ I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

    **B.** ☐ I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends ☐ does not extend beyond the preparation of this declaration.

**NOTE:** If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### *Preparer's Certification*

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### *Preparer's Signature*

8.  Preparer's Signature                                                         Date of Signature (mm/dd/yyyy)

## Part 8. Additional Information

If you need extra space to provide any additional information within this declaration, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.**  Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.**  A-Number (if any) ▶ A-

**3.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

**D.**

**4.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

**D.**

**5.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

**D.**

**6.**  **A.**  Page Number    **B.**  Part Number    **C.**  Item Number

**D.**

DEFENDANT'S
EXHIBIT

CASE
NO. 6·23-CV-0007

EXHIBIT
NO.  068

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |


# INTERVENOR DEFENDANTS'
# TAB 68, ECF 175-3



**U.S. Citizenship
and Immigration
Services**

<div style="border:1px solid">

**EXHIBIT
2**

</div>

Home > Humanitarian > Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

# Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

English | Kreyòl Ayisyen |

> **ⓘ ALERT:** Updated Review Process for the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans
>
> The U.S. government may grant advance travel authorization to up to 30,000 noncitizens each month to seek parole on a case-by-case basis under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans. Due to high interest in these processes, we are updating the review process effective May 17, 2023. Under the new review process, we will randomly select about half of the monthly total of Forms I-134A, Online Request to be a Supporter and Declaration of Financial Support, regardless of filing date, from the entire pending workload to review. We will review the other half of the monthly total of Forms I-134A based on when the case was submitted under the first-in, first-out method, which prioritizes the oldest Forms I-134A for review. This is intended to maintain a meaningful and equitable opportunity for all beneficiaries of a Form I-134A to move forward through the process and seek advance travel authorization. For more information, see our web alert.

> **ⓘ ALERT:** Starting Jan. 6, 2023, you must submit Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, if you are a potential supporter of a Cuban, Haitian, Nicaraguan, or Venezuelan or their immediate family member as part of the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.
>
> You should not file Form I-134, Declaration of Financial Support, if you are a potential supporter of an individual under the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans.
>
> If you submitted Form I-134 online before Jan. 6, 2023, under the Process for Venezuelans, your case will continue to process and no further action is required. You should not submit a Form I-134A.

> **ⓘ ALERT:** Access to the processes is free. Neither the U.S.-based supporter nor the beneficiary is required to pay the U.S. government a fee to file the Form I-134A, be considered for travel

authorization, or parole. Beware of any scams or potential exploitation by anyone who asks for money associated with participation in this process.

DHS has announced processes through which nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members, may request to come to the United States in a safe and orderly way. Qualified beneficiaries who are outside the United States and lack U.S. entry documents may be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for up to two years for urgent humanitarian reasons or significant public benefit. To participate, eligible beneficiaries must:

- Have a supporter in the United States;
- Undergo and clear robust security vetting;
- Meet other eligibility criteria; and
- Warrant a favorable exercise of discretion.

Individuals participating in these processes must have a supporter in the United States who agrees to provide them with financial support for the duration of their parole in the United States. The first step in the process is for the U.S.-based supporter to file a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS for each beneficiary they seek to support, including minor children. The U.S. government will then review the supporter information provided in the Form I-134A to ensure that they are able to financially support the beneficiaries they are agreeing to support.

See below for additional information on the processes and country specific eligibility requirements. Additional information is also available on our Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page.

↗ Close All   ↗ Open All

## Eligibility                                              ⌃

| Term | Definition |
|------|-----------|
| Supporter | An individual who holds lawful status in the United States or is a parolee or beneficiary of deferred action or Deferred Enforced Departure (DED) who has passed security and background vetting and demonstrated sufficient financial resources to receive, maintain, and support the individual(s) whom they commit to supporting for the duration of their stay in the United States.<br><br>Examples of individuals who meet the supporter requirement include:<br><br>• U.S. citizens and nationals;<br>• Lawful permanent residents, lawful temporary residents, and conditional permanent residents;<br>• Nonimmigrants in lawful status (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status);<br>• Asylees, refugees, and parolees;<br>• Individuals granted Temporary Protected Status (TPS); and<br><br>Beneficiaries of deferred action (including deferred action for childhood arrivals) or DED. |
| Beneficiary | A national of Cuba, Haiti, Nicaragua, or Venezuela (or their immediate family member of any nationality) who is outside the United States and who may be considered for parole under these processes.<br><br>Immediate family members of any nationality in these processes include:<br><br>• A spouse or common-law partner; and<br>• Unmarried child(ren) under the age of 21. NOTE: If a child is under 18, they must be traveling with a parent or legal guardian in order to use this process. |

**Who May be Considered for Advance Travel Authorization**

In order to be eligible to request and ultimately be considered for an advance authorization to travel to the United States to seek parole under these processes, beneficiaries must:

• Be outside the United States;
• Be a national of Cuba, Haiti, Nicaragua, or Venezuela; or be an immediate family member (spouse, common-law partner, and/or unmarried child under the age of 21) who is traveling with an eligible Cuban, Haitian, Nicaraguan, or Venezuelan;
• Have a U.S.-based supporter who filed a Form I-134A on their behalf that USCIS has vetted and confirmed;

- Possess an unexpired passport valid for international travel;
- Provide for their own commercial travel to an air U.S. POE and final U.S. destination;
- Undergo and pass required national security and public safety vetting;
- Comply with all additional requirements, including vaccination requirements and other public health guidelines; and
- Demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, and that a favorable exercise of discretion is otherwise merited.

An individual is ineligible to be considered for parole under these processes if that person is a dual national or permanent resident of, or holds refugee status in, another country, unless DHS operates a similar parole process for the country's nationals. This requirement does not apply to immediate family members (spouse, common-law partner, or unmarried child under the age of 21) of an eligible national of Cuba, Haiti, Nicaragua, or Venezuela with whom they are traveling.

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under these processes if that person:

- Fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;
- Has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;
- Has crossed irregularly into the United States, between the POEs, after the date the process was announced (for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023), except individuals permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) will remain eligible;
- Has irregularly crossed the Mexican or Panamanian border after the date the process was announced (for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023);
- Is Cuban or Haitian and has been interdicted at sea after April 27, 2023; or
- Is under 18 and not traveling through this process accompanied by a parent or legal guardian.

**Important Note about Venezuelan Passports**

The beneficiary must have a valid, unexpired passport. Certified extensions of passport validity serve to meet this requirement. If a beneficiary's passport validity has been extended, the expiration date of the extension should be reflected as the passport expiration date. CBP will not authorize travel if the beneficiary's passport or extension is expired.

Consistent with the National Assembly decree of May 21, 2019, certain expired Venezuelan passports remain valid. A Venezuelan passport:

- Issued before June 7, 2019 (even if expired before this date), without a passport extension ("prórroga"), is considered valid and unexpired for five years beyond the expiration date printed in the passport.

- Issued before June 7, 2019 (even if expired before this date), with a "prórroga" issued before June 7, 2019, is considered valid and unexpired for five years beyond the expiration date of the "prórroga."

- Issued before June 7, 2019 (even if expired before this date), with a "prórroga" issued on or after June 7, 2019, is considered valid and unexpired through the expiration date of the "prórroga" or for five years beyond the expiration date printed in the passport, whichever is later.

- Issued on or after June 7, 2019, without a "prórroga" is not considered valid beyond the expiration date printed in the passport.

- Issued on or after June 7, 2019, with a "prórroga" issued on or after June 7, 2019, is considered valid and unexpired through the expiration date of the "prórroga."

## Unaccompanied Children ⌃

**Children under the age of 18 traveling without their parent or legal guardian are not eligible for advance authorization to travel or parole under these processes.** Upon arrival at a U.S. port of entry, a child who is not traveling with their parent or legal guardian may be transferred to the custody of the Department of Health and Human Services (HHS), as required by law under the Trafficking Victims Protection Reauthorization Act of 2008. For more information, please visit the HHS Unaccompanied Children webpage.

Since they are ineligible to pursue travel authorization under these processes, children who are not traveling with a parent or legal guardian but are coming to the United States to meet a parent or legal guardian may instead seek parole through the standard Form I-131 parole process. In the Form I-131 parole process, children who wish to travel without a parent or legal guardian will need written permission from all adults with legal custody of the child (including parents or legal guardians) to travel to the United States.

Evidence to accompany the Form I-131 will need to include the duration of the stay in the United States and evidence of relationship between the child and the parent or legal guardian in the United States. If the legal guardian is providing the written permission, the requestor must include proof of legal guardianship issued by a government authority. In addition, the application should include a statement about the relationship of the child to the person filing the Form I-131, and if they intend to provide care and custody of the child in the United States or reunite the child with a parent or legal guardian in the United States. For more information, please see our Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole page, which has information about the requirements for requesting parole for children.

You may request a fee waiver when submitting a Form I-131 for a child as described in the above paragraph. For more information on how to request a fee waiver, please see the Form I-912, Request for Fee Waiver, webpage.

## Who Can be a Supporter ⌃

U.S.-based supporters will initiate an online request on behalf of a named beneficiary, by submitting a Form I-134A to USCIS for each beneficiary, including minor children. Supporters can be individuals filing independently, filing with other individuals, or filing on behalf of organizations, businesses, or other entities. There is no fee required to file Form I-134A. The supporter will be vetted by the U.S. government to protect against exploitation and abuse and to ensure that they are able to financially support the beneficiary they are agreeing to support.

To serve as a supporter, an individual or individual representing an entity must:

- Be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States such as Temporary Protected Status or asylum; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- Pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- Demonstrate sufficient financial resources to receive, maintain, and support the individual(s) they are agreeing to support for the duration of their parole period.

Supporters who file Form I-134A on behalf of a beneficiary under these processes must be willing and able to receive, maintain, and support the beneficiary listed in Form I-134A for the duration of their parole. Examples of the types of support for beneficiaries that supporters should keep in mind when considering their ability to meet this commitment include:

- Receiving the beneficiary upon arrival in the United States and transporting them to initial housing;
- Ensuring that the beneficiary has safe and appropriate housing for the duration of their parole and initial basic necessities;
- As appropriate, helping the beneficiary complete necessary paperwork such as for employment authorization, for a Social Security card, and for services for which they may be eligible;
- Ensuring that the beneficiary's health care and medical needs are met for the duration of the parole; and
- As appropriate, assisting the beneficiary with accessing education, learning English, securing employment, and enrolling children in school.

Supporters must include the name of the beneficiary on Form I-134A. Supporters may not file a Form I-134A on behalf of an unnamed beneficiary. A supporter may agree to support more than one beneficiary, such as for different members of a family group, but must file a separate Form I-134A for each beneficiary.

**Supporters must file a separate Form I-134A for each beneficiary, even minor children.** Multiple supporters may join together to support a beneficiary. In this case, a supporter should file a Form I-134A and in the filing include supplementary evidence demonstrating the identity of, and resources to be provided by, the additional supporters and attach a statement explaining the intent to share responsibility to support the beneficiary. These supporters' ability to support a beneficiary will be assessed collectively.

Organizations, businesses, and other entities can play a critical role in providing support for beneficiaries arriving through this process. Although an individual is required to file and sign the

Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all of the necessary support to the beneficiary. Individual supporters filing with or on behalf of an organization, business, or other entity should submit evidence of the entity's commitment to support the beneficiary when they file the Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other credible representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary. Individuals who are filing in association with an organization, business, or other entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary.

Organizations outside of the government may be able to help potential supporters and beneficiaries to prepare for this process. Two organizations that specialize in providing the public with information about providing welcome to newcomers and resources to support participation in these processes are listed below.

- Welcome.us☒ provides information on welcoming and supporting newcomer populations.
- Community Sponsorship Hub☒ has established the Sponsor Circle Program☒, which can provide resources and ongoing guidance to supporters.

This information is provided for informational purposes only. DHS does not endorse these entities. Using these entities in lieu of any other entity does not give any parolee preferential treatment in the adjudication of their application.

## Process Steps                                                                ⌃

Beneficiaries cannot directly apply for these processes. A supporter in the United States must first complete and file Form I-134A with USCIS on behalf of a beneficiary and include information about them and contact details, such as an email address. If we deem the Form I-134A sufficient, in our discretion, we will send the beneficiary information about the next step in the process to be considered for authorization to travel to the United States and parole consideration at an airport of entry.

Once beneficiaries receive their travel authorization, they should arrange to fly directly to their final destination in the United States. Upon arrival at the interior port of entry, individuals will be inspected by CBP and required to submit additional information, to include fingerprints, for further biometric vetting, and then be considered for a discretionary grant of parole. Those who attempt to enter the U.S. at land ports of entry will not be considered for parole through this process and will generally be denied entry.

The key steps in the processes include:

### Step 1: Financial Support

- A U.S.-based supporter will submit a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I-134A identifies and collects information on both the supporter and the

beneficiary. The supporter must submit a separate Form I-134A for each beneficiary they are seeking to support, including immediate family members and minor children.

- USCIS will then vet the supporter to ensure that they are able to financially support the individual they are agreeing to support and to protect against exploitation and abuse. USCIS, in our discretion, must vet and confirm supporters before they move forward in the process.

### Step 2: Submit Biographic Information

- If USCIS confirms a supporter, the listed beneficiary will receive an email from USCIS with instructions on how to create a USCIS online account and other next steps. The beneficiary must confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.
- As part of confirming eligibility in their online account, individuals who seek authorization to travel to the United States must confirm that they meet public health requirements, including certain vaccination requirements.

### Step 3: Submit Request in CBP One Mobile Application

- After confirming biographic information in their online account and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS on how to access the CBP One mobile application (PDF, 771.55 KB). The beneficiary must enter their biographic information into CBP One and provide a photo.

### Step 4: Advance Travel Authorization to the United States

- After completing Step 3, the beneficiary will receive a notice in their online account confirming whether CBP will, in its discretion, provide them with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis.
- If approved, this authorization is valid for 90 days. Beneficiaries are responsible for securing their own travel via air to the United States. Approval of advance authorization to travel does not guarantee entry or parole into the United States at a U.S. port of entry. Parole is a discretionary determination made by CBP at the port of entry, based on a finding that parole is warranted due to urgent humanitarian reasons or significant public benefit.

### Step 5: Seeking Parole at the Port of Entry

- When a beneficiary arrives a port of entry, CBP will inspect them and consider them for a grant of discretionary parole on a case-by-case basis.
- As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspection process. Individuals who are determined to pose a national security or public safety threat, or otherwise not warrant parole as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE).

### Step 6: Parole

- Individuals granted parole under these processes generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations.

- Individuals granted parole may request work authorization from USCIS by filing a <u>Form I-765</u>, <u>Application for Employment Authorization</u>, either <u>online</u> or via mail.

---

## What to Expect After Filing Form I-134A ⌃

After the supporter files the Form I-134 with USCIS, we will review the form and supporting evidence to ensure that the supporter has sufficient financial resources to support the beneficiary for the duration of the parole period and conduct background checks on the supporter. We will determine whether the Form I-134A is sufficient, and we may request additional evidence to make our determination. If approved, beneficiaries will receive an email from USCIS with instructions on how to set up a USCIS online account and other next steps. Individuals should check their email, including spam and junk folders, for important messages from USCIS.

### If the Form I-134A is Sufficient

If we confirm in our discretion that the Form I-134A is sufficient, the beneficiary will receive an email from USCIS with instructions on how to set up a USCIS online account and other next steps. The beneficiary must confirm their biographic information on myUSCIS and attest to completion of all requirements, including:

- An attestation affirming that
  - you are not a permanent resident or dual national of any country other than your country of nationality, and that you do not currently hold refugee status in any country, unless DHS operates a similar parole process for the country's nationals; or
  - you are the spouse, common-law partner, or unmarried child under the age of 21 and traveling with an eligible national;
- An <u>attestation </u>to certify understanding of the family relationship requirements for children under 18; and
- An attestation that you have completed vaccine requirements or are eligible for an exception to vaccine requirements for measles, polio, and the first dose of a COVID-19 vaccine <u>approved or authorized by the U.S. Food and Drug Administration (FDA)</u> or <u>Emergency Use Listed (EUL) by the World Health Organization (WHO)</u> ⧉.

After arriving in the United States, the beneficiary must attest to receiving a medical screening for tuberculosis, including an Interferon-Gamma Release Assay (IGRA) test, within 90 days.

Find more information on vaccine requirements on the <u>preview of the vaccine attestation page</u> .

### If the Form I-134A is Insufficient

If we are unable to confirm the Form I-134A is sufficient, that decision is final. The beneficiary will receive an email from USCIS notifying them that we determined the Form I-134A filed on their behalf was insufficient. We will not consider the beneficiary for parole under this parole process based on the insufficient Form I-134A. However, the supporter may file a new Form I-134A on behalf of the same or another beneficiary, or a different supporter may file a Form I-134A on behalf of the beneficiary.

**Authorization to Travel to the United States**

Once the beneficiary has confirmed their biographic information and attested to completing all other requirements, we will process their case further. Beneficiaries will receive an email instructing them to check their online account in myUSCIS for the result of their authorization to travel. This authorization is valid for 90 days.

If the beneficiary has been authorized to travel to the United States, they must arrange and fund their own travel. Beneficiaries must arrange to fly to the United States by air directly to an interior port of entry and their final destination.

## After the Beneficiary is Paroled into the United States                           ⌄

### Applying for Employment Authorization

After you are paroled into the United States, you are eligible to apply for discretionary employment authorization from USCIS. To apply for an Employment Authorization Document (EAD), you must submit Form I-765, Application for Employment Authorization, using the (c)(11) category code with the required fee, or apply for a fee waiver.

To file Form I-765 online, eligible applicants will access their USCIS online account at my.uscis.gov.

Applicants who are requesting a waiver of the Form I-765 filing fee must submit Form I-765 by mail with Form I-912, Request for Fee Waiver.

### Obtaining a Social Security Number and Card

We encourage you to apply for a Social Security number (SSN) using Form I-765, Application for Employment Authorization, and following the form instructions. If you request an SSN in Part 2 (Items 13.a-17.b) of your Form I-765, and we approve your Form I-765, USCIS will electronically transmit that data to the Social Security Administration (SSA), and SSA will assign you an SSN and issue you a Social Security card. SSA will mail your Social Security card directly to the address you provide on Form I-765. SSNs generally are assigned to people who are authorized to work in the United States. SSNs are used to report your wages to the government and to determine your eligibility for Social Security benefits.

If you do not request an SSN on your Form I-765, you can apply for an SSN after you receive your EAD from USCIS using the instructions on SSA's Social Security Number and Card webpage.

### Address Updates

If you are residing in the United States longer than 30 days, you must report your physical address in the United States. If your address changes after you enter the United States, you must notify us within 10 days of the change, by either:

- Using our online change of address form; or
- Through your existing USCIS online account (if you have an account). For more information on how to create an online account, visit the How to Create a USCIS Online Account.

Changing your address online will update the address on file with USCIS for each pending application, petition, or request for which you provide a receipt number when filling out the Online Change of Address form. It is important to include the receipt number for any cases pending with USCIS in your address change request, so that we can update the address associated with those cases. We will mail secure documents to the address on file. You can find the receipt number on the receipt notice (Form I-797C, Notice of Action) that we issued after you filed your application, petition, or request. We send receipt notices to the address listed on the application, petition, or request.

**Terminating Your Parole**

If you have already been paroled into the United States, your parole will automatically be terminated if:

- You depart the United States (without an Advance Parole Document before traveling outside the United States); or
- Your parole period expires.

DHS may also decide to terminate your parole at its discretion for other reasons, such as violating any laws of the United States. We expect you will leave the country when your parole expires. If you stay in the United States after your parole expires, officials who encounter you may refer you to U.S. Immigration and Customs Enforcement (ICE) for immigration proceedings.

**Leaving the United States**

If we grant you travel authorization, you may present it only once for travel to the United States to seek parole at the U.S. port of entry. After you are paroled into the United States, if you want to leave the United States and then return as a parolee, you must request an Advance Parole Document by filing Form I-131, Application for Travel Document, before traveling outside the United States. If you leave the United States without getting an Advance Parole Document, your parole will be terminated when you depart. For information on how to apply for an Advance Parole Document while you are in the United States, please see the Form I-131 page.

---

## Contacting USCIS About Form I-134A ︿

The best way to contact us depends on the type of inquiry.

**Case Status Inquiries:** You can check the status of your Form I-134A in your USCIS online account or in Case Status Online. Please note that the USCIS Contact Center can only provide the same information about the status of your case that is available in your USCIS online account.

**Corrections:** You can generally correct a submitted Form I-134A in your USCIS online account or by sending a secure message from your USCIS online account. See the "Correcting a Submitted Form I-134A" section on the Frequently Asked Questions about the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page for more information.

**Other Inquiries:** For other inquiries, see the "Contacting USCIS About Form I-134A" section on the <u>Frequently Asked Questions about the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans</u> page.

## Resources for Victims of Abuse, Violence, or Exploitation ⌃

Please note that beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for filing Form I-134 on their behalf or for providing financial support while they are in the United States.

Access to these processes is free. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the Form I-134A. Beware of any scams or potential exploitation by anyone who asks for money associated with the Form I-134 or participation in these processes.

DHS recommends the following actions to avoid intimidating situations:

- Avoid individuals who promise to "get you to the United States quickly" if you pay an exorbitant sum of money.
- Keep your passport and other identity documents in your possession at all times.
- If you are concerned that the individual who filed Form I-134A on your behalf is not a legitimate organization or entity or legal representative, see the <u>Scams, Fraud, and Misconduct</u> webpage.

Call the 24-hour National Human Trafficking Hotline at 1-888-373-7888 or report an emergency to law enforcement by calling 911. Trafficking victims, whether or not U.S. citizens, are eligible for services and immigration assistance.

There are many forms of abuse and exploitation, including domestic violence, forced marriage, and human trafficking. In the United States, there are laws that may help you avoid or escape an abusive situation.

- **Domestic Violence** is a pattern of behavior in a relationship that is used to gain or maintain power and control over an intimate partner, parent, or child. Domestic abuse can involve physical, sexual, emotional, financial, or psychological abuse or threats.
- **Forced marriage** is a marriage that takes place without the consent of one or both people in the marriage. Consent means that you have given your full, free, and informed agreement to marry your intended spouse and to the timing of the marriage. Forced marriage may occur when family members or others use physical or emotional abuse, threats, or deception to force you to marry without your consent. For additional information on forced marriage, please visit the <u>Forced Marriage</u> webpage.
- **Human Trafficking** involves exploiting someone to compel a commercial sex act or forced labor. Generally, this exploitation must involve force, fraud, or coercion to be considered human trafficking. However, if someone under 18 years old is induced to perform a commercial sex act, that is considered human trafficking even if there is no force, fraud, or coercion.

If you have experienced or fear forced marriage, domestic violence, human trafficking, or other abuse, please contact the resources below to receive free help in your language:

- **National Domestic Violence Hotline:** 800-799-7233, 800-787-3224 (TTY), www.ndvh.org☑
- **National Center for Missing and Exploited Children:** 800-843-5678, www.missingkids.com☑
- **The National Center for Victims of Crime:** 800-394-2255, 800-211-7996 (TTY), www.victimsofcrime.org☑
- **National Human Trafficking Hotline:** 888-373-7888, Text: 233733

For more information and additional resources related to gender-based violence, see the DHS Gender-Based Violence Pamphlets.

## Protect Yourself from Immigration Scams   ⌃

- We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney or accredited representative working for a Department of Justice recognized organization can give you legal advice. Visit the Avoid Scams page for information and resources.

Some common scams to be aware of include:

- **Government impersonators:**  Look out for individuals who pose as USCIS officials. USCIS will only contact you through official government channels and will not contact you through your personal social media accounts (such as Facebook, Twitter, LinkedIn, etc.).
- **Misleading offers of support:** Look out for individuals who attempt to contact you online or through your social media accounts to offer to be your supporter or connect you to a supporter in exchange for a fee or other form of compensation. Similarly, look out for individuals seeking biographic information from you, such as your passport number or date of birth, through your social media accounts, to offer to support you for parole. Supporters should be able to provide financial support to beneficiaries for up to a 2-year period of parole. Beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for the potential supporter submitting Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on their behalf or for providing financial support while they are in the United States. Find more information on potential exploitation and abuse in the Understand Your Rights (PDF) guide.
- **Scam Websites:** Some websites claim to be affiliated with USCIS and offer step-by-step guidance on completing a USCIS application or petition. Make sure your information is from uscis.gov, dhs.gov, or is affiliated with uscis.gov. Make sure the website address ends with .gov.
- **Payments by Phone or Email:** USCIS will never ask you to transfer money to an individual. We do not accept Western Union, MoneyGram, PayPal, or gift cards as payment for immigration fees. In addition, we will never ask you to pay fees to a person on the phone or by email.
- **Notarios Públicos and unauthorized practitioners of immigration law:** In the United States, a notario público is not authorized to provide you with any legal services related to immigration benefits. Only an attorney or an accredited representative working for a Department of Justice

Case 6:23-cv-00007   Document 175-3   Filed on 06/20/23 in TXSD   Page 14 of 14

(DOJ)-recognized organization can give you legal advice. For more information about finding legal services, visit our website.

## Related Links ⌃

- Form I-134A, Online Request to be a Supporter and Declaration of Financial Support
- Form I-134A, Online Request to be a Supporter and Declaration of Financial Support (PDF, 556.5 KB)
- Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans
- Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Flyer (PDF, 401.27 KB)
- Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Flyer (PDF, 335.05 KB) (Spanish)
- Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Flyer (PDF, 340.46 KB) (Haitian-Creole)

↗ Close All   ↗ Open All

Last Reviewed/Updated: 06/13/2023

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-0007

EXHIBIT
NO.    069

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 69, ECF 175-4


**U.S. Citizenship and Immigration Services**

<div style="border:1px solid">

**EXHIBIT 3**

</div>

Home > Humanitarian > Processes for Cubans, Haitians, Nicaraguans, and Venezuelans > Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

# Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

English | Kreyòl Ayisyen |

 Close All    Open All

## General Questions ⌃

**Q1. Is the U.S. government limiting how many individuals are allowed to enter the United States under these processes?**

The U.S. government will provide travel authorization for up to 30,000 individuals to come to the United States each month across the Cuban, Haitian, Nicaraguan, and Venezuelan parole processes. This allows for a steady pace of operations and arrivals of individuals seeking parole. DHS removed the prior 24,000 limit on Venezuelan beneficiaries to conform with this new approach.

The U.S. government is implementing these comprehensive efforts to reduce the irregular migration of Cubans, Haitians, Nicaraguans, and Venezuelans, to lawfully and safely bring qualifying individuals into the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. DHS is not setting a limit on the overall number of beneficiaries or anticipated duration of these processes at this time and will continue to monitor the processes and their impact.

**Q2. If I am paroled into the United States through these processes, what happens when my 2-year period of parole ends?**

There are a full range of existing lawful immigration pathways, including an extension of parole, immigrant and nonimmigrant visas, asylum, and Temporary Protected Status (TPS), that certain parolees may be eligible for in accordance with U.S. laws.

---

## Filing Form I-134A, Online Request to be a Supporter and Declaration of Financial Support ⌃

**Q1. How can attorneys fill out Form I-134A for their clients who would like to become a supporter?**

There is no option at this time for an attorney or accredited representative to use an online representative account to file a Form I-134A on behalf of a supporter or submit travel authorization information on behalf of a beneficiary after confirmation of the Form I-134A.

**Q2. I am an attorney assisting a supporter with Form I-134A. If the supporter fills out the preparer declaration on the form, can I get information about the supporter or beneficiary?**

No. The preparer declaration simply reflects that you helped an individual complete the declaration (form filling). If you are an attorney or accredited representative, you must submit a Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative to USCIS if you wish to receive information about your client's (supporter's) Form I-134A. USCIS does not currently allow representatives to complete Form I-134A online on behalf of a supporter using a representative account. However, a representative who has submitted a valid Form G-28 to USCIS separately through a representative account may inquire about their client's (supporter) case by contacting the USCIS Contact Center.

**Q3. Can you submit Form I-134A by paper?**

No. Supporters filing under these processes may only submit Form I-134A online through their USCIS online account.

**Q4. Is there a cost to file Form I-134A?**

No. There is no fee to file Form I-134A, and supporters may not ask for a fee from a beneficiary to file the Form I-134A on the beneficiary's behalf. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the request. Beware of any scams or potential exploitation by anyone who asks for money for the Form I-134A or for participation in these processes.

**Q5. If I submitted Form I-134 before Jan. 6, 2023, do I need to submit the new Form I-134A?**

No. If you submitted Form I-134 online before Jan. 6, 2023 (for the process for Venezuelans or Uniting for Ukraine), we will continue to process your Form I-134. You should not file a new Form I-134A.

**Q6. What is the difference between Form I-134 and Form I-134A?**

Before Jan. 6, 2023, there were 2 versions of Form I-134: a version filed online by potential supporters filing under Uniting for Ukraine and the process for Venezuelans, and a version filed on paper by individuals agreeing to provide financial support to other types of beneficiaries.

When we implemented the processes for Cuba, Haiti, and Nicaragua on Jan. 6, 2023, we updated the online version of Form I-134 and renamed it Form I-134A to differentiate between the 2 versions of the form. As of Jan. 6, 2023, if you seek to support a beneficiary under Uniting for Ukraine or the processes for Cubans, Haitians, Nicaraguans, or Venezuelans, you must submit Form I-134A through a free online account. If you submitted Form I-134 online before Jan. 6, 2023 (for the process for Venezuelans), we will continue to process your Form I-134.

## Processing Times                                                            ⌃

**Q1. How long will it take between the time a potential supporter submits Form I-134A and when a beneficiary is granted advance travel authorization under these processes?**

Case processing times vary. USCIS and U.S. Customs and Border Protection (CBP) are reviewing and processing cases as thoroughly and efficiently as possible. The U.S. government will provide advance travel authorization for up to 30,000 noncitizens to come to the United States each month to seek parole on a case-by-case basis under these processes.

Due to high interest in these processes, we are updating the review process effective May 17, 2023. We are updating this process because the number of supporters who have submitted Form I-134A is significantly higher than the 30,000 monthly advance travel authorizations available. It is intended to maintain a fair, equitably balanced, and available pathway for all beneficiaries of a Form I-134A to move forward through the review process and seek travel authorization.

Under the new review process, we will randomly select about half of the monthly total of Forms I-134A, regardless of filing date, from the entire pending workload to review. We will review the other half of the monthly total based on when the case was submitted under the first-in, first-out method, which prioritizes the oldest Forms I-134A for review.

We will not accept a duplicate Form I-134A from a potential supporter if a previously submitted Form I-134A between the same potential supporter and beneficiary is pending. If we do not confirm a Form I-134A, but a supporter believes they meet the requirements to be a supporter under the process, they may file a new Form I-134A and submit additional information as evidence.

During the process, several steps must be completed, including robust security vetting, which will depend on action taken by potential supporters and beneficiaries. In the initial part of the process, we will review and provide responses to the potential supporter's Form I-134A as quickly as possible. Once we confirm the Form I-134A, we will contact the beneficiary via email with instructions on how to create a USCIS online account and add their case. In the online account, the beneficiary reviews their biographical information and completes the necessary attestations (including attestations for eligibility and vaccine requirements) for themselves and travel group members and submits the information to CBP.

The beneficiary must also take and submit their photo within the CBP One mobile app. After they submit their photo, the process transitions to CBP. CBP will vet available biographic information and the facial photograph to determine whether to authorize the beneficiary's travel to the United States to seek parole. CBP will then send the travel authorization determination to USCIS to post it to the beneficiary's USCIS online account. If CBP approves the travel authorization, the beneficiary is responsible for arranging and funding their own airline travel to the United States. If CBP approves travel authorization, it is generally valid for 90 days.

The status of a travel authorization may change at any time as a result of the vetting process. Individuals should monitor their USCIS online account frequently for messages and notices from USCIS, and for the most current travel authorization status.

**Q2. If the processing of my Form I-134A is taking longer than expected, should I submit a new Form I-134A?**

No. Potential supporters cannot submit a duplicate Form I-134A for the same beneficiary. We will not accept a duplicate Form I-134A when a Form I-134A filed by the potential supporter on behalf of the same beneficiary is already pending.

You can monitor the status of your Form I-134A in your USCIS online account or check your most recent status in Case Status Online. Please note that the USCIS Contact Center cannot provide any additional information on the status of your case.

We will only accept an inquiry if the Form I-134A filed on your behalf has been pending more than six months. This includes inquiries submitted through the secure mailbox in your USCIS online account. Please note this is a default timeframe for inquiring and you should not necessarily expect a decision on your Form I-134A in that timeframe.

## Questions Relating to Supporters ⌃

**Q1. I have a pending immigration case (such as an application for asylum or Temporary Protected Status (TPS)). Am I eligible to apply to become a supporter?**

No. If you have a pending immigration case such as a pending asylum application or pending initial TPS application but do not hold a lawful status in the United States, or are not a parolee or recipient of deferred action or Deferred Enforced Departure (DED), you are ineligible to become a supporter.

In general, to serve as a supporter, an individual or an individual representing an entity must:

- Be a U.S. citizen, U.S. national, or lawful permanent resident; hold a lawful status in the United States such as TPS or asylum; or be a parolee or recipient of deferred action or DED;
- Pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- Demonstrate sufficient financial resources to receive, maintain, and support the beneficiary for the duration of their parole period.

For more information about who can be a supporter, please visit our Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page.

**Q2. I was granted an initial TPS and have re-registered for TPS but am waiting for final approval from USCIS. Can I apply to be a supporter?**

Yes. If you were granted initial TPS and have a pending re-registration for TPS, you are eligible to be a supporter. In general, to serve as a supporter, an individual or individual representing an entity must be a U.S. citizen, U.S. national, or lawful permanent resident; hold a lawful status in the United States such as Temporary Protected Status or asylum; or be a parolee or recipient of deferred action or Deferred Enforced Departure.

For more information about who can be a supporter, please visit our Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page.

**Q3. If I am in removal proceedings and have TPS, can I be a supporter?**

Yes, you can be a supporter if you have TPS and are in removal proceedings. However, if an immigration judge has issued a removal order in your case and you are appealing your decision to the Board of Immigration Appeals, you cannot be a supporter.

**Q4. If I am paroled into the United States for removal proceedings, can I be a supporter?**

No. If you have been paroled into the United States solely for removal proceedings, you cannot be a supporter, unless you otherwise hold lawful status in the United States or are the beneficiary of deferred action or Deferred Enforced Departure (DED).

**Q5. Do I need to be a family member of a beneficiary to submit a Form I-134A on their behalf under the process?**

No. Anyone who meets the requirement to become a supporter and is confirmed by USCIS under the processes may support eligible beneficiaries, or their immediate family members, whether or not they are related to the beneficiary.

**Q6. Can organizations serve as supporters?**

Although an individual is required to file and sign the Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all the necessary support to the beneficiary.

Individual supporters filing with or on behalf of an entity should submit evidence of the entity's commitment to support the beneficiary when they file Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other authorized representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary (See the USCIS Policy Manual for more information.) Individuals who are filing in association with an entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary. For more information, please visit the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans webpage.

**Q7. How does the process work when there is more than one supporter for a beneficiary?**

Multiple supporters may join together to support a beneficiary. In this case, one supporter should file a Form I-134A and include supplementary evidence demonstrating the identity of, and resources to be provided by, the additional supporters and attach a statement explaining the intent to share responsibility to support the beneficiary. We will assess these supporters' collective ability to support a beneficiary.

Organizations, businesses, and other entities based in the United States can also support individuals arriving through the process. Although an individual is required to file and sign the Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all of the necessary support to the beneficiary. Individual supporters filing with or on behalf of an organization, business, or other entity should submit evidence of the entity's

commitment to support the beneficiary when they file the Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other authorized representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary (See the USCIS Policy Manual for more information.) Individuals who are filing in association with an organization, business, or other entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary.

### Q8. I want to support a family of 4. Can I file 1 Form I-134A for the entire family?

No. Supporters must file a separate Form I-134A for each beneficiary, including minor children. Note that children under the age of 18 must be traveling to the United States in the care and legal custody of their parent or legal guardian.

### Q9. Can I agree to support more than one beneficiary?

Yes. An individual may submit a separate Form I-134A for each beneficiary the individual wants to agree to support. There is no limit on how many beneficiaries a supporter may agree to support, but USCIS will determine whether a supporter has the financial ability to support all beneficiaries for the duration of the parole period, which is up to 2 years. File all Forms I-134A using the supporter's same online USCIS Account.

### Q10. I am a U.S. citizen, but I live outside the United States. Can I become a supporter?

No. To be eligible to become a supporter, you must be based in the United States.

### Q9. If USCIS does not confirm my Form I-134A, will you explain why?

After we complete our review of Form I-134A, if we determine that a potential supporter does not meet the requirements to be a supporter, we will send a non-confirmation notice to both the supporter and beneficiary. If we need additional information, we may send a Request for Evidence. If a supporter believes they meet the requirements to be a supporter under the process, they may file a new Form I-134A and submit additional information as evidence. An alternative potential supporter may also file a Form I-134A for a beneficiary who was included in a prior Form I-134A that was not confirmed.

## Proof of Supporter Income and Assets                                                ⌃

### Q1. Is there a specific income requirement for Form I-134A?

No. Each potential supporter's circumstances are unique, and we review financial information provided by them on Form I-134A about all assets and resources. We use the Federal Poverty Guidelines, as outlined by the Department of Health and Human Services, as a general guide in determining the supporter's ability to support the beneficiary for the duration of the beneficiary's anticipated period of parole. When we use the Federal Poverty Guidelines, we consider a supporter's household size to include the beneficiary listed on the supporter's Form I-134A, even if they do not intend to live with the supporter.

**Q2. For Form I-864, Affidavit of Support Under Section 213A of the INA, a sponsor must show the means to maintain income at 125 percent of the Federal Poverty Guidelines for the household size (or 100 percent of the Federal Poverty Guidelines, if the sponsor is on active duty in the Armed Forces of the United States). On Form I-134A, will I have to show income at 100 percent or 125 percent of the Federal Poverty Guidelines?**

Form I-864 and Form I-134A are used for different purposes. Under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, we will use the Federal Poverty Guidelines as a general guide in determining your financial ability, using information you provide on Form I-134A to support a beneficiary for the duration of their parole, which could be up to 2 years.

**Q3. What type of financial proof must I provide? Do I need to provide my tax filings, proof of employment, and bank statement, or can I submit only 1 of these documents?**

Supporters should determine what financial information they have about their assets to help USCIS determine their financial suitability. Some examples of financial evidence may include your federal income tax filing; bank statements, Form W-2, Wage and Tax Statement, from your employer; pay stubs or pay statements from the past few months; and any proof of income coming into your household.

**Q4. Will the named beneficiary on my Form I-134A be able to see my financial information, including the evidence that I provide?**

No. Beneficiaries do not have access to their supporters' financial information submitted to USCIS as proof of income and assets.

**Q5. Does USCIS consider the beneficiary's income and financial resources in determining whether their Form I-134A is sufficient?**

No. When we are determining whether a Form I-134A is sufficient, we do not consider information about the beneficiary's income or financial resources.

## Questions Relating to Beneficiaries    ⌃

**Q1. If I am already in the United States, can I be a beneficiary under these processes?**

No. To be eligible to be beneficiaries under the processes, you and your immediate family members must be outside the United States. The Form I-134A should record your current physical address outside of the United States.

**Q2. If I reside in another country with a Temporary Protection Permit (Permiso de Protección Temporal), does this temporary permit disqualify me from being considered for advance travel under the process?**

A Temporary Protection Permit is a temporary status. This permit does not mean you are a permanent resident of the third country and does not disqualify you from this process. However, you are not eligible for this process if you are a permanent resident or a dual national of any other country or hold refugee status in any country.

**Q3. If I am a beneficiary, do I have to live with my supporter after I am paroled into the United States?**

No. You are not required to live with your supporter. However, the types of support beneficiaries may need in addition to financial support for the duration of their parole period include safe and appropriate housing, health care, transportation, obtaining initial basic necessities, assistance with submitting forms such as the employment authorization application, learning English, securing employment, and enrolling children in school.

**Q4. Can minor children have dual citizenship?**

Yes. Minor children of eligible beneficiaries may have dual citizenship.

**Q5. I meet the requirements to be considered for a travel authorization under the process, but my husband is a dual national of another country. Can I be the primary beneficiary so he can qualify for the process?**

Yes. While eligible beneficiaries under the process may not be a permanent resident or be a dual national of any other country, and not currently hold refugee status in any country (unless DHS operates a similar parole process for the country's nationals) this requirement does not apply to immediate family members. Immediate family members in this process include a spouse or common-law partner of an eligible beneficiary under the process and their unmarried child(ren) under the age of 21.

**Q6. Can children under the age of 18 years old be paroled into the United States without their parent or legal guardian under these processes?**

No. Children under the age of 18 years old must travel with an accompanying parent or legal guardian. If unaccompanied, children are not eligible for parole under this process. Upon arrival at a U.S. port of entry, a child who is not traveling with their parent or legal guardian may be transferred to the custody of the Department of Health and Human Services (HHS), as required by law under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), to protect the child from human trafficking and other forms of exploitation. For more information, please visit the HHS Unaccompanied Children webpage. Children who are not traveling with a parent or legal guardian but are coming to the United States to meet a parent or legal guardian may instead seek parole through the standard Form I-131 parole process.

**Q7. What is a "legal guardian"?**

A legal guardian is an individual who:

- Has been granted legal custody of an individual or minor, by a court of competent jurisdiction, or by the state or recognized governmental entity; and
- Can lawfully exercise and assume legal obligations on that individual's or minor's behalf.

If the document is provided in a foreign language, an accompanying certified translation into English is required.

Written authorization from a parent to allow an individual other than the parent or legal guardian of the child to travel with a minor child is not enough evidence of legal guardianship.

**Q8. Does each family group member need their own individual USCIS online account, including children under the age of 18 years old?**

No. Each beneficiary must have their own confirmed Form I-134A, but principal beneficiaries can add travel group members to their USCIS online account, including their spouses or common law partners of any nationality and their minor children. For example, after we confirm a Form I-134A for a minor child and a separate Form I-134A for that child's parent or legal guardian, the parent or legal guardian, as the principal beneficiary, can add the child to their own travel group through their own USCIS online account. The principal beneficiary will review and confirm biographic information and complete attestations for travel group members, including their spouse and children. However, once the principal beneficiary completes and submits the attestations to CBP for their travel group members and themselves, the principal beneficiary cannot add any other travel group members to their USCIS online account unless the travel group members are under the age of 18 years old.

**Q9. I lived outside my country of nationality for some time and returned there recently. Do I need to reside there for a specific amount of time before I will be eligible under this process?**

There is no required length of time that you must have resided in your country of nationality before your supporter submits Form I-134A on your behalf.

**Q10. I understand that having a pending immigration case with USCIS will not make me ineligible for the process; however, if I am paroled into the United States under the process and my pending immigration case is approved, will that affect my ability to adjust status at a later time?**

If you are paroled into the United States under these processes and have a separate immigration case pending with USCIS, your parole under this process will not directly affect your ability to adjust status. The 2-year parole period under these processes will enable you to seek humanitarian relief or other immigration benefits, including adjustment of status, for which you may be eligible, and to work and contribute to the United States.

**Q11. Do I need to repay my supporter for agreeing to financially support me under this new process?**

No. Beneficiaries do not need to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for filing Form I-134A on their behalf or for providing financial support while they are in the United States. Access to this process is free. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the Form I-134A or participation in the process. Beware of any scams or potential exploitation by anyone who asks for money associated with applying to this process.

For more information, visit our Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page and reference the section called 'Resources for Victims of Abuse, Violence, or Exploitation.'

---

## Passport Questions for Beneficiaries                                          ⌃

**Q1. My passport is expired. Do I need to request an extension, or will my expired passport be accepted?**

You must have a valid, unexpired passport. Certified extensions of passport validity serve to meet this requirement. If your government has extended the validity of your passport, the passport expiration date should be the expiration date of the extension. CBP will not authorize travel if your passport or extension has expired.

**Q2. Can children travel under the passport of their parents?**

Minor children traveling with their parent must have their own passport and may not be included on a parent's passport.

## Biometric Screening ⌃

**Q1. Where will my biometrics be taken?**

You must submit certain biographic and biometric information to DHS for screening and vetting purposes. If you receive authorization to travel to the United States, upon arrival to a U.S. port of entry, you must submit additional information, to include fingerprints, for further biometric vetting.

## Medical Screening and Vaccines ⌃

**Q1. What if I do not have access to a U.S. Food and Drug Administration COVID-19 vaccine?**

Before traveling to the United States, you must attest that you have completed vaccine requirements or are eligible for an exception to vaccine requirements for measles, polio, and the first dose of COVID-19 vaccine approved or authorized by the U.S. Food and Drug Administration or Emergency Use Listed (EUL) by the World Health Organization.

Previews of the required attestations can be found on our Processes for Cubans, Haitians, Nicaraguans, and Venezuelans page.

## Travel Authorization ⌃

**Q1. My travel authorization will expire soon, and I have been unable to arrange travel to the United States. Can I request an extension?**

If, for reasons beyond your control, you cannot travel within the 90-day travel authorization validity period, your supporter may submit a one-time request for a 90-day travel authorization extension to USCIS. Only confirmed supporters who have filed Form I-134A, Online Request to be a Supporter and Declaration of Financial Support (previously the Form I-134, Declaration of Financial Support) on behalf of an eligible beneficiary or their immediate family member may request a one-time extension of a previously approved travel authorization. You may not request an extension of your travel authorization on your own behalf.

Supporters must submit the extension request no more than 30 days before, and no more than 30 days after, the expiration date of the original approved travel authorization period. Supporters must request a separate extension for each beneficiary by following the steps below.

To submit the request, a supporter must:

- Step 1: Log in to your online account.
- Step 2: From the top of the webpage, select the "My Account" drop-down menu and select "Inbox."
- Step 3: Click on the "New Message" button.
- Step 4: For the subject, select "A case already filed online" from the drop-down menu, and for your case receipt number, select your receipt number for Form I-134A.
- Step 5: In the message field, state your continued interest in supporting the named beneficiary who has not yet traveled to the United States and indicate that you are requesting an extension of the beneficiary's travel authorization, then click Send.

We will review the supporter's request for a travel authorization extension and submit the request, along with the beneficiary's information, to CBP to conduct additional vetting. If CBP approves the request the beneficiary will receive an email notification when the extended travel authorization notice has been posted to their account. Please note that for privacy reasons, only the beneficiary will be able to view their extended travel authorization notice in their online account. The beneficiary should notify the supporter when they receive their extended travel authorization notice.

If the beneficiary's original approved travel authorization expired more than 30 days before or after the submission of the extension request, or if the beneficiary cannot travel to the United States during the one-time 90-day extension, the supporter must submit a new Form I-134A on the beneficiary's behalf to obtain a new travel authorization.

**Q2. I (a beneficiary) mistakenly submitted incorrect information about myself and my minor children to CBP and was denied travel authorization. What should I do?**

Your supporter will need to submit a new Form I-134A on your behalf.

**Q3. If my travel authorization is denied, can CBP tell me why?**

Due to the secure nature of the vetting and screening process, CBP cannot offer additional information about the process, or provide details about the status or result of a beneficiary's travel authorization review. If your travel authorization is denied, CBP cannot explain why the denial occurred. If your travel authorization is still pending, CBP asks you to remain patient while the review continues.

**Q4. If I am paroled into the United States under these processes, will I be able to apply for an Advance Parole Document?**

Yes. If you are paroled into the United States and want to apply for an Advance Parole Document, which will allow you to seek parole into the United States at a port of entry when you return from a trip outside the United States, you should file a Form I-131, Application for Travel Document. For more information about Advance Parole Documents, including about fees and fee waivers, visit the Form I-131 webpage.

Please note that obtaining an Advance Parole document does not guarantee you will be paroled back into the United States. CBP will make a separate discretionary decision on your request for parole when you arrive at a port of entry.

## Employment Authorization ⌃

**Q1. If I am paroled into the United States under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, will I be employment authorized incident to parole, as certain Afghan and Ukrainian nationals are?**

No. Parolees under the processes for Cubans, Haitians, Nicaraguans, and Venezuelans do not automatically receive employment authorization. You must file a Form I-765, Application for Employment Authorization.

**Q2. If approved to travel to the United States as a beneficiary under this new process, when can I apply for employment authorization?**

After you are paroled into the United States, you are eligible to apply for discretionary employment authorization from USCIS. To apply for an Employment Authorization Document, you must submit Form I-765, Application for Employment Authorization, using the (c)(11) category code with the required fee or apply for a fee waiver. You may submit Form I-765 through your USCIS online account with the required fee. To request a fee waiver, you must file by mail Form I-912, Request for a Fee Waiver, and Form I-765. You cannot file Form I-912 online through your USCIS online account.

**Q3. How long will it take to approve my employment authorization application?**

While processing times will vary depending on the complexities of each case, we encourage online filing because it prevents delays associated with mailing, provides an immediate receipt, and requires an applicant to establish a USCIS account that allows you to track the progress of your case. Paper-filed employment authorizations can also be added to an individual's online account. Whether you submit an application by mail or online, we will use available technology to reduce the processing time.

## Correcting a Submitted Form I-134A ⌃

**Q1. If I entered an incorrect email address for the beneficiary when I submitted Form I-134A as a potential supporter, what is the fastest way to submit the correction and get USCIS to resend the Account Access email to the beneficiary?**

You should log in to your USCIS online account, go to the Notices tab, and use the Unsolicited Evidence feature to upload a letter you have signed by hand (not electronically). The letter should:

- Explain that the email address for the beneficiary you entered on Form I-134A was incorrect; and

- Request that USCIS update the beneficiary's email address and send the USCIS Account Notice to the beneficiary's correct email address.

Note: The letter should list both the original, incorrect email address provided on the Form I-134A and the updated, correct email address for the beneficiary. You also must keep the original signed letter in case we ask for it later.

You should then send a secure message from your USCIS online account:

- Log in to your online account, select the MyAccount dropdown, then select Inbox;
- Select "New message," then "A case already filed online;"
- Select your receipt number for Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, from the drop-down menu; and
- State in your message that the beneficiary's email address needs to be changed and that you have uploaded unsolicited evidence. The message should include both the original, incorrect email address and the updated, correct email address for the beneficiary.

We will review the request, make appropriate updates, and issue the beneficiary a copy of the USCIS Account Notice using the updated, correct email address. We will also notify you by email that the issue has been resolved. Please note that it may take more than 30 days to receive a response.

**Q2. How can I correct my passport information on Form I-134A?**

If we have already confirmed a Form I-134A submitted by a supporter and your (the beneficiary's) passport information is incorrect, you will need to use your online account to:

- Upload a copy of a valid, unexpired passport as Unsolicited Evidence in the Notices tab; and
- Send USCIS a message from your inbox. In the message, you must indicate that you have submitted evidence to correct passport information.

You will receive a response in your inbox. Do not submit attestations to CBP until we respond to the request to update your passport information. Submitting the attestations before you receive a response from USCIS could affect your travel authorization and request for parole.

**Q3. My supporter misspelled my name or entered incorrect information about me on Form I-134A. How can I correct the information?**

After USCIS confirms your supporter's Form I-134A, you will be able to review the information they provided about you, including the spelling of your name, your contact information, and any other biographical information. It is important to correct your biographical information in your USCIS online account before you proceed with the next step of submitting your information to CBP.

Please note that you cannot correct your biographical information after CBP issues a Travel Authorization notice. If CBP issues a travel notice based on incorrect information, both you and your supporter will need to start the process again from the beginning by submitting a new Form I-134A.

**Q4. If my supporter mistakenly selected the wrong country for me, how can they fix this error?**

Your supporter should send a secure message from their USCIS online account asking us to correct your country of nationality on Form I-134A by following the steps below:

- Log in to their online account, select the MyAccount dropdown, then select "Inbox";

- Select "New message," then "A case already filed online";
- Select the receipt number for Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, from the drop-down menu; and
- State in their message that the beneficiary's country of nationality needs to be changed and that they have uploaded unsolicited evidence.

We will review the request, make appropriate updates, and issue you a copy of the USCIS Account Notice using the updated, correct country of nationality. We will also notify your supporter by email that the issue has been resolved.

**Q5: I (the beneficiary) received an error code in the CBP One mobile app that says "Record cannot be found: Check your date of birth, passport and A-number in your myUSCIS account to ensure they are correct." What do I do?**

To address the error and check that your attestations have been properly submitted:

- Log into your USCIS online account and check that your attestations were submitted to CBP. You should see an alert that says: "Your information and attestations were successfully submitted to U.S. Customs and Border Protection (CBP)."
- Next, select "View your biographic information" and ensure your date of birth is in the MM/DD/YYYY format and that your passport number is correct.

If you need to correct your passport information or date of birth, or if all your information appears correct and you are still unable to proceed, you should use your USCIS account to:

- Upload a copy of your valid, unexpired passport as Unsolicited Evidence in your Notices tab; and

Send USCIS a message from your inbox. In the message, you must identify the information that is incorrect or indicate that your information appears correct, but you are unable to proceed in the CBP One mobile app.

## Contacting USCIS About Form I-134A                                                        ⌃

**Q1. What if I have an issue with account access or need a password reset?**

Please use our online need help form.

**Q2. If I need to submit an inquiry on my case, how can I contact USCIS?**

The best way to contact us depends on the type of inquiry.

*Case Status Inquiries*
You can monitor the status of your Form I-134A in your USCIS online account or check your most recent status in Case Status Online. Please note that the USCIS Contact Center cannot provide any additional information on the status of your case.

We will only accept a case status inquiry if the Form I-134A filed on your behalf has been pending more than six months. This includes inquiries submitted through the secure mailbox in your USCIS online account. Please note this is a default timeframe for inquiring and you should not necessarily expect a decision on your Form I-134A in that timeframe.

*Form I-134A Corrections*
If you need to correct information on submitted Form I-134A, see the section above on Correcting a Submitted Form I-134A.

**Q3. All Forms I-134A that I submitted are showing as confirmed in my account. However, the head of household beneficiary did not receive confirmation instructions for opening their online portal from USCIS, even though their spouse and children did. What should I do?**

To ensure they have not missed a notification from USCIS, they should check their spam and junk mail folders. In general, in situations where a beneficiary has not received their Account Notice, call the USCIS Contact Center at 800-375-5283 (TTY 800-767-1833) or +1-212-620-3418 for calls outside the United States. Alternatively, as a supporter you can send USCIS a secure message regarding the issue through your own USCIS online account, and after we complete the verification process, we can email the Account Notice to the beneficiary's email that we have on file.

**Q4. My Form I-134A has been confirmed, but you have not contacted my beneficiary yet. What should I do?**

If your beneficiary has not received the emailed notices, you should review the Form I-134A and ensure that you provided the correct email address. If the email address is correct, the beneficiary should check their spam and junk mail folders. In general, in situations where the beneficiary has not received their Account Notice, they should call the USCIS Contact Center. The number for those outside the United States is +1-212-620-3418. Alternatively, the supporter can send USCIS a secure message regarding the issue through their own USCIS online account, and after we complete the verification process, we can email the Account Notice to the beneficiary's email that we have on file.

If the email address is incorrect, log in to your USCIS online account, go to the Notices tab, and use the Unsolicited Evidence feature to upload a letter you have signed by hand (not electronically). The letter should:

- Explain that the email address for the beneficiary you entered on Form I-134A was incorrect; and
- Request that USCIS update the beneficiary's email address and send the USCIS Account Notice to the beneficiary's correct email address.

Note: Your letter should list both the original, incorrect email address provided on the Form I-134A and the updated, correct email address for the beneficiary. You must also keep the original signed letter in case we ask for it later.

If a beneficiary still cannot find the notices, they should call the USCIS Contact Center at 800-375-5283. The number for those outside the United States is +1-212-620-3418.

How to Avoid Scams                                                                                         ⌃

**Q1. Where can I get more information about the processes or help with Form I-134A?**

We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney or accredited representative working for a Department of Justice recognized organization can give you legal advice. Visit the Avoid Scams page for information and resources as well as our Common Scams page that includes information on specific scams targeting supporters and beneficiaries under these processes.

Organizations outside of the government may be able to help potential supporters and beneficiaries to prepare for these processes. Two organizations that specialize in providing the public with information about providing welcome to newcomers and resources to support participation in these processes are listed below.

- Welcome.us provides information on welcoming and supporting newcomer populations.
- Community Sponsorship Hub has established the Sponsor Circle Program, which can provide resources and ongoing guidance to supporters.

This information is provided for informational purposes only. DHS does not endorse these entities. Using these entities instead of any other entity does not give any parolee preferential treatment when we adjudicate their application.

**Q2. Is there a fee or cost to participate in this process?**

Access to these processes is free. Neither the supporter nor the beneficiary is required to pay the U.S. government a fee for the Form I-134A. Beware of any scams or potential exploitation by anyone who asks for money associated with the Form I-134A or participation in these processes. Please note that beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for filing Form I-134A on their behalf or for providing financial support while they are in the United States.

**Q3. What should I do if someone reached out online or through social media and offered to be my supporter?**

Beware of individuals who contact you online or through social media and:

- Say they are government officials;
- Offer to be your supporter or connect you to a supporter in exchange for a fee or other form of compensation; or
- Ask biographic information such as your passport number or date of birth.

Neither the supporter nor the beneficiary needs to pay the U.S. government a fee for the Form I-134A. Beware of any scams or potential exploitation by anyone who asks for money associated with the Form I-134A or participation in these processes. USCIS will only contact you through official government channels and will never contact you through your personal social media accounts (such as Facebook, Twitter, LinkedIn, etc.). Please see our Common Scams page for more information.

## REAL ID ^

**Q1. Are parolees who came to the United States through these processes eligible for REAL ID-compliant driver's licenses or identification cards?**

Eligible beneficiaries under the process and their immediate family members paroled into the United States are not eligible for a REAL ID-compliant driver's license or identification card because parole is not included in the REAL ID Act (PDF) as a category authorized to receive a REAL ID-compliant license or identification card. This does not apply to Afghan parolees who fall within the scope of section 2502(b)(3) of the Afghanistan Supplemental Appropriations Act. However, parolees with another eligible category covered under the REAL ID Act, such as an approved or pending application for Temporary Protected Status or asylum, can potentially qualify for a REAL ID-compliant driver's license or identification card. In addition, many driver's license issuing authorities allow parolees to apply for a driver's license or ID card that is not REAL ID-compliant. For more information, please see REAL ID Frequently Asked Questions and guidance from the Department of Motor Vehicles for the jurisdiction where you live.

↗ Close All   ↗ Open All

Last Reviewed/Updated: 06/14/2023