

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO.    070

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | § |
| | § |
| *Plaintiffs,* | § |
| | § |
| vs. | § |
| | §  CIVIL ACTION No. |
| | §  6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § |
| HOMELAND SECURITY, *et al.*, | § |
| | § |
| *Defendants,* and | §  JUDGE DREW B. TIPTON |
| | § |
| VALERIE LAVEUS, *et al.*, | § |
| | § |
| *Intervenor Defendants.* | § |

# INTERVENOR DEFENDANTS'
# TAB 70, ECF 175-5

PRE-DECISIONAL/DELIBERATIVE

U.S. Department of Homeland Security
Washington, DC 20528


**Homeland Security**

December 22, 2022

**ACTION**

## MEMORANDUM FOR THE SECRETARY

| | | |
|---|---|---|
| **FROM:** | Robert Silvers<br>Under Secretary<br>Office of Strategy, Policy, and Plans | ROBERT P SILVERS Digitally signed by ROBERT P SILVERS Date: 2022.12.22 18:02:04 -05'00' |
| | Troy Miller<br>Acting Commissioner<br>U.S. Customs and Border Protection | TROY A MILLER Digitally signed by TROY A MILLER Date: 2022.12.22 19:34:03 -05'00' |
| | Ur M. Jaddou<br>Director<br>U.S. Citizenship and Immigration Services | UR M JADDOU Digitally signed by UR M JADDOU Date: 2022.12.22 18:37:46 -05'00' |

**SUBJECT:**     **Parole Process for Certain Cuban Nationals**

### I.     Summary

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and on creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand processing capacity and multinational collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, we need to take immediate steps to provide safe, orderly pathways for the large numbers of individuals seeking to access the United States, and to disincentivize such individuals from taking the dangerous journey to and arriving, without authorization, at the southwest border (SWB).

Building on the success of the migration enforcement process for Venezuelans, DHS is proposing to implement a similar process to address the increasing number of encounters of Cuban nationals at the SWB and at sea, which have reached record levels over the past six months. Similar to Venezuela, Cuba has restricted DHS's ability to remove individuals to Cuba, which has constrained the Department's ability to respond to this surge.

PRE-DECISIONAL/DELIBERATIVE

EXHIBIT
4

PRE-DECISIONAL/DELIBERATIVE

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[1] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make a dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] It also has led to a precipitous decline in Venezuelan irregular migration throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October to just 668 in November.[3]

DHS anticipates that implementing a similar process for Cubans would reduce the number of Cubans seeking to irregularly enter the United States between POEs along the SWB or by sea, by coupling a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process. Implementation of the new parole process for Cubans will be contingent on the GOM accepting the return, departure, or removal to Mexico of Cuban nationals seeking to irregularly enter the United States between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States would be required to initiate the application, apply on behalf of a Cuban national (or the immediate family members of a Cuban national), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Cuban nationals would be required to meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Individuals would be ineligible if they:

1) have been ordered removed from the United States within the prior five years;
2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal

---

[1] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

2

PRE-DECISIONAL/DELIBERATIVE

of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;

3) have entered Mexico or Panama without authorization after the date of the announcement; or

4) are a permanent resident or dual national of any country or hold refugee status in any country other than Cuba, unless DHS operates a similar parole process for the country's nationals.

Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel to seek entry at an interior port of entry.

A grant of parole under this process would be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and to allow for increased removals of Cubans from the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits, including adjustment of status pursuant to the Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note), for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally would be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Cuban nationals pursuant to this process would provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Cubans to flee their home country, to include crippling economic conditions and dire food shortages, widespread social unrest, and the Government of Cuba's (GOC) violent repression of dissent.[4] Most significantly, DHS anticipates this process would: (i) enhance the security of the U.S. SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

---

[4] Washington Office on Latin America, *U.S.-Cuba Relations: The Old, the New and What Should Come Next*, Dec. 16, 2022, https://www.wola.org/analysis/us-cuba-relations-old-new-should-come-next/, (last visited Dec. 17, 2022).

3

Cuba AR_000129

PRE-DECISIONAL/DELIBERATIVE

The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent Parole Process for Haitians, Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memo describes the current conditions at the border; the measurable impact of the process for Venezuelans; the parameters of the proposed process for Cubans, including eligibility criteria and vetting mechanisms, and the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends approval of the policy and policy rationale identified in this memo.

**II. Background and Rationale**

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[5] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[6] Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[7]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and

---

[5] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[6] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[7] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

4

PRE-DECISIONAL/DELIBERATIVE

Panama, as well as civil society. Other migrants who were about to enter the Darién Gap have turned around and headed back south. And still others who were intending to migrate north are staying where they were to apply for this parole process. Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change of migratory flows.

2. Increase of Cuban Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[8] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[9] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.[10]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[11] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[12] (NCA) and, since the late 2010s, from countries throughout the Americas.[13] Migrant populations from these newer source countries have

---

[8] OIS analysis of historic CBP data.

[9] *Id.*

[10] *Id.*

[11] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2, 518-536 (Sept. 1999).

[12] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[13] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014 – FY 2019, the last full year before the start of the COVID-19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010 – FY 2013, and for 10 percent of total encounters in FY 2014 – FY 2019.

5

PRE-DECISIONAL/DELIBERATIVE

included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[14]

*Trends in Migration of Cubans*

Cubans are fleeing the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980.[15]  In FY 2022, DHS encountered about 213,709 unique Cuban nationals at the SWB, a seven-fold increase over FY 2021 rates, and a marked 29-fold increase over FY 2020.[16]  FY 2022 average monthly unique encounters of Cuban nationals at the land border totaled 17,809, a stark increase over the average monthly rate of 589 unique encounters in FYs 2014—2019.[17]  These trends are only accelerating in FY 2023.  In October and November of this year, DHS has encountered 62,788 unique Cuban nationals at the border— almost one third FY 2022's record total.[18]  The monthly average of 31,394 unique Cuban nationals is a 76 percent increase over the FY 2022 monthly average.[19]  The first 10 days of December have seen 15,657 encounters of Cubans at the SWB.[20]  In FY 2023, Cuban nationals have represented 16.5 percent of all unique encounters at the SWB, the second largest origin group.[21]

Maritime migration from Cuba also increased sharply in FY 2022 compared to FY 2021.  According to DHS data, in FY 2022, a total of 5,740 Cuban nationals were interdicted at sea, the top nationality, compared to 827 in FY 2021, an almost 600 percent increase in a single fiscal year.[22]

In addition to the increase of Cuban nationals in U.S. Coast Guard (USCG) interdictions at sea and CBP encounters at the SWB, USBP encounters of Cubans in southeast coastal sectors are

---

[14] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[15] El País, *The Cuban Migration Crisis, Biggest Exodus in History Holds Key to Havana-Washington Relations,* Dec. 15, 2022,  https://english.elpais.com/international/2022-12-15/the-cuban-migration-crisis-biggest-exodus-in-history-holds-key-to-havana-washington-relations.html, (last visited Dec. 17, 2022).

[16] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] OIS analysis of CBP UIP data pulled on December 12, 2022.

[21] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[22] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

6

PRE-DECISIONAL/DELIBERATIVE

also on the rise.[23]  In FY 2022, DHS encountered 2,657 unique Cuban nationals (46 percent of total unique encounters), an increase of 1,040 percent compared to FY 2021.[24]  This trend also has accelerated sharply in FY 2023, as CBP has made 1,917 unique encounters of Cuban nationals in the first two months of the FY— almost three-quarters of FY 2022's total.[25]  Cuban nationals are 79 percent of all unique encounters in these sectors in October and November.[26]

3.  Push and Pull Factors

DHS assesses that the high—and rising—number of Cuban nationals encountered at the SWB is driven by three key factors:  First, Cuba is facing its worst economic crisis in decades due to the lingering impacts of the COVID-19 pandemic, high food prices, and economic sanctions.[27]  Second, the government's response has been marked by further political repression, including widespread arrests and arbitrary detentions in response to protests.[28]  Third, the United States faces significant limits on the ability to return Cuban nationals who do not establish a legal basis to remain in the United States to Cuba or elsewhere; absent the ability to return Cubans who do not have a lawful basis to stay in the United States, more individuals are willing to take a chance that they can come—and stay.

Further, in November 2021, the Government of Nicaragua announced visa-free travel for Cubans.[29]  This policy provided Cubans a more convenient and accessible path into the continent, facilitating their ability to begin an irregular migration journey to the SWB via land routes.[30]  Many such Cuban migrants fall victim to human smugglers and traffickers, who look to exploit the most vulnerable individuals for profit with utter disregard for their safety and

---

[23] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[24] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[25] *Id.*

[26] *Id.*

[27] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s*, July 1, 2021, https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s, (last visited Dec. 17, 2022).

[28] Miami Herald, *As Cubans Demand Freedom, President Diaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests*, October 2, 2022, https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html, (last visited Dec. 17, 2022).

[29] Reuters, Nicaragua Eliminates Visa Requirement for Cubans, November 23, 2021, https://www.reuters.com/world/americas/nicaragua-eliminates-visa-requirement-cubans-2021-11-23/, (last visited Dec. 17, 2022).

[30] The New York Times, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*, May 4, 2022, https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html, (last visited Dec. 17, 2022).

7

Cuba AR_000133

PRE-DECISIONAL/DELIBERATIVE

wellbeing, as they attempt the dangerous journey northward through Central America and Mexico.[31]

*Factors pushing migration from Cuba*

There are a number of economic and other factors that are driving migration of Cuban nationals. Cuba is undergoing its worst economic crisis since 1990s[32] due to the lingering impact of the COVID-19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[33] In July 2022, the Government of Cuba (GOC) reported the economy contracted by 10.9% in 2020, grew by 1.3% in 2021, and is projected to expand by 4% in 2022.[34] However, this projected expansion is unlikely to respond to the needs of the Cuban people. Mass shortages of basic and other basic goods continue to persist, and Cubans wait in lines for hours to receive subsidized cooking oil or other basic goods.[35] Deepening poverty, exacerbated by the COVID-19 pandemic, has led to food shortages and rolling blackouts, and continues to batter the economy.[36] This combination of factors has created untenable economic conditions on the island that are likely to continue to drive Cubans to travel irregularly to the United States in the immediate future.[37]

The GOC has not been able to effectively address these issues to date, and has instead taken to repressive tactics to manage public discontent. Cuba remains a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which continues to restrict freedom of expression, association, assembly, and other basic human rights.[38] The GOC employs arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.[39] While the Cuban constitution grants limited rights of assembly and association, the GOC restricts these freedoms in practice.[40] The government routinely blocks any attempts to assemble that might result in opposition to, or criticism of, the government.[41] This was evident when the

---

[31] CNN, *Cubans are Arriving to the U.S. in Record Numbers. Smugglers are Profiting from Their Exodus,* https://www.cnn.com/2022/05/12/americas/cuba-mass-migration-intl-latam/index.html, May 12, 2022, (last visited Dec. 17, 2022).

[32] The Economist, supra note 25.

[33] Congressional Research Service, *Cuba: U.S. Policy in the 117th Congress,* Sept. 22, 2022, https://crsreports.congress.gov/product/pdf/R/R47246, (last visited Dec. 17, 2022).

[34] Caribbean Council, *Gil Says Economic Recovery Gradual, Inflation Must Be Better Addressed,* Cuba Briefing, July 25, 2022, https://www.caribbean-council.org/gil-says-economic-recovery-gradual-inflation-must-be-better-addressed/, (Last visited Sept. 25, 2022).

[35] Washington Post, *In Cuba, a Frantic Search for Milk,* May, 21, 2022, https://www.washingtonpost.com/world/interactive/2022/cuba-economy-milk-shortage/, (last visited Sept. 25, 2022).

[36] New York Times, *'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future,* Dec. 10, 2022. https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html, (last visited Dec. 16, 2022).

[37] *Id.*

[38] U.S. Department of State, *2021 Country Reports on Human Rights Practices: Cuba,* https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/, (last visited Dec. 17, 2022).

[39] *Id.*

[40] *Id.*

[41] *Id.*

8

Cuba AR_000134

PRE-DECISIONAL/DELIBERATIVE

human rights situation in Cuba began to decline significantly in 2020.[42]  In November 2020, the government cracked down on the San Isidro Movement (MSI), a civil society group opposed to restrictions on artistic expression.[43]  This crackdown coupled with deteriorating economic conditions (food and medicine shortages and blackouts) led to demonstrations in Havana and throughout the country.[44]

According to a Human Rights Watch report, the GOC also committed systematic human rights violations in response to massive anti-government protests in July 2021 with the apparent goal of punishing protesters and deterring future demonstrations.[45]  The report documents a wide range of human rights violations against well-known government critics and ordinary citizens, including harassment, arbitrary detention, abuse-ridden prosecutions, beatings, and other cases of ill-treatment that in some cases constitute torture.[46]  Several organizations reported countrywide internet outages, followed by erratic connectivity, including restrictions on social media and messaging platforms.[47]

Protests over the challenges of obtaining basic necessities have continued as have heavy-handed government responses.  In September 2022, a prolonged blackout caused by Hurricane Ian led to protests in Havana and other cities.[48]  Cuban President Miguel Díaz-Canel denounced the peaceful gatherings as "counterrevolutionary" and "indecent," remarking that "demonstrations of this type have no legitimacy."[49]  Amnesty International received reports of the GOC deploying the military and police to repress these protests as well as reports of arbitrary detention.[50]

The government's repression and inability to address the underlying shortages that inspired those lawful demonstrations have generated a human rights and humanitarian crisis that is driving Cubans from the country.  On June 2, 2022, the Inter-American Commission on Human Rights (IACHR) in its 2021 Annual Report stated that no guarantees currently exist for exercising freedom of expression in Cuba.[51]  Although the forms of harassment of independent journalists,

[42] Congressional Research Service, Cuba: U.S. Policy Overview, Aug. 5, 2022, https://crsreports.congress.gov/product/pdf/IF/IF10045, (last visited Dec. 17, 2022).
[43] Id.
[44] Id.
[45] Human Rights Watch, Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators, July 11, 2022. https://www.hrw.org/report/2022/07/11/prison-or-exile/cubas-systematic-repression-july-2021-demonstrators.
[46] Id.
[47] Human Rights Watch, World Report 2022 – Cuba. See https://www.hrw.org/world-report/2022/country-chapters/cuba.
[48] Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts, https://www.reuters.com/world/americas/cubans-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/.
[49] Miami Herald, As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests, October 2, 2022, https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html, (last visited Dec. 17, 2022).
[50] Amnesty International, Cuba: Tactics of Repression Must Not be Repeated, Oct. 5, 2022, https://www.amnesty.org/en/latest/news/2022/10/cuba-repression-must-not-be-repeated/, (last viewed Dec. 19, 2022).
[51] IACHR, Annual Report 2021 - Chapter IV.B - Cuba, p.678, June 2, 2022, https://www.oas.org/en/iachr/reports/ia.asp?Year=2021, (last visited December 19, 2022).

9

Case 6:23-cv-00007   Document 175-25   Filed on 06/22/23 in TXSD   Page 41 of 454

PRE-DECISIONAL/DELIBERATIVE

artists, activists, and any who question government officials are not new, the 2021 Annual Report notes that they are worsening quickly.[52] The government controls formal media and closely monitors and targets perceived dissidents within the artistic community, mainstream artists, and media figures who express independent or critical views.[53] GOC frequently blocks access to many news websites and blogs and has repeatedly imposed targeted restrictions on critics' access to cellphone data.[54]

Cuba's deteriorating economic conditions and political repression continue to increasingly drive Cubans out of their country. As a result, many have taken dangerous irregular journeys, including through maritime means, often costing their lives at sea and on land while trying to reach the United States.

*Return Limitations*

Due to the global COVID-19 pandemic, the GOC stopped accepting regular returns of their nationals via ICE ERO aircraft after February 28, 2020. The U.S. Government has been engaged in discussions with the GOC to reactivate the Migration Accords, which specify that the United States will process 20,000 Cuban nationals—not including immediate relatives of U.S. citizens—to come to the United States through immigrant visas and other lawful pathways, such as the Cuban Family Reunification Parole (CFRP) program, and that the Cuban government will accept the repatriation of its nationals who are encountered entering the United States without authorization. As part of these ongoing discussions, DHS is pursuing the resumption of removal flights to Cuba. However, the GOC has only agreed to accept one flight per month, in line with the cadence of removals via charters prior to the pandemic. Such a limited number of removal flights will not, absent other efforts, impose a material consequence for the sharply increasing volume of Cuban nationals DHS is encountering.

As a result, the U.S. did not return any Cuban nationals directly to Cuba in FY2022. In addition, other countries, including Mexico, have generally refused to accept the returns of Cuban nationals, with limited exceptions including Cubans who have immediate family members who are Mexican citizens or who otherwise have legal status in Mexico.

Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the GOM's acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between POEs.

Returns alone, however, are not sufficient. The proposed process seeks to combine a consequence for Cuban nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air

---

[52] *Id.*
[53] *Id.*
[54] *Id.*

10

Cuba AR_000136

Case 6:23-cv-00007   Document 192-25   Filed on 06/20/23 in TXSD   Page 451 of 454

PRE-DECISIONAL/DELIBERATIVE

to and seek parole into enter the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Cuban nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP-H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[55]

The impact has been particularly acute in certain border sectors. The increased flows of Cuban nationals are disproportionately occurring within the remote Del Rio and Yuma sectors, both of which are at risk of operating, or are currently operating, over capacity.[56] In FY 2022, 73 percent of unique encounters of Cuban nationals occurred in these two sectors.[57] Thus far in FY 2023, Del Rio and Yuma sectors have accounted for 72 percent of unique encounters of Cuban nationals.[58] In FY 2022, Del Rio and Yuma sectors encountered over double (137 percent increase) the number of migrants as compared to FY 2021, a fifteen-fold increase over the average for FY 2014—FY 2019, in part as a result of the sharp increase in Cuban nationals being encountered there.[59]

The focused increase in encounters within those two sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, it has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants,

---

[55] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[56] OIS analysis of data pulled from CBP UIP December 7, 2022.

[57] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[58] *Id.*

[59] *Id.*

11

PRE-DECISIONAL/DELIBERATIVE

such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[60]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to remove Cubans and other populations by sending the message that there is no consequence for illegal entry.

The sharp increase in maritime migration has also had a substantial impact on DHS resources. USCG has surged resources and shifted assets from other missions due to this increased irregular maritime migration. In response to the persistent elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force—Southeast (HSTF-SE) elevated the operational phase of DHS's mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[61] Operation Vigilant Sentry is HSTF-SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.[62] The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF-SE's Unified Command staff and operational rhythm.[63] For example, between July 2021 and August 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[64] USCG also added two MH-60 helicopters to respond to increased maritime migration flows in FY 2022.[65] Moreover, USCG has had to almost double its flight hour coverage per month to support migrant interdictions in FY 2022.[66] Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Cuban nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more

---

[60] Data from SBCC, as of December 11, 2022.
[61] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force – Southeast, August 21, 2022.
[62] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).
[63] *Id.*
[64] *Id.*
[65] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.
[66] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).

12

Case 6:23-cv-00007   Document 192-35   Filed on 06/20/23 in TXSD   Page 21 of 34

PRE-DECISIONAL/DELIBERATIVE

quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay, or repatriate those encountered at sea while also delivering on other maritime missions.

### III. Overview and Discussion of Proposed Cuban Parole Process

Like the Venezuelan process, this proposed Cuban parole process would provide a streamlined way for individuals from Cuba who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and to seek a temporary period of parole for up to two years for significant public benefit and urgent humanitarian reasons, provided that they have a supporter in the United States, pass robust national security and public safety vetting, meet other specified criteria, and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's proposed design.

*Supporters*: U.S.-based supporters would initiate an application on behalf of a Cuban national and, if applicable, the national's immediate family members. Supporters could be individuals filing on their own, with other individuals, or on behalf of entities. They would be required to provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters would be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Cuban nationals would need to be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an interior POE and final U.S. destination; pass required screening and vetting; and comply with all additional requirements, including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the Centers for Disease Control and Prevention (CDC).

Cuban nationals would be ineligible for this process if they;
   1) have been ordered removed from the United States within the prior five years;
   2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;
   3) have entered Mexico or Panama without authorization after the date of the announcement; or
   4) are a permanent resident or dual national of any country or hold refugee status in any country other than Cuba, unless DHS operates a similar parole process for the country's nationals.

Unaccompanied children (i.e., children under 18 not traveling with a parent or legal guardian) would not be eligible for this process.

*Beneficiary vetting*: Potential beneficiaries would be required to submit biographic and biometric information—in the form of a live photograph—in advance of travel. This information

13

Cuba AR_000139

PRE-DECISIONAL/DELIBERATIVE

would be used for vetting by the National Targeting Center (NTC) and to inform classified vetting support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect additional biometrics—namely, an additional photograph and fingerprints. This biometric information would support additional vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted on a discretionary basis.

Beneficiaries also would be subject to continuous vetting throughout their period of parole. Parole could be terminated, and the noncitizen placed into removal proceedings, if derogatory information emerges during continuous vetting.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries would be able to access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting would receive an advance authorization to travel electronically, which would facilitate their ability to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries would be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the POE, parole generally would be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States would be required to leave prior to the expiration of their parole. During this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[67] Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States generally would be placed in removal proceedings. During this two-year period, the Department would continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly immigration processes, and increase removal options for Cuban nationals who are subject to a final order of removal.

*Employment Authorization and Public Benefits*: Parolees would be eligible to apply for employment authorization for the duration of the parole.[68] U.S. Citizenship and Immigration Services (USCIS) anticipates that it would be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of employment authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or

---

[67] Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note),, https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf, (last viewed Dec. 16, 2022).
[68] 8 C.F.R. § 274a.12(c)(11).

14

Cuba AR_000140

PRE-DECISIONAL/DELIBERATIVE

food banks, than the population of Cuban nationals currently encountered crossing the SWB or at sea, thus minimizing—and ultimately reducing—the burden on the states.[69]

Further, Cuban nationals who are paroled into the United States are eligible for certain benefits, akin to those received by admitted refugees, under the HHS-administered Cuban-Haitian Entrant Program (CHEP).[70] Regardless of benefit eligibility, the proposed process would require parolees to have a willing supporter that would provide additional support, as needed. In addition, parolees would be eligible to seek employment authorization—an added benefit beyond what is provided for under CHEP. They will therefore be in a better position to work and support themselves than the present situation where recent migrants from Cuba are processed into immigration proceedings but generally are not immediately eligible to request employment authorization.[71] DHS believes that these factors should mitigate, if not entirely overcome, any additional burden on states that may result from the creation of this parole process and that any marginal cost is outweighed by the significant public benefits and urgent humanitarian reasons for paroling individuals on a case-by-case basis pursuant to such a process.

*Scope/Termination*: The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent parole Processes for Haitians, Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memorandum, once approved, would be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any

---

[69] *Id.* Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.*, 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

[70] *See* Refugee Education Assistance Act of 1980, Pub. L. No. 96-422 (8 U.S.C. § 1522 note); 8 C.F.R. § 212.5(h); 45 C.F.R. §§ 400.62, 401.2, 401.12.

[71] Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. See generally, e.g., 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

15

Cuba AR_000141

Case 6:23-cv-00007   Document 192-5   Filed on 06/20/23 in TXSD   Page 16 of 34

PRE-DECISIONAL/DELIBERATIVE

party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## IV. Justification for Cuban Parole Process

The Secretary of Homeland Security has, under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[72] Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[73] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[74] DHS may terminate parole in its discretion at any time.[75] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[76]

### 1. Significant Public Benefit

The proposed process, which would impose new consequences for Cubans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Cuban nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States would serve a significant public benefit, for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhanced border security through a reduction in irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improved vetting for national security and public safety; (iii) reduced strain on DHS personnel and resources; (iv) minimized domestic impact of irregular migration from Cuba; (v) a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfillment of important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

*Enhanced border security by reducing irregular migration of Cuban nationals*

---

[72] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). DHS notes that Cubans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[73] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).

[74] *See* 8 C.F.R. § 212.5(c).

[75] *See* 8 C.F.R. § 212.5(e).

[76] *See* 8 C.F.R. § 274a.12(c)(11).

16

Case 6:23-cv-00007   Document 192-35   Filed on 06/20/23 in TXSD   Page 17 of 34

PRE-DECISIONAL/DELIBERATIVE

As described above, Cuban nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Cubans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Cuban individuals along the SWB and at sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process will be contingent on the GOM's acceptance of Cuban nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be returned to Cuba or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Cuban nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

*Improved vetting for national security and public safety*

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before such individuals arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Cuban parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes before they travel to the United States.

As described above, the proposed vetting would require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

*Reduced burden on DHS personnel and resources*

By reducing encounters of Cuban nationals encountered at sea or at the SWB, and channeling decreased flows of Cuban nationals to interior POEs, we anticipate the proposed process could relieve some of the impact increased migratory flows has had on the DHS workforce along the SWB. This process could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—allowing for the removal of

17

Cuba AR_000143

Case 6:23-cv-00007   Document 195-35   Filed on 06/20/23 in TXSD   Page 18 of 694

PRE-DECISIONAL/DELIBERATIVE

more noncitizens with final orders of removal faster and reducing the number of days migrants
are in DHS custody. While the proposed process would also draw on DHS resources within
USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct
vetting, these requirements involve different parts of DHS and require fewer resources as
compared to the status quo.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address
the heightened rate of maritime encounters. Providing a safe and orderly alternative path is
expected to also reduce the number of Cubans who seek to enter the United States by sea, and
will allow USCG to better balance its other important missions, including its counter-drug
smuggling operations, protection of living marine resources, support for shipping navigation, and
a range of other critical international engagements.[77]

For those who enter the United States at the SWB, allowing Cubans permitted to voluntarily
depart or withdraw their application for admission one time and still be considered for parole
through the process also will reduce the burden on DHS personnel and resources that would
otherwise be required to obtain and execute a final order of removal. This includes reducing
strain on detention and removal flight capacity, officer resources, and reducing costs associated
with detention and monitoring.

*Minimize the domestic impact*

Though the Venezuelan process has significantly reduced the encounters of Venezuelan
nationals, other migratory flows continue to strain domestic resources, which is felt most acutely
by border communities. Given the inability to remove, return, or repatriate Cuban nationals in
substantial numbers, DHS is currently conditionally releasing 87 percent of the Cuban nationals
it encounters at the border, pending their removal proceedings or the initiation of such
proceedings, and Cuban nationals accounted for 23 percent of all encounters released at the
border in November 2022.[78] The increased volume of provisional releases of Cuban nationals
puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million
available through FEMA's EFSP to support NGOs and local governments that provide initial
reception for migrants entering through the SWB. These entities have engaged to provide
services and assistance to Cuban nationals and other noncitizens who have arrived at our border,
including by building new administrative structures, finding additional housing facilities, and
constructing tent shelters to address the increased need.[79] FEMA funding has supported building
significant NGO capacity along the SWB, including a substantial increase in available shelter
beds in key locations.

---

[77] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).
[78] OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through November 30, 2022.

[79] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other
States,* Sept. 21, 2022, https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

18

Cuba AR_000144

Case 6:23-cv-00007   Document 195-35   Filed on 06/24/23 in TXSD   Page 81 of 694

PRE-DECISIONAL/DELIBERATIVE

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[80] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[81] Since Cuban nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this proposed parole process would address these concerns by diverting flows of Cuban nationals into a safe, and orderly process, in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process would help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the SWB. Beneficiaries would be required to fly to the interior, rather than arriving at the SWB. They also would only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also would be eligible to apply for work authorization, thus enabling them to support themselves.

*Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks*

The proposed process, which would incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[82] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[83] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[84] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[85] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since

---

[80] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave,* Apr. 27, 2022, https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[81] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day,* Sept. 23, 2022, https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

[82] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[83] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[84] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[85] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

19

Cuba AR_000145

PRE-DECISIONAL/DELIBERATIVE

March 2022.[86]  CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[87]  The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north.  These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[88] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow.  Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.  Tragically, a significant number of individuals perish along the way.  The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[89]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers.  Human smugglers and migrant populations continue to use unseaworthy, overly crowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human smuggling networks and migrants consider the attempts worth the risk.[90]

The increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences.  In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration.  In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull.  USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel

---

[86] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

[87] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[88] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[89] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP0JR; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[90] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).

20

Cuba AR_000146

PRE-DECISIONAL/DELIBERATIVE

and survivor.[91]  The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants; the others were presumed lost at sea.[92]

DHS anticipates this process would save lives and undermine the profits and operations of the dangerous TCOs that put migrants lives at risk for profit because it would incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights rather, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB.  By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants.  DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[93]

*Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration.  This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); [94] the Collaborative Migration Management Strategy (CMMS); [95] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[96]  The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[97]  The

---

[91] Adriana Gomez Licon, Associated Press, *Situation 'dire' as Coast Guard seeks 38 missing off Florida*, Jan. 26, 2022, https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019
[92] Adriana Gomez Licon, Associated Press, *Coast Guard suspends search for migrants off Florida*, Jan. 27, 2022, https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ac239
[93] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42, (last visited Dec. 18, 2022).
[94] National Security Council, *Root Causes of Migration in Central America* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.
[95] National Security Council, *Collaborative Migration Management Strategy*, July 2021, https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.
[96] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration), June 10, 2022, https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.
[97] *Id.*

21

Cuba AR_000147

PRE-DECISIONAL/DELIBERATIVE

L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[98]

The U.S. Government has been working with the GOC to restart the Cuba Migration Accords. On November 15, 2022, U.S. and Cuban officials met in Havana to discuss the implementation of the Accords and to underscore our commitment to pursuing safe, regular, and humane migration between Cuba and the United States.[99] These Migration Talks provide an opportunity for important discussions on mutual compliance with the Migration Accords—composed of a series of binding bilateral agreements between the United States and Cuba signed in 1984, 1994, 1995, and 2017—which establish certain commitments of the United States and Cuba relating to safe, legal, and orderly migration.

In September 2022, the U.S. Government announced the resumption of operations under the CFRP program, which allows certain beneficiaries of family-based immigrant petitions to seek parole into the United States while waiting for a visa number to become available. Beginning in early 2023, U.S. Embassy Havana will resume full immigrant visa processing for the first time since 2017, which will, over time, increase the pool of noncitizens eligible for CFRP.[100] Approved beneficiaries through this process will enter the United States as parolees but will be eligible to apply for adjustment to lawful permanent resident (LPR) status once their immigrant visas become available. Also during this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[101]

While these efforts represent important progress for certain Cubans who are the beneficiaries of a family-based immigrant petition, CFRP's narrow eligibility, challenges faced operating in Cuba, and more modest processing throughput mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process would help achieve these goals by providing an immediate and temporary orderly process for Cuban nationals to lawfully enter the United States while we work to improve conditions in Cuba and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus would provide the United States another avenue to lead by example.

The process also would respond to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico, Honduras, Guatemala, and Costa Rica—are affected by the increased movement of Cuban nationals and have been seeking greater U.S. action to address these challenging flows for some time. Cuban flows contribute to strain

---

[98] *Id.*

[99] Department of State, *Migration Talks with the Government of Cuba,* Nov. 15, 2022; https://www.state.gov/migration-talks-with-the-government-of-cuba-2/.

[100] USCIS, *USCIS Resumes Cuban Family Reunification Parole Program Operations,* https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations, Sept. 9, 2022 (last visited Dec. 10, 2022).

[101] Public Law 89-732, Cuban Adjustment Act of 1966 (CAA), Nov. 2, 1966, https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf, (last viewed Dec. 16, 2022).

22

PRE-DECISIONAL/DELIBERATIVE

governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process would add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It would also strengthen the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, as part of a regional response—many of which are already taking important steps. Any effort to meaningfully address the crisis in Cuba would require continued efforts by these and other regional partners.

Importantly, the United States would not implement the new parole process without the ability to remove or return to Mexico Cuban nationals who attempt to enter the United States irregularly across the SWB. The United States' ability to execute this process thus would be contingent on the GOM's willingness to accept the return of Cuban nationals who bypass this new process and attempt to enter the United States irregularly between POEs.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—would require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this proposed process would be responsive to the GOM's request that the United States increase lawful pathways for migrants and would also be aligned with broader Administration domestic and foreign policy priorities in the region. It would couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process would be to reduce the irregular migration of Cuban nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

2.  Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this proposed process would address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The GOC continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who

23

PRE-DECISIONAL/DELIBERATIVE

oppose their positions.[102]  This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

**V. Consideration of process elements**

   1.  Length of parole and employment authorization

The proposed length of parole is up to two years.  This is consistent with other parole processes, such as the process for Venezuelan nationals and Uniting for Ukraine (U4U) for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the CFRP established in 2007.  A two-year period of parole would enable a realization of the significant public benefits and meets the urgent humanitarian reasons that Cuban nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole would need to be sufficiently long to make it an attractive alternative to the status quo, where migrants put their lives in smugglers' hands to enter the country irregularly.  DHS believes that a period of two years would achieve that goal.  It would allow beneficiaries to gain work authorization, contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole would provide eligible beneficiaries sufficient time to pursue a durable immigration status or benefit if eligible under the law.  Beneficiaries may qualify for asylum; others may qualify for adjustment of status pursuant to the Cuban Adjustment Act or based on the immediate availability of a family- or employment-based immigrant visa.

*Third*, a two-year period would provide a window for the U.S. Government to work with the GOC to increasingly accept the return of Cuban nationals who are subject to a final order of removal.  Finally, this two-year period would provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other immigration pathways, both to the United States and to other partner nations.

   2.  Supporter Vetting

After DHS learned of certain instances in which U4U supporters, including family members, ceased providing housing and other support for parolees prior to the end of their parole period, DHS made form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation.  This was intended to further reduce the risk that supporters do not follow through

---

[102] *Id.*; Congressional Research Service, Cuba: U.S. Policy in the 117th Congress, Sept. 22, 2022, https://crsreports.congress.gov/product/pdf/R/R47246.

Cuba AR_000150

PRE-DECISIONAL/DELIBERATIVE

on their obligations; it was also intended to address risks of human trafficking, and other forms of abuse.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[103]  While such risks cannot be completely mitigated, this parole process is structured to address these risks to the greatest extent possible.  The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB.  As described above, all migrants, but particularly women and children, are susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[104]  A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations.  Almost all, if not all, migrants are required to pay compulsory fees and taxes by criminal organizations at different points along their journey north.[105]  We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, would meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3.  Eligibility Criteria

*Exception for One-Time Voluntary Departure or Withdrawal of an Application for Admission*

Individuals encountered entering the United States irregularly between POEs may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility to seek parole via the Cuba parole process.  This exception provides an incentive for migrants, who would otherwise be ineligible for this process, to accept the option to voluntarily leave the United States, and thus, reduce strain on limited DHS personnel and resources associated with obtaining and later executing an order of removal.

*Consideration of Beneficiaries with Particular Vulnerabilities or other Compelling Circumstances*

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have particular vulnerabilities or other compelling circumstances.  We have ultimately concluded that such a requirement is not preferable for a combination of operational and policy reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism.  For instance, any such vulnerability screening would require a process for triaging potential

---

[103] Department of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf, (last visited Dec. 17, 2022).

[104] *Id.* at 386.

[105] Homeland Security Operational Analysis Center operated by the RAND Corporation, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?*, 2019. https://www.rand.org/pubs/research_reports/RR2852.html, (last viewed Dec. 17, 2022).

25

Case 6:23-cv-00007   Document 92535 Filed on 06/20/23 in TXSD   Page 36 of 89

PRE-DECISIONAL/DELIBERATIVE

beneficiaries and identifying those who are more vulnerable.  To be effective, it would require third parties—likely international NGOs—to play a role in the screening.  However, DHS lacks authority to fund such screening outside the United States.  Such a screening requirement also would substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Cuban nationals who would otherwise make the dangerous journey to the U.S.-Mexico border.  Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration that this process seeks to achieve.

For these programmatic reasons, DHS determined that keeping eligibility at the nationality level—like U4U and the Venezuela process—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Cuban nationals.  DHS similarly rejected this consideration in weighing the scope of the process for Venezuelans.

**VI. Consideration of alternative approaches**

DHS has considered several alternative approaches to the proposed parole process coupled with an enforcement mechanism to manage the current surge in migration from Cuban nationals.  These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

  1.  Status quo

DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB, driven in increasing part by a surge in migration by Cuban nationals.  DHS has seen similarly high rates of Cubans encountered at sea in the Caribbean.  Importantly, DHS anticipates that encounters of Cuban nationals at the border are likely to continue to increase in the coming weeks and months.  This sharp increase shows no signs of abating absent material changes such as those proposed here.

As described above, the current surge in irregular migration from Cuba has forced DHS to reallocate resources and personnel to the SWB and in the Caribbean.  Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY

26

Cuba AR_000152

PRE-DECISIONAL/DELIBERATIVE

staffing to support SWB and maritime operations is simply not sustainable in the long term. For these reasons, DHS has concluded that maintaining the status quo is not an option.

### 2. Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. We continue to engage in such efforts with multiple countries. That said, partner countries have already extended themselves in historic ways with limited results. The bottom line is that our foreign partners do not have the capability to sufficiently impact these flows in the immediate term; currently, only Mexico operates removal flights in the region to Cuba, but their operations are limited.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process in the time that is needed.

### 3. Increasing removals to Cuba

DHS data show that increases in returns of individuals from a given country can reduce encounters at the border over time.[106] For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico during specific periods of time over the past year have led to a sustained decrease in encounters of migrants from those countries at the border.

DHS is in bilateral discussions with the GOC to restart removal flights in the near future and will continue to engage with the GOC to increase its ability to repatriate their citizens who do not have a legal basis to remain in the United States. However, and despite these ongoing concerted efforts, it is unlikely that a potential restart in removal flights would keep pace with the volume of Cuban nationals that DHS is encountering.

Because of these factors, returns to Cuba—while an effective consequence regime for those who enter the United States irregularly and do not have a valid asylum claim—is not a viable option, at scale, and not a viable option to meet immediate needs.

### 4. Utilizing contiguous territory return authority

DHS considered whether returning Cuban nationals to Mexico under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C), either through the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. As this policy was being finalized, a district court stayed your October 29, 2021 memorandum

---

[106] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, U.S. Customs and Border Protection Commissioner, and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

27

Cuba AR_000153

PRE-DECISIONAL/DELIBERATIVE

terminating MPP. See Dkt. 178, *Texas v. Biden*, No. 21-cv-67 (N.D. Tex. Dec. 15, 2022).  For two reasons, we have decided that proceeding with the proposed process is preferable to attempting to manage the current surge in migration by relying on the programmatic use of the contiguous territory return authority at this time and for this population.

First, the resources and infrastructure necessary to use contiguous return authority at the scale that would be required given current—and anticipated—flows are not currently available.  To employ the contiguous return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings.  This would require, among other things, the construction of substantial additional court capacity along the border.  It would also require the reassignment of immigration judges and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are coming into and out of the country to attend hearings.

Second, programmatic implementation of the contiguous territory return authority requires Mexico's concurrence and support.  When DHS was previously under an injunction requiring it to re-implement MPP, the GOM would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints.  Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration we are seeing today.  The Government of Mexico announced the end of the court-ordered reimplementation of MPP on October 25, 2022.[107]  Any potential re-starting of returns under MPP or another programmatic use of the contiguous-territory return authority would require the Government of Mexico to make a new independent decision to accept noncitizens that would be returned under this authority.

DHS is, however, continuing to evaluate the recent district court decision and considering the effect of the court's stay and other relevant developments on the use of contiguous territory return authority going forward.

5.  Increasing the use of detention for Cuban nationals

DHS considered whether it could detain all or most Cuban nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result.  There are, however, legal and operational limits in the ability to do so.

*First*, there are legal limits on the duration of detention for those ordered removed and who—like the Cuban nationals—do not have a significant likelihood of removal in the foreseeable future.  Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from detaining

---

[107] Government of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU*, Oct. 25, 2022, https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu, (last visited Dec. 19, 2022).

28

PRE-DECISIONAL/DELIBERATIVE

individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[108]

*Second,* it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Cuban nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Cuban nationals is not a viable option at this time.

6. Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. For Cubans in particular, the U.S. Government also committed to increasing immigrant visa adjudication and restarting the CFRP program.[109] DHS and interagency partners will continue these efforts and more. However, those alternative processes are narrow and require, in many cases, multiple steps and in-person engagement or referrals that are difficult for many individuals to access and are limited by operational constraints.

A key feature of this proposed process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully electronic and accessible from anywhere. We thus assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Cuba today—and that regional efforts to improve safe, orderly pathways, while critically important, will not be sufficiently timely to address the immediate needs. We assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

**VII. Administrative Procedure Act**

This proposal would be exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

---

[108] *Zadvydas v. Davis,* 533 U.S. 678 (2001).

[109] The White House, *Fact Sheet: The Los Angeles Declaration* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.

29

Cuba AR_000155

PRE-DECISIONAL/DELIBERATIVE

*First*, the Department would merely be adopting a general statement of policy,[110] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[111]  As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[112]  Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[113]  In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[114]  This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Cuban nationals to enter the United States. The United States would not implement the new parole process without the ability to return Cuban nationals who attempt to enter irregularly across the SWB to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and attempt to enter the United States irregularly between POEs.  Thus, initiating and managing this process would require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now.  It also would complicate broader discussions and negotiations about migration management.  For now, the GOM has indicated it is prepared to make an independent decision to accept a substantial number of Cuban returns or removals.  The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date.  Additionally, making it publicly known that we plan to return or remove nationals of Cuban to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

---

[110] 5 U.S.C. § 553(b)(A).

[111] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[112] 5 U.S.C. § 553(a)(1).

[113] *Mast Indus. v. Regan*, 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[114] *See, e.g., Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

30

Cuba AR_000156

PRE-DECISIONAL/DELIBERATIVE

Moreover, this process is not only responsive to the interests of the GOM and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[115] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[116]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be contrary to the public interest and impracticable. The number of Cubans encountered at the SWB are already high, and the Office of Immigration Statistics estimates border encounters will continue to rise, and potentially rise dramatically, should the Title 42 public health order be lifted. While DHS has already taken multiple additional measures to address and prepare, a delay would exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[117]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Cuban nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[118] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the

---

[115] *See* 82 Fed. Reg. 4902 (Jan. 17, 2017).

[116] *See* 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[117] *See Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[118] *See* 5 U.S.C. § 553(b)(B).

31

Cuba AR_000157

PRE-DECISIONAL/DELIBERATIVE

notice-and-comment process.[119]  If, for example, advance notice of a coming price increase
would immediately produce market dislocations and lead to serious shortages, advance notice
need not be given.[120]  A number of cases follow this logic in the context of economic regulation.

The same logic applies here, where the Department is responding to exceedingly serious
challenges at the border, and advance announcement of that response would significantly
increase the incentive, on the part of migrants and others (such as smugglers), to engage in
actions that would compound those very challenges.  It is well-established that migrants may
change their behavior in response to perceived imminent changes in U.S. immigration policy.
For example, as detailed above, implementation of parole process for Venezuelans was
associated with a drastic reduction in irregular migration by Venezuelans.  Had the parole
process been announced prior to a lengthy notice and comment period, it likely would have had
the opposite effect, resulting in many hundreds and thousands of Venezuelan nationals
attempting to cross the border before the program went into effect.  Overall, the Department's
experience has been that in some circumstances when public announcements have been made
regarding changes in our immigration laws and procedures that would restrict access to
immigration benefits to those attempting to enter the United States along the U.S.-Mexico land
border, there have at times been dramatic increases in the numbers of noncitizens who enter or
attempt to enter the United States.  And it is well-established that such persons may change their
behavior in response to perceived imminent changes in U.S. immigration policy.[121]  Smugglers
routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance in order to undertake such procedures
because—as noted above—maintaining the status quo, which involves record numbers of Cuban
nationals currently being encountered attempting to enter irregularly at the SWB, coupled with
DHS's extremely limited options for processing, detaining, or quickly removing such migrants,
unduly impedes DHS's ability to fulfill its critical and varied missions.  At current rates, a delay
of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an

---

[119] *See, e.g., Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94-95 (D.C. Cir. 2012) (noting that the "good cause" exception
"is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the
purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial
manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up));
*DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was
in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the
public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would
have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze
deadline." (cleaned up)).

[120] *See, e.g., Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was
present in this case based upon [the agency's] concern that the announcement of a price increase at a future date
could have resulted in producers withholding crude oil from the market until such time as they could take advantage
of the price increase.").

[121] Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, July 26,
2022, https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-
media, (last viewed Dec. 6, 2022).

32

Cuba AR_000158

PRE-DECISIONAL/DELIBERATIVE

opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[122]  DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[123]  DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities.  A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[124]  DHS concluded that "a surge could result in significant loss of human life."[125]

---

[122] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[123] *Id.*

[124] *Id.*

[125] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

33

**Recommendation**

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Cuban nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.



Approve/d                                              rove/date_____

DEC 2 2 2022

Modify/date _____   Needs discussion/date_____

34

Cuba AR_000160