

DEFENDANT'S
EXHIBIT

CASE
NO. 6-23-cv-0007

EXHIBIT
NO. 071

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 71, ECF 175-6

Case 6:23-cv-00007   Document 195-26   Filed on 06/20/23 in TXSD   Page 61 of 535

PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
Washington, DC 20528

December 22, 2022

**ACTION**

## MEMORANDUM FOR THE SECRETARY

FROM:       Robert Silvers
                Under Secretary
                Office of Strategy, Policy, and Plans

                ROBERT P SILVERS *Digitally signed by ROBERT P SILVERS Date: 2022.12.22 18:51:16 -05'00'*

                Troy Miller
                Acting Commissioner
                U.S. Customs and Border Protection

                TROY A MILLER *Digitally signed by TROY A MILLER Date: 2022.12.22 19:31:44 -05'00'*

                Ur M. Jaddou
                Director
                U.S. Citizenship and Immigration Services

                UR M JADDOU *Digitally signed by UR M JADDOU Date: 2022.12.22 18:38:31 -05'00'*

SUBJECT:     **Parole Process for Certain Haitian Nationals**

**I. Summary**

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and on creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand processing capacity and multinational collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, we need to take immediate steps to provide safe, orderly pathways for the large numbers of individuals seeking to access the United States, and to disincentivize such individuals from taking the dangerous journey to and arriving, without authorization, at the southwest border (SWB).

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[1] Specifically, DHS provided a new parole process for Venezuelans

---

[1] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

PRE-DECISIONAL/DELIBERATIVE

EXHIBIT 5

Case 6:23-cv-00007   Document 195-35   Filed on 08/24/23 in TXSD   Page 2 of 35

PRE-DECISIONAL/DELIBERATIVE

who are backed by supporters in the United States to come to the United States by flying to interior ports of entry (POEs)—thus obviating the need for them to make a dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[2] It also has led to a precipitous decline in Venezuelan irregular migration throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October to just 668 in November.[3]

DHS anticipates that implementing a similar process for Haitians would reduce the number of Haitians seeking to irregularly enter the United States between POEs along the SWB or by sea, by coupling a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process. Implementation of the new parole process for Haitians will be contingent on the GOM accepting the return, departure, or removal to Mexico of Haitian nationals seeking to irregularly enter the United States between POEs on the SWB.

DHS relies on the State Department, through Embassies overseas, to determine whether repatriation flights can be operated to a given country. The U.S. Embassy in Port au Prince has authorized repatriation flights given current conditions. However, the Haitian government and the International Organization of Migration have capacity constraints that, when combined with the tenuous security environment in Haiti, currently constrain DHS's ability to remove individuals in sufficient numbers to respond to a surge in migration. Further, the security environment has delayed immigrant visa processing and the operational restart of the Haitian Family Reunification Parole (HFRP) program at the U.S. Embassy in Port-au-Prince, frustrating the efforts of tens of thousands of Haitians to lawfully travel to the United States.

Instituting a similar process for Haitians is critical to responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety. At the end of FY 2021, DHS experienced a focused surge in Haitian migration in the Del Rio sector of the border that strained its capacity to process individuals in a timely manner, necessitating an all of government response. In FY

---

[2] Office of Immigration Statistics (OIS) analysis of data pulled from U.S. Customs and Border Protection (CBP) Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf, (last viewed Dec. 11, 2022).

2

PRE-DECISIONAL/DELIBERATIVE

2022, DHS encounters of Haitians at the SWB increased to unprecedented levels, with 48,697 unique encounters, as compared to the annual average of 3,242 unique encounters for FY 2014 to FY 2019.[4]  In addition, the number of Haitian nationals entering Panama through the Darién Gap has been steadily increasing in recent months—something that has been a key predictor of migrant movement towards the SWB in the past, including with nationals of Venezuela a few months ago.  Haitians represented the third highest nationality encountered in the Darién Gap between January and November 2022, at 16,933 encounters, and the number of Haitian encounters in Panama doubled between September and November 2022.[5]

Haitian migrants are also increasingly taking to the sea in makeshift boats.  Maritime migration from Haiti also increased sharply in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[6]

While attempted irregular entry of Haitians between POEs has waned since June 2022, DHS assesses that this trend could quickly shift again, given the prevalence of displaced Haitian communities gathered in Mexico and the increasing volume of Haitians traversing the Darién Gap on their way north.

DHS anticipates that instituting a Venezuela-like process for nationals of Haiti would reduce the irregular migration of Haitians in the hemisphere, disincentivize Haitians in northern Mexico from seeking to enter along the SWB of the United States without authorization, and reduce dangerous attempts to travel to the United States by sea.  This would be accomplished by coupling a meaningful incentive to seek a safe, orderly means of traveling by air to interior ports of entry in the United States, with the imposition of consequences for those who seek to enter without authorization along the SWB.  Individuals could access this lawful process from safe locations in Haiti, or in third countries far from the SWB.  Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.  Implementation of the new parole process for Haitians will be contingent on the GOM accepting the return, departure, or removal to Mexico of Haitian nationals seeking to irregularly enter the United States between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States would be required to initiate the application, apply on behalf of a Haitian national (and certain non-Haitian nationals who are immediate family members of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Haitian nationals would be required to meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole.  Individuals would be ineligible if they:

---

[4] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.
[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf, (last viewed Dec. 11, 2022).
[6] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

3

Case 6:23-cv-00007   Document 195-35   Filed on 06/20/23 in TXSD   Page 94 of 535

PRE-DECISIONAL/DELIBERATIVE

1) have been ordered removed from the United States within the prior five years;
2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to Immigration and Nationality Act (INA) section 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;
3) have entered Mexico or Panama without authorization after the date of the announcement; or
4) are a permanent resident or dual national of any country or hold refugee status in any country other than Haiti, unless DHS operates a similar parole process for the country's nationals.

Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel to seek entry at an interior port of entry.

A grant of parole under this process would be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region. These strategies will support efforts to stabilize conditions in Haiti, thus diminishing the push factors and enabling more regular removals of those Haitians who nonetheless enter the United States or partner nations unauthorized and who lack a valid claim of asylum or other forms of protection. The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally would be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Haitian nationals pursuant to this process would provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that have displaced hundreds of thousands of Haitians throughout the Western Hemisphere, to include concurrent health, economic, and political crises. Most significantly, DHS anticipates this process would: (i) enhance the security of the U.S. SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the

4

PRE-DECISIONAL/DELIBERATIVE

separate and independent Parole Process for Cubans, Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memo describes the current Haitian migration trends; the measurable impact of the process for Venezuelans that informs this recommendation regarding Haitian migration; the parameters of the proposed process for Haitians, including eligibility criteria and vetting mechanisms, and the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends approval of the policy and policy rationale identified in this memo.

**II. Background and Rationale**

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[7] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[8] Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[9]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and

---

[7] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.
[8] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[9] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

5

PRE-DECISIONAL/DELIBERATIVE

Panama, as well as civil society.[10]  Other migrants who were about to enter the Darién Gap have turned around and headed back south.[11]  And still others who were intending to migrate north are staying where they were to apply for this lawful process.[12]  Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can yield a meaningful change of migratory flows.

2. Increase of Haitian Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered.  Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[13]  By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[14]  However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.[15]

Shifts in demographics have also had a significant effect on migration flows.  Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[16]  Beginning in the 2010s, a growing share of migrants have come from Northern Central America[17] (NCA) and, since the late 2010s, from countries throughout the Americas.[18]  Migrant populations from these newer source countries have

---

[10] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama*, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, Nov. 9 2022 (last viewed Dec. 8, 2022).

[11] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[12] Axios, *Biden's new border policy throws Venezuelan migrants into limbo*, Nov. 7 2022, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap, (last viewed Dec. 8, 2022).

[13] OIS analysis of historic CBP data.

[14] *Id.*

[15] *Id.*

[16] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518-536.

[17] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[18] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014 – FY 2019, the last full year before the start of the COVID-19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010 – FY 2013, and for 10 percent of total encounters in FY 2014 – FY 2019.

6

PRE-DECISIONAL/DELIBERATIVE

included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[19]

*Trends in Haitian Migration*

1. Migration by Land

Since 2019, increasing numbers of Haitians have sought to enter the United States at the land border. In FY 2019, DHS encountered just 3,039 Haitian nationals at the SWB.[20] This number grew to 4,431 unique encounters in FY 2020, and then sharply increased by 881 percent to 43,484 unique encounters in FY 2021.[21]

In September 2021, the U.S. experienced a mass migration event involving approximately 15,000 Haitians crossing into Del Rio, Texas within a matter of days. The group included many thousands who had left Haiti years before, spent time living and working in countries like Chile and Brazil, and then traveled up to our border through Panama.[22] This led to thousands of Haitian nationals living in a makeshift camp under a bridge in Del Rio and placed immense strain on U.S. government resources that were employed to respond to the event.

Unique encounters of Haitian nationals at the SWB continued to increase in FY 2022 to 48,697, with a peak of 9,753 unique encounters in a single month in May.[23] While encounters of Haitian migrants at our border have declined since June, the Government of Panama, which tracks irregular migration through the Darién Gap, has observed a surge in land-based encounters of Haitian nationals migrating north in recent months. Encounters of Haitian nationals in Panama jumped from 1,021 in July, to 2,170 in September, to 4,607 in November.[24]

Those numbers are rising at a time when Haitians are already concentrated in Mexico. UNHCR estimates that there are 62,680 Haitians in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[25] From October 2021 to October 2022, approximately 55,429 Haitian nationals were granted 12-month temporary humanitarian visitor status in Mexico, the highest of

---

[19] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[20] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[21] *Id.*

[22] The Texan, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio*, Oct. 7, 2021, https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/

[23] CBP, Nationwide Encounters, https://www.cbp.gov/newsroom/stats/nationwide-encounters, (last visited , Dec. 17, 2022; OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[24] Servicio Nacional de Migración de Panamá, Irregulares Por Darien, November 2022.

[25] UNHCR Global Focus, *Mexico*, See countries of origin data for 2022 and 2023, https://reporting.unhcr.org/mexico?year=2022.

7

Haiti AR_000104

PRE-DECISIONAL/DELIBERATIVE

any nationality and almost twice as many as the second-highest nationality.[26] Some Haitians migrating north have sought asylum in Mexico—a number that peaked in 2021—and may be planning to settle there permanently.[27] However, DHS assesses that many thousands of Haitians are waiting in Mexico with the ultimate goal of entering the United States, with many reporting they are waiting until the CDC Title 42 Order is lifted.[28]

2. Migration by Sea

Increasing numbers of Haitian migrants also continue to migrate to the United States via maritime routes, often endangering their own lives in precarious and unseaworthy vessels. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[29]

The southeast coastal border sectors also have seen increases in unique encounters of Haitian nationals who arrived to the United States by sea.[30] In FY 2021, those sectors encountered 593 unique Haitian nationals, a 411 percent increase compared to 116 in FY 2020.[31] In FY 2022, unique encounters of Haitian nationals in coastal sectors tripled from FY 2021 to 1,788—comprising 31 percent of total unique encounters by USBP in the southeast coastal sectors.[32]

3. Push and Pull Factors

DHS assesses that the high number of Haitian nationals encountered at the land border and interdicted at sea is driven primarily by two key factors: First, the displacement of Haitians throughout the Western Hemisphere caused by years of political, health, and economic crises, as well as the explosion in gang violence in Haiti—exacerbated by events that took place in the summer of 2021—are causing thousands to leave the country. Second, the precarious security situation's impact on DHS's ability to remove Haitian nationals who do not establish a legal basis to remain in the United States or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

*Factors pushing migration from Haiti*

---

[26] OIS analysis of *Instituto Nacional de Migracion* data.

[27] Estadísticas Comisión Mexicana de Ayuda a Refugiados, *Mexico Commission for Assistance of Refugee data show that about 6,000 Haitians applied for asylum in Mexico in 2020, 50,000 in 2021, and nearly 16,000 in 2022 (through November),* https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022__1-Dic._.pdf, (last viewed Dec. 17, 2022).

[28] (U)(SBU) NCTC Online Current, *Mexico: Potential Impact of End of Title 42 on Migrant Populations and Border Flows in Mexico* (Dec. 1, 2022).

[29] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[30] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[31] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[32] *Id.*

8

PRE-DECISIONAL/DELIBERATIVE

In recent years, Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country. This has led tens of thousands of Haitians to lose hope and attempt to migrate.[33]

On August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure.[34] Just days later, Tropical Storm Grace hit Haiti, with heavy downpours hampering the continuing rescue efforts for those impacted by the earthquake.[35] Within a month, over 650,000 Haitians required humanitarian assistance, including 260,000 children.[36] The World Bank estimates that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP.[37]

Amidst the political, security, and environmental crises, Haiti's economy has collapsed. Even before the events of 2021, Haiti already stood as the poorest country in the Americas and one of the poorest in the world.[38] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean region, ranking 170 out of 189 on the UN's Human Development Index.[39]

In addition to the economic turmoil the island has confronted, the security situation in Haiti has been problematic for some time. Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse.[40] The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five

---

[33] Council on Foreign Relations, *Ten Graphics That Explain the U.S. Struggle With Migrant Flows in 2022*, Dec. 1, 2022, https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022, (last viewed Dec. 19, 2022).
[34] UNICEF, *Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families*, https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti, (last viewed Dec. 12, 2022).
[35] The Washington Post, *Tropical Depression Grace Drenching Haiti Days After Major Earthquake*, Aug. 16, 2021, https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/, (last viewed Dec. 19, 2022).
[36] UNICEF, *One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance*, Sept. 15, 20221, https://www.unicef.org.uk/press-releases/one-month-after-haiti-earthquake-260000-children-still-need-humanitarian-assistance-unicef/, (last visited Dec. 19, 2022).

[37] The World Bank, *Haiti Overview*, Updated Nov. 8, 2022, https://www.worldbank.org/en/country/haiti/overview, (last visited Dec. 19, 2022).

[38] *Id.*
[39] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living.
[40] Catherine Porter, Michael Crowley, and Constant Méheut, The New York Times, *Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation* (July 7, 2021), https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html.

9

PRE-DECISIONAL/DELIBERATIVE

times more than in 2019.[41]  This recent surge in gang violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and medicines.[42]  Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, has caused 8,146 hospitalizations and 188 deaths.[43]

The situation has deteriorated to such a point that the Haitian Government, on October 7, 2022, asked for international military assistance to help address the converging crises.[44]

Over the past two years, many of the Haitian nationals encountered at our SWB actually left Haiti for opportunities in South America many years before.[45]  This Haitian diaspora occurred after the January 2010 earthquake in Haiti that killed more than 217,000 and displaced more than 1.5 million people.  Many migrated to Brazil, which offered employment opportunities, humanitarian protection, and support from large and growing Haitian diaspora communities.[46]  Others migrated to Chile, where Haitian nationals could, until 2020, enter visa-free.  As of 2020, there were an estimated 143,000 Haitians living in Brazil, and 180,000 in Chile.[47]  However, over the past two years declining economic conditions in Chile and Brazil, which were exacerbated by the COVID-19 pandemic, have led many Haitian migrants to leave those countries to head north.[48]

---

[41] *See* International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* July 27, 2022, https://www.crisisgroup.org latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists; Office of the High Commissioner for Human Rights, *Sexual violence in Port-au-Prince: A weapon used by gangs to instill fear,* Oct. 14, 2022, https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear. Doctors Without Borders, *Returning to Haiti means death,* Aug. 12, 2022, https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.

[42] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince,* May 17, 2022, https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.

[43] Pan American Health Organization, *Cholera Outbreak in Hispaniola Situation Report #6,* Nov. 17, 2022, https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.

[44] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html, (last viewed Dec. 17, 2022).

[45] Migration Policy Institute, *Haitian Migration through the Americas: A Decade in the Making,* Sept. 30, 2021, https://www.migrationpolicy.org/article/haitian-migration-through-americas; Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border (last visited Dec. 19, 2022).

[46] *Id.*

[47] Migration Policy Institute, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome,* May 2021, https://www.migrationportal.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/, (last visited Dec. 19, 2022).

[48] Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border, (last visited Dec. 19, 2022).

Haiti AR_000107

PRE-DECISIONAL/DELIBERATIVE

As noted above, UNHCR estimates that there are 62,680 Haitians in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[49]  Many thousands more are between Mexico and South America.

*Return Limitations*

While the Government of Haiti generally accepts repatriations, gang activity and conditions in the country have created significant instability, at times curtailing DHS's ability to repatriate Haitians, either by plane or maritime repatriations by sea.  For example, in early September 2022, destabilizing events, including gangs seizing control over a key fuel terminal, led to a pause in repatriation flights.  The International Organization for Migration (IOM), which provides required services for individuals returned to Haiti has had to curtail operations, and its ability to help receive migrants in Haiti is evaluated on a day-to-day basis.[50]  In recent weeks, the situation has improved slightly since a gang alliance released a blockade on the country's main fuel terminal,[51] and on December 13 ICE conducted a repatriation flight of 20 Haitians, the first such flight of FY 2023.  But the ability to conduct returns is tenuous, and not something that can be counted on at scale should large numbers of Haitian nationals once again start crossing our SWB.

The maritime environment is similarly impacted by the limitation on returns.  Even a temporary inability of DHS to repatriate Haitians interdicted at sea could have a cascading effect on U.S. Government resources.  U.S. Coast Guard (USCG) uses its vessels to conduct direct repatriations, yet these have limited capacity to hold migrants; they cannot continue to hold migrants for extended periods of time if repatriations are not possible.  In such a circumstance, DHS would be dependent on either third-country assistance or support, which would depend on unresolved diplomatic negotiations, or usage of Naval Station Guantanamo Bay, which would require tremendous fiscal, manpower, and logistical resources -- made all the more difficult by recent health crises facing Haitians like cholera and requirements surrounding COVID-19.  While there is also the option of bringing interdicted Haitians to the United States for processing, that move would upend decades of U.S. policy and risks triggering a dangerous maritime mass migration event.

4.  Impact on DHS Resources and Operations

*Impact on DHS Resources*

---

[49] UNHCR Global Focus, *Mexico*, See countries of origin data for 2022 and 2023, https://reporting.unhcr.org/mexico?year=2022.
[50] International Organization for Migration, *IOM Assists Over 10,800 Haitians Returned from the US, Mexico and Caribbean in Past Month* (Oct. 22, 2021). https://haiti.iom.int/news/iom-assists-over-10800-haitians-returned-us-mexico-and-caribbean-past-month; International Organization for Migration, *IOM condemns violence and looting of humanitarian supplies in Haiti* (Sept. 24, 2022). https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti.
[51] ABC News, *Key fuel depot in Haiti reopens for 1st time since September*, Nov. 8, 2022, https://abcnews.go.com/International/wireStory/key-fuel-depot-haiti-reopens-1st-time-september-92912341.

11

PRE-DECISIONAL/DELIBERATIVE

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Haitian nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program – Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[52]

*Impact on Border Operations*

The impact has been particularly acute in certain border sectors. In FY 2021, 81 percent of unique Haitians encountered occurred in the Del Rio sector.[53] In FY 2022, flows shifted disproportionately to the El Paso and Yuma sectors, which accounted for 82 percent of unique encounters in that year, while Del Rio fell to 13 percent.[54] All three sectors remain at risk of operating, or are currently operating, over capacity.[55] In FY 2022, El Paso and Yuma sector encounters increased by 161 percent, a seven-fold increase over the average for FY 2014 – FY 2019, in part as a result of the increases in Haitian nationals being encountered there.[56]

The focused increase in encounters within those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—up until the past two years—they have not been a focal point for large numbers of individuals entering irregularly, have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional

---

[52] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness*, Apr. 26, 2022, https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[53] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[54] *Id.*

[55] OIS analysis of data pulled from CBP UIP December 7, 2022.

[56] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

12

PRE-DECISIONAL/DELIBERATIVE

capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[57]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.

*Impact on DHS Maritime Operations*

In FY 2022, interdictions of Haitians surged to 4,025, compared to just 824 interdictions at sea in FY 2019.[58] While these numbers are significantly smaller than those encountered at the land border, they are high for the maritime environment where the safety risk is particularly acute.

Responding to this increase requires significant resources. In response to the persistent elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force – Southeast (HSTF—SE) elevated the operational phase of DHS's mass migration plan from Phase 1A (Preparation) to Phase 1B (Prevention).[59]

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF-SE's Unified Command staff and operational rhythm. Between July 2021 and December 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[60] USCG also added two MH-60 helicopters to respond to increased maritime migration flows in FY 2022.[61] USCG almost doubled its flight hour coverage per month to support migrant interdictions in FY 2022.[62] Increased resource demands translate into increased maintenance on those high demand air and sea assets, while diverting them from other mission-essential functions.

DHS assesses that a reduction in the flow of Haitian nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

**III. Overview and Discussion of Proposed Haitian Parole Process**

---

[57] Data from SBCC, as of December 11, 2022.
[58] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.
[59] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).
[60] *Id.*
[61] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.
[62] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).[63] 8 C.F.R. § 274a.12(c)(11).

13

Haiti AR_000110

Case 6:23-cv-00007   Document 19-26   Filed on 06/20/23 in TXSD   Page 14 of 35

PRE-DECISIONAL/DELIBERATIVE

Like the Venezuelan process, this proposed Haitian parole process would provide a streamlined way for individuals from Haiti who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and to seek a temporary period of parole for up to two years for significant public benefit and urgent humanitarian reasons, provided that they have a supporter in the United States, pass robust national security and public safety vetting, meet other specified criteria, and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's proposed design.

*Supporters*: U.S.-based supporters would initiate an application on behalf of a Haitian national and, if applicable, the national's immediate family members. Supporters could be individuals filing on their own, with other individuals, or on behalf of entities. They would be required to provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters would be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Haitian nationals would need to be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an interior POE and final U.S. destination; pass required screening and vetting; and comply with all additional requirements, including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the Centers for Disease Control and Prevention (CDC).

Haitian nationals would be ineligible for this process if they;
1) have been ordered removed from the United States within the prior five years;
2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;
3) have entered Mexico or Panama without authorization after the date of the announcement; or
4) are a permanent resident or dual national of any country or hold refugee status in any country other than Haiti, unless DHS operates a similar parole process for the country's nationals.

Unaccompanied children (i.e., children under 18 not traveling with a parent or legal guardian) would not be eligible for this process.

*Beneficiary vetting*: Potential beneficiaries would be required to submit biographic and biometric information—in the form of a live photograph—in advance of travel. This information would be used for vetting by the National Targeting Center (NTC) and to inform classified vetting support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

14

PRE-DECISIONAL/DELIBERATIVE

Upon arrival at a POE, DHS will collect additional biometrics—namely, an additional photograph and fingerprints. This biometric information would support additional vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted on a discretionary basis.

Beneficiaries also would be subject to continuous vetting throughout their period of parole. Parole could be terminated, and the noncitizen placed into removal proceedings, if derogatory information emerges during continuous vetting.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries would be able to access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting would receive an advance authorization to travel electronically, which would facilitate their ability to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries would be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the POE, parole generally would be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States would be required to leave prior to the expiration of their parole. Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States generally would be placed in removal proceedings. During this two-year period, the Department would continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly immigration processes, and increase removal options for Haitian nationals who are subject to a final order of removal.

*Employment Authorization and Public Benefits*: Parolees would be eligible to apply for employment authorization for the duration of the parole.[63] U.S. Citizenship and Immigration Services (USCIS) anticipates that it would be able to adjudicate the majority of such applications within a few weeks after the application is filed. They will therefore be in a better position to work and support themselves than the present situation where recent migrants from Haiti are processed into removal proceedings but can only apply for employment authorization in certain circumstances.[64]

Because of a combination of work authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or food banks,

---

[63] 8 C.F.R. § 274a.12(c)(11).
[64] *Id.*

15

PRE-DECISIONAL/DELIBERATIVE

than the population of Haitian nationals currently encountered crossing the SWB, thus minimizing—and ultimately reducing—the burden on the states.[65]

Further, Haitian nationals who are paroled into the United States are eligible for certain benefits, akin to those received by admitted refugees, under the HHS-administered Cuban-Haitian Entrant Program (CHEP).[66] Regardless of benefit eligibility, the proposed process would require parolees to have a supporter that would provide additional support, as needed. In addition, parolees would be eligible to seek employment authorization—an added benefit beyond what is provided for under CHEP. They will therefore be in a better position to work and support themselves than the present situation where recent migrants from Haiti are processed into immigration proceedings but generally are not immediately eligible to request employment authorization.[67] DHS believes that these factors should mitigate any additional burden on states that may result from the creation of this parole process and that any marginal cost is outweighed by the significant public benefits and urgent humanitarian reasons for paroling individuals on a case-by-case basis pursuant to such a process.

*Scope/Termination*: The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent parole Processes for Cubans, Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memorandum, once approved, would be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any

---

[65] *Id.* Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.*, 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

[66] *See* Refugee Education Assistance Act of 1980, Pub. L. No. 96-422 (8 U.S.C. § 1522 note); 8 C.F.R. § 212.5(h); 45 C.F.R. §§ 400.62, 401.2, 401.12.

[67] Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. See generally, e.g., 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

16

Haiti AR_000113

Case 6:23-cv-00007   Document 195-26   Filed on 06/20/23 in TXSD   Page 27 of 35

PRE-DECISIONAL/DELIBERATIVE

party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## IV. Justification for Haitian Parole Process

The Secretary of Homeland Security has, under section 212(d)(5)(A) of the INA, the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[68]  Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[69]  DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[70]  DHS may terminate parole in its discretion at any time.[71]  By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[72]

### 1. Significant Public Benefit

The proposed process, which would impose new consequences for Haitians who seek to enter the United States irregularly between POEs while providing an alternative opportunity for eligible Haitian nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States would serve a significant public benefit, for several, interrelated reasons.  Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhanced border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduced strain on DHS personnel and resources; (iv) minimized domestic impact of irregular migration from Haiti; (v) a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfillment of important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

*Enhanced border security by reducing irregular migration of Haitian nationals*

---

[68] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). DHS notes that Haitians paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[69] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).

[70] *See* 8 C.F.R. § 212.5(c).

[71] *See* 8 C.F.R. § 212.5(e).

[72] *See* 8 C.F.R. § 274a.12(c)(11).

17

Haiti AR_000114

Case 6:23-cv-00007   Document 195-26   Filed on 06/20/23 in TXSD   Page 23 of 35

PRE-DECISIONAL/DELIBERATIVE

As described above, in FY 2022, Haitian nationals made up a significant and growing number of those encountered seeking to cross, unauthorized, into the United States by land or who are intercepted after taking to the sea. While the number of Haitian encounters at our land border have decreased in recent months, they could quickly rise again due to the conditions in Haiti, the significant number of Haitians present in Mexico, and the increasing number of Haitians crossing into Panama from South America.

By incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, DHS assesses that the new parole process will mitigate anticipated future surges of Haitians seeking to cross into the United States without authorization, whether by land or by sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives to travel in a lawful and orderly manner can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's acceptance of Haitian nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be returned to Haiti or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Haitian nationals to Mexico will impose a consequence on irregular entry that may not exist should the security situation in Haiti continue to deteriorate to the extent that DHS cannot effectuate sufficient returns in a safe manner.

*Improved vetting for national security and public safety*

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before such individuals arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Haitian parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described above, the proposed vetting will require prospective beneficiaries to upload a live photograph via an app. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

*Reduced burden on DHS personnel and resources*

By mitigating an anticipated increase in encounters of Haitian nationals along the SWB as well as maritime interdictions, and channeling decreased flows of Haitian nationals to interior POEs,

18

Case 6:23-cv-00007 Document 195-26 Filed on 06/20/23 in TXSD Page 20 of 35

PRE-DECISIONAL/DELIBERATIVE

we anticipate the process will relieve some of the forecasted impact increased migratory flows could have on the DHS workforce, resources, and other missions.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Haitians who seek to enter the United States by sea, and will allow USCG, in particular, to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.[73]

For those who enter the United States at the SWB, allowing Haitians permitted to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal, and lessen the likelihood that DHS would face another mass migration event scenario similar to what happened in Del Rio in September 2021. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

*Minimize the domestic impact*

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Recent experience, including the Del Rio incident in August 2021, show that migratory surges can happen suddenly and quickly overwhelm U.S. government and partner resources. Given the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted. The proposed Haiti process directly mitigates against such a surge—and the impact it would have on State and local governments and civil society stakeholders—by providing a substantial incentive for Haitians to use a lawful process to fly directly to the United States, and a significant consequence for those who do not.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Haitian nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[74] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are

---

[73] PLCY Memorandum to File, Data on Maritime Migration (Dec. 22, 2022).

[74] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States,* Sept. 21, 2022, https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

19

PRE-DECISIONAL/DELIBERATIVE

quickly reaching capacity due to the high number of arrivals,[75] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[76]  As Haitian nationals are amongst those being conditionally released into communities after being processed along the SWB, this proposed parole process would address these concerns by diverting flows of Haitian nationals into an orderly and lawful process, in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process would help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB.  Beneficiaries would be required to fly to the interior, rather than arriving at the SWB.  They also would only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also would be eligible to apply for work authorization, thus enabling them to support themselves.

*Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks.*

The proposed process, which would incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks.

In FY 2022, more than 750 migrants died attempting to enter the United States,[77] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[78]  The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[79] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[80]  Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[81]  CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S.

---

[75] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[76] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

[77] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.

[80] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[81] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.

20

Haiti AR_000117

Case 6:23-cv-00007   Document 195-35   Filed on 06/20/23 in TXSD   Page 21 of 55

PRE-DECISIONAL/DELIBERATIVE

Border Patrol encounters.[82]  The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north.  These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[83] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow.  Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.  Tragically, a significant number of individuals perish along the way.  The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[84]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers.  Human smugglers and migrant populations continue to use unseaworthy, overly crowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human smuggling networks and migrants consider the attempts worth the risk.

The increase in migrants taking to sea, under dangerous conditions, has also led to devastating consequences.  In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration.  In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull.  USCG crews interviewed the survivor who indicated there were 34 others on the vessel who were not in the vicinity of the capsized vessel and survivor.[85]  The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[86]  In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became

---

[82] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[83] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[84] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2JP01R; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.

[85] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019

[86] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, https://apnews.com/article/florida-lost-at-sea-79253c1c65ef5708f19a97b6875ae239

21

Case 6:23-cv-00007   Document 195-36   Filed on 06/20/23 in TXSD   Page 22 of 35

PRE-DECISIONAL/DELIBERATIVE

disabled off of the Florida Keys.[87]  They pulled 18 Haitian migrants out of the sea after they
became trapped in ocean currents while trying to swim to shore.[88]

DHS anticipates this process would save lives and undermine the profits and operations of the
dangerous TCOs that put migrants lives at risk for profit because it would incentivize intending
migrants to use a safe and orderly means to access the United States via commercial air flights,
thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey.

*Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western
Hemisphere has been a top foreign policy priority for the Administration.  This is reflected in
three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration
in Central America (Root Causes Strategy);[89] the Collaborative Migration Management Strategy
(CMMS);[90] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration),
which was endorsed in June 2022 by 21 countries.[91]  The CMMS and the L.A. Declaration call
for a collaborative and regional approach to migration, wherein countries in the hemisphere
commit to implementing programs and processes to stabilize communities hosting migrants or
those of high outward-migration; humanely enforce existing laws regarding movements across
international boundaries, especially when minors are involved; take actions to stop migrant
smuggling by targeting the criminals involved in these activities; and provide increased regular
pathways and protections for migrants residing in or transiting through the 21 countries.[92]  The
L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular
pathways for migrants and refugees."[93]

In June 2022, the U.S. Government announced the planned resumption of operations under the
HFRP program.[94]  Approved HFRP beneficiaries enter the United States as parolees but are

---

[87] Ashley Cox, CBS News CW44 Tampa, More than 180 people rescued from overloaded vessel in Florida Keys,
Nov. 22, 2022, https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-
florida-keys/

[88] *Id.*

[89] National Security Council, *Root Causes of Migration in Central America* (July 2021),
https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[90] National Security Council, *Collaborative Migration Management Strategy* (July 2021),
https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-
Strategy.pdf?utm_medium=email&utm_source=govdelivery.

[91] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022)
https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-
and-protection/.

[92] *Id.*

[93] *Id.*

[94] White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and
Foreign Partner Deliverables (June 2022) https://www.whitehouse.gov/briefing-room/statements-
releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-
foreign-partner-deliverables/.

22

Case 6:23-cv-00007   Document 175-25   Filed on 06/20/23 in TXSD   Page 23 of 35

PRE-DECISIONAL/DELIBERATIVE

eligible to apply for lawful permanent residence (LPR) status once their immigrant visas become available. However, the security situation in Haiti makes it virtually impossible to resume the program in a timely manner and with enough resources to process meaningful numbers of beneficiaries. Furthermore, the Department of State has noted its reduced presence in Haiti due to the security situation, hampering its ability to process parents, spouses, and children of U.S. citizens and lawful permanent residents for more than 20,000 beneficiaries with immigrant visas currently available.

While HFRP and other efforts represent important progress for certain Haitians who are the beneficiaries of family-based immigrant petitions, HFRP's narrow eligibility, coupled with the operational challenges posed by the security situation and Department of State's limited family-based visa processing, result in modest processing throughput and mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process would help achieve these goals by providing an immediate, temporary, and orderly process for Haitian nationals to lawfully enter the United States while we work to improve conditions in Haiti and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus would provide the United States another avenue to lead by example.

The process also would respond to an acute foreign policy need complementary to regional efforts. Many countries in the region are affected by the surge in migration of Haitian nationals, and some are eagerly seeking greater United States action to address these challenging flows. The Dominican Republic, which shares a border with Haiti, hosts thousands of Haitian migrants. Brazil and Chile, which had provided Haitians a legal pathway allowing them to reside there, saw Haitians leaving in very high numbers as a result of declining economic conditions, which were only exacerbated by the COVID-19 pandemic.[95] Peru, Ecuador, and Colombia have observed Haitian migrants who had been residing in South America for some time transiting their countries in order to reach the SWB. Panama has been particularly hard-hit by these migratory flows given its geographic location; additionally, the Darién Gap serves as a bottleneck and also creates a humanitarian challenge for the country as it seeks to provide shelter, medical care, food, and other services to migrants exiting the jungle.[96]

Along with the Venezuelan process, this new process would add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It would also strengthen the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, as part of a regional response—many of which are already taking important

---

[95] Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border, (last visited Dec. 19, 2022).
[96] Reuters, *Thousands of mostly Haitian Migrants Traverse Panama on Way to United States*, Sept. 26, 2021, https://www.reuters.com/world/americas/thousands-mostly-haitian-migrants-traverse-panama-way-united-states-2021-09-26/, (last viewed Dec. 19, 2021).

23

Haiti AR_000120

Case 6:23-cv-00007   Document 195-36   Filed on 06/20/23 in TXSD   Page 24 of 35

PRE-DECISIONAL/DELIBERATIVE

steps. Any effort to meaningfully address the crisis in Haiti would require continued efforts by these and other regional partners.

Importantly, the United States would not implement the new parole process without the ability to remove or return to Mexico Haitian nationals who attempt to enter the United States irregularly across the SWB. The United States' ability to execute this process thus would be contingent on the GOM's willingness to accept the return of Haitian nationals who bypass this new process and attempt to enter the United States irregularly between POEs.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—would require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this proposed process would be responsive to the GOM's request that the United States increase lawful pathways for migrants and would also be aligned with broader Administration domestic and foreign policy priorities in the Region. It would couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process would be to reduce the irregular migration of Haitian nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

2. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this proposed process also would address the urgent humanitarian needs of many Haitian nationals. As described above, escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti.[97] This process provides a safe mechanism for Haitian nationals who seek to enter the United States for urgent humanitarian reasons, without having to make a dangerous journey by land or sea.

**V. Consideration of process elements**

1. Length of parole and employment authorization

---

[97] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12182.

24

Case 6:23-cv-00007   Document 175-25   Filed on 06/20/23 in TXSD   Page 35 of 53

PRE-DECISIONAL/DELIBERATIVE

The proposed length of parole is up to two years. This is consistent with other parole processes, such as the process for Venezuelan nationals and Uniting for Ukraine (U4U) for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the Haitian Family Reunification Parole Program established in 2007. A two-year period of parole would enable a realization of the significant public benefits and meets the urgent humanitarian reasons that Haitian nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole would need to be sufficiently long to make it an attractive alternative to the status quo, where migrants put their lives in smugglers' hands to enter the country irregularly. DHS believes that a period of two years would achieve that goal. It would allow beneficiaries to gain work authorization, contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole would provide eligible beneficiaries sufficient time to pursue a durable immigration status or benefit if eligible under the law. Beneficiaries may qualify for asylum; others may qualify for adjustment of status based on the immediate availability of a family- or employment-based immigrant visa.

*Third*, a two-year period would provide a window for the U.S. Government and international partners to work with the Government of Haiti to stabilize conditions in that country, and further provide an opportunity for the U.S. Government to work with the Government of Haiti to increasingly accept the return of Haitian nationals who are subject to a final order of removal. Finally, this two-year period would provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other lawful immigration pathways, both to the United States and to other partner nations.

2.   Supporter Vetting

After DHS learned of certain instances in which U4U supporters, including family members, ceased providing housing and other support for parolees prior to the end of their parole period, DHS made form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation. This was intended to further reduce the risk that supporters do not follow through on their obligations; it was also intended to address risks of human trafficking, and other forms of abuse.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[98] While such risks cannot be completely mitigated, this parole process is structured to address these risks to the greatest extent possible. The process—with the

---

[98] Department of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.

Haiti AR_000122

PRE-DECISIONAL/DELIBERATIVE

reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB. As described above, all migrants, but particularly women and children, are susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[99]  A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations. Almost all, if not all, migrants are required to pay compulsory fees and taxes by criminal organizations at different points along their journey north.[100]  We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, would meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3. Eligibility Criteria

*Exception for One-Time Voluntary Departure or Withdrawal of an Application for Admission*

Individuals encountered entering the United States irregularly between POEs may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility to seek parole via the Haiti parole process.  This exception provides an incentive for migrants, who would otherwise be ineligible for this process, to accept the option to voluntarily leave the United States, and thus, reduce strain on limited DHS personnel and resources associated with obtaining and later executing an order of removal.

*Consideration of Beneficiaries with Particular Vulnerabilities or other Compelling Circumstances*

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have particular vulnerabilities or other compelling circumstances. We have ultimately concluded that such a requirement is not preferable for a combination of operational and policy reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism.  For instance, any such vulnerability screening would require a process for triaging potential beneficiaries and identifying those who are more vulnerable.  To be effective, it would require third parties—likely international NGOs—to play a role in the screening.  However, DHS lacks authority to fund such screening outside the United States.  Such a screening requirement also would substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

---

[99] *Id.* at 386.

[100] Homeland Security Operational Analysis Center operated by the RAND Corporation, 2019, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?.* https://www.rand.org/pubs/research_reports/RR2852.html, (last visited Dec. 20, 2022).

26

PRE-DECISIONAL/DELIBERATIVE

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Haitian nationals who would otherwise make the dangerous journey to the U.S. border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration that this process seeks to achieve.

For these programmatic reasons, DHS determined that keeping eligibility at the nationality level—like U4U and the Venezuela process—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Haitian nationals. DHS similarly rejected this consideration in weighing the scope of the process for Venezuelans.

**VI. Consideration of alternative approaches**

DHS has considered several alternative approaches to the proposed parole process coupled with an enforcement mechanism to manage the current surge in migration from Haitian nationals. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

   1. Status quo

DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB, driven in part by Haitian nationals. DHS has seen similarly high rates of Haitians interdicted at sea in the Caribbean. Importantly, DHS anticipates that encounters of Haitian nationals at the border are likely to increase in the coming weeks and months.

Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and temporary duty staffing to support SWB and maritime operations is simply not sustainable in the long term. For these reasons, DHS has concluded that maintaining the status quo is not an option.

   2. Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. We continue to engage in such efforts. That said, partner countries already extended themselves in historic ways with limited results. The bottom line is that our foreign partners in the region have

27

Haiti AR_000124

Case 6:23-cv-00007   Document 175-26   Filed on 06/20/23 in TXSD   Page 328 of 525

PRE-DECISIONAL/DELIBERATIVE

seen record movements of migrants that far outstrip their capacity to process and provide protection, and they simply do not have the capability to meaningfully impact these flows in the immediate term, as is needed.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process in the time that is needed.

3. Increasing removals to Haiti

DHS data show that increases in returns of individuals from a given country can reduce encounters at the border over time.[101]  For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico during specific periods of time over the past year have led to a sustained decrease in encounters of migrants from those countries at the border.

While DHS has recently and successfully conducted a first removal flight of FY 2023, increased gang activity and other security challenges jeopardize airport, seaport, and supporting operations in Haiti, leaving this return option somewhat unpredictable.  Our on-the-ground partners face logistical and capacity limitations, as well as security risks, that constrain their ability to reliably support receiving returned Haitians in a safe and humane way.  At the present time, DHS cannot rely on a regular removal cadence or sufficient support for a large number of removals— something that would quickly become apparent in the event of another surge in Haitian migration.

Because of these factors, the ability of the U.S. Government to return individuals without a lawful basis to stay—while a critical piece of what is contemplated—is volatile. Other options must also be considered to ensure that DHS has the capacity to safely and humanely effectuate removals of Haitian migrants encountered at the border who do not establish a lawful basis to remain in the United States.

4. Utilizing contiguous territory return authority

DHS considered whether returning Haitian nationals to Mexico under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C), either through the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. As this policy was being finalized, a district court stayed your October 29, 2021 memorandum terminating MPP. *See* Dkt. 178, *Texas v. Biden,* No. 21-cv-67 (N.D. Tex. Dec. 15, 2022).  For two reasons, we have decided that proceeding with the proposed process is preferable to attempting to manage the current surge in migration by relying on the programmatic use of the contiguous territory return authority at this time and for this population.

---

[101] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, the U.S. Customs and Border Protection Commissioner, and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

28

Case 6:23-cv-00007   Document 175-25   Filed on 06/20/23 in TXSD   Page 29 of 35

PRE-DECISIONAL/DELIBERATIVE

*First*, the resources and infrastructure necessary to use contiguous return authority at the scale that would be required given current—and anticipated—flows are not currently available. To employ the contiguous return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings. This would require, among other things, the construction of substantial additional court capacity along the border. It would also require the reassignment of immigration judges and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are coming into and out of the country to attend hearings.

*Second*, programmatic implementation of the contiguous territory return authority requires Mexico's concurrence and support. When DHS was previously under an injunction requiring it to re-implement MPP, the GOM would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints. Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration we are seeing today. The GOM announced the end of the court-ordered reimplementation of MPP on October 25, 2022.[102] Any potential re-starting of returns under MPP or another programmatic use of the contiguous-territory return authority would require the GOM to make a new independent decision to accept noncitizens that would be returned under this authority.

DHS is, however, continuing to evaluate the recent district court decision and considering the effect of the court's stay and other relevant developments on the use of contiguous territory return authority going forward.

5. <u>Increasing the use of detention for Haitian nationals</u>

DHS considered whether it could detain all or most Haitian nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result. There are, however, legal and operational limits in the ability to do so.

*First*, there are legal limits on the duration of detention for those ordered removed and who—like the Haitian nationals—do not have a significant likelihood of removal in the foreseeable future. Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from detaining individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[103]

---

[102] Government of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU*, Oct. 25, 2022, https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu, (last visited Dec. 19, 2022).
[103] *Zadvydas v. Davis*, 533 U.S. 678 (2001).

29

Haiti AR_000126

PRE-DECISIONAL/DELIBERATIVE

*Second*, it is not a viable option operationally. If ICE diverted all of its detention space to focus on Haitian nationals, it would no longer have space to detain those put in expedited removal who *could* be more readily removed to their home countries than a high volume of Haitians at this time. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Haitian nationals is not a viable option at this time.

6.  Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. For Haitians in particular, the U.S. Government also committed to increasing immigrant visa adjudication and restarting the HFRP program.[104] DHS and interagency partners will continue these efforts and more. However, those alternative processes are narrow and require, in many cases, multiple steps and in-person engagement or referrals that are difficult for many individuals to access. Furthermore, these alternative processes are particularly difficult to implement given the security situation in Haiti that has hampered both the resumption of HFRP and the Department of State's ability to process thousands of eligible family members of U.S. citizens and lawful permanent residents for immigrant visas in Haiti.

A key feature of this proposed process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully virtual and accessible from anywhere. We thus assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Haiti today—and that regional efforts to improve lawful pathways, while critically important, will not be sufficiently timely to address the immediate needs. We thus assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

**VII. Administrative Procedure Act**

This proposal would be exempt from notice-and-comment rulemaking requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First*, the Department would merely be adopting a general statement of policy,[105] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the

---

[104] The White House, *Fact Sheet: The Los Angeles Declaration* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.
[105] 5 U.S.C. § 553(b)(A).

30

Haiti AR_000127

PRE-DECISIONAL/DELIBERATIVE

agency proposes to exercise a discretionary power."[106]  As section 212(d)(5)(A) of the INA, 8
U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland
Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be
subject to requirements for notice-and-comment rulemaking and a delayed effective date, the
process would be exempt from such requirements because it involves a foreign affairs function
of the United States.[107]  Courts have held that this exemption applies when the rule in question
"is clearly and directly involved in a foreign affairs function."[108]  In addition, although the text of
the Administrative Procedure Act does not expressly require an agency invoking this exemption
to show that such procedures may result in "definitely undesirable international consequences,"
some courts have required such a showing.[109]  This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—
including the GOM—to provide a lawful process for Haitian nationals to enter the United States.
The United States would not implement the new parole process without the ability to return
Haitian nationals who attempt to enter irregularly across the SWB to Mexico, and the United
States' ability to execute this process thus requires the GOM's willingness to accept into Mexico
those who bypass this new process and attempt to enter the United States irregularly between
POEs.  Thus, initiating and managing this process would require careful, deliberate, and regular
assessment of the GOM's responses to U.S. action in this regard and ongoing, sensitive
diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine
the foreign policy imperative to act now.  It also would complicate broader discussions and
negotiations about migration management.  For now, the GOM has indicated it is prepared to
make an independent decision to accept a substantial number of Haitian returns or removals.
That willingness to accept the returns or removals could be impacted by the delay associated
with a public rulemaking process involving advance notice and comment and a delayed effective
date.  Additionally, making it publicly known that we plan to return or remove nationals of Haiti
to Mexico at a future date would likely result in a surge in migration, as migrants rush to the
border to enter before the rule becomes final—which would adversely impact each country's
border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of the GOM and key foreign
partners—and necessary for addressing migration issues requiring coordination between two or
more governments—it is also fully aligned with larger and important foreign policy objectives of
this Administration and fits within a web of carefully negotiated actions by multiple
governments (for instance in the L.A. Declaration).  It is the view of the United States that the

---

[106] *See Lincoln v. Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 n.31
(1979)).
[107] 5 U.S.C. § 553(a)(1).
[108] *Mast Indus. v. Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).
[109] *See, e.g., Rajah v. Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

Haiti AR_000128

Case 6:23-cv-00007   Document 175-26   Filed on 06/24/23 in TXSD   Page 32 of 35

PRE-DECISIONAL/DELIBERATIVE

implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[110] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[111]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be contrary to the public interest and impracticable. The number of Haitians encountered at the SWB are already high, and the Office of Immigration Statistics estimates border encounters will continue to rise, and potentially rise dramatically, should the Title 42 public health order be lifted. A delay would exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[112]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[113] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[114] If, for example, advance notice of a coming price increase

---

[110] *See* 82 Fed. Reg. 4902 (Jan. 17, 2017).

[111] *See* 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[112] *See Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[113] *See* 5 U.S.C. § 553(b)(B).

[114] *See, e.g., Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94-95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze deadline." (cleaned up)).

32

Case 6:23-cv-00007   Document 195-25   Filed on 06/20/23 in TXSD   Page 38 of 535

PRE-DECISIONAL/DELIBERATIVE

would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[115]  A number of cases follow this logic in the context of economic regulation.

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges.  It is well-established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.  For example, as detailed above, implementation of parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans.  Had the parole process been announced prior to a lengthy notice and comment period, it likely would have had the opposite effect, resulting in many hundreds and thousands of Venezuelan nationals attempting to cross the border before the program went into effect.  Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have at times been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States.  And it is well-established that such persons may change their behavior in response to perceived imminent changes in U.S. immigration policy.[116]  Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers.  In total, inaction unduly impedes DHS's ability to fulfill its critical and varied missions.  At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area.  For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[117]  DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant

---

[115] *See, e.g., Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[116] Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media, July 26, 2022, (last viewed Dec. 6, 2022).

[117] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

33

Haiti AR_000130

Case 6:23-cv-00007   Document 175-25   Filed on 06/20/23 in TXSD   Page 34 of 55

PRE-DECISIONAL/DELIBERATIVE

change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[118]  DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities.  A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[119]  DHS concluded that "a surge could result in significant loss of human life."[120]

---

[118] *Id.*

[119] *Id.*

[120] *Id.*; *accord, e.g.*, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

34

Haiti AR_000131

**Recommendation**

Given the immediate challenge we face along the SWB and at sea as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Haitian nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ prove/date_____

DEC 2 2 2022

Modify/date _____ Needs discussion/date_____

35

Haiti AR_000132

**DEFENDANT'S EXHIBIT**

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 072

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' TAB 72, ECF 175-7

PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
Washington, DC 20528

December 22, 2022

**ACTION**

**MEMORANDUM FOR THE SECRETARY**

FROM:          Robert Silvers
               Under Secretary
               Office of Strategy, Policy, and Plans

     ROBERT P SILVERS  Digitally signed by ROBERT P SILVERS Date: 2022.12.22 18:03:06 -05'00'

               Troy Miller
               Acting Commissioner
               U.S. Customs and Border Protection

     TROY A MILLER  Digitally signed by TROY A MILLER Date: 2022.12.22 19:36:20 -05'00'

               Ur M. Jaddou
               Director
               U.S. Citizenship and Immigration Services

     UR M JADDOU  Digitally signed by UR M JADDOU Date: 2022.12.22 18:37:08 -05'00'

SUBJECT:       **Parole Process for Certain Nicaraguan Nationals**

**I. Summary**

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.  This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and on creating safe, orderly, and humane processes for migrants seeking protection throughout the region.  This includes domestic efforts to expand processing capacity and multinational collaboration to prosecute migrant smuggling and human trafficking criminal organizations as well as their facilitators and money laundering networks.  While this strategy shows great promise, it will take time to fully implement.  In the interim, we need to take immediate steps to provide safe, orderly pathways for the large numbers of individuals seeking to access the United States, and to disincentivize such individuals from taking the dangerous journey to and arriving, without authorization, at the southwest border (SWB).

Building on the success of the migration enforcement process for Venezuelans, DHS is proposing to implement a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained the Department's ability to respond to this surge.

> **EXHIBIT
> 6**

Nicaragua AR_000127

PRE-DECISIONAL/DELIBERATIVE

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[1] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make a dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] It also has led to a precipitous decline in Venezuelan irregular migration throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October to just 668 in November.[3]

DHS anticipates that implementing a similar process for Nicaraguans would reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB, by coupling a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans will be contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to irregularly enter the United States between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States would be required to initiate the application, apply on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are immediate family members of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals would be required to meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Individuals would be ineligible if they:

1) have been ordered removed from the United States within the prior five years;

---

[1] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).
[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES-%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

2

PRE-DECISIONAL/DELIBERATIVE

2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: such individuals may be permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;

3) have entered Mexico or Panama without authorization after the date of the announcement; or

4) are a permanent resident or dual national of any country or hold refugee status in any country other than Nicaragua, unless DHS operates a similar parole process for the country's nationals.

Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel to seek entry at an interior port of entry.

A grant of parole under this process would be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and to allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally would be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process would provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations by the Ortega regime. Most significantly, DHS anticipates this process would: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole

3

Case 6:23-cv-00007   Document 94-27   Filed on 06/20/23 in TXSD   Page 38 of 32

PRE-DECISIONAL/DELIBERATIVE

Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memo describes the current conditions at the border; the measurable impact of the process for Venezuelans; the parameters of the proposed process for Nicaraguans, including eligibility criteria and vetting mechanisms, and the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends approval of the policy and policy rationale identified in this memo.

**II. Background and Rationale**

   1.  <u>Impact of Venezuela Process</u>

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[4] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[5] Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[6]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and

---

[4] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[5] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[6] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

4

PRE-DECISIONAL/DELIBERATIVE

Panama, as well as civil society.[7]  Other migrants who were about to enter the Darién Gap turned around and headed back south.[8]  And still others who were intending to migrate north are staying where they were to apply for this parole process.[9]  Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change of migratory flows.

2.  Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered.  Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[10]  By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[11]  However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.[12]

Shifts in demographics have also had a significant effect on migration flows.  Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[13]  Beginning in the 2010s, a growing share of migrants have come from Northern Central America[14] (NCA) and, since the late 2010s, from countries throughout the Americas.[15]  Migrant populations from these newer source countries have

---

[7] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama*, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, Nov. 9 2022 (last viewed Dec. 8, 2022).
[8] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, Oct. 14, 2022 (last viewed Dec. 8, 2022).
[9] Axios, *Biden's new border policy throws Venezuelan migrants into limbo*, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap, Nov. 7 2022 (last viewed Dec. 8, 2022).
[10] OIS analysis of historic CBP data.
[11] *Id.*
[12] *Id.*
[13] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518-536.
[14] Northern Central America refers to El Salvador, Guatemala, and Honduras.
[15] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3

5

PRE-DECISIONAL/DELIBERATIVE

included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[16]

*Trends in Migration of Nicaraguans*

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the U.S. Southwest Border.[17]  Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system, and causing many asylum seekers to wait years for an initial interview.[18]  According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[19]  According to international organization estimates, Costa Rica is home to an estimated 500,000 – 600,000 Nicaraguan migrants, while Costa Rican officials estimate the number is over 1 million.[20]  The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica.  As a result, the U.S. and Mexico are seeing surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate this year than the previous year and with a surge in

---

percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014 – FY 2019, the last full year before the start of the COVID-19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010 – FY 2013, and for 10 percent of total encounters in FY 2014 – FY 2019.

[16] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[17] AP News, *Fleeing Nicaraguans Strain Costa Rica's Asylum System,* Sept. 2, 2022, https://apnews.com/article/covid-health-elections-presidential-caribbean-5204478d15dbbb6ca706c66cc7459a5, (last viewed Dec. 17, 2022).

[18] *Id.*

[19] UNHCR, *'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system*, March 25, 2022, https://news.un.org/en/story/2022/03/1114792, (last viewed December 9, 2022).

[20] The Department of State Cable, 22 San Jose 4796.

[21] Reuters, *Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants*, Aug. 10, 2022, https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/, (last viewed Dec. 4, 2022).

Nicaragua AR_000132

Case 6:23-cv-00007   Document 94527   Filed on 06/20/23 in TXSD   Page 41 of 32

PRE-DECISIONAL/DELIBERATIVE

migration having significantly contribute to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300, and increased further—and sharply—in FY 2022.[23] DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which comprised nine percent of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014—2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of this year, DHS has encountered 51,000 Nicaraguan nationals at the border—nearly one third of the record total of Nicaraguan encounters in FY 2022.[27]

### 3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the U.S. – at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

*Factors pushing migration from Nicaragua*

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have

---

[22] UNHCR, *Number of displaced Nicaraguans in Costa Rica doubles in less than a year*, Mar. 25, 2022, https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html, (last viewed Dec. 7, 2022).
[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.
[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.
[25] *Id.*
[26] *Id.*
[27] *Id.*, and OIS analysis of UIP CBP data pulled on November 28, 2022.
[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the US*, July 29, 2021, https://www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.

7

PRE-DECISIONAL/DELIBERATIVE

deteriorated there due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that "Since taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary."[31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive "has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms . . . supported by the other branches of government."[32] The IACHR reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua,"[33] and that as of late September, "more than 2000 organizations of civil society – linked to political parties, academic, and religious spaces – have been cancelled" since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists."[35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to

---

[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections*, Nov. 8, 2022, https://www.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections.

[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President*, Nov. 3, 2021, https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua*, 2, (Sep. 2, 2022, https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.

[32] Inter-American Commission On Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law*, OEA/Ser.L/V/II, Doc. 288, 65, Oct. 25, 2021, https://www.oas.org/en/iachr/reports/pdfs/2021_nicaragua-en.pdf.

[33] Inter-American Commission on Human Rights (IACHR), *Annual Report 2021*, Chapter IV.B – Nicaragua, 775, Jun. 2, 2022, https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.

[34] IACHR, *In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms*, Sep. 28, 2022, https://www.oas.org/en/iachr/expression/showarticle.asp?lID=1&artID=1257

[35] Human Rights Watch, *Nicaragua: Government Dismantles Civil Society*, Jul. 19, 2022, https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.

[36] IACHR, *Annual Report 2021*, Chapter IV.B – Nicaragua, 775 (Jun. 2, 2022), https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.

8

Nicaragua AR_000134

PRE-DECISIONAL/DELIBERATIVE

flee Nicaragua and to request international protection in the context of the ongoing serious
human rights crisis in the country."[37]  In August 2022, Ortega had a bishop, five priests, and two
seminarians arrested, claiming that the bishop "persisted in destabilizing and provocative
activities."[38]  Prior to the November 2022 municipalities election, the government closed 200
nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America.
According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was
only $2,090.80, the second lowest in the region above Haiti.[40]  According to the World Food
Program, almost 30 percent of Nicaraguan families live in poverty in the country, "over 8
percent struggle in extreme poverty, surviving on less than $1.25 daily", and "17 percent of
children aged under five suffer from chronic malnutrition.[41]  Migrants often seek economic
opportunities to be able to support their families that remain in Nicaragua.  Remittances from the
United States to Nicaragua from January—September 2022 have surpassed the total remittances
sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international
protection worldwide.[43]  More than 100,000 filed asylum applications in 2021; this is a five-fold
increase from 2020.[44]  Daniel Ortega's repressive policies, coupled with widespread poverty,
have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere,
including increasingly in the United States.

Human smugglers often target vulnerable populations who face the types of circumstances that
Nicaraguans face, such as repression and lack of economic opportunity.  Smugglers' increasingly
sophisticated use of social media increases their ability to reach vulnerable migrants, advertise
services, and fuel misinformation designed to encourage migrants to take a dangerous journey

---

[37] IACHR, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to
Flee from Nicaragua*, Dec. 20, 2021,
http://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/346.asp.
[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent*, Aug. 19, 2022,
https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/.
[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua*, Nov. 8, 2022,
https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.
[40] The World Bank, *GDP per Capita (Current US$) – Latin America & Caribbean, Nicaragua*,
https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false (last
visited Dec. 6, 2022).
[41] World Food Programme, *Nicaragua*, https://www.wfp.org/countries/nicaragua (last visited: Sept. 26, 2022)
[42] Banco Central De Nicaragua, *Remesas Por País de Origen*,
https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm. (last visited Dec. 6, 2022).
[43] UNHCR USA, *Displacement in Central America*, https://www.unhcr.org/en-us/displacement-in-central-
america.html.
[44] UNHCR, *2021 Global Trends Report*, June 16, 2022, https://www.unhcr.org/62a9d1494/global-trends-report-
2021.

9

PRE-DECISIONAL/DELIBERATIVE

north.[45]  The U.S. economy's historic recovery from the pandemic[46] and strong labor market provide additional incentive to migrate.[47]  Interviews with migrants encountered along the SWB indicate that economic opportunity, violence, and perceptions of U.S. policy underscored the decision to leave their home.[48]

*Return Limitations*

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the U.S. to effectively manage the number of encounters of Nicaraguans by the United States.  Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[49]  Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals.

For the United States, the Government of Nicaragua permits one charter removal flight every other week of up to 135 individuals per flight, which allows DHS to remove a small fraction of the Nicaraguan migrants it currently encounters and who do not have a legal basis to remain in the United States.  In FY 2022, DHS repatriated 12 Nicaraguans encountered at the SWB, and expelled 4,148 (a total of 4,160) Nicaraguans encountered at the SWB.[50]  This is equivalent to 3 percent of Nicaraguan encounters during the same period.[51]  DHS, in coordination with the Department of State, has repeatedly engaged with the Government of Nicaragua to increase the permitted cadence of flights but has so far not been successful.

Returns alone, however, are not sufficient.  The proposed process seeks to *combine* a consequence for Nicaraguan nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to and seek parole into enter the United States, without making the dangerous journey to the border.

4.  Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—

---

[45] (U/SBU) DHS Office of Intelligence and Analysis, *Human Smuggler Using Social Media to Broaden Access to Illicit Pathways in the United States*, June 6, 2022.
[46] U.S. Department of the Treasury, *The U.S. Economic Recovery in International Context*, June 8, 2022, https://home.treasury.gov/news/featured-stories/the-us-economic-recovery-in-international-context.
[47] CNN Business, *US economy added a robust 263,000 jobs in November*, Dec. 2, 2022, https://www.cnn.com/2022/12/02/economy/november-jobs-report/index.html.
[48] (U/LES) DHS Migration Indications and Warning Cell Update Dec. 14, 2022.
[49] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.
[50] OIS analysis of CBP subject-level data through October 31, 2022.
[51] OIS analysis of OIS Persist Dataset and CBP subject-level data based on data through October 31, 2022.

10

PRE-DECISIONAL/DELIBERATIVE

DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program – Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[52]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity.[53] In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[54] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[55] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014—FY 2019.[56]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB

---

[52] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.

[53] OIS analysis of data pulled from CBP UIP December 7, 2022.

[54] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[55] *Id.*, and CBP UIP data for November 1–27 pulled on November 28, 2022.

[56] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

11

PRE-DECISIONAL/DELIBERATIVE

operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[57]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to remove Nicaraguans and other populations by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

**III. Overview and Discussion of Proposed Nicaraguan Parole Process**

Like the Venezuelan process, this proposed Nicaraguan parole process would provide a streamlined way for individuals from Nicaragua who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and to seek a temporary period of parole for up to two years for significant public benefit and urgent humanitarian reasons, provided that they have a supporter in the United States, pass robust national security and public safety vetting, meet other specified criteria, and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's proposed design.

*Supporters*: U.S.-based supporters would initiate an application on behalf of a Nicaraguan national and, if applicable, the national's immediate family members. Supporters could be individuals filing on their own, with other individuals, or on behalf of entities. They would be required to provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters would be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Nicaraguan nationals would need to be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an interior POE and final U.S. destination; pass required screening and vetting; and comply with all additional requirements, including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the Centers for Disease Control and Prevention (CDC).

Nicaraguan nationals would be ineligible for this process if they;
    1) have been ordered removed from the United States within the prior five years;

---

[57] Data from SBCC, as of December 11, 2022.

12

PRE-DECISIONAL/DELIBERATIVE

2) have crossed into the United States between POEs along the SWB after the date of the announcement, with the following exception: individuals may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility;

3) have entered Mexico or Panama without authorization after the date of the announcement; or

4) are a permanent resident or dual national of any country or hold refugee status in any country other than Nicaragua, unless DHS operates a similar parole process for the country's nationals.

Unaccompanied children (i.e., children under 18 not traveling with a parent or legal guardian) would not be eligible for this process.

*Beneficiary vetting*: Potential beneficiaries would be required to submit biographic and biometric information—in the form of a live photograph—in advance of travel. This information would be used for vetting by the National Targeting Center (NTC) and to inform classified vetting support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect additional biometrics—namely, an additional photograph and fingerprints. This biometric information would support additional vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted on a discretionary basis.

Beneficiaries also would be subject to continuous vetting throughout their period of parole. Parole could be terminated, and the noncitizen placed into removal proceedings, if derogatory information emerges during continuous vetting.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries would be able to access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting would receive an advance authorization to travel electronically, which would facilitate their ability to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries would be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the POE, parole generally would be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States would be required to leave prior to the expiration of their parole. Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States generally would be placed in removal proceedings. During this two-year period, the Department would continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly

13

PRE-DECISIONAL/DELIBERATIVE

immigration processes, and increase removal options for Nicaraguan nationals who are subject to a final order of removal.

*Employment Authorization and Public Benefits*: Parolees would be eligible to apply for employment authorization for the duration of the parole.[58] U.S. Citizenship and Immigration Services (USCIS) anticipates that it would be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of work authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or food banks, than the population of Nicaraguan nationals currently encountered crossing the SWB, thus minimizing—and ultimately reducing—the burden on the states.[59]

*Scope/Termination*: The Secretary would retain the sole discretion to terminate the process at any point. The number of travel authorizations granted under this process would be spread across this process and the separate and independent parole Processes for Cubans, Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate memoranda that we have submitted to you today), and would not exceed 30,000 each month. Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

This memorandum, once approved, would be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

### IV. Justification for Nicaraguan Parole Process

The Secretary of Homeland Security has, under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-

---

[58] 8 C.F.R. § 274a.12(c)(11).

[59] *Id.* Noncitizens paroled for a period of one year or more are considered "qualified aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.,* 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. REAL ID Act of 2005, Pub. L. 109-13, Div. B, section 202(c)(2)(B), (d)(11), 119 Stat. 313, 315 (49 U.S.C. 30301 note).

14

Case 6:23-cv-00007   Document 195-7   Filed on 06/20/23 in TXSD   Page 45 of 202

PRE-DECISIONAL/DELIBERATIVE

case basis for urgent humanitarian reasons or significant public benefit."[60]  Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[61]  DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[62]  DHS may terminate parole in its discretion at any time.[63]  By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[64]

   1.  Significant Public Benefit

The proposed process, which would impose new consequences for Nicaraguans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States would serve a significant public benefit, for several, interrelated reasons.  Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhanced border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improved vetting for national security and public safety; (iii) reduced strain on DHS personnel and resources; (iv) minimized domestic impact of irregular migration from Nicaragua; (v) a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfillment of important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

*Enhanced border security by reducing irregular migration of Nicaraguan nationals*

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly.  DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB.  This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns

---

[60] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").
[61] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).
[62] *See* 8 C.F.R. § 212.5(c).
[63] *See* 8 C.F.R. § 212.5(e).
[64] *See* 8 C.F.R. § 274a.12(c)(11).

15

Case 6:23-cv-00007   Document 195-3   Filed on 06/20/23 in TXSD   Page 16 of 32

PRE-DECISIONAL/DELIBERATIVE

that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process will be contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be returned to Nicaragua or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

*Improved vetting for national security and public safety*

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before such individuals arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described above, the proposed vetting would require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

*Reduced burden on DHS personnel and resources*

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate the proposed process could relieve some of the impact increased migratory flows has had on the DHS workforce along the SWB. This process could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the proposed process would also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, allowing Nicaraguans permitted to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute

16

PRE-DECISIONAL/DELIBERATIVE

a final order of removal.  This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

*Minimize the domestic impact*

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities.  Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[65]  The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB.  These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[66]  FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services.  Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[67] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[68]  Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this proposed parole process would address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process, in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process would help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants

---

[65] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[66] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States,* Sept. 21, 2022, https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office.

[67] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave,* Apr. 27, 2022, https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.

[68] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day,* Sept. 23, 2022, https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

17

Case 6:23-cv-00007   Document 194-37   Filed on 06/20/23 in TXSD   Page 71 of 232

PRE-DECISIONAL/DELIBERATIVE

at the SWB. Beneficiaries would be required to fly to the interior, rather than arriving at the SWB. They also would only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also would be eligible to apply for work authorization, thus enabling them to support themselves.

*Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks*

The proposed process, which would incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because TCOs—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[69]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[70] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[71] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[72] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[73] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[74] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[75] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the

---

[69] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.
[70] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border*, Sept. 7, 2022, https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.
[71] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*
[72] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border*, Sept. 7, 2022, https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html.
[72] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*
[74] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'*, Sept. 5, 2022, https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream.
[75] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

Nicaragua AR_000144

PRE-DECISIONAL/DELIBERATIVE

migrants are pawns;[76] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[77]  Tragically, a significant number of individuals perish along the way.  The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[78]

DHS anticipates this process would save lives and undermine the profits and operations of the dangerous TCOs that put migrants lives at risk for profit because it would incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights rather, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants.  DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[79]

*Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere*

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration.  This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[80] the Collaborative Migration Management Strategy (CMMS);[81] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration),

---

[76] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness*, Apr. 26, 2022, https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.
[77] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, July 25, 2022, https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.
[78] Reuters, *Migrant Truck Crashes in Mexico Killing 54*, Dec. 9, 2021, https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico*, July 25, 2022, https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.
[79] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42.
[80] National Security Council, *Root Causes of Migration in Central America* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.
[81] National Security Council, *Collaborative Migration Management Strategy* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.

19

Case 6:23-cv-00007   Document 175-3   Filed on 06/20/23 in TXSD   Page 92 of 212

PRE-DECISIONAL/DELIBERATIVE

which was endorsed in June 2022 by 21 countries.[82] The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[83] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[84]

This new process would help achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus would provide the United States another avenue to lead by example.

The process also would respond to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—and something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process would add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It would also strengthen the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, as part of a regional response—many of which are already taking important steps. Any effort to meaningfully address the crisis in Nicaragua would require continued efforts by these and other regional partners.

Importantly, the United States would not implement the new parole process without the ability to remove or return to Mexico Nicaraguan nationals who attempt to enter the United States irregularly across the SWB. The United States' ability to execute this process thus would be contingent on the GOM's willingness to accept the return of Nicaraguan nationals who bypass this new process and attempt to enter the United States irregularly between POEs.

---

[82] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.
[83] *Id.*
[84] *Id.*

20

Nicaragua AR_000146

PRE-DECISIONAL/DELIBERATIVE

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—would require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this proposed process would be responsive to the GOM's request that the United States increase lawful pathways for migrants and would also be aligned with broader Administration domestic and foreign policy priorities in the Region. It would couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process would be to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

2. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this proposed process would address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua for the reasons outlined in this memo. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose their positions.[85] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey here.

**V. Consideration of process elements**

1. Length of parole and employment authorization

The proposed length of parole is up to two years. This is consistent with other parole processes, such as the process for Venezuelan nationals and Uniting for Ukraine (U4U) for Ukrainian nationals and their qualifying immediate family members, Operation Allies Welcome for Afghan nationals, and the Cuban Family Reunification Parole Program established in 2007. A two-year period of parole would enable a realization of the significant public benefits and meets the urgent

---

[85] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.

21

PRE-DECISIONAL/DELIBERATIVE

humanitarian reasons that Nicaraguan nationals are seeking entry into the United States, for the following reasons:

*First*, the period of parole would need to be sufficiently long to make it an attractive alternative to the status quo, where migrants put their lives in smugglers' hands to enter the country irregularly. DHS believes that a period of two years would achieve that goal. It would allow beneficiaries to gain work authorization, contribute to the U.S. economy, and achieve stability and predictability in their lives, even if temporarily.

*Second*, a two-year period of parole would provide eligible beneficiaries sufficient time to pursue a durable immigration status or benefit if eligible under the law. Beneficiaries may qualify for asylum; others may qualify for adjustment of status based on the immediate availability of a family- or employment-based immigrant visa.

*Third*, a two-year period would provide a meaningful amount of time for the United States government, in conjunction with foreign partners, to continue its ongoing work to help address the root causes of migration, including the humanitarian and economic conditions in Nicaragua that are spurring a large migratory flow. For similar reasons, a two-year period would also provide a window for the U.S. Government to work with the Government of Nicaragua to increasingly accept the return of Nicaraguan nationals who are subject to a final order of removal. Finally, this two-year period would provide meaningful time to fully develop the multi-prong, regional strategy to address migration in our region, including improving refugee processing and other immigration pathways, both to the United States and to other partner nations.

2. Supporter Vetting

After DHS learned of certain instances in which U4U supporters, including family members, ceased providing housing and other support for parolees prior to the end of their parole period, DHS made form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation. This was intended to further reduce the risk that supporters do not follow through on their obligations; it was also intended to address risks of human trafficking and other forms of abuse.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[86] While such risks cannot be completely mitigated, this parole process is structured to address these risks to the greatest extent possible. The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB. As described above, all migrants, but particularly women and children, are

---

[86] Department of State, *Trafficking in Persons Report* (July 2022), https://www.state.gov/wp-content/uploads/2022/10/20221020-2022-TIP-Report.pdf.

PRE-DECISIONAL/DELIBERATIVE

susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[87] A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations. Almost all, if not all, migrants are required to pay compulsory fees and taxes by criminal organizations at different points along their journey north.[88] We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, would meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3.   Eligibility Criteria

*Exception for One-Time Voluntary Departure or Withdrawal of an Application for Admission*

Individuals encountered entering the United States irregularly between POEs may be permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) while still maintaining their eligibility to seek parole via the Nicaragua process. This exception provides an incentive for migrants, who would otherwise be ineligible for this process, to accept the option to voluntarily leave the United States, and thus, reduce strain on limited DHS personnel and resources associated with obtaining and later executing an order of removal.

*Consideration of Beneficiaries with Particular Vulnerabilities or other Compelling Circumstances*

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have particular vulnerabilities or other compelling circumstances. We have ultimately concluded that such a requirement is not preferable for a combination of operational and policy reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism. For instance, any such vulnerability screening would require a process for triaging potential beneficiaries and identifying those who are more vulnerable. To be effective, it would require third parties—likely international NGOs—to play a role in the screening. However, DHS lacks authority to fund such screening outside the United States. Such a screening requirement would also substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Nicaraguan nationals who would

---

[87] *Id.* at 386.
[88] Homeland Security Operational Analysis Center operated by the RAND Corporation, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?*, 2019. https://www.rand.org/pubs/research_reports/RR2852.html.

23

Case 6:23-cv-00007   Document 94537   Filed on 06/20/23 in TXSD   Page 24 of 29

PRE-DECISIONAL/DELIBERATIVE

otherwise make the dangerous journey to the U.S.-Mexico border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration that this process seeks to achieve.

For these programmatic reasons, DHS determined that keeping eligibility at the nationality level—like U4U and the Venezuela process—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Nicaraguan nationals. DHS similarly rejected this consideration in weighing the scope of the process for Venezuelans.

**VI. Consideration of alternative approaches**

DHS has considered several alternative approaches to the proposed parole process coupled with an enforcement mechanism to manage the current surge in migration from Nicaraguan nationals. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

1. Status quo

DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB, driven in increasing part by a surge in migration by Nicaraguan nationals. Importantly, DHS anticipates that encounters of Nicaraguan nationals at the border are likely to continue to increase in the coming weeks and months. This sharp increase shows no signs of abating absent material changes such as those proposed here.

As described above, the current surge in irregular migration from Nicaragua has forced DHS to reallocate resources and personnel to the SWB. Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY staffing to support SWB operations is simply not sustainable in the long term. For these reasons, DHS has concluded that maintaining the status quo is not an option.

2. Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. We continue to engage in such efforts. That said, partner countries have already extended

24

PRE-DECISIONAL/DELIBERATIVE

themselves in historic ways with limited results. The bottom line is that our foreign partners do not have the capability to sufficiently impact these flows in the immediate term.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process in the time that is needed.

3. Increasing removals to Nicaragua

DHS data show that increases in returns of individuals from a given country can reduce encounters at the border over time.[89] For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico during specific periods of time over the past year have led to a sustained decrease in encounters of migrants from those countries at the border.

DHS considered whether more could be done in the immediate term to increase returns of Nicaraguan nationals to Nicaragua and continues to engage in those efforts. DHS has already been engaging with the Government of Nicaragua to increase its ability to repatriate their citizens who do not have a legal basis to remain in the United States. Despite these concerted efforts, which are ongoing, DHS has not received cooperation from the government to allow an increase of removals.

Because of these factors, return to Nicaragua – while an effective consequence regime for those who enter the United States irregularly and do not have a valid asylum claim – is not a viable option, at scale. As stated above, DHS intends to continue to work to address root causes, including the political instability and repression that have led to difficulties in returning Nicaraguan nationals to Nicaragua. That, however, will require time and is not a viable option to meet immediate needs.

4. Utilizing contiguous territory return authority

DHS considered whether returning Nicaraguan nationals to Mexico under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C), either through the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. As this policy was being finalized, a district court stayed your October 29, 2021 memorandum terminating MPP. *See* Dkt. 178, *Texas v. Biden*, No. 21-cv-67 (N.D. Tex. Dec. 15, 2022). For two reasons, we have decided that proceeding with the proposed process is preferable to attempting to manage the current surge in migration by relying on the programmatic use of the contiguous territory return authority at this time and for this population.

---

[89] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, U.S. Customs and Border Protection Commissioner, and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

25

Nicaragua AR_000151

PRE-DECISIONAL/DELIBERATIVE

*First*, the resources and infrastructure necessary to use contiguous return authority at the scale that would be required given current—and anticipated—flows are not currently available. To employ the contiguous return authority at a scale sufficient to meaningfully address the anticipated migrant flows, the United States would need to rebuild, redevelop, and significantly expand infrastructure for noncitizens to be processed in and out of the United States and attend immigration court hearings throughout the duration of their removal proceedings. This would require, among other things, the construction of substantial additional court capacity along the border. It would also require the reassignment of immigration judges and ICE attorneys to conduct the hearings and CBP personnel to receive and process those who are coming into and out of the country to attend hearings.

*Second*, programmatic implementation of the contiguous territory return authority requires Mexico's concurrence and support. When DHS was previously under an injunction requiring it to re-implement MPP, the GOM would only accept the return of MPP enrollees consistent with available shelter capacity in specific regions, and indeed had to pause the process at times due to shelter constraints. Notably, Mexico's shelter network is already strained from the high volume of northbound irregular migration we are seeing today.[90] The GOM announced the end of the court-ordered reimplementation of MPP on October 25, 2022.[91] Any potential re-starting of returns under MPP or another programmatic use of the contiguous-territory return authority would require the GOM to make a new independent decision to accept noncitizens that would be returned under this authority.

DHS is, however, continuing to evaluate the recent district court decision and considering the effect of the court's stay and other relevant developments on the use of contiguous territory return authority going forward.

5. Increasing the use of detention for Nicaraguan nationals

DHS considered whether it could detain all or most Nicaraguan nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result. There are, however, legal and operational limits in the ability to do so.

*First*, there are legal limits on the duration of detention for those ordered removed and who—like the Nicaraguan nationals—do not have a significant likelihood of removal in the foreseeable future. Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from

---

[90] WTOL News, *U.S. Court Rejects Maintaining COVID-19 Asylum Restrictions*, Dec. 16, 2022, https://www.wtol.com/article/news/nation-world/migrants-mexico-us-border-asylum-limits-end/507-02a353b7-d61f-4536-b3c9-bb45c3fbb388, (last visited Dec. 17, 2022).
[91] Government of Mexico, *Finaliza el programa de estancias migratorias en México bajo la Sección 235 (b)(2)(C) de la Ley de Inmigración y Nacionalidad de EE. UU*, Oct. 25, 2022, https://www.gob.mx/sre/prensa/finaliza-el-programa-de-estancias-migratorias-en-mexico-bajo-la-seccion-235-b-2-c-de-la-ley-de-inmigracion-y-nacionalidad-de-ee-uu. (last visited Dec. 19, 2022).

26

PRE-DECISIONAL/DELIBERATIVE

detaining individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[92]

*Second*, it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Nicaraguan nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Nicaraguan nationals is not a viable option at this time.

6. Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. The U.S. Government also committed to increasing immigrant visa adjudication.[93] DHS and interagency partners will continue these efforts and more. However, those alternative processes are narrow and require, in many cases, multiple steps and in-person engagement or referrals that are difficult for many individuals to access.

A key feature of this proposed process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully virtual and accessible from anywhere. We assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Nicaragua today—and that regional efforts to improve lawful pathways, while critically important, will not be sufficiently timely to address the immediate needs. We thus assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

**VII. Administrative Procedure Act**

This proposal would be exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

---

[92] *See Zadvydas v. Davis*, 533 U.S. 678 (2001).
[93] The White House, *Fact Sheet: The Los Angeles Declaration* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.

27

PRE-DECISIONAL/DELIBERATIVE

*First*, the Department would merely be adopting a general statement of policy,[94] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[95]  As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[96]  Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[97]  In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[98]  This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States.  The United States would not implement the new parole process without the ability to return Nicaraguan nationals who attempt to enter irregularly across the SWB to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and attempt to enter the United States irregularly between POEs.  Thus, initiating and managing this process would require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now.  It also would complicate broader discussions and negotiations about migration management.  For now, the GOM has indicated it is prepared to make an independent decision to accept a substantial number of Nicaraguan returns or removals.  The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date.  Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

---

[94] 5 U.S.C. § 553(b)(A).
[95] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).
[96] 5 U.S.C. § 553(a)(1).
[97] *Mast Indus. v. Regan*, 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).
[98] *See, e.g., Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

28

PRE-DECISIONAL/DELIBERATIVE

Moreover, this process is not only responsive to the interests of the GOM and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[99] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[100]

*Third*, DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be contrary to the public interest and impracticable. The numbers of Nicaraguans encountered at the SWB are already high, and the Office of Immigration Statistics estimates border encounters will continue to rise, and potentially rise dramatically, should the Title 42 public health order be lifted. While DHS has already taken multiple additional measures to address and prepare, a delay would exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[101]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the proposed process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[102] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would

---

[99] *See* 82 Fed. Reg. 4902 (Jan. 17, 2017).
[100] *See* 87 Fed. Reg. 63,507 (Oct. 19, 2022).
[101] *See Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[102] *See* 5 U.S.C. § 553(b)(B).

29

PRE-DECISIONAL/DELIBERATIVE

result from the notice-and-comment process.[103]  If, for example, advance notice of a coming
price increase would immediately produce market dislocations and lead to serious shortages,
advance notice need not be given.[104]  A number of cases follow this logic in the context of
economic regulation.

The same logic applies here, where the Department is responding to exceedingly serious
challenges at the border, and advance announcement of that response would significantly
increase the incentive, on the part of migrants and others (such as smugglers), to engage in
actions that would compound those very challenges.  It is well-established that migrants may
change their behavior in response to perceived imminent changes in U.S. immigration policy.
For example, as detailed above, implementation of parole process for Venezuelans was
associated with a drastic reduction in irregular migration by Venezuelans.  Had the parole
process been announced prior to a lengthy notice and comment period, it likely would have had
the opposite effect, resulting in many hundreds and thousands of Venezuelan nationals
attempting to cross the border before the program went into effect.  Overall, the Department's
experience has been that in some circumstances when public announcements have been made
regarding changes in our immigration laws and procedures that would restrict access to
immigration benefits to those attempting to enter the United States along the U.S.-Mexico land
border, there have at times been dramatic increases in the numbers of noncitizens who enter or
attempt to enter the United States.  And it is well-established that such persons may change their
behavior in response to perceived imminent changes in U.S. immigration policy.[105]  Smugglers
routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance in order to undertake such procedures
because—as noted above—maintaining the status quo, which involves record numbers of
Nicaraguan nationals currently being encountered attempting to enter irregularly at the SWB,
coupled with DHS's extremely limited options for processing, detaining, or quickly removing
such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions.  At

---

[103] *See, e.g., Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94-95 (D.C. Cir. 2012) (noting that the "good cause" exception
"is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the
purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial
manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up));
*DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was
in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the
public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would
have ensued a massive rush to raise prices and conduct 'actual transactions'— or avoid them—before the freeze
deadline." (cleaned up)).

[104] *See, e.g., Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was
present in this case based upon [the agency's] concern that the announcement of a price increase at a future date
could have resulted in producers withholding crude oil from the market until such time as they could take advantage
of the price increase.").

[105] Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media*,
https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media, July
26, 2022, (last viewed Dec. 6, 2022).

30

Nicaragua AR_000156

current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[106] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[107] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[108] DHS concluded that "a surge could result in significant loss of human life."[109]

**Recommendation**

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Nicaraguan nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve _________________ ove/date _________________

DEC 2 2 2022

[106] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[107] *Id.*

[108] *Id.*

[109] *Id.*; *accord, e.g.*, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

Modify/date____________________________ Needs discussion/date____________________________