DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 073

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, §<br>§ | |
| *Plaintiffs*, §<br>§ | |
| vs. §<br>§ | CIVIL ACTION NO.<br>6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF §<br>HOMELAND SECURITY, *et al.*, §<br>§ | |
| *Defendants,* and §<br>§ | JUDGE DREW B. TIPTON |
| VALERIE LAVEUS, *et al.*, §<br>§ | |
| *Intervenor Defendants*. § | |

# INTERVENOR DEFENDANTS'
# TAB 73, ECF 175-8

PRE-DECISIONAL/DELIBERATIVE

EXHIBIT
7

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

October 12, 2022

## ACTION

MEMORANDUM FOR THE SECRETARY

FROM:        Robert Silvers
             Under Secretary
             Office of Strategy, Policy, and Plans

ROBERT P SILVERS  Digitally signed by ROBERT P SILVERS Date: 2022.10.12 16:12:28 -04'00'

             Christopher Magnus
             Commissioner
             U.S. Customs and Border Protection

CHRISTOPHER J MAGNUS  Digitally signed by CHRISTOPHER J MAGNUS Date: 2022.10.12 15:32:11 -04'00'

             Ur M. Jaddou
             Director
             U.S. Citizenship and Immigration Services

UR M JADDOU  Digitally signed by UR M JADDOU Date: 2022.10.12 14:50:21 -04'00'

SUBJECT:     **Parole Process for Certain Venezuelan Nationals**

---

### Summary

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating meaningful and safe, orderly, and humane processes for migration throughout the region. While this strategy shows great promise, it will take time to fully implement in a way that will have meaningful effects on migratory patterns in the region. These changes will not take effect quickly enough to have an immediate impact on the significant challenges we face today along the southwest border (SWB).

In light of this reality, DHS is proposing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between ports of entry (POE) along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe, orderly, and streamlined manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, we anticipate that this effort will serve as a deterrent to irregular migration, by

Case 6:23-cv-00007   Document 157-3-8 Filed on 03/08/2022 in TXSD Page 2-42 of 222

PRE-DECISIONAL/DELIBERATIVE

providing a meaningful alternative to irregular migration, and by imposing immediate consequences on Venezuelan nationals who seek to irregularly enter the United States between POEs.  It would provide an incentive for Venezuelans to avoid the often-dangerous journey to the border altogether by putting in place a safe, orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[1]  After this process is announced, Venezuelan nationals attempting to irregularly enter the United States between POEs would be subject to expulsion or removal to Mexico or other third countries and ineligible for parole under this process as a result.  Only those who meet specified criteria and pass national security and public safety vetting would be eligible for consideration for parole under this process.

Implementation of the parole process will be conditioned on the GOM—for the first time— accepting the expulsion or removal of large numbers of Venezuelan nationals seeking to irregularly enter the United States between POEs on the SWB.  As such, this new process will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB.

The new parole policy would be modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at POEs along the SWB.  Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safer and more orderly process.  This new process would be procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years.  As in U4U, applications will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual (and certain non-Venezuelan nationals who are immediate family members of a primary beneficiary) and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Venezuelan nationals would be required to meet several eligibility criteria to be considered, on a case-by-case basis, for advance travel authorization or parole.  Individuals would be ineligible if they have been ordered removed from the United States within the prior five years.  They are ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after the date of the announcement.  Venezuelan nationals also are ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela.  In addition, Venezuelan nationals must meet the following criteria: (i) beneficiaries must travel by air to seek entry at a POE; and (ii) beneficiaries must pass vetting for national security and public safety purposes prior to traveling to the United States and again at the POE.  Only those who meet all specified criteria would be eligible to receive advance

---

[1] *See* 8 U.S.C. § 118d(d)(5) (granting the Secretary the "discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

2

PRE-DECISIONAL/DELIBERATIVE

Case 6:23-cv-00007   Document 95-2-8 Filed on 03/24/23 in TXSD DP Page 5 of 22

PRE-DECISIONAL/DELIBERATIVE

authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

A discretionary grant of parole would be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate nonetheless and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period would also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States as they do so. Those who are not granted asylum or other immigration benefits will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process would provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate it would: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere. The process would be capped at 24,000 Venezuelan beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

This memo includes information on the current conditions at the border; outlines the proposed process; details eligibility criteria and vetting mechanisms; further explains the significant public benefit and urgent humanitarian reasons that warrant temporary parole of covered individuals on a case-by-case basis; assesses possible alternatives; and recommends that you approve the policy and policy rationale identified in this memo.

## I.     Background

1.  Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from

3

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

2011–2017.[2]  These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID-19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on flows.  Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.  Beginning in the 2010s, a growing share of migrants have been from Northern Central America[3] (NCA) and, since the late 2010s, from countries throughout the Americas.  Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[4]

The most recent rise in the numbers of encounters at the border have been driven in significant part by a surge in migration of Venezuelan nationals.  Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328.  They increased again by almost four-fold in FY 2022, to an estimated 186,000 unique encounters—comprising 11 percent of all unique encounters in FY 2022.  Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022, compared to a monthly average of 127 unique encounters from FY 2014–2019.[5]  Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased 45 percent.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating.  Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three Northern Central American countries combined.[6]

---

[2] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[3] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[4] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually.  Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020.  As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent.  OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[5] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022.  Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months.  Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

[6] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

4

Venezuela AR_000120

PRE-DECISIONAL/DELIBERATIVE

2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country.  Second, the lack of safe, orderly, and humane migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options.  Third, the United States faces significant limits on the ability to expel or remove Venezuelan nationals to Venezuela or elsewhere, as described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

*Factors pushing migration from Venezuela*

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[7]  Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[8]  In a February 2022 report, Amnesty International noted that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity."[9]  Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[10]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[11]  At least in the short-term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere.  As described below, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

---

[7] UNHCR, Venezuela Situation, available at: https://www.unhcr.org/en-us/venezuela-emergency.html (last visited September 24, 2022)
[8] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, April 12, 2022, available at: https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/ (last visited September 24, 2022)
[9] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.11, Feb. 10, 2022, available at:
https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited September 25, 2022)
[10] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at:
https://www.amnesty.org/en/documents/amr53/5133/2022/en/ (last visited September 25, 2022)
[11] *Id.*

5

PRE-DECISIONAL/DELIBERATIVE

Case 6:23-cv-00007   Document 157-2-8 Filed on 03/04/2023 in TXSD DP Page 26 of 222

PRE-DECISIONAL/DELIBERATIVE

*Return Limitations*

There are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[12] But Venezuela does not allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally failed to accept Venezuelans as well. As a result, DHS was only able to repatriate 22 Venezuelan nationals to Venezuela in FY 2022.

*Overall Effect*

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly incentivized irregular migration. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of return flights, average daily encounters fell by 37 percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[13] Since then, encounters for both countries have fluctuated but remain well below the pre-August 4 numbers; in September 2022, encounters averaged 509 per day for Guatemala and 474 per day for Honduras.[14]

---

[12] *Louisiana v. CDC*, -- F. Supp. 3d --, 2022 WL 1604901 (W.D. La. May 20, 2022).
[13] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.
[14] OIS analysis of UIP data pulled October 6, 2022.

6

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000122

Case 6:23-cv-00007   Document 95-3-8 Filed on 03/24/23 in TXSD Page 27 of 22

PRE-DECISIONAL/DELIBERATIVE

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1 – November 1, 2021



Note: Figure depicts 30-day average of daily encounters.
Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The proposed process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This proposal is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[15] Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

3. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022.

---

[15] OIS Persist Dataset based on data through August 31, 2022.

7

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program – Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in FY 2022 appropriations for SWB enforcement and processing capacities.[16]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[17] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), a ten-fold increase over the average for FY 2014 - FY 2019, primarily as a result of increases in Venezuelans and other non-traditional source countries.[18] The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22—September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[19] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[20] Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in

---

[16] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, April 26, 2022.
[17] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1 – 30, 2022.
[18] OIS analysis of OIS Persist Dataset through August 31, 2022.
[19] Data from SBCC, as of September 29, 2022.
[20] Data SBCC, as of September 29, 2022.

8

Venezuela AR_000124

Case 6:23-cv-00007   Document 95-2-8 Filed on 03/24/23 in TXSD Page 9 of 22

PRE-DECISIONAL/DELIBERATIVE

the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II.  Overview and Discussion of Proposed Venezuela Parole Process

This process would provide a streamlined way for individuals from Venezuela who are outside the United States to be considered, on a case-by-case basis, for advance authorization to travel to the United States and seek a temporary period of parole for up to two years for urgent humanitarian reasons and significant public benefit. Such individuals must have a supporter in the United States; pass robust national security and public safety vetting; meet other specified criteria; and warrant a favorable exercise of discretion. The following provides additional detail and analysis of the process's planned design.

*Supporters*: U.S.-based supporters will initiate an application on behalf of a Venezuelan national and, if applicable, their immediate family members. Supporters can be individuals filing on their own, with other individuals, or on behalf of entities. They must provide evidence of income and assets and declare their willingness to provide financial support to parolees for the length of parole. Supporters will be required to undergo vetting, including to identify potential human trafficking concerns.

*Beneficiaries*: To benefit from this process, Venezuelan nationals must be outside the United States; have a U.S.-based supporter who has agreed to provide financial assistance, as needed; possess a valid passport for international travel; provide for their own commercial travel to an air POE and final U.S. destination; pass required screening and vetting. They must comply with additional requirements including vaccination requirements and other public health guidelines identified by the DHS Chief Medical Officer following consultation with the CDC.

Venezuelan nationals are ineligible for this process if they have been ordered removed from the United States within the past five years or if they are subject to a bar based on a prior removal order;[21] have crossed without authorization into the United States between the POEs or have irregularly crossed the Mexican or Panamanian border after the date of the announcement. They are ineligible if they are a permanent resident or dual national of any country other than Venezuela, or currently hold refugee status in any country. Venezuelans who are currently in Mexico or Panama as of the date of the announcement, however, will be eligible if they meet all the other eligibility criteria.

Unaccompanied children (*i.e.*, children under 18 not traveling with a parent or legal guardian) are not eligible for this process.

*Beneficiary vetting*: Potential beneficiaries will be required to submit biographic and biometric information in the form of a live photograph in advance of travel. This information will be used for vetting by the National Targeting Center (NTC) and to inform classified vetting

---

[21] *See* Immigration and Nationality Act (INA) § 212(a)(9)(A), 8 U.S.C. § 1182(a)(9)(A).

9

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000125

PRE-DECISIONAL/DELIBERATIVE

support by national security partners leveraging the process and technology of the National Vetting Center (NVC).

Upon arrival at a POE, DHS will collect an additional photograph and fingerprints. This biometric information will support further vetting against available databases to inform an independent and case-by-case determination by CBP officers whether parole is warranted.

Beneficiaries also will be subject to continuous vetting throughout their period of parole. If derogatory information emerges during this continuous vetting, parole may be terminated and the noncitizen placed into removal proceedings.

*Online processing*: All touchpoints in the travel authorization and parole processes—for both supporters and potential beneficiaries up to their arrival at a POE—are accessible online. Potential beneficiaries can access and advance their case online from their home country or other third countries, including Mexico. Approved beneficiaries who pass all the requisite vetting may receive electronically an advance authorization to travel, allowing them to fly via commercial carrier into the United States and seek parole at a POE. Beneficiaries will be responsible for arranging and funding their own travel.

*Duration and Conditions of Parole*: If approved on a case-by-case basis at the port of entry, parole generally will be granted for a period of up to two years. Individuals who do not acquire another lawful means of remaining in the United States will be required to leave prior to the expiration of their parole. Those who overstay the grant of parole without acquiring a lawful means of remaining in the United States will be placed in removal proceedings. During this two-year period, the Department will continue to work to address the root causes of irregular migration, improve refugee processing and other safe, lawful, and orderly immigration processes, and increase removal options for Venezuelan nationals.

*Employment Authorization and Public Benefits*: Parolees will be eligible to apply for employment authorization for the duration of the parole.[22] USCIS anticipates that it will be able to adjudicate the majority of such applications within a few weeks after the application is filed.

Because of a combination of work authorization and the supporter requirement, DHS expects this population to require less in the way of emergency services, short-term shelter, or food bank resources than the population of Venezuelans currently encountered crossing the SWB, thus minimizing—and ultimately reducing—the burden on states and localities.[23]

---

[22] 8 C.F.R. § 274a.12(c)(11).

[23] *Id.* Venezuelans paroled for a period of one year or more are considered "Qualified Aliens" (QAs) pursuant to 8 U.S.C. § 1641(b)(4). QAs generally must wait five years in order to be eligible for public benefits. *See generally, e.g.,* 8 U.S.C. § 1612. Because the proposed parole period under this process is only two years, DHS

10

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000126

PRE-DECISIONAL/DELIBERATIVE

*Scale and Pace:* The process will be capped at 24,000 Venezuelan beneficiaries. DHS anticipates significant public interest in the process. If needed in order to better manage the processing workload and volume, DHS may cap throughput or travel authorization output to a fixed amount per day.

*Sunset/Renewal/Termination:* As described above, the process will be capped at 24,000 Venezuelan beneficiaries over a six-month time period. After this cap is reached, the process will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

## III.    Justification for Venezuela Parole Process

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[24] Parole is not an admission of the individual to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[25] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole. DHS may terminate parole in its discretion at any time.[26] Under the current regulations, parolees may apply for and be granted employment authorization to work lawfully in the United States. [27]

*Significant Public Benefit*

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines new consequences for those who seek to enter the United States irregularly between POEs, with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States— will serve a significant public benefit for multiple intersecting reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process could result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhancing border security and national security by vetting individuals

---

does not expect this policy to have a significant impact on demand for such benefits federally. Parolees are also not generally eligible for a REAL-ID compliant driver's license; however, states may choose to make alternative licenses available to noncitizens, including parolees, who do not qualify for a REAL-ID compliant license, so long as they meet certain requirements. Section 202(c)(2)(B), (d)(11) of the Real ID Act of 2005.
[24] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").
[25] INA §§ 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)A).
[26] *See* 8 C.F.R. § 212.5(e).
[27] *See* 8 C.F.R. § 274a.12(c)(11).

11

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000127

PRE-DECISIONAL/DELIBERATIVE

before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

1. Enhance the security of our border by reducing irregular migration of Venezuelan nationals.

Implementation of the parole process is contingent on the GOM agreeing to accept the return of a significant number of Venezuelan nationals encountered at the SWB attempting to irregularly enter the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public health Order, these returns would take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal, who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico would impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the incentive provided by the opportunity to apply for advance authorization to travel to the United States to seek a parole, this process will create a combination of incentives and disincentives that could lead to a substantial decline in irregular migration by Venezuelans at the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

2. Enhance border security and national security by vetting individuals before they arrive at our border.

The Venezuelan parole process described above would allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to undertake this vetting *before* an individual arrives at the border so that we can stop individuals who could pose threats to national security or public safety threats from even crossing into the country.

12

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000128

PRE-DECISIONAL/DELIBERATIVE

As described above, the proposed vetting will require prospective beneficiaries to upload a live photograph via an app. This will substantially enhance the scope of the pre-travel vetting— thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel *before* they arrive at our border. This is an improvement over the status quo.

3.  Reduce the burden on DHS personnel and resources.

As already described, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through the streamlined process DHS is contemplating, we anticipate the process could relieve some of this burden. This could free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the proposed process would also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

4.  Minimize the domestic impact.

The increased migratory flows have put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more provisional releases, the strains are shared by others as well. Given the inability to return or repatriate Venezuelans in substantial numbers, DHS is currently conditionally releasing 95 percent of the Venezuelan nationals it encounters at the border pending their removal proceedings or the initiation of such proceedings. Venezuelan nationals accounted for 27 percent of all encounters released at the border in September 2022.[28] Venezuelan nationals thus account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This

---

[28] OIS analysis of CBP book-out dispositions for September 1 – 27, 2022 based on CBP UIP data pulled September 28, 2022.
[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, September 21, 2022, available at:
https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office. (Last visited: September 29, 2022).

13

Venezuela AR_000129

PRE-DECISIONAL/DELIBERATIVE

funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30]  Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32]  The proposed parole process would address these concerns by diverting flows of Venezuelan nationals to interior POEs through an orderly and lawful process.  DHS anticipates this will yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances.  They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support.  Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves.  We anticipate that this process will help reduce the burden on communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

5.  <u>Disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks.</u>

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34]  The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36]  Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since

---

[30] Lauren Villagran. El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. September 14, 2022, available at: https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/. (Last visited: September 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them free bus rides as shelters reach capacity. September 20, 2022, available at: https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/. (Last visited September 29, 2022).
[31] Email from City of San Diego Office of Immigration Affairs to DHS, September 23, 2022.
[32] Denelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, September 23, 2022, available at: https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day, (Last visited: September 29, 2022).
[33] https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html
[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.
[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, September 7, 2022, available at: https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html, (Last visited: September 30, 2022).
[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

14

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly vulnerable. Children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that require immediate attention.[39] According to Panamá Migración, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migratory movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

The proposed process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

---

[37] Migrants risk death crossing treacherous Rio Grande river for 'American dream' | US-Mexico border | The Guardian https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream
[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.
[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., October 11, 2021, available at: https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us (last visited September 29, 2022).
[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá – Colombia 2022, available at: https://www.migracion.gob.pa/inicio/estadisticas
[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, April 26, 2022.
[42] Migrant truck crashes in Mexico killing 54, available at: https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R (last visited September 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X (last visited October 2, 2022)

15

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

6. Fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Signatory countries are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example. The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. According to the Venezuelan Ambassador to Costa Rica, 1,700 Venezuelan migrants were entering Costa Rica daily in the month of September 2022.[44] Colombia, Peru and Ecuador are now hosting almost 4 million displaced Venezuelans between them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of which are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[45] Unofficial accounts indicate Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022 to the week of October 1, 2022.

---

[43] L.A. Declaration
[44] The Department of State Cable, 22 San Jose 796
[45] The Department of State Cable, 22 Panama 624

16

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000132

PRE-DECISIONAL/DELIBERATIVE

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap,
February – September 2022



Note: September figure is a preliminary estimate.
Source: Panama Migration Report, September 24, 2022

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and
Panama, all of which are also affected by the increased movement of Venezuelan nationals—
have been seeking greater action to address these challenging flows for some time.
Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends
that contribute to large populations of migrants, many of whom are Venezuelan, entering
Mexico.  These entries strain local governmental and civil society resources in Mexican border
communities in both the south and north, and have at times led to violence, crime, and unsafe
and unhealthy encampments.

The United States is already taking key steps to address some of these concerns.  On June 10,
2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the
U.S. Agency for International Development (USAID) announced $314 million in new funding
for humanitarian and development assistance for refugees and vulnerable migrants across the
hemisphere, including support for socio-economic integration and humanitarian aid for
Venezuelans in 17 countries of the region.[46]  And on September 22, 2022, PRM and USAID
announced nearly $376 million in additional humanitarian assistance, which will provide
essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed

---

[46] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian
Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at:
https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-
new-stabilization-efforts-venezuela (last visited October 11, 2022).

17

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000133

PRE-DECISIONAL/DELIBERATIVE

assistance for migrants, refugees, and host communities across the region. This funding will
further address humanitarian needs in the region.[47]

The new process adds to these efforts and enables the United States to lead by example. It is a
key mechanism to advance the larger domestic and foreign policy goals of this Administration
to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It
also lays the foundation for the United States to press regional partners to undertake additional
actions with regards to these populations, many of which are already taking important steps.
Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has
provided temporary protected status for more than 1.5 million of them. Costa Rica is
developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the
Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a
second regularization process that would provide certain Venezuelans a two-year temporary
residency visa.[48] Any effort to meaningfully address the crisis in Venezuela will require
continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to
return Venezuelan nationals to Mexico who enter irregularly across the SWB. The United
States' ability to execute this process thus requires the GOM to accept the return of Venezuelan
nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, GOM has made clear that in order to effectively manage the migratory flows that
are impacting both countries, the United States needs to provide additional safe, orderly, and
lawful processes for migrants who seek to enter the United States. As the GOM makes a
unilateral decision whether to accept returns of third country nationals and how best to manage migration within Mexico, it is closely watching the United States' approach to
migration management and whether the United States is delivering on its plans in this space.
Initiating and managing this process—which is dependent on GOM's actions—will require
careful, deliberate, and regular assessment of GOM's responses to unilateral U.S. actions and
ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United
States and is aligned with broader Administration domestic and foreign policy priorities in the
region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the
United States with the imposition of consequences for those who seek to enter irregularly along
the SWB. The goal of this process is to reduce the irregular migration of Venezuelan nationals
throughout the hemisphere while we, together with partners in the region, work to improve

---

[47] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected
by the Ongoing Crisis in Venezuela and the Region, September 22, 2022, available at:
https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-
additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela, (last visited September
30, 2022).

18

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000134

PRE-DECISIONAL/DELIBERATIVE

conditions in sending countries and create more lawful immigration and refugee pathways in
the region, including to the United States.

*Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this proposed process would
address the urgent humanitarian needs of many Venezuelans subject to the repressive regime of
Nicolás Maduro. This process provides a safe mechanism for Venezuelan nationals who seek
to leave their home country to enter the United States without making a dangerous journey that
puts them in the hands of smugglers.

## IV.    Consideration of changes to this process

1. Length of parole and employment authorization

The proposed length of parole is up to two years. This is consistent with other parole
processes, such as U4U for Ukrainian nationals and their qualifying immediate family
members, Operation Allies Welcome for Afghan nationals, and the Cuban Family
Reunification Parole Program established in 2007. A two-year period of parole would provide
significant public benefit and meets the urgent humanitarian needs of Venezuelan nationals are
seeking entry into the United States, for the following reasons:

*First*, the period of parole needs to be sufficiently long to make it an attractive alternative to
the status quo, in which migrants put their lives in smugglers' hands to enter the country
irregularly. DHS believes that a period of two years achieves that goal. It allows beneficiaries
to gain work authorization and contribute to the U.S. economy, and achieve stability and
predictability in their lives, even if temporarily.

*Second*, a two-year period of parole provides eligible beneficiaries sufficient time to pursue a
durable immigration status or benefit under the law. Some Venezuelan beneficiaries may
qualify for asylum, while others may qualify for adjustment of status based on the availability
of a family- or employment-based immigrant visa.

*Third*, a two-year time period provides a meaningful amount of time for the United States
government, in conjunction with foreign partners, to continue its ongoing work to help address
the root causes of migration, including the humanitarian and economic conditions in the region
that are spurring a large migratory flow. For similar reasons, a two-year time period also
provides a window for the U.S. Government to work with Venezuela to increasingly accept the
return of Venezuelan nationals who are subject to a final order of removal. Finally, this two-
year period will provide meaningful time to fully develop the multi-prong, regional strategy to
address migration in our region, including improving refugee processing and other lawful
immigration pathways, both for the United States and to other partner nations.

19

Venezuela AR_000135

PRE-DECISIONAL/DELIBERATIVE

2. <u>Supporter Issues</u>

DHS has learned of certain instances in which U4U supporters, including family members, have ceased providing housing and other support for parolees prior to the end of their parole period. DHS has learned from the U4U experience and is making form changes and associated vetting enhancements to improve confirmation of supporter suitability, clarify guidance on minimum supporter requirements, and communicate to beneficiaries about what rights, protections and benefits may be available if they are a victim of exploitation and other forms of abuse. This is intended to further reduce the risk that supporters do not follow through on their obligations; it is also intended to address risks of human trafficking, and other forms of abuse and exploitation.

This is particularly important because human smuggling and trafficking, including forced labor, is a major concern in this region.[49] While such risks cannot be completely mitigated, this parole process is being structured to address these risks to the greatest extent possible. The process—with the reviews and vetting in place—poses a significantly lower risk of exploitation than the dangerous journey to the SWB. As described above, all migrants, but particularly women and children, are susceptible to the risk of kidnapping, exploitation, sexual abuse, and human trafficking along smuggling routes.[50] A significant portion of such migrants pay smugglers exorbitant fees, thus enriching and supporting the smuggling organizations. Almost all, if not all, are required to pay compulsory fees and taxes by criminal organizations at different points along their journey North. We thus assess that the parole of individuals pursuant to this process, even if we cannot completely mitigate the risk of exploitation, will meaningfully serve the significant public benefit of decreasing reliance on smuggling networks and protecting individuals from trafficking and exploitation.

3. <u>Eligibility Criteria</u>

DHS has separately considered whether it should further focus eligibility only on beneficiaries who may have vulnerabilities or other compelling circumstances. We have ultimately concluded that such a requirement is not preferable for a combination of operational and substantive reasons.

*First*, it would be very difficult to implement an objective and fair screening mechanism. For instance, any such vulnerability screening would require a process for triaging potential beneficiaries and identifying those who are more vulnerable. To be effective, it would require third parties—likely international NGOs—to play a role in the screening. However, DHS lacks authority to fund such screening outside the United States. Such a screening requirement also would substantially delay the implementation of this new process, in that it would require the creation of infrastructure and deployment of personnel that currently are not in place.

---

[49] 2022 Trafficking in Persons Report, available at: https://www.state.gov/reports/2022-trafficking-in-persons-report/ (last visited September 30, 2022).
[50] *Id.* at 386.

20

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000136

PRE-DECISIONAL/DELIBERATIVE

*Second*, imposition of a vulnerability screening requirement would fail to meet the foreign policy goals of providing an alternative option for a broader swath of Venezuelan nationals who would otherwise make the dangerous journey to the U.S.-Mexico border. Because only a subset would likely meet vulnerability criteria (particularly if there is a high standard for establishing vulnerability), the parole process might not be deemed a viable alternative to irregularly crossing and entry; it would, as a result, fail to serve the disincentive to irregular migration this process seeks to achieve.

For these reasons, DHS determined that keeping eligibility at the nationality level—like U4U—is the best option to achieving the multiple goals of reducing flows to the border, responding to the foreign policy requests of partner nations, and providing protections to deserving Venezuelan nationals.

## V.   Consideration of alternative approaches

DHS has considered several alternative approaches to managing the current surge in migration from Venezuela. These alternative approaches are weighed based on the following key goals, as identified above: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

1. Status quo

First, DHS considered the impact of keeping the status quo, which has resulted in record encounters at the SWB driven by a surge in migration by Venezuelan nationals. Venezuelans account for an estimated 186,000 unique encounters in FY 2022, up from 47,328 unique encounters in FY 2021, an increase of 293 percent. Venezuelans alone account for 22 percent of the total growth in unique encounters between 2021 and 2022.[51]

Importantly, DHS anticipates that encounters of Venezuelan nationals at the border are likely to continue to increase in the coming weeks and months. As noted above, Panama has seen a 30-fold increase of Venezuelan nationals crossing irregularly into its territory from Colombia over the past six months, with more than 12,700 entering irregularly during the week ending October 1, 2022. And, as noted above, Panama is currently encountering more than 3,000 people, mostly Venezuelans, entering from Colombia through the Darién Gap each day. This sharp increase shows no signs of abating absent material changes such as those proposed here.

---

[51] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data through September 30, 2022.

21

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

As described above, the current surge in Venezuelan migration has forced DHS to reallocate resources and personnel to the SWB. Although DHS will continue to use all available resources to enforce the immigration laws of the United States and secure our borders, maintaining this level of emergency supplemental appropriations and TDY staffing to support SWB operations is simply not sustainable in the long term.

For these reasons, DHS has concluded that maintaining the status quo is not an option.

2.  Increased enforcement by third countries

DHS considered whether there is more that could be done to diplomatically influence other foreign partners in the region to do more to address these irregular migratory flows. However, we have already been engaging at the highest levels of government with these countries and many have extended themselves in historic ways with limited results. The bottom line is that our foreign partners in the region have seen record movements of migrants that far outstrip their capacity to process and provide protection, and they simply do not have the capability to meaningfully impact these flows in the immediate term, as is needed.

Simply pressing foreign partners to do more—without also taking steps to provide a lawful process for entry to the United States that can meaningfully shift incentives against irregular migration—will not achieve the desired goals of this process.

3.  Increasing removals to home countries

As noted above, DHS data shows that increases in returns of individuals from a given country can reduce encounters at the border over time. For example, increases in returns to Guatemala, Honduras, and El Salvador from the United States and Mexico over the past year have led to a sustained decrease in encounters at the border.

DHS considered whether more could be done in the immediate term to increase returns of Venezuelans to Venezuela. However, that is currently not a viable option given the current status of diplomatic relations with Venezuela.

As stated above, DHS intends to continue to work to address root causes, including the political instability and repression that have led to difficulties in returning Venezuelans to Venezuela. That, however, will require time and is not a viable option to meet immediate needs.

4.  Utilizing contiguous territory return authority

DHS considered whether resuming and greatly scaling up the return of Venezuela individuals to Mexico under section 235(b)(2)(C) of the INA, either by restarting the Migrant Protection Protocols (MPP) or via another programmatic use of the authority, would have a similar effect to the proposed process. Notably, the contiguous territory return authority that was used to implement MPP can only be used with individuals "pending a proceeding" under INA § 240—meaning that any individual returned to Mexico under this authority would need to be placed in

22

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000138

PRE-DECISIONAL/DELIBERATIVE

full removal proceedings, in the United States, and continue to come in and out of the United States for court hearings. DHS has concluded that this is not a feasible or preferred option for the following key reasons:

*First*, it would not necessarily diminish the strains at the border and could potentially exacerbate them. Moreover, those enrolled in MPP need to periodically enter the United States for their court hearings and then return to Mexico afterwards. The need to process these individuals each they time for their court hearings, and maintain custody of them while they are in the United States, adds to the strain on already stretched resources along the SWB.

By contrast, the parole process DHS is proposing is specifically designed to provide significant incentives for Venezuelan nationals to apply to travel to the United States from where they are situated, and to incentivize them not to travel to Mexico in the first instance. Venezuelan nationals who are in Mexico as of the day of the announcement would also have no need to travel to, or congregate along, the SWB.

*Second*, the application of MPP generally results in concentrating individuals close to the border, in some of the most dangerous parts of Mexico. This is because individuals who are enrolled in MPP must remain proximate to the border so that they can travel to and from their court hearings—creating significant humanitarian concerns.[52] In previously considering whether to continue MPP, the Secretary ultimately concluded that the "substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico" outweighed any potential gain in terms of reduced migratory flows.[53] The recent court-ordered reimplementation of MPP confirmed these concerns, as individuals were subject to kidnappings, rapes, and other targeted violence.[54]

*Third*, it is operationally infeasible. Even at its height in August 2019, only 12,000 individuals per month were enrolled in the MPP program, or roughly 400 a day. This is considerably less than the more than 1,200 Venezuelan nationals currently being encountered at the border daily. To employ the contiguous return authority at scale, the United States would need to build and develop a massive amount of infrastructure for noncitizens to be processed in and out of the United States throughout the duration of their removal proceedings. This would require, among other things, the construction of additional court capacity along the border, additional funding for transportation and security contracts, additional immigration judges and ICE prosecutors to conduct the hearings, and more CBP personnel to receive and process those who are coming into and out of the country to attend court. The number of resources needed to put

---

[52] Robbie Whelan. *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program.* Wall Street Journal. December 28, 2019. Available at: https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000

[53] *See* Memorandum from Secretary Mayorkas to ICE Director Tae D. Johnson et al re Termination of the Migrant Protection Protocols at 2 (Oct. 29, 2021); *see also* DHS, Explanation of the Decision to Terminate the Migrant Protection Protocols (Oct. 29, 2021).

[54] Human Rights First. *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico.* September 15, 2022. Available at https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico/.

23

Venezuela AR_000139

PRE-DECISIONAL/DELIBERATIVE

in place a program at the scale needed to address the current flows, and with the appropriate humanitarian protections, is simply not operationally feasible.

*Fourth,* implementation of MPP requires Mexico's unilateral concurrence and support—something that is unlikely at scale. When the Department was under a court-ordered obligation to re-implement MPP, Mexico only agreed to accept the return of a small number of MPP enrollees, consistent with available shelter capacity in specific regions. Even those limited returns had to be paused on a number of occasions due to security concerns raised by Mexico or a lack of shelter capacity.

5. Increasing the use of detention for Venezuelan nationals

DHS considered whether it could detain all or most Venezuelan nationals instead of conditionally releasing them, and thus deter flows and avoid some of the impact in border communities as a result. There are, however, legal and operational limits in the ability to do so.

*First,* there are legal limits on the duration of detention for those ordered removed and who—like the Venezuelan nationals—do not have a significant likelihood of removal in the foreseeable future. Specifically, the U.S. Supreme Court's ruling in *Zadvydas v. Davis* restricts DHS from detaining individuals with final orders of removal for more than 180 days unless there is a significant likelihood of removal in the reasonably foreseeable future.[55]

*Second,* it is not a viable option operationally. Even if ICE diverted all of its detention space to focus on Venezuelan nationals, it would reach its detention capacity in three weeks. Doing so would, however, mean that ICE would no longer have space to detain those put in expedited removal who *could* be removed to their home countries. It would mean releasing others, some of whom may be deemed national security and public safety threats, in contradiction of both statutory mandates and the common-sense policy decision to focus detention space on those who pose a threat to public safety. For these reasons, DHS assesses that addressing the problem by detaining large numbers of Venezuelan nationals is not a viable option at this time.

6. Increasing other lawful pathways to the United States and other countries

DHS could focus *only* on the lawful pathways, including protection processes, that are already in place and have been already announced. As part of these efforts to meet the deliverables outlined in the L.A. Declaration, the U.S. Government committed during the Summit of the Americas in June 2022 to resettle 20,000 refugees from the Western Hemisphere in FY 2023. The U.S. Government also committed to increasing immigrant visa adjudications.[56] However, those alternative processes are narrow and in many cases difficult to access.

---

[55] *Zadvydas v. Davis,* 533 U.S. 678 (2001).
[56] Fact Sheet: The Los Angeles Declaration.

24

PRE-DECISIONAL/DELIBERATIVE

Venezuela AR_000140

PRE-DECISIONAL/DELIBERATIVE

A key feature of this new process that differentiates it from other processes and programs—and that we deem critical to meet the current moment—is that it is intended to be fully virtual and accessible from anywhere. We thus assess that existing programs are unlikely to provide a sufficiently available and attractive incentive to impact the flows from Venezuela today—and that regional efforts to improve lawful pathways, while critically important, will not be sufficiently timely to address the immediate needs. We thus assess a need to implement the process being considered in order to provide the incentive to wait, rather than make the dangerous journey to the border that we are trying to deter.

## VI.   Administrative Procedure Act

This proposal is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[57] *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[58]

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[59] In addition, although under the Administrative Procedure Act, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[60] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Venezuelan nationals to enter the United States. The United States will not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly across the SWB to Mexico, and the United States ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is

---

[57] 5 U.S.C. § 553(b)(A).
[58] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).
[59] 5 U.S.C. § 553(a)(1).
[60] *See, e.g., Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).

25

Venezuela AR_000141

PRE-DECISIONAL/DELIBERATIVE

prepared to make a unilateral decision to accept a substantial number of Venezuela returns.
That willingness to accept the returns could be impacted by the delay associated with a public
rulemaking process involving advance notice and comment and a delayed effective date.
Additionally, making it publicly known that we plan to return nationals of Venezuela to
Mexico at a future date would likely result in a surge in migration, as migrants rush to the
border to enter before the rule becomes final—which would adversely impact each country's
border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign
partners—and necessary for addressing migration issues requiring coordination between two or
more governments—it is also fully aligned with larger and important foreign policy objectives
of this Administration and fits within a web of carefully negotiated actions by multiple
governments (for instance in the L.A. Declaration). It is the view of the United States that the
implementation of this process will advance the Administration's foreign policy goals by
demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing
migration through the hemisphere, both of which are essential to maintaining a strong bilateral
relationship.

The invocation of the foreign affairs exemption here is also consistent with Department
precedent. In 2017, for example, DHS published a notice eliminating an exception to
expedited removal for certain Cuban nationals, which explained that the change in policy was
consistent with the foreign affairs exemption because the change was central to ongoing
negotiations between the two countries.[61]

*Third*, DHS assesses that there is good cause to find that the delay associated with
implementing this process through notice-and-comment rulemaking would be impracticable
and contrary to the public interest because of the need for coordination with the GOM
described above, and the urgent border and national security and humanitarian interests in
reducing and diverting the flow of irregular migration.[62] It would be impracticable to delay
issuance in order to undertake such procedures because—as noted above—maintaining the
status quo, which involves record numbers of Venezuelan nationals currently being
encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited
options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's
ability to fulfill its critical and varied missions. At current rates, a delay of just a few months
to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce
and divert migrant flows in the near term, harm border security, and potentially result in scores
of additional migrant deaths. Undertaking such procedures would also be contrary to the
public interest because an advance announcement of the proposed process would seriously
undermine a key goal of the policy by incentivizing even more irregular migration of
Venezuelan nationals seeking to enter the United States before the process would take effect.

---

[61] *See* 82 FR 4902 (January 17, 2017).
[62] *See* 5 U.S.C. § 553(b)(B).

26

Venezuela AR_000142

**Recommendation**

Given the immediate challenge we face along the SWB as described in this memo, and the time it will take for the long-term administration strategy to produce durable and lasting results to irregular migration, we recommend the immediate and temporary approach described in this memo to address the current challenge as we await results from the long term, durable approach. Therefore, we recommend that you approve this memo in full, including the proposed parole process for Venezuelan nationals and the accompanying rationale.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

Approve/ ███████████████

10/12/22

Disapprove/date _____

Modify/date _____       Needs discussion/date _____

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 074

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,                    §
                                             §
        *Plaintiffs*,                        §
                                             §
        vs.                                  §        CIVIL ACTION NO.
                                             §        6:23-CV-00007
UNITED STATES DEPARTMENT OF                  §
HOMELAND SECURITY, *et al.*,                 §
                                             §
        *Defendants,* and                    §        JUDGE DREW B. TIPTON
                                             §
VALERIE LAVEUS, *et al.*,                    §
                                             §
        *Intervenor Defendants.*             §


# INTERVENOR DEFENDANTS'
# TAB 74, ECF 175-9

Case 6:23-cv-00007   Document 95-75-9   Filed on 08/24/2023 in TXSD   Page 30 of 82

PRE-DECISIONAL/DELIBERATIVE

<div style="border:1px solid">

**EXHIBIT 8**

</div>

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

December 22, 2022

**ACTION**

## MEMORANDUM FOR THE SECRETARY

FROM:        Robert Silvers
               Under Secretary
               Office of Strategy, Policy, and Plans

ROBERT P SILVERS — Digitally signed by ROBERT P SILVERS Date: 2022.12.22 18:05:25 -05'00'

                Troy Miller
               Acting Commissioner
               U.S. Customs and Border Protection

TROY A MILLER — Digitally signed by TROY A MILLER Date: 2022.12.22 19:39:13 -05'00'

                Ur M. Jaddou
               Director
               U.S. Citizenship and Immigration Services

UR M JADDOU — Digitally signed by UR M JADDOU Date: 2022.12.22 18:36:35 -05'00'

SUBJECT:      **Updates to the Parole Process for Certain Venezuelan Nationals**

**1. Summary**

On October 12, 2022, PLCY, CBP, and USCIS recommended, and you approved, a new process for Venezuelans that provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at the port of entry, on a case-by-case basis for urgent humanitarian reasons or significant public benefit.[1]  This process is contingent on DHS's ability to impose a consequence on such individuals for entering the United States without authorization along the Southwest Border (SWB).  Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2]  It also has led to a precipitous decline in Venezuelan irregular migration

---

[1] *See* Memorandum for the Secretary from Under Secretary for Strategy, Policy, and Plans Silvers et al, re Parole Process for Certain Venezuelan Nationals, Oct. 12, 2022; DHS, DHS Announces New Migration Enforcement Process for Venezuelans, Oct. 12, 2022, https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

throughout the Western Hemisphere.  The number of Venezuelans attempting to enter Panama through the Darién Gap was down from 40,593 in October to just 668 in November.[3]

For the reasons described in the October 12 memo, and based on the demonstrated success of the process, DHS would like to ensure its continuation, including to account for the expected transition from enforcing the Centers for Disease Control and Prevention's (CDC) public health Order issued pursuant to Title 42 authorities to immigration processing pursuant to Title 8 authorities.  As such, the purpose of this memo is to recommend two changes to the existing process for Venezuelans:

1) Removing the 24,000 limit on travel authorizations for Venezuelans.  This would be replaced with a monthly cap of 30,000 travel authorizations across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate memoranda sent to you today).  Each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

   This change reflects the fact that DHS has received about 100,000 supporter applications over the first two months of the process.  It would, as a result, allow DHS to continue to maintain a strong incentive for Venezuelan nationals to wait in safe locations and apply and be vetted to fly directly to the U.S., rather than entering without authorization at the SWB.  This change further accounts for DHS establishing similar—but separate and independent— parole processes for nationals of Cuba, Haiti, and Nicaragua.

2) Updating the eligibility criteria by including an exception that would enable Venezuelans, who crossed without authorization into the United States at the SWB and were subsequently authorized a one-time option to voluntarily depart or voluntarily withdraw their application for admission, to still maintain their eligibility to participate in this parole process.  This change would preserve resources that otherwise would be expended on processing individuals through expedited removal or full removal proceedings, and allow more individuals the option to seek parole through this process.  This change would also update the dual nationality ineligibility provision to accommodate the implementation of other similar parole processes.

DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing irregular migration at our border and throughout the hemisphere, and instead channels these flows into a safe, secure, and orderly process that is sufficiently robust to continue to incentivize migrants to use it.

**II. Background**

---

[3] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEM BRE_2022.pdf (last viewed Dec. 11, 2022).

2

Case 6:23-cv-00007   Document 95-5   Filed on 08/24/23 in TXSD   Page 32 of 82

PRE-DECISIONAL/DELIBERATIVE

On October 19, 2022, DHS published a Federal Register Notice to describe a new effort to address the high number of Venezuelans encountered at the SWB.[4]  To date, Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization, are either expelled to Mexico pursuant to the CDC's Title 42 public health Order or, if not expelled, processed for removal proceedings or the initiation of such proceedings.

Upon the termination of the Title 42 public health Order, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities.  For this process to continue to be effective, the Government of Mexico (GOM) will need to make an independent decision to accept the return of Venezuelan nationals under Title 8 processes—thus continuing to maintain, and expand, on the success of the Venezuela process to date.

*Eligibility to Participate in the Process*

Pursuant to the October 12 memorandum, DHS implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner.  To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022.  Venezuelan nationals also are ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela; as a conforming change, this memorandum seeks your approval to limit this "dual national ineligibility provision" such that it does not apply if DHS operates a similar parole process for the additional country's nationals.  Only those who meet all specified criteria would be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.  The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

**III. Assessment of the Process to Date**

The Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can yield a meaningful change of migratory flows.  The new parole process for Venezuelans enables those who are backed by supporters in the United States to come to the United States by flying to interior ports of entry— thus obviating the need for such individuals to make a dangerous journey to the SWB.  Meanwhile, the GOM made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health

---

[4] *Id.*

3

PRE-DECISIONAL/DELIBERATIVE

order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process.

Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day.[5] As of the week ending December 4, the number has fallen further, to an average of 86 a day.[6] With the vast majority of those encountered returned to Mexico, fewer releases has freed up DHS resources that would otherwise be used to process these individuals; it also means fewer individuals for state and local governments, as supported by civil society, to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién Gap have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[7] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[8] And still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[9]

DHS has seen strong interest in this parole process. As of December 12, 2022, DHS has received almost 96,000 supporter applications, confirmed more than 18,600 of them, and authorized travel for more than 14,700 Venezuelan beneficiaries. Already more than half of the available number of travel authorizations have been approved.[10] Of those authorized to travel to the United States, more than 8,400 have arrived and were paroled into the country.[11] Nearly 2,800 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 1,900 came from Venezuela, 1,200 from Mexico, and 2,500 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[12]

## IV. Proposed Changes

---

[5] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.
[6] *Id.*

[7] La Prensa Latina Media, *More Than 4,000 Migrants Voluntarily Returned to Venezuela from Panama*, Nov. 9 2022, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/, (last viewed Dec. 8, 2022).

[8] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, Oct. 14, 2022, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html, (last viewed Dec. 8, 2022).

[9] Axios, *Biden's New border Policy Throws Venezuelan Migrants into Limbo*, Nov. 7 2022, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap, (last viewed Dec. 8, 2022).

[10] Department of Homeland Security, Daily Venezuela Report, Dec. 12, 2022.
[11] *Id.*
[12] *Id.*

4

Venezuela AR_000147

Case 6:23-cv-00007   Document 95-5   Filed on 08/24/23 in TXSD   Page 34 of 82

PRE-DECISIONAL/DELIBERATIVE

Given the early success of the process, DHS is seeking two changes to the process to ensure its continued viability, particularly as we prepare for an eventual transition from Title 42 processing to full Title 8 processing at the border.

*Replace the 24,000 limit on travel authorizations*

As provided for in the October 12 memorandum and described in the October 19 *Federal Register* Notice, there is a limit of 24,000 travel authorizations issued as part of the Venezuela process. The demand has exceeded the limit. As of December 12, in less than two months of operation, DHS has received more than 96,000 applications from supporters, and has approved well more than half of the available travel authorizations (14,700 of 24,000). When DHS reaches the numerical cap, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see an increased irregular migration of Venezuelans as a result.

Accordingly, we recommend that you replace the numerical limit on travel authorizations for Venezuelans. We recommend that you replace it with a monthly cap of 30,000 travel authorizations spread across this process and the separate and independent processes recommended for nationals of Cuba, Haiti, and Nicaragua. Under this change, DHS would continue to intake applications and process travel authorizations at a pace that could accommodate up to 30,000 each month, but would retain flexibility within that cap in terms of how the authorizations are considered and processed. This recommended change is based on DHS's experience with the pre-existing Venezuela process, taking into account a combination of DHS resource limitations, supporter and beneficiary demand, and an assessment of the effect on migratory flows. We recommend that the Department continue to evaluate this cap and make adjustments if needed over time.

As before, the Secretary would retain the sole discretion to terminate the process at any point. Although the monthly limit on the number of travel authorizations granted under this process would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans , each of these processes would operate independently, and any action to terminate or modify any of the other processes would have no bearing on the criteria for or independent decisions with respect to this process.

*Update eligibility criteria*

With the GOM's independent decision to accept returns of Venezuelans, DHS is currently expelling Venezuelans who are encountered after entering the United States without authorization, pursuant to the Title 42 public health order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[13]

---

[13] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

5

Case 6:23-cv-00007   Document 95-5   Filed on 08/24/23 in TXSD   Page 35 of 82

PRE-DECISIONAL/DELIBERATIVE

When the Title 42 public health order is no longer in place, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8 authorities, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to INA § 240B, 8 U.S.C. § 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4), or may be ordered removed. DHS assesses that this change will, in addition to providing migrants a one-time opportunity to continue to access a parole process about which they may not have been fully informed, be appreciated by the GOM and inform their internal decision making as they consider whether to make an independent decision to accept the return of migrants processed pursuant to Title 8. In addition, permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

If the proposed change is put into effect, individuals would, in general, continue to be ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization along the SWB after October 19, 2022. The change would, however, introduce the following exception: individuals who have been permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) would still maintain their eligibility to participate in the parole process. This change would only be applicable for those individuals who crossed into the United States after December 20, 2022.

DHS considered not implementing this request but decided that it was needed to inform the Government of Mexico's independent decision to accept the return of Venezuelan nationals under Title 8 processes. This in turn is critical to our ability to continue combining the Venezuela process with a consequence for those who fail to pursue this process and instead cross the SWB without authorization; this change is in the Department's interest at this time.

## VI. Administrative Procedure Act

The October 12 memorandum authorizing this process explained that implementation of this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[14] (2) the process pertains to a foreign affairs function of the United States,[15] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[16] The changes recommended in this memorandum are amenable to immediate issuance and implementation for the same reasons.

---

[14] 5 U.S.C. § 553(b)(A).

[15] 5 U.S.C. § 553(a)(1).

[16] 5 U.S.C. § 553(b)(B).

6

PRE-DECISIONAL/DELIBERATIVE

First, these changes relate to a general statement of policy, *i.e.*, a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[17]  As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, these changes continue to pertain to a foreign affairs function of the United States, as described in the October 12 decision memorandum, and are directly responsive to ongoing conversations with, and requests from, foreign partners.  Specifically, the GOM has urged the U.S. to consider lifting the 24,000 limit,[18] which would allow more Venezuelans able to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders.  Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's willingness to continue to accept returns under Title 8 processes and produce undesirable international consequences.  Absent these changes, once the Title 42 public health order is lifted, DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable.  That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere, and to our border.

Finally, even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.  Specifically, as noted above, absent the implementation of these changes DHS would not be able to seamlessly transition the Venezuela process to Title 8 authorities after the Title 42 public health order ceases to be in effect.  This would, in turn, undermine the substantial improvement to border security that has been achieved through the dramatic reduction of unauthorized entries that has resulted from the implementation of the Venezuela process to date.  For these reasons, DHS cannot delay in issuing the FRN associated with this process.

---

[17] *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[18] Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock'*, Dec. 13, 2022, https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/. (last viewed Dec. 14, 2022)

7

Case 6:23-cv-00007   Document 95-5   Filed on 08/24/23 in TXSD   Page 37 of 22

**Recommendation**

For the reasons described in this memo, we recommend that you approve the two changes to the process for Venezuelans, announced on October 12, 2022 and implemented on October 19, 2022.

1. Remove the 24,000 limit on travel authorizations put in place by the prior *Federal Register* notice and instead establish a monthly limit that would be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans, and shall not exceed 30,000 each month.

2. Update the eligibility criteria in the previous *Federal Register* notice by including an exception that would permit Venezuelans who crossed without authorization into the United States after December 20, 2022, who have been permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c, or a single voluntary withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4), to maintain their eligibility to participate in this parole process. This change also updates the dual nationality ineligibility provision to accommodate the implementation of other similar parole processes.

We further recommend that you approve the sending of a draft *Federal Register* notice (FRN) that reflects this decision memo into interagency clearance. Once through interagency clearance, the FRN will be presented to you for final approval and signature.

This memorandum, once approved, would, together with the October 12 memorandum, be an internal policy statement of the Department of Homeland Security. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

Approve/date ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ prove/date _____

DEC 2 2 2022

Modify/date _____   Needs discussion/date_____

8

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 075

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 75, ECF 175-10

 U.S. Chamber of Commerce

**EXHIBIT 9**

# Understanding America's Labor Shortage: The Most Impacted States

Every state is facing an unprecedented challenge finding workers to fill open jobs. Learn which states have been impacted the most by the nation's worker shortage crisis.



**Lindsay Cates**

Senior Manager, Communications and Strategy, U.S. Chamber of Commerce

**Stephanie Ferguson**

Director, Global Employment Policy & Special Initiatives, U.S. Chamber of Commerce

**Published**

May 02, 2023

America is facing a worker shortage crisis: There are too many open jobs without people to fill them. The interactive map below shows which states are suffering the most from a labor shortage by comparing their Worker Shortage Index ratios.

The Chamber's Worker Shortage Index ratio indicates the number of available workers for every job opening. States with a higher ratio have more workers available to fill open jobs. For example, a ratio of 0.39 means a state has just 39 workers for every 100 open jobs. A ratio above 1.0 would indicate a surplus of available workers compared to job openings.

# The Worker Shortage Across America

Explore the interactive map below to see the impact of the worker shortage crisis in each state.

**State**

Select a state                                                      ⌄



**Worker Shortage Index**

| Least Severe | Severe | More Severe | Most Severe |

Workforce Data Definitions (BLS):

- **Job Openings:** All positions that are unfilled and have available work

6/19/23, 6:35 PM Case 6:23-CV-00007standDocumentsst175r shortagFilerd eonstas06s/20/29sates TXSDhanPage 3coofe8e

- **Unemployed Workers:** People that do not have a job, have looked for work in the last four weeks, and are currently available and able to work

- **Labor Force Participation Rate:** The percentage of the population that is working or actively looking for work

- **Quit Rate:** The number of employees who voluntarily quit as a percent of total employment

- **Hire Rate:** All additions to payroll as a percentage of total employment

## More State-by-State Workforce Analysis

There is a national worker shortage affecting the nation, and many states are feeling the impact. The vast majority of states have more job openings today than it had before the pandemic, while labor force participation remains below pre-pandemic levels.



The U.S. has lost millions of workers since the start of the pandemic. As of February 2023, the national labor force participation rate is .7 percentage points below pre-pandemic levels. That equates to 1.8 million workers who have left the workforce since the start of the pandemic in February 2020.



Oregon, Illinois, Alaska, Oklahoma, Utah and New Jersey are the only states that have a higher percentage of their labor force working than before the pandemic. The vast majority have seen their labor forces shrink because of early retirements, increased savings, less immigration, among other factors.

# How Does Each State's Labor Force Participation Rate Compare to Pre-Pandemic?*



March 2023

More participation          Less participation

*February 2020
Source: Based on December 2022 labor force participation
rates. U.S. Chamber of Commerce Analysis, BLS Data

The U.S. Chamber and U.S. Chamber Foundation are helping employers discover and develop talent through the America Works Initiative. For more information, contact Jenna Shrove at jshrove@uschamber.com.

**About the authors**



**Lindsay Cates**

Lindsay is a manager on the communications and strategy team. She previously worked as a writer and editor at U.S. News and World Report.



**Stephanie Ferguson**

_____

**Topics**

WORKFORCE    ECONOMY

View this online



©2023 U.S. Chamber of Commerce