AO386-B

**DEFENDANT'S EXHIBIT**

CASE
NO. 6:23-CV 00007

EXHIBIT
NO. 098

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 98, ECF 175-33



# A Vanishing Breed

## How the Decline in U.S. Farm Laborers Over the Last Decade Has Hurt the U.S. Economy and Slowed Production on American Farms

**JULY 2015**

Prepared for the Partnership for a New American Economy by
Stephen G. Bronars, Ph.D.
*Partner, Edgeworth Econonics*



PARTNERSHIP FOR A
NEW AMERICAN
ECONOMY

EXHIBIT
32

## TABLE OF CONTENTS

Executive Summary ........................................................................................................... 1

Part I: Introduction ............................................................................................................ 4

Part II: Background ............................................................................................................ 6

Part III: The Scale of the Decline ..................................................................................... 7

Part IV: Analyzing the Farm·Labor Shortage by Region ............................................... 9

Part V: Evidence That the Decline in Workers Led to a Labor Shortage ..................... 12

Part VI: How Immigration is Driving the Shortage and Changing the Profile of U.S. Farmworkers ..... 15

Part VII: The Impact on the Economy ............................................................................ 21

Part VIII: Conclusion ....................................................................................................... 24

Methodology Appendix .................................................................................................... 25



PARTNERSHIP FOR A
NEW AMERICAN
ECONOMY

## ABOUT THE PARTNERSHIP FOR A NEW AMERICAN ECONOMY

The Partnership for a New American Economy brings together more than 500 Republican, Democratic and Independent mayors and business leaders who support sensible immigration reforms that will help create jobs for Americans today. Visit www.renewoureconomy.org to learn more.

# EXECUTIVE SUMMARY

In the last few years, many Americans have heard stories about the difficult labor situation faced by many U.S. farmers. Despite unemployment rates remaining high in some parts of the country, news reports have described farmers in Texas losing dozens of acres of carefully cultivated squash due to a lack of available field hands.[1] In Georgia, blackberries have been left to rot in the field,[2] while in California, asparagus and cantaloupe farmers have been forced to abandon fields of otherwise healthy crops, even during a time of drought when crop yields are unusually low.[3] Past research from the Partnership for a New American Economy (PNAE) and the Agriculture Coalition for Immigration Reform has found such labor challenges have created a frustrating reality in the U.S. farming industry: At a time when more Americans are trying to eat fresh and locally grown produce, farmers don't have the labor they need to expand their operations and keep pace with rising demand. From 1998 to 2012, in fact, the share of American fresh produce that was imported grew by more than 79 percent.[4]

In this report, we examine more closely the main source of the issue—the declining supply of labor available to American farmers. Although farmers cultivating labor-intensive crops such as fresh fruits, vegetables, and tree nuts have long worried about the supply of available workers, few national studies have documented the scale of the decline in crop laborers that has occurred in recent years on American farms. In this report, we tackle that gap in the scholarship, relying on data from the National Agriculture Workers Survey, the U.S. Department of Agriculture's Farm Labor Survey (FLS),

## "To lose a healthy crop solely because of labor is pretty agonizing."

BRUCE TALBOTT
Orchard and Vineyard Manager, Palisade, Colorado

and the Census of Agriculture to produce robust estimates of how the agricultural workforce has shifted in the last decade.

Our work presents a troubling picture for American farms—and reiterates what many U.S. farmers have long known. In the last decade, as fewer young agricultural workers have come to the United States, the number of field and crop laborers available to farms has been rapidly declining. This drop has created a severe labor shortage in many key parts of the country vital to American farmers and iconic crops. It has also had an impact far beyond rural America: The lack of workers has not only hurt the ability of U.S. farms to grow and expand, it has cost our economy tens of thousands of jobs in related industries like trucking, marketing, and equipment manufacturing. When the drought on the West Coast ends and crop production returns to normal levels, the labor shortages documented here could be even more dramatic—producing greater economic pain for the region and the country as a whole.

---

1 Rivers, Rebecca. 2013. "Lack of workers prove costly to local producers." Fox 34 News: Lubbock, Texas, August 6.

2 Schneider, Craig. 2011. "Farm owners, workers worry about immigration law's impact on crops." *The Atlanta Journal Constitution*, June 3.

3 Gonzalez, Jonathan. 2013. "California's new drought: Labor shortage in the fields." *Bakersfieldnow.com*, Nov. 20.

4 Bronars, Stephen G. and Zeitlin, Angela Marek. 2014. "No Longer Home Grown." Partnership for a New American Economy and the Agriculture Coalition for Immigration Reform. (Available online.)

# Key findings:

**The supply of workers available to U.S. farmers has been rapidly declining.**
Between 2002 and 2014, the number of full-time equivalent field and crop workers has dropped by at least 146,000 people, or by more than 20 percent. Wage patterns indicate that this caused a major labor shortage on U.S. farms.

**The labor shortage has hurt our country's ability to produce labor-intensive fruits, vegetables, and tree nuts.**
Had labor shortages not been an issue, production of these crops could have been higher by about $3.1 billion a year. Given that farm revenues often trickle down to other industries in our economy, that $3.1 billion in additional farm production would have led to almost $2.8 billion in added spending on non-farm services like transportation, manufacturing, and irrigation each year.  That spending would have created more than 41,000 additional non-farm jobs in our economy annually.

**The number of potential farmworkers immigrating to the United States has greatly slowed over the last decade.**
Between 2002 and 2012, the number of new field and crop workers immigrating to the United States fell by roughly 75 percent. This led to a drop in the number of entry-level workers available for difficult jobs like hoeing, harvesting, and planting.

**Some parts of the country were particularly hard hit by the recent labor decline.**
The number of full-time equivalent field and crop workers in California declined by about 85,000 people between 2002 and 2014. The vast majority of this decline happened before the drought started in 2011. The southeastern part of the United States was also hard hit. Alabama, Georgia, and South Carolina lost about 8,500 workers total, or more than one in four of the crop workers employed in 2002. Colorado, Nevada, and Utah lost 36.7 percent of their full-time equivalent field workforce, or 7,029 people.

**Today's field and crop workers are rapidly aging, signaling even greater potential future challenges when the current generation of workers retires.**
While 36.1 percent of field and crop workers during the 1998–2002 period had arrived in the United States within the past five years, just 11.5 percent were in that situation by 2008–2012. Because many new immigrant farmworkers tend to be young, this has caused the workforce to age dramatically. While 14.2 percent of farmworkers were 45 years old or older in the 1998–2002 period, by 2008–2012, that figure had more than doubled, reaching 27.1 percent.

**U.S.-born workers are not filling labor gaps on American farms.**
From 2002 to 2014, the increase in U.S.-born workers offset less than three percent of the dramatic decline in field and crop workers on U.S. farms caused by dwindling foreign-born workers.

This report makes clear that the manpower challenges faced by U.S. farmers should be a major concern for American policymakers. The 41,000 non-farm jobs that could have been created each year by solving the farm labor shortage would have provided a valuable boost to the U.S. economy during a time when the country struggled to produce enough jobs. The ongoing labor troubles faced by farmers also present major questions about how sustainable it will be for small farmers to continue growing the most labor-intensive fruit and vegetable crops for the long term. Anecdotally, many farmers say they have already shifted some of their acreage to mechanically harvested commodities like corn, alfalfa, and wheat.[5] These crops on average require fewer workers, generate less revenue for the community,[6] and create fewer ancillary jobs.[7] Between 2002 and 2012, some 300,000 acres of farmland previously used to grow fresh fruit, vegetables, and tree nuts were taken out of production altogether.

Despite the unsustainable situation faced by U.S. farmers and ranchers, however, little has been done in recent years to address the underlying labor issue. Key industry groups such as the American Farm Bureau Federation and Western Growers have long advocated for bills that would allow farmers to bring in hundreds of thousands temporary farmworkers during times of high labor need.[8] The current temporary farm guest worker program is so cumbersome, expensive, and unworkable that as recently as 2012, it was used by just 6 percent of all hired farmworkers.[9] For the last decade, however, Congress has failed to pass any sort of concrete temporary visa program for the industry, and mandatory employer verification programs in some states have placed many workers already here out of reach. As this report demonstrates, farmers today are greatly hindered by a situation that forces them to compete for the dwindling supply of workers interested and able to do farm work. Whether the agriculture industry can escape this cycle—and continue to expand and provide for the needs of American families—may very much depend on what happens going forward in Washington.

5 Ibid.

6 Informa Economics. 2007. "An Analysis of the Effect of Removing the Planting Restrictions on the Program Crop Base," p. 13.

7 United States Department of Agriculture, Economic Research Service. 2015. "Agricultural Trade Multipliers." February 26. Available online: http://www.ers.usda.gov/data-products/agricultural-trade-multipliers/effects-of-trade-on-the-us-economy.aspx#.Uxv4zty4mIl.

8 American Farm Bureau Federation. 2015. "Agricultural Labor Reform: Introduction.", accessed May 3, 2015. http://www.fb.org/index.php?action=issues.aglabor

9 Patrick O'Brien, John Kruse, and Darlene Kruse. WAEES and the American Farm Bureau Federation. 2014. "Gauging the Farm Sector's Sensitivity to Immigration Reform via Changes in Labor Costs and Availability."

# PART I
# INTRODUCTION

Last year, Bruce Talbott, a farmer in Palisade, Colorado, was having a major issue on the roughly 400-acre farm that had been in his family since the early 1900s: Finding enough workers to bring in his fruit. Talbott, whose main crop is peaches, has an intense season. During the early part of the peach harvest, in July, trees must be picked every 48 hours to ensure fruit comes off at the perfect level of ripeness. When the season started last year, however, 20 of the 60 crop laborers he needed to do the work were nowhere to be found.

Talbott says that the labor problems he faced last season crept up on him gradually. In the last decade, he says the flow of new, young, immigrant workers that used to join his crew each year slowed first to a trickle and then stopped altogether. Without them, Talbott had to rely on the same workers to return year after year, but many retired or took up jobs in other industries. "I've got a lot of workers older than 50, and one guy who's in his 70s," Talbott says. While those workers continue putting in time on the farm, many of them struggle to work the 10 or 11-hour days sometimes required during peak harvest season. "We welcome these guys back each year like family," Talbott says, "But I'm 56 years old, and I can't do what I did when I was 30, and it's the same with them."

Talbott has dug deep in recent years in an attempt to find workers from other sources. He used teams of prisoners on work release, some of which struggled with the more delicate, skilled aspects of the work. And Talbott says any Coloradan unemployed from another industry "who could walk in the door" was offered a job on the spot. That rarely led, however, to long-time employees: Over several seasons, Talbott had 60 such workers come out at the start of the season, but most dropped out after one or two days, and only two made it through to the end of their contracts. "This is hard, hot work in the sun," Talbott says, "And when you hire guys from other industries, when they get a chance to go back to their old line of work, that's what they do."

Last season those labor shortages wound up taking a toll on Talbott's farm. He had to leave about 100 bins of peaches in the field, or more than 50 tons of product. It was the first time his farm, Talbott Mountain Gold, had actually lost otherwise healthy fruit due to labor issues. "We try to look at the harvest like a war: Sometimes you lose the battle, and you have to go on to the next one," Talbott says, "But to lose a healthy crop solely because of labor is pretty agonizing." The harvest is also a particularly critical time for him: His farm makes 70 percent of its revenue during its 40 days of peak harvest.[10]

In this report, we explore data on the labor challenges that have made the last decade so difficult for fresh fruit and vegetable growers like Talbott. Consistent with Talbott's recent experience, we find that in the last decade there has been a huge drop in the number of new young farm laborers joining the U.S. workforce. In fact, in the parts of the country where the most labor-intensive fresh fruits and vegetables are grown, the size of the full-time equivalent workforce has shrunk by almost a fifth. This has created fierce competition among U.S. farmers for the dwindling number of field laborers that are left—driving up farm wages, leaving huge holes in the workforce, and pushing smaller farms out of business altogether. It has also changed the face of today's farmworkers: Currently, more than one out of every four field laborers is older than age 45, leaving many farmers worrying the situation may only worsen in the coming years as more workers find less physically demanding jobs or retire.

To get a full picture of the current labor issues facing U.S. farms, our analysis relies on several federal data sources. We use data from the United States Department of Agriculture's Farm Labor Survey (FLS) and the U.S. Census of Agriculture to determine how the number of full-time equivalent field and crop workers has dropped in recent years, both nationally and in individual regions. Using data from the National

---

10 Bruce Talbott, interview by Angela Marek Zeitlin, May 13, 2015.

Agricultural Workers Survey, a survey administered by the U.S. Department of Labor, we are able to show that much of this recent decline is due to fewer new immigrants joining the workforce. We also rely on a recent study from the USDA to project the impact that the farm labor situation has had on our broader economy in the last decade.

Our work produces troubling results that have implications not just for our country's $400 billion agriculture industry, but the U.S. economy overall.[11] Considering that experts estimate every farm job supports three additional jobs in related, often higher-paying fields like trucking, irrigation, and marketing, it is little surprise that the precipitous drop in the supply of laborers has had much broader repercussions.[12] We estimate that the dire labor situation affecting U.S. farms has cost our economy almost $3 billion in spending outside of the farming sector each year, and as many as 41,000 non-farm jobs annually.

Talbott says that in his pocket of Western Colorado he has seen the labor situation temper farmers' expansion plans and push many out of the business. While there were about 250 growers in his region when he started 30 years ago, today there are just roughly 60. "Labor played a big role in that," he says. For now, however, he says he will continue trying to find ways to eke out another harvest this year, and hope that Congress overcomes its gridlock and creates a feasible guest worker program that will allow our farmers adequate labor to meet the country's food production needs. "You can't be in agriculture unless you're an optimist," he says, "but the longer things stay unchanged in Washington, it gets harder and harder to be an optimist each year."

11 Randy Schnepf. 2015. "U.S. Farm Income Outlook for 2015" (Feb. 18, 2015), Congressional Research Service, p. 12. Available Online: https://www.fas.org/sgp/crs/misc/R40152.pdf.

12 Holt, James. 2007. Testimony to Committee on Agriculture, U.S. House of Representatives on October 4, 2007, page 5.

# PART II

# BACKGROUND

The goal of this report is to document how dramatically the number of laborers available to U.S. farmers has declined in recent years—particularly the workers needed to harvest the most labor-intensive crops. Before discussing these trends, however, it is necessary to understand some background on the nature of agricultural production.

For many fresh fruits and vegetables, mechanized harvesting is not feasible, meaning growers are dependent upon less-skilled and semi-skilled workers to pick produce by hand.[13] This is far different from commodity crops like corn, soybeans, and wheat that can often be harvested by as few as one or two employees using machines. For this reason, fresh produce growers are often among the first to feel any contraction in labor supply—and they feel it most acutely. We focus on these growers in this report.

In many parts of our analysis, we also discuss the labor declines that have occurred nationally for the farm sector, and specifically for the areas of the country where most of the fresh produce and tree nuts are grown. To produce the latter figures, we exclude some Midwestern states such as Kansas, North Dakota, South Dakota, Iowa, and Nebraska, where commodity crops make up a large share of crop production.[14] In Iowa, for instance, less than .08 percent of the agricultural products sold in 2012 were fresh fruits, tree nuts, vegetables, or melons.[15] The state, however, led the country in terms of its corn production.[16] Such states have far different labor needs than areas such as the southeastern United States or California, which are heavily populated by fresh produce growers. Moreover, any decreases in the agricultural labor force in states that specialize in mechanized crops are likely to reflect other trends, such as increased mechanization or more efficient machines.

On farms, workers can take on a variety of job functions, serving as field or crop workers, livestock workers, graders and sorters, equipment operators, inspectors, or managers. In this report, however, we often focus specifically on field and crop workers. This is largely because this position is the most common one on U.S. farms and is also particularly important to fresh produce or nut growers that are dependent upon hand harvesting. It is also the position most likely to be impacted by any slowdowns in arrivals of young, foreign-born workers in our economy or at the border. From 1998 to 2000, for instance—a period largely before the major shortage farmers are experiencing now—about 80 percent of all field and crop workers in the country were foreign-born, and more than 60 percent of those workers were recent immigrants who had been in the country for fewer than 10 years.[17] This compares to the just over half of all agriculture workers who are generally immigrants.[18]

---

13 Although some crops such as blueberries, baby leaf lettuce, and pungent onions with lower water content can be picked by machine, this statement still holds true for the majority of fruits and vegetables for the fresh market.

14 United States Department of Agriculture, Economic Research Service. 2013. "Corn: Overview." Last modified: May 16. Available Online: http://www.ers.usda.gov/topics/crops/corn.aspx.

15 U.S. Department of Agriculture. 2015. "2014 State Agriculture Overview: Iowa." Accessed June 10, 2015. Available here: http://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=IOWA.

16 Ibid.

17 U.S. Department of Labor, Employment and Training Administration. National Agricultural Workers Survey, 1998–2000.

18 U.S. Census Bureau. American Community Survey, 2009–2013 American Community Survey.

## PART III

# THE SCALE OF THE DECLINE

To assess how the number of field and crop workers has declined in recent years, we rely primarily on the USDA's Farm Labor Survey (FLS), which reports farm employment separately by broad occupations. The survey finds that from 2002 to 2014, the total number of full-time equivalent field and crop workers hired by farms declined by 21.8 percent. In other words, the size of the workforce farmers had to draw from dropped by more than a fifth. A drop was seen among both full-year field and crop workers and seasonal workers involved in shorter harvest seasons. From 2002 to 2014, the number of full-year field and crop workers dropped by 22.8 percent, while the number of full-year equivalent seasonal employees dropped by 18.5 percent.

Of course, a drop in the total number of field and crop workers does not tell us the whole story, as a smaller pool of workers could be putting in more hours on the job. To answer this concern, we also examined this variable, looking at the number of hours worked by field and crop workers.[19] Once again, we found that in 2014, field and crop workers as a group put in roughly 80 percent of the hours they worked as recently as 2002. Specifically, we found that the aggregate number of hours worked by such farm employees fell by 22.4 percent.

While the shortage is already dramatic in percentage terms, the figures are equally powerful when translated into the number of farm laborers missing from the 2014 labor force. Using FLS data and the U.S. Census of Agriculture, we can estimate how the recent drop in the labor supply has impacted the total supply of full time equivalent field and crop workers in the country. Figure 1 indicates that between 2002 and 2014, the number of full-time equivalent field and crop workers in the United States declined by between 146,000 and 164,000

> ## "Two years ago, the situation got so bad, we were barely keeping our heads above water."

**GARY WISHNATZKI**
owner of Wish Farms, Plant City, Florida

people.[20] Even after excluding states in the Midwest—where mechanized agriculture is most likely to replace manual farm labor—the decline in full-time equivalent employment during the period was between 130,000 and 139,000 workers. That represented a decline of almost 20 percent in the parts of the country where the most labor-intensive crops are grown—a major shock to the supply of available field and crop workers.

Farmers who have worked in the industry for decades say that in recent years they have experienced the most severe labor shortages of their careers. That is certainly what Gary Wishnatzki, the owner of Wish Farms in Plant City, Florida, says he has seen recently. To bring in the harvest on his 1,500-acre farm, Wishnatzki typically needs 700 or 800 workers. Strawberries, his primary crop, are incredibly labor-intensive, requiring pickers to revisit each bush every three days to pick the rapidly ripening fruit. "Two years ago, the situation got so bad, we were barely keeping our heads above water," Wishnatzki recalls. That year, despite extensive recruiting, he had only 500 of the

---

19 The Farm Labor Survey reports hours worked per week and number of employees in each of the four survey weeks per year. The results reported in Figure 1 are based on the average across all four weeks of the survey.

20 To ensure that our figures accurately reflect the dynamics at play on U.S. farms, our estimates come from two federal data sources, the USDA's Farm Labor Survey and the U.S. Census of Agriculture. The two surveys use different benchmarks to establish the number of fulltime equivalent field and crop workers in 2002. Baseline employment is somewhat higher in the Census of Agriculture, leading the estimates of decline to appear somewhat larger from that source.

**Figure 1: Supply of Full-Time Equivalent Field and Crop Workers, 2002–2014**



■ 2002   ■ 2014

workers he needed. He lost about a fifth of his crop, an event he says cost him hundreds of thousands of dollars.

Wishnatzki says that because the situation has not improved since then, he's had to substantially cut back on his active acreage. This year, he's harvesting just 500 acres of strawberries, despite demand for his product rising dramatically in recent years. With a lighter crop load, Wishnatzki was able to find enough workers this year to get the job done, but he still has major struggles. "We are so desperate for workers, we can't really put any requirements on the people who show up," Wishnatzki says, "We tolerate absenteeism; our workers pretty much come and go as they please. As an employer, you feel like you've pretty much lost control of the labor force." He says he hopes Congress passes some sort of guest worker bill before the situation deteriorates further. "I worry that Congress isn't going to act until the farming industry is in a full-blown crisis," he says, "but by then, it might be too late."[21]

---

21 Gary Wishnatzki, interview conducted by Angela Marek Zeitlin, May 19, 2015.

## PART IV

# ANALYZING THE FARM LABOR SHORTAGE BY REGION

While the employment of full-time equivalent field and crop workers declined in the United States overall from 2002 to 2014, there was substantial variation in employment changes across regions. Table 2 presents the change in the number of field and crop workers employed in each of the 18 regions identified in the Farm Labor Survey (FLS) between 2002 and 2014. The table also includes figures from the Census of Agriculture to show that the declines are reflected across data multiple sources. As the table shows, the declines in some areas have been particularly dramatic. California leads all the regions in terms of the percentage scale of the recent decline. Between 2002 and 2014, the state lost 87,219 total field and crop workers, according to the FLS, shrinking its workforce by close to 40 percent. The drop in the number of farmworkers was similarly dramatic in the Mountain II region, an area including Colorado, Nevada and Utah. That region lost more than one out of three of its field and crop workers. The southeastern United States, including Alabama, Georgia, and South Carolina, saw its field and crop workforce shrink by almost 27 percent.

Once again, we looked at the aggregate hours worked by all field and crop workers to get a sense of the scale of the decline. We display those figures for each region in Table 1. In 15 of the 18 regions, the number of hours worked by field and crop workers has declined in the last 12 years. And in six regions, the drop in the total number of hours worked by field and crop workers was large enough to exceed 20 percent. In the southern plains region, an area including Texas and Oklahoma, the number of hours worked declined by 23.3 percent. A collection of northeastern states, including New Jersey, Pennsylvania, Delaware, and Maryland, saw the number of hours worked decline by 21 percent. And once again, employment declines in California were sizeable: The

**Between 2002 and 2014, the southeastern United States, including Alabama, Georgia, and South Carolina, saw its field and crop workforce shrink by almost 27 percent.**

number of hours worked by field and crop workers there dropped by close to 42 percent over a 12-year period.

There is no doubt that the drought in California has played a role in farmers' recent agricultural employment and production decisions.[22] However, most of the decline in the number of hired field and crop workers in California occurred before the drought began in 2011. The number of field and crop workers hired in California declined by about 40 percent between 2002 and 2011 but by less than 3 percent between 2011 and 2014. In other words, the adjustments to hiring decisions made by growers and farmers in California in the years leading up to the drought were much larger than the employment changes that occurred afterwards.

Because of California's role as an outlier case, we also considered another possible explanation for some of the labor decline in the state: The recent shift that many California

22 See, for instance: Strom, Stephanie. 2014. "California's Thirsting Farmland." *New York Times*, April 20. Available Online: http://www.nytimes.com/2014/04/21/business/energy-environment/californias-thirsting-farmland.html?_r=0

farms have made away from fresh fruit and vegetable harvesting into popular tree nuts such as almonds and pistachios. It is important to note that the vast majority of U.S.-produced tree nuts tracked by the USDA are grown in California, and the shifting of acreage into such crops is a phenomenon largely unique to the state.[23] Such crops, however, do require less labor, and therefore could theoretically explain some of the recent labor decline in the number of laborers. One study from the University of California- Davis, for instance, estimated that the average acre of almonds, one of the more commonly grown tree nuts, requires about as third as much labor to harvest as an acre of fresh produce.[24]

However, the numbers clearly show that California's shift towards tree nuts cannot explain the majority of the recent decline in field and crop workers. Based on the acreage shifts we saw in the 2002 to 2014 period, we estimate that the move towards tree nuts led to a 9.3 percent decline in the labor needs of California farmers. At the high end, that means that about 20,600 of the missing field and crop workers could be explained by the gravitation towards more tree nuts in the state. Even after accounting for that factor, however, California still saw its supply of full time equivalent field and crop workers fall by 66,600 people—or roughly 30 percent.

As noted earlier, employment changes vary substantially by region. When looking at the impact of shifts in available labor supply on production and hiring decisions for labor-intensive crops, it is important to once again separate the Midwest (the Northern Plains, Corn Belt and Lake regions) from the rest of the United States. Although as Table 2 shows, some regions in the Midwest experienced a decline in the number of hired field and crop workers, overall agricultural employment, including workers hired in other job titles such as equipment operators, tended to increase in these regions.[25] It is also important to note here that in one non-Midwestern region in our analysis, the Pacific Northwest, the number of field and crop workers hired from 2002 to 2014 actually grew by 12.7 percent. Although it is difficult to pinpoint the exact reason for this increase, some of it may be due to the

milder climate in the area or local growers having some moderate success recruiting U.S.-born farmworkers.[26]

## Table 1: Change in the Number of Hours Worked by Field and Crop Workers, 2002–2014

| Region | States | Change in Annual Hours Worked |
|---|---|---|
| Northeast I | CT, ME, MA, NH, NY, RI, VT | -16.4% |
| Northeast II | DE, MD, NJ, PA | -21.0% |
| Appalachian I | NC, VA | -38% |
| Appalachian II | KY, TN, WV | -15.0% |
| Southeast | AL, GA, SC | -26.3% |
| Lake | MI, MN, WI | -8.1% |
| Cornbelt I | IL, IN, OH | -25.5% |
| Cornbelt II | IA, MO | -18.3% |
| Delta | AR, LA, MS | -13.5% |
| Northern Plains | KS, NE, ND, SD | 1.5% |
| Southern Plains | OK, TX | -23.5% |
| Mountain I | ID, MT, WY | 2.8% |
| Mountain II | CO, NV, UT | -22.0% |
| Mountain III | AZ, NM | -10.1% |
| Pacific | OR, WA | 19.4% |
| Florida | FL | -15.3% |
| California | CA | -41.9% |
| Hawaii | HI | -5.8% |
| Overall | - | -22.4% |

---

23 US Department of Agriculture, National Agricultural Statistics Service. "California Agricultural Statistics, Crop Year 2013." 2014. (See page 43.) Available here: http://www.nass.usda.gov/Statistics_by_State/California/Publications/California_Ag_Statistics/Reports/2013cas-all.pdf.

24 University of California Cooperative Extension. "Sample Costs to Produce an Orchard and Produce Almonds." 2012.  Available here: http://aic.ucdavis.edu/almonds/cost%20studies/AlmondSprinkleSV2012.pdf.

25 This increase in other employment categories can be seen in the Census of Agriculture.

26 Although this may be a factor in the Northwest, it is difficult to say with any certainty. In the NAWs we see some evidence that the number of U.S.-born field and crop laborers working in the Northwest appears to have grown in recent years. From 1998 to 2000, 12.87 percent of the full time equivalent field and crop workers in the Northwest region were native-born. Ten years later, in 2008–2012, that figure had risen to almost 20 percent. This occurred during a period when we know that Washington and Oregon were gaining more field and crop workers overall. In the NAWs, however, the Northwest region is defined somewhat differently than it is in the Farm Labor Survey we use for the bulk of the report. In the NAWs, the region includes the states Montana, Idaho, Colorado, Utah, and Nevada in the "Northwest" region, making exact comparisons between the two difficult.

**Table 2: The Magnitude of the Decline in Employment of Full-Time Equivalent Field and Crop Workers Nationally and by Region**

| Region | States | Change in Number of Field/Crop Workers Employed 2002–2014 | | Percent Change |
|---|---|---|---|---|
| | | Farm Labor Survey | Census of Agriculture | |
| California | CA | -67,219 | -65,301 | -39.4% |
| Mountain II | CO, NV, UT | -4,244 | -7,029 | -36.7% |
| Cornbelt II | IL, IN, OH | -9,043 | -14,235 | -31.5% |
| Southeast | AL, GA, SC | -6,956 | -8,667 | -26.9% |
| Appalachian II | KY, TN, WV | -4,777 | -6,170 | -25.4% |
| Cornbelt II | IA, MO | -3,619 | -6,100 | -24.5% |
| Northeast II | DE, MD, NJ, PA | -5,716 | -7,243 | -19.5% |
| Florida | FL | -8,504 | -9,196 | -18.5% |
| Northeast I | CT, ME, MA, NH, NY, RI, VT | -6,027 | -5,926 | -17.9% |
| Southern Plains | OK, TX | -5,669 | -7,133 | -17.6% |
| Delta | AR, LA, MS | -5,950 | -4,803 | -17.0% |
| Lake | MI, MN, WI | -4,434 | -7,412 | -14.9% |
| Mountain III | AZ, NM | -1,853 | -2,860 | -14.0% |
| Appalachian I | NC, VA | -3,798 | -4,431 | -13.4% |
| Mountain I | ID, MT, WY | 233 | 309 | 2.1% |
| Northern Plains | KS, NE, ND, SD | 1,129 | 2,000 | 6.3% |
| Pacific | OR, WA | 7,595 | 9,859 | 12.7% |
| Overall | - | -145,851 | -164,361 | -21.8% |

*Source: Farm Labor Survey and U.S. Census of Agriculture*

# PART V

# EVIDENCE THAT THE DECLINE IN WORKERS LED TO A LABOR SHORTAGE

The steep decline in the number of available farm laborers between 2002 and 2014 on its own does not indicate that a labor shortage actually occurred. Could the decline in the number of workers be the result of more machines taking the place of workers in the agriculture industry? Or could it be due to farmers choosing to take more of their land out of production altogether? In this section, we discuss recent wage data for farm laborers, and how trends in those statistics indicate that the driving force behind the recent declines was a drop in the labor supply, which caused shortages on U.S. farms.

To understand what the wage data means it is useful to first understand the labor patterns on American farms, and in particular, fresh produce operations. U.S. agriculture relies heavily on seasonal and part-year employment because of the nature of agricultural production.[27] Typically, crops must be harvested within a narrow time frame or the considerable investment in the season's harvest will be squandered or lost. According to the 2012 U.S. Census of Agriculture, 63.5 percent of farm jobs in the United States are seasonal, lasting fewer than 150 days during the course of the year. In the case of field and crop workers, who are so essential to fresh produce operations, the season is often far shorter. Based on 2012 Agricultural Census data, we estimate that the average duration of a seasonal farm job is about six weeks. (See the Methodology Appendix for more detail on how we arrived at this and other estimates.)

One consequence of the reduced supply of available farm labor is that it has become much more expensive for farms to hire seasonal farmworkers, a development that has placed a strain on many U.S. farms. Studies have shown that foreign-born farmworkers are much more likely to hold seasonal jobs than U.S.-born field and crop workers, who make up a

small share of the industry.[28] It should be little surprise then that in recent years—as immigration has slowed—wages for seasonal positions have increased. What is surprising, however, is by how much such wages have grown. Using Census of Agriculture data, we estimate that the average payroll cost per seasonal employee increased by 89 percent between 2002 and 2012 while the average cost per full-year employee increased by 33 percent in nominal, non-inflation adjusted, terms. This has meant that seasonal workers have increasingly taken up a larger and larger share of total farm payroll costs. In 2012, 42 percent of growers' payroll costs were being used to pay for seasonal labor, compared to just 36 percent in 2002.

It is worth noting that some of the wage increase that occurred between 2002 and 2012 is likely due to longer duration seasonal jobs. Using U.S. Census of Agriculture data, we estimate that in 2002 the average seasonal job lasted four or five weeks, compared to the six-week average duration in 2012. The addition of one or two weeks to the average seasonal worker's schedule, however, cannot alone explain the full wage increase that has occurred in recent years. Offering jobs with a longer duration may also be a sign that farmers are trying to better compete for a limited number of workers, who can be more selective about the jobs they choose.

To understand the different dynamics at play in the farm sector, it is useful to look at how the real, inflation-adjusted, wages of field and crop workers changed compared to the real wages of other less-skilled jobs during the 2002 to 2014 period. Figure 2 shows that between 2002 and 2014 the average hourly wage of field and crop workers increased by 7.9 percent. While that figure might sound small on the surface, it is notable how much it differs from the eight other occupations considered,

---

27 We use the terms seasonal work and part-year work interchangeably.

28 For example see: Martin, Philip L. and Taylor, J. Edward. 2000. "For California farmworkers future holds little prospect for change," *California Agriculture*, January-February, p. 19–25.

**Figure 2: Hourly Wages of Field and Crop Workers Have Risen Faster than Wages for Other Less-Skilled Positions**



**Figure 3: Employment of Field and Crop Workers Has Declined More than Other Less-Skilled Positions**



*Source: U.S. Farm Labor Survey and Bureau of Labor Statistics, Occupational Employment Statistics*

which represent a wide range of less-skilled jobs across a number of industries, theoretically drawing from similar pools of workers. In all the other occupations, real, hourly wages actually *declined* between 2002 and 2014, in come cases, quite notably. The wages for cashiers, for instance, shrunk by 5.8 percent between 2002 and 2014, while the wages of laundry and dry cleaning workers dropped by 5.0 percent. Comparatively then, field and crop workers saw their wages grow roughly 13 to 14 percent faster than less-skilled workers in those three occupations during the 2002–2014 time period.

While field and crop workers represent the only occupation that experienced real wage growth during the period we consider, the divergence between wage patterns for the field and crop sector and other industries becomes more pronounced beginning in 2008. This indicates that as the economy has improved and employment has increased, employers in non-agricultural industries have been able to find enough workers to fill job vacancies without upward pressure on wages. Farmers, on the other hand, faced a hard time finding sufficient numbers of laborers and have had to bid up wages to attract and retain workers.

One sign of how acute the situation has been in recent years for growers is that farmers have raised the wages of field and crop workers despite a variety of outside pressures that have made it difficult for them do so. Between the 1998 and 2012, the amount of fresh fruits and vegetables imported into the United States grew by 94.6 percent. The amount of fresh fruits grew by 58.1 percent.[29]  That surge in imports—and the downward pressure they placed on prices—hindered the ability of farmers to raise the cost of their goods. From 1998 to 2012, for instance, the price of fresh fruits in the country grew by 39.0 percent— almost 2 percentage points slower than inflation.[30] The price of fresh vegetables grew by 41.5 percent.[31] Had prices grown more rapidly, it would have been easier for farmers to raise wages for their workers; as it is, they had to do so despite it being potentially harmful to the bottom line.

While fruits and vegetables are still largely harvested by hand, machines, of course, improve each year, and farmers gain access to tools that can at least somewhat lessen their reliance on labor. This was certainly true in the 2002 to 2012

period considered here,[32] a time when some crops, such as baby leaf lettuce, became more widely machine harvested.[33] However, wage and employment data indicates that the available supply of field and crop workers has declined *even more* than any decline in demand for labor that has occurred since 2002 due to mechanization. Figure 3 shows that the employment of field and crop workers has declined more rapidly than the employment of of other less-skilled workers since 2002.[34] A decline in the demand for field and crop workers due to mechanization would reduce both their employment and relative wages. In contrast, a reduction in the available supply of needed field and crop workers would reduce their employment *but increase* their relative wages substantially. Looking at Tables 3 and 4 together, it is clear that is what has happened, indicating that a real shortage occurred.

It is also worth noting that we observe both a 19 percent decline in employment and a 14.5 percent increase in relative wages over the period 2002 to 2014 for field and crop workers outside the Midwest.[35] If the demand for field and crop workers remained stable over this period, the correlation described above is consistent with a labor demand "elasticity," or relationship between wages and employment, of 1.3 percent. Put simply, this elasticity means that each 1.3 percent drop in the available supply of labor results in a one percent increase in the wages paid to field and crop workers. These co-movements in field and crop worker wages and employment are consistent with economic theory and existing studies of the demand for farm labor.[36] The co-movements in wages and employment of field and crop workers that we observe are well within the range of elasticity estimates found in a large meta-analysis on farm labor shortages conducted by researchers at Clemson University and Colorado State University in 2000.[37]

---

29 This is based on calculations using U.S. Department of Agriculture Yearbook data. The volume of fresh fruits and vegetables imported is measured in weight. The fresh fruit category excludes some more exotic fruits that are rarely grown in America, such as bananas, limes, and mangoes, which generally do not translate into increased competition for U.S. farmers.

30 Overall inflation figures were calculated using the Bureau of Labor Statistics Inflation CPI Inflation Calculator. Accessed on July 6, 2015. Available here: http:// data.bls.gov/cgi-bin/cpicalc.pl.

31 USDA, Economic Research Service. 2014. "Fresh Fruit and Vegetable Price Spreads." Last updated January 22, 2015. Calculated using data from the Bureau of Labor Statistics and the National Agricultural Statistics Service.

32 From 2009 to the 2012, for instance, The Food, Conservation, and Energy Act of 2008 made $230 million in federal funding available to address five key issues facing the fresh fruit and vegetable industry. One issue considered was how to better mechanize the harvesting of some crops—the first time the government invested in such research since the 1980s. See: Calvin, Linda and Martin, Philip. 2010. "The U.S. Produce Industry and Labor," United States Department of Labor, p. 11.

33 Ibid. p. 40.

34 These data are from the Farm Labor Survey, which reports hours worked per week and number of employees for four survey weeks per year. The results reported in Figure 2 are based on the average across all four survey weeks.

35 While Figure 2 presented evidence on real wage changes (wage changes relative to price changes) for purposes of evaluating the impact of the shift in supply of farm labor we measure changes in the relative wage of farm workers. Between 2002 and 2014 wages of field and crop workers outside the Midwest increased 14.5 percent more than wages of other less-skilled, blue-collar workers.

36 The theory of labor demand and the idea that a shift in labor supply due to a decline in immigration causes co-movements in wages and employment along a labor demand curve is routinely covered in labor economics textbooks. See, for example, Contemporary Labor Economics (10th edition) by McConnell, Brue and MacPherson, McGraw Hill.

37 Espey, Molly and Thilmany, Dawn D. 2000. "Farm Labor Demand: A Meta-Regression Analysis of Wage Elasticities," *Journal of Agricultural and Resource Economics*, 25(1), p. 252-266.

**PART VI**

# HOW IMMIGRATION IS DRIVING THE SHORTAGE AND CHANGING THE PROFILE OF U.S. FARMWORKERS

One reason why farmers today struggle to fill field and crop laborer jobs has to do with a simple reality: In recent years, fewer young immigrants have come to the United States and entered into farm work. Some of this likely has to do with a slowdown in the number of undocumented immigrants attempting to enter the United States in the aftermath of the Great Recession. In the years since 2008, the number of Mexicans apprehended trying to cross the border has hit historic lows, an indicator that immigration is slowing. While the Border Patrol apprehended 1.6 million such immigrants in 2000, the figure hit just 229,000 in 2014.[38] That drop-off has hurt an industry that historically has relied on immigrant workers to fill jobs that Americans have little interest in or expertise in performing. In 2001, before the labor decline, as much as 78 percent of the U.S. crop workforce was made up of immigrants, and 53 percent of all crop workers lacked authorization to work in the United States.[39]

As this section demonstrates, the slowdown in the arrival of young, immigrant farmworkers in the last decade has placed a major strain on American farms. The results in this section use data from the National Agricultural Worker Survey (NAWS), a survey conducted by U.S. Department of

## The slowdown in the arrival of young, immigrant farmworkers in the last decade has placed a major strain on American farms.

Labor that collects information about field and crop workers by surveying farmworkers at their place of work. Because most farmworker jobs are seasonal, and many farmworkers are migrant laborers, the NAWS conducts its survey at the farmworker's place of work rather than his or her household.

Due to the relatively small sample size of the NAWS, we divide the sample into three separate time periods, 1998–2002, 2003–2007, and 2008–2012. Figure 4 shows the distribution of foreign-born field and crop workers by their foreign-born status and length of time since first arriving in the United States for these three time periods. From 1998 to 2002, more than 36 percent of field and crop workers were immigrants who had been in the United States for less than five years. Five years later (from 2003 to 2007), the field and crop workers who arrived in the United States within the past five years had dropped to 26.7 percent. The decline in recent arrivals of immigrants and guest workers accelerated even further in the final set of years we consider. By the 2008–2012 time period,

38 Krogstad, Jens M. and Passel, Jeffrey S. 2014. "U.S. Border Apprehensions of Mexicans Fall to Historic Lows," Pew Research Center, December 30.

39 U.S. Department of Labor, Employment and Training Administration. National Agricultural Workers Survey 2001–2002.

only 11.5 percent of field and crop workers had been in the United States for less than five years—an almost 25 percentage point drop from the figures just one decade years earlier.

The other notable trend in Figure 4 is the increase in the share of field and crop workers who are foreign-born individuals who have lived in the United States for long time periods. During the 1998–2002 period, only 6.5 percent of field and crop workers were immigrants who had arrived in the United States at least 25 years ago. By 2008–2012, more than 15.2 percent of field and crop workers fell into that category, or almost one in six of them. The decline in recent immigrant field and crop workers was partially offset by the increase in employment among foreign-born workers who had been in the United States for at least 25 years. However, for each additional foreign-born field and crop worker in the United States for at least 25 years there were 5.3 fewer workers who recently arrived from a foreign country—showing that the decline in immigration was far greater than more experienced workers could effectively compensate for.

In Table 3 we bring together some of the figures described above to produce hard estimates of how the field and crop worker population has declined in recent years among immigrants in the United States for various time periods. These figures show that almost *all* of the decline in field and crop workers in the United States can be explained by the lack of recent immigrant arrivals. Specifically, from 2002 to 2014, the number of foreign-born, full-time equivalent field and crop workers who have been in the United States for less than five years has declined by roughly 170,000 to 190,000 people. At the same time, the number of foreign-born field and crop workers who arrived in America between five and 25 years ago declined modestly, while the number of foreign-born field and crop workers in the United States for longer than 25 years increased by roughly 35,000 people, slightly offsetting the decline in other immigrant categories.

The slowdown in the number of new, immigrant workers has had an impact on farms all across the country. Table 4 shows that the trend towards fewer recent arrivals of foreign-born workers is apparent in all six of the geographic regions included in the NAWS. (It is worth noting here that the NAWS divides the country into only six regions, whereas the FLS we used earlier to estimate the size of the decline by region divides the country into 18 areas, making their figures not directly comparable.)[40]

40 In the NAWS, the East includes North Carolina, Virginia, Kentucky, Tennessee, West Virginia, Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island, Vermont, Delaware, Maryland, New Jersey, and Pennsylvania. The Southeast includes Arkansas, Louisiana, Mississippi, Alabama, Georgia, South Carolina, and Florida. The Midwest includes Illinois, Indiana, Ohio, Iowa, Missouri, Kansas, Nebraska, North Dakota, South Dakota, Michigan, Minnesota, and Wisconsin. The Southwest includes Arizona, New Mexico, Oklahoma, and Texas. The Northwest includes Idaho, Montana, Wyoming, Colorado, Nevada, Utah, Oregon, and Washington.

### Figure 4: U.S. Field and Crop Workers by Foreign Born Status and Length of Time in United States, 1998–2012



### Table 3: All of the Decline in Employment of Field and Crop Workers has Been due to an Immigration Slowdown

| Years in U.S. | Change in Full-Time Equivalent, Foreign-Born Field/Crop Workers, 2002–2014 | |
|---|---|---|
| | Farm Labor Survey | Census |
| 0 to 4 | -169,123 | -190,586 |
| 5 to 9 | -3,945 | -3,544 |
| 10 to 14 | -3,372 | -3,800 |
| 15 to 19 | -1,875 | -2,112 |
| 20 to 24 | -2,667 | -3,005 |
| 25+ | 31,635 | 35,650 |
| U.S. Born | 2,695 | 3,037 |
| Total Change | -145,851 | -164,361 |
| Total Change Foreign-Born | -148,546 | -167,398 |

**Table 4: Distribution of Foreign-Born Field and Crop Workers by Length of Time in the United States by Region, 1998–2012**

| | Foreign-Born 0 to 4 years in the U.S. | Foreign-Born 5 to 9 years in the U.S. | Foreign-Born 10 to 14 years in the U.S. | Foreign-Born 15 to 19 years in the U.S. | Foreign-Born 20 to 24 years in the U.S. | Foreign-Born 25+ Years in the U.S. | U.S.- Born |
|---|---|---|---|---|---|---|---|
| **East** | | | | | | | |
| 1998–2002 | 39.41 | 13.29 | 8.16 | 3.82 | 2.18 | 2.32 | 30.83 |
| 2003–2007 | 26.07 | 11.94 | 6.88 | 4.4 | 4.35 | 3.96 | 42.39 |
| 2008–2012 | 13.7 | 15.54 | 8.8 | 6.83 | 4.43 | 10.74 | 39.96 |
| **Southeast** | | | | | | | |
| 1998–2002 | 45.56 | 10.72 | 8.01 | 5.11 | 3.02 | 1.66 | 25.91 |
| 2003–2007 | 26.95 | 13.79 | 8.08 | 6.97 | 4.48 | 4.39 | 35.33 |
| 2008–2012 | 13.66 | 16.22 | 14.66 | 10.69 | 4.98 | 8.38 | 31.41 |
| **Midwest** | | | | | | | |
| 1998–2002 | 22.01 | 8.49 | 8.73 | 5.89 | 5.84 | 5.47 | 43.57 |
| 2003–2007 | 13.96 | 9.07 | 5.81 | 4.84 | 3.51 | 7.55 | 55.26 |
| 2008–2012 | 5.95 | 10.4 | 11.64 | 6.54 | 3.15 | 6.38 | 55.95 |
| **Southwest** | | | | | | | |
| 1998–2002 | 24.74 | 8.27 | 14.07 | 11.16 | 7.33 | 12.33 | 22.09 |
| 2003–2007 | 17.4 | 8.49 | 6.17 | 8.49 | 11.6 | 17.36 | 30.55 |
| 2008–2012 | 6.42 | 9.35 | 9.38 | 8.34 | 9.55 | 22.32 | 34.62 |
| **Northwest** | | | | | | | |
| 1998–2002 | 33.69 | 18.27 | 14.39 | 6.82 | 7.07 | .6.89 | 12.87 |
| 2003–2007 | 18.92 | 18.08 | 13.91 | 11.03 | 9.07 | 12.72 | 16.27 |
| 2008–2012 | 7.46 | 17.28 | 14.51 | 13.72 | 9.31 | 18.09 | 19.64 |
| **California** | | | | | | | |
| 1998–2002 | 41.32 | 14.51 | 11.96 | 11.26 | 8.19 | 9.5 | 3.26 |
| 2003–2007 | 38.53 | 14.97 | 12.36 | 9.78 | 8.48 | 12.98 | 3.69 |
| 2008–2012 | 16.49 | 20.45 | 16.01 | 11.13 | 10.13 | 22.13 | 3.67 |

According to the NAWS, the largest relative declines in the share of recent arrivals occurred in the Northwest and the Southeast regions. The largest relative increase in foreign-born workers who arrived in the United States at least 25 years ago occurred in the Southeast and the East.

While the trend towards fewer recent immigrants might seem like a positive development for U.S. farms, particularly if it meant that employers would have access to more experienced and skilled workers, the change has actually translated into meaningful staffing challenges and shortages, particularly for entry-level positions. The length of time that a foreign-born worker has lived in the United States is highly correlated with the length of time the individual has

been working in U.S. agriculture. Inexperienced field and crop workers, a group largely comprised of recent immigrants, tend to work on certain entry-level tasks. Table 5 shows that harvest work is the most common task performed by foreign-born workers who have been in the United States for less than five years, followed by pre-harvest tasks. Pre-harvest work includes hoeing, thinning, and transplanting crops, while harvest tasks are typically the hand picking of crops. With fewer new immigrants arriving, these are the positions farmers often have the most trouble filling.

More experienced workers, on the other hand, tend to work in semi-skilled tasks, which include more technical jobs such as pruning and irrigating. Semi-skilled work is also

**Table 5: Fraction of Foreign-Born Field and Crop Workers Performing Various Farming Tasks, 1998–2012**

**1998–2002**

| Years in U.S. | Pre-Harvest | Harvest | Post-Harvest | Semi-Skilled |
| --- | --- | --- | --- | --- |
| 0 to 4 | 26.7% | 45.9% | 9.9% | 18.4% |
| 5 to 9 | 19.9% | 38.3% | 12.8% | 29.1% |
| 10 to 14 | 19.5% | 36.6% | 12.8% | 31.0% |
| 15 to 19 | 19.6% | 34.9% | 11.1% | 34.4% |
| 20 to 24 | 17.6% | 33.4% | 8.9% | 39.9% |
| 25+ | 19.1% | 41.0% | 4.7% | 35.2% |

**2003–2007**

| Years in U.S. | Pre-Harvest | Harvest | Post-Harvest | Semi-Skilled |
| --- | --- | --- | --- | --- |
| 0 to 4 | 28.6% | 43.6% | 15.0% | 12.8% |
| 5 to 9 | 21.0% | 40.3% | 18.3% | 20.4% |
| 10 to 14 | 22.1% | 34.7% | 20.5% | 22.6% |
| 15 to 19 | 22.5% | 36.0% | 18.8% | 22.7% |
| 20 to 24 | 19.1% | 34.6% | 13.9% | 32.4% |
| 25+ | 21.4% | 30.5% | 13.9% | 34.2% |

**2008–2012**

| Years in U.S. | Pre-Harvest | Harvest | Post-Harvest | Semi-Skilled |
| --- | --- | --- | --- | --- |
| 0 to 4 | 35.6% | 28.6% | 16.5% | 19.1% |
| 5 to 9 | 37.8% | 24.3% | 17.9% | 20.0% |
| 10 to 14 | 32.0% | 25.5% | 17.5% | 24.9% |
| 15 to 19 | 30.9% | 23.9% | 22.7% | 22.5% |
| 20 to 24 | 30.0% | 19.8% | 19.0% | 31.3% |
| 25+ | 24.5% | 23.0% | 16.6% | 35.9% |

more likely to involve some farm equipment. The other type of work represented in Table 5 includes post-harvest tasks, which can include the sorting and grading of crops, and even packing of the crops if it occurs in the field.

The recent trends in the agricultural workforce have also led to a sharp decrease in the number of migrant farmers. Recent arrivals are more than twice as likely as those who have been in the United States 25 years or more to work as migrant farmworkers, or workers who "follow the crop" throughout the year. Figure 6 shows that almost half of recent immigrant field and crop workers are migrant workers. The definition of a migrant farmworker in the NAWS data is someone who works on a farm that is at least 75 miles from their residence. Only about a quarter of foreign-born workers who have been in the United States for 25 years or more

work as migrant laborers. This is likely because foreign-born field and crop workers who are long-term residents of the United States are older and more likely to be assimilated to their communities. However, it does not match the reality of the U.S. farming sector, where many jobs include short harvests in relatively remote parts of the country. Chalmers Carr, the owner of Titan Farms, the East Coast's largest peach growing operation, says that in recent years, he's seen the supply of migrant farmworkers moving north through his area start to dry up. "It used to be that you'd see guys who'd finished the citrus season in Florida moving North as far as New Hampshire and New York to pick apples and blueberries," says Carr, whose farm is based in Ridge Spring, South Carolina, "You can't really count on that anymore."[41]

41 Chalmers Carr, interview conducted by Angela Marek Zeitlin, May 18, 2015.

**Figure 5: Age Distribution of Foreign-Born Field and Crop Workers, 1998–2012**



- 45 and Above
- 26 to 44
- 25 & Under

Given that many outside agriculture often argue that un-employed, U.S.-born workers should be filling American farm jobs, it is worth examining this issue by presenting information about the role U.S.-born workers played filling field and crop positions during the period examined in this study. According to the NAWS data, in the 1998-2002 period, about 20 percent of field and crop workers were born in the United States. By 2008-2012, that figure had risen to roughly 27 percent. As discussed in Section III, this occurred during a period when overall employment of field and crop workers dropped by more than a fifth. Using the distribution of field and crop workers by foreign-born status from the NAWS, we estimate that the increase in employment of U.S.-born field and crop workers offset only 2.7 percent of the decline in field and crop workers that occurred between 2002 and 2014. Our findings echo what growers often say anecdotally—that many native-born workers are unwilling or unable to do farm jobs.

In California, the state that saw the greatest decline in full-time equivalent field and crop workers, U.S.-born farm laborers played a very different role. In the 1998–2002 period, U.S.-born workers made up 3.26 percent of California's field and crop workforce. By the 2008–2012 period, that figure had risen only marginally, growing to 3.67 percent. That growth in the *share* of field and crop workers born in the United States, however, only occurred because of the dramatic decline in the number of foreign-born workers coming into California in the 2002 to 2014 period. In reality, the total number of U.S.-born field and crop workers in California from 2002 to 2014 declined by 31.8 percent. That means that in the state where they were arguably needed most, native-born workers played no role offsetting the labor decline—in fact, they only exacerbated it.

**Figure 6: Fraction of Field and Crop Workers in Migrant Jobs by Foreign Status and Time Period**



- 0-4
- 5-9
- 10-14
- 15-19
- 20-24
- 25+
- U.S. Born

The U.S.-born farmworkers who have entered agriculture in recent years are also not likely to have filled the labor-intensive field and crop jobs that are the focus of this study. U.S.-born field and crop workers tend to gravitate towards the same types of semi-skilled tasks that often attract the most experienced foreign-born workers.[42] Native-born farmworkers are also unlikely to fill migrant-farming jobs, seasonal jobs, and the "follow the crop" jobs that have typically been filled by recent foreign-born arrivals. As Figure 6 demonstrates, just 12 percent of all the field and crop workers employed in migrant-farming jobs in 2008 to 2012 were born in America.

Another interesting consequence of the recent slowdown in the arrival of immigrant farmworkers: The data shows that today's field and crop workers are significantly aging. Figure 5 shows that 38.2 percent of foreign-born workers in 1998–2002 were age 25 and under, and only 14.2 percent were older than age 45. By 2008–2012 the fraction of foreign-born field and crop workers age 25 and under had dropped to 20.7 percent and the fraction of foreign-born workers age 45 and above had nearly doubled to 27.1 percent. The aging of the workforce is a worry to many U.S. farm owners: Unlike other industries, where older workers may be capable of producing more due to their increased experience, studies have consistently found that farm workers pick and process less as they age, likely due to the physically strenuous nature of the work.[43] One study, for instance, found that the productivity of farm workers overall peaks at around age 35 or 45, and declines steeply afterwards.[44] The aging of field and crop workers also poses the threat that in the coming years, retirement may worsen the labor shortage described in this report still further.

Bruce Frasier, a farmer who grows onion plants and cantaloupes on a 2,200-acre farm in southern Texas, knows full well the implications of having an older workforce. Frasier says it has been three years since he's had a new person join the 100-person team of laborers that harvests his fields during the high season. Without new, young workers joining the ranks, Frasier says his workforce has aged dramatically. Today, he estimates that 65 percent of the workers on his farm are older than age 50, and one in five is 60 plus. "We love our workers and have tons of respect for them," Frasier says, "but as they get older, their capacity starts to diminish." Frasier says some of his older workers put in just two or three hours before heading home to rest—and

that can make the harvest difficult. "When the onions are ripe in our region," he says, "they can't really wait."

Frasier says the lack of new workers has created some real labor challenges for his operation and the many onion farms that surround him. "Last year, everyone who was employable in our area was basically employed," Frasier says. That left the onion farms in his area fiercely competing for a small group of experienced and available farmworkers. Frasier says his farm tried raising wages partway through the season to compete with nearby oil fields and other onion operations. In the end though even that wasn't enough. Frasier's farm, Dixondale Farms, still lost 25 to 30 percent of its onion plants. "It's hard to describe the feeling until you experience it," Frasier says, "but it felt like a state of depression." Despite strong demand this year, he says he is turning down about 25 percent of the orders he receives. "We should be expanding," he says, "but we have to be realistic in this labor market."[45]

---

42 This statement is based on tabulations of the National Agricultural Worker Survey from 1998 to 2012.

43 See: Tauer, Loren W. 1984. "Productivity of Farmers at Various Ages," North Central Journal of Agricultural Economics, Vol. 6, No. 1. January, and Weigel. M.M., R.X. Armijos, and O. Beltran. 2014. "Musculoskeletal Injury, Functional Disability, and Health-Related Quality of Life in Aging Mexican Immigrant Farmworkers," Journal of Immigrant Minority Health, Vol. 16

44 Tauer, ibid.

45 Bruce Frasier, interview conducted by Angela Marek Zeitlin, May 14, 2015.

# PART VII
# THE IMPACT ON THE ECONOMY

The sharp decline in immigrant labor described above, coupled with the small number of U.S.-born workers who have taken up farm jobs, has caused the supply of field and crop workers available to farmers to shrink substantially. The resulting reduction in farm laborers is equivalent to a decline of at least 130,000 full-time equivalent field and crop workers in states and regions outside the Midwest—the areas where the most labor-intensive crops are grown. The question we address in this section is: How much higher would the value of crops produced by U.S. farms in recent years have been if growers had had access to an adequate number of workers? And also, how much would our economy have benefitted from that higher production on American farms?

To gain a better understanding of the potential for farm output today, and the loss in farm production experienced over the last decade, it is useful to compare the amount of fruits, vegetables, melons, and tree nuts sold by U.S. farms during the 1992–2002 and 2002–2012 time periods. We focus on these crops because they are the most labor-intensive and therefore the products most likely to be adversely affected by a sharp decline in labor supply. Table 6 shows that between 1992 and 2002 the number of acres harvested for these labor-intensive crops increased by 4.3 percent. In addition, output per acre[46] for fruits, vegetables, melons, and nuts increased by 10.2 percent during the period. Finally, it is important to note that over this time period the number of hours worked by field and crop workers was also increasing, growing by 5.6 percent.[47]

These trends were quite different in the decade from 2002 to 2012, indicating the potential impact of recent labor challenges. First, the number of acres harvested for fruits,

> "The labor situation in the fresh produce industry is probably the most bleak it has ever been. And the future is not looking much better."

JOE MARINO
Owner, Sun Valley Orchards, Swedesboro, New Jersey

vegetables, melons, and tree nuts declined by more than 300,000 acres, falling 5.0 percent. For some crops, the acreage declines were particularly steep: The number of acres devoted to fruits and melons during that period, for instance, fell by 14.6 percent, while growers cut the number of acres they were devoting to vegetables by 13.8 percent. In addition to these declines, output per acre for these labor-intensive crops increased by only 7.4 percent over the period—almost 3 percent less than in the previous decade.

Some of the productivity increase in the 2002–2012 decade, as measured by output per acre, can be explained by the already-mentioned shift to grow more tree nuts in California. We estimate that roughly a third of the increase in productivity during that decade can be explained by that factor alone. The productivity on acres used to grow fresh fruits and melons as well as vegetables increased by just 5.0 percent during the period—meaning the impact of any increased mechanization for such crops was fairly minimal. The decline in harvested acreage and the slowdown in

---

46 This is a weighted average using the number of pounds of agricultural output of each product produced per acre in 2002, as tracked by the USDA in its "Fruit and Tree Nut Yearbook" and its "Vegetable Yearbook." See the Methodology Appendix for more details on calculations and methods.

47 Aggregate hours worked are based on the Farm Labor Survey.

Table 6: Change in Acres Planted and Output for Various U.S. Crops, 1992–2012

| Crop | Change in Acreage | | Change in Output | | Change in Output/Acre | |
|---|---|---|---|---|---|---|
| | 1992–2002 | 2002–2012 | 1992–2002 | 2002–2012 | 1992–2002 | 2002–2012 |
| Fruit and Melons | 5.5% | -14.6% | 12.6% | -12.4% | 6.6% | 2.5% |
| Tree Nuts | 30.1% | 49.7% | 67.3% | 82.1% | 28.5% | 22.5% |
| Vegetables | 10.1% | -13.6% | 19.0% | -5.6% | 8.1% | 9.6% |
| Total | 4.3% | -5.0% | 22.4% | -3.4% | 10.2% | 7.4% |

Source: USDA Fruit and Tree Nut Yearbook and USDA Vegetable and Melon Yearbook.
Note: Both the output change and the output per acre change are based on weighted averages.

productivity growth occurred during a decade when hours worked by field and crop workers fell by about 22 percent.[48]

The absence of an available and reliable supply of farm labor is an important reason for the decline in harvested acres for fresh fruits, vegetables, melons, and tree nuts. Had the number of harvested acres of fruits, vegetables, melons and tree nuts increased between 2002 and 2012 at the same rate as it did from 1992 to 2002, output of these crops would have been higher by 9.5 percent. The inability of farmers and growers to hire field and crop workers, especially in the peak hiring seasons in the summer and fall, is a leading explanation for this output gap. The USDA estimates that the value of fresh fruits, vegetables, melons and tree nuts is about $32.9 billion.[49] A 9.5 percent increase in the output of those farm products then would raise the value of the crops produced by about $3.1 billion per year.

Numerous studies have indicated that the farm sector plays an important role in the American economy.[50] Much of this has to do with how much other industries are intertwined and dependent upon the products produced by American farms. For example, as the amount of fresh fruits and vegetables produced by a farm drops, spending on the transportation of

the farm's produce from farm to market, the marketing and sale of produce, and the production and maintenance of any equipment used in the process will also decline. A recent USDA study found that every dollar in fresh fruits, vegetables or tree nuts that a farm is able to produce results in 89 cents of additional economic activity in the broader economy.[51]

Using the USDA study, it quickly becomes clear that the $3.1 billion in missed production of fresh fruits and vegetables in the 1998–2012 period had a notable impact on the broader U.S. economy. Had U.S. growers produced $3.1 billion more of those labor-intensive products between 1998 and 2012, the U.S. economy would have experienced $2.8 billion in additional spending on goods and services outside of agriculture each year. Over a 12-year period, that spending would have totaled $33.6 billion.

That additional spending would have also resulted in more job creation, particularly in the trade, transportation, and service sectors. The USDA estimates that each billion dollars of fresh fruits produced by American growers creates 2,301 additional, non-farm jobs in the economy.[52] The numbers of non-farm jobs produced as a result of a billion dollars of additional vegetable or tree-nut production are 7,386 and 33,149, respectively.[53] Assuming that the 9.5 percent increase in fresh produce and tree nut production mirrors current trends regarding the share of sales devoted to each type of crop, we estimate that the United States missed out on creating 41,300 non-farm jobs each year as

48 The reason why a 22 percent decline in employment resulted in a modest slowdown in output per acre is due to increasing mechanization of crops, a shift from more labor-intensive fruits to less labor-intensive nuts, and the fact that the biggest drops in employment were for the least skilled and experienced farmworkers.

49 U.S. Department of Agriculture. 2014. "Fruit and Tree Nut Yearbook." Available Online: http://usda.mannlib.cornell.edu/MannUsda/viewDocumentInfo.do?documentID=1377. See also, U.S. Department of Agriculture. 2014. "Vegetable and Melons Yearbook". Available Online: http://usda.mannlib.cornell.edu/MannUsda/viewDocumentInfo.do?documentID=1212

50 See, for instance: Joint Economic Committee, United States Congress. "The Economic Contribution of America's Farmers and the Importance of Agricultural Exports" (September 2013); or Daniel Sumner, Jose E. Bervejillo, and Nicolai V. Kuminoff. 2003. "The Measure of California Agriculture and its Importance in the State's Economy." In California Agriculture Dimensions and Issues, ed. J. Siebert: University of California Giannini Foundation of Agricultural Economics. Division of Agriculture and Natural Resources.

51 United States Department of Agriculture, Economic Research Service, "Effects of Trade on the U.S. Economy" (Feb. 13, 2014). Accessed March 5, 2014. Available here: http://www.ers.usda.gov/data-products/agricultural-trade-multipliers/effects-of-trade-on-the-us-economy.aspx#.Ukv4zty4mll.

52 Custom figures produced using the app available here: "Agricultural Trade Multipliers: Overview," United States Department of Agriculture, last modified February 2, 2015, http://www.ers.usda.gov/data-products/agricultural-trade-multipliers.aspx.

53 Ibid.

a direct result of the missed production growth that would have been possible without a labor shortage. Over a 10-year period, that would have translated into more than 400,000 new farm jobs—a meaningful job boost to our economy that would have occurred even during the recent recession.

Joe Marino, the owner of Sun Valley Orchards in Swedesboro, New Jersey, runs a large growing, packing, sales and transporting business that is the largest fresh produce operation in New Jersey—and among the largest on the East Coast. Given the scale of his operation, he says he has no doubt that the labor struggles he's had in recent years have had a trickle down effect on other industries in his area, and beyond. Last summer, a period when his 3,000-acre farm was in the height of its bell pepper, asparagus, and cucumber harvest, Marino says that he didn't have "anywhere near" the 200 to 250 workers he typically needs for hand harvesting. Marino says that without those workers, he and his partners had to look at what crops were selling best, and decide which ones to give up on and leave in the field. They gave up on a cucumber harvest two weeks early to shift workers over to do maintenance on the bell pepper crop. "It's a horrible feeling to know that you can be the best and brightest farmer in the world, and do everything right, but still not be able to pick your crop because of labor," Marino says, "It's hard to comprehend sometimes."

Marino says that because of the triage approach to farming he had to adopt last year, the "financial impact on us was just huge." And that impacted his plans for this year. Marino wound up putting off the purchase of two large tractors he had planned to buy this year, hurting the local dealership. He also cut down his spending on fertilizer and put off a planned upgrade to his on-site repair shop, where mechanics service the various equipment used on the farm. Much of the money he was going to is instead being channeled into fees to comply with the H-2A program, a temporary visa program that Marino is trying to use this year to bring in farm laborers. Many farmers say it is expensive and unworkable, and Marino estimates that "conservatively" he is spending about $1,000 per employee this year to comply with its rules. "It really hurts farms like mine," Marino says, "You can't tack a labor surcharge on a box of cucumbers of bell peppers—the price has hardly changed in the last 15 years—so it hurts our bottom line." More frustratingly, he says his farm was paying "a substantial wage" before joining the program, higher than the starting wage at the local Wal-Mart or Starbucks.

Marino is a fourth generation farmer, and he says what he is seeing now in his industry is unprecedented. "The labor situation in the fresh produce industry is probably the most bleak it has ever been," he says, "And the future is not looking much better." Marino says that if Congress doesn't give the industry some sort of viable guest worker program in the future, he may seriously consider telling his

four children to pursue work outside of the family business. "I wouldn't want the sort of worry for them we've faced," he says, "It's a heavy burden to carry."[54]

---

54 Joe Marino, interview conducted by Angela Marek Zeitlin, May 18, 2015.

# PART VIII

# CONCLUSION

Analyzing a variety of federal data sources, this study demonstrates the real and pressing labor problem that confronts U.S. growers of fresh produce. Between 2002 and 2014, the supply of field and crop workers in the United States available to farmers dropped by more than a fifth. This has placed extreme pressure on farms from one end of the country to another. In California, growers already worried about drought or other challenges saw their supply of labor drop by almost 40 percent. In Florida and the Southeastern parts of the United States, roughly 17,800 full-time equivalent field and crop workers essentially vanished from the workforce—a painful blow for almost any industry.

In this report, we demonstrate that immigration played an inescapable role in this decline. Between 2002 and 2014, the number of very recent immigrant field and crop workers in the United States, or those who had arrived within the last five years, dropped by as much as 190,000 people. Although older farmworkers and a small number of U.S.-born workers stepped in to slightly offset the decline, growers in the United States were still left short as many as 167,000 field and crop workers. This left huge holes in entry-level positions such as hand harvesting and hoeing, and also made it increasingly difficult for farmers to find migrant farmworkers.

Given the labor situation growers have faced in recent years, many in the industry say it is more important than ever that our country provide a workable visa for temporary farm laborers. The H-2A program for agricultural workers that exists now is expensive and burdensome.[55] Farmers frequently complain that workers arrive too late, shaving weeks off their harvest. The visa's lack of portability also means that growers must often commit to pay workers for a longer period than they actually need them. As recently as 2012, just 5 percent of

farmworkers in the country were on the H-2A program.[56] In recent years, however, as the labor situation has worsened, more growers have turned to the H-2A program as a last resort: Between 2010 and 2014, the number of H-2A positions certified by the Department of Labor swelled by almost 38,000, growing the number of new H-2A workers by 50 percent.[57]

Entering the H-2A program, however, will not be a long-term solution for many farms. The costs alone threaten some smaller growers. And for the large share of farms outside the program, the labor issue itself further straps many operations, raising costs and making it more difficult for them to reliably get the labor they need to succeed at arguably their core task—the harvesting of crops. This report shows that the labor shortage farmers have described in recent years is a real and pressing concern, and one that has not improved as wages have risen, providing a potential incentive to American unemployed workers to join the industry. Congress should not wait for this situation to deteriorate further to take action to protect U.S. farms. Our report shows that inaction on this issue is already costing American businesses roughly $3.1 billion in non-farm income and more than 41,000 potential new non-farm jobs each year. Fixing the farm labor shortage would provide a valuable boost to our broader economy, and ensure that America's growers can expand—and feed the evolving needs of consumers—in the years ahead.

---

56 Ibid.

57 United States Department of Labor, Office of Foreign Labor Certification Performance Data, 2014. "H-2A Temporary Agricultural Labor Certification Program- Selected Statistics, FY 2014." Available here: http://www.foreignlaborcert.doleta.gov/pdf/H-2A_Selected_Statistics_FY2014_Q4.pdf; and United States Department of Labor, Office of Foreign Labor Certification Performance Data, 2010. "H-2A Temporary Agricultural Labor Certification Program- Selected Statistics, FY 2010." Available here: http://www.foreignlaborcert.doleta.gov/performancedata.cfm.

---

55 Patrick O'Brien et al. 2014. "Gauging the Farm Sector's Sensitivity to Immigration Reform via Changes in Labor Costs and Availability."

# METHODOLOGY APPENDIX

**Using the Farm Labor Survey to Determine
the Number of Field and Crop Workers by Region**

The primary data source used to document the decline in field and crop workers is the quarterly Farm Labor Survey (FLS) administered by the U.S. Department of Agriculture. The FLS reports data for particular "survey" weeks in January, April, July, and October. The FLS is a survey of employers and does not contain demographic information about the workforce (including whether or not the worker is foreign-born). The FLS reports data for 18 regions, but three of the "regions" are individual states: California, Florida, and Hawaii. The FLS should be viewed as a snapshot of the number of hired farm employees at work in a particular week. Although the FLS had reported the number of unpaid family workers on farms during the 1980s and early 1990s those workers are no longer reported by the FLS. The FLS also does not include contract labor, i.e. farmworkers who are paid by the agency who contracted for their services and who are not paid by the farms directly. For these reasons, the FLS understates the number of farmworkers.

In this report we assume that the snapshot picture of employment in each of the four quarterly reports are in place for the entire 13-week period for that quarter. Based on this assumption, we can measure the number of full-time equivalent employees by aggregating the four quarterly reports into an annual total.

It is important to note that the full-time equivalent total employment is comprised of many seasonal employees who rotate in and out of the workforce. More stable employment totals in the FLS are divided into two groups: workers who are expected to be employed for 150 days or more during the year and seasonal employees who are expected to be employed for no more than 149 days.

The FLS does not report employment totals for field and crop workers separately, but does report wages for livestock and field and crop workers separately, and a combined wage for livestock and field and crop workers. We use these wage reports in the FLS to decompose the employment totals into field and crop workers and livestock workers for each region and each quarterly report.

For example, in California in October 2014, livestock workers had a reported average wage of $12.05 and field and crop workers were paid $11.45, on average. The FLS also reports a combined wage for field and livestock workers of $11.56. Because the combined wage is 11 cents higher than the field and crop worker wage—and there is a 60-cent differential between the livestock wage and the field and crop worker wage—we can conclude that 11 out of 60 of the combined employees are livestock workers and 49 out of 60, or 81.7 percent, of the combined employees are field and crop workers. The FLS reports 169,000 hired workers on California farms in October 2014, including 133,000 long-term employees and 36,000 workers who expect to be employed for fewer than 150 days. Our methodology allows us to determine that about 138,000, or 81.7 percent, of these hired employees are field and crop workers, with 108,600 longer-term employees and 29,400 working for the short term.

We then aggregated these results across quarters in the same calendar year and examined trends in employment of field and crop workers. Hours worked per week are not reported separately for field and crop workers and other occupation groups. Therefore we had to assume that the average length of the workweek was the same for all farmworkers, regardless of occupation.

**Using the Census of Agriculture
to Benchmark the Farm Labor Survey**

The Census of Agriculture is conducted every five years. We were therefore able to compare the counts of hired labor between the Census of Agriculture and the FLS. There are important differences between the surveys that make it a challenge to compare employee counts between the two data sets. The Census of Agriculture counts all hired labor who ever worked on a farm over the course of the entire year. Therefore although the Census reported 3,036,470 hired employees on farms in 2002, this does not represent the number of full-time

equivalent employees. The Census reports that 2,108,762 of these hired workers were employed for 149 days or less.

The Census does not report how long the seasonal employees, or those working 149 days or fewer per year, are employed in a given year. If we knew this variable, it would be straightforward to convert seasonal employees to full-time equivalent employees and compare the FLS with the Census figures. The Census does report, however, different annual wages for full-year and seasonal employees, and for farms that hire only full-year or part-year workers. For example, in 2002 the Census reports that average part-year employee earned just 8.5 percent of the average full-year employee. We used that ratio to adjust the employment figures for the 1,010,892 part-year employees on farms that employ both part-year and full-year employees. This factor means that the 2,108,762 part-year hired workers in 2002 translate into 179,719 full-time equivalent employees or 8.5 percent of the total full-year equivalent workers on farms.

The calculations described above are done for individual states and then are aggregated into the same 18 regions as are designated by the FLS. The Census does not report employment totals for field and crop workers separately so we use the weights from the FLS to adjust the full-time equivalent employment totals. The Census data includes both labor hired directly and labor hired through contractors. It is therefore not surprising that we estimate there are 138,223 more full-time equivalent crop workers under the Census than the FLS numbers. (Our Census estimates produce 640,192 full-time equivalent field and crop workers while the FLS produces 778,415.) While workers hired directly by farms are not surveyed by the Department of Labor and the Bureau of Labor Statistics, farmworkers hired by contractors are included in BLS surveys, which we referenced to cross-check our numbers. The BLS Occupational Employment Statistics survey for 2002 indicates that contractors hired 158,280 field and crop workers that year.

In other words, combining this different data sets and methods yields totals of field and crop workers both directly hired by farms and hired by contractors of about 778,415 using the Census of Agriculture or 798,472 if we combined the BLS and FLS data. The difference between the employment totals we produce using these two quite different methods diverge by only about 2.5 percent, giving us added confidence in our estimates.

### Wage Changes

We used the Farm Labor Survey to track wage changes for field and crop workers over time. These wages are reported for field and crop workers quarterly in the FLS and we used weighted averages to obtain the annual overall average.

We also compared wage changes in the FLS to wage changes imputed from the Census of Agriculture. The Census of Agriculture reports total payroll and number of employees

for farms that only hired seasonal employees, hired only hired full-year employees, and hired both. We use the ratio of pay of farms that hired only full-year employees and the only seasonal employees to decompose payroll of the farms that hire both types of labor into full-year and part-year labor costs. This is how we determined that seasonal labor costs per employee increased by 89 percent between 2002 and 2012 compared to 33 percent for full-year employees.

### Changes in Foreign-Born Population of Crop Workers

We used the National Agricultural Worker Survey to measure the shares of field and crop workers by place of birth and length of time in the United States. While the NAWS contains weight factors that allow us to combine observations across regions and years, the public-use data does not include variables that would allow us to count the number of foreign-born crop workers directly from the NAWS. We obtained counts of foreign-born workers by combining the percentages from the NAWS with the hard counts from the FLS. So, for example, if the FLS data reports that there were 138,000 hired field and crop workers in the state of California and the NAWS indicates that 3.67 percent of field and crop workers in California were born in the United States, we would report that about 5,100 hired field and crop workers in California were native-born. We assumed that the NAWS data for 2009 to 2012 (with respect to foreign-born status) was applicable to 2014. If the trend in fewer foreign-born recent arrivals continued, this means our estimate of the drop in farm labor is likely conservative.

### Acreage Utilization and Agricultural Output

We used the USDA's Fruits and Tree Nut Yearbook data tables and the Vegetable and Melon data tables to measure the number of acres devoted to three major types of crops: fresh fruits and melons, fresh vegetables, and tree nuts. We used these tables to obtain the production totals for each major crop type as measured in thousands of pounds. Our measures of increased production are within each major crop type but do not control for price differences among fresh fruits or fresh vegetables, for example. Our earlier work in this area indicated

### Appendix Table 1: Weights Used to Construct Total Change in Output and Output Per Acre of Fruit, Melons, Vegetables, and Tree Nuts, 2002–2012



| | Share of Acreage in 2002 |
|---|---|
| Fruits and Melons | 57.5% |
| Tree Nuts | 14.7% |
| Vegetables | 27.7% |

*Source: Vegetables, 2004 Summary, U.S. Department of Agriculture, January 2005 and Fruit and Tree Nut Yearbook Tables, USDA Economic Research Service.*

that measures of changes in output over time are robust to whether more disaggregated controls are used. The changes in total output and output per acre that we computed from 1992 to 2002 and from 2002 to 2012 hold constant the share of acreage devoted to each of the three major crop categories. (See that information in Appendix Table 1 below.) Finally, in assessing the economic impact of more agricultural production, we used USDA estimates of the total dollar value of production of fresh fruits, vegetables, melons, and tree nuts.

**Length of the Average Seasonal Job**

To produce estimates of how the length of seasonal jobs has changed in recent years, we compared the payroll expenses for full-time and part-time farm labor reported in the Census of Agriculture. In 2002 payroll costs per seasonal employee were 8.5 percent of full-year employees, implying that their work year was 8.5 percent as long as full-year workers, or about 4.4 weeks. In the 2007 Census, however, the seasonal to full-year cost ratio was 9.3 percent, which is consistent with a seasonal job duration of about 4.8 weeks. By 2011, the ratio had jumped to 11.8 percent, leading us to estimate that seasonal jobs lasted 6.2 weeks that year.

**Estimating How Much U.S.-Born Workers
Offset the Labor Decline**

As mentioned in the text, we combined the NAWS data on the share of field and crop workers by place of birth and length of time in the United States with the Farm Labor Survey data on full-time equivalent employment of field and crop workers to estimate the number of native-born field and crop workers. We then compared the changes in native-born field and crop workers over time to the decline in foreign-born workers over the same time period.

For example, we found that outside the state of California, the increasing share of native-born field and crop workers translated to an increase of full-time equivalent workers of 6,300 from 2002 to 2014. The declining share of foreign-born workers translated into a decline of full-time equivalent workers of 64,900 over the same period. Because 6,300 is 9.7 percent of 64,900, we conclude that outside the state of California the increase in domestic labor supply offset 9.7 percent of the decline in labor supply caused by the slowdown in the flow of immigrant labor.

As noted in the report, for the country overall, U.S.-born workers offset less than 3 percent of the total labor decline. That is because native-born employment in California fell by 2,300 people, reducing the national gain in native-born field and crop workers to 4,000 full-time equivalent field and crop workers, or an increase of 3.4 percent over 2002 levels. The increase of 4,000 native-born workers also amounts to just 2.7 percent of the decline in foreign labor supply between 2002 and 2014.

**Estimating the Share of Hired Farm Workers
on the H-2A Visa Program in FY 2014**

In its publicly available data, the U.S. Department of Labor reports certifying 116,689 H-2A positions in the FY 2014 period.  To produce our estimate that roughly 6 percent of the hired farm labor workforce was in the country that year on H-2A visas, we then divide the number of certified H-2A workers by an estimate of the number of people working in hired farm labor positions in 2014.

To determine the number of hired farm workers in the country in 2014, we start with the U.S. Census estimate that there were 2.655 million hired farm jobs in the country that year. We know, however, that many of those jobs are seasonal or of short duration and some workers may hold multiple jobs throughout the course of the year. Using NAWS, we estimate that the average farm worker holds 1.293 jobs per year.  That allows us to then estimate that 2.054 million people hold hired farm positions annually.  We use that figure to determine the share of hired farm workers in the country on H-2A visas.

PARTNERSHIP FOR A
NEW AMERICAN
ECONOMY



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV00007

EXHIBIT
NO. 099

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 99, ECF 175-34

EXHIBIT
33

# THE HBI CONSTRUCTION LABOR MARKET REPORT

*Fall 2021*

Based on research of the Research of the Economics Group, National Association of Home Builders



<u>Executive Summary</u>

A lack of skilled construction labor is a key limiting factor to expand home construction and improve housing inventory and affordability. Housing was a bright spot for the economy during the second half of 2020, as construction activity helped lead an economic rebound. However, sales outpaced home construction, resulting in growing backlog and supply-chain bottlenecks. For construction to expand further, more workers must be recruited and trained for the sector.

This report provides an overview of the state of the nation's construction labor market. Key findings include:

- The estimated number of construction worker growth required for the sector is approximately 740,000 per year, according to NAHB analysis of BLS data and projections
- Construction employment currently totals 7.42 million
    - Residential construction represents 3.1 million of this total
- The number of open construction sector jobs currently averages between 300,000 to 400,000 each month
- Construction employment is broad-based across the nation
- Self-employment in construction is currently 22% of the labor force, down from 26% in 2010
- Half of payroll workers in construction earn more than $50,460 annually and the top 25% make at least $71,000.
    - In comparison, the U.S. median wage is $49,150, while the top quartile (top 25%) makes at least $67,410
- Immigrant workers now account for 24% of the construction workforce, down slightly from the 2016 record high share of 24.4%.
- Women make up a growing share of the construction employment, up to 10.9% in 2020 from 10.3% in 2019
- The median age of construction workers is 41
    - However, due to aging trends, the share of construction workers aged 25 to 54 decreased from 72.2% in 2015 to 69.0% in 2019

**Construction Employment Outlook**

A lack of skilled construction labor is a key limiting factor for improving housing inventory and housing affordability. As detailed below, in recent months the number of open, unfilled jobs in the overall construction industry totals 300,000 to 400,000 positions. Moreover, given forecasts for additional home construction, required to reduce the existing housing deficit, and a rebound and recovery for nonresidential construction, the nation will require addition construction workers.

As explored in this report, there are several ways to measure the current need for additional workers. According to new NAHB Economics analysis of Bureau of Labor Statistics (BLS) data and projections, the average annual number of occupational openings in construction totals approximately 740,000 a year.[1] This estimate is determined by estimating the required net growth in employment due to construction expansion *plus* workers required to replace individuals who leave the sector permanently. This estimate reflects a need of more than 61,000 net hires a month. Over the course of 2022-2024, this total represents a need for an additional 2.2 million net hires for construction.

It is worth noting that the pace of gross hiring in construction is larger than these net estimates. In fact, over the period 2017-2020, total hires in the sector averaged approximately 4.8 million annually. These larger estimates reflect rehires in the sector as workers shift from business to business within the sector.

On a simple net basis, 2021 BLS estimates find that total construction employment is forecasted to rise from 6.97 million in 2020 (reflecting declines in the spring of 2020 during the virus recession) to 7.37 million in 2030, for a net need of 40,000 workers per year. This represents a forecast of average annual construction employment growth of 5.7% per year.

**US Employment**

During the first eight months of 2021, 4.7 million jobs were created and monthly employment growth averaged 586,000 per month. In August, total nonfarm employment, however, was 5.3 million less than its pre-pandemic level in February 2020 level. Total nonfarm payroll employment increased by 235,000 in August 2021, the smallest monthly gain in the past seven months. The June increase was revised up by 24,000, while the July increase was revised up by 110,000 from 943,000 to 1,053,000.

The national unemployment rate declined to 5.2% in August, the lowest point since the pandemic began. The rate was 9.6 percentage points lower than its recent high of 14.8% in April 2020 and 1.7 percentage points higher than the rate in February 2020. The August decrease in the unemployment rate reflected the decrease in the number of persons unemployed (-318,000) and an increase in the number of persons employed (509,000). The labor force participation rate, the proportion of the population either looking for a job or already with a job, was at 61.7% in August.

---

[1] BLS occupational projections are found here: https://www.bls.gov/emp/tables/occupational-projections-and-characteristics.htm



**Figure 1. Monthly Change in Payroll Employment and Unemployment Rate**

Source: Bureau of Labor Statistics.

In August, professional and business services, transportation and warehousing, educational services, and other services had job gains, while employment in retail trade declined over the month. Employment in leisure and hospitality was unchanged in August, after increasing for six straight months.



**Figure 2. August Employment Changes by Selected Industry**
**(month-over-month change, in thousands)**

Source: Bureau of Labor Statistics.

## Residential Construction Employment

Total construction industry (both residential and non-residential) payroll employment totaled 7.42 million in August 2021. Out of this total, residential construction employment now stands at 3.1 million in August, broken down as 881,000 builders and 2.2 million residential specialty trade contractors. The 6-month moving average of job gains for residential construction was 10,550 a month. Over the last 12 months, home builders and remodelers added 153,300 jobs on a net basis. Since the low point following the Great Recession, residential construction has gained 1,076,700 positions.

In August, the unemployment rate for construction workers declined by 1.4 percentage points to 5.9% on a seasonally adjusted basis. The unemployment rate for construction workers has been trending lower, after reaching 14.1% in April 2020, due to the housing demand impact of the COVID-19 pandemic.



Figure 3. Residential Construction Employment and Unemployment Rate

Source: Bureau of Labor Statistics.

### State-Level Employment Data

According to the Bureau of Labor Statistics (BLS), nationwide total nonfarm payroll employment increased by 943,000 in July, following an upwardly revised increase of 938,000 jobs in June. Nonfarm payroll employment increased in 47 states and the District of Columbia in July compared to the previous month while three states (Oklahoma, Kentucky, and Tennessee) lost jobs.

On a month-over-month basis, employment data was strong in California, which added 114,400 jobs, followed by Texas (+80,900) and North Carolina (+75,600). Oklahoma, Kentucky, and Tennessee lost a total of 13,700 jobs, where the largest decline was reported in Tennessee (-6,100). In percentage terms, Vermont employment increased by 2.3% while Kentucky reported a 0.3% decline between June and July.

Year-over-year ending in July, 7.3 million jobs have been recovered marking the economic rebound from the COVID-19 pandemic induced recession. All the states and District of Columbia added jobs compared to a year ago. The range of job gains spanned 864,400 jobs in California to 8,300 jobs added in Wyoming. In percentage terms, Hawaii reported the highest increase by 10.0%, while Oklahoma increased by 1.6% compared to a year ago.



Percent Change in Total Nonfarm Employment (Ths.#, SA) - YoY (July)

Across the 48 states which reported construction sector jobs data—which includes both residential as well as non-residential construction— 29 states reported an increase in July compared to June, while 17 states lost construction sector jobs. Kansas and Tennessee reported no change. North Carolina added 4,300 construction jobs while Colorado lost 1,600. Overall, the construction industry gained 11,000 jobs in July compared to the previous month. In percentage terms, New Jersey increased by 2.7% while New Hampshire reported a decline of 2.2% between June and July.

Year-over-year, construction sector jobs in the U.S. increased by 224,000, which is a 3.1% increase compared to the July 2020 level. California added 39,900 jobs, which was the largest gain of any state, while New York lost 3,600 jobs, which was the largest decline. In percentage terms, Rhode Island had the highest annual growth rate in the construction sector by 15.1%. Over this period, Wyoming reported the largest decline at 4.3%.



Percent Change in Total Construction Employment (Ths.#, SA) - YoY (July)

## Residential Construction Employment across States and Congressional Districts

According to the latest 2019 American Community Survey (ACS), over 11 million people, including self-employed workers, worked in construction in 2019. The residential construction employment estimates, which only includes workers directly employed by the industry and do not count jobs created in related industries (such as design and architecture, furniture making, building materials, landscaping, etc), totaled 4.4 million people. It accounts for 2.8% of the US employed civilian labor force. In 2020, despite the widespread curtailment of economic activity due to Covid-19, home building created additional jobs as the rest of the economy struggled.

Not surprisingly, the most populous state—California—also has the most residential construction workers. Close to 640,000 California residents worked in home building in 2019, accounting for over 3.3% of the state employed labor force. Florida comes in second with over 430,000 residential construction workers. Florida has fewer residents than Texas but owing to its large vacation and seasonal housing stock, employs more residential construction workers. In Florida, residential construction workers account for a relatively high 4.3% of the employed labor. Even though this share is well above the national average (2.8%), it is drastically lower than in 2006 when Florida registered the highest share among all 50 states and the District of Columbia, 6.5%.

Other states with a high prevalence of seasonal, vacation homes top the list of states with the highest share of residential construction workers in 2019. Idaho with 5.2% of the employed labor force working in home building takes the top spot on the list. Utah and Florida follow with 4.4% and 4.3%, respectively. Vermont and Montana also register shares in excess of 4%. In addition, ten other states register shares of residential construction workers that exceed 3%: Maine (3.6%), Nevada (3.5%), Washington (3.5%), Colorado (3.5%), New Hampshire (3.4%), Arizona (3.4%), North Carolina (3.4%), California (3.3%), Oregon (3.1%) and Delaware (3.1%).

## The Share of Home Building Workers in the Labor Force, 2019



Source: 2019 ACS, 2019 QCEW, NAHB Estimates

As of 2019, the average congressional district has about 10,000 residents working in residential construction, but that number is often significantly higher in some congressional districts. In Idaho's 1st (Rep. Russ Fulcher – R), 24,000 residents are in home building. Florida's 25th (Rep. Mario Díaz-Balart – R) that stretches from west of Miami to east of Naples and Marco Island and Arizona's 7th (Rep. Ruben Gallego – D) that includes much of inner Phoenix and comprises the western part of the state are close second and third with about 22,000 residents employed in home building. Utah's 4th (Rep. Burgess Owens – R) and Montana's single Congressional district (Rep. Matt Rosendale – R) have over 21,000 residents working in home building.

## Residential Construction Employment, 2019



RC workers
including self-employed

<5,000
5,000 - <7,500
7,500 - <10,000
10,000 - <15,000
15,000+

*Source: 2019 ACS, 2019 QCEW, NAHB Economics*

Next on the list are three congressional districts in Florida and Idaho's 2nd (Rep. Mike Simpson-R) with about 20,000 residents working in home building. Florida's 19 (Rep. Byron Donalds-- R) and Florida's 21st (Rep. Lois Frankel – D) are in the south and Florida's 14th (Rep. Kathy Castor – D) serves most of Tampa. California's 41st (Rep. Mark Takano -- D) in western Riverside and 29th (Rep. Tony Cárdenas – D) in the north central San Fernando Valley and Florida's 10th (Rep. Val Demings – D) in Orange County conclude the top dozen list with close to 19,000 residential construction workers.

By design, Congressional districts are drawn to represent roughly the same number of people. So generally, large numbers of residential construction workers translate into high shares of RC workers in their district employed labor forces. Three districts in Florida (Florida's 19th, 17th, and 25th) register the highest shares of residential construction workers in the employed labor force, 6%, 5.8% and 5.7%, respectively, by far exceeding the national average of 2.8%. The other congressional districts on the top 10 list all register the shares of residential construction workers in excess of 5%. These include Arizona's 7th, Idaho's 2nd, Texas's 33rd and 29th, Florida's 21st, and California's 41st and 29th.

At the other end of the spectrum there are several districts that contain parts of large urban areas: the District of Columbia (Rep. Eleanor Holmes Norton -- D), Pennsylvania's 3rd (Rep.

Dwight Evans – D) that includes areas of the city of Philadelphia, Georgia's 5th (Rep. Nikema Williams – D) that includes most of Atlanta, the 12th of New York (Rep. Carolyn Maloney – D), located in New York City, and among others, Louisiana's 2nd (currently vacant) that contains New Orleans. Most residents in these urban districts tend to work in professional, scientific, and technical services. The District of Columbia stands out for having the lowest number of RC workers residing in the district, around 1,500. At the same time, it has a disproportionally large share of public administration workers. The 12th District of New York and the 7th District of Illinois are home to a very large group of finance and insurance workers. Meanwhile, in Pennsylvania's 2nd, more than a third of residents work in health care and educational services.

## Job Openings and Labor Turnover in Construction

The count of open construction jobs weakened in July to 321,000 unfilled positions, according to data from the BLS Job Openings and Labor Turnover Survey (JOLTS). The housing market remains underbuilt and requires additional labor, lots and lumber and building materials to add inventory.

Overall, hiring in the construction sector remained solid in July, increasing to a 5.2% rate. The post-virus peak rate of hiring occurred in May 2020 (10.3%) as a rebound took hold in home building and remodeling. Hiring has generally slowed since that time, except for a weather-related rebound in March 2021. Hiring has been impeded due to a lack of workers.

Construction sector layoffs ticked down in July to a 2.4% rate. In April 2020, the layoff rate was 10.9%. Since that time however, the sector layoff rate has been below 3%, except for February 2021 due to weather effects.

The job openings rate in construction edged down to 4.2% in July, with 321,000 open positions in the sector. This is higher than the 298,000 count recorded a year ago. Looking forward, the construction job openings rate is likely to see increased upward pressure as both the residential and nonresidential construction sectors trend higher. Attracting skilled labor will remain a key objective for construction firms in the coming quarters and will become more challenging as the labor market strengthens.



**Construction Labor Market**

## Self-Employment in Residential Construction

The timely payroll employment and unemployment statistics from the Bureau of Labor Statistics (BLS) do not include self-employed workers. Counting self-employed is particularly important in the home building industry since they traditionally make up a larger share of the labor force. According to the 2019 American Community Survey (ACS), 22% (2.4 million) of construction workers are self-employed. This is significantly higher than an economy-wide average of 9.7% of the employed labor force. Nevertheless, construction self-employment rates are now lowest on record, down from a record high of over 26% in 2010.

The construction industry has been adding payroll jobs since 2011 while the number of self-employed construction workers continued dwindling until 2015 and registered only modest gains since then. In 2019, construction payroll employment exceeded 8 million workers thus breaking the previous payroll record of 7.9 million set in 2006. In comparison, the number of self-employed workers in construction remained 11% below the cyclical high of 2.7 million reached in 2006.



Additional insights into construction self-employment rates can be gained by examining a cross-state variation. Many states, where home building accounts for a higher share of the labor force, also register higher shares of self-employed. Notably, Maine, Montana, New Hampshire, Idaho and Vermont have the highest shares of self-employed construction workers in the nation and some of the highest shares of residential construction workers in the state labor force. The share of self-employed reaches 37% in Maine, 32% in Montana and New Hampshire, and over 28% in Idaho and Vermont.



**Construction Self-Employment Rates, 2019**

Source: 2019 ACS

## Wages in Construction

According to the 2020 Bureau of Labor Statistics Occupational Employment Statistics (OES) Survey data, half of payroll workers in construction earn more than $50,460 and the top 25% make at least $71,000. In comparison, the U.S. median wage is $49,150, while the top quartile (top 25%) makes at least $67,410.

Reflecting the divergent paths residential and commercial construction took during the pandemic, overall construction wages did not register sharp gains that would be consistent with a strong pace of home building and persistent labor shortages that weigh residential construction down.

Year over year, median wages in construction rose 3%. However, wages of multiple entry-level construction trades increased faster.  Median wages of helpers of various construction tradesmen went up 5%.

The highest paid occupation in construction is Chief Executive Officers (CEO) with half of CEOs making over $176,160 per year. Lawyers working in construction are next on the list with the median wages of $146,150 and the top 25 percent on the pay scale earning over $201,000 annually. Out of the next 15 highest paid trades in construction, 13 are various managers. The highest paid managers in construction are architectural and engineering managers, with half of them making over $135,910 and the top quartile earning at least $170,920.



**Highest Paid Occupations in Construction, 2020**

| Occupation | Median | Top 25% Make at Least |
|---|---|---|
| Chief Executives | 176,160 | Undisclosed |
| Lawyers | 146,150 | 201,070 |
| Architectural/ Engineering Managers | 135,910 | 170,920 |
| CIS Managers | 135,420 | 168,470 |
| Training and Development Managers | 130,350 | 174,530 |
| Financial Managers | 120,010 | 160,300 |
| Sales Managers | 119,040 | 160,540 |
| Purchasing Managers | 114,030 | 143,640 |
| Marketing Managers | 112,960 | 158,940 |
| Computer Hardware Engineers | 112,260 | 141,960 |
| General and Operations Managers | 104,420 | 154,950 |
| PR, Fundraising Managers | 104,230 | 152,860 |
| Human Resources Managers | 104,110 | 139,190 |
| Advertising and Promotions Managers | 103,470 | 153,240 |

■ Median   ■ Top 25% Make at Least

Among construction trades, elevator installers top the median wages list with half of them earning over $87,970 a year, and the top 25% making at least $108,330. First-line supervisors of construction trades are next on the list, with half of them making over $67,560 and top quartile earning at least $87,160. Boilermakers are close third highest paid construction craft. Half of these craftsmen working in construction earn over $67,170, and the highest paid 25% bring in at least $81,950.

In general, construction trades that require more years of formal education, specialized training or licensing tend to offer higher annual wages. Median wages of construction and building inspectors are $62,330 and the wages in the top quartile of the pay scale exceed $82,790. Half of plumbers in construction earn over $55,920, with the top quartile making over $75,640. Electricians' wages are similarly high.

Carpenters are one of the most prevalent construction trades in the industry. The trade requires less formal education. Nevertheless, the median wages of carpenters exceed the national median. Half of carpenters working in construction earn over $49,730.



**Highest Paid Construction Occupations in Construction, 2020**

| Occupation | Median | Top 25% Make at Least |
|---|---|---|
| Elevator/Escalator Installers/Repairers | 87,970 | 108,330 |
| First-Line Supervisors of Construction Trades | 67,560 | 87,160 |
| Boilermakers | 67,170 | 81,950 |
| Pile Driver Operators | 63,170 | 97,300 |
| Construction and Building Inspectors | 62,330 | 82,790 |
| Tapers | 59,490 | 76,640 |
| Structural Iron and Steel Workers | 56,000 | 75,180 |
| Plumbers, Pipefitters, and Steamfitters | 55,920 | 75,640 |
| Electricians | 55,360 | 74,320 |
| Brickmasons and Blockmasons | 55,280 | 69,780 |
| Operating Engineers | 52,090 | 71,170 |
| Sheet Metal Workers | 51,790 | 70,440 |
| Paperhangers | 51,740 | 90,280 |
| Terrazzo Workers/ Finishers | 51,710 | 74,870 |
| Underground Mining Machine Operators | 50,960 | 63,000 |
| Carpenters | 49,730 | 64,670 |

■ Median   ■ Top 25% Make at Least

## Immigrants in Construction

According to the most recent American Community Survey (ACS), the number of immigrant workers in construction approached 2.8 million in 2019, the highest level recorded by the ACS. Immigrant workers now account for 24% of the construction workforce, slightly below the 2016 record high share of 24.4%. The share of immigrants is higher in construction trades, reaching 30%. The latest statistics confirm that immigrant workers remain a vital source of labor to the construction industry amid ongoing skilled labor shortages exacerbated by a pandemic boost to housing demand.

The latest ACS data show that 11.5 million workers, including self-employed, worked in construction in 2019. Out of these, 8.7 million were native-born, and 2.8 million were foreign-born.

While the number of immigrant workers in construction reached a new record high, breaking the housing boom era record levels, the number of native-born workers in construction remained 7% below the cyclical high reached in 2006, when 9.4 million native-born workers were in construction.



**US Construction Labor Force**

*Source: 2004-2019 ACS PUMS, NAHB estimates*

Even as native-born workers have generally been a lagging source of construction workforce growth, 2019 registered a noticeable increase in their numbers. As a result, the share of immigrants declined slightly in 2019 but nevertheless remains at historically high levels.

Another contributing factor to the recently declining share of immigrants was a noticeable decrease in the inflow of newly arrived immigrants into the construction work force. Just over 44,000 new immigrants entered the construction industry in 2017 and additional 56,000 in 2018. This is a substantial drop even compared to 2016, when over 67,000 new immigrants joined in. In comparison, over 130,000 new immigrants were joining the construction labor force annually in 2004 and 2005.

### Annual Flow of New Immigrants into Construction and Single-Family Starts



Source: 2004-2019 ACS PUMS, NAHB estimates

NAHB's earlier research showed that over the last 15 years, the time span these data are available, the annual flow of new immigrant workers into construction remained highly correlated with measures of new home construction, especially new single-family starts.  The number of newly arrived immigrants in construction rose rapidly when housing starts were rising and declined precipitously when the housing industry was contracting. The response of immigration has been quite rapid, occurring in the same year as a change in the single-family construction activity. This correlation broke in 2017 when NAHB's estimates showed a surprising drop in the number of new immigrants in construction despite steady gains in housing starts.

The 2017 noticeable drop and 2018 anemic gains in the number of new immigrants in construction may seem puzzling given favorable economic conditions but most likely reflect changes in the US immigration policies.

Similar trends are observed in the rest of the US economy, with the share of immigrants in the labor force stabilizing at record high levels but showing no further gains in recent years. Over the last 15 years, the entire US labor force has become more dependent on foreign-born labor with its share rising from less than 15% in 2004 to 17% in 2019. Excluding construction, where the reliance on foreign-born workers is greater, the share of immigrants in the US labor force increased from just over 14% in 2004 to 16.6%, the highest level recorded by the ACS, in 2018. The share of immigrants stabilized at these record high levels with no further increases in 2019.



Source: 2004-2019 ACS PUMS, NAHB estimates

Concentration of immigrants is particularly high in some of the trades needed to build a home, like drywall/ceiling tile installers (53%), painters (46%), roofers (44%), cement masons (39%), and construction laborers (38%) – trades that require less formal education but consistently register some of the highest labor shortages in the NAHB/Wells Fargo Housing Market Index (HMI) surveys and NAHB Remodeling Market Index (RMI).

The most recent October 2020 HMI survey shows ongoing labor shortages exacerbated by a pandemic boost to housing demand. Over 73% of builders report shortages of carpenters and framing crews and 60% of builders report shortages of brick masons and cement masons directly employed by their firms.

Comparing the HMI survey data over the recent years, construction trades with the most consistent labor shortages are framing crews, carpenters and bricklayers – all requiring unique technical expertise but less formal education.



The two most prevalent construction occupations, laborers and carpenters, account for about 30% of the construction labor force. More than a third of all construction laborers (38%) and 30% of carpenters are of foreign-born origin.

Reliance on foreign-born labor is quite uneven across the US states. Immigrants comprise close to 40% of the construction workforce in California and Texas. In New Jersey, 37% of the construction labor force is foreign-born. In Nevada, New York and Florida, one out of three construction industry workers come from abroad.

Traditionally, construction immigrants are concentrated in a few populous states, with more than half of all immigrant construction workers (56%) residing in California, Texas, Florida, and New York. These are not only the most populous states in the U.S. (together accounting for a third of the country's population), they are also particularly reliant on foreign-born construction labor, as more than a third of the construction industry workforce in these states comes from abroad.

## Immigrant Workers in the Construction Labor Force, 2019



Source: 2019 American Community Survey, PUMS, NAHB Estimates

However, the reliance on foreign-born labor is also noticeable outside of these traditional immigrant magnets. This is evident in states like Nevada, New Jersey, Maryland, and Connecticut, where immigrants, as of 2019, account for between 28 and 34% of the construction labor force.

While most states draw the majority of immigrant foreign-born workers from the Americas, Hawaii relies more heavily on Asian immigrants. European immigrants are a significant source of construction labor in North East and Illinois.

<u>Women in Construction</u>

The number of women employed in the construction industry grew slightly in 2020, rising to around 1.17 million, while the construction industry lost 587,000 jobs in 2020 when the pandemic hit the economy. Currently, women make up a growing share of the construction employment, up to 10.9% in 2020 from 10.3% in 2019. As the construction skilled labor shortage remains a key challenge, adding new workers is an important goal of the industry. Bringing additional women into the construction labor force represents a potential opportunity for the future. Here we explore the state of women in the construction industry using labor force statistics from the Current Population Survey (CPS).

During the Great Recession, the number of female construction workers declined sharply by almost 30 percent to 807,000 by 2010. From 2010 to 2017, the total slowly expanded to around 970,000 but remained below the peak of pre-recession levels. The number of women working in construction increased to 1.17 million in 2020, edged up by 0.4% in 2020 during the pandemic.



Source: Labor Force Statistics from the Current Population Survey

Overall, the share of women in construction increased to 10.9% in 2020. According to the Current Population Survey, women in the construction are mostly involved in such occupations as office and admnistrative support, management, business and financial operations. Sales and office occupations employed the largest number of women within the construction industry. For example, women accounted for 69 percent of workers in sales and office occupations, including 444,000 women in office and administrative support, and 32,000 in sales and related occupations in 2020. Around 398,000 women were engaged in management, professional, and related occupations.

While construction and mainenance occupations account for the largest number of employees in construction, and is where additional workers are needed,  women comprised only 6 percent of the such occupations. More improvement is needed here. Other groups such as production, transportation, and material moving occupations, and service occupations employed only around 14,000 female workers.



**Construction Workers by Occupation Categories and Gender**

Source: 2020 Labor Force Statistics from the Current Population Survey

**Age of Construction Labor Force**

NAHB analysis of the most recent 2019 American Community Survey (ACS) data reveals that the median age of construction workers is 41, the same as a typical worker in the national labor force. While the residential construction has been adding jobs during the pandemic, access to skilled labor is still a business challenge in 2021.



The median age of construction workers varies across the states. The color coding in the map above tracks the median age of construction workers. States with the oldest median age of construction workers (47 years old) are Maine, followed by New Hampshire (46 years old) and West Virginia, where the median age of construction workers is 45. Construction workers are younger on average in the central part of the nation. Half of all construction workers in North Dakota and Alaska are under 36, while in Oklahoma and Utah half are under 38.

The second data series mapped above is the difference between the median age of construction workers in each state and the median age of the overall workforce. These estimates are reported as the numbers printed on each state. A positive number indicates that on average, construction workers are older than a typical worker in the state labor force. New Mexico is the state where the median age of construction workers is 4 years higher than the overall median, followed by Maine and West Virginia (+3). Meanwhile, a negative number indicates construction workers are, in general, younger than the state labor force. In Alaska, the median age of construction workers is 3 years younger than the overall median.

The ACS data also allow analyzing median age by occupations. Construction occupations with younger workers include helpers, construction trades, solar photovoltaic installs. Older workers are concentrated in managerial positions such as inspectors, construction supervisors and construction managers.





More young people are entering the construction trades, as the share of workers under the age of 25 reached 10.8% in the construction industry in 2019, compared to only 9.7% in 2015. Consequently, the median age of construction workforce is 41 in 2019, a year younger than in 2018. This is good news for the long-run objective of the industry bringing in a new generation of skilled labor, but more needs to be done.



**Distribution of Construction Employment by Age**
**2015 – 2019**

Source: 2019 American Community Survey, PUMS data

However, the proportion of older construction workers, ages 55+, also increased from 18.1% to 20.3%. Simultaneously, the share of construction workers ages 25 to 54 decreased from 72.2% in 2015 to 69.0% in 2019. This change in age composition of construction labor force is largely because the last elements of the Baby Boomer generation are entering the 55+ group and a large share of skilled workers displaced during the Great Recession left the construction industry.





Source: 2019 American Community Survey, PUMS data

Compared to the workforce in all industries, construction has a relatively smaller share of younger workers, but a larger proportion of workers in their prime-working age. The chart above shows that, as of 2019, only 8.7% of construction workers were 20-24 years old and 2.1% under 20, less than the employment share of these two age groups in all industries. Around 69% of construction workforce were in the prime working years of 25-54, compared to 63% in overall workforce.

The relative greater share of workers in construction in the 35-55 age group, mostly Gen X-ers, reveals the current challenge. Gen X is a smaller generational group than the Baby Boomers. The share of workers ages 55 and older was 20.3% in construction, implying that a substantial portion of workforce could retire in near future, highlight the need for more efforts in attracting talent in the industry.



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV 00000

EXHIBIT
NO. 100

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.,*      §
     §
       *Plaintiffs,*      §
     §
       vs.      §     CIVIL ACTION NO.
     §     6:23-CV-00007
UNITED STATES DEPARTMENT OF      §
HOMELAND SECURITY, *et al.,*      §
     §
       *Defendants,* and      §     JUDGE DREW B. TIPTON
     §
VALERIE LAVEUS, *et al.,*      §
     §
       *Intervenor Defendants.*      §

# INTERVENOR DEFENDANTS'
# TAB 100, ECF 175-35

EXHIBIT
34

# Construction Workforce Shortage Tops Half a Million in 2023, Says ABC

*Posted @ Thursday, February 9, 2023 9:50 AM by Erika Walter* | Files in **Construction Economic Update,Construction Economics,News Release 2023**

**WASHINGTON**, Feb. 9—The construction industry will need to attract an estimated 546,000 additional workers on top of the normal pace of hiring in 2023 to meet the demand for labor, according to a proprietary model developed by Associated Builders and Contractors.



"The construction industry must recruit hundreds of thousands of qualified, skilled construction professionals each year to build the places where we live, work, play, worship, learn and heal," said Michael Bellaman, ABC president and CEO. "As the demand for construction services remains high, filling these roles with skilled craft professionals is vital to America's economy and infrastructure rebuilding initiatives."

ABC's proprietary model uses the historical relationship between inflation-adjusted construction spending growth, sourced from the U.S. Census Bureau's Construction Put in Place survey, as well as payroll construction employment, sourced from the U.S. Bureau of Labor Statistics, to convert anticipated increases in construction outlays into demand for construction labor at a rate of approximately 3,620 new jobs per billion dollars of additional construction spending. This increased demand is added to the current level of above-average job openings. Projected industry retirements, shifts to other industries and other forms of anticipated separation are also embodied within computations.

The construction industry averaged more than 390,000 job openings per month in 2022, the highest level on record, and the industry unemployment rate of 4.6% in 2022 was the second lowest on record, higher than only the 4.5% unemployment rate observed in 2019. National payroll construction employment was 231,000 higher in December 2022 than in December 2021.

"Despite sharp increases in interest rates over the past year, the shortage of construction workers will not disappear in the near future," said ABC Chief Economist Anirban Basu. "First, while single-family home building activity has moderated, many contractors continue to experience substantial demand from a growing number of mega-projects associated with chip manufacturing plants, clean energy facilities and infrastructure. Second, too few younger workers are entering the skilled trades, meaning this is not only a construction labor shortage but also a skills shortage.

"With nearly 1 in 4 construction workers older than 55, retirements will continue to whittle away at the construction workforce," said Basu. "Many of these older construction workers are also the most productive, refining their skills over time. The number of construction laborers, the most entry-level occupational title, has accounted for nearly 4 out of every 10 new construction workers since 2012. Meanwhile, the number of skilled workers has grown at a much slower pace or, in the case of certain occupations like carpenter, declined.

"To fill these important roles, ABC is working hard to recruit, educate and upskill the construction workforce through our national network of more than 800 apprenticeship, craft, safety and management education programs—including more than 300 government-registered apprenticeship programs across 20 different construction occupations—to build the people who build America," said Bellaman. "ABC members invested $1.6 billion in 2021 to educate 1.3 million course attendees to build a construction workforce that is safe, skilled and productive."

In 2024, the industry will need to bring in more than 342,000 new workers on top of normal hiring to meet industry demand, and that's presuming that construction spending growth slows significantly next year.

View ABC's methodology in creating the workforce shortage model.



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV 00007

EXHIBIT NO. 101

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

STATE OF TEXAS, *et al.,* §
§
*Plaintiffs,* §
§
vs. § CIVIL ACTION NO.
§ 6:23-CV-00007
UNITED STATES DEPARTMENT OF §
HOMELAND SECURITY, *et al.,* §
§
*Defendants,* and § JUDGE DREW B. TIPTON
§
VALERIE LAVEUS, *et al.,* §
§
*Intervenor Defendants.* §


# INTERVENOR DEFENDANTS'
# TAB 101, ECF 175-36

Case 6:23-cv-00007   Document 275-35   Filed 08/06/23 in TXSD   Page 56 of 63



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Information Technology*
Washington, DC  20529

**U.S. Citizenship
and Immigration
Services**

# Memorandum

TO:          Dominic Mancini
             Deputy Administrator,
             Office of Information and Regulatory Affairs,
             Office of Management and Budget

THROUGH:     Eric Hysen                    ERIC N        Digitally signed by ERIC
             DHS Chief Information Officer  HYSEN         N HYSEN
                                                         Date: 2022.12.29
                                                         15:46:20 -05'00'

FROM:        Samantha Deshommes            SAMANTHA L     Digitally signed by
             USCIS Office of Policy and Strategy,  DESHOMMES  SAMANTHA L DESHOMMES
             Chief Regulatory Officer                       Date: 2022.12.29 13:34:32
                                                            -05'00'

SUBJECT:     Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – Form
             I-134A, Online Request to be a Supporter and Declaration of Financial Support;
             and USCIS Form I-134, Declaration of Financial Support

**Purpose:** USCIS is requesting emergency approval of the new USCIS Form I-134A, Online
Request to be a Supporter and Declaration of Financial Support, which is a new collection of
information.  USCIS is also requesting emergency approval of a revision of USCIS Form I-134,
Declaration of Financial Support, to remove the electronic collection of information, which is the
basis for the new USCIS Form I-134A.  USCIS is seeking approval for both collections of
information under 5 CFR 1320.13.

**Background:**  Section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C.
1182(d)(5)) provides the Secretary of Homeland Security with the discretionary authority to
parole noncitizens into the United States temporarily, under such reasonable conditions that the
Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant
public benefit." *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 6 U.S.C. 202(4)
(charging the Secretary with the responsibility for "[e]stablishing and administering
rule…governing…parole").  To support DHS's current efforts to curb a surge in migrants

EXHIBIT
**35**

Cuba AR_001179

Case 6:23-cv-00007   Document 175-36 Filed on 08/26/23 in TXSD Page 2 of 63

crossing the Southwest Border (SWB) without authorization and immediately expand the avenues for lawful migration into the United States, DHS has created a streamlined process that allows certain citizens of designated countries and their immediate family members to come to the United States temporarily as parolees for urgent humanitarian reasons or significant public benefit. The process currently applies to Ukraine and Venezuela (with a numerical cap), but, with this emergency revision, it is being extended to Nicaragua, Cuba, and Haiti, and the numerical cap on Venezuela is being lifted. DHS will use Form I-134A to determine whether a U.S.-based individual has sufficient financial resources and access to those funds to support the beneficiary for the duration of their temporary stay in the United States. Form I-134A is used by a U.S. based individual (the supporter) to request to be considered as a supporter and to agree to provide financial support to the beneficiary named on the form during the beneficiary's period of stay in the United States.

USCIS is now splitting the two versions of the USCIS Form I-134 into separate OMB-controlled collections of information as the populations are different and the purposes for which the information collections are conducted are different enough to warrant their separation. As a result, USCIS will revert use of USCIS Form I-134 for its original purpose and will begin use of USCIS Form I-134A for the persons identified above as seeking parole into the United States. Other than expanding the eligible countries and associated instructions, the USCIS Form I-134A will match the previously approved online Form I-134 content. To facilitate the transition between versions, Form I-134 online requests that are saved and in process when the Form I-134A is deployed, will be automatically converted to Form I-134As upon submission and the receipt notices will reflect the new form number and name.

**Discussion:** OMB has previously approved a revision to USCIS Form I-134, *Declaration of Financial Support* (OMB control number 1615-0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. To support the expanded efforts and make the collection more flexible, DHS has created a new information collection that will be the first step in these parole processes and will cease using the paper USCIS Form I-134 for this purpose. U.S.-based supporters will submit USCIS Form I-134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States.

DHS requests emergency approval because the delay associated with the normal information collection request clearance process would harm the public interest. The expansion of these processes to include Cubans, Haitians, and Nicaraguans and the expansion of the current process for Venezuelans will improve border security, limit irregular migration, and create additional safe and orderly processes for people fleeing humanitarian crises to come to the United States.

Each of these countries is experiencing significant political, economic, and humanitarian challenges. Cuba, Nicaragua, and Venezuela are under the control of repressive authoritarian regimes that routinely oppress dissenting voices. Haiti, the poorest country in our hemisphere, faces an extremely challenging security environment punctuated by extreme political instability, and its citizens are subject to endemic, indiscriminate violence imposed by the criminal organizations and gangs. These conditions are driving irregular migration throughout the hemisphere as well as to our border.

Cuba AR_001180

There has been a significant increase in unique encounters of Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals, which jumped by more than 10-fold from an average of 15,557 in FY 2014 – FY 2019 to 169,436 in FY 2021.  CHNV encounters increased further – and sharply – in fiscal year (FY) 2022.  DHS encountered an estimated 605,000 unique CHNV nationals in FY 2022.

This process is directly responsive to requests from key foreign partners—including the Government of Mexico (GOM)—to provide a lawful process for Cuban, Haitian, Nicaraguan, and Venezuelan nationals to enter the United States.  The United States will only implement the new parole process while able to return or remove to Mexico such nationals who enter without authorization across the SWB.  The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of individuals who bypass this process and enter the United States without authorization.  Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying the information collection approval would be contrary to the public interest because it would incentivize even more irregular migration of Cuban, Haitian, Nicaraguan, and Venezuelan nationals seeking to enter the United States.  Thus, the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration would be exacerbated by a delay of the approval of this request.

USCIS seeks emergency processing of both the Form I-134 and I-134A information collection packages in accordance with 5 CFR 1320.13. USCIS certifies that the requirements of 5 CFR 1320.13(a) are met and that:

- The collection of information is needed immediately and is essential to the mission of the agency.
- The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information.
- Public harm is reasonably likely to result if normal clearance procedures are followed.

USCIS greatly appreciates the timely consideration of this request.

**Recommendation**: Please sign decision memo requesting emergency approval of this collection of information under 5 CFR 1320.13.

3

Cuba AR_001181



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV-0007

EXHIBIT NO. 102

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,           §
                                    §
    *Plaintiffs,*               §
                                    §
    vs.                         §     CIVIL ACTION NO.
                                    §     6:23-CV-00007
UNITED STATES DEPARTMENT OF         §
HOMELAND SECURITY, *et al.*,        §
                                    §
    *Defendants,* and           §     JUDGE DREW B. TIPTON
                                    §
VALERIE LAVEUS, *et al.*,           §
                                    §
    *Intervenor Defendants.*    §


# INTERVENOR DEFENDANTS' TAB 102, ECF 175-37

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
    SECURITY, *et al.*,
    *Defendants*.

Case 6:23-cv-00007

TEXAS'S RESPONSE TO DEFENDANTS' DISCOVERY REQUESTS

    Texas serves the following Responses and Objections to Defendants' First Set of Requests for Production, Interrogatories, and Requests for Admission to Plaintiffs.

Dated May 19, 2023.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

*/s/ Leif A. Olson*
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Deputy Chief, Special Litigation
Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON
America First Legal Foundation

1

EXHIBIT
36

Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

## CERTIFICATE OF SERVICE

I certify that on May 19, 2023, I served a copy of this document by electronic mail to all counsel listed below:

EREZ REUVENI
Assistant Director
Erez.R.Reuveni@usdoj.gov

BRIAN WARD
Senior Litigation Counsel
Brian.C.Ward@usdoj.gov

JOSEPH A. DARROW
Joseph.A.Darrow@usdoj.gov

ELISSA P. FUDIM
Elissa.P.Fudim@usdoj.gov

ERIN T. RYAN
Erin.T.Ryan@usdoj.gov
Trial Attorneys

U.S. DEPARTMENT OF JUSTICE
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 307-4293

*Counsel for Federal Defendants*

Esther H. Sung
esther.sung@justiceactioncenter.org
Karen C. Tumlin
karen.tumlin@justiceactioncenter.org
Jane Bentrott
jane.bentrott@justiceactioncenter.org
Lauren Michel Wilfong*
lauren.wilfong@justiceactioncenter.org
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272

Daniel Hatoum
daniel.hatoum@raicestexas.org
Vanessa Rivas-Bernardy
vanessa.rivas@raicestexas.org
The Refugee and Immigrant Center
for Education and Legal Services
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
(210) 960-3206

Monika Y. Langarica
langarica@law.ucla.edu

2

Ahilan T. Arulanantham
arulanantham@law.ucla.edu
Center for Immigration Law and
Policy
UCLA School of Law
385 Charles E. Young Dr. E., Box
951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

*Counsel for Intervenors*

*/s/ Ryan D. Walters*

## OBJECTION TO DEFINITION

Texas objects to Defendants' definition of the term "You" as " any Plaintiff State, including all its agencies, subdivisions, and officers acting in official capacity."

"A party to a cause of action is a person who is both named as a party and subject to the court's jurisdiction." *Nagle v. Lee*, 807 F.2d 435, 440 (5th Cir. 1987). Texas's executive department is not like the federal executive branch— a complete unit with "one man" wielding the entire executive power to whom all "lesser officers must" be accountable. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020) (quotations omitted). "[U]nlike the federal constitution, the Texas Constitution does not vest the executive power solely in one chief executive. Instead, the executive power is spread across several distinct elected offices." *In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022). The design creates a "decentralize[d] executive authority." *State v. Brabson*, 976 S.W.2d 182, 186 (Tex. Crim. App. 2012) (Womack, J., concurring).

The Attorney General of Texas, who brought this suit on Texas's behalf, does not have a free-floating Executive power to direct State agencies to take any action. Texas's "Executive" is non-unitary to the point where "neither the Governor nor the Attorney General has statutory authority [even] to directly control" the actions of many non-elected departments. *In re Abbott*, 645 S.W.3d at 281.Under Texas law, the Attorney General represents "the state *qua* state and as *parens patriae*." *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997). Texas's discovery obligations are limited to information or documents in the possession or control of the Attorney General of Texas.

Additionally, the State of Texas has more than 320,000 full-time employees and thousands more part-time employees spread across the general government, health and human services, public education, higher education, the judiciary, public safety and criminal justice, natural resources, business and economic development, regulatory and other state agencies, the legislature, and the Office of the Attorney General. This extends even more broadly to political subdivisions within the State. It is impossible to represent, even after a reasonable and diligent search, that all, each, or every bit of information falling within a description can or has been assembled.

However, Texas has made diligent efforts to obtain responsive information and documents from what it has determined would be the most likely sources.

Such information or documents now in the possession of the Attorney General of Texas will be noted in each response.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1:** How many Cuban, Haitian, and Nicaraguan noncitizens live in your State? Provide this data for each of these populations for the relevant period, by year and month, and since January 6, 2023.

> **Answer to Interrogatory No. 1:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 1.

**Interrogatory No. 2:** How many Cuba, Haitian, and Nicaraguan noncitizens paroled into the country under the Cuban, Haitian, and Nicaraguan Parole Processes live in your State?

> **Answer to Interrogatory No. 2:** Texas does not track this information.

**Interrogatory No. 3:** How many Venezuelan noncitizens live in your State? Provide this data for the relevant period, by year and month, and since October 18, 2022.

> **Answer to Interrogatory No. 3:** Texas does not track this information in general, or by year or month. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are included in the response to Request for Production No. 2.

**Interrogatory No. 4:** How many Venezuelan noncitizens paroled into the country under the Venezuelan Parole Process live in your State?

> **Answer to Interrogatory No. 4:** Texas does not track this information.

**Interrogatory No. 5:** For each of Interrogatories No. 1 and 3, state how many of these individuals were paroled into the United States under the CHNV Parole Processes and how many entered the United States through a process other than the CHNV Parole Processes.

> **Answer to Interrogatory No. 5:** Texas does not track this information.

5

**Interrogatory No. 6:** Describe your means of tracking the data requested in Interrogatories No. 1 to 5. Identify all sources of data and their author(s).

> **Answer to Interrogatory No. 6:** Texas has responded to this in its Responses to Interrogatories No. 1 to 5.

**Interrogatory No. 7:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have been convicted of crimes in your State during the relevant period? Provide data for the relevant period, by year, and since the Effective Dates.

> **Answer to Interrogatory No. 7:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.
>
> Subject to and without waiving these objections, a list of citizens of Cuba, Haiti, Nicaragua, and Venezuela who have been incarcerated or confined by the Texas Department of Criminal Justice (with dates of sentence for the former) are produced at TEXAS_000172–TEXAS_000173.

**Interrogatory No. 8:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received healthcare and medical services for which some or all the cost has been paid by your State without reimbursement, and how much money did you spend on such services. Provide data for expenditures which occurred during the relevant period, by year, and since the Effective Dates.

6

**Answer to Interrogatory No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, Texas states that neither it nor the Texas Health and Human Services Commission tracks the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000162. As to uncompensated care for illegal aliens by state public hospital districts, the Texas Health and Human Services Commission has tracked those costs for the relevant time periods.

**Interrogatory No. 9:** How many Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State have received state-subsidized

7

public education and how much money was spent on providing such services? Provide data for the relevant period, by year, and since the Effective Dates.

>**Answer to Interrogatory No. 9:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

>Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

>Subject to and without waiving these objections, the Texas Education Agency tracks this information.

**Interrogatory No. 10:** What costs, if any, has your State incurred from issuing drivers' licenses or State-identification-documents to Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens who live in your State? Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 10:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: While the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are U.S. citizens or not)—see also the documents at TEXAS_000022.

**Interrogatory No. 11:** What costs, if any, has your State incurred from providing family and child welfare social services to Cuban, Haitian, Nicaraguan and Venezuelan noncitizens who live in your State. Provide data for the relevant period, by year, and since the Effective Dates.

**Answer to Interrogatory No. 11:** Texas objects that it is not alleging injury on this basis for standing purposes. Texas also objects that it is

9

entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But] MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections: the Texas Department of Family and Protective Services tracks costs incurred for noncitizens born in Cuba, Haiti, Nicaragua, and Venezuela. *See* documents produced at TEXAS_000001.

**Interrogatory No. 12:** For each of Interrogatories No. 7 to 11, state how many of the individuals were paroled into the United States under the CHNV Parole Processes, how many entered the United States other than through the CHNV Parole Processes, and your means of tracking such data. Identify all sources of data and their author(s).

**Answer to Interrogatory No. 12:** Texas does not track this information.

10

**Interrogatory No. 13:** For each of Interrogatories No. 7 to 11, state your means of tracking the data. Identify all sources of data and their author(s).

> **Answer to Interrogatory No. 13:** Texas has responded to this Interrogatory in its Responses to Interrogatories No. 7 to 11.

**Interrogatory No. 14:** Describe your injury with respect to each of your claims for relief in the Amended Complaint, broken down by claim. Identify which documents you have provided in response to these Requests support each claim.

> **Answer to Interrogatory No. 14:** Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the increased presence of aliens in Texas. In addition to the declarations Texas has submitted in its motion for preliminary injunction briefing (and supplemental ones it is entitled to submit before trial), Texas has produced documents relating to costs relating to driver licenses (produced at TEXAS_000002–TEXAS_000099), education (produced at TEXAS_003239–TEXAS_003255), healthcare (produced at TEXAS_000100–TEXAS_000162), law enforcement (produced at TEXAS_000163–TEXAS_003238), and family protective services (produced at TEXAS_000001).

**Interrogatory No. 15:** To what extent do noncitizens present in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives. Specify the categories of economic value and the amount of money earned from each category. To the extent possible, specify the economic contribution by Cubans, Haitians, Nicaraguans and Venezuelans nationals specifically.

> **Answer to Interrogatory No. 15:** Texas objects to this request. Any purported benefits Plaintiff receives as a result of the challenged policies are irrelevant to Plaintiff's standing based on its injuries from the same. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and

11

citations omitted). Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks this information.

**Interrogatory No. 16:** For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

> **Answer to Interrogatory No. 16:** Texas denies Request No. 22 because an injury sufficient for standing is not undermined by an offset in benefits. *See Texas v. United States*, 555 F. Supp. 3d 351, 382 (S.D. Tex. 2021) ("even if the Government *could* demonstrate that increased enforcement in the prioritized categories might displace a drop in the total number of detained aliens resulting from the deprioritized categories, this "offset" would be irrelevant as a matter of law.") (Tipton, J.), *appeal dismissed,* No. 21-40618, 2022 WL 517281 (5th Cir. Feb. 11, 2022). Texas also denies Request No. 22 because a hypothetical situation where fewer aliens from those countries came to live in Texas after institution of the CHNV Parole Processes would not necessarily mean that the latter caused the former.

> Texas partially denies Request Nos. 8 & 9 on the bases identified in those responses.

OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:** Provide all documents and data that show the number of Cubans, Haitians, and Nicaraguans who live in your State, by year, during the relevant period and since January 6, 2023, broken down by nationality.

> **Response to Request No. 1:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 2:** Provide all documents and data that show the number of Venezuelans who live in your State, by year, during the relevant period and since October 18, 2022.

> **Response to Request No. 2:** Texas does not track this information in general, or by year. However, the Texas Demographic Center examines

federal census information on this topic, and the relevant data from the American Community Survey estimates are produced at TEXAS_003256–TEXAS_003265.

**Request for Production No. 3:** Provide all documents and data that show the number of Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States under the CHNV Parole Processes specifically, who live in your State.

**Response to Request No. 3:** Texas does not track this information.

**Request for Production No. 4:** Provide all documents and data that show the cost to your State from providing unreimbursed medical care to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 4:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But] MPP is precisely the sort of large-scale policy that's amenable to challenge

13

using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Health and Human Services Commission does not track the citizenship of beneficiaries of the Family Violence Program. Documents from the Texas Health and Human Services Commission showing expenditures for Emergency Medicaid and CHIP-Perinatal are produced at TEXAS_000100–TEXAS_000162.

**Request for Production No. 5:** Provide all documents and data that show the cost to your State from providing public education to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 5:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, the Texas Education Agency does not track this information but see documents produced at TEXAS_003239–TEXAS_003255.

**Request for Production No. 6:** Provide all documents and data that show the cost to your State from providing social services to Cubans, Haitians, Nicaraguans, and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group, and the type of social service.

**Response to Request No. 6:** Texas objects to this request. It is unduly burdensome and not proportional to the needs of the case. It is impossible for Texas to describe each and every "social service" as requested in the interrogatory. It also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But]

15

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving its objections, Texas has submitted the evidence of the social services provided to illegal aliens that it intends to rely on and is entitled to supplement that evidence before trial. Texas provides driver licenses, education, health care, and law-enforcement services to illegal aliens in the State.

**Request for Production No. 7:** Provide all documents and data that show the cost to your State from providing driver's licenses or other identification documents to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 7:** Texas also objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Plaintiff has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling Texas.

Plaintiff also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. … [But]

16

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, while the Texas Department of Public Safety tracks the birth country of applicants, it does not track the particular citizenship of applicants (as opposed to whether they are US citizens or not). Documents are being produced at TEXAS_000002–TEXAS_000099.

**Request for Production No. 8:** Provide all documents and data that show the cost to your State associated with law enforcement related to Cubans, Haitians, Nicaraguans and Venezuelans, by year, during the relevant time period, and since the Effective Dates, broken down by the nationality of the noncitizen group.

**Response to Request No. 8:** Texas objects that it is entitled to rely only on certain harms to demonstrate its standing, and the amount of injury is irrelevant. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("But the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an 'identifiable trifle.'") (internal citation and quotation marks omitted). The scope of any injury is also irrelevant relating to the irreparable injury prong of the requirements for a preliminary (or permanent) injunction, because "when 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order.

Texas also objects to this request because expenditures on individual aliens are not relevant to the standing inquiry when challenging a large-scale immigration program such as at issue in this case. *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021) ("The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. ... [But]

17

MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing 'conjectural' or 'hypothetical' about that.")

Subject to and without waiving these objections, documents are being produced at TEXAS_000163–TEXAS_003238, particularly TEXAS_000172–TEXAS_000173.

**Request for Production No. 9:** Provide all documents relating to any and all additional injuries that you allege have been caused, or will be caused, to you by noncitizens who enter the United States pursuant to the CHNV Parole Processes.

**Response to Request No. 9:** Texas objects to this request as the scheduling order allows supplementation of submitted declarations before trial. Texas has submitted the evidence of injury it intends to rely on and will supplement on those same bases as permitted by the scheduling order—Texas provides driver licenses, education, healthcare, and law-enforcement services to illegal aliens in the State.

**Request for Production No. 10:** Provide all documents and data that indicate to what extent Cubans, Haitians, Nicaraguans, and Venezuelans who live in your State contribute economic value to your State in any way, tangible and intangible, including but not limited to: paying state income, sales, property and other taxes, providing labor and employment opportunities, owning homes, and contributing to civic and social causes and initiatives, by year, during the relevant time and since the Effective Dates.

**Response to Request No. 10:** Texas objects to this request. Any purported benefits Texas receives from the challenged policies are irrelevant to its standing based on its injuries caused by those policies. *See Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury. Our standing analysis is not an accounting exercise....") (internal quotation marks and citations omitted).

Subject to and without waiving this objection, neither the Texas Comptroller of Public Accounts nor the Texas Demographic Center tracks this information.

**Request for Production No. 11:** Provide all documents and data consulted or relied upon in responding to Defendants' accompanying Interrogatories and Requests for Admission.

**Response to Request No. 11:** Copies of all such documents and data are included in the responses to the other Requests for Production of Documents. Communications that constitute attorney-client privilege and work product are not being produced for any responses.

### RESPONSES TO REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Cubans, Haitians, Nicaraguans and Venezuelans paroled into the United States pursuant to the CHNV Parole Processes have been inspected by immigration authorities and permitted to enter the United States.

**Response to Request No. 1:** Texas can neither admit nor deny this request as it does not have knowledge of Defendants' actions regarding any inspections of Cubans, Haitians, Nicaraguans, and Venezuelans made during implementation of the CHNV Parole Processes.

**Request for Admission No. 2:** You lack any basis to assess the cost to your State caused by any Cubans, Haitians, Nicaraguans, and Venezuelans paroled into the United States pursuant to the CHNV Parole Processes since the Effective Dates.

**Response to Request No. 2:** Texas can neither admit nor deny this request as it does not have knowledge of how many aliens from those countries have been paroled into Texas pursuant to the CHNV Parole Processes.

**Request for Admission No. 3:** You have no evidence that you incurred more costs from Cubans, Haitians, and Nicaraguans entering your State each month since January 6, 2023 than you incurred each month in 2022 from the same populations.

**Response to Request No. 3:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered Texas during these time periods.

19

**Request for Admission No. 4:** You have no evidence that you incurred more costs from Venezuelans entering your State each month since October 18, 2022 than you incurred each earlier month in 2022 from the same population.

> **Response to Request No. 4:** Texas can neither admit nor deny this request as it does not have knowledge of how many Venezuelans have entered Texas during these time periods.

**Request for Admission No. 5:** You cannot quantify how much money your State would save if no Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens granted parole through the CHNV Parole Processes were present in your State.

> **Response to Request No. 5:** Texas can neither admit nor deny this request as it concerns a future event contingent on many factors; the request does not concern facts that have ever been in existence. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny. The request therefore does not fall within either of the two categories of information for which requests for admission may be made. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to "(A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents.").

**Request for Admission No. 6:** You do not track unreimbursed medical expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

> **Response to Request No. 6:** Texas admits that it does not track this information and denies that the Texas Health and Human Services Commission does not have information regarding unreimbursed Emergency Medicaid of CHIP-Perinatal payments for citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000162).

**Request for Admission No. 7:** You do not track unreimbursed educational expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 7:** Texas admits that neither it nor the Texas Education Agency tracks either category of information.

**Request for Admission No. 8:** You do not track unreimbursed family and child welfare service expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 8:** Texas admits that it does not track such information. Texas denies that the Texas Department of Family and Protective Services does not track unreimbursed family and child welfare service expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela (see documents produced at TEXAS_000001) but admits that it does not track such expenses for those released under the CHNV Parole processes specifically.

**Request for Admission No. 9:** You do not track unreimbursed law enforcement expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 9:** Texas admits that it does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally, or under the CHNV Parole Processes specifically. Texas denies that the Texas Department of Criminal Justice does not track unreimbursed law enforcement expenditures made specifically on behalf of citizens of Cuba, Haiti, Nicaragua, and Venezuela released into the country generally (see documents produced at TEXAS_000172–TEXAS_000173) but admits that the Texas Department of Criminal Justice does not track such information under the CHNV Parole Processes specifically.

**Request for Admission No. 10:** You do not track unreimbursed drivers' licensing and state-identification-document expenditures made specifically on behalf of Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens released into the country generally, or under the CHNV Parole Processes specifically.

**Response to Request No. 10:** Texas admits that it does not track unreimbursed driver licensing and state-identification-document expenditures made specifically on behalf of citizens of Cuba, Haiti,

Nicaragua, and Venezuela, either released into the country generally or under the CHNV Parole Processes. Texas admits that the Texas Department of Public Safety does not track the citizenship of driver license or state-identification-document holders, including for citizens of Cuba, Haiti, Nicaragua, and Venezuela (but does track country of birth and whether they are citizens of the United States, see documents produced at TEXAS_000022), whether released into the country generally or under the CHNV Parole Processes.

**Request for Admission No. 11:** You have not made any changes to State budgeting, programs, or services in response to Defendants' implementation of the CHNV Parole Processes.

> **Response to Request No. 11:** Texas can neither admit nor deny this request as it is contingent on many factors, including the motivations of each member of the State Legislature and whether such a motivation can be attributed to the Legislature as a whole, or motivations within other State agencies outside its control. There is no information Texas knows or can readily obtain that is sufficient to enable it to admit or deny.

**Request for Admission No. 12:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's revenue by paying taxes.

> **Response to Request No. 12:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 13:** Cubans, Haitians, Nicaraguans, and Venezuelans released into the country generally, or under the CHNV Parole Processes specifically, who live in your State, contribute to the State's economy through their labor and purchase of goods or services.

> **Response to Request No. 13:** Texas can neither admit nor deny this request as it does not track such numbers based on citizenship, and neither does the Texas Comptroller of Public Accounts.

**Request for Admission No. 14:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have entered the United States generally since the promulgation of the CHNV Parole Processes than were entering prior to the promulgation of these processes.

22

**Response to Request No. 14:** Texas can neither admit nor deny this request as it does not have knowledge of how many Cubans, Haitians, and Nicaraguans have entered the United States during these time periods.

**Request for Admission No. 15:** From September 2022 to February 2023, the number of unique encounters of Venezuelans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: September 33,494, October 20,804, November 6,253, December 6,067, January 2,552, February 1,172, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Venezuelans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: September 33,804, October, 22,037, November 7,955, December 8,166, January 9,100, February 5,559, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 15:** Texas admits that the referred-to web pages say that, but it can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 16:** From December 2022 to February 2023, the number of unique encounters of Cubans at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 42,183, January 6,053, February 140, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Cubans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 34,710, January 6,433, February 753, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 16:** Texas admits that the press release says that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 17:** From December 2022 to February 2023, the number unique encounters of Haitians at the Southwest border (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 3,928, January 2,238, February 168, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Haitians encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 5,138, January 3,174,

February 7,430, *see* https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 17:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 18:** From December 2022 to February 2023, the number of unique encounters of Nicaraguans encountered at the Southwest border, (in other words, persons not previously encountered in the prior 12 months), between ports of entry, were, respectively by month: December 34,868, January 3,223, February 279, *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update, and the total number of Nicaraguans encountered at the Southwest border, both at ports of entry and between ports of entry, were, respectively: December 35,387, January 3,377, February 639, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

> **Response to Request No. 18:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 19:** Following the implementation of the CHNV Parole Processes for Cuban, Haitian, and Nicaraguan noncitizens, and changes to the implementation of the process for Venezuelans, Border Patrol encounters with Cubans, Haitians, Nicaraguans, and Venezuelans between ports of entry at the southwest border declined from a 7-day average of 1,231 on January 5, to 59 on January 31 (a 95% drop in just three weeks), *see* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, to just 46 on February 28—a drop of 98% in just two months. *See* https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2023-monthly-operational-update.

> **Response to Request No. 19:** Texas admits that the referred-to web pages say that, but Texas can neither admit nor deny the accuracy of these numbers.

**Request for Admission No. 20:** You have no basis for disputing the accuracy of the data set forth on the following government websites: https://www.cbp.gov/newsroom/national-media- release/cbp-releases-february-

2023-monthly-operational-update, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

**Response to Request No. 20:** Texas admits that it has no basis to dispute the accuracy of the data on the listed web pages but can neither admit nor deny that they are accurate.

**Request for Admission No. 21:** Fewer Cubans, Haitians, Nicaraguans, and Venezuelans have come to live in your State in the three months since the promulgation of the CHNV Parole Processes than did in the three months prior to the promulgation of these processes.

**Response to Request No. 21:** Texas can neither admit nor deny this because the information that would allow it to do so is in Defendants' possession.

**Request for Admission No. 22:** If fewer Cubans, Haitians, Nicaraguans, and Venezuelans were paroled or otherwise allowed to enter the country after the CHNV Parole Processes were instituted than before the CHNV Parole Processes were instituted, and as a result fewer Cubans, Haitians, Nicaraguans, and Venezuelans came to live in your States, you have no injury, and thus no standing in this case.

**Response to Request No. 22:** Denied.

**Request for Admission No. 23:** Fewer Cuban, Haitian, Nicaraguan and Venezuelan nationals are released into the United States as a result of Mexico agreeing to accept the returns of Cuban, Haitian, Nicaraguan and Venezuelan nationals.

**Response to Request No. 23:** Texas does not have sufficient information to admit or deny.