

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23 -CV0007

EXHIBIT
NO. 104

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 104, ECF 175-39

United States Citizenship and Immigration Services

Department of Homeland Security

EXHIBIT 38

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *Budget Overview*



**Fiscal Year 2023**
**Congressional Justification**

CIS - 1

Department of Homeland Security

United States Citizenship and Immigration Services

# Table of Contents

*United States Citizenship and Immigration Services* .................................................................1

Appropriation Organization Structure ...................................................................................3

Budget Comparison and Adjustments...................................................................................4

Personnel Compensation and Benefits...................................................................................9

Non Pay Budget Exhibits.........................................................................................................10

Supplemental Budget Justification Exhibits ..........................................................................12

CIS - 2

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 3 of 27

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services

### Appropriation Organization Structure

| Organization Name | Level | Fund Type (* Includes Defense Funding) |
|---|---|---|
| **United States Citizenship and Immigration Services** | Component | |
| **Operations and Support** | Appropriation | |
| Employment Status Verification | PPA | Discretionary - Appropriation |
| Application Processing | PPA | Discretionary - Appropriation |
| Information Technology and Cybersecurity | PPA | Discretionary - Appropriation |
| **Federal Assistance** | Appropriation | |
| Citizenship and Integration Grants | PPA | Discretionary - Appropriation |
| **Immigration Examinations Fee Account** | Appropriation | |
| Adjudication Operations | PPA | Mandatory - Fee |
| Immigration Policy and Support | PPA | Mandatory - Fee |
| Refugee and Asylum Operations | PPA | Mandatory - Fee |
| Immigration Records and Applicant Services | PPA | Mandatory - Fee |
| Premium Processing (Including Transformation) | PPA | Mandatory - Fee |
| **H-1B Nonimmigrant Petitioner Account** | Appropriation | |
| Adjudication Operations | PPA | Mandatory - Fee |
| **Fraud Prevention and Detection Account** | Appropriation | |
| Adjudication Operations | PPA | Mandatory - Fee |

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 4 of 27

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Budget Comparison and Adjustments
### Appropriation and PPA Summary
(Dollars in Thousands)

| | FY 2021 Enacted | FY 2022 Annualized CR | FY 2022 President's Budget | FY 2023 President's Budget |
|---|---|---|---|---|
| **Operations and Support** | $117,790 | $367,790 | $459,504 | $903,622 |
| Employment Status Verification | $117,790 | $117,790 | $114,504 | $109,611 |
| Application Processing | - | $250,000 | $345,000 | $764,698 |
| Information Technology and Cybersecurity | - | - | - | $29,313 |
| **Federal Assistance** | $10,000 | $10,000 | $10,000 | $10,000 |
| Citizenship and Integration Grants | $10,000 | $10,000 | $10,000 | $10,000 |
| **Immigration Examinations Fee Account** | $4,301,935 | $4,944,463 | $4,944,463 | $5,004,024 |
| Adjudication Operations | $1,694,174 | $1,832,963 | $1,832,963 | $1,845,449 |
| Immigration Policy and Support | $1,204,788 | $1,297,020 | $1,297,020 | $1,280,925 |
| Refugee and Asylum Operations | $255,363 | $435,753 | $435,753 | $336,421 |
| Immigration Records and Applicant Services | $385,891 | $478,752 | $478,752 | $599,398 |
| Premium Processing (Including Transformation) | $761,720 | $899,975 | $899,975 | $941,831 |
| **H-1B Nonimmigrant Petitioner Account** | $14,333 | $15,000 | $15,000 | $20,000 |
| Adjudication Operations | $14,333 | $15,000 | $15,000 | $20,000 |
| **Fraud Prevention and Detection Account** | $36,679 | $52,870 | $52,870 | $53,960 |
| Adjudication Operations | $36,679 | $52,870 | $52,870 | $53,960 |
| **Total** | $4,480,738 | $5,390,123 | $5,481,837 | $5,991,606 |

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2021 Enacted | | | FY 2022 President's Budget | | | FY 2023 President's Budget | | | FY 2022 to FY 2023 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Operations and Support | 419 | 398 | $117,790 | 1,705 | 1,620 | $459,504 | 4,001 | 3,014 | $903,622 | 2,296 | 1,394 | $444,118 |
| Federal Assistance | - | - | $10,000 | - | - | $10,000 | - | - | $10,000 | - | - | - |
| Immigration Examinations Fee Account | 17,749 | 18,107 | $4,301,935 | 20,654 | 18,649 | $4,944,463 | 20,079 | 18,713 | $5,004,024 | (575) | 64 | $59,561 |
| H-1B Nonimmigrant Petitioner Account | - | - | $14,333 | - | - | $15,000 | - | - | $20,000 | - | - | $5,000 |
| Fraud Prevention and Detection Account | 171 | 171 | $36,679 | 185 | 176 | $52,870 | 185 | 176 | $53,960 | - | - | $1,090 |
| Total | 18,339 | 18,676 | $4,480,738 | 22,544 | 20,445 | $5,481,837 | 24,265 | 21,903 | $5,991,606 | 1,721 | 1,458 | $509,769 |
| Subtotal Discretionary - Appropriation | 419 | 398 | $127,790 | 1,705 | 1,620 | $469,504 | 4,001 | 3,014 | $913,622 | 2,296 | 1,394 | $444,118 |
| Subtotal Mandatory - Fee | 17,920 | 18,278 | $4,352,948 | 20,839 | 18,825 | $5,012,333 | 20,264 | 18,889 | $5,077,984 | (575) | 64 | $65,651 |

## Component Budget Overview

The FY 2023 Budget includes $913.6M, 4,001 positions; and 3,014 full-time equivalents (FTE) in discretionary budget authority for the U.S. Citizenship and Immigration Services (USCIS). This funding level represents an increase of $444.1M above the FY 2022 President's Budget.

The FY 2023 Budget also estimates $5.1B in total mandatory budget authority for the Immigration Examinations Fee Account (IEFA), the H-1B Nonimmigrant Petitioner Account, and the Fraud Prevention and Detection Account (FPDA).

The funding enables USCIS to fully meet its mission requirements, including the following:

- Strengthen and effectively administer the immigration system;
- Strengthen National security safeguards and combat fraud;
- Reinforce quality and consistency in administering immigration benefits.

The FY 2023 discretionary funding supports the E-Verify Program (Employment Status Verification PPA), the Citizenship and Integration Grant Program, application processing, and IT and cybersecurity enhancements.

The Employment Status Verification (ESV) PPA provides funds for the operations, mission support, and associated management and administration costs of E-Verify. E-Verify is an internet-based program that enables an employer to determine a newly-hired employee's eligibility to work in the

Case 6:23-cv-00007 Document 175-39 Filed on 06/20/23 in TXSD Page 6 of 27

**Department of Homeland Security** United States Citizenship and Immigration Services

United States by verifying information reported on an employee's Form I-9, Employment Eligibility Verification, against data from the Department of Homeland Security, Social Security Administration, Department of State, and Departments of Motor Vehicles of participating States.

Application Processing supports the Administration's priority of decreasing application processing times, reducing the backlog, and expanding humanitarian processing efforts.

Information Technology and Cybersecurity provides funding for staff and equipment to safeguard USCIS' information technology (IT) infrastructure. USCIS is committed to efficiently processing immigration benefits, while ensuring and protecting its systems, key personal data, and stakeholder information through these initiatives.

USCIS Citizenship and Integration Grant Program is funded via the Federal Assistance account. In FY 2023, USCIS expects to award $10.0M in grants to organizations that help prepare lawful permanent residents (LPRs) for naturalization.[1] The grants aim to promote prospective citizens' inclusion into American civic life by funding educational programs designed to increase their knowledge of English, U.S. history, and civics.

---

[1] For a list of past grant recipients, please visit: https://www.uscis.gov/citizenship/organizations/grant-program

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2021 | FY 2022 | FY 2023 |
|---|---|---|---|
| **Enacted/Request/Collections** | $4,908,232 | $4,828,291 | $5,276,466 |
| Carryover - Start of Year | $1,100,275 | $1,603,600 | $1,157,175 |
| Recoveries | $129,770 | - | - |
| Rescissions to Current Year/Budget Year | ($24,685) | ($8,744) | - |
| Net Sequestered Resources | ($43,360) | $26,865 | ($659) |
| Reprogramming/Transfers | $4,085 | - | - |
| Supplementals | - | $193,000 | - |
| CHIMP | ($4,000) | ($4,000) | ($4,000) |
| **Total Budget Authority** | **$6,070,317** | **$6,639,012** | **$6,503,982** |
| Collections - Reimbursable Resources | $71,674 | $75,000 | $75,000 |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$6,141,991** | **$6,714,012** | **$6,578,982** |
| Obligations (Actual/Estimates/Projections) | $4,480,738 | $5,481,837 | $6,917,409 |
| Obligations – Reimbursable | $57,653 | $75,000 | $75,000 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 21,055 | 22,544 | 24,265 |
| Enacted/Request FTE | 20,003 | 20,445 | 21,903 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 18,353 | 21,460 | 24,265 |
| FTE (Actual/Estimates/Projections) | 18,676 | 20,445 | 21,903 |

CIS - 7

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Collections – Reimbursable Resources
### (Dollars in Thousands)

| | FY 2021 Enacted | | | FY 2022 President's Budget | | | FY 2023 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Canada/UK Visa | - | - | $6,069 | - | - | $9,500 | - | - | $9,500 |
| Department of Defense - Department of Defense | - | - | $7,265 | - | - | $7,500 | - | - | $7,500 |
| Department of Health and Human Services - Department Wide | - | - | $317 | - | - | $5 | - | - | $5 |
| Department of Homeland Security - Department of Homeland Security | - | - | $1,234 | - | - | $952 | - | - | $952 |
| Department of Homeland Security - Federal Emergency Management Agency | - | - | $6,632 | - | - | $12,994 | - | - | $12,994 |
| Department of Homeland Security - U.S. Customs and Border Protection | - | - | $38,423 | - | - | $19,154 | - | - | $19,154 |
| Department of Homeland Security - U.S. Immigration and Customs Enforcement | - | - | $12,614 | - | - | $12,500 | - | - | $12,500 |
| Department of Justice - Department of Justice | - | - | $373 | - | - | $311 | - | - | $311 |
| SAVE Collections | - | - | $8,902 | - | - | $12,000 | - | - | $12,000 |
| Department of Homeland Security – CISA | - | - | $74 | - | - | $74 | - | - | $74 |
| General Service Administration (GSA) | - | - | $11 | - | - | $10 | - | - | $10 |
| Department of State | - | - | $102 | - | - | - | - | - | - |
| US International Development Finance Corporation (DFC) | - | - | $41 | - | - | - | - | - | - |
| Total Collections' | - | - | $81,983 | - | - | $75,000 | - | - | $75,000 |

* Collections includes all funding for actual and anticipated incoming reimbursables.

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2021 Enacted | | | | FY 2022 President's Budget | | | | FY 2023 President's Budget | | | | FY 2022 to FY 2023 Total Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Operations and Support | 419 | 398 | $51,343 | $129.00 | 1,705 | 1,620 | $258,247 | $159.41 | 4,001 | 3,014 | $528,447 | $175.32 | 2,296 | 1,394 | $270,200 | $15.93 |
| Immigration Examinations Fee Account | 17,749 | 18,107 | $2,416,175 | $133.37 | 20,654 | 18,649 | $2,787,629 | $149.48 | 20,079 | 18,713 | $2,826,882 | $151.07 | (575) | 64 | $39,253 | $1.59 |
| Fraud Prevention and Detection Account | 185 | 171 | $17,311 | $101.23 | 185 | 176 | $25,978 | $147.60 | 185 | 176 | $27,068 | $153.80 | - | - | $1,090 | $6.19 |
| Total | 18,353 | 18,676 | $2,484,828 | $140.26 | 22,544 | 20,445 | $3,071,854 | $150.25 | 24,265 | 21,903 | $3,382,397 | $154.43 | 1,721 | 1,458 | $310,543 | $4.18 |
| | | | | | | | | | | | | | | | | |
| Subtotal Discretionary - Appropriation | 419 | 398 | $51,343 | $129.00 | 1,705 | 1,620 | $258,247 | $159.41 | 4,001 | 3,014 | $528,447 | $175.34 | 2,296 | 1,394 | $270,200 | $15.93 |
| Subtotal Mandatory - Fee | 17,934 | 18,278 | $2,433,485 | $130.99 | 20,839 | 18,825 | $2,813,607 | $134.09 | 20,264 | 18,889 | $2,853,950 | $151.09 | (575) | 64 | $40,343 | $17.00 |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2021 Enacted | FY 2022 President's Budget | FY 2023 President's Budget | FY 2022 to FY 2023 Total Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $1,753,683 | $2,155,559 | $2,342,954 | $187,395 |
| 11.3 Other than Full-time Permanent | $9,400 | $15,513 | $18,397 | $2,884 |
| 11.5 Other Personnel Compensation | $59,310 | $87,083 | $160,696 | $73,613 |
| 12.1 Civilian Personnel Benefits | $661,124 | $813,699 | $860,318 | $46,619 |
| 13.0 Benefits for Former Personnel | $1,311 | - | $32 | $32 |
| Total - Personnel Compensation and Benefits | $2,484,828 | $3,071,854 | $3,382,397 | $310,543 |
| Positions and FTE | | | | |
| Positions - Civilian | 18,354 | 22,544 | 24,265 | 1,721 |
| FTE - Civilian | 18,676 | 20,445 | 21,903 | 1,458 |

Case 6:23-cv-00007  Document 175-39  Filed on 06/20/23 in TXSD  Page 10 of 27

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
### Non Pay Budget Exhibits
#### Non Pay Summary
*(Dollars in Thousands)*

|  | FY 2021 Enacted | FY 2022 President's Budget | FY 2023 President's Budget | FY 2022 to FY 2023 Total Change |
|---|---|---|---|---|
| Operations and Support | $66,447 | $201,257 | $375,175 | $173,918 |
| Federal Assistance | $10,000 | $10,000 | $10,000 | - |
| Immigration Examinations Fee Account | $1,885,760 | $2,156,834 | $2,177,142 | $20,308 |
| H-1B Nonimmigrant Petitioner Account | $14,333 | $15,000 | $20,000 | $5,000 |
| Fraud Prevention and Detection Account | $19,369 | $26,892 | $26,892 | - |
| **Total** | $1,995,909 | $2,409,983 | $2,609,210 | $199,226 |
| Subtotal Discretionary - Appropriation | $76,447 | $211,257 | $385,175 | $173,918 |
| Subtotal Mandatory - Fee | $1,919,462 | $2,198,726 | $2,224,034 | $25,308 |

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 11 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

## Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2021 Enacted | FY 2022 President's Budget | FY 2023 President's Budget | FY 2022 to FY 2023 Total Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $4,288 | $65,982 | $80,687 | $14,705 |
| 22.0 Transportation of Things | $10,515 | $12,510 | $13,024 | $514 |
| 23.1 Rental Payments to GSA | $279,235 | $312,434 | $292,922 | ($19,512) |
| 23.2 Rental Payments to Others | $1,243 | $4,385 | $10,026 | $5,641 |
| 23.3 Communications, Utilities, & Miscellaneous | $66,965 | $56,424 | $56,538 | $114 |
| 24.0 Printing and Reproduction | $8,158 | $7,669 | $9,074 | $1,405 |
| 25.1 Advisory & Assistance Services | $723,112 | $723,901 | $830,765 | $106,864 |
| 25.2 Other Services from Non-Federal Sources | $33,405 | $147,948 | $140,316 | ($7,632) |
| 25.3 Other Purchases of goods and services | $308,385 | $435,103 | $469,993 | $34,890 |
| 25.4 Operations & Maintenance of Facilities | $1,924 | $3,135 | $3,704 | $569 |
| 25.6 Medical Care | - | - | $1 | $1 |
| 25.7 Operation & Maintenance of Equipment | $119,465 | $111,762 | $159,927 | $48,165 |
| 26.0 Supplies & Materials | $13,790 | $18,099 | $18,894 | $795 |
| 31.0 Equipment | $379,638 | $446,903 | $459,623 | $12,720 |
| 32.0 Land and Structures | $31,016 | $49,408 | $49,408 | - |
| 41.0 Grants, Subsidies, and Contributions | $10,007 | $10,091 | $10,080 | ($11) |
| 42.0 Insurance Claims and Indemnities | $2,763 | $4,228 | $4,228 | - |
| Total - Non Pay Budget Object Class | $1,995,909 | $2,409,983 | $2,609,210 | $199,227 |

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Supplemental Budget Justification Exhibits
### FY 2023 Counter Unmanned Aerial Systems (CUAS) Funding

The FY 2023 Budget for USCIS does not include any funding for Counter Unmanned Aerial Systems.

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 13 of 27

Department of Homeland Security

United States Citizenship and Immigration Services

**United States Citizenship and Immigration Services**
**Status of Congressionally Requested Studies, Reports and Evaluations**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2020 | 4/17/2020 | H. Rept. 116-180 | Not later than 120 days after the date of enactment of this Act, Dept. of Homeland Security, the Dept. of Labor, the Dept. of State, and the United States Digital Service are directed to report on options to improve the execution of the H-2A and H-2B visa programs, including: processing efficiencies; combatting human trafficking; protecting worker rights; and reducing employer burden, to include the disadvantages imposed on such employers due to the current semiannual distribution of H-2B visas on October 1 and April 1 of each fiscal year.

USCIS is encouraged to leverage prior year materials relating to the issuance of additional H-2B visas, to include previous temporary final rules, to improve processing efficiencies. | Transmitted – January 21, 2022 |
| 2021 | 1/27/2021 | H. Rept. 116-458 | The Committee is concerned that the Departments of Homeland Security and State have neglected their duty under the Immigration and Nationality Act to take affirmative steps to fully allocate all available immigrant visa numbers to prospective family- and employment-based immigrants. This inaction is especially concerning given the unprecedented demand for such visa numbers and the availability of ready and willing applicants currently within the United States, including many currently employed in occupations deemed essential by the Department of Homeland Security. Not later than 30 days after the date of enactment of this Act, the Committee directs USCIS, in consultation with the Department of State, to brief the Committee on a plan to fully allocate family- and employment-based visas in fiscal year 2021, and a contingency plan to allocate prior year unused visas in the event that such action is required (see, e.g., Silva v. Bell, 605 F.2d 978 (7th Cir. 1979)). | Transmitted – July 8, 2021 |

CIS - 13

Department of Homeland Security

United States Citizenship and Immigration Services

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 2/26/2021 | Joint Explanatory Statement Division F | USCIS shall provide the Committees a plan, not later than 60 days after the date of enactment of this Act, on establishing a quarterly, public report on backlogs for each form type or immigration benefit request. Such reporting shall include, at a minimum, the total number of applicants or petitioners in each USCIS backlog; be identified by form type or immigration benefit request; and indicate the length of time pending in each backlog. | Transmitted -- March 23, 2021 |
| 2021 | 3/26/2021 | Joint Explanatory Statement Division F | The Committee is concerned about the increase in spending by USCIS when compared to available revenue. In an effort to avoid a future need for an influx of appropriations, USCIS shall brief the Committee within 90 days of the date of enactment of this act and quarterly thereafter on budget operations, including revenue projections, actual spending, and other financial forecasts. At a minimum, the briefing shall include the annual operating plan and detail the spending of each directorate and office, overview of operations, revenue and expenses delineated by form type, other agency expenses including payments or transfers to other Federal agencies, and carryover or reserve fund projections and spending. USCIS shall include any such analysis in its quarterly reporting to the Committee. Additionally, USCIS shall develop productivity measures that convey the baseline capacity and capabilities for processing applications and petitions and capture the impact of investments in personnel, technology, or changes to processes and policies on such measures. Updates on USCIS performance against these measures shall be included with the quarterly budget reporting. | Transmitted – December 22, 2021 and February 17, 2022 |

CIS - 14

| Department of Homeland Security | | | United States Citizenship and Immigration Services | |
|---|---|---|---|---|
| 2021 | 3/26/2021 | Joint Explanatory Statement Division F | "1) Processing Times: USCIS is directed to prioritize the timely processing of citizenship and other applications, with a goal of adjudicating all requests within six months of submission. Further, if USCIS publishes a Notice of Proposed Rulemaking or Final Rule that proposes or adopts any amendment to 8 C.F.R. § 103.7(e) (3 – 5) that would impact fee levels, USCIS shall include the following information in its associated publications in the Federal Register:<br><br>(1) a detailed description of steps the agency will take to reduce all average processing times to fewer than six months within one year of publication; and<br>(2) an analysis of the amount of discretionary funding needed, if any, to enable USCIS to limit fees to rates that do not exceed appropriate inflation rates.<br><br>USCIS is further directed to provide a report to the Committee, not later than 90 days after the date of enactment of this Act, on the number of application forms processed by month for fiscal years 2016 to 2020 for the following:<br>(1) form I-130 (Petition for Alien Relative);<br>(2) form I-360 (Petition for Amerasian, Widow(er), or Special Immigrant);<br>(3) form I-485 (Application to Register Permanent Residence or Adjust Status);<br>(4) form I-751 (Petition to Remove Conditions on Residence);<br>(5) form N-400 (Application for Naturalization); and<br>(6) forms for initial and renewed employment authorization.<br>The report shall also include the following data, as applicable:<br>(1) the immigration status of the petitioner (U.S. citizen or legal permanent resident (LPR));<br>(2) the nationality of the applicant;<br>(3) the date the application was initially filed;<br>(4) the processing time; and<br>(5) the field office or service center responsible for processing the application.<br>The report shall also describe the reasons for any changes in processing rates or trends; any policy | Transmitted – September 29, 2021 |

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 16 of 27

Department of Homeland Security

United States Citizenship and Immigration Services

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| | | | changes related to processing; and what steps USCIS is taking to address any delays. 2) Processing Times for Immigration Benefits: The Committee is concerned that processing times for citizenship and other applications at USCIS continues to increase. The Committee expects USCIS to adjudicate citizenship and other applications in a timely manner. Within 90 days of the date of enactment of this act, the Committee directs USCIS to report on measures implemented to promptly reduce processing delays." | |
| 2021 | 3/26/2021 | Joint Explanatory Statement Division F | "Not later than 90 days after the date of enactment of this Act, USCIS is directed to brief the Committees on the feasibility of complying with each of the directives in House Report 116-458 regarding the following topics: (1) replacement certificates of naturalization and certificates of citizenship; (2) humanitarian petitions; (3) military naturalization applications; and (4) unused visas. " | Transmitted – July 23, 2021 |
| 2021 | 3/26/2021 | Joint Explanatory Statement Division F | The Committee remains concerned about the pace of refugee admissions and directs the Department to submit to the Committee and make available to the public on its website not later than 90 days after the date of enactment of this act the following information for each of fiscal years 2018 through 2021: the number of USCIS staff assigned to the Refugee Corps at the Refugee Affairs Division of USCIS; the number of refugee processing circuit rides conducted; the number of USCIS Refugee Corps officers assigned to each circuit ride; the destination region and country for each circuit ride; the number of refugee interviews conducted by USCIS; and the number of approvals and denials issued by USCIS. | Transmitted – June 29, 2021 |

CIS - 16

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 17 of 27

**Department of Homeland Security**

United States Citizenship and Immigration Services

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 3/26/2021 | Joint Explanatory Statement Division F | The Committee is concerned about the prolonged delays at USCIS processing centers across the country and directs USCIS to provide a report to the Committee within 90 days of the date of enactment of this act on the efforts and specific actions, if any, that the agency is taking to reduce the backlog of asylum applications, while ensuring that asylum applicants are properly reviewed for security purposes. | Transmitted – October 20, 2021 |
| 2021 | 03/26/2021 | H. Rept. 116-458 | Not later than 90 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committee[s] detailing the Office of Citizenship's accomplishments during fiscal year 2020 and its planned accomplishments for fiscal year 2021. | Transmitted – May 3, 2021 |
| 2021 | 03/26/2021 | H. Rept. 116-458 | USCIS is directed to ensure that military naturalization applications are processed within six months, as required by the Military Personnel Citizenship Processing Act of 2008 (Public Law 110–382), and to establish a military naturalization promotion program, in conjunction with the Department of Defense, to ensure all military service members and their families learn about and consider their eligibility to apply for naturalization before the military service member's separation from the military. Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committee on the status of meeting this requirement | Transmitted – April 26, 2021 |

**CIS - 17**

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 18 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 03/26/2021 | H. Rept. 116-458 | The Committee is concerned that enhanced security-vetting requirements may be overburdening the agencies responsible for the U.S. Refugee Admissions Program (USRAP), potentially exacerbating historic lows in refugee admissions. Accordingly, USCIS is directed to collaborate with the Department of State and the Federal Bureau of Investigation to provide a report, not later than 90 days after the date of enactment of this Act, that identifies for the past five fiscal years the yearly number of refugees in the USRAP pipeline who are: awaiting an interview with USCIS; pending security clearance after a USCIS interview; cleared for admission into the United States; and awaiting departure. This report shall also specify the average processing times, disaggregated by the applicant's nationality, for completing each step listed above. Finally, this report shall establish the number of DHS personnel assigned to security screening of refugees for the each of the five reported years and the estimated number of personnel for the budget year. | Transmitted – October 15, 2021 |
| 2021 | 03/26/2021 | H. Rept. 116-458 | Not later than 120 days after the date of enactment of this Act, USCIS is directed to require that each individual performing asylum officer duties or reviewing the decisions of such personnel, receive annual training on the dynamics of domestic and sexual violence and how such dynamics impact asylum seekers and their applications. The training must be conducted by individuals with documented expertise in this subject area. Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committee on the status of meeting this requirement. | Transmitted – May 24, 2021 |

CIS - 18

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 19 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 04/27/2021 | H. Rept. 116-458 | The Committee provides $36,972,000 in discretionary funding for the SAVE program in lieu of relying solely on fee funding. Not later than 120 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that includes calculations of the percentage of all SAVE inquiries from user agencies made pursuant to mandates in federal law and the percentage related to benefits for which federal law does not require immigration status verification. The report shall provide this information for the last three fiscal years. In addition, the report shall include estimates of the per-inquiry and total amount of SAVE operational costs not recouped in user fees for each fiscal year. | Transmitted – June 14, 2021 |
| 2021 | 04/27/21 | H. Rept. 116-458 | "Not later than 120 days after the date of enactment of this Act, the Department shall report to the Committee on the administrative remedies that the Department of Labor has issued in each of the last three fiscal years against entities or persons who violate H-2B requirements. The report should contain, but not be limited to: (1) a list of entities or persons cited, by industry and violation; (2) the number of H-2B workers impacted and the nature of those impacts; (3) the effects on the domestic workforce; (4) the number of entities or persons debarred from the H-2B program due to violations; (5) a description of the criteria and methodology for debarment decisions; and (6) a justification for why repeat offenders, if any, are allowed to continue to participate in the program.". | Transmitted – June 3, 2021 |
| 2021 | 04/27/2021 | H. Rept. 116-458 | Within 120 days of the date of enactment of this Act, the Department shall report to the Committee on the distribution of visas granted through the H-2B program. The report should contain, but not be limited to, a tabulation of the percent of overall visas issued to the top 15 employers. | Transmitted – June 29, 2021 |

CIS - 19

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 20 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 06/25/2021 | H. Rept. 116-458 | Also, not later than 180 days after the date of enactment of this Act, the Department, in consultation with the Department of Labor, shall continue to brief the Committees on the impacts of the current H-2B visa semiannual distribution on employers, employees, and agency operations. | Transmitted – December 3, 2021 |
| 2021 | 06/25/2021 | Joint Explanatory Statement Division F | The Committee is concerned about the closure of USCIS international field offices. The Committee recognizes that USCIS international offices provide critical functions for U.S. military personnel, facilitate international adoptions, provide services for refugees and their families, promote family unity, and provide other immigration services, including for U.S. citizens and permanent residents traveling abroad. The Committee directs the agency to report to the Committee within 180 days of the date of enactment of this act on the impact of these closures on: U.S. military personnel and other customers; USCIS operations, including processing backlogs and staff capacity and training; and any additional projected impacts on other agencies including the Department of State. | Transmitted – May 16, 2021 |

CIS - 20

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| | | | The Committee directs USCIS to refrain from imposing fees upon any individual filing a humanitarian petition, including but not limited to a request for asylum; refugee admission; protection under the Violence Against Women Act (VAWA); Special Immigrant Juvenile status; a T or U visa; or a Special Immigrant Visa for Iraqi and Afghan nationals. USCIS shall also refrain from imposing fees on any individual who receives humanitarian protection and subsequently requests adjustment of status or petitions for another benefit. USCIS is also directed to adjudicate U Visa certification requests within 90 days of submission, and to provide a report not later than 180 days after the date of enactment of this Act that identifies, on a quarterly basis, the average response time for adjudicating U Visa applications for each of the past five fiscal years and describes concrete steps that are being taken to speed the process. | |
| 2021 | 06/25/2021 | H. Rept. 116-458 | For each individual filing a humanitarian petition for U Visa status who has provided a completed Form I-918, Supplement B (U Nonimmigrant Status Certification) certified by a sponsoring law enforcement agency, the Committee directs USCIS to make a rebuttable presumption that the individual has met the helpfulness requirement if there is no evidence showing otherwise. USCIS shall report, on a publicly accessible website, state-by-state data on denial and approval ratios for such petitions, redacted as necessary to protect the safety or privacy of the individual. | Transmitted – August 12, 2021 |
| | | | The Committee also urges USCIS to increase the number of personnel dedicated to reviewing and adjudicating VAWA Self-Petition applications, T-visa applications, and U-visa applications, and to issue employment authorization to individuals who have filed VAWA Self-Petition applications or applications for nonimmigrant status under section 101(a)(15)(T) or 101(a)(5)(U) of the Immigration and Nationality Act not later than the approval date or 180 days after the application filing, whichever is earlier. | |

CIS - 21

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 22 of 27

Department of Homeland Security

United States Citizenship and Immigration Services

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 06/25/2021 | H. Rept. 116-458 | The Committee directs USCIS to refrain from imposing fees upon any individual filing a humanitarian petition, including but not limited to a request for asylum; refugee admission; protection under the Violence Against Women Act (VAWA); Special Immigrant Juvenile status; a T or U visa; or a Special Immigrant Visa for Iraqi and Afghan nationals. USCIS shall also refrain from imposing fees on any individual who receives humanitarian protection and subsequently requests adjustment of status or petitions for another benefit. USCIS is also directed to adjudicate U Visa certification requests within 90 days of submission, and to provide a report not later than 180 days after the date of enactment of this Act that identifies, on a quarterly basis, the average response time for adjudicating U Visa applications for each of the past five fiscal years and describes concrete steps that are being taken to speed the process.<br>For each individual filing a humanitarian petition for U Visa status who has provided a completed Form I-918, Supplement B (U Nonimmigrant Status Certification) certified by a sponsoring law enforcement agency, the Committee directs USCIS to make a rebuttable presumption that the individual has met the helpfulness requirement if there is no evidence showing otherwise. USCIS shall report, on a publicly accessible website, state-by-state data on denial and approval ratios for such petitions, redacted as necessary to protect the safety or privacy of the individual.<br>The Committee also urges USCIS to increase the number of personnel dedicated to reviewing and adjudicating VAWA Self-Petition applications, T-visa applications, and U-visa applications, and to issue employment authorization to individuals who have filed VAWA Self-Petition applications or applications for nonimmigrant status under section 101(a)(15)(T) or 101(a)(5)(U) of the Immigration and Nationality Act not later than the approval date or 180 days after the application filing, whichever is earlier. | Transmitted -- August 12, 2021 |

CIS - 22

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 23 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 04/28/2021 | Joint Explanatory Statement Division F | Not later than 60 days after the date of submission of the fiscal year 2022 budget request, USCIS shall brief the Committees on a plan to develop an agency-wide workload staffing allocation model that incorporates personnel levels and existing assets and capabilities on USCIS operations. The model should allow USCIS to assess the impact of potential policy changes, vetting procedures, business process improvements, IT modernization, the streamlining of forms, and other factors on its operations and finances to better understand the costs and benefits of such changes prior to execution. It should not assume that duties related to the agency's core mission will be performed by employees detailed from other agencies. The briefing shall also identify current resource gaps; implementation challenges; and any key policy or legislative proposals that would help improve the agency's ability to become more efficient and reduce backlogs. | Transmitted – July 21, 2021 |
| 2021 | 4/25/2021 | Joint Explanatory Statement Division F | Not later than 60 days after the date of enactment of this Act, USCIS shall brief the Committees on its efforts to leverage analytic capabilities to better inform workload and fee projections. | Transmitted – June 15, 2021 |
| 2021 | 5/26/2021 | H.Rept 116-458 | The Committee is concerned about the E-Verify program's performance. While the database errors have improved as the system's functionality has evolved, the program's accuracy is still insufficient, resulting in individuals falsely being identified as ineligible to work, especially those with temporary protected status. When an individual is falsely identified as ineligible to work and has received a final non-confirmation from the system, there is no formal process for review of this determination. Not later than 90 days after the date of enactment of this Act, USCIS is directed to brief the Committee on a proposed review process for E-Verify final non-confirmations. | Transmitted – March 12, 2021 |

**CIS - 23**

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 24 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 01/27/2021 | Joint Explanatory Statement Division F | The agreement includes $10,000,000 above the request to support the Citizenship and Integration Grant program. In addition, USCIS continues to have the authority to accept private donations to support this program. USCIS is directed to provide an update on its planned use of this authority not later than 30 days after the date of enactment of this Act, to include efforts undertaken to solicit private donations. | Transmitted – January 27, 2021 |
| 2021 | 5/26/2021 | H.Rept 116-458 | Within 90 days of the date of enactment of this Act, USCIS is directed to brief the Committees on its proposed guidelines and requirements for the fiscal year 2021 Citizenship and Integration Grant Program, and to consider the recommendations for the program detailed in House Report 116-458.<br><br>House Report 116-458 states: Grant Guidelines and Requirements. —The Committee is concerned that the guidelines set forth in USCIS's Notice of Funding Opportunity (NOFO) for fiscal year 2019 imposed unnecessary and overly restrictive conditions on prospective grant recipient organizations. USCIS is directed to provide more flexible consideration to proposals that: (1) provide portions of the English and civics instruction and naturalization assistance in native languages in addition to English; (2) propose the use of personnel with non-traditional qualifications for teaching English as a second language; and (3) are focused on helping individuals prepare and file N-400 applications submitted without an attached G-28 filed by a representative of the grant recipient organization. | Transmitted – June 15, 2021 |

**CIS - 24**

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 25 of 27

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2021 | 03/31/2021 | P. L. 117-159 Section 4103 | Not later than 180 days after the date of the enactment of this Act, the Secretary of Homeland Security shall provide to the appropriate Committees a 5-year plan, including projected cost estimates, procurement strategies, and a project schedule with milestones, to accomplish each of the following: (1) Establish electronic filing procedures for all applications and petitions for immigration benefits. (2) Accept electronic payment of fees at all filing locations. (3) Issue correspondence, including decisions, requests for evidence, and notices of intent to deny, to immigration benefit requestors electronically. (4) Improve processing times for all immigration and naturalization benefit requests. | Transmitted – September 29, 2021 |

**CIS - 25**

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Authorized/Unauthorized Appropriations

| Budget Activity (Dollars in Thousands) | Last year of Authorization Fiscal Year | Authorized Level Amount | Appropriation in Last Year of Authorization Amount | FY 2023 President's Budget Amount |
|---|---|---|---|---|
| **Operations and Support** | N/A | $631,745 | $707,395 | $903,622 |
| Employment Status Verification | 2002 | $631,745 | $707,395 | $109,611 |
| Application Processing | N/A | N/A | N/A | $764,698 |
| Information Technology and Cybersecurity | N/A | N/A | N/A | $29,313 |
| **Federal Assistance** | N/A | N/A | N/A | $10,000 |
| Citizenship and Integration Grants | N/A | N/A | N/A | $10,000 |
| **Fee Accounts** | N/A | Such sums as are available | Such sums as are available | Such sums as are available |
| Immigration Examinations Fee | 1988 | Such sums as are available | Such sums as are available | Such sums as are available |
| H-1B Non-immigrant Petitioner | 1998 | Such sums as are available | Such sums as are available | Such sums as are available |
| Fraud Prevention and Detection | 2004 | Such sums as are available | Such sums as are available | Such sums as are available |

CIS - 26

Department of Homeland Security

United States Citizenship and Immigration Services

Case 6:23-cv-00007   Document 175-39   Filed on 06/20/23 in TXSD   Page 27 of 27

# United States Citizenship and Immigration Services
## Proposed Legislative Language

### Operations and Support

For necessary expenses of United States Citizenship and Immigration Services for operations and support, including for the E-Verify Program, *information technology and cybersecurity*, application processing, the reduction of backlogs within USCIS asylum, field, and service center offices, *additional support for asylum adjudication workloads*, and support of the refugee program; [$459,504,000] *$903,622,000[*, of which $87,619,000 shall remain available until September 30, 2023]: Provided, That such amounts shall be in addition to any other amounts made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)).

| Language Provision | Explanation |
|---|---|
| ..., *information technology and cybersecurity, ... additional support for asylum adjudication workloads,* | Requesting expanded authority to use discretionary funds for additional purposes associated with the FY 2023 Budget. |
| ... [$459,504,000] *$903,622,000* | Dollar change only. No substantial change proposed. |
| ... [, of which $87,619,000 shall remain available until September 30, 2023] | Two-year funding availability is no longer being requested in the FY 2023 Budget. |

### Federal Assistance

For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, $10,000,000.

| Language Provision | Explanation |
|---|---|
| N/A | N/A |

CIS - 27



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV00007

EXHIBIT
NO. 105

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 105, ECF 175-40

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

STATE OF TEXAS, et al.                )
                                      )
                  Plaintiffs          )
                                      )
      v.                              )       No. 6:23-cv-00007
                                      )
DEPARTMENT OF HOMELAND                )
SECURITY., et al.                     )
                                      )
                  Defendants.         )

**DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS'
[REVISED] FIRST SET OF DISCOVERY REQUESTS**

Pursuant to Federal Rules of Civil Procedure 33, 34, 36 Defendants hereby submit their

objections and responses to Plaintiffs' [Revised] First Set of Discovery Requests.

Defendants' responses and objections are based on the information known to Defendants

at this time and are made without prejudice to supplement these responses should additional

responsive information be discovered.  By answering any request, Defendants do not concede the

materiality of the subject matter to which it refers.  Defendants' responses are made expressly

subject to, and without waiving or intending to waive, any questions, or objections as to the

competency, relevancy, materiality, privilege, or admissibility as evidence or for any other

purpose, of any of the documents or information provided, or of the subject matter thereof, in any

proceeding including any trial of this action or any subsequent proceeding.  Inadvertent production

of any document or information which is privileged, was prepared in anticipation of litigation, or

is otherwise immune from discovery, shall not constitute a waiver of any privilege or other ground

for objecting to discovery with respect to that document or any other document, or its subject

**EXHIBIT
39**

matter, or the information contained therein, or of Defendants' right to object to the use of any

such document or the information contained therein during any proceeding in this litigation or

otherwise.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1**

Produce all checklists, lesson plans, or training materials used to implement or administer

the Parole Program.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1**

Defendants object to Request No. 1 on the grounds that its reference to "checklists" and

"lesson plans" is vague and ambiguous. Defendants further object to this request on the grounds

that it seeks information that is not relevant to the claims and defenses raised in this Administrative

Procedures Act ("APA") litigation, which must be governed by a review of the Certified

Administrative Record. Under the APA, the district court's review of merits issues must be "based

on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470

U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420

(1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  To the extent Plaintiffs seek internal pre-

decisional documents and/or communications and internal agency communications that could

implicate the deliberative process, attorney-client, and attorney work product privileges,

Defendants object that any such documents would be deliberative in nature and therefore

privileged and not subject to discovery. *See Dep't of Interior v. Klamath Water Users Protective

Ass'n*, 532 U.S. 1, 8 (2001). Subject to and notwithstanding these objections, Defendants refer

Plaintiffs to documents at Bates labeled 23-cv-00007_0001-143.

**REQUEST FOR PRODUCTION NO. 2**

Produce all documents related to crime rates of or criminal activity by Parole Program beneficiaries.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2**

Defendants object to Request No. 2 on the grounds that it is vague as to the meaning of "crime rates" and "criminal activity." These terms are not defined, and thus, could conceivably be interpreted in a variety of different ways, to include, for example, documents relating to convictions, arrests, and/or charges. Additionally, it is unclear whether this Request is seeking information regarding *any* crimes, committed anywhere in the world, at any time, or whether it is limited in any temporal or geographic manner. Moreover, this Request is overly broad to the extent it seeks all "documents related to" crime rates or criminal activity, which may include information not within the Defendants' possession, custody, and control, such as documents maintained by state or local agencies, and/or by foreign governments.

Defendants also object to Request No. 2 to the extent it seeks internal agency communications which could implicate the deliberative process, attorney-client, and attorney-work-product privileges. Subject to and notwithstanding these objections and confining the terms "crime rates" and "criminal activity" to convictions, arrests and/or charges, Defendants are producing information regarding criminal history after arrival to the United States pursuant to the CHNV parole processes of CHNV parole beneficiaries between October 18, 2022 and March 31, 2023, at Bates labeled 23-cv-00007_0144-145. For an explanation of how Defendants generated "criminal history" see document Bates labeled at 23-cv-00007_145.

**REQUEST FOR PRODUCTION NO. 3**

Produce all documents related to reduction of wages or displacement of American workers caused by Parole Program beneficiaries.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

Defendants object to Request No. 3 on the grounds that it is vague and confusing as to what Plaintiffs mean by "displacement of American workers" and on the grounds that it is overly broad to the extent it seeks all "documents related to" reduction of wages or displacement of workers. Defendants also object to the extent this Request seeks documents which may include internal agency communications which could implicate the deliberative process, attorney-client, and attorney work product privileges. Subject to and notwithstanding these objections, Defendants state that they have no responsive documents as this is not data that Defendants systematically track.

**REQUEST FOR PRODUCTION NO. 4**

Produce all documents related to forecasted or actual use of public education by Parole Program beneficiaries.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4**

Defendants object to Request No. 4 on the grounds that it is overly broad to the extent it seeks all "documents related to" forecasted or actual use of public education by Parole Program beneficiaries which may include internal agency communications which could implicate the deliberative process, attorney-client, and attorney work product privileges. Subject to and notwithstanding these objections, Defendants refer Plaintiffs to document Bates labeled 23-cv-00007_0146, which contains the number of Cuban, Haitian, Nicaraguan, Venezuelan (CHNV)

beneficiaries of school age (children 6 to 17 years old) who have arrived in the United States pursuant to the CHNV parole processes for the period of October 18, 2022 to March 31, 2023.

## REQUEST FOR PRODUCTION NO. 5

Produce all documents related to the subjects of Request for Production Nos. 2, 3, and 4 but for all aliens from Cuba, Haiti, Nicaragua, and Venezuela who have illegally arrived at the border since January 20, 2021.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 5

*See* Responses to Request for Production Nos. 2, 3, and 4, which we incorporate herein. Defendants further object to Request No. 5 on the grounds that it is vague as to the phrase "illegally arrived." For purposes of this request, Defendants interpret "illegally arrived" as referring to CHNV noncitizens who were encountered by USBP between ports of entry at the Southwest Border. Defendants also object to the extent that such information may include internal agency communications which could implicate the deliberative process, attorney-client, and attorney-work-product privileges. Defendants further object to this request on the grounds that it seeks information that is not relevant to the claims and defenses raised in this Administrative Procedures Act ("APA") litigation, which must be governed by a review of the Certified Administrative Record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Subject to and notwithstanding these objections, Defendants refer Plaintiffs to documents Bates labeled 23-cv-00007_0147-150 which contains information regarding the number of CHNV nationals who were encountered by USBP at the Southwest Border between January 20, 2021 and March 31, 2023.

**REQUEST FOR PRODUCTION NO. 6**

Produce copies of any advance travel authorization questionnaires or forms. Note that this requests only the template forms, not completed forms.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6**

Defendants object to Request No. 6 as vague and ambiguous. It is unclear what Plaintiffs mean by "questionnaires" and unclear if Plaintiffs refer to online forms or applications. Defendants also object because the term is ambiguous in that it does not identify the type of "travel authorization" it refers to. Defendants also object to this Request to the extent it seeks information related to the required steps that intending CHNV parole beneficiaries must complete to be considered for an advance travel authorization. Defendants also object to this Request to the extent it seeks any prior draft versions of the requested documents, as such documents may implicate the deliberative process, attorney-client, and attorney work product privileges. Subject to and notwithstanding these objections, Defendants refer Plaintiffs to documents Bates labeled 23-cv-00007_0151-176.

**REQUEST FOR PRODUCTION NO. 7**

Produce all documents consulted or relied upon in responding to this First Set of Discovery Requests.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7**

Defendants object to Request No. 7 on the grounds that it is overly broad and includes internal agency communications which could implicate the deliberative process, attorney-client, and attorney-work-product privileges.

## INTERROGATORIES

### INTERROGATORY NO. 1

Identify, by month, the number of Parole Program applications (a) received, (b) adjudicated, (c) approved, (d) denied, (e) pending, (f) granted employment authorization, and (g) denied employment authorization.

### RESPONSE TO INTERROGATORY NO. 1

Defendants object to Interrogatory No. 1 on the grounds that it is vague as to the word "applications." The word "applications" in the CHNV parole processes could potentially refer to information submitted by a person seeking to become a financial supporter, a person seeking advance travel authorization, and a person with advance travel authorization seeking parole at a port of entry. Subject to and notwithstanding these objections, construing the word "applications" to refer to USCIS confirmations of Forms I-134/I-134A for the CHNV parole processes, Defendants provides the following response:

For Interrogatory No. 1(a)-(e), DHS's Office of Immigration Statistics ("OIS") has information on the number of CHNV nationals who initiated the parole processes and whose applications were confirmed by USCIS; CHNV nationals who have submitted information through CBP One and whose applications were approved, denied, or expired; CHNV nationals with approved advance travel authorization; CHNV nationals with denied advance travel authorization; and CHNV nationals whose application was pending adjudication for the period covering October 18, 2022 to March 31, 2023. This information is broken down by country and month with associated totals for each category.

CHNV Parole Process Applications by Month and Status: October 18, 2022 – March 31, 2023 and January 6, 2023 – March 31, 2023

| Month | Venezuela | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 37,452 | 8,997 | 8,661 | 322 | 4 |
| November 2022 | 7,158 | 6,606 | 6,380 | 197 | 11 |
| December 2022 | 1,853 | 2,062 | 2,018 | 42 | 5 |
| January 2023 | 4,934 | 13,235 | 12,996 | 236 | 68 |
| February 2023 | 1,420 | 6,216 | 6,085 | 127 | 30 |
| March 2023 | 901 | 6,044 | 5,931 | 111 | 150 |
| Total | 53,718 | 43,160 | 42,071 | 1,035 | 268 |

| Month | Nicaragua | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 0 | 0 | 0 | 0 | 0 |
| November 2022 | 0 | 0 | 0 | 0 | 0 |
| December 2022 | 0 | 0 | 0 | 0 | 0 |
| January 2023 | 6,064 | 1,900 | 1,839 | 61 | 7 |
| February 2023 | 12,695 | 5,881 | 5,730 | 151 | 16 |
| March 2023 | 1,319 | 6,017 | 5,888 | 129 | 74 |
| Total | 20,078 | 13,798 | 13,457 | 341 | 97 |

| Month | Haiti | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 0 | 0 | 0 | 0 | 0 |
| November 2022 | 0 | 0 | 0 | 0 | 0 |
| December 2022 | 0 | 0 | 0 | 0 | 0 |
| January 2023 | 27,448 | 4,098 | 4,024 | 73 | 9 |
| February 2023 | 8,148 | 11,698 | 11,543 | 153 | 37 |
| March 2023 | 4,266 | 13,266 | 13,131 | 134 | 106 |
| Total | 39,862 | 29,062 | 28,698 | 360 | 152 |

| Month | Cuba | | | | |
|---|---|---|---|---|---|
| | Received | Adjudicated | Approved | Denied | Pending |
| October 2022 | 0 | 0 | 0 | 0 | 0 |
| November 2022 | 0 | 0 | 0 | 0 | 0 |
| December 2022 | 0 | 0 | 0 | 0 | 0 |
| January 2023 | 17,803 | 5,814 | 5,735 | 78 | 10 |
| February 2023 | 5,217 | 5,964 | 5,799 | 165 | 21 |
| March 2023 | 2,057 | 8,176 | 8,103 | 73 | 105 |
| Total | 25,077 | 19,954 | 19,637 | 316 | 136 |

Notes: Data as of 4/14/2023. "Applications received" pertains to CHNV beneficiaries (i.e., people with my USCIS accounts). Due to datasource differences, the number of USCIS applications received is not equal to the sum of those OFO adjudicates and labels as pending. Adjudicated applications include expired applications, in addition to approved and denied applications. Data are preliminary and subject to change. Data do not include individuals with multiple nationalities. Applications approved are those that have not expired due to failure to travel within a 90-day window and have not been cancelled. Includes approved applications for people that have already entered the United States. The Venezuela parole process started October 18, 2022 so numbers start then. The Cuba, Haiti, and Nicaragua parole processes started January 6, 2023 so CHN numbers start then.

Source: DHS Office of Immigration Statistics analysis of USCIS and OFO data.

For Interrogatory No. 1(f) and (g), USCIS has information about the number of employment authorization applications it has granted and denied to CHNV beneficiaries. This

information is broken down in the table below. The information was pulled from USCIS systems on April 17, 2023 and is an accurate reflection of what the systems showed on that date. This information is subject to change with the passage of time.

| Country | Year | Month | Approval | Denial | Total |
|---------|------|-------|----------|--------|-------|
| **I-765, Application for Employment Authorization For CHNV Approvals and Denials, by year and month Through March, 2023** | | | | U.S. Citizenship and Immigration Services | |
| Grand Total | | | 10,675 | 18 | 10,693 |
| Cuba | | | 3,216 | 4 | 3,220 |
| Cuba | 2023 | Feb | 967 | - | 967 |
| Cuba | 2023 | Mar | 2,249 | 4 | 2,253 |
| Haiti | | | 2,683 | 1 | 2,684 |
| Haiti | 2023 | Feb | 290 | - | 290 |
| Haiti | 2023 | Mar | 2,393 | 1 | 2,394 |
| Nicaragua | | | 333 | - | 333 |
| Nicaragua | 2023 | Feb | 32 | - | 32 |
| Nicaragua | 2023 | Mar | 301 | - | 301 |
| Venezuela | | | 4,443 | 13 | 4,456 |
| Venezuela | 2022 | Nov | 47 | - | 47 |
| Venezuela | 2022 | Dec | 850 | - | 850 |
| Venezuela | 2023 | Jan | 790 | 1 | 791 |
| Venezuela | 2023 | Feb | 787 | 3 | 790 |
| Venezuela | 2023 | Mar | 1,969 | 9 | 1,978 |

Notes:
1) This report reflects the most up to date data available at the time the database is queried.
2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

Source:
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

## INTERROGATORY NO. 2

Identify (for the Parole Program) the average processing time for (a) the adjudication of Form I-134(a) by an intending supporter of an alien, (b) from approval of the Form I-134(a) to the approval of advanced travel authorization, and (c) at the port of entry for parole beneficiaries.

## RESPONSE TO INTERROGATORY NO. 2

Defendants object to Interrogatory No. 2 on the grounds that it incorrectly refers to Form I-134/134A as "Form I-134(a)" and is unduly burdensome because data is not tracked in all instances in the manner requested.  Additionally, Defendants object to this Request on the grounds that it is vague and ambiguous because Plaintiffs have not defined the term "processing" and it is not clear what specific actions Plaintiffs intend to be covered by this term.  Defendants further

object on the grounds that it seeks information that is not relevant to the claims and defenses raised in this Administrative Procedures Act ("APA") litigation, which must be governed by a review of the Certified Administrative Record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Subject to and notwithstanding these objections, construing the term "processing" as referring to the required actions and steps to make one of the determinations referenced in subparts (a) through (c), Defendants provide the following response:

For Interrogatory No. 2(a), USCIS has information about the average processing time for the adjudication of Form I-134/I-134A. This information is broken down in the table below. The information was pulled from USCIS systems on April 24, 2023, and is an accurate reflection of what the systems showed on that date. This information is subject to change with the passage of time.

| Country | Average Processing Time (In months) | Total Completions |
|---------|-------------------------------------|-------------------|
| **CNHV** | **1.2** | **138,254** |
| Cuba | 0.8 | 24,279 |
| Haiti | 0.9 | 38,523 |
| Nicaragua | 0.6 | 17,961 |
| Venezuela | 1.7 | 57,491 |

For Interrogatory No. 2(b), CBP does not have an automated way to track the average time between approval of a Form I-134/I-134A and the determination of whether to issue an advance travel authorization. The time for such an assessment varies based on several factors including, for example, the length of time between the point the Form I-134/I-134A is confirmed to when the beneficiary goes into myUSCIS to confirm biographic data and submit an attestation. CBP's role

in the overall process does not start until the beneficiary goes into myUSCIS, completes the necessary steps within myUSCIS, and the case is then referred to CBP. Once the case is referred to CBP and the beneficiary completes the required steps in CBP One, CBP conducts systems checks and vetting to determine the individual's eligibility for the CHNV processes and whether it is appropriate to issue a travel authorization. The travel authorization is either approved following such comprehensive systems checks and vetting or, if more detailed vetting is needed, is referred for further vetting. If further vetting is required, the vetting is generally completed within approximately fourteen days.

For Interrogatory No. 2(c), Defendants require additional time to respond to this Request. Defendants will supplement this response by May 24, 2023.

**INTERROGATORY NO. 3**

Identify the number residing in Texas from the totals in each subcategory of Interrogatory No. 1.

**RESPONSE TO INTERROGATORY NO. 3**

*See* Response to Interrogatory No. 1, which is incorporated herein by reference. Defendants object to Interrogatory No. 3 on the grounds that it is vague and ambiguous as to whether it refers to financial supporters residing in Texas, or beneficiaries residing in Texas, or a combination thereof for each of the enumerated categories. The address information collected at the time of parole is only that provided by the noncitizen. Subject to and notwithstanding these objections, and limiting the response to (a), (b), (c), Defendants provide the following responses: as of May 18, 2023, CBP records reflect that, of the noncitizens paroled into the United States under the CHNV parole processes between October 18, 2022 and March 31, 2023, 7,198 beneficiaries provided OFO with an intended destination address in the state of Texas.

**INTERROGATORY NO. 4**

Identify the number of minors from the populations identified in the subcategories in Interrogatory Nos. 1 and 3 (both total and residing in Texas).

**RESPONSE TO INTERROGATORY NO. 4**

*See* Responses to Interrogatory Nos. 1 and 3, which are incorporated herein by reference. Subject to and notwithstanding these objections and limiting the response to the categories in Interrogatory No. 1 (a), (b), (c), Defendants provide the following response: as of May 18, 2023, CBP records reflect that, of the noncitizens paroled into the United States under the CHNV parole processes between October 18, 2022 and March 31, 2023, there were 1,399 CHNV beneficiaries under the age of 18 with an intended address in Texas and there were 8,374 CHNV beneficiaries under the age of 18 in total.

**INTERROGATORY NO. 5**

Identify, by month, the number (both total and residing in Texas) of (1) grants of parole of aliens under 8 U.S.C. § 1182(d)(5)(A) since January 20, 2021, and (2) how many of such grantees of parole remain in the United States (and within Texas). Note that this inquiry is not limited to grants of parole under the Parole Program.

**RESPONSE TO INTERROGATORY NO. 5**

Defendants object to Interrogatory No. 5 to the extent it seeks information about parole granted by any DHS component other than CBP. As such, this request exceeds the scope of this case. Defendants further object on the grounds that it seeks information that is not relevant to the claims and defenses raised in this Administrative Procedures Act ("APA") litigation, which must be governed by a review of the Certified Administrative Record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing

court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Further, to compile information about a parolee's current residence is unduly burdensome, as this would require months of manual review of A-Files and electronic information systems. DHS also has no comprehensive method to track whether a parolee remains in the United States. A parolee does not need permission to leave the United States either before or after the expiry of the parole period. Subject to and notwithstanding these objections, Defendants provide the following response:

OIS has information about CBP paroles for the period covering January 20, 2021 to March 31, 2023. The data below covers paroles by both U.S. Border Patrol (USBP) and Office of Field Operations (OFO). This information is broken down by the table below. The information was pulled from CBP systems and analyzed on May 4, 2023.

CBP Paroles by Fiscal Year: January 20, 2021 - March 31, 2023

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | NA | NA | NA | 691 | 2,380 | 2,766 | 2,146 | 4,324 | 6,220 | 8,926 | 23,761 | 26,583 | 77,797 |
| 2022 | 13,430 | 8,579 | 22,804 | 22,164 | 12,417 | 31,560 | 68,301 | 68,033 | 62,768 | 65,031 | 67,507 | 128,678 | 571,272 |
| 2023 | 106,308 | 133,752 | 177,404 | 52,927 | 53,429 | 62,719 | NA | NA | NA | NA | NA | NA | 586,539 |
| Total | 119,738 | 142,331 | 200,208 | 75,782 | 68,226 | 97,045 | 70,447 | 72,357 | 68,988 | 73,957 | 91,268 | 155,261 | 1,235,608 |

Notes: Data as of May 4, 2023. USBP paroles based on apprehension date; OFO paroles based on event date. OFO paroles include individuals with a parole disposition and individuals given a Notice to Appear and released with an I-94. USBP paroles only include individuals with a parole disposition. "NA" here means not applicable, as data does not cover dates later than March 2023.
Source: OIS analysis of CBP data.

## INTERROGATORY NO. 6

Identify, by month, the number (both total and residing in Texas) of aliens from each of Cuba, Haiti, Nicaragua, and Venezuela who have illegally arrived at, or crossed, the border since the initiation of the Parole Program.

## RESPONSE TO INTERROGATORY NO. 6

Defendants object to Interrogatory No. 6 on the grounds that it is vague and ambiguous as to the phrase "illegally arrived at...the border," as this term is not defined. In addition, Plaintiffs

have not defined the term "crossed the border," and do not state whether this is intended to cover a population different from individuals who have "illegally arrived." DHS is only able to provide information about nationals of CHNV countries who were encountered by USBP. DHS is unable to provide information about whether this specific population resides in Texas, or elsewhere, because this is not the type of information tracked through automated systems. Rather, this information may be found through a manual review of A-Files, which would take months to complete. Further, DHS cannot provide information about those who were not encountered. Subject to and notwithstanding these objections, and construing this Interrogatory as requesting information about the number of nationals of CHNV countries who have been encountered by the USBP after crossing the Southwest Border between ports of entry, Defendants provide the following information:

OIS has information about the number of nationals from CHNV countries encountered by USBP at the Southwest Border for the period covering October 18, 2022 (the beginning of the Venezuela process) to March 31, 2023 for Venezuelans, and from January 6, 2022 (the beginning of the Cuba, Haiti and Nicaragua parole processes) to March 31, 2023 for Cubans, Haitians, and Nicaraguans. This information is broken down in the table below. This information was pulled from CBP systems and analyzed on April 21, 2023.

Unauthorized Immigrants Encountered by USBP at the
Southwest Border by Select Nationality: October 18, 2022 -
March 31, 2023 and January 6, 2023 - March 31, 2023

| Nationaltiy | Individuals |
|-------------|-------------|
| Cuba | 3,571 |
| Haiti | 220 |
| Nicaragua | 2.571 |
| Venezuela | 19,985 |
| Total | 26,347 |

Note: Data as of 4/21/2023. Venezuelan numbers start
October 18, 2022, the date the Venezuelan parole program
started. All other numbers start January 6, 2023, the date the
Cuban, Haitian, and Nicaraguan parole processes started.
Source: DHS Office of Immigration Statistics.

## INTERROGATORY NO. 7

State how you identified the nationalities of the persons in your response to Interrogatory

No. 6.

## RESPONSE TO INTERROGATORY NO. 7

*See* Response to Interrogatory No. 6, which is incorporated herein by reference. Subject to

and notwithstanding these objections, Defendants state that the noncitizens referenced in

Interrogatory No. 6 self-report their country of origin and such information may be cross-checked

through documents and/or databases which may confirm or refute the information provided if there

have been prior encounters and successful repatriations.

## INTERROGATORY NO. 8

Identify any enforcement actions to collect from intending supporters who have signed

Form I-134(a).

## RESPONSE TO INTERROGATORY NO. 8

Defendants object to Interrogatory No. 8 on the grounds that it incorrectly refers to Form

I-134/134A as "Form I-134(a)" and is vague as to the phrases "enforcement action" and "collect."

Subject to and notwithstanding this objection, Defendants state that no enforcement actions have commenced.

## INTERROGATORY NO. 9

Identify any policies or procedures (planned or implemented) to provide information from Form I-134(a) to States to collect from intending supporters.

## RESPONSE TO INTERROGATORY NO. 9

*See* Response to Interrogatory No. 8, which is incorporated herein by reference. Defendants further object to Interrogatory No. 9 on the grounds that in seeking policies or procedures that are "planned," such request may include internal agency communications which could implicate the deliberative process, attorney-client, and attorney-work-product privileges. Subject to and notwithstanding this objection, Defendants state that there is no information responsive to this Interrogatory and refer Plaintiffs to the administrative record.

## INTERROGATORY NO. 10

Identify the average processing time for approval of an alien's Advance Travel Authorization under the Parole Program.

## RESPONSE TO INTERROGATORY NO. 10

Defendants object to Interrogatory No. 10 on the grounds that it is irrelevant to the claims and defenses in this APA litigation, which must be governed by a review of the Certified Administrative Record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Additionally, this Interrogatory is duplicative of Interrogatory No. 2, to the extent that Interrogatory No. 2(b) encompassed the time to assess

advance travel authorizations.  Subject to and notwithstanding this objection, Defendants refer Plaintiffs to the response for Interrogatory No. 2.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1**

Admit that Texas does not get reimbursed by the federal government for expenses incurred to provide public education to individuals who are paroled.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

Defendants object to Request for Admission No. 1 because the Request is overbroad and relates to information outside the control of DHS. Defendants lack comprehensive insight into whether any federal agency may or may not reimburse Texas for public education costs associated with CHNV parole process beneficiaries or parolees in general. Accordingly, Defendants are unable to admit or deny.

**REQUEST FOR ADMISSION NO. 2**

Admit that Texas does not get reimbursed by the federal government for expenses incurred to provide Emergency Medicaid services to individuals who are paroled.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2**

Defendants object to Request for Admission No. 2 on the grounds that "Emergency Medicaid" is not defined. This Request is also overbroad because it relates to information outside the control of DHS.  Defendants lack comprehensive insight into whether and the extent to which any federal agency may or may not reimburse Texas for expenses incurred to provide Emergency Medicaid services to CHNV parole process beneficiaries or parolees in general.  Accordingly, Defendants can neither admit nor deny.

**REQUEST FOR ADMISSION NO. 3**

Admit that Texas does not get fully reimbursed by the federal government for expenses incurred to incarcerate individuals who are paroled.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3**

Defendants object to Request for Admission No. 3 because "expenses incurred" is not defined. This Request is also overbroad because it relates to information outside the control of DHS. Defendants lack comprehensive insight into whether any federal agency may or may not reimburse Texas for expenses incurred to incarcerate parolees, if and when, they engage in and are charged with criminal activity resulting in incarceration. Accordingly, Defendants are unable to admit or deny.

**REQUEST FOR ADMISSION NO. 4**

Admit that Texas does not get reimbursed by the federal government for expenses incurred to provide driver's licenses to individuals who are paroled.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4**

Defendants object to Request for Admission No. 4 because "expenses incurred" is not defined. This Request is also overbroad because it relates to information outside the control of DHS. Defendants lack comprehensive insight into whether any federal agency may or may not reimburse Texas for expenses related to the issuance of drivers' licenses for parolees. In this instance, Defendants believe that the Request is based on a premise that has not been established

as true, and which, on information and belief, is false—that Texas incurs a net expense from issuing drivers licenses to individuals who are paroled. Accordingly, deny.

**REQUEST FOR ADMISSION NO. 5**

Admit that Parole Program beneficiaries are not being detained pending any immigration proceedings.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5**

Defendants object to Request for Admission No. 5 on the grounds that it is vague and ambiguous as to what Plaintiffs mean by "immigration proceedings." It is unclear if Plaintiffs are asking whether any CHNV parole process beneficiary has been detained or whether any could be detained. Further, the Request assumes a fact not established: that there are pending immigration proceeding for CHNV beneficiaries. Therefore, Defendants can neither admit nor deny.

**REQUEST FOR ADMISSION NO. 6**

Admit that you do not know whether the number of Parole Program beneficiaries paroled into the United States is lower than the number of aliens from Cuba, Haiti, Nicaragua, and Venezuela who would have otherwise illegally arrived at the border.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6**

Deny.

**REQUEST FOR ADMISSION NO. 7**

Admit that the vetting and screening of Parole Program beneficiaries is not as thorough as aliens applying for a visa to come to the United States.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7**

Defendants object to Request for Admission No. 7 on the grounds that it seeks information that is not relevant to the claims and defenses in this APA litigation, which must be governed by

a review of the Certified Administrative Record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Defendants further object to this request on the grounds that the word "thorough" is vague and ambiguous. Defendants further object that it does not specify what type of visa it refers to. Defendants therefore can neither admit nor deny.

## REQUEST FOR ADMISSION NO. 8

Admit that you consider a lack of detention capacity to meet the standard of "urgent humanitarian reasons" or "significant public benefit" under 8 U.S.C. § 1182(d)(5)(A).

## RESPONSE TO REQUEST FOR ADMISSION NO. 8

Defendants object to Request for Admission No. 8 on the grounds that it seeks information not relevant to the claims or defenses in this APA litigation, which must be governed by a review of the Certified Administrative Record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Subject to and notwithstanding this objection, Defendants admit that lack of detention capacity is one factor considered based on a totality of the circumstances and in connection with other factors, that may be considered by an immigration officer when determining the appropriate processing pathway, which could include parole.

## REQUEST FOR ADMISSION NO. 9

Admit that you consider an overall reduction of aliens arriving at the border to meet the standard of "urgent humanitarian reasons" or "significant public benefit" under 8 U.S.C. § 1182(d)(5)(A).

**RESPONSE TO REQUEST FOR ADMISSION NO. 9**

Defendants object to Request to Admit No. 9 on the grounds that it is vague and ambiguous, and therefore Defendants can neither admit nor deny.

**REQUEST FOR ADMISSION NO. 10**

Admit that, under the Parole Program, you make no determination that paroling any individual applicant satisfies the standards of "urgent humanitarian reasons" or "significant public benefit" under 8 U.S.C. § 1182(d)(5)(A).

**RESPONSE TO REQUEST FOR ADMISSION NO. 10**

Deny.

**REQUEST FOR ADMISSION NO. 11**

Admit that Parole Program beneficiaries are free to relocate to another state other than the state of residence at the time of initial application or parole.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11**

Defendants object to Request for Admission No. 11 on the grounds that the words "are free" are vague and ambiguous. Defendants admit that they are aware of no physical impediment to prevent parole beneficiaries from relocating between States.

**REQUEST FOR ADMISSION NO. 12**

Admit that the advance travel authorization questionnaire under the Parole Program seeks less information from applicants than the forms aliens must complete for Electronic System for Travel Authorization, nonimmigrant visas, or immigrant visas.

### RESPONSE TO REQUEST FOR ADMISSION NO. 12

Defendants object to Request for Admission No. 12 on the grounds that it is vague and ambiguous as to what Plaintiffs mean by "questionnaires" and unclear if Plaintiffs refer to online forms or applications. It is also unclear whether Plaintiffs intend to seek information about parole beneficiaries, parole supporters, or both. Defendants also object to the extent that Plaintiffs are seeking to draw a comparison between the processing of individuals for visas and ESTAs and the ATA processes, as the processes are completely separate and serve fundamentally different purposes. Defendants construe this Request as asking for information related to the required steps that both intending supporters and intending parole beneficiaries must complete to be considered for an advance travel authorization. Defendants only admit with regards to ESTA.

Date: May 19, 2023                    Respectfully submitted,

                                      BRIAN M. BOYNTON
                                      *Principal Deputy Assistant Attorney General*

                                      WILLIAM C. PEACHEY
                                      *Director*
                                      Office of Immigration Litigation
                                      District Court Section

                                      EREZ REUVENI
                                      *Assistant Director*

                                      BRIAN C. WARD
                                      *Senior Litigation Counsel*

                                      */s/ Erin T. Ryan*
                                      ERIN T. RYAN
                                      ELISSA P. FUDIM
                                      *Trial Attorneys*
                                      U.S. Department of Justice
                                      Civil Division
                                      Office of Immigration Litigation
                                      District Court Section
                                      P.O. Box 868, Ben Franklin Station
                                      Washington, DC 20044
                                      Tel.: (202) 532-5802
                                      Email: erin.t.ryan@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | |
|---|---|
| STATE OF TEXAS., *et al.*, | |
| *Plaintiffs*, | Case No. 6: 23-cv-00007 |
| v. | **CERTIFICATION OF** |
| | **DEFENDANTS' RESPONSES TO** |
| DEPARTMENT OF HOMELAND | **PLAINTIFFS' FIRST SET OF** |
| SECURITY, *et al.*, | **INTERROGATORIES TO ALL** |
| *Defendants* | **DEFENDANTS** |

I, Avideh Moussavian, hereby declare that I am the Chief of the Office of Policy and Strategy at U.S. Citizenship and Immigration Services. Based upon reasonable inquiry, I certify that the information contained in USCIS's responses to Interrogatory Nos. 8 and 9 are true and correct to the best of my knowledge, information, and belief.

Dated: May 18, 2023

AVIDEH MOUSSAVIAN   Digitally signed by AVIDEH MOUSSAVIAN
Date: 2023.05.18 16:18:00 -04'00'

Avideh Moussavian
Chief, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security

DEFS.' RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES, Case No. Case 6: 23-cv-00007

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY., et al. | ) | |
| | ) | |
| Defendants. | ) | |

### CERTIFICATION OF RESPONSES TO PLAINTIFFS'
### [REVISED] FIRST SET OF INTERROGATORIES

I, Marc Rosenblum, hereby declare that I am the Deputy Assistant Secretary in the Office of Immigration Statistics for the U.S. Department of Homeland Security (DHS). Based on reasonable inquiry and information provided to me in my official capacity, I certify that the information pertaining to DHS contained in Defendants' Responses to Interrogatory Nos. 1(a)-(e), and 5-7 of Plaintiffs' [Revised] First Set of Interrogatories is true and correct to the best of my knowledge, information, and belief.

Dated: May 19, 2023

MARC R
ROSENBLUM

Digitally signed by MARC R
ROSENBLUM
Date: 2023.05.19 13:47:42
-04'00'

Marc Rosenblum
Deputy Assistant Secretary
U.S. Department of Homeland Security

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

STATE OF TEXAS., *et al.*,

                         *Plaintiffs*,

             v.

DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                       *Defendants*

Case No. 6: 23-cv-00007

**CERTIFICATION OF
DEFENDANTS' RESPONSES TO
PLAINTIFFS' FIRST SET OF
INTERROGATORIES TO ALL
DEFENDANTS**

    I, Katherine J. Lotspeich, hereby declare that I am the Chief of the Office of Performance and Quality. Based upon reasonable inquiry, I certify that the information contained in USCIS's responses to Interrogatory Nos. 1(f), 1(g), and 2(a) are true and correct to the best of my knowledge, information, and belief.

Dated: May 18, 2023

> Digitally signed by
> KATHERINE J LOTSPEICH
> Date: 2023.05.18 16:52:53
> -04'00'

Katherine J. Lotspeich
Chief, Office of Performance and Quality

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br>*Defendants* | Case No. 6: 23-cv-00007<br><br>**CERTIFICATION OF<br>DEFENDANTS' RESPONSES TO<br>PLAINTIFFS' FIRST SET OF<br>INTERROGATORIES TO ALL<br>DEFENDANTS** |

I, Graham Dudley, hereby declare that I am the Acting Director, Enforcement Programs Division, Admissibility and Passenger Programs, Office of Field Operations, U.S. Customs and Border Protection. Based upon reasonable inquiry, I certify that the information contained in CBP's responses to Interrogatory Nos. 2(b), 2(c), 3, 4, and 10, is true and correct to the best of my knowledge, information, and belief.

Dated: May 19, 2023

Graham Dudley
Acting Director, Enforcement Programs Division
Admissibility and Passenger Programs
Office of Field Operations
U.S. Customs and Border Protection



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,                          §
                                                   §
    *Plaintiffs*,                                §
                                                   §
vs.                                                §   CIVIL ACTION NO.
                                                   §   6:23-CV-00007
UNITED STATES DEPARTMENT OF                        §
HOMELAND SECURITY, *et al.*,                       §
                                                   §
    *Defendants,* and                             §   JUDGE DREW B. TIPTON
                                                   §
VALERIE LAVEUS, *et al.*,                          §
                                                   §
    *Intervenor Defendants.*                      §

# INTERVENOR DEFENDANTS'
# TAB 106, ECF 175-41

 **U.S. Citizenship and Immigration Services**

> **EXHIBIT 40**

Home > Humanitarian > Uniting for Ukraine

# Uniting for Ukraine

English | Русский | Українська |

---

ℹ **ALERT:** Starting Jan. 6, 2023, you must submit <u>Form I-134A, Online Request to be a Supporter and Declaration of Financial Support</u>, if you are a potential supporter of a Ukrainian or their immediate family member as part of Uniting for Ukraine.

You should not file Form I-134, Declaration of Financial Support, if you are a potential supporter of an individual under Uniting for Ukraine.

If you submitted Form I-134 online before Jan. 6, 2023, under Uniting for Ukraine, your case will continue to process and no further action is required. You should not submit a Form I-134A.

---



On April 21, 2022, the United States announced a key step toward fulfilling President Biden's commitment to welcome Ukrainians fleeing Russia's invasion. Uniting for Ukraine provides a pathway for Ukrainian citizens and their immediate family members who are outside the United States to come to the United States and stay temporarily in a 2 year period of parole. Ukrainians participating in Uniting for Ukraine

must have a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States.

The first step in the Uniting for Ukraine process is for the U.S.-based supporter to file a I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS. The U.S. government will then vet the supporter to ensure that they are able to financially support the individual whom they agree to support.

For more information on Uniting for Ukraine, see the DHS webpage.

⤢ Close All   ⤡ Open All

## Eligibility for Uniting for Ukraine                                          ⌃

| Term | Definition |
|------|------------|
| Supporter | An individual who holds lawful status in the United States or is a parolee or beneficiary of deferred action or Deferred Enforced Departure (DED) who has passed security and background vetting and demonstrated sufficient financial resources to receive, maintain, and support the individuals whom they commit to support for the duration of their stay in the United States.<br><br>Examples of individuals who meet the supporter requirement include:<br><br>• U.S. citizens and nationals;<br>• Lawful permanent residents, lawful temporary residents, and conditional permanent residents;<br>• Nonimmigrants in lawful status (that is, who maintain the nonimmigrant status and have not violated any of the terms or conditions of the nonimmigrant status);<br>• Asylees, refugees, and parolees;<br>• TPS holders; and<br>• Beneficiaries of deferred action (including DACA) or Deferred Enforced Departure. |

| Term | Definition |
|------|------------|
| Beneficiary | The Ukrainian citizen (or their non-Ukrainian immediate family member) who is outside the United States and who may be considered for parole under Uniting for Ukraine.<br><br>Immediate family members in this process include:<br><br>• the spouse or common-law partner of a Ukrainian citizen; and<br><br>• their unmarried children under the age of 21. NOTE: If a child is under 18, they must be traveling with a parent or legal guardian in order to use this process. |

**Who May be Considered for Parole under Uniting for Ukraine**

To be considered for parole under Uniting for Ukraine, the beneficiary must have a supporter who files a Form I-134A on their behalf.

Beneficiaries are eligible for the process if they:

- Resided in Ukraine immediately before the Russian invasion (through Feb. 11, 2022) and were displaced as a result of the invasion;
- Are a Ukrainian citizen and possess a valid Ukrainian passport (or are a child included on a parent's passport);
  - If not a Ukrainian citizen, they must be an immediate family member of a Ukrainian citizen beneficiary of Uniting for Ukraine with a valid passport;
- Have a supporter who filed a Form I-134A on their behalf that USCIS has vetted and confirmed as sufficient; and
- Clear biographic and biometric security checks;

Note: To be eligible for this process, children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian.

The supporter must complete and file Form I-134A with USCIS and be vetted by the U.S. government to protect against exploitation and abuse, and ensure that they are able to financially support the Ukrainians they are agreeing to support.

**Who Is Not Eligible for Parole Under Uniting for Ukraine**

Ukrainian citizens who are present in the United States will not be considered for parole under Uniting for Ukraine. However, Ukrainian citizens present in the United States may be eligible for Temporary Protected Status (TPS). For more information, please see our Temporary Protected Status for Ukraine page.

**Children traveling without their parent or legal guardian are not eligible for parole under Uniting for Ukraine.** Upon arrival at a U.S. port of entry, a child who is not traveling with their parent or legal guardian may be placed in the custody of the Department of Health and Human Services (HHS), as required by law under the Trafficking Victims Protection Reauthorization Act of 2008

(TVPRA), to protect the child from human trafficking and other forms of exploitation. For more information, please visit the HHS Unaccompanied Children webpage.

Since they are ineligible to pursue Uniting for Ukraine, children who are not traveling with a parent or legal guardian but are coming to the United States to meet a parent or legal guardian may instead seek parole through the standard Form I-131 parole process. In the Form I-131 parole process, children who wish to travel without a parent or legal guardian will need written permission from all adults with legal custody of the child (that is, their parents or legal guardian(s)) to travel to the United States. Evidence to accompany the Form I-131 will need to include the duration of the stay in the United States and evidence of relationship between the child and the parent or legal guardian in the United States. If the legal guardian is providing the written permission, the requestor must include proof of legal guardianship issued by a government authority. In addition, the application should include a statement about the relationship of the child to the person filing the Form I-131, and if they intend to provide care and custody of the child in the United States or reunite the child with a parent or legal guardian in the United States. For more information, please see our Humanitarian or Significant Public Benefit Parole page, which has information about the requirements for requesting parole for children.

You may request a fee waiver when submitting a Form I-131 for a Ukrainian child as described in the above paragraph. For more information on how to request a fee waiver, please see the Form I-912, Request for Fee Waiver webpage.

**Can the standard parole process be used to seek travel authorization for a Ukrainian child whose adoption is not yet complete?**

This process may not be used by prospective adoptive parents to circumvent any adoption processes. For information about adoption from Ukraine, visit the DOS Ukraine Adoption Information Page.

---

## Who Can Be a Supporter for a Beneficiary Under Uniting for Ukraine ⌃

Supporters who file Form I-134A on behalf of a beneficiary under Uniting for Ukraine must be in lawful status in the United States or a parolee or beneficiary of deferred action or Deferred Enforced Departure (DED) and willing and able to receive, maintain, and support the beneficiary listed in Form I-134A. Examples of the types of support for beneficiaries that supporters should keep in mind when considering their ability to meet this commitment include:

- Receiving the beneficiary upon arrival in the United States and transporting them to initial housing;
- Ensuring that the beneficiary has safe and appropriate housing for the duration of their parole and initial basic necessities;
- As appropriate, helping the beneficiary complete necessary paperwork such as for employment authorization, for a Social Security card, and for services for which they may be eligible;
- Ensuring that the beneficiary's health care and medical needs are met for the duration of the parole; and

- As appropriate, assisting the beneficiary with accessing education, learning English, securing employment and enrolling children in school.

Supporters must include the name of the beneficiary on Form I-134A. Supporters may not file a Form I-134A on behalf of an unnamed beneficiary. A supporter may agree to support more than one beneficiary, such as for different members of a family group, but must file a separate Form I-134A for each beneficiary.

At least one Form I-134A must be filed for each beneficiary. Multiple supporters may join together to support a beneficiary. In this case, a supporter should file a Form I-134A and include in the filing supplementary evidence demonstrating the identity of, and resources to be provided by, the additional supporters and attach a statement explaining the intent to share responsibility to support the beneficiary. These supporters' ability to support a beneficiary will be assessed collectively.

The Form I-134A requires an individual to sign the form; organizations may not serve as the named supporter on a Form I-134A. However, if an organization or other entity is providing financial or other services to the beneficiary for the purpose of facilitating support, this information should be provided as part of the evidence submitted with the Form I-134A and will be taken into account in determining the supporter's ability to support the beneficiary.

There is no fee to file a Form I-134A.

USCIS supports America's immigration process in many ways, including overseeing the approval process for citizen financial support of new arrivals to our country. DOS has collaborated with Welcome.us☐ to provide the American people and private sector with information on welcoming and supporting newcomer populations. The Welcome.us Ukraine webpage☐ includes information for those interested in learning more about supporting someone from Ukraine.

## How to Be Considered for Parole Under Uniting for Ukraine      ⌃

Ukrainian beneficiaries cannot directly apply for parole under Uniting for Ukraine. A supporter must first complete and file Form I-134A with us on behalf of a Ukrainian beneficiary and include information about them and contact details, such as email address. If we deem the Form I-134 sufficient, we will send the Ukrainian beneficiary information about the next step in the process to be considered for authorization to travel to the United States and parole consideration by U.S. Customs and Border Protection (CBP).

As of April 25, 2022, the primary process for Ukrainians fleeing Russia's invasion and seeking parole into the United States is through Uniting for Ukraine. This process enables approved Ukrainians to travel to the United States, be considered for parole for a period of up to 2 years, and be eligible to apply for employment authorization while in the United States. The United States strongly encourages Ukrainians in Europe who seek to travel to the United States to complete the request

from Europe. Ukrainians who present at U.S. land ports of entry without a valid visa or without pre-authorization to travel to the United States through Uniting for Ukraine may be denied entry and referred to apply through this process.

Ukrainians who have a pending request for parole filed with USCIS on Form I-131, Application for Travel Document, but wish to be considered for parole under Uniting for Ukraine instead must have their supporter submit a Form I-134 following these instructions to be considered for parole under Uniting for Ukraine. USCIS will provide petitioners who currently have a pending Form I-131 for a Ukrainian beneficiary with a notice explaining the process to be considered for parole under Uniting for Ukraine and the actions they must take if they would like to withdraw their Form I-131 in light of the new Uniting for Ukraine process.

## What to Expect After the Form I-134A Is Filed                                             ⌃

After the supporter files the Form I-134A with USCIS, we will review the form and supporting evidence to ensure that the supporter has sufficient financial resources to support the Ukrainian beneficiary for the duration of the parole period and conduct background checks on the supporter. We will determine whether the Form I-134A is sufficient, and we may request additional evidence to make our determination. If approved, Ukrainian beneficiaries will receive an email from USCIS with instructions on how to set up an account with myUSCIS and other next steps. Individuals should check their email, including spam and junk folders, for important messages from USCIS.

**If the Form I-134A is Sufficient**

If we confirm the Form I-134A is sufficient, the Ukrainian beneficiary will receive an email from USCIS with instructions on how to set up an account with myUSCIS and other next steps. The Ukrainian beneficiary will be required to confirm their biographic information on myUSCIS and attest to completion of all requirements including:

- An underlineattestation to certify understanding of the family relationship requirements for children under 18 for Uniting for Ukraine; and

- An attestation that you have completed vaccine requirements or are eligible for an exception to vaccine requirements for measles, polio, and the first dose of an FDA approved or authorized COVID-19 vaccine or a WHO-Emergency use listed (EUL) COVID-19 vaccine ⍐.

Upon arrival to the United States, the beneficiary will need to attest to receiving a medical screening for tuberculosis, including an Interferon-Gamma Release Assay (IGRA) test, within 90 days.

Find more information on vaccine requirements on the preview of the vaccine attestation page.

**If the Form I-134A is Insufficient**

If we are unable to confirm the Form I-134A is sufficient, that decision is final. The Ukrainian beneficiary will receive an email from USCIS notifying them that we determined the Form I-134A filed on their behalf was insufficient. We will not consider the Ukrainian beneficiary for parole under Uniting for Ukraine based on the insufficient Form I-134A. However, the supporter may file a new

Form I-134A on behalf of the same or another Ukrainian beneficiary, or a different supporter may file a Form I-134A on behalf of the beneficiary

**Authorization to travel to the United States**

Once the Ukrainian beneficiary has confirmed their biographic information and attested to completing all other requirements, their case will be further processed. Ukrainians will receive an email instructing them to check their myUSCIS account for the result of their authorization to travel. If the individual has been authorized to travel to the United States to seek parole under Uniting for Ukraine, they will be responsible for arranging and funding their own travel. This authorization is valid for 90 days.

## Information on Uniting for Ukraine if You Have a Pending Form I-131, Application for Travel Document ⌃

If you already applied for humanitarian parole on behalf of a beneficiary who is a Ukrainian citizen, and your Form I-131, Application for Travel Document, is pending with USCIS, we will send a notice explaining that you are eligible to reapply through Uniting for Ukraine.

**Benefits of applying through Uniting for Ukraine**

- There is no fee to apply for parole through Uniting for Ukraine. If you previously paid the processing fee for your Form I-131, although fees paid to USCIS are generally non-refundable, we will refund fees paid in this circumstance.

- Uniting for Ukraine may help beneficiaries receive temporary safe haven in the United States more quickly. Due to a surge of requests, our processing times for Form I-131 humanitarian parole are significantly longer than usual.

**How to apply through Uniting for Ukraine if you already have a Pending I-131, Application for Travel Document**

If you already filed a Form I-131, Application for Travel Document, for humanitarian parole on behalf of a Ukrainian who is outside the United States, you may either withdraw your pending Form I-131 or leave your Form I-131 pending with USCIS. Whether you withdraw your Form I-131 will have no impact on your ability to file a Form I-134 on behalf of the same individual under Uniting for Ukraine.

- If you choose to withdraw your pending Form I-131, you will receive a fee refund.

- If you choose to leave your Form I-131 pending, we will retain the fee, and adjudicate it in the future.

If you wish to provide support to a Ukrainian beneficiary under the Uniting for Ukraine process, you must file a new Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, even if you already submitted a prior Form I-134, Declaration of Financial Support, with your pending Form I-131.

## After the Beneficiary Is Paroled into the United States ⌃

**Employment Authorization**

Effective Nov. 21, 2022, beneficiaries paroled into the United States under *Uniting for Ukraine* are employment authorized incident to parole. This means that if you are paroled into the United States under *Uniting for Ukraine*, USCIS does not need to approve your application for employment authorization before you can work in the United States. Your unexpired Form I-94, Arrival/Departure Record, with a class of admission (COA) of "UHP" is an acceptable List A document that shows your identity and work authorization for Form I-9, Employment Eligibility Verification.

Within 90 days of hire (or in the case of reverification, the date employment authorization expires), you must provide your employer either:

- Your unexpired Form I-765, Employment Authorization Document (EAD); or
- Your unrestricted Social Security card and a List B identity document from the Form I-9 Lists of Acceptable Documents. (Note: A Social Security card that contains no employment restrictions is not available to individuals who are parolees and are not admitted to the United States on a permanent basis. See the Social Security Administration's Types of Social Security Cards webpage.)

Individuals who received their Form I-94 at the time of their parole into the United States should visit the U.S. Customs and Border Protection (CBP) Form I-94 website to view and print a copy of their Form I-94.

For more information, please see Employee Rights and Resources on I-9 Central.

**Fee Exemption for Initial EADs**

Effective Nov. 21, 2022, USCIS is exempting the fee to file Form I-765, Application for Employment Authorization, for **initial** EADs for individuals paroled into the United States under *Uniting for Ukraine* who file by mail. To apply for discretionary employment authorization, you must submit Form I-765, Application for Employment Authorization, using the (c)(11) category code. You do not need to pay a filing fee for your initial EAD. Beginning Dec. 5, 2022, you may file your fee exempt Form I-765 online.

To obtain the fee exemption when filing Form I-765 online to request an initial EAD:

- In the basis of eligibility section, provide your "eligibility category";
- For the category under which you are applying, select "**c(11) Ukraine Parole**" from the drop-down;
- Select your reason for applying as "**Initial permission to accept employment**"; and
- Review and submit application to receive $0 fee.

To obtain the fee exemption when mailing a paper Form I-765 to USCIS to request an initial:

- Select "Initial permission to accept employment" (Part 1, Item 1.a.) ;
- Enter "Ukraine" in:

- ○ Country of Citizenship (Part 2, Items 18.a. and 18.b.), and/or
- ○ Country of Birth (Part 2, Item 19.c.);
- Enter "C11" in the Eligibility Category (Part 2, Item 27.); and
- Submit no payment.

**Note:** For the fee exemption to apply, Form I-765 must be postmarked on or after Nov. 21, 2022, or submitted online on or after Dec. 5, 2022.

We encourage parolees to file Form I-765 online. To file Form I-765 online, eligible applicants must first visit my.uscis.gov to create a USCIS online account. There is no cost to create an account, which offers a variety of features, including the ability to communicate with USCIS about your application through a secure inbox.

**Obtaining a Social Security Number and Card**

You must have a Social Security number (SSN) properly assigned in your name by the Social Security Administration (SSA) to work in the United States so that your wages may be reported and to determine eligibility for Social Security benefits. We encourage you to apply for an SSN using Form I-765, Application for Employment Authorization, and following the form instructions. If you request an SSN in Part 2 (Items 13.a-17.b) of your Form I-765, and your application is approved, USCIS will electronically transmit that data to the SSA, and SSA will assign you an SSN and issue you a Social Security card. SSA will mail your Social Security card directly to the address you provide on Form I-765.

If you do not request an SSN on your Form I-765, you can apply for an SSN using the instructions on SSA's Social Security Number and Card webpage.

**Address Updates**

If you are residing in the United States longer than 30 days, you must report your physical address in the United States. You can change your address online and update your address on any pending applications and petitions at the same time using the USCIS Online Change of Address system. You must report a change of address within 10 days of moving to a different physical residence within the United States or its territories.

This will update your address on file with USCIS for pending applications, petitions, or requests that you include receipt numbers for on the form.

It is important to include the receipt number for any pending cases with USCIS with your address change request, so we can update the address associated with those cases. We will mail secure documents to the address on file. You can find the receipt number on the receipt notice (Form I-797C, Notice of Action) that we issued after you filed your application or petition. We send receipt notices to the address listed on the application or petition.

It is important to include the receipt number for any pending cases with USCIS with your address change request, so we can update the address associated with those cases. We will mail secure documents to the address on file. You can find the receipt number on the receipt notice (Form I-797C, Notice of Action) that we issued after you filed your application or petition. We send receipt notices to the address listed on the application or petition.

**Terminating Your Parole**

If you have already been paroled into the United States, your parole will automatically be terminated if:

- You depart the United States without obtaining advance authorization to travel; or
- Your parole period expires.

DHS may also decide to terminate your parole for other reasons, such as violating any laws of the United States. Individuals with expired parole are expected to depart the country of their own accord. Individuals in the United States encountered after their parole has terminated may be referred to U.S. Immigration and Customs Enforcement (ICE) for immigration proceedings.

**Leaving the United States**

If we grant you travel authorization, you may present it only once for travel to the United States to seek parole at the U.S. port of entry. After you are paroled into the United States, if you want to leave the United States and then return as a parolee, you must request an Advance Parole Document by filing Form I-131, Application for Travel Document, before traveling outside the United States. If you leave the United States without getting an Advance Parole Document, your parole will be terminated when you depart. For information on how to apply for an Advance Parole Document while you are in the United States, please see the Form I-131 page.

## Contacting USCIS 

**Beneficiaries**

If a beneficiary of a confirmed I-134A, Online Request to be a Supporter and Declaration of Financial Support, needs to correct information supplied to the supporter who completed the Form I-134, the beneficiary should send a secure message to USCIS using their USCIS online account. If the beneficiary has an issue with online account access or needs a password reset, they should use our online need help form. To ask about the status of a Form I-134A, beneficiaries can send a secure message from their USCIS account or call the USCIS Contact Center at 800-375-5283 (TTY 800-767-1833). The number for those outside the United States is 212-620-3418.

**Supporters**

To inquire about the status of a submitted Form I-134A or make a correction to a submitted Form I-134A, supporters should send a secure message from their USCIS online account.

For more information, see the **Contacting USCIS About Form I-134A** section on the <u>Frequently Asked Questions about *Uniting for Ukraine*</u> page.

---

## Resources for Victims of Abuse, Violence or Exploitation ⌃

There are many forms of abuse and exploitation, including domestic violence, forced marriage, and human trafficking. In the United States, there are laws that may help you avoid or escape an abusive situation.

- **Domestic Violence** is a pattern of behavior in a relationship that is used to gain or maintain power and control over an intimate partner, parent, or child. Domestic abuse can involve physical, sexual, emotional, financial, or psychological abuse or threats.
- **Forced marriage** is a marriage that takes place without the consent of one or both people in the marriage. Consent means that you have given your full, free, and informed agreement to marry your intended spouse and to the timing of the marriage. Forced marriage may occur when family members or others use physical or emotional abuse, threats, or deception to force you to marry without your consent. For additional information on forced marriage, please visit the <u>Forced Marriage</u> webpage.
- **Human Trafficking** involves exploiting someone to compel a commercial sex act or forced labor. Generally, this exploitation must involve force, fraud, or coercion to be considered human trafficking. However, if someone under 18 years old is induced to perform a commercial sex act, that is considered human trafficking even if there is no force, fraud, or coercion.

If you have experienced or fear forced marriage, domestic violence, human trafficking, or other abuse, please contact the resources below to receive free help in your language:

- **National Domestic Violence Hotline:** 800-799-7233, 800-787-3224 (TTY), <u>www.ndvh.org</u>
- **National Center for Missing and Exploited Children**: 800-843-5678, <u>www.missingkids.com</u>
- **The National Center for Victims of Crime:** 800-394-2255, 800-211-7996 (TTY), <u>www.victimsofcrime.org</u>
- **National Human Trafficking Hotline:** 888-373-7888, Text: 233733

---

## Protect Yourself from Immigration Scams ⌃

We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney or accredited representative working for a <u>Department of Justice recognized organization</u> can give you legal advice. Visit the <u>Avoid Scams</u> page for information and resources.

Some common scams to be aware of include:

- **Government impersonators:** Look out for individuals who pose as USCIS officials. USCIS will only contact you through official government channels and will not contact you through your

personal social media accounts (such as Facebook, Twitter, LinkedIn, etc.).

- **Misleading offers of support:** Look out for individuals who attempt to contact you online or through your social media accounts to offer to be your supporter or connect you to a supporter in exchange for a fee or other form of compensation. Similarly, look out for individuals seeking biographic information from you, such as your passport number or date of birth, through your social media accounts, to offer to support you for parole. Supporters should be able to provide financial support to beneficiaries for up to a 2-year period of parole. Beneficiaries are not obligated to repay, reimburse, work for, serve, marry, or otherwise compensate their supporter in exchange for the potential supporter submitting Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on their behalf or for providing financial support while they are in the United States. Find more information on potential exploitation and abuse in the Understand Your Rights (PDF) guide.

- **Scam Websites:** Some websites claim to be affiliated with USCIS and offer step-by-step guidance on completing a USCIS application or petition. Make sure your information is from uscis.gov, dhs.gov, or is affiliated with uscis.gov. Make sure the website address ends with .gov.

- **Payments by Phone or Email:** USCIS will never ask you to transfer money to an individual. We do not accept Western Union, MoneyGram, PayPal, or gift cards as payment for immigration fees. In addition, we will never ask you to pay fees to a person on the phone or by email.

- **Notarios Públicos and unauthorized practitioners of immigration law:** In the United States, a notario público is not authorized to provide you with any legal services related to immigration benefits. Only an attorney or an accredited representative working for a Department of Justice (DOJ)-recognized organization can give you legal advice. For more information about finding legal services, visit our website.

---

## Related Links ⌃

- I-134A, Online Request to be a Supporter and Declaration of Financial Support
- Frequently Asked Questions About Uniting for Ukraine
- *Uniting for Ukraine* Flyer (PDF, 287.88 KB)
- *Uniting for Ukraine* Flyer (PDF, 292.23 KB) (Ukrainian)
- *Uniting for Ukraine* Flyer (PDF, 290.55 KB) (Russian)

Non-USCIS Links

- DHS *Uniting For Ukraine*
- HHS' Office of Refugee Resettlement's Ukrainian Assistance Resources

---

⤢ Close All   ⤢ Open All

Last Reviewed/Updated: 06/06/2023



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV00007

EXHIBIT
NO. 107

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,               §
                                        §
        *Plaintiffs,*                   §
                                        §
    vs.                                 §    CIVIL ACTION NO.
                                        §    6:23-CV-00007
UNITED STATES DEPARTMENT OF             §
HOMELAND SECURITY, *et al.*,            §
                                        §
        *Defendants,* and               §    JUDGE DREW B. TIPTON
                                        §
VALERIE LAVEUS, *et al.*,               §
                                        §
        *Intervenor Defendants.*        §


# INTERVENOR DEFENDANTS'
# TAB 107, ECF 175-42

# A year into war, U.S. sponsors apply to welcome 216,000 Ukrainian refugees under Biden policy

cbsnews.com/news/a-year-into-war-u-s-sponsors-apply-to-welcome-216000-ukrainian-refugees-under-biden-policy

Camilo Montoya-Galvez

*Washington* — A year into the war in Ukraine, Americans across nearly 10,000 zip codes in all 50 states have applied to sponsor the arrival of more than 216,000 Ukrainians displaced by the Russian invasion of their homeland, according to federal statistics obtained by CBS News.

So far, more than 115,000 Ukrainians have arrived in the U.S. under the sponsorship program, which the Biden administration set up two months after Russian President Vladimir Putin launched a large-scale military offensive against Ukraine on Feb. 24, 2022, triggering the largest refugee exodus in Europe since World War II.

In just a matter of days last year, millions of Ukrainians, mostly women and children, fled the country. While some have returned, eight million Ukrainian refugees remain scattered across Europe, in countries like Poland and Germany, according to the United Nations. Another five million have been internally displaced inside Ukraine.

EXHIBIT
41



Ukrainian refugees wait in line to attend a job fair in the Brooklyn borough of New York on Feb. 1, 2023.
ANGELA WEISS/AFP via Getty Images

By all measures, the U.S. sponsorship program, called Uniting for Ukraine, is an unprecedented policy, allowing tens of thousands of Americans to facilitate the entry of an unlimited number of refugees through a free and entirely-online application system that, in stark contrast to most immigration programs, adjudicates cases in a matter of weeks or even days.

It has also become one of the main symbols of the Biden administration's steadfast support to the Ukrainian war effort, which has received billions of dollars in aid and weapons from the U.S. Last week, during a surprise visit to Kyiv, President Biden vowed to continue American assistance to the beleaguered country.

Since it was created in late April 2022, the Uniting for Ukraine program has garnered interest from across the U.S. As of Feb. 21, the U.S. Citizenship and Immigration Services (USCIS) had received 216,210 requests to sponsor Ukrainian refugees from individuals living in 9,766 zip codes in all 50 states, the District of Columbia, and Puerto Rico, according to the unpublished federal data obtained by CBS News.

Two-thirds of the Uniting for Ukraine sponsorship requests have originated in eight states: New York (28,974), Illinois (26,191) California (24,776), Washington (18,546), Florida (14,463), Pennsylvania (12,177), New Jersey (11,395) and Ohio (7,700). But Americans in 13 other states have applied to sponsor more than 2,000 Ukrainian refugees each, and only eight states have fewer than 300 sponsorship applications filed by their residents.

Over half of the applications to sponsor Ukrainians have been filed by individuals in 10 metropolitan areas, including New York City (33,347), Chicago (25,900) and Seattle (12,373). But overall, the government has received sponsorship bids from Americans in over 700 metropolitan areas and cities, the statistics show.

In less than a year, Uniting for Ukraine has become the largest private refugee sponsorship program in U.S. history; though the program's beneficiaries are not legally refugees. While they are fleeing a war, these Ukrainians don't have refugee status, which offers a path to permanent U.S. residency. Instead, they have been granted permission to live and work in the U.S. for two years under an authority known as parole.

Many of those sponsoring Ukrainians are members of the Ukrainian diaspora in the U.S., helping their family members and friends. Indeed, the states with the largest Ukrainian-American communities — New York, California, Washington and Illinois — are also the states with the highest number of sponsorship bids.

But Americans with no connections to Ukraine have also signed up to sponsor strangers. Welcome.US, an organization based in Washington, D.C., has connected more 1,500 Ukrainians with American sponsors through an online platform, according to the group's chief executive officer, Nazanin Ash.

"There are so many types of civic-minded Americans," Ash said. "It belies what we perceive as the toxicity of our immigration debate. Below the level of the toxicity about the way our politicians talk about immigration is a nation of welcomers who have been looking for an opportunity to be a good neighbor."

When she heard of Welcome.US's matching platform last year, Mary-Catherine Oxford, a dean at a community college in northern California, jumped at the chance to sponsor a refugee family, a long-held dream. Through that platform, she met Anna Tereshchenko, a 33-year-old mother hoping to escape Dnipro, a city in central Ukraine targeted by Russian missile attacks.

An IT worker, Tereshchenko had signed up for the matching platform since she lacked ties to the U.S. The two exchanged messages to get to know each other, and after having conversations with her husband, Oxford offered to sponsor Tereshchenko and her 12-year-old daughter. Days after Oxford submitted an application, Tereshchenko and her daughter were approved to come to the U.S. under the Uniting for Ukraine program.

"It's definitely a leap of faith," Oxford said about the decision to sponsor and host strangers from half a world away. But Oxford said it was also a leap of faith for Tereshchenko to agree to live with strangers in the U.S.

Tereshchenko and her daughter arrived in the U.S. on Aug. 31, and have been living in Santa Rosa, California, with Oxford, her husband and their 9-year-old daughter ever since. Tereshchenko is currently working part-time at a retail store, while her daughter is learning English at a middle school.



From left to right: Mary-Catherine Oxford and her daughter, along with Anna Tereshchenko and her daughter. February 2023.  Oxford family

Life in the U.S. has not been easy, Tereshchenko said, noting she has struggled to find a full-time job in her profession. But she said she's thankful that her daughter is safe in the U.S. As the war rages on, it will become increasingly difficult to return to Ukraine, she added.

"It's very difficult to start to build a new life and then just have to move somewhere," she said.

For Oxford, a recent conversation with her daughter demonstrated that she had made the right decision in sponsoring Tereshchenko's family: "She said, 'I'm really glad we're helping people.' If that's the lesson my daughter walks away with, that's successful to me."

Besides the sponsorship bids, Americans have helped raise millions of dollars in wartime aid to Ukrainians, including $275 million in GoFundMe donations, according to the company.

In addition to the Uniting for Ukraine arrivals, an additional 156,000 Ukrainians have entered the U.S. since the start of the war under other immigration pathways, including those with visas or formal refugee status, and more than 20,000 Ukrainians processed along the U.S.-Mexico border last spring, government data show.

In fact, it was the sudden arrival of thousands of Ukrainian refugees to the U.S. southern border last year that prompted the Biden administration to implement the sponsorship policy. After launching the program, it largely stopped processing Ukrainians along the Mexican border, warning that they would be expelled if they attempted to enter the U.S. unlawfully. The number of Ukrainians flying to Mexico subsequently plummeted.

Since then, the Biden administration has used Uniting for Ukraine as a model to reduce illegal border crossings. In January, it announced it would allow up to 30,000 Cubans, Haitians, Nicaraguans and Venezuelans to enter the U.S. legally each month if Americans agreed to sponsor their arrival. At the same time, it said migrants from these countries would be expelled to Mexico if they crossed into the U.S. illegally.

The State Department also unveiled a first-of-its-kind initiative last month that will allow groups of private American citizens to sponsor the permanent resettlement of refugees from all corners of the world through the traditional refugee program. The program is hoping to recruit 10,000 sponsors in the next year.

Unlike other refugee and migrant populations, Ukrainians have largely received a warm welcome and robust bipartisan support in the U.S., including from Republicans who traditionally back stricter immigration controls. The rapid arrival of tens of thousands of Ukrainians, however, has prompted some advocates to accuse the Biden administration of favoring certain migrant groups over others.

Biden administration officials have justified the scale and pace of the Uniting for Ukraine process, in part, by saying that unlike other populations, most Ukrainians intend to return home once the war ends — an assessment supported by surveys conducted by United Nations officials.

Mariana, 20, who arrived in the U.S. last July with her mother, said she's thankful to be living and working in America. Her new life in the Chicago suburbs is "peaceful," she mentioned. But the young refugee said she wishes to return to Ukraine eventually; though there's no telling when that will be possible.

"It depends how long the war will continue," said Mariana, who asked for her surname to be omitted. "I miss my friends. I miss my family. And I miss my home. But it's still not safe to be there."



Mariana and her mother after coming to the U.S. from Ukraine. February 2023.  Mariana

Mariana and her mother, who lived in the western Ukrainian city of Ivano-Frankivsk, were able to come to the U.S. through a Uniting for Ukraine sponsorship bid filed by her aunt in North Carolina. The 20-year-old is finishing up her Ukrainian college studies online, and working as a dispatcher at a trucking company.

While she's glad to no longer live under constant war sirens and curfews, Mariana said she's hoping to be able to go back to Ukraine before her permission to be in the U.S. expires in 2024. In the meantime, she said she's rooting for her country thousands of miles away.

"I'm very glad that they are not surrendering, and I hope that with the help of Europe and America, the war will end soon," she added.

## War in Ukraine

More



U.S. says Ukraine counteroffensive could be long, and at a "high cost"



IAEA chief visits Russian-occupied Ukraine nuke plant after dam blast



Ukrainian troops describe the slow, perilous push to retake their land



Ukrainians expected to finish Abrams tank training by end of summer

In:
- Ukraine
- Russia
- Refugee
- Migrants

Camilo Montoya-Galvez



Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

Twitter



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV 00007

EXHIBIT NO. 108

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 108, ECF 175-43

**SUPPLEMENTARY INFORMATION:** The United States is signatory to the International Maritime Organization's International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), as amended. The special construction or purpose of some vessels makes them unable to comply with the light, shape, or sound signal provisions of the 72 COLREGS. Under statutory law, however, specified 72 COLREGS provisions are not applicable to a vessel of special construction or purpose if the Coast Guard determines that the vessel cannot comply fully with those requirements without interfering with the special function of the vessel.[1]

The owner, builder, operator, or agent of a special construction or purpose vessel may apply to the Coast Guard District Office in which the vessel is being built or operated for a determination that compliance with alternative requirements is justified,[2] and the Chief of the Prevention Division would then issue the applicant a certificate of alternative compliance (COAC) if he or she determines that the vessel cannot comply fully with 72 COLREGS light, shape, and sound signal provisions without interference with the vessel's special function.[3] If the Coast Guard issues a COAC, it must publish notice of this action in the Federal Register.[4]

The Chief of Prevention Division, Eighth District, U.S. Coast Guard, certifies that the HAYDEN GRACE, O.N. 1326783 is a vessel of special construction or purpose, and that, with respect to the position of the mast lights, stern light, and sidelights, it is not possible to comply fully with the requirements of the provisions enumerated in the 72 COLREGS, without interfering with the normal operation, construction, or design of the vessel. The Chief of Prevention Division, Eighth District, U.S. Coast Guard, further finds and certifies that the mast lights, stern light, and sidelights are in the closest possible compliance with the applicable provisions of the 72 COLREGS.[5]

This notice is issued under authority of 33 U.S.C. 1605(c) and 33 CFR 81.18.

Dated: October 13, 2022.

**A.H. Moore, Jr.,**
*Captain, U.S. Coast Guard, Chief, Prevention Division, Eighth Coast Guard District.*

[FR Doc. 2022–22712 Filed 10–16–22; 8:45 am]
**BILLING CODE 9110–04–P**

---

[1] 33 U.S.C. 1605.
[2] 33 CFR 81.5.
[3] 33 CFR 81.9.
[4] 33 U.S.C. 1605(c) and 33 CFR 81.18.
[5] 33 U.S.C. 1605(a); 33 CFR 81.9.

---

# DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Venezuelans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to immediately address the increasing number of encounters of Venezuelan nationals along the southwest border (SWB), as the Administration continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Venezuelans who do not avail themselves of this process, and instead enter the United States without authorization between POEs, will be subject to expulsion or removal. As part of this effort, the Department of Homeland Security (DHS) will implement a process—modeled on the successful *Uniting for Ukraine* (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide housing and other supports as needed; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of entry (POE), rather than arriving at a land POE. Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication.

**DATES:** DHS will begin accepting online applications for this process on October 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445, (202) 282–9708.

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuela Parole Process

This notice describes the implementation of a new parole process for certain Venezuelan nationals announced by the Secretary of Homeland Security on October 12, 2022,[1] including the eligibility criteria

---

[1] DHS Announces New Migration Enforcement Process for Venezuelans, October 12, 2022, available at: *https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans.*

---

and filing process. The parole process is intended to enhance border security by reducing the record levels of Venezuelan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The Secretary's announcement followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated October 12, 2022.[2] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration. The strategy—a shared endeavor with partner countries—focuses on addressing the root causes of migration, which currently are fueling unprecedented levels of irregular migration, and creating safe and orderly processes for migration throughout the region. This strategy will reduce regional irregular migration in the mid- to long-term, but we anticipate continued substantial pressures along the southwest border over the coming months.

In light of this reality, DHS is implementing an immediate effort to address the increasing number of encounters of Venezuelan nationals at the SWB as we continue to implement the broader and long-term strategy. We anticipate that this new effort would reduce the record levels of Venezuelan nationals seeking to irregularly enter the United States between POEs along the SWB, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

With the cooperation of the Government of Mexico (GOM), and potentially other governments, this effort is intended to serve as a deterrent to irregular migration by providing a meaningful alternative to irregular migration and by imposing immediate consequences on Venezuelan nationals who choose to not avail themselves of the new process and instead seek to irregularly enter the United States

---

[2] See Memorandum from the Secretary from U.S. Customs and Border Protection Commissioner and U.S. Citizenship and Immigration Services Director, Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022).

EXHIBIT
42

Venezuela AR_000073

between POEs. It will also provide an incentive for Venezuelans to avoid the often dangerous journey to the border altogether, by putting in place a safe and orderly process for Venezuelan nationals to travel to the United States to seek a discretionary, case-by-case grant of parole into the United States, based on significant public benefit and urgent humanitarian reasons.[3] Venezuelan nationals who irregularly enter the United States between POEs after October 19, 2022 are subject to expulsion or removal from the United States; those who enter irregularly into the United States, Mexico, or Panama will also be found ineligible for a discretionary grant of parole under this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process.

Implementation of the parole process is conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. As such, this new process will couple a meaningful incentive to seek a lawful, safe and orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly.

The new policy is modeled on *Uniting for Ukraine* (U4U), the successful parole process that was put in place in the wake of Russia's unprovoked invasion of Ukraine, when thousands of Ukrainian migrants spontaneously arrived at SWB POEs. Once U4U was implemented, such spontaneous arrivals fell sharply, and travel shifted to a safe and orderly process. This new process is procedurally similar to U4U, in which certain Ukrainians with U.S.-based supporters who meet specified eligibility criteria have been able to travel to the United States to seek a discretionary, case-by-case grant of parole for up to two years. As in U4U, applications using this parole process will be initiated by a supporter in the United States who would apply on behalf of a Venezuelan individual and commit to providing the beneficiary housing and other financial support, as needed, for the duration of their parole.

In addition to the supporter requirement, Venezuelan nationals are required to meet several eligibility criteria, as outlined in more detail later in this notice, to receive advance authorization to travel to the United States and be considered for parole, on

a case-by-case basis. Importantly, individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022. Only those who pass national security and public safety vetting and agree to fly to an interior POE, as opposed to entering between POEs, and who meet all specified criteria below will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process.

Any discretionary grants of parole will be for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged and long-term strategy and engage with our foreign partners throughout the region. These efforts are intended to support conditions that would decrease irregular migration, work to improve refugee processing and other lawful immigration pathways in the region, and allow for increased removals of those who continue to migrate irregularly and lack a valid claim of asylum or other lawful basis to remain in the United States. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the U.S. economy as they do so. Those who are not granted asylum or other immigration benefits will need to leave the United States at the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Venezuelan nationals pursuant to this process will provide a significant public benefit for the United States, while also addressing the urgent humanitarian reasons that Venezuelan nationals are fleeing, to include repression and unsafe conditions in their home country. Most significantly, we anticipate that parole will: (i) enhance the security of our SWB by reducing irregular migration of Venezuelan nationals; (ii) enhance border security and national security by vetting individuals prior to their arrival at a United States POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of Venezuelan irregular migration; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important

foreign policy goals to manage migration collaboratively in the hemisphere. The process is capped at 24,000 beneficiaries. After this cap is reached, DHS will not approve additional beneficiaries, absent a Secretary-level decision, at the Secretary's sole discretion, to continue the process.

*B. Conditions at the Border*

1. Trends and Flows: Increase of Venezuelan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year. By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[4] These gains were subsequently reversed, however, as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.

Shifts in demographics have also had a significant effect on irregular migration. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons. Beginning in the 2010s, a growing share of migrants have been from Northern Central America[5] (NCA) and, since the late 2010s, from countries throughout the Americas. Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence and political oppression and for other non-economic reasons.[6]

The most recent rise in the numbers of encounters at the border has been driven in significant part by a surge in

[3] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[4] Office of Immigration Statistics (OIS) analysis of historic CBP data.

[5] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[6] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of Title 42 expulsions in 2020. As the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

Venezuela AR_000074

migration of Venezuelan nationals. Unique encounters of Venezuelan nationals increased throughout fiscal year (FY) 2021, totaling 47,328. More than 25% of Venezuela's population has left the country. The United States is seeing a rising rate of Venezuelans encountered at our border over the past two years, which has surged in the last few months. Average monthly unique encounters of Venezuelan nationals at the land border totaled 15,494 in FY 2022,[7] rising further to over 25,000 in August and 33,000 in September, compared to a monthly average of 127 unique encounters from FY 2014–2019.[8] Of note, unique encounters of Venezuelan nationals rose 293 percent between FY 2021 and FY 2022, while unique encounters of all other nationalities combined increased by 45 percent. Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its territory from Colombia via the Darién jungle each day.

In recent months, this surge in irregular migration of Venezuelan nationals has been accelerating. Nationals from Venezuela accounted for 25,130 unique encounters in August 2022, and the Office of Immigration Statistics (OIS) estimates that there were 33,500 unique encounters in September, more than Mexico and more than all three NCA countries combined.[9]

### 2. Push and Pull Factors

DHS assesses that the high—and rising—number of Venezuelan encounters has three key causes: First, the deteriorating conditions in Venezuela, including repression, instability, and violence, are pushing large numbers to leave their home country. Second, the lack of safe and orderly migration alternatives throughout the entire region, including to the United States, means that those seeking refuge outside of Venezuela have few lawful options. Third, the United States faces significant limits on the ability to return Venezuelan nationals to Venezuela or elsewhere, as

described below; absent such a return ability, more individuals are willing to take a chance that they can come—and stay.

#### a. Factors Pushing Migration From Venezuela

A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country.[10] Maduro has arbitrarily banned key opposition figures from participating in the political process, detained hundreds of political prisoners, employed judicial processes to circumscribe political parties, and denied opposition political representatives equal access to media coverage and freedom of movement in the country.[11] In a February 2022 report, Amnesty International reported that "[c]rimes under international law and human rights violations, including politically motivated arbitrary detentions, torture, extrajudicial executions and excessive use of force have been systematic and widespread, and could constitute crimes against humanity."[12] Amnesty International further reported that "trends of repression in Venezuela have been directed against a specific group of people: those perceived as dissidents or opponents" of Nicolás Maduro.[13]

According to the United Nations High Commissioner for Refugees, Venezuela has become the second-largest external displacement crisis in the world, following Syria.[14] At least in the short term, the crisis is expected to continue, thus continuing to push Venezuelans to seek alternatives elsewhere. As described above, Panama is currently seeing more than 3,000 people, mostly Venezuelan nationals, crossing into its

territory from Colombia via the Darién jungle each day.

#### b. Return Limitations

At this time, there are significant limits in DHS's ability to expel or return Venezuelans who enter the United States without authorization in between POEs. DHS is currently under a court-ordered obligation to implement the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, under which covered noncitizens may be prevented entry or expelled to prevent the spread of communicable disease.[15] But Venezuela does not presently allow repatriations via charter flights, which significantly limits DHS's ability to return those subject to the Title 42 Order or who are ordered removed. To date, other countries, including Mexico, have generally been reluctant to accept Venezuelans as well. As a result, DHS was only able to repatriate a small number of Venezuelan nationals to Venezuela in FY 2022.

#### c. Overall Effect

DHS assesses that the combination of the country conditions in Venezuela, the lack of safe and orderly lawful pathways, and the present inability to expel or remove Venezuelan nationals engaged in irregular migration, has significantly led to the significant increase in irregular migration among Venezuelan nationals. Conversely, DHS assesses that the return of a significant portion of Venezuelans who enter irregularly at the border, coupled with an alternative process pursuant to which Venezuelans could enter the United States lawfully, would meaningfully change the incentives for those intending to migrate—leading to a decline in the numbers of Venezuelans seeking to irregularly cross the SWB.

This prediction is based on prior experience: CBP saw rapidly increasing numbers of encounters of Guatemalan and Honduran nationals from January 2021 until August 2021, when these countries began accepting the direct return of their nationals. In January 2021, CBP encountered an average of 424 Guatemalan nationals and 362 Honduran nationals a day. By August 4, 2021, the 30-day average daily encounter rates had climbed to 1,249 Guatemalan nationals and 1,502 Honduran nationals—an increase of 195 percent and 315 percent, respectively. In the 60 days immediately following the resumption of routine flights, average daily encounters fell by 37

---

[7] FY 2022 CBP data cited in this notice is based on internal reporting to date. CBP releases official data in regular intervals; final FY 2022 figures may differ to some degree from the figures cited here.

[8] OIS analysis of OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of U.S. Customs and Border Protection (CBP) data from Unified Immigration Portal (UIP) as of October 6, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this notice unique encounter data are defined to also include OFO paroles and other OFO administrative encounters.

[9] OIS Persist Dataset based on data through August 31, 2022 and OIS analysis of CBP UIP data as of October 6, 2022.

[10] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[11] 2021 Country Reports of Human Rights Practices: Venezuela, U.S. Department of State, Apr. 12, 2022, available at: *https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/* (last visited Sept. 24, 2022).

[12] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p. 11, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[13] Venezuela: Calculated repression: Correlation between stigmatization and politically motivated arbitrary detentions, Amnesty International, p.52, Feb. 10, 2022, available at: *https://www.amnesty.org/en/documents/amr53/5133/2022/en/* (last visited Sept. 25, 2022).

[14] UNHCR, Venezuela Situation, available at: *https://www.unhcr.org/en-us/venezuela-emergency.html* (last visited Sept. 24, 2022).

[15] *Louisiana* v. *CDC,*—F. Supp. 3d—, 2022 WL 1604901 (W.D. La. May 20, 2022).

Venezuela AR_000075

**63510**      **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

percent for Guatemala and 42 percent for Honduras, as shown in Figure 1 below.[16]

Figure 1: Daily Encounters of Guatemalan and Honduran Nationals, May 1–November 1, 2021.



NOTE: Figure depicts 30-day average of daily encounters.
Source: OIS analysis of OIS Persist Dataset.

Returns alone, however, are not sufficient. While the numbers of encounters of Guatemalan and Honduran nationals have fallen, CBP is currently encountering a total of around 1,000 nationals from these two countries each day. The process thus seeks to *combine* a consequence for Venezuelan nationals who seek to enter the United States irregularly at the land border with an incentive to use the lawful process to request authorization to travel by air to and enter the United States, without making the dangerous journey to the border.

This effort is informed by the way that similar incentives and disincentives worked in the U4U process. In the two weeks prior to U4U's implementation, DHS encountered a daily average of 940 nationals of Ukraine at the U.S.-Mexico land border seeking to enter the United States. After the new parole process launched and approved Ukrainians could fly directly into the United States—whereas those who sought to enter irregularly were subject to expulsion pursuant to the Title 42 public health Order—daily encounters dropped to fewer than twelve per day.[17]

Mexican officials also reported seeing a similar decline in the number of inbound Ukrainian air passengers.

**3. Impact on DHS Resources and Operations**

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in significant part by the number of Venezuelan nationals encountered—DHS has taken a series of extraordinary steps. Largely since FY 2021, DHS has built and now operates 10 soft-sided processing facilities, which cost $688 million in FY 2022. It has detailed 3,770 officers and agents from CBP and ICE to the SWB. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from elsewhere in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 in grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP—H) to assist with the reception and onward travel of irregular migrants arriving at the SWB.

This spending is in addition to $1.4 billion in FY 2022 one-year surge funding for SWB enforcement and processing capacities.[18]

The impact has been particularly acute in certain border sectors. The increased flows of Venezuelan nationals are disproportionately occurring within the remote Del Rio, El Paso, and Yuma sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 93 percent of unique encounters of Venezuelan nationals occurred in these three sectors, with the trend rising to 98 percent in September 2022.[19] In FY 2022, the Del Rio, El Paso, and Yuma sectors encountered almost double the number of migrants as compared to FY 2021 (an 87 percent increase), and a tenfold increase over the average for FY 2014–FY 2019, primarily as a result of increases in Venezuelans and other non-traditional sending countries.[20]

The focused increase in encounters in those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—until the past two years—they have never been a focal point for large numbers of individuals entering irregularly, they have limited infrastructure and personnel in place to safely process the elevated encounters

---

[16] OIS analysis of OIS Persist Dataset based on data through August 31, 2022.

[17] OIS Persist Dataset based on data through August 31, 2022.

[18] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[19] OIS analysis of OIS Persist Dataset through August 31, 2022 and CBP UIP data for September 1–30, 2022.

[20] OIS analysis of OIS Persist Dataset through August 31, 2022.

Venezuela AR_000076

that they are seeing. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border, but is far away from other CBP sectors, which makes it challenging to move individuals elsewhere for processing during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors with capacity to process. In just one week (between September 22–September 28), El Paso and Yuma sectors operated a combined 79 decompression buses staffed by Border Patrol agents to neighboring sectors.[21] In that same week, El Paso and Yuma sectors also operated 29 combined lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[22]

Because these assets are finite, using DHS air resources to operate lateral flights impacts DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. This is concerning given the correlation between DHS's ability to operate return flights to non-contiguous home countries and encounters at the border, as described above. DHS assesses that a reduction in the flow of Venezuelans arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with discretionary authority to parole noncitizens into the United States temporarily, under such reasonable conditions that the Secretary may prescribe, on a case-by-case basis for "urgent humanitarian reasons or significant public benefit."[23] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[24] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[25] Individuals may be granted advance authorization to travel to the United

States to seek parole.[26] DHS may terminate parole in its discretion at any time.[27] Individuals who are paroled into the United States generally may apply for employment authorization.[28]

This effort will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Venezuelan nationals to remain where they are and use a lawful process to request authorization to travel by air to and ultimately enter the United States for the purpose of seeking a discretionary grant of parole for up to two years.

## III. Justification for the Process

### A. Significant Public Benefit

The case-by-case parole of Venezuelan nationals pursuant to this process—which combines consequences for those who seek to enter the United States irregularly between POEs with an opportunity for eligible Venezuelan nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—will serve a significant public benefit for multiple, intersecting reasons. Specifically, as noted above, we assess that the parole of eligible individuals pursuant to this process will result in the following: (i) enhancing the security of our border by reducing irregular migration of Venezuelan nationals; (ii) enhancing border security and national security by vetting individuals before they arrive at our border; (iii) reducing the strain on DHS personnel and resources; (iv) minimizing the domestic impact of Venezuelan irregular migration; (v) disincentivizing a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfilling important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhancing the Security of Our Border by Reducing Irregular Migration of Venezuelan Nationals

Implementation of the parole process is contingent on the GOM agreeing to accept the return of Venezuelan nationals encountered irregularly entering the United States without authorization between POEs. While DHS remains under the court order to implement the CDC's Title 42 public

health Order, these returns will take the form of expulsions. Once Title 42 is no longer in place, DHS will engage the GOM to effectuate Title 8 removals of individuals subject to expedited removal who cannot be returned to Venezuela or elsewhere. The ability to effectuate returns to Mexico will impose a consequence on irregular entry that currently does not exist.

As described above, Venezuelan nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. We assess that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly parole process, the numbers will continue to grow. By pairing a consequence on those seeking to irregularly cross between the POEs with the opportunity to apply for advance authorization to travel to the United States to seek a discretionary grant of parole, this process will create a combination of incentives and disincentives that will lead to a substantial decline in irregular migration by Venezuelans to the SWB.

As also described above, this expectation is informed, in part, by past experience with respect to the ways that flows of irregular migration decreased from NCA countries once nationals from those countries were returned to their home countries and shifts that took place once the U4U process was initiated. These experiences provide compelling evidence of the importance of coupling effective disincentives for irregular entry with incentives for lawful entry as a way of addressing migratory surges.

### 2. Enhance Border Security and National Security by Vetting Individuals Before They Arrive at Our Border

The Venezuelan parole process described above will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States. It is important to note that all noncitizens DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing, and that individuals who are determined to pose a national security or public safety threat are detained pending removal. Venezuelan nationals seeking parole via this process will still be subject to this vetting upon their arrival at the POE. That said, there are distinct advantages to being able to conduct some vetting actions *before* an individual arrives at the border to prevent individuals who

[21] Data from SBCC, as of September 29, 2022.
[22] Data from SBCC, as of September 29, 2022.
[23] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").
[24] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).
[25] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[26] *See* 8 CFR 212.5(f).
[27] *See* 8 CFR 212.5(e).
[28] *See* 8 CFR 274a.12(c)(11).

could pose threats to national security or public safety from even traveling to the United States.

As described above, the vetting will require prospective beneficiaries to upload a live photograph via a mobile application. This will substantially enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them an advance authorization to travel before they arrive at our border.

### 3. Reduce the Burden on DHS Personnel and Resources

As discussed above, the impact of the increased migratory flows has strained the DHS workforce in ways that have been particularly concentrated in certain sectors along the SWB. By reducing encounters of Venezuelan nationals at the SWB, and channeling decreased flows of Venezuelan nationals to interior POEs through this streamlined process, we anticipate the process will relieve some of this burden. This will free up resources, including those focused on decompression of border sectors, which in turn could enable an increase in removal flights—enabling the removal of more noncitizens with final orders of removal faster and reducing the number of days in DHS custody. While the process will also draw on DHS resources within USCIS and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require minimal resources as compared to the status quo.

### 4. Minimize the Domestic Impact

The increase in irregular migration, including the change in demographics, has put a strain on domestic resources, which is felt most acutely by border communities. As the number of arrivals increases, thus necessitating more conditional releases, the strains are shared by others as well. Given the current inability to return or repatriate Venezuelans in substantial numbers, Venezuelan nationals account for a significant percentage of the individuals being conditionally released pending their removal proceedings or the initiation of such proceedings after being encountered and processed along the SWB.

State and local governments, along with NGOs, are providing services and assistance to the Venezuelans and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[29] DHS also has worked with Congress to make approximately $290 million available since FY 2019 through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. This funding has allowed DHS to support building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Despite these efforts, local communities have reported strain on their ability to provide needed social services.[30] Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[31] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[32] The parole process will address these concerns by diverting flows of Venezuelan nationals to interior POEs through a safe and orderly process and ensuring that those who do arrive in the United States have support during their period of parole. The effort is intended to yield a decrease in the numbers arriving at the SWB.

Moreover, and critically, beneficiaries will be required to fly to the interior, rather than arriving at the SWB, absent extraordinary circumstances. They will only be authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also will be eligible to apply for work authorization, thus enabling them to support themselves. We anticipate that this process will help reduce the burden on

communities, state and local governments, and NGOs that currently support the reception and onward travel of migrants arriving at the SWB.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[33] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[34] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[35] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[36] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[37] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[38] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils of the journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. Migrants are increasingly traveling to the SWB from South America through the Darién Gap, an incredibly dangerous and grueling 100-kilometer stretch of dense jungle between Colombia and Panama. Women and children are particularly at risk for diarrhea, respiratory diseases, dehydration, and other ailments that

---

[29] Aya Elamroussi and Adrienne Winston, Washington, DC, approves creation of new agency to provide services for migrants arriving from other states, CNN, Sept. 21, 2022, available at: *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office* (last visited Sept. 29, 2022).

[30] Lauren Villagran, El Paso struggles to keep up with Venezuelan migrants: 5 key things to know. Sep. 14, 2022, available at: *https://www.elpasotimes.com/story/news/2022/09/14/venezuelan-migrants-el-paso-what-to-know-about-their-arrival/69493289007/* (last visited Sept. 29, 2022); Uriel J. Garcia. El Paso scrambles to move migrants off the streets and gives them bus rides as shelters reach capacity. Sept. 20, 2022, available at: *https://www.texastribune.org/2022/09/20/migrants-el-paso-texas-shelter/* (last visited Sept. 29, 2022).

[31] Email from City of San Diego Office of Immigration Affairs to DHS, Sept. 23, 2022.

[32] Danelle Confair, Local migrant shelter reaching max capacity as it receives hundreds per day, KGUN9 Tucson, Sept. 23, 2022, available at: *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day* (last visited Sept. 29, 2022).

[33] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[34] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[35] Priscilla Alvarez, First on CNN: A record number of migrants have died crossing the US-Mexico border, Sept. 7, 2022, available at: *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html* (last visited Sept. 30, 2022).

[36] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

[37] Valerie Gonzalez, The Guardian, Migrants risk death crossing treacherous Rio Grande river for 'American dream,' Sept. 5, 2022, available at: *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream* (last visited Oct. 11, 2022).

[38] Rescue Beacons and Unidentified Remains, Fiscal Year 2022 Report to Congress, U.S. Customs and Border Protection.

Venezuela AR_000078

**Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices **63513**

require immediate medical attention.[39] According to Panama migration authorities, of the over 31,000 migrants passing through the Darién Gap in August 2022, 23,600 were Venezuelan.[40]

These migration movements are in many cases facilitated by numerous human smuggling organizations that treat the migrants as pawns.[41] These organizations exploit migrants for profit, often bringing them through across inhospitable jungles, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico last December, and the tragic incident in San Antonio, Texas on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[42]

This new process, which will incentivize intending migrants to use a safe and orderly means to access the United States via commercial air flights, cuts out the smuggling networks. DHS anticipates it will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit.

### 6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy); the Collaborative Migration Management Strategy (CMMS); and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries. The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration. Countries that have endorsed the L.A. Declaration are committed to implementing programs and processes to stabilize communities that host migrants, or that have high outward migration. They commit to humanely enforcing existing laws regarding movements across international boundaries, especially when minors are involved, taking actions to stop migrant smuggling by targeting the criminals involved in these activities, and providing increased regular pathways and protections for migrants residing in or transiting through the 21 countries. The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[43]

This new process helps achieve these goals by providing an immediate and temporary safe and orderly process for Venezuelan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing, and other lawful pathways into the United States and other Western Hemisphere countries. It thus enables the United States to lead by example.

The process also responds to an acute foreign policy need. The current surge of Venezuelan nationals transiting the Darién Gap is impacting every country between Colombia and the SWB. Colombia, Peru, and Ecuador are now hosting almost 4 million displaced Venezuelans among them. The Government of Panama has repeatedly signaled that it is overwhelmed with the number of migrants, a significant portion of whom are Venezuelan, emerging from harrowing journeys through the Darién Gap.

Reporting indicates that in the first six months of 2022, 85 percent more migrants, primarily Venezuelans, crossed from Colombia into Panama through the Darién Gap than during the same period in 2021—including approximately 40,000 Venezuelans in September alone.[44] Again, Darién Gap migrant encounters now average more than 3,000 each day, predominantly comprised of Venezuelan nationals.

Figure 2 shows that the number of Venezuelan nationals processed by Panama after entering irregularly from Colombia increased by almost 30-fold from the week of April 1, 2022, to the week of October 1, 2022.

Figure 2: Panamanian Encounters of Venezuelan Nationals in the Darién Gap, February–September 2022

---

[39] UNICEF, 2021 Records Highest Ever Number of Migrant Children Crossing the Darien Towards the U.S., Oct. 11, 2021, available at: *https://www.unicef.org/lac/en/press-releases/2021-records-highest-ever-number-migrant-children-crossing-darien-towards-us* (last visited Sept. 29, 2022).

[40] Panamá Migración, Irregulares en Tránsito Frontera Panamá—Colombia 2022, available at: *https://www.migracion.gob.pa/inicio/estadisticos*

[41] DHS Plan for Southwest Border Security and Preparedness, DHS Memorandum for Interested Parties, Alejandro N. Mayorkas, Secretary of Homeland Security, Apr. 26, 2022.

[42] Jacob Garcia, Reuters, Migrant truck crashes in Mexico killing 54, available at: *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R* (last visited Sept. 29, 2022); Mica Rosenberg, Kristina Cooke, Daniel Trotta, The border's toll: Migrants increasingly die crossing into U.S. from Mexico, July 25, 2022, available at: *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL1N2Z247X* (last visited Oct. 2, 2022).

[43] L.A. Declaration.

[44] The Department of State Cable, 22 Panama 624.

Venezuela AR_000079

**63514**      **Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices



Note: September figure is a preliminary estimate.
Source: Panama Migration Report, September 24, 2022.

Key allies throughout the region—including the Governments of Mexico, Costa Rica, and Panama, all of which are also affected by the increased movement of Venezuelan nationals—have been seeking greater action to address these challenging flows for some time. Meanwhile, the GOM has consistently expressed concerns with policies, programs, and trends that contribute to large populations of migrants, many of whom are Venezuelans, entering Mexico. These entries strain local governmental and civil society resources in Mexican border communities in both the south and north, and have at times led to violence, crime, and unsafe and unhealthy encampments.

The United States is already taking key steps to address some of these concerns. On June 10, 2022, the Department of State's Bureau of Population, Refugees, and Migration (PRM) and the U.S. Agency for International Development (USAID) announced $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.[45] And on September 22, 2022,

PRM and USAID announced nearly $376 million in additional humanitarian assistance, which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region. This funding will further address humanitarian needs in the region.[46]

This new process adds to these efforts and enables the United States to lead by example. It is a key mechanism to advance the larger domestic and foreign policy goals of this Administration to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. It also lays the foundation for the United States to press regional partners to undertake additional actions with regards to these populations, many of which are already taking important steps. Colombia, for example, is hosting more than 2.4 million displaced Venezuelans and has provided temporary protected status for more than 1.5 million of them. Costa Rica is developing plans to renew temporary protection for Venezuelans. And on June 1, 2022, the Government of Ecuador—which is hosting more than 500,000 Venezuelans—authorized a second regularization process that would provide certain Venezuelans a

two-year temporary residency visa.[47] Any effort to meaningfully address the crisis in Venezuela will require continued efforts by these and other regional partners.

Importantly, the United States will not implement the new parole process without the ability to return Venezuelan nationals to Mexico who enter irregularly. The United States' ability to execute this process thus requires the GOM to accept the return of Venezuelan nationals who bypass this new process and enter the United States irregularly between POEs.

For its part, the GOM has made clear that in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe and orderly processes for migrants who seek to enter the United States. As the GOM makes a unilateral decision whether to accept returns of third country nationals at the border and how best to manage migration within Mexico, it is closely watching the United States' approach to migration management and whether the United States is delivering on its plans in this space. Initiating and managing this process—which is dependent on the GOM's actions—will require careful, deliberate, and regular assessment of the GOM's responses to unilateral U.S. actions and ongoing, sensitive diplomatic engagements.

This process is responsive to the GOM's desire to see more lawful pathways to the United States and is aligned with broader Administration

---

[45] The United States Announces More Than $314 Million in New Stabilization Efforts and Humanitarian Assistance for Venezuelans and Other Migrants at the Summit of the Americas, June 10, 2022, available at: *https://www.usaid.gov/news-information/press-releases/jun-10-2022-united-states-announces-more-314-million-new-*

*stabilization-efforts-venezuela* (last visited Oct. 11, 2022).

[46] The United States Announces Nearly $376 Million in Additional Humanitarian Assistance for People Affected by the Ongoing Crisis in Venezuela and the Region, Sept. 22, 2022, available at: *https://www.usaid.gov/news-information/press-releases/sep-22-2022-the-us-announces-nearly-376-million-additional-humanitarian-assistance-for-people-affected-by-ongoing-crisis-in-venezuela* (last visited Sept. 30, 2022).

[47] Venezuela Regional Crisis—Complex Emergency, June 14, 2022, available at: *https://www.usaid.gov/sites/default/files/documents/2022-06-14_USG_Venezuela_Regional_Crisis_Response_Fact_Sheet_3.pdf* (last visited Sept. 26, 2022).

Venezuela AR_000080

**Federal Register** / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices          **63515**

domestic and foreign policy priorities in the region. It will couple a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly. The goal of this process is to reduce the irregular migration of Venezuelan nationals throughout the hemisphere while we, together with partners in the region, work to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro. This process provides a safe and orderly mechanism for Venezuelan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters will initiate an application on behalf of a Venezuelan national [48] by submitting a Form I–134, Declaration of Financial Support, to USCIS for each beneficiary. Supporters can be sole individuals, individuals filing on behalf of a group, or individuals representing an entity. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United

States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Venezuela or be a non-Venezuelan immediate family member [49] and of traveling with a Venezuelan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134 on their behalf that USCIS has vetted and confirmed;

• possess a passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Venezuelan national is ineligible to be considered for parole under this process if that person is a permanent resident or dual national of any country other than Venezuela, or currently holds refugee status in any country. [50]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• failed to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar based on a prior removal order; [51]

• has crossed irregularly into the United States, between the POEs, after October 19, 2022;

• has irregularly crossed the Mexican or Panamanian borders after October 19, 2022; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child. [52]

_Travel requirements:_ Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to the United States.

_Health Requirements:_ Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at https://www.uscis.gov/venezuela.

### C. Processing Steps

Step 1: Financial Support

A U.S.-based supporter will submit a Form I–134, Declaration of Financial Support with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134 identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134 for each beneficiary they are seeking to support, including Venezuelans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the individual and any immediate family members whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS on how to create an account with myUSCIS and instructions on next steps for completing the application. The beneficiary will be required to confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive

---

[48] Certain non-Venezuelans may use this process if they are an immediate family member of a Venezuelan beneficiary and traveling with that Venezuelan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[49] See the preceding footnote.

[50] This limitation does not apply to immediate family members traveling with a Venezuelan national.

[51] See, e.g., INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[52] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

Case 6:23-cv-00007   Document 175-143   Filed on 03/24/2023 in TXSD DP Page 216 of 041

**63516**         Federal Register / Vol. 87, No. 201 / Wednesday, October 19, 2022 / Notices

instructions through myUSCIS on how to access the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice to their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[53] Approval of advance authorization to travel does not guarantee parole into the United States at a U.S. POE. That parole is a discretionary determination made by CBP at the POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Upon their arrival at a POE, each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspectional process. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to

apply for employment authorization under existing regulations. Individuals may request authorization to work from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for work authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Sunset, Renewal, and Termination*

The process is capped at 24,000 beneficiaries. After this cap is reached, the program will sunset absent a decision by the Secretary to continue the process, based on the Secretary's sole discretion. The Secretary also retains the sole, unreviewable discretion to terminate the process at any point.

*E. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[54] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[55] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[56] In addition, although under the APA, invocation of this exemption from notice-and-comment rulemaking does not require the agency to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing,[57] and DHS can make one here.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM— to provide a lawful process for Venezuelan nationals to enter the United States. The United States will

not implement the new parole process without the ability to return Venezuelan nationals who enter irregularly to Mexico, and the United States' ability to execute this process thus requires the GOM's willingness to accept into Mexico those who bypass this new process and enter the United States irregularly between POEs. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this unilateral U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now and result in definitely undesirable international consequences. It also would complicate broader discussions and negotiations about migration management. For now, Mexico has indicated it is prepared to make a unilateral decision to accept a substantial number of Venezuela returns. That willingness to accept the returns could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return nationals of Venezuela to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the rule becomes final—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the request of Mexico and key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining a strong bilateral relationship.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, in 2017 DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in

---

[53] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[54] 5 U.S.C. 553(b)(A).

[55] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[56] 5 U.S.C. 553(a)(1).

[57] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

Venezuela AR_000082

policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[58]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM described above, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[59] It would be impracticable to delay issuance in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Venezuelan nationals currently being encountered attempting to enter irregularly at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, unduly impedes DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths. Undertaking such procedures would also be contrary to the public interest because an advance announcement of this process would seriously undermine a key goal of the policy by incentivizing even more irregular migration of Venezuelan nationals seeking to enter the United States before the process would take effect.

*F. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

First, OMB has approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. USCIS is making some changes to the online form in connection with the implementation of the process described above. These changes include: requiring two new data elements for U.S.-based supporters ("Sex" and "Social Security Number");

adding a third marker ("X") in addition to "M" and "F" in accordance with this Administration's stated gender equity goals; and adding Venezuela as an acceptable option for the beneficiary's country of origin. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

Second, OMB has approved an emergency request under 5 CFR 1320.13 for a new information collection from CBP entitled *Advance Travel Authorization.* OMB has approved the emergency request for a period of 6 months and will assign a control number to the collection. This new information collection will allow certain noncitizens from Venezuela, and their qualifying immediate family members, who lack United States entry documents to submit information through the newly developed CBP ATA capability within the CBP One™ application as part of the process to request an advance authorization to travel to the United States to seek parole. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA. More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2022–22739 Filed 10–18–22; 8:45 am]
**BILLING CODE 9110–9M–P**

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–7050–N–52]**

**30-Day Notice of Proposed Information Collection: Debt Resolution Program, OMB Control No.: 2502–0483**

**AGENCY:** Office of Policy Development and Research, Chief Data Officer, HUD.
**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for an additional 30 days of public comment.
**DATES:** *Comments Due Date:* November 18, 2022.
**ADDRESSES:** Interested persons are invited to submit comments regarding

this proposal. Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to OIRA_submission@ omb.eop.gov or *www.reginfo.gov/public/ do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function.
**FOR FURTHER INFORMATION CONTACT:** Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4176, Washington, DC 20410–5000; email Colette Pollard at *Colette.Pollard@hud.gov* or telephone 202–402–3400. This is not a toll-free number. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https:// www.fcc.gov/consumers/guides/ telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

The Federal Register notice that solicited public comment on the information collection for a period of 60 days was published on March 23, 2022 at 87 FR 1479.

**A. Overview of Information Collection**

*Title of Information Collection:* Debt Resolution Program.
*OMB Approval Number:* 2502–0483.
*OMB Expiration Date:* November 30, 2022.
*Type of Request:* Revision of a currently approved collection.
*Form Number:* HUD–56141, HUD–56142, HUD–56146.
*Description of the need for the information and proposed use:* HUD is required to collect debt owed to the agency. As part of the collection process, demand for repayment is made on the debtor(s).
*Respondents:* Individuals or Households, Business or other For-Profit.
*Estimated Number of Respondents:* 648.
*Estimated Number of Responses:* 2,159.
*Frequency of Response:* 1.
*Average Hours per Response:* 1.
*Total Estimated Burden:* 590 hours.

⁵⁸ *See* 82 FR 4902 (Jan. 17, 2017).
⁵⁹ 5 U.S.C. 553(b)(B).



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV 00007
EXHIBIT
NO. 109

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' TAB 109, ECF 175-44

# Customs and Border Protection
# After Action Report (AAR)
# Mass Migration Event (MME)
# Del Rio, Texas
# September 8, 2021 – September 24, 2021
# Report Date: October 7, 2021



# United States Border Patrol

# Del Rio Sector

EXHIBIT

**43**

**Op Order Name:**    Del Rio, TX Mass Migration Event (MME)
**Report Date:**      October 5, 2021
**Authors:**          PAIC ██████████, PAIC ██████████, PAIC ██████████,
PAIC ██████████

## DATES

A. Mass Migration Event Operational Dates:  September 8, 2021 – September 24, 2021

## LOCATION

Del Rio, Texas, Del Rio Sector (DRT) ████████
████████████████████

## COMMAND

A. **Mass Migration Event Chain of Command**:

████████      Del Rio Sector (Interim) Chief Patrol Agent
              Laredo Sector Deputy Chief Patrol Agent (Incident
              Commander)
████████      Del Rio Station Patrol Agent in Charge (Deputy IC)
              Eagle Pass Station Patrol Agent in Charge (Deputy IC)
              Special Operations Detachment Patrol Agent in Charge
              (Deputy IC)

## DESCRIPTION:

A. **Executive Summary**

From September 8, 2021 to September 24, 2021, Del Rio Sector (DRT) experienced an unprecedented Mass Migration Event (MME) of primarily Haitian nationals illegally crossing into the United States that created a humanitarian crisis which overwhelmed U.S. Border Patrol (USBP), CBP and greater DHS resources.  This was the largest mass migration event in recorded history of the USBP.  A gap in intelligence dissemination and inadequate resourcing and response capabilities resulted in DRT being unprepared to initially manage the volume and speed of which migrants illegally crossed into the United States in a short period of time.  An Incident Command Post (ICP) stood up by USBP and supported by numerous federal, state, local law enforcement components, and non-governmental organizations (NGOs), led efforts to manage the MME.  During the 17-day MME, DRT, supported by internal and external partners encountered 19,752 migrants making illegal entry seeking passage into the United States.

DRT faced significant challenges when thousands of primarily Haitian nationals illegally crossed into the United States in ████ at the weir dam and accumulated underneath the Del Rio Port of Entry (DRL POE) International Bridge.  At one point, the mass of subjects underneath the bridge reached approximately 15,000 migrants from 58 different

countries. USBP, along with internal and external partners, faced conditions consistent with those of a mass casualty type event, public health and humanitarian crisis. Already faced with overcrowded temporary holding facilities and limited ground and air transport capabilities, DRT could not relocate subjects to safer facilities/environments from the bridge in an expeditious manner commensurate with the need. Many of the subjects suffering from heat exhaustion or other conditions necessitated immediate medical attention. Additionally, migrants required water and nourishment while waiting for days in areas that became increasingly unsanitary.

Supported by multiple sectors, internal and external partners, the Incident Commander (IC) employed over ███ law enforcement and support personnel to feed, provide general and medical care, transport and process the migrants over the 17-day span. On September 24, 2021, DRT transported the last remaining migrants from underneath the bridge and formally returned command of operations back to Del Rio Station. During the MME, DRT fortunately did not experience any migrant deaths, violent events, or use of force incidents.

## B. Mission Statement

CBP will protect our nation's borders, personnel, infrastructure, and ensure the health and safety of the traveling public, while managing the effects of a land mass migration surge. CBP will provide additional manpower and resources to Del Rio Sector and Field Office to ensure border security in coordination with State and Local law enforcement partners.

## C. Intelligence/ Events Leading to Event

a. Since June of 2021, in the Del Rio Station (DRS) area of responsibility, large numbers of migrants began congregating at the boundary fence near the ███████ ████████" waiting to turn themselves in to law enforcement and Border Patrol agents. There was no shelter at this location for migrants, especially families with vulnerable persons, small children and pregnant females, were consistently experiencing medical issues due to the heat and exposure to the elements.

b. On July 30, 2021, DRT implemented a temporary staging area under the DRL POE International Bridge to allow the freely congregating migrants shelter from the elements while they waited to surrender to Border Patrol agents. Due to the number of migrants congregating at this location DRT provided security, 900 feet of temporary fencing, water, four light plants, twelve port-a-potties, hand washing stations, and dumpsters to maintain sanitation and to prevent the spread of disease as much as possible with limited resources.

c. On average, between 200 to 1,000 migrants were staged under the bridge while DRT arranged for transportation to various stations and other Sectors for processing. A large portion these migrants were Haitian. The identified catalyst

Case 6:23-cv-00007    Document 47-4 Filed on 03/06/2023 in TXSD Page 94 of 129

that caused a rapid increase in migrants staged under the International Bridge was the short notice cancelation of Title 42 expulsion flights from September 8, 2021, until September 19, 2021, to Haiti. Throughput was interrupted as 900 migrants that were processed for expulsion flights had to be re-processed through other available dispositional pathways. DRT was already holding approximately 3,200 migrants in temporary holding facilities, 688% over its capacity, when the mass migration event began. The number of staged migrants rapidly increased from 2,456 on September 13, 2021, to a high of 14,921 on September 18, 2021.

**D. Timeline of Events**

Day 1: Wednesday September 8, 2021
- DRT holding 2,159 in custody / 648 unprocessed
- Title 42 Flights to Haiti Cancelled
- Total DRT POE (Bridge) Encounters 345

Day 2: Thursday September 9, 2021
- Total DRT POE Encounters 454

Day 3: Friday September 10, 2021
- Total DRT POE Encounters 486

Day 4: Saturday September 11, 2021
- Current state of DRT POE is 907 subjects under the bridge. Most are identified as Haitian migrants.
- Numbers of illegal crossings begin to rapidly increase

Day 5: Sunday September 12, 2021
- DRT holding 2,274 in custody / 1,015 unprocessed
- Additional 499 DRT POE Encounters
- A total of 1,500 migrants are reported to be staged under the DRT POE Bridge

Day 6: Monday September 13, 2021
- Additional 738 DRT POE Encounters
- A total of 2,456 migrants are staged under the DRT POE Bridge

Day 7: Tuesday September 14, 2021
- Additional 848 DRT POE Encounters
- A total of 3,171 migrants are staged under the DRT POE Bridge
- Intelligence reports 8 full charter buses arrive in Ciudad Acuna with more on the way

Day 8: Wednesday September 15, 2021
- 7,007 migrants staged under the DRT POE Bridge
- Del Rio Sector requests additional manpower and OA assistance
- Overtime guidance is updated for all USBP manpower

Day 9: Thursday September 16, 2021
- Encounters increase to over 1,000 per day and rapidly increase
- A total of 10,503 migrants are staged under the DRT POE Bridge
- Initial request to close the Del Rio POE is submitted
- ICE Aviation Operations is directed to resume Haitian flights beginning next week
- OA assistance begins to arrive in mass

Day 10: Friday September 17, 2021
- DRT holding 2,286 in custody / 1,255 unprocessed
- A total of 13,965 migrants are staged under the DRT POE Bridge
- EOC expands for additional OA tracking and transportation coordination
- Del Rio Sector begins transporting migrants to other Sectors for processing assistance
- DHS Volunteer Force reaches high water mark of ███ personnel
- Bureau of Prisons reaches high water mark of ███ personnel
- Texas DPS begins relocating up to ███ troopers to assist in securing the border
- Texas National Guard is activated and begins to arrive in Del Rio
- DRT POE closes at 1600 hours and reroutes traffic to the Eagle Pass POE.
- Eagle Pass POE entry lanes are reduced to one lane of entry for all cross-border traffic
- All Del Rio Sector Checkpoints closed
- SOG Mobile Command Center (MCC) arrives and becomes operational as ICP

Day 11: Saturday September 18, 2021
- A high-water mark of 14,921 migrants staged under the DRT POE bridge
- Outside temperature reaching 106° Fahrenheit.
- Government of Mexico (GOM) increases efforts to deter migrants in Ciudad Acuna
- GOM established 5 active checkpoints on highways leading into the State of Coahuila, Mexico.  All buses with migrants are being turned around.
- ICE ERO increases manpower support to Del Rio Sector

Day 12: Sunday September 19, 2021
- DRT holding 2,789 in custody / 1,986 unprocessed
- A total of 11,941 migrants are staged under the DRT POE bridge
- Texas DPS hits a high-water mark of ███ personnel
- First 3 Title 42 Expulsion Flights to Haiti begin
- Del Rio Police Department deployed to assist
- Kinney County Sheriff's Office deployed to assist
- Val Verde County Sheriff's Office deployed to assist

Day 13: Monday September 20, 2021
- A total of 10,413 migrants are staged under the DRT POE bridge
- HHS DMAT reaches high water mark of ███ personnel for medical assistance
- San Antonio Fire Department personnel arrive for medical assistance

Case 6:23-cv-00007    Document 47-4  Filed on 03/06/23 in TXSD    Page 226 of 29

- HSI reaches high water mark of ███ personnel
- OFO begins processing migrants at the Export Lot and Passport Control Area.
- Prosecution accepted for migrant bus event in Sarita, Texas (escape)

Day 14: Tuesday September 21, 2021
- A total of 8,556 migrants are staged under the DRT POE bridge
- ICE ERO reaches high water mark of ███ personnel
- Expulsion flights continue to Haiti

Day 15: Wednesday September 22, 2021
- DRT holding in custody 2,745 / 1,103 unprocessed
- A total of 4,994 migrants are staged under the DRT POE bridge
- OFO manpower reaches a high-water mark of ███ officers
- USBP manpower reaches a high-water mark of ███ agents

Day 16: Thursday September 23, 2021
- DRT holding 3,216 in custody / 1,059 unprocessed
- A total of 3,447 migrants are staged under the DRT POE bridge

Day 17: Friday September 24, 2021
- DRT holding 2,959 in custody / 743 unprocessed
- All migrants moved to processing facilities. Zero (0) remain under the DRT POE bridge
- Demobilization begins and OA support begins to reduce
- Operational control of DRT POE is transferred back to Del Rio Station PAIC
- Del Rio POE issues a press release for the re-opening of the port at 1600 hours



Case 6:23-cv-00007   Document 125-14   Filed on 08/07/23 in TXSD   Page 87 of 129

E. **Statistics/ Outcomes based on the information from e3 (All statistics are preliminary, subject to change, and should be considered unofficial)**

   a. Total Encounters (T8 and T42): 19,752
- No Entry Zone Confirmed: 107
- Del Rio Zone ▉: 19,538
- 5 Encounters (Mexican Nationals) are amenable to Title 42 immediate and therefore do not have an assigned Zone in e3

   b. Disposition Breakdown:
- Deportable Apprehensions (T8): 13,926
- Title 42 Delayed (T42): 5,821
- Title 42 Immediate (T42): 5

   c. Demographics:
- Family Unit (FMUA): 10,646
- Single Adults (SAs and FMGs): 9,047
- Unaccompanied Children (UACs): 59

   d. Peak Holding at POE Bridge was 14,921 on 9/18/2021

   e. Peak Day: 09/21/2021 had a total of 2,958 encounters

   f. Highest in custody number 3,216 on 9/23/2021 (DRT only)

   g. Citizenship:
- A total of 58 unique Countries of Citizenship were encountered.
- Top 5 Countries (95% of all encounters):
  1. Haiti: 13,893 (70%)
  2. Chile: 2,146 (11%)
  3. Cuba: 1,210 (6%)
  4. Venezuela: 1,077 (5%)
  5. Brazil: 489 (2%)
- Haitian subjects traveled through multiple countries prior to entering the United States. Some subjects from Chile, Brazil, or other countries may belong to Haitian Family Units but have citizenship in the country in which they were born.
- See Country Breakdown (Annex A) for a full list of the 58 countries and encounters.

   h. Total number processed for Title 42 expulsion to Haiti was 4,435 with 3,440 expelled during the reporting period.
- As of September 30, 2021, 6,085 Haitians have been expelled by aircraft (additional flights are expected)

   i. There were ▉▉▉ Law Enforcement and support personnel who responded to the MME (Refer to Annex B for agency breakdown)

   j. Contracts for 139 porta potties, 28 hand washing stations, and 8 bulk trash bins were used to support the migrants (this was wholly insufficient but also exhausted total regional supplies)

    k.  Red Cross provided 17,000 hygiene kits (each kit contained a razor blade that had to be removed prior to issuance)

    l.  World Central Kitchen and local contracted vendors provided 14,000 meals daily to migrants on average.

    **m.**  CBP medical personnel responded to 672 calls for assistance to evaluate and treat migrants.  A total of 425 migrants required advanced care and were referred to HHS DMAT medical personnel.  Migrants were treated for a variety of issues ranging from seizures to respiratory distress.  Medical teams delivered one baby at the POE bridge and 10 others were born at local hospitals.  A total of 16 migrants were transported to local hospitals after being evaluated by DMAT medical personnel.  **There were zero (0) deaths during the MME.**

    n.  Border Patrol Search and Rescue teams successfully performed 56 water rescues in the Rio Grande River.  Most water rescues occurred on September 23, 2021 (53 rescues)

    o.  ██ transport buses and ██ transport vans were surged into Del Rio for assistance. (There actual requirement was ██ busses, but the requirement could not be met from current government/private sector supplies)

- ██ USBP buses
- ██ Contract Services buses
- ██ United States Marshal Service buses
- ██ Bureau of Prison buses
- ██ leases buses
- ██ Vans
- ██ contracted vans

**F.  Law Enforcement and Support Partners**

    a.  Air and Marine Operations

    b.  Office of Field Operations

    c.  Department of Homeland Security Volunteer Force

    d.  Immigration and Customs Enforcement, Enforcement and Removal Operations Special Response Team (ERO/SRT)

    e.  Homeland Security Investigations Special Response Team (HSI/SRT)

    f.  Department of Justice (DOJ) Bureau of Prisons (BOP)

    g.  Health and Human Services (HHS)

    h.  Texas Department of Public Safety (DPS)

    i.  Texas Military Department (Texas National Guard)

    j.  Val Verde County Sheriff's Office (VVSO)

    k.  City of Del Rio, Mayor's Office

    l.  Del Rio Police Department (DRPD)

    m.  Texas Parks and Wildlife Department (TPWD)

    n.  San Antonio Fire Department (FDSA)

    o.  Texas Intrastate Fire Mutual Aid System (TIFMAS)

    p.  National Institute of Migration of Mexico (INM)

q. Mission Border Hope (NGO, Eagle Pass, TX)
r. Val Verde Border Humanitarian Coalition (NGO, Del Rio, TX)
s. World Central Kitchen (NGO)

## G. Roles and Responsibilities

The U.S. Border Patrol was the lead Component charged with managing the MME due to statutory authority. The Incident Command Post (ICP) was stood up on September 16, 2021, and the Incident Commander (IC) was responsible for coordination with supporting federal, state, local partners, and non-governmental organizations. The IC conducted daily operational briefs with supporting partners for situational awareness as well as task assignments. Responsibilities were broken down into the support categories of Administrative Support, Intelligence Support, Operational Support, Logistical Support and Medical Support. The DRT Sector Chief maintained responsibility of controlling the outer perimeter and security patrols within the crowds in the containment zone, which afforded the ability to provide security and immediate medical assistance when necessary



## H. Technical Performance

The current processing pathways in place are adequate for normal migrant and seasonal flow. However, the sheer volume of the mass migration overwhelmed throughput within CBP, ICE, and HHS. Personnel, CBP facility holding/detention capacities, and transportation (ground and air) are wholly insufficient to safely manage this type of Mass Migration event. Synchronization between USBP and ERO manifests continues to evolve to decrease processing and transfer of custody time.

## I. Equipment Performance

All equipment performed as expected. Del Rio Sector and CBP Facilities, Maintenance, and Equipment (FM&E) facilitated many contracts in support of life sustaining functions

Haiti AR 000950

Case 6:23-cv-00007   Document 145-44   Filed on 03/18/2023 in TXSD DP Page 86 of 291

for migrants and personnel assisting with operations, security, and support. Equipment not readily available to CBP was contracted through local vendors.

**J. Finance and Resources**
   a. Del Rio Sector Finance Office continues to work through pending acquisitions and reconciliation processes. Actual figures are expected to fluctuate as reimbursements and fiscal year closeouts continue.
   Estimates are current as of October 7, 2021.
   b. DRT Sector Expenses:
   c. OFAM / FM&E Expenses:
   d. PMOD Expenses:
   e. SPAD Expenses:
   f. Border Patrol TDY estimate per day
   g. Overtime cost estimate
   h. HHS DMAT cost estimate:
   i. Loyal Source Contract for 13 days:
   j. Sanitation Expenses:
   k. Del Rio Sector weekly fuel cost:
   l. Ground Transportation:
   m. ICE flight cost
   n. Department of Defense flight support cost estimate -
   o. DHS Volunteer Force
   **p. Total DRT / Border Patrol Cost Estimate:**
   q. Additionally, Office of Field Operations (OFO) reported a loss of an average of ▮ daily in estimated duties and fees collected as well as an estimated ▮ lost in import value.

**K. Safety Concerns**

Ensuring the safety of migrants, law enforcement, and support personnel was the first line of effort for the IC.

   a. The Del Rio POE closure mitigated potential risk to all personnel below the bridge.
   b. A Temporary Flight Restriction (TFR) was put in place for the safety and security of the migrants and the numerous law enforcement aviation assets supporting operations. Media and privately owned drones caused a concern and the TFR provided an effective way to mitigate safety issues while allowing operations to continue uninterrupted.
   c. AMO was able to synchronize aviation support and leverage local organic resources to provide ISR capabilities to maintain situational awareness and enhance officer safety on a 24 hour cycle.
   d. Local and national media requests for drone coverage were coordinated through the DRT Strategic Communications Office.

e.  CBP EMTs were immediately requested and redirected to support medical needs.
f.  COVID exposure and other contagious disease spread in a mass migration event continues to be a safety issue for law enforcement and the general public. Multiple CBP employees deployed to Del Rio reported testing positive for COVID either during or immediately after their deployment as well as one agent contracting SCABIES infection.
g.  FBI continually monitored information from both anti-law enforcement and anti-immigrant threat groups. Many National Security issues were mitigated during the mass migration event to include two special interest migrants with national security concerns being apprehended and the interception of a possible violent actor at the Del Rio Port of Entry.

**L.  Communication of Directions, Events and Changes to Plans**

Incident command conducted daily scheduled and hasty meetings with all executive leaders throughout the MME. Communication was adequate to ensure operational expectations and requirements were clear for supporting law enforcement personnel. On-site visits by Headquarters personnel and White House officials ensured the full scope of the event was understood for maximum support of resources and planned actions.

**M.  Strategic Communications**

Strategic Communications (StratCom) and CBP Public Affairs (PA) are a critical role to ensure leadership at all levels as well as the media and the general public have the perspective of the agents on the ground managing the MME. Both DRT StratCom and CBP PA are co-located in Del Rio and synchronizes the messaging. Del Rio Sector StratCom had been messaging the use of the bridge as a staging location for large groups of migrants arriving since July 31, 2021. This created an advantage with the Del Rio Mayor and local law enforcement officials as they were already aware of the situation before the mass migration event occurred. Del Rio Sector had previously posted the use of the bridge and current situation on social media, new articles, distributed photos, and even had Congressional visits at the location before the mass migration event.

On September 13, 2021, numbers staged at the bridge began to rapidly increase. Due to the previous engagements with the City of Del Rio, resources began to arrive in support of the efforts. Messaging was put on hold until press conferences could be held that were approved by the Office of Public Affairs (OPA). The only messaging that StratCom released was the POE closure to the Office of Congressional Affairs (OCA) on September 17, 2021. Media and community members were the only entities distributing information which caused the Border Patrol to lose control of the messaging.

Chief Ortiz provided a short interview with local KENS 5 on September 17, 2021 and held a formal press conference on September 19, 2021. The DHS Secretary also held a press conference on September 20, 2021. Headquarters approval was required for all social media posts. The early and consistent release of unconstrained accurate messaging

Case 6:23-cv-00007   Document 175-44   Filed on 03/24/2023 in TXSD Page 81 of 231

from the Border Patrol would have provided a more holistic view to the public and other law enforcement agencies.

Detailing media support and additional StratCom personnel early in the crisis was needed to manage multiple site visits which overwhelmed the small Del Rio StratCom team.

### N. Environmental Concerns

Summer temperatures reached as high as 106° and weather threatened the safety of the migrants that illegally crossed the border and the law enforcement personnel managing on scene issues. Additionally, migrants had no water, food, or shelter to protect themselves from the environmental hazards. Medical support was needed for on-site assistance for minor and advanced medical care. CBP EMTs were the first to surge to the area followed by HHS DMAT personnel for an increased capability and capacity. Zero fatalities occurred during the MME.

### O. Physiological Impacts (Stress and Fatigue Impact)

The chaotic scene and high level of coordination required long hours of work in a very stressful environment. Leadership and personnel performing tasks to care for the migrants endured physical and mental exhaustion to ensure solutions were carried through to manage the MME. Mandated overtime further reduced rest cycles. The arrival of additional high-level leadership and detailers was needed early in the mass migration event to reduce physical and physiological impacts. CBP, State and Local law enforcement as well as all support personnel rose to the challenges of the crisis that produced a highly successful resolution of the MME.

### Lessons Learned (issues/ recommendations)

### A. Title 42 Flights Cancelled
   a. On September 8, 2021, DRT Staff was informed by ICE/ERO that Title 42 flights supporting the expulsion of migrants from the United States would be cancelled. USBP was required to reprocess hundreds of migrants under Parole ATD, which created an immediate backlog of nearly over 1000 migrants. Additionally, it is believed the halt in expulsions was communicated immediately within the Haitian population creating an added pull factor and a rush to cross illegally into the U.S.
   b. In lieu of Title 42 expulsion and expected termination of CDC Tile 42 authority, USBP and DHS partners should seek alternative options to immediately remove amenable migrants from custody upon completion of processing.
   c. Advanced warning needs to be given when expulsion flights are cancelled in order to avoid a disruption in throughput due to re-processing requirements.

### B. Del Rio POE Closure
   a. DRT Staff coordinated with DRL Staff for several days prior to the closure of the DRL POE. On September 16, 2021, USBP formally made the request the close the Del Rio POE due to increasing number of migrants under the bridge and for

Case 6:23-cv-00007   Document 175-44 Filed on 07/06/2023 in TXSD Page 91 of 291

security and safety concerns. On the evening of September 17, 2021, the Del Rio Field Office closed the Del Rio POE. Additionally, the Eagle Pass POE, the nearest POE (approximately 50 miles away) was reduced to one lane due to OFO manpower supporting the MME. The closures resulted in significant delays for all essential and commercial cross border travel from Ciudad Acuna to Piedras Negras.

b. In future MMEs, POE closures should be considered, discussed, and planned with OFO to be engaged swiftly to address security concerns. The POE closure mitigated risks to the migrants directly below the bridge, POE footprint security, and allowed Mexican authorities an opportunity to disperse migrants staged along the Rio Grande River, thus reducing cross border activity at the Weir Dam and the Boat Ramp crossings.

### C. Migrant Transportation Coordination (Busses)

a. DHS lacked sufficient transportation and there was no mass transportation coordination mechanism within the Department to relocate the mass of migrants in Del Rio. CBP and ERO transportation capabilities were also limited. DOJ Bureau of Prisons assisted CBP by providing busses and drivers that could drive beyond the time restrictions set forth in current CBP transportation contracts. The Commissioner's Action Group (CAG) assisted with the reallocation of CBP contracted buses and communicated directly with the IC to coordinate additional transportation throughout the Southern United States and to Haiti as well.

b. Establish a scalable, high capacity CBP transportation contract. A scalable contract will allow CBP to increase or redirect contracted transportation assets throughout the nation or throughout established regions to better support sectors when migrant flows develop and or evolve.

c. Establish inter and intra agency MOUs to expand transportation capacity immediately within hours, not days.

d. As the MME emerged, DRT expanded their sector transportation cell from a minimally staffed coordination element that mostly coordinated movement within sector to a fully staffed unit comprised of subject matter experts who coordinated detainee movement from the incident site to CPCs and stations in and outside of DRT.

### D. ERO Manifest Issues

a. USBP does not have access to ERO systems of record utilized for passenger manifests, nor does ERO have access to USBP's detention module in e3. This lack of access forces USBP agents to manually enter names and dates of birth to generate manifest rosters for ERO. This process is not efficient -- the process to generate a manifest for an expulsion flight of 130 passengers requires 8-man hours to produce from DRT personnel alone.

b. USBP and ERO systems must be linked to generate passenger manifests more efficiently, or DHS should have a singular processing system that accommodates

Case 6:23-cv-00007   Document 175-44   Filed on 03/8/2023 in TXSD   Page 104 of 291

all Departmental requirements from intake/processing, care and custody, and finally book-out/manifesting. It is also recommended USBP maintain ERO teams imbedded onsite at USBP sectors or temporary holding facilities to expedite manifest coordination.

   c. CBP and ERO functions in a mass migration event are intertwined with what CBP interdicts. Greater volumes of people need to be swiftly and effectively moved by ERO to expanded ERO holding capacities across the nation.

## E. Lead Field Command Construct

   a. The Lead CBP Field Coordinator (LFC) construct provides an identified CBP leader directed to develop and maintain a regional based preparedness plan that incorporates coordinated planning and leverages the resources and capabilities of all CBP Components within a region. Although the Del Rio MME warranted unified emergency and humanitarian responses from CBP, DHS, and local law enforcement resources, the LFC construct was not activated.

   b. It is recommended for CBP leadership to consider at what point during a crisis, such as the Del Rio MME, a LFC activation is warranted. Trigger points may need to be identified that would assist with LFC activation requirements.

## F. Detention Capacity

   a. Del Rio Sector's (DRT) total detention capacity is ▓▓▓▓ and has been averaging 500 percent over capacity at any given time which results in excessive time-in-custody and overcrowding at every station, including the soft side processing facility in Eagle Pass. DRT, along with USBP Sectors along the Southwest Border (SWB), continue to experience overcrowding at levels not seen before. There is no indication that ICE/ERO detention capacity will ever increase to meet the flow of migrants illegally entering the Unites States through Del Rio Sector or any SWB sector. ICE/ERO needs to immediately address their shortfall in holding capacity across the nation.

   b. It is recommended that USBP HQ in collaboration with ICE ERO take ownership of the detention space problem and, with the support of all pertinent DHS partners, embark on a Regional Processing and Detention Centers (RPDC) initiative that will alleviate overcrowding in DRT, LRT, and RGV (specifically) as well as the rest of the SWB. Multiple RPDC facilities centrally located in the southwest or south-central area of Texas and supported by DHS ICE partners would be responsible for Housing, Processing, and the proper disposition of migrants. The centers would also serve and the central transportation coordination hub. Initial holding capacities ▓▓▓▓ should be scalable and gauged by current in custody numbers, projections for evolving large migration volume headed to our southwest border, and processing times.

Case 6:23-cv-00007   Document 175-44   Filed on 07/28/2023 in TXSD   Page 115 of 291

**G. Designated Areas at IC for Supporting Agencies**

    a. Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP). The ICP in Del Rio was comprised of a Mobile Command Center (MCC) provided by USBP SOG. The MCC was located approximately 100 yards away from the migrant staging area. Although AMO, ERO and Texas DPS had representation in the ICP, no other supporting components or agencies were staged nearby.

    b. When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements. Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.

**H. Regional Mobile Command Centers**

    a. DRT does not possess its own MCC and therefore requested SOG's MCC which arrived on September 17, twenty-four hours after it was requested. Prior to establishing a location for the ICP, the IC staff maintained a mobile posture on foot or in vehicles.

    b. The IC recommends the procurement of sector MCCs to support future incidents. At a minimum, one MCC could support multiple sectors using a regional concept. For example, one centrally located MCC could support incidents from Rio Grande Valley to Del Rio Sector. This should evolve to every sector having an MCC with further ability to create expanded climate-controlled IC tent structures to supplement for multiple LE partner collaboration.

**I. Personnel Lodging**

    a. There were ▮▮▮ law enforcement, first responder, and support personnel (internal and external to DHS) supporting the Del Rio MME. Del Rio, TX has an approximate population of 36,000 and limited lodging options throughout the local and regional economies. Many deployed personnel could not secure lodging within a 55-mile radius and traveled over 100 miles from their lodging sites to the Del Rio POE daily. DRT coordinated with the City of Del Rio to secure 500 retrofitted lodging spaces at the local convention center through contractual services made available to DHS employees.

    b. At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.

**J. Sensitive Compartmented Information Facilities (SCIF)**

    a. The dissemination of relevant information for MMEs is critical for Sectors when preparing for mass migration management, and all other law enforcement operations. Most USBP Sectors do not have the ability to communicate high-

Case 6:23-cv-00007    Document 175-44 Filed on 08/18/2023 in TXSDP Page 216 of 291

      level law enforcement and sensitive information from the Intelligence Community (IC) without Sensitive Compartmented Information Facilities (SCIF).

    b. All USBP Sectors must have access to SCIFs located at designated sites within a sector or within reasonable commuting distances to receive pertinent IC information or other sensitive law-enforcement information. Even portable solutions like Yuma Sector's capability would be acceptable access. DHS needs to invest in SCIF buildouts for all USBP Sectors.

### K. Department of Defense (DoD) Crisis Response Force (CRF) Support

    a. Even with the combined resources from DHS and DOJ, DRT experienced significant challenges at the onset of the mass migration event (MME). The most significant challenges were the transportation, housing, feeding, security, and welfare of migrants.

    b. Sectors planning for an MME should consider Department of Defense (DoD) Requests for Assistance (RFA) for Crisis Response Force (CRF) elements. The CRF was an approved duty description for RFA FY21 however, DoD did not approve the CRF for RFA FY22. A separate or updated RFA is required for this function to be available to CBP during a mass migration event. A CRF would provide DHS with assistance to enhance force protection, medical, aviation, and engineering capabilities. More specifically, the CRF should include additional support functions to include CDL Drivers, high-capacity Transportation Vehicles, high-capacity Field Holding Structures, security functions associated with the stand up of high-capacity field holding structures, medical, and high-capacity fixed wing support for moving both CBP personnel and migrants. DoD RFAs are submitted through the CBP Executive Agent as requirements are identified by CBP. This RFA needs to be approved yearly, all associated actions executable with preset timelines when CBP identifies emerging incidents and continues to evolve with the expanding MME problem sets impacting the country.

    c. The speed, number, and frequency of MMEs require DoD pre-coordinated assistance that is immediately responsive and agile. DHS always looks internally before seeking assistance outside the department. CBP currently does not have the organic resources to fill the various capability gaps identified during large mass migration events.

### SUMMARY

The seventeen (17) day Mass Migration Event (MME) required a whole of government response to ensure the safety, rapid transport, and efficient processing of migrants from 58 different countries that illegally crossed into the United States and congregated under the Del Rio Port of Entry International Bridge. The MME was unlike anything that CBP had encountered in its history and at its peak, 14,921 migrants were staged under the bridge. CBP temporary holding facilities were already over capacity and local resources were inadequate to manage the speed and volume of migrants flowing into the United States. State, Local, and Community partners

responded to CBP's support request and exhausted all available resources to assist in managing the event.  All Southwest Border Patrol Sectors assisted by sending personnel and resources to Del Rio and hundreds of Border Patrol agents and CBP officers from across the country arrived to assist.

A massive effort to care for the migrant's safety and basic needs was underway as ground and air transportation relocated thousands of migrants to facilities across the Southwest Border for processing.  This unprecedented historical response to the MME successfully prevented any loss of life and treated hundreds of migrants in need of medical assistance.  The Office of Field Operations played a key role in assisting the Border Patrol and in the closure of the Port of Entry was the turning point that increased safety and gained a greater response from the Government of Mexico and officials in the National Capital Region.  The response by the State of Texas and the surge of Department of Public Safety Troopers was monumental.

Intelligence and open-source reporting have indicated that tens of thousands more migrants are traveling to the southern border of the United States that intend to make illegal entry. Transnational Organized Crime (TOC) elements have exploited policy changes and are facilitating the movement of migrants through the Western Hemisphere to the U.S. Southern Border with profit being the primary driving factor.  National Security continues to be at greater risk as CBP collapses resources and personnel to manage large groups of migrants.  TOC will continue to exploit our border in areas left vulnerable while CBP attends to MME as they occur. Policy changes and increased capacity and capabilities of all components and agencies that have a role in Border Security and thereby National Security, the immigration process, and the detention/adjudication continuum are needed for the humane and efficient management of mass migration.

### ANNEXES:

- Annex A: Country Breakdown of Encounters
- Annex B: Supporting Personnel and Asset List
- Annex C: Photos


End of Report

Case 6:23-cv-00007   Document 175-44   Filed on 03/24/23 in TXSD   Page 110 of 231

### ANNEX A: Country Encounter Breakdown (September 8, 2021 to September 24, 2021)

| Country | Deportable Apprehensions | T42 Delayed | T42 Immediate | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 1 | 0 | 0 | | 0% |
| ANGOLA | 49 | 0 | 0 | | 0% |
| ARGENTINA | 3 | 0 | 0 | | 0% |
| BAHAMAS | 2 | 0 | 0 | | 0% |
| BANGLADESH | 1 | 0 | 0 | | 0% |
| BENIN | 1 | 0 | 0 | | 0% |
| BOLIVIA | 6 | 0 | 0 | | 0% |
| BRAZIL | 375 | 114 | 0 | 489 | 2% |
| BURKINA FASO | 18 | 1 | 0 | | 0% |
| CAMEROON | 14 | 1 | 0 | | 0% |
| CENTRAL AFRICAN REPUBLIC | 2 | 0 | 0 | | 0% |
| CHAD | 3 | 0 | 0 | | 0% |
| CHILE | 1,628 | 520 | 0 | 2,146 | 11% |
| COLOMBIA | 62 | 0 | 0 | | 0% |
| CONGO | 11 | 0 | 0 | | 0% |
| COSTA RICA | 6 | 0 | 0 | | 0% |
| CUBA | 1,204 | 5 | 0 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | | 0% |
| DEM REP OF THE CONGO | 12 | 0 | 0 | | 0% |
| DOMINICAN REPUBLIC | 54 | 1 | 0 | | 0% |
| ECUADOR | 35 | 12 | 0 | | 0% |
| EL SALVADOR | 4 | 8 | 3 | | 0% |
| EQUATORIAL GUINEA | 2 | 0 | 0 | | 0% |
| ERITREA | 5 | 0 | 0 | | 0% |
| ETHIOPIA | 1 | 0 | 0 | | 0% |
| FRANCE | 2 | 1 | 0 | | 0% |
| FRENCH GUIANA | 5 | 0 | 0 | | 0% |
| GAMBIA | 2 | 0 | 0 | | 0% |
| GHANA | 50 | 0 | 0 | | 0% |
| GUATEMALA | 4 | 9 | 0 | | 0% |
| GUINEA | 23 | 0 | 0 | | 0% |
| GUYANA | 9 | 0 | 0 | | 0% |
| HAITI | 8,878 | 5,015 | 0 | 13,893 | 70% |
| HONDURAS | 22 | 54 | 2 | | 0% |
| MALI | 3 | 0 | 0 | | 0% |
| MAURITANIA | 5 | 0 | 0 | | 0% |
| MEXICO | 31 | 69 | 0 | | 1% |
| NICARAGUA | 169 | 1 | 0 | | 1% |
| NIGER | 3 | 0 | 0 | | 0% |
| NIGERIA | 9 | 0 | 0 | | 0% |
| PAKISTAN | 5 | 0 | 0 | | 0% |
| PANAMA | 12 | 1 | 0 | | 0% |
| PAPUA NEW GUINEA | 1 | 0 | 0 | | 0% |
| PERU | 19 | 0 | 0 | | 0% |
| PHILIPPINES | 1 | 0 | 0 | | 0% |
| SAO TOME AND PRINCIPE | 1 | 0 | 0 | | 0% |
| SENEGAL | 48 | 2 | 0 | | 0% |
| SIERRA LEONE | 5 | 0 | 0 | | 0% |
| SOMALIA | 4 | 0 | 0 | | 0% |
| SOUTH AFRICA | 4 | 0 | 0 | | 0% |
| SURINAME | 1 | 0 | 0 | | 0% |
| TAJIKISTAN | 2 | 0 | 0 | | 0% |
| TOGO | 4 | 0 | 0 | | 0% |
| TURKEY | 5 | 0 | 0 | | 0% |
| URUGUAY | 23 | 0 | 0 | | 0% |
| UZBEKISTAN | 9 | 0 | 0 | | 0% |
| VANUATU | 1 | 0 | 0 | | 0% |
| VENEZUELA | 1,071 | 6 | 0 | 1,077 | 5% |
| **Total** | 13926 | 5921 | 5 | 19752 | |

| Country | FMUA | Single Adults | UAC | Total | % of Encounters |
|---|---|---|---|---|---|
| ANDORRA | 0 | 1 | 0 | | 0% |
| ANGOLA | 35 | 12 | 2 | | 0% |
| ARGENTINA | 2 | 1 | 0 | | 0% |
| BAHAMAS | 1 | 1 | 0 | | 0% |
| BANGLADESH | 0 | 1 | 0 | | 0% |
| BENIN | 0 | 1 | 0 | | 0% |
| BOLIVIA | 2 | 4 | 0 | | 0% |
| BRAZIL | 485 | 4 | 0 | 489 | 2% |
| BURKINA FASO | 9 | 10 | 0 | | 0% |
| CAMEROON | 0 | 15 | 0 | | 0% |
| CENTRAL AFRICAN REPUBLIC | 0 | 2 | 0 | | 0% |
| CHAD | 3 | 0 | 0 | | 0% |
| CHILE | 2,144 | 1 | 0 | 2,146 | 11% |
| COLOMBIA | 35 | 27 | 0 | | 0% |
| CONGO | 8 | 3 | 0 | | 0% |
| COSTA RICA | 5 | 1 | 0 | | 0% |
| CUBA | 219 | 988 | 3 | 1,210 | 6% |
| CZECH REPUBLIC | 2 | 0 | 0 | | 0% |
| DEM REP OF THE CONGO | 10 | 1 | 1 | | 0% |
| DOMINICAN REPUBLIC | 26 | 29 | 1 | | 0% |
| ECUADOR | 32 | 15 | 0 | | 0% |
| EL SALVADOR | 8 | 6 | 1 | | 0% |
| EQUATORIAL GUINEA | 0 | 2 | 0 | | 0% |
| ERITREA | 0 | 5 | 0 | | 0% |
| ETHIOPIA | 0 | 1 | 0 | | 0% |
| FRANCE | 3 | 0 | 0 | | 0% |
| FRENCH GUIANA | 4 | 1 | 0 | | 0% |
| GAMBIA | 0 | 2 | 0 | | 0% |
| GHANA | 16 | 34 | 0 | | 0% |
| GUATEMALA | 10 | 3 | 0 | | 0% |
| GUINEA | 3 | 17 | 3 | | 0% |
| GUYANA | 9 | 0 | 0 | | 0% |
| HAITI | 6,805 | 7,063 | 25 | 13,893 | 70% |
| HONDURAS | 45 | 25 | 8 | | 0% |
| MALI | 1 | 2 | 0 | | 0% |
| MAURITANIA | 0 | 5 | 0 | | 0% |
| MEXICO | 27 | 71 | 2 | | 1% |
| NICARAGUA | 69 | 98 | 3 | | 1% |
| NIGER | 3 | 0 | 0 | | 0% |
| NIGERIA | 4 | 5 | 0 | | 0% |
| PAKISTAN | 0 | 5 | 0 | | 0% |
| PANAMA | 12 | 1 | 0 | | 0% |
| PAPUA NEW GUINEA | 0 | 1 | 0 | | 0% |
| PERU | 12 | 7 | 0 | | 0% |
| PHILIPPINES | 1 | 0 | 0 | | 0% |
| SAO TOME AND PRINCIPE | 0 | 1 | 0 | | 0% |
| SENEGAL | 3 | 47 | 0 | | 0% |
| SIERRA LEONE | 4 | 1 | 0 | | 0% |
| SOMALIA | 0 | 4 | 0 | | 0% |
| SOUTH AFRICA | 0 | 4 | 0 | | 0% |
| SURINAME | 1 | 0 | 0 | | 0% |
| TAJIKISTAN | 0 | 2 | 0 | | 0% |
| TOGO | 0 | 4 | 0 | | 0% |
| TURKEY | 0 | 1 | 0 | | 0% |
| URUGUAY | 20 | 2 | 1 | | 0% |
| UZBEKISTAN | 0 | 9 | 0 | | 0% |
| VANUATU | 0 | 1 | 0 | | 0% |
| VENEZUELA | 569 | 500 | 8 | 1,077 | 5% |
| **Total** | 10,646 | 9,047 | 59 | 19,752 | |



Case 6:23-cv-00007   Document 175-44 Filed on 03/08/2023 in TXSD Page 620 of 291

Annex C
Photo Annex
Del Rio Mass Migration Event

LAYDOWN at ONSET



BUILDUP



Case 6:23-cv-00007   Document 175-44 Filed on 03/04/2023 in TXSD Page 72 of 291

Annex C
Photo Annex
Del Rio Mass Migration Event

FINAL LAYDOWN





Case 6:23-cv-00007   Document 175-44   Filed on 03/24/23 in TXSD   Page 128 of 291

Annex C
Photo Annex
Del Rio Mass Migration Event

September 16, 2021



September 17, 2021



Case 6:23-cv-00007   Document 175-44   Filed on 03/24/23 in TXSD   Page 128 of 291

Annex C
Photo Annex
Del Rio Mass Migration Event

September 18, 2021



September 19, 2021



Case 6:23-cv-00007   Document 175-44   Filed on 03/24/23 in TXSD   Page 24 of 71

Annex C
Photo Annex
Del Rio Mass Migration Event

September 22, 2021



September 22, 2021



Case 6:23-cv-00007   Document 195-44   Filed on 07/8/2023 in TXSD   Page 125 of 291

Annex C
Photo Annex
Del Rio Mass Migration Event

September 23, 2021



September 24, 2021



Haiti AR 003407
ARC13546

Case 6:23-cv-00007   Document 175-44   Filed on 07/24/23 in TXSD   Page 526 of 291

Annex C
Photo Annex
Del Rio Mass Migration Event





Case 6:23-cv-00007   Document 175-44   Filed on 03/24/23 in TXSD   Page 532 of 791

## Del Rio Mass Migration 09/2021
### Known Costs

| Del Rio Surge Requirements | Projected O&S Costs | O&S Obligations |
|---|---|---|
| HHS Disaster Medical Assistance Team (DMAT) & Caregiver Services | | |
| Transportation Costs | | |
| Operational Costs | | |
| TDY | | |
| Overtime | | |
| Volunteer Force | | |
| AMO Flight Hours | | |
| Soft-Sided Facilities (SSF) and Medical Service Contract (MSC)** | | |
| Del Rio Surge Requirements Total | | |

* FY22 Q1 Projected Costs are not provided specific to Del Rio given they are embedded in the overall SWB costs.

** Soft-Sided Facilities and Medical Service Contract costs are not specific to Del Rio; they are embedded in the overall SWB contracts.

Operational Costs include water, food, Del Rio Civic Center, porta-johns, sanitary products, bridge trash clean-up, consumables for safety and sustainment.

TDY, OT, and Volunteer Force are estimates for Del Rio based on latest obligations; Del Rio Sector costs are embedded within overall SWB costs.

Hall/AR01948

Case 6:23-cv-00007   Document 195-14 Filed on 03/08/2023 in TXSD Page 42 of 121

**Surge Planning Considerations – Emerging Actions from Del Rio Mass Migration Event**

**September 8, 2021, to September 24, 2021**

Del Rio Sector (DRT) experienced an unprecedented number of migrant apprehensions that placed DRT in a critical state by overwhelming transportation, processing, and detention capacities. A complex issue quickly became chaotic as Emergency Operations increased and multiple components and outside agencies surged manpower and resources to the area. The unique situation did not allow for best practices to be implement and emerging practices became the path forward for a crisis event the Border Patrol had not encountered in its history.

**Emerging Practices and Response Considerations:**

- Activate the Region VI or Region IX LFCs
  - ➢ The Lead CBP Field Coordinator (LFC) is directed to develop and maintain a CBP Region Preparedness Plan that incorporates the coordinated plans and leverages the resources and capabilities of each OBP, OFO, and AMO component within the region.
  - ➢ The CBP Region Preparedness Plan will establish a CBP Region Mass Migration Task Force (MMTF). The MMTF provides the organizational framework to facilitate the assignment of roles to participating agencies, define processes for intra-departmental collaboration, and detect a mass migration event or other contingency operation.
  - ➢ Operation Vigilant Sentry Southwest describes the basic organization and structure by which the MMTF will deploy resources and direct multi-agency operations to address a potential or full-scale mass migration event.
- Plan according to a Mass Casualty Type Event:
  - ➢ Increase capacity and capability for feeding, medical, transportation, and holding.
  - ➢ Contracts were established with local restaurants to prepare meals. World Central Kitchen brought in for meal prep and distribution. They also consolidated local meal contracts into one CBP contract.
  - ➢ Sector MSS personnel were used to receive and distribute food and water while uniformed agents continued security and transport operations.
  - ➢ HHS DMAT (Disaster Medical Assistance Team) was activated for increased medical support. DMAT can provide advanced level care on site.
  - ➢ Bureau of Prison (BOP) bus drivers required deputization to provide support to CBP. Local CBP OCC was able to conduct the deputization. Approximately 48-hour lead time was needed to ensure compliance. The Commissioner's Action Group (CAG) coordinated BOP support.
  - ➢ All SWB Sectors assisted with holding processed and unprocessed migrants to reduce the total numbers in DRT staged at the POE bridge.
  - ➢ Consider all available operational and operational support resources to support MME (ex. MRT, Task Forces, & Checkpoints).
  - ➢ Calls for other federal, state, and local assistance should take place as early as possible.

Case 6:23-cv-00007   Document 175-44 Filed on 03/24/23 in TXSD DP Page 52 of 131

- Sector Transportation Coordination Cell:
  - ➤ Consider limitations of local ICE/ERO office and contracted transportation services.
  - ➤ Transportation Coordination Cell consists of subject matter experts in flight operations and transportation coordination between sectors and contractual services.
  - ➤ Coordinate detainee transportation with receiving sectors and identify transporting components (CBP Contracted, USBP, DOJ).
  - ➤ Coordinate flight manifest requirements between transporting station/s and ICE/ERO
  - ➤ Coordinate transportation to flight lines
- Personnel Lodging Considerations:
  - ➤ At the onset of an imminent MME, sectors should immediately examine lodging availability and begin communicating with contractual service representatives to secure available lodging accommodations and other associated resources to support deployed personnel.
  - ➤ In instances where lodging through the local economy is not available, communicate with local officials for potential options, such as retrofitting city office space or convention centers.
- Designated Areas at IC for Supporting Agencies
  - ➤ Law Enforcement command and supporting elements should be considered when establishing the location of the Incident Command Post (ICP). The ICP should be comprised of a Mobile Command Center (MCC) located appropriately distanced from the incident site.
  - ➤ When establishing the ICP, the IC, Deputy ICs and planners should allocate adjacent or nearby footprints for support federal, state, and local LE partners to situate their command elements. Consider climate-controlled shelters for cooperating agency meetings and government or non-government delegation visits.
- Accountability
  - ➤ Identify an expedient process to account for migrants entering an established containment area. DRT utilized a ticket system to track the number of migrants making entry into the US. The same ticket system was also used to prioritize the order of movement of migrants during transport.
- Designated Areas for Medical and NGOs
  - ➤ Identify location/s for Medical sites such as mobile hospitals and decontamination sites.
  - ➤ Consider the location/s for feeding services that affords a practical distance from containment areas.
- Additional Hygiene and Sanitation Assistance
  - ➤ Medical recommendation as per CBP Office of Chief Medical Officer is 1 porta-johns per 32 persons.
  - ➤ Handwashing Stations 1 per 100 persons is recommended.

- ➤ Coordinate for additional bulk water delivery and water buffalo stations for drinking water and personal hygiene.
- ➤ Collapsible plastic water containers passed out upon arrival for individual use will support the CDC recommended amount of water for adequate life sustainment.
- ➤ Decontamination stations for agents: power washers for boots and water/bleach buckets for dunking.
- Ensure an early site visit by CBP HQ Personnel, White House Officials, or Commissioner Action Group
  - ➤ Firsthand visual assessment led to greater support. News and other official reporting do not provide the same impact as being on site.
  - ➤ Ensured financial assistance at a more rapid approval rate
  - ➤ Once the HQ visit was done, expect +72 hours for funding to start flowing.
- Establish a Regional Communication Representative to assist local PAO
  - ➤ Local PAO was overwhelmed with coordinating congressional and dignitary site visits.
  - ➤ Talking points and briefing memos were generated from the Regional Representative that assisted the Chief and IC
  - ➤ Ensured better coordination with Media and NGOs
  - ➤ Allowed IC personnel to focus on the operational requirements
- New Requests for Assistance (RFA) need to be established with DoD
  - ➤ The Crisis Response Force (CRF) activation would have provided a MP Company, Medical, Close Air Rotary Support, and Engineering Support. A phone call to the J3 at NORTHCOM is the requirement to activate the CRF. Note: The CRF was not approved by DoD for RFA FY22
  - ➤ RFAs should include: CDL Drivers, High-Capacity Transportation Vehicles, High-Capacity Field Holding Structures, High-Capacity Fixed Wing Support for moving both CBP personnel and migrants.
- Closure of POEs
  - ➤ Full closure of POE directly affected. Justification is for the safety of the migrants and the LE officials managing the scene.
  - ➤ Partial closure / lane reduction of adjacent POEs (ex. Eagle Pass POE closed all but one lane for all vehicles entering the US)
  - ➤ Closing the POE was the turning point to gains support from both the GOM as well as the NCR.
  - ➤ Implement a TFR (temporary flight restriction) for security and uninterrupted ISR assistance.
- MOU with the United States Coast Guard for fixed wing air support (National Level)
  - ➤ CONUS flights only. USBP personnel provided security
- Imbed ERO for assistance requirements / pre-coordination planning
  - ➤ Processing support and expedited file completion
  - ➤ Transportation surge
- Request for additional overtime funding
  - ➤ 6th day was mandated

- ➤ Option of 2-4 additional hours of OT per shift should be considered instead of a mandated 6th day to avoid burnout.
- ➤ Consider requests for bi-weekly overtime cap waivers for personnel expected to work beyond Congressionally mandated bi-weekly limits.



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV 00007

EXHIBIT NO. 110

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 110, ECF 175-45



Abbott.

#BetoForGovernor



○     ↑↓ 1     ♡ 5     ᐧ�□�□     ⬆

 Jason Talbott @HisMajestyJason · Aug 8, 2022
A growing pop. by birth occurs when workers have needs met and feel comfortable.
You're bragging about growth from existing corporations dragging their employees to Texas, to backfill all the people who DIED because you utterly failed as a leader during a public health crisis



○     ↑↓     ♡ 2     ᐧ□ᐧ     ⬆

**Don't miss what's happening**
People on Twitter are the first to know.                    Log in     S

Explore

Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV 00007

EXHIBIT
NO. 111

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.,*                    §
                                             §
        *Plaintiffs,*                        §
                                             §
    vs.                                      §    CIVIL ACTION NO.
                                             §    6:23-CV-00007
UNITED STATES DEPARTMENT OF                  §
HOMELAND SECURITY, *et al.,*                 §
                                             §
        *Defendants,* and                    §    JUDGE DREW B. TIPTON
                                             §
VALERIE LAVEUS, *et al.,*                    §
                                             §
        *Intervenor Defendants.*             §

# INTERVENOR DEFENDANTS'
# TAB 111, ECF 175-46

𝕏 Twitter

🔍 Explore

⚙ Settings

🔍 Search Twitter

← **Tweet**

**Greg Abbott** ✔
@GregAbbott_TX

Texas leads America in population growth—adding more than 1,000 people a day. As one newcomer put it: The people are friendly, the schools are great and the weather is appealing. Newcomers are welcome. They just need to help keep TX an appealing state.  statesman.com/news/20181224/ ...

12:17 AM · Dec 26, 2018

**691** Retweets   **233** Quotes   **2,733** Likes   **6** Bookmarks

💬        🔁        ♡        🔖        ⬆

**1984 Is Today** ✔ @Tribble_Bait · Dec 26, 2018
Good luck on that.

💬        🔁        ♡        �_ᴸ        ⬆

**Politically Stripped** ™ ✔ @politstrip · Dec 26, 2018
Americans tend to have more kids when they can afford more kids. Congratulations Texas for being a family friendly state with a great economy!

💬        🔁        ♡ 1       ⬆        ⬆

**Ving Aints** 🇺🇸/🏳️/■/■ ✔ @VingAints · Dec 26, 2018
Why did you have to spoil a nice tweet with good thoughts by adding that last unnecessary sentence? Lighten up eh? Live and let live.

💬        🔁        ♡        ⬆        ⬆

**David Jobes** ✔ @davidlj58 · Dec 26, 2018
Concerned that those arriving are from blue states.

💬        🔁        ♡ 4       ⬆        ⬆

**melissa** 👵👵👵 ✔ @my3monkees · Dec 26, 2018
Including the 400+ migrants that ICE dropped off at a Greyhound bus station in El Paso?? Wake up Governor👵👵👵

💬        🔁        ♡        ⬆        ⬆

**James Parker** ✔ @JamesPa45978861 · Dec 26, 2018
Yes we are getting way to many illegal aliens and people from the left is coming in as well to destroy our state and our economy and turn this state into a blue state and I don't like it they can stay in their own country and the left can stay in the democrat run states Texas 😡

💬        🔁        ♡        ⬆        ⬆

**Diane Hardwick** ✔ @DianeHardwick · Dec 26, 2018
AND SUPPORT THE PRESIDENT

💬        🔁        ♡        ⬆        ⬆

**Rebel★UltraNuclearMAGA #1A #2A...l Sta...** ✔ @... · Dec 26, 2018
The problem is they tend to bring their liberal agenda to TX that caused the State they fled to be undesirable...

💬        🔁        ♡        ⬆        ⬆

**Brandon Izzarelli** ✔ @MrIzzy11B · Dec 26, 2018
Can we stop taking Californians sir!!!!!

💬        🔁        ♡

**New to Twitter?**
Sign up now to get your own per...

G  **Sign up with G**

🍎  **Sign up with /**

**Create accour**

By signing up, you agree to the T
Privacy Policy, including Cookie U

**Relevant people**

**Greg Abbott** ✔ @GregAbbott_TX
Texas Governor Greg Twitter Feed

**What's happening**

MLB · LIVE
**Cubs at Pirates**

Trending in United States
**Logan Paul**
1,740 Tweets

Politics · Trending
**Taiwan**
105K Tweets

Trending in United States
**#BlackMusicHonors**

Trending in United States
**#BlackInkCrew**

Show more

Terms of Service   Privacy Policy
Accessibility   Ads info   More ···

**EXHIBIT 45**

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   S



🐦

🔍 Explore

⚙ Settings

Proud & Blessed to be a Texan.
A diversity of Colors, Religions, Ethnicities enjoying the most affordable
quality of life.

○   ⇄   ♡   �ᐧ�I◫   ⬆

**Shane Thacker** ✔ @shanebo · Dec 26, 2018   ⋯
To translate that for all y'all newcomers, don't bring the culture you came
from with you. If you do we might run you off.

○   ⇄   ♡ 2   �ᐧI◫   ⬆

**Some Guy** ✔ @JustHereToShare · Dec 26, 2018   ⋯
You should encourage limited government conservatives to implement Glen
Reynold's Welcome Wagon plan there to make sure it can remain a great
state. pjmedia.com/instapundit/21...

○   ⇄   ♡ 1   ᐧI◫   ⬆

**MC-🀄** ✔ @jinks1054 · Dec 26, 2018   ⋯
But the growth are liberal Californians and no doubt illegal aliens. I fear for
Texas.

○   ⇄   ♡   ᐧI◫   ⬆

**sterling sorbet** ✔ @expeedee · Dec 26, 2018   ⋯
Just what they said about California.

○   ⇄   ♡   ᐧI◫   ⬆

**Hugh Gautier** ✔ @hugh_gautier · Dec 26, 2018   ⋯
The next question is: How many of them are illegals that you are counting?
Considering the number of people determines how many Congress members
the state gets. They need to be LEGAL citizens to be counted for members in
Congress.

○   ⇄   ♡   ᐧI◫   ⬆

**Rob Wigton** @WigtonRobert · Dec 26, 2018   ⋯
Texas is borderline californication today!  Ya'll need to build a.wall with or w/o
the feds and Trump....js

○   ⇄   ♡   ᐧI◫   ⬆

**jjnewboots** 🀄⚔🀄 ✔ @jjnewboots · Dec 27, 2018   ⋯
I don't necessarily see this as a great thing.  A lot of the people migrating in
do not 🖤 Texas and want to change it.

○   ⇄   ♡   ᐧI◫   ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   S

Explore

Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in



AO386-B

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 112

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 112, ECF 175-47

| **Office of the Texas Governor**

 gov.texas.gov/top-texas-touts-people



## Top Texas Touts:  People

- Jobs magnet: Our skilled, young, diverse, and growing workforce is more than 14.6 million strong.
- Texas is again the top state for population growth, for the 17th year in a row, and has surpassed 30 million in total population for the first time.
- Texas is younger and faster growing than the nation.
- Texas gains about 1,000 people every day, including newly born Texans and people moving from other states and other countries.
- Texas is by far the "stickiest" state: More than 82 percent of those born here stay here.
- Texas is the top state for attracting young adults, age 25-39, the nation's emerging workforce.
- Texas is home to more than 1.7 million veterans and serving military members, including active duty, reserve, and National Guard.
- Texas is home to more women veterans than any other state.
- Our greatest natural resource is the people of the Lone Star State; they are why businesses relocate here.

Back to the main Top Texas Touts page

```
EXHIBIT
46
```

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV 00007

EXHIBIT
NO. 113

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 113, ECF 175-48

**The New York Times** | https://www.nytimes.com/2023/03/10/us/politics/migrants-asylum-biden-mexico.html

# At the End of a Hard Journey, Migrants Face Another: Navigating Bureaucracy

The Biden administration's new rules have brought down a record number of border crossings, but critics say they expose the pitfalls of policies intended to manage an immediate problem.

**By Eileen Sullivan and Steve Fisher**

March 10, 2023

WASHINGTON — Etienne Termulis spent nine days trying to make an appointment with the U.S. government for a chance to seek asylum.

The process is part of a new border management plan the Biden administration announced this year to decrease the number of illegal crossings at the southern border. But immigration advocates say, and some migrants' experiences show, that it is far from the "fair, orderly and humane" system the president has promised.

To complete an application for one of the government's programs, migrants must use an app, called C.B.P. One, on a smartphone in a location with decent internet access. That is where things got tricky for Mr. Termulis, who is Haitian.

Because the shelter where he was staying in Reynosa, Mexico, did not have internet, he, his wife and their 6-year-old daughter had to venture into the city center to find a signal. Reynosa is one of the country's more violent cities, dominated by cartels that kidnap, rape and extort migrants.

"I have to risk my life just to get an appointment," Mr. Termulis, 47, said of the repeated trips into town.

Mr. Termulis and his wife struggled to capture the photograph required for the application for facial recognition. And when they did take the picture and managed to upload it, there were no appointments left.

**EXHIBIT 47**

The difficulties Mr. Termulis faced are just some of the complications with President Biden's signature border plan.

Mr. Biden came into office pledging to return humanity to the immigration system and to reopen access to asylum after the Trump administration systematically restricted it. Two years later, critics say the Biden administration's immigration policies are less about broadly restoring the international right to seek asylum and more focused on enforcement measures to deter migrants, many of whom are fleeing authoritarian countries and economic devastation, from coming to the United States.

But the Biden administration's turn to these increasingly restrictive measures is intended to help manage the record number of border crossings amid relentless Republican attacks and as it prepares for the expiration on May 11 of the public health measure, known as Title 42, that allowed the authorities to swiftly expel migrants.

Mr. Biden's plan has several components: It expands the use of a government app for migrants to apply for a humanitarian exemption to Title 42, which mostly shut down access to asylum since the beginning of the coronavirus pandemic.

The administration also created a legal pathway for people from Cuba, Haiti, Nicaragua and Venezuela to be eligible for a two-year parole in the United States, while also expelling people from those four countries to Mexico if they cross the border illegally. Those who do are also ineligible for the parole program.

Asylum seekers, mostly from Venezuela, using the C.B.P. One app on their phones at a shelter in Ciudad Juárez last month.  Jose Luis Gonzalez/Reuters

Immigration advocates criticize the policies for trying to manage immediate problems rather than seeking broader changes. But the policies have achieved the administration's goal of bringing down the number of border crossings.

Americans remain divided over who should be allowed to come into the country. A recent nationwide survey of 1,247 U.S. adults conducted in February for The Associated Press by NORC at the University of Chicago found that 44 percent say immigration should be reduced, while only 20 percent would like to see more immigrants allowed into the country. In general, Democrats are more inclined to broaden access to asylum than Republicans, and most respondents do not think Mr. Biden is doing a good job on immigration.

Mr. Biden's new policies have drawn support from some Democrats on the southern border who represent districts where migrants cross into the country illegally.

"I commend the Biden administration for the recently announced changes and for taking the appropriate steps to do what they can while some in Congress continue to sit on their hands," Representative Vicente Gonzalez, Democrat of Texas, said after the president announced the new measures in January.

The two options to gain entry to the United States, where migrants can then start the process to apply for asylum, are confusing. Migrants and advocates say the U.S. government has yet to clearly communicate the new policies to migrants.

In some cases, migrants do not know about either option; if they do, they do not know whether they are eligible. If a migrant does not have a sponsor lined up in the United States to support them for the two-year parole, then the exemption to Title 42 is the better option for them. And for migrants who have been waiting in Mexico for months in anticipation of the end of Title 42, applying for that exemption can seem to be the fastest way to get to the United States.

In the past two years in particular, border policies have not been enforced consistently, leading to more confusion about who is allowed to seek refuge in the country. The U.S. immigration system has long been a maze of benefits and backlogs, and it worsens each year Congress neglects to update decades-old laws.

For years, foreigners have faced dwindling legal options to enter the United States. So the creation of a legal pathway with a two-year parole in the U.S. for migrants from Cuba, Haiti, Nicaragua and Venezuela — who have been fleeing authoritarian and unstable governments in increasing numbers — was a welcome development for human rights advocates. But they argue that such options should be available to all migrants in need.

"It is a short-term solution, and it smacks of politics more than a solution that gets to the root of the problem," said Ana Lorena Delgadillo, the director of the migrant-advocacy nonprofit Foundation for Justice, which is based on Mexico. She and others argue that a lack of legal pathways to the United States will continue to drive migrants to risk their lives and enter illegally.

Still, immigration advocates advise that the two-year parole is a better choice for asylum seekers than the exemption to the public health rule because it provides them with stability in the United States and permission to work. Most migrants who are given exemptions to the public health rule are recorded as entering the country illegally and have to wait for years to appear in immigration court.

Applying for the two-year parole begins with a sponsor in the United States who commits to providing financial support to the applicant. Once the government approves the sponsor, the applicant submits additional information and must have official travel documents like a visa or a passport to travel to the United States.

Haitians, especially, have faced problems with the new parole program because there is not a fully functioning government in place to reliably issue official travel documents. Since the assassination of Haiti's president in July 2021, the Caribbean country has become increasingly unstable, ceding more control to gangs.

Since the program was announced, many Haitians have been crowding local migration centers with suitcases and bags, trying to get their documents, said Representative Sheila Cherfilus-McCormick, Democrat of Florida, who closely tracks Haitian migrant issues. Extortionists have been demanding large sums of money to provide Haitians with their paperwork, according to a local news report.

Ms. Cherfilus-McCormick said the Biden administration needed to create a pathway with a process that took into account the particular challenges of people from specific countries.

"We were asking them to look at the circumstances and to actually create a real process that will really work," she said.

Despite the problems with gaining access to both options, Mr. Biden pointed to them as a success in his State of the Union address last month.

President Biden visited the border in El Paso in January. He has pointed to the new border policies as a success.  Doug Mills/The New York Times

Parole is one of the few immigration benefits the executive branch can offer without Congress's permission.

"This is a very novel approach to building lawful and safe pathways premised on the foundational point, which historically has been proven true," Alejandro N. Mayorkas, the homeland security secretary, recently said. "That people will wait if we deliver for them a lawful and safe pathway to come here."

Twenty Republican-led states disagree, saying the two-year parole option is essentially a new visa program that Congress did not approve.

Immigration advocates and some Democrats are also critical of the new plan, but for different reasons. They say these and other measures the administration has said it will put in place — as well as policies that are under consideration, such as reviving the practice of detaining migrant families — have striking similarities with Trump-era policies that were widely condemned because they restricted access to asylum.

Before Trump-era restrictions, migrants could request asylum when they crossed the border. Biden administration officials reject any comparison to the previous administration and say their policies are focused on finding ways to decrease the number of illegal crossings and expand migrants' ability to seek legal pathways.

Currently, border authorities can swiftly expel migrants under Title 42. But the administration has said it plans to continue expulsions to Mexico through longstanding immigration enforcement law and will speed up the process of screening migrants to see if they fear persecution — a process that immigration advocates characterize as rushed asylum screenings.

Late last year, the city of El Paso was overwhelmed with Nicaraguan migrants released from government custody after crossing the border illegally because the United States had not been expelling them back to their country for diplomatic reasons. Shelters were at capacity, and many were sleeping on the streets.

But after the new measures were put in place, the decrease in illegal crossings was almost immediate — so much so that some Border Patrol agents who had been assigned to administrative duties to process the high numbers of migrants were returning to their original job of policing the border.

"It's day and night," said Ruben Garcia, the executive director of Annunciation House, a nonprofit in El Paso that helps migrants with shelter and transportation.

Migrants crossing the Rio Grande into Texas in December. People who enter the United States illegally are not offered the same parole options as those who use the C.B.P. One app.  Paul Ratje for The New York Times

According to data provided by the Homeland Security Department, some 7,800 Cubans, 5,100 Haitians and 1,600 Nicaraguans were approved for the two-year parole program and had arrived in the United States as of Feb. 17.

The Biden administration began the two-year parole program for Venezuelans in October. Since then, nearly 22,000 Venezuelans had arrived in the United States as of Feb. 17.

For the other option, which is not a legal pathway but rather a safer way of reaching the United States than swimming across the Rio Grande, migrants waiting in Mexico have been getting up in the early hours to try to secure an appointment through C.B.P. One to apply for an exemption to Title 42. Appointments have been filling up within 10 to 15 minutes, with demand far exceeding availability.

Capturing the photograph for the application has been especially difficult — an issue that advocates and migrants have said has come up among many people with darker skin tones.

"People are trying for hours to simply take a picture, and the app could not recognize their faces," said Guerline M. Jozef, the co-founder and executive director of the Haitian Bridge Alliance, an organization that helps people seeking asylum. "Migrants were trying everything. In tents, it was too dark; outside, the sun was too bright. None of it was working."

Ms. Jozef has spent time in Mexico in since early January, explaining the new options to thousands of migrants.

At the Kaleo shelter in Reynosa, where the Termulis family has been staying, food, lodging and medical care are available to migrants. But good internet service is still a challenge, said Felicia Rangel-Samponaro, the director of the shelter.

Haitian migrants at a shelter in Reynosa, Mexico, last year. Reynosa is one of the more violent cities in Mexico.  Kirsten Luce for The New York Times

Mr. Termulis and his family had been rising before dawn to try to be ready for the virtual queue that, until this week, opened at 6 a.m. daily and offered appointments for two weeks later. The queue for appointments now opens at 8 a.m.

A Homeland Security official, speaking on the condition of anonymity to discuss internal data, said that more than 46,000 migrants from over 85 countries had made appointments for an exemption to Title 42. Venezuelans and Haitians made up the nationalities of those who had secured the most appointments.

Mr. Termulis eventually scheduled an interview for himself and his wife, but in a frustrating twist, neither was able to add their daughter to the app. He entered California on Feb. 15, after his interview, while his wife and daughter remained in Mexico.

"I cried bitterly, like a child, in that moment," Mr. Termulis said, when he learned that his family would not be immediately joining him.

They were finally able to secure an appointment for March 8 and successfully crossed into the United States. But other migrants have been less fortunate, trying to secure appointments since January, Ms. Jozef said.

Recently, the app was updated to make groups of appointments available at the same time, so a family could stay together, another homeland security official said.

When asked about issues with the government app, like the problems with securing a picture and difficulty securing appointments, Mr. Mayorkas has said he is aware of them.

"There are, from time to time, issues with it, and we remediate very swiftly," he said on Feb. 2. "We're mindful of those and its impact on people's ability to access the relief we extend."

But, he said, thousands of people have had success.

Eileen Sullivan reported from Washington, and Steve Fisher reported from Reynosa, Mexico. Miriam Jordan contributed reporting from Los Angeles.

Eileen Sullivan is a Washington correspondent covering the Department of Homeland Security. Previously, she worked at the Associated Press where she won a Pulitzer Prize for investigative reporting. @esullivannyt

A version of this article appears in print on , Section A, Page 19 of the New York edition with the headline: Gains for Border Policies Are Greeted by Criticism



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV00007

EXHIBIT NO. 114

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.*,           §
                                     §
        *Plaintiffs*,                §
                                     §
    vs.                              §    CIVIL ACTION NO.
                                     §    6:23-CV-00007
UNITED STATES DEPARTMENT OF          §
HOMELAND SECURITY, *et al.*,         §
                                     §
        *Defendants*, and            §    JUDGE DREW B. TIPTON
                                     §
VALERIE LAVEUS, *et al.*,            §
                                     §
        *Intervenor Defendants*.     §

# INTERVENOR DEFENDANTS' TAB 114, ECF 175-49



**UNHCR**
The UN Refugee Agency

# Welcoming the Stranger:
# Affirmations for Faith Leaders

EXHIBIT
48

الترحيب بالغريب: إقرار للقادة الدينيين الترحيب بالغريب: إقرار للقادة الدينيين

4إبريل 2013

من القيم الجوهرية لديني الترحيب بالغريب وباللاجئ وبالنازح الداخلي، وبغيره. وسوف أعامله/أعاملها كما أحب أن أعامل. وأدعو الآخرين، بمن فيهم القادة الدينيين في مجتمعنا، أن يفعلوا الشيء نفسه .

أنا، برفقة القادة الدينيين والمنظمات القائمة على الدين ومجتمعات الضمير حول العالم، أؤكد على ما يلي :

سوف أرحب بالغريب .

من تعاليم ديني هو أن العطف والرحمة والحب وكرم الضيافة للجميع: لإبن جلدتي المولود في بلدي، وللغريب الذي ولد في بلد آخر؛ لابن المجتمع الذي أنتمي إليه وللقادم الجديد .

سوف أتذكر وأُذكِّر أبناء مجتمعي بأننا جميعاً في حكم "الغريب" في مكان ما، وأنه علينا أن نعامل الغريب الوافد على مجتمعنا كما نحب أن نُعامل، و أن نقف في وجه عدم التسامح .

سوف أتذكر وأُذكِّر أبناء مجتمعي بأنه لا أحد يغادر وطنه بلا سبب: البعض يفر بسبب الاضطهاد أو العنف أو الاستغلال؛ والبعض الآخر يفر إثر حدوث كوارث طبيعية؛ فيما يفر آخرون بحثاً في توفير حياة أفضل لأسرهم .

أدرك أن من حق الجميع التمتع بالعيش بكرامة واحترام كبير. وأن الجميع في بلدي، بمن فيهم الغريب، يخضعون لقوانينه، ولا ينبغي أن يخضع أي منهم للعداء أو التمييز .

أقرّ أن الترحيب بالغريب يحتاج أحياناً إلى قدر من الشجاعة، غير أن البهجة والأمل المترتبة على هذا الفعل تفوق المخاطر والتحديات التي تنطوي على ذلك .

سوف أمنح الغريب حفاوة الضيافة، لأن هذا سيعود بالبركة على مجتمعي وعلى عائلتي وعلى الغريب وعلى أنا أيضاً .

سوف أحترم وأجلّ حقيقة أن الغريب قد يكون منتمياً لدين آخر أو أن يكون لديه معتقدات تختلف عن معتقداتي أو عن معتقدات أفراد آخرين في مجتمعي .

سوف أحترم حق الغريب في ممارسة دينه بحرية. وسوف أسعى لإيجاد فسحة يتمكن فيها من العبادة بحرية .

سوف أتحدث عن ديني دون أن أقلل من أو أسخر من معتقدات الآخرين .

سوف أمد جسوراً بيني وبين الغريب. سوف أضرب المثل بنفسي وأشجع الآخرين على فعل الشيء نفسه .

سوف أبذل جهدي ليس فقط للترحيب بالغريب، بل أيضاً للاستماع له باحترام. وسوف أعمل على نشر ثقافة فهم الآخر والترحيب به بين أبناء مجتمعي .

سوف أتحدث عالياً من أجل العدالة الاجتماعية للغريب، تماماً كما أفعل من أجل أبناء مجتمعي الآخرين.

حيثما أرى عداوة تجاه الغريب في مجتمعي، سواء بالأقوال أو الأفعال، لن أتجاهل ذلك، بل سآخذ على عاتقي إرساء الحوار والدعوة للسلم .

لن أصمت عندما أرى آخرين، بمن فيهم القادة الدينيين في مجتمعي، يتحدثون بما يسيء للغرباء، والحكم عليهم قبل معرفتهم، أو عندما أرى أن الغرباء يُهمشون أو يتعرضون للظلم أو الاضطهاد .

سوف أشجّع أبناء ديني على العمل مع أبناء الديانات الأخرى والمنظمات القائمة على الدين من أجل إيجاد طرق أفضل لمساعدة الغريب .

سوف أرحب بالغريب .

**المبادئ الأساسية**

إن الدعوة لـ "الترحيب بالغريب"، من خلال توفير الحماية والضيافة، واحترام الغريب أو أهل الديانات الأخرى ومعاملتهم باحترام ومساواة، هو أمر متجذر في كل الأديان الرئيسية.

في الأبنِشاد (Upanishads) ، نجد تموينة "الضيف كإله" التي تعبر عن الأهمية العظمى لكرم الضيافة في الثقافة الهندية. ونجد قيم العطف (كارونا) وعدم العنف تجاه الجميع (أهمسا)، والاستعداد لخدمة الغريب والضيف المجهول (سِبها) هي من صميم القانون الهندي (دارما). لقد كان تقديم الطعام والمأوى للغريب المحتاج واجباً تقليدياً على صاحب المنزل ولا يزال في هذا التقليد متبعاً من قِبل الكثيرين. وبشكل عام، فإن مفهوم "الدارما" يجسد مهمة قيام كل شخص بواجباته، بما في ذلك التزاماته تجاه المجتمع والتي يجب أن تتم احتراماً لقيم عدم العنف وعدم الأنانية للصالح العام.

وتركز "التريتكا" على أهمية تقوية أربع حالات للعقل: السيتّا (الطاقة)، والموديتا (الفرح التعاطفي)، والأوبيخا (ضبط النفس)، والكارونا (العطف). هناك العديد من التقاليد البوذية ولكن مفهوم (الكارونا) هو عقيدة أساسية في جميع تلك التقاليد، حيث يجسد صفات الصبر وعدم التمييز والدمج والتعاطف مع معاناة الآخرين، وهذا يعكس الدور المحوري للعطف في الأديان الأخرى.

وأشارت التوراة في ست وثلاثين موضعاً إلى احترام "الغريب". ويحتوي سفر اللاويين على واحدة من أبرز معتقدات الدين اليهودي: "وَإِذَا نَزَلَ عِنْدَكَ غَرِيبٌ فِي أَرْضِكُمْ فَلا تُظْلِمُوهُ. كَالْوَطِنِيِّ مِنْكُمْ يَكُونُ لَكُمُ الْغَرِيبُ النَّازِلُ عِنْدَكُمْ، وَتُحِبُّهُ كَنَفْسِكَ، لأَنَّكُمْ كُنْتُمْ غُرَبَاءَ فِي أَرْضِ مِصْرَ" سفر اللاويين، الإصحاح 19، آية 33-34. إضافة إلى ذلك، تنص التوراة على أنه : "لا تُضَايِقِ الْغَرِيبَ فَإِنَّكُمْ عَارِفُونَ نَفْسَ الْغَرِيبِ، لأَنَّكُمْ كُنْتُمْ غُرَبَاءَ فِي أَرْضِ مِصْرَ"، الإصحاح 23 آية 9.

وفي إنجيل مَتَّى (25:35): نسمع النداء التالي: "لأَنِّي جِعْتُ فَأَطْعَمْتُمُونِي. عَطِشْتُ فَسَقَيْتُمُونِي. كُنْتُ غَرِيبًا فَآوَيْتُمُونِي". وفي رسالة بولس إلى العبرانيين نقرأ: "لِتَثْبُتِ الْمَحَبَّةُ الأَخَوِيَّةُ. لاَ تَنْسَوْا إِضَافَةَ الْغُرَبَاءِ، لأَنَّ بِهَا أُنَاسًا أَضَافُوا أُنَاسًا مَلاَئِكَةً وَهُمْ لاَ يَدْرُونَ."

وعندما فر الرسول محمد، (ص)، من الاضطهاد الذي تعرض له في مكة، لجأ إلى المدينة المنورة، حيث استقبل بحفاوة. فالهجرة النبوية ترمز إلى الخروج من أرض الاضطهاد، فيما تجسد الحفاوة التي حظي بها الرسول النموذج الإسلامي في حماية اللاجئ. ويحض القرآن الكريم على حماية طالب اللجوء، أو المستأمن، سواء كان مسلماً أو غير مسلم، وتكون سلامته مكفولة بشكل دائم في إطار مؤسسة الأمان (توفير الأمن والحماية) كما يتضح ذلك من سورة الأنفال، حيث يقول تعالى: "وَالَّذِينَ آمَنُوا وَهَاجَرُوا وَجَاهَدُوا فِي سَبِيلِ اللَّهِ وَالَّذِينَ آوَوْا وَنَصَرُوا أُولَئِكَ هُمُ الْمُؤْمِنُونَ حَقًّا لَهُمْ مَغْفِرَةٌ وَرِزْقٌ كَرِيمٌ" سورة الأنفال 74.

هناك عشرات الملايين من اللاجئين والنازحين حول العالم. تتطلب أدياننا منا أن نتذكر دوماً بأننا جميعاً لاجئون على هذه الأرض، نسير معاً في رحلة من الأمل.

**خلفية عامة**

في شهر ديسمبر من عام 2012، نظم المفوض السامي للأمم المتحدة لشؤون اللاجئين أنطونيو غوتيريس حواراً مع قادة دينيين ومنظمات دينية إنسانية، وأكاديميين وممثلين حكوميين من بلدان مختلفة حول العالم تحت عنوان "الدين والحماية". وفي كلمته التي افتتح بها الحوار، أشار المفوض السامي إلى أن "كل النظم القيمية الدينية الكبرى تتمسّك بقيم الإنسانية والاهتمام بالآخر والاحترام، وتُعنى بنتع الحماية لمن هم في خطر. لذلك فإن مبادئ قانون اللجوء الحديث تمتد جذورها إلى تلك النصوص والتقاليد القديمة". وفي ختام ذلك الحوار الهام، تبنى المفوض السامي توصية بإعداد مدونة سلوك للقادة الدينيين للترحيب بالمهاجرين، واللاجئين وغيرهم من النازحين قسراً، والوقوف معاً ضد رهاب الأجانب.

واستجابة لهذا النداء في الفترة ما بين فبراير حتى إبريل 2013، قام تحالفٌ مكوّن من منظمات إنسانية ودينية رائدة ومؤسسات أكاديمية (من بينها الجمعية العبرية لمساعدة المهاجرين (HIAS) ، والإغاثة الإسلامية عبر العالم، والمؤسسة اليسوعية لخدمة اللاجئين، والاتحاد اللوثري العالمي، ومركز أوكسفورد للدراسات الهندوسية، وأديان من أجل السلام، وكلية اللاهوت الكاثوليكي الروماني بجامعة فيينا، والمجلس العالمي للكنائس، والتحالف الإنجيلي العالمي والرؤية العالمية) بصياغة إقرار بعنوان: "الترحيب بالغريب: إقرار للقادة الدينيين". ويليم هذا الإقرار، الذي تُرجِم من الإنجليزية إلى العربية والصينية والفرنسية والروسية

والإسبانية، القادة الدينيين من جميع الأديان للترحيب بالغريب بكرامة واحترام وبدعم مفعم بالمحبة. وستستخدم المجموعات الدينية في
مختلف أنحاء العالم هذا الإقرار والموارد الداعمة له كأداة عملية لحشد الدعم للاجئين وغيرهم من النازحين ضمن مجتمعاتهم .

# ENGLISH

### WELCOMING THE STRANGER: AFFIRMATIONS FOR FAITH LEADERS

**A core value of my faith is to welcome the stranger, the refugee, the internally displaced, the other. I shall treat him or her as I would like to be treated. I will challenge others, even leaders in my faith community, to do the same.**

**Together with faith leaders, faith-based organizations and communities of conscience around the world, I affirm:**

I will welcome the stranger.

My faith teaches that compassion, mercy, love and hospitality are for everyone:  the native born and the foreign born, the member of my community and the newcomer.

I will remember and remind members of my community that we are all considered "strangers" somewhere, that we should treat the stranger to our community as we would like to be treated, and challenge intolerance.

I will remember and remind others in my community that no one leaves his or her homeland without a reason: some flee because of persecution, violence or exploitation; others due to natural disaster; yet others out of love to provide better lives for their families.

I recognize that all persons are entitled to dignity and respect as human beings. All those in my country, including the stranger, are subject to its laws, and none should be subject to hostility or discrimination.

I acknowledge that welcoming the stranger sometimes takes courage, but the joys and the hopes of doing so outweigh the risks and the challenges. I will support others who exercise courage in welcoming the stranger.

I will offer the stranger hospitality, for this brings blessings upon the community, upon my family, upon the stranger and upon me.

I will respect and honor the reality that the stranger may be of a different faith or hold beliefs different  from mine or other members of my community.

I will respect the right of the stranger to practice his or her own faith freely. I will seek to create space where he or she can freely worship.

I will speak of my own faith without demeaning or ridiculing the faith of others.

I will build bridges between the stranger and myself. Through my example, I will encourage others to do the same.

I will make an effort not only to welcome the stranger, but also to listen to him or her deeply, and to promote understanding and welcome in my community.

I will speak out for social justice for the stranger, just as I do for other members of my community.

Where I see hostility towards the stranger in my community, whether through words or deeds, I will not ignore it, but will instead endeavor to establish a dialogue and facilitate peace.

I will not keep silent when I see others, even leaders in my faith community, speaking ill of strangers, judging them without coming to know them, or when I see them being excluded, wronged or oppressed.

I will encourage my faith community to work with other faith communities and faith-based organizations to find better ways to assist the stranger.

I will welcome the stranger.

## Founding Principles

The call to "welcome the stranger," through protection and hospitality, and to honor the stranger or those of other faiths with respect and equality, is deeply rooted in all major religions.

In the *Upanishads*, the mantra *atithi devo bhava* or "the guest is as God" expresses the fundamental importance of hospitality in Hindu culture. Central to the Hindu *Dharma*, or Law, are the values of *karuna* or compassion, *ahimsa* or non-violence towards all, and *seva* or the willingness to serve the stranger and the unknown guest. Providing food and shelter to a needy stranger was a traditional duty of the householder and is practiced by many still. More broadly, the concept of *Dharma* embodies the task to do one's duty, including an obligation to the community, which should be carried out respecting values such as non-violence and selfless service for the greater good.

The *Tripitaka* highlights the importance of cultivating four states of mind: *metta* (loving kindness), *muditha* (sympathetic joy), *upekkha* (equanimity), and *karuna* (compassion). There are many different traditions of Buddhism, but the concept of *karuna* is a fundamental tenet in all of them. It embodies the qualities of tolerance, non-discrimination, inclusion and empathy for the suffering of others, mirroring the central role which compassion plays in other religions.

The Torah makes thirty-six references to honoring the "stranger." The book of Leviticus contains one of the most prominent tenets of the Jewish faith: "The stranger who resides with you shall be to you as one of your citizens; you shall love him as yourself, for you were strangers in the land of Egypt." (Leviticus 19:33-34). Further, the Torah provides that "You shall not oppress the stranger, for you know the soul of the stranger, having yourselves been strangers in the land of Egypt." (Exodus 23:9)

In Matthew's Gospel (25:35) we hear the call: "I was hungry and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me…" And in the Letter to the Hebrews (13:1-2) we read, "Let mutual love continue. Do not neglect to show hospitality to strangers, for by doing that some have entertained angels without knowing it."

When the Prophet Muhammad fled persecution in Mecca, he sought refuge in Medina, where he was hospitably welcomed. The Prophet's *hijrah*, or migration, symbolizes the movement from lands of oppression, and his hospitable treatment embodies the Islamic model of refugee protection. The Holy Qur'an calls for the protection of the asylum seeker, or *al-mustamin*, whether Muslim or non-Muslim, whose safety is irrevocably guaranteed under the institution of *Aman* (the provision of security and protection). As noted in the Surat Al-Anfal: "Those who give asylum and aid are in very truth the believers: for them is the forgiveness of sins and a provision most generous." (8:74)

There are tens of millions of refugees and internally displaced people in the world. Our faiths demand that we remember we are all migrants on this earth, journeying together in hope.

## Background

In December 2012, UN High Commissioner for Refugees António Guterres organized a Dialogue with faith leaders, faith-based humanitarian organizations, academics and government representatives from countries around the world on the theme of "Faith and Protection." As the High Commissioner noted in his opening remarks, "…all major religious value systems embrace humanity, caring and respect, and the tradition of granting protection to those in danger. The principles of modern refugee law have their oldest roots in these ancient texts and traditions." At the conclusion of this landmark event, the High Commissioner embraced a recommendation for the development of a Code of Conduct for faith leaders to welcome migrants, refugees and other forcibly displaced people, and stand together against xenophobia.

In response to this call, from February through April 2013, a coalition of leading faith-based humanitarian organizations and academic institutions (including HIAS, Islamic Relief Worldwide, Jesuit Refugee Service, Lutheran World Federation, Oxford Centre for Hindu Studies, Religions for Peace, University of Vienna Faculty of Roman Catholic Theology, World Council of Churches, World

Evangelical Alliance and World Vision International) drafted "Welcoming the Stranger: Affirmations for Faith Leaders." The Affirmations, which have been translated into Arabic, Chinese, French, Hebrew, Russian and Spanish, inspire leaders of all faiths to "welcome the stranger" with dignity, respect and loving support. Faith groups around the world will use the Affirmations and supporting resources as practical tools to foster support for refugees and other displaced people in their communities.

### ACCUEILLIR L'ÉTRANGER : AFFIRMATIONS DES CHEFS RELIGIEUX

L'une des valeurs fondamentales de ma foi est d'accueillir l'étranger, le réfugié, le déplacé interne, l'autre. Je le/la traiterai comme j'aimerais qu'on me traite. Je demanderai aux autres, même aux dirigeants de ma communauté religieuse, de faire de même.

De concert avec les chefs religieux, les organisations confessionnelles, et les communautés religieuses du monde entier, j'affirme :

J'accueillerai l'étranger.

Ma foi m'enseigne que la compassion, la miséricorde, l'amour et l'hospitalité visent chacun : le compatriote ainsi que l'étranger, le membre de ma communauté ainsi que le nouveau venu.

Je me souviendrai et je rappellerai aux membres de ma communauté que nous sommes tous considérés comme « étrangers » quelque part, et que nous devrions traiter l'étranger dans notre communauté comme nous souhaiterions être traités nous-mêmes et lutter contre l'intolérance.

Je me souviendrai et je rappellerai aux membres de ma communauté que personne ne quitte sa patrie sans raison : certains fuient la persécution, la violence ou l'exploitation ; d'autres les catastrophes naturelles ; d'autres encore souhaitent offrir, par amour, une vie meilleure à leur famille.

Je reconnais que toute personne, en tant qu'être humain, a le droit à la dignité et au respect. Tous ceux qui se trouvent dans mon pays, y compris l'étranger, sont soumis à ses lois, et personne ne devrait faire l'objet d'hostilité ou de discrimination.

Je reconnais que l'accueil de l'étranger nécessite parfois du courage mais que les joies et les espoirs qui lui sont associés en surpassent les risques et les défis. Je soutiendrai ceux qui font preuve de courage en accueillant l'étranger.

Je ferai preuve d'hospitalité envers l'étranger car ceci confère une bénédiction à ma communauté, à ma famille, à l'étranger et à moi-même.

Je respecterai et j'honorerai le fait qu'un étranger puisse être d'une autre confession ou avoir des croyances différentes des miennes ou de celles des membres de ma communauté.

Je respecterai le droit de l'étranger de pratiquer librement sa propre religion. Je m'efforcerai d'aménager un lieu où il/elle pourra librement pratiquer son culte.

Je parlerai de ma foi sans mépriser ou ridiculiser celle des autres.

Je construirai des ponts entre l'étranger et moi-même. Par mon exemple, j'encouragerai les autres à faire de même.

Je ferai un effort non seulement pour accueillir l'étranger mais également pour l'écouter avec attention et pour promouvoir la compréhension et l'accueil dans ma communauté.

Je défendrai la justice sociale pour l'étranger, tout comme je le fais pour d'autres membres de ma communauté.

Lorsque je serai témoin d'hostilité à l'égard de l'étranger dans ma communauté, que ce soit par des paroles ou par des actes, je ne l'ignorerai pas mais je tenterai plutôt d'établir un dialogue et de faciliter la paix.

Je ne me tairai pas lorsque je verrai d'autres personnes, y compris les chefs de ma communauté religieuse, parler mal des étrangers, les juger sans chercher à les connaître, ou lorsque je les verrai exclus, lésés ou opprimés.

J'encouragerai ma communauté religieuse à œuvrer avec d'autres communautés et organisations confessionnelles pour trouver de meilleurs moyens de porter secours à l'étranger.

J'accueillerai l'étranger.

**Principes fondateurs**

L'appel visant à « accueillir l'étranger », par le biais de la protection et de l'hospitalité, et à honorer l'étranger ou les fidèles d'autres confessions avec respect et sur un pied d'égalité, est profondément enraciné dans toutes les grandes religions.

Dans les *Upanishads*, le mantra *atithi devo bhava* ou « l'hôte est semblable à Dieu » exprime l'importance fondamentale de l'hospitalité dans la culture hindoue. Au centre du *dharma* ou de la Loi hindoue, se trouvent les valeurs de *karuna* ou de compassion, *ahimsa* ou non-violence à l'égard de tous et de *seva* ou volonté de servir l'étranger et l'hôte inconnu. Fournir nourriture et abri à l'étranger dans le besoin est traditionnellement du devoir du chef de famille et bon nombre s'y conforment encore. Plus généralement, le concept du *dharma* consacre l'injonction à faire son devoir, y compris à l'égard de la communauté, ce qui doit se faire dans le respect des valeurs telles que la non-violence et l'abnégation au service du bien.

Le *Tripitaka* souligne l'importance de cultiver quatre états d'âme : *metta* (l'amour bienveillant), *muditha* (la joie sympathique), *upekkha* (l'équanimité), et *karuna* (la compassion). Les traditions du bouddhisme sont multiples et variées mais le concept de *karuna* en est la pierre angulaire. Il recouvre les qualités de tolérance, de non-discrimination, d'inclusion et d'empathie pour la souffrance des autres, reflétant le rôle central que joue la compassion dans d'autres religions.

La Torah contient 36 occurrences de l'honneur dû à l'étranger. Le Lévitique contient l'un des fondements les plus remarquables de la foi juive : « L'étranger qui séjourne parmi vous, vous sera comme celui qui est né parmi vous, et tu l'aimeras comme toi-même ; car vous avez été étrangers dans le pays d'Egypte ». (Lévitique 19:33-34). Par ailleurs, la Torah déclare « tu n'opprimeras point l'étranger ; vous savez vous-mêmes ce qu'éprouve l'étranger, car vous avez été étrangers dans le pays d'Egypte. » (Exode 23:9)

Dans l'Evangile de Matthieu (32:32), nous entendons l'appel : « J'ai eu faim et vous m'avez donné à manger, j'ai eu soif et vous m'avez donné à boire, j'étais étranger et vous m'avez accueilli... ». Et dans la Lettre aux Hébreux (13:1-2), nous lisons « Persévérez dans l'amour fraternel. N'oubliez pas l'hospitalité ; quelques-uns en la pratiquant ont, à leur insu, logé des anges. »

Lorsque le Prophète Mohammed a fui la persécution de la Mecque, il a cherché refuge à Medina, où il a été accueilli avec hospitalité. L'*hijrah* du Prophète, ou la migration, symbolise le déplacement depuis les terres d'oppression et le traitement hospitalier qui lui a été réservé incarne le modèle islamique de la protection des réfugiés. Le Saint Coran appelle à la protection du demandeur d'asile, ou *al-mustamin*, qu'il soit musulman ou non-musulman, dont la sécurité est irrévocablement garantie par l'institution d'*Aman* (la fourniture de sécurité et de protection). Comme mentionné

dans la Sourate Al Anfal : « [...] ceux qui [...] ont donné refuge et porté secours, ceux-là sont les vrais croyants : à eux, le pardon et une récompense généreuse. » (8 :74)

Le monde compte aujourd'hui des dizaines de millions de réfugiés et de déplacés internes. Nos croyances exigent que nous nous rappelions que nous sommes tous des migrants sur cette Terre, cheminant ensemble dans l'espoir.

**Contexte général**

En décembre 2012, António Guterres, le Haut Commissaire des Nations Unies pour les réfugiés, a organisé un Dialogue avec des chefs religieux, des organisations humanitaires confessionnelles, des représentants de gouvernements du monde entier et des chercheurs sur le thème « Foi et Protection ». Comme le Haut Commissaire l'a noté dans ses remarques liminaires, « ... tous les systèmes de valeurs des principales religions embrassent l'humanité, le soin et le respect de l'autre, ainsi que la tradition d'octroyer une protection aux personnes en danger. Les principes du droit moderne des réfugiés s'enracinent profondément dans ces Ecritures et Traditions anciennes. » Lors de la clôture de cet événement marquant, le Haut Commissaire a souscrit à une recommandation relative à l'élaboration d'un code de conduite à l'intention des chefs religieux visant à accueillir les migrants, les réfugiés et d'autres personnes déplacées de force et à lutter contre la xénophobie.

En réponse à cet appel, de février à avril 2013, une coalition de grandes organisations humanitaires confessionnelles et d'établissements universitaires (y compris HIAS, Islamic Relief Worldwide, Jesuit Refugee Service, Fédération Luthérienne Mondiale, Oxford Centre for Hindu Studies, Religions for Peace, University of Vienna Faculty of Roman Catholic Theology, le Conseil Oecuménique des Eglises, World Evangelical Alliance et World Vision International) ont rédigé « Accueillir l'étranger : affirmations des chefs religieux. » Ces affirmations, traduites en arabe, chinois, espagnol, français, hébreu et russe, appellent les chefs de toutes les confessions à « accueillir l'étranger » dans la dignité, le respect et l'appui bienveillant. Des groupes confessionnels dans le monde entier utiliseront également ces affirmations et leurs ressources d'appui comme des instruments pratiques visant à mobiliser un soutien pour les réfugiés et les autres personnes déplacées dans leurs communautés.

# RUSSIAN

### Приветствуя выходцев из других стран: обязательства религиозных лидеров

Основа моей веры – это приятие странников, беженцев, внутренне перемещенных и иных лиц.  Я буду относиться к ним так, как хотел бы, чтобы они относились ко мне. Я буду настаивать, чтобы все, в том числе и лидеры моей религиозной общины, относились к ним, исходя из этого принципа.

Вместе с религиозными лидерами, высокоморальными религиозными организациями и общинами я подтверждаю:

Я буду приветствовать выходцев из других стран.

Моя вера учит состраданию, милосердию, любви и гостеприимству по отношению ко всем: к тем, кто родился на моей родине и за ее пределами, к членам моей общины и странникам.

Я буду помнить сам и напоминать членам своей общины, что для кого-то мы все есть «чужие», что в нашей общине мы должны относиться к выходцам из других стран  так же, как хотели бы, чтобы они относились к нам, и бороться с нетерпимостью.

Я буду помнить сам и напоминать членам своей общины, что никто не покидает родину без причины: некоторые бегут от преследований, насилия и эксплуатации,  другие – из-за стихийных бедствий, третьи – из-за желания обеспечить лучшую жизнь для своих семей.

Я признаю, что все люди имеют право на защиту своего достоинства и уважения  человеческой личности. В нашей стране все люди, в том числе и выходцы из других стран, должны жить по ее законам, и никто не должен подвергаться дискриминации или становиться  объектом вражды.

Я признаю, что приятие выходцев из других стран  иногда требует мужества, но радости и надежды  перевешивают сомнения и проблемы. Я буду поддерживать тех, кто проявляет мужество, приветствуя странников.

Я буду оказывать гостеприимство выходцам из других стран, т.к. это принесет благословение общине, странникам, моей семье и мне самому.

Я буду признавать и уважать тот факт, что вера и убеждения выходцев из других стран  могут отличаться от моей веры или от убеждений других членов моей общины.

Я  буду уважать право выходцев из других стран на свободу вероисповедования. Я  буду стремиться предоставить  им возможность для свободного отправления культа.

Говоря о своей вере, я не буду унижать или высмеивать веру других.

Я буду стараться находить общий язык с выходцами из других стран и призывать членов моей общины делать то же самое.

Я буду не только проявлять гостеприимство к выходцам из других стран, но и искренне к ним прислушиваться, содействуя установлению взаимопонимания и радушного приема в моей общине.

Я буду выступать за такую же социальную справедливость для выходцев из других стран, как и для членов моей общины.

Если в своей общине я увижу враждебность по отношению к выходцам из других стран, будь то посредством слов или поступков, я не буду игнорировать эти поступки, а буду стремиться к установлению диалога и мира.

Я не буду молчать, если увижу, что другие члены или даже лидеры моей религиозной общины критикуют выходцев из других стран и осуждают их, не пытаясь понять , или если я увижу, что их бойкотируют, обвиняют или угнетают.

Я буду призывать свою религиозную общину работать с другими общинами и религиозными организациями, чтобы определить наиболее эффективные методы помощи выходцам из других стран.

Я буду приветствовать выходцев из других стран.

**Основополагающие принципы**

Концепции "приятия странников", оказания защиты и гостеприимства и уважения к ним имеют глубокие корни во всех основных религиях.

В Упанишадах, мантра *атити дево бхава* («гость равен Богу») выражает принципиальную важность гостеприимства в индуистской культуре. Центральное место в индуистской Дхарме (или в Законе Бытия), занимают понятия *каруна* (или сострадание), *ахимса* (ненасилие и отказ от насилия по отношению ко всему живому) и *сева* (готовность услужить страннику или гостю). Обеспечение продовольствием и жильем нуждающихся странников являлось традиционной обязанностью домовладельца и практикуется многими до сих пор. В более широком смысле, понятие *Дхармы* воплощает обязательства выполнять свой долг, в том числе перед сообществом, уважая такие ценности, как отказ от насилия и бескорыстное служение добру.

*Трипитака* подчеркивает важность культивирования четырех состояний ума: *Метта* (любящая доброта), *Мудита* (совместная радость), *Упеккха* (невозмутимость) и *Каруна* (сострадание). Среди многочисленных традиций буддизма, концепция *Каруна* является основополагающей. Она воплощает в себе толерантность, не дискриминацию, включенность, сочувствие к страданиям других, отражая центральную роль, которую сострадание играет в других религиях.

В Торе тридцать шесть раз упоминается необходимость уважения к "странникам". Книга Левит содержит один из самых известных принципов еврейской веры: "Странник, который проживает с вами, будет для вас как один из ваших граждан; люби его, как самого себя, ибо вы сами были странниками в земле Египетской". (Левит 19:33-34) Кроме того, в Торе сказано: "Вы не должны притеснять иноземца, ибо вы знаете душу чужестранца, потому что сами были странниками в земле Египетской". (Исход 23:9)

В Евангелии от Матфея (25:35) мы слышим призыв: "Я был голоден, и вы дали мне еду, меня мучила жажда, и вы дали мне пить, я был странником, и вы приняли меня ... " И в Послании к Иудеям (13:1-2) мы читаем: "Пусть взаимная любовь продолжается. Страннолюбия не забывайте, ибо через него некоторые, не зная, оказали гостеприимство Ангелам".

Когда Пророк Мухаммед бежал от преследований в Мекке, он нашел убежище в Медине, где был гостеприимно принят. *Хиджра*, или миграция, Пророка символизирует исход из мест угнетения, а радушный прием его в Медине воплощает в себе исламскую модель защиты беженцев. Священный Коран призывает к защите лица, ищущего убежище (*аль-мустамин*), будь то мусульманин или не мусульманин, чья безопасность неизменно гарантирована принципами *Амана* (обеспечение безопасности и защиты). Как упоминается в Суре Аль-Анфар:

"Те, которые дают приют и оказывают помощь, являются истинно верующими: им уготованы прощение грехов и щедрый удел." (8:74)

Сегодня в мире десятки миллионов беженцев и внутренне перемещенных лиц. Наша вера требует, чтобы мы помнили, что на этой земле мы все мигранты, движимые общей надеждой.

**Историческая справка**

В декабре 2012 года Верховный комиссар ООН по делам беженцев Антониу Гутерриш пригласил к диалогу религиозных лидеров, религиозные гуманитарные организации, ученых и государственных деятелей для обсуждения темы "Вероисповедание и защита ". В своём приветственном выступлении Верховный комиссар отметил, что "все важнейшие мировые религиозные учения говорят о необходимости проявлять человеколюбие, заботу и уважение, а также призывают следовать традиции предоставления защиты тем, кто в опасности. Принципы современного законодательства о беженцах имеют свои глубокие корни в древних текстах и учениях". Результатом этой знаменательной встречи стал призыв Верховного комиссара разработать для религиозных лидеров Кодекс поведения, предписывающий приятие мигрантов, беженцев и насильственно перемещенных лиц и совместное противостояние ксенофобии.

В ответ на этот призыв коалиция ведущих религиозных гуманитарных организаций и научных учреждений, в том числе HIAS, Islamic Relief Worldwide, Jesuit Refugee Service, Lutheran World Federation, Oxford Centre for Hindu Studies, Religions for Peace, University of Vienna Faculty of Roman Catholic Theology, World Council of Churches, World Evangelical Alliance and World Vision International, разработала проект данного документа. Принципы, которые были переведены на английский, арабский, китайский, французский, иврит, русский и испанский языки, призваны вдохновить лидеров всех конфессий и призвать их относиться к странникам с достоинством, уважением, любовью и поддержкой. Различные религиозные конфессии во всем мире будут использовать данные обязательства  и другие ресурсы в качестве практических инструментов в целях мобилизации членов своих общин в поддержку беженцев и других перемещенных лиц.

### ACOGER AL EXTRANJERO: AFIRMACIONES DE LÍDERES DE COMUNIDADES BASADAS EN LA FE

**Un valor central de mi fe es acoger al extranjero, al refugiado, al desplazado interno, al otro. Los trataré a ellos como quisiera ser tratado yo mismo. E invitaré a los demás, incluidos los líderes de mi comunidad de fe, a que hagan lo mismo.**

Junto con los líderes de fe, las organizaciones religiosas y las comunidades de conciencia del mundo, afirmo:

Acogeré al extranjero.

Mi fe enseña que la compasión, la misericordia, el amor y la hospitalidad, son para todos: el nacido en el país y el nacido en el extranjero, el miembro de mi comunidad y el recién llegado.

Recordaré y haré recordar a los miembros de mi comunidad que todos somos considerados "extranjeros" en algún lugar, que debemos tratar al extranjero en nuestra comunidad como quisiéramos ser tratados nosotros mismos, y que debemos desafiar la intolerancia.

Recordaré y haré recordar a otros en mi comunidad que nadie deja su hogar sin una razón: algunos huyen de la persecución, la violencia o la explotación; otros debido a los desastres naturales; y otros quienes motivados por el amor desean proveer una vida mejor a su familia.

Reconozco que todas las personas tienen derecho a la dignidad y al respeto debido a su condición de seres humanos. Todos en mi país, incluidos los extranjeros, están sujetos a las leyes del país, y nadie debe ser sometido a hostilidad o discriminación.

Reconozco que acoger al extranjero a veces requiere coraje, pero las alegrías y las esperanzas de hacerlo sobrepasan grandemente los riesgos y desafíos. Apoyaré a quienes practiquen con valentía en su cotidianeidad el acoger al extranjero.

Ofreceré hospitalidad al extranjero, puesto que ello trae bendiciones sobre la comunidad, sobre mi familia, sobre el extranjero y sobre mí.

Respetaré y honraré el hecho que el extranjero pueda tener una fe diferente o mantener creencias diferentes a las mías o a las de otros miembros de mi comunidad.

Respetaré el derecho del extranjero a practicar su fe con libertad. Buscaré crear espacios donde pueda ejercer su culto libremente.

Hablaré de mi propia fe sin menospreciar ni ridiculizar la fe de otros.

Construiré puentes entre el extranjero y yo. A través de mi ejemplo, animaré a otros a hacer lo mismo.

Haré un esfuerzo no solo para acoger al extranjero, sino también para escucharle en profundidad, y para promover el entendimiento y la acogida en mi comunidad.

Me manifestaré por la justicia social para el extranjero, así como lo hago para los otros miembros de mi comunidad.

Cuando vea hostilidad hacia el extranjero en mi comunidad, sea en palabras o en hechos, no la ignoraré sino que me empeñaré en establecer un diálogo y facilitar la paz.

No me mantendré callado cuando vea a otros, incluso líderes de mi comunidad de fe, hablar mal de los extranjeros, juzgándolos sin conocerlos, o cuando vea que éstos son excluidos, maltratados u oprimidos.

Animaré a mi comunidad de fe a trabajar con otras comunidades de fe y organizaciones religiosas para encontrar mejores maneras de asistir al extranjero.

Acogeré al extranjero.

**Principios fundacionales**

La llamada a "acoger al extranjero", a través de la protección y la hospitalidad, y a honrar al extranjero y a las personas de otra fe con respeto e igualdad, está profundamente arraigada en todas las religiones principales.

En los Upanishads, el mantra *atithi devo bhava* o "el huésped es como Dios" expresa la importancia fundamental de la hospitalidad en la cultura hindú. En el *Dharma*, o Ley hindú, son centrales los valores de *karuna* o compasión, *ahimsa* o no-violencia hacia todos, y *seva* o voluntad de servir al extranjero y al huésped desconocido. Dar comida y hospitalidad al extranjero en necesidad era un deber tradicional del dueño de una casa y es practicado todavía por muchos. De manera más amplia, el concepto de *Dharma* comprende la tarea de hacer el propio deber, que incluye una obligación hacia la comunidad que debe ser llevada a cabo respetando valores como la no-violencia y el servicio desinteresado por el bien común.

El Tripitaka subraya la importancia de cultivar cuatro estados de la mente: *metta* (cariñosa amabilidad), *muditha* (alegría empática), *upekkha* (ecuanimidad) y *karuna* (compasión). Hay muchas tradiciones diferentes en el budismo, pero el concepto de *karuna* es un mandato fundamental en todas ellas. Incluye las cualidades de tolerancia, no discriminación, inclusión, y empatía por el sufrimiento de otros, que refleja el papel central que la compasión tiene en otras religiones.

La Torah hace treinta y seis referencias a honrar al "extranjero". El libro de Levítico contiene una de las afirmaciones más prominentes de la fe judaica: "El extranjero que reside con ustedes será como uno de sus ciudadanos para ustedes, lo amarán como a sí mismos, pues ustedes fueron extranjeros en la tierra de Egipto" (Lev 19:33-34). Además, la Torah manda que "no oprimirán al extranjero, pues conocen su alma, habiendo sido ustedes extranjeros en la tierra de Egipto". (Éxodo 23:9)

En el Evangelio de Mateo (25:35) oímos la llamada: "Estaba hambriento y me diste de comer, estaba sediento y me diste de beber, era extranjero y me acogiste..." Y en la Carta a los Hebreos (13:1-2) leemos: "Dejen que el amor mutuo continúe. No dejen de mostrar hospitalidad a los extranjeros, pues gracias a ella algunos han cuidado ángeles sin saberlo".

Cuando el profeta Muhammad huyó de la persecución en La Meca, buscó refugio en Medina, donde fue acogido con hospitalidad. La *hijrah*, o migración, del Profeta simboliza el movimiento desde tierras de opresión, y el tratamiento hospitalario encarna el modelo islámico de protección a los refugiados. El Sagrado Corán insta a la protección del solicitante de asilo, o *al-mustamin*, sea

musulmán o no, cuya seguridad es irrevocablemente garantizada bajo la institución del *Aman* (la provisión de seguridad y protección). Como indica el Sura Al anfál, "Quienes les dieron refugio y auxilio, ésos son los creyentes de verdad. Tendrán perdón y generoso sustento."(8:74)

Hay decenas de millones de refugiados y desplazados internos en el mundo. Nuestra fe nos exige recordar que todos somos migrantes en esta tierra, viajando juntos en la esperanza.

**Antecedentes**

En diciembre de 2012, el Alto Comisionado de la Naciones Unidas para los Refugiados, António Guterres, organizó un diálogo sobre el tema "fe y protección" con los líderes de fe, organizaciones confesionales, académicos y representantes de gobiernos de países de todo el mundo. Tal y como señaló el Alto Comisionado en sus palabras de bienvenida, "...todos los principales sistemas de valores religiosos comprenden la humanidad, el cuidado, el respeto, y la tradición de brindar protección a las personas en peligro. Los principios del derecho de los refugiados vigente tienen sus raíces en estos antiguos textos y tradiciones". Al final de este importante evento el Alto Comisionado acogió una recomendación para la elaboración de un Código de Conducta para los líderes de fe para acoger a los migrantes, refugiados y otras personas desplazadas forzosamente y para permanecer unidos en contra de la xenofobia.

En respuesta a este llamado, desde el mes de febrero hasta abril de 2013, una alianza de las principales organizaciones humanitarias confesionales e instituciones académicas (incluyendo la Organización Hebrea de Ayuda a Inmigrantes y Refugiados (HIAS, por sus siglas en inglés), Islamic Relief Worldwide (Socorro Islámico Mundial), El Servicio Jesuita a Refugiados, La Federación Luterana Mundial, El Centro de Oxford de Estudios Hindúes, Religiones por la Paz, Facultad de Teología Católica Romana de la Universidad de Viena, el Consejo Mundial de Iglesias, Alianza Evangélica Mundial y Visión Mundial Internacional), redactó "Acoger al Extranjero: Afirmaciones de Líderes de Comunidades Basadas en la Fe". Estas Afirmaciones han sido traducidas al árabe, chino, francés, hebreo, ruso y español, y animan a todos los líderes de fe a "acoger al extranjero" con dignidad, respecto y brindar apoyo con cariño. Los grupos de fe en todo el mundo utilizarán las Afirmaciones y los recursos de apoyo como herramientas prácticas para fomentar la ayuda a los refugiados y a otras personas desplazadas en sus comunidades.

### FREMDE WILLKOMMEN HEISSEN –
### SELBSTVERPFLICHTUNGEN VON RELIGIONSFÜHRERINNEN UND RELIGIONSFÜHRERN

Einer der zentralen Werte meines Glaubens ist, die Fremde, den Flüchtling, die Binnenvertriebene, den Anderen willkommen zu heissen. Ich behandle ihn oder sie, wie ich selbst behandelt werden möchte. Ich werde Andere, ja auch die Verantwortlichen meiner Glaubensgemeinschaft dazu anhalten, sich ebenso zu verhalten.

Gemeinsam mit Religionsführerinnen und Religionsführern, religiösen Organisationen und Weltanschauungsgemeinschaften in der ganzen Welt bekräftige ich:

Ich werde Fremde willkommen heissen.

Mein Glaube lehrt mich, dass Mitgefühl, Barmherzigkeit, Liebe und Gastfreundschaft allen Menschen gelten: dem Einheimischen und der Fremden, dem Mitglied meiner Gemeinschaft und dem Neuling.

Ich werde mir bewusst machen und die Mitglieder meiner Gemeinschaft daran erinnern, dass wir alle irgendwo als „Fremde" gelten, dass wir den Fremden in unserer Gemeinschaft so begegnen sollten, wie wir wünschen, dass man uns begegnet. Und nicht hinnehmen werde ich Intoleranz.

Ich werde mir bewusst machen und andere in meiner Gemeinschaft daran erinnern, dass niemand sein Heimatland grundlos verlässt: Viele müssen fliehen, weil sie verfolgt werden, Gewalt oder Ausbeutung erleiden; andere wegen einer Naturkatastrophe, wieder andere aus Liebe zu ihrer Familie, der sie ein besseres Leben ermöglichen möchten.

Ich erkenne an, dass jede und jeder Einzelne als Mensch Anspruch auf Würde und Achtung hat. Alle Menschen in meinem Land, auch die Fremden, unterstehen seinen Gesetzen und niemand sollte Feindseligkeit oder Diskriminierung ausgesetzt sein.

Ich bin mir bewusst, dass es manchmal Mut erfordert, Fremde willkommen zu heissen, aber die Freude und Hoffnung, die daraus erwachsen, überwiegen die Risiken und Probleme. Ich werde jene unterstützen, die Mut zeigen, wenn sie Fremde aufnehmen.

Ich werde mich Fremden gegenüber gastfreundschaftlich erweisen, denn das bringt Segen über meine Gemeinschaft, meine Familie, die Fremden und mich.

Ich werde die Tatsache respektieren und anerkennen, dass Fremde einer anderen Religion angehören oder andere Glaubensüberzeugungen vertreten als ich und andere meiner Gemeinschaft.

Ich werde das Recht der Fremden achten, den eigenen Glauben ungehindert auszuüben. Ich werde danach streben, einen Raum zu schaffen, wo sie frei Gottesdienst und Gebete feiern können.

Ich werde von meinem eigenen Glauben sprechen, ohne den Glauben anderer abzuwerten oder zu verspotten.

Ich werde Brücken bauen zwischen den Fremden und mir. Durch mein Vorbild werde ich andere ermutigen, ebenso zu handeln.

Ich werde mich bemühen, Fremden nicht nur gastfreundlich zu begegnen, sondern ihnen auch aufmerksam zuzuhören und mich in meiner Gemeinschaft für Verständnis und Gastfreundschaft einsetzen.

Ich werde die Stimme erheben, damit Fremden soziale Gerechtigkeit zuteilwird, genau wie ich dies für andere Angehörige meiner Gemeinschaft tue.

Wo ich in meiner Gemeinschaft in Wort oder Tat Anfeindungen gegenüber Fremden erlebe, werde ich dies nicht übersehen, sondern stattdessen darauf bedacht sein, Dialog und Frieden zu fördern.

Ich werde nicht schweigen, wenn ich erlebe, dass andere, auch Leitungsverantwortliche meiner Glaubensgemeinschaft, negativ über Fremde reden, über sie urteilen, ohne sie kennenzulernen, oder wenn ich sehe, dass ihnen Unrecht getan wird, sie ausgeschlossen oder unterdrückt werden.

Ich werde meine Glaubensgemeinschaft ermutigen, gemeinsam mit anderen Glaubensgemeinschaften und religiösen Organisationen zusammenzuarbeiten, wenn es darum geht, bessere Möglichkeiten für die Unterstützung der Fremden zu finden.

Ich werde Fremde willkommen heissen.

Grundprinzipien

Der Aufruf, „Fremde willkommen heissen", ihnen also Schutz und Gastfreundschaft zu gewähren, und Fremde oder Angehörige anderer Glaubensrichtungen zu achten und als gleichwertig zu behandeln, ist in allen grossen Religionen tief verwurzelt.

In den *Upanishaden* bringt das Mantra *Atithi devo bhava* oder „der Gast wird verehrt wie Gott" die grundlegende Bedeutung der Gastfreundschaft in der hinduistischen Kultur zum Ausdruck. Eine zentrale Stellung im hinduistischen *Dharma* oder Gesetz haben die Werte *Karuna* (Mitgefühl), *Ahimsa* (Gewaltlosigkeit gegenüber allen Menschen) und *Seva* (Bereitschaft, der Fremden und dem unbekannten Gast zu dienen). Hilfsbedürftigen Fremden Nahrung und Unterkunft zu bieten, war traditionell die Pflicht des Haushaltsvorstands, die nach wie vor vielfach praktiziert wird. Darüber hinaus kann *Dharma* als Konzept für die Pflichterfüllung verstanden werden, einschliesslich der Verpflichtung gegenüber der Gemeinschaft, die umgesetzt werden sollte unter Beachtung von Werten wie Gewaltlosigkeit und dem selbstlosen Dienst um des Gemeinwohls willen.

Die *Tripitaka* misst der Pflege von vier Geisteshaltungen grosse Bedeutung bei: *Metta* (liebevolle Güte), *Mudita* (Mitfreude), *Upekkha* (Gleichmut) und *Karuna* (Mitgefühl). In den vielfältigen buddhistischen Traditionen stellt *Karuna* durchgängig einen wesentlichen Grundsatz dar. Er umfasst die Eigenschaften der Toleranz, Gleichbehandlung, Integration und des Mitfühlens mit dem Leiden anderer – parallel zu dem zentralen Platz, den das Mitgefühl in anderen Religionen einnimmt.

Die Tora spricht 36 Mal von der Achtung „der Fremdlinge". Im Buch Levitikus wird einer der wesentlichen Glaubenssätze des Judentums formuliert: „Wenn ein Fremdling bei euch wohnt in eurem Lande, den sollt ihr nicht bedrücken. Er soll bei euch wohnen wie ein Einheimischer unter euch, und du sollst ihn lieben wie dich selbst; denn ihr seid auch Fremdlinge gewesen in Ägyptenland." (Levitikus 19,33f.) Weiterhin legt die Tora fest: „Die Fremdlinge sollt ihr nicht unterdrücken; denn ihr wisst um der Fremdlinge Herz, weil ihr auch Fremdlinge in Ägyptenland gewesen seid." (Exodus 23,9)

Das Matthäusevangelium (25,35) richtet den Ruf an uns: „Denn ich bin hungrig gewesen und ihr habt mir zu essen gegeben. Ich bin durstig gewesen und ihr habt mir zu trinken gegeben. Ich bin ein Fremder gewesen und ihr habt mich aufgenommen…" Im Hebräerbrief (13,1f.) wiederum lesen wir: „Bleibt fest in der brüderlichen Liebe. Gastfrei zu sein vergesst nicht; denn dadurch haben einige ohne ihr Wissen Engel beherbergt."

Als der Prophet Mohammed aus Mekka floh, weil er verfolgt wurde, suchte er in Medina Zuflucht, wo er willkommen geheissen wurde. Die *Hidschra* oder Auswanderung des Propheten steht symbolisch für den Wegzug aus Ländern, in denen Unterdrückung herrscht, und die Gastfreundschaft, die ihm entgegengebracht wurde, gibt das islamische Modell des Flüchtlingsschutzes vor. Der Heilige Koran ruft dazu auf, den/die Asylsuchende/n oder *Musta'min*,

egal ob muslimischen Glaubens oder nicht, zu schützen; die Sicherheit dieser Menschen ist unumstösslich garantiert unter dem Rechtsinstitut des *Aman* (Gewährung von Sicherheit und Schutz). In der Sure Al-Anfál heisst es: „...jene, die Herberge und Hilfe gaben – diese sind in der Tat wahre Gläubige. Ihnen wird Vergebung und eine ehrenvolle Versorgung." (8,74)

Die Zahl der Flüchtlinge und Binnenvertriebenen weltweit bewegt sich im zweistelligen Millionenbereich. Unser jeweiliger Glaube mahnt uns, eingedenk zu sein, dass wir alle Migrantinnen und Migranten auf dieser Erde sind, hoffnungsvoll gemeinsam unterwegs.

Hintergrund

Im Dezember 2012 organisierte der Hohe Flüchtlingskommissar der Vereinten Nationen, António Guterres, einen Dialog mit Religionsführerinnen und Religionsführern, humanitären Organisationen, die aus dem Glauben heraus handeln, Wissenschaftler/innen und Vertreter/innen von Staaten weltweit zum Thema „Glaube und Flüchtlingsschutz". In seiner Eröffnungsrede stellte der Hohe Flüchtlingskommissar fest: „...die Wertesysteme aller grossen Religionen vertreten Humanität, Fürsorge und Achtung sowie die Tradition, Menschen in Gefahr Schutz zu gewähren. Die Grundsätze des modernen Flüchtlingsrechts haben ihre ältesten Wurzeln in diesen historischen Texten und Traditionen." Zum Abschluss dieser wegweisenden Veranstaltung unterstützte der Hohe Flüchtlingskommissar eine Empfehlung zur Erarbeitung eines Verhaltenskodex für Leitungsverantwortliche der Religionen, der die gastfreundliche Aufnahme von Migrant/innen, Flüchtlingen und anderen gewaltsam vertriebenen Menschen sowie das gemeinsame Eintreten gegen Fremdenfeindlichkeit festschreibt.

Als Reaktion auf diesen Aufruf formulierte zwischen Februar und April 2013 eine Gruppe von führenden humanitären Organisationen und akademischen Einrichtungen aus dem religiösen Bereich (darunter HIAS, Islamic Relief Worldwide, der Jesuiten-Flüchtlingsdienst, der Lutherische Weltbund, das Oxford Centre for Hindu Studies, Religions for Peace, die Katholisch-Theologische Fakultät der Universität Wien, der Ökumenische Rat der Kirchen, die Weltweite Evangelische Allianz und World Vision International) das vorliegende Dokument „Fremde willkommen heissen – Selbstverpflichtungen von Religionsführerinnen und Religionsführern". Es wurde bereits auch ins Arabische, Chinesische, Französische, Hebräische, Russische und Spanische übersetzt und inspiriert Leitungsverantwortliche aller Religionen, „Fremde willkommen zu heissen" und ihnen Würde, Achtung und liebevolle Unterstützung entgegenzubringen. Weltweit werden Glaubensgemeinschaften das Dokument und die zugehörigen Handreichungen als praktische Instrumente nutzen, um die Hilfeleistung für Flüchtlinge und andere Vertriebene in ihrer Gemeinschaft zu fördern.

מסבירים פנים לזר :

הצהרות של מנהיגי דת

ערך מכונן במסורות הדתית שלי מחייב אותי להסביר פנים לזר, לפליט, לעקור, ל״אחר״. אתנהג אליו או אליה, כפי שהייתי רוצה שיתנהגו אלי. אתגבר אחרים, כולל מנהיגים בקהילתי הדתית, לנהוג באותה דרך.

יחד עם מנהיגים דתיים, ארגונים דתיים וקהילות של אנשי מצפון ברחבי העולם, אני מצהיר/ה כי :

אקדם בברכה את פני הזר.

המסורת הדתית שלי מלמדת, כי חמלה, חסד, אהבה והכנסת אורחים הם ערכים המתייחסים לכל בני האדם : ילידי הארץ, ואלה שנולדו מחוצה לה, בני ובנות קהילתי ואלו שזה מקרוב הגיעו.

כי מוטל עלינו להתייחס אל ;אזכור ואזכיר לבני ובנות קהילתי כי כולנו נמצאים על תקן של ״זרים״ במקום כלשהו וכי מוטל עלינו להוקיע גילויים של חוסר סובלנות.;הזר בקהילתנו כפי שהיינו רוצים שיתייחסו אלינו

אזכור ואזכיר לבני ובנות קהילתי, כי אף אחד אינו גולה ממולדתו מרצון וללא סיבה : יש המלטים בגין רדיפה, אלימות או ניצול, יש הנמלטים בגין אסון טבע, ואחרים עוזבים מתוך אהבה למשפחותיהם והרצון להעניק להן חיים טובים יותר.

אני מודע/ת לעובדה שכל בני האדם אשר הם זכאים לחיות חיים בכבוד. כל התושבים החיים בארצי, כולל הזרים, כפופים לחוקים ואף אחד  אינו צריך להיות חשוף לאפליה וגילויי עוינות.

אני מודע לכך שלעתים, דרוש אומץ להסביר פנים לזר, אולם האושר והתקווה הנובעים מהתנהגות זו גוברים על הסיכונים והאתגרים הטמונים במעשה מעין זה. אתמוך באלה הנוהגים באומץ בהסבירם פנים לזר.

אפתח ביתי לזר, למען תבוא ברכה על קהילתי, על משפחתי, על הזר ועליי.

אכבד את  המציאות לפיה הזר עשוי להיות בעל אמונות השונות משלי ומשל בני ובנות קהילתי.

אכבד את חופש הפולחן של הזר, ואת  זכותו לקיים את אמונתו, ואפעל להעניק לו מקום בו יוכל לקיים את פולחנו הדתי בחופשיות.

אדבר על הדת שלי מבלי ללגלג או ל זלזל בדתם של אחרים.

אכונן גשר בין הזר לביני. אעודד אחרים לפעול כמוני על ידי  מתן דוגמה אישית.

אעשה כל מאמץ לא רק להסביר פנים לזר, אלא גם להקשיב לו קשב רב ולקדם הבנה ופתיחות בקרב קהילתי.

אפעל  למען צדק חברתי עבור הזר כפי שאני עושה זאת למען יתר חברי קהילתי.

כל אימת שאתקל בעוינות כלפי הזר בתוך קהילתי, בין אם במלל או במעשים, לא אתעלם ממנה ואנסה ליצור דו-שיח ולהשכין שלום.

לא אשתוק אם אשמע שחברים בקהילתי, לרבות מנהיגים דתיים, מדברים בגנות זרים, שופטים אותם מבלי להכירם, מדיינים אותם, עושים להם עוול, או מכחאים אותם.

אעודד את הקהילה הדתית שלי לשתף פעולה עם קהילות וארגונים דתיים אחרים, לחבור אליהם במטרה למצוא דרכים טובות יותר לסייע לזר.

אסביר פנים לזר.

## עקרונות יסוד

הקריאה "להסביר פנים לזר" באמצעות הגנה עליו וקבלתו כאורח, הקריאה לכבד זרים או אנשים בעלי אמונות שונות ולנהוג כלפיהם בשוויון, היא קריאה המושרשת עמוק בכל הדתות המרכזיות.

ובתרגום: "האורח הוא כאלוהים" , מבטאת את atithi devo bhava, המנטרה בכתבי *Upanishads* בכתבי האופנישדות -
החוט החיוני, הם *Dharma* החשיבות הבסיסית שתתברנת החירדרות מקנה להכנסת אורחים. עקרים מרכזיים ב-
תנכונות לשרת את עצמי ה-*seva* - אי האלימות כלפי כל הברואים וכן ה- *ahimsa* ה-חמלה, ה-*karuna* ערכי ה-
את האורח הבלתי מוכר. אספקת מזון ומחסה לזר הנצרך היא חובה - הנובעת מן המסורת - אשר חלה על בעל
דארמה טומנת בחובה את *Dharma* החברה, ורבים ממשיכים לקיימו כיום. באופן נרחב יותר התפיסה של ה-
הצורך של האדם למלא את חובתו, ובכלל זה החובה כלפי הקהילה, אותה יש למלא תוך כיבוד ערכים כגון: אי
אלימות ומתן שירות נטול אנוכיות לטובת הכלל.

- טוב לב הנובע מאהבה, *metta* - טריפיטאקה מדגישה את החשיבות בטיפוח ארבעה הלכי רוח: ה- *Tripitaka*-
חמלה. קיימות מסורות שונות של בודהיזם, אך *karuna* - שלווה וה- *upekkha* ה- אושר סימפטטי, ה- *mudita*-
חמלה מהוות דבך יסודי בכולן. הוא מבטא את: תכונות הסובלנות, אי האפליה, ההכלל, *karuna* המשגע
והאמפתיה לסבלם של אחרים, באופן המשקף את תפקידה המרכזי של החמלה בדתות אחרות.

בתורה ישנם שלושים ושישה אזכורים לכיבוד "הזר" (הגר). ספר ויקרא מציין את אחד מהעקרונות הבולטים ביותר
במסורת היהודית: "וּאֲזֶרֶת מִכֶּם יִהְיֶה לָכֶם הַגֵּר הַגָּר אִתְּכֶם וְאָהַבְתָּ לוֹ כָּמוֹךָ כִּי-גֵרִים הֱיִיתֶם בְּאֶרֶץ מִצְרָיִם" (ויקרא,
יט; לג-לד). יתרה על כך, התורה מצווה: "וְגֵר לֹא תִלְחָץ וְאַתֶּם יְדַעְתֶּם אֶת-נֶפֶשׁ הַגֵּר כִּי-גֵרִים הֱיִיתֶם בְּאֶרֶץ מִצְרָיִם"
(שמות, כ"ג; ט').

בבשרה על פי מתי (כה;לח) אנו עדים לקריאה: "כִּי רָעֵב הָיִיתִי וּנְתַתֶּם לִי לֶאֱכֹל, צָמֵא הָיִיתִי וְהִשְׁקִיתֶם אוֹתִי, עוֹבֵר
אֹרַח הָיִיתִי וַאֲסַפְתֶּם אוֹתִי...". באיגרת אל העברים (יג; א-ב) אנו קוראים: "תְּהֵא אַהֲבַת אַחִים קַיֶּמֶת בֵּינֵיכֶם. הַכְנָסַת
אוֹרְחִים אַל תִּשְׁכַח, כִּי יֵשׁ אֲשֶׁר הִכְנִיסוּ אֶל בֵּיתָם מַלְאָכִים מִבְּלִי לָדַעַת זֹאת."

כאשר הנביא מוחמד נמלט מרדיפה במכה, הוא מבקש מקלט במדינה, שם הוא מתקבל בברכה. ההגירה של הנביא,
או ההג'ירה, מסמלת את היציאה מארצות של דיכוי והיחס החם לו הוא זוכה, מבטא את הדגם האיסלאמי להגנה על
פליטים. הקוראן הקדוש מטיף להגנה על מבקשי המקלט - אל מוסתאמין, בין אם הוא מוסלמי או לא. שלומו של
מבקש המקלט מובטח באמצעות מוסד ה-אמאן (הקטיית ביטחון) והגנה. כפי שמצוין בסורת אל-אנפאל:
"והמאמינים והמהגרים הקמים להיאבק למען ה', ואלה אשר נתנו מחסה והושיטו עזרה, כל אלה מאמינים הם
באמת ובתמים, ויזכו במחילה ויפורנסו ביד רחבה" (סורה 8, פסוק 74).

בעולם חיים היום עשרות מיליוני פליטים ועקורים. אמונותינו מחייבות אותנו לזכור כי כולנו נמצאים במעמד של
מהגרים על פני הארץ, כולנו נעים יחדיו במסע של תקווה.

## רקע

בדצמבר 2012 קיים הנציב העליון לפליטים, מר אנתוניו גוטרז, דו-שיח בנושא "אמונה והגנה", בהשתתפותם של
מנהיגי דת, ארגוני דת הומניטריים, אנשי אקדמיה ונציגי ממשלה ממדינות ברחבי העולם. כפי שצניו הנציב העליון
בדברי הפתיחה שלו, "...כל הדתות המרכזיות דוגלות בערכים של אנושיות, אהבת הזולת וכבוד, כמו גם במסורות
של הגנה על הנזקקים בסכנה. שורשיהם של עקרונות דיני הפליטים המודרניים נטועים במסורות ובמקורות
העתיקים הללו." בתום אירוע מכונן זה, איפנ הנציב העליון המלצה לפתח קוד התנהגות עבור מנהיגי דת, הקורא
להסביר פנים למהגרים, לפליטים ולאחרים שעוקרו מבתיהם ולהתייצב יחדיו נגד שנאת זרים.

בתגובה לקריאה זו, בחודשים פברואר - אפריל 2013 חברה יהודי קבועה של ארגונים הומניטריים ומוסדות
אקדמיים (לרבות היא"ס, הארגון לסיוע אסלאמי עולמי, השירות הישועי לפליטים, הפדרציה הלותרנית העולמית,
מרכז אוקספורד לימודי הינדואיזם, דתות למען שלום, הפקולטה לתאולוגיה קתולית באוניברסיטת וינה, מועצת
הכנסיות העולמית, הברית האוונגליסטית העולמית וחזון העולמי העולמי") וניסחה את המסמך "מסגרות פנים
לזר: הצהרות של מנהיגי דת." הצהרות אלה, אשר תורגמו לערבית, סינית, צרפתית, עברית, רוסית וספרדית,
מעוררות השראה עבור מנהיגים מכל הדתות לקבל את פני הדתות בכבוד ובתמיכה אוהבת. קבוצות דת בכל העולם

תשתמשנה בהצהרות ובמקורות עליהם הן נסמכות בתור כלים מעשיים לעידוד התמיכה בפליטים ובעקורים בקרב
קהילותיהם.

.

# TURKISH

### YABANCILARA HOŞGÖRÜ İLE KUCAK AÇMAK- DİNİ LİDERLER İÇİN BEYANAT

İnancımın en önemli değerlerinden biri de yabancılara, mültecilere, ülkesinde yerinden edilmişlere; yani ötekine hoşgörü ile kucak açmaktır. Kendime nasıl davranılmasını istiyorsam ona da öyle muamele edeceğim ve başkalarına hatta ait olduğum inanç grubunun önde gelenlerine de bu yönde teşvikte bulunacağım.

Dünyanın her tarafındaki dini liderler, inanç temelli kuruluşlar ve sağduyulu topluluklarla birlikte beyan ediyorum ki:

Yabancılara hoşgörü ile kucak açacağım.

Dinim bana şefkat, merhamet, sevgi ve misafirperverliğin; yerli veya yabancı, kendi toplumumun üyesi ya da dışarıdan yeni katılan herkese gösterilmesi gerektiğini öğretir.

Bizim de bir yerlerde yabancı konumunda olduğumuzu, bize nasıl muamele edilmesini istiyorsak bizim aramızda yabancı olana da aynı şekilde muamele etmemiz gerektiğini hatırda tutacak, çevremdeki insanlara da bunu hatırlatacak ve hoşgörüsüzlükle mücadele edeceğim.

Kimsenin vatanını sebepsiz terk etmeyeceğini; bazılarının işkence, şiddet ve haksızlıktan kurtulmak için, bazılarının doğal afetten dolayı ve bazılarının da ailelerine daha iyi bir hayat temin edebilmek adına bunu yaptığını hatırda tutacak ve çevremdekilere hatırlatacağım.

Her bir bireyin insan olduğu için saygın ve onurlu olduğu inancındayım. Yabancılar da dahil olmak üzere yaşadığım ülkedeki herkes kanunlara tabidir ve hiç kimse düşmanlık ve ayrımcılığa maruz bırakılmamalıdır.

Ben inanıyorum ki yabancılara kucak açmak bazen cesaret gerektirir ama bunu yapmanın hasıl ettiği mutluluk ve yeşerttiği umutlar getirdiği risk ve zorluklardan daha fazladır. Bu nedenle yabancılara kucak açma cesaretini gösteren herkesi destekleyeceğim.

Yabancılara karşı misafirperverlik sergileyeceğim zira bu, içinde bulunduğum topluma, aileme, bana ve söz konusu yabancıya güzellikler getirir.

Yabancıların farklı bir dine mensup olmalarını ya da benim inancımdan veya içinde bulunduğum toplumun diğer üyelerinden farklı inançlara sahip bulunmalarını saygı ile karşılayacağım.

Yabancıların kendi inançlarını özgürce yaşama hakkına saygı göstereceğim ve ibadetlerini rahat bir şekilde yapabilecekleri şartları oluşturmak için uğraşacağım.

Kendi inancımı anlatırken başkasının inancını kötülemeyecek ve alaya almayacağım.

Yabancılarla kendi aramda köprüler kuracağım ve sergilediğim bu tavır yoluyla başkalarını da böyle davranmaya teşvik edeceğim.

Yabancılara sadece kucak açmakla kalmayıp, onlara dikkatle kulak vererek toplumda anlayışı ve kucaklayıcı yaklaşımı desteklemeye gayret göstereceğim.

Aynen toplumun diğer fertleri için yaptığım gibi yabancılar için de sosyal adaleti savunacağım.

İçinde bulunduğum toplumda yabancılara karşı ister sözlü ister fiili bir düşmanlık sergilendiğine şahit olduğumda bunu görmezlikten gelmeyecek, aksine diyalog tesis etmek ve barışı mümkün kılmak adına girişimde bulunacağım.

Kendi inanç grubumdan insanların hatta önde gelen kişilerin yabancılar hakkında kötü konuştuğunu, tanımadan onları yargıladıklarını ve o yabancıların dışlandıklarını, haksızlığa ve baskıya maruz bırakıldıklarını gördüğümde sessiz kalmayacağım.

Yabancılara yardım etmek adına daha etkili yöntemler bulabilmek için kendi inanç grubumu, diğer dini gruplar ve inanç temelli kuruluşlar ile birlikte çalışmaya teşvik edeceğim.

Yabancılara hoşgörü ile kucak açacağım.

Ana ilkeler

Himaye ederek ve misafirperverlik göstererek yabancıya kucak açma çağrısı ve yabancıları ya da farklı inançlara mensup olanları saygıyla ve eşitlik anlayışı içinde kabullenme bütün dinlerde çok köklü bir esastır.

Upanişad'da geçen "Misafir Tanrı gibidir" ibaresi misafirperverliğin Hindu kültüründeki büyük önemini ortaya koyar. Ayrıca Karuna (sempati), Ahimsa (herkese karşı şiddet yasağı) ve Seva (yabancıya ve tanınmayan misafire hizmet etme), Hindu hukukunda (Dharma), merkezi bir yer tutar. İhtiyaç sahibi yabancılara yemek ve barınak temin etmek, ev sahibinin geleneksel bir göreviydi ve günümüzde de pek çok insan tarafından bu gelenek hala uygulanmaktadır. Daha geniş anlamda, Dharma konsepti daha fazla iyilik adına şiddetsizlik ve diğerkâmlık değerlerine saygı duyarak, bireyin topluma ve kendisine karşı yerine getirmesi gereken sorumlulukları içerir.

Tripitaka şu dört ruhsal gelişimin önemini altını çiziyor: Metta (İyilik), Mudita (Sevinç), Üpekkha (Soğukkanlılık) ve Karuna (Empati). Budizm'de pek çok farklı gelenek olsa da Karuna tüm bu geleneklerin köşe taşıdır. İçerdiği hoşgörü, eşitlik, kucaklayıcılık, başkasının acısına empatiyle yaklaşma gibi özelliklerle şefkatin diğer dinlerde oynadığı role karşılık gelir.

Tevrat 36 kez yabancıyı onurlandırmaya değinir. Levitikus kitabında ise Yahudilik inancının en temel ilkelerinden biri yer alır: "Eğer vatanınızda bir yabancı kalıyorsa, o sizin için, sizin aranızda doğanlar gibi olmalı ve sen onu kendini sevdiğin gibi sevmelisin; çünkü siz de Mısır'da bir zamanlar yabancıydınız." (Levitikus 19,33f.) Bunun dışında Tevrat'ta şu şekilde buyuruluyor: "Yabancıları ezmemelisiniz; çünkü siz de bir zamanlar Mısır'da yabancıydınız ve yabancı olmanın ne demek olduğunu kendinizden de biliyorsunuz." (Exodüs 23,9)

Matta İncilinde de (25,35) şöyle seslenildiğini işitiyoruz: "Ben açtım ve siz bana yiyecek verdiniz. Ben susamıştım ve siz bana içecek verdiniz. Ben bir yabancıydım ve siz bana kucak açtınız." Ve yine İbranilere yazılan bir mektupta da: "Karşılıklı sevgiyi devam ettirin. Yabancılara misafirperverlik göstermeyi ihmal etmeyin; çünkü aranızdan bazıları böyle yaparak farkında olmadan melekleri ağırlamış oldular."

Hz. Muhammed Mekke'deki zulümden kaçarak Medine'ye sığındı ve sıcak bir şekilde karşılandı. Hz. Peygamber'in hicreti baskı altında olunan toprakları terk etmenin bir sembolü haline geldi ve misafirperverlikle karşılanışı da mültecilerin korunması konusunda İslami bir model oluşturdu. Kur'an-ı Kerim Müslüman olsun ya da olmasın bütün himaye talep edenleri korumayı emreder ve bu insanların güvenliği Eman (güvenlik ve himaye) müessesesinin garantisi altındadır. Enfal süresinde de geçtiği gibi : "(Hicret edenlere) kucak açıp yardım edenler gerçek müminlerdir. Onlara bir mağfiret ve pek değerli bir nasip vardır." (8,74)

Dünyada on milyonlarca mülteci ve ülkesinde yerinden edilmiş insan var. İnançlarımız bizden, hepimizin bu dünyada göçmen olduğumuzu ve birlikte umut içinde seyahat ettiğimizi hatırda tutmamızı istiyor.

## Arka plan

Birleşmiş Milletler Mülteciler Yüksek Komiseri António Guterres, Aralık 2012'de dünyanın dört bir tarafından dini liderleri, inanç temelli yardım kurumlarını, bilim adamlarını ve hükümet temsilcilerini, 'İnanç ve Himaye' konulu bir programda buluşturdu. Açılış konuşmasında Mülteciler Yüksek Komiseri şunları açıkladı: "Bütün büyük dini değer sistemleri insanlığı, yardımseverliği, saygıyı ve tehlikede olanları himaye etme geleneğini benimser. Modern mülteci hukukunun kökleri de söz konusu eski metinlere ve geleneklere uzanır." Bu çok önemli faaliyetin bitiminde Mülteciler Yüksek Komiseri, göçmenlere, mültecilere ve diğer zorla yurdundan edilenlere kucak açılması konusunda, dini liderlere yönelik olarak bir 'Prensipler Dizisi' geliştirilmesini ve yabancı düşmanlığına karşı birlikte mücadele edilmesini önerdi.

Bu davete cevap olarak Şubat-Nisan 2013 tarihleri arasında bir grup önde gelen inanç temelli yardım kuruluşları ve akademik kurumlardan oluşan bir koalisyon, (Söz konusu kurum ve kuruluşlardan bazıları: HİAS- Mültecileri koruyan Uluslararası Yahudi Sivil Toplum Kuruluşu, İslamic Relief Worldwide- Uluslararası İslami Yardım Kurumu, Jesuit Refugee Service- Cizvit Mülteci Servisi, Lutheran World Federation- Lutheran Dünya Federasyonu, Oxford Centre for Hindu Studies- Oxford Hindu Bilimleri Araştırma Merkezi, Religions for Peace- Barış İçin Dinler, University of Vienna Faculty of Roman Catholic Theology- Viyana Üniversitesi Katolik Din bilimi Fakültesi, World Council of Churches- Dünya Kiliseler Konseyi, World Evangelical Alliance- Dünya Evanjelik Birliği, World Vision International- Uluslararası Dünya Vizyonu) "Yabancılara Hoşgörü ile Kucak Açmak: Dini Liderler İçin Beyanat" dosyasını hazırladı. Bu doküman Arapça, Çince, Fransızca, İbranice, Rusça ve İspanyolca dillerine de çevrildi ve bütün dinlerden kanaat önderlerine, onurla, saygıyla ve sevgi yüklü destekle yabancılara kucak açma konusunda ilham kaynağı oldu. Dünyanın her yerinde dini gruplar bu bildiriyi ve destekleyici materyalleri, toplumları içindeki mültecilere ve zorla yurdundan edilmiş insanlara daha iyi destek sunabilme adına pratik araçlar olarak değerlendireceklerdir.