

**DEFENDANT'S EXHIBIT**

CASE NO. 6:23-CV 00007

EXHIBIT NO. 115

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

STATE OF TEXAS, *et al.*,  §
§
*Plaintiffs*,  §
§
vs.  §   CIVIL ACTION NO.
§   6:23-CV-00007
UNITED STATES DEPARTMENT OF  §
HOMELAND SECURITY, *et al.*,  §
§
*Defendants*, and  §   JUDGE DREW B. TIPTON
§
VALERIE LAVEUS, *et al.*,  §
§
*Intervenor Defendants*.  §

# INTERVENOR DEFENDANTS'
# TAB 115, ECF 175-50

EXHIBIT
49

FEBRUARY 04, 2021

# Executive Order on Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act, 8 U.S.C. 1101 *et seq.*, I hereby order as follows:

**Section 1. Policy.** The long tradition of the United States as a leader in refugee resettlement provides a beacon of hope for persecuted people around the world, promotes stability in regions experiencing conflict, and facilitates international collaboration to address the global refugee crisis. Through the United States Refugee Admissions Program (USRAP), the Federal Government, cooperating with private partners and American citizens in communities across the country, demonstrates the generosity and core values of our Nation, while benefitting from the many contributions that refugees make to our country. Accordingly, it shall be the policy of my Administration that:

(a) USRAP and other humanitarian programs shall be administered in a manner that furthers our values as a Nation and is consistent with our domestic law, international obligations, and the humanitarian purposes expressed by the Congress in enacting the Refugee Act of 1980, Public Law 96-212.

(b) USRAP should be rebuilt and expanded, commensurate with global need and the purposes described above.

(c) Delays in administering USRAP and other humanitarian programs are counter to our national interests, can raise grave humanitarian concerns, and should be minimized.

(d) Security vetting for USRAP applicants and applicants for other humanitarian programs should be improved to be more efficient, meaningful,

and fair, and should be complemented by sound methods of fraud detection to ensure program integrity and protect national security.

(e)  Although access to United States humanitarian programs is generally discretionary, the individuals applying for immigration benefits under these programs must be treated with dignity and respect, without improper discrimination on the basis of race, religion, national origin, or other grounds, and should be afforded procedural safeguards.

(f)  United States humanitarian programs should be administered in a manner that ensures transparency and accountability and reflects the principle that reunifying families is in the national interest.

(g)  My Administration shall seek opportunities to enhance access to the refugee program for people who are more vulnerable to persecution, including women, children, and other individuals who are at risk of persecution related to their gender, gender expression, or sexual orientation.

(h)  Executive departments and agencies (agencies) should explore the use of all available authorities for humanitarian protection to assist individuals for whom USRAP is unavailable.

(i)  To meet the challenges of restoring and expanding USRAP, the United States must innovate, including by effectively employing technology and capitalizing on community and private sponsorship of refugees, while continuing to partner with resettlement agencies for reception and placement.

(j)  The Special Immigrant Visa (SIV) programs for Iraqi and Afghan allies provide humanitarian protection to nationals of Iraq and Afghanistan experiencing an ongoing, serious threat because they provided faithful and valuable service to the United States, including its troops serving in those countries.  The Federal Government should ensure that these important programs are administered without undue delay.

**Sec. 2.  Revocation, Rescission, and Reporting.**  (a)  Executive Order 13815 of October 24, 2017 (Resuming the United States Refugee Admissions Program With Enhanced Vetting Capabilities), and Executive Order 13888 of September 26, 2019 (Enhancing State and Local Involvement in Refugee Resettlement), are revoked.

(b)  The Presidential Memorandum of March 6, 2017 (Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits, Ensuring Enforcement of All Laws for Entry Into the United States, and Increasing Transparency Among Departments and Agencies of the Federal Government and for the American People), is revoked.

(c)  Within 90 days of the date of this order, the Secretary of State and the Secretary of Homeland Security shall provide a report to the President, through the Assistant to the President for National Security Affairs (APNSA), describing all agency actions, including memoranda or guidance documents, that were taken or issued in reliance on or in furtherance of the directives revoked by subsections (a) and (b) of this section.  This report shall include recommendations regarding whether each action should be maintained, reversed, or modified, consistent with applicable law and as appropriate for the fair, efficient, and secure administration of the relevant humanitarian program or otherwise in the national interest.

**Sec. 3.  Special Immigrant Visas for Iraqi and Afghan Allies.**  (a)  Within 180 days of the date of this order, the Secretary of State, in consultation with the Secretary of Defense and the Secretary of Homeland Security, shall complete a review of the Iraqi and Afghan SIV programs and submit a report to the President with recommendations to address any concerns identified.  The report shall include:

(i)  an assessment of agency compliance with existing law governing the SIV programs, including program eligibility requirements and procedures for administrative review;

(ii)  an assessment of whether there are undue delays in meeting statutory benchmarks for timely adjudication of applications, including due to insufficient staffing levels;

(iii)  a plan to provide training, guidance, and oversight with respect to the National Visa Center's processing of SIV applications;

(iv)  a plan to track the progress of the Senior Coordinators as provided under section 1245 of the Refugee Crisis in Iraq Act of 2007 (RCIA), subtitle C of title XII of Public Law 110-181, and section 602(b)(2)(D)(ii)(II) of the Afghan Allies Protection Act of 2009 (AAPA), title VI of division F of Public Law 111-8, as amended; and

(v)   an assessment of whether adequate guidelines exist for reconsidering or reopening applications in appropriate circumstances and consistent with applicable law.

(b)  The Secretary of State, in consultation with the Secretary of Defense, shall also direct a review of the procedures for Chief of Mission approval of applications with the aim of, as appropriate and consistent with applicable law:

(i)   ensuring existing procedures and guidance are sufficient to permit prospective applicants a fair opportunity to apply and demonstrate eligibility;

(ii)  issuing guidance that would address situations where an applicant's employer is unable or unwilling to provide verification of the applicant's "faithful and valuable service," and provide for alternative forms of verification;

(iii)  revising requirements to facilitate the ability of applicants to demonstrate the existence of a qualifying contract with the United States Government and require that the supervisor verifying the applicant's "faithful and valuable service" be a United States citizen or national;

(iv)  ensuring that applicants are not prejudiced by delays in verifying their employment; and

(v)   implementing anti-fraud measures to ensure program integrity.

(c)  Within 180 days of the date of this order, the Secretary of State shall submit to the President the results of the review described in subsection of this section.

(d)  Within 180 days of the date of this order, the Secretary of State, in consultation with the Secretary of Defense and the Secretary of Homeland Security, shall conduct a review and submit a report to the President identifying whether additional populations not currently provided for under section 1059 of the National Defense Authorization Act for Fiscal Year 2006, Public Law 109-163, section 1244 of the RCIA, or section 602 of the AAPA are at risk as a result of their faithful and valuable service to the United States Government.  The review should also evaluate whether it would be appropriate to seek legislation that would create a SIV program for

individuals, regardless of nationality, who faithfully assisted the United States Government in conflict areas for at least 1 year or made exceptional contributions in a shorter period and have experienced or are experiencing an ongoing serious threat as a result of their service.

(e)  Within 180 days of the date of this order, the Secretary of State and the Secretary of Homeland Security shall ensure that appropriate policies and procedures related to the SIV programs are publicly available on their respective agency's websites, and that any revisions to such policies and procedures in the future are made publicly available on those websites within 30 days of issuance.

**Sec. 4.  Steps to Improve the Efficacy, Integrity, Security, and Transparency of USRAP.**  (a)  Consistent with the policy set forth in section 1 of this order and to facilitate this order's effective and expeditious implementation:

(i)   The APNSA shall designate a National Security Council Senior Director to be responsible for coordinating the agencies and vetting partners involved in USRAP.

(ii)   The Secretary of State shall designate a senior-level employee to have primary responsibility for overseeing refugee application processing, consistent with applicable law.

(iii)   The Secretary of Homeland Security shall designate a senior-level employee to have primary responsibility for coordinating the review and any revision of policies and procedures regarding the vetting and adjudication of USRAP refugee applicants, including follow-to-join refugee applicants and post-decisional processing, consistent with applicable law.

(iv)   The Director of the Office of Management and Budget shall assign a team of technology, process, and data experts from the United States Digital Service to assist agencies in streamlining application processing, improving the automation and effectiveness of security vetting and fraud detection, and strengthening data-driven decision-making.

(b)  Within 30 days of the date of this order, the Secretary of State and the Secretary of Homeland Security shall provide the President a report on the fraud detection measures in place for USRAP.  The report shall also include a plan to enhance fraud detection within components at both agencies and

recommendations for the development of new anti-fraud programs, as appropriate and consistent with applicable law.

(c) The Secretary of Homeland Security, in consultation with the Secretary of State, shall promptly consider taking all appropriate actions, consistent with applicable law, to expand refugee vetting and adjudication capacity, including by:

(i) developing more efficient processes to capture and share refugee applicant biometric data; and

(ii) permitting the use of video and audio teleconferencing to conduct refugee interviews and establishing the necessary infrastructure to do so.

(d) To increase refugee adjudication capacity, the Office of Personnel Management shall, consistent with applicable law, support the use of all hiring authorities, including expanded use of direct hiring authority, for positions associated with the adjudication of refugee applications.

(e) Within 30 days of the date of this order, the heads of all agencies involved in the Security Advisory Opinion process and other inter-agency vetting processes for refugee applicants, including follow-to-join refugee applicants, shall submit data to the National Vetting Governance Board on the number of staff performing refugee security vetting, the thresholds for checks, and the rates at which checks have returned an objection. Such data shall be disaggregated by age range, gender, and nationality of the refugee applicant. The National Vetting Governance Board shall meet to consider if and how agency processes and staffing levels should change to improve security reviews and make refugee arrivals more efficient, and shall share any conclusions and recommendations with the heads of relevant agencies, including the Director of the Office of Management and Budget, in order to inform potential resourcing strategies where necessary.

(f) Within 60 days of the date of this order, agencies responsible for the Security Advisory Opinion process shall meet to consider proposals from member agencies to adjust the list of countries and other criteria that require a Security Advisory Opinion for a refugee case.

(g) The Secretary of Homeland Security, in consultation with the Secretary of State, shall consider whether to promulgate regulations and any other policies, including internal oversight mechanisms, to ensure the quality,

integrity, efficiency, and fairness of the adjudication process for USRAP applicants, while also taking due account of the challenges facing refugee applicants.  The Secretary of Homeland Security, in consultation with the Secretary of State, should consider adopting regulations or policies, as appropriate and consistent with applicable law, that:

(i)   develop mechanisms to synthesize reliable, detailed, and current country conditions that may be relied upon, where appropriate, to make specific factual and legal determinations necessary for the adjudication of refugee applications from individuals or from individuals within a designated group of applicants;

(ii)   ensure that refugee applicants have timely access to their own application records;

(iii)  permit refugee applicants to have a representative at their interview at no cost to the United States Government; and

(iv)  ensure, when refugee applications are denied for non-security or non-fraud-based reasons, an applicant is given a short explanation describing the basis for the denial, so that the applicant has a meaningful opportunity to present additional evidence and to request a review of the decision.

(h)  The Secretary of State and the Secretary of Homeland Security shall provide the President, through the APNSA, a report describing any action taken pursuant to subsection (g) of this section within 180 days of the date such action is taken.

(i)  The Secretary of Homeland Security shall ensure that adjudicators are trained in the standards governing refugee claims of women, children, and other individuals who are more vulnerable to persecution due to their age, gender, gender expression, or sexual orientation.

(j)  The Secretary of State and the Secretary of Homeland Security shall consider taking actions, as appropriate and consistent with applicable law, to recognize as "spouses" for purposes of derivative status through USRAP individuals who are in committed life partnerships but who are unable to marry or to register their marriage due to restrictions in the law or practices of their country of origin, including for individuals in same-sex, interfaith, or camp-based marriages.  The Secretary of State and the Secretary of Homeland Security shall provide the President a report, through the APNSA,

Case 6:23-cv-00007   Document 175-50   Filed on 06/20/23 in TXSD   Page 8 of 10

describing any action taken pursuant to this subsection within 180 days of the date such action is taken.

(k)  Within 120 days of the date of this order, the Secretary of State and the Secretary of Health and Human Services shall, as appropriate and consistent with applicable law, deliver a plan to the President, through the APNSA, to enhance the capacity of USRAP to welcome refugees by expanding the use of community sponsorship and co-sponsorship models by refugee resettlement agencies, and by entering into new public-private partnerships.

(l)  The Secretary of State, in consultation with the Secretary of Homeland Security, shall consider ways to expand mechanisms under which non-governmental organizations with direct access to and knowledge of refugees abroad in camps or other settings could identify and directly refer to USRAP particularly vulnerable individuals who have a strong possibility of qualifying for admission to the United States as refugees.

(m)  Within 180 days of the date of this order, the Secretary of State and the Secretary of Homeland Security shall take all appropriate steps, taking into account necessary safeguards for program integrity, to ensure that the current policies and procedures related to USRAP are publicly available on their respective websites, and that any new or revised policies and procedures are made publicly available on their websites within 30 days of their adoption.

(n)  Within 180 days of the date of this order, the Secretary of State, in consultation with the Secretary of Homeland Security, and as appropriate and consistent with applicable law, shall develop options for improving USRAP applicants' ability to access relevant material from their case files on an expedited basis to inform timely appeals from adverse decisions.

**Sec. 5.  Improving Performance.** (a)  The Secretary of State, in consultation with the Attorney General and the Secretary of Homeland Security, shall develop and ensure adherence to a plan that addresses USRAP processing backlogs.  In developing this plan, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, and the Director of National Intelligence, and in collaboration with the National Vetting Governance Board and United States Digital Service, shall conduct a review of refugee security vetting processes and develop recommendations to increase their efficiency, fairness, and effectiveness, consistent with the

humanitarian goals of USRAP and the national security and foreign policy interests of the United States.

(b)  The plan and review described in subsection (a) of this section shall also:

(i)  examine whether existing vetting processes, including the Security Advisory Opinion process, can be improved to increase efficiency and provide more effective security reviews; and

(ii)  seek to bring national average processing times within the period described in 8 U.S.C. 1571(b).

(c)  Within 120 days of the date of this order, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit to the President the plan described in subsection (a) of this section, including the Secretary's recommendations for process improvements.

**Sec. 6.  Climate Change and Migration.**  Within 180 days of the date of this order, the APNSA, in consultation with the Secretary of State, the Secretary of Defense, the Secretary of Homeland Security, the Administrator of the United States Agency for International Development, and the Director of National Intelligence, shall prepare and submit to the President a report on climate change and its impact on migration, including forced migration, internal displacement, and planned relocation.

This report shall include, at a minimum, discussion of the international security implications of climate-related migration; options for protection and resettlement of individuals displaced directly or indirectly from climate change; mechanisms for identifying such individuals, including through referrals; proposals for how these findings should affect use of United States foreign assistance to mitigate the negative impacts of climate change; and opportunities to work collaboratively with other countries, international organizations and bodies, non-governmental organizations, and localities to respond to migration resulting directly or indirectly from climate change. The APNSA shall work with appropriate agencies to ensure that the report, or a summary thereof, is made publicly available.

**Sec. 7.  General Provisions.**  (a)  Nothing in this order shall be construed to impair or otherwise affect:

Case 6:23-cv-00007   Document 175-50   Filed on 06/20/23 in TXSD   Page 10 of 10

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

<div style="text-align: right;">JOSEPH R. BIDEN JR.</div>



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CU-00007

EXHIBIT
NO. 116

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

STATE OF TEXAS, *et al.*,

     *Plaintiffs,*

vs.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

     *Defendants,* and

VALERIE LAVEUS, *et al.*,

     *Intervenor Defendants.*

§
§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO.
6:23-CV-00007

JUDGE DREW B. TIPTON

# INTERVENOR DEFENDANTS'
# TAB 116, ECF 175-51

# 1.5 million apply for U.S. migrant sponsorship program with 30,000 monthly cap

⊚ cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications

Camilo Montoya-Galvez

*Washington* — In just a few months, the U.S. received more than 1.5 million requests from individuals hoping to sponsor the entry of migrants from four countries, an extraordinary number that could jeopardize the Biden administration's objective of reducing border crossings, internal documents obtained by CBS News show.

The flurry of hundreds of thousands of sponsorship applications on behalf of would-be migrants from Cuba, Haiti, Nicaragua and Venezuela has overwhelmed caseworkers at the U.S. Citizenship and Immigration Services (USCIS), which can approve no more than 30,000 arrivals under the program each month.

American citizens, residents and others in the U.S. with a legal immigration status are eligible to sponsor migrants from these four countries, as long as they agree to financially support them. Migrants who arrive under the program are granted two-year work permits under the humanitarian parole authority.

Due to the massive and rapidly mounting backlog of unresolved applications, USCIS recently altered the way it processes these cases, selecting half of the requests it reviews each month through a lottery system. The other half will continue to be adjudicated on a first come, first serve basis.

The internal Department of Homeland Security documents obtained by CBS News indicated that as of the end of last month, the agency was receiving an average of nearly 12,000 applications per day from those seeking to sponsor Cubans, Haitians, Nicaraguans and Venezuelans, calling the number "overwhelming." The documents noted that less than three days' worth of applications were processed per month due to the 30,000 monthly cap.

More than 100,000 migrants have arrived in the U.S. under the sponsorship initiative. But the government was overseeing more than 580,000 pending cases for Haitians, more than 380,000 for Cubans, nearly 120,000 for Venezuelans and more than 20,000 for Nicaraguans at the end of April. Other cases were being reviewed or had been approved.

A version of the program was first launched in October 2022 to allow Venezuelans with U.S.-based sponsors to fly to the U.S. directly, as part of an effort to reduce what at the time were record arrivals of Venezuelan migrants along the southern border. In January, the initiative was expanded to include Cubans, Haitians and Nicaraguans, who also journeyed to the U.S.-Mexico border in record numbers last year.

EXHIBIT
50



SAN DIEGO, CALIFORNIA, UNITED STATES - 2023/05/12: Asylum seekers are seen scaling a hill between the US-Mexico border to reach the Mexican military who was providing aid alongside the US volunteers Jon Putman/SOPA Images/LightRocket via Getty Images

The sponsor program has been paired with a policy of returning Cubans, Haitians, Nicaraguans and Venezuelans who cross the southern border illegally to Mexico, which agreed to take back these nationalities, first under the now-expired Title 42 public health order and now under regular U.S. immigration law.

The combination of returns to Mexico with the sponsorship program has led to a sharp drop in illegal border crossings by migrants from these four crisis-stricken countries, whose governments won't or can't accept large numbers of U.S. deportations due to diplomatic or operational reasons.

Top White House officials have boasted about the strategy's success. But the soaring number of applications for the sponsorship program, far above its 30,000 monthly cap, threatens to derail the policy's main objective: encouraging would-be migrants to refrain from crossing the southern border illegally by offering them a meaningful chance to enter the U.S. legally.

The internal DHS documents say the hundreds of thousands of pending cases have caused "significant" wait times for applicants. If the monthly cap is not raised, the documents acknowledged, the program's effectiveness could diminish.

"The migrants who are desperate, and they're desperate migrants, will wait only so long before they say 'it's not happening and I'll take my chances getting something else,' whether that's entering clandestinely or just show up at the border and see if they can be let in," said

Case 6:23-cv-00007   Document 175-51   Filed on 06/20/23 in TXSD   Page 3 of 5

Theresa Cardinal Brown, a former DHS official and current immigration analyst at the Bipartisan Policy Center, a Washington think tank.

Top U.S. officials have not indicated that they will raise the 30,000 monthly cap on admissions. Representatives for DHS did not say whether they were considering increasing the number of monthly arrivals.

"This Administration has led the largest expansion of legal pathways in decades, and the parole processes for individuals from Cuba, Haiti, Nicaragua, and Venezuela is just one of those many pathways now available to individuals seeking to enter the United States lawfully," DHS said Monday in a statement to CBS News.

The department noted it had recently decided to use a random selection process to allocate half of the approximately 1,000 travel authorizations issued each day under the program, in order to "ensure that all individuals who apply have optimism that they will be able to travel to the United States soon."

"Now in their fifth month, the parole processes for Cubans, Haitians, Nicaraguans and Venezuelans have continued to successfully reduce irregular migration and we expect that to continue, but challenges remain, including current court cases trying to block these successful measures," DHS added in its statement.



SAN DIEGO, CALIFORNIA, UNITED STATES - 2023/05/12: Asylum seekers are loaded into vans to be officially processed into the United States system.  Jon Putman/SOPA Images/LightRocket via Getty Images

Case 6:23-cv-00007   Document 175-51   Filed on 06/20/23 in TXSD   Page 4 of 5

In April 2022, the Biden administration launched its first version of the sponsorship policy, setting up a program dubbed Uniting for Ukraine to allow Americans to sponsor Ukrainians fleeing the Russian invasion of their homeland. Unlike the subsequent sponsor program, Uniting for Ukraine has no numerical cap. As of earlier in May, 127,000 Ukrainians had come to the U.S. under the policy.

Changing the cap for the Cuban, Haitian, Nicaraguan and Venezuelan sponsorship initiative could have legal and foreign affairs implications.

The Biden administration and the Mexican government have tied the arrival of up to 30,000 migrants in the U.S. to Mexico's commitment to accept the return of the same number of Cubans, Haitians, Nicaraguans and Venezuelans turned away by American border officials.

"Thirty thousand for 30,000 is something that has proven to work, and we've committed — both countries — to continue with that arrangement of 30,000 to 30,000 after May 11," a senior U.S. official told reporters earlier this month.

The sponsorship policy is also being challenged in federal court by a coalition of Republican-led states that argue the Biden administration does not have the legal authority to use parole to admit up to 360,000 migrants each year outside of the regular visa system.

Blas Nuñez Neto, the top DHS official for border and immigration policy, said last week that Mexico was "unlikely" to continue accepting returns of Cubans, Haitians, Nicaraguans and Venezuelans if the sponsorship program was blocked in court.

Daily unlawful border crossings soared to a record high 10,000 earlier this month, just prior to the termination of the Title 42 public health restrictions on migration, but have since plummeted to 3,000 in recent days.

Biden officials have attributed the sharp drop in border crossings to increased formal deportations of those who enter the U.S. illegally and a restriction that disqualifies many migrants from asylum, as well as efforts by Mexican and Guatemalan military and law enforcement officials to slow U.S.-bound migration.

## Immigration

More



Border concerns prompted U.S. officials to decline granting status to migrants



U.S. extends temporary legal status Trump sought to end for certain immigrants



Asylum limits justified given "sheer number" of migrants, top official says



U.S. plans to admit nearly 40,000 asylum-seekers per month through app
Camilo Montoya-Galvez



Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

Twitter



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 117

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 117, ECF 175-52

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF
TEXAS VICTORIA DIVISION

<div style="border:1px solid black; display:inline-block; padding:4px">
**EXHIBIT
A**
</div>

STATE OF TEXAS, *et al.,*

               *Plaintiffs,*

   v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

             *Defendants.*

Case No. 6:23-cv-00007

**DECLARATION OF DR. GERMÁN A. CADENAS
(pursuant to 28 U.S.C. § 1746)**

I, Dr. Germán A. Cadenas, upon my personal knowledge, hereby declare as follows:

    1.  I am a United States citizen and was born in Mérida, Venezuela in 1987. In 2002, when I was 15, I moved to the United States with my family. I was undocumented from 2003-2011. I became a Lawful Permanent Resident after marrying my partner. I became a U.S. citizen in 2015.

    2.  I lived in Arizona for 14 years, where I completed high school, graduated college at Arizona State University, and to my knowledge, became the first undocumented person to be admitted to a Ph.D. program in the state. After earning my Ph.D. from Arizona State University, I moved from Arizona in 2016 to pursue a doctoral internship and postdoctoral fellowship at the University of California, Berkeley. In 2018, I accepted a position at Lehigh University as a

1

tenure-track professor in the Counseling Psychology program and moved to Philadelphia, Pennsylvania, where I currently live.

3.   My academic work centers primarily on the psychology of immigration and focuses on the impact of immigration policy on the psychological wellbeing of undocumented youth. I also develop interventions to support undocumented youth in educational settings. I regularly provide trainings to educators and healthcare providers across the country on best practices for supporting undocumented youth on college campuses and in the community. My own experience struggling to navigate higher education while I was undocumented motivates and informs my work to eliminate barriers that prevent undocumented youth from accessing the resources they need to thrive.

4.   I have also studied and published writing on declining conditions in Venezuela and their impact on the wellbeing of Venezuelans. For example, I am the author of *The Growing Venezuelan Diaspora in the United States*, published in 2018 in an academic compilation on Latinx Immigrants as part of the International and Cultural Psychology book series.

5.   On October 26, 2022, I submitted to United States Citizenship and Immigration Services ("USCIS") Form I-134, Declaration of Financial Support in support of my uncle. In January 2023, my application was approved and my uncle was authorized to travel to the United States and seek parole under the recently established parole process for Venezuelans. He was successfully paroled into the country in March 2023. As his supporter, I am providing, and will continue to provide, financial support to my uncle for the duration of his parole over the next two years.

6.   My uncle is 63 years old. He is a Venezuelan citizen and was born in Mérida, Venezuela. He later moved to the state of Barinas, where he lived until arriving in the United States this

2

month. He is an agricultural engineer and worked for a variety of private companies, and briefly for a public agricultural institute, in Venezuela. Because of the difficult economic situation in Venezuela, he has struggled to find stable employment since 2007 and had trouble accessing basic necessities while also serving as the primary caregiver for my 91-year-old grandmother, a cancer survivor.

7.   The challenges he faces are exacerbated by political repression in Venezuela. My uncle is opposed to the Hugo Chavez and Nicolás Maduro regimes, and he has lived in fear of speaking freely about his political beliefs. The government in Venezuela controls everything and makes life difficult for those who it views as opposition. My uncle was fired from a good job in 2007, after raising concerns of corruption within a public institute overseeing agricultural lending and development.

8.   Life in Venezuela has become increasingly difficult for most of its residents. I see this both through my own academic scholarship as well as through the experiences of people like my uncle, an older adult who has been dedicated to caring for an elderly person for over 20 years. There is rampant economic instability, crime, corruption, and political tension in Venezuela, which makes daily functioning an ongoing challenge. Every day brings hassles, both new unexpected barriers and old worsening ones. For instance, the value of the currency has plummeted, making it nearly impossible to obtain necessities with the average wages and compensation. My uncle had to sell his vehicle because he could not afford its repairs, and to obtain gas to drive he would have to spend hours in line, sometimes all night.

9.   The government in Venezuela controls access to most good jobs, which are not attainable despite someone's qualifications, unless the job candidate is an open supporter of the regime.

Most institutions have been eroded by the regime, including legal institutions and the rule of law. The courts make decisions based on bribes and corruption.

10. Access to quality healthcare and medications is limited unless one can pay for private healthcare, which has an exorbitant cost. This has been a tremendous challenge for my uncle given my grandmother's health problems. For example, my grandmother went blind in one eye after a doctor made errors during her cataract surgery. She was unable to pursue a personal injury case because of the corrupt legal system. Because of her past botched surgery, my grandmother is afraid of having another surgery, which she needs because she has cataracts in her other eye. My uncle feels distressed from witnessing the decay of the country and its impact on him and my grandmother.

11. I sponsored my uncle because I see it as my responsibility to return the care and support he has shown me throughout my life. My uncle has been an important figure in my life and I want him to be safe and reunited with our family. Growing up, he was like a second father to me. We spent many summers and Christmas holidays together. He provided major support to my parents in times of need, and he and my mom worked together to care for my grandmother during her cancer treatments. Thanks to him, I speak English: he enrolled me in English classes in Venezuela when I was a child and paid my tuition, though it was very expensive. My uncle has supported me my whole life and is a dear member of my family. It is a gift to now be in a position where I can support him.

12. Despite the distance, we have remained close over the last 20-plus years since I left Venezuela. We stayed in regular contact through text messages, phone calls, and occasional visits. Despite the significant cost, my uncle traveled from Venezuela to attend my college graduation, and later my marriage celebration, both times while on a tourist visa. Unfortunately,

4

as economic and social conditions worsened in Venezuela in recent years, such trips have become increasingly difficult to make. The electricity is also unstable where he lives, as is the case in many parts of the country, and he experiences several hours without electric power on a regular basis. This makes it difficult to communicate using technology.

13. Our family is very close-knit, and it's been hard for us to be here, knowing that there are extended family members like my uncle back in Venezuela who are really struggling. My family has been waiting a long time for a program like this, so when the parole program for Venezuelans opened in October, I applied as soon as possible to support my uncle.

14. It took me several days to gather the necessary documentation - such as bank statements and pay stubs - to complete the first part of the application process. My partner is also listed on the application as a supporter because we wanted to make it clear that we intend to support my uncle with our two incomes, if needed. I provided information about our bank accounts and our retirement accounts—all of our assets. The application was quite detailed and lengthy. I had to complete it with my uncle on the phone to make sure all the information was correct, and it took us several hours. The process is not very accessible for people with varying degrees of technology literacy. For example, I have loved ones with lower levels of English proficiency and technology literacy who also sponsored a family member. They were unable to complete the form on their own and required additional help.

15. After I completed the initial phase of the application process, I did not hear anything about the outcome for several months. Finally, in January 2023 I received notification that USCIS had approved my application. At that point, my uncle had to use the CBP One application to submit additional documents and information. That part of the process was difficult and stressful because CBP One requires an up-to-date smart phone, internet connection, and high

technology literacy. My uncle had an old smart phone and the CBP One application did not work

on it: he could not download it on his phone. After a lot of back and forth, we were finally able

to upload his documents, but it took almost one week of troubleshooting and seeking help from

friends with more up-to-date phones in Venezuela that could run the application.

16. When my uncle first arrived in the United States, I met him at the airport and provided

him housing at my home in Philadelphia. He had a comfortable room to stay in, as well as access

to public transportation and my car as-needed. I showed him around our neighborhood and city

and made sure he had everything he needed to be comfortable and begin to acclimate to life in

the United States. He has since moved to live with another family member in Arizona, and he is

welcome to return and live with me at any point in the future.

17. My uncle is an engineer with significant professional experience, but he is open to

accepting any employment opportunities once he receives work authorization. While I am

committed to supporting my uncle financially, he is also eager to contribute to the family as

much as possible. He is committed to learn and integrate himself into his new community. We

have already found options for English classes, and he is looking into additional educational

opportunities. We are already concerned about what might happen if the program is blocked

before he is granted his work permit, for which he applied within a week of arriving. We are

trying to stay positive and thankful that he's here with us now.

18. It is a big relief to me, my parents, and the rest of my family that my uncle is here and

safe. Sponsoring my uncle is a way for me not only to reciprocate the love and support he has

shown me my entire life, but also to give back to my entire family. Having my uncle here

relieves me and my family from some of the stress and worry about the daily hardships and lack

of safety that he and other relatives have been living with in Venezuela for the past 20 years.

6

Even as we celebrate being together again, we also fear what would happen if he had to return to Venezuela. It would be a major relief to me and my family if he is able to remain in safety here. If there is a possibility to extend or renew his parole, I will apply for it and continue to support my uncle during any extended period of parole he is granted.

19. My family and I are thrilled that my uncle is here and safe. However, we remain concerned about the safety and wellbeing of other family members who remain in Venezuela. If the humanitarian parole program remains in place, I would like to explore the feasibility of sponsoring additional family members who are in vulnerable situations.

20. The humanitarian parole program for Venezuelans has been immensely beneficial for me and my family, and I know that it will continue to be helpful to us in the future if it is allowed to continue. The parole program for the nationals of other countries is a good and needed program that will allow for more families to be reunited, for loved ones to be together, and for people to seek temporary refuge from a difficult set of conditions that have negatively impacted millions of people. The positive impact that this program has had and will have on my family is immeasurable, and given the work I do, I feel confident in saying that this is also the case for countless other supporters and beneficiaries.

21. Knowing that the program is already in peril causes me a lot of strain and uncertainty. It is unimaginable to think of the distress, both physical and mental, that my uncle would experience if he had to return to Venezuela. Not having the parole program would also cause stress to my family as we would continue to worry about the safety and wellbeing of my uncle. We, Americans, should protect this program as it reflects the best of a humanitarian approach to immigration policy.

Case 6:23-cv-00007   Document 175-52   Filed on 06/20/23 in TXSD   Page 8 of 8

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at ___Philadelphia, PA___ on March _27_ , 2023.

Dr. Germán A. Cadenas



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV 00007

EXHIBIT
NO. 118

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.,*                §
                                         §
    *Plaintiffs,*                     §
                                         §
vs.                                      §    CIVIL ACTION NO.
                                         §    6:23-CV-00007
UNITED STATES DEPARTMENT OF              §
HOMELAND SECURITY, *et al.,*             §
                                         §
    *Defendants,* and                 §    JUDGE DREW B. TIPTON
                                         §
VALERIE LAVEUS, *et al.,*                §
                                         §
    *Intervenor Defendants.*          §


# INTERVENOR DEFENDANTS'
# TAB 118, ECF 175 53

```
EXHIBIT
   B
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.,*

      *Plaintiffs,*

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

      *Defendants.*

Case No. 6:23-cv-00007

**SUPPLEMENTAL DECLARATION OF DR. GERMÁN A. CADENAS**
**(pursuant to 28 U.S.C. § 1746)**

I, Germán A. Cadenas, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen and was born in Mérida, Venezuela in 1987. I moved to the United States in 2002 and became a U.S. citizen in 2015. I currently live in Philadelphia, Pennsylvania.

2. On October 26, 2022, I submitted to United States Citizenship and Immigration Services ("USCIS") Form I-134, Declaration of Financial Support in support of my uncle. In January 2023, my application was approved and my uncle was authorized to travel to the United States and seek parole under the parole process for Venezuelans. He was successfully paroled into the country on March 15, 2023.

1

As his supporter, I am providing financial support to my uncle for the duration of his parole over the next two years.

3. When my uncle first arrived in the United States, I met him at the airport and hosted him at my home in Philadelphia. I helped him get oriented to life in the United States and supported him as he applied for work authorization. His application is still pending.

4. While living at my home, my uncle and my three-year-old daughter connected in a way that deeply moved me. One of the first days after my uncle arrived, we went for a nature walk with my daughter at the Wissahickon Valley Park in Philadelphia. As we walked along the creek, my uncle spotted a family of ducks. My uncle showed them to my daughter and started making duck noises. My daughter, copying him, started making duck noises, too, for the first time. It's a very small moment but the bonding and joy they both experienced was palpable. We are so grateful for those moments and connections, especially because I do not have a lot of family in the United States. This program has been a meaningful, wonderful, and invaluable way for my daughter to connect with someone who played such a formative role in my own life, whom she probably wouldn't have been able to meet in person but for this program.

5. On March 19, 2023, my uncle flew to Arizona to stay with my parents in their home for an extended period. He and my mother had not been together in person since early in 2018. This program is allowing them to be reunited as siblings. My

mother has described this experience as nothing short of a miracle, since there was no other way for him to have been able to come to the United States.

6. My uncle is doing well and my parents are very happy to have him there. My family is helping my uncle get oriented to his new community and adjust to life in Arizona. My uncle is helping my family wherever he can, cooking meals for them and helping around the house. He has also been taking time to rest and read, which is an incredible privilege that is easy to take for granted for those of us who live in relatively safe and stable environments. For him, it has been a positive adjustment to not have to worry about whether he will have access to necessities, such as food, electricity, and healthcare.

7. My uncle is also making up for lost time with our family. After almost 20 years living apart, my uncle and other family members are enjoying the little day-to-day moments, like sharing a meal, that all families deserve. While I know my uncle is eager to contribute to the family as much as possible—and for that reason applied for work authorization within days of his arrival to the United States —I am glad that my uncle has this time to rest and catch up with people he loves. It is good for him to be able to slow down and not have to worry about meeting his basic needs every day, like he did in Venezuela.

8. Since arriving in the United States, my uncle and I have searched for different options for English classes, and he has started attending a class. He already had a basic level of English proficiency, and I am confident that he will quickly learn

to communicate more fluently. Other than this, my uncle is enjoying a slower pace of life and getting to know the Phoenix metropolitan area and what it has to offer.

9.   I have been in constant communication with my uncle and family in Arizona since my uncle arrived there. We use WhatsApp, a videoconference application, to talk frequently. My daughter loves speaking to my uncle on the phone, and they have continued to develop their bond that way while he is living in Arizona. We hope to visit soon, as well.

10. I remain available to cover my uncle's living costs, and he is welcome to return and live with me at any point in the future.

11. While I am committed to supporting my uncle financially, he is also eager to contribute to the family as much as possible. My family plans to connect my uncle with employment once he receives work authorization. For example, my father cleans office buildings, and he can connect my uncle with past employers. While we are doing our best to take it day by day, we are already concerned about what might happen if the parole program is blocked before he is granted his work permit. We are trying to stay positive and thankful that he's here with us now.

12. My spouse and I are very glad that we sponsored my uncle through this program and are so happy that he is here. This program means that our family can be together, that my uncle can rest, and that he will soon hopefully be able to work and live a normal life without worrying about political unrest. There are many families all over the globe that don't have these privileges. I am very grateful that my uncle has that chance now, thanks to the parole program.

4

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Philadelphia, Pennsylvania on June 13, 2023.

Germán A. Cadenas

AO386-B

**DEFENDANT'S EXHIBIT**

CASE NO. 6:23-CV 00007

EXHIBIT NO. 119

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' TAB 119, ECF 175-54

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| EXHIBIT |
| C |

STATE OF TEXAS, *et al.,*

        *Plaintiffs,*

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

        *Defendants.*

Case No. 6:23-cv-00007

**DECLARATION OF DR. NAN LANGOWITZ**
**(pursuant to 28 U.S.C. § 1746)**

I, Dr. Nan Langowitz, upon my personal knowledge, hereby declare as follows:

1.  I am a United States citizen. I was born in Manhasset, New York, in 1957.

2.  I currently live in Wellesley, Massachusetts, which is a suburb of Boston. I have lived

here for over three decades.

3.  I grew up in Port Washington, New York. After getting a B.A. in Government from

Cornell University, I attended business school at New York University, then worked for a brief

time on Wall Street. I decided I wanted to become a professor, so in 1982, I moved to Boston for

my doctoral studies at Harvard Business School, where I studied organizational innovation and

technology. I have taught at several institutions but in 1992, I joined the faculty at Babson

College in Wellesley, where I have been teaching ever since.

1

Case 6:23-cv-00007   Document 175-54   Filed on 06/20/23 in TXSD   Page 32 of 98

4.  I submitted to United States Citizenship and Immigration Services ("USCIS") Form I-134, Declaration of Financial Support, for a Venezuelan woman named Janeth, her son, and her daughter-in-law to be considered for authorization to travel to the United States and to seek parole under the recently established parole process for Venezuelans. I am able to sponsor and financially support Janeth and her family for the next two years. The applications for all three family members were granted and they arrived in the United States in December 2022.

5.  I am sponsoring Janeth's family because I feel compelled to help people in need, and I see it as a way of paying things forward, especially because I know that I am descended from people who, like Janeth, came to the United States as immigrants. My own grandparents showed up in the United States as strangers in a strange land, and somehow they managed to find their footing here. My paternal grandmother, for example, came to this country in the early 1910s from Hungary, fleeing a difficult life and religious persecution in her town. My other grandparents, as well as those of my husband, have similar stories. We don't know who helped our grandparents find their way after they arrived in the United States, but it is very likely that someone provided to my grandparents the same kind of assistance and support that I am now providing to Janeth. It's very gratifying to be able to provide that kind of support to Janeth, who, like my grandparents, came to the United States to start a new life.

6.  I am blessed to be able to sponsor Janeth with the support of my synagogue, which for over six years has been helping immigrant and refugee families resettle in the United States. In 2016, my synagogue launched a refugee resettlement program to aid Syrian refugees. My husband and I immediately got involved with the group; I believe we attended the very first meeting. I have been volunteering with my synagogue ever since, for over six years, helping immigrant families resettle in the United States.

7. The group that originally formed to assist Syrian refugees has since been renamed the New American Resettlement Committee. It has resettled to the Boston area at least 11 families from Syria, Afghanistan, Ukraine, and Venezuela through refugee and parole programs set up by the federal government. The Committee consists of dozens of volunteers and a leadership team, which makes decisions about how many families the synagogue can sponsor through these programs and how to find volunteers to support and sponsor, when needed, families. It also is responsible for raising and administering funds.

8. I am not part of the leadership team, but I have volunteered my time and effort to the Committee since the synagogue first committed to support a family from Syria in 2016. My involvement with the Committee has largely been related to housing—finding and gathering furnishings so a family we welcome has everything they need for a home once we secure living arrangements for them.

9. Almost everything we gather to furnish a new household is donated by members of the synagogue, as well as from other religious congregations in our community, including churches and mosques. Typically, a team of three to four people will work together to furnish a home, with each person responsible for a different room. Once we put out a call for the things we need, it's amazing how everything shows up and turns the house into a real and functional home for the family we are trying to support. I have worked on the Committee's household-setup team for six families: A Syrian family, two Afghan families, two Ukrainian families, and Janeth's family from Venezuela.

10. In early November 2022, a member of the Committee's leadership team came to me and told me about Janeth's family and their need for a sponsor.

3

11. My husband and I considered what might happen if someone in Janeth's family had an extraordinary medical expense. Although the synagogue would be providing financial support for Janeth's family, emergency expenses can get quite big. But my husband and I decided that we would be willing to use our own personal resources to cover any such costs. We made this decision because we feel that our family has been very blessed, and we have adequate resources to support our own family as well as Janeth's.

12. I probably would have agreed to sponsor any family, but I was especially moved by Janeth's story. Janeth is a political scientist and human rights advocate from Venezuela. She is clearly a person who consistently helps those around her, even in the face of persecution and harassment by the Venezuelan government for her activism, causing her to flee Venezuela for Colombia. Even in Colombia, she continued helping those in her new community. Her tremendous strength inspires me. When you hear her story, you can't help but feel compelled to help her.

13. On November 12, 2022, I filed the Form I-134 for Janeth, her son, and her daughter-in-law. I included a letter from the executive director of my synagogue's organization stating its ability to financially support Janeth's family. It was a testimonial letter, outlining the amount of money in the fund, the organization's willingness to support Janeth's family, and how the organization has supported families in the past.

14. After filing the Form I-134, I visited the USCIS filing website every day to check on the status of the sponsorship applications. Each day I saw the same message about how USCIS was processing the request. After waiting two or three weeks, I decided to write my congressman. A staff member of Congressman Jake Auchincloss responded quickly and explained that his office would be willing to send an inquiry to USCIS about my sponsorship application if I was able to

demonstrate urgency in having Janeth's application processed promptly. I worked with an organization in Colombia to get an official letter from the office of the city ombudsman of the local municipality where Janeth and her family were living to show Janeth's urgent need. I also obtained a certified translation of the letter, and provided both the original letter and the translation to the congressman's office. The office then placed an inquiry with USCIS regarding Janeth's application.

15. I don't know if my efforts helped, but about a week later, on December 13, 2022, we received notice that the Form I-134 had been approved. I was the person in charge of our household set-up team for Janeth's family, so I worked hard in the following weeks to finalize their living arrangements.

16. Before they were able to leave Colombia and come to the United States, Janeth had been forced to separate from her son and his wife for their personal safety. She had also been forced to move to a new location every week, again for personal safety reasons—and her son and his wife had been doing the same. The night before they flew to the United States, they were finally reunited. They sent us a photo of the three of them together and it was so joyful. We could tell they were so excited.

17. On December 30, 2022, Janeth's family arrived in the United States. We set them up temporarily in a volunteer's basement apartment. On January 12, 2023, we moved them into a two-bedroom apartment. Our synagogue's New American Resettlement Committee works with our local Jewish Family Service to get favorable apartment rental rates from a local landlord. Then we support families' rental payments for the first year. Once families are able to start working, we ask them to begin contributing to their rent, with the goal that they can pay their full rent and their other expenses by the end of the first year.

Case 6:23-cv-00007   Document 176-54   Filed on 03/24/23 in TXSD   Page 76 of 93

18. To help support each newly arrived family become self-sufficient and able to pay their own expenses and rent after a year, the New American Resettlement Committee follows a model originally established by HIAS, the oldest refugee resettlement agency operating in the United States. Under the HIAS model, for each family the synagogue sponsors, we assign a core team of five people – typically one person responsible for one of five "pathways": education, medical, employment, community engagement, and cultural orientation. Each person provides support to that family in their assigned pathway, and the team meets weekly to make sure we're all communicating about the family's needs and how we can support them. For Janeth's family, I share the duties of the community engagement and employment pathways with another volunteer. When Janeth's family has a question or needs help, they know which person to go to.

19. The team supporting Janeth's family is in the process of getting them work authorization; they applied for work permits the first week of February and all had biometrics appointments in late February. We help ensure they have access to nutritious food and basic necessities. Additionally, all three of them have been taking English as a Second Language classes and each has a volunteer language tutor from our synagogue.

20. While we await their work authorizations, we have been searching for job opportunities for them. Janeth would like to continue working in public policy, as she has deep expertise in that area from her work in Venezuela and Colombia. In fact, we just heard about an opportunity she is well-suited for and the employer expressed interest in her, so that is something she will pursue when she is granted authorization to work. Janeth's daughter-in-law has an undergraduate degree in tourism and is interested in hospitality and housekeeping management. She was invited by a senior living apartment complex to apply for a job there once she gets her work permit. And Janeth's son is interested in construction work or perhaps landscaping; our team has already

Case 6:23-cv-00007   Document 175-54   Filed on 06/29/23 in TXSD   Page 8 of 9

identified several possible opportunities for him. They are so anxious to begin working and contributing to their expenses.

21. Sponsoring Janeth's family has been an incredibly rewarding process for me and my husband. It has been wonderful to be able to play a role in helping people reimagine and reestablish their lives in a completely different place and become contributing members of the United States. It's what we often hear politicians talking about—the American Dream—but this is how it happens. The first family our synagogue sponsored—a Syrian family with four kids—has now been here in the States for about seven years. They are supporting themselves, own a home, and even welcomed their fifth child into the world. It's the same process my grandparents went through in the early twentieth century.

22. To be able to help another family adjust to the United States and see their growth and adaptation is very rewarding. In the HIAS model the Committee has adopted to provide support to our resettled families, we use the word "pathways" intentionally. We do not lead the families we are assisting; we walk with them side-by-side and we learn with them. That's how we have approached our work. The families who have come to the United States through these refugee and parole programs have had to be incredibly resilient and strong in ways that I can't even imagine. It's a privilege for me and my fellow volunteers at the synagogue to do whatever we can to launch Janeth and the other families in their new lives so that they can adapt and continue making decisions about their own lives.

23. I'm very happy that the synagogue is continuing to support families through the parole programs. Already, the synagogue is sponsoring another Ukrainian family that arrived to the United States last week. The synagogue is also sponsoring additional members of Janeth's extended family—the mother, sister, and niece of Janeth's daughter-in-law. I recently initiated

the I-134A forms process for them, and plan on finding another apartment, working on the

household set-up team, and doing everything else necessary to bring the rest of Janeth's family to

the United States. The situation in Venezuela is so dire that it is important to me to be able to

help more of Janeth's family so that they can be together in the safety of the United States.


I declare under penalty of perjury and under the laws of the United States that the foregoing is

true and correct.


Executed at Wellesley, Massachusetts on March 27, 2023.


Nan Langowitz
_____
Nan Langowitz



DEFENDANT'S EXHIBIT

CASE NO. 6:23-CV-00007

EXHIBIT NO. 120

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' TAB 120, ECF 175-55

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

> EXHIBIT
> D

STATE OF TEXAS, *et al.*,

    *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

    *Defendants*.

Case No. 6:23-cv-00007

**SUPPLEMENTAL DECLARATION OF NAN LANGOWITZ**
**(pursuant to 28 U.S.C. § 1746)**

I, Nan Langowitz, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen. I was born in Manhasset, New York in 1957.

2. I am currently living in Wellesley, Massachusetts, where I have lived for over three decades. I am currently part of the faculty at Babson College in Wellesley, where I have been teaching since 1992.

3. I have sponsored Janeth, a Venezuelan political scientist and human rights advocate, her son, Sergio, and his wife, Katherine, for parole through the recently created parole pathway for Venezuelans. I filed Forms I-134, Declaration of Financial Support, for the three of them in November 2022. The applications were granted a

1

few weeks later, and Janeth and her family arrived in the United States in December 2022. As of the date I signed this declaration, they have been in the United States for just under six months.

4. All three have been settling into their community and their new lives in the United States well. They are very happy to be here, and particularly to be in a safe and peaceful environment—they appreciate how quiet and calm their neighborhood is. They recently met another resettled Venezuelan family whom the Jewish social service agency we partner with is also supporting, which I think was great for them.

5. A group of us from my synagogue's New American Resettlement Committee have been helping Janeth's family with various aspects of their adjustment to life in the United States. We found housing for them, and we are continuously working to make sure their basic needs are met by assisting with their work authorization applications, setting them up with English language instruction, medical care, providing financial support for groceries and other necessities, and assisting with transportation.

6. Janeth, Sergio, and Katherine applied for work authorization in early February and had their biometrics appointments a few weeks later, but their applications remain pending. The synagogue continues to support them financially in the meantime. As they wait, Sergio and Katherine have been doing volunteer work. Sergio volunteers about once a week with a moving company, the owner of which is bilingual and has a particular interest in hiring bilingual crew members like Sergio. Volunteering gives him a chance to meet people and practice his English as well as

2

be productively occupied outside his family. Katherine has been volunteering about twice a week at a bilingual daycare, where she gets to practice her English and have a sense of fulfillment working with the children. Both employers have expressed a willingness to hire Sergio and Katherine once their work authorizations are granted. Janeth is also exploring options for project-specific work related to her past community organizing and grant-writing work in Colombia. All three of them are eager to begin working once they're authorized so they can start contributing to their expenses and become self-sufficient.

7. Janeth, Sergio, and Katherine continue to take ESL classes, and they meet with tutors once a week. The language skills of all three of them have greatly improved over the months they have been here. Their current ESL classes will end in late June, at which point their tutors will evaluate them to determine the best next course for them. Additionally, Katherine has already completed a childcare certification course, which has been and will continue to be helpful with her volunteer work at the daycare and her future employment.

8. I remain in frequent contact with Janeth's family via our personal phone group chat, and I see them at least once a week, sometimes more. Most Wednesdays, I help them with groceries. I sometimes see them on other occasions, too. For example, in early May there was a special event to help raise funds to support the Jewish social service agency we partner with to support this and other newly arrived families. The same event honored a local landlord who provides subsidized rent for immigrant families in the community, including for Janeth's family. I went with Janeth's family

3

to the event, and I could tell it was very powerful for them to be in a room full of people who believe in supporting and welcoming newcomers like them.

9. As her sponsor, I have also been providing support so that Janeth can figure out what she might want to do beyond the temporary parole period she and her family have been granted. She had an appointment with an immigration attorney last month to learn more about what options might be available to her and her family and has been advised that they are strong candidates for asylum. The non-profit law firm will be helping Janeth apply for asylum in the next few weeks.

10. In addition, I have filed applications to sponsor additional members of Janeth's extended family—namely, for Katherine's mother, sister, and niece, so that they can all be together in a place of safety. I know that Katherine's separation from her family over the past few months has been very hard on her. Accordingly, on March 27, 2023, I filed Forms I-134A, Online Request to be a Supporter and Declaration of Financial Support, for Katherine's mother, Ingrid, and Katherine's sister, Stephanie. Initially, I was unable to apply to sponsor Stephanie's eight-year-old daughter because she needed to apply for a passport. Luckily, it arrived in early May, and I updated my sponsorship application to include her I-134A on May 9, 2023. Within a few days of doing so, I received email confirmation that the sponsorship applications had been approved, and Stephanie and Ingrid received emails instructing them to create USCIS accounts to begin the process of seeking parole. Stephanie added her daughter to her application and uploaded their documentation in preparation for their

anticipated travel to the United States. On June 8, 2023, travel authorization for all three of them was granted.

11. Janeth, Katherine, and Sergio are all so excited that the travel authorizations for Katherine's family have been granted and they are one step closer to seeking parole to the United States. Katherine in particular is ecstatic about this development—she had been emotional about being apart from her mother, sister, and niece, and about starting a new and important chapter of her life in United States without them. She is overjoyed that they will be reunited soon in the safety of the United States.

12. The Committee's leadership team is in the initial phases of planning for Katherine's family's arrival. We are starting to think about housing. We hope we can find a suitable place for the whole family to live together, or at least a place for them that is close to where Janeth, Katherine, and Sergio live.

13. In addition to Katherine's family, my synagogue is currently engaged in supporting other families also arriving through the parole pathways. A Ukrainian family arrived in April, and the Committee is helping them with all aspects of their resettlement. We have also been involved in supporting one of our Afghan families in preparation for their upcoming move to California to be closer to other family members out there. Different parts of that family have been separated for many months, including parents separated from children, so it is incredibly gratifying to know that they will be reuniting soon and that we have been instrumental in bringing them to a place of safety where they can be together.

14. This has been an amazing process for me to be a part of. I can see Janeth's family is so much more at peace than when they first arrived, and it makes me feel good to see that. And our synagogue's sponsorship of families generally has been wonderful. Welcoming others in need is an integral expression of our faith, so there are many of us from the community who are involved in these efforts, and it has really brought our synagogue together.

Executed at Wellesley, Massachusetts on June 13, 2023.

_____

Nan Langowitz

6

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 121

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 121, ECF 175-56

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

> ## EXHIBIT
> ## E

| | |
|---|---|
| STATE OF TEXAS, *et al.,* | |
| *Plaintiffs,* | |
| v. | Case No. 6:23-cv-00007 |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,* | |
| *Defendants.* | |

## DECLARATION OF ANNE VALERIE DANIEL-LAVEUS
### (pursuant to 28 U.S.C. § 1746)

I, Anne Valerie Daniel-Laveus, upon my personal knowledge, hereby declare as follows:

1.   I am a United States citizen who was born in Port au Prince, Haiti, in 1981. I first came to the U.S. at age 18 to attend college as an international student at Slippery Rock University in Pennsylvania. I graduated in 2005 with a Bachelor's Degree in International Business and Spanish.

2.   I naturalized as a U.S. citizen in 2008. I currently live in Hollywood, Florida. I have lived here for about 18 years, since 2005.

3.   While in Florida, I pursued a Master's Degree in Business Administration with a concentration in Entrepreneurship at Nova Southeastern University in Florida. I worked for

1

American Express for ten years. However, I realized that my true passion was in education and
felt called to become a teacher.

4.   I am currently a middle school teacher, and teach technology classes to sixth, seventh,
and eighth graders. I have taught other subjects in the past, including intensive reading, business,
and speech and debate. I have been a teacher for the past five years.

5.   On or around January 17, 2023, I submitted to United States Citizenship and Immigration
Services ("USCIS") a Form I-134A, Online Request to be a Supporter and Declaration of
Financial Support, on behalf of my brother, Reginald Daniel, and his 14-year-old son. I am able
to sponsor and financially support my brother and nephew for the next two years as required for
them to receive travel authorization and seek parole under the recently established parole process
for Haitians.

6.   I am sponsoring Reginald and his son to seek parole into the United States because I feel
responsible for ensuring that my brother and nephew are in as safe and stable conditions as
possible. I feel privileged to have made a life for myself here and want them to have the same
opportunity as I had. My mother has an approved family-based visa petition for him and his son,
but they will have to wait for years for a visa to become available. When the parole program for
Haitians started earlier this year, I leapt at the chance to bring them here sooner and faster. My
brother has faced significant challenges in Haiti, both due to the country's deteriorating
conditions and as a victim of violence. As his older sister – especially after our dad passed away
from colon cancer last year – I feel responsible for looking out for him and my nephew.

7.   Reginald is currently 37 years old. He was born in 1985 and currently lives in Port au
Prince, Haiti. We speak approximately every 2-3 days. We have become particularly close since
our father's passing last year.

8.   Unfortunately, Reginald's life in Haiti has been extremely challenging. In 2015, a police officer shot him in the head at point-blank range. He had been socializing with his friends in a public park near my grandmother's house when a man approached and pointed at my brother, saying, "Here's the guy." Another person, whom my brothers' friends knew was a police officer, pulled out a gun, placed the barrel against his head, and shot him. The gunshot should have immediately killed him, but the bullet ricocheted off his skull and came back out. My brother fell to the ground bleeding.

9.   One of the other men in the park knew my grandmother so he stepped in and carried my brother on his back to a private hospital located about a mile away. The hospital did not want to treat him and blocked him at the entrance gate, thinking he did not have the necessary funds, but the man insisted that my father could pay for my brother's care. My father worked in the medical field, in pharmaceuticals. The doctor called my father, realized that he had the resources to pay, and treated Reginald for his gunshot wound. If the hospital had denied him care, I am certain that Reginald would have bled out at the hospital gate.

10. Reginald had a long, difficult recovery. Haiti does not have an equitable or advanced health care system, and it is only through my father's connections with doctors and others in the pharmaceutical industry that Reginald was able to receive medication and follow-up care. He had to have part of his brain removed, and for a time the doctors doubted he would get all his abilities back. For a long time, he suffered epileptic seizures because of brain swelling.

11. After Reginald was shot, my family feared for his life. We immediately moved him away from my grandmother's house, where he had lived before the shooting. For more than two years after that, my family kept my brother inside, away from public spaces, so that he would not receive any further threats while he recovered. Our family did not go to the police after the

3

Case 6:23-cv-00007   Document 176-56   Filed on 06/29/23 in TXSD   Page 54 of 98

shooting because the man who shot him was a police officer. In Haiti, there is little public trust in the police. Our family feared retaliation if we pursued an investigation. In Haiti, it is often better not to stir things up.

12. Amazingly, though, Reginald is now fully functional in every way, and has been since 2021. Despite a long recovery from the shooting, his mind is sharp, he is in very good health, and he is able to work with his hands. I don't anticipate him needing additional medical services once he arrives in the U.S., apart from annual check-ups. I will help him find private insurance.

13. Even though my brother has recovered from the shooting, he has not been able to find steady work because of the deteriorating conditions in Haiti. Before he was shot, he had finished high school and previously worked for Digicel, one of the phone companies in Haiti. He had also done tech support, including working for some time with HaïNet, an internet services company. But there are no good opportunities in Haiti for young men anymore. Gangs target successful people for violence and kidnapping so that they can extort the victims' families for ransom money. I personally know of several people from my old neighborhood who have been kidnapped; some were released, but others have completely disappeared. Entire neighborhoods are now run by gangs that sometimes put a neighborhood on lockdown for days, only letting residents out perhaps once a week so that they can buy food. Haiti is very scary and there's no place to find and hold down a job, or to raise a family.

14. As a result, my mother and I have to send money to Reginald in Haiti every month so that he and his son can survive. It would be better for our family for so many reasons if Reginald and his son were able to come to the United States: we could all be together; my brother could raise his son in a safe place; and Reginald could find work to help support our family.

4

15. Coming to the United States would also benefit my nephew, Reginald's son, who has likewise faced a lot of instability and danger in his life. After the earthquake in 2010, he moved in with my father and my father's girlfriend because the house where he and Reginald had been living was completely destroyed. He ended up remaining under my father's care after Reginald was shot because Reginald was not able to look after his son during his recovery. My father's girlfriend has continued looking after my nephew since my father's passing. Now that Reginald is fully recovered, we have been trying to transition my nephew back to Reginald's home. However, one of the two schools where my nephew might have been transferred was recently shut down after a student was shot while leaving class. The student who was shot was a bystander, just trying to get an education.

16. Recently, my nephew was also the victim of an attempted kidnapping at his last school. As he was leaving one afternoon, a man on a motorcycle was waiting for him and said that he had been sent to pick him up. My nephew became frightened and ran back into school, where he hid until the man left. He called home and a family member confirmed that they had not sent anyone to get him, so he remained at the school until someone from our family could pick him up much later.

17. As with Reginald, my nephew and I have grown closer since my father's death. Because he lives with my father's girlfriend, I'm not able to speak with him as often as I would like – but I bought him a laptop and phone so we have been able to be in touch more regularly. We are kin. I want to be more involved in raising my nephew to help him have the same opportunities I had. My stepson is leaving for Army training in a few weeks so I will have space at my house for my nephew. I'm looking forward to spending more time with him, helping him get an education, and instilling good values in him.

5

18. The thing I want most for Reginald and his son is for them to have a normal life. I don't want them to have to worry about whether someone will come after them with a gun. I don't want them to have to live under lockdown, in fear of gangs or kidnappers. I want them to have the same kinds of opportunities I had when I came to the United States as a young person, such as attending college.

19. Accordingly, I helped my mom file a family-based immigrant visa petition for Reginald and his son in 2020 and it was approved in 2021. We have been waiting since then for a visa to become available for him and his son. But all the information available on the USCIS website indicates that we will be waiting for at least six more years. It's just not tenable for Reginald and his son to remain in Haiti for that long – the country is too dangerous and the conditions are too unstable.

20. I learned about the Haiti parole program from an acquaintance. I didn't know at first if it was legitimate, so I contacted a lawyer friend of mine. She told me it was a real program, and that my brother and nephew seemed to qualify, so I immediately looked into filing an application to sponsor them.

21. When I first tried to fill out the application, the website crashed. I decided to gather all of the information I would need first and try again later. I have sufficient savings to support my brother and nephew, in addition to having a steady job as a teacher. I have taught at the same school for five years. I gathered a letter from my bank, a letter from my school, and the other supporting documentation that the program required. It took me about a week to gather all of this information. I ended up applying on January 17, 2023.

22. My mother, a U.S. citizen, lives with me and is thrilled at the prospect of having Reginald and his son finally together with us in the States. She is not in good health, and currently suffers

6

from diabetes. She used to take blood anticoagulants due to her blood not coagulating correctly. Because travel is difficult for her and she cannot get the medicine for her condition in Haiti, she has not been able to spend much time with my nephew – her grandson – in person, and feels like she has missed out on a lot of his life and personal milestones. She speaks to him on FaceTime and is looking forward to spending a lot of time with him if he is allowed to come to the United States

23. Moreover, my mother suffers from depression, especially since my father's sudden death last year. The possibility of being reunited with her son and grandson has given her a lot of hope. When she learned that I had applied for them under the Haiti parole program, her face lit up in a way that I had not seen in a long time – she seemed like her old self again. I think it will be very good for my mother to have my nephew around.

24. I feel certain that Reginald would have real opportunities here to develop a career, earn money to help support our family, and provide a more stable environment for his son. He won't have a language barrier when he gets here because we both learned English while attending an American high school in Haiti. He is very honest, organized, and capable. He is interested in cars and has picked up some skills as a mechanic, so he is considering pursuing training as a mechanic at a technical school. I also have shared information with him about a JavaScript software training program that a friend of mine did; she was able to land a six-figure salary after completing the program. Reginald loves computers so that might be a good option. I also have an uncle in New York who has some leads on jobs for Reginald.

25. My family's hope is that my brother's permanent resident visa comes through while he is here through the parole program so that he does not need to return to Haiti and continue to wait after the two years' parole. Haiti is a very dangerous place right now, and it continues to

deteriorate. It's the worst that I have seen it in my whole life. I just want my brother and nephew to be safe and with the rest of our family and to have access to the same opportunities I had. I am grateful that the parole program for Haitians allows him to be safe and together with us in the United States while he waits for his visa.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Hollywood, Florida on March 27, 2023.

Anne Valerie Daniel-Laveus

8



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 122, ECF 175-57

> **EXHIBIT**
> **F**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

STATE OF TEXAS, *et al.,*

        *Plaintiffs,*

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

        *Defendants.*

Case No. 6:23-cv-00007

## SUPPLEMENTAL DECLARATION OF ANNE VALERIE DANIEL-LAVEUS
### (pursuant to 28 U.S.C. § 1746)

I, Anne Valerie Daniel-Laveus, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen. I was born in Port-au-Prince, Haiti, in 1981. I came to the United States when I was eighteen years old and became a United States citizen in 2008.

2. I am a teacher and I currently live in Hollywood, Florida. I've been living here for about eighteen years, since 2005.

1

3. On or around January 17, 2023, I filed the Form I-134A to the United States Citizenship and Immigration Services ("USCIS") to sponsor my brother Reginald and his fourteen-year-old son.

4. On or around June 8, 2023, Reginald received an email from USCIS letting him know that my I-134A had been approved, and that he could set up a profile on the USCIS Online portal to confirm his biographical information. The email from USCIS said that my declaration of financial support "states that [I] agree to provide financial support to [Reginald] for the duration of the period of parole in the United States that [Reginald] may be granted. USCIS has reviewed the Form I-134A and confirmed it is sufficient."

5. As Reginald's sponsor, I did not receive any notification from USCIS that my I-134 had been found sufficient; I learned this for the first time from Reginald. I was surprised that USCIS did not inform me directly via email, but I was able to log in and confirm my sponsorship status. I am fortunate that Reginald is computer-savvy and literate and was able to share the news with me. In Haiti, illiteracy and a lack of access to technology are both major issues. Although Reginald was able to navigate this process without issues, I imagine that other Haitians might not have as easy a time understanding what the update from USCIS meant – especially because the message from USCIS came in English, rather than Haitian Kreyol or French.

6. Now that I have received this approval, I helped Reginald and his son add their biographical information on the morning of June 12. He does not have reliable internet access, so I called him and helped him answer all the questions on the USCIS

2

Online portal. I was able to combine Reginald's online profile with his son's, so they will receive any updates together.

7. From what I have heard, USCIS will likely take one to two weeks to verify the biographical information, and then Reginald and his son will be able to receive travel authorization. I plan to buy Reginald and his son plane tickets as soon as their authorization comes through. I am hopeful that Reginald and his son will be able to join me in the United States soon.

8. I am glad that I finally heard back from USCIS because I had been growing frustrated with how long it was taking for my sponsorship application to be adjudicated. I collected all the documents and information needed to show that I can financially support my brother and nephew, including a bank statement and letter showing how much money I have saved in my bank account, documentation of my assets and income, and a letter from my school verifying my job as a teacher and my annual salary. I was very careful in filling out all the forms and gathering all the information and documents, so I was confused about why I was still waiting for my sponsorship application to be reviewed and approved.

9. Waiting for my sponsorship application to be adjudicated was becoming especially frustrating for me because I knew people who applied to sponsor individuals through these parole pathways months after I applied and had their applications approved more quickly than my own. Since it was not clear to me why some people's applications were moving quicker than others, on or around May 9, I reached out to my state representative, Congresswoman Debbie Wasserman Schultz,

to inquire about my sponsorship application and ask why my application has been stalled for over four months. I was given no definitive answer about the timing for my application to be adjudicated, except that Representative Wasserman Schultz's office would look into the issue. I am not sure if my application's approval was related to an inquiry by Representative Wasserman Schultz, but I remain puzzled by why certain applications took longer than others.

10. The uncertainty concerning when my sponsorship application would be adjudicated was difficult for all of us. The conditions in Haiti continue to be the worst I have ever seen, so knowing my brother and nephew were still there was hard for me, as Reginald's older sister and as an aunt to my young nephew.

11. At the time of my previous declaration, we were in the process of trying to move my nephew back into my brother's home. In early April, I was finally able to coordinate with Reginald so that he and his son could live together while they wait for my sponsorship application to be approved. It was a huge relief to me that they were finally able to be together again because it's best for my nephew to be with his dad. Still, the many months of waiting for my sponsorship application to be approved were difficult for both of them given the danger and instability in Haiti right now.

12. Over the course of just a few months this year, the conditions in Haiti have continued to deteriorate as civic unrest and violence persist virtually unchecked. Recently, Reginald had to rush my nephew home from school because of riots that were happening in the area. Due to these riots, several people were burned alive in the open streets. In addition, access to basic necessities has either greatly diminished

4

or is non-existent, and prices for them have increased exponentially. As a result, in April I had to start doubling the amount of money I send to Reginald twice a month, for him and my nephew to be able to pay for food and water, medical care, schooling for my nephew, and overall living expenses.

13. I also had to send extra money in April so that Reginald could buy a used motorcycle to take his son to and from school. Although we were able to bring my nephew back to live with Reginald, we learned we couldn't transfer my nephew to a school closer to Reginald's home. Getting a motorcycle was necessary for Reginald to be able to pick up and drop off my nephew at school when there isn't a lockdown in their neighborhood and it is safe for him to go to school.

14. I continue to worry every day for the safety and well-being of my brother and nephew while they are still in Haiti—there is only so much I can do being so far away from them. I do not begrudge him a penny, but it always felt like the money I send is never enough. The limbo of waiting for my sponsorship application to be adjudicated also made it hard to plan for the future. For example, I recently found out that Reginald's house no longer gets reliable electricity. I spent a lot of time researching solar panels, batteries, and other ways to try and make sure that my brother and nephew get at least some power each day, but the available options are expensive. It was hard to decide what to do when it wasn't clear if Reginald will be in Haiti for another week, another month, or another year.

15. Now that my sponsorship application has been approved, I can see the light at the end of the tunnel. All of our family, but especially Reginald and my nephew, are

eager for them to come to the United States through the Haitian parole pathway and begin anew in a safe environment, surrounded by family. I remain happy that I am in a position to support my brother and nephew, but it will be so much easier for all of us now that my sponsorship application has been approved and they should be able to come to the United States. They will be safe here, our family would finally be together, and Reginald and his son could start building a new life for themselves.

16. I have everything ready to support my nephew and brother if they are granted parole. My stepson has left for the Army, and his room in my house is now set up for my nephew. I continue to remain in frequent contact with Reginald and my nephew, and my mother speaks to them almost on a daily basis. My nephew tells her that he cannot wait to come here and be with all of us. My children are also eager for Reginald and my nephew to arrive, but they express disappointment and confusion as to why it is taking so long for them to be able to come here.

17. When Reginald and his son arrive, my top priority is giving Reginald some time and space to acclimate to life in the United States. He has been through a lot and I want him to be able to relax. After this initial adjustment period, Reginald has been looking into training as a mechanic. My uncle has been sharing information about a specific training program that he might use.

18. I also am looking forward to taking Reginald's son and my children to do various summer activities together, such as going to the pool.

19. I still do not know exactly how long we will have to wait for my Reginald and his son to receive travel authorization. We are one step closer to being reunited, but

6

I worry that we still have to wait for the authorization as the situation in Haiti continues to decline.

20. My primary hope now is that the parole pathway for Haitians will continue operating long enough so Reginald and his son can receive travel authorization to come to the United States to be considered for parole, so they can be safe with me and the rest of our family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Hollywood, Florida on June 14, 2023.

6/14/23

Anne Valerie Daniel-Laveus

7



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-CV-00007

EXHIBIT
NO. 123

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 123, ECF 175-58

EXHIBIT
G

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

STATE OF TEXAS, *et al.*,

                    *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                    *Defendants*.

Case No. 6:23-cv-00007

### DECLARATION OF FRANCIS MARGARITA ARAUZ RAMIREZ
(pursuant to 28 U.S.C. § 1746)

I, Francis Margarita Arauz Ramirez, upon my personal knowledge, hereby declare as follows:

1.  I am a United States citizen. I was born in Leon, Nicaragua on October 3, 1984. I became a naturalized United States citizen in 2016.

2.  I am the mother of a 13-year-old United States citizen boy.

3.  I currently live in Oakland, California. I have lived in Oakland since I arrived in the United States in 2010. My father had lived in the United States and obtained residency through a law called NACARA. Later, he petitioned for my mother, and then for me and my son, who was 18 months old at the time, as well as for my brother and his young daughter. My brother and our kids all came to the United States in 2010 and have lived here ever since.

1

4.  I currently work as a truck driver, driving 18-wheel trucks at the Port of Oakland. I enjoy my job because I help ensure sure goods that arrive at the port get to where they need to go. In order to be a truck driver in the Port of Oakland, I have to have a commercial driver's license, Class A. I also have a Transportation Worker Identification Credential, which was issued by the Transportation Security Administration. I have been a truck driver since 2021.

5.  Before working as a truck driver, I was a delivery driver for a medicine company for about four years, from about 2017 to 2021.

6.  Before working as a delivery driver, I mostly worked with children. In 2014, I graduated from Chabot College in Hayward, California, as a teacher's assistant. From 2013 to 2016, I worked at a private preschool. From 2016 to 2017, I worked in childcare, both with private families and at a private daycare. I had to pass FBI background checks in order to get hired for all of the jobs that involved children.

7.  When I first arrived to the U.S., I worked in a food packing warehouse, and I also did some house cleaning work. But in Nicaragua, I was a social worker, so I wanted to return to work similar to that, and that's how I started studying to work with children.

8.  On February 7, 2023, I submitted to United States Citizenship and Immigration Services Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of my husband, Moises Esteban Benavides Rodriguez. I am able to sponsor and financially support Moises for at least the next two years so that he may be considered for authorization to travel to the United States as part of the recently established parole process for Nicaraguans.

9.  Moises and I got married on June 12, 2022, but we have been in each other's lives since 2006. I met Moises while studying at university in Nicaragua. We got together in 2006 and had our son in 2009. I left Nicaragua in 2010 and unfortunately Moises could not join me. We

2

initially tried to have a long-distance relationship, but after I arrived in the United States, we took time away from our relationship because the distance was very hard on me. We never stopped being in touch because of our son, so we remained good friends, and he constantly asked me to consider getting back together. Over time, our love for each other and our family prevailed, and we decided to formalize our partnership by getting married last year. I am so happy I married Moises, but I miss him deeply as he is still in Nicaragua.

10. In Nicaragua, Moises, my husband, lives in Leon and works for an international non-governmental organization called Living Water, which helps people access potable water by digging wells in remote communities. Moises digs wells for Living Water. Unfortunately, the government of Nicaragua has declined to renew permits that Living Water needs to continue operating in Nicaragua, which I think is a part of the government's plans to get international entities out of the country.

11. Moises and I worry a lot about what will happen if the government shuts down Living Water or further targets it and the people who work there.

12. In October 2022, I petitioned for my husband through a family visa, but his application has not yet been approved. I understand that it could take years before he is granted permission to come to the United States.

13. I am now sponsoring my husband under the parole program for Nicaraguans because I need my husband and my son urgently needs his father during these critical teenage years. My son is growing older, and he has pressing needs that I'm struggling to fulfill by myself, such as being diagnosed with Attention Deficit Hyperactivity Disorder (ADHD). He takes medication and sees a therapist to treat his ADHD, but over the years he has struggled to focus in school and

3

complete simple tasks. I need my son's dad to help me manage this, and I know my son needs the love, support, and guidance of his father, like I need it from my husband, who I love deeply.

14. I also hope that once he receives authorization to do so, my husband can work so that he can contribute to our household. I have almost always worked two jobs or overtime to support my son, but it means that my parents, who are growing older, have to step in to care for him— they pick him up from school, prepare dinner, and generally watch over him when I am working. My husband should be here so that either he can care for our son when I work, or so that he can contribute financially and between the two of us we can spend more time caring for our son.

15. On days when my son has appointments with his pediatrician or therapist—which happen regularly, around every three months—I have to take time away from work, which causes me to lose that income. I of course do it willingly because my son's health comes first, but I hope my husband will be able to support with that as well.

16. My husband has struggled being far away from me and our son all these years. Even though we talk on the phone regularly, and me and my son visit my husband about once per year (with the exception of a period of about three years when I did not join and only my son visited with my father), my husband is sad when we are far away and brightens up completely when we visit. I think the birth of our son gave me and my husband a new kind of purpose in this life, but the separation has taken a toll on my husband. I am certain that when my husband is approved to come to the United States, the opportunity to parent our son in a more traditional way will change his life for the better.

17. If and when Moises is approved to come to the United States, he will live with me and our son in a studio that is at my parents' house. I have already started to explore job options for him and am willing and able to provide for him until he can start working.

4

18. In addition to strengthening our immediate family, I know that once Moises is approved to come to the United States, it will lessen the strain on my United States citizen parents who for over a decade have had to act as additional caretakers for my son.

19. I am in love with my husband and want to finally be with him after so many years of not being together in the same place. I am eager to start a new chapter with my husband and family in the United States.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Oakland, California on March 27, 2023.

_____
Francis Margarita Arauz Ramirez

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Monika Y. Langarica, certify that I am fluent in Spanish and English, that I am competent to interpret between these languages, and that I interpreted and transcribed the foregoing between English and Spanish accurately. I further certify that I have read the foregoing to Francis Margarita Arauz Ramirez in Spanish and that she affirmed that it is true and correct.

Executed: March 27, 2023                    *Monika Y. Langarica*
                                            Monika Y. Langarica



DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 124

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

STATE OF TEXAS, *et al.,*  §
 §
 *Plaintiffs,*  §
 §
vs.  §   CIVIL ACTION NO.
 §   6:23-CV-00007
UNITED STATES DEPARTMENT OF  §
HOMELAND SECURITY, *et al.,*  §
 §
 *Defendants,* and  §   JUDGE DREW B. TIPTON
 §
VALERIE LAVEUS, *et al.,*  §
 §
 *Intervenor Defendants.*  §

# INTERVENOR DEFENDANTS'
# TAB 124, ECF 175-59

> **EXHIBIT H**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

STATE OF TEXAS, *et al.,*

        *Plaintiffs,*

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

        *Defendants*

Case No. 6:23-cv-00007

### SUPPLEMENTAL DECLARATION OF FRANCIS MARGARITA ARAUZ RAMIREZ
### (pursuant to 28 U.S.C. § 1746)

I, Francis Margarita Arauz Ramirez, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen. I was born in Leon, Nicaragua on October 3, 1984. I became a naturalized United States citizen in 2016.

2. I currently live in Oakland, California.

3. On February 7, 2023, I submitted to United States Citizenship and Immigration Services Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of my husband, Moises Esteban Benavides Rodriguez. I submitted the request to sponsor and financially support

1

Moises for at least the next two years so that he could be considered for authorization to travel to the United States as part of the recently established parole process for Nicaraguans.

4. I was overjoyed to learn on April 4, 2023, that my application to sponsor my husband Moises had been approved and he had been given permission to come to the United States by June 30, 2023. In the weeks following his approval, I made the necessary arrangements including purchasing him a flight to San Francisco for May 4, 2023.

5. It was such a relief to know that Moises would finally be able to reunite with me and our son. When he finally arrived to be with us on May 4, I cried tears of joy. I also saw my son's face light up in a way I have not seen before, which made me even happier.

6. Everything has gone smoothly since my husband's arrival on May 4. He is spending a lot of time with our son, especially during the Oakland teachers' strike. Our son is showing him things like how to use the buttons at crosswalks to cross the street.

7. My son normally does not like being out of the house very much, but now that his father is here, he wants to go outside with him to show him around areas where we walk and eat out at restaurants. I can tell my son is more energized with his father here. It makes me so happy to see them reunited.

8. The time my husband is spending with our son while I am at work has also been a great relief to my parents, who are now able to focus more on resting and doing

things they like around the house. My husband is also cooking for our whole family, which lightens the load for my mom and dad.

9.  Right now, we are still waiting for my husband to obtain work authorization. We submitted the required paperwork and documents, including Moises's passport photos, which USCIS received on May 22, 2023. On June 12, 2023, Moises attended his fingerprints appointment in connection with the work authorization application. In the meantime, I have been asking around for job opportunities for when he does have his work permit. My cousin works at a refrigeration company, and she has agreed to recommend Moises for a job there once he can work. We are also looking into English classes for Moises.

10. I am in love with my husband and am thrilled to finally be with him after so many years of not being together in the same place. This new chapter with my husband and family in the United States has gotten off to the best start, and I'm hopeful for what the rest of it will be like.

3

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Oakland, California on June 13, 2023.

_Francis Margarita Arauz Ramirez_

Francis Margarita Arauz Ramirez

CERTIFICATE OF INTERPRETATION AND TRANSCRIPTION

I, Monika Y. Langarica, certify that I am fluent in Spanish and English, that I am competent to interpret between these languages, and that I interpreted and transcribed the foregoing between English and Spanish accurately. I further certify that I have read the foregoing to Francis Margarita Arauz Ramirez in Spanish and that she affirmed that it is true and correct.

Executed: June 13, 2023                    _/s/Monika Y. Langarica_
                                           Monika Y. Langarica

4



AO386-B

**DEFENDANT'S EXHIBIT**

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 125

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 125, ECF 175-60

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

EXHIBIT

I

STATE OF TEXAS, *et al.*,

            *Plaintiffs*,

   v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

            *Defendants*.

Case No. 6:23-cv-00007

**DECLARATION OF ERIC SYPE**
**(pursuant to 28 U.S.C. § 1746)**

I, Eric Sype, upon my personal knowledge, hereby declare as follows:

     1.   I am a United States citizen currently living in Oakland, California. I was born in

Wenatchee, Washington, in 1993. I lived in Cashmere, Washington, until the age of 18, when I

moved to attend Seattle University, where I earned my bachelor's degree in 2015. In 2021, I

earned a graduate degree in Development Practice at the University of California, Berkeley.

     2.   I have been living in Oakland since January 2023. I currently work as the U.S. organizer

for an international digital rights nonprofit. I have had my current job since 2021, when I

finished my graduate program.

     3.   Together with my parents, I am in the process of submitting to United States Citizenship

and Immigration Services ("USCIS") Form I-134A, Online Request to be a Supporter and

1

Declaration of Financial Support, on behalf of my close longtime friend, Oldrys, who lives in Nicaragua.

4.  Oldrys is 34 years old. He is married to Marlene, and they have two children: a 7-year-old son and a 2-year-old daughter. They all live in a community called El Limón Dos in Nicaragua. Oldrys currently works in construction. I understand he attended some university but was unable to complete his degree due to certain filing fees.

5.  I have known Oldrys since 2014, when I interned with a non-governmental organization in Nicaragua that focused on youth empowerment. Oldrys's family hosted me in their home for the four months that I was there, and I became incredibly close with the family. Since returning to the United States, I speak with them by phone at least once a month, and often weekly. I visit them whenever I have an opportunity to do so, especially for important family milestones like the birth of Oldrys's children and the marriage of his sister. Before the COVID pandemic, I tried to visit them at least once a year and have been fortunate to see them about seven times over the past nine years. Each time I visit, I stay in Oldrys's family's home.

6.  During one year that I lived in Colombia, I was unable to return home to Washington for the holidays, so I visited Oldrys's family in Nicaragua instead. Oldrys and his family again welcomed me into their home, inviting me to join their Christmas and New Year's celebrations, which are very significant to their family and community.

7.  In 2021, I visited Nicaragua to attend the wedding of Oldrys's sister. Despite their family hosting wedding celebrations during that time, they also hosted me and my partner in their home for the duration of our visit. In their community, it is customary for the family of the wedding party to serve food at the celebration. My partner and I participated in the serving of the food as part of Oldrys's family.

2

8.  I also traveled to Nicaragua as soon as possible after the birth of each of Oldrys's

children and was able to meet his son when he was only a month old, and his daughter when

she was only 14 months old.

9.  Oldrys and his family live in a community with few opportunities; he works in

construction but is chronically underemployed and barely earns enough to meet his family's

basic needs, which is very hard for Oldrys. The economic situation has only gotten worse with

the pandemic and political instability in Nicaragua. Over the last six months, Oldrys has been

seeking ways to better provide for his family. But the options in Nicaragua and surrounding areas

are limited and often dangerous or exploitative. As soon as I heard about the new parole process

for Nicaraguans, I told Oldrys about it and promised to get more information if he was interested.

Oldrys now hopes to come to the United States to benefit from employment authorization and

opportunities as part of the parole program for Nicaraguans.

10. My parents and I are prepared to attest to our ability to sponsor and financially support

Oldrys for the next two years so that he may be considered for authorization to travel to the

United States and seek parole under the recently established parole process for Nicaraguans.

11. Members of my family own apple, pear, and cherry orchards in Washington that rely

heavily on migrant labor from Mexico through the H-2A program. The family farm constantly

suffers from labor shortages and is looking for additional workers. My cousin is willing and

eager to provide Oldrys employment at the orchards, and Oldrys is excited to take advantage of

the opportunity if and when he is granted permission to work in the United States. Oldrys is

excited for the opportunity to improve his English, spend time with me and my family, and for

new experiences and opportunities in the United States.

3

Case 6:23-cv-00007   Document 176-60   Filed on 06/20/23 in TXSD   Page 54 of 65

12. I am sponsoring Oldrys as a way to reciprocate the warmth and generosity his family has shown me over the years. He and his family have been extremely welcoming, kind, and supportive of me. They welcomed me into their home, family, and community nearly a decade ago, when I was a young person in an unfamiliar country. I have tried to return that love and support in any way that I can. This is no exception; if I can support Oldrys through this process, I will do it.

13. I also believe in participating in this program as a way to mitigate the destabilization that United States foreign policy has contributed to in countries like Nicaragua. Oldrys's family have suffered from economic instability in their community and if obtaining authorization to work in the United States can offset their suffering, I think that's a good thing.

14. When I learned about the opportunity to sponsor Oldrys through this program, I began gathering the necessary documents and information to do so. This required collecting documents and information pertaining to me, my parents, and Oldrys. Because of how onerous the process is, I have not yet submitted the application, but plan to do so as soon as possible. We are waiting, for example, for an appraisal of my parents' home, so that we can include that as an asset in the I-134A application.

15. If Oldrys is approved to come to the United States under the program, he will live with my parents, whose home is located minutes away from my family's apple, pear, and cherry orchards in Cashmere, Washington. My parents have a four-bedroom home that they live alone in with their dog. They are willing and able to host Oldrys there and provide him food, shelter, and transportation for the duration of his stay. I will personally ensure that Oldrys feels welcome in the United States by introducing him to the community that I was born and raised in. Also, I

have taught English as a Second Language classes in the past and plan to conduct weekly
English classes with Oldrys over video calls.

16. Oldrys plans to return to his family in Nicaragua at the conclusion of his parole period.
He has spoken with me at length to weigh the benefits of participating in this program with the
temporary absence from his family. Although Oldrys wants to proceed with his participation in
the parole program in order to invest in his family's future, he has strong bonds to his family and
community in Nicaragua which he is anxious to return to.


I declare under penalty of perjury and under the laws of the United States that the foregoing is
true and correct.


Executed at Oakland, California on March 26, 2023.


Eric Sype

DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 126

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.,* | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.,* | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 126, ECF 175-61

> **EXHIBIT J**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| |
|---|
| STATE OF TEXAS, *et al.*, |
| *Plaintiffs,* |
| v. |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, |
| *Defendants.* |

Case No. 6:23-cv-00007

## SUPPLEMENTAL DECLARATION OF ERIC SYPE
### (pursuant to 28 U.S.C. § 1746)

I, Eric Sype, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen. I was born in Wenatchee, Washington, in 1993. I currently live in Oakland, California.

2. On April 3, 2023, I submitted to United States Citizenship and Immigration Services ("USCIS") Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, on behalf of my close longtime friend, Oldrys, who lives in Nicaragua. My parents are also listed as supporters on the form. I submitted the request so that my parents and I could be approved to sponsor and financially support Oldrys for the next two years so that he can be considered for authorization to travel to the United States as part of the parole process for Nicaraguans.

1

3. Filling out the I-134A required collecting documents and information pertaining to me, my parents, and Oldrys, including documents that demonstrate my assets and my parents' assets, such as an appraisal of my parents' home. It also required Oldrys to apply for a passport. Oldrys applied as soon as we heard about the program. It took about six weeks for Oldrys's passport to be processed, at which point he had to travel by bus to the nearest city to pick it up.

4. My cousin also provided a letter of support for the I-134A application. My cousin, who owns apple, pear, and cherry orchards in Washington, provided a letter confirming that he will hire Oldrys to work on his orchards if Oldrys is granted parole and employment authorization. The family farm constantly suffers from labor shortages and is always looking for additional workers.

5. When I submitted the Form I-134A, I received a notification saying USCIS had sent me a receipt notice with instructions for further action. However, I never received those instructions. A few days after I submitted the form, I sent an email through the USCIS portal letting them know I had not received the referenced instructions, but USCIS did not respond. On May 3rd, 2023, I used the chat function on the USCIS website to follow up on my email. I spoke with a USCIS employee who took my reference number and confirmed that there was nothing wrong with my application, it was just in process.

6. Oldrys and I were in almost constant communication in the weeks after I submitted the I-134A application. It has been stressful for both of us as we wait for news and sit with the uncertainty around what will happen with the

application. We worry whether Oldrys will be able to come the United States through the parole program.

7. Oldrys has faced additional stress in the last few weeks because his mother is experiencing health issues that affect her quality of life. She had surgery at the end of 2022 that resulted in several complications which have left her bedridden until she can seek additional care. His mother's health struggles only deepen Oldrys's desire to participate in the parole program so that he can better provide for not only his children but also for his mother's health needs.

8. My parents and I continue preparing to ensure Oldrys has what he needs in Cashmere, especially once the seasons change and Oldrys needs winter items. My parents remain willing and able to host Oldrys at their home, which is minutes away from where Oldrys will be able to work on the family orchards in Cashmere. They are prepared to provide him with food, shelter, and transportation for the duration of his stay.

9. My parents' Christian church is also excited and prepared to welcome Oldrys to the community. The church has offered to pay for Oldrys's flight to the United States if he is granted travel authorization. In addition, another member of my parents' church is hosting a Nicaraguan person who was recently granted asylum, and they hope to connect him with Oldrys. This connection and show of support is especially meaningful to Oldrys as a fellow Christian. Oldrys is a prominent member of the church in his community in Nicaragua and he is eager

to contribute to the church community that already made him feel welcome in Washington.

10. To Oldrys, this program means being able to create a better future for his family and provide opportunities for his children that would not otherwise be possible. To me, this program provides an opportunity to reciprocate the love, support, and generosity that Oldrys and his family have always shown to me. This program is a bright spot in an otherwise complicated immigration system. I deeply hope it will offer reprieve to Oldrys and allow me to welcome him into my community, as he has done for me throughout so many years.

I declare under penalty of perjury and under the laws of the United States that the

foregoing is true and correct.

Executed at Oakland, California on June 13, 2023.

_____

Eric Sype