

DEFENDANT'S EXHIBIT

CASE NO. 6:23-cv-00007

EXHIBIT NO. 132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 132, ECF 175-67

### DECLARATION OF EDUARDO JOSE RODRIGUEZ HERNANDEZ

I, Eduardo Jose Rodriguez Hernandez, upon my personal knowledge, hereby declare as follows:

1. I am a lawful permanent resident of the United States. I have lived here since 2010, when I signed a contract to play professional baseball with the Baltimore Orioles in P-1A professional athlete nonimmigrant status. I will be eligible to and plan to apply for United States citizenship in 2025.

2. After a few years in the "minor leagues," I had my debut in Major League Baseball in 2015 playing for the Boston Red Sox. Pitching for the Red Sox, we won the 2018 World Series—a moment I will never forget. Since 2022, I have been a starting pitcher for the Detroit Tigers.

3. I currently live in Birmingham, Michigan with my wife, Catherine, and our two children, ages nine and six. Our off-season home is in a suburb of Miami. I love the home my wife and I have built here together and, at the same time, I dearly miss my parents and family members who still live in Venezuela, where I was born in 1993.

4. I have submitted to United States Citizenship and Immigration Services ("USCIS") four Forms I-134A, Online Requests to be a Supporter and Declaration of Financial Support, on behalf of: my father and mother, Rigoberto Rodriguez Vegas and Petra Magaly Hernandez de Rodriguez; my brother, sister-in-law and niece, Luis Ronardo Rodriguez Hernandez, Andrea Isabel Rueda Palencia, and Avril Betania Rodriguez Rueda; my mother-in-law, Vicenta Cristina Taipe Paez; and my brother-in-law, Cristopher David Taipe Paez.

5. I filed the applications on behalf of my family so that the Department of Homeland Security may consider them for authorization to travel to the United States and seek parole under the recently established parole process for Venezuelans. For the next two years, I am able to sponsor and financially support all of these family members as much as they need.

6. It was an easy decision to try to sponsor my family to seek parole into the United States. I've been trying to bring them over for years and, despite having applied for travel visas (my mother, mother-in-law and my brother all applied for tourist visas in at the U.S. Embassy in Santo Domingo, Dominican Republic in 2017) they were all denied. There is no reason that they were not approved for tourist visas, they have all always lived, worked, attended school, and had family in Venezuela, they were always going to obey the law and depart on time, none of them have any criminal history, and none of them have ever been to the United States or tried to come to the United States. The only reason that I can think of as to why they were denied for temporary visas is because of the current political situation in Venezuela.

7. My father was a truck driver in Venezuela, and wants to work as a truck driver again in the United States. Catherine's brother is going to work and attend school, and my brother,

1

┌─────────────┐
│  **EXHIBIT** │
│             │
│    **P**     │
└─────────────┘

Luis desperately wants to work and take care of his family. Under the socialist government in Venezuela, there are no options for him. He takes care of my parents, since I support our family in Venezuela financially.

8.   My family has never been granted a chance even to visit me. It makes me sad that they've never seen me pitch in the Major Leagues. Every time I play a game, I wonder if one day, I'll get to see them in the stands cheering me on.

9.   We've been a baseball family for as long as I can remember. My dad played baseball as a kid and passed on his love for the game to me and my brother. He taught me how to play and, as my skills improved, I was accepted into the Goodyear baseball academy back home. My dad was always on the sidelines, being a constant source of support and encouraging me to do my best.

10. When I debuted for the Boston Red Sox in 2015, dozens of my family and friends gathered to watch on a television outside my parents' house in Venezuela. My mom—my role model—told me she was so happy and proud that she cried watching me on TV that day. The last time my family saw me play baseball in person was in Venezuela at the 2016 World Baseball Classic. Despite the distance, my family is still a big part of my career. They cheer me on from afar, texting or calling me before and after games, whether we win or lose.

11. When my brother excitedly called me in December 2022 to tell me about a way for us to be together again through this new parole process for Venezuelans, the first thought that went through my mind was: I'll finally have the chance to bring my family here. I got so excited.

12. If their parole is granted, I want to bring them to the ballpark to see my games for the first time—but I also really look forward to just being a family together. To me, my wife, and kids, that means having dinners together, going to the beach, and helping each other in our everyday lives.

13. It would also be amazing to watch my kids reunite with their cousin, my niece. Despite mostly knowing each other through FaceTime and short visits in third countries such as Colombia, the kids have become emotionally very close. My daughter is so happy this dream might come true, she asks me every week when she'll get to see her cousin—and her grandma.

14. I would also be thrilled to watch my family thrive here. There are no jobs available for them given the current conditions in Venezuela. However—even though I am prepared to do so as needed—I don't expect to need to support my family for very long once they arrive. They want to go to school, work, and carve their own paths to success. I have no doubt that, if ever given the chance, they will. In the meantime, if they are granted parole, they will be able to live with me first and, after they get settled, I would help them find places of their own with whatever assistance they need.

15. I understand that parole programs have been used as a bridge toward family reunification in circumstances like mine, as I will be able to sponsor my family for visas in two years,

when I become a citizen myself. But even then, I've been told that family-based immigrant visas are incredibly difficult to get because of the limited numbers available and take years to process. I deeply hope we don't have to wait many years more to all be together again: I miss them incredibly, and I sometimes worry for their safety and well-being in Venezuela.

16. The opportunity to bring my family here through the parole program for Venezuelans would change my life, my wife and kids' lives, and my family's life. Really, it would fill my heart to be all together again, I think I will probably cry. (I don't cry very often.) This program has brought us hope and the possibility of being together again is so important to each of us.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct. Executed at Southwest Ranches, Florida on the 1st of June, 2023.

Eduardo Jose Rodriguez Hernandez



AO386-B
DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 133

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 133, ECF 175-68

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| EXHIBIT |
| Q |

STATE OF TEXAS, *et al.,*

                *Plaintiffs,*

   v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

                *Defendants.*

Case No. 6:23-cv-00007

**DECLARATION OF HEATHER SCANLON**
**(pursuant to 28 U.S.C. § 1746)**

I, Heather Scanlon, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen. I was born in Alexandria, Virginia, in 1969.

2. I reside in Raleigh, North Carolina, where I have lived for 11 years. I am currently not employed; I am a married mother of five, continuing to homeschool my two youngest children and engaging in many community service projects. Before I stopped working for pay, I earned an undergraduate business degree from the University of Virginia and an MBA from Kellogg Business School at Northwestern University. I worked in a variety of corporate roles, most recently running strategy and investor relations for a spin-off company from Marriott Corp, Crestline Capital.

1

3.  Through the parole pathways that the Biden administration recently created for nationals of Cuba, Haiti, Nicaragua, and Venezuela, I have applied to the United States Citizenship and Immigration Services to sponsor a Cuban family of three in dire need. The good fortune that I had to be born in America has made me keenly aware of the challenges faced by immigrants and refugees who may not have viable paths out of their countries to reach a place of safety and stability where they can build a future for themselves. I had a difficult upbringing but I was blessed with good health, intellect, a supportive community and a strong work ethic—often working two or three jobs at once from middle school until grad school—which allowed me to succeed in the United States and live a fulfilling life. Yet for many people around the world, no matter how determined they are, or how many jobs they work, they may never be able to get ahead. This is certainly the case for the Cuban family I am sponsoring who, despite both husband and wife being 15+ years into professional careers, being college educated, and living in a multi-generational household, have a life savings of less than $200. I told them that they could live in my home and borrow bikes to get to the nearest strip shopping center so that husband and wife could each work two full-time hourly jobs in a grocery store and other shops or restaurants that struggle to find workers, earning and saving approximately $1,500 weekly. They asked me if I was joking. They were elated about this possibility.

4. Mid-January of 2023, I read a re-print of a *New York Times* article about migrants crossing through the Darien Gap between Colombia and Panama.[1] The Darien Gap is an extremely inhospitable landscape and a dangerous crossing point. Because of the dense rainforest, it is the only gap in the Panamerican Highway. Migrants have to cross on foot and are often at the mercy of human traffickers and organized criminals.

5. The article featured a Venezuelan mother and her 6-year-old daughter who were fleeing instability in their home country. They already had attempted to relocate to Chile but found it impossible to earn a living there. So, they decided to try to come to the United States. While crossing the Darien Gap, the mother, Alexandra, suffered an injury and became separated from her daughter. Fortunately, a fellow migrant helped her daughter continue on the trek and made sure she remained safe. Alexandra and her daughter were reunited days later once they had crossed the Darien Gap.

6. As Alexandra and her daughter traveled through Central America, they learned that the Biden administration had declared that anyone arriving at the U.S. border would be stopped and sent back home. Because of this announcement, they decided not to continue their journey and instead ended up staying at a refugee camp in Honduras for several months.

7. I was very moved by their story and wanted to help Alexandra and her daughter. I contacted the journalist who wrote the article, and she connected me to

---

[1] Julie Turkewitz, *A Girl Loses Her Mother in the Jungle, and a Migrant Dream Dies*, N.Y. Times (Nov. 9, 2022), https://www.nytimes.com/2022/11/09/world/americas/migrants-darien-gap.html.

several other people who were already helping them, having read the original article published in the fall. One person in Minnesota had set up a GoFundMe to raise money for Alexandra and her daughter to settle in the US. To date, 120 people have donated more than $16,000. Two other families—one in New York and another in Georgia—had separately applied to sponsor them through the parole process for Venezuelans. Another family in Colorado had offered to house them and had arranged all aspects of life including donations in kind, a job offer, holiday gifts, and a public Spanish immersion school ready to take Alexandra's daughter. They asked me if I would get up to speed on the process and resources, and put together a community of support, so that I could serve as a backup in case they had any issues. I readily agreed, having done just that and so much more.

8. The approval process from both sets of applications by two different American households is still pending after more than 6 and 7 months respectively, so long that the Colorado family that was ready to receive Alexandra and her daughter is relocating to Spain for work. However, the community of Americans, me included, wanting to help Alexandra and her daughter have filed an addendum to one of the I-134a applications outlining our widespread support   The Colorado family also shipped me enormous boxes of items amassed for Alexandra and her daughter that are now awaiting their arrival in my home where my family and a host of volunteers I have recruited will welcome them and  help them launch their lives anew in the Triangle area of North Carolina.

9.  Because I had originally believed that Alexandra and her daughter were fully supported, I looked for other ways to help migrants. I'm the type of person who leaves no stone unturned, so I did a thorough investigation about all the ways I could help. I connected with a refugee resettlement agency in the Triangle area and recruited 22 people who would complete training, apply, and pass background clearances to ultimately create three support circles to welcome and launch refugees in the area. We are now matching with three refugee families and will support them in their first several months in the United States. From a subset of those 22 volunteers, I have also created a support circle for a woman who has sponsored and just welcomed a Ukrainian mother and son through U4U.

10. In addition, I discovered Welcome.US, a website that helps connect potential American sponsors with beneficiaries through U4U and the CHNV parole pathways. I completed Welcome.US's sponsorship and settlement training, set up a sponsor profile, and was immediately approached by six people seeking sponsorship for them and/or their families. I chose to sponsor a Cuban family of three and in April submitted I-134A forms for them. I am still waiting for the applications to be processed. I am also trying to recruit other potential sponsors to support migrants through the CHNV program.

11. I had been interested in helping immigrants and refugees for a very long time, but hadn't known how to help until now. The work I have started doing in the past half year sponsoring, recruiting volunteers to create refugee support circles, and helping other immigrants keeps me very busy, but it is also very fulfilling.

Some of my children are also helping and learning, including about how blessed we are to have been born in the USA.

12. I do have a concern about how long the sponsorship applications for Alexandra and her daughter have been pending—the USCIS approval process seems like a black hole, and while we have been waiting, Alexandra and her daughter were deported from Honduras. One of the Americans that applied to sponsor them paid for the family's flights back to Venezuela, where they have been anxiously awaiting approval of their applications. I am glad that they are together and that they are in a familiar place while they wait, but it's not a good situation for them—Alexandra's daughter is not in school where she should be, as she was a Honduran refugee at the time of public school registration and her only option now —private school—is too costly. Further, Alexandra has sent me photos of her daughter, who is much thinner than she was even when they made the trek through the Darien Gap. They are not getting enough to eat. From the GoFundMe account, we have sent them some money, but the express purpose of those funds was to help them settle in the United States so we do not feel at liberty to use much of the money beyond its stated purpose. Four of us across the US have reached out multiple times to both USCIS and to multiple members of Congress to check on the status of their applications, but we have not received meaningful updates. We are all so concerned that their applications have been passed over or lost in the shuffle; they have been waiting since November.

13. Through my work this year with refugee resettlement agencies, the CHNV parole pathways, and local refugee support circles, I have seen first-hand how critical the CHNV parole pathways are in providing migrants a safe pathway to come to the United States and setting them up with the best possible prospects for success during their time here in the country.

14. My experience working with a nine- and ten-year-old set of sisters and their grandmother from Venezuela is a tragic case in point. I became aware of this broken family when the Spanish Family Center in Raleigh—a program run by Catholic Charities—heard that I spoke Spanish and was searching for how to help immigrants. They asked if I would meet with them to help and potentially house them.

15. The girls' mother had brought her daughters with her on the arduous journey to the United States to try and give them a better life. While en route to the United States last summer, the mother had learned of an opportunity in Raleigh with a multi-level marketing company, which promised to give her a job, a place to live, and a car. To anyone knowledgeable in the United States, this offer would sound too good to be true, but I can only assume that the mother felt like she had no other options. The mother and daughters crossed the desert and entered the US in July 2022—just a few months before the Biden administration announced a new parole pathway for Venezuelans. They found their way to Raleigh, where they were put in a small house with seven other people. The multi-level marketing company

gave the mother access to a junker of a car and put her to work selling cookware to Latin American community members through personal sales appointments.

16. Because she had no childcare for her two daughters and they weren't registered for school, the mother was forced to take them with her as she drove considerable distances between Raleigh, Durham, and Chapel Hill to sales appointments. Unfortunately, because the car she was given was so poorly maintained, the mother had problems with one of the tires on the car while she was driving to an appointment. She lost control of the car, drove into a tree, and died immediately. Her daughters were in the backseat and escaped without serious injury, but lost their mother.

17. The State of North Carolina had no idea how to handle these two girls. So, the girls were sent back to live in the small house with strangers they had only met the month prior. By that time, however, the Biden administration had adopted a new parole pathway for Venezuelans. The girls' grandmother, learning of their plight, left everything behind in Venezuela. There is no Embassy in Venezuela to apply to come to the US so she traveled to neighboring Colombia, where she lived in the airport and on the streets of Bogota until she was able to find a sponsor in North Carolina and secure humanitarian parole status to enter the US. After two months, she came to the United States to reunite with her granddaughters. The girls remain undocumented and are at risk of being deported. The girls' Venezuelan father, who lives in Panama, worries for them, but does not know how to legally

travel to the U.S. to be with them. At least they are safe and in the care of their grandmother, who may remain here for two years under her grant of parole.

18. The contrast between the stories of these two girls and their mother and Alexandra and her daughter could not be starker to me. When this mother and her daughters were desperate enough to travel to the border, there was no legal pathway for them to come into the United States. They were forced to enter without documents, were seemingly trafficked by a multi-level marketing company or someone working for the company, and were exploited in a way that led to this mother's completely avoidable death, leaving her daughters scarred and alone with no family in a foreign country where they didn't speak the language. Alexandra and her daughter, however, have a legal pathway. They are in Venezuela eagerly awaiting approval of the sponsorship applications, and no longer need to brave the dangers of the overland trek to the southern border or expose themselves to the risk that they will be trafficked or assaulted. They will have a home ready for them when they finally enter the United States, they have supportive sponsors, and I have no doubt that they will thrive and do beautifully here for the duration of their parole.

19. As the overwhelming response to the CHNV parole pathways indicates, there are many people like me here in the United States who are willing and available to help folks like Alexandra and her daughter. We are people who also would, no doubt, have been willing to support the mother and her two daughters, who simply had the misfortune to come to the United States a short time before the

Venezuelan parole pathway was announced. Alexandra and her daughter, on the one hand, and the mother and her two daughters, on the other hand, show that there are two different ways that migration to the United States can happen, and what an enormous difference the CHNV parole pathways and other similar parole programs can make.

20. I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Eastham, Massachusetts on June 17, 2023.

*Heather Scanlon*

Heather Scanlon



DEFENDANT'S
EXHIBIT

CASE
NO. 6:23-cv-00007

EXHIBIT
NO. 134

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS'
# TAB 134, ECF 175-69

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

**EXHIBIT R**

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § | Civil Action No. 6:23-CV-00007<br><br>Judge Drew M. Tipton |
| | § § | **DECLARATION   OF   ERIC SCHWARTZ** |
| *Plaintiffs,* | § § | |
| v. | § § § | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in | § § § § § § § § § § | |

| | |
|---|---|
| his official capacity, | § |
| | § |
| *Defendants*, and | § |
| | § |
| VALERIE LAVEUS; FRANCIS ARAUZ; | § |
| PAUL ZITO; ERIC SYPE; KATE | § |
| SUGARMAN; NAN LANGOWITZ; and | |
| GERMAN CADENAS, | § |
| | § |
| *Intervenors*. | § |
| | § |

## <u>DECLARATION OF ERIC P. SCHWARTZ</u>

ERIC P. SCHWARTZ declares pursuant to 28 U.S.C. § 1746:

**<u>Background</u>**

      1.     I am currently a Professor of Public Affairs at the Hubert H. Humphrey School of Public Affairs at the University of Minnesota. From 2011 to 2017, I was both a professor and the dean of the Humphrey School.

      2.     Between 2017 and 2022, I served as the President of Refugees International, an independent nonprofit organization that advocates for assistance and protection for forcibly displaced persons, while on leave from the Humphrey School and the University of Minnesota.

      3.     Prior to academia, much of my career was spent working for the federal government, principally in the executive branch, although my career in government began as a Congressional Subcommittee staff member. Throughout my time in government, I focused on matters of migration and humanitarian protection, particularly as it intersects with foreign policy.

2

4.      From July 2009 to October 2011, I served as Assistant Secretary of State for the Bureau of Population, Refugees, and Migration ("PRM").  Before that, from 1993 to 2001, I served as the principal human rights and humanitarian official on the National Security Council ("NSC") staff, ultimately in the role of Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.  Prior to that I served from 1989 to 1993 as staff consultant to the U.S. House of Representatives Foreign Affairs Subcommittee on Asian and Pacific Affairs.

5.      The Assistant Secretary of State for PRM is the senior-most State Department official devoted primarily to migration, refugee, and humanitarian issues.   The Assistant Secretary is also the senior-most State Department official for whom a principal focus, day-in and day-out, is diplomacy on U.S. foreign policy issues involving international migration and humanitarian objectives.  In that role, I regularly interacted with the heads of offices and agencies such as the International Committee of the Red Cross, the UN High Commissioner for Refugees, the UN Office for the Coordination of Humanitarian Affairs, and the UN Relief and Works Agency for Palestine Refugees in the Near East, among others.  I pursued U.S. foreign and international humanitarian objectives not only with leaders of these international organizations, but also with heads of state and other senior officials in countries dealing with issues of forcible displacement.  During my tenure as Assistant Secretary, the Bureau I led had an annual budget of about $1.85 billion.

6.      During the eight years that I served in the White House, I was the principal official on the NSC staff overseeing refugee- and international migration-related issues. In that role I was involved in a broad array of issues that impacted U.S. national security interests and were of deep concern to the NSC, such as forced migration from Haiti connected to political

violence in that country, U.S. refuge and/or resettlement of Kosovars in the context of the Serbian

government attack on that population, and emigration of asylum-seekers from Vietnam, among

many other issues.

7.      During the more than three years I served on the staff of the House of

Representatives Foreign Affairs Subcommittee on Asian and Pacific Affairs, I advised Members

of Congress, including the subcommittee's chairman, Representative Stephen J. Solarz, on a range

of migration-related issues.  This included working on legislative proposals to expand access to

refugee resettlement to certain nationals from the former Soviet Union to also include nationals

from Vietnam, Cambodia, and Laos.

8.      Based on my experience as Assistant Secretary of State for PRM, my years

on the NSC and with the House Foreign Affairs Subcommittee, and my career focused on

humanitarian and migration issues, I understand that foreign relations matters are frequently

complex, delicate, and of great importance to the national interest.  This is particularly true when

such matters involve sensitive, fragile, and often tense bilateral or multilateral negotiations with

foreign governments in which all parties are working to secure an agreement that advances their

own foreign policy priorities.

9.      As I have seen, when engaging in negotiations with a foreign

government(s), it is critical for the Executive to have as many legislative and administrative tools

at its disposal as possible.  This is especially the case in the humanitarian context, when flexibility

in particular can be critical to ensuring life-saving and life-sustaining action that furthers human

rights objectives long-articulated by executive and legislative branches.

10.     The development and implementation of migration policy frequently has significant impacts beyond the borders of the United States and, as a result, on U.S. objectives around the world.

11.     Based on my professional experience, the ability to make commitments regarding migration policy that are within the purview of the Executive can be a powerful foreign policy tool to promote the interests of the United States, through advancing negotiating objectives with foreign governments, and through achieving humanitarian, human rights, anti-trafficking, and regional security goals, among others. I am aware of the periodic use of the statutory parole authority by past administrations to advance this nation's foreign policy interests, and I have had personal experience with several of those instances. I believe that in each of these instances, parole was the only reasonable approach to serve urgent humanitarian needs or to otherwise advance the national interest. Other options were, as a practicable matter, unavailable due, for example, to constraints related to access to affected populations and the need to move quickly to secure foreign policy and national security objectives.

**The Cuban Migration Accords and Parole**

12.     During my tenure on the NSC, I was involved in White House and agency deliberations around Cuban migration, including migration accords between the United States and Cuba.

13.     Early during the administration in 1994, we began to see a significant increase in the departure of boats from Cuba filled with would-be migrants headed to the United States.  Cuba was experiencing economic and political turmoil, due in large part to the end of financial support that the country had been receiving from the Soviet Union prior to its collapse. As conditions in the country worsened, Cuban president Fidel Castro criticized what he claimed

5

were inadequate U.S. efforts to stem hijacking and loosened restrictions on people seeking to leave, which resulted in tens of thousands of Cubans taking to the seas en route to the United States.

14.     This migration was irregular and disorderly, and it not only posed a significant risk to the lives of these migrants but also consumed Coast Guard resources due to interdiction and rescue efforts.

15.     As Castro had decades earlier deployed a similar tactic that spurred a tremendous out-migration from Cuba culminating in the 1980 Mariel boatlift, this renewed wave of Cuban nationals taking to the sea created significant tensions between the United States and Cuba.

16.     This was a topic of great public concern in the United States that represented a major humanitarian and border management challenge.  It was of great importance to the administration and to the country that the Clinton Administration find some way of directing Cuban migration into safe, legal, and orderly channels.

17.     After months of negotiations, in September 1994 the United States agreed to provide a minimum of 20,000 travel documents each year to Cuban nationals interested in immigrating to the United States, not including the immediate relatives of U.S. citizens, in exchange for the Cuban government's commitment to discourage irregular and unsafe departures by sea. Both countries also agreed to continue to discuss Cuba's willingness to accept the return of Cuban nationals excludable from the United States. Communique Between the United States of America and Cuba, 94-909, signed at New York Sept. 9, 1994, entered into force Sept. 9, 1994.

18.     The United States understood at the time that some share of the 20,000 figure would come through immigrant visa programs and an in-country refugee program operated out of the U.S. Interests Section in Havana, Cuba.  The United States also understood that we

6

would have to rely heavily on the ability of the Attorney General to use the statutory authority to parole a significant number of Cuban nationals into the country in order to meet the U.S. government's commitment.

19.    Shortly after this agreement was reached, the Immigration and Naturalization Service ("INS"), in partnership with the Department of State, created the Special Cuban Migration Program ("SCMP") to select applicants who met certain, preset requirements for parole in an effort to meet the 20,000 figure to which we had committed.

20.    Individuals interested in participating in the SCMP would register and be selected randomly to receive individualized consideration of their application.  Potential parolees had to meet certain criteria established by the Executive, and several were based on education, work experience, and/or U.S. family ties. Of course, the program was open only to Cuban nationals. Registration periods for the program took place in fiscal years 1994, 1996, and 1998, and enough individuals registered during those periods that individuals could continue to be selected, interviewed, and paroled for many years after that.

21.    If the U.S. Government had not been able to rely upon the statutory parole authority when it negotiated the 20,000 figure with the Government of Cuba, it is not clear that the agreement could have been reached and it is not clear that Fidel Castro would have taken steps to discourage continued largescale irregular migration to the United States by boat.

22.    Similarly, if the U.S. Government had not been able to utilize parole effectively in the years following the agreement it is all but certain that the U.S. Government would have failed to uphold its commitment and diplomatic relations between the countries would have been diminished.  That would have caused significant harm to U.S. foreign policy interests,

7

including by potentially triggering an increase once more in largescale Cuban migration to the United States by sea.

23.     Had the executive's ability to use its statutory parole authority been unduly constrained, it also would have likely interfered with the U.S. government's ability to reach a second migration-related agreement with Cuba in May 1995 in which the United States began returning to Cuba certain Cuban nationals interdicted at sea or apprehended entering the U.S. Naval Base at Guantanamo Bay and Cuba agreed not to take any punitive actions against such people.  In that agreement, the United States and Cuba also reached an understanding about how the United States would proceed with the approximately 20,000 Cuban nationals who had been interdicted at sea beginning in August 1994 and taken to a safe haven at the U.S. Naval Base at Guantanamo Bay. Although a small number who met certain specified criteria were already being paroled into the United States on a case-by-case basis and a small number had agreed to voluntarily return to Cuba, the large majority remained at Guantanamo and the situation required resolution.

24.     In the May 1995 Joint Statement on Migration, both countries agreed that the limited criteria for Cuban nationals remaining at Guantanamo to be considered for parole would need to be expanded and that up to 5,000 paroles could be counted each year toward the 20,000 annual figure provided in the September 1994 agreement.  The United States anticipated that the large majority of Cubans at Guantanamo—about 15,000 people—would be paroled into the United States, also on a case-by-case basis, and the remainder would be returned to Cuba with negotiated assurances that such individuals would face no reprisals for their decision to leave Cuba. The same assurances would apply to Cuban nationals interdicted at sea en route to the United

8

States who similarly would be returned to Cuba after first being screened for refugee status. Office

of Public Affairs, U.S.-Cuba Joint Statement on Migration, White House, May 2, 1995.[1]

25.     As the then-NSC director for human rights, refugees, and migration, in the

NSC Office of Global Affairs and Multilateral program, I worked closely with the NSC Office of

Democracy, led by my colleague Morton Halperin, in the evolution of the overall approaches on

Cuban migration.

**The Rescue and Resettlement of Kurds in Northern Iraq Using Parole**

26.     A dramatic and compelling example of the critical importance of the parole

authority involved the 1996 rescue and resettlement of Kurds affiliated with U.S. non-

governmental organizations who fled northern Iraq. These individuals were at risk of persecution

and/or death at the hands of Saddam Hussein, and the administration initiated a large-scale

evacuation following Cabinet-level deliberations in which I was directly involved. Ultimately,

some five thousand or more individuals were assisted by U.S. agencies and paroled into the United

States.

27.     Having this quick and flexible authority was absolutely critical to the

administration's capacity to achieve critical foreign policy objectives—including the avoidance of

atrocities against individuals who had been affiliated with U.S. agencies. Needless to say, the

United States not only had a moral interest in achieving this objective, but also an interest related

to communicating to others that the United States will stand by—and not abandon—those who

seek to promote humanitarian and human rights objectives.

---

[1] *Available at* https://www.american.edu/centers/latin-american-latino-studies/upload/1995-migration-agreement.pdf.

**The Resettlement Opportunity for Vietnamese Returnees Initiative and Parole**

28.     Also during my tenure on the NSC and beginning in around 1996, I led a
U.S. government effort to establish the Resettlement Opportunity for Vietnamese Returnees
("ROVR") initiative.  Along with State Department officials, I was also involved in negotiations
with the Government of Vietnam on this initiative.  And I advised the U.S. National Security
Advisor, Anthony Lake, who was also involved in efforts to secure the program.

29.     For many years preceding the establishment of ROVR, the United States
had used a variety of migration pathways—including both refugee admissions and parole—to
bring large numbers of Vietnamese nationals and their family members to the United States. There
were critically important foreign policy objectives that were served through these efforts:
international humanitarian goals that are critical components of U.S. foreign policy as well as
communicating to others around the world that the United States government will not walk away
from those who have in been associated with the U.S. government or U.S. government agencies.
And in fact, the effective execution of such programs also helped to lay the groundwork for
normalization of relations with Vietnam, and to support countries in the region that were hosting
large numbers of Vietnamese nationals for long periods of time.

30.     As countries in southeast Asia that had long hosted Vietnamese refugees
worked to close their camps and repatriate Vietnamese nationals back to their home country—
most of whom at this point had already been screened by the United Nations High Commissioner
for Human Rights and others and determined not to be refugees—the United States wanted to
provide one final opportunity to consider these individuals for resettlement in the United States.

31.     During our efforts to establish ROVR, it became clear that U.S. processing
directly from host countries would not be possible, in large measure because governments of these

countries would have been concerned that it could draw additional refugees into the camps from other areas or countries.  That would run counter to their efforts to close the camps.  As a result, we worked with the Government of Vietnam to facilitate prompt interviews for U.S. resettlement for these individuals upon their return to Vietnam.

32.     The United States would submit lists of names to the Government of Vietnam in order for them to be cleared for interviews by U.S. personnel.  Due to various cumbersome requirements initially imposed by the Government of Vietnam, things got off to a slow start, but we negotiated efficiencies and the program improved.

33.     Although ROVR was primarily a refugee admissions program, as with other parole programs, individuals who were determined not to be refugees were considered for parole and many ultimately were paroled into the United States in furtherance of the United States's important foreign policy objectives.

34.     More broadly, through the pre-existing Orderly Departure Program for resettlement of Vietnamese that was established in 1979, many thousands of people who were denied refugee status in the United States were favorably considered for parole and allowed to travel to the United States if they paid for their own travel and had affidavits of support from relatives or organizations in the United States.

35.     For all programs of resettlement from Vietnam after the conflict had ended, parole was an important tool—and its absence would have created significant foreign policy challenges.  In particular, it would have undermined the United States' ability to meet our humanitarian objectives and risked causing additional and unnecessary friction with the Government of Vietnam as we sought to move our bilateral relationship in a new direction.

11

**The Lautenberg Refugee Program and Parole**

      36.    As staff consultant to the House Foreign Affairs Subcommittee on Asian and Pacific Affairs, I was involved in the evolution of legislation that was enacted in 1989 that both (a) relied upon the continued and expanded use of parole for certain populations that were of particular interest to U.S. foreign policy; and (b) extended to these individuals the ability to adjust their status in the United States to that of a lawful permanent resident (i.e., a "green card" holder).

      37.    Specifically, in 1988, then-Attorney General Edwin Meese wrote in a letter to the White House that he had determined that Soviet refugee applicants were being processed at the U.S. Embassy in Moscow in a manner inconsistent with the Refugee Act of 1980 and that he was sending INS personnel to the Embassy to address the issue. *See* Letter from Edwin Meese III, Attorney General, to Lt. Gen. Colin Powell, Assistant to the President for National Security Affairs, Aug. 4, 1988.[2] Although his particular concern was left unstated in the letter, I recall that he believed refugee status determinations—in which refugee officers determine whether or not an individual meets the legal definition of a "refugee," which is the same one that is used in the asylum context—needed to be made on more of a case-by-case basis rather than with a presumption of refugee status based on proof that an individual is a member of a persecuted group. Attorney General Meese was clear that the changes he would be implementing likely would decrease the refugee grant rate, but he committed to using his parole authority to allow potentially a "significant number of emigrants" determined not to be refugees to nevertheless enter the United States.

      38.    The refugee grant rate did, in fact, drop significantly for these Soviet refugee applicants, and many who were denied were Jews, Evangelical Christians, and others and who nonetheless risked discrimination in the Soviet Union. This was of great concern to many

---

[2] *Available at* https://archive.org/details/sovietrefugeeshe00unit/page/128/mode/2up.

humanitarians and humanitarian organizations, as well as to Members of Congress. As a result, Members began work on legislation to provide for more favorable treatment for these individuals in the refugee status determination process. In particular, the legislation effectively created presumptions of refugee status for members of historically persecuted groups mentioned in the legislation. The chair of the House Foreign Affairs Subcommittee for which I worked supported similarly heightened humanitarian protection for other populations of particular concern to U.S. foreign policy interests—Vietnamese, Cambodians, and Laotians.

39.    In 1989, Congress enacted legislation commonly referred to as the Lautenberg Amendment that modified the refugee status determination process for certain nationals of the Soviet Union, Vietnam, Cambodia, and Laos. Moreover, the legislation authorized individuals from these countries denied refugee status who had been paroled into the country— and those who still would be paroled into the country in the remainder of the fiscal year—to adjust their status to that of a lawful permanent resident.

40.    Congress has repeatedly reauthorized and extended that legislation, demonstrating congressional approval not only of the modified refugee status determination process for these individuals, but also for the continued use of parole for individuals determined not to meet the legal definition of a "refugee" and for the continued ability of those parolees to become lawful permanent residents (and ultimately, the opportunity to apply for U.S. citizenship).

41.    The flexibility provided by Congress to the executive in deciding when, whether, and how to use the parole authority—within certain specified constraints—has been of great value to the advancement of U.S. foreign policy interests. In particular, after winning often hard-fought concessions from foreign governments to permit the emigration of their nationals, parole has enabled the United States to meet its undertakings to those governments about our

willingness accept individuals who have been forced to flee but who might not have met all the requirements for refugee status. In addition, it has demonstrated that the United States will not break faith with those who have been subject to discrimination and abuse, communicating U.S. global credibility as a proponent of human rights and humanitarian values.

**The Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes**

42.     I am very familiar with the Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes that the Department of Homeland Security recently began to implement as part of a broader suite of migration management policies. I understand that these processes were adopted—and are continuing to be implemented—in furtherance of extensive bilateral negotiations with the Government of Mexico regarding the management of migration at the U.S.-Mexico border and throughout South and Central America, and that the United States Government has specifically secured a commitment from the Government of Mexico that while the former will parole up to 30,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela each month, the latter will accept the removal or return of up to 30,000 nationals from these countries each month. I further understand that these processes were adopted to advance commitments made by the U.S. Government as part of the Los Angeles Declaration on Migration and Protection and that other countries that are signatories to that Declaration have similarly enacted laws and adopted policies in furtherance of their commitments.

43.     The stated goal of the Cuban, Haitian, Nicaraguan, and Venezuelan Parole Processes—to facilitate safe, legal, and orderly migration and discourage dangerous irregular migration, in partnership with foreign governments in the region—is essentially the same goal that the United States pursued nearly 30 years ago when it agreed to use the statutory parole authority as part of the 1994 and 1995 agreements with Cuba. *See* Joint Communiqué on Migration, U.S.-

Cuba (Sept. 9, 1994) ("Representatives of the United States of American and the Republic of Cuba today concluded talks concerning their mutual interest in normalizing migration procedures and agreed to take measures to ensure that migration between the two countries is safe, legal, and orderly."); Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) ("The United States of America and the Republic of Cuba have reached agreement on steps to normalize further their migration relationship. These steps build upon the September 9, 1994 agreement and seek to address safety and humanitarian concerns and to ensure that migration between the countries is safe, legal, and orderly.").

44.     It is also the very same goal reflected in the George W. Bush administration's decision in 2007 to create the Cuban Family Reunification Parole Program that remains in place today. *See* Department of Homeland Security, Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) ("The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.").

45.     And just as decreasing dangerous arrivals by boat was a priority of the U.S. Government in negotiating agreements with Cuba in the mid-1990s and in adopting the Cuban Family Reunification Parole Program, the recent modifications to the Cuban and Haitian Parole Processes that disqualify people for parole consideration if they are interdicted at sea subsequent to the modifications demonstrate how important this priority remains to the Government of the United States. *See, e.g.*, Department of Homeland Security, Implementation of a Change to the Parole Process for Cubans, 88 FR 26329, 26331 (Apr. 28, 2023) ("In response to the increase in maritime migration and interdictions, and to disincentivize migrants from attempting the dangerous journey to the United States by sea, DHS will make individuals who have been

15

interdicted at sea after April 27, 2023 ineligible for the parole process for Cubans. Further, DHS expects this change in eligibility criteria to materially reduce the number of maritime interdictions, by incentivizing migrants to use safe and orderly means to access the United States.").

46.    I further understand that the new Cuban Parole Process was created in part to support United States Government negotiations with the Government of Cuba to "reactivate the Migration Accords." Department of Homeland Security, Implementation of a Parole Process for Cubans, 88 FR 1266, 1270 (Jan. 9, 2023). The U.S. Government's stated reason for seeking to reactivate the Migration Accords is that it could help the United States secure the cooperation of the Cuban government in accepting the repatriation of many more of its nationals who are ordered removed from the United States after attempting entry without authorization, which, in turn, is expected to decrease further irregular migration and instead channel people through various safe, legal, and orderly pathways. Id. at 1270-71. The Cuban Parole Process in particular, therefore, is very clearly grounded in a complex and shifting diplomatic relationship with the Government of Cuba that has been ongoing for nearly 30 years—and certainly longer.

I declare under the penalty of perjury that the foregoing is true and correct.

Eric P. Schwarz

Executed in _Silver Spring, Maryland_, on June 17, 2023.

16