# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | CIVIL ACTION NO. |
| *Plaintiffs,* | § | 6:23-CV-00007 |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | JUDGE DREW B. TIPTON |
| | § | |
| *Federal Defendants,* and | § | |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

**Introduction**................................................................................................................1

**Findings of Fact**..........................................................................................................1

A.    Creation and Implementation of the Parole Pathways for Cubans, Haitians, Nicaraguans, and Venezuelans ............................................................................1

B.    Background on Migration from Cuba, Haiti, Nicaragua, and Venezuela...........7

C.    The Parole Pathways Application Process..........................................................10

D.    The Parole Pathways Facilitate Sponsorship for a Wide Range of Reasons ...................15

E.    The CHNV Parole Pathways Draw Upon DHS's Statutory and Historical Parole Authority ......................................................................................................21

F.    The Scope and Impacts of the CHNV Pathways .............................................48

G.    Texas' Alleged Injuries from the CHNV Pathways. ........................................53

**Conclusions of Law**....................................................................................................70

H.    Texas Lacks Standing .......................................................................................70

I.    The Plaintiff States Other than Texas Also Lack Standing ..............................81

J.    Plaintiff States Fail on the Merits of their APA Claims ...................................81

K.    Decades of executive and congressional action confirm the lawfulness of the pathways. ...........................................................................................................85

L.    The CHNV Parole Pathways Are Not Arbitrary and Capricious ....................87

M.    The Remaining Factors Do Not Support Injunctive Relief ..............................91

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Adams v. Vance,*
   570 F.2d 950 (D.C. Cir. 1978) ................................................................95

*Ala. Ass'n of Realtors v. Dep't Health & Hum. Serv.,*
   141 S. Ct. 2485 (2021) ........................................................................103

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ..............................................................................80

*Arizona Christian Sch. Tuition Org. v. Winn,*
   563 U.S. 125 (2011) ..............................................................................71

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ................................................................79

*Bailey v. State of Alabama,*
   219 U.S. 219 (1911) ..............................................................................99

*Beame v. Friends of the Earth,*
   434 U.S. 1310 (1977) .......................................................................93, 94

*Biden v. Missouri,*
   142 S. Ct. 647 (2022) ............................................................................89

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) (Kavanaugh, J., concurring) .............83, 84, 88, 95

*Burlington Truck Lines v. United States,*
   371 U.S. 156 (1962) ..............................................................................88

*California v. Texas,*
   141 S. Ct. 2104 (2021) ......................................................................76, 92

*Cent. & S. W. Servs. v. United States EPA,*
   220 F.3d 683 (5th Cir. 2000) ..............................................................101

*In re Chan Kam-Shu,*
   477 F.2d 333 (5th Cir. 1973) ................................................................96

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ..........................................................................82, 83

*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ..............................................................................97

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ..............................................................................98

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................71, 74, 75, 77

ii

*Cole v. General Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007) ................................................................70

*Costanzo v. Tillinghast*,
    287 U.S. 341 (1932)............................................................................87

*Crain v. City of Selma*,
    952 F.3d 634 (5th Cir. 2020) ................................................................98

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ..........................................................75, 76

*Croft v. Governor of Texas*,
    562 F.3d 735 (5th Cir. 2009) ...............................72, 73, 74, 76, 77, 81

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) (Gorsuch, J. concurring)...................................99

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020)..................................................................89, 90

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022) ................................................................75

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)......................................................................92, 97

*Edmonson v. Leesville Concrete Co.*,
    500 U.S. 614 (1991) ............................................................................99

*Env't Conservation Org. v. City of Dallas*,
    529 F.3d 519 (5th Cir. 2008) ................................................................70

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020) ................................................................72

*Exodus Refugee Immigr., Inc. v. Pence*,
    838 F.3d 902 (7th Cir. 2016) ................................................................98

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021)........................................................................89

*Florida v. Mellon*,
    273 U.S. 12 (1927)..............................................................................72

*FPL Energy Me. Hydro LLC v. FERC*,
    287 F.3d 1151 (D.C. Cir. 2002) ...........................................................90

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)......................................................................100

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)............................................................................84

*Hawaii v. Trump*,
    878 F.3d 662 (9th Cir. 2017) ................................................................95

iii

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ................................................................95, 96

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ...............................................................92, 93

*I.N.S. v. Aguirre Aguirre*,
  526 U.S. 415 (1999) .............................................................................83, 84

*INS v. Abudu*,
  485 U.S. 94 (1988) ......................................................................................83

*Knapp v. U.S. Dep't of Agric.*,
  796 F.3d 445 (5th Cir. 2015) ...............................................................87, 88

*Louisiana ex rel. Landry v. Biden*,
  64 F.4th 674 (5th Cir. 2023) ................................................................79, 80

*Lewis v. Casey*,
  518 U.S. 343 (1996) ....................................................................................72

*Lorillard v. Pons*,
  434 U.S. 575 (1978) .............................................................................86, 87

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ......................................................................................74

*Louisiana Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin.*,
   70 F.4th 872 (5th Cir. 2023) .....................................................................79

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................70, 71, 73, 74, 76, 77, 78, 81

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ....................................................................................99

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ....................................................................................79

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ....................................................................................99

*Moore v. Tangipahoa Par. Sch. Bd.*,
  507 Fed.Appx. 389 (5th Cir. 2013) ............................................................93

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................87, 88, 89, 91

*Nat'l Fed. Indep. Bus. v. Occupational Safety & Health Admin.*,
  142 S. Ct. 661 (2022) ................................................................................103

*O'Donnell v. Harris Cty.*,
  892 F.3d 147 (5th Cir. 2018), *overruled on other grounds by Daves v. Dallas County*, 22 F. 4th 522 (5th Cir. 2022) ......................................................99, 100

*Pickett v. Hous. Auth. of Cook City*,
  114 F. Supp. 3d 663 (N.D. Ill. 2015) ......................................................96

*Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*,
  USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023)
  ......................................................................................11, 12, 13, 14, 15

*Quillen v. Walcott*,
  434 U.S. 246 (1978).................................................................95, 96

*Raines v. Byrd*,
  521 U.S. 811 (1997).................................................................71, 73

*Reno v. American-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1990).......................................................................78

*Rogers v. San Antonio*,
  392 F.3d 758 (5th Cir. 2004) ..........................................................85

*Russello v. U.S.*,
  464 U.S. 16 (1983).........................................................................85

*S.A. v. Trump*,
  No. 18-cv-0353-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019).........................39

*Salazar v. Bruno*,
  559 U.S. 700 (2010).......................................................................96

*Salazar v. Maimon*,
  750 F.3d 514 (5th Cir. 2014) ......................................................85, 86

*Sampson v. Murray*,
  415 U.S. 61 (1974).................................................................93, 96

*Shannon v. United States*,
  512 U.S. 573 (1994).......................................................................84

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976).........................................................................77

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
  549 U.S. 422 (2007).......................................................................81

*Soc'y of Separationists, Inc. v. Herman*,
  959 F.2d 1283 (5th Cir. 1992) ..........................................................72

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).......................................................................73

*Texans for Free Enterprise v. Tex. Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) ......................................................95, 97

*Texas Ass'n of Mfrs. V. United States Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ..........................................................101

*Texas (DACA) v. United States*,
  50 F.4th 498 (2022)...............................................................72, 73

*Texas v. United States*,
　352 F. Supp. 3d 665, 690 (N.D. Tex. 2018) ...................................................101

*Texas v. United States*,
　549 F. Supp. 3d 572 (S.D. Tex. 2021) .........................................................101

*Texas v. United States (DAPA)*,
　809 F.3d 134 (5th Cir. 2015) ................................................................74, 75

*Trump v. Hawaii*,
　138 S. Ct. 2392 (2018) ............................................................................95

*United States v. Texas*,
　143 S. Ct. 1964 (2023) .................................71, 72, 73, 77, 78, 79, 80, 81, 97, 100

*Valley Forge Christian College v. Americans United for Separation of Church
and State, Inc.*,
　454 U.S. 464 (1982) ..............................................................................71

*Veasey v. Abbott*,
　830 F.3d 216 (5th Cir. 2016) ....................................................................98

*Village of Arlington Heights v. Metropolitan Housing Devt. Corp.*,
　429 U.S. 252 (1977) ..............................................................................98

*W. Va. v. Environmental Prot. Agency*,
　142 S. Ct. 2587 (2022) ..........................................................................102

*Weinberger v. Romero-Barcelo*,
　456 U.S. 305 (1982) .....................................................................96, 97, 100

*Wheeler v. Pilgrim's Pride Corp.*,
　591 F.3d 355 (5th Cir. 2009) (en banc) ..........................................................84

*Whitmore v. Arkansas*,
　495 U.S. 149 (1990) ..............................................................................73

*Winter v. NRDC, Inc.*,
　555 U.S. 7 (2008) ........................................................................93, 94, 96

*Worldcall Interconnect, Inc. v. F.C.C.*,
　907 F.3d 810 (5th Cir. 2018) ................................................................87, 90

## Statutes

8 U.S.C. § 1182(d)(5) .......................................................21, 23, 25, 28, 81, 84, 85

8 U.S.C. § 1182(d)(5)(A) .............................................21, 78, 82, 85, 86, 102

8 U.S.C. § 1182(d)(5)(B) ...........................................................................22, 23

8 U.S.C. § 1229a(a)(3) ..............................................................................90

Cuban Adjustment Act of 1966 ...........................................................................27

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 .....................................23

National Defense Authorization Act of 2020 .............................................................38

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ........................................21, 22, 30

U.S. Code Title 8 ............................................................................................................3, 68

**<u>Rules and Regulations</u>**

8 C.F.R. § 274a.12 ...........................................................................................................88

**Introduction**

Pursuant to the Court's instructions at trial, *e.g.*, Trial Transcript ("Trial Tr.") vol. 2 of 2, 333-334, Intervenor Defendants submit the following post-trial proposed findings of fact and conclusions of law for the Court's resolution of this case on the merits.

**Findings of Fact**

**A.      Creation and Implementation of the Parole Pathways for Cubans, Haitians, Nicaraguans, and Venezuelans**

1.      The Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE") (collectively, "Federal Defendants") announced and implemented the Uniting for Ukraine Parole Process ("Uniting for Ukraine") in April 2022 to respond to an increase in Southwest border encounters with Ukrainian nationals following Russia's invasion of Ukraine in February 2022.  Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 27, 2022); *see also* Administrative Record, Cuba AR_000069, Fed. Defs' Trial Ex. A.

2.      Through Uniting for Ukraine, supporters with legal status in the United States may apply to sponsor qualifying Ukrainian nationals and their immediate family members.  *Id*.

3.      Uniting for Ukraine allows an uncapped number of qualifying individuals with approved financial sponsors to obtain authorization to travel to a port of entry in the United States where they may be considered for a two-year period of parole. *Id*.

1

4.     Following the implementation of Uniting for Ukraine, unauthorized border encounters with Ukrainians swiftly declined to levels seen before Russia's invasion of Ukraine.  *See, e.g.*, Ukrainian SW Border Encounters for FY 2022, Int. Defs' Trial Ex. 56; Ukrainian SW Border Encounters for FY 2023, Int. Defs' Trial Ex. 57.

5.     Likewise, Federal Defendants announced and implemented the Parole Process for Venezuelans ("Venezuelan Parole Process") in October 2022 to respond to an increase in Southwest border encounters with Venezuelan nationals in the summer and early fall of 2022.  Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022); *see also* Administrative Record, Cuba AR_000073, Fed. Defs' Trial Ex. A.

6.     The Venezuelan Parole Process provides an avenue for DHS to process noncitizens in the interior of the United States and away from the United States-Mexico border, allowing eligible individuals to avoid traveling through Mexico.  *Id.*

7.     DHS's development of the Venezuelan Parole Process involved negotiations with Mexico.  *Id*.

8.     For years, DHS had unsuccessfully sought Mexico's agreement to accept the removal of individuals from certain countries where the United States cannot send removable noncitizens, including, for example, Venezuelans.  Federal Defendants' Response in Opposition to the Motion for Preliminary Injunction ("Defs' P.I. Opp."), ECF No. 176 at 4; *see also* Declaration of Blas Nuñez-Neto Declaration ("Nuñez-Neto Decl.") Fed. Defs' Trial Ex. HH ¶¶ 11-16.

9.      As a part of the Venezuelan Parole Process, Mexico agreed to accept the removal of Venezuelan nationals who failed to follow the Venezuelan Parole Process or were otherwise removable, initially under the Title 42 order, and later under Title 8.  *Id.* at ¶ 18.

10.     Thus, the Venezuelan Parole Process was designed to disincentivize Venezuelans from making the journey to the southern border and provided a mechanism that allowed DHS to remove otherwise unremovable noncitizens.  *Id.*

11.     Within a week of announcement of the Venezuelan Parole Process, the number of Venezuelans encountered at the Southwest border fell from over 1,100 per day to under 200 per day; and as of the week ending December 4, to an average of 86 per day.  Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Oct. 19, 2022).

12.     The Venezuelan Parole Process also led to a decline in Venezuelans making the hazardous journey through the Darién Gap.  *Id.* (dropping from 40,593 in October 2022 to just 668 in November); *see also* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 21.

13.     Because the Venezuelan Parole Process decreased dangerous migration patterns, reduced border encounters, and increased DHS's ability to remove certain noncitizens, DHS sought to create similar processes with regards to other migrant populations that would have similar effects.  Nuñez-Neto Decl. Fed. Defs' Trial Ex. HH ¶¶ 11-16.

14.     Thus, on January 9, 2023, DHS announced a continued parole process for Venezuelans with minor modifications, and new similar parole processes for

nationals of Cuba, Haiti, and Nicaragua (the "CHNV Pathways").  Nuñez-Neto Decl. Fed. Defs' Trial Ex. HH ¶ 18; *see e.g.*, 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelans); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023).

15.     The CHNV Pathways were modeled on Uniting for Ukraine and the October 2022 Parole Process for Venezuelans.  *See* 87 Fed. Reg. 25040 (Implementation of the Uniting for Ukraine Parole Process); 87 Fed. Reg. 63507 (Implementation of a Parole Process for Venezuelans); *see also* Fed. Defs' Trial Ex. W; Administrative Record, Cuba AR_000073, Fed. Defs' Trial Ex. A.

16.     Through the CHNV Pathways, supporters with legal status in the United States could apply to sponsor qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela, and their immediate family members.  *See, e.g.*, 88 Fed. Reg. 1243, 1244 (Implementation of a Parole Process for Haitians).

17.     The CHNV Pathways allow up to 30,000 total qualifying individuals (with approved financial sponsors) from these four countries combined each month to obtain authorization to travel to a port of entry in the United States to be considered for a two-year period of parole.  *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, U.S. Dep't of Homeland Sec. (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-

announces-new-border-enforcement-measures-and, ECF No. 22-1; *see also* 88 Fed. Reg. 1243, 1244, 1253 (Implementation of a Parole Process for Haitians).

18. The Federal Register notices that establish the CHNV Pathways list their basic parameters and offer detailed explanations for their creation. *See, e.g.*, 88 Fed. Reg. 1266 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelans).

19. The Notices explain that the CHNV Pathways would provide significant public benefits, address urgent humanitarian objectives, and further important foreign policy objectives. *Id.*

20. For example, the Cuban and Haitian Process notices cite the following objectives:

> [I]mprove vetting for national security and public safety . . . reduce the strain on DHS personnel and resources . . . minimize the domestic impact of irregular migration from [Cuba/Haiti] . . . disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks . . . [and] fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

88 Fed. Reg. 1266, 1272 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243, 1248 (Implementation of a Parole Process for Haitians).   The Nicaraguan Parole Process notice contains nearly identical language. *See* 88 Fed. Reg. 1255, 1256.

21. The CHNV Pathways are also the result of diplomatic engagement with regional partner countries who have requested that the United States help manage irregular migration in the Western Hemisphere.  Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 48-61.

22. The CHNV Parole Pathways are one way the United States has sought to fulfill its diplomatic commitments to expand access to regular pathways for migrants and refugees, including commitments made in the Los Angeles Declaration on Migration and Protection, which was endorsed in June 2022 by the United States and 20 other partner countries. *Id*.

23. The diplomatic community focused on the CHNV countries in part because political and humanitarian conditions in each of these four countries are prompting irregular migration throughout the Western Hemisphere. *Id*. at ¶ 50.

24. As a part of the CHNV Parole Process, Mexico agreed to accept the removal of CHNV nationals who failed to follow the CHNV Parole Process or were otherwise removable. *Id.* at ¶ 25.

25. The CHNV Pathways are accompanied by corresponding "significant consequences for those who fail to use those pathways," including presumptive ineligibility for asylum; potential removal to Mexico, which will accept returns of 30,000 individuals per month who fail to use the CHNV Pathways; and, if removed, a five-year ban and potential criminal prosecution on any attempted reentry. *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), ECF 22-1; *see also* Circumvention of Lawful Pathways, 88 Fed. Reg. 31314 (May 16, 2023).

26. In developing the CHNV Pathways, DHS considered the expectation that they would reduce the burdens caused by irregular migration; the impact of the processes on state and local communities; public safety and financial vetting; and the ability of parolees to apply for work authorization in order to be financially independent.

See, *e.g.*, 88 Fed. Reg. 1279, 1280 (Implementation of Changes to the Parole Process for Venezuelans); 88 Fed. Reg. 1255, 1260-61 (Implementation of a Parole Process for Nicaraguans).

**B.     Background on Migration from Cuba, Haiti, Nicaragua, and Venezuela**

27.     **Cuba.** Cuba has a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which restricts freedoms of expression, association, peaceful assembly, and other human rights.   88 Fed. Reg. 1266, 1270 (Implementation of a Parole Process for Cubans).

28.     Since late 2020, the human rights situation in Cuba has deteriorated considerably, with the Cuban government employing arbitrary detention and military deployment to harass critics, activists, and political opponents; prosecutions without fair trial guarantees; restrictions on social media and messaging platforms; and beatings that amount to torture. *Id.*

29.     These forms of government repression are rapidly worsening. *Id.*

30.     Cuba is also currently experiencing its worst economic crisis since the 1990s, resulting in mass shortages of basic goods, rolling blackouts, and untenable conditions. *Id.*

31.     Cubans are fleeing the island in record numbers, surpassing even the Mariel exodus of 1980. *Id.* at 1269.

32.     **Haiti.** In recent years, Haiti has experienced natural disasters, economic crisis, pervasive hunger, political assassinations, and widespread gang violence.  88 Fed. Reg. 1243, 1246 (Implementation of a Parole Process for Haitians).

33. In 2021, Haiti experienced a 7.2 magnitude earthquake and Tropical Storm Grace within days of one another, leaving over 650,000 Haitians requiring humanitarian assistance and causing damage of over $1.6 billion—eleven percent of Haiti's GDP. *Id.*

34. On July 7, 2021, assassins killed Haitian President Jovenel Moïse.  *Id.*

35. Gangs have filled the resulting power vacuum, carrying out thousands of documented killings and even more kidnappings.  *Id.*

36. Gang violence has shuttered businesses, destroyed essential infrastructure like water networks, hampered attempts to control a serious cholera outbreak, and left Haitians struggling to find basic necessities like food, water, and medicine.  *Id.* at 1246–47.

37. Because of these compounding humanitarian crises, increasing numbers of Haitians have been forced to leave the island.  *See id.* at 1246.

38. **Nicaragua.** Since 2007, Nicaraguan President Daniel Ortega's administration has consolidated control over the country's institutions and dismantled the rule of law. 88 Fed. Reg. 1255, 1258 (Implementation of a Parole Process for Nicaraguans).

39. The Ortega administration has particularly targeted non-governmental organizations, causing thousands linked to political parties and academic and religious spaces to be shut down.  *Id.*

40. Recently, Nicaragua's government began cracking down on the Catholic Church, shutting down radio stations, terminating church-affiliated organizations, detaining and exiling church officials, and branding church leadership as coup-mongers. Maria Montes & Savarni Sanka, *In Nicaragua, Crackdown on Religious Actors*

*Further Imperils Return to Democracy*, U.S. INST. PEACE (Oct. 7, 2022), https://www.usip.org/publications/2022/10/nicaragua-crackdown-religious-actors-further-imperils-return-democracy, Int. Defs' Trial Ex. 2.

41.     The Nicaraguan government's efforts to shut down non-governmental organizations are "part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation, intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists." 88 Fed. Reg. 1255 at 1258.

42.     The government targets human rights defenders and other critics with death threats; assaults; police intimidation, harassment, and surveillance; online defamation campaigns; and arbitrary detention and prosecution. *World Report 2022: Nicaragua*, HUM. RTS. WATCH, https://www.hrw.org/world-report/2022/country-chapters/nicaragua (last visited Sep. 20, 2023), Int. Defs' Trial Ex. 3.

43.     Political repression and poverty exacerbate significant food insecurity and hunger in Nicaragua. 88 Fed. Reg. 1255 at 1258.

44.     For these reasons, the number of individuals fleeing Nicaragua has increased. *See id*.

45.     **Venezuela.** "A complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of [President] Nicolás Maduro have caused nearly 7 million Venezuelans [or more than one quarter of the country's population] to flee their country." 87 Fed. Reg. 63507, 63509 (Implementation of a Parole Process for Venezuelans).

46.    President Maduro's repressive tactics, including extrajudicial executions, forced disappearances, jailing political opponents, prosecuting civilians in military courts, torturing detainees, and cracking down on protestors and journalists, are serious enough for a U.N. factfinding mission to find they constitute crimes against humanity. *World Report 2022: Venezuela*, HUM. RTS. WATCH, https://www.hrw.org/world-report/2022/country-chapters/venezuela (last visited July 27, 2023), Int. Defs' Trial Ex. 4.

47.    Venezuela's healthcare system has collapsed, and millions in Venezuela cannot access basic nutrition. *See WFP Venezuela Food Security Assessment Main Findings | Data Collected between July and September 2019*, WORLD FOOD PROGRAMME (Feb. 23, 2020), https://reliefweb.int/report/venezuela-bolivarian-republic/wfp-venezuela-food-security-assessment-main-findings-data, Int. Defs' Trial Ex. 5; *World Report 2022: Venezuela*, HUM. RTS. WATCH, https://www.hrw.org/world-report/2022/country-chapters/venezuela (last visited July 27, 2023), Int. Defs' Trial Exhibit 4.

48.    Consequently, Venezuela has become the second-largest external displacement crisis in the world.  87 Fed. Reg. 63507, 63509 (Implementation of a Parole Process for Venezuelans).

## C.    The Parole Pathways Application Process

49.    To be eligible for the CHNV Pathways, noncitizen beneficiaries must: (1) be outside of the United States; (2) be a national of Cuba, Haiti, Nicaragua, or Venezuela, or be the immediate family member who is traveling with an eligible national of Cuba, Haiti, Nicaragua, or Venezuela; (3) have a supporter in the United

States who commits to providing financial and other support; (4) pass rigorous biometric and biographic national security and public safety screening and vetting; (5) possess a valid unexpired passport; (6) provide for their own commercial travel to the U.S.; (7) comply with all additional requirements including vaccinations and other public health guidelines; and (8) warrant a favorable exercise of discretion for urgent humanitarian reasons or significant public benefit. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68.

50.   Individuals are ineligible for the Parole Pathways if they: (1) fail to pass security or public safety vetting, (2) are deemed not to merit a favorable exercise of discretion, (3) have been ordered removed from the United States within the prior five years or are subject to a bar to admissibility based on a prior removal order, (4) have crossed without authorization into the United States, between Ports of Entry, after the date the relevant Parole Pathway was announced, (5) have crossed the Mexican or Panamanian border without authorization after the date the relevant Parole Pathway was announced, (6) are Cuban or Haitian and have been interdicted at sea after April 27, 2023, (7) are an unaccompanied immigrant child (someone under 18 and not traveling with a parent or legal guardian), or (8) are a dual national or permanent resident of, or hold refugee status in, another country, unless DHS operates a similar parole process for the country's nationals. *Id.*

51.   Individuals seeking parole cannot directly apply to these programs; a supporter with legal status in the United States who is willing and able to financially support the parolee must file the application. *Id.*

52. Supporters can apply to sponsor individually, together with other individuals, or on behalf of organizations, businesses, or other entities. *Id.*

53. Supporters must pass background vetting including for public safety and national security concerns, to protect against abuse, and to ensure that they are able to financially support the beneficiary they are applying to support. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68.

54. Supporters swear under penalty of perjury that they will receive the parolee in the United States; ensure safe housing; help complete applications for employment authorization and a Social Security card; ensure the parolee's health needs are met; and assist them in accessing education, learning English, and securing employment. *Id.*

55. To begin the application process, the supporter first submits a Form I-134A, "Online Request to be a Supporter and Declaration of Financial Support," with USCIS. *Form I-134A, Online Request to be a Supporter and Declaration of Financial Aid*, USCIS, https://www.uscis.gov/sites/default/files/document/forms/i-134a.pdf,  Administrative Record, Cuba AR_001211, Fed. Defs' Trial Ex. A.

56. USCIS requires a separate form for each beneficiary a person intends to sponsor. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68. For example, Ms. Laveus completed separate I-134A forms for each individual she sponsored: her brother Reginald and her nephew. *See* Declaration of Anne Valerie Daniel-Laveus ("Laveus Decl."), Int. Defs' Trial Ex. 122

12

57.     The I-134A application solicits detailed financial information for both the supporter and beneficiary, including income information, complete lists of assets owned, and other financial obligations. *Form I-134A, Online Request to be a Supporter and Declaration of Financial Aid*, USCIS, https://www.uscis.gov/sites/default/files/document/forms/i-134a.pdf, Administrative Record, Cuba AR_001211, Fed. Defs' Trial Ex. A.

58.     DHS requires financial information to verify that the supporter has sufficient financial resources to support the individual(s) they are agreeing to support for the duration of their parole period. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68.

59.     The I-134A application asks each supporter to explain why the intended beneficiary merits prioritization in determining a possible grant of parole for urgent humanitarian reasons or significant public benefit. Fed. Defs' Trial Ex. K.

60.     The I-134A application also asks supporters to certify that they understand that if they pass the first round of vetting by USCIS, they may need to submit to further screening, including submitting biometrics. *Form I-134A, Online Request to be a Supporter and Declaration of Financial Aid*, USCIS, https://www.uscis.gov/sites/default/files/document/forms/i-134a.pdf, Administrative Record, Cuba AR_001211, Fed. Defs' Trial Ex. A.

61.     Upon receipt of the I-134A application, USCIS performs its first round of vetting. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated July 12, 2023), Int. Defs' Trial Ex. 68.

62.     The USCIS reviewer considers any urgency, individual welfare implications, and potential help to a community or group.  Fed. Defs' Trial Ex. K.

63.     The USCIS reviewer may consider whether the application references any of several conditions including political unrest, family reunification, medical or caregiving needs, and severe economic hardship.  *Id.*

64.     If USCIS "confirms a supporter," meaning the sponsor and intended beneficiary have passed the first round of the vetting process and the reviewer determines that the provided explanation for parole is sufficient, the intended beneficiary receives an email from USCIS with instructions to use the CBP One mobile application to submit their biographic information and a photo.  *Id.*; *see also Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68.

65.     After USCIS processes the second round of submitted information, the beneficiary receives a notice confirming whether USCIS will provide them with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis.  *Id.*

66.     If approved, the beneficiary may make the trip only via air to a U.S. port of entry.  *Id.*

67.     The beneficiary has 90 days to secure their own travel following USCIS's preliminary approval.  *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68.

68. USCIS's preliminary approval of travel for the parolee beneficiary does not guarantee entry or parole into the United States. *Id.*

69. Upon arriving at a U.S. port of entry, CBP performs additional individualized screening and vetting of the beneficiary, including through a personal interview and fingerprint biometric vetting. *Id.*

70. Intervenor Eric Sype testified at trial that it took about three hours for his sponsored parolee and friend, Oldrys, to be processed by CBP upon his arrival at the U.S. port of entry. *See* Trial Tr. vol. 1 of 2, 88:4-7.

71. As to each such individual, a CBP officer considers that individual for a grant of discretionary parole. *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, USCIS, https://www.uscis.gov/CHNV (last updated Sep. 6, 2023), Int. Defs' Trial Ex. 68.

72. The CBP officer's consideration is conducted on a case-by-case basis. *Id.*

73. If the individual is approved, they are paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. *Id.*

74. Individuals are "expect[ed] to leave the country when [their] parole expires." Int. Defs' Trial Ex. 68. Individuals who "stay in the United States after [their] parole expires" are subject to being referred to U.S. Immigration and Customs Enforcement for removal proceedings. *Id.*

**D.    The Parole Pathways Facilitate Sponsorship for a Wide Range of Reasons**

75. Thousands of Texans support the Parole Pathways: Texas ranks among the top five states based on numbers of residents supporting parolees.  Federal Defendants'

Responses and Objections to Plaintiffs' Revised First Set of Discovery Requests ("Fed. Defs' R&Os to Pls' First Set of Requests"), Pls' Trial Ex. 38.

76. The Parole Pathways promote humanitarianism, stability and safety, family reunification, religious expression, community building, and economic prosperity, including for Texans. *See generally* Declaration of Paul Zito ("Zito Decl."), Int. Defs' Trial Ex. 129.

77. Cuba, Haiti, Nicaragua, and Venezuela are experiencing humanitarian crises. *Supra* ¶¶ 27-48.

78. The individuals whom Intervenors are sponsoring have suffered these conditions first-hand. *See, e.g.*, Declaration of Dr. Germán A. Cadenas ("Cadenas Decl."), Int. Defs' Trial Ex. 117; Supplemental Declaration of Dr. Germán A. Cadenas ("Supp. Cadenas Decl."), Int. Defs' Trial Ex. 118; Declaration of Dr. Nan Langowitz ("Langowitz Decl."), Int. Defs' Trial Ex. 119; Supplemental Declaration of Dr. Nan Langowitz ("Supp. Langowitz Decl."), Int. Defs' Trial Ex. 120; Laveus Decl., Int. Defs' Trial Ex. 121; Supplemental Declaration of Anne Valerie Daniel-Laveus ("Supp. Laveus Decl."), Int. Defs' Trial Ex. 122; Declaration of Francis Margarita Arauz Ramirez ("Arauz Decl."), Int. Defs' Trial Ex. 123; Supplemental Declaration of Francis Margarita Arauz Ramirez ("Supp. Arauz Decl."), Int. Defs' Trial Ex. 124; Declaration of Eric Sype ("Sype Decl."), Int. Defs' Trial Ex. 125; Supplemental Declaration of Eric Sype ("Supp. Sype Decl."), Int. Defs' Trial Ex. 126; Declaration of Dr. Kate Sugarman ("Sugarman Decl."),  Int. Defs' Trial Ex. 127; Supplemental Declaration of Dr. Kate Sugarman ("Supp. Sugarman Decl."),

Int. Defs' Trial Ex. 128; Zito Decl., Int. Defs' Trial Ex. 129; Supplemental Declaration of Paul Zito ("Supp. Zito Decl."), Int. Defs' Trial Ex. 130.

79.   Ms. Laveus's nephew was recently at risk in Haiti because of nearby riots in which several people were burned alive.  Supp. Laveus Decl., Int. Defs' Trial Ex. 122 ¶ 12.

80.   The Cuban family Mr. Zito has applied to sponsor risks incarceration due to their Christian faith.  Zito Decl., Int. Defs' Trial Ex. 129 ¶ 12.

81.   The family Dr. Langowitz sponsored was forced to flee Venezuela after speaking out about government corruption.  Langowitz Decl., Int. Defs' Trial Ex. 119 ¶ 12.

82.   The individual Mr. Sype has sponsored, Oldrys, suffers from extreme financial hardship, which has worsened due to political instability, the pandemic, and natural disasters. Sype Decl., Int. Defs' Trial Ex. 125 at ¶ 9; *see also* Trial Tr. vol. 1 of 2, 46:25-47:21.

83.   The absence of safe pathways does not prevent the migration of individuals seeking safety and security for themselves and their families. *See, e.g.*, *2023: A Moment of Truth for Global Displacement*, UNHCR, https://www.unhcr.org/spotlight/2023/01/2023-a-moment-of-truth-for-global-displacement/ (last visited June 19, 2023), Int. Defs' Trial Ex. 81; *Seven-fold increase in the number of children walking through the Panamanian jungle towards North America this Year*, UNICEF (Mar. 30, 2023), https://www.unicef.org/press-releases/seven-fold-increase-number-children-walking-through-panamanian-jungle-towards-north, Int. Defs' Trial Ex. 82; Declaration of Heather Scanlon ("Scanlon Decl."), Int. Defs' Trial Ex. 133.

84. The CHNV Pathways promote access to safety.  *See, e.g.*, Supp. Laveus Decl., Int. Defs' Trial Ex. 122; Zito Decl., Int. Defs' Trial Ex. 129; Langowitz Decl., Int. Defs' Trial Ex. 119.

85. The CHNV Pathways allow proposed parolees to receive travel authorization before leaving their home countries and thus avoid treacherous journeys and dangerous conditions at the border.  *See, e.g.*, Scanlon Decl., Int. Defs' Trial Ex. 133 ¶¶ 14–20.

86. The Parole Pathways also allow family reunification.  *See, e.g.*, Cadenas Decl., Int. Defs.' Trial Ex. 117; Laveus Decl., Int. Defs' Trial Ex. 121; Arauz Decl., Int. Defs' Trial Ex. 123.

87. Three of the Intervenors applied to support their family members.  *See, e.g.*, Cadenas Decl., Int. Defs.' Trial Ex. 117; Laveus Decl., Int. Defs' Trial Ex. 121; Arauz Decl., Int. Defs' Trial Ex. 123.

88. Ms. Arauz made her family whole by reunifying with her husband and bringing him home to their son.  Supp. Arauz Decl., Int. Defs' Trial Ex. 124 ¶¶ 4–5.

89. Ms. Laveus reunited her brother and nephew with her elderly mother and herself. Laveus Decl., Int. Defs' Trial Ex. 121 ¶ 22.

90. World Series champion Eduardo Rodríguez has applied to sponsor his Venezuelan parents and other family members so they can reunite after eight years of seeing him play Major League Baseball only on television.  Declaration of Eduardo Jose Rodriguez Hernandez ("Hernandez Decl."), Int. Defs' Trial Ex. 132 ¶¶ 2, 4, 10, 12.

91.    The Parole Pathways also facilitate community building and the free exercise of religion.  *See, e.g.*, Langowitz Decl., Int. Defs' Trial Ex. 119; Zito Decl., Int. Defs' Trial Ex. 129.

92.    Mr. Zito, a devout Christian, seeks to answer a "calling from God" in sponsoring Abel, his close friend who has experienced religious persecution in Cuba.  Zito Decl., Int. Defs' Trial Ex. 129 ¶¶ 8, 12, 14.

93.    Similarly, Dr. Langowitz's synagogue, whose members work together to sponsor and support families seeking parole, has grown closer through their collective efforts to welcome families.  Langowitz Decl., Int. Defs' Trial Ex. 119 ¶ 14.

94.    The Parole Pathways additionally foster economic growth.  *See, e.g.*, Sype Decl., Int. Defs' Trial Ex. 125; Supp. Sype Decl., Int. Defs' Trial Ex. 126; Expert Declaration of Jennifer Hunt ("Hunt Expert Decl."), Int. Defs' Trial Ex. 137; Declaration of Jocelyn Wyatt ("Wyatt Decl."), Int. Defs' Trial Ex. 135.

95.    Mr. Sype's cousin will experience relief from a perennial labor shortage on his farm when he can employ Mr. Sype's parolee and friend, Oldrys.  Supp. Sype Decl., Int. Defs' Trial Ex. 126 ¶ 4.

96.    There is broad-based consensus among economists that immigration increases economic growth.  Hunt Expert Decl., Int. Defs' Trial Ex. 13 ¶ 6.

97.    Immigrants of all skill and education levels contribute to the economy by increasing specialization and productivity and contribute billions to Texas's Gross Domestic Product each year.  *Id.* at ¶ 8.

98.    People recently granted parole from Afghanistan, Ukraine, and Latin American countries have had a positive impact on the United States economy.  *Immigration*

19

*parole has added 450,000 workers to industries with critical labor shortages*, fwd.us (April 20, 2023), https://wp.fwd.us/news/immigration-labor-shortages/, Int. Defs' Trial Ex. 85 at 2; *see also, e.g.*, Int. Defs' Trial Exs. 86-99 (articles on labor shortages and needs in the United States and how immigrants are key to addressing this issue); Wyatt Decl., Int. Defs' Trial Ex. 135 ¶ 5 (matching paroled individuals with labor needs).

99.   It is likely that many paroled individuals, including in Texas, are working in industries with labor shortages. *Id.*

100.   The ability to receive work authorization allows parolees to be self-supporting, generates tax revenue, and helps fill labor shortages, including in Texas—which as of December 2022, had 829,000 unfilled jobs. *See, e.g.*, *Understanding America's Labor Shortage: The Most Impacted States*, U.S. Chamber of Commerce (May 2, 2023), https://www.uschamber.com/workforce/the-states-suffering-most-from-the-labor-shortage?state=, Int. Defs' Trial Ex. 75; *Immigration parole has added 450,000 workers to industries with critical labor shortages*, fwd.us (April 20, 2023), https://wp.fwd.us/news/immigration-labor-shortages/, Int. Defs' Trial Ex. 85 at 2.

101.   USCIS has received over 1.5 million applications from U.S. supporters seeking to sponsor individuals under the CHNV Pathways. *See, e.g.*, *1.5 million apply for U.S. migrant sponsorship program with 30,000 monthly cap*, CBS News (May 22, 2023), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/, Int. Defs' Trial Ex. 116.

E.      **The CHNV Parole Pathways Draw Upon DHS's Statutory and Historical Parole Authority**

*The Legislative History of the Parole Authority*

102. Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5)(A), states that "the Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any [noncitizen] applying for admission to the United States."

103. Congress declined to define "case-by-case," "urgent humanitarian reasons," or "significant public benefit," or to delineate with further specificity the circumstances under which the executive may grant parole. *See* 8 U.S.C. § 1182(d)(5)(A); Expert Declaration of Yael Schacher ("Schacher Expert Decl."), Int. Defs' Trial Ex. 141 ¶¶ 8, 21.

104. The executive's authority to parole individuals into the country was originally codified in Section 212(d)(5) of the 1952 INA, which established that "the Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." Immigration and Nationality Act, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 182-188 (1952), Int. Defs' Trial Ex. 6; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 12,

105. Congress did not define the terms "emergent" or "public interest" and did not modify the wording of the parole provision for 28 years until the passage of the Refugee Act of 1980. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 12.

106.    Between 1952 and 1980, lacking a permanent statutory provision specifically providing for the entry of refugees into the United States, the Executive frequently used the parole authority to facilitate the entry of refugees in a programmatic manner—*i.e.*, by defining a group, typically by nationality plus additional factors, whose entry could be justified by emergent or public interest reasons, with applications of individuals therein considered on a case-by-case basis. *See, e.g.*, *id.* at ¶ 4.

107.    The first such use was in 1956, when President Dwight D. Eisenhower directed the Attorney General to parole into the country approximately 30,000 Hungarian refugees who had fled during that country's revolution. S. Comm. On the Judiciary, 96th Cong., *Review of U.S. Refugee Resettlement Programs and Policies* 9 (Comm. Print 1980), Int. Defs' Trial Ex. 7.

108.    In 1980, Congress passed the Refugee Act, which established for the first time a specific, permanent legal process to admit people to the United States as refugees. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980), Int. Defs' Trial Ex. 8.

109.    In passing the Refugee Act, and in recognition of the fact that refugees now had a unique legal pathway to the United States, Congress added a restriction to the parole authority, codified at INA § 212(d)(5)(B), preventing the Attorney General from paroling a refugee into the United States "unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a

refugee."  *Id.* § 212(d)(5)(B); 94 Stat. at 108, Int. Defs' Trial Ex. 8; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 17.

110.   The conference report adopted by both chambers accompanying the final legislation explained that "[t]he conferees, in accepting the House limitation on the parole of refugees, recognize that it does not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees."  H.R. Rep. No. 96-781, at 20 (1980) (Conf. Rep.), Int. Defs' Trial Ex. 9.

111.   The last time Congress amended the parole authority was in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689 (1996), Int. Defs' Trial Ex. 10; *see also* Schacher Expert Decl., Trial Ex. 141 ¶¶ 19–20, 22.

112.   In relevant part, IIRIRA struck from the INA the language that allowed the Attorney General to grant parole for "emergent reasons or for reasons deemed strictly in the public interest" and replaced it with language allowing the Attorney General to grant parole for "urgent humanitarian reasons or significant public benefit."  IIRIRA § 602(a), 110 Stat. at 3009-546, 3009-689, Int. Defs' Trial Ex. 10; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 20.

113.   In addition, in an attempt to address the concern that parole was allowing large groups of non-citizens to remain in the United States for long periods of time regardless of whether they had a path to permanent legal status, Congress required that long-term parolees who have yet to become lawful permanent residents be

counted against numerical caps on family-sponsored immigration.  IIRIRA § 603, 110 Stat. at 3009-690, Int. Defs' Trial Ex. 10; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 19.

114.   IIRIRA also amended the parole statute to specify that parole must be granted "only on a case-by-case basis."  IIRIRA § 602(a), 110 Stat. at 3009-546, Int. Defs' Trial Ex. 10; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 22.

115.   As Congress worked on the legislation that eventually became IIRIRA, the House Judiciary Committee considered a proposal that would have instead authorized parole for "an urgent humanitarian reason" or "for a reason deemed strictly in the public interest," and which contained precise definitions of each of those phrases. H.R. Rep. No. 104-469, pt. 1, at 77-78 (1995), Int. Defs' Trial Ex. 11; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 21.

116.   Under the proposal considered by the Judiciary Committee, parole could be used for an "urgent humanitarian reason" only in cases involving certain medical emergencies, and would be authorized as "strictly in the public interest" only where the parolee assisted the U.S. government in a law enforcement activity and was either needed in the United States or their life would have been threatened outside the country, or where the parolee was to be criminally prosecuted. H.R. Rep. No. 104-469, pt. 1, at 347-48, Int. Defs' Trial Ex. 11; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 21.

117.   In connection with and in support of these proposed narrowing definitions, the House Judiciary Committee Report records language, which the Plaintiff States cite to in their briefing, that criticizes the executive's use of the parole authority "to

admit entire categories of aliens who do not qualify for admission under any other category in immigration law," in "contraven[tion of] the intent of section 212(d)(5)." H.R. Rep. No. 104-469, pt. 1, at 140, Int. Defs' Trial Ex. 11; *see also* Plaintiff States' Motion for Preliminary Injunction ("Pls' P.I."), ECF No. 22 at 7, 11.

118.   However, before the bill was brought to the Floor of the U.S. House of Representatives for a vote, the language defining and restricting when parole could be used was stripped from the bill. *Compare* H.R. Rep. No. 104-469, pt. 1, at 140, Int. Defs' Trial Ex. 11 *with* IIRIRA § 602, 110 Stat. at 3009-689, Int. Defs' Trial Ex. 10.

119.   The legislation that ultimately passed both chambers and was signed into law as IIRIRA left the terms "urgent humanitarian reasons" and "significant public benefit" undefined. IIRIRA § 602, at 3009-689, Int. Defs' Trial Ex. 10; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 21.

120.   Although IIRIRA added the specification that parole should be granted on a "case-by-case basis," in practice, the manner in which the executive exercised the parole authority remained consistent before and after the enactment of IIRIRA. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 9.

121.   Both before and after the enactment of IIRIRA, successive administrations used parole in a programmatic manner by identifying a group of people whose entry through parole could be warranted for emergent or urgent humanitarian reasons or would be in the public interest or advance a significant public benefit, and then

allowing potentially eligible members of that defined group to apply and be considered for parole on a case-by-case basis. *Id.*

122.   Both before IIRIRA expressly codified the requirement as well as after, contemporaneous documents reflect the executive's understanding that parole was granted on a case-by-case basis. *See, e.g.*, Immigration and Naturalization Service, *INS Focus: What is Immigration Parole?* (1994), Int. Defs' Trial Ex. 12; United States General Accounting Office (GAO), *Cuba: U.S. Response to the 1994 Cuban Migration Crisis*, p. 4 (Sept. 1995), Int. Defs' Trial Ex. 13; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 22.

123.   After the passage of IIRIRA, in June 2001, George W. Bush administration INS General Counsel Bo Cooper issued a legal opinion concluding that "a class whose members generally would be considered appropriate candidates for parole does not conflict with the 'case-by-case' decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case." Administrative Record, Cuba AR_000097, Fed. Defs' Trial Ex. A; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 25.

124.   The memo concluded that "[s]o long as individual consideration is given to parole decisions," the agency's determination "that it is generally in the public interest" to parole members of the designated class into the United States "does not violate the case-by-case requirement." Administrative Record, Cuba AR_000097, Fed. Defs' Trial Ex. A; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 25.

125.   The contemporaneous understanding that the codification of the "case-by-case" requirement in IIRIRA did not preclude large-scale parole programs or otherwise change the status quo is exemplified by the Cuban Migration Accords: a series of programs to parole large numbers of Cubans that existed before and continued unchanged after the 1996 passage of IIRIRA. *See* Declaration of Eric Schwartz ("Schwartz Decl."), Int. Defs' Trial Ex. 134 ¶ 20.

126.   When passing IIRIRA, Congress also reaffirmed and reauthorized the Cuban Adjustment Act of 1966, which continues to allow Cuban parolees who enter through large-scale parole programs to become lawful permanent residents after one year, until Cuba becomes a democracy.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 51.

127.   Since the 1996 passage of IIRIRA, both Republican and Democratic administrations have created parole programs to allow the parole of broadly defined classes of individuals, for example: Cubans; Haitians; Chinese and Russian nationals seeking to visit the Commonwealth of the Northern Mariana Islands and Guam; family members of U.S. military service members; minor children from El Salvador, Guatemala, and Honduras; family members of Filipino World War II veterans; Afghan allies; and Ukrainians. *See, e.g.*, Schacher Expert Decl., Int. Defs' Trial Ex. 141; Declaration of Morton H. Halperin ("Halperin Decl."), Int. Defs' Trial Ex. 131; Schwartz Decl., Int. Defs' Trial Ex. 134.

128.   Both before and after the passage of IIRIRA, Congress has passed legislation extending various benefits and services to individuals benefitting from several large-scale uses of parole. *See, e.g.*, IIRIRA, Pub. L. No. 104-208, Div. C, § 646,

110 Stat. 3009-546, 3009-709, Int. Defs' Trial Ex. 10; National Defense Authorization for Fiscal Year 2020, Pub. L. No. 116-92, § 1758, 133 Stat. 1198, 1860–61 (2019), Int. Defs' Trial Ex. 14; Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43, Div. C, 135 Stat. 344, 372-379 (2021), Int. Defs' Trial Ex. 15; Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136 Stat. 1211 (2022), Int. Defs' Trial Ex. 16.

### Historical Uses of the Parole Authority

129.    Ever since the parole authority was codified in Section 212(d)(5) of the 1952 INA, parole has been a frequently used tool of successive administrations to advance the public interest by furthering important foreign policy goals.  *See, e.g.*, Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 7; Halperin Decl., Int. Defs' Trial Ex. 131 ¶ 3; Schwartz Decl., Int. Defs' Trial Ex. 134 ¶ 11; *supra* ¶¶ 19-24.

130.    For example, the parole authority has been used multiple times to facilitate the entry of nationals of Cuba during and after the Cold War, as well as nationals of Vietnam and other Southeast Asian countries following the Vietnam War, all in the interest of furthering key foreign policy goals.  *See, e.g.*, Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 33, 42–43; Halperin Decl., Int. Defs' Trial Ex. 131 ¶¶ 11, 21–23, 28, 32–33, 35; Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 13, 19–20, 22, 29.

131.    The parole authority has enabled administrations to serve urgent humanitarian needs and promote the national interest through achieving humanitarian, human rights, anti-trafficking, and regional security goals, among others. *See, e.g.*,

Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 8-11, 41; Halperin Decl., Int. Defs' Trial Ex. 131 ¶¶ 3, 35.

132.    Historical uses of the executive parole authority—and subsequent congressional action expressing approval of executive parole programs—include, but are not limited to the following examples:

a.      Hungarian Parole (1956): In 1956, President Dwight D. Eisenhower began issuing a series of orders that resulted in the parole of approximately 30,000 Hungarian nationals fleeing Soviet repression of the Hungarian Revolution. *See, e.g.*, Dep't of Justice, Immigration and Naturalization Serv., *Annual Report of the Immigration and Naturalization Serv.* 2–3 (1957), Int. Defs' Trial Ex. 17; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 13, 31.

b.      The goals of this parole program were concerned with foreign policy: to support opponents of communism in a non-military fashion, shore up Cold War alliances (especially with Austria and Yugoslavia, where most Hungarians initially fled), and reassert America's moral leadership by promoting solutions to refugee and migration crises. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 13, 31.

c.      Cuban Parole (1961-1975): Beginning with the Kennedy administration in 1961 and lasting through the Ford administration in 1975, more than 400,000 Cubans were paroled into the United States. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 14–15.

d.      Vietnamese, Cambodian, and Laotian Parole (1975-1998): In the aftermath of the Vietnam War, the United States government paroled Vietnamese

nationals (and subsequently also Cambodian and Laotian nationals) through a series of programs adopted over the course of more than two decades as part of a broader international effort to better manage the migration of Vietnamese people seeking to leave the country.  Schacher Expert Decl., Int. Defs' Trial Ex. 141. ¶¶ 33–41

e.  Cuban/Haitian Entrant Parole (1980): In April 1980, thousands of Cubans began arriving in Florida from Mariel, Cuba, in what eventually became known as the Mariel Boatlift.  Mirta Ojito, *The Long Voyage from Mariel Ends*, New York Times (Jan. 16, 2005), https://www.nytimes.com/2005/01/16/weekinreview/the-long-voyage-from-mariel-ends.html, Int. Defs' Trial Ex. 21.

f.  Initially, these individuals were granted parole for 60 days and allowed to seek asylum under the procedures of the newly enacted Refugee Act of 1980.  U.S. Dep't of State, *Cuban Haitian Arrivals in the U.S.* (1980), Int. Defs' Trial Ex. 22.

g.  As more Cubans and Haitians continued to arrive, INS announced that it would extend and then re-extend six-month grants of parole to already-arrived Cubans and Haitians.  *Id.*

h.  More than 125,000 Cubans and 25,000 Haitians were paroled.  *See* Ruth Ellen Wasem, *U.S. Immigration Policy on Haitian Migrants*, CRS Report for Congress 1 n.1 (last updated Jan. 22, 2007), https://www.fosterglobal.com/policy_papers/CRSUSPolicyTowardHaitian Immigrants.pdf, Int. Defs' Trial Ex. 23.

i.  Lautenberg Parole Program (1988 – 2012): In 1988, under the Reagan administration, the Attorney General began paroling people from the Soviet Union who had been denied refugee status, but whose parole he deemed to be in the public interest—particularly members of historically persecuted groups, such as Soviet Jews and Evangelical Christians (the "Lautenberg Program").  Schwartz Decl., Int. Defs' Trial Ex. 134 ¶ 38; *see also* Ruth Marcus, *U.S. Moves to Ease Soviet Emigres' Way*, Washington Post (Dec. 9, 1988), https://www.washingtonpost.com/archive/politics/1988/12/09/us-moves-to-ease-soviet-emigres-way/fa59b7a5-d203-42d5-8f40-e9da4d60eab8/, Int. Defs' Trial Ex. 25.

j.  The Lautenberg Program was subsequently extended to other populations of particular concern to U.S. foreign policy interests, namely nationals of Vietnam, Cambodia, and Laos.  *See, e.g.*, Schwartz Decl., Int. Defs' Trial Ex. 134 ¶ 38; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 18.

k.  "Orderly Departure Program" for Vietnamese Parole (1989-1999): Because the continued displacement of Vietnamese nationals during and following the Vietnam War was destabilizing to neighboring countries, the United Nations High Commissioner for Refugees worked with the Vietnamese government and other countries to create the Orderly Departure Program ("ODP") to try and better manage migration.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 35; *see also* United States General Accounting Office

(GAO), *Refugee Program: The Orderly Departure Program from Vietnam* (April 1990), Int. Defs' Trial Ex. 27.

l.    Under the ODP, the United States and other western countries committed to receive Vietnamese nationals directly from Vietnam, while Vietnam itself committed to deter irregular (and dangerous) migration by boat. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 39.

m.    Between 1990 and 1994, over 45,000 Vietnamese nationals were paroled into the United States under the ODP. *Id.*

n.    <u>Cuban Migration Accords Parole (1994 - present)</u>: In September 1994, in response to a sharp increase in irregular sea migration from Cuba, the United States and Cuba jointly agreed to pursue policies designed to reduce such irregular migration of Cubans to the United States, including a pledge from the United States to allow a minimum level of 20,000 Cubans to migrate legally to the United States each year, including through parole, but not counting the immediate relatives of United States citizens. *See, e.g.*, Halperin Decl., Int. Defs' Trial Ex. 131 ¶ 20; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 46-48; Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 13-17.

o.    To assist the United States in fulfilling this pledge, and to include people likely to migrate irregularly via sea, the Attorney General created a Special Cuban Migration Program in 1994 to allow approximately 5,000 Cuban nationals between the ages of 18 and 55 to enter the United States each year through a parole lottery. *See, e.g.*, Halperin Decl., Int. Defs' Trial Ex. 131

¶¶ 18-23; Schacher Expert Decl., Int. Defs' Trial Ex. ¶¶ 47-48; Schwartz Decl., Int. Defs' Trial Ex. 134, ¶¶ 19-20.

p.   In 1996, when passing IIRIRA, Congress reaffirmed the Cuban Adjustment Act that allowed Cuban parolees to become lawful permanent residents after a year if they are admissible at that time, mandating that the CAA stay in place until the President determines that a democratically elected government in Cuba is in power.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 51.

q.   The Cuban Adjustment Act remains in effect today and applies to all Cubans paroled into the United States (including Cubans who are paroled through the CHNV Parole Pathways).  *See* Cuban Adjustment Act, Pub. L. No. 89-732, §§ 1–2, 80 Stat. 1161, Int. Defs' Trial Ex. 19.

r.   Resettlement Opportunity for Vietnamese Returnees (1995): In 1995, countries where displaced Vietnamese nationals had first sought refuge after the Vietnam War took steps to close refugee camps and repatriate to Vietnam individuals whom those and other countries and the United Nations High Commissioner for Refugees had determined did not meet their refugee definition.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 40.

s.   In response, the United States and Vietnam negotiated an agreement called the Resettlement Opportunity for Vietnamese Returnees ("ROVR"), which required Vietnamese nationals to return to Vietnam (thereby facilitating efforts to close refugee camps in neighboring countries) to apply to be resettled in the United States as a refugee or, failing that, to enter the United

States as a parolee.  *See, e.g.*, Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 31-33; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 40-41.

t.   By allowing the reunification of Vietnamese families in the United States and the resettlement of key populations of interest to the United States, the ROVR program contributed crucially to the normalization of U.S.-Vietnam relations.  *See, e.g.*, Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 35-41; Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 33-35.

u.   <u>Cuban Medical Professionals Parole ("CMPP") Program (2006-2017)</u>: As relations with Cuba soured in the early 2000s, the George W. Bush administration created a parole program in 2006 to allow Cuban doctors and other medical professionals working in third countries to request that they and their dependents be paroled into the United States.  *See* Michael H. Erisman, Brain Drain Politics: The Cuban Medical Professional Parole Programme, International Journal of Cuban Studies, Vol. 4, No. 3/4, 2012, at 269–90, https://www.jstor.org/stable/41946012, Int. Defs' Trial Ex. 29.

v.   The "Cuban Medical Professionals Parole" program, as it was called, was designed to undermine Cuba's efforts to cultivate foreign influence through its international medical aid program, by trying to divert the medical professionals central to that program to the United States instead.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 52-53, 55.

w.   Approximately 7,000 Cubans were paroled into the United States before the CMPP Program stopped accepting applications in January 2017 as a step toward normalizing relations with Cuba and toward a more regional and

34

multilateral approach to managing migration and forced displacement. *Id.* at ¶ 58; *see also* Dep't of Homeland Sec., *Statement by Secretary Johnson on the Continued Normalization of our Migration Relationship with Cuba* (Jan. 12, 2017), Int. Defs' Trial Ex. 28.

x.    Individuals who were paroled into the United States through the CMPP Program were eligible to adjust status to lawful permanent residence after one year pursuant to the Cuban Adjustment Act. *See* Cuban Adjustment Act, Pub. L. No. 89-732, §§ 1–2, 80 Stat. 1161, Int. Defs' Trial Ex. 19.

y.    <u>Cuban Family Reunification Parole ("CFRP") Program (2007-2017; 2021 – present)</u>: In 2007, the George W. Bush administration created a parole program that invited the Cuban national beneficiaries of certain approved family-based immigrant visa petitions to request parole so that they could reunify with their family in the United States rather than waiting in Cuba, separated from their family, for a visa number to become available. Administrative Record, Cuba AR_000001, Fed. Defs' Trial Ex. A.

z.    In the Federal Register Notice establishing the program, USCIS explained that the parole program "serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States." *Id.*

aa.     Because the Cuban Adjustment Act provides an independent statutory authority for Cuban parolees to adjust status one year after entry, those paroled into the United States under the CFRP Program may adjust status even before their family-based immigrant visa number is immediately available.  *See* Cuban Adjustment Act, Pub. L. No. 89-732, §§ 1–2, 80 Stat. 1161, Int. Defs' Trial Ex. 19.

bb.     <u>Commonwealth of the Northern Mariana Islands/Guam Parole (2009-2019)</u>: Under the Obama administration, DHS announced that CBP generally would look favorably upon 45-day parole requests by Chinese and Russian nationals who wished to travel to the Commonwealth of the Northern Mariana Islands ("CNMI") for business or pleasure.   U.S. Customs and Border Protection, *Important Update in Entry Requirements: Parole for Citizens of the Russian Federation and the People's Republic of China for the CNMI Only* (Nov. 16, 2009), Int. Defs' Trial Ex. 31; *see also* Special Representatives of the United States and the Commonwealth of the Northern Mariana Islands, *Report to the President on 902 Consultations Related to the DHS Discretionary Parole Program* (2019), Int. Defs' Trial Ex. 32.

cc.     DHS subsequently extended the parole policy for CNMI in 2012 to include requests by Russian nationals seeking parole to enter Guam.  U.S. Customs and Border Protection, *Russian Citizens Now Eligible to Travel to Guam Visa-Free* (Jan. 26, 2012), https://www.cbp.gov/newsroom/national-media-

release/russian-citizens-now-eligible-travel-guam-visa-free, Int. Defs' Trial Ex. 33.

dd.    According to DHS, the policy "was justified on the economic benefit such workers and visitors would provide to the U.S. territory." International Entrepreneur Rule, 81 Fed. Reg. 60130, 60135 (Aug. 31, 2016), Int. Defs' Trial Ex. 34.

ee.    <u>Military Families Parole (2013 – present)</u>: In 2013, the Obama administration issued a policy memorandum allowing for the paroling-in-place of spouses, children, and parents of active-duty military personnel and veterans who had not previously been admitted or paroled into the United States.  *See* U.S. Citizenship and Immigration Servs., *Policy Memorandum: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i), PM-602-0091* (Nov. 15, 2013), Int. Defs' Trial Ex. 35.

ff.    The memorandum creating the military families parole program observed that "[m]ilitary preparedness can potentially be adversely affected if active members [of the U.S. military] . . . worry about the immigration status of their spouses, parents, and children."  *Id.*

gg.    Amid public reports that the Trump administration was considering ending the parole policy for military families, Congress included a provision in the

National Defense Authorization Act of 2020 that expressed the sense of Congress that "parole in place reinforces the objective of military family unity" and explicitly directed the Secretary of Homeland Security to continue exercising the same discretion to consider, on a case-by-case basis, grants of parole-in-place to military families. National Defense Authorization Act for Fiscal Year 2020, § 1758, 133 Stat. at 1860, Int. Defs' Trial Ex. 14; Franco Ordoñez, *Trump Wants To Withdraw Deportation Protections For Families of Active Troops*, NPR (June 27, 2019), https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-deportation-protections-for-families-of-active-troops, Int. Defs' Trial Ex. 36.

hh.  Central American Minors Parole (2014 – present): In 2014, the Obama Administration created the Central American Minors ("CAM") Refugee and Parole Program, which allowed certain lawfully present individuals in the United States to financially sponsor their minor unmarried children in El Salvador, Guatemala, and Honduras and request that those children receive a refugee resettlement interview for potential resettlement in the United States.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 59-60; *see also* U.S. Citizenship and Immigration Servs., *Central American Minors (CAM) Program* (June 23, 2023), Int. Defs' Trial Ex. 38.

ii.  Where an applicant to the CAM program was not deemed to be a refugee but was nonetheless determined to be at risk of harm in their country,

38

USCIS would consider whether the child merited a grant of parole as a matter of discretion.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 60.

jj.  The Trump administration sought to terminate the CAM Parole Program in 2017 but was enjoined from doing so.  *See S.A. v. Trump*, No. 18-cv-0353-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019).

kk.  Haitian Family Reunification Parole ("HFRP") Program (2014 – present): In 2014, the Obama administration created a program to allow the Haitian national beneficiaries of certain approved family-based immigrant visa petitions to be paroled into the United States to reunify with their family and adjust status to that of a lawful permanent resident, rather than waiting in Haiti, separated from their family, for the visa to become available.  *See* Administrative Record, Cuba AR_000002, Fed. Defs' Trial Ex. A; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 61.

ll.  Like the similar Cuban Family Reunification Parole Program, the HFRP Program recognized that "[b]y expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States."  Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 Fed. Reg. 7,5579, 75,582 (Dec. 18, 2014); *see also* Administrative Record, Cuba AR_000003, Fed. Defs' Trial Ex. A.

mm.  The Federal Register Notice about the program also acknowledged that the program would promote family unity and expedite the ability of parole beneficiaries to obtain employment authorization and earn wages that could

be returned to Haiti through remittances to help fund "the rebuilding and development of a safe and economically strong Haiti," a "priority for the United States." *Id.*

nn.    Approximately 8,300 applications for parole have been approved through the HFRP Program. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 61.

oo.    Filipino World War II Veterans Parole ("FWVP") Program (2016 – present): In 2016, the Obama administration created a parole program that would facilitate the case-by-case, discretionary parole into the United States of certain family members of approximately 2,000 to 6,000 surviving U.S. citizens or lawful permanent residents of Filipino descent who served in the U.S. military during World War II.    Administrative Record, Cuba AR_000006, Fed. Defs' Trial Ex. A.

pp.    The administration identified as the significant public benefit of the FWVP program that it would "recognize[] the extraordinary contributions and sacrifices of Filipino veterans who fought for the United States during World War II" and also "enhance[] the ability of such elderly veterans and their spouses to obtain care and support from their family members abroad" thereby addressing urgent humanitarian concerns. *Id.*

qq.    Operation Allies Refuge/Operation Allies Welcome (2021 – present): As the U.S. government wound down its military presence in Afghanistan, the Biden administration adopted a parole process for Afghan nationals evacuated from the country, including journalists, human rights activists, humanitarian workers, the family members of American citizens and lawful

40

permanent residents, and individuals at risk because of their valuable service to the United States during its military presence in Afghanistan. Dep't of Homeland Sec., *Operation Allies Welcome Afghan Parolee and Benefits Report* (May 8, 2023), Int. Defs' Trial Ex. 39.

rr.  In September 2021, Congress enacted the Afghanistan Supplemental Appropriations Act, which made paroled Afghan nationals, and those yet to be paroled through the program, eligible for various benefits and services. Afghan Supplemental Appropriations Act, Pub. L. No. 117-43, 135 Stat. 344, 372-379 (Sep. 30, 2021), Int. Defs' Trial Ex. 40.

ss.  As of March 2023, more than 90,000 Afghan nationals had been welcomed to the United States through Operation Allies Welcome and more than 76,000 were eligible for the benefits made available in the September Act. Dep't of Homeland Sec., *Operation Allies Welcome Afghan Parolee and Benefits Report* (May 8, 2023), Int. Defs' Trial Ex. 41.

tt.  <u>Uniting for Ukraine ("U4U") Parole Process (2022 – present)</u>: Following Russia's unprovoked invasion of Ukraine in February 2022, the Biden administration created the U4U Parole Process to facilitate the parole into the United States of certain displaced Ukrainian nationals and their immediate family members because of a dramatically sharp increase in asylum-seeking Ukrainian nationals presenting at the southwest border in March and April 2022.  Administrative Record, Cuba AR_000069, Fed. Defs' Trial Ex. A.

uu.   Ukrainian nationals seeking parole through the program must be supported by one or more individuals or entities in the United States who have demonstrated to USCIS that they have sufficient income and resources to support the parole beneficiary for two years.  Administrative Record, Cuba AR_000070–71, Fed. Defs' Trial Ex. A; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 62.

vv.   In May 2022, Congress passed legislation to provide various benefits and services to Ukrainian nationals who had been paroled and those who could continue to be paroled through the program.  Additional Ukraine Supplemental Appropriations Act, 136 Stat. 1211, Int. Defs' Trial Ex. 42.

ww.   Parole Process for Venezuelans (2022): Based on the success of the U4U Parole Process, the Biden administration announced a Parole Process for Venezuelans in October 2022.  Administrative Record, Cuba AR_000073, Fed. Defs' Trial Ex. A.

xx.   Like U4U, the Venezuela Parole Process required a financial sponsor present in the United States to commit to supporting the parole beneficiary for two years.  Administrative Record, Cuba AR_000074, Fed. Defs' Trial Ex. A.

yy.   Unlike U4U, which contained no numerical limitation, the Venezuela Parole Process was capped at 24,000 grants of parole for the life of the program.  *Id.*

zz.   The Federal Register Notice about the program emphasized that the temporary and case-by-case parole of Venezuelan nationals "will provide a

significant public benefit for the United States" by enhancing border security, reducing irregular migration, allowing the vetting of individuals before they arrive in the United States, reducing strain on DHS personnel and resources at the border, disincentivizing a dangerous journey that endangers migrants and enriches smuggling networks, and fulfilling important foreign policy goals to manage migration collaboratively with regional partners. *Id.*

133. Throughout the seven decades since codifying the parole authority in the 1952 INA, Congress has never once revoked parole granted to individuals who were paroled into the United States through a parole program created by any administration. *Cf.* Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 8.

134. Throughout the seven decades since codifying the parole authority in the 1952 INA, Congress has never taken action to halt the executive's programmatic use of the parole authority or to otherwise constrain any particular use of that authority. *Cf. id.* at ¶ 8.

135. No court has ever held a large-scale or programmatic exercise of the parole authority to be unlawful. *Id.*

### The CHNV Parole Pathways as Compared to Prior Parole Programs

136. As the FRN for each CHNV Pathway states, each "will provide a significant public benefit" by "reducing unauthorized entries;" "reducing irregular migration" and "vetting individuals prior to their arrival at a U.S. [Port of Entry];" "minimiz[ing] the domestic impact of irregular migration;" "disincentiviz[ing] a dangerous and irregular journey that puts migrant lives and safety at risk and enriches smuggling networks;" and "fulfill[ing] important foreign policy goals to manage migration

collaboratively in the hemisphere." 88 Fed. Reg. 1266 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243 (Implementation of a Parole Process for Haitians); 88 Fed. Reg. 1255 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1279 (Implementation of Changes to the Parole Process for Venezuelan).

137.   The justifications provided in the Federal Register Notices for the CHNV Parole Pathways are similar in many respects to the humanitarian, foreign policy, and migration control goals of prior parole programs.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 63.

138.   *Reducing irregular migration*: The statutory parole authority has historically been used to manage and control migration challenges—frequently at the Southwest border and in coastal waterways—in a flexible way.  Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 9, 11; *see also* Halperin Decl., Int. Defs' Trial Ex. 131 ¶ 35.

139.   For example, multiple parole programs were created as part of the Cuban Migration Accords to address a dramatic increase in Cubans attempting to leave the country by boat in the early- to mid-1990s.  Halperin Decl., Int. Defs' Trial Ex. 131 ¶ 4.

140.   It was a priority of the Clinton administration to direct Cuban migration into safe, legal, and orderly channels because irregular migration by sea posed a significant risk to the lives of the migrants and also consumed Coast Guard resources due to interdiction and rescue efforts.  Schwartz Decl., Int. Defs' Trial Ex. 134 ¶ 14-16.

141.   Similarly, both the 2022 Ukraine and Venezuela Parole Processes were adopted in response to sharp increases in encounters with nationals of those countries at the Southwest border.  *See supra* ¶¶ 1, 5, 132.tt-zz.

142.   The Federal Register Notices for the CHNV Parole Pathways acknowledge "increasing numbers of encounters" at the nation's borders and identify as a significant public benefit the channeling of dangerous and irregular migration into safer pathways.  *See, e.g.*, 88 Fed. Reg. 1255, 1256 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1266, 1267 (Implementation of a Parole Process for Cubans); 88 Fed. Reg. 1243, 1244 (Implementation of a Parole Process for Haitians); 87 Fed. Reg. 63507, 63511 (Implementation of a Parole Process for Venezuelans).

143.   *Vetting individuals prior to entry.* The CHNV Parole Pathways require potential parole beneficiaries to apply, be vetted, and qualify for travel authorization before coming to the United States and presenting themselves at an interior port of entry for inspection and consideration for discretionary parole.  U.S. Citizenship & Immigration Services, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (June 14, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans, Int. Defs' Trial Ex. 69.

144.   In a similar fashion, the United States worked with the Government of Vietnam to adopt screening and processing capability within Vietnam during the ROVR program so that Vietnamese nationals could be vetted and come to the United States directly from Vietnam rather than embark on dangerous journeys to transit countries where they would live in refugee camps.  Schwartz Decl., Int. Defs' Trial Ex. 134 ¶¶ 31-33; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 40-41.

145. Like previous parole programs, each potential parole beneficiary for the CHNV Pathways is assessed on a case-by-case basis and must pass background checks. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 64.

146. In addition, like the CAM program for Central American Minors, ODP for Vietnamese nationals, and the 2022 Ukrainian and Venezuelan parole programs, the CHNV Pathways require each parole beneficiary to have a financial supporter in the United States whose application must be approved before parole can be granted. *Id.* at ¶¶ 59-60, 64; *see also* U.S. Citizenship and Immigration Servs., Central American Minors (CAM) Program (June 23, 2023), Int. Defs' Trial Ex. 38; Administrative Record, Cuba AR_000069-72, 000073-83, Fed. Defs' Trial Ex. A.

147. *Disincentivizing irregular travel that endangers migrants and enriches smugglers.* Irregular migration puts migrants' lives at risk and can be frequently facilitated by smugglers. Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 64.

148. DHS has cited the reduction of irregular migration that endangers migrants as a significant public benefit justifying prior parole programs, including the Cuban Family Reunification Parole Program and the Haitian Family Reunification Parole Program. *See* Administrative Record, Cuba AR_000001, Fed. Defs' Trial Ex. A; U.S. Citizenship and Immigration Services, *DHS To Implement Haitian Family Reunification Parole Program* (Oct. 17, 2014), Int. Defs' Trial Ex. 43.

149. The Federal Register Notices for the CHNV Pathways identify as a significant public benefit the reduction and deterrence of irregular migration that enriches smuggling networks and endangers vulnerable migrants. *See, e.g.*, 88 Fed. Reg. 1255, 1261-62 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg.

1266, 1273-74 (Implementation of a Parole Process for Cubans); 88 Fed. Reg.1243, 1250-51 (Implementation of a Parole Process for Haitians); 87 Fed. Reg.  63507, 63512-13 (Implementation of a Parole Process for Venezuelans).

150.    *Fulfilling important foreign policy goals.*   Consistent with prior parole programs, the CHNV Pathways are part of a broader foreign policy strategy to enhance cooperation and burden-sharing throughout the Americas to address common migration challenges.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 65; Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 48-51; *see also* Schwartz Decl., Int. Defs' Trial Ex. 134 ¶ 41; Halperin Decl., Int. Defs' Trial Ex. 131 ¶ 143.

151.    Like the ODP and ROVR programs that worked with other stakeholder countries and the United Nations High Commissioner on Refugees to allow the parole of Vietnamese nationals directly into the United States, the CHNV Pathways are part of a broader collaborative foreign policy strategy intended to encourage safe migration pathways and work with key regional allies to stabilize migrants in host communities experiencing high outward migration.  Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 49; *see also* The White House, Los Angeles Declaration on Migration and Protection (June 10, 2022), (endorsed in June 2022 by 21 countries), Int. Defs' Trial Ex. 44.

152.    Like the Uniting for Ukraine program, the federal government is employing the CHNV Pathways in combination with efforts to increase the resettlement in the United States of refugees from Cuba, Haiti, Nicaragua, and Venezuela, and in support of efforts by other countries in the region to host and extend protections to similar groups.  Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶ 65.

153. In addition, the CHNV Pathways are similar to other parole programs, such as those pertaining to the parole of Vietnamese and Cuban nationals, wherein the number of people considered for parole is linked to relations and negotiations with foreign governments, including origin and transit or regional countries. *Id*. at ¶ 66.

**F.    The Scope and Impacts of the CHNV Pathways**

154. The impact of the CHNV Pathways in reducing irregular as well as overall migration from Cuba, Haiti, Nicaragua, and Venezuela is similar to that of the Uniting for Ukraine Parole Process, launched in April 2022. *See id*.; *see also* 87 Fed. Reg. 63507, 63508-09 (Implementation of a Parole Process for Venezuelans); Mem. of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief, ECF 222 at 6-7.

155. *Uniting for Ukraine.* Southwest border encounters with Ukrainians increased from a couple hundred per month in the first quarter of 2022 to over 20,000 in April 2022. U.S. Customs and Border Protection Encounters: Southwest Border, Ukranian Nationals, FY 2022, Int. Defs' Trial Ex. 56.

156. Within a month of the announcement and adoption of the Uniting for Ukraine program, border encounters with Ukrainians fell by over 80% and have remained lower than recent levels ever since. *Id.*; *see also* Ukrainian SW Border Encounters for FY 2023, Int. Defs' Trial Ex. 57.

157. *Irregular migration from the CHNV Countries*. For FY 2021, FY 2022, and the first quarter of FY2023, CBP data show increasing border encounters with Cuban, Haitian, Nicaraguan, and Venezuelan nationals that reached a peak of over 90,000

encounters in December 2022. *See* U.S. Customs and Border Protection Encounters: CHNV SW Border Encounters for FY 2021, Int. Defs' Trial Ex. 51; U.S. Customs and Border Protection Encounters: CHNV SW Border Encounters for FY 2022, Int. Defs' Trial Ex. 54.

158.   In January 2023, when the CHNV Pathways were implemented, border encounters with nationals from these four countries dropped by over 75%.  U.S. Customs and Border Protection Encounters: CHNV SW Border Encounters for FY2023, Int. Defs' Trial Ex. 55.

159.   In February 2023—when Plaintiffs filed their First Amended Complaint—there were 8,817 border encounters with nationals of Cuba, Haiti, Nicaragua, and Venezuela, down from 56,491 border encounters in October 2022 (a decrease of nearly 85%).  U.S. Customs and Border Protection Encounters: CHNV SW Border Encounters for FY2023, Int. Defs' Trial Ex. 55.

160.   Since the CHNV Pathways were implemented, border encounters with nationals from those four countries have remained at levels well below the numbers of southwest border encounters recorded in FY2022. CHNV SW Border Encounters for FY2023, Int. Defs' Trial Ex. 53.

161.   "As was the case following the implementation of the parole process for Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between ports of entry dropped significantly after DHS introduced the new processes, from a seven-day average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven-day average of 205 just two weeks later." Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 26.

162.     "The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop and represented a significant decline of 94 percent from the peak [Cuban, Haitian, Nicaraguan, and Venezuelan] encounters of 3,644 on December 10, 2022." *Id.*

163.     Encounters with individuals from Cuba, Haiti, Nicaragua, and Venezuela at the Southwest border have since remained below the levels recorded for most of FY2022. U.S. Customs and Border Protection Encounters: Southwest Border CHNV, FY 2022, Int. Defs' Trial Ex. 52.

164.     Since the implementation of the CHNV Pathways, the number of individuals from Cuba, Haiti, Nicaragua, and Venezuela who are released (subject to strict conditions) has reduced by over 90%, from over 2,300 per day to less than 300 per day. *See* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 29, 30–31.

165.     The CHNV Parole Pathways have reduced the number of individuals from Cuba, Haiti, Nicaragua, and Venezuela who are conditionally released at the southern border. *Id*.

166.     The reduction of irregular migration by Cuban, Haitian, Nicaraguan, and Venezuelan nationals since the creation of the CHNV Pathways has in turn reduced pressure on the Southwest border in general, as border encounters with nationals of those four countries represented a significant percentage of all Southwest border encounters before the CHNV Parole Pathways were adopted. *Compare* U.S. Customs and Border Protection Encounters: Southwest Border, All Nationalities, FY 2021, Int. Defs' Trial Ex. 48 *with* U.S. Customs and Border Protection Encounters: Southwest Border, All Nationalities, FY 2023, Int. Defs' Trial Ex. 50.

167.   Although the Parole Pathways limit grants of travel authorization to a total of 30,000 individuals per month, they have produced a much larger corresponding decrease in net migration. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 20, 26, 33; *see* Mem. of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief, ECF 222 at 10-12.

168.   The significant reduction in Southwest border encounters has allowed DHS to focus more of its resources on its primary mission: border security.  Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 28.

169.   The reduction in border encounters with, and conditional releases of, Cuban, Haitian, Nicaraguan, and Venezuelan nationals has also alleviated pressures on border communities and the non-governmental organizations ("NGOs") that serve those communities.  *Id.* at ¶ 34.

170.   Before the CHNV Pathways were adopted, local officials and NGOs reported concerns that shelters established to provide housing and support to individuals who have recently crossed the border would reach capacity, which would limit key services to support noncitizens once they were processed out of DHS custody. Raquel Torres, *Migrant Aid Groups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022), Int. Defs' Trial Ex. 60; Denelle Confair, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day*, KGUN9 Tucson (Sep. 22, 2022), Int. Defs' Trial Ex. 62.

171.   *Overall arrivals to the United States.* Nationwide encounters of nationals from Cuba, Haiti, Nicaragua, and Venezuela trended upward through FY2021, FY2022,

and the first quarter of FY2023, peaking at nearly 100,000 encounters in December 2022.  Mem. of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief, ECF 222 at 10-12.

172.    In January 2023, when the CHNV Pathways began operation alongside the already-implemented Venezuela Parole Pathway, nationwide encounters of nationals from these four countries dropped by over 64,000 to less than a quarter of the previous month's total, and has since remained well below the levels observed in December 2022.  *Id.* at 10-11.

173.    Since their adoption in October 2022 (for the Venezuela Parole Pathway) and January 2023 (for the Cuba, Haiti, and Nicaragua Parole Pathways), the CHNV Pathways have reduced total arrivals, including through irregular migration, to the United States, of individuals from Cuba, Haiti, Nicaragua, and Venezuela.  Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 18–28.

174.    If the CHNV Pathways are enjoined, it is likely that Mexico will stop accepting removals of CHNV nationals.  Nunez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 38.

175.    If the CHNV Pathways are enjoined, net CHNV migration is likely to increase.  *Id.* ¶ 40.

176.    If the CHNV Pathways are enjoined, CHNV migration is likely to become more concentrated along Texas's southern border with Mexico rather than distributed throughout interior POEs.  *Id.*

G.    **Texas' Alleged Injuries from the CHNV Pathways.**

177.    There is no evidence that Texas has made any decision in reliance on either the existence or the absence of the CHNV Pathways.

178.    Texas is the only Plaintiff State that has offered or will offer any evidence of alleged injury caused by the CHNV Pathways.  Joint Notice of Stipulations ("Joint Stip."), ECF 139.

179.    Texas's asserted injuries are the same for all of its claims for relief.  Texas's Updated Response to Defendants' Discovery Requests, Fed. Defs' Trial Ex. O at 12.

180.    The CHNV Pathways do not directly regulate Texas. 88 Fed. Reg. 1255, 1261-62 (Implementation of a Parole Process for Nicaraguans); 88 Fed. Reg. 1266, 1273-74 (Implementation of a Parole Process for Cubans); 88 Fed. Reg.1243, 1250-51 (Implementation of a Parole Process for Haitians); 87 Fed. Reg.  63507, 63512-13 (Implementation of a Parole Process for Venezuelans).

181.    Texas asserts injuries from costs imposed by the "increased presence of [noncitizens] in Texas."  Texas's Updated Response to Defendants' Discovery Requests, Fed. Defs' Trial Ex. O at 12.

182.    Texas claims injury based on four asserted categories: (1) that "each" person seeking a driver's license in Texas creates an expense for Texas; (2) that, as the population of undocumented immigrants in Texas increases, "the education costs to the State will increase"; (3) that "some" undocumented immigrants "admitted through the Program will require [as many as three state-funded healthcare] services, causing Texas to incur [unspecified] costs"; and (4) that there will be

additional costs of "increased law enforcement as its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to [undocumented] immigration." Pls' P.I., ECF 22 at 10-14.

183.  Texas has additionally claimed injury stemming from CHNV Pathways beneficiaries' future eligibility for Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF"). Plaintiffs' Opposition to Intervenor Defendants' Motion to Dismiss ("Pls' Opp. to Int. Defs' Mot. to Dismiss"), ECF 253 at 16.

184.  Any future eligibility for SNAP or TANF would be triggered three years after the expiration of any individual's two-year grant of parole pursuant to the CHNV Pathways. *Id.*

185.  Texas's asserted injury arises from the executive's allegedly unlawful decision to create a program pursuant to which it grants parole to third parties. *Id.*

186.  Texas's asserted injury is based only on the alleged indirect effects on its spending resulting from a federal policy that does not regulate Texas. *Id.*

187.  These claims of harm stem from potential costs of providing governmental services to those residing within its borders. *Id.*

188.  Since the CHNV Pathways were initiated, the number of documented and undocumented migrants from CHNV countries has decreased. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 26, 29, 31 n.16.

189.  Texas concedes that the presence of noncitizens in Texas from Cuba, Haiti, Nicaragua, and Venezuela, has decreased since the adoption of the CHNV Pathways. Trial Tr. vol. 2 of 2, 132:1-19.

190.    Because Texas is not experiencing an increased presence of CHNV noncitizens, Texas is not suffering increased costs attributable to the CHNV Pathways.

191.    There is no evidence that the CHNV Pathways have created a significant likelihood of increased costs to Texas.

192.    Texas has admitted that it does not collect data about CHNV parolees.  Texas's Response to Defendants' Discovery Requests ("Tex.'s Resp. to Defs' Disc. Req."), Int. Defs' Trial Ex. 102.

193.    Texas's claims of injury are not tied to any individual who has been granted parole under the CHNV Pathways.

194.    Texas refers frequently to "illegal aliens" when it is indeed referring to undocumented immigrants.  *See, e.g.*, Pls' P.I., ECF 22 at 12-13.

195.    Texas has not produced any evidence that costs associated with other populations of immigrants, including undocumented immigrants, unaccompanied immigrant children, and CHNV nationals generally, are attributable to the CHNV Pathways.

196.    Texas has not produced any evidence that costs associated with other populations of immigrants, including undocumented immigrants, unaccompanied immigrant children, and CHNV nationals generally, are representative of costs associated with the CHNV Pathways.

197.    Texas's allegations of injury propagate false stereotypes about immigrants that are unsupported by the factual record and based on irrelevant comparisons, *compare* Pls' P.I., ECF 22 *with* Pls' Trial Exs. 4-7, and contradicted by widely available empirical evidence, *see, e.g.*, Joint Expert Declaration of Patricia Gándara and Gary Orfield ("Gándara and Orfield Joint Expert Decl."), Int. Defs' Trial Ex. 136; Hunt

Expert Decl., Int. Defs' Trial Ex. 137; Supplemental Expert Declaration of Leighton Ku ("Supp. Ku Expert Decl."), Int. Defs' Trial Ex. 1; Expert Declaration of Charis Kubrin ("Kubrin Expert Decl."), Int. Defs' Trial Ex. 139; Expert Declaration of Cyierra Roldan ("Roldan Expert Decl."), Int. Defs' Trial Ex. 140.

198.   Texas receives at least some fees and reimbursements that directly offset and occur as part of the same transaction as the costs it complains of.  *See eg.,* Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶ 25.

199.   Texas receives other countervailing benefits directly from the provision of services on which it bases its claims of alleged financial injury.  Gándara and Orfield Joint Expert Decl., Int. Defs' Trial Ex. 136 ¶¶ 17-20.

200.   Texas has declined to produce evidence of offsetting fees, reimbursements, and other countervailing benefits directly associated with its claims of alleged financial injury.  *See e.g.,* Declaration of Sheri Gipson ("Gipson Decl."), Pls' Tr.  Ex. 4; Declaration of Rebecca Waltz ("Waltz Decl."), Pls' Trial Ex. 5; Declaration of James Terry ("Terry Decl."), Pls' Trial Ex. 6; Declaration of Susan Bricker ("Bricker Decl."), Pls' Trial Ex. 7.

***Texas's Alleged Costs***

***Drivers' licenses***

201.   Texas has not provided evidence that it has or will incur any driver license costs attributable to CHNV Pathways parolees.  *See* Gipson Decl., Pls' Trial Ex. 4.

202.   Texas provides an improbably high estimate of the likely cost to the state of issuing drivers licenses to paroled individuals from Cuba, Haiti, Nicaragua, and Venezuela who may reside in Texas.  Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶ 3.

203.   Texas's estimated transaction cost of providing a driver's license to a noncitizen, excluding estimated departmental overhead that may or may not be needed, is approximately $3.60.  *Id.*  at ¶ 13.

204.   Texas charges approximately $33 in fees for each noncommercial drivers' license it provides.  *Id.* at ¶ 25.

205.   Texas's estimated expenses to provide driver's licenses does not incorporate any revenues Texas receives for providing driver's licenses.  *Id.*

206.   Texas attributes the vast majority of its estimated cost of providing drivers' licenses to new Texas residents—approximately $197.89 of an estimated $200 biennial cost—to the costs of acquiring additional DMV technology, staff, and office space. *Id.* ¶¶ 10, 13.

207.   Texas concedes that it does not know if it will need additional DMV technology, staff, or office space to issue drivers' licenses to CHNV parolees.  Gipson Decl., Pls' Trial Ex. 4 ¶ 8.

208.   The costs of acquiring additional technology, staff, or office space are overhead costs, not attributable to any individual driver's license transaction.  *Id.*

209.   Many of Texas's DMV offices "are already at a staffing level that would allow them to handle an increase [in customers] …since no [single] Department of Motor Vehicle office will be serving all the newly admitted residents."  Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶ 14.

210.   Texas has already allotted funding for 175 additional DMV staffers to meet expected demand, and those positions have not yet been filled.  *Id*. at ¶¶ 17–20.

211.    Texas has extant excess DMV capacity to handle population flows.  *Id.* at ¶¶ 17–20.

212.    Texas has not proven that its projected infrastructure estimates are realistic, likely, or reliable.

213.    Texas has not proven that it will incur a financial loss from the provision of driver's licenses to additional Texas residents present through the CHNV Pathways.

214.    Texas is "among the nation's fastest-growing, largest-gaining states" with the majority of its population growth since 2000 resulting from "natural increases (more births than deaths)" and net domestic migration gains.  Kristie Wilder, *Texas Joins California as State with 30-Million-Plus Population*, U.S. Census Bureau (Mar. 30, 2023), Int. Defs' Trial Ex. 64.

215.    The 10,000 additional driver's licenses Texas estimates it will have to issue as a result of the CHNV Pathways comprise approximately one percent of those it issues to the approximately 385,000 intra-country migrants that move to Texas, which Texas has welcomed, and the 425,000 Texas residents who turn 16 every year.  Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶ 16; *see also* Greg Abbott (@GregAbbott_TX), Twitter (Dec. 26, 2018, 12:17 AM), Int. Defs' Trial Ex. 110; Greg Abbott (@GregAbbott_TX), Twitter (Dec. 26, 2018, 12:17 AM), Int. Defs' Trial Ex. 111; *Top Texas Touts: People*, Texas Office of the Governor, Int. Defs' Trial Ex. 112.

216.    Texas has also failed to factor in additional offsetting fees resulting from issuing drivers' licenses to new residents, including title and registration fees, and transit authority surcharges.  Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶¶ 23-24.

217. Texas has failed to factor in additional revenues to the state when individuals who are issued driver's licenses subsequently purchase vehicles. *Id.* at ¶¶ 26-29.

***Education***

218. Texas has not provided evidence that it has or will incur costs associated with the education of individuals who enter the state through the CHNV Pathways. *See* Terry Decl., Pls' Trial Ex. 6.

219. Texas's claims of financial injury stemming from education services concern its own estimated costs of providing "bilingual and compensatory" education. *Id*. at ¶ 3.

220. Texas does not explain the sources or methodology it used to arrive at its estimated projections, nor does it provide supporting financial documents. Gándara and Orfield Joint Expert Decl., Int. Defs' Trial Ex. 136 ¶¶ 12-13.

221. Texas has not proven that its projected educational cost estimates are realistic, likely, or reliable. *See* Terry Decl., Pls' Trial Ex. 6.

222. Texas's educational costs could only increase because of the CHNV Pathways if they result in increased use of those programs by CHNV noncitizens in Texas.

223. Texas has not proven there will be, or is likely to be, increased use of those programs by CHNV noncitizens in Texas.

224. Even if Texas did prove increased use of those programs, the actual costs associated with educating English language learners can be "as low as zero, depending on a myriad [of] factors," including existing infrastructure and resources and the distribution of students at a particular school. Gándara and Orfield Joint Expert Decl., Int. Defs' Trial Ex. 136 ¶ 14.

225.   In Texas, bilingual education is an *opt-in* program that is only available in Texas through the Fifth Grade.  *Id.* at ¶ 15.

226.   Texas relies on estimated educational costs associated with Unaccompanied Immigrant Children ("UCs") to support its alleged injury.  Terry Decl., Pls' Trial Ex. 6.

227.    UCs are excluded from eligibility for the CHNV Pathways. United States Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 12, 2023), Int. Defs' Trial Ex. 68.

228.   Children who may reside in Texas after entering through the CHNV Pathways are differently situated than children who arrive without a parent, as they will have done so with their parents and with financial sponsorship.  Gándara and Orfield Joint Expert Decl., Int. Defs' Trial Ex. 136 ¶ 16.

229.   Texas has not provided evidence that the estimated costs it relies on are reliable indicators of costs that will likely be attributable to the CHNV Pathways.

230.   Texas has not factored in documented federal reimbursements in the form of major compensatory education funds for low-income and English language learner students.  *Id.* at ¶ 18.

231.   Texas does not factor in benefits to the state resulting from investments in education.  *Id.* at ¶¶ 17-19

232.   The provision of bilingual education benefits Texas by increasing the probability of students' graduation, which raises employment and income and in turn provides substantial benefits to the state and local economy and tax revenue.  Fluency in two languages is additionally a labor market advantage, and "immigrant students who

speak a non-English language fluently make these programs possible for more U.S. English-only students," who greatly benefit from these programs as well.  *Id.* at ¶ 22.

### *Law Enforcement*

233.   Texas has not provided evidence that it has or will incur increased law enforcement related costs as a result of the CHNV Pathways.  *See* Waltz Decl., Pls' Trial Ex. 5.

234.   Texas has not provided evidence that it has or will incur *any* law enforcement related costs as a result of the CHNV Pathways.  *See id.*

235.   Texas produced documents concerning crime and undocumented immigration, but none of these documents supports the conclusion that crime in Texas will increase as a result of the CHNV Pathways.  *Id.*

236.   People who are granted parole under the CHNV Pathways undergo extensive vetting and enter the United States with lawful status, financial sponsorship, and eligibility for employment authorization. United States Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 12, 2023), Int. Defs' Trial Ex. 68.

237.   Texas receives corresponding federal reimbursements, including documented reimbursements through the federal State Criminal Alien Assistance Program, which Texas confirms participation in.  Waltz Decl., Pls' Trial Ex. 5 ¶¶ 5-7, 11; *see also* U.S. Bureau of Justice Assistance, FY21 State Criminal Alien Assistance Program (SCAAP) Award Information for Texas Department of Criminal Justice, Int. Defs' Trial Ex. 63.

238. The idea that citizens suffer increased crime due to undocumented immigration is factually untrue and has been disproven.  Kubrin Expert Decl., Int. Defs' Trial Ex. 139 ¶ 9.

239. Research has consistently concluded that immigrants are less likely to be involved in crime compared to non-immigrants.  *Id.* at ¶ 11.

240. Both documented and undocumented immigrants are incarcerated at lower rates than individuals who are U.S.-born.  *Id.* at ¶ 15.

241. Increased immigration does not increase crime.  *Id.* at ¶¶ 17-20.

242. If anything, immigration decreases crime.  Kubrin Expert Decl., Int. Defs' Trial Ex. 139 ¶¶ 17-20.

### *Health care*

243. Texas has not provided evidence that it has or will incur increased healthcare-related costs as a result of the CHNV Pathways.

244. Texas has not provided evidence that it has or will incur *any* healthcare-related costs as a result of the CHNV Pathways.

245. Texas bases its healthcare-related injury on costs associated with undocumented immigrants who do not qualify for the CHVN Pathways.  *See, e.g.*, Supp. Ku Expert Decl., Int. Defs' Trial Ex. 1 ¶¶ 10-11; *see also* United States Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 12, 2023), Int. Defs' Trial Ex. 68.

246. Individuals who enter through the CHNV Pathways are differently situated than the population cited by Texas, as parolees enter so with authorization and financial sponsorship by individuals who assume financial responsibility, including for healthcare costs, in addition to employment authorization.  *Id.*

247. Texas' proffered evidence purporting to show its costs for Children's Health Insurance Program ("CHIP") and non-Emergency Medicaid as a result of undocumented immigration are flawed and unreliable because undocumented immigrants are not eligible to be beneficiaries of those programs. Supp. Ku Expert Decl., Int. Defs' Trial Ex. 1 ¶ 13.

248. Texas also relies on evidence of claims under Emergency Medicaid and CHIP associated with all nationals from Cuba, Haiti, Nicaragua, and Venezuela, irrespective of documentation status. *Id.* at 1 ¶ 11; *see also* Bricker Decl., Pls' Tr. Ex. 7 ¶ 9.

249. Texas provides no evidence to indicate that these estimates would be reliable to determine costs it has or will incur as to individuals who are resident in Texas through the CHNV Pathways.

250. Even so, the number of people Texas identifies would amount to only 0.007% of Texas Medicaid beneficiaries and 0.2% of CHIP beneficiaries—representing a "miniscule share" of Texas's beneficiaries under these programs. Ku Expert Decl, Int. Defs' Trial Ex. 138, ¶ 11.

251. Medical cost burdens for recent immigrants from Cuba, Haiti, Nicaragua, and Venezuela are so small that they do not displace services for other needy people. Supp. Ku Expert Decl., Int. Defs' Trial Ex. 1 at ¶¶ 16-19.

252. Federal reimbursements enable Texas to recoup much of the state public hospitals' uncompensated care expenditure on all persons, irrespective of immigration status and regardless of ability to pay. *Id.* at ¶¶ 13-14.

253.    Texas has failed to produce evidence that it incurs any net costs after direct reimbursements for medical services rendered.  *Id.* at ¶¶ 13-14.

### Wages

254.    Texas has offered no evidence in support of its allegations related to wages.  *See* Gipson Decl., Pls' Trial Ex. 4; Waltz Decl., Pls' Trial Ex. 5; Terry Decl., Pls' Trial Ex. 6; Bricker Decl., Pls' Trial Ex. 7.

255.    Economists across the political spectrum agree that immigration increases economic growth.  Hunt Expert Decl., Int. Defs' Trial Ex. 137 ¶ 6.

### Strained Finances and Ability to Provide Services

256.    Texas has provided no evidence of strained finances or hampered ability to provide essential services.  Pls' P.I., ECF 22 at 25.

257.    Texas has provided no evidence that the CHNV Pathways have resulted or will result in strained finances or a hampered ability to provide essential services.  *Id.* at 25.

### Additional Program Benefits

258.    Texas fails to account for the numerous additional benefits resulting from the CHNV Pathways.  *See id.*; Texas' Responses to Defendants' Discovery Requests, Fed Defs' Trial Ex. M; Texas' [Corrected] Response to Defendants' Discovery Requests, Fed Defs' Trial Ex. N.

259.    The CHNV Pathways provide critical benefits to U.S.-based sponsors, including to Intervenor Defendants, residents of Texas and other Plaintiff States, and to parolees.  *See, e.g.*, Zito Decl., Int. Defs' Trial Ex. 129; Laveus Decl., Int. Defs' Trial Ex. 121.

260. An order enjoining or vacating the CHNV Pathways would cast uncertainty on the future for all Intervenor Defendants and their parole beneficiaries, as well as many others similarly positioned, including sponsors who are waiting to welcome their intended beneficiaries to the United States, *see, e.g*., Sugarman Decl., Int. Defs' Trial Ex. 127, sponsors who are supporting their parole beneficiaries while they await work authorization to be granted, *see, e.g.,* Supp. Arauz Decl., Int. Defs' Trial Ex. 124, and parole beneficiaries who are lawfully seeking pathways to longer-term or permanent legal status in the United States, or awaiting the issuance of an immigrant visa. *See, e.g*., Laveus Decl., Int. Defs' Trial Ex. 121.

***Family Reunification***

261. Through the CHNV Pathways, U.S. citizen and university professor Dr. Germán Cadenas reunited with his Venezuelan uncle who "was like a second father" to him. Cadenas Decl., Int. Defs' Trial Ex. 117 ¶¶ 2, 11.

262. Through the CHNV Pathways, U.S. citizen and Florida schoolteacher, Ms. Valerie Laveus, has reunited with her Haitian brother and nephew who had faced extreme harm in Haiti.  Laveus Decl., Int. Defs' Trial Ex. 121 ¶¶ 4, 6, 8.  Now "[their] family would finally be together, and [her brother and nephew] could start building a new life for themselves."  Supp. Laveus Decl., Int. Defs' Trial Ex. 122 ¶ 15.

263. Under the Pathways, a truckdriver with the Port of Oakland was finally able to reunite with her Nicaraguan husband and their U.S. citizen son who lives with a learning disability.  *See* Arauz Decl., Int. Defs' Trial Ex. 123 ¶ 4, 13; Supp. Arauz Decl., Int. Defs' Trial Ex. 124 ¶ 6.  The reunification has improved conditions for all of them, confirmed by her own statement: "I need my son's dad to help me manage [my son's special needs], and I know my son needs the love, support,

guidance of his father, just like I need it from my husband, who I love deeply." Arauz Decl., Int. Defs' Trial Ex. 123 ¶ 13.

264. A Major League Baseball player—a starting pitcher with the Detroit Tigers—seeks to avail himself of CHNV Pathways to reunite with his parents so that they can finally see their son pitch in the Major Leagues. Hernandez Decl., Int. Defs' Trial Ex. 132 ¶¶ 1-2, 8.

### *Access to Safety and Medical Care*

265. Before Mr. Cadenas's uncle was granted parole under the CHNV Pathways, he faced "political repression" in Venezuela as an opponent of the Hugo Chavez and Nicolas Maduro regimes.  Cadenas Decl., Int. Defs' Trial Ex. 117 ¶¶ 7.  He was fired from his job in 2007 after raising corruption concerns and has since struggled to find work and access to basic necessities. *Id.* at ¶¶ 6-7.

266. Before Ms. Laveus's sponsorship application was approved, her brother was "shot [] in the head at point-blank range" at the hands of a police officer, obstructed access to critical medical care following the attack, and her nephew was the victim of an attempted kidnapping while on his way home from school.  Laveus Decl., Int. Defs' Trial Ex. 121 ¶¶ 8-9, 10, 16.

267. The CHNV Pathways gave Dr. Nan Langowitz an opportunity to sponsor the family of a Venezuelan political scientist and human rights advocate who faced persecution and harassment by the Venezuelan government.  Langowitz Decl., Int. Defs' Trial Ex. 119 ¶ 12.

268. For Dr. Kate Sugarman, a Maryland family physician, sponsorship through the CHNV Pathways will allow her to facilitate access to life-saving surgery for a young woman who is "rapidly deteriorating" as she suffers "from various rare and

life-threatening medical conditions, including progressive neurologic disorders that can cause the compression of the spinal cord and brain stem, which in turn can cause the loss of movement, numbness, pain, and problems with breathing." Sugarman Decl., Int. Defs' Trial Ex. 127 ¶ 3-5, 7.  The young woman needs "immediate corrective surgery," but the doctors will not perform it until she has someone who can provide full-time after care, which the young woman's Venezuelan mother can provide if she is granted parole under the CHNV Pathways. *Id.* at ¶ 7.

269.   Heather Scanlon's experience providing humanitarian support to migrants documents the exploitation faced by migrants without access to the CHNV Pathways as compared to the safe housing and financial sponsorship waiting in the United States for those who enter through the CHNV Pathways.  Scanlon Decl., Int. Defs' Trial Ex. 133 ¶ 18.

### *Free Exercise of Religion*

270.   The CHNV Pathways allowed Paul Zito, a Texas native, businessman, and devout Christian, to sponsor the family of a "devout Christian" whom he met on trips to Cuba with a charity that seeks to "facilitate the adoption of orphaned children into families within the churches and seminaries."  Zito Decl., Int. Defs' Trial Ex. 129 ¶¶ 7-9.

271.   In Mr. Zito's words, he "connected with Abel on a deep level because as believers, [they] are called to one another."  *Id.* at ¶ 10.  Mr. Zito believes "God put Abel before [him]" and sees the opportunity to sponsor him as "a calling from God."  *Id.* at ¶¶ 10, 14.

272. For Dr. Langowitz, the opportunity to sponsor is connected to her Jewish faith and a tribute to the people who helped her own family when they were forced to flee to the United States because of religious persecution.  Langowitz Decl., Int. Defs' Trial Ex. 119 ¶¶ 5-6.  Dr. Langowitz's synagogue has committed to assist with efforts to welcome under the CHNV Pathways.  *Id.* at ¶ 14.

   ***Foreign Policy***

273. The CHNV Pathways advance United States foreign policy goals.  Int. Defs' Trial Ex. 101.

274. The CHNV Pathways respond to requests from regional partner countries to help manage irregular migration in the Western Hemisphere and to fulfill the United States' international commitments.  Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 37, 48.

275. The CHNV Pathways are "directly responsive to requests made by the Government of Mexico and other key foreign partners throughout the hemisphere to "address irregular migration through shared responsibilities and require close coordination," which aligns with U.S. commitments outlined in international commitments including the Los Angeles Declaration on Migration and Protection, which has been endorsed by 21 countries.  *Id.* at ¶ 37.

276. The CHNV Pathways are a tool in negotiations between the United States and the Government of Mexico.  *Id.* at ¶ 31 n.16.

277. The CHNV Pathways are a component of the Government of Mexico's first-ever agreement with the United States to receive individuals from Cuba, Haiti, Nicaragua, and Venezuela who are removed under Title 8 of the U.S. Code.  *Id.* at ¶¶ 6-7.

278. The Government of Mexico has made clear that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come to the United States. *Id.* at ¶ 7.

279. If the United States is unable to provide lawful processes through the CHNV Pathways, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the border. *Id.* at ¶ 38.

280. The Cuban Parole Pathway also supports ongoing negotiations with the Government of Cuba to reactivate the Migration Accords, through which the United States Government aims to fulfill its commitment to facilitate the lawful entry into the United States of 20,000 Cuban nationals each year, and the Cuban government will in turn accept the repatriation of Cuban nationals encountered entering the United States without authorization. 88 Fed. Reg. 1266, 1270 (Implementation of a Parole Process for Cubans).

### *Economic Benefits*

281. Mr. Eric Sype's sponsorship of his close friend Oldrys will provide a reprieve for Oldrys, whose community in Nicaragua has been impacted by multiple tropical storms and political unrest, causing Oldrys extreme financial hardship. Trial Tr., vol. 1 of 2, 82:2-83-9.

282. Mr. Sype's sponsorship will also benefit Mr. Sype's cousin, whose rural Washington farm faces labor shortages and will benefit from the opportunity to employ Mr. Sype's friend once he is authorized for employment. Sype Decl., Int. Defs' Trial Ex. 125 ¶¶ 4, 10.

283.   Other industries with labor shortage needs also benefit from opportunities to employ individuals granted parole through programs like the CHNV Pathways. Wyatt Decl., Int. Defs' Trial Ex. 135 ¶¶ 9-10.

284.   Nonprofit organizations like Alight "work with employers to identify specific fields where labor shortages exist" and facilitate thoughtful connections with newcomers who arrive in the United States through parole programs like the CHNV Pathways. *Id.* at ¶ 6.

285.   "[T]he U.S. has huge labor needs that cannot be met solely by hiring domestic workers," making it a "win-win situation to match the talents of paroled individuals with U.S. labor needs." *Id.* at ¶ 5.

286.   Economic consensus holds that immigration increases economic growth.  Hunt Expert Decl., Int. Defs' Trial Ex. 137 ¶ 6.

287.   Immigrants of all skill and education levels contribute to the economy by "increasing specialization and productivity" and contribute billions to Texas's Gross Domestic Product each year.  *Id*. at ¶ 8.

## Conclusions of Law

**H.    Texas Lacks Standing**

288.   Standing is "an irreducible constitutional minimum," *Cole v. General Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), that courts are "obliged to resolve" as a "threshold matter of jurisdiction." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008).

289.   Article III standing is "'not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'" *United States v. Texas*, 143 S. Ct. 1964 (2023) (hereinafter "*Guidelines*") (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 476 (1982)); *see also Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011) ("In an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so.").

290.   The "[s]tanding doctrine helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system.  By ensuring that a plaintiff has standing to sue, federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'" *Guidelines*, 143 S. Ct. at 1969 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

291.   Standing is of utmost importance in cases where the judiciary is asked to usurp decisions by the political branches.  *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

292.   "When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, *much more* is needed' to establish standing."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)) (emphasis added).

293. The Court must determine whether Plaintiffs had standing "at the time the [operative] complaint was filed." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992)

294. Plaintiffs bear the burden to prove standing "with the manner and degree of evidence required at the successive stages of the litigation." *Texas (DACA) v. United States,* 50 F.4th 498, 513 (2022) (hereinafter "*DACA*"); *see also Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence.").

295. Plaintiffs' burden to prove standing grows as the stages of litigation progress. *Lewis v. Casey*, 518 U.S. 343, 357-58 (1996).

296. When states complain only of "indirect effects on state revenues or state spending . . . standing can become more attenuated." *Id.* at 1972 n.3; *see also Florida v. Mellon*, 273 U.S. 12, 16-18 (1927).

297. Because the CHNV Pathways do not directly regulate Texas, *supra* ¶¶ 180, 86, and Texas complains only of indirect effects on state spending as a result of that federal program, *supra* ¶¶ 186, the burden for Texas to establish standing is higher. *Guidelines,* 143 S. Ct. at 1970.

298. Article III standing requires a plaintiff to show "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Texas*, 562 F.3d

735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

299.   To be redressable, a plaintiff's "alleged injury [also] must be legally and judicially cognizable." *Guidelines*, 143 S. Ct. at 1970 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

300.   Texas's claimed injury is not cognizable because, in the operative Complaint, Texas complains exclusively of "attenuated" indirect effects over state coffers, "including as a result of having to "incarcerate or supply social services such as healthcare and education to noncitizens," and because this case implicates an immigration policy that (1) implements the Executive's discretionary authority and foreign policy and (2) does not exercise coercive power over the state. *Supra* ¶¶ 19-20, 102-03, 136-37, 150-53, 181-82, 186-87, 195-96, 273-80; *see also Guidelines*, 143 S. Ct. at 1968-69, 1972 n.3.

***Texas Failed to Prove Injury in Fact.***

301.   Texas has not met its burden to prove its alleged pocketbook injuries are concrete or actual. *Supra* ¶¶ 191-200; s*ee Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

302.   To establish its alleged injury, Texas would need to establish increased costs associated with an increase of people from the CHNV countries. *Supra* ¶¶ 181-82, 187; *see also DACA,* 50 F.4th at 513.

303.   As Texas admits that the presence of noncitizens from CHNV countries has decreased, Texas has not met its burden to establish injury in fact. *Supra* ¶¶ 188-90; *see also Croft*, 562 F.3d at 745; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (to satisfy standing, the plaintiff must show it suffered an "injury in

fact" that is "actual or imminent, not 'conjectural' or 'hypothetical'") (quoting *Los Angeles v. Lyons*, 461 U.S. 95 (1983)).

304.  Texas fails to satisfy Article III standing on this basis alone. *Croft*, 562 F.3d at 745; *see also Lujan*, 504 U.S. at 560.

305.  In determining whether Texas has standing, the Court must consider offsetting benefits that "arise from the same transaction as the costs." *Texas v. United States (DAPA)*, 809 F.3d 134, 155 (5th Cir. 2015) (hereinafter "*DAPA*").

306.  Fees Texas collects for providing drivers licenses stem from the same transaction of providing drivers licenses, whereas general overhead costs for DMV infrastructure do not stem from the same transaction. *See supra* ¶¶ 208; *see also supra* ¶¶ 201-13; *DAPA*, F.3d at 155.

307.  Even if a net decrease in the relevant population would not dispose of Texas's standing, Texas has not proven that it will experience any net costs after factoring in revenues and reimbursements related to the same transactions it cites to show injury, and therefore Texas lacks standing on this independent basis. Supra ¶¶ 202-04; *see also supra* 198-217; *see Lujan*, 504 U.S. at 560.

308.  Texas has also failed to establish concrete and actual injury because it does not collect data about CHNV parolees and instead claims financial harms stemming exclusively from populations that are not at issue in this case and are not reasonable proxies for the population that are. *Supra* ¶¶ 193, 195-9; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[A] theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement" of actual or impending injury).

309.   Texas has also failed to establish concrete and actual injury because its alleged injury from increased costs associated with an alleged increase of people from the CHNV countries is undercut by offsetting reimbursements, revenues, fees, and other countervailing benefits in each category of alleged cost. *Supra* ¶¶ 198-200; *see Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no standing where plaintiff state's claim of monetary injury was unsupported by the facts and thus "purely speculative").

310.   Fifth Circuit precedent prohibits Texas from changing its theory of standing at trial. *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022) ("At successive stages of this litigation, plaintiffs have changed their standing theory from "increased risk" to "reasonable access" to "equal access." The forfeiture rules—which apply to arguments in favor of standing as they do to other arguments in federal litigation . . . prohibit such efforts to move the goalposts.").

311.   Texas's new theory additionally fails on the merits where the net decreases in migration from CHNV countries—and any associated costs thereof—"arise from the same transaction" as the CHNV Pathways themselves, and thus must be considered in the standing analysis. *DAPA*, 809 F.3d at 155.

312.   Texas's complaints concerning costs associated with CHNV Pathways beneficiaries' alleged future eligibility for SNAP or TANF benefits, *supra* ¶¶ 183-84, which would be triggered three years after the expiration of any grant of parole pursuant to the CHNV Pathways, are "forfeit[ed]" and far too speculative to establish standing. *E.T.*, 41 F.4th at 717; *see also Clapper*, 568 U.S. at 410.

313. Texas has failed to establish Article III standing because it has failed to show "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent . . . ." *Croft*, 562 F.3d at 745 (citing *Lujan*, 504 U.S. at 560-61 (1.

***Texas Shows No Causal Connection Between its Alleged Injury and the CHNV Pathways***

314. Texas's asserted injuries—estimated, indirect costs tied to population increases as a result of immigration generally, *supra* ¶¶ 181-87, 193—are not traceable to the CHNV Pathways.  *California v. Texas*, 141 S. Ct. 2104, 2116-17 (2021) (finding no standing where Texas could not establish that its "pocketbook injury in the form of the increased use of (and therefore cost to) state-operated medical insurance programs" and other "expenses" was "fairly traceable" "to any actual or possible unlawful Government conduct")

315. Texas's complaints of costs associated with undocumented immigrants and unaccompanied minors do not satisfy the traceability requirement of Article III standing because Texas has failed to establish that undocumented immigrants and unaccompanied minors are reasonable proxies to assess the costs associated with CHNV parolees.  *See supra* ¶¶ 195-96, 226-29, 245-51; *California,* 141 S. Ct. at 2116-17.

316. Texas also has not shown any injury traceable to the CHNV Parole Pathways because Texas has not produced evidence showing that a CHNV parolee residing in Texas has utilized *any* uncompensated services as Texas alleges. ¶¶ 186-93, 195-96, 201, 213, 223, 233, 235, 256-57; *Crane*, 783 F.3d at 252 (finding no standing where State failed to trace claimed injury directly to challenged policy as opposed to undocumented immigration generally).

76

317.   Texas has failed to establish an injury traceable to the CHNV Parole Pathways because it can only speculate that some unspecified number of parolees may settle in Texas; that, notwithstanding eligibility for work authorization and supporters' guarantees of financial support, they may nonetheless enroll in state programs; and do so in sufficiently high numbers that they may strain Texas's finances. *See supra* ¶¶ 181-200, 213, 229, 243-44, 247-53; *Clapper*, 568 U.S. at 413 (finding "speculative" theory of injury could not satisfy the "fairly traceable" requirement" of standing); *Guidelines,* 143 S. Ct. at 1972 n.3 (warning "federal courts must remain mindful of bedrock Article III constraints" where States attempt to assert standing based on "indirect effects on state revenues or state spending").

318.   Texas has failed to establish Article III standing because it has failed to show "a causal connection between the injury and the conduct complained of . . . ." *Croft*, 562 F.3d at 745 (citing *Lujan*, 504 U.S. at 560-61).

### *Texas's Alleged Injury is Not Redressable*

319.   The injury Texas claims here is not redressable.

320.   Texas has failed to show any redressable injury because *the CHNV Pathways themselves* reduce the alleged harms Texas complains of by "reducing irregular migration" and reducing the **total arrivals** of people from Cuba, Haiti, Nicaragua, and Venezuela, *supra* ¶¶159-63, 188-90, such that any order from this court enjoining the CHNV Parole Pathways would not reduce—and would actually be expected to increase—the costs that Texas complains of.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976) ("[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the

claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.").

321.    Texas additionally fails to satisfy redressability because it complains of alleged costs incurred from ordinary governance, including that which results from domestic in-migration and international immigration, but mostly from undocumented immigration—not any costs resulting from the CHNV Parole Pathways themselves, *supra* ¶¶ 187, 193-96—which an order in this case would not address. *See Lujan*, 504 U.S. at 561 ("[[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (internal punctuation and citation omitted).

322.    Texas has also failed to articulate a redressable injury because this Court cannot disrupt this discretionary authority of the executive on which the CHNV Pathways are premised and which is bound up in diplomatic agreements with foreign nations and other issues of foreign policy. Supra ¶¶ 19-24, 150-53, 273-80; *see Guidelines*, 143 S. Ct. at 1971-73 (courts may not impermissibly "run up against the Executive's Article II authority to enforce federal law," including in immigration policies that implicate "foreign policy objectives," (citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-491 (1990)); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[T]he Attorney General may . . . in his discretion, parole . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit any [noncitizen] applying for admission to the United States . . . .").

323. Texas has failed to establish Article III standing because it has failed to establish "the likelihood that a favorable decision will redress the injury." *Guidelines*, 143 S. Ct. at 1970.

### No Other Special Standing Theories Apply

324. Because Texas has failed to establish each of the basic Article III standing requirements, it cannot invoke special solicitude to cure the patent defects in its underlying legal theory. *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683–84 (5th Cir. 2023) ("Regardless of the applicability of the special solicitude, [states] must still satisfy the basic requirements of standing."); *see also Arizona v. Biden*, 40 F.4th 375, 385-86 (6th Cir. 2022) (special solicitude "does not allow [plaintiff states] to bypass proof of injury" required by Article III); *Louisiana Dep't of Wildlife & Fisheries v. National Oceanic & Atmospheric Admin*, 70 F.4th 872, 882 (5th Cir. 2023) ("[Special solicitude] is not a standing shortcut when standing is otherwise lacking . . . [It] does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and particularized.") (citing *Massachusetts v. EPA*, 549 U.S. 497, 517-20 (2007).

325. Given the waning significance of special solicitude in the "years since" *Massachusetts v. EPA*, the propriety of invoking special solicitude has been called into question altogether. *Guidelines*, 143 S. Ct. at 1977 (Gorsuch, J., concurring) ("[I]t's hard not to think . . . that lower courts should just leave that idea [of special solicitude] on the shelf in future [years].") (internal citations omitted).

326. Though the Supreme Court has not expressly overruled the concept of special solicitude, it has clarified that where a state complains only of indirect effects from

a federal program that does not regulate the state directly, "much more" is needed for a state to establish standing, *Guidelines*, 143 S. Ct. at 1970, and therefore special solicitude could not apply in cases such as this. *See also Louisiana,* 64 F.4th at 683 (finding Louisiana had no standing to challenge federal policy that applied "only to federal executive departments and agencies" and provided "no substantial pressure for [states] to change *their* laws").

327.   Because Texas relies on special solicitude to meet the lowest possible burden to establish standing, Texas has failed to establish standing consistent with *Texas* (*Priorities*), requiring "much more" in cases such as this.

328.   Even if special solicitude still applied in cases such as this, Texas has failed to establish each of the basic Article III standing requirements, *supra* ¶¶ 288-323, and therefore it cannot invoke special solicitude to overcome those defects. *Louisiana*, 64 F.4th at 683–84.

329.   To invoke *parens patriae* to sue on behalf of Texas's residents based on their health and well-being, a state must claim a quasi-sovereign interest in the wellbeing of its "residents in general," and may not claim such an interest only in a particular subset thereof. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982).

330.   Because Texas's asserted injury is based on the provision of basic services to a subset of its residents that are generally available to all its residents, *supra* ¶ 187, Texas may not invoke *parens patriae* in support of its injury here. *Id.*

## I.      The Plaintiff States Other than Texas Also Lack Standing

331.    The other Plaintiff States fail to establish standing because they fail to show they have suffered, or will suffer, an injury due to the CHNV Pathways that may be redressed by any relief the Court may enter for the Plaintiffs.  *Supra* ¶ 178.

332.    Because Plaintiff States only "seek to establish Article III injury based on alleged injuries to Texas" and do "not submit any evidence as to injury for any other State Plaintiff," *see id*; Joint Notice of Stipulations ("Joint Stip."), ECF 139, the other Plaintiff States have not met their burden and lack standing.  *Guidelines*, 143 S. Ct. at 1970; *Croft*, 562 F.3d at 745 (citing *Lujan*, 504 U.S. at 560).

## J.      Plaintiff States Fail on the Merits of their APA Claims

333.    Because Plaintiffs lack standing, this Court lacks Article III jurisdiction to reach the merits of Plaintiffs' claims.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) ("'Without jurisdiction the court cannot proceed at all in any cause'; it may not assume jurisdiction for the purpose of deciding the merits of the case.") (citation omitted).

334.    Plaintiff States additionally fail on the merits of their claims.

### The CHNV Pathways Are Authorized by Statute

335.    The parole statute authorizes the Executive to grant parole on a "case-by-case" basis for "urgent humanitarian reasons or significant public benefits." 8 U.S.C. § 1182(d)(5).

336.    The Parole Statute does not define "case-by-case" review.  *Id.; see* ¶ 103.

337.    The Parole Statute does not contain a numerical cap.  *Id*.; *see* ¶ 102.

338.   The CHNV Pathways comport with the statutory requirement that parole be granted on a "case-by-case" basis because DHS considers and adjudicates each CHNV Pathway application individually.  *Supra* ¶¶ 68-72.

339.   The Parole Statute does not define "urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A); *see* ¶ 103.

340.   The Parole Statute accords broad discretion to the Executive to determine what constitutes an urgent humanitarian reason or significant public benefit.  Fed. Defs' P.I. Opp., ECF 176 at 21-26; *see also* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, *in his discretion* parole into the United States temporarily *under such conditions as he may prescribe. . . .*") (emphases added).

341.   Because DHS determined the CHNV Pathways are justified by urgent humanitarian reasons and confer significant public benefits, *supra* ¶¶ 18-20, 136-53, the CHNV Pathways comport with the statutory requirement that parole be granted in the executive's discretion for "urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).

342.   Because the CHNV Pathways comport with the Parole Statute's plain text, "that is the end of the matter."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

343.   Even if the Parole Statute were "silent or ambiguous," "[c]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  *Id*. at 844.

344. "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

345. DHS's interpretation of the Parole Statute is reasonable, particularly given the long history of similar parole programs, *supra* ¶¶ 129-135, and well-reasoned, having provided extensive consideration of relevant factors including humanitarian and political crises, irregular and dangerous migration, and foreign policy implications. *See supra* ¶¶ 18-20, 136-53; *see also Chevron*, 467 U.S. at 844.

346. Federal Defendants are owed "deference" for their well-reasoned "administrative interpretation" of their authority under the Parole Statute. *Chevron*, 467 U.S. at 842.

347. In the context of policies issued pursuant to the Parole Statute that are justified by underlying foreign policy needs, courts "must be deferential to the President's Article II foreign-policy judgment." *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) (hereinafter "*Texas*").

348. "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *I.N.S. v. Aguirre Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)).

349. Federal Defendants are especially entitled to judicial deference in their interpretation of the Parole Statute because the CHNV Pathways implicate matters of foreign policy, including historic negotiations with the Government of Mexico, and the role of the United States in a collaborative regional approach to migration in the western hemisphere. *Texas*, 142 S. Ct. at 2548; *supra* ¶¶ 256-263.

350.   Because courts should accord greater deference in this context, Federal Defendants' reasoned interpretation of the Parole Statute to establish the CHNV Pathways should not be disturbed.  *Texas*, 142 S.Ct. at 2548 (Kavanaugh, J., concurring); *see also I.N.S.*, 526 U.S. at 425 (highlighting the importance of "judicial deference" when the Executive Branch renders a decision on how to handle foreign affairs).

351.   Texas's interpretation of the Parole Statute is erroneous, as it improperly relies on congressional history of *failed* amendments to § 1182(d)(5) that *would have* imposed limits to the statute by defining the terms "urgent humanitarian reason" and "strictly in the public interest" to encompass only very limited criteria; that history does not and cannot reflect congressional intent.  *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."); *see also Shannon v. United States,* 512 U.S. 573, 584 (1994) ("[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point."); Abbe R. Gluck, *Imperfect Statutes, Imperfect Courts: Understanding Congress's Plan in the Era of Unorthodox Lawmaking*, 129 Harv. L. Rev. 62, 77 n.90 (2015) ("[The Supreme Court] has long applied a 'rejected proposal rule,' under which it refuses to construe statutes to incorporate provisions that Congress has expressly rejected.").

352.   Congress's intent to leave undisturbed the Executive's ability to use the parole authority programmatically is demonstrated by its choice to largely leave it as originally constructed by opting for a 1996 amendment that left key terms undefined.  *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 361–62 (5th Cir. 2009)

(en banc) (holding Congress's failure to amend a statute despite opportunities to do so upheld the statute's traditional interpretation).

353.   Congress did not intend that the executive justify the urgent humanitarian reason or significant public benefit for each grant of parole on an individual basis, and permits the executive to consider those criteria in the aggregate. *Compare* 8 § 1182(d)(5)(B) (prohibiting the parole of a refugee "unless the Attorney General determines that compelling reasons in the public interest ***with respect to that particular [noncitizen]***") (emphasis added) *with* 8 § 1182(d)(5)(A) (containing no similar limitation); *see also Russello v. U.S.*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up)).

354.   The CHNV Pathways are consistent with the text of 8 U.S.C. § 1182(d)(5).

**K.   Decades of executive and congressional action confirm the lawfulness of the pathways.**

355.   Even if the Court were to read ambiguity into the Parole Statute, the statute's post-enactment administrative interpretations confirm the lawfulness of the CHNV Pathways.  *Salazar v. Maimon*, 750 F.3d 514, 519 (5th Cir. 2014) (to the extent a court finds a "statute is subject to differing interpretations," then it "must 'examine its legislative history, predecessor statutes, pertinent court decisions, and post-enactment administrative interpretations'") (quoting *Rogers v. San Antonio*, 392 F.3d 758, 761 (5th Cir. 2004)).

356.   The lawfulness of the CHNV Pathways is confirmed by past agency interpretation where presidential administrations have repeatedly invoked Section 1182(d)(5)(A)

to promulgate programmatic parole policies substantially similar to the Parole Pathways: identifying a group of people whose entry through parole could be warranted for emergent or urgent humanitarian reasons or would be in the public interest or advance a significant public benefit, including when measured in the aggregate, and then allowing eligible members of that group to apply and be considered on a case-by-case basis. *Supra* ¶¶ 106-07, 120-27, 129-32; *see also Salazar*, 750 F.3d at 519.

357.   The lawfulness of the CHNV Pathways is confirmed by past agency interpretation where presidential administrations have repeatedly invoked Section 1182(d)(5)(A) to promulgate programmatic parole policies that were motivated by analogous concerns as the CHNV Pathways, including the need to relieve certain groups of the limitations of other immigration statutes, manage the land or maritime borders, fulfill important foreign policy goals, promote family reunification, and disincentivize use of dangerous pathways to the United States.  *See supra* ¶¶ 129-32, 136-53; *Salazar*, 750 F.3d at 519.

358.   No court has ever found a programmatic application of the parole authority to exceed Section 1182(d)(5)(A).  *Supra* ¶135; *see e.g.*, *Salazar*, 750 F.3d at 519.

359.   No court has ever found a use of the parole authority that was justified by the program's aggregate public benefits to exceed Section 1182(d)(5)(A).  *Supra* ¶ 135; *see also Salazar*, 750 F.3d at 519.

360.   The lawfulness of the CHNV Pathways is confirmed because, both before and after 1996, Congress has never acted to curtail any programmatic use of the parole authority.  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to

be aware of an administrative or judicial interpretation of a statute" and adopts or ratifies that interpretation when it does not act to amend the statute and instead re-enacts it without change.); *see also supra* ¶¶ 133-34.

361.   Far from indicating disapproval, the lawfulness of the CHNV Pathways is confirmed because Congress has repeatedly ratified programmatic uses of the parole authority that are materially indistinguishable from the CHNV Pathways, *supra* ¶¶ 129-132, further confirming the lawfulness of the CHNV Pathways. *Costanzo v. Tillinghast*, 287 U.S. 341 (1932) ("The failure of Congress to alter or amend . . . creates a presumption in favor of the administrative interpretation. . . ."); *see also Lorillard*, 434 U.S. at 580.[1]

**L.     The CHNV Parole Pathways Are Not Arbitrary and Capricious**

362.   "The arbitrary and capricious standard is highly deferential." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015).

363.   An action is not arbitrary and capricious if there's a rational connection between the facts the agency found and the decision it made. *Worldcall Interconnect, Inc. v. F.C.C.*, 907 F.3d 810, 817 (5th Cir. 2018).

364.   "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (hereinafter "*State Farm*").

365.   Because Federal Defendants considered extensive data, country conditions, and the success of prior iterations of programmatic parole to develop the CHNV Pathways,

---

[1] For the same reasons, Texas additionally fails on the merits of its ultra vires claim.

they "examine[d] the relevant data," and explained "'a rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962); *see also Knapp*, 796 F.3d at 453; *supra* ¶¶ 13-14, 16-20, 23--33, 35, 36-39, 41-43, 46.

366.    Therefore, the CHNV Pathways satisfy the "highly deferential" arbitrary and capricious standard. *Id*.

367.    Because the CHNV Pathways are justified by several additional foreign policy reasons, including historic negotiations with the Government of Mexico, and the role of the CHNV Pathways as part of a collaborative regional approach to migration in the western hemisphere, *supra* ¶¶ 276-280, additional deference to the executive's statutory interpretation is warranted, as courts "must be deferential to the President's Article II foreign-policy judgment." *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring).

368.    Texas additionally fails on its arbitrary and capricious claim that Federal Defendants implemented the CHNV Pathways despite knowing "the costs imposed on states like Texas as a result of increased [undocumented] immigration," Pls' P.I., ECF 22 at 23, because it has failed to substantiate either increased migration as a result of the CHNV or corresponding increased costs, *supra* ¶¶ 177-257.

369.    Further undermining Texas's claims of costs, individuals granted parole through the CHNV Pathways are eligible under existing regulations to apply for work authorization for the duration of their period of parole, which allows them to contribute to the economy. *Supra* ¶¶ 73, 94-101; 8 C.F.R. § 274a.12.

370.   Even if Texas had established that the CHNV Pathways imposed the costs it claims (it has not), *see supra* ¶¶ 190, 195-257, the record reflects that DHS did consider such potential costs.  *Supra* ¶ 26.

371.   As DHS did consider the factors Texas complains it did not, this is sufficient to satisfy the arbitrary and capricious standard.  *See State Farm*, 463 U.S. at 43 ("[A] court is not to substitute its judgment for that of the agency. . . ."); *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) ("[T]he role of courts in reviewing arbitrary and capricious challenges is to 'simply ensur[e] that the agency has acted within a zone of reasonableness.'") (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).

372.   Texas also has not established how any costs undermine its "reliance interests," Pls' P.I., ECF 22 at 22-23, which are implicated when an agency "changes course" from "longstanding policies."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

373.   Reliance interests are more than regular interests; rather, they refer to "legitimate reliance" on a longstanding program that has caused those affected to make decisions "all in reliance on" the existence of that program.  *Id*. at 1914.

374.   Because Texas has not proven it relied on any federal policy related to the CHNV Pathways in order to make decisions, Texas fails to prove that Federal Defendants did not consider their reliance interests.  *Regents*, 140 S. Ct. at 1914*.

375.   Texas also fails to prove that Federal Defendants did not consider their reliance interests when "chang[ing] course" because no such change occurred here; Texas admits that the CHNV Pathways built upon U4U, which DHS had been

implementing for months, and the CHNV Pathways resemble decades of similar parole processes.  *Supra* ¶¶ 129-153.

376.  Even if DHS had changed course and Texas's claim of potential costs could constitute a reliance interest, DHS did consider those costs in developing the CHNV Pathways, *supra* ¶ 26, and therefore the CHNV Pathways satisfy this aspect of arbitrary and capricious review, *Regents*, 140 S. Ct. at 1915.

377.  Texas's complaint that the CHNV Pathways are arbitrary and capricious because there is insufficient evidence of a "sudden surge of migrants from several specific countries," Pls' P.I., ECF 22 at 23, is disproven by the record and Texas's concession that the CHNV Pathways have reduced migration from CHNV countries.  *Supra* ¶¶ 164-167, 173; Trial Tr. vol. 2 of 2, 244-249; *see also FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (A federal policy must be upheld if it is supported by "substantial evidence," which is "something ***less than*** a preponderance."  (emphasis added)). This again evinces a rational connection between the facts the agency found and the decision it made. *Worldcall Interconnect, Inc.*, 907 F.3d at 817.

378.  Finally, Texas's complaint that DHS did not explain "how" it would remove individuals after the two-year parole period lapses, Pls' P.I., ECF 22 at 23-24, fails because DHS did explain this, *supra* ¶¶ 24-25, 74.

379.  Texas does not explain why a new mechanism is needed or authorized in light of exclusive removal procedures prescribed at 8 U.S.C. § 1229a(a)(3).

380.  Texas's concern ignores that the CHNV Pathways make the removal of CHNV individuals more possible, rather than less, as a result of the contingent agreement

with Mexico, *see supra* ¶¶ 8-9, 24, again illustrating "a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43.

381.   Texas's concern ignores that a primary purpose of parole is to permit the recipient to reside in the United States while continuing to pursue a visa application, and thus many parolees are likely to have changed status during the pendency of their parole and not require removal, *see supra* ¶ 260, illustrating once more "a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43.

382.   Because arbitrary and capricious review is satisfied if the agency decision partially, but does not completely, solves an identified problem, the CHNV Pathways are not arbitrary and capricious to the extent they do not provide an even more extensive mechanism—in addition to exclusive statutory removal procedures, the removal agreement with Mexico, and the likely status change of many parolees—for removal.  *Id*. at 51.

383.   Texas's dissatisfaction with DHS's conclusion does not render DHS's conclusion arbitrary and capricious, as arbitrary and capricious review does not permit plaintiffs or courts to substitute their judgment for that of an agency.  *Id*. at 43.

384.   Texas's claims of arbitrary and capricious agency action are thus unsupported by the record.

## M.   The Remaining Factors Do Not Support Injunctive Relief

385.   To obtain injunctive relief of any nature or scope, Texas must prove that: "(1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance

of hardships between the plaintiffs and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

386.   Texas is not entitled to injunctive relief, including a nationwide injunction, because Texas has not made the "clear showing" to carry its "burden of persuasion" that it has met each criterion to obtain such relief. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

***Texas Has Not Established Irreparable Injury***

387.   Texas has not established any actual injury caused by the CHNV Parole Pathways. *See supra* ¶¶ 177-257; *Am. Holland Ins. Co.*, 777 F.2d at 997 ("The record does not substantiate the granting of an injunction. [The Plaintiff] has failed to make a clear showing of irreparable harm.").

388.   Texas also has not established irreparable injury because it claims fiscal injury based only on speculative financial costs that it cannot tie to the CHNV Pathways. *California*, 141 S. Ct. at 2117-20 (holding that the Plaintiff States "have failed to show how [their alleged] injury is directly traceable to any actual or possible unlawful Government conduct"); *see also supra* ¶¶ 191-257.

389.   Texas also has not shown irreparable injury because it has provided no evidence as to CHNV parole beneficiaries. *See Am. Holland Ins. Co.*, 777 F.2d at 997; *supra* ¶¶ 191-197.

390.   Texas also has not shown irreparable injury because it has provided no evidence to support its assertions that sufficient numbers of CHNV parole beneficiaries will resettle within Texas and, despite having work authorization and financial support from sponsors, will enroll in state programs in sufficiently high numbers that they

will strain Texas's ability to provide essential services to other Texas residents. *See Sampson v. Murray*, 415 U.S. 61, 89 (1974); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 Fed.Appx. 389, 397–98 (5th Cir. 2013) (finding "general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" is insufficient to establish irreparable harm); *see also supra* ¶¶ 201-257.

391.    Texas has not established that any injury is irreparable, because Texas admits that revenues, fees, and other countervailing benefits offset those alleged costs. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (weighing the "economic benefits" of a challenged program against its costs when balancing the parties' hardships); *supra* ¶¶ 198-200, 216-217, 305, 309.

### The Balance of Hardships Does Not Weigh in Favor of Injunctive Relief

392.    The balance of hardships weighs against an injunction because the evidence shows that a lack of injunction would pose no harm to Texas, and in fact would benefit Texas, whereas an injunction would inflict significant harm on the Intervenor and Federal Defendants. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" when considering whether to award injunctive relief) (citation and internal punctuation omitted).

393.    The balance of hardships does not weigh in favor of an injunction because Texas has not established that it would suffer any injury, much less irreparable injury, in the absence of an injunction. *See supra* ¶¶ 191-257; *Holland Am.*, 777 F.2d at 998 ("In the absence of irreparable injury to [the Plaintiff], the injunction must be overturned.").

394.     Even to the extent Texas has proven it would experience some injury as a result of the CHNV Pathways, Texas has not proven that the magnitude of that injury would be anything more than *de minimis* costs, *see supra* ¶¶ 190-257, and thus any hardship Texas experiences in the absence of an injunction would be significantly outweighed by the harm an injunction would inflict on Intervenors, Federal Defendants, and the public interest, *see, e.g.*, *Winter*, 555 U.S. at 24 (requiring plaintiffs to show *irreparable* injury in the absence of an injunction and instructing courts to balance the competing claims of injury of the parties) (citation and internal punctuation omitted).

395.     The Court must also consider the countervailing impacts an injunction might have on Texas, as an injunction could cause more crowding at its southern border and greater migration of individuals who do not have financial sponsors, *supra* ¶ 176, weighing against Texas's claim of hardship. *Beame*, 434 U.S. at 1313 (balancing parties' hardships, the Court found that a city's reliance on economic harm "does not weigh entirely in [its] favor" because "there will be some economic benefits" from the challenged action).

396.     An injunction would pose significant harm to the Intervenor Defendants by cutting off the safe, lawful, and orderly pathway to the United States that the CHNV Pathways would afford to those who continue awaiting approval of their applications; and it would cast uncertainty on the future for Intervenor Defendants, as well as others similarly positioned, who are supporting their parole beneficiaries while they await work authorization to be granted, or while they pursue applications for longer-term or permanent legal status in the United States. *Supra* ¶ 260; *see*

Declarations and Supplemental Declarations of Intervenor Defendants, Int. Defs' Trial Exs. 117-130; *see also Quillen v. Walcott*, 434 U.S. 246, 255 (1978) (collecting cases holding that the relationship between parent and child is "constitutionally protected"); *Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017) (finding that prolonged separation of family members outweighs any national security interests articulated by the government), *rev'd on other grounds*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *Texans for Free Enterprise v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (injunctions protecting First Amendment freedoms are in the public interest); *see also Hernandez v. Sessions*, 872 F.3d 976, 966 (9th Cir. 2017) (considering the "indirect hardship to friends and family members" separated from the Plaintiffs when evaluating the hardships an injunction would impose).

397.    Nor does the balance of hardships support an injunction that would interfere with the executive's conduct of foreign affairs, especially with respect to a statutory tool whose use by the executive Congress has repeatedly ratified and also declined to constrain since its codification in the 1952 INA.  *See Texas*, 142 S. Ct. at 2543 (warning against "unwarranted judicial interference in the conduct of foreign policy . . . without the affirmative intention of the Congress clearly expressed," including "in the context of immigration law, where the dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.") (internal punctuation and citation omitted)); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (where injunctive relief "deeply intrudes into the core concerns of the executive, a court is

'quite wrong in routinely applying to this case the traditional standards governing more othodox stays.'") (quoting *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974)).

### The Public Interest Does Not Support Injunctive Relief

398.    "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 55 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

399.    The public interest does not support an injunction of the CHNV Pathways because an injunction would harm multiple significant public interests. *Salazar v. Bruno*, 559 U.S. 700, 714 (2010) ("[A] court should be particularly cautious when contemplating relief that implicates public interests.") (citations omitted)); *see also Quillen v. Walcott*, 434 U.S. 246, 255 (1978)

400.    An injunction of the CHNV Pathways would disserve the significant public interest in stability and safety in immigration to the United States. *Supra* ¶¶ 20-23, 83-85, 136, 147-149; *cf. In re Chan Kam-Shu*, 477 F.2d 333, 338 (5th Cir. 1973) (affirming parole of noncitizen because the "physical protection" of a noncitizen is "within the public interest").

401.    An injunction of the CHNV Pathways would disserve the significant public interest in the reunification of families. *Supra* ¶¶ 76, 86-90, 261-264; *see also Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017); *Hernandez v. Sessions*, 872 F.3d 976, 966 (9th Cir. 2017); *Pickett v. Hous. Auth. of Cook City*, 114 F. Supp. 3d 663 (N.D. Ill. 2015) ("[T]he public interest is seriously disserved by [Plaintiff] family's separation.").

402.   An injunction of the CHNV Pathways would harm the more than 1.5 million individuals in the United States who have applied to sponsor parole beneficiaries through the CHNV Pathways, as well as their communities, and disserve the significant public interest in the enrichment of local economies and communities. *Supra* ¶¶ 101, 259-260; *see Guidelines*, 143 S. Ct. at 1985 (warning against broad relief that would "purport to define the rights and duties of sometimes millions of people who are not parties before them" or that "can also sweep up nonparties who may not wish to receive the benefit of the court's decision") (Gorsuch, J., concurring).

403.   An injunction of the CHNV Pathways would disserve the significant public interest in the free exercise and expression of sincerely held religious beliefs. *Supra* ¶¶ 66, 80-82, 253-255; *see also Texans for Free Enterprise*, 732 F.3d at 539.

404.   An injunction of the CHNV Pathways would disserve the executive's discretion in the conduct of foreign relations.  *Supra* ¶¶ 17-18, 123-125, 147-151; *see also Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.").

405.   An injunction would disserve at least fifteen other States and the District of Columbia which are not parties to this case and support the CHNV Pathways. *See MercExchange, L.L.C.*, 547 U.S. at 391; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

***Texas's Claims Are Discriminatory and Not Legally Cognizable***

406.     Texas's allegations of injury suggest discriminatory intent because they propagate false stereotypes about immigrants that are unsupported by the factual record, based on irrelevant comparisons, and contradicted by widely available empirical evidence. *See Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (circumstantial evidence of discriminatory intent exists where the purported problem to be addressed "was almost nonexistent"); *Exodus Refugee Immigr., Inc. v. Pence*, 838 F.3d 902, 904-05 (7th Cir. 2016) (policy excluding Syrian refugees was discriminatory because it was "based solely on the threat . . . they pose to the safety of the residents of Indiana. But . . . targeting Syrian refugees is discrimination on the basis of nationality"); *see also supra* ¶¶ 188, 190-257.

407.     By singling out parole beneficiaries of the CHNV Pathways for imposing costs on the state to which all Texas residents contribute, alleging injury where Texas actually benefits, relying on disproven racial stereotypes, and challenging only programs that benefit parole beneficiaries of color while declining to challenge a virtually identical program that benefits white parole beneficiaries, Texas's claims and allegations in this lawsuit suggest discriminatory intent. *See supra supra* ¶¶ 188, 190-257; *see also Village of Arlington Heights v. Metropolitan Housing Devt. Corp.*, 429 U.S. 252, 270 (1977); *Crain v. City of Selma,* 952 F.3d 634, 641 (5th Cir. 2020).

408.     Racial or national origin discrimination cannot form the justification that establishes irreparable injury, as the equal protection clause forbids states from discriminating on that basis in almost all circumstances. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

409.   Texas cannot do indirectly through this lawsuit what it cannot do directly, *Bailey v. State of Alabama*, 219 U.S. 219, 239, 244-45 (1911), and this court cannot "plac[e its] power, property and prestige behind the [alleged] discrimination." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624 (1991) (citation omitted).

### Nationwide Relief Is Not Supported by the Evidence

410.   The evidence adduced at trial does not support nationwide equitable relief, either in the form of an injunction or vacatur.

411.   An injunction is inappropriate relief in this APA suit.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

412.   To the extent any injunction is issued, because only Texas has proffered any evidence of injury, an injunction would not properly extend beyond the State of Texas.  *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J. concurring) (criticizing the "routine issuance of nationwide injunctions as patently unworkable", "sowing chaos", and as "shar[ing] the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case"), *denying modification*, 140 S. Ct. 2709 (2020); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

413.   To the extent any injunctive relief is appropriate, any such relief must be limited to what is necessary to effectuate relief from the legal injury shown.  *O'Donnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) ("[A] district court abuses its discretion if it does not narrowly tailor an injunction to remedy the specific action which gives rise to the order.") (internal quotations omitted), *overruled on other*

grounds by *Daves v. Dallas County*, 22 F. 4th 522 (5th Cir. 2022).   Texas's
proffered evidence does not justify a nationwide injunction blocking the CHNV
Parole Pathways.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's
remedy must be tailored to redress the plaintiff's particular injury.").

414.   Because the twenty other Plaintiff States have failed to establish *any* injury to
themselves, those states are not entitled to equitable relief.  *Supra* ¶¶ 331-332; *Gill*,
138 S. Ct. at 1934; *O'Donnell v. Harris Cty.*, 892 F.3d at 163.

415.   Nationwide relief is also unwarranted because it would create problems for
"nonparties who may not wish to receive the benefit of the court's decision,"
including the "[d]ozens of states, counties, and cities" that do not wish to be bound
by the district court's order.   *Guidelines,* 143 S. Ct. at 1985 (Gorsuch, J.,
concurring).

416.   Promoting uniformity in immigration enforcement, Pls' P.I., ECF 22 at 27, does
not justify nationwide relief here, especially in light of the significant hardships that
an injunction would impose on the Federal and Intervenor Defendants; on non-
parties, including the 1.5 million individuals who have applied as CHNV Pathways
sponsors and their intended parole beneficiaries; and on the weighty public interest
in providing safe, orderly, legal and humane pathways to the United States,
reunifying families, honoring the free exercise of religion, enriching our local
communities and economies, and advancing important foreign policy goals.  *See*
*Weinberger*, *v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[C]ourts of equity
should pay particular regard for the public consequences in employing the
extraordinary remedy of injunction.").

417.  To the extent that the Court finds any relief for the States is appropriate, the appropriate relief in this case is remand without vacatur. *Cent. & S. W. Servs. v. United States EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

418.  "Remand, not vacatur," is "generally appropriate relief" in an APA suit. *Texas Ass'n of Mfrs. V. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 369 (5th Cir. 2021).

419.  Remand, not vacatur, "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive." *Cent. & S.W. Servs.,* 220 F.3d at 692.

420.  Vacatur is not appropriate here because there is a serious possibility DHS could cure any procedural defect on remand, and because vacating would cause significant disruption. *Supra* ¶¶ 150-176, 260; *see Cent. & S.W. Servs.,* 220 F.3d at 692.

421.  To the extent the Court finds that the States are entitled to a vacatur of, or an injunction against, the CHNV Parole Pathways, it is appropriate to stay this relief "until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court." *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021); appeal filed No. 21-40680 (5th Cir. Sept. 16, 2021); *Texas v. United States*, 352 F. Supp. 3d 665, 690 N.D. Tex. 2018), *aff'd in part, vacated in part, remanded*, 945 F.3d 355 (5th Cir. 2019).

**The Major Questions Doctrine is Not Implicated by this Case**

422.    The Major Questions doctrine applies only when an agency asserts "highly consequential power beyond what Congress could reasonably be understood to have granted." *W. Va. v. Environmental Prot. Agency*, 142 S. Ct. 2587, 2609 (2022).

423.    It does not apply here, where DHS established and operated the CHNV Pathways pursuant to its congressionally granted parole authority, which allows the DHS secretary to, "in his discretion," parole non-citizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

424.    The history of the use of parole authority both pre- and post-1996 likewise demonstrates that the CHNV Pathways are squarely within the powers that Congress reasonably intended to grant to DHS.  *See generally* Schacher Expert Decl., Int. Defs.' Trial. Ex. 141.

425.    Although Congress left the key terms in the statute—"urgent humanitarian need," "significant public benefit," and "case by case"—Congress explicitly rejected attempts to narrow the terms' definitions in the most recent amendments to the DHS's parole authority in 1996, leaving them to DHS to interpret.  Trial Tr. vol. 1 of 2, 20:19-21:5; *supra* ¶¶ 351-361.

426.    Congress notably also declined to impose a numerical cap on the use of parole. Trial Tr. vol. 1 of 2, 21:4-5.

427.    The Major Questions doctrine is at most one potential tool of statutory interpretation; it does not apply in cases of "clear congressional authorization," such as this one. *W. Va.*, 142 S. Ct. at 2609.

428.    DHS's exercise of the parole authority also bears no resemblance to the narrow situations that gave rise to other Major Questions cases.

429.    One through-line of Major Questions precedent is that the challenged agency action newly attempted to regulate beyond the agency's primary congressionally delegated area of responsibility. *See, e.g.*, *Ala. Ass'n of Realtors v. Dep't Health & Hum. Serv.*, 141 S. Ct. 2485, 2487 (2021) (holding that the Centers for Disease Control lacked the authority to implement a nationwide eviction moratorium); *Nat'l Fed. Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661 (2022) (holding that OSHA could not force 84 million Americans to either obtain the COVID-19 vaccine or undergo weekly medical testing).

430.    Here, in contrast, DHS is exercising a form of authority expressly granted by statute and in response to one of its primary areas of congressionally granted responsibility—namely, immigration—and in ways that are materially indistinguishable from decades of prior uses of the same statutory authority.

431.    As a result, this case does not implicate the Major Questions doctrine.


Respectfully submitted,

                         */s/ Monika Y. Langarica*
                         **Monika Y. Langarica***
                         California Bar No. 308518
                         langarica@law.ucla.edu

                         **Ahilan T. Arulanantham***
                         California Bar No. 237841
                         arulanantham@law.ucla.edu

**Talia Inlender***
California Bar No. 253796
inlender@law.ucla.edu

**CENTER FOR IMMIGRATION LAW AND POLICY**
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

**Esther H. Sung (Attorney-In-Charge)***
California Bar No. 255962
*Application for Admission pending*
esther.sung@justiceactioncenter.org

**Karen C. Tumlin***
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Jane Bentrott***
California Bar No. 323562
D.C. Bar No. 1029681
Virginia Bar No. 87903
jane.bentrott@justiceactioncenter.org

**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

**Brandon Galli-Graves***
Texas Bar No. 24132050
brandon.galli-graves@raicestexas.org

**THE REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES (RAICES)**
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
Telephone: (210) 960-3206
Facsimile: (210) 634-1279

*admitted pro hac vice*

**Kate Kaufmann Shih**

Texas Bar No. 24066065
Federal Bar No. 1214426
kateshih@quinnemanuel.com

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713)221-7100

## CERTIFICATE OF SERVICE

I certify that on September 29, 2023, I filed this motion through the Court's CM/ECF system, which served it on all counsel of record.

*/s/ Monika Y. Langarica*