# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

# INTERVENOR DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................... 1

RESPONSES TO THE COURT'S QUESTIONS .................................... 3

ARGUMENT ......................................................................................... 8

I.   Texas Lacks Standing. ................................................................. 8

    a.   Standing Is Determined at the Time the Complaint is Filed and Requires Assessment of All Record Evidence. ....................... 8

    b.   Texas Lacks Injury. ............................................................... 9

        i.   The Court Should Not Accept Texas's New Theories of Standing, Which Are Meritless in Any Event. ......................... 11

        ii.   Regardless of Net Migration, Texas Has Failed to Establish Injury Because the Court Must Consider Net Costs. ................................................................................... 16

    c.   Texas's Alleged Injury is Not Redressable. ............................. 18

    d.   Special Solicitude Has Been Narrowed, Further Undermining Texas's Standing. ................................................................. 20

II.  Texas's Merits Arguments Fail. ................................................. 22

    a.   The CHNV Pathways Are Consistent with the Statute ............ 22

        i.   The CHNV Pathways Comport with Unambiguous Statutory Text. ..................................................................... 22

        ii.   The CHNV Pathways Are Consistent with Congressional Intent. ................................................................................. 34

        iii.   The Major Questions Doctrine Cannot Save Texas's Case. ....... 40

    b.   The CHNV Pathways Are Not "Arbitrary and Capricious." ...... 41

III.  The Balance of Hardships and the Public Interest Overwhelmingly Favor Defendants, Precluding Any Equitable Relief. ................................ 46

IV.  If Any Relief Is Justified, It Must Be Remand Without Vacatur. ...... 48

CONCLUSION ...................................................................................... 54

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ala. Ass'n of Realtors v. Dep't Health & Hum. Serv.*,
141 S. Ct. 2485 (2021) ............................................................ 41

*Amoco Prod. Co. v. Vill. Of Gambell, AK*,
480 U.S. 531 (1987) ....................................................... 49, 50

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977) ..................................................... 49

*Benisek v. Lamone*,
138 U.S. 1942 (2018) ..................................................... 49, 50

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ....................................................... 39

*Cent. & S. W. Servs. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ............................................ 3, 54

*Chem. Mfrs. Ass'n v. EPA*,
870 F.2d 177 (5th Cir. 1989) ............................................ 54

*Croft v. Governor of Texas*,
562 F.3d 735 (5th Cir. 2009) ............................................ 18

*Ctr. for Biological Diversity v. EPA*,
937 F.3d 533 (5th Cir. 2019) ............................................ 13

*Dep't of Homeland Sec. v. New York*,
140 S.Ct. 599 (2020) (Gorsuch, J., concurring) .................... 52

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891,1913 (2020) ............................................ 43

*E.T. v. Paxton*,
19 F.4th 760 (5th Cir. 2021) ....................................... 4, 12, 51

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ....................................................... 46, 49

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) ....................................................... 42, 43

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020) .............................................................. 4, 8

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ........................................................................... 45

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ......................................................................... 37, 39

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) ................................................................. 51

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ............................................................................... 48

*Florida v. United States*,
    Case No. 3:21cv1066-TKW-EMT, 2022 WL 2431414 (N.D. Fla. May
    4, 2022)...................................................................................................... 7

*FPL Energy Me. Hydro LLC v. FERC*,
    287 F.3d 1151 (D.C. Cir. 2002)....................................................... 42, 46

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ........................................................................... 51

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ............................................................................... 31

*Henderson v. Stalder*,
    287 F.3d 374 (5th Cir. 2002) .................................................... 14, 16, 18

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) ................................................................. 46

*U.S. ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ............................................................................... 22

*Louisiana ex rel. Landry v. Biden*,
    64 F.4th 674 (5th Cir. 2023)................................................................. 20

*Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric
    Admin.*,
    70 F.4th 872 (5th Cir. 2023)................................................................. 20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................... 5, 8, 13, 14, 18

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................... 21

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.*
    *Automobile Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 46

*Nat'l Fed. Indep. Bus. v. Occupational Safety & Health Admin.*,
    142 S. Ct. 661 (2022) .......................................................... 27, 34, 41, 42

*Oh v. Collecto, Inc.*,
    No. 20-01937 (KM) (ESK), 2021 WL 3732881 (D.N.J. Aug. 23, 2021) ................ 13

*Saxbe v. Bustos*,
    419 U.S. 65 (1974) ............................................................................. 39

*Schaffer ex rel. Schaffer v. Weast*,
    546 U.S. 49 (2005) .......................................................................... 8, 26

*Soc'y of Separationists, Inc. v. Herman*,
    959 F.2d 1283 (5th Cir. 1992) .............................................................. 8

*Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ................................................................ 4

*Texas Gen. Land Off. v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ................................................................ 6

*Texas v. Biden (Minimum Wage)*,
    No. 6:22-cv-00004, slip op. (S.D. Tex. Sept. 26, 2023)........................ 19, 33, 40, 51

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019).................................................... 3, 4

*Texas v. United States*,
    50 F.4th 498 (2022)........................................................................... 5, 8

*Texas v. United States (DAPA)*,
    809 F.3d 134 (5th Cir. 2015) ......................................... 6, 14, 16, 17, 18

*Texas v. United States*,
    Case No. 1:18-cv-00068, 2023 WL 5951196 (S.D. Tex. Sept. 13,
    2023)............................................................................................... 31

*Texas v. United States (DACA)*,
    549 F. Supp. 3d 572 (S.D. Tex. 2021) *aff'd in part, vacated in part,*
    *remanded*, 50 F.4th 498 (5th Cir. 2022) ................................................ 21

*Texas v. USA,*
   Case 1:14-cv-00254, ECF 347 (S.D. Tex. May 19, 2016) ...................................... 53

*Turkiye Halk Bankasi A.S. v. United States,*
   598 U.S. 264 (2023) ..................................................................... 32

*U.S. v. Sineneng-Smith,*
   140 S.Ct. 1575 (2020) .................................................................... 7

*United States v. Texas (Guidelines),*
   143 S. Ct. 1964 (2023) ......................................................... 5, 18, 19, 20, 21

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) .................................................................. 40, 41

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ................................................................... 40

*Whitfield v. United States,*
   543 U.S. 209 (2005) .................................................................... 33

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ............................................................... 4, 46, 50

*Worldcall Interconnect, Inc. v. F.C.C.,*
   907 F.3d 810 (5th Cir. 2018) ........................................................... 41

## Statutes

8 U.S.C. § 1152(d)(5)(A) .................................................................. 33

8 U.S.C. § 1182(d)(5) ............................................................... 7, 8, 28

8 U.S.C. § 1182(d)(5)(A) ....................... 7, 22, 23, 27, 31, 32, 33, 35, 37, 40, 41

8 U.S.C. § 1182(d)(5)(B) ............................................................ 32, 33

## Other Authorities

87 Fed. Reg. at 63507 .................................................................... 36

87 Fed. Reg. 63507, 63516 (Oct. 19, 2022) ............................................... 25

87 Fed. Reg. at 63508 ................................................................ 29, 37

87 Fed. Reg. at 63509 ................................................................ 28, 37

87 Fed. Reg. at 63516 .................................................................... 25

88 Fed. Reg. at 1243 ......................................................................................... 36, 37

88 Fed. Reg. 1243, 1253 (Jan. 9, 2023) ........................................................... 24

88 Fed. Reg. at 1244 ............................................................................................. 29

88 Fed. Reg. at 1245 ............................................................................................. 37

88 Fed. Reg. at 1246 ............................................................................................. 28

88 Fed. Reg. at 1253 ........................................................................................ 25, 37

88 Fed. Reg. at 1255 ........................................................................................ 36, 37

88 Fed. Reg. 1255, 1264 (Jan. 9, 2023) ........................................................... 25

88 Fed. Reg. at 1256 ............................................................................................. 29

88 Fed. Reg. at 1257-58 ....................................................................................... 37

88 Fed. Reg. at 1259 ............................................................................................. 28

88 Fed. Reg. at 1264 ........................................................................................ 25, 37

88 Fed. Reg. 1266, 1276 (Jan. 9, 2023) ........................................................... 24

88 Fed. Reg. at 1267 ........................................................................................ 36, 37

88 Fed. Reg. at 1268 ............................................................................................. 29

88 Fed. Reg. at 1269 ........................................................................................ 28, 36

88 Fed. Reg. at 1276 ............................................................................................. 25

88 Fed. Reg. at 1277 ............................................................................................. 37

88 Fed. Reg. at 1279 ............................................................................................. 36

88 Fed. Reg. at 1280 ............................................................................................. 37

## INTRODUCTION

Per ECF 271, Intervenor Defendants submit the following post-trial memorandum of law addressing the questions on which the Court requested further briefing during trial, as well as other matters relevant to the Court's adjudication. The answers to the Court's questions illustrate why Texas has failed to prove its case.

Texas asks this Court to accept a standing standard so low as to render it meaningless. Longstanding precedent and recent Supreme Court admonitions alike dispense with Texas's standing arguments: Texas cannot change its standing theory at the eve of trial; it cannot ask this Court to ignore the *evidence* of reduced net migration in the record; and it cannot rely on special solicitude as a substitute for evidence of the injury-in-fact and redressability that Article III demands.

On the merits, Texas seeks to recharacterize the Parole Pathways for people from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV Pathways") as permitting unlimited and undocumented immigration in order to argue that they contravene statutory authority—but that is simply false. The CHNV Pathways, which are justified by well-documented urgent humanitarian reasons and significant public benefit, permit a limited number of eligible individuals with sworn financial sponsors to be considered for parole on a case-by-case basis. Texas asks this Court to be the first *in over seven decades* to invalidate one of dozens of parole programs of its kind. Doing so would require this Court to substitute its own judgment for congressional intent and executive discretion over a program involving foreign policy—and to do so absent any evidence of harm.

1

Even if the Court permits Texas to invoke jurisdiction on its thin theory of harm, *and* finds that Texas has succeeded on the merits of its novel claims, the Court cannot grant the relief Texas seeks. Texas asks for an extraordinary nationwide injunction that would halt the CHNV Pathways and strip people who have obtained parole under it of their status, along with a vacatur of the program. Such relief would be unlawful in every respect. Because Texas concedes that total migration of individuals from CHNV countries has *decreased* since the CHNV Pathways took effect, it cannot establish *any* actual harm, let alone at a scale that outweighs the competing harms to Intervenors and the public interest. An order blocking the CHNV Pathways would extinguish the opportunities of Intervenors, like countless others, to exercise deeply held religious beliefs, reunify with their families, protect the lives of loved ones, and create economic opportunities for individuals and communities in need. Absent Texas's showing of harm, longstanding equitable principles do not permit this Court to enjoin the CHNV Pathways even in Texas, let alone nationwide.

Nor should the Court vacate the CHNV Pathways. To the extent the Court finds any errors, those errors could be cured by the agency—whether through notice and comment, re-assessing the harms, or altering program processes. Thus, the only appropriate course would be to remand without vacatur.

Finally, the Court most certainly should not strip people now living with the support of their sponsors of their immigration status. There would be absolutely no legal basis to support such an unprecedented order.

The sweeping nationwide relief Texas seeks is inappropriate, unlawful, and far outweighed by the harm it would cause to Intervenors, other sponsors, beneficiaries, families, employers, and communities—not to mention to countless Texans and Texas itself.

## RESPONSES TO THE COURT'S QUESTIONS

Intervenor Defendants provide concise answers below to each question raised by the Court. More fulsome explication for the complex questions as well as additional post-trial argument follow thereafter.

### 1. What does an "intermediate course," or limited relief, look like? [Trial Tr. vol. 2 of 2, 332:3-10]

Should the Court find the challenged action unlawful, an "intermediate course"—and indeed the only appropriate remedy—would be remand without vacatur. Any other remedy would risk significant disruption to international relations, global migration patterns, domestic immigration policy and agency resources, conditions along the southern border, and up to seven other ongoing parole programs affecting thousands of people, including Uniting for Ukraine ("U4U") and Afghan Allies Welcome. *See* Expert Declaration of Yael Schacher ("Schacher Expert Decl.") Int. Defs' Trial Ex. 141; Declaration of Blas Nuñez-Neto Declaration ("Nuñez-Neto Decl."), Fed. Defs' Trial Ex. HH ¶¶ 5-7, 27-51; *see also Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019) (finding remand without vacatur appropriate when vacatur "would be disruptive" and there is a "serious possibility" the agency's defects could be cured (citing *Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

3

Should the Court disagree, it still should not issue an injunction, as Texas has certainly proven no harm from the CHNV Pathways that outweighs the harm that an injunction would cause Intervenors, nonparties, and the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). A nationwide injunction would be still more unwarranted. *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021). Nor should the Court strip thousands of CHNV Pathways beneficiaries of their lawful status; Texas has provided no authority to support that draconian request. *See infra* Section IV.

## 2. What would the remedy be if the only violation is failure to engage in notice-and-comment? [Trial Tr. vol. 2 of 2, 332:3-10]

Remand without vacatur would be the most appropriate remedy. *See Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (ordering remand without vacatur following notice and comment violation); *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (same).

## 3. Explain the relevance of the Major Questions doctrine to this case. [Trial Tr. vol. 2 of 2, 310:13-17]

The Major Questions doctrine is not relevant to this case, and Texas has failed to sufficiently demonstrate its applicability here. *See infra* Section II(a)(iii).

## 4. Is standing determined at the time of the complaint, or later? [Trial Tr. vol. 2 of 2, 265:8-23]

As discussed extensively at trial, the Court must determine whether Plaintiff States had standing as of the date they filed the operative (amended) complaint, ECF 20, and Plaintiff States must carry the burden of proving they have standing with evidence at trial. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing

by a preponderance of the evidence."); *see also Texas v. United States,* 50 F.4th 498, 513 (2022) (hereinafter "*DACA*") ("At summary judgment, [the plaintiffs] can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." (cleaned up)). *See infra* Section I(a).

### 5. Can the Court consider data post-dating the complaint to determine standing? [Trial Tr. vol. 2 of 2, 267:7-10]

The Court can look to any evidence in the trial record, including evidence post-dating the complaint. Plaintiff States pled future injury as a result of the CHNV Pathways, *see* First Amended Complaint ("FAC"), ECF 20, and they bear the burden of proving those allegations "with the manner and degree of evidence required at the successive stages of litigation." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992).

### 6. Is $1 of harm sufficient to establish standing? [Trial Tr. vol. 2 of 2, 119:10-11]

Not here, where Texas complains only of indirect costs from a federal policy that does not regulate Texas. "[F]ederal policies frequently generate indirect effects on state revenues or state spending," and every such effect does not suffice for standing. *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023) (hereinafter "*Guidelines*"). In addition, Texas has not provided any evidence that it has suffered even one dollar of harm as a result of the CHNV Pathways. *See infra* Section I(b).

### 7. Can the Court factor reimbursements into the equation to determine standing? [Trial Tr. vol. 2 of 2, 267:11-270:5]

Yes, and it is required to do so. As discussed at trial, the Court must consider offsetting reimbursements and revenues that "arise from the same transaction as the

costs." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (hereinafter "*DAPA*").

*See infra* Section I(b).

8. **Is the expenditure of funds on one person paroled through the CHNV Pathways sufficient to give Texas standing, even if net migration has decreased? What authority establishes whether the Court can consider the net decrease in migration? [Trial Tr. vol. 2 of 2, 264: 16-21; 266: 3-11]**

No. Texas claims increased spending *as a result of increased migration caused by the CHNV Pathways*, *see* FAC, ECF 20 ¶ 5, but the CHNV Pathways have reduced total migration from CHNV countries. *See, e.g.,* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 31, n.16. Under binding precedent, the Court must consider "offsets" to total migration of individuals from CHNV countries because the total reduction is part of the "same transaction" as the CHNV Pathways themselves. *DAPA*, 809 F.3d at 155-56. *See infra* Section I(b).

9. **Is the Fifth Circuit's border wall decision in June 2023, which establishes that financial injury is sufficient to establish standing, still binding? How is it distinguishable here? [Trial Tr. Vol. 2 of 2, 276:10-278:3]**

No, because it predates *Guidelines* and cannot be reconciled with it. The standing analysis in *Texas General Land Office v. Biden*, 71 F.4th 264 (5th Cir. 2023) (hereinafter "*Texas GLO*"), particularly its analysis of indirect harm, *id*. at 273, and special solicitude, *id*. at 274, is materially indistinguishable from the argument Texas made and lost before the Supreme Court in *Guidelines*. Moreover, *Texas GLO* assessed standing at the motion to dismiss stage; it did not consider a factual record, let alone a developed record like this one, involving direct offsets to the alleged financial injury that Texas has refused even to try to calculate. *Id*. at 269.

6

10. **Can an ultra vires claim exist alongside an exceeding statutory authority claim under the APA? [Trial Tr. vol. 2 of 2, 308:11-16]**

Intervenor Defendants take no position on this issue.

11. **Is it a question of fact or law whether parole is being granted on a case-by-case basis? [Trial Tr. vol. 2 of 2, 305:25 – 306:6]**

Whether the Federal Defendants are granting parole on a "case-by-case" basis under the CHNV Pathways is a mixed question of fact and law. Whether parole is being granted on a case-by-case basis, in compliance with 8 U.S.C. § 1182(d)(5)(A), is a question of fact. *See, e.g.*, *Florida v. United States*, Case No. 3:21cv1066-TKW-EMT, 2022 WL 2431414, at *12 (N.D. Fla. May 4, 2022) ("[W]hether Defendants are truly making individualized case-by-case parole decisions in compliance with the statutory scheme is a disputed factual issue . . . ."). But because Congress expressly left "case-by-case" undefined in the statute, what it means to grant parole on a case-by-case basis is a question of law on which the Executive is entitled to substantial deference. *Id.* at *9 ("Congress's failure to define 'urgent humanitarian reasons' or 'significant public benefit' in § 1182(d)(5) gives [the federal agency] discretion to fill in the gaps.").

In any event, Texas expressly affirmed at trial that it is bringing only a facial, not an as-applied, challenge to the CHNV Pathways. *See* Trial Tr. vol. 2 of 2, 298:21–24. As a result, the Court should not consider whether Federal Defendants are, as a factual matter, granting parole on a "case-by-case" basis. *See U.S. v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("[C]ourts normally decide only questions presented by the parties.") (internal punctuation and citation omitted).

12.  **Whose burden is it to prove whether parole is being granted on a case-by-case basis? [Trial Tr. vol. 2 of 2, 305:25–306:6]**

It is Texas's burden to show that the Federal Defendants are not granting parole on a case-by-case basis as § 1182(d)(5) requires. *See, e.g.*, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[P]laintiffs bear the burden of persuasion regarding the essential aspects of their claims."). Plaintiff States have come nowhere close to meeting this burden. *See infra* Section II(a)(i).

## ARGUMENT

I.  **Texas Lacks Standing.**

   a.  **Standing Is Determined at the Time the Complaint is Filed and Requires Assessment of All Record Evidence.**

The Court must determine whether Plaintiff States had standing "at the time the [operative] complaint was filed." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992). Once a case has progressed to a trial on the merits, however, the standing elements are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan,* 504 U.S. at 561. "Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence." *Env't Tex. Citizen Lobby, Inc.*, 968 F.3d at 367; *see also DACA,* 50 F.4th at 513 (plaintiffs bear the burden of proving standing "with the manner and degree of evidence required at the successive stages of the litigation.").

Thus, while Texas's standing is assessed at the time the First Amended Complaint was filed on February 14, 2023, ECF 20, Texas shoulders the growing burden to *prove* its standing claims throughout the course of this litigation. Under these longstanding requirements, Texas has failed to prove standing.

### b. Texas Lacks Injury.

In the First Amended Complaint, Plaintiff States pled harm resulting from the CHNV Pathways allowing "potentially hundreds of thousands of *additional* aliens to enter each of their already overwhelmed territories."[1] FAC, ECF 20 ¶ 5 (emphasis added). Texas alleged categories of increased costs including education, healthcare, and "many other social services" that would supposedly increase due to the program. *Id.* at ¶ 64 ("As the number of illegal aliens *increases*, the number of illegal aliens receiving such services likewise increases.") (emphasis added). Nineteen of the additional twenty Plaintiff States alleged similar harm resulting from increased undocumented immigrants in their states. *See id.* at ¶¶ 64-139. At this stage of the case, mere allegations do not suffice to confer standing, and Texas has admitted it cannot prove those allegations because the record disproves them. Trial Tr. vol. 2 of 2, 131:24-132:20.

The trial record proves that at the time of the operative complaint—February 14, 2023—both total migration and border encounters with individuals from the CHNV countries had decreased dramatically. In January 2023, when the CHNV Pathways were implemented, border encounters with individuals from these four countries dropped by over 75%, and that decrease continued through February 2023. *Compare* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 55 with U.S. Customs and Border Protection

---

[1] Here and below, *supra* at 11, 12 and 31, Intervenor Defendants depart from their practice of replacing terminology for noncitizens and immigrants that they find pejorative in order to precisely state Texas's allegations.

Encounters: Southwest Border Venezuelan Nationals, FY 2023, Int. Defs' Trial Ex. 59; *see also* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 31, n.16 ("total CHNV arrivals fell to approximately 1,326 per day, a 44 percent reduction from their pre-CHNV process levels."); Memorandum of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief ("Economist Amici Curiae in Opp. to Pls' P.I."), ECF 222 at 8 ("In December 2022, CHNV migrants accounted for over a third of all DHS border encounters, but by February 2023 that number had dropped by roughly 77,000, to less than 10 percent of that greatly reduced total.").

Total migration by individuals from CHNV countries had thus *decreased* between when the CHNV Pathways were implemented in January 2023 and when the First Amended Complaint was filed in February 2023, and the undisputed trial record confirms it has *continued to decrease* since the filing of the complaint. Nuñez-Neto Decl., Fed Defs' Trial Ex. HH ¶¶ 29-31. This necessarily *reduced*, rather than increased, alleged state expenditures associated with individuals from CHNV countries. Thus, "[b]y their own argument, the huge drop in CHNV migration since December 2022 must mean the States spent *less* money on newly arrived CHNV nationals than they did before the Program went into effect . . . Texas thus reaps fiscal benefits—not harms—from the Program." Economist Amici Curiae in Opp. to Pls' P.I., ECF 222 at 13.

As the record evidence proves the opposite of Texas's alleged basis for standing, Texas has failed to carry its burden to prove injury-in-fact. This alone defeats standing and requires dismissal for lack of jurisdiction.

       i.   <u>The Court Should Not Accept Texas's New Theories of Standing, Which Are Meritless in Any Event.</u>

For nearly seven months leading up to trial, Texas complained of harm resulting from costs associated with allowing "more than a third of a million *more illegal aliens* into the United States annually" as a result of the CHNV Pathways. FAC, ECF 20 ¶ 6 (emphasis added). Texas complained the CHNV Pathways would increase the number of immigrants residing in Texas and thus increase costs associated with driver's licenses, education, law enforcement, and medical care. *Id.* at ¶¶ 3, 64-72; Pls.' Motion for Preliminary Injunction ("Pls' P.I."), ECF 22 at 24-27. In discovery responses, Texas confirmed that its case was based entirely on this theory of harm. Texas's Updated Discovery Response, Fed. Defs' Trial Ex. O ("Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the *increased presence of aliens* in Texas.") (emphasis added). The declarations that Texas proffered into the trial record are likewise based on this theory of harm. *See generally* Declaration of Sheri Gipson ("Gipson Decl."), Pls' Trial Ex. 4; Declaration of Rebecca Waltz ("Waltz Decl."), Pls' Trial Ex. 5; Declaration of James Terry ("Terry Decl."), Pls' Trial Ex. 6; Declaration of Susan Bricker ("Bricker Decl."), Pls' Trial Ex. 7. Yet, the record evidence clearly showed—and indeed, Texas admitted at trial—that there has been a net *decrease* in migration from the CHNV countries since the CHNV Pathways were implemented. Trial Tr. vol. 2 of 2, 131:24-132:20 (Mr.

Walters for the State of Texas responding "[t]hat is what the data looks like to me" when asked by the Court if Texas agrees that there are fewer individuals from CHNV countries coming to the United States after implementation of the CHNV Pathways).

Seeming to realize on the eve of trial that the facts were fatal to its theory of harm, Texas scrambled to salvage its case. *After* the parties completed discovery, briefed Texas's preliminary injunction motion, filed trial exhibit lists, and *after* Intervenor Defendants moved to dismiss on standing, Texas changed its theory completely. *Seven days* before trial, in its Proposed Findings of Fact/Conclusions of Law ("PFOF/COL"), Texas swapped its original theory of harm for another, which was otherwise unmentioned in any court filing up to that point. *See* ECF No. 244 at 16, ¶ 76.

Texas *now* claims that an increased presence of noncitizens (as Texas pled), or even an increased presence of noncitizens from the CHNV countries, is irrelevant, and that the Court can only narrowly consider costs associated with the specific "paroled aliens" who have entered through the CHNV Pathways. Pls' PFOF/COL, ECF 244 ¶ 76; s*ee also* Trial Tr. vol. 2 of 2, 130:1-3 ("[B]efore the program, there were zero coming through the program. One month later there is 30,000 coming through the program."); *see also id.* at 129:5-132:24. Texas's attempt to recast its theory of harm is both unpermitted and without merit.

*First*, binding precedent prohibits Texas's attempts to "move the [standing] goalposts" in this manner." *E.T.*, 41 F.4th at 717 ("At successive stages of this litigation, plaintiffs have changed their standing theory from 'increased risk' to

'reasonable access' to 'equal access.' The forfeiture rules—which apply to arguments in favor of standing as they do to other arguments in federal litigation . . . prohibit such efforts to move the goalposts."); *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived."); *Oh v. Collecto, Inc.*, No. 20-01937 (KM) (ESK), 2021 WL 3732881, at *4 (D.N.J. Aug. 23, 2021) ("The same principle applies to allegations to support standing. A plaintiff must include allegations of injury in the complaint and establish standing at the outset of a case, or the court is powerless to act. . . . Jurisdiction cannot be a moving target." (citing *Lujan*, 504 U.S. at 561)). The prohibition is critical here, where permitting Texas to shift their theory would prejudice Intervenor Defendants, who have had no opportunity to seek discovery on Texas's new standing theory, or to fully address it with evidence or in briefing. In short, it would be grossly unfair to consider Texas's new theory, and the Court should find it forfeited. *Id.*

*Second*, if the Court does consider Texas' brand-new theory, it nonetheless fails on its merits. As a threshold issue, Texas wrongly argued that it suffers harm from the CHNV Pathways because of increased spending compared to a "baseline of zero" individuals before the program. Trial Tr. vol 2 of 2, 259:6-8. But that mischaracterizes the state of migration from CHNV countries prior to the implementation of the CHNV Pathways, which was higher than it was after its implementation. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 26. Thus, this case does not concern "a choice between regular migration and no migration at all." Economist Amici Curiae in Opp. to Pls'

13

P.I., ECF 222 at 13 n.11. To the extent Texas claims harm from such a "misleading baseline," that alleged harm is not concrete or actual. *Lujan*, 504 U.S. at 560.

Moreover, even if the Court does accept Texas's false baseline, Texas's only legal argument supporting its belated theory is that the Court may not consider "offsets" to total migration of people from CHNV countries. Trial Tr. vol. 2 of 2, 248:23-251:1. Texas is wrong. Those offsets, *i.e.*, the decrease in net migration, "arise from the same transaction" as the CHNV Pathways themselves, and thus must be considered in the standing analysis. *DAPA*, 809 F.3d at 155.

In *DAPA*, the Fifth Circuit rejected the "offset" to driver's license costs because the downstream "benefits to the state" that it considered, such as vehicle registration fees, were not "sufficiently connected" to the costs of issuing driver's licenses. *Id.* at 156. In doing so, the court distinguished *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002), where the offsetting costs in question "involved a much tighter nexus" and, therefore, had to be considered. *DAPA*, 809 F.3d at 156. *Henderson* concerned a challenge to a Louisiana statute authorizing the issuance of pro-life automobile license plates. 287 F.3d at 376-77. The Fifth Circuit held that the individual plaintiffs, who complained of the use of their tax money to distribute the license plates, lacked standing in part because the fees that consumers pay in exchange for the license plates "offset the administrative cost" associated with their issuance—and thus, there was no basis to conclude that the pro-life license plates cost the State more on net. *Id.* at 379.

Here, the record shows the CHNV Pathways *themselves* include harsh ineligibility requirements that disincentivize and thereby reduce unauthorized migration—not to mention parole and the ability to travel to an interior port of entry as incentives for using the limited CHNV Pathways. *See, e.g.,* United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (last updated July 12, 2023), Int. Defs' Trial Ex. 68; United States Citizenship and Immigr. Servs., Frequently Asked Questions About the Process for Cubans, Haitians, Nicaraguans, and Venezuelans (last updated June 14, 2023), Int. Defs' Trial Ex. 69. The CHNV Pathways also rely on and incorporate negotiations with the Government of Mexico that resulted in new removal mechanisms for unauthorized entrants from the CHNV countries. *See, e.g.,* U.S, Dep't of Homeland Sec., Parole Process for Certain Cuban Nationals (Dec. 22, 2022), Int. Def. Trial Ex. 70 ("Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the [Government of Mexico's] acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between [ports of entry]."); Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 25.[2] Because "the costs of unauthorized entry have risen, while the CHNV Program offers the benefit of a new legal entry alternative," the

---

[2] *See also* U.S. Dep't of Homeland Sec., Parole Process for Certain Haitian Nationals (Dec. 22, 2022); Int. Defs' Trial Ex. 71; U.S. Dep't of Homeland Sec., Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022), Int. Defs' Trial Ex. 72; U.S. Dep't of Homeland Sec., Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022), Int. Defs' Trial Ex. 73; U.S. Dep't of Homeland Sec., Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022), Int. Defs' Trial Ex. 74.

CHNV Pathways disincentivize unauthorized migration. Economist Amici Curiae in Opp. to Pls' P.I, ECF 222 at 6. Thus, the factors contributing to the net decrease in migration from CHNV countries are a part of the "same transaction" as the CHNV Pathways themselves. *DAPA*, 809 F.3d at 155.

To the extent Texas complains of costs associated with CHNV nationals, the corresponding net decrease in migration from CHNV countries is a *direct* "offset" to those purported costs that arise from the CHNV Pathways themselves, and so that alleged injury is "insufficient to confer standing." *Henderson*, 287 F.3d at 381.

ii. Regardless of Net Migration, Texas Has Failed to Establish Injury Because the Court Must Consider Net Costs.

In addition to the fact that Texas's proffered evidence purporting to show costs associated with CHNV Pathways has nothing to do with the CHNV Pathways, *see* Int. Defs' Motion to Dismiss, ECF 197 at 11-12, Texas's alleged financial injury suffers from further fatal flaws.

The evidence in the record concerning Texas's costs associated with education, drivers' licenses, healthcare, public safety, and other economic impact prove that Texas receives offsetting reimbursements, revenues, fees, and other countervailing benefits within each category. Because Texas has affirmatively refused to produce complete revenue data in discovery, Int. Defs' Advisory, ECF 177 at 1-2; Pls' Response to Int. Defs' Advisory, ECF 178 at 4, even after the Court explicitly put Texas "on notice" that "net costs as opposed to gross costs . . . [is] an issue," July 7, 2023 Tr. 27:17-285, it cannot prove that its costs are not fully offset. Thus, Texas cannot carry its burden to prove injury-in-fact on this basis alone.

16

Texas's incomplete revenue disclosures confirm, however, that Texas's cost estimates ignore fees that directly offset driver's license costs, in addition to the fiscal benefits from increasing driver's license access. Expert Declaration of Cyierra Roldan ("Roldan Expert Decl."), Int. Defs' Ex. 140 ¶¶ 22-24. To the extent Texas argues that additional fees like vehicle registration fees cannot be considered because they do not arise from the transaction of providing a driver's license, then by Texas's logic, neither can it rely on overhead and infrastructure costs for the DMV's general operation (which comprise the vast majority of Texas's estimated costs). Gipson Decl., Pls' Ex. 4 ¶ 9. If the Court considers only the driver's license transaction itself, as Texas purports it should, the record in this case shows that Texas makes an average of $30 in net profit for each license it provides to a noncitizen, disproving any injury regardless of migration statistics. *See* Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶ 25.

In *DAPA,* federal defendants did not dispute Texas's accounting of costs associated with issuing driver's licenses, including Texas's conclusion that it would lose money on each license issued to the estimated 500,000 noncitizens it estimated would receive Texas licenses in a very short period of time if the program at issue were allowed to go into effect. 809 F.3d at 155. In other words, *DAPA* did not consider this argument or the factual record in this case, which demonstrates that Texas makes a profit on the (many fewer) licenses for which CHNV parolees are eligible.

Similarly, Texas's estimated education costs ignore both federal compensation for students receiving bilingual education and the value of education as an

investment from which the state benefits. Joint Expert Declaration of Patricia Gándara and Gary Orfield ("Gándara and Orfield Joint Expert Decl."), Int. Defs' Trial Ex. 136 ¶¶ 17-19. And Texas's claims about uncompensated healthcare ignore federal compensation that benefits Texas. Expert Declaration of Leighton Ku ("Ku Expert Decl."), Int. Defs' Trial Ex. 138 ¶¶ 12-14. Moreover, even *if* Texas had proven a net increase in migration (which it has not), increased immigration often suppresses crime which decreases law enforcement costs. Expert Declaration of Charis Kubrin ("Kubrin Expert Decl."), Int. Defs' Trial Ex. 139 ¶ 19. Finally, more broadly, economists across the political spectrum agree that immigration increases economic growth. Expert Declaration of Jennifer Hunt ("Hunt Expert Decl."), Int. Defs' Trial Ex. 137 ¶ 7.

Since these "offsetting benefits . . . arise from the same transaction as the costs," the Court must consider them in determining Texas's standing—which Texas bears the burden to prove. *DAPA*, 809 F.3d at 155. When properly considered, the offsets demonstrate that Texas has failed to prove *net costs* to the state resulting from the CHNV Pathways, and therefore failed to establish standing. *Henderson*, 287 F.3d at 381.

### c. Texas's Alleged Injury is Not Redressable.

Additionally, Texas has failed to establish Article III standing because it has failed to establish "the likelihood that a favorable decision will redress the injury." *Guidelines*, 143 S. Ct. at 1970; *see also Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61). "When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of

someone else, *much more* is needed' to establish standing." *Guidelines*, 143 S. Ct. at 1971 (emphasis added). When states complain only of "indirect effects on state revenues or state spending . . . standing can become more attenuated." *Id.* at 1972 n.3.

Here, Texas complains exclusively of "indirect effects on state revenues or state spending" arising from a policy that implements the Executive's statutory authority to exercise discretion over whom to parole. Like the policy at issue in *Guidelines*, the CHNV Pathways do not exercise coercive authority over Texas. *Id.* Thus, the alleged indirect injuries are again too "attenuated" and therefore not cognizable. Indeed, whether or not one dollar of injury is sufficient to confer standing in cases concerning policies that *directly regulate* state coffers, *see Texas v. Biden (Minimum Wage)*, No. 6:22-cv-00004, slip op. at 6-8 (S.D. Tex. Sept. 26, 2023) (hereinafter "*Minimum Wage*"), such is not the case here, where the immigration policy at issue does not directly regulate Texas, and Texas has failed to prove even one dollar of harm from the CHNV Pathways. *See supra* Section (I)(b)(i).[3]

Moreover, Texas's alleged injury is not redressable because Texas has not claimed *any* injury traceable to the CHNV Pathways; it complains of alleged costs incurred from immigration generally, and mostly from undocumented immigration. *E.g.,* FAC, ECF 20 ¶¶ 6, 64. Thus, *even if* immigrants—undocumented or otherwise—

---

[3] Unlike in *Minimum Wage*, where "[t]he evidence of Texas's injury [was] generally uncontroverted by Defendants," slip op. at 7, here, Federal and Intervenor Defendants have vigorously disputed Texas's alleged injury, and Intervenor Defendants were denied in their efforts to obtain additional discovery regarding the nature and scope of Texas's claimed injuries. *See* July 7, 2023 Min. Entry.

impose actual injury on Texas, and *even if* this Court finds the CHNV Pathways unlawful, an order blocking the CHNV Pathways still would not redress those purported harms because an order would not curtail undocumented immigration. Indeed, the record shows Texas's alleged costs would increase if the CHNV Pathways are blocked. *See, e.g.,* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 39-40.

Finding otherwise could impermissibly "run up against the Executive's Article II authority to enforce federal law," including in the immigration context, which implicates "foreign policy objectives." *Guidelines*, 143 S. Ct. at 1971-72. That is particularly true here, where the Executive is endowed with exclusive authority to implement the parole statute on which the CHNV Pathways are premised, and where interference with such authority obstructs federal foreign policy. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 48-51.

Texas's alleged injury is not redressable and therefore Texas lacks standing.

### d. Special Solicitude Has Been Narrowed, Further Undermining Texas's Standing.

Special solicitude cannot establish Texas's standing. First, "[r]egardless of the applicability of the special solicitude, [states] must still satisfy the basic requirements of standing." *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683–84 (5th Cir. 2023); *see also Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023) ("[Special solicitude] is not a standing shortcut when standing is otherwise lacking . . . [It] does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and

particularized."). Because Texas has failed to satisfy those basic requirements, *supra* Sections (I)(b)-(c), special solicitude is irrelevant.

Further, in rejecting Texas's standing theory in *Guidelines*, the Supreme Court failed even to mention special solicitude and described the case establishing that doctrine narrowly, as involving "a statutorily authorized petition for rulemaking, not a challenge to the Executive's enforcement discretion." 143 S. Ct. at 1975 n.6 (citing *Massachusetts v. EPA,* 549 U.S. 497 (2007)). The Court made clear that in cases such as this one, where the plaintiff is not directly regulated and claims injury only indirectly, its burden to prove standing is higher. *Compare id*. at 1970 ("When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing.") *and id*. at 1972 n.3 ("When states complain only of "indirect effects on state revenues or state spending . . . standing can become more attenuated."); *with Texas v. United States (DACA),* 549 F. Supp. 3d 572, 590 (S.D. Tex. 2021) (defining special solicitude as a "relaxed standard in the traditional causation and redressability analysis of standing") *aff'd in part, vacated in part, remanded*, 50 F.4th 498 (5th Cir. 2022). That "relaxed standard" for which Texas advocates is irreconcilable with the majority opinion in *Guidelines* requiring "much more" in cases like this.

Confirming as much, Justice Gorsuch's concurrence indicated that the majority opinion suggests the Court has now abandoned special solicitude altogether. *Guidelines*, 143 S. Ct. at 1977 (Gorsuch, J., concurring) ("[I]t's hard not to think . . . that lower courts should just leave that idea [of special solicitude] on the shelf in

future [years].") (internal citations omitted). Because the majority opinion in *Guidelines*—issued after *Texas GLO*, *supra* Short Answer 9—made clear that the burden to prove standing in cases such as this is *higher*, the low standard of special solicitude cannot apply.

Indeed, even if the doctrine is not entirely obsolete, Texas cannot articulate any concrete way in which it actually helps them here. Thus, Texas lacks standing.

## II. Texas's Merits Arguments Fail.

### a. The CHNV Pathways Are Consistent with the Statute.

The CHNV Pathways are consistent with both the statutory text and with Congressional intent. No evidence in the trial record proves otherwise.

#### i. The CHNV Pathways Comport with Unambiguous Statutory Text.

As the Court and the parties acknowledged at trial, Congress left undefined and up to the interpretation of the executive the key statutory terms: "case-by-case," "urgent humanitarian reason," and "significant public benefit." *See, e.g.*, Trial Tr. vol. 2 of 2, 10:18-11:2. What is more, Congress said expressly that the parole authority would be exercised at the executive's discretion. *See* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . *in his discretion* parole into the United States . . ."); *see also U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543-44 (1950) ("It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." (internal punctuation and citation omitted)). As Justice Kavanaugh observed in his

concurrence in *Biden v. Texas*, "every President since the late 1990s has employed the parole option," and "[b]ecause the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101." 142 S. Ct. 2528, 2548.

*Case-by-case.* As noted above, *supra* Short Answer 11, Texas has disclaimed an as-applied challenge to the CHNV Pathways. The Court need not—and should not—consider whether, as an as-applied, factual matter, Federal Defendants are granting parole under the CHNV Pathways on a case-by-case basis. Nevertheless, the evidence in the record shows that under the CHNV Pathways, DHS paroles individuals "under such conditions as [it] may prescribe only on a case-by-case basis," just as the statute commands. *See* 8 U.S.C. § 1182(d)(5)(A). Individualized case-by-case assessment is built into the discretionary grant of parole at multiple stages in the process, including:

> (1) in adjudicating the completed I-134A form, both when USCIS considers whether the applicant meets the requisite criteria and when it determines whether the sponsor is able to financially support the beneficiary;

> (2) in deciding whether or not to grant individualized travel authorization, which requires the parole beneficiary to submit additional personal information to USCIS to establish their eligibility for travel authorization *and* a discretionary grant of parole; and

(3) at the port of entry, where CBP screens the individual parole beneficiary in person to again determine whether parole is warranted. *See, e.g.*, United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (last updated July 12, 2023), Int Defs' Trial Ex. 68; Trial Tr. Vol. 1, 87:23-88:18 (noting that it took Intervenor Defendant Eric Sype's sponsored parole beneficiary "around three hours to be processed through immigration").

Both the sponsor and the parole beneficiary are informed that "parole is a discretionary determination made by CBP at the port of entry, based on a finding that parole is warranted due to urgent humanitarian reasons or significant public benefit." United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Int Defs' Trial Ex. 68. DHS guidance to the USCIS and CBP officers responsible for the determinations referenced above confirms that, at multiple points in the process, those officers retain discretion to grant or deny parole. *See, e.g.*, Fed. Defs' Trial Exs. K, L.

The Federal Register Notices (FRNs) for each CHNV Pathway likewise confirm the discretionary nature of the grant of parole, emphasizing that "[e]ach individual arriving at a [port of entry]" through the CHNV Pathways "will be inspected by CBP and considered for a grant of discretionary parole . . . on a case-by-case basis." *See, e.g.*, Implementation of a Parole Process for Cubans ("Cuban Parole Process FRN"), 88 Fed. Reg. 1266, 1276 (Jan. 9, 2023); Implementation of a Parole Process for Haitians ("Haitian Parole Process FRN"), 88 Fed. Reg. 1243, 1253 (Jan. 9, 2023);

Implementation of a Parole Process for Nicaraguans ("Nicaraguan Parole Process FRN"), 88 Fed. Reg. 1255, 1264 (Jan. 9, 2023); Implementation of Parole Process for Venezuelans ("Venezuelan Parole Process FRN"), 87 Fed. Reg. 63507, 63516 (Oct. 19, 2022). The FRNs further warn that "[i]ndividuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole . . . as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention." *See, e.g.*, Cuban Parole Process FRN, 88 Fed. Reg. at 1276; Haitian Parole Process FRN, 88 Fed. Reg. at 1253; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1264; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63516.

Intervenor Defendant Eric Sype's testimony confirms the rigor of the adjudicative process. Mr. Sype testified that the I-134A application process was very "time consuming and involved," Trial Tr. vol. 1 of 2, 49:11-22, and that Oldrys (the beneficiary he sponsored) took "around three hours to be processed through immigration" at the port of entry. *Id.* at 88:2-18. There is no contrary evidence in the record suggesting that Oldrys, or indeed any other beneficiary of the CHNV Pathways, was granted parole in a manner inconsistent with the parole statute's case-by-case requirement.

Texas musters only one argument that parole under the CHNV Pathways is not granted on a case-by-case basis. This argument does not carry Texas's burden to demonstrate that the CHNV Pathways are inconsistent with the statutory text. *See,*

*e.g.*, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[P]laintiffs bear the burden of persuasion regarding the essential aspects of their claims.").

Texas argues that the approval rate of the CHNV Pathways is so high that parole cannot possibly be granted on a case-by-case basis, but instead must be granted "en masse." Pls' P.I., ECF 22 at 15-16. To establish the allegedly high approval rates of the CHNV Pathways, Texas points to data on the number of "parole process applications" received, adjudicated, approved, denied, and pending. Pls' Trial Ex. 41. There are, however, at least three different stages of adjudication in the CHNV Pathways (the I-134A application; travel authorization; and port of entry assessment), and Texas has not proffered any evidence clarifying which stage of the process the cited "parole process application" data reflects. Without such evidence, the data sheds no light on, and certainly provides no evidence of, allegedly "en masse" grants of parole. Because ineligible individuals are winnowed out at *each* stage, the Court cannot draw any reliable inference about overall approval rates from the single-point-in-time approval rate data cited by Texas.

There is simply no inconsistency between a high approval rate and case-by-case consideration, as can be seen everywhere in everyday life. If a high approval rate is tantamount to acting "en masse," then the Senate acted "en masse" when it confirmed 94.7 percent of President Trump's Circuit Court nominees;[4] court security officers at federal courthouses act "en masse" when they permit virtually everyone

---

[4] Congressional Research Service, *Judicial Nominations Statistics and Analysis: U.S. Circuit Court and District Courts, 1977-2022* (Apr. 3, 2023), *available at* https://crsreports.congress.gov/product/pdf/R/R45622.

entry who queues up for the security line each day; and the Transportation Security Administration likewise acts "en masse" with regards to the approximately 2.5 million passengers who pass through their security checkpoints at airports every day.

To support its claims of "en masse" grants of parole, Texas also cites Justice Alito's dissent *Biden v. Texas*, in which he observed that parole of more than 27,000 individuals per month at the border gives rise to an inference that the Government is not really making these [parole] decisions on a case-by-case basis." 142 S. Ct. at 2528. Not only is Justice Alito's observation in dissent is neither controlling nor probative, but Texas is trying to compare apples and oranges. Parole granted in the context discussed in that case is not programmatic and does not involve any specific, pre-determined criteria for parole eligibility; rather, it affects all individuals considered for parole at the southwest border pursuant to 8 U.S.C. § 1182(d)(5)(A). By contrast, the CHNV Pathways involve the consideration of a narrow group of self-selecting, *prescreened applicants* who must fit specific, pre-determined eligibility criteria that were developed in connection with the Executive's consideration of the urgent humanitarian reasons and significant public benefits at stake. Any inference that the Court could draw from Justice Alito's dissent on non-programmatic parole in *Biden v. Texas* has little, if any, relevance here.

And similar to Texas's attempt to equate a high approval rate with acting "en masse," the bare number of individuals whose applications are approved within a particular time period is not a reasoned or logical basis for concluding that those individuals did not receive case-by-case consideration. Arguments from that basis are

mere speculation, and *far* more evidence than those numbers alone would be necessary to reach any conclusion. Yet here, and despite having every opportunity to develop the record on this issue in discovery, Texas has proffered nothing beyond speculation, unsupported by actual evidence.

*Urgent humanitarian reason/significant public benefit.* The FRNs for each of the CHNV Pathways articulate why the case-by-case parole of nationals from the CHNV countries is necessary "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). As extensively documented by the Administrative Record, each FRN provides detailed information about the political, economic, and humanitarian crises occurring in each of the CHNV countries that have "led tens of thousands of Haitians to lose hope and attempt to migrate," Haitian Parole Process FRN, 88 Fed. Reg. at 1246; "have pushed thousands of Nicaraguans to seek humanitarian relief . . . in the United States," Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1259; have caused Cubans to "flee[] the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980," Cuban Parole Process FRN, 88 Fed. Reg. at 1269; and "have caused nearly 7 million Venezuelans to flee their country," Venezuelan Parole Process FRN, 87 Fed. Reg. at 63509. *See also see also* Fed. Defs' Trial Exs. A, B, C, D.

In addition, citing this evidence but also specifically the significant increase in Cubans, Haitians, Nicaraguans, and Venezuelans arriving at the United States border in 2022—together, nationals of the four countries made up approximately forty percent of the total number of migrants presenting at the border—each FRN

states that the "temporary, case-by-case parole" of qualifying nationals of the CHNV countries "will provide a significant public benefit for the United States by reducing unauthorized entries along our [Southwest border] while also addressing the urgent humanitarian reasons" causing the displacement of hundreds of thousands of Cubans, Haitians, Nicaraguans, and Venezuelans. *See* Cuban Parole Process FRN, 88 Fed. Reg. at 1268; Haitian Parole Process FRN, 88 Fed. Reg. at 1244; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1256; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63508. Each FRN further identifies additional significant public benefits of the CHNV Pathways, including enhanced border security; reduced irregular migration; the ability to vet individuals before they arrive in the United States; reduced strain on DHS personnel and resources, particularly along the border with Mexico; disincentivizing dangerous irregular travel that jeopardizes migrant lives and safety and enriches smuggling networks; and the fulfillment of important foreign policy goals to manage migration collaboratively. *Id*. Texas disputes none of these facts; nor do they seriously contend that these circumstances fail to meet the statutory criteria.

At trial, the Court expressed concern that a broad interpretation of the statutory parole authority could allow the executive to grant parole even to individuals seeking to come to the United States for purely economic reasons. Trial Tr. vol. 2 of 2, 182:7-13. The CHNV Pathways do not present that situation. The FRNs for the CHNV Pathways reflect multiple interconnected considerations related to both urgent humanitarian reasons *and* significant public benefits that went into the

creation and adoption of each Pathway, including important foreign policy goals, specific humanitarian crises in the CHNV countries, and, as reflected in CBP data, the sharp increase in migration at the United States' southern border, specifically of CHNV nationals, in the months immediately preceding the adoption of the CHNV pathways. *See* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2022, Int. Defs' Trial Ex. 52; U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 52. All of these considerations speak to and provide the foundation for the urgent humanitarian reasons and significant public benefits underlying the CHNV Pathways. These conditions might overlap with or exacerbate economic need in individual cases, but nothing about that possibility makes the CHNV Pathways inconsistent with the statute. In short, this case neither requires nor justifies deciding the outer bounds of the parole authority.

The parole granted to Intervenor Defendant Eric Sype's beneficiary, Oldrys, bears out these considerations: Mr. Sype testified that Oldrys sought parole to the United States because, among other things, Oldrys's community has been impacted by multiple tropical storms and hurricanes which caused his in-laws to lose their home and political uprisings that caused "basically all economic activity" in the country to stop, such that "there was no work for any extended period of time." Trial Tr. vol 1 of 2, 82:2-83-9.

Texas does not rebut the humanitarian reasons or significant public benefits advanced by the CHNV Pathways. Instead, Texas claims (in wholly conclusory

fashion) that the statutory language does not permit the executive to "admit entire categories of aliens." Pls' P.I., ECF 22 at 15 (quoting H.R. Rep. No. 104-496, at 180 (1996)). Not only is this assertion just a conclusion, but it is wrong. It is undisputed that this language from the legislative history concerns proposed amendments that Congress *rejected*. Intervenor Defendants' Post-Trial Proposed Findings of Fact/Conclusions of Law, ¶¶ 115-119; *see also* Trial Tr. vol. 2 of 2, 15:14-18:22, 162:18-163:2. Simply put, Congress refused to narrowly limit what qualified as an "urgent humanitarian reason" or a "reason deemed strictly in the public interest." Congress's rejection of this qualifying language defeats Texas's argument. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation.").

Similarly unpersuasive is the interpretation Judge Hanen recently adopted in *Texas v. United States*, Case No. 1:18-cv-00068, 2023 WL 5951196 (S.D. Tex. Sept. 13, 2023). Relying exclusively on an inapposite paragraph of a 2008 agency memorandum, Judge Hanen held erroneously (and arguably in *dicta*), that parole may only be granted under 8 U.S.C. § 1182(d)(5)(A) pursuant to "two Congressionally limited exceptions"—for "urgent medical, family, and related needs" and to "those individuals aiding law enforcement." *Id.* at *15. But the legislative history *actually* reflects that Congress considered and declined to limit the parole authority in this manner, choosing instead to leave the interpretation of "urgent humanitarian reasons" and "significant public benefits" to the discretion of the executive.

31

Wherever the "line" or outer bound limiting the executive's broad discretionary authority might be, it certainly is not where Texas claims it is; and in any event, this case does not require the Court to draw it. The evidentiary record shows that the CHNV Pathways are wholly consistent with the plain text of 8 U.S.C. § 1182(d)(5)(A), and Texas has not met its burden to show otherwise, either as a matter of fact or law.

Texas also argues the executive may not consider the aggregate effects of a broader parole program to determine that parole would satisfy an "urgent humanitarian reason" or "significant public benefit." Pls. P.I., ECF 22 at 17-18. Texas claims the statute requires the executive to determine that each grant of parole to each individual beneficiary would be for an urgent humanitarian reason or significant public benefit. *Id.* But Texas points to no command in the statute requiring this—and it cannot because such a command does not exist. Nor does Texas cite any precedent supporting their ahistorical interpretation of the statute—and it cannot, because such precedent does not exist.

To the contrary, the statute as a whole makes plain that the requirement to make individualized (non-aggregate) assessments does *not* apply here. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (discussing the courts' "duty to construe statutes, not isolated provisions"). Congress imposed this exact condition on a distinct and readily identifiable group of potential parolees—those already determined to be refugees—in the immediately following statutory provision, § 1182(d)(5)(B). Therein, Congress expressly commanded that the Attorney General may parole a refugee into the United States only when he or she "determines that

compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States." 8 U.S.C. § 1182(d)(5)(B) (emphasis added). Congress did not employ this narrower condition in the provision pursuant to which the CHNV Pathways were adopted, § 1182(d)(5)(A).

Congress's inclusion of this individual-level assessment requirement in § 1182(d)(5)(B) "clearly demonstrates that it knows how to impose such a requirement when it wishes to do so," and that it clearly decided *not* to impose that requirement for the relevant statutory provision, § 1182(d)(5)(A). *Whitfield v. United States*, 543 U.S. 209, 216 (2005). More generally, the lack of a similar specific command in 8 U.S.C. § 1152(d)(5)(A), combined with the lack of any definition or guidance for the meaning of "case-by-case," confirms both that an individualized assessment of the urgent humanitarian reason or significant public benefit for a specific individual's parole is not required, and that Congress left it to the discretion of the executive how to grant parole on a "case-by-case basis." *Cf. Minimum Wage*, No. 6:22-cv-00004, slip op. at 21 (S.D. Tex. Sept. 26, 2023) (contrasting different statutory provisions and concluding that a clear expression of Congress's direction in one section and its absence from another "demonstrates that Congress knew how to" impose a certain a directive and therefore "did no such thing with respect to" the provision lacking the same statement).

But even if the Court determines that, as a matter of statutory interpretation, § 1182(d)(5)(A) requires the executive to assess the urgent humanitarian reason or significant public benefit at the individual level, the record reflects that this is

consistent with the CHNV Pathways. In fact, there is *no* evidentiary basis to conclude otherwise. The record evidence reflects that sponsors and potential parole beneficiaries are warned multiple times that parole is granted only on a case-by-case basis; that sponsors must explain why they believe parole for the individual they are sponsoring will provide a significant public benefit or satisfy an urgent humanitarian reason; and that individual beneficiaries face individualized assessment upon arrival at ports of entry. *See, e.g.*, United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Int. Defs' Trial Ex. 68; Trial Tr. vol. 2 of 2, 5:19-6:6.

Oldrys, who sought parole pursuant to the CHNV Pathways after facing severe economic instability in the wake of political unrest and natural disasters in Nicaragua, *see* Trial Tr. vol. 1 of 2, 46:22–47:15; 81:24–82:23, was processed for three hours at the port of entry before being granted parole. *Id*. at 87:23-88:18. Texas has no evidence that this individualized process was inconsistent with the statute. Indeed, Texas has provided no evidentiary basis to conclude that Oldrys's parole, or any other grant of parole under the CHNV Pathways, is inconsistent with its erroneously narrow interpretation of the parole statute.

> ii.  <u>The CHNV Pathways Are Consistent with Congressional Intent.</u>

The CHNV Pathways likewise comport with seven decades of prior uses of the parole authority, further illustrating their consistency with Congressional intent.

As the Supreme Court recently recognized in *Biden v. Texas*, "Every administration, including the Trump and Biden administrations, has utilized [the parole] authority to some extent." 142 S. Ct. at 2543. Indeed, different

34

administrations have exercised their discretion under the parole authority in several ways ever since creating the parole authority in 1952 and codifying it in its modern form in the 1996 enactment of IIRIRA. And Congress—through its *enactments*, as opposed to discussions of ultimately rejected amendments to which Texas tethers its arguments—has *consistently* expressed approval of the Executive's programmatic use of the parole authority. As detailed below, this includes by affirmatively ratifying certain parole programs; by declining to defund, prohibit, or otherwise roll back any parole program or grants thereunder; and by rejecting attempts to prevent or otherwise limit the executive's use of the parole authority to create programs allowing certain broadly defined populations to be considered for parole on a case-by-case basis.

The CHNV Pathways comport with numerous other executive exercises of the parole authority that Congress has either ratified or to which it has acquiesced. It is Texas's legal challenge to the CHNV Pathways, and not the Pathways themselves, that contravene Congressional intent.

*Congressional Ratification.* The record details multiple instances when Congress ratified the executive's use of the parole authority by legislating to extend benefits to individuals who had been granted parole under programs created pursuant to 8 U.S.C. § 1182(d)(5)(A). *See, e.g.*, Int. Defs' Trial Exs. 10, 14, 15, 16;[5] *see*

---

[5] Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689 (1996), Int. Defs' Trial Ex. 10; National Defense Authorization for Fiscal Year 2020, Pub. L. NO. 116-92, 133 Stat. 1198 (2019), Int. Defs' Trial Ex. 14; Extending Government Funding and Delivering

*also* Schacher Expert Decl., Int. Defs' Trial Ex. 141. While the CHNV Pathways share DNA with many of these prior ratified programs, of particular relevance here is legislation providing benefits for Ukrainians paroled through U4U. Fed. Defs' Trial Ex. A at Cuba AR_000069. The CHNV Pathways are expressly "modeled on the successful Uniting for Ukraine (U4U)" program. *See* Cuban Parole Process FRN, 88 Fed. Reg. at 1279; Haitian Parole Process FRN, 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63507.

Like the U4U program, the CHNV Pathways were created to provide, among other things, a "safe, legal, and orderly pathway" for individuals who have been displaced from their countries due to crises. *Compare* Fed. Defs' Trial Ex. A at Cuba AR_000069 *with* Cuban Parole Process FRN, 88 Fed. Reg. at 1267; Haitian Parole Process FRN, 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63507. Like the U4U program, the CHNV Pathways were adopted, in part, in response to an unprecedented uptick in Southwest border encounters with nationals of the pertinent countries before adoption of the program. *Compare* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 56 *with* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2021, Int. Defs' Trial Exs. 52, 53; *see also* Cuban Parole Process FRN, 88 Fed. Reg. at 1269; Haitian Parole

---

Emergency Assistance Act, Pub. L. No. 117-43, Div. C, 135 Stat. 344, 372-379 (2021), Int. Defs' Trial Ex. 15; Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136 Stat. 1211 (2022), Int. Defs' Trial Ex. 16.

Process FRN, 88 Fed. Reg. at 1245; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1257-58; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63509. And like the U4U program, parole under the CHNV Pathways requires a United States-based sponsor to commit to financially supporting the paroled beneficiary for the duration of their parole. *Compare* Fed. Defs' Trial Ex. A at Cuba AR_000070 *with* Cuban Parole Process FRN, 88 Fed. Reg. at 1267; Haitian Parole Process FRN, 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63508.

In form and function, the CHNV Pathways are materially indistinguishable from U4U and other similar exercises of the parole authority that Congress has ratified and effectively approved. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 145 (2000) (holding that congressional actions premised on an agency's interpretation of its statutory authority "effectively ratified" agency's interpretation). If anything, U4U represents an even *broader* use of parole power: the executive placed no limit on the number of individuals who could be paroled through U4U, whereas the executive did so limit the CHNV Pathways. *Compare* Fed. Defs' Trial Ex. A at Cuba AR_000069 *with* Cuban Parole Process FRN, 88 Fed. Reg. at 1277; Haitian Parole Process FRN, 88 Fed. Reg. at 1253; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1264; Venezuelan Parole Process FRN, 88 Fed. Reg. at 1280.

*No Congressional Disapproval of Any Parole Program.* Congress has never acted to overturn or cut back any parole program adopted under 8 U.S.C. § 1182(d)(5)(A)—including parole programs that have allowed parole for materially

Case 6:23-cv-00007   Document 282   Filed on 09/29/23 in TXSD   Page 45 of 64

indistinguishable urgent humanitarian reasons and significant public benefits articulated by the CHNV Pathways. Multiple prior administrations have used the parole authority to achieve the identified statutory benefits in aggregate, for example, to deter irregular migration, to advance important foreign policy goals, and to manage migration collaboratively with international partners. *See* Declaration of Eric Schwartz ("Schwartz Decl."), Int. Defs' Trial Ex. 134 ¶¶ 9, 11, 14-6; Declaration of Morton Halperin ("Halperin Decl."), Int. Defs' Trial Ex. 131 ¶¶ 4, 35; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 64-66; *see also* Fed. Defs' Trial Ex. A at Cuba AR_000001; Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 48-51. The urgent humanitarian reasons and significant public benefits identified in the FRNs for the CHNV Pathways are entirely consistent with multiple prior uses of the parole authority, to which Congress has consistently acquiesced and declined to overturn.

*No Congressional Action to Substantively Constrain the Parole Authority.* Congress has left the parole provision untouched since 1996. The 1996 amendment added the "case-by-case" language and swapped in the current "urgent humanitarian reasons" and "significant public benefit" criteria for what had been there since 1952 ("emergent reasons or for reasons deemed strictly in the public interest")—the latter of which, it should be noted, altered the criteria somewhat but did not make them stricter. Following those amendments, multiple administrations have used the parole authority to "designat[e] a class whose members generally would be considered appropriate candidates for parole," and then to allow "the adjudicator [to] individually determine whether a person is a member of the class and whether there

are any reasons not to exercise the parole authority in the particular case." *See* Fed. Defs' Tr. Ex. A at Cuba AR_000097; *see also* Int. Defs' PFOF/COL, ECF 245.

As the Administrative Record reflects, the executive has found that such a use of the parole authority "does not violate the case-by-case requirement" of the statute "[s]o long as individual consideration is given to parole determinations." *See* Fed. Defs' Tr. Ex. A at Cuba AR_000097. Not only are the CHNV Pathways and other numerous parole programs entirely consistent with this interpretation of the parole provision, Congress has also declined to adopt any legislation that would limit or otherwise constrain such an interpretation. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 145; *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) ("[L]ongstanding administrative construction is entitled to great weight, particularly when, as here, congress has revisited the Act and left the practice untouched."); *cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983) (holding that Congress's awareness of widely known agency statutory interpretation spanning decades "when enacting other and related legislation make out an unusually strong case of legislative acquiescence" to that interpretation).

Although Texas insists on casting the CHNV Pathways as a rogue and unchecked exercise of the parole authority, this argument withers in the face of an unrebutted trial record establishing that Congress has consistently approved of or acquiesced to every administration's use of the parole authority to create parole programs that, like the CHNV Pathways, define a population whose members the executive determines are appropriate candidates for parole; facilitate the case-by-

case adjudication of parole for that population; and articulate the same or similar urgent humanitarian reasons and significant public benefits articulated by the CHNV Pathways.

iii. <u>The Major Questions Doctrine Cannot Save Texas's Case.</u>

While the Major Questions doctrine is, at most, one potential tool of statutory interpretation, it is inapplicable in cases of "clear congressional authorization," such as this one. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). DHS established the CHNV Pathways pursuant to expressly granted parole authority, which allows the DHS secretary to, "in his discretion," parole non-citizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). As explained at trial and above, *see supra* Section II(a)(i), this is precisely what DHS has been doing. Major Questions simply does not apply.

Courts have also invoked the Major Questions doctrine when the Executive suddenly uses a "long-extant" statute in ways the statute had never previously been used. *E.g.*, *Minimum Wage*, 6:22-CV-00004, at 23 (S.D. Tex. Sep. 26, 2023) ("When the executive branch claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, courts typically greet its announcement with a measure of skepticism." (internal quotations omitted) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). This case could not be more different: there is a long history of materially indistinguishable and undisturbed uses of the same authority. *See supra* Section II(a)(ii). Not only have Democrat and Republican presidents used this same authority to implement similar parole programs for seven decades, including since the 1996 enactment of IIRIRA, but

40

Plaintiff States themselves admit that the CHNV Pathways were directly modeled on the existing and highly popular U4U program. FAC, ECF 20 ¶ 43. Stated differently, because there is nothing "transformative" about this use of the parole authority, the Major Questions doctrine is not implicated. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014).

Finally, DHS's exercise of the parole authority bears no resemblance to the other typical through-line of Major Questions precedent: when the challenged agency action newly attempted to regulate beyond the agency's primary congressionally delegated area of responsibility. *See, e.g.*, *Ala. Ass'n of Realtors v. Dep't Health & Hum. Serv.*, 141 S. Ct. 2485, 2487 (2021) (holding that the Centers for Disease Control lacked the authority to implement a nationwide eviction moratorium); *Nat'l Fed. Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661 (2022) (holding that OSHA could not force 84 million Americans to either obtain the COVID-19 vaccine or undergo weekly medical testing). It cannot possibly be disputed that DHS is acting within its primary areas of congressionally granted responsibility—namely, managing migration and border security in manners that implicate foreign policy.

For all these reasons, the Major Questions doctrine is irrelevant to this case.

### b.  The CHNV Pathways Are Not "Arbitrary and Capricious."

An application of the parole authority of § 1182(d)(5)(A) is not arbitrary and capricious if there is a rational connection between the facts the agency found and the decision made. *Worldcall Interconnect, Inc. v. F.C.C.*, 907 F.3d 810, 817 (5th Cir. 2018). An agency is afforded additional deference in the context of policies issued pursuant to the parole statute, as courts "must be deferential to the President's

Article II foreign-policy judgment." *Biden v. Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). Federal policy must be upheld if it is supported by "substantial evidence," which is *"less than* a preponderance." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (emphasis added).

Here, substantial evidence in the record demonstrates: the CHNV Pathways constitute well-reasoned policy aimed at reducing complex political, humanitarian, and economic crises associated with increased migration from the relevant countries. *See* Fed. Defs' Trial Exs. 14, 43 (DHS data highlighting the increase in migration); *cf* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 11-16. And, within the first six months of being implemented, the CHNV Pathways are undisputedly achieving their stated goal. Despite granting travel authorization to a total of 30,000 individuals per month, the program has produced a much larger corresponding decrease in net migration, therefore allowing CBP, including in Texas, to focus its resources on border management. Nuñez-Neto Decl. Fed. Defs' Trial Ex. HH ¶¶ 11-16, 20-28.

Grasping at straws, Texas argues the CHNV Pathways are arbitrary and capricious because the government failed to consider their "reliance interests." Pls' P.I., ECF 22 at 22-23. Yet, Texas has not even been able to *identify* a cognizable reliance interest to show standing, including at trial, when the Court repeatedly asked it to do so. Trial Tr. vol. 1 of 2, 147:17-151:9. Reliance interests are only implicated when a party makes decisions based (*i.e.*, relies) upon a longstanding policy, and a change in that policy causes them hardship or liability *because* of their reliance. For example, in *Encino Motorcars, LLC v. Navarro*, the Supreme Court held

that the Department of Labor, in reversing a 1978 decision that certain employees of the regulated industry *were* exempt from the Fair Labor Standards, acted arbitrarily and capriciously in failing to consider the reliance interests these employees held for *over* three decades. 579 U.S. 211, 222 (2016). As the Court explained, the regulated industry had "negotiated and structured their compensation plans against this background understanding" that those employees were exempt, and thus the agency's reversal would "necessitate systemic, significant changes" to the "compensation arrangements" that it had relied upon the prior rule. *Id.* at 222-23. Those reliance interests in the agency's longstanding policy had to be explicitly considered before the agency could reverse course. *Id.* Here, by contrast, Texas cannot claim to have had a reliance interest in a newly created policy like the CHNV Pathways, because it did not previously exist. Nor can Texas articulate any reliance that it placed on the pre-Pathways *status quo* or how, even if it had so relied, that reliance is now to their detriment.

With no real "reliance interest," Texas asks this Court to equate its alleged injury (the purported fiscal costs of immigration) with "reliance interests." First, this is not the law. *See id.*; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891,1913 (2020) (an agency implicates a party's reliance interests when that party has made decisions *in reliance upon* a longstanding policy and the agency later "changes course" from those "longstanding policies" to the detriment of the party who relied upon the status quo ante).

Second, to the extent Texas's "reliance" argument has any merit, the CHNV Pathways do not ignore "costs." To the contrary, DHS contemplated a decrease in the number of individuals migrating from these four countries, which would reduce the very injury Texas complains of. Trial Tr. vol. 2 of 2, 30:11-20; *see also* Fed. Defs' Trial Ex. 42. Like parole processes promulgated in the past, *see generally* Schacher Expert Decl,, Int. Defs.' Tr. Ex. 141, the record clearly shows the CHNV Pathways have already lowered migration and therefore any costs associated with increased migration. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 26, 29, 31, 174-179 n.16. The requirement that each parolee have a fiscal sponsor—which is neither a statutory requirement for parole nor required it many other such programs—likewise demonstrates that DHS considered the potential costs that Texas claims it ignores.

Moreover, Texas's discussion of costs is not probative of any likely costs associated with the CHNV Pathways. Texas's evidence estimates purported costs of undocumented immigrants and unaccompanied children from all nations, but the CHNV parolees are not undocumented immigrants and unaccompanied children are categorically ineligible for the CHNV Pathways. United States Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, Int. Defs' Trial Ex. 68. The CHNV Pathways only allow adults and families to be lawfully admitted under parole after a series of successful background checks, security vetting, and an approved sworn declaration of financial support. United States Citizenship and Immigr. Servs., Form I-134, Declaration of Financial Support, Int. Defs' Trial Ex. 67.

Texas's "evidence" as to costs of parolees is likewise unsubstantiated and inconsistent. Indeed, the record is replete with well-established empirical evidence contradicting each of Texas's claims. *See e.g.*, Kubrin Expert Decl., Int. Defs' Trial Ex. 139 ¶ 19 ("[H]igher or increased immigration does not lead to more crime" and "often suppresses it"); Gándara & Orfield Expert Decl., Int. Defs' Trial Ex. 136 ¶¶ 13–14 (determining the educational costs of bilingual students tends to be close to zero); Ku Expert Decl., Int. Defs' Trial Ex. 138 ¶¶12-15 (even when ignoring federal compensation policies that benefit states, the medical costs for undocumented immigrants are "so small that they do not displace services for other needy people"); Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶¶ 22–24 (driver's licenses have a net fiscal benefit to states). Texas's evidence simply does not support any "arbitrary and capricious" behavior.

Beyond its lack of evidence or reliance interests, Texas asks this Court to assess the rationality of the CHNV Pathways in a vacuum—ignoring the complexity of the problems it seeks to address in favor of terminating it for failing to resolve the challenges of global migration through one action alone. However, it is impermissible for the Court to replace the executive's extensively reasoned policy judgment regarding a complex issue only to appease a challenger's own policy preference; nothing in the Constitution, U.S. Code, or precedent gives Texas (or any other state) a heckler's veto over federal immigration policy. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("[A] court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency . . . has reasonably

considered the relevant issues and reasonably explained the decision."); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A] court is not to substitute its judgment for that of the agency.").

This Court should reject Texas's claims of arbitrary and capricious agency action for there is "substantial evidence" in the record supporting that the CHNV Pathways have a rational connection to reducing unauthorized immigration and costs to states. *FPL Energy Me. Hydro LLC*, 287 F.3d at 1160.

## III.     The Balance of Hardships and the Public Interest Overwhelmingly Favor Defendants, Precluding Any Equitable Relief.

The Court must weigh the balance of equities and hardships between Plaintiffs and Defendants and the public interest when considering whether to grant an injunction or other equitable relief. *Winter*, 555 U.S. at 20; *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Texas's hardship, if any, is eclipsed by the countervailing hardships Intervenor and Federal Defendants would suffer, even before considering the public's exceptional interest in maintaining the CHNV Pathways. Because Texas cannot make the "clear showing" to carry its "burden of persuasion" that it has met this criterion, *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985), it cannot receive equitable relief.

The CHNV Pathways allow Intervenor Defendants—alongside individuals across the United States—to tangibly support their global neighbors, exercise deeply held religious beliefs, reunify with their families, protect the lives of family members and loved ones, and create economic opportunities for individuals and communities in need. Int. Defs' Response in Opposition to Pls.' Motion for Preliminary Injunction,

ECF 175 at 27-29; Int. Defs' PFOF/COL, ECF 245 at 87-90. Texas's request for relief would extinguish these opportunities.

Yet, Texas pushes even further. Texas concedes it hopes to establish precedent that would threaten various other similar parole programs currently operating, foremost among them, U4U. Pretrial Conference Tr., 91:2-10 ("[I]f the precedent we create would show later that that program is also unlawful for the same reasons, we don't have to actually file litigation . . . . [T]hrough the Anglo-American system of precedent, it takes care of itself.") (cleaned up); *see also id.* at 90:16-91:10. Thus, not only would sponsors and beneficiaries of the CHNV Pathways suffer from an injunction, but also other parolees and their families, communities, employers, and employees currently benefiting from other ongoing parole programs, which would likewise be at risk of termination following such a decision from this Court. Int. Defs' PFOF/COL, ECF 245 at 27-44.

This is to say nothing of the hardships the United States would suffer from an injunction or vacatur of the CHNV Pathways. As Federal Defendants explained at trial, foreign policy negotiations played a key role in the development and implementation of the CHNV Pathways. *E.g.*, Trial Tr. vol. 1 of 2, 194, 219; *accord* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 37. Given this fact, enjoining or vacating the CHNV Pathways threatens to frustrate foreign relations with Mexico and other Central and South American countries. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 38.

And although Texas and other Plaintiff States seek the termination of the CHNV Pathways (even though the latter have not even attempted to prove standing or entitlement to relief), at least fifteen other States and the District of Columbia support the CHNV Pathways and submitted an amicus brief detailing the hardships both the States themselves and individuals residing in those states would suffer if the CHNV Pathways were enjoined. Brief for Amici Curiae States, ECF 247. These include: the loss of significant economic benefits through state and local taxes and spending power; the proliferation of labor shortages in key industries; family separations and the endangerment of parolees; diminishment in public safety; and increased costs of public services like healthcare. *Id.*

For all of these reasons, Texas has not established that it suffers any hardship. And even if the Court were to find Texas has proven some amount of hardship, it is heavily outweighed by the harms Federal and Intervenor Defendants, at least fifteen other states, and the public would suffer if Texas received the relief it seeks.

## IV. If Any Relief Is Justified, It Must Be Remand Without Vacatur.

As detailed above, Plaintiffs are not entitled to relief for several independent reasons. However, should the Court find otherwise, the only appropriate relief would be remand without vacatur. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."). In determining whether to order the more drastic equitable relief Texas seeks—such as a permanent injunction or

vacatur—the Court is required to consider the likelihood of disruption and harm that would result from such an order. Here, the likely consequences confirm that remand without vacatur is the only prudent and lawful course.

*First*, no injunctive relief should issue. A permanent injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 U.S. 1942, 1943 (2018) (affirming denial of injunction where balance of equities and public interest "tilt" against plaintiffs). When considering whether to grant injunctive relief for legal violations, federal courts must also "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 542 (1987). Plaintiffs *must prove* that a permanent injunction would not disserve the public interest *and* that the balance of equities tips in Plaintiffs' favor. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs have not even attempted to carry their burden with regard to either factor, which by itself requires denying any injunctive relief.

Texas's total failure to show any net injury is fatal to its request for injunctive relief. *Supra* at Section I(b). Even *if* just one dollar in net costs could satisfy standing, *but see supra* Short Answer 6, the Court cannot ignore that reimbursements, revenues, and other benefits Texas receives from the CHNV Pathways *at least* significantly offset its costs when assessing the parties' relative equities for purposes of an injunction. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (balancing parties' hardships, the Court found that a city's reliance on economic harm

"does not weigh entirely in [its] favor" because "there will be some economic benefits" from the challenged action). To obtain an injunction, Texas must not only demonstrate more than *de minimis* harm, but must also prove that the financial injury it suffers—the only injury it has sought to prove—*outweighs* the likely harm to Defendants and the general public if an injunction issues. *Winter*, 555 U.S. at 20. To the extent Texas has shown any fiscal cost, it plainly does not outweigh the hardship to Defendants on the other side of the equation.

The uncontested evidence demonstrates the likely destabilizing effects of an injunction on foreign policy, border management, and safe migration pathways; on Intervenors whose ability to sponsor family and friends as well as to exercise their sincerely held religious beliefs would be at risk; and on the public interest in addressing humanitarian crises, reuniting families, and filling domestic labor shortages, among others. *Supra* Section III. Moreover, such an injunction would cause widespread harm throughout the country, including in the 16 *amici* states, ECF 239-1, and threaten up to seven other *ongoing* parole programs including U4U and Afghan Allies Welcome. Schacher Expert Decl., Int. Defs.' Trial. Ex. 141; USCIS, Family Reunification Parole Processes, available at https://www.uscis.gov/FRP. The overwhelming imbalance in equities and interests is hard to overstate—to reiterate, Texas has *not even tried* to carry its burden—confirming that no injunction should issue. *See Benisek*, 138 U.S. at 1943; *Amoco Prod. Co.*, 480 U.S. at 542.

*Second*, even if the Court finds that Texas would otherwise be entitled to an injunction, it is not entitled to a nationwide injunction. The Supreme Court and Fifth

Circuit caution that "a federal court's 'constitutionally prescribed role is to vindicate the individual rights *of the people appearing before it*,' and accordingly '[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury.' *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 393 (5th Cir. 2023) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018)). No Plaintiff State other than Texas has even attempted to prove injury, and Texas has never even attempted to show that people paroled into other states would come to Texas in such numbers as to cause it material harm, let alone harm sufficient to offset the interests of nonparties.

The nationwide injunction Texas seeks would permit and incentivize a single state experiencing any downstream budgetary effect from our federal constitutional system to dictate national policy, notwithstanding the countervailing interests of several other states. *See* Brief for Amici Curiae States, ECF 247. Moreover, the Court cannot consider any hypothetical interests of the other Plaintiff States that affirmatively abandoned this case, declining not only to attempt to show injury but also to participate in the litigation at all beyond lending their names for the pleadings. Joint Notice of Stipulation, ECF 139. Thus, any injunction must be narrowly tailored to vindicate only the injury the Court finds has occurred, which *at most* could be an injury to Texas. *E.T.*, 19 F.4th at 769 (finding a blanket injunction was unlawfully overbroad where it was not narrowly tailored to the parties); *Minimum Wage*, No. 6:22-cv-00004, slip op. at 35 (finding a nationwide injunction inappropriate because, when "ordering the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the

51

court could still be acting in the judicial role of resolving cases and controversies." (quoting *Dep't of Homeland Sec. v. New York*, 140 S.Ct. 599, 600 (2020) (Gorsuch, J., concurring)).[6]

*Third*, for the first time at trial, Texas articulated that it is seeking an even more extraordinary remedy: the retroactive invalidation of grants of parole already issued under the CHNV Pathways. Trial Tr. vol. 1 of 2, 174:1-7 ("[I]f you vacate it, it takes away any of the legal authority of anyone who was issued parole under it. . . . [T]hey would then be here unlawfully."); Trial Tr. vol. 2 of 2, 236:11-13 (Mr. Walters for the State of Texas explaining that the relief Plaintiffs request is that "if the action is nullified, then, obviously, they [current parolees] will not have the status that that action grants"). Texas has neither provided authority for its eleventh-hour request nor attempted to demonstrate that it would be equitable and in the public interest.

Though Texas purports to seek the clawback of prior grants of parole through vacatur, it has cited no authority establishing that vacatur alone would have this effect. Even Plaintiffs concede that the CHNV Pathways merely created a process for accessing existing statutory parole authority, and that the underlying parole authority would remain even after vacaturs. Pls' Opposition to Motion to Intervene, ECF 127 at 6 ("Curtailing the program …. simply curtails [potential parolees'] ability to [seek parole] through a particular set of processes."). Vacating the CHNV Pathways at most could foreclose DHS's ability to use those processes prospectively,

---

[6] If no injunction could be narrowly tailored to remedy the specific harm Texas has proven, then no injunction should issue given the obvious imbalance in equities.

but it would have no legal effect on those who have already made their way through those processes. However, if Texas is correct that this effect would be automatic alongside vacatur, then there would be no need for the Court to order it at all. Trial Tr. vol. 2 of 2, 236:11-13.

What Texas actually requests is an extraordinary mandatory injunction commanding the executive to revoke previously issued grants of parole and work authorization. This would result in tens of thousands of paroled individuals losing their jobs and ongoing streams of income, while hundreds of businesses would lose their workers—including in Texas. *See, e.g.*, Phillip Connor, *Immigration parole has added 450,000 workers to industries with critical labor shortages*, FWD.us (Apr. 20, 2023), Int. Defs. Tr. Ex. 85. If anything, this would intensify, rather than redress, the injury Texas complains of. *See supra* Section I(c). Texas's request would also subject paroled individuals to the threat of deportation. The Court should decline to impose cruel, unnecessary harm on people who came to the United States through an established, documented process. *Supra* Section II(a)(i); *see, e.g.*, Supplemental Declaration of Anne-Valerie Daniel-Laveus, Int. Defs. Tr. Ex. 122.

Moreover, whether or not that extraordinary and cruel remedy could be contemplated as a sanction for misconduct if, in the future, the government continued to adjudicate applications *after* the Court issues a nationwide injunction blocking the program, *cf.*, *Texas v. USA* , Case 1:14-cv-00254, ECF 347 (S.D. Tex. May 19, 2016), it could not as an injunction where Texas has not even attempted to meet its burden to show an injunction clawing back the status of thousands of third parties *who are*

*not represented in this litigation* would be equitable, in the public interest, encompassed by their complaint, or even legal. To be clear, it is not.

*Finally*, if any relief is warranted, the only appropriate relief would be to remand the decision to the agency without vacatur. This remedy "is generally appropriate when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d at 692 (citation omitted). Both conditions are met here.

Here, there is a serious possibility that any infirmity identified by the Court could be cured on remand. For example, if the Court finds DHS should have engaged in notice and comment rulemaking or should have considered certain factors, remand would permit DHS to consider any such factor, curing the infirmity. *Chem. Mfrs. Ass'n v. EPA,* 870 F.2d 177, 264 (5th Cir. 1989). On the other hand, vacatur would disrupt the settled interests of intervenors, communities, employers, and states throughout the country, while undermining border management, safe migration patterns, and foreign policy.

## CONCLUSION

For the foregoing reasons, the Court should deny Texas's requested relief.

Dated: September 29, 2023          Respectfully submitted,

*/s/ Monika Y. Langarica*
**Monika Y. Langarica***
California Bar No. 308518
langarica@law.ucla.edu

**Ahilan T. Arulanantham\***
California Bar No. 237841
arulanantham@law.ucla.edu

**Talia Inlender\***
California Bar No. 253796
inlender@law.ucla.edu

CENTER FOR IMMIGRATION LAW AND POLICY
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

**Esther H. Sung (Attorney-In-Charge)\***
California Bar No. 255962
*Application for Admission pending*
esther.sung@justiceactioncenter.org

**Karen C. Tumlin\***
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Jane Bentrott\***
California Bar No. 323562
D.C. Bar No. 1029681
Virginia Bar No. 87903
jane.bentrott@justiceactioncenter.org

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

**Brandon Galli-Graves\***
Texas Bar No. 24132050
brandon.galli-graves@raicestexas.org

THE REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES (RAICES)
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
Telephone: (210) 960-3206

55

Facsimile: (210) 634-1279

**Kate Kaufmann Shih**
Texas Bar No. 24066065
Federal Bar No. 1214426
kateshih@quinnemanuel.com

Q<small>UINN</small> E<small>MANUEL</small> U<small>RQUHART</small> & S<small>ULLIVAN</small> **LLP**
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713)221-7100

*\*admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing instrument was served via ECF pursuant to the Federal Rules of Civil Procedure on the 29th day of September 2023, upon all counsel of record in this matter.

_/s/ Monika Y. Langarica_