# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Civil Action No. 6:23-cv-00007 |
| ) | |
| U.S. DEPARTMENT OF ) | |
| HOMELAND SECURITY, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |

## DEFENDANTS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 4

I.    Standing is judged as of the time of the operative complaint. .............................4

II.   Plaintiffs have not identified a cognizable Article III injury sufficient to challenge use of the parole authority ................................................................................11

III.  The Court cannot look at the effects of parolees under the CHNV processes in isolation without considering the larger number of CHNV releases prior to the parole processes .....................................................................................................20

IV.  Special solicitude does not relieve a plaintiff of the burden to establish a concrete injury traceable to the challenged agaency action. ..........................................27

V.   Plaintiffs' ultra vires claim is not viable .............................................................30

VI.  Review of compliance with Section 1182(d)(5)(A)'s "case-by-case" language is a mixed question of law and fact. .......................................................................38

VII. The major questions doctrine has no application in this case. ...........................44

VIII. Scope of relief generally ...................................................................................51

IX.   Scope of relief for a notice-and-comment claim.................................................55

X.    Any relief the Court grants should be limited to prospective relief....................61

CONCLUSION.............................................................................................................. 62

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ................................................................................. 53

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
   141 S. Ct. 2485 (2021) ................................................................. 45, 46, 48

*Allied-Signal, Inc. v. United States NRC,*
   988 F.2d 146 (1993) ................................................................................. 59

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   38 F. Supp. 2d 114 (D.D.C. 1999) ..................................................... 56, 57

*American Hosp. Ass'n v. Becerra,*
   142 S. Ct. 1896 (2022) ............................................................................. 46

*Anderson v. Watt,*
   138 U.S. 694 (1891) ................................................................................... 4

*Apter v. Dep't of Health & Hum. Servs.,*
   No. 22-40802, 2023 WL 5664191 (5th Cir. Sept. 1, 2023) ..................... 30

*Arizona v. Biden,*
   31 F.4th 469 (6th Cir. 2022) ............................................................... 52, 53

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ................................................................... 29

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................................. 29

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ........................................................................... 35, 36

*Arpaio v. Obama,*
   27 F. Supp. 3d 185 (D.D.C. 2014) ....................................................... 15, 22

*Ascendium Educ. Solutions, Inc. v. Cardona,*
   78 F.4th 470 (D.C. Cir. 2023) ................................................................. 41

*BCCA Appeal Grp. v. U.S. EPA,*
   355 F.3d 817 (5th Cir. 2003) ................................................................... 43

*Becerra v. Empire Health Found.*,
    142 S. Ct. 2354 (2022) ................................................................................. 46

*Biden v. Missouri*,
    142 S. Ct. 647 (2022) ................................................................................... 46

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ................................................................................. 13

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) .............................................................. 12, 19, 21, 43

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983) ..................................................................................... 48

*Boelens v. Redman Homes, Inc.*,
    759 F.2d 504 (5th Cir. 1985) ......................................................................... 4

*Bolante v. Keisler*,
    506 F.3d 618 (7th Cir. 2007) ....................................................................... 41

*Braidwood Mgmt. Inc. v. Becerra*,
    627 F. Supp. 3d 624 (N.D. Tex. 2022) ......................................................... 52

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ....................................................................... 55

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................... 28, 52

*Cent. & S. W. Servs. v. EPA*,
    220 F.3d 683 (5th Cir. 2000) ....................................................................... 59

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ................................................................ 36, 37

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ................................................................................ 39, 40

*City of Arlington, Tex. v. F.C.C.*,
    668 F.3d 229 (5th Cir. 2012) ....................................................................... 56

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ....................................................................................... 10

iv

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) ................................................................................. passim

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) ..................................................................................... 46

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
704 F.3d 413 (5th Cir. 2013) ............................................................................. 5

*D.A.M. v. Barr*,
486 F. Supp. 3d 404 (D.D.C. 2020) ................................................................ 61

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ................................................................................... 51, 53

*Dallas Safari Club v. Bernhardt*,
518 F. Supp. 3d 535 (D.D.C. 2021) ................................................................ 34

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ........................................................................................ 48

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ..................................................................................... 9, 23

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) .................................................................... 13, 14, 28, 46

*DHS v. New York*, 140 S. Ct. 599, 600 (2020)
140 S. Ct. 599 (2020) ...................................................................................... 51

*E. V. v. Robinson*,
906 F.3d 1082 (9th Cir. 2018) ........................................................................ 35

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) ........................................................................................ 46

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023) ........................................................................... 54

*Florida v. Mellon*,
273 U.S. 12 (1927) ............................................................................... 15, 17, 28

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................................... 45, 47, 50

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
    528 U.S. 167 (2000) ........................................................................................... 5

*Garcia-Mir v. Smith,*
    766 F.2d 1478 (11th Cir. 1985) ....................................................................... 41

*Gen. Land Off. v. Biden,*
    71 F.4th 264 (5th Cir. 2023) ..................................................................... 10, 17

*Georgia v. President of the United States,*
    46 F.4th 1283 (11th Cir. 2022) ....................................................................... 54

*Geyen v. Marsh,*
    775 F.2d 1303 (5th Cir. 1985) ............................................................. 30, 31, 35

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ..................................................................................... 51

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ......................................................................................... 47

*Haaland v. Brackeen,*
    143 S. Ct. 1609 (2023) ..................................................................................... 15

*Hampton v. Mow Sun Wong,*
    426 U.S. 88 (1976) ........................................................................................... 40

*Harris v. City of Houston,*
    151 F.3d 186 (5th Cir. 1998) ............................................................................. 5

*Hassan v. Chertoff,*
    593 F.3d 785 (9th Cir. 2010) ........................................................................... 41

*Heartland By-Products, Inc. v. United States,*
    568 F.3d 1360 (Fed. Cir. 2009) ....................................................................... 61

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ......................................................................................... 53

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ......................................................................................... 19

*Henderson v. Stalder,*
    287 F.3d 374 (5th Cir. 2002) ..................................................................... 18, 25

*Hinck v. United States*,
550 U.S. 501 (2007) ................................................................................. 33

*Huddleston v. FBI*,
No. 4:20-CV-00447, 2022 WL 4593084 (E.D. Tex. Sept. 29, 2022) ............... 43

*In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*,
No. MDL 1712, 2008 WL 2246989 (E.D. Pa. May 30, 2008) ........................ 23

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ..................................................................... 23

*INS v. Abudu*,
485 U.S. 94 (1988) .................................................................................... 40

*INS v. Aguirre-Aguirre*,
526 U.S. 415 (1999) ............................................................................ 39, 50

*Int'l Bhd. of Teamsters v. Daniel*,
439 U.S. 551 ............................................................................................ 41

*Issaq v. Holder*,
617 F.3d 962 (7th Cir. 2010) ..................................................................... 38

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service*,
58 F. Supp. 3d 1191 (D.N.M. 2014) ........................................................... 34

*Jean v. Nelson*,
727 F.2d 957 (11th Cir. 1984) .............................................................. 41, 50

*Jeanty v. Bulger*,
204 F. Supp. 2d 1366 (S.D. Fla. 2002) ....................................................... 41

*Ketcham v. U.S. Nat'l Park Serv.*,
No. 16-CV-00017-SWS, 2016 WL 4268346 (D. Wyo. Mar. 29, 2016) ............ 34

*Kotha v. Renaud*,
No. 3:21-CV-641-N, 2021 WL 4027697 (N.D. Tex. May 12, 2021) ................ 34

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) .................................................................................. 31

*Leal v. Azar*,
489 F. Supp. 3d 593 (N.D. Tex. 2020) ................................................... 35, 37

*Leal v. Azar*,
No. 2:20-CV-185-Z, 2020 WL 7672177 n.7 (N.D. Tex. Dec. 23, 2020) .......................... 37, 38

*Leal v. Becerra*,
No. 2:20-CV-185-Z, 2021 WL 1163663 (N.D. Tex. Mar. 26, 2021) ...................................... 35

*Leal v. Becerra*,
No. 21-10302, 2022 WL 2981427 (5th Cir. July 27, 2022)..................................................... 35

*Lewis v. Casey*,
518 U.S. 343 (1996)................................................................................................................ 17

*Little Sisters of the Poor v. Pennsylvania*,
140 S. Ct. 2367 (2020) ........................................................................................................... 46

*Loa-Herrera v. Trominski*,
231 F.3d 984 (5th Cir. 2000) ............................................................................................ 12, 62

*Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
70 F.4th 872 (5th Cir. 2023) ............................................................................................. 24, 25

*Louisiana v. Becerra*,
20 F.4th 260 (5th Cir. 2021) .................................................................................................. 54

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...................................................................................................... passim

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994)................................................................................................................ 51

*Mak v. INS*,
435 F.2d 728 (2d Cir. 1970)................................................................................................... 42

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360, (1989)............................................................................................................... 42

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) ................................................................................................................. 39

*Massachusetts v. EPA*,
549 U.S. 497 (2007)......................................................................................................... 28, 29

*Morice v. Hosp. Serv. Dist. #3*, No.,
18-cv-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019) ....................................................... 51

*Morris v. Gilmer*,
 129 U.S. 315 (1889) ..................................................................... 4

*Mullan v. Torrance*,
 9 Wheat. 537, 6 L.Ed. 154 (1824) .............................................. 4

*Nat. Res. Def. Council v. Zinke*,
 347 F. Supp. 3d 465 (E.D. Cal. 2018) ...................................... 38

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
 545 U.S. 967 (2005) ................................................................. 46

*Nat'l Hand Tool Corp. v. Pasquarell*,
 889 F.2d 1472 (5th Cir. 1989) ................................................. 42

*New Mexico v. McAleenan*,
 450 F. Supp. 3d 1130 (D.N.M. 2020) .................................. passim

*New York v. FERC*,
 535 U.S. 1 (2002) ..................................................................... 46

*Newman–Green, Inc. v. Alfonzo–Larrain*,
 490 U.S. 826 (1989) ................................................................... 4

*NFIB v. OSHA*,
 142 S. Ct. 661 (2022) .......................................................... 46, 47

*Nicholson v. Brown*,
 599 F.2d 639 (5th Cir. 1979) ................................................... 43

*Norman v. Niagara Mohawk Power Corp.*,
 873 F.2d 634 (2d Cir. 1989) .................................................... 34

*Palmer v. Trump Model Mgmt., LLC*,
 175 F. Supp. 3d 103 (S.D.N.Y. 2016) ..................................... 34

*Paterson v. Weinberger*,
 644 F.2d 521 (5th Cir. 1981) ..................................................... 8

*Pennsylvania v. New Jersey*,
 426 U.S. 660 (1976) ................................................................. 16

*Porter v. Califano*,
 592 F.2d 770 (5th Cir. 1979) ................................................... 34

*Public Citizen v. EPA*,
    343 F.3d 449 (5th Cir. 2003) ............................................................................ 42

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................ 15

*Red Lion Broad. Co. v. FCC*,
    395 U.S. 367 (1969) ........................................................................................ 39

*Regions Ins., Inc. v. Ace Prop. & Cas. Ins. Co.*,
    80 F. Supp. 3d 730 (M.D. La. 2015) .................................................................. 8

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ........................................................................................ 18

*Reno v. Flores*,
    507 U.S. 292 (1993) ........................................................................................ 42

*Reynoldsville Casket Co. v. Hyde*,
    514 U.S. 749 (1995) ........................................................................................ 61

*Rhode Island v. Narragansett Indian Tribe*,
    19 F.3d 685 (1st Cir.  1994) ............................................................................. 39

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007) .......................................................................................... 4

*Sacal-Micha v. Longoria*,
    449 F. Supp. 3d 656 (S.D. Tex. 2020) .............................................................. 41

*Samirah v. O'Connell*,
    335 F.3d 545 (7th Cir. 2003) ........................................................................... 62

*Savage Servs. Corp. v. United States*,
    25 F.4th 925 (11th Cir. 2022) .......................................................................... 33

*Sierra Club v. Marita*,
    46 F.3d 606 (7th Cir. 1995) ............................................................................. 42

*Smith v. GC Servs. Ltd. P'ship*,
    986 F.3d 708 (7th Cir. 2021) ........................................................................... 23

*Smith v. Potter*,
    No. 3:08-cv-660, 2009 WL 3156528 (S.D. Miss. Sept. 28, 2009) ........................... 8

*Spencer v. Kemna,*
    523 U.S. 1 (1998)..............................................................................4, 17

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016).........................................................................55, 56

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
    289 F.3d 89 (D.C. Cir. 2002)..................................................................59

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009).........................................................................24, 55

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021) ..................................................................60

*Texas ex rel. Falkner v. Nat'l Bank of Com. of San Antonio,*
    290 F.2d 229 (5th Cir. 1961) ..................................................................48

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ..................................................................21

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ...............................................21, 22, 28, 29

*Texas v. United States,*
    106 F.3d 661 (5th Cir. 1997) .......................................................15, 19, 50

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ..................................................................55

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ..........................................................passim

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021)......................................................................11, 17

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)...........................................................................46

*Trump v. New York,*
    141 S. Ct. 530 (2020).............................................................................28

*U.S. Postal Serv. v. Gregory,*
    534 U.S. 1 (2001)...................................................................................43

*United States Telecom Ass'n* v. *FCC,*
   855 F.3d 381 (D.C. Cir. 2017) ........................................................... 47

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) ............................................................. 58

*United States v. Midwest Oil Co.,*
   236 U.S. 459 (1915) ........................................................................... 48

*United States v. Texas,*
   143 S. Ct. 1964 (2023) ................................................................. passim

*Utility Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014) ............................................................. 45, 47, 48

*Warth v. Seldin,*
   422 U.S. 490 (1975) ........................................................................... 14

*Watkins v. Willis,*
   No. 22-11602, 2023 WL 4614497 (11th Cir. July 19, 2023) ................. 31

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ................................................................. passim

*Whitman v. American Trucking Assn's,*
   531 U.S. 457 (2001) ........................................................................... 47

*Yang v. INS,*
   79 F.3d 932 (9th Cir. 1996) ............................................................... 42

*Youth Alive v. Hauppauge Sch. Dist.,*
   No. 08-CV-1068 NGG VMS, 2012 WL 4891561 (E.D.N.Y. Oct. 15, 2012) ........................ 23

**Statutes**

5 U.S.C. § 702(1) ............................................................................. 53

5 U.S.C. § 706(2)(C) ........................................................................ 32

6 U.S.C. § 202(4) ....................................................................... 39, 50

8 U.S.C. § 1103 ............................................................................... 19

8 U.S.C. § 1103(a)(1) ................................................................. 41, 50

8 U.S.C. § 1182(d)(5) ............................................................ 3, 30, 38

8 U.S.C. § 1182(d)(5)(A) ............................................................................................ 18

8 U.S.C. § 1983 ........................................................................................................... 33

8 U.S.C. § 1226(c) ...................................................................................................... 18

28 U.S.C. § 706(2)(C) ................................................................................................ 38

28 U.S.C. §§ 2241 ...................................................................................................... 33

# INTRODUCTION

On February 14, 2023, Plaintiffs filed an amended complaint challenging four parole processes that the U.S. Department of Homeland Security (DHS) implemented that are designed to enhance the security of the U.S southwest border and limit irregular migration for nationals of Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV" countries). *See* 87 Fed. Reg. 63507; 88 Fed. Reg. 1,243, 1,255, 1,266, 1,279. Plaintiffs challenged the parole processes under the Administrative Procedure Act (APA) on three grounds, arguing that the parole processes: 1) violate DHS's statutory parole authority, 2) cannot be implemented without going through notice-and-comment rulemaking, and 3) are arbitrary and capricious. ECF No. 20, ¶¶ 140-41. Plaintiffs also argued the parole processes are ultra vires. *Id*. at ¶¶ 142-143. That same day, Plaintiffs moved for a preliminary injunction on their APA claims. ECF No. 22. The Court consolidated its ruling on the motion for preliminary injunction with a ruling on the merits. *See* ECF No. 134 at 2. The Parties subsequently completed briefing on the motion for preliminary injunction and submitted pretrial proposed findings of fact and conclusions of law, and on August 24 and 25, 2023, the Court held a two-day trial on Plaintiffs' challenges to the parole processes.

For the reasons set out in Defendants' response to the motion for preliminary injunction, ECF No. 176, Defendants' Pretrial Proposed Findings of Fact and Conclusions of Law, ECF No. 240, discussed at trial, ECF No. 277- 278, and set out in Defendants' concurrently filed Post-trial Proposed Findings of Fact and Conclusions of Law, the Court should reject Plaintiffs' challenges and grant judgment in Defendants' favor. In short, because the CHNV processes have substantially reduced the number of individuals released into the United States from these four countries, Plaintiffs do not have standing to challenge the parole processes. Second, Plaintiffs do not have a cause of action under the APA because parole is committed to agency discretion, the processes they challenge are not final agency actions, and Plaintiffs are not within the zone of interests of

Section 1182(d)(5)(A). Third, Plaintiffs cannot succeed on the merits because DHS is statutorily authorized to use parole in its discretion on a case-by-case basis for urgent humanitarian reasons or significant public benefit. DHS reasonably explained how parole of certain CHNV nationals would address urgent humanitarian needs or provide a significant public benefit, including by enhancing border and national security, reducing the strain on DHS personnel and resources, and fulfilling important foreign policy goals. Plaintiffs have not identified any factor the agencies improperly failed to consider, and DHS's conclusions with respect to each of these processes are supported by a substantial record. *See* ECF Nos. 92, 93, 94, 95. These processes are statements of policy about how DHS plans to process parole requests that do not determine the outcome in any individual case. They are thus not required to go through notice-and-comment rulemaking and, in any event, both the foreign affairs and good cause exceptions to rulemaking apply.

Finally, the CHNV processes have substantially reduced unauthorized entries from these four countries and, through negotiations with Mexico, have allowed DHS to impose new consequences for noncitizens who do enter unlawfully. Thus, all the remaining factors weigh strongly against granting an injunction or vacating parole processes that use DHS's statutory parole authority to enhance border security, reduce irregular migration to the southwest border, and incentivize safe, lawful, and orderly migration through the use of parole.

Defendants submit this separate brief to address specific questions the Court requested supplemental briefing on at the conclusion of trial, along with some closely related questions that also arose over the course of trial. On August 31, 2023, the Court ordered that, "[n]o later than September 29, 2023, the Parties shall … file post-trial memoranda of law addressing the questions on which the Court requested further briefing at the conclusion of trial, and any other matter they may wish to address, no later than this date." ECF No. 271. Those questions include: 1) whether

standing is judged based on facts at the time of the complaint, the amended complaint, or at trial, and whether the Court can consider evidence that post-dates the complaint when evaluating standing; 2) the effect of the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), on Plaintiffs' ability to base standing on indirect State costs with respect to driver's licenses, education, healthcare, or law enforcement; 3) whether, in evaluating standing, the Court can compare the number of CHNV nationals being released into Texas before and after the parole processes were put in place, or whether the court should consider the number of CHNV nationals paroled in under these processes in isolation; 4) whether special solicitude still applies to questions of State standing; 5) whether Plaintiffs can raise an ultra vires claim, and if so, whether they can do so in the same case in which they raise an APA claim; 6) whether the government's compliance with the "case-by-case" language in 8 U.S.C. § 1182(d)(5) is a question of fact or a question of law; 7) whether the major questions doctrine applies in this case; and, 8) what the proper scope of relief is if the Court does something other than grant or deny relief in full, and in particular what that relief would look like if the Court were to grant relief solely on Plaintiffs' notice-and-comment claim.

For the reasons set out below, none of the answers to these questions weigh in favor of granting relief to Plaintiffs. If the Court ultimately rules in favor of Plaintiffs on any claim, the Court should, at most, remand without vacatur given the serious negative consequences of eliminating parole processes that have undeniably drastically lowered unlawful migration and total entries from nationals of the covered countries.

# ARGUMENT

## I.     Standing is judged as of the time of the operative complaint.

In a case like this where Plaintiffs filed a complaint but then later amended the complaint, standing is judged based on the facts as they existed at the time of the operative complaint. "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989)). However, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). Here, Plaintiffs filed their complaint on January 24, 2023, ECF No. 1, and amended the complaint on February 14, 2023, ECF No. 20. Accordingly, standing must be judged based on the circumstances as they existed on February 14, 2023.

This does not mean, however, that evidence post-dating the operative complaint is always irrelevant. Although the general rule is "that subject-matter jurisdiction 'depends on the state of things at the time of the action brought,'" *Rockwell*, 549 U.S. at 473 (quoting *Mullan v. Torrance*, 9 Wheat. 537, 539, 6 L.Ed. 154 (1824)), "[t]he state of things and the originally alleged state of things are not synonymous," *id.* (citing *Anderson v. Watt*, 138 U.S. 694, 701 (1891); *Morris v. Gilmer,* 129 U.S. 315, 326 (1889)). Thus, "demonstration that the original allegations were false will defeat jurisdiction." *Id*. And, of course, the doctrine of mootness would not exist if courts could never consider post-complaint evidence. It is well established that a plaintiff must maintain standing "through all stages of federal judicial proceedings," *Spencer v. Kemna*, 523 U.S. 1, 7 (1998), and injury sufficient to confer standing "at the commencement of the litigation … must

4

continue throughout its existence," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, *Inc.,* 528 U.S. 167, 189 (2000) (citation omitted). Courts thus can consider "intervening circumstances" that post-date the operative complaint to determine whether an injury a plaintiff identified at the outset no longer exists and thus cannot be redressed by a favorable ruling. *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co*., 704 F.3d 413, 425 (5th Cir. 2013); *Harris v. City of Houston,* 151 F.3d 186, 189 (5th Cir. 1998).

Mootness is implicated only where a plaintiff establishes standing at the start of a case but circumstances subsequently change. Where, however, a plaintiff fails to establish standing at the outset, there is no need to consider post-complaint evidence because intervening circumstances can only deprive a plaintiff of standing, they cannot provide standing that did not initially exist. *See Lujan*, 504 U.S. at 571 n.4 (explaining that parties cannot create standing based on actions that post-date the complaint where standing "did not exist at the outset"). That is the case here, where the evidence in the trial record establishes that there had already been a sharp decline in the number of CHNV nationals released into the United States at the time Plaintiffs filed the amended complaint. This decline following the implementation of the CHNV processes forecloses Plaintiffs' theory of harm. There is thus no basis to consider, and the Court ultimately need not address more recent evidence post-dating the amended complaint, though that evidence simply confirms a continuing decline in the number of arriving CHNV nationals.

In the amended complaint Plaintiffs speculate that Texas will be harmed if it has to expend additional funds to provide services to CHNV nationals, arguing that, "[a]s the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services increases." ECF No. 20, ¶ 64. Plaintiffs' theory of harm, as set out in their amended complaint, thus depends on the assumption that the number of CHNV nationals in Texas would increase following the

implementation of the parole processes. *Id.* But the evidence pre-dating that allegation in the operative complaint already showed that the number of CHNV nationals had decreased. And indeed each of the Federal Register notices sets out as part of the justification for these four processes the sharp decline in arrivals from Venezuela following the start of the Venezuela process:

> Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day. The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darie'n Gap—an inhospitable jungle that spans between Panama and Colombia— was down from 40,593 in October 2022 to just 668 in November.

88 Fed. Reg. at 1267 (Cuba process); *see also* 88 Fed. Reg. at 1243 (same for Haiti process); 88 Fed. Reg. at 1279 (same for Venezuela process); 88 Fed. Reg. at 1256 (same for Nicaragua process). The evidence in the record establishes that prior to Plaintiffs' amended complaint, the number of Venezuelans encountered at the southwest border had declined sharply from 1,100 per day prior to the parole process to 86 per day in December 2022, *id.*, and further declined to "28 per day" by "the week ending January 22, 2023," Defendants' Trial Ex. HH, ¶ 20.

The evidence of a decline in arrivals in the trial record prior to the operative complaint is not limited to Venezuelan nationals:

> As was the case following the implementation of the parole process for Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between ports of entry dropped significantly after DHS introduced the new processes, from a seven-day average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven -day average of 205 just two weeks later. The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop and represented a significant decline of 94 percent from the peak CHNV encounters of 3,644 on December 10, 2022.

6

Defendants' Trial Ex. HH, ¶ 26. The evidence establishes a decline in encounters of Cuban, Haitian, and Nicaraguan nationals from an average of 1,231 on the date those parole processes were implemented to an average of 205 encounters by January 19, 2023—prior to both the initial and amended complaints, and during a time period when encounters of nationals from other countries were rising. *Id*. At trial, Plaintiffs did not dispute that the data in the trial record shows a decrease in arrivals from the four countries after the parole processes were in place. *See* Trial Tr. (Aug. 25) at 131:25-132:6 (conceding data shows that, "at this point as opposed to before the program, there are fewer aliens coming into the country now as opposed to before the program from those four countries"); *id.* at 132:10-20 (same); *id.* at 244:6-17 (Court noting that Texas had "stipulated that it did reduce the number of people who came from those countries," and that "it is not disputed that the number of immigrants who have come into the State of Texas, the rate of that has decreased since the program started").

The evidence in the record that postdates the operative complaint further underscores the conclusion that the number of CHNV nationals released into Texas and the United States as a whole declined following implementation of the parole processes. Defendants' Trial Ex. HH, ¶¶ 29-31; Ex. II, ¶¶ 4-6. Both pre-complaint and post-complaint evidence—regardless of whether that dividing line is drawn at the complaint or the amended complaint—shows that Plaintiffs have not been injured, and to the extent they tried to allege a prospective injury, that the injury could not possibly have been "actual or imminent" or "*certainly* impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 11-12 (2013) (emphasis in original). Because the evidence in the trial record prior to the amended complaint—or even, under Plaintiffs' position, the initial complaint—alone establishes a decrease of CHNV nationals released into the United States, the Court should find Plaintiffs cannot establish standing based on that evidence alone.

Plaintiffs' theory of harm is based entirely on speculative allegations that, had they been plausible and identified an imminent harm, might have, at most, been a response to a *facial* attack on standing at the pleading stage. But allegations of hypothetical prospective harm cannot be taken as true where Defendants have raised a factual attack on standing based on actual evidence predating the operative complaint that forecloses Texas's theory of harm. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (noting that, when a challenge to standing is supported by evidence, the plaintiff must respond by providing actual evidence of harm and must prove standing by a preponderance of the evidence); *Smith v. Potter*, No. 3:08-cv-660, 2009 WL 3156528, at *2 (S.D. Miss. Sept. 28, 2009), *aff'd*, 400 F. App'x 806 (5th Cir. 2010). And because this case is at the trial stage rather than the pleading stage, Plaintiffs face an even higher burden of proof to establish standing, which increases at successive stages of litigation. *See Lujan*, 504 U.S. at 561; *Regions Ins., Inc. v. Ace Prop. & Cas. Ins. Co.*, 80 F. Supp. 3d 730, 733 (M.D. La. 2015). "The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan,* 504 U.S. at 561. As a case proceeds to later stages, the "plaintiff can no longer rest on [ ] mere allegations, but must set forth by affidavit or other evidence specific facts," and "at the final stage, those facts (if controverted) must be supported adequately by evidence adduced at trial." *Id*. (quotation marks and citations omitted); *see also Clapper*, 568 U.S. at 411-12. The evidence in the record post-dating the amended complaint is thus ultimately unnecessary to resolve the standing question in this case because Plaintiffs' purely theoretical allegations of harm fail in the face of concrete pre-complaint evidence to the contrary. Had the Court ruled that Plaintiffs had standing at some earlier point in the case, then post-complaint evidence could be considered and would show that any assertion of injury was moot. *Id*.

8

At trial, Plaintiffs cited two cases to argue that a prospective injury need not have actually materialized to establish standing, but neither of those cases supports finding Plaintiffs have standing in this case. First, Plaintiffs pointed to language in *Davis v. FEC* noting that "the injury required for standing need not be actualized." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). But *Davis* stands only for the proposition that standing can be based on concrete evidence of impending harm when all the evidence in the record supports the conclusion that the threatened injury is real and immediate, even if later unexpected developments lead to the threatened harm never actually materializing. *Id*. When a plaintiff alleges a "prospective injury," the plaintiff must still show that "the threatened injury is real, immediate, and direct." *Id*. Plaintiffs cannot make that showing here because all the evidence in the record establishes that the number of CHNV nationals released into the United States began declining soon after the parole processes were implemented, before the operative complaint. Therefore Texas has no basis to argue that "the prospective operation of" the challenged parole processes "presents a realistic and impending threat of direct injury," as needed to establish standing. *Id*.

In *Davis* there was no such countervailing evidence at the time of the complaint or at summary judgment, let alone trial. As the Supreme Court noted, at the time of the complaint "there was no indication that" the harm was unlikely to materialize, and even the facts in "the record at summary judgment" supported the conclusion that plaintiff faced a concrete and imminent threat of harm sufficient to support standing. *Id*. at 734-35. *Davis* does not apply here, where the record evidence contradicts Texas's allegations of harm and had already foreclosed Texas's assertions of prospective harm by the time Plaintiffs filed the operative complaint. The allegation that Texas's costs might increase if the number of CHNV nationals in Texas increased was nothing but a hypothetical, abstract injury, and an "[a]bstract injury is not enough"—Texas "must show that" it

"has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (quotation marks and citation omitted). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotation marks, brackets, and citation omitted). The evidence in the record at trial predating the operative complaint prevents Plaintiffs from making any such showing of threatened injury. Plaintiffs cannot show that the purported threatened injury was certainly impending given the lack of evidence of a materialized injury as of the amended complaint—at which time one of the challenged parole processes had already been in place for nearly four months.

Second, Plaintiffs cited the border wall case, but that case is similarly inapposite because the Fifth Circuit was reviewing an order resolving the case at the pleading stage where defendants did not raise a factual attack on standing. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 269 (5th Cir. 2023). The Fifth Circuit highlighted that "[i]njury in fact [was] not at issue" because the "Federal Defendants [did] not contest the sufficiency" of plaintiffs' pleading with respect to harm. *Id*. at 272. In a case where defendants did not raise a factual attack on standing, the court noted that any arguments against standing would be "a factual merits defense, not a response cognizable on a motion to dismiss where allegations in Texas's complaint must be taken as true." *Id*. at 272-73. Here, in contrast, this case is at the trial rather than the pleading stage, and Defendants have entered evidence into the trial record showing that the number of CHNV nationals was already declining at the time the complaint was filed and at the time it was amended, so Texas's allegations of harm cannot be taken as true. The burden was on Texas to prove the State had suffered some concrete

harm from the parole processes and "in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quotation marks and citation omitted). The border wall case provides no support for finding standing at trial where the only evidence in the trial record contradicts the allegations of harm in the operative complaint.

In sum, standing is judged as of the time of the operative complaint, and at trial, must be supported by concrete evidence. All the evidence in the trial record contradicts Plaintiffs' allegations of harm and arguments for standing. The evidence in the record as of the date of the operative complaint forecloses any argument that Plaintiffs faced any actual harm or any imminent, certainly impending injury. Even if the Court could consider post-complaint evidence in these circumstances, it would similarly show Plaintiffs have not been harmed and that they faced no imminent harm either when they filed the initial complaint or when they amended it.

## II.    Plaintiffs have not identified a cognizable Article III injury sufficient to challenge use of the parole authority.

Even if Plaintiffs could somehow establish an increase in CHNV nationals despite all the evidence in the trial record showing that the number of CHNV released into the United States was already declining prior to this suit, Plaintiffs' claims of injury are not cognizable. The Supreme Court's decision in *United States v. Texas* ("*Texas priorities*"), 143 S. Ct. 1964 (2023) seriously calls into question whether indirect State costs with respect to driver's licenses, education, healthcare, or law enforcement can be a basis for Article III standing even if Plaintiffs had been able to provide evidence of such costs. In *Texas priorities*, the Supreme Court made clear that courts must examine "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Id.* at 1970. In doing so, courts must consider whether the "asserted injury" is the type that has "traditionally" been "redressable in federal court,"

and determine the dispute is one that "is traditionally thought capable of resolution through the judicial process." *Texas priorities*, 143 S. Ct. at 1970. Here the asserted injury—the allegation that DHS's parole processes may cause indirect costs—does not satisfy these requirements.

Despite decades of historical precedent showing the Executive has long used the parole authority in similar ways to the CHNV processes,[1] Plaintiffs have not identified cases showing a historical tradition of courts reviewing disputes with respect to parole practices or that this is the type of dispute that has traditionally been redressable in federal court. Just as plaintiffs in *Texas priorities* failed to cite any precedent for reviewing Executive policies with respect to arrest and prosecution, here the Plaintiff "States have not cited any precedent, history or tradition of courts" reviewing or ordering the Executive to change its use of its discretionary parole authority. *Id.* at 1970. In fact, cases suggest there is no history or tradition of courts finding indirect costs related to State expenditures for parolees are a sufficient basis to challenge the Executive's use of discretionary parole authority. *See Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) (noting that "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment" with respect to the use of parole, particularly when that judgment is based in part on "foreign-policy reasons"); *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (because the Secretary's "discretionary judgment regarding the application of parole … is not subject to review," "the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" is also not subject to review).

---

[1] *See* Defendants' Post-trial Proposed Findings of Fact at ¶ 55, and Conclusions of Law at ¶¶ 127-35.

The *Texas priorities* decision also made clear that States will have greater difficulty establishing standing when a theory of harm is based solely on indirect costs that may result from changes in federal policy that could affect a State's population. *Texas priorities* calls into question whether indirect costs related to driver's licenses, education, healthcare, or law enforcement can satisfy Article III. 143 S. Ct. at 1972 n.3. As the Supreme Court noted, "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id*. In such circumstances, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id*.

Like the guidance at issue in the *Texas priorities* case, the parole processes do not direct States or state agencies to take any particular action with respect to law enforcement or social services costs, making any allegations of costs indirect. Contrast this with, for example, the Supreme Court's discussion of direct injuries just one week later in the student loan forgiveness case, where the Court explained that the challenged policy would by its terms directly "cut … revenues" of a State entity, which the Court viewed as "necessarily a *direct* injury to Missouri itself." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (emphasis added). The Supreme Court reasoned that the challenged act would have eliminated a sizeable portion of loans serviced by a State entity, costing it approximately "$44 million a year" as a direct result, and eliminating the portion of those revenues that is used to fund education in Missouri. Or consider the census case, where the asserted injury is more properly characterized as direct. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). There the Supreme Court held plaintiff States had shown that changes to the census would cause an undercount in their population such that they would "lose

13

out on federal funds that are distributed on the basis of state population." *Id*. at 2565. The line between direct and indirect injuries will not always be clear, and many cases will present tough questions. Indeed, the dissent in *Texas priorities* described *Dep't of Commerce* as a case where standing was based "in part on indirect financial injury." *Texas priorities*, 143 S. Ct. at 1994 (Alito, J., dissenting). But wherever *Nebraska* and *Dep't of Commerce* fall on the spectrum between direct and indirect injuries, the alleged injury here is clearly indirect because it involves a more attenuated theory of harm than either of those cases, and precisely the same theory of indirect harm that was insufficient in *Texas priorities*. Plaintiffs argue immigration policy will regulate third parties in a way that will affect the State's population, and that in turn will allegedly cause the State costs.

Plaintiffs face a substantially harder burden to prove standing when the alleged injury is based entirely on these types of potential indirect costs. Plaintiffs do not allege that States are directly regulated by the parole processes. When a "suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be … proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action." *Lujan*, 504 U.S. at 561. "When … a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed." *Id*. The Supreme Court has consistently held that "when the plaintiff is not himself the object of the government action or inaction he challenges"—in other words where the plaintiff is arguing standing based on indirect injuries—plaintiffs face a "substantially more difficult" burden to establish standing. *Id*.; *see also Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) (noting that where "the harm to petitioners may have resulted indirectly" because they are "a third party" not directly regulated by the challenged policy "the indirectness of the injury" may "make it substantially more difficult to meet the minimum requirement of Art. III"). And as the Supreme Court long ago held,

14

an indirect theory of harm based solely on the assertion that a change in federal policy will affect a State's population and in turn affect State revenue is insufficient to satisfy Article III. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting standing where State argued change in federal policy would "have the result of inducing potential taxpayers to withdraw property from the state," negatively affecting State revenue). Such injuries are "at most, only remote and indirect" and insufficient to show the type of more "direct injury" required for standing. *Id*. at 18; *see also Texas priorities*, 143 S. Ct. at 1972, n.3 (citing these same cases, *Florida v. Mellon* and *Lujan*, in noting that standing arguments premised on "indirect effects" and "attenuated" harms may not satisfy "bedrock Article III constraints").

As noted above, the *Texas priorities* decision is clear that courts must consider "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." 143 S. Ct. at 1970. Applying that logic here, the absence during the vast majority of our Nation's history of suits like this one premised on speculative indirect State costs from regulation of third parties is powerful evidence that such suits are incompatible with our constitutional structure, which "contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (noting limits on State standing to raise claims against the Federal government). "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," and a "State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (A "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase

in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws.").

Following *Texas priorities*, it is no longer sufficient for a State simply to argue that some change in federal policy may cause a change in population that may in turn cause indirect changes in States expenditures with respect to driver's licenses, education, healthcare, or law enforcement. 143 S. Ct. at 1972 n.3. This is particularly true in cases such as this one where the change in federal policy neither directly regulates State entities nor affects federal funding to States. When faced with an identical theory of harm in *Texas priorities*, the Supreme Court reaffirmed that courts must closely examine such "attenuated" arguments for standing to ensure they can satisfy bedrock Article III constraints. *Id*. And courts generally should not consider these types of indirect costs sufficient to satisfy Article III for another reason—because such costs are self-inflicted and traceable to decisions of State legislatures rather than to changes in federal policy. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"). Finding standing whenever a change in federal policy might arguably cause some incidental costs to States would allow any State to challenge any change in immigration policy, and improperly draw courts into all sorts of generalized grievances on behalf of States who were unable to obtain their preferred policy outcomes through the political process. "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner. *Clapper*, 568 U.S. at 408. A theory of standing that would allow any State to sue the Federal government any time it changed federal immigration policy merely by saying the change might affect its

16

population would vitiate the rule that "[t]he mere fact that a state is the plaintiff is not enough" to establish Article III standing unless the State has suffered a concrete harm of the sort that has traditionally "furnish[ed a] ground for judicial redress." *Mellon*, 273 U.S. at 17.

At trial Plaintiffs cited the Fifth Circuit's decision in the border wall case in support of their argument that the Fifth Circuit has treated allegations of costs related to things like driver's licenses as cognizable harms. *See Gen. Land Off.*, 71 F.4th at 272. As explained above, however, that case does not apply here because it was decided at the pleading stage in a case without a factual attack on standing, so the court had to take plaintiffs' allegations of harm as true. *See supra* at 10. The Fifth Circuit's decision in the border wall case also predates the Supreme Court's decision in *Texas priorities*, which calls into question the continued viability of the theory of standing discussed in the border wall case. 143 S. Ct. at 1972 n.3. Moreover, even if costs related to driver's licenses, education, healthcare, or law enforcement were sufficient to establish standing in one case, that does not relieve Texas of the burden in subsequent cases to show cognizable Article III injury traceable to the challenged actions. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *see also Lewis v. Casey,* 518 U.S. 343, 357 (1996) ("The actual-injury requirement would hardly serve [its] purpose … if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.").

Plaintiffs have not shown any increase in costs whatsoever here, and certainly cannot trace any increase to the CHNV processes. And there is evidence in the record of direct offsets that undermine Texas's assertions of harm, such as the fact that Texas charges more for driver's licenses than the expenses they have identified. *See* Defendants' Trial Ex. R, S. The Fifth Circuit

has held that these types of offsets must be considered. *See Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (citing *Henderson v. Stalder*, 287 F.3d 374, 379-81 (5th Cir. 2002), and noting that the Fifth Circuit had held that licensing fees were an offset that must be considered in the standing analysis); *see also id.* at 162 (noting standing based on licensing fees "was based largely on the need to hire employees, purchase equipment, and obtain office space," steps that "would be unnecessary" without a showing of some significant increase in population, making "causation" a "substantial obstacle" to finding standing on this theory in most cases).

To the extent Plaintiffs argue that *Texas priorities* is distinguishable because it dealt with arrest policies, other distinctions weigh in the opposite direction and against finding standing here. For example, the memorandum in *Texas priorities* concerned enforcement actions the statutes provided DHS "shall" take. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). The Court explained that the States' challenge nevertheless was not cognizable because it interfered with the Executive's inherent Article II discretion. *Texas priorities*, 143 S. Ct. at 1973. This case concerns a statute in which Congress expressly placed the authority for granting parole in the "discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A). Thus, a judicial order that would force the Executive to exercise its discretion in a particular way would interfere not only with the Executive's inherent Article II discretion but also with the express discretion Congress granted in the statute. This demonstrates that, under the logic of *Texas priorities*, Plaintiffs' challenge to the parole processes is not a matter fit for judicial resolution.

In *Texas priorities*, the Supreme Court also noted that Executive discretion "extends to the immigration context" because "the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" 143 S. Ct. at 1971-72 (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91

18

(1999)). In this case, which involves parole processes that directly implicate and depend on negotiations with foreign governments, and their agreement to accept the removal of CHNV nationals, the foreign-policy objectives are even clearer than they were in the priorities case. *See Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring) (When "the President chooses the parole option … for foreign-policy reasons, a court … must be deferential to the President's Article II foreign-policy judgment").[2]

Finally, the decision to implement the CHNV processes involved a "complicated balancing" of various factors, including foreign affairs, "inevitable resource constraints and regularly changing public-safety and public-welfare needs," and DHS's limited ability to remove individuals from these four countries. *Texas priorities*, 143 S. Ct. at 1972. The Supreme Court held these factors also weigh against finding under Article III or the APA that "federal courts" are "the proper forum for resolving" such disputes. *Id*. Here, DHS was dealing with difficult questions related how to best use its limited resources where those resources were indisputably insufficient to remove or detain all CHNV nationals who attempted to enter unlawfully prior to CHNV processes and Mexico's resulting agreement to accept removal of these individuals. Such difficult policy questions are not easily susceptible to judicial resolution because there are no "meaningful standards for assessing those policies," which "explain[s] why federal courts have not traditionally entertained lawsuits of this kind." *Id*. at 1972-1973 (*citing Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985)); *see also Texas*, 106 F.3d at 667 (noting that 8 U.S.C. § 1103 "commits enforcement of the INA to" the Secretary's "discretion" and "is unreviewable under the Administrative

---

[2] *See* Defendants' Post-trial Proposed Findings of Fact at ¶¶ 10-14, 39-54 (addressing the foreign-policy reasons for the parole processes, and the negative impact on foreign affairs and multilateral efforts to control irregular migration that would result if the parole processes were vacated or enjoined).

Procedure Act because a court has no workable standard against which to judge the agency's exercise of discretion").

The Supreme Court's decision in *Texas priorities* forecloses Plaintiffs' arguments that speculative indirect costs from changes in immigration policy are sufficient to establish standing, and no binding Fifth Circuit law requires the Court to reach a different conclusion in this case.

## III.   The Court cannot look at the effects of parolees under the CHNV processes in isolation without considering the larger number of CHNV releases prior to the parole processes.

Courts are not required to ignore reality when considering whether Plaintiffs have sustained an injury-in-fact. An "injury in fact" means just that—that the injury must "in fact" exist. In its amended complaint, Texas alleged the following injury: (i) "[a]s the number of illegal aliens in Texas increases, the number of illegal aliens receiving [social] services likewise increases," ECF 20, ¶ 64, (ii) "[i]f the Defendants allow these new aliens [from the CHNV processes] into the United States . . . the harm will continue to grow," *id.* at ¶ 71, and (iii) Texas will be harmed because it "cannot recover from the federal government its *increased costs, which it would otherwise not incur.*" *Id.* at ¶ 73 (emphasis added). At trial, Texas's witness declarations averred that the State's injury was based on the assumption that the State's costs would increase if the number of noncitizens released into the State increased. *See, e.g.* Plaintiffs' Trial Ex. 4 (Gipson Decl.), ¶ 10 (discussing licensing costs: "[A]n increase in the number of individuals . . . will substantially burden driver license resources"); Ex. 5 (Waltz Decl.), ¶ 9 (discussing law enforcement costs: "To the extent the number of aliens in TDCJ [Texas Department of Criminal Justice] custody increases, TDCJ's unreimbursed expenses will increase."); Ex. 6 (Terry Decl.), ¶ 7 (discussing education: "[T]he total costs to the State of providing public education to UACs [unaccompanied alien children] will rise in the future to the extent that the number of UAC enrolled

20

in the State's public school system increases."); Pl. Opp. to Motion to Exclude, ECF 252, at 14 (summarizing Ex. 8, Bricker Decl., discussing healthcare: "Susan Bricker testifie[d] regarding various programs in which Texas is involved and how the costs bore by Texas would increase if additional aliens are admitted under the CHNV program."). In short, Texas's theory of standing at the pleading stage and going into trial was based on allegations that the CHNV processes were likely to increase the number of CHNV nationals in the State and thus increase the State's costs.

Plaintiffs' original theory of standing seemed to be guided by Plaintiffs' reading of *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (the "DAPA" case), *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) (the "MPP" case), and *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (the "DACA" case). But, following the trial and the presentation of evidence, it is clear that this case is readily distinguishable from the DAPA, MPP and DACA cases. In the DAPA case, the Fifth Circuit held that the plaintiff States had standing to challenge the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program because the program would enable at least five-hundred thousand undocumented immigrants in Texas to become eligible for State-funded benefits. 809 F.3d at 155. Thus, "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152-153. In the MPP case, the Fifth Circuit held that the plaintiff States had standing to challenge the termination of the Migrant Protection Protocols ("MPP") based upon the district court's factual finding that "MPP's termination has increased the number of immigrants paroled into Texas," 20 F.4th at 970, thereby resulting in increased costs to the State, *id*. at 970-72 (finding standing where the challenged action "increased the number of parolees in the state" overall). In the DACA case, the Fifth Circuit held that the plaintiff States had standing to challenge the Deferred Action for Childhood Arrivals ("DACA") program, because there was evidence in

the record that "if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs." 50 F.4th at 520. It is critical that in each case, the Fifth Circuit concluded that plaintiffs had standing based on the same rationale—evidence of more noncitizens in the State who qualify for specific State-sponsored programs meant more costs.[3]

In this suit, Texas's theory of standing falls squarely outside the Fifth Circuit's rationale in the DAPA, DACA, and MPP cases. At trial, Texas's theory of injury crumbled in the face of the undisputed data—from both before Plaintiffs filed the operative complaint and after—which demonstrated that the number of CHNV nationals released into the country *decreased* following implementation of the challenged processes. *See generally* Defendants' Trial Ex. II, ¶¶ 5, 6; Tr. 132:1-6, 249:17-19. In the five months leading up to the implementation of the CHNV processes, CBP released a daily average of 2,356 CHNV nationals into the United States. Ex. II, at ¶¶ 4, 6, n.2. In the months following implementation, average daily releases fell to 1,401—a forty-one percent decrease. *Id*. If, applying Plaintiffs' theory, more noncitizens from Cuba, Haiti, Nicaragua and Venezuela in Texas mean more costs, then fewer noncitizens from those countries in Texas necessarily mean fewer costs. Ex. II, at ¶¶ 4-6; Tr. 132:1-6, 249:17-19. As a result, Texas now asks the Court to consider the CHNV processes in a vacuum—to compare the number of CHNV nationals released into the country under the challenged processes (and thus the costs associated with those individuals) against a baseline of zero. Tr. 259:4-8. In other words, Texas asks the Court to ignore reality. The Court cannot do so.

---

[3] Defendants dispute that standing was properly established in these three cases or that standing can be based on the presence of more people in a State. *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (A state "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources.").

To have standing, a plaintiff must establish, among other requirements, that it has suffered an injury-in-fact caused by the challenged action. *Lujan*, 504 U.S. at 560–62. An "injury-in-fact" means just that: the injury must "in fact" exist. *Id.* "Monetary costs are of course an injury." *Texas priorities*, 143 S. Ct. at 1970. But to satisfy Article III, monetary costs must be "concrete … particularized . . . actual or imminent." *Lujan*, 504 U.S. at 560. In other words, they must be real. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (to have standing, injury must be "real"). The costs Texas now claims to have incurred from the CHNV processes are not real in any sense. They do not exist on any balance sheet, ledger, or bank statement. So unlike the DAPA case, Texas cannot show the CHNV processes caused or will cause "a major effect on the state[']s fisc[]," 809 F.3d at 152-53. At most, the data presented at trial evidenced net savings, which would not constitute injury. An injury necessarily implies that some situation has gotten worse for the plaintiff relative to the status quo ante. *In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019) ("To the extent the challenged regulations require Plaintiffs to do what they've already been doing [], they do not have standing to challenge them."); *Smith v. GC Servs. Ltd. P'ship*, 986 F.3d 708, 711 (7th Cir. 2021) (plaintiff lacked standing where she was no worse off than if the challenged action had not occurred); *Youth Alive v. Hauppauge Sch. Dist.*, No. 08-CV-1068 NGG VMS, 2012 WL 4891561, at *4 (E.D.N.Y. Oct. 15, 2012) (Plaintiff does not have standing "when state action leaves her no worse off. Such a result would eliminate the injury-in-fact requirement for standing in Equal Protection cases entirely."); *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, No. MDL 1712, 2008 WL 2246989, at *5 (E.D. Pa. May 30, 2008) (Dismissing class action for lack of standing where "the plaintiffs cannot show that they have suffered a concrete financial loss because they are no worse off than they were before.").

A plaintiff thus cannot show standing where the "present costs and burdens" existed "even before" the challenged policy "was enacted." *Clapper*, 568 U.S. at 416-17. In *Clapper*, the Supreme Court considered and compared costs and burdens both prior to and following enactment of a policy, indicating that courts are not limited to considering whatever prospective costs a plaintiff alleges in isolation. *Id*. Because an injury for standing purposes requires some negative change compared to the status quo ante relative to the plaintiff, there is no such thing as injury from a program in the abstract. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("We know of no precedent for the proposition that . . . a plaintiff . . . retains standing to challenge . . . [a] regulation in the abstract[], apart from any concrete application that threatens imminent harm to his interests. Such a holding would fly in the face of Article III's injury-in-fact requirement."). For example, in *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023), the State of Louisiana brought an action challenging the National Marine Fisheries Service rule requiring certain shrimping vessels in Louisiana waters to use turtle excluder devices. The State claimed it had standing because it would incur enforcement costs as a result of the rule. *Id.* at 876. The Court concluded, however, that the State lacked standing because a standing argument premised upon increased enforcement costs "is necessarily contingent on a finding that the Final Rule will increase [the State's] enforcement costs," which the State did not establish because, among other reasons, it did not show that the rule would actually lead to increased enforcement or that such costs would not be offset. *Id.* at 881. In sum, Texas's contention that the Court should compare the number of CHNV parolees with a baseline of zero to find standing is without basis.

Nonetheless, Texas has argued that the Court may do so because "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed

from the relationship with the defendant." Tr. 153:2-15 (quoting *DAPA*, 809 F.3d at 155–56), 263:10-23, 264:16-22. This argument misses the point and misunderstands the case law. Even if the parole of 30,000 CHNV nationals per month into the United States could constitute an injury on its own, courts consider "those offsetting benefits that are of the same type and arise from the same transaction as the costs." *DAPA*, 809 F.3d at 155. A critical component of the CHNV processes is that they each provide that "[i]mplementation of the new parole process [] is contingent on the government of Mexico accepting the return, departure, or removal to Mexico of [CHNV] nationals seeking to enter the United States without authorization," 88 Fed. Reg. 1244, 1256, 1267-68, 1279, and "[CHNV nationals] who do not avail themselves of this new process and instead enter the United States without authorization between ports of entry generally are subject to removal, including to third countries such as Mexico." *Id*. Accordingly, in considering the effect of the CHNV processes—vis-à-vis Texas's injury—the Court must consider not only the number of individuals paroled into the country through the processes, but also the number of CHNV nationals who are deterred from entering or who can now be removed from the United States as a result of the processes because these effects have a "nexus" to the parole processes, *Texas*, 809 F.3d at 156. *See Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th at 884 ("State would suffer no cognizable injury because [Defendant] would provide commensurate funding to [State agency] for its additional enforcement efforts."); *Henderson v. Stalder*, 287 F.3d 374, 379-80 (5th Cir. 2002) (finding plaintiffs lacked standing based on the cost of producing specialized license plates, where that cost was offset by payments made by members of the public to cover those costs). In the DAPA case, the Fifth Circuit held that where standing was premised upon the cost of issuing drivers licenses, it did not need to consider, for example, the fact that individuals with licenses might buy auto

insurance, thereby reducing State expenses associated with uninsured motorists. These offsets, it held, were different in kind than licenses. *DAPA*, 809 F.3d at 155. Here, on the other hand, as the Court correctly noted, it is "comparing apples to apples" when it considers, for example, the cost to Texas of educating school-aged children paroled into the country from Haiti before and after the CHNV processes became operative. Tr. 250:18-21.

In sum, Plaintiffs' contortionist theory of standing—under which a State could theoretically save money and still claim monetary injury—makes a mockery of Article III standing. Texas has not shown that it suffered an injury-in-fact or faced certainly impending risk of such injury, let alone one that is traceable to the CHNV processes or redressable by Court order. To establish redressability, a plaintiff must show its injuries are capable of being remedied by a favorable decision. *Lujan*, 504 U. S., at 561; *Texas priorities*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (explaining that an injury is not redressable where federal officials would have the same underlying discretion such that the same result is likely to occur even without the challenged policy). What injury would be remedied by a favorable order here? Were the Court to vacate the CHNV processes, the data shows that Texas would likely have *more* CHNV nationals in the State and its costs would *increase*. Ex. II, at ¶ 4-6. Would that remedy its injury? Of course not. It would perpetuate the very harms Texas asserts in this case—having more noncitizens in its State. Texas purports not to want such a result, further showing that it suffers no injury at all from processes that achieve the very result Texas claims to want—fewer CHNV national in its territory.

Given the overwhelming and undisputed trial record, the Court should dismiss this case for lack of standing.

**IV.    Special solicitude does not relieve a plaintiff of the burden to establish a concrete injury traceable to the challenged agency action.**

The Supreme Court's decision in *Texas priorities* questioned the circumstances in which special solicitude might apply and confirmed that the doctrine has no application when a State asserts standing based on the type of indirect costs Plaintiffs have asserted in this suit.

In *Texas priorities*, the majority noted that plaintiffs based "part of their argument for standing" on *Massachusetts v. EPA*, 549 U.S. 497 (2007). *See* 143 S. Ct. at 1964 n.6. But the Court held that ultimately, "none of the various theories of standing asserted by the States … overcomes the fundamental Article III problem with this lawsuit." *Id*. n.3. Plaintiffs in *Texas priorities* based standing on the same theory of indirect costs that Plaintiffs raise in this case—that immigration policy might affect the number of people in the State, which might in turn affect State expenditures with respect to law enforcement or "social services such as healthcare and education." *Id*. at 1968-69. Rejecting plaintiffs' theory of harm, the Supreme Court emphasized that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Texas priorities*, 143 S. Ct. at 1964 n.3. Special solicitude did not save plaintiffs' arguments that they had standing to challenge the agency guidance, a point the concurrence also noted while explaining the limited historical application of the doctrine overall. *Id*. at 1977 (Gorsuch, J., concurring). As Justice Gorsuch, writing for himself and two other Justices, explained: "Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence.' … Nor has 'special solicitude' played a meaningful role in this Court's decisions in the years since."

27

*Id.* (citation omitted).[4] As the concurrence warned, "it's hard not to think … that lower courts should just leave that idea on the shelf in future" cases. *Id*.

Ultimately, it is no surprise that special solicitude was no aid to the plaintiff States in *Texas priorities* because even in the rare circumstances where the doctrine has been applied, it does not relieve States of the obligation to meet the basic requirements of Article III by showing a concrete and particularized injury traceable to the challenged agency action. *Massachusetts*, 549 U.S. at 522. Even if a State satisfies the additional criteria discussed below that are necessary to invoke special solicitude, special solicitude would at most lower the threshold for establishing redressability. *See Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022). But a looser standard for redressability cannot overcome the failure to establish a concrete harm, and is thus of no use to plaintiff States alleging indirect, unsubstantiated costs that are insufficient to satisfy "bedrock Article III constraints." *Texas priorities*, 143 S. Ct. at 1964 n.3; *see Mellon*, 273 U.S. at 17-18 (States may sue the United States only if they have suffered a "direct injury," not where the alleged harm is "only remote and indirect"). Special solicitude thus has no place in a case predicated on indirect costs.

*Massachusetts* in contrast involved a direct harm to a state, namely the threatened loss of territory owned by and subject to the sovereignty of the State. *Massachusetts*, 549 U.S. at 521. The Supreme Court has long treated the loss of territory as a distinct and legally cognizable harm. *See* Ann Woolhandler & Michael G. Collins, State Standing, 81 Va. L. Rev. 387, 415-16 (1995) (discussing 19th-century cases). Plaintiffs' challenge to the CHNV processes involves only alleged

---

[4] Indeed, the Supreme Court has never afforded States "special solicitude" in any other case. To the contrary, the Court's decisions since *Massachusetts* have consistently analyzed state standing without granting States favorable treatment simply because they are States. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2116-20 (2021); *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

"indirect fiscal burdens"—a "humdrum feature" of many federal policies, including many policies with respect to immigration. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.). "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Id.* at 386-87 (citing *Arizona v. United States*, 567 U.S. 387, 394-97 (2012)). "The States have distinctly less, not more, solicitude in this area." 40 F.4th at 387.

Special solicitude does not apply in this case for additional reasons. A State invoking special solicitude must also show, among other things, a procedural right to challenge the action in question. *Texas*, 50 F.4th at 514. *Massachusetts* attached "critical importance" to the State's "procedural right" provided by the Clean Air Act to submit a petition for rulemaking and challenge the denial of such a petition related to emissions standards. *Massachusetts*, 549 U.S. at 516, 518; *see also id.* at 527 (noting case dealt with the denial of a petition "for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file"); 42 U.S.C. § 7607(b)(1); *Texas priorities*, 143 S. Ct. at 1975 n.6 (noting that in *Massachusetts*, "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than a challenge to an exercise of the Executive's discretion). The INA creates no similar procedural right for States to challenge use of the discretionary authority in the parole statute. To invoke special solicitude, an agency action must also be "imposing substantial pressure on" the State's "quasi-sovereign" interests." *Texas*, 809 F.3d at 153. In the DAPA case, the Fifth Circuit held that this requirement was satisfied where immigration policy placed substantial pressure on the State to change its laws related to driver's licenses. *Id.* Even if that were sufficient to establish a quasi-sovereign interest, Plaintiffs here have not asserted that the CHNV processes have placed any pressure on them to change any State laws. *See also Arizona*, 40 F.4th at 386-87 (finding this

type of quasi-sovereign interest requires showing actual "regulation of" the State or "preemption of local lawmaking authority").

Because a State seeking to invoke special solicitude "must" among other things "be exercising a procedural right created by Congress" and at a minimum show that it is under substantial pressure to change State law with respect to some quasi-sovereign interest of the State, the Fifth Circuit has held that the "factors" necessary to invoke special solicitude "will seldom exist." *Texas*, 809 F. 3d at 162. This case is not the rare case where Texas can assert the factors necessary to invoke it.

## V.    Plaintiffs' ultra vires claim is not viable.

The Court asked the parties to brief whether following the 1976 amendment to the APA, Plaintiffs' ultra vires claim is still viable. As set forth below, it is not. *Apter v. Dep't of Health & Hum. Servs.*, No. 22-40802, 2023 WL 5664191, at *8 (5th Cir. Sept. 1, 2023) ("[U]nder our precedent, Congress apparently did away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity when it amended the APA in 1976.") (cleaned up); *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) ("[T]he principal purpose of [the 1976 amendment to the APA] was to do away with the ultra vires doctrine.").

In their amended complaint, Plaintiffs purport to assert an "ultra vires" claim "at equity" against Defendants: "Defendants' parole program exceeds their statutory parole authority under 8 U.S.C. § 1182(d)(5)." ECF No. 20 ¶ 143. They assert an identical claim under the Administrative Procedure Act ("APA"): "Defendants' parole program should be held unlawful" under the APA because "[t]he program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5)." *Id.* at ¶ 141(a). Indeed, at trial counsel for Texas admitted the claims are identical.

Tr. 308:4-10. The Court should reject Plaintiffs' ultra vires claim as preempted by the APA. Even

if such a stand-alone claim could exist, it cannot co-exist with an identical claim under the APA.

Before 1976, "to avoid the bar of sovereign immunity, courts indulged in the fiction that a

federal official acting . . . beyond his statutory powers was acting for himself only and not as an

agent of government." *Geyen*, 775 F.2d at 1307. From this fiction, the "ultra vires" action was

born. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (If "the officer is

not doing the business which the sovereign has empowered him to do or he is doing it in a way

which the sovereign has forbidden[,] [h]is actions are ultra vires his authority and therefore may

be made the object of specific relief."). The ability to sue for an ultra vires claim, or a claim at

equity, was thus sometimes referred to as the "Larson doctrine."[5] Even under the Larson doctrine,

however, if a suit which is nominally directed against an individual officer is in substance a suit

against the government, sovereign immunity applies, and the claim cannot proceed regardless of

whether it is styled as a suit at law or at equity. *Id.* at 688; *Watkins v. Willis*, No. 22-11602, 2023

WL 4614497, at *3 (11th Cir. July 19, 2023) (same). The test for making this determination

requires looking to the remedy. *Larson*, 337 U.S. at 388. If the suit "will not require action by the

sovereign," there is "no jurisdictional difficulty." *Id.* On the other hand, a suit nominally directed

at an officer, but seeking judicial "compulsion against the sovereign" is barred. *Id.* at 688. In

*Dugan v. Rank*, the Supreme Court expanded upon the test, by adding that a suit is also against the

sovereign if the remedy sought "would expend itself on the public treasury or domain, or interfere

with the public administration." 372 U.S. 609, 620 (1963).

---

[5] Cases that refer to the Larson doctrine generally do not italicize or underline the word "Larson,"
so Defendants do not do so either.

Here, even if the Larson doctrine were still viable it would not apply here because Plaintiffs' suit, challenging the CHNV processes—i.e. immigration policy at the highest level—is in substance one against the federal government, not against any individual who is nominally named in the complaint. Stated differently, Plaintiffs are not suing any officer named in the complaint in their individual capacity; they are challenging actions taken by the named individuals only in their role as part of government agencies. Given that Plaintiffs' ultra vires claim is identical to their APA claim, the latter of which clearly must be against the government, , Plaintiffs cannot plausibly contend that the mirroring ultra vires claim is somehow *not* directed against the government. For that reason alone, Plaintiffs' at equity ultra vires claim fails.

Plaintiffs' ultra vires claim also fails because the Larson doctrine is no longer viable. In 1976, Congress recognized that "actions challenging official conduct are intrinsically against the United States" and should be "treated as such for all practical purposes." H.R.Rep. No. 1656, 94th Cong., 2d Sess. 11 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad. News 6121, 6131. At the same time, to permit certain types of ultra vires lawsuits to continue, Congress waived sovereign immunity from lawsuits seeking nonmonetary relief through nonstatutory judicial review of agency action. Act. of Oct. 21, 1976, Pub. L. No. 94–574, § 1, 90 Stat. 2721, 2721. Congress codified that waiver in what is now section 706(2)(C) of the APA. Section 706(2)(C), by its express terms, offers a vehicle to challenge unconstitutional and otherwise ultra vires executive action. 5 U.S.C. § 706(2)(C) (permitting court to review and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). While the Supreme Court has not specifically held that the ultra vires doctrine or Larson doctrine is no longer viable following the 1976 amendment to the APA, its precedent unwaveringly suggests this result.

It is "well-established" that "a precisely drawn, detailed statute preempts more general remedies." *Hinck v. United States*, 550 U.S. 501, 506 (2007) (internal citations omitted). "And that makes sense: when the legislature has attacked a specific problem—and crafted a detailed and precise remedy to address that problem—we should generally assume that the law represents Congress's considered and exclusive judgment on that issue." *Savage Servs. Corp. v. United States*, 25 F.4th 925, 939 (11th Cir. 2022). The Supreme Court has repeatedly applied this rule to preclude litigants from circumventing restrictive statutory provisions, such as those in the APA, by invoking more general statutes or common law causes of action. In *Preiser v. Rodriguez*, for example, the Court held that prisoners cannot challenge their continued detention under 8 U.S.C. § 1983 even if their claim falls with the statute's "literal terms." Instead, they must do so under the more specific habeas corpus statutes, 28 U.S.C. §§ 2241 and 2254, which contain exhaustion of remedies requirements. 411 U.S. 475, 488 (1973). In *Brown v. GSA*, the Court held that section 717 of the Civil Rights Act of 1964 was the exclusive remedy for federal employment discrimination. 425 U.S. 820, 834 (1976) (rejecting an interpretation that would "driv[e] out of currency" a narrowly aimed provision "with its rigorous ... time limitations" by permitting "access to the courts under other, less demanding statutes"). In *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, the Supreme Court rejected the State's contention that it could avoid the twelve-year statute of limitations under the 1972 Quiet Title Act—a federal statute that, just like the APA, created an explicit waiver of sovereign immunity—by instead pursuing a Larson suit at equity against the officials. 461 U.S. 273, 286 (1983). The Court noted that if it were to permit such an action, multiple provisions of the Quiet Title Act, including its statute of limitations, would be "rendered nugatory." *Id*. at 285. "It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful

pleading." *Id.*, quoting *Brown* 425 U.S. at 833. As a result, the Court held that the Quiet Title Act represented the only mechanism by which litigants could challenge the federal government's title to real property. *Id.*[6] These cases compel the same result here.

If litigants could bring suit at equity against federal officials for ultra vires action, these litigants would be able to circumvent the APA's record rule, undermining Congress's clear intent that challenges to agency action should proceed only in the manner and to the extent authorized by the APA's specific provisions.[7] *See e.g. Ketcham v. U.S. Nat'l Park Serv.*, No. 16-CV-00017-SWS, 2016 WL 4268346, at *2 (D. Wyo. Mar. 29, 2016) (stating that permitting standalone claims to agency action outside the APA would run afoul of Congress's intent in limiting judicial review to the agency record and would incentivize every aggrieved party to plead similar standalone claims to "trade in the APA's restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure."); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service*, 58 F. Supp. 3d 1191, 1238 (D.N.M. 2014) (same). But just as litigants cannot raise an at equity claim to avoid the Quiet Title Act's statute of limitations, *Block*, 461 U.S. at 284, neither can litigants raise

---

[6] *See also e.g. Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637–38 (2d Cir. 1989) (affirming dismissal of RICO claim where complaint, "distilled to its essence, alleges no more than that appellants were discriminated against for having made complaints about safety at a nuclear plant," after concluding Energy Reorganization Act provided exclusive federal remedy for such a claim); *Palmer v. Trump Model Mgmt., LLC*, 175 F. Supp. 3d 103, 109 (S.D.N.Y. 2016) ("Plaintiff's RICO claim, which is based on Defendants' alleged misrepresentations in her labor application, falls squarely within the scope of the INA. Allowing Plaintiff to use the civil RICO statute to redress substantive violations of the INA would thwart Congress' careful, comprehensive scheme to remedy violations falling within the INA's scope.") (cleaned up).

[7] Under the APA "[j]udicial review is ordinarily limited to the administrative record." *Kotha v. Renaud*, No. 3:21-CV-641, 2021 WL 4027697, at *2 (N.D. Tex. May 12, 2021) (holding plaintiff's styling of challenge as to unlawful agency *inaction* as opposed to action, as specified in section 706(2), did not mean it could go outside the record) (citing *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 539 (D.D.C. 2021)). The Fifth Circuit has recognized that even in constitutional challenges to agency action, where the constitutional gravamen means the court should not defer to the agency's view of the law or facts, but rather perform its own analysis, its "independent examination" is still "of the record." *Porter v. Califano*, 592 F.2d 770, 781 (5th Cir. 1979).

an at equity claim to avoid the APA's record rule. This remains true even if a court ultimately determines that the APA does not apply, because, for example, there was no final agency action or because the plaintiff was not within the zone of interests of the challenged statute. *Id.* (holding that plaintiff had to bring its claims under the Quiet Title Act, not under the Larson doctrine, notwithstanding the fact that those claims would ultimately be nonviable because they were time-barred). Indeed, the Supreme Court has stated that the power of the federal courts at equity "is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The APA creates that statutory limitation.

Thus, to the extent Plaintiffs have a claim for equitable relief arising from alleged ultra vires action by Defendants, this claim must be brought under the APA and its procedures. *Geyen*, 775 F.2d at 1307 ("[T]he principal purpose of [the 1976 amendment to the APA] was to do away with the ultra vires doctrine."); *E. V. v. Robinson*, 906 F.3d 1082, 1092 (9th Cir. 2018) ("[S]ince 1976 federal courts have looked to [5 U.S.C.] § 702 ... to serve the purposes of the [ultra vires doctrine] in suits against federal officers.") (internal quotation omitted).

Plaintiffs argued, however, in opposition to Defendants' motion to exclude evidence, that an at equity ultra vires claim is still viable notwithstanding the 1976 amendments to the APA. ECF No. 252, at 2-3; Tr. 56:2-15. They based their argument primarily upon passing language in *Armstrong*, 575 U.S. 320, and Judge Kacsmaryk's vacated decision in *Leal v. Azar*, 489 F. Supp. 3d 593, 599 (N.D. Tex. 2020), *judgment entered sub nom. Leal v. Becerra*, No. 2:20-CV-185-Z, 2021 WL 1163663 (N.D. Tex. Mar. 26, 2021), and *vacated and remanded sub nom. Leal v. Becerra*, No. 21-10302, 2022 WL 2981427 (5th Cir. July 27, 2022). At the pre-trial conference, they also based their argument on *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). Tr. 59:9-13, 60:20-61:20. Their reliance is misplaced.

35

Plaintiffs have relied upon language in *Armstrong* that "federal courts may in some circumstances grant injunctive relief against state officers who are violating . . . federal law" and "in a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." ECF No. 252, at 2, quoting *Armstrong*, 575 U.S. at 326-27; Tr. 59:14-23. But that language appears in the portion of the Court's decision where it held that the ability of a party to sue to enjoin unconstitutional action by state officers does not rest upon an implied right of action contained in the Supremacy Clause. *Id*. Later in the decision the Court discussed whether the plaintiffs, providers of residential rehabilitation services to Medicaid-eligible individuals, could pursue a cause of action at equity against the State to enforce a provision of the Medicaid Act. *Id*. at 327. It held that the plaintiffs did not have that right, because at equity actions are subject to both express and implied statutory constraints, and the Medicaid Act impliedly precluded such private rights of action. *Id*. at 328. Thus, if anything, *Armstrong* supports the arguments that Defendants have made that the APA impliedly precludes Plaintiffs from bringing an ultra vires claim at equity.

*Reich* is simply inapplicable. In *Reich*, appellants sued the Secretary of Labor seeking declaratory and injunctive relief to prevent the Secretary from enforcing President Clinton's Executive Order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike. 74 F.3d. at 1324-25. Although the lawsuit was nominally against the Secretary of Labor, the action that appellants challenged was the President's issuance of the Executive Order, which appellants claimed, *inter alia*, violated the National Labor Relations Act. *Id*. at 1325. There was no dispute that "[a]ppellants could not possibly have relied on the APA for a cause of action . . . because . . . the President is not an 'agency' under that Act." *Id*. at 1326. Thus, in holding that appellants could pursue a nonstatutory claim, *id*. at 1327, the

Court was not opining upon the continued viability of "at equity" "ultra vires" claims against federal agencies following the 1976 amendments of the APA. By contrast, here, Plaintiffs are not challenging Presidential action for which no other statutory review is available; they are challenging agency action for which APA statutory review is available. *Reich* is thus irrelevant. At a minimum, *Reich* lends no support to Plaintiffs' attempt to raise an ultra vires claim in the same case where they have raised an APA claim.

Plaintiffs' reliance on *Leal* is equally misplaced. First, even if *Leal* stood for the proposition that an ultra vires claim is viable following the 1976 amendments, it obviously is not binding on this court, and is not persuasive in light of the above-noted Supreme Court cases. But, more importantly, *Leal* does not stand for that proposition. In *Leal*, a case challenging the Affordable Care Act's contraceptive mandate, Judge Kacsmaryk acknowledged "it is an open question whether the 1976 amendments to the APA abrogated the Larson doctrine in suits against federal agency officials," because there had "been little need to litigate" the question following the 1976 amendments. 489 F. Supp. 3d at 599. Nonetheless, because "Defendants [did] not challenge Plaintiffs' invocation of this 'equitable cause of action,' [] the Court assume[d] the Larson doctrine applie[d]." *Leal v. Azar*, No. 2:20-CV-185-Z, 2020 WL 7672177, at *6 n.7 (N.D. Tex. Dec. 23, 2020). By contrast, Defendants in this action have disputed the viability of Plaintiffs' at equity ultra vires claim throughout this litigation. *See* ECF Nos. 120, 213, 240, Tr. 16:2-21:15.

Finally, even if the Larson doctrine were viable and applicable to this action—neither of which are true—Plaintiffs cannot simultaneously pursue an APA claim and an at equity claim for the same conduct in the same lawsuit. Even in *Leal*, Judge Kacsmaryk noted that Plaintiffs could pursue their Larson doctrine claim because "Plaintiffs are *not* bringing an APA claim." *Leal*, 2020 WL 7672177 at *6 (emphasis in original). If a party could pursue both claims in the same action,

different evidence would be admissible for each claim. The APA claim would be strictly limited by the record rule—where extra-record evidence could not be considered, but hearsay documents within the administrative record could be considered. *Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 495 (E.D. Cal. 2018) ("If this claim were governed by the APA's record review rule, hearsay would not be an issue for documents within the AR. This is because the AR is what it is.") (internal citations omitted). Meanwhile, the ultra vires claim would be governed by the Federal Rules of Civil Procedure and the Federal Rules of Evidence, such that the court could consider documents beyond the administrative record but could not consider any hearsay documents contained within the administrative record. It is unimaginable that Congress would have crafted a strict record rule for actions challenging agency action in excess of statutory authority, 28 U.S.C. § 706(2)(C), if it intended to permit parties to challenge the same conduct, in the same action, governed by an entirely different set of evidence.

Accordingly, the Court should reject and dismiss Plaintiffs' ultra vires claim. Further, to the extent the Court permitted Plaintiffs to admit extra-record evidence in support of their ultra vires claim, that evidence should not be used in the Court's findings of fact or considered in the Court's adjudication of this APA case. Tr. 111:16-112:5.

## VI.   Review of compliance with Section 1182(d)(5)(A)'s "case-by-case" language is a mixed question of law and fact.

The determination of whether the government is making parole determinations on a case-by-case basis as required by 8 U.S.C. § 1182(d)(5) is a mixed question of law and fact.

At the outset, interpreting the requirements of a statute, such as Section 1182(d)(5)(A), is a question of law. *Issaq v. Holder*, 617 F.3d 962, 968 (7th Cir. 2010) ("Whether an agency correctly interprets a statute is a question of law."); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 691 (1st Cir. 1994) ("The search for statutory meaning inevitably reduces to a pure

question of law."). Burden of proof does not apply to strict questions of law. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 114 (2011) (Breyer, J., concurring) ("[T]he evidentiary standard of proof applies to questions of fact and not to questions of law."). However, where the Court must determine the meaning of words or phrases in a statute, the interpretation given by the agency charged with primary responsibility for enforcement of the statute is entitled to considerable deference. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 (1969) (stating, it is a "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction"); *see New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1168 (D.N.M. 2020) (stating in a case discussing Section 1182(d)(5) parole, "[t]he federal judiciary accords considerable deference to agencies' interpretations of their own organic statutes -- the statutes Congress has tasked an agency with enforcing, from which it derives its authority to act."); *Cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

Congress did not define "urgent humanitarian reasons" or "significant public benefit" as used in Section 1182(d)(5), and instead conferred authority upon the Secretary the authority to "issue such instructions" and "perform such other acts as he deems necessary for carrying out his authority" under the INA. 8 U.S.C. § 1103(a)(1), (3); 6 U.S.C. § 202(4) ("The Secretary shall be responsible for …[e]stablishing and administering rules … governing … parole"). Nor did Congress impose numerical limits on the individuals granted parole under Section 1182(d)(5) for a particular urgent humanitarian reason or significant public benefit. DHS's interpretation and application of these terms are thus entitled to deference. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate

questions of foreign relations.'" (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)); *Chevron, Inc.*, 467 U.S. at 842; *New Mexico*, 450 F. Supp. 3d at 1169:

> A number of policy considerations animate *Chevron* deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, is granting discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state than a unified but Circuit-fragmented federal judiciary can.

Deference owed to DHS does not depend solely on *Chevron*. For example, in *INS v. Abudu*, the Supreme Court recognized—without citing *Chevron*—that deference is due to immigration agencies because they "must exercise especially sensitive political functions that implicate questions of foreign relations." 485 U.S. 94, 108 (1988) (citing *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-102 n.21 (1976) ("[T]he power over aliens is of a political character and therefore subject only to narrow judicial review")). Similarly, in *INS v. Jong Ha Wong*, the Court concluded that the Ninth Circuit improperly rejected the Attorney General's narrow construction of the term "extreme hardship." 450 U.S. 139, 145 (1981) (per curiam) ("The Attorney General and his delegates have the authority to construe 'extreme hardship' narrowly should they deem it wise to do so."). And in *INS v. Miranda*, the Court observed, "[T]he INS is the agency primarily charged by Congress to implement the public policy underlying these laws. Appropriate deference must be accorded its decisions." 459 U.S. 14, 19 (1982) (per curiam) (citations omitted). More generally, given that Congress has employed broad phrases in section 1182(d)(5), deference is owed to DHS's interpretation even without regard to *Chevron*. *See, e.g.*, *Ascendium Educ. Solutions, Inc.*

*v. Cardona*, 78 F.4th 470, 485 & n.1 (D.C. Cir. 2023) (Walker, J., concurring) (citing, e.g., Brett

M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2153–54 (2016)).

DHS's interpretation is also entitled to greater deference than in cases of statutory silence

because the INA contains an *express* delegation of authority, providing that the "determination

and ruling by the Attorney General with respect to all questions of law" arising from "the

administration and enforcement of [the INA] and all other laws relating to the immigration and

naturalization of" noncitizens "shall be controlling," 8 U.S.C. § 1103(a)(1). "Congress has

delegated remarkably broad discretion to executive officials under the [INA]" and its grants of

authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766

F.2d 1478, 1484 (11th Cir. 1985); *see Jean v. Nelson*, 727 F.2d 957, 966 & n.8 (11th Cir. 1984),

*aff'd*, 472 U.S. 846 (1985). Further underscoring the unreviewable discretion inherent in parole,

courts lack jurisdiction to review parole decisions under 1252(a)(2)(B)(ii). *See, e.g., Hassan v.*

*Chertoff*, 593 F.3d 785, 790 (9th Cir. 2010); *Bolante v. Keisler*, 506 F.3d 618, 621 (7th Cir. 2007);

*Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 667 (S.D. Tex. 2020); *Jeanty v. Bulger*, 204 F.

Supp. 2d 1366, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

Further, there are many historical examples of Congress passing legislation supporting

DHS's longstanding interpretation of the terms "urgent humanitarian reasons" and "significant

public benefit" to include socio-political concerns, natural disasters and mitigating irregular

migration, and similarly supporting DHS's use of parole for groups of individuals subject to the

same qualifying "urgent humanitarian reasons" and "significant public benefit." *See* Defendants'

Conclusions of Law at ¶¶ 131-35. Deference is given long-standing interpretations of statutes. *Int'l*

*Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20 (1979). As the former Immigration and

Naturalization Service has explained, "[d]esignating, whether by regulation or policy, a class

whose members generally would be considered appropriate candidates for parole does not conflict with a 'case-by-case' decision requirement since the adjudicator must individually determine whether the person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case." *See* Cuba AR at 92 (Memorandum from General Counsel of INS, *Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status*, June 15, 2001). That interpretation of the Secretary's authority under Section 1182(d)(5) is consistent with decades of judicial precedent. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting agency need not "forswear use of reasonable presumptions and generic rules" even where statue required "some level of individualized determination"); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir. 1996) (similar); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (similar). In short, what Section 1182(d)(5)(A) requires for "case-by-case" parole is a question of law, but because the agency "is entitled to considerable deference in its interpretation" of terms in a statute it administers, *Nat'l Hand Tool Corp. v. Pasquarell*, 889 F.2d 1472, 1475 (5th Cir. 1989), the Court should defer to the agency's interpretation.

Whether DHS has applied the statute appropriately (i.e. in any particular case) is a question of fact. Plaintiffs bear the burden of proof as to questions of fact. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, (1989) (The standard of review under the APA is a narrow one, and the plaintiff bears the burden of proof.); *Public Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003); *Sierra Club v. Marita*, 46 F.3d 606, 617 (7th Cir. 1995). There is no evidence to suggest that DHS has dispensed parole *en masse*. At the outset, each of the parole processes explicitly provides that "[o]nly those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process." 88 Fed. Reg. 1244, 1256, 1267, 1279. Defendants' statement that parole under

the processes will be, and has been, granted only on a case-by-case basis is entitled to a presumption of regularity. *See, U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 10 (2001) (administrative agencies are given a presumption of regularity in regard to adherence to their own regulations); *BCCA Appeal Grp. v. U.S. EPA,* 355 F.3d 817, 832 (5th Cir. 2003) ("[T]here is a presumption of regularity to the EPA's choice of analytical methodology, so challenging parties must overcome a 'considerable burden.'"); *Nicholson v. Brown*, 599 F.2d 639, 649 (5th Cir. 1979) ("Administrative action ... comes before the courts clothed with a presumption of regularity."); *Huddleston v. FBI*, No. 4:20-CV-00447, 2022 WL 4593084, at *14 (E.D. Tex. Sept. 29, 2022) (agency is entitled to a presumption of regularity that its employees adhere to agency policy.); *cf. Biden v. Texas*, 142 S. Ct. 2528, 2546 (2022) (noting the extraordinarily high burden of overcoming "presumption of regularity that normally attends agency action").

Plaintiffs have not overcome this presumption because they submitted no evidence as to whether DHS has granted parole to any individual other than on a case-by-case basis.[8] On the contrary, the evidence in the record shows that that determinations are being made on a case-by-case basis. First, Blas Nuñez-Neto, Assistant Secretary for Border and Immigration Policy with the DHS, stated so in his declaration. Defendants' Trial Ex. II, ¶ 3 ("Parole is granted by CBP at the port of entry on an individualized, case-by-case basis."). Second, CBP interviewed Oldryn at his designated point-of-entry for about three hours, Tr. 88:2-18, and there is no evidence in the record that the length of his interview was an anomaly. Third, CBP officers at ports of entry have denied parole requests even for individuals who were authorized to travel to ports of entry. Ex. II,

---

[8] It is questionable whether the Court has jurisdiction to review such case-by-case parole grants because of the prohibition for review under 8 U.S.C. § 1252(a)(2)(B)(ii), but this question is moot because there is no such evidence in the record in any event.

¶ 3 ("CBP has, when making this determination, denied parole for noncitizens who traveled with advance travel authorization pursuant to the CHNV process.").

Accordingly, because the CHNV processes expressly state that parole will be granted exclusively on a case-by-case basis and because the trial record is devoid of evidence that DHS has granted to parole to anyone without such case-by-case determinations, this Court should find as a matter of law and fact that DHS's use of Section 1182(d)(5) complies with the statutory mandates.

## VII.    The major questions doctrine has no application in this case.

In their pretrial proposed conclusions of law, Plaintiffs argued for the first time that the parole processes violate the major questions doctrine. ECF No. 244 at 29. That doctrine is a method of statutory interpretation that presumes Congress does not delegate extraordinary regulatory authority over issues of major political or economic significance without providing clear statutory authorization. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022). The doctrine has no application here.

The Supreme Court has applied the major questions doctrine only in "extraordinary cases" where there is a gross mismatch between an agency's assertion of regulatory authority and the history and context of the supposed statutory authorization. *See West Virginia*, 142 S. Ct. at 2608-09. Plaintiffs argue the major questions doctrine is implicated here because "Congress would not have created an avenue for the Executive to ignore established channels of immigration by way of the parole power." ECF No. 244 at. 29. But many of the factors required for applying the major questions doctrine are not present here. As Plaintiffs acknowledge, *id.*, the major questions doctrine applies only in circumstances where an agency takes action of "vast 'economic and political significance,'" without statutory authorization, *Alabama Ass'n of Realtors v. Dep't of*

*Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). It is also implicated only in cases where the agency is using its regulatory authority, *West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022), and relying on a "long-extant statute" to claim "unheralded power," *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). And even when applicable, the major questions doctrine limits agency action only in "extraordinary cases" where the agency is not simply interpreting the statute and filling in gaps, but rather taking action that Congress could not possibly have anticipated when it enacted the relevant statutory authority. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). This is no such case.

First, Plaintiffs have not shown that this case involves vast economic and political consequences. *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. Plaintiffs assert harm based on unsubstantiated indirect costs that depend on an increased number of noncitizens in Texas, while all the evidence in the trial record shows a decrease in CHNV nationals in Texas compared to the status quo ante. All the evidence thus shows that there has been no negative impact or costs to the Plaintiff States. This hardly qualifies as the type of vast political and economic impact necessary to invoke the major questions doctrine. *See, e.g.*, *id.* at 2489 (discussing "$50 billion" in "economic impact" covering "80% of the country" and affecting "between 6 and 17 million" individuals). Plaintiffs' attempt to invoke this doctrine thus fails at the outset.

Even if the parole processes had vast economic and political significance, that alone would not be enough to invoke the major questions doctrine. The Supreme Court has never treated the major questions doctrine as a license for courts to override statutory text simply because an agency's action is economically or politically consequential. Many agency actions can be characterized as costly or politically salient, but the Supreme Court has not applied the major questions doctrine as a matter of course. To the contrary, it regularly decides challenges to actions

45

of major economic and political significance under the usual rules of statutory interpretation without imposing heightened-specificity requirements for statutory authorization. *See, e.g.*, *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (challenge to COVID-19 vaccine mandate); *Collins v. Yellen*, 141 S. Ct. 1761, 1776 (2021) (challenge to statutory authority for agency actions related to Fannie Mae and Freddie Mac during the 2008 financial crisis); *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2380-81 (2020) (challenge related to religious exceptions to contraceptive-coverage mandate in Affordable Care Act); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571-72 (2019) (challenge to Secretary's authority under the Census Act); *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (challenge to Executive authority under the Immigration and Nationality Act). This also includes Health and Human Services policies that often involve many billions of dollars, *see, e.g.*, *Becerra v. Empire Health Found.*, 142 S. Ct. 2354 (2022); *American Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022), and various other agency actions implicating billions in costs to the energy, utility, and telecommunications industries, *see, e.g.*, *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014); *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005); *New York v. FERC*, 535 U.S. 1 (2002).

Second, the major questions doctrine is implicated when an agency takes regulatory action. The Supreme Court has applied the major questions doctrine in cases where agencies assert some new power to regulate. *See, e.g.*, *West Virginia*, 142 S. Ct. at 2608 (EPA's authority to regulate power plants with emissions standards based on restructuring the Nation's mix of electricity generation); *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (OSHA's authority to adopt "a broad public health regulation" requiring vaccination or other COVID-19 precautions in the workplace); *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (CDC's authority to regulate "the landlord-tenant relationship" by issuing a nationwide eviction moratorium); *Utility Air Regulatory*

*Grp.*, 573 U.S. at 324 (EPA's power to assert permitting authority over millions of small sources); *Gonzales v. Oregon*, 546 U.S. 243, 266-68 (2006) (Attorney General's authority to ban drugs used in physician-assisted suicide); *Whitman v. American Trucking Assn's*, 531 U.S. 457, 465-68 (2001) (EPA's authority to consider implementation costs in setting national ambient air quality standards); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159-61 (FDA's authority to regulate tobacco products).

The focus on whether a case involves an "[e]xtraordinary grant[] of *regulatory authority*" makes good sense: the major questions doctrine rests on "separation of powers principles and a practical understanding of legislative intent," both of which inform the way one would expect Congress to legislate if it intended to grant an agency "'extravagant statutory power over the national economy.'" *West Virginia*, 142 S. Ct. at 2609 (citation omitted, emphasis added). Applicability of the doctrine is therefore tailored to assertions of "expansive regulatory authority over some major social or economic activity." *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 421 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of rehearing en banc); *see also West Virginia*, 142 S. Ct. at 2618 (Gorsuch, J., concurring) ("The framers believed that the power to make new laws regulating private conduct was a grave one that could, if not properly checked, pose a serious threat to individual liberty."). The parole processes, in contrast, are statements of agency policy that do not involve any new assertion of regulatory authority, or any regulation of individuals that can reasonably be described as an assertion of some new, extravagant, or coercive regulatory authority. These guidance documents address how DHS plans to exercise the existing discretionary parole authority already contained in Section 1182(d)(5)(A) and do not involve any "significant encroachment into the lives" of individuals. *NFIB*, 142 S. Ct. at 665.

Third, various other factors distinguish this case from cases where the major questions doctrine has been applied. This is not a case where the agency lacks "'comparative expertise' in making [the relevant] policy judgments," *West Virginia*, 142 S. Ct. at 2613 (citation omitted), or has asserted authority that falls outside its "particular domain," *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. Section 1182(d)(5)(A) expressly grants the agency the authority to grant parole. Nor is this a case where an agency has relied on a "long-extant statute" to claim "unheralded power." *Utility Air*, 573 U.S. at 324. The Executive has long used the parole authority in a similar manner, both before and after the amendments to Section 1182(d)(5)(A) in 1996, and under administrations of both parties.[9] *See United States v. Midwest Oil Co*., 236 U.S. 459, 481, 491 (1915) (Congress's awareness of and "long acquiescence in [] Executive action" without "repudiate[ion]" constitutes "tacit consent."); *Texas ex rel. Falkner v. Nat'l Bank of Com. of San Antonio*, 290 F.2d 229, 233 (5th Cir. 1961) ("Congress has long been apprised of this construction, and the fact that Congress has failed to enact legislation specifically repudiating the practice or placing the practice in a definite legislative scheme is sufficient indication that Congress has given its tacit approval."); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983); *Dames & Moore v. Regan*, 453 U.S. 654, 678-79 (1981).

Finally, even if applicable, the major questions doctrine would not justify enjoining or vacating the parole processes. The major questions doctrine does not override ordinary principles of statutory construction whenever an agency action can be described as consequential. Rather, it applies only in "extraordinary cases" where there is a gross mismatch between an

---

[9] *See* Defendants' Post-trial Proposed Findings of Fact ¶ 55 (providing long list of historical examples).

48

agency's assertion of regulatory authority and the history and context of the supposed congressional authorization. *West Virginia*, 142 S. Ct. at 2608-09. Here there is no such mismatch.

The parole processes fit well within the statutory text and the long historical tradition of using the parole authority for certain groups from certain countries, often to advance foreign affairs goals. *See* Defendants' Post-trial Proposed Conclusions of Law at ¶¶ 127-30. Thus, even if the doctrine applied, Section 1182(d)(5)(A) provides statutory authorization for the parole processes that makes the doctrine irrelevant. Plaintiffs do not dispute that Congress authorized the use of parole through Section 1182(d)(5)(A)—the statute does that expressly. Plaintiffs simply dispute whether the parole processes satisfy the case-by-case, significant-public-benefit, and urgent-humanitarian-reasons portions of the statute. But the limits Plaintiffs urge the Court to read into the statute closely mirror proposed amendments Congress considered, and rejected, even after considering the broad use of parole prior to 1996 for large numbers of Cubans and other groups. *See* H.R. Rep. No. 104-469, at 140 (1996) (legislative history of rejected amendments which suggested narrowing authority "to admit entire categories of aliens," arguing "specific limitations on the Attorney General's discretion are necessary" because existing authority was used, for example, to parole tens of thousands of Cubans to implement a "migration agreement" with Cuba); *see also id.* at 78 (proposed amendments that would have limited definition of "urgent humanitarian reason" to "a medical emergency," "organ or other tissue" donations to a family member, or "imminent" death of "a close family member in the United States," and limited "public interest" to parole necessary to assist with or allow for criminal prosecution in the United States). Congress ultimately declined to narrow the statutory authority and instead left these terms undefined, delegating the responsibility of defining and applying them to the agency. *See also* Defendants' Post-trial Proposed Conclusions of Law at ¶¶ 120-26.

Plaintiffs are thus asking the Court to rewrite the statute to obtain their preferred policy outcome when they could not obtain that outcome through the political process. Since Congress specifically rejected limiting amendments that would have narrowed the statutory authority in the way Plaintiffs now seek, they cannot reasonably argue that they are raising issues that Congress did not consider when it enacted Section 1182(d)(5)(A) in its current form, as required for the major questions doctrine to apply. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 159 (citing Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 370 (1986) ("A court may also ask whether the legal question is an important one. Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration")). Congress considered the question of whether the parole authority should be limited, including whether the definitions of urgent humanitarian reason and significant public benefit should be narrowed, and rejected any such narrowing. H.R. Rep. No. 104-828, at 162, 245 (1996) (rejecting proposed amendments). In rejecting those narrowing amendments, Congress chose instead to delegate authority to the agency to interpret the terms "significant public benefit" and "urgent humanitarian reasons" using its expertise and experience, authority Congress elsewhere expressly provided to DHS to use as necessary in implementing the INA as a whole. *See* 8 U.S.C. § 1103(a)(1), (3); 6 U.S.C. § 202(4); *Texas v. United States*, 106 F.3d 661, 665 (5th Cir. 1997) ("Courts must give special deference to congressional and executive branch policy choices pertaining to immigration."); *Aguirre-Aguirre*, 526 U.S. at 424-25; *Jean*, 727 F.2d at 966 & n.8; *New Mexico*, 450 F. Supp. 3d at 1168.

Given the historical, repeated use of parole in a similar manner to the CHNV processes, and Congress's consideration of that history as well as amendments that would have limited the authority before reenacting the parole authority largely in the same form, Plaintiffs cannot show

that DHS is using the parole authority in some new "sweeping" and "transformative" way that "Congress could not have intended to delegate." *West Virginia*, 142 S. Ct. at 2608, 2610. In such circumstances the normal tools of statutory interpretation rather than the major questions doctrine apply. And those traditional tools of statutory interpretation firmly support upholding the statutory authority for the parole processes. If Plaintiffs want to narrow that statutory authority or influence the Executive Branch's use of that authority, the proper avenue is "the political process" and the various checks on that process the Supreme Court has identified as available to voters and to Congress. *Texas priorities*, 143 S. Ct. at 1975.

## VIII.   Scope of relief generally

If the Court grants any relief it should be limited, at most, to the State of Texas. Article III requires that relief be narrowly tailored to address the "concrete and particularized" harms that individual Plaintiff States have established through "evidence" at trial. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Accordingly, any relief the Court grants must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *Morice v. Hosp. Serv. Dist. #3*, No. 18-cv-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (plaintiff "lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit").

Unlike with standing, where a court "may address the merits of each claim" as long as one plaintiff has standing for each claim, and "need not inquire into the standing of the other Plaintiffs," "when it comes to granting relief, each Plaintiff must show it has standing to obtain the relief

sought." *Braidwood Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 638-39 (N.D. Tex. 2022). In other words, the rule that it is sufficient for one Plaintiff to show standing for each claim does not apply for purposes of determining the scope of relief. *Id*. "A valid Article III remedy 'operate[s] with respect to specific parties,' not with respect to a law 'in the abstract.'" *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, C.J., concurring) (quoting *California v. Texas*, 141 S. Ct. 2104, 2115 (2021)). As a result, "courts generally grant relief in a party-specific and injury-focused manner." *Id*. (questioning the judicial authority for granting "nationwide" or "universal remedies" that "give States victories they did not earn and sometimes give States victories they do not want"); *see also Texas priorities*, 143 S. Ct. at 1980-83 (Gorsuch, J., concurring) (noting separation-of-powers concerns and other issues with universal remedies, including the questionable basis under the APA for vacating agency actions rather than setting aside their application to a particular plaintiff).

The trial record in this case is devoid of evidence that *any* State has suffered concrete harm, so the Court should deny Plaintiffs' requested relief. But if the Court disagrees, there is no basis to grant relief beyond Texas because Plaintiffs did not even attempt to introduce any evidence of harm outside of Texas. In fact, Plaintiffs "stipulate[d] that they will only seek to establish irreparable injury for purposes of any equitable relief based on alleged harm to Texas and that they will not submit any evidence as to irreparable harm for any other State Plaintiff." ECF No. 139. Because Texas has stipulated that there is no evidence in the trial record of harm to any State other than Texas, relief must be limited, at most, to Texas.

Accordingly, if the Court ultimately enjoins the CHNV processes, it should enjoin their application only in Texas, for example by enjoining DHS from granting advance travel authorization to any noncitizen who indicates an intent to reside in Texas during the term of his or

her parole. The same limits apply if the Court were to vacate the parole processes rather than enjoin them. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944), including the principle of party-specific relief, *see* Samuel Bray, A Response to The Lost History of the "Universal" Injunction, Yale J. on Reg. N. & C. (Oct. 6, 2019); Bray 438 n.121. And the APA confirms that these traditional limitations on relief apply by, among other things, providing that the statute's authorization of judicial review does not affect "the power or duty of the court to … deny relief on any … equitable ground," 5 U.S.C. § 702(1); *see Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). Plaintiffs have argued that agency actions are often vacated as a whole rather than as to particular plaintiffs, but Article III's basic requirement that a remedy be narrowly tailored to address the particular injury or harm a plaintiff has established applies to all remedies, not just injunctions. *See DaimlerChrysler*, 547 U.S. at 352 (A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought."). "After a court has remedied a claimant's injury"—which here would be, at most, injuries to Texas—"it is fair to ask what controversy remains for a court to adjudicate or remedy," and thus what basis there is for any broader relief. *Arizona*, 31 F.4th at 483 (Sutton, C.J., concurring); *see also Texas priorities*, 143 S. Ct. at 1981-83 (Gorsuch, J., concurring) (noting there "are many reasons to think" the APA's use of "set aside" means courts should set aside the application of an agency policy as to a particular plaintiff "rather than 'vacate'" the policy).

Plaintiffs have previously argued that geographically-limited relief would be ineffective because noncitizens could be paroled into another State and later move to Texas. But they put forward no evidence at trial that this has happened or is likely to happen. The lack of evidence in the trial record distinguishes this case from other cases where Plaintiffs have made a similar

53

argument, as does several unique aspects of the parole processes Plaintiffs challenge. A central feature of the parole processes is that they allow individuals to fly to an airport in the interior of the United States to seek parole in order to reduce the strain on agency resources at the border. The processes also require parolees to have "a supporter who has agreed to receive them and provide basic needs, including housing support." 88 Fed. Reg. 1273. There is no reason to believe let alone any evidence in the trial record showing that individuals would seek parole at airports in another State where they have a supporter if their intended destination was actually Texas. There is thus no basis to extend relief to any other State, let alone to the majority of States that have elected not to join this lawsuit, including a group of States who support the parole processes and welcome parolees in their States. *See* ECF No. 247 (Amicus Brief filed by group of States that support the parole processes). Ultimately Plaintiffs have the burden "to *prove* that whatever injunction they request" is "no broader" than necessary "to protect against their proven injuries." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023). Because Plaintiffs introduced no actual evidence of harm to Texas from individuals paroled into other States, their speculation that noncitizens would seek parole in other States but move to Texas would be insufficient to justify relief beyond Texas even if their speculative theory of harm was plausible. Texas failed to meet its burden to prove that broader relief is justified.

It makes no difference that this case involves immigration law. Immigration law is not a special context that warrants a different rule or that justifies ignoring basic requirements of Article III. All relief, even in cases involving "national rules and policies"—must be narrowly tailored to remedy the specific harm shown. *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022). Plaintiffs have not shown that "complete relief" could not be provided by limiting relief, at most, to Texas, the only State that argued it is harmed. *See Louisiana v. Becerra*, 20 F.4th

260, 264 (5th Cir. 2021) (narrowing injunction to plaintiff states by staying "application to any other jurisdiction"); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (noting "scope of the remedy must be no broader … than necessary to redress the injury shown" and narrowing relief "to the plaintiff states"). To the extent Plaintiffs cite Fifth Circuit decisions on the need for uniformity in immigration law, those cases refer to Congress's power "[t]o establish an uniform Rule of Naturalization." U.S. Const. art. 1, § 8, cl. 4; *see Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015); *Texas v. United States*, 787 F.3d 733, 769 (5th Cir. 2015). Plaintiffs have not raised any argument in this case that the parole processes relate to naturalization, nor could they since parole is expressly time-limited to a term of two years at most and does not provide eligibility for naturalization.

The Court should deny relief. If does grant relief, that relief must be limited to Texas. *See also* Defendants' Post-trial Proposed Conclusions of Law at ¶¶ 256-273.

## IX.   Scope of relief for a notice-and-comment claim

If the Court grants relief on Plaintiffs' notice-and-comment claim, relief should similarly be limited only to plaintiffs who have established a concrete injury for the same reasons set out above, and the injury cannot solely be the lack of rulemaking. The lack of opportunity to comment on the parole processes through notice-and-comment rulemaking is not, in itself, a sufficient injury to satisfy Article III and obtain relief. The "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *Summer v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). "It makes no difference that the procedural right has been accorded by Congress," because "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id.*; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (Congress' creation of a procedural right

"does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). Thus, even if the Court finds the parole processes are the type of agency action that should require notice-and-comment rulemaking and none of the APA's exceptions apply, Plaintiffs still must show a concrete injury before the Court can order rulemaking. Because "Article III standing requires a concrete injury even in the context of a statutory violation," Plaintiffs cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 578 U.S. at 341.

Texas, the only State that has argued it is harmed by the parole processes, has not attempted to identify harm to support a notice-and-comment claim. This matters because "[a]n agency's failure to comply with the APA is harmless" if it "had no bearing" on "the substance of [the] decision reached." *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 243-44 (5th Cir. 2012) (declining to address argument that agency improperly "fail[ed] to use notice-and-comment rulemaking" where no harm resulted). Nowhere has Texas articulated what information it would have raised in response to an opportunity to comment on the parole processes. Plaintiffs do not say anything about what information they would have submitted in response to an opportunity to comment anywhere in their complaint. *See generally* ECF No. 20. And at trial, they could not describe what interests or information they believed the agency should have, but did not, consider. When pressed, Plaintiffs cited reliance interests in the abstract as something DHS should have considered, but could not explain what those reliance interests were. Tr. 324:11 (the Court noting that Plaintiffs "can't even identify them"); 328:25-329:5 (Plaintiffs acknowledging that they did not "list them in any of the briefing before trial"); 329:6-7 (the Court noting, "how in the world can they consider them if you can't name them today?"); *see also generally* Tr. 320:5-329:22; *Am.*

*Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (finding harmless error where the plaintiff "did not explain what it would have said had it been given an opportunity to respond").

To the extent Plaintiffs' argument is that DHS should have considered costs to the States that would be caused by the parole processes, this argument fails for similar reasons as Plaintiffs' arguments for standing. All the evidence in the trial record indicates that the number of CHNV nationals in Texas has decreased, meaning that any costs borne by the State from CHNV nationals must also have necessarily decreased. There is no basis to order DHS to conduct notice-and-comment rulemaking so that the agency can consider something that does not exist, nor can there be any reliance interests in a status quo ante where the costs the States allege they incur from CHNV nationals must have been greater.

Moreover, the costs to States and border communities from unremovable CHNV nationals prior to the parole processes *was* something the agency considered, and reducing those costs, as the evidence shows has happened, was one of the goals of the parole processes. As the agency explained, one of the "justification[s] for the process" is to "minimize the domestic impact" of "migratory flows" that "strain domestic resources, which is felt most acutely by border communities." 88 Fed. Reg. at 1272-73 (Cuba process). In particular, the agency considered the fact that, due to "the inability to remove, return, or repatriate" nationals from these countries "in substantial numbers," prior to the parole processes CHNV nationals were often conditionally released, which put "strains on U.S. border communities." *Id*. at 1273. Despite various efforts to reduce the costs to border States, the agency noted "[n]evertheless, local communities have reported strain on their ability to provide needed social services," including "[l]ocal officials and NGOs" and other "stakeholders in the border region." *Id*. DHS thus considered costs to border

57

States, and viewed the parole processes as a mechanism to reduce those costs by imposing consequences that otherwise would not exist for CHNV nationals, and in other ways:

> DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the [southwest border]. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the [southwest border]. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

*Id*. at 1272-73; *see also* 88 Fed. Reg. 1248-50 (considering same issues for the Haiti process); 88 Fed. Reg. 1260-62 (considering same issues for the Nicaragua process); 87 Fed. Reg. 63512; 88 Fed. Reg. 1280 (considering same issues for the Venezuela process). "The purpose of notice-and-comment rulemaking is to" allow "the agency to disclose its thinking on matters that will affect regulated parties." *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011). Even if States were regulated by the parole processes, "when a party's claims were considered," they cannot show any harm from an agency's failure to undertake formal rulemaking "even if there were APA deficiencies." *Id*. Because Plaintiffs have been unable to identify something the agency should have considered but did not because it did not engage in formal rulemaking, Plaintiffs have not shown any harm to support a notice-and-comment claim or remedy.

If the Court ultimately does order DHS to conduct notice-and-comment rulemaking, technically that remedy should also be limited at most to Texas. But practically, even if the Court orders notice-and-comment rulemaking only to address some concrete injury the Court finds Texas has established, any State would be free to comment on a subsequent notice of proposed rulemaking, and any resulting regulation would apply outside of Texas. The Court should, nonetheless, limit the remedy in other ways.

If the Court rules that the parole processes can only be implemented following notice-and-comment rulemaking, the Court should remand to the agency with instructions to conduct rulemaking but without vacating the parole processes in the interim. Remand without vacatur is especially appropriate where, as here, vacatur could produce "disruptive consequences," including to foreign policy and the security of the border. *Allied-Signal, Inc. v. United States NRC*, 988 F.2d 146, 150 (1993) (citation omitted) (remanding without vacating an "inadequately supported rule" based on the disruptive consequences vacatur would cause while the agency undertakes further action on remand); *see also Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur for agency to further consider comments that were submitted based on the disruptive consequences that would result from vacatur pending reconsideration); *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (collecting cases and describing "established administrative practice" of D.C. Circuit "remand[ing] without vacating when the agency failed to follow notice-and-comment procedures").

There is overwhelming evidence in the trial record of the disruptive consequences vacatur would cause here. DHS Assistant Secretary Nuñez-Neto set out at length the disruption vacatur or an injunction might cause. *See* Defendants' Trial Ex. HH, ¶¶ 27-53. Those consequences include, increased strain on agency resources at the border and increased border releases, *id*. ¶¶ 29-31; eliminating a safe and orderly process for individuals who seek to come to the United States lawfully, and taking away consequences for those who chose not to, *id*. ¶¶ 32-33; increasing the costs and impact on border communities, *id*. ¶¶ 34-35; undermining foreign relations and multilateral efforts to address irregular migration in the region, *id*. ¶¶ 36-38, 45-53; and, causing a surge of CHNV migrants at the southwest border, *id*. ¶¶ 39-44. Indeed, as explained, the CHNV processes were implemented in an effort to prevent an influx of CHNV nationals attempting to

enter the country unlawfully. Invalidating those processes while notice-and-comment rulemaking proceeds—which may take months—would jeopardize border security and agreements with foreign governments concerning irregular migration, including Mexico's agreement to accept the removal of CHNV nationals. *Id*. at ¶¶ 6-7. "Mexico has made clear that its willingness to continue to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States." *Id*. at ¶ 7. "In other words, if DHS cannot provide lawful processes for some CHNV nationals to come directly to the United States, Mexico will almost certainly stop accepting returns or removals of CHNV nationals," and "DHS expects, in turn, that without both the incentives and disincentives associated with the CHNV processes … there will be another increase in migration at the [southwest border]—the precise outcome that Plaintiffs allegedly seek to avoid." *Id*.

In addition, "[r]emand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," and "[o]nly in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). Here, if the Court finds there is some aspect of State costs that DHS should have further considered, the agency can easily remedy that issue on remand. *See Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021) (rejecting request for vacatur for "failing to allow proper notice-and comment … and failing to consider … costs," and instead remanding without vacatur to permit agency to cure notice-and-comment violation). Because remand without vacatur with instructions to conduct formal rulemaking could resolve any issue the Court identifies with DHS's reasoning, the disruptive consequences of vacatur to the agency, the border, and foreign relations, and the complete lack of evidence that Plaintiffs would

face any harm if the parole processes remain in place pending notice-and-comment rulemaking on remand, the Court should, at most remand without vacatur with instructions to conduct notice-and-comment rulemaking.

## X. Any relief the Court grants should be limited to prospective relief.

Finally, if the Court were to vacate the parole processes it should do so only prospectively. During closing arguments, Texas stated that if the Court vacates the CHNV processes, those individuals who were granted parole under the processes would lose their parole status and "they would then be here unlawfully". Tr. 173:24-174:10, 235:22-236:15. That interpretation is wrong. "New legal principles, even when applied retroactively, do not apply to cases already closed." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 758 (1995). This principle applies equally in the administrative and immigration contexts. *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 414 (D.D.C. 2020) ("a judicial order vacating an agency rule does not *automatically* void every decision the agency made pursuant to the invalid rule.") (emphasis in original). In *D.A.M.*, a district court in Washington D.C. held that vacatur of DHS's rule colloquially known as the transit rule, which was applied to thousands of individuals' asylum applications prior to its invalidation, "does not mean that petitioners' removal orders (along with thousands of others) were automatically extinguished." Similarly, here, were the Court to vacate the CHNV processes, those individuals who received parole under the processes would not automatically be divested of their parole. *See also Heartland By-Products, Inc. v. United States*, 568 F.3d 1360, 1366-67 (Fed. Cir. 2009) (court's holding applies going forward, even to facts that predate the holding, but that "does not mean that final judicial or administrative decisions are to be reopened" if inconsistent with the new precedent).

Neither can the court craft an order which revokes their status. Section 1252(a)(2)(B)(ii)

61

provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review-any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii). In other words, Section 1252(a)(2)(B)(ii) deprives the courts of jurisdiction to consider challenges to discretionary parole decisions. *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003) ("Because the Attorney General's decision to grant or revoke parole is squarely within the ambit of § 1252(a)(2)(B)(ii), we hold that the district court lacked jurisdiction to review, much less reverse, the revocation of [plaintiff's] parole."); *see also Loa-Herrera*, 231 F.3d at 990-91 ("Congress "has denied... district court[s] jurisdiction to adjudicate deprivations of … statutory and constitutional rights to parole."). Because the Court lacks jurisdiction to review any discretionary parole decision made under Section 1182(d)(5), then *a fortiori*, it lacks authority to divest individuals of such parole retroactively—particularly those who are not even parties to this proceeding.

## CONCLUSION

For these reasons, the Court should grant final judgment in favor of Defendants.

Dated: September 29, 2023               Respectfully submitted,

ALAMDAR S. HAMDANI                      BRIAN M. BOYNTON
*United States Attorney*                *Principal Deputy Assistant Attorney General*

                                        WILLIAM C. PEACHEY
                                        *Director*
                                        Office of Immigration Litigation
                                        District Court Section

                                        EREZ REUVENI
                                        *Assistant Director*

                                        */s/ Brian C. Ward*
                                        BRIAN C. WARD
                                        *Senior Litigation Counsel*
                                        U.S. Department of Justice, Civil Division
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, DC 20044
                                        Tel.: (202) 616-9121
                                        Email: brian.c.ward@usdoj.gov

                                        */s/ Elissa Fudim*
                                        ELISSA FUDIM
                                        *Trial Attorney*
                                        U.S. Department of Justice, Civil Division
                                        Office of Immigration Litigation,
                                        District Court Section
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel: (202) 598-6073
                                        Email: elissa.p.fudim@usdoj.gov

                                        *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Brian C. Ward*
BRIAN C. WARD
U.S. Department of Justice