**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
　　　　　*Plaintiffs,*

　　　v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
　*et al.*,
　　　　　*Defendants.*

Case 6:23-cv-00007

## PLAINTIFF STATES' SUPPLEMENTAL BRIEF

T<small>ABLE OF</small> C<small>ONTENTS</small>

Table of Contents ........................................................................................................ ii

Table of Authorities .................................................................................................... iv

Argument ....................................................................................................................... 1

I.    Plaintiff States have standing. ................................................................... 1

    A.    Standing is determined by facts in existence when the suit was commenced, and evidence of injury pre-dating the challenged agency action is relevant. .................................. 1

    B.    Offsetting benefits in the form of reduced overall migrant flows from the CHNV countries do not affect the standing inquiry ..................................................... 4

    C.    Plaintiff States have demonstrated a legally cognizable injury in fact .............. 15

    D.    Texas's injuries are traceable to the Parole Program and redressable by this Court. ..................................................................................... 27

    E.    Texas is entitled to special solicitude in the standing inquiry. ........................ 29

II.    Plaintiffs' claims are reviewable under the APA. .................................... 31

    A.    No statute bars review. ..................................................................... 32

    B.    *Heckler v. Chaney* does not bar review. ............................................. 33

III.    Plaintiffs have a cause of action. .......................................................... 34

IV.    The Parole Program is final agency action. ........................................... 36

    A.    The Parole Program is the consummation of the agency's decisionmaking process. ....................................................................................... 36

    B.    The Parole Program creates legal consequences and determines rights and obligations. ..................................................................................... 37

V.    The Parole Program vastly expands parole beyond the only two statutory categories for permissible grants of parole. ....................................................... 39

    A.    "Significant public benefit" and "urgent humanitarian reasons" under the parole authority are limited. ......................................................................... 39

    B.    The text of the parole statute and legislative history make clear that Congress intended IIRIRA to strictly limit application of the parole power. ......................... 45

    C.    The Parole Program unlawfully expands parole eligibility, and the Program is therefore contrary to law and arbitrary and capricious. ....................................... 46

VI.    Grants of parole under the Parole Program are not and will not be temporary... 48

    A.    Defendants are knowingly paroling tens of thousands of aliens every month that they are unable and unwilling to eventually remove. .......................................... 48

VII.    The Parole Program fails to satisfy the requirement of reasoned decisionmaking because it failed to consider the States' reliance interests. ..................................... 57

ii

VIII.    DHS's interpretation of its parole authority is precluded by the Major Questions Doctrine. ............................................................................................................57

IX.    An *ultra vires* claim is viable even when paired with APA claims and no statute bars review here. ........................................................................................................... 66

    A.    *Ultra vires* remains a viable cause of action even after enactment of the APA. 67

    B.    Plaintiffs may assert an APA claim and an *ultra vires* claim in the same action... 69

    C.    Even if a statute otherwise bars review, an *ultra vires* claim is viable. ..............71

X.    The foreign-affairs exception to notice-and-comment rulemaking is limited. ......73

XI.    The Parole Program should be vacated in its entirety, declared unlawful, and a nationwide injunction against its implementation should be issued. ........................................77

    A.    The Parole Program should be vacated. ........................................................77

    B.    The Parole Program should be declared unlawful. ...........................................83

    C.    Implementation of the Parole Program should be permanently enjoined. .......83

CERTIFICATE OF SERVICE.................................................................................. 92

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
   141 S. Ct. 2485 (2021) ................................................................................................57

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)..............................................................................................65, 66

*Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*,
   751 F.2d 1239 (Fed. Cir. 1985) ...............................................................................74

*Amador v. Meeker*,
   No. 8:11-CV-1977, 2011 WL 4502092 (M.D. Fla. Sept. 28, 2011)..........................43

*American School of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902)................................................................................................66, 67

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014).................................................................................3

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................................................36

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) .........................................................................................24, 25

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) ....................................................................................34, 36, 66

*Breen v. Selective Serv. Loc. Bd. No. 16, Bridgeport, Conn.*,
   396 U.S. 460 (1970)....................................................................................................71

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) (en banc)......................................................................78

*Carr v. Alta Verde Indus., Inc.*,
   931 F.2d 1055 (5th Cir. 1991) ....................................................................................1

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .................................................................66, 67, 68, 71

*City of N.Y. v. Permanent Mission of India to United Nations*,
   618 F.3d 172 (2d Cir. 2010)..................................................................................74, 75

iv

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ....................................................................................3

*Cochran v. SEC,*
   20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v.
   FTC,* 142 S. Ct. 890 (2023) ..................................................................... 20

*In re Core Comm'n, Inc.,*
   531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring) ............................81

*Crawford v. Hinds Cnty. Bd. of Supervisors,*
   1 F.4th 371 (5th Cir. 2021) ........................................................................3

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r,*
   187 F.2d 789 (3d Cir. 1951) ......................................................................79

*Cruz-Miguel v. Holder,*
   650 F.3d 189 (2d Cir. 2011) ......................................................................46

*Daimler Trucks N. Am. LLC v. E.P.A.,*
   737 F.3d 95 (D.C. Cir. 2013) .................................................................... 82

*Dart v. United States,*
   848 F.2d 217 (D.C. Cir. 1988) ...................................................................68

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
   45 F.4th 846 (5th Cir. 2022) .....................................................................78

*Davis v. FEC,*
   554 U.S. 724 (2008) .......................................................................... 1, 2, 3

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) .............................................................................. 20

*Dept. of Commerce v. New York,*
   139 S. Ct. 2251 (2019) .............................................................................. 28

*DHS v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ...................................................................... *passim*

*Dombrowski v. Pfister,*
   380 U.S. 479 (1965) ...................................................................................3

*E. Bay Sanctuary Covenant v. Trump,*
   932 F.3d 742 (9th Cir. 2018) (Bybee, J.) ........................................73, 75, 76

*EME Homer City Generation, L.P. v. E.P.A.*,
   795 F.3d 118 (D.C. Cir. 2015) (Kavanaugh, J.) .......................................................81

*Enhanced Commc'ns of N. New England, Inc. v. Pub. Utils. Comm'n*,
   2017 ME 178, 169 A.3d 408.............................................................................. 40

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...............................................................................................58

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023) ......................................................................69, 70, 80

*Florida v. Mayorkas*,
   --- F.Supp.3d ----, 2023 WL 3398099 (N.D. Fla. May 11, 2023)........................ 17, 38

*Franciscan Alliance, Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ...................................................................................78

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ...............................................................................................15

*Garcia v. Peery*,
   No. CV 15-6273, 2016 WL 6304647 (C.D. Cal. Aug. 26, 2016)...............................43

*GLO v. Biden*,
   71 F.4th 264 (5th Cir. 2023) .....................................................................................1

*Graham v. Caston*,
   568 F.2d 1092 (5th Cir. 1978)..................................................................................72

*Guerrero-Lasprilla v. Barr*,
   140 S. Ct. 1062 (2020) ............................................................................................37

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) .................................................................................78

*Hart v. Massanari*,
   266 F.3d 1155 (9th Cir. 2001)..................................................................................67

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) ...............67, 70, 71

*Heckler v. Chaney*,
   470 U.S. 821 (1985)............................................................................... 22, 26, 33, 34

*Hornof v. United States*,
   No. 2:19-CV-00198, 2023 WL 5627631 (D. Me. Aug. 31, 2023) ........................... 42

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) *vacated and rev'd on other grounds*, 727 F.2d 957
(11th Cir. 1984) (en banc) ................................................................................................. 73

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) (Breyer, J., dissenting) .................................................................. 42

*Jonaitiene v. Holder*,
660 F.3d 267 (7th Cir. 2011) ............................................................................................ 43

*King v. Burwell*,
576 U.S. 473 (2015) ..................................................................................................... 57, 58

*Kitty Hawk Aircargo, Inc. v. Chao*,
418 F.3d 453 (5th Cir. 2005) .............................................................................................. 2

*L.A. Haven Hospice, Inc. v. Sebelius*,
638 F.3d 644 (9th Cir. 2011) .............................................................................................. 6

*Leedom v. Kyne*,
358 U.S. 184 (1958) ..................................................................................................... 71, 72

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973) .......................................................................................................... 21

*Louisiana v. CDC*,
603 F. Supp. 3d 406 (W.D. La. 2022) .............................................................................. 73

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...................................................................................................... 1, 79

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ..................................................................................................... 79, 80

*Lynch v. Leis*,
382 F.3d 642 (6th Cir. 2004) .............................................................................................. 2

*Manges v. Camp*,
474 F.2d 97 (5th Cir. 1973) ......................................................................................... 72, 73

*Markva v. Haveman*,
317 F.3d 547 (6th Cir. 2003) .............................................................................................. 6

*Massachusetts v. EPA*,
549 U.S. 497 (2007) .......................................................................................................... 31

*Mississippi Miss. Band of Choctaw Indians v. Holyfield*,
  490 U.S. 30 (1989) ................................................................ 40

*Nat. Res. Def. Council v. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring) ................... 81

*Nat. Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) ................................................. 82

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) .............................................. 79

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020) .................................................... 6

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir. 2008) ............................................... 83

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) .......................................... 79

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne, Wyo.*,
  393 U.S. 233 (1968) ......................................................... 71

*Ortega-Cervantes v. Gonzales*,
  501 F.3d 1111 (9th Cir. 2007) ............................................... 46

*Pederson v. Louisiana State Univ.*,
  213 F.3d 858 (5th Cir. 2000) ................................................. 1

*Plyler v. Doe*,
  457 U.S. 202 (1982) ......................................................... 39

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
  No. 6:20-cv-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (Barker, J.) .... 78

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ................................................. 73

*Ram v. INS*,
  243 F.3d 510 (9th Cir. 2001) ................................................ 46

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007) .......................................................... 2

*Roe v. Mayorkas*,
  No. 22-CV-10808-ADB, 2023 WL 3466327 (D. Mass. May 12, 2023) ............. 33

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) ........................................................................2

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir.), *vacated* ............................................................67, 68

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) .................................................................... 82

*State of N.C. v. Hudson*,
    665 F. Supp. 428 (E.D.N.C. 1987) ............................................................ 40

*Suitum v. Tahoe Regional Planning Agency*,
    520 U.S. 725 (1997) ........................................................................................3

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ........................................................................................3

*Sutton v. St. Jude Med. S.C., Inc.*,
    419 F.3d 568 (6th Cir. 2005) ........................................................................6

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    No. 6:22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.).........................78

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    No. 6:23-CV-59-JDK, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023) (Kernodle,
    J.)................................................................................................ 81, 82

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021), *rev'd on other grounds, Biden v. Texas*,
    142 S. Ct. 2528 (2022) ................................................................................23

*Texas v. Biden (MPP)*,
    20 F.4th 928 (2021) ....................................................................... *passim*

*Texas v. Biden*,
    No. 2:21-cv-067-Z, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022)
    (Kacsmaryk, J.) ................................................................................ 26, 80

*Texas v. Biden*,
    No. 6:22-CV-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) (Tipton, J.)..............15, 28

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019).........................................................................1

*Texas v. United States*,
  —F. Supp. 3d—, No. 1:18-CV-00068, 2023 WL 5951196 (S.D. Tex. Sept. 13,
  2023) ...................................................................................................................27

*Texas v. United States*,
  106 F.3d 661 (5th Cir. 1997) ...........................................................................39

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ........................................................... 57, 77, 80

*Texas v. United States*,
  524 F. .................................................................................................................16

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. 2021) (Hanen, J.) ...........................................24, 27

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. 2015) (Hanen, J.) ....................................... 26, 37, 73

*Texas v. United States (DACA)*,
  50 F.4th 498 (5th Cir. 2022) ............................................................... *passim*

*Texas v. United States (DAPA)*,
  809 F.3d 134 (5th Cir. 2015) ............................................................... *passim*

*Torres-Balderas v. Lynch*,
  806 F.3d 1157 (8th Cir. 2015) ..........................................................................43

*U.S. Army Corps of Engrs. v. Hawkes Co.*,
  578 U.S. 590 (2016).................................................................................... 36, 37

*United States Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016)............................................................................3

*United States v. Blanco*,
  392 F.3d 382 (9th Cir. 2004) ........................................................................... 44

*United States v. Bozarov*,
  974 F.2d 1037 (9th Cir. 1992)...........................................................................67

*United States v. Calderon-Lopez*,
  268 F. App'x 279 (5th Cir. 2008) ................................................................. 42

*United States v. Clark*,
  617 F.2d 180 (9th Cir. 1980) ...........................................................................67

*United States v. Clements*,
    686 F. App'x 849 (11th Cir. 2017) ........................................43

*United States v. House*,
    808 F.2d 508 (7th Cir. 1986) (Easterbrook, J.) ........................5

*United States v. Jumaev*,
    20 F.4th 518 (10th Cir. 2021) ..........................................42

*United States v. Kahre*,
    No. CR-S-05-0121, 2007 WL 9757487 (D. Nev. Apr. 20, 2007) ..........43

*United States v. Mills*,
    334 F. App'x 946 (11th Cir. 2009) .....................................43

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
    412 U.S. 669 (1973) ....................................................7

*United States v. Texas* (*Enforcement Priorities*),
    143 S. Ct. 1964 (2023) ...........................................*passim*

*United States v. Williams*,
    571 F. App'x 887 (11th Cir. 2014) ....................................43

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) .......................................77

*V.I. Tel. Corp. v. FCC*,
    444 F.3d 666 (D.C. Cir. 2006) ........................................78

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ...............................................66, 76

*Yassini v. Crosland*,
    618 F.2d 1356 (9th Cir. 1980) ........................................75

*Zhang v. Slattery*,
    55 F.3d 732 (2d Cir. 1995), *superseded by statute on other grounds* ...........75

**Statutes**

5 U.S.C. § 551(4) .........................................................33

5 U.S.C. §553(a)(1) .......................................................74

5 U.S.C. § 701(a) .........................................................32

5 U.S.C. § 702 ...................................................................................................30

5 U.S.C. § 703 ...................................................................................................83

5 U.S.C. § 705 ...................................................................................................79

5 U.S.C. § 706 ............................................................................................29, 79

5 U.S.C. § 706(2) .......................................................................................77, 79

5 U.S.C. § 706(2)(A) ........................................................................................78

5 U.S.C. § 704 ...................................................................................................36

8 U.S.C. 1101(a)(15)(A)-(V) ...........................................................................61

8 U.S.C. § 1182(a)(1)(ii) ..................................................................................62

8 U.S.C. §§ 1182(a)(4) and 1183a ...................................................................62

8 U.S.C. § 1182(a)(4)(A) ..................................................................................63

8 U.S.C. § 1182(d)(5) ................................................................................. passim

8 U.S.C. § 1183(a)(1)(A) ..................................................................................64

8 U.S.C. § 1183a(a)(1)(B) ................................................................................64

8 U.S.C. § 1183a(a), (f) ....................................................................................64

8 U.S.C. § 1183a(f)(1)(A) .................................................................................63

8 U.S.C. § 1187 .................................................................................................65

8 U.S.C. § 1201(h) ........................................................................................... 60

8 U.S.C. § 1202(e) ............................................................................................62

8 U.S.C. § 1252(a)(2)(B)(ii) .......................................................................32, 33

8 U.S.C. § 1254a ...............................................................................................49

8 U.S.C. § 1254a(b)(1) ......................................................................................49

8 U.S.C. § 1365b ...............................................................................................55

8 U.S.C. § 1611(b)(1)(A) ..................................................................................39

8 U.S.C. § 1612 (2)(L) .......................................................................................... 22

8 U.S.C. § 1613(a) ................................................................................................ 22

8 U.S.C. § 1641(b)(4) ........................................................................................... 22

Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–
      208, § 602, 110 Stat. 3009 (1996) ............................................................... 40

Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108458,
      118 Stat. 3638 ...........................................................................................55

National Labor Relations Act, 9 U.S.C. § 159(d) ...........................................71

Tex. Transp. Code § 521.142(a) .......................................................................4, 5

## Other Authorities

8 C.F.R. § 1.3(a)(4)(vi) ......................................................................................... 22

8 C.F.R. § 235.1(f)(1) ........................................................................................... 60

8 C.F.R. § 274a.12(c)(14) (2022) ........................................................................ 22

22 C.F.R. §§ 40.1–46.7 ........................................................................................62

42 C.F.R. § 34.1 et seq. ........................................................................................62

42 C.F.R. § 417.422(h) ........................................................................................ 22

47 Fed. Reg. 30044, 30044-45 (July 9, 1982) ................................................... 41

64 Fed. Reg. 526 (Jan. 5, 1999) .......................................................................... 51

75 Fed. Reg. 3476 (Jan. 21, 2010) ......................................................................50

86 Fed. Reg. 13574 (Mar. 9, 2021) .....................................................................52

86 Fed. Reg. 41863 (Aug. 3, 2021) .....................................................................50

87 Fed. Reg. 55024 (Sep. 8, 2022) ......................................................................52

88 Fed. Reg. 5022 (Jan. 26, 2023) .......................................................................50

88 Fed. Reg. 40294, 40297 (Jun. 9, 2023) ......................................................... 51

Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 § 3531.4 (3d ed.) ...........6

Black's Law Dictionary ............................................................................................ 40

*Black's Law Dictionary* 1612 (3d ed. 1933) ...............................................................79

*Circumvention of Lawful Pathways*, 88 Fed. Reg. 31314 at 31317 (May 16, 2023) ...........................59

*Collection of Biometric Data From Aliens Upon Entry to and Departure From the United States*, 85 Fed. Reg. 74162, 74163 (Nov. 19, 2020).......................................56

Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1311, 1335–36 ...............................................................................................................5

H.R. Rep. No. 104-469 (1996)......................................................................................45

Mary D. Fan, *The Right to Benefit from Big Data as a Public Resource*, 96 N.Y.U. L. Rev. 1438, 1473 (2022) ............................................................................................ 40

*Significant*, *American Heritage Dictionary* (5th ed. 2018) ............................................. 40

*Significant*, *Black's Law Dictionary* (11th ed. 2019) ...................................................... 40

**ARGUMENT**

## I.  Plaintiff States have standing.

Texas has demonstrated each of the three elements required to have standing to bring its claims: (a) an injury in fact, (b) fairly traceable to the challenged actions, (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

### A.  Standing is determined by facts in existence when the suit was commenced, and evidence of injury pre-dating the challenged agency action is relevant.

"The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted); *see also Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ("'In identifying an injury that confers standing, courts look exclusively to the time of filing.'") (citing *Loa-Herrera v. Trominksi*, 231 F.3d 984, 987 (5th Cir. 2000); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) ("[A fact concerning injury in existence] at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.").

This suit was filed on January 24, 2023. ECF No. 1. No facts after that date can serve to defeat standing retroactively. *See GLO v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) ("As this

action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing).

That the Plaintiff States filed an amended complaint on February 14, 2023, ECF No. 20, does not change the relevant time period for evaluating standing. "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction," *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007), but "subject-matter jurisdiction depends on the state of things at the time of the action brought," *i.e.*, at the time the plaintiff *commenced suit*, *id*. at 473 (citation and internal quotation marks omitted). "The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (cleaned up); *see also id.* ("Thus, although we examine the allegations in SUWA's Amended Complaint, our inquiry focuses on whether SUWA had standing when the original complaint was filed in April 2007."); *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (rejecting the argument that the time of the most recent amended complaint is the relevant time period); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005) ("We do not think, however, that the actual use of checkpoints in 1997, 1998, and 1999 is relevant on the issue of standing because all of these events occurred after [the plaintiff] filed her original complaint") (quoting *Park v. Forest Serv. of the United States,* 205 F.3d 1034, 1037 (8th Cir. 2000)).

This means that the Defendants' attempts to undermine Plaintiff States' standing by pointing to post-filing numbers of migrant flows cannot succeed.

Even if the Court considered post-filing evidence of migrant flows, such evidence could not undermine standing here because "the injury required for standing need not be actualized." *Davis*

*v. FEC*, 554 U.S. 724, 734(2008). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Id.*

"Since injunctive relief looks to the future," *Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965), a plaintiff seeking prospective relief need only show that future injury is "fairly likely" at the time the suit was commenced. *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("a realistic probability"). Texas, therefore, faced a "substantial risk" of future injury from the flow of migrants due to the operation of the Parole Program. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Texas was not required to show that it was "literally certain" that it would be injured in the future. *Clapper*, 568 U.S. at 414 n.5. It needed only to show a "substantial risk" that injury would occur. *Susan B. Anthony List*, 573 U.S. at 158.

In APA cases, there will often be no evidence of present or past injury because "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (citation omitted). Facial challenges to regulation are generally ripe the moment the challenged regulation is passed. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n.10 (1997).

"[P]ast wrongs [are] evidence" of the likelihood of a future injury but "do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Crawford*, 1 F.4th at 375 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 (1983)). That Texas's evidence of injury pre-dates the Parole Program is sufficient for standing in such a context.

Courts in the Fifth Circuit have relied on data pre-dating the challenged program to support injury in immigration cases. *See, e.g., Texas v. United States (DACA)*, 50 F.4th 498, 517–18 (5th Cir. 2022) (relying on data for uncompensated care for illegal aliens in Texas's public hospitals from fiscal years 2006 and 2008 in challenge to a program that began in 2012).

### B. Offsetting benefits in the form of reduced overall migrant flows from the CHNV countries do not affect the standing inquiry.

The Defendants deny that Texas is suffering injury in fact because they claim that the Parole Program is reducing overall migration on net. *See* ECF No. 240, Defs.' Proposed Findings of Fact & Conclusions of Law, at ¶¶ 15–54; *id.* at ¶¶ 56–79; *see also id.* at ¶ 56 ("In fact, the number of CHNV nationals released into the United States, including those through the CHNV process and otherwise, has *decreased* since the CHNV processes were implemented."). According to the Defendants, the Parole Program has reduced the incentives of Cubans, Haitians, Nicaraguans, and Venezuelans to enter the country illegally at the southern border, and it has enabled the government to persuade Mexico to accept the return of these illegal entrants who spurn the available Parole Program, leading to fewer migrants that enter the country through catch-and-release. This argument does not defeat Texas's Article III standing.

First, even if the Defendants are correct to insist that the Parole Program has reduced the overall number of migrants, it is still injuring Texas by increasing the number of migrants who are eligible for driver's licenses due to the "affirmative immigration relief" provided by parole. The law of Texas allows parolees to obtain driver's licenses because those individuals have documentation that authorizes their presence in the United States. *See* Tex. Transp. Code § 521.142(a) (requiring applicants for driver's licenses to present "documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States").

4

Migrants who enter the country through catch-and-release or by crossing the border illegally cannot obtain driver's licenses because they lack the "documentation" required by section 521.142(a). So even if one grants the factual premise of the Defendants' argument, it does nothing to mitigate the injury imposed on the Department of Public Safety, which loses money for each additional customer seeking a limited-term driver license or personal identification certificate. *See* Pls.' Proposed FOFs and COLs, ECF No. 244, at ¶¶ 49–50. Reducing the number of *illegal immigrants*—who were never eligible for driver's licenses in the first place—does nothing to offset the injury to DPS from the increased number of *parolees*.

Second, the Defendants cannot cancel or offset the undisputed fiscal injury to DPS by arguing that the Parole Program reduces the fiscal burden on other units of the Texas government. Those who impose fiscal harm on one unit of the government cannot negate that injury by showing that their illegal acts saved the government money in other areas and wound up as a net positive to the public fisc. A prisoner who murders a fellow inmate must reimburse the government for funeral-related expenses—even when he can prove that the murder saved the government money overall by freeing it of the far greater costs of housing and feeding the murdered inmate. *See United States v. House*, 808 F.2d 508, 509–10 (7th Cir. 1986) (Easterbrook, J.); *id.* at 510 ("[T]he funeral expenses caused by murder are current losses notwithstanding offsets."). Tobacco companies that injure the government's public-health programs by causing them to spend money treating smoking-related illnesses cannot defeat Article III injury by showing that their products saved the government money overall by reducing social security expenditures or boosting the government's tax coffers. *See* Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1311, 1335–36 ("By killing off smokers before they can consume pension, Medicare, nursing home, and

5

social security benefits, and by paying substantial excise taxes, tobacco companies contribute substantial sums of money to government accounts—perhaps even more than they cost these accounts in the form of health care benefits for sick smokers.").

Courts and commentators have uniformly rejected the idea that an Article III injury can be negated by pointing to offsetting benefits in other areas. *See Texas v. United States (DAPA)*, 809 F.3d 134, 155 (5th Cir. 2015) (Article III is not "an accounting exercise" and courts "consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs."); *New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020) ("'[T]he fact that an injury may be outweighed by other benefits ... does not negate standing.'" (citation omitted)); *Wright & Miller*, § 3531.4 Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury."); *see also L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656–59 (9th Cir. 2011) (holding that a hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); *Sutton v. St. Jude Med. S.C., Inc.,* 419 F.3d 568, 570–75 (6th Cir. 2005) (concluding that a patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased the risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman,* 317 F.3d 547, 557–58 (6th Cir. 2003) (deciding that grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

6

The Defendants do not acknowledge these authorities or explain how their offsetting-benefits argument can be squared with the Fifth Circuit's binding pronouncement in *DAPA*.

Third, it is *still* an injury in fact for the Parole Program to cause Texas to spend more money on driver's licenses—*even if* those costs are more than offset by savings in other areas. Causing the State government to allocate more resources to DPS is itself an injury, independent of the overall fiscal implications for the government as a collective entity. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)). Texas does not need to prove that it will spend more money overall in response to the Defendants' Parole Program. It is enough to show that the Parole Program will cause Texas to spend more money on a discrete government function (such as driver's licenses), regardless of whether the Program somehow provides fiscal benefits to other components of the government.

Further, the Defendants' claim of reduced crossings does not stand up to scrutiny. At trial, the Defendants relied on numbers from a snapshot in time. After the trial, DHS publicly released more data on border encounters. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (courts may take "judicial notice of publicly-available documents and transcripts produced by the [a federal agency], which were matters of public record directly relevant to the issue at hand").

DHS's updated numbers show that total nationwide encounters with aliens from Cuba, Haiti, Nicaragua, and Venezuela have *increased* since the trial—to 76,604 in August from 56,708 in July (and September data is not yet available), an astounding 35% increase in just one month's time:



*Nationwide Encounters*, U.S. Customs and Border Protection, https://bit.ly/3tjIiyF (select "2022" and "2023" under "FY"; select "Cuba," "Haiti," "Nicaragua," and "Venezuela" under "Citizenship").

The numbers are 180 degrees at odds with the Federal Defendants′ story. In August 2023, CBP encounters with CHNV aliens rebounded to their pre-CHNV levels.

Additionally, the above graph also demonstrates that the month-on-month decreases that the Federal Defendants attributed to the Parole Program have a much simpler (and more logical) explanation. The above graph plots lines for FY2022 and FY2023. The same month-to-month

trends in 2022 closely repeat in 2023. Illegal immigration follows seasonal patterns, and it appears that the decrease that the Federal Defendants attributed to the Parole Program was merely an artifact of normal seasonal variation in illegal immigrant flows.

Further confirming this interpretation is that the pattern for CHNV encounters follows the same trend as the data for all aliens, including non-CHNV aliens. Total nationwide encounters—including all nationalities—similarly increased to 304,162 in August from 245,213 in July, a 24% increase:



*Nationwide Encounters*, U.S. Customs and Border Protection, https://bit.ly/3tjIiyF (select "2022" and "2023" under "FY"; select "all" under "Citizenship"). And once again, the graphs for FY2022 and FY2023 follow similar trends.

The same pattern also holds for encounters only along the southwest border, increasing to 232,972 in August from 183,494 in July, a 27% increase:

10



*Southwest      Land      Border      Encounters*, U.S.      Customs      and      Border
Protection, https://bit.ly/3RCmkkD (select "2022" and "2023" under "FY"). And, once again,
the trends for FY2022 and FY2023 are similar.

And finally, the following graph shows nationwide trends for all nationalities *except* the
CHNV countries. This graph thus contains numbers *only* for aliens *not* able to take advantage of
the programmatic parole offered by the Parole Program. Yet, once again, the national trend lines
follow the same, now familiar pattern:

11



The best evidence available thus contradicts the Federal Defendants' claims about decreased illegal immigration from the CHNV countries. And the FY2022 and nationwide graphs further confirm that the Federal Defendants' interpretation is incorrect. Any reduced immigration that Texas experienced in June and July is more correctly attributed to the hot Texas sun than the Parole Program.

Regardless, it is implausible that the Parole Program challenged here was the cause of reduced migrant flows. That Program does one thing only: create a program to parole 30,000 aliens from the CHNV countries into the United States every month. Migrant flows are affected by a multitude of variables, including the actions of foreign nations (including Mexico's agreement to accept removals of aliens from CHNV countries) and other federal immigration policies not

challenged here (such as the Circumvention of Lawful Pathways Rule limiting asylum claims, 88 Fed. Reg. 31314 (May 16, 2023), which DHS has recently claimed the loss of would lead to "a return to elevated encounter levels," ECF No. 57-2 at ¶28 in *Indiana v. Mayorkas*, No. 1:23-cv-106 (D.N.D)).[1] Defendants' own declarant, for example, explains that "the increase in Venezuelan migration experienced in early May can likely be attributed to a number of factors, including: misinformation campaigns by smugglers, the aftermath of the fire in a Mexican government facility that killed a number of Venezuelan migrants in March and impacted enforcement efforts in Mexico, and the limited number of available CBP One appointments to present at a port of entry." Defs. Ex. HH at ¶22. DHS has also recently sought a stay in the Eleventh Circuit by declaring that "Numerous factors can drive a large increase in the number of noncitizens or a dramatic decrease in encounters, including a temporary decrease in encounters." ECF No. 3-2 in *Florida v. Mayorkas*, No. 23-11644 (11th Cir.). Of course, events like these will happen again—the Parole Program has no expiration date, and Plaintiffs seek relief for future injury.

The Court must evaluate injury based on the specific agency action challenged here, not overall federal immigration policy or actions of foreign nations not subject to the APA. *See Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022) (holding that the lower court erred in reviewing an abstract decision instead of each individual operative agency action); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990) (rejecting a wholesale challenge to an entire "program" under the APA because that program was not an agency action, but rather was made up of many individually challengeable

---

[1] The Court may take judicial notice of such declarations filed in other courts. *See Texas v. Biden*, 554 F. Supp. 3d 818, 837 (N.D. Tex. 2021) (after trial in MPP case, taking judicial notice of declaration by DHS official in other litigation).

agency actions); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011–12 (9th Cir. 2021) (rejecting a broad APA challenge to immigration policies that the plaintiffs labelled a "program" to try to challenge them all in "one fell swoop," and instead requiring the plaintiffs to either "identify a particular action ... that they wish to challenge under the APA, or ... pursue their remedies before the agency or in Congress"); *Brnovich v. Biden*, ––– F. Supp. 3d ––––, 2022 WL 4448322, at *10 (D. Ariz. Sept. 23, 2022) (applying *Biden v. Texas* to reject a challenge to the defendants' "policy of programmatically mass-granting parole to unauthorized aliens" because the plaintiffs "d[id] not challenge a particular, discrete agency action, but rather some generalized and amorphous conception of Defendants' detention and parole policies").

Again, Defendants' own declarant discusses how "the imposition of stiffened consequences for irregular migration in place at the land border … including a new condition on asylum eligibility, at least a five-year bar on admission to the United States, and the potential for criminal prosecution for repeat illegal entries" have all contributed to lower encounters of Venezuelan migrants between ports of entry. Defs. Ex. HH at ¶23. The actions of foreign nations have also contributed to a decline. *Id.* at ¶50 (discussing actions of Colombia, Costa Rica, Ecuador, Canada, Guatemala, and Mexico).

A mere "temporal correlation" with migrant flows does not demonstrate that the Parole Program was the cause of a net decrease. *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 798 (D. Ariz. 2022). "Correlation is not causation." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009), and there are "myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States.'" *Arizona*, 584 F. Supp. 3d at 795 (quoting *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021)). As

"any number of variables might influence an alien's independent decision to enter the country illegally," *Arizona*, 584 F. Supp. 3d at 797 (internal quotations omitted), the standing inquiry is properly focused on the effects of the specific agency action challenged here, which does nothing other than providing a process for 30,000 aliens from the CHNV countries to be paroled into the United States every month. Injury must be evaluated based on that action alone.

### C. Plaintiff States have demonstrated a legally cognizable injury in fact.

"For standing purposes, even 'a dollar or two' of injury suffices." *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008)); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Texas is suffering injury in fact—concrete and particularized injuries attributable to the Defendants' actions. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The financial injury to Texas—that it must spend money on government programs and services for paroled aliens whom they otherwise would not, due to the Defendants' unlawful policy of programmatically granting parole to aliens from Cuba, Haiti, Nicaragua, and Venezuela—is an injury to a legally protected interest. *DAPA*, 809 F.3d at 152–54.

"Federal law affirmatively requires the States to make some of these expenditures" on aliens present in the State. *Texas v. Biden (MPP)*, 20 F.4th 928, 969 (2021) (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid).

That injury is concrete because Texas incurs actual costs to operate its detention, educational, social services, and driver license programs due to the need to serve aliens who, due to the Defendants' policy, have been unlawfully paroled into the United States.

That injury is imminent and occurring because Texas operates the programs at issue now and intends to continue doing so in the future. *Texas v. United States*, 524 F. Supp. 3d 598, 619 (S.D. Tex. 2021) (Tipton, J.) ("alleged injuries to its detention and education costs are sufficiently concrete and actual or imminent" in challenge to 100-day pause in removals).

Texas need not show that any actual Parole Program beneficiaries partake of any of these benefits to show standing, and standing is not defeated by the fact that some of the beneficiaries could have been paroled under a different circumstance. As the Fifth Circuit explained:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional 'driver's license as a result" of 'MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971.

The Northern District of Florida recently held that similar injuries as those alleged by Texas here were sufficient to confer standing on the State of Florida to challenge a different unlawful federal parole program. "[T]he evidence presented ... established that Florida suffers substantial harm—both to its sovereignty and its public fisc—when the federal government releases aliens into the country on 'parole' (or otherwise) rather than detaining them as required

by the INA." *Florida v. Mayorkas*, --- F.Supp.3d ----, 2023 WL 3398099, at *5 (N.D. Fla. May 11, 2023). Furthermore, "[t]he harm to Florida [was] irreparable because it cannot be undone through monetary remedies, because the United States has sovereign immunity from damages claims, and there is no way to remedy the impact on state sovereignty that flows from the Florida's inability to exclude aliens who were improperly 'paroled' into the country from its territory." *Id.* at *5.

### 1. *Texas's injury in fact remains legally cognizable.*

The Supreme Court's decision in *United States v. Texas* ("*Enforcement Priorities*"), 143 S. Ct. 1964 (2023), explicitly does not apply to cases like this one.

*Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are

rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

This extremely narrow and "highly unusual" case does not apply here. That is because the Plaintiff States' injuries are not based on a mere failure to arrest particular aliens on the border—they are based on the Defendants' release of aliens into the States via parole—through an adjudicatory process—making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any particular aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id*. (cleaned up; citations omitted). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id*. at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id*. at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare

costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id*. at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

The Supreme Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, exceptions articulated by the Supreme Court would apply even if it did.

### a. The Parole Program is affirmative immigration relief, grants eligibility for benefits, and is not mere non-enforcement.

The *Enforcement Priorities* majority noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *Texas v. United States* (*DAPA*), 809 F.3d 134, 154 (5th Cir. 2015) (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also*

21

8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This applies to this case. The Parole Program makes its recipients eligible for various federal and state benefits. Under federal law, aliens paroled into the United States become eligible for various benefits after five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States"). Beneficiaries of the Parole Program are also eligible for employment authorization to work in the United States.

Here, the Plaintiff States' injuries are not based on a mere failure to arrest particular parole-eligible aliens—instead, a grant of parole—like a grant of deferred action—is not mere non-enforcement but constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration

22

relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated).

This exception applies to this case due to the effects that parole has on aliens and States. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP causing injuries to States via paroling aliens, *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues). Increasing grants of parole even indirectly through termination of MPP satisfied this test:

> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original). In this case, the challenged agency action—directly increasing parolees—even more directly causes this injury. When a policy "has increased the number of aliens released on parole into the United States, including Texas," *MPP*, 20 F.4th at 966, that meant that more aliens were being released into the States to use healthcare services and public education—and parole made them eligible for subsidized driver's licenses. *Id*. at 968. This was sufficient for Article III standing and remains the case here.

The Plaintiff States' injuries on this basis are not indirect—courts in the DACA litigation described these same injuries from "affirmative immigration relief" that makes aliens eligible for benefits as *direct* costs to the States. *See DACA*, 50 F.4th at 517 ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of

23

healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").

As with the termination of MPP, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). Paroling aliens makes them eligible for benefits, imposing *direct* costs on the Plaintiff States.

The Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) reinforces that the costs to the Plaintiff States in this case are direct rather than indirect. That case upheld the State of Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id.* at 2365, and it interacted with the federal government to service student loans and received administrative fees for these services, *id.* The loss of those fees was "an injury in fact *directly* traceable to the" loan forgiveness program, *id.* (emphasis added), as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself," *id.* at 2366 (emphasis added).

This is most closely analogous to the driver's license costs imposed on the Plaintiff States here. Texas interacts with the federal government through the REAL ID Act, *see DAPA*, 809 F.3d

24

at 155 n.58, and ties eligibility for subsidized licenses to lawful presence—as aliens with parole status are eligible to receive subsidized licenses from Texas, and "[b]ecause driving is a practical necessity in most of the state, there's little doubt many newly paroled aliens have applied—and without the district court's injunction, will apply in the future—for Texas driver's licenses." *MPP*, 20 F.4th at 970–71 (citing *DAPA*, 809 F.3d at 156).

Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366, the financial injuries imposed on the Plaintiff States here are direct rather than indirect.

### b. The Plaintiff States have standing because the agency action challenged here constitutes an abdication of Defendants' statutory responsibilities.

The *Enforcement Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. "But the States have not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

The Parole Program is just such an extreme example that constitutes abdication of the Federal Defendants' statutory responsibilities to grant parole only on a case-by-case basis for significant public benefit or urgent humanitarian reasons. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from

"parol[ing] aliens *en masse.*" *Id.* at 997. Yet the Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

While "the parole statute does not set any limit on the number of individuals DHS can decide to release on parole," "the number of aliens paroled each month ... gives rise to a strong inference that the Government is not really making these parole decisions on a case-by-case basis." *Texas v. Biden*, No. 2:21-cv-067-Z, 2022 WL 17718634, at *12 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) (cleaned up) (quoting *Biden*, 142 S. Ct. at 2554 (Alito, J., dissenting)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The number cited by Justice Alito as giving rise to this inference—and relied on by Judge Kacsmaryk in finding that DHS failed to examine whether its rescission of the MPP program caused it to violate the limits on its parole power—was 27,000 a month, *id.* at *13—fewer than the 30,000 a month authorized by the Parole Program.

Judge Hanen had previously found that States had standing to challenge DAPA based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id.* at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, Judge Hanen relied on APA reviewability under *Heckler v. Chaney, id.* at 641, to also find standing—the same analysis adopted by the *Enforcement Priorities* majority.

The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in that case or argued that the Executive has entirely ceased enforcing the relevant statutes." 143 S. Ct. at 1974. But here, the Parole Program "prevents

26

immigration officials from enforcing these [limiting] provisions of the" parole statute. *Texas*, 549 F. Supp. 3d at 608.

Just recently, Judge Hanen found States had standing on this basis to challenge the DACA program:

> Texas and the other Plaintiff States have clearly raised that very issue in this case. They have repeatedly pleaded that DHS has abdicated or abandoned its enforcement duties and, by doing so, violated the Take Care Clause of the Constitution. They have consistently urged this Court to address this issue and even raised it again after the remand. This Court has followed the general jurisprudential rule of constitutional avoidance in declining to address this contention. *Texas I* and *Texas II* were both resolved on issues related to the Administrative Procedure Act; however, the fact that this Court has declined to address the Take Care Clause issue does not mean that the Plaintiff States have not pleaded such a cause of action. Standing has never been determined solely by those issues upon which the Court ultimately rules. The Plaintiff States have clearly pleaded into this very exception to the "no standing" rule outlined by the Supreme Court [in *Enforcement Priorities*].

*Texas v. United States*, —F. Supp. 3d—, No. 1:18-CV-00068, 2023 WL 5951196, at *9–10 (S.D. Tex. Sept. 13, 2023).

Now that the Supreme Court has explicitly approved abdication of statutory responsibilities as a basis for standing, this Court should find standing for the States here on this additional ground—even without a Take Care Clause claim, this case involves allegations of total disregard of Congress's limits on the parole authority and thus constitutes an abdication of Defendants' statutory responsibilities.

**D. Texas's injuries are traceable to the Parole Program and redressable by this Court.**

Texas has been spending money and will spend more money in the future on programs to serve unlawfully paroled aliens who would not have otherwise entered the United States. Texas's spending of money is directly traceable to the Parole Program. *See DAPA*, 809 F.3d at 161. "[A]n increase in parolees causes the States financial harm by way of driver's license applications … [and]

27

healthcare" and it is "obvious that if the total number of in-State aliens [via parole] increases, the States will spend more on healthcare." *MPP*, 20 F.4th at 969.

The increased expenditures for driver licenses, incarceration, education, and social services arising from the increased presence of aliens who otherwise would not be present in Texas is not so tenuously connected to the Parole Program that it cannot be traced to the Defendants' actions. Aliens' future behavior can be traced to the Defendants' policies, where it is likely that aliens who have historically behaved in a certain way will continue to do so. That is not speculation, but a predictable effect of Defendants' policies. *See Dept. of Commerce v. New York*, 139 S. Ct. 2251, 2566 (2019). The rate of aliens' (1) applications for driver licenses, (2) incarceration, (3) usage of public education, and (4) usage of social services, and the costs that these impose on Texas, are such predictable effects. Further, these increases, and their attendant costs, can be traced to Defendants' policies because the evidence shows the general propensity of aliens to use these public services and be incarcerated at rates that impose non-trivial costs on Texas, and there is no suggestion that aliens who currently would not have been paroled but for Defendants' policies behave differently than other aliens.

"When establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) (quoting *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)).

The relief the States seek would redress the harms they allege. If the Defendants' Parole Program were set aside, and if Defendants were not allowed to parole aliens *en masse*, but instead were required to follow Congress's commands in the INA for paroling aliens, those aliens would

no longer be present in Texas to require the public services that they would otherwise receive. *DAPA*, 809 F.3d at 161. At the very least, enjoining the change in policy would authorize line-level officers to apply the commands of 8 U.S.C. § 1182(d)(5) and to grant parole "only on a case-by-case basis" rather than mass-releasing tens of thousands of aliens into the United States.

### E. Texas is entitled to special solicitude in the standing inquiry.

Because "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514 (citing *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007)). Under this standard, a state will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts*, 549 U.S. at 518).

The Plaintiffs have satisfied the test for special solicitude standing because they have shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of the State''s quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52).

Texas satisfies the first prong because it is "asserting a procedural right under the APA to challenge an agency action," *id.* at 970 (citation omitted), something it can do for all of its claims. *See* 5 U.S.C. § 706.

### 1. Texas has a procedural right to challenge the agency action in question.

Plaintiffs in this case established a procedural right to challenge the Parole Program under the APA because they have suffered a legal wrong and are being adversely affected or aggrieved by

it. *See* 5 U.S.C. § 702; *see also MPP*, 20 F.4th at 970 n.10 (noting that such a procedural right is not limited to notice-and-comment claims but includes substantive claims under the APA).

As in *DACA*, the Plaintiffs here use their procedural right to "challenge[] DHS''s affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DACA*, 50 F.4th at 514. Further like *DACA*, the Plaintiffs' procedural right under the APA in this case does not evaporate because of their status as States; instead, "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). The Plaintiffs thus satisfy the first element of special solicitude.

### 2.   The challenged action affects Texas' quasi-sovereign interests.

The Plaintiffs also satisfy the second element of special solicitude because the Parole Program affects their quasi-sovereign interests. Those "quasi-sovereign interests" are "a judicial construct that does not lend [themselves] to a simple or exact definition." *DACA*, 50 F.4th at 514 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).

"'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quoting *Massachusetts*, 549 U.S. at 519). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government." *Id.* (quoting *Massachusetts*, 549 U.S. at 519). The Parole Program's pressure on Texas to change its laws relating to driver's license eligibility or participation in the Medicaid program "gave rise to a quasi-sovereign interest." *DACA*, 50 F.4th at 515.

In *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id*. Specifically, the Fifth Circuit reasoned that the State's "interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*." *Id*. And because the States "surrendered some of their sovereign prerogatives over immigration" upon entering the union, including their power to "establish their own classifications of aliens," they relied on the federal government to protect their interests and were analogous to the plaintiffs in Massachusetts. *Id*.

Therefore, the Fifth Circuit determined, "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *DACA*, 50 F.4th at 515. It also recognized that "a State's inability to legislate around DACA can create a quasi-sovereign interest," meaning that "a quasi-sovereign interest could arise based on 'federal preemption of state law.'" *Id*.

The Parole Program implicates those quasi-sovereign interests just as the DACA Memorandum did. If Plaintiffs sought to change the classifications of parole recipients to alleviate their injuries, they would be threatened with federal preemption. The Fifth Circuit acknowledged these federal preemption concerns in *DACA*, concluding that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *Id*. at 516. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id*. (citing *Arizona*, 567 U.S. at 409). The same is true under the Parole Program.

## II.   Plaintiffs' claims are reviewable under the APA.

The Administrative Procedure Act (APA) establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1905 (cleaned up). "That presumption can be rebutted by a showing that the relevant statute

precludes review, or that the agency action is committed to agency discretion by law." *Id.* (cleaned up). Neither exception applies in the current action.

Establishing unreviewability is a heavy burden, and where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *DAPA*, 809 F.3d at 164 (cleaned up). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

There is a well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action. *DAPA*, 809 F.3d at 163 (quoting *Reno v. Catholic Soc. Servs., Inc.*, 113 S. Ct. 2485 (1993)). Only a narrow group of matters are regarded as "committed to agency discretion," such that they are exempt from review under the APA under 5 U.S.C. § 701(a)—an agency's decision not to institute enforcement proceedings, for example, or statutes drawn in such broad terms that "there is no law to apply." *DAPA*, 809 F.3d at 163. That is not the case here, where Congress set forth both specific legal criteria for eligibility for parole and a specific process for determining whether those criteria are met. *See* 8 U.S.C. § 1182(d)(5).

## A.   No statute bars review.

Courts have consistently rejected the Defendants' claim that 8 U.S.C. § 1252(a)(2)(B)(ii) bars review of the type of programmatic challenge the States assert here. "To the contrary, the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *MPP*, 20 F.4th at 977 (rejecting argument that "an *entire program*—operating across an international border and affecting thousands or millions of people and dollars—is

rendered unreviewable by § 1252(a)(2)(B)(ii)) (emphasis in original); *see also Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023) ("the Court agrees with Plaintiffs that § 1252(a)(2)(B)(ii) does not bar all judicial review of agency action taken under § 1182(d)(5)(A)" and collecting cases holding the same thing); *id*. at *9 (DHS parole policies at issue in the case were reviewable under the APA, because "the guidelines in § 1182(d)(5)(A) provide sufficient guidance such that the [Federal] Defendants' actions are not unreviewable under the narrow exception articulated in § 701(a)(2).").

### B. *Heckler v. Chaney* does not bar review.

#### 1. *Heckler* does not apply to agency rules.

The Parole Program is a "rule" under the APA. A rule is "an agency statement of general ... applicability and future effect" that either "prescribe[s] law or policy" or "describe[s] [agency] organization, procedure, or practice requirements. 5 U.S.C. § 551(4). "*Heckler* does not apply to agency rules." *MPP*, 20 F.4th at 978. Courts "apply *Heckler*, if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id*. at 984. Such one-off enforcement decisions would include, for example, a particular decision to grant (or not grant) parole to a specific alien. Plaintiffs here do not challenge such decisions. Thus, this Court need proceed no further—the Parole Program is reviewable under the APA.

#### 2. The Parole Program is not "mere nonenforcement" that would be subject to *Heckler*.

Even if *Heckler* could apply to the Parole Program as a rule, it wouldn't apply because of what the rule does. The operation of the Parole Program "would trigger eligibility for federal benefits and state benefits that would not otherwise be available to illegal aliens." *Texas v. United States (DAPA)*, 809 F.3d 134, 166 (5th Cir. 2015). "[T]o be reviewable agency action, [the

33

challenged action] need not directly confer public benefits—removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" *Id.* at 167 (quoting *Heckler*, 470 U.S. at 832).

Under Texas law, § 1182(d)(5) parole satisfies the state's "lawful presence" requirement—which is a prerequisite to obtaining a Texas driver's license. Thus, the Parole Program functions to "remov[e] a categorical bar on receipt of [public] benefits and thereby mak[e] a class of persons newly eligible for them." *DAPA*, 809 F.3d at 167. The removal of that bar "provides a focus for judicial review." *Heckler*, 470 U.S. at 832; *accord DAPA*, 809 F.3d at 167.

### 3. Even if—despite these limitations—*Heckler*'s presumption against review applied, it is rebutted by Congress's limits of the parole power.

Even if *Heckler*'s presumption against reviewability applied, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *MPP*, 20 F.4th at 982.

That rebuttal holds here. The Supreme Court in *Biden v. Texas*, 142 S. Ct. 2528, 2543–44 (2022), recently stated that parole authority "is not unbounded" because of its case-by-case limitation and limit to urgent humanitarian reasons or significant public benefit and "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained.") (quoting landmark APA case *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983)).

## III.   Plaintiffs have a cause of action.

Plaintiffs have a cause of action under the APA because their claims are within the zone of interests protected by the INA. The zone-of-interest test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521

(citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225).

In this case, the interests or purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Thus, Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id.* at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*, 809 F.3d at 163). Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing. *Id.*

Texas falls within the zone of interests of the INA as a whole, which is the proper reference for actions under the APA, rather than any particular section. *MPP*, 20 F.4th at 975–76. One reason the INA was enacted was the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must furnish under the Emergency Medicaid program and its obligation to furnish a public education. *DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601).

Texas's interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Id.* By strictly limiting the exercise of the parole power, Section 1182(d) ensures that aliens are not released into the United States to impose costs on

American citizens and taxpayers. Texas's injuries flow from just that problem and it may use the APA to protect its interests under the INA.

## IV.    The Parole Program is final agency action.

The Parole Program is subject to judicial review because it constitutes final agency action. *See* 5 U.S.C. § 704. It marks the consummation of the Defendants' decisionmaking process, and it is one from which legal consequences flow or by which rights or obligations are determined. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Engrs. v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

### A.    The Parole Program is the consummation of the agency's decisionmaking process.

Similarly, the Parole Program is final agency action because it "consummate[s] the agency's decisionmaking process," *Bennett*, 520 U.S. at 178; *Hawkes*, 578 U.S. at 597–98, of interpreting the parole criteria for applicants from the four countries it applies to. Moreover, the program creates rights for aliens (to apply through a particular process not available to other applicants) and produces legal consequences for them (parole into the United States through a process not available to other applicants), hallmarks of a final, substantive agency action.

A rule that will eventually result in orders applying it constitutes final agency action despite the application to individual cases having yet to be completed. *See Biden*, 142 S. Ct. at 2545 n.7 ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such judicial authorization had been obtained.").

36

**B. The Parole Program creates legal consequences and determines rights and obligations.**

Action "bind[ing]" an "agenc[y]" to a legal view "gives rise to 'direct and appreciable legal consequences.'" *Hawkes*, 578 U.S. at 598 (citation omitted). The Defendants do not have discretion to disregard the statutory parole criteria for classes of applicants. *See DAPA*, 809 F.3d at 171 ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up).

The Parole Program binds the agency. It does not genuinely leave the agency and its personnel free to exercise discretion, as demonstrated by the parole approval rates of nearly 100% under the Program. *See* Pl's Ex.41 (DHS adjudicated 194,683 cases between October 2022 and June 30, 2023, approving 189,942—for approval rate of 97.5%). This sort of approval rate demonstrates that the agency is not applying the Parole Program's criteria on a case-by-case basis. *See Texas v. United States*, 86 F. Supp. 3d 591, 670 n. 101 (S.D. Tex. 2015), *aff'd, DAPA*, 809 F.3d 134 ("Evidence of DACA's approval rate [somewhere between 94–99%], however, persuades the Court that this [discretionary] 'factor' is merely pretext").

"[T]he application of a legal standard to settled facts" is a mixed question of law and fact and "encompass[es] questions about whether settled facts satisfy a legal standard." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020). Determining whether decisions under the Parole Program are conducted on a case-by-case basis is a mixed question of law and fact.

Here, the undisputed facts show that the Defendants are paroling substantial numbers of Cubans, Haitians, Nicaraguans, and Venezuelans—to the extent that there could not possibly be the type of case-by-case analysis envisioned by Congress when it amended 8 U.S.C. § 1182(d)(5) in 1996. The facts further show that virtually every single alien who applies for parole is allowed to

enter the country, with approval rates of 97% or higher for aliens from each CHNV country. *See* ECF No. 244, Plaintiffs Proposed Findings of Fact and Conclusions of Law at ¶¶ 40-44. As the Fifth Circuit held, "[d]eciding to parole aliens en masse is the opposite of case-by-case decisionmaking." *Texas v. Biden*, 20 F.4th 928, 942 (5th Cir. 2021).

And the paucity of information that the Defendants collect about each alien applying for parole conclusively shows that a case-by-case determination is impossible. The Northern District of Florida made this point about another similar parole program, and it is equally true here:

> However, like the Parole+ATD policy, the new policy does not explain how a meaningful evaluation of the criteria that determine whether the policy may be utilized (e.g., the alien's "national security risk" and "public safety threat") could possibly occur in light of the the evidence in [the Florida Parole+ATD case], which established that DHS "has no idea whether [the arriving aliens] have criminal histories or not" because it "has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports." Moreover, whenever the policy discusses individual, case-by-case consideration of each alien, it does so with reference to overcrowding and the CBP's resource constraints, not with regard to any characteristics of that specific alien that might constitute a legally sufficient reason for parole, which strongly suggests that the repeated "case-by-case," "individualized" language is (as it was in the Parole+ATD policy) pretextual.

*Florida v. Mayorkas*, 2023 WL 3398099 at *5 (quoting *Florida v. United States*, No. 3:21-cv-1066, 2023 WL 2399883, at *12, *31) (N.D. Fla.).

The Parole Program also alters the rights of aliens by creating a program where the agency adjudicates applications for parole, and parole makes aliens eligible for federal and State benefits. *See DACA*, 50 F.4th at 521–24 (DACA is a substantive rule because it provides "affirmative immigration relief … following extensive proceedings that are effectively adjudications" and "eligibility for benefits"); *DAPA*, 809 F.3d at 173 n.137 ("[P]lac[ing] a cost on the states" by

38

increasing the number of those eligible under Texas law for driver's licenses is also a sign that a rule is binding).

Illegal aliens are eligible to participate in Texas's Emergency Medicaid program. 8 U.S.C. § 1611(b)(1)(A). An illegal alien wrongfully paroled into Texas is eligible for Emergency Medicaid, and Texas is legally obligated to bear part of the cost of furnishing him with that program.

The Parole Program also affects Texas's legal obligation to provide a public-school education. Texas is required by both federal and state law to provide all children with a public-school education. *See generally Plyler v. Doe*, 457 U.S. 202 (1982); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) ("[T]he State's public education expenditures for the children of undocumented aliens are required by the equal protection clause[.]"). Just as the Parole Program requires Texas to bear the medical costs of paroled illegal aliens, it requires Texas to bear the cost of educating alien children who would otherwise never have entered the United States (or would have been detained and deported or removed).

## V. The Parole Program vastly expands parole beyond the only two statutory categories for permissible grants of parole.

### A. "Significant public benefit" and "urgent humanitarian reasons" under the parole authority are limited.

When Congress adopted the current version of Section 1182(d)(5) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),"), it severely restricted the parole authority. Pre-IIRIRA, the INA granted broad parole authority to the Attorney General "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5) (1996). IIRIRA amended the INA "by striking 'for emergent reasons or for reasons deemed strictly in the public interest' and inserting '*only* on a *case-by-case* basis for *urgent humanitarian reasons or significant public benefit*.'"

Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, § 602, 110 Stat. 3009 (1996) (emphasis added).

Congress chose not to define in IIRIRA the terms "significant public benefit" and "urgent humanitarian reasons." And Congress did not explain its decision to remove the term "public interest" and instead use the term "public benefit," but it is likely that the change has little legal consequence, as "[a]bstract, often interchangeably used terms such as 'public benefit,' [and] 'public interest,' ... are often used in public policy." Mary D. Fan, *The Right to Benefit from Big Data as a Public Resource*, 96 N.Y.U. L. Rev. 1438, 1473 (2022); *see also, e.g., State of N.C. v. Hudson*, 665 F. Supp. 428, 445 (E.D.N.C. 1987) (using "public interest" and "public benefit" as synonyms) (cleaned up)); *Enhanced Commc'ns of N. New England, Inc. v. Pub. Utils. Comm'n*, 2017 ME 178, 169 A.3d 408, 413 n.4 (cleaned up) (same).

However, Congress provided a strong direction as to their intended meaning by coupling the word "significant" with the phrase "public benefit." Thus, interpreting the import of IIRIRA's amendment to the parole statute hinges on the meaning of "significant." "[I]n the absence of a statutory definition [courts] 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Mississippi Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). Black's Law Dictionary defines "significant" as meaning "[o]f special importance; momentous, as distinguished from insignificant. *Significant*, *Black's Law Dictionary* (11th ed. 2019). Similarly, the American Heritage Dictionary defines "significant" to mean "[h]aving or likely to have a major effect; important," and also "[f]airly large in amount or quantity." *Significant*, *American Heritage Dictionary* (5th ed. 2018).

Since the prior version of the statute already limited the grant of parole to situations "in the public interest" Congress's decision to add "significant" means that post-IIRIRA, the benefit to the public must be greater than it used to be. Before IIRIRA was enacted, Congress and the executive branch had both provided specific examples of situations in which an alien would qualify for parole under the old, more forgiving "public interest" standard. An INS rulemaking from 1982 summarizes those examples:

> The legislative history of the parole provision shows a Congressional intent that parole be used in a restrictive manner. The drafters of the Immigration and Nationality Act of 1952 *gave as examples situations where parole was warranted in cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution.* H. Rep. No. 1365,82nd Cong., 2d Sess., at 52 (1952). In 1965, a Congressional committee stated that the parole provisions "were designed to authorize the Attorney General to act only in emergent, individual, and *isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law.*" S. Rep. No. 748, 89th Cong., 1st Sess., at 17 (1965). Finally, in the Refugee Act of 1980, Congress removed the Attorney General's authority to parole groups of aliens as refugees. Pub L. 96-212,96th Cong., 2d Sess., 94 Stat. 108 (1980).

Detention and Parole of Inadmissible Aliens; Interim Rule with Request for Comments, 47 Fed. Reg. 30044, 30044-45 (July 9, 1982) (emphasis added) (available at https://tinyurl.com/3drwn2ex).

Thus, under the prior, less stringent standard, Congress gave as paradigmatic examples of valid exercises of the parole power "cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution" and "isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law." *Id.*

The Parole Program falls far outside what would have been allowed even pre-IIRIRA, let alone the stricter standard imposed by IIRIRA.

Post-IIRIRA court decisions illustrate that the Parole Program falls miles outside the carefully circumscribed boundary of allowable situations where the parole statute is properly applied. When describing "Congress' provision of parole," Justice Breyer provided two examples of what Congress had in mind: "release for the purpose of medical care or to testify in a court proceeding." *Jennings v. Rodriguez*, 138 S. Ct. 830, 872 (2018) (Breyer, J., dissenting).

The Fifth Circuit has explained, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947.

The District of Maine explained that "there are various types of parole, including port of entry parole, which applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods of entry. Other types of parole include humanitarian parole, granted in instances of medical emergency; and public interest parole, granted for aliens participating in legal proceedings." *Hornof v. United States*, No. 2:19-CV-00198, 2023 WL 5627631, at *25 n.49 (D. Me. Aug. 31, 2023) (cleaned up) (quoting *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005)).

"The Government often utilizes significant public benefit parole to secure testimony from noncitizens—who otherwise would not have legal status to be in the United States—in criminal proceedings." *Id.* at *25 (granting summary judgment to the federal government in action by aliens who were paroled into the United States against their will and then detained to compel their testimony); *see United States v. Jumaev*, 20 F.4th 518, 548 n.17 (10th Cir. 2021) (referring to "Significant Public Benefit Parole so that [a witness] could remain in the U.S.); *United States v.*

42

*Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (explaining that an ICE special agent had "requested Significant Public Benefit Paroles in order to facilitate ... reentry into the United States" for witnesses); *Garcia v. Peery*, No. CV 15-6273, 2016 WL 6304647, at *5 (C.D. Cal. Aug. 26, 2016) (describing efforts by DHS special agent to obtain testimony of crime victim by "secur[ing] a 'Significant Public Benefit Parole'"); *Amador v. Meeker*, No. 8:11-CV-1977, 2011 WL 4502092, at *1 (M.D. Fla. Sept. 28, 2011) (explaining that alien who had "agreed to cooperate with [a] federal investigation and testify against" defendants "was granted 'significant public benefit' parole"); *United States v. Kahre*, No. CR-S-05-0121, 2007 WL 9757487, at *1 (D. Nev. Apr. 20, 2007) (noting that "the I.R.S. is attempting to obtain a significant public benefit parole into the U.S. for" a "Special Circumstances Witness" in criminal trial). The government also paroles into the United States the family members of cooperating witnesses. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) (explaining that "the United States government brought the children [of a cooperating witness] and [the witness's] mother to the United States temporarily under Significant Public Benefit Parole").

Aliens have also been granted "'significant public benefit parole' to remain in the country because of ... work as a confidential source" for the FBI. *United States v. Williams*, 571 F. App'x 887, 890 (11th Cir. 2014); *see United States v. Clements*, 686 F. App'x 849, 851 (11th Cir. 2017) (referring to "Significant Public Benefit Parole program, which allows illegal aliens who are informants for law enforcement to gain lawful status in the United States"); *Torres-Balderas v. Lynch*, 806 F.3d 1157, 1158 (8th Cir. 2015) (stating that alien who had assisted "the St. Louis Police Department as well as the FBI in matters concerning false documents" received "[i]n exchange ... a one-year Significant Public Benefit Parole"); *United States v. Mills*, 334 F. App'x 946, 947 (11th

Cir. 2009) (referring to "application for a Significant Public Benefit Parole" filed by DEA on behalf of informant); *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004) (referring to "public benefit parole" received by paid confidential informant).

Perhaps the most telling examples of public benefit parole come from DHS's own explanations. One such example is from *Milardo v. Kerilikowske*, in which two "deportees seeking to comply with the legislative subpoenas" from the Connecticut legislature sued to contest ICE's denial of their parole applications. No. 3:16-MC-00099, 2016 WL 1305120, at *1 (D. Conn. Apr. 1, 2016), *aff'd sub nom. Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016). ICE provided to the aliens a letter that explained that "Significant public benefit parole 'is a temporary measure generally used to provide a legal mechanism for informants, witnesses, criminals, and defendants' to 'assist with ongoing investigations, prosecutions or testify as witnesses in proceedings.'" *Id.* at *2 (quoting text of ICE letter).

A public-facing DHS website providing information to aliens about the evidence required for "humanitarian or significant public benefit parole requests" provides the following list of the "Most Common Types of Parole Requests":

    a.  Requests Based on Medical Reasons
    b.  Requesting Parole for Children
    c.  To Receive Medical Treatment in the United States
    d.  To Be an Organ Donor to an Individual in the United States
    e.  To Reunite With Family in the United States for Urgent Humanitarian Reasons
    f.  To Care For or Otherwise Provide Support to a Seriously or Terminally Ill Relative in the United States
    g.  To Attend a Funeral or Settle the Affairs of a Deceased Relative in the United States
    h.  To Come to the United States for Protection from Targeted or Individualized Harm
    i.  To Participate in Civil Legal Proceedings in the United States
    j.  To Return to the United States After: Failing to get a travel document before departure from the United States; OR Failing to return to the United States before a travel document expired

Dep't of Homeland Sec., *Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests* (May 23, 2022), https://tinyurl.com/bp59audc. Notably, under the bullet point for "Protection from Targeted or Individualized Harm," DHS specifically informs aliens that "[p]arole is generally not intended to be used to avoid normal refugee processing or to provide protection to individuals at generalized risk of harm around the world." *Id.*

The Parole Program does not fit within any of these established examples of the lawful exercise of the parole power. The Parole Program does not fit because it is illegal.

**B. The text of the parole statute and legislative history make clear that Congress intended IIRIRA to strictly limit application of the parole power.**

At trial, the Federal Defendants made much of the fact that in the enacted version of IIRIRA, Congress ultimately decided not to include portions of the House version of the bill that would have "define[d] urgent humanitarian reasons or significant public benefit." ECF No. 278, Trial Tr. vol. 2, 16:17-19. Because the House version of the parole statute was not adopted, the Federal Defendants criticize, *id.* at 15:14–16:5, Texas's use of language from a House report explaining that parole was not intended to be "a supplement to Congressionally-established immigration policy" and that the Executive Branch's abuse of the parole authority "illustrates why further, specific limitations on the Attorney General's discretion are necessary." H. Comm. on the Judiciary, H.R. Rep. No. 104-469, at 140 (1996).

The Federal Defendants' argument about Congress deciding not to use the House's definitions in the parole statute is a *non sequitur* because the House Report was not talking about the potential definitions in its version of the bill. The report was making a much broader point that still stands regardless of the definitions' adoption, which is that Congress believed the Executive

was abusing the parole authority and violating the statute and that, therefore, more restrictions were needed to curtail that abuse.

Indeed, Congress was crystal clear that the final amendment it *did* adopt was intended to limit the federal government's exercise of the parole power from what it had been doing before. The section heading in IIRIRA that makes this amendment is titled "**LIMITATION** ON USE OF PAROLE." IIRIRA, 110 Stat. 3009, 3009-689 (§602) (Sept. 30, 1996) (emphasis added); *see Ram v. INS*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret its meaning"). The Circuits that have examined the legislative history of the parole statute all agree with Texas's interpretation of IIRIRA: that it was a response to the Executive's abuse of the statute and was drafted to strictly limit when the parole power could be exercised. *E.g. Cruz-Miguel v. Holder*, 650 F.3d 189, 199 and n.15 (2d Cir. 2011) ("Congress, in IIRIRA, specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" because "parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy" (citing H. R. Rep. No. 104–469, pt. 1, at 140–41 (1996)); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007) ("Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A)"); *see also* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 112-125 (summarizing the legislative history and judicial interpretation of IIRIRA).

**C. The Parole Program unlawfully expands parole eligibility, and the Program is therefore contrary to law and arbitrary and capricious.**

In contrast to the traditionally accepted (and limited) public benefit uses of parole, the Parole Program expands the "public benefits" into all-encompassing categories that are so broad it is difficult to see any limiting principle to them at all. Indeed, the Defendants' delineated

46

categories of "public benefit" are so broad that they could be used to justify paroling into the United States just about every alien currently living outside the United States. Specifically, the Federal Register notice for the Parole Program lists the following purported "public benefits": "(i) enhance border security through a reduction in irregular migration ... including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration ...; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration." 88 Fed. Reg. 1249; 88 Fed. Reg. 1260; 88 Fed. Reg. 1272. These "benefits" fall far outside the limited types of public benefits that have traditionally been understood to fall under the statute. That alone makes the program unlawful.

However, even if the Federal Defendants' list of purported "benefits" did qualify as "significant public benefits" under the statute, the Parole Program would still fail to achieve any of them. The trial testimony from the Intervenor Defendants' only witness contradicts all of the Defendants' claims about the purposes of the program. Quite simply, there is *no* evidence that alien beneficiaries of the Parole Program are being paroled for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). The Intervenor Defendants' witness, Eric Sype, provided testimony about his family's sponsorship for the parole of their good friend from Nicaragua, Oldrys. Mr. Sype testified over and over that there was no reason other than economic

benefit for Oldrys to come to the United States. ECF No. 277, Trial Tr. vol. 1 at 45, 59-60, 68-71, 73-74, 84.

Furthermore, Mr. Sype could not recall DHS ever inquiring whether there were any urgent humanitarian reasons for Oldrys to come to the United States. *Id.* at 75-76. Mr. Sype also could not recall any inquiries from DHS about any significant public benefit for Oldrys to enter the United States. *Id.* at 76-77. Moreover, there was never any risk of irregular migration by Oldrys, as Mr. Sype testified that he had no reason to believe that would have ever traveled to the southwestern border of the United States and attempted to enter illegally. *Id.* at 65-67, 78-80.

## VI. Grants of parole under the Parole Program are not and will not be temporary.

As established above, Congress only permits the use of parole "temporarily." But—despite the Defendants' contentions and public descriptions about the program's nature—grants under the Parole Program are not and will not be temporary, particularly as applied to the populations in question. This is so because the Defendants are knowingly paroling into the United States tens of thousands of aliens every month that they know they will not be able to remove in the future. And further—based on their conduct elsewhere—the Defendants are likely to extend or "re-parole" significant numbers of the grants of parole under the Parole Program.

### A. Defendants are knowingly paroling tens of thousands of aliens every month that they are unable and unwilling to eventually remove.

The Defendants elsewhere officially acknowledge great difficulty removing aliens to Cuba, Haiti, Nicaragua, and Venezuela. Yet through this Parole Program, they knowingly parole into the United States tens of thousands every month whom they acknowledge they will not be able to remove.

Three of the countries in the Parole Program are currently designated for Temporary Protected Status (TPS), a designation under the immigration laws that generally prevents the removal of nationals to a country so designated. *See* 8 U.S.C. § 1254a. The Secretary of DHS can designate any foreign country or part of a foreign country for TPS "only if":

A. the [Secretary] "finds" that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

B. the [Secretary] finds that-
   i. there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
   ii. the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
   iii. the foreign state officially has requested designation under this subparagraph; or

C. the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1). Once the Secretary makes such a designation, for any alien inside the United States from such a country, he "may grant the alien temporary protected status in the United States and shall not remove the alien from the United States during the period in which such status is in effect." *Id.* § 1254a(a)(1)(A). Further, the Secretary "shall authorize the alien to engage in employment in the United States[.]" *Id.* § 1254a(a)(1)(B).

Once designated for TPS, it is a near certainty that the designations will continue indefinitely. And in all likelihood, new designations and redesignations will continue to be made indefinitely. Meaning, as it applies to the three TPS countries in the Parole Program, the Defendants have essentially employed a "temporary two-step," where the Defendants "temporarily" parole hundreds of thousands of aliens into the United States under the Parole

Program, and they will likely then designate/redesignate nationals of these countries for "Temporary" protected status.

Additionally, even assuming that the Defendants *did not* grant TPS for all of the aliens in the Parole Program, their own data establishes that there is no realistic probability of removing even a small fraction of the nationals paroled into the United States at the end of their authorized period of parole.

### 1. Haiti

The Defendants initially designated Haiti for TPS in 2010. Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010). They did so after concluding "that there exists in Haiti 'extraordinary and temporary conditions,' preventing Haitian nationals from returning to Haiti in safety and that permitting eligible Haitian nationals to remain temporarily in the United States would not be contrary to the national interest." *Id.* 3477. The Defendants have renewed this designation repeatedly since then—with the exception of an announced termination in 2019 that is the subject of ongoing litigation. And the Defendants designated Haiti *again* for TPS on August 3, 2021, based on a number of security, economic, and health concerns. Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41863 (Aug. 3, 2021).

On January 26, 2023, the Defendants *again* extended and redesignated TPS for Haiti. Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5022 (Jan. 26, 2023). The Defendants justified that extension and redesignation based on their assessment that "circumstances continue to make return to Haiti dangerous for Haitian nationals living in the United States." *Id.* at 5025.

### 2. Nicaragua

The Defendants initially designated Nicaragua for TPS on January 5, 1999. Designation of Nicaragua Under Temporary Protected Status, 64 Fed. Reg. 526 (Jan. 5, 1999). It was extended 13 times, based on the "same statutory basis of environmental disaster" until DHS attempted to terminate the designation during the Trump Administration. Reconsideration and Rescission of Termination of Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40297 (Jun. 9, 2023). That termination was the subject of ongoing litigation, and on June 9, 2023, DHS announced the rescission of the decision to terminate. *Id.*

In deciding to rescind the termination decision and to extend the designation, DHS explained that in Nicaragua, "conditions continued to substantially disrupt living conditions and temporarily affected the country's ability to adequately handle the return of its nationals residing in the United States." *Id.* 40298. DHS concluded:

> In summary, while progress has been made in repairing damage caused by the 1998 hurricane, Nicaragua continues to experience numerous natural disasters that significantly disrupt living conditions and adversely impact its ability to adequately handle the return of those granted TPS. Nicaragua is encumbered by the effects of several significant natural disasters, environmental challenges, political instability, and a resulting humanitarian crisis that adversely impact the country's ability to fully recover and continue to render the country temporarily unable to adequately handle the return of its nationals.

*Id.* 40,301.

### 3. Venezuela

On March 9, 2021, the Defendants designated Venezuela for TPS. Designation of Venezuela for Temporary Protected Status and Implementation of Employment Authorization for

Venezuelans Covered by Deferred Enforced Departure, 86 Fed. Reg. 13574 (Mar. 9, 2021). The

Defendants did so because:

> Venezuela is currently facing a severe humanitarian emergency. Under Nicolás
> Maduro's influence, the country "has been in the midst of a severe political and
> economic crisis for several years." Venezuela's crisis has been marked by a wide
> range of factors, including: Economic contraction; inflation and hyperinflation;
> deepening poverty; high levels of unemployment; reduced access to and shortages
> of food and medicine; a severely weakened medical system; the reappearance or
> increased incidence of certain communicable diseases; a collapse in basic services;
> water, electricity, and fuel shortages; political polarization; institutional and
> political tensions; human rights abuses and repression; crime and violence;
> corruption; increased human mobility and displacement (including internal
> migration, emigration, and return); and the impact of the COVID–19 pandemic,
> among other factors.

*Id.* 13576 (footnotes omitted).

On September 8, 2022, the Defendants extended the TPS designation for Venezuela.

Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024

(Sep. 8, 2022). In extending TPS, the Defendants concluded that there "continue to be

extraordinary and temporary conditions in Venezuela that prevent Venezuelan nationals . . . from

returning to Venezuela in safety, and it is not contrary to the national interest of the United States

to permit Venezuelan TPS beneficiaries to remain in the United States temporarily." *Id.* 55027.

They specifically noted:

> Venezuela continues to be in a humanitarian emergency. Venezuela continues to
> face economic contraction, poverty, high levels of unemployment, reduced access
> to and shortages of food and medicine, a severely weakened medical system, a
> collapse in basic services, political polarization, institutional and political tensions,
> human rights abuses and repression, crime and violence, corruption, and increased
> human mobility and displacement.

*Id.*

### 4.  Removals to the CHNV countries

In addition to their admissions regarding their inability to remove Haitians, Nicaraguans, and Venezuelans to their home countries, the Defendants' own publicly available data demonstrate the extent of the problem. Specifically, between Fiscal Years 2012 and 2021, they were only able to remove approximately:

- 3,705 Cubans

- 11,349 Haitians

- 12,511 Nicaraguans

- 7,324 Venezuelans

Dep't of Homeland Sec. Off. of Immigr. Stat., *2021 Yearbook of Immigration Statistics*, Dep't of Homeland Sec. (Nov. 2022), https://bit.ly/3ZFFE2r (see Table 41).

Thus, cumulatively, over the course of a decade the Defendants were able to remove 34,889 aliens to these four countries. In comparison, the Parole Program brings 30,000 nationals of these four countries to the United States *each and every month* for the indefinite future. If even a fraction of the aliens paroled into the United States decide to overstay their authorized period of parole, DHS effectively has little to no chance of being able to remove them from the United States in a timely fashion.

### 5.  DHS will likely re-parole or extend parole for aliens under the Parole Program.

DHS has a mechanism in place for any recipient of parole to apply for a renewal of their parole, which DHS calls "re-parole." As DHS explains on its public-facing website for parolees and parole applicants, "Although parole is temporary in nature, in some instances, an individual may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States." *Humanitarian or Significant*

*Public Benefit Parole for Individuals Outside the United States*, U.S. Citizenship and Customs Servs. (May 2, 2023), https://tinyurl.com/4ndkpp2u. Indeed, the procedure for applying for re-parole is trivially simple: an alien simply files "a new Form I-131, Application for Travel Document," checks the proper box, and then finishes by "[w]riting 're-parole' across the top of the application." *Id.* The Defendants have never exempted aliens in the Parole Program from DHS's normal re-parole application process.

The Defendants were incorrect, therefore, when they claimed at trial that there is "currently no mechanism for individuals to renew their parole under the CHNV parole processes." ECF No. 277, Trial Tr. vol. 1 at 234:12-13. To the contrary, that mechanism exists, and will almost certainly be applied to aliens participating in the Parole Program.

The federal government's Afghan parole program is instructive. In conjunction with the federal government's military withdrawal from Afghanistan in the summer of 2021, Secretary Mayorkas issued a memo instituting a parole program for Afghans that "instructed the CBP Acting Commissioner to parole eligible Afghan nationals into the United States for 2 years." Dep't of Homeland Sec. Off. of Inspector Gen., *The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases*, Dep't of Homeland Sec. (Sep. 29, 2022), https://tinyurl.com/5n7k7ku7. When those two-year grants of parole were set to expire, DHS went into action to ensure the program participants could remain in the United States. DHS didn't just authorize "re-parole" on an individualized basis, but instead set up a re-parole program. Secretary Mayorkas announced a "new streamlined and fee-exempt process" so that "eligible Afghan nationals will be able to continue living and working here as they pursue a permanent status." Press Release, Dep't of Homeland Sec., DHS Announces Re-parole Process for Afghan

Nationals in the United States, (June 8, 2023) (available at https://tinyurl.com/3yjubv3j). DHS has an entire webpage dedicated to helping Afghan parolees navigate the re-parole process. *Re-Parole Process for Certain Afghans*, U.S. Immigr. and Customs Servs. (Sep. 27, 2023), https://tinyurl.com/46jbmnja. Thus, for the tens of thousands of Afghan nationals that have been paroled into the United States, DHS appears to consider their permanent presence in the United States a foregone conclusion. There is no reason to believe DHS will treat aliens in the Parole Program any differently.

Given the sheer volume of aliens that DHS has paroled, and will continue to parole, into the United States under the Parole Program, the availability of re-parole generally, and the very recent history of a programmatic "re-parole" scheme for tens of thousands of aliens from one country, there is every reason to conclude that the Defendants will do the same here.

6. **Defendants acted arbitrarily and capriciously and contrary to law by creating the Parole Program without consideration of the likelihood that paroled aliens will ever leave or be removed.**

Aliens from the CHNV countries are rarely removed, and the Defendants have a long track record of instituting "temporary" programs for allowing aliens into the country that never actually end.

Compounding the problem, the Executive Branch has ignored the Congressional requirements to create systems to track aliens. Congress has repeatedly directed the Executive Branch to create a comprehensive biometric entry-exit system to ensure proper tracking of aliens in the United States. *See e.g.*, Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108458, 118 Stat. 3638 (codified in relevant part at 8 U.S.C. § 1365b) ("Congress finds that completing a biometric entry and exit data system as expeditiously as possible is an essential investment in efforts to protect the United States by preventing the entry of terrorists."); Uniting

and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (PATRIOT Act), Pub. L. No. 107-56, 115 Stat. 272. Yet even though Congress mandated decades ago that the Executive Branch implement a biometric exit control system, "currently there is no comprehensive system in place to collect biometrics from aliens departing the country." *Collection of Biometric Data From Aliens Upon Entry to and Departure From the United States*, 85 Fed. Reg. 74162, 74163 (Nov. 19, 2020).

For the Parole Program specifically, the Defendants admitted in their discovery responses that their ability to track parolees is essentially nonexistent: "DHS ... has no comprehensive method to track whether a parolee remains in the United States" and "DHS is unable to provide information about whether [Parole Program participants] reside[] in Texas, or elsewhere, because this is not the type of information tracked through automated systems." (Pl. Ex. 38 at 13-14, Doc 263-2 at 48-49.)

Given these facts, it was arbitrary and capricious for the Defendants to institute the Parole Program. The parole statute only empowers DHS to parole aliens into the United States "temporarily." 8 U.S.C. § 1182(d)(5)(a). The Federal Register notices implementing the Parole Program parrot this language, claiming that the "grant of parole under this process is for a temporary period of up to two years." 88 Fed. Reg. 1243, 1244; 88 Fed. Reg. 1255, 1256; 88 Fed. Reg. 1266, 1268. Yet, as explained above, there is little prospect that Parole Program aliens will ever be ended, the Defendants do not even have the ability to track aliens in the Program, and there is every indication that the Defendants will renew the aliens' "temporary" status in perpetuity. Even worse, since the Parole Program is not really temporary, the Program is not only arbitrary

and capricious, but it is also contrary to law because it violates the plain language of the parole statute's "temporarily" requirement.

The Parole Program is *not* temporary, and it was arbitrary, capricious, and contrary to law for the Defendants to implement it. This court should therefore enjoin or vacate it.

## VII.   The Parole Program fails to satisfy the requirement of reasoned decisionmaking because it failed to consider the States' reliance interests.

DHS was required to assess the States' reliance interests "in the first instance," before it made its decision to act to create the Parole Program. *See MPP*, 20 F.4th at 990. And the Fifth Circuit has flatly rejected DHS's assertion that "Texas, as a 900-mile border state, has no reliance interests in the enforcement of" immigration laws "according to the governing statutes." *Texas*, 40 F.4th at 228. And the Supreme Court has treated costs to the States as part of their reliance interests. *See Regents*, 140 S. Ct. at 1913 (highlighting assertions that "States and local governments could lose $1.25 billion in tax revenue each year").

## VIII.   DHS's interpretation of its parole authority is precluded by the Major Questions Doctrine.

Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). The Major Questions Doctrine is a principle of statutory interpretation under which courts will not assume that Congress has assigned to the Executive Branch questions of "deep 'economic and political significance'" unless Congress has done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

In *West Virginia v. EPA,* the Supreme Court explained that the Major Questions Doctrine required applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue.... Extraordinary grants of regulatory authority are rarely

accomplished through modest words, vague terms, or subtle devices." 142 S. Ct. 2587, 2609 (cleaned up).

A central characteristic of our constitutional republic is that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* Thus, the Supreme Court explained that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme.... We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also King*, 576 U.S. at 486; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Here, the federal government is doing exactly what the Supreme Court said the executive cannot do. It is using the Parole Program as a way of ignoring and circumventing the channels of immigration that Congress has established.

There could hardly be a clearer application of the Major Questions Doctrine than here. There can be no doubt that one of the questions of deepest political significance is whom the government allows into our country, especially for long-term or permanent residence. *King*, 576 U.S. at 486.

Congress manifestly did *not* expressly or clearly authorize the parole program when it adopted Section 1182(d)(5). The very structure of the INA makes this abundantly clear because Congress already created an entirely separate system that is strikingly similar to the Parole Program; specifically our country's system for issuing visas.

Congress gets to decide how aliens may enter the United States. The Parole Program purports to create a new, parallel immigration system. On its text, Section 1182(d)(5) does not

contain within it a clear and unambiguous grant of such vast authority. And if that fact were not already clear, it becomes abundantly clear in the context of our immigration system as a whole.

Congress would not have adopted dozens of statutory sections setting forth immigration requirements in great detail, just for one small subparagraph to confer on the executive the authority to replace all of that with its own alternate system. The statutory scheme that Congress created to establish our visa system is intricate and detailed. The Parole Program copies some of those elements, complete with application forms for aliens and numerical quotas. However, at every step of the process, the Parole Program omits significant elements and requirements that Congress has imposed and instead replaces them with far less stringent requirements; often replacing them with nothing at all and merely eliminating those congressional requirements. If Congress had meant for something like the Parole Program to be established, it would have set it up. It didn't. The parole program is therefore illegal.

The Parole Program relies on the CBP One smartphone app ("CBP One") and an alien's application through the app for "Advance Travel Authorization" ("ATA"). In a separate rulemaking, the Defendants have explained that CBP One allows aliens to "schedule a time to arrive at [Ports of Entry ("POE")] along the [Southwest Border], to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain POEs." *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31314 at 31317 (May 16, 2023). One "function[] of the CBP One app" is its "Advance Travel Authorization ('ATA') functionality used as part of the CHNV parole processes." Id. at 31401.

CBP One requires that, before arriving at a POE, aliens enter "limited biographic information into CBP One and submit a live photo." 88 Fed. Reg. at 1264; 88 Fed. Reg. at 1253;

59

88 Fed. Reg. at 1276. After aliens "have submitted information through CBP One," the Defendants claim that "CBP conducts systems checks and vetting to determine the individual's eligibility for the CHNV processes and whether it is appropriate to issue a travel authorization." (Pl. Ex. 38 at 7, 11 (Doc. 263-2 at 42, 46.)

The visa process established by statute is strikingly similar to the CBP One ATA process, except that the visa process was created by Congress, whereas the CBP One and ATA process was wholly invented by the Defendants without any clear congressional authorization, and without even going through notice-and-comment rulemaking.

As with ATAs, visas do not give aliens the right to enter the United States, but only to travel to a POE and request admission. 8 U.S.C. § 1201(h) (nothing in the INA "shall be construed to entitle any alien, to whom a visa ... has been issued, to be admitted the United States, if, upon arrival ... he is found to be inadmissible.... The substance of this subsection shall appear upon every visa application.").

And, also just like with ATAs, when aliens with valid visas arrive at POEs, CBP officers decide whether the alien is admissible and whether to allow the alien to enter the country. 8 C.F.R. § 235.1(f)(1) ("Each alien seeking admission at a United States port-of-entry ... must establish to the satisfaction of the inspecting officer that the alien is not subject to removal ... and is entitled, under all of the applicable provisions of the immigration laws and this chapter, to enter the United States.").

Unlike ATAs, however, the visa process enacted by Congress and implemented through authorized regulation is stricter and much more involved. The Defendants' use of the word

"limited" is apt, when they describe the ATA process as merely involving the collection of only "limited biographic information." 88 Fed. Reg. at 1264; 88 Fed. Reg. at 1253; 88 Fed. Reg. at 1276.

For example, Congress has defined 22 different classifications of non-immigrant visas covering a variety of possible allowable travel purposes, and concomitant restrictions and limitations. 8 U.S.C. 1101(a)(15)(A)-(V) (defining 22 different classifications of non-immigrant visa); *id*. § 1153 (defining classifications of immigrant visas); *see also* U.S. Dep't of State, *Directory of Visa Categories*, (accessed Sep. 25. 2023), https://tinyurl.com/3p46jxtn (listing 32 categories of immigrant visas); *see also*, *e.g.*, *id*. § 1182(a) (setting forth factors making an alien ineligible for a visa and inadmissible to the United States); *id*. § 1372 (establishing system to track and monitor alien students and exchange visitors to ensure their compliance with terms of their visas); *id*. § 1184 (imposing specific visa classification-based restrictions and limitations for a number of different visa categories).

Congress has also established numerical limitations and quotas for a variety of different visa classifications. *E.g.*, *id*. § 1151 (imposing annual numerical caps for various immigrant visa classifications); *id*. § 1184(e) (imposing "annual numerical limit" on certain nonimmigrant professionals); *id*. § 1184(g) (imposing "limitation on numbers" of [t]emporary workers and trainees"); *id*. § 1184(p) (imposing "numerical limitations" on annual number of recipients of visa for certain victims of crimes).

Congress has also imposed specific requirements for the documents aliens must have to enter the United States. *E.g. id*. § 1181 (imposing documentary requirements for admission of immigrant aliens); *id*. §§ 1201, 1204 (imposing standards and requirements for issuance of visas);

*id*. § 1202 (imposing requirements for visa applications); *id*. § 1203 (imposing requirements for reentry permits).

Furthermore, Congress has empowered the Secretary of State, and *not* the Defendants, to issue regulations for the issuance of entry documents into the United States. *See, e.g.,* § 1202 (making nine separate references to regulations "prescribed" or "issued" related to issuance of visas and specifically providing for "regulations issued by the Secretary of State" and empowering the Secretary of State with discretion to establish different "application forms for the various classes of nonimmigrant admissions"). Indeed, the Secretary of State has established a detailed regulatory scheme for the issuance of visas, including detailed visa application forms, and procedures for the assessment of aliens for ineligibility for admission into the United States and for national security and public health and safety. 22 C.F.R. §§ 40.1–46.7.

The requirements that an alien must fulfill to get a visa are extensive. For example, to get an immigrant visa, aliens must pay a substantial fee of between $205 and $345 for each applicant applying for an immigrant visa, and a fee between $185 and $315 for each applicant applying for a nonimmigrant visa, and an identical fee must be paid for every member of a family, including children. Dep't of State, *Fees for Visa Services*, (accessed Sep. 25, 2023) https://tinyurl.com/uhdz4x5e. Then, aliens must appear in person for a visa interview with a Department of State consular officer at an embassy or consulate. 8 U.S.C. § 1202(e).

Aliens applying for immigrant visas must submit to a number of other requirements, such as comprehensive medical exams, 42 C.F.R. § 34.1 et seq.; strict vaccination requirements, 8 U.S.C. § 1182(a)(1)(ii); and must provide conclusive proof that they have the financial means to support themselves. 8 U.S.C. §§ 1182(a)(4) and 1183a.

The Parole Program circumvents the process that Congress has created for immigration into the United States—it completely evades numerous limits that Congress has imposed, such as numerical quotas and caps, visa security requirements, required visa fees, security and medical vetting, and affidavits of support to prove that aliens have sufficient financial support.

For example, under the congressionally created immigration system, "Any alien who ... is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). To determine whether an alien may become a public charge, the consular officer and DHS officer "shall at a minimum consider the alien's; age health; family status; assets, resources, and financial status; and education and skills." *Id.* § 1182(a)(4)(B)(i) (cleaned up). Additionally, they "may also consider any affidavit of support under section 1183a." *Id.* § 1182(a)(4)(B)(ii).

The Defendants, however, have decided to ignore Congress's affidavit of support requirements. Instead, the Defendants invented their own separate extra-statutory process. Thus, aliens applying for ATA who cannot prove they have enough financial resources to support themselves do not need to submit an affidavit of support. Rather, the ATA process requires financial sponsors of aliens instead to sign Form I-134A. *See* 88 Fed. Reg. at 1252, 1263, and 1275 ("U.S.-based supporters must initiate the process by filing Form I-134A on behalf of a [CHNV] national and, if applicable, the national's immediate family members.")

On virtually every dimension, the I-134A is far more lenient than the affidavit of support. For example, Congress has determined that the affidavit of support may only be signed by a financial sponsor with strong and lasting ties to the United States: a U.S. citizen, national, or lawful permanent resident sponsor. 8 U.S.C. § 1183a(f)(1)(A). The form I-134a, on the other hand, may be signed by aliens who are only temporarily present in the United States or who only have tenuous

63

ties to the country: "[n]onimmigrants in lawful status," "[a]sylees, refugees, and parolees," "[h]olders of Temporary Protected Status," and "[b]eneficiaries of deferred action (including DACA), or Deferred Enforced Departure." (Pl. Exh. 19 at 10, 23-cv-00007_0050, Doc. 263-1 at 15.) Thus, an alien present in the United States on a tourist visa for only a period of months—or weeks—would qualify to sign a Form I-134A. Moreover, the affidavit of support legally obligates the sponsor to "maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line." 8 U.S.C. § 1183(a)(1)(A). The Form I-134A, however, does not actually require *any* level of support, but will be approved if the financial sponsor's "remain[ing] ... income/assets meets at least 100% of the HHS poverty guidelines." Pl. Exh. 21 at 12, 23-cv-00007_0084, ECF No. 263-1 at 51.)

The obligation of a financial sponsor who has signed an affidavit of support remains until the sponsored alien naturalizes, leaves the United States, or has worked for 40 quarters. 8 U.S.C. § 1183a(a), (f). Furthermore, under federal law, the affidavit of support is a "contract ... that is legally enforceable against the sponsor by the sponsored alien, the Federal Government, any State (or any political subdivision of such State), or by any other entity that provides any means-tested public benefit…" 8 U.S.C. § 1183a(a)(1)(B). And sponsors are subject "to the jurisdiction of any Federal or State court for" enforcement actions requiring them to pay for the alien's support. *Id.* § 1183a(a)(1)(C).

In contrast, Form I-134A does not impose any binding, enforceable obligation at all. Indeed, the Federal Defendants basically admit as much in their interrogatory responses. In response to an interrogatory asking the Federal Defendants to "[i]dentify any enforcement actions to collect from intending supporters who have signed Form I-134(a)," the Federal Defendants admitted that "no

enforcement actions have commenced." Pl. Ex. 38 at 15–16, ECF No. 263-2 at 50–51. And when the Federal Defendants were asked to "[i]dentify any policies or procedures (planned or implemented) to provide information from Form I-134(a) to States to collect from intending supporters," they responded that "there is no information responsive to this Interrogatory." Pl. Ex. 38 at 16, ECF No. 263-2 at 51.

The ATA process allows aliens to travel to the United States without a visa. Congress, however, has already implemented such a process. For countries with populations representing a low risk of overstaying in the United States, Congress has created the Visa Waiver Program ("VWP"), 8 U.S.C. § 1187, which allows visa-free travel for temporary non-immigrant travelers who fill out a simple form through the Electronic System for Travel Authorization ("ESTA"). All countries in the Parole Program—Cuba, Haiti, Nicaragua, and Venezuela—are non-VWP countries. Yet, even though Congress has clearly established that these CHNV aliens do not qualify for visa-free travel to the United States, Defendants have created by executive fiat what is essentially a parallel system for visa-free immigration to the United States for aliens from countries with populations with a high risk of overstaying in the United States.

The Parole Program creates an entirely new and parallel immigration system. This newly created system was never authorized by Congress. If that were not bad enough, this new system lacks most of the procedures and protections that Congress has carefully created and imposed.

"Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). In this context, this means that the executive branch lacks the authority to conjure up a new extra-statutory immigration system more to its liking.

The parole statute does not contain a clear and unambiguous grant of authority to establish a new, parallel system for the visa-free immigration to the United States of 360,000 aliens every year, in perpetuity. When Congress wrote the statutory section that establishes the Visa Waiver Program, it used 8,635 words. *Id.* In contrast, Congress only used 190 words to draft the statutory subsection that confers the parole authority. *Id.* § 1182(d)(5). The Defendants are trying to shoehorn their gargantuan new immigration system into the "modest words, vague terms, [and] subtle devices" of a small subsection buried in the middle of one section out of the 208 sections of the INA. *West Virginia v. EPA*, 142 S. Ct. at 2609 (cleaned up).

"Congress ... does not ... hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). And Congress did not hide the elephant of an entirely new immigration system in the mousehole of Section 1182(d)(5).

## IX.   An *ultra vires* claim is viable even when paired with APA claims and no statute bars review here.

The Plaintiff States have the right to assert a non-statutory cause of action for *ultra vires* executive action. This remains true regardless of any other statutory bar to relief and even though the Plaintiff States also have asserted an APA cause of action.

The Supreme Court first recognized the right to assert a cause of action for non-statutory review of executive action in 1902 in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902). "The reasoning of *McAnnulty* has been employed repeatedly," up until the present day. *Chamber of Com. of U.S. v. Reich* ("Reich"), 74 F.3d 1322, 1327 (D.C. Cir. 1996). "[G]enerally, judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Id.* Thus, "courts will ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects

66

the courts to grant relief when an executive agency violates such a command." *Id*. at 1328. (cleaned up).

Such *ultra vires* claims have been successfully asserted in a variety of contexts. Courts have held there to be a valid non-statutory cause of action against (1) an "Executive Order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike," *Chamber of Com. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996); (2) travel bans, *Hawaii v. Trump*, 878 F.3d 662, 672 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); (3) claims against the Secretary of Commerce for acting "in excess of his delegated authority under the [Export Administration Act]," even though the statute precluded judicial review, *United States v. Bozarov*, 974 F.2d 1037, 1045 (9th Cir. 1992); and (4) the President's construction of a border wall, *Sierra Club v. Trump*, 963 F.3d 874, 891–93 (9th Cir.), *vacated*[2] *on other grounds sub nom. Biden v. Sierra Club*, No. 20-138, 2021 WL 2742775 (U.S. July 2, 2021) (cleaned up).

If these all fall within the scope of federal action that may be challenged through non-statutory action, then an unprecedented, sweeping executive action to create unilaterally a parallel immigration system not authorized by statute does too.

### A. *Ultra vires* remains a viable cause of action even after enactment of the APA.

The Supreme Court has never overruled the *McAnnulty* rule allowing for non-statutory review of *ultra vires* actions. Nor has Congress abrogated it through statute. "[N]othing in the subsequent enactment of the APA ... repeal[ed] the [doctrine allowing] review of *ultra vires* actions .... [W]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on

---

[2] A vacated case in the Ninth Circuit '"continues to have persuasive force.'" *Hart v. Massanari*, 266 F.3d 1155, 1159 (9th Cir. 2001); *see also United States v. Clark*, 617 F.2d 180, 184 (9th Cir. 1980).

his authority." *Id.* (citation omitted); *see Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (explaining that the APA's reviewability limitation in Section 701 "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review"—"not repeal the review of ultra vires actions that was recognized long before" the APA).

This is true also for actions challenging executive actions as *ultra vires*: "when Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced. The passage of the APA has not altered this presumption. Prior to the APA's enactment courts had recognized the right of judicial review of agency actions that exceeded authority, and nothing in the subsequent enactment of the APA altered that doctrine of review to repeal the review of *ultra vires* actions. When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Sierra Club v. Trump*, 963 F.3d at 891. Thus, "review is ordinarily available when an agency exceeds its delegation of authority," *Id.* (citing *Reich*, 74 F.3d at 1325–26).

In *Reich* the plaintiffs did not assert an APA claim when they filed their complaint because the federal government had not issued any relevant regulations when the plaintiffs filed their complaint. *Reich*, 74 F.3d at 1326. However, even after the federal government issued regulations, the plaintiffs chose not to amend their complaint to add any APA claims, instead relying still on their *ultra vires* claim. Nevertheless, in *Reich* the federal government still argued "that a cause of action under the APA [was] not available" *Id.* at 1326-27. The D.C. Circuit, however, stated that "we doubt the validity of [the federal government's] unsupported interpretation of the APA." *Id.* at 1327. Other courts—including the Fifth Circuit—have agreed, confirming that a plaintiff may assert an APA claim and an *ultra vires* claim in the same case.

**B. Plaintiffs may assert an APA claim and an *ultra vires* claim in the same action.**

In *Feds for Medical Freedom v. Biden* ("*Feds for Medical Freedom I*"), federal employee plaintiffs challenged the Biden administration's COVID-19 vaccine mandates for federal employees. 581 F. Supp. 3d 826, 829 (S.D. Tex. 2022) (Brown, J.). The plaintiffs' complaint in that case asserted two *ultra vires* claims and three APA claims. Plaintiffs' Complaint, *Feds for Medical Freedom I*, No. 3:21-cv-356, ¶¶ 163-178, 185-223 (S.D. Tex. Dec. 21, 2021), ECF No. 1. The district court preliminarily enjoined the vaccine mandate, finding that the plaintiffs were likely to succeed on the merits of their *ultra vires* and that APA claims would also potentially be viable in the case. *Feds for Medical Freedom I*, 581 F. Supp. 3d at 833-35. On the *ultra vires* claims, the court stated that claim "[t]he government has offered no answer—no limiting principle to the reach of the power they insist the President enjoys. For its part, this court will say only this: however extensive that power is, the federal-worker mandate exceeds it." *Id.* at 835. On the APA claims, the district court stated that the President's executive order imposing the vaccine mandate was not reviewable under the APA but that "agency denials of religious or medical exemptions, additional vaccination requirements by agencies apart from the federal-worker mandate, or other discretionary additions to the executive order would likely be reviewable under the APA's arbitrary-and-capricious standard." *Id.* A three-judge panel of the Fifth Circuit vacated and remanded. *Feds for Med. Freedom v. Biden* (*Feds for Medical Freedom II*"), 30 F.4th 503 (5th Cir. 2022).

The Fifth Circuit sitting en banc, however, reversed the three-judge panel and affirmed the district court, holding that the district court had jurisdiction and that its grant of a preliminary injunction was not an abuse of discretion because "[t]he district court carefully considered these [preliminary injunction] factors and wrote a thorough opinion explaining its decision to grant

69

preliminary relief. After carefully considering the district court's opinion and the Government's criticisms of it, we are unpersuaded that the district court abused its discretion. And we need not repeat the district court's reasoning, *with which we substantially agree.*" *Feds for Med. Freedom v. Biden* ("*Feds for Medical Freedom III*"), 63 F.4th 366, 387 (5th Cir. 2023).

*Feds for Medical Freedom III* endorsed the district court's analysis, which concluded that the plaintiffs were likely to succeed on their *ultra vires* claims and would also be justified in concurrently asserting APA claims. The Fifth Circuit has thus endorsed exactly the approach the States have taken here of asserting APA and *ultra vires* claims in the same action.

*Feds for Medical Freedom I and III* were not one-off events. The Fifth Circuit has also accepted in other cases that APA and *ultra vires* claims may be asserted together in the same action. For example, in *Apter v. HHS*, doctors filed an action challenging FDA social media posts critical of the use of the drug Ivermectin to treat COVID-19. 2023 WL 5664191 (5th Cir. Sept. 1, 2023). The plaintiffs asserted both *ultra vires* and APA claims, and the Fifth Circuit held that the plaintiffs' "*ultra vires* claim has merit enough to overcome immunity under the common law, and therefore under the APA as well." *Id.* at *5. The offending social media posts not only "are plausibly ultra vires. The Posts are plausibly agency action, too." *Id.* at *1. Thus, both APA and *ultra vires* claims were potentially viable.

Other circuits have held the same thing. For example, in *Hawaii v. Trump*, the State of Hawaii and other plaintiffs challenged a presidential proclamation barring the entry into the United States of certain aliens. 878 F.3d at 662, *rev'd on other grounds*, 138 S. Ct. 2392. The plaintiffs asserted APA and non-statutory *ultra vires* claims. The Ninth Circuit held that both sets of "claims are justiciable." *Id.* at 680-83. On the APA claims, the court explained that "[t]he Government

also contends that Plaintiffs' statutory claims are unreviewable for lack of a cause of action and lack of statutory standing. We disagree." *Id.* at 680. On the *ultra vires* claims, it explained that "[e]ven if there were no 'final agency action' review under the APA, courts have also permitted judicial review of presidential orders implemented through the actions of other federal officials. This cause of action, which exists outside of the APA, allows courts to review ultra vires actions.... When, as here, Plaintiffs challenge the President's statutory authority to issue the Proclamation, we are provided with an additional avenue by which to review these claims." *Id.* at 682-83 (cleaned up).

At least since *Reich*, the federal government has consistently argued against non-statutory review claims. It has consistently lost those arguments. The States' *ultra vires* claim is justiciable and may be asserted concurrently with their APA claims.

### C. Even if a statute otherwise bars review, an *ultra vires* claim is viable.

Even where a statute would otherwise bar review, the Supreme Court has long recognized an exception for plaintiffs alleging *ultra vires* action. *See Leedom v. Kyne,* 358 U.S. 184, 188-90 (1958). The *Kyne* exception permits courts to review claims seeking "to strike down [administrative action] made in excess of [an agency's] delegated powers and contrary to ... specific" statutory language, even if a statute purports to "foreclose[] review ... in a District Court." *Id.* at 188; *see also Breen v. Selective Serv. Loc. Bd. No. 16, Bridgeport, Conn.*, 396 U.S. 460, 467–68 (1970) (holding that draft board had clearly departed from its statutory mandate and acted in a lawless manner and thus *utra vires* exception applied); *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne, Wyo.*, 393 U.S. 233, 238–39 (1968) (same).

In *Kyne*, the NLRB claimed that the National Labor Relations Act, 9 U.S.C. § 159(d), precluded district court jurisdiction to review NLRB actions except under specific circumstances not present in that case. 358 U.S. at 188. The Supreme Court rejected this argument, holding that

district courts retain authority to review agency action: "If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." *Id.* at 190. Federal courts therefore had jurisdiction in *Kyne* because the action in question was "an attempted exercise of power that had been specifically withheld [by Congress]" and, as such, the NLRB was acting "in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 184.

This case fits squarely within the *Kyne* exception. Here, the States allege that the Defendants have acted beyond the limits of their statutory authority under the INA in an attempt to improperly create a separate, parallel immigration system outside of the boundaries of the plain language of the statutes and beyond Congress's clear intent. The Defendants' actions are thus patently *ultra vires*.

If Defendants' reading of § 1252(a)(2)(B) were correct, the States would have no other subsequent opportunity to seek review of the Parole Program. In that circumstance, the *Kyne* exception permits this Court to hear the States' challenge, as it squarely alleges *ultra vires* action.

"[A] clear departure from designated authority *demands* judicial review." *Manges v. Camp*, 474 F.2d 97, 99 (5th Cir. 1973) (emphasis added). It is settled law in the Fifth Circuit that federal district courts may exercise Article III jurisdiction under *Kyne* to enjoin administrative enforcement actions where agency action is *ultra vires*. *See, e.g.*, *Graham v. Caston*, 568 F.2d 1092, 1097 (5th Cir. 1978) ("If an administrative official clearly departs from statutory authority, the administrative action is subject to judicial review even though a jurisdictional withdrawal statute is otherwise applicable." (citations omitted)). Therefore, if an agency "was not acting within ...

authority granted by Congress, then [a jurisdiction-stripping statute] could not withdraw jurisdiction.... This exception comes into play when there has been a clear departure from statutory authority, and thereby exposes the offending agency to review of administrative action otherwise made unreviewable by statute." *Manges*, 474 F.2d at 99. "Thus even 'unreviewable' administrative actions may be subject to judicial review ... such as when there has been a clear departure from the agency's statutory authority." *Texas v. United States*, 86 F. Supp. 3d 591, 643 (S.D. Tex.), aff'd, 809 F.3d 134 (5th Cir. 2015) (citing *Manges*, 474 F.2d at 99).

Just such a clear departure has occurred here. The parole statue has *never* been used to create a parallel immigration system like the Parole Program.

## X.    The foreign-affairs exception to notice-and-comment rulemaking is limited.

The Defendants invoke the foreign-affairs-function exception for notice-and-comment, claiming "the implementation of the [Parole Program] will advance the Administration's foreign policy goals" and was in response "to requests from key foreign partners." 88 Fed. Reg. at 1277.

However, "[a]s with other exceptions to the notice-and-comment requirements, the foreign affairs exception 'must be narrowly construed.'" *Louisiana v. CDC*, 603 F. Supp. 3d 406, 437 (W.D. La. 2022) (quoting *DAPA*, 809 F.3d at 171). And even "in the immigration context," the government must make a strong showing that allowing even a short notice-and-comment period "will provoke definitely undesirable international consequences." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018) (Bybee, J.).

Multiple circuits have adopted the "definitely undesirable international consequences" standard. *See Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) ("For the exception to apply… [there must be] *definitely undesirable international consequences*." (emphasis added) (citation omitted)). *See also, Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (holding that ""the

exception should be construed narrowly to include only those "'affairs' which ... would clearly provoke definitely undesirable international consequences.") (cleaned up) *vacated and rev'd on other grounds*, 727 F.2d 957 (11th Cir. 1984) (en banc) (same); *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that exception applied *because* "disclosure ... would 'provoke definitely undesirable international consequences.'" (citation omitted)). The Fifth Circuit does not appear to have addressed the "foreign affairs" exception yet. But there is no reason to believe that it would split from, and adopt a less-stringent standard than, the four circuits have adopted the "definitely undesirable consequences" standard.

As an initial matter, this is hardly the first time that an administration has attempted to invoke the "foreign affairs" exception in the immigration context—which courts have frequently and repeatedly struck down. The Defendants' attempt here is particularly flimsy and merits decisive rejection.

The APA provides an exception to notice-and-comment requirements for "foreign affairs function[s]." 5 U.S.C. §553(a)(1). It has no such exception for immigration functions. *Id.*

"The dangers of an expansive reading of the foreign affairs exception in [the immigration] context are manifest." *City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010). Immigration matters, by their very nature, have implications for "foreign affairs." But if those implications alone sufficed, federal courts would effectively recognize a *de facto* immigration exception to notice-and-comment requirements that Congress refused to create. Thus, federal courts have long ago made clear that such implications do not provide generalized immunity from notice-and-comment requirements: "The foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate

foreign affairs." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980); *see also Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (citation omitted), *superseded by statute on other grounds* (holding that "the foreign affairs exception would become distended" without the "definitely undesirable" standard). "[I]t would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." *City of N.Y.*, 618 F.3d at 202.

Accordingly, courts have routinely "disapproved[] the use of the foreign affairs exception where the Government has failed to offer evidence of consequences that would result from compliance with the APA's procedural requirements." *E. Bay*, 932 F.3d at 776 (collecting cases).

The Defendants largely point to the supposed foreign affairs benefits of the Parole Program in broad, non-descriptive terms, and then hypothesize that even a slightly delayed implementation "could" affect other countries' willingness to assist or cause "an even greater surge in migration" before the Program took effect. 88 Fed. Reg. at 1277. But, as Judge Bybee has explained for the Ninth Circuit, even when there are "ongoing negotiations" with other countries, the government must "explain[] how immediate publication of the Rule, instead of announcement of a proposed rule followed by a thirty-day period of notice and comment, is necessary for [those] negotiations." *E. Bay*, 932 F.3d at 776.

Similarly here, the Defendants could have announced the Parole Program as a proposed rule on January 9, 2023, then opened a notice-and-comment period, and simultaneously stated that anyone who attempts to cross illegally after January 9 (similar to what the Program already says, *see, e.g.,* 88 Fed. Reg. at 1252) will be barred from relief. That immediately eliminates any incentive to cross illegally, even though the Program would not yet be in effect. Because the Defendants

failed to explain contemporaneously why that option was insufficient, the Program required notice-and-comment.

The government's invocation of the foreign affairs exception does not identify *any* potential "undesirable international consequences"—let along ones that will "definitely" occur. That rationale is thus insufficient on its face. Indeed, it is *exactly* what courts have made clear does not suffice: "the foreign affairs exception requires the Government to do more than merely recite that the Rule 'implicates' foreign affairs." *E. Bay*, 932 F.3d at 775. But that is all the Defendants have done here, with the slight modification of swapping the word "implicates" for "involves." Moreover, just as while the "reference in the Rule that refers to our 'southern border with Mexico' [was] not sufficient" in *East Bay*, the mere allusion to discussions with Mexico, and unspecified other counties does not suffice here.

Accepting the government's threadbare rationale here would have particularly pernicious effects. It would effectively permit any agency to avoid notice-and-comment rulemaking through the expedient of *talking* perfunctorily with foreign nations about the same subject—which is all that the government says here. In other words, the executive branch could avoid any obligation to give notice to, and take comments from, the *American* public by talking to a foreign government or two instead. If that were the law, why would an agency *ever* trouble itself with intentionally burdensome notice-and-comment requirements when it could instead engage in a cursory and *un*burdensome conversation with a foreign government? Thankfully, federal courts have never permitted such naked circumvention of the APA under the foreign-affairs exception, and there is no reason for this case to be the first.

**XI.   The Parole Program should be vacated in its entirety, declared unlawful, and a nationwide injunction against its implementation should be issued.**

    **A. The Parole Program should be vacated.**

Under the APA, an agency action that a court holds unlawful is "set aside," *i.e.*, vacated. 5 U.S.C. § 706(2). "The ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).

The Fifth Circuit explained that "[r]emand without vacatur of the agency action is 'generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" *MPP*, 20 F.4th at 1000 (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). "But by default, remand *with* vacatur is the appropriate remedy." *Id.* (emphasis in original). The test focuses on "'(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.'" *Id.* (quoting *United Steel*, 925 F.3d at 1287).

The Fifth Circuit recently "reject[ed] DHS's contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. Furthermore, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective because [aliens] would be free to move among states." *Id.* (citing *DAPA*, 809 F.3d at 188).

    **1.   The remedy of vacatur is authorized by the APA.**

Federal Defendants continue to push their radical claim that vacatur is not a legitimate remedy under the Administrative Procedure Act ("APA"). But the Fifth Circuit just recently affirmed such a remedy, finding it "was well within its discretion to order vacatur" of the DACA

Memorandum. *DACA*, 50 F.4th at 530. And when reviewing the prior termination of MPP, that court did the same, *MPP*, 20 F.4th at 1000–01, making the availability of this remedy the law of the case.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting Federal Defendants' arguments against availability of vacatur under the APA); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same).

"'Set aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). For more than 30 years, vacatur has been "the ordinary result" when the D.C. Circuit "determines that agency regulations are unlawful." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). In the Fifth Circuit, vacatur is the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). And the Supreme Court has affirmed lower court decisions vacating administrative action. *See, e.g., Regents of the Univ. of California*, 140 S. Ct. at 1901 & 1916 n.7.

The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts have long relied on the "set aside" authority to vacate unlawful agency actions.

When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2). Likewise, section 706(1) suggests that section 706(2) authorizes vacatur. The former allows courts to "compel" agency action while the latter authorizes the inverse. 5 U.S.C. § 706.

If agency actions are vacated, vacatur cannot be limited only to the parties. "[H]ow could this Court vacate the Rule with respect to the … plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). Such a result would clash with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). *See generally Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (discussing *Lujan* during its analysis of the scope of relief to be awarded). *Lujan*'s five-Justice majority observed that an "entire" agency program is "affected" by a successful "challenge[] under the APA." *Lujan*, 497 U.S. at 890 n.2. Similarly, *Lujan*'s four-Justice dissent explained that when a "plaintiff prevails" in APA litigation,

79

"the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting).

Nationwide vacatur is also the only possibility, and relief applying to Texas alone would not provide even Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [alien] beneficiaries would be free to move among states." *DAPA*, 809 F.3d at 188; *see also Biden*, 2022 WL 17718634, at *18 ("'[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State.") (brackets in original, quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

That this incidentally benefits other States as well is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted). This principle applies equally to vacatur.

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id.* at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567

U.S. 387, 401 (2012)), meaning that "[p]artial implementation of [the challenged immigration policy] would "detract[ ] from the 'integrated scheme of regulation' created by Congress," *id.*(quoting *Arizona*, 567 U.S. at 401).

Thus, the Court should continue to interpret the APA as authorizing the remedy of vacatur and recognize that it nullifies the agency action universally rather than precludes its application to any particular parties.

**2.  The Parole Program should be vacated.**

In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *DACA*, 50 F.4th at 529 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

Vacatur is necessary because "remand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). And "[b]ecause vacatur is the default remedy ... defendants bear the burden to prove that vacatur is unnecessary." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:23-CV-59-JDK, 2023 WL 4977746, at *13–14 (E.D. Tex. Aug. 3, 2023) (Kernodle, J.) (citation omitted).

Under the first factor, remand without vacatur is proper only where the agency failed "adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule." *Id.* (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)). For violation of the notice-and-comment requirements, a total "[f]ailure to provide the required notice and to invite public comment[,] is a fundamental flaw that normally requires vacatur of the rule." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020); *see also Daimler Trucks N. Am. LLC v. E.P.A.*, 737 F.3d 95, 103 (D.C. Cir. 2013) (noting that "the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

And because the Parole Program is contrary to law, DHS will not be able to make such a substantiation because there is no possibility that it could correct the fundamental errors of Parole Program. When the Fifth Circuit considered the first factor in the propriety of vacatur framework in the DACA case, it concluded that there was "no possibility that DHS could obviate the[] conflicts on remand" because DACA had "severe" deficiencies and "fundamental substantive defects" that "contradict[ed] significant portions of the INA." *DACA*, 50 F.4th at 529. The same holds here.

As to the second factor—disruptiveness—Defendants may not rely on the "uncertainty that typically attends vacatur of any rule." *Nat. Res. Def. Council*, 955 F.3d at 85 (rejecting agency's disruption argument). And "the threat of disruptive consequences cannot save a rule when its

fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'"
*North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat. Res. Def. Council v. EPA*,
489 F.3d 1250, 1261–62 (D.C. Cir. 2007)). No amount of asserted disruptiveness can save the
Parole Program from being vacated.

### B.  The Parole Program should be declared unlawful.

"The existence of another adequate remedy does not preclude a declaratory judgment that
is otherwise appropriate." Fed. R. Civ. P. 57. The APA expressly contemplates declaratory relief:
"The form of proceeding for judicial review … includ[es] actions for declaratory judgments or
writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703. Plaintiffs have established that the
Parole Program violates the APA and they are entitled to a declaration delineating the rights and
legal relations among themselves and the Defendants. The Court should declare that the Parole
Program is substantively and procedurally unlawful under the APA.

### C.  Implementation of the Parole Program should be permanently enjoined.

A permanent injunction is proper when a plaintiff has prevailed on the merits, there is no
adequate remedy at law for the plaintiff's injury, the balance of the harms favors the plaintiff, and
an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391
(2006). Texas has satisfied each of these elements.

The briefing and trial have shown that the Parole Program is unlawful on multiple grounds,
satisfying the first element.

The second element is met—there is no adequate remedy at law, as sovereign immunity
prevents Texas from recovering from the Defendants the money it has spent in the past and will
have to spend in the future to furnish social and educational services to illegal aliens who would
not have required those services had they not been unlawfully paroled. *See Texas v. Biden*, No. 6:22-

83

CV-00004, 2023 WL 6281319, at *15 (S.D. Tex. Sept. 26, 2023) (Tipton, J.). Nor can Texas do so for the money it has spent in the past and will have to spend in the future to provide services to aliens who would not have been paroled but for the Parole Program. *See DAPA*, 809 F.3d at 186.

Because this case involves governments as the parties, the final two elements—the balance of hardships and the public interest—"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord DAPA*, 809 F.3d at 187.

Without an injunction, Texas will suffer continued direct costs via driver's licenses, healthcare, education, and incarceration costs—vacatur alone would not prevent Defendants from continuing to violate the limits on their parole authority. The harms the Defendants assert do not outweigh these harms to Texas and its residents. Texas's harm is immediate, irreparable, and continuing.

Conversely, the Defendants face essentially no harm from maintaining the status quo ante. *See Wages & White Lion Invs., LLC v. United States Food & Drug Admin.*, 16 F.4th 1130, 1144 (5th Cir. 2021) ("the *status quo* [is] the state of affairs before the" challenged agency action). Any inefficiency resulting from an injunction against the Parole Program is "outweighed by the major financial losses [that] states face." *DAPA*, 809 F.3d at 187.

"[T]he public is served when the law is followed," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013), *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). There is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, — F. Supp. 3d —, No. 2:21-cv-067-Z, 2022 WL 17718634, at *17 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) (quoting

84

*Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). This remains true "even in pursuit of desirable ends." *Wages & White Lion Invs.*, 16 F.4th at 1143 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021)). Furthering that public interest is precisely what Plaintiffs seek here.

No foreign policy concerns can serve to preclude permanent injunctive relief. "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). While "[t]he [G]overnment's interest in efficient administration of the immigration laws at the border is ... weighty," "control over matters of immigration is a sovereign prerogative, largely within the control of the executive *and the legislature*." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (emphasis added). Congress's limits over the parole power mean that *its* interests are paramount in this area of foreign relations. "[W]here the agency's discretion has been clearly constrained by Congress[,] [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate." *Ramirez v. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018).

The scope of an injunction issued by this Court's is reviewed only for abuse of discretion. *DAPA*, 809 F.3d at 187–88. A nationwide injunction would not be an abuse of discretion and, in fact, is the only proper relief in this case. There are five reasons for this:

*First*, *DAPA* and *Texas* make plain that a nationwide injunction is the Fifth Circuit's *default* approach in immigration case such as this one. *Texas* reiterates the Fifth Circuit's general rule that "[i]n the context of immigration law, *broad relief is appropriate* to ensure uniformity and consistency in enforcement." 40 F.4th at 229 n.18 (emphasis added). *Texas* further renewed *DAPA*'s holding

that "'*a geographically-limited injunction would be ineffective* because [migrants] would be free to move among states.'" *Id.* (quoting *DAPA*, 809 F.3d at 188 (emphasis added)). It would not be an abuse of discretion for this Court to follow the Fifth Circuit's *DAPA* and *Texas* reasoning.

*Second*, a nationwide injunction is required because the legal violations here are incontestably systemwide and nationwide. For example, *Dayton Board of Education v. Brinkman* provides that "only if there has been a systemwide impact may there be a systemwide remedy." 433 U.S. 406, 417 (1977). The Defendants' failure to conduct notice-and-comment rulemaking was a *systemwide violation*, as were its other APA transgressions. Similarly, *Califano v. Yamasaki* explicitly held that "[t]he scope of injunctive relief is dictated *by the extent of the violation established*, not by the geographical extent of the plaintiff class." 442 U.S. 682, 702 (1979) (emphasis added). Here, the Defendants' APA violations were *nationwide*, and it is therefore not an abuse of this Court's discretion to follow *Califano*'s exhortation not to limit relief to "the geographical extent of the plaintiff" states, as the Defendants demand. *Id.*

*Third*, the balance of harms to non-parties of a potential nationwide injunction are entirely one-sided. Non-parties cannot suffer any cognizable harms from non-implementation of *illegal* agency action.

*Fourth*, neither the Federal Defendants nor the Intervenors have supplied any evidence that a limited injunction could be actually workable in practice. Without any such evidence, common-sense operational concerns require that the scope of an injunction be national. It is an obvious truism that immigrants tend to move around. And once in the United States, alien parolees who entered the United States in other states would be free to move into Texas at will. A nationwide injunction is therefore the only way to afford proper relief to Texas.

86

*Fifth*, recent news reports state that the Defendants plan to implement a "Remain in Texas" policy requiring aliens claiming asylum to remain in Texas. And even though Texas is only one of four states on the Southwestern Border, Defendants apparently plan to implement this new policy only in the State of Texas.[3] The Defendants' "Remain in Texas" policy appears to be motivated out of a desire to specifically punish Texas for its efforts to secure its border and to challenge the Executive Branch's lawless actions in the immigration context. Given the Defendants' current apparent plans to exact retribution against Texas, they do not come to this issue with clean hands. There is little reason to believe that the Defendants would implement in good faith any sort of limited injunction applying only to Texas.

---

[3] Eric Gay, Biden administration considers forcing migrant families to remain in Texas, LA Times, (Sep. 7, 2023), https://tinyurl.com/ywpu6222.

Dated: September 29, 2023

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

/s/ Ryan D. Walters
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

GENE P. HAMILTON
JAMES K. ROGERS
America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
611 Pennsylvania SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
james.rogers@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512)686-3940 (phone)
(512)686-3941 (fax)
jonathan@mitchell.law

*Counsel for the State of Texas*

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*


Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*


Raúl R. Labrador
Attorney General of Idaho
Lincoln Davis Wilson, ISB No. 11860
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
lincoln.wilson@ag.idaho.gov

*Counsel for the State of Idaho*


Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*


Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*


Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

Kris Kobach
Attorney General of Kansas
Jesse A. Burris, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

Jeff Landry
Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
Solicitor General
Joseph Scott St. John (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Daniel Cameron
Attorney General of Kentucky
Marc Manley
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Clark L. Hildabrand
Senior Counsel
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

Sean D. Reyes
Utah Attorney General
Melissa Holyoak
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

| | |
|---|---|
| Patrick Morrisey | Bridget Hill |
| Attorney General of West Virginia | Wyoming Attorney General |
| Lindsay See | Ryan Schelhaas |
| Solicitor General | Chief Deputy Attorney General |
| Michael R. Williams | Wyoming Attorney General's Office |
| Senior Deputy Solicitor General | 109 State Capitol |
| Office of the West Virginia | Cheyenne, WY 82002 |
| Attorney General | Tel: (307) 777-5786 |
| State Capitol, Bldg 1, Room E-26 | ryan.schelhaas@wyo.gov |
| Charleston, WV 25305 | |
| Tel: (681) 313-4550 | *Counsel for the State of Wyoming* |
| Lindsay.S.See@wvago.gov | |
| Michael.R.Williams@wvago.gov | |

*Counsel for the State of West Virginia*

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 29, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

/s/Ryan D. Walters
RYAN D. WALTERS

92