**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
  SECURITY, *et al.*,
    *Defendants.*

Case 6:23-cv-00007

**PLAINTIFFS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    Plaintiffs, the States of Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming, propose that the Court find these facts and reach these conclusions of law following the trial of this case. They file these proposals pursuant to the Court's order at ECF No. 271.

**PROPOSED FINDINGS OF FACT**

**A. Parties.**

1.    The State of Texas is one of the plaintiffs in this case. It has quasi-sovereign interests in the health and well-being, both physical and economic, of its residents and in not being discriminatorily denied its rightful status within the federal system.

2.    The States of Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming are other plaintiffs in this case. They have quasi-sovereign interests in the health

and well-being, both physical and economic, of their residents and in not being discriminatorily denied their rightful status within the federal system.

3. Pursuant to the parties' stipulation (*see* ECF No. 139), the Plaintiff States only seek to establish Article III injury based on alleged injuries to Texas and only seek to establish irreparable injury for purposes of any equitable relief based on alleged harm to Texas.

4. But a group of plaintiffs need not show that more than one of them is likely to be injured. "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)); *see also Texas v. United States (DACA)*, 50 F.4th 498, 514, 530–31 (5th Cir. 2022) (noting "Texas is the only state [of nine] that has attempted to demonstrate standing," but upholding nationwide injunctive relief applicable to all States).

5. Defendant Department of Homeland Security ("DHS") implements the Parole Program. DHS oversees Defendants U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

6. Alejandro Mayorkas is the Secretary of DHS. He administers the program challenged here.

7. Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. He administers important aspects of the challenged program, including the CBP One app.

8. Defendant Patrick "P.J." Lechleitner is the Acting Director of ICE. He administers important aspects of the challenged program. His predecessor was Tae Johnson, who retired on June 30 and was listed as a Defendant in the complaint for this action. Under Fed. R. Civ. P. 25(d), Mr. Lechleitner "is

automatically substituted as a party" in this action because he is Mr. Johnson's successor.

9.      Defendant Ur Mendoza Jaddou is the Director of USCIS. She administers important aspects of the challenged program.

**B. Statutory text.**

10.     This case involves 8 U.S.C. § 1182(d)(5). Paragraph A of that subsection states:

> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

11.     Paragraph B of that subsection states:

> The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

8 U.S.C. § 1182(d)(5)(B).

**C. The Parole Program.**

12.     On December 22, 2022, Secretary Mayorkas issued a decision memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela (the "CHNV Parole Program").

13.     Although the Defendants referred to this memorandum as authority for the new program, *see, e.g.*, Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023), they did not publicly release it or issue it following notice-and-comment procedures.

14.     On January 5, 2023, President Biden and the Defendants announced the creation of the CHNV Parole Program, which was modeled off recent programs the Defendants had created for nationals of Ukraine and Venezuela. Pl. Ex. 2 (ECF No. 263 at 2).

15.     A DHS press release claimed the program "will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border." *Id.* (ECF No. 263 at 3).

16.     Without authority, the Defendants decreed that, under the Parole Program, subject to an alien obtaining a "supporter in the United States who commits to providing financial and other support" and certain background checks, "[aliens] can seek *advance authorization* to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]" *Id.* (emphasis added).

17.     The Defendants further decreed that the program "will allow up to 30,000 qualifying nationals *per month* from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." *Id.* (emphasis added).

18.     On January 6, Defendant USCIS published a new website for this new program entitled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans." Pl. Ex. 3 (ECF No. 263 at 6).

19.  The website lists the basic requirements for the program as they were contained in its announcement the day prior but added additional details, including:

- The "supporter" agrees to provide the alien with financial support for the duration of their parole in the United States and begins the process by filing a Form I-134A "Online Request to be a Supporter and Declaration of Financial Support." *Id.* (ECF No. 263 at 6-7).

- There is no cost to apply for the program for the alien or the "supporter." *Id.* (ECF No. 263 at 6).

- "Supporters" can include: "U.S. citizens or nationals"; "lawful permanent residents, lawful temporary residents, and conditional permanent residents"; "*nonimmigrants in lawful status* (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status)"; "asylees, refugees, and *parolees*; *individuals granted Temporary Protected Status*"; and, "*beneficiaries of deferred action* (including deferred action for childhood arrivals) or deferred enforced departure." *Id.* (ECF No. 263 at 7) (emphasis added).

- The beneficiaries can be any national of Cuba, Haiti, Nicaragua, or Venezuela, plus their immediate family members. But beneficiaries cannot be minor children traveling without adults. *Id.* (ECF No. 263 at 8-9).

- Upon approval of Form I-134A, the alien is authorized to travel to the United States at the alien's own expense, and upon arrival, the alien will be considered for parole into the United States. *Id.* (ECF No. 263 at 12).

20.  The Defendants did not publish advance notice of the program in the Federal Register before posting details about the program on the Department's website. The Defendants have not published the decision memorandum from

Secretary Mayorkas despite referring to such a memorandum in the four separate Federal Register notices announcing the Parole Program.

21.     The Defendants have not published any analysis or supporting materials for the Secretary's decision memorandum.

22.     On January 9, 2023, the Department published four separate notices in the Federal Register regarding the implementation of the CHNV Parole Program, with one notice for each eligible nationality. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

23.     In substance, the Federal Register notices do not differ from the website content, explaining the general parameters of the program and qualifications. However, they offer more analysis from the Department as to why, in the Department's view, the program comports with the limitations on the Secretary's parole power under 8 U.S.C. § 1182(d)(5). *See, e.g.*, 88 Fed. Reg. at 1260–63.

24.     The Defendants did not provide an opportunity for public comment or undertake a formal notice-and-comment rulemaking process. Instead, they asserted that their new program was exempt from notice-and-comment rulemaking because (1) "the Department is merely adopting a general statement of policy," (2) the program is exempt "because it involves a foreign affairs function of the United States," and (3) "there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable." *See, e.g.*, 88 Fed. Reg. at 1264–65.

25. The Defendants did not explain or analyze how they would remove from the United States aliens paroled through the program after any authorized parole period, despite admitting general difficulty in removing such aliens to their home countries.

26. The Defendants did not consult the Plaintiff States about the potential effects of this program or the ability of the Plaintiff States to provide services to aliens paroled through the program.

27. The Defendants, if they have devised a mechanism, did not explain any such mechanism for the recovery of funds from "supporters" who do not actually provide for the needs of aliens paroled under the program, whether by the Department itself, any federal entity, or most pertinent to the Plaintiff States, by any State.

### 1. The CBP One App.

28. The Parole Program relies on the CBP One smartphone app ("CBP One"). In a separate rulemaking, the Defendants have explained that CBP One allows aliens to "schedule a time to arrive at [Ports of Entry ("POE")] along the [Southwest Border], to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain POEs." Circumvention of Lawful Pathways, 88 Fed. Reg. 31314, 31317 (May 16, 2023). One "function[] of the CBP One app" is its "Advance Travel Authorization ('ATA') functionality used as part of the CHNV parole processes." *Id.* at 31401.

29. CBP One requires that, before arriving at a POE, aliens "enter limited biographic information into CBP One and submit a live photo." 88 Fed. Reg. at 1264; 88 Fed. Reg. at 1253; 88 Fed. Reg. at 1276. After aliens "have submitted information through CBP One," then "CBP conducts systems checks and

vetting to determine the individual's eligibility for the CHNV processes and whether it is appropriate to issue a travel authorization." Pl. Ex. 38 (ECF No. 263-2 at 46) (Response to Interrogatory Nos. 1, 2).

30. The visa process established by statute is strikingly similar to the CBP One ATA process. Visas do not give an alien the right to enter the United States, but only to travel to a POE and request admission. 8 U.S.C. § 1201(h) (nothing in the INA "shall be construed to entitle any alien, to whom a visa ... has been issued, to be admitted the United States, if, upon arrival ... he is found to be inadmissible.... The substance of this subsection shall appear upon every visa application."). And when an alien in possession of a valid visa arrives at a POE, a CBP officer decides whether the alien is admissible.

31. However, the visa process enacted by Congress and implemented through authorized regulation is stricter and much more involved. *See*, *e.g.* 8 U.S.C. 1101(a)(15)(A)-(V) (defining 22 different classifications of non-immigrant visa); *id.* § 1153 (defining classifications of immigrant visas); ; *id.* § 1182(a) (establishing classes of aliens ineligible for visas or admissions); *id.* § 1372 (establishing system to track and monitor alien students and exchange visitors to ensure their compliance with terms of their visas); *id.* § 1184 (imposing specific visa classification-based restrictions and limitations for a number of different visa categories);

32. Congress has also established numerical limitations and quotas for a variety of different visa classifications. *E.g.*, *id.* § 1151 (imposing annual numerical caps for various immigrant visa classifications); *id.* § 1184(e) (imposing "annual numerical limit" on certain nonimmigrant professionals); *id.* § 1184(g) (imposing "limitation on numbers" of [t]emporary workers and trainees"); *id.* § 1184(p) (imposing "numerical limitations" on annual number of recipients of visa for certain victims of crimes).

33.     Congress has also imposed specific requirements for the documents aliens must have to enter the United States. *E.g. id*. § 1181 (imposing documentary requirements for admission of immigrant aliens); *id*. §§ 1201, 1204 (imposing standards and requirements for issuance of visas); *id*. § 1202 (imposing requirements for visa applications); *id*. § 1203 (imposing requirements for reentry permits).

34.     Furthermore, Congress has empowered the Secretary of State, and *not* the Defendants to issue regulations for the issuance of entry documents into the United States. *E.g.* § 1202 (making nine separate references to regulations "prescribed" or "issued" related to issuance of visas and specifically providing for "regulations issued by the Secretary of State" and empowering the Secretary of State with discretion to establish different "application forms for the various classes of nonimmigrant admissions"). Indeed, the Secretary of State has established a detailed regulatory scheme for the issuance of visas, including assessment of aliens for ineligibility for admission into the United States and for national security and public health and safety. 22 C.F.R. §§ 40.1-46.7.

35.     Indeed, every aspect of the visa process established by Congress is far stricter than the unlawful ATA process established by the Defendants through CBP One. For example, to get an immigrant visa, aliens must pay a substantial fee of between $205 and $345 for each applicant applying for an immigrant visa, and a fee between $185 and $315 for each applicant applying for a nonimmigrant visa, and an identical fee must be paid for every member of a family, including children. *Fees for Visa Services*, DEP'T OF STATE, https://tinyurl.com/uhdz4x5e (accessed Sep. 25, 2023). Then, aliens must appear in person for a visa interview with a Department of State consular officer at the embassy or consulate. 8 U.S.C. § 1202(e). Aliens applying for

immigrant visas must submit to a number of other requirements, such as comprehensive medical exams, 42 C.F.R. § 34.1 et seq.; strict vaccination requirements, 8 U.S.C. § 1182(a)(1)(ii); and providing conclusive proof that they have the financial means to support themselves, or instead get a U.S. sponsor to sign an affidavit of support that legally obligates the sponsor to financially support the alien until the alien naturalizes, leaves the United States, or has worked for 40 quarters (and which allows state and local governments to sue the sponsor to get reimbursed for government support provided to the alien, whereas the financial support form for an ATA does not impose as long of a commitment on the sponsor and does not allow states to sue to recover expenditures),  8 U.S.C. §§ 1182(a)(4) and 1183a.

36.    For countries with populations representing a low risk of overstaying in the United States, Congress has created the Visa Waiver Program ("VWP"), 8 U.S.C. § 1187, which allows visa-free travel for temporary non-immigrant travelers who fill out a simple form through the Electronic System for Travel Authorization ("ESTA"). All countries in the CHNV Parole Program—Cuba, Haiti, Nicaragua, and Venezuela—are non-VWP countries. Yet, even though Congress has clearly established that these CHNV aliens do *not* qualify for visa-free travel to the United States, Defendants have created by executive fiat what is essentially a parallel system for visa-free immigration to the United States for aliens from countries with populations with a *high* risk of overstaying in the United States. The CHNV Parole Program circumvents the process that Congress has created for immigration into the United States—it completely evades numerous limits that Congress has imposed, such as numerical quotas and caps, visa security requirements, required visa fees, security vetting, and affidavits of support to prove that aliens have sufficient financial support from friends and family to ensure that they will not become

10

a burden on public resources. When Congress wrote the statutory section that establishes the Visa Waiver Program, it used 8,635 words. *Id.* In contrast, Congress only used 190 words to draft the statutory subsection that confers the parole authority. *Id.* § 1182(d)(5).

37.   The CBP One process requires far less information than an application for a visa. CBP's official ATA guide contains screenshots from CBP One and shows the paucity of information an alien must provide through CBP One. Ex. 30. CHNV applicants only required to provide their names, their passport, a photograph, and a U.S. government A-number, if they have one. *Id.*

**D. The Intervenor Defendants' Witness**

38.   The trial testimony from the Intervenor Defendants' only witness contradicts all of Defendants' claims about the purposes of the program. Quite simply, there is no evidence that alien beneficiaries of the CHNV Program are being paroled for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). The Intervenor Defendants' witness, Eric Sype, provided testimony about his family's sponsorship for the parole of their good friend from Nicaragua, Oldrys. Mr. Sype repeatedly testified that there was no reason besides economic benefit for Oldrys to come to the United States. Trial Tr. vol. 1 at 45, 59-60, 68-71, 73-74, 84, (ECF No. 277).

39.   Furthermore, Mr. Sype could not recall DHS ever even inquiring whether there were any urgent humanitarian reasons for Oldrys to come to the United States. *Id.* at 75-76. Mr. Sype also could not recall any inquiries from DHS about any whether there was a significant public benefit for Oldrys to enter the United States. *Id.* at 76-77. Moreover, there was never any risk of irregular migration

by Oldrys, as Mr. Sype testified that he had no reason to believe that Oldrys would have ever travelled to the southwestern border of the United States and attempted to enter illegally. *Id*. at 65-67, 78-80.

**E.  Effect of the Parole Program.**

40.  From October 2022 to June 2023, 71,633 aliens from Venezuela applied to be beneficiaries of the CHNV Parole Program. The Defendants adjudicated 60,422 of these applications, and approved 58,397 of those applications they adjudicated, for an approval rate of 97.5%. Pl's Ex. 41 (ECF No. 263-2 at 85).

41.  From January 2023 to June 2023, 39,699 aliens from Nicaragua applied to be beneficiaries of the Parole Program. The Defendants adjudicated 30,930 of these applications, and approved 29,935 of the applications they adjudicated, for an approval rate of 96.7%.  *Id.*

42.  From January 2023 to June 2023, 78,838 aliens from Haiti applied to be beneficiaries of the Parole Program. The Defendants adjudicated 64,285 of these applications, and approved 63,214 of those applications they adjudicated, for an approval rate of 98.3%. *Id*. From January 2023 to June 2023, 44,360 aliens from Cuba applied to be beneficiaries of the Parole Program. The Defendants adjudicated 39,046 of these applications, and approved 38,396 of those applications they adjudicated, for an approval rate of 98.3%. *Id*. The total number of aliens who applied to be beneficiaries of the Parole Program from October 2022 to June 2023 is 234,530. The Defendants adjudicated 194,683 of these applications, and approved 189,942 of those applications they adjudicated, for an approval rate of 97.5%. *Id*.

43.  Because the CHNV Parole Program allows a beneficiary to enter the United States with that beneficiary's spouse and children under the age of 21, the total

number of aliens granted parole under the CHNV Parole Program is likely several times higher than the numbers listed in the preceding paragraphs.

44. The number of beneficiaries paroled into the United States under the CHNV Parole Program between October 18, 2022, and June 30, 2023, and who listed Texas as their intended destination is 13,990. Pl's Ex. 41 (ECF No. 263-2 at 89).

45. Because the CHNV Parole Program allows a beneficiary to enter the United States with that beneficiary's spouse and children under the age of 21, the total number of aliens residing in Texas because of the CHNV Parole Program is likely several times higher.

46. Out of the aliens paroled into the United States under the CHNV Parole Program between October 18, 2022, and June 30, 2023, there were 2,664 beneficiaries under the age of 18 with an intended address in Texas, out of a total of 17,806 beneficiaries under the age of 18 in the Parole Program. Pl's Ex. 41 (ECF No. 263-2 at 89-90).

47. As a result of the Defendants' adoption of the CHNV Parole Program, some illegal aliens who otherwise would not have entered the United States will instead use health care and public education services in Texas or be incarcerated in Texas.

48. Under federal law, aliens paroled into the United States become eligible for various benefits after five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C.A. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-

tested public benefit ... 5 years" after "the date of the alien's entry into the United States"). Because the State of Texas pays these benefits and they are partially financed from the state budget, the Parole Program will increase Texas's costs because more aliens being paroled into the United States will cause more individuals to claim benefits in Texas. This causes quantifiable financial harm to Texas.

49.   Beneficiaries of the CHNV Parole Program are also eligible for employment authorization to work in the United States. This harms Texas's interests as *parens patriae* to protect the economic well-being of its populace.

## F.  Costs.

### 1.  Driver Licenses.

50.   Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section 521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)." Similar statutes govern the issuance of an original personal identification certificate. Pl. Ex. 4 (ECF No. 263 at 21).

51.   If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action) and otherwise meets eligibility requirements, DPS will issue a limited-term driver license or

personal identification certificate to a non-citizen resident of Texas. *Id.* (ECF No. 263 at 21-22). A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence. *Id.* In fiscal year 2023 (September 2022 through April 2023), DPS issued 312,837 limited-term licenses and identification certificates. In fiscal year 2022 (September 2021 through August 2022), DPS issued 414,567 limited-term licenses and identification certificates. *Id.*

52.   For each non-United States citizen resident of Texas who seeks a limited-term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). *Id.* ¶ 6. The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited-term licenses. *Id.* (ECF No. 263 at 23).

53.   Each additional customer seeking a limited-term driver license or personal identification certificate imposes a cost on DPS exceeding $33. *Id.* Furthermore, DPS estimates that for an additional 10,000 driver license customers seeking a limited-term license, DPS would incur a biennial cost of approximately $2,014,870.80. *Id.* For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand. *Id.*

**2. Incarceration.**

54.   The average cost of incarcerating an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") in Texas Department of Criminal Justice ("TDCJ") facilities was $77.49 per day from July 1, 2020 to June 30, 2021. Pl. Ex. 5 (ECF No. 263 at 35). During that period, TDCJ incarcerated 7,058 eligible inmates for a total of 1,984,597 days. The total cost of incarcerating these inmates for that period was $153,786,422. Of that amount, the SCAAP program reimbursed only $17,364,520. *Id*. Thus, for each day that a criminal alien was incarcerated in TDCJ facilities, the net cost to the State of Texas was approximately $68.74.

55.   To the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will also increase, and the net cost to the State of Texas of detaining those aliens will increase. *Id.*.

56.   TDCJ also incurs costs to keep aliens in custody or add them to mandatory parole or supervision programs when those aliens are not detained or removed by federal immigration authorities. *Id.* (ECF No. 263 at 36) . For Fiscal Year 2022, the average per-day cost of these programs for each inmate not detained or removed is $4.69, which would total $9,307,760, based on the number of inmates for the most recently completed SCAAP application. *Id.*

**3. Education.**

57.   The estimated average per-student, per-year funding entitlement for a student in Texas public schools in Fiscal Year 2023 will be $9,564. Pl. Ex. 6(ECF 263 at 39). For a student who qualifies for Bilingual and Compensatory Education weighted funding, that amount is $11,781. *Id.*

58.   While Texas does not have information on the total number of alien children attending public schools in the State, there is available data for a subset of those children—unaccompanied alien children (UAC). *Id.*. The Defendants'

16

records reflect that they have already paroled into the United States 8,885 school-age aliens through the CHNV Parole Program. Pl. Ex. 29 (ECF No. 263-2 at 3). This includes 2,664 school-age aliens in Texas. Pl. Ex. 41  (ECF No. 263-2 at 90).

59.   The total costs to Texas of providing public education to alien children will rise as the number of such children increases. . Pl. Ex. 6 (ECF No. 263 at 40)

60.   School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 15,000 students in enrollment growth across Texas each year. The Foundation School Program is the primary funding mechanism for providing state aid to public schools in Texas. Any additional alien children enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent. *Id.*

### 4. Social services.

61.   The Texas Health and Human Services Commission ("HHSC") provides three principal categories of services and benefits to illegal aliens in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage ("CHIP Perinate"). Illegal aliens also receive uncompensated medical care from public hospitals in the State. Pl. Ex. 7  (ECF No. 263 at 50).

62.   The Emergency Medicaid program is a federally required program jointly funded by the federal government and the states. It provides Medicaid coverage, limited to emergency medical conditions, including childbirth and labor, to illegal aliens living in the United States. *Id.* (ECF No. 263 at 51)..

63.     Medicaid enrollment data collected by the Texas Integrated Eligibility Redesign System (TIERS) contains a variable related to immigration status. Using the percentage of Emergency Medicaid clients with 'UN' (for "undocumented") alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS, HHSC has estimated the portion of Emergency Medicaid payments attributable to illegal aliens in Texas. *Id.* (ECF No. 263 at 51-52).

64.     Texas CHIP Perinate Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. HHSC can estimate the number of illegal aliens served by CHIP Perinatal Coverage by using the percentage of CHIP Perinate clients with 'UN' alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS. *Id.* (ECF No. 263 at 53).

65.     The following chart shows HHSC's estimates of the total cost to the State to furnish coverage under each program to illegal aliens:

| FY | Emerg. Medicaid | CHIP Perinatal |
|------|------------------|-----------------|
| 2019 | $116 million | $11.1 million |
| 2020 | $88.3 million | $16.9 million |
| 2021 | $95.6 million | $25.8 million |
| 2022 | $72.2 million | $30.9 million |

*Id.* (ECF No. 263 at 52-54).

66.     In May 2023, HHSC used TIERS data to produce estimates of expenditures for Emergency Medicaid services provided to aliens from Cuba, Haiti, Nicaragua, and Venezuela. The expenditure calculations reflect the sum of paid amounts on Emergency Medicaid claims for services to individuals with a country of

origin listed as one of those four countries, regardless of immigration status. *Id.* (ECF 263 at 52)..

67. In May 2023, HHSC used TIERS data to produce estimates of expenditures for CHIP Perinate services provided to non-citizens from Cuba, Haiti, Nicaragua, and Venezuela. The expenditure calculations reflect the sum of capitation payments for individuals with a country of origin listed as one of those four countries, regardless of immigration status. *Id.* (ECF 263 at 54).

68. The following chart shows HHSC's estimates of the total cost to the State to furnish coverage under each program to aliens from Cuba, Haiti, Nicaragua, and Venezuela:

| FY | Emerg. Medicaid | CHIP Perinatal |
|----|-----------------|----------------|
| 2019 | $207,000 | $28,000 |
| 2020 | $141,000 | $37,000 |
| 2021 | $123,000 | $64,000 |
| 2022 | $178,000 | $80,000 |
| 2023 | $30,000 | $51,000 |

69. *Id.* (ECF 263 at 52-54) (2023 numbers are partial figures covering only up through May 5, 2023).

70. HHSC also calculated expenditures since October 1, 2022, for emergency Medicaid services provided to individuals from Venezuela ($8,115) and since January 6, 2023, for services provided to individuals from Cuba, Haiti, and Nicaragua ($25,660). *Id.* (ECF 263 at 52).

71. HHSC also calculated expenditures since October 1, 2022, for CHIP Perinate services provided to individuals from Venezuela ($16,500), and since January 6, 2023, for services provided to individuals from Cuba, Haiti, and Nicaragua ($31,000). *Id.* (ECF 263 at 54).

72.  Although all of these cost estimates include some margin of uncertainty, it is clear that both of these programs have some positive cost to the State of Texas due to utilization by aliens, including illegal aliens. *Id.* (ECF 263 at 55).

## PROPOSED CONCLUSIONS OF LAW

### A. Jurisdiction.

73.  This case arises under the Constitution and laws of the United States, the federal government is a defendant, and the States seek to compel federal officials to perform their duties. The Court, therefore, has subject matter jurisdiction. 28 U.S.C. §§ 1331, 1346, 1361.

74.  Further, the States' allegations that they are suffering a legal wrong because of the Agency Defendants' actions entitles them to judicial review of those actions before the Court. 5 U.S.C. §§ 702–703.

75.  The Court has jurisdiction to declare the rights and legal relations among the parties and to decree an injunction supporting that declaration. 28 U.S.C. §§ 2201–2202.

76.  The Court has jurisdiction to compel the Agency Defendants to fulfill their duties under the law and to hold unlawful and set aside their actions and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right or power; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law. 5 U.S.C. § 706.

### B. Standing.

77.  Texas has standing to bring this action.

#### 1. Traditional standing.

78.  Texas has demonstrated each of the three elements required to have standing to bring its claims: (a) an injury in fact, (b) fairly traceable to the challenged

actions, (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

**a. Injury in fact.**

79.   Texas has suffered an injury in fact—concrete and particularized injuries attributable to the Defendants' actions. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

80.   The financial injury to Texas—that it must spend money on government programs and services for paroled aliens whom they otherwise would not, due to the Defendants' unlawful policy of programmatically granting parole to aliens from Cuba, Haiti, Nicaragua, and Venezuela—is an injury to a legally protected interest. *Texas v. United States* [hereinafter *DAPA*] 809 F.3d 134, 152–54 (5th Cir. 2015). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

81.   "Federal law affirmatively requires the States to make some of these expenditures." *Texas v. Biden* [hereinafter *MPP*], 20 F.4th 928, 969 (2021) (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid).

82.   That injury is concrete because Texas incurs actual costs to operate its detention, educational, social services, and driver license programs, due to the need to serve illegal aliens who, due to the Defendants' policy, have been unlawfully paroled into the United States.

83.   Data of costs from illegal aliens is relevant here because courts "assume, for purposes of the standing analysis, that Texas is correct on the merits of its claim[s]," *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). If the CHNV Parole Program is unlawful, then aliens paroled under its auspices have no basis to be considered lawfully present in the United States and would be

removable as any other illegal alien. *See Texas v. United States* [hereinafter *DACA*], 50 F.4th 498, at 514 (5th Cir. 2022) ("Those presently subject to DACA would be removable if the DACA program were ended" by judicial relief, despite having received deferred action status); *id.* at 508 (referring to DACA recipients as "illegal aliens" despite having "documented" deferred action status).

84.   That injury is particular because Texas is doing the spending. *Texas v. United States*, 524 F. Supp. 3d 598, 619 (S.D. Tex. 2021) (Tipton, J.).

85.   That injury is imminent and occurring because Texas operates the programs at issue now and intends to continue doing so in the future. *Texas v. United States*, 524 F. Supp. 3d at 619 ("alleged injuries to its detention and education costs are sufficiently concrete and actual or imminent" in challenge to 100-day pause in removals).

86.   Texas need not show that any actual CHNV beneficiaries partake of any of these benefits to show standing, and standing is not defeated by the fact that some of the beneficiaries could have been paroled under a different circumstance. As the Fifth Circuit explained:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971.

87.   Any purported offsetting benefits Texas could receive from the operation of the CHNV Parole Program, whether from the paroled aliens themselves or reduced entry of other aliens through effects of the program, do not affect the standing inquiry. The Fifth Circuit has addressed this exact point in this context:

> Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state. It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and buy auto insurance, reducing the expenses associated with uninsured motorists. The government suggests employment authorization would lead to increased tax revenue and decreased reliance on social services.

> Even if the government is correct, that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs. "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.

*DAPA*, 809 F.3d at 155–56 (5th Cir. 2015). And the court further explained:

> Here, none of the benefits the government identifies is sufficiently connected to the costs to qualify as an offset. The only benefits that are conceivably relevant are the increase in vehicle registration and the decrease in uninsured motorists, but even those are based on the independent decisions of DAPA beneficiaries and are not a direct result of the issuance of licenses. Analogously, the Third Circuit held that sports leagues had standing to challenge New Jersey's decision to license sports gambling, explaining that damage to the leagues' reputations was a cognizable injury despite evidence that more people would have watched sports had betting been allowed. *NCAA,* 730 F.3d at 222–24. The diminished public perception of the leagues and the greater interest in sports were attributable to the licensing plan but did not arise out of the same transaction and so could not be compared.

> In the instant case, the states have alleged an injury, and the government predicts that the later decisions of DAPA beneficiaries would produce offsetting benefits. Weighing those costs and benefits is

precisely the type of "accounting exercise," *id.* at 223, in which we cannot engage. Texas has shown injury.

*Id.* at 155–56; *see also L.A. Haven Hospice, Inc. v. Sebelius,* 638 F.3d 644, 656–59 (9th Cir. 2011) (holding that a hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); *Sutton v. St. Jude Med. S.C., Inc.,* 419 F.3d 568, 570–75 (6th Cir. 2005) (concluding that a patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman,* 317 F.3d 547, 557–58 (6th Cir.2003) (deciding that grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

**b. Traceability.**

88.   Texas's injuries are fairly traceable to the Defendants.

89.   Texas has been spending money and will spend more money in the future on programs to serve unlawfully paroled aliens who would not have otherwise entered the United States. Texas's spending of money is directly traceable to the CHNV Parole Program. *See DAPA*, 809 F.3d at 161; *Texas v. Biden*, 554 F. Supp. 3d 818, 837 (N.D. Tex. 2021) (fiscal injuries to States are fairly traceable to agency action that "necessarily increases the number of aliens released … into the United States and the plaintiff States specifically").

90.   "[A]n increase in parolees causes the States financial harm by way of driver's license applications … [and] healthcare" and it is "obvious that if the total number of in-State aliens [via parole] increases, the States will spend more on healthcare." *MPP*, 20 F.4th at 969.

91.   The increased expenditures for driver licenses, incarceration, education, and social services arising from the increased presence of aliens who otherwise would not be present in Texas is not so tenuously connected to the CHNV Parole Program that it cannot be traced to the Defendants' actions. A plaintiff seeking prospective relief need only show that future injury is "fairly likely." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("a realistic probability"). Aliens' future behavior can be traced to the Defendants' policies, where it is likely that aliens who have historically behaved in a certain way will continue to do so. That is not speculation, but a predictable effect of Defendants' policies. *See Dept. of Commerce v. New York*, 139 S. Ct. 2251, 2566 (2019). The rate of aliens' 1) applications for driver licenses, 2) incarceration, 3) usage of public education, and 4) usage of social services, and the costs that these impose on Texas, are such predictable effects. Further, these increases, and their attendant costs, can be traced to Defendants' policies because the evidence shows the general propensity of aliens to use these public services and be incarcerated at rates that impose non-trivial costs on Texas, and there is no suggestion that aliens who currently would not have been paroled but for Defendants' policies behave differently than other aliens. *See Davis v. FEC*, 554 U.S. 724 (2008).

92.   Texas therefore faces a "substantial risk" of future injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Texas is not required to show that it is "literally certain" that it will be injured. *Clapper*, 568 U.S. at 414 n.5. It needs to only show a "substantial risk" that injury will occur. *Susan B. Anthony List*, 573 U.S. at 158.

93. Even if this were not the case, the "standing analysis is not an accounting exercise." *DAPA*, 809 F.3d at 156 (internal quotation omitted). That some aliens impose costs on Texas, as described above, and that some aliens require the expenditure of public funds that would otherwise not be spent is sufficient to create standing.

94. The effects of the CHNV Parole Program will increase Texas's healthcare costs, education costs, and enforcement and correctional costs, inflicting on Texas an actual and imminent financial injury. *See California v. Texas*, 141 S. Ct. 2104, 2118 (2021) (using both "logic and "intuition" to conclude that practical "benefits" gave individuals sufficient "incentive" to enroll in government programs).

**c. Redressability.**

95. The relief the States seek would redress the harms they allege. If the Defendants' Parole Program were set aside, and if Defendants were not allowed to parole aliens *en masse*, but instead were required to follow Congress's commands in the INA for processing aliens who unlawfully cross the border, those aliens would no longer be present in Texas to require the public services that they would otherwise receive. *DAPA*, 809 F.3d at 161. At the very least, enjoining the change in policy would authorize line-level officers to apply the commands of 8 U.S.C. § 1182(d)(5) and to grant parole "only on a case-by-case basis" rather than mass-releasing into the United States tens of thousands of aliens into the United States. Based on past practice, providing line-level officers with that authority will significantly reduce the number of illegal aliens that enter Texas or that impose costs on the State.

96. The Supreme Court's recent decision regarding Texas's standing to challenge DHS's prioritization memo does not affect this result. *See United States v.*

*Texas*, 143 S. Ct. 1964 (2023). That opinion concluded that standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id*. at 1968 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). In the Supreme Court's view, it was being asked "to order [DHS] to alter its arrest policy so [DHS] arrests more noncitizens." *Id*. Unlike the prioritization case, however, this case is not about arrests or custody. Whatever discretion the Defendants might have in choosing which aliens to arrest or otherwise take into custody, they have no discretion to parole into the country—by granting "affirmative immigration relief"—aliens who do not meet the statutory criteria for parole.

## 2. Special solicitude.

97.   Even if Texas could not satisfy the traditional standing inquiry, it would have standing due to the special solicitude it is due as a sovereign State.

98.   Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *MPP*, 20 F.4th at 969 (citation omitted). Texas satisfies the first prong because it is "asserting a procedural right under the APA to challenge an agency action," *id*. (internal citation omitted), something it can do for all of its claims. *See* 5 U.S.C. § 706.

99.   As stated above, the Defendants' actions affect Texas's quasi-sovereign interests. By pressuring "Texas to change its detention or education budgets," the CHNV Parole Program is affecting a quasi-sovereign interest. *Texas v. United States*, 524 F. Supp. 3d 598, 630 (S.D. Tex. 2021) (Tipton, J.).

100.   "Thus, Texas is entitled to special solicitude in the standing inquiry. If nothing else, that means imminence and redressability are easier to establish here

than usual." *MPP*, 20 F.4th at 970 (citation omitted). Standing will therefore exist "if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *DACA*, 50 F.4th at 514 (citation omitted).

101.   The remaining prong of the standing analysis—causation (or traceability)—is also subject to the special solicitude doctrine. *See Texas v. United States*, 549 F. Supp. 3d 572, 585 (S.D. Tex. 2021) (Hanen, J.), ("The Fifth Circuit has explicitly interpreted special solicitude to lower the level of certainty required in the traditional causation and redressability analysis.").

**C. Administrative Procedure Act claims.**

   **1. The Parole Program is susceptible to judicial review.**

102.   The Administrative Procedure Act (APA) establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). "That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law." *Id.* (cleaned up). Neither exception applies in the current action.

103.   Establishing unreviewability is a heavy burden, and where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *DAPA*, 809 F.3d at 164 (cleaned up). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

104.  There is a well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action. *DAPA*, 809 F.3d at 163 (quoting *Reno v. Catholic Soc. Servs., Inc.*, 113 S. Ct. 2485 (1993)). Only a narrow group of matters are regarded as "committed to agency discretion," such that they are exempt from review under the APA under 5 U.S.C. § 701(a)—an agency's decision not to institute enforcement proceedings, for example, or statutes drawn in such broad terms that "there is no law to apply." *DAPA*, 809 F.3d at 163. That is not the case here, where Congress set forth both specific legal criteria for eligibility for parole and a specific process for determining whether those criteria are met. *See* 8 U.S.C. § 1182(d)(5).

### a. The CHNV Parole Program is final agency action.

105.  The CHNV Parole Program is susceptible of judicial review because it constitutes final agency action. *See* 5 U.S.C. § 704. It marks the consummation of the Defendants' decision-making process, and it is one from which legal consequences flow or by which rights or obligations are determined. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Engrs. v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

106.  The Parole Program is definitive, rather than advisory, and there is no indication that it is tentative or interlocutory. It, therefore, marks the consummation of the decision-making process. *Bennett*, 520 U.S. at 178; *Hawkes*, 578 U.S. at 597–98.

107.  Similarly, the CHNV Parole Program is final agency action because it "consummate[s] the agency's decisionmaking process" of interpreting the parole criteria for applicants from those four countries. Moreover, the program creates rights for aliens (to apply through a particular process not available to other applicants) and produces legal consequences for them (parole into the

United States through a process not available to other applicants), hallmarks of a final, substantive agency action. The Defendants do not have discretion to disregard the statutory parole criteria for classes of applicants; that a CBP agent rubber-stamps an application for parole upon an applicant's arrival at a port of entry does not convert the imposition of a class-based program into a case-by-case procedure that is consummated only upon the rubber-stamping. *See Biden v. Texas*, 142 S. Ct. 2528, 2545 n.7 (2022) ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such judicial authorization had been obtained.").

108. The CHNV Parole Program also alters the rights and obligations of the States. Illegal aliens are eligible to participate in Texas's Emergency Medicaid program. Illegal aliens are eligible to participate in this program. 8 U.S.C. § 1611(b)(1)(A). An illegal alien wrongfully paroled into Texas is eligible for Emergency Medicaid, and Texas is legally obligated to bear part of the cost of furnishing him with that program.

109. The CHNV Parole Program also affects Texas's legal obligation to provide a public-school education. Texas is required by both federal and state law to provide noncitizen children with a public-school education. *See generally Plyler v. Doe*, 457 U.S. 202 (1982); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) ("[T]he State's public education expenditures for the children of undocumented aliens are required by the equal protection clause[.]"). Just as the CHNV Parole Program requires Texas to bear the medical costs of paroled illegal aliens, it requires Texas to bear the cost of educating alien children who would otherwise never have entered the United States (or would have been detained and deported or removed)—and Texas's evidence involving

unaccompanied alien children is sufficient to show standing even for programs that do not apply to that category of children specifically. *See Texas v. United States*, 549 F. Supp. 3d 572, 593–94 (S.D. Tex. 2021) (Hanen, J.) ("Texas has similarly established for standing purposes that it bears the burden of increased education costs [due to DACA program].") (citing declaration by official from Texas Education Agency virtually identical to that submitted here and noting that it was "speaking in terms of unaccompanied children but setting out annual education costs per child and cost of bilingual education").

**b. Within the zone of interests.**

110.    Texas may challenge the CHNV Parole Program under the APA only if its injury is arguably within the zone of interests protected by the underlying statutes. This test is "not especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (quoting *Clarke v. Secs. Indus. Assn.*, 479 U.S. 388, 399 (1987).

111.    Texas's injuries are within the zone of interests protected by Sections 1182(d)(5), which, as with the rest of the Immigration and Nationality Act, were enacted to protect and benefit the States, the Nation's citizens, and the nation's legal immigrants. In particular, one reason it was enacted was the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Texas must furnish under the Emergency Medicaid program and its obligation to furnish a public education. *See DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601).

112.    Texas falls within the zone of interests of the INA as a whole, which is the proper reference for actions under the APA, rather than any particular section. *MPP*, 20 F.4th at 975–76.

113.  Texas's interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *DAPA*, 809 F.3d at 163. By strictly limiting the exercise of the parole power, Section 1182(d) ensures that aliens are not released into the United States to impose costs on American citizens and taxpayers. Texas's injuries flow from just that problem.

**2. Action contrary to law.**

114.  For the same reasons that the CHNV Parole Program is not a proper exercise of agency discretion that would free it from judicial review, it contradicts the law that the Defendants are bound to follow. The CHNV Parole Program is thus not in accordance with law and in excess of statutory jurisdiction, authority, and limitation. 5 U.S.C. § 706(2)(A), (C).

115.  A key characteristic of the CHNV Parole Program is the programmatic grant of parole to entire classes of aliens. However, the Defendants lack the authority to do this. "Throughout the mid-twentieth century, the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants," so, "[i]n response, Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *MPP*, 20 F.4th at 947.

116.  A plain language reading of the statute makes clear that programmatic grants of parole are unlawful. Rather, DHS may grant parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5).

117.  When Congress adopted the current version of Section 1182(d)(5) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), it severely restricted the parole authority. Pre-IIRIRA, the INA granted broad parole authority to the Attorney General "under such conditions

as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5) (1996). IIRIRA amended the INA "by striking 'for emergent reasons or for reasons deemed strictly in the public interest' and inserting '*only* on a *case-by-case* basis for *urgent humanitarian reasons or significant public benefit*.'" IIRIRA, PL 104–208, September 30, 1996, 110 Stat 3009, § 602 (emphasis added). The section heading in IIRIRA that makes this amendment is titled "*LIMITATION* ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat. 3009, §602 (Sept. 30, 1996) (emphasis added); *see Ram v. INS*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret its meaning").

118.  The legislative history, and cases examining it, confirm the intent already evident from IIRIRA's text. "Congress enacted [IIRIRA] in a comprehensive effort to strengthen and tighten the immigration laws." *Arevalo v. Ashcroft*, 344 F.3d 1, 4 (1st Cir. 2003). The House Conference Report on IIRIRA similarly made plain that the bill's purpose was "to improve deterrence of illegal immigration to the United States by ... reforming exclusion and deportation law and procedures." H.R. Rep. No. 104-828, at 1,199 (1996) (Conf. Rep.). President Clinton's signing statement likewise described IIRIRA as "landmark immigration reform legislation that ... strengthens the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system." 32 Wkly. Comp. Pres. Doc. 1935 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3388, 3391 (Sep. 30, 1996).

119.  "Congress, in IIRIRA, specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States.'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 (2d Cir. 2011). "The legislative history indicates that this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration

policy." *Id.* at n.15 (citing H. R. Rep. No. 104–169, pt. 1, at 140–41 (1996)). "Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A)...." *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007).

120.   The IIRIRA House Conference Report further explains that Congress intended the amendment to Section 1182(d)(5) to limit the parole authority: "the Attorney General's parole authority *may be exercised only* on a case-by-case basis for urgent humanitarian reasons or significant public benefit." H. R. Rep. No. 104-828, at 245 (Conf. Rep.) (emphasis added).

121.   The House Judiciary Committee Report on IIRIRA further explained the purpose of the amendment to Section 1182(d)(5):

> The text of section [1182](d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, *and not as a supplement to Congressionally-established immigration policy.* In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. *This contravenes the intent of section [1182](d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.*

H. Comm. on the Judiciary, H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

122.   Because the House version of the parole statute was not adopted, the Federal Defendants criticize Texas's reliance on this House report. Trial Tr. vol. 2, 15:14-16:5, ECF No. 278. While it is true that the final version of IIRIRA that was enacted did not incorporate some definitions of terms that the House version of the bill had proposed, this is of little relevance because the quoted section of the House Report was not talking about the potential definitions that were ultimately rejected. Rather, the report was making a much broader point that still stands regardless of the definitions' adoption, which is that Congress

believed the Executive was abusing the parole authority and violating the INA and that, therefore, more restrictions were needed to curtail that abuse. Indeed, other courts have cited this portion of the House Report when examining the legislative history of IIRIRA. *E.g. Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (citing H. R. Rep. No. 104–469, pt. 1, at 140–41 (1996) to explain that IIRIRA "was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

123. To make things even clearer, Congress even entitled the IIRIRA amendment to the parole provisions, "limitation on use of parole." Pub. L. No. 104-208, 110 Stat. 3009, § 602; *see Ram*, 243 F.3d at 514 n.3 (section headings and titles "may be used to interpret its meaning").

124. The Fifth Circuit has explained that the

> § 1182(d)(5) parole power gives the executive branch a limited authority to permit incoming aliens to stay in the United States without formal authorization *when their particular cases* demonstrate an urgent humanitarian need or that their presence will significantly benefit the public. The power must be exercised on a case-by-case basis. Quintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available.

> *MPP*, 20 F.4th at 947 (emphasis added).

125. This requirement that the requirement of a significant public benefit be obtained from the "particular cases" of specific aliens means that broad purported public benefits that are not specific to any individualized circumstance violate the strictures of the parole power.

126.   The rationale such as that given in favor of the CHNV Parole Program is programmatic and not specific to the circumstances of individual recipients. It finds a "a significant public benefit for several, interrelated reasons":

> Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) provide a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

88 Fed. Reg. at 1248.

127.   Accordingly, the CHNV Parole Program's grants of parole to tens of thousands of aliens also run headlong into the Fifth Circuit's holding that a programmatic parole provision violates § 1182(d)(5)(A): "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *Texas,* 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id.* at 997. Yet the Parole Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

128.   While "the parole statute does not set any limit on the number of individuals DHS can decide to release on parole," "the number of aliens paroled each month … gives rise to a strong inference that the Government is not really making these parole decisions on a case-by-case basis." *Texas v. Biden*, No. 2:21-cv-067-Z, 2022 WL 17718634, at *12 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) (cleaned up) (quoting *Biden,* 142 S. Ct. at 2554 (Alito, J., dissenting)), *appeal*

*dismissed,* No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The number cited by Justice Alito as giving rise to this inference—and relied on by Judge Kacsmaryk in finding that DHS failed to examine whether its rescission of the MPP program caused it to violate the limits on its parole power—was 27,000 a month, *id.* at *13—fewer than the 30,000 a month authorized by the CHNV Parole Program.

129.   And DHS's past practices broadly using the parole power do not "create power." *Id.* (quoting *Medellin v. Texas*, 552 U.S. 491 (2008); *see also Judulang v. Holder*, 565 U.S. 42, 61 (2011) ("Arbitrary agency action becomes no less so by simple dint of repetition," and "longstanding capriciousness receives no special exemption from the APA.").

130.   In contrast to the traditionally accepted (and limited) public benefit uses of parole, the CHNV program expands the "public benefits" into all-encompassing categories that are so broad as to leave almost no limiting principle to them at all. Indeed, the Defendants' delineated categories of "public benefit" are so broad that they could be used to justify paroling into the United States just about every alien currently living outside the United States. Specifically, the Federal Register notice for the CHNV Program lists the following purported "public benefits": "i) enhance border security through a reduction in irregular migration ... including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration ...; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage

irregular migration." 88 Fed. Reg. 1249; 88 Fed. Reg. 1260 (Jan. 9, 2023); 88 Fed. Reg. 1272 (Jan. 9, 2023). These "benefits" fall far outside the limited types of public benefits that have traditionally been understood to fall under the statute. That alone makes the program unlawful.

131. Under the Major Questions Doctrine, an executive action is unlawful if it presents a question of "vast 'economic and political significance,'" that Congress has not expressly assigned to the Executive Branch the power to take that action. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.") (cleaned up); *West Virginia v. EPA*, 142 S.Ct. 2587, 2608 (2022); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

132. Congress would not have created an avenue for the Executive to ignore established channels of immigration by way of the parole power.

### 3. Lack of reasoned decisionmaking.

133. The APA's prohibition of agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), requires agencies to engage in reasoned decisionmaking. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

134.   An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *United States v. Garner*, 767 F.2d 104, 116–17 (5th Cir. 1985) (quoting *State Farm*, 463 U.S. at 50).

135.   In implementing the CHNV Parole Program, the Defendants did not analyze— did not even mention—the harms, social and financial, that paroling aliens impose on Texas, or any other State, "entirely fail[ing] to consider [that] important aspect of the problem." *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51) (alteration in *Regents*). Failing to consider the important costs of a policy renders that policy arbitrary and capricious. *See Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'").

136.   The Defendants also failed to consider alternative approaches to the CHNV Parole Program. As with another DHS policy recently rejected by the Supreme Court, implementing the Parole Program "'without any consideration whatsoever' of a [more limited] policy" was arbitrary and capricious. *Regents*, 140 S. Ct. at 1912 (quoting *State Farm*, 463 U.S. at 51).

137.   Even if there were some way to explain or justify the decisions that led to the CHNV Parole Program, it would be irrelevant because the Defendants did not provide any such explanation or justification in implementing the CHNV Parole Program itself.

138.   The Federal Register notices announcing the CHNV Parole Program do not reveal a consideration of the costs the program would impose on the States or their residents or the consideration of more-limited policies that might have allowed for lower levels of paroled aliens being released into the States. *See* 88 Fed. Reg. 1266; 88 Fed. Reg. 1243; 88 Fed. Reg. 1255; 88 Fed. Reg. 1279.

139.   The Defendants' decision-making "must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang*, 565 U.S. at 55. One broad purpose of immigration law and policy is to minimize the costs and expenses related to the presence of illegal aliens in the country. *See Demore v. Kim*, 538 U.S. 510, 530 n.14 (2003). There is no evidence that the CHNV Parole Program considered this factor.

140.   The APA's arbitrary-and-capricious framework applies, as the Supreme Court has recognized, to "DHS's exercise of discretion within th[e] statutory framework" of § 1182(d)(5)(A). *Biden*, 142 S. Ct. at 2543. The Defendants were therefore required to examine the relevant data and articulate a satisfactory explanation for their action, including a rational connection between the facts found and the regulatory choice made. *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Texas v. United States*, 524 F. Supp. 3d at 652 (citations omitted). This reasoned decisionmaking includes, among other things, consideration of whether there was legitimate reliance on the status quo prior to an agency's change in course, for "[i]t would be arbitrary and capricious to ignore such matters." *Regents*, 140 S. Ct. at 1913.

141.   The CHNV Parole Program is arbitrary and capricious because the Defendants have relied on factors which Congress had not intended them to consider, entirely failed to consider an important aspect of the problem, and offered explanations for its decision that run counter to the evidence. *State Farm*, 463 U.S. at 43.

142.    First, because the Defendants addressed only the benefits that might obtain from the *accumulated* effect of paroling thousands of aliens, they did not make—indeed, could not make—the showing actually required by § 1182(d)(5)(A): that admitting each *individual* parolee will yield a humanitarian or public benefit. Similarly, the program is arbitrary and capricious because it does not require applicants to explain why their parole *specifically* would yield humanitarian or public benefits.

143.    Second, the Defendants did not consider and account for the Plaintiff States' reliance interests. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (cleaned up). In fact, perhaps because they did not conduct notice-and-comment rulemaking, the Defendants did not address reliance interests of any kind. That is a *per se* violation of the APA because it is "arbitrary and capricious to ignore such matters," *Regents,* 140 S. Ct. at 1913, and "that consideration must be undertaken by the agency in the first instance." *Id*.

144.    "The Supreme Court has recognized that border states 'bear[ ] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (per curiam) (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)).

145.    Those costs are just as relevant here—perhaps even more so, given that aliens paroled into the United States under the CHNV Parole Program would be eligible to receive work authorization, which the Defendants claim they are working to make as efficient as possible. *See* 88 Fed. Reg. at 1272, 1276.

146.    Third, the Defendants justify the CHNV Parole Program on the basis that there is a sudden surge of migrants from several specific countries, such that emergency measures are needed—so urgent, in fact, that they cannot wait for a notice-and-comment rulemaking. But—as explained below in discussing the notice-and-comment requirements—the notices announcing the Program rely on events that are hardly sudden—ranging from COVID-19, to political and natural events occurring well in the past. Because the cited evidence does not support the justification of this emergency measure, it is arbitrary and capricious.

147.    Fourth, the Defendants did not explain or analyze how they would remove from the United States the hundreds of thousands of aliens paroled through their program at the end of any period of authorized parole, despite admitting general difficulty in removing such aliens even currently, *see, e.g.*, 88 Fed. Reg. at 1270–71, and despite the pattern of so-called "temporary" immigration policies becoming permanently entrenched, *see, e.g., Saget v. Trump*, 375 F. Supp. 3d 280, 295 (E.D.N.Y. 2019).

148.    Temporary Protected Status (TPS) is a designation under the immigration laws that generally prevents the removal of nationals to a country so designated. See 8 U.S.C. § 1254a. Once the DHS Secretary makes such a TPS designation, for any alien inside the United States from such a country, he "may grant the alien temporary protected status in the United States and shall not remove the alien from the United States during the period in which such status is in effect." Id. § 1254a(a)(1)(A). Further, the Secretary "shall authorize the alien to engage in employment in the United States[.]" Id. § 1254a(a)(1)(B). Once designated for TPS, it is a near certainty that the designations will continue indefinitely. And in all likelihood, new designations and redesignations will continue to be made indefinitely.

149. Three of the countries in the Parole Program —Haiti, Nicaragua, and Venezuela—are currently designated for TPS. Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41863 (Aug. 3, 2021); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40297 (Jun. 9, 2023); Extension of the Designation of Venezuela for Temporary Protected Status, 87 Fed. Reg. 55024 (Sep. 8, 2022). This means the Defendants have essentially employed a "temporary two-step," where the Defendants "temporarily" parole hundreds of thousands of aliens into the United States under the Parole Program, after which they can then designate/redesignate nationals of these countries for "Temporary" protected status and permanently protect them from removal.

150. In addition to their admissions regarding their ability to remove Haitians, Nicaraguans, and Venezuelans to their home countries, the Defendants' own publicly available data demonstrate the extent of the problem. Specifically, between Fiscal Years 2012 and 2021, they were only able to remove approximately: 3,705 Cubans, 11,349 Haitians, 12,511 Nicaraguans, and 7,324 Venezuelans. Dep't of Homeland Sec. Off. of Immigr. Stat., *2021 Yearbook of Immigration Statistics*, DHS. (Nov. 2022), https://bit.ly/3ZFFE2r (see Table 41). Thus, cumulatively, the Defendants were able to remove 34,889 aliens to these four countries over a decade. In comparison, the Parole Program brings 30,000 nationals of these four countries to the United States each and every month for the indefinite future. If even a fraction of the aliens paroled into the United States decides to overstay their authorized period of parole, DHS effectively has little to no chance of being able to remove them from the United States in a timely fashion.

151. The Defendants admitted in their discovery responses that their ability to track parolees is essentially nonexistent: "DHS ... has no comprehensive

method to track whether a parolee remains in the United States" and "DHS is unable to provide information about whether [CHNV Program participants] reside[] in Texas, or elsewhere, because this is not the type of information tracked through automated systems." Pl. Ex. 38 at 13-14 (ECF 263-2 at 48-49).

152.   The Federal Register notices implementing the CHNV Program claim that the "grant of parole under this process is for a temporary period of up to two years." 88 Fed. Reg. at 1244; 88 Fed. Reg. at 1,256; 88 Fed. Reg. at 1268. Yet, there is every indication that CHNV participants who want to remain in the United States will be able to remain permanently. DHS has a mechanism in place for any recipient of parole to apply for a renewal of their parole, which DHS calls "re-parole." As DHS explains on its public-facing website for parolees and parole applicants, "Although parole is temporary in nature, in some instances, an individual may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States." Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States, U.S. Citizenship and Customs Servs. (May 2, 2023), https://tinyurl.com/4ndkpp2u. Indeed, the procedure for applying for re-parole is trivially simple: an alien simply files "a new Form I-131, Application for Travel Document," checks the proper box, and then finishes by "[w]riting 're-parole' across the top of the application." *Id.*

153.   The Defendants have never exempted aliens in the CHNV Program from DHS's normal re-parole application process. The only substantive

acknowledgment that the Defendants give of the possibility that the 360,000 new parolees every year will not depart the United States is on the USCIS website, which blandishes, "Individuals with expired parole are expected to depart the country of their own accord. Individuals in the United States encountered after their parole has terminated generally will be placed in removal proceedings." *See* Pl. Ex. 3 at 10, ECF 263 at 15. The Defendants' willful blindness to their own historical experience is arbitrary and capricious. There is little prospect that CHNV Program aliens will ever be ended, the Defendants do not even have the ability to track aliens in the Program, and there is every indication that the Defendants will renew the aliens' "temporary" status in perpetuity. Even worse, since the CHNV Program is not really temporary, the program is not only arbitrary and capricious, but it is also contrary to law because it violates the plain language of the parole statute's "temporarily" requirement. Similarly, the Defendants do not explain or analyze how the "sponsor" requirement for applicants will be enforced. Although the sponsor—who can be a parolee himself—must pledge to provide financial support, no enforcement mechanism is described. These unenforceable "parchment requirements" are designed only to give the appearance of selectivity, all while creating the equivalent of a new visa program for hundreds of thousands otherwise ineligible aliens each year.

### 4. Lack of notice and comment

154. Rules are exempt from the APA's notice-and-comment requirement if they are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]" 5 U.S.C. § 553(b). This exemption is "narrowly construed." *DAPA*, 809 F.3d at 171.

### a. Policy statement.

155. Distinguishing between a legislative rule and a policy statement depends on "two criteria: whether the [agency action] (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *DAPA*, 809 F.3d at 171 (cleaned up). A court making that determination must be "mindful but suspicious of the agency's own characterization," and its primary consideration is whether the action "has binding effect on agency discretion or severely restricts it." *Id.*

156. Under that evaluation, the CHNV Parole Program is not "merely … a general statement of policy," 88 Fed. Reg. at 1276, as the Defendants claim. The program certainly imposes rights and obligations by establishing a framework for the showing required to parole up to 360,000 aliens into the country annually. *See DACA*, 50 F.4th at 521–24 (DACA is not a policy statement because it provides "affirmative immigration relief … following extensive proceedings that are effectively adjudications" and "eligibility for benefits").

157. Two criteria distinguish a policy statement from a substantive rule: whether it imposes rights and obligations, and whether it genuinely leaves the agency and its decision-makers free to exercise discretion. *DAPA*, 809 F.3d at 171.

158. For the same reasons discussed above in analyzing whether the CHNV Parole Program is final agency action, it imposes rights and obligations.

159. The key inquiry in determining whether a rule genuinely leaves the agency and its personnel free to exercise discretion is the extent to which the agency

and its personnel have the freedom to follow or not to follow that rule in an individual case—or, on the flip side, whether it so dominates the consideration that "one need only determine whether a given case is within the rule's criteria." *Profls. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596–97 (1995). As long as personnel remain free to consider individual facts in various cases, the action is not a substantive rule. *Id.*

160. The CHNV Parole Program does not genuinely leave the agency and its personnel free to exercise discretion, as demonstrated by the parole approval rates of nearly 100% under the program.

   **b. Foreign Affairs Function.**

161. The foreign-affairs exception to the APA's notice-and-comment requirement is narrow, and even "in the immigration context," the government must make a strong showing that allowing even a short notice-and-comment period "will provoke definitely undesirable international consequences." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018) (Bybee, J.). Accordingly, courts "disapprove[] the use of the foreign affairs exception where the Government has failed to offer evidence of consequences that would result from compliance with the APA's procedural requirements." *Id.* at 776 (collecting cases).

162. The Defendants' assertion that the Parole Program "will advance the Administration's foreign policy goals" and was in response "to requests from key foreign partners," 88 Fed. Reg. at 1277, is not enough. As Judge Bybee explained for the Ninth Circuit, even when there are "ongoing negotiations" with other countries, an agency must "explain[] how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a thirty-day period of notice and comment, is necessary for [those] negotiations." *E. Bay*,

932 F.3d at 776 (emphasis in original). The Defendants do no such thing, only pointing to the CHNV Parole Program's supposed foreign-affairs benefits and hypothesizing that even a slight delay "could" affect other countries' willingness to assist or cause "an even greater surge in migration" before the Program took effect. 88 Fed. Reg. at 1277.

163.    That is not explanation; it is supposition. The Defendants could have proposed, and opened a notice-and-comment period on, the CHNV Parole Program on January 9 and simultaneously stated that anyone attempting to cross illegally after that date would be barred from the Program—similar to what the Program already says, *see, e.g.*, 88 Fed. Reg. at 1252. That would have eliminated the incentive for an "even greater surge in migration" that purported to trouble the Defendants while assuring "key foreign partners" that the U.S. was proceeding expeditiously. But the Defendants do not explain why that option was insufficient; their notices certainly give no indication it would have caused "definitely undesirable international consequences." A purported impact on foreign affairs was not good cause to avoid notice and comment.

**c.  Good cause.**

164.    The "good cause" exception to notice-and-comment is narrowly construed and only reluctantly countenanced, to be used only "on a break-glass-in-case-of-an-emergency basis[.]" *Natl. Horsemen's Benevolent & Protective Assn. v. Black*, 53 F.4th 869, 883 & n.26 (5th Cir. 2022). The only "good cause" the Defendants posit in their notices is that notice and comment "would seriously undermine a key goal of the policy: it would incentivize even more irregular migration." 88 Fed. Reg. at 1277. But that is wrong. As explained above, announcing the program and stating that anyone who attempts to cross illegally after January

48

9 (as the program already says) would have had the same effect: immediately deterring aliens from seeking to cross illegally into the United States.

165.   Nor could the Defendants claim recent events provide an urgent basis to take action. Border crossings have been steadily increasing over the course of the Biden Administration, 88 Fed. Reg. at 1245, 1268–69, which the Defendants themselves chalk up to long-extant things like the "lingering impacts of the COVID-19 pandemic," the refusal of Cuba to accept returned aliens as of February 2020, the response to April 2018 protests in Nicaragua, an assassination and earthquake in Haiti in Summer 2021, and the November 2021 decision by Nicaragua to allow Cubans to visit without visas. 88 Fed. Reg. at 1246, 1258, 1268–70. Those events are neither sudden nor urgent—the most recent of them occurred more than a year before the Defendants announced the Program—let alone so compelling that they overcome the strong presumption of notice-and-comment.

### d. Procedural Rule.

166.   Nor is the CHNV Parole Program a procedural rule exempt from notice-and-comment rulemaking requirements.

167.   The first test the Fifth Circuit uses to determine whether a rule is procedural is the "substantial impact test." *See DAPA*, 809 F.3d at 176. This test "is the primary means by which [the court] look[s] beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Id*. (citing *U.S. Dept. of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984)). "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *DAPA*, 809 F.3d at 176 (quoting *Kast Metals*, 744 F.2d at 1153). In making this determination, the question is not

"whether the rule is 'substantive' or 'procedural,' but rather whether the rule will have a 'substantial impact' on those regulated." *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir.), *modified on reh'g*, 36 F.3d 89 (5th Cir. Sept. 7, 1994).

168.   In determining whether the rule will have a "substantial impact" on those regulated, the Court may consider whether the rule creates legal or financial obligations for the plaintiff and whether the rule restricts the discretion of agency officials. If the rule has a substantial impact on "the regulated industry, or an important class of the members or the products of that industry," then "notice and opportunity for comment should first be provided" because the exemption from the notice-and-comment requirement "does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated." *Phillips*, 22 F.3d at 620. *See id.* (concluding the rule at issue was not procedural because, in part, "[t]he rule narrowly restrict[ed] the discretion of MMS officials in determining the value of NGLP's" and "[i]t foreclose[d] other valuation methods by prescribing binding valuation criteria"); *DAPA*, 809 F.3d at 176 (concluding DAPA "undoubtedly [satisfies the substantial impact] test—conferring lawful presence on 500,000 illegal aliens residing in Texas forces the state to choose between spending millions of dollars to subsidize driver's licenses and amending its statutes"). *See also Texas*, 328 F. Supp. 3d at 728 (concluding DACA is not a procedural rule, having found it "undoubtedly satisfies [the substantial impact] test because it has forced the states to spend money on various social services costs, which are clearly modif[ications] of substantive rights" (quotation omitted)).

169.   The CHNV Parole Program satisfies the substantial-impact test.

170.   First, as discussed above, the CHNV Parole Program affects Texas's legal obligations. Specifically, it affects Texas's legal and financial obligations to

partially fund Emergency Medicaid, public education, and corrections costs for aliens paroled into the United States.

171. The second test for determining whether a rule is procedural asks the Court to weigh two considerations.

172. First, the Court must consider the "effect on those interests ultimately at stake in the agency proceeding." *DAPA*, 809 F.3d at 176 (citing *Natl. Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)) (quotation omitted). "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." *DAPA*, 809 F.3d at 176 (citing *Natl. Sec. Counselors*, 931 F. Supp. 2d at 107). The CHNV Parole Program affects the rights and obligations of Texas, DHS, and certain aliens, so this consideration weighs against characterizing it as procedural.

173. Second, the Court must assess whether the CHNV Parole Program affects the substantive standards by which DHS determines whether to parole certain aliens. *See DAPA*, 809 F.3d at 176–77 ("[R]ules are generally considered procedural so long as they do not 'change the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide." (quotation omitted)).

174. By departing from the case-by-case determination requirements in Section 1182(d)(5) and effectively replacing them with a categorical public-benefit determination for evaluating parole applications, the CHNV Parole Program alters the substantive standards by which DHS determines whether and when to parole certain aliens.

175. Therefore, this test also weighs against classifying the memoranda implementing the CHNV Parole Program as procedural rules.

### D. Equitable cause of action.

176. Even were Plaintiff States not able to use the APA to challenge the CHNV Parole Program, they would have a cause of action at equity.

177. The "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

178. "Federal officials, notwithstanding sovereign immunity, may be enjoined under the *Larson* doctrine — the federal counterpart to [*Ex parte*] *Young*." *Leal v. Azar*, 489 F. Supp. 3d 593, 599 (N.D. Tex. 2020) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)), *vacated as moot*, *Leal v. Becerra*, No. 20-11083, 2021 WL 5021034 (5th Cir. June 3, 2021).

179. "Under the *Larson* doctrine, there are two types of suits that can proceed against federal officers in their official capacities: (1) suits alleging a federal official acted *ultra vires* of statutorily delegated authority; and (2) suits alleging 'the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional.'" *Id*. at 599 (quoting *Larson*, 337 U.S. at 689–90).

180. As explained above, the Defendants are exceeding the limitations of the parole authority granted by Congress, harming the States. The use of the CHNV Parole Program is *ultra vires* and subject to equitable relief outside the APA.

### E. Remedies.

#### 1. Entitlement to a permanent injunction.

181. A permanent injunction is proper when a plaintiff has prevailed on the merits, there is no adequate remedy at law for the plaintiff's injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

182.  Texas has satisfied each of these elements.

### a.  Prevail on the merits.

183.  As described above, Texas has prevailed on the merits of its claims.

### b.  Irreparable harm.

184.  For an injury to be sufficiently "irreparable," Texas need only show that the injury "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)); *Humana, Inc. v. Avram A. Jacobson, M.D., P.*A., 804 F.2d 1390, 1394 (5th Cir. 1986).

185.  Texas "bears many of the consequences of unlawful immigration" and will suffer irreparable harm absent an injunction. *Arizona*, 567 U.S. at 397. The increase in the presence of illegal aliens will inflict significant financial costs on Texas, including but not limited to driver licenses, healthcare, education, as well as enforcement and correctional services.

186.  These financial injuries are irreparable. Sovereign immunity prevents Texas from recovering from the Defendants the money it has spent in the past and will have to spend in the future to furnish social and educational services to illegal aliens who would not have required those services had they not been unlawfully paroled. Nor can Texas do so for the money it has spent in the past and will have to spend in the future to provide services to aliens who would not have been paroled but for the Parole Program. *See DAPA*, 809 F.3d at 186. Indeed, the Fifth Circuit rebuffed an attempt by Texas in the late 1990s to force the federal government to pay medical, educational, and criminal justice expenditures caused by immigration. *See Texas*, 106 F.3d at 663–64.

### c. Balance of hardships and public interest

187. Because this case involves governments as the parties, the final two elements, the balance of hardships and the public interest, "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord DAPA*, 809 F.3d at 187. The balance of the hardships favors Texas, and the public interest will be served by enjoining the Parole Program.

188. Without an injunction, Texas will suffer continued harm to its state budgets and interests as *parens patriae. See Franciscan Alliance, Inc. v. Burwell*, 227 F. 3d 660, 694 (N.D. Tex. 2016).

189. The harms the Defendants assert do not outweigh these harms to Texas and its residents.

190. Texas's harm is immediate, irreparable, and continuing. Texas has a significant interest in maintaining the health and safety of its residents. Conversely, the Defendants face essentially no harm from maintaining the status quo ante. *See Wages & White Lion Invs., LLC v. United States Food & Drug Admin.*, 16 F.4th 1130, 1144 (5th Cir. 2021) ("the *status quo* [is] the state of affairs before the" challenged agency action). Any inefficiency resulting from an injunction inhibiting the Defendants is outweighed by the financial losses Texas will incur. Any inefficiency resulting from an injunction against the Parole Program is "outweighed by the major financial losses [that] states face." *DAPA*, 809 F.3d at 187.

191. "[T]he public is served when the law is followed," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013), including when the Defendants obey, rather than violate, a congressional command. An injunction requiring the Defendants to do the former and forbidding the latter is thus in the public interest. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the

perpetuation of unlawful agency action."); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases) ("[T]he public interest in enforcement of the immigration laws is significant."); *cf. Nken*, 556 U.S. at 436 ("There is always a public interest in prompt execution of removal orders[.]").

### 2. Scope of injunctive relief.

#### a. Geographic scope.

192.  Under "appropriate circumstances," a federal district court has the authority "to issue a nationwide injunction." *DAPA*, 809 F.3d at 188. One such appropriate circumstance is when a nationwide injunction is necessary to ensure uniformity in immigration policies prescribed by federal law. *Id.* at 187–88; *see also E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020) ("[C]ases implicating immigration policy have a particularly strong claim for uniform, nationwide relief." (citation omitted)). Another such circumstance is when "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [the] beneficiaries [of the unlawful policy] would be free to move among states." *DAPA*, 809 F.3d at 188.

193.  Both circumstances exist here.

194.  First, the Parole Program affects national immigration policy, which is designed to be uniform. *See id.* at 187–88.

195.  Second, a geographically limited injunction cannot protect Texas from irreparable harm because aliens paroled into other States can move to Texas. *Id.* at 188.

#### b. Substantive scope.

196.  "[T]he scope of injunctive relief is dictated by the extent of the violation established." *O'Donnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018)

(quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). An injunction must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *O'Donnell v. Goodhart*, 900 F.3d 220, 224 (5th Cir. 2018) (quoting *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

197.   Here, Texas's injuries are specifically caused by the unlawful parole of aliens into the United States because of the CHNV Parole Program. It is, therefore, appropriate to enjoin the Defendants from implementing and enforcing the program. Specifically, the Court will issue a decree enjoining the Defendants; their agents, attorneys, and employees; and all those acting in concert with them, either directly or indirectly, from implementing or enacting any part of the CHNV Parole Program.

### 3. Vacatur is warranted.

198.   The CHNV Parole Program is unlawful and invalid and should be vacated in its entirety as a result.

199.   A "reviewing court shall … hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. § 706(2) (emphasis added). "[D]istrict courts have a duty to vacate unlawful agency actions." *Franciscan Alliance*, 414 F. Supp. 3d at 945.

200.   Because the Defendants have violated the APA, the Court will issue a decree vacating their invalid action.

### 4. Declaratory relief is warranted.

201.   "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

202.   The Plaintiff States have established that the CHNV Parole Program was issued in violation of the APA and are entitled to a declaration delineating the

rights and legal relations among itself and the Defendants. The Court will issue such a declaration.

### CONCLUSION AND PRAYER

The Plaintiff States request that the Court, following its trial of this matter, find the facts and reach the conclusions of law described in this filing. They further request all other relief to which they may be entitled.

Dated: September 29, 2023

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal
Strategy

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

Respectfully submitted,

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON
JAMES K. ROGERS
America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
611 Pennsylvania SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
james.rogers@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512)686-3940 (phone)
(512)686-3941 (fax)
jonathan@mitchell.law

*Counsel for the State of Texas*

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*

Raúl R. Labrador
Attorney General of Idaho
Lincoln Davis Wilson, ISB No. 11860
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
lincoln.wilson@ag.idaho.gov

*Counsel for the State of Idaho*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

Kris Kobach
Attorney General of Kansas
Jesse A. Burris, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

Jeff Landry
Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
Solicitor General
Joseph Scott St. John (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Daniel Cameron
Attorney General of Kentucky
Marc Manley
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Clark L. Hildabrand
Senior Counsel
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

Sean D. Reyes
Utah Attorney General
Melissa Holyoak
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

Patrick Morrisey
Attorney General of West Virginia
Lindsay See
Solicitor General
Michael R. Williams
Senior Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 29, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/ Ryan D. Walters*
RYAN D. WALTERS