# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | Civil Action No.: 6:23-CV-00007 |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | JUDGE DREW B. TIPTON |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants* | § | |

# INTERVENOR DEFENDANTS' RESPONSE TO
# TEXAS'S POST-TRIAL BRIEF (ECF No. 285)

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

I.  Texas Has Utterly Failed to Establish Standing................................... 3

    A.  The First Amended Complaint Controls Texas's Standing, Which Fails in Any Event. ........................................................... 3

        1.  Standing Is Determined at the Time of the Operative Complaint.......................................................................... 3

        2.  Regardless of Which Date Controls, Texas Cannot Prove Injury In Fact................................................................. 5

    B.  Texas Has Failed to Prove Injury In Fact. ................................... 7

        1.  Texas Has Failed to Meet Its Burden of Proof at Each Successive Stage of Litigation......................................... 7

        2.  This Court Should Reject Texas's Eleventh-Hour Attempt to Introduce Extra-Record Data................................... 10

        3.  Even if This Court Accepts Texas's Extra-Record Data, Texas Has Failed to Prove Standing. ........................... 13

            a.  The New Data Illustrates the Unprecedented Effects of the CHNV Pathways, Including an Ongoing Net Reduction in Migration............................ 13

            b.  Regardless of Net Migration, Texas Has Still Not Proven Harm from the CHNV Pathways........................ 19

    C.  Texas Has Not Proven Injury Traceable to the CHNV Pathways or Redressable by a Court Order. ........................................... 24

    D.  Neither "Abdication" nor Special Solicitude Can Create Article III Standing for Texas. ............................................................ 27

        1.  Texas's Ahistorical Abdication Arguments Are Meritless. ........ 27

        2.  Texas Cannot Claim Special Solicitude to Overcome a Meritless Claim for Standing....................................... 31

II.   On the Merits, Texas Fails to Demonstrate How the CHNV Pathways Differ in Any Meaningful Way from Past and Ongoing Lawful Uses of the Statutory Parole Authority. ........................................................ 34

    A.   The CHNV Pathways Are Consistent with Statutory Parole Authority, and Texas's Arguments to the Contrary Are Inapposite. ....................................................................................... 34

        1.   Texas Has No Support for Its Assertion That Parole Under § 1182(d)(5) Is and Has Always Been Limited to Medical Emergencies and Criminal Prosecutions...................... 37

        2.   Texas's Argument That the CHNV Pathways Cannot Be Justified Under the Statute's "Significant Public Benefit" Prong Is Both Irrelevant and Wrong. ......................................... 40

        3.   The CHNV Pathways Do Not Violate the Statutory Requirement That Grants of Parole Be Temporary................... 47

    B.   Texas's Major Questions Argument Ignores Legal Precedent and Misleads the Court. ................................................................... 50

    C.   Texas Has Failed to Prove the CHNV Pathways Are Not the Product of Reasoned Decision-Making. ................................. 54

III.  Texas Seeks an Extreme and Unwarranted Scope of Relief. ......................... 55

    A.   Texas has Not Shown Harm That Warrants a Nationwide Injunction................................................................................ 55

    B.   Texas Has Entirely Failed to Address Harms to Intervenor Defendants and to the Public Interest. ................................. 59

    C.   Vacatur Is Not Warranted Where Remand Without Vacatur Would Be Sufficient................................................................ 63

CONCLUSION............................................................................................. 67

## TABLE OF AUTHORITIES

**Page**

### Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ...................................................................... 33

*Ball v. LeBlanc,*
792 F.3d 584 (5th Cir. 2015) ....................................................... 12

*Benisek v. Lamone,*
138 S. Ct. 1942 (2018) ................................................................. 58

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ................................................................. 24

*Biden v. Texas,*
142 S. Ct. 2528 (2022) ......................................... 21, 24, 28, 29, 30, 46

*Boelens v. Redman Homes, Inc.,*
759 F.2d 504 (5th Cir. 1985) ......................................................... 3

*California v. Texas,*
141 S. Ct. 2104 (2021) ................................................................. 31

*Cent. & S.W. Servs., Inc. v. EPA,*
220 F.3d 683 (5th Cir. 2000) ....................................................... 64

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1984) ...................................................................... 10

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .......................................................... 9, 10, 24

*Cleveland Branch, NAACP v. City of Parma,*
263 F.3d 513 (6th Cir. 2001) ......................................................... 5

*Cnty. of Riverside v. McLaughlin,*
500 U.S. 44 (1991) ....................................................................... 3

*Crane v. Johnson,*
783 F.3d 244 (5th Cir. 2015) ....................................................... 28

*Crawford v. Hinds Cnty. Bd. of Supervisors,*
1 F.4th 371 (5th Cir. 2021) .......................................................... 10

*Davis v. FEC,*
554 U.S. 724 (2008) ................................................................. 7

*Department of Commerce v. New York,*
139 S. Ct. 2551 (2019) ...................................................... 25, 32

*Dep't of Homeland Sec. v. New York,*
140 S. Ct. 599 (2020) ............................................................. 59

*E.T. v. Paxton,*
19 F.4th 760 (5th Cir. 2021) ................................................. 20

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,*
968 F.3d 357 (5th Cir. 2020) ................................................ 10

*Feds for Med. Freedom v. Biden,*
63 F.4th 366 (5th Cir. 2023) ........................................... 58, 59

*Florida v. Mayorkas,*
No. 3:23-cv-9962, 2023 WL 3398099
(N.D. Fla. May 11, 2023) ...................................................... 22

*Florida v. United States,*
No. 3:21-cv-1066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) ............ 22

*Funk v. Stryker Corp.,*
631 F.3d 777 (2011) .............................................................. 13

*Gill v. Whitford,*
138 S. Ct. 1916 (2018) ..................................................... 58, 59

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) .............................................................. 38

*Holder v. Humanitarian Law Project,*
561 U.S. 1, 34 (2010) ....................................................... 62, 63

*Holland Am. Ins. Co. v. Succession of Roy,*
777 F.2d 992 (5th Cir. 1985) ........................................... 56, 60

*JJ Plank Co., LLC v. Bowman,*
No. CV 18-0798, 2018 WL 4291751 (W.D. La. Sept. 7, 2018) .............. 13

*Kitty Hawk Aircargo, Inc. v. Chao,*
418 F.3d 453 (5th Cir. 2005) .................................................. 4

*Lewis v. Casey,*
    518 U.S. 343 (1996) ........................................................................ 8

*Louisiana v. Biden,*
    64 F.4th 674 (5th Cir. 2023) ...................................................... 31

*Louisiana v. Nat'l Oceanic & Atmospheric Admin.,*
    70 F.4th 872 (5th Cir. 2023) ...................................................... 31

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................... 7, 8, 9, 16

*Lynch v. Leis,*
    382 F.3d 642 (6th Cir. 2004) ...................................................... 5

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .................................................................. 32

*Missouri v. Biden,*
    No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) ................... 58, 59

*Nat. Res. Def. Council, Inc. v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007)................................................... 66

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) ................................................... 66

*O'Reilly v. U.S. Army Corps of Eng'rs,*
    477 F.3d 225 (5th Cir. 2007) ........................................... 63, 64, 66

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) .................................................................. 24

*Rivera v. Marriott Int'l, Inc.,*
    456 F. Supp. 3d 330 (D.P.R. 2020)........................................... 13, 19

*Rockwell International Corp. v. United States,*
    549 U.S. 457 (2007) .................................................................. 3-4

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) .................................................................... 63

*Sebelius v. Cloer,*
    569 U.S. 369 (2013) .................................................................. 41

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .................................................................... 9

v

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021) ....................................................... 63, 64, 66

*Texas v. Biden,*
    No. 6:22-CV-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) ....................... 59

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ................................................................ 21

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ................................................... 21, 28, 64

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ................................................................ 27

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .................................................... 21, 28, 60

*Texas v. United States,*
    86. F. Supp 3d 591 (S.D. Tex. 2015) ...................................................... 28

*Texas General Land Office v. Biden,*
    71 F.4th 264 (5th Cir. 2023) ................................................................. 4

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ....................................................................... 7

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...................................................................... 58

*Trump v. New York,*
    141 S. Ct. 530 (2020) ....................................................................... 32

*Turkiye Halk Bankasi A.S. v. United States,*
    598 U.S. 264 (2023) ......................................................................... 42

*United States v. Sineneng-Smith,*
    140 S. Ct. 1575 (2020) ................................................................. 37, 41

*United States v. Texas,*
    143 S. Ct. 1964 (2023) ...................................... 21, 23, 24, 26, 27, 28, 31, 32, 34

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) ......................................................................... 46

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ...................................................................... 53

vi

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ..................................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................. 56, 58

## Statutes

8 C.F.R. § 208.16 ..................................................................... 52

8 U.S.C. § 1101 ........................................................................ 52

8 U.S.C. § 1158 ........................................................................ 51

8 U.S.C. § 1182(d)(5) ........................................... 30, 35, 36, 51, 52, 53

8 U.S.C. § 1201 ........................................................................ 51

8 U.S.C. § 1202 ........................................................................ 51

8 U.S.C. § 1229(b) .................................................................... 52

8 U.S.C. § 1231(b)(3) ................................................................ 52

8 U.S.C. § 1254a ...................................................................... 52

18 U.S.C. § 1621 ...................................................................... 53

Administrative Procedure Act .................................... 9, 28, 33, 54

Cuban Adjustment Act ............................................... 48, 49, 55

IIRIRA ..................................................... 34, 44, 45, 48, 49

William Wilberforce Trafficking Victims Protection Reauthorization
  Act of 2008, Pub. L. No. 110-457, § 235(d), 122 Stat. 5044 (2008) ...................... 52

## Other Authorities

47 Fed. Reg. 30044 .................................................................. 38

47 Fed. Reg. 30045 .................................................................. 38

87 Fed. Reg. at 6350 ................................................................ 46

87 Fed. Reg. at 63507 ........................................................... 30, 62

87 Fed. Reg. at 63508 ........................................................... 30, 41

88 Fed. Reg. at 1243 ............................................................................. 30, 46, 62

88 Fed. Reg. at 1248 ...................................................................................... 41

88 Fed. Reg. at 1255 ............................................................................. 30, 46, 62

88 Fed. Reg. at 1256 .................................................................................. 30, 41

88 Fed. Reg. at 1266 ............................................................................. 30, 46, 62

88 Fed. Reg. at 1267 ...................................................................................... 30

88 Fed. Reg. at 1268 ...................................................................................... 41

88 Fed. Reg. at 1279 ...................................................................................... 62

88 Fed. Reg. at 6350 ...................................................................................... 46

David Bier, *126 Parole Orders Over 7 Decades: A Historical Review of
     Immigration Parole Orders* (July 17, 2023), Cato Institute,
     https://www.cato.org/blog/126-parole-orders-over-7-decades-
     historical-review-immigration-parole-orders ...................................................... 45

Detention and Parole of Inadmissible Aliens; Interim Rule with
     Request for Comments, 47 Fed. Reg. 30044, 30044–45 (July 9, 1982) ............... 38

*Guidance on Evidence for Certain Types of Humanitarian or
     Significant Public Benefit Parole Requests*, U.S. Citizenship and
     Immigration Services,
     https://www.uscis.gov/humanitarian/humanitarian-parole/guidance-
     on-evidence-for-certain-types-of-humanitarian-or-significant-public-
     benefit-parole-requests (last visited Oct. 26, 2023) ...................................... 39, 40

H.R. Rep. No. 104-469 (1996) ......................................................................... 38, 48-49

*Humanitarian or Significant Public Benefit Parole for Individuals
     Outside the United States*, U.S. Citizenship and Immigration
     Services, https://www.uscis.gov/humanitarian/humanitarian_parole
     (last visited Oct. 26, 2023) ........................................................................... 40

*Nationwide Encounters*, U.S. CBP,
     https://www.cbp.gov/newsroom/stats/nationwide-encounters ............................. 16

*Stats and Summaries*, U.S. CBP,
     https://www.cbp.gov/newsroom/stats#:~:text=OFO%20is%20the%20
     law%20enforcement,including%20facilitating%20lawful%20interna
     tional%20travel (last modified Sep. 8, 2023)...................................................... 18

Julie Turkewitz & Isayen Herrera, *Why Are So Many Venezuelans Going to the United States*, N.Y. Times (Sep. 24, 2023), https://www.nytimes.com/2023/09/24/world/americas/why-are-so-many-venezuelans-going-to-the-united-states.html ............................................. 17

*United States*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/humanitarian_parole (last visited Oct. 26, 2023) ............................................................................ 40

*Venezuela Travel Advisory*, U.S. Department of State (July 17, 2023), https://travel.state.gov/content/travel/en/traveladvisories/traveladvi sories/venezuela-travel-advisory.html.................................................. 17

## INTRODUCTION

Texas's post-trial arguments confirm what Intervenor Defendants have pressed throughout this case: Texas cannot win the relief it seeks because the CHNV Pathways do not injure Texas and they comport with clear congressional authority. In contrast, an order enjoining or vacating the CHNV Pathways would not only harm Texas, but it would be devastating for people across the country, including Intervenor Defendants and countless others like them who are eager to sponsor their loved ones and global neighbors.

Once more, Texas has utterly failed to prove standing on the record before this Court. Instead, unable to grapple with the evidence in this case, Texas stumbles over itself to urge the Court to impute standing by looking to unrelated cases with entirely distinct records, many of which predate and are at odds with recent Supreme Court precedent. When that, too, fails, Texas attempts to salvage its case by inviting this Court to blind itself to the *trial record* that wholly disproves Texas's standing, but to simultaneously accept extraneous *posttrial* data devoid of procedural safeguards and critical context. The Court must refuse Texas's self-serving invitation.

Texas's merits arguments fare no better. Texas is incapable of squaring its theory that the CHNV Pathways contravene law with the record in this case demonstrating that for decades, presidential administrations of both parties have adopted, and Congress has acceded to, materially indistinguishable parole programs. Indeed, Texas urges the Court to be the *first in history* to invalidate a parole program of this kind by ignoring reality and instead considering the CHNV Pathways through the lens of failed amendments and limitations that simply do not exist in the law.

1

Again, the Court must reject Texas's ahistorical reading of the parole authority and its attempt to rewrite duly passed federal statutes.

On its requested relief, Texas again makes no effort to prove with evidence *in this case* that it is entitled to an extraordinary nationwide injunction. It does even less to engage, as it is required to do, with the immeasurable harm that blocking the CHNV Pathways would create for Intervenor Defendants and for the public interest more broadly.

Texas's requested relief would eliminate the life-changing opportunities that the CHNV Pathways provide for Intervenor Defendants, program beneficiaries like them, and communities across the United States. Enjoining the CHNV Pathways would extinguish Intervenor Defendant Paul Zito's opportunity to answer a "calling from God" by sponsoring his close friend and brother in faith, Abel, whom he sees as a "brother in need." Declaration of Paul Zito, Int. Defs' Trial Ex. 129 at ¶ 14. Families across the United States would be unable to reunite as Intervenor Defendant Valerie Laveus has done with her brother and nephew who, before the CHNV Pathways, were trapped in unspeakable conditions in Haiti. Declaration of Anne Valerie Daniel-Laveus, Int. Defs' Trial Ex. 121 at ¶¶ 5, 8–11. Indeed, enjoining the CHNV Pathways would block the ability of countless individuals across the country to exercise deeply held religious beliefs, reunify with their families, protect the lives of loved ones, and create economic opportunities for individuals and communities in need. Absent Texas's showing of harm, longstanding equitable principles do not permit this Court to enjoin the CHNV Pathways even in Texas, let alone nationwide.

Nor has Texas proven that it is entitled to nationwide vacatur where remand without vacatur would allow Federal Defendants to cure any defects without disrupting foreign relations, national security, and the lives of tens of thousands of individuals—among them Intervenor Defendants in this case.

Texas has failed to prove its case at every step and this Court must deny its requested relief.

## ARGUMENT

### I.   Texas Has Utterly Failed to Establish Standing.

#### A.   The First Amended Complaint Controls Texas's Standing, Which Fails in Any Event.

##### 1.   <u>Standing Is Determined at the Time of the Operative Complaint.</u>

The flaws in Texas's standing claims begin at the very first step of the analysis and cascade down from there. Standing is determined at the time of the operative complaint, which here is the First Amended Complaint ("FAC"), ECF No. 20, filed on February 14, 2023. Texas' arguments to the contrary are unavailing.

Binding circuit and Supreme Court precedent establish that because "the general rule [is] that an amended complaint ordinarily supersedes the original and renders it of no legal effect," courts "must look to the amended complaint" on jurisdictional questions, which include standing. *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (considering "*the time the second amended complaint was filed*" in determining that "*at that moment*," plaintiffs had a cognizable injury (emphases added)). Notwithstanding Texas's selective excerpts, *Rockwell International Corp. v.*

*United States* supports this position: "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." 549 U.S. 457, 473–74 (2007). There, the Supreme Court *rejected* the argument Texas advances here: that the lower court could only look to the original complaint to determine subject matter jurisdiction. *See id.* This Court need not look to out-of-circuit cases to determine what binding Fifth Circuit and Supreme Court precedent have already instructed: the amended complaint is operative for purposes of determining standing.

The Fifth Circuit cases Texas would have this Court rely on do not address the specific question of when standing is determined in cases in which an operative complaint is temporally set apart from the initial filing. *See* Plaintiff States' Supplemental Brief, ECF No. 285 ("Texas's Post-Trial Brief") at 2. For example, Texas attempts to rely on *Kitty Hawk Aircargo, Inc. v. Chao*, but that case does not include any discussion of an amended complaint. *See* 418 F.3d 453 (5th Cir. 2005). It stands only for the proposition that "[t]he party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the [operative] complaint to establish its standing," which, in *Kitty Hawk*, was the *only* complaint—the original complaint. *Id.* at 460. Similarly, in *Texas General Land Office v. Biden*, the Fifth Circuit looked to the date of the second complaint filed in a consolidated case and simply held that a border wall plan that *postdated the second complaint* could not be considered to defeat standing. *See* 71 F.4th 264, 272 n.12 (5th Cir. 2023).

4

Texas's reliance on out-of-circuit cases also fails. *See* Texas's Post-Trial Brief at 2. For example, in *Lynch v. Leis*, the Sixth Circuit did not look to the time of the original complaint; instead, the court noted that "[s]tanding 'is to be determined as of the time the complaint is filed'" and ultimately determined that, because of nuances undisputedly not at issue in this case, the Second Amended Complaint (rather than the Third or the original) was operative for purposes of determining standing. 382 F.3d 642, 647 (6th Cir. 2004) (quoting *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001)).

Texas strains to argue that the date of the *original* complaint, January 24, 2023, controls, presumably to advance its view that pre-enforcement challenges are somehow exempt from standing requirements. Texas is wrong; because the FAC superseded the original complaint, the relevant date for the Court's standing analysis is February 14, 2023. Moreover, it does not matter because Texas cannot establish standing as of either date. As explained further below, by the end of January 2023 total migration from CHNV countries was at record lows, and this drop only continued into February 2023. This is fatal to Texas's case.

> 2.   <u>Regardless of Which Date Controls, Texas Cannot Prove Injury In Fact.</u>

The record data unequivocally proves that between December 2022 and January 2023—when the CHNV Pathways were announced and when Texas filed this lawsuit—total migration of individuals from CHNV countries was down by a record-breaking reduction. *See* U.S. Customs and Border Protection ("U.S. CBP") Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 53 (reflecting a

drop from 91,369 land border encounters of individuals from CHNV countries in December 2022 to 22,120 in January 2023); Declaration of Blas Nuñez-Neto ("Nuñez-Neto Decl."), Fed. Defs' Trial Ex. HH at ¶ 31, n.16 ("[T]otal CHNV arrivals fell to approximately 1,326 per day, a 44 percent reduction from their pre-CHNV process levels."); Memorandum of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief ("Economist Amici Curiae in Opp. to Pls' P.I."), ECF No. 222 at 10–11 ("January 2023 marked the largest monthly drop in Cuban, Haitian, and Nicaraguan [total] migration in the history of DHS's data—more than *doubling* the previous record decline." (emphasis in original)).[1]

Those declines continued into February 2023. *See, e.g.*, U.S. CBP Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 53 (reflecting a continued decline in land border encounters of individuals from CHNV countries from 22,120 in January to 14,382 in February 2023).

Regardless of which is the controlling complaint, the original, ECF No. 1, filed January 24, 2023, or the FAC, ECF No. 20, filed February 14, 2023, the record evidence reflects a net reduction in migration of individuals from CHNV countries through each relevant period and thus Texas has failed to prove injury in fact.

---

[1] *See also* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶ 20 ("Within a week of the announcement of the Venezuelan process on October 12, 2022, the number of Venezuelans encountered at the SWB fell sharply, from an average of over 1,100 a day from October 5–11 to under 200 per day from October 18–24, and . . . 28 per day the week ending January 22, 2023.").

**B.      Texas Has Failed to Prove Injury In Fact.**

      1.      <u>Texas Has Failed to Meet Its Burden of Proof at Each Successive Stage of Litigation.</u>

Texas has utterly failed to meet its burden to prove standing as the litigation has progressed. Because this case has proceeded to trial, "the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (internal quotation marks omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (holding the party bearing the burden of proving jurisdiction must do so "with the manner and degree of evidence required at the successive stages of the litigation"). Here, the evidence adduced at trial categorically *disproves* Texas's allegations of harm. And the Court cannot accept Texas' invitation to find standing despite *no* evidence of existing harm and based on the records of *other* cases at this late stage of the litigation.

Texas acknowledges that "the proof required to establish standing increases as the suit proceeds," Texas's Post-Trial Brief at 1 (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)) (internal quotation marks omitted). Yet it has done *nothing* to prove that the CHNV Pathways would cause "the number of illegal aliens in Texas [to] increase[]," [2] which would in turn cause Texas to spend more money on education, healthcare, and social services, as it pled in its FAC. ECF No. 20 at ¶ 64. This, despite

---

[2] Here and *infra* at 25, Intervenor Defendants depart from their practice of replacing terminology for noncitizens and immigrants that they find pejorative in order to precisely state Texas's allegations.

having had numerous opportunities to do so, including during discovery; in response to Intervenor Defendants' attempt to compel responsive discovery, *see* Pls' Response to Int. Defs' Advisory, ECF No. 178 at 4; when it filed its trial witness and exhibit list, Pls' Exhibit and Witness List, ECF No. 260; in response to Intervenor Defendants' Motion to Dismiss, ECF No. 197; and at trial. Texas has thus failed to prove standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan*, 504 U.S. at 561) (internal quotations omitted).

What is more, Texas still fails to address or refute the extensive record evidence *disproving* its standing claims. As discussed, *supra* Section I(A)(2), Texas cannot demonstrate that the CHNV Pathways lead to increased migration into the state of Texas because the trial evidence shows a net reduction in migration of people from CHNV countries since the inception of the CHNV Pathways. *See, e.g.*, U.S. CBP Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 53 (reflecting a significant drop in land border encounters of individuals from CHNV countries between December 2022 and January 2023). Thus, "[b]y [Texas's] own argument, the huge drop in CHNV migration since December 2022 must mean the States spent less money on newly arrived CHNV nationals than they did before the Program went into effect. . . . Texas thus reaps fiscal benefits—not harms—from the Program." Economist Amici Curiae in Opp. to Pls' P.I., ECF No. 222 at 13. Moreover, and critically, Texas has failed to demonstrate that *even if* the CHNV Pathways caused increased net migration to the state, costs to Texas would increase as a result. Indeed,

Texas cannot do so. The trial record shows Texas has failed to prove net costs associated with its alleged harms from the provision of social services to CHNV parolees, *see infra* Section I(B)(3)(b), even after this Court put Texas "on notice" that "net costs as opposed to gross costs . . . [is] an issue," July 7, 2023 Pre-Mot. Conference and Mot. Hr'g Tr. 27:17–28:5.

Rather than address the record evidence, Texas simply disclaims its burden of proof altogether by suggesting that because Administrative Procedure Act ("APA") cases often have "no evidence" of injury, it need provide none. *See* Texas's Post-Trial Brief at 3. No such APA exception to standing exists. Moreover, in this case, there *is* extensive record evidence which disproves Texas's theory of standing. And while Texas seeks prospective relief, it still must prove that a future injury due to the CHNV Pathways is "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotations omitted). At this stage, Texas "can no longer rest on mere allegations, but must set forth by . . . evidence" its injury in fact. *See id.* at 412 (citing *Lujan*, 504 U.S. at 561) (internal quotation marks omitted). Texas's position illuminates the indispensable nature of this requirement: its efforts to diminish this standard to require "no evidence" simply because it plead prospective injury has no limiting principle. *See* Texas's Post-Trial Brief at 3. By Texas's logic, *any* claim for prospective relief would have essentially no burden of proof. But that is not the law. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a

'substantial risk' that the harm will occur." (quoting *Clapper*, 568 U.S. at 409, 414, n.5)); *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1984) (finding no standing due to the "speculative nature" of claims of future harm).

Scrambling to support its claims, Texas next recognizes that evidence of prior wrongs "do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy," Texas's Post-Trial Brief at 3 (quoting *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021)) (internal quotations omitted), yet in the same breath, incoherently concludes "[t]hat Texas's evidence of injury pre-dat[ing] the Parole Program is sufficient for standing in such a context." Texas's Post-Trial Brief at 3. First, Texas's statement is contradictory. More importantly, Texas's conclusory assertion cannot suffice to establish standing where Intervenor Defendants' unrefuted evidence lays bare the irrelevance of and flaws with Texas's outdated data. *Compare* Texas's Post-Trial Brief at 4–7 *with infra* note 7.

"Because this case was tried, Plaintiffs need[] to prove standing by a preponderance of the evidence." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020). Texas has failed to do so.

### 2.    This Court Should Reject Texas's Eleventh-Hour Attempt to Introduce Extra-Record Data.

Incapable of proving standing on the trial record, Texas now asks this Court to look to *extra-record* data to save its case (while hypocritically also urging the Court *not* to look to "post-filing numbers of migrant flows," Texas's Post-Trial Brief at 2). *Id.* at 7. Texas effectively asks this Court to replace *trial record evidence that*

10

*disproves standing* with extraneous post-trial data, in a manner devoid of critical procedural safeguards, fairness, and context. The Court must reject Texas's invitation.

As an initial matter, permitting Texas to now supplement the trial record with extra-record data would be a sharp departure from the Court's earlier decision declining Texas's request at trial to rely on extra-record data. Trial Tr. vol. 1 of 2 at 14:17–15:1 ("I have never had a trial close and had supplemental evidence submitted post-trial. . . . I don't know how I receive data after the record is closed. . . . So at this point, I am not inclined to accept as part of the trial record."); Trial Tr. vol. 2 of 2 at 148:23–25 ("I have already denied the States the opportunity to supplement the record . . ..."). As Federal Defendants noted at trial, "the line has to be drawn somewhere," Trial Tr. vol. 1 of 2 at 8:3, and the Court unequivocally drew that line at trial. Trial Tr. vol. 1 of 2 at 89:18–19 ("[T]he record is officially closed.").

Permitting Texas to disregard the rules of trial would be fundamentally unfair to Intervenor Defendants, who have closely observed this Court's scheduling orders and availed themselves of established procedures, which give all parties an opportunity to be heard, to ensure their trial record was complete. *See, e.g.*, Int. Defs' Mot. to Reconsider or Clarify, ECF No. 225 (seeking reconsideration of Court order excluding evidence from trial record, including U.S. CBP data); Pls' Opp. to Int. Defs" Mot. to Reconsider, ECF No. 226. That unfairness would be particularly acute in light of the Court's denial of a request from Intervenor Defendants to similarly supplement their exhibit list with data that was in existence and publicly available before trial.

Order on Mot. to Reconsider or Clarify, ECF No. 231 at 2 ("As to the three additional exhibits offered by the Intervenor Defendants that were not part of their prior briefing and were not identified by the deadline in the Court's Scheduling Order, those are untimely."). Permitting Texas to alter the record now would also render meaningless this Court's pre-trial and trial procedures concerning exhibit lists and evidentiary arguments; what would be the value of those exercises if parties could simply inject any of the universe of data and documents available on the internet after trial?

In addition to being wholly outside of the trial record, the data on which Texas now seeks to rely postdates trial. But if Texas had wanted to rely on data from July and August in this case, it could and should have agreed to Defendants' requests to extend the trial date. *See, e.g.*, Defs' Joint Mot. to Amend Scheduling Order, ECF No. 181 (noting Texas's opposition to Federal and Intervenor Defendants' joint request). Instead, Texas wants to have its cake and eat it too: rush to trial at the expense of the other litigants, but lean on a record that neither the Court nor Defendants had the opportunity to interrogate during the pre-trial conference and two-day trial.

Nor does judicial notice create a catch-all exemption where, as here, the proffered evidence would prejudice other parties or "alter[] the outcome." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (rejecting challenge to judicial notice where defendant's explanation of prejudice was "vague, cursory, and unpersuasive" and made "no showing that the district court's consideration of the [supplemental evidence] altered the outcome."). Judicially noticing the extraneous evidence now

would contravene "equity and fairness" where the "evidence should have been produced no later than the hearing, not as part of the post-hearing briefing." *JJ Plank Co., LLC v. Bowman*, No. CV 18-0798, 2018 WL 4291751, at *4 (W.D. La. Sept. 7, 2018) (granting motion to strike reference to information available on publicly available websites offered for the first time in briefing after a preliminary injunction motion hearing). Indeed, "accepting disputed evidence not tested in the crucible of trial is a sharp departure from standard practice." *Rivera v. Marriott Int'l, Inc.*, 456 F. Supp. 3d 330, 337 (D.P.R. 2020) (internal citation omitted).

The single case Texas cites in inviting the Court to so depart is inapposite. In *Funk v. Stryker Corp.*, the Fifth Circuit held that *at the motion to dismiss stage*, the district court's taking judicial notice of publicly available documents was appropriate and did not convert the motion to dismiss into a motion for summary judgment. *See* 631 F.3d 777, 783 (2011). That case has no bearing here, where the trial record has closed, the parties litigated the evidence in the record at trial, and the parties are now in post-trial briefing to conclude arguments based on the evidence in the record.

3.      <u>Even if This Court Accepts Texas's Extra-Record Data, Texas Has Failed to Prove Standing.</u>

a.      *The New Data Illustrates the Unprecedented Effects of the CHNV Pathways, Including an Ongoing Net Reduction in Migration.*

Even if this Court permits Texas to unilaterally reopen the record after the close of trial, which it should not, the Court still must reject Texas's mischaracterizations of the post-trial data.

First, Texas boldly misleads this Court by saying that August 2023 numbers "rebounded to their pre-CHNV levels," Texas's Post-Trial Brief at 8, where Texas's own extra-record graph contradicts its claim. Total migration of individuals from CHNV countries remains significantly lower—by over 20,000 individuals per month—than it was before implementation of the CHNV Pathways in January 2023. *Id.* Yet again, this fact alone defeats Texas's standing; where the CHNV Pathways have reduced total migration from the pre-CHNV Pathways levels, Texas has suffered no harm, regardless of any recent changes in migration trends.

Second, seasonal variation in migration is no answer for the dramatic impact that the CHNV Pathways had on encounters of individuals from Cuba, Haiti, and Nicaragua ("CHN") following implementation of the CHNV Pathways. "The reduction [in the number of CHN nationals encountered between ports of entry] occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop[.]" Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶ 26. As Economist Amici identified, *total* encounters of individuals from CHN countries dropped from over 80,000 in December 2022 to about 20,000 in January 2023. ECF No. 222 at 11. One year earlier, encounters for the same population had fallen "only slightly" from December 2021 to January 2022, and they *rose* 38 percent from December 2020 to January 2021. *Id.* at 11 n.9; *see also* Technical App., ECF No. 222-1 ¶ 7. The "hot Texas sun," Texas's Post-Trial Brief at 12, is simply no explanation for the truly unprecedented drop in total migration of people from CHNV countries in the winter months of December 2022 and January 2023, as demonstrated by Texas's own extra-

record graph. *See id.* at 8. Nor is the "hot Texas sun" an answer for why total non-CHNV apprehensions rose sharply between June and July 2023 but CHNV apprehensions continued to trend in the opposite direction during the same period. *Compare* graph, *id.* at 8, *with* graph, *id.* at 12.

Indeed, Texas's oversimplification ignores the reality that the impact of the CHNV Pathways can be best observed by looking to the data about migration from Venezuela immediately following implementation of the Pathways for Venezuela in October and November 2022, compared to January and February 2023 for Cuba, Haiti, and Nicaragua. The evidence already in the record proves that the Pathways resulted in a precipitous drop in migration directly following implementation of the Pathways for the respective countries—precisely the moment when the impact of the Pathways themselves, as opposed to the myriad other factors influencing migration patterns, can best be evaluated. *See supra* Section I(A)(2).

Texas urges this Court to derive standing by looking to absolute numbers from August 2023 *only*—and in a vacuum devoid of context. But the intervening *ten* months since the implementation of the Pathways for Venezuela have seen numerous additional external factors that may be affecting Venezuelan migration, and Texas has introduced no evidence to disaggregate the impact of the CHNV Pathways from that of other factors on Venezuelan migration.[3] Indeed, Texas's argument that it is "implausible" that the CHNV Pathways were "the cause of reduced migrant flows," following implementation of the CHNV Pathways, Texas's Post-Trial Brief at 12, cuts

---

[3] *See infra* note 5.

15

both ways, and is fatal for Texas. Texas spills considerable ink detailing what it considers external factors that could have led to changes in migration patterns *immediately* following implementation of the CHNV Pathways. *Id.* at 12–15. But by that same admission, it is even less plausible that Texas can prove that the CHNV Pathways have caused any alleged post-trial increased migration to Texas or anywhere in the United States a whopping *ten months* following their implementation. Because Texas bears the burden of proof, *Lujan*, 504 U.S. at 560, this alone defeats standing.

Finally, Texas's extra-record graphs, Texas's Post-Trial Brief at 8–12, oversimplify recent trends, and in particular, context specific to Venezuela, including, as discussed, its earlier implementation date and recent growing unrest in that country. In reality, when data for Venezuela is disaggregated, the CHN data still prove that the CHNV Pathways have maintained a consistent, drastic reduction in the number of people making the perilous trek to the southern border. Data concerning Border Patrol apprehensions for individuals from CHN countries reflect a consistent reduction from 79,370 in December 2022 to 11,072 in January 2023, 880 in February 2023, and 1,436 in August 2023. *Nationwide Encounters*, U.S. CBP, https://www.cbp.gov/newsroom/stats/nationwide-encounters (FY: select "2022" and "2023;" Region: select "Southwest Land Border;" Citizenship: select "Cuba," "Haiti," and "Nicaragua;" Component: select "U.S. Border Patrol.").[4] The fiscal year 2023 data

---

[4] As discussed in this brief, and in Intervenor Defendants' simultaneously filed Motion to Strike, Intervenor Defendants vehemently oppose Texas's attempt to inject

is a drastic departure from higher numbers and variations reflected in the graph for fiscal year 2022, further disproving Texas's argument about ordinary seasonal migration and *proving* what Defendants have pressed throughout this case: setting aside the growing unrest in Venezuela,[5] the CHNV Pathways have drastically

---

extra-record evidence at this stage of litigation, including by requesting judicial notice of post-trial data. However, to the extent the Court is inclined to take judicial notice of the data Texas has now offered, Intervenor Defendants request the Court do the same for the post-trial data cited here and other publicly available sources offered in notes 5 and 6.

[5] As of July 17, 2023, the U.S. Department of State has issued a "Level 4" travel warning: "Do not travel to Venezuela due to crime, civil unrest, kidnapping, and the arbitrary enforcement of local laws. Reconsider travel due to wrongful detentions, terrorism, and poor health infrastructure." *Venezuela Travel Advisory*, U.S. Department of State (July 17, 2023), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html. For Venezuelans, the "health care situation is dire. . . . electricity and gasoline shortages . . . continue because of the country's deteriorating infrastructure. Caracas, the capital, has suffered almost daily electricity cuts in the last year, while lines for subsidized gasoline last up to six hours." Julie Turkewitz & Isayen Herrera, *Why Are So Many Venezuelans Going to the United States*, N.Y. Times (Sep. 24, 2023), https://www.nytimes.com/2023/09/24/world/americas/why-are-so-many-venezuelans-going-to-the-united-states.html.

reduced and *maintained* a reduction in irregular migration of individuals from the impacted countries.[6] *Id.*



These nuances further underscore why Texas should not be permitted to inject this data into the record after trial and confirm why the opportunity to thoroughly

---

[6] Filtering for apprehensions made exclusively by CBP component agency U.S. Border Patrol, rather than grouping with those made by the Office of Field Operations, is critical to discern the number of individuals migrating irregularly between ports of entry. The Office of Field Operations has "broad law enforcement authorities" at official "ports of entry," whereas U.S. Border Patrol is "responsible for securing U.S. borders between ports of entry." *Stats and Summaries*, U.S. CBP, https://www.cbp.gov/newsroom/stats#:~:text=OFO%20is%20the%20law%20enforce ment,including%20facilitating%20lawful%20international%20travel (last modified Sep. 8, 2023).

analyze and interrogate data "in the crucible of trial" is critical. *Rivera*, 456 F. Supp. 3d at 337.

In short, even *if* this Court is persuaded to consider Texas's extra-record post-trial data, Texas has still failed to prove standing.

> b. *Regardless of Net Migration, Texas Has Still Not Proven Harm from the CHNV Pathways.*

As discussed, Texas has utterly failed to meet its burden to *prove* its standing claims, instead urging this Court to turn a blind eye to the record in this case and impute its standing based upon other cases with entirely different records. Critically, Texas has failed to demonstrate that *even if* the CHNV Pathways caused increased net migration to the state, costs to Texas would increase as a result. Indeed, Texas cannot do so. The trial record shows Texas has failed to prove net costs associated with its alleged harms from the provision of social services to CHNV parolees.[7]

Texas's arguments concerning driver's licenses illustrate this point. First, Texas argues that regardless of a net decrease in migration, it is injured because

---

[7] *See, e.g.*, Expert Declaration of Cyierra Roldan ("Roldan Expert Decl."), Int. Defs' Trial Ex. 140 at ¶ 25 ("Texas's statement about being overburdened, does not factor in the fees paid by people who apply for the licenses. Texas charges $33 per person for a new Class A, B, or C driver's license . . . ."); Joint Expert Declaration of Patricia Gándara and Gary Orfield ("Gándara and Orfield Joint Expert Decl."), Int. Defs' Trial Ex. 136 at ¶¶ 17–19 (noting the ways in which Texas ignores federal compensation received for education funds and other offsetting benefits); Expert Declaration of Leighton Ku ("Ku Expert Decl."), Int. Defs' Trial Ex. 138 at ¶¶ 12–14 (pointing out the accounting errors in Texas's healthcare cost calculations); Expert Declaration of Charis Kubrin ("Kubrin Expert Decl."), Int. Defs' Trial Ex. 139 at ¶ 19 (noting the findings supporting a negative relationship between immigration and crime); Expert Declaration of Jennifer Hunt ("Hunt Expert Decl."), Int. Defs' Trial Ex. 137 at ¶ 7 ("[I]t is the consensus of the NAS panel of experts that the inflow of foreign-born workers . . . is integral to the nation's economic growth.").

migrants "who enter the country through catch-and-release or by crossing the border illegally" are not eligible for driver's licenses, while the CHNV Pathways allow individuals who are eligible for driver's licenses into Texas. Texas's Post-Trial Brief at 4–5.[8] This argument fails. The reduction in net migration Federal Defendants point to *in this case* concerns just that—*net* migration. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶ 31 n.16 ("Accounting for individuals who came to the United States through a safe, orderly process . . . *total* CHNV arrivals fell to approximately 1,326 per day, a 44 percent reduction from their pre-CHNV process levels.") (emphasis added). Thus, Texas's reductive claim that it does not benefit from decreases in individuals who lack documentation to obtain driver's licenses is non-responsive to the reality that *all* migration, including that which occurs through lawful channels, has decreased. Moreover, it is *Texas* who bears the burden of proving a net increase in individuals now obtaining driver's licenses because of the CHNV Pathways, which it has failed to do.

Second, as Intervenor Defendants have discussed at length, Int. Defs' Post-Trial Brief, ECF No. 282 at 16–18, Texas has failed to prove net costs associated with issuing even one driver's license where Texas refused to make complete revenue disclosures associated with this category of alleged harm. *Id.* at 16–17. The record proves that driver's licenses are in fact an income-*generator*—not drain—for the state.

---

[8] Texas's eleventh-hour argument about harm from issuing driver's licenses regardless of a net reduction in irregular migration is yet another example of Texas impermissibly "mov[ing] the [standing] goalposts" after trial, which this Court should reject. *See E.T. v. Paxton*, 19 F.4th 760, 717 (5th Cir. 2021); *see also* Int. Defs' Post-Trial Brief, ECF 282 at 11–13.

Roldan Expert Decl., Int. Defs' Ex. 140 at ¶¶ 22–25. Because these "offsetting benefits . . . arise from the same transaction as the costs," the Court must consider them in determining Texas's standing. *Texas v. United States* (hereinafter "*DAPA*"), 809 F.3d 134, 155 (5th Cir. 2015). And certainly, the Court cannot consider Texas's alleged agency overhead and infrastructure expenditures for the Department of Public Safety's general operation, which comprise the vast majority of Texas's estimated costs, and are unquestionably not part of the same transaction as driver's license issuance. Declaration of Sheri Gipson, Pls' Ex. 4 ¶ 9; *see also* Int. Defs' Post-Trial Brief, ECF No. 282 at 17.

Again, unable to grapple with the record in this case, Texas urges this Court to look to different cases with entirely different records, all of which predate *United States v. Texas* (hereinafter "*Guidelines*"), 143 S. Ct. 1964 (2023), to find that Texas has standing. This includes *Texas v. Biden,* 20 F.4th 928 (5th Cir. 2021) , which the Supreme Court *reversed*, *Biden v. Texas* (hereinafter "*MPP*"), 142 S. Ct. 2528, 2548 (2022) ("We therefore reverse the judgment of the Court of Appeals"), and *DAPA,* 809 F.3d at 134, which did not result in a binding Supreme Court decision and, as Intervenor Defendants have discussed, Int. Defs' Post-Trial Brief, ECF No. 282 at 17, involved a completely different trial court record with undisputed allegations of financial injury to the plaintiff states, *DAPA,* 809 F.3d. at 155 (noting that the federal government did not dispute Texas's figures). Texas additionally seeks to rely on *Texas v. United States* (hereinafter "*DACA*"), 50 F.4th 498 (5th Cir. 2022), which similarly did not involve disputed allegations of harm. *See id.* at 517–18 ("The record does not

indicate precisely what portion of all costs for [undocumented immigrants] is spent on DACA recipients, but no one disputes that some are. An expert for defendants estimated that DACA recipients overall impose . . . cost[s] . . . on Texas per year . . . [and on] local Texas communities.").[9]

Texas's reliance on *Florida v. Mayorkas,* No. 3:23-cv-9962, 2023 WL 3398099, at *5 (N.D. Fla. May 11, 2023) (hereinafter *Florida II*) speaks to Texas's inability to grapple with the record in this case, even when invoking the support of other cases. Texas seeks to analogize to *Florida II* but misses the point entirely by simply comparing the parole policies at issue in each case (a comparison which is flawed on its face where *Florida II* did not concern a parole *program* like the CHNV Pathways), rather than engaging with the records of alleged harm. There is no discussion in *Florida II* about the record concerning alleged harm in that case because the district court relied on an earlier decision in a different case to find the plaintiff state had standing. *Id.* at *4 (citing *Florida v. United States* (hereinafter *Florida I*), No. 3:21-cv-1066, 2023 WL 2399883, at *12, *31 (N.D. Fla. Mar. 8, 2023)). But the decision in *Florida I* includes no discussion of whether the defendants challenged the allegations of harm in that case. *See Florida I*, 2023 WL 2399882, at *16–17.

Moreover, contrary to Texas's arguments, *Guidelines* undermines its standing for various reasons. Texas hinges its case on the majority's caveat about programs implicating prosecutorial discretion and the conferral of benefits, but it misreads the

---

[9] Texas also seeks to analogize to out-of-circuit cases and law review articles concerning murder and death by tobacco, all of which have no bearing on this case. Texas's Post-Trial Brief at 5–6.

plain text of the majority opinion. The Supreme Court did not hold that states *would* have standing to challenge such programs, but only that such challenges "*could* lead to a different standing analysis." *Guidelines*, 143 S. Ct. at 1974 (emphasis added). Whether or not that exception could establish standing in those cases, it does not here.

First, it remains undisputed that parole under the CHNV Pathways rests on longstanding statutory authority that the Executive Branch has repeatedly exercised through materially indistinguishable programs for decades. *See infra* Section I(D)(1).

Second*,* the employment authorization that CHNV Pathways parolees may separately apply for undermines Texas's injury claims; employment creates revenue for the state through taxes. *See* Int. Defs' Trial Ex. 137 at 3 ("Data show that immigrants expand the U.S. economy's productive capacity, stimulate investment, increase aggregate demand, and promote specialization that in the long run boosts productivity."). Texas cannot coherently assert injury from individuals receiving employment authorization while simultaneously asserting injury from spending money on social and welfare services.

Third, Texas asserts injury from beneficiaries' alleged future reliance on SNAP and TANF benefits, but Texas did not assert this injury in its complaint, *see* FAC, ECF No. 20, and the Court should not permit Texas to rely on it now. In any event, any potential future SNAP and TANF benefits costs simply do not flow from the CHNV Pathways. As Texas acknowledges, parolees would not be eligible for such benefits until *five years after receiving parole*, Texas's Post-Trial Brief at 22, which

would be *three years after their parole expires*. Such potential future injury untethered to the CHNV Pathways is far too speculative for standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

In addition, as in *Guidelines*, the CHNV Pathways involve no exercise of authority over Texas. Indeed, the harms Texas asserts are only "indirect," and therefore "more attenuated." *Guidelines*, 143 S. Ct. at 1971–72 n.3. Texas contends its harm is direct under *Biden v. Nebraska*, but in that case, Missouri suffered direct injury because the challenged program discharged loans held by the state, *directly* costing it tens of millions of dollars in processing fees it would no longer be able to collect. 143 S. Ct. 2355, 2365–66 (2023). Here, the government has not discharged any loans held by Texas or deprived it of corresponding revenue. Its injuries remain "indirect," and it must show "much more" to establish standing. *Guidelines*, 143 S. Ct. at 1972. Moreover, *Nebraska* does not concern the Executive's exercise of discretion in the immigration context, which presents unique redressability considerations, *Id.* at 1971–72 (citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–491 (1999)), nor does it implicate "foreign affairs consequences" of the policy at issue, as this case does. *See MPP*, 142 S. Ct. at 2543. Thus, *Biden v. Nebraska* has no bearing on this case.

### C. Texas Has Not Proven Injury Traceable to the CHNV Pathways or Redressable by a Court Order.

Texas has likewise failed to prove its alleged harm is traceable to the CHNV Pathways or redressable by an order from this Court. *See* Int. Defs' Post-Trial Brief, ECF No. 282 at 18–20.

Rather than prove traceability with evidence, Texas again points the Court to another case, *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), to argue that it need not do so because "[a]liens' future behavior can be traced to the Defendants' policies, where it is likely that aliens who have historically behaved in a certain way will continue to do so." Texas's Post-Trial Brief at 28. Texas goes on to argue that "evidence shows the general propensity of aliens to use public services and be incarcerated at rates that impose non-trivial costs" but points to *no* such evidence. *Id.* Nor does Texas engage with the undisputed evidence in the record in this case proving the opposite. Int. Defs' Trial Ex. 139 at ¶ 25 ("[B]ased on the collective research, including studies conducted in Texas and Florida specifically, immigrants, including undocumented immigrants, are disproportionately less likely to engage in crime compared to their native-born counterparts and increases in immigration are not associated with crime increases, resulting in a very low risk that citizens will 'suffer increased crime . . . due to illegal immigration,' as feared by the Plaintiff States.").[10]

---

[10] Once more, Texas points to costs of basic governance that it must expend on *all Texas residents* to claim harm associated with "aliens" under the CHNV Pathways, but Texas fails to explain why it is not equally injured by general population growth, which it has welcomed for years, Kristie Wilder, *Texas Joins California as State with 30-Million-Plus Population*, U.S. Census Bureau (Mar. 30, 2023), Int. Defs' Trial Ex. 64, or by costs associated with individuals paroled under U4U, which it has not challenged. *See* Camilo Montoya-Galvez, *A Year Into War, U.S. Sponsors Apply to Welcome 216,000 Ukrainian Refugees Under Biden Policy*, CBS News (Feb. 24, 2023), Int. Defs' Trial Ex. 107; s*ee also* Int. Defs' Opp. to Texas's Prelim. Inj. Mot., ECF No. 175 at 25–26.

Instead, Texas conclusively asserts "there is no suggestion that [parolees] who currently would not have been paroled but for" the CHNV Pathways will behave differently. Texas's Post-Trial Brief at 28. But first, it is *Texas* who bears the burden of proving standing; Defendants bear no burden to disprove Texas's assumptions. Second, Texas *could* have used data, for example, of others paroled under similar programs, like Uniting for Ukraine ("U4U"), to attempt to show that the "general propensity" of individuals paroled under the CHNV Pathways supports its standing. But it did not, and thus, it has failed to prove standing.

Moreover, as Intervenor Defendants have explained, the indirect nature of Texas's claimed harm also defeats redressability. Like the policy at issue in *Guidelines*, the CHNV Pathways do not exercise coercive authority over Texas. *See Guidelines*, 143 S. Ct. at 1972 n.3; *see also,* Int. Defs' Trial Ex. 175-3. The alleged indirect injuries are too "attenuated" and therefore not cognizable. *Guidelines*, 143 S. Ct. at 1972 n.3. Finally, because Texas has not claimed *any* injury traceable to the CHNV Pathways, and instead has complained of immigration generally, and mostly of undocumented immigration, *e.g.,* FAC, ECF No. 20 at ¶¶ 6, 64, an order blocking the CHNV Pathways simply would not redress Texas's purported harms. Indeed, the record shows Texas's alleged costs would increase if the CHNV Pathways are blocked. *See, e.g.,* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶¶ 39–40.

Texas's alleged harms are not concrete; nor are they traceable or redressable. For each of these independent reasons, Texas has failed to prove standing and this Court lacks Article III jurisdiction.

**D.     Neither "Abdication" nor Special Solicitude Can Create Article III Standing for Texas.**

1.      Texas's Ahistorical Abdication Arguments Are Meritless.

Perhaps recognizing the weaknesses in its claims for Article III standing, Texas now asks this Court to find standing based on misplaced and ahistorical abdication arguments. These arguments misrepresent binding precedent and ignore decades of materially indistinguishable uses of the statutory parole authority.

First, Texas argues that the Supreme Court has "explicitly approved abdication of statutory responsibilities as a basis for standing." Texas's Post-Trial Brief at 27. In doing so, Texas relies on *Guidelines*, 143 S. Ct. 1964. But the *Guidelines* Court did no such thing. Instead, the Court noted that "an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. The Court therefore mentioned the *possibility* of abdication *supporting* Article III standing, not replacing it, and only in cases of *extreme* non-enforcement. *Id.* In fact, the Supreme Court has never found standing on the basis of this "abdication theory," let alone found that a party is otherwise exempt from Article III standing requirements *if* it were to apply. Similarly, Intervenor Defendants are aware of no case in which the Fifth Circuit has applied the "abdication theory" of standing that Texas advances here. *See, e.g.*, *Texas v. United States*, 40 F.4th 205, 222 (5th Cir. 2022) (discussing abdication in the context

of APA reviewability; determining standing without any discussion thereof);[11] *DAPA,* 809 F.3d at 150 (finding that, because there is standing based on Texas's undisputed claims about driver's licenses, they "need not address the other possible grounds for standing"); *Crane v. Johnson*, 783 F.3d 244, 252 n.34 (5th Cir. 2015) (declining to address Mississippi's abdication argument for standing because it was waived).

Notably, while Texas leans heavily on the district court orders in cases concerning MPP, DAPA, and DACA to support its novel "abdication" theory of standing, *see* Texas's Post-Trial Brief at 26–27, as previously discussed, neither the Fifth Circuit nor the Supreme Court found standing on this basis. Moreover, none of those programs stemmed from the same well-established, statutory parole authority as the CHNV Pathways here. Indeed, Judge Hanen has acknowledged that "the concept of state standing by virtue of federal abdication is not well established." *Texas v. United States*, 86. F. Supp 3d 591, 640 (S.D. Tex. 2015) *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016). The statutory context here is particularly ill-suited for an abdication argument. Unlike in other cases, Texas does not even allege that the Executive is failing to fulfill statutory responsibilities (relating, for example, to detention or removal); instead, Texas premises its claims on a purely discretionary exercise of statutory authority that has been used to fulfill a variety of statutory and constitutional obligations relating to migration, border

---

[11] This Fifth Circuit case is also inapposite here given the more recent Supreme Court decision in *Guidelines*, in which the Court ultimately found Texas lacked standing. *See* 143 S. Ct. at 1974.

28

security, and foreign affairs. Texas might disagree with the Administration's policy choices, but that is no basis to claim abdication.

Additionally, the record in this case plainly demonstrates that Texas's claims that the CHNV Pathways constitute an extreme disregard for executive responsibility are both incorrect and ahistorical. Texas relies entirely on DHS's discretionary decision to impose a numerical monthly cap on the CHNV Pathways in making its argument for abdication, Texas's Post-Trial Brief at 26, but, again, Texas never explains how the CHNV Pathways constitute "en masse" parole given that the government individually considers requests under the program. *See* Int. Defs' Trial Ex. 68; Trial Tr. vol. 2 of 2 at 5:19–6:6. To the extent Texas relies on any purported high approval rates under the CHNV Pathways, this argument fails because it ignores nuances of the program process which involves multiple stages of adjudication that winnow out ineligible applicants. *See* Int. Defs' Post-Trial Brief, ECF No. 282 at 25–26. Finally, as Intervenor Defendants have discussed, there is no inconsistency between a high rate of approval and case-by-case consideration, as numerous examples aptly demonstrate. *Id.* at 26–27.

Texas leans heavily on dicta from Justice Alito's dissent in *MPP*, including as it appears in subsequent district court orders, in support of their argument that the number of parole grants *alone* supports a finding that the CHNV Pathways are not administered case-by-case. Texas's Post-Trial Brief at 26 (citing *MPP*, 142 S. Ct. At 2554 (Alito, J., dissenting)). But this dicta, and Texas' reliance on it, ignores the reality that even the *failed* amendments to the parole statute did not include a

numerical limitation on the parole authority. *See* 8 U.S.C. § 1182(d)(5); *see also* Int. Defs' Post-Trial Brief, ECF No. 282 at 34–36. And it distracts from what the *majority* opinion in the very same Supreme Court case recognized: "[e]very administration, including the Trump and Biden administrations, has utilized this authority [under 8 U.S.C. § 1182(d)(5)] to some extent." *MPP*, 142 S. Ct. at 2543.

Texas ignores the decades of nearly identical programmatic uses of the statutory parole authority, including, most notably, the program on which Texas recognizes that the CHNV Pathways are modeled—U4U.[12] *See* Implementation of a Parole Process for Cubans ("Cuban Parole Process FRN"), 88 Fed. Reg. 1266, 1267 (Jan. 9, 2023); Implementation of a Parole Process for Haitians ("Haitian Parole Process FRN"), 88 Fed. Reg. 1243, 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans ("Nicaraguan Parole Process FRN"), 88 Fed. Reg. 1255, 1256 (Jan. 9, 2023); Implementation of Parole Process for Venezuelans ("Venezuelan Parole Process FRN"), 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022); *see also* Int. Defs' Post-Trial PFOF/COL, ECF No. 281 at ¶ 132; Int. Defs' Post-Trial Brief, ECF No. 282 at 34–40 (outlining the extensive historical uses of the parole authority). Texas fails to *mention* this history, let alone contend with it. Instead, it asks this Court to be the *first* to find a parole program created pursuant to the parole statute unlawful, *and* to

---

[12] Indeed, the U4U parole program—along with numerous others, such as parole for displaced Vietnamese and Cambodian nationals following the Vietnam War and Operation Allies Welcome for Afghans following the United States' withdrawal from Afghanistan—illustrates the importance of the parole authority as a flexible tool that the executive may use to respond to future or unfolding cases of conflict or instability abroad. *See* Int. Defs' Post-Trial PFOF/COL, ECF No. 281 at ¶¶ 123–32.

go a step further by making the remarkable declaration that, notwithstanding decades of similar programs, the CHNV Pathways suddenly and uniquely constitute a *complete abdication* of executive responsibility justifying the creation of a novel ground for standing. *See Guidelines*, 143 S. Ct at 1974. It is Texas's arguments, not the CHNV Pathways, that are an extreme departure. This Court should reject them.

        2.    <u>Texas Cannot Claim Special Solicitude to Overcome a Meritless Claim for Standing.</u>

Once again looking to warp standing rules to create Article III standing where none has been established, Texas invokes "special solicitude." Texas's Post-Trial Brief at 29. Like its proposed "abdication theory," however, special solicitude cannot create standing for Texas out of whole cloth.

"Regardless of the applicability of special solicitude, [states] must still satisfy the basic requirements of standing." *Louisiana v. Biden*, 64 F.4th 674, 684 (5th Cir. 2023); *accord Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023) ("[Special solicitude] is not a standing shortcut when standing is otherwise lacking. . . . [It] does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and particularized."). Because Texas has failed to meet the basic standing requirements, *see supra* Section I(A)–(C), special solicitude cannot save its case. *See Guidelines*, 143 S. Ct. at 1976 (Gorsuch, J., concurring) ("[S]tanding doctrine derives from Article III, and nothing in that provision suggests a State may have standing when a similarly situated private party

does not." (citing *Massachusetts v. EPA*, 549 U.S. 497, 536–38 (2007) (Roberts, C.J., dissenting))).

Moreover, as Intervenor Defendants have discussed at length, *see*, *e.g.*, ECF No. 282 at 20–22, *Guidelines* undermines the viability of special solicitude altogether. In that case, the Court declined to apply special solicitude in nearly indistinguishable circumstances where Texas sought standing based on arguments of indirect costs arising from an alleged increase in the number of people in the state and the social services the state alleged it would in turn have to provide. *Id.* at 1968–69. The majority acknowledged the plaintiff's special solicitude arguments but ultimately found that "none of the various theories of standing asserted by the States . . . overcomes the fundamental Article III problem with this lawsuit." 143 S. Ct. at 1972 n.3. Justice Gorsuch further noted that that special solicitude has not "played a meaningful role" in the Court's jurisprudence since *Massachusetts v. EPA* and warned lower courts that "it's hard not to think" that they "should just leave that idea on the shelf in future [cases]." *Guidelines*, 143 S. Ct. at 1977 (Gorsuch, J., concurring).[13]

Rather than heed the warnings of Justice Gorsuch and the *Guidelines* Court, Texas seeks to invoke special solicitude here in a manner that lacks limiting principles altogether. First, Texas's distillation of the first prong of special solicitude

---

[13] To illustrate Justice Gorsuch's observation, the Supreme Court has not afforded any state special solicitude in any case in the fifteen years since *Massachusetts*, indicating that, if the doctrine is not dead entirely, it is at the very least reserved for truly exceptional circumstances. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2116–20 (2021) (no discussion of special solicitude in the Court's rejection of Texas's standing); *Trump v. New York*, 141 S. Ct. 530, 534–37 (2020) (per curiam) (same); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (same).

is entirely circular. Texas argues it has standing because Texas "ha[s] suffered a legal wrong and [is] being adversely affected or aggrieved by it." Texas's Post-Trial Brief at 29–30. Under this logic, states would always have standing to bring challenges under the APA based on hollow allegations alone, paying no mind to bedrock Article III principles.

Additionally, the CHNV Pathways do not implicate a "quasi-sovereign interest" for Texas because, to the extent this doctrine remains applicable, a state must claim a quasi-sovereign interest in the wellbeing of its "residents in general," and may not claim such an interest only in a particular subset thereof. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). But here, Texas invokes special solicitude based on the provision of basic services only to a subset of residents—those paroled in through the CHNV Pathways—when those services are otherwise available to all of its residents. *See* Int. Defs' Post-Trial PFOF/COL, ECF No. 281 at ¶¶ 328–330. Rather than address the fatal nature of its asserted "quasi-sovereign interest," Texas pivots to assert that Texas would be federally preempted from "chang[ing] the classifications of parole recipients," Texas's Post-Trial Brief at 31, and therefore the CHNV Pathways necessarily implicate Texas's "quasi-sovereign interest." *Id.* at 30–31. But again, by Texas's logic, states would *always* have standing to challenge *any* federal immigration policy, regardless of whether they have articulated or proven injury that satisfies Article III requirements. This is incompatible with Supreme Court precedent. This Court should reject Texas's attempt to ignore "bedrock Article III constraints in cases brought by

States against an executive agency or authority." *See Guidelines*, 143 S. Ct. at 1972 n.3.

No special standing theories can save Texas from its failure to prove injury in fact, let alone injury that is traceable to the CHNV Pathways and redressable by an order from this Court. Texas has failed to establish standing and thus this Court lacks Article III jurisdiction.

## II. On the Merits, Texas Fails to Demonstrate How the CHNV Pathways Differ in Any Meaningful Way from Past and Ongoing Lawful Uses of the Statutory Parole Authority.

### A. The CHNV Pathways Are Consistent with Statutory Parole Authority, and Texas's Arguments to the Contrary Are Inapposite.

As Intervenor Defendants have explained, DHS acted well within the statutory parole authority when it decided to create the challenged parole programs to better serve the Executive's statutory and constitutional responsibilities relating to migration, national security, and foreign affairs. *See* Int. Defs.' Post-Trial Brief, ECF No. 282 at 22–40. For more than seven decades, successive administrations of both parties have used the parole authority to create materially indistinguishable parole programs; and in response Congress has consistently indicated its knowledge and *approval* of such programmatic uses of the parole statute via legislation, including via the legislation on which Texas rests its contrary argument, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). *See* Pub L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689 (1996), Int. Defs' Trial Ex. 10.

The parole statute, 8 U.S.C. § 1182(d)(5), has been used to create more than 100 parole programs materially indistinguishable from the CHNV Pathways over the last 70 years. To be sure, over the arc of this history, some members of Congress have at times expressed opposition to various parole programs, but that is neither unexpected nor unhealthy. Such disputes are inherent to democracy and the task of governing itself, to say nothing of the reasonable policy disagreements that can be had regarding the various (and complicated) domestic and foreign policy issues bound up with these uses of the parole statute. But Congress has not once enacted legislation to block the Executive from using its statutory parole authority to implement such a program. Instead, Congress has time and again indicated its knowledge and *approval* of these uses of the parole authority. *See* Declaration of Yael Schacher ("Schacher Expert Decl."), Int. Defs' Trial Ex. 141 at ¶¶ 8–9, 24, 27–29, 34, 51.

Certainly, Congress has repeatedly enacted legislation extending immigration status and other privileges to large numbers of people who entered the country pursuant to parole programs. *See id.* But congressional approval of parole programs has gone beyond that in at least two ways. First, in addition to those parolees already in the United States, Congress has on multiple occasions enacted legislation to make *future* beneficiaries of parole programs eligible for benefits, including the ability to adjust status to that of lawful permanent residence. *See, e.g.*, *id.* at ¶¶ 16, 34. Second, Congress has even blessed using the parole statute for parole programs just like the CHNV Pathways, as in the National Defense Authorization Act for Fiscal Year 2020.

*See* Pub. L. NO. 116-92, 133 Stat. 1198 (2019), Int. Defs' Trial Ex. 14. Therein, Congress "essentially mandated" the continuation of parole program for certain family members of the U.S. armed forces created by the Executive years earlier. *Id*; *see also* Schacher Expert Decl., Int. Defs' Trial Ex. 141 at ¶ 28. In that statute, Congress expressly "reaffirmed" the use of the parole authority in these circumstances; directed DHS to "consider, on a case-by-case basis, whether granting the request would enable military family unity that would constitute a significant public benefit" within the meaning of 8 U.S.C. § 1182(d)(5); and then expressed the "sense of Congress" that the use of parole here "reinforces the objective of military family unity." National Defense Authorization Act for Fiscal Year 2020, Int. Defs' Trial Ex. 14. In other words, Congress instructed the Executive to continue a previously discretionary programmatic use of the parole statute, and to do so within the existing statutory framework, indicating plainly that such a use of the parole statute is authorized.

This history cannot be reconciled with Texas's arguments that the parole statute is (and has always been) limited to medical emergencies and participants in criminal prosecutions. *See* Texas's Post-Trial Brief at 41–45. Undoubtedly for that reason, Texas has chosen throughout this litigation not even to *acknowledge* the 70+ year history of administration after administration using the parole statute to create parole programs materially indistinguishable from the CHNV Pathways. Texas's silence on this history—choosing not to address it in briefing its request for a

preliminary injunction (even on reply), at trial, or post-trial—is deafening.[14] Texas apparently hopes that this Court will come up with a way to distinguish those uses of the parole authority that its counsel cannot, but that is not how our adversarial system of justice works. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). Texas's failure even to *try* to address this central problem with its legal claim should be fatal, since the Court cannot supply an argument Texas has not itself made. *See id.*

Nonetheless, in the event that the Court entertains Texas's invitation to supplant the legislative balance struck by Congress, as well as the Executive's invocation of that legislatively conferred discretionary authority, Intervenor Defendants explain below why those arguments are erroneous.

1. <u>Texas Has No Support for Its Assertion That Parole Under § 1182(d)(5) Is and Has Always Been Limited to Medical Emergencies and Criminal Prosecutions.</u>

Following discovery and trial, Texas has rested its legal claim that the CHNV Pathways exceed the statutory parole authority principally on its contention that the parole statute authorizes "humanitarian" parole for medical emergencies and "public benefit" parole in connection with criminal prosecutions—and *only* in those circumstances is parole authorized. *See* Texas's Post-Trial Brief at 41–45. Texas's post-trial claim is similar to what it alleged when filing suit, except that previously

---

[14] The closest Texas has come to making an argument is the bare observation that "past practices broadly using the parole power do not 'create power,'" Texas's PFOF/COL, ECF No. 286 at ¶ 129 (citation omitted), but that platitude has no application here, where the undisputed facts establish that Congress has consistently enacted legislation approving of programmatic uses of the parole statute.

Texas relied exclusively on a 1996 House committee report pertaining to legislation that would have narrowly defined the parole authority to support its interpretation of the statute. FAC, ECF No. 20 at ¶ 38 (quoting H.R. Rep. No. 104-469, at 140 (1996)); Texas's Prelim. Inj. Mot., ECF 22 at 15 (same). Now that Texas has realized that this committee report concerned failed legislation,[15] Texas has abandoned reliance on it and has swapped into its place a 1982 Notice of Interim Rule with Request for Comments by the former Immigration and Naturalization Service ("INS Notice"). *See* Texas's Post-Trial Brief at 41. That INS Notice, however, lists medical emergencies and criminal prosecutions *as examples* of circumstances warranting parole. *See* Detention and Parole of Inadmissible Aliens; Interim Rule with Request for Comments, 47 Fed. Reg. 30044, 30044–45 (July 9, 1982). The INS Notice, in turn, cites a House committee report from 1952 (the year the current statute, as amended, was first codified) and a Senate committee report from 1965 (about a bill—and from a Congress—that left the parole statute untouched). *Id.* According to Texas, this INS Notice establishes that "Congress"[16] authorized only these "paradigmatic examples" of parole even *before* the 1996 amendment to the statute, and so they must similarly be the only permissible uses of parole under the allegedly "stricter standard imposed by IIRIRA." Texas's Post-Trial Brief at 41.

---

[15] This failed legislation would have limited the parole statute in the precise way that Texas wants this Court to limit the statute, but through judicial interpretation rather than legislation. *Cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006) ("Congress' rejection of the very language that would have achieved the result the [party] urges here weighs heavily against [that] interpretation.").

[16] Texas's Brief misleads the Court when it erroneously ascribes the contents of these *committee* reports to "Congress" as a whole.

There are many problems with Texas's argument that a 40-year-old notice discussing *examples* in connection with a statute that no longer exists establishes congressional intent to preclude DHS from using the current parole statute as it has done here. To start: the INS Notice itself does not even hint that the examples Texas quotes are the *only* permissible uses of the parole statute. Nor can Texas cite anything else, either pre- or post-IIRIRA, that supports its interpretation of the statute. Instead, all Texas can cite are opinions or agency documents mentioning that circumstances involving medical emergencies and in connection with criminal prosecutions are examples of permissible uses of the parole authority. *See* Texas's Post-Trial Brief at 42–45. But that does nothing to prove the statute is *limited* to those circumstances, and Texas has no evidence or even argument for that proposition.

To the contrary, even documents Texas cites *also* mention parole programs as a permissible use of the parole statute. The INS Notice itself, for example, gave notice of a use of parole that, by Texas's logic, is unlawful: for noncitizens subject to mandatory detention when detention space and/or conditions do not permit their continued detention. Similarly, the DHS website listing "common types of parole requests" that Texas block-quotes, Texas's Post-Trial Brief at 44–45, *also* discusses numerous parole programs and links to more information about those programs— Texas just does not mention that.[17] Most damning of all, Texas ignores that one of

_____

[17] In addition, Texas inexplicably links to guidance on a particularized (evidentiary) issue within the parole adjudication process, rather than more general pages about

the two "[q]uintessential modern uses of the parole power" mentioned in the Fifth Circuit MPP decision—"paroling [noncitizens] who qualify for a visa but are waiting for it to become available," Texas's Post-Trial Brief at 42 (citing *Texas*, 20 F.4th at 947)—is describing a programmatic use of parole that has occurred repeatedly post-IIRIRA and that bears little resemblance to the artificially constrained view of the parole authority that Texas is asking the Court to impose. *See* Schacher Expert Decl., Int. Defs' Trial Ex. 141 at ¶¶ 54, 61 (describing Haitian and Cuban family reunification parole programs).[18] Ruling for Texas here would require this Court to hold unlawful what the Fifth Circuit has held is a "quintessential" use of parole.

> 2.   Texas's Argument That the CHNV Pathways Cannot Be Justified Under the Statute's "Significant Public Benefit" Prong Is Both Irrelevant and Wrong.

Similarly fatal to Texas's claim that the CHNV Pathways are contrary to law is Texas's categorical failure to address one of the two asserted bases for the program: the humanitarian prong of the parole statute. All of Texas's arguments concern *only* the "significant public benefit" part of the statute. *See* Texas's Post-Trial Brief at 39–

---

parole broadly. *Compare Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/humanitarian-parole/guidance-on-evidence-for-certain-types-of-humanitarian-or-significant-public-benefit-parole-requests (last visited Oct. 26, 2023), *with Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/humanitarian_parole (last visited Oct. 26, 2023). The page Texas links is obscured in the brief due to Texas's use of a link shortening service (bitly.com).

[18] Two of the beneficiaries sponsored for parole by Intervenor Defendants qualify for a family-based visa but are waiting for it to become available. Declaration of Anne-Valerie Laveus ("Laveus Decl."), Int. Defs' Trial Ex. 121 at ¶ 6; Declaration of Francis Margarita Arauz Ramirez ("Arauz Decl."), Int. Defs' Trial Ex. 123 at ¶ 12.

48; Texas's PFOF/COL, ECF No. 286 at ¶¶ 114–132. Yet the CHNV Pathways are expressly justified by *both* parts of the statute. *See* Cuban Parole Process FRN, 88 Fed. Reg. at 1268; Haitian Parole Process FRN, 88 Fed. Reg. at 1248; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1256; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63508. Texas's failure even to address the independently sufficient basis for the CHNV Pathways is fatal to its claim—and it makes irrelevant its arguments regarding the public benefit side of the statute, which the Court need not consider. *See Sineneng-Smith*, 140 S. Ct. at 1579.[19]

Even if the Court is persuaded to opine on that topic, it should reject Texas's argument that the CHNV Pathways cannot be justified under the "significant public benefit" prong of the post-IIRIRA statute. First, in addition to having no support for the premise that the statute has somehow *always* been limited to medical emergencies and criminal prosecutions, Texas' argument has no support in the text of the statute, which is where any statutory construction case begins. *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).

---

[19] Texas's only nod to the humanitarian prong of the statute is its blatant mischaracterization of Intervenor Defendant Eric Sype's testimony. *Compare* Texas's Post-Trial Brief at 47 (suggesting Oldrys's parole was solely for economic benefit) *with* Trial Tr. vol 1 of 2, 82:2-83:9 (testifying that multiple natural disasters and political uprisings caused the loss of Oldrys's family home and "basically all economic activity to stop"). But even if the Court credits that mischaracterization (which it should not), Texas's baseless reliance on Mr. Sype's testimony to argue there is "no evidence" that the statute is being used for urgent humanitarian reasons or public benefit impermissibly flips the burden of proof and is foreclosed because Texas has disclaimed an as-applied challenged here. *See infra* note 21.

For decades, Congress left the terms "emergent reasons" and "public interest" undefined and subject to agency interpretation. Congress replaced those terms in IIRIRA with "urgent humanitarian reasons" and "public benefit," and Texas concedes that Congress chose to similarly leave the new terms undefined. Texas's Post-Trial Brief at 40. Indeed, as discussed, Texas at long last acknowledges that Congress in IIRIRA decided "not to use the House's definitions in the parole statute," *id.* at 45 (discussing the House report on which it had previously relied), although even that concession misstates the legislative history. The House *Judiciary Committee's* proposed definitions were never even endorsed by *the House*; they were stripped from the legislation before it even came to the Floor for a vote. Int. Defs' Post-Trial PFOF/COL, ECF No. 281 at ¶ 118. Texas also concedes that the change from "public interest" to "public benefit" made no material difference. Texas's Post-Trial Brief at 40 ("[I]t is likely that the change has little legal consequence.").

With nowhere left to turn, Texas argues that the decision by Congress to add the word "significant" before "public benefit" indicates a clear intent to narrow the use of the authority beyond what was previously authorized as being "in the public interest." Texas's Post-Trial Brief at 41. Even taking Texas at its word that the inclusion of the word "significant" demands attention, "this Court has a 'duty to construe statutes, not isolated provisions.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (citation omitted). The rest of the statute and the broader statutory context make clear that—although there were *some members* of Congress then (as now) who believed that the parole statute should not be used to

create parole programs like the CHNV Pathways and should be used only for cases that fall neatly within narrowly defined terms—the compromise that Congress reached in IIRIRA did not reflect that view.

Moreover, even as Texas fixates on the purported transformative nature of the word "significant" in the statute, it conveniently omits the full phrase that "significant public benefit" replaced, which required the grant of parole to be "*strictly in the public interest*" (emphasis added). Int. Defs' Post-Trial PFOF/COL, ECF No. 281 at ¶ 112. The words "strictly" and "significant" are plainly not synonymous, but the change from "strictly in the public interest" to "significant public benefit" undermines Texas's argument that the addition of the word "significant" was meant to have any greater effect than the admittedly immaterial replacement of "public interest" with "public benefit." Moreover, even if the requirement that the public benefit be "significant" means a greater benefit than was required before, then the deletion of the word "strictly" must be interpreted to render permissible some uses of the parole statute that were previously unauthorized. Similarly, the change to the criteria for parole under the "humanitarian" prong of the statute (which Texas ignores), from "for emergent reasons" to "for urgent humanitarian reasons" also does not establish that Congress intended to *curtail* that prong of the parole authority. Texas ignores that, to the extent it argues the Court must ascribe transformative meaning to the *addition* of the words "urgent humanitarian," it must ascribe equal meaning to the *deletion* of the word "emergent" and therefore conclude that this change authorizes parole where it previously was unavailable, in non-emergent

43

circumstances. Texas fails to provide any coherent interpretation of the statute, construed as a whole, that supports its assertion that any of the single changed words were clearly intended to scale back longstanding uses of parole that Congress had ratified (and continued to ratify post-IIRIRA).

Further undermining Texas's flimsy statutory argument, other parts of IIRIRA (to say nothing of many legislative enactments *since* then) reinforce that Congress understood parole programs would continue after its enactment. IIRIRA is 750 pages long and has multiple sections relevant to the parole authority. Section 602, entitled "Limitation on Use of Parole," has two subsections: the first amended the statute in the way just discussed, to change the criteria slightly and to textually codify the existing practice of considering parole applications on a "case-by-case" basis, which had not previously been a textual limitation.[20] *See* IIRIRA § 602(a)*, Int. Defs' Trial Ex. 10. The second "[l]imitation" added by section 602 increased transparency by requiring the Executive to provide reports to the judiciary committee of each chamber of Congress regarding the use of parole. *Id.* at § 602(b). Notably, these reports must include the "categories" of noncitizens paroled into the United States (the word "categories" appears three times in two sentences), *id.*, indicating congressional understanding that there would continue to be "categories" of parolees.

---

[20] At least since the 1980s, the Executive had interpreted the prior version of the parole statute to require case-by-case adjudication even in the context of parole programs; for that reason, the textual codification of this understanding in IIRIRA did not change the way the parole statute was being administered. *See* Schacher Expert Decl., Int. Defs' Trial Ex. 141. Texas has never contested this.

Looking beyond section 602 further illustrates that IIRIRA reflects congressional approval of parole programs. Specifically, as Congress did countless times before and since, section 646 of IIRIRA provided a pathway to citizenship for noncitizens the Executive paroled into the United States pursuant to a programmatic use of parole. *Id. a*t § 646. In that section, Congress directed the Attorney General to adjust the status (to that of lawful permanent resident, or "green card" holder) of certain Polish and Hungarian noncitizens who were denied refugee status and then paroled into the United States during a 25-month period starting on November 1, 1989, and to do so without regard to various grounds of inadmissibility. *Id.* These Hungarian and German parolees had been brought to the United States pursuant to a parole program created by the Administration of George H.W. Bush. *See* David Bier, *126 Parole Orders Over 7 Decades: A Historical Review of Immigration Parole Orders* (July 17, 2023), Cato Institute, https://www.cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders. Texas has no explanation for why, if Congress believed parole programs unlawful and parolees brought in through them unlawfully present (as Texas argues), it would nonetheless instruct the Attorney General to put those parolees on a path to U.S. citizenship just as it had numerous times before for beneficiaries of other parole programs.

The rest of what Texas has to say about the "public benefit" prong of the statute fares no better. The Federal Register notices regarding the CHNV Pathways identify at least at least six discrete public benefits justifying the Pathways, including deterring irregular migration and enhancing border security; improving national

security and public safety; reducing the number of migrant deaths; reducing the amount of money going to smuggling networks; and fulfillment of important foreign policy goals. *See* Cuban Parole Process FRN, 88 Fed. Reg. at 1266; Haitian Parole Process FRN 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 6350. Texas asserts that these benefits "fall far outside the limited types of public benefits that have traditionally been understood to fall under the statute," which "alone makes the program unlawful." Texas's Post-Trial Brief at 47. Unsurprisingly, Texas cites nothing in support of its premise, and its *ipse dixit* is demonstrably false, as reflected by the undisputed record evidence establishing the long historical use of the parole authority to create parole programs for the same asserted public benefits as in the CHNV Pathways. *See generally* Schacher Expert Decl., Int. Defs' Trial Ex. 141 (comparing the CHNV Pathways to past parole programs). As discussed above, Texas's strategic choice to ignore this history neither makes that history disappear nor permits this Court to supply arguments Texas has not itself made.[21]

---

[21] Texas's assertion that the CHNV Pathways "fail to achieve any of [the identified public benefits]," Texas's Post-Trial Brief at 47–48, has even less merit. Not only has Texas disclaimed any as-applied challenge, *see* Trial Tr. vol. 2 of 2 at 298:21–24; *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449–50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases." (citation omitted)), Texas has zero evidence in support of that contention and can cite no authority for the proposition that this Court could even review that question. *See MPP*, 142 S. Ct. at 2549 (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to foreign policy and foreign relations." (discussing the DHS

3.   The CHNV Pathways Do Not Violate the Statutory Requirement That Grants of Parole Be Temporary.

Texas's final argument for why the CHNV Pathways violate the parole statute is premised on the assertion that—because of *other* aspects of immigration law, foreign affairs, and/or *potential future* Executive or congressional actions—some unknown (and unknowable) number of CHNV parolees may be permitted to remain in the United States for longer than the two-year grants of parole they received through the CHNV Pathways. Texas's Post-Trial Brief at 48–57. Texas spends approximately ten pages setting up the premise of this argument and just a sentence or two attempting to tether it to a legal claim, *see id.* at 56–57, ultimately asserting that the likelihood that some of the parolees will stay long-term means the Pathways "violate[] the plain language of the parole statute's 'temporarily' requirement," *id.* at 57, notwithstanding that their two-year grants of parole are by definition temporary.

Even setting aside the speculative nature of Texas's argument, nothing about the possibility that some CHNV parolees will stay in the United States long term is inconsistent with law. This is best seen in the simple fact that the statute contains no temporal limit or prohibition against future changes in immigration status. Texas gives no basis to read such a limit into the statute. Moreover, as Texas challenges specific agency actions, hypothetical future developments pursuant to *other* statutory authority or agency actions are plainly not encompassed within its lawsuit.

---

Secretary's judgment regarding what is a "significant public benefit" under the parole statute)).

The long history of similar parole programs also reflects the reality that the prospect of parolees remaining in the United States long term does nothing to undermine the lawfulness of the exercise of parole. Over the decades, Congress has frequently enacted legislation to allow significant numbers of long-term parolees brought in through parole programs to adjust status to lawful permanent residence. As mentioned above, IIRIRA was one such example. Congress has also enacted legislation at various times over the years to provide assistance to long-term beneficiaries of parole programs. Schacher Expert Decl., Int. Defs' Trial Ex. 141 at ¶¶ 13, 16, 18; *see also* Int. Defs' Trial Exs. 15, 16, 18-20, 37, 40, 42. As mentioned above, Congress has even made *future* beneficiaries of parole programs eligible for benefits, including the ability to adjust status to that of lawful permanent residence. Schacher Expert Decl., Int. Defs' Trial Ex. 141 at ¶ 16. None of these actions can be reconciled with Texas's claim that Congress made it unlawful to parole in individuals who might stay in the United States long term.

The incoherence in Texas's "temporarily" argument can be seen plainly by considering the nearly 60-year history of parole being used for many hundreds of thousands of Cuban nationals who became eligible to adjust status to lawful permanent residence under the Cuban Adjustment Act just one year after their arrival. The interaction between parole programs for Cubans and the Cuban Adjustment Act is an example of the purported "abuse" of the parole statute identified in the House Report regarding the *rejected* precursor to IIRIRA upon which Texas previously relied. *See supra* n.15, and accompanying text (discussing H.R. Rep. No.

104-469); *see also* Declaration of Morton H. Halperin, Int. Defs.' Trial Ex. 131 (discussing creation of several Cuban parole programs in the years prior to the enactment of IIRIRA); Declaration of Eric Schwartz, Int. Defs.' Trial Ex. 134 (same). Ultimately, IIRIRA addressed the Cuban Adjustment Act—and reaffirmed that Cuban parolees can continue to adjust status after one year, Pub. L. No. 104–208, § 606, notwithstanding congressional knowledge that parole had been and would continue to be used to meet the United States' obligations under the Cuban Migration Accords. Texas gives no basis to overturn this congressional judgment.

Were that not enough to defeat Texas's "temporarily" argument—and it is— IIRIRA section 603, is a flashing beacon of congressional understanding that parole would be used for periods of time far beyond what Texas claims the statute authorizes. Section 603 is designed to reduce the number of family-based immigrant visas available each year by the number of individuals paroled into the country two years prior who remained in the United States for longer than one year. This provision makes no sense if, as Texas claims, it violates the parole statute for the Executive to parole individuals into the United States who may end up staying for longer periods of time.

* * * * *

As discussed above, Texas's claim that the CHNV Pathways are not authorized by Congress requires willful ignorance not only of the actual text of the statute and the long history of the Executive using the parole authority in materially indistinguishable ways, but also of how Congress has responded to this long history.

Congress has rejected attempts to amend the parole statute in the precise way that Texas asks this Court to construe the statue notwithstanding that rejection. Texas gives no reason why this Court, or the judiciary more generally, should side with those who were outvoted over those who found compromise in designing the modern parole statute and in continuing to entrust the discretionary parole authority to the Executive's reasoned judgment.

## B. Texas's Major Questions Argument Ignores Legal Precedent and Misleads the Court.

Texas' major questions argument presents yet another attempt to substitute Texas's immigration policy preferences for those of Congress. But legal precedent, grounded in separation of powers principles, requires otherwise. Texas makes no attempt to meaningfully engage with Supreme Court, Fifth Circuit, or Southern District precedent on the major questions doctrine. The reason for this is simple—the law does not support Texas's arguments. *E.g.*, Int. Defs' Post-Trial Brief, ECF No. 282 at 40–41; Fed. Defs' Post-Trial Brief, ECF No. 284 at 44–51.

Instead of explaining why this precedent supports its position, Texas dedicates nine pages to painting a picture of the narrow immigration system it would prefer— one in which individuals must come to the United States through the visa process, or not at all. Texas's Post-Trial Brief at 58–66. But this is not the system Congress elected.

Although Texas purports to consider the Parole Pathways "in the context of our immigration system as a whole," Texas's Post-Trial Brief at 59, it homes in exclusively on perceived discrepancies between the visa and parole processes,

asserting that these differences conclusively demonstrate that the Parole Pathways are unlawful. *See id.* at 60–63. As an initial matter, this is demonstrably false for the reasons Federal and Intervenor Defendants have explained throughout every stage of the proceedings. *See, e.g.*, Fed. Defs' Post-Trial Brief, ECF No. 284 at 44–51; Int. Defs' Post-Trial Brief, ECF No. 282 at 22–40. The CHNV Pathways are premised on the statutory parole authority at 8 U.S.C. § 1182(d)(5), which Congress delegated to the Executive Branch separate and apart from the visa processes at 8 U.S.C. §§ 1201–1202. As Intervenor Defendants have discussed, the CHNV Pathways comport with unambiguous statutory text, are consistent with congressional intent, and are materially indistinguishable from decades of prior parole programs. *E.g.*, Int. Defs' Post-Trial Brief, ECF No. 282 at 22–40.

Moreover, Texas's myopic focus on visa processes at best betrays fundamental ignorance of the lawful avenues available for migration, and at worst, misleads the Court. Although Texas would have the Court believe that the sole proper way to immigrate to the United States is through the visa process, *see* Texas's Post-Trial Brief at 58–59, 63, Texas ignores the numerous other ways individuals may lawfully immigrate and obtain status in the United States. For example, Texas completely fails to acknowledge avenues for humanitarian protection built into the immigration system established by Congress, including but not limited to asylum,[22] withholding

---

[22] 8 U.S.C. § 1158.

of removal,[23] protection under the Convention Against Torture,[24] refugee processing,[25] Temporary Protected Status,[26] Special Immigrant Juvenile Status,[27] and cancellation of removal,[28] among others. It is unclear why Texas has decided the *visa* process is the most apt comparison to a statute authorizing discretionary parole for "urgent *humanitarian* reasons," 8 U.S.C. § 1182(d)(5) (emphasis added), instead of any of these other *humanitarian* pathways to immigration status.

And this is not the only place Texas distorts reality. In seeking to impute visa requirements on the CHNV Pathways, Texas complains that unlike the "affidavit of support" required by the visa process, the CHNV Pathways require only Form I-134A, which according to Texas, "does not impose any binding, enforceable obligation at all." Texas's Post-Trial Brief at 64. As an initial matter, the *parole* statute requires no such "enforceable obligation," *see* 8 U.S.C. § 1182(d)(5), so Texas's complaint is irrelevant. But even taken at face value, Texas's claim is false. As the record reflects, including on Form I-134A itself, individuals seeking to sponsor CHNV nationals for parole must certify, *under penalty of perjury*, to financially support their intended beneficiary for the extent of their two-year parole period. *See, e.g.*, United States Citizenship and Immigr. Servs., *Form I-134A, Declaration of Financial Support*, Int.

---

[23] 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16.

[24] *Id.*

[25] 8 U.S.C. § 1101.

[26] 8 U.S.C. § 1254a.

[27] 8 U.S.C. § 1101(a)(27)(J); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 235(d), 122 Stat. 5044 (2008).

[28] 8 U.S.C. § 1229(b).

Defs' Trial Ex. 67.[29] And the fact that "no enforcement actions had commenced," Texas's Post-Trial Brief at 64–65, three months after the rollout of the CHNV Pathways, is irrelevant. Binding obligations need not reflect "enforcement actions" and, in any event, the statute requires no such "enforcement actions" at all. *See* 8 U.S.C. § 1182(d)(5).Contrary to what Texas would have this Court believe, the Executive's use of the parole authority is not a backdoor to "an entirely new and parallel immigration system"—it is part and parcel of the comprehensive immigration system Congress passed. The CHNV Pathways were not implemented pursuant to the *visa* authority, but rather, the *parole* authority. They are distinct but complementary statutory frameworks, with distinct histories, requirements, and authorizations, and they have been utilized alongside one another by over seven decades of successive administrations. *See, e.g.*, Int. Defs' Post-Trial Brief, ECF No. 282 at 22–40. Comparisons to any other immigration pathways can be only that— comparisons. And they certainly do not invoke the major questions doctrine where the CHNV Pathways are grounded in "clear congressional authorization" in the *parole* statute. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (internal quotations omitted).

Thus, despite Texas's attempts to convince the Court otherwise, the CHNV Pathways must rise or fall on the text and history of the parole statute, not a straw

---

[29] The penalty for federal perjury includes fines and imprisonment for up to five years. 18 U.S.C. § 1621.

man modeled after the visa process. Because Texas does not have the support of either case law or history, its arguments fail.

### C.     Texas Has Failed to Prove the CHNV Pathways Are Not the Product of Reasoned Decision-Making.

The CHNV Pathways Texas amply satisfy the APA's requirement for reasoned decision-making; indeed, DHS provided *far* more explanation of the various factors affecting its decision to create the CHNV Pathways than is historically typical for the creation of parole programs. The reasons that it gave, moreover, are of the same kind that led past Administrations to create materially indistinguishable parole programs. *See* Int. Defs' Post-Trial PFOF/COL, ECF No. 281 at ¶¶136–53; Schacher Expert Decl., Int. Defs' Trial Ex. 141 at ¶ 63.

Texas nonetheless asserts that DHS acted arbitrarily and capriciously in creating the CHNV Pathways because, Texas claims, it "failed to consider [Texas's] reliance interests." Texas's Post-Trial Brief at 57. But Texas could not coherently articulate *what* those reliance interests are, even when this Court pressed it at trial. Trial Tr. vol. 2 of 2 at 320:5–329:22. Read most charitably, Texas's arguments conflate "reliance interests" with "costs to the States," Texas's Post-Trial Brief at 57, even where (as here) those alleged costs are not due to the reliance on anything at all and, in any event, were *lowered* by the challenged agency action. *See supra* Section I(B)(3)(b). Texas can cite nothing to support its idiosyncratic view of the law. *See also* Trial Tr. vol. 2 of 2 at 320:5–329:22 (questions and answers regarding Texas's inability to articulate any reliance interests at stake).

The other arbitrary and capricious argument in Texas's brief fares no better. Similar to a version of its "contrary to law" argument, Texas asserts that "it was arbitrary and capricious for the Defendants to institute the Parole Program" given the likelihood that—due to other aspects of immigration law and decisions that might be made in the future by either of the political branches—some parolees would stay beyond their initial two-year grant of parole. Texas's Post-Trial Brief at 56. As discussed above, *supra* Section II(A)(3), Congress enacted the current version of the parole statute knowing with certainty that some noncitizens would be paroled in and would later stay permanently pursuant to lawful avenues, because in the same statute it reaffirmed the ability of Cuban parolees to adjust to lawful permanent residence after just one year. In other words, when it enacted the operative version of the parole statute, Congress was well aware of how its application would interact with other aspects of immigration law and policy, which it even reinforced, through reenactment of the Cuban Adjustment Act; these interactions are thus no basis to conclude that the agency acted arbitrarily and capriciously.

## III.    Texas Seeks an Extreme and Unwarranted Scope of Relief.

### A.    Texas has Not Shown Harm That Warrants a Nationwide Injunction.

To support its claim for nationwide injunctive relief, Texas only asserts—without citing any evidence—that the CHNV Pathways will impose costs related to driver's licenses, health care, education, and incarceration. Texas's Post-Trial Brief at 84. This single self-serving and unsubstantiated assertion is not sufficient for Texas to carry its "burden of persuasion" to show that the balance of equities and the

public interest weigh in favor of injunctive relief. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

It is telling that, in requesting nationwide relief, Texas does not even cite its own supporting declarations—the only "evidence" of any of Texas's alleged harms—when it claims that the CHNV Pathways inflict injury justifying injunctive relief. The declarations, after all, substantiate very little, instead describing Texas's alleged harms entirely in terms of estimates, hypotheticals, and unsupported beliefs that either concern undocumented immigrants, a population not at issue in this case, or are only indirectly associated with the CHNV Pathways. *See, e.g.*, Declaration of Sheri Gipson, Pls' Trial Ex. 4 at ¶¶ 8-10 (outlining only "estimated costs" for issuing driver's licenses; claiming that DPS "may" have to devote more resources to issuing driver's licenses; asserting that the CHNV Pathways "may" create an "added customer base"); Declaration of Rebecca Waltz, Pls' Trial Ex. 5 at ¶¶ 3, 6, 9 (providing an "estimate of the cost" for incarcerating "undocumented" individuals; stating only that "it is my belief" that undocumented individuals will contribute to incarceration costs); Declaration of James Terry, Pls' Trial Ex. 6 at ¶¶ 3–5, 7 (providing "estimates" of "approximate[]" costs associated with education; outlining a hypothetical based on unaccompanied immigrant children, a population not eligible for the CHNV Pathways); Declaration of Susan Bricker, Pls' Trial Ex. 7 at ¶¶ 5–12 (providing only "estimates" or "estimated costs" of health care associated with undocumented individuals, with a "margin of uncertainty"). Nor do the declarations, or any other

evidence proffered by Texas, address substantial evidence in the record that Texas's alleged harms are non-existent and otherwise directly offset by other revenues or benefits. *See supra* Section I(B)(3)(b); *see generally* Roldan Expert Decl., Int. Defs' Trial Ex. 140; Gándara and Orfield Joint Expert Decl., Int. Defs' Trial Ex. 136; Supplemental Expert Declaration of Leighton Ku, Int. Defs' Trial Ex. 1; Kubrin Expert Decl., Int. Defs' Trial Ex. 139; Hunt Expert Decl., Int. Defs' Trial Ex. 137.

Moreover, in pressing this Court for a nationwide injunction, Texas persists in ignoring the trial record and in urging this Court to do the same. Texas refuses to address, much less refute, evidence that most of its alleged injuries are either vastly smaller than Texas claims, *see supra* Section I(B)(3)(b), or aren't actually attributable to the CHNV Pathways (but instead are attributable to undocumented immigrants, a population not at issue in this case). *See, e.g.*, Gándara and Orfield Joint Expert Decl., Int. Defs' Trial Ex. 136 at ¶ 16; Supplemental Expert Declaration of Leighton Ku, Int. Defs' Trial Ex. 1 at ¶ 10; Kubrin Expert Decl., Int. Defs' Trial Ex. 139 at ¶ 10; Hunt Expert Decl., Int. Defs' Trial Ex. 137 at ¶ 4. Texas similarly refuses to address, much less refute, evidence of directly offsetting reimbursements, revenues, fees, and other countervailing benefits that significantly reduce, if not completely recompense, the harms that Texas claims. The record simply does not support Texas's claim to nationwide injunctive relief.

Moreover, Texas's self-serving claim that a nationwide injunction "is the Fifth Circuit's *default* approach in immigration cases" because the "Constitution requires a uniform Rule of Naturalization," *see* Texas's Post-Trial Brief at 79–85, is wrong for

at least two reasons. First, the Naturalization Clause of the Constitution has no bearing here because the Pathways and the parole statute are not and do not relate to a rule of naturalization, so that provision is irrelevant to the scope of relief in this case. Second, Texas wholly ignores controlling Supreme Court precedent admonishing that injunctive relief "is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter,* 555 U.S. at 24). It likewise ignores recent Fifth Circuit precedent holding that "a plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697, at *29 (5th Cir. Oct. 3, 2023) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933-34 (2018)) (internal quotation marks omitted), because "as a general rule, American courts of equity did not provide relief beyond the parties to the case." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring)) (internal quotation marks omitted). Despite Texas's insistence otherwise, controlling precedent does not compel the nationwide injunction that Texas seeks.

It is no wonder that Texas wishes the Court to turn a blind eye to such controlling precedent limiting equitable relief to the injury shown by the plaintiff: Fifteen other states and the District of Columbia submitted an amicus brief setting out the hardships they and their residents would suffer if the CHNV Pathways were enjoined, Brief for Amici Curiae States, ECF No. 247, and of the twenty-one plaintiff states who are parties to this suit, only Texas has attempted to prove any injury

caused by the CHNV Pathways. Moreover, to the extent that this Court finds Texas has shown injury at all, it has failed to prove anything more than *de minimis* harm, much less any harm that outweighs the likely and substantial harm an injunction would inflict on Intervenor Defendants, the Federal Defendants, and the public interest. Given the trial record developed in this case, the nationwide injunction that Texas seeks would impermissibly stray beyond "vindicat[ing] the individual rights of the people appearing before [the court]" to "vindicat[ing] . . . generalized partisan preferences." *Missouri*, 2023 WL 6425697, at *29 (quoting *Gill*, 138 S. Ct. at 1933–34; *see also Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *16 (S.D. Tex. Sept. 26, 2023) ("[W]hen a court . . . order[s] the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." (quoting *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring))).

Texas cannot avoid the fact that it has failed "to prove that whatever injunction [it] request[s] is broad enough to protect against [its] proven injuries and no broader." *Feds for Med. Freedom*, 63 F.4th at 389. Neither the record nor the case law supports a nationwide injunction here.

### B. Texas Has Entirely Failed to Address Harms to Intervenor Defendants and to the Public Interest.

Texas likewise fails to address the substantial record documenting the harms that an injunction would inflict on Federal Defendants, Intervenor Defendants, and the public interest. Texas's only mention of the balance of equities is its self-serving

assertion that the Defendants "face essentially no harm from maintaining the status quo ante," Texas's Post-Trial Brief at 84, while citing *no evidence*, but only *DAPA*—a case with an entirely different factual record and entirely different legal issues—for the proposition that the CHNV Pathways would inflict financial losses on Texas that outweigh any harms an injunction might cause. 809 F.3d at 187. This does not satisfy Texas's "burden of persuasion" to show that injunctive relief—indeed, any relief—is warranted. *Holland Am. Ins. Co.*, 777 F.2d at 997.

In its post-trial briefing and proposed findings of fact and conclusions of law, Texas fails even to acknowledge or address record evidence of the immeasurable benefits of the CHNV Pathways that an injunction would eliminate, including the humanitarian protections that a safe pathway to the United States affords;[30] the free exercise of deeply held religious beliefs;[31] the reunification of families;[32] safety from harm;[33] and economic growth, including where it serves mutual interests.[34]

---

[30] Declaration of Heather Scanlon ("Scanlon Decl."), Int. Defs' Trial Ex. 133 at ¶ 18 (expressing relief that her sponsored parole beneficiaries "no longer need to brave the dangers of the overland trek to the southern border or expose themselves to the risk that they will be trafficked or assaulted").

[31] Supplemental Declaration of Dr. Nan Langowitz, Int. Defs' Trial Ex. 120 ¶ 14 ("Welcoming others in need is an integral expression of our faith . . . It has really brought our synagogue together.")

[32] Arauz Decl., Int. Defs' Trial Ex. 123  ¶ 13 ("I am now sponsoring my husband. . . because I need my husband and my son urgently needs his father").

[33] Supplemental Declaration of Anne Valerie Daniel-Laveus ("Supp. Laveus Decl."), Int. Defs' Trial Ex. 122 ¶ 25 ("I just want my brother and nephew to be safe and with the rest of our family and to have access to the same opportunities I had.").

[34] *See* Hunt Expert Decl., Int. Defs' Trial Ex. 137 at ¶ 3 ("Data shows that immigrants expand the U.S. economy's productive capacity, stimulate investment, increase aggregate demand, and promote specialization that in the long run boosts

For example, Ms. Scanlon, awaits the opportunity to sponsor a woman and her daughter so that they can avoid making the perilous journey through the Darien Gap to reach safety in the United States. Scanlon Decl., Int. Defs' Trial Ex. 133 at ¶¶ 4–7, 12, 18. And Mr. Zito also remains in limbo while awaiting the opportunity to finally sponsor Abel, whom he sees as "a brother in need." Declaration of Paul Zito ("Zito Decl."), Int. Defs' Trial Ex. 129 at ¶ 14. Mr. Zito sees "the opportunity [to sponsor Abel] for what it is: a calling from God." *Id.* Likewise, Major League Baseball pitcher, Eduardo Rodriguez, remains in limbo. Declaration of Eduardo Jose Rodriguez Hernandez ("Rodriguez Hernandez Decl."), Int. Def' Trial Ex. 132 at ¶¶ 4–5. He has sponsored his parents so that they can finally come see him play in the big leagues in person. *Id.* ¶¶ 2, 4–6, 8, 10–12. And the trial record, which remains unrefuted, clearly establishes that immigration increases economic growth while having no negative impact on native employment. Hunt Expert Decl., Int. Defs' Trial Ex. 137 at ¶ 6.

Texas makes no effort to address, much less refute, any of these significant interests that weigh against injunctive relief. Nor does Texas acknowledge, much less refute, the significant public benefits of the CHNV Pathways, as articulated in the relevant Federal Register Notices, including the urgent humanitarian reasons compelling mass migration from the CHNV countries, enhancing national security,

---

productivity."); Declaration of Eric Sype ("Sype Decl."), Int. Defs' Trial Ex. 125 ¶¶ 9, 11 ("Oldrys. . . is chronically underemployed and barely earns enough to meet his family's basic needs. . . The economic situation has only gotten worse with the pandemic and political instability in Nicaragua. . . The family farm [where Oldrys plans to work in Washington] constantly suffers from labor shortages and is looking for additional workers.").

reducing irregular migration, improving vetting of migrants, reducing strain on DHS personnel and resources at the border, including in Texas, disincentivizing irregular migration that endangers migrant lives and enriches smuggling networks, and fulfilling important foreign policy goals. *See generally* Venezuelan Parole Process FRN, 87 Fed. Reg. at 63507; Cuban Parole Process FRN, 88 Fed. Reg. at 1266; Haitian Parole Process FRN, 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Changes to Venezuelan Parole Process FRN, 88 Fed. Reg. at 1279. Even if the Court believes the reasons given therein are inadequate, they are still plainly relevant to the balancing this Court must engage in when considering whether to order injunctive relief. What is more, the trial record is clear that foreign policy concerns and negotiations with foreign countries were key to the development and implementation of the CHNV Pathways, and that enjoining or vacating the CHNV Pathways would complicate foreign relations with Mexico and other regional partners. *See, e.g.*, Trial Tr. vol. 1 of 2 at 194:8–17; Nunez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶¶ 37–38.

In urging this Court to dismiss the significant foreign policy concerns that weigh against permanent nationwide injunctive relief, Texas relies on *Holder v. Humanitarian Law Project* for the proposition that Supreme Court precedents "make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." Texas's Post-Trial Brief at 85 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)). But such an argument again requires the Court to engage in willful blindness and ignore that in *Holder*, the

Supreme Court ultimately *deferred* to the executive's foreign policy judgment, observing that "when it comes to collecting evidence and drawing factual inferences in this area [of national security and foreign relations], 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate." 561 U.S. at 34 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)). *Holder* does *not* command the lower courts to engage in an independent assessment of the national security and foreign policy concerns implicated by an executive action, as Texas suggests. To the contrary, *Holder* stresses that "national security and foreign policy concerns arise . . . in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess," such that the conclusions the executive branch reaches are entitled to the deference of the courts, which do not have access to the same facts and evidence as the executive. *Id.* at 33–34.

Thus, even if the Court does find that Texas has proven some minimal amount of injury, that injury is vastly outweighed by the harms an injunction would inflict on the Federal and Intervenor Defendants, at least fifteen other states, and the public interest.

### C. Vacatur Is Not Warranted Where Remand Without Vacatur Would Be Sufficient.

To the extent that this Court determines that any relief is warranted, the Court should remand to the agency without vacatur. Texas spills a great deal of ink arguing in favor of a nationwide vacatur, but "only in rare circumstances is remand for agency reconsideration not the appropriate solution." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (quoting *O'Reilly*

*v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238–39 (5th Cir. 2007)) (internal punctuation omitted) (emphasis added). Remand is appropriate here because "there is at least a serious possibility that the [agency] will be able to substantiate its decision given an opportunity to do so, and . . . vacating would be disruptive." *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (internal punctuation and citation omitted); *see also DACA*, 50 F.4th at 529; *Tex. Ass'n of Mfrs.*, 989 F.3d at 389.

First, to the extent the Court finds that Federal Defendants did not sufficiently consider certain factors—for example, the alleged reliance interests that Texas has consistently failed to identify, *see* Texas's Post-Trial Brief at 57; Trial Tr. vol. 2 of 2 at 320:5–329:22, or that the agency should have engaged in notice and comment rulemaking—remand would allow DHS to adopt such factors into its analysis or to allow public comment on the CHNV Pathways, and therefore cure any deficiency. *See, e.g., Tex. Ass'n of Mfrs.*, 989 F.3d at 389 (remanding without vacatur because "there is a serious possibility that the [agency] will be able to remedy its failures" and because the agency "must allow industry to comment and consider the new justification for the Final Rule"). Likewise, if the Court finds that the CHNV Pathways are unauthorized by the statute because the statute requires further individualized assessment of the urgent humanitarian reason or the significant public benefit of a grant of parole, remand would allow the agency to revise the CHNV Pathways to incorporate such a requirement. Texas cites several out-of-circuit cases suggesting that without vacatur, an agency will delay taking action to rectify a rule

that a court has found unlawful, but Texas cites to no evidence in the record indicating that such bad faith delay will occur here—because no such evidence exists.

Second, Texas also fails to grapple with the record as it relates to the factor of disruptiveness. Texas's Post-Trial Brief at 82–83. The record is replete with undisputed evidence that the Federal Defendants created and adopted the CHNV Pathways based on sensitive negotiations with foreign partners to manage migration collaboratively in the hemisphere—and that these negotiations would unravel if the CHNV Pathways are enjoined, and as a result, irregular migration to the United States from Cuba, Haiti, Nicaragua, and Venezuela would increase. *See, e.g.*, Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶¶ 37–38, 48–61. The record likewise reflects that enjoining the CHNV Pathways would disrupt the lives of Intervenor Defendants, as well as the lives of millions of other United States citizens and residents who have sponsored or await their opportunity to sponsor parole beneficiaries through the CHNV Pathways, by preventing them from reuniting with family,[35] expressing their sincerely held religious beliefs,[36] extending humanitarian aid to individuals in need,[37]

---

[35] Declaration of Dr. Germán A. Cadenas, Int. Defs' Trial Ex. 117 ¶¶ 2, 7, 11; Laveus Decl., Int. Defs' Trial Ex. 121 ¶¶ 4, 6, 8–10, 16; Supp. Laveus Decl., Int. Defs' Trial Ex. 122 ¶ 15; Arauz Decl., Int. Defs' Trial Ex. 123 at ¶¶ 4, 13; Supplemental Declaration of Francis Margarita Arauz Ramirez, Int. Defs' Trial Ex. 124 ¶ 6; Rodriguez Hernandez Decl., Int. Defs' Trial Ex. 132, ¶¶ 1–2, 8.

[36] Declaration of Dr. Nan Langwitz, Int. Defs' Trial Ex. 119 ¶¶ 12, 14; Zito Decl., Int. Defs' Trial Ex. 129 ¶¶ 7–10, 14.

[37] Declaration of Dr. Kate Sugarman, Int. Defs' Trial Ex. 127 ¶¶ 3–5, 7; Scanlon Decl., Int. Defs' Trial Ex. 133 ¶ 18.

and welcoming individuals who would contribute to their local communities and economies.[38]

Texas does not even attempt to deny that vacatur would severely disrupt delicate negotiations with foreign partners, on regional migration patterns, and on the daily lives of tens of thousands of U.S.-based sponsors and their intended parole beneficiaries. Instead, Texas relies on out-of-circuit cases to argue that "[n]o amount of asserted disruptiveness" can prevent vacatur. Texas's Post-Trial Brief at 83. Adopting Texas's argument, however, would render the disruptiveness factor meaningless. Moreover, it would be inconsistent with controlling precedent expressly holding that vacatur is inappropriate when, like here, it would have disruptive consequences. *Tex. Ass'n of Mfrs.*, 989 F.3d at 389; *O'Reilly*, 477 F.3d at 238–39. Moreover, the cases Texas cites concern EPA standards intended to regulate emissions over the course of a year. *See North Carolina v. EPA*, 531 F.3d 896, 902 (D.C. Cir. 2008); *Nat. Res. Def. Council, Inc. v. EPA*, 489 F.3d 1250, 1254 (D.C. Cir. 2007). These cases have little, if any, relevance to the CHNV Pathways, which have immediate and direct impacts on foreign relations, the United States' foreign policy goals, regional migration patterns, national security, and the daily lives of tens of thousands of individuals.

The disruption that vacatur would cause is especially grave given the extraordinary remedy that Texas articulated at trial—the retroactive invalidation of

---

[38] Sype Decl., Int. Defs' Trial Ex. 125 ¶¶ 4, 10; Declaration of Jocelyn Wyatt, Int. Defs' Trial Ex. 135 ¶¶ 5–6, 8–10.

grants of parole and work authorization already issued under the CHNV Pathways. Trial Tr. vol. 1 of 2 at 174:1–7("[I]f you vacate it, it takes away any of the legal authority of anyone who was issued parole under it . . . [T]hey would then be here unlawfully."); Trial Tr. vol. 2 of 2 at 236:11-13 ("[I]f the action is nullified, then obviously, they [current parolees] will not have the status that that action grants . . . "). Texas's apparent abandonment of this remedy in its Post-Trial Brief speaks to the unlawful nature of such relief, which would require a mandatory injunction commanding the executive to *revoke* previously issued grants of parole, work authorization, and travel authorization, and to its immensely disruptive effects, which would reverberate through communities in all fifty states. Taken at face value, Texas's request for nationwide vacatur—including the vacatur of grants of parole and work authorization pursuant to the CHNV Pathways—would result in tens of thousands of paroled individuals and their families losing their ability to remain in the country and their sources of income and livelihoods, and it would result in businesses across the country losing key workers, to the detriment of local economies.

To the extent the Court finds any relief is warranted, the proper remedy is remand without vacatur, allowing the agency to cure any defects without disrupting foreign relations, national security, and the lives of tens of thousands of individuals— among them Intervenor Defendants in this case.

## CONCLUSION

For the foregoing reasons, the Court should deny Texas's requested relief.

DATED: October 27, 2023

Respectfully submitted,

*/s/ Monika Y. Langarica*
**Monika Y. Langarica\***
California Bar No. 308518
langarica@law.ucla.edu

**Ahilan T. Arulanantham\***
California Bar No. 237841
arulanantham@law.ucla.edu

**Talia Inlender\***
California Bar No. 253796
inlender@law.ucla.edu

**CENTER FOR IMMIGRATION LAW AND POLICY**
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

**Esther H. Sung (Attorney-In-Charge)\***
California Bar No. 255962
Application for Admission pending
esther.sung@justiceactioncenter.org

**Karen C. Tumlin\***
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Jane Bentrott\***
California Bar No. 323562
D.C. Bar No. 1029681
Virginia Bar No. 87903
jane.bentrott@justiceactioncenter.org

**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

68

**Brandon Galli-Graves***
Texas Bar No. 24132050
brandon.galli-graves@raicestexas.org

**THE REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES (RAICES)**
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
Telephone: (210) 960-3206
Facsimile: (210) 634-1279

**Will Thompson**
Texas Bar No. 24094981
willthompson@quinnemanuel.com

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
3100 McKinnon Street, Suite 1125
Dallas, Texas 75201
Telephone: (469) 902-3612
Facsimile: (469) 902-3610

*admitted pro hac vice

**CERTIFICATE OF SERVICE**

I certify that on the 27th day of October 2023, a copy of the foregoing instrument was served upon all counsel of record in this matter via ECF pursuant to the Federal Rules of Civil Procedure.

/s/ *Monika Y. Langarica*