**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:23-cv-00007 |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
POST-TRIAL SUPPLEMENTAL BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 1

    I.    Plaintiffs lack standing to challenge the parole processes. .................................... 1

    II.   Plaintiffs' claims are not reviewable under the APA ........................................ 22

    III.  The CHNV processes are consistent with Section 1182(d)(5)(A) ..................... 31

    IV.  Parole grants for CHNV nationals are temporary, and the CHNV processes directly address the problem of unremovable CHNV nationals .................................... 37

    V.   Plaintiffs have not identified any reliance interests ........................................ 42

    VI.  The major questions doctrine does not apply in this case. ............................... 43

    VII. Plaintiffs' "at equity" ultra vires claim is not viable ...................................... 46

    VIII. Notice-and-comment rulemaking was not required ........................................ 51

    IX.  Scope of relief .............................................................................................. 56

CONCLUSION ............................................................................................................... 62

# TABLE OF AUTHORITIES

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2485 (2021) ................................................................................. 44

*Apter v. HHS*,
  80 F.4th 579 (5th Cir. 2023) ............................................................ 46, 47, 48, 49

*Arizona v. Biden*,
  31 F.4th 469 (6th Cir. 2022) .......................................................................... 60

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ...................................................................... 56, 60

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................................ 46, 51

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) .......................................................................... 37

*Babb v. Wilkie*,
  140 S. Ct. 1168 (2020) .................................................................................. 23

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................ 26, 28, 30

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) .................................................................................. 18

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ........................................................................... passim

*Boelens v. Redman Homes, Inc.*,
  759 F.2d 504 (5th Cir. 1985) ........................................................................... 3

*Brnovich v. Biden*,
  630 F. Supp. 3d 1157 (D. Ariz. 2022) ............................................................... 14

*Capital Area Immigrants' Rights. Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ............................................................... 52, 53

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) .......................................................................... 56

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................. 5

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ............................................................................... 26

*Cruz-Miguel v. Holder*,
    650 F.3d 189 (2d Cir. 2011) ................................................................. 35

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ............................................................... 58

*Davis v. FEC*,
    554 U.S. 724 (2008) ................................................................................. 1

*Department of Homeland Security v. New York*,
    140 S. Ct. 599 (2020) ............................................................................. 56

*Department of Homeland Security v. Regents of Univ. of California*,
    140 S. Ct. 1891 (2020) ..................................................................... 18, 42

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ........................................................................... 17

*DRG Funding Corp. v. HUD*,
    76 F.3d 1212 (D.C. Cir. 1996) ............................................................. 28

*E. Bay Sanctuary Covenant v. Trump*,
    909 F.3d 1219 (9th Cir. 2018) ............................................................. 53

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020) ............................................................... 13

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ............................................................................... 52

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ............................................................... 26

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) ........................................................ passim

*Feds for Med. Freedom v. Biden*,
    581 F. Supp. 3d 826 (S.D. Tex.) .................................................... 49, 50

*FERC v. Electric Power Supply Ass'n,*
    577 U.S. 260 (2016) ..................................................................................... 39

*Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros,*
    53 F.3d 1565 (11th Cir. 1995) ..................................................................... 39

*Florida v. Mayorkas,*
    --- F.Supp.3d ----, 2023 WL 3398099 (N.D. Fla. May 11, 2023) ............................ 6, 7

*Florida v. United States,*
    No. 3:21-CV-1066-TKW-ZCB, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) ........................ 7

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ..................................................................................... 49

*Funk v. Stryker Corp.,*
    631 F.3d 777 (5th Cir. 2011) ...................................................... 10, 11, 12

*Gahagan v. USCIS,*
    911 F.3d 298 (5th Cir. 2018) ........................................................................ 23

*Gen. Land Off. v. Biden,*
    71 F.4th 264 (5th Cir. 2023) .......................................................................... 2

*Geyen v. Marsh,*
    775 F.2d 1303 (5th Cir. 1985) ..................................................................... 46

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ................................................................ 57, 60, 61

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ..................................................................................... 25

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ......................................................................................... 59

*In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.,*
    No. MDL 1712, 2008 WL 2246989 (E.D. Pa. May 30, 2008) ................................ 14

*In re Gee,*
    941 F.3d 153 (5th Cir. 2019) ........................................................................ 14

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ................................................................................... 34

*King v. Burwell,*
  576 U.S. 473 (2015)..................................................................44

*Kitty Hawk Aircargo, Inc. v. Chao,*
  418 F.3d 453 (5th Cir. 2005) ......................................................2

*Lane v. Halliburton,*
  529 F.3d 548 (5th Cir. 2008) ....................................................53

*Larson v. Domestic & Foreign Com. Corp.,*
  337 U.S. 682 (1949)..................................................................46

*Linda R.S. v. Richard D.,*
  410 U.S. 614 (1973)..................................................................16

*Loa-Herrera v. Trominski,*
  231 F.3d 984 (5th Cir. 2000) ....................................................24

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990).............................................................14, 27

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992).............................................................15, 21

*Lynch v. Leis,*
  382 F.3d 642 (6th Cir. 2004) ..................................................4, 5

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994).............................................................60, 61

*Martinelli v. Hearst Newspapers, L.L.C.,*
  65 F.4th 231 (5th Cir. 2023) ....................................................34

*Mast Indus., Inc. v. Regan,*
  596 F. Supp. 1567 (Ct. Int'l Trade 1984) ................................53

*Mexichem Fluor, Inc. v. EPA,*
  866 F.3d 451 (D.C. Cir. 2017) ..................................................57

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)....................................................................37

*Music, Inc. v. Xanthas, Inc.,*
  855 F.2d 233 (5th Cir. 1988) ....................................................36

*Nat. Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ................................................................. 57

*Nat'l Min. Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................... 28

*New York v. Permanent Mission of India to United Nations*,
   618 F.3d 172 (2d Cir. 2010) ................................................................... 52

*Ortega-Cervantes v. Gonzales*,
   501 F.3d 1111 (9th Cir. 2007) ............................................................... 35

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ............................................................................... 41

*Park v. Forest Serv. of the United States*,
   205 F.3d 1034 (8th Cir. 2000) ................................................................. 2

*Patel v. Garland*,
   142 S. Ct. 1614 (2022) ........................................................................... 24

*Pederson v. Louisiana State Univ.*,
   213 F.3d 858 (5th Cir. 2000) ................................................................... 1

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ............................................................................... 35

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007) ............................................................................. 2, 3

*Roe v. Mayorkas*,
   2023 WL 3466327 (D. Mass. May 12, 2023) ......................................... 52

*S. Utah Wilderness All. v. Palma*,
   707 F.3d 1143 (10th Cir. 2013) ............................................................... 3

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
   402 F.3d 1198 (Fed. Cir. 2005) ............................................................... 3

*Smith v. GC Servs. Ltd. P'ship*,
   986 F.3d 708 (7th Cir. 2021) ................................................................. 14

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................... 14

*Sure-Tan, Inc. v. N.L.R.B.*,
  467 U.S. 883 (1984) ................................................................................ 16

*Texas Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir. 1998) .................................................................. 40

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ............................................................ passim

*Texas v. Biden*,
  No. 6:22-CV-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) .............. 5, 60

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) .................................................................... 1

*Texas v. United States*,
  106 F.3d 661 (5th Cir. 1997) .................................................................. 20

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ........................................................................... 35

*United States v. Cortez*,
  449 U.S. 411 (1981) ............................................................................... 59

*United States v. Hoang*,
  636 F.3d 677 (5th Cir. 2011) .................................................................. 35

*United States v. House*,
  808 F.2d 508 (7th Cir. 1986) .................................................................... 9

*United States* v. *Texas*,
  143 S. Ct. 1964 (2023) ..................................................................... passim

*Util. Air Regul. Grp. v E.P.A*.,
  573 U.S. 302 (2014) ......................................................................... 43, 45

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) .................................................................... 14

*Winter v. NRDC*,
  555 U.S. 7 (2008) ........................................................................... 58, 60

*Yassini v. Crosland*,
  618 F.2d 1356, 1360 (9th Cir. 1980) ....................................................... 54

*Youth Alive v. Hauppauge Sch. Dist.*,
   No. 08-CV-1068 NGG VMS, 2012 WL 4891561 (E.D.N.Y. Oct. 15, 2012) ......................... 14

**Statutes**

5 U.S.C. § 553(a)(1) ........................................................................................................ 52, 54

5 U.S.C. § 553(d) ................................................................................................................... 55

8 U.S.C. § 1151(c) .................................................................................................................. 45

8 U.S.C. § 1182(d)(5)(A) ................................................................................................... 31, 45

## INTRODUCTION

For the reasons set out in Defendants' Post-trial Brief and Proposed Findings of Fact and Conclusions of Law, Dkt. Nos. 283-84, the Court should reject Plaintiffs' challenges to the CHNV parole processes and grant judgment in Defendants' favor. Here, Defendants respond to arguments Plaintiffs raise in their post-trial brief and their proposed findings and conclusions. Dkt. Nos. 285-86. For the reasons set out below, none of the arguments Plaintiffs raise show that they have standing, that the Court has jurisdiction, or that any of their claims succeed on the merits. And even if they did, there is no basis for the overbroad relief Plaintiffs seek.

## ARGUMENT

**I.    Plaintiffs lack standing to challenge the parole processes.**

### A.  Standing is determined based on the time of the operative complaint.

In their post-trial brief, Plaintiffs first argue that the Court should assess standing as of the date they filed their original rather than amended complaint. Dkt. 285 at 1. That is incorrect. As both the Supreme Court and the Fifth Circuit have held, where a plaintiff voluntarily amends a complaint, standing is judged by the facts as they existed at the time of amendment. *See* Dkt. 284 at 4. Plaintiffs have provided no reason to depart from these controlling and longstanding precedents. In their brief, Plaintiffs cite a variety of cases in support of their incorrect argument that standing should be determined at the time of the initial complaint. These cases do not support Plaintiffs' position, however, because they either did not involve an amended complaint; held, as Defendants have argued, that standing must be judged at the time of the amended complaint; or, dealt with specific exceptions to the default rule, none of which apply here.

Plaintiffs first cite *Davis v. FEC*, 554 U.S. 724, 734 (2008), and *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), Dkt. 285, at 1, but neither case involved an amended complaint. Plaintiffs next cite *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000), but the issue in that case

was that the district court improperly considered facts at "the time of trial" to determine standing. Defendants do not argue that the Court should consider the facts at the time of trial, and *Pederson* otherwise says nothing that undermines Defendants' argument that the relevant time to determine standing is as of the amended complaint. *See* Dkt. 284 at 4. Plaintiffs also cite the border wall case, but that case also did not involve an amended complaint. *See* Dkt. 285 at 1-2 (citing *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023)). Plaintiffs cite language from that decision declining to address post-complaint factual developments when assessing standing, but the quoted language addressed whether factual developments after the *operative* complaint can defeat standing, not whether factual developments *before* the amended, operative complaint can defeat standing. *Id*. at 272 n.12. Plaintiffs' reliance on *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005), and *Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037 (8th Cir. 2000), Dkt. 285 at 2, is misplaced for the same reason. Neither case involved an amended complaint. In cases where there is no amended complaint, standing is judged at the time of the initial, and only, complaint, but the language Plaintiffs cite in these cases says nothing about the rule in cases where a plaintiff does amend the complaint.

Plaintiffs cite *Rockwell*, but in that case, immediately after stating the default rule that standing generally is determined based on the facts at the time an action is brought, the Court held expressly that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007). The Supreme Court noted that there are exceptions to the default rule that apply, for example, in removal cases where looking at jurisdiction solely based on the time of the amended complaint could "raise forum-manipulation concerns that simply do not exist when it is the *plaintiff* who chooses a federal forum." *Id*. n.6. In the latter circumstances,

2

the Court must assess standing at the time of the amended complaint. *Id.* Plaintiffs have not identified any exception to that rule that applies here. *Rockwell* also cited approvingly the Fifth Circuit's decision in *Boelens*, *id*. at 474, which similarly held that courts "must look to the amended complaint in assessing original federal question jurisdiction." *Boelens v. Redman Homes, Inc*., 759 F.2d 504, 508 (5th Cir. 1985).

Plaintiffs next cite cases that are based on a different exception to the default rule, which applies in patent infringement cases. Dkt. 285 at 2. In patent infringement cases, courts have "held that if the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc*., 402 F.3d 1198, 1203 (Fed. Cir. 2005) (discussing exceptions to the default rule in cases involving diversity jurisdiction, the removal statute, and patent infringement). Plaintiffs cite language from the Tenth Circuit's decision in *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013), which itself quoted *Schreiber* for the proposition that standing is determined at the time of original complaint even if the complaint is amended. But, as explained, the quoted proposition applied to a patent-holder plaintiff based on a different rule that applies in patent infringement cases. The decision in *S. Utah Wilderness All.* acknowledged that, "[w]here, as here, the original complaint has been superseded by an amended complaint, [courts] examine the amended complaint in assessing a plaintiff's claims, including the allegations in support of standing." *Id*. (quotation marks and citation omitted). The decision in *S. Utah Wilderness All.* should not be read to announce some broader exception to the rule that standing must be judged as of the time of the operative complaint, and even if it did, it could not apply here since that out-of-circuit decision is inconsistent with Supreme Court and Fifth Circuit precedent holding standing is judged at the time of the operative complaint in cases like this.

Plaintiffs cite *Lynch v. Leis*, 382 F.3d 642 (6th Cir. 2004), as rejecting the argument that the time of the most recent complaint is the relevant time period. Dkt. 285 at 2. *Lynch* noted in a footnote that federal jurisdiction "may not be created by amendment" in certain circumstances, but cited a treatise that specifically addressed removal jurisdiction and diversity jurisdiction, neither of which are implicated here. *Id.* at 647 & n.4 (quoting 3 Moore's Federal Practice § 15.14[3]15–34 (3d ed. 2000)); *see also* 3 Moore's Federal Practice § 15.14[3] at n.30 (collecting decisions supporting proposition in cases removed to federal court or based on diversity jurisdiction). And the court in *Lynch* ultimately decided that "the operative date" for determining standing was "May 25, 2000," the date of "the Second Amended Complaint," despite arguments that the court should determine standing at the time of "the first complaint." *Lynch*, 382 F.3d at 647.

Plaintiffs argue that "Defendants' attempts to undermine Plaintiff States' standing by pointing to post-filing numbers of migrant flows cannot succeed," Dkt. 285 at 2, but this misstates Defendants' argument at trial and in briefing. Plaintiffs cannot establish standing because the evidence in the trial record shows that the number of CHNV nationals being released into the United States declined after implementation of the CHNV processes and before Plaintiffs filed the operative complaint. Dkt. 284 at 5-7. And even if the Court were to improperly assess standing at the time Plaintiffs filed their initial complaint, the evidence in the trial record similarly shows a decline in releases of CHNV nationals prior to that date. *Id*. Indeed, each of the four parole processes noted the sharp decline in arrivals from Venezuela prior to January 2023, and the evidence in the trial record showing a decline in arrivals and releases prior to the initial complaint was not limited to Venezuela, but includes similar evidence for all four countries before Plaintiffs initially filed suit on January 24, 2023. *See, e.g.* Dkt. 284 at 6-7.

4

Plaintiffs never grapple with the evidence in the record pre-dating this suit showing a decline in the number of CHNV nationals being released into the United States. Instead they argue that, because they are seeking prospective relief, they only need to show a prospective injury, Dkt. 285 at 3, but none of the cases they cite dealt with circumstances where the pre-complaint evidence in the record directly contradicts the alleged theory of harm. Plaintiffs concede that even with a prospective injury they must still show that the harm is "real and immediate." *Id*. (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983)). Despite this case going to trial, Plaintiffs' arguments for standing are untethered from the actual evidence in the trial record related to their alleged harm. There is no pre-complaint or pre-amended-complaint evidence in the record establishing that Plaintiffs faced a prospective injury that was concrete, real, imminent, or certainly impending. Plaintiffs thus cannot meet their burden to prove standing. *See* Dkt. 284 at 8-11.

**B.  Reduced releases of CHNV nationals and the absence of increased costs are fatal to Plaintiffs' standing.**

Plaintiffs next acknowledge the "reduc[tion] [of] overall migrant flows from the CHNV countries," but argue that the Court does not need to consider this fact, and even if it does, such consideration would not "affect the standing inquiry." Dkt. 285 at 4-15. Both assertions are wrong. As Defendants and Intervenor Defendants explained, the Court cannot consider Texas's alleged injuries from the CHNV processes in a vacuum and must instead consider them in the context of reality, by comparing Texas's costs attributable to CHNV nationals before the implementation of the CHNV processes with its costs attributable to the same population after the implementation of the CHNV processes. Dkt. 284, at 20-26; Dkt. 282, at 16-18. And doing so defeats Plaintiffs' standing. Plaintiffs do not persuasively argue to the contrary.

In the introduction to section C of their brief, titled "Plaintiff States have demonstrated a legally cognizable injury in fact," Plaintiffs cite this Court's decision in *Texas v. Biden*, No. 6:22-

CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023), for the proposition that even "a dollar or two" of injury suffices for the purpose of establishing standing. Dkt. 285 at 15. But that of course begs the question posed by the Court—how is that dollar or two of injury evaluated, in isolation or in light of the status quo ante? There is also the problem that Plaintiffs have not established that they have suffered even a dollar or two of injury. Tellingly, Plaintiffs' claim that Texas "incurs actual costs to operate its detention, educational, social services, and driver license programs due to the need to serve aliens who, due to the Defendants' policy, have been unlawfully paroled into the United States," Dkt. 285 at 16, cites to nothing the record evidence. That is because there is no evidence in the record of Texas's costs associated with CHNV nationals since the implementation of the CHNV processes. The trial record establishes that whatever those costs may be, they are less than they were before the CHNV processes were implemented. Dkt. 284, at 20-26.

In the same section of their brief, Plaintiffs cite the Fifth Circuit's decision in *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 142 S. Ct. 2528 (2022) (the "MPP" case), and a Northern District of Florida decision, *Florida v. Mayorkas*, --- F.Supp.3d ----, 2023 WL 3398099, at *5 (N.D. Fla. May 11, 2023) (*Florida II)*,[1] ostensibly for the proposition that in both cases, the Fifth Circuit and Florida district court based standing on injuries similar to those alleged by Texas in this case. Dkt. 285 at 16-17. But that is simply wrong. In the MPP case, the Fifth Circuit held that the plaintiff States had standing to challenge the termination of the Migrant Protection Protocols ("MPP") based upon the district court's factual

---

[1] Lest there be no confusion, the *Florida* decision Texas cites is not the decision issued by the district court in the Northern District of Florida concerning the government's Parole Plus Alternative to Detention Policy that proceeded through trial in Pensacola earlier this year. It is instead a decision granting an emergency motion for a temporary restraining order in a more recent related case.

finding that "MPP's termination has increased the number of immigrants paroled into Texas," 20 F.4th at 970, thereby resulting in increased costs to the State, *id*. at 970-72 (finding standing where the challenged action "increased the number of parolees in the state" overall). Plaintiffs quote language from the MPP case noting that standing can be shown through "large-scale statistics and figures," 20 F.4th at 971, but, unlike in the MPP case, the trial record here is devoid of any such statistics showing an increase in the relevant population following the challenged agency actions.

In *Florida II*, the court did not grapple with standing, instead simply concluding the State had standing for same reasons the court concluded the State had standing in an earlier, related case, *Florida v. United States*, No. 3:21-CV-1066-TKW-ZCB, 2023 WL 2399883, at *18 (N.D. Fla. Mar. 8, 2023) (*Florida I*). *Florida II*, 2023 WL 3398099, *4 ("The Court determined in *Florida [I]* that . . . Florida had standing. . . . The Court sees nothing materially different about the new policy or the parties' arguments that would compel a different result with respect to the policy challenged in this case."). In *Florida I*, the Court based standing upon a finding that "the evidence showed that the number of 'immigrant children and youth' enrolled in Florida schools have increased by more than 17,000 students since January 2021, which is corresponds [sic] to the timeframe within which more than 100,000 aliens (including many family units with children) were released into Florida under the challenged policies." *Florida I*, 2023 WL 2399883, at *18. Thus, in both the MPP case and the *Florida* cases, standing was premised upon the same rationale: The presence of more noncitizens in the State who qualify for specific State sponsored programs meant more costs to the State. But here, all the evidence shows that *fewer* CHNV nationals were released in Texas in the months following implementation of the CHNV processes. In short, neither the MPP case nor the *Florida* cases stand for the proposition that the Court can consider

the CHNV processes in the abstract without reference to whether Texas's costs increased or decreased following their implementation.

Plaintiffs do not make any specific arguments in support of their contention that the Court can compare the alleged costs imposed by CHNV nationals in the months following the parole processes against a baseline of zero. Instead, in Section B of their brief, titled "Offsetting benefits in the form of reduced overall migrant flows from the CHNV countries do not affect the standing inquiry," Plaintiffs argue that even if Defendants are correct that the Court must compare Texas's costs before and after the implementation of the CHNV processes, Plaintiffs still have standing. Dkt. 285 at 4-15. These arguments fail.

Plaintiffs state that even if it is true that the CHNV processes reduced the total number of CHNV nationals in Texas (as Plaintiffs conceded at trial, Tr. 31:25-132:6, 132:10-20, 244:6-17), Texas is still injured because the CHNV processes increased the number of CHNV nationals who are paroled into the State and thus eligible for driver's licenses, resulting in a cost to the State. Dkt. 285 at 4. The problem with Plaintiffs' argument is two-fold. First, Plaintiffs have not pointed to any evidence to show that the number of CHNV nationals released into Texas has increased since the CHNV processes were implemented. Parole under Section 1182(d)(5)(A) existed prior to the CHNV processes, and all the evidence in the trial record indicates that a greater number of CHNV nationals were released into Texas before the CHNV processes were implemented. *See* Defendants' Proposed Findings of Fact at ¶¶ 42-46, 64-68, and Proposed Conclusions of Law at ¶¶ 31, 186-205. Second, Texas makes money from the issuance of driver's licenses. Dkt. 284 at 17; Exs. R, S. Each license costs Texas $1.80, Pl.'s Ex. 4, ¶ 8, Defendants' Ex. S, whereas Texas charges $33 for each license. Defendants' Ex. R. Thus, even if Texas were issuing more driver's licenses to CHNV nationals now than before the implementation of the CHNV processes—a fact

that is nowhere in the record—Texas would still incur a profit, not a loss, from issuing more licenses.

Plaintiffs' next argument fares no better. Plaintiffs argue that "[t]hose who impose fiscal harm on one unit of the government cannot negate that injury by showing that their illegal acts saved the government money in other areas and wound up as a net positive to the public fisc." Dkt. 285 at 5. But Plaintiffs have mischaracterized Defendants' argument. Defendants are not arguing that savings of one type (for example, law enforcement savings) should offset costs of another type (for example, educational costs). Rather, Plaintiffs lack standing because they have not established that they have incurred costs of *any* type. Texas's "asserted injuries are the same for all its claims for relief and arise from costs imposed by the *increased presence of aliens* in Texas." Defendants' Trial Ex. O (Texas's Updated Discovery Response) (emphasis added). In other words, each category of injury that Texas claimed to suffer was based on the same premise—that costs would increase *if*—and only if—the number of CHNV nationals in Texas increased. *See* Plaintiffs' Trial Ex. 4 (Gipson Decl.), ¶ 10; Ex. 5 (Waltz Decl.), ¶ 9; Ex. 6 (Terry Decl.), ¶ 7; Pl. Opp. to Motion to Exclude, Dkt. 252, at 14; Dkt. 284 at 20-21.

But the evidence showed that the number of CHNV nationals released in to Texas *decreased* following the implementation of the CHNV Processes. *See generally* Defendants' Trial Ex. II, ¶¶ 5, 6; Tr. 132:1-6, 249:17-19. Because there is no evidence in the record of *any* cost to Texas, there is no question to resolve about whether savings of a different type may properly be considered as offsets. Plaintiffs cite a string of irrelevant cases to support their argument that costs in one area should not be offset by savings in another. Dkt. 285 at 5-6. (citing, *e.g.*, *United States v. House*, 808 F.2d 508, 509-10 (7th Cir. 1986) ("A prisoner who murders a fellow inmate must reimburse the government for funeral-related expenses—even when he can prove that the murder

saved the government money overall by freeing it of the far greater costs of housing and feeding the murdered inmate.")). But because Plaintiffs have not established any costs, the cases they cite addressing offsets in different areas are irrelevant. Plaintiffs also do not, and cannot, dispute that if Plaintiffs had been able to identify evidence of costs that the Court would have to consider offsets of the same type, as the Fifth Circuit has held. *See* Dkt. 284 at 17-18.

Plaintiffs' next argument appears to be just a repeat of its prior two, woven together. Plaintiffs argue that Texas will incur costs from allocating more resources to its Department of Public Safety ("DPS"), which issues driver's licenses. Dkt. 285 at 7. But there is no evidence in the record that demand for licenses increased, or that Texas allocated more resources to DPS after the parole processes were in place—or that such allocations are imminent.

Plaintiffs go a different direction with their next argument. They argue that although the data submitted at trial showed, as their counsel conceded, Tr. 131:25-132:6; 132:10-20, that the number of CHNV nationals being released into Texas declined following implementation of the CHNV processes, recently released post-trial data shows that the number of CHNV nationals encountered nationwide has increased since trial. Dkt. 285 at 7-12. There are several problems with this argument. First, the Court already rejected Plaintiffs' request that it consider post-trial evidence when, at trial, Plaintiffs asked the Court to allow them to submit extra-record, yet-to-be-released data in their post-trial brief—*i.e.* the exact data they rely upon here. Tr. 15:25-16:3. And it did so for good reason. As the Court noted, there is no way "to keep a trial record open after a plaintiff rests." Tr. 15:25-16:3. Plaintiffs ignore the Court's ruling, and argue, as they did at trial, that the Court can take judicial notice of the data. Dkt. 285 at 7. For this proposition, Plaintiffs rely upon *Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011). But the procedural posture in *Funk* was markedly different than here. In *Funk*, the Court held that the district court, in considering a motion

10

to dismiss under Rule 12(b)(6), properly took judicial notice of publicly available documents. *Id*. at 783. Taking judicial notice of public documents or data on a motion to dismiss is a far cry from doing so post-trial. There is a substantial risk of prejudice doing so post-trial because other parties, here Defendants, are deprived of the opportunity to address the documents or data via testimony.

Second, the data is irrelevant because as Defendants explained in their brief, standing is evaluated at the time of the operative complaint. Dkt. 284 at 4-10. Plaintiffs themselves argue that the only evidence that the Court can look at for purposes of standing is evidence that existed at the time Plaintiffs filed their original, not even amended, complaint. Dkt. 285 at 1. Plaintiffs cannot reasonably argue that the Court cannot consider evidence in the trial record from after the original complaint was filed on January 24, 2023, Dkt. 285 at 1-2, while at the same time arguing that the Court should take judicial notice of even later evidence that is not even in the trial record. Because Plaintiffs lacked standing at the time they filed both their original complaint and amended complaint, they cannot remedy that now. *See supra* at 4-5; Dkt. 284 at 4-10.

Third, the data Plaintiffs now offer to the Court is nationwide data rather than data limited to the southwest border or to Texas, despite Plaintiffs' having stipulated that they would "not submit any evidence as to injury for any other State Plaintiff" or "attempt to introduce" such evidence "at any stage of this case," Dkt. 139. Updated data limited to Texas is different than what Plaintiffs attempt to introduce in the charts in their brief, but that data is also not properly before the Court for the reasons noted above.

Fourth, even if the Court were to consider the new data Plaintiffs submit, it changes nothing. Although the number of CHNV nationals encountered by Border Patrol has increased since the time of trial, the number of encounters is still *less* than it was before the implementation of the CHNV processes, defeating Plaintiffs' theory of standing. Fifth, encounter data does not tell

the full story. As a result of the CHNV processes, certain CHNV nationals encountered by Border Patrol between ports of entry may be removed to Mexico. Ex. HH, at ¶¶ 6, 17, 25. So, unlike prior to the CHNV processes when DHS's ability to detain or remove CHNV nationals to their country of origin was limited, the number of CHNV nationals encountered by Border Patrol now is not representative of the number of CHNV nationals released into the country. *Id*. For each of these reasons, the new data improperly proffered by Plaintiffs does not change the fact that Plaintiffs cannot establish standing.

Plaintiffs' next argument challenges the premise that the decrease in the number of CHNV nationals released into Texas is attributable to the CHNV processes. Dkt. 285 at 12-13. Instead, Plaintiffs suggest that the decrease may have been caused by "the hot Texas sun," Dkt. 285 at 12, "normal seasonal variation in illegal immigrant flows," Dkt. 285 at 9, or other immigration policies such as the Circumvention of Lawful Pathways Rule, 88 Fed. Reg. 31314 (May 16, 2023), Dkt. 285 at 12. Plaintiffs' musings, however, are purely speculative because Plaintiffs declined to call any witnesses, at trial or via declaration, to provide testimony or evidence as to the causes of migration and the number of noncitizens in Texas. Nonetheless, Plaintiffs' theories do not account for the precipitous drop in CHNV encounters immediately following the implementation of the CHNV processes. Ex. HH, at ¶¶ 20-21, 26.[2] The "hot Texas sun" theory does not explain why there was a dramatic drop in encounters in October 2022 when the Venezuela process was implemented, *id.* at ¶¶ 20-21, or in January 2023 when the Cuban, Haitian and Nicaraguan processes were implemented, *id*. at ¶ 26. Neither can the Lawful Pathways Rule account for the

---

[2] Even the chart Plaintiffs improperly submit in their brief at page 8 shows a sharp decline after the CHNV processes were implemented, and this dramatic decrease was much greater following CHNV processes than at the same times in prior years.

precipitous decline in encounters in October 2022 and January 2023 because that Rule was not adopted until May 2023.

Perhaps aware of these problems, Plaintiffs fall back on arguing that migrant flows are affected by many variables. Dkt. 285 at 13. Indeed, Defendants do not dispute that migration may be influenced by many factors. But Plaintiffs carry the burden of proof. They must establish that the CHNV processes have caused Texas an injury-in-fact. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence."). Defendants have no burden to definitely prove that the decrease in CHNV nationals in Texas following the implementation of the CHNV processes is solely the result of those processes and nothing else, though the evidence in the trial record supports that conclusion. The degree to which weather, or any other factor, may contribute to migratory trends is beside the point because Plaintiffs can point to no evidence that releases of CHNV nationals into Texas increased following implementation of the parole processes. Thus, comparing Texas's costs from CHNV nationals in Texas before the CHNV processes were implemented with the same costs after the processes were implemented demonstrates that Texas has not sustained an injury—period, full stop.

Plaintiffs next argue that "[t]he Court must evaluate injury based on the specific agency action challenged here, not overall federal immigration policy or actions of foreign nations not subject to the APA." Dkt. 285 at 13. But a critical component of the CHNV processes is that they are contingent upon Mexico's accepting the removal to Mexico of CHNV noncitizens seeking to enter the United States without authorization. Dkt. 284 at 25. The deterrent effect of removal to Mexico and the United States' ability to now remove CHNV nationals to Mexico are both central to what the CHNV processes are intended to accomplish. Moreover, the quartet of decisions that

13

Plaintiffs cite in support of their argument—*Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022), *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990), *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011-12 (9th Cir. 2021), and *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1173 (D. Ariz. 2022)—did not address how to evaluate injury for purposes of standing, or standing at all. Those decisions concerned the contours of final agency action and hold that final agency action is a discrete action, not an amalgamated group of actions. None of these cases suggests that this Court should consider Texas's alleged injuries from the CHNV processes by falsely presuming a baseline of zero when doing so contravenes reality. For the reasons set forth in Defendants' brief, that is simply not the rule. Dkt. 284, at 20-26; *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("We know of no precedent for the proposition that ... a plaintiff ... retains standing to challenge ... [a] regulation in the abstract[], apart from any concrete application that threatens imminent harm to his interests. Such a holding would fly in the face of Article III's injury-in-fact requirement."); *In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019) ("To the extent the challenged regulations require Plaintiffs to do what they've already been doing [], they do not have standing to challenge them."); *Smith v. GC Servs. Ltd. P'ship*, 986 F.3d 708, 711 (7th Cir. 2021) (plaintiff lacked standing where she was no worse off than if the challenged action had not occurred); *Youth Alive v. Hauppauge Sch. Dist.*, No. 08-CV-1068 NGG VMS, 2012 WL 4891561, at *4 (E.D.N.Y. Oct. 15, 2012) (plaintiff lacks standing "when state action leaves her no worse off. Such a result would eliminate the injury-in-fact requirement for standing in Equal Protection cases entirely."); *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Pracs. Litig.*, No. MDL 1712, 2008 WL 2246989, at *5 (E.D. Pa. May 30, 2008) (dismissing class action for lack of standing where "the plaintiffs cannot show that they have suffered a concrete financial loss because they are no worse off than they were before.").

14

In sum, comparing Texas's costs attributable to CHNV nationals before the implementation of the CHNV processes with its costs attributable to the same population after the implementation of the CHNV processes, it is clear that Texas has not incurred any "concrete," "particularized," "actual," or "imminent" injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Texas v. ATF*, No. 6:23-CV-00013, Opinion at 19-20 (S. D. Tex. Oct. 27, 2023) (Tipton, J.) ("reject[ing] Texas's request to infer harm" in the absence of clear evidence "to meet its Article III burden of establishing injury-in-fact"). It has sustained no injury at all. Plaintiffs' therefore lack standing, and this case should be dismissed on that basis.

### C.  Plaintiffs have not identified a legally cognizable injury.

Plaintiffs next argue that their alleged injuries remain legally cognizable following the Supreme Court's decision in *United States v. Texas* ("*Texas priorities*"), 143 S. Ct. 1964 (2023)*,* which held that Texas's allegations of indirect financial harm were insufficient to challenge the guidance at issue in that case. Dkt. 285 at 17. To make this assertion, Plaintiffs argue that the holding of *Texas priorities* was narrow and has no application outside challenges to Executive arrest and prosecution policies. *Id*. at 17-18. But the holding of *Texas priorities* was not so limited.

This case implicates the same type of concerns that animated the Supreme Court's decision in *Texas priorities*. For example, the Supreme Court stated that, in assessing standing, courts must examine "history and tradition" to guide the determination of whether a case is one that Article III has traditionally empowered federal courts to consider. *Texas priorities*, 143 S. Ct. at 1970. Plaintiffs have not identified any history or tradition of courts finding attenuated theories of harm based on indirect financial costs allegedly caused by changes in immigration policy, the use of parole, or potential effects on a State's population sufficient to satisfy Article III. Dkt. 284 at 11-12. This case thus falls within a long line of precedent holding that Plaintiffs bear a high burden to

establish concrete harm when they are not directly regulated by a policy but rather assert only indirect harm. *Id*. at 13-17. And this case involves the same kinds of factors that the Supreme Court held have traditionally weighed against finding these sorts of injuries are redressable in federal court. For example, this case challenges agency actions that are directly intertwined with DHS's chosen method of enforcing and prosecuting the immigration laws against third parties. *Id*. at 18-20. It also involves the Executive Branch's broad constitutional discretion in carrying out foreign affairs, in addition to the discretion Congress expressly granted the Secretary in Section 1182(d)(5)(A). *Id.* And the policy choice to implement a parole process for CHNV nationals and removal to a third country for those who do not come lawfully involved a similar balancing of complicated factors, including resource constraints that made it impossible to detain or remove all CHNV nationals who otherwise might be subject to removal. *Id*. Because immigration enforcement in such circumstances involves this complicated balancing of factors, plaintiffs generally "have no judicially cognizable interest in procuring enforcement of the immigration laws" in a particular manner. *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

Plaintiffs argue that *Texas priorities* stands only for the proposition that indirect costs are insufficient to establish Article III standing if they result from the government's failure to arrest certain noncitizens. Dkt. 285 at 19-20. But *Texas priorities* followed a long line of Supreme Court decisions holding States face a substantially harder burden to show standing when they are not directly regulated by the challenged policy and any allegations of costs are thus indirect. *See* Dkt. 284 at 14-17. Even if the holding of *Texas priorities* were limited to arrest and prosecution policies, its rationale draws on cases that did not involve such policies, and it called into question more generally standing arguments based on attenuated indirect costs. *Id*. Thus, at a minimum, *Texas*

*priorities* must be read to hold that plaintiffs face a substantially higher evidentiary burden when claiming standing based on indirect social costs. That holding applies here, and Plaintiffs do not come close to identifying concrete evidence of costs sufficient to meet this burden.

Plaintiffs maintain that *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), found injury based on indirect costs and is "on-point Supreme Court precedent" this Court must apply. Dkt. 285 at 20-21. As explained, however, the injury in *Dep't of Commerce* was more direct than Plaintiffs' alleged costs here because it was based on evidence that a change in the census would undercount a State's population and lead directly to a loss of federal funds which are based on population. Dkt. 285 at 13-14. The alleged injuries here are more attenuated and indirect than the basis for standing in *Dep't of Commerce* and involve exactly the same types of allegations of harm that the Supreme Court considered and described as "attenuated" and "indirect" in *Texas priorities*, making that decision the more "on-point Supreme Court precedent."

Plaintiffs next argue that even if *Texas priorities* applies to this case generally, it would not foreclose standing because certain "exceptions articulated by the Supreme Court would apply even if it did." Dkt. 285 at 21. The Supreme Court did not, however, hold that there were necessarily exceptions to its holding; rather, it noted that certain factors might affect the standing analysis in "cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions," and reserved resolution of those questions for another day. 143 S. Ct. at 1973. Moreover, because Plaintiffs argue that this case does not involve arrest policies, they have no basis to invoke the factors the Supreme Court said might "arguably" be relevant in challenges to such policies. *Id*. In any event, even if these factors are relevant here, they do not change the standing analysis.

Plaintiffs argue *Texas priorities* does not bar standing to challenge the CHNV processes because those processes provide legal benefits, a distinction the Supreme Court said "could lead to a different standing analysis." Dkt. 285 at 21 (quoting 143 S. Ct. at 1974). Plaintiffs cite the DACA case as an example of a policy that included "provision of benefits even though that agency action did not itself supply those benefits." *Id.* at 21-22 (citing *DHS v. Regents of Univ. of California*, 140 S. Ct. 1891, 1902 (2020)). In the DACA case, however, the Supreme Court noted that "[t]he Government acknowledges that '[d]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands.'" *Regents*, 140 S. Ct. at 1913. In this case, it is Section 1182(d)(5)(A), not the CHNV processes, that provides potential eligibility for benefits. As a result, Plaintiffs' argument suffers from the same problem as many of their arguments with respect to the effects of the CHNV processes—parole under Section 1182(d)(5)(A) existed before, and would exist without, the CHNV processes, and more CHNV nationals were being released into the United States before the CHNV processes were put in place. *See* Defendants' Proposed Findings of Fact at ¶¶ 42-46, 64-68, and Proposed Conclusions of Law at ¶¶ 31, 186-205. There is thus no basis to argue that more individuals are eligible for some sort of benefit as a result of the CHNV processes. Plaintiffs' reliance on arguments related to "[i]ncreasing grants of parole," Dkt. 285 at 23, are irrelevant in the absence of evidence of any such increase.

Plaintiffs assert that injuries resulting from agency actions they claim make noncitizens eligible for benefits are "direct" injuries. Dkt. 285 at 23-24. But to make this argument, Plaintiffs rely on decisions from the DACA case, which are distinguishable for the reasons noted above. And to the extent those cases refer to the types of costs Plaintiffs raise here as direct, those decisions carry no force on this point now that the Supreme Court has described exactly the same type of injuries as *indirect* in *Texas priorities*. Plaintiffs also cite the Supreme Court's discussion of direct

injuries in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). But that case dealt with a policy that would have caused a direct financial loss to a State entity and is easily distinguishable on that basis. *See* Dkt. 284 at 13-14. Plaintiffs argue that the harm in *Nebraska* is similar to their allegations of harm related to driver's licenses. Dkt. 285 at 24-25. However, they cannot point to anything in the CHNV processes that regulates driver's licenses. Rather, their theory of harm is the same indirect theory addressed in *Texas priorities*, that immigration policy will affect the number of individuals in their State, and that those individuals in turn may impose costs on the State. As explained, Plaintiffs face a high burden to prove harm based on such an indirect theory, and their effort fails because there is no evidentiary basis to conclude either that more CHNV nationals sought Texas driver's licenses following implementation of the parole processes or that Texas incurs net costs from issuing limited-term driver's licenses.

Next, Plaintiffs argue that *Texas priorities* is distinguishable based on the Supreme Court's statement that the standing analysis might be different if an agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." Dkt. 285 at 25 (citing 143 S. Ct. at 1973-74). Plaintiffs argue the Court should find standing here based on their argument that DHS is not complying with Section 1182(d)(5)(A), but they make no attempt to trace this argument to any harm or explain how they can show standing on this basis. The evidence in the trial record shows that the CHNV processes led to the release of fewer CHNV nationals and a greater ability to enforce the immigration laws against CHNV nationals through removal to Mexico. There is no basis to conclude that DHS has abdicated a statutory duty, let alone in a manner that is causing Texas some harm. And Plaintiffs' argument that the Court should infer that DHS is not making parole decisions on a case-by-case basis, Dkt. 285 at 25-26, is not based on any record evidence. It is also inconsistent with the express terms of

the CHNV processes, which, among other things, require additional advanced vetting and advance travel authorization that can only be done on an individual basis. As the Fifth Circuit has held, "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," and a "State's allegation that defendants have failed to enforce the immigration laws … is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997).

### D. Plaintiffs have not identified injuries traceable to the CHNV processes or redressable by this Court.

Plaintiffs next argue the Court can find Texas has suffered an injury traceable to the CHNV processes. Dkt. 285 at 27-29. According to Plaintiffs, "increased expenditures for driver licenses, incarceration, education, and social services arising from the increased presence of aliens who otherwise would not be present in Texas is not so tenuously connected to the Parole Program that it cannot be traced to the Defendants' actions." Dkt. 285 at 28. This argument fails at each step.

Plaintiffs have not put forth any evidence of an "increased presence of aliens" in the State. To the contrary, all the evidence in the trial record shows that the number of CHNV nationals released into the United States was substantially lower in the months after the parole processes were implemented. *See* Defendants' Proposed Findings of Fact at ¶¶ 42-46. Plaintiffs submitted evidence related only to costs prior to the CHNV processes, and put forth no evidence that these costs have increased or that CHNV processes are causing or would be the cause of any increase even if they could identify one. *Id*. at ¶¶ 56-85. Accordingly, Plaintiffs have no evidence of increased expenditures for driver's licenses, incarceration, education, or social services for CHNV nationals following the implementation of the parole processes and no evidence of harm traceable to those processes as a result.

20

Without any evidence of causation or effect tied to the CHNV processes, there is no basis for Plaintiffs' argument for redressability. *Id*. at 28-29. Plaintiffs' argument on redressability is essentially that the increased number of CHNV nationals in Texas "would no longer be present in Texas to require the public services that they otherwise receive" without the CHNV processes. *Id*. This argument has no bearing in the absence of trial evidence that there was any increased number of CHNV nationals released in Texas in the months following implementation of the parole processes. There is thus simply no evidence of an injury that can be redressed.

The CHNV processes provide guidance to agency officials and a process through which parole requests are submitted, but they do not guarantee parole in any case or direct a CBP official to grant parole to any CHNV national when he or she arrives at a port of entry. With or without the CHNV processes, immigration officials would retain discretion to parole CHNV nationals under Section 1182(d)(5)(A), just like prior to the CHNV processes, when an increased number of CHNV nationals were arriving in the United States and DHS had fewer options to deal with them because, without the parole processes, Mexico will not accept their removal. *See* Defendants' Proposed Conclusions of Law at ¶¶ 31-39, 44; *see also Lujan*, 504 U. S., at 561; *Texas priorities*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (explaining that an injury is not redressable where "federal officials" would "possess the same underlying" discretion even without the challenged policy). Because the evidence shows that releases decreased in the months after the CHNV processes took effect, and because Mexico has made clear that its willingness to continue to accept CHNV nationals from the United States is contingent on pathways like the CHNV processes remaining in place, enjoining or vacating the CHNV processes is likely to lead to increased releases of CHNV nationals, directly contradicting and foreclosing Plaintiffs' argument for redressability. *See* Defendants' Proposed Findings of Fact at ¶¶ 49-50; Dkt. 284 at 25.

### E.  Texas is not entitled to special solicitude.

As Plaintiffs acknowledge, even where special solicitude has been applied, it was relevant to a plaintiff's burden to establish redressability. Dkt. 285 at 29. They do not argue, nor could they, that special solicitude relieves a Plaintiff of the burden or reduces the burden to satisfy Article III's requirement to prove a concrete injury in fact traceable to the challenged action. Because Plaintiffs cannot do that, special solicitude has no bearing on the standing analysis in this case. *See* Dkt. 284 at 27-30.

Even if special solicitude could make a difference in this case, Plaintiffs fail the other requirements to invoke it. First, they cannot show a particular procedural right like the one in the Clean Air Act that the Supreme Court identified as a critical aspect of its holding in *Massachusetts*. *See* Dkt. 284 at 29. Plaintiffs argue that raising an APA claim is sufficient, *see* Dkt. 285 at 29-30, but the Supreme Court has never held that an APA claim alone is sufficient to satisfy this requirement, and the Court has not applied special solitude in cases where it might otherwise have been implicated if an APA claim was alone enough, *see* Dkt. 27-28 & n.4. Nor have Plaintiffs shown that the CHNV processes affect Texas's quasi-sovereign interests. *See* Dkt. 284 at 29-30. Plaintiffs argue that the "Parole Program's pressure on Texas to change its laws relating to driver's license eligibility or participation in the Medicaid program" is enough to satisfy this requirement. Dkt. 285 at 30. This argument is missing a critical step. Plaintiffs never identify or explain how the CHNV processes are placing any pressure on the State to change these laws. Again, the trial record contains no evidence that Texas has incurred any additional costs in either of these areas, so it is entirely unclear how there could be any pressure on Texas to change its laws.

Special solicitude does not apply in this case, nor would it change the outcome of the standing analysis if it did.

## II.     Plaintiffs' claims are not reviewable under the APA.

Plaintiffs next argue that their claims are reviewable under the APA because no statute bars review, *Heckler v. Chaney* does not apply, they are in the zone of interests, and the CHNV processes are final agency actions. *See* Dkt. 285 at 31-39. There is no merit to any of these arguments.

First, Plaintiffs argue that no statute bars review in this case, and dispute that 8 U.S.C. § 1252(a)(2)(B)(ii) applies here. Dkt. 285 at 32-33. In Section 1252(a)(2)(B)(ii), Congress provided that, "[n]otwithstanding any other provision of law," "no court shall have jurisdiction to review . . . any other decision or action of the . . . Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the ... Secretary." That jurisdictional bar applies here because when Congress granted the Secretary parole authority in Section 1182(d)(5)(A), it specified that the authority was "in his discretion." *See* Defendants' Proposed Conclusions of Law at ¶¶ 68-75. Plaintiffs nonetheless maintain that Section 1252(a)(2)(B)(ii) applies only to review of decisions related to individual noncitizens and not to "programmatic" challenges. Dkt. 285 at 32-33. But the language of Section 1252(a)(2)(B)(ii) is not so limited. Section 1252(a)(2)(B)(ii) broadly bars review not only of individual decisions but also "*any* other decision or action of" the Secretary related to the relevant provisions of the INA, including the Secretary's discretionary authority under Section 1182(d)(5)(A). 8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added); *see Babb v. Wilkie*, 140 S. Ct. 1168, 1173 n.2 (2020) (noting that the Supreme Court has "repeatedly explained that the word 'any' has an expansive meaning").

Plaintiffs cite the Fifth Circuit's decision in the MPP case in support of their argument, specifically the Fifth Circuit's statement that "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." Dkt. 285 at 32 (quoting

*Texas MPP v. Biden*, 20 F.4th 928, 977 (5th Cir. 2021)). That ruling is no longer good law. The Supreme Court granted certiorari in that case and held, among other things, that Section 1252(f)(1) applied to programmatic challenges brought by Texas, foreclosing any argument that Section 1252's sub-provisions should be read as applying only to cases involving individual noncitizens. *See Biden v. Texas*, 142 S. Ct. 2528, 2538 (2022); *see also Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) (noting that the Supreme Court can overrule "Fifth Circuit precedent … implicitly" if it "establishes a rule of law inconsistent with that precedent"). The Fifth Circuit's decision in the MPP case also predates the Supreme Court's later ruling in *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022), which addressed a related section, 8 U.S.C. § 1252(a)(2)(B)(i), and held that jurisdictional bar was not limited "to certain kinds of decisions" but rather "prohibits review of *any* judgment *regarding* the granting of relief" under the relevant provisions of the INA. *Id.* (emphasis in original). In doing so, the Supreme Court clarified that the statutory bars to judicial review in Section 1252 extend "not just [to] discretionary judgments or the last-in-time judgment" in individual cases, but rather bar review of judgments "of whatever kind" including any decisions "*relating to*" or leading up to those individual decisions. *Id.* (emphasis in original). Following *Patel*, Plaintiffs can no longer argue that programmatic challenges to agency policies or practices escape Section 1252. *Id.*; *see also* Defendants' Proposed Conclusions of Law at ¶¶ 68-75.

The Fifth Circuit reached the same conclusion when reviewing a similar bar to jurisdiction in Section 1226(e) for parole decisions made under Section 1226 and that bar's effect on programmatic challenges to the manner in which those decisions are made. *Loa-Herrera v. Trominski*, 231 F.3d 984 (5th Cir. 2000). The Fifth Circuit held that where the Secretary's "discretionary judgment regarding the application of parole … is not subject to review," "the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus

24

supplied satisfies regulatory, statutory, and constitutional constraints," are also not subject to review. *Id.* at 991 (emphasis in original). The Fifth Circuit has thus held, as the Supreme Court did in *Patel*, that where a decision is discretionary and unreviewable, policies and practices for making the decisions are similarly unreviewable. *Id*. Thus, even if Section 1252(a)(2)(B)(ii) were focused on individual decisions, it would still apply to Plaintiffs' challenge to how those decisions are made.

Second, Plaintiffs argue that *Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985), does not apply to bar review because the parole processes are agency rules and *Heckler* applies only to "one-off agency enforcement decisions rather than to agency rulemaking." Dkt. 285 at 33. Here, Plaintiffs again cite the Fifth Circuit's decision in the MPP case and, once again, subsequent developments in the Supreme Court undermine Plaintiffs' argument. In *Texas priorities* the Supreme Court did not need to reach *Heckler* directly because the Court held Plaintiffs lacked standing, but it did cite *Heckler* approvingly as part of its standing analysis. *See United States v. Texas*, 143 S. Ct. 1964, 1972 (2023). By citing *Heckler*'s reasoning as relevant in a case that did not involve only "one-off agency enforcement decisions" but rather dealt with "new Guidelines for immigration enforcement," the Supreme Court indicated that *Heckler* is relevant in the latter circumstances as well. *Id*. If *Heckler* was relevant to the guidelines at issue in *Texas priorities* then it is also relevant to agency guidance related to parole decisions. Dkt. 285 at 33.

Plaintiffs also argue that *Heckler* should not apply because the CHNV processes trigger eligibility for state benefits that would not otherwise be available. Dkt. 285 at 33-34. They argue that, because "§ 1182(d)(5) parole satisfies the state's 'lawful presence' requirement—which is a prerequisite to obtaining a Texas driver's license," the parole processes remove a bar to receipt of benefits and are reviewable on that basis. Dkt. 285 at 34. But Section 1182(d)(5)(A) parole would

exist even without the CHNV processes, which do not guarantee parole to any individual and, in fact, all the evidence in the trial record indicates that a greater number of CHNV nationals were being released into Texas *prior* to the parole processes. *See also* Defendants' Proposed Findings of Fact at ¶¶ 42-46, 64-68, and Proposed Conclusions of Law at ¶¶ 31, 186-205. Plaintiffs also argue that *Heckler* does not apply because Section 1182(d)(5)(A)'s "case-by-case," and "urgent humanitarian reasons or significant public benefit" language set out specific guidelines the agency must follow. Dkt. 285 at 34. However, as explained previously and below, Congress declined to define those terms or provide any guidelines for how they should apply that would allow for judicial review. *See* Defendants' Proposed Conclusions of Law at ¶¶ 102-138.

Third, Plaintiffs argue they are in the zone of interests of the INA and therefore have a cause of action. Dkt. 285 at 34-35. This is incorrect. Plaintiffs must show that Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). It is thus incorrect for Plaintiffs to argue they are within the zone of interests of the INA as a whole or that this would be a sufficient basis to raise a challenge to implementation of Section 1182(d)(5)(A). The zone of interests "is to be determined not by reference to the overall purpose of the Act in question … but by reference to the *particular provision of law* upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasis added). Plaintiffs point to nothing in Section 1182(d)(5) that indicates Congress intended to permit a State to raise claims with respect to the implementation of that section. *See* Defendants' Proposed Conclusions of Law at ¶¶ 80-90; *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) (finding no cause of action for organizations seeking to challenge parole practices and raising similar arguments with respect to the zone of interests). The Supreme Court's recent decision in *Texas priorities* reaffirmed that non-regulated

26

parties have no cognizable interest in how the INA is enforced against others. *Texas priorities*, 143 S. Ct. at 1970-72. Although *Texas priorities* focused on Article III standing and found Texas lacked injury in fact, the principles the Supreme Court articulated are also relevant to the zone-of-interests inquiry. That inquiry requires a court to determine whether "the injury [the plaintiff] complains of (his aggrievement, or the adverse effect upon him) falls within" the interests protected by the relevant statute. *Lujan*, 497 U.S. at 883. And *Texas priorities* is relevant to that determination, affecting both what cognizable "aggrievement" or "adverse effect" a plaintiff can assert and what interests are protected by the relevant statute.

*Texas priorities* makes clear that, in enacting the INA, Congress was not concerned with protecting the interests of non-regulated entities like States that claim immigration enforcement decisions may impose downstream costs on them. Congress did not, in Section 1182(d)(5), give any indication that it intended to make allegations of the type of harm Plaintiffs allege here "legally cognizable injuries redressable by a federal court." *Texas priorities*, 143 S. Ct. at 1973 (noting the result might be different in other circumstances where Congress "specifically authorize[s] suits against the Executive Branch by a defined set of plaintiffs who have suffered concrete harms from executive under-enforcement" and "specifically authorize[s] the Judiciary to enter appropriate orders" related to the interests of those plaintiffs). *Texas priorities* undermines the foundational premise of prior zone-of-interests holdings that permitted a more lenient approach to this requirement or a broader construction of the relevant zone. Moreover, Plaintiffs' argument that they are in the zone of interests fails on its own terms. Plaintiffs argue "Texas's interests in not 'spending millions of dollars to subsidize' illegal aliens are within the zone of interests protected by the INA." Dkt. 285 at 35. But there is no evidence that Texas has spent a dollar as a result of

27

the CHNV processes, let alone "millions of dollars." The interest Plaintiffs cite is simply not implicated in this case.

Fourth, Plaintiffs argue that the CHNV processes are final agency actions because they consummate the agency's decision-making process, create legal consequences, and determine rights and obligations. Dkt. 285 at 36-39. None of these points are correct. The CHNV processes do not bind DHS to any particular course with respect to granting parole to any noncitizen, and parole decisions continue to be made on a case-by-case basis by CBP officials considering individual requests for parole at ports of entry. It is only in making those individual decisions that the agency completes its decision-making process in a way that determines rights and produces legal consequences. *See* Defendants' Proposed Conclusions of Law at ¶¶ 55-62. Plaintiffs argue "[a] rule that will eventually result in orders applying it constitutes final agency action despite the application to individual cases having yet to be completed." Dkt. 285 at 36. But an agency process or guidance that relates to individual agency decisions that will be made at some later point does not become reviewable "final agency action" until that later point when it is actually applied "in a particular situation" to an individual or regulated entity. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.); *DRG Funding Corp. v. HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("courts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action" (internal quotations omitted)). Plaintiffs cannot point to any effect the CHNV processes would have absent those individual final parole decisions at ports of entry, making the parole processes "interlocutory" actions that do not "mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178.

Nor can Plaintiffs identify legal consequences, rights, or obligations that are created by the CHNV processes. Each process expressly provides that "[a]ll of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior [port of entry], are entirely discretionary," that it "is being implemented as a matter of the Secretary's discretion," and that "[i]t is not intended to and does not create any rights, substantive or procedural." 88 Fed. Reg. at 1,253. Plaintiffs argue the processes do not genuinely leave the agency with discretion because a high number of parole applicants are approved under these processes. Dkt. 285 at 37. But Plaintiffs do not identify anything in the CHNV processes themselves that necessarily dictates the outcome of individual parole decisions, and Plaintiffs acknowledge that DHS denies parole in some cases even after individuals have cleared every earlier stage of the process and reached a port of entry. Individuals who reach that last stage must have already cleared earlier stages of screening and vetting, met the additional requirements that are necessary to apply through the CHNV processes in the first place, and, in many cases, these are individuals whose applications were prioritized by the agency at an earlier stage because they presented the strongest arguments for urgent humanitarian reasons or significant public benefit. *See* Defendants' Ex. II ¶ 3. There is no reason to expect a high denial rate at the last step of the process, and Plaintiffs offer no explanation for why the existing approval rate is inconsistent with CBP officers exercising discretion at that stage.

Plaintiffs also offer no explanation for what legal consequence or rights the CHNV processes create that would not exist independent of these processes. As explained, parole under Section 1182(d)(5)(A) would exist even without the CHNV processes. *See* Defendants' Proposed Findings of Fact at ¶¶ 42-46, 64-68, and Proposed Conclusions of Law at ¶¶ 31, 186-205. The greater number of CHNV nationals released into the United States in the months prior to the CHNV

processes forecloses Plaintiffs' arguments that the processes are providing some new legal rights or benefits that allow noncitizens to seek to driver's licenses, healthcare, or education that did not previously exist. *See* Dkt. 285 at 38-39.

The remainder of Plaintiffs' argument addresses a different issue, whether evaluating the case-by-case nature of parole determinations is a question of fact or question of law. Dkt. 285 at 37-38. Plaintiffs state in summary fashion that this determination is a mixed question of fact and law, but neither provide guidance as to the interplay between the two, nor cite to any legal authority. Plaintiffs also decline to respond to the Court's inquiry as to which party bears the burden of proof. *Id*. As set forth in Defendants' brief, the standard governing parole—*i.e.* what constitutes urgent humanitarian reasons and significant public benefit—is a question of law, for which neither party bears the burden of proof. Dkt. 284, 38-42. Whether DHS has applied the statute appropriately is a question of fact, for which Plaintiffs bear the burden of proof. Dkt. 284, at 42-44. Further, whether DHS is applying the statute appropriately requires consideration of each parole determination. *Id*. Yet, Plaintiffs argue that DHS cannot be conducting a case-by-case analysis because the approval rate is high. Dkt. 285 at 38. But as noted above, the approval rates cited by Plaintiffs are the rates at which CHNV nationals, who have already gone through vetting prior to traveling via air to the United States are paroled into the country once they have reached an interior airport in the United States.

Plaintiffs also argue, based on the "paucity" of information collected by DHS about parolees, that there is no way review can be case-by-case. Dkt. 285 at 38. For that proposition, they cite *Florida I* and *Florida II*. *Id*. Plaintiffs' argument is flawed. First, Plaintiffs deride DHS for not collecting enough information about prospective parolees, but they neither cite any evidence suggesting that DHS does not collect adequate information, nor suggest what additional

information DHS ought to be collecting but is not collecting. In fact, the CHNV processes permit DHS to collect more information about prospective parolees and review it over a longer period of time than was possible before the implementation of the processes, when many more CHNV nationals simply showed up at the border, and DHS had to review their information in a more limited manner—as was the situation in the *Florida* cases. Simply put, Plaintiffs have failed to submit any evidence that demonstrates DHS has granted parole to any individual other than on a case-by-case basis. As such, the Court can only assume that DHS has made parole determinations on a case-by-case basis, particularly where Plaintiffs bear the burden of proof and have failed to meet their burden. Dkt. 284 at 38-44.

## III.   The CHNV processes are consistent with Section 1182(d)(5)(A).

The CHNV processes comply with the statutory text and fit well within DHS's authority under Section 1182(d)(5). Section 1182(d)(5)(A) authorizes parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit:

> The [Secretary] may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). The parole decisions made through the CHNV processes satisfy each of these requirements. Each process requires case-by-case consideration of each parole request. *See* Defendants' Proposed Conclusions of Law at ¶¶ 91-101. This includes vetting the supporter each potential parolee must identify, reviewing information provided by the supporter and applicant, including information they must provide for why they believe a favorable exercise of discretion for urgent humanitarian reasons or significant public benefit is warranted for the particular applicant, evaluating whether to provide travel authorization to the particular noncitizen, and, even if the noncitizen is granted travel authorization to fly to the United States to seek parole,

31

a CBP officer at a port of entry must still inspect the individual and consider whether it is appropriate to grant parole to that specific individual. *Id*. at ¶¶ 94-97. Each of the CHNV processes also sets out reasons why an immigration official may conclude that parole of a noncitizen from one of the covered countries is justified for urgent humanitarian reasons or significant public benefit. *Id*. at ¶¶ 116-24. These processes thus fall squarely within the historical use of the parole authority to advance foreign affairs goals related to particular countries. *Id*. at ¶¶ 125-130. Congress has repeatedly affirmed this statutory authority by rejecting attempts to narrow Section 1182(d)(5)(A), and by expressing support for parole to certain categories or groups of noncitizens in subsequent legislation. *See Id*. at ¶¶ 102-15, 131-38.

Plaintiffs attempt to contest this conclusion by arguing that Congress severely restricted the parole authority in 1996 when it enacted Section 1182(d)(5)(A) in its current form. Dkt. 285 at 39-45. Plaintiffs ground their argument for a narrow reading of the parole authority in the word "significant" in the statute, and argue it implies that Congress was constraining the parole authority in 1996. *Id*. at 40-41. They concede, however, as they must, that "Congress chose not to define in IIRIRA the terms 'significant public benefit' and 'urgent humanitarian reasons.'" *Id*. at 40. Plaintiffs also cite a 1982 notice of proposed rulemaking that described some legislative history of the 1952 enactment of the INA and gave "examples" of the types of cases where parole was warranted, including the need for immediate medical attention, witnesses, and noncitizens being brought into the United States for prosecution. *Id*. at 41. Plaintiffs maintain that the Court should read these examples as the scope of the earlier parole authority and hold that Congress was trying to further limit that authority in 1996. *Id*. at 41.

There are several problems with these arguments. First, Congress did not simply add the word "significant" to the existing statutory language. Rather, it reworked the provision "by striking

… 'for reasons deemed strictly in the public interest' and inserting … 'significant public benefit.'" *See* H.R. Rep. No. 104-828, at 162. Plaintiffs argue as if the prior version of the statute said only "public benefit," and Congress amended that term to instead read "significant public benefit." Dkt. 285 at 40-41. But in reality, Congress effectively replaced the word "strictly" with "significant," and Plaintiffs offer no explanation for why significant public benefit should be read more narrowly than the full phrase it appears to have replaced, "strictly in the public interest." And if Plaintiffs' argument about the meaning of "significant" had any force, then the converse argument, that Congress loosened or broadened the standard by removing the word "strictly," would also be true.

Ultimately, given Congress's reworking of the language in Section 1182(d)(5)(A), the more important point is the one noted above, that Plaintiffs concede that Congress chose not to define "significant public benefit" in the statute. And the narrow definition Plaintiffs ask this Court to read into the phrase "significant public benefit"—to limit it to cases of immediate need for medical attention, witnesses, and noncitizens being brought in for prosecution—are exactly the definitions some in Congress urged Congress to adopt to narrow the parole authority in 1996. H.R. Rep. No. 104-469, at 78 (1996) (proposed amendments that would have limited definition to include "a medical emergency," assistance "in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity" for which "the alien's presence in the United States is required by the Government," and cases where an "alien is to be prosecuted in the United States for a crime"). Congress rejected those amendments. *See* H.R. Rep. No. 104-828, at 162, 245 (1996); Defendant's Proposed Conclusion of Law at ¶¶ 86-119. Plaintiffs cannot now through litigation procure a judgment reading the parole statute in a way that Congress explicitly rejected.

As to Plaintiffs' argument that parole prior to 1996 was used narrowly, the legislative history of the rejected 1996 amendments noted that the version of the parole statute in force prior

to that date had been used for categories of noncitizens, including tens of thousands of Cubans the Executive was paroling in under that version of the statute. *See* H.R. Rep. No. 104-469, at 140 (1996). And the legislative history of the version of Section 1182(d)(5)(A) that Congress ultimately adopted also anticipated that "categories of aliens" would be "paroled into the United States" under Section 1182(d)(5)(A) and provided for reporting to Congress on those categories. *See* H.R. Rep. No. 104-828, at 162, 245 (1996) (requiring reporting "concerning the number and categories of aliens paroled" "for each country of origin"). Accordingly, even if the 1952 version of the statute could be read as Plaintiffs urge, the legislative history of the 1996 changes show that Congress did not view the parole authority in place prior to that date in the same way, and specifically rejected attempts to narrow it in that manner going forward.

Plaintiffs cite cases they view as detailing the proper use of parole. Dkt. 285 at 42. First, they cite Justice Breyer's dissent in *Jennings v. Rodriguez*, which mentions parole for medical reasons or to provide testimony. *Id*. That opinion, a dissent, merely gave an "example" of the uses of parole to make the point that the parole statute "*adds to* the circumstances under which a noncitizen can be released." *Jennings v. Rodriguez*, 138 S. Ct. 830, 872 (2018) (emphasis in original). Plaintiffs also cite language in the Fifth Circuit's decision in the MPP case which noted parole had been used for medical reasons and for noncitizens who qualify for a visa but are waiting for the visa to become available. Dkt. 285 at 42. But the Fifth Circuit similarly stated it was providing an "example" of modern uses of parole, *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021), and in any event, the Fifth Circuit's discussion of parole is dicta because the parole authority was not directly challenged or at issue in that case, and so was not fully briefed. *See, e.g.*, *Texas v. Biden*, No. 2:21-cv-067-Z, July 22, 2021 Trial Tr. at 63:17-21 (counsel for Texas conceding that Plaintiffs were "not challenging … any kind of individual grant of parole or even the parole

policies" in the MPP case); *Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022) (noting Supreme Court was not addressing question of "whether the Government is lawfully exercising its parole authorities pursuant to sections 1182(d)(5) and 1226(a)"); *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 240 (5th Cir. 2023) (courts not bound by dicta from prior cases). Plaintiffs also cite other cases that give examples of various uses of parole, but those cases do not purport to set the outer limits of the parole authority. Moreover, parole has long been used, both before and after 1996, in other ways, including in a manner similar to the CHNV processes. *See* Defendants Proposed Findings of Fact at ¶ 55 (listing historical examples); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2413 (2018) (declining to "confine expansive language [in the INA] in light of its past applications" by the Executive).

Plaintiffs argue that the legislative history of the unadopted amendments in 1996 is still relevant because it was "making a much broader point that … Congress believed the Executive was abusing the parole authority … and that, therefore, more restrictions were needed to curtail that abuse." Dkt. 285 at 45-46. This argument does not hold together. As explained above, the legislative history they cite reflects the views of some in Congress who favored a more restricted parole authority, but whose views were not shared or adopted by the Congress as a whole. *See* Defendants' Proposed Conclusions of Law at ¶¶ 102-10.

Plaintiffs also cite the section title in the 1996 IIRIRA amendments, "limitation on use of parole," *see* Dkt. 285 at 46, but nothing in this title indicates it was intended to specifically limit some pre-IIRIRA practice. And section titles cannot override the actual text of a statute. *See e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *United States v. Hoang*, 636 F.3d 677, 681 (5th Cir. 2011). Also, this section title was not actually included in the statute, Section 1182, and nothing in the language of this title can be read to incorporate the

35

limitations Congress rejected anyway. Plaintiffs also cite two cases that purportedly support their reading of the 1996 amendments. Dkt. 285 at 46 (citing *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011), and *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007)). Neither case addressed the issue here, and the language Plaintiffs rely on from those cases concerned the same legislative history of amendments Congress rejected. *See Cruz-Miguel*, 650 F.3d at 199 n.15 (citing H. R. Rep. No. 104–469, at 140–41 (1996)); *Ortega-Cervantes*, 501 F.3d at 1119 (citing H. R. Rep. No. 104–469, at 141 (1996)). Since Congress rejected those proposed amendments, this legislative history carries no weight for the reasons noted. *See supra* at 33-34. The legislative history of the actual provisions Congress enacted shows that Congress was well aware of the historically broad use of parole, that Congress rejected amendments that would have narrowed the parole authority in precisely the ways Plaintiffs urge this Court to do, and, as Plaintiffs concede, that Congress left the terms in Section 1182(d)(5)(A) undefined. And subsequent history shows that Congress has repeatedly expressed support for similar uses of parole through subsequent legislation. *See* Defendants' Proposed Conclusions of Law at ¶¶ 125-38.

Plaintiffs ultimately argue that the CHNV processes are arbitrary and capricious because they expand parole eligibility. Dkt. 285 at 46-48. This argument fails for the same reasons their arguments for a narrow reading of the statute fail—parole eligibility under the CHNV processes is similar to historical uses of parole, both before and after 1996, and Congress rejected the version of the statute they ask this Court to nonetheless read into the text of Section 1182(d)(5)(A). Plaintiffs are thus improperly attempting to obtain a legislative result through the courts that could not be achieved through the legislative process.

Finally, Plaintiffs fall back on the testimony of Mr. Eric Sype related to his support for a beneficiary named Oldrys. Specifically, Plaintiffs argue that DHS's grant of parole to Oldrys was

not justified because Mr. Sype testified that Oldrys sought parole for economic reasons and would not have otherwise come to the United States but for the CHNV processes. Dkt. 285 at 47-48. Therefore, according to Plaintiffs, there was neither an urgent humanitarian reason nor significant public benefit for his parole. But as noted at trial, Tr. 172:5-13, Mr. Sype's testimony about the reasons Oldrys sought parole was hearsay. Hearsay is not admissible even in a bench trial. *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988). Furthermore, while Mr. Sype testified to his understanding that Oldrys was seeking parole for economic reasons, Mr. Sype explained that Oldrys' need for better economic opportunity was driven by widespread political uprising in Nicaragua as well as historic hurricanes and flooding near Oldrys' home. Tr. 81:24-82:23. Further, regardless of what Mr. Sype understood to be Oldrys' urgent humanitarian reason for parole, Mr. Sype admitted he has no idea what Oldrys told the CBP officers during his multi-hour inspection or other justifications Oldrys may have provided to CBP to support his parole. Tr. 84:18-85:11. In short, there are no conclusions to be drawn from Mr. Sype's testimony. As for whether Oldrys or other members of his family would have tried to cross into the United States had Oldrys not been granted parole under the CHNV processes, Mr. Sype clearly stated he did not know. Tr. 79:1-80:18. Thus, as to significant public benefit, again, there are no conclusions to be drawn from Mr. Sype's testimony.

IV.     **Parole grants for CHNV nationals are temporary, and the CHNV processes directly address the problem of unremovable CHNV nationals.**

The parole processes satisfy the APA's "highly deferential" standard of review. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). To satisfy judicial scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

37

The CHNV processes easily meet this standard as they present a rational response to increased migration from nationals from CHNV countries, who the government has historically been unable to remove in any substantial numbers. The CHNV processes combine "a clear meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States." 88 Fed. Reg. at 1268.

Plaintiffs nevertheless argue that the CHNV processes are arbitrary and capricious because paroles under the processes are not truly temporary. Dkt. 285 at 48-57. Their argument has two components: Defendants know they will not be able to remove most CHNV parolees should they overstay their parole, Dkt. 285 at 48-53, and Defendants will likely re-parole or extend parole for those paroled under the CHNV processes, Dkt. 285 at 53-55. Both aspects of Plaintiffs' argument are flawed.

Plaintiffs dedicate many pages of their brief, Dkt. 285 at 48-53, to a proposition that is not disputed: DHS has historically been unable to remove most removable noncitizens from the four CHNV countries.[3] Thus, according to Plaintiffs, if CHNV parolees overstay their parole, and socio-political and diplomatic conditions in two years mirror those today, DHS will be unable to remove many of those CHNV nationals. But this is based on two assumptions, which are completely unknown. First, it is unknown what, if any, percentage of CHNV parolees will remain in the United States without authorization after their period of parole expires. The processes explicitly provide that parolees must leave after two years, and if they fail to do so, they will

---

[3] Plaintiffs include, among the reasons that DHS cannot remove some CHNV nationals, the provision of temporary protected status ("TPS") to nationals of Venezuela, Nicaragua, and Haiti. Dkt. 285 at 49-52. But TPS is the not the cause of DHS's inability to remove many Venezuelan, Nicaraguan, and Haitian nationals. Moreover, TPS is not part of the parole processes and Plaintiffs themselves argue the Court should consider only the CHNV processes and not other polices not at issue here. Dkt. 285 at 13.

generally be put into removal proceedings. *See e.g.* 88 Fed. Reg. at 1268. Plaintiffs acknowledge that ICE can currently remove a limited number of CHNV nationals, Dkt. 285 at 53, and that could continue to be true in two years, allowing for removal of the CHNV parolees who may overstay their parole. Second, it is unknown if conditions in two years will mirror those today.[4] Diplomatic conditions may improve in Cuba, Haiti, Nicaragua, and Venezuela, or alternatively Mexico (or some other country) may be willing to accept the return of CHNV nationals at that time, just as Mexico decided to accept the removal of CHNV nationals who do not follow lawful pathways and processes to the United States.

More to the point, however, whatever challenges DHS will face in two years in removing CHNV nationals, there is no reason to believe that those challenges would be less serious in the absence of the CHNV processes. On the contrary, absent the CHNV processes, there likely be *more* removable CHNV noncitizens from these countries in two years, because there were more CHNV nationals released in the country before the CHNV processes were implemented, Ex. II at ¶¶ 4-7. Indeed, DHS put the CHNV processes in place precisely because of its inability to remove many otherwise removable CHNV nationals, and to bring the number of people that fall into that category down. So, while DHS may not be able to remove all CHNV parolees who remain in the United States without authorization after their period of parole expires, agency action is not arbitrary and capricious simply because it does not fully eliminate a problem, especially when more comprehensive solutions are not readily available or will depend on further diplomatic negotiation with foreign nations. *See FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292

---

[4] For example, as the Court may have seen in the news, Venezuela recently decided to accept the direct repatriation from the United States to Venezuela of a limited number of removable Venezuelan nationals. While the number is relatively low, and does not change the rationale for the Venezuelan parole process, Defendants reference it only to make the point that conditions may indeed change over time.

(2016) (agency need not adopt perfect solution or even the best of available alternatives to survive APA review); *Fla. Manufactured Hous. Ass'n, Inc. v. Cisneros*, 53 F.3d 1565, 1582 (11th Cir. 1995) ("We agree with HUD that the regulations are not invalid merely because they fail to solve every weather-related problem and cannot completely prevent damage from another storm of the ferocity of Hurricane Andrew."); *see also Texas*, 142 S. Ct. at 2543 (noting deference due to Executive decisions that depend on or are limited by foreign affairs and the ability to secure agreements from Mexico or other nations). As long as "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld," *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998). The CHNV processes are a rational solution to the problem of increased irregular migration from CHNV countries, with demonstrated success. Thus, speculation that DHS may be unable to remove some CHNV parolees in the future does not render the CHNV processes arbitrary and capricious.

Second, Plaintiffs argue that Defendants were incorrect at trial when they told the Court that there is presently no mechanism in place for CHNV parolees to seek re-parole under the CHNV processes. Plaintiffs say that a public-facing USCIS website provides that "in some instances, an individual may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States." Dkt. 285 at 53-54, citing *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, U.S. Citizenship and Customs Servs. (May 2, 2023), https://tinyurl.com/4ndkpp2u.[5] But as Defendants noted at trial, there is currently no mechanism for noncitizens paroled through the CHNV processes to seek re-parole without returning to their home countries at the end of their

_____

[5] Defendants are unable to access the website Plaintiffs have cited, but believe Plaintiffs are referring to https://www.uscis.gov/humanitarian/humanitarian_parole.

period of parole.[6] CHNV parolees cannot be re-paroled under the CHNV processes because the processes state on their face that eligible noncitizens must be located outside the United States. *See e.g.* 88 Fed. Reg. at 1275; Tr. 23:11-21. Moreover, the weblink to which Plaintiffs refer specifically states that the processes discussed on that page, including for re-parole, does *not* apply to noncitizens who seek parole or who were paroled into the United States under "special parole" and processes, such as the CHNV processes. The Court may not speculate as to what may or may not happen in the future to determine whether an agency decision made almost a year ago complied with the APA. In short, Plaintiffs cannot challenge the CHNV processes based on aspects of those processes that do not actually exist.

Plaintiffs also argue, for the first time, that the CHNV processes are arbitrary and capricious because, in contravention of Congressional requirements, DHS has no biometric mechanism to track whether a parolee remains in the United States. Dkt. 285 at 55. Plaintiffs did not raise this challenge in either their amended complaint or their motion for a preliminary injunction, and it is therefore forfeited. Dkts. 20, 22. Nonetheless, it is irrelevant. Even though DHS cannot comprehensively track how many parolees leave the country, as noted repeatedly, it is undisputed that there were more CHNV nationals released into this country before the CHNV processes were implemented.

Plaintiffs also argue that the non-temporary nature of the CHNV processes render them contrary to law. Dkt. 285 at 57. But Plaintiffs' argument is based on a false premise. The CHNV processes are temporary—they state so on their face. *See e.g.* 88 Fed. Reg. at 1268. They are not

---

[6] Plaintiffs also discuss the process for continued parole available to Afghan parolees in the United States, Dkt. 285 at 54, but the process employed there is irrelevant because it deals with parole for Afghans who had to be evacuated from Afghanistan and thus involves different factors and considerations that might implicate a need for re-parole that is not present here.

rendered contrary to law merely because of the possibility that some parolees may violate the law and remain in the United States without authorization after their period of parole expires. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (courts "assume that [individuals] will conduct their activities within the law"). Whether the CHNV processes are contrary to law depends on whether they comply with the statute—which they do—not whether beneficiaries of the processes may comply with its provisions. Further, the CHNV processes allow greater ability to remove CHNV nationals and thus greater ability to enforce the immigration laws than without them.

## V.    Plaintiffs have not identified any reliance interests.

Plaintiffs include a section on reliance interests in their post-trial brief, but they neither discuss the case law defining reliance interests nor identify the reliance interests they believe the agency should have considered. *See* Dkt. 285 at 57. As previously explained, reliance interests are the interests of a regulated entity that has taken some action in reliance on an existing agency policy and who faces some unexpected harm or penalty as a result of a sudden change in course by the agency. *See* Defendants' Proposed Conclusions of Law at ¶ 178; Dkt. 284 at 56-58. Here, Plaintiffs are not the regulated entity, and they have neither identified any action they took in reliance on the status quo ante approach to parole—which the record evidence shows previously led to more releases of CHNV nationals—nor have they identified any harm they have suffered from the CHNV processes. Plaintiffs did not cite any particular reliance interests in their complaint, amended complaint, or their pre-trial briefing. And when asked at trial what their reliance interests are, Plaintiffs could not name them. *See* Defendants' Proposed Conclusions of Law at ¶ 178; Dkt. 284 at 56. Despite being put on notice at trial that an agency cannot consider reliance interests Plaintiffs cannot even identify, Tr. 329:6-7, Plaintiffs make no attempt to articulate their reliance interests in the three sentences they devote to this issue in their post-trial

brief, *see* Dkt. 285 at 57. While an agency should consider "legitimate reliance" on "longstanding policies" that have "engendered serious reliance interests," *Regents*, 140 S. Ct. at 1913, Plaintiffs cannot identify any such interests here, so there was nothing for the agency to consider.

To the extent Plaintiffs imply DHS should have considered costs to the States despite being unable to identify any actual costs, costs to States are not reliance interests unless they satisfy the other requirements for reliance interests. In other words, a State must show it was regulated by and took some action in reliance on the prior agency approach and that the costs are traceable to a policy change that undermines that reliance. *See* Defendants' Proposed Conclusions of Law at ¶ 178; Dkt. 284 at 56-58. In any event, even if indirect State costs could be considered reliance interests, the agency did consider State costs and costs to border communities when developing the parole processes, and reasonably anticipated that these processes would reduce those costs. *See* Dkt. 284 at 57-58. Nothing in the record suggests, much less establishes, that conclusion was arbitrary and capricious.

## VI.     The major questions doctrine does not apply in this case.

Plaintiffs next argue that the major questions doctrine applies to this case, mostly by arguing that various provisions of the INA include specific requirements for obtaining a visa that are not required of someone seeking parole under the CHNV processes. *See* Dkt. 285 at 55-66. This argument fails because Plaintiffs do not meaningfully address the threshold requirements for applying the major questions doctrine. Plaintiffs' argument is really just a general statutory structure argument, but it has no basis because none of the requirements they cite are part of Section 1182(d)(5)(A) or required for parole, and there is nothing in the INA that makes the various avenues the INA provides for coming to the United States mutually exclusive.

43

The major questions doctrine applies only in cases where an agency's action will have "vast economic and political" consequences. *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (quotation marks and citation omitted). Plaintiffs provide no explanation for how this case involves any such consequences. Their argument on this point is limited to one one line: "There can be no doubt that one of the questions of deepest political significance is whom the government allows into our country, especially for long-term or permanent residence." Dkt. 285 at 58 (citing *King v. Burwell*, 576 U.S. 473, 486 (2015)). This case, however, does not involve "long-term or permanent residence," *id.*, and even if it did, that alone would not be enough to invoke the doctrine. If the major questions doctrine was implicated any time an immigration action related to noncitizens coming to the United States, it would greatly expand the doctrine beyond the narrow circumstances where it has been applied. *Id.* In *King v. Burwell*, which Plaintiffs cite in support of their argument, the Supreme Court held the case involved vast economic and political consequences because it dealt with tax credits "involving billions of dollars in spending each year and affecting the price of health insurance for millions of people." 576 U.S. at 485. Here, Plaintiffs have not shown that the CHNV processes involve even one dollar of costs to Texas, let alone the type of vast economic and political effects necessary to invoke the major questions doctrine. *See, e.g.*, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (discussing "$50 billion" in "economic impact" covering "80% of the country" and affecting "between 6 and 17 million" individuals as meeting this standard); *see also* Dkt. 284 at 44-45.

Even if Plaintiffs had identified major economic or political consequences, that alone would also be insufficient to invoke the major questions doctrine. *See* Dkt. 284 at 45 (collecting other cases involving actions with major political effects or billions in economic impact where

Supreme Court did not apply the major questions doctrine). Plaintiffs must also show that an agency is taking an extraordinary regulatory action involving new, extravagant, or coercive action with respect to private conduct. *Id.* at 46-47. Plaintiffs make no attempt to meet this standard, nor could they. Plaintiffs must also show that an agency is making policy judgments beyond its area of expertise. *Id*. at 48. Plaintiffs do not attempt to meet this standard either. Nor is there any basis to argue the agency is using a "long-extant statute" to claim some new and "unheralded power," as it must to invoke the doctrine, *see Util. Air*, 573 U.S. at 324, when the parole authority has a long history of being used in a similar manner, including in the time since it was last amended in 1996. *See* Defendants Proposed Findings of Fact at ¶ 55. Plaintiffs have not shown that this is an extraordinary case where there is a gross mismatch between the agency's action and the history and language of Section 1182(d)(5)(A). *See* Dkt. 284 at 48-51.

Instead, Plaintiffs argue the CHNV processes allow individuals to come to the United States without satisfying the various criteria Congress set out for individuals seeking visas to come to the United States. Dkt. 285 at 58-66. But the requirements they cite are not included in Section 1182(d)(5)(A), and they cannot point to anything in Section 1182(d)(5)(A) that requires DHS to incorporate visa requirements from other statutes into the requirements for Section 1182(d)(5)(A) parole. Rather Congress authorized the Secretary to parole noncitizens into the United States "in his discretion … under such conditions as he may prescribe." 8 U.S.C. § 1182(d)(5)(A). Plaintiffs also cannot point to anything in the INA that says the INA's various provisions must be read so narrowly that there is no overlap. Plaintiffs argue Congress would not have created a system where someone who might seek some category of visa might also be able to seek parole, but they cite nothing in support of this argument. Dkt. 285 at 59. And Plaintiffs' argument proves too much. Elsewhere in their brief, they cite other examples of parole that they deem to be proper exercises

of Section 1182(d)(5)(A)'s authority, *see* Dkt. 285 at 42-44, but those examples similarly did not

require parolees to satisfy the requirements of the INA's separate visa provisions.

Plaintiffs argue that "Congress has also established numerical limitations and quotas for a

variety of different visa classifications." Dkt. 285 at 61. But Congress did not set any specific

numerical limits for parole. Rather, at the same time Congress amended Section 1182(d)(5), it also

amended 8 U.S.C. § 1151(c) to provide "that aliens paroled into the United States in the second

previous fiscal year who do not depart within 365 days and who have not yet become permanent

resident aliens … will be counted towards the worldwide level of family-sponsored immigrants."

H.R. Rep. No. 104-828, at 162, 245 ("Treatment of Long-Term Parolees in Applying Worldwide

Numerical Limitations"); *see also* S. Rep. No. 104-249, at 34 (1996) (discussing amendments

adopted related to "counting of long-term parolees"). Congress thus anticipated the issue Plaintiffs

appear to raise, and addressed it not by restricting the parole authority or placing any numerical

limit on the number of parolees, but by counting parolees towards the annual cap on migration.

Plaintiffs' extensive discussions of requirements for seeking visas under other provisions

of the INA, *see* Dkt. 285 at 60-65, are thus irrelevant to the scope of authority under Section

1182(d)(5)(A).

VII.    **Plaintiffs' "at equity" ultra vires claim is not viable.**

Plaintiffs' ultra vires claim is subject to dismissal for two reasons. First, it fails because

where, as here, a lawsuit is nominally directed against an individual officer but is in substance a

suit against the government, sovereign immunity applies, and an ultra vires claim cannot proceed

regardless of whether it is styled as a suit at law or at equity. *Larson v. Domestic & Foreign Com.*

*Corp.*, 337 U.S. 682, 689 (1949); Dkt. 284 at 31-32. Second, it fails because the claim was

preempted by the 1976 amendments to the APA. *Apter v. HHS*, 80 F.4th 579 (5th Cir. 2023)

("Congress [] did away with the *ultra vires* doctrine [] when it amended the APA in 1976."); *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) ("[T]he principal purpose of [the 1976 amendment to the APA] was to do away with the ultra vires doctrine."); Dkt. 284 at 32-38. Indeed, the Supreme Court has stated that the power of the federal courts at equity "is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

Nonetheless, Plaintiffs argue not only that their ultra vires claim remains viable but that the Fifth Circuit has "confirm[ed] that a plaintiff may assert an APA claim and an *ultra vires* claim in the same case." Dkt. 285 at 68. In support of this argument, Plaintiffs rely upon *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023), and *Apter*. Plaintiffs' reliance is misplaced. Indeed, as noted above, *Apter* stands for the opposite conclusion, explicitly stating that "under our precedent, Congress apparently did away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity when it amended the APA in 1976." *Id*. at 593 (cleaned up).[7]

In *Apter*, doctors brought a declaratory judgment action against the Food and Drug Administration (FDA), alleging that social media posts made by the FDA discouraging the use of Ivermectin for treatment of COVID-19 exceeded the FDA's authority under its enabling act and the Federal Food, Drug, and Cosmetic Act. *Id*. at 583-84. The doctors asserted an ultra vires claim under both the APA and common law. *Id*. at 587. The FDA moved to dismiss, arguing, *inter alia*, that the United States's waiver of sovereign immunity did not include the plaintiffs' ultra vires claims. Specifically, the FDA argued that under the common law ultra vires doctrine, a strong merits argument is needed to overcome sovereign immunity, and that this "merits-adjacent inquiry" applied equally to that portion of plaintiffs' APA claim that asserted ultra vires conduct.

---

[7] As Fifth Circuit law is clear, there is no need for Defendants to discuss the district court cases and out-of-circuit cases upon which Plaintiffs also rely for the conclusion that this Court can consider an APA and ultra vires claim in the same action.

*Id*. at 588. The district court granted the motion to dismiss, and the doctors appealed. *Id*. at 583. The Fifth Circuit reversed. *Id*. In doing so, the Court stated that "the Doctors' *ultra vires* claim has merit enough to overcome immunity under the common law, and therefore under the APA." 80 F.4th at 588.

Plaintiffs argue this language suggests the common law ultra vires doctrine is alive and well. Dkt. 285 at 70. But the Court was not endorsing the viability of a stand-alone ultra vires claim outside the APA. Rather, the Court was addressing whether the United States waived sovereign immunity with respect to the plaintiffs' APA ultra vires claim. In finding that it did, the Court "assum[ed] without deciding" that the "merits-adjacent" sovereign immunity waiver test traditionally applied at common law applies equally to APA ultra vires claims. 80 F.4th at 588. Because the FDA did not argue either in its motion to dismiss or on appeal that the plaintiffs' common law ultra vires claim was preempted by the APA, *see Apter v. HHS*, 3:22-cv-00184, Dkt. 25 (motion to dismiss at the district court), 22-40802, Dkt. 37 (brief on appeal), the Fifth Circuit was not asked to decide whether the plaintiffs' common law ultra vires claim was subject to dismissal on that basis. 80 F.4th at 593 ("[B]ecause the Doctors can use the APA to assert their *ultra vires* claims, we decline to consider whether the Doctors might also be able to assert their *ultra vires* claims using only the common law version of that doctrine.").

Nonetheless, in dicta, the court observed that plaintiffs' common law ultra vires claim is no longer viable. "Under our precedent, Congress [] did away with the *ultra vires* doctrine [] when it amended the APA in 1976." *Id*. at 593. The Court also observed that other circuits that continue to recognize a common law ultra vires claim do so only when no statutory remedy is available:

> We also note the D.C. Circuit's recent decision holding that common-law *ultra vires* claims are available only when there is no alternative procedure for review. Similarly, the Ninth Circuit has held that common law *ultra vires* claims are available only when

> APA *ultra vires* claims are not. Moreover, several other circuit courts have applied the common-law doctrine only when APA review was unavailable.

*Id*.

Thus, contrary to Plaintiffs' contention, the Fifth Circuit did not find that a common law ultra vires claim remains viable, or that it can coexist alongside an APA ultra vires claim. And, given the Fifth's Circuit's precedent in *Geyen*, holding that "the principal purpose of [the 1976 amendment to the APA] was to do away with the ultra vires doctrine,"–which the Fifth Circuit specifically cited in *Apter*, 80 F.4th at 593—there is no basis for such a conclusion.

Neither does *Feds for Med. Freedom* stand for the proposition that a common law ultra vires claim remains viable, or that it can coexist alongside an APA ultra vires claim. In that case, the plaintiffs challenged an executive order that required all federal employees to be vaccinated or obtain a religious or medical exemption, or else face termination. *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 830 (S.D. Tex.), *vacated and remanded*, 30 F.4th 503 (5th Cir. 2022), *reh'g en banc granted, opinion vacated*, 37 F.4th 1093 (5th Cir. 2022), *on reh'g en banc*, 63 F.4th 366 (5th Cir. 2023), and *aff'd*, 63 F.4th 366 (5th Cir. 2023). Plaintiffs challenged the executive order as ultra vires under both the common law and APA. *Feds for Med. Freedom*, No. 3:21-cv-356, Dkt. 1, ¶¶ 163-178, 185-223. The district court held that the President's executive order was ultra vires under the common law and issued a nationwide injunction. 581 F. Supp. 3d at 836. It declined, however, to consider the plaintiffs' APA claims, including the plaintiffs' ultra vires claim under the APA, stating "there is nothing for the court to review under the APA" because "[t]he Supreme Court held in *Franklin v. Massachusetts* that executive orders are not reviewable under the APA." *Id*. at 835 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992)). Upon en banc review, the Fifth Circuit affirmed the district court decision. 63 F.4th 366.

49

Plaintiffs argue that "[t]he Fifth Circuit has [] endorsed exactly the approach the States have taken here of asserting APA and *ultra vires* claims in the same action" as evidenced by the fact that the district court in *Feds for Med. Freedom* "concluded that the plaintiffs were likely to succeed on their *ultra vires* claims and would also be justified in concurrently asserting APA claims." Dkt. 285 at 70. Plaintiffs mischaracterize the district court's decision. As noted above, the district court held that the plaintiffs' APA claims, both its ultra vires and arbitrary and capricious claims, were improper because the APA does not apply to executive action. 581 F. Supp. 3d at 835. Merely to illustrate the distinction between a challenge to executive action (which is not subject to the APA) and a challenge to agency action (which is subject to the APA), the district court noted that "agency denials of religious or medical exemptions, additional vaccination requirements by agencies apart from the federal-worker mandate, or other discretionary additions to the executive order would likely be reviewable under the APA's arbitrary-and-capricious standard." *Id*. But because "the plaintiffs [had] not challenged any discretionary agency action—only the implementation of the federal-worker mandate itself," the court held "there [was] nothing for the court to review under the APA." *Id*. The district court did not suggest that the plaintiffs could maintain a common law ultra vires claim challenging *agency action* or that plaintiffs could challenge agency action as ultra vires simultaneously under both the common law doctrine and under the APA. Nor did the Court of Appeals endorse such ideas. Indeed, neither Court had occasion to do so because the case did not involve a challenge to agency action in the first place. Here, by contrast, Plaintiffs are challenging agency action, not an executive order issued by the President. The common law ultra vires doctrine does not apply because it was preempted by the APA. *See* Dkt. 284, at 30-38.

Finally, Plaintiffs argue that their ultra vires claim remains viable notwithstanding the jurisdiction-stripping provision in Section 1252(a)(2)(B)(ii). Dkt. 285 at 71. Plaintiff's rationale seems to be that no agency has discretion to act outside its statutory authority. *Id*. But that argument distills down to nothing more than an argument that Section 1252(a)(2)(B)(ii) does not apply in the first place. That argument is incorrect for the reasons Defendants have noted, *see supra* at 23-24, but ultimately that disagreement is immaterial to Court's inquiry regarding the viability of Plaintiffs' ultra vires claim.[8] If Section 1252(a)(2)(B)(ii) does not bar Plaintiffs' ultra vires claim, that claim must still be brought under the APA, not as a separate ultra vires claim. *See* Dkt. 284 at 30-38. None of the cases that Plaintiffs cite in support of their argument that "even if a statute otherwise bars review, an *ultra vires* claim is viable," Dkt. 285 at 71, suggests that such a claim may be brought under the common-law ultra vires doctrine as opposed to under the APA, or that identical claims may be brought under *both* the common law and the APA. For the all the reasons set forth in Defendants' moving brief, including that such an approach would make the limitations Congress placed on APA claims meaningless if such challenges to agency action could just be reframed as ultra vires claims, they cannot. *See* Dkt. 284 at 30-38. Plaintiffs' ultra vires claim must be rejected and dismissed.

## VIII.   Notice-and-comment rulemaking was not required.

As rules of agency procedure and general statements of policy, the CHNV processes were not required to go through notice-and-comment rulemaking. *See* Defendants' Proposed Conclusions of Law at ¶¶ 181-205. In addition, even if the parole processes were the type of agency

---

[8] Furthermore, if Section 1252(a)(2)(B)(ii) applies to, and thus bars, the APA claim, it would also apply, and thus bar, the ultra vires claim. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (the power of the federal courts at equity "is subject to express and implied statutory limitations.").

actions to which rulemaking requirements might apply, the good cause and foreign affairs exceptions would apply. *Id*. at ¶¶ 206-243. In their post-trial brief, Plaintiffs address only the latter of those exceptions, arguing the foreign affairs exception to rulemaking is limited. Dkt. 285 at 73-76.

Plaintiffs argue that the Court should read the foreign affairs exception to apply only where rulemaking would cause "definitely undesirable international consequences," citing cases they concede are exclusively outside the Fifth Circuit. Dkt. 285 at 73-74. This language is not part of the statute, which requires no such showing. The foreign-affairs exception applies when a rule "involve[s]" a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). The proper question is whether the agency's action "involve[s]" a "foreign affairs function," 5 U.S.C. § 553(a)(1), such as where the agency's action is part of, and necessary to, ongoing diplomatic negotiations and commitments. If it does, it is inappropriate to require anything more than what is required by the foreign-affairs exception's text.

"[T]he phrase 'provoke definitely undesirable international consequences'" is merely "an illustration given in the APA's legislative history"; it is not "the definition for 'foreign affairs function.'" *New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) (quoting H.R. Rep. No. 79–1980, at 23 (1946)). The Supreme Court has repeatedly noted the limited role of this type of history in statutory interpretation and instructed that "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). There is no textual basis for interpreting the phrase "involve[s] a … foreign affairs function" as requiring a showing of definitely undesirable international consequences. *See New York*, 618 F.3d at 202; *Capital Area Immigrants' Rights. Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020)

(noting that such an interpretation would be "unmoored from the legislative text"); *cf. Roe v. Mayorkas*, 2023 WL 3466327, at *17 (D. Mass. May 12, 2023) ("Where, as [with changes to the process for Afghan humanitarian parole], actions involve core foreign policy functions, the Court finds they fall within the [foreign affairs] exception without an analysis of the specific undesirable consequences." (quotation marks omitted)).

Even if the legislative history addressing "definitely undesirable international consequences" were relevant, that history notes only that such consequences would be one "example" of a foreign affairs function. *See* H. Rep. No. 79-1980, at 257. Transforming this example of one circumstance in which the exception might apply into the core of the exception and a requirement in every case would go even further than the legislative history does. Plaintiffs' proposed reading of the foreign affairs exception would also make it superfluous because the good-cause exception would apply where taking public comment would lead to negative international consequences. *CAIR*, 471 F. Supp. 3d at 53 ("[R]equiring negative consequences would render the 'military or foreign affairs function' superfluous since the 'good cause' exception ... would apply."); *Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1581 (Ct. Int'l Trade 1984) (same). This formulation of the exception would also require courts to evaluate how serious a particular international consequence would be, which is "generally beyond the authority or competency of a court's adjudicative powers." *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008).

Even if a showing of "undesirable consequences" were required, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018). That is case here. A delay in implementing the CHNV processes would encourage a surge in

arrivals during any comment period that could overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration through Mexico to the border that these processes seek to decrease, undermining the United States' negotiations with its foreign partners. 88 Fed. Reg. at 1,253; Cuba AR 187; *Yassini v. Crosland*, 618 F.2d 1356, 1360 (9th Cir. 1980) (holding exception applied to Immigration and Naturalization Service action given need for "prompt response" to foreign affairs crisis). Plaintiffs argue that the foreign affairs exception should not be read to extend to every case that involves immigration. Dkt. 285 at 74-75. This is not a typical immigration case, however, because the CHNV processes do not implicate foreign affairs solely in the way many immigration policies do, through removal of noncitizens to their home countries. Here, the relevant negotiations were sensitive, ongoing negotiations with a third country, Mexico. Whatever limits there may be on applying the foreign affairs function to immigration cases solely because they involve immigration generally, negotiating with another country to accept the removal of noncitizens *who are not from that country* clearly "involve[s] a … foreign affairs function." 5 U.S.C. § 553(a)(1).

Plaintiffs next argue that the government has not offered "evidence of consequences that would result from compliance with the APA's procedural requirements." Dkt. 285 at 75. The record refutes that that view, *see, e.g.*, Cuba AR 147-49, 188 (noting concern of Mexico and other countries about anticipated surged in migration following end of Title 42, and that their willingness to cooperate in accepting "increased returns of migrants was contingent on expanding the model provided by U4U and the Venezuela process"), 1276, 1733. And regardless, the heightened evidentiary requirement Plaintiffs demand constitutes "unwarranted judicial interference in the conduct of foreign policy." *Texas*, 142 S. Ct. at 2543.

Plaintiffs also argue that "Defendants could have announced the Parole Program as a

proposed rule on January 9, 2023, then opened a notice-and-comment period, and simultaneously stated that anyone who attempts to cross illegally after January 9 … will be barred from relief" to "eliminate[ ] any incentive to cross illegally, even though the Program would not yet be in effect." Dkt. 285 at 75-76. However, to put consequences in place immediately to prevent a surge in arrivals while a comment period was pending, DHS would have had to implement the processes as legislative rules. But to do so, DHS would have had to identify "good cause" for those consequences to take effect immediately without waiting for the comment period to conclude. *See* 5 U.S.C. § 553(d) (providing that substantive rule must be published "not less than 30 days before its effective date" unless the agency finds "good cause" for making it effective without waiting for this period). If there was "good cause" to impose consequences immediately, then there was also "good cause" under Section 553 that exempts the CHNV processes from notice-and-comment requirements entirely, and there is nothing in the statute that requires the agency to provide a comment period in those circumstances.

Simply stating that individuals who attempted to enter unlawfully after January 9, 2023 would be ineligible for the CHNV processes, as Plaintiffs suggest, would do little to prevent a surge in arrivals from those countries. Noncitizens from these countries would have a strong incentive to enter the United States before the CHNV processes were implemented and DHS gained the ability to remove them to Mexico. And since noncitizens who entered unlawfully during the comment period would have no need for the CHNV processes at all, barring them from the processes would be a meaningless consequence with no deterrent effect on unlawful entry. Because delaying implementation to allow for a comment period would have increased the migration the CHNV processes were designed to address, the good cause exception would apply even if the foreign affairs exception to rulemaking did not. *See* Defendants' Proposed Conclusions

of Law at ¶¶ 227-43.

## IX.    Scope of relief

Plaintiffs argue that the CHNV processes should be vacated and that their implementation should be permanently enjoined nationwide. Dkt. 285 at 76-87. But in doing so, they ignore the *Texas priorities* decision, and others like it, that highlight separation-of powers concerns and other issues with universal remedies, including the questionable basis under the APA for vacating agency actions rather than setting aside their application to a particular plaintiff. *Texas priorities*, 143 S. Ct. at 1980-83 (Gorsuch, J., concurring); *see also DHS v. New York*, 140 S. Ct. 599, 600–01 (2020) (opinion concurring in grant of stay); *Trump* v. *Hawaii*, S. Ct. 2392, 2427 (2018) (Thomas, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C. J., concurring).

First, Plaintiffs argue that the APA authorizes vacatur as a remedy and refer to Defendants' argument to the contrary as "radical." Dkt. 285 at 77. In support of their argument, Plaintiffs cite to the Fifth Circuit's decisions in DACA, 50 F.4th at 530, the *MPP* case, 20 F.4th at 1000–01, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023), and a string of other district court and out-of-circuit cases. Dkt. 285 at 78. But Justice Gorsuch endorsed precisely the same "radical" view in his concurrence in *Texas priorities.* As Justice Gorsuch correctly explained, courts that have granted vacatur have misread Section 706 of the APA, which is concerned with the scope of review not remedies. *Texas*, 143 S. Ct. at 1981-82 (Gorsuch, J., concurring). *Texas*, 143 S. Ct. at 1981-82 (Gorsuch, J., concurring). Section 703 of the APA, which addresses the remedies available for APA claims, does not authorize vacatur. *Texas priorities*, 143 S. Ct. at 1983. Although the Court in *Texas priorities* did not ultimately need to resolve this question since the case was reversed on

standing grounds, multiple justices signed on to the view that the grounds for vacatur in the APA are questionable. *Id*.

Next Plaintiffs argue that "if agency actions are vacated, vacatur cannot be limited only to the parties." Dkt. 285 at 79. Not so. Dkt. 284, 51-55. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Here, if the Court ultimately enjoins the CHNV processes, it should enjoin their application only in Texas—for example, by enjoining DHS from granting advance travel authorization to any noncitizen who indicates an intent to reside in Texas. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (in crafting a remedy, a court should "try to limit the solution to the problem" by vacating or enjoining only "the problematic applications while leaving other applications in force."); *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451 (D.C. Cir. 2017) (following the Supreme Court's guidance to "limit the solution to the problem" by vacating the challenged rule as to some entities and not others.).

Plaintiffs argue that providing relief to Texas alone would be meaningless, because "there is a substantial likelihood" that paroled CHNV nationals would travel to Texas. Dkt. 285 at 80. But Plaintiffs do not cite to any evidence for this proposition. *Id.* Instead they simply cite the Fifth Circuit's decision in DACA, and one of the district's court's decisions in MPP, for the notion that more limited relief is inappropriate. Dkt. 285 at 80. But those cases preceded recent Supreme Court precedent questioning universal relief and also ignore the reality here that the CHNV parolees have a financial supporter in a particular state. It is not at all obvious that an individual with a financial supporter in one state would choose to leave that security to travel instead to live in Texas. Dkt. 284, at 53-43. There is certainly no evidence of that in the trial record despite the fact that Plaintiffs have the burden to prove that any injunction they seek is no broader than necessary to remedy their

alleged injuries. *Feds for Med Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023). And while Plaintiffs purport to address the "incidental benefit" to other states from nationwide vacatur, Dkt. 285 at 80, they disregard that many states have filed amici briefs on behalf of the Government arguing that they benefit from the CHNV processes and do not want to see them vacated. *See* Dkt. 247.

Plaintiffs next argue that vacatur is preferable to remand without vacatur because remand alone would invite agency indifference. Dkt. 285 at 81. But Plaintiffs provide the Court with no *evidence* in this case to support such a suggestion Plaintiffs offer nothing that suggests that Defendants would drag their feet and do nothing if the CHNV processes were remanded for further consideration or for notice and comment. And to the contrary, agency action is entitled to a presumption of regularity. Dkt. 284 at 43.

Finally, Plaintiffs argue that they are entitled to an injunction enjoining the implementation of the CHNV processes. Dkt. 285 at 83-85. They argue that a balancing of the equities favors this remedy. Plaintiffs argue that absent an injunction, they will continue to incur costs for driver's licenses, education, health care, education and law enforcement. Dkt. 285 at 84. They claim such harm is "immediate, irreparable, and continuing." Dkt. 285 at 84. Tellingly, Plaintiffs provide no citations for either sentence.

Plaintiffs then argue that, conversely, Defendants will face no harm from an injunction because "the public is served when the law is followed." Dkt. 285 at 84, quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). But that reasoning cannot be reconciled with *Winter v. NRDC*, 555 U.S. 7, 32 (2008), in which the Supreme Court made clear that permanent injunctive relief "does not follow from success on the merits as a matter

of course," and that a court must still address "the balance of equities and consideration of the public interest." 555 U.S. at 32.

Further, an injunction would irreparably harm the United States and the public by frustrating the "public interest in effective measures to prevent the entry" of noncitizens without authorization at the Nation's borders. *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The public interest is served by encouraging noncitizens to avail themselves of lawful, orderly pathways to entering, and by DHS's increased ability to enforce the immigration laws as a result of cooperation from Mexico that is dependent on keeping the parole processes in place. An injunction would thus undermine "sensitive and weighty interests of … foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010), by enjoining agency actions that result from and support ongoing diplomatic negotiations.

Finally, Plaintiffs argue that nationwide injunctive relief is the proper remedy for five reasons. Dkt. 285 at 85-87. None of these arguments are persuasive. First, Plaintiffs argue that *DAPA* makes clear that nationwide relief is appropriate because migrants are free to move among the states. Dkt. 285 at 85, quoting *DAPA*, 809 F.3d at 188. But as noted above, *DAPA* predates *Texas priorities*, and there is a logical distinction between supposing that migrants already living in the United States, some for many years, may move among the states, and supposing—with zero evidentiary support—that recently arrived CHNV nationals with contacts and supports in another state, would then choose to move to Texas.[9]

---

[9] Plaintiffs' reliance on *DAPA* is also misplaced because it was based in part upon the Congressional principle of a uniform Rue of Naturalization. U.S. Const. art. 1, § 8, cl. 4; *see Texas*, 809 F.3d at 187. Plaintiffs have not raised any argument in this case that the parole processes relate to naturalization, nor could they since parole is expressly time-limited to a term of two years and does not provide eligibility for naturalization.

Second, Plaintiffs argue that "a nationwide injunction is required because the legal violations here are incontestably systemwide and nationwide." Dkt. 285 at 86. But even assuming this Court were to find that to be the case, another court elsewhere in the country might disagree. *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Nationwide injunctions "short-circuit the decision making benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top."). Indeed, for precisely that reason, this Court recently declined to grant nationwide relief in another case concerning a national policy. *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *16 (S.D. Tex. Sept. 26, 2023). And universal remedies are problematic in other ways. They conflict with Article II's requirement that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury," *Gill*, 138 S. Ct. at 1934 (emphasis added), and the rule in equity that relief "be no more burdensome to the defendant than necessary to provide complete relief to the *plaintiffs*." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). Such remedies also circumvent Rule 23's class-action requirements, incentivize forum shopping, and overburden courts' emergency dockets." *See, e.g.*, *Arizona*, 40 F.4th at 395-98. And those concerns apply equally to universal vacatur. *Texas*, 143 S. Ct. at 1985-86 (Gorsuch, J., concurring). Universal vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary circumstances," *id.*, which do not exist here.

Third, Plaintiffs argue that "[n]on-parties cannot suffer any cognizable harms from non-implementation of *illegal* agency action." Dkt. 285 at 86. But this argument runs into the two problems noted above: it cannot be reconciled with *Winter*, which recognizes that injunctive relief "does not follow from success on the merits as a matter of course," 555 U.S. at 32, and it assumes that every other court in the country would agree with this Court's ultimate conclusions.

Fourth, Plaintiffs argue that Defendants have not provided "evidence" that a more limited injunction would be workable. Dkt. 285 at 86. But Defendants have no burden to provide such "evidence." Rather, Plaintiffs have the burden "to *prove* that whatever injunction they request" is "no broader" than necessary "to protect against their proven injuries." *Feds for Med Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (any relief the Court grants must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). Nonetheless, Defendants have provided the Court with a workable alternative—enjoining the processes only as to those CHNV nationals who profess an intent to live in Texas. While Plaintiffs claim that "[i]t is an obvious truism that immigrants tend to move around," Dkt. 285 at 86, they do not support this truism, and there is no reason to believe that a parolee would seek to live anywhere other than near their financial supporter.

Fifth, Plaintiffs argue that "recent news reports state that the Defendants plan to implement a 'Remain in Texas' policy requiring aliens claiming asylum to remain in Texas," and that Defendants are planning to do so "to specifically punish Texas" and "exact retribution." Dkt. 285 at 87. As a result, Plaintiffs argue, "[t]here is little reason to believe that the Defendants would implement in good faith any sort of limited injunction applying only to Texas." *Id*. There is no basis for this outrageous accusation, which is not worthy of response, other than to state that Defendants will comply with any order issued by the Court.

Accordingly, should this Court decide to vacate or enjoin the CHNV processes, such a remedy should be narrowly applied only to Texas.

## CONCLUSION

For these reasons, the Court should grant final judgment in favor of Defendants. If the Court instead grants relief to Plaintiffs, given the chaotic impact any vacatur or injunction would have on circumstances at the border, Defendants respectfully request that the Court stay its decision for 14 days to allow Defendants a reasonable amount of time to consider whether to seek an emergency appeal.

Dated: October 27, 2023                    Respectfully submitted,

ALAMDAR S. HAMDANI                         BRIAN M. BOYNTON
*United States Attorney*                   *Principal Deputy Assistant Attorney General*

                                           WILLIAM C. PEACHEY
                                           *Director*
                                           Office of Immigration Litigation
                                           District Court Section

                                           EREZ REUVENI
                                           *Assistant Director*

                                           */s/ Brian C. Ward*
                                           BRIAN C. WARD
                                           *Senior Litigation Counsel*
                                           U.S. Department of Justice, Civil Division
                                           Office of Immigration Litigation
                                           District Court Section
                                           P.O. Box 868, Ben Franklin Station
                                           Washington, DC 20044
                                           Tel.: (202) 616-9121
                                           Email: brian.c.ward@usdoj.gov

                                           */s/ Elissa Fudim*
                                           ELISSA FUDIM
                                           *Trial Attorney*
                                           U.S. Department of Justice, Civil Division
                                           Office of Immigration Litigation,
                                           District Court Section
                                           P.O. Box 868, Ben Franklin Station
                                           Washington, D.C. 20044
                                           Tel: (202) 598-6073
                                           Email: elissa.p.fudim@usdoj.gov

                                           *Counsel for Defendants*

63

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2023, I electronically filed this brief with the Clerk of the Court for the United States District Court for the Northern District of Texas by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Brian C. Ward*
BRIAN C. WARD
U.S. Department of Justice
