**United States District Court**
**Southern District of Texas**
**Victoria Division**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
|       *Plaintiffs,* | |
| | |
|    v. | Case 6:23-cv-00007 |
| | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, | |
|   *et al.*, | |
|       *Defendants.* | |

# PLAINTIFF STATES' SUPPLEMENTAL RESPONSE BRIEF

TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... iii

Argument ......................................................................................................................... 1

I.   Plaintiff States have standing. ................................................................... 1

A.   Defendants' offsets argument based on overall migrant flows collapses on its own terms. ..................................................................................................... 1

B.   This case is not moot. ...................................................................................... 6

C.   The Supreme Court's decision in *Enforcement Priorities* does not save Defendants. ................................................................................................... 7

D.   Texas's injuries are not "self-inflicted." ....................................................... 8

E.   Intervenors' attempts to challenge Texas's evidence of injury fail. ............ 9

II.   The CHNV Program is unlawful under the Major Questions Doctrine, and *Chevron* deference therefore does not apply. ................................................. 11

A.   *Chevron* deference does not apply because the CHNV Program was never adopted under proper APA procedures. ............................................. 11

B.   Chevron deference does not apply because it is precluded by the Major Questions Doctrine. ...................................................................................... 12

III.   Defendants have acted in excess of their authority, and Plaintiff States are entitled to relief against *ultra vires* action. ............................................................ 24

IV.   Relief should not be limited. ..................................................................... 26

CERTIFICATE OF SERVICE ................................................................................. 32

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama-Coushatta Tribe of Texas v. United States,*
    757 F.3d 484 (5th Cir. 2014) ...................................................................26

*Arcia v. Fla. Sec'y of State,*
    772 F.3d 1335 (11th Cir. 2014) .................................................................6

*Biden v. Texas,*
    142 S. Ct. 2528 (2022) .........................................................................8, 23

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ...........................................................25, 26

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) ...............................................................................11

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) .................................................................17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .................................................................................6

*Crawford v. Hinds Cnty. Bd. of Supervisors,*
    1 F.4th 371 (5th Cir. 2021) .......................................................................6

*Daimler Trucks N. Am. LLC v. E.P.A.,*
    737 F.3d 95 (D.C. Cir. 2013) ...................................................................27

*Davis v. FEC,*
    554 U.S. 724 .............................................................................................6

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .............................................................................27

*Ellis v. Railway Clerks,*
    466 U.S. 435 (1984) ..................................................................................7

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) .................................................................................12

*Franciscan All., Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) .....................................................................7

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) ..................................................................... 21

*Int'l Refugee Assistance Project v. Trump*,
    883 F.3d 233 (4th Cir.), *judgment vacated on other grounds*, 138 S. Ct. 2710
    (2018) (Gregory, C.J., concurring) ........................................................... 17

*King v. Burwell*,
    576 U.S. 473 (2015) .................................................................................. 12

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012) .................................................................................... 7

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................ 24, 26

*Medellin v. Texas*,
    552 U.S. 491 (2008) .................................................................................. 23

*Michigan v. U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) ................................................................... 26

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ................................................................... 27

*Nationwide Encounters*,
    U.S. Customs and Border Protection,  https://bit.ly/3tjIiyF ................... 3, 4

*Pederson v. Louisiana State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ..................................................................... 7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ............................................................... 27

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .................................................................................... 6

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) (Kacsmaryk, J.) ......................... 2, 8

*Texas v. Biden* (*MPP*),
    20 F.4th 928 (5th Cir. 2021) .......................................................... 8, 9, 22

*Texas v. Biden*,
    No. 6:22-cv-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) .................... 10

iv

*Texas v. United States,*
 40 F.4th 205 (5th Cir. 2022) ................................................................ 1, 2, 14

*Texas v. United States (DAPA),*
 809 F.3d 134 (5th Cir. 2015) ..................................................... *passim*

*Trudeau v. Fed. Trade Comm'n,*
 456 F.3d 178 (D.C. Cir. 2006) ..................................................................26

*United States v. Sulik,*
 929 F.3d 335 (6th Cir. 2019) ................................................................... 17

*United States v. Texas (Enforcement Priorities),*
 143 S. Ct. 1964 (2023) .......................................................... 7, 8, 9, 10

**Statutes**

5 U.S.C. § 702 ......................................................................................25

8 U.S.C. 1225(a)(4) .............................................................................. 19

8 U.S.C. 1229c ..................................................................................... 19

8 U.S.C. § 1101(a)(15)(B) .................................................................... 20

8 U.S.C. § 1182(d)(5)(a) ................................................................ 11, 23

**Other Authorities**

22 C.F.R. § 41.31(b)(1)......................................................................... 20

**ARGUMENT**

## I.   Plaintiff States have standing.

### A.   Defendants' offsets argument based on overall migrant flows collapses on its own terms.

To keep this Court from reviewing the unlawful CHNV Program, Federal Defendants and Intervenors have developed an argument on standing that is not applied in any other circumstance. Instead of evaluating the effects of the challenged agency action, they insist this Court must consider the entire universe of factors that affect migrant flows, including actions by foreign governments and other federal immigration policies. *See* ECF No. 285 at 26–29. Imagine if this theory took hold.  A homeless man wrongfully arrested could not sue in federal court if he received healthcare while incarcerated. Parents denied a $5000 education tax credit due to their religion could not sue in federal court if they were also entitled to a state-funded $10,000 public education. An unlawful regulation on a mining company could not be challenged if—due to its discovery of minerals, the collapse of a competitor, or other market conditions—it made an increased profit.

The Federal Defendants and Intervenors have been pushing this theory that reduced overall migrant flows mean that Texas is not injured by the CHNV Program. But the test is whether the challenged program *itself* increases migrant flows, not overall numbers resulting from a multitude of policies and outside forces. If the federal government builds a border wall, the collapse of the Mexican government leading to an explosion of refugees would not mean that the wall did not have the effect of reducing migrant flows. There are always many factors that affect this rate, as Federal Defendants have conceded in this and other litigation. *See* ECF No. 285 at 26–29.

The Fifth Circuit previously rejected an attempt by Federal Defendants to use overall immigration numbers to defeat State standing relating to a particular agency action. In *Texas v.*

1

*United States*, 40 F.4th 205 (5th Cir. 2022), the court faced an argument that "various statistics show[ed] an increase in arrests and expulsions year-over-year," and "the percentage of enforcement actions involving noncitizens increased as compared to the same time frame in fiscal year 2020." *Id.* at 218 n.6. The court rejected the relevance of these overall numbers because "for purposes of standing, the inquiry is whether the [challenged agency action] caused Texas to have to incur additional financial, law enforcement, and welfare costs, not whether there were generally more enforcement actions year-over-year in the midst of a historic immigration crisis." *Id.*

But all this debate is irrelevant now. This Court may take judicial notice of publicly available federal government data, even data published after trial. *See Texas v. Biden*, 554 F. Supp. 3d 818, 837 n.7 (N.D. Tex. 2021) (Kacsmaryk, J.) (taking judicial notice of August 2, 2021, declaration filed in another case after bench trial concluded on July 22, 2021). The Federal Defendants' publicly available statistics confirm that nationwide encounters with aliens from Cuba, Haiti, Nicaragua, and Venezuela are skyrocketing, and overall numbers from those countries are higher than before the CHNV Program came online. As the States explained in their opening post-trial brief, there were 56,708 encounters with CHNV aliens in July and 76,604 encounters in August— a 35% increase in just one month. ECF No. 285 at 7.

CBP's recently released September numbers show that the problem has only worsened— nationwide encounters with CHNV aliens in September 2023 totaled 113,324, a 47.9% increase from August and a mindboggling increase of 99.8% from July.



| FY | 2020 | 2021 | 2022 | 2023 | Reset Filters |

**FY Nationwide Encounters by Month**

|      | OCT    | NOV    | DEC    | JAN    | FEB    | MAR    | APR    | MAY    | JUN    | JUL    | AUG    | SEP     | Total   |
|------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|---------|---------|
| 2023 | 80,528 | 89,471 | 98,631 | 35,807 | 37,768 | 43,104 | 73,275 | 71,328 | 61,213 | 56,675 | 76,587 | 113,324 | 837,711 |
| 2022 | 30,066 | 42,154 | 55,826 | 48,178 | 35,239 | 55,212 | 57,852 | 61,113 | 45,241 | 55,959 | 64,256 | 84,227  | 635,323 |
| 2021 | 2,973  | 2,662  | 3,531  | 4,811  | 6,586  | 13,615 | 13,937 | 17,789 | 24,364 | 28,993 | 28,802 | 41,188  | 189,251 |
| 2020 | 3,689  | 2,997  | 2,982  | 2,082  | 2,314  | 1,840  | 384    | 816    | 1,371  | 2,096  | 2,690  | 3,749   | 26,990  |

*Nationwide Encounters*, U.S. Customs and Border Protection, https://bit.ly/3tjIiyF (select "Cuba," "Haiti," "Nicaragua," and "Venezuela" under "Citizenship"). Notably, this includes a dramatic increase of encounters with aliens from these four countries by the Border Patrol— something the program was supposed to stop:



*Id.* (further selecting the "U.S. Border Patrol under "Component").

According to the Federal Defendants, before the CHNV Program, there were 1,100 daily encounters of Venezuelans and 1,231 daily encounters of Cubans, Haitians, and Nicaraguans, for a total of 2,331 daily encounters. Defs. Ex. HH at ¶¶ 20, 26; ECF No. 284 at 19–20. Defendants state that "[i]n the five months leading up to the implementation of the CHNV processes, CBP released a daily average of 2,356 CHNV nationals into the United States." ECF No. 284 at 35. The 113,324 CHNV encounters in September 2023 work out to an average daily encounter rate of 3,777. Daily encounters with CHNV aliens are now unambiguously *higher* than before the CHNV Program started. Texas has therefore shown injury from the CHNV Program even under Federal Defendants' and Intervenors' flawed theory that overall migrant flows from the CHNV countries could affect the Plaintiff States' standing to challenge a specific program.

While the Plaintiff States still maintain that a statistical comparison of the encounters before and after the announcement of the program is not relevant for standing purposes, the September data disprove the argument advanced by the Federal Defendants. Moreover, their own statistics now confirm the Plaintiff States' allegation that the CHNV Program would incentivize increased illegal immigration.

On October 9, 2023, the House Judiciary Committee released a report on the border crisis that contains updated CHNV Program numbers. Staff of House Comm. on the Judiciary and Subcomm. on Immigration Integrity, Security, and Enforcement, 118th Cong., *The Biden Border Crisis: New Data And Testimony Show How The Biden Administration Opened The Southwest Border And Abandoned Interior Enforcement*, (Oct. 9, 2023), https://tinyurl.com/3dr96dwm. The following chart, which comes from the report, confirms that the Administration continues to process about 30,000 aliens a month, with 194,632 aliens in the CHNV Program having been paroled into the United States by August 31, 2023:

**CHNV Travel Authorizations, Arrivals, and Entries: January 1, 2023 - September 26, 2023**

|  | Cuba | | | | Haiti | | | | Nicaragua | | | | Venezuela | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Applied | Approved | Traveled | Paroled | Applied | Approved | Traveled | Paroled | Applied | Approved | Traveled | Paroled | Applied | Approved | Traveled | Paroled | Applied | Approved | Traveled | Paroled |
| January | 5,877 | 5,762 | 4,033 | 3,956 | 4,288 | 4,108 | 1,592 | 1,573 | 1,931 | 1,841 | 341 | 331 | 13,520 | 13,074 | 5,762 | 5,585 | 25,616 | 24,785 | 11,728 | 11,445 |
| February | 6,043 | 5,832 | 5,557 | 5,455 | 11,920 | 11,649 | 6,494 | 6,177 | 6,017 | 5,778 | 2,389 | 2,253 | 6,410 | 6,158 | 8,182 | 8,009 | 30,390 | 29,417 | 22,622 | 21,894 |
| March | 8,390 | 8,245 | 5,226 | 5,084 | 13,590 | 13,314 | 10,356 | 10,062 | 6,255 | 6,006 | 4,783 | 4,478 | 6,419 | 6,124 | 7,458 | 7,293 | 34,654 | 33,689 | 27,823 | 26,917 |
| April | 5,838 | 5,669 | 7,074 | 6,892 | 13,209 | 12,722 | 10,391 | 10,175 | 6,972 | 6,523 | 5,160 | 4,924 | 6,078 | 5,571 | 5,835 | 5,728 | 32,097 | 30,485 | 28,460 | 27,719 |
| May | 9,099 | 8,798 | 6,269 | 6,118 | 11,625 | 11,179 | 11,629 | 11,445 | 5,100 | 4,754 | 5,721 | 5,463 | 6,417 | 5,829 | 5,502 | 5,404 | 32,241 | 30,560 | 29,121 | 28,400 |
| June | 4,003 | 3,723 | 7,784 | 7,619 | 10,218 | 9,672 | 10,857 | 10,657 | 5,155 | 4,708 | 4,662 | 4,415 | 4,494 | 4,004 | 6,205 | 6,079 | 23,870 | 22,107 | 29,508 | 28,770 |
| July | 4,004 | 3,874 | 3,462 | 3,405 | 11,954 | 11,587 | 9,456 | 9,267 | 5,436 | 5,055 | 4,386 | 4,158 | 6,430 | 5,899 | 4,766 | 4,683 | 27,824 | 26,415 | 22,070 | 21,513 |
| August | 5,579 | 5,478 | 6,124 | 6,034 | 11,631 | 11,337 | 10,887 | 10,648 | 5,221 | 4,928 | 5,440 | 5,252 | 5,288 | 5,016 | 6,220 | 6,040 | 27,719 | 26,759 | 28,671 | 27,974 |
| September | 4,471 | 4,226 | 3,568 | NA | 10,791 | 10,076 | 11,078 | NA | 5,092 | 4,539 | 4,164 | NA | 4,377 | 3,836 | 4,509 | NA | 24,731 | 22,677 | 23,319 | NA |
| Total | 53,304 | 51,607 | 49,097 | 44,563 | 99,226 | 95,644 | 82,740 | 69,974 | 47,179 | 44,132 | 37,046 | 31,274 | 59,433 | 55,511 | 54,439 | 48,821 | 259,142 | 246,894 | 223,322 | 194,632 |

NA - Data not available.

Note: Applications are those individuals who have received I-134/A confirmation, completed their beneficiary materials, and been passed to CBP for vetting and approval or denial of a travel authorization; note that not all application individuals will have completed their beneficiary materials in CBP One. Approved travel authorizations are for those individuals who have passed the security check by CBP for the CHNV parole processes. Each authorization only covers one individual, but an individual may be authorized multiple times. Applications approved are those that have not expired due to failure to travel with in a 90-day window and have not been cancelled. These include approved applications for people who have already entered the United States. Travel authorization dates are the received date for the application; for example, if an application was received in November, it would be counted in October. Paroles include individuals who received a CHNV parole disposition from OFO at the time of arrival and inspection at the port of entry. An individual eligible for a parole process may not necessarily have the same nationality as that type of parole; for example, a minor with Costa Rican nationality may be eligible for Venezuelan parole if that minor has a Venezuelan mother. Venezuela numbers start October 18, 2022, the date the Venezuela parole process started. All other numbers start January 6, 2023, the date the Cuba, Haiti, and Nicaragua parole processes started. OFO disposition data as of September 7, 2023; all other data as of September 26, 2023.

Source: OIS analysis of USCIS I-134/I-134A data, CBP ATA Beneficiaries Vetting Summary Report_2023-09-26, and OFO inadmissibles data.

*Id.* at 61.

Even if the evidence of migrant flows after this suit was commenced showed a decrease in number of CHNV nationals coming into the country, such evidence could not undermine standing here, because "the injury required for standing need not be actualized." *Davis v. FEC*, 554 U.S. 724, 734 (2008). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct" and "[a] plaintiff may challenge the prospective operation of a statute that presents a realistic and impending threat of direct injury." *Id.* (citations omitted). A plaintiff seeking prospective relief need only show that future injury is "fairly likely" at the time suit was commenced. *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("a realistic probability").

As the magnitude and direction of the shifts in migrant flows since the start of the CHNV Program demonstrate, Texas faced a "substantial risk" of future injury from the flow of migrants due to the operation of the Program. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Texas was not required to show that it was "literally certain" that it would be injured in the future. *Clapper*, 568 U.S. at 414 n.5. The CHNV Program has no expiration date, and it was reasonable for Texas to foresee that the program would threaten its education, incarceration, driver's license, and healthcare costs over the life of the Program. That was all that Article III requires.

**B.  This case is not moot.**

Defendants still do not understand the distinction between standing and mootness. They cite language from cases as supporting the proposition that standing must be shown throughout the litigation, but the passages they cite are about mootness, not standing. *See* ECF No. 284 at 17–18 (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). Standing is determined—even after trial—based on facts that

existed when the suit was commenced. ECF No. 285 at 15–16. Any attempt to use facts after the commencement of suit to show lack of Article III jurisdiction must be evaluated under the test for mootness, not standing. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000).

The difference between these two Article III doctrines is important because "the burden of proving mootness is higher than simply showing a lack of standing." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 n.40 (5th Cir. 2022). A case is moot if "it is *impossible* for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (emphasis added; quotation omitted). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks,* 466 U.S. 435, 442 (1984). Defendants do not meet their heavy burden of showing that Texas could never suffer an injury from the operation of the CHNV Program that could be redressed by this Court. Again, there is no expiration date on the CHNV Program, and—as reinforced by the recent September numbers that show the folly of trying to use a snapshot of time to show the effects of such a program—migrant flows can dramatically change month-to-month, due to the multitude of factors that influence it. *See* ECF No. 285 at 26–29.

## C. The Supreme Court's decision in *Enforcement Priorities* does not save Defendants.

Plaintiff States have addressed the irrelevance of the Supreme Court's decision in *United States v. Texas (Enforcement Priorities)*, 143 S. Ct. 1964 (2023) at length. ECF No. 285 at 31–41. Plaintiffs will address a few additional points.

Federal Defendants point to the *Enforcement Priorities* majority's explanation that "courts must consider whether the 'asserted injury' is the type that has 'traditionally' been 'redressable in federal court,' and determine the dispute is one that 'is traditionally thought capable of resolution through the judicial process.'" ECF No. 284 at 24–25 (citing *Enforcement Priorities*, 143

7

S. Ct. at 1970). They suggest that a State challenging federal immigration policies on the basis of injuries due to social service costs fails that test. But *Enforcement Priorities* explicitly cited two cases where Texas challenged federal immigration policies as examples that were not prohibited by its rationale. This included *Texas v. United States (DAPA)*, 809 F.3d 134 (5th Cir. 2015), which upheld Texas standing to challenge a program of "affirmative immigration relief" based solely on driver's license costs; and *Biden v. Texas*, 142 S. Ct. 2528 (2022)—the MPP case—where Texas' standing was based on driver's licenses, incarceration costs, education, and healthcare costs, *Texas v. Biden*, 554 F. Supp. 3d 818, 838–39 (N.D. Tex. 2021)—the same four categories of harm in this case. And the injury to Texas in the MPP litigation was based on aliens being *paroled* into Texas. *Texas v. Biden* (*MPP*), 20 F.4th 928, 966–68 (5th Cir. 2021).

Defendants claim that "[*Enforcement*] *Priorities* calls into question whether indirect costs related to driver's licenses, education, healthcare, or law enforcement can satisfy Article III." ECF No. 284 at 26 (citing *Enforcement Priorities*, 143 S. Ct. at 1972 n.3). As explained above, Enforcement Priorities blessed standing based on those categories of injury. As Plaintiffs have explained, however, the costs in *Enforcement Priorities* were considered indirect only because they involved a challenged to the government's "mere non-enforcement," while distinguishing challenges to "affirmative immigration relief"—such as the CHNV Program—that create direct injuries for those same categories of injury. ECF No. 285 at 35–39.

### D.  Texas's injuries are not "self-inflicted."

Federal Defendants assert that Texas's injuries are "self-inflicted," because Texas could change its policies to avoid the costs from more paroled aliens—presumably, they imagine that the failure of Texas to (1) abolish all public schools, (2) grant driver's licenses only to U.S. citizens (though that could be preempted, so maybe abolish such licenses completely), (3) pull out of the

Medicaid program, or (4) close all of its prisons, means the costs to those programs are its own fault. *See* ECF No. 284 at 29 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).  But the Fifth Circuit has repeatedly rejected this identical argument based on the same authority:

> Finally, the Government says Texas's injuries are self-inflicted and therefore entirely irrelevant to the standing inquiry. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). Our court addressed and rejected precisely this argument in *DAPA*. *See* 809 F.3d at 157–60 (citing *Wyoming v. Oklahoma*, 502 U.S. 437 (1992)). The Government does not acknowledge that exhaustive, precedent-based treatment of the issue, and it offers no reason at all for holding that Texas's injury is self-inflicted in this case when it was not in *DAPA*. Here, as there, Texas is injured by the "Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.* at 163.

*MPP*, 20 F.4th at 972 (citations truncated).

### E.  Intervenors' attempts to challenge Texas's evidence of injury fail.

Intervenors attempt to challenge Texas's declarations in support of their injuries. ECF No. 282 at 23–25.

As to driver's licenses, Intervenors assert that "Texas's cost estimates ignore fees that directly offset driver's license costs, in addition to the fiscal benefits from increasing driver's licenser access." ECF No. 282 at 24.  The Fifth Circuit has stated that the latter "benefits" are irrelevant to the standing inquiry:

> Instead of disputing those figures, the United States claims that the costs would be offset by other benefits to the state. It theorizes that, because DAPA beneficiaries would be eligible for licenses, they would register their vehicles, generating income for the state, and buy auto insurance, reducing the expenses associated with uninsured motorists. The government suggests employment authorization would lead to increased tax revenue and decreased reliance on social services. … Even if the government is correct, that does not negate Texas's injury …

*DAPA*, 809 F.3d at 155. Of course, the Supreme Court in *Enforcement Priorities* cited the Fifth Circuit's *DAPA* ruling—which found standing solely on the same driver's license data as in this

case—as a model for State standing to challenge federal immigration policies. *Enforcement Priorities*, 143 S. Ct. at 1974.

It is also strange to suggest that Texas "ignores" revenue from applications, when the DPS declaration directly states that "[e]ach additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS that exceed [the application fee] of $33," and that every 10,000 licenses cost DPS an average of over $200 per license. Pls. Ex. 4 at ¶8.

Intervenors fare no better on education costs. They state that Texas's declaration "ignore[s] both federal compensation for students receiving bilingual education and the value of education as an investment from which the [S]tate benefits." ECF No. 282 at 24–25. But the latter purported "benefits" crash into the logic of *DAPA*, and the Intervenors strangely believe that federal funds of $1227 per low-income student and $122 per non-English-speaking student, Intervenors' Ex. 136 at ¶18, neutralize standing when Texas incurs costs of $9,564 per student, and $11,781 per each non-English-speaking student. Pls. Ex. 6 at ¶3. Given that $1 of injury is sufficient for standing, it is unclear what function these numbers are meant to perform in this case. *See Texas v. Biden*, No. 6:22-cv-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) ("For standing purposes, even 'a dollar or two' of injury suffices.") (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008)).

Equally baffling is Intervenors' attack on Texas's evidence of its healthcare costs, which they say "ignore[s] compensation that benefits Texas." ECF No. 282 at 25. They cite to their own declaration that *admits* that the federal government only picks up 60 percent of the costs of Medicaid—leaving the remaining 40 percent to Texas—and testifies that Texas faces a "net cost"

despite that federal funding. Intervenors' Ex. 138 at ¶13. With friends like their expert, Intervenors have no need of enemies.

II.   **The CHNV Program is unlawful under the Major Questions Doctrine, and *Chevron* deference therefore does not apply.**

Section 1182(d)(5) is clear: parole cannot be granted programmatically. Even if there *were* ambiguity, the Major Questions Doctrine requires that this court *not* grant any deference to the Executive's interpretation of Section 1182(d)(5). Accordingly, the CHNV Program is unlawful, and this Court should grant the States the relief they seek.

All parties to this case agree that it is a mixed question of fact and law whether grants of parole under the CHNV are "temporar[y]" and granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(a); *see* ECF No. 285 at 37 (States); ECF No. 284 at 38 (Federal Defendants); ECF No. 282 at 7 (Intervenor Defendants). However, the Federal Defendants and Intervenors incorrectly extrapolate from this to the mistaken conclusion that the CHNV Program's interpretation of "case-by-case" is entitled to *Chevron* deference. ECF No. 284 at 39–40; ECF No. 282 at 7.  It is not.

A.   ***Chevron* deference does not apply because the CHNV Program was never adopted under proper APA procedures.**

As an initial matter, the Federal Defendants are not entitled to any *Chevron* deference here because they have not engaged in any APA rulemaking through which they have provided an interpretation of the statute. If the Federal Defendants wanted to get *Chevron* deference, then they should have followed the APA and subjected the CHNV Program to notice-and-comment rulemaking. As the Supreme Court has explained, "*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct

procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

**B. Chevron deference does not apply because it is precluded by the Major Questions Doctrine.**

Furthermore, even if the CHNV Program were not procedurally defective, the Defendants' interpretation of Section 1182(d)(5) would still not be entitled to deference. Under *Chevron*'s "two-step framework," courts "ask whether the statute is ambiguous and, if so, whether the agency's interpretation is reasonable." *King v. Burwell*, 576 U.S. 473, 485 (2015) (citing *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). However, "[t]his approach is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Id.* (cleaned up). When an agency interpretation of a statute involves "a question of deep economic and political significance," *id.* at 486 (cleaned up), courts do not defer to the Executive. Instead, it is the court's "task to determine the correct reading" of the statute. *Id.* "If the statutory language is plain, [courts] must enforce it according to its terms." *Id.* (cleaned up). And because "oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," courts "must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (cleaned up).

Under binding Fifth Circuit precedent, the Doctrine applies here and establishes that the CHNV Program is unlawful. And when the Major Questions Doctrine applies, courts afford no deference at all to the Executive and construe the statute *de novo*. As the States explained in their opening post-trial brief, the statutory context makes clear that Congress did not intend for the

parole power to confer on the Executive the authority to create a new parallel immigration system. ECF No. 285 at 57–66.

The Federal and Intervenor Defendants put forward several arguments as to why they believe the Major Questions Doctrine should not apply here. As with so much in this case, the Fifth Circuit has already rejected those arguments.

### 1. The Major Questions Doctrine applies because the CHNV Program has deep economic and political significance.

The Federal Defendants first argue that the CHNV Program does not "involve[] vast economic and political consequences" because "there has been no negative impact or costs to the Plaintiff States." ECF No. 284 at 45. However, this argument incorrectly conflates the statutory analysis with the standing analysis. When the Fifth Circuit has held the Major Questions Doctrine to apply in the immigration context, it has never analyzed whether the challenged action would cause any specific harm to the plaintiffs in the case. The Major Questions Doctrine is triggered not by specific harm to plaintiffs but when the Executive action is generally a "decision[] of vast 'economic and political significance," *DAPA*, 809 F.3d at 183 (cleaned up). Thus, in *DAPA*, the Doctrine applied because the challenged executive action "would make 4.3 million otherwise removable aliens eligible for lawful presence, employment authorization, and associated benefits," *id.* at 181, not because of any specific harm to Texas.

In *DAPA*, the Fifth Circuit rejected the DHS Secretary's interpretation of the relevant statutes because that interpretation "would allow him to grant lawful presence and work authorization to any illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility. Even with 'special deference' to the Secretary, the INA flatly does not permit the reclassification of millions of illegal

aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." *Id.* at 184. The DHS Secretary's interpretation here of the parole statute would similarly "allow him to grant lawful presence and work authorization to any illegal alien" that position is as "untenable" here as it was in *DAPA*.

In *Texas v. United States* (*DACA*), the federal government again made similar arguments trying to defend DACA, arguing that the DHS Secretary had the authority to implement DACA because the INA conferred on him the power to "'[e]stablish[] national immigration enforcement policies and priorities' and to carry out the administration and enforcement of immigration laws, including to 'establish such regulations,' 'issue such instructions,' and 'perform such other acts as he deems necessary for carrying out his authority.'" 50 F.4th 498, 526–27 (5th Cir. 2022) (alterations in original) (quoting 6 U.S.C. § 202(5) and 8 U.S.C. § 1103(a)).

Relying on its prior holding in *DAPA*, the Fifth Circuit rejected his argument, explaining that "these broad grants of authority cannot reasonably be construed as assigning decisions of vast economic and political significance to an agency." *Id.* at 527 (cleaned up).

The size of the CHNV Program falls well within the Fifth Circuit's *DAPA* and *DACA* parameters for an immigration program that qualifies as having "deep economic and political significance." *Id.* at 526. In *DACA*, the federal government tried to distinguish the DACA program from the Fifth Circuit's prior *DAPA* holding by arguing that DACA was much smaller in scope than DAPA and thus did not have deep economic and political significance—specifically, "[a]bout 4.3 million aliens would have been eligible for DAPA, whereas about 1.5 million aliens are eligible for DACA." *Id.* at 527.

14

The Fifth Circuit was not convinced: "Any difference in size does not meaningfully diminish the importance of the issues at stake." *Id.* So too here. And even if the size of the program were the determinative factor, the CHNV Program is of very similar scope to DACA.

The CHNV Program has no expiration date—it will run indefinitely and may only be terminated at the DHS Secretary's discretion. 88 Fed. Reg. at 1,253, 88 Fed. Reg. at 1,277 ("The Secretary retains the sole discretion to terminate the Parole Process"); 88 Fed. Reg. at 1,264 ("The Secretary retains the sole discretion to terminate the process at any point"). At a rate of 360,000 grants of parole per year, the CHNV Program would reach the same number of beneficiaries as DACA after a little more than four years. Indeed, the number of potential beneficiaries *already* exceeds DACA. As of May 22, 2023—just four and a half months after the start of the CHNV Program—DHS had "received more than 1.5 million requests from individuals hoping to sponsor the entry of migrants from" the CHNV countries. ECF No. 265-13 at 13 (Intervenors' Ex. 116.)

### 2. All agree that the CHNV Program has enormous political and economic significance.

In determining that DACA was of "deep economic and political significance," the Fifth Circuit also found relevant what the parties themselves had to say about the program: "As the parties and their amici attest, DACA is of enormous political and economic significance to supporters and opponents alike." *DACA*, 50 F.4th at 526–27. For example, in *DACA*, "[a]mici businesses report that national GDP may contract by as much as $460 billion without DACA. An expert for the Intervenors estimated that DACA contributes over $3.5 billion in net fiscal benefits to federal, state, and local entities." *Id.* at 527 (citations omitted).

The same is true here—the briefing submitted by the Federal Defendants, the Intervenor Defendants, and the amici all make clear the enormous political and economic significance of the CHNV Program to its supporters. *See, e.g.*, ECF No. 175 at 29 (PI opposition motion of Intervenor Defendants noting "the breadth and depth of the national public interest in maintaining the Parole Pathways" and acknowledging that "DHS has received over 1.5 million applications from U.S. supporters hoping to welcome Cuban, Haitian, Nicaraguan, and Venezuelan nationals"); ECF No. 176 at 1, 5, 22 (PI opposition motion of Federal Defendants noting "historically high levels of irregular migration and the potential for additional increases"); ECF No. 203 at 6 (amicus brief of the Cato Institute, *et al.*, in support of the Defendants claiming that "some 7 million people" have fled Venezuela since 2015); ECF No. 222 at 1, 8 (amicus brief of Dr. Stan Veuger, *et al.*, in support of the Defendants noting that "CHNV nationals represent[] up to half of [the] total" number of aliens illegally crossing the Southwest border and claiming that CHNV "potentially saved DHS over $310 million in monthly immigrant detention costs alone"); ECF No. 236 at 10 (amicus brief of Haitian-Americans United, Inc. in support of the Defendants claiming that "participants in the Parole Program will provide a substantial benefit to the economy" and also claiming that Haitians in the Boston area "earned $511 million in income; had a consumer demand that supported an additional 1,674 jobs; contributed $256 million to Boston's gross city product; contributed $26 million in state income taxes; and contributed $8.4 million in state sales taxes." (cleaned up)); ECF No. 238 at 9 (amicus brief of Lutheran Immigration and Refugee Service in support of the Defendants admitting that aliens from the CHNV countries "accounted for forty percent of all people stopped at the United States border"); ECF No. 247 at 1–2 (amicus brief of the State of New York, *et al.* in support of the Defendants claiming that aliens from the CHNV "countries and

other countries are essential to the fabric of our communities and are key contributors to our economies. They work in critical jobs, pay billions of dollars in taxes, and wield considerable spending power."); ECF No. 250 at 24 (amicus brief of Legal Information Network for Ukraine in support of the Intervenor Defendants, acknowledging that "[w]ithin the first few months of the CHNV program, the U.S. received over 1.5 million requests for parole").

### 3. Other circuits agree that immigration policy involves questions of deep economic and political significance.

The Fifth Circuit does not stand alone in holding that immigration policy involves questions of deep economic and political significance. Other circuits have pointed out the same thing. *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 291 (4th Cir.), *judgment vacated on other grounds*, 138 S. Ct. 2710 (2018) (Gregory, C.J., concurring) ("Courts require a clear statement of congressional intent before finding that Congress has ceded decisions of great economic and political significance, including in the immigration arena."); *United States v. Sulik*, 929 F.3d 335, 338 (6th Cir. 2019) (referring to the "ongoing debate about a matter of great political significance: this country's immigration policy"); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) ("we must respectfully decline to give deference to the DOJ Memorandum" about withdrawing federal grants from immigration sanctuary jurisdictions because "where, as here, an agency's interpretation involves an issue of deep economic and political significance, it may not be entitled to deference" (cleaned up)).

### 4. The CHNV Program is a substantive rule.

The Federal Defendants additionally argue that the Major Questions Doctrine does not apply here because the CHNV Program is merely a collection of "statements of agency policy that do not involve any new assertion of regulatory authority, or any regulation of individuals that can

reasonably be described as an assertion of some new, extravagant, or coercive regulatory authority." ECF No. 284 at 47. Of course, whether the CHNV Program is a substantive rule or just a policy is one of the core issues in this case. In making that determination, courts do not look at "the agency's self-serving label" of its action, but instead "look[] to the contents of the agency's *action*." *DACA*, 50 F.4th at 522 (cleaned up) (emphasis added). Courts are thus "mindful but suspicious of the agency's own characterization of what it has done." *Id.* (cleaned up). The "primary focus is whether the rule has binding effect on agency discretion or severely restricts it." *Id.* (cleaned up).

Courts "distinguish policy statements from substantive rules based on two criteria: whether the pronouncement (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Id.* at 522. The federal government argued the same thing about *DACA* that it argues here about the CHNV Program, claiming "that DACA is a general statement of policy exempt from notice and comment." *DACA*, 50 F.4th at 522. The Fifth Circuit was again not convinced, holding that "DACA is not a policy statement." *Id.* at 524. And just like DACA, the CHNV Program fails both relevant criteria.

*First*, the CHNV Program imposes rights and obligations. The Federal Register notices announcing the Program contain boilerplate that the Program "does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal." 88 Fed. Reg. at 1,253; 88 Fed. Reg. at 1,264; 88 Fed. Reg. at 1,277. Yet those very same notices confer many rights, including the following:

- The right to "lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole." 88 Fed. Reg. at 1,243; 88 Fed. Reg. at 1,255; 88 Fed. Reg. at 1,267.

18

- The right to be "eligible to apply for work authorization." 88 Fed. Reg. at 1,250; 88 Fed. Reg. at 1,261; 88 Fed. Reg. at 1,273.
- The right to remain eligible for the program even after making one attempt to cross the border illegally and then opting for "a single instance of voluntary departure pursuant to ... 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to ... 8 U.S.C. 1225(a)(4)."

88 Fed. Reg. at 1,252; 88 Fed. Reg. at 1,263; 88 Fed. Reg. at 1,276. Similarly, the Federal Register

notices also impose obligations on beneficiaries, who must:

- "[B]e outside the United States."
- Be a national of one of the four CHNV countries.
- "[H]ave a U.S.-based supporter who filed a Form I-134A on their behalf"
- "[B]e responsible for arranging and funding their own commercial air travel to an interior POE of the United States."

*Id.*

Thus, even though the "Government argues that [the program] confers no rights because the memorandum says it does not," what matters for this Court's analysis is the "contents of the agency's action." *DACA*, 50 F.4th at 523 (cleaned up). Here, the Federal Register notices spell out a number of specific rights and obligations created by the Program. The first criterion is thus satisfied.

*Second*, the CHNV Program does not leave "the agency and its decision-makers free to exercise discretion." Documents recently released by the House of Representatives confirm that the CBP One app is little more than an electronic rubber stamp for approving virtually all aliens who apply for Advanced Travel Authorization and parole. *New Documents Obtained by Homeland Majority Detail Shocking Abuse of CBP One App*, Homeland Security Republicans (Oct. 23, 2023), https://bit.ly/3Q3vTXw.

"Overall, 95.8 percent of all inadmissible aliens who scheduled appointments through the app [between January 12, 2023, and September 30, 2023] ... were ultimately issued a "Notice to

Appear" (NTA) and released into the United States on parole." *Id.* Of the 278,431 appointments scheduled using the App, 266,846 of these individuals were released into the interior. *Id.* Of the CHNV countries, the House report only released figures for Venezuela, and they confirm that the high approval rates continue: "Out of 57,381 appointments made by Venezuelan nationals, 55,690 were released on parole, a rate of 97 percent." *Id.*

Yet, despite all the statistics that prove otherwise, the Intervenor Defendants still attempt to argue that immigration officers retain discretion to make parole determinations on a case-by-case basis. ECF No. 282 at 23–26. They fail, however, to explain convincingly how an approval rate of 97.5%, ECF No. 285 at 37—a percentage higher even than the margin of victory achieved by totalitarian dictators in Soviet-era "elections"—could ever be considered a free exercise of discretion. The Intervenor Defendants obfuscate the issue by making apples-to-oranges comparisons, likening the CHNV Program to wholly different and inapposite domains, such as Senate confirmations of judges and security checkpoints at courthouses.

A far more apt apples-to-apples examination is to compare CHNV Program approval rates with the visa approval rates from each CHNV country. The most common type of non-immigrant visa is the B1/B2 visa, which only permits aliens to visit "temporarily for business or temporarily for pleasure," 8 U.S.C. § 1101(a)(15)(B), and which forbids employment. 22 C.F.R. § 41.31(b)(1). Such B1/B2 visas, often colloquially referred to as "tourist visas," generally have *lower* standards for approval than other types of visas, such as for employment or immigrant visas, because those other visa classifications allow aliens to live and work in the United States. The Department of State publicly releases the refusal rates for B1/B2 visas for each country. Those official numbers tell a tale completely at odds with what the Federal Defendants and Intervenors are telling here.

20

The following are the 2022 tourist visa approval rates for each CHNV nationality contrasted with the CHNV Program approval rate:

|  | Tourist Visa Approval Rate | CHNV Program Approval Rate |
|---|---|---|
| Cuba: | 43.49% | 98.3% |
| Haiti: | 52.88% | 98.3% |
| Nicaragua: | 49.19% | 96.7% |
| Venezuela: | 65.99% | 97.5% |
| Average: | 52.96% | 97.7% |

U.S. Dep't of State, *Adjusted Refusal Rate - B-Visas Only Fiscal Year 2022 By Nationality*, (accessed Oct. 27, 2023), https://tinyurl.com/47tjvx8v (approval rate calculated by subtracting refusal rates listed in source from 100); ECF No. 286 at 12, FoF ¶¶ 40–42; *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (courts may take "judicial notice of publicly-available documents and transcripts produced by the [a federal agency], which were matters of public record directly relevant to the issue at hand").

The stark contrast between the approval rates for tourist visas and CHNV Program approvals puts the lie to any contention that immigration officers granting parole under the CHNV Program are exercising any kind of meaningful discretion.

Nor should this Court give any credence to the Intervenor Defendants' contention that "ineligible individuals are winnowed out" at different stages of the CHNV Program and that this Court, therefore, "cannot draw any reliable inference about overall approval rates from the single-point-in-time approval rate data cited by Texas." ECF No. 282 at 26. The Intervenor Defendants present no evidence at all to support their claim that potential beneficiaries are "winnowed out" at earlier stages in the CHNV Process or that the statistics produced by the Federal Defendants failed to account for denials at any hypothetical earlier stages. Rather, the Federal Defendants'

discovery response on this issue specifically affirms that their statistics "constru[e] the word 'applications' to refer to USCIS confirmations of Forms I-134/I-134A for the CHNV parole processes," and would thus apparently capture all stages of the CHNV application process. ECF No. 263-2 at 83 (Pls. Ex. 41 at Resp. to ROG No. 1).

Furthermore, the data from the October 9, 2023, House Judiciary Committee report confirm that there is hardly any "winnowing" going on. The committee report shows that, through the end of August 2023 (the final date for which complete data is available), 234,411 aliens completed applications for the CHNV Program, of whom DHS approved 224,217 for DHS's pseudo-visa of Advanced Travel Authorization (ATA), or an approval rate of 95.7%. Some aliens with ATA do not end up traveling to the United States. Of the 200,003 aliens who actually traveled, 194,632 were paroled, or an approval rate of 97.3%. Multiplying the two approval rates together yields an overall start-to-finish approval rate of 93.1%—in other words, an alien who completes a CHNV Program application and who is committed to traveling to the United States if approved has a 93.1% chance of getting paroled. This 93.1% CHNV Program rate is 1.76 times higher than the average approval rate of 52.96% for tourist visas for CHNV aliens.

### 5. Evidence of individual determinations are not necessary to adjudicate this case— statistics are enough.

Nor is it relevant that, as the Federal Defendants claim, "Plaintiffs have ... submitted no evidence as to whether DHS has granted parole to any individual other than on a case-by-case basis." ECF No. 284 at 43. The States were not required to submit evidence as to individual aliens. Rather, the Fifth Circuit has made plain that challenges to broad national immigration policies like this one are "precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures." *MPP*, 20 F.4th at 971.

6.  **The practices of prior administrations do not establish the legality of the CHNV Program.**

The Defendants claim that "[t]he Executive has long used the parole authority in a similar manner, both before and after the amendments to Section 1182(d)(5)(A) in 1996, and under administrations of both parties." ECF No. 184 at 48. As a factual matter, this incorrect—never has the Executive implemented a parole program that is so far-reaching and broad. But even if it *were* true, it would be irrelevant. "[P]ast practice does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (cleaned up).

There is "no authority for the doctrine that the Executive can acquire authority forbidden by law through a process akin to adverse possession." *Biden*, 142 S. Ct. at 2557 (Alito, J., dissenting). The federal government made nearly the same type of "authority through adverse possession" argument in both *DAPA* and *DACA*. Both times, the Fifth Circuit rejected it, holding that "historical practice does not, by itself, create power," *DACA*, 50 F.4th at 527 (quoting *DAPA*, 809 F.3d at 179) (cleaned up). So too here. As explained above and in the States' opening post-trial brief, the plain language of Section 1182(d)(5), the legislative history of IIRIRA, and the overall statutory scheme of the INA structure make clear that Congress did not confer the authority to create the CHNV Program.

Just like DAPA and DACA, and as the States explained in their prior brief, the CHNV Program "is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute." *DACA*, 50 F.4th at 528; ECF No. 285 at 57–66. And thus, just like DAPA and DACA, the CHNV Program "violates the substantive requirements of the APA." *Id.*

23

**III.     Defendants have acted in excess of their authority, and Plaintiff States are entitled to relief against *ultra vires* action.**

The Plaintiff States have outlined in great detail why the CHNV Program violates Section 1182(d)(5). Because of this, the Defendants are acting in excess of their authority. It is well-settled that such actions may be challenged outside the APA through a non-statutory review claim. *See Leedom v. Kyne*, 358 U.S. 184, 188-90 (1958).

The Federal Defendants make two arguments against the Plaintiffs' *ultra vires* claim. Neither is valid.

*First*, the Federal Defendants argue that, because of the doctrine of sovereign immunity, a non-statutory *ultra vires* claim must be asserted against a public officer acting in excess of his authority and not against the government itself. The Federal Defendants go on to argue that the Plaintiff States' claim "is in substance one against the federal government, not against any individual who is nominally named in the complaint" and that, therefore, the doctrine of sovereign immunity forecloses any *ultra vires* claim." ECF No. 284 at 32. Or, "[s]tated differently, Plaintiffs are not suing any officer named in the complaint in their individual capacity; they are challenging actions taken by the named individuals only in their role as part of government agencies," and therefore, the States' *ultra vires* claim fails. *Id.*

However, this argument is nothing more than frivolous question-begging. Boiled down, the Federal Defendants' argument is that, because the CHNV Program was created by federal officials acting in their official capacity, they have sovereign immunity from suit. Or, in even simpler terms, their argument is that, because the federal officials were not acting in excess of their authority, they are entitled to sovereign immunity. This argument only works if the Federal Defendants *were* acting within the scope of their delegated statutory authority. But the whole crux of the States'

*ultra vires* claim is whether the CHNV Program exceeds the authority delegated by Congress in Section 1182(d)(5). If it does, then the federal official Defendants are most decidedly *not* protected by sovereign immunity, and there is no *Larson* problem here. The D.C. Circuit explained this in *Reich*: "under [*Larson*], if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). This is because, if the federal official's powers are limited by statute, "his actions beyond those limitations ... are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do. So, there is no sovereign immunity to waive—it never attached in the first place." *Id.*

The same holds true here. If the federal officials named as Defendants in this case—Alejandro Mayorkas, Ur Jaddou, Tae Johnson, and Troy Miller—are acting in excess of the authority granted by Section 1182(d)(5), then they are "not doing the business which the sovereign has empowered [them] to do," and there is thus "no sovereign immunity to waive." *Id.*

*Second*, the Federal Defendants argue that the availability of a non-statutory review claim did not survive Congress's 1976 amendment of the APA to add 5 U.S.C. § 706(2)(C), which waived sovereign immunity and created a right of judicial review under the APA for agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." ECF No. 238 at 32–38. The Fifth Circuit has already rejected this argument and has specifically held that Section 702, as amended, allows for non-statutory causes of action: "Section 702 also waives immunity for claims where a person is 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.' This type of waiver applies when judicial review is sought pursuant to a statutory *or non-statutory cause of action* that arises completely apart from the general provisions

of the APA." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (quoting 5 U.S.C. § 702).

The D.C. Circuit has also held that the 1976 amendments did not abolish non-statutory causes of action: "nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of ultra vires actions recognized long before, in *McAnnulty*. When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328. Indeed, federal courts have "repeatedly[] rejected" the federal government's argument, "expressly holding that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) (cleaned up). In *Trudeau*, the D.C. Circuit comprehensively analyzed the legislative history of the 1976 amendments and held that "the measure's clear purpose [was] elimination of the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity" and "the Senate Report plainly indicated that Congress expected the waiver to apply to nonstatutory actions, and thus not only to actions under the APA." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186–87 (D.C. Cir. 2006); *see also Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 776 (7th Cir. 2011) (same).

Congress's 1976 amendments were not meant to foreclose non-statutory review claims, and sovereign immunity does not shield the CHNV Program. The *Kyne* exception applies here, and the States are entitled to assert a non-statutory review claim for *ultra vires* action.

## IV.   Relief should not be limited.

Both Federal Defendants and Intervenors argue that if the sole meritorious claim against the CHNV Program is the failure to undergo notice-and-comment rulemaking, the proper remedy is remand without vacatur. ECF No. 282 at 11; ECF No. 284 at 72. The cases they cite for this

proposition, however, involve defects in the process of notice-and-comment rulemaking. But the CHNV Program never underwent any part of the notice-and-comment process. Such a total "[f]ailure to provide the required notice and to invite public comment[,] is a fundamental flaw that normally requires vacatur of the rule." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020); *see also Daimler Trucks N. Am. LLC v. E.P.A.*, 737 F.3d 95, 103 (D.C. Cir. 2013) (noting that "the court typically vacates rules when an agency 'entirely fail[s]' to provide notice and comment"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

And the Supreme Court has held that an agency action "must be vacated" even where the sole infirmity is arbitrary-and-capricious decisionmaking. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020).

As to the requirement of universal relief in the immigration context, Federal Defendants assert "there is no reason to believe let alone any evidence in the trial record showing that individuals" granted parole under the CHNV Program would relocate to Texas. ECF No. 284 at 67. They ask the Court to ignore what it can take judicial notice of—that many people come to Texas from other States every month because of the culture and economic dynamism here. *See* https://www.census.gov/data/tables/time-series/demo/geographic-mobility/state-to-state-migration.html. The Fifth Circuit case law is unanimous that in challenges to immigration policies, nationwide relief is the only plausible answer. *See* ECF No. 285 at 94–95, 99–101.

Dated: October 27, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

Respectfully submitted,

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON
JAMES K. ROGERS
America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
james.rogers@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512)686-3940 (phone)
(512)686-3941 (fax)
jonathan@mitchell.law

*Counsel for the State of Texas*

28

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*


Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*


Raúl R. Labrador
Attorney General of Idaho
Lincoln Davis Wilson, ISB No. 11860
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
lincoln.wilson@ag.idaho.gov

*Counsel for the State of Idaho*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*


Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*


Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

Kris Kobach
Attorney General of Kansas
Jesse A. Burris, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

Jeff Landry
Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
Solicitor General
Joseph Scott St. John (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Daniel Cameron
Attorney General of Kentucky
Marc Manley
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

30

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Clark L. Hildabrand
Senior Counsel
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

Sean D. Reyes
Utah Attorney General
Melissa Holyoak
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

Patrick Morrisey
Attorney General of West Virginia
Lindsay See
Solicitor General
Michael R. Williams
Senior Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 27, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS