**Exhibit A**

**2024 WL 677713**
Only the Westlaw citation
is currently available.
United States District Court, N.D. Florida,
Pensacola Division.

State of FLORIDA, Plaintiff,
v.
UNITED STATES of
America, et al., Defendants.
State of Florida, Plaintiff,
v.
Alejandro Mayorkas, et al., Defendants.

Case No. 3:21cv1066-TKW-ZCB,
Case No. 3:23cv9962-TKW-ZCB
|
Signed February 20, 2024

**Synopsis**
**Background:** State of Florida filed suit against United States and federal immigration agencies and officials, claiming violation of statutory detention mandates under Immigration and Nationality Act (INA) by releasing noncitizens arriving at Southwest Border into United States en masse through various non-detention policies, including Parole Plus Alternative to Detention (Parole+ATD) policy and exercise of prosecutorial discretion, and seeking declaratory relief, vacatur under Administrative Procedure Act (APA), and permanent injunctive relief. The United States District Court for the Northern District of Florida, No. 3:21cv1066-TKW-ZCB, and 3:23cv9962-TKW-ZCB, 660 F.Supp.3d 1239, held a bench trial, and ordered vacatur of Parole+ATD policy as violative of INA. Federal government appealed. The United States Court of Appeals for the Eleventh Circuit remanded for limited purpose of determining whether district court had jurisdiction in light of intervening United States Supreme Court decision in *United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624.

On remand, the District Court, T. Kent Wetherell, II, J., held that Florida's suit alleged injuries of the type redressable by a federal court, and thus Florida had Article III standing to bring suit.

Ordered accordingly.

**Procedural Posture(s):** Other.

**Attorneys and Law Firms**

Anita J. Patel, Henry Charles Whitaker, Joseph Edward Hart, Karen Ann Brodeen, Natalie Christmas, James Hamilton Percival, II, Florida Attorney Generals Office Office of the Attorney General, Tallahassee, FL, for Plaintiff in No. 3:21cv1066.

Elissa Fudim, Joseph Anton Darrow, Erin T. Ryan, DOJ-USAO, Civil Division - Immigration Litigation, Washington, DC, Marie Armstrong Moyle, DOJ-USAO, Tallahassee, FL, for Defendant United States in No. 3:21cv1066.

Elissa Fudim, Joseph Anton Darrow, Erin T. Ryan, DOJ-USAO, Civil Division - Immigration Litigation, Washington, DC, for Defendants Troy Miller, U.S. Customs and Border Protection, Ur M. Jaddou, U.S. Citizenship and Immigration Services, Alejandro Mayorkas, Department of Homeland

Security, Tae D. Johnson, U.S. Immigration And Customs Enforcement in No. 3:21cv1066.

Matt A. Crapo, Pro Hac Vice, Immigration Reform Law Institute, Washington, DC, for Amicus Immigration Reform Law Institute in No. 3:21cv1066.

Anita J. Patel, Daniel William Bell, Henry Charles Whitaker, John Matthew Guard, Natalie Christmas, Tallahassee, FL, James Hamilton Percival, II, Florida Attorney Generals Office Office of the Attorney General, Tallahassee, FL, Darrick William Monson, Florida Attorney General's Office Office of the Solicitor General, Tallahassee, FL, Joseph Edward Hart, Florida Office of Insurance Regulation, for Plaintiffs in No. 3:23cv9962.

Elissa Fudim, Joseph Anton Darrow, Sarah B. Fabian, DOJ-USAO, Civil Division - Immigration Litigation, Washington, DC, for Defendants in No. 3:23cv9962.

# CORRECTED[*] ORDER REGARDING JURISDICTION

[*] Corrected typographic errors, moved former footnote 4 into the body of the order, and made minor edits throughout. The substantive analysis is unchanged.

T. KENT WETHERELL, II, UNITED STATES DISTRICT JUDGE

**\*1** The Eleventh Circuit remanded this case "for the limited purpose of determining whether [this Court] had jurisdiction in light of [*United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023)]." The Court sees no reason for additional briefing from the parties on this issue because that would only serve to further delay the disposition of the appeal, which the Eleventh Circuit expedited, and the parties already had an opportunity to provide their views on the impact of *Texas* in their appellate briefs, which the Court has reviewed.

The jurisdictional question framed by the remand order, as the Court understands it, is whether *Texas* impacts this Court's determination that Florida has standing to challenge the policies at issue in these cases. The answer is no.[1]

[1] The Court recognizes that Justice Gorsuch's concurring opinion in *Texas* was critical of the idea that states are entitled to "special solicitude" in the standing analysis, *see* 599 U.S. at 688-89, 143 S.Ct. 1964 (Gorsuch, J., concurring in the judgment), and that this Court discussed that doctrine in its standing analysis, *see Florida v. United States*, 660 F. Supp. 3d 1239, 1264-65 (N.D. Fla. 2023) (*Florida I*), but Justice Gorsuch's views on "special solicitude" only garnered three votes on the Supreme Court and this Court's finding that Florida had standing did not depend solely on that doctrine.

*Texas* reiterated the familiar test for standing: "To establish standing, a plaintiff must show [1] an injury in fact [2] caused by the defendant and [3] redressable by a court order." 599 U.S. at 676, 143 S.Ct. 1964 (citing *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). That is the exact same test this Court applied in these cases. *See Florida I*, 660 F. Supp. 3d at 1264; *Florida v. Mayorkas*, ––– F. Supp. 3d ––––, ––––, 2023 WL 3398099, at *4 (N.D. Fla. May 11, 2023) (*Florida II*); *Florida v. Mayorkas*, 2023 WL 3567851 (N.D. Fla. May 16, 2023) (*Florida III*).[2] Thus, resolution of the question framed by the remand order boils down to whether this Court's application of that test would come out any differently based on *Texas*. It would not.

[2] The order granting the preliminary injunction (*Florida III*) incorporated the standing analysis from the temporary restraining order (*Florida II*), see 2023 WL 3567851, at *2 n.3, which in turn, adopted the standing findings from *Florida I, see* ––– F. Supp. 3d at ––––, 2023 WL 3398099, at *4.

*Texas* was a suit brought by two states challenging a policy that prioritized which aliens the Department of Homeland Security (DHS) would arrest and prosecute. *See* 599 U.S. at 674, 143 S.Ct. 1964. The Supreme Court explained that the suit "essentially [asked] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests," *id.*, and the Court held that the suit "is not the kind redressable by a federal court," *id.* at 678, 143 S.Ct. 1964, because it is well established that one person lacks standing to challenge the government's decision to prosecute (or not prosecute) another person, *id.* at 674, 677, 143 S.Ct. 1964 (citing *Linda R. S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)).

**\*2** The policies at issue in these cases do not involve arrest or prosecution, but rather explain how DHS will exercise its statutory "parole" authority under 8 U.S.C. § 1182(d)(5) with respect to aliens who are already in DHS custody after arriving at the Southwest Border.[3] Nothing in *Texas* held that federal courts cannot adjudicate the validity of non-detention/parole policies like these. Indeed, the Supreme Court made a point of noting that "policies governing the continued detention of noncitizens who have already been arrested arguably might raise a different standing question than arrest or prosecution policies." *Id.* at 683, 143 S.Ct. 1964 (citing *Biden v. Texas*, 597 U.S. 785, 142 S.Ct. 2528, 213 L.Ed.2d 956 (2022)).

[3] This difference is significant because, in *Texas*, the states did not dispute that DHS could continue to prosecute (or not prosecute) whomever it wants without the policy challenged in that case. *See* 599 U.S. at 706, 143 S.Ct. 1964 (Barrett, J., concurring in the judgment). Here, by contrast, DHS clearly understood that it could not continue to use "parole" as "processing pathway" for aliens arriving at the Southwest Border (at least those arriving without an appointment under the policy that was challenged in *Texas v. Dep't of Homeland Security*, No. 6:23-cv-7 (S.D. Tex.)) after the challenged policies were vacated and enjoined because the data maintained by DHS reflects that it essentially

stopped paroling aliens into the country in response to the orders in these cases. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2023 ("U.S. Border Patrol – Disposition and Transfers" tab showing almost no releases on "parole" between January and September 2023 except for the short time in May that the PWC policy was in effect). That, however, does not mean that DHS stopped its "catch and release" practices entirely because the data also shows that DHS has continued to release hundreds of thousands of aliens per month, but at least now the aliens are not being released until after DHS initiates removal proceedings by issuing them a notice to appear. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics ("U.S. Border Patrol – Disposition and Transfers" tab showing an average of more than 100,000 monthly "Notice to Appear/Own Recognizance" releases between October 2023 and January 2024).

The Court recognizes that in *Biden v. Texas*, the Supreme Court left unanswered the question of "whether the detention requirement in [8 U.S.C. §]1225(b)(2)(A) is subject to principles of law enforcement discretion, as the Government argues, or whether the Government's current practices simply violate that provision." *See* 597 U.S. at 803 n.5, 142 S.Ct. 2528; *see also Florida I*, 660 F. Supp. 3d at 1248 (suggesting that this case requires the question left open by *Biden v. Texas* to be answered). However, the fact that the Supreme Court made a point in *Texas* of stating that a different standing analysis may apply to non-detention/release policies such as those at issue in these cases establishes that *Texas* does not control the resolution of the standing issue in these cases.

Moreover, unlike the suit in *Texas*, which the Supreme Court described as "extraordinarily unusual," 599 U.S. at 686, 143 S.Ct. 1964, there is nothing extraordinary (or unusual) about the suits filed by Florida challenging DHS's non-detention/parole policies. The Court was simply asked in these cases to decide whether the challenged policies complied with the clear and unambiguous terms of the statute that restricted DHS's authority to "parole" aliens into the country who would otherwise be subject to mandatory detention until the completion of their immigration proceedings. That is precisely the type of issue that, according to *Texas*, federal courts "routinely and appropriately decide[ ]." *See* 599 U.S. at 684, 143 S.Ct. 1964 (citing multiple cases in which courts reviewed agency action for compliance with applicable statutory requirements).

**\*3** The "Article II problems" with judicial review of the "arrest and prosecution policies" at issue in *Texas* are not implicated in these cases because, unlike arrest and prosecution, statutes mandating detention and restricting release do not implicate principles of "Executive Branch enforcement discretion" or contravene any "deeply rooted history of enforcement discretion in American law." Indeed, as this Court explained when rejecting DHS's argument that principles of law enforcement discretion militated in favor of construing the statutes requiring detention of

aliens to be permissive rather than mandatory, the Supreme Court has held that "the concept of law-enforcement discretion does not 'set agencies free to disregard legislative direction' and that Congress is free to cabin enforcement discretion by providing 'guidelines for the agency to follow in exercising its enforcement powers.' " *Florida I*, 660 F. Supp. 3d at 1274 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832-33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)).

The Court did not overlook that the non-detention/parole policies at issue in these cases are similar to the arrest and prosecution policies at issue in *Texas* in the sense that "the Executive Branch (i) invariably lacks the resources to arrest and prosecute [or detain] every violator of every law and (ii) must constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *Texas*, 599 U.S. at 680, 143 S.Ct. 1964; *see also Florida I*, 660 F. Supp. 3d at 1260 (recognizing that DHS does not have sufficient detention capacity to detain all arriving aliens). That, however, does not make the challenged policies nonjusticiable—particularly since the evidence established that DHS has "continued to ask for less detention capacity in furtherance of [its] prioritization of 'alternatives to detention' over actual detention" and that it has "chosen to combat the historic 'surge' of aliens arriving at the border with one hand tied behind [its] back by not taking advantage of all of the statutory tools provided by Congress—such as returning aliens to a contiguous territory under [8 U.S.C.] § 1225(b)(2)(C) or, potentially, closing the border to particular classes of aliens under [8 U.S.C.] § 1182(f)." *Id.* at 1261.

Nor did the Court overlook the statement in *Texas* that a state's claim for standing "can become more attenuated" when the claim is based on policies that "generate indirect effects on state revenues or state spending." *See* 599 U.S. at 680 n.3, 143 S.Ct. 1964. However, the fact that standing might be "more attenuated" in those circumstances does not mean that a state can never establish standing based on the adverse financial impacts of federal policies or programs. *Id.* ("To be sure, States sometimes have standing to sue the United States or an executive agency or officer."). Moreover, the additional costs that the evidence established that Florida has actually incurred and would likely continue to incur as a result of the challenged policies are far less "attenuated" than the potential loss of future population-based funding that the Supreme Court held was sufficient to give New York and other states standing to challenge the inclusion of a citizenship question on the census. *See Dep't of Com. v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2565, 204 L.Ed.2d 978 (2019).

Moreover, separate and apart from the monetary costs, the Court found that Florida also suffered injury to its "sovereignty" since it could not exclude from its territory the aliens who were released into the country under the challenged policies but should have been detained pending completion of their immigration proceedings. *See Florida I*, 660 F. Supp. 3d at 1264-65; *Florida II*, ––– F. Supp. 3d at ––––, 2023 WL 3398099, at *5. That conclusion was based on the holding in *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023), that injuries to "state sovereignty" can support standing because they are real and concrete even though

they are "intangible," and nothing in *Texas* appears to undermine that holding.

**\*4** Two final points are worth noting—

First, although the Court has done its best to understand *Texas* and discern how it applies in these cases, the Court tends to agree with the concurring opinions' observations that the majority opinion is a bit of a jurisprudential mess that raises more questions than it answers.[4] *See Texas*, 599 U.S. at 686-89, 143 S.Ct. 1964 (Gorsuch, J., concurring in the judgment), 704-09 (Barrett, J., concurring in the judgment). However, the majority opinion makes perfectly clear that it was not intended to break any new legal ground in the Article III standing context, *see id.* at 686, 143 S.Ct. 1964 ("The Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo."), and as an inferior court, this Court is obliged to accept that characterization of the decision at face value. Moreover, even if Justice Gorsuch was correct in his concurring opinion that the real problem with the states' standing in *Texas* was "redressability," that would not affect the Court's standing analysis in these cases because the primary redressability problem identified by Justice Gorsuch was 8 U.S.C. § 1252(f)(1),[5] *id.* at 690-93, 143 S.Ct. 1964 (Gorsuch, J., concurring in judgment), which is not implicated in these cases, *see Florida I*, 660 F. Supp. 3d at 1284-85; *Florida II*, ––– F. Supp. 3d at ––––, 2023 WL 3398099, at \*6.

[4] For what it's worth, the Court is most persuaded by Justice Alito's dissent.

[5] Justice Gorsuch also raised questions about the propriety of vacatur of agency action as a viable remedy under the APA, but he did not appear to reach a definitive conclusion on that issue. *See Texas*, 599 U.S. at 701-02, 143 S.Ct. 1964 (Gorsuch, J., concurring in the judgment) ("In raising questions about the district court's claim that § 706(2) authorizes vacatur of agency action, I do not pretend that the matter is open and shut. Thoughtful arguments and scholarship exist on both sides of the debate."). Moreover, in these cases, the Court found that anything short of vacatur of the challenged policies would not afford complete relief to Florida for the harm it suffered. *See Florida I*, 660 F. Supp. 3d at 1284-85.

Second, although not directly related to the issue framed by the remand order, it is noteworthy that the data provided by DHS in its monthly status reports in Case No. 3:23-cv-9962 confirm what the record in *Florida I* demonstrated about the problems with using parole as a "processing pathway." Those reports provide details about the 2,572 aliens who were improperly released under the Parole with Conditions (PWC) policy after the Court entered its temporary restraining order enjoining DHS from implementing or enforcing that policy. The most recent report shows that, as of January 18, 2024, all but 8 of those "parolees" are still in the country and 355 (14%) of them have still not been issued a notice to appear—which means that those aliens are still not in immigration proceedings more than after 8 months they were released into the country. *See* Case No. 3:23-cv-9962, ECF Doc. No. 66 at 2, 4. More significantly,

the report indicates that 34 (1.3%) of the aliens have still not yet "checked in" with DHS as required as a condition of their parole—which means that DHS has no idea where they are or what they are doing in the country. *Id.* at 2; *see also* Case No. 3:23-cv-9962, ECF Doc. No. 64 at 10 (explaining the actions being taken by DHS to track down the aliens who are still "unaccounted for"). If the PWC policy had not been enjoined and those percentages remained constant, there would likely be hundreds of thousands more aliens in the country on "parole" but not in any sort of immigration proceedings and thousands more who would be completely unaccounted for, which would have further exacerbated the harm to Florida.

\* \* \*

**\*5** In sum, for the reasons stated above, the Court finds that it had jurisdiction in these cases because nothing in *Texas* undermines the Court's determination that Florida had Article III standing to challenge the parole policies at issue in these cases.

**DONE and ORDERED** this 20th day of February, 2024.

**All Citations**

--- F.Supp.3d ----, 2024 WL 677713

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.