United States District Court
Southern District of Texas
ENTERED
March 08, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of U.S. Citizenship and Immigration Services, in her official capacity; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

This is an immigration case focusing on a new parole process created by the Department of Homeland Security ("DHS") called the CHNV Parole Program (interchangeably, the "CHNV Parole Program" or the "Program"). The Program grants a pathway for parole in the United States to nationals from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV nationals"). The Program provides up to a two-year parole for up to 30,000 qualifying CHNV nationals per month—360,000 per year. DHS argues that 8 U.S.C. § 1182(d)(5) gives it the authority to implement the Program. Plaintiffs, a collection of 21 States,[1] disagree arguing that the scope of the CHNV Parole Program exceeds the authority given to DHS by Congress under that statute. The Parties do agree, however, that the record establishes that the number of CHNV nationals entering the United States since the Program's implementation has dramatically decreased by as much as 44 percent. Plaintiffs, therefore, are unable to demonstrate that they have been injured by the Program, and as a result, they lack standing to bring these claims. In reaching this conclusion, the Court does not address the lawfulness of the Program. The Court may only reach that question after a plaintiff has established that it has standing.

In recent years there has been an immigration crisis at the Southwest border of the United States with devastating effects. *See, e.g., Florida v. United States*, 660 F.Supp.3d 1239, 1247 (N.D. Fla. 2023), *appeal docketed*, No. 23-11642 (11th Cir. May 17, 2023); *State of*

---

1 Plaintiffs are 21 states including Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming.

*Tex. v. U.S. Dep't of Homeland Sec.*, No. 2:23-CV-00055, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023); *see also State v. United States Dep't of Homeland Sec.*, 88 F.4th 1127, 1130 (5th Cir. 2023), *vacated sub nom. Dep't of Homeland Sec. v. Tex.*, No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024). From 2011 to 2017, encounters[2] along the Southwest border averaged fewer than 400,000 per year. In 2022, however, DHS reported *more than 2.2 million encounters*—a nearly 600 percent increase.

Of particular concern for DHS has been a surge in migration of CHNV nationals, who are attempting to enter the United States in unprecedented numbers. When a CHNV national is encountered attempting to enter the United States, DHS is placed in a difficult position. For a variety of reasons, DHS's ability to remove or return CHNV nationals to their home countries is limited.[3] Thus, when a CHNV national is encountered, they are given a "conditional release." A conditional release consists of issuing the alien[4] a Notice to Appear ("NTA"), and then releasing them into the United States. The NTA requires—or at least requests—that the alien self-report to an immigration judge. These conditional releases have now become routine. For example, between May 1 and October 17 of 2022,

---

2 By "encounter," the Court refers to any situation in which either U.S. Customs and Border Protection or U.S. Border Patrol discovers an alien attempting to enter the United States unlawfully. *See, e.g., Reporting Terminology and Definitions,* https://www.dhs.gov/ohss/about-data/glossary (last visited March 8, 2024).

3 *See infra* II.C.4.

4 The Court understands that some may find the term "alien" offensive, and the Court's intent is certainly not to offend. The term is used in this opinion because it is contained in the statutes as well as official government documents quoted by the Supreme Court in a seminal immigration case. *See Arizona v. United States*, 567 U.S. 387, 397, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012). Moreover, "alien" and "immigrant" are different and defined statutory terms. *Compare* 8 U.S.C. § 1101(a)(3) *with id.* § 1101(a)(15).

an estimated 113,229 Venezuelan nationals were encountered at the Southwest border, and 99,055—87 percent—of them were conditionally released.[5]

In January 2023, DHS announced the CHNV Parole Program. According to DHS, the Program would alleviate some of the difficulties caused by CHNV nationals illegally entering the United States at such a high rate. Under the Program, CHNV nationals can apply to DHS for a two-year grant of parole in the United States. But before applying, they must first find a "supporter"—a U.S. citizen or resident that agrees to provide them with financial support for the duration of their parole. Once a supporter is designated and fills out an online request and declaration, a CHNV national may apply to DHS for advance authorization to travel to the United States. If given advance authorization, the CHNV national may fly to an interior port of entry where a U.S. Citizenship and Immigration Services ("USCIS") agent will determine whether to grant parole.

As far as DHS is concerned, the Program has been a tremendous success. From October 2022 to June 2023, DHS has adjudicated 194,683 applications from CHNV nationals hoping to become beneficiaries of the program and approved 189,942 of them—an approval rate of 97.5 percent.

After the Program was implemented, twenty-one states filed suit against Defendants.[6] Plaintiffs argue the Program should be set aside for three reasons: (1) the

---

5 (Dkt. No. 264 at 321).

6 Defendants are DHS, DHS Secretary Alejandro Mayorkas, in his official capacity, USCIS, Ur Jaddou, in her official capacity as USCIS Director, U.S. Customs and Border Protection, Troy Miller, in his official capacity as Acting Commissioner of CBP, U.S. Immigration and Customs Enforcement, and Patrick "P.J." Lechleitner, in his official capacity as Acting Director of ICE.

(continue)

Program exceeds any authority given to Defendants under Title 8 Section 1182(d)(5), (2) the Program failed to include a notice-and-comment period, and (3) the Program is arbitrary and capricious. The Court held a bench trial on August 23–25, 2023.

But before this Court may address the merits of Plaintiffs' claims, the Constitution requires Plaintiffs to demonstrate that they have standing to bring suit. For the reasons explained below, they have not done so. The Court will first address certain evidentiary issues that have arisen along the way.

## I. EVIDENTIARY ISSUES

Intervenors filed a Motion to Strike Extra-Record Evidence in Texas's Post-Trial Brief. (Dkt. No. 292). The Motion asks the Court to strike all references and citations to four categories of U.S. Customs and Border Protection ("CBP") data cited in Texas's Post-Trial Brief. (*Id.* at 1–2). Those categories are:

(1) CBP data describing nationwide encounters of CHNV aliens through August 2023;

(2) CBP data describing nationwide encounters of aliens of all nationalities through August 2023;

(3) CBP data describing encounters along the Southwest border of aliens of all nationalities through August 2023; and

(4) CBP data describing nationwide encounters of aliens of all nationalities except CHNV countries through August 2023.

(*Id.* at 2). Intervenors argue this data should be stricken for three reasons. First, Texas's introduction of the evidence is incompatible with this Court's instruction that the record

Valerie Laveus, Paul Zito, Francis Arauz, Eric Sype, Dr. Kate Sugarman, Dr. Nan Langowitz, and Dr. Germán Cadenas (the "Intervenors") joined this lawsuit several months later.

closed at trial. (*Id.*). Second, permitting Texas to supplement the record would implicate fairness and due process concerns and prejudice Intervenors who had no opportunity to examine, interrogate, or rebut it within the procedural safeguards of trial. (*Id.*). And third, Texas's characterization of the Post-Trial Data is misleading. (*Id.*). The Court disagrees.

The Federal Rules of Evidence allow courts to take judicial notice of adjudicative facts. *See* Fed. R. Evid. 201. Facts subject to judicial notice are those which are "not subject to reasonable dispute" because they are (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Courts *may* take judicial notice *sua sponte*. Fed. R. Evid. 201(c)(1). And they *must* "take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). A request to take judicial notice may be done by brief. *See MAZ Encryption Techs., LLC v. Blackberry Ltd.*, 347 F.Supp.3d 283, 293 (N.D. Tex. 2018) (citing *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 423 (5th Cir. 2013)). "On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e). "If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard." *Id.* An "opponent's opportunity to address the issue in briefing is sufficient to provide the opportunity to be heard regarding the propriety of taking judicial notice of facts." *MAZ*, 347 F.Supp.3d at 293 (citing *Ctr. for Biological Diversity*, 704 F.3d at 423).

Courts "may take judicial notice at *any stage* of the proceeding." Fed. R. Evid. 201(d) (emphasis added).

Texas requested the Court to take judicial notice of certain sets of CBP data released after trial. (*See* Dkt. No. 285 at 21–26). That data has been supplied to the Court. (*See id.* at 22–26). Intervenors have not demonstrated that the data is inaccurate or that taking judicial notice is inappropriate. The Rules require judicial notice here. *See* Fed. R. Evid. 201(c)(2). Accordingly, the Court **DENIES** the Motion and considers the contested facts as part of the record in determining the merits of the case.[7]

## II. FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence.

### A. THE PARTIES

1. Plaintiffs in this suit are a group of twenty-one states—Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming.

2. DHS implements the Parole Program. DHS oversees Defendants USCIS, CBP, and Immigration and Customs Enforcement ("ICE").

3. Defendant Alejandro Mayorkas is the Secretary of DHS. He administers the Program challenged here.

4. Defendant Troy Miller is the Senior Official Performing the Duties of the Commissioner of CBP. He administers important aspects of the challenged Program, including the CBP One application.

---

[7] Also contained in the Motion is Intervenors' request that the Court take judicial notice of certain data and other publicly available sources offered by Intervenors. (Dkt. No. 292 at 9 n.3). The request is unopposed. (*See* Dkt. No. 298 at 8). The request is **GRANTED.**

5. Defendant Patrick "P.J." Lechleitner is the Acting Director of ICE. He administers important aspects of the challenged program.

6. Defendant Ur Mendoza Jaddou is the Director of USCIS. She administers important aspects of the challenged program.

### B. RELEVANT STATUTES

7. This case involves 8 U.S.C. § 1182(d)(5). Paragraph A of that subsection provides:

> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

8. Paragraph B of that subsection continues:

> The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

*Id.* § 1182(d)(5)(B).

### C. THE CHNV PAROLE PROGRAM

#### 1. <u>Crisis on the Southwest Border</u>

9. Increases in immigration at the Southwest border during the current administration in particular have strained DHS's operational capacity. These surges are driven in large part by an increase in migration from Cuba, Haiti, Nicaragua, and

Venezuela ("CHNV")—countries from which DHS has never encountered migration at these levels in its history. (Dkt. No. 264 at 316).

10. This increase has been especially challenging because it is difficult for DHS to remove CHNV nationals to their home countries. (*Id.* at 320); *see also infra* II.C.4.

**2. The Program**

11. In an attempt to alleviate the migration crisis at the Southwest border, on December 22, 2022, DHS and Secretary Mayorkas issued a decision memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela—the CHNV Parole Program. (Dkt. No. 263 at 76, 80, 84, and 88).

12. On January 5, 2023, President Biden and Defendants announced the creation of the CHNV Parole Program. (*Id.* at 2–4).

13. According to a DHS press release, the Program was designed to "provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border." (*Id.* at 3).

14. Under the Program, CHNV nationals can "seek advance authorization to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]" (*Id.*). This authorization is subject to certain background check and public health requirements as well as the CHNV national obtaining a "supporter in the United States who commits to providing financial and other support[.]" (*Id.*).

15. Defendants further decreed that the Program "will allow up to 30,000 qualifying nationals per month from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." (*Id.*).

16. On January 6, 2023, USCIS published a webpage[8] for this new program entitled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans." (*Id.* at 6).

17. The webpage listed the basic requirements for the Program as they were contained in DHS's announcement the day prior, but added additional details, including:

> a. The "supporter" agrees to provide the CHNV national with financial support for the duration of their parole in the United States and begins the process by filing a Form I-134A "Online Request to be a Supporter and Declaration of Financial Support." (*Id.* at 7).

[8] https://www.uscis.gov/CHNV (last visited March 8, 2024).

b. There is no cost to apply for the Program for the CHNV national or the "supporter." (*Id.* at 6).

c. "Supporters" can include: U.S. citizens and nationals; lawful permanent residents, lawful temporary residents, and conditional permanent residents; nonimmigrants in lawful status (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status); asylees, refugees, and parolees; individuals granted Temporary Protected Status; and, beneficiaries of deferred action (including deferred action for childhood arrivals) or deferred enforced departure. (*Id.* at 7).

d. The beneficiaries of the Program can be any national of Cuba, Haiti, Nicaragua, or Venezuela, plus their immediate family members. However, beneficiaries cannot be minor children traveling without adults. (*Id.* at 8–10).

e. Upon approval of a Form I-134A, the CHNV national is authorized to travel to the United States at their own expense, and upon arrival, will be considered for parole into the United States. (*Id.* at 12).

f. In July 2023, DHS updated the supporter form, Form I-134A, for the CHNV processes to include a new question: "[a] grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Please explain why a favorable exercise of discretion is merited for this individual." Both USCIS and CBP Office of Field Operations officers have access to the response to this question to inform their decision making. (Dkt. No. 264 at 66, 70).

18. On January 9, 2023, the Department published four separate notices in the Federal Register regarding the implementation of the CHNV Parole Program—one for each eligible nationality.[9] (*Id.* at 315–16).

19. The Federal Register notices do not substantively differ from the webpage's content, explaining the general parameters of the Program and qualifications. The notices do, however, offer more analysis on why the Program allegedly comports with 8 U.S.C. § 1182(d)(5). *See, e.g.*, 88 Fed. Reg. at 1260–63.

---

[9] *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); and Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

20. Defendants did not publish advance notice of the Program in the Federal Register before posting the Program's details on the webpage.

21. Defendants provide three reasons for why a notice-and-comment period was not required. First, "the Department is merely adopting a general statement of policy[.]" Second, the Program is exempt "because it involves a foreign affairs function of the United States[.]" And third, "there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable." 88 Fed. Reg. at 1264–65.

22. Defendants did not explain or analyze how they would remove CHNV nationals paroled through the Program after the authorized parole period despite admitting general difficulty in removing such individuals to their home countries.

23. Defendants did not consult Plaintiffs about the potential effects of the Program or the ability of Plaintiffs to provide services to CHNV nationals paroled through the Program.

24. Defendants did not explain any mechanism for recovering funds from "supporters" who do not actually provide for the needs of CHNV nationals paroled under the Program, whether by the Department itself, any federal entity, or by any State.

### 3. <u>The Program in Application</u>

25. Once an alien's supporter form is approved, the Program relies on the CBP One smartphone application ("CBP One"). 88 Fed. Reg. at 1263–64. One "function[] of the CBP One app" is its "Advance Travel Authorization ('ATA') functionality used as part of the CHNV parole processes." 88 Fed. Reg. 31314, 31401.

26. CBP One requires that CHNV nationals "enter limited biographic information into CBP One and submit a live photo" before arriving at a port of entry. 88 Fed. Reg. at 1252, 1264, 1276.

27. After the CHNV national submits their information through CBP One, "CBP conducts systems checks and vetting to determine the individual's eligibility for the CHNV processes and whether it is appropriate to issue a travel authorization." (Dkt. No. 263–2 at 46).

28. After a travel authorization is granted, a CBP officer considers the request for parole at the port of entry on an individualized, case-by-case basis. CBP has, when making this determination, denied parole for aliens who traveled with advance travel authorization pursuant to the CHNV processes. (Dkt. No. 264 at 340).

29. Individuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully or irregularly crossed the Mexican or Panamanian border after January 9, 2023. 88 Fed. Reg. at 1,252, 1,263, 1,276, 1,279.

**4. Agreement with Mexico**

30. Prior to the Program, when a CHNV national was detained for illegally entering the United States, DHS faced significant challenges in returning the alien back to their home country. (Dkt. No. 264 at 320).

31. For example, Venezuela currently does not allow repatriations via charter flights, which significantly restricts DHS's ability to remove Venezuelan nationals. Nicaragua currently allows only one charter removal flight every 15 days, equivalent to two percent of Nicaraguan encounters in 2022. And while DHS has recently restarted removal flights to Cuba, conducting a flight on April 24, 2023, and another on May 10, 2023, following a pause in operations since February 2020 as a result of the COVID-19 pandemic, the cadence and volume at which DHS can facilitate such removals does not keep pace with the number of Cuban nationals DHS has encountered at times. While DHS can operate removal flights to Haiti, the precarious security situation on the ground there, including the security situation at the airport, has at times raised operational challenges in doing so. (*Id.*).

32. As a result, DHS claims that 96 percent of CHNV nationals detained while attempting entry in 2022 could not be removed by DHS under the Title 42 public health order. Instead, they were generally excepted from the order and processed pursuant to Title 8. And under Title 8 processing, the alien generally wound up being conditionally released into the country. (*Id.* at 320–21).

33. To ameliorate these issues, the Program was conditioned on an agreement with Mexico. 88 Fed. Reg. at 1,243–44, 1,256, 1,267–68, 1,279. Specifically, because the Program would require CHNV nationals to enter the United States via an interior port of entry—as opposed to traveling through Mexico to reach the Southwest border—the Government of Mexico agreed to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect.[10]

[10] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration (last visited March 8, 2024); U.S. Dep't of Homeland Sec., *DHS and DOJ Finalize Rule to Incentivize Use of Lawful Immigration Pathways* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/dhs-and-doj-finalize-rule-incentivize-use-lawful-immigration-pathways (last visited March 8, 2024).

34. The Government of Mexico has indicated that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States. (Dkt. No. 264 at 318, 331).

**D. RESULTS OF THE PROGRAM SO FAR**

35. From October 2022 to June 2023, 71,633 Venezuelans applied to the Program. DHS adjudicated 60,422 of the applications. Of these, 58,397 applications were approved—an approval rate of 96.6 percent. (Dkt. No. 263-2 at 85).

*36.* From January 2023 to June 2023, 39,699 Nicaraguans applied to the Program. DHS adjudicated 30,930 of the applications. Of these, 29,935 applications were approved—an approval rate of 96.8 percent. (*Id.*).

37. From January 2023 to June 2023, 78,838 Haitians applied to the Program. DHS adjudicated 64,285 of the applications. Of these, 63,214 applications were approved—an approval rate of 98.3 percent. (*Id.*).

38. From January 2023 to June 2023, 44,360 Cubans applied to the Program. DHS adjudicated 39,046 of the applications. Of these, 38,396 applications were approved—an approval rate of 98.3 percent. (*Id.*).

39. The total number of Program applicants from October 2022 to June 2023 was 234,530. Of these, DHS adjudicated 194,683 of the applications. 189,942 applications were approved—a total Program approval rate of 97.6 percent. (*Id.*).

**E. EFFECTS ON TEXAS**

40. Between October 2022 and June 2023, the number of CHNV parolees who listed Texas as their intended destination is 13,990. (Dkt. No. 263-2 at 89).

41. Of the total CHNV parolees for the same period, 17,806 were minors under eighteen, and 2,664 of them reported Texas as their intended address. (*Id.* at 89–90).

**1. <u>An Increase in CHNV Nationals Entering Texas Would Impose Healthcare Costs on the State.</u>**

42. The Texas Health and Human Services Commission ("HHSC") provides two different categories of services and benefits to aliens that Texas has shown would impose costs on the State: Texas Emergency Medicaid and Texas Children's Health Insurance Program (CHIP) Perinatal Coverage ("CHIP Perinatal"). (Dkt. No. 263 at 50).

43. The Emergency Medicaid program is a federally required program jointly funded by the federal government and the states. It provides Medicaid coverage, limited

to emergency medical conditions, including childbirth and labor, to aliens living in the United States. (*Id.* at 51–52).

44. In May 2023, HHSC estimated expenditures for Emergency Medicaid services provided to CHNV nationals. The expenditure calculations reflect the sum of paid amounts on Emergency Medicaid claims for services to individuals with a country of origin listed as one of those four countries, regardless of immigration status. The expenditure calculations are as follows: $207,000 in 2019; $141,000 in 2020; $123,000 in 2021; $178,000 in 2022; and $30,000 in 2023 (as of May 5, 2023). (*Id.* at 52).

45. CHIP Perinatal provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. (*Id.* at 53).

46. In May 2023, HHSC estimated the cost of Texas CHIP Perinatal services provided to aliens from Cuba, Haiti, Nicaragua, and Venezuela. The total estimated cost to Texas for these services was approximately $28,000 in 2019; $37,000 in 2020; $64,000 in 2021; $80,000 in 2022; and $51,000 in 2023 (as of May 5, 2023). (*Id.* at 54). Further, since October 1, 2022, Texas paid an estimate of $47,500 in services for aliens from Cuba, Haiti, Nicaragua, and Venezuela. (*Id.*).

47. While these figures are estimates, the Court finds that through these two programs, Texas will inevitably expend some health care resources on CHNV nationals who enter the United States under the Parole Program.

### 2. An Increase in CHNV Nationals Entering Texas Would Impose Incarceration Costs on the State.

48. According to a 2022 figure, the average cost of incarcerating an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") in Texas Department of Criminal Justice ("TDCJ") facilities is $77.49 per day. (Dkt. No. 263 at 35).

49. From July 1, 2020, to June 30, 2021, TDCJ incarcerated 7,058 eligible inmates for a total of 1,984,597 days. Using the 2022 per-day figure, the estimated cost of incarcerating these inmates for that period was $153,786,422. (*Id.*).

50. Of that amount, SCAAP reimbursed only $17,364,520. Thus, Texas paid approximately $68.74 per day per criminal alien incarcerated in TDCJ facilities. (*Id.*).

51. Texas, via TDCJ, also incurs costs to keep aliens in custody or add them to mandatory parole or supervision programs when those aliens are not detained or removed by federal immigration authorities. (*Id.* at 36). For example, in Fiscal Year 2022, the average per-day cost of these programs for each inmate not detained or removed is $4.69, which would mean total costs of $9,307,760, based on the most recently completed SCAAP application. (*Id.* at 36).

52. In all, if the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will also increase. In turn, the net cost to Texas from detaining those aliens will also increase. Similar to Texas's healthcare expenditures, the Court finds that Texas will inevitably expend some incarceration related costs on CHNV nationals who enter the United States under the Program.

### 3. <u>An Increase in CHNV Nationals Under the Age of 18 Entering Texas Would Impose Education Costs on the State.</u>

53. Texas is required by both federal and state law to provide alien children with a public-school education.[11]

54. For each student enrolled in a Texas public school during Fiscal Year 2023, the Texas Education Agency ("TEA") estimates a cost of $9,564 to Texas. (*Id.* at 39).

55. For students that qualify for the Bilingual and Compensatory Education services, TEA estimates an $11,781 cost per student. (*Id.*).

56. James Terry, Associate Commissioner for School Finance and Chief School Finance Officer at TEA, authored an affidavit summarizing Texas's education costs. Terry explains the costs by referring to unaccompanied children ("UAC"). He avers that "the total costs to [Texas] of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in [Texas's] public school system increases." (*Id.* at 40).

57. But UAC cannot be paroled under the Program. Instead, any individual "determine[d] to be an unaccompanied child" is expressly "ineligible for advance authorization to travel to the United States as well as parole under this process." 88 Fed. Reg. at 1,252, 1,263, 1,276.

58. Accompanied children, however, are eligible for parole under the Program. In fact, between October 18, 2022 and June 30, 2023, 2,664 CHNV parolees under the age of 18 reported Texas as their intended address. (Dkt. No. 263–2 at 89–90).

59. Although Associate Commissioner Terry speaks in terms of UAC, nothing about the costs Texas incurs for education are exclusive to UAC. Rather, the Court understands Terry's affidavit to mean that Texas is forced to spend, at minimum, $9,564 per student enrolled in the Texas public school systems. (Dkt. No. 263 at 39).

---

[11] *See generally Plyler v. Doe*, 457 U.S. 202, 230, 102 S.Ct. 2382, 2401–02, 72 L.Ed.2d 786 (1982); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) ("[T]he State's public education expenditures for the children of undocumented aliens are required by the equal protection clause[.]").

60. Thus, an increase in CHNV nationals under the age of 18 entering Texas under the Parole Program will inevitably result in at least some costs for Texas.

**4. An Increase in CHNV Nationals Seeking Drivers' Licenses Would Not Impose Additional Costs on the State.**

61. Texas makes two arguments with respect to driver's licenses: (1) issuing licenses to CHNV nationals costs Texas money, and (2) for every additional 10,000 requests for a limited term license, Texas is forced to incur costs of hiring more staff and building more facilities. (Dkt. No. 286 at 14–15).

62. As to Texas's first argument—that providing limited-term licenses to CHNV nationals will cost Texas—the Court finds that Texas makes a profit administering limited-term licenses.

63. CHNV nationals paroled into Texas would qualify for a limited-term license. Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [the Texas Department of Public Safety ("DPS")] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section 521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)." (Dkt. No. 263 at 21–22).

64. If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action) and otherwise meets eligibility requirements, DPS will issue a limited-term driver license or personal identification certificate to an alien resident of Texas. (*Id.* at 22).

65. A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence. (*Id.*).

66. For each paroled CHNV national that applies for a limited-term license, Texas would pay $0.30 for verification services. Further, Texas estimates that 18% of those customers would require additional verification services, each costing Texas an additional $0.50. (*Id.*).

67. DPS also verifies each alien's social security number and eligibility though both the Social Security Online Verification and the American Association of Motor Vehicle Administrators. This process costs Texas an additional $0.05 per customer. And

when the customer is seeking a commercial driver's license, Texas pays $0.028 for additional verification. (*Id.* at 22–23).

68. The production of each limited-term license card costs Texas $1.35. (Dkt. No. 264 at 172).

69. Thus, for each customer seeking a limited-term license, Texas spends a maximum of $2.23.

70. Texas charges $33 for every limited-term license. (*Id.* at 169). Therefore, limited-term license applicants do not cost Texas money. Instead, the State profits roughly $30 for each license.

71. As to Texas's second argument—that for every 10,000 CHNV nationals that enter Texas and request a limited-term license, Texas will bear a biennial cost of approximately $2,014,870.80—the Court finds that the evidence in the record is speculative and insufficient.

72. This amount includes hiring additional staff, opening additional offices, and expanding current facilities. As support, Texas offers an affidavit from Sheri Gipson, the Chief of DPS. (Dkt. No. 263 at 23). In Gipson's affidavit, she states that "[f]or every 10,000 additional customers above the 10,000-customer threshold, DPS *may* have to open additional driver license offices or expand current facilities to meet that increase in customer demand." (*Id.*) (emphasis added).

73. Evidence submitted by Intervenors suggests that 10,000 new applicants would not require more offices or expanded facilities. (*See* Dkt. No. 265-18 at 8). Cyierra Roldan, Deputy Director of the Immigration Research Initiative, authored a declaration in which she notes that "[i]f 10,000 noncitizens were to reside in Texas due to the parole process and obtain driver's licenses, that would only be a small .16 percent increase to all driver's license transactions and an even smaller .14 percent increase to all transactions, much smaller than the increase due to migrants from other states and individuals turning l6 getting a permit." (*Id.*).

74. It is improbable that DPS would be forced to build new offices or expand current facilities because of a .14 percent increase in transactions, and Texas has provided no further evidence or explanation as to how that might be.

75. In sum, Texas profits on limited-term licenses and has not established that an additional 10,000 license seeking parolees would require Texas to build new offices or spend on expansions.

### 5. <u>Migration of CHNV Nationals has Decreased Since the Start of the Parole Program</u>

76. Despite the high approval rate of Program applications, the record reflects that the Program has resulted in a decrease of CHNV nationals entering the United States.

77. Specifically, in the five-plus months before implementation of the Program, DHS conditionally released an average of 2,356 CHNV nationals per day into the United States. (Dkt. No. 264 at 328 n.16, 340–41).

78. In the nearly five months after the Program started, DHS conditionally released an average of 239 CHNV nationals per day, an additional 297 CHNV nationals were arriving through the new CBP One process per day on average, and an additional 791 CHNV nationals were being paroled through the new CHNV processes per day on average, for a total of 1,326 arrivals of CHNV nationals per day. (*Id.* at 328 n.16).

79. Thus, as of May 2023, the total number of CHNV nationals entering the United States had declined from an average of 2,356 per day prior to the Program starting to 1,326 per day in the months after—a 44 percent reduction. (*Id.*).

80. The decline in CHNV nationals entering the United States after the rollout of the Program was occurring at the time that Plaintiffs filed their Amended Complaint on February 14, 2023.

81. For example, the number of Venezuelan nationals attempting to enter the United States substantially decreased following the start of the Venezuelan parole process. Prior to October 12, 2022, when Venezuela's parole process was announced, DHS was encountering an average of 1,100 Venezuelan nationals per day at the Southwest border. Within a week of the Venezuelan process announcement, DHS observed the number of encounters per day begin to drop. By the week ending in January 22, 2023, DHS reported a daily average of just 28 Venezuelan encounters per day. (*Id.* at 324).

82. This significant drop in encounters was not just limited to Venezuelan nationals. Rather, encounters of Cuban, Haitian, and Nicaraguan nationals dropped from a daily average of 1,231, recorded the week before the Program was implemented, to an average of 205 encounters just two weeks later. (*Id.* at 326).

83. Taken together, these facts mean that less than a month after the Program was in effect for all four countries, an average of 233 CHNV nationals were being encountered at the Southwest border each day. About 7,000 per month. And in all of January, DHS approved 24,744 applications from CHNV nationals to be paroled under the Program. (Dkt. No. 263-2 at 85). Assuming each of the estimated 7,000 encountered CHNV nationals were conditionally released, and all 24,744 approved applications

resulted in a CHNV national entering the country on parole, the Court estimates that 31,744 CHNV nationals entered the United States in January 2023.

84. In the five months preceding the Program, an average of 2,356 CHNV nationals were entering the country per day. If the Program never went into effect, and that daily average played out into January, the data suggests that 73,036 CHNV nationals would have entered the country in January 2023. Thus, on February 14, 2023, when Plaintiffs filed suit, fewer CHNV nationals were entering the country compared to before the Program began.

85. Plaintiffs agree that since the implementation of the Program, CHNV nationals have been entering the United States at a lower rate than before. At trial, Texas conceded as much:

> THE COURT: Well, let me ask you this. I think this is where we get to it. Is it Texas's position that -- does Texas agree with the statement that at this point as opposed to before the Program, there are fewer aliens coming into the country now as opposed to before the Program from those four countries?
>
> MR. WALTERS (Texas): That's what the data looks like up through June.
>
> THE COURT: Okay.

(Trial Transcript (Aug. 25) at 131:24-132:7).

86. And again:

> THE COURT: So the only evidence in the record, I should say, then, is that the numbers are decreasing –
>
> MR. WALTERS (Texas): Right. So –

(*Id.* at 249:17-249:19).

87. In conclusion, the Parties agree, and the record reflects, that the number of CHNV nationals entering the United States has dramatically declined from the date the Program commenced through the last date for which data was received by the Court.

## III. STANDING

A plaintiff must have standing to sue in federal court. The Supreme Court has distilled the standing doctrine into an "irreducible constitutional minimum" whereby a

plaintiff must demonstrate (1) that he has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39, 136 S.Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016). While Plaintiffs would submit that each State has standing, (*see* Dkt. No. 20 at 12–29), only one needs standing to proceed to the merits. *Biden v. Nebraska*, 600 U.S. 477, 489, 143 S. Ct. 2355, 2365, 216 L.Ed.2d 1063 (2023) ("If at least one plaintiff has standing, the suit may proceed."). At the request of Plaintiffs, the Court focuses its standing analysis on Texas. Since there was a final trial on the merits, Texas must prove standing by a preponderance of the evidence. *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021), *as revised* (Dec. 21, 2021) ("*MPP II*"), *rev'd and remanded on other grounds*, 597 U.S. 785, 142 S. Ct. 2528, 213 L. Ed. 2d 956 (2022).[12] Standing is determined at the time the case commenced. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5, 112 S.Ct. 2130, 2142 n.5, 119 L.Ed.2d 351 (1992).

### A. INJURY-IN-FACT

To prove an injury in fact, Texas must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (cleaned up). In the context of state challenges to federal immigration policies, states have historically proven

---

[12] For clarity, the Fifth Circuit initially considered various states' challenge to DHS's Migrant Protection Protocols program on a motion for stay pending appeal, and later did so again on the merits. The Court discusses both at various points, and in so doing, the former will be referred to as "*MPP I*," and the latter as "*MPP II*."

injury-in-fact by demonstrating the *additional costs* paid across state-funded industries because of *additional aliens*. The most common showings include costs absorbed by the state in issuing driver's licenses, administering healthcare, and providing education. *See, e.g.*, *MPP II*, 20 F.4th at 968–969 (driver's licenses and healthcare); *Texas v. United States*, 50 F.4th 498, 517–518 (5th Cir. 2022) (healthcare and education) ("*DACA*"); *Gen. Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) ("*GLO*") (all three). The Fifth Circuit made clear recently that these types of fiscal harms remain viable Fifth Circuit caselaw. *GLO*, 71 F.4th at 272. In this case, Texas alleges precisely these types of harms, submitting that "[t]he increase in the presence of illegal aliens will inflict significant financial costs on Texas, including but not limited to *driver licenses, healthcare, education, as well as enforcement and correctional services*."[13] (Dkt. No. 286 at 53) (emphasis added); (*see also* Dkt. No. 20 at 12–13); (Dkt. No. 22 at 25).

Both Defendants and Intervenors take issue with the premise that Texas is suffering any injury at all. As put by Defendants, Texas's theory for standing "was based on allegations that the CHNV processes were likely to increase the number of CHNV nationals in the State and thus increase the State's costs." (Dkt. No. 284 at 34). And as observed by Intervenors, the trial record disproves this theory. (*See* Dkt. No. 282 at 17–18). Intervenors argue that the undisputed data presented at trial confirms that the CHNV Parole Program has *reduced* the total number of individuals from the four

---

[13] At trial, Texas asserted quasi-sovereign interests for purposes of availing itself to special solicitude. But as to injury-in-fact, Texas's basis for standing is dollar damages. (*See* Dkt. No. 278 at 246).

countries, and consequently, Texas has actually spent less money as a result of the Program. (*Id.* at 16–18).

Plaintiffs do not dispute either contention: (1) that there are fewer aliens coming into the country from those four countries, or (2) that as a result, Texas is spending less money. Instead, Plaintiffs argue that the Program can injure Texas for standing purposes *even if* it reduces the rate of overall CHNV migrant flows. (Dkt. No. 294 at 6–7). According to Plaintiffs, "the test is whether the challenged program *itself* increases migrant flows, not overall numbers resulting from a multitude of policies and outside forces." (*Id.*at 6) (emphasis in original). In other words, Texas suggests that the Court look only to the costs incurred by the nationals that have come through the CHNV Parole Program in a vacuum and ignore the net decrease in costs due to the corresponding decrease in the overall migration of those nationals.

**1. <u>Forfeiture of Texas's Revised Theory of Injury-In-Fact</u>**

Before considering the merits of the Parties' arguments as to injury-in-fact, the Court must address Intervenors' assertion that the Court should not consider Texas's new theory of harm. In short, Intervenors argue that "[f]or nearly seven months leading up to trial," Texas complained of harm resulting from an increase in the number of immigrants residing in Texas. (Dkt. No. 282 at 18). And once Texas realized "on the eve of trial that the facts were fatal to its theory of harm," Texas swapped its theory by claiming that whether an increase in CHNV nationals occurred is irrelevant, as the Court "can only narrowly consider costs associated with the specific 'paroled aliens' who have entered through the CHNV Pathways." (*Id.* at 19). According to Intervenors, Texas is

married to its first theory and has forfeited the alternative theory. (*Id.* at 19–20). The Court disagrees.

It is true that "[a]rguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived." *Ctr. for Biological Diversity v. United States Env't. Prot. Agency*, 937 F.3d 533, 542 (5th Cir. 2019). But there are two key limitations to this principle. First, courts that have applied the forfeiture rule did so when the plaintiffs re-characterized their injury *on appeal*. *See, e.g.*, *E.T. v. Paxton*, 41 F.4th 709, 716–17 (5th Cir. 2022); *Durbois v. Deutsche Bank Nat'l Tr. Co.*, 37 F.4th 1053, 1059 (5th Cir. 2022); *United States ex rel. Drummond v. BestCare Lab'y Servs., LLC*, 950 F.3d 277, 285 (5th Cir. 2020); *United States v. Vasquez*, 899 F.3d 363, 380 n.11 (5th Cir. 2018). And while Intervenors offer one New Jersey district court opinion for the proposition that a plaintiff cannot change their theory on standing at the district court stage without amending the pleading, (*see* Dkt. No. 282 at 20 (citing *Oh v. Collecto, Inc.*, No. 2:20-CV-01937, 2021 WL 3732881 (D.N.J. Aug. 23, 2021))), that reasoning does not fit this case.

In *Oh*, a Fair Debt Collection Practice Act case, the plaintiff originally asserted standing based on a letter the plaintiff received requesting certain documentation in connection with a debt. *Id.* at *1. The plaintiff alleged that the contents of the letter violated federal law. *Id.* at *1. At the summary judgment stage, however, the plaintiff added a new theory for standing. That is, the plaintiff argued that she never owed the debt, and the debt collector reported it in a way that negatively impacted her credit. *Id.* at *2. The court found that the new standing theory was precluded. *See id.* at *4–*5. This case is different.

Unlike the plaintiff in *Oh*, Texas is not alleging a new injury. Throughout this case, Texas has maintained that its injury is comprised of the same costs to the public fisc. Texas, therefore, has not forfeited the ability to argue that those same costs may be viewed in isolation instead of in comparison with amounts spent in previous years.

Moreover, one of the main drivers for the forfeiture rule is to exclude theories that neither side "had the opportunity to brief[.]" *Ctr. For Biological Diversity*, 937 F.3d at 542. In this case, this consideration also weighs against finding forfeiture because the Parties had ample opportunity to argue—and in fact did argue at length—Texas's theory both (1) at trial, and (2) in post-trial briefing. And while Intervenors argue that they were prejudiced because they "have had no opportunity to seek discovery on Texas's new standing theory," (Dkt. No. 282 at 20), this argument is unpersuasive. As stated above, Texas is not asserting a new injury. In fact, Texas has consistently asserted the same injury throughout this litigation. Instead, faced with the fact that its out-of-pocket costs have declined during the relevant period, Texas simply pivoted to arguing that this reality does not matter for standing purposes. This argument is based on the same facts that supported its original standing argument. For these reasons, Intervenors' forfeiture argument fails.

**2. <u>Evaluation of Texas's Alleged Injury-In-Fact</u>**

With respect to injury-in-fact, the Parties' disagreement boils down to whether the CHNV Parole Program should be construed as increasing the number of CHNV nationals entering Texas. Specifically, the Parties disagree about what the baseline migration

numbers should be for "before versus after" purposes in evaluating whether Texas has been injured by the Program.

As mentioned, in the five months preceding the Program, DHS conditionally released an average of 2,356 CHNV nationals per day. (Dkt. No. 264 at 340–42). And in the nearly five months since the Program's implementation, that figure had dwindled to 1,326.[14] (*Id.*). Plaintiffs ask the Court to consider only whether *any* aliens have been released into the United States under the Program. (Dkt. No. 285 at 18); (Dkt. No. 294 at 6). If so, the money Texas is required to spend on those aliens is sufficient to establish standing. (*Id.*). In other words, there were zero aliens coming in through the Program before it existed, so if any come in under the Program, that is an increase. (*Id.*); (*see also* Trial Transcript (Aug. 25) at 249:22–249:24). This theory ultimately fails.

As the Fifth Circuit has warned, "federal courts must consider plaintiffs' *actual injury*—not the labels plaintiffs put on that injury." *E.T.*, 41 F.4th at 717 (emphasis added). In assessing injury-in-fact, substance matters. This is because "the law of standing is

---

[14] The daily averages submitted by Defendants were calculated with data ranging from before the Program began to May 2023. This is problematic because, as the Supreme Court has made clear, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Davis v. FEC*, 554 U.S. 724, 734, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008) (emphasis added). Plaintiffs filed their Amended Complaint on February 14, 2023. (Dkt. No. 20). This date serves as the operative complaint because when a plaintiff "voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 474, 127 S.Ct. 1397, 1409, 167 L. Ed. 2d 190 (2007). Here, no Party submits calculations of CHNV nationals entering the United States using *only* data taken before February 14. However, as explained in the Court's Findings of Fact, the consistent drop of CHNV encounters since the Program began, partnered with the fact that the Program approves a monthly maximum of 30,000 applications, leaves little room for doubt that the numbers have decreased since the Program's inception. In fact, Texas concedes as much. (*See* Trial Transcript (Aug. 25) at 131:24-132:7, 249:17-249:19).

fraught with the danger that plaintiffs will engage in 'artful pleading' to make an end-run around the strictures of Article III." *Id.* Upon review, Plaintiffs' theory on injury-in-fact is unavailing because their proffered re-characterization attempts to skirt the fact that Texas is not financially harmed by the Program. This conclusion is grounded in the way that the term "harm" has long been understood in the immigration context: relative to the status quo, and relative to Plaintiff's position absent the challenged policy.

For most, if not all, recent Fifth Circuit immigration cases, a comparative rise in the number of migrants in the State was the norm. And because of that rise, either of the two dueling theories of injury at issue in this case—(1) looking to the costs incurred under the challenged agency action versus (2) looking to the costs that would have been incurred absent the challenged agency action—would have produced additional costs and, therefore, an injury under either formulation. The Court begins by discussing two of these immigration cases before delving into multiple cases, immigration and beyond, which are much more instructive on how fiscal injuries should be conceptualized. Together, these cases indicate that the latter formulation, looking to the costs that would have been incurred absent the challenged agency action, is the appropriate lens through which the Court must consider the CHNV Parole Program.

In *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015), *as revised*, (Nov. 25, 2015) ("*DAPA*"), *aff'd by equally divided Court*, 597 U.S. 547, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016), various states challenged a program, Deferred Action for Parents of Americans ("DAPA"), that would give legal status to illegal immigrants who were parents of citizens or lawful permanent residents. *Id.* at 147. The Fifth Circuit held that Texas demonstrated

an injury-in-fact because "DAPA would enable at least 500,000 illegal aliens in Texas" who qualify for the relevant cost-incurring expenses to remain in Texas. *Id.* at 155. The Circuit's reasoning in *DAPA* was premised on the fact that the number of people eligible for cost-incurring expenses in Texas would rise under the program.[15] Similarly, in *DACA*, various states challenged the DACA program, which permitted deferral of the removal of certain aliens and conferred certain benefits upon them. *DACA*, 50 F.4th at 508. Texas demonstrated injury-in-fact from "pocketbook injuries on the State in the form of healthcare, education, and social service costs." *Id*. at 517. Again, Texas established standing because DACA would indisputably increase the number of aliens in Texas.

These two cases provide guidance because they demonstrate that an injury in the challenge-to-an-immigration-program context is typically premised on an increase in the number of aliens entering under the program, which necessarily leads to increased costs. But these cases do not provide the baseline for comparison purposes. That is because in *DAPA* and *DACA*, it was not disputed that the number of aliens would increase under the programs and the resulting costs to Texas would increase as well. *DAPA*, 809 F.3d at 155; *DACA*, 50 F.4th at 509.

While the discussions in *DAPA* and *DACA* did not specify for injury-in-fact purposes whether the proper question is whether Texas's costs increased as compared to pre-program expenditures or whether Texas had to expend any resources at all on aliens covered by the programs, the same cannot be said for *MPP II*, *GLO*, and *Louisiana v. Nat'l*

---

15 There was no dispute in *DAPA* that the number of aliens in Texas would increase under the program.

*Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023) ("*LDFW*"). In each of these cases, the Fifth Circuit signaled that injury is relative.

In April 2021, Texas and Missouri challenged DHS's termination of the Migrant Parole Protocols ("MPP"), a program which returned certain undocumented aliens to Mexico for the duration of their removal proceedings. *MPP II,* 20 F.4th at 941. In evaluating Texas's alleged injury at the preliminary injunction stage, the Fifth Circuit noted that "MPP's termination has caused an *increase* in unlawful immigration into Texas." *State v. Biden*, 10 F.4th 538, 548 (5th Cir. 2021) (emphasis added) ("*MPP I*"). And on this same issue at the merits stage, the Fifth Circuit asserted that "[t]he district court's *most important finding* was that MPP's termination has *increased* the number of aliens released on parole into the United States, including Texas[.]" *MPP II,* 20 F.4th at 966 (emphasis added). Finding that illegal encounters "skyrocketed" since MPP's termination, the Circuit explained that the States' fiscal harms were attributable "precisely [to] that increase[.]" *Id.* at 968.

In reading the Fifth Circuit's repeated use of "increase" in context, it is clear what the increase is relative to—not zero immigration, but immigration levels prior to the termination of MPP. The Fifth Circuit's consistent use of comparative and relative verbiage, rather than absolute verbiage, is telling.

The Fifth Circuit's recent holding in *GLO* also illustrates this approach. There, a group of plaintiffs, including Texas, sued DHS to challenge the manner in which it spent funds that had been appropriated by Congress for the "construction of [a] barrier system along the southwest border." 71 F.4th at 268. Texas alleged the same type of injuries that

it alleges here, arguing that the State would incur costs "from the increase in unlawful migrants entering and remaining in the State[.]" *Id.* at 271. In finding that there was an injury-in-fact for Rule 12(b)(6) purposes, the Fifth Circuit attributed Texas's damages to "*increased* illegal immigration." *Id.* at 273 (emphasis added). The Circuit discussed Texas's costs in connection with "the *relative* number of illegal aliens entering Texas," and "*relative* to a non-border wall policy." *Id.* at 272–73 (emphasis added). Just as with *MPP I* and *MPP II*, *GLO* considered the situation Texas would be placed in absent the challenged agency action as the baseline for injury-in-fact. Had the baseline instead been zero, the appropriate inquiry would have merely been whether illegal immigration was occurring at all under the challenged agency action, and this would wholly obviate the before-versus-after comparison.

Finally, the Fifth Circuit has relied on this comparative lens for assessing injuries beyond the immigration context. In one particularly analogous case, *LDWF*, Louisiana challenged a federal rule requiring certain shrimping vessels in Louisiana waters to use turtle excluder devices. *LDWF,* 70 F.4th at 875. In that case, one of Louisiana's purported injuries was the additional strain on Louisiana Department of Wildlife and Fisheries' enforcement resources. *Id.* at 881. The Fifth Circuit rejected this argument observing that this position was "necessarily contingent on a finding that the Final Rule will *increase* LDWF enforcement costs" compared to what the LDWF had been paying before the rule. *Id.* (emphasis added). Had Texas's proposed theory of injury carried the day, Louisiana would have only needed to show that the LDWF would incur some enforcement costs

attributable to the Final Rule. Again, the Fifth Circuit considered injury in context, and not in a vacuum.

In sum, when deciding whether a state has been injured for Article III standing purposes, the Fifth Circuit reviews whether the numbers of aliens, and the associated amount expended because of them, increased relative to those same numbers prior to the implementation of the challenged program. In *MPP II*, the Fifth Circuit declared that the "*most important finding*" was whether the agency action "increased the number of aliens released . . . into the United States."[16] 20 F.4th at 966 (emphasis added). Here, that "most important finding" results in a different outcome, a decrease. And in contrast to *GLO*, where Texas's fiscal injuries were tied to an *increase* in the number of illegal entries, the rate of entries here has decreased subsequent to the implementation of the CHNV Parole Program.

The Fifth Circuit has consistently looked to the impact that the challenged agency action had on the State's fiscal interests in *DAPA*, *DACA*, *MPP I*, *MPP II*, *GLO*, and *LDWF*. And in doing so, the Fifth Circuit has invariably considered whether expenditures increased as compared to pre-agency action expenditures. In this case, those expenditures declined subsequent to the implementation of the CHNV Parole Program, and the Court has before it a case in which Plaintiffs claim that they have been injured by

---

16 Like in *GLO*, under a baseline-of-zero theory, the Fifth Circuit's reliance on the increase in aliens would have been wholly unnecessary in *MPP I* and *MPP II*. Applying Texas's proposed theory to *MPP I* and *MPP II*, Texas's bar would have been much lower. Rather than demonstrating that "MPP's termination has caused an increase in immigration into Texas," *MPP I*, 10 F.4th at 548, Texas would have only needed to show that MPP's termination resulted in *any* immigration into Texas.

a program that has actually lowered their out-of-pocket costs. As a result, the Court finds that Texas has failed to prove that it suffered an injury-in-fact for purposes of Article III standing.[17]

## IV. CONCLUSION

The Court finds that Plaintiffs have not proven that Texas has suffered an injury and therefore do not have standing to maintain this suit.[18] This case is **DISMISSED** without prejudice.[19] The Court **DENIES** all requested relief and will enter a final judgment by separate order.

It is SO ORDERED.

Signed on March 8, 2024.

Drew B Tipton

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

---

[17] Because the Court finds that Texas has not suffered an injury, it need not consider Defendants' other arguments with respect to (1) offsetting benefits, and (2) the viability of indirect costs constituting injury in the wake of *United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023).

[18] The Court would make one final point. Proving injury-in-fact in similar challenges—and even for the CHNV Parole Program—is not an insurmountable hurdle. In this case, Texas was required to prove by a preponderance of the evidence that terminating the Program would reduce migration flow from the four countries or that migrant flow increased as a result of the Program. Should Texas meet this burden in the future, a different result on this point may follow.

[19] A case that is dismissed for lack of standing should ordinarily be dismissed without prejudice. *E.g.*, *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209 (5th Cir. 2010); *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 468 (5th Cir. 2020).