**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
      *Plaintiffs,*

    v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
      *Defendants.*

Case 6:23-cv-00007

# PLAINTIFF STATES' OPPOSED RULE 59(e) MOTION TO RECONSIDER JUDGMENT

# TABLE OF CONTENTS

Table of Contents .................................................................................................................... ii

Table of Authorities ............................................................................................................... iii

Standard of Review ................................................................................................................. 1

    I.   The Opinion applied the wrong standards in evaluating standing. ..................................... 2

        A.     The Opinion engaged in an impermissible accounting exercise. .............................. 2

        B.     The Opinion impermissibly evaluated facts occurring after the complaint to find a lack of standing. ............................................................................................................... 7

    II.  The Opinion disregarded data that the number of CHNV nationals entering the United States increased after implementation of the Program. ..................................... 9

Conclusion ............................................................................................................................ 13

Certificate of Conference ..................................................................................................... 18

Certificate of Compliance ..................................................................................................... 18

CERTIFICATE OF SERVICE .................................................................................................... 18

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
 78 F.4th 210 (5th Cir. 2023) ................................................................ 9, 11

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
 1 F.4th 371 (5th Cir. 2021) ................................................................ 10, 13

*Davis v. FEC*,
 554 U.S. 724 (2008) ................................................................................ 10

*Edward H. Bohlin Co. v. Banning Co.*,
 6 F.3d 350 (5th Cir. 1993) ........................................................................ 1

*Ellis v. Railway Clerks*,
 466 U.S. 435 (1984) .................................................................................. 9

*Franciscan All., Inc. v. Becerra*,
 47 F.4th 368 (5th Cir. 2022) ..................................................................... 9

*Gill v. City of Philadelphia*,
 No. 3:13-cv-917, 2016 WL 6427285 (S.D. Miss. Oct. 28, 2016) ................ 1

*GLO v. Biden*,
 71 F.4th 264 (5th Cir. 2023) ............................................................. 5, 7, 8

*Kemp v. United States*,
 596 U.S. 528 (2022) .................................................................................. 1

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
 567 U.S. 298 (2012) .................................................................................. 9

*L.A. Haven Hospice, Inc. v. Sebelius*,
 638 F.3d 644 (9th Cir. 2011) ..................................................................... 2

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) .................................................................................. 2

*Markva v. Haveman*,
 317 F.3d 547 (6th Cir. 2003) ..................................................................... 2

*Marquette Transportation Co. Gulf-Inland, LLC v. Bulgare*,
 No. CV 19-10927, 2022 WL 5520694 (E.D. La. May 17, 2022) ................. 1

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020)........................................................................2

*Pederson v. Louisiana State Univ.*,
  213 F.3d 858 (5th Cir. 2000).....................................................................8

*Ross v. Marshall*,
  426 F.3d 745 (5th Cir. 2005)...................................................................10

*Sutton v. St. Jude Med. S.C., Inc.*,
  419 F.3d 568 (6th Cir. 2005).....................................................................2

*Templet v. Hydrochem, Inc.*,
  367 F.3d 473 (5th Cir. 2004).....................................................................1

*Texas v. Biden*,
  554 F. Supp. 3d 818 (N.D. Tex. 2021) (Kacsmaryk, J.)..............................6

*Texas v. Biden (MPP)*,
  20 F.4th 928 (5th Cir. 2021)......................................................................6

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022)......................................................................7

*Texas v. United States (DACA)*,
  50 F.4th 498 (5th Cir. 2022)......................................................................3

*Texas v. United States (DAPA)*,
  809 F.3d 134 (5th Cir. 2015).................................................................2, 4

*Trevino v. City of Fort Worth*,
  944 F.3d 567 (5th Cir. 2019).....................................................................1

*White v. New Hampshire Dept. of Employment Sec.*,
  455 U.S. 445 (1982)..................................................................................1

**Other Authorities**

88 Fed. Reg. 31314 (May 16, 2023) .......................................................12

Federal Rule of Civil Procedure 59(e) ......................................................1

Wright & Miller, *Federal Practice and Procedure* § 2821 (3d ed. 2012) ........................1, 2

Plaintiffs respectfully ask the Court to reconsider its final judgment dismissing this case and its opinion explaining that judgment. ECF 305 ("Opinion"), 306. Most fundamentally, the Opinion applied the wrong standard to determine whether the Plaintiffs had demonstrated that Texas had standing to challenge the CHNV Program. Even under the Opinion's articulated standard, the facts demonstrated that the Program led to increased CHNV nationals entering the United States. This Motion is opposed by Federal Defendants and Intervenor Defendants.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(e) provides that a motion to alter or amend a judgment must be filed no later than twenty-eight days after the entry of judgment. *Kemp v. United States*, 596 U.S. 528, 537 (2022). "A Rule 59(e) motion 'calls into question the correctness of a judgment,'" *Templet v. Hydrochem, Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)), and allows a court "to rectify its own mistakes in the period immediately following entry of judgment." *White v. New Hampshire Dept. of Employment Sec.*, 455 U.S. 445, 450 (1982). The standard for reconsideration under Rule 59(e) "allows a court to alter or amend a judgment to," among other things, "correct a manifest error of law or fact." *Trevino v. City of Fort Worth*, 944 F.3d 567, 570 (5th Cir. 2019); *see also Gill v. City of Philadelphia*, No. 3:13-cv-917, 2016 WL 6427285, at *1 (S.D. Miss. Oct. 28, 2016) (granting motion to reconsider where the "[c]ourt erred by applying the wrong standard").

In deciding such a motion, the Court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). Although Plaintiff States have filed a notice of appeal, this Court retains jurisdiction over this Motion. *See Marquette Transportation Co. Gulf-Inland, LLC v. Bulgare*, No. CV 19-10927, 2022 WL 5520694, at *2 & n.14 (E.D. La. May 17, 2022); *see also* Wright & Miller, *Federal Practice and Procedure* § 2821 (3d ed. 2012) ("The district court does, however, retain jurisdiction over motions for alteration or amendment of a judgment filed after a notice of appeal is given.").

I.     **The Opinion applied the wrong standards in evaluating standing.**

To establish Article III standing, a plaintiff must show a concrete and particularized injury, fairly traceable to the defendant's challenged action, and likely redressable by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

A.   **The Opinion engaged in an impermissible accounting exercise.**

The Fifth Circuit has held that Article III standing "is not an accounting exercise." *Texas v. United States (DAPA)*, 809 F.3d 134, 156 (5th Cir. 2015). That means "once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id*. In other words, a court is to consider "only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *Id*. at 155–56; *see also* N*ew York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020) ("'[T]he fact that an injury may be outweighed by other benefits … does not negate standing.'" (citation omitted)); *Wright & Miller*, 13A *Federal Practice and Procedure* § 3531.4 (3d ed. 2012) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury."); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656–59 (9th Cir. 2011) (hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); *Sutton v. St. Jude Med. S.C., Inc.,* 419 F.3d 568, 570–75 (6th Cir. 2005) (patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased the risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman,* 317 F.3d 547, 557–58 (6th Cir. 2003) (grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

Yet, the Opinion's holding that Texas lacked standing never addressed this rule. It found that since the implementation of the CHNV Program, the number of CHNV nationals entering the

United States has decreased. Opinion at 2.[1] From that, the Court concluded that Texas could not show that the Program had injured it and thus lacked standing. *Id.* at 2. It explained that in determining whether a State has been injured, it must examine "whether the number of aliens, and the associated amount expended because of them, increased relative to those same numbers prior to the implementation of the challenged program." *Id.* at 30.

As explained above, however, courts should not weigh a given program's costs versus other benefits in assessing standing. Here, the Court repeatedly found facts showing that Texas would be required to spend money because of the CHNV Program. Specifically, it found that "Texas will inevitably expend some health care resources on CHNV nationals who enter the United States under the Parole Program," Opinion at 14, and that "an increase in CHNV nationals under the age of 18 entering Texas under the Parole Program will inevitably result in at least some costs for Texas." Opinion at 16. Those findings were sufficient to establish standing. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Texas v. United States (DACA)*, 50 F.4th 498, 518 (5th Cir. 2022).

The Court was required to evaluate injury based on the specific agency action challenged here, not the overall federal immigration policy or actions of foreign nations that are not subject to the APA. *See* ECF 285 at 27–28. The Plaintiffs were not permitted to challenge the federal government's overall immigration policy—with its many discrete agency actions—so this Court wrongly evaluated the challenge to the particular program here by evaluating overall immigration flows for a discrete period of time rather than the indisputable increased flows of 30,000 aliens a month created by the CHNV Program itself. Indeed, the key point is that even if overall immigration flows decreased for such a discrete period of time, they would have decreased *even more* if the unlawful CHNV Program were enjoined.

---

[1]     References to pagination for documents filed on this Court's electronic docket are to the stamped page numbers in the header of those filings.

The Federal Defendants contend that an agreement with Mexico offsets the costs to Texas. Specifically, due to various reasons, it is difficult for the United States to deport aliens from Cuba, Haiti, Nicaragua, and Venezuela back to those countries. Opinion at 12. But, according to the Court, the CHNV Program "was conditioned on an agreement with Mexico." Opinion at 12. Because the CHNV Program requires CHNV nationals to enter the United States via an interior port of entry as opposed to traveling through Mexico to enter the United States, Mexico agreed "to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect." Opinion at 12. According to the Federal Defendants, the standing analysis requires considering the number of individuals who can be removed from the United States under this separate agreement, not just the number who enter the country through the Program. ECF 284 at 38. Not so.

Even though Federal Defendants couched this reduction in flow as offsetting benefits of the same type and that arise from the same transaction as the costs, *see* ECF 284 at 38 (citing *DAPA*, 809 F.3d at 155), the Court did not evaluate it under that test—*see* Opinion at 31 n.31 (stating it need not consider "arguments with respect to … offsetting benefits"). Even if the Court had done so, it could not have found that test satisfied, because removing such aliens (or discouraging others to not come because of the prospect of being removed) is not a "benefit" "of the same type" nor does it "arise from the same transaction" as the "costs." *DAPA*, 809 F.3d at 155. Aliens who are removed (or removable) to Mexico are not the same group of people who are paroled into the country under the Program, so federal immigration policies applied to them are not "of the same type" or "arise from the same transaction" as the grants of parole under the Program. Trial Transcript (Aug. 25) at 132:10–24 (Texas's counsel making this point).

Aliens who are removed to Mexico entered the United States illegally, *see* Opinion at 12, whereas those paroled under the Program enter through a purportedly lawful process. Opinion at 12 ("Individuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully …"). The only testimony this Court heard at trial emphasized this point. Intervenor Defendants' sole witness, Eric Sype, testified that Oldrys—the

alien Sype sponsored to enter the United States through the CHNV Program—had never left his own country of Nicaragua and he had no reason to believe that Oldrys would have unlawfully crossed the border into the United States if he were not a Program beneficiary. Trial Transcript (Aug. 24) at 65:1–67:14. Accordingly, even if the Program was conditioned on this agreement with Mexico, it addresses a different category of aliens than those removable to Mexico.

The Opinion's analysis is contrary to Fifth Circuit precedent. In *GLO v. Biden*, 71 F.4th 264 (5th Cir. 2023), the Federal Defendants argued that the States lacked standing because the challenged agency action—refusing to fund the border wall—allowed them to spend the money on "system-enhancing technology" they argued would reduce fiscal injuries to the States because the latter would be more effective at reducing migrant flows. *Id.* at 273–74. The Fifth Circuit disagreed on the independent basis that this was an impermissible accounting exercise: "[E]ven if the installation of system-enhancing technology assists in border control, 'that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs.'" *Id.* at 273 (quoting *DAPA*, 809 F.3d at 155); *see also id.* at 274 ("Federal Defendants argue that the States have not cited evidence demonstrating their 'preferred' border-barrier system would be more effective than the system DHS has elected to construct … [but] as noted above, once an 'injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant.'") (quoting *DAPA*, 809 F.3d at 155–56).

The Opinion contains the same reasoning rejected by the Fifth Circuit: the challenged agency action (here: the CHNV Program; there: the refusal to build the border wall) allows the federal immigration authorities to pursue alternative actions that reduce the flow of aliens on net (here: the agreement with Mexico to accept the removal of CHNV aliens who do not go through the Program; there: the funding of "system-enhancing technology" instead of the wall).

The Opinion also adopts an argument made by Federal Defendants in the case challenging the Migrant Protection Protocols (MPP) but rejected by the Fifth Circuit. There, the States challenged the termination of MPP because the termination led to the specific aliens eligible for

MPP being paroled into the United States, causing fiscal harms to the States. The Federal Defendants argued that the States could not demonstrate injury from the termination of MPP because the data cited by the district court showed alien "encounters jumped from 58,000 in January 2019, when MPP first took effect, to 144,000 in May 2019, while MPP was still in effect." Br. for Appellants in *Texas v. Biden*, No. 21-10806 (5th Cir.), 2021 WL 4444444, at *12–14. The Fifth Circuit disagreed—instead of relying on overall flows of aliens eligible for MPP (all non-Mexicans from the Western Hemisphere), it looked specifically at the harm from the challenged agency action (the termination of MPP): "The district court's most important finding was that MPP's termination has increased the number of aliens *released on parole* [due to the challenged agency action—the termination of MPP] into the United States, including Texas." *Texas v. Biden (MPP)*, 20 F.4th 928, 966 (5th Cir. 2021) (emphasis added). "*MPP's termination [i.e., the specific agency action challenged in the case]*, combined with the lack of detention capacity, has increased and (without an injunction) will increase the total number of parolees" into the States. *Id.* at 967. The Fifth Circuit did not rely on overall migration numbers that could be influenced by many factors, ignoring the Federal Defendants' data showing that illegal migration actually increased under MPP.

And here is the coup de grâce: "Even if the termination of MPP played *no* role in the increasing number of migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity." *Id.* (emphasis in original). So, the *MPP* court held that even if the challenged agency action (the termination of MPP) did not itself increase the number of aliens paroled into the States, the States had standing. *See id.* at 968 ("even if the Government were correct that MPP was an ineffective deterrent, the fact remains that, according to both the record and the Government's own brief, MPP's termination drastically increases the proportion of incoming aliens who are paroled rather than returned to Mexico. And it is precisely that increase in paroles that causes the States' harms."); *see also Texas v. Biden*, 554 F. Supp. 3d 818, 837 (N.D. Tex. 2021) (Kacsmaryk, J.) ("Defendants' termination of MPP necessarily increases the number

of aliens present in the United States regardless of whether it increases the absolute number of would-be immigrants. MPP authorized the return of certain aliens to Mexico. Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute."). Given that analysis, it is apparent that the States have standing to challenge an agency action that *directly* paroles 30,000 aliens a month.

The Fifth Circuit also rejected another attempt by Federal Defendants to use overall immigration numbers to defeat standing relating to a particular agency action. In *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), the court faced a challenge where the States' injuries were based on agency action that reduced federal arrests of certain criminal aliens. Defendants argued against standing because "various statistics show[ed] an increase in arrests and expulsions year-over-year," and "the percentage of enforcement actions involving noncitizens increased as compared to the same time frame in fiscal year 2020." *Id.* at 218 n.6.

The Fifth Circuit rejected the relevance of these overall numbers: "[F]or purposes of standing, the inquiry is whether the [challenged agency action] caused Texas to have to incur additional financial, law enforcement, and welfare costs, not whether there were generally more enforcement actions year-over-year in the midst of a historic immigration crisis." *Id.* This directly contradicts the Opinion's view that courts should not "look only to the costs incurred by the nationals that have come through the CHNV Program in a vacuum and ignore the net decrease in costs due to the corresponding decrease in overall migration of those nationals." Opinion at 22.

**B. The Opinion impermissibly evaluated facts occurring after the complaint to find a lack of standing.**

Even apart from its reliance on an impermissible accounting exercise, the Opinion also evaluated facts that arose after the filing of the complaint. Standing, however, is determined—even after trial—based on facts that existed when the suit was commenced. ECF 285 at 15–16. The Court recognized this principle, observing that "[s]tanding is determined at the time the case commenced." Opinion at 20 (quoting *Lujan*, 504 U.S. at 570 n.5). Any attempt to use facts after

the commencement of suit to show lack of Article III jurisdiction must be evaluated under the test for mootness, not standing. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000). Plaintiffs made this point in their post-trial briefing. *See* ECF 294 at 11–12. The Opinion's failure to evaluate the post-complaint migrant flows under the correct legal standard is a fundamental mistake of law.

The Court noted that "in the five months preceding the Program, DHS conditionally released an average of 2,356 CHNV nationals per day" and that "in the nearly five months since the Program's implementation, that figure had dwindled to 1,326." Opinion at 25. Because of this temporary decrease, the Court reasoned that "Plaintiffs' theory on injury-in-fact is unavailing because their proffered re-characterization attempts to skirt the fact that Texas is not financially harmed by the Program." *Id.* at 26.

However, it was error to find a lack of standing based on a comparison of the daily border crossing numbers for the five months before and after the CHNV Program started. *See GLO*, 71 F.4th at 272 n.12 ("As this action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing). Rather, the proper inquiry was whether Texas's alleged injuries were "fairly likely" at the time of the complaint, and post-trial briefing confirmed the likelihood: "The 113,324 CHNV encounters in September 2023 work out to an average daily encounter rate of 3,777. Daily encounters with CHNV aliens are now unambiguously *higher* than before the CHNV Program started." ECF 294 at 9. It was error for this Court to ignore that Texas had "shown injury from the CHNV Program even under Federal Defendants' and Intervenors' flawed theory that overall migrant flows from the CHNV countries could affect the Plaintiffs' standing to challenge a specific program." *Id.* The Federal Defendants' "own statistics now confirm the Plaintiffs' allegation that the CHNV Program would incentivize increased illegal immigration." *Id.* at 5. The Opinion fails to consider these publicly available facts brought to its attention in the post-trial briefing, even though the Court found it was required to take judicial notice of such facts. Opinion at 6–7.

The difference between the two Article III doctrines is important because "the burden of proving mootness is higher than simply showing a lack of standing." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 n.40 (5th Cir. 2022). A case is moot if "it is *impossible* for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (emphasis added; quotation omitted). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks,* 466 U.S. 435, 442 (1984).

Defendants did not meet their heavy burden of showing that Texas could *never* suffer an injury from the operation of the CHNV Program that this Court could redress. Again, there is no expiration date on the Program, and—as reinforced by the updated numbers demonstrating the increased flow of CHNV migrants after the Program's implementation, discussed below—migrant flows can dramatically change month-to-month due to the multitude of factors that influence it. *See* ECF 285 at 26–29.

## II. The Opinion disregarded data that the number of CHNV nationals entering the United States increased after implementation of the Program.

The Plaintiffs' harms as alleged in the Amended Complaint were sufficient to confer standing, and the facts presented at trial and in post-trial briefing support those allegations. However, because the Plaintiffs here seek "prospective relief," *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 228 (5th Cir. 2023), this is not the end of the standing analysis: "[A] plaintiff seeking prospective relief need only show that future injury is 'fairly likely.'" *Id.* (quoting *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021)); *see also* Trial Transcript (Aug. 25) at 242:1–242:7 (counsel for Texas citing *Alliance for Hippocratic Medicine* for proposition that "you do not need to show certainty that some things would happen when you have a pre-enforcement review if you're seeking prospective injunctive relief"); ECF 285 at 17 (Plaintiffs' post-trial brief citing "fairly likely" standard); ECF 294 at 11 (Plaintiffs' post-trial response brief citing "fairly likely" standard).

A plaintiff can thus establish standing based on an injury that it anticipated when it filed the complaint. *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 377 (5th Cir. 2021) (Ho, J., concurring) (quoting *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005)) ("[A] plaintiff cannot establish standing based on an injury that it did not 'anticipate at the time it filed the complaint.'" (cleaned up)). Although not necessary to show standing—because "the injury required for standing need not be actualized," merely "threatened," *Davis v. FEC*, 554 U.S. 724, 734 (2008)—if an actual injury occurs after the filing of the complaint then standing is satisfied because evidence post-dating the complaint that shows that the injury actually *did* happen necessarily shows that this injury was "fairly likely" and "anticipate[d]." Thus, Judge Ho pointed out in *Crawford* that when the plaintiff presented post-complaint evidence that proved his predicted harms did, in fact, occur, "he [was] not presenting a new injury that did not threaten him until after he filed suit. Rather, he [was] producing further evidence to confirm the existence of a threat present when he filed suit." *Id.* (Ho, J., concurring).

Although not necessary to satisfy Article III, the Plaintiffs have presented just this sort of evidence here. The border crossing numbers that they cited in their post-trial briefing show that crossings of aliens from CHNV countries have skyrocketed—and are higher than before the CHNV Program was implemented. The numbers the Plaintiffs cited in their Notice of Supplemental Authority—filed earlier the same day the Court issued its judgment and the Opinion—further confirm it. ECF 304. It was a "manifest error of law or fact," *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005), for the Opinion to set aside these data and instead find that "the rate of entries here has decreased subsequent to the implementation of the CHNV Program." Opinion at 30. It was a manifest error of law and fact for the Opinion to ignore that Texas's predicted harms have come true—for three reasons.

*First*, the post-trial briefs show that border crossings from aliens from CHNV countries have continued to increase and are higher than ever. And because the rate of crossings by CHNV aliens has *increased*, Texas's predicted harms have manifested, and the States, therefore, have standing. Texas's predicted harms are not just "fairly likely"—they have been actualized. The

Plaintiffs' post-trial brief—which used the Federal Defendants' own publicly reported numbers, requested the Court take judicial notice of them, ECF 294 at 7, and which this Court found it was *required* to take such notice, Opinion at 6–7—"show[ed] that the Defendants' claim of reduced crossings does not stand up to scrutiny" because those "numbers show that total nationwide encounters with aliens from Cuba, Haiti, Nicaragua, and Venezuela have *increased* since the trial— to 76,604 in August from 56,708 in July," ECF 285 at 21, "a 35% increase in just one month." ECF 294 at 7. The "September [2023] numbers show that the problem has only worsened—nationwide encounters with CHNV aliens in September 2023 totaled 113,324, a 47.9% increase from August and a mindboggling increase of 99.8% from July." *Id.* "[N]ationwide encounters with aliens from Cuba, Haiti, Nicaragua, and Venezuela are skyrocketing, and overall numbers from those countries are higher than before the CHNV Program came online." *Id.*

*Second*, any decrease around the time the complaint was filed was because of seasonal variation and not because of the CHNV Program. ECF 285 at 22–29. The Opinion assumed that temporary decreases in border crossings by CHNV aliens around the time that the CHNV Program began were caused by the Program, but the facts belie this assumption. The post-trial brief shows that "[i]llegal immigration follows seasonal patterns" and that border crossings for *all* aliens decreased during the same months that crossings by CHNV aliens also decreased, thus demonstrating "that the decrease that the Federal Defendants attributed to the Parole Program was merely an artifact of normal seasonal variation in illegal immigrant flows." ECF 285 at 23. The CHNV Program could not have been the cause of decreases in CHNV alien crossings because "the pattern for CHNV encounters follow[ed] the same trend as the data for all aliens, including non-CHNV aliens." *Id.*

*Third*, evidence in the record shows that even Federal Defendants pointed to factors other than the CHNV Program as responsible for any reduction in migrant flows. *See* ECF 285 at 26–29. Migrant flows are affected by a multitude of variables, including the actions of foreign nations (including Mexico's agreement to accept removals of aliens from CHNV countries) and other federal immigration policies not challenged in this case (such as the Circumvention of Lawful

Pathways Rule limiting asylum claims, 88 Fed. Reg. 31314 (May 16, 2023), which DHS claimed the loss of would lead to "a return to elevated encounter levels," ECF 57-2 at ¶28 in *Indiana v. Mayorkas*, No. 1:23-cv-106 (D.N.D)).

Defendants' own declarant in this case explained that "the increase in Venezuelan migration experienced in early May can likely be attributed to a number of factors, including: misinformation campaigns by smugglers, the aftermath of the fire in a Mexican government facility that killed a number of Venezuelan migrants in March and impacted enforcement efforts in Mexico, and the limited number of available CBP One appointments to present at a port of entry." Defs. Ex. HH at ¶22. DHS also sought a stay in the Eleventh Circuit by declaring that "[n]umerous factors can drive a large increase in the number of noncitizens or a dramatic decrease in encounters, including a temporary decrease in encounters." ECF 3-2 in *Florida v. Mayorkas*, No. 23-11644 (11th Cir.). Of course, events like these will happen again—the Parole Program has no expiration date, Trial Transcript (Aug. 24) at 128:14–129:3; Trial Transcript (Aug. 25) at 253:9–253:16, 271:22–271:24; ECF 285 at 62–69; ECF 304 at 3–4, and Plaintiffs seek relief for future injury. This lack of an expiration date means that almost all aliens admitted under the Program will be able to remain indefinitely in the United States. Comparing Program parolees to aliens illegally crossing the border is inapposite because the latter are subject to removal from the United States, where they will no longer impose costs on Texas or any other State.

Federal Defendants' own declarant further states how "the imposition of stiffened consequences for irregular migration in place at the land border … including a new condition on asylum eligibility, at least a five-year bar on admission to the United States, and the potential for criminal prosecution for repeat illegal entries" have all contributed to lower encounters of Venezuelan migrants between ports of entry. Defs. Ex. HH at ¶ 23. The actions of foreign nations have also contributed to a decline, according to that evidence in the record. *Id.* at ¶ 50 (discussing actions of Colombia, Costa Rica, Ecuador, Canada, Guatemala, and Mexico). The Court cannot use such other federal policies or actions of foreign governments—not subject to challenge in this

case—to find a lack of standing to challenge this particular agency action creating the CHNV Program.

*     *     *

The case has been litigated to conclusion, and this Court should render a decision on the merits. In *Crawford*, the plaintiff filed his complaint in 2017, alleging future harm was likely. 1 F.4th at 373. The district court dismissed, finding that the plaintiff's claimed harm was too speculative. *Id*. Yet, while the case was pending, the claimed harm actually happened—twice, in 2018 and again in 2019. As Judge Ho observed, "[i]f [the plaintiff] had brought suit in 2020, there would be no doubt about his standing to seek injunctive relief. … The question on appeal is whether he has standing given that he brought this suit in 2017. That is, we must decide whether, for purposes of determining standing, we are allowed to consider his post-filing" evidence from "2018 and 2019." *Crawford*, 1 F.4th at 377. There was "no reason why we should treat this 2017 suit any differently than we would treat the hypothetical 2020 suit. In either case, Crawford has presented evidence of a sufficient threat of future injury at the time of suit to establish standing for injunctive relief." *Id*. at 377–78. So too here. This Court should not treat the Plaintiffs' February 14, 2023, Amended Complaint any differently than a new suit filed in April 2024.

As Texas pointed out in the post-trial briefing, "[t]he CHNV Program has no expiration date, and it was reasonable for Texas to foresee that the program would threaten its education, incarceration, driver's license, and healthcare costs over the life of the Program. That was all that Article III requires." ECF 294 at 11. The States predicted that crossings by CHNV aliens would increase, and they did. This is more than enough to establish standing.

CONCLUSION

The Court should grant Plaintiffs' motion for reconsideration, vacate its final judgment, and determine the merits of their claims.

Dated: April 4, 2024.                      Respectfully submitted,

KEN PAXTON                                 */s/ Ryan D. Walters*
Attorney General of Texas                  RYAN D. WALTERS
                                           Chief, Special Litigation Division
BRENT WEBSTER                              Texas Bar No. 24105085
First Assistant Attorney General           Southern District of Texas No. 3369185
                                           ryan.walters@oag.texas.gov
RALPH MOLINA
Deputy Attorney General for Legal Strategy DAVID BRYANT
                                           Senior Special Counsel
OFFICE OF THE ATTORNEY GENERAL             Texas Bar No. 03281500
P.O. Box 12548                             Southern District of Texas No. 808332
Austin, Texas 78711-2548                   david.bryant@oag.texas.gov
(512) 463-1700
                                           GENE P. HAMILTON
                                           JAMES K. ROGERS
                                           America First Legal Foundation
                                           Virginia Bar No. 80434
                                           Southern District of Texas No. 3792762
                                           611 Pennsylvania Avenue SE, #231
                                           Washington, DC 20003
                                           (202) 964-3721
                                           gene.hamilton@aflegal.org
                                           james.rogers@aflegal.org

                                           JONATHAN F. MITCHELL
                                           Mitchell Law PLLC
                                           111 Congress Avenue, Suite 400
                                           Austin, Texas 78701
                                           (512)686-3940 (phone)
                                           (512)686-3941 (fax)
                                           jonathan@mitchell.law

                                           *Counsel for the State of Texas*

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*

Raúl R. Labrador
Attorney General of Idaho
Joshua N. Turner, ISB No. 12193
Alan M. Hurst, ISB No. 12425
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
josh.turner@ag.idaho.gov
alan.hurst@ag.idaho.gov

*Counsel for the State of Idaho*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

15

Kris Kobach
Attorney General of Kansas
Jesse A. Burris, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

Elizabeth B. Murrill
Attorney General of Louisiana
Kelsey L. Smith
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

Russell Coleman
Attorney General of Kentucky
Marc Manley
Assistant Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478
Marc.Manley@ky.gov

*Counsel for the Commonwealth of Kentucky*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

16

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Whitney Hermandorfer
Director of Strategic Litigation
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

Sean D. Reyes
Utah Attorney General
Stanford E. Purser
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
spurser@agutah.gov

*Counsel for the State of Utah*

Patrick Morrisey
Attorney General of West Virginia
Lindsay See
Solicitor General
Michael R. Williams
Principal Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

### CERTIFICATE OF CONFERENCE

I certify that on April 3, 2024, I conferred via email with counsel for Federal Defendants, and counsel for Intervenor Defendants. Both sets of Defendants stated that they oppose this Motion.

*/s/Ryan D. Walters*
RYAN D. WALTERS

### CERTIFICATE OF COMPLIANCE

I certify that this motion complies with Rule 16.c. of Judge Tipton's Court Procedures because it contains 4,909 words, excluding the parts of the document exempt from that Rule, according to Microsoft Word.

*/s/Ryan D. Walters*
RYAN D. WALTERS

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 4, 2024, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS